Nos. 15-2385, 15-2386

# In the United States Court of Appeals for the Seventh Circuit

_____

KLEEN PRODUCTS LLC, ET AL.,
PLAINTIFFS-APPELLEES

*v.*

INTERNATIONAL PAPER COMPANY, ET AL.,
DEFENDANTS-APPELLANTS

_____

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, NO. 10-CV-5711, HON. HARRY D. LEINENWEBER, PRESIDING*

_____

## OPENING BRIEF FOR DEFENDANT-APPELLANT ROCKTENN CP, LLC

_____

ELIZABETH P. PAPEZ
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC  20006*
*(202) 282-5000*
*epapez@winston.com*

MATTHIAS A. LYDON
JAMES F. HERBISON
MICHAEL P. MAYER
WILLIAM P. FERRANTI
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, Illinois 60601*
*(312) 558-5600*
*malydon@winston.com*

*Counsel for Defendant-Appellant RockTenn CP, LLC*

## AMENDED CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385, 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):

RockTenn CP, LLC

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn LLP

(3)     If the party or amicus is a corporation:

      (i)     Identify all its parent corporations, if any; and

           RockTenn CP, LLC is wholly owned by Rock-Tenn Company which, as of July 1, 2015, is owned by WestRock Company

      (ii)    List any publicly held company that own 10% or more of the party's or amicus' stock:

           None

Attorney's Signature: s/Matthias A. Lydon     Date: August 10, 2015

Attorney's Printed Name: Matthias A. Lydon

Please indicate if you are *Counsel of Record* for the above listed party pursuant to Circuit Rule 3(d).     Yes

Address:     Winston & Strawn LLP
                35 West Wacker Drive
                Chicago, Illinois 60601
Phone Number:     (312) 558-5600
Fax Number:     (312) 558-5700
Email Address:     malydon@winston.com

**AMENDED CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385, 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):

 RockTenn CP, LLC

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Winston & Strawn LLP

(3)     If the party or amicus is a corporation:

      (i)     Identify all its parent corporations, if any; and

            RockTenn CP, LLC is wholly owned by Rock-Tenn Company which, as of July 1, 2015, is owned by WestRock Company

      (ii)     List any publicly held company that own 10% or more of the party's or amicus' stock:

            None

Attorney's Signature: s/James F. Herbison          Date: August 10, 2015

Attorney's Printed Name: James F. Herbison

Please indicate if you are *Counsel of Record* for the above listed party pursuant to Circuit Rule 3(d).          No

Address:          Winston & Strawn LLP
                  35 West Wacker Drive
                  Chicago, Illinois 60601
Phone Number:     (312) 558-5600
Fax Number:       (312) 558-5700
Email Address:    jherbison@winston.com

## AMENDED CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385, 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):

RockTenn CP, LLC

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn LLP

(3)    If the party or amicus is a corporation:

(i)    Identify all its parent corporations, if any; and

RockTenn CP, LLC is wholly owned by Rock-Tenn Company which, as of July 1, 2015, is owned by WestRock Company

(ii)    List any publicly held company that own 10% or more of the party's or amicus' stock:

None

Attorney's Signature: s/Michael P. Mayer                    Date: August 10, 2015

Attorney's Printed Name: Michael P. Mayer

Please indicate if you are *Counsel of Record* for the above listed party pursuant to Circuit Rule 3(d).                No

Address:                Winston & Strawn LLP
                        35 West Wacker Drive
                        Chicago, Illinois 60601
Phone Number:           (312) 558-5600
Fax Number:             (312) 558-5700
Email Address:          mmayer@winston.com

**AMENDED CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385, 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):

 RockTenn CP, LLC

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Winston & Strawn LLP

(3)     If the party or amicus is a corporation:

>    (i)     Identify all its parent corporations, if any; and
>
>            RockTenn CP, LLC is wholly owned by Rock-Tenn Company which, as of July 1, 2015, is owned by WestRock Company
>
>    (ii)    List any publicly held company that own 10% or more of the party's or amicus' stock:
>
>            None

Attorney's Signature: s/William P. Ferranti          Date: August 10, 2015

Attorney's Printed Name:  William P. Ferranti

Please indicate if you are *Counsel of Record* for the above listed party pursuant to Circuit Rule 3(d).          No

Address:          Winston & Strawn LLP
                  35 West Wacker Drive
                  Chicago, Illinois 60601
Phone Number:     (312) 558-5600
Fax Number:       (312) 558-5700
Email Address:    bferranti@winston.com

## AMENDED CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385, 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing the item #3):

RockTenn CP, LLC

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Winston & Strawn LLP

(3)     If the party or amicus is a corporation:

     (i)     Identify all its parent corporations, if any; and

          RockTenn CP, LLC is wholly owned by Rock-Tenn Company which, as of July 1, 2015, is owned by WestRock Company

     (ii)     List any publicly held company that own 10% or more of the party's or amicus' stock:

          None

Attorney's Signature: s/Elizabeth P. Papez     Date: August 10, 2015

Attorney's Printed Name: Elizabeth P. Papez

Please indicate if you are *Counsel of Record* for the above listed party pursuant to Circuit Rule 3(d). No

Address:     Winston & Strawn LLP
          1700 K Street, N.W.
          Washington, DC 20006
Phone Number: (202) 282-5000
Fax Number: (202) 282-5000
Email Address: epapez@winston.com

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..........................................................................vii

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

INTRODUCTION .......................................................................................... 2

STATEMENT OF THE CASE ..................................................................... 4

  A.  Procedural background ............................................................. 4

  B.  RockTenn's bankruptcy............................................................. 5

  C.  RockTenn's operations post-discharge .................................. 6

  D.  Class certification...................................................................... 7

SUMMARY OF ARGUMENT ..................................................................... 9

STANDARD OF REVIEW ......................................................................... 14

ARGUMENT .................................................................................................. 15

I.  The District Court Failed To Assess—And Plaintiffs Cannot Meet—
The Requirements Of Rule 23 With Respect To The Post-Discharge
Claim Against RockTenn. ................................................................. 15

  A.  The district court abused its discretion by failing to
consider Rule 23's requirements with respect to the
separate theory of liability against RockTenn. .................... 16

  B.  Plaintiffs cannot establish classwide impact and damages
for the post-discharge period to which their claim against
RockTenn is confined. ............................................................ 19

II.  The Certification Order Conflicts With Settled Bankruptcy Law. ................. 26

CONCLUSION ............................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Express Co. v. Italian Colors Rest.*,
  133 S. Ct. 2304 (2013) ........................................................... 16

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ........................................... 15, 19

*Andrews v. Chevy Chase Bank*,
  545 F.3d 570 (7th Cir. 2008) ................................................. 14

*Berger v. Home Depot USA, Inc.*,
  741 F.3d 1061 (9th Cir. 2014) ............................................... 16

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) ........................................... 17, 22

*Byron v. Chevrolet Motor Div. of Gen. Motors Corp.*,
  1995 WL 465130 (S.D.N.Y. Aug. 7, 1995) ............................ 30

*Coats v. Penrod Drilling Corp.*,
  61 F.3d 1113 (5th Cir. 1995) ................................................. 18

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ...................................................*passim*

*Cox v. Zale Delaware, Inc.*,
  239 F.3d 910 (7th Cir. 2001) ................................................. 29

*Davis v. A & J Electronics*,
  792 F.2d 74 (7th Cir. 1986) ................................................... 30

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
  100 F.3d 462 (6th Cir. 1996) ................................................. 24

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ................................................. 16

*Geinosky v. City of Chicago*,
  675 F.3d 743 (7th Cir. 2012) ................................................. 30

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ................................................. 16

*In re Grossman's Inc.*,
    607 F.3d 114 (3d Cir. 2010) (en banc)................................................. 28

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2009)................................................................. 18

*In re Lear Corp.*,
    2012 WL 5438929 (S.D.N.Y. Nov. 5, 2012)......................................... 30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) ...................................................... 18, 26

*In re Texaco, Inc.*,
    182 B.R. 937 (Bankr. S.D.N.Y. 1995)................................................. 27

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) .................................................. 19, 25, 26

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ......................................... 11, 20, 23, 29

*In re WorldCom, Inc.*,
    546 F.3d 211 (2d Cir. 2008)........................................... 11, 23, 29

*Int'l Paper Co. v. MCI WorldCom Network Servs., Inc.*,
    442 F.3d 633 (8th Cir. 2006) ............................................................. 23

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011) ............................................................. 14

*Kress v. CCA of Tennessee, LLC*,
    694 F.3d 890 (7th Cir. 2012) ............................................................. 14

*McDermott, Inc. v. AmClyde*,
    511 U.S. 202 (1994) ........................................................................... 18

*Palmero v. United States*,
    112 F.2d 922 (1st Cir. 1940)............................................................. 30

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ........................................................... 18

*Pruitt v. Mote*,
    503 F.3d 647 (7th Cir. 2007) (en banc) ....................................... 15, 19

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
    323 F.3d 32 (1st Cir. 2003)................................................................ 16

*United States v. Williams,*
  31 F.3d 522 (7th Cir. 1994) ................................................................ 30

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011) ...................................................................... 17

*Xechem, Inc. v. Bristol-Myers Squibb Co.,*
  372 F.3d 899 (7th Cir. 2004) ............................................................ 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  401 U.S. 321 (1971) .......................................................................... 24

## STATUTES

11 U.S.C. § 101.......................................................................... 12, 27

11 U.S.C. § 524.............................................................................. 28

11 U.S.C. § 1102.............................................................................. 5

11 U.S.C. § 1103.............................................................................. 5

11 U.S.C. § 1141...................................................................... 12, 27, 28

15 U.S.C. § 1............................................................................ 1, 4, 10, 24

15 U.S.C. § 15.............................................................................. 25

28 U.S.C. § 1292(e)......................................................................... 1

28 U.S.C. § 1331.............................................................................. 1

28 U.S.C. § 1337.............................................................................. 1

28 U.S.C. § 2072(b) ........................................................................ 28

## OTHER AUTHORITIES

Fed. R. App. P. 5 ............................................................................ 1

Fed. R. App. P. 28(i) ...................................................................... 1

Fed. R. Civ. P. 23 .................................................................*passim*

H.R. Rep. 595, 95th Cong., 1st Sess. (1977)................................. 27

S. Rep. No. 989, 95th Cong., 2nd Sess. (1978) ........................... 27

## JURISDICTIONAL STATEMENT

These consolidated appeals arise from an order granting class certification in an antitrust action. Plaintiffs claim that defendants conspired to restrict the supply of containerboard and raise prices, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* Appendix of Defendants-Appellants ("A.") 58-59, Dkt. 65, Consol. & Am. Compl. ("Am. Compl."), ¶¶ 196-201. The district court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

On March 26, 2015, the district court granted Plaintiffs' motion for class certification. *See* Required Short Appendix ("S.A.") 1-66, Dkt. 871, Mem. Op. & Order. On April 9, 2015, RockTenn CP, LLC ("RockTenn") and its co-defendants filed separate, timely petitions for leave to appeal, which this Court granted. *See* Order, Nos. 15-8006, 15-8007 (7th Cir. June 22, 2015). Per Fed. R. App. P. 5(d)(2), no notice of appeal was required. After appellants paid their filing fees, the appeals were re-docketed and consolidated. *See* Order, Nos. 15-2385, 15-2386 (7th Cir. July 2, 2015). This Court has jurisdiction pursuant to 28 U.S.C. § 1292(e), Fed. R. Civ. P. 23(f), and Fed. R. App. P. 5.

## STATEMENT OF THE ISSUES

Common issues raised by the certification order are addressed in the opening brief by RockTenn's co-defendants ("Joint Brief"). Pursuant to Fed. R. App. P. 28(i) and the consolidation order entered in these appeals (which directed appellants "to avoid unnecessary duplication by filing a joint brief or a joint appendix or by adopting parts of a co-appellant's brief"), RockTenn joins and adopts those arguments.

This brief addresses the following additional issues raised by the decision to certify a class against RockTenn:

I.      Whether the district court abused its discretion by failing to apply the requirements of Rule 23 to the separate and distinct claim and theory of liability that Plaintiffs are advancing against RockTenn for alleged antitrust violations following RockTenn's discharge from bankruptcy on June 30, 2010, just four months before the end of the seven-year class period.

II.     Whether the district court committed legal error, and thereby abused its discretion, by premising class certification on a sweeping and unprecedented theory of joint and several liability that subjects RockTenn to class litigation over pre-discharge conduct in violation of its discharge order, the Rules Enabling Act, and settled bankruptcy precedent.

## INTRODUCTION

The class certification order should be reversed for all the reasons provided by RockTenn's co-defendants in the Joint Brief, which RockTenn joins and adopts. RockTenn—discharged from bankruptcy just four months before the end of the seven-year class period—files this brief to address additional reasons the certification order violates Rule 23 and conflicts with RockTenn's discharge order, the Rules Enabling Act, and controlling class certification and bankruptcy precedents.

RockTenn is one of several defendants Plaintiffs accuse of conspiring to raise containerboard prices by artificially restricting output over a class period running from February 2004 to November 2010. But RockTenn is uniquely situated with respect to these claims due to its bankruptcy and June 2010 discharge. Plaintiffs

2

have recognized as much, conceding in their complaint that they "seek[] to recover damages from [RockTenn] for post-discharge conduct only." A.10, Dkt. 65, Am. Compl. ¶ 22. The certification order likewise acknowledges that, if RockTenn's "post-discharge conduct does not give rise to an antitrust violation, RockTenn will be absolved of all liability." S.A.65.

But the certification order does not show that Plaintiffs satisfied the requirements for proceeding as a class with respect to this liability claim against RockTenn. Nor could it, because the record contains no evidence of conspiratorial conduct causing antitrust impact or damages during the four months post-discharge. This is not surprising because neither RockTenn nor its co-defendants did anything during this period that could independently support the class liability and damages claims the district court certified. Plaintiffs have relied on purported "lag effects" of price increases that occurred *before* discharge. The law is clear, however, that RockTenn may not be held liable unless *post-discharge* actions inflicted post-discharge injury; it is not enough that *pre-discharge* actions allegedly had continuing post-discharge effects, as Plaintiffs contend.

In certifying the class against RockTenn nonetheless, the district court violated the mandate that plaintiffs must satisfy the requirements of Rule 23 with respect to *each* liability claim on which they seek certification. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Citing the "absence of controlling, binding authority," the court held that certifying the proposed class would "not violate the bankruptcy discharge order" because, the court reasoned, if RockTenn "joined (or

3

more correctly, re-joined) the conspiracy post-bankruptcy," then it could be held jointly and severally liable for the entire conspiracy—including for the many years and many billions of dollars of alleged damages otherwise indisputably covered by the discharge order.  S.A.64.

The district court's assessment is wrong.  First and foremost, the doctrine of joint and several liability is immaterial to the Rule 23 analysis.  Joint and several liability is a *damages* rule, triggered, if at all, only after *liability* is established— that is, only if Plaintiffs can show that, post-discharge, RockTenn engaged in concerted action prohibited by the antitrust laws, and that such post-discharge conduct caused post-discharge antitrust impact and damages.  Further, even if the doctrine of joint and several liability could be considered at the Rule 23 stage, it cannot be used to resurrect liability already discharged in bankruptcy—and it certainly cannot excuse Plaintiffs from meeting Rule 23 requirements with respect to all liability claims on which they seek certification.  The certification of a class against Rock-Tenn should be reversed.

## STATEMENT OF THE CASE

### A.     Procedural background

Plaintiffs filed this suit in September 2010, alleging that defendants— integrated manufacturers of containerboard products—conspired to raise prices by restricting supply of containerboard, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  S.A.2-3.  Plaintiffs' allegations span a period of nearly seven years, from February 15, 2004 to November 8, 2010, and encompass a wide range of products.  S.A.2.  The district court certified a nationwide class to proceed with these claims,

further details of which are set forth in the certification order (S.A.1-66) and the Joint Brief.

