Nos. 15-2385 & 15-2386

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

KLEEN PRODUCTS LLC, ET AL.,
individually, and on behalf of all others similarly situated,

*Plaintiffs – Appellees,*

*v.*

INTERNATIONAL PAPER CO., ET AL.

*Defendants – Appellants.*

---

On Appeal From The United States District Court
For The Northern District Of Illinois
Case No. 1:10-cv-05711 – Hon. Harry D. Leinenweber

---

**BRIEF OF DEFENDANTS-APPELLANTS
INTERNATIONAL PAPER COMPANY, GEORGIA-PACIFIC LLC,
WEYERHAEUSER COMPANY, AND TEMPLE-INLAND INC.**

---

James T. McKeown
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
(414) 297-5530

Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL  60604
(312) 660-7600

*Counsel for Defendant-Appellant*
*International Paper Company*

Miguel A. Estrada
   *Counsel of Record*
Jonathan C. Bond
Jesenka Mrdjenovic
Lindsay S. See
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

*Counsel for Defendant-Appellant*
*Georgia-Pacific LLC*

[*Additional counsel listed on inside cover*]

Andrew S. Marovitz
Britt M. Miller
Joshua Yount
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
(312) 782-0600

Michael B. Kimberly
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C.  20006
(202) 263-3127

*Counsel for Defendant-Appellant
Temple-Inland Inc.*


Margaret H. Warner
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 756-8000

*Counsel for Defendant-Appellant
Weyerhaeuser Company*

Ryan A. Shores
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Beth A. Wilkinson
Alexandra M. Walsh
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street, N.W.
Washington, D.C.  20006
(202) 223-7300

*Counsel for Defendant-Appellant
Georgia-Pacific LLC*


Stephen Y. Wu
Michelle S. Lowery
MCDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Suite 4400
Chicago, IL  60606
(312) 372-2000

*Counsel for Defendant-Appellant
Weyerhaeuser Company*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[    ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

International Paper Company

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Foley & Lardner LLP; EimerStahl LLP; Wyatt, Tarrant & Combs, LLP; Gibson Dunn & Crutcher LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/  James T. McKeown          Date:  08/10/2015

Attorney's Printed Name:  James T. McKeown

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes**  X     **No** _____

Address:  Foley & Lardner LLP

777 East Wisconsin Ave., Milwaukee, WI  53202-5306

Phone Number:  (414) 297-5530          Fax Number:  (414) 297-4900

E-Mail Address:  jmckeown@foley.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**　　[   ]　　PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

　　International Paper Company

(2)　The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　Foley & Lardner LLP; EimerStahl LLP; Wyatt, Tarrant & Combs, LLP; Gibson Dunn & Crutcher LLP

(3)　If the party or amicus is a corporation:

　　i)　Identify all its parent corporations, if any; and

　　　　N/A

　　ii)　list any publicly held company that owns 10% or more of the party's or amicus' stock:

　　　　N/A

Attorney's Signature: s/  Nathan P. Eimer　　　　　　　　　Date: 08/10/2015

Attorney's Printed Name: Nathan P. Eimer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** _____　**No** ☒

Address: EimerStahl LLP

　　224 South Michigan Ave., Suite 1100, Chicago, IL  60604-2516

Phone Number: (312) 660-7600　　　　　Fax Number: (312) 692-1718

E-Mail Address: neimer@eimerstahl.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Georgia-Pacific LLC

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gibson, Dunn & Crutcher LLP; Hunton & Williams LLP; Quinn Emanuel Urquhart & Sullivan LLP;

Figliulo & Silverman, P.C.; Paul, Weiss, Rifkind, Wharton & Garrison LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

Georgia-Pacific Holdings LLC; Koch Industries, Inc.

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/  Miguel A. Estrada                    Date: 08/10/2015

Attorney's Printed Name: Miguel A. Estrada

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  ✕   **No** _____

Address: Gibson, Dunn & Crutcher LLP

1050 Connecticut Ave., N.W., Washington, D.C.  20036

Phone Number: (202) 955-8257                    Fax Number: (202) 530-9616

E-Mail Address: mestrada@gibsondunn.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Georgia-Pacific LLC

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Gibson, Dunn & Crutcher LLP; Hunton & Williams LLP; Quinn Emanuel Urquhart & Sullivan LLP;

    Figliulo & Silverman, P.C.; Paul, Weiss, Rifkind, Wharton & Garrison LLP

(3)   If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       Georgia-Pacific Holdings LLC; Koch Industries, Inc.

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

Attorney's Signature: s/  Jonathan C. Bond      Date: 08/10/2015

Attorney's Printed Name: Jonathan C. Bond

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ✕

Address: Gibson, Dunn & Crutcher LLP

       1050 Connecticut Ave., N.W., Washington, D.C.  20036

Phone Number: (202) 887-3577      Fax Number: (202) 530-4219

E-Mail Address: jbond@gibsondunn.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Georgia-Pacific LLC

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Gibson, Dunn & Crutcher LLP; Hunton & Williams LLP; Quinn Emanuel Urquhart & Sullivan LLP;

Figliulo & Silverman, P.C.; Paul, Weiss, Rifkind, Wharton & Garrison LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

Georgia-Pacific Holdings LLC; Koch Industries, Inc.

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Jesenka Mrdjenovic    Date: 08/10/2015

Attorney's Printed Name: Jesenka Mrdjenovic

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ☒

Address: Gibson, Dunn & Crutcher LLP

1050 Connecticut Ave., N.W., Washington, D.C.  20036

Phone Number: (202) 887-3722    Fax Number: (202) 530-9602

E-Mail Address: jmrdjenovic@gibsondunn.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __15-2385__

Short Caption: __Kleen Products LLC, et al. v. International Paper Co., et al.__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[　]　　PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

__Georgia-Pacific LLC__

_____

(2)　The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

__Gibson, Dunn & Crutcher LLP; Hunton & Williams LLP; Quinn Emanuel Urquhart & Sullivan LLP;__

__Figliulo & Silverman, P.C.; Paul, Weiss, Rifkind, Wharton & Garrison LLP__

_____

(3)　If the party or amicus is a corporation:

　i)　Identify all its parent corporations, if any; and

　　__Georgia-Pacific Holdings LLC; Koch Industries, Inc.__

　ii)　list any publicly held company that owns 10% or more of the party's or amicus' stock:

　　__N/A__

Attorney's Signature: __s/  Lindsay S. See__　　Date: __08/10/2015__

Attorney's Printed Name: __Lindsay S. See__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** _____　**No** __✕__

Address: __Gibson, Dunn & Crutcher LLP__

__1050 Connecticut Ave., N.W., Washington, D.C.  20036__

Phone Number: __(202) 887-3761__　　Fax Number: __(202) 530-9621__

E-Mail Address: __lsee@gibsondunn.com__

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Georgia-Pacific LLC

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Gibson, Dunn & Crutcher LLP; Hunton & Williams LLP; Quinn Emanuel Urquhart & Sullivan LLP;

   Figliulo & Silverman, P.C.; Paul, Weiss, Rifkind, Wharton & Garrison LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      Georgia-Pacific Holdings LLC; Koch Industries, Inc.

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  s/  Ryan A. Shores          Date:  08/10/2015

Attorney's Printed Name:  Ryan A. Shores

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** _____     **No** ☒

Address:  Hunton & Williams LLP

      2200 Pennsylvania Ave., N.W.  Washington, D.C.  20037

Phone Number:  (202) 955-1521          Fax Number:  (202) 778-2201

E-Mail Address:  rshores@hunton.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Georgia-Pacific LLC

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Gibson, Dunn & Crutcher LLP; Hunton & Williams LLP; Quinn Emanuel Urquhart & Sullivan LLP;

    Figliulo & Silverman, P.C.; Paul, Weiss, Rifkind, Wharton & Garrison LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       Georgia-Pacific Holdings LLC; Koch Industries, Inc.

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

Attorney's Signature: s/ Beth A. Wilkinson      Date: 08/10/2015

Attorney's Printed Name: Beth A. Wilkinson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ✕

Address: Paul, Weiss, Rifkind, Wharton & Garrison LLP

       2001 K Street, N.W., Washington, D.C. 20006

Phone Number: (202) 223-7340      Fax Number: (202) 204-7395

E-Mail Address: bwilkinson@paulweiss.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __15-2385__

Short Caption: __Kleen Products LLC, et al. v. International Paper Co., et al.__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[  ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   __Georgia-Pacific LLC__

   _____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   __Gibson, Dunn & Crutcher LLP; Hunton & Williams LLP; Quinn Emanuel Urquhart & Sullivan LLP;__

   __Figliulo & Silverman, P.C.; Paul, Weiss, Rifkind, Wharton & Garrison LLP__

   _____

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

      __Georgia-Pacific Holdings LLC; Koch Industries, Inc.__

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      __N/A__

Attorney's Signature: __s/  Alexandra M. Walsh__          Date: __08/10/2015__

Attorney's Printed Name: __Alexandra M. Walsh__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** __✕__

Address: __Paul, Weiss, Rifkind, Wharton & Garrison LLP__

   __2001 K Street, N.W., Washington, D.C.  20006__

Phone Number: __(202) 223-7317__          Fax Number: __(202) 204-7367__

E-Mail Address: __awalsh@paulweiss.com__

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[　]　　PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Temple-Inland Inc.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Mayer Brown LLP

(3) If the party or amicus is a corporation:

　i)　Identify all its parent corporations, if any; and

International Paper Company

　ii)　list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Andrew S. Marovitz　　　　Date: 08/10/2015

Attorney's Printed Name: Andrew S. Marovitz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☒　**No** _____

Address: Mayer Brown LLP

71 S. Wacker Drive, Chicago, IL  60606-4637

Phone Number: (312) 782-0600　　　　Fax Number: (312) 701-7711

E-Mail Address: amarovitz@mayerbrown.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: ___15-2385___

Short Caption: ___Kleen Products LLC, et al. v. International Paper Co., et al.___

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]**    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Temple-Inland Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Mayer Brown LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

      International Paper Company

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature: ___s/ Britt M. Miller___    Date: ___08/10/2015___

Attorney's Printed Name: ___Britt M. Miller___

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** __✗__

Address: ___Mayer Brown LLP___

___71 S. Wacker Drive, Chicago, IL  60606-4637___

Phone Number: ___(312) 782-0600___    Fax Number: ___(312) 701-7711___

E-Mail Address: ___bmiller@mayerbrown.com___

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[    ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Temple-Inland Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Mayer Brown LLP

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

International Paper Company

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/  Joshua D. Yount          Date: 08/10/2015

Attorney's Printed Name:  Joshua D. Yount

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ✕

Address:  Mayer Brown LLP

71 S. Wacker Drive, Chicago, IL  60606-4637

Phone Number:  (312) 782-0600          Fax Number: (312) 701-7711

E-Mail Address:  jyount@mayerbrown.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Temple-Inland Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Mayer Brown LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      International Paper Company

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  s/  Michael B. Kimberly                    Date:  08/10/2015

Attorney's Printed Name:  Michael B. Kimberly

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No**  ☒

Address:  Mayer Brown LLP

        1999 K Street N.W., Washington, D.C.  20006

Phone Number:  (202) 263-3000              Fax Number:  (202) 263-3300

E-Mail Address:  mkimberly@mayerbrown.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Weyerhaeuser Company

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   McDermott Will & Emery LLP

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

      N/A

   ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:  s/  Margaret H. Warner          Date: 08/10/2015

Attorney's Printed Name:  Margaret H. Warner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  X    **No** _____

Address:  McDermott Will & Emery LLP

   500 North Capitol Street, N.W., Washington, D.C.  20001

Phone Number:  (202) 756-8228          Fax Number:  (202) 756-8087

E-Mail Address:  mwarner@mwe.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385

Short Caption: Kleen Products LLC, et al. v. International Paper Co., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[    ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Weyerhaeuser Company

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

McDermott Will & Emery LLP

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Stephen Y. Wu    Date: 08/10/2015

Attorney's Printed Name: Stephen Y. Wu

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ✕

Address: McDermott Will & Emery LLP

227 West Monroe Street, Suite 4400, Chicago, IL  60606

Phone Number: (312) 372-2000    Fax Number: (312) 984-7700

E-Mail Address: swu@mwe.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __15-2385__

Short Caption: __Kleen Products LLC, et al. v. International Paper Co., et al.__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

__Weyerhaeuser Company__

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

__McDermott Will & Emery LLP__

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

__N/A__

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

__N/A__

Attorney's Signature: __s/  Michelle S. Lowery__          Date: __08/10/2015__

Attorney's Printed Name: __Michelle S. Lowery__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** __✕__

Address: __McDermott Will & Emery LLP__

__227 West Monroe Street, Suite 4400, Chicago, IL  60606__

Phone Number: __(312) 984-2139__          Fax Number: __(312) 984-7700__

E-Mail Address: __mslowery@mwe.com__

rev. 01/15 GA

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ............................................................................. 1

STATEMENT OF THE ISSUES ................................................................................. 1

INTRODUCTION .................................................................................................... 2

STATEMENT OF THE CASE .................................................................................... 5

SUMMARY OF ARGUMENT ................................................................................... 14

STANDARD OF REVIEW ........................................................................................ 16

ARGUMENT ......................................................................................................... 17

     I.     Plaintiffs Failed To Prove That Common Questions Predominate Over Highly Individualized Questions Of Alleged Antitrust Impact And Damages ............................................... 17

          A.     Plaintiffs Offered No Reliable, Common Method To Prove Classwide Antitrust Impact ............................................... 18

               1.     Plaintiffs Offered No Reliable, Common Method To Prove That Class Members Paid Higher Prices Because Of The Alleged Conspiracy ..................................................................... 20

                    a.     Plaintiffs' Purported Conspiracy Evidence And Harris's Structure-Conduct-Performance Analysis Are Irrelevant To Antitrust Impact ............................ 22

                    b.     Dwyer's Analyses Cannot Prove That All Or Nearly All Members Suffered Antitrust Impact .................................................... 26

               2.     The District Court Erred By Presuming Common Impact .................................................................. 32

**TABLE OF CONTENTS**
*(continued)*

**Page**

B.   Plaintiffs Presented No Reliable, Common Method To Prove The Amount Of Class Members' Alleged Damages ........................................................................ 35

1.   Plaintiffs' Only Damages Analysis Cannot Prove Class Members' Damages But Only Average Classwide Charges ............................................. 35

2.   Plaintiffs' Damages Model Is Legally Insufficient Because It Does Not Reliably Assess Only Damages Caused By Alleged Antitrust Violations ........................................... 41

C.   The District Court Failed To Conduct The Rigorous Analysis Of Plaintiffs' Expert Evidence That Rule 23 Requires .................................................................. 43

II.   A Class Action Is Inferior And Unmanageable Because Diverse, Highly Individualized Defenses Make Class Litigation Impracticable ........................................................ 48

A.   Classwide Litigation Is Inferior Because Numerous Individual Releases Bar Many Class Members' Claims To Varying Degrees .......................................... 49

B.   Numerous Other Individualized Contract Defenses Make A Single Classwide Trial Unmanageable ......................... 51

CONCLUSION .......................................................................... 55

CERTIFICATE OF COMPLIANCE

CIRCUIT RULE 30(d) STATEMENT

STATUTORY ADDENDUM

SHORT APPENDIX

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Am. Express Co.* v. *Italian Colors Rest.*,
    133 S. Ct. 2304 (2013) .......................................................................... 17

*Am. Honda Motor Co.* v. *Allen*,
    600 F.3d 813 (7th Cir. 2010) ............................................................ 44, 46

*Andrews* v. *Chevy Chase Bank*,
    545 F.3d 570 (7th Cir. 2008) ................................................................... 49

*ATA Airlines, Inc.* v. *Fed. Express Corp.*,
    665 F.3d 882 (7th Cir. 2011) ................................................................... 45

*Atl. Richfield Co.* v. *USA Petrol. Co.*,
    495 U.S. 328 (1990) ........................................................................... 22, 33

*Bell Atl. Corp.* v. *AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ............................................................ 19, 36

*Bigelow* v. *RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946) ................................................................................. 38

*Blades* v. *Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) .......................................... 18, 20, 22, 34

*Blair* v. *Equifax Check Servs., Inc.*,
    181 F.3d 832 (7th Cir. 1999) ................................................................... 55

*In re Blood Reagents Antitrust Litig.*,
    783 F.3d 183 (3d Cir. 2015) ................................................................... 46

*Blue Cross & Blue Shield United of Wis.* v. *Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ...................................... 21, 24, 28, 31

*Bridge* v. *Phx. Bond & Indem. Co.*,
    553 U.S. 639 (2008) ................................................................................. 39

*In re Bridgestone/Firestone, Inc. Tires Prods. Liability Litig.*,
    288 F.3d 1012 (7th Cir. 2002) ............................................................... 54

*Broussard* v. *Meineke Disc. Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ................................................................. 41

## TABLE OF AUTHORITIES
### *(continued)*

**Cases *(continued)***                                               **Page(s)**

*Butler* v. *Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) .......................................................................... 36, 37

*Califano* v. *Yamasaki*,
   442 U.S. 682 (1979) ............................................................................................ 17

*CE Design Ltd.* v. *King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) .............................................................................. 55

*Cimino* v. *Raymark Indus., Inc.*,
   151 F.3d 297 (5th Cir. 1998) .............................................................................. 41

*Comcast Corp.* v. *Behrend*,
   133 S. Ct. 1426 (2013) ..........2, 14, 17, 18, 21, 24, 31, 35, 36, 37, 41, 43, 44, 46, 54

*Daubert* v. *Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ................................................................................ 13, 45, 46

*Denney* v. *Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ............................................................................... 19

*Ellis* v. *Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) .............................................................................. 45

*Espenscheid* v. *DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) .................................................................... 30, 36, 37

*Feltner* v. *Columbia Pictures Television, Inc.*,
   523 U.S. 340 (1998) ............................................................................................ 40

*Garber* v. *Randell*,
   477 F.2d 711 (2d Cir. 1973) ............................................................................... 39

*Gen. Elec. Co.* v. *Joiner*,
   522 U.S. 136 (1997) ............................................................................................ 24

*Gen. Tel. Co. of Sw.* v. *Falcon*,
   457 U.S. 147 (1982) ............................................................................................ 17

*Halvorson* v. *Auto-Owners Ins. Co.*,
   718 F.3d 773 (8th Cir. 2013) .............................................................................. 19

# TABLE OF AUTHORITIES
### *(continued)*

**Cases *(continued)*** **Page(s)**

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002)...........................................................22, 23

*In re Hotel Tel. Charges*,
  500 F.2d 86 (9th Cir. 1974)...................................................................39

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ............................................................19, 45

*In re IKO Roofing Shingle Prods. Liab. Litig.*,
  757 F.3d 599 (7th Cir. 2014).......................................19, 21, 27, 41, 48

*James Cape & Sons Co.* v. *PCC Constr. Co.*,
  453 F.3d 396 (7th Cir. 2006).................................................................18

*Kohen* v. *Pac. Inv. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009).................................................................20

*Lindsey* v. *Normet*,
  405 U.S. 56 (1972)..................................................................................40

*Loeb Ind., Inc.* v. *Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002).................................................................38

*Lozano* v. *AT&T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007)...........................................................52, 53

*Mazza* v. *Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012).................................................................19

*McLaughlin* v. *Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) ............................................................39, 40

*Messner* v. *Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012)......................11, 16, 17, 37, 38, 44, 46, 48

*Mullins* v. *Direct Digital, LLC*,
  __ F.3d __, 2015 WL 4546159 (7th Cir. July 28, 2015) ......................40

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) .............................................................13, 33

**TABLE OF AUTHORITIES**
*(continued)*

**Cases** *(continued)*                                                **Page(s)**

*Ortiz* v. *Fibreboard Corp.*,
    527 U.S. 815 (1999) ............................................................. 39

*Parko* v. *Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ................................. 38, 39, 44

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
    261 F.3d 355 (3d Cir. 2001) ................................................ 50

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013) .................... 19, 21, 24, 31, 32, 33, 34, 36

*Robinson* v. *Tex. Auto. Dealers Ass'n*,
    387 F.3d 416 (5th Cir. 2004) ................................. 13, 33, 50

*Sargent-Welch Scientific Co.* v. *Ventron Corp.*,
    567 F.2d 701 (7th Cir. 1977) .............................................. 25

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) ................................................ 7

*Tyson Foods, Inc.* v. *Bouaphakeo*,
    135 S. Ct. 2806 (2015) ...................................................... 20

*Unger* v. *Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) .............................................. 33

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ........................... 13, 32, 33, 34

*Wagner* v. *NutraSweet Co.*,
    95 F.3d 527 (7th Cir. 1996) ................................................ 51

*Wal-Mart Stores, Inc.* v. *Dukes*,
    131 S. Ct. 2541 (2011) ....................... 3, 17, 18, 33, 39, 40, 41

*Walsh* v. *Ford Motor Co.*,
    807 F.2d 1000 (D.C. Cir. 1986) ......................................... 53

*West* v. *Prudential Sec., Inc.*,
    282 F.3d 935 (7th Cir. 2002) ......................................... 24, 44

**TABLE OF AUTHORITIES**
*(continued)*

**Cases** *(continued)* <span style="float:right">**Page(s)**</span>

*Windham* v. *Am. Brands, Inc.*,
  565 F.2d 59 (4th Cir. 1977) .......................................................................... 36, 39

**Statutes**

15 U.S.C. § 1 ...................................................................................................... 1

15 U.S.C. § 15 ............................................................................................... 1, 18

15 U.S.C. § 26 .................................................................................................... 1

28 U.S.C. § 1292 ................................................................................................ 1

28 U.S.C. § 1331 ................................................................................................ 1

28 U.S.C. § 1337 ................................................................................................ 1

28 U.S.C. § 2072 ......................................................................................... 33, 39

**Rules**

Fed. R. App. P. 5 ................................................................................................ 1

Fed. R. Civ. P. 23 ..............................................1, 2, 5, 7, 14, 16, 17, 18, 19, 20, 21, 33,
  34, 35, 39, 41, 43, 44, 45, 47, 48, 54, 55

Fed. R. Evid. 702 .......................................................................................... 13, 45

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis*
  *of Antitrust Principles and Their Application* (2015) .................. 19, 20, 24, 25, 30

Frank K. Easterbrook, *Workable Antitrust Policy*,
  84 Mich. L. Rev. 1696 (1986) .............................................................................. 23

Fed. R. Civ. P. 23, 2003 Advisory Committee's note ........................................... 54, 55

Hilarious Graphs Prove That Correlation Isn't Causation,
  http://goo.gl/em6A4q .................................................................................... 28

**TABLE OF AUTHORITIES**
*(continued)*

**Other Authorities *(continued)*** **Page(s)**

Marc Ivaldi et al., *The Economics of Tacit Collusion*, Final Report for
DG Competition, European Comm'n (Mar. 2003) ................................................ 23

Timothy J. Muris, *Improving the Economic Foundations of Competition
Policy*, 12 Geo. Mason L. Rev. 1 (2003) ................................................................ 23

Joshua D. Wright, *The Antitrust/Consumer Protection Paradox: Two
Policies at War with Each Other*, 121 Yale L.J. 2216 (2012) ............................. 23

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337, as plaintiffs-appellees brought suit under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Appendix ("A.") 3-5, 58-59.

