Nos. 15-2385 & 15-2386

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

KLEEN PRODUCTS LLC, ET AL.,
individually, and on behalf of all others similarly situated,

*Plaintiffs – Appellees,*

*v.*

INTERNATIONAL PAPER CO., ET AL.

*Defendants – Appellants.*

On Appeal From The United States District Court
For The Northern District Of Illinois
Case No. 1:10-cv-05711 – Hon. Harry D. Leinenweber

**APPENDIX OF DEFENDANTS-APPELLANTS INTERNATIONAL PAPER
COMPANY, GEORGIA-PACIFIC LLC, WEYERHAEUSER COMPANY,
TEMPLE-INLAND INC., AND ROCKTENN CP, LLC**

**VOLUME I (Pages A.1–A.134)**

Matthias A. Lydon
James F. Herbison
Michael P. Mayer
William P. Ferranti
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601
(312) 558-5600

Elizabeth Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000

*Counsel for Defendant-Appellant
RockTenn CP, LLC*

Miguel A. Estrada
Jonathan C. Bond
Jesenka Mrdjenovic
Lindsay S. See
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

*Counsel for Defendant-Appellant
Georgia-Pacific LLC*

*[Additional counsel listed on inside cover]*

James T. McKeown
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
(414) 297-5530

Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL  60604
(312) 660-7600

*Counsel for Defendant-Appellant
International Paper Company*

Ryan A. Shores
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Beth A. Wilkinson
Alexandra M. Walsh
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street, N.W.
Washington, D.C.  20006
(202) 223-7300

*Counsel for Defendant-Appellant
Georgia-Pacific LLC*

Andrew S. Marovitz
Britt M. Miller
Joshua Yount
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
(312) 782-0600

Michael B. Kimberly
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C.  20006
(202) 263-3127

*Counsel for Defendant-Appellant
Temple-Inland Inc.*

Margaret H. Warner
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 756-8000

Stephen Y. Wu
Michelle S. Lowery
MCDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Suite 4400
Chicago, IL  60606
(312) 372-2000

*Counsel for Defendant-Appellant
Weyerhaeuser Company*

# TABLE OF CONTENTS

**Page**

## *Volume I*

Consolidated and Amended Complaint for Violation of the Sherman
Act (Nov. 8, 2010) (D.E.65) ..............................................................A.1

Amendments to Plaintiffs' Consolidated and Amended Complaint
(June 3, 2014) (D.E.648) ..............................................................A.67

Amendments to Plaintiffs' Consolidated and Amended Complaint
(Oct. 23, 2014) (Submitted as Exhibit A to Plaintiffs' Motion for
Leave to Amend, Approved in D.E.806) (D.E.777, Ex. A) ............................A.86

Transcript of Proceedings of Nov. 24, 2010 (docketed Jan. 3, 2011)
(D.E.108).......................................................................A.90

Memorandum Opinion and Order on Defendants' Motion to Dismiss
(Apr. 8, 2011) (D.E.193) ..............................................................A.111

## *Volume II*

Report of Mark Joseph Dwyer, Ph.D. in Support of Plaintiffs' Motion
for Class Certification (June 11, 2014) (D.E.658-4)....................................A.135

Exhibits (1-12) to Report of Mark Joseph Dwyer, Ph.D. in Support of
Plaintiffs' Motion for Class Certification (June 11, 2014)
(D.E.658-5).......................................................................A.160

Declaration of Michael J. Harris, Ph.D. in Support of Plaintiffs' Motion
for Class Certification (June 11, 2014; Revised July 17, 2014)
(docketed July 9, 2015) (D.E.955)...................................................A.174

Exhibits to Declaration of Michael J. Harris, Ph.D. in Support of
Plaintiffs' Motion for Class Certification (June 11, 2014) ........................A.234

Exhibits 1, 3, 4 (D.E.658-3).............................................A.234

Exhibit 2 (Revised July 17, 2014) (D.E.955-1) ................................A.257

Transcript of Deposition of Mark J. Dwyer, Ph.D. (Aug. 12, 2014)
(docketed Sept. 22, 2014) (D.E.763, Ex. 3)..................................A.262

Transcript of Deposition of Michael J. Harris, Ph.D. (July 22, 2014)
(docketed Sept. 22, 2014) (D.E.763, Ex. 2)..................................A.334

**TABLE OF CONTENTS**
*(continued)*

**Page**

**_Volume III_**

Report of Dennis W. Carlton, Ph.D., with Exhibits (Sept. 19, 2014)
    (D.E.759)........................................................................................................A.441

Report of Janusz A. Ordover, Ph.D., with Appendices (Sept. 19, 2014)
    (D.E.758)........................................................................................................A.535

Transcript of Deposition of Dennis W. Carlton (Oct. 28, 2014)
    (Excerpt Submitted as Exhibit 25 to Plaintiffs' Reply in Support
    of Class Certification) (docketed July 9, 2015) (D.E.956, Ex. 25) ..............A.730

Transcript of Deposition of Janusz A. Ordover (Oct. 30, 2014)
    (Excerpt Submitted as Exhibit 54 to Plaintiffs' Reply in Support
    of Class Certification) (docketed July 9, 2015) (D.E.957, Ex. 54) ..............A.745

Reply Report of Mark Joseph Dwyer, Ph.D in Support of Plaintiffs'
    Motion for Class Certification (Dec. 16, 2014)
    (docketed Dec. 19, 2014) (D.E.826-3)..........................................................A.751

Reply Declaration of Michael J. Harris, Ph.D. (Corrected) in Support of
    Plaintiffs' Motion for Class Certification (Dec. 19, 2014)
    (docketed July 9, 2015) (D.E.962)................................................................A.868

## CIRCUIT RULE 30(d) STATEMENT

The undersigned attorney hereby certifies, pursuant to Circuit Rule 30(d), that all material required under Circuit Rule 30(a) and (b) is included in this Appendix and in the Short Appendix bound with Appellants' opening brief.


Dated:  August 10, 2015                     /s/ Miguel A. Estrada
                                        Miguel A. Estrada
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C.  20036
                                        (202) 955-8500
                                        mestrada@gibsondunn.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **KLEEN PRODUCTS LLC; R.P.R. ENTERPRISES, INC.; MIGHTY PAC, INC., FERRARO FOODS, INC.; FERRARO FOODS OF NORTH CAROLINA, LLC; DISTRIBUTORS PACKAGING GROUP, LLC; RHE HATCO, INC.; THULE, INC.; and CHANDLER PACKAGING, INC,** individually and on behalf of all those similarly situated, | Case No. 1:10-cv-05711  <br><br> <u>CLASS ACTION</u> <br><br> **CONSOLIDATED AND AMENDED COMPLAINT FOR VIOLATION OF THE SHERMAN ACT** <br><br> **JURY TRIAL DEMAND** |
| **Plaintiff,** | |
| **v.** | |
| **PACKAGING CORPORATION OF AMERICA; INTERNATIONAL PAPER; CASCADES CANADA, INC; NORAMPAC HOLDINGS U.S. INC.; WEYERHAEUSER COMPANY; GEORGIA PACIFIC LLC; TEMPLE-INLAND INC.; TIN INC.; and SMURFIT-STONE CONTAINER CORPORATION** | |
| **Defendants.** | |

## Index

Nature of the Action.....................................................................................................3

Jurisdiction and Venue.................................................................................................5

Parties..........................................................................................................................6

Co-Conspirators.........................................................................................................11

Class Action Allegations............................................................................................11

Trade and Commerce.................................................................................................13

    Containerboard Products.....................................................................................13

    The Structure of the Containerboard Industry ...................................................14

    Industry and Trade Association Membership .....................................................19

    History of Anticompetitive Conduct and Acts of Concealment .........................20

Violations Alleged .....................................................................................................22

2005............................................................................................................................26

2006............................................................................................................................32

2007............................................................................................................................38

2008............................................................................................................................40

2009............................................................................................................................45

2010............................................................................................................................47

Active Concealment...................................................................................................57

Antitrust Impact and Damages..................................................................................57

Claim for Relief .........................................................................................................58

Prayer .........................................................................................................................59

Jury Trial Demand .....................................................................................................61

CONSOLIDATED AMENDED COMPLAINT

A.2

Plaintiffs Kleen Products LLC; R.P.R. Enterprises, Inc.; Mighty Pac, Inc.; Ferraro Foods, Inc.; Ferraro Foods of North Carolina, LLC; Distributors Packaging Group, LLC; RHE Hatco, Inc.; Thule, Inc. and Chandler Packaging Group, Inc. individually and on behalf of a class of all those similarly situated, bring this action for treble damages under the antitrust laws of the United States against Defendants, and demand a trial by jury.

## NATURE OF THE ACTION

1.     This case is an antitrust class action brought to recover for the injuries sustained by Plaintiffs and the members of the Plaintiff Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure.  The Plaintiff Class, defined more fully below in Paragraph 28, consists of all persons and entities that purchased Containerboard Products directly from Defendants between August 2005 and the present (the "Class Period").

2.     Containerboard, which includes both linerboard and corrugating medium, is the principal raw material used to manufacture corrugated products such as boxes and other types of corrugated containers.  Linerboard is used as the facing to which corrugating medium is fluted and laminated to produce sheets.  The containerboard sheets are subsequently printed, cut, folded and glued to produce corrugated products.  As used herein, "Containerboard Products" includes linerboard, corrugated medium, corrugated sheets and corrugated products, including boxes and other containers.  Defendants are integrated producers of the Containerboard Products sold to the Plaintiff Class.

3.     Various Containerboard Products manufacturers, including multiple Defendants herein and their predecessors, have been subject to governmental investigations and civil lawsuits concerning their engagement in anticompetitive conduct over the past two decades.  The Containerboard Products industry is highly susceptible to collusive behavior and anticompetitive conduct due to a small number of manufacturers, inelastic product demand, the commodity-like

nature of the products, and an inability of any single manufacturer to unilaterally control supply and price.

4.     The consolidation of the containerboard industry has further concentrated the industry and exacerbate the conditions that led to the anticompetitive conduct at issue in this complaint.

5.     Defendants employ various acts and practices to facilitate the combination or conspiracy alleged herein.  Defendants' opportunities and ability to engage in anticompetitive practices are also fostered through the frequent meetings and events held by industry trade organizations led by officers and/or board members who simultaneously serve as the Defendants' employees.

6.     Beginning in 2005, the Containerboard Products industry was faced with decreasing profit margins, rising product demand, and a promising macroeconomic outlook. Nevertheless, Defendants began a coordinated across-the-board imposition of capacity restraints, leading to a subsequent restriction in the supply of Containerboard Products on the market.  The goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the Class Period.  Defendants' conspiracy included a scheme to impose capacity constraints which had the effect of creating an artificial shortage of Containerboard Products in the United States during a time of stable or increasing demand, thereby allowing Defendants to charge supra-competitive prices to the Plaintiff Class.  As detailed below, the conspiracy was effected, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in massive and unprecedented idling of production capacity, reduced production and near simultaneous across-the-board price increases.

7.     Defendants' anticompetitive conduct cannot be explained away as independent parallel behavior.  As multiple Defendants confirm in their own quarterly reports, market demand for Containerboard Products remained stable or was expected to increase during the period of coordinated production capacity restriction.  Similarly, no significant lasting changes in production costs account for the Defendants' repeated price increases.  In fact, during the Class

Period, price increases outpaced cost increases by over fifty percent (50%). Although basic economics holds that manufacturers in a competitive market faced with similar demand conditions as evidenced here would be expected to increase production to satisfy market demand and gain market share, each Defendant refrained. In sum, Defendants' conduct, individually and collectively, evidences a restriction of freedom and sense of obligation associated with an agreement.

8.      The market impacts of Defendants' scheme on the Plaintiff Class have been, and continue to be, substantial. As a result of Defendants' market domination and their coordinated restriction of production and operations capacity, direct purchasers of Containerboard Products were forced to pay substantially higher prices during the conspiracy period than they would have paid in a competitive market.

9.      Giving a voice to those impacted by Defendants' coordinated actions, on July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "*3rd Containerboard Increase puts the Integrity of Our Industry on the Line*." The article notes that in light of the manufacturing capacity cuts, as well as the absence of cost drivers, yet another price increase, the third for 2010, beyond already historic highs "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies" and noted the similarity of the present situation to "the years 1994-1995, [when] six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak" which resulted in allegations of collusion, government investigations, a consent decree and over $200 million paid in settlements.

## JURISDICTION AND VENUE

10.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Plaintiff Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.

11.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

12.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

13.    The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

**PARTIES**

14.    During the Class Period, each of the Plaintiffs purchased Containerboard Products directly from one or more of the Defendants and thereby suffered injury to their business or property:

a.    Plaintiff Kleen Products LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Minnetonka, Minnesota;

b.    Plaintiff R.P.R. Enterprises, Inc. is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in Kansas City, Missouri;

c.    Plaintiff Mighty Pac, Inc. is a corporation organized and existing under the laws of the State of an Illinois, with its principal place of business in Palatine, Illinois;

d.    Plaintiff Ferraro Foods, Inc. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Piscataway, New Jersey;

CONSOLIDATED AMENDED COMPLAINT

A.6

e.   Plaintiff Ferraro Foods of North Carolina, LLC is a limited liability company organized and existing under the laws of the State of North Carolina, with its principal place of business in High Point, North Carolina;

f.   Plaintiff Distributors Packaging Group LLC is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business in Carrollton, Texas;

g.   Plaintiff Thule, Inc. is a corporation organized and existing under the laws of the State of Connecticut with its principal pace of business in Seymour, Connecticut;

h.   Plaintiff RHE Hatco, Inc. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Garland, Texas; and,

i.   Plaintiff Chandler Packaging, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Diego, California.

15.   Defendant Packaging Corporation of America ("PCA") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. During the Class Period, PCA and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

16.   Defendant International Paper ("International Paper") is a New York corporation with its principal place of business in Memphis, Tennessee. During the Class Period, International Paper and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

17.   Defendant Norampac U.S. Holdings Inc. ("Norampac") is a Canadian corporation with its principal place of business in Saint-Bruno, Quebec, Canada. Norampac Inc. was formed

in 1997 as a joint venture by Cascades Inc. ("Cascades Inc.") and Domtar Corporation and became a wholly-owned and controlled subsidiary division of Cascades Inc. and/or Cascades Canada Inc. in December 2006. Norampac Holdings US Inc. is a Delaware corporation with residency in Delaware. Norampac Industries Inc. is a New York Corporation with a place of business in Niagara Falls, New York and which lists it Principal Executive Office as "c/o Cascades Inc." in Montreal, Quebec, Canada. These and other businesses engaged in the Containerboard Products business using the Norampac name, as detailed below, and are collectively referred to hereafter as "Norampac". During the Class Period, Norampac and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including by and through its corporate parent, Cascades Canada, Inc., sold Containerboard Products in interstate commerce directly to purchasers in the United States. Norampac's (and Cascades Canada, Inc.) subsidiaries and divisions in Canada serviced customers in the United States by selling Containerboard Products directly to them as alleged above. Norampac's subsidiaries and divisions located in the United States including Norampac Industries, Inc. Lancaster Division in Lancaster, New York (corrugated packaging containers) and Niagara Falls Division in Niagara Falls, New York (corrugated medium); Norampac New England, Inc., Thompson Division in Thompson, Connecticut (corrugated packaging containers) and Leominster Division in Leominster, Massachusetts (corrugated products) Norampac New York City Inc., Maspeth, New York (corrugated products) and Norampac Schenectady Inc. (corrugated packaging) also sold Containerboard Products in interstate commerce directly to purchasers in the United States.

18.     Defendant Cascades Canada Inc. ("Cascades") is a Canadian corporation with its principal place of business in Kingsley Falls, Quebec, Canada. Cascades describes Norampac as both a subsidiary and a division of Cascades and represents that its Containerboard Group conducts business under the name Norampac. Plaintiffs are informed and believe that Cascades uses the Norampac name or brand in connection with certain of its Containerboard Products businesses that are not owned, directly or indirectly, by Norampac. During the Class Period, Cascades and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates,

CONSOLIDATED AMENDED COMPLAINT

including, but not limited to Defendant Norampac, sold Containerboard Products in interstate commerce directly to purchasers in the United States.

19.     Defendant Weyerhaeuser Company ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington. During the Class Period, Weyerhaeuser and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

20.     Defendant Georgia-Pacific LLC ("Georgia-Pacific") is a Georgia corporation with its principal place of business in Atlanta, Georgia. During the Class Period, Georgia-Pacific and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

21.     Defendant Temple-Inland, Inc. ("Temple-Inland") is a Delaware corporation with its principal place of business at Austin, Texas. During the Class Period, Temple-Inland and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including Defendant TIN, Inc. sold Containerboard Products in interstate commerce directly to purchasers in the United States (Defendant Temple-Inland, Inc. and Defendant TIN, Inc. are collectively referred to hereafter as "Temple-Inland").

22.     Defendant Smurfit-Stone Container Corporation ("Smurfit-Stone") is a Delaware corporation with its principal place of business at Chicago, Illinois. During the Class Period, Smurfit-Stone and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States. On or about January 26, 2009, Smurfit-Stone filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware; effective June 30, 2010, Smurfit-Stone was discharged under a plan of reorganization. However, many of Smurfit-Stone's most senior executives, including those with responsibility for Containerboard Products, continued with the company substantially throughout the conspiracy alleged herein, including through the inception of bankruptcy proceedings and after the discharge became effective, such as Patrick J. Moore, Chief Executive Officer and John Knudsen, Senior Vice President. After its discharge for

bankruptcy, Smurfit-Stone knowingly and intentionally joined the conspiracy. This complaint seeks to recover damages from Smurfit-Stone for post-discharge conduct only, and in no way seeks to violate any Orders of the above-referenced Bankruptcy Court. Specific post-discharge actions by Smurfit-Stone in furtherance of the conspiracy as alleged, *inter alia*, in paragraphs 168-172 and 174-178 are consistent with the actions taken by all of the Defendants throughout the Class Period and that it is part of the ongoing antitrust conspiracy to and including the date of the filing of this complaint. [Plaintiff Thule, Inc. alleges that Smurfit-Stone participated as co-conspirator with the other Defendants and has performed acts and made statements in furtherance of the conspiracy, however, does not join in the allegations naming Smurfit-Stone as a Defendant.]

23.    "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Containerboard Products manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold Containerboard Products in interstate commerce directly to purchasers in the United States during the Class Period.

24.    To the extent that subsidiaries and divisions within Defendants' corporate families sold or distributed Containerboard Products to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this complaint because Defendants wished to ensure that the prices paid for such Containerboard Products would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing and collecting monies from Plaintiffs and the members of the Plaintiff Class for Containerboard Products was known to and approved by their respective corporate parent named as a Defendant in this complaint.

**CO-CONSPIRATORS**

25.    Various other persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.    The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.

26.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

27.    Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

**CLASS ACTION ALLEGATIONS**

28.    Each Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

> All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as August 2005 until the Present.

> Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

29.    <u>Class Identity</u>: The Plaintiff Class is readily identifiable and is one for which records should exist.

30.    <u>Numerosity</u>:  Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members as above described, the exact number and their identities being known to Defendants and their co-conspirators.

31.     <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because each Plaintiff purchased Containerboard Products directly from one or more of the Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

32.     <u>Common Questions Predominate</u>:  There are questions of law and fact common to the Class, including, but not limited to:

     a.  Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Containerboard Products sold in interstate commerce in the United States;

     b.  The identity of the participants of the alleged conspiracy;

     c.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

     d.  Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

     e.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Plaintiff Class;

     f.  The effect of Defendants' alleged conspiracy on the prices of Containerboard Products sold in the United States during the Class Period; and,

     g.  The appropriate class-wide measure of damages.

33.     These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

34.     <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

CONSOLIDATED AMENDED COMPLAINT

A.12

35.     Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical.  Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## TRADE AND COMMERCE

### Containerboard Products

36.     Containerboard is the principal raw material used to manufacture corrugated products.  Containerboard includes both corrugating medium and linerboard.  Linerboard is a flat wood-fiber paperboard.  Corrugated medium is a type of fluted paperboard made from the same material as linerboard.  Linerboard is used as the inner and outer facings, or liners, of corrugated products. Corrugating medium is fluted and laminated to linerboard in corrugator plants to produce corrugated sheets. The sheets are subsequently printed, cut, folded and glued to produce corrugated products, mostly boxes and other containers.  As used herein, "Containerboard Products" includes linerboard, corrugated medium, corrugated sheets and corrugated products including corrugated boxes and other corrugated containers.

37.     Defendants and their co-conspirators manufacture and sell linerboard, corrugated medium, containerboard and corrugated boxes and other corrugated containers.

38.     Containerboard Products is a multi-billion dollar industry.  During the relevant time period, annual sales of Containerboard Products were in the tens of billions of dollars.

39.     The containerboard industry is heavily concentrated.  As of 2010, Defendants had a combined share of approximately 83% of the containerboard market, controlling nearly thirty

million tons of annual production.  Collectively, Defendants and their co-conspirators control an even greater proportion of the supply of Containerboard Products in the market.

40.    The price of corrugated medium is tied to the price of linerboard.  As a result, the price of containerboard is directly tied to the price of corrugated medium and linerboard. Likewise, because containerboard is used in the manufacture of corrugated containers, a rise in the price of containerboard results in a similar rise in the price of corrugated containers. Collectively, Defendants and their co-conspirators utilize most of the linerboard and medium they manufacture to produce containerboard and corrugated containers that they sell to the Plaintiff Class.  In some instances, Defendants sell the manufactured linerboard and corrugated medium to other Defendants or independent converters who in turn produce containerboard sheets and corrugated products.  Corrugated products are generally viewed as interchangeable commodities because most manufacturers are able to supply the product needs of most customers.

## The Structure of the Containerboard Products Industry

41.    Economists Haizheng Li and Jifeng Luo (hereinafter "Li and Luo") of the Georgia Institute of Technology have thoroughly examined the containerboard industry and concluded that the characteristics of the containerboard industry make it highly susceptible to horizontal price-fixing and output restrictions:

> The linerboard industry is very capital intensive and thus entry is restricted because of the large amount of capital and the long-term nature of investment…Firms may have similar cost curves if the equipment used is similar. Additionally, the demand for containerboard is relatively inelastic because of no major substitutes.  Therefore, the US linerboard industry may have a certain degree of oligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.[1]

42.    Antitrust law and economics have identified several factors which make markets susceptible to price-fixing.  Those factors include: relatively few firms with a large share of the market; high barriers to entry into the market; lack of close substitutes/commodity nature of the

---

[1] Li, Haizheng and Jifeng Luo. *Industry consolidation and price in the US linerboard industry.*  Journal of Forest Economics 14 (2008) at 98.

good; inelastic demand; and inability of any single firm to control supply and price unilaterally. The Containerboard Products industry demonstrates all of these factors.

43.    <u>Relatively Few Firms</u>:  Historically, Containerboard Products has been considered a concentrated industry.  In the last decade, however, a series of mergers and acquisitions have led to a significant increase in market concentration.  In 1995, the top five firms controlled approximately 42% of the containerboard market and the top 10 firms had a combined 66% market share. During the relevant time period of this complaint, the containerboard industry endured considerable consolidation resulting in the top five firms controlling approximately 72.5%, of the containerboard market while the Defendants' combined share reached approximately 83%.

44.    The consolidation of the Containerboard Products industry involving Defendants and their co-conspirators both during the Class Period and immediately preceding it has been substantial.  The following are examples of transactions that lead to such concentration:

    a.  In 1999, PCA acquired the containerboard and corrugated packaging products business of Pactiv Corporation, formerly known as Tenneco Packaging;

    b.  In 2001, Temple-Inland acquired the corrugated packaging operations of Chesapeake Corporation and Elgin Corrugated Box Company and ComPro Packaging LLC;

    c.  In 2002, Weyerhaeuser acquired Williamette Industries, including its Containerboard Products businesses

    d.  In 2002 Temple-Inland acquired Gaylord Container Corporation;

    e.  In September 2002, Smurfit-Stone purchased the Stevenson Mill containerboard mill and the related corrugated container assets;

    f.  In March 2003, Smurfit-Stone acquired complete control of Smurfit-MBI which operated 15 corrugated container plants in Canada;

    g.  In February 2004, PCA purchased Acorn Corrugated Box Co.;

    h.  In March 2004, Georgia-Pacific bought the assets of Temple-Inland's corrugated box plants;

i.   In July 2004, International Paper acquired Box USA ;

j.   In April 2005, PCA acquired Midland Container Corp.;

k.   In September 2005, the Jefferson Smurfit Group merged with Kappa Packaging;

l.   In October 2005, Norampac acquired three Standard Paper box plants;

m.   In December 2005, privately-held Koch Industries, Inc., purchased Georgia-Pacific for $21 billion;

n.   In April 2006, Georgia-Pacific acquired Smurfit-Stone's Brewton, Alabama linerboard mill;

o.   In March 2008, International Paper announced its acquisition of Weyerhaeuser's Packaging Business for $6 billion;

p.   In April 2008, Smurfit-Stone acquired Calpine Corrugated LLC; and,

q.   In 2008 Temple-Inland acquired a 50% interest in PBL, a joint venture that manufactures containerboard.

45.     In 2009, Temple-Inland presented the following graphic illustration of the changes brought about by the consolidation of the Containerboard Products industry:



16

CONSOLIDATED AMENDED COMPLAINT

46.  <u>Barriers to Entry</u>:   There are two significant barriers to entry to the Containerboard Products industry: 1) capital-intensive start-up costs; and 2) high transportation costs.  The equipment used to manufacture Containerboard Products is both highly specialized and very expensive.   Li and Luo conclude that the "linerboard industry is very capital intensive…entry is restricted because of the large amount of capital and the long-term nature of investment."   Another industry report affirmed that "the industry is capital-intensive."[2] Consequently, large capital investments prohibit new entrants.   At a 2005 industry trade conference attended by Defendants' officers, employees or representatives, presenter Deloitte Development LLC instructed the audience not to overestimate "the threat of new entrants into the market," indicating that entry into the containerboard market was highly unlikely.[3]

47.  <u>Manufacturers Have Similar Costs</u>:  Defendants and their co-conspirators share relatively similar costs.  The technology and process of containerboard manufacturing are well known and Defendants and their co-conspirators employ the same types of equipment and processes in the production process.