### B.    RockTenn's bankruptcy

In January 2009, RockTenn (then, Smurfit-Stone Container Corporation) filed for Chapter 11 bankruptcy protection.[1]  *See* Petition, *In re Smurfit-Stone Container Corp.*, No. 09-10235 (Bankr. D. Del.) (filed Jan. 26, 2009).  During bankruptcy, the company's operations were scrutinized by a creditors committee, other stakeholders, advisors to the committee, and ultimately the bankruptcy court.  *See* 11 U.S.C. § 1102; 11 U.S.C. § 1103(c); Dkt. 753-2, Denton Aff. ¶¶ 27, 41, 83-85.  For example, in December 2009, RockTenn closed two containerboard mills (in Missoula, Montana and Ontonagon, Michigan).  Both closures were addressed with the bankruptcy court and approved by the creditors committee.  *See* A.47, Dkt. 65, Am. Compl. ¶ 160; Dkt. 753-5, Disclosure Statement for the Joint Plan of Reorganization for Smurfit-Stone Container Corp. and its Debtor Subsidiaries, Jan. 27, 2010, at 80.  RockTenn also increased prices during this bankruptcy period, including once following a price increase first announced by non-party Longview Fibre, *not* by any of the alleged conspirators.  These price increases, like the mill closures, were vetted and approved by the creditors committee.  Dkt. 753-2, Denton Aff. ¶¶ 83-85.

On June 30, 2010, RockTenn was discharged from bankruptcy with a discharge order releasing the company from any and all claims pre-dating June 30,

---

[1] In 2011, after the initial complaint was filed in this matter, Smurfit-Stone was acquired by Rock-Tenn Company and was merged into one of Rock-Tenn Company's subsidiaries—known as RockTenn CP, LLC or "RockTenn."  For ease of reference, this brief refers to the company at all times as "RockTenn," as did the district court.  *See* S.A.60.

2010. *See* Dkt. 753-3, Confirmation Order ¶¶ 51, 53 (as of June 30, 2010, all persons are "permanently, forever and completely stayed, restrained, prohibited, barred and enjoined" from commencing any action based on a pre-discharge claim).

It is undisputed that Plaintiffs' antitrust claims are within the scope of the discharge order. According to Plaintiffs, their claims arose as early as February 2004—and there is no question that Plaintiffs had every opportunity to assert those claims in the bankruptcy court. Plaintiffs' expert even admitted that they drafted their initial complaint in 2009, while RockTenn was in bankruptcy. A.341-43, Dkt. 763-2, Harris Dep. at 26, 31-35. But Plaintiffs never filed a claim. Rather than get in line with the rest of RockTenn's unsecured creditors, they waited until September 2010—just a few months after RockTenn's discharge—to file their complaint. To avoid having this action enjoined by the bankruptcy court, Plaintiffs formally conceded that they may "seek[] to recover damages from [RockTenn] for post-discharge conduct only." A.10, Dkt. 65, Am. Compl. ¶ 22.

## C.    RockTenn's operations post-discharge

Plaintiffs' theory is that RockTenn joined, rejoined, or "reaffirmed its participation" in the alleged conspiracy following its emergence from bankruptcy. A.88, Dkt. 777-1, Am. to Compl. ¶ 168. There is, however, no evidence that RockTenn reduced capacity between June 30, 2010 and the end of the class period on November 8, 2010. (As noted, Plaintiffs' claim is that defendants increased prices *by reducing supply*. A.4-5, Dkt. 65, Am. Compl. ¶¶ 6-7.) RockTenn closed no mills. It took no economic downtime. It was unable to increase prices. *See* A.145, A.166, Dkt. 658-4, 658-5, Dwyer Report at 11 n.18 & Ex. 5; Dkt. 658, Pls. Mem. in Supp. of Mot. for

6

Class Cert. at 20.  Nor have Plaintiffs alleged or presented evidence that *any* containerboard purchaser, including any Named Plaintiff, paid a higher price after discharge than before.  *See* Dkt. 753-6, 753-7, FERR105-18, FERR122-26 & Ferraro 30(b)(6) Dep. at 80, 190-91.  And the PPW price index—a published industry price index used by Plaintiffs and their experts to purportedly show classwide impact—did not increase post-discharge.  A.437, Dkt. 763-2, Harris Dep. at 411.  None of this is disputed, and Plaintiffs make no allegations to the contrary.[2]

### D.    Class certification

Notwithstanding these facts and their concession that RockTenn may be held liable for post-discharge conduct only, Plaintiffs moved to certify a single class against all defendants, defined as: "All persons that purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010."  S.A.2 (exclusions omitted).

In support, Plaintiffs relied on purportedly common evidence of antitrust liability, impact, and damages across a seven-year period beginning in early 2004.  *See* Dkt. 658, Pls. Mem. in Supp. of Mot. for Class Certif. at 2-5.  This evidence did not include common proof of impact or damages for the post-discharge portion of the class period (*i.e.*, June 30 through November 8, 2010) that governs Plaintiffs' separate claim against RockTenn.  Although they argued that effects of the alleged con-

---

[2] For these reasons, perhaps, former Plaintiff Thule, Inc. made a point of *declining* to "join in the allegations naming Smurfit-Stone as a Defendant."  A.10, Dkt. 65, Am. Compl. ¶ 22.

spiracy continued into the post-discharge period, Plaintiffs did not explain whether or to what extent any such supposed effects can be attributed to *post-discharge actions*, nor did they tender any economic model or methodology a fact-finder might use to draw this critical distinction. *See infra* Argument Section I.

The relevant portion of the certification order (S.A.60-65) recognizes that, if RockTenn's "post-discharge conduct does not give rise to an antitrust violation, RockTenn will be absolved of all liability." S.A.65; *see also* S.A.62 (acknowledging the court's earlier "promise[] to hold Plaintiffs to their word that their complaint is about imposing liability based on post-discharge conduct" only). And yet the district court certified a single class against all defendants, including RockTenn, without any analysis of impact or damages specific to the post-discharge period.

Instead, the district court reasoned that, "[i]n the absence of controlling, binding authority," it could certify a class against RockTenn because RockTenn could be held jointly and severally liable for its co-defendants' alleged acts in the pre-discharge period. S.A.64. Although the district court said that this would potentially put RockTenn "on the hook for its co-conspirators' actions" only (S.A.65), in fact, the district court's ruling and rationale may allow Plaintiffs to collect damages from RockTenn not just for its co-defendants' pre-discharge actions, but for Rock-Tenn's own alleged pre-discharge actions as well. *See* A.89, Dkt. 777-1, Am. to Compl. ¶ 168.a. (claiming that the other defendants are liable for RockTenn's pre-discharge sales, as well as their own, and that RockTenn is jointly and severally liable for the alleged damages for the entire conspiracy).

This Court granted RockTenn's Rule 23(f) petition for leave to appeal, as well as the petition filed by RockTenn's co-defendants, and should now reverse or vacate the certification order for the reasons in this filing and in the Joint Brief.

## SUMMARY OF ARGUMENT

I.    Rule 23 requires that "at the class certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Comcast,* 133 S. Ct. at 1433. The order here violates this mandate for the reasons in the Joint Brief and because the "liability" case Plaintiffs pleaded against RockTenn is based on "post-discharge conduct only" (A.10, Dkt. 65, Am. Compl. ¶ 22), yet neither the district court's order nor Plaintiffs' class certification filings identify Rule 23 evidence specific to that period—much less evidence sufficient to establish the commonality and other elements required for certification of class claims covering this period and this distinct claim.

The district court excused this fatal flaw by relying on the doctrine of joint and several liability, thus certifying a class against RockTenn based on purportedly common proof of *pre-discharge* conduct. That was improper. *Even if* joint and several liability could be used to circumvent RockTenn's discharge order, at a minimum Plaintiffs would *first* need to establish that RockTenn actually violated the antitrust laws after its discharge. That means proving an unlawful agreement, impact, and damages, *Comcast,* 133 S. Ct. at 1430—all post-discharge. Yet the district court failed to require Plaintiffs to present Rule 23 evidence on this threshold matter of liability. Instead, the certification order improperly uses the joint and several theory of *damages* allocation to excuse Plaintiffs from satisfying Rule 23 on the

9

threshold antitrust *liability* claim they pleaded against RockTenn.  That is reversible error.

In focusing on the "novel" application of joint and several liability proposed by Plaintiffs, while neglecting Plaintiffs' failure to make the showing required by Rule 23, the certification order does no more than pose a hypothetical imperative: According to Plaintiffs and the district court, if RockTenn violated the Sherman Act in the four months following its discharge from bankruptcy, then RockTenn can be held jointly and severally liable for all damages across the entire seven-year conspiracy.  S.A.64-65.  But joint and several liability—a *damages* rule—is irrelevant to proof of the hypothetical.  As the district court itself recognized, because RockTenn emerged from bankruptcy with a clean slate, a showing of post-discharge *liability* is a necessary predicate to putting RockTenn "on the hook" for pre-discharge *damages*.  S.A.65.  Plaintiffs, too, have admitted that they must "'pro[ve] that RockTenn's *post-discharge conduct* gives rise to liability,'" and that only "once liability is established" can the "general rule of joint and several liability appl[y]."  Opp. to Pet. for Leave to Appeal (filed in No. 15-8007 on April 27, 2015) ("23(f) Opp.") at 4 (quoting S.A.64-65) (emphasis added).

In other words, joint and several liability is immaterial to the question of whether Plaintiffs presented Rule 23 evidence on each element of RockTenn's alleged post-discharge liability.  To certify a class on their distinct claim against RockTenn, Plaintiffs needed to present post-discharge, classwide evidence of the Section 1 triad—agreement, impact, and damages.  They did none of these things.

Indeed, Plaintiffs failed even to *proffer* Rule 23 evidence specific to the post-discharge period, as required "particularly with respect to the alleged anticompetitive effect of the violation." *Comcast*, 133 S. Ct. at 1433. They presented no evidence of classwide impact during the limited time for which RockTenn may be liable: No evidence that RockTenn restricted supply through mill closures, downtime, or any other means during the class period after discharge. No evidence that any containerboard purchaser paid a higher price after discharge (certainly not any Named Plaintiff—yet another Rule 23 deficiency that RockTenn raised, but the district court failed to address). No economic model for the post-discharge period. And no method to determine whether supposed post-discharge effects were caused by pre- or post-discharge actions. Plaintiffs' experts admitted that they never even tried to assess antitrust impact in the post-discharge time frame, and Dr. Dwyer's report shows no price increase implemented after RockTenn's discharge, and therefore no antitrust impact.

Instead, Plaintiffs' model relied entirely on purported evidence of supply constraints (certain mill closures) and price increases that occurred *before* discharge. As a matter of law, however, it is not enough for Plaintiffs to show continuing effects from alleged actions taken pre-discharge; they must show post-discharge actions that caused post-discharge impact. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009); *In re WorldCom, Inc.*, 546 F.3d 211, 221 (2d Cir. 2008). That is the only way RockTenn could be held liable based *solely* on its post-discharge actions—as the discharge order requires, and as Plaintiffs them-

selves have repeatedly averred is their burden.  On this record, including Plaintiffs' admitted lack of any impact evidence specific to the post-discharge period, the certification order cannot stand.

II.    The certification order's improper reliance on the doctrine of joint and several liability violates not only Rule 23, but also the Rules Enabling Act, settled bankruptcy law, and the principle that acts of co-conspirators are imputed *at the time those acts were taken*.  Central to the Bankruptcy Code, 11 U.S.C. § 1141(d)(1) provides that, "confirmation of a plan discharges the debtor from any debt that arose before the date of such confirmation."   And a "debt" is any actual or potential "liability on a claim."  *See* 11 U.S.C. § 101(12), 5(A).  Here, it is undisputed that Plaintiffs' price-fixing claim arose before RockTenn's bankruptcy and discharge, and is a "claim" within the scope of RockTenn's discharge order.

In fact, Plaintiffs actually prepared a draft complaint while RockTenn's bankruptcy was pending.  But rather than assert their claim in bankruptcy and join the queue with RockTenn's other unsecured creditors, Plaintiffs waited and filed suit after RockTenn's discharge, seeking a full recovery from the post-discharge entity.  Then, to avoid a bankruptcy court injunction, Plaintiffs conceded that their claim against RockTenn turns on post-discharge conduct only.  Their joint-and-several-liability theory, however, is inconsistent with that concession and with the bankruptcy law that forced it.  *All* pre-discharge conduct—including conduct for which RockTenn might otherwise be held jointly and severally liable—is encompassed by RockTenn's discharge order.

This conclusion follows not only from bankruptcy law, but also from the very theory of conspiracy liability. That theory imputes the acts of one co-conspirator to another, treating those acts as if they had been committed by the other co-conspirator. That is why, for example, personal jurisdiction can exist over co-conspirators in jurisdictions where they never set foot. But if the *fact* of the act and the *where* of the act are imputed to co-conspirators, then the *when* of the act should be, too. Thus, all pre-discharge actions of RockTenn's alleged co-conspirators are treated as if they were RockTenn's acts—and, as such, discharged by § 1141.

Finally, confirming that Plaintiffs' approach cannot be correct, Plaintiffs would go so far as to force RockTenn to pay damages allegedly caused by *its own* pre-discharge conduct. According to Plaintiffs, the other defendants are responsible for RockTenn's pre-discharge conduct (alleged price-fixing from February 2004 through June 2010). At the same time, by allegedly rejoining the conspiracy after June 2010, RockTenn is supposedly responsible for its co-defendants' liability, *including for its own pre-discharge sales*. This cannot be correct. Plaintiffs provided no justification for using joint and several liability (or any other doctrine) to expose a defendant to class claims discharged in bankruptcy. And the certification order similarly fails to justify this striking incursion on settled statutory and judicial bankruptcy protections. *See* S.A.64 (citing the "*absence* of controlling, binding authority" *prohibiting* class claims based on pre-discharge conduct) (emphasis added).

For all of these reasons, the certification ruling as to RockTenn should be reversed. The district court cited its sweeping theory of joint and several liability as

13

*the* basis for subjecting RockTenn to these class claims. S.A.64-65. But the district court's assessment conflicts with the statutorily mandated fresh start provided by RockTenn's bankruptcy discharge, the Rules Enabling Act, and the very theory of conspiracy liability. And even if the district court were correct in its legal ruling that a post-discharge violation could put RockTenn "on the hook" (S.A.65) for damages for the entire conspiracy, fresh start be damned, that still would not excuse Plaintiffs from their failure to meet the requirements of Rule 23 with respect to their distinct, post-discharge claim against RockTenn.

## STANDARD OF REVIEW

A district court's decision to certify a class is reviewed for abuse of discretion. *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 892 (7th Cir. 2012). Underlying factual findings are reviewed for clear error. *Id.* As the district court noted at the outset of its decision, however, "[f]or the most part, the parties agree on the basic facts, and both parties' experts rely upon the same data, so there are little if any factual disputes that the Court must resolve to decide class certification." S.A.6. In other words, the disputes between the parties are *legal*, not factual. *Id.*; *see also* S.A.62 (discussing the "novel" legal issue posed by Plaintiffs' complaint against RockTenn). "'[P]urely legal determinations made in support of a class certification decision are reviewed de novo.'" *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 888 (7th Cir. 2011) (quoting *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 573 (7th Cir. 2008)) (quote marks and alterations omitted). And an error of law is, by definition, an abuse of discretion. *Kress*, 694 F.3d at 892.

# ARGUMENT

## I. The District Court Failed To Assess—And Plaintiffs Cannot Meet— The Requirements Of Rule 23 With Respect To The Post-Discharge Claim Against RockTenn.

The district court ignored that liability questions in this case plainly are not common for all defendants, given RockTenn's discharge, and that Plaintiffs failed to provide a model to assess antitrust impact or injury during the limited time for which RockTenn may be liable for allegedly participating in the alleged conspiracy. The lack of analysis is, alone, an abuse of discretion. *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010) ("It is an abuse of discretion not to exercise discretion.") (citation omitted); *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007) (en banc) (where "the district court applie[s] only half of the prevailing legal standard, … that is necessarily an abuse of discretion").

And if the court had considered the matter, it would have found that Plaintiffs provided no basis for finding predominance with respect to this claim against RockTenn, confined as it is to the post-discharge period and a theory of liability that is distinct from that asserted against the other defendants. As Plaintiffs have admitted, before joint and several liability can attach, they must *first* prove that RockTenn violated the antitrust laws *during the post-discharge period. E.g.*, 23(f) Opp. at 4 (citing S.A.64-65). But Plaintiffs have no such evidence—common and classwide or otherwise. On this record, certification is not permissible and the certification order should be reversed.