This Court has jurisdiction under 28 U.S.C. § 1292(e).  The district court entered its order granting class certification on March 26, 2015.  Short Appendix ("S.A.") 1.  On April 9, 2015, defendants timely petitioned this Court for permission to appeal under Federal Rule of Civil Procedure 23(f) and Federal Rule of Appellate Procedure 5.  Pet. for Permission to Appeal, No. 15-8006 (Apr. 9, 2015).  This Court granted the petition on June 22, 2015.  Order, No. 15-8006 (June 22, 2015).

## STATEMENT OF THE ISSUES

1.      Whether the district court erred by finding predominance and certifying a massive antitrust class action where plaintiffs proffered no common method to prove that all or nearly all class members paid higher prices because of the alleged unlawful acts—but were permitted in effect to presume common impact—and also offered no common method for determining the amount of each class member's purported damages.

2.      Whether the district court erred in deeming a class action a superior way of litigating plaintiffs' claims despite releases barring various portions of many putative class members' claims and widespread variation in the terms of their contracts with defendants that bear directly on the validity of their claims.

1

# INTRODUCTION

The district court's decision certifying a single, massive class action seeking $11 billion in treble damages contravenes core principles of antitrust and class-action law. Plaintiffs allege a sprawling, nationwide conspiracy by defendants to manipulate the prices of thousands of diverse containerboard and corrugated products by restricting capacity. They seek to litigate in one case the heterogeneous claims of thousands of individual purchasers who bought different products—from inputs like unprocessed linerboard, to finished boxes for produce, to retail floor displays—at different times and different prices over nearly seven years. Federal Rule 23(b)(3) undisputedly required plaintiffs to show that the key elements of their individual claims can be proved with common, reliable methods at trial, such that individual questions will not "overwhelm questions common to the class." *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1433 (2013). Plaintiffs further had to show that trying their claims in one proceeding is not only manageable, but superior to any alternative. Plaintiffs never made either showing. The district court nevertheless certified a class based on multiple errors of law without the "'rigorous analysis'" Rule 23 requires. *Id.* at 1432 (citation omitted).

Blackletter antitrust law requires plaintiffs to prove not just the alleged conspiracy, but *also* that each claimant paid higher prices *because of* the alleged conspiracy and the *amount* it supposedly overpaid. Plaintiffs accordingly conceded that, to satisfy Rule 23's predominance requirement, they had to show that those elements are capable of *common* proof at trial. The district court was not permitted

to take plaintiffs' assurances on faith, but was duty-bound to scrutinize the evidence and determine whether plaintiffs actually demonstrated common methods to prove each element without the need for innumerable individualized adjudications. But the district court abdicated that duty, finding predominance despite plaintiffs' failure to present common methods to prove either antitrust impact or damages.

None of the analyses presented by plaintiffs' experts can show that any—much less all or nearly all—class members paid higher prices as a *result* of alleged collusion. Plaintiffs presented a qualitative analysis based on a structure-conduct-performance paradigm discredited decades ago as a substitute for empirical proof of collusion, let alone antitrust impact, and quantitative analyses that admittedly did not control for the many factors that lawfully affect prices; these analyses cannot show that the supposed conspiracy *caused* class members' alleged overcharges. Yet instead of requiring plaintiffs to show that antitrust impact can be *proved* with common evidence, the district court allowed plaintiffs to *presume* classwide impact—relying on an outlier, out-of-circuit decision that eviscerates a core tenet of antitrust law and contravenes Supreme Court precedent.

The district court similarly excused plaintiffs' failure to offer any common method to determine individual claimants' damages. Plaintiffs tendered, and the court accepted, a method that at best shows only purported classwide *averages*, and that admittedly cannot calculate any individual class member's alleged harm. Adjudicating plaintiffs' claims *en masse* on that basis amounts to precisely the "Trial by Formula" that the Supreme Court has repudiated, *Wal-Mart Stores, Inc.* v.

*Dukes*, 131 S. Ct. 2541, 2561 (2011), and violates the rights of defendants and absent class members under the Rules Enabling Act, due process, and the Seventh Amendment.

The district court was led into error by its uncritical acceptance of plaintiffs' expert evidence.  Indeed, while the district court spent pages reciting the reports of plaintiffs' experts, it barely mentioned defendants' experts—Drs. Dennis Carlton and Janusz Ordover—and failed to address the fundamental errors in plaintiffs' expert evidence detailed in Carlton's and Ordover's reports.  And despite allowing plaintiffs' experts to submit "reply" reports spanning more than 150 pages and relying on those reports to certify a class, the court refused defendants' repeated requests to hold an evidentiary hearing at which plaintiffs' evidence could be properly tested.  At a bare minimum, the court's failure to scrutinize plaintiffs' expert evidence critically and to confront challenges to that evidence requires vacating and remanding for the district court to conduct the proper analysis.

The class-certification ruling independently must be set aside because the district court failed to grapple with numerous *other* individualized issues that would make class litigation utterly unmanageable.  Thousands of class members released some or all of their claims in settlements that vary widely in temporal scope, which would at a minimum require multiple complex, ineffective limiting instructions.  And many class members' purchase contracts contain clauses that bar or limit their claims or require idiosyncratic procedures.  The court dismissed these obstacles to coherent case administration based on further legal errors and an unrealistic hope

that these problems might be solved retroactively by rejiggering the class definition later. That is a clear abuse of the court's discretion.

While class certification may be appropriate in certain cases of alleged price-fixing conspiracies, plaintiffs failed to demonstrate that certification is proper here. By choosing to seek certification of a class of purchasers of thousands of vastly different products, plaintiffs took on a heavy burden to prove that their diverse claims have enough in common that they can be litigated collectively *without* thousands of individualized adjudications and *without* abrogating the rights of defendants or absent class members. Yet plaintiffs offered no evidence capable of answering the relevant legal questions on a classwide basis. The district court's class-certification ruling should be reversed, or at a minimum vacated and remanded for application of the rigorous analysis Rule 23 requires.

## STATEMENT OF THE CASE

**1.** Plaintiffs, a diverse group of purchasers that bought various products from various defendants at various times and prices, filed this sprawling class action in 2010, alleging that defendants—integrated manufacturers of containerboard and corrugated products—unlawfully conspired to restrict the supply of containerboard in order to increase prices. S.A.2-3. Containerboard is a type of thick paper made from wood fibers that is used in corrugated products. A.180. One type of containerboard, "linerboard," makes up the two facings of a corrugated sheet, while "medium" is used in the fluted interior portion. *Ibid.* Both components come in a range of "grades or basis weights" depending on the desired use. A.181; Docket En-

try ("D.E.") 763, Ex.4, at 1.1-1.3. Rolls of linerboard and medium are shipped to converting facilities, which use corrugators to assemble linerboard and medium into corrugated sheets. A.180, 552.

Using various specialized machines including die-cutters and flexo-folder-gluers, sheets are used to make tens of thousands of different corrugated products, which differ significantly in composition and design to meet a variety of needs. D.E.763, Ex.6, at 6; *id.*, Ex.4, at 1.7-1.9; A.552-53. Products often differ depending on customers' specifications and applications. For example, boxes for shipping produce that requires refrigeration must withstand humid conditions, and packaging for frozen meat often has a special wax coating. *See* D.E.763, Ex.7, at 149306-08. And containers designed for foodstuffs differ starkly from boxes for shipping sneakers, and further still from non-box products, such as retail floor displays. *Id.*, Ex.4, at 2.18-2.19.

Because of their different uses and characteristics, corrugated products compete in different markets and differ markedly in price and cost. D.E.763, Ex.8, at 141775; *id.*, Ex.9, at 404252-53. And each product faces different substitutes. "Flexible" packaging and plastic containers may be substitutes for some corrugated boxes but not others. *See, e.g., id.*, Ex.8; A.479. Finished products also typically compete in narrow geographic markets: Generally, "customers for a box plant are within 150 miles of the plant, due primarily to significant freight costs." A.402.

**2.** Despite the myriad differences among types of products, plaintiffs allege a single, sweeping conspiracy to manipulate containerboard *and* corrugated-

product prices.  A.13-59.  As plaintiffs' experts conceded, A.275, 353, despite five years of litigation, dozens of depositions, and millions of pages of documents produced, plaintiffs have presented no "evidence of express collusion."  *Cf. In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015).  Nevertheless, relying primarily on "expert" evidence, plaintiffs allege that defendants colluded for nearly seven years "to restrict the supply of containerboard by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory." D.E.658, at 1.  This purported collusion allegedly "set the stage for coordinated price increases of all Containerboard Products," defined to include "linerboard, corrugated medium, containerboard sheets and corrugated containerboard products, including boxes and other containers."  *Id.* at 1, 6.

Plaintiffs sought certification under Rule 23(b)(3) of a single class of "[a]ll persons that purchased Containerboard Products directly from any of the Defendants … for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010."  S.A.2-3; D.E.658, at 1.[1]  Plaintiffs conceded that, to satisfy Rule 23(b)(3)'s predominance requirement, they must show "that the key elements of [their] case"—*i.e.*, conspiracy, antitrust impact, and damages—"can be established using common proof at trial."  D.E.658, at 1-2.  They asserted that all

---

[1]  Plaintiffs originally alleged that the conspiracy began in 2005, A.3, 11, but years into the litigation, on the eve of their deadline for seeking class certification, plaintiffs amended their complaint to expand the class period to encompass 2004, A.67; *see also* D.E.627, at 3. That eleventh-hour amendment enabled plaintiffs to elide the inconvenient fact that their own damages analysis, when applied to the *original* class period, showed negative or *de minimis* overcharges.  A.515-16, 602-04.

three elements were capable of common proof, relying on reports of two experts, Dr. Michael Harris and Dr. Mark Dwyer. *See id.* at 49-61.

    **a.**    Harris performed no empirical analysis (but nonetheless blessed Dwyer's findings). Instead, Harris opined on the nature of the containerboard and corrugated-product markets—which he assumed without analysis constitute a *single* market, A.397-98—and defendants' alleged conduct, based on a "structure-conduct-performance" paradigm. S.A.25; A.369. Harris examined eight characteristics of the containerboard industry, which he claimed were consistent with an oligopolistic market, A.362-63, and concluded that "Defendants had the motive, opportunity, and means to collude." A.178. Harris further claimed that because of these features, *if* defendants colluded "as alleged by the Plaintiffs, they would have succeeded" in "elevating prices above what they would have been" for "all, or nearly all, class members." A.178-79.

    Because 40% of defendants' price-increase announcements (six of 15) *failed* during the class period, Harris posited that the alleged conspiracy was "unstable." A.357. He also recognized that some price increases that *were* implemented were attributable in part to supply and demand forces, not collusive behavior. A.388. Harris made no attempt, however, to identify to what extent each price increase was attributable to market forces or to determine whether class members paid more than they would have *absent* the alleged collusion. *Ibid*. Rather, after examining roughly 25 contracts, he speculated that the "vast majority" of the thousands of con-

tracts at issue in this case tied contract prices to those published in public indices like *Pulp and Paper Weekly*.  A.191-92, 377-78.[2]

    **b.**    Dwyer performed two analyses purporting to show antitrust impact and a third—a regression—addressing damages.  Dwyer determined that defendants collectively made a total of "15 price increase announcements for Containerboard Products during the class period," and analyzed whether "these announced price increases were effective."  A.138, 141-42.

    Dwyer first compared the timing of these price-increase announcements (which were for containerboard, not corrugated products) with increases in a monthly price index for a single product in a defined geographical area—"42lb. unbleached kraft linerboard for delivery east of the Rocky Mountains"—published in *Pulp and Paper Weekly* (the "PPW index").  A.143.  The survey used to generate the PPW Index, however, does not compile the prices paid by large portions of the proposed class; it excludes all corrugated-products buyers and buyers who bought more than 5,000 tons of containerboard per month.  A.481-82.  Dwyer asserted that nine of 15, or 60%, of the "defendants' price increase announcements [were] reflected by increases in the PPW Index."  A.144-45.  According to Dwyer, this alone established a "class-wide price impact of such announcements."  A.142.

    Dwyer's second impact analysis purported to examine whether a given purchaser paid a higher price for a product up to nine months after a price-increase an-

---

   [2]  Harris claimed that he later reviewed additional contracts, but did not identify how many, how they were selected, or why they were representative.  A.880.

nouncement than it paid for the same product before that announcement.  A.138, 148-49, 313; D.E.763, Ex.33.  Although Dwyer asserted that his before-and-after matching analysis showed that nearly all putative class members were "impacted," A.138, his analysis considered only a fraction of the putative class.  It excluded class members that had not purchased the same product both before and after price-increase announcements, A.314—more than half of the class—and thousands that purchased only after a *failed* price increase and could not have suffered any "impac[t]" from that announcement, A.478, 501.

Moreover, although Harris conceded that various factors other than the alleged conspiracy contributed to price increases, A.357, 388, 417, 431, Dwyer admitted that *neither* of his two impact analyses accounted for such factors, including market forces and defendants' costs, A.325-26, 486-87.  Nor did Dwyer (or Harris) analyze to what extent purported increases in input costs (such as linerboard) were passed on to purchasers of corrugated products.  *See* A.325-26, 350-51, 431.

Dwyer also performed a regression to estimate classwide damages.  A.158-59.  He compared the prices paid during the class period for both what he called "Intermediate Corrugated Products" (such as linerboard) and "Final Corrugated Products" (such as boxes) with prices paid in a "benchmark period that includes months before and after the class period."  A.154-55, 157-59.  Dwyer performed a regression analysis that he claimed "isolate[d] the direct price effects of the alleged collusion" from other factors that might explain higher prices during the class period, such as inflation, systemic seasonal price shifts, and factors influencing downstream demand.

10

A.139-40, 156-57.  Dwyer estimated average, classwide overcharges of 3.81% for In-

termediate products, and 2.92% for Final products.  A.158.  He multiplied these per-

centages by total class purchases to estimate total classwide damages of $801.27

million for Intermediate products and $2.991 billion for Final products purchases—

totaling $3.792 billion, A.158-59, which if trebled would exceed $11 billion.

Dwyer himself did not select most of the variables in his model.  Instead, he

used a "stepwise" computer program that he touted as "neutral" and objective,

which automatically selected variables based on their relative explanatory power.

A.157, 273, 292-93.  A stepwise program selects one independent variable at a time

based on the variable's statistical explanatory value with respect to the remaining,

unexplained variation in the dependent variable (here, average price).  *See* A.604-

05.  The program thus was designed to select the independent variables that pur-

portedly explained the variation in average prices.  But Dwyer *forced* the program

to include an "indicator (dummy) variable" for the alleged conspiracy.  A.139-40,

155, 157-58, 507-09, 606-07.

**3.**     Defendants opposed class certification, arguing (*inter alia*) that plain-

tiffs failed to show that common questions predominate over individual ones.

D.E.763, at 27-63.  Defendants specifically challenged the reliability and sufficiency

of Harris's and Dwyer's analyses of impact and damages, reminding the court of its

duty to scrutinize that expert evidence and urging it to "take evidence" and hold a

hearing to test plaintiffs' experts' submissions.  *Id.* at 3-4 (quoting *Messner* v.

*Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012)).

Defendants also presented reports by their own experts—Carlton and Ordover—who demonstrated that plaintiffs proffered no reliable, common method to prove antitrust impact or damages.  D.E.763, at 27-63.  For example, Carlton and Ordover showed that plaintiffs' empirical analyses of impact—Dwyer's PPW and before-and-after matching analyses—were inadequate because, as Dwyer admitted, A.279, neither accounted for factors other than the alleged conspiracy that could cause price increases.  D.E.763, at 27-33, 43-44.  And Dwyer's damages regression identified *average* alleged overcharges across customers, products, and years, and could not prove how much each class member supposedly overpaid.  *Id.* at 48-57. Carlton and Ordover further explained that Dwyer's methodology was fundamentally flawed in numerous respects.  Most significantly, when they recreated Dwyer's calculations *without* forcing the program to include the conspiracy variable, it never selected that variable as explaining price variation for the Final-products category, which represents 80% of the damages Dwyer calculated.  A.508-10, 606-08.

Defendants further argued that a class action would be unmanageable, and certainly not superior, due to settlement releases in prior litigation, *In re Linerboard Antitrust Litig.*, MDL 1261 (E.D. Pa.), that bar or restrict many class members' claims, and the terms of class members' purchase contracts that further limit many claims, such as provisions mandating arbitration or shortening limitations periods.  D.E.763, at 63-72.

In response, plaintiffs tendered a 94-page "reply" report from Dwyer and a 62-page "reply" from Harris presenting "new" and "alternative analys[es]" of anti-

trust impact and other issues.  A.760, 795, 807-10, 901, 903-05.  The district court accepted and considered these replies, without allowing defendants any opportunity to test or respond to them.  S.A.11-12, 30-32, 49-50.

    **4.**    The district court certified plaintiffs' proposed class based solely on the papers, rejecting repeated requests for an evidentiary hearing and oral argument in this $11 billion case.  S.A.1, 5.  Although recognizing that "[e]xpert reports in this case are indeed critical to class certification," it deferred ruling on the expert evidence because defendants had not explicitly moved to exclude plaintiffs' experts as categorically inadmissible under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702.  S.A.5.

    The court held that common questions predominated because antitrust impact and damages were, in its view, capable of common proof.  S.A.20-55.  It concluded that Dwyer's comparison of the timing of price-increase announcements and changes in the PPW Index could show antitrust impact.  S.A.33-39.  The court excused Dwyer's failure to analyze whether class members would have paid lower prices "but-for" the alleged conspiracy, reasoning—contrary to the holdings of two other circuits—that if plaintiffs can "'prove at trial [that] the price range was affected generally,'" common impact may be presumed for *all* plaintiffs, and no "'but-for' comparison" is needed, even if prices were negotiated individually.  S.A.21, 37 (citing *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254-55 (10th Cir. 2014), *petition for cert. filed*, No. 14-1091 (Mar. 25, 2015)); *but see In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008); *Robinson* v. *Tex. Auto.*

*Dealers Ass'n*, 387 F.3d 416, 423-24 (5th Cir. 2004). The court also excused the inability of Dwyer's damages regression to assess individual claimants' damages, stating that individualized damages issues do not defeat predominance and that classwide estimates were sufficient. S.A.53-54.

The court dismissed the manageability difficulties posed by the *Linerboard* releases, deeming them irrelevant because *Linerboard* arose out of events in the 1990s. It also found that other contract terms would not make class litigation inferior because the court could *later* exclude affected purchasers. S.A.55-60.

Defendants petitioned for permission to appeal, which this Court granted.

## SUMMARY OF ARGUMENT

The district court's class-certification decision contravenes controlling precedent and eviscerates fundamental requirements of antitrust and class-action law. A court cannot certify a class under Rule 23(b)(3) unless the plaintiffs "satisfy through evidentiary proof" (*Comcast*, 133 S. Ct. at 1432) both of Rule 23(b)(3)'s requirements: "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs failed to satisfy either requirement.

I.     As plaintiffs conceded, to show predominance in this suit concerning thousands of different products, they had to proffer—*beyond* common evidence of supposed collusion—common, reliable methods of proving two other, critical ele-

14

ments of their claims:  antitrust impact and damages.  Plaintiffs failed to show any common, reliable method capable of proving either element.

**A.**     To prove classwide antitrust impact at trial, plaintiffs must show that nearly all class members were injured *because of* the alleged conspiracy.  But plaintiffs offered no common, reliable method to demonstrate that nearly all class members *were* injured, let alone *why*.  Harris's structure-conduct-performance analysis rests on a discredited economic paradigm and in any event proves nothing about the prices class members paid.  And neither Dwyer's analysis of the PPW Index nor his before-and-after matching exercise addressed the critical question whether the alleged collusion *caused* the supposedly higher prices plaintiffs paid, because those analyses admittedly did not control for non-collusive factors that undeniably affect prices.  The court excused plaintiffs' failure based on its legally erroneous view that impact could be *presumed*, which contradicts Supreme Court precedent and nullifies the antitrust-impact requirement.

**B.**     Plaintiffs also offered no reliable, common method for proving class members' damages.  Their sole damages analysis was severely flawed, but in any event undisputedly shows only *average* purported overcharges—covering nearly seven years and thousands of different products—and cannot identify the amount (if any) that any specific class member overpaid for a particular product at a particular time.  The district court overlooked this failure as well, deeming individualized damages issues irrelevant and holding plaintiffs' averaging approach sufficient.

That holding has no basis in Rule 23 and violates the Rules Enabling Act, due process, and the Seventh Amendment.

**C.**     The district court compounded its legal errors by failing to scrutinize rigorously plaintiffs' expert evidence.  It ignored the fatal deficiencies in that evidence detailed by Carlton and Ordover, and accepted reply reports attempting to rehabilitate that evidence with new analyses, without allowing defendants to respond.  The court defaulted on its duty to confront defendants' challenges to the reliability and sufficiency of plaintiffs' expert evidence.  Yet it relied on that evidence to certify a class without holding a hearing at which it could be properly tested.