48.  Moreover, the fewer the number of firms in an industry, the more similar costs become for the remaining firms. Accordingly, the recent consolidation of the Containerboard Products industry has in turn driven Defendants' costs to be even more similar.  Further, paper manufacturing has relatively few economies of scale.  Industry reports state that "Large and small producers operate the same kinds of plants –large producers just have more of them."[4]  The combination of these industry facts – consolidation, similar plants, and technology – indicates that the Defendants have very similar cost structures.

49.  Because Containerboard Products are bulky and cumbersome to transport, long-distance shipping is expensive.   Consequently, there are geographic entry barriers to the Containerboard Products industry as well.  One industry report stated that "[t]he effective sales

---

[2] Hoover's Industry Profile: Paper Products Manufacture.
[3] Sinoway, Mike, "Pricing Opportunities in the Forest Products Industry," June 28, 2005, Deloitte Development LLC.
[4] See PCA Form 10-K, filed February 20, 2008 at p.11.

CONSOLIDATED AMENDED COMPLAINT

A.17

area for corrugated boxes, for example, is only about 150 miles from the production plant."[5] High start-up costs and shipping costs make entry into the containerboard market very difficult.

50.     No Close Substitutes/Commodity Nature of the Products:     Containerboard Products do not have close substitutes in the market.     The closest substitutes for corrugated containers are plastic containers, which comprise a very small portion of the container or packaging market.     Likewise, containerboard and corrugated packaging are commodities because containerboard and corrugated containers made by any one of the Defendants are interchangeable with that of any of the other Defendants.     In its 2007 10-K filing, PCA acknowledged this fact, noting "[c]ontainerboard is generally considered a commodity-type product and can be purchased from numerous suppliers."[6]

51.     Inelastic Demand:     The demand for Containerboard Products is very inelastic.     Li and Luo estimated the price elasticity of demand for linerboard to be 0.18.     This means that a one percent increase in linerboard price would result in just a 0.18% decrease in the quantity demanded.     When elasticity is this low, concerted price increases are likely to be profitable and sustainable since purchasers will continue to buy nearly the same quantity of containerboard despite price increases.[7]

52.     No Firm With Sufficient Unilateral Market Power:     While the Defendants and their co-conspirators collectively comprise approximately 83% of the containerboard market, no single firm has sufficient market power to unilaterally control supply and price.     For example, PCA's 10-K for the year ending December 31, 2006, states that "PKG [stock symbol for PCA] operates in an industry that is highly competitive, with no single containerboard or corrugated packaging producer having a dominant position."     Similarly, Temple-Inland's 10-K for the year ending December 31, 2006, states "[g]iven the commodity nature of our manufactured products, we have little control over market pricing or market demand.     No single company is dominant in any of our industries."[8]     As a result, when single manufacturers have attempted to raise prices

---

[5] Hoover's Industry Profile: Paper Products Manufacture; see also, PCA Form 10-K, filed February 20, 2008, at p. 11, noting, "[c]orrugated producers generally sell within a 150-mile radius of their plants."
[6] See PCA Form 10-K, filed February 20, 2008, at p. 11.
[7] See N. Gregory Mankiw, PRINCIPLES OF ECONOMICS (5th ed. 2009), at p. 94.
[8] See Temple-Inland Form 10-K, filed February 23, 2007, at p. 10.

without the agreement of other firms, customers are able to resist the unilateral price increase by turning to other manufacturers.

**Industry and Trade Association Membership**

53.    The Fibre Box Association ("FBA") is a Containerboard Products trade organization.  Its members include Defendants PCA, International Paper, Norampac, Georgia-Pacific, Temple-Inland and Smurfit-Stone.  According to its 2007 tax records, Thomas A. Hassfurther, PCA's current Executive Vice President, served as FBA's 1st Vice Chairman, and its board of directors includes representatives from Temple-Inland, Georgia-Pacific, International Paper, Weyerhaeuser, and Smurfit-Stone.  The FBA holds at least three meetings each year where executives and other representatives of the Defendants and their co-conspirators have an opportunity to meet and talk with one another, including communicating about supply and prices.  Further, the FBA holds dozens of networking events each year which give the Defendants and their co-conspirators additional opportunities to communicate with one another. Further, the FBA publishes a set of antitrust guidelines that it distributes to its members.  Notably absent from these guidelines are prohibitions on communicating or agreeing with other containerboard product manufacturers concerning output, supply or capacity decisions.

54.    The American Forest & Paper Association ("AF&PA") is a trade organization representing forest and building product industries as well as pulp, paper and paperboard manufacturers.  Its members include PCA, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland and Smurfit-Stone.  During the Class Period, its officers have included James Hannan, President and CEO of Georgia-Pacific and John Faraci, Chairman and CEO of International Paper and its board of directors has included Daniel S. Fulton, President & CEO of Weyerhaeuser, Patrick J. Moore, Chairman & CEO of Smurfit-Stone, Doyle R. Simons, Chairman & CEO of Temple-Inland, and Paul T. Stecko, Chairman & CEO of PCA.  The AF&PA holds several meetings a year where executives and other representatives of the Defendants have an opportunity to meet and talk with one another, including communicating about supply and prices.  As described below, AF&PA forums have included instructions on steps to conceal anticompetitive communications between firms.

55.     RISI (founded as Resource Information Systems Inc.) is an information provider to the global forest products industry and provides market news and information. RISI hosts conferences regarding containerboard every two years, bringing together companies in the containerboard industry. Executives of all Defendants attended both the 2006 and 2008 conferences.

56.     The International Corrugated Case Association ("ICCA") is an international trade association that serves to "promote and protect the general welfare of the worldwide corrugated container industry" by, among other things, collecting and disseminating information about corrugated products, issues, services and resources around the world. Every year, ICCA members participate in a global summit. Defendants Georgia-Pacific, Smurfit-Stone, International Paper and Temple-Inland are all members of the ICCA.

### History of Anticompetitive Conduct and Acts of Concealment

57.     The Defendants and their co-conspirators have a prior history of anticompetitive horizontal agreements with one another.  For decades, the paper and pulp industry has consistently demonstrated cartelization and anticompetitive behavior.  In particular, the linerboard, corrugated,  containerboard and corrugated products segments of the industry have a history of antitrust violations.  A consent decree was entered on April 23, 1940, in the action entitled *United States of America, Plaintiff, against National Container Association, et al., Defendants* (SDNY Civil Action No. 8-318) and in *United States v. Container Corporation of America, et al*., 393 US 333 (1969) the defendants (including certain predecessors of Defendants herein) were found to have violated Section 1 of the Sherman Act after being charged with conspiring to restrain price competition in sale of corrugated containers in the Southeastern United States from January 1, 1955, to October 14, 1963.[9]

58.     International Paper, Weyerhaeuser, PCA and Georgia-Pacific were also defendants in an alleged nationwide price-fixing conspiracy among manufacturers of folding cartons from 1960 to 1974.  *See In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727 (N.D. Ill.

---

[9] See *U.S. v. Container Corp. of America*, 273 F.Supp. 18, (M.D.N.C. Aug 31, 1967) and *U.S. v. Container Corp. of America*, 1970 WL 513, 1970 Trade Cases P 73,217 (M.D.N.C. May 19, 1970) (on remand).

1977), 557 F. Supp. 1091, 1093 (N.D. Ill. 1983) and 687 F. Supp. 1223 (N.D. Ill. 1988). On September 19, 1979, prior to trial, the class action parts of the case were settled for approximately $200 million.

59.    In 1978, a federal grand jury in the Southern District of Texas indicted 14 companies and 26 individuals, including International Paper, Weyerhaeuser and Stone Container Corporation (predecessor to Smurfit-Stone) for participating in a conspiracy east of the Rocky Mountains to fix prices of corrugated containers and sheets. *See United States v. International Paper Co.*, No. H-78-11 and *United States v. Boise Cascade Corp.*, No. H-78-12. International Paper, Weyerhaeuser and Stone Container Corporation and almost all of the other defendants pleaded *nolo contendere*; those that did not were acquitted at trial.

60.    In a related case, PCA, International Paper, Stone Container and Georgia-Pacific were also involved in a price fixing cartel over corrugated containers and corrugated cardboard sheets from 1964-1975. Those firms that did not settle went to trial and most settled before a verdict was rendered; the sole defendant remaining at the time of the verdict was found liable for participating in a price fixing conspiracy over corrugated containers and corrugated sheets from 1964-1975. *See In re Corrugated Container Antitrust Litigation*, 556 F.Supp. 1117, 1125 (.S.D.Tex.1982).

61.    In 1998, Stone Container Corp. (now known as Smurfit-Stone) entered into a consent agreement with the Federal Trade Commission ("FTC") in which it pledged to refrain from "entering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties." *See In the Matter of Stone Container Corp.*, Docket No. C-8306, Decision and Order, May 18, 1998.

62.    Smurfit-Stone, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland, and PCA participated in a price-fixing cartel over containerboard from 1993-1995. See *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002). As part of the conspiracy, these firms increased the "downtime" of linerboard machines, reducing production and

inventory.  At the same time, they purchased substantial amounts of containerboard from one another, protecting market shares, causing an artificial shortage and an increase in the price of linerboard.  At the peak of the cartel's efficacy in 1995, the price of linerboard peaked at $530/ton.  The class action claims were settled in 2003 when the defendants agreed to pay their customers over $200 million, however, lawsuits brought by plaintiffs opting out of the class proceeded.

63.    As a result of their exposure to prior antitrust lawsuits, Defendants have taken steps to conceal their anticompetitive communications with one another.  For example, at the American Forest & Paper Association's 128th Annual Paper Week held in New York City in April 2005, Defendants attended a seminar entitled "Are You Vulnerable to Lawsuits?" aimed at reducing vulnerability to antitrust litigation.[10]  Because the Defendants have received training on how to avoid getting caught communicating with one another regarding price and output decisions, the amount of conspiratorial evidence that can be obtained from public sources and without access to internal records and testimony is highly limited.  Nevertheless, the existence of an agreement is unambiguously evidenced by Defendants' coordinated conduct during the Class Period.

## **VIOLATIONS ALLEGED**

64.    The unprecedented industry consolidation detailed in paragraphs 43-45 created an environment conducive to collusion.  Further, at or about the onset of the Class Period, the Containerboard Products industry was experiencing decreased profit margins, rising product demand, and a promising economic outlook.  Additionally, shortly before the Class Period, the Containerboard Products industry endured two failed price increases.  Specifically, on May 31, 2003, Official Board Markets reported that a $35/ton price increase in both linerboard and corrugated medium failed, noting "[n]ot only is this attempt a failure, but discounting prevails." While prices steadily increased in 2004, by early 2005 they again began to erode, bottoming out in spring 2005.  On May 31, 2005, Official Board Markets reported that Defendant International Paper announced a $50/ton price increase; but due to other Defendants not backing the price

---

[10] *Are You Vulnerable to Lawsuits?*  Official Board Markets, April 23, 2005.

increase with a "firm stance," the end result was a failed increase. In June 2005, "it became apparent that industry-wide price hikes weren't sticking. Instead of rising about 10%, prices on the thick paper used to make corrugated containers slipped as inventories of boxes inched higher."[11] These factors acted together as the catalyst for Defendants to coordinate their capacity restraints in order to reduce available supplies and thereby fix, raise, stabilize and maintain the prices of Containerboard Products.

65.    In October 2003, Smurfit-Stone announced a massive restructuring plan intended "to reduce [containerboard] capacity."[12] According to its Chief Executive Officer Pat Moore, the designed goal was "to cut supply enough at Smurfit [-Stone] to force price increases throughout the industry."[13] After the failed May 2005 price increase, Smurfit-Stone recognized that their independent action to reduce containerboard capacity could not force industry prices upward unless Defendants supported both the capacity reduction and subsequent price increases.

66.    The period of 2005-2010 witnessed an exceptional number of containerboard plant closings, capacity reductions, and price increases that can only be explained by concerted effort by the Defendants and their co-conspirators. Defendants increased Containerboard Products prices eight times between August 2005 and August 2010. Over that period, Containerboard Product prices have increased over fifty percent (50%) despite the economic downturn during the latter half of the Class Period. Each of these price increases was implemented by the Defendants nearly simultaneously and was facilitated by reductions in supply and production capacity. In the face of increasing demand, these reductions make no economic sense absent conspiracy and collusion. Norampac's 2005 20-F filing illustrates these phenomena:

> In 2005, industry box shipments decreased by 0.4% in North America while North American containerboard operating rates were approximately 95%. Containerboard producers in the United States reduced their inventories and drove a US$30/ton increase on linerboard in October following a US$55/ton decrease in the first three quarters of the year…

---

[11] *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05,* Crain's Chicago Bus., June 27, 2005, at p. 4.
[12] *Clayton, Mo., Packaging Firm Smurfit-Stone Container Thinks Outside the Box,* St. Louis Dispatch, Aug. 22, 2004, at p. 1.
[13] *Ibid.*

The market share of the top five containerboard producers increased from 48% in 1995 to 64% in 2005. This consolidation has helped accelerate the rationalization of inefficient containerboard mill capacity. In 2005, a total of over 1.5 million tons of North American containerboard capacity was permanently closed. Furthermore, the industry has generally adopted a model of balancing supply with current demand as opposed to maximizing capacity utilization. As a result, operating rates in the industry in recent years more closely reflect the current economic environment. Overall, market consolidation and rationalization have helped to create a less volatile and more stable industry pricing environment.

67.    Demand for Containerboard Products is tied to overall consumer demand and spending.  In mid-2005 and continuing thereafter through 2007, consumer demand, including demand for Containerboard Products in the U.S., was relatively stable and industry expectations were that demand would increase, yet Defendants cut capacity and raised prices.  These actions were contrary to Defendants' unilateral economic interests because, given market conditions and expectations that demand was increasing, in a competitive market capacity would, at minimum, be maintained if not expanded, in order to enhance volumes, revenues, profits and market share. During the second half of 2008, consumer demand in the United States plummeted, yet Defendants continued to raise prices.  In August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%; and notwithstanding fears of deflation in the general economy, increased prices an unprecedented three times in 2010 to all-time highs, without any underlying cost justifications. This led one market commentator to note that the series of historic price increases "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies." The same commentator noted the similarity of the present conduct of Defendants to the conduct in the prior *Linerboard* cases.

68.    Defendants and their co-conspirators were also able to facilitate the conspiracy in part by causing artificially inflated, supra-competitive prices to be published in trade publications which served to indicate and index prices or to function as list prices for Containerboard Product purchasers.  Certain supply and purchase contracts between Defendants and purchasers were tied to the prices listed in those trade publications.

69.    Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.  As a result of Defendants' conduct as

alleged herein, their production capacity of Containerboard Products was significantly reduced while their prices increased by approximately 50% between 2005 and 2010:

**Containerboard Capacity and Prices**

70.    Defendants profited substantially from these price increases.  In a December 2005 presentation by International Paper's Executive Vice President and Chief Financial Officer, Marianne Parrs, one slide titled *Strong Leverage to Improving Prices: Price Sensitivity of U.S. Businesses* showed that there would be a $0.15 earnings per share increase for every $50 change in the price of containerboard.

## 2005

71.    In the 1st Quarter of 2005, having previously indicated its intent to force price increases through the industry by cutting its capacity, Defendant Smurfit-Stone closed its 203,000 tons-per-year Fernandina Beach, Florida containerboard plant.  Notwithstanding the closure of this plant, on May 5, 2005, Smurfit-Stone reported in its SEC Form 10-Q filing that "[w]e expect our profitability to improve in the 2nd Quarter of 2005 as a result of stronger demand and high sales prices for containerboard and corrugated containers."

72.    During the 1st Quarter of 2005, Defendant PCA idled 65,000 tons per year of production capacity by taking off-line one of its three paper machines at its containerboard plant in Tomahawk, Wisconsin.

73.    Defendant Weyerhaeuser likewise reported strong demand for Containerboard Products during the 1st Quarter of 2005 in its 3rd Quarter 2005 Form 10-Q, stating that:

> Containerboard sales increased $36 million. Unit shipments increased 45,000 tons, or approximately 18 percent, and price realizations, which include freight and are net of normal sales deductions, increased $71 per ton, or approximately 22 percent in the first quarter of 2005, compared to the same period of 2004. These increases were mainly due to an improvement in demand for corrugated packaging in U.S. markets.

74.    Similarly, Defendant International Paper reported in its May 6, 2005 Form 10-Q that "2nd Quarter earnings normally benefit from seasonally higher containerboard and box demand."

75.    Nevertheless, in the 2nd Quarter of 2005, International Paper took approximately 530,000 tons of containerboard downtime compared with approximately 215,000 of downtime in the 2nd Quarter of 2004.  In its 10-Q filed on August 5, 2005, Defendant explained that this was "market related downtime" which was "taken to balance internal supply with demand to help

manage inventory levels." However, when a manufacturing plant is idled during "downtime", the firm must continue to pay fixed costs, which are very high in the Containerboard Products industry. Smurfit-Stone acknowledged this fact in its SEC Form 10-K for the 2006 fiscal year, stating "the industry is capital intensive, which leads to high fixed costs and has historically resulted in continued production as long as prices are sufficient to cover marginal costs." Accordingly, "market related downtime" is very costly and is economically irrational from a single-firm's point of view during periods of strong demand, such as the 2nd Quarter of 2005.

76.    As previously alleged, at the onset of the Class Period, Defendants were experiencing decreased profit margins and historically high demand. In that context, in June 2005, high level executives and other representatives from each of the Defendants and their co-conspirators, including Pete Correll, Chairman and CEO of Georgia-Pacific, David A. Spraley, Vice President of Georgia-Pacific, C. Richard Larrick, General Manager of Georgia-Pacific, Russell Bishop, Chief Information Officer of Weyerhaeuser, Dick Thomas, Vice President of Weyerhaeuser, Ronnie Cosper, Papermill Superintendent for Smurfit-Stone, and others were reported as attending the PIMA 2005 Leadership Conference in Nashville, Tennessee.[14] The theme of this conference was "Success through Collaborative Teamwork." Topics discussed included "Effective Collaboration through Teamwork" and "Price Execution in the Forest Products Industry."

77.    During this conference, Deloitte Consulting LLP gave a presentation called "Pricing Opportunities in the Forest Products Industry." Deloitte began its presentation by stating that the industry was "rich in competitive intelligence, which facilitates strategic pricing analysis." The presentation also included a discussion regarding the several factors which made coordinated price increases possible, such as "underestimating competitor's desire to raise prices" and "overestimating the threat of new entrants into the market."[15]

---

[14] The Paper Industry Management Association, or "PIMA," describes itself as "the premier association for management professionals in the paper and pulp industry" with the goal of contributing "to the strength of the international pulp and paper community by providing the means for our members to address relevant industry issues and to develop their management and leadership skills."

[15] Sinoway, Mike, "Pricing Opportunities in the Forest Products Industry," June 28, 2005, Deloitte Development LLC.

78.     Immediately before this conference, on June 27, 2005, Smurfit-Stone reported that it "has no immediate plans to close down plants."[16]  But only days later, on July 1, 2005, Deutsche Bank, which monitors the containerboard industry and issues regular reports on developments within the industry, reported that "[t]here has been a lot of 'chatter' suggesting that one or more of the big integrated producers will soon shutter capacity."[17]

79.     On July 19, 2005, Deutsche Bank reported "IP [International Paper] capacity withdrawals will help uncoated and CB [containerboard] producers.  Among the names: DTC [Domtar], PKG [Packaging Corporation of America], TIN [Temple-Inland]."[18]

80.     Beginning in early 2005 and continuing throughout the remainder of the year, Defendant Temple-Inland closed containerboard converting facilities in Antioch, California, Newark, Delaware, Atlanta, Georgia, and Louisville, Kentucky.  This reduced the supply of corrugated containers and aided in the overall scheme to increase the price of Containerboard Products.  Temple-Inland closed these facilities despite acknowledging in its May 10, 2005 10-Q that "market demand strengthened, resulting in higher prices for most of our product offerings." The closures were against Temple-Inland's unilateral economic self-interest because they were made during a period of increasing demand and prices.

81.     In the 3rd Quarter of 2005, Smurfit-Stone permanently closed two more of its containerboard mills as part of what the company called "its ongoing assessment and restructuring efforts."  Smurfit-Stone closed mills in New Richmond, Quebec and Bathurst, New Brunswick.  It closed these mills despite acknowledging in its 10-Q, filed with the SEC on August 8, 2005, that "in the third quarter of 2005, we expect seasonally strong demand for containerboard and corrugated containers."   All together, these mills accounted for approximately 274,000 tons per year of containerboard.  According to its 2007 Annual Report, in 2005  Smurfit-Stone shut down 8.5% of its total capacity.  The closures were against Smurfit-

---

[16] *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05*, Crain's Chicago Bus., June 27, 2005, at p. 4.
[17] *050701 Containerboard & Boxes -- Boxed in*, Deutsche Bank – Equity Research
[18] *050719 IP Thoughts on Restructuring*, Deutsche Bank – Equity Research

Stone's unilateral economic self-interest because they were made during a period of increasing demand and prices.

82.     Despite Smurfit-Stone's disclaimer regarding plant closures only a few weeks before, on August 4, 2005 Deutsche Bank reported:

> Smurfit-Stone today announced a number of permanent capacity closures…a bit more capacity than we expected, a bit earlier than we expected.  They amount to 480K tons…or about 1.3% NA capacity…With Smurfit having done a good deal of "heavy lifting", we'll be watching the behavior of other major competitors like International Paper and Weyerhaeuser…the outlook of demand has also improved remarkably in recent weeks.[19]

83.     The following day, the St. Louis Post-Dispatch reported that Smurfit-Stone stated that "the closures are part of its restructuring efforts and will reduce its container-board manufacturing capacity by about 700,000 tons."[20]    Approximately one month later, on September 7, 2005, Smurfit-Stone announced a price increase of $30/ton to take effect on October 1, 2005.  On September 17, 2005, Defendant PCA followed with the announcement of a $30 per ton price increase also effective October 1, 2005.

84.     During the 2nd quarter of 2005, Georgia-Pacific reduced the number of its containerboard shipments "due to slowback and maintenance downtime."[21]    A slowback is another form of output restriction in lieu of completely shutting a machine or mill down. Georgia-Pacific did both in 2005, scheduling all major maintenance downtime across its mills in the fourth quarter of 2005 while announcing price increases of $30 per ton on linerboard medium, and 8% on boxes to be effective during that quarter.[22]

85.     In the 3rd Quarter of 2005, International Paper also announced the closing of its 100,000 ton-per-year mill in Fort Madison, Iowa.

---

[19] *050804 Bigger - Sooner - Enough -- Smurfit Announces Mill Shuts,* Deutsche Bank – Equity Research
[20] *Smurfit-Stone plans to close plants, lay off 565,* ST. LOUIS POST-DISPATCH, August 5, 2005, p. C3.
[21] *Georgia-Pacific Reports Second quarter Results,* Canada NewsWire, July 28, 2005, at p. 4.
[22] *Q3 2005 Georgia-Pacific Earnings Conference Call – Final,* FD (Fair Disclosure) Wire, Oct. 27, 2005, at p. 6.

86.     On September 20, 2005, Deutsche Bank reported that containerboard prices were moving up but that "[w]hether prices can rise further without more supply reductions remains an open question."[23]

87.     That same month, September 2005, Defendant Norampac permanently closed one of its two 150,000 tons-per-year paper machines at its Red Rock, Ontario containerboard mill. Additionally, in 2005, Norampac took "market related downtime" equal to 6.7% of its North American capacity despite increasing prices and demand.

88.     In October 2005, Norampac CEO Marc-Andre Depin commented on the September 2005 machine shut down by noting, "[i]f everyone would remove the same amount of capacity percentage-wise as we have, I think our business would look a lot better.  You have to be ready to let go of business if you want to keep the price up."[24]  In its 2005 Form 20-F, Norampac also noted, "continued industry consolidation, rationalization of inefficient containerboard mill capacity and market-related downtime have helped to better balance supply with demand and create a less volatile pricing environment."[25]

89.     On September 27, 2005, members of the FBA again met in Atlanta, Georgia at Georgia-Pacific's offices for the Corrugated Packaging Alliance Meeting.[26]  Just days later, on October 1, 2005, Defendants and their co-conspirators raised prices on linerboard by 7% ($30/ton) from $450/ton to $480/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 7% ($30/ton) from $420/ton to $450/ton.  Notably, the effective date of the price increase, as well as the amount of price increase, was implemented uniformly throughout the industry and mirrored the increase announced by Smurfit-Stone and PCA just weeks prior.   On October 3, 2005, Deutsche Bank reported that all major containerboard producers were now supporting the price increase.[27]

---

[23] *051017 Deutsche Bank - September Containerboard Monitor,* Deutsche Bank – Equity Research.
[24] Arzoumanian, M. *Board Increase Flies Through*, Official Board Markets, Volume 81, Issue 44, Oct. 29, 2005.
[25] See Norampac Form 20-F for year ending December 31, 2005, at p. 16.
[26] The Corrugated Packaging Alliance, or "CPA," states its mission is in part "to provide a coordinated industry forum that effectively acts on competing materials matters that could not be accomplished by individual members."
[27] *051003 Dr Paper's Pulse on Pricing,* Deutsche Bank – Equity Research

CONSOLIDATED AMENDED COMPLAINT

A.30

90.     Just one month later, on October 27, 2005, Deutsche Bank reported on another expected price increase: "Chemical producers do it, metal producers do it…maybe CB producers can do it too.  Two CB price hikes in 60 days is quite unusual.  A December price hike is unprecedented."[28]  Defendants were able to accomplish the across-the-board price increases by sharing supply and capacity curtailment information with one another in order to coordinate supply restrictions substantial enough to force and sustain a Containerboard Products price increase.