15

**A.    The district court abused its discretion by failing to consider Rule 23's requirements with respect to the separate theory of liability against RockTenn.**

Rule 23 "imposes stringent requirements for certification that in practice *exclude* most claims." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (emphasis added).  And these requirements must be met with respect to *each* claim and theory of liability on which Plaintiffs seek to certify a class.  *See, e.g.*, *Comcast*, 133 S. Ct. at 1433.  As the Supreme Court explained in *Comcast*, itself an antitrust action, "at the class certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Id.*; *see also, e.g.*, *EQT Prod. Co. v. Adair*, 764 F.3d 347, 366-67 (4th Cir. 2014) (vacating certification and requiring separate class certification analysis for separate classes and theories of liability); *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068-70 (9th Cir. 2014) (separately analyzing class certification requirements for each theory of liability in affirming denials of certification); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441 (4th Cir. 2003) ("Rule 23's predominance requirement is met by examining *each cause of action* independently of one another, not the entire lawsuit."); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38-43 (1st Cir. 2003) (reversing decertification on two of three claims).

Yet the district court here failed to analyze Rule 23's requirements with respect to Plaintiffs' claim against RockTenn.  That claim—as Plaintiffs and the district court have repeatedly recognized—is limited to the abbreviated, four-month post-discharge period, from June 30 to November 8, 2010.  *E.g.*, A.10, Dkt. 65, Am.

Compl. ¶ 22 ("This complaint seeks to recover damages from [RockTenn] for post-discharge conduct only, and in no way seeks to violate any Orders of the above-referenced Bankruptcy Court."); A.132, Dkt. 193, Mem. Op. & Order at 22 (April 8, 2011) (RockTenn "can be held liable only for its actions taken post discharge."); *accord* S.A.65.

Put another way, given the discharge order, this case does ***not*** involve "a single, central, common issue of liability" between all class members and all defendants. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). As the district court itself explained: "Although the class period is defined in Paragraph 1 of the complaint as running from May 2005 to the present day, and that is true as to all other defendants, that is, *all defendants other than [RockTenn]*, the provision of Paragraph 22 of the complaint [limiting liability to post-discharge conduct] cannot be more clear." A.96, Dkt. 108, Nov. 24, 2010 Hrg. Tr. at 7.

Accordingly, under Rule 23 and *Comcast*, Plaintiffs had to show a predominance of common questions of law or fact relating to the essential elements of their antitrust claim against RockTenn, *see* Fed. R. Civ. P. 23(b)(3); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-52 (2011); *Comcast*, 133 S. Ct. at 1432-33—that is, (1) an agreement or conspiracy, (2) injury resulting from that conspiracy (antitrust impact), and (3) measurable damages. *Comcast*, 133 S. Ct. at 1430. Here, however, the district court only touched on the first element—evidence of conduct giving rise to an antitrust violation—and never finished the certification analysis for Plaintiffs' separate claim against RockTenn with respect to classwide impact or damages.

Yet "impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009). Indeed, without a reliable method to prove classwide antitrust impact for the abbreviated class period, common issues of fact *cannot* predominate and class certification *must* be denied. *See, e.g.*, *Comcast*, 133 S. Ct. at 1433 (holding antitrust claims cannot be certified under Rule 23(b)(3) unless plaintiffs present a model showing antitrust impact and damages attributable to the alleged antitrust violation are capable of being proven by evidence common to the class); *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (reversing certification where district court "should have investigated the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact.").

In lieu of a class certification analysis for the distinct theory of liability against RockTenn, the district court applied the principle of joint and several liability—a *damages* theory. S.A.64. But that was improper, because the joint and several doctrine is about "apportionment of damages." *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1124-25 (5th Cir. 1995); *see also McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220-21 (1994) ("Joint and several liability … can result in one defendant's paying more than its apportioned share of liability."). As Plaintiffs admit

(23(f) Opp. 4), the doctrine cannot even come into play unless they *first* establish that they can prove impact and damages on a classwide basis for their post-discharge liability claim.

Yet the certification order never assesses whether (much less finds that) Plaintiffs' class certification evidence is "consistent with [their] liability case" as Rule 23 requires. *Comcast*, 133 S. Ct. at 1433. For this reason alone, the district court's certification ruling as to RockTenn is an abuse of discretion. *Pruitt*, 503 F.3d at 649 (it "is necessarily an abuse of discretion" to apply "only half of the prevailing legal standard"); *Am. Honda*, 600 F.3d at 816 ("It is an abuse of discretion not to exercise discretion.") (citation omitted). For the separate, limited claim alleged against RockTenn, Plaintiffs should have been required to establish classwide impact and damages arising from post-discharge actions. But the district court never held them to this burden. In addition, and as we now show, beyond the district court's failure to consider the matter, Plaintiffs failed to provide any basis for finding the requirements of Rule 23 met with respect to their claim against RockTenn.

### B.    Plaintiffs cannot establish classwide impact and damages for the post-discharge period to which their claim against RockTenn is confined.

Emerging from bankruptcy in June 2010, discharge order in hand, RockTenn was similar to a new entrant into the concentrated containerboard market. It is not enough to show that RockTenn sold containerboard at prevailing market prices. Such pricing should be expected and is not unlawful. *See generally In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 874-77 (7th Cir. 2015). And this is so even if those prevailing prices were the result of a pre-discharge price-fixing conspiracy, as

Plaintiffs allege. As a matter of law, RockTenn may not be held liable unless its post-discharge actions inflicted antitrust injury; it is not enough that pre-discharge actions allegedly had post-discharge effects. *E.g.*, *In re Travel Agent Comm'n*, 583 F.3d at 902. These principles should be dispositive against class certification here because they require Rule 23 showings Plaintiffs simply did not make.

Although they have repeatedly conceded that the Discharge Order constrains their claim against RockTenn to "post-discharge conduct only" (*e.g.*, A.10, Dkt. 65, Am. Compl. ¶ 22), Plaintiffs tendered no separate economic or damages model for the post-discharge period—nor any method for a finder of fact to distinguish pre-discharge conduct and effects from post-discharge conduct and effects. In fact, Plaintiffs' experts, Drs. Mark Dwyer and Michael Harris, outright admitted that they never performed any empirical analysis to assess impact for the post-discharge time period:

> Q.    Did you do any empirical analysis to assess classwide impact for a period beginning June 30, 2010 as a result of any price increase implemented after June 30, 2010?
>
> * * *
>
> A.    No, I did not.

A.327, Dkt. 763-2, Dwyer Dep. at 258-59; *see also* A.388, Dkt. 763-2, Harris Dep. at 217 ("I did not do the empirical analysis. Dr. Dwyer did."); 23(f) Opp. 15 (Plaintiffs conceding they have only "one theory of antitrust impact").

Dr. Dwyer's impact analysis examined price increase announcements which were effective from February 2004 to April 2010, *covering only a time period for which RockTenn has been discharged of liability.* See A.145, A.166, Dkt. 658-4, 658-

5, Dwyer Report at 11 n.18 & Ex. 5. What is more, Dwyer's own model showed that class members were not injured during the post-discharge period (from June 30, 2010 through November 8, 2010)—and Dwyer himself admitted that there was no price increase implemented after RockTenn's discharge, and therefore no antitrust impact. *See id.* (showing no price increase implementation events after April 2010).

Further, the central basis for Plaintiffs' attempt to show classwide impact is the PPW price index—a published industry price index. Plaintiffs' theory is that when the PPW index moved up, there was impact; if it did not move, there was no impact. Setting aside all the problems with Plaintiffs' misuse of that index (explained in the Joint Brief), Dr. Harris conceded that there was no increase in that index—and thus no impact—post-discharge. A.437, Dkt. 763-2, Harris Dep. at 411.

The Supreme Court has been perfectly clear that "a methodology that identifies damages *that are not the result of the wrong*" is an impermissible basis for certification. *Comcast*, 133 S. Ct. at 1434 (emphasis added). Here, the certification order and underlying record is devoted in no way whatsoever to the "wrong" alleged against RockTenn (a supposed post-discharge violation). *See also id.* at 1435 ("the first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*") (citation omitted; emphasis added by the Court).

In addition, although Plaintiffs contend that "collusive restrictions in supply" were used as the means to force price increases during the class period (A.138, Dwyer Report ¶ 7; *see also* A.4-5, Dkt. 65, Am. Compl. ¶¶ 6-7), there is no evidence

21

that RockTenn restricted supply post-discharge, as it closed no mills nor took any economic downtime. Nor is there a shred of evidence that RockTenn raised prices for any purchaser of containerboard products after emerging from bankruptcy—including any of the Named Plaintiffs. In fact, only one class representative even purchased post-discharge from RockTenn, and it paid the exact same price then as before. Dkt. 753-6, 753-7, FERR105-18, FERR122-26 & Ferraro 30(b)(6) Dep. at 80, 190-91. This adequacy problem, which RockTenn raised but the district court did not address, further underscores the predominance problem: Plaintiffs could not even provide evidence that *they* suffered any impact from any supposed post-discharge agreement by RockTenn to fix prices, much less could they provide evidence or a methodology for showing *classwide* impact or damages during the four-month post-discharge period.

Thus, even ignoring all of the other problems with Plaintiffs' efforts to show classwide impact through their analysis of pre-discharge price increases and supply reductions (as detailed in the Joint Brief), the record is devoid of evidence showing that any post-discharge action inflicted classwide impact or damages. *Cf. Butler*, 727 F.3d at 800 (distinguishing *Comcast* where, by using two classes to separate distinct claims, "there is no possibility … that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis").

Plaintiffs have argued that "time lags" caused pre-discharge price increases to have post-discharge antitrust impact (a theory the district court did not endorse). 23(f) Opp. 14. This, however, not only raises questions about the integrity and dili-

gence of the creditors and bankruptcy court[3]; it also confirms Plaintiffs' improper reliance on pre-discharge conduct as the basis for certification. The law is clear: Plaintiffs may **not** satisfy their burden using pre-discharge conduct—***even if such pre-discharge conduct had post-discharge effects***. *In re Travel Agent Comm'n*, 583 F.3d at 902 (dismissing antitrust claims after debtor emerged from bankruptcy where plaintiffs attempted to show price impact based on pre-discharge conduct); *see also In re WorldCom*, 546 F.3d at 220-21 (rejecting claim for post-discharge liability premised on pre-discharge conduct); *Int'l Paper Co. v. MCI WorldCom Network Servs., Inc.*, 442 F.3d 633, 636 (8th Cir. 2006) (same).

It is worth underscoring the Sixth Circuit's *In re Travel Agent Commission* decision, which squarely rejects Plaintiffs' theory. In that case, the plaintiffs complained that the debtor (United) conspired to eliminate commissions and drive independent travel agents out of business, including by bringing commissions all the way down to 0% by March 2002. 583 F.3d at 899. To avoid the fact that United went into bankruptcy in December 2002, and emerged with a discharge order in January 2006, the plaintiffs claimed that United "rejoined the conspiracy after emerging from bankruptcy" by continuing, post-discharge, to pay the same 0% commission that it had adopted in March 2002. *Id.* at 901-02. The district court re-

---

[3] Between January 2009 and June 2010, RockTenn closed two containerboard mills (in Missoula, Montana and Ontonagon, Michigan). Both closings were addressed with the bankruptcy court and approved by the Official Committee of Unsecured Creditors. *See* Dkt. 753-5, Disclosure Statement for the Joint Plan of Reorganization for Smurfit-Stone Container Corp. and its Debtor Subsidiaries, Jan. 27, 2010, at 80. Likewise, price increases during this time—one of which was triggered and announced in the first instance by Longview Fibre, a company *not* named by Plaintiffs as a defendant and co-conspirator—were vetted and approved by the creditors committee. Dkt. 753-2, Denton Aff. ¶¶ 83-85.

jected that theory: "United's post-reorganization 0% commission policy did not create a new § 1 claim because its decision was 'merely a reaffirmation of a previous act.'" *Id.* at 902 (quoting district court). And the Sixth Circuit affirmed, explaining that the focus must be "the timing of the causes of injury … as opposed to the *effects* of the overt acts." *See id.* (citation omitted). Here, Plaintiffs point only to RockTenn continuing to charge pre-discharge prices—the "time lags" theory, which fails as a matter of law. They have not even tried to identify any new "cause[] of injury," *id.*, nor have they provided any methodology for a finder of fact to determine whether any post-discharge effects were caused by pre- or post-discharge actions.

Put another way, because any pre-discharge price-fixing claim against Rock-Tenn is barred, Plaintiffs must be able to establish on a classwide basis that *a new claim arose* post-discharge—which they cannot do without a showing that Rock-Tenn's post-discharge actions caused post-discharge, classwide injury. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-39 (1971) (in the context of a continuing antitrust conspiracy, a new cause of action accrues *at most* "each time a plaintiff is injured by an act of the defendants"); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) ("Each discrete act with fresh adverse consequences starts its own period of limitations."); *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) ("An antitrust cause of action accrues … each time a defendant commits an act that injures the plaintiff's business.") (citing *Zenith Radio*). Plaintiffs have no such evidence.

Upon discharge, vis-à-vis its competitors in the oligopolistic containerboard market, RockTenn was for all intents and purposes a new entrant. And a new entrant is perfectly free to charge prevailing prices, *In re Text Messaging*, 782 F.3d at 874-77—as is any other market participant not engaged in express collusion, for that matter: "It is one thing to prohibit competitors from agreeing not to compete; it is another to order them to compete." *See id.* at 874-75 (absent actual collusion, "convergence by the sellers on a joint profit-maximizing price" is not price fixing). "We can, moreover, without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing and other market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it." *Id.* at 879.

Finally, faced with the discharge order and no post-discharge supply restriction or price increase, Plaintiffs rely on a handful of RockTenn statements that supposedly prove RockTenn's post-discharge participation in the alleged conspiracy. *E.g.*, 23(f) Opp. at 12-13. But there are two problems with this: *First*, even if this evidence showed some sort of bad intent, Plaintiffs' antitrust claims require them to show not only unlawful agreement, but also impact and damages. 15 U.S.C. § 15; *Comcast*, 133 S. Ct. at 1430. As already discussed, and as Plaintiffs' own experts have conceded, Plaintiffs have no evidence of post-discharge impact or damages—much less classwide.

*Second*, Plaintiffs distort the statements on which they rely. For example, they say a "top executive" informed a competitor of a conspiratorial price increase

(23(f) Opp. at 12), but in fact, a sales employee merely made a routine communication to a customer regarding a possible price increase (which was not implemented). *See* Dkt. 842-2, McGurk 30(b)(6) Dep. Tr. at 113-114.  Plaintiffs also point to phone calls by RockTenn's CEO to competitors, but ignore that the calls' purpose was to find a buyer for certain of RockTenn's Canadian assets.  *See* Dkt. 842-3, P. Moore Dep. at 162-69.  Nor is there anything nefarious about RockTenn's CEO speaking to the press about RockTenn's emergence from bankruptcy (*see* Dkt. 835-1, Ex. I), or RockTenn's attendance at a trade association meeting (*see* Dkt. 835-1, Ex. F).  *See In re Text Messaging*, 782 F.3d at 878.

In sum, under Rule 23 and Supreme Court precedent Plaintiffs may proceed on a class basis only upon a showing that liability issues are common and that *every* claim they seek to certify is amenable to classwide proof on antitrust liability, impact, and damages.  Here, however, not only does RockTenn's discharge order plainly preclude lumping it together with the other defendants (as even Plaintiffs have conceded), but Plaintiffs' agreement evidence also fails, and the record contains no proof whatsoever of impact or damages specific to the post-discharge period, nor any methodology for separating and setting aside post-discharge effects (if any) caused by alleged conspiratorial actions taken pre-discharge.  Accordingly, the certification order as to RockTenn should be reversed.  "No damages model, no predominance, no class certification." *Rail Freight*, 725 F.3d at 253.