**II.**     Certification is independently improper because plaintiffs failed to show that a class action is superior.  Thousands of class members' claims are barred by releases arising out of the *Linerboard* litigation that differ markedly in scope.  And many class members' purchase contracts contain diverse clauses foreclosing or restricting their claims.  These provisions give rise to highly heterogeneous individualized defenses, which would make trying the claims in a single class action hopelessly complex and would inevitably abridge defendants' rights.  The district court disregarded these difficulties based on multiple misunderstandings of the law.

## STANDARD OF REVIEW

Class proponents "bear the burden of showing that a proposed class satisfies the Rule 23 requirements," and this Court reviews decisions granting class certification for abuse of discretion.  *Messner*, 669 F.3d at 811.  If "the district court bases its discretionary decision on an erroneous view of the law or a clearly erroneous as-

sessment of the evidence, then it has necessarily abused its discretion." *Ibid.* The district court's assessment of what expert evidence is capable of proving is a question of law reviewed *de novo*. *See Comcast*, 133 S. Ct. at 1433-34 n.5.

## ARGUMENT

## I.    Plaintiffs Failed To Prove That Common Questions Predominate Over Highly Individualized Questions Of Alleged Antitrust Impact And Damages.

Because class actions are an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Califano* v. *Yamasaki*, 442 U.S. 682, 700-01 (1979), Rule 23 "imposes stringent requirements for certification that in practice exclude most claims," including claims seeking to "'vindicate the policies underlying the antitrust laws,'" *Am. Express Co.* v. *Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (citation omitted). Because plaintiffs rely on Rule 23(b)(3), they must show not merely that some common questions exist, but that "questions of law or fact common to class members *predominate* over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3) (emphasis added), and that class litigation will "'generate common *answers*,'" *Wal-Mart*, 131 S. Ct. at 2551 (citation omitted). Plaintiffs must *prove* that Rule 23's predominance requirement is met; neither speculation nor shortcuts through presumptions suffice. *See Comcast*, 133 S. Ct. at 1432; *Gen. Tel. Co. of Sw.* v. *Falcon*, 457 U.S. 147, 160 (1982).

As plaintiffs acknowledged, establishing predominance requires them to "sho[w] that the key elements of [their] case"—including antitrust impact and dam-

ages—"can be established using common proof at trial." D.E.658, at 1-2. A court cannot certify a class unless it determines, "'after a rigorous analysis,'" that plaintiffs carried that burden. *Comcast*, 133 S. Ct. at 1432 (citation omitted). It cannot gloss over the need for individualized adjudications by allowing "Trial by Formula." *Wal-Mart*, 131 S. Ct. at 2561. The district court's ruling here contravenes those commands and must be reversed. At a bare minimum, that ruling must be vacated and remanded for the district court to conduct the rigorous analysis Rule 23 requires.

### A.    Plaintiffs Offered No Reliable, Common Method To Prove Classwide Antitrust Impact.

Plaintiffs admitted that antitrust "impact" (or antitrust "injury") is a "key element[t] of [their] case," and that to secure class certification they must show that antitrust impact is capable of classwide proof at trial. D.E.658, at 1-2; *accord Blades* v. *Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005) ("plaintiffs need to demonstrate that common issues prevail as to the existence of a conspiracy *and* the fact of injury" (emphasis added)). As plaintiffs put it, "antitrust impact is a causation inquiry." D.E.658, at 3. Only a person "injured in his business or property *by reason of* anything forbidden in the antitrust laws may sue therefor." 15 U.S.C. § 15(a) (emphasis added). Plaintiffs thus must prove that they suffered "injuries that reflect the anticompetitive effect of either the violation or the anticompetitive acts made possible by the violation," not other causes. *James Cape & Sons Co.* v. *PCC Constr. Co.*, 453 F.3d 396, 399 (7th Cir. 2006); *see also Comcast*, 133 S. Ct. at 1433; A.269-70.

This causation requirement not only "limit[s]" plaintiffs' "damages … to the sort of injury that flows from unlawful conduct" the antitrust laws proscribe, *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014), but also "is an element of the cause of action" itself, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008). At trial, therefore, "every class member must prove at least some antitrust impact resulting from the alleged violation." *Ibid.*; *accord* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 338 (2015) ("Areeda & Hovenkamp") ("Every plaintiff in a civil case must show that its injuries were 'caused' by the defendant's illegal conduct."). Plaintiffs thus bore the burden of "show[ing] that they can prove, through common evidence, that all class members were in fact injured *by the alleged conspiracy*." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (emphasis added); *see also Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance").

A contrary reading of Rule 23 would violate Article III. *See Halvorson* v. *Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013) ("In order for a class to be certified, each member must have standing and show an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision."); *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (same); *Mazza* v. *Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) (same). Although this Court has held

that plaintiffs need not prove at this stage that *every* class member suffered an Article III injury, it has recognized that "a class should not be certified if it is apparent that [the class] contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen* v. *Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 676-77 (7th Cir. 2009).[3]

Plaintiffs offered no common method to prove that all or nearly all class members were injured *at all*, let alone *because of* the supposed conspiracy. The district court, however, excused plaintiffs from showing a common method to prove that critical causal link, based on an erroneous view of antitrust law and Rule 23 and uncritical acceptance of plaintiffs' expert evidence.

> ### 1. Plaintiffs Offered No Reliable, Common Method To Prove That Class Members Paid Higher Prices Because Of The Alleged Conspiracy.

Plaintiffs allege that they were injured by prices that were "maintained at artificially inflated and supra-competitive levels." A.58. Proving this type of injury "requires showing that the actual price paid exceeded the 'but for' price," *i.e.*, the price plaintiffs would have paid *but for* the alleged conspiracy. 2A Areeda & Hovenkamp § 396e. Thus, "[t]o establish antitrust impact, an expert is 'required to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive,'" *Blades*, 400 F.3d at 569 (citation omitted), so that the expert can make a statistical comparison of the price actually paid to the but-for

---

[3]  The Supreme Court recently granted certiorari to consider this issue in *Tyson Foods, Inc.* v. *Bouaphakeo*, 135 S. Ct. 2806 (2015).

price and determine whether the purchasers were injured by the alleged unlawful acts.

As the Supreme Court made clear in *Comcast*, plaintiffs must isolate anti-trust impact caused by the *particular* alleged antitrust violations on which their case rests. *See* 133 S. Ct. at 1433 ("[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the] theory [of antitrust violations]."). "[W]ithout a theory of loss that match[es] the the-ory of liability," a class cannot be certified. *IKO Roofing*, 757 F.3d 602. If a "model does not even attempt" to measure only injuries attributable to the purported anti-trust violation, it cannot satisfy Rule 23(b)(3). *Comcast*, 133 S. Ct. at 1433; *see also Rail Freight*, 725 F.3d at 252-53; *Blue Cross & Blue Shield United of Wis.* v. *Marsh-field Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (rejecting model that failed "to make a responsible estimate of the prices that [plaintiff] would have paid had it not been for the conspiracy").

Plaintiffs presented *no* analysis capable of proving classwide impact caused by the alleged unlawful acts. Plaintiffs' experts admitted that factors unrelated to collusive conduct—including supply and demand—affect prices paid for container-board and corrugated products. Harris conceded that various events other than the alleged conspiracy contributed to price increases for containerboard, and that at least "some portion" of each alleged price increase "was a result of supply and de-mand factors" rather than collusion. A.357, 388, 417, 431. As Dwyer conceded, it was thus necessary to "contro[l] for such factors" in order to "isolate any price effects

during the class period that are due to the alleged collusion." A.155; *see also* A.139-40, 156-57. *None* of the analyses of common impact on which the district court relied, however, even attempted to control for other factors that might explain changes in the prices class members purportedly paid.

> ### a.  Plaintiffs' Purported Conspiracy Evidence And Harris's Structure-Conduct-Performance Analysis Are Irrelevant To Antitrust Impact.

The district court relied on two types of qualitative evidence plaintiffs presented:  (1) evidence that was "mostly duplicative of [plaintiffs'] conspiracy evidence" concerning the alleged collusion itself, and (2) Harris's impressionistic "structure-conduct-performance" analysis. S.A.24-26. Neither type of evidence can possibly prove antitrust impact on a classwide basis.

Plaintiffs' evidence purportedly demonstrating an unlawful agreement—which defendants vigorously dispute—is irrelevant to impact because "proof of conspiracy is not proof of common injury." *Blades*, 400 F.3d at 572; *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (stressing importance of "distinguish[ing] between the existence of a conspiracy and its efficacy"). Even "in a case involving horizontal price fixing, … plaintiffs [a]re still required to 'show that the conspiracy caused *them* an injury for which the antitrust laws provide relief.'" *Atl. Richfield Co.* v. *USA Petrol. Co.*, 495 U.S. 328, 344 (1990) (citation omitted).

Harris's freeform structure-conduct-performance analysis is equally incapable of proving impact. As current and former FTC commissioners have explained,

although the "structure-conduct-performance paradigm" was in vogue decades ago, it was "successfully debunked … in the 1970s" by the "Chicago School," Joshua D. Wright, *The Antitrust/Consumer Protection Paradox: Two Policies at War with Each Other*, 121 Yale L.J. 2216, 2234-35 (2012), and "was overturned because its empirical support evaporated" and its "theoretical flaws" were exposed, Timothy J. Muris, *Improving the Economic Foundations of Competition Policy*, 12 Geo. Mason L. Rev. 1, 9-10 (2003). By the mid-1980s, "it [was] hard to find an economist who believe[d] in the old structure-conduct-performance paradigm." Frank K. Easterbrook, *Workable Antitrust Policy*, 84 Mich. L. Rev. 1696, 1698 (1986).

Yet even taken at face value, Harris's structure-conduct-performance analysis is incapable of proving classwide *antitrust* impact. Harris simply examined the industry and alleged conduct and drew inferences about whether defendants "had the motive, opportunity and means to collude." A.232. Whatever relevance a market's structure and performance may have in showing that collusion was "feasible," *cf. High Fructose*, 295 F.3d at 655, the very paper on which Harris relied explains that "the fact that firms *could* sustain collusion does not mean that they actually succeed in doing it," Marc Ivaldi et al., *The Economics of Tacit Collusion*, Final Report for DG Competition, European Comm'n 63 (Mar. 2003) (cited in A.877-78 & nn.23-29). "It is thus impossible to rely on a theoretical analysis alone to determine whether collusion is *actually* taking place." *Ibid.*

*A fortiori*, Harris's structure-conduct-performance analysis certainly cannot show that every member of a massive class was *injured because of* the alleged collu-

sion.  "[T]here is a difference between an actual and a threatened harm."  *Marsh-field Clinic*, 152 F.3d at 594.  Proof that it was "possible" for defendants to raise prices through a conspiracy does not constitute proof that "class members were *in fact* injured."  *Rail Freight*, 725 F.3d at 252.

The district court never explained how Harris's analysis of market structure and alleged conduct could demonstrate classwide antitrust impact.  Although Harris asserted that "the economic evidence" he examined shows that defendants' conduct "would have impacted all, or nearly all, class members," he failed to support that claim.  A.155.  The district court could not simply accept Harris's unsubstantiated say-so.  *See Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997) (court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *West* v. *Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002).  Indeed, whether Harris's analysis proves *anything* about common impact is a question of law for the court, not an issue on which the court may abdicate to the expert.  *See Comcast*, 133 S. Ct. at 1433-34 n.5 (what "data contained within an econometric model … *prove* is no more a question of fact than what our opinions hold" (emphasis added)).  In any event, Harris admittedly could not opine "as to what the price increases would have been in the 'but for' world" because he "did not do the empirical analysis."  A.388.

Harris's analysis here, moreover, ignores key differences *within* the "market" he examined.  "Proof of impact using common proof is problematic when the class members are in many different product and geographic markets."  2A Areeda &

Hovenkamp § 396e.  Defining the market correctly at the outset is thus critical.  *See id.* § 531a.  Harris's market analysis is meaningless because he erred fundamentally at that crucial threshold step.  He erroneously assumed—without any analysis—that containerboard and corrugated products are in the *same* product market.  A.888-89.  The "most important" factor for delineating a market, however, is the "uniqueness of the product's functions and therefore its uses":  Two products "are considered to be in the same market" if they "are 'reasonably interchangeable by consumers for the same purposes.'"  *Sargent-Welch Scientific Co.* v. *Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977) (citation omitted).  Containerboard and corrugated products—made using different machinery and processes—are not remotely interchangeable, and Harris never showed otherwise.  Consumers would not accept rolls of unprocessed containerboard as reasonable substitutes for finished boxes.  Indeed, many corrugated products are not substitutes for each other.  A.398 (bins and displays are not substitutes).

The district court excused this failure, crediting Harris's claim that the containerboard and corrugated-products markets are one and the same because "containerboard is simply a corrugated product that hasn't been folded yet."  S.A.30.  But it is purchasers' perceptions of the product and its uses, not how sellers make products, that define a market.  *See Sargent-Welch*, 567 F.2d at 710 (market definition "'which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful'" (citation omitted)).

Harris further assumed, without explanation, that the geographic market was *national* in scope—contradicting his admission that "generally … customers for a box plant are *within 150 miles* of the plant, due primarily to significant freight costs." A.402 (emphasis added). This error is especially significant because, as Carlton explained, "the extent to which an increase in the price of containerboard will affect the price of corrugated products can differ across the country." A.479. Yet the district court never grappled with this error. Because Harris's entire qualitative analysis consists of inferences based on the scope and structure of a market that he defined *incorrectly*, it is unreliable.

> **b.** **Dwyer's Analyses Cannot Prove That All Or Nearly All Members Suffered Antitrust Impact.**

The district court also credited Dwyer's comparison of defendants' price-increase announcements with movements in the PPW Index and Dwyer's before-and-after matching exercise. S.A.33. Each analysis is deeply flawed and unreliable, but even taken at face value neither can prove common antitrust impact.[4]

***PPW Index.*** The district court leaned heavily on the purported correlation Dwyer found between defendants' price-increase announcements for containerboard

---

[4]  Plaintiffs also claimed that Dwyer's damages regression reinforced his finding of classwide antitrust impact. D.E.658, at 57-59. Even the district court did not cite the regression as proof of impact, and for good reason: Dwyer admitted that his damages regression is incapable of proving that each class member was injured. A.279, 304; S.A.47. It shows only *average* "overcharges" across the class. A.158-59. By definition, an *average* overcharge does not prove that *all* or even most class members paid higher prices. Indeed, when the regression is applied to subsets of the class—*e.g.*, those that purchased a particular product from a particular defendant in a particular month, or that purchased in the *original* class period (2005-2010)—it calculates *negative* average overcharges, "which logically implies no antitrust injury." A.623-25; *see also* A.513-16, 602-04.

(which allegedly stemmed from a conspiracy to restrict capacity) and the PPW Index. S.A.33-35. Of the 15 price-increase announcements Dwyer examined, he found increases in the PPW Index after only nine. *Ibid.* Contrary to the court's assertion, the fact that the PPW index increased after some (but not all) price-increase *announcements* does not remotely "demonstrat[e] that nearly all class members suffered antitrust impact" because of the supposed capacity-restriction *conspiracy*. S.A.35.

Most importantly, Dwyer's PPW analysis is incapable of proving that class members paid more because of the alleged conspiracy because he made no effort to discern what part (if any) of the increases in the PPW Index *resulted from* the alleged conspiracy, rather than other causes. *See* A.278-79, 313. Dwyer's analysis did not try to isolate increases allegedly due to collusion from increases caused by other factors. For example, the price of pulp, a proxy for certain of defendants' costs, increased 59% over the class period, A.467, 497, but Dwyer made no attempt to account for changes in defendants' costs.

At most, Dwyer's PPW analysis can show only a weak correlation between price-increase announcements and higher containerboard prices generally. But it cannot answer the critical question whether the *alleged conspiracy caused* those price-increase announcements and in turn the purportedly higher prices class members paid. *Cf. IKO Roofing*, 757 F.3d at 602. Because his analysis "fail[s] to correct for salient factors, not attributable to the defendant's misconduct, that may

have caused the harm of which the plaintiff is complaining," it is incapable of proving antitrust impact. *Marshfield Clinic*, 152 F.3d at 593.

Indeed, Dwyer's analysis cannot even show that the price-increase announcements caused the increases in the PPW Index that he observed. Relying on correlation as evidence of a *causal link* contravenes a rudimentary precept of empirical analysis. *Cf.* Hilarious Graphs Prove That Correlation Isn't Causation, http://goo.gl/em6A4q (last visited Aug. 10, 2015) (showing 99% correlation between the divorce rate in Maine and the per capita nationwide consumption of margarine). Dwyer himself emphasized that "treat[ing] correlation as a measure of a causal effect" is error, and argued in critiquing another analysis that, "to accurately measure the causal influence of pulp prices on the PPW Index," one must "control for the other factors affecting the PPW Index." A.805. Yet he ignored that admonition himself.

The PPW Index, in fact, cannot even prove that class members were injured *at all*. Dwyer erroneously "assume[d]—contrary to the evidence—that prices paid by all or nearly all individual putative class members move in tandem with the PPW index." A.484-85. But the Index does not capture the price that any putative class members actually paid. The PPW Index is a complex, "normalized" measure of the price of a single product—42 lb. unbleached kraft linerboard in one section of the country, D.E.763, Ex.12, at 4-7—and is not intended to reflect the price paid by all or nearly all purchasers. It is designed instead to represent average prices paid by small- to mid-size linerboard buyers that, unlike larger buyers, may be unable to

negotiate lower prices, and is based on targeted survey data and subject to numerous exclusions. *Id.* at 7. For instance, it excludes transactions that are contractually linked to an index, as well as spot transactions, *i.e.*, "orders filled over a period of less than one month without the expectation of future business." *Ibid.*

Moreover, because the PPW Index focuses exclusively on one input—a particular type of linerboard, *see* A.143—it omits purchasers of *finished* corrugated products, like boxes, that account for more than 80% of alleged class purchases, *see* A.173; *see also* A.483-85. Dwyer admitted that "[a]dditional variable costs" besides containerboard prices affect corrugated products' prices. A.806; *see also* A.325. And numerous other factors can affect the extent to which an increase in an input's price is passed through in the price of the final product, including "the extent to which substitutes are available for the final product" and the degree of competition, which vary from one product to another and across different geographic markets. A.479. Indeed, Harris conceded that determining the extent to which increases in an input's price affect prices of finished products requires a complex, multi-factor analysis, which none of plaintiffs' experts even attempted. A.350-51, 431; *see also* A.278-79. The structure of the industry, in fact, would make it very hard for a hypothetical cartel to police the extent of pass-through, as 70% to 90% of containerboard is consumed *internally* by integrated manufacturers that use it to produce corrugated products. A.574.

The district court assumed all of these problems away. It dismissed the PPW Index's narrow scope and unrepresentative nature on the ground that the Index *in-*

*fluences* the prices used in contracts.  S.A.37.  Prices for containerboard and corrugated products, however, are frequently negotiated individually.  *See*, *e.g.*, D.E.763, Ex.5, at 86-89, 114-17; *id.*, Ex.13, at 77-80.  And "[w]hen transaction prices are negotiated," "proof of antitrust injury is bound to be individualized."  2A Areeda & Hovenkamp § 398c n.21.

The district court rejoined that "Plaintiffs ha[d] produced evidence" that "in most individually negotiated contracts, the PPW index factored into the negotiated price."  S.A.37.  There is much less to that "evidence," however, than meets the eye.  Harris asserted that the "vast majority of sales … [were] pegged to published price indices" based on a cursory review of approximately 25 purchasing contracts, A.191, 377-78, and claimed later to have examined an unspecified additional number, A.880.  But he never explained how he selected those samples or why they were representative.  *See* A.596-97; *cf. Espenscheid* v. *DirectSat USA, LLC*, 705 F.3d 770, 774 (7th Cir. 2013) (purportedly "'representative' members of the class" were not a basis for certification where plaintiffs failed to explain "how these 'representatives' were chosen," and representatives might well have been "hand picked" by counsel).

The court also ignored the fact that many contracts contained provisions that render the PPW Index irrelevant.  Some contracts contained "most-favored-nation provisions" that could prevent automatic price increases if other customers paid less.  A.206-07.  And purchasers of containers for seasonal items (such as fresh produce) often lock in prices for an entire season.  *See*, *e.g.*, D.E.763, Ex.14.  Other contracts similarly contain provisions capping prices irrespective of changes in the

PPW Index.  *See*, *e.g.*, *id.*, Ex.15.  Each contract must be independently evaluated to determine whether prices were tied to the public indices and the effect of other contract provisions which could negate any potential price increase.  These individualized inquiries would overwhelm any common questions regarding impact.

As Carlton demonstrated, moreover, thousands of putative class members purchased only during periods when the PPW Index was *flat or falling*.  A.501-02.  Even accepting plaintiffs' unsupported method of showing impact, they offered no method to prove that *those* class members were injured.

**Before-And-After Matching Exercise.**  Dwyer's analysis comparing prices paid by some class members before a price-increase announcement with prices they paid for the same products afterward (S.A.33) cannot prove classwide antitrust impact for many of the same reasons.  Dwyer admittedly did not attempt to isolate the effects of the supposed conspiracy.  A.325-26.  His before-and-after matching exercise thus cannot answer the relevant question whether class members paid more *because of* supposed collusion.  Instead, his analysis automatically attributes every price increase to unlawful conduct, and improperly "identifies damages that are not the result of the wrong."  *Comcast*, 133 S. Ct. at 1434; *see also Marshfield Clinic*, 152 F.3d at 593; *Rail Freight*, 725 F.3d at 252.

Moreover, like his PPW analysis, Dwyer's before-and-after exercise cannot show that all class members even paid higher prices.  It examined only class members that happened to purchase the same product both within a certain window before a price-increase announcement and afterward—less than half of the putative

31

class.  A.314.  Yet Dwyer offered no empirical basis to extrapolate his results to those he excluded—including the thousands of putative class members that purchased after a *failed* price-increase announcement.  A.331, 478, 501-02.  Those customers could not have suffered any impact from those announcements, and Dwyer performed no analysis to show that those customers were impacted by earlier events.  Even as to those Dwyer did consider, his methodology produced a significant number of false positives, further undermining its reliability.  *See Rail Freight*, 725 F.3d at 254.  Applying Dwyer's analysis, Carlton found that "36 to 39 percent of putative class members" were "impacted" by higher prices in periods *before* and *after* the alleged conspiracy and after *failed* price-increase announcements, when the PPW Index was constant or even falling.  A.494.