91.     On November 16, 2005, there was a meeting of the FBA's Board of Directors.  That same day, Deutsche Bank reported that containerboard "[i]nventory numbers dropped steeply in October, much more than typical…inventories down to 2.18 million tons, lowest level since 1994."[29]  Notably, the last time that containerboard inventories were reported to be this low was during a horizontal output restriction conspiracy that ran from 1993-1995.  *See In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir.2002).

92.     Less than two weeks after the meeting of the FBA's Board of Directors, on or about November 28, 2005, Weyerhaeuser and PCA announced a 40$/ton price hike, effective January 1, 2006.

93.     Regarding these announced price hikes, on November 28, 2005 Deutsche Bank reported that they "are likely to be joined by others before long."[31]  Deutsche Bank also reported that:

> Industry sources report that 2 of North America's 6 largest containerboard producers (Weyerhaeuser, PCA) are talking with customers about a price hike on January 1.  It would appear that the increases are in the $40/ton range…Because January and early February tends to be one of the slowest periods of the year, a January price hike is unusual…Box plant inventories fell 208K in October and have fallen 356K in 2 months.  Measured in terms of days of supply, box plant inventories are at only 2.8 weeks - the lowest level we can find in our 20+yrs of data…Further supply reductions could heat the market even further over the next month or two.[32]

---

[28] *051027 Deutsche Bank - Smurfit-Stone Container*, Deutsche Bank – Equity Research
[29] *051116 Deutsche Bank - October Containerboard Monitor and Numbers*, Deutsche Bank – Equity Research
[31] *051128 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[32] *051128 Deutsche Bank - Paper and Packaging*, Deutsche Bank – Equity Research

94.     The following day, Weyerhaeuser announced its intent to indefinitely idle its 350,000 tons-per-year linerboard machine in Plymouth, North Carolina.  On November 29, 2005, Deutsche Bank reported that "[t]he shutdown removes nearly 1% of US containerboard capacity at a point when the market has begun to tighten rapidly.  Containerboard was already a tight market."[33]

95.     On December 3, 2005, Official Board Markets reported that Weyerhaeuser was informing its customers about the $40 price increase and that "Packaging Corp. of America, Smurfit-Stone Container Corp. and Temple-Inland are telling their customers the same thing."

96.     In total, Defendants and their co-conspirators shut down nearly 1 million tons of containerboard capacity in 2005, or over 3% of total market capacity.  Their conduct cannot be reconciled with the strong demand the industry anticipated throughout 2005 and thereafter. Defendants and their co-conspirators did not have economic justification to unilaterally cull capacity or reduce production of corrugated containers.  As demand and prices were increasing, independent firms acting in their unilateral self-interest had an incentive to refrain from reducing capacity in order to produce sufficient containerboard to meet the strong demand for corrugated containers, not to restrain output as they did.

## 2006

97.     The Defendants and their co-conspirators also anticipated strong demand for Containerboard Products in 2006.  For example, in its 10-K for the year ending December 31, 2005, International Paper reported that "[w]e see favorable signs of positive momentum for the remainder of 2006.  We anticipate that demand in North America for both uncoated paper and industrial packaging products will be stronger."

98.     Effective on or about January 1, 2006, Defendants and their co-conspirators again raised prices on linerboard by 8% ($40/ton) from $480/ton to $520/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 9% ($40/ton) from $450/ton to $490/ton.  These price increases, deemed "unusual" by Deutsche Bank just weeks before (see ¶¶ 91 and 93, *supra*), occurred across-the-board and were imposed by all

---

[33] *051129 Deutsche Bank – Weyerhaeuser*, Deutsche Bank – Equity Research

Defendants and their co-conspirators at or about the same time. In 2007, PCA Chairman and CEO, Paul Stecko, commented on the January 2006 price hike, noting "since consolidation began, inventories have trended down and we did get a price increase last January. So that would historically not be a normal time."[34]

99.     That same month, in January 2006, the Corrugated Packaging Alliance Action Team met at Georgia-Pacific's headquarters in Atlanta, Georgia. Despite the record low containerboard and corrugated container inventories and rising containerboard product prices, over the course of the following year Defendants and co-conspirators continued to reduce capacity of Containerboard Products. In its Form 20-F for fiscal year ending December 31, 2005, Norampac noted, "[i]n the first quarter of 2006, the situation was positive. In particular, several North American producers announced capacity reductions or closures and some of them have also reduced their box making capacity."

100.    In the 1st Quarter of 2006, Weyerhaeuser closed its 350,000 tons-per-year Plymouth, North Carolina containerboard plant. This plant shutdown was not in Weyerhaeuser's economic self-interest as it came at a time of rising prices and record low inventories, as evidenced by its 2006 1st Quarter 10-Q wherein Weyerhaeuser reported that:

> The company anticipates improvement in earnings for the Containerboard, Packaging and Recycling segment in the second quarter primarily due to implementation of previously announced price increases for both containerboard and corrugated packaging and a seasonal increase in demand for corrugated packaging.

101.    On February 13, 2006, Deutsche Bank reported that containerboard "[p]rices are rising - even faster than expected. Transaction prices on U.S. kraft linerboard and corrugating medium rose $40/ton in January - fully reflecting the price hike. Spot prices have reportedly risen further."[35]

102.    On February 21, 2006, Deutsche Bank reported that containerboard inventories "remain at historically lean levels" and characterized containerboard prices as "rapidly rising."[36]

---

[34] Transcript of Q1 2007 PCA Earnings Conference Call, April 18, 2007, at p. 6.
[35] *060213 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[36] *060221 Deutsche Bank - January Containerboard*, Deutsche Bank – Equity Research

Deutsche Bank also noted that: "A $50/ton price hike has been announced for late March/early April. A $40/ton January increase on linerboard & corrugated medium appears to have taken hold with relative ease. A $30/ton October hike also went in with ease."[37] On March 4, 2006, Official Board Markets noted:

> "Other integrateds that have announced recently (all up $50 per ton) include Weyerhaeuser (April 1), Norampac (March 20), and Packaging Corp. of America (March 21)…¶…Last month, Georgia-Pacific announced a $50 per ton increase is scheduled to take effect April 1…¶…If this latest increase is fully implemented it will mean that containerboard prices have risen 33 percent since mid-October.

103. On March 6, 2006, International Paper filed its Form 10-K for year ending December 31, 2005. In its Executive Summary discussing the outlook for 2006, it was noted that "…operating rates should improve in 2006 reflecting announced industry capacity reductions in uncoated papers and containerboard."[38]

104. On March 14, 2006, the FBA's Executive Committee met. Approximately three weeks later, in early April 2006, Defendants and their co-conspirators raised prices on linerboard again, this time by nearly 10% ($50/ton) from $520/ton to $570/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 10% ($50/ton) from $490/ton to $540/ton. These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time.

105. In sum, between October 2005 and April 2006, the Defendants and their co-conspirators raised prices in concert three times, October 2005, January 2006, and April 2006. By April 2006, the price of linerboard had reached prices of $560-570/ton – its highest level since 1995. A trade journal reported, "[s]ince October 2005, board prices have risen 33%. The quickness of the jump is unprecedented."[39]

106. The price increases in containerboard and its components caused corrugated container prices to rise as well. As reported by Deutsche Bank: "It appears that most of the first two containerboard price hikes have made their way into box prices. Producers are now trying to

---

[37] *Ibid.*
[38] International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p. 11.
[39] Paperboard and Packaging, April 2006, at p. 16.

push this spring's $50/ton hike downstream to boxes.  There are encouraging early signs in the corrugated sheet & local box markets."[40]

107.    Defendants' costs, however, did not increase during this period.  In discussing the increasing profit margins enjoyed by the industry in the first quarter of 2006, Deutsche Bank noted "[h]igher prices and a moderation of cost pressures were the key drivers."[41]  Thus, increased costs cannot explain Defendants' price increases.   Notably, in April 2006, containerboard prices reached their highest peak since 1995 – which was also during a period of known collusion.  *See In re Linerboard Antitrust Litigation.*

108.    In its May 9, 2006 10-Q, International Paper reiterated its bullish outlook for demand, noting that "[e]ntering the 2nd quarter, we expect operating profits to be somewhat higher than in the 1st quarter.  Product demand and projects sales volumes are solid across all of our key platform businesses."

109.    Strong demand throughout 2006, combined with the capacity cuts and output restrictions imposed by the Defendants and their co-conspirators, resulted in significantly higher prices for Containerboard Products.  As stated in Weyerhaeuser's 2006 2nd Quarter 10-Q: "The increasing price realizations for containerboard and corrugated packaging resulted from an increase in industry demand for corrugated packaging, coupled with high containerboard mill operating rates and low inventory levels."  Despite an increase in demand which began at least in 2005, in early 2006, Weyerhaeuser closed its 350,000 ton-per-year containerboard machine at its Plymouth, N.C., mill.

110.    On June 8, 2006, Deutsche Bank reported on the effect of recent tightening of supply by Defendants:

> Most containerboard companies reported q/q [quarter over quarter] margin gains in Q1 2006.  Higher prices and a moderation of cost pressures were the key drivers…Published estimates for linerboard price have risen $120/ton since September, reaching $515/ton - - - the highest level since October 1995…Supply discipline has been an essential part of

---

[40] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research
[41] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research

the equation. Since early 2005, 1.67MM tons of capacity have been closed.[42]

111.    On June 15, 2006, Deutsche Bank confirmed the price increases resulted in higher corrugated container prices to the Plaintiff Class: "The strong box volume and lower inventories in May enhance the odds that producers will get full pass through of the CB hike into boxes… [t]he May figures show very solid demand and an inventory level reviving from upward climb."[43]

112.    On July 18, 2006, Deutsche Bank reported that "[PCA] says that April hike is now essentially fully into boxes."[44]

113.    On July 25, 2006, Deutsche Bank reported that Weyerhaeuser's "box prices were up 5.3%."[45]

114.    On August 7, 2006, Deutsche Bank reported that "[c]ompany earnings announcements to date show the 3rd price hike is being passed in the form of higher box prices."[46]

115.    Despite the substantially increased prices already brought about by a constriction of capacity and supply, in the 3rd Quarter of 2006, Norampac closed its 300,000 tons-per-year Ontario, Canada plant.  On August 31, 2006, the *Toronto Sun* reported the closure, noting that Norampac cited "unfavourable economic factors" as the reason for the closure.[47]  The Ontario plant was 20% of Norampac's total containerboard capacity and nearly 1% of total North American containerboard capacity.  Norampac blamed the closure on high energy and input costs.  However, as recently as June 2006, the trade press had indicated that Containerboard Products producers' margins were increasing due in part to a moderation of costs.  In response to the plant closing, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement.  Linerboard prices are up $120/ton over the last year, and the YTD operating rate

---

[42] *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research
[43] *060615 Deutsche Bank Report - May Containerboard & Box Numbers Big Volumes*, Deutsche Bank – Equity Research
[44] *060718 Deutsche Bank Report - COMPANY ALERT - Packaging Corp. of America*, Deutsche Bank – Equity Research
[45] *060725 Deutsche Bank Report - COMPANY ALERT – Weyerhaeuser*, Deutsche Bank – Equity Research
[46] *060807 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[47] *N. Ontario Mill To Shut Down,* THE TORONTO SUN, August 31, 2006, at p. 54.

for linerboard in the US is 98.9%."[48]  This plant shutdown was not in Norampac's unilateral economic self-interest as it came at a time of rising containerboard prices, tight supply and high plant operating rates; however, as alleged above, Norampac had previously urged the industry to "remove the same amount of capacity percentage-wise" as Norampac so that the "business would look a lot better," because, as its CEO committed to the industry, "You have to be ready to let go of business if you want to keep the price up.".

116.    On October 9, 2006, Deutsche Bank reported that containerboard "[d]emand remains solid."[49]

117.    On October 18, 2006, Deutsche Bank reported that PCA had record earnings per share in the 3rd Quarter of 2006, which reflected the hikes in containerboard prices.  Deutsche Bank also reported that PCA was "trimming output @ pt when mkt appears to be easing. [sic] They're not 'free riding' & not delaying – encouraging signs…4Q impact of mill outages will remove 12K tons from system…production cut-backs by a player often viewed as industry 'free rider' are constructive."[50]  PCA was contributing to the cartel by taking downtime and reducing containerboard output while demand remained strong.  Under competitive market conditions, PCA's downtime would not have been in its unilateral interest; rather, it would have continued as a free rider on the output reductions of the other Defendants.  PCA's downtime under then-current market conditions and expectations made economic sense only pursuant to an agreement or understanding with its competitors that they would also restrict supply.

118.    This was confirmed by PCA's 10-K for the year ending December 31, 2006:

> Industry supply and demand trends were favorable throughout 2006.  Industry shipments of corrugated products increased 1.3% during 2006 compared to 2005, on a per workday basis.  During this same period, industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2006 at its second lowest level in the past 25 years, on a weeks of supply basis.  Since September 2005, linerboard prices have increased $120 per ton, or approximately 30%, as reported by industry publications.

---

[48] *060830 Deutsche Bank Report - Norampac closing Red Rock*, Deutsche Bank – Equity Research
[49] *061009 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank - Equity Research
[50] *061018 Deutsche Bank Report - PKG in 100 Words No more 100% operating rates?* Deutsche Bank - Equity Research

119.    Just one week after reporting that PCA was taking downtime to further reduce any slack in the supply constraint, on October 25, 2006, Deutsche Bank reported: "Best news may be SSCC's [Smurfit-Stone] Q4 'maintenance' downtime.    With markets appearing to slow, throttling back on supply could help pricing environment."[51]

120.    In October 2006, Weyerhaeuser and International Paper announced a price increase effective on January 1, 2007.

121.    The unprecedented across-the-board increases in containerboard prices were due to a concerted effort by the Defendants and their co-conspirators to restrict output and capacity. Industry trade journals reported that the "linerboard market began to tighten in the fourth quarter of 2005 and containerboard dropped to an unusually low level of 2.2 million tons."[52]    Another trade journal noted that "capacity reductions…may be the most important overall factor behind the strong price gains" and that "[w]ith supplies short, mills were in the drivers' seat and began to aggressively push up prices."[53]

122.    All together, between 1st Quarter 2005 and 3rd Quarter 2006, Defendants and their co-conspirators shut down nearly 1.7 million tons worth of containerboard capacity.    In comparison, the conspiracy among a similar set of defendants in 1993-1995 was executed by shutting down only 300,000-350,000 tons of capacity.    *See In re Linerboard Antitrust Litigation*, 305 F.3d at p. 154.    These massive shutdowns were part of the Defendants and their co-conspirators' concerted effort to stabilize and raise the price of Containerboard Products.

### 2007

123.    In 2007, Defendants and their co-conspirators continued to shut down capacity in furtherance of their conspiracy.    In late January 2007, International Paper took 74,000 tons of containerboard capacity offline.    In April, PCA reported that it took unspecific downtime in the 1st and 2nd Quarters of 2007.

124.    On April 18, 2007, PCA Chairman and CEO, Paul Stecko, stated the following with respect to industry-wide inventories during PCA's 1st Quarter earnings conference call:

---

[51] *061025 Deutsche Bank Report - SSCC Q3 in 100 Words*, Deutsche Bank - Equity Research
[52] Pulp & Paper (Jan. 2007) at p. 15.
[53] Paper Age (September/October 2006) at p. 15.

> Our containerboard inventories at the end of the first quarter were down about 2000 tons compared the year-end 2006 levels. I should also note that yesterday the Fibre Box Association released industry statistics for the month of March and in our opinion these statistics are very encouraging. Corrugated products demand was up 3.4% per workday and containerboard inventories fell by 75,000 tons to 2.472 million tons or 4.1 weeks of supply. This is 200,000 tons lower than the average March containerboard inventory for the past ten years and on a weeks of supply basis, this is the lowest March ending inventory on record. So pretty healthy statistics.

125.    In June 2007, Smurfit-Stone closed down two plants, a 148,000 tons-per-year plant in Vernon, California and a 52,000 tons-per-year plant in Carthage, Indiana.

126.    On June 18-20, 2007, there was a Joint AF&PA, AICC and FBA Washington Fly-In meeting in Washington, DC. Shortly thereafter, Weyerhaeuser announced a $40/ton price hike, effective August 1, 2007.

127.    In early July 2007, PCA and Smurfit-Stone also announced a $40/ton containerboard price hike, also effective August 1, 2007.

128.    Regarding whether these announced price hikes would work, Deutsche Bank commented that "the global containerboard backdrop remains just about as favorable as any we have seen in over 20 yrs."[54] On July 6, 2007, Deutsche Bank reported that "[v]irtually all major containerboard producers have slated $40-50/ton hikes for August."[55]

129.    On or about August 1, 2007, Defendants and their co-conspirators raised prices on containerboard again, this time by over 7% ($40/ton) from $570/ton to $610/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 7% ($40/ton) from $540/ton to $580/ton. These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

130.    On September 4, 2007, Deutsche Bank reported that the "full $40/ton price hike initiative for August was reflected in the trade papers and most of our trade reports suggest uncharacteristic discipline from the big integrateds."[56]

---

[54] 070703 Deutsche Bank Report - August Containerboard Price Hike, Deutsche Bank - Equity Research
[55] 070706 Deutsche Bank Report - Dr. Paper's Weekly Wrap Up (7/6/07), Deutsche Bank - Equity Research
[56] 070904 Deutsche Bank Report - Dr. Paper's Pulse on Pricing, Deutsche Bank - Equity Research

131.    On September 6, 2007, Norampac announced that it had entered into a joint venture with two other Containerboard Products manufacturers, including Smurfit-Stone, to establish a new company called Niagara Sheet LLC.  Commenting on the transaction, Marc-André Dépin, President and CEO of Norampac, noted "[t]he participation of Norampac in this joint venture follows the trend of our investment strategy which aims to consolidate our expansion in the United States and enable us to ensure the quality of our products and the satisfaction of our customers."

132.    October 2007, International Paper closed down its 200,000 tons-per-year containerboard plaint in Terra Haute, Indiana.

133.    PCA's 2007 10-K reported that the company's gross profits as a percentage of net sales increased from 20.3% to 22.7% "primarily due to the increased sales prices" of its corrugated products and that from 2006 to 2007, "industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2007 at its second-lowest level in the past 25 years, on a weeks-of-supply basis."

134.    Temple-Inland reported in its 2007 10-K that "[i]n 2007, corrugated packaging prices and linerboard prices moved higher as a result of price increases implemented in 2006 and 2007.  In 2006, corrugated packaging and linerboard prices moved higher reflecting price increases implemented in late 2005 and in 2006."  Notably, Temple-Inland also reported that prices for other paper products – specifically, gypsum wallboard – had decreased in the same period.

135.    Defendants and their co-conspirators did not have independent economic justification to cut capacity or reduce production of corrugated containers in the face increasing demand and prices. To the contrary, independent firms acting competitively and in their unilateral self-interest had an incentive to refrain from such acts.

**2008**

136.    On February 1, 2008, Deutsche Bank reported that "plant inventories fell from 3.1 to 3.0 weeks, one of the lowest levels in history."[57]

---

[57] *080201 Deutsche Bank Report - January Containerboard Monitor,* Deutsche Bank - Equity Research

137.   On or about March 17, 2008, International Paper announced that it was purchasing Weyerhaeuser.   This merger made International Paper the single largest containerboard producer with 11.5 million tons per year of global containerboard capacity.   As indicated above, prior to the merger announcement, International Paper had been idling and reducing its capacity.

138.   On March 24-26, 2008, the FBA's Annual Meeting 2008, was held at the J.W. Marriott Desert Springs in Palm Desert, California.   At this Annual Meeting, the FBA's Board of Directors meeting was also held.

139.   On March 30-April 2, 2008, the American Forest & Paper Association held its Annual Paper Week convention in New York, New York.

140.   On or about May 5, 2008, International Paper's purchase of Weyerhaeuser was approved.   As a result of the merger, the top seven containerboard producers made up a combined market share of approximately 80%.

141.   On or about May 10, 2008, Georgia-Pacific announced an increase on containerboard prices by $55/ton, effective July 1, 2008, and new reports stated that "within hours after this announcement, Smurfit-Stone…told its customers the same price increase details."[58]   Shortly thereafter, International Paper, Weyerhaeuser, PCA and Norampac also instituted identical price increases.[59]

142.   On May 16, 2008, Deutsche Bank reported that containerboard inventory was the "second-lowest April level in 20 years."[60]

143.   On May 28, 2008, Deutsche Bank reported that both Smurfit-Stone and Georgia-Pacific recently announced a $50/ton price hike, effective July 1, 2008.[61]

144.   On June 16, 2008, in a report primarily focusing on International Paper and Smurfit-Stone, Deutsche Bank reported: "IP's Packaging head, Carol Roberts, acknowledged that IP's number one priority was increasing prices.  Roberts argued that independent boxmakers

---

[58] Board producers again try for price increase; $55 per ton," Official Board Markets, May 31, 2008 (citing an earlier May 10, 2008 article).
[59] "More Integrateds Want Increase." Official Board Markets, June 7, 2008.
[60] *080516 Deutsche Bank Report - April Containerboard Monitor*, Deutsche Bank - Equity Research
[61] *080528 Deutsche Bank Report - July Price Hike*, Deutsche Bank - Equity Research

would welcome a disciplined push on containerboard and box prices as it would provide them with an opportunity to restore margins. They are showing some leadership. IP has recently announced an 11% box price increase effective July 1. Smurfit's Chuck Hinrich's [sic] noted that "we understand urgency around current price increase." Deutsche Bank further noted that in terms of "more capacity rationalization in containerboard and boxes . . . both IP and [Smurfit-Stone] acknowledged the need to maintain a balanced supply/demand situation."[62]

145. On or about July 1, 2008, despite the effects of an economic recession felt throughout the United States, Defendants and their co-conspirators raised prices on linerboard yet again, this time by over 9% ($55/ton) from $610/ton to $665/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($40/ton) from $580/ton to $635/ton. The Defendants quickly followed the price increases in containerboard and corrugated medium by announcing an 11% increase in the price of finished boxes.[63] These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

146. On July 16, 2008, Buckingham Research Group stated that "we are bullish on containerboard given low inventories, high operating rates, recent outages and closures . . .we believe that the July containerboard $55/ton price increase has gained traction and will be reflected in the trade journals this weekend."[64]

147. In late August, International Paper, whose "number one priority was increasing prices" by means of a "disciplined push" as detailed above, in fact showed its "leadership" and announced a price increase of $60 per ton, effective October 1, 2008.[65] Shortly thereafter, Smurfit-Stone, Temple-Inland and Georgia-Pacific also announced identical price increases and on September 8, 2008 it was reported that Citigroup had confirmed that Temple-Inland, Smurfit-Stone and Georgia-Pacific "have followed International Paper's move to raise containerboard

---

[62] June 16, 2008 Deutsche Bank Paper & Packaging report, at 3.
[63] P. Scott Vallely. *Update on Containerboard Grades: Notes from Deutsche Bank Research Paper.* (June 17, 2008)
[64] July 16, 2008 Buckingham Research Group analyst report, International Paper, at 3.
[65] *IP Wants yet More for Board: Will Others Follow?*, Official Board Markets, September 6, 2008.

CONSOLIDATED AMENDED COMPLAINT

prices by $60/ton. They point out that this means that at least 70% of the US capacity have announced an October increase."[66]

148.    On August 20, 2008, Deutsche Bank reported that "[d]espite sluggish demand, the [July] containerboard [price] hike succeeded, supported by rising input costs, high operating rates, lean inventories (aided by outages at large mills owned by IP & [Weyerhaeuser]), and strong export markets. The next stop is the related box price hike, which will play out over the next few months. Producers are looking to get more than a simple pass-through of higher containerboard costs." Regarding input prices Deutsche Bank reported "while prices are rising, some important input costs appear to be rolling over. OCC costs have been declining steadily since the March high, and energy costs are falling sharply. Longer-term, we view the increased consolidation created by IP's acquisition of WY's packaging business as positive for the industry."[67]

149.    The AICC objected to the October price increases because "[the] announcements by International Paper and other integrated producers, coming as they do within 90 days of the $55 per ton increase in July, are unjustified based on current economic indicators and inputs. We believe they even border on collusion. Containerboard products, using their increasing market share in what one analyst called 'the hammer,' have in this announcement exhibited an unbridled arrogance toward their independent customers and a blatant disregard for the users of corrugated boxes." In fact, price increases in the face of soft demand are inconsistent with unilateral economic interests and are counter-intuitive without collective and coordinated decreases in production capacity.[68]

150.    In October 2008, Smurfit-Stone shut down its 135,000 tons-per-year corrugated medium plant in Snowflake, Arizona. That same month, International Paper began idling its 250,000 tons-per-year containerboard plant in Albany, Oregon. Less than a month later, in

---

[66] "SSCC, TIN, IP: Recommendations," Theflyonthewall.com, Sept. 8, 2008.
[67] August 20, 2008 Deutsche Bank Paper & Packaging industry analyst report, at 64, 68
[68] *AICC Strongly Opposes $60 per ton Board Price Increase: Borders on Collusion*, Official Board Markets, September 20, 2008.

CONSOLIDATED AMENDED COMPLAINT

November 20008, International Paper shut down its 430,000 tons-per-year linerboard plant in Valiant, Oklahoma.