## II.    The Certification Order Conflicts With Settled Bankruptcy Law.

Plaintiffs failed to submit Rule 23 evidence specific to their post-discharge claim against RockTenn.  The district court's order purports to excuse that failure

on the ground that RockTenn can be held jointly and severally liable for the damages incurred by its alleged co-conspirators for the entire class period.  S.A.63-65. This error of law violates not only Rule 23 (as just discussed), but also the Rules Enabling Act and settled bankruptcy law.  Whether or not it subsequently violated the antitrust laws (it did not), RockTenn simply may not be required to pay damages for any supposed antitrust violations that pre-date its discharge.

A central concern of the Bankruptcy Code's is that "once a debt is discharged, the debtor will not be pressured *in any way* to repay it."  *In re Texaco, Inc.*, 182 B.R. 937, 949 (Bankr. S.D.N.Y. 1995) (quoting H.R. Rep. 595, 95th Cong., 1st Sess. 365-66 (1977); S. Rep. No. 989, 95th Cong., 2nd Sess. 80 (1978)).  To that end, the Code provides that "the confirmation of a plan discharges the debtor from *any debt* that arose before the date of such confirmation."  11 U.S.C. § 1141(d)(1) (emphasis added).  A "debt" is a "liability on a claim," 11 U.S.C. § 101(12), and a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).

Here, Plaintiffs had a "right to payment" for any alleged pre-discharge violations by RockTenn and its alleged co-conspirators (including for joint-and-several-liability damages), as evidenced by their preparation of a draft complaint during RockTenn's bankruptcy (A.341-43, Dkt. 763-2, Harris. Dep. at 26, 31-35), their allegations against RockTenn and the other defendants of price-fixing as early as February 2004 (A.67-68, Dkt. 648, Am. to Compl. ¶¶ 1, 6), and their experts' analysis

purporting to show impact and damages from prices increases announced between February 2004 and April 2010 (A.145, A.166, Dkt. 658-4, 658-5, Dwyer Report at 11 n.18 & Ex. 5). This conclusion is reinforced by the "pre-petition relationship" test, which determines when a claim accrues for purposes of discharge. Under that test, "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." *In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010) (en banc). Applying that test here, Plaintiffs' conspiracy claim—their supposed harm at the hands of RockTenn*, including RockTenn's alleged liability for the alleged conduct of its alleged co-conspirators*—plainly arose pre-petition.

Instead of asserting their claims in bankruptcy, however, Plaintiffs "stood on the side," which the district court correctly ruled precludes them from now "advance[ing] a claim based on the predischarge conduct." A.108, Dkt. 108, Nov. 24, 2010 Hrg. Tr. at 19. Claimants like Plaintiffs should not be permitted to lie in wait and attack a post-discharge entity (for a full recovery) when other creditors are required to submit their claims to the bankruptcy court and comply with the priority framework created by federal law. Plaintiffs should not be rewarded for their gamesmanship. Nor can they be: any and all rights and claims were extinguished by the discharge order and cannot be revived. *See* 11 U.S.C. § 1141(d)(1); 11 U.S.C. § 524; 28 U.S.C. § 2072(b).

By permitting pre-discharge conduct to serve as the basis for post-discharge liability, the certification order thus violates not only Rule 23, but also the Rules

Enabling Act, 28 U.S.C. § 2072(b), which prohibits Rule 23 from "abridg[ing], en-larg[ing] or modify[ing] any substantive right." It effectively allows Plaintiffs to "salvage an otherwise untimely claim … because of past alleged anticompetitive conduct." *In re Travel Agent Comm'n*, 583 F.3d at 902; *see also In re WorldCom*, 546 F.3d at 221 (rejecting post-discharge claim based on pre-discharge conduct).

Plaintiffs' theory is also perverse. What if they had filed a claim in bank-ruptcy, and then recovered or settled? By their lights, it would make no difference; they could obtain the same damages all over again via joint and several liability be-cause, as the district court put it, "it is the *co-conspirators'* liability that is based on pre-discharge conduct, not RockTenn's." S.A.65. That cannot be correct.

In fact, on the district court's rationale, RockTenn can actually be held liable for its own pre-discharge actions. The district court insisted that "[i]t only *appears* that [RockTenn] is being held liable for pre-discharge conduct because of the joint and several liability rule." S.A.65. But appearances here do not deceive: Against the other defendants, Plaintiffs' claim includes RockTenn's pre-discharge sales (A.89, Dkt. 777-1, Am. to Compl. ¶ 168.a.); and against RockTenn, Plaintiffs con-tend there is joint and several liability for all damages awarded against the other defendants (*id.*). Coming full circle, RockTenn may end up "on the hook" not only "for its co-conspirators' actions" as the district court asserted (S.A.65), but for its own pre-discharge actions as well. That result is contrary to "one of the goals of bankruptcy law," which is to relieve debtor of the "crushing weight" of past debts that "prevent[] him from making [a] fresh start." *Cox v. Zale Delaware, Inc.*, 239

29

F.3d 910, 912 (7th Cir. 2001).[4] And it is all the more at odds with federal bankruptcy law where, as here, the claimants decided to lay in wait rather than assert the claim in the bankruptcy proceeding, as they could and should have done.

Beyond bankruptcy law, Plaintiffs' attempt to avoid discharge is also inconsistent with the very theory of conspiracy liability. Joint and several liability is imposed because the acts of co-conspirators are imputed to one another; that is, the acts of one conspirator are treated as having been committed by every other. That is why, for example, personal jurisdiction can exist over co-conspirators in jurisdictions where they never set foot. *Davis v. A & J Electronics*, 792 F.2d 74, 76 (7th Cir. 1986); *Palmero v. United States*, 112 F.2d 922, 926 (1st Cir. 1940). But if the *fact* of the act is imputed, *United States v. Williams*, 31 F.3d 522, 526 (7th Cir. 1994), and the *where* of the act is imputed, *Davis*, 792 F.2d at 76; *Palmero*, 112 F.2d at 926, then the *when* of the act should be imputed as well. *Cf. Geinosky v. City of Chicago*, 675 F.3d 743, 749-50 (7th Cir. 2012) (ruling that, if certain defendants were part of conspiracy, "they can still be held liable for the later actions of co-conspirators that harmed the plaintiff during the limitations period," but *not*, as the plaintiff there conceded, for their own acts outside the statute of limitations); *Byron v. Chevrolet Motor Div. of Gen. Motors Corp.*, 1995 WL 465130, at *10 n.7 (S.D.N.Y. Aug. 7, 1995) (rejecting argument in copyright infringement case that "joint and several li-

---

[4] *See also In re Lear Corp.*, 2012 WL 5438929, at *3 (S.D.N.Y. Nov. 5, 2012) (in case that settled before court could decide joint and several liability issues, identifying two distinct questions related to "the scope of a bankruptcy discharge," specifically, whether a post-discharge antitrust violation could (1) cause the debtor's own discharged damages to "come alive again," and/or (2) support an award for pre-discharge damages "that relate only to the conduct of [the debtor's] co-conspirators") (emphasis omitted).

ability defeats defendants' statute of limitations defense" because, "[d]espite joint and several liability, [plaintiff] is not relieved of proving that each and every defendant engaged in some infringing activity within the limitations period").

In short, given the constraints placed on their claim against RockTenn by the discharge order and their own pleadings, Plaintiffs may not use a downstream theory of joint and several damages liability to subject RockTenn to class antitrust claims for the alleged conduct (output restraints and overcharges) they say occurred before and during RockTenn's bankruptcy. All pre-discharge acts of RockTenn's alleged co-conspirators were imputed to RockTenn, and thus discharged.

## CONCLUSION

For each and all of these reasons, the district court's certification order should be reversed as to RockTenn; and it should be reversed as to all defendants, including RockTenn, for the reasons given in the Joint Brief.

Respectfully submitted,

s/Matthias A. Lydon
MATTHIAS A. LYDON
JAMES F. HERBISON
MICHAEL P. MAYER
WILLIAM P. FERRANTI
*Winston & Strawn LLP*
*35 W. Wacker Drive*
*Chicago, Illinois 60601*
*(312) 558-5600*
*malydon@winston.com*

ELIZABETH P. PAPEZ
*Winston & Strawn LLP*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 282-5000*
*epapez@winston.com*

*Counsel for Defendant-Appellant*
*RockTenn CP, LLC*

AUGUST 10, 2015

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as it contains 8,318 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as qualified by Circuit Rule 32(b), as it has been prepared in a 12-point, proportionally spaced typeface, Century Schoolbook, by using Microsoft Word 2010.


Dated:  August 10, 2015                           s/Matthias A. Lydon
                                                  MATTHIAS A. LYDON

                                                  *Counsel for Defendant-Appellant*
                                                  *RockTenn CP, LLC*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included either in the Short Appendix bound hereto or in the Joint Separate Appendix filed herewith.


Dated:  August 10, 2015                              s/Matthias A. Lydon
                                                     MATTHIAS A. LYDON

                                                     *Counsel for Defendant-Appellant*
                                                     *RockTenn CP, LLC*

# SHORT APPENDIX

**TABLE OF CONTENTS TO SHORT APPENDIX**

1.     Dkt. 871, Mem. Op. & Order (Mar. 26, 2015) ........................................ S.A.1-66

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

KLEEN PRODUCTS LLC, *et al.*,
individually and on behalf of
all those similarly situated,

          Plaintiffs,

      v.

INTERNATIONAL PAPER, *et al.*,

         Defendants.

Case No.  10 C 5711
       (UNDER SEAL)

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion to Strike [ECF
No. 845], and Plaintiffs' Motion for Class Certification [ECF
No. 657.]  These Motions have resulted in a deluge of
briefing; the Class Certification Motion alone spawned seven
separate briefs that total more than 300 pages (not including
the attached exhibits) and that include two sur-replies and
several notices of supplemental authority.  The Court has
rigorously analyzed all of the parties' submissions, and for
the following reasons, Defendants' Motion to Strike [ECF
No. 845] is granted in part and denied in part, and
Plaintiffs' Class Certification Motion [ECF No. 657] is
granted.

## I.  BACKGROUND

Plaintiffs are a proposed class of entities that directly purchased Containerboard Products from Defendants. Containerboard Products include containerboard itself and the various products made out of containerboard, such as containerboard sheets, which are used to make corrugated products like displays, boxes, and other containers. Plaintiffs allege that Defendants engaged in a conspiracy to artificially manipulate the market in order to increase the price of Containerboard Products in violation of antitrust laws. *See,* 15 U.S.C. § 1.  The crux of Plaintiffs' Complaint is that Defendants agreed "to restrict the supply of containerboard by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory." [Pl.'s Mot. for Class Cert. at 1, ECF No. 660.] According to Plaintiffs, these actions illegally increased the price of containerboard, which caused them to pay more for Containerboard Products than they otherwise would have paid absent the conspiracy.

Plaintiffs seek to certify as a class:

All persons that purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010.

The proposed class definition also excludes certain groups from being class members:

> Specifically excluded from this Class are the Defendants; officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendants. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

Defendants oppose certification, arguing that Plaintiffs have not satisfied Rule 23.

## II.   LEGAL STANDARD

"To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) requires Plaintiffs to prove "numerosity, typicality, commonality, and adequacy of representation." *Id.* Plaintiffs in this case seek certification under Rule 23(b)(3), which also requires them to prove that: (1) the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual members; and (2) a class action is superior to other available methods of resolving the controversy. *Id.*

Plaintiffs bear the burden of satisfying Rule 23, which is not "'a mere pleading standard.'" *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551-52 (2011)). To meet this burden, Plaintiffs must "satisfy through evidentiary proof" each of Rule 23's elements. *Id.* In deciding a class certification motion, the Court must conduct a "rigorous analysis" before it can determine whether Plaintiffs have satisfied Rule 23's requirements. *Id.* (internal quotation marks omitted). This often means that a Court must resolve issues that also bear on the merits of the claim, but only if those issues overlap with class certification issues. *Id.*

Despite the need for rigorous analysis, "the court should not turn the class certification proceedings into a dress rehearsal for a trial on the merits." *Messner,* 669 F.3d at 811. Instead, the Court need only consider the evidence submitted by the parties and determine whether Plaintiffs have proven each of Rule 23's elements by a preponderance of the evidence. *Id.*

### III.  ANALYSIS

There are two preliminary issues the Court must address. First, the Seventh Circuit has held that "[w]hen an expert's report or testimony is 'critical to class certification,' . . . a district court must make a conclusive [*Daubert*] ruling on

- 4 -

S.A.4

any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Id.* at 812 (quoting *Am. Honda Motor Co. v. Allen,* 600 F.3d 813, 815–16 (7th Cir. 2010)). Expert reports in this case are indeed critical to class certification, but no Defendant has yet challenged Plaintiffs' experts on Rule 702 or *Daubert* grounds. To the contrary, Defendants have "expressly reserve[d] their right to move to exclude [Plaintiffs' experts] under *Daubert* and Rule 702." [Def.'s Mem. in Opp. to Pl.'s Mot. for Class Cert. ("Def.'s Opp. Br.") at 40 n.35, ECF No. 763.] Although Defendants vigorously challenge Plaintiffs' experts' methodology and conclusions in the context of arguing that Plaintiffs' have not satisfied Rule 23, none of those arguments are based on Rule 702 or *Daubert*. Defendants have not challenged, for example, Plaintiffs' experts' education or qualifications. The Court therefore reserves ruling on Plaintiffs' experts' admissibility until Defendants raise and brief that issue.

Second, Defendants seek a full evidentiary hearing prior to the Court deciding whether to certify the class. Plaintiffs oppose such a hearing, arguing that it is unnecessary and would waste time and money. Several courts have held evidentiary hearings prior to deciding a class certification motion, *see, e.g., In re Groupon, Inc. Sec.*

- 5 -

S.A.5

*Litig.,* No. 12 C 2450, 2014 WL 2035853, at *2 (N.D. Ill. May 16, 2014), but as far as the Court is aware, such hearings are not required.  Rather, the Supreme Court and Seventh Circuit have admonished district courts not to simply accept Plaintiffs' pleadings as true and to conduct a "rigorous analysis" of the Plaintiffs' class certification claims.  *See, Comcast Corp.,* 133 S.Ct. at 1432 ("Repeatedly, we have emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question . . . .") (internal quotation marks omitted).  As stated above, the parties have submitted an avalanche of briefing and opposing expert reports that set forth the parties' positions on the issues.  Included in this briefing are thousands of pages of documents substantiating the parties arguments.  Moreover, the parties' central dispute is legal, not factual.  The dispute centers mainly on the proper legal standard under Rule 23 and whether Plaintiffs' experts' reports are enough to satisfy that standard.  For the most part, the parties agree on the basic facts, and both parties' experts rely upon the same data, so there are little if any factual disputes that the Court must resolve to decide class certification.  Given the extensive paper record and the completeness of the parties' briefing, an evidentiary hearing would not add much to the Court's analysis.  Thus, the Court

is confident that it can determine class certification based on a careful examination of the evidentiary record the parties have submitted.

Having resolved those threshold issues, the Court must first decide Defendants' Motion to Strike some of the materials Plaintiffs submitted with their reply brief. Once that issue is decided, the Court can then determine whether Plaintiffs have satisfied Rule 23. All Defendants have joined in a single response to Plaintiffs' Class Certification Motion, to which Plaintiffs have replied. Defendant RockTenn joined in the combined response but also filed a separate response to the Class Certification Motion based on arguments that apply only to RockTenn. Plaintiff replied to RockTenn's response, to which RockTenn filed a Sur-reply, which prompted Plaintiffs to file a Sur-sur-reply. After deciding the Motion to Strike, the Court will first consider the joint opposition to class certification and then consider RockTenn's unique opposition.

**A. Motion to Strike Plaintiffs' Reply Experts' Reports**

Plaintiffs' initial Class Certification Motion contained expert reports from Drs. Mark Dwyer and Michael Harris. Defendants' combined response to the Motion included expert reports from Drs. Janusz Ordover and Dennis Carlton, who both criticized Plaintiffs' experts' reports in a number of ways,

including a criticism of Plaintiffs' experts' choice of testing and methodology to prove class-wide injury. In response, Plaintiffs obtained reply expert reports from Drs. Dwyer and Harris, and also obtained a report from a new expert, Dr. Douglas Zona. Defendants have moved to strike certain portions of Dr. Dwyer's reply report and all of Dr. Zona's report.