## 2.     The District Court Erred By Presuming Common Impact.

The district court nevertheless found predominance because it exempted plaintiffs from showing any common method for *proving* antitrust impact.  It reasoned that, where plaintiffs allege that defendants conspired to increase the general price range for a product, plaintiffs "can show impact without a 'but-for' comparison … even if there are negotiated prices or a variety of prices."  S.A.21.  Relying in part on the Tenth Circuit's decision in *Urethane*, 768 F.3d at 1254-55, the court held that, if plaintiffs show that "the conspiracy caused an increase to the standard market price of the product," as reflected in a widely used price index, classwide impact may simply be *presumed*.  S.A.21-22, 37.  That determination contravenes settled principles of antitrust and class-action law.

The Supreme Court has made clear that, even in horizontal price-fixing cas-
es, antitrust impact is an element of the plaintiff's claim that must be proven, not
presumed. *See Atl. Richfield*, 495 U.S. at 344. The district court's view eviscerates
that requirement. And it contravenes Rule 23's mandate that plaintiffs show that
antitrust impact is capable of common *proof*, not common conjecture. *See Rail
Freight*, 725 F.3d at 252-53; *Unger* v. *Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir.
2005) ("Rule 23 requires the court to 'find,' not merely assume, the facts favoring
class certification").

Allowing class plaintiffs to bypass the required showing of impact by invok-
ing a judicially invented presumption would also violate the Rules Enabling Act,
28 U.S.C. § 2072(b), which forbids Federal Rules from "abridg[ing], enlarg[ing] or
modify[ing] any substantive right[s]." *Ibid.* "A class cannot be certified on the
premise that [a defendant] will not be entitled to litigate its statutory defenses to
individual claims." *Wal-Mart*, 131 S. Ct. at 2561. Defendants are entitled to
demonstrate that any purported increase in an individual purchaser's price resulted
from factors unrelated to the alleged collusion. But the district court's presumption
renders that right a nullity.

The First and Fifth Circuits, in fact, have rejected a presumption of common
impact in similar circumstances. *See New Motor Vehicles*, 522 F.3d at 29; *Robinson*,
387 F.3d at 423-24. The district court never confronted those cases, which defend-
ants cited, relying instead on *Urethane*, 768 F.3d at 1254-55, which affirmed class
certification after a full-blown jury trial. But *Urethane* itself never grappled with

these principles or precedents. *Urethane* derived its theory that plaintiffs can by-pass Rule 23's requirements by invoking an "inference of class-wide impact" from a handful of district-court decisions, without attempting to reconcile that shortcut with the Supreme Court's antitrust case law, Rule 23, or the Rules Enabling Act. *Ibid.*

In any event, even if the district court's presumption were legally sound, it would not eliminate plaintiffs' duty to show classwide proof of *causation*. Even if changes in the "standard market price" presumptively affect all purchasers, and even if the PPW Index represented a "standard market price," *but see supra* pp. 28-31, plaintiffs must show that common evidence can demonstrate that "the conspiracy *caused* an increase to the standard market price" itself. S.A.22 (emphasis added). Plaintiffs never made that showing. Because Dwyer's PPW analysis undisputedly failed to control for other factors that could have caused increases in the PPW Index, *supra* pp. 27-28, it cannot show that defendants' allegedly wrongful conduct *caused* the increases he observed. The district court tried to sidestep this hurdle as well, reasoning that "'[p]roof of a *conspiracy* to establish a "base" price would establish at least the fact of damage'"—*i.e.*, that common evidence of collusion *simpliciter* suffices to show impact. S.A.22 (emphasis added) (citation omitted). That reasoning eliminates the impact element altogether. *See Blades*, 400 F.3d at 572.

*****

None of plaintiffs' analyses, in short, can demonstrate "that all class members were in fact injured *by the alleged conspiracy*." *Rail Freight*, 725 F.3d at 252

34

(emphasis added).  Proving antitrust impact at trial would necessitate individualized inquiries that would dwarf litigation of any common questions.

### B.    Plaintiffs Presented No Reliable, Common Method To Prove The Amount Of Class Members' Alleged Damages.

The district court's predominance finding is independently erroneous because determining each class member's damages would dominate the litigation.  Rule 23 required plaintiffs to show either a common method of proving class members' damages or that calculating individual damages would not overwhelm supposedly common issues.  *See Comcast*, 133 S. Ct. at 1433.  Plaintiffs failed to carry that burden.  The district court nevertheless held that individualized damages issues did not defeat predominance, but its ruling disobeys controlling precedent and renders Rule 23(b)(3)'s predominance requirement a nullity.

### 1.    Plaintiffs' Only Damages Analysis Cannot Prove Class Members' Damages But Only Average Classwide Charges.

Plaintiffs offered no common methodology that can establish the amount of any class member's purported overcharge.  Their only damages analysis, Dwyer's regression, purports to determine only two "average overcharges" among class members, from which Dwyer claimed to derive aggregate damages (by multiplying those averages by total class purchases); they admittedly cannot show the damages any particular class member experienced.  *See* A.158-59.  Indeed, Dwyer conceded that his regression is "focused on aggregate damages," and is not designed to calculate individual plaintiffs' damages.  A.270; *see also* A.601-02.  Those *averages* cannot be used to adjudicate plaintiffs' individual claims without violating the Rules Ena-

bling Act and the Constitution.  Dwyer's model, moreover, cannot reliably prove even average damages because Dwyer stacked the deck in implementing it.

Because plaintiffs have no *other* common method to prove damages, a class trial would necessitate "individual damage calculations" that "will inevitably overwhelm questions common to the class." *Comcast*, 133 S. Ct. at 1433.  The district court erroneously dismissed this fatal defect (S.A.54) based on an incorrect view of the law that contravenes the Rules Enabling Act, due process, and the Seventh Amendment.

The district court brushed aside the need for individualized adjudications of damages because it believed that "individualized damages issues … alone will not defeat class certification."  S.A.54.  That view squarely contradicts *Comcast*, which held that individualized damages issues *do* foreclose predominance if plaintiffs present no classwide method to adjudicate damages tethered to their theory of antitrust violations *and* if resolving those individualized damages issues would "overwhelm questions common to the class."  133 S. Ct. at 1433.  Damages issues thus are *not* irrelevant to predominance, and they *will* preclude certification if adjudicating them will swamp common questions.  *See, e.g.*, *Espenscheid*, 705 F.3d at 773-75; *Rail Freight*, 725 F.3d at 252-55; *Bell Atl.*, 339 F.3d at 303-06; *Windham* v. *Am. Brands, Inc.*, 565 F.2d 59, 67-72 (4th Cir. 1977).

The district court misread *Butler* v. *Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), to establish a contrary rule.  But *Butler* simply recognized a corollary to the principle *Comcast* articulated:  "*If* the issues of liability are genuinely common

issues, *and* the damages of individual class members *can be readily determined*," *then* "the fact that damages are not identical across all class members should not preclude class certification." *Id.* at 801 (emphases added). If each class member's damages can be ascertained through simple arithmetic without individualized fact-finding, class certification may be permissible if those mechanical damages determinations do not overwhelm any common questions. The Court in *Butler*, for example, expected that damages calculations would involve straightforward calculations of the replacement value or repair costs for defective washing machines. *See id.* at 798.

*Butler*'s corollary has no application here because plaintiffs have never suggested, much less demonstrated, that individual class members' damages are readily determinable—for example, by applying a simple arithmetic formula to common evidence. Nor could they. Class members allegedly purchased tens of thousands of different containerboard and corrugated products mostly pursuant to individually negotiated contracts with different defendants and different terms over a period of almost seven years. The problem is not that class members' damages are not identical, but that reliably determining each claimant's damages would necessitate thousands of individualized adjudications, destroying any efficiency class litigation might otherwise achieve. *See, e.g., Comcast*, 133 S. Ct. at 1433; *Espenscheid*, 705 F.3d at 773-75.

The district court's reliance on *Messner*, 669 F.3d 802, which pre-dated *Comcast*, was similarly misplaced. In *Messner*, the Court concluded that plaintiffs *had*

shown a common method to establish classwide damages. *See id.* at 818-19. To be sure, that method was complex and entailed "multiple analyses," but "those analyses all rel[ied] on common evidence … and a common methodology." *Id.* at 819. To the extent *Messner* suggested that individualized damages issues *never* preclude predominance, such statements were dicta and did not survive *Comcast*.

The district court also improperly deemed Dwyer's regression good enough, even though it generated only "average overcharges," A.158, based on a similar error of law. S.A.53-54. The court misinterpreted the statement in *Loeb Industries, Inc.* v. *Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002), that plaintiffs "are permitted to use estimates and analysis to calculate a reasonable approximation of their damages" (*id.* at 493) as blanket approval of speculating at class members' damages through rough averages or guesswork. S.A.54. *Loeb* held only that a class may be certified using a "reasonable approximation" of the damages experienced by *individual* plaintiffs. 306 F.3d at 490-93. It said nothing about apportioning average damages *among* class members. And it certainly did not hold that certification is proper based upon an estimate of average, classwide overcharges, with no method of attributing them to individual plaintiffs. *See ibid.*; *see also*, *e.g.*, *Bigelow* v. *RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (factfinders cannot award damages "based on speculation or guesswork"). Any doubt is erased by this Court's subsequent decision in *Parko* v. *Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014). *Parko* reversed class certification because the district court failed to assess properly "the realism of the plaintiffs' injury and damage model" where differences among class

members meant that it could not simply "be assumed that every class member has experienced the same" injury. *Id.* at 1086.

The district court's contrary view also contravenes the Supreme Court's teaching and violates the Rules Enabling Act and defendants' constitutional rights. Indeed, the damages trial the district court apparently envisioned is precisely the type of "Trial by Formula" that the Supreme Court has emphatically "disapprove[d]." *Wal-Mart*, 131 S. Ct. at 2561. The district court evidently contemplated that class members' damages would be approximated using Dwyer's averages. That approach would transparently "abridge, enlarge or modify" the "substantive right[s]" of defendants and class members alike, which the Rules Enabling Act flatly forbids. 28 U.S.C. § 2072(b); *see also Ortiz* v. *Fibreboard Corp.*, 527 U.S. 815, 845 (1999). "Roughly estimating the gross damages to the class as a whole"—as Dwyer's model does—"and only subsequently allowing for the processing of individual claims" would "alter defendants' substantive right to pay damages reflective of their actual liability." *McLaughlin* v. *Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge* v. *Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); *see also Windham*, 565 F.2d at 72 (rejecting similar "fluid recovery" approach); *In re Hotel Tel. Charges*, 500 F.2d 86, 89-90 (9th Cir. 1974) (same).

The district court's approach also unlawfully abrogates *class members'* rights. If Peter suffered $1,000 in damages as a result of collusive conduct, but Paul only $100 (or zero), Rule 23 cannot be interpreted to permit robbing Peter to pay Paul a $550 "average" overcharge. *See Garber* v. *Randell*, 477 F.2d 711, 715 (2d Cir. 1973)

(consolidation devices cannot "have the effect of merging the rights of some parties with those of others"). That is precisely what occurred here. Dwyer's regression, applied to subsets of the class, shows that many putative class members paid *no* overcharge. A.513-14, 623-25. Yet Dwyer's averaging approach imputes damages to *every* class member.

Adjudicating damages based on classwide averages also impermissibly prevents defendants from contesting the merits of individual claims and raising individualized defenses. "'Due process requires that there be an opportunity to present *every* available defense.'" *Lindsey* v. *Normet*, 405 U.S. 56, 66 (1972) (citation omitted). That is especially true where, as here, the viability and amount of each claim directly "affects the total amount of damages [the defendant] owes to the class." *Mullins* v. *Direct Digital, LLC*, __ F.3d __, 2015 WL 4546159, at *15 (7th Cir. July 28, 2015). A class cannot be "certified on the premise that [the defendant] will *not* be entitled to litigate its … defenses to individual claims." *Wal-Mart*, 131 S. Ct. at 2561 (emphasis added). "[M]ask[ing] the prevalence of individual issues" would constitute "an impermissible affront to defendants' due process rights." *McLaughlin*, 522 F.3d at 232; *see also ibid.* (rejecting approach plaintiffs urge here, based on concerns of "overcompensating *individual* plaintiffs" and requiring defendants to "overpa[y] in the aggregate").

The Seventh Amendment, moreover, entitles defendants to have a jury determine the amount of damages owed to each claimant. *See Feltner* v. *Columbia Pictures Television, Inc.*, 523 U.S. 340, 352-53 (1998). Class proceedings are permit-

ted if these determinations can accurately be made in common, but the desire for common proceedings does not permit changing the individual recoveries the law allows, through use of averages or otherwise. *See Cimino* v. *Raymark Indus., Inc.*, 151 F.3d 297, 319-20 (5th Cir. 1998) (awarding damages based on average damages found as to *other* plaintiffs "violate[d] [defendant's] Seventh Amendment right to have the amount of the legally recoverable damages fixed and determined by a jury").

Rule 23 cannot be construed to authorize these results. *See Wal-Mart*, 131 S. Ct. at 2561. The fact that the district court found this "shortcut" "necessary in order for th[e] suit to proceed as a class action should have been a caution signal to the district court that class-wide proof of damages was impermissible." *Broussard* v. *Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 343 (4th Cir. 1998).

## 2.     Plaintiffs' Damages Model Is Legally Insufficient Because It Does Not Reliably Assess Only Damages Caused By Alleged Antitrust Violations.

Dwyer's damages model is inadequate as a matter of law in any event because it does not calculate damages linked to plaintiffs' theory of antitrust violations. His manipulation of the regression model causes it to attribute to collusion damages that have other causes and renders his model entirely unreliable.

An expert "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the] theory" of unlawful conduct plaintiffs allege. *Comcast*, 133 S. Ct. at 1433; *see also IKO Roofing*, 757 F.3d at 602. Among other failures, Dwyer's model fails that basic requirement.

Although he purported to control in his regression (unlike in his impact analyses) for factors other than the alleged conspiracy that could explain price variation, A.139-40, and claimed that he employed a "neutral" method to select which other variables to include, A.273, 296, Dwyer in fact deliberately skewed the model to reach the result he wanted.

Dwyer used a computer program that automatically selected which variables to include in the regression in a "stepwise," sequential fashion based on their relative explanatory power in light of all the data. A.157, 292-93. The point of that approach was purportedly to minimize subjectivity; the program would determine independently which variables had a sufficient effect on prices to merit inclusion and would exclude those that did not. *See ibid.* Had Dwyer allowed the program to operate unimpeded and to select variables for inclusion, it would have *excluded* the "indicator (dummy) variable" he created to reflect the effect of the supposed conspiracy in every regression he ran for finished products, which account for *80%* of the alleged damages. *See* A.606-08.

Dwyer, however, put his thumb on the scale by forcing the model first to include his conspiracy variable, regardless of whether the program would have selected it based on its explanatory power. Doing so prevented the program from estimating the contributions, if any, of the alleged conspiracy and other potential determinants of price changes. It is thus impossible to ascertain from Dwyer's results whether and to what extent the effect he ascribed to the conspiracy actually reflects other factors. A.606-07. Indeed, as Carlton and Ordover showed, when the pro-

gram is *not* manipulated, it excludes the conspiracy variable altogether in many models, which strongly suggests that Dwyer's damages findings are a fiction. A.508-10, 606-08.

Dwyer's model thus suffers the same fatal flaw as the damages model the Supreme Court held insufficient in *Comcast*. It does *not* reliably limit the damages it calculates to the only theory of anticompetitive conduct plaintiffs assert, but instead chalks up to collusion considerable price variation that has *other* causes. Certification is not permitted where a damages methodology cannot give a reviewing court "assurance" that it can "bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to" the class's theory of antitrust violations. *Comcast*, 133 S. Ct. at 1434-35.

The district court mistakenly believed that it was reasonable for Dwyer to override the program and include the conspiracy variable because otherwise the regression would reveal nothing about the conspiracy's effect on prices. S.A.51-52. But the fact that the computer model frequently rejected the conspiracy variable told Dwyer all he needed to know: that the conspiracy variable did *not* explain the prices that class members paid as well as other factors. A.606-07. The district court's finding of predominance based on a rigged model is inconsistent with the rigorous analysis Rule 23 requires.

### C. The District Court Failed To Conduct The Rigorous Analysis Of Plaintiffs' Expert Evidence That Rule 23 Requires.

The district court's numerous errors in accepting plaintiffs' proposed proof of impact and damages resulted from its uncritical acceptance of plaintiffs' expert evi-

dence.  The court defaulted on its duty to undertake the "'rigorous analysis'" Rule 23 requires, *Comcast*, 133 S. Ct. at 1432 (citation omitted), and prevented defendants from testing properly the reliability and sufficiency of that evidence.  At a minimum, this Court should vacate the class-certification ruling and remand for the district court to conduct the analysis the law demands.

"[W]hen an expert's report or testimony is critical to class certification … a district court must conclusively rule on any challenge to the expert's … submissions prior to ruling on a class certification motion."  *Am. Honda Motor Co.* v. *Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (citation omitted).  "A district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits," but must confront those questions head-on.  *West*, 282 F.3d at 938.  This duty to resolve "tough questions" about an expert's qualifications and methodology applies *before* class certification, *Messner*, 669 F.3d at 813, and often necessitates "holding [an] evidentiary hearin[g]," *West*, 282 F.3d at 938.

The district court acknowledged that Dwyer's and Harris's analyses were "critical" to class certification, S.A.5, triggering the court's obligation to scrutinize those analyses and "conclusively rule on any challenge to [them]," *Am. Honda*, 600 F.3d at 815-16; *see also Messner*, 669 F.3d at 812.  The court accordingly "should have investigated the realism of the plaintiffs' injury and damage model[s] in light of the defendants' counterarguments, and to that end should have taken evidence."  *Parko*, 739 F.3d at 1086.  And it had a "responsibility" to examine the

soundness of those analyses, including whether they "were built on a rational foundation" and were "[p]roperly implemented." *ATA Airlines, Inc.* v. *Fed. Express Corp.*, 665 F.3d 882, 893, 896 (7th Cir. 2011). Yet the court "reserve[d] ruling on Plaintiffs' experts' admissibility," S.A.4-5, and refused even to conduct the evidentiary hearing that defendants repeatedly requested to test plaintiffs' evidence thoroughly before relying on that testimony to certify a class. This was error.

The district court justified its refusal to confront defendants' challenges to Dwyer's and Harris's evidence *before* ruling on class certification on the ground that defendants had not moved to exclude that evidence as inadmissible for all purposes under *Daubert* or Rule 702. S.A.4-5. But the court conflated its duty to examine rigorously the *reliability* and *sufficiency* of expert evidence with the separate issue of its *admissibility* for any purpose. *See Ellis* v. *Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (vacating certification where district court "confused the *Daubert* standard … with the 'rigorous analysis' standard" under Rule 23; "[i]nstead of judging the persuasiveness of the evidence presented, the district court seemed to end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible," which was "error"); *Hydrogen Peroxide*, 552 F.3d at 323 ("opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason"). And the district court read into *Messner* a limitation confining this duty to *Daubert* challenges that the opinion does not contain.

*See* 669 F.3d at 812 ("a district court must make *a conclusive ruling on any challenge* to that expert's qualifications *or submissions*" (emphases added)).

In any event, as *Comcast* made clear, a formal *Daubert* motion is not necessary for a defendant to attack an expert's "expertise" for purposes of certifying a class. 133 S. Ct. at 1431-32 n.4. That defendants did not object under *Daubert* to the admissibility of plaintiffs' expert evidence "d[id] not make it impossible for [defendants] to argue that the evidence failed 'to show that the case is susceptible to awarding damages on a class-wide basis,'" and did not excuse the court from addressing those challenges. *Ibid.* (citation omitted).

The Third Circuit recently echoed that conclusion, relying on *Messner* and *American Honda*. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015). A court cannot certify a class based on an expert's methodologies and testimony, it held, "unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*." *Id.* at 187. *Blood Reagents* roundly rejected the argument (echoed by the district court here) that such an inquiry was unnecessary because the defendant had "waived the opportunity to bring a *Daubert* challenge." *Id.* at 188 n.9. The defendant "consistently challenged the reliability of plaintiffs' expert's methodologies and the sufficiency of his testimony to satisfy Rule 23(b)(3)," which triggered the district court's duty to assess rigorously the reliability of that expert evidence before relying on it to grant certification. *Id.* at 188.

46

So too, here, defendants consistently challenged the reliability and sufficiency of plaintiffs' expert evidence, and, invoking this Court's precedent, repeatedly asked for an evidentiary hearing to test the plaintiffs' experts' theories and methodologies. *E.g.*, D.E.836, at 2 ("Conducting an evidentiary hearing is especially important here, where the analyses of the parties' experts are central to class certification."); D.E.763, at 3-7 & n.2, 36; D.E.943, at 11; D.E.846, at 3 n.2. Rule 23 required the district court to scrutinize that evidence closely and rule conclusively on defendants' challenges to it, however they were styled. Its failure to do so at least compels vacatur.

The district court's justification for declining to hold an evidentiary hearing is equally unpersuasive. It cited the "avalanche" of evidence submitted by the parties as sufficient reason to resolve class certification on the papers. S.A.6. But the immense volume of evidence counseled in *favor* of holding a hearing to allow that evidence to be tested through cross-examination and oral argument, which could have elucidated the many flaws in Dwyer's and Harris's analyses and cleared up the district court's misapprehension of what those analyses can (and cannot) prove.

A hearing was especially important because the court allowed Dwyer and Harris to present new analyses and arguments in lengthy reply declarations—and its opinion echoed those replies in rejecting defendants' critiques of their analyses— *without* affording defendants any chance to answer the new submissions. S.A.7-12, 30, 49-50. That was an abuse of discretion. This Court has faulted district courts' determinations of expert reliability even where the challenging parties did have an

47

opportunity to respond to new expert material in reply submissions and at oral argument. *Messner*, 669 F.3d at 812. The district court's refusal to scrutinize plaintiffs' expert evidence rigorously while *denying* defendants those opportunities at least compels vacatur and remand for the court to conduct the proper procedure.