151.    In November 2008, Smurfit-Stone announced temporary closures of several containerboard mills: (i) Smurfit-Stone temporarily shut down its 550 ton-per-year Missoula, Montana linerboard machine (from November 10, 2008 through the end of 2008); (ii) Smurfit-Stone also temporarily shut down its linerboard machine at its containerboard mill in Hodge, Louisiana (from November 24, 2008 to December 11, 2008);[69] (iii) Smurfit-Stone temporarily closed its 800 tons-per-day containerboard mill in Ontonagon, Michigan (from November 24, 2010 through at least the end of the year);[70] and (iv) Smurfit-Stone temporarily shut down its Panama City, Florida containerboard mill (from November 22, 2008 through the end of 2008).[71] Between fourth quarter of 2008 and first quarter of 2009, over 800,000 tons per year of capacity was idled by Defendants.

152.    In the 4th quarter of 2008:

    a.    Smurfit-Stone idled plants in Matane, Quebec (174,000 tpy), Missoula, Montana (171,000 tpy), and Jacksonville, Florida (170,000 tpy).

    b.    Georgia-Pacific idled plants in Cedar Springs, Georgia (265,000 tpy);  Palatka, Florida (40,000 tpy) and announced the temporary closure of its corrugating medium mill in Toledo, Oregon from December 23, 2008 to December 30, 2008.[72]

    c.    PCA engaged in significant mill downtime or slowbacks in the fourth quarter of 2008.[73]

    d.    Temple-Inland took "108,000 tons market related" and "22,000 tons maintenance related" downtime 2008, despite rising prices and inventories  were the "lowest year entering level in 3 years."

---

[69] *SSCC Shuts Down two Board Machines: In Louisiana and Montana*, Official Board Markets, November 15, 2008.
[70] *SSCC to Close Michigan Mill: May Reopen in January*, Official Board Markets, November 22, 2008.
[71] *CC Will Shut Down Florida Mill: More Layoffs Coming*, Official Board Markets, November 22, 2008.
[72] *GP Will Close Oregon Mill: For one Week*, Official Board Markets, December 6, 2008.
[73] *PCA Slows Board Production: Lower Earnings*, Official Board Markets, December 13, 2008.

     e.    International Paper announced plans to close its containerboard mills in Pineville, Louisiana and Albany, Oregon and that it would permanently shut down its previously idled machine in its Valliant, Oklahoma containerboard mill. These permanent shutdowns reduced International Paper's North American paper and board capacity by 2.1 million tons.

153.    Outlining the history of containerboard price increases imposed during much of the Class Period, Temple-Inland reported in its 2008 10-K that "[i]n 2008, corrugated packaging prices were up as a result of price increases implemented in 2007 and mid-2008… In 2007, corrugated packaging prices and paperboard prices moved higher as a result of price increases implemented in 2006 and 2007. In 2006, corrugated packaging and paperboard prices moved higher reflecting price increases implemented in late 2005 and in 2006."[74] In a related presentation Temple-Inland revealed that it had taken "108,000 tons market related" and "22,000 tons maintenance related" downtime during 2008, which according to the same presentation saw TIC's average box prices increase by $29 per ton. The presentation also noted that inventories were at the "lowest year entering level in 3 years."

**2009**

154.    On February 27, 2009, Deutsche Bank reported that "in recent months, containerboard demand has been off sharply, but published containerboard prices have remained remarkably 'sticky,'" commenting that, "[w]ith extremely weak demand, lower input costs and a stronger US$, the modest erosion in domestic pricing appears a victory for producers. Production discipline has kept inventories in check and limited domestic pricing erosion . . . the industry has done an impressive job to date in keeping prices relatively stable," and "[t]he industry is taking an unprecedented amount of market downtime to keep the market in balance. IP alone took 700K tons in 4Q." [75]

155.    In the same report, Deutsche Bank commented on Temple-Inland's containerboard and box business: "This business should show reasonable resiliency in an

---

[74] Temple-Inland 2008 10-K, filed Feb. 23, 2009, at 25; TIC Nov. 4, 2008 10-Q, at 19.
[75] February 27, 2009 Deutsche Bank Paper & Packaging industry analyst report, at 39, 61, and 68.

economic downturn, because of (1) recent industry consolidation, (2) recent industry capacity rationalization, (3) end markets weighted toward non-discretionary items such as food and beverages, and (4) an easing trend in some important input costs such as energy, recycled fiber, and transportation."

156.    In 2009, John Geenan, a Senior Vice-President of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), explained that the containerboard industry aggressively managed capacity in order to maintain or increase pricing and that whenever prices threaten to decrease the industry rapidly removed capacity.

157.    During an investor presentation in February, 2009, Temple-Inland stated that it had "centralized pricing decision making" and a "structured and disciplined approach to the market."  The same presentation included a slide titled "*North American Corrugated Packaging Industry Fundamentals*," noting the "Consolidating industry… Significant capacity rationalization and downtime . . . [and] Improved pricing."   Temple-Inland continued that "[i]mproved industry fundamentals has led to higher average prices and reduced volatility" in linerboard pricing, and referred to remarkable "industry discipline".[76]

158.    Deutsche Bank commented on June 2, 2009, "we're impressed that prices have not fallen further.  Besides very weak domestic demand, the industry is also coping with sharply lower export volumes . . . the supply discipline to date has been impressive."

159.    On December 7, 2009, Deutsche Bank described a "notable effort" by containerboard producers to increase prices, stating that "[i]n recent weeks, most major producers have announced $50-70/ton hikes for January 1.  We are surprised by the timing, because this is a seasonally weak period."  The same report emphasized that a January 1 price increase was "somewhat unusual timing because the market is entering a seasonally weak period, but we expect the larger producers to support the hike," and also noted that despite declining prices in the prior year, "the wonder is how the industry kept prices from falling further, given extremely weak demand and low input costs."

---

[76] TIC Feb. 2009 Investor Presentation, at 22 and 25 – 26.

160.    On December 14, 2009, Smurfit-Stone announced the permanent closure of its Containerboard Products mills in Missoula, Montana (620,000 tons of linerboard annually) and Ontonagon, Michigan (280,000 tons of medium annually) effective December 31, 2009.   In response to the Missoula mill closure, Montana state senator Cliff Larson sent a letter to Judge Brendan L. Shannon, presiding Judge in Smurfit-Stone's Chapter 11 Bankruptcy proceedings, stating:

> "We are told that Smurfit-Stone does not want the plant to run because they want to control 'the market.'  Well, what about competition?  What about gathering in cash for investors and creditors?   With electric generating capacity of about seventeen megawatts setting idle, trained plant workers willing to work and generate that biomass energy source we have a ready source of green energy sadly not generated. Another income source - not actualized."

According to Smurfit-Stone's Disclosure Statement, the Ontonagon Mill and Missoula Mill closures were "ordinary course transactions" which did not require Bankruptcy Court approval.

## 2010

161.    As the U.S. economy began to emerge from the recession, Defendants and their co-conspirators again raised prices on linerboard by over 8% ($50/ton) from $585/ton to $635/ton, effective on or about January 1, 2010.   At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 8% ($50/ton) from $555/ton to $605/ton.  This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.  Deutsche Bank commented on the January price increase, "It is hard to recall another hike being so readily passed through during a seasonally-weak period."[77]

162.    Less than a month later, several Defendants, including International Paper, began to discuss an additional price increase for March or April in various forums.[78]  Deutsche Bank reported "[w]e give this second containerboard hike a good chance of success," in part because

---

[77] February 8, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1.
[78] *More Board Makers want Price Increase*, Official Board Markets, March 6, 2010.

CONSOLIDATED AMENDED COMPLAINT

"[International Paper] is the clear industry leader, with about 30 percent of the domestic market."[79]

163.    Effective on or about April 1, 2010, Defendants and their co-conspirators again raised prices on linerboard by over 9% ($60/ton) from $635/ton to $695/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($60/ton) from $605/ton to $665/ton.  This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.

164.    As a result of the January and April price increase, total containerboard prices increased by $110 per ton.  In presenting its earnings for the first quarter of 2010, Temple-Inland looked forward and anticipated higher prices in the third quarter.

165.    On May 5, 2010, PCA stated in its 10-Q for the second quarter that "[r]eported industry containerboard inventories at the end of March 2010 were at their lowest level in nearly 30 years…"[80]

166.    On May 17, 2010, Deutsche Bank presciently wrote of more price hikes to come based upon "a host of recent conversations across the trade," stating, "we are increasingly convinced of the third price hike attempt in 2010 [for containerboard].  Hikes in Jan & Apr added $110/ton to domestic list prices.  We expect the next attempt to be in the $40-50/ton range with implementation slated between July 15th and Sep 1st.  Industry fundamentals remain strong….a spring corrugated box hike appears to be going in with relative ease, and a host of recent conversations across the trade point to a growing sense of 'when,' not 'if' the next initiative will appear."[81]

167.    As predicted by Deutsche Bank, "based upon conversations across the trade" on June 30, 2010, Defendants International Paper and Georgia-Pacific informed its customers of another $60/ton price hike effective August 1, 2010.  In fact, announcements from other Defendants soon followed, including Defendants PCA, Smurfit-Stone and Norampac .

---

[79] *IP Leads off Second Board Price Increase Attempt*, Official Board Markets, February 27, 2010.
[79] *IP Leads off Second Board Price Increase Attempt*, Official Board Markets, February 27, 2010.
[80] PCA May 5, 2010 10-Q, at 16.
[81] May 17, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1.

CONSOLIDATED AMENDED COMPLAINT

168.    After its discharge from bankruptcy, Smurfit-Stone joined the conspiracy, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in further idling of production capacity, reduced production and another near simultaneous across-the-board price increase.

169.    In a July 1, 2010, investor presentation, Smurfit-Stone's CEO Pat Moore and President & COO Steve Klinger reported that between 2005 and 2010, the company had closed 54 container plants.[82]   Smurfit-Stone described the industry's "permanent capacity adjustments" of a total of 2,365,000 tons of containerboard capacity since the end of 2008, and also described the steadily declining industry inventory rates over the prior decade.[83]

170.    On July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "3rd Containerboard Increase puts the Integrity of Our Industry on the Line."   In light of the significant manufacturing capacity cuts, as well as the absence of cost drivers, the article recognizes that a third price increase in 2010 in that environment "calls into question the integrity of our industry."   The article goes on to forewarn of serious repercussions:

> This third increase is rightfully calling into question the pricing activities of the major companies.  During the years 1994-1995, six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak of $525-535/ton.  These actions rightfully caused corrugated users to seek alternative packaging and reduce their corrugated purchases – witness the growth of returnable plastic container use in the mid-1990s. A far more serious result was an inventory collusion allegation and subsequent class action lawsuit brought by the corrugated industry's customer base that cost containerboard makers over $210 million in settlements.

171.    On or about August 3, 2010, Defendant Smurfit-Stone conducted an 'earnings call" to discuss their financial results for second quarter of 2010.   In response to a question about scheduled downtime, Steven J. Klinger, President and COO, stated that the company had completed "42% of [its] related downtime and expect in the back half of the year a very similar level to what we took in all of second quarter.  So just over the back half of the year, about the

---

[82] Smurfit-Stone "Targeted Accelerated Performance Improvement" presentation, July 1, 2010, at 18.
[83] *Id.* at pp 27-28.

same amount that we took in the second quarter" and "the second half of the year should see maintenance downtime from a [tons] standpoint at levels about consistent with what we incurred in the second quarter alone".[84]  In fact, however, Smurfit-Stone forecast this downtime despite "historic low" inventory and rising prices.[85]

172.    During the August 3, 2010 "earnings call" Smurfit-Stone revealed that it had "maintained market share during not only a challenging environment from an industry standpoint, but clearly in our extremely challenging environment for us internally" and "our customers, particularly in our container business and in our mill business, were quite loyal during this [while in Chapter 11] and we improved some of our business with them."   In fact, Smurfit-Stone's August 3, 2010 earnings press release reported "higher average prices," "higher selling prices" and "improved selling prices" at the same time that it announced plans to close three more converting plants.

173.    During an August 11, 2010 analyst conference call, Norampac President and CEO Marc-Andre Depin stated that the "dynamic of [the containerboard sector] are really, really positive for price increase implementation.  So we are going one after the other.  So we will see about the next one.  But I think the dynamics are all there for a price increase and having good backlogs of finished product, which is regular boxes and folding cartons and containerboard and CRB grades…. as I mentioned, Q3, Q4, for sure we have prices increase… the market has been really, really tight."[86]

174.    On or about September 13, 2010, the Gerson Lehman Group stated matters bluntly, "for the 3rd price increase within a year by major paper mills to work, it must be supported by major paper converters...these include: TIN, Temple-Inland, IP International Paper; SSCC Smurfit-Stone Corrugated Container; PKG Packaging Company of America; GP Georgia-Pacific; … & others."[87]

---

[84]  Final Transcript 8/3/10 Earnings Conf. Call, pp 7-8.
[85]  Final Transcript 8/3/10 Earnings Conf. Call, p. 10
[86]  August 11, 2010 Cascades, Inc. Q2 2010 Earnings Conference Call, at 11.
[87]  http://www.glgroup.com/News/The-third-price-increase-in-less-than-a-year%E2%80%A6when-will-they-ever-learn--50520.html

175.    On or about September 15, 2010, Smurfit-Stone participated in the UBS Global Paper & Forest Products conference call.  When asked about its "pricing power" if inventory levels were to rise CEO Patrick Moore responded that "as long as we continue to see a demand environment that we're operating in today - again, very stable, reasonably steady growth, unless we have a major dislocation in the demand side of things or unless pricing levels really begin to attract a lot of supply....inventory levels [will] continue to be very low."  Smurfit-Stone further reported that it had "fully implemented" its January and April 2010 price increases and that it was "[a]ggressively pursuing all three 2010 price increases".

176.    It is hardly consistent with competition that a company such as Smurfit-Stone in a Chapter 11 proceeding or just emerging from Chapter 11 could simultaneously maintain its pricing power, maintain or increase its market share and raise prices.  As Gerson Lehman indicated, such pricing power could only be accomplished if "supported" by its competitors.  Nor is it consistent with competition that a company in such circumstances would engage in substantial downtime in the face of low inventories and rising prices.

177.    The Defendants and their co-conspirators raised the price of containerboard in order to cause an increase in the price of corrugated containers.  Because Defendants convert 81% of the containerboard they manufacture into corrugated containers, Defendants reduced containerboard capacity and jointly increased containerboard prices in order to artificially drive up the price of corrugated containers and increase their profits.

178.    To accomplish the unprecedented price increases during the Class Period, the Defendants and their co-conspirators needed to reduce capacity in a concerted fashion.  No single Defendant could reduce capacity enough to cause an industry-wide price increase.  Accordingly, the Defendants reduced capacity in concert to prevent any one Defendant from bearing the brunt of the capacity shutdown.  Defendants' coordinated efforts to restrict containerboard supply substantially reduced the inventory available for sale to Plaintiff Class[88]:

---

[88] M. Wilde, Deutche Bank, *Containerboard Market Overview*, Apr. 15, 2010, at p. 5.







Sources: Industry Inventory: Fiber Box Association and American Forest & Paper Association; Linerboard Prices: Industry Publications

179.    Further, the price of both linerboard and corrugated medium rose at exactly the same time by exactly the same per-ton amounts.  This identical and simultaneous across-the-board price increase on multiple products can only be explained by concerted and coordinated behavior by the Defendants.



**There Are No Innocent Explanations for the Coordinated Price Increases**

180.    Despite the unprecedented price increases implemented in the Containerboard Products industry during the Class Period, there were no sustained significant changes in production costs which could account for those price increases or Defendants' coordinated reduction in manufacturing capacity and product supply.   During the Class Period, prices increased at over double the rate of corresponding manufacturing costs.

181.    There are four main costs which are responsible for the bulk of the total cost to manufacture and produce Containerboard Products.   They are: 1) raw material costs; 2) labor costs; 3) energy costs; and 4) environmental compliance costs.   As explained below, there were no significant or sustained changes in any of these types of costs during the Class Period.

182. <u>Raw Material Costs</u>: Pulpwood (woodchips used to produce various paper products) is the main input for linerboard. Consequently, it is by far the most significant portion of linerboard cost, representing approximately 40-50%. Alternately, other factors including energy and labor cumulatively represent only about 25%. Because pulpwood prices represent such a large portion of linerboard cost, significant changes in the former may be detected in changes in the latter. The price of pulpwood has increased at a constant rate since the middle of 2001 (an average of roughly 6% per year). As a result, there are no major fluctuations in pulpwood price that correspond to the fluctuations in Containerboard Products.

183. <u>Labor costs</u>: According to PCA's executives: "[l]abor costs in a well run containerboard mill run $30-$40/ton cash cost, which is a relatively small part of the overall manufacturing cost…"[89] Average weekly earnings for production workers at paperboard mills has remained flat during the Class Period. Additionally, the 2005 annual report for Smurfit-Stone stated that both post-retirement healthcare and life insurance benefits were reduced in 2005. Therefore, labor costs can largely be dismissed as an explanation for Containerboard Products price increases.

184. <u>Energy Costs</u>: Studies by economists have found no significant effect of energy costs on containerboard prices.[90] Additionally, International Paper, the largest producer of containerboard, stated in its 2005 10-K that, "[w]hile energy, wood and raw material price movements are mixed, their impact for the quarter is expected to be flat." In reference to the first few months of 2006, it was further added, "[w]e are starting to see some reductions in natural gas and southern wood costs that, if the trend continues, should benefit operations as the year progresses."[91] Despite some volatility in the natural gas mark since that time, natural gas prices in 2010 are at or below the natural gas prices existing at the beginning of the Class Period.

185. Despite the absence of any lasting cost increases, Defendants have nevertheless attempted to blame increasing costs as the reason for their capacity restrictions and increases in

---

[89] Paul Stecko, *Creating Shareholder Value in Containerboard Markets*. PULP & PAPER 63 (March 1, 2005).
[90] *See e.g.* Li, H. and Luo, J.  Industry Consolidation and Price in the US Linerboard Industry. Journal of Forest Economics 14 (2008), pp. 93-115.
[91] International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p.11.

Containerboard Products prices.  Specifically, in the third quarter of 2006, the President and CEO of Norampac attempted to explain the closure of Norampac's 300,000 tons-per-year Ontario mill as follows: "[t]his decision was taken to mitigate the negative impacts of several economic factors such as growing fiber supply costs, rising energy costs and the strengthening of the Canadian dollar."[92]  However, as this explanation does not comport with the relevant market data, it serves as little more than a pretense for collusive activity.  *See In re Linerboard Antitrust Litigation*, 504 F.Supp.2d 38, 53 (E.D.Pa. 2007) ("[t]he Third Circuit has long recognized that evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action' by an alleged conspirator. [Citations].")

186.    In response to Norampac's announcement, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement.  Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%."[93]

187.    There is no consistent observable relationship between the price of natural gas (the predominant source of energy for the Containerboard Products industry) and the price of Containerboard Product.  For example, although there was a brief uptick in the price of natural gas in the 4th Quarter 2005, the increased prices during the same period outpaced any corresponding manufacturing cost increase.  Moreover, the price of natural gas fell nearly 40% from December 2005 to April 2006 without any corresponding price decrease in Containerboard Products.  In fact, in April 2006, well after the 40% drop in natural gas prices, Defendants and their co-conspirators again raised prices by over 10%.  If energy costs were responsible for price changes (as explained by Defendants to their customers) a 40% decrease in energy costs should result in a lower containerboard price, not a 10% increase.  Similarly, from April 2006 through June 2007, the price of natural gas declined by approximately 7%.  However, in August 2007, the Defendants and their co-conspirators raised containerboard prices by 7%.  These increases in the prices for Containerboard Products cannot be explained by changes in energy costs.

---

[92] http://timview.blogspot.com/2006/09/red-rock-mill-shut.html
[93] *060830 Deutsche Bank Report - Norampac closing Red Rock*, Deutsche Bank – Equity Research

188.     Deutsche Bank reported that PCA reduced its natural gas usage "to barely over 3% of purchased fuels (was 9% year ago)."[94]  On April 18, 2006, Deutsche Bank doubted the ability of the Defendants and their co-conspirators to push further price increases through noting that "raw material costs for natural gas & wastepaper have fallen."[95] This is further indication that neither natural gas costs nor raw material costs had a significant impact on costs associated with producing Containerboard Products.

189.     <u>Environmental Costs</u>: The Defendants' public filings report that "Compliance with environmental standards should not adversely effect our competitive position or operating results."[96]    Accordingly, compliance with environmental regulations cannot explain the extraordinary increase in price of containerboard during the Class Period.

190.     The elimination of cost explanations supports an inference of conspiracy.  Both the capacity reductions and the price increases of the period beginning summer 2005 were record breaking in magnitude.  In early 2006, one trade journal reported, "Since October 2005, board prices have risen 33%.  The quickness of the jump is unprecedented."[97]  In regards to capacity reductions during this period, another trade journal called them "unprecedented."  By the end of 2006, the Defendants had successfully driven inventory to their lowest levels in twenty five years.  In addition, demand for Containerboard Products is tied to overall consumer demand and spending.  In about the second half of 2008, general consumer demand in the United States plummeted.  Yet, in August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%.  Even though the U.S. economy has continued to be weak with fears of deflation being expressed by economists and policymakers in 2009-2010, during 2010 Defendants and their co-conspirators raised Containerboard Product prices an unprecedented three times in one year to all time highs.   Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.

---

[94] *060124 Deutsche Bank - Packaging Corp's 4Q in 100 words*, Deutsche Bank – Equity Research
[95] *060418 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[96] See e.g. Smurfit-Stone Form 10-K, filed March 06, 2006 at p. 7.
[97] Paperboard and Packaging. (April 2006) at 16.

CONSOLIDATED AMENDED COMPLAINT

191.    The unprecedented reduction in North American containerboard supply was not the result of the closure of one producer's machines but rather concerted effort by the Defendants and their co-conspirators to reduce capacity in an effort to raise and stabilize prices of Containerboard Products to supra-competitive levels.

## ACTIVE CONCEALMENT

192.    Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively, actively and fraudulently concealed their unlawful conduct from Plaintiffs and the Plaintiff Class.  Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases, including that energy and raw material cost increases were responsible for the price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection.  In addition to the various pretexts and false justifications detailed above, Defendants also maintain, and in some instances, disseminated directly to their customers or posted on their websites "codes of ethics" which among other things, expressed their strict adherence to the antitrust laws.  In the latter part of the Class Period, Defendants also falsely attempted to blame the demise of the "black liquor" tax credit for the increase in prices at a time when prices for other paper products which would have been similarly impacted, decreased.

193.    Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced.

194.    As a result of the concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## ANTITRUST IMPACT AND DAMAGES

195.    Defendants' unlawful conspiracy has had at least the following effects:

a.  Prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Containerboard Products were artificially fixed, raised, stabilized and maintained at artificially inflated and supra-competitive levels in the United States;

b.  Plaintiffs and the other members of the Class paid more for Containerboard Products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

c.  Competition in the sale of Containerboard Products was restrained, suppressed and eliminated in the United States; and,

d.  As a direct and proximate result of Defendants' illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured in their respective businesses and property, in amounts according to proof at trial.

## **CLAIM FOR RELIEF**

### **VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

196.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

197.    Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Containerboard Products in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

198.    The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, and/or stabilized prices for Containerboard Products in the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

199.    The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce.  The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed co-conspirators.  These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

200.    The contract, combination or conspiracy has had the following effects, among others:

    a.  Prices charged to Plaintiffs and Class members for Containerboard Products were fixed or stabilized at higher, artificially derived, supra-competitive levels;

    b.  Plaintiffs and Class members have been deprived of the benefits of free, open and unrestricted competition in the market for Containerboard Products; and

    c.  Competition in establishing the prices paid, customers of, and territories for Containerboard Products has been unlawfully restrained, suppressed and eliminated.

201.    As a proximate result of the Defendants' unlawful conduct, Plaintiffs and Class members have suffered injury in that they have paid supra-competitive prices for Containerboard Products.  Plaintiffs and Class members will continue to be injured in their business and property by paying more for Containerboard Products purchased directly from the Defendants and their co-conspirators than they would pay in the absence of the contract, combination or conspiracy.

## **PRAYER**

WHEREFORE, Plaintiffs pray as follows:

A.    That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and that Plaintiffs be named representatives of the Class.