Federal Rule of Civil Procedure 26(a)(2) governs expert discovery and "requires a party to disclose to the other parties a written report of a retained expert that includes 'a complete statement of all opinions the witness will express and the basis and reasons for them.'" *Sloan Valve Co. v. Zurn Indus., Inc.,* No. 10 C 204, 2013 WL 3147349, at *1 (N.D. Ill. June 19, 2013) (quoting FED. R. CIV. P. 26(a)(2)(b)(i)). An expert rebuttal report is meant to "contradict or rebut evidence" disclosed in the initial report, FED. R. CIV. P. 26(a)(2)(D)(ii), and its "proper function . . . is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Pearls v. Terre Haute Police Dep't,* 535 F.3d 621, 630 (7th Cir. 2008). Rule 26 does not address reply expert reports, but, much like reply briefs, parties may not advance new arguments for the first time in a reply expert report. *Sloan Valve Co.,* 2013 WL 3147349, at *1. If a reply expert report is truly rebuttal evidence, then it

- 8 -

S.A.8

is admissible and the opposing party is not entitled to respond to it. *Id.* at *4. If, however, the reply report contains new opinions that are not proper rebuttal testimony, the report must be stricken. *Id.* at *2–3.

### 1. Dr. Dwyer's Reply Report

Plaintiffs' disclosed Dr. Dwyer as an expert within the time frame outlined in the Court's scheduling order. The question is whether his reply report constitutes new and alternative opinion testimony or is instead proper rebuttal testimony in support of his original report.

*Sloan Valve Co.* is instructive. In that case, the plaintiff's initial expert report calculated damages based on "collateral unit sales ratios," and in that report the expert included data on both weighted and unweighted ratios. *Id.* at *2. Despite including both sets of data, the expert's damages calculation relied solely on the weighted ratios. *Id.* In response, the defendant's expert attacked the plaintiff's expert for relying upon only the weighted ratios. *Id.* Consequently, the plaintiff's expert's reply report conducted a new calculation using the unweighted ratios in order to demonstrate that using the unweighted ratios would not change his initial conclusions. *Id.* The court found that this was proper reply expert testimony because, "rather than offering a new opinion and changing the basis for the calculation of the

collateral unit sales, [the plaintiff's reply expert] included the [new] calculation . . . to refute [the defendant's expert's] criticisms." *Id.*

The plaintiff's reply expert report also included a "revised and increased estimate of incremental costs" based on data that the defendant first disclosed in its rebuttal expert's report. *Id.* at *3. The court refused to strike that reply expert testimony because it was based on data that was previously unavailable to the plaintiff's expert due to the defendant's failure to disclose it. *Id.* Finally, the court struck a portion of the plaintiff's expert report that constituted "a new, alternative collateral sales calculation" based on data that was available to the plaintiff's expert when he filed his initial report. *Id.* The plaintiff argued that the new calculation was in response to the defendant's expert's criticism, but the court found that the opinion was new because it included a new opinion based on data that was not a part of the plaintiff's expert's initial report, though it was available to him. *Id.*

In this case, Dr. Dwyer's initial report concluded that "all or nearly all members of the proposed class were impacted by price increases implemented by the defendants," which is explored more thoroughly below in the Court's analysis regarding class certification. Dr. Dwyer's conclusion was

based on "systematic, empirical comparisons of net prices paid by class members of Containerboard Products before and after price increase implementation dates previously announced by the defendants." Defendants' experts criticized Dr. Dwyer for conducting what Defendants call a "one penny more" analysis, where any increase in price is attributed to Defendants' alleged conduct. This, according to Defendants, means that Dr. Dwyer's methods did not account adequately for other factors that would have caused an increase in price even without a conspiracy. Defendants' experts argue that Dr. Dwyer should have done a "but-for" analysis to determine antitrust impact.

In his reply, Dr. Dwyer does the analyses that Defendants' experts argue he should have done initially. Importantly, Dr. Dwyer does not abandon his prior methods or conclusions. Rather, he conducted the additional analyses to refute Defendants' arguments and to show that his original conclusions and opinions are sound and a reliable method of assessing antitrust impact. This makes Dr. Dwyer's reply report remarkably similar to the reply report allowed in *Sloan Valve Co.* Much like the reply report in that case that included new calculations based on the same data included in the initial report, here Dr. Dwyer's reply report is based on the same data in his original report and does not seek to

- 11 -

S.A.11

include new data. Instead of abandoning his prior methods in favor of the new ones, Dr. Dwyer's reply concludes that the new calculations support his initial methodology and opinions. Dr. Dwyer further concludes that Defendants' experts are wrong when they say that the additional testing and methods show that there is no antitrust impact. This is the very purpose of a reply report:  to refute a defendant's expert's arguments and to provide further support, rather than abandoning, one's initial opinions. Dr. Dwyer will be held to the original methodology and opinions in his initial report, but that does not mean he cannot respond to Defendants' experts' criticisms in defending his initial conclusions.  Thus, the Court denies Defendants' Motion to Strike to the extent that it seeks to strike portions of Dr. Dwyer's reply report.

### 2.  Dr. Zona's Reply Report

Dr. Zona was not initially an expert disclosed before class certification briefing.  Dr. Zona is an expert Plaintiffs hired to examine "the opening expert reports submitted by Drs. Harris and Dwyer, as well as the reports submitted by Drs. Carlton and Ordover."  He also conducted his own "but-for" analysis and concludes that Dr. Dwyer's "methodology and opinions on both impact and damages [is] reliable and valid."

Defendants are probably correct that Dr. Zona's report should be stricken. The Court need not engage in lengthy analysis, however, because Plaintiffs do not need Dr. Zona's report to satisfy Rule 23, a point Plaintiffs concede. Thus, the Court grants Defendants' Motion to Strike Dr. Zona's report.

## B. Class Certification — Combined Arguments

Having narrowed the range of expert evidence to only the reports and deposition testimony of Drs. Dwyer, Harris, Ordover, and Carlton, the Court now considers whether to certify Plaintiffs' proposed class based on the parties' combined briefing.

### 1. Rule 23(a) Elements

In order to warrant class certification, Plaintiffs must prove "numerosity, typicality, commonality, and adequacy of representation." *Messner,* 669 F.3d at 811. As Defendants correctly note, Rule 23(b)'s predominance standard often overlaps with typicality, commonality, and adequacy. Thus, Defendants have focused their arguments on predominance issues rather than individually attacking each of Rule 23(a)'s elements. Essentially, Defendants have conceded that typicality, commonality, and adequacy have been satisfied so long as Plaintiffs have adequately proven predominance.

– 13 –

S.A.13

As to numerosity, Defendants have not specifically challenged that element in their briefing, and the element is easily satisfied in this case. The sales data relied upon by both parties' experts establish that the proposed class numbers in the thousands. A potential class that large is sufficiently numerous for Rule 23(a) purposes. *See, Schmidt v. Smith & Wollensky LLC,* 268 F.R.D. 323, 326 (N.D. Ill. 2010).

### 2. Rule 23(b)(3) Elements

Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Court will discuss predominance first and then, if necessary, superiority.

### i. Predominance

The parties' statements of the proper legal standard for determining predominance differ greatly. To read Plaintiffs' version, one would think that predominance naturally flows from the fact that this is an antitrust case. [Pl.'s Mot. for Class Cert. at 49, ECF No. 660.] Defendants' version, on the other hand, would lead one to believe that the Supreme Court's opinion in *Comcast* makes satisfying predominance nearly

- 14 -

insurmountable. [Def.'s Opp. Br. at 23–27, ECF No. 763.]   The truth is somewhere in the middle.

The predominance inquiry under Rule 23(b)(3) "'trains on the legal or factual questions that qualify each class member's case as a genuine controversy,' with the purpose being to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Messner,* 669 F.3d at 814 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)).  Predominance is similar to Rule 23(a)'s typicality and commonality requirements, but "the predominance criterion is far more demanding." *Id.* (internal quotation marks omitted).  And although the Supreme Court has said that "predominance is a test readily met" in antitrust cases, that simply means that "in antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification." *Id.* at 815 (internal quotation marks and citation omitted).   This does not, however, make class certification automatic in antitrust cases. *See, id.*

Generally, predominance is satisfied when "'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication.'"  *Id.* (quoting 7AA Wright and Miller, *Federal Practice & Procedure* § 1778 (3d Ed. 2011)).  In other words, "common questions can predominate if a common nucleus

of operative facts and issues underlies the claims brought by the proposed class." *Id.* (internal quotation marks omitted). The presence of some individual questions is not fatal, but individual questions cannot predominate over the common ones. *Id.* To determine if a question is common, the Court must look to the evidence necessary to answer that question; if "the members of a proposed class will need to present evidence that varies from member to member" to answer the question, then the question is an individual one.  *Id.* (internal quotation marks omitted).  Conversely, "if the same evidence will suffice for each member" to answer the question at issue, then the question is common.  *Id.*

"Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S.Ct. 2179, 2184 (2011)).    In the antitrust context, plaintiffs must prove:    "(1) that [Defendants] violated federal antitrust law; and (2) that the antitrust violation caused them some injury." *Id.* Plaintiffs must also show damages, but "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification." *Id.* (citing *Wal-Mart,* 131 S.Ct. at 2558).

To provide a clearer analysis, the Court will discuss each antitrust element separately, keeping in mind that

- 16 -

S.A.16

"Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove" that each individual element is "susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds,* 133 S.Ct. 1184, 1196 (2013). "Rather, the inquiry is more holistic." *In re High-Tech Employee Antitrust Litig.,* 985 F.Supp.2d 1167, 1184 (N.D. Cal. 2013). And although predominance analysis is not simply "bean counting," *Butler v. Sears, Roebuck and Co.,* 727 F.3d 796, 801 (7th Cir. 2013), analyzing each element separately is useful in isolating what questions are common and determining whether those questions predominate.

### a.  Plaintiffs' Liability Proof

Plaintiffs have established that common questions regarding liability predominate over any individual issues. Plaintiffs' theory of liability is based on Defendants' alleged conspiracy to coordinate supply restrictions and price increase announcements in order to cause the price of Containerboard Products to increase.  To prove each element of a conspiracy, virtually all class members would be relying on the same evidence that Plaintiffs have submitted in support of class certification — namely the documents, emails, phone records, and other indirect evidence necessary to prove that Defendants conspired in violation of antitrust laws. This type of alleged conspiracy is the prototypical example of an issue

where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence. *See,* 7AA Wright & Miller, Federal Practice & Procedure § 1781 (3d Ed. 2014) ("[W]hether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the prerequisite in Rule 23(b)(3).").

Defendants' arguments on this issue go entirely to the merits of Plaintiffs' conspiracy claims. Defendants argue that Plaintiffs have not established a conspiracy, offering up several innocent reasons for their conduct. Defendants also attach great significance to Plaintiffs' failure to produce any explicit, direct agreement among Defendants to fix prices. Because Plaintiffs have not proven an actual conspiracy, Defendants argue that the Court should deny class certification.

But whether Defendants actually conspired is not the issue before the Court. The issue is whether the conspiracy question will be decided by evidence common to the class, and both parties have demonstrated that the evidence either proving or disproving a conspiracy will be common to the entire class. Defendants' arguments on this point are

- 18 -

identical to the defendants' liability arguments in *In re Polyurethane Foam Antitrust Litigation,* No. 1:10 MD 2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014). In that case, the defendants argued that "the price-fixing conspiracy alleged in the Complaint did not exist," based on "the failure of discovery to yield evidence of any agreement among foam manufactures to fix the timing or content of price increase letters." *Id.* at *16 (internal quotation marks and alterations omitted). The defendants also argued that their conduct was "consistent with legal and economic theory predictions of behavior" in the relevant markets. *Id.* The court rejected those arguments at the class certification stage, noting that those arguments "do not succeed in showing liability questions — however answered — cannot be answered through common proof." *Id.*

Like the defendants in *In re Polyurethane Foam,* Defendants' arguments here do not demonstrate the lack of common proof; rather, Defendants' own evidence tending to disprove a conspiracy is common to the entire class. Defendants' arguments, if correct, might entitle them to summary judgment or a verdict in their favor, but such merits arguments are inapplicable at this stage. *Id.* Thus, Plaintiffs have established that common questions predominate the liability issue.

b.  Plaintiffs' Impact Proof

The heart of the battle in this case lies in the second element, *i.e.,* causation, which is often referred to as antitrust impact.  According to Defendants, individual issues overwhelm the common questions regarding impact because Plaintiffs' experts have not provided a just and reliable method of proving that the alleged antitrust violations harmed all or nearly all class members.  Thus, according to Defendants, Plaintiffs' only avenue of proving causation is through individual proof relating to each of the thousands of class members, which makes class certification inappropriate.

Given the parties' overlapping arguments relating to impact and damages, the Court must first outline an important distinction:  "impact" and "damages" are two separate elements in an antitrust claim.  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 256 F.R.D. 82, 88 (D. Conn. 2009). Impact is "*whether* the plaintiffs were harmed," whereas "damages quantify *by how much*." *Id.*  Parties and courts often conflate the two, leading to "confusion about what a plaintiff's burden precisely is at the motion for class certification stage." *Id.* Oftentimes, demonstrating impact and damages involves "comparing the 'but-for' price — the price a customer would have paid in the absence of the conspiracy —

and the actual price paid." *Id.* When that happens, the single comparison establishes both impact and damages. *Id.* Thus:

> [O]ne way of demonstrating predominance is to show that there is a common method for proving that the class plaintiffs paid higher actual prices than in the but-for world, such as using an econometric regression model incorporating a variety of factors to demonstrate that a conspiracy variable was at work during the class period, raising prices above the "but-for" level for all plaintiffs.

*Id.* Defendants in this case base a large portion of their impact arguments on the perceived lack of a "but-for" analysis.

But, "where other methods of common proof exist to show class-wide impact such as lock-step increases of national price lists in an oligopolistic market, comparing 'but-for' prices with actual transaction prices is not the *only* way for plaintiffs to succeed in an motion for class certification." *Id.* For example, "'if it appears that plaintiffs may be able to prove at trial . . . the price range was affected generally,'" then the plaintiffs can show impact without a "but-for" comparison, and this is so even if there are negotiated prices or a variety of prices. *Id.* (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996)); *see also, In re Urethane Antitrust Litig.*, 768 F.3d at 1254–55. The court in *Hedges* summed up this point succinctly:

> The proof necessary to demonstrate that the defendants conspired to maintain an inflated "base" from which all pricing negotiations began and that this "base" price was higher than the "base" price which would have been established by competitive conditions would be common to all members of the class. Proof of a conspiracy to establish a "base" price would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary. . . . [T]he proof with respect to the "base" price from which these negotiations began, or the structure of the conspiracy to affect individual negotiations, would be common to the class. Accordingly . . . the fact of damage is predominantly, if not entirely, a common question.

*Hedges Enters., Inc. v. Cont'l Grp., Inc.,* 81 F.R.D. 461, 475 (E.D. Penn. 1979). Courts have long held that a plaintiff can demonstrate antitrust impact by showing that the conspiracy caused an increase to the standard market price of the product at issue. *See, e.g., In re Urethane Antitrust Litig.,* 768 F.3d at 1254–55 (finding impact satisfied for class certification purposes based in part on evidence of "parallel issuance of similar product . . . price-increase announcements"); *In re Urethane Antitrust Litig. (Urethane II),* 251 F.R.D. 629, 638 (D. Kan. 2008) ("[E]vidence of a standardized pricing structure, which (in light of the alleged conspiracy) presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact."); *In re Indust. Diamonds Antitrust Litig.,* 167 F.R.D. 374, 383

(S.D.N.Y. 1996) ("[I]f a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury.").

This distinction between impact and damages is crucial in a case like this, where Plaintiffs have presented (1) record and expert evidence independently showing impact and (2) an econometric model that attempts to prove both damages and therefore impact. Because Plaintiffs do not rely solely on their econometric damages model for their impact proof, Defendants' impact arguments based on the lack of a "but-for" comparison are ineffective. *See, e.g., In re EPDM Antitrust Litigation,* 256 F.R.D. at 88–89. Those arguments go to damages, not impact. With this distinction in mind, the Court now addresses impact.