## II.     A Class Action Is Inferior And Unmanageable Because Diverse, Highly Individualized Defenses Make Class Litigation Impracticable.

Class certification is independently foreclosed because plaintiffs did not and cannot prove, as Rule 23(b)(3) requires, that class treatment is "superior" to any alternatives, especially in light of the "likely difficulties in managing a class action" in this massive, sprawling case. Fed. R. Civ. P. 23(b)(3), (b)(3)(D). Apart from the difficulties posed by individualized adjudications of damages, class litigation would be rendered hopelessly unmanageable by the diverse array of individualized contract-based defenses that variously bar or restrict the claims of numerous putative class members. Rule 23(b)(3) required the court "to evaluate" such "practical considerations that may make class treatment unwieldy despite the apparently common issues." *IKO Roofing*, 757 F.3d at 603. But it abdicated that responsibility by brushing aside these difficulties based on erroneous views of contract law and of the contracts at issue, never grappling with the insurmountable practical obstacles they pose for a class trial. The resulting complications "are so grave that it [was] an abuse of discretion" to grant certification. *Ibid.*

### A.    Classwide Litigation Is Inferior Because Numerous Individual Releases Bar Many Class Members' Claims To Varying Degrees.

Trying this case as a class action would require the district court to account for the fact that many class members already released some or all of their claims in the aftermath of *Linerboard*, MDL 1261.  Although *Linerboard* settled in 2003, many putative class members opted out of the class and filed separate suits against most of the defendants here.  Between 2004 and 2008, these opt-out plaintiffs settled those actions, entering into broad releases that bar them from asserting any claims based on the pricing and sale of containerboard prior to the effective dates of each of their respective settlements.  D.E.763, Ex.39.  All told, 39 different settlement agreements apply to various plaintiffs and defendants in this action, which affect almost 10,000 of the individual claims at issue.  *See ibid*.

The periods covered by the releases significantly overlap with the class period here—February 2004 to November 2010—in some cases, barring claims arising from conduct occurring over the first *two-thirds* of the class period.  S.A.2.  But the releases also vary in scope, covering different time periods and parties.  Sorting out these variables would make litigation of this case as a class action hopelessly complex.  *See Andrews* v. *Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) (superiority absent where class proceedings would break down into "a multitude of individual, varied" claims, and proceeding as a class action was "neither 'economical' nor 'efficient' in any sense of those terms").

Tellingly, neither plaintiffs nor the district court ever attempted to explain how a classwide trial could proceed if these releases are given their legal effect.

49

Nor could they.  The intractable manageability problems the releases pose could not be mitigated by, for instance, simply limiting damages to the post-effective-date period for each settling plaintiff.  *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 367 (3d Cir. 2001) (class members cannot "rel[y] upon the common nucleus of operative facts" underlying released claims "to fashion a separate remedy … outside the confines of the Released Claims").  And relying entirely on limiting instructions to remind the jury which evidence could be considered as to which defendants and which class members would impermissibly risk juror confusion and prejudice.  *See Robinson*, 387 F.3d at 426 (reversing class certification on manageability grounds because "parties have an interest in ensuring that the jurors will have a reasonable chance of remembering which party presented which evidence").

The district court instead dismissed the complicating effects of these releases by deeming them inapplicable, based on a basic misunderstanding of contract law.  S.A.53-58.  The court noted that the *complaint* in *Linerboard* "allege[d] collusive behavior in the mid-nineties," while the alleged conduct here "occurred nearly a decade later," and on that basis deemed the releases irrelevant.  S.A.57.  This reading, the court believed, was necessary to avoid allowing releases to immunize future antitrust violations.  *Ibid.*  That reasoning erroneously conflates the conduct that gave rise to the *original* complaint in *Linerboard* with the scope of the releases that resolved the opt-out plaintiffs' *follow-on actions*.

In any event, as this Court has made clear, for releases of individual claims, it is not the scope of a *complaint*, but the terms of the *releases* themselves that dictate what claims are released. *See*, *e.g.*, *Wagner* v. *NutraSweet Co.*, 95 F.3d 527, 533 (7th Cir. 1996). This Court has not hesitated to enforce settlement agreements releasing known and unknown claims alike arising from all conduct that occurred before a settlement's effective date. *Ibid.* The releases here expressly released potential claims based on the price and sale of containerboard for "any conduct *prior to the Effective Date*," not limited to the conduct that gave rise to the original *Linerboard* allegations. *See*, *e.g.*, D.E.763, Ex.38, at IP1604631 (emphasis added).

The district court's concern that enforcing the releases would allow defendants to obtain permanent immunity from the antitrust laws is thus unfounded. The *Linerboard* releases bar only conduct prior to each release's effective date. They do not, as the district court thought, give defendants carte blanche "to keep colluding" (S.A.57) indefinitely. Nor would the unavailability of class treatment in this context leave claimants insufficient incentives to pursue their individual claims, as the many opt-out claims in *Linerboard* illustrate. It was error to certify a class despite releases that show there is no practical way the case could proceed to trial on a classwide basis.

## B.   Numerous Other Individualized Contract Defenses Make A Single Classwide Trial Unmanageable.

The *Linerboard* releases are just one example of the many types of individualized defenses that a jury would have to try to untangle in a classwide trial. Class members' purchase contracts also contain a plethora of divergent provisions that

give rise to individualized contract defenses, which would be case-ending for many putative class members and would materially limit many others' claims. But the district court wrongly discounted these individualized defenses and their effect of making class litigation impracticable.

Many putative class members' purchases were governed by individualized purchase contracts containing "disqualifying clauses," such as mandatory arbitration and mediation provisions, forum-selection clauses, jury waivers, provisions shortening the statute of limitations, and clauses eliminating certain remedies, such as treble damages. D.E.763, Ex.46. Indeed, for part of the class period, defendant Georgia-Pacific's standard terms for *all* containerboard and packaging sales included a Delaware forum-selection clause and significantly limited available remedies. *Id.*, Ex.43, at 1-2; *id.*, Ex.44, at 1-2.

Accounting for these contracts would require sorting through these provisions and delving into state-specific law to resolve any questions of enforceability or application. Some contracts with disqualifying clauses, for example, are not signed by all parties, *see* D.E.763, Ex.46, which undoubtedly will give rise to litigation over their enforceability. Disqualifying clauses found to be enforceable would destroy any possible cohesion among the class, curtailing the number of class members that can recover at all and sharply limiting the claims of others that remain. Classwide proceedings attempting to give fair weight to all of these individualized issues would be utterly unmanageable—especially in a classwide trial. *See Lozano* v. *AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) (holding that "predom-

inance was defeated" where "state-by-state review of contract" law would be required to assess enforceability of individual contract provisions).

The district court was wrong to give short shrift to these concerns. The court attempted to distinguish *Lozano* on the ground that the state-law contracts there directly precluded class actions. S.A.58. But *Lozano* was primarily concerned about the same type of "state-by-state review of contract" law that would undoubtedly cut cleavages through the class here, not the specific content of some of the individual provisions. 504 F.3d at 728; *cf. Walsh* v. *Ford Motor Co.*, 807 F.2d 1000, 1016 (D.C. Cir. 1986) (Edwards & R.B. Ginsburg, JJ.) (party seeking certification of nationwide class "must creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles'" (citation omitted)). Moreover, many of the disqualifying clauses—such as mandatory arbitration clauses and jury-waiver provisions—although not addressed to class certification itself, have the same effect of precluding affected plaintiffs from participating in class proceedings.

Even disqualifying clauses that do not categorically bar claimants from participating in a class action pose extreme practical complications that the district court was required, yet failed, to confront. Clauses imposing a diverse range of substantive restrictions that foreclose claims or certain relief (*e.g.*, altering limitations periods or permissible remedies) would make a coherent class trial all but impossible. And procedural limitations such as mandatory mediation and forum-selection clauses would splinter pre-trial proceedings.

The district court acknowledged, in fact, that it "may indeed be necessary" "to exclude those class members that purchased pursuant to a disqualifying clause." S.A.59.  That realization should have led the court to decline to certify a class unless and until plaintiffs demonstrate how these massive manageability problems can be resolved.  *See* Fed. R. Civ. P. 23(c), 2003 Advisory Committee's note ("A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met.").  But instead of heeding its own warning by declining to certify a class, the district court pressed ahead and certified a class anyway, claiming that its "authority under Rule 23(c)(1)(C) to modify the class any time before final judgment" could be deployed to solve any problems later.  S.A.59.  That approach does not comport with Rule 23.

Class certification is appropriate under Rule 23(b)(3) *only if* plaintiffs have "satis[fied] through evidentiary proof" each of Rule 23(b)(3)'s requirements.  *Comcast*, 133 S. Ct. at 1432.  That principle would be toothless if a court cognizant that a case will pose grave manageability difficulties may nevertheless certify a class and count on radically reshaping the class later on, after the litigation is well underway.  If the district court's view were the law, decisions certifying classes could never be reversed based on manageability concerns because the mere possibility of *post hoc* class-definition surgery and similar fixes would always be an answer.  *But see*, *e.g.*, *In re Bridgestone/Firestone, Inc. Tires Prods. Liability Litig.*, 288 F.3d 1012, 1015-19 (7th Cir. 2002) (class action not manageable where claims were governed by many different jurisdictions' laws).  Indeed, the district court's certify-first,

54

ask-questions-later approach impermissibly revives the practice of "conditional" certification that the 2003 amendments to Rule 23 specifically eliminated. Fed. R. Civ. P. 23(c), 2003 Advisory Committee's note.

There is nothing to be gained, and much to be lost, from including class members at the outset that very likely will have to be removed later. Putting off the questions raised by the releases and disqualifying clauses achieves no efficiency; the court ultimately must undertake the cumbersome task of ascertaining which class members' claims are contractually barred. And cutting members out of the class later cannot solve the problems posed by class members whose claims are merely limited but not totally foreclosed.

The practical effect of the district court's approach is to inflate artificially the case's potential value, increasing the prospect that defendants will be "coerce[d]" "into settling on highly disadvantageous terms regardless of the merits of the suit." *CE Design Ltd.* v. *King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011). That settlement pressure, untethered to the merit *vel non* of plaintiffs' claims, is precisely the type of unjust outcome that Rule 23(f) review exists to prevent. *See Blair* v. *Equifax Check Servs., Inc.*, 181 F.3d 832, 835 (7th Cir. 1999).

## CONCLUSION

The district court's class-certification ruling should be reversed, or alternatively vacated and remanded for the court to conduct the rigorous analysis that Rule 23 requires.

Dated: August 10, 2015

James T. McKeown
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 297-5530

Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600

*Counsel for Defendant-Appellant*
*International Paper Company*

Andrew S. Marovitz
Britt M. Miller
Joshua Yount
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600

Michael B. Kimberly
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
(202) 263-3127

*Counsel for Defendant-Appellant*
*Temple-Inland Inc.*

Margaret H. Warner
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

*Counsel for Defendant-Appellant*
*Weyerhaeuser Company*

Respectfully submitted,

  /s/ Miguel A. Estrada
Miguel A. Estrada
  *Counsel of Record*
Jonathan C. Bond
Jesenka Mrdjenovic
Lindsay S. See
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com

Ryan A. Shores
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 955-1500

Beth A. Wilkinson
Alexandra M. Walsh
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 223-7300

*Counsel for Defendant-Appellant*
*Georgia-Pacific LLC*

Stephen Y. Wu
Michelle S. Lowery
MCDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Suite 4400
Chicago, IL 60606
(312) 372-2000

*Counsel for Defendant-Appellant*
*Weyerhaeuser Company*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.    This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,998 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12-point New Century Schoolbook font.


Dated:  August 10, 2015                    _/s/ Miguel A. Estrada_____
                                           Miguel A. Estrada
                                           GIBSON, DUNN & CRUTCHER LLP
                                           1050 Connecticut Avenue, N.W.
                                           Washington, D.C.  20036
                                           (202) 955-8500
                                           mestrada@gibsondunn.com

## CIRCUIT RULE 30(d) STATEMENT

The undersigned attorney hereby certifies, pursuant to Circuit Rule 30(d), that all material required under Circuit Rule 30(a) and (b) is included in the Short Appendix and the Appendix submitted together with this brief.


Dated:  August 10, 2015                    /s/ Miguel A. Estrada
                                          Miguel A. Estrada
                                          GIBSON, DUNN & CRUTCHER LLP
                                          1050 Connecticut Avenue, N.W.
                                          Washington, D.C.  20036
                                          (202) 955-8500
                                          mestrada@gibsondunn.com

**STATUTORY ADDENDUM**

# STATUTORY ADDENDUM:
## TABLE OF CONTENTS

**Document**                                                                                                    **Page**

15 U.S.C. § 15 ............................................................................................................Add. 1

28 U.S.C. § 2072 ........................................................................................................Add. 2

Fed. R. Civ. P. 23 .......................................................................................................Add. 3

## 15 U.S.C. § 15.  Suits by persons injured

### (a) Amount of recovery; prejudgment interest

Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.  The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances.  In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—

(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

(2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

(3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.

### (b) Amount of damages payable to foreign states and instrumentalities of foreign states

(1) Except as provided in paragraph (2), any person who is a foreign state may not recover under subsection (a) of this section an amount in excess of the actual damages sustained by it and the cost of suit, including a reasonable attorney's fee.

(2) Paragraph (1) shall not apply to a foreign state if—

(A) such foreign state would be denied, under section 1605(a)(2) of title 28, immunity in a case in which the action is based upon a commercial activity, or an act, that is the subject matter of its claim under this section;

(B) such foreign state waives all defenses based upon or arising out of its status as a foreign state, to any claims brought against it in the same action;

(C) such foreign state engages primarily in commercial activities; and

(D) such foreign state does not function, with respect to the commercial activity, or the act, that is the subject matter of its claim under this section as a procurement entity for itself or for another foreign state.

**(c) Definitions**

For purposes of this section—

(1) the term "commercial activity" shall have the meaning given it in section 1603(d) of title 28, and

(2) the term "foreign state" shall have the meaning given it in section 1603(a) of title 28.

## 28 U.S.C. § 2072.  Rules of procedure and evidence; power to prescribe

(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals.

(b) Such rules shall not abridge, enlarge or modify any substantive right.  All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect.

(c) Such rules may define when a ruling of a district court is final for the purposes of appeal under section 1291 of this title.

## Fed. R. Civ. P. 23.  Class Actions

(a) PREREQUISITES.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

 (1) the class is so numerous that joinder of all members is impracticable;

 (2) there are questions of law or fact common to the class;

 (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

 (4) the representative parties will fairly and adequately protect the interests of the class.

(b) TYPES OF CLASS ACTIONS.  A class action may be maintained if Rule 23(a) is satisfied and if:

 (1) prosecuting separate actions by or against individual class members would create a risk of:

  (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

  (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

 (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

 (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

  (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

  (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

(c) Certification Order; Notice to Class Members; Judgment; issues Classes; Subclasses.

(1) *Certification Order.*

(A) *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

(B) *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

(C) *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

(2) *Notice.*

(A) *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

(B) *For (b)(3) Classes.* For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

(3) *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

(A) for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

(B) for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

(4) *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

(5) *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

(d) CONDUCTING THE ACTION.

(1) *In General.* In conducting an action under this rule, the court may issue orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

(B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

(i) any step in the action;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

(E) deal with similar procedural matters.

(2) *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

(e) SETTLEMENT, VOLUNTARY DISMISSAL, OR COMPROMISE. The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

(f) APPEALS. A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

(g) CLASS COUNSEL.

(1) *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class;

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(C) may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

(D) may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and (E) may make further orders in connection with the appointment.

(2) *Standard for Appointing Class Counsel.*  When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4).  If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

(3) *Interim Counsel.*  The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

(4) *Duty of Class Counsel.*   Class counsel must fairly and adequately represent the interests of the class.

(h) ATTORNEY'S FEES AND NONTAXABLE COSTS.  In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.  The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets.  Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

**SHORT APPENDIX**

### SHORT APPENDIX:
### TABLE OF CONTENTS

**Document**                                                          **Page**

District Court Class-Certification Order (Mar. 26, 2015) ..................................... S.A.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

KLEEN PRODUCTS LLC, *et al.*,
individually and on behalf of
all those similarly situated,

            Plaintiffs,

      v.

INTERNATIONAL PAPER, *et al.*,

            Defendants.

Case No.  10 C 5711
         (UNDER SEAL)

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion to Strike [ECF No. 845], and Plaintiffs' Motion for Class Certification [ECF No. 657.] These Motions have resulted in a deluge of briefing; the Class Certification Motion alone spawned seven separate briefs that total more than 300 pages (not including the attached exhibits) and that include two sur-replies and several notices of supplemental authority. The Court has rigorously analyzed all of the parties' submissions, and for the following reasons, Defendants' Motion to Strike [ECF No. 845] is granted in part and denied in part, and Plaintiffs' Class Certification Motion [ECF No. 657] is granted.

## I.  BACKGROUND

Plaintiffs are a proposed class of entities that directly purchased Containerboard Products from Defendants. Containerboard Products include containerboard itself and the various products made out of containerboard, such as containerboard sheets, which are used to make corrugated products like displays, boxes, and other containers. Plaintiffs allege that Defendants engaged in a conspiracy to artificially manipulate the market in order to increase the price of Containerboard Products in violation of antitrust laws. *See,* 15 U.S.C. § 1. The crux of Plaintiffs' Complaint is that Defendants agreed "to restrict the supply of containerboard by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory." [Pl.'s Mot. for Class Cert. at 1, ECF No. 660.] According to Plaintiffs, these actions illegally increased the price of containerboard, which caused them to pay more for Containerboard Products than they otherwise would have paid absent the conspiracy.

Plaintiffs seek to certify as a class:

All persons that purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010.

The proposed class definition also excludes certain groups from being class members:

> Specifically excluded from this Class are the Defendants; officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendants. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

Defendants oppose certification, arguing that Plaintiffs have not satisfied Rule 23.

## II.  LEGAL STANDARD

"To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012).  Rule 23(a) requires Plaintiffs to prove "numerosity, typicality, commonality, and adequacy of representation." *Id.* Plaintiffs in this case seek certification under Rule 23(b)(3), which also requires them to prove that:  (1) the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual members; and (2) a class action is superior to other available methods of resolving the controversy. *Id.*

Plaintiffs bear the burden of satisfying Rule 23, which is not "'a mere pleading standard.'" *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551-52 (2011)). To meet this burden, Plaintiffs must "satisfy through evidentiary proof" each of Rule 23's elements. *Id.* In deciding a class certification motion, the Court must conduct a "rigorous analysis" before it can determine whether Plaintiffs have satisfied Rule 23's requirements. *Id.* (internal quotation marks omitted). This often means that a Court must resolve issues that also bear on the merits of the claim, but only if those issues overlap with class certification issues. *Id.*

Despite the need for rigorous analysis, "the court should not turn the class certification proceedings into a dress rehearsal for a trial on the merits." *Messner,* 669 F.3d at 811. Instead, the Court need only consider the evidence submitted by the parties and determine whether Plaintiffs have proven each of Rule 23's elements by a preponderance of the evidence. *Id.*

### III. ANALYSIS

There are two preliminary issues the Court must address. First, the Seventh Circuit has held that "[w]hen an expert's report or testimony is 'critical to class certification,' . . . a district court must make a conclusive [*Daubert*] ruling on

- 4 -

**S.A.4**

any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Id.* at 812 (quoting *Am. Honda Motor Co. v. Allen,* 600 F.3d 813, 815–16 (7th Cir. 2010)). Expert reports in this case are indeed critical to class certification, but no Defendant has yet challenged Plaintiffs' experts on Rule 702 or *Daubert* grounds. To the contrary, Defendants have "expressly reserve[d] their right to move to exclude [Plaintiffs' experts] under *Daubert* and Rule 702." [Def.'s Mem. in Opp. to Pl.'s Mot. for Class Cert. ("Def.'s Opp. Br.") at 40 n.35, ECF No. 763.] Although Defendants vigorously challenge Plaintiffs' experts' methodology and conclusions in the context of arguing that Plaintiffs' have not satisfied Rule 23, none of those arguments are based on Rule 702 or *Daubert.* Defendants have not challenged, for example, Plaintiffs' experts' education or qualifications. The Court therefore reserves ruling on Plaintiffs' experts' admissibility until Defendants raise and brief that issue.

Second, Defendants seek a full evidentiary hearing prior to the Court deciding whether to certify the class. Plaintiffs oppose such a hearing, arguing that it is unnecessary and would waste time and money. Several courts have held evidentiary hearings prior to deciding a class certification motion, *see, e.g., In re Groupon, Inc. Sec.*

*Litig.,* No. 12 C 2450, 2014 WL 2035853, at *2 (N.D. Ill. May 16, 2014), but as far as the Court is aware, such hearings are not required. Rather, the Supreme Court and Seventh Circuit have admonished district courts not to simply accept Plaintiffs' pleadings as true and to conduct a "rigorous analysis" of the Plaintiffs' class certification claims. *See, Comcast Corp.,* 133 S.Ct. at 1432 ("Repeatedly, we have emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question . . . .") (internal quotation marks omitted). As stated above, the parties have submitted an avalanche of briefing and opposing expert reports that set forth the parties' positions on the issues. Included in this briefing are thousands of pages of documents substantiating the parties arguments. Moreover, the parties' central dispute is legal, not factual. The dispute centers mainly on the proper legal standard under Rule 23 and whether Plaintiffs' experts' reports are enough to satisfy that standard. For the most part, the parties agree on the basic facts, and both parties' experts rely upon the same data, so there are little if any factual disputes that the Court must resolve to decide class certification. Given the extensive paper record and the completeness of the parties' briefing, an evidentiary hearing would not add much to the Court's analysis. Thus, the Court

is confident that it can determine class certification based on a careful examination of the evidentiary record the parties have submitted.