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

CONSOLIDATED AMENDED COMPLAINT

C.      That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

D.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F.      That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws; and,

G.      That Plaintiffs and members of the Class have such other, further or different relief, as the case may require and the Court may deem just and proper under the circumstances.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated:     November 8, 2010

/s/ Daniel J. Mogin
Daniel J. Mogin
Matthew T. Sinnott
Kristy F. Greenberg (Of Counsel)
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
T: 619-687-6611
F: 619-687-6610
dmogin@moginlaw.com
msinnott@moginlaw.com
kgreenberg@moginlaw.com

Michael J. Freed
Steven A. Kanner
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015 USA
T: 224-632-4500
F: 224-632-4521
mfreed@fklmlaw.com
skanner@fklmlaw.com
mmoskovitz@fklmlaw.com

Daniel E. Gustafson
Daniel C. Hedlund
Jason S. Kilene
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
T: 612-333-8844
F: 612-339-6622
DGustafson@gustafsongluek.com
DHedlund@gustafsongluek.com
JKilene@gustafsongluek.com

H. Laddie Montague, Jr.
Martin Twersky
Matthew P. McCahill
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
T: 800-424-6690
F: 215-875-4604
hlmontague@bm.net
mtwersky@bm.net
mmccahill@bm.net

Joseph Goldberg
FREEDMAN BOYD HOLLANDER
GOLDBERG IVES & DUNCAN, P.A.
20 First Plaza
Albuquerque, NM 87012
T: 505-842-9960
F: 505-842-0761
jg@fbdlaw.com

Howard Langer
LANGER GROGAN & DIVER, P.C.
1717 Arch Street
Philadelphia, PA 19103
T: 215-320-5661
F: 215-320-5703
hlanger@langergrogan.com

Chris Burke
SCOTT + SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
T: 619-233-4565
F: 619-233-0508
cburke@scott-scott.com

Alexander M. Schack
Geoff Spreter LAW OFFICES OF
ALEXANDER M.
SCHACK
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
T: (858) 485-6535
F: (858) 485-0608
alexschack@amslawoffice.com
geoffspreter@amslawoffice.com

Dianne M. Nast
Erin C. Burns
RODANAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
T: 717-892-3000
F: 717-892-1200
dnast@rodanast.com
eburns@rodanast.com

Simon B. Paris
Patrick Howard
Charles J. Kocher
SALTZ MONGELUZZI BARRETT &
BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
T: 215.575.3986
F: 215.575.3894
sparis@smbb.com
phoward@smbb.com
ckocher@smbb.com

Leland Shurin
Richard F. Lombardo
Kathy Woods
SHAFFER LOMBARDO SHURIN, P.C.
911 Main Street, Suite 2000
Kansas City, MO 64105
T: (816) 931-0500
F: (816) 931-5774
lshurin@sls-law.com
rlombardo@sls-law.com
kwoods@sls-law.com

W. Joseph Bruckner
Heidi M. Silton
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com

Anthony D. Shapiro
Jeffrey T. Sprung
Ronnie Seidel Spiegel
HAGENS BERMAN SOBOL SHAPIRO
LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
T: 206-623-7292
F: 206-623-0594
tony@hbsslaw.com
jeffs@hbsslaw.com
ronnie@hbsslaw.com

Bonny E. Sweeney
Alexandra S. Bernay
Paula M. Roach
ROBBINS GELLER RUDMAN &
DOWD     LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
T: 619-231-1058
F: 619-231-7423
bsweeney@rgrdlaw.com
xbernay@rgrdlaw.com
proach@rgrdlaw.com

Jonathan P. Whitcomb
DISERIO MARTIN O'CONNOR &
CASTIGLIONI LLP
One Atlantic Street
Stamford, CT  06901
T: 203-358-0800
F: 203-348-2321
jwhitcomb@dmoc.com

Jay W. Eisenhofer
Robert G. Eisler
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
T:  646-722-8500
F:  646-722-8501
reisler@gelaw.com

Marvin A. Miller
Matthew E. VanTine
Lori A. Fanning
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
T: 312-332-3400
F: 312-676-2676
mmiller@millerlawllc.com
mvantine@millerlawllc.com
lfanning@millerlawllc.com

Samuel H. Rudman
ROBBINS GELLER RUDMAN & DOWD
LLP
58 South Service Road, Suite 200
Melville, NY  11747
T: 631-367-7100
F: 631-367-1173
srudman@rgrdlaw.com

Bruce K. Cohen
MEREDITH COHEN GREENFOGEL &
SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA 19102
T: 215 564 5182
F: 215-569-0958
bcohen@mcgslaw.com

Vincent J. Esades
Scott W. Carlson
Heins Mills & Olson, P.L.C.
310 Clifron Avenue
Minneapolis, MN  55403
T:  612-338-4605
F:  612-338-4692
vesades@heinsmills.com
scarlson@heinsmills.com

Brian P. Murray
Lee Albert
MURRAY, Frank & SAILER LLP
275 Madison Avenue, Suite 801
New York, New York 10016
T: (212) 682-1818
F: (212) 682-1892
bmurray@murrayfrank.com
lalbert@murrayfrank.com

Garrett Blanchfield
Reinhardt Wendorf & Blanchfield
E-1250 First Nat'l Bank Building
332 Minnesota Street
St. Paul, MN  55101
T:  651-287-2100
F:  651-287-2103
g.blanchfield@rwblawfirm.com


Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA  94111
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813
guido@saveri.com
rick@saveri.com
cadio@saveri.com

Robert J. LaRocca
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
T:  215-238-1700
F:  215-238-1968
rlarocca@kohnswift.com

Manuel J. Dominguez
William Lewis
BERMAN DEVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
jdominguez@bermandevalerio.com
wlewis@bermandevalerio.com

CONSOLIDATED AMENDED COMPLAINT

CONSOLIDATED AMENDED COMPLAINT

<u>CERTIFICATE OF SERVICE BY ELECTRONIC MEANS</u>

      I, Daniel J. Mogin, one of the attorneys for plaintiffs, hereby certify that on November 8, 2010, service of the foregoing ***Consolidated Amended Complaint*** was accomplished pursuant to ECF as to Filing Users and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.


                                      */s/ Daniel J. Mogin*

                                        Daniel J. Mogin

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KLEEN PRODUCTS LLC, *et al*. individually and on behalf of all those similarly situated, | ) ) ) |
| | )     Case No. 1:10-cv-05711 |
| Plaintiffs, | ) |
| | )     Hon. Harry D. Leinenweber |
| v. | ) |
| | ) |
| PACKAGING CORPORATION OF AMERICA, *et al*., | )     ***FILED UNDER SEAL*** ) |
| | ) |
| Defendants. | ) |

**AMENDMENTS TO PLAINTIFFS'
CONSOLIDATED AND AMENDED COMPLAINT**

Plaintiffs hereby submit the following Amendments to their Consolidated and Amended Complaint pursuant to the Court's June 2, 2014 Minute Entry (ECF No. 647):

¶1.    This case is an antitrust class action brought to recover for the injuries sustained by Plaintiffs and the members of the Plaintiff Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure. The Plaintiff class, defined more fully below in Paragraph 28, consists of all persons and entities that purchased Containerboard Products directly from Defendants between ***February 15, 2004 and November 8, 2010*** (the "Class Period").[1]

¶6.    Beginning ***in or about 2004***, the Containerboard Products industry was faced with decreasing profit margins, rising product demand, and a promising macroeconomic outlook. Nevertheless, Defendants began a coordinated across-the-board imposition of capacity restraints,

---

[1]  The paragraph numbers correspond to the paragraph numbers in the Consolidated Amended Complaint, ECF #65. Unless noted otherwise, Plaintiffs' proposed amendments are in italics and bolded throughout this pleading to indicate the amended language only.

leading to a subsequent restriction in the supply of Containerboard Products on the market. The goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the Class Period. Defendants' conspiracy included a scheme to impose capacity **and supply** constraints which had the effect of creating an artificial shortage of Containerboard Products in the United States during a time of stable of increasing demand, thereby allowing Defendants to charge supra-competitive prices to the Plaintiff Class. As detailed below, the conspiracy was effected, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in massive and unprecedented idling of production and capacity, reduced production and near simultaneous across-the-board price increases.

¶28.    Each Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

> All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as **February 15, 2004 through November 8, 2010**.

> Specifically excluded from this Class are the Defendants; officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

¶64.    The unprecedented industry consolidation detailed in paragraphs 43-45 created an environment conducive to collusion. Further, at or about the onset of the Class Period, the Containerboard Products industry was experiencing decreased profit margins, rising product demand, and a promising economic outlook. Additionally, shortly before **and near the beginning of** the Class Period, the Containerboard Products industry **experienced price decreases and at least one failed price increase attempt**. Specifically, on May 31, 2003,

Official Board Markets reported that a $35/ton price increase in both linerboard and corrugated medium failed, noting "[n]ot only is this attempt a failure, but discounting prevails." While prices steadily increased in 2004, ***due at least in part to the two successful coordinated price increases implemented by Defendants***, by early 2005 they again began to erode, bottoming out in spring 2005. On May 31, 2005, Official Board Markets reported that Defendant International Paper announced a $50/ton price increase; but due to other Defendants not backing the price increase with a "firm stance," the end result was a failed increase. In June 2005, "it became apparent that industry-wide price hikes weren't sticking. Instead of rising about 10%, prices on the thick paper used to make corrugated containers slipped as inventories of boxes inched higher."[11] These factors acted together as the catalyst for Defendants to ***redouble their coordinated*** capacity restraints in order to reduce available supplies and thereby fix, raise, stabilize and maintain the prices of Containerboard Products.

¶66.    The period of ***2004 – 2010*** witnessed an exceptional number of containerboard plant closings, capacity reductions, and price increases that can only be explained by concerted effort by the Defendants and their co-conspirators. Defendants increased Containerboard Product prices ***ten times between March 2004 and August 2010***. Over that period, Containerboard Product prices have increased over fifty percent (50%) despite the economic downturn during the latter half of the Class Period. Each of these price increases was implemented by the Defendants nearly simultaneously and was facilitated by reductions in supply and production capacity. In the face of increasing demand, these reductions make no economic sense absent conspiracy and collusion. Norampac's 2005 20-F filing illustrates these phenomena:

> In 2005, industry box shipments decreased by 0.4% in North America while North American containerboard operating rates were approximately 95%. Containerboard producers in the United States reduced their inventories and drove

---

[11] *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05,* Crain's Chicago Bus., June 27, 2005, at p.4 (emphasis in original Consolidated Amended Complaint).

a US$30/ton increase on linerboard in October following a US$55ton decrease in the first three quarters of the year…

The market share of the top five containerboard producers increased from 48% in 1995 to 64% in 2005. This consolidation has helped accelerate the rationalization of inefficient containerboard mill capacity. In 2005, a total of over 1.5 million tons of North American containerboard capacity was permanently closed. Furthermore, the industry has generally adopted a model of balancing supply with current demand as opposed to maximizing capacity utilization. As a result, operating rates in the industry in recent years more closely reflect the current economic environment. Overall, market consolidation and rationalization have helped to create a less volatile and more stable industry pricing environment.

¶67.    Demand for Containerboard Products is tied to overall consumer demand and spending. **Beginning in 2004** and continuing thereafter through 2007, consumer demand, including demand for Containerboard Products in the U.S., was relatively stable and industry expectations were that demand would increase, yet Defendants cut capacity, **restricted supply** and raised prices. These actions were contrary to Defendants' unilateral economic interests because, given market conditions and expectations that demand was increasing, in a competitive market capacity would, at minimum, be maintained if not expended, in order to enhance volumes, revenues, profits and market share. During the second half of 2008, consumer demand in the United States plummeted, yet Defendants continued to raise prices. In August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%; and notwithstanding fears of deflation in the general economy, increased prices an unprecedented three times in 2010 to all-time highs, without any underlying cost justifications. This led one market commentator to note that the series of historic price increases "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies." The same commentator noted the similarity of the present conduct of Defendants to the conduct in the prior *Linerboard* cases.

¶69.  Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity and, in turn, supply.  As a result of Defendants' conduct as alleged herein, their production capacity of Containerboard Products was significantly reduced while their prices increased by approximately 50% **between 2004 and 2010**:

[Graphical Depiction of Containerboard Capacity, Prices, and Demand]

### *2004*

***¶70.a. Demand for Containerboard Products began to rise in 2004.  Defendant International Paper forecasted increased earnings in the second quarter of 2004 as a result of increased demand, previously announced price increases, and "improved manufacturing operations."[A1] Defendant PCA reported in May 2004 that its corrugated products demand remained very strong, and that April 2004 shipments were up 9.3% as compared to one year earlier.[A2]  Defendant Temple-Inland projected that the industry's box shipments would increase by approximately 3.7% for the second half of 2004, based on demand for the first half of the year.[A3]***

---

[A1]  International Paper Q1 2004 Form 10-Q, filed May 6, 2004, at p. 14, 19.  International Paper further noted that "price increases in containerboard, certain bleached board grades and boxes announced in the first quarter, together with improved manufacturing operations, will have a positive impact on operating results."  International Paper Q1 2004 Form 10-Q, *supra*, at p. 19.

[A2]  GP-KLEEN00477477, *Packaging Corporation of America Company Profile*, dated January 2005, at slide 26.

[A3]  Temple-Inland 00291545, *Temple-Inland Investment Presentation,* dated May 7, 2004.  In contrast, historical demand growth from 1980 – 2003 was approximately 2%.  *Id*.  *See also* Temple-Inland 00348444, Email from Paul Recht (Temple-Inland) to Sharon Fuss (Temple-Inland) Re:  FW:  April 1st, 2004 Box Price Increase – Justification Documents, dated February 25, 2004, with attachment Temple-Inland 00348456, *Why is there a price increase*, author and date unknown (in justifying increasing containerboard prices by over 8% in March 2004, the author explained that January 2004 box shipments rose 10.5% year-over-year and that inventories were "at their lowest level since 1994").

**¶70.b. In response to "strong demand", all Defendants increased prices for Containerboard Products while simultaneously reducing capacity by idling machines and taking downtime.[A4]   The first 2004 price increase was implemented by all Defendants by March 1, 2004.[A5]   Defendant Weyerhaeuser was the first company to announce the price increase in early January 2004.[A6]   Association of Independent Corrugated Converters ("AICC") documents explained that "everyone is behind [the price increase] but no one else has announced."[A7]   Defendant International Paper quickly followed with its January 16, 2004, announcement that it would also be increasing liner and medium prices by $50/ton.[A8]**

---

[A4]  The alleged conspiracy began at a time presently unknown to Plaintiffs.  However, Plaintiffs allege that the Class Period begins on February 15, 2004, the date that the first price increase for 2004 became effective.

[A5]  *See* IP095108 at 95119, *Domestic Business Team Meeting*, dated February 18, 2004. International Paper identified the following additional companies as participating in the price increase:  Defendant Smurfit-Stone (price increase implemented on February 15, 2004); Defendant Norampac (price increase implemented February 23, 2004); Defendant Georgia-Pacific (price increase implemented March 1, 2004); Defendant Temple-Inland (price increase implemented on March 1, 2004); Defendant PCA (price increase implemented on March 1, 2004; and Defendant Weyerhaeuser (price increase implemented on March 1, 2004).  (Non-parties MeadWestvaco and Pratt also implemented price increases on March 1, 2004.)

    Prior to the first 2004 price increase, in October 2003, Defendant Smurfit-Stone announced a massive restructuring plan with, admittedly, the ultimate goal of reducing capacity. *See* GP-KLEEN01017202 at 1017203, Email from Bill Caesar (McKinsey) to Christian Fischer (McKinsey) and Matthew Denton (Georgia-Pacific), Re:  Interesting Article, dated September 10, 2004 (forwarding an August 2004 article from the St. Louis Post-Dispatch discussing Smurfit-Stone's restructuring plan).  Smurfit-Stone explained to the St. Louis Post-Dispatch that the company would no longer be adhering to the industry's former practice of running mills as fast as they could, independent of changes in demand.  GP-KLEEN01017202 at 1017203, *supra*. Rather, it planned to "cut supply enough at Smurfit to force price increases throughout the industry".  GP-KLEEN01017202 at 1017203, *supra*.

[A6] Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto.  *See also* RT00000875 at p. 1-2.

[A7] RT 00000875 at p.1.

[A8] *See* SSCC 00361942, Email from Daniel Moore (International Forest Products Corp.) to "Market Watch" Re:  IP, dated January 16, 2004 (informing recipients that "IP announced a

*International Paper's price increase was effective February 16, 2004.[A9]  Internal International Paper documents circulated in February 2004 confirm that its price increase would be followed by "our competitors [who] will implement [the price increase] on March 1".[A10]  On January 19, 2004, Defendant Temple-Inland announced that it would be increasing prices by $50/ton, effective March 1, 2004.[A11]  Internal Temple-Inland documents infer that the company raised prices, at least in part, because all other Defendants were raising prices.[A12] On January 22, 2004, Defendant Georgia-Pacific announced that it would also be increasing prices by $50/ton, effective March 1, 2004.[A13]  By that time, all other Defendants had announced similar price increases.[A14]*

---

price increase today on all containerboard grades.  $50 for all order [sic] place [sic] Feb [sic] 15 or later").

[A9]  IP095108 at 95110.

[A10]  IP095108 at 95110.

[A11]  Temple-Inland 00149975.

[A12] Temple-Inland 00348444.

[A13]    GP-KLEEN00546219.   *See also* Defendant Georgia-Pacific LLC's Objections and Responses to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increases effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6, dated December 20, 2013.

[A14]    *See* GP-KLEEN00546217,.  *See also* Temple-Inland 00149975; IP095108 at IP095119,; Defendant Weyerhaeuser Company's Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6, dated September 11, 2013; Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto, dated December 20, 2013; Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6, dated September 27, 2013; Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6, dated December 20, 2013.

¶70.c.  *Around the same time that the first 2004 price increase was being implemented, Credit Suisse provided Defendants Georgia-Pacific, International Paper, Temple-Inland, and Smurfit-Stone with its publication entitled The Holy Grail: Secular Headwinds.*[A15] *The Holy Grail emphasized that "every decision the market leaders make needs to be carefully guided by a goal of increasingly clear economic alignment of incentives".*[A16] *It promoted "rational decision making" about capacity and stressed that "bad outcomes" can result if "rational producers in a commodity business decide to row in different directions".*[A17] *The Holy Grail likewise instructed that "consolidation does tend to help make industry behavior healthier"*[A18] *and that "discipline" and "capacity rationalization" were necessary in order to "avert[] pricing collapse and sustain[] higher levels of pricing and cash flow."*[A19] *The message of The*

---

Internal Norampac documents infer that a price increase for whitetop planned for around the same time might not have happened because all Defendants had not agreed to participate in the price increase.  In an email from Robert Lanthier to Francois Guite sent in February 2004, Mr. Lanthier explained:  "The price increase on whitetop may not happen since it has been confirmed by different sources that Smurfit Stone is not announcing any increase on their whitetop.  For sure, we will not push for a price increase if the rest of our competitors are not doing it."  NORAMPAC00038698.

[A15] GP-KLEEN01015352; IP289887; SSCC 00481565; Temple-Inland 00017529.

[A16] GP-KLEEN01015352 at 1015372.  *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529.  Credit Suisse further noted that the "key is not to worry about driving [free-riders] out of business … but rather, to work toward a business model where interests tend to align rather than collide.  Industry consolidation is one obvious example of how that can happen, but it is far from the only one."  GP-KLEEN01015352 at 1015372.

[A17] GP-KLEEN01015352 at 1015371. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529.

[A18] GP-KLEEN01015352 at 1015374. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529.

[A19]  GP-KLEEN01015352 at 1015377. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529.  Credit Suisse published *Holy Grail* articles at various times throughout the Class Period, which it circulated among Defendants and continued to emphasize the need for "discipline".  *See The Holy Grail – Rising Risk*, Credit Suisse Equity Research, dated June 24, 2010, found at IP356757, Temple-Inland 00476330, and PCoA000339518 ("Impressive production discipline has many asking whether industry consolidation is necessary, or whether

*Holy Grail was remarkably similar to the advice contained in McKinsey's Chasing In On Consolidation, written for Defendant International Paper in 2002,[A20] and distributed to Defendant Georgia-Pacific in September 2004.[A21]  Like The Holy Grail, Cashing In On Consolidation emphasized that North American Containerboard producers needed to show leadership through "good conduct",[A22] which was only possible where multiple market leaders aligned "incentives" and "actions" in order to "enjoy the benefits of higher prices".[A23]*

*¶70.d.  In early March 2004, Defendant International Paper CEO John Faraci announced to the company's Board of Directors that "excess capacity in North America may have to be rationalized".[A24]  A few days later, Defendant PCA circulated an internal call to arms, in which an Executive Vice President demanded at least three additional, $40-$50*

---

the industry's biggest issues are behind us").  Evidence that Defendants highly regarded *The Holy Grail* can be found in International Paper's internal documents.  For instance, Thomas Cleves explained to John Faraci in 2008 that "[w]e should take advantage of the Holy Grail it [sic] is a thoughtful analysis of our industry and it helps us to understand how major sell-side and buy-side players think about our industry and International Paper."  IP551322, Memo from Thomas A. Cleves (International Paper) to J. Faraci (International Paper) Re:  Thoughts on the 2008 Holy Grail, dated February 19, 2008.

[A20]  IP108305, *Cashing In On Consolidation*, McKinsey on Paper, dated 2002.

[A21]  GP-KLEEN00141863, Email from Bill Ceasar (McKinsey) to Matthew Denton (Georgia-Pacific) and Christian Fischer (Georgia Pacific) Re:  McK article on consolidation in Pulp & Paper, dated September 15, 2004, with attachment GP-KLEEN00141864, *Cashing In On Consolidation*, McKinsey on Paper, dated 2002.  In sending *Cashing In On Consolidation* to Georgia-Pacific, McKinsey underscored its conclusion that "NA Containerboard is a 'leak-tight' segment where market leaders have the ability and incentive to lead – basically that this was a place where industry leadership mattered."  GP-KLEEN00141863, *supra*.

[A22]  IP108305 at 108314.

[A23]  IP108305 at 108309-311.

[A24]  IP112019 at 112107, *Discussion on Corporate Strategy Options*, John Faraci, undated (presentation given on March 9-10 [year unknown, but appears to be from 2004 based on presentation materials], discussing statistics from 2003 through February 2004).

*industry-wide price increases over the next 18 months.[A25]  This executive cited to "historically"*
*low inventory, "heavy" mill downtime, capacity reductions to "more closely align[] supply with*
*demand", industry consolidation, and increased demand as justification for the price*
*increases.[A26]  Two months after that, Defendant Georgia-Pacific circulated a memorandum*
*similar to PCA's.[A27]  Therein, Executive Vice President of Packaging Christian Fisher*
*requested that Georgia-Pacific employees "identify, develop, and capture every profit-*
*improvement opportunity we can – starting now."[A28]  Mr. Fischer further explained that a*
*"tight market" and a "second price increase" would help increase Georgia-Pacific's 2004*
*profits, "but they alone will not get us there.  We have to find and execute on every opportunity*
*possible to reach our goal."[A29]*

¶*70.e.  By April 26, 2004, Defendants PCA, Georgia-Pacific, Temple-Inland, and*
*Weyerhaeuser had announced the second price increase for 2004, increasing Containerboard*
*Products prices by $50/ton, effective June 1, 2004.[A30]  Defendants Norampac, International*

---

[A25]  PCoA000026178.

[A26]  PCoA000026178.

[A27]  GP-KLEEN01441611, Email from Christian Fischer (via Linda Brown) (Georgia-Pacific) to Georgia-Pacific Employees, Re:  Profit Improvement Draft, dated May 12, 2004.

[A28]  GP-KLEEN01441611.

[A29]  GP-KLEEN01441611.

[A30]  *See* SSCC 00352370, Pulp and Paper Weekly Report, dated April 26, 2004 ("PCA and Weyerhaeuser as well as Georgia-Pacific Corp. and Temple-Inland Inc. plan $50/ton increases on their linerboard and corrugated medium for the open market, for June 1.  If implemented, it would be the second increase"); Temple-Inland 00131080, Email from Arif Ali (Temple-Inland) to "GO_BJD_DIRECT_REPORTS" (Temple-Inland) Re:  Paper Price Increase ("Temple Inland is announcing today another $50/ton price increase to its paperboard customer effective June 1.  This follows the similar announcement by GP, WY and PCA"); IP091972, Letter from Carl Bohm (Weyerhaeuser) to Rick Start (Richwood & Laminating) Re:   Containerboard Price Increase Announcement, dated April 8, 2004 (confirming Weyerhaeuser's "recent discussion" with Richwood & Laminating that Weyerhaeuser will be increasing prices for liner and medium by $50 per ton, effective June 1, 2004); IP352950, *National Containerboard Price Increase Announcements*, no author, dated May 14, 2004 (listing participants in the June 2004 price

*Paper, and Smurfit-Stone participated in the price increase as well.*[A31]  *Defendant Temple-Inland reported that the price increase was "met with no resistance in marketplace", as customers were more concerned about obtaining sufficient product than paying higher prices.*[A32]  *Defendants experienced higher EBIDTA and EBIT margins in large part due to the two 2004 price increases.*[A33]

---

increase and providing the date the price increase was announced, the date the increase was effective and by how much Defendants increased liner and medium prices).  *See also* Defendant Georgia-Pacific LLC's Objections and Responses to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increase effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 ("In early May 2004, GP announced a $50/ton price increase effective June 1, 2004"), dated December 20, 2013; Defendant Weyerhaeuser Company's Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increase effective March 1, 2004 and June 1, 2004), dated September 11, 2013; Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto (identifying an April 12, 2004 announcement of a $50/ton price increase, effective June 1, 2004), dated December 20, 2013; IP0955004, Deutsche Bank Equity report from Mark Wilde, dated April 12, 2004 (reporting that Defendant Weyerhaeuser had announced  a price increase of $50/ton in containerboard, effective June 1, 2004, and explaining that "[t]his breaks the normal seasonal pattern of containerboard hikes in late summer/early autumn").

[A31] Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increases effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendants Cascades Canada ULC and Norampac U.S. Inc.'s Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 (identifying a $50 price increase for linerboard and corrugated medium, effective June 1, 2004), dated December 20, 2013; IP352950, *National Containerboard Price Increase Announcements*, dated May 14, 2004 (identifying Defendants Weyerhaeuser, Georgia-Pacific, Temple-Inland, International Paper, PCA, and Smurfit-Stone as increasing liner and medium prices by $50/ton, effective June 1, 2004).

[A32]  Temple-Inland 00569157, Email from Pat Maley (Temple-Inland) to Kenny Jastrow (Temple-Inland), Re: May Operating Highlights, dated June 14, 2004 ("The domestic $50/ton price increase proposed for June 1 has met with no resistance in marketplace.  Customers are more concerned about supply availability than the increase").

¶70.f.  *Defendants also reduced mill capacity, took downtime and idled machines both temporarily and permanently throughout 2004.  Weyerhaeuser announced in late 2003 that it would be permanently closing a 270,000 ton medium mill in North Bend, Oregon,[A34] only to announce on January 13, 2004, that it would be increasing liner and medium prices.  Around the same time as the price increase announcement, Weyerhaeuser reduced Containerboard Products by approximately 21,000 tons through "market downtime".[A35]  Similarly, Temple-Inland's January 19, 2004 price increase announcement was followed by the company's January 26, 2004, announcement that it was closing its Dallas, Texas plant.[A36]  Defendant Smurfit-Stone, which implemented its price increase in February 2004, permanently closed its medium mill in Thunder Bay, Ontario in the first quarter of 2004, removing approximately 160,000 tons of medium from the market.[A37]  After announcing its price increase on January 16, Defendant International Paper closed a Roanoke Rapids, North Carolina machine during the second quarter of 2004, effectively removing nearly 300,000 tons of liner from the market.[A38]  In January 2004, Defendant Georgia-Pacific announced its price increase, but*

---

[A33]  Norampac0036222, *Memorandum Re Competitor Benchmarking Fourth quarter 2004*, Norampac, dated February 22, 2005 ("All manufacturers experienced a higher EBITDA and EBIT margins mainly due to the two price increases occurred in 2004").