Demonstrating antitrust impact for class-certification purposes does not require that Plaintiffs *prove* antitrust impact. Instead, Plaintiffs need "only to demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Messner,* 669 F.3d at 818 (internal quotation marks omitted). The focus, then, is on the evidence necessary to establish antitrust impact, not on whether Plaintiffs have adequately proven it. Again, the

- 23 -

S.A.23

Court's overriding concern is whether Plaintiffs have established that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amgen Inc.,* 133 S.Ct. at 1196 (internal quotation marks omitted).

Although Defendants have concentrated their impact arguments on the expert evidence, the Court looks to all the evidence to determine whether Plaintiffs have established that evidence common to the class is capable of proving antitrust impact. *See, In re Urethane Antitrust Litig.,* 768 F.3d 1245, 1255–56 (10th Cir. 2014). The evidence in this case that goes to antitrust impact consists of (1) record evidence, which Plaintiffs allege shows illegal and anticompetitive conduct that increased the base price for Containerboard Products, (2) testimony from Dr. Harris regarding Defendants' industry and its susceptibility to collusive conduct, and (3) testimony from Drs. Dwyer and Harris that purport to establish that all or nearly all class members suffered harm as a result of the conspiracy.

First, Plaintiffs' have mustered a large amount of record evidence relevant to impact, which is mostly duplicative of their conspiracy evidence. Specifically, Plaintiffs produced evidence of what appears to be coordinated price increases, coordinated supply reductions, and other similar conduct that, according to Plaintiffs, Defendants would not have engaged in

- 24 -

unless acting as part of a conspiracy.  Plaintiffs also point to memoranda, phone calls, and trade association meetings that show the ability for Defendants to communicate with and monitor each other regarding their allegedly collusive activity.

Defendants respond by pointing to other evidence showing that they added capacity and supply during the class period, which would negate some of Plaintiffs' factual claims. Defendants also argue there are innocent reasons for their conduct.  The Court need not decide at this stage which evidence to believe, however, because regardless of these factual disputes, the evidence on both sides is common to all class members.  The question is whether Defendants' industry made it possible for them to collude in a way that would allow them to harm all or nearly all class members, and the evidence that both parties rely on to answer that question is common to the class.

Second, Plaintiffs rely on Dr. Harris to establish that the Containerboard Products market was ripe for collusion during the class period, and that Defendants' conduct is more likely the result of collusion than independent behavior.  Dr. Harris conducted a "structure, conduct, performance" ("SCP") analysis to determine whether "the structure, conduct, and performance of [Defendants'] industry [was] consistent with,

- 25 -

S.A.25

and likely to facilitate, collusive conduct, thereby providing a motive to collude and suggesting that any collusion would be broadly successful." [Declaration of Dr. Harris at 5, ECF No. 658-2.] Dr. Harris also considered whether Defendants' conduct during the class period was more consistent with "concerted action or their unilateral self-interest." [*Id.*] Ultimately, Dr. Harris concludes that (1) "the economic evidence shows that Defendants had the motive, opportunity, and means to collude and were they to do so, . . . they would have succeeded," and (2) "the conduct of the Defendants was more consistent with collusion than with independent economic decision-making." [*Id.*]

In support of these opinions, Dr. Harris looked at a variety of industry-wide figures like capacity, operating rates, inventory, demand, and pricing in the containerboard market. Importantly, Dr. Harris found that the "vast majority of sales of . . . Containerboard Products are pegged to published price indices," the most common of which is the price for "42# Kraft liner [published] in Pulp and Paper Weekly ("PPW")." The PPW index in this case is critical because Drs. Harris and Dwyer rely in part on the movement of that index in demonstrating that all or nearly all class members suffered antitrust impact, as discussed more thoroughly below.

As to the "structure" portion of the SCP analysis, Dr. Harris analyzed the extent to which the Containerboard Products market is highly concentrated and the barriers to entry in that market. The evidence shows that, in 2003, only six North American firms controlled 72% of the Containerboard Products market, and by 2007, those six firms became five and accounted for 74% of the market. The evidence also shows, and Defendants do not challenge, that there are significant barriers to any new firms entering the market, such as the enormous amount of capital necessary to start a new firm. Dr. Harris also analyzed Containerboard Products to determine whether they are homogenous, which would mean that class members would see all Defendants as essentially offering the same product. If this is so, then the primary method of competition in the Containerboard Products market is price, rather than some other factor. Dr. Harris concludes that product homogeneity makes collusion easier, and finds that Containerboard Products are interchangeable commodities that are highly homogenous. This conclusion is based on Defendants' own statements, presentations, and tax filings, which tend to show that Defendants admit the commodity nature of Containerboard Products.

Finally, Dr. Harris analyzed the frequency of Defendants' interactions amongst each other and their participation and

membership in trade associations.  A conspiracy is much less likely to exist, Dr. Harris concludes, if firms communicate rarely.  On the other hand, constant communication and participation in trade association events provide a fertile ground for collusion.  Dr. Harris relies on academic economic literature for his conclusion "that trade associations tend to facilitate collusive conduct," and the evidence indeed shows that Defendants frequently interacted with each other as a part of their business operations and at various trade association meetings.  Based on all this evidence and his own expert experience and opinion, Dr. Harris concludes that the "structural characteristics of the industry . . . are consistent with and would facilitate successful collusion among the Defendants."

As to the conduct portion of the SCP analysis, Dr. Harris looked at mill closures, operating rates/inventories/trades, downtime/slowback, coordinated pricing, monitoring, direct communication among Defendants, and Defendants' prior history of antitrust violations.  In general, Dr. Harris concludes that, in the face of constant and increasing demand during the class period, Defendants reduced capacity — and therefore supply — by closing or slowing down the rate of production at mills. Specifically, Dr. Harris points to strategic mill closures or "downtime" that reduced capacity and supply in the

face of "strong growth in box demand."  Also important to Dr.
Harris's analysis are the various price increase announcements
that occurred during the class period. Defendants collectively
announced fifteen price increases during the class period,
nine of which were fully implemented.  Defendants made these
various announcements at near-identical times and for near-
identical amounts.  These announcements often occurred very
shortly after various trade association meetings.  Dr. Harris
concludes that this conduct runs contrary to what independent
firms would do when faced with similar market conditions and
that Defendants' conduct is more consistent with collusive
behavior than with normal, unilateral activity.

     As to the "performance" portion of the SCP analysis, Dr.
Harris relies on Dr. Dwyer's report, which Dr. Harris
concludes is sound and founded in accepted economic theory.
Based on Defendants' actual economic performance, Dr. Harris
concludes that Defendants' performance is consistent with
collusion.

     Defendants hurl several attacks at Dr. Harris's opinions.
First, Defendants argue that Dr. Harris failed to define the
relevant market for purposes of his SCP analysis.  According
to Defendants, this failure is fatal and makes Dr. Harris's
analysis useless.  Defendants contend that Containerboard
Products cannot possibly be a single market, because

- 29 -

S.A.29

Containerboard Products include containerboard and corrugated products, which are not interchangeable and thus are not part of the same market. *See, Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 710 (7th Cir. 1977).

Dr. Harris correctly responds, however, that the Containerboard Products market is the relevant market, and this is so despite the fact that the market includes both containerboard and corrugated products. Defendants draw an analogy between components of a personal computer and the personal computer itself, arguing that the components and the computer could not possibly be the same market, and therefore containerboard and corrugated products likewise cannot comprise a single market. The analogy fails because the analogs are not truly analogous; containerboard is not *a* component that goes into a corrugated product, it is *the* component. As Dr. Harris points out, containerboard is simply a corrugated product that hasn't been folded yet. Moreover, containerboard has no other use except for being folded into a corrugated product. And, there are no substitutes for containerboard — that is, corrugated products cannot come from some other source other than containerboard. Perhaps most importantly, Defendants' businesses are vertically integrated such that "the firms who manufacture the containerboard are the very same firms who convert that containerboard into

corrugated products." [Reply Declaration of Dr. Harris at 24, ECF No. 826-2.] This means that there is no useful or principled way to separate the two into separate markets; they appear to be part in parcel of the same market. Thus, the Court finds that Plaintiffs have established and defined the relevant market for antitrust purposes.

Defendants next criticize Dr. Harris for failing to conduct a "but-for" analysis for each event that Dr. Harris analyzed, such as mill closures and downtime. In short, Defendants argue that Dr. Harris should have looked to each individual event during that class period, such as each mill closure, and then determined whether that specific event would have occurred even absent a conspiracy, and then further analyzed whether that specific event caused all or nearly all class members to pay higher prices than they otherwise would have paid.

Aside from "but-for" analysis not being required to show antitrust impact, this argument fails because it sets the hurdle too high. Defendants have not pointed to any case law or economic theory that says an expert conducting a SCP analysis must look at all events in isolation, and then view each individual event to see if that event specifically is the one that caused antitrust impact. To the contrary, it is a well-accepted practice to look to industry events as a whole

to determine whether a defendant's conduct is consistent with
collusion, as Dr. Harris does with his SCP analysis.  *See, In
re Processed Egg Prods. Antitrust Litig.,* --- F.Supp.3d ---,
No. 08-md-2002, 2015 WL 337224, at *11 (E.D. Penn. Jan. 26,
2015).  Dr. Harris correctly notes that "[n]othing in economic
theory suggests that individuals or firms act on the basis of
a single reason or animating event."  [Reply Declaration of
Dr. Harris at 24, ECF No. 826-2.]  Dr. Harris's analysis
simply looked at all of Defendants' capacity-reducing
decisions in total to determine whether they were more likely
the result of collusion or not.  Plaintiffs' theory of harm is
that Defendants' collusive actions caused an increase in the
market price of Containerboard Products, which harmed all or
nearly all class members, and Dr. Harris's SCP analysis is
consistent with and supports that theory.  Several courts have
relied on an expert's analysis on the structures and features
of a market in certifying a class.  *See, e.g., In re EPDM
Antirust Litig.,* 256 F.R.D. at 90 ("The plaintiffs have not
merely alleged that these prices lists existed and that they
affected all EPDM purchasers — they have . . . provided expert
opinion that the structural characteristics of the EPDM market
would support collusive increases of prices to artificially
high levels.").

Third, Plaintiffs rely on Dr. Dwyer's analysis of Defendants' conduct and the corresponding movement of the PPW index to demonstrate impact. Dr. Dwyer looked at "industry-wide reflections of price and actual prices paid by class members before and after" Defendants' price increase announcements. [Report of Mark Joseph Dwyer, Ph.D., at 7, ECF No. 658-4.] Dr. Dwyer's analysis started with looking at the nature of Defendants' price increase announcements. Of those fifteen announcements, fourteen included all Defendants. For eleven of those fifteen, the announcements were made during the same month. And, for all fifteen, the amount of the increased price was either identical or near-identical across all Defendants. Because of the "lock-step" nature of these price increase announcements, Dr. Dwyer found that "[t]he extent to which the [Defendants'] price increase announcements are reflected — both in timing and in magnitude — in a published price index for linerboard is indicative of impact on prevailing market prices and therefore of the class-wide price impact of such announcements." [*Id.* at 8.] Such a method is a common way that courts have allowed experts to demonstrate impact. *See, In re Urethane Antitrust Litig.,* 768 F.3d at 1254–55.

As briefly mentioned above, the PPW index is the price index Dr. Dwyer relied on for his analysis. PPW and its price

index are published by "RISI," which is a private publisher that has been publishing the PPW index consistently for thirty years, including throughout the class period. As Dr. Dwyer explains:

> Every third week of the month, PPW publishes price indexes for a variety of paper products, including linerboard and corrugated medium. These transaction price indexes are based on surveys of buyers and sellers of a particular containerboard grade. RISI included in the prices it published in its surveys only those related to transactions between non-affiliated parties. Internal transfers and trades between producers were excluded. PPW also excludes transactions that were contractually tied to a price index. These filters make the indexes more representative of the prices class members actually paid.

[Report of Mark Joseph Dwyer, Ph.D., at 9, ECF No. 658-4.] Of the various products that PPW provides an index for, Dr. Dwyer relied on the price for "42 lb. unbleached kraft linerboard." [*Id.*] This index price, according to Dr. Dwyer, "is used as the industry linerboard price in [Defendants'] own analysis of industry pricing." [*Id.*] This is supported by evidence indicating that Defendants do indeed rely upon the PPW index in setting their prices for Containerboard Products, negotiating prices in individual contracts, and analyzing the market. [Pl.'s Mot. for Class Cert. at 9, ECF No. 660 (citing evidence ranging from Defendants' own documents to deposition testimony demonstrating the pervasive use of the PPW index in determining Containerboard Product pricing).]

- 34 -

In comparing the PPW index and Defendants' price increase announcements, Dr. Dwyer found that nine of the fifteen announcements "are reflected by increases in the PPW Index after the effective dates of those announced increases." [Report of Mark Joseph Dwyer, Ph.D., at 11, ECF No. 658-4.] Most importantly, in all nine instances, the dollar amounts that the PPW index increased matched Defendants' announced increase. According to Dr. Dwyer, "[i]f a substantial portion of survey participants had reported that they did not experience a price increase, the PPW Index would not reflect an increase identical to what the defendants had announced." [*Id.*] In other words, Defendants collectively announced near-identical price increases, and shortly following those announcements, the PPW index showed that most customers experienced an increase in price exactly equal to the price increase Defendants announced. Thus, the lock-step increase in the PPW index that followed and tracked Defendants' collective price-increase announcements demonstrates that nearly all class members suffered antitrust impact.

Defendants first counter Dr. Dwyer's PPW index assessment by arguing that there is nothing surprising about the fact that a published index price would increase once manufacturers in a market announce that prices are increasing. In logical terms, Defendants characterize Dr. Dwyer's analysis as running

afoul of the *post hoc ergo propter hoc* fallacy: that the PPW index increased *after* Defendants announcements does not necessarily mean it increased *because* of those announcements.

But, as Dr. Dwyer states, there is more than simple correlation here. First, there is more to the relationship between Defendants' price increase announcements and the PPW index than, say, the relationship between a Chicagoan jumping on one foot and not being eaten by a wild lion. It would be absurd to say that, because the Chicagoan was not eaten by a lion after jumping on one foot, jumping on one foot must keep lions away. That is because there are several reasonable, common-sense alternatives for why the Chicagoan was not eaten by a lion — for one, the lack of wild lions roaming Chicago. But here, as Dr. Dwyer demonstrates, there does not appear to be any other reasonable explanation for such a close relationship between the PPW index and Defendants' price increase announcements. Moreover, the source of the PPW index is known; the index represents actual prices purchasers paid following Defendants' price increase announcements. This constitutes strong evidence that Defendants' price increase announcements caused the PPW index to increase. And this, in turn, constitutes strong evidence that all or nearly all class members were impacted by the increased price, given

Plaintiffs' evidence regarding the paramount importance of the PPW index in setting prices.

Defendants also argue that Plaintiffs' reliance on the PPW index in analyzing impact is misplaced. Defendants argue that the index does not reflect class member's actual transaction prices because it is "not a mathematical reflection of actual transaction prices; it is a level that virtually nobody actually pays for tonnage within assessed specifications." [Def.'s Opp. Br. at 14, ECF No. 763.] Additionally, Defendants argue that a large number of class members individually negotiated a price rather than simply paying the index price. These arguments miss the mark because Plaintiffs have produced evidence showing that (1) Defendants largely rely on the PPW index in setting prices, and (2) in most individually negotiated contracts, the PPW index factored into the negotiated price. At the least, Plaintiffs have presented sufficient evidence that would allow a fact-finder to infer that, even for negotiated prices, the starting point for those negotiations would be higher if the market price for the product was artificially inflated. This comports with the "prevailing view" that "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *In re Urethane Antitrust Litig.,* 768 F.3d at 1254. Thus, Defendants' attempt

- 37 -

to minimize the importance of the PPW index fails to defeat class certification. And, to the extent that Defendants' arguments regarding the merits of relying on the PPW index are correct, those arguments are still based on class-wide evidence, which supports a finding of predominance.