Having resolved those threshold issues, the Court must first decide Defendants' Motion to Strike some of the materials Plaintiffs submitted with their reply brief.  Once that issue is decided, the Court can then determine whether Plaintiffs have satisfied Rule 23.  All Defendants have joined in a single response to Plaintiffs' Class Certification Motion, to which Plaintiffs have replied.  Defendant RockTenn joined in the combined response but also filed a separate response to the Class Certification Motion based on arguments that apply only to RockTenn.  Plaintiff replied to RockTenn's response, to which RockTenn filed a Sur-reply, which prompted Plaintiffs to file a Sur-sur-reply.  After deciding the Motion to Strike, the Court will first consider the joint opposition to class certification and then consider RockTenn's unique opposition.

### A.  Motion to Strike Plaintiffs' Reply Experts' Reports

Plaintiffs' initial Class Certification Motion contained expert reports from Drs. Mark Dwyer and Michael Harris. Defendants' combined response to the Motion included expert reports from Drs. Janusz Ordover and Dennis Carlton, who both criticized Plaintiffs' experts' reports in a number of ways,

including a criticism of Plaintiffs' experts' choice of
testing and methodology to prove class-wide injury. In
response, Plaintiffs obtained reply expert reports from Drs.
Dwyer and Harris, and also obtained a report from a new
expert, Dr. Douglas Zona. Defendants have moved to strike
certain portions of Dr. Dwyer's reply report and all of Dr.
Zona's report.

Federal Rule of Civil Procedure 26(a)(2) governs expert
discovery and "requires a party to disclose to the other
parties a written report of a retained expert that includes 'a
complete statement of all opinions the witness will express
and the basis and reasons for them.'" *Sloan Valve Co. v. Zurn
Indus., Inc.,* No. 10 C 204, 2013 WL 3147349, at *1 (N.D. Ill.
June 19, 2013) (quoting FED. R. CIV. P. 26(a)(2)(b)(i)). An
expert rebuttal report is meant to "contradict or rebut
evidence" disclosed in the initial report, FED. R. CIV.
P. 26(a)(2)(D)(ii), and its "proper function . . . is to
contradict, impeach or defuse the impact of the evidence
offered by an adverse party." *Pearls v. Terre Haute Police
Dep't,* 535 F.3d 621, 630 (7th Cir. 2008). Rule 26 does not
address reply expert reports, but, much like reply briefs,
parties may not advance new arguments for the first time in a
reply expert report. *Sloan Valve Co.,* 2013 WL 3147349, at *1.
If a reply expert report is truly rebuttal evidence, then it

is admissible and the opposing party is not entitled to respond to it. *Id.* at *4. If, however, the reply report contains new opinions that are not proper rebuttal testimony, the report must be stricken. *Id.* at *2–3.

### 1. Dr. Dwyer's Reply Report

Plaintiffs' disclosed Dr. Dwyer as an expert within the time frame outlined in the Court's scheduling order. The question is whether his reply report constitutes new and alternative opinion testimony or is instead proper rebuttal testimony in support of his original report.

*Sloan Valve Co.* is instructive. In that case, the plaintiff's initial expert report calculated damages based on "collateral unit sales ratios," and in that report the expert included data on both weighted and unweighted ratios. *Id.* at *2. Despite including both sets of data, the expert's damages calculation relied solely on the weighted ratios. *Id.* In response, the defendant's expert attacked the plaintiff's expert for relying upon only the weighted ratios. *Id.* Consequently, the plaintiff's expert's reply report conducted a new calculation using the unweighted ratios in order to demonstrate that using the unweighted ratios would not change his initial conclusions. *Id.* The court found that this was proper reply expert testimony because, "rather than offering a new opinion and changing the basis for the calculation of the

collateral unit sales, [the plaintiff's reply expert] included the [new] calculation . . . to refute [the defendant's expert's] criticisms." *Id.*

The plaintiff's reply expert report also included a "revised and increased estimate of incremental costs" based on data that the defendant first disclosed in its rebuttal expert's report. *Id.* at *3. The court refused to strike that reply expert testimony because it was based on data that was previously unavailable to the plaintiff's expert due to the defendant's failure to disclose it. *Id.* Finally, the court struck a portion of the plaintiff's expert report that constituted "a new, alternative collateral sales calculation" based on data that was available to the plaintiff's expert when he filed his initial report. *Id.* The plaintiff argued that the new calculation was in response to the defendant's expert's criticism, but the court found that the opinion was new because it included a new opinion based on data that was not a part of the plaintiff's expert's initial report, though it was available to him. *Id.*

In this case, Dr. Dwyer's initial report concluded that "all or nearly all members of the proposed class were impacted by price increases implemented by the defendants," which is explored more thoroughly below in the Court's analysis regarding class certification. Dr. Dwyer's conclusion was

based on "systematic, empirical comparisons of net prices paid by class members of Containerboard Products before and after price increase implementation dates previously announced by the defendants." Defendants' experts criticized Dr. Dwyer for conducting what Defendants call a "one penny more" analysis, where any increase in price is attributed to Defendants' alleged conduct. This, according to Defendants, means that Dr. Dwyer's methods did not account adequately for other factors that would have caused an increase in price even without a conspiracy. Defendants' experts argue that Dr. Dwyer should have done a "but-for" analysis to determine antitrust impact.

In his reply, Dr. Dwyer does the analyses that Defendants' experts argue he should have done initially. Importantly, Dr. Dwyer does not abandon his prior methods or conclusions. Rather, he conducted the additional analyses to refute Defendants' arguments and to show that his original conclusions and opinions are sound and a reliable method of assessing antitrust impact. This makes Dr. Dwyer's reply report remarkably similar to the reply report allowed in *Sloan Valve Co.* Much like the reply report in that case that included new calculations based on the same data included in the initial report, here Dr. Dwyer's reply report is based on the same data in his original report and does not seek to

- 11 -

**S.A.11**

include new data.  Instead of abandoning his prior methods in favor of the new ones, Dr. Dwyer's reply concludes that the new calculations support his initial methodology and opinions. Dr. Dwyer further concludes that Defendants' experts are wrong when they say that the additional testing and methods show that there is no antitrust impact. This is the very purpose of a reply report:  to refute a defendant's expert's arguments and to provide further support, rather than abandoning, one's initial opinions. Dr. Dwyer will be held to the original methodology and opinions in his initial report, but that does not mean he cannot respond to Defendants' experts' criticisms in defending his initial conclusions.  Thus, the Court denies Defendants' Motion to Strike to the extent that it seeks to strike portions of Dr. Dwyer's reply report.

### 2.  *Dr. Zona's Reply Report*

Dr. Zona was not initially an expert disclosed before class certification briefing.  Dr. Zona is an expert Plaintiffs hired to examine "the opening expert reports submitted by Drs. Harris and Dwyer, as well as the reports submitted by Drs. Carlton and Ordover."  He also conducted his own "but-for" analysis and concludes that Dr. Dwyer's "methodology and opinions on both impact and damages [is] reliable and valid."

Defendants are probably correct that Dr. Zona's report should be stricken. The Court need not engage in lengthy analysis, however, because Plaintiffs do not need Dr. Zona's report to satisfy Rule 23, a point Plaintiffs concede. Thus, the Court grants Defendants' Motion to Strike Dr. Zona's report.

## B. Class Certification — Combined Arguments

Having narrowed the range of expert evidence to only the reports and deposition testimony of Drs. Dwyer, Harris, Ordover, and Carlton, the Court now considers whether to certify Plaintiffs' proposed class based on the parties' combined briefing.

### 1. Rule 23(a) Elements

In order to warrant class certification, Plaintiffs must prove "numerosity, typicality, commonality, and adequacy of representation." *Messner,* 669 F.3d at 811. As Defendants correctly note, Rule 23(b)'s predominance standard often overlaps with typicality, commonality, and adequacy. Thus, Defendants have focused their arguments on predominance issues rather than individually attacking each of Rule 23(a)'s elements. Essentially, Defendants have conceded that typicality, commonality, and adequacy have been satisfied so long as Plaintiffs have adequately proven predominance.

As to numerosity, Defendants have not specifically challenged that element in their briefing, and the element is easily satisfied in this case. The sales data relied upon by both parties' experts establish that the proposed class numbers in the thousands. A potential class that large is sufficiently numerous for Rule 23(a) purposes. *See, Schmidt v. Smith & Wollensky LLC,* 268 F.R.D. 323, 326 (N.D. Ill. 2010).

### 2. Rule 23(b)(3) Elements

Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Court will discuss predominance first and then, if necessary, superiority.

### i. Predominance

The parties' statements of the proper legal standard for determining predominance differ greatly. To read Plaintiffs' version, one would think that predominance naturally flows from the fact that this is an antitrust case. [Pl.'s Mot. for Class Cert. at 49, ECF No. 660.] Defendants' version, on the other hand, would lead one to believe that the Supreme Court's opinion in *Comcast* makes satisfying predominance nearly

- 14 -

insurmountable. [Def.'s Opp. Br. at 23–27, ECF No. 763.]   The truth is somewhere in the middle.

The predominance inquiry under Rule 23(b)(3) "'trains on the legal or factual questions that qualify each class member's case as a genuine controversy,' with the purpose being to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Messner,* 669 F.3d at 814 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)).   Predominance is similar to Rule 23(a)'s typicality and commonality requirements, but "the predominance criterion is far more demanding." *Id.* (internal quotation marks omitted).   And although the Supreme Court has said that "predominance is a test readily met" in antitrust cases, that simply means that "in antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification." *Id.* at 815 (internal quotation marks and citation omitted).   This does not, however, make class certification automatic in antitrust cases. *See, id.*

Generally, predominance is satisfied when "'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication.'"   *Id.* (quoting 7AA Wright and Miller, Federal Practice & Procedure § 1778 (3d Ed. 2011)).   In other words, "common questions can predominate if a common nucleus

– 15 –

**S.A.15**

of operative facts and issues underlies the claims brought by the proposed class." *Id.* (internal quotation marks omitted). The presence of some individual questions is not fatal, but individual questions cannot predominate over the common ones. *Id.* To determine if a question is common, the Court must look to the evidence necessary to answer that question; if "the members of a proposed class will need to present evidence that varies from member to member" to answer the question, then the question is an individual one. *Id.* (internal quotation marks omitted). Conversely, "if the same evidence will suffice for each member" to answer the question at issue, then the question is common. *Id.*

"Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S.Ct. 2179, 2184 (2011)). In the antitrust context, plaintiffs must prove: "(1) that [Defendants] violated federal antitrust law; and (2) that the antitrust violation caused them some injury." *Id.* Plaintiffs must also show damages, but "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification." *Id.* (citing *Wal-Mart,* 131 S.Ct. at 2558).

To provide a clearer analysis, the Court will discuss each antitrust element separately, keeping in mind that

"Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove" that each individual element is "susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds,* 133 S.Ct. 1184, 1196 (2013). "Rather, the inquiry is more holistic." *In re High-Tech Employee Antitrust Litig.,* 985 F.Supp.2d 1167, 1184 (N.D. Cal. 2013). And although predominance analysis is not simply "bean counting," *Butler v. Sears, Roebuck and Co.,* 727 F.3d 796, 801 (7th Cir. 2013), analyzing each element separately is useful in isolating what questions are common and determining whether those questions predominate.

### a. Plaintiffs' Liability Proof

Plaintiffs have established that common questions regarding liability predominate over any individual issues. Plaintiffs' theory of liability is based on Defendants' alleged conspiracy to coordinate supply restrictions and price increase announcements in order to cause the price of Containerboard Products to increase. To prove each element of a conspiracy, virtually all class members would be relying on the same evidence that Plaintiffs have submitted in support of class certification — namely the documents, emails, phone records, and other indirect evidence necessary to prove that Defendants conspired in violation of antitrust laws. This type of alleged conspiracy is the prototypical example of an issue

where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence. *See,* 7AA Wright & Miller, Federal Practice & Procedure § 1781 (3d Ed. 2014) ("[W]hether a conspiracy exists is a common question that is thought to predominate over the other issues in the case and has the effect of satisfying the prerequisite in Rule 23(b)(3).").

Defendants' arguments on this issue go entirely to the merits of Plaintiffs' conspiracy claims. Defendants argue that Plaintiffs have not established a conspiracy, offering up several innocent reasons for their conduct. Defendants also attach great significance to Plaintiffs' failure to produce any explicit, direct agreement among Defendants to fix prices. Because Plaintiffs have not proven an actual conspiracy, Defendants argue that the Court should deny class certification.

But whether Defendants actually conspired is not the issue before the Court. The issue is whether the conspiracy question will be decided by evidence common to the class, and both parties have demonstrated that the evidence either proving or disproving a conspiracy will be common to the entire class. Defendants' arguments on this point are

identical to the defendants' liability arguments in *In re Polyurethane Foam Antitrust Litigation,* No. 1:10 MD 2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014). In that case, the defendants argued that "the price-fixing conspiracy alleged in the Complaint did not exist," based on "the failure of discovery to yield evidence of any agreement among foam manufactures to fix the timing or content of price increase letters." *Id.* at *16 (internal quotation marks and alterations omitted). The defendants also argued that their conduct was "consistent with legal and economic theory predictions of behavior" in the relevant markets. *Id.* The court rejected those arguments at the class certification stage, noting that those arguments "do not succeed in showing liability questions — however answered — cannot be answered through common proof." *Id.*

Like the defendants in *In re Polyurethane Foam,* Defendants' arguments here do not demonstrate the lack of common proof; rather, Defendants' own evidence tending to disprove a conspiracy is common to the entire class. Defendants' arguments, if correct, might entitle them to summary judgment or a verdict in their favor, but such merits arguments are inapplicable at this stage. *Id.* Thus, Plaintiffs have established that common questions predominate the liability issue.

b.  Plaintiffs' Impact Proof

The heart of the battle in this case lies in the second element, *i.e.,* causation, which is often referred to as antitrust impact.  According to Defendants, individual issues overwhelm the common questions regarding impact because Plaintiffs' experts have not provided a just and reliable method of proving that the alleged antitrust violations harmed all or nearly all class members.  Thus, according to Defendants, Plaintiffs' only avenue of proving causation is through individual proof relating to each of the thousands of class members, which makes class certification inappropriate.

Given the parties' overlapping arguments relating to impact and damages, the Court must first outline an important distinction:  "impact" and "damages" are two separate elements in an antitrust claim.  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation,* 256 F.R.D. 82, 88 (D. Conn. 2009). Impact is "*whether* the plaintiffs were harmed," whereas "damages quantify *by how much*." *Id.*  Parties and courts often conflate the two, leading to "confusion about what a plaintiff's burden precisely is at the motion for class certification stage." *Id.* Oftentimes, demonstrating impact and damages involves "comparing the 'but-for' price — the price a customer would have paid in the absence of the conspiracy —

and the actual price paid." *Id.* When that happens, the single comparison establishes both impact and damages. *Id.* Thus:

> [O]ne way of demonstrating predominance is to show that there is a common method for proving that the class plaintiffs paid higher actual prices than in the but-for world, such as using an econometric regression model incorporating a variety of factors to demonstrate that a conspiracy variable was at work during the class period, raising prices above the "but-for" level for all plaintiffs.

*Id.* Defendants in this case base a large portion of their impact arguments on the perceived lack of a "but-for" analysis.

But, "where other methods of common proof exist to show class-wide impact such as lock-step increases of national price lists in an oligopolistic market, comparing 'but-for' prices with actual transaction prices is not the *only* way for plaintiffs to succeed in an motion for class certification." *Id.* For example, "'if it appears that plaintiffs may be able to prove at trial . . . the price range was affected generally,'" then the plaintiffs can show impact without a "but-for" comparison, and this is so even if there are negotiated prices or a variety of prices. *Id.* (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996)); *see also, In re Urethane Antitrust Litig.*, 768 F.3d at 1254–55. The court in *Hedges* summed up this point succinctly:

> The proof necessary to demonstrate that the defendants conspired to maintain an inflated "base" from which all pricing negotiations began and that this "base" price was higher than the "base" price which would have been established by competitive conditions would be common to all members of the class. Proof of a conspiracy to establish a "base" price would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary. . . . [T]he proof with respect to the "base" price from which these negotiations began, or the structure of the conspiracy to affect individual negotiations, would be common to the class. Accordingly . . . the fact of damage is predominantly, if not entirely, a common question.

*Hedges Enters., Inc. v. Cont'l Grp., Inc.,* 81 F.R.D. 461, 475 (E.D. Penn. 1979). Courts have long held that a plaintiff can demonstrate antitrust impact by showing that the conspiracy caused an increase to the standard market price of the product at issue. *See, e.g., In re Urethane Antitrust Litig.,* 768 F.3d at 1254–55 (finding impact satisfied for class certification purposes based in part on evidence of "parallel issuance of similar product . . . price-increase announcements"); *In re Urethane Antitrust Litig. (Urethane II),* 251 F.R.D. 629, 638 (D. Kan. 2008) ("[E]vidence of a standardized pricing structure, which (in light of the alleged conspiracy) presumably establishes an artificially inflated baseline from which any individualized negotiations would proceed, provides generalized proof of class-wide impact."); *In re Indust. Diamonds Antitrust Litig.,* 167 F.R.D. 374, 383

(S.D.N.Y. 1996) ("[I]f a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury.").

This distinction between impact and damages is crucial in a case like this, where Plaintiffs have presented (1) record and expert evidence independently showing impact and (2) an econometric model that attempts to prove both damages and therefore impact. Because Plaintiffs do not rely solely on their econometric damages model for their impact proof, Defendants' impact arguments based on the lack of a "but-for" comparison are ineffective. *See, e.g., In re EPDM Antitrust Litigation,* 256 F.R.D. at 88–89. Those arguments go to damages, not impact. With this distinction in mind, the Court now addresses impact.

Demonstrating antitrust impact for class-certification purposes does not require that Plaintiffs *prove* antitrust impact. Instead, Plaintiffs need "only to demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Messner,* 669 F.3d at 818 (internal quotation marks omitted). The focus, then, is on the evidence necessary to establish antitrust impact, not on whether Plaintiffs have adequately proven it. Again, the

Court's overriding concern is whether Plaintiffs have established that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amgen Inc.,* 133 S.Ct. at 1196 (internal quotation marks omitted).

Although Defendants have concentrated their impact arguments on the expert evidence, the Court looks to all the evidence to determine whether Plaintiffs have established that evidence common to the class is capable of proving antitrust impact. *See, In re Urethane Antitrust Litig.,* 768 F.3d 1245, 1255–56 (10th Cir. 2014). The evidence in this case that goes to antitrust impact consists of (1) record evidence, which Plaintiffs allege shows illegal and anticompetitive conduct that increased the base price for Containerboard Products, (2) testimony from Dr. Harris regarding Defendants' industry and its susceptibility to collusive conduct, and (3) testimony from Drs. Dwyer and Harris that purport to establish that all or nearly all class members suffered harm as a result of the conspiracy.

First, Plaintiffs' have mustered a large amount of record evidence relevant to impact, which is mostly duplicative of their conspiracy evidence. Specifically, Plaintiffs produced evidence of what appears to be coordinated price increases, coordinated supply reductions, and other similar conduct that, according to Plaintiffs, Defendants would not have engaged in

unless acting as part of a conspiracy.  Plaintiffs also point
to memoranda, phone calls, and trade association meetings that
show the ability for Defendants to communicate with and
monitor each other regarding their allegedly collusive
activity.

Defendants respond by pointing to other evidence showing
that they added capacity and supply during the class period,
which would negate some of Plaintiffs' factual claims.
Defendants also argue there are innocent reasons for their
conduct.  The Court need not decide at this stage which
evidence to believe, however, because regardless of these
factual disputes, the evidence on both sides is common to all
class members.  The question is whether Defendants' industry
made it possible for them to collude in a way that would allow
them to harm all or nearly all class members, and the evidence
that both parties rely on to answer that question is common to
the class.

Second, Plaintiffs rely on Dr. Harris to establish that
the Containerboard Products market was ripe for collusion
during the class period, and that Defendants' conduct is more
likely the result of collusion than independent behavior.  Dr.
Harris conducted a "structure, conduct, performance" ("SCP")
analysis to determine whether "the structure, conduct, and
performance of [Defendants'] industry [was] consistent with,

and likely to facilitate, collusive conduct, thereby providing a motive to collude and suggesting that any collusion would be broadly successful." [Declaration of Dr. Harris at 5, ECF No. 658-2.] Dr. Harris also considered whether Defendants' conduct during the class period was more consistent with "concerted action or their unilateral self-interest." [*Id.*] Ultimately, Dr. Harris concludes that (1) "the economic evidence shows that Defendants had the motive, opportunity, and means to collude and were they to do so, . . . they would have succeeded," and (2) "the conduct of the Defendants was more consistent with collusion than with independent economic decision-making." [*Id.*]

In support of these opinions, Dr. Harris looked at a variety of industry-wide figures like capacity, operating rates, inventory, demand, and pricing in the containerboard market. Importantly, Dr. Harris found that the "vast majority of sales of . . . Containerboard Products are pegged to published price indices," the most common of which is the price for "42# Kraft liner [published] in Pulp and Paper Weekly ("PPW")." The PPW index in this case is critical because Drs. Harris and Dwyer rely in part on the movement of that index in demonstrating that all or nearly all class members suffered antitrust impact, as discussed more thoroughly below.

As to the "structure" portion of the SCP analysis, Dr. Harris analyzed the extent to which the Containerboard Products market is highly concentrated and the barriers to entry in that market.  The evidence shows that, in 2003, only six North American firms controlled 72% of the Containerboard Products market, and by 2007, those six firms became five and accounted for 74% of the market.  The evidence also shows, and Defendants do not challenge, that there are significant barriers to any new firms entering the market, such as the enormous amount of capital necessary to start a new firm.  Dr. Harris also analyzed Containerboard Products to determine whether they are homogenous, which would mean that class members would see all Defendants as essentially offering the same product.  If this is so, then the primary method of competition in the Containerboard Products market is price, rather than some other factor.  Dr. Harris concludes that product homogeneity makes collusion easier, and finds that Containerboard Products are interchangeable commodities that are highly homogenous.  This conclusion is based on Defendants' own statements, presentations, and tax filings, which tend to show that Defendants admit the commodity nature of Containerboard Products.