[A34]  *See* SSCC 00083396, Excel Spreadsheet, Tab "Closures" (listing, by company, all liner and medium closures in North America from 1998 – 2010).  *See also* GP-KLEEN01012988, at 1013005, *Containerboard & Packaging Segment 2004 Annual Business Plan*, Georgia-Pacific – January 27, 2004 (table demonstrating announced closed or idled Containerboard Products machines from 2002 – 2004).

[A35]  Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27.

[A36]  *See* Temple-Inland 00348962, Email from Paul Recht (Temple-Inland), Re:  Dallas Plant Closing, dated January 27, 2004.

[A37]  SSCC 00083396.  *See also* SSCC 00863598, Excel Spreadsheet, Tab "CB Summary – by Month" (demonstrating monthly change in containerboard production from 1988- 2010).

[A38]  IP579040, *North American Containerboard Review*, International Paper, dated June 2006. *See also* SSCC 00083396; GP-KLEEN01012988, at 1013005.

*also took downtime to remove Containerboard Products from the market and brought inventory levels to "record low levels."[A39]   In March 2004, the same month that Georgia-Pacific implemented the price increase, it took additional downtime to remove Containerboard Products from the market.[A40]   In total, it is estimated that approximately 563 million tons of containerboard products were removed from the market in 2004.[A41]*

*¶70.g.   By April 26, all Defendants had announced the second 2004 price increase. In April 2004, Weyerhaeuser presented a Mill System Operating Strategy wherein it recommended that Containerboard inventories be "managed at much lower levels during 2004".[A42] Under Weyerhaeuser's proposed inventory management system, box inventories exceeding 440,000 tons would trigger selective downtime.[A43]   From March through May 2004, Weyerhaeuser also effectively reduced its Containerboard Products by approximately 50,000 tons through maintenance downtime.[A44]   Weyerhaeuser's total downtime in 2004 resulted in*

---

[A39]  GP-KLEEN00106864, *Georgia-Pacific Downtime 2004*, Tab Summary by Machine Month 2004, dated September 9, 2008; GP-KLEEN01025183, Internal Georgia-Pacific Email from Matthew Denton, Re:   December 2003 Flash – Containerboard & Packaging Segment (Preliminary due to LIFO), dated January 9, 2004.

On May 19, 2004, Defendant Norampac publicly announced that it was closing its Concord, Ontario box plant.   The plant officially closed on March 31, 2005.   Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 8 (identifying Norampac box plant and mill closures that occurred between 2003 - 2010), dated September 27, 2013.

[A40] GP-KLEEN00106864.

[A41] SSCC 00083396.

[A42] WY0090805 at p.8, *Mill System Operating Strategy*, dated April 14, 2004.

[A43]  WY0090805 at p.8.

[A44] Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27, *supra,* n.48.   In March 2004, Weyerhaeuser removed approximately 29,000 tons of product through downtime.   It removed approximately 17,000 tons of product through downtime in April 2004, and approximately 4,000 tons of product through downtime in June

*removing approximately 124,000 tons of Containerboard Product from the market.*[A45] *Defendant Georgia-Pacific likewise removed containerboard product from the market in April 2004 by taking downtime.*[A46] *Similar to Weyerhaeuser, Georgia-Pacific removed approximately 148,644 tons of containerboard products from the market in 2004 through downtime.*[A47]

*¶70.h. On May 19, 2004, Deutsche Bank analyst Mark Wilde reported that inventories were at "an extremely lean level."*[A48] *Noting that operating rates were at 94.4%, total industry inventories for mills and box plants stood at 3.6 weeks of supply, and that box shipments increased 4.2% YTD, Mr. Wilde doubted that "fundamentals … could get any stronger".*[A49] *Mr. Wilde further explained that "[i]t's been years since the containerboard numbers looked so positive" and that the June 2004 price increase, if successful, would "go down as the biggest single year price gain in the containerboard history."*[A50]

*¶70.i. Against the backdrop of the April 2004 price increase announcements, executives from Defendants and their co-conspirators, including Steven Klinger, Executive Vice President of Packaging for Georgia-Pacific, Ron Zimbleman, Vice President of Sales and Marketing for Containerboard for Temple-Inland, Dennis Colley, then the Vice President of*

---

2004. Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27, *supra*.

[A45] *See* Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27 (adding the total maintenance downtime taken in 2004 to the total market downtime taken in 2004).

[A46] GP-KLEEN00106864.

[A47] GP-KLEEN00490370 at p.25, Georgia-Pacific Sales & Marketing Presentation, undated.

[A48] SSCC 00347633, Memo from Mark Wilde of Deutsche Bank Securities, Inc. Re: Containerboard Monitor, dated May 19, 2004.

[A49] SSCC 00347633.

[A50] SSCC 00347633.

*Containerboard for International Paper, Bill Wandmacher, Vice President and General Manager of the Containerboard Mill Division for Smurfit-Stone, Gerry Greeter, Vice President and General Manager of Containerboard Sales for PCA, Carl Bohm, Vice President of Containerboard for Weyerhaeuser, and Jim Keller, Senior Vice President of Containerboard for Weyerhaeuser, attended an AF&PA Executive Committee Containerboard Group meeting at AF&PA headquarters on March 22, 2004.[A51]  During this meeting, International Paper Vice President and General Manager of its containerboard business Dennis Colley was elected vice chair of the Containerboard Group Executive Committee,[A52] and Deutsche Bank analyst Mark Wilde provided an "economic outlook covering the paper packaging industry".[A53]  The committee also approved Terry Serie's, Vice President of Statistics for AF&PA, request to form a "task force of Containerboard Group members who would work toward developing a long range plan."[A54]  Just weeks later, on April 6, 2004, representatives from Defendants and their co-conspirators attended a Containerboard Division Membership meeting held by the AF&PA in Charleston, North Carolina.[A55]*

---

[A51]  AFPA_ESI_01897, *Minutes of the Meeting*, Executive Committee Containerboard Group, dated March 22, 2004 (identifying the persons listed as attendees during roll call).  Mr. Zimbleman is identified as attending on behalf of Inland Paperboard & Packaging.  Inland Paperboard & Packaging is the largest subsidiary of Temple-Inland.  *See* http://www.risiinfo.com/db_area/archive/p_p_mag/1997/9703/copro.htm (last viewed March 7, 2014).

[A52]  AFPA_ESI_01897 (noting that Mr. Colley's term will begin at the conclusion of the Fall Meeting 2005).

[A53]  AFPA_ESI_01897.

[A54]  AFPA_ESI_01897.

[A55]  AFPA-P-GS-00341 at p.2-3, *Minutes of the Meeting*, Containerboard Division Membership Containerboard Group, AF&PA, dated April 6, 2004 (listing the following persons as attendees during roll call:  Jane Cowan and Mollie Hilliard from Georgia-Pacific; Tom Benefield and Melissa Murphy from International Paper; Kathleen Lents and Heidi Patton from PCA; Jack Greenshields and Scott Spurgeon from Rock-Tenn; Wayne Cameron from Smurfit-Stone; Barry Baker and Kent McFerran from Temple-Inland; and Jenny Iranon and Anne Olsen from Weyerhaeuser).

*70.j.    On May 2, 2004, executives from Defendants Norampac, Temple-Inland, PCA, Georgia-Pacific, Weyerhaeuser and International Paper attended an FBA Board of Directors meeting.[A56]  Around the same time, Deutsche Bank analyst Mark Wilde gave a presentation to the FBA entitled "A New Ball Game: A Review of the Containerboard & Corrugated Packaging Business".[A57]  Therein, Mr. Wilde applauded the industry for improving "fundamentals" that would "restore margins", including lower inventories, capacity rationalization, and industry consolidation.[A58]  Mr. Wilde concluded the presentation by asking "[n]ow, with Fundamentals Improving … how do we react?"[A59]*

*70.k.    In early July 2004, International Paper CEO John Faraci appears to have had a telephone call with Lee Thomas, President and Chief Operating Officer for Georgia-Pacific, ostensibly on AF&PA business.[A60]  Shortly thereafter, on July 17, 2004, representatives from Defendants Weyerhaeuser, Rock-Tenn, Smurfit-Stone, and Georgia-Pacific attended a*

---

[A56]   FBAKP0001176, *Minutes of Meeting from Board of Directors Meeting*, Fibre Box Association, dated May 2, 2004 (listing the following persons as members and attending: Marc-Andre Depin from Norampac, Bart Doney from Temple-Inland, Tom Hassfurther (for William Sweeney) from PCA, Steven Klinger from Georgia-Pacific, Daniel Pyne from Weyerhaeuser, and Carol Roberts from International Paper).

[A57]   GP-KLEEN01017172, Email from Matthew Denton, (Georgia-Pacific) Re: FW: A Whole New Ballgame? A Review of the Containerboard & Corrugated Packaging Business, dated May 10, 2004, with attachment GP-KLEEN01017174, *A New Ball Game A Review of the Containerboard & Corrugated Packaging Business*, Mark Wilde of Deutsche Bank Securities Inc., dated May 5, 2004, Exhibit 33 to Mark Wilde Deposition Transcript. *See also* RT 00001035, Email from Mark Wilde (Deutsche Bank) Re: A Whole New Ball Game? A Review of the Containerboard & Corrugated Packaging Business, dated May 10, 2004, with attachment RT 00001036, *A New Ballgame A Review of the Containerboard & Corrugated Packaging Business*, Mark Wilde of Deutsche Bank Securities, Inc., dated May 5, 2004.

[A58]  GP-KLEEN01017174 at 1017177, 1017187-88.

[A59]  GP-KLEEN01017174 at 1017189. Defendant Smurfit-Stone appears to have announced its participation in the June 2004 price increase approximately three days after Mr. Wilde posed this question. *See* IP352950.

[A60]  IP333836.

*Paperboard Packaging Alliance Board of Advisors meeting in Washington, D.C.[A61] In late September 2004, executives from Defendants, including Steven Klinger from Georgia-Pacific, Marc-Andre Depin from Norampac, Daniel G. Pyne from Weyerhaeuser, and Carol Roberts from International Paper, attended another FBA Executive Committee meeting.[A62] In October 2004, AF&PA circulated antitrust compliance guidelines to Defendants, instructing them on how to implement "changes" to "reduce the risk of antitrust litigation".[A63] The draft guidelines warned Defendants not to say things like, "[t]he industry needs to show some discipline to get prices up", or "[w]e all need to recognize that there is too much capacity and we need to do something about it."[A64] The guidelines were endorsed by the AF&PA for use by all members during the October 30, 2004, AF&PA Board of Directors meeting, which was attended by executives from Defendants.[A65] That same month, the AF&PA CEO Statistics Committee met to discuss, among other things, the "Long-Term Vision and Goals Plan for Domestic and International Statistics."[A66] The attendees included Smurfit-Stone CEO Patrick Moore, David Dreilbelbis on behalf of James Rubfight for Rock-Tenn, PCA CEO Paul Stecko,*

---

[A61] AFPA_ESI_00705, *Minutes of Meeting*, Paperboard Packaging Alliance Board of Advisors, dated June 17, 2004 (identifying the following persons as members and attending the meeting in roll call: Dick Dudley from Weyerhaeuser, Nick George from Rock-Tenn, Nat Holmes from Smurfit-Stone, and George Wurtz from Georgia-Pacific).

[A62] FBAKP0002635, *Minutes of Meeting*, FBA Executive Committee, dated September 28, 2004 (identifying the persons listed as attending the meeting).

[A63] . GP-KLEEN01061118; AFPA-P2-AT-00058.

[A64] GP-KLEEN01061118; AFPA-P2-AT-00058.

[A65] SSCC 00305730, *Minutes*, American Forest & Paper Association Board of Directors Meeting, dated October 30, 2004. The following persons were identified as being present during for all or part of the meeting: John Faraci, CEO of International Paper; Kenny Jastrow, CEO of Temple-Inland; Patrick Moore, CEO of Smurfit-Stone; and Steve Rogel, CEO of Weyerhaeuser.

[A66] SSCC 00159174, *Minutes*, AF&PA CEO Statistics Committee, dated Friday, October 29, 2004.

*Bob Amen from International Paper, Sonny Jackson from Smurfit-Stone, Richard Taggart from Weyerhaeuser, and Lyn Withey from International Paper.*[A67] *Executives from Defendants met on at least one more occasion in 2004. Steve Klinger from Georgia-Pacific, Paul Brown (for Carol Roberts) from International Paper, James Davis from Smurfit-Stone, Marc-Andre Depin from Norampac, Daniel Pyne from Weyerhaeuser, and William Sweeney from PCA attended a Fibre Box Association Board of Directors meeting on November 16, 2004, in Chicago, Illinois.*[A68]

¶76.  As previously alleged, ***beginning in 2004***, Defendants were experiencing decreased profit margins and historically high demand.  In that context, in June 2005, high level executives and other representatives from each of the Defendants and their co-conspirators, including Pete Correll, Chairman and CEO of Georgia-Pacific, David A. Spraley, Vice President of Georgia-Pacific, C. Richard Larrick, General Manager of Georgia-Pacific, Russell Bishop, Chief Information Officer of Weyerhaeuser, Dick Thomas, Vice President of Weyerhaeuser, Ronnie Cosper, Papermill Superintendent for Smurfit-Stone, and others were reported as attending the PIMA 2005 Leadership Conference in Nashville, Tennessee.[14]  The theme of this conference was "Success through Collaborative Teamwork."  Topics discussed included "Effective Collaboration through Teamwork" and "Price Execution in the Forest Products Industry."

¶179.  Further, the price of both linerboard and corrugated medium rose at exactly the same time by exactly the same per-ton amounts.  This identical and simultaneous across-the-

---

[A67] SSCC 00159174.

[A68] FBAKP0001228, *Minutes of Meeting*, Fibre Box Association Board of Directors, dated November 16, 2004 (identifying the persons listed above as attending the meeting).  The minutes indicate that Mr. Klinger was Chairman of the association.

[14]  The Paper Industry Management Association, or "PIMA", describes itself as "the premier association for management professionals in the paper and pulp industry" with the goal of contributing "to the strength of the international pulp and paper community by providing the means for our members to address relevant industry issues and to develop their management and leadership skills."

board price increase on multiple products can only be explained by concerted and coordinated

behavior by the Defendants.



Dated: June 3, 2014                          Respectfully submitted,


*/s/ Michael J. Freed*

Michael J. Freed                            Daniel J. Mogin
Robert J. Wozniak                           Jodie Williams
**FREED KANNER LONDON**                     **THE MOGIN LAW FIRM, P.C.**
**& MILLEN LLC**                            707 Broadway, Suite 1000
2201 Waukegan Road, Suite 130               San Diego, CA 92101
Bannockburn, IL 60015 USA                   T: 619-687-6611
T: 224-632-4500                             F: 619-687-6610
F: 224-632-4521


*Co-Lead Counsel for the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KLEEN PRODUCTS LLC, individually and on behalf of all others similarly situated, | Case No. 1:10-cv-05711 |
| Plaintiffs, | Honorable Harry D. Leinenweber |
| v. | |
| INTERNATIONAL PAPER, et al., | |
| Defendants. | |

**[PROPOSED] AMENDMENTS TO PLAINTIFFS'**
**CONSOLIDATED AND AMENDED COMPLAINT**

Plaintiffs hereby submit the following Amendments to their Consolidated and Amended Complaint (ECF No. 65 as amended by ECF No. 648):

¶ 19.   Defendant Weyerhaeuser Company ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington.  During the Class Period, Weyerhaeuser and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.  ***On or about March 17, 2008 it was announced that International Paper was purchasing Weyerhaeuser's Containerboard Packaging and Recycling business; that acquisition was completed on or about August 4, 2008  and  Weyerhaeuser's Containerboard Products businesses and properties  were transferred to the ownership and control of International Paper.***[1]

---

[1] The paragraph numbers herein correspond to the paragraph numbers in the Consolidated Amended Complaint (ECF No. 65, as amended by ECF No. 648).  Plaintiffs' proposed amendments are in ***bold italics*** and proposed deletions appear in strikethrough font.

¶ 21.    Defendant Temple-Inland, Inc. ("Temple-Inland") is a Delaware corporation with its principal place of business at ***Memphis, Tennessee*** ~~Austin, Texas~~.  During the Class Period, Temple-Inland and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including Defendant TIN, Inc. sold Containerboard Products in interstate commerce directly to purchasers in the United States (Defendant Temple-Inland, Inc. and Defendant TIN, Inc. are collectively referred to hereafter as "Temple-Inland").  ***On or about May 17, 2011 International Paper made an unsolicited offer to acquire Temple-Inland; that acquisition was completed on or about February 13, 2012 and  Temple-Inland became a wholly owned and controlled subsidiary of International Paper.***

¶ 22.    Defendant ***RockTenn CP, LLC ("RockTenn"), formerly known and originally sued as*** Smurfit-Stone Container Corporation ("Smurfit-Stone") ***is a Delaware corporation with its principal place of business at Norcross, Georgia.  During the relevant time period, Smurfit-Stone was*** ~~is~~ a Delaware corporation with its principal place*s* of business at Chicago, Illinois ***and Creve Coeur, Missouri***. During the Class Period, Smurfit-Stone and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States. On or about January 26, 2009, Smurfit-Stone filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware; effective June 30, 2010, Smurfit-Stone was discharged under a plan of reorganization. ~~However,~~ ***Smurfit-Stone participated in the conspiracy alleged herein throughout the Class Period through the actions of*** many of Smurfit-Stone's most senior executives, including ***Patrick J. Moore, Chief Executive Officer and John Knudsen, Senior Vice President***, ~~*those* and others~~ with responsibility for Containerboard Products**. ~~, continued with the company substantially throughout the conspiracy alleged herein, including~~**

2

~~through the inception of bankruptcy proceedings and after the discharge became effective, such as Patrick J. Moore, Chief Executive Officer and John Knudsen, Senior Vice President. After its discharge for bankruptcy, Smurfit-Stone knowingly and intentionally joined the conspiracy~~.  This complaint seeks to recover damages from Smurfit-Stone for post-discharge conduct only, and in no way seeks to violate any Orders of the above-referenced Bankruptcy Court.  ***By operation of law, however, the damages arising from Smurfit-Stone's post-discharge conduct include damages incurred by Plaintiffs and the Class throughout the Class Period under the principle of joint and several liability imposed on antitrust conspirators.***  ~~Specific post-discharge actions by Smurfit-Stone in furtherance of the conspiracy alleged, *inter alia*, in paragraphs 168-172 and 174-178 are consistent with the actions taken by all of the Defendants throughout the Class Period and that it is part of the ongoing antitrust conspiracy to and including the date of the filing of this complaint. [Plaintiff Thule, Inc. alleges that Smurfit-Stone participated as coconspirator with the other Defendants and has performed acts and made statements in furtherance of the conspiracy, however does not join in the allegations naming Smurfit-Stone as a Defendant.]~~

¶140.   On or about May 5, 2008, International Paper's purchase of Weyerhaeuser was approved ***and the acquisition was completed on or about August 4, 2008, at which time Weyerhaeuser's Containerboard Products businesses and properties were transferred to the ownership and control of International Paper***.  As a result of the merger, the top seven containerboard producers made up a combined market share of approximately 80%.

¶ 168.   After its discharge from bankruptcy, Smurfit-Stone ~~joined~~ *reaffirmed its participation in* the conspiracy, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in further idling of production capacity, reduced

production and another near simultaneous across-the-board price increase. ***Other specific post-discharge actions taken by Smurfit-Stone in furtherance of the conspiracy are alleged, inter alia, in paragraphs 169-172 and 174-178 and are consistent with the actions taken by all of the Defendants and Smurfit-Stone throughout the Class Period.***

*¶ 168.a.  **Regardless of whether Smurfit-Stone participated in the conspiracy throughout the Class Period or joined the conspiracy immediately after its discharge from bankruptcy, this complaint seeks to recover damages from RockTenn only for Smurfit-Stone's post-discharge conduct, and in no way seeks to violate any Orders of the above-referenced Bankruptcy Court.  By operation of law, however, the damages arising from Smurfit-Stone's post-discharge conduct include damages incurred by Plaintiffs and the Class throughout the Class Period under the principle of joint and several liability imposed on antitrust conspirators. This complaint also seeks to recover damages from the remaining Defendants for Smurfit-Stone's pre-discharge conspiratorial conduct.***

Dated:  October 23, 2014

Respectfully submitted,

*/s/ Michael J. Freed*
Michael J. Freed
Robert J. Wozniak
**FREED KANNER LONDON
  & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
T: (224) 632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com

Daniel J. Mogin
**THE MOGIN LAW FIRM, P.C.**
707 Broadway, Suite 1000
San Diego, CA 92101
T: (619) 687-6611
dmogin@moginlaw.com

*Co-lead Counsel for the Proposed Class*

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3     KLEEN PRODUCTS LLC, et al.,       )  No. 10 C 5711
                                         )
 4                       Plaintiffs,     )  Chicago, Illinois
                                         )  November 24, 2009
 5                                       )  9:30 o'clock a.m.
       -vs-                              )
 6                                       )
                                         )
 7     PACKAGING CORPORATION OF          )
       AMERICA, et al.,                  )
 8                                       )
                         Defendants.     )
 9

10                 TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MILTON I. SHADUR
11
       APPEARANCES:
12     For the Plaintiffs:      FREED KANNER LONDON & MILLEN LLC
                                2201 Waukegan Road, Suite 130
13                              Bannockburn Illinois 60015
                                BY:  MR. STEVEN A. KANNER
14                                   MR. MICHAEL J. FREED
                                         and
15                              THE MOGIN LAW FIRM
                                707 Broadway, Suite 1000
16                              San Diego, California  92101
                                BY:  MR. DANIEL J. MOGIN
17
       For Plaintiff Thule:     MILLER LAW LLC
18                              115 South LaSalle Street, Suite 2910
                                Chicago, Illinois 60603
19                              BY:  MR. MARVIN A. MILLER
                                         and
20                              ROBBINS GELLER RUDMAN & DOWD LLP
                                655 West Broadway, Suite 1900
21                              San Diego, California
                                BY:  MS. ALEXANDRA S. BERNAY
22