Although Plaintiffs have provided additional testimony from Drs. Dwyer and Harris to prove the merits of antitrust impact – that all or nearly all class members *actually* suffered antitrust harm — at this point the Court is satisfied that Plaintiffs demonstrated that the impact element of their antitrust claim is capable of proof at trial through evidence common to the class. Each class member, if forced to proceed on an individual basis, would be relying on the same evidence of the structure, conduct, and performance of Defendants' industry and their uniform price-increase announcements in order to show an elevated baseline price for the Containerboard Products they purchased during the class period. Thus, the impact evidence in this case is common to the class, and because the evidence, if true, establishes that Defendants' conspiracy caused a market-wide increase to the price of Containerboard Products, Plaintiffs have established impact for class certification purposes. Numerous cases have found that when a plaintiff produces evidence that the alleged conspiracy increased the baseline price of a product, "there

is an inference of class-wide impact." *In re Urethane Antitrust Litig.,* 768 F.3d at 1254 (collecting cases across several jurisdictions). Evidence that multiple defendants issued "parallel . . . price-increase announcements" especially supports the inference of class-wide impact, and this is true "even when prices are individually negotiated." *Id.* at 1254–55. Defendants' arguments that, in fact, most class members were not impacted by the alleged conspiracy may ultimately prove successful at trial or summary judgment. But at the class certification stage, those issues are not before the Court. Therefore, Plaintiffs have established that common questions predominate over individual issues as to impact.

c.  Plaintiffs' Damages Proof

Damages are but one element that the Court considers in determining predominance under Rule 23(b)(3). *Roach v. T.L. Cannon Corp.,* --- F.3d ---, No. 13-3070-cv, 2015 WL 528125, at *6-7 (2nd Cir. Feb. 10, 2015). To establish predominance, a plaintiff must produce a reliable method of measuring class-wide damages based on common proof. *See, id.* But, "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification." *Messner,* 669 F.3d at 815 (citing *Wal-Mart,* 131 S.Ct. at 2558). Thus, if Defendants are correct that Plaintiffs' multiple-regression model is not capable of proving class-wide damages, that alone

will not defeat certification. *See, id.* Instead, the Court
would need to consider whether the individual issues in
calculating damages would overwhelm the common issues relating
to liability and impact.

Defendants resist these principles, arguing that the
Supreme Court changed the law in this area with its decision
in *Comcast*. Defendants argue that, "since *Comcast,* a class
should not be certified if the plaintiffs fail to present a
damages model applicable to individual class members on a
class-wide basis or through a simple computation." [Def.'s
Opp. Br. at 55, ECF No. 763.] As several courts since *Comcast*
have noted, however, *Comcast* did not change the well-
established rule that the existence of individual damage
issues does not automatically defeat class certification.
*See, e.g., In re Nexium Antitrust Litig.,* 777 F.3d 9, Nos. 14-
1521, 14-1522, 2015 WL 265548, at *8 (1st Cir. Jan. 21, 2015)
(stating, post-*Comcast*, that "the Supreme Court . . . and the
circuits in other cases have made clear that the need for some
individualized determinations at the . . . damages stage does
not defeat class certification").

The Seventh Circuit has also stated *Comcast*'s meaning in
the class certification context, explaining that *Comcast* was
concerned with a damages methodology that measured the harm
resulting from four theories of liability, three of which the

district court had rejected.  *In re IKO Roofing Shingle Prods. Liability Litig.,* 757 F.3d 599, 602 (7th Cir. 2014).  Because the damages model did "not even attempt" to "measure only those damages attributable to" the remaining liability theory, *Comcast Corp.,* 133 S.Ct. at 1433, "the class could not get anywhere," *In re IKO Roofing Shingle Prods. Liability Litig.,* 757 F.3d at 602.  Also, the plaintiffs relied solely on their damages model to also prove impact, rather than presenting separate evidence of impact.  Finally, as several courts have noted, *Comcast* was based entirely on one key concession: the plaintiffs in that case inexplicably did not challenge the district court's conclusion that it could not certify the class unless damages were measurable "on a class-wide basis through use of a common methodology."  *Comcast Corp.,* 133 S.Ct. at 1430; *see also, In re Urethane Antitrust Litig.,* 768 F.3d at 1258 ("First, unlike the claimants in *Comcast,* our plaintiffs did not concede that class certification required a method to prove class-wide damages through a common methodology.").  Plaintiffs in this case have not made a similar concession, and they have presented additional class-wide evidence showing that impact is capable of proof at trial, as discussed above.  Thus, the Court will consider whether Plaintiffs' damages model is capable of quantifying damages on a class-wide basis.  If so, Plaintiffs have

established predominance as to each element of their antitrust claim and the class will be certified.  If not, the Court will determine whether individual damages issues will overwhelm the common issues.

In establishing damages, Plaintiffs rely on Dr. Dwyer, who conducted a "preliminary analysis that demonstrates the feasibility of reliably estimating damages on a class-wide basis through the use of . . . multiple regression analysis." Although no expert in this case explains in simple terms what a "multiple regression analysis" entails, the method is common enough to understand through case law and references like the *Reference Manual on Scientific Evidence* by Professor Daniel Rubinfeld, which the Seventh Circuit has deemed a reliable source for understanding this type of technical evidence. *See, ATA Airlines, Inc. v. Fed. Express Corp.,* 665 F.3d 882, 889–90 (7th Cir. 2011).  "Multiple regression analysis is a statistical tool for understanding the relationship between or among two or more variables."  Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in Reference Manual on Statistical Evidence 305 (3d Ed. 2011)).  The tool looks at a dependent variable, which is the variable to be explained, and independent variables, which are the variables "thought to influence the dependent variable."  *In re EPDM Antitrust Litig.,* 256 F.R.D. at 95.  Here, the price of Containerboard

Products is the dependent variable, and the independent variables are the various factors that might have an effect on price, like the alleged conspiracy and the costs involved in producing the products. This type of statistical tool "allows economists to estimate whether a certain market factor has an effect on the dependent variable and to what degree. By determining whether a particular variable in the equation influences the dependent variable, the economist can accept or reject that variable as having an influence on the dependent variable." *Id.* Multiple regression analysis is common in antitrust cases, where the plaintiffs use it to show that an alleged "conspiracy" has a statistically significant impact on the dependent variable — usually price. Rubinfeld, *Reference Guide on Multiple Regression* 305–07.

Dr. Dwyer purports to do precisely this type of analysis in measuring damages. But, the Court cannot simply accept Dr. Dwyer's report simply because it appears to do a multiple regression analysis. Rather, "as painful as it may be," *ATA Airlines, Inc.,* 665 F.3d at 896, the Court must rigorously screen expert evidence when certifying a class to ensure that the damages model only seeks to prove damages that flow from the harm alleged, *Comcast Corp.,* 133 S.Ct. at 1435.

The reliability of an expert's multiple regression analysis depends on the choices the expert makes in choosing

- 43 -

variables and setting up the model. *See,* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression* 311-17. In determining whether a model is set up correctly, courts consider several questions: "has the expert correctly identified the dependent variable; has he or she chosen the correct explanatory variable that is relevant to the question at issue; are the additional variables chosen all correct or are some missing [or] irrelevant; is the form of the analysis correct?" *In re EPDM Antitrust Litig.,* 256 F.R.D. at 95. (citing a prior edition of Professor Rubinfeld's *Reference Guide on Multiple Regression*).

Here, Dr. Dwyer estimates the economic damages attributable to the alleged conspiracy by looking at prices class members actually paid and what they would have paid "but for" the alleged conspiracy. To do this, Dr. Dwyer created two categories of products: Intermediate Containerboard Products ("ICP"), which consists of roll stock and corrugated sheets, and Final Containerboard Products ("FCP"), which consists of all other Containerboard Products. [Report of Mark Joseph Dwyer, Ph.D., at 19, ECF No. 658-4.] Dr. Dwyer then selected a benchmark period of months before and after the class period to compare the prices class members paid during the class period to those prices outside the period. Next, Dr. Dwyer conducted a multiple regression analysis

- 44 -

whereby he analyzed the change in the price of Containerboard Products during the class period.  He included several independent variables to control for non-conspiratorial economic factors that normally influence price, and he also included a "dummy variable," which is the independent variable that tests whether the alleged conspiracy influenced price. "A positive estimated effect for this dummy variable indicates that prices during the class period are higher than can be explained by the economic factors serving as controls and therefore supports the inference that the elevation is attributable to the collusion alleged by plaintiffs." [*Id.*]

As the Court understands it, under Dr. Dwyer's model, if the non-conspiratorial economic factors fully explain the increase in price during the class period, then the dummy variable indicator would be close to zero, which means that the conspiracy had virtually no effect on price.  If this is the case, there are no damages because the conspiracy did not increase prices above what the prices would have been absent the conspiracy.  Conversely, if the increase in price is attributable solely to the conspiracy and no other economic factor, then the dummy variable would be close to one.  If this is the case, the damages would be astronomical because the full amount of the price increases during the class period would be attributed solely to the conspiracy.

Dr. Dwyer accounted for numerous variables in an attempt
control for economic factors that might explain the change in
price during the class period.  The Court need not list them
all, but Dr. Dwyer grouped them into four categories:
downstream demand; production and delivery; inflation; and
seasonal factors.  Importantly, these categories include
independent variables that account for various costs that
affect price like the price of pulp that goes into making
containerboard, labor costs, and fuel costs associated with
production and delivery.

With the potential variables selected, Dr. Dwyer ran
regressions for the ICP and FCP categories.  Dr. Dwyer used
two different procedures to determine which independent
variables, in addition to the dummy variable, would be
included in the regression.  Under the first procedure, the
Alkaike Information Criterion (the "AICC method"), the dummy
variable reflected an overcharge of 4.05% for the ICP product
category and 3.61% for the FCP product category.  Under the
second procedure, the Bayesian Information Criterion (the "BIC
method"), the ICP overcharge was 4.04% and the FCP overcharge
was 2.38%.

Dr. Dwyer also attempted to assess the robustness of his
results by including only the 10 independent variables "with
the most explanatory power." [*Id.*]  This regression shows an

- 46 -

S.A.46

overcharge attributable to the conspiracy of 3.33% for the FCP products and 2.78% for the ICP products. Dr. Dwyer then used the average overcharge amounts mentioned above to calculate damages. The average overcharge was 2.92% for the FCP products and 3.81% for the ICP products.

To arrive at a total damages figure, Dr. Dwyer multiplied the average ICP and FCP overcharges by the dollar amount of purchases class members made during the class period. Dr. Dwyer also attempted to subtract out of the total purchases those that were made during the class period, but whose prices were part of a contract entered into before the class period. This method is consistent with Plaintiffs theory of harm that Defendants' conspiracy raised the market price that all class members paid for Containerboard Products during the class period. During the class period, class members paid $21.06 billion for ICP products. Based on Dr. Dwyer's overcharge of 3.81%, class members paid $801.27 million dollars more than they would have absent the conspiracy. Class members also paid $102.25 billion for FCP products. Based on Dr. Dwyer's overcharge of 2.92%, class members paid $2.991 billion dollars more than they would have absent the conspiracy. Dr. Dwyer's report also breaks down the total amount of damages caused by each Defendant. In sum, Dr. Dwyer's preliminary estimate of damages is $3.792 billion.

Defendants first argue briefly that Dr. Dwyer's report cannot be trusted because it only shows damages based on the class period reflected in Plaintiffs Amended Complaint, rather than the period initially alleged. Defendants cite no authority for disregarding an expert's methodology because he relied upon the class period as alleged in an amended complaint. Dr. Dwyer did what was asked of him based on the class period supplied to him by Plaintiffs. That Plaintiffs amended their Complaint does not change the Court's analysis on whether Dr. Dwyer's model is capable of demonstrating class-wide damages. To the extent Defendants' arguments are relevant, they go to the weight a jury might give Dr. Dwyer's testimony, not its reliability or admissibility. *See, In re Urethane Antitrust Litig.,* 768 F.3d at 1263 (refusing to reverse district court based on the defendants' argument that the plaintiffs' expert moved the class period start date to maximize damages).

As to the substance of Dr. Dwyer's damages model, Defendants' experts first attack Dr. Dwyer's use of a technique called "principal components" to address a collinearity problem. The parties' experts appear to agree that running regressions in this case presents a collinearity problem, which occurs when two independent variables are

highly correlated or related. Including collinear variables in a regression often skews the results.

To correct for collinearity, Dr. Dwyer inserted 150 independent variables into a computer program that would then select "principal components," which are those components that, according to the program, best explain the covariance across the independent variables. The program produced 133 principal components, which Dr. Dwyer then inserted into two different "stepwise regression" programs — AICC and BIC. Both programs operate the same way by starting "with a core model in which the variables that are entering into the model selection are absent." [Dwyer Dep. 137:25–138, Aug. 12, 2014, Ex. 3, ECF No. 763-2.] The programs then "consider[] adding a variable one step at a time," creating a model "until none of the remaining factors meet a certain threshold of explanatory power." [Dwyer Dep. 138:2-6, Ex. 3, ECF No. 763-2.] The only difference between AICC and BIC is the relevant threshold at which the program stops selecting new variables from the 133 available.

Defendants broadly claim that, according to economists, "'stepwise regression is to be avoided.'" [Def.'s Opp. Br. at 51 (quoting Peter Kennedy, *A Guide to Econometrics* 49 (6th Ed. 2008), ECF No. 763.] But as Dr. Dwyer points out in his reply report, the "stepwise regression" that "is to be avoided" is

not the same regression that Dr. Dwyer performed, though admittedly economists often use "stepwise regression" to describe Dr. Dwyer's approach, a point Dr. Dwyer alluded to in his deposition. [Dwyer Dep. 120:3-5 ("Stepwise can sometimes have a particular meaning that would be inappropriate here."), Ex. 3, ECF No. 763-2.] Dr. Dwyer provides academic support for the type of model selection procedures he used, and the Court has compared the description of the stepwise method that is disfavored and Dr. Dwyer's method, and the two are indeed different. Furthermore, Dr. Dwyer notes that the model selection methods he used are included in most or all statistical software packages. The Court finds it unlikely that a model selection method that supposedly is rejected by the academic community would be included in all the software that same community uses to run regressions. Finally, Defendants have not cited any case law that rejects an expert's model solely because of the expert's use of Dr. Dwyer's model selection method. The Court therefore refuses to ignore Dr. Dwyer's report solely because he employed a stepwise regression.

Defendants next take issue with the way Dr. Dwyer used the AICC and BIC model selection methods. Defendants assert that, despite Dr. Dwyer's claim that his model is neutral, he did not allow either selection model to select variables in a

neutral fashion.    This is so, Defendants argue, because Dr.
Dwyer "limited the variables the stepwise software could
exclude so that the conspiracy dummy variable *had to be
included*." [Def.'s Opp. Br. at 51, ECF No. 763.] Defendants
interpret this method as forcing the model to assign the
conspiracy variable a value even if the model would have
otherwise excluded it as having no explanatory value.
Defendants argue that Dr. Dwyer should have simply let the
software select from all the available variables, and
Defendants contend that, by doing so, the conspiracy variable
would not have been selected.

Dr. Dwyer, however, had good reason for including the
conspiracy variable in each of his regressions.    As he
correctly states, allowing the conspiracy variable to be
omitted would tell the experts nothing about the conspiracy's
effect on price. Moreover, Defendants are incorrect that
forcing the model to test for the alleged conspiracy's effect
on price necessarily means the model will find such an effect.
Presumably, if the conspiracy had no effect on price, the
model would show that the conspiracy variable had a zero or
statistically insignificant effect on price.    Because the
independent variable at issue is the existence of a
conspiracy, Dr. Dwyer reasonably included that variable in his

regressions.  Otherwise, his regressions would tell us nothing about the conspiracy's effect on price.

Additionally, Defendants' arguments are inconsistent.  On the one hand, Defendants criticize Dr. Dwyer for using a stepwise regression to select which independent variables to include in each model, rather than using his own independent judgment to select those variables.  On the other hand, they criticize him for using his economic judgment to use the conspiracy and inflation variables in each model, rather than letting the program pick all of the variables.  Both experts state that the stepwise method can exclude variables that the program finds less explanatory, even though economic principles compel inclusion of the variable.  Dr. Dwyer used his economic expertise to select certain factors that test for conspiracy and control for inflation, along with other factors selected by the stepwise programs.  To the extent that Defendants challenge the specific factors included and excluded from his model, those arguments go to the weight and probative value of his testimony, not to the underlying methodology.  *See, In re Urethane Antitrust Litig.,* 768 F.3d at 1260–61.