Finally, Dr. Harris analyzed the frequency of Defendants' interactions amongst each other and their participation and

membership in trade associations.  A conspiracy is much less likely to exist, Dr. Harris concludes, if firms communicate rarely.   On the other hand, constant communication and participation in trade association events provide a fertile ground for collusion.  Dr. Harris relies on academic economic literature for his conclusion "that trade associations tend to facilitate collusive conduct," and the evidence indeed shows that Defendants frequently interacted with each other as a part of their business operations and at various trade association meetings.  Based on all this evidence and his own expert experience and opinion, Dr. Harris concludes that the "structural characteristics of the industry . . . are consistent with and would facilitate successful collusion among the Defendants."

As to the conduct portion of the SCP analysis, Dr. Harris looked at mill closures, operating rates/inventories/trades, downtime/slowback, coordinated pricing, monitoring, direct communication among Defendants, and Defendants' prior history of antitrust violations.  In general, Dr. Harris concludes that, in the face of constant and increasing demand during the class period, Defendants reduced capacity — and therefore supply — by closing or slowing down the rate of production at mills. Specifically, Dr. Harris points to strategic mill closures or "downtime" that reduced capacity and supply in the

face of "strong growth in box demand." Also important to Dr. Harris's analysis are the various price increase announcements that occurred during the class period. Defendants collectively announced fifteen price increases during the class period, nine of which were fully implemented. Defendants made these various announcements at near-identical times and for near-identical amounts. These announcements often occurred very shortly after various trade association meetings. Dr. Harris concludes that this conduct runs contrary to what independent firms would do when faced with similar market conditions and that Defendants' conduct is more consistent with collusive behavior than with normal, unilateral activity.

As to the "performance" portion of the SCP analysis, Dr. Harris relies on Dr. Dwyer's report, which Dr. Harris concludes is sound and founded in accepted economic theory. Based on Defendants' actual economic performance, Dr. Harris concludes that Defendants' performance is consistent with collusion.

Defendants hurl several attacks at Dr. Harris's opinions. First, Defendants argue that Dr. Harris failed to define the relevant market for purposes of his SCP analysis. According to Defendants, this failure is fatal and makes Dr. Harris's analysis useless. Defendants contend that Containerboard Products cannot possibly be a single market, because

Containerboard Products include containerboard and corrugated products, which are not interchangeable and thus are not part of the same market. *See, Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 710 (7th Cir. 1977).

Dr. Harris correctly responds, however, that the Containerboard Products market is the relevant market, and this is so despite the fact that the market includes both containerboard and corrugated products. Defendants draw an analogy between components of a personal computer and the personal computer itself, arguing that the components and the computer could not possibly be the same market, and therefore containerboard and corrugated products likewise cannot comprise a single market. The analogy fails because the analogs are not truly analogous; containerboard is not *a* component that goes into a corrugated product, it is *the* component. As Dr. Harris points out, containerboard is simply a corrugated product that hasn't been folded yet. Moreover, containerboard has no other use except for being folded into a corrugated product. And, there are no substitutes for containerboard — that is, corrugated products cannot come from some other source other than containerboard. Perhaps most importantly, Defendants' businesses are vertically integrated such that "the firms who manufacture the containerboard are the very same firms who convert that containerboard into

corrugated products." [Reply Declaration of Dr. Harris at 24, ECF No. 826-2.] This means that there is no useful or principled way to separate the two into separate markets; they appear to be part in parcel of the same market. Thus, the Court finds that Plaintiffs have established and defined the relevant market for antitrust purposes.

Defendants next criticize Dr. Harris for failing to conduct a "but-for" analysis for each event that Dr. Harris analyzed, such as mill closures and downtime. In short, Defendants argue that Dr. Harris should have looked to each individual event during that class period, such as each mill closure, and then determined whether that specific event would have occurred even absent a conspiracy, and then further analyzed whether that specific event caused all or nearly all class members to pay higher prices than they otherwise would have paid.

Aside from "but-for" analysis not being required to show antitrust impact, this argument fails because it sets the hurdle too high. Defendants have not pointed to any case law or economic theory that says an expert conducting a SCP analysis must look at all events in isolation, and then view each individual event to see if that event specifically is the one that caused antitrust impact. To the contrary, it is a well-accepted practice to look to industry events as a whole

- 31 -

**S.A.31**

to determine whether a defendant's conduct is consistent with collusion, as Dr. Harris does with his SCP analysis. *See, In re Processed Egg Prods. Antitrust Litig.,* --- F.Supp.3d ---, No. 08-md-2002, 2015 WL 337224, at *11 (E.D. Penn. Jan. 26, 2015). Dr. Harris correctly notes that "[n]othing in economic theory suggests that individuals or firms act on the basis of a single reason or animating event." [Reply Declaration of Dr. Harris at 24, ECF No. 826-2.] Dr. Harris's analysis simply looked at all of Defendants' capacity-reducing decisions in total to determine whether they were more likely the result of collusion or not. Plaintiffs' theory of harm is that Defendants' collusive actions caused an increase in the market price of Containerboard Products, which harmed all or nearly all class members, and Dr. Harris's SCP analysis is consistent with and supports that theory. Several courts have relied on an expert's analysis on the structures and features of a market in certifying a class. *See, e.g., In re EPDM Antirust Litig.,* 256 F.R.D. at 90 ("The plaintiffs have not merely alleged that these prices lists existed and that they affected all EPDM purchasers — they have . . . provided expert opinion that the structural characteristics of the EPDM market would support collusive increases of prices to artificially high levels.").

Third, Plaintiffs rely on Dr. Dwyer's analysis of Defendants' conduct and the corresponding movement of the PPW index to demonstrate impact. Dr. Dwyer looked at "industry-wide reflections of price and actual prices paid by class members before and after" Defendants' price increase announcements. [Report of Mark Joseph Dwyer, Ph.D., at 7, ECF No. 658-4.] Dr. Dwyer's analysis started with looking at the nature of Defendants' price increase announcements. Of those fifteen announcements, fourteen included all Defendants. For eleven of those fifteen, the announcements were made during the same month. And, for all fifteen, the amount of the increased price was either identical or near-identical across all Defendants. Because of the "lock-step" nature of these price increase announcements, Dr. Dwyer found that "[t]he extent to which the [Defendants'] price increase announcements are reflected — both in timing and in magnitude — in a published price index for linerboard is indicative of impact on prevailing market prices and therefore of the class-wide price impact of such announcements." [*Id.* at 8.] Such a method is a common way that courts have allowed experts to demonstrate impact. *See, In re Urethane Antitrust Litig.,* 768 F.3d at 1254–55.

As briefly mentioned above, the PPW index is the price index Dr. Dwyer relied on for his analysis. PPW and its price

index are published by "RISI," which is a private publisher
that has been publishing the PPW index consistently for thirty
years, including throughout the class period. As Dr. Dwyer
explains:

> Every third week of the month, PPW publishes price
> indexes for a variety of paper products, including
> linerboard and corrugated medium. These transaction
> price indexes are based on surveys of buyers and
> sellers of a particular containerboard grade. RISI
> included in the prices it published in its surveys
> only those related to transactions between non-
> affiliated parties. Internal transfers and trades
> between producers were excluded. PPW also excludes
> transactions that were contractually tied to a price
> index. These filters make the indexes more
> representative of the prices class members actually
> paid.

[Report of Mark Joseph Dwyer, Ph.D., at 9, ECF No. 658-4.] Of
the various products that PPW provides an index for, Dr. Dwyer
relied on the price for "42 lb. unbleached kraft linerboard."
[*Id.*] This index price, according to Dr. Dwyer, "is used as
the industry linerboard price in [Defendants'] own analysis of
industry pricing." [*Id.*] This is supported by evidence
indicating that Defendants do indeed rely upon the PPW index
in setting their prices for Containerboard Products,
negotiating prices in individual contracts, and analyzing the
market. [Pl.'s Mot. for Class Cert. at 9, ECF No. 660 (citing
evidence ranging from Defendants' own documents to deposition
testimony demonstrating the pervasive use of the PPW index in
determining Containerboard Product pricing).]

In comparing the PPW index and Defendants' price increase announcements, Dr. Dwyer found that nine of the fifteen announcements "are reflected by increases in the PPW Index after the effective dates of those announced increases." [Report of Mark Joseph Dwyer, Ph.D., at 11, ECF No. 658-4.] Most importantly, in all nine instances, the dollar amounts that the PPW index increased matched Defendants' announced increase. According to Dr. Dwyer, "[i]f a substantial portion of survey participants had reported that they did not experience a price increase, the PPW Index would not reflect an increase identical to what the defendants had announced." [*Id.*] In other words, Defendants collectively announced near-identical price increases, and shortly following those announcements, the PPW index showed that most customers experienced an increase in price exactly equal to the price increase Defendants announced. Thus, the lock-step increase in the PPW index that followed and tracked Defendants' collective price-increase announcements demonstrates that nearly all class members suffered antitrust impact.

Defendants first counter Dr. Dwyer's PPW index assessment by arguing that there is nothing surprising about the fact that a published index price would increase once manufacturers in a market announce that prices are increasing. In logical terms, Defendants characterize Dr. Dwyer's analysis as running

– 35 –

**S.A.35**

afoul of the *post hoc ergo propter hoc* fallacy: that the PPW index increased *after* Defendants announcements does not necessarily mean it increased *because* of those announcements.

But, as Dr. Dwyer states, there is more than simple correlation here. First, there is more to the relationship between Defendants' price increase announcements and the PPW index than, say, the relationship between a Chicagoan jumping on one foot and not being eaten by a wild lion. It would be absurd to say that, because the Chicagoan was not eaten by a lion after jumping on one foot, jumping on one foot must keep lions away. That is because there are several reasonable, common-sense alternatives for why the Chicagoan was not eaten by a lion — for one, the lack of wild lions roaming Chicago. But here, as Dr. Dwyer demonstrates, there does not appear to be any other reasonable explanation for such a close relationship between the PPW index and Defendants' price increase announcements. Moreover, the source of the PPW index is known; the index represents actual prices purchasers paid following Defendants' price increase announcements. This constitutes strong evidence that Defendants' price increase announcements caused the PPW index to increase. And this, in turn, constitutes strong evidence that all or nearly all class members were impacted by the increased price, given

Plaintiffs' evidence regarding the paramount importance of the PPW index in setting prices.

Defendants also argue that Plaintiffs' reliance on the PPW index in analyzing impact is misplaced. Defendants argue that the index does not reflect class member's actual transaction prices because it is "not a mathematical reflection of actual transaction prices; it is a level that virtually nobody actually pays for tonnage within assessed specifications." [Def.'s Opp. Br. at 14, ECF No. 763.] Additionally, Defendants argue that a large number of class members individually negotiated a price rather than simply paying the index price. These arguments miss the mark because Plaintiffs have produced evidence showing that (1) Defendants largely rely on the PPW index in setting prices, and (2) in most individually negotiated contracts, the PPW index factored into the negotiated price. At the least, Plaintiffs have presented sufficient evidence that would allow a fact-finder to infer that, even for negotiated prices, the starting point for those negotiations would be higher if the market price for the product was artificially inflated. This comports with the "prevailing view" that "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *In re Urethane Antitrust Litig.,* 768 F.3d at 1254. Thus, Defendants' attempt

to minimize the importance of the PPW index fails to defeat class certification.   And, to the extent that Defendants' arguments regarding the merits of relying on the PPW index are correct, those arguments are still based on class-wide evidence, which supports a finding of predominance.

Although Plaintiffs have provided additional testimony from Drs. Dwyer and Harris to prove the merits of antitrust impact – that all or nearly all class members *actually* suffered antitrust harm — at this point the Court is satisfied that Plaintiffs demonstrated that the impact element of their antitrust claim is capable of proof at trial through evidence common to the class. Each class member, if forced to proceed on an individual basis, would be relying on the same evidence of the structure, conduct, and performance of Defendants' industry and their uniform price-increase announcements in order to show an elevated baseline price for the Containerboard Products they purchased during the class period.   Thus, the impact evidence in this case is common to the class, and because the evidence, if true, establishes that Defendants' conspiracy caused a market-wide increase to the price of Containerboard Products, Plaintiffs have established impact for class certification purposes.   Numerous cases have found that when a plaintiff produces evidence that the alleged conspiracy increased the baseline price of a product, "there

is an inference of class-wide impact." *In re Urethane Antitrust Litig.,* 768 F.3d at 1254 (collecting cases across several jurisdictions). Evidence that multiple defendants issued "parallel . . . price-increase announcements" especially supports the inference of class-wide impact, and this is true "even when prices are individually negotiated." *Id.* at 1254–55. Defendants' arguments that, in fact, most class members were not impacted by the alleged conspiracy may ultimately prove successful at trial or summary judgment. But at the class certification stage, those issues are not before the Court. Therefore, Plaintiffs have established that common questions predominate over individual issues as to impact.

### c.  Plaintiffs' Damages Proof

Damages are but one element that the Court considers in determining predominance under Rule 23(b)(3). *Roach v. T.L. Cannon Corp.,* --- F.3d ---, No. 13-3070-cv, 2015 WL 528125, at *6-7 (2nd Cir. Feb. 10, 2015). To establish predominance, a plaintiff must produce a reliable method of measuring class-wide damages based on common proof. *See, id.* But, "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification." *Messner,* 669 F.3d at 815 (citing *Wal-Mart,* 131 S.Ct. at 2558). Thus, if Defendants are correct that Plaintiffs' multiple-regression model is not capable of proving class-wide damages, that alone

will not defeat certification. *See, id.* Instead, the Court would need to consider whether the individual issues in calculating damages would overwhelm the common issues relating to liability and impact.

Defendants resist these principles, arguing that the Supreme Court changed the law in this area with its decision in *Comcast*. Defendants argue that, "since *Comcast,* a class should not be certified if the plaintiffs fail to present a damages model applicable to individual class members on a class-wide basis or through a simple computation." [Def.'s Opp. Br. at 55, ECF No. 763.] As several courts since *Comcast* have noted, however, *Comcast* did not change the well-established rule that the existence of individual damage issues does not automatically defeat class certification. *See, e.g., In re Nexium Antitrust Litig.,* 777 F.3d 9, Nos. 14-1521, 14-1522, 2015 WL 265548, at *8 (1st Cir. Jan. 21, 2015) (stating, post-*Comcast*, that "the Supreme Court . . . and the circuits in other cases have made clear that the need for some individualized determinations at the . . . damages stage does not defeat class certification").

The Seventh Circuit has also stated *Comcast*'s meaning in the class certification context, explaining that *Comcast* was concerned with a damages methodology that measured the harm resulting from four theories of liability, three of which the

district court had rejected.  *In re IKO Roofing Shingle Prods. Liability Litig.*, 757 F.3d 599, 602 (7th Cir. 2014).  Because the damages model did "not even attempt" to "measure only those damages attributable to" the remaining liability theory, *Comcast Corp.*, 133 S.Ct. at 1433, "the class could not get anywhere," *In re IKO Roofing Shingle Prods. Liability Litig.*, 757 F.3d at 602.  Also, the plaintiffs relied solely on their damages model to also prove impact, rather than presenting separate evidence of impact.  Finally, as several courts have noted, *Comcast* was based entirely on one key concession: the plaintiffs in that case inexplicably did not challenge the district court's conclusion that it could not certify the class unless damages were measurable "on a class-wide basis through use of a common methodology."  *Comcast Corp.*, 133 S.Ct. at 1430; *see also, In re Urethane Antitrust Litig.*, 768 F.3d at 1258 ("First, unlike the claimants in *Comcast,* our plaintiffs did not concede that class certification required a method to prove class-wide damages through a common methodology.").  Plaintiffs in this case have not made a similar concession, and they have presented additional class-wide evidence showing that impact is capable of proof at trial, as discussed above.  Thus, the Court will consider whether Plaintiffs' damages model is capable of quantifying damages on a class-wide basis.  If so, Plaintiffs have

established predominance as to each element of their antitrust claim and the class will be certified.  If not, the Court will determine whether individual damages issues will overwhelm the common issues.

In establishing damages, Plaintiffs rely on Dr. Dwyer, who conducted a "preliminary analysis that demonstrates the feasibility of reliably estimating damages on a class-wide basis through the use of . . . multiple regression analysis." Although no expert in this case explains in simple terms what a "multiple regression analysis" entails, the method is common enough to understand through case law and references like the *Reference Manual on Scientific Evidence* by Professor Daniel Rubinfeld, which the Seventh Circuit has deemed a reliable source for understanding this type of technical evidence. *See, ATA Airlines, Inc. v. Fed. Express Corp.,* 665 F.3d 882, 889–90 (7th Cir. 2011).  "Multiple regression analysis is a statistical tool for understanding the relationship between or among two or more variables."  Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, in Reference Manual on Statistical Evidence 305 (3d Ed. 2011)).  The tool looks at a dependent variable, which is the variable to be explained, and independent variables, which are the variables "thought to influence the dependent variable."  *In re EPDM Antitrust Litig.,* 256 F.R.D. at 95.  Here, the price of Containerboard

- 42 -

Products is the dependent variable, and the independent variables are the various factors that might have an effect on price, like the alleged conspiracy and the costs involved in producing the products. This type of statistical tool "allows economists to estimate whether a certain market factor has an effect on the dependent variable and to what degree. By determining whether a particular variable in the equation influences the dependent variable, the economist can accept or reject that variable as having an influence on the dependent variable." *Id.* Multiple regression analysis is common in antitrust cases, where the plaintiffs use it to show that an alleged "conspiracy" has a statistically significant impact on the dependent variable — usually price. Rubinfeld, *Reference Guide on Multiple Regression* 305–07.

Dr. Dwyer purports to do precisely this type of analysis in measuring damages. But, the Court cannot simply accept Dr. Dwyer's report simply because it appears to do a multiple regression analysis. Rather, "as painful as it may be," *ATA Airlines, Inc.,* 665 F.3d at 896, the Court must rigorously screen expert evidence when certifying a class to ensure that the damages model only seeks to prove damages that flow from the harm alleged, *Comcast Corp.,* 133 S.Ct. at 1435.

The reliability of an expert's multiple regression analysis depends on the choices the expert makes in choosing

variables and setting up the model. *See,* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression* 311-17. In determining whether a model is set up correctly, courts consider several questions: "has the expert correctly identified the dependent variable; has he or she chosen the correct explanatory variable that is relevant to the question at issue; are the additional variables chosen all correct or are some missing [or] irrelevant; is the form of the analysis correct?" *In re EPDM Antitrust Litig.,* 256 F.R.D. at 95. (citing a prior edition of Professor Rubinfeld's *Reference Guide on Multiple Regression*).

Here, Dr. Dwyer estimates the economic damages attributable to the alleged conspiracy by looking at prices class members actually paid and what they would have paid "but for" the alleged conspiracy. To do this, Dr. Dwyer created two categories of products: Intermediate Containerboard Products ("ICP"), which consists of roll stock and corrugated sheets, and Final Containerboard Products ("FCP"), which consists of all other Containerboard Products. [Report of Mark Joseph Dwyer, Ph.D., at 19, ECF No. 658-4.] Dr. Dwyer then selected a benchmark period of months before and after the class period to compare the prices class members paid during the class period to those prices outside the period. Next, Dr. Dwyer conducted a multiple regression analysis

whereby he analyzed the change in the price of Containerboard Products during the class period. He included several independent variables to control for non-conspiratorial economic factors that normally influence price, and he also included a "dummy variable," which is the independent variable that tests whether the alleged conspiracy influenced price. "A positive estimated effect for this dummy variable indicates that prices during the class period are higher than can be explained by the economic factors serving as controls and therefore supports the inference that the elevation is attributable to the collusion alleged by plaintiffs." [*Id.*]

As the Court understands it, under Dr. Dwyer's model, if the non-conspiratorial economic factors fully explain the increase in price during the class period, then the dummy variable indicator would be close to zero, which means that the conspiracy had virtually no effect on price. If this is the case, there are no damages because the conspiracy did not increase prices above what the prices would have been absent the conspiracy. Conversely, if the increase in price is attributable solely to the conspiracy and no other economic factor, then the dummy variable would be close to one. If this is the case, the damages would be astronomical because the full amount of the price increases during the class period would be attributed solely to the conspiracy.

Dr. Dwyer accounted for numerous variables in an attempt control for economic factors that might explain the change in price during the class period.  The Court need not list them all, but Dr. Dwyer grouped them into four categories: downstream demand; production and delivery; inflation; and seasonal factors.  Importantly, these categories include independent variables that account for various costs that affect price like the price of pulp that goes into making containerboard, labor costs, and fuel costs associated with production and delivery.

With the potential variables selected, Dr. Dwyer ran regressions for the ICP and FCP categories.  Dr. Dwyer used two different procedures to determine which independent variables, in addition to the dummy variable, would be included in the regression.  Under the first procedure, the Alkaike Information Criterion (the "AICC method"), the dummy variable reflected an overcharge of 4.05% for the ICP product category and 3.61% for the FCP product category.  Under the second procedure, the Bayesian Information Criterion (the "BIC method"), the ICP overcharge was 4.04% and the FCP overcharge was 2.38%.

Dr. Dwyer also attempted to assess the robustness of his results by including only the 10 independent variables "with the most explanatory power." [*Id.*]  This regression shows an

overcharge attributable to the conspiracy of 3.33% for the FCP products and 2.78% for the ICP products. Dr. Dwyer then used the average overcharge amounts mentioned above to calculate damages. The average overcharge was 2.92% for the FCP products and 3.81% for the ICP products.

To arrive at a total damages figure, Dr. Dwyer multiplied the average ICP and FCP overcharges by the dollar amount of purchases class members made during the class period. Dr. Dwyer also attempted to subtract out of the total purchases those that were made during the class period, but whose prices were part of a contract entered into before the class period. This method is consistent with Plaintiffs theory of harm that Defendants' conspiracy raised the market price that all class members paid for Containerboard Products during the class period. During the class period, class members paid $21.06 billion for ICP products. Based on Dr. Dwyer's overcharge of 3.81%, class members paid $801.27 million dollars more than they would have absent the conspiracy. Class members also paid $102.25 billion for FCP products. Based on Dr. Dwyer's overcharge of 2.92%, class members paid $2.991 billion dollars more than they would have absent the conspiracy. Dr. Dwyer's report also breaks down the total amount of damages caused by each Defendant. In sum, Dr. Dwyer's preliminary estimate of damages is $3.792 billion.