23     Court Reporter:          ROSEMARY SCARPELLI
                                219 South Dearborn Street
24                              Room 1412
                                Chicago, Illinois  60604
25                              (312) 435-5815
```

1    APPEARANCES:   (Continued)

2    For Defendant            KIRKLAND & ELLIS LLP
     Packaging Corporation    300 North LaSalle Street
3    of America:              Chicago Illinois 60654
                              BY:  MR. DANIEL E. LAYTIN
4
     For Defendant            GIBSON DUNN & CRUTCHER LLP
5    International Paper:      555 Mission Avenue, Suite 3000
                              San Francisco California 94105
6                             BY:   MR. GEORGE A. NICOUD, III
                                        and
7                             EIMER STAHL KLEVORN & SOLBERG
                              224 South Michigan Avenue
8                             Suite 1100
                              Chicago, Illinois 60604
9                             BY:   MR. NATHAN P. EIMER
                                   MR. JOHN K. THEIS
10
     For Defendant            K&L GATES LLP
11   Cascades, Inc. and       70 West Madison Street, Suite 3100
     Norampac Industries:     Chicago Illinois 60602
12                            BY:  MR. SCOTT M. MENDEL

13   For Defendant            McDERMOTT WILL & EMERY
     Weyerhaeuser Company:    227 West Monroe Street, Suite 4400
14                            Chicago, Illinois 60606
                              BY:  MS JENNIFER A. DIVER
15
     For Defendant            FIGLIULO & SILVERMAN
16   Georgia Pacific:         Ten South LaSalle Street, Suite 3600
                              Chicago, Illinois 60603
17                            BY:   MR. JAMES R. FIGLIULO
                                        and
18                            QUINN EMANUEL URQUHART
                              & SULLIVAN LLP
19                            51 Madison Avenue, 22nd Floor
                              New York, New York 10010
20                            BY:   MR. STEPHEN R. NEUWIRTH

21   For Defendant            MAYER BROWN LLP
     Temple-Inland, Inc.:     71 South Wacker Drive
22                            Chicago, Illinois 60606
                              BY:  MR. ANDREW S. MAROVITZ
23

24

25

1  APPEARANCES:  (Cont.)

2  For Smurfit-Stone          WINSTON & STRAWN LLP
   Container Corporation:     35 West Wacker Drive
3                             Chicago, Illinois 60601
                              BY:  MR. R. MARK McCAREINS
4                                  MR. JAMES F. HERBISON

5  ALSO PRESENT:             SIDLEY & AUSTIN LLP
                             One South Dearborn Street
6                            Chicago, Illinois 60603
                             BY:  MR. MATTHEW A. CLEMENTE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  This is 10 C 5711, Kleen Products

2     versus Packaging Corporation of America.

3          THE COURT:  If there are more persons than one out

4     on the phone, first identify yourselves, if you would, for

5     the record.  And then if you have an occasion to talk again,

6     make sure that you give your name up front so that our court

7     reporter can match it with what is -- what is being said with

8     who says it.  Okay?

9          MR. NEUWIRTH:  Thank you, your Honor.  This is

10    Stephen Neuwirth from Quinn Emanuel Urquhart & Sullivan for

11    defendant Georgia Pacific.

12         THE COURT:  And you are the only one on the phone?

13         MR. THEIS:  No, your Honor.  This is Jack Theis

14    from Eimer Stahl Klevorn & Solberg on behalf of International

15    Paper.

16         THE COURT:  Okay.  And then --

17         MS. BERNAY:  Good morning, your Honor, Alexandra

18    Bernay from Robbins Geller Rudman & Dowd on behalf of

19    plaintiff Thule.

20         THE COURT:  Okay.  And that is it on the phone?

21         MR. MOGIN:  Good morning, your Honor, this is

22    Daniel Mogin on behalf of the other plaintiffs.

23         THE COURT:  Okay.  Now I guess we have to go from

24    left to right as I have it and the court reporter has it, and

25    so let's do that.

1          MR. KANNER:  Good morning, your Honor, Steve Kanner

2    from the Freed Kanner firm in Chicago here on behalf of the

3    plaintiffs.

4          MR. MILLER:  Good morning, your Honor, Marvin

5    Miller on behalf of Thule.

6          MR. FREED:  Good morning, your Honor, Michael Freed

7    on behalf of class plaintiffs other than Thule.

8          MR. McCAREINS:  Good morning, your Honor, Mark

9    McCareins and Jim Herbison on behalf of Smurfit Stone.

10          MR. EIMER:  Good after -- good morning, your Honor,

11    Nate Eimer on behalf of International Paper.

12          MR. NICOUD:  Good morning, your Honor, Trey Nicoud

13    also on behalf of International Paper.

14          MS. DIVER:  Good morning, your Honor, Jennifer

15    Diver on behalf of Weyerhaeuser Company.

16          MR. FIGLIULO:  Good morning, Jim Figliulo on behalf

17    of Georgia Pacific.

18          MR. MENDEL:  Scott Mendel on behalf of defendants

19    Cascades and Norampac.

20          MR. MAROVITZ:  Good morning, your Honor, Andy

21    Marovitz on behalf of Temple-Inland.

22          MR. LAYTIN:  Dan Laytin for PCA.

23          THE COURT:  Well, good morning to all of you.  As

24    always, I shudder when I try to figure out the total hourly

25    rate that we are looking at here, but put that aside.  And I

1  am very appreciative for all of you making yourselves

2  available on short notice, but -- and there is no reason you

3  have to be standing around for this.  I want to tell you

4  where I am and why I have called this meeting.  Okay?  So you

5  can all be seated, if you will.

6       This request that I have made has been occasioned

7  by my having reviewed the submissions that were made in the

8  Bankruptcy Court in Delaware, although I didn't get a chance

9  to read the most recent one that just got tendered to me.

10 But I don't know if that may be another copy of the November

11 19th reply brief which I had already received.  So if that is

12 the thing that got delivered physically, I have already read

13 that.  Okay.

14      And that in turn caused me to review once again the

15 Consolidated Complaint in this antitrust case.  If I may be

16 blunt, counsel for Smurfit-Stone are seeking to obtain an

17 order from the Bankruptcy Court that I believe it has no

18 jurisdiction to entertain, and I would be remiss if I were

19 not to order counsel for Smurfit-Stone and plaintiffs'

20 counsel who are before me to apprise the bankruptcy judge of

21 why I have concluded that.

22      Let me explain.  It is just flat-out misleading to

23 characterize the lawsuit before me as seeking relief from

24 Smurfit-Stone that is at odds with its discharge in

25 bankruptcy.  That I do not regard as accurate and I think --

1   although I don't like to say this, I think that

2   Smurfit-Stone's counsel really ought to know that.  Although

3   the class period is defined in Paragraph 1 of the complaint

4   as running from May 2005 to the present day, and that is true

5   as to all other defendants, that is, all defendants other

6   than Smurfit-Stone, the provision of Paragraph 22 of the

7   complaint cannot be more clear.  After reciting the facts, as

8   it does, about Smurfit-Stone's entry into and its emergence

9   from Chapter 11 proceedings with a discharge, the complaint

10  says this:   "This complaint seeks to recover damages from

11  Smurfit-Stone for post-discharge conduct only and in no way

12  seeks to violate any orders of the above-referenced

13  Bankruptcy Court," and then goes on to identify some specific

14  post charge -- post-discharge actions that were allegedly

15  taking place in furtherance of a conspiracy.

16            Now that disclaimer, I suggest, could not be more

17  express.  And I can assure you of one thing, and that is that

18  the plaintiffs are going to be held to that in my court.  And

19  what do I get offered up in the way of responses from

20  Smurfit-Stone?  What I view as inaccurate and impermissible

21  arguments, based on all the allegations of the complaint that

22  speak, it is true, of Smurfit-Stone's predischarge conduct.

23            Now why do I say that that is really misleading?

24  It is because that contention, I believe, impermissibly

25  conflates evidence with claims.  It is an ironic coincidence

1   that all of you were, I guess, sitting in court when I just

2   was talking to the young lady about the employment

3   discrimination case and made exactly that distinction.  And I

4   will -- I certainly wouldn't expect all you gurus in the

5   antitrust field to be generalists, as used to be the case in

6   ancient days, and to know, for example, about employment

7   discrimination, but that is exactly the same proposition,

8   that is, the conduct that was present, or allegedly present

9   -- I shouldn't be misunderstood as making any findings.  I am

10  not.

11          But things that would be predischarge that could be

12  considered, for example, on the issue whether Smurfit-Stone

13  was possessed of the prohibited intent that might be an

14  element of the antitrust claim of fixing prices in restraint

15  of trade are certainly permissible.  And the fact that

16  Smurfit-Stone has been washed clean of any potential for

17  damages on that score does not alter the fact that those

18  allegations may well be considered by the Court.

19          Again, you know, it is -- as I say, it was really

20  ironic because I hadn't anticipated when I asked you to come

21  in that I was going to be dealing with precisely the same

22  phenomenon in a case in another area of the law.  But it is

23  just the same, that is, the idea that liability does not

24  control -- or the lack of liability does not control, the

25  appropriateness of allegations that are in the -- that are in

1    the complaint that deal with a time period for which

2    Smurfit-Stone no longer has any potential liability of the

3    type that the Bankruptcy Court could deal with appropriately.

4           Now my colleagues and I are constantly

5    encountering, I will say, misguided defense lawyers who

6    sometimes move, for example, to strike allegations relating

7    to the earlier time frame, the same sort of thing that I

8    dealt with not ten minutes before all of you stepped up here.

9    That is wrong.  And it is equally wrong here.

10          Now I can tell you I don't have any desire to

11   create a tug of war or any kind of conflict with the

12   bankruptcy judge in Delaware.  But what you are asking the

13   judge to do is to enjoin litigation that addresses, so far as

14   Smurfit-Stone is concerned, only a period over which the

15   Bankruptcy Court has no jurisdiction.  Now every federal

16   judge has an affirmative duty to police jurisdiction.  As I

17   know all the practitioners in this district are aware, I

18   regularly address sua sponte cases in which federal

19   jurisdiction is absent, either dismissing or remanding those

20   cases, as the case may be.

21          There is no lesser duty, as I view it, to protect

22   and preserve jurisdiction where it clearly exists, as it does

23   here.  If injunctive relief is indeed called for, I suppose

24   that I ought to have no hesitancy in acting to enjoin

25   Smurfit-Stone from the effort to impede this Court's

1  jurisdiction.

2          Anyway, so much for my unkind comments.  But I felt

3  compelled to deal with that because, as I understand it, you

4  know, you people have teed up in front of the bankruptcy

5  judge in Delaware something that urges the bankruptcy judge

6  to do something that I think is inappropriate and that is, as

7  I would emphasize again, outside of the jurisdiction of that

8  court.  The Bankruptcy Court would have no business, of

9  course, enjoining or stopping this proceeding to the extent

10 that it seeks post-discharge responsibility on

11 Smurfit-Stone's part.

12         So with my having said that, I suppose I would like

13 to ask Smurfit-Stone what -- now, I read your stuff, but I've

14 got to tell you I found it unpersuasive.  But maybe you have

15 got something that would overcome what I have just said.

16         MR. McCAREINS:  Your Honor, Mark McCareins on

17 behalf of Smurfit-Stone in the antitrust case.  Two comments.

18 First, since there is no motion pending before your Honor on

19 this point, how would you envision memorializing your Court's

20 ruling which you just gave?

21         THE COURT:  I have specifically delivered it to you

22 orally, and there is a record of that.  And when you want to

23 know about memorializing it, the Court's statement is

24 memorialized.  And I've got to tell you I did this quite

25 deliberately.

1    Again, when I said I don't want to create a tug of

2    war, I don't want a -- I don't want to get a bankruptcy

3    judge's nose out of joint out of the sense that I have

4    intermeddled with the Bankruptcy Court's jurisdiction,

5    because I haven't.  But I would also be remiss, as I say, if

6    the bankruptcy judge didn't have before him the views of this

7    Court in connection with what is -- has been tendered there

8    as a request for preliminary injunctive relief that I think

9    is out of bounds.  And so that is -- I didn't -- you know, I

10   haven't -- although I am -- as you know, I am not hesitant to

11   commit myself to paper, and it is not just the fact that my

12   secretary happens to be away in Hawaii on vacation.  That is

13   not really the issue.

14         But I felt that it would be most appropriate, given

15   what I understand to be the timetable and the fact that the

16   issues have been posed to the Bankruptcy Court, at a minimum

17   I think that report should be made to the Bankruptcy Court

18   about the views that I have just expressed.

19         Now, I am not -- you know, I am not going to order

20   the Bankruptcy Court to do anything.  Of course not.  But I

21   do have power over the litigants, and so if I were to say,

22   "Smurfit-Stone, subside," I would expect they wouldn't want

23   to run the risk of contempt over here.  But who wants -- who

24   wants to do something like that?  I don't.  But again, you

25   know, I thought through this thing, as you might gather, and

1  I read through the Complaint, and it confirmed exactly what I

2  had thought from day one.

3           And somehow the -- what I consider misguided is the

4  effort to sort of scrap the allegations in the Complaint that

5  it is quite true do not serve as a basis for liability for

6  Smurfit-stone because it is discharged, it is washed clean of

7  anything in terms of potential liability for those earlier

8  acts, if they occurred.  Don't misunderstand, if they

9  occurred.  But to say those don't belong in the Complaint

10  because of the fact that there is no liability is a

11  misunderstanding, I think, of what the law is and ought to

12  be.  And you could not -- you know, we are dealing with good

13  lawyers on all sides here.  And I don't think that the

14  Consolidated Complaint could have been more precise and more

15  obvious and more clear and more accurate in what I just read

16  than it has been.

17           So that is -- that is my message to you, and I

18  would hope that a word to the many wise ones here would be

19  sufficient.

20           MR. McCAREINS:  One other thought.  I am not

21  counsel to Smurfit in the bankruptcy matter.

22           THE COURT:  Yeah.

23           MR. McCAREINS:  Matt Clemente from Sidley & Austin

24  is here who represents Smurfit in the bankruptcy proceeding.

25           MR. CLEMENTE:  Good morning, your Honor.

1        MR. McCAREINS:  And, Matt, would you like to

2    address any of these issues?

3        THE COURT:  Sure.

4        MR. CLEMENTE:  I would.  Thank you, your Honor.

5    For the record, Matt Clemente, Sidley Austin, on behalf of

6    Smurfit-Stone Container Corporation.  And, your Honor, I do

7    appreciate your comments.  And just as an initial matter, we

8    will be certain to inform Judge Shannon of your comments

9    today.  So rest assured we will absolutely take care to do

10   that.

11       Your Honor, as you may or may not know, I have been

12   counsel to Smurfit throughout its Chapter 11 reorganization

13   proceedings which concluded on June 30, 2010, with the entry

14   of a confirmation order, a key provision of which, as your

15   Honor is aware, is a discharge and a discharge injunction.

16       THE COURT:  Right.  And you are out.  Okay.

17       MR. CLEMENTE:  Well, we are out.  However, your

18   Honor, I was slightly disturbed by what I heard your Honor

19   say today for obvious reasons.  Are you suggesting that we

20   are out, but we are not really out?

21       THE COURT:  Oh, no, on the contrary.  What I am

22   saying -- you know, here:  For example, Smurfit-Stone clearly

23   has to respond to discovery.  The fact that it is discharged

24   from liability for that doesn't say that it is -- that from

25   the beginning of the world to the date of June 30th has

1    vanished from the scene.  It hasn't.  It existed.  And

2    whatever happened during that earlier period may be relevant

3    in this action to the extent that it bears upon

4    Smurfit-Stone's potential liability from the time of

5    discharge forward.  If --

6          MR. CLEMENTE:  That is where, your Honor, we would

7    have a slight disagreement.

8          THE COURT:  Suppose that somebody murdered somebody

9    else and then has -- and then a conviction is vacated for

10   that.  And then the person comes along and kills somebody

11   else afterwards.  The idea that the Court should put on

12   blinders in terms of sentencing and say, "Oh, well, that

13   never existed," is just unrealistic.  You know, in the

14   criminal field as well we often look at situations in which

15   there is no potential for punishment or for sanctions or

16   anything else in an earlier time, and yet we are aware of the

17   matter and take it into account.  No different, really.

18         MR. CLEMENTE:  Your Honor, I would actually

19   respectfully disagree with that, although I --

20         THE COURT:  You can.

21         MR. CLEMENTE:  Although I believe reorganization

22   proceedings are crucially important, it is clearly not on the

23   level of murder proceedings.  I wouldn't purport to suggest

24   that.

25         But what we have here, your Honor, is a situation

1   where a group of plaintiffs who have not disputed the notice

2   of the bankruptcy process, have not disputed the things that

3   give rise to a claim that accrued prior to the discharge,

4   made a decision to wait until after the discharge was entered

5   to prosecute this particular proceeding.  And then they are

6   using --

7              THE COURT:  So what is wrong with that?

8              MR. CLEMENTE:  I am going to get to that, your

9   Honor.  Then they are using the strength of allegations

10  related to predischarge conduct.  Your Honor, we also

11  examined the Complaint, including the speaking notice that

12  was filed yesterday in front of your Honor.  And if I might

13  quote:  "Such allegations are clearly relevant to this

14  antitrust case; however, since they provide background

15  concerning Smurfit-Stone's participation in an illegal

16  conspiracy, which knowledge was carried over by senior

17  executives to Smurfit-Stone in its post bankruptcy conduct."

18  Your Honor, what they are trying to do is they are trying to

19  say, "We had a claim prior to the discharge.  We chose not to

20  pursue it.  Now we are going to pursue that very same claim

21  and say, you know what, we are just going to limit liability

22  for post-discharge conduct, but we are going to bootstrap" --

23             THE COURT:  Not in my court are they going to be in

24  a position to do what you characterize as pursue a claim.

25  There is one way to pursue a claim, and that is to seek to

1  obtain a judgment.  That is how you pursue a claim.  They are

2  clearly not going to get any kind of relief, any kind of

3  judgment that stands -- that is based upon -- predischarge

4  conduct.  That is a very different phenomenon from the one

5  that I talked about, and that is that predischarge conduct

6  may well be taken into account.  And by the way, you know, I

7  read their response.  I wasn't -- I was not taken by the fact

8  that they chose to rehash early on all of the substantive

9  part because that is really -- I am talking about their

10  response in the Bankruptcy Court.

11          MR. CLEMENTE:  I understand, your Honor.

12          THE COURT:  Because that, as far as I am concerned,

13  was really irrelevant.  They are not -- they are not proving

14  their case before the Bankruptcy Court in Delaware.

15          MR. CLEMENTE:  I understand, your Honor.

16          THE COURT:  And they shouldn't try.  But again I

17  think that what you have said really does not face up to the

18  points that I have made, and that is that -- that I am going

19  to be very careful, I can assure you, to separate out any

20  prospect of seeking liability for pre -- for predischarge

21  conduct.

22          But the notion that, as I say, the Court should don

23  blinders and not take matters into his -- suppose -- again,

24  you know, it really is a parallel.  If there is -- if what we

25  have as a necessary ingredient of an antitrust claim is bad

1    intent, okay, and bad intent can be manifested by earlier

2    conduct that creates inferences about current intent -- that

3    happens all the time and it does not get in the way of

4    404(b), incidentally, because it is one of the things that

5    404(b) quite expressly excludes from the notion of

6    inadmissibility.

7            So again I think we are functioning somewhat at

8    cross-purposes, because I know you have got -- you know, you

9    have got a mindset that is -- that is a proper advocate's

10    mindset.  But I've got to tell you I am not bringing an

11    advocate's point of view to this one.  I am bringing what is

12    an objective and, I trust, judicial -- and I trust as well

13    judicious -- point of view to the point that I am dealing

14    with.

15            So you people go ahead and -- but I've got to tell

16    you, I would urge that given the characterization that I have

17    just placed, it is not well-considered to be seeking an

18    injunction against their proceeding on a post-discharge

19    theory of liability against Smurfit-Stone and to place that

20    before a Bankruptcy Court that really has no jurisdiction.

21    Once the discharge is made, that is out.

22            And indeed there are a number of cases that they

23    cited that basically say that a party that has been

24    discharged from bankruptcy is not then insulated from

25    post-discharge responsibility for whatever conduct that might

1  be actionable.  That is all we are going to be looking at

2  here.

3           Again I can assure you I am not going to permit

4  anything other than the representation that they have made

5  here in the paragraph that I read as establishing any

6  predicate for a potential liability on the part of

7  Smurfit-Stone.

8           But if it is engaged indeed in a conspiracy, the

9  notion that it should not be responsible, when the alleged

10  co-conspirators are, would I think really offend the justice

11  system.  Why should -- why should you be -- go clean, if that

12  is true -- and again I emphasize I am not making any findings

13  -- when everybody else may be on the hook?  It is just not

14  right, and it is not the law.

15           MR. CLEMENTE:  Your Honor, if I may, the only

16  distinction that I would continue to urge your Honor to

17  consider is, again, had this claim been brought in a

18  bankruptcy context as an initial matter, like we believe it

19  should have been, there would have been an adjudication,

20  perhaps in front of a nonbankruptcy forum.  I am not

21  suggesting it would have been Judge Shannon ultimately making

22  that adjudication.  But what would have not have happened if

23  -- had that claim been adjudicated and dealt with in the

24  bankruptcy process, three months later an additional

25  complaint could have been filed alleging pre-petition --

1    predischarge conduct being relevant to that post-discharge

2    claim that they are alleging.  That is the point that we are

3    trying to make, your Honor.  There is a distinction there

4    that they cannot stand on the sidelines while the bankruptcy

5    process goes forward, okay, and then arise three months later

6    and say --

7              THE COURT:  The consequence -- the consequence of

8    their, as you put it, having stood on the side is that they

9    have no ability to advance a claim based on the predischarge

10   conduct.  That is the consequence.  They are stuck.  Okay?

11   But the idea that you should somehow ease yourself out of

12   this lawsuit on that basis is just wrong.

13             And I know that we all get boring when we repeat

14   ourselves, and I am no exception to that.  But I've got to

15   tell you that you really have not -- I think you may have

16   lost your moorings on that one, because you haven't really

17   thought through what the effect is of, as you put it, their

18   not having presented that to the Bankruptcy Court.  Suppose

19   they had.  What would have happened is exactly the same thing

20   that has happened now, and that is the Bankruptcy Court would

21   have rejected it as one of the claims --

22             MR. CLEMENTE:  Correct.

23             THE COURT:  -- and it is gone as a claim.  Again,

24   that doesn't go to the issue --

25             MR. CLEMENTE:  And it would have been dealt with in

1    the bankruptcy context and it would have been treated in

2    accordance with the bankruptcy plan.  What we have now here,

3    your Honor, is a post -- an alleged post-discharge claim that

4    is being proven -- or allegedly being proven based on

5    predischarge conduct that would allow collection of monies to

6    advance on top of --

7              THE COURT:  Did you ever see Cool Hand Luke?

8              MR. CLEMENTE:  Part of it, I must admit, your

9    Honor.

10             THE COURT:  "What we have here is a failure to

11   communicate."  And you just haven't gotten it.

12             MR. CLEMENTE:  No, your Honor, I do get where you

13   are coming from, your Honor.

14             THE COURT:  I guess not.  But I really have said

15   all that I have to say this morning.

16             I thought it was important to get the message over

17   to everybody, because it affects this Court's jurisdiction.

18   And this Court has just as much of an obligation, as I say,

19   to preserve its jurisdiction as it does to reject

20   jurisdiction if it doesn't exist.  So that is where we are.

21   Okay?

22             Thank you all.

23             MR. CLEMENTE:  Thank you, your Honor.

24             MR. McCAREINS:  Thank you, your Honor.

25             MR. EIMER:  Have a nice holiday.

1        THE COURT:  Pardon?

2        MR. EIMER:  Have a nice holiday.

3        THE COURT:  Thank you.  You too.

4        MR. EIMER:  Thank you.

5        THE COURT:  I guess all but Smurfit-Stone.

6        (Which were all the proceedings heard.)

7                        CERTIFICATE

8        I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   s/Rosemary Scarpelli/        Date:  November 24, 2010

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KLEEN PRODUCTS, LLC, et al.,   )
                            )
           Plaintiffs,   )
                            )
     v.                 )   No.  10 C 5711
                            )
PACKAGING CORPORATION OF   )
AMERICA, et al,.           )
                            )
          Defendants.   )

<u>MEMORANDUM OPINION AND ORDER</u>

This action is the outgrowth of a number of class actions that had been brought against Packaging Corporation of America ("Packaging"), International Paper Company ("International Paper"), Cascades Canada, Inc. ("Cascades"), Norampac Holdings U.S., Inc. ("Norampac"), Weyerhaeuser Company ("Weyerhaeuser"), Geogia-Pacific, LLC ("Georgia-Pacific"), Temple-Inland, Inc. ("Temple") and Smurfit-Stone Container Corporation ("Smurfit-Stone"),[1] charging violations of Sherman Act §1 ("Section 1," 15 U.S.C. §1).  As a result of the sequence of events described in the next paragraph, the present action is the only one pending, with the individual plaintiffs (also serving as the putative

---

    [1]  Despite this Court's general preference for avoiding the generic terms "plaintiffs" and "defendants" in favor of using the individual names of litigants before it, that generic usage (with initial capital letters) makes the most sense here because of the large number of combatants on each side of the "v." sign and because the analysis most often speaks in group rather than individual terms.  This opinion likewise cites to Defendants' original supporting memorandum as "D. Mem.," to Plaintiffs' responsive memorandum as "P. Mem." and to Defendants' reply memorandum as "D.R. Mem."

class representatives) comprising Kleen Products, LLC, R.P.R.
Enterprises, Inc., Mighty Pac, Inc., Ferraro Food, Inc., Ferraro
Foods of North Carolina, LLC, Distributors Packaging Group, LLC,
RHE Hatco, Inc. and Chandler Packaging Group.[2]

This Court originally received, via random assignment, <u>Kleen
Prods., LLC v. Packaging Corp. of Am.</u>, 10 C 5711, the first-filed
among a number of prospective class actions brought in this
District Court.  Four of those later-filed cases[3] were then
reassigned to this Court's calendar on grounds of relatedness
under this District Court's LR 40.4.

This Court then required Plaintiffs to file a Consolidated
and Amended Complaint ("Complaint") under the original case
number (Dkt. 51) and dismissed all the other cases without
prejudice (Dkt. 69).  As it has in a number of other cases, this
Court followed a sealed bid procedure to rule on the designation

---

[2]  As n.3 reflects, Thule, Inc. ("Thule") had originally
filed its own Complaint in Case No. 10 C 6797, advancing
essentially identical class action claims against almost all of
the Defendants.  As later stated in the text, that action was
dismissed without prejudice when the current Complaint was filed,
with Thule being included as a coplaintiff in the present action.
Now, while this memorandum opinion and order was in the final
stages of preparation, this Court has received from Thule's
counsel a notice of voluntary dismissal as to all of the
Defendants whom it had targeted, so that it is no longer a party
to the litigation.

[3]  <u>R.P.R. Enters., Inc. v. Packaging Corp. of Am. et al</u>,
10 C 5849, <u>El Jay Poultry Corp. v. Packaging Corp. of Am. et al</u>,
10 C 5896, <u>Mighty Pac, Inc. v. Packaging Corp. of Am. et al</u>,
10 C 6125 and <u>Thule, Inc. v. Packaging Corp. of Am., et al</u>,
10 C 6797.

of class counsel (Dkt. 145).

During that rather lengthy procedural sequence, Defendants jointly filed a Fed. R. Civ. P. ("Rule") 12(b)(6) motion to dismiss the Complaint with prejudice. After settling the class counsel issue, this Court ordered a response by Plaintiffs and a reply by Defendants to complete the briefing process. For the reasons set out below, Defendants' motion is denied.

### Rule 12(b)(6) Standard

Under Rule 12(b)(6) a party may move for dismissal of a complaint on the grounds of "failure to state a claim upon which relief can be granted." Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) did away with the Rule 12(b)(6) formulation first announced in Conley v. Gibson, 355 U.S. 41, 45-46 (1957) "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." As Twombly, id. at 562-63 put it:

> Conley's "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the Conley Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement.

Twombly, id. at 570 held that to survive a Rule 12(b)(6) motion a complaint must provide "only enough facts to state a claim to

3

relief that is plausible on its face." Or put otherwise, "[f]actual allegations must be enough to raise a right to relief above the speculative level" (id. at 555).

But almost immediately thereafter the Supreme Court issued another opinion that seemed to cabin the Twombly opinion somewhat. Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007) has described the two opinions this way:

> In Bell Atlantic Corp. v. Twombly, [550 U.S. 544,] 127 S.Ct. 1955 (2007), the Supreme Court wrote that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ...a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]' to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." Id. at 1964-65 (citations omitted). Two weeks later the Court clarified that Twombly did not signal a switch to fact-pleading in the federal courts. See Erickson v. Pardus, [551 U.S. 89,] 127 S.Ct. 2197 (2007). To the contrary, Erickson reaffirmed that under Rule 8 "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the...claim is and the grounds upon which it rests.'" 127 S.Ct. at 2200, quoting Twombly, [551 U.S. at 93,] 127 S.Ct. at 1964. Taking Erickson and Twombly together, we understand the Court to be saying only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.

Since then Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) has shed further light on the principles articulated in Twombly, so that the ensuing caselaw tendency has been to treat the pair of cases like a two-horse entry (1 and 1A) in the jurisprudential

4

sweepstakes.  But because this case like <u>Twombly</u> involves the
antitrust canon, this opinion will look more to <u>Twombly</u> for
application of the concept of "plausibility" in the present
context.

### Section 1 Standard

<u>Twombly</u>, 550 U.S. at 553-54 (ellipses and brackets in
original, but internal quotation marks and citations omitted)
also set out the applicable substantive requirements of a
Section 1 claim:

> Because §1 of the Sherman Act does not prohibit [all]
> unreasonable restraints of trade...but only restraints
> effected by a contract, combination, or conspiracy,
> [t]he crucial question is whether the challenged
> anticompetitive conduct stem[s] from independent
> decision or from an agreement, tacit or express.  While
> a showing of parallel business behavior is admissible
> circumstantial evidence from which the fact finder may
> infer agreement, it falls short of conclusively
> establish[ing] agreement or...itself constitut[ing] a
> Sherman Act offense.  Even conscious parallelism, a
> common reaction of firms in a concentrated market
> [that] recogniz[e] their shared economic interests and
> their interdependence with respect to price and output
> decisions is not in itself unlawful.

<u>Twombly</u>, <u>id</u>. at 557 made it clear that Plaintiffs must place such
an allegation of conscious parallelism "in a context that raises
a suggestion of a preceding agreement, not merely parallel
conduct that could just as well be independent action."

In constructing its plausibility standard, <u>Twombly</u>, <u>id</u>. at
556 (internal footnote and quotation marks omitted) did not
require any determination of probability:

5

> Asking for plausible grounds to infer an agreement does
> not impose a probability requirement at the pleading
> stage; it simply calls for enough fact to raise a
> reasonable expectation that discovery will reveal
> evidence of illegal agreement. And, of course, a well-
> pleaded complaint may proceed even if it strikes a
> savvy judge that actual proof of the facts alleged is
> improbable, and that a recovery is very remote and
> unlikely.

And In re Text Messaging Antitrust Litig., 630 F.3d 622, 629 (7th

Cir. 2010) has further clarified the distinction between

probability and plausibility in the Section 1 context:

> Probability runs the gamut from a zero likelihood to a
> certainty. What is impossible has a zero likelihood of
> occurring and what is plausible has a moderately high
> likelihood of occurring. The fact that the allegations
> undergirding a claim could be true is no longer enough
> to save a complaint from being dismissed; the complaint
> must establish a nonnegligible probability that the
> claim is valid; but the probability need not be as
> great as such terms as "preponderance of the evidence"
> connote.

Put another way, what Plaintiffs must do is to "nudge[ ] their

claims across the line from conceivable to plausible" (Twombly,

550 U.S. at 570).

## Factual Background

Countless industrial and consumer products are manufactured

from containerboard, the principal raw material used to

manufacture corrugated products such as linerboard and corrugated

boxes (¶36[4]). That being so, the prices of those corrugated

products are of course tied directly to the price of

---

[4] Citations to the Complaint will simply take the form
"¶--."

containerboard (¶40).

During the class period the containerboard industry was heavily consolidated (¶39). Significant barriers to entry in the form of capital-intensive startup costs and high transportation costs make that industry susceptible to an oligopolistic structure (¶41). Containerboard industry firms share a cost structure because of those barriers to entry and the degree of consolidation in the industry (¶¶47-48). Because there are no close substitutes for containerboard, the demand for the product is inelastic (¶¶50-51). While the containerboard industry is consolidated, no single firm has sufficient market power to control the supply and price of the product (¶52).

There are a number of important industry groups and trade associations in the containerboard industry (¶¶53-56). Most Defendants belong to one or both of two prominent organizations: the Fibre Box Association ("FBA") and the American Forest and Paper Association (¶¶53-54).

From the 1930s onward the containerboard industry has been subject to extensive antitrust litigation and other charges of unfair competition (¶¶57-62). In this instance Plaintiffs allege the existence of such behavior beginning in August 2005 and continuing through the present (¶1). In August 2005 the containerboard industry faced complex environmental factors, including declining profit margins, rising demand and a promising

7

economic environment (¶64).  Between 2003 and 2005 individual producers had tried and failed to institute price increases at least twice (id.).

In 2005 many of the Defendants, including Smurfit-Stone, Packaging, International Paper, Temple, Georgia-Pacific and Norampac, significantly reduced their production capacity through plant closures, capacity idling or scheduled production downtime (¶¶71-72, 75, 78-81, 84-87).  Those capacity reductions coincided in time with the existence of a high demand for containerboard (¶¶73-75).

In June 2005 industry leaders, including many representatives of Defendants, attended an industry conference where pricing strategies were discussed (¶¶76-77).  Just over three months after the conference, each of Smurfit-Stone, Packaging and Georgia-Pacific announced a $30 per ton price increase effective October 1, 2005 (¶¶83-84).  After an FBA conference on September 27 the remaining Defendants followed suit by announcing a $30 per ton price increase effective October 1 (¶89).  Only a few months later, on November 28, the FBA Board of Directors met (¶91).  At that meeting both Weyerhaeuser and Packaging announced $40 per ton price increases effective January 1, 2006 (id.).  All other Defendants matched the $40 per ton price hike on January 1 (¶98).  Then on March 14, 2006 the FBA Executive Committee met again (¶104), and Defendants raised

their prices by $50 per ton only a few weeks later (id.).

Even though prices were increasing throughout 2005 and into 2006, many of the Defendants reduced capacity during that period (¶¶115, 117-18). Such capacity decreases continued through 2007 (¶¶123, 125, 132). Shortly after a large industry conference in June 2007, both Packaging and Smurfit-Stone announced $40 per ton price increases effective August 1 (¶¶126-27). On or about August 1 all other Defendants followed suit (¶129).

In late March of 2008, as the economy was beginning to decline, the industry conducted a series of conferences (¶¶138-39). Less than two months later, in early May, both Georgia-Pacific and Smurfit-Stone announced $55 per ton price increases to take effect July 1 (¶141). Most of the remaining Defendants instituted identical price increase in the same time period (id.). About a month later International Paper announced its intention to raise prices by an additional $60 per ton on October 1 (¶145). International Paper's price increase was followed by the majority of the industry soon thereafter (id.). Over the course of the remainder of the year the industry saw a continued decrease in production (¶¶150, 152).

Despite a drastic economic slowdown in 2009, containerboard prices were sticky and for the most part remained at the levels achieved by earlier price increases (¶¶154-58). In the face of economic weakness and normal seasonal weakness, Defendants raised

prices by $50 per ton on January 1, 2010.  Defendants continued
to raise prices through the summer of 2010, raising prices by $60
per ton on April 1 and August 1 (¶¶163, 167).

**Conscious Parallelism**

Plaintiffs assert that Defendants engaged in the type of
parallel business behavior that meets the threshold requirement
of conscious parallelism.  In particular Plaintiffs allege that
Defendants' uniformly contemporaneous[5] supply restrictions and
price increases establish such parallelism (P. Mem. 3-4).[6]  There
are numerous allegations of circumstances where, in the context
of alleged parallel capacity reductions, Defendants raised prices
simultaneously or most Defendants raised prices closely following
announced price increases by a small number of Defendants.  Thus
at first blush Plaintiffs' allegations certainly seem to allege
the required conscious parallelism.

Defendants attempt to counter those allegations in a number
of ways.  First they argue that their capacity reductions were

_____

[5]  "Contemporaneous" is employed here in the broader sense,
connoting essentially the same time rather than lockstep
conformity.  As the just-completed extended account reflects,
many of the increases by different Defendants followed the
actions of others after a short time interval.  But that of
course is common in conscious parallelism scenarios.

[6]  Plaintiffs can prove relevant parallel activity by
showing either direct price-fixing or by showing output-
restriction alone (Gen. Leaseways, Inc. v. Nat'l Truck Leasing
Assoc., 744 F.2d 588, 594-95 (7th Cir. 1984)).  Here Plaintiffs
proceed by adducing substantial evidence of both activities.

10

not truly parallel. More specifically, they suggest that they made only modest capacity reductions, that the reductions were made in varying amounts and not all at the same time and that they did not follow each others' reductions. Those contentions are unconvincing for a number of reasons.

For one thing, Defendants give unwarrantedly short shrift to the amount of detail provided by Plaintiffs. As partially detailed above, Plaintiffs have provided specific allegations of just the type of reductions that Defendants characterize as required (P. Mem. 3-4). More significantly, Defendants' characterizations of Plaintiffs' allegations as assertedly insufficient reflect only their partisan view. To the contrary, Plaintiffs have alleged more than mere modest capacity reductions.[7] Similarly, while there may be some variation in the amount[8] and timing[9] of reductions, that variation is not

---

[7] In its separate memorandum, Temple argues that allegations of capacity reductions are not the same as allegations of reduced supply (T. Mem. 4-7). While that may be technically correct, such an assertion does not address the alleged price parallelism (the ultimate concern) or the simple fact that capacity restrictions demonstrate a long-term decline in possible supply and create the kind of restriction needed to enforce cartel behavior.

[8] Variations in the size of capacity reductions do not disprove the existence of a conspiracy, just as "[e]ven a single act may be sufficient to draw a defendant within the ambit of a conspiracy" (United States v. Consol. Packaging Corp., 575 F.2d 117, 126 (7th Cir. 1978)).

[9] Capacity reductions need not be simultaneous to demonstrate conscious parallelism (In re Plasma-Derivative

11

substantial enough to overcome the otherwise strong suggestion of

conscious parallelism.[10]  More generally, Defendants' exclusive

concentration on small details[11] without refuting the bigger

picture allegations forgets a basic tenet confirmed nearly a half

century ago in Cont'l Ore Co. v. Union Carbide & Carbon Corp.,

370 U.S. 690, 699 (1962)(quoting an earlier Sixth Circuit

opinion):

> [T]he character and effect of a conspiracy are not to
> be judged by dismembering it and viewing its separate
> parts, but only by looking at it as a whole.

---

Protein Therapies Antitrust Litig., No. 09 C 7666, 2011 WL
462648, at *7 (N.D. Ill. Feb. 9)).

[10]  Defendants point to specific periods of time during the
class period when industry capacity actually increased (D. Mem.
12-15).  That focus is unconvincing.  As In re High Fructose
Antitrust Litig., 295 F.3d 651, 657 (7th Cir. 2002) has
indicated, additions to capacity during the class period "do[ ]
not disprove the existence of the conspiracy."  Further, to the
extent that capacity increases took place after Defendants were
able to effectuate their intended price increases, "no further
action by the conspirators is required to effect the objectives
of the conspiracy" because "each sale at the fixed price
continues to benefit the conspirators" (Morton's Market, Inc. v.
Gustafson's Dairy, Inc., 198 F.3d 823, 838 (11th Cir. 1999)).

[11]  Defendants contend that Plaintiffs' allegations of mill
closures actually rebut a suggestion of a conspiracy on the
premise that closures impose permanent restrictions on capacity,
while only temporary underutilization is required for the mutual
deterrence needed to maintain a stable cartel (D. Mem. 11).
Plaintiffs successfully refute that argument in a number of ways,
including their pointing out that in this specific context mill
closures were combined with more temporary reductions in capacity
(P. Mem. 32 n.29).  Further information about the specific
capacities of each Defendant will reveal whether the mill
closures actually furthered a conspiracy or may perhaps tend to
make its existence less likely.

Most important, though, are the Complaint's allegations of parallel price increases. While Defendants do attempt to cast doubt on the parallel nature of the capacity reductions, they do not refute the allegations of directly parallel pricing activity. Even without any parallel capacity reductions, consistent parallel price increases are enough to make a threshold showing of conscious parallelism.

Instead of denying the parallel nature of the price increases, Defendants argue that such parallel pricing does not suggest an agreement because it is an expected result of lawful interdependent conduct in a consolidated industry (D. R. Mem. 11-13). Those arguments do not refute the obvious plausibility of Plaintiffs' threshold showing of conscious parallelism for Rule 12(b)(6) purposes.[12] Rather, as discussed below, they address whether one of the possible additional contextual factors are present.

### Additional Factors

Conscious parallelism alone is not enough for antitrust liability. As <u>Text Messaging</u>, 630 F.3d at 627 has recently put it:

---

[12] Cases cited by Defendants themselves confirm that parallel pricing decisions may be sufficient to meet the threshold requirement of conscious parallelism (see, e.g., <u>White v. R.M. Packer Corp.</u>, No. 10-1130, 2011 WL 565655, at *1-2 (1st Cir. Feb. 18)).

> [A] complaint that merely alleges parallel behavior
> alleges facts that are equally consistent with an
> inference that the defendants are conspiring and an
> inference that the conditions of their market have
> enabled them to avoid competing without having to agree
> not to compete.

For that reason Plaintiffs must provide additional contextual factors that support a plausible inference of an agreement even if they do not "exclude every plausible interpretation of the facts that does not support their theory of liability" (In re Potash Antitrust Litig., 667 F.Supp.2d 907, 936-37 (N.D. Ill. 2009) (quotation marks omitted)). To that end Plaintiffs allege a number of such additional factors (P. Mem. 19-20).[13]

Plaintiffs first argue that a number of the specific capacity and pricing decisions made by Defendants were against their self-interest and thus suggest the presence of an agreement. Plaintiffs point out that Defendants initially cut capacity despite favorable economic conditions and that they later increased prices notwithstanding declining demand (P. Mem. 24). Defendants respond that a decision to maintain or increase prices in a period of declining demand is rational when demand is inelastic because decreased prices will not appreciably increase demand (D. Mem. 23)--a contention that seems to have some force where, as here, Plaintiffs have alleged that demand is inelastic.

---

[13] This opinion discusses the suggested additional factors in the same sequence as discussed by Plaintiffs, even though from this Court's perspective Plaintiffs have not ordered such factors according to their persuasiveness.

That, however, would not explain why Defendants would cut capacity despite a favorable economic environment.  After all, in an inelastic market such reductions in capacity could be used as leverage to increase prices on the static group of consumers by creating product scarcity.  Defendants seek to undercut that possibility by suggesting that the relevant reductions, as alleged, actually took place during a period of declining market demand (D. Mem. 15).

But Plaintiffs allege otherwise--they assert that such capacity reductions, at least in large part, took place when the industry foresaw rising demand (P. Mem. 24).  On that score it must be remembered that the present context requires only plausibility of Plaintiffs' version and that this is not the time to evaluate evidentiary disputes as to whether Defendants reduced capacity in anticipation of increasing demand or because they began to see declining demand on the horizon.[14]

Plaintiffs also urge that Defendants would be acting against their own interests if they independently cut production, including permanent measures such as plant closings.  Plaintiffs suggest that such capacity reductions are against Defendants'

---

[14]  Plaintiffs also argue that Defendants' price increases were unusual and unprecedented.  While Plaintiffs do allege some dramatic price increases, Defendants are correct in pointing out that Plaintiffs provide no comparative evidence as to whether the price increased were out of line with industry price increases before or after the class period (D. Mem. 16).

interest because they cannot be easily reversed and because "absent an agreement, the first firm to move takes a significant risk that competitors won't follow" (Plasma, 2011 WL 462648, at *9).

Defendants respond that this model of pricing behavior is incomplete. They claim that in a consolidated industry it is rational for an individual firm to exercise price leadership by announcing a future price increase early and waiting to see what happens (D. Mem. 19-20). If other firms follow suit the leader will effectuate the price increases, while if other firms do not follow suit the leader can abandon the increase. Defendants contend that non-leader firms will often rationally follow the leader's price increase because raising the price even higher would risk the loss of business, whereas maintaining a lower price would forgo profits. Defendants also add that not all Defendants permanently closed mills or otherwise permanently reduced capacity (D. R. Mem. 4-6).

To be sure, those contentions may be plausible--but that does not negate the plausibility of Plaintiffs' competing version. In that regard, it is certainly plausible that firms may see an agreement as a useful way to avoid the inherent uncertainty in such speculative price leadership, especially where as here there are a sizable number of individual firms, so that firms must anticipate and respond to the behavior

16

of many actors.  It is likewise plausible that the conduct of
some Defendants in permanently reducing capacity while others did
not may stem in whole or in part from the latter group's having
previously reduced capacity or not having enough existing
capacity to threaten the conspiracy.  In sum, the timing of
capacity cuts and price increases may not call for a ruling in
Plaintiffs' favor as a matter of law, but it also does not
undermine the plausibility of an alleged conspiracy.

Plaintiffs also assert that drastic changes in the
industry's structure and pricing further support the existence of
a conspiracy (P. Mem. 9-10).  Allegations of significant market
consolidation in combination with the move from a model of
maximizing capacity utilization to balancing supply with current
demand at least hint at the types of "marked change in
[D]efendants' behavior in the market...that have been held
sufficient to make an antitrust conspiracy plausible" (Standard
Iron Works v. Arcelormittal, 639 F.Supp.2d 877, 900 (N.D. Ill.
2009)(internal quotation marks omitted)).

In that regard Defendants rightly point out that Plaintiffs
do not allege drastic changes at the beginning of the class
period, but allege instead that the industry consolidated and
changed its model throughout the decade preceding the class
period (D. R. Mem. 16-17).  That however does not contribute
significantly to the plausibility or implausibility mix--it may

17

place some weight on Defendants' side of the balance scales, but the factors already discussed here weigh more heavily in Plaintiffs' favor.

Even more significantly, Plaintiffs also stress as an additional factor the temporal proximity of price increases and capacity reductions to trade association and industry events--really the most persuasive evidentiary support that they proffer.  It is striking that all Defendants repeatedly--twice in each of 2005 and 2006 and once in each of 2007 and 2008--raised their prices soon after an industry event.[15]  As <u>Text Messaging</u>, 630 F.3d at 628 has said, belonging to a trade association or attending industry events and exchanging price information is "not illegal in itself" but "facilitates price fixing."  Where as here price increases are consistently and closely timed soon after industry gatherings, significant weight is lent to allegations of a conspiracy.

Defendants attempt to respond to those timing links by asserting that there are dozens of such industry events each year, so it is assertedly inevitable that price increases would fall in proximity to such events (D. Mem. 25).  Once again that possible explanation cannot carry the day where the issue is

---

[15]  Defendants point to a few situations where they did not follow each other's announced price increases (D. Mem. 18), but such arguments "fail[ ] to distinguish between the existence of a conspiracy and its efficacy" (<u>High Fructose</u>, 295 F.3d at 656).

plausibility of Plaintiffs' inculpatory implication.[16]  Although it might be conceivable that such parallel pricing conduct was not in any way linked to such events, Defendants have made no attempt to offer up specific alternate explanations.

As for Plaintiffs' references to numerous public statements by Defendants as a claimed additional factor, they have not tied such statements temporally to price increases or capacity reductions (P. Mem. 39-42).  Nor do any of those statements contain any kind of smoking gun admission.  Hence this Court gives those public statements no weight in the plausibility analysis.

That is not true, though, of the significance to be accorded the structure of the containerboard industry itself (P. Mem. 25-26).  Text Messaging, 630 F.3d at 627-28 has made that point well:

> Parallel behavior of a sort anomalous in a competitive
> market is thus a symptom of price fixing, though
> standing alone it is not proof of it; and an industry
> structure that facilitates collusion constitutes
> supporting evidence of collusion. An accusation that
> the thousands of children who set up makeshift lemonade
> stands all over the country on hot summer days were
> fixing prices would be laughed out of court because the
> retail sale of lemonade from lemonade stands
> constitutes so dispersed and heterogeneous and
> uncommercial a market as to make a nationwide

---

[16]  Defendants also assert that "[p]articipation in trade associations is presumed legitimate" and correspondingly that opportunities to conspire at a trade meeting do not suggest an agreement (D. R. Mem. 13-14).  That however ignores the crucial timing element discussed here.

19

conspiracy of the sellers utterly implausible. But the
complaint in this case alleges that the four defendants
sell 90 percent of U.S. text messaging services, and it
would not be difficult for such a small group to agree
on prices and to be able to detect "cheating"
(underselling the agreed price by a member of the
group) without having to create elaborate mechanisms,
such as an exclusive sales agency, that could not
escape discovery by the antitrust authorities.

Plaintiffs contend that the consolidated nature of the
industry, inability of one firm to control the market, barriers
to entry, cost structures, inelasticity of demand and commodity-
like products make the containerboard industry susceptible to
collusion (P. Mem. 26).  Defendants counter only by arguing that
to focus on the structure of an industry alone as a basis for
establishing plausibility would invite an endless tide of
lawsuits against all consolidated industries (D. R. Mem. 17).
But that ignores the comparative analysis exemplified by Text
Messaging, as well as the threshold determination of conscious
parallelism that must be made to reach this stage.  Thus the
structure of the containerboard industry provides some additional
contextual support for the plausibility of a conspiracy.

Lastly, Plaintiffs state that the history of the industry
also suggests the plausibility of their allegations (P. Mem. 39).
As Defendants correctly point out in response, it would be unfair
to make too much of earlier accusations of unfair competition or
of certain settlements that may have been, at least partially,
the result of rational economic calculations about the costs of

litigation (D. Mem. 30-31).  Although Defendants fare somewhat
better in this final exchange, what has gone before in this
opinion more than satisfies the need for plausibility in the
Complaint's threshold portrayal of a claimed conspiracy in the
containerboard industry during the class period.

### Individual Defendants

All Defendants save Weyerhaeuser have filed separate
memoranda that largely apply to the filing party the arguments
made in Defendants' collective submission.  To the extent that
individual defendants argue that they did not engage in the
requisite supply reductions, price increases or other activity
discussed above, the earlier analysis explains how Plaintiffs
have plausibly alleged an industry-wide conspiracy.  In
particular, each defendant has on multiple occasions increased
its prices soon after an industry-wide meeting.  To demonstrate
that it could not have plausibly participated in such a
conspiracy, an individual defendant would have to argue that it
engaged in none of the relevant activity.  No individual
defendant has done so.

Smurfit-Stone's situation requires a bit of added
discussion.  That corporation, an industry participant throughout
the class period, instituted bankruptcy proceedings on
January 26, 2009 and emerged from bankruptcy on June 30, 2010
(S-S. Mem. 3).  As this Court has made plain, and as neither side

now disputes, Smurfit-Stone can be held liable only for its actions taken post-discharge--but actions taken pre-discharge do not vanish and can be considered with respect to specific issues such as intent (Dkt. 24).  So Smurfit-Stone's pre-discharge actions can establish plausibility as to its claimed intent and agreement to engage in a conspiracy for the same reasons that apply to other defendants.

That does not of course answer the question whether Smurfit-Stone participated in the conspiracy post-discharge.  On that score Plaintiffs allege that in two conference calls and a separate investor presentation Smurfit-Stone signaled its positive impression of ongoing industry consolidation, intent to reduce capacity and desire to raise prices in line with others in the industry (P. Mem. 45-48).  Because those allegations plausibly suggest that Smurfit-Stone was acting consistently with a conspiracy in which it may have participated pre-filing, Smurfit-Stone will not be spared the burden of defending the case shared by its fellow defendants.

### Corrugated Boxes

As for one separate facet of their Rule 12(b)(6) motions, Defendants argue that Plaintiffs have not alleged a conspiracy as to the sale of corrugated boxes, an end-use product of containerboard (D. R. Mem. 17-18).  Not so.  Throughout the Complaint Plaintiffs discuss the effect of the prices of

containerboard on the prices of corrugated boxes, alleging
specifically that the price increases for containerboard were in
part intended to increase the prices of corrugated boxes and
other corrugated products (¶¶106, 111).

Further, Plaintiffs allege that Defendants are integrated
producers of those products and so benefit from increases in
prices of both raw materials and end-use products (¶2). Most
importantly, Defendants identify nothing in the Complaint that
even hints that the relevant price increases, supply reductions
and other contextual factors were limited to containerboard and
not to corrugated products. Hence all of the preceding
discussion and its plausibility analysis apply with equal force
to corrugated boxes.

### Conclusion

In sum, Plaintiffs have successfully pleaded an antitrust
claim. All of Defendants' motions to dismiss (Dkt. Nos. 115,
119, 121, 124, 127, 134 and 137) are denied, and Defendants are
ordered to answer the Complaint on or before May 2, 2011. If and
to the extent that the parties have not previously engaged in the
advance disclosures called for by Rule 26(a), they are ordered to
do so by that same May 2 date. Finally, a status hearing is set
for 8:45 a.m. May 9, 2011 to discuss the future course of this

litigation.

_____

Milton I. Shadur
Senior United States District Judge

Date:  April 8, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of August, 2015, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case, including the counsel identified below, are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

> W. Joseph Bruckner
> Brian D. Clark
> Devona L. Wells
> LOCKRIDGE GRINDAL NAUEN
> 100 Washington Avenue S., Ste. 2200
> Minneapolis, MN 55401
>
> Michael J. Freed
> Steven A. Kanner
> Robert J. Wozniak
> FREED KANNER LONDON
> & MILLEN LLC
> 2201 Waukegan Road, Ste. 130
> Bannockburn, IL 60015
>
> Daniel J. Mogin
> Jodie Williams
> THE MOGIN LAW FIRM, P.C.
> 707 Broadway, Ste. 1000
> San Diego, CA 92101
>
> *Counsel for All Plaintiffs-Appellees*

>   /s/ Miguel A. Estrada     
> Miguel A. Estrada
> GIBSON, DUNN & CRUTCHER LLP
> 1050 Connecticut Avenue, N.W.
> Washington, D.C. 20036
> (202) 955-8500
> mestrada@gibsondunn.com