Of course, in some instances, inclusion or exclusion of a certain variable might be egregious enough to render an expert's report inadmissible altogether.  *See, In re Scrap*

*Metal Antitrust Litig.,* 527 F.3d 517, 530 (6th Cir. 2008). But that is not the case here. Defendants have not pointed to some specific, major factor that Dr. Dwyer excluded that shows his model is wholly without merit. To the contrary, Dr. Dwyer went to great lengths to include in his independent variables all sorts of factors that might otherwise explain the price increases during the class period. His methodology therefore appears to be firmly rooted in sound economic and econometric principles, and the large majority of Defendants' experts' criticisms go to the merits of whether the price of Containerboard Products "increased disproportionately to the cost of inputs as the result of a conspiracy to raise/maintain prices, or instead resulted from a non-collusive cause." *In re EPDM Antitrust Litig.,* 256 F.R.D. at 98. This is a merits question that the Court does not need to resolve in order to decide whether to certify the class.

Defendants finally argue that Dr. Dwyer's damages calculations do not support class certification because his model "cannot be applied to individual plaintiffs, and Dwyer admitted that comparing a customer's price to the price predicted by his regression model would not indicate whether or not the customer had been damaged." [Def.'s Opp. Br. at 56, ECF No. 763.] But in a complicated antitrust case such as this, where the theory of harm is that the entire market price

of a product was inflated as a result of a conspiracy, "plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 493 (7th Cir. 2002); *See also, In re Scrap Metal Antitrust Litig.,* 527 F.3d 517 at 529 (approving a method of comparing a defendant's profits before and after a violation in "proving antitrust damages").

Moreover, to the extent that there are individualized damages issues, that alone will not defeat class certification, especially where, as here, common issues predominate the liability and impact elements of Plaintiffs' claim. *Butler,* 727 F.3d at 801. And, should discovery demonstrate that individual damages issues indeed threaten to overwhelm the common issues such that class certification becomes inappropriate, Defendants may seek to decertify the class or modify the class so that only liability and impact are decided on a class-wide basis. *Messner,* 669 F.3d at 826. In light of the key, overwhelming common questions of liability and impact in this case, Defendants have not demonstrated that individual damages issues threaten to overwhelm the litigation.

In sum, the Court has poured over the parties submissions and accompanying evidentiary record and finds that Plaintiffs

- 54 -

have satisfied the predominance requirement of Rule 23(b)(3) based on competent evidence common to the class.

### ii. Superiority

Lastly, Plaintiffs must demonstrate that proceeding on a class basis is superior to other forms of resolving the dispute. Plaintiffs have made a sufficient showing that class treatment in this case is superior to individual cases. The overarching liability and impact issues are common to the class and can "be resolved in one stroke." *Butler,* 727 F.3d at 801 (internal quotation marks omitted). And given the breadth and importance of the common issues, "the superiority requirement . . . poses no serious obstacle to class certification here." *Messner,* 669 F.3d at 814 n.5.

In attempting to defeat superiority, Defendants argue first that releases they obtained as a result of settling a prior antitrust lawsuit bar many class members' claims in this suit. Second, Defendants argue that many class members purchased Containerboard Products pursuant to contracts that include various "disqualifying clauses," such as forum selection clauses, jury waivers, and clauses that set the available time to bring a claim and the available damages. Defendants conclude that these issues make a class action unmanageable and create a "quagmire" that causes individual issues to predominate the common questions.

As to the first argument, when parties settle a case, a "court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged . . . in connection with any matter or fact set forth or referred to in the complaint." *Wal-Mart Stores, Inc. v. Visa,* 396 F.3d 96, 107 n.13 (2d Cir. 2005) (internal quotation marks omitted). Such a "general release is valid as to all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry." *Oberweis Dairy, Inc. v. Associated Mild Producers, Inc.,* 568 F.Supp. 1096, 1101 (N.D. Ill. 1983) (citing *Goodman v. Epstein,* 582 F.2d 388, 402–04 (7th Cir. 1978)). In other words, "a release applies only as long as the released conduct arises out of the identical factual predicate as the settled conduct." *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d 390, 399 (S.D.N.Y. 2011) (internal quotation marks omitted).

Defendants settled with various opt-in and opt-out plaintiffs the *In re Linerboard Antitrust Litigation* lawsuit in the Eastern District of Pennsylvania. The lawsuit involved an alleged conspiracy that occurred between 1993 and 1995, although some individual cases did not settle until as late as 2008. According to Defendants, a "typical" settlement agreement from the *Linerboard* litigation released Defendants from all claims "relating in any way to any conduct prior to

– 56 –

S.A.56

the Effective Date" of the agreement "concerning the purchase, sale, distribution, or pricing of linerboard, medium, corrugated containers [or] corrugated sheets." [Def.'s Opp. Br. at 64 n.59, ECF No. 763.] Defendants argue that such a broad agreement bars the claims at issue here, and that determining whether those claims are barred makes class action impracticable.

The Court disagrees. Although the release language is very broad, Plaintiffs' claims in this case are not based on an "identical factual predicate as the settled conduct." *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d at 399. The conduct at issue in the prior litigation was Defendants' allegedly collusive behavior in the mid-nineties. The actions at issue here are coordinated market manipulation and price-increase announcements that occurred nearly a decade later. And even though the collusive behavior that was alleged in the prior litigation is similar to the behavior alleged here, the claims in this case are not based on Defendants' alleged price-fixing behavior of the nineties. Under Defendants' argument, they are free to keep colluding in violation of antitrust laws so long as they conspire in the same way as they were alleged to have behaved in a prior settled case. The Court is unaware of any case supporting this argument; indeed, several cases are to the contrary. *See, id.* Because

none of the *Linerboard* releases apply to this new case that is based on different facts, the Court finds that those releases do not defeat class certification.

Defendants' second argument is that several contractual provisions apply to disqualify some class members from participating in the class. According to Defendants, "the multitude of individualized issues (under the laws of multiple states) presented by the disqualifying clauses . . . render the class action mechanism inefficient." [Def.'s Opp. Br. at 72.]

The Court rejects this argument for several reasons. First, Defendants' argument relies on *Lozano,* in which the Seventh Circuit approved of a district court relying on class-action waivers in arbitration agreements to find class certification inappropriate. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (7th Cir. 2007). Unlike the arbitration agreements in *Lozano,* however, none of the clauses here preclude class actions. *Lozano* therefore provides no support for Defendants' position.

Second, Defendants rely heavily on *In re Titanium Dioxide Antitrust Litigation,* in which the court enforced clauses contained within individual class members' contracts. *In re Titanium Dioxide Antitrust Litigation,* 962 F.Supp.2d 840, 851–52 (D. Md. 2013). That case also fails to support Defendants'

argument because there, the court *did not* find the existence of contractual provisions to be an impediment to class certification. *Id.* at 846 (stating that the defendants' motion to modify the class definition to exclude class members who were subject to various contractual provisions was premature until "after the expiration of the class opt-out period"). Plaintiffs are correct that the majority of cases hold that the existence of contractual provisions does not automatically defeat class certification. *See, e.g., id.; Herkert v. MRC Receivables Corp.,* 254 F.R.D. 344, 350 (N.D. Ill. 2008) ("[A] possibility that some of the putative class members could have cardmember agreements with varying terms . . . does not necessarily preclude class certification.").

In the alternative, Defendants ask that the Court at least modify the class definition to exclude those class members that purchased pursuant to a disqualifying clause. This may indeed be necessary, but the Court agrees with the court in *Titanium Dioxide* that the more appropriate time to address this issue is after the class is certified and Defendants can determine which specific class members are subject to potentially disqualifying contractual provisions. The Court has the authority under Rule 23(c)(1)(C) to modify the class any time before final judgment. To the extent that class members are not eligible to participate due to their

specific contracts, Defendants may file a motion to modify the class to exclude those specific members once that information is known.

Because Plaintiffs have proven beyond mere pleading each of Rule 23's elements, the Court finds that class certification is appropriate.    The only remaining issue is Defendant RockTenn's arguments as to why a class action cannot proceed against it.

### C.  Class Certification — Defendant RockTenn's Argument

RockTenn's position in this case is unique.   (The Court uses "RockTenn" for ease of reference, although RockTenn was formally known as Smurfit-Stone Container Corporation during its bankruptcy proceedings).    Unlike any other Defendant, RockTenn filed for bankruptcy prior to this lawsuit, which resulted in a bankruptcy discharge order dated June 30, 2010 that released RockTenn from any claims predating the discharge order.    Thus, according to RockTenn, Plaintiffs' must independently establish a separate, RockTenn-specific class with a period starting no earlier than June 30, 2010.

In all the briefing on this issue, both parties rely on the exact same source material to support their argument: Judge Milton Shadur's statements during a hearing on November 24, 2010.  According to RockTenn, Judge Shadur made it crystal clear that Plaintiffs would need to define and seek

certification on a wholly separate class applicable just to RockTenn.  Plaintiffs, on the other hand, argue that Judge Shadur could not have stated in any plainer terms that such a separation was unnecessary.  The Court can resolve this issue easily by simply referring to what Judge Shadur said, in light of case law that supports those statements.

Neither party really explains the context for the hearing before Judge Shadur, but from reading the entire transcript of that hearing, it appears that RockTenn asked the bankruptcy court to enjoin this Court from hearing a claim against RockTenn.  Judge Shadur set the hearing to inform RockTenn of his position on RockTenn's motion and to provide an avenue for communicating his opinion to the bankruptcy court without having to get into a "tug-of-war" with that court.  Judge Shadur informed RockTenn that he had read the complaint and its allegations and found that Plaintiffs were only seeking to hold RockTenn liable for its post-discharge conduct. Understandably, Judge Shadur found it inappropriate for RockTenn to ask the bankruptcy court to enjoin this Court from entertaining a cause of action that is founded on post-discharge conduct over which the bankruptcy court has no jurisdiction.  Judge Shadur stated that he found it "flat-out misleading [for RockTenn] to characterize the lawsuit before [the Court] as seeking relief from [RockTenn] that is at odds

- 61 -

S.A.61

with its discharge in bankruptcy." [Hr'g Tr. 6, Nov. 24, 2010, ECF No. 108.]

Judge Shadur acknowledged that the complaint's allegations "speak . . . of [RockTenn's] pre[-]discharge conduct," but he noted the key difference between *basing liability* on pre-discharge conduct and *relying* in part on pre-discharge conduct as evidence supporting a post-discharge conspiracy. RockTenn's argument, in other words, "conflates evidence with claims." [*Id.* at 7.] RockTenn is correct that the Court promised to hold Plaintiffs to their word that their complaint is about imposing liability based on post-discharge conduct. But, contrary to both parties' assertions, Judge Shadur did not mention or address any issues related to the proper size or scope of the class to be certified. That is the issue currently before the Court.

The issue presented by Plaintiffs' complaint is novel. Plaintiffs have provided evidence that RockTenn participated in the alleged conspiracy post-bankruptcy. If a fact-finder found this to be true, RockTenn's bankruptcy discharge order would not protect it, since that order applies only to pre-discharge conduct. Plaintiffs have also sued RockTenn's alleged co-conspirators, and co-conspirators are joint and severally liable "*for all damages* caused by the [entire] conspiracy." *Paper Sys. Inc. v. Nippon Paper Indus. Co.,* 281

- 62 -

F.3d 629, 632 (7th Cir. 2002) (emphasis added). No problem so far. But, the conspiracy for which Plaintiffs seek to hold RockTenn's co-conspirators liable predates RockTenn's discharge from bankruptcy, and that pre-discharge conspiracy included RockTenn. The question, then, is whether RockTenn, based on its post-discharge conduct, can be jointly and severally liable for its co-conspirators' damages when the basis for the co-conspirators' liability is pre-discharge conduct that includes RockTenn. RockTenn argues that to hold it jointly liable is to punish it for pre-discharge conduct. Plaintiffs argue that such a result is the consequence of the general joint and several liability principles in the antitrust context.

Neither party has cited a case directly on point, nor can the Court find one. RockTenn cites cases that preclude class certification against defendants that emerged from bankruptcy, but in those cases liability was premised on solely pre-discharge conduct. *See, In re Travel Agent Comm'n Antitrust Litig.,* 583 F.3d 896, 901 (6th Cir. 2009). Plaintiffs cite cases involving joint and several liability, but none of the defendants in those cases had filed for bankruptcy. *See, e.g., Paper Sys. Inc.,* 281 F.3d at 632. Moreover, the Court notes that important principles weigh on both sides of the issue. On the one hand, bankruptcy is meant to absolve a

debtor of liability for its pre-discharge conduct. *In re Ruben,* 774 F.3d 1138, 1141 (7th Cir. 2014) ("A principal goal of bankruptcy is to provide the debtor with . . . a fresh start.") (internal quotation marks omitted). On the other hand, joint and several liability is a "vital instrument for maximizing deterrence." *Paper Sys. Inc.,* 281 F.3d at 633.

In the absence of controlling, binding authority, the Court finds that holding RockTenn jointly and severally liable does not violate the bankruptcy discharge order for several reasons. Plaintiffs alleged that RockTenn joined (or more correctly, re-joined) the conspiracy post-bankruptcy. Generally speaking, "a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators." *Havoco of Am., Ltd. v. Shell Oil Co.,* 626 F.2d 549, 554 (7th Cir. 1980). Although a debtor discharged in bankruptcy is indeed provided a clean slate, what the debtor does with that slate matters. Assuming that RockTenn did, in fact, re-join the conspiracy as alleged, RockTenn certainly would have had knowledge of what has gone on before and presumably would have had the intent to pursue the same objectives. *See, id.* ,Seen properly, RockTenn would not be "held liable" for its pre-discharge conduct. Liability would be premised solely on its

post-discharge conduct.  It only *appears* that it is being held liable for pre-discharge conduct because of the joint and several liability rule, which makes RockTenn on the hook for its co-conspirators' actions.  But it is the *co-conspirators'* liability that is based on pre-discharge conduct, not RockTenn's.

The distinction may be a fine one, but it is important.  If, for example, RockTenn is ultimately correct on the merits, *i.e.,* its post-discharge conduct does not give rise to an antitrust violation, RockTenn will be absolved of all liability, despite its participation in the pre-discharge conspiracy.  The Court has made clear that it will hold Plaintiffs to their burden of proof that RockTenn's post-discharge conduct gives rise to liability.  But, once liability is established, the general rule of joint and several liability applies.  It would be a windfall to defendants to allow them to join a conspiracy post-bankruptcy, with the perfect knowledge and intent to continue causing damages to vast numbers of consumers, and then refuse to enforce joint and several liability while the remaining co-conspirators are all subject to such liability.  If RockTenn did in fact choose to rejoin the alleged conspiracy, it cannot be heard to complain that it may be on the hook for all the damages the conspiracy caused.

Admittedly, this creates potential problems for trial. For example, what is a jury to do with evidence of both pre- and post-discharge conduct in determining RockTenn's liability? For one, the Court may give a limiting instruction that explains to the jury that, in order to determine whether RockTenn violated antitrust laws, it must only consider RockTenn's post-discharge conduct and determine whether that conduct violated the law. These problems, however, can be addressed later if the case goes to trial. For now, the Court agrees with Plaintiffs that this case can proceed as a single class action.

## IV.  CONCLUSION

For the reasons stated herein, Defendants' Motion to Strike [ECF No. 845] is granted in part and denied in part. Plaintiffs' Class Certification Motion [ECF No. 657] is granted. Named Plaintiffs are hereby designated as class representatives, and Michael J. Freed of Freed Kanner London & Millen LLC and Daniel J. Mogin of The Mogin Law Firm, P.C., are hereby designated as Co-Lead Counsel.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 3/26/2015

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2015, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Matthias A. Lydon
MATTHIAS A. LYDON

*Counsel for Defendant-Appellant*
*RockTenn CP, LLC*