Defendants first argue briefly that Dr. Dwyer's report cannot be trusted because it only shows damages based on the class period reflected in Plaintiffs Amended Complaint, rather than the period initially alleged. Defendants cite no authority for disregarding an expert's methodology because he relied upon the class period as alleged in an amended complaint. Dr. Dwyer did what was asked of him based on the class period supplied to him by Plaintiffs. That Plaintiffs amended their Complaint does not change the Court's analysis on whether Dr. Dwyer's model is capable of demonstrating class-wide damages. To the extent Defendants' arguments are relevant, they go to the weight a jury might give Dr. Dwyer's testimony, not its reliability or admissibility. *See, In re Urethane Antitrust Litig.,* 768 F.3d at 1263 (refusing to reverse district court based on the defendants' argument that the plaintiffs' expert moved the class period start date to maximize damages).

As to the substance of Dr. Dwyer's damages model, Defendants' experts first attack Dr. Dwyer's use of a technique called "principal components" to address a collinearity problem. The parties' experts appear to agree that running regressions in this case presents a collinearity problem, which occurs when two independent variables are

highly correlated or related. Including collinear variables in a regression often skews the results.

To correct for collinearity, Dr. Dwyer inserted 150 independent variables into a computer program that would then select "principal components," which are those components that, according to the program, best explain the covariance across the independent variables. The program produced 133 principal components, which Dr. Dwyer then inserted into two different "stepwise regression" programs — AICC and BIC. Both programs operate the same way by starting "with a core model in which the variables that are entering into the model selection are absent." [Dwyer Dep. 137:25–138, Aug. 12, 2014, Ex. 3, ECF No. 763-2.] The programs then "consider[] adding a variable one step at a time," creating a model "until none of the remaining factors meet a certain threshold of explanatory power." [Dwyer Dep. 138:2-6, Ex. 3, ECF No. 763-2.] The only difference between AICC and BIC is the relevant threshold at which the program stops selecting new variables from the 133 available.

Defendants broadly claim that, according to economists, "'stepwise regression is to be avoided.'" [Def.'s Opp. Br. at 51 (quoting Peter Kennedy, *A Guide to Econometrics* 49 (6th Ed. 2008), ECF No. 763.] But as Dr. Dwyer points out in his reply report, the "stepwise regression" that "is to be avoided" is

not the same regression that Dr. Dwyer performed, though admittedly economists often use "stepwise regression" to describe Dr. Dwyer's approach, a point Dr. Dwyer alluded to in his deposition.  [Dwyer Dep. 120:3–5 ("Stepwise can sometimes have a particular meaning that would be inappropriate here."), Ex. 3, ECF No. 763-2.]  Dr. Dwyer provides academic support for the type of model selection procedures he used, and the Court has compared the description of the stepwise method that is disfavored and Dr. Dwyer's method, and the two are indeed different.   Furthermore, Dr. Dwyer notes that the model selection methods he used are included in most or all statistical software packages.   The Court finds it unlikely that a model selection method that supposedly is rejected by the academic community would be included in all the software that same community uses to run regressions.   Finally, Defendants have not cited any case law that rejects an expert's model solely because of the expert's use of Dr. Dwyer's model selection method.   The Court therefore refuses to ignore Dr. Dwyer's report solely because he employed a stepwise regression.

Defendants next take issue with the way Dr. Dwyer used the AICC and BIC model selection methods.  Defendants assert that, despite Dr. Dwyer's claim that his model is neutral, he did not allow either selection model to select variables in a

neutral fashion.  This is so, Defendants argue, because Dr. Dwyer "limited the variables the stepwise software could exclude so that the conspiracy dummy variable *had to be included*." [Def.'s Opp. Br. at 51, ECF No. 763.] Defendants interpret this method as forcing the model to assign the conspiracy variable a value even if the model would have otherwise excluded it as having no explanatory value. Defendants argue that Dr. Dwyer should have simply let the software select from all the available variables, and Defendants contend that, by doing so, the conspiracy variable would not have been selected.

Dr. Dwyer, however, had good reason for including the conspiracy variable in each of his regressions.  As he correctly states, allowing the conspiracy variable to be omitted would tell the experts nothing about the conspiracy's effect on price. Moreover, Defendants are incorrect that forcing the model to test for the alleged conspiracy's effect on price necessarily means the model will find such an effect. Presumably, if the conspiracy had no effect on price, the model would show that the conspiracy variable had a zero or statistically insignificant effect on price.  Because the independent variable at issue is the existence of a conspiracy, Dr. Dwyer reasonably included that variable in his

regressions.  Otherwise, his regressions would tell us nothing about the conspiracy's effect on price.

Additionally, Defendants' arguments are inconsistent.  On the one hand, Defendants criticize Dr. Dwyer for using a stepwise regression to select which independent variables to include in each model, rather than using his own independent judgment to select those variables.  On the other hand, they criticize him for using his economic judgment to use the conspiracy and inflation variables in each model, rather than letting the program pick all of the variables.  Both experts state that the stepwise method can exclude variables that the program finds less explanatory, even though economic principles compel inclusion of the variable.  Dr. Dwyer used his economic expertise to select certain factors that test for conspiracy and control for inflation, along with other factors selected by the stepwise programs.  To the extent that Defendants challenge the specific factors included and excluded from his model, those arguments go to the weight and probative value of his testimony, not to the underlying methodology.  *See, In re Urethane Antitrust Litig.,* 768 F.3d at 1260–61.

Of course, in some instances, inclusion or exclusion of a certain variable might be egregious enough to render an expert's report inadmissible altogether.  *See, In re Scrap*

*Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008). But that is not the case here. Defendants have not pointed to some specific, major factor that Dr. Dwyer excluded that shows his model is wholly without merit. To the contrary, Dr. Dwyer went to great lengths to include in his independent variables all sorts of factors that might otherwise explain the price increases during the class period. His methodology therefore appears to be firmly rooted in sound economic and econometric principles, and the large majority of Defendants' experts' criticisms go to the merits of whether the price of Containerboard Products "increased disproportionately to the cost of inputs as the result of a conspiracy to raise/maintain prices, or instead resulted from a non-collusive cause." *In re EPDM Antitrust Litig.*, 256 F.R.D. at 98. This is a merits question that the Court does not need to resolve in order to decide whether to certify the class.

Defendants finally argue that Dr. Dwyer's damages calculations do not support class certification because his model "cannot be applied to individual plaintiffs, and Dwyer admitted that comparing a customer's price to the price predicted by his regression model would not indicate whether or not the customer had been damaged." [Def.'s Opp. Br. at 56, ECF No. 763.] But in a complicated antitrust case such as this, where the theory of harm is that the entire market price

of a product was inflated as a result of a conspiracy, "plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 493 (7th Cir. 2002); *See also, In re Scrap Metal Antitrust Litig.,* 527 F.3d 517 at 529 (approving a method of comparing a defendant's profits before and after a violation in "proving antitrust damages").

Moreover, to the extent that there are individualized damages issues, that alone will not defeat class certification, especially where, as here, common issues predominate the liability and impact elements of Plaintiffs' claim. *Butler,* 727 F.3d at 801. And, should discovery demonstrate that individual damages issues indeed threaten to overwhelm the common issues such that class certification becomes inappropriate, Defendants may seek to decertify the class or modify the class so that only liability and impact are decided on a class-wide basis. *Messner,* 669 F.3d at 826. In light of the key, overwhelming common questions of liability and impact in this case, Defendants have not demonstrated that individual damages issues threaten to overwhelm the litigation.

In sum, the Court has poured over the parties submissions and accompanying evidentiary record and finds that Plaintiffs

have satisfied the predominance requirement of Rule 23(b)(3) based on competent evidence common to the class.

### ii. Superiority

Lastly, Plaintiffs must demonstrate that proceeding on a class basis is superior to other forms of resolving the dispute. Plaintiffs have made a sufficient showing that class treatment in this case is superior to individual cases. The overarching liability and impact issues are common to the class and can "be resolved in one stroke." *Butler,* 727 F.3d at 801 (internal quotation marks omitted). And given the breadth and importance of the common issues, "the superiority requirement . . . poses no serious obstacle to class certification here." *Messner,* 669 F.3d at 814 n.5.

In attempting to defeat superiority, Defendants argue first that releases they obtained as a result of settling a prior antitrust lawsuit bar many class members' claims in this suit. Second, Defendants argue that many class members purchased Containerboard Products pursuant to contracts that include various "disqualifying clauses," such as forum selection clauses, jury waivers, and clauses that set the available time to bring a claim and the available damages. Defendants conclude that these issues make a class action unmanageable and create a "quagmire" that causes individual issues to predominate the common questions.

– 55 –

**S.A.55**

As to the first argument, when parties settle a case, a "court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged . . . in connection with any matter or fact set forth or referred to in the complaint." *Wal-Mart Stores, Inc. v. Visa,* 396 F.3d 96, 107 n.13 (2d Cir. 2005) (internal quotation marks omitted). Such a "general release is valid as to all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry." *Oberweis Dairy, Inc. v. Associated Mild Producers, Inc.,* 568 F.Supp. 1096, 1101 (N.D. Ill. 1983) (citing *Goodman v. Epstein,* 582 F.2d 388, 402-04 (7th Cir. 1978)). In other words, "a release applies only as long as the released conduct arises out of the identical factual predicate as the settled conduct." *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d 390, 399 (S.D.N.Y. 2011) (internal quotation marks omitted).

Defendants settled with various opt-in and opt-out plaintiffs the *In re Linerboard Antitrust Litigation* lawsuit in the Eastern District of Pennsylvania. The lawsuit involved an alleged conspiracy that occurred between 1993 and 1995, although some individual cases did not settle until as late as 2008. According to Defendants, a "typical" settlement agreement from the *Linerboard* litigation released Defendants from all claims "relating in any way to any conduct prior to

the Effective Date" of the agreement "concerning the purchase, sale, distribution, or pricing of linerboard, medium, corrugated containers [or] corrugated sheets." [Def.'s Opp. Br. at 64 n.59, ECF No. 763.] Defendants argue that such a broad agreement bars the claims at issue here, and that determining whether those claims are barred makes class action impracticable.

The Court disagrees. Although the release language is very broad, Plaintiffs' claims in this case are not based on an "identical factual predicate as the settled conduct." *In re Digital Music Antitrust Litig.,* 812 F.Supp.2d at 399. The conduct at issue in the prior litigation was Defendants' allegedly collusive behavior in the mid-nineties. The actions at issue here are coordinated market manipulation and price-increase announcements that occurred nearly a decade later. And even though the collusive behavior that was alleged in the prior litigation is similar to the behavior alleged here, the claims in this case are not based on Defendants' alleged price-fixing behavior of the nineties. Under Defendants' argument, they are free to keep colluding in violation of antitrust laws so long as they conspire in the same way as they were alleged to have behaved in a prior settled case. The Court is unaware of any case supporting this argument; indeed, several cases are to the contrary. *See, id.* Because

none of the *Linerboard* releases apply to this new case that is based on different facts, the Court finds that those releases do not defeat class certification.

Defendants' second argument is that several contractual provisions apply to disqualify some class members from participating in the class. According to Defendants, "the multitude of individualized issues (under the laws of multiple states) presented by the disqualifying clauses . . . render the class action mechanism inefficient." [Def.'s Opp. Br. at 72.]

The Court rejects this argument for several reasons. First, Defendants' argument relies on *Lozano,* in which the Seventh Circuit approved of a district court relying on class-action waivers in arbitration agreements to find class certification inappropriate. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (7th Cir. 2007). Unlike the arbitration agreements in *Lozano,* however, none of the clauses here preclude class actions. *Lozano* therefore provides no support for Defendants' position.

Second, Defendants rely heavily on *In re Titanium Dioxide Antitrust Litigation,* in which the court enforced clauses contained within individual class members' contracts. *In re Titanium Dioxide Antitrust Litigation,* 962 F.Supp.2d 840, 851–52 (D. Md. 2013). That case also fails to support Defendants'

argument because there, the court *did not* find the existence of contractual provisions to be an impediment to class certification. *Id.* at 846 (stating that the defendants' motion to modify the class definition to exclude class members who were subject to various contractual provisions was premature until "after the expiration of the class opt-out period"). Plaintiffs are correct that the majority of cases hold that the existence of contractual provisions does not automatically defeat class certification. *See, e.g., id.;* *Herkert v. MRC Receivables Corp.,* 254 F.R.D. 344, 350 (N.D. Ill. 2008) ("[A] possibility that some of the putative class members could have cardmember agreements with varying terms . . . does not necessarily preclude class certification.").

In the alternative, Defendants ask that the Court at least modify the class definition to exclude those class members that purchased pursuant to a disqualifying clause. This may indeed be necessary, but the Court agrees with the court in *Titanium Dioxide* that the more appropriate time to address this issue is after the class is certified and Defendants can determine which specific class members are subject to potentially disqualifying contractual provisions. The Court has the authority under Rule 23(c)(1)(C) to modify the class any time before final judgment. To the extent that class members are not eligible to participate due to their

specific contracts, Defendants may file a motion to modify the class to exclude those specific members once that information is known.

Because Plaintiffs have proven beyond mere pleading each of Rule 23's elements, the Court finds that class certification is appropriate.    The only remaining issue is Defendant RockTenn's arguments as to why a class action cannot proceed against it.

### C.  Class Certification — Defendant RockTenn's Argument

RockTenn's position in this case is unique.   (The Court uses "RockTenn" for ease of reference, although RockTenn was formally known as Smurfit-Stone Container Corporation during its bankruptcy proceedings).    Unlike any other Defendant, RockTenn filed for bankruptcy prior to this lawsuit, which resulted in a bankruptcy discharge order dated June 30, 2010 that released RockTenn from any claims predating the discharge order.    Thus, according to RockTenn, Plaintiffs' must independently establish a separate, RockTenn-specific class with a period starting no earlier than June 30, 2010.

In all the briefing on this issue, both parties rely on the exact same source material to support their argument: Judge Milton Shadur's statements during a hearing on November 24, 2010.  According to RockTenn, Judge Shadur made it crystal clear that Plaintiffs would need to define and seek

– 60 –

certification on a wholly separate class applicable just to RockTenn. Plaintiffs, on the other hand, argue that Judge Shadur could not have stated in any plainer terms that such a separation was unnecessary. The Court can resolve this issue easily by simply referring to what Judge Shadur said, in light of case law that supports those statements.

Neither party really explains the context for the hearing before Judge Shadur, but from reading the entire transcript of that hearing, it appears that RockTenn asked the bankruptcy court to enjoin this Court from hearing a claim against RockTenn. Judge Shadur set the hearing to inform RockTenn of his position on RockTenn's motion and to provide an avenue for communicating his opinion to the bankruptcy court without having to get into a "tug-of-war" with that court. Judge Shadur informed RockTenn that he had read the complaint and its allegations and found that Plaintiffs were only seeking to hold RockTenn liable for its post-discharge conduct. Understandably, Judge Shadur found it inappropriate for RockTenn to ask the bankruptcy court to enjoin this Court from entertaining a cause of action that is founded on post-discharge conduct over which the bankruptcy court has no jurisdiction. Judge Shadur stated that he found it "flat-out misleading [for RockTenn] to characterize the lawsuit before [the Court] as seeking relief from [RockTenn] that is at odds

with its discharge in bankruptcy." [Hr'g Tr. 6, Nov. 24, 2010, ECF No. 108.]

Judge Shadur acknowledged that the complaint's allegations "speak . . . of [RockTenn's] pre[-]discharge conduct," but he noted the key difference between *basing liability* on pre-discharge conduct and *relying* in part on pre-discharge conduct as evidence supporting a post-discharge conspiracy. RockTenn's argument, in other words, "conflates evidence with claims." [*Id.* at 7.] RockTenn is correct that the Court promised to hold Plaintiffs to their word that their complaint is about imposing liability based on post-discharge conduct. But, contrary to both parties' assertions, Judge Shadur did not mention or address any issues related to the proper size or scope of the class to be certified. That is the issue currently before the Court.

The issue presented by Plaintiffs' complaint is novel. Plaintiffs have provided evidence that RockTenn participated in the alleged conspiracy post-bankruptcy. If a fact-finder found this to be true, RockTenn's bankruptcy discharge order would not protect it, since that order applies only to pre-discharge conduct. Plaintiffs have also sued RockTenn's alleged co-conspirators, and co-conspirators are joint and severally liable "*for all damages* caused by the [entire] conspiracy." *Paper Sys. Inc. v. Nippon Paper Indus. Co.,* 281

F.3d 629, 632 (7th Cir. 2002) (emphasis added). No problem so far. But, the conspiracy for which Plaintiffs seek to hold RockTenn's co-conspirators liable predates RockTenn's discharge from bankruptcy, and that pre-discharge conspiracy included RockTenn. The question, then, is whether RockTenn, based on its post-discharge conduct, can be jointly and severally liable for its co-conspirators' damages when the basis for the co-conspirators' liability is pre-discharge conduct that includes RockTenn. RockTenn argues that to hold it jointly liable is to punish it for pre-discharge conduct. Plaintiffs argue that such a result is the consequence of the general joint and several liability principles in the antitrust context.

Neither party has cited a case directly on point, nor can the Court find one. RockTenn cites cases that preclude class certification against defendants that emerged from bankruptcy, but in those cases liability was premised on solely pre-discharge conduct. *See, In re Travel Agent Comm'n Antitrust Litig.,* 583 F.3d 896, 901 (6th Cir. 2009). Plaintiffs cite cases involving joint and several liability, but none of the defendants in those cases had filed for bankruptcy. *See, e.g., Paper Sys. Inc.,* 281 F.3d at 632. Moreover, the Court notes that important principles weigh on both sides of the issue. On the one hand, bankruptcy is meant to absolve a

debtor of liability for its pre-discharge conduct. *In re Ruben,* 774 F.3d 1138, 1141 (7th Cir. 2014) ("A principal goal of bankruptcy is to provide the debtor with . . . a fresh start.") (internal quotation marks omitted). On the other hand, joint and several liability is a "vital instrument for maximizing deterrence." *Paper Sys. Inc.,* 281 F.3d at 633.

In the absence of controlling, binding authority, the Court finds that holding RockTenn jointly and severally liable does not violate the bankruptcy discharge order for several reasons. Plaintiffs alleged that RockTenn joined (or more correctly, re-joined) the conspiracy post-bankruptcy. Generally speaking, "a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators." *Havoco of Am., Ltd. v. Shell Oil Co.,* 626 F.2d 549, 554 (7th Cir. 1980). Although a debtor discharged in bankruptcy is indeed provided a clean slate, what the debtor does with that slate matters. Assuming that RockTenn did, in fact, re-join the conspiracy as alleged, RockTenn certainly would have had knowledge of what has gone on before and presumably would have had the intent to pursue the same objectives. *See, id.* ,Seen properly, RockTenn would not be "held liable" for its pre-discharge conduct. Liability would be premised solely on its

- 64 -

**S.A.64**

post-discharge conduct.  It only *appears* that it is being held liable for pre-discharge conduct because of the joint and several liability rule, which makes RockTenn on the hook for its co-conspirators' actions.  But it is the *co-conspirators'* liability that is based on pre-discharge conduct, not RockTenn's.

The distinction may be a fine one, but it is important. If, for example, RockTenn is ultimately correct on the merits, *i.e.,* its post-discharge conduct does not give rise to an antitrust violation, RockTenn will be absolved of all liability, despite its participation in the pre-discharge conspiracy.  The Court has made clear that it will hold Plaintiffs to their burden of proof that RockTenn's post-discharge conduct gives rise to liability.  But, once liability is established, the general rule of joint and several liability applies.  It would be a windfall to defendants to allow them to join a conspiracy post-bankruptcy, with the perfect knowledge and intent to continue causing damages to vast numbers of consumers, and then refuse to enforce joint and several liability while the remaining co-conspirators are all subject to such liability.  If RockTenn did in fact choose to rejoin the alleged conspiracy, it cannot be heard to complain that it may be on the hook for all the damages the conspiracy caused.

Admittedly, this creates potential problems for trial. For example, what is a jury to do with evidence of both pre- and post-discharge conduct in determining RockTenn's liability? For one, the Court may give a limiting instruction that explains to the jury that, in order to determine whether RockTenn violated antitrust laws, it must only consider RockTenn's post-discharge conduct and determine whether that conduct violated the law. These problems, however, can be addressed later if the case goes to trial. For now, the Court agrees with Plaintiffs that this case can proceed as a single class action.

## IV.    CONCLUSION

For the reasons stated herein, Defendants' Motion to Strike [ECF No. 845] is granted in part and denied in part. Plaintiffs' Class Certification Motion [ECF No. 657] is granted. Named Plaintiffs are hereby designated as class representatives, and Michael J. Freed of Freed Kanner London & Millen LLC and Daniel J. Mogin of The Mogin Law Firm, P.C., are hereby designated as Co-Lead Counsel.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 3/26/2015

**S.A.66**

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August, 2015, I electronically filed the foregoing brief and short appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system on the following:

W. Joseph Bruckner
Brian D. Clark
Devona L. Wells
LOCKRIDGE GRINDAL NAUEN
100 Washington Avenue S., Ste. 2200
Minneapolis, MN  55401

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
FREED KANNER LONDON
& MILLEN LLC
2201 Waukegan Road, Ste. 130
Bannockburn, IL   60015

Daniel J. Mogin
Jodie Williams
THE MOGIN LAW FIRM, P.C.
707 Broadway, Ste. 1000
San Diego, CA  92101

*Counsel for All Plaintiffs-Appellees*

Matthias A. Lydon
James F. Herbison
Michael P. Mayer
William P. Ferranti
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601
(312) 558-5600

Elizabeth Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000

*Counsel for Defendant-Appellant
RockTenn CP, LLC (Appellant in
Consolidated Case No. 15-2386)*

  /s/ Miguel A. Estrada
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com