Nos. 15-2385 & 15-2386

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

KLEEN PRODUCTS LLC, ET AL.,
individually, and on behalf of all others similarly situated,

*Plaintiffs – Appellees,*

*v.*

INTERNATIONAL PAPER CO., ET AL.

*Defendants – Appellants.*

On Appeal From The United States District Court
For The Northern District Of Illinois
Case No. 1:10-cv-05711 – Hon. Harry D. Leinenweber

**APPENDIX OF DEFENDANTS-APPELLANTS INTERNATIONAL PAPER COMPANY, GEORGIA-PACIFIC LLC, WEYERHAEUSER COMPANY, TEMPLE-INLAND INC., AND ROCKTENN CP, LLC**

**VOLUME II (Pages A.135–A.440)**

Matthias A. Lydon
James F. Herbison
Michael P. Mayer
William P. Ferranti
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601
(312) 558-5600

Elizabeth Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C.  20006
(202) 282-5000

*Counsel for Defendant-Appellant
RockTenn CP, LLC*

Miguel A. Estrada
Jonathan C. Bond
Jesenka Mrdjenovic
Lindsay S. See
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

*Counsel for Defendant-Appellant
Georgia-Pacific LLC*

*[Additional counsel listed on inside cover]*

James T. McKeown
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
(414) 297-5530

Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL  60604
(312) 660-7600

*Counsel for Defendant-Appellant*
*International Paper Company*

Andrew S. Marovitz
Britt M. Miller
Joshua Yount
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
(312) 782-0600

Michael B. Kimberly
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C.  20006
(202) 263-3127

*Counsel for Defendant-Appellant*
*Temple-Inland Inc.*

Ryan A. Shores
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Beth A. Wilkinson
Alexandra M. Walsh
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street, N.W.
Washington, D.C.  20006
(202) 223-7300

*Counsel for Defendant-Appellant*
*Georgia-Pacific LLC*

Margaret H. Warner
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 756-8000

Stephen Y. Wu
Michelle S. Lowery
MCDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Suite 4400
Chicago, IL  60606
(312) 372-2000

*Counsel for Defendant-Appellant*
*Weyerhaeuser Company*

# TABLE OF CONTENTS

**Page**

## *Volume I*

Consolidated and Amended Complaint for Violation of the Sherman
Act (Nov. 8, 2010) (D.E.65) ...............................................................A.1

Amendments to Plaintiffs' Consolidated and Amended Complaint
(June 3, 2014) (D.E.648) ................................................................A.67

Amendments to Plaintiffs' Consolidated and Amended Complaint
(Oct. 23, 2014) (Submitted as Exhibit A to Plaintiffs' Motion for
Leave to Amend, Approved in D.E.806) (D.E.777, Ex. A) ............................A.86

Transcript of Proceedings of Nov. 24, 2010 (docketed Jan. 3, 2011)
(D.E.108)............................................................................A.90

Memorandum Opinion and Order on Defendants' Motion to Dismiss
(Apr. 8, 2011) (D.E.193) .................................................................A.111

## *Volume II*

Report of Mark Joseph Dwyer, Ph.D. in Support of Plaintiffs' Motion
for Class Certification (June 11, 2014) (D.E.658-4).....................................A.135

Exhibits (1-12) to Report of Mark Joseph Dwyer, Ph.D. in Support of
Plaintiffs' Motion for Class Certification (June 11, 2014)
(D.E.658-5)..........................................................................A.160

Declaration of Michael J. Harris, Ph.D. in Support of Plaintiffs' Motion
for Class Certification (June 11, 2014; Revised July 17, 2014)
(docketed July 9, 2015) (D.E.955)...............................................A.174

Exhibits to Declaration of Michael J. Harris, Ph.D. in Support of
Plaintiffs' Motion for Class Certification (June 11, 2014) ........................A.234

   Exhibits 1, 3, 4 (D.E.658-3)...............................................A.234

   Exhibit 2 (Revised July 17, 2014) (D.E.955-1) ................................A.257

Transcript of Deposition of Mark J. Dwyer, Ph.D. (Aug. 12, 2014)
(docketed Sept. 22, 2014) (D.E.763, Ex. 3)..................................A.262

Transcript of Deposition of Michael J. Harris, Ph.D. (July 22, 2014)
(docketed Sept. 22, 2014) (D.E.763, Ex. 2)..................................A.334

i

# TABLE OF CONTENTS
## *(continued)*

**Page**

### *Volume III*

Report of Dennis W. Carlton, Ph.D., with Exhibits (Sept. 19, 2014)
(D.E.759)..........................................................................................................A.441

Report of Janusz A. Ordover, Ph.D., with Appendices (Sept. 19, 2014)
(D.E.758)..........................................................................................................A.535

Transcript of Deposition of Dennis W. Carlton (Oct. 28, 2014)
(Excerpt Submitted as Exhibit 25 to Plaintiffs' Reply in Support
of Class Certification) (docketed July 9, 2015) (D.E.956, Ex. 25) ..............A.730

Transcript of Deposition of Janusz A. Ordover (Oct. 30, 2014)
(Excerpt Submitted as Exhibit 54 to Plaintiffs' Reply in Support
of Class Certification) (docketed July 9, 2015) (D.E.957, Ex. 54) ..............A.745

Reply Report of Mark Joseph Dwyer, Ph.D in Support of Plaintiffs'
Motion for Class Certification (Dec. 16, 2014)
(docketed Dec. 19, 2014) (D.E.826-3)...........................................................A.751

Reply Declaration of Michael J. Harris, Ph.D. (Corrected) in Support of
Plaintiffs' Motion for Class Certification (Dec. 19, 2014)
(docketed July 9, 2015) (D.E.962)................................................................A.868

## CIRCUIT RULE 30(d) STATEMENT

The undersigned attorney hereby certifies, pursuant to Circuit Rule 30(d), that all material required under Circuit Rule 30(a) and (b) is included in this Appendix and in the Short Appendix bound with Appellants' opening brief.


Dated:  August 10, 2015                     /s/ Miguel A. Estrada

Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KLEEN PRODUCTS LLC, et al. individually and on behalf of all those similarly situated,<br><br>　　　　　　　Plaintiffs,<br>　　v.<br><br>PACKAGING CORPORATION OF AMERICA, et al.,<br>　　　　　　　Defendants. | Case No. 1:10-cv-05711<br><br>Hon. Harry D. Leinenweber<br><br><u>CLASS ACTION</u> |

**REPORT OF MARK JOSEPH DWYER, PH.D.
IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

**Harris Economics Group
June 11, 2014**

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

# I.    Introduction

## I.A.    Assignment

1.    I have been retained by the class plaintiffs in the above captioned matter with regard to two issues. The first is to determine whether reliable empirical methods, common to the class, exist to assess class-wide impact due to the unlawful collusion alleged to have been entered into by the defendants.[1] Second, I have been asked to determine whether reliable empirical methods, common to the class, exist to measure aggregate damages to the class should the trier of fact determine that unlawful collusion took place.[2]

2.    Taken together, my assignment is to determine the feasibility of conducting empirical studies to assess and quantify the impact on the class of the alleged anticompetitive behavior. The econometric analyses that I have utilized to accomplish this assignment are well-accepted in the discipline for these purposes and allow for the determination of whether all or nearly all class members were impacted by the collusion alleged. They also demonstrate that an econometric model can be employed to estimate the amount of damages sustained by the class and hence to quantify the impact to the class as a whole.[3]

3.    My empirical analysis and the methodology employed are neutral – they do not assume that plaintiffs are correct in their allegations. Nor do my analyses or methodology assume that there was impact or the amount of damages. This does not mean, however, that the results of my analyses are irrelevant to the answers to these questions or to plaintiffs' allegations. The results of

---

1    The defendants are referred to below with 2 to 4 letter abbreviations: as International Paper ("IP"); Weyerhauser ("WY"); Temple-Inland ("TI"); Georgia Pacific ("GP"); Norampac / Cascades ("NP"); Smurfit Stone Container Corporation ("SSCC"); and Packaging Corporation of America ("PCA").

2    The class is defined as "All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010." "Amendments to Plaintiffs' Consolidated and Amended Complaint ," p. 2, filed June 3, 2014.

3    For a discussion of econometric methods applied to antitrust litigation, see for example, Baker, J. and D. Rubinfeld "Empirical Methods Used in Antitrust Litigation" *American Law and Economics Review,* Vol. 1, No. 1 & 2, 1999, pp. 386-435.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

the damages model are consistent with plaintiffs' allegations of collusion.

4.    The materials I have relied upon are listed in Exhibit 1. The facts and data on which I base the opinions reflected in this report are of a type reasonably relied upon by experts in the field of econometrics. I have utilized standard and widely accepted empirical methods on a class-wide basis to assess the extent to which any impact from the alleged collusion was widespread and to provide a preliminary measure of the but-for competitive prices for Containerboard Products and the aggregate damages to the class. These measures demonstrate the ability to apply such common empirical methods on a class-wide basis to assess common impact and estimate damages.

## I.B.    Background

5.    My name is Mark Dwyer. I am an economic consultant with Harris Economics Group, LLC in Glendale, California. I earned a PhD in economics with a specialization in econometrics from the University of Rochester. Since then I have been a professional economist specializing in econometric issues for the last 19 years. For the last 13 years, I have focused on econometric issues in civil litigation consulting. Prior to that, I taught econometric methods at the graduate and undergraduate levels for 6 years at UCLA. My CV is attached as Exhibit 2. I have provided deposition testimony in state and federal court. In federal court, I have provided testimony on empirical evidence regarding common impact and on the estimation of class-wide damages in antitrust class actions. Harris Economics Group is being compensated for the time I spend on this matter at its normal and customary rate of $360 per hour.

## I.C.    Allegations

6.    The Consolidated Amended Complaint alleges that "[t]he goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the class period."[4] I understand that the proposed class period begins February 15, 2004 and continues

---

4    Amendments to Plaintiffs' Consolidated and Amended Complaint at p. 2.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

through at least November 8, 2010. Containerboard Products, as defined in the Consolidated Amended Complaint include linerboard, corrugating medium, containerboard sheets, boxes, and other corrugated containers.[5]

## I.D.    Summary of Conclusions

7.    Plaintiffs allege that defendants colluded to restrain supply in order to raise or maintain prices. The plaintiffs also allege that the alleged collusive restrictions in supply were employed by the defendants to support announced price increases for the Class Products during the class period. Using widely-accepted econometric methods, I investigate whether these announced price increases were effective, employing evidence that is common to the class. I find that all or nearly all members of the proposed class were impacted by price increases implemented by the defendants. This conclusion is based on systematic, empirical comparisons of net prices paid by class members for Containerboard Products before and after price increase implementation dates previously announced by the defendants.[6] These results show that price increase implementations were widespread and broadly effective, causing all or nearly all class members to pay higher prices after the implementations than before.

8.    Further, I found all or nearly all class members to be impacted even after accounting for not only net prices but also after accounting for additional possible or "offered" discounts reflected in the defendants' sales transactions data – i.e., potential discounts that defendants' data do not clearly reflect were paid to class members. Even had these additional discounts been provided to class members, they would not have altered the conclusion that price increases implemented by the defendants were widespread and broadly effective, thereby impacting all or nearly all class members.

---

5    For brevity, I refer to linerboard (both kraft and recycled) and corrugating medium (both semichemical and recycled) collectively as "roll stock" and to corrugated sheets, boxes and other containers as "corrugated products".

6    By net price, I am referring to transaction prices paid by class members net of discounts that the defendants' sales transaction data indicated were paid to class members for a specified product (line item) within a specified purchase (invoice) on a specified date.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

9.  Additionally, I considered a broader sample of class members by comparing weighted average prices across products for each class member before and after defendant price increase implementation months. On the basis of this measure as well, price increases implemented by the defendants were widespread and broadly effective, thereby impacting all or nearly all class members.

10. Finally, I accounted for lump-sum payments to some class members, reflected in the sales transactions data but not identified to particular purchase transactions.[7] My review shows that these payments were not larger in aggregate during the class period than they were outside the class period and therefore did not offset the price increases implemented by the defendants. Hence, these lump-sum payments would not affect the conclusion that all or nearly all class members were impacted by the announced price increases.

11. In summary, all four of these measures of impact show that all or nearly all class members paid higher prices as a result of price increases announced and implemented by the defendants and alleged by the plaintiffs to be facilitated by the collusive restriction in supply.

12. Finally, I have employed standard econometric methods, multiple regression analysis, on a class-wide basis to demonstrate, preliminarily, that such methods may be used to quantify aggregate overcharge damages to the class. This preliminary regression analysis explains the movements in aggregate Containerboard Product prices in response to supply and demand factors over two periods: a benchmark period in which there is no allegation that the defendants colluded, and the class period, within which it is alleged that the defendants colluded. The regression analysis includes variables to account for the effects of important competitive (supply and demand) factors on the observed prices, thus allowing me to isolate the direct price effects of the alleged collusion. This analysis also included an indicator (dummy)

---

7  The defendants did not provide their sales transaction databases. Instead the defendants provided extracts of various fields from these databases.

Mark Dwyer, Ph.D.                                        Case No. 1:10-cv-05711

variable for measuring the extent of price elevation during the class period not explained by the competitive factors controlled for. This regression analysis produces estimates of the percentage increase in aggregate prices due to the measured collusive effects. I am able to apply this estimated percentage overcharge to the dollar volume of purchases of Containerboard Products during the class period and thereby estimate aggregate damages to the class.

13. I estimated aggregate price percentage overcharges separately for Intermediate Containerboard Products (roll stock and sheets) and for Final Containerboard Products (e.g., corrugated containers and displays). This preliminary analysis shows statistically significant overcharges of 3.81% for Intermediate Containerboard Products and of 2.92% for Final Containerboard Products, which when applied to the approximately $21 billion in Intermediate Containerboard Product class purchases and $102 billion in Final Containerboard Product class purchases results in damages of approximately $3.8 billion.

14. The results of this regression analysis are consistent with the allegations of cartel behavior. Also, these results are consistent with, and corroborate, my impact conclusions drawn from the price increase implementation analysis summarized above.

## II.    Class-wide Empirical Evidence of Common Impact

### II.A.    Objectives & Methods

15. Plaintiffs allege that defendants colluded to restrict the supply of Containerboard Products in order to raise and stabilize prices for Containerboard Products from February 15, 2004 through at least November 8, 2010. These supply restrictions are alleged to have ultimately facilitated the implementation of coordinated price increases announced and implemented by the defendants.

16. Plaintiffs' allegations identify the means by which the allegedly collusive

6

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

restrictions in supply injured the class members; and that is through a number of price increases announced and implemented by the defendants during the class period. These price increase implementations occurred as and after the alleged coordinated restraints in supply took place. I can then assess how widespread the impact on class members was by systematically examining and comparing both industry-wide reflections of price and actual prices paid by class members before and after these announced price increases, which I refer to as Price Increase Implementation Events ("PIIEs").

17.  Section II.B describes the defendants' price increase announcements and evidence of the class-wide impact of those announcements as reflected in industry wide price measures.

18.  Section II.C considers evidence of class-wide impact by examining actual prices paid by class members, as reflected in the sales transactions data provided by the defendants. Section II.C.1 describes the identification of class members and the measurement of net prices from these defendant data. Section II.C.2 describes the relevant PIIEs. Section II.C.3 presents impact results – that impact to the class is widespread, affecting all or nearly all class members. Section II.D examines the sensitivity of these results to alternative measures of customer prices and finds that class-wide impact is robust. Section II.E evaluates payments, including off-invoice, lump-sum payments, made by some defendants to certain class members. I find that such payments do not alter the conclusions based on the other empirical analyses I described and hence do not alter my opinion of common impact.

## II.B.    The Defendants' Price Increase Announcements and Assessment of Class-Wide Impact Based on Industry-Wide Price Data

19.  The defendants' documents describe 15 price increase announcements for

Mark Dwyer, Ph.D.                                          Case No. 1:10-cv-05711

Containerboard Products during the class period.[8] These announcements are listed in Exhibit 3. These announcements nearly all follow similar patterns. For 14 of the 15 announcements, all 7 defendants participated.[9] For each announcement, the month in which the price increase was to be implemented for each defendant is listed. For 11 of the 15 announcements, the implementation month for every defendant is the same.

20.  Not only were the announced price increases intended to be implemented coincidentally, they were nearly uniform in the amounts. All 15 price increases included linerboard and corrugating medium products generally. Exhibit 3 lists the announced price increases for 42lb. eastern unbleached kraft linerboard. For 12 of the 15 announcements, the amount of this increase is identical across the 7 defendants. For the remaining 3 announcements, the announced increases were within $10/ton of each other, i.e., within about +/- 2% of each other relative to the average price of this linerboard grade.[10]

21.  Given the lock-step nature of these price increase announcements and their implementations, a first place to examine class-wide impact is with a review of readily available, comprehensive, industry-wide measures of prices. The extent to which the defendants' price increase announcements are reflected – both in timing and in magnitude – in a published price index for linerboard is indicative of impact on prevailing market prices and therefore of the class-wide price impact of such announcements.

---

8  See GP-KLEEN: 00074419, 00075247, 00086753, 00328735, 00528361, 00559646, 00630642, 00633894, 00634058, 00634156, 00636722, 00638883, 00638886, 00638903, 00642439, 00642598, 00642618, 00642629, 00642811, 00643582, 00644502, 00644782, 00652056, 00679172, 00679229, 01025029, 01025142, 01456220; IP: 0955004, 0985657, 1131608, 1131863, 1242597, 1316324, 143739, 143740, 143741, 143742, 143743, 143746, 143747, 318743, 323609, 338552, 350501, 352950, 498100, 498647, 499465, 657888, 673256, 679991, 680889, 754507, 754509; SSCC: 00090777, 00131595, 00135050, 00138890, 00145950, 00178251, 00188584, 00192004, 00229889, 00341677, 00361964, 00361976, 00361976, 00362042, 00373470, 00436551; TIN: 00131080, 00149975, 00150869, 00192831, 00192843, 00220011, 00323080, 00353457, 00457605, 00457710, 00506823, 01358789, 01358789, 01362307; WY: 0061835, 0063801, 0072206, 0080561, 0091907; DBSI: 00001063, 00003408; NORAMPAC: 00044483, 00171117; PCoA: 000354315, 000573450.

9  For Announcement 8 (Apr/May 2007) TI, IP, and PCA participated.

10 Over the class period, the average of the PPW Index (midpoint) is $520/ton. $10 is about 2% of this amount.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

II.B.1.    Evidence of Class-wide Impact in Published Market Price Index

22.  A private publisher – RISI[11] – produces a weekly survey of prices that includes the containerboard industry. This weekly survey is called <u>Pulp & Paper Weekly</u> ("PPW"). This weekly survey has been published for more than 30 years and was published continuously throughout the class period. Every third week of the month, PPW publishes price indexes for a variety of paper products including linerboard and corrugating medium. These transaction price indexes are based on surveys of buyers and sellers of a particular containerboard grade. RISI included in the prices it published in its surveys only those related to "transactions between non-affiliated parties."[12] Internal transfers and trades between producers were excluded. PPW also excludes transactions that were contractually tied to a price index.[13] These filters make the indexes more representative of the prices class members actually paid.

23.  For Containerboard Products, one price index series is prominent – the transaction price index for 42lb. unbleached kraft linerboard for delivery east of the Rocky Mountains ("PPW Index"). This is a class product. The PPW Index is used as the industry linerboard price in the defendants' own analysis of industry pricing.[14] One reason for the prominence of the PPW Index is its pervasive role as a reference price for contracts. This index serves as a reference price for contracts not just for linerboard, but for semichemical medium and generally, for other Containerboard Products as well.[15]

24.  Another reason for the prominence of this price index is that transaction prices, as reflected in these transaction price indexes for other grades of Containerboard Products move in strikingly similar patterns. These series are plotted below. PPW publishes monthly transaction price indexes for 4 other

---

11  <u>http://www.risiinfo.com/</u>

12  "'Transaction' price estimates reflect regular transactions between mills (and in some cases brokers) and independent converters on regular size orders." RISI-00001549.

13  RISI-00001548-52. Many roll stock prices may vary with the PPW indexes themselves. Such prices contain no independent assessment of market conditions by buyers and sellers and so provide no additional information upon which to base an index value.

14  See       GP-KLEEN01017053-071;       GP-KLEEN00141844-45;       IP107771;       IP107791; GP-KLEEN01067374.

Mark Dwyer, Ph.D.                                   Case No. 1:10-cv-05711

linerboard grades and 2 semichemical medium grades. During the class period, correlations of these 6 other grade price indexes with the PPW Index all exceed 0.990, indicating that these prices move virtually in lock-step with the transaction prices reflected in the PPW Index.[16] See Exhibit 4.



25. Another reason for its prominence is the broad geography over which the survey is conducted. The PPW Index incorporates transactions across the country, including "prices in the Northeast, Southeast, Midwest, and South Central sections of the country."[17] Because the PPW Index surveys transactions for domestic delivery, it excludes non-class foreign sales.

26. For all of these reasons, the PPW Index is reflective of class member transaction prices for Containerboard Products. As Exhibit 3 indicates,

---

15 Deposition of Todd K. Petracek, March 19, 2014, pp. 141-142, 198-199; Temple-Inland_00370892; PCoA000585718; PCoA000026236; PCoA00059432; Temple Inland 00051818, Temple Inland 00051798, Temple Inland 00051775, Temple Inland 00051770, Temple Inland 00051757, Temple Inland 00051691, PCoA 000197041, PCoA 000166161, IP089891, IP 043353, IP009998, IP12123, GP-KLLEN00362592; Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al, United States Bankruptcy Court For The District of Delaware, Case No. 09-10235 (BLS), (Denton Affidavit), p.4; Declaration of Stephen R. Read, In re: Smurfit-Stone Container Corporation, et al, United States Bankruptcy Court For The District of Delaware, Case No. 09-10235 (BLS), p.6; GP-KLEEN 01074015.

16 Two variables are positively correlated when the variables tend to move in the same direction and when one increases the other increases as well.  When two variables have no (linear) relationship, their correlation is 0.0. When the two variables are exactly positively linearly related the correlation coefficient is +1.00.

17 RISI-00001549.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

following most price increase announcements issued by the defendants during the class period, price rises were reflected in increases in the PPW Index. Specifically 9 of 15 of the defendants' price increase announcements are reflected by increases in the PPW Index after the effective dates of those announced increases.[18] That a market-wide price index, which is both a survey largely oriented towards the inclusion of class member Containerboard Product purchases and a determinant of class member Containerboard Product prices, reflects these 9 announcements is evidence that these events broadly impacted class Containerboard Product purchase prices.

27. Additionally, in all 9 of these cases, the dollar amounts of the increases in the PPW Index match the defendants' announced price increases That the dollar amounts of the PPW Index align with the defendants' announced increases is evidence that the increases were uniform across class members. The PPW Index weights responses from surveys of market participants (i.e., buyers and sellers of 42lb. unbleached kraft linerboard). If a substantial portion of survey participants had reported that they did not experience a price increase, the PPW Index would not reflect an increase identical to what the defendants had announced.[19]

28. The effectiveness of the defendants' price increase announcements in raising class-wide prices, as reflected in the PPW Index is even more apparent when the direction of the movements of the PPW Index during the class period are considered. During the 82 months of the class period, the PPW Index changed 21 times. Of these 11 were increases in the index while 10 were declines. Thus, as captured by this PPW Index of linerboard transaction prices, more than 80% (i.e., 9 out of 11) of all price increases during the class period are

---

18 The implementation months for these 9 price increases are: Feb/Mar 2004; Jun 2004; Oct 2005; Jan 2006; Mar/Apr 2006; Aug 2007; Jul 2008; Jan 2010; and Apr 2010. See Exhibit 5.

19 The PPW Index is reported as a range. Throughout the class period, the spread between the high and low values of the range was stable at $10/ton. Exhibit 5 reports the midpoint of this range. Changes to the midpoint reflect equal changes to both endpoints of the reported range. That the range does not widen around the defendants' implementation months is additional evidence that the increases were uniform across linerboard purchasers.

Mark Dwyer, Ph.D.                                      Case No. 1:10-cv-05711

coincident with the defendants' price increase announcements.

29. This is an unlikely coincidence. If the defendants' announcements were ineffective in raising class member prices, one would expect the probability of an increase in the PPW Index to be about the same in months where the defendants implemented a price increase as it is over the whole class period. Over the 82 months of the class period, the probability of a PPW Index increase is 11/82 or 13.4%. The probability that the 9 PPW Index price increases that we observe in the defendants' implementation months of Exhibit 3 are a matter of chance is less than one-hundredth of one percent (0.0054%). This shows that the relationship of the price increases reflected in the PPW Index to the defendants' price increase announcements is statistically significant. At any conventional level of significance, this result provides a statistical rejection of any assertion that the defendants' price increases are unrelated to the increases observed in the PPW Index.

30. In summary, the prices for linerboard and medium reflected in the PPW Index increased for 9 of the 15 PIIEs during the class period. The timing, direction, and magnitude of PPW Index movements supports the conclusion of class-wide impact for purchasers of linerboard and medium. Further, given that much evidence ties corrugated prices to the PPW Index, the results of this examination of the PPW index provides indirect evidence that the defendants' price increase announcements had a class-wide impact on class-members purchase prices for these corrugated Containerboard Products as well. These results are sufficiently significant and robust to support my opinion that all or nearly all class members were impacted by the defendants' collusive behavior as alleged by the plaintiffs.

## II.C.   Assessing Common Impact Based on Sales Transactions Price Data

31. In this section I extend the preceding impact analysis based on market-level price data, to consider whether examination of prices actually paid by class members supports or is inconsistent with the conclusion of pervasive,

class-wide impact described in Section II.B above. I start with an overview of the methods I used in examining each of the defendants' sales transaction data to identify class members, Containerboard Products, and to compute net product prices (in Section II.C.1). I then turn to my examination of the relevant price data, again for each defendant, and find that all or nearly all of the class members examined in that defendant's data paid higher prices on transactions after the effective dates of the price increase announcements alleged by plaintiffs to be facilitated by the collusive supply restrictions (Sections II.C.2, II.C.3, II.D.1, and II.D.2 ).

### II.C.1.    Identifying Class Members and Net Product Prices

32. To identify transactions by those customers who are class members, I removed from the defendants' transactions data inter-defendant trades, within-defendant transfers, sales designated as exports, and foreign sales.[20] I further removed transactions that were not for Containerboard Products.

33. Similarly, I identified class members' net prices in the defendants' sales transaction data. Net prices are defined by incorporating any applicable discounts or adjustments to the price, indicated as being on the invoice line item in the defendants' sales transactions data.

### II.C.2.    Price Increase Implementation Events ("PIIEs")

34. The response of the PPW Index to the defendants' price increase implementations in section II.B.1 above supports the conclusion that the majority of those price increase implementations resulted in increases in that overall market price, thus impacting all or nearly all class members. In this section, I compare class member net product prices before and after each PIIE to see whether class member net prices for that Containerboard Product systematically increased after the PIIE, thus also supporting the conclusion

---

20 Across defendant datasets, the total number of class member identifications is 230,884. For almost all defendants, no information was provided to unify separate customer identifiers (e.g., customer numbers) when those customers were part of the same company. This is but one reason why class member counts are likely overstated here, and why the share of class members showing evidence of impact is likely understated.

that all or nearly all class members were impacted by the collusive conduct alleged by plaintiffs.

35. Exhibit 5 lists the PIIEs associated with the defendants' price increase announcements between February 2004 and August 2010 that showed market-wide price increases as reflected in increases in the PPW Index. Several of these PIIEs occur in successive quarters. Defendants' documents indicate that price increase implementations may take a number of months to impact class members, depending on what type of contracts different class members have and when those contracts come up for renewal.[21] For this reason, when an implementation month of one PIIE falls within 4 months of an implementation month in the following PIIE, the two events are combined.

1) The February/March 2004 and June 2004 PIIEs are treated as one combined PIIE.

2) The October 2005, January 2006, and March/April 2006 PIIEs are treated as one combined PIIE.

3) The January 2010 and April 2010 PIIEs are treated as one combined PIIE.

Together with the stand-alone PIIEs of August 2007 and July 2008 these consolidations result in the 5 PIIEs numbered in Exhibit 5. Exhibit 5 also reflects the total increase in the PPW Index corresponding to each (combined) PIIE.

36. Exhibit 5 also shows that these PIIEs had comparable effects across the PPW price indexes for the other grades of linerboard and medium. This offers further corroboration of the market-wide impact of these price increases, and of their reach across all Containerboard Products.

II.C.3.   The Impact of Defendant Price Increase Implementations on Class Member Net Prices

37. I compare the net prices paid by a class member for a specific product in the month before the effective date of the announced price increase to the price paid for that class member for the same product after the effective date. I

---

21 See IP134689, SSCC00101201, GP-KLEEN 01074015.

considered the modal net price paid by a class member in that month as the monthly net price.[22] The pre-event price is the monthly net price in the closest month up to (and including) the month prior to the PIIE as listed in Exhibit 5. The comparisons then are to the monthly net prices for that same product within 3 months, 6 months, and 9 months after the PIIE.[23] These post-PIIE windows were selected to reflect the potential that contracts or other negotiations may have delayed the implementation of a given price increase for some months for some class members.

38. Exhibit 6 presents the results of these systematic comparisons. These results show that the overwhelming number of class members examined (92%), constituting almost all of the dollar volume of class purchases examined (more than 99%), and the bulk of transactions examined (82%) were impacted, that is, showed elevated prices following a PIIE. These results were consistent across defendants and product groups. Overall, this analysis shows that these Defendants' price increase implementations systematically pervade class member purchases, supporting the conclusion that all or nearly all class members were impacted.[24]

---

22 For the definition of net price used, see ¶33. Across the defendants' sales transaction data, more than 80% of monthly net product prices are unique. Those unique monthly prices are modal prices. For those monthly product prices that are not unique, the modal price is the price for a given class member, product, and month that occurs most frequently.

23 Since two of the 5 PIIEs occur within 12 months of one another, I limited my examination to at most 9 months following the PIIE. Where there is a subsequent increase in the PPW Index in months following a PIIE, I limit the period after the PIIE to exclude that subsequent increase.

24 The impact percentages presented above (and below) are almost certainly conservative. Within each defendant's sales transactions data, customers need not have a unique identifier across different defendant computer systems, or in some cases even across plants from which products were shipped. This means that a single class member can be represented as different customers both within and across the defendants' datasets. Nor is there a feasible way to identify class members' purchases across defendants, as each defendant uses different methods to identify a class member. It is likely that some of those class members assessed in Exhibit 6 for whom no price increase was measured were in fact impacted with a price increase but under a different customer identification, either within the same defendant's data or in another defendant's data.

Mark Dwyer, Ph.D.                                        Case No. 1:10-cv-05711

## II.D.    Alternative Price Measures & Impact

### II.D.1.    Weighted Average Containerboard Product Prices & Offered Discounts

39.  Defendants' sales transaction data identify "offered" discounts and rebates but are unclear whether those potential discounts or rebates were in fact provided to class members. In Exhibit 7 I report the results of the price comparison analysis described above and reported in Exhibit 6, but taking into account the additional "offered" discounts that class members may or may not have received.

40.  In order to examine how, if at all, such offered discounts or rebates might affect the analysis of price increases identified above, I assumed that such "offered" discounts in fact were given. The set of class members for whom these price changes can be assessed is identical to that in Exhibit 6. The total assessed dollars in Exhibit 7 are reduced by the total value of offered discounts. Comparison of the difference in these assessed dollars between Exhibits 7 and 6 shows that offered discounts for the class as a whole are quite small. The defendant with the highest percentage value of offered discounts is SSCC, at 0.96%.

41.  Price increase results reported in Exhibit 7 are quite similar to those in Exhibit 6. The overall share of tested class members showing price increases is 93%. Similar levels of impact hold at the defendant and product type levels. Class members who show impact here account for virtually all the dollar volume measurable for price changes. In the event that such offered discounts or rebates were in fact given, they show no evidence of having impeded or offset the price increase implementations of Exhibit 5. From these results, I conclude that the class-wide impact results of Exhibit 6 are not materially affected by the incorporation of potential (i.e., "offered") discounts and do not require modification of my opinion of common impact.

### II.D.2.    Weighted Average Customer Prices

42.  The two impact analyses above focus on price movements at the product

16

level. To examine the robustness of these impact results to the definition of products as I was able to identify them from the defendants' sales data, in this section I examine the monthly weighted average price for all products that a class member purchased from a given defendant.[25]

43. Exhibit 8 assesses price movements around PIIE events for about 16,000 additional class member identifications, as compared to Exhibits 6 and 7. On this price measure, 94% of assessable roll stock class members and 87% of assessable corrugated product class members show monthly price increases following at least one PIIE. Across defendants, the share of class members paying higher weighted average monthly prices ranges from 83% to 91%.[26] Overall, these class members paying higher weighted average monthly prices accounted for about 97% of the dollar value of assessable purchases. As in Exhibits 6 and 7, impacted class members account for virtually all class purchases that could be analyzed. In summary, the results of these weighted average monthly price comparisons are consistent with and supportive of the conclusions of the more precise comparisons made at the customer-product level in Exhibits 6 and 7, that all or nearly-all class members were affected by higher prices following the defendants PIIEs.

## II.E.    Payments to Class Members

44. The defendants' production data also indicate payments or credits to class members that are not associated with a sales invoice line-item and are therefore not tied to particular product purchases.

45. To see what effect, if any, these payments may have on the conclusion that all or nearly all class members were impacted by the defendants' conduct, I examine these additional payments as a percentage of defendants' sales

---

25 I computed and compared customer weighted average monthly prices separately for corrugated Class Products and for roll stock Class Products.

26 Comparable figures when product prices are matched range from 90% to 95%, as indicated in Exhibit 6. That weighted average prices would be somewhat lower than product-specific comparisons is consistent with an economic substitution effect. When faced with price increases, some class members may have substituted from higher grade Containerboard Products to lower grade Containerboard Products.

Mark Dwyer, Ph.D.                                          Case No. 1:10-cv-05711

outside and during the class period.[27] Exhibit 9 summarizes these results. Class members are included in this comparison if they made purchases in both the class period and outside the class period. For each class member for whom such a comparison can be made, I compute annual payment shares ("APS"), that is, the share of total annual payments from a given defendant as a share of the class member's total annual purchases from that defendant.

46.  96% of class members did not receive APS during the class period that were significantly higher (in a statistical sense) from APS paid outside the class period. This result is consistent across product types (i.e., corrugated vs. roll stock) and across defendants.

47.  I also examined the sensitivity of these results to two different APS scenarios found in the defendants' data. In the first scenario, I include class members who received either no APS or at most one APS within and outside the class period. Over 56,000 class member identifications fit within this category. Across defendants and product types, 95% of these class members either have no APS at all, or have an APS within the class period that is no higher than the APS received outside the class period. Similar results (ranging from 92% to 98%) hold for corrugated products and roll stock separately and for each defendant considered separately.

48.  Under the second scenario, Exhibit 9 describes those class member identifications (over 54,000) for whom more than one APS were received either within the class period, outside the class period or both. Here the exhibit compares the average APS within the class period to the average APS outside the class period. Overall, 97% of these class members did not receive statistically significantly higher APS during the class period. Across product types (roll stock and corrugated) and across defendants similar percentages of these class members (ranging from 92% to 99%) did not receive statistically significantly higher APS during the class period.

49.  These results confirm that defendants' annual payments to class members do

---

27 As this analysis compares annual payments received to annual purchases, for this exhibit "class period" refers to the calendar years 2004 through 2010.

Mark Dwyer, Ph.D.                                                   Case No. 1:10-cv-05711

not weaken the conclusion of common impact.

50.  In summary, all of the analyses above, based on evidence common to the
     class, indicate that the defendants' price increases not only caused
     market-wide price increases, but that these price increases were
     disseminated to all or nearly all class members.

# III.    Estimating Damages on a Class-wide Basis

## III.A.    Introduction

51.  In this section I assess whether damages may be reliably estimated on a
     class-wide basis through the use of well-accepted empirical methods. I
     conduct a preliminary analysis that demonstrates the feasibility of reliably
     estimating damages on a class-wide basis through the use of one such
     method, multiple regression analysis. Section III.B describes the measures of
     aggregate prices used in this preliminary damages analysis. Section III.C
     describes the benchmark period used and the reasons why that benchmark
     period was selected. Section III.D describes the variables used to control for
     other economic factors affecting prices. Section III.E presents the results of
     this regression analysis of aggregate prices. Section III.F combines the
     overcharges from these regression results with class purchases for a
     preliminary estimate of aggregate, class-wide damages.

## III.B.    Aggregate Price Measures

52.  To measure aggregate, class-wide prices, I first compute monthly percentage
     changes in net prices for each class member and product combination where
     a monthly price is observed in successive months.[28] I rolled up these monthly
     percentage price changes into two product categories or levels –
     Intermediate Containerboard Products ("ICP") (consisting of roll stock and

---

28 In any given month, for customer – product combinations that lack a purchase in the prior
   month, I consider purchases up to 3 months prior. I then compute the average percentage
   change in monthly price. For example if a customer purchased a given product in January for
   $110 and then again in March for $120, the average monthly percentage price increase would
   be $10/$110/2 = 4.55%. Percentage price changes are actually measured as average monthly
   log price differences.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

corrugated sheets) and Final Containerboard Products ("FCP") (consisting of all other Containerboard Products). For each of these two product types, I then arrived at an aggregate price series.

### III.B.1.    Aggregate Class Prices Follow the PPW Index

53.  These ICP and FCP aggregate class price series can be compared to the PPW Index. Exhibit 10 provides the results of such aggregate class price regressions. For both the ICP and FCP class prices, more than 97% of the variation in aggregate class prices is explained by these regressions. The PPW Index terms in both regressions are statistically significant at all conventional significance levels.

54.  These regressions corroborate the impact of the defendants PIIEs reported in Exhibit 5. These PIIEs were fully reflected in the PPW Index. These regressions indicate that the PPW Index has a strong statistical relationship to the aggregate Containerboard Product prices that I use in my damages regressions.

## III.C.    Use of a Benchmark Period

55.  The estimation of economic damages attributable to cartel behavior, like that alleged here, reflects the difference between prices class members paid and the prices they would have paid "but for" the alleged collusion. Often this comparison involves prices paid during the class period to prices paid during a period believed not to be affected by the alleged collusion, a "benchmark" period. The difference between these prices, controlling for changes in otherwise competitive conditions, is the overcharge and may constitute a reliable measure of damages (per purchase unit) caused by the alleged collusion.

56.  Benchmark periods may be drawn from before the class period, after the class period, or both before and after the class period.[29] Given defendant

---

29 In some circumstances benchmarks may coincide with the class period and be based on a different geographic market or a similar, but distinct product market.

Mark Dwyer, Ph.D.                                                    Case No. 1:10-cv-05711

sales transaction data availability, I consider here a benchmark period that includes months before and after the class period.

## III.D.    Damages Multiple Regression Analysis

57.  In comparing prices between a benchmark period and the class period, I employ standard econometric methods to adjust for non-conspiratorial factors that may distinguish prices in these two periods. By controlling for such factors, these methods isolate any price effects during the class period that are due to the alleged collusion. In my experience, the most common econometric method used to control for non-conspiratorial factors affecting price is multiple regression analysis. This typically involves the specification and estimation of an equation relating class member prices to economic factors affecting price. These economic factors function as controls – their influence on prices is taken to be independent of the alleged conspiracy.

58.  I estimate multiple regression models over the entire set of available data, spanning both the class period and the benchmark period.

59.  To capture changes in prices during the class period that are not attributable to these control factors, I add an indicator (dummy) variable. A positive estimated effect for this dummy variable indicates that prices during the class period are higher than can be explained by the economic factors serving as controls and therefore supports the inference that the elevation is attributable to the collusion alleged by plaintiffs.

60.  In this way the regression equation explains changes between prices as observed in the benchmark period and prices observed in the class period. When prices are elevated during the class period in a way that is unrelated to the effect of supply and demand factors that normally explain price movements, the regression model provides a measure of the effect on prices of the additional factor alleged to be elevating prices during the class period, namely the alleged cartel.

III.D.1.   Economic Factors for the Damages Multiple Regression Analysis

61.  The economic factors I consider in these preliminary damages regressions can be grouped into four categories. The first category consists of economic factors measuring downstream (i.e., final product) demand, including indicators of overall economic activity and the business cycle. Here I consider: corrugated box shipments, linerboard consumption (i.e., the difference between linerboard production and the change in linerboard inventories), the S&P 500 stock market index, the University of Michigan Index of Consumer Sentiment, M2 money supply, initial unemployment insurance claims, new housing permits, non-farm employment, manufacturing hours, industrial production, a corporate bond rate index, and the Institute of Supply Management Purchase Managers Index.[30]

62.  The second category of economic factors address costs of Containerboard Product production and delivery. This category consists of recycled corrugated prices (old corrugated containers, "OCC"), pulp prices, a chemical cost index, labor costs, natural gas, crude oil, heating oil, electricity, coal, and diesel.[31]

63.  The third category consists of an overall measure of inflation. I use the

---

[30] For example references regarding the role of such demand factors in pricing, see GP-KLEEN 01074014, GP-KLEEN01074016-KLEEN01074019, GP-KLEEN01074023. For example references regarding the role of box shipments in pricing see GP-KLEEN01017053, GP-KLEEN01067346, IP115517, GP-KLEEN01074017, GP-KLEEN01074023. For an example reference regarding the S&P 500 index see SSCC 00083999; regarding the consumer sentiment index see IP010499 (slide 9); regarding the M2 money supply see SSCC 00084000, IP1102785, and IP1168908; regarding unemployment see LAZ_0035720, SSCC 00476500; regarding new housing permits see IP107779, SSCC 00476500; regarding non-farm employment see SSCC 00476500; regarding manufacturing hours see PCoA000430898; regarding industrial production see GP-KLEEN00141649, GP-KLEEN01017053, IP115517; regarding the corporate bond rate see IP107770; regarding the purchase manager's index see LAZ_0035723, 3 May 2006 issue of Deutsche Bank "Paper & Packaging" pp. 1-2. For linerboard consumption see http://www.risiinfo.com/pages/abo/methodology/forecasting/.

[31] For example references regarding the role of costs in Containerboard Product pricing see GP-KLEEN01017067, GP-KLEEN01070419, IP107770. For an example reference regarding OCC see SSCC 00841533, GP-KLEEN01070419, SSCC 00476500, SSCC 00080167; regarding fiber costs see IP107762, SSCC 00841533, SSCC 00476500, SSCC 00080167; regarding the chemical cost index see SSCC 00476500; regarding energy costs see IP107770, GP-KLEEN01070419, SSCC 00476500; regarding natural gas see SSCC 00476500, SSCC 00080167. Also see the 8 October 2007 issue of Deutsche Bank's "Paper & Packaging" regarding relevance of chemical costs, hourly wages, energy costs, natural gas, transportation costs. See SSCC 00476500 regarding prices for crude oil, heating oil, electricity, coal, and diesel.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

Producer Price Index published by the BLS.[32]

64. The final category consists of monthly indicator variables that control for possible systematic variations in pricing based on the season.[33]

65. All variables are measured monthly. For most of the economic factors listed above, I sought to include variables that would capture the delayed price responses to these factors through the current quarter and that could account for year-on-year effects. In the aggregate class price regression equations, I have included these economic factors using a technique known as principal components to ameliorate colinearity among these factors.[34]

66. In order to determine which of the economic factors identified above best explain prices, I use a stepwise model selection procedure to identify principal components with the most explanatory power.[35] In this way, the model selection process is fully reproducible and is not influenced by subjective determinations, nor by implications with respect to the estimated conspiracy effect of the selection of some economic factors versus others.

## III.E.    Regression Model Results

67. Results for the ICP and FCP aggregate price regressions are given in Exhibit 11. Two regression models were fitted – one for ICP (Intermediate Corrugated Products) and one for FCP (Final Corrugated Products).[36] I considered three specifications of each regression. The first two specifications use different model selection criteria to select those factors with the most explanatory power for each aggregate price.[37] Under the first procedure ("AICC") for the ICP regression model, the overcharge (as reflected by the conspiracy dummy variable) was 4.05%. Using that same model selection criterion, the

---

32 For references regarding the role of the PPI in pricing see, e.g., IP107770, SSCC 00841533, SSCC 00476500.

33 For example references regarding the role of seasonal factors in pricing see KLEEN01017067, IP107766, SSCC 00476500.

34 For a discussion of principal components in regression analysis, and how they can be used to reduced colinearity, see Jolliffe, I. *Principal Component Analysis, 2nd ed.*, Springer 2002.

35 This procedure is implemented in the Stata statistical software. See Lindsey, Charles and Simon Sheather "Variable Selection in Linear Regression," *The Stata Journal* 10, 4, pp. 650-669, (2010) "(Lindsey & Sheather 2010)". Available at http://bit.ly/1pzqOCL.

36 See ¶52.

overcharge estimate for the the FCP regression model was 3.61%. Under the second model selection criterion ("BIC"), the ICP overcharge estimate is 4.04% while the FCP overcharge estimate is 2.38%.

68. I considered another model specification based on these results. As a way of assessing robustness of the overcharge estimates to the number or principal components included in each aggregate price regression, I considered only the 10 principal components in the AICC specifications with the most explanatory power. The final specifications in Exhibit 11 consider regressions with just these 10 principal components.[38] These specifications imply an ICP overcharge of 3.33% and an FCP overcharge of 2.78%. For both price regressions, the conspiracy effects are statistically significant at all conventional levels of significance, across all three specifications.[39] These damage regression results are consistent with plaintiffs' allegations of collusion. The average overcharge across these three specifications, is 3.81% for ICP and 2.92% for FCP. I use these averages in the damages estimates below.

## III.F.    Estimated Damages

69. To compute preliminary measures of class-wide damages, I multiplied the average ICP and FCP overcharges of Section III.E by class purchases.[40] These average overcharges are given in Exhibit 11 as 3.81% for ICP and 2.92% for FCP. Exhibit 12 presents these preliminary damages results. For ICP class purchases of $21.06 billion, this 3.81% average overcharge implies damages

---

37 These two alternative model selection procedures are known as the "Bias-Corrected Akaike Information Criterion", or "AICC" and the "Bayesian Information Criterion", or "BIC". See Hurvich, Clifford and Chih-Ling Tsai "Regression and time series model selection in small samples", *Biometrika,* 76, 2, pp. 297-307 (1989) and Schwarz, G. "Estimating the Dimension of a Model," *The Annals of Statistics,* 6, pp. 461-464 (1978).

38 These specifications also include the monthly dummies determined by the AICC criterion, the maintained price inflation controls, and the conspiracy effect.

39 These statistics have been corrected for the possible presence of heteroskedasticity and residual serial correlation.

40 Class purchases are measured from March 1, 2004 through October 31, 2010. Defendants did not identify purchases that were governed by fixed price contracts initiated prior to the start of the class period. Even so, I have attempted to reduce class purchases for such products.

24

Mark Dwyer, Ph.D.                                          Case No. 1:10-cv-05711

of $801.27 million. For FCP class purchases of $102.25 billion, the 2.92% average overcharge implies preliminary damages of $2.991 billion. Combining these figures yields total preliminary class-wide damages of $3.792 billion. Across both FCP and ICP, the preliminary overall overcharge percentage is 3.08%.

70. This preliminary damages estimate, based on sales transactions data provided by the defendants, provides a demonstration of the feasibility of computing class-wide damages.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Glendale, California.

Dated: Wednesday, June 11, 2014

Mark Dwyer

25

Exhibit 1   Case: 15-2385   Document: 27-2   Filed: 08/10/2015   Pages: 313

# List of Documents Relied Upon

**DBSI**
· DBSI 00001063
· DBSI 00003408

**GP-KLEEN**
· GP-KLEEN 01074015
· GP-KLEEN00074419
· GP-KLEEN00075247
· GP-KLEEN00086753
· GP-KLEEN00141646
· GP-KLEEN00141647
· GP-KLEEN00141648
· GP-KLEEN00141649
· GP-KLEEN00328735
· GP-KLEEN00528361
· GP-KLEEN00559646
· GP-KLEEN00630642
· GP-KLEEN00633894
· GP-KLEEN00634058
· GP-KLEEN00634156
· GP-KLEEN00636722
· GP-KLEEN00638883
· GP-KLEEN00638886
· GP-KLEEN00638903
· GP-KLEEN00642439
· GP-KLEEN00642598
· GP-KLEEN00642618
· GP-KLEEN00642629
· GP-KLEEN00642811
· GP-KLEEN00643582
· GP-KLEEN00644502
· GP-KLEEN00644782
· GP-KLEEN00652056
· GP-KLEEN00679172
· GP-KLEEN00679229
· GP-KLEEN01017053
· GP-KLEEN01017054
· GP-KLEEN01017060
· GP-KLEEN01017061
· GP-KLEEN01017067
· GP-KLEEN01025029
· GP-KLEEN01025142
· GP-KLEEN01067346
· GP-KLEEN01067346
· GP-KLEEN01067371
· GP-KLEEN01070419
· GP-KLEEN01074014
· GP-KLEEN01074016-KLEEN01074019
· GP-KLEEN01074023
· GP-KLEEN01456220
· GP-KLLEN00362592

**IP**
· IP009998
· IP010499
· IP043353
· IP089891
· IP095108
· IP0985657
· IP107762
· IP107766
· IP107770
· IP1102785
· IP1131608
· IP1131863
· IP115517
· IP1168908
· IP12123
· IP1242597
· IP1316324
· IP134689
· IP143739
· IP143740
· IP143741
· IP143742
· IP143743
· IP143746
· IP143747
· IP1777550
· IP318743
· IP323609
· IP338552
· IP350501
· IP352950
· IP498100
· IP498100
· IP498647
· IP499465
· IP582203
· IP657888
· IP673256
· IP679991
· IP680889
· IP754507
· IP754509
· IP955004

**LAZ**
· LAZ_0035720
· LAZ_0035723

**NP**
· NP 00044483
· NP 00171117

**PCoA**
· PCoA 000354315
· PCoA 000166161
· PCoA 000197041
· PCoA 000430898
· PCoA 000573450

**RISI**
· 00001548-52
· 00001674

**SSCC**
· SSCC 00080167
· SSCC 00083400
· SSCC 00083999
· SSCC 00090777
· SSCC 00101201
· SSCC 00131595
· SSCC 00135050
· SSCC 00138890
· SSCC 00145950
· SSCC 00178251
· SSCC 00188584
· SSCC 00192004
· SSCC 00229889
· SSCC 00341677
· SSCC 00361964
· SSCC 00361976
· SSCC 00362042
· SSCC 00373470
· SSCC 00436551
· SSCC 00476500
· SSCC 00841533

**TIN**
· Temple-Inland 00051770
· Temple-Inland 00051691
· Temple-Inland 00051757
· Temple-Inland 00051775
· Temple-Inland 00051798
· Temple-Inland 00051818
· Temple-Inland 00131080
· Temple-Inland 00149975
· Temple-Inland 00150869
· Temple-Inland 00192831
· Temple-Inland 00192843
· Temple-Inland 00220011
· Temple-Inland 00323080
· Temple-Inland 00353457
· Temple-Inland 00457605
· Temple-Inland 00457710
· Temple-Inland 00506823
· Temple-Inland 01358789
· Temple-Inland 01362307

CONFIDENTIAL
HEG
6/10/2014

Exhibit 1     Case: 15-2385     Document: 27-2     Filed: 08/10/2015     Pages: 313

**WY**
·WY0061835
·WY0063801
·WY0072206
·WY0080561
·WY0091907

**Other**
·2013.12.20 GP's Supplemental R&O to Plaintiffs Interrogatories 5, 6, 7.pdf
·2013/06/21 TI letter to Charles Goodwin
·2013/07/19 GP letter to Charles Goodwin (OMS/DW)
·2013/07/31 GP letter to Charles Goodwin (Panther)
·2013/08/06 of PCA letter to Charles Goodwin (mills), page 24
·2013/08/06 PCA letter to Charles Goodwin (converters), page 24
·2013/10/28 call with GP (SMDW, BVP)
·2013/11/15 IP letter to Charles Goodwin (CRS, IFREEWAY)
·2014/01/06 SSCC letter to Charles Goodwin, page 12
·3 May 2006 issue of Deutsche Bank's "Paper and Packaging" (20060503.pdf)
·8 October 2007 issue of Deutsche Bank's "Paper & Packaging" (20071008 A.pdf)
·Baker, J. and D. Rubinfeld "Empirical Methods Used in Antitrust Litigation" *American Law and Economics Review,* Vol. 1, No. 1 & 2, 1999, pp. 386-435.
·Consolidated Amended Complaint filed November 8 2010 p. 11.
·Declaration of Stephen R. Read, In re: Smurfit-Stone Container Corporation, et al, United States Bankruptcy Court For The District of Delaware, Case No. 09-10235 (BLS)
·Denton Affidavit
·http://www.risiinfo.com/pages/abo/methodology/forecasting/
·Hurvich, Clifford and Chih-Ling Tsai "Regression and time series model selection in small samples " *Biometrika* 76, 2, pp. 297-307
·IP Data Definition Tables (BOARDS, UNISIS, SAP, POWERCUBE)
·IP SUPPLEMENTAL RESPONSE TO 2D INTERROGATORIES DIRECTED AT DEFENDANTS.PDF
·Jolliffe, I. *Principal Component Analysis, 2 $^{nd}$ ed.* , Springer 2002
·Lindsey, Charles and Simon Sheather "Variable Selection in Linear Regression," The Stata Journal 10, 4, pp. 650-669, (2010) "(Lindsey & Sheather 2010)". Available at http://bit.ly/1pzqOCL.
·Noramapc Supplemental Responses to Plaintiffs 2nd Set of Interrogatories....pdf
·RockTenn's Supplemental Responses to Nos. 5-7 of Pltfs' Second set of rogs to all Defts (00041254).pdf
·Supplemental Response to Interrogatory 6 - Exhibit A.PDF
·Supplemental Response to Interrogatory 7 - Exhibit B.PDF
·Temple-Inland Supplemental Responses to Plaintiffs Second Interrogatorie....pdf
·WY Supplemental Responses & Objection to Second Set of Interrogatories t...

**Exhibit 2**



**MARK J. DWYER, Ph.D**
Economist
Tel: 213. 621. 7636
mdwyer@harrisecongroup.com

**EDUCATION**

Ph.D. in Economics, University of Rochester, 1995
     Fields: Econometrics, General Equilibrium Theory
M.A. in Economics, University of Rochester, 1994
M.A. in Finance, The Wharton School, 1989
B.A. in Physics, University of Pennsylvania, 1984

**EXPERIENCE**

Harris Economics Group
     *Consultant to the Firm, April 2008 – Present*
Econ One Research, Inc.
     *Consultant to the Firm, July 2013 – Present*
     *Senior Economist, January 2006 – July 2013*
     *Economist, May 2001 – December 2005*
UCLA
     *Extension Instructor, Economics 2012 – Present*
     *Assistant Professor, Economics Department July 1995 – April 2001*
Rice University
     *Visiting Lecturer, Economics Department 1995*
University of Virginia
     *Guest Lecturer, Economics Department 1995*
Australian National University
     *Visiting Fellow, Dept. of Statistics & Econometrics 1994*

**PRIOR TESTIMONY**

In Re: Static Random Access Memory (SRAM) Antitrust Litigation MDL No. 1819
     U.S. District Court, Northern District of California, Oakland Division
     Reply Report, June 28, 2010
     Deposition, May 12, 2010
     Corrected Report, May 5, 2010
     Reply Declaration, July 2, 2009
     Deposition, April 2, 2009
     Declaration in Support of Plaintiffs' Motion for Class Certification, January 29, 2009

In Re: Touchstone Cardiovascular Resources, Inc. v. Dr. Daniel Martinez et al.
     CAUSE NO.  2008-12-6480-D
     U.S. District Court Cameron County, Texas
     Deposition: January 12, 2010
     Report, October 28 2009

**Exhibit 2**

**PRIOR TESTIMONY** (continued)

In Re: Western States Wholesale Natural Gas Antitrust Litigation,
    MDL No. 1566,
    CV-S-03-1431-PMP (PAL)
    U.S. District Court, District of Nevada
    Reply Declaration in Support of Plaintiffs' Motion for Class Certification, October 30, 2009
    Declaration, August 12, 2009
    Deposition, March 12, 2009
    Declaration in Support of Class Plaintiffs' Motion for Class Certification, October 17, 2008

In Re: DVD CCA v. Kaleidescape, 1-04-CV-031829
    Superior Court, State of California, Santa Clara County
    Deposition, March 20, 2007

In Re: Natural Gas Commodities Litigation, 03-CV6186(VM)
    U.S. District Court, Southern District of New York
    Report, October 23, 2006
    Declaration, February 1, 2006
    Declaration, January 5, 2006
    Reply Declaration in Support of Plaintiffs' Motion for Class Certification, May 9, 2005
    Deposition, March 4, 2005
    Declaration in Support of Plaintiffs' Motion for Class Certification, January 24, 2005


**AFFILIATIONS**

American Economic Association
American Finance Association
Econometric Society
Antitrust Law Section of the American Bar Association (Associate)

CONFIDENTIAL
HEG
6/11/2014

Exhibit 3

# 15 Defendant Price Increase Announcements

| Announcement | Year | Implementation Year and Month | | | | | | | Target Increase ($ / ton) | Prior Month | Following Month | Net PPW Increase ($ / ton) |
| | | GP | PCA | IP | WY | TI | NP | SSCC | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2004 | MAR | MAR | FEB | MAR | MAR | FEB | FEB | 40-50 | JAN | APR | 45 |
| 2 | 2004 | JUN | JUN | JUN | JUN | JUN | JUN | JUN | 50 | MAY | JUL | 50 |
| 3 | 2005 | APR | APR | APR | APR | APR | APR | MAR | 50 | FEB | MAY | -15 |
| 4 | 2005 | OCT | OCT | OCT | OCT | OCT | OCT | OCT | 30-40 | SEP | NOV | 30 |
| 5 | 2006 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | DEC | FEB | 40 |
| 6 | 2006 | MAR | MAR | APR | APR | APR | APR | APR | 50 | FEB | MAY | 50 |
| 7 | 2007 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | DEC | FEB | 0 |
| 8 | 2007 | N/A | MAY | APR | N/A | MAY | N/A | N/A | 40 | MAR | JUN | 0 |
| 9 | 2007 | AUG | AUG | AUG | AUG | AUG | AUG | AUG | 40-50 | JUL | SEP | 40 |
| 10 | 2008 | MAR | MAR | AUG | AUG | AUG | MAR | AUG | 50 | FEB | APR | 0 |
| 11 | 2008 | JUL | JUL | JUL | JUL | JUL | JUL | JUL | 55 | JUN | AUG | 55 |
| 12 | 2008 | OCT | OCT | OCT | * | OCT | OCT | OCT | 60 | SEP | NOV | 0 |
| 13 | 2010 | JAN | JAN | JAN | * | JAN | JAN | JAN | 50 | DEC | FEB | 50 |
| 14 | 2010 | APR | APR | APR | * | APR | APR | APR | 60 | MAR | MAY | 60 |
| 15 | 2010 | AUG | AUG | AUG | * | AUG | AUG | AUG | 60 | JUL | SEP | 0 |

*Acquired by IP

CONFIDENTIAL
HEG
6/9/2014

Exhibit 4

# PPW Transaction Price Series Correlations with Linerboard Index ("PPW Index")

| Index | Correlation |
|---|---|
| 42lb unbleached kraft linerboard for delivery west of the Rocky Mountains | 0.998 |
| 35-36 lb high performance linerboard for delivery east of the Rocky Mountains | 0.995 |
| 42 lb white top liner for delivery east of the Rocky Mountains | 0.990 |
| 42 lb white top liner for delivery west of the Rocky Mountains | 0.990 |
| 26 lb semichemical corrugating medium for delivery east of the Rocky Mountains | 0.997 |
| 26 lb semichemical corrugating medium for delivery west of the Rocky Mountains | 0.995 |

Exhibit 5

CONFIDENTIAL
HEG
6/10/2014

# 5 Defendant Price Increase Implementation Events ("PIIEs")

| PIIE | Year | Implementation Year and Month | | | | | | | Target Increase ($ / ton) | Prior Month | Following Month | Net PPW ($ / ton) | Net PPW Increase (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | GP | PCA | IP | WY | TI | NP | SSCC | | | | | |
| 1 | 2004 | MAR | MAR | FEB | MAR | MAR | FEB | FEB | 40-50 | JAN | JUL | 95 | 27% |
| | 2004 | JUN | JUN | JUN | JUN | JUN | JUN | JUN | 50 | | | | |
| 2 | 2005 | OCT | OCT | OCT | OCT | OCT | OCT | OCT | 30-40 | | | | |
| | 2006 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | SEP | MAY | 120 | 30% |
| | 2006 | MAR | MAR | APR | APR | APR | APR | APR | 50 | | | | |
| 3 | 2007 | AUG | AUG | AUG | AUG | AUG | AUG | AUG | 40-50 | JUL | SEP | 40 | 8% |
| 4 | 2008 | JUL | JUL | JUL | JUL | JUL | JUL | JUL | 55 | JUN | AUG | 55 | 10% |
| 5 | 2010 | JAN | JAN | JAN | * | JAN | JAN | JAN | 50 | DEC | MAY | 110 | 21% |
| | 2010 | APR | APR | APR | * | APR | APR | APR | 60 | | | | |

*Acquired by IP

# PPW Transaction Price Series Increases at Defendant PIIEs

| # | Index | Price Increase Implementation Event (PIIE) | | | | |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| | | Net PPW Increase ($ / Ton) | | | | |
| 1 | 42lb unbleached kraft linerboard for delivery east of the Rocky Mountains ("PPW Index") | $95 | $120 | $40 | $55 | $110 |
| 2 | 42lb unbleached kraft linerboard for delivery west of the Rocky Mountains | $95 | $120 | $45 | $55 | $130 |
| 3 | 35-36 lb high performance linerboard for delivery east of the Rocky Mountains | $95 | $120 | $40 | $55 | $110 |
| 4 | 42 lb white top liner for delivery east of the Rocky Mountains | $70 | $90 | $40 | $55 | $110 |
| 5 | 42 lb white top liner for delivery west of the Rocky Mountains | $70 | $90 | $45 | $55 | $130 |
| 6 | 26 lb semichemical corrugating medium for delivery east of the Rocky Mountains | $110 | $120 | $40 | $55 | $110 |
| 7 | 26 lb semichemical corrugating medium for delivery west of the Rocky Mountains | $110 | $120 | $45 | $55 | $130 |

Exhibit 6

# Comparison of Class Member Net Product Prices
# Before and After Defendant Price Increase Implementations

| Defendant | Type | Number of Assessed Customers | Customers with Post-Event Price Increases ("Increase Customers") | Increase Customers as Percent of Assessed Customers | Total Post-Event Purchase Assessed Dollars ($ Millions) | Total Post-Event Purchase Dollars Paid by Increase Customers ($ Millions) | Percent of Assessed Post-Event Purchase Dollars Paid by Increase Customers | Total Post-Event Purchase Dollars Showing Price Increases ($ Millions) | Percent of Post-Event Dollars Showing Higher Prices for Increase Customers |
|---|---|---|---|---|---|---|---|---|---|
| All Defendants | All | 78,224 | 72,030 | 92% | 14,619.5 | 14,456.8 | 99% | 11,842.3 | 82% |
| All Defendants | Corrugated | 77,134 | 70,980 | 92% | 12,548.9 | 12,393.9 | 99% | 9,936.1 | 80% |
| All Defendants | Roll Stock | 1,090 | 1,050 | 96% | 2,070.6 | 2,062.9 | 100% | 1,906.2 | 92% |
| | | | | | | | | | |
| GP | All | 3,455 | 3,237 | 94% | 3,021.9 | 2,987.7 | 99% | 2,479.8 | 83% |
| IP/WY | All | 38,029 | 34,378 | 90% | 5,216.7 | 5,123.7 | 98% | 4,325.1 | 84% |
| NP | All | 1,930 | 1,745 | 90% | 146.3 | 143.5 | 98% | 108.2 | 75% |
| PCA | All | 16,748 | 15,729 | 94% | 1,569.6 | 1,559.8 | 99% | 1,309.1 | 84% |
| SSCC | All | 9,467 | 8,784 | 93% | 2,197.9 | 2,182.5 | 99% | 1,673.6 | 77% |
| TI | All | 8,595 | 8,157 | 95% | 2,467.1 | 2,459.6 | 100% | 1,946.6 | 79% |

The Pre-Event Price for a particular customer and product is the latest modal monthly price prior to the month of the implementation date for the announced price increase.

The Post-Event Price for a particular customer and product is the latest modal monthly price within 3 or 6 or 9 months following the month of the implementation date for the announced price increase.

"Corrugated" refers to Box plant, corrugator, and sheet feeder corrugated products.

"Roll Stock" refers to liner and medium products.

CONFIDENTIAL
HEG
6/10/2014

CONFIDENTIAL
HEG
6/10/2014

Exhibit 7

# Comparison of Class Member Weighted Average Offered Product Prices Before and After Defendant Price Increase Implementations

| Defendant | Type | Number of Assessed Customers | Number of Customers with Post-Event Weighted Average Price Increases (Increase Customers) | Increase Customers as Percent of Assessed | Total Adjusted Post-Event Purchase Dollars Assessed ($ Millions) | Total Adjusted Post-Event Purchase Dollars Paid by Increase Customers ($ Millions) | Percent of Adjusted Assessed Post-Event Purchase Dollars Paid by Increase Customers | Total Adjusted Post-Event Purchase Dollars Showing Price Increases ($ Millions) | Percent of Adjusted Post-Event Dollars Showing Higher Prices for Increase Customers |
|---|---|---|---|---|---|---|---|---|---|
| All Defendants | All | 78,224 | 72,639 | 93% | 14,538.5 | 14,425.9 | 99% | 11,646.1 | 81% |
| All Defendants | Corrugated | 77,134 | 71,581 | 93% | 12,478.1 | 12,369.2 | 99% | 9,740.9 | 79% |
| All Defendants | Roll Stock | 1,090 | 1,058 | 97% | 2,060.4 | 2,056.6 | 100% | 1,905.2 | 93% |
| GP | All | 3,455 | 3,207 | 93% | 3,021.9 | 3,012.6 | 100% | 2,076.6 | 69% |
| IP/WY | All | 38,029 | 34,573 | 91% | 5,173.7 | 5,093.4 | 98% | 4,353.9 | 85% |
| NP | All | 1,930 | 1,759 | 91% | 146.1 | 143.7 | 98% | 114.3 | 80% |
| PCA | All | 16,748 | 15,992 | 95% | 1,568.1 | 1,561.8 | 100% | 1,348.8 | 86% |
| SSCC | All | 9,467 | 8,915 | 94% | 2,176.8 | 2,168.8 | 100% | 1,733.2 | 80% |
| TI | All | 8,595 | 8,193 | 95% | 2,451.9 | 2,445.6 | 100% | 2,019.4 | 83% |

The Pre-Event Price for a particular customer and product is the latest monthly weighted average offered price prior to the month of the implementation date for the announced price increase.

The Post-Event Price for a particular customer and product is the latest monthly weighted average offered price within 3 or 6 or 9 months following the month of the implementation date for the announced price increase.

"Corrugated" refers to Box plant, corrugator, and sheet feeder corrugated products.

"Roll Stock" refers to liner and medium products.

Exhibit 8

# Comparison of Class Member Weighted Average Monthly Net Prices
## Before and After Defendant Price Increase Implementations

| Defendant | Type | Number of Assessed Customers | Number of Customers with Post-Event Price Increases ("Increase Customers") | Increase Customers as Percent of Assessed Customers | Total Post-Event Purchase Dollars Assessed ($ Millions) | Total Post-Event Purchase Dollars Paid by Increase Customers ($ Millions) | Percent of Assessed Post-Event Purchase Dollars Paid by Increase Customers | Total Post-Event Purchase Dollars Showing Price Increases ($ Millions) | Percent of Post-Event Dollars Showing Higher Prices for Increase Customers |
|---|---|---|---|---|---|---|---|---|---|
| All Defendants | All | 94,161 | 82,347 | 87% | 20,253.9 | 19,697.0 | 97% | 15,049.8 | 76% |
| All Defendants | Corrugated | 92,903 | 81,168 | 87% | 17,642.7 | 17,107.4 | 97% | 12,929.6 | 76% |
| All Defendants | Roll Stock | 1,258 | 1,179 | 94% | 2,611.2 | 2,589.6 | 99% | 2,120.3 | 82% |
| GP | All | 3,752 | 3,112 | 83% | 3,447.4 | 3,310.8 | 96% | 2,460.5 | 74% |
| IP/WY | All | 44,404 | 37,846 | 85% | 7,085.1 | 6,808.1 | 96% | 5,277.2 | 78% |
| NP | All | 2,166 | 1,790 | 83% | 166.6 | 160.2 | 96% | 122.0 | 76% |
| PC | All | 20,044 | 18,084 | 90% | 2,165.1 | 2,129.8 | 98% | 1,731.3 | 81% |
| SSCC | All | 14,138 | 12,897 | 91% | 4,278.2 | 4,220.1 | 99% | 3,292.4 | 78% |
| TI | All | 9,657 | 8,618 | 89% | 3,111.6 | 3,067.9 | 99% | 2,166.4 | 71% |

The Pre-Event Price for a particular customer is the latest weighted average monthly price prior to the month of the implementation date for the announced price increase.

The Post-Event Price for a particular customer is the latest weighted average monthly price within 3 or 6 or 9 months following the month of the implementation date for the announced price increase.

"Corrugated" refers to Box plant, corrugator, and sheet feeder corrugated products.

"Roll Stock" refers to liner and medium products.

CONFIDENTIAL
HEG
6/10/2014

CONFIDENTIAL
HEG
6/10/2014

Exhibit 9

# Defendant Annual Payment Shares (APS) to Class Members
## By Defendant and Product Type

| Defendant | Type | Overall Share With No Significant APS Increase | At Most One APS In or Out of Class Period[1] | | Multiple APS In or Out of Class Period | |
|---|---|---|---|---|---|---|
| | | | Number of Class Members Compared | Share with No APS Increase in Class Period | Number of Class Members Compared | Share With No Significant APS Increase In Class Period[2] |
| All Defendants | All | 96% | 56,556 | 95% | 54,659 | 97% |
| All Defendants | Corrugated | 96% | 55,702 | 95% | 53,216 | 97% |
| All Defendants | Roll Stock | 92% | 854 | 92% | 1,443 | 92% |
| GP | All | 96% | 4,223 | 92% | 4,426 | 99% |
| IP/WY | All | 96% | 24,135 | 95% | 18,962 | 97% |
| NC | All | 97% | 2,006 | 98% | 913 | 96% |
| PCA | All | 96% | 15,345 | 96% | 12,048 | 97% |
| SSCC | All | 95% | 6,341 | 93% | 13,385 | 96% |
| TI | All | 97% | 4,506 | 96% | 4,925 | 98% |

1. As this analysis compares annual payments received to annual purchases, for this exhibit "class period" refers to the calendar years 2004 through 2010.
2. Significance level is set at 5%.

CONFIDENTIAL
HEG
6/11/2014

Exhibit 10

# Regressions of Aggregate Prices on PPW Index

| Regression Variable | FCP | ICP |
|---|---|---|
| PPW Index | | |
| Lag 1 | 0.034 | 0.243 |
| | (0.526) | (0.000) |
| Lag 2 | 0.234 | 0.394 |
| | (0.000) | (0.000) |
| Lag 3 | 0.190 | -0.038 |
| | (0.000) | (0.169) |
| | | |
| Constant | -2.765 | -3.630 |
| | (0.000) | (0.000) |
| | | |
| Observations | 141 | 141 |
| Adjusted R-squared | 0.976 | 0.977 |
| Joint test PPW (p-value) | (0.000) | (0.000) |

P-values (in parentheses) are based on HAC standard errors.

FCP: Final Containerboard Products
ICP: Intermediate Containerboard Products

CONFIDENTIAL
HEG
6/11/2014

Exhibit 11

# Preliminary Damage Regression Model Results
## Alternative Model Selection Methods

| | AICC | BIC | 10 PC[2] | Average |
|---|---|---|---|---|
| **FCP[3]** | | | | |
| Overcharge | 3.61% | 2.38% | 2.78% | 2.92% |
| P-value[1] | 0.000 | 0.000 | 0.000 | 0.000 |
| Regressors | 65 | 108 | 20 | 64 |
| Observations | 144 | 144 | 144 | 144 |
| Adjusted R-squared | 99.6% | 99.9% | 96.7% | 98.7% |
| **ICP[4]** | | | | |
| Overcharge | 4.05% | 4.04% | 3.33% | 3.81% |
| P-value[1] | 0.000 | 0.000 | 0.000 | 0.000 |
| Regressors | 62 | 104 | 18 | 61 |
| Observations | 144 | 144 | 144 | 144 |
| Adjusted R-squared | 99.2% | 99.8% | 95.5% | 98.2% |

[1] P-values are based on HAC standard errors.
[2] 10 principal components with highest absolute t statistics
[3] FCP = Final Containerboard Products
[4] ICP = Intermediate Containerboard Products

CONFIDENTIAL
HEG
6/10/2014

Exhibit 12

# Preliminary Class Damages Estimates

| Defendant | Type | Class Purchases Billion $ | Damages Million $ | Overcharge % |
|---|---|---|---|---|
| All Defendants | All | 123.31 | 3,792.08 | 3.08% |
| | | | | |
| All Defendants | ICP | 21.06 | 801.27 | 3.81% |
| All Defendants | FCP | 102.25 | 2,990.81 | 2.92% |
| | | | | |
| GP | All | 21.48 | 671.32 | 3.13% |
| IP/WY | All | 44.23 | 1,343.24 | 3.04% |
| PCA | All | 12.94 | 394.23 | 3.05% |
| NP | All | 0.51 | 18.08 | 3.57% |
| SSCC | All | 25.51 | 793.06 | 3.11% |
| TI | All | 18.64 | 572.15 | 3.07% |

These preliminary estimates are net of potential legacy fixed price contracts.

FCP: Final Containerboard Products
ICP: Intermediate Containerboard Products

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

KLEEN PRODUCTS LLC,

                    Plaintiff,

        v.

PACKAGING CORPORATION OF
AMERICA

                    Defendants.

Case No. 1:10-cv-05711

CLASS ACTION

**(REVISED July 17, 2014)**
**DECLARATION OF MICHAEL J. HARRIS, PH.D.**
**IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

**Harris Economics Group**
**June 11, 2014**

400 North Brand Blvd. Suite 970
Glendale, CA 91203

I. Introduction

   A. Background and Qualifications

      1. I am President of Harris Economics Group (HEG).  HEG is an economic consulting firm.  I have been a consulting economist for leading management and economic consulting firms for the last twenty-seven years.  I have provided economic research and consulting across a diverse set of industries and an equally diverse set of issues including market power, anti-competitive conduct, pricing, asset valuation, trade secrets, competitive bidding, class certification, compensatory and punitive damages, and regulation, including deregulation.

      2. I hold a Ph.D. in economics from the University of Washington with specializations in industrial organization and applied microeconomics.  I have been retained as an economic expert in over sixty cases on a range of topics before state and federal Courts, the Federal Energy Regulatory Commission (FERC), numerous State Regulatory Commissions, the Ontario Energy Board, and the Alberta Energy and Utilities Board.  In many of these engagements, I have been retained to address issues related to class certification and the quantification of class-wide damages.

      3. With respect to class certification, I have been retained and provided opinions in the following cases:

         • In Re: Natural Gas Commodities Litigation

         • Natural Gas Antitrust Cases I, II, III, and IV

         • Stand Energy Corporation v. Columbia Gas Transmission et al

         • Petro Computer Systems, Inc. et al v. Micron Technology Inc. et al

         • In Re Western States Wholesale Natural Gas Antitrust Litigation

            ○ Fairhaven Power Company v. Encana Power Corporation

            ○ Arandell Corporation v. Xcel Energy et al

            ○ Heartland Regional Medical Center v. Oneok Inc. et al

- ○ Learjet Inc. et al v. Oneok Inc. et al
- ○ Breckenridge Brewery Of Colorado, LLC et al v. Oneok Inc. et al
- In Re Static Random Access Memory Antitrust Litigation
- In Re Ira A. Adams, et al. v. State of California
- Michael Shames, et al v. The Hertz Corp, et al

4. In addition to the above assignments, I have also provided substantial consulting support on numerous additional class actions involving direct and indirect purchasers.  My curriculum vitae and list of testimony is attached as Exhibit 1

B.  Assignment

1. I was asked by attorneys for the class Plaintiffs to determine whether there is economic evidence common to the class that supports Plaintiffs' allegation that the Defendants engaged in a conspiracy the goal of which was to increase the price of Containerboard Products above competitive levels.[1]  I was also asked to determine if there is economic evidence common to the class that Defendants' conduct, if proved, would have impacted all, or nearly all, class members.

2. Plaintiffs allege that beginning in 2004 the Defendants, during a period of stable or increasing demand, imposed coordinated supply constraints, including the shutting of capacity and coordinated price increases in order to fix, raise, maintain and stabilize the prices of Containerboard Products above competitive levels they otherwise would have been during the Class period.[2]

---

[1] (Plaintiffs' Complaint) p.4 The Complaint defines Containerboard Products as "linerboard, corrugated medium, corrugated sheets and corrugated products including corrugated boxes and other corrugated containers." For purposes of this declaration, I use the term "Containerboard" to mean   linerboard and corrugated medium and containerboard sheets.  The term "corrugated products" refers to all the products produced from containerboard, including corrugated boxes and other corrugated containers. Citations throughout the declaration will be in abbreviated form.  The full citation is provided in Works Cited in Exhibit 2.
[2] (Plaintiffs' Complaint) p.4, ¶6   (Amendments to Plaintiffs' Consolidated and Amended Complaint), ¶ 6

3

3. The proposed class consists of direct purchasers of Containerboard Products from the Defendants and includes:

> All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010. Specifically excluded from this Class are the Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state, or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.[3]

4. Industrial organization (IO) is a discipline within economics that seeks to understand how the productive activities of firms are matched with the demand for goods and services and the relationship between firms and markets. IO also seeks to understand under which conditions markets operate efficiently and conversely under which conditions they fail. Anticompetitive conduct such as that alleged by the Plaintiffs is an example of a market failure. Thus, the assignment I have been given is one commonly carried out by economists. Economists regularly evaluate markets with the objective of characterizing behavior as competitive or anti-competitive. Given collusion is illegal and thus often hidden, economists must evaluate the structural and behavioral features of markets, draw inferences, and ultimately determine if firms have the motive, opportunity and means to collude. To evaluate the containerboard industry, I employ a structure-conduct-performance paradigm to draw inferences. This is a widely accepted approach and dates back to work done in the 1930s by Edward S. Mason of Harvard and refined by numerous scholars subsequently.[4]

---

[3] (Amendments to Plaintiffs' Consolidated and Amended Complaint), ¶ 28
[4] (Scherer & Ross, 1990), p. 4. The Structure Conduct Performance (SCP) paradigm is used extensively by antitrust economists and was refined most notably by Joe S. Bain in 1959 and described in his book Industrial Organization. The SCP method is taught to economics students and presented in numerous texts. The U.S. Department of Justice

5. In examining the economic evidence, the questions I address are the following:

    a. Are the structure, conduct, and performance of the industry consistent with, and likely to facilitate, collusive conduct, thereby providing a motive to collude and suggesting that any collusion would be broadly successful?

    b. Was the Defendants' conduct over the class period consistent with concerted action or their unilateral self interest?

    c. Would the alleged collusive conduct of the Defendants likely be successful on a generalized basis and have an impact on all, or nearly all, class members?

    d. Are the answers to the questions above based on economic evidence that is common to the class?

    e. Is the empirical analysis of impact and damages, as set forth in the report of Dr. Mark Dwyer,[5] sound and consistent with the other economic evidence and findings?

6. I have relied on numerous documents and case materials.  Exhibit 2 contains the material that I have relied on.

7. For my work in this matter, I am being compensated at the rate of $460 per hour and those of my staff from $115 to $360 per hour. My fee is not contingent on the outcome of this case.

C. Summary and Conclusions

1. Based on my evaluation of the economic evidence, common to the class, and the discovery produced thus far, I have concluded that:

    • the economic evidence shows that Defendants had the motive, opportunity, and means to collude and were they to do so, as alleged by the Plaintiffs, they would have succeeded;

---

and the Federal Trade Commission utilize structural measures to evaluate proposed mergers.  See (U.S. Department of Justice and the Federal Trade Commissions, 2010).

[5]  I am also working with Dr. Mark Dwyer, the class Plaintiffs' expert on damages and impact.  Dr. Dwyer has submitted a declaration that report his empirical findings regarding class wide impact and damages.

- as a preliminary matter, the economic evidence shows that the conduct of the Defendants was more consistent with collusion than with independent economic decision-making, with each Defendant exhibiting conduct that was contrary to its unilateral self interest, acting independently.  The conduct only makes economic sense if the Defendants were engaged in collective action; and

- the empirical evidence, common to the class, indicates that the Defendants were able to successfully elevate prices above the level one would expect from non-coordinated behavior.

2.  I have also concluded, based on the economic evidence common to the class, that the collusive conduct of the Defendants would have been broadly and generally successful, elevating prices above what they would have been without collusion, thus impacting all, or nearly all, class members.  The empirical evidence also supports this finding.

3.  I have reviewed the empirical analysis undertaken by Dr. Dwyer.  His methods and models are sound, well-accepted and widely used by economists.  I find his empirical results to be consistent with my economic analysis.  His empirical analyses reliably shows that all, or nearly all, class members were impacted by the price increases implemented during the class period.  He has also developed a preliminary class-wide damage model that reliably estimates the economic damages suffered by the class, showing that the performance of this industry was consistent with collusion.

6

D.  Organization

   1.  The remainder of this Declaration is divided into seven further sections.  In Section II, I provide an overview of Containerboard Products. In Section III, I provide brief summaries of the Defendants. In Section IV, I provide an overview of the industry.  In Section V, I provide an economic assessment of the structural characteristics of this industry. In Section VI, I present my preliminary evaluation and findings with respect to the Defendants' conduct.  In Section VII, I discuss the empirical findings with respect to performance measures achieved by the Defendants.  In Section VIII, I summarize my opinions.

II.  Class Products Overview

  A.  Containerboard

   1.  Containerboard is the raw material used to manufacture corrugated products.  Containerboard includes both linerboard and medium. Linerboard is used as the inner and outer facings of containerboard sheets while medium is the fluted sheet sandwiched between the linerboard. The combination is called containerboard.  It is used to make corrugated boxes, among other products.

   2.  Large containerboard machines are used to convert essentially a fibre slurry at one end of the machine (the wet end) to a finished roll of linerboard or medium on the other (dry end).   The finished sheets of linerboard and medium are then rolled onto cores, subsequently trimmed into smaller rolls and shipped to converting locations.  To produce a containerboard sheet it is necessary to first crimp the medium sheet and then laminate it to the outer and inner liner sheets.  The machine responsible for this process is called a corrugator.  The finished sheets are then packaged for direct shipment to converting plants ("sheet plants"), or die-cut, printed, folded and glued in packaging plants for ultimate delivery to end retail customers.[6]

---

[6] GP-KLEEN01074008

3. Containerboard may be manufactured from either "virgin" fibers (kraft linerboard) or from recycled fibers from used corrugated containers (often referred to as old corrugated containers (OCC)) and trim waste from converting operations. Kraft linerboard is made predominantly from softwoods like pine whereas semi-chemical corrugating medium is made from hardwoods such as oak.[7]

4. Linerboard is made in a range of grades or basis weights. Almost 80% of the linerboard produced in the U.S. in 2010 was unbleached kraft linerboard, and the most common grade was 42 lb. Basis weight represents the weight in pounds per thousand square feet of linerboard. Producers also market linerboard by performance characteristics, appearance and color. The fluting in medium comes in a variety of profiles. Generally, larger flute sizes determine vertical compression strength and cushioning. The most common grade of medium is 26 lb.

B. Corrugated Products

1. Corrugated products include, most importantly, boxes but also displays, bulk bins, wrap around cases, etc. By far, the vast majority of corrugated products by sales volume and revenue are commodity boxes.[8] The most common form of box is the regular slotted container (RSC).[9]

2. A box is generally defined by its inner dimensions of length, width, and depth. Boxes can also be defined as to whether they include "joints" or are die-cut. Joints are required to join panels to form the box. Joints can be glued or stapled. A die-cut box does not have joints but instead is a one-piece panel that has been scored and then folded together.

3. While boxes may vary, the industry recognizes them as standardized. The Manufacturer's Certification Stamp is affixed to each box and identifies whether the containerboard is single-, double-, or triple-walled. It certifies

---

[7] GP-KLEEN01074008

[8] In a GP POV summary presentation (GP00917132) it is noted that "Integrated producers (see page 5) produce 28 of the 33 million tons of North American boxes (84%) and produce a considerably higher proportion of commodity boxes. In a script for an investor call, Smurfit-Stone notes that: "Clearly, most of our customers are looking for a basic box to protect their goods. There is little need for high end packaging services or solutions and the box is not an essential part of their marketing process." (SSCC 00838344)

[9] (Dixon Container Company, 2014), p. 3

8

the Mullen Bursting Test or the Edge Crush Test. The latter measures the linerboard stacking strength while the former measures the bursting strength of the linerboard.[10] The industry recognizes that box types may be categorized into eight groupings, as recognized in the "International Fibreboard Case Code".[11]

## III. The Defendants

### A. Packaging Corporation of America (PCA)

1. In 2005, PCA described itself as the sixth largest producer of containerboard and corrugated products in the United States.[12] PCA produced approximately 2.3 million tons of containerboard (kraft linerboard and semi-chemical medium) -of which 82% was consumed in its own corrugated products plants, 13% was sold to domestic customers and the remaining 5% sold on the export market. PCA had four mills located in the U.S. with a combined capacity of approximately 2.426 million tons.[13] PCA operated 68 corrugated manufacturing operations in 2005.[14] Of these 68 plants, 40 were corrugated plants and the remaining 28 sheet plants. PCA operated in 27 states.

2. PCA sells to over 8,300 customers of which 65-70% is regional or local accounts, the remaining 30% to 35% are national accounts.[15]

### B. International Paper (IP)

1. In 2005, IP described itself as the third largest manufacturer of containerboard in the U.S. During this period IP produced approximately 4,600 tons of containerboard in the U.S. Of this amount, about 70% was consumed in its own corrugated facilities. IP operated 6 mills in the U.S., 9 in total with a combined capacity of 4.8 million tons.[16]

2. IP operated 67 container plants. IP's Industrial Packaging Division produces a number of corrugated products such as bulk packaging,

---

[10] (Dixon Container Company, 2014)
[11] (Pinnington, 2009)
[12] (Packaging Corporation of America - Annual Report, 2005)
[13] (Packaging Corporation of America 10-K, 2005)
[14] Ibid. p.6
[15] Ibid. pp. 3, 6-8
[16] (International Paper 10-K, 2005), pp. 17 and A4, GP-KLEEN00388772

produce packaging, protein packaging, retail displays, retail ready packaging, transport packaging and wax and wax alternatives.[17]   IP's plants are located throughout the United States.   In 2008, IP acquired Weyerhaeuser's containerboard and packaging businesses making it the largest Containerboard Products manufacturer in the US. In 2012, IP closed on its acquisition of Temple Inland further securing its role as the largest manufacturer of containerboard.[18]

C. Norampac (NP)

1. NP was the 7th largest containerboard and linerboard company in 2002 according with combined liner board capacity of 2,101,000 tons.[19]  NP was created as part of a partnership between Cascades and Domtar.  Today, NP operates five containerboard mills, has 19 corrugated plants and three folding carton plants.[20]

D. Weyerhaueser (WY)

1. In 2006, WY described itself as the second largest producer of corrugated products in the North America. With 9 mills in the U.S. and Mexico, the company produces about 6.2 million short tons of containerboard per year with the majority of that is converted to packaging in its own manufacturing facilities.[21]

2. Weyerhaeuser had 75 packaging plants in the U.S. As mentioned, IP acquired Weyerhaeuser's Containerboard packaging business in 2008.[22]

E. Georgia Pacific (GP)

1. In fiscal year 2005, GP owned and operated 4 containerboard plants in North America with a capacity of 3.7 million tons.  Of that containerboard capacity, GP's converting facilities consume between 70 and 75% of the

---

[17] (International Paper, 2014)
[18] (Merced & Cane, 2011).  See also (PR Newswire, 2012) and (Daniel & Hinton, 2008)
[19] (Goldman Sachs, 2004)
[20] (Norampac, 2011)
[21] (Weyerhaeuser Co. 10K, 2006)
[22] GP-KLEEN00388772, p. 86

containerboard they produce.[23] Koch Industries acquired GP for $13.2 billion.[24]

F. Temple Inland (TIN)

   1. In its 2005 Annual Report, TIN described itself as the third largest producer of corrugated packaging in the U.S. The Company produced approximately 3.4 million tons of containerboard in their 6 liner board corrugating medium mills.[25] TIN also has 67 converting and other facilities. Combined, the mills had an annual capacity of 3.5 million tons. Approximately 92% of the containerboard produced was converted in the company's corrugated facilities with the remainder sold in the domestic and export markets.[26]

   2. TIN had 72 converting facilities producing a range of products from commodity brown boxes to die cut containers. The company served about 7,100 packaging customers in a variety of industries including food, paper, glass containers, chemical, appliance and plastics.

G. Smurfit-Stone (Smurfit) (now known as RockTenn CP LLC, a subsidiary of third-party RockTenn (RTC))

   1. In 2005, Smurfit operated 19 combined paper mills with a paperboard production capacity on the order of 7,200 thousand tons. Historically, Smurfit was the second largest North American containerboard and corrugated box producer in North America.[27]

   2. RTC acquired Smurfit for $3.5 billion in 2011.[28]

IV. Market/Industry Overview

   1. In evaluating the structural characteristics of this industry there are a number of relevant economic characteristics. These include capacity, operating rates, inventory, demand, integration, inter-Defendants transactions, input costs, imports/exports, distribution channels, pricing, and industry fundamentals prior to, and during, the class period.

---

[23] (Georgia-Pacific Corporation, 2005)
[24] (Sorkin, 2005)
[25] (Temple Inland 10-K, 2005) p. 6
[26] Ibid, pp. 6, 12 and 25
[27] (Smurfit Stone Container Corp 10-K, 2005)
[28] (Spector, 2011)

A.  Capacity

1. Resource System Information, Inc. (RISI) reports annual containerboard capacity data for six global regions: North America, Europe, Asia & Oceania, Latin America, Africa, and the Middle East. The table below shows capacity over the period 2000-2011:

**Table 1[29]**

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| North America | 36,649 | 35,906 | 35,774 | 35,884 | 35,360 | 35,434 | 36,139 | 36,032 | 34,254 |
| Europe | 28,616 | 29,263 | 29,607 | 30,873 | 31,616 | 32,256 | 32,545 | 32,401 | 33,378 |
| Asia & Oceania | 39,773 | 42,805 | 46,016 | 49,697 | 53,615 | 58,934 | 64,302 | 68,215 | 71,498 |
| Latin America | 6,743 | 7,124 | 7,541 | 7,760 | 8,125 | 8,561 | 8,955 | 8,981 | 9,271 |
| Africa | 1,741 | 1,866 | 2,056 | 2,075 | 2,060 | 2,215 | 2,450 | 2,457 | 2,561 |
| Middle East | 673 | 783 | 888 | 1,038 | 1,223 | 1,373 | 1,450 | 1,540 | 1,802 |

2. Notably, over the period 2002 to 2010 every region, with the exception of North America, has shown substantial increases in aggregate containerboard capacity.  Asia & Oceania added over 32 million tons of capacity reflecting the enormous growth experienced in China.  Other than North America, Europe experienced the lowest level of growth but still added capacity, with capacity in 2010 approximately 117% of the level in 2002.  The capacity level in the U.S., on the other hand, not only did not increase but, in fact, contracted by more than six percent over this period.  In contrast, both industrial production of nondurable goods and foods, both considered drivers of box shipments, were increasing year over year from 2002 until the onset of the recession in 2008 as were box shipments.[30]

3. The decline in capacity in North America is a reflection, in part, of the closing of mills across the industry. Since 2000, there have been approximately 47 closures for a combined reduction of 8,646 thousand tons

---

[29] RISI
[30] (Waghorne, pp. 8, 9, 11, and 13)

of capacity.[31] The declining level of U.S capacity has had a direct impact on operating rates of US containerboard mills.

B. Operating Rates

　　1. Operating rates are closely monitored by firms in this industry, including Defendants, as important to price levels.  The higher the operating rates, the more likely higher prices may be maintained.  The trend in operating rates of North American containerboard mills has risen over the relevant time period. With the exception of the recessionary years of 2008 and 2009 (but with a very quick and strong recovery in 2010), the operating rates have trended up since 2000.  Operating rates hovered around 80-85% in 2000 but have steadily increased since.

**Table 2[32]**

| Year | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Op Rate | 85.9 | 90.9 | 91.0 | 95.38 | 93.94 | 97.01 | 97.04 | 91.95 | 85.06 | 95.88 | 94.92 |

　　2. The operating rate of the industry is calculated by dividing containerboard production by containerboard capacity.  The increase in operating rate is consistent with declining capacity over this period.  Even assuming constant absolute capacity but increasing demand, the amount of capacity relative to demand would shrink thus pushing up operating rates.

C. Inventory

　　1. The level of containerboard inventory is closely watched and pushed to lower and lower levels, and as will be discussed later, without regard to customer service. There is an inverse relationship between inventory levels and containerboard price. Similar to operating rates, it appears that firms see an "optimal" inventory level as it relates to price to be something on the order of less than four weeks of supply and ideally less than 3.5, recognizing that the industry has the power to raise prices when inventories

---

[31] SSCC 00083396
[32] Source: AFPA Containerboard Statistics.  Annual rates reflect average of monthly rates reported by AFPA.

13

fall below 3.5 weeks.[33] Again, like operating rate targets, specific inventory level targets provide an economic focal point for the industry, as will be discussed in Section VI.E.

2. From the year 2000 forward there has been a gradual decline in inventory being held either at mills or box plants.  In a Smurfit presentation on "containerboard fundamentals," it was noted that, "[h]istorically, inventory levels at or below 2.5MM tons and/or 4.2 weeks of supply support price movements." In this slide of the presentation there is also a graph depicting inventory level by quarter by year back to 1995. It is clear from the graph that inventory levels have trended down.  The presentation goes on to state, "May 2010 inventories were 1.93MM tons and 4.1 weeks of supply; both represent **the lowest levels of any month since at least the early 1980s.**"[34] Smurfit's observation is also borne out by data published by the American Forest and Paper Association (AFPA). In January 2000 inventories reported by AFPA were approximately 3.1 million short tons and trended down to 2.3 million in December 2010.[35]

D.  Demand

1. Containerboard has no intrinsic value, so its demand is derived. Only after it is converted into packaging material (or display, partition, etc.) does containerboard represent a commercial product.  Containerboard production is either exported or sold (or transferred) to a domestic converting facility.[36]

2. Citing 2004 data published by The Fibre Box Association (FBA), PCA's 2004 10-K reported that the value of corrugated products manufactured from containerboard was $23.7 billion.[37]  Non-durable production drives the bulk of demand for corrugated products and has increased in importance. In 2000 roughly 22.0 percent of corrugated was accounted for by durable

---

[33] IP037102, p.15 and GP-KLEEN01074003 at 019
[34] SSCC 00080167, p.17 [emphasis added]
[35] American Forest and Paper Association, 2010 Statistics for Time Series, September 2011, p.8, see also AFPA_ESI_01358
[36] Of course, containerboard production can also be used to increase inventories but the inventories will ultimately be drawn down and used to produce packaging materials.
[37] (Packaging Corporation of America 10-K, 2005), p.5

goods. That proportion consistently fell over the years so that in 2009 it had shrunk to only 10.0 percent.[38]

E. Integration

1. I examine the level of vertical integration in the industry between containerboard production and box plants.  A measure of integration is the proportion of containerboard production consumed by a firm's box plants.  By any measure, the level of integration in this industry is significant.  According to various research reports the level of integration among the majors was as follows: IP (70%), Smurfit (73%), TIN (93%), PCA (80%), WY (83%*), and GP (73%*).[39]  The higher the level of integration the less containerboard a firm sells on the open market to third party converters.  It has been reported that in some cases, firms (IP and TIN) were actively increasing their level of integration as a means to lower their open market tonnage.[40]

F. Inter-Defendant Trades and Sales

1. The Defendants are intertwined by virtue of the significant volume of containerboard bought, sold, and traded among each other – in some cases one Defendant acting as another's largest supplier.[41]  The documents evidence, for example, trades between PCA and GP, TIN and Smurfit.[42]  Smurfit traded with TIN, IP, PCA, WY.[43]  WY in turn traded with Smurfit, TIN and IP.[44]  For an integrated firm trading allows it to minimize freight costs from its mill to its converting facilities and to obtain incremental supply when it is incapable of supplying the entire need of its converting facilities.

2. The Defendants are also intertwined by virtue of numerous joint venture box plants that they have created.  A PCA document explains that joint

---

[38] SSCC 00080167, p.8
[39] With the exception of GP and WY, GP01074015.  For GP and WY, GP-KLEEN00388772, p.45 (*estimates based on graph information)
[40] GP-KLEEN01074015
[41] PCoA0000028453 at 454, "Georgia Pacific: They continue to be our largest West supplier with 5-7,000 tons of liner shipping to LA and SLC."
[42] PCoA000162246-162254, PCoA0000032218
[43] SSCC0625696, IP473391, WY0108926.  See also SSCC 00840592
[44] WY0108926

ventures "reduce[ ] the potential outlets for paper supply and boxes…,"[45] In early 2005, Smurfit's CEO proposed a joint venture with IP and WY – the "Top 3 integrated packaging companies" at the time – involving their entire box plant systems to "establish[] one entity with nearly 50% market share, hence significant pricing control" and "eliminate irrational pricing behavior." The proposal spoke of eliminating competition that undermined box plant "rationalization."[46]

G.  Input Costs

    1. There are essentially two types of containerboard mills.  There are those that produce containerboard using virgin kraft fibre and those that utilize recycled fiber from old corrugated containers (OCC).  The other inputs of both types of mills are similar.  In the case of a recycled mill, OCC accounts for roughly 22 percent of the cost of production.  For an unbleached kraftliner mill, wastepaper and virgin fiber account for roughly 35 percent of the cost of production.  The remaining input costs for the recycled and unbleached kraftliner mills are similar but account for differing proportional amounts of the overall production cost.[47]

H.  Imports and Exports

    1. The volume of imports or exports of corrugated containers is not large.[48]  In December of 2010, there were approximately 56 thousand short tons of containerboard imported into the U.S. and 2.78 million tons produced.[49] By far, the largest volume imported comes from Canada, which represents about 93 percent of imported volume.[50]  There are also trace amounts imported from Mexico, South America, Spain, China, and other Asian countries.

    3. The volume of containerboard exports is, relatively speaking, much greater than imports, although still comparatively small in relation to total

---

[45] PCoA000034921 at 922
[46] SSCC 00840598-601. See also SSCC 00840592
[47] GP-KLEEN01074008
[48] (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. ), p.4
[49]  AFPA, U.S. Containerboard Statistics, December 2010, AFPA-P2-JH-E-00764
[50] Ibid., In December 2010 Canada accounted for 52 of the 56 thousand tons of imported containerboard.

production.  In December 2010, U.S. mills exported approximately 369 thousand short tons of containerboard representing about 13 percent of all containerboard produced.[51]

4. Due to higher transportation costs, oversupply, volatile export demand, increased global competition and capacity additions, export markets tend to offer lower net prices and margins.[52]  Although, as a proportion of total production, the volume of exports is modest, the impact on market prices can be significant.  It is clear that there is significantly more volatility in exports relative to imports.  In a GP document showing imports and exports over the period January 2007 to January 2010, imports are shown to be fairly constant and in the range of approximately 50 to 90 short tons whereas exports oscillate significantly from month to month.  The document indicates the ten year export minimum at 189,500 tons and the maximum at 406,000 tons.[53]  That firms use exports as an economic tool to control domestic supply is evidenced by industry insiders and analysts.  In discussing a potential price hike, a research report interviewed industry executives about market conditions and was told, "There has been dumping [of CTB supply] to South America to keep prices high."[54]  In a 2007 email exchange, Mark Polivka sent the Supply Chain report and notes, "working with sales to deliver as much export as possible to offset consumption shortfalls and drive inventory levels lower."[55]

---

[51] Ibid.
[52] (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. ), p.4
[53] GP-KLEEN01424599, p.18
[54] (Franklin, 2012)f , p.13
[55] SSCC00362902

I.  Distribution Channels

1. Liner and medium are converted into corrugated packaging via two channels.  The bulk of the liner and medium produced is sent directly to box plants where it is converted into corrugated containers.  Alternatively, the liner and medium can be sold to an independent sheetfeeder who then combines the liner and medium and sells the finished board to a sheet plant, which then converts the already combined sheets into corrugated containers.  A 2011 GP document reported thatout of the 34 million tons of liner and medium produced by the entire industry, 4 million tons went to exports and 1 million tons to other uses and inventory.  Out of the remaining 29 million tons of liner and medium combined, 82 percent was shipped directly to box plants while the remaining 18 percent was shipped to sheetfeeders who in turn sold to sheet plants.[56]

J.  Pricing

1. There are a number of features about how containerboard and boxes are priced that deserve attention.  These features include the use and reliance on public indices for pricing of Containerboard Products, the relationship between actual transaction prices and published indices, the lag between price announcements, implementation, and the means by which increases in the price of containerboard translate into higher prices for corrugated products (i.e., boxes), and the relationship of input costs to prices.

2. The vast majority of sales of both Containerboard Productsare pegged to published price indices.  The price posted for 42# Kraft liner in Pulp and Paper Weekly (PPW) is widely referenced, as evidenced in Defendant presentations, investor reports, the contracts between Defendants and their customers, testimony of industry executives and experts, and Requests For Quotations (RFQ) issued by corrugated customers.[57]

3. Containerboard customers understand and accept that prices are tied to an index. My review of RFQs reveals that customers seek standardization

---

[56] GP-KLEEN01100218
[57] A 2010 presentation by Smurfit estimated that 92% of container boxes are tied to PPW, with the remaining 8% "tied to market." [SSCC00101201, p.32]   In describing how "new prices" are determined an IP Pricing Manager  first noted

(including pricing terms) in how corrugated manufacturers bid on potential business. For example, a Nautilus RFQ had the following language: "For the bidding event, prices for each SKU should be based on the going market rate (monthly) of US Linerboard 42# unbleached Kraft East per Pulp & Paper Week as per the latest edition at the time of the bidding event."[58] Similar language is found in a HJ Heinz RFQ.[59]

4. Finally, not only do the Defendants price with reference to the published index, they also utilize the index when trading with each other and their downstream corrugating facilities.   A PCA memo discussing "Mill Market Adjustments"notes:   "The beginning point is Pulp and Paper midpoint List price for the respective regional location of each plant (the differentiation being east or west).  This List price is predicated on 42# linerboard and 26# corrugating medium."[60]  In her testimony, Ms. Mollie Hilliard of GP affirmed that "trades were typically priced off of indices reported in Pulp & Paper Week."[61]

5. I have reviewed a sample of contracts between a number of the Defendants and their customers.  Without exception all of the contracts in the sample had pricing tied to public indices.[62]

6. Some of the Defendants track and compare their actual transactions prices to published indices.  Those documents reflect a high degree of correlation between actual transaction prices and the published indices.[63]

---

that "most prices are based on our 42# kraft liner and that they take into account pulp and paper pricing (presumably published), current market conditions, a customer's current pricing, etc." [IP0995216] In a 2010 investor conference call, the Chairman and Chief Executive Officer for Temple-Inland stated, "Most of our box prices are either directly or indirectly influenced by adjustments in published linerboard prices." [Temple-Inland 00553966]  In its 2010 bankruptcy proceeding, Smurfit submitted an Affidavit stating: "The contract prices for many sales of containerboard and corrugated containers are linked to the Linerboard Index Price.  However, these contracts have price movement mechanisms that lag the movement of the Linerboard Index Price." [ (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. ), p. 4]. In an investor report, Dr. Mark Wilde, of Deutsche Bank, stated: "In practice, box prices are often linked to the published containerboard indices…" [GP-KLEEN01074003 at 015]

[58] PCoA000017862 at 864
[59] PCoA000018015 at 017
[60] PCoA000045086
[61] Hilliard Dep. Tr. at p. 67, Lines 3-5
[62] Temple Inland 00051818, Temple Inland 00051798, Temple Inland 00051775, Temple Inland 00051770, Temple Inland 00051757, Temple Inland 00051692, PCoA 000197041, PCoA 000166161, IP089891, IP043351 at 353, IP009997 at 998, IP012123, GP-KLLEN00362591 at 592
[63] See, for example, GP-KLEEN01018364

7. The industry also recognizes that prices, while still tied to indices, may lag any price changes in those indices. The length of lag will differ for small versus large customers and perhaps other dimensions but will ultimately track the change in the published index.[64]

8. Box prices increase in response to containerboard prices through mathematical formulas spelled out in supply agreements. For example, PCA described its formula to its customer: a 7.5 percent increase in box prices based on a $55/ton increase in liner and medium. The calculation starts with the "baseline composite index price" which is a weighted average price of the pre-increase price of liner ($555) and medium ($535). From there the proportion increase was the ratio of the increase amount ($55) multiplied by 75 percent and divided by the composite index price ($547) to arrive at 7.5 percent.[65] Regardless of mathematical formulas, the Defendants recognize that containerboard price increases translate into box price increases. In a TIN presentation, it is noted, "Supply and demand is driving the linerboard increase – box prices increase follows 100% of the time.[66]

9. It is recognized in the industry that input cost is not the principle driver of prices. IP, for example, found that "59 percent of the variance in 42# Kraft Liner pricing can be explained by the variance in supply and demand, including inventory and 41 percent of the variance can be explained by the variance in cost."[67] Under the title "supply and demand," IP notes that Inventory accounts for 28 percent with the remaining 31 percent accounted for by Operating Rate.[68] A March 2008 McKinsey & Company presentation discusses how industry prices and margins have been boosted, noting that, "roughly 55% was due to prudent capacity management…and the

---

[64] GP-KLEEN01074015
[65] Baseline Composite Index Price: (60% x $555) + (40% x 535) = $547 per short ton; Box price increase: (75% x $55)/$547 = 7.5%, PCoA 000428673
[66] Temple-Inland00072964, p.2
[67] IP105350 at 357
[68] IP037102, p.13

remaining 45% was due to differential manufacturing cost escalation, particularly of the marginal producers."[69]

10. As an economic matter, changes in input costs must have some impact on pricing at least over some long term horizon.  Costs cannot rise above prices for any length of time without an adjustment in prices.  However, when viewed side by side it is apparent that prices of Containerboard Products adjust independent of changes in costs. Documents showing the relationship between pricing and cost all show a disconnect between changes in costs and changes in prices.  In one GP document the 42# Liner price is compared with Average Cost for the period 1991 to 2009. There appears to be a weak relationship between cost and price.[70] In another graphical analysis by IP, price increases over the 2007 to 2009 period are compared with cost increases.  The graph makes it clear that the price increases vastly exceeded the cost increases.[71]  Finally, in an IP document the short- and long-run relationship between US 42# Kraft Liner and US 26# Medium prices are compared with cost over the period 1992-2009, showing that there is little relationship between prices and cost but interestingly, this same document shows that a comparison between the price and cost of European 175 gram Kraft Liner for the short- and long-run reveals a close relationship between European price and cost.[72]

K.  Trends in Industry Fundamentals

1. 2000-2004: Following the bursting of the "Dot-Com" bubble[73] in early 2000, production of containerboard declined to 2,680 tons in June of that year but steadily and gradually increased to 2,922 tons in February of 2004.[74]. During this period, operating rates for virgin and recycled containerboard fluctuated but rose from the low 80% to the low 90%.[75]  Inventories

---

[69] IP268609, p.6
[70] GP-KLEEN00395006, p.9
[71] IP0954335, p.33 (note: the labels on the graph indicating "Market" and "Cost" are reversed)
[72] IP259277 at 275 and 277
[73] (Wikipedia Commons, n.d.)
[74] American Forest & Paper Association 2010 Statistics For Time Series Analysis, p. 1 of 18. (seasonally adjusted figures). See also AFPA_ESI_01358
[75] IP579512, p.47

21

fluctuated as well but, for the most part, stayed within a band of 4.0 to 5 weeks of supply.[76]   In February 2000 transaction prices for unbleached kraft linerboard 42lb. East stood at $460.  From that point forward prices trended noticeably down until reaching a low of $360 in February 2004.[77]

2. 2004-2010: Industry fundamentals changed dramatically.  While monthly production of containerboard continued to fluctuate, it stayed in a band of 2800-2900 tons until the effects of the great recession started to manifest in November 2008.[78]  Operating rates started out in the mid to high 90% in 2004 and, while varying slightly, stayed strong and consistently in the high 90s reaching upwards of 98% until the onset of the great recession.[79] Beginning in 2004, containerboard inventories were around 4 weeks of supply.  With the exception of a few months, inventories never rose above 4.5 weeks and generally trending down and at times as low as 3.5 weeks.[80] The most dramatic change over this period was in prices.  With the exception of a period in 2005, prices for unbleached kraft linerboard 42lb. East rose steadily from the low of $360 in February 2004 to a high of $610 right before the impact of the great recession.[81]

V.   Economic Assessment

1. Economists seek to identify characteristics that influence economic performance.   The structure-conduct-performance paradigm is utilized by economists to understand economic outcomes.  The performance (e.g., market prices) is dependent on the conduct of the sellers (i.e., competition versus cooperation), which in turn depends on the structure of the industry, which itself can reflect the economic features of the market and the voluntary actions of the incumbent firms (i.e., mergers, acquisitions and

---

[76] IP579512, p. 46
[77] RISI – 00001674 (prices reflect mid-points)
[78] American Forest & Paper Association 2010 Statistics For Time Series Analysis, p. 1 of 18. (seasonally adjusted figures). See also AFPA_ESI_01358
[79] IP579512, p.47
[80] IP579512, p.46
[81] RISI – 00001674 (prices reflect mid-points)

consolidation).[82]    I now assess a number of relevant features of the containerboard industry.

A. Market Share/Concentration

    1. Economists look to market share and market concentration because both affect the possibility and success of collusion.[83] It is well accepted in economics that collusion among firms is much more likely to occur in concentrated markets with relatively few firms.

    2. The North American containerboard and corrugated industries, of which the U.S. constitutes almost 94 percent,[84] have historically exhibited high and increasing levels of market concentration.[85] Underlying the increase in concentration were ongoing acquisitions.  From 1990 to 2003 ten firms were merged into six firms with a combined North American market share of 72 percent.[86]  By 2007 these six firms had become five with a combined market share of 74 percent.[87] In 1995 the top 3 and top 6 containerboard producers had a market share of 27 and 50 percent, respectively.[88] By 2003 the combined market share of the top 3 containerboard producers almost equaled the market share of the top 6 in 1995, at 49 percent.[89]  By 2007 the top 5 producers had a combined market share of 74 percent.[90]

    3. As the combined market share of the large integrated firms increases so does market concentration as measured by the Herfindahl-Hirschman Index (HHI).[91]   In an April 2011 presentation by Ken Waghorne, Vice

---

[82] (Sherer & Ross, 1990), pp. 4-5
[83] (Tirole, 1995), p. 243
[84] Of the total North American capacity of 34,254 thousand tons shown in Table 1, U.S. accounted for 32,088 thousand tons.
[85] The Defendants in their analysis and presentations for the most part discuss and report on the North American containerboard industry rather than the U.S. alone.  However, the bulk of the industry by any measure is U.S.  For example, of the 34.25 million tons of North American capacity reported in 2010, 32.09 million tons were located in the U.S.
[86] GP-KLEEN00404231, p.9
[87] IP0954335, p.15
[88] IP0954335, p.15
[89] IP307902, p.39
[90] IP0954335, p.15
[91] The HHI is a measure of the size of firms in relation to the industry and is used as an indicator of the amount of competition among them.  It is a measure employed by antitrust economists and the U.S. Department of Justice (DOJ) when assessing mergers.  (U.S. Department of Justice and the Federal Trade Commissions, 2010), pp.18-19

President of RISI, the HHI of the containerboard industry was depicted on the graph below:[92]



4. The graph shows the increase in concentration as depicted by the rising HHI. The trend in concentration was upward and significantly higher in 2011 compared to 1993-1995. Second, the concentration of the industry during the class period was over double that observed during the class period (1993-1995) of the last Linerboard Antitrust Litigation. Finally, it depicts the focus that firms within the industry and industry observershave on the consolidation and increased concentration of the containerboard industry. The graph is titled: "Increased Containerboard Consolidation is Providing Producers With More Pricing Power." The entities recognize what economists know well --- increased market concentration, all other things constant, creates an environment that is conducive to price increases. In short, increased market concentration confers what economists call market power on incumbent firms. The HHI presented in the RISI analysis reflects an HHI assuming independent conduct not joint conduct. If the Defendants collude and essentially mirror the behavior of a single firm, the HHI calculation would be vastly higher thus reflecting an even greater market power. For example, in 2007 the combined market share of just IP, Smurfit, GP, TIN, and PCA was 74 percent. Acting as a single firm, this market share would contribute 5476 to the HHI calculation

---

[92] (Waghorne, 2011), p. 23

24

even before adding in the market shares of the remaining firms in the industry. A market with an HHI of 5476 is over twice the HHI threshold for which the DOJ considers "highly concentrated."[93]

5. The concentration observed with containerboard production is also mirrored in the corrugated box industry. In 1986 the top 6 firms had a combined market share of 41.8%. In 1997 the top 6 firms had a combined market share of 58.8% and by 2007 the top 6 had a combined market share of 81%. In just over twenty years the combined market share of the top 6 firms almost doubled.[94]

B. Barriers to Entry

1. High profits in a market serve as a signal to other firms to enter the market. To enjoy the supra-normal profits from collusion, colluding firms must be free of the threat of entry by other firms.[95] Barriers to entry allow colluding firms in a concentrated market to successfully exploit their market power to raise prices by constraining the entry of new firms into the market who then might compete away the gains achieved by the colluding incumbents.

2. A barrier to entry is a substantial advantage to incumbent firms that can be overcome only by an entrant making large expenditures and efforts. Examples of barriers to entry include brand loyalty, intellectual property rights, and high fixed costs of capital facilities

3. In terms of fixed costs, the paper industry is considered to be the "most capital intensive industry" in North America, and mills and plants can take years to construct and cost over $1 billion.[96] In an April 2008 presentation, Colleen Walker of the Center for Paper Business and Industry Studies (CPBIS) stated, "A new mill hasn't been built in last 12+ years. Even with zoning, environmental & regulatory clearances, the cost would be economically prohibitive for major players."[97]

---

[93] (U.S. Department of Justice and the Federal Trade Commissions, 2010), p.19
[94] IP0954335, p.14
[95] (Tirole, 1995), p. 305
[96] Temple-Inland 00024456 at 476
[97] (Walker, McNutt, & Cenatempo, 2013), p.4; see also (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. ), p.3

4. Imports generally are not considered a significant threat as a form of entry. An IP presentation on "North American Industry Dynamics," headlined that the "Threat of Imports is Currently Low." Among the reasons given was that, "85% of N.A. industry is leak proof due to integrated suppliers," and "[i]ndependent corrugators make up the remaining 15% of converting capacity."[98] In another presentation it was noted that, "[i]mports are not a significant threat to North America due to production and transportation costs."[99]

5. The data bears out the limited role of imports. As noted in Section IV.I, in December 2010 only 56 thousand tons on containerboard was imported to augment the 2.78 million tons produced in the U.S. in that month. The same is true for boxes. In an April 2010 Affidavit Mr. Denton of Smurfit notes that "[t]here is not material exporting or importing of containers."[100]

C. Demand Elasticities

1. The price responsiveness of demand influences the success of collusive conduct on prices. If demand for a product is highly sensitive to price changes, it is unlikely that a group of firms colluding could effectively raise prices.[101] The elasticity of a product is a function of the availability of substitutes to that product. In the presence of substitute products, if a group of firms attempted to increase prices, their customers would simply reduce purchases of the exploited product and purchase the alternative substitute products. Thus, the ability to maintain the price above competitive levels would be constrained, undermining a motive to collude.

2. The containerboard industry recognizes that there is no widespread substitute for containerboard. A TIN presentation noted that, "[r]eusable shipping containers have not significantly penetrated the market due to an uncompetitive value proposition for most potential buyer (sic)." It also notes that, "[n]o viable product substitutes exist or have been developed that

---

[98] IP107342 at 354
[99] GP-KLEEN01017026, p.18
[100] (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. )p.4, ¶7
[101] (Viscusi, Vernon, & Joseph E. Harrington, 2000), p. 259

significantly threaten current markets for corrugated." [102] An IP presentation noted that, "N.A. supply & demand is not impacted by imports or substitution."[103]

3. Analysis of the containerboard market confirms empirically the low elasticity of demand. A study conducted by the research firm Poyry found low short- and long-run elasticities of demand. The study concluded that Kraftliner "demand appears rather inelastic."[104] The study showed the same for Testliner, which is containerboard made with recycled product. Interestingly, in evaluating the period 1987-2003 the study showed very little difference between short and long-run elasticities. That the short and long-run elasticities were almost identical strongly suggests that substitution opportunities were minimal. Economists expect long run elasticities to be more responsive than short run elasticities because in the short run there can be transaction costs and other impediments that prevent customers from substituting to other products.[105] However, over time transactions costs usually will become less onerous and any other impediments less significant. Thus, customers will be more likely to switch in the face of increasing prices.

D. Product Homogeneity

1. Product homogeneity implies that the products of all sellers are alike and thus are substitutes for each other. The primary dimension, in which sellers compete, then, is price. Product homogeneity makes collusion easier.[106]

2. When products are substitutes for each other they are called commodities. An example is wheat. A particular wheat variety grown by one farmer is indistinguishable and hence perfectly substitutable with the same variety of another farmer. In commodity markets the processes that determine prices (including collusive activity) typically are common across the incumbent firms in that market. Commodity markets are more susceptible to collusive

---

[102] Temple-Inland 00080408, p. 6
[103] IP066785 at 828
[104] IP263040 at 124
[105] (Pindyck 1989), p. 282
[106] (Scherer & Ross, 1990), p. 279

27

activity than markets with highly differentiable products.[107] It is widely acknowledged in the containerboard industry that containerboard is a "commodity."

3. For example, Credit Suisse put it succinctly: "Like it or not, most buyers really don't care whose name is on the paper (or board) as long as it prints well and doesn't jam the equipment."[108] The Defendants themselves acknowledge this fact.  PCA's 2005 10-K filing noted: "Containerboard is generally considered a commodity-type product and can be purchased from numerous suppliers."[109] An IP presentation on North American Industry Dynamics stated:  "While Containerboard is a Global Commodity, North America has Regional Dynamics."[110] GP's internal documents confirm that containerboard is viewed as a commodity.   In a January 2008 "Containerboard Price Point of View-Methodology" the notion of a "tool" called the "Industry Cost Curve analytical framework" was discussed.  The authors noted that "[t]he tool is used in commodity-based manufacturing industries."[111] Finally, the DOJ also views containerboard as a commodity that is undifferentiated and substantially the same from producer to producer.[112]

4. Corrugated products manufactured from the containerboard are also considered commodities.  As noted in Section II.B., there are a variety of box types.  However, by far the most common form of box is the regular slotted container.[113]   A wide swath of corrugated packaging is characterized as "undifferentiated brown boxes."[114] In an assessment of the potential acquisition of TIN by IP in 2010, it is noted: "*Boxes are a commodity* and not difficult to manufacture."[115] IP's Pricing Manager noted

---

[107] (Scherer & Ross, 1990), p. 279
[108] GP-KLEEN01015368
[109] (Packaging Corporation of America - Annual Report, 2005), p.10
[110] IP010952 p. 14
[111] GP-KLEEN00375366, p. 8
[112] Department of Justice, Antitrust Division, United States v. International Paper Company et al,; Proposed Final Judgment and Competitive Impact Statement, (DOJ Statement) IV. The Relevant Market
[113] (Dixon Container Company, 2014), p. 3
[114] GP-KLEEN00478369, p.3
[115] EVERCORE00014511 [emphasis added]

that there are a "[l]imited [number] of corrugated mfg. plants and converters offering similar products."[116]   Outside analysts outlining the threats to corrugated and folding carton markets noted: "Increased commoditization of **core** packaging business."[117] Another presentation discussing the North American Corrugated Packaging Industry notes that the business has a "commodity product."[118]   A PCA presentation discussing industry characteristics noted: "Prices [are] Hinged to a Commodity" and "Box Plants – Little Differentiation."[119]

5. While a box plant needs to manufacture to a customer's particular box specifications, the vast majority of box plants can manufacture to that same customer's box specification.   This is confirmed by Ms. Rachel Kenyon of the FBA. When asked "And so those member competitors can each customize boxes for the food service industry, right?" Ms. Kenyon responds "Yes." When asked about other categories, she responds, "It could be for any one of these or anyone that is not listed here."[120] This is also well recognized in the industry because box customers routinely multi-source across multiple box plants as a way to diversify their supply chain and minimize risk of disruptions or shortages.

6. The proposed class representatives have testified that they view boxes as commodities and order the same boxes from multiple sources.[121]   David Westphal testified that: "Price is a very important thing and a box basically is a box, so we could get it from different suppliers, and price is what was a driving factor."[122] Robert Ramm testified that: "[p]rimarily price" drove the choice, "[t]here isn't a difference in the design whatsoever."[123] Westphal

---

[116] IP0995216.  Notes of interview with Rebecca Dupuy, Containerboard Pricing Manager
[117] Dean_000050 (emphasis added)
[118] Evercore 00014508
[119] PCoA000025127, p. 4
[120] Video Deposition of 30 (b) (6) and 45 Witness For Fibre Box Association, Rachel Kenyon, April 16, 2014, Tr. at p.151, line 13 to p.152, line 3.
[121] See Deposition of George Howell of Kleen Products, p. 85, at 2-17, p. 162, at 8-19, p. 174, at 2-11
[122] Deposition of David Westphal (RHE Hatco) at 73:23-25.
[123] Deposition of Robert Ramm (RPR) at 48-49

and Ramm testified that even so-called "specialty boxes" are identical except for printing on the outside.[124]

E. Contract Provisions

1. Contract provisions, such as the most favored nation provision which tie prices of one customer to another can affect the likelihood and extent of successful collusive behavior.[125] Contracts, for both containerboard and corrugated containers, often either peg the price of the product to a widely observed price indexand/or call for periodic updating based on prevailing market conditions. In addition, contracts often include provisions that tie the renegotiated price to the prices observed in transactions between the seller and other purchasers and/or the prices observed in transactions between the purchaser and other sellers, such as the following:

> Pricing for Containerboard delivered hereunder shall be the prevailing market prices and established quarterly no later than the 15th day of the previous month for sales of Containerboard of like grade and quality from primary mill suppliers, which shall be mutually agreed to by the parties from time-to-time, **after giving due consideration to prices of Seller's Containerboard sold to like third party purchasers and to the prices of like Containerboard purchased by Buyer from other primary mill suppliers**.[126]

> In the event Buyer presents Seller with a bona fide offer from a third party to sell Buyer one or more specific grades and/or basis weights of Containerboard being provided by Seller under this Contract, at a price or prices lower than Seller's then current price, Seller shall have ten (10) days to decide whether it will meet such third party offer.[127]

2. These provisions connect the most recent negotiated prices to other prices. Thus, these provisions serve to propagate the impact of the collusion from one buyer to many. I have reviewed a sample of the Defendants' contracts

---

[124] David Westphal (RHE Hatco) at 104:2-17 ("specialty box" does not vary from other boxes in size, quality, or material only in printing); Deposition of Robert Ramm (RPR) at 45:3-9
[125] See: (Department of Justice, 2012). A 2012 workshop by the DOJ and FTC discussing the competitive implications of MFN provisions.
[126] PCoA000035024, emphasis added
[127] GP-KLEEN000033831

for containerboard and corrugated containers and have found these provisions to be quite common.

F.  Frequency of Interactions

1. The frequency of interactions between firms speaks to the success or failure of collusive conduct.[128] When firms participate in very infrequent public bids for large orders, there tends to be less success in collusive activities.  This results because the motivation to cheat on the collusive price and win the bid is very high.

2. The frequency of interaction is determined by both the actual frequency with which a firm transacts with any particular customer and the number of customers of that firm and others in the market.  Given customers, for the most part, do not transact at the same time, firms in the market will be frequently interacting with each other and their customers.

3. The Defendants' have thousands of customers and transact frequently.  Contracts with customers span months and longer.  Because contract dates are staggered, the Defendants are constantly facing off with their customers and by extension with each other.

4. The Defendants trade significant volumes of containerboard between themselves. As a result, they are in frequent interaction.  The trade in containerboard provides an instrument to punish firms that might stray from a collusive agreement and thus supports collusive outcomes.  In addition, trades and swaps also provide a source of pricing information among and across the Defendants which facilitates collusive behavior.

5. As previously discussed in Section IV.F the Defendants are also engaged in numerous joint ventures.  In addition to their effect on supply, such joint ventures also provide and additional source of communication between the Defendants and a means to exact retaliation against firms deviating from a collusive arrangement.

G.  Market Transparency

---

[128] (Ivaldi, Jullien, Rey, Seabright, & Tirole, 2003), p.19 or (Scherer & Ross, 1990), p. 306.

31

1. Market transparency serves to prevent cheating on the cartel or at least imposes a high cost on the firm who cheats from the collusive agreement.[129]  More frequent and observable price adjustments make it easier for firms to identify cheating and thus easier to punish the cheating firm, thus promoting the success of collusion.

2. In the case of containerboard and corrugated containers there is market transparency.  The publicly available price indices (e.g., PPW) that track transaction prices provide transparency.  As was previously discussed, the contracts of the Defendants include provisions that tie the current price to prices observed elsewhere in the market.  In addition, the Defendants actively seek out market intelligence from their customers, analysts or their "trading partners", including other Defendants.[130]  In all, the Defendants have a very good sense of prevailing transaction prices across their markets.

3. The AF&PA also provides extensive reports and monthly statistics of the containerboard industry.  For example, the AF&PA monthly and annual statistical summaries provide production for domestic and export, operating rates, box plant consumption, and inventories at mill and box plants.[131]

H. Trade Associations

1. It is well documented that trade associations tend to facilitate collusive conduct.[132]  The Young Lawyers Division of the American Bar Association has observed that: "[m]ost 'price-fixing' and other per se illegal conspiracies happen in trade associations."[133]

2. There are two principal trade associations that are utilized by the Defendants.  First, there is the Fibre Box Association (FBA).  The FBA holds at least three meetings each year where executives and other representatives of the Defendants have the opportunity to meet and

---

[129] (Ivaldi, Jullien, Rey, Seabright, & Tirole, 2003)p. 22
[130] Section VI.F below will discuss how the Defendants conduct market intelligence
[131] See for example, Annual Statistical Summary and Statistics for Time Series Analysis, 2004.  The American Forest & Paper Association, Containerboard Group.
[132] (Levenstein & Suslow, 2011), p. 4
[133](Murray, Swindell, & Ewing, 2007), p3.  See also, (Posner, 2001), ch. 6 at p. 170

communicate as well as dozens of networking events. Currently, employees from a number of the Defendants serve on FBA's Executive Committee and Board of Directors.[134]

3. In addition to the FBA, there is the American Forest & Paper Association (AFPA). Similar to the FBA, the AFPA holds meetings several times a year, which provide the Defendants opportunities to meet and communicate.

4. The Defendants use the meetings to communicate with each other. On October 5, 2006 the AF&PA held its Containerboard Division Membership Meeting.[135] An October 19, 2006, email from Smurfit's Brian McGurk to TIN references in-person meetings as a pre-curser to the Containerboard Division Membership Meeting: "As you both know, the ramp up to[] the actual meetings and post San Diego dialogue creates considerable energy and opportunities for all companies involved."[136] Mr. McGurk continued: "As both Larry and I re-iterated in our Austin visit, we value the long term relationship with Temple Inland."[137]

I.   Conclusion

1. The structural characteristics of this industry described above are consistent with and would facilitate successful collusion among the Defendants. Therefore, as is well recognized among economists, this industry structure provides to Defendants a powerful motive to collude.

2. In addition, certain of these structural characteristics – presence of trade associations, frequency of interactions and trades among the firms – provide to Defendants ample opportunity to collude

3. Further, these structural characteristics also provide substantial support for the conclusion that any collusion by the Defendants would ultimately be broadly and generally successful. Successful collusion would affect prices throughout the entire industry having a widespread impact across all or nearly all customers. The fact that transactions are pegged to indices, the

---

[134] (Fibre Box Association, 2014)
[135] AFPA-P-GS-00643, AFPA-P-GS-00644
[136] McGurk Ex. 134/SSCC 00625963
[137] McGurk Ex. 134/SSCC 00625963

33

use of most-favored-nations provisions in customer contracts, and the level of vertical integration also buttress a finding of common impact.

VI.    Preliminary Assessment of Defendants' Conduct

1.    In this section I evaluate the Defendants' conduct across a number of relevant dimensions including: mill closures, operating rates/inventories/trades, downtime/slowback, coordinated pricing, the use of focal points, monitoring inter-firm behavior, direct communications among them, and prior antitrust violations.   The nature of the Defendants' conduct in each of these areas sheds light on whether their behavior should be viewed as independent or is more reflective of coordinated action.

2.    The Plaintiffs allege that as a means to fix, raise, and maintain the price of containerboard products, Defendants engaged in a coordinated effort to restrain supply.   The effect of such restraints was to create an artificial shortage.   Operationally, a shortage in supply is manifested in high operating rates and low inventories.   High operating rates can result from reductions in capacity in the face of constant or increasing demand.   A reduction in capacity in turn can be the result of permanently shutting capacity or temporarily idling capacity by taking downtime.   Inventory levels are in direct control of the Defendants.

3.    The Defendants operate in what economists call an oligopolistic market. Such markets are characterized by the presence of a small number of dominant firms offering similar products.   In an oligopolistic market firms are interdependent.[138]   That is, each firm, even when acting unilaterally, develops "conjectures" of what other firms will do in response to its actions.[139]   For example, the price a firm sets is dependent on what it expects other firms will do in response.   If one firm leads with a price increase, the other firms can either follow and propose similar increases or maintain their current price.   From the incumbent firms' perspective, an

---

[138] (Scherer & Ross, 1990), p. 199.

[139] In contrast, firms in a purely competitive market do not respond to other firms in the market.  They simply produce and sell that amount of output until the marginal cost of the last unit produced is equivalent to the market price, which they take as given.  (Pindyck & Rubinfeld, 1989), p. 255.

ideal equilibrium would have all firms setting their prices consistent with that achieved by a hypothetical monopolist.[140]   This price would yield the highest profits for that market.

4. Whether firms can increase and maintain prices in an oligopolistic market above what would normally be achieved through independent actions depends on the level of coordination and cooperation. Because illegal cartels very often form in secret, economists must evaluate the economic evidence and draw inferences as to whether market prices are the result of collusion.   In evaluating a market, economists look to whether the incumbent firms have the motive, opportunity, and means to collude and whether the observed conduct reflects unilateral independent self interest or is only rational in the context of collective action.[141]

5. As discussed in Section IV, and consistent with the allegations of Plaintiffs' complaint in this case, during the alleged class period, capacity and inventories in this industry were reduced and operating rates increased. This was done during periods of constant or increasing demand.   The Defendants during this time sought to reduce supply.   In the remainder of this Part of the Declaration, I turn to an economic evaluation of the Defendants' conduct in this regard, to determine, consistent with well-accepted economic principles, whether that conduct is more consistent with unilateral actions by Defendants or by collusion among them.

A.  Mill Closures

1. Exhibit 3 lists the mill closures since 2000.  Since 2004, 31 mills have been closed with a combined capacity of 5,967 thousand tons. The Defendants were responsible for 83 percent of the total capacity closed during this period. Further, the mill closures occurred during periods of increasing box shipments.[142]  The figures cited accounts only for permanent closures.  In addition to the permanent closures, the Defendants also "indefinitely idled"

---

[140] (Scherer & Ross, 1990), p. 235.
[141] For a discussion of "action contrary to self interest" see Werden pp.745-751.
[142] See: (Waghorne, 2011), p.13 shows box shipments steadily trending up from 2001/2 through 2008 before the impact of the U.S. recession in 2008.

numerous facilities during the class period.[143] The question is whether such closures were in the unilateral self-interest of each Defendant or were they economically rational only if done as a result of coordination by the Defendants.

2. In a competitive market capacity can be used to strategically gain market share when rival firms attempt to increase prices.[144] Thus, closing capacity limits competitive options of firms to respond to increases in customer demand.  In a market where firms coordinate actions as a means to increase prices (a cartel), it is desirable to eliminate the possibility that firms will cheat on the collusion and attempt to grab market share as prices increases.  A firm can signal to rival firms that it wants to move to a less competitive pricing regime by closing capacity.[145]  By removing capacity, the firm is signaling that it will not be able to undercut and outmaneuver its rivals.  The closing of capacity becomes what economists sometimes call a "facilitating practice,"[146] which is an activity that makes collusion more likely and more effective, either by making coordination easier or making it easier to sustain a collusive agreement.[147]

3. Shutting capacity in the circumstances Defendants faced during the class period is both a facilitating practice and a potential "plus factor" used to evaluate collusive behavior.  Plus factors are "additional evidence" beyond just parallel conduct that helps distinguish concerted action among firms from unilateral decision making.[148]

4. The economic literature distinguishes between a reduction in supply (which would follow from capacity curtailments) during a trough in a business cycle and a reduction in supply at the peak of economic activity.   An article on plus factors recognizes:

---

[143] For example, IP indefinitely idled a plant in Albany Oregon in October 2008, Smurfit did the same to three locations in 2008, GP idled two locations in 2009 (GP-KLEEN01074003 at 016)
[144] (Scherer & Ross, 1990), p.296
[145] (Tirole, 1995),  p.328
[146] For a discussion of facilitating practices see, (Hay, 2005)
[147] (Harrington, 2011), p.154
[148] (Werden, 2004), pp. 745-756

36

"Restriction in supply by subsets of firms when demand is strong, profits are high, and prices are relatively high, however, leads to the strong inference of collusion—namely, it is a super plus factor – for two reasons.   First, there are substantial foregone profits from restricting supply when demand is strong.  Second, buyers will take measures to resist price increases in such an environment, and it is quite unlikely that unilateral conduct by sellers would not take advantage of the opportunity to sell incremental units at higher prices."[149]

5. The capacity cuts by Defendants in this case were undertaken during periods of strong growth in box demand.   By each Defendant cutting capacity, the Defendants effectively increased industry operating rates and reduced their ability to capture incremental market share both at the time and in the future.   Attempts at capturing incremental market share at all costs would be what one investor analysis would term "destructive behavior."   A February 2004 report notes:   "As we see it, the destructive behavior of containerboard producers in aggregate is the result of almost entirely rational behavior by individual producers.   If individuals acting rationally create destructive behavior, then there is something wrong with the group, not the individuals."[150] What the Defendants did was consistent with coordinate group behavior but not unilateral self-interest.

6. The fact that the curtailment of capacity in general would not be in the unilateral self interest of a single producer can also be found in some of the analysis undertaken by IP. In a presentation IP evaluated the impact of capacity closures and downtime under two scenarios. Under the first scenario all firms undertook the capacity closures and downtime and in the second scenario only IP undertook the capacity closure and downtime. The results show that under scenario two where IP alone undertakes the action, the impact on price is minimal but the negative impact on margins very significant.  By all firms acting together in a coordinated fashion, there would be a significant positive impact on price and large positive increase

---

[149] (Kovacic, Marshall, Marx, & Halbert L. White, 2011), p. 421
[150] (Connelly, Cha, & McGovern, 2004), p. 35.

37

in net margins.  Acting alone, on the other hand, generates large negative margins.[151]

7. In internal documents at the time, Smurfit also recognized that shutting capacity through mill closures left Smurfit without "the capacity to benefit from market demand..."[152]  In early 2004, even outside investors were questioning Smurfit capacity closures: "Why have you taken a disproportional amount of mill rationalizations."[153]  An economically rational firm would not be willing to risk not meeting future demand or close a "disproportional" share of its mill unless it has great confidence that other firms will coordinate and engage in similar cooperative behavior.

8. After IP acquired WY in August 2008, IP idled and closed the facilities that WY had expressly anticipated were needed to remain open.[154]  An economically rational firm would not purchase assets valued in the millions simply to close them.  A firm would not pursue such a strategy unless it understood that other firms would not bring idled capacity on line or increase utilization. Therefore, such conduct should be viewed as a super plus factor.  A highly regarded Industrial Organization economist has noted that, "One example of a **socially perverse effect** is that the incumbent may buy the entrant's capacity and scrap part of it..."[155]  The discussion related to how an incumbent firm treats a potential entrant.  This perverse effect also applies to an acquisition of an incumbent firm by another.  In fact, it is worse when the acquisition is of an incumbent firm because when an incumbent firm purchases a new entrant and then scraps its capacity, market concentration remains unchanged.  However, an acquisition of an existing firm and subsequent scrapping of its capacity will lead to higher market concentration.

---

[151] IP307902, pp. 44-45
[152] SSCC 00185811
[153] SSCC 00834559
[154] IP idled the Valiant Mill and the Albany plant, Keller Deposition, pp. 90-91
[155] (Tirole, 1995), p. 321 (emphasis added)

38

9. The actions undertaken by the Defendants to close capacity do not appear to be consistent with their unilateral self-interests. Rather, it is only rational in the context of coordinated collective action.

B. Operating Rates/Inventories/Trades

1. With the exception of the recessionary years of 2008-2009, the Defendants successfully increased industry operating rates into the upper 90s, which was a marked difference from the years preceding 2004. Through their decisions to cut capacity, the Defendants achieved high operating rates. For the same reasons that such conduct is not in their self interest from a capacity perspective so too it is inconsistent with unilateral self interest from an operating rate perspective. High operating rates limits the firm's ability to respond to positive changes in market conditions. In addition, in most industries high operating rates translate into more physical stress on machines resulting in more maintenance and a higher risk of outages. The latter is particularly problematic. High operating rates limits the ability of the Defendants to respond to future growth in demand, particularly spikes in demand. To the extent high operating rates result in forced outages it also puts the Defendants at risk of meeting the current demand of their customers. This is not economically rationale behavior when viewed through the prism of unilateral self interest.

2. The effort to reduce inventories also appears economically counter to the unilateral self interest of the Defendants. For example, GP provided SOP reports.[156] The SOP reports detailed the demand, supply, and planned and actual inventory levels in the GP system on monthly basis. I have reviewed the SOPs. In all the months covered by the SOP reports, GP's actual inventory levels were below their targeted levels. This placed GP at risk in meeting the needs of their customers. Presumably, GP accepted this risk because there was an offsetting benefit--- i.e., higher prices due to low inventories. However, higher prices can be achieved only if all the

---

[156] GP-KLEEN00264372, GP-KLEEN00335687. GP-KLEEN00257983, GP-KLEEN00249209, GP-KLEEN00279893, GP-KLEEN00961373

Defendants collectively reduce inventories. The inventory behavior of GP is not reflective of a firm pursuing its unilateral self interest.

3. IP similarly recognized that its reduction in inventories was putting it "close to the edge" in meeting customers' needs.[157] It would not be economically rational for an individual firm to risk the loss of customers due to inadequate inventory levels unless that action provided some benefit. Given that IP, alone, cannot lower aggregate industry inventory levels, the benefit has to accrue from collective action. Smurfit recognized that reduction in inventories put them at risk in supplying customers: "Someone way smarter than I am needs to tell me how to satisfy our customers and grow our business without the #1 ingredient for boxes,"[158] In December 2009 a Smurfit executive stated: "There is nowhere to go with ANY orders. I honestly think of this disaster as a career limiting event. We really have to shed orders – which is next to impossible in trying to keep inventory down."[159] In another exchange between the container division and the mills from John Lingle to Jeff Doyle, it is stated that: "We need something to change. This cannot continue. We have few options." It lists the options with one being, "You could run our orders on time - and keep us supplied in paper…"[160] This demonstrates a firm willing to jeopardize performance (and ultimately customer satisfaction) for a goal of lowering inventories, which if done by Smurfit alone would have no impact on market prices.

4. The Defendants were able to maintain and lower inventories through their use of trades between each other. If one firm was faced with very low inventories in one location and somewhat higher inventories in another, it could engage in a trade and supplement the low inventories at the one location and reduce the higher inventories at the other. The importance of this is that it does not have to produce more to alleviate the low inventories and thus aggregate industry inventory levels remain the same. This is a

---

[157] IP582203
[158] SSCC 00109900 at 901
[159] SSCC 00111219
[160] SSCC  00354240

type of cooperative behavior not generally observed in competitive markets. In a competitive market, firms with higher inventory would use that inventory to gain market share from the firm lacking inventory rather than use that inventory to strengthen its competitor.

5. The use of trades between Defendants as well as inter-Defendant sales of product also provided the opportunity for communication between the Defendants. Not only were the Defendants discussing their trade needs but also the downtime and closures of their mills. In the deposition of James R. Keller, he noted that WY would report the maintenance downtime to trade partners but not the market downtime.[161] A review of downtime for WY from 2000-2008 shows that in 2000 WY took total downtime of 332,000 of which 62,000 was maintenance and 270,000 was market downtime. By 2008, the total was 118,795 but comprised entirely of maintenance downtime.[162] There is evidence that downtime was identified as maintenance when, if fact, it was market downtime. In a 2007 WY email exchange, Lenard Mutz is describing why certain downtime should be "coded" as maintenance. John Yerke responds: "This was mkt downtime that we extended by about two days to do some maint. The whole thing is mkt related. W/O soft mkts this would not have been…"[163]

6. Smurfit communicated downtime (market and maintenance), closures, production capacity and swing capacity to its competitor trading partners. In some cases, Smurfit would learn of capacity closures before they were announced. For example, Smurfit learned of an IP mill closure in August 2009 although the closure was not announced until October 2009.[164]

7. The Defendants had a cooperative and close relationship with their trading partners. PCA described GP as their "largest West supplier" and having an "extremely strong trade relationship with IP."[165] Smurfit noted that it

---

[161] Keller Deposition, Tr. p. 229, lines 12 to p. 230, line 6
[162] KellerDeposition, Ex. 24 tab 27
[163] WY0003211
[164] McGurk Deposition Tr. p.103 and Exhibit 121
[165] PCoA000028453 at 454

"values the long term relationship with TIN" and has a "strong business partnership" with IP.[166]

8. The strong relationships led to cooperation rather than competition between the Defendants. In July 2008 WY had a mill outage. Although Mathew Blanchard of Smurfit wanted to target WY's customers, instead Smurfit ended up supplying containerboard to WY.[167] Smurfit extended the same courtesy to IP during a 2008 outage. Rather than charging IP a high price for containerboard, Smurfit provided price protection on a significant volume of containerboard.[168]

9. The Defendants planned the closure of mills with the assurance they could engage in trades with other Defendants to make up shortages. In assessing the closure of its Plymouth, N.C. and Hueneme mills, WY evaluated the options via its "Containerboard Supply Restructuring" plan which included potential trades with IP, Smurfit, and TIN.[169] Smurfit did the same when it contemplated closing its Missoula mill. In his deposition Brian McGurk testified that trades were an option to replace the output of the mill.[170]

10. The economic literature views inter-firm sales as indicative of collusion. In their paper on Plus Factors and Agreement in Antitrust Law, the authors note: "Cartels will often need to redistribute gains and losses to maintain their agreements. In some circumstances, the observation that one seller buys output from another seller at market prices leads to a **strong inference of collusion**, such as when each seller has excess capacity, the product made by each seller is **physically identical**, and the value-to-weight ratio of the product is high."[171]

11. The target and achievement of high operating rates and low inventory levels to the detriment of customer service and competitive advantage is

---

[166] SSCC 00625963 and IP473391
[167] SSCC 00625355 and SSCC 00625356
[168] IP473391 and McGurk Deposition Tr. p. 197
[169] WY0062605
[170] McGurk Deposition, Tr. p. 235-236
[171] (Kovacic, Marshall, Marx, & Halbert L. White, 2011), p.423 [emphasis added]

not the behavior of a firm pursuing its unilateral self interest but rather only rational for a firm coordinating its actions with other firms. Similarly, the use of trades provided a vehicle to communicate between the Defendants and intertwines the business operations of the Defendants. Finally, the cooperative behavior observed and the reliance on trades as an outright substitution for mill production is not the behavior of competitive firms pursuing their independent self-interest.

C. Downtime/Slowback

1. In addition to permanent shutdowns of capacity, it is also possible to slow or temporarily stop the productive capabilities of a mill. There are a number of terms for this, including downtime, market downtime, economic downtime, slowback, etc. but the effect is the same—the removal of productive capacity and thus the ability to supply the market, causing prices to rise or stabilize.

2. Downtime might be a rational response to slowing market conditions. That is, if a firm anticipates a significant and prolonged downturn in orders, it might make economic sense to take downtime rather than incur the ongoing costs of an underutilized mill. On the other hand, in a competitive market, one would expect firms to compete vigorously, typically through prices, as a means to increase mill utilization. Which decision is made would depend on the economic environment at the time. One of the reasons for taking downtime in this industry was to reduce inventory levels, which is one of the most important drivers of price. A 2006 WY presentation notes: "Slowback and/or extended maintenance outages instituted at all containerboard mills for remainder of year to manage inventory to safe levels…"[172] The same strategy was employed by others including Smurfit.[173] Defendants recognized that a goal of downtime was

---

[172] WY0080309, p.6
[173] SSCC00204172

43

to put upward pressure on prices: "IP is taking a disproportionate amount of downtime in an effort to maximize our price."[174]

4. The action of taking a "disproportionate" amount of downtime is in itself an act that is contrary to the unilateral self-interest of IP. Taking excess downtime, without coordinating with its competitors, puts IP in a vulnerable position with respect to the other mills. IP would expect that the other mills, also facing underutilization, would seek out with lower prices IP's customers to gain market volume and increase their own mill usage. Assuming a competitive market, unilateral downtime puts the firm at a disadvantage by effectively allowing IP's competitors an upper hand in responding to increased competition from competitors or an increase in demand.

5. IP's downtime is not fully justified as a response to slowing market conditions.  For example, the sales volumes of the Industrial Packaging unit of IP rose by 6 percent from 2004 to 2005.  However, a comparison of downtime taken in the first four months of 2004 and 2005 reveals that downtime increased from 48 thousand tons in April 2004 to 850 thousand tons in April 2005.[175]

6. Similar to IP, an examination of GP's downtime shows that it is not fully justified by economic conditions.  For example, GP provided documents on mill production and downtime.  A review of the data shows that on numerous occasions GP slowed back equipment while at the same time purchasing containerboard on the open market to meet demand.[176]  It is not clear why a firm would constrain its productive capability during a period in which it could not satisfy demand for their product unless this action had beneficial consequences in some other economic dimension.  A 2008 email

---

[174] IP1034902, p.32.  This document also reported the downtime of other producers.  The document reflects that in the year in question IP, SSCC, GP, Temple-Inland, and PCA took combined downtime of 84 percent of the industry total. Absent the collective downtime of the other Defendants, and assuming IP has no market power IP would not be in a position to have any impact on price.  Thus, IP is placing itself in a vulnerable position for which there is little to no economic value unless collectively, the other major firms follow suit.

[175] IP832857, slides 5-6

[176] GP-KLEEN00264372, GP-KLEEN00335687. GP-KLEEN00257983, GP-KLEEN00249209, GP-KLEEN00279893, GP-KLEEN00961373

exchange among GP employees suggests that favorable economic dimension.   In the email one individual is complaining that GP is missing out on spot orders from regular accounts in the West because it lacks product—the result of constraining productive capabilities and reducing inventories.   The author then discusses the possibility of engaging in "East/West" trades to provide more tons in the West.   The individual who started the email finally requests:   "Formally, let's take slow back off."   At that point, Mr. Mike Adams who is identified as "Pres. CTBD &Kraft" enters the discussion and states, "I want to ensure we have looked at all trade options before we take slowback off in Toledo.   Long term we still need to take tons out in our system."[177] From the exchange it is clear that to GP the goal of taking "tons out of system" outweighed the risks of failing to satisfy customer orders.   From an economic perspective, "taking tons out of system" is another way of saying reducing supply in order to have a beneficial impact on price.   Given that GP's supply decisions alone would have little or no impact on price, GP derives a benefit only if the industry collectively acts to reduce supply.   Thus, GP is engaged in an act that is beneficial from a collective perspective but not if acting in its unilateral self interest.

7. GP's perspective on supply restrictions is also found in a number of documents discussing the concept of "diffusion."   GP defines diffusion as, "% of downtime taken by producers left of the demand curve."[178]   GP states that, "High diffusion rate means more producers left of the demand curve are taking downtime, mitigating the negative impact on price."     The terminology used in the documents is not standard economic jargon but the concept is clear.   "Left of the demand curve" refers to that portion of the supply curve representing all firms with marginal costs equal to or less than the prevailing market price. These would then be firms that are enjoying relatively higher profits from their sales and hence not firms one would

---

[177] GP-KLEEN00329753-756
[178] GP-KLEEN00055869 at 871

45

expect to be taking downtime if acting in their unilateral self-interest.   In economics the highest cost firm providing the last unit of supply is termed the "marginal" firm.  All firms with marginal costs less than the highest cost firm are termed "infra-marginal."  The concept of diffusion is illustrated in a number of spreadsheets where GP quantified the impact of diffusion.[179]  In one spreadsheet, GP ranks all the production facilities by cash cost and calculates cumulative capacity up the cash cost ranking.  There were 78 facilities in the ranking with the lowest cost coming in at $229 and the highest at $519.  The Defendants are represented all along the ranking.  These 78 facilities were capable of meeting a market demand of 24,396 tons.   GP used this information to identify at what cost (price) market demand would intersect with industry supply (and thus cost).  For example, the spreadsheet shows that the industry can meet a market demand of 21,469 at a cost (price) of $401.   Similarly, if market demand falls to 20,884 the market price (as dictated by the industry supply curve) would fall to $368.  This simply reflects the fact that as price falls below cash cost the marginal facilities would shut down.  GP's view of diffusion and its ability to "mitigate" price declines is rooted not in the marginal firms shutting down but rather the infra-marginal firms shutting down.  In short, prices can be supported if some lower cost firms take downtime.  The goal is to keep the higher cost facilities operating and thus prop up market prices.

8.  Diffusion, as used by GP, would require that all lower cost firms simultaneously take downtime in the same proportion.  From an economic perspective once a firm observes lower demand it would naturally shut down the highest cost facilities and move production to the lower cost facilities.  Granted, there may be reasons why it might be desirable for a firm to keep a higher cost facility operating (e.g., freight costs, product mix, etc.).  However, it is highly unlikely that all firms in the industry (or at least those with major capacity holdings) would face the same sets of reasons.  Taking downtime at lower cost facilities while operating higher cost facilities

---

[179] See, for example, GP-KLEEN00958242, Tab: Diffusion Adjusted MPBE

is not efficient and would be contrary to a firm's unilateral self interest. This scheme can only be supported if other firms engage in the same behavior.

9. As a preliminary matter, the economic evidence shows that the Defendants knowingly employed downtime as a means to either increase or support prices and did so in a manner inconsistent with their unilateral self-interests, suggesting coordinated rather than independent action on the part of the Defendants.

D. Coordinated Pricing

1. Exhibit 4 highlights the announcement date, implementation date, and amount of increase for each of the Defendants.  The Defendants' future price increases are made known to the public (and to each other).  As was the case with capacity cuts, in the context of a market susceptible to collusion the use of future price announcements is considered a facilitating device.[180] The use of price announcements supports, in part, a type of collusion called "price signaling."[181] By giving advance notice, a firm is signaling its desire to increase prices and is afforded the opportunity to watch what the other firms in the industry do.  Other firms can respond with similar announcements or may not respond at all.

2. From 2004 to 2010 the Defendants were successful in full implementation of price increases on nine occasions.  In each instance the Defendants announced within weeks of each other and for similar, and in most cases identical, amounts.   In some instances subsequent price increase announcements were issued within months of a previous increase.[182] The quick succession of price increaseswas not justified on a cost or demand basis.  In what appears to be an IP presentation developed around 2007, there is a slide comparing box demand and price.  The title of this slide is, "In today's market, Box demand not the key driver of price."[183]

---

[180] (Hay, 2005), p.16
[181] (Harrington), pp.144-147
[182] For example, March 2004 and June 2004 and October 2005 and January 2006.
[183] IP0954463, p. 7

3. The price announcements also often came not long after trade group meetings. On November 16, 2005 there was a meeting of FBA's Board of Directors. Within two weeks WY and PCA announced price increases effective January 1, 2006. Interestingly, in 2007 in an earnings conference call, the Chairman of PCA noted that since consolidation took hold in the industry inventories had trended down. He noted that the historically it would not have been a normal time to achieve a price increase.[184] There was an FBA Executive Committee meeting on March 14, 2006. In early April Defendants raised prices. In June 18, 2007 there was a joint AFPA, Associated of Independent Corrugated Converters, and the FBA meeting. Not long after WY announced a price increase which was followed by the other Defendants. From March 30 to April 2, 2008 the AFPA held its Annual Paper Week convention. By the latter part of May and early June the Defendants had announced price increases.

4. Defendants appear to have shared information about price increases before they were made public. On July 8, 2010 Smurfit announced a price increase to be effective August 1. However, on July 1 Brian McGurk of Smurfit sent an email to Barry Baker of TIN informing him of the price increase.[185] On December 1, 2009, McGurk emailed Robert Lantheir of NP with its January 1 price-increase announcement one day before the increase was publicly announced.[186] Additionally, McGurk emailed TI's Barry Baker announcing a July 1, 2010, price increase for a trade to TIN.[187]

5. As a whole, the timing and equivalence in the dollar amounts of the price increases is consistent with collusive behavior. When viewed individually the inference of coordination is reinforced. On May 28, 2008 GP

---

[184] Transcript of Q1 2007 PCoA Earnings Call, April 18, 2007, at p.6. See also PCoA000219119
[185] McGurk Ex. 108/SSCC 00518759
[186] McGurk Ex. 118/SSCC 00514885
[187] Ex. 108/SSCC00518759

48

announced a price increase of $55 to be effective July 1, 2008. In six days all the Defendants announced identical price increases and effective dates. By mid 2008 box shipments had plummeted due to the impending deep recession in the U.S. economy and operating rates had been on the decline. While box shipments improved in 2010 relative to 2008 they were still significantly below pre-2008 levels. Despite the soft box market, Defendants succeeded in pushing a price increase through in January and April 2010. Raising prices at a time when surplus exists has been considered a "plus factor" when evaluating potential conspiracies.[188] If the Defendants could coordinate price increases during a period a prolonged recessionary slump in the period 2008-2010, they certainly could do so from 2004 to 2008 when their collective capacity and supply management decisions pushed operating rates to all time highs.

6. The price increase announcements themselves act to facilitate coordinated behavior. The timing, amounts, and economic conditions in which the price increases were implemented are consistent with collusive behavior.

E. Focal Points: Role of Outside Consultants and Targets

1. The Defendants have received a steady drumbeat of advice on the structural and operational targets that should be reached in order to successfully raise prices. These targets serve as what economists and game theorists call focal points --a type of facilitating device.[189] Coordination among firms requires that individual firms have a degree of certainty that other firms will follow their actions. Absent certainty and confidence, firms have an incentive to deviate and undermine the collusive arrangement. Actions taken to reduce uncertainty are called "facilitating practices" or "facilitating devices."[190] Focal points serve to strengthen coordination among firms. The common focal point is price ceilings. It has been demonstrated that regardless of whether the price ceiling is binding

---

[188] (Werden, 2004), p. 746
[189] (Harrington, 2011), pp. 145-155
[190] For a discussion of facilitating practices see: (Hay, 2005)

49

firms tend to price in accordance with the price ceiling.[191]  An operating rate or inventory "weeks of supply" target, as is found repeatedly in this industry, can serve as a focal point.

2.  Consultants to the containerboard industry have provided extensive guidance to industry participants.  Numerous outside consultants circulated economic and price increase strategy among Defendants.  A 2002 article by McKinsey & Company (McKinsey) titled, "Cashing In On Consolidation," sums up the fundamentals of achieving higher product prices in the forest products industry.   The article provides a fairly detailed roadmap and includes the following thoughts:

- "Many attempts to raise prices are met with failure because the market structures are not supportive."[192]
- "We have found that market leaders need three structural preconditions to fully benefit from their past consolidation efforts to create value through good conduct"[193].
- "The first is that a market segment must be relatively leak-tight from both the supply and demand side.  Some are too leaky, or vulnerable to new sources of supply, for any **leadership curtailment** to be effective…. Before attempting capacity curtailment and pricing actions, leaders must understand the dynamics of current and prospective sources of supply leaks.  …If customers react strongly enough, it can undermine suppliers' attempts to reduce slack.  Our research has shown that many forest products market segments are relatively leak-tight with a specified geography and segment definition"[194]
- "Assuming a defined market is not vulnerable to significant leaks, and many are not, the second precondition is that **market leaders must be able to curtail sufficient supply to effectively bridge demand volatility**…   For example, in North American containerboard, the three natural market leaders can effectively straddle excess capacity and expected demand volatility by idling less than 10 percent of their assets."[195]
- "Having the ability to take leadership actions is not sufficient: the third precondition is that the right incentives to do so must be in place."[196]

---

[191] (Knittel & Stango, 2003)

[193] GP-KLEEN00141864 at 867
[194] GP-KLEEN00141864 at 867-8 [emphasis added]
[195] GP-KLEEN00141864 at 868 [emphasis added]
[196] GP-KLEEN00141864 at 868

3. The article concludes with a "Market Leadership Segment Assessment" matrix. On the left axis is whether (i.e., yes or no) the segment is "leak-tight" and on the right whether "market leaders have ability and incentive to lead." Of the eight segments in North America and Europe only two are in the upper-right quadrant of the matrix that directs these segments to "exploit full potential." These segments were Containerboard and Newsprint-North America.[197]

4. Two years after the McKinsey article, a report by Credit Suisse First Boston titled, "The Holy Grail Secular Headwinds: Structure-Behavior Performance," echoed many of the McKinsey article's conclusions.

- "As we see it, the destructive behavior of containerboard producers in aggregate is the result of almost entirely rational behavior by individual producers. If individuals acting rationally create destructive group behavior, then there is something wrong with the group, not the individuals."[198]
- "Structure doesn't drive performance: structure drives behavior. We have often used containerboard as an example of a troubled industry structure, and activity of the last couple of years helps illustrates our point. Several of the industry's top ten producers have been engaged in a major effort to keep production in line with demand. A few large producers haven't bought in, but most have to some extent."[199] (note: based on date of report, "last couple of years" would reflect 2002 and 2003)
- "Consolidation changes an industry's structure and those changes, large or small, change the operating parameters of the business. Every change in structure affects behavior, if only to change the number of decision makers of capital available to be deployed."[200]
- "Containerboard is easily the grade with the best evidence of active, focused leadership and yet it has some of the toughest challenges too, which make that focus less valuable than it might be otherwise."[201]

---

[197] GP-KLEEN00141864 at 874
[198] GP-KLEEN01015352 at 386
[199] GP-KLEEN01015352 at 386
[200] GP-KLEEN01015352 at 386
[201] GP-KLEEN01015352 at 399

5. Just one year later in 2005 the consultancy Deloitte Development prepared a presentation for the forest products industry titled, "Pricing Opportunities in the Forest Products Industry." The presenter noted that:

- "Pricing improvement is an untapped opportunity for most forest product companies."[202]

6. Under the section on "Strategic pricing common issues and obstacles," the presenter noted:
- "Limited understanding of competitor capabilities"
- "Underestimating competitor's desire to raise prices"
- "Underestimating customer switching costs"[203]

7. Under the section on "price execution common issues & obstacles," the presenter notes:

- "History of unsustainable price increases"
- "Steadily declining margins"[204]

8. The strategytouted by these industry consultants and observers went beyond simply suggesting capacity reductions, discipline and leadership to concrete economic targets. For example, in a 2010 report by Dr. Mark Wilde of Deutsche Bank titled, "Going For A Hat Trick—Dr. Containerboard's Check-Up", he includes a section on "What drives containerboard & box pricing?" He has a number of pronouncements including:
- "In the end, we're back in Econ 101: supply & demand. The supply/demand balance in the containerboard market is the most critical factor in our view. During the current upswing, the story has hinged heavily on supply --- especially, supply reductions."[205]

---

[202] (Sinoway, 2005), p.2
[203] Ibid., p.5
[204] Ibid., p.7
[205] GP-KLEEN01074003 at 016

9. Just following the above quote, he highlights the nineteen capacity closures from 2007-2010.   He goes on to identify the impact that such closures have had on the economics of the industry.

- "Among the best proxies for supply/demand balance are operating rates and inventory levels.  Historically, we've regarded an operating rate in the 92-94% range as indicative of a market in which balance.  Anything above that level has indicated a tight market with 'pricing power' for producers…. Like operating rates, inventory levels have always been a proxy for the supply/demand balance…. In recent years, producers have become more adept at managing demand and maintaining inventories."[206]
- "Price hikes typically failed when OCC costs were more stagnant, and inventory levels were above 3.5 weeks of supply."[207]

10. Dr. Wilde also includes a table depicting "failed" and "successful" price initiatives and comparing each to the linerboard operating rate and weeks of supply of inventory.   The report thus provides two distinct metrics for firms in the industry to strive for.

11. The Defendants thought highly of Dr. Wilde and heeded the advice.  In a June 2009 email exchange in which Dr. Wilde's research report was circulated, Carol Roberts of IP had this to say, "Wilde is pretty influential. Very encouraging.  Up in Chicago visiting box plants.  All very concerned about having and getting board.  Know we have tried to turn up production. From your end are you comfortable we can and are meeting box plant needs.  **Know we are intentionally playing close to the edge.  Driving inventories down was vitally important.**"[208]

12. The 2002 article referenced previously by McKinsey titled, "Cashing In On Consolidation" was the result of a collaboration between McKinsey &Company and IP.  IP retained McKinsey in 2002 to consult on pricing and capacity management.[209] McKinsey was also retained in 2004, 2005, 2006,

---

[206] GP-KLEEN01074003 at 018
[207] Ibid at 019
[208] IP582203
[209] IP107724

2008, 2009, and 2010.[210]  Moreover, McKinsey's work was not limited to just IP.  The firm also provided consulting services to at least GP.[211]

13. There are also numerous documents studying and forecasting two of the most important targets of price in the industry – operating rates and inventory levels.  The Defendants are keen to know when operating rates and inventory levels hit their optimal values--- i.e., values that support price increases.[212] John Sims of IP testified that he developed analysis showing the linkages between operating rates and inventory levels and price and developed appropriate thresholds to determine when IP had pricing power.[213] The Defendants are also aware of each other's capacity at the mill and product level as well as who is shutting down capacity or taking downtime.[214]  They also have a sense of who is "willing to manage capacity" and the need for "prudent capacity management."[215]  Finally, the Defendants are aware of the importance, impact, and role of taking downtime on maintaining price.[216]

14. A July 2003 email exchange between Matthew Denton of GP and Mark Wilde of Deutsche Bank in 2003 (after a failed price hike) highlights the knowledge the industry has about the underlying economic fundamentals and what needs to be done.  Mr. Wilde had emailed Mr. Denton with the inquiry, "Could we (see) something this autumn."  Mr. Denton responds, "yes" and starts discussing various economic factors and adds:

> "we had those economics behind the spring increase and that didn't happen, partially due to seasonally soft demand but also due to the apparent stupidity and a lack of understanding of incremental economics…one competitor allegedly stated that they were using the price increase opportunity to increase volume and market share, and, ironically, their returns have struggled significantly"[217]

---

[210] IP651704, IP096084, IP111906, IP096155, IP195892, IP213946, IP107059, IP161711, IP089004, IP138224, IP130449, IP812903
[211] GP-KLEEN00141726
[212] For example, see GP-KLEEN01017026, pp.7-8;  IP579512, pp.46-47; IP259270 at 274
[213] (Sims Deposition), Tr. at 157-158, 162
[214] For example, see GP-KLEEN00375469, p.10
[215] For example, see IP579512, p.55; IP268609, p. 5
[216] IP105350 at 354
[217] GP-KLEEN01501856

54

15. The exchange (that took place prior to the class period) highlights Mr. Denton's knowledge of how prices are determined at the margin based on the industry demand and supply curves and that trying to push more supply on the market (as was done by the "stupidity" of the competitor) is not the means by which price increases are sustained. Only by restricting supply can prices be increased. That is, supply discipline needs to be heeded by the large firms.

16. The drumbeat of advice by industry consultants provided a clear common focal point for the Defendants --- a focal point that facilitated coordinated behavior. The consultants thereby provided to Defendants a means to collude.

## F. Monitoring

1. Monitoring by firms to a collusive arrangement is necessary to ensure that no one firm deviates from the agreed upon operational and pricing parameters. The Defendants expended considerable effort to monitor the actions and operational status of ostensibly competing firms in this industry.

2. The Defendants possess a detailed picture of the cost structures, capacities, planned capacity reductions, and use of downtime in the industry. Not only did GP know the cash cost plus freight of the other firms in North America, it knew that cost by specific input (e.g., wood, pulp, chemicals, energy, personnel, etc.), as reflected in an internal spreadsheet.[218] The spreadsheet noted the location and capacity of each mill and rank ordered the firms by cash cost plus freight. The analysis also denoted the "price call" which purportedly is where North American demand meets the marginal supplier. This spreadsheet was part of a more comprehensive presentation discussing the economics of the industry.

3. Firms within the industry evaluated downtime by firm and, importantly, which producers should take downtime to "optimize" the industry cost

---

[218] GP-KLEEN00025732 at Tab "Current_Jan08"

curve.[219] A document on downtime noted that, "Who takes downtime is extremely important."  Specifically, it argued that "1st and 2nd quartile producers change the shape of the cost curve.   It turns out that the 1st and 2nd quartile producers are the lowest cost producers.  In essence, what the author is arguing is that by reducing the supply of lower cost producers, you effectively push demand to higher cost mills, thereby increasing price.

4. Not surprisingly, the Defendants knew the capacity, operating rates and products at the mill level along with shutdowns and downtime.[220]  There is also evidence that the Defendants knew whether each other are "short" or "long" specific products.[221]

G.  Direct Communications Among Defendants

1. There are numerous instances in which the Defendants have communicated competitive information directly with each other and/or shared non-public information.   On January 1, 2010, after 17 years with IP, Mike Exner joined Smurfit as Senior Vice President.[222]  IP released Mr. Exner from a non-compete agreement so he could make the move.[223]  Mr. Exner brought with him a thumb drive containing IP documents including a November 18, 2008 presentation.[224]  In March 2010, Mr. Exner emailed Smurfit executives that he had some "very very reliable" information about IP's plan to convert machinery.[225]  Later he informed executives that IP had actually trialed new production.[226]

2. On October 16, 2007, Smurfit trading representatives notified IP employees that Smurfit would have "numerous mill maintenance outages four to six months in the future."[227] The next day, Smurfit's Brian McGurk prepared a status report of the company's trade negotiations with TIN and IP, wherein

---

[219] See IP037102, p.22 for downtime by firm,GP-KLEEN00958242for illustration of cost curve and GP-KLEEN00395006, p.12 for perspective on who should take downtime.  See also GP-KLEEN00387869
[220] See for example, IP130489
[221] GP-KLEEN00310659
[222] SSCC 00479424 at 60
[223] Exner Dep. Tr. at 282-84
[224] ExnerDep Tr. at 345]
[225] Exner Ex. 10/SSCC 00466044
[226] Exner Ex. 11/SSCC 00178118
[227] SSCC 00347406

he noted that Smurfit "gave International Paper a high level overview of its 2008 position relative to swing capacity."[228]

3. On August 7, 2006, a SSCC sales representative forwarded to Senior Vice President of Sales Mathew Blanchard an email from David Parry at GP "looking to get pricing from [SSCC] as soon as possible".[229] GP's pricing matrix was attached to the email.[230]

4. In addition to direct communication, Defendants could communicate indirectly through industry analysts. Smurfit admitted that the use of analysts heavily influenced the industry. Smurfit's Steve Dunning testified that he used analysts' forecasts to develop his own pricing forecasts for the following year.[231] Stephen R. Read testified at Smurfit's bankruptcy confirmation hearing that industry analysts could go to each containerboard company and discuss pricing, whereas people working at the individual companies could not.[232] When the judge asked, "They could collude for you?" Read replied, "That's exactly right . . . the analysts, they have this unique position in life where they can go out and—and talk to everybody."[233]

H. Prior Antitrust Violations

1. The foregoing discussion should also be placed in the context of history. The Defendants are no strangers to antitrust violations. It began with a consent decree entered on April 23, 1940 and followed by a finding in 1969 that Defendants violated Section 1 of the Sherman Act after being charged with conspiring to restrain price competition in the sale of corrugated containers in the Southeastern United States from 1955- 1963. Many of the Defendants in this case were also alleged to have participated in a price fixing cartel from 1964-1975. With the exception of one Defendant in that case, the remainder settled either before trial or before a verdict. The

---

[228] McGurk Ex. 133/SSCC 00353564; SSCC 00353565 at 567
[229] Blanchard Ex. 10/SSCC 00365429
[230] SSCC 00365432
[231] Dunning Depo. at 229:24-235:9, 273:1-15; see also Dunning Ex. 18/SSCC004825894
[232] Read Testimony, In re Smurfit-Stone Container Corp., No. 09-10235, at 28-29 (Bankr. Del. Apr. 29, 2010).
[233] Read Testimony, In re Smurfit-Stone Container Corp., No. 09-10235, at 28-29 (Bankr. Del. Apr. 29, 2010).

remaining Defendant was found liable. Thus, a jury finding that a cartel existed to fix corrugated container prices—a cartel with many of the same firms in this case.  In 1998 Stone Container Corporation entered into a consent agreement with the Federal Trade Commission in which it agreed to refrain from "entering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement understanding, plan or program with any manufacturer or sell of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties.[234] Furthermore, the conduct the Federal Trade Commission took issue with was similar to the conduct in this case: taking and communicating downtime; purchasing significant volumes of linerboard from competitors; and using downtime as a means to drive inventory levels lower.[235]

I.  Conclusion

1. This review, thus far[236] of the economic evidence of Defendants' conduct supports my preliminary opinion that the Defendants' conduct is more consistent with collusion than independent behavior.  The economic evidence shows that Defendants' behavior with respect to mill closures, inventory levels, downtime and trades all were contrary to their independent self-interests and made economic sense only in the context of concerted behavior.  Further, the Defendants conduct included the use of signaling, focal points and use of consultants that were both facilitative of collusion and constituted means of carrying out collusion.  Finally, Defendants direct communications of competitive information and persistent monitoring of their competitors was consistent with maintenance, monitoring and policing a collusive agreement.

VII.  Defendants' Economic Performance

1. I have reviewed the analysis undertaken by Dr. Dwyer with respect to common impact and class-wide damages.  His methods and models are

---

[234] (Plaintiffs' Complaint), ¶ 61
[235] (In the Matter of Stone Container Corporation, a corporation, 1998)
[236] It is my understanding that discovery continues and as such so too will my investigation.

sound, well-accepted and widely used by economists. I find his empirical results to be entirely consistent with my economic analysis of common impact. His empirical analyses reliably show that all, or nearly all, class members were impacted by the price increases implemented during the class period.

2. He has developed preliminary class-wide damages models that reliably estimates the economic damages suffered by the class. He has concluded that prices in the containerboard industry were above the level one would expect absent collusion. This performance measure is indicative of collusion among Defendants and is to be expected based on the structural attributes of the industry and the conduct of the Defendants.

VIII.  Conclusion

1. The structure, conduct and performance of this industry support my economic opinion that the Defendants engaged in collusive behavior rather than independent behavior. The Defendants had the motive, opportunity and means to collude. Any attempt at collusion would have been broadly and generally successful given the economic characteristics of the industry. As a preliminary matter and based on the discovery produced thus far I further conclude that the conduct of the Defendants is more consistent with collusion than independent decision-making.

2. I have also concluded, based on the economic evidence I have described, that the conduct of the Defendants would have impacted all, or nearly all, class members. The empirical analysis on common impact performed by Dr. Dwyer is consistent with my economic findings. He has also demonstrated that it is possible to construct econometric models capable of reliably measuring class-wide damages. His results showing elevated prices during the class period is also consistent with my finding that the Defendants were engaged in conduct that had the effect of increasing prices above levels one would expect absent collusion.

3. These opinions are all based on evidence that is common to the class. They do not require inquiry into individual class members' behaviors or circumstances.

I declare under penalty of perjury the foregoing is true and correct. Executed at Glendale, California

Dated: June 11, 2014

_____

Michael J. Harris

**EXHIBIT 1**

**Dr. MICHAEL HARRIS**
**President**
**Harris Economics Group**
**Glendale, California**
**818-241-2388**

Dr. Harris has been a consulting economist for the last twenty six years.  He has worked across a diverse set of industries but has a significant amount of experience in the energy industry.  He has provided testimony, economic research and consulting on matters related to pricing, price manipulation, competitive bidding, regulation, antitrust, compensatory and punitive damages, and class certification.  He has analyzed market power, anticompetitive conduct, alternative forms of price regulation, and studied the evolution of industry deregulation and restructuring.


**EDUCATION**

     Ph.D., Economics, University of Washington, Seattle
     B.A., Economics, University of Colorado, Boulder


**WORK EXPERIENCE**

     President, Harris Economics Group, September 2007-Present
     Econ One Research, Inc., Senior Economist, 2000-2007
     Navigant Consulting, Principal, 1993-2000
     Arlon Tussing & Associates, Economist, 1988-1993


**SAMPLE OF RELEVANT TESTIMONY AND CONSULTING EXPERIENCE:**

*Antitrust and Competition*

- Testified regarding a price fixing conspiracy in the market for static random access memory
- Testified regarding competition in natural gas storage markets
- Submitted an Affidavit on the effect of merger in industrial gas market
- Testified regarding market power in the patronage advertising market
- Submitted testimony regarding natural gas pipeline market power
- Testified regarding the manipulation of natural gas price indices
- Testified regarding competition between steam and natural gas
- Testified regarding framework for evaluating competitiveness of markets
- Developed model to assess competitiveness of California crude oil market
- Conducted market power evaluation of California natural gas pipelines

**Dr. Michael Harris**
**Page 2 of 3**

<u>Class Certification</u>

- Submitted declarations and testified in support of certification of a class of purchasers of NYMEX natural gas futures contracts
- Submitted a declaration opposing certification of a class of residents allegedly impacted by the actions of a state agency.
- Submitted declarations in support of certification of a class of purchasers of dynamic random access memory
- Submitted declarations in support of certification of a class of purchasers of static random access memory
- Submitted declarations in support of a class of purchasers of natural gas in a number of Midwest states
- Submitted declaration in support of certification of a class of purchasers of natural gas in California

<u>Valuation, Economic Loss and Damages</u>

- Testified regarding damages stemming breach of a retail product license agreement
- Testified regarding the economic basis for punitive damages
- Testified regarding access and valuation of utility assets
- Submitted testimony regarding proper oil royalty valuation standard

<u>Contract Disputes</u>

- Submitted an expert report and provided deposition testimony regarding damages stemming from a breach-of-contract between two firms in the semi-conductor industry
- Testified regarding the appropriateness of the natural gas pricing provisions in a long-term electric supply contract
- Submitted testimony regarding reformation of long-term contracts
- Testified regarding breach of licensing agreement
- Testified regarding outcome of competitive bidding process

<u>The Economics of Regulated Industries:</u>

- Testified on the appropriateness of FERC gas cost filings
- Submitted testimony regarding manipulation of natural gas price indices
- Testified regarding price stabilization strategies
- Testified regarding utility prudence
- Testified regarding incentive ratemaking
- Testified regarding rate of return
- Testified regarding utility demand forecasts

<u>Market Studies</u>

- Conducted evaluation of Alberta natural gas storage market
- Conducted overview of the business and financial risk of the U.S interstate pipeline industry.
- Developed a comprehensive study of the North American natural gas market.
- Developed due diligence studies of new pipeline projects.

**Dr. Michael Harris**
**Page 3 of 3**
**ENGAGED AS AN EXPERT IN CASES BEFORE THE FOLLOWING COURTS AND ADMINISTRATIVE AGENCIES:**

- (10) United States District Courts
- (5) State Courts
- Numerous Arbitration Panels
- The Federal Energy Regulatory Commission
- The Ontario Energy Board
- The Alberta Energy and Utilities Board
- The Corporation Commission of the State of Oklahoma
- The Massachusetts Department of Telecommunications & Energy
- The State of Rhode Island Public Utilities Commission
- The Connecticut Department of Public Utility Control
- The Corporation Commission of the State of Kansas
- The Public Service Commission of Wisconsin
- The New Mexico Public Service Utility Commission

## CASE LIST OF MICHAEL J. HARRIS, Ph.D.
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 1. Buccaneer Energy v. Gunnison Energy Corporation | United States District Court For The District of Colorado | Civil Action No. 1:12-cv-01618 | Declaration | September 2013 | Plaintiff |
| 2. Michael Shames, et al v. The Hertz Corporation, et all | United States District Court Southern District of California | Case No. 07CV2174 MMA | Expert Report | April 2011 | Plaintiffs |
| 3. In Re Carbon Processing and Reclamation, LLC, et al. v. Valero Marketing and Supply, Co., et al. | In The United States District Court for the Western District of Tennessee Western Division | Case No. 2:09-CV-02127-STA-CGC | Expert Report | October 2010 | Plaintiffs |
| 4. In Re Dynegy Marketing and Trade v. Multiut Corporation, Nachson Draman, and Future Associates | In The United States District Court for the Northern District of Illinois Eastern Division | No. 02 C 7446 | Affidavit | May 2010 | Plaintiffs |
| 5. In Re Ira A. Adams, et al. v. State of California, acting by and through the Department of Fish and Game, John McCamman, Ed Pert, and Randy Kelley | Superior Court of the State of California, County of Plumas | Case No.CV09-00065 | Declaration (2) | November 2009 | Defendants |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 6. In Re Energy Transfer Partners Natural Gas Litigation | In The United States District Court Southern District of Texas Houston Division | Civil Action No.4-07-ev-3349 | Affidavit | April 2009 | Plaintiffs |
| 7. In Re Static Random Access Memory (SRAM) Antitrust Litigation | In The United States District Court Northern District of California Oakland Division | No. M: 07-CV-01819-CW MDL No. 1819 | Expert Report (2), Declaration, Deposition Testimony (2), Reply Declaration, Reply Report (2) | January 2009- June 2010 | Plaintiffs |
| 8. In Re Western States Wholesale Natural Gas Antitrust Litigation *Breckenridge Brewery Of Colorado, LLC et al v. Oneok Inc. et al* | In The United States Court District of Nevada | CV-S-03-1431-PMP (PAL) *Case 2:06-cv-01351-PMP-PAL* | Declaration (3), Deposition Testimony, Affidavit, Reply Declaration (4) | October 2008- October 2009 | Plaintiffs |
| 9. In Re Western States Wholesale Natural Gas Antitrust Litigation *Learjet Inc., et al v. Oneok Inc. et al* | In The United States Court District of Nevada | CV-S-03-1431-PMP (PAL) *Civil Action No. 05-cv-1500* | Declaration (3), Deposition Testimony, Affidavit, Reply Declaration (4) | October 2008- October 2009 | Plaintiffs |
| 10. In Re Western States Wholesale Natural Gas Antitrust Litigation *Heartland Regional Medical Center et al v. Oneok Inc. et al* | In The United States Court District of Nevada | CV-S-03-1431-PMP (PAL) *Case No. 07BU-CV01316* | Declaration (3), Deposition Testimony, Affidavit, Reply Declaration (4) | October 2008- October 2009 | Plaintiffs |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

## CASE LIST OF MICHAEL J. HARRIS, Ph.D.
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 11. In Re Western States Wholesale Natural Gas Antitrust Litigation: *Arandell Corp. et al v. Xcel Energy Inc. et al* | In The United States Court District of Nevada: | CV-S-03-1431-PMP (PAL) *Case No. 07-C-0076-C* | Declaration (3), Deposition Testimony, Affidavit, Reply Declaration (4) | October 2008-October 2009 | Plaintiffs |
| 12. In Re Western States Wholesale Natural Gas Antitrust Litigation *Fairhaven Power Company v. Encana Power Corp. et al* | In The United States Court District of Nevada | CV-S-03-1431-PMP (PAL) *Case No 2:05-CV-00243...* | Declaration (2) | May 2008-October 2008 | Plaintiffs |
| 13. Centerpoint Energy Inc., et al v. Angela Sullivan Engledowl and Railroad Commission of Texas | In The District Court of Travis County, Texas, 261st Judicial District | No. D-1-GN-07-001939 | Affidavit | February 2008 | Plaintiffs |
| 14. Ergon West-Virgina v. Dynegy Marketing & Trade | In The United States District Court Southern District of Mississippi Jackson Division | No. 3:06CV714 | Expert Report, Deposition Testimony | October 2007 | Plaintiff |
| 15. Gulf South Pipeline Company, LP v. Roaring Creek, LP. | In The County Court of the Second Judicial District of Jasper County Mississippi Special Court of Eminent Domain | Cause No. 27-0050 | Affidavit | September 2007 | Plaintiff |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**A.239**

## CASE LIST OF MICHAEL J. HARRIS, Ph.D.
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 16. Petro Computer Systems, Inc., et al. v. Micron Technology, Inc., et al. | In The United States District Court Northern District Of California San Francisco Division | M-02-1486-PJH | Declarations (2), Deposition Testimony, Letter to Judge | June 2007-June, 2011 | Plaintiffs |
| 17. Michael Scott Anderson and Robert J. Hewitt v. Houston Pipeline Company, L.P., Energy Transfer Partners | In The District Court Of Victoria County, Texas | Cause No. 07-3-65,478-D | Trial Testimony | March 2007 | Plaintiffs |
| 18. Cherokee County Cogeneration v. Dynegy Marketing (Breach of Contract) | In The District Court Of Harris County, Texas 291st Judicial District | 2006-07706 | Expert Report, Supplemental Report (2), Affidavit | December 2006-November 2010 | Plaintiff |
| 19. In Re CMS Energy Securities Litigation (Market Manipulation) | United States District Court Eastern District of Michigan | Civ. No 02 CV 72004 (GCS) | Expert Report, Deposition Testimony | August 2006 | Plaintiffs |
| 20. Advanced Research Chemicals, Inc. v. Praxair, Inc. (Compensatory and Punitive Damages | United States District Court For The Northern District Of Oklahoma | 03-CV-867-EA (C) | Expert Report (2), Affidavit, Deposition Testimony | December 2005 | Plaintiffs |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 21. Stand Energy Corporation v. Columbia Gas Transmission, et al (Class Certification and Damages) | United States District Court For The Southern District Of West Virginia | 2:04-0867 | Declaration (2), Deposition Testimony (3), Supplemental Declaration, Revised Supplemental Declaration, Expert Report, Reply Report (2), Supplemental Report | November 2005- January 2009 | Plaintiffs |
| 22. Natural Gas Anti-Trust Cases I,II, III, and IV (Class Certification and Damages) | Superior Court Of The State of California, County of San Diego | J.C.C. Proceedings Nos. 4221, 4224, 4226 and 4228 | Declaration (3) | November 2005- August 2006 | Plaintiffs |
| 23. California Department of Water Resources v. Sempra Energy Resources (Damages) | American Arbitration Association | 74 y 198 00193 04 VSS | Trial Testimony Expert Report, Rebuttal Report, Declaration, Deposition Testimony | May 2005 | Plaintiffs |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 24. In re: Natural Gas Commodities Litigation (Class Damages) | United States District Court For The Southern District Of New York | 03-CV6186 (VM), Class Action | Declaration (4), Reply Declaration, Affidavit, Reply Affidavit Deposition Testimony, Expert Report | January 2005- January 2006 | Plaintiffs |
| 25. In re: Calpine Corporation Securities Litigation (Securities Violations) | United States District Court Northern District Of California Oakland Division | C-02-12000 SBA, Class Action | Affidavit, Declaration (2), Expert Report, Supplemental Report, Reply Report, Deposition Testimony | November 2004 | Plaintiffs |
| 26. Structural Dynamics, L.L.C. v. Tech Transfer, Inc. and Geoff Anderson (Trade Secret s) | District Court Of Harris County Texas 80th Judicial District | 2004-00086 | Expert Report | July 2004 | Defendants |
| 27. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Evaluation of gas cost filings) | United States Of America Federal Energy Regulatory Commission | EL00-95-045 EL00-98-042 | Declaration, Technical Conference Presentation | May 2003 | The California Parties |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**A.242**

## CASE LIST OF MICHAEL J. HARRIS, Ph.D.

President
Harris Economics Group
Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 28. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Gas price manipulation) | United States Of America Federal Energy Regulatory Commission | EL00-95-000 EL00-95-045 EL00-95-075 | Prepared Rebuttal Testimony | April 2003 | The California Parties |
| 29. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Gas price manipulation) | United States Of America Federal Energy Regulatory Commission | EL00-95-000 EL00-95-045 EL00-95-075 | Prepared Testimony | March 2003 | The California Parties |
| 30. California Electricity Oversight Board v. Sellers Of Energy and Capacity (Evaluation of long-term contracts) | United States Of America Federal Energy Regulatory Commission | EL02-62-003 | Prepared Rebuttal Testimony, Deposition Testimony | December 2002 | California Electricity Oversight Board |
| 31. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Gas price manipulation) | United States Of America Federal Energy Regulatory Commission | EL00-95-045 | Declaration | October 2002 | The California Parties |
| 32. Fun 4 All Corporation v. MGA Entertainment (Compensatory damages resulting from breach of contract) | United States Of America District Court Southern California: Arbitration | | Expert Report, Trial Testimony | June 2002 | Plaintiff |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**A.243**

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| | | | | |
|---|---|---|---|---|
| 33. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Marginal gas cost analysis) | United States Of America Federal Energy Regulatory Commission | EL00-95-053 EL00-95-045 | Declaration | June 2002 | The California Parties |
| 34. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Marginal gas cost analysis) | United States Of America Federal Energy Regulatory Commission | EL00-95-045 EL00-98-042 | Prepared Rebuttal Testimony, Trial Testimony | March 2002 | The California Parties |
| 35. In the Matter of a Application by ATCO Gas for the Transfer of the Carbon Storage Facility (Market power evaluation) | Alberta Energy and Utilities Board | 1237639 | Expert Report, Rebuttal Testimony, Response, Trial Testimony (2) | March 2002 | ATCO Gas |
| 36. Complaint of Enogex Inc. Concerning Competitive Bidding (Bidding evaluation) | Corporation Commission of the State of Oklahoma | PUD 20000339 | Responsive Testimony, Rebuttal Testimony, Trial Testimony | October 2001 | Oklahoma Natural Gas Company |
| 37. Weld Air Alaska, Inc., v. Airgas, Inc. (Antitrust) | United States District Court For The District Of Alaska | A01-195 Civ. (HRH) | Affidavit, Reply Affidavit | July 2001 | Plaintiff |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 38. Application To Require Oklahoma Natural Gas To Inform Commission Regarding Appropriate Methods To Lesson Price Volatility (Price stabilization strategies) | Corporation Commission of the State Of Oklahoma | PUD 200100097 | Direct Testimony, Trial Testimony | 2001 | Oklahoma Natural Gas Company |
| 39. Application To Review Oklahoma Natural Gas' Least Cost Procurement Practices (Prudency review) | Corporation Commission of the State of Oklahoma | PUD 200100057 | Responsive Testimony, Trial Testimony | May 2001 | Oklahoma Natural Gas Company |
| 40. Department of Conservation and Natural Resources v. Exxon Corporation (Punitive damages) | Circuit Court of Montgomery Alabama | CV-99-2368 | Deposition Testimony, Trial Testimony | March 2001 | State of Alabama |
| 41. For Waiver From Certain Provisions of OAC: 165:45-19 to Provide Downstream Unbundling | Corporation Commission of the State of Oklahoma | PUD 200100111 | Direct Testimony | March 2001 | Oklahoma Natural Gas Company |
| 42. Perry Minton and Dean Allen v. Amalgamated Acme Affiliates (Antitrust) | County Court at Law Travis County Texas | 99-12045-A | Deposition Testimony, Trial Testimony | February 2001 | Defendant |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

## CASE LIST OF MICHAEL J. HARRIS, Ph.D.
### President
### Harris Economics Group
### Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 43. Lloyd Tanner and Shaw Industries v. Miliken & Company (Trade Secrets) | United States of America District Court Central District of California | CV-00-02763 MMM (RCx) | Expert Report | 2001 | Plaintiff |
| 44. Application of Proposed Modification to Wisconsin Gas Co.'s Existing Gas Cost Recovery Mechanism (Incentive ratemaking) | Public Service Commission of Wisconsin | 6630-GR-101 | Direct Testimony | June 2000 | WEGO |
| 45. In The Matter of Wisconsin Gas Company's Proposed Gas Cost Incentive (Incentive ratemaking) | Public Service Commission of Wisconsin | 6650-GR-116 | Direct Testimony | April 2000 | Wisconsin Gas Company |
| 46. In The Matter of Northern Border Pipeline Company's Appropriate Return on Equity (Return on equity) | United States of America Federal Energy Regulatory Commission | RP99-322-000 RP96-45-000 | Direct Testimony, Answering Testimony | January 2000 | Pan Alberta Canada |
| 47. In The Matter of the Appropriate Return on Equity for the Transco and Disco Business Operations of Ontario Hydro Services Company (Return on equity) | Ontario Energy Board | EST99-03374 | Expert Report (co-authored), Trial Testimony | January 1999 | Ontario Energy Board |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**A.246**

# CASE LIST OF MICHAEL J. HARRIS, Ph.D.
## President
## Harris Economics Group
## Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 48. In The Matter of the Economic Evaluation of Natural Gas Capacity Contract with El Paso Natural Gas Company (Market power evaluation) | United States of America Federal Energy Regulatory Commission | RP97-287-010 | Affidavit | March 1998 | Amoco Energy Trading |
| 49. Application of the Wisconsin Electric Power Company For Authority to Increase Rates for Steam Services (Electric dispatch analysis) | Public Service Commission of Wisconsin | 6639-UR-110 | Direct Testimony, Trial Testimony | January 1998 | Wisconsin Gas Company |
| 50. Cablevision of Boston v. Boston Edison (Pricing of utility assets) | Massachusetts Department of Telecommunications & Energy | 97-82 | Direct Testimony, Trial Testimony | December 1997 | Boston Edison Company |
| 51. In The Matter of the Commission's Investigation of the Rates for Gas Service of PNM Gas Services (Incentive ratemaking) | New Mexico Public Service Utility Commission | 2762 | Direct Testimony | October 1997 | Public Service Company of New Mexico |
| 52. In The Matter of Gas Rates for Providence Gas Company (Demand forecasts) | Rhode Island Public Utility Commission | | Direct Testimony, Trial Testimony | 1997 | Providence Gas Company |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 53. E.M. Lovelace v. Amerada Hess Corporation (Class settlement) | Circuit Court of Escambia County Alabama | CV-96-297 | Affidavit | 1997 | E.M. Lovelace |
| 54. In The Matter of Wisconsin Gas Company's Proposed Gas Cost Incentive Mechanism (Incentive ratemaking) | Public Service Commission of Wisconsin | 6650-GR-113 | Rebuttal Testimony, Trial Testimony | June 1997 | Wisconsin Gas Company |
| 55. In The Matter of Competition Implementation Issues (Market evaluation standards) | Public Service Commission of Wisconsin | 05-GI-108 (Phase III) | Direct Testimony, Rebuttal Testimony, Trial Testimony | 1996 | Wisconsin Gas Company |
| 56. In The Matter of Gas Cost Recovery Mechanisms (Incentive ratemaking) | Public Service Commission of Wisconsin | 05-GI-106 | Direct Testimony, Rebuttal Testimony, Trial Testimony | 1996 | Wisconsin Gas Company |
| 57. In The Matter of Wisconsin Power and Lights Gas Sales Forecast (Demand forecasting) | Public Service Commission of Wisconsin | 6680-UR-110 | Rebuttal Testimony, Trial Testimony | November 1996 | Wisconsin Power and Light |
| 58. In The Matter of Northern Border's Appropriate Return on Equity (Return on equity) | United States of America Federal Energy Regulatory Commission | RP96-45-000 | Direct Testimony, Rebuttal Testimony | 1996 | Canadian Association of Petroleum Producers |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| | | | | |
|---|---|---|---|---|
| 59. In The Matter of DPUC Review of the Purchased Gas Adjustment Clause (Incentive ratemaking) | Connecticut Department of Public Utility Control | 96-01-28 | Direct Testimony, Trial Testimony | 1996 | Southern Connecticut Gas Company |
| 60. In The Matter of Providence Gas Company's Rates and Demand Forecast (Demand forecasting) | Rhode Island Public Utility Commission | | Direct Testimony, Trial Testimony | 1995 | Providence Gas Company |
| 61. In The Matter of the Application of Kansas Pipeline to Increase Rates (Return on equity; acquisition premium) | Corporation Commission of the State of Kansas | 190, 362-U | Direct Testimony, Trial Testimony | 1994 | Missouri Gas Energy |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

# Exhibit 2

## Works Cited

***External Sources***

Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. , Case No. 09-10235 (BLS) (United States Bankruptcy Court For The District of Delaware).

Amendments to Plaintiffs' Consolidated and Amended Complaint, 1:10-cv-05711 (U.S. District Court June 3, 2014).

Connelly, M. W., Cha, D., & McGovern, S. (2004). *The Holy Grail: Secular Headwinds, Structure, Behavior, Performance.* Credit Suisse.

Department of Justice. (2012, August 17). *Press Releases 2012.* Retrieved from U.S. Department of Justice: http://www.justice.gov/atr/public/press_releases/2012/286144.htm

Dixon Container Company. (2014). *Box Basics.* Retrieved March 1, 2014, from dixoncontainer.com: http://dixoncontainer.com/box%20basics.html

Fibre Box Association. (2014). *Executive Committee.* Retrieved from Fibre Box Association: http://www.fibrebox.org/ViewPage.aspx?ContentID=316

Franklin, D. (2012, May 10). *Containerboard Price Hike for the Fall Unlikely to Stick.* Retrieved from Blueshift Ideas: http://blueshiftideas.com/reports/051205ContainerboardPriceHikefortheFallUnlikelytoStick.pdf

Georgia-Pacific Corporation. (2005). *Form 10-K.* Atlanta.

Goldman Sachs. (2004, February). Packaging and Newsprint. *Confidential Memorandum.*

Harrington, J. (2011, June 29). *Lectures on Collusive Practices.* Athens: CRESSE. Retrieved from John Hopkins University: www.yumpu.com/en/s/9MDKhPb6lZY1NSxv

Hay, G. A. (2005). *Facilitating Practices.* Ithaca: Cornell Lagal Studies Research Paper No. 05-029.

In the Matter of Stone Container Corporation, a corporation, Docket No. C-3806 (United States of America, Before Federal Trade Commission May 8, 1998).

International Paper 10-K. (2005). *Annual Report.* Washington, D.C.: Securities and Exchange Commissions.

International Paper. (2014, June). *Containerboard & Saturating Kraft.* Retrieved from International Paper: http://www.internationalpaper.com/us/en/Products/Containerboard/index.html

Ivaldi, M., Jullien, B., Rey, P., Seabright, P., & Tirole, J. (2003, March 3). *European Commission > Competition.* Retrieved from European Commission: http://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.pdf

Knittel, C. R., & Stango, V. (2003). Price Ceilings as Focal Points for Tacit Collusion: Evidence from Credit Cards. *American Economic Review.*

Kovacic, W. E., Marshall, R. C., Marx, L. M., & Halbert L. White, J. (2011). Plus Factors and Agreement in Antitrust Law. *Michigan Law Review, Vol. 110, No. 3*, 421.

Levenstein, M. C., & Suslow, V. Y. (2011). Breaking Up Is Hard to Do: Determinants of Cartel Duration. *The Journal of Law and Economics*.

Merced, M. J., & Cane, J. (2011, September 6). Dealbook - International Paper Wins Temple-Inland. *The New York Times*. New York, YY.

Murray, M., Swindell, J., & Ewing, K. (2007, December 19). *American Bar Association Presentation - Antitrust for Trade Associations.* Retrieved from Americanbar.org: apps.americanbar.org/antitrust/at.../at.../AntitrustforTradeAssociations.ppt

Norampac. (2011). *History and Structure*. Retrieved from Norampac: http://www.norampac.com/en/profil-norampac/historique-et-structure

Oak Packaging and Supply. (2010). *Corrugated Basics.* Retrieved 03 01, 2014, from http://www.oakpackaging.com: http://www.oakpackaging.com/include/assets/Corrugated_Basics.pdf

Pacific Container Corp. (n.d.). *Pacific Container - Box Basics*. Retrieved March 1, 2014, from pccbox.com: http://pccbox.com/box-basics.html

Packaging Corporation of America - Annual Report. (2005, December 31). 2005. *Annual Report*.

Packaging Corporation of America 10-K. (2005). *Form 10-K 2005.*

Pindyck, R. S., & Rubinfeld, D. L. (1989). *Microeconomics.* New York: Macmillan Publishing Company.

Pinnington, T. (2009). *The Corrugated Industry – In Pursuit of Excellence.* (M. Brunton, Ed.) Andover: Brunton Technical Publications.

Plaintiffs' Complaint, Plaintiff v. Packaging Corporation of America, et. al 1:10-cv-05711 (United States District Court Northern District of Illinois December 2010).

Posner, R. A. (2001). *Antitrust Law, Second Edition.* Chicago: University of Chicago Press.

Scherer, F. M., & Ross, D. (1990). *Industrial Market Structure and Economic Performance.* Boston: Houghton Mifflin Company.

Sinoway, M. (2005). Pricing opportunities in the Forest Products Industry. *PIMA's Leadership Conference* (p. 2). Nashville: Deloitte.

Smurfit Stone Container Corp 10-K. (2005). *Annual Report.* Washington, D.C.: Securities and Exchange Commission.

Spector, C. M. (2011, January 24). Surfit Deal is Set. *The Wall Street Journal*.

Temple Inland 10-K. (2005). *Temple Inland Annual Report.* Washington, D.C.: Securities and Exchange Commission.

Tirole, J. (1995). *The Theory of Industrial Organization.* Cambridge: The MIT Press.

U.S. Department of Justice and the Federal Trade Commissions. (2010). *Horizontal Merger Guidelines.*

Viscusi, W. K., Vernon, J. M., & Joseph E. Harrington, J. (2000). *Economics of Regulation and Antitrust.* Cambridge: The MIT Press.

Waghorne, K. (2011). *US Corrugated Box and Container Board Outllok.* RISI.

Walker, C., McNutt, J., & Cenatempo, D. (2013). *Speaker Presentations.* Retrieved from University of Maine Pulp and Paper Foundation: http://www.mainepulpaper.org/openhouse/speakerpresentations/ColleenWalker.pdf

Werden, G. J. (2004). Economic Evidence on the Existence of Collusion: Reconciling Antitrust Law with Oligopoly Theory. *Antitrust Law Journal, Vol. 71 No. 3*, 745-756.

Weyerhaeuser Co. 10K. (2006). *Annual Report*. Washington, D.C.: Securities and Exchange Commission.

Wikipedia Commons. (n.d.). *Dot-com bubble*. Retrieved from Wikipedia: http://en.wikipedia.org/wiki/Dot-com_bubble

Yagalla, M. (2013, July 2013). *Who Knew Containerboard Was Such a Great Business*. Retrieved from The Motley Fool: http://beta.fool.com/aseanmark/2013/07/23/who-knew-containerboard-was-such-a-great-business/41149/

### DEFENDANT AND THIRD PARTY PRODUCTION SOURCES

| | |
|---|---|
| AFPA_ESI_01352 | GP-KLEEN00958242 |
| AFPA-P-GS-00643 | GP-KLEEN00961373 |
| AFPA-P-GS-00644 | GP-KLEEN01015352 |
| DEAN_000047 | GP-KLEEN01017026 |
| EVERCORE00014504 | GP-KLEEN01018364 |
| GP-KLEEN 01015352 | GP-KLEEN01074003 |
| GP-KLEEN 01074015 | GP-KLEEN01074015 |
| GP-KLEEN00025732 | GP-KLEEN01424599 |
| GP-KLEEN00033830 | GP-KLEEN01501856 |
| GP-KLEEN00055869 | IP009997 |
| GP-KLEEN00141726 | IP010952 |
| GP-KLEEN00141864 | IP012123 |
| GP-KLEEN00249209 | IP037012 |
| GP-KLEEN00257983 | IP037102 |
| GP-KLEEN00264372 | IP043351 |
| GP-KLEEN00279893 | IP066785 |
| GP-KLEEN00310659 | IP089004 |
| GP-KLEEN00329753 | IP089891 |
| GP-KLEEN00335687 | IP0954335 |
| GP-KLEEN00362591 | IP0954463 |
| GP-KLEEN00375366 | IP096084 |
| GP-KLEEN00375469 | IP096155 |
| GP-KLEEN00387869 | IP0995216 |
| GP-KLEEN00388772 | IP103745 |
| GP-KLEEN00395006 | IP105350 |
| GP-KLEEN00404231 | IP107059 |
| GP-KLEEN00478369 | IP107342 |

IP107724
IP111906
IP130449
IP130489
IP138224
IP161711
IP195892
IP213946
IP259270
IP259277
IP263040
IP268609
IP307902
IP473391
IP579512
IP651704
IP663709
IP812903
IP832857
PC0A000017862
PC0oA000197041
PcoA0000028453
PCoA000018015
PCoA000025127
PCoA000028453
PCoA000032218
PCoA000034921
PCoA000035024
PCoA000045086
PCoA000162246
PCoA000166161
PCoA000428673
PCoA000710668
SSCC  00354240
SSCC 00080167
SSCC 00101201
SSCC 00109900
SSCC 00178118
SSCC 00185811
SSCC 00204172
SSCC 00347406
SSCC 00353564
SSCC 00353565

SSCC 00362902
SSCC 00365429
SSCC 00365432
SSCC 00466043
SSCC 00476500
SSCC 00479424
SSCC 00514885
SSCC 00518759
SSCC 00518759
SSCC 00625355
SSCC 00625356
SSCC 00625963
SSCC 00625963
SSCC 00625963
SSCC 00770710
SSCC 0080167
SSCC 00834559
SSCC 00840592-601
SSCC 0095106
SSCC 0625696
Temple-Inland 00024456
Temple-Inland 00051692
Temple-Inland 00051757
Temple-Inland 00051770
Temple-Inland 00051775
Temple-Inland 00051798
Temple-Inland 00051818
Temple-Inland 00072964
Temple-Inland 00080408
Temple-Inland 00553966
WY0003211
WY0062605
WY0080309
WY0108926
WY0108926

| Company | Timing | Location | PMs | Liner | | Medium | | SUM |
| | | | | Kraft | Recycled | Semi-Chem | Recycled | |
|---|---|---|---|---|---|---|---|---|
| SSCC | 4Q98 | Alton, IL | 2 | | | | 246 | 246 |
| | | Circleville, OH | 1 | | | | 121 | 121 |
| | | Jacksonville, FL | 1 | 393 | | | | 393 |
| | | Port Wentworth, GA | 1 | 375 | | | | 375 |
| | 1Q00 | York, PA | 2 | | | | 130 | 130 |
| | 4Q02 | Missoula, MT #1 | 1 | 180 | | | | 180 |
| | 4Q03 | Seminole (Jacksonville, FL) [1] | 0 | | 360 | | (270) | 90 |
| | 1Q04 | Thunder Bay, ONT | 1 | | | | 160 | 160 |
| | 3Q05 | Bathurst, NB | 1 | | | | 243 | 243 |
| | | Fernandina Beach, FL #2 | 1 | 203 | | | | 203 |
| | | New Richmond, QUE | 1 | 235 | | | | 235 |
| | 2Q07 | Carthage, IN | 1 | | | | 52 | 52 |
| | | Vernon, CA (L.A.) | 1 | | | | 148 | 148 |
| | 4Q08 | Snowflake, AZ | 1 | | | | 135 | 135 |
| | 4Q09 | Ontonagon, MI | 2 | | | 280 | | 280 |
| | 1Q10 | Missoula, MT | 2 | 620 | | | | 620 |
| *SSCC Total* | | | *19* | *2,006* | *360* | *280* | *965* | *3,611* |
| Intl Paper / Union Camp | 4Q98 | Gardiner, OR | 1 | 321 | | | | 321 |
| | 2Q01 | Savanah, GA #2 | 1 | 175 | | | | 175 |
| | 1Q02 | Oswego, NY | 1 | | 100 | | | 100 |
| | 2Q04 | Roanoke Rapids, NC #4 | 1 | 300 | | | | 300 |
| | 3Q05 | FT Madison, IA | 1 | | | 100 | | 100 |
| | 4Q07 | Terre Haute, IN | 1 | | | 200 | | 200 |
| | 4Q09 | Albany, OR | 2 | 576 | | | | 576 |
| | | Pineville, LA | 1 | 390 | | | | 390 |
| | | Valliant, OK #3 | 1 | 206 | | 224 | | 430 |
| *Intl Paper / Union Camp Total* | | | *10* | *1,968* | *100* | *524* | | *2,592* |
| IP / Weyerhaeuser / Wilamette | 3Q01 | Springfield, OR (#1) | 1 | 243 | | | | 243 |
| | 2Q02 | Plymouth, NC | 1 | | | 215 | | 215 |
| | 3Q02 | Hawesville, KY | 1 | | | | 200 | 200 |
| | 4Q02 | Sturgeon Falls, ONT | 1 | | | | 100 | 100 |
| | 4Q03 | North Bend, OR | 1 | | | | 275 | 275 |
| | 1Q06 | Plymouth, NC (#1) | 1 | | 350 | | | 350 |
| *IP / Weyerhaeuser / Wilamette Total* | | | *6* | *243* | *350* | *215* | *575* | *1,383* |
| Temple-Inland / Gaylord | 2Q98 | Newark, CA | 1 | | | | 74 | 74 |
| | 2Q02 | Bogalusa, LA (#5 & 6) | 2 | 115 | | | | 115 |
| | 3Q02 | Antioch, CA | 1 | | 425 | | | 425 |
| *Temple-Inland / Gaylord Total* | | | *4* | *115* | *425* | | *74* | *614* |
| Stone / Four M Corp | 3Q98 | Port St Joe, FL (Stone Four M) | 2 | 519 | | | | 519 |
| Stone / Four M Corp Total | | | 2 | 519 | | | | 519 |
| *Norampac* | *3Q05* | *Red Rock, ONT (#1)* | *1* | *150* | | | | *150* |
| | 4Q06 | Red Rock, ONT (#2) | 1 | 300 | | | | 300 |
| *Norampac Total* | | | *2* | *450* | | | | *450* |
| Groveton Paperboard | 1Q06 | Groveton, NH | 1 | | | 150 | | 150 |
| *Groveton Paperboard Total* | | | *1* | | | *150* | | *150* |
| PCA | 1Q05 | Tomahawk, WI (#3) | 1 | | | 65 | | 65 |
| *PCA Total* | | | *1* | | | *65* | | *65* |
| Longview Fiber | 3Q01 | Longview, WA #1 | 1 | 135 | | | | 135 |
| | 4Q01 | Longview, WA #3 | 1 | | | | | - |
| | 1Q07 | Longview, WA #4 | 1 | | | 82 | | 82 |
| *Longview Fiber Total* | | | *3* | *135* | | *82* | | *217* |
| Menasha | 3Q05 | Ostego, MI | 2 | | | | 305 | 305 |
| *Menasha Total* | | | *2* | | | | *305* | *305* |
| Bay State Paper | 2Q04 | Boston, MA | 2 | | 51 | | 52 | 103 |
| *Bay State Paper Total* | | | *2* | | *51* | | *52* | *103* |
| West Fraser (Eurocan) | 1Q10 | Kitamat, BC | 1 | 370 | | | | 370 |
| *West Fraser (Eurocan) Total* | | | *1* | *370* | | | | *370* |
| Pomona Paper Co | 4Q02 | Pomona, CA | 1 | | | | 72 | 72 |
| *Pomona Paper Co Total* | | | *1* | | | | *72* | *72* |
| Banner Fibreboard | 3Q07 | Wellsburg, WV | 1 | | 20 | | | 20 |

Exhibit 3 - pg 1
A.254

Exhibit 3
Mill Closures

| Company | Timing | Location | PMs | Liner | | Medium | | SUM |
|---------|--------|----------|-----|-------|---------|-----------|---------|-----|
| | | | | Kraft | Recycled | Semi-Chem | Recycled | |
| *Banner Fibreboard Total* | | | *1* | | *20* | | | *20* |
| American Tissue | 2Q01 | Harriman, TN | 1 | | | | 80 | 80 |
| *American Tissue Total* | | | *1* | | | | *80* | *80* |
| Catalyst (formerly Norske) | 4Q08 | Elk Falls Mill, BC | 1 | 144 | | | | 144 |
| Catalyst (formerly Norske) Total | | | 1 | 144 | | | | 144 |
| | | | *57* | *5,951* | *1,306* | *1,316* | *2,123* | *10,695* |

Source: SSCC 00083396

Exhibit 3 - pg 2
**A.255**

EXHIBIT 4

# 15 Defendant Price Increase Announcements

| Announcement | Year | Implementation Year and Month | | | | | | | Target Increase ($ / ton) | Prior Month | Following Month | Net PPW Increase ($ / ton) | Net PPW Increase (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | GP | PCA | IP | WY | TI | NP | SSCC | | | | | |
| 1 | 2004 | MAR | MAR | FEB | MAR | MAR | FEB | FEB | 40-50 | JAN | APR | 45 | 13% |
| 2 | 2004 | JUN | JUN | JUN | JUN | JUN | JUN | JUN | 50 | MAY | JUL | 50 | 11% |
| 3 | 2005 | APR | APR | APR | APR | APR | APR | MAR | 50 | FEB | MAY | -15 | -3% |
| 4 | 2005 | OCT | OCT | OCT | OCT | OCT | OCT | OCT | 30-40 | SEP | NOV | 30 | 8% |
| 5 | 2006 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | DEC | FEB | 40 | 9% |
| 6 | 2006 | MAR | MAR | APR | APR | APR | APR | APR | 50 | FEB | MAY | 50 | 11% |
| 7 | 2007 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | DEC | FEB | 0 | 0% |
| 8 | 2007 | N/A | MAY | APR | N/A | MAY | N/A | N/A | 40 | MAR | JUN | 0 | 0% |
| 9 | 2007 | AUG | AUG | AUG | AUG | AUG | AUG | AUG | 40-50 | JUL | SEP | 40 | 8% |
| 10 | 2008 | MAR | MAR | MAR | MAR | MAR | MAR | MAR | 40-50 | FEB | APR | 0 | 0% |
| 11 | 2008 | JUL | JUL | JUL | JUL | JUL | JUL | JUL | 55 | JUN | AUG | 55 | 10% |
| 12 | 2008 | OCT | OCT | OCT | * | OCT | OCT | OCT | 60 | SEP | NOV | 0 | 0% |
| 13 | 2010 | JAN | JAN | JAN | * | JAN | JAN | JAN | 50 | DEC | FEB | 50 | 9% |
| 14 | 2010 | APR | APR | APR | * | APR | APR | APR | 60 | MAR | MAY | 60 | 10% |
| 15 | 2010 | AUG | AUG | AUG | | AUG | AUG | AUG | 60 | JUL | SEP | 0 | 0% |

*Acquired by IP

# Exhibit 2

## Works Cited

***External Sources***

Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. , Case No. 09-10235 (BLS) (United States Bankruptcy Court For The District of Delaware).

Amendments to Plaintiffs' Consolidated and Amended Complaint, 1:10-cv-05711 (U.S. District Court June 3, 2014).

Connelly, M. W., Cha, D., & McGovern, S. (2004). *The Holy Grail: Secular Headwinds, Structure, Behavior, Performance.* Credit Suisse.

Department of Justice. (2012, August 17). *Press Releases 2012.* Retrieved from U.S. Department of Justice: http://www.justice.gov/atr/public/press_releases/2012/286144.htm

Dixon Container Company. (2014). *Box Basics.* Retrieved March 1, 2014, from dixoncontainer.com:    http://dixoncontainer.com/box%20basics.html

Fibre Box Association. (2014). *Executive Committee.* Retrieved from Fibre Box Association:    http://www.fibrebox.org/ViewPage.aspx?ContentID=316

Franklin, D. (2012, May 10). *Containerboard Price Hike for the Fall Unlikely to Stick.* Retrieved from Blueshift Ideas: http://blueshiftideas.com/reports/051205ContainerboardPriceHikefortheFallUnlikelytoStick.pdf

Georgia-Pacific Corporation. (2005). *Form 10-K.* Atlanta.

Goldman Sachs. (2004, February). Packaging and Newsprint. *Confidential Memorandum.*

Harrington, J. (2011, June 29). *Lectures on Collusive Practices.* Athens: CRESSE. Retrieved from John Hopkins University: www.yumpu.com/en/s/9MDKhPb6lZY1NSxv

Hay, G. A. (2005). *Facilitating Practices.* Ithaca: Cornell Lagal Studies Research Paper No. 05-029.

In the Matter of Stone Container Corporation, a corporation, Docket No. C-3806 (United States of America, Before Federal Trade Commission May 8, 1998).

International Paper 10-K. (2005). *Annual Report.* Washington, D.C.: Securities and Exchange Commissions.

International Paper. (2014, June). *Containerboard & Saturating Kraft.* Retrieved from International Paper: http://www.internationalpaper.com/us/en/Products/Containerboard/index.html

Ivaldi, M., Jullien, B., Rey, P., Seabright, P., & Tirole, J. (2003, March 3). *European Commission > Competition.* Retrieved from European Commission: http://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.pdf

Knittel, C. R., & Stango, V. (2003). Price Ceilings as Focal Points for Tacit Collusion: Evidence from Credit Cards. *American Economic Review.*

Kovacic, W. E., Marshall, R. C., Marx, L. M., & Halbert L. White, J. (2011). Plus Factors and Agreement in Antitrust Law. *Michigan Law Review, Vol. 110, No. 3,* 421.

Levenstein, M. C., & Suslow, V. Y. (2011). Breaking Up Is Hard to Do: Determinants of Cartel Duration. *The Journal of Law and Economics*.

Merced, M. J., & Cane, J. (2011, September 6). Dealbook - International Paper Wins Temple-Inland. *The New York Times*. New York, YY.

Murray, M., Swindell, J., & Ewing, K. (2007, December 19). *American Bar Association Presentation - Antitrust for Trade Associations*. Retrieved from Americanbar.org: apps.americanbar.org/antitrust/at.../at.../AntitrustforTradeAssociations.ppt

Norampac. (2011). *History and Structure*. Retrieved from Norampac: http://www.norampac.com/en/profil-norampac/historique-et-structure

Oak Packaging and Supply. (2010). *Corrugated Basics*. Retrieved 03 01, 2014, from http://www.oakpackaging.com: http://www.oakpackaging.com/include/assets/Corrugated_Basics.pdf

Pacific Container Corp. (n.d.). *Pacific Container - Box Basics*. Retrieved March 1, 2014, from pccbox.com: http://pccbox.com/box-basics.html

Packaging Corporation of America - Annual Report. (2005, December 31). 2005. *Annual Report*.

Packaging Corporation of America 10-K. (2005). *Form 10-K 2005.*

Pindyck, R. S., & Rubinfeld, D. L. (1989). *Microeconomics.* New York: Macmillan Publishing Company.

Pinnington, T. (2009). *The Corrugated Industry – In Pursuit of Excellence.* (M. Brunton, Ed.) Andover: Brunton Technical Publications.

Plaintiffs' Complaint, Plaintiff v. Packaging Corporation of America, et. al 1:10-cv-05711 (United States District Court Northern District of Illinois December 2010).

Posner, R. A. (2001). *Antitrust Law, Second Edition.* Chicago: University of Chicago Press.

Scherer, F. M., & Ross, D. (1990). *Industrial Market Structure and Economic Performance.* Boston: Houghton Mifflin Company.

Sinoway, M. (2005). Pricing opportunities in the Forest Products Industry. *PIMA's Leadership Conference* (p. 2). Nashville: Deloitte.

Smurfit Stone Container Corp 10-K. (2005). *Annual Report.* Washington, D.C.: Securities and Exchange Commission.

Spector, C. M. (2011, January 24). Surfit Deal is Set. *The Wall Street Journal*.

Temple Inland 10-K. (2005). *Temple Inland Annual Report.* Washington, D.C.: Securities and Exchange Commission.

Tirole, J. (1995). *The Theory of Industrial Organization.* Cambridge: The MIT Press.

U.S. Department of Justice and the Federal Trade Commissions. (2010). *Horizontal Merger Guidelines.*

Viscusi, W. K., Vernon, J. M., & Joseph E. Harrington, J. (2000). *Economics of Regulation and Antitrust.* Cambridge: The MIT Press.

Waghorne, K. (2011). *US Corrugated Box and Container Board Outllok.* RISI.

Walker, C., McNutt, J., & Cenatempo, D. (2013). *Speaker Presentations.* Retrieved from University of Maine Pulp and Paper Foundation: http://www.mainepulpaper.org/openhouse/speakerpresentations/ColleenWalker.pdf

Werden, G. J. (2004). Economic Evidence on the Existence of Collusion: Reconciling Antitrust Law with Oligopoly Theory. *Antitrust Law Journal, Vol. 71 No. 3*, 745-756.

Weyerhaeuser Co. 10K. (2006). *Annual Report.* Washington, D.C.: Securities and Exchange Commission.

Wikipedia Commons. (n.d.). *Dot-com bubble.* Retrieved from Wikipedia: http://en.wikipedia.org/wiki/Dot-com_bubble

Yagalla, M. (2013, July 2013). *Who Knew Containerboard Was Such a Great Business.* Retrieved from The Motley Fool: http://beta.fool.com/aseanmark/2013/07/23/who-knew-containerboard-was-such-   a-great-business/41149/

### *DEFENDANT AND THIRD PARTY PRODUCTION SOURCES*

| | |
|---|---|
| AFPA_ESI_01352 | GP-KLEEN00958242 |
| AFPA-P-GS-00643 | GP-KLEEN00961373 |
| AFPA-P-GS-00644 | GP-KLEEN01015352 |
| DEAN_000047 | GP-KLEEN01017026 |
| EVERCORE00014504 | GP-KLEEN01018364 |
| GP-KLEEN 01015352 | GP-KLEEN01074003 |
| GP-KLEEN 01074015 | GP-KLEEN01074015 |
| GP-KLEEN00025732 | GP-KLEEN01424599 |
| GP-KLEEN00033830 | GP-KLEEN01501856 |
| GP-KLEEN00055869 | IP009997 |
| GP-KLEEN00141726 | IP010952 |
| GP-KLEEN00141864 | IP012123 |
| GP-KLEEN00249209 | IP037012 |
| GP-KLEEN00257983 | IP037102 |
| GP-KLEEN00264372 | IP043351 |
| GP-KLEEN00279893 | IP066785 |
| GP-KLEEN00310659 | IP089004 |
| GP-KLEEN00329753 | IP089891 |
| GP-KLEEN00335687 | IP0954335 |
| GP-KLEEN00362591 | IP0954463 |
| GP-KLEEN00375366 | IP096084 |
| GP-KLEEN00375469 | IP096155 |
| GP-KLEEN00387869 | IP0995216 |
| GP-KLEEN00388772 | IP103745 |
| GP-KLEEN00395006 | IP105350 |
| GP-KLEEN00404231 | IP107059 |
| GP-KLEEN00478369 | IP107342 |

IP107724
IP111906
IP130449
IP130489
IP138224
IP161711
IP195892
IP213946
IP259270
IP259277
IP263040
IP268609
IP307902
IP473391
IP579512
IP651704
IP663709
IP812903
IP832857
PC0A000017862
PC0oA000197041
PcoA0000028453
PCoA000018015
PCoA000025127
PCoA000028453
PCoA000032218
PCoA000034921
PCoA000035024
PCoA000045086
PCoA000162246
PCoA000166161
PCoA000428673
PCoA000710668
SSCC  00354240
SSCC 00080167
SSCC 00101201
SSCC 00109900
SSCC 00178118
SSCC 00185811
SSCC 00204172
SSCC 00347406
SSCC 00353564
SSCC 00353565

SSCC 00362902
SSCC 00365429
SSCC 00365432
SSCC 00466043
SSCC 00476500
SSCC 00479424
SSCC 00514885
SSCC 00518759
SSCC 00518759
SSCC 00625355
SSCC 00625356
SSCC 00625963
SSCC 00625963
SSCC 00625963
SSCC 00770710
SSCC 0080167
SSCC 00834559
SSCC 00840592-601
SSCC 0095106
SSCC 0625696
Temple-Inland 00024456
Temple-Inland 00051692
Temple-Inland 00051757
Temple-Inland 00051770
Temple-Inland 00051775
Temple-Inland 00051798
Temple-Inland 00051818
Temple-Inland 00072964
Temple-Inland 00080408
Temple-Inland 00553966
WY0003211
WY0062605
WY0080309
WY0108926
WY0108926

**Revised July 17, 2014 Documents**

*Outside Documents*

Daniel, R., & Hinton, C. (2008, March 17). Weyerhaeuser to sell business to IP for $6 billion. Retrieved from www.marketwatch.com:
http://www.marketwatch.com/story/international-paper-buying-weyerhaeuser-assets-for-6-billion

PR Newswire. (2012, February 13). International Paper Completes Acquisition of Temple-Inland. Retrieved from www.prnewswire.com:
http://www.prnewswire.com/news-releases/international-paper-completes-acquisition-of-temple-inland-139211549.html

U.S. Department of Justice, Antitrust Division, United States v. International Paper Company et al,; Proposed Final Judgment and Competitive Impact Statement, (DOJ Statement)

*Depositions*

Dunning, Steve. Deposition.
Keller, James. Deposition.
Kenyon, Rachel. Video Deposition, April 16, 2014.
McGurk, Brian. Deposition.
Ramm, Robert. Deposition (RPR).
Sims, John. Deposition.
Westphal, David. Deposition (RHE Hatco).

*DEFENDANT AND THIRD PARTY PRODUCTION SOURCES*

SSCC 00083396
AFPA_ESI_01358
SSCC00625839
GP-KLEEN01074008
IP579512
IP307902
IP582203
SSCC00111219
IP1034902
IP0954463
IP582203

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


KLEEN PRODUCTS LLC, et al.,    )

individually and on behalf    )

of all those similarly    )

situated,    )

     )

      Plaintiffs,    )

     )

    v.    ) Civil Case No:

     ) 1:1-cv-05711

PACKAGING CORPORATION OF    )

AMERICA, et al.,    )

     )

      Defendants.    )



(PURSUANT TO PROTECTIVE ORDER, THE FOLLOWING

TRANSCRIPT IS DESIGNATED HIGHLY CONFIDENTIAL.)


VIDEOTAPED DEPOSITION OF MARK J. DWYER, PH.D.


August 12, 2014


9:02 a.m.


555 South Flower Street

Suite 3500

Los Angeles, California



REPORTED BY:

Kristi Caruthers, CLR, CSR No. 10560

VIDEOTAPED DEPOSITION OF MARK J. DWYER, PH.D., held at Foley & Lardner, 555 South Flower Street, Suite 3500, Los Angeles, California, pursuant to agreement before Kristi Caruthers, a California Shorthand Reporter of the State of California.



A P P E A R A N C E S:

FOR THE PLAINTIFFS:
JOSH RISSMAN, ESQ.
DANIEL HEDLUND, ESQ.
Gustafson Gluek LLC
Canadian Pacific Plaza
120 South 6th Street
Suite 2600
Minneapolis, Minnesota 55402
612.333.8844
dhedlund@gustafsongluek.com
jrissman@gustafsongluek.com
(NOT PRESENT)
MICHAEL FREED, ESQ.
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road
Suite 130
Bannockburn, Illinois 60015
224.632.4500
mfreed@fklmlaw.com

ON BEHALF OF THE PLAINTIFFS AND THE DEPONENT:
JOSEPH GOLDBERG, ESQ.
VINCENT J. WARD, ESQ.
FREEDMAN BOYD HOLLANDER GOLDBERG URIAS & WARD, P.A.
20 First Plaza
Suite 700
Albuquerque, New Mexico 87102
505.842.9960
jg@fbdlaw.com
vjw@fbdlaw.com



A P P E A R A N C E S (Continued):

FOR THE PLAINTIFFS:
DANIEL J. MOGIN, ESQ.
THE MOGIN LAW FIRM, P.C.
707 Broadway
Suite 1000
San Diego, California 92101
619.687.6611
dmogin@moginlaw.com

FOR THE DEFENDANT PACKAGING CORPORATION OF AMERICA:

ANDY SCRAG, ESQ.
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, Illinois 60654
312.862.2000
andy.schrag@kirkland.com
(NOT PRESENT)

FOR THE DEFENDANT TEMPLE-INLAND, INC.:

SEAN McDONNELL, ESQ.
MAYER BROWN LLP
1999 K. Street, N.W.
Washington, DC 20006-1101
202.263.3000
smcdonnell@mayerbrown.com



A P P E A R A N C E S (Continued):

FOR THE DEFENDANT GEORGIA-PACIFIC:
RYAN A. SHORES, ESQ.
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
202.955.1619
rshores@hunton.com

-- AND --

JEFFREY A. OGAR, ESQ.
GEORGIA-PACIFIC
133 Peachtree Street, N.E.
Atlanta, Georgia 30348-5605
404.652.4598

FOR THE DEFENDANT CASCADES, INC. AND NORAMPAC HOLDINGS, US, INC.:
SCOTT M. MENDEL, ESQ.
K&L GATES, LLP
70 West Madison
Suite 3100
Chicago, Illinois 60602-4207
312.807.4252
scott.mendel@klgates.com

FOR THE DEFENDANT ROCKTENN CP, LLC:
JAMES F. HERBISON, ESQ.
WINSTON & STRAWN, LLP
35 W. Wacker Drive
Chicago, Illinois 60601
312.558.5909
jherbison@winston.com

| 1 | A P P E A R A N C E S (Continued): |
| 2 | |
| 3 | FOR THE DEFENDANT INTERNATIONAL PAPER: |
| 4 | JAMES T. McKEOWN, ESQ. |
| | FOLEY & LARDNER LLP |
| 5 | 777 East Wisconsin Avenue |
| | Milwaukee, Wisconsin 53202-5306 |
| 6 | 414.297.5530 |
| | jmckeown@foley.com |
| 7 | |
| 8 | |
| | ALSO PRESENT: |
| 9 | |
| | GUSTAVO BAMBERGER, COMPASS LEXECON |
| 10 | |
| | THOMAS A. STEMWEDEL, COMPASS LEXECON |
| 11 | |
| | KEITH FARRIS, VIDEOGRAPHER |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

[Page 6]

| 1 | INDEX TO EXAMINATION |
| 2 | WITNESS: MARK J. DWYER, PH.D. |
| 3 | EXAMINATION                    PAGE |
| 4 | By Mr. McKeown        16, 169 |
| 5 | (AFTERNOON SESSION)        169 |
| 6 | By Mr. Herbison            256 |
| 7 | By Mr. Shores              267 |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

[Page 7]

| 1 | INDEX TO EXHIBITS |
| 2 | MARK J. DWYER, PH.D. |
| 3 | Tuesday, August 12, 2014 |
| 4 | Kristi Caruthers, CLR, CSR 10560 |
| 5 | |
| 6 | MARKED:        DESCRIPTION:        PAGE: |
| 7 | Dwyer 1      Exhibit 1 to Dr. Dwyer's        13 |
| 8 | Report, List of Documents |
| 9 | Relied Upon |
| 10 | Dwyer 2      Exhibit 2 to Dr. Dwyer's        13 |
| 11 | Report, C.V. |
| 12 | Dwyer 3      Exhibit 3 to Dr. Dwyer's        13 |
| 13 | Report, 15 Defendant Price |
| 14 | Increase Announcements |
| 15 | Dwyer 4      Exhibit 4 to Dr. Dwyer's        13 |
| 16 | Report, PPW Transaction |
| 17 | Price Series Correlations |
| 18 | with Linerboard Index |
| 19 | ("PPW Index") |
| 20 | Dwyer 5      Exhibit 5 to Dr. Dwyer's        13 |
| 21 | Report, 5 Defendant Price |
| 22 | Increase Implementation |
| 23 | Events ("PIIEs") |
| 24 | |
| 25 | |

[Page 8]

| 1 | INDEX TO EXHIBITS |
| 2 | MARK J. DWYER, PH.D. |
| 3 | Tuesday, August 12, 2014 |
| 4 | Kristi Caruthers, CLR, CSR 10560 |
| 5 | |
| 6 | MARKED:        DESCRIPTION:        PAGE: |
| 7 | Dwyer 6      Exhibit 6 to Dr. Dwyer's        13 |
| 8 | Report, Comparison of Class |
| 9 | Member Net Product Prices |
| 10 | Before and After Defendant |
| 11 | Price Increase Implementations |
| 12 | Dwyer 7      Exhibit 7 to Dr. Dwyer's        13 |
| 13 | Report, Comparison of Class |
| 14 | Member Weighted Average |
| 15 | Offered Product Prices |
| 16 | Before and After Defendant |
| 17 | Price Increase |
| 18 | Implementations |
| 19 | Dwyer 8      Exhibit 8 to Dr. Dwyer's        13 |
| 20 | Report, Comparison of |
| 21 | Class Member Weighted |
| 22 | Average Monthly Net Prices |
| 23 | Before and After Defendant |
| 24 | Price Increase |
| 25 | Implementations |

[Page 9]

[3]  (Pages 6 to 9)

INDEX TO EXHIBITS

MARK J. DWYER, PH.D.

Tuesday, August 12, 2014

Kristi Caruthers, CLR, CSR 10560

MARKED:        DESCRIPTION:        PAGE:

Dwyer 9      Exhibit 9 to Dr. Dwyer's        13
             Report, Defendant Annual
             Payment Shares (APS) to
             Class Members By Defendant
             and Product Type

Dwyer 10     Exhibit 10 to Dr. Dwyer's       13
             Report, Regressions of
             Aggregate Prices on PPW
             Index

Dwyer 11     Exhibit 11 to Dr. Dwyer's       13
             Report, Preliminary Damage
             Regression Model Results,
             Alternative Model Selection
             Methods

Dwyer 12     Exhibit 12 to Dr. Dwyer's       13
             Report, Preliminary Class
             Damages Estimates

[Page 10]

---

INDEX TO EXHIBITS

MARK J. DWYER, PH.D.

Tuesday, August 12, 2014

Kristi Caruthers, CLR, CSR 10560

MARKED:        DESCRIPTION:        PAGE:

Dwyer 18     Document titled "PIIE        269
             Windows"

INFORMATION REQUESTED:
        (NONE)

QUESTIONS UNANSWERED BY DEPONENT:
        (NONE)

[Page 12]

---

INDEX TO EXHIBITS

MARK J. DWYER, PH.D.

Tuesday, August 12, 2014

Kristi Caruthers, CLR, CSR 10560

MARKED:        DESCRIPTION:        PAGE:

Dwyer 13     Report of Mark Joseph        21
             Dwyer, Ph.D. In Support
             of Plaintiffs' Motion
             for Class Verification,
             June 11, 2014

Dwyer 14     Article titled "Business     24
             Cycle Analysis Without
             Much Theory, A Look At
             Structural VARs"

Dwyer 15     Article Dr. Dwyer            25
             helped author titled "Econ
             Inside Economic Theories
             in Practice/Spring 2004

Dwyer 16     Amended List of Documents    27
             Relied Upon

Dwyer 17     Expert Report of Mark        261
             Dwyer, Ph.D.

[Page 11]

---

LOS ANGELES, CALIFORNIA

TUESDAY, AUGUST 12, 2014

9:02 A.M.

---o0o---

(Whereupon, Dwyer Exhibits 1 - 12
were marked for identification by
the deposition reporter and are
attached hereto.)

THE VIDEOGRAPHER:  Good morning.
This begins the videotaped deposition of Mr. Mark
Dwyer taken by the defendant in the matter of
"Kleen Products versus Packaging Corporation of
America, et al."

This case is in the United States
District Court, Northern District of Illinois,
Eastern Division, Case Number 1:10-cv-05711.

This deposition is being held at
the law firm Foley & Lardner on August 12th, 2014.

My name is Keith Farris from U.S.
Legal Support and I am the video specialist.  The
court reporter today is Miss Kristi Caruthers also
from U.S. Legal Support.  We are going on the
record at 9:03 a.m.

[Page 13]

**[4]  (Pages 10 to 13)**

1    Would all counsel introduce
2 yourselves and state whom you represent.
3    MR. GOLDBERG:  Hi, I'm Joe Goldberg
4 from Freedman Boyd Hollander in Albuquerque,
5 New Mexico.  I'm representing class plaintiffs and
6 I will represent Dr. Dwyer in the deposition.
7    MR. WARD:  Good morning.  Vincent
8 Ward, Freedman Boyd on behalf of plaintiffs.
9    MR. FREED:  Michael Freed from
10 Freed Kanner London & Millen in the Chicago area
11 also representing class plaintiffs.
12    MR. MOGIN:  Dan Mogin on behalf of
13 class plaintiffs.
14    MR. MENDEL:  John Mendel, K & L
15 Gates Chicago, representing Defendants Cascades
16 and Norampac.
17    MR. BAMBERGER:  Gustavo Bamberger
18 of Compass Lexecon.
19    MR. SHORES:  Ryan Shores, Hunton &
20 Williams LLP, representing Georgia-Pacific.
21    MR. OGAR; Jeff Ogar from
22 Georgia-Pacific.
23    MR. HERBISON:  Jim Herbison from
24 Winston & Strawn on behalf of RockTenn CP, LLC.
25    MR. McDONNELL:  Sean McDonnell from

[Page 14]

1 Mayer Brown LLP on behalf of Temple-Inland.
2    MR. STEMWEDEL:  Tom Stemwedel of
3 Compass Lexecon.
4    MR. McKEOWN:  Jim McKeown of
5 Foley & Lardner on behalf of International Paper.
6    THE VIDEOGRAPHER:  Thank you.  Will
7 the court reporter now swear in the witness.
8
9    MARK J. DWYER, PH.D.,
10    called as a deponent and sworn in by
11    the deposition reporter, was examined
12    and testified as follows:
13
14    DEPOSITION REPORTER:  Right hand,
15 please.
16    Do you solemnly swear that the
17 testimony you are about to give in this matter
18 shall be the truth, the whole truth, and nothing
19 but the truth, so help you God?
20    THE DEPONENT:  I do.
21 ///
22 ///
23 ///
24
25

[Page 15]

1    EXAMINATION
2 BY MR. McKEOWN:
3    Q.  Good morning, Dr. Dwyer.
4    A.  Good morning, Mr. McKeown.
5    Q.  Have you ever had your deposition
6 taken before?
7    A.  Yes, I have.
8    Q.  About how many occasions?
9    A.  I think five occasions.
10    Q.  So you're probably familiar with
11 how this works, but let me just go over a couple
12 of basics, if we could.
13    We're going to be here for a while
14 today, but if at any time you want to take a
15 break, just let me know.  We'll take a break.
16 Your counsel may tell me as well.
17    It's going to be important that we
18 try not to talk over each other.  I'll try to let
19 you finish your answer if you would wait for me to
20 finish my question before you answer.  Okay?
21    A.  Sure.
22    Q.  Similarly, the court reporter can't
23 take down "huh-uh" or "uh-huhs," so we ask that
24 you answer verbally.  Agreed?
25    A.  Agreed.

[Page 16]

1    Q.  If at any time you don't understand
2 one of my questions, if you could please let me
3 know.  If you answer the question, I have to
4 assume that you understood it.  Okay?
5    A.  Okay.
6    Q.  Can you tell me when you first
7 started working on the Kleen Products litigation?
8    A.  I don't have a clear sense of the
9 month that occurred in.  It was a few years ago.
10    Q.  Can you tell me approximately what
11 year?
12    A.  I think it may have been the end of
13 2010, beginning of 2011.
14    Q.  Were you retained separately from
15 Dr. Harris?
16    A.  No, I was not.
17    Q.  Did you have the same support team
18 as Dr. Harris?
19    A.  My support team consists of
20 individuals at Harris Economics Group.
21    Q.  Well, let me -- perhaps my question
22 wasn't clear.
23    Did you rely upon the same
24 individuals at Harris Economics Group as Dr. Harris
25 for this matter?

[Page 17]

1     A.  I'm not sure.  I don't think so.
2  I'm not sure who he was with this offering him
3  support.
4     Q.  I think we're talking about the
5  same Dr. Harris.  I'm talking about the Michael
6  Harris who's an expert in this case.
7        Is that the same person you're
8  speaking of?
9     A.  Yes.
10     Q.  At Harris Economics?
11     A.  Yes.
12     Q.  Are you an owner of Harris
13  Economics, or own a share of it?
14     A.  No.
15     Q.  Can you tell me how many hours you
16  have devoted to this matter?
17     A.  No.  I don't know.
18     Q.  Can you give me any estimate at
19  all?
20     A.  It's been a full-time engagement
21  for, I would guesstimate, about a year and less
22  than that prior to that period.
23     Q.  When you say "full-time engagement,"
24  40 hours a week?
25     A.  That would be my rough estimate.

[Page 18]

1     Q.  And do you have a team that has
2  also been spending full time on this matter?
3        MR. GOLDBERG:  Object to the form
4  of the question.
5        THE DEPONENT:  Could you rephrase
6  the question?
7  BY MR. McKEOWN:
8     Q.  Certainly.
9        In addition to yourself, are there
10  other members of Harris Economics that have been
11  assisting you with this matter?
12     A.  Yes, there are.
13     Q.  Can you tell me how much time,
14  approximately, they have been spending supporting
15  you in this matter?
16     A.  Approximately, I -- I don't have a
17  number.  There have been -- I can't say.  Perhaps,
18  half to three-quarters of their time has been
19  spent in support of this case.
20     Q.  For how long?
21     A.  One individual was hired by Harris
22  Economics Group in October, so her work would have
23  started at that point, another individual I think
24  about the same time, October 2013, a third
25  individual has been working on the case longer,

[Page 19]

1  potentially back to 2011, I believe.
2     Q.  What is your hourly rate?
3     A.  My hourly rate through Harris
4  Economics Group or the rate that Harris Economics
5  Group billed?
6     Q.  There's a distinction?  What's your
7  hourly rate to Harris Economics Group?
8     A.  My hourly rate is 216.
9     Q.  What is the hourly rate that Harris
10  Economics Group charges you out?
11     A.  I believe it's 360.
12     Q.  Are you an employee of Harris
13  Economics Group?
14     A.  No, I'm not.
15     Q.  Do you have a retention agreement
16  with Harris Economics Group?
17        MR. GOLDBERG:  Object to the form.
18        THE DEPONENT:  I have a verbal
19  agreement, not a written agreement.
20  BY MR. McKEOWN:
21     Q.  Okay.  Dr. Harris (sic), I want to
22  hand you a group of documents that we've had the
23  court reporter mark, Exhibits 1 through 12.  If
24  you could just look through those, and my question
25  is:  Are these exhibits, 1 through 12, the

[Page 20]

1  exhibits to your report in this matter?
2        And you'll note that each exhibit
3  in the lower right-hand corner matches the exhibit
4  to the report.
5        (Documents reviewed by deponent.)
6        THE DEPONENT:  Yes, they appear to
7  be.
8        (Whereupon, Dwyer Exhibit 13 was
9        marked for identification by the
10        deposition reporter and is attached
11        hereto.)
12  BY MR. McKEOWN:
13     Q.  Let me hand you what's been marked
14  as Exhibit 13 to the deposition today.
15        Can you identify that as a copy of
16  your report in this matter?
17        MR. GOLDBERG:  While Dr. Harris is
18  doing that, I'll offer the same stipulation I
19  offered in Dr. Harris's deposition and I routinely
20  offer, which is that there are copying mistakes
21  that sometimes occurs but not all that often; that
22  we agree those copying mistakes can be corrected,
23  inserted into the record without having to reopen
24  the deposition.  That's all right with us if it's
25  all right with the defendants.

[Page 21]

[6]  (Pages 18 to 21)

HIGHLY CONFIDENTIAL

1        MR. McKEOWN:  It's fine with me.
2        MR. GOLDBERG:  Okay.
3        MR. McKEOWN:  I didn't personally
4    copy them, so I have a much higher confidence that
5    they'll be okay.
6        (Documents reviewed by deponent.)
7        THE DEPONENT:  Yes, that's a page
8    in my report.
9    BY MR. McKEOWN:
10       Q.  Can you tell me how much in total
11   you have billed Harris Economics for your time in
12   this matter?
13       A.  No, I cannot.
14       Q.  Do you have any approximation?
15       A.  Not as I sit here now.
16       Q.  If you could turn to Exhibit 2 in
17   the stack of exhibits I gave you a moment ago.
18       A.  All right.
19       Q.  Is this a true and accurate copy of
20   your CV?
21       A.  This is a copy of my CV, but I
22   believe it omits one most recent joint declaration
23   with Dr. Harris, unintentionally of course, the
24   prior version of my CV.
25       Q.  What was that declaration?  What

**[Page 22]**

1    McKeown might be the only person who has read that
2    for a decade.
3        MR. McKEOWN:  Could you please mark
4    that.
5        MR. GOLDBERG:  This is 14?
6        MR. McKEOWN:  It should be 14.
7    BY MR. McKEOWN:
8        (Whereupon, Dwyer Exhibit 14 was
9        marked for identification by the
10       deposition reporter and is attached
11       hereto.)
12   BY MR. McKEOWN:
13       Q.  Dr. Dwyer, I've handed you what's
14   been marked as Exhibit 14.
15       Is this the article you referenced?
16       A.  Yes, it is.
17       Q.  And you wrote this with Dr. Cooley;
18   is that correct?
19       A.  That's correct.
20       Q.  And believed it accurate at the
21   time?
22       A.  Yes.
23       Q.  Anything that has happened since
24   then that causes you to disavow the positions you
25   took in the article?

**[Page 24]**

1    matter?
2        A.  That's Buccaneer.  I had two Cs and
3    two Bs versus Gunnison Energy, SG Interests I v.
4    SG interests IV, I believe is the caption, and
5    that's in Colorado.  It's a natural gas case, and
6    that was in September of last year, 2013.
7        Q.  Can you tell me if that's in state
8    or federal court?
9        A.  I'm not sure.
10       Q.  Were you offered a tenure when you
11   taught at UCLA?
12       A.  I did not come up for tenure at
13   UCLA.
14       Q.  Your CV does not list any
15   publications.
16       Have you had any publications?
17       A.  I have one publication from
18   approximately 1996 in the Journal of Economic
19   Dynamics and Control.
20       MR. McKEOWN:  I'm --
21       MR. GOLDBERG:  Is that it?
22       MR. McKEOWN:  I'm guessing it might
23   be.
24       MR. GOLDBERG:  Depositions are just
25   wonderful things.  They really are.  You --

**[Page 23]**

1        A.  It's been quite some time since
2    I've reviewed this work so I don't recall what my
3    positions were.
4        Q.  That's fair.
5        Mark this one, please.
6        (Whereupon, Dwyer Number 15 was
7        marked for identification by the
8        deposition reporter and is attached
9        hereto.)
10   BY MR McKEOWN:
11       Q.  Dr. Dwyer, you've been handed
12   what's been marked Exhibit 15.  Is this a piece
13   that you helped author?
14       A.  Yes, it is.
15       Q.  And was this sent out by Econ One,
16   your prior former employer?
17       A.  I believe it was.
18       Q.  And did you believe the accuracy of
19   this article at the time you wrote it?
20       A.  Yes, I did.
21       Q.  There are -- on the second page
22   there are three end notes.
23       A.  Yes.
24       Q.  Do you consider each of those three
25   sources to be authoritative in the field of

**[Page 25]**

**[7]  (Pages 22 to 25)**

1    economics?
2        A.  I view them to be -- the first two
3    in particular to be standard yet somewhat dated
4    references that are commonly used in economics and
5    econometrics, and the third is a reasonably
6    well-cited journal article.
7        Q.  Let's take a look at Exhibit 13,
8    which is your report.  You can set those articles
9    to the side.
10           Did you write this report?
11       A.  Yes, I did.
12       Q.  Did you have occasion after writing
13   your report to amend the list of items you relied
14   upon?
15       A.  I'm sorry.  The question?
16       Q.  Sure.  If you look at Exhibit 1,
17   it's a list of documents relied upon.
18       A.  Yes.
19       Q.  Did you have occasion after writing
20   the report to amend that list?
21       A.  What -- I'm sorry.  What does
22   "occasion" mean?
23       Q.  Did you amend the list?  I'm going
24   to show it to you in just a second.
25       A.  Okay.  I assume I did.

[Page 26]

1           MR. GOLDBERG:  This will be now
2    Exhibit 16, even though it says Exhibit 1 up here.
3           (Whereupon, Dwyer Exhibit Number 16
4           was marked for identification by the
5           deposition reporter and is attached
6           hereto.)
7    BY MR. McKEOWN:
8        Q.  Dr. Dwyer, you've been handed
9    Exhibit 16, which has the heading Amended List of
10   Documents Relied Upon.
11          Do you see that?
12       A.  Yes, I do.
13       Q.  Did you or someone under your
14   direction prepare this amended list?
15       A.  Yes.
16       Q.  Do you know why?
17       A.  Sitting here I don't recall what
18   the contract was.
19       Q.  Assuming that we include the
20   amended list of documents in addition to the
21   original Exhibit 1, does Exhibit 1 to your
22   deposition and Exhibit 16 to your deposition
23   include a listing of everything you've relied upon
24   for your work in this matter?
25       A.  Yes, it does.

[Page 27]

1        Q.  Now, with respect to your report,
2    which was marked Exhibit 13, does this report
3    reflect your best efforts to address the issues
4    that you were asked to address in this case?
5        A.  Yes, it does.
6        Q.  As you sit here today, do you have
7    any corrections to the report?
8        A.  Aside from the -- the error in the
9    CV, I believe I detected a missing period when I
10   was reading it.
11       Q.  Other than the missing period?
12       A.  Nothing else.
13       Q.  Is your report complete with
14   respect to your work?
15       A.  Yes.
16       Q.  And you recognize that you signed
17   the report under penalty of perjury that
18   everything was true and correct; correct?
19       A.  Yes.
20       Q.  Okay.  Now, I'd like to direct your
21   attention to Page 2 of the report at Paragraph 1,
22   and in particular you indicate that you've been
23   asked to look at two issues, and the second
24   sentence says:
25           "The first is to

[Page 28]

1           determine whether reliable
2           empirical methods, common to
3           the class, exist to assess
4           class-wide impact due to the
5           unlawful collusion alleged to
6           have been entered into by the
7           defendants."
8        Do you see that?
9        A.  Yes, I do.
10       Q.  Now, you use the term there
11   "classwide impact."
12          What do you mean by class-wide
13   impact?
14       A.  By class-wide, I mean impact -- by
15   class-wide impact, I mean evidence, empirical
16   evidence in this context that Defendants' actions
17   raise prices for a great proportion of the vast
18   majority of class members.
19       Q.  Do you use the term class-wide
20   impact to mean the same thing as common impact?
21       A.  In this context I do.
22       Q.  And is it correct that the impact
23   that you are looking at here or that you are
24   attempting to analyze here is impact caused by
25   some antitrust wrong?

[Page 29]

[8]  (Pages 26 to 29)

1    A.   That's the allegation I'm taking as
2  given, yes.
3    Q.   That you understand the impact
4  needs to be caused by the antitrust wrongdoing as
5  opposed to some change in price that comes from
6  something else; correct?
7    A.   That's correct.
8    Q.   Now, I think you said a great
9  proportion for the vast majority of class members.
10    What do you mean by great
11  proportion of the vast majority of class members?
12    Do you have a standard?
13    A.   I don't have a empirical threshold.
14    Q.   Well, let's say you had a thousand
15  customers and one customer represented 90 percent
16  of the total sales to all the customers, would
17  impact just to that one customer be common impact
18  in your view?
19    A.   No, it would not.
20    Q.   What if it was 10 percent of the
21  customers made up 50 percent of the sales, would
22  that in your view be a common impact?
23    A.   I don't have a numerical threshold.
24  The evidence on common impact that I've related
25  and reported here had multiple measures in it and

[Page 30]

1    A.   That if I'm conducting a test or a
2  measure to see whether customers are impacted and
3  some percentage of the class, potential class
4  members do not have sufficient data for me to make
5  a comparison, then I would focus on those so for
6  whom I can make that comparison and draw
7  inferences on.
8    Q.   Going back to your report, Exhibit
9  13, still in Paragraph 1 there on Page 2, about
10  four lines down, it says:
11    "Second, I have been
12  asked to determine whether
13  reliable empirical methods,
14  common to the class, exist to
15  measure aggregate damages to
16  the class should the trier
17  of fact determine that
18  unlawful collusion took place."
19    Do you see that?
20    A.   Yes, I do.
21    Q.   Now, the model that is referenced
22  here, is that the regression model that you do in
23  Part 3 of your report?
24    A.   The reliable and empirical methods
25  are the methods I use in the damages section of

[Page 32]

1  it's taken some of those measures together to form
2  the basis of my opinion.
3    Q.   And we're going to get to your
4  opinion and we're going to talk about those
5  measures.  I'm just trying to understand right now
6  how you evaluate the issue of common impact.
7    And so, for example, if you had 10
8  percent of the customers and you determined that
9  they were affected, and they accounted for 50
10  percent of the total sales in the industry, I'm
11  trying to understand if you would consider that
12  common impact.
13    A.   I could consider that evidence a
14  common impact.
15    Q.   Even though it's only 10 percent of
16  the members of the class?
17    A.   If the methods I was using to
18  assess common impact were only applicable to
19  those, to that percentage, then I would take that
20  as evidence of common impact.
21    Q.   Even though you didn't have such
22  evidence for the other 90 percent?
23    A.   If it's a data limitation, yes.
24    Q.   What do you mean by data
25  limitation?

[Page 31]

1  the report.
2    Q.   Do you consider the damages section
3  more than the regression model?
4    A.   It has several regression models.
5    Q.   My mistake.  There are multiple
6  regression models within the damages report.
7    Is that what you're saying?
8    MR. GOLDBERG:  There are multiple,
9  multiple regression models.
10    MR. McKEOWN:  See, if I had said
11  that you would have objected to form.
12    MR. GOLDBERG:  I would not have.
13  BY MR. McKEOWN:
14    Q.   The models that you have put
15  together for this case, they are not designed to
16  identify the damages of an individual plaintiff;
17  is that correct?
18    A.   They're focused on aggregate
19  damages.
20    Q.   Now, if your regression models
21  showed positive damages to any particular
22  plaintiff or group of plaintiffs, would you
23  consider that indicative of the damages to that
24  group?
25    A.   I'm sorry.  Could I have the

[Page 33]

[9]  (Pages 30 to 33)

1  hypothetical again?
2      Q.  Sure.  Assume that we took some
3  group of plaintiffs and put their data -- their
4  pricing into your model and it showed a positive
5  indication that there was an overcharge, would you
6  consider that damage of those individuals --
7      MR. GOLDBERG:  Object to the form
8  of the question.
9  BY MR. McKEOWN:
10     Q.  -- in this case?
11     A.  No, not necessarily.
12     Q.  Why not?
13     A.  There are lots of empirical issues
14  with sample.
15         And, for instance, one could pick a
16  very small sample of customers or one that's not
17  sufficient to identify supply and demand factors
18  adequately, and so in that context that limited
19  view of the data would not allow me to make
20  estimates of -- reliable estimates of overcharges.
21     Q.  And similarly, then, if you had a
22  negative value for overcharge, if you ran it for
23  some group of plaintiffs, would you consider that
24  also not indicative of whether there was damages?
25     MR. GOLDBERG:  Same objection;

[Page 34]

1  if one, in general, in economics needs an answer
2  to an empirical question as to what is our best
3  estimate of damages or what is our best estimate
4  of any model parameter, one uses reliable,
5  verifiable methods to make that estimate, that
6  estimate may or may not pass a given level of
7  statistical significance, whatever that level may
8  be.  That's still a best estimate of that effect.
9  BY MR. McKEOWN:
10     Q.  Is that true of both, when you're
11  looking at damages from an aggregate class basis
12  and if one were to look at on an individual basis?
13     MR. GOLDBERG:  Object to the form.
14     THE DEPONENT:  If, hypothetically
15  speaking, one wants to use as much data as
16  possible that seems relevant to a question at
17  hand, and so if I were to compare results on a
18  subsample to -- that ignore a paramount of data, I
19  would not put those at the same level of
20  reliability as one which uses all the data
21  available.
22  BY MR. McKEOWN:
23     Q.  I don't think I understood your
24  answer.  Let me try to take that apart.
25         Let's assume you ran your

[Page 36]

1  object to the form.
2      THE DEPONENT:  I think there are a
3  lot of aspects to this hypothetical that are not
4  specified, and I'm not sure -- I'd have to take
5  some time to evaluate them, but I believe that the
6  answer is similar; that in either direction under
7  the scope, that that would be something that I
8  would not rely on.
9  BY MR. McKEOWN:
10     Q.  If your regression model did not
11  have -- or models, excuse me, did not have a
12  statistically significant coefficient for the
13  conspiracy dummy variable, would you consider that
14  insufficient to show damages?
15     A.  I would not consider that
16  insufficient to measure damages.
17     Q.  So that even if you ran your
18  regression and obtained a coefficient on the dummy
19  variable for conspiracy and that coefficient was
20  not statistically significantly different than
21  zero, you still think you could use that
22  coefficient to estimate damages?
23     MR. GOLDBERG:  Object to the form
24  of the question.
25     THE DEPONENT:  As a hypothetical,

[Page 35]

1  regressions across the entire dataset that you
2  used, and you received a coefficient on the
3  conspiracy dummy variable that was not
4  statistically significant but was positive.  In
5  your view, as an economist, could you say to
6  reasonable degree of certainty in the field of
7  economics that you can estimate damages with that
8  regression result?
9      MR. GOLDBERG:  Object to form.
10     THE DEPONENT:  As an economist I
11  would say that's my best estimate and I would
12  convey what uncertainty there is with that
13  estimate.
14     MR. McKEOWN:  Could you read the
15  question back?
16     (The record was read as follows:
17     Q.  Let's assume you ran your
18         regressions across the entire
19         dataset that you used, and you
20         received a coefficient on the
21         conspiracy dummy variable that
22         was not statistically significant
23         but was positive.  In your view,
24         as an economist, could you say
25         to reasonable degree of certainty

[Page 37]

[10]  (Pages 34 to 37)

1    in the field of economics that
2    you can estimate damages with
3    that regression result?)
4  BY MR. McKEOWN:
5        Q.  Dr. Dwyer, is that question that I
6  asked capable of being answered yes or no?
7        A.  Yes.
8        Q.  Okay.  And what is the answer to my
9  question?
10       A.  I think it's yes.
11       Q.  Would you like to hear it again?
12       A.  Yes, please.
13           MR. McKEOWN:  Read it again,
14  please.
15       (The record was read as follows:
16           Q.  Let's assume you ran your
17       regressions across the entire
18       dataset that you used, and you
19       received a coefficient on the
20       conspiracy dummy variable that
21       was not statistically significant
22       but was positive.  In your view
23       as an economist, could you say
24       to reasonable degree of certainty
25       in the field of economics that

[Page 38]

1    you can estimate damages with
2    that regression result?)
3           THE DEPONENT:  Yes.
4  BY MR. McKEOWN:
5        Q.  And you would estimate based on
6  that that there were damages; is that correct?
7        A.  If it were positive, yes.
8        Q.  If the same hypothetical but the
9  coefficient is negative, would it be your opinion
10 to a reasonable degree of certainty that there are
11 no damages?
12       A.  Yes, it would.
13       Q.  Now, with respect to your various
14 regression models that you have in your damage
15 section -- let me back up.
16           As I understand your report -- I'm
17 going to describe it generally but then I'm going
18 to ask you a question.  It's your testimony I'm
19 interested in.
20           As I understand your report, after
21 the introductory section you have a section on
22 class-wide impact, and then you have a section on
23 class-wide damages, Part 3 being the damages
24 section; correct?
25       A.  That's correct.

[Page 39]

1        Q.  The Part 3 of your report, the part
2  that starts on Page 19, estimated damages on a
3  class-wide basis, is it correct that this work
4  that we find described in Part 3 is not intended
5  to give an opinion that there is common impact in
6  this case?
7        A.  The primary focus of this work is
8  on damages as opposed to common impact, though I
9  think it is corroborative of the issue of common
10 impact.
11       Q.  In what way do you think it is
12 corroborative of common impact?
13       A.  I think there may be multiple ways,
14 but at least in one regard be the reported
15 statistical significance of the conspiracy
16 effects.
17       Q.  The statistical significance on the
18 dummy variable?
19       A.  That's right.
20       Q.  Anything else that you can think
21 of?
22       A.  I think Exhibit 10 bears on that as
23 well in that it takes a constructive approach and
24 verifies that the Pulp & Paper Weekly Linerboard
25 Index that I've used is representative of

[Page 40]

1  aggregate prices in the industry.
2        Q.  Was there any data that you asked
3  for -- and I want to go back to your entire work,
4  not just the damages work now.
5           Was there any data that you asked
6  for that you could not receive?
7           MR. GOLDBERG:  Could not?
8           MR. McKEOWN:  Did not.
9           MR. GOLDBERG:  Thank you.
10          That's a dangerous question to ask
11 any statistician.
12          THE DEPONENT:  Yes, there are.  At
13 least in one regard, I requested more data
14 regarding the physical characteristics of
15 products, particularly of corrugated products that
16 I was able to receive.
17 BY MR. McKEOWN:
18       Q.  Anything else?
19       A.  Some of the transactions data is
20 incomplete or short, particularly for earlier
21 years, not extending back as far as had been
22 requested.
23       Q.  To the best of your knowledge, were
24 you given access to all the financial and
25 transactional data that the defendants produced?

[Page 41]

[11]  (Pages 38 to 41)

1    A.  Yes.
2    Q.  We're going to use some different
3  terms during the deposition and your reference to
4  corrugated products cause me to think that we
5  probably ought to have a common understanding on
6  that.
7         When I use the term containerboard,
8  I'm referring to linerboard or medium; understood?
9    A.  Understood.
10    Q.  When I say corrugated products, I'm
11  referring to boxes, sheets, displays.
12         Understood?
13    A.  Understood.
14    Q.  And when you used corrugated
15  products just a moment ago to describe where
16  you're trying to get more information about the
17  physical characteristics, were you using
18  corrugated products in the same sentence that I
19  just was?
20    A.  Yes, I was.
21    Q.  If you look back at your report,
22  Exhibit 13, on Page 2 still, Paragraph 3, first
23  sentence starts:
24         "My empirical analysis
25         and the methodology employed

[Page 42]

1  are neutral."
2         Do you see that?
3    A.  Yes, I do.
4    Q.  What do you mean by neutral?
5    A.  Here I mean that the methodology
6  and analysis do not assume that the plaintiffs are
7  correct in their allegations.
8    Q.  Was it important to you that your
9  methodology be neutral?
10    A.  Yes.
11    Q.  And as you say, for it to be
12  neutral it has to not presuppose the outcome;
13  correct?
14    A.  That's correct.
15    Q.  Now, to what extent does your work
16  in this case rely on any of the work done by
17  Dr. Harris?
18    A.  I think there's some overlap in
19  sources but I don't know that my work relies on
20  Dr. Harris's work.
21    Q.  Have you read Dr. Harris's report?
22    A.  I have.
23    Q.  Did you read his deposition
24  testimony?
25    A.  No, I have not.

[Page 43]

1    Q.  Did you see in Dr. Harris's report
2  that he endorsed your work?
3    A.  Yes, I did.
4    Q.  I didn't note whether or not you
5  were endorsing his work in your report or whether
6  that's beyond --
7         MR. GOLDBERG:  Is the question --
8         MR. McKEOWN:  Let me finish the
9  question.
10         MR. GOLDBERG:  Great.  All right.
11  BY MR. McKEOWN:
12    Q.  What I'm trying to understand,
13  Dr. Harris endorsed and, some might say,
14  incorporated by reference certain parts of your
15  report or your report in its entirety.  What I'm
16  trying to understand, are you similarly endorsing
17  Dr. Harris's report or are you separate and
18  distinct from Dr. Harris?
19         MR. GOLDBERG:  I'm going to object
20  to the form of the question and I'm going to go a
21  little further.  Are you asking whether Dr. Dwyer
22  in his report endorses Dr. Harris's work or are
23  you asking at any time?
24         MR. McKEOWN:  Well, somewhere in
25  the middle.  Not at any time but in this case at

[Page 44]

1  any time, the work for this case.
2         MR. GOLDBERG:  So you want a -- you
3  want a general --
4  BY MR. McKEOWN:
5    Q.  In your report or otherwise, you're
6  endorsing Dr. Harris's work?
7         MR. GOLDBERG:  Same objection,
8  object to the form of the question.  If you
9  understand.
10         THE DEPONENT:  I think so.  I
11  endorsed Dr. Harris's report as I read it.  I
12  agree with its conclusions, but I did not rely on
13  it in writing my report.
14  BY MR. McKEOWN:
15    Q.  Was there anything in Dr. Harris's
16  report you disagreed with?
17    A.  Not that I can recall.
18    Q.  Do you agree with Dr. Harris's
19  understanding that whatever conspiratorial
20  activity occurred was with respect to
21  containerboard as opposed to corrugated packaging?
22         MR. GOLDBERG:  Object to the form
23  of the question.
24         THE DEPONENT:  I don't recall
25  Dr. Harris expressing an opinion that the alleged

[Page 45]

[12]  (Pages 42 to 45)

1    conspiracy excluded corrugated.
2    BY MR. McKEOWN:
3        Q.  What is your understanding of the
4    alleged conspiracy in terms of what it concludes?
5        A.  My understanding is that the
6    alleged conspiracy used supply restrictions of the
7    various forms to facilitate collusion among the
8    defendants in restricting supply and raising,
9    ultimately raising the price of what plaintiffs
10   refer to as containerboard, which concludes liner,
11   medium and corrugated products.
12       Q.  Is it your understanding that the
13   alleged conspiracy was to raise the price for
14   corrugated products?
15       MR. GOLDBERG:  Hold on for a
16   second.  Read the question back, please.
17       (The record was read as follows:
18       Q.  Is it your understanding
19       that the alleged conspiracy was
20       to raise the price for corrugated
21       products?)
22       MR. GOLDBERG:  Object to the form
23   of the question.
24   BY MR. McKEOWN:
25       Q.  Let me rephrase the question,

[Page 46]

1    products.
2    BY MR. McKEOWN:
3        Q.  But your understanding that the
4    conspiracy was to restrict the supply of
5    containerboard?
6        MR. GOLDBERG:  Object to the form
7    of the question.
8        THE DEPONENT:  I'm not sure I
9    understand the question.
10   BY MR. McKEOWN:
11       Q.  In any of your work, have you
12   undertaken anything that you believe is evidence
13   of a conspiracy as distinguished from evidence of
14   common impact or an attempt to estimate damages?
15       MR. GOLDBERG:  Object to the form
16   of the question.
17       THE DEPONENT:  Can I have the
18   question reread, please.
19       (The record was read as follows:
20       Q.  In any of your work, have
21       you undertaken anything that
22       you believe is evidence of a
23       conspiracy as distinguished from
24       evidence of common impact or
25       an attempt to estimate damages?)

[Page 48]

1    Dr. Dwyer.
2        MR. GOLDBERG:  Thank you.
3    BY MR. McKEOWN:
4        Q.  What I'm trying to understand is
5    whether -- is your understanding that there was a
6    conspiracy alleged as to restricting the supply of
7    containerboard that may have had the effect on
8    prices of corrugated products or whether there was
9    a conspiracy that included a conspiracy to raise
10   prices for corrugated products?
11       MR. GOLDBERG:  Object to the form
12   of the question.
13       THE DEPONENT:  My understanding is
14   that it is a -- what has been alleged is a
15   conspiracy to restrict supply in order to raise
16   prices of corrugated products.
17   BY MR. McKEOWN:
18       Q.  Restrict supply of containerboard
19   or restrict supply of corrugated products?
20       MR. GOLDBERG:  Object to the form
21   of the question.
22       THE DEPONENT:  I'm of the view that
23   a restriction of supply of containerboard, which
24   is an essential ingredient in corrugated, would
25   similarly restrict the supply of corrugated

[Page 47]

1        THE DEPONENT:  I would say that the
2    statistical significance of the damage estimates
3    offers some corroborating evidence of the -- of
4    alleged conspiracy, so the -- I think the term was
5    undertaken, it was not -- I did not undertake to
6    find that result.
7    BY MR. McKEOWN:
8        Q.  Would you agree that none of your
9    common impact analyses established proof of a
10   conspiracy?
11       MR. GOLDBERG:  Object to the form
12   of the question.  You're asking him -- you're
13   asking him a legal conclusion.  As with Dr. Harris
14   we are representing Dr. Dwyer to opine about
15   statistical and econometric matters.
16       MR. McKEOWN:  And I just want to
17   make sure I understand how broadly he's going to
18   try to interpret his statistical and econometric
19   matters.
20       MR. GOLDBERG:  Sure.  You get to
21   ask the questions; I get to make my objections.
22   BY MR. McKEOWN:
23       Q.  Go ahead.
24       A.  It's my understanding that I'm
25   offering economic and econometric evidence and

[Page 49]

1    proof is determined by a court.
2        Q.   Do you hold any opinion as an
3    economist as to whether or not any of the common
4    impact analyses that you have gone through in
5    Part 2 of your report establishes the existence of
6    a conspiracy?
7        A.   I don't know what the term
8    "establishes" means in this context. I believe
9    that the evidence is corroborative of the
10   potential for an alleged conspiracy to have taken
11   place.
12       Q.   Look at Paragraph 3 of your report.
13   At the bottom line of Page 2 the last sentence
14   starts, right here at the end:
15           "The results of the
16       damages model are consistent
17       with Plaintiffs allegations
18       of collusion."
19        Do you see that?
20       A.   Yes, I do.
21       Q.   Now you say "consistent." You're
22   not -- it does not appear here that you're opining
23   that they are proving collusion. Am I missing
24   something?
25           MR. GOLDBERG: Object to the form

[Page 50]

1    of the question.
2            THE DEPONENT: I mean nothing more
3    than consistent in this sentence.
4    BY MR. McKEOWN:
5        Q.   What do you mean by the word
6    "collusion"?
7        A.   That refers to the allegations of
8    coordinated supply restrictions of the plaintiffs.
9        Q.   Have you seen in your review of
10   documents any proof of an actual agreement amongst
11   defendants to restrain supply of containerboard or
12   corrugated products?
13           MR. GOLDBERG: Object to the form
14   of the question.
15           THE DEPONENT: In my document
16   review I have not seen any written agreements.
17   BY MR. McKEOWN:
18       Q.   In your document review, have you
19   seen any indication of an oral agreement to
20   restrict the supply of containerboard or
21   corrugated products?
22           MR. GOLDBERG: Object to the form
23   of the question.
24           THE DEPONENT: I have not seen
25   references to an oral agreement.

[Page 51]

1    BY MR. McKEOWN:
2        Q.   We talked a little bit before about
3    your various regression models. Mr. Goldberg
4    corrected me that there were multiple. You had
5    models for two groups of products; is that right,
6    one that you called intermediate containerboard
7    products and one that you called vinyl
8    containerboard products?
9        A.   That's correct.
10       Q.   As I understood the intermediate
11   containerboard products, intermediate
12   containerboard products include containerboard and
13   sheets; is that correct?
14       A.   That's correct.
15       Q.   The final containerboard products
16   included boxes, displays, packaging materials; is
17   that also correct?
18       A.   Yes, corrugated -- I think
19   corrugated materials, corrugated packaging
20   products.
21       Q.   What is a sheet?
22       A.   A sheet is a rectangular
23   construction which has two -- two sheets of
24   linerboard and one of -- typically one of medium
25   that's been corrugated or bolted in between it and

[Page 52]

1    glued together.
2        Q.   Why didn't you include sheets
3    within the same grouping as corrugated products as
4    opposed to splitting them up the way you did?
5            MR. GOLDBERG: By corrugated
6    products, you mean?
7            MR. McKEOWN: Boxes.
8            MR. GOLDBERG: You mean what
9    Dr. Dwyer identified as final products.
10           MR. McKEOWN: In the same group as
11   what he identified as final products.
12           THE DEPONENT: The division I made
13   in the damages analysis was between -- is between
14   products that are primarily in my view for
15   consumption within the industry as opposed to
16   products that are consumed outside the industry.
17   BY MR. McKEOWN:
18       Q.   Why did you make the distinction?
19       A.   I felt it was important to make
20   that distinction because I view those as largely
21   separate sets of customers. Separate could be
22   affected by separate and distinct demand issues
23   and timing of demand issues.
24       Q.   Did you at any time run your
25   regression models and reject the results where you

[Page 53]

1  had included the sheets with what you categorized
2  as final containerboard products?
3       MR. GOLDBERG: Object -- object to
4  the form of the question.
5       THE DEPONENT: No, I have not.
6  BY MR. McKEOWN:
7      **Q.** Let me give you a hypothetical.
8      If, when you ran your regressions,
9  the results came back that three of the six models
10  had a negative number, coefficient for the
11  conspiracy dummy variable, would you still find
12  that there was evidence of class-wide damage?
13       MR. GOLDBERG: Object to the form
14  of the question.
15       THE DEPONENT: I don't think I have
16  enough to make an assessment on what the
17  implication would be there.
18  BY MR. McKEOWN:
19      **Q.** What if you ran your regression
20  models and the coefficients for intermediate
21  containerboard products came back as negative but
22  the final containerboard products came back as
23  positive? In that situation, would you believe
24  you could find damages?
25       MR. GOLDBERG: Object to the form

**[Page 54]**

1  I'm trying to understand what you did and didn't
2  do with respect to your work?
3       MR. GOLDBERG: Are you done with
4  your question?
5       MR. McKEOWN: I am.
6       MR. GOLDBERG: Object to the form
7  of the question.
8  BY MR. McKEOWN:
9      **Q.** Is it correct that you did not run
10  any type of analysis to determine the amount of
11  the supply reduction that would be necessary for
12  any particular price increase?
13      **A.** I didn't quantify that relationship.
14      **Q.** Did you run any analysis on it?
15       MR. GOLDBERG: Object to the form
16  of the question.
17       THE DEPONENT: I reviewed data but
18  I didn't run any statistical analysis on it.
19  BY MR. McKEOWN:
20      **Q.** Are you intending to offer any
21  opinion as to the amount of the supply reduction
22  that was necessary to enable a price increase?
23      **A.** No, I'm not.
24      **Q.** And you didn't study whether any
25  specific defendant supply reduction was part of a

**[Page 56]**

1  of the question.
2       THE DEPONENT: I haven't considered
3  what the interpretation would be in that -- in
4  that context.
5  BY MR. McKEOWN:
6      **Q.** Take a look at your report again,
7  Exhibit 13. I'm sorry, Paragraph 7. The second
8  sentence says:
9      "The plaintiffs also
10      allege that the alleged
11      collusive restrictions and
12      supply were employed by
13      the defendants to support
14      announced price increases
15      for the class products
16      during the class period."
17      Do you see that?
18      **A.** Yes, I do.
19      **Q.** Did you make any study of the
20  amount of supply reductions that would have been
21  necessary to enable the defendants to raise
22  prices?
23      **A.** No, not a formal study of that
24  particular issue.
25      **Q.** Did you do any calculation on that?

**[Page 55]**

1  conspiracy; correct?
2       MR. GOLDBERG: Would you read the
3  question back for me, please.
4      (The record was read as follows:
5      **Q.** And you didn't study whether
6      any specific defendant supply
7      reduction was part of a
8      conspiracy; correct?)
9       MR. GOLDBERG: Object to the form
10  of the question.
11       THE DEPONENT: I didn't study
12  whether the supply restrictions -- I didn't -- I'm
13  not clear on the question. I didn't study a
14  conspiracy, whether the supply restriction was
15  part of a conspiracy. I think that's correct.
16  BY MR. McKEOWN:
17      **Q.** Okay. Let me try it again. I'm
18  attempting to make sure I understand what you're
19  not offering opinions on.
20      And as I understand it -- and I'll
21  go through a series of questions, but you're not
22  offering evidence or opinions as an economist that
23  a specific reduction in supply by a specific
24  defendant was part of a conspiracy; correct?
25       MR. GOLDBERG: Object to the form

**[Page 57]**

**[15] (Pages 54 to 57)**

**A.276**

1    of the question.
2        THE DEPONENT:  That's correct.
3    BY MR. McKEOWN:
4        Q.  You've been asked to assume certain
5    things for purposes of your analysis.  You're not
6    doing an economic study on that; correct?
7        MR. GOLDBERG:  Object to the form
8    of the question.
9        THE DEPONENT:  I did not do a
10   formal study of supply restrictions and the
11   connection to prices, potential price increases.
12   BY MR. McKEOWN:
13       Q.  And you didn't do anything in your
14   econometrics work or other analysis to measure the
15   effect on price from any capacity reduction;
16   correct?
17       A.  That's correct.
18       Q.  And that would be correct, whether
19   it was a capacity reduction by one of the
20   defendants or by someone who was not a defendant;
21   correct?
22       A.  That's correct.
23       Q.  You didn't do anything to measure
24   any causal relationship between the supply
25   reduction and a price increase; correct?

[Page 58]

1        MR. GOLDBERG:  Object to the form
2    of the question.
3        THE DEPONENT:  That's correct.
4    BY MR. McKEOWN:
5        Q.  Is it also correct that you did not
6    undertake any such analysis and then reject it
7    once you saw the results?
8        A.  That's correct.
9        Q.  Take a look at Exhibit 3 to your
10   deposition, which is also Exhibit 3 to your
11   report.
12       A.  Yes.
13       Q.  This lists the 15 price increase
14   announcements made by the defendants during the
15   class period; is that correct?
16       A.  That's correct.
17       Q.  Now, according to your chart, 6 of
18   the 15 price increase announcements did not result
19   in increase in the PPW price; correct?
20       A.  That's correct.
21       Q.  Now, is it your understanding that
22   all 15 price increase announcements were
23   undertaken as part of the alleged conspiracy?
24       A.  I'm taking that as given.  Yes,
25   that's the premise I -- well, yes, that's correct.

[Page 59]

1        Q.  If it were the case that only a
2    single price increase announcement were found to
3    be part of a conspiracy, would that be enough in
4    your view to find a common impact?
5        MR. GOLDBERG:  Object to the form
6    of the question.
7        THE DEPONENT:  Can I have the
8    question reread.
9        (The record was read as follows:
10       Q.  If it were the case that
11       only a single price increase
12       announcement were found to be
13       part of a conspiracy, would that
14       be enough in your view to find
15       a common impact?)
16       THE DEPONENT:  I think I would want
17   to modify my analysis to consider just that price
18   increase.
19   BY MR. McKEOWN:
20       Q.  How would you do that?
21       A.  I -- without the details, my --
22   sitting here today, I would -- I assume I would
23   focus it on that particular price increase
24   analysis, the impact analysis.
25       Q.  And run the same types of analyses

[Page 60]

1    that you did in your report?
2        A.  That's correct.
3        Q.  Do you hold any view whether or not
4    the alleged conspiracy was more stable or less
5    stable at different points in time?
6        MR. GOLDBERG:  Object to the form
7    of the question.
8        THE DEPONENT:  I have a hypothesis
9    based on what I've observed in the historical data
10   that there appear to be periods where price
11   increases were not reflected in the -- what I
12   refer to as PPW Index and other cases where it is
13   reflected.
14       That leads me to the hypothesis
15   that the strength or degree of coordination of the
16   alleged conspiracy may have fluctuated over time.
17   BY MR. McKEOWN:
18       Q.  Did you conduct any analyses to
19   measure the strength of the conspiracy over time?
20       MR. GOLDBERG:  Object to the form.
21       THE DEPONENT:  No, I did not.
22   BY MR. McKEOWN:
23       Q.  Did you conduct any analyses to
24   estimate the degree of coordination over time?
25       MR. GOLDBERG:  Same objection.

[Page 61]

**[16]  (Pages 58 to 61)**

1      THE DEPONENT:  No, I did not.
2    BY MR. McKEOWN:
3      Q.   Do you have an understanding of the
4    term "but for" world?
5      A.   Yes, I do.
6      Q.   What is your understanding of that
7    term?
8      A.   In the context of my report, the
9    "but for" world is estimates of what prices would
10   have been absent the alleged conspiracy.
11     Q.   Did you use the concept of a "but
12   for" world both in looking at your damage model
13   and for common impact or just for one?
14     A.   I used that term only for the
15   damages model.
16     Q.   Is there a "but for" price that
17   should be applied in the common impact analysis?
18     A.   I don't understand the question.
19     Q.   In what way did you use a "but for"
20   price for your damages model?
21     A.   The "but for" price in the damages
22   model is the estimated price absent the alleged --
23   the conspiracy dummy effect, the conspiracy
24   indicator effect, estimated effect of collusion.
25     Q.   Okay.  And my question is:  Did you

[Page 62]

1    in your common impact analyses use any comparable
2    concept of expected price or a "but for" price?
3      A.   It's not something I've considered,
4    but I think from a common impact perspective, one
5    could think of the failure of individual class
6    members' prices to respond to an announcement in
7    implementation, price increase implementation
8    as -- as the alternative that I'm examining, do
9    prices respond or not to these price increase
10   implementation, announced price increase
11   implementation.
12     Q.   If you were going to test that, how
13   would you do it?
14          MR. GOLDBERG:  Object to the form.
15          THE DEPONENT:  If I were to test
16   what?
17   BY MR. McKEOWN:
18     Q.   Well, you just said that you could
19   think that the failure of an individual class
20   member's price is to respond to the implementation
21   of a price increase, that that's something, you
22   know, that might be the concept of the "but for"
23   price in your common impact or any common impact
24   analysis.
25          If you were going to apply the "but

[Page 63]

1    for" concept for price to your common impact
2    analysis, how would you do it?
3      A.   I'm interpreting my common impact
4    as having a "but for" price.  Not in the sense of
5    absent collusion but absent impact.
6      Q.   So what is your "but for" price in
7    your impact analysis?
8      A.   From this perspective, which I
9    haven't considered previously, the "but for" price
10   is the nonimpact where someone did not respond to
11   a price increase announcement.
12     Q.   Let me give you a hypothetical, see
13   if I understand this.
14          There is -- if we look at Exhibit
15   3, there appears to be -- let's go with announcement
16   number one, make it simple, a price increase that
17   was in 2004 that appears to have taken effect in
18   either February or March of that year.  Do I
19   understand what you're saying -- strike that.
20          Looking at that price increase
21   announcement in early 2004, which where various
22   defendants would have had either a February or
23   March effective date, is what you are saying that
24   the "but for" price would be the price that a
25   customer paid if that customer after the price

[Page 64]

1    increase announcement did not see an increase in
2    its price?
3          MR. GOLDBERG:  Object to the form.
4          THE DEPONENT:  Not the "but for"
5    price in terms of damages, no.
6    BY MR. McKEOWN:
7      Q.   In terms of impact, is that the
8    "but for" price?
9          MR. GOLDBERG:  Same objection.
10          THE DEPONENT:  In this
11   interpretation of "but for" price, which I have
12   not used in my report, if one -- if one were to
13   impose a "but for" price interpretation on a
14   common impact, that's correct.
15   BY MR. McKEOWN:
16     Q.   In any of the other cases you've
17   worked on, have you ever included an analysis of a
18   "but for" price in your common impact analysis?
19     A.   Only to the extent that I have
20   here, which is not -- I haven't labeled it as such
21   and don't consider it to be.  I'm trying to take a
22   definition from the damages and apply it to common
23   impact, but I don't really see that it is a
24   particular useful construct.
25     Q.   And when you say only to the extent

[Page 65]

[17]  (Pages 62 to 65)

1  you were doing it here, you mean here in response
2  to my questions as distinguished from your report?
3      A.  That's correct.
4      Q.  Is it correct that you have not
5  attempted to estimate what the "but for" world
6  would be with respect to capacity in the
7  containerboard industry for any time period
8  between 2000 and 2012?
9      A.  That's correct.
10      Q.  Is it true that you have not
11  attempted to estimate what in the "but for" world
12  the level of exports would be for anytime between
13  2000 and 2012?
14      A.  I'm taking the level of exports to
15  be the same in the actual "but for" world.
16      Q.  So you're treating actual exports
17  that occurred from 2000 to 2012 as equal to what
18  the exports would be in the "but for" world; is
19  that correct?
20      A.  That's correct.
21      Q.  Is it correct that you have not
22  attempted to estimate which facilities would have
23  been closed in the "but for" world?
24      A.  That's correct.
25      Q.  Is it true that you have not

**[Page 66]**

1  attempted to estimate which price increases would
2  have been successful in the "but for" world?
3      A.  That's correct.
4      Q.  Is it true that you haven't
5  attempted to estimate what the inventory level
6  would be in the "but for" world?
7      A.  That's correct.
8      Q.  Is it also true that you haven't
9  attempted to estimate what the operating rates for
10  containerboard mills would be in the "but for"
11  world?
12      A.  That's correct.
13      Q.  Would you agree that a customer who
14  has not paid more than what the price would be in
15  the "but for" world has not suffered any damage?
16      MR. GOLDBERG:  Read the question
17  back, please.
18      (The record was read as follows:
19      Q.  Would you agree that a
20      customer who has not paid more
21      than what the price would be
22      in the "but for" world has not
23      suffered any damage?)
24      MR. GOLDBERG:  Object to the form
25  of the question.

**[Page 67]**

1      THE DEPONENT:  No, I would not
2  agree with that.
3  BY MR. McKEOWN:
4      Q.  Why not?
5      A.  The damages analysis estimates a --
6  an aggregate price, and a customer may or -- may
7  be above that price or below that price in the
8  actual world, so their position relative to the
9  "but for" estimated aggregate price is not
10  directly interpretable in terms of damages that
11  they may have suffered.
12      Q.  So does that mean that if the
13  customer's price was above the "but for" price, it
14  might also be the case that customer suffered
15  no damage?
16      A.  My opinion is -- regarding -- on
17  damages is regarding aggregate damages, so I have
18  not considered allocations as to damages to
19  individual class members.
20      Q.  As a matter of economics, if a
21  customer pays more than the "but for" price, is it
22  your understanding that it may or may not be that
23  that customer has suffered damage from the alleged
24  conspiracy?
25      MR. GOLDBERG:  The hypo we now use

**[Page 68]**

1  is if the customer pays more than the "but for"
2  price?
3      MR. McKEOWN:  Correct.
4      THE DEPONENT:  The customer has his
5  or her own price for a particular product, and the
6  relationship between that and the aggregate price,
7  the aggregate "but for" price is not something I
8  can speculate at.  Not right now.
9  BY MR. McKEOWN:
10      Q.  So that for any given customer, if
11  one were to look at the "but for" price calculated
12  by your regression models, for that customer it
13  would be pure speculation as to whether or not
14  that price reflects injury or lack of injury; is
15  that correct?
16      MR. GOLDBERG:  Object to the form
17  of the question.
18      THE DEPONENT:  I believe the common
19  impact analysis is relevant to whether there was
20  injury or not for that particular customer.
21  BY MR. McKEOWN:
22      Q.  With respect -- let me rephrase the
23  question.
24      With respect to your regression
25  model and the "but for" prices that your

**[Page 69]**

**[18]  (Pages 66 to 69)**

1    regression model would estimate, is it your
2    testimony that it would be pure speculation to
3    attempt to say whether a particular customer based
4    on whether that customer's price was above or
5    below the "but for" price estimated by your market
6    actually suffered damage?
7         MR. GOLDBERG:  Object to the form
8    of the question.  I want to make sure, Jim, that
9    I'm understanding correctly.
10         The question, as I'm understanding
11    it, is you're asking whether Dr. Dwyer's models
12    that he used in Part 3, that is to estimate
13    aggregate damages, whether those models can be
14    used to focus on a particular customer and give a
15    result that he would render an opinion that
16    customer has...
17         MR. McKEOWN:  That's my current
18    question.
19         MR. GOLDBERG:  That's right.
20    That's the question.  I want to make sure
21    I'm understanding.
22         MR. McKEOWN:  That's the question
23    on the tape.
24         MR. GOLDBERG:  All right.  I object
25    to the form of the question.

**[Page 70]**

1    have been impacted.
2    BY MR. McKEOWN:
3         Q.  But if I took any individual
4    customer and I took their prices -- let me back up
5    again.
6         Apart from your model, if a
7    customer pays more than what a model would say is
8    the "but for" price, is it your view that that
9    customer has been damaged?
10         MR. GOLDBERG:  Same objection.
11         THE DEPONENT:  I think the fact
12    that damages, again, related to the common impact
13    analysis.
14    BY MR. McKEOWN:
15         Q.  So you can't answer my question?
16         A.  I don't understand -- I don't --
17    the question doesn't seem to make sense to me.
18         MR. GOLDBERG:  I'm not seeking to
19    stop this line of inquiry, but when you get to a
20    breaking point, let's take a break.
21    BY MR. McKEOWN:
22         Q.  Let's see if I can understand this
23    point and then we can take a quick break.
24         MR. GOLDBERG:  Sure.
25    ///

**[Page 72]**

1         THE DEPONENT:  In the absence of
2    further analysis, my estimate of the individual
3    damage is the aggregate damage, percent
4    overcharge.
5    BY MR. McKEOWN:
6         Q.  Now you have me confused.  And
7    we'll spend more time with your regression.  Don't
8    worry.
9         But you have estimated through your
10    regression what would be the "but for" price; is
11    that correct?
12         A.  The "but for" aggregate price.
13         Q.  The "but for" aggregate price.
14         What I'm trying to understand is
15    whether if I were to take a customer's prices, an
16    individual customer, whether that customer's
17    prices are above or below your projected "but for"
18    price in your model, your opinion is it would be
19    pure speculation at this point as to whether or
20    not that particular customer has suffered damage;
21    is that right?
22         MR. GOLDBERG:  Object to the form
23    of the question.
24         THE DEPONENT:  No, I've reached the
25    conclusion that most -- virtually all customers

**[Page 71]**

1    BY MR. McKEOWN:
2         Q.  You understand "but for" price to
3    be what you would estimate the price to be if
4    there were no illegal conduct; is that correct?
5         MR. GOLDBERG:  Object to the form
6    of the question.
7         THE DEPONENT:  That's correct.
8    BY MR. McKEOWN:
9         Q.  Completely apart from this case, a
10    customer pays more than what is estimated as a
11    "but for" price, would you be of the view that
12    that customer has suffered damage?
13         A.  As I understand it, we're talking
14    about completely different prices.  We're talking
15    about an individual customer price in the second
16    part of your hypothetical versus a "but for" price
17    from the aggregate damages model in this case or
18    another case.
19         Q.  So what you're saying is that one
20    cannot look at the individual damages based on
21    your aggregate model; is that correct?
22         MR. GOLDBERG:  Object to the form.
23         THE DEPONENT:  One could use the
24    damages analysis as a starting point for
25    allocation, but it does not imply a particular

**[Page 73]**

**[19]  (Pages 70 to 73)**

1  allocation of damages.
2  BY MR. McKEOWN:
3      Q.  So whether or not any particular
4  customer's price is above or below your projected
5  "but for" price with your model, your aggregate
6  classwide model, it wouldn't tell you, in your
7  view, whether or not that customer suffered
8  damage; correct?
9      A.  That's not the purpose of the
10  model, that's correct.
11      Q.  I understand it's not the purpose
12  of the model; I want to also understand that
13  that's not what you say the model would do.
14      MR. GOLDBERG:  Is there a question
15  there?
16      Q.  Yes.  Is that correct?
17      MR. GOLDBERG:  Okay.  Thank you.
18      THE DEPONENT:  Yes, that's correct.
19      MR. McKEOWN:  Why don't we take a
20  break.
21      THE VIDEOGRAPHER:  Going off the
22  record at 10:22.
23      (Whereupon, a recess was held
24      from 10:22 a.m. to 10:38 a.m.)

**[Page 74]**

1      the March or April time frame.
2      Q.  Of which year?
3      A.  Of 2014.
4      Q.  So prior to March or April 2014,
5  you did not run any analyses?
6      MR. GOLDBERG:  Object to the form.
7      THE DEPONENT:  My recollection is
8  that prior to that time period, the focus was on
9  Kleen data.
10  BY MR. McKEOWN:
11      Q.  And I think this was -- that you
12  understood this in my question, but let me
13  rephrase to make sure.
14      Prior to March or April 2014, you
15  didn't run any quantitative analysis --
16      MR. GOLDBERG:  Object to form.
17  BY MR. McKEOWN:
18      Q.  -- with respect to Kleen; is that
19  correct?
20      A.  I may have run some analyses on
21  fragments of the data or prior versions of the
22  data, but they were superseded when the data was
23  updated.
24  BY MR. McKEOWN:
25      Q.  If you could turn in your report,

**[Page 76]**

1      THE VIDEOGRAPHER:  We are back on
2  the record at 10:40.  This is Disc 2 in the
3  deposition of Dr. Mark Dwyer.
4  BY MR. McKEOWN:
5      Q.  Good morning again, Dr. Dwyer.
6      A.  Good morning, Mr. McKEOWN.
7      Q.  I just want to try to finish off
8  the discussion we had right before the break.
9      Is it correct that you have not at
10  this point attempted to calculate the "but for"
11  price for an individual customer within the class
12  period?
13      A.  That's correct.
14      Q.  And that your aggregate model does
15  not estimate the "but for" price for an individual
16  customer; is that also correct?
17      A.  Yes.
18      Q.  Does Exhibit 13, your report,
19  reflect all the opinions you're offering in this
20  case?
21      A.  To date, yes.
22      Q.  Can you tell me when was the first
23  time you ran an analysis either on common impact
24  or on damages?
25      A.  I believe that would have been in

**[Page 75]**

1  Exhibit 13, to Paragraph 6, which starts on the
2  bottom of Page 3, looking at the second sentence
3  which starts on the third line:
4      "I understand that the
5      proposed class period begins
6      February 15, 2004 and
7      continues through at least
8      November 8, 2010."
9      Do you see that?
10      A.  Yes, I do.
11      Q.  When did you first come to an
12  understanding that this was the class period that
13  you were to look at?
14      A.  I believe it was this year, early
15  this year.  The start of the class period was
16  given to me first and then the end of the class
17  period was -- was somewhat later when it was
18  communicated.
19      Q.  What were you relying on for the
20  start of the class period?
21      A.  I was relying on a version of the
22  complaint.
23      Q.  Did you rely on anything from
24  Dr. Harris with respect to what the class period
25  should be?

**[Page 77]**

**[20]  (Pages 74 to 77)**

1          MR. GOLDBERG:  Object to the form
2    of the question.
3          THE DEPONENT:  No, I didn't.
4    BY MR. McKEOWN:
5          Q.  When did you come to have an
6    understanding as to the end of the class period?
7          A.  I think that came shortly before
8    the most recent amendment to the complaint was
9    filed.
10         Q.  What are you relying on for the end
11   of the class period?
12         A.  That data stated in the Amendment
13   to the Plaintiffs' Consolidated Amended Complaint.
14         Q.  Other than what's stated in the
15   amended complaints, are you relying on anything
16   else for the start date or the end date of the
17   class period?
18         A.  No, I'm not.
19         Q.  So you haven't done any independent
20   economic analysis of when the class period should
21   start or end; is that fair?
22         A.  That's fair.
23         Q.  Did you at any time attempt your
24   regressions or other analyses on a different class
25   period and then reject that analyses?

[Page 78]

1          MR. GOLDBERG:  Object to the form
2    of the question.
3          THE DEPONENT:  No, I did not.
4    BY MR. McKEOWN:
5          Q.  Did you ever run any economic
6    analyses or regressions on the class period before
7    the amendment was made to change the start date?
8          MR. GOLDBERG:  Read the question
9    back, please.
10         (The record was read as follows:
11         Q.  Did you ever run any economic
12         analyses or regressions on the
13         class period before the amendment
14         was made to change the start date?)
15         THE DEPONENT:  My recollection
16   sitting here is that the start date of
17   February 15th was determined prior to the run of
18   regressions.
19   BY MR. McKEOWN:
20         Q.  So that you didn't run any
21   regressions until there was the amended pleading
22   with the February 15, 2014 -- excuse me --
23   February 15, 2004 start date; is that correct?
24         A.  That's my recollection, yes.
25         Q.  For your analyses you used a

[Page 79]

1    benchmark period; correct?
2          A.  Yes.
3          Q.  Okay.  And I believe your benchmark
4    period was February 1 -- strike that.
5          What was your preconspiracy
6    benchmark period?
7          A.  I believe it started in January of
8    2001 and included January of 2004 -- up through
9    and including January 2004.
10         Q.  What was your post-class benchmark
11   period?
12         A.  I believe that was December of 2010
13   up through December of 2012.
14         Q.  I just want to make sure I
15   understand how you handled the month in which the
16   start date and the end date for the class period
17   occurred.
18         So let's take, for example,
19   February of 2004 and you have a class period
20   started February 15th.  Did you include -- when
21   you ran your various analyses, starting from
22   February 15 forward in the class period, did you
23   include all of February or did you omit February
24   from your data?
25         A.  Sitting here, I don't recall

[Page 80]

1    whether -- I don't believe I omitted them.  I
2    believe -- or omitted February.  I believe it was
3    either included in the benchmark period or the
4    class period, but I don't recall which.
5          Q.  Would the same answer be the case
6    for November of 2010?  You don't recall whether
7    it's in the benchmark period or the class period?
8          A.  No, I don't.
9          Q.  No, the answer would not be the
10   same, or no, you don't remember?
11         A.  I don't remember.
12         Q.  What's the purpose of a benchmark
13   period?
14         A.  The purpose of the benchmark period
15   is to measure relationships between price and
16   explanatory variables supplying manufacturers
17   where the conspiracy has not been alleged to have
18   been operative.
19         Q.  The benchmark period that we're
20   talking about, are those the benchmark periods you
21   used for your regression models?
22         A.  Yes, they are.
23         Q.  Did you use those benchmark periods
24   in any way for your common impact analyses?
25         A.  No, I did not.

[Page 81]

[21]  (Pages 78 to 81)

**[Page 82]**

1      Q.  Why did you not include January 1,
2   2000 through December 31, 2000 in your benchmark
3   period?
4      A.  The choice of -- the determination
5   that -- to start in 2001 was based on the
6   availability of Defendants' transactions data.
7      Q.  What data were you missing from
8   2000 that prohibited you or kept you from using
9   2000 as a benchmark date?
10         MR. GOLDBERG:  Object to the form.
11         THE DEPONENT:  I'm not completely
12   certain, but my recollection is that I was missing
13   Temple-Inland data.
14   BY MR. McKEOWN:
15      Q.  Was the fact that you were missing
16   data from a single defendant sufficient for you
17   not to include that period within the benchmark?
18         MR. GOLDBERG:  Object to the form
19   of the question.
20         THE DEPONENT:  I don't recall
21   whether it was a single defendant or whether there
22   were other defendants for whom data was either
23   missing or sparse in the year 2000.
24   BY MR. McKEOWN:
25      Q.  That wasn't quite my question.  My

**[Page 83]**

1   question was:  If you're missing data from a
2   single defendant, would that in your view mean you
3   couldn't use that period as part of a benchmark
4   period?
5      A.  Not necessarily.
6      Q.  How do you decide whether or not
7   you have enough data to include a period within a
8   benchmark?
9      A.  My recollection is that I've looked
10   at the overall number of transactions that were
11   available to me on an annual basis and found that
12   2000 was substantially reduced relative to other
13   years.
14      Q.  Do you know if it was substantially
15   reduced as to either containerboard products as
16   distinguished from corrugated products?
17      A.  No, I don't.
18      Q.  Would it make a difference to you
19   in whether or not you could use the data if you
20   had data for a containerboard but not corrugated
21   products for some defendants?
22      A.  It might.
23      Q.  But sitting here today you can't
24   tell me what that effect would be?
25      A.  That's correct.

**[Page 84]**

1      Q.  Did you load the data from 2000
2   into your system for possible analysis?
3      A.  Yes.
4      Q.  Did you run any analyses with that
5   data and then reject that analyses?
6         MR. GOLDBERG:  Object to the form
7   of the question.
8         THE DEPONENT:  No.
9   BY MR. McKEOWN:
10      Q.  Do you have any rule of thumb as to
11   how much data you need in order for something to
12   be a legitimate benchmark period?
13         MR. GOLDBERG:  By rule of thumb you
14   mean the standard metric.
15   BY MR. McKEOWN:
16      Q.  The standard metric for Dr. Dwyer,
17   even if not standard for the rest of the world.
18      A.  In my judgment, the data was
19   insufficient to use.  The amount of data available
20   for 2000 was insufficient, but I don't recall what
21   the drop was that led me to that conclusion.
22   BY MR. McKEOWN:
23      Q.  And you don't recall whether it was
24   more than just Temple data that was unavailable?
25      A.  Sitting here, no.

**[Page 85]**

1      Q.  In the SRAM litigation, did you
2   have defendants for which you did not have data?
3      A.  I don't recall.
4      Q.  In other cases, have you had
5   situations where you did not have data and yet ran
6   your regression study?
7      A.  Sitting here, I just don't recall.
8      Q.  And sitting here today, you can't
9   give me any rule of thumb in terms of how much
10   data would need to be missing before you'd be
11   uncomfortable including a period within a
12   benchmark period; is that correct?
13      A.  That's correct.
14      Q.  Would the same be true for the
15   class period, that you would be uncomfortable
16   calculating anything for part of the class period
17   if you didn't have a sufficient level of data?
18         MR. GOLDBERG:  Read the question
19   back, please.
20         (The record was read as follows:
21      Q.  Would the same be true for
22      the class period, that you would
23      be uncomfortable calculating
24      anything for part of the class
25      period if you didn't have a

**[22]  (Pages 82 to 85)**

1    sufficient level of data?)
2         MR. GOLDBERG:  Object to the form
3    of the question.
4         THE DEPONENT:  Yes.
5    BY MR. McKEOWN:
6         Q.  Have you assumed that the
7    containerboard market was in a competitive
8    equilibrium during your benchmark period?
9         A.  I've assumed that the -- as
10   alleged, that the conspiracy was not operating
11   during that period.
12   BY MR. McKEOWN:
13        Q.  That's not quite my question.  My
14   question was whether or not you thought in the
15   benchmark period predating the conspiracy the
16   market was in a competitive equilibrium?
17        A.  I'd need some qualification as to
18   what competitive equilibrium means.
19        Q.  What does it mean to you as an
20   economist?
21        A.  Usually when I see the term
22   competitive equilibrium, it's referring to an
23   idealized market with very small sellers, a
24   commodity product in which we -- you know, a zero
25   profit, a zero economic profit condition where the

[Page 86]

1    price is equal to marginal cost.
2         Q.  Did you make any assessment as to
3    what the business cycle is for a competitive
4    equilibrium?
5         A.  I don't understand the question.
6         Q.  Let me put it a different way.  Do
7    you believe there could be a competitive
8    equilibrium in an industry for which there are a
9    limited number of larger players?
10        MR. GOLDBERG:  Larger players.
11   Sellers?  Larger players --
12        MR. McKEOWN:  Sellers.  Thank you.
13        MR. GOLDBERG:  I want to help you.
14        THE DEPONENT:  I believe that there
15   can be a market equilibrium that is absent of
16   collusion in an industry with large players.
17   BY MR. McKEOWN:
18        Q.  And have you done any study to
19   determine whether or not the containerboard
20   industry was a market equilibrium in the pre-class
21   period?
22        MR. GOLDBERG:  Object to the form
23   of the question.
24        THE DEPONENT:  No, I have not.
25   ///

[Page 87]

1    BY MR. McKEOWN:
2         Q.  You've just taken that as an
3    assumption that the pre February 2004 period the
4    market was in an equilibrium; is that correct?
5         A.  That it was in an equilibrium, not
6    necessarily a perfectly competitive equilibrium
7    but an equilibrium for that industry.
8         Q.  And therefore you didn't need to do
9    any study to determine it; correct?
10        A.  I didn't see such a study as being
11   relevant to my study.
12        Q.  Did you ever consider and reject
13   the concept of a benchmark period that started on
14   the back end prior to November of 2010?
15        A.  Not that I recall.
16        Q.  Did you ever consider any benchmark
17   period other than the February 15, 2004 through
18   November 8, 2010?
19        MR. GOLDBERG:  Read your question
20   back to me again.
21        (The record was read as follows:
22        Q.  Did you ever consider any
23        benchmark period other than the
24        February --)
25        MR. McKEOWN:  I'm sorry.  That was

[Page 88]

1    backwards.  Let me try it again.
2    BY MR. McKEOWN:
3         Q.  For your class period, I just want
4    to make sure I understand whether you have studied
5    or considered any other period or just took it as
6    an assumed period from February 15, 2004 through
7    November 8, 2010.
8         Can you tell me whether you did any
9    analysis or any study of a different period or
10   just took this as an assumption?
11        A.  I took that as an assumption.
12        Q.  If you are asked to re-run your
13   models on a different proposed class period, you
14   could do it; correct?
15        MR. GOLDBERG:  Object to the form.
16        THE DEPONENT:  Yes, I could.
17   BY MR. McKEOWN:
18        Q.  Do you believe that a regression
19   model should be stable over time?
20        A.  Not necessarily.
21        Q.  If the regression model is not
22   stable over time, what do you need to do to assure
23   the validity of the outcome?
24        MR. GOLDBERG:  Object to the form
25   of the question.

[Page 89]

1     MR. McKEOWN:  Do you want that read
2  back?
3     THE DEPONENT:  No.
4     There are econometric models that
5  allow for parameters of the model to vary over
6  time, so those models capture variability and
7  effects over time.
8  BY MR. McKEOWN:
9     Q.  So that your model then becomes
10  stable by the addition of those variables --
11     MR. GOLDBERG:  Object to the form.
12  BY MR. McKEOWN:
13     Q.  -- is that correct?
14     A.  I'm not sure that's -- I understand
15  what the stability would be in that context.
16     Q.  When you run a regression, are you
17  making the assumption that the causal factors have
18  the same impact over the period of time you're
19  studying?
20     A.  On average, yes.
21     Q.  And that if you believe that there
22  was some change in the causal factors, you might
23  need to include some other variable or some dummy
24  variable to account for that change.
25     Do you agree with that?

**[Page 90]**

1     A.  Yes.
2     Q.  And for example, in your regression
3  you included variables for seasons to account for
4  what might be different effects in different times
5  of the year; is that right?
6     A.  That's correct.
7     Q.  Did you run any tests to determine
8  the stability of your regression models?
9     MR. GOLDBERG:  Object to the form.
10     THE DEPONENT:  I presented a number
11  of regression models to evaluate the stability of
12  their results so in that sense I believe I offered
13  some evidence of stability.
14  BY MR. McKEOWN:
15     Q.  Did you run any tests across any of
16  the individual models to test the stability of the
17  individual model?
18     A.  No, I did not.
19     Q.  What are the industry standard
20  tests that are run across models to determine the
21  stability of a regression model?
22     A.  I'm not aware that any stability
23  assessment is found in the majority of the
24  empirical literature in economics.
25     Q.  Are you aware of any tests that are

**[Page 91]**

1  used to test the stability of a model over time?
2     A.  Sure.
3     Q.  What are those?
4     A.  One is the Chow test.
5     Q.  Any others?
6     A.  A somewhat related test is a Reset
7  test.
8     Q.  Any others?
9     A.  In general, the inclusion of
10  additional variables are -- could be considered
11  tests of model variations over time.
12     Q.  And you didn't run any of those; is
13  that correct?
14     A.  I considered the set of explanatory
15  variables to be complete and sufficient.
16     Q.  Was there any reason why you did
17  not include within your regression work data that
18  you had, other than the 2000 data?
19     A.  The -- yes.  I have access to a lot
20  more data than in the regression models.
21     Q.  Was there any transactional data
22  for corrugated products, invoice level data, that
23  you elected not to use?
24     A.  Yes, interdependent sales,
25  self-supply transactions and exports.

**[Page 92]**

1     Q.  I didn't word my question very
2  carefully.
3     Was there any defendant for whom
4  you elected not to include any data for that
5  defendant for some period of time, even though you
6  had some data available for that defendant?
7     A.  Not that I recall, unless I wasn't
8  able to understand and process that data.  Take a
9  look at the transactions data.
10     Q.  But sitting here today, you don't
11  recall excluding, say, the corrugated products
12  data for Temple; is that correct?
13     A.  That's correct.
14     Q.  And you don't recall whether you
15  excluded the corrugated products data for
16  Georgia-Pacific; is that correct?
17     A.  I may -- I think I did exclude
18  some -- I don't recall it precisely, but I may
19  have excluded some early corrugated data for
20  Georgia-Pacific, Georgia-Pacific.
21     Q.  Why?
22     A.  In a phone conference with
23  Georgia-Pacific, we were -- I was -- I was
24  essentially told that the data was unreliable from
25  my recollection.

**[Page 93]**

**[24]  (Pages 90 to 93)**

1    Q.  If you could turn to your report,
2  Exhibit 13, again, and go to Page 13 and look at
3  Paragraph 32, which was the question you started
4  to answer for me a moment ago of what was
5  excluded, I believe.
6         So you listed here that you
7  "removed from the transactional data
8  inter-defendant trades within-defendant transfers,
9  sales designated as exports and foreign sales."
10        Do you see those?
11   A.  Yes, I do.
12   Q.  Was the reason why you excluded
13  those because they were not, as you understood it,
14  within the class that was alleged in this case?
15   A.  That's correct.
16   Q.  If you look at Footnote 20 at the
17  end of that sentence, it says:
18        "Across defendant datasets,
19        the total number of class member
20        identifications is 230,884."
21        Do you see that?
22   A.  Yes.
23   Q.  What does that mean?
24   A.  That means that the information
25  available to me to identify the purchaser from a

**[Page 94]**

1  defendant.  That's what I'm referring to, who
2  meets the cate- -- meets the qualifications of
3  being a class member, or potential class member,
4  amounted to 230,884 different entries.
5         They may be referring to the same
6  economic entity, but I haven't been able to
7  determine that.
8    Q.  But in theory, there could be
9  230,884 different customers?
10        MR. GOLDBERG:  Object to the form
11  of the question.
12  BY MR. McKEOWN:
13   Q.  Is that correct?
14   A.  I don't believe that's
15  correct.
16   Q.  Why not?
17   A.  Because I undertook some limited
18  comparisons across different customer
19  identifications and saw similarities that I had no
20  way of systematizing and expanding across
21  defendants' dataset, within each defendant's
22  datasets or across defendants' datasets to make
23  the connections between one identification and
24  another, but they appear to be the same economic
25  entity.

**[Page 95]**

1    Q.  How much time did you spend on that
2  effort?
3    A.  I don't recall.  It's a task that I
4  undertook in part myself and also delegated to
5  others.
6    Q.  How many overlaps did you see?
7         MR. GOLDBERG:  By "overlaps" --
8         MR. McKEOWN:  I --
9         MR. GOLDBERG:  Excuse me.  By
10 "overlaps" you mean what Dr. Dwyer described where
11 he saw -- not in a systematic way, but that across
12 defendants or within defendants different customer
13 identifiers could be the same economic entity.
14        MR. McKEOWN:  Correct.
15        MR. GOLDBERG:  Thank you.
16        MR. McKEOWN:  Well phrased,
17 Mr. Goldberg.
18        THE DEPONENT:  I don't recall the
19 number.  Some -- I do recall seeing for some
20 apparent national customers several different
21 identifications.
22 BY MR. McKEOWN:
23   Q.  Can you give me any estimate of the
24 number of customers that as you looked at this you
25 concluded there was some overlaps or likely

**[Page 96]**

1  overlaps of customer names across the datasets and
2  across defendants?
3    A.  No.
4    Q.  Was it more than a thousand?
5         MR. GOLDBERG:  Your question is
6  that he, Dr. Dwyer, saw?
7         MR. McKEOWN:  Correct.
8         THE DEPONENT:  In the data that I
9  reviewed, which was a small sample, I would say
10 the number was -- of entities that appeared to me
11 to have multiple identifications out of a
12 relatively small sample was in a 100 to 200 range.
13 BY MR. McKEOWN:
14   Q.  Do you have any idea how many your
15 team saw that they thought might be overlaps or
16 had similar names?
17        MR. GOLDBERG:  Your question is a
18 nominal number, not a percentage?
19        MR. McKEOWN:  Correct.
20        THE DEPONENT:  No, I don't.  It
21 would be about the same order.
22 BY MR. McKEOWN:
23   Q.  Several hundred?
24   A.  Yeah.
25   Q.  Now, you say in the last sentence

**[Page 97]**

**[25]  (Pages 94 to 97)**

1    of Footnote 20:
2         "This is but one reason
3    why class member counts are
4    likely overstated here."
5         Do you see that?
6    A.   Yes.
7    Q.   Okay.  So basically what you're
8    suggesting is that because there could be a
9    customer who appears in several different
10   defendants' datasets that there may be fewer than
11   230,000 total customers; correct?
12   A.   I think the reason I'm referring to
13   here is within each defendant's dataset, but
14   another reason would be across defendants'
15   datasets.
16   Q.   But the concept is the fact that
17   some customer may appear either across a single
18   defendant's datasets or across different
19   defendants' datasets is why you think that class
20   member counts are likely overstated when you say
21   230,884; is that correct?
22   A.   That's correct.
23   Q.   Now, you say
24        "Why the share of
25   class members showing evidence

[Page 98]

1         of impact is likely understated."
2         Do you see that at the end of that
3    footnote?
4    A.   Yes, I do.
5    Q.   Is there any situation in your view
6    when it could be overstated?
7    MR. GOLDBERG:  It being?
8    MR. McKEOWN:  Evidence of the fact
9    that he's found in this case.
10   MR. GOLDBERG:  The estimate of
11   class members who were impacted.
12   THE DEPONENT:  Not from the basis
13   of -- no, I don't on the basis of this mechanism,
14   no.
15   BY MR. McKEOWN:
16   Q.   Let's talk a little bit about your
17   regression model.
18        You used, as we talked about
19   before, several regression models; correct?
20   A.   Yes.
21   Q.   And in each of those models, you
22   defined your dependent variable as a price
23   variable; is that correct?
24   A.   Yes.
25   Q.   And I think you used the monthly

[Page 99]

1    value for the log of the net price; is that
2    correct?
3    A.   That's the underlying building
4    block of the price period, yes.
5    Q.   And you would have -- in each model
6    you would have a single price entry for every
7    month that's included within the model; correct?
8    A.   Yes.
9    Q.   So it's not like you're putting all
10   millions of transactions into that model and
11   running regressions in all of them; you have a
12   value for each month, from January 1, 2001 through
13   December of 2012; correct?
14   MR. GOLDBERG:  Object to the form.
15   THE DEPONENT:  Yes.
16   BY MR. McKEOWN:
17   Q.   In your models -- is it correct
18   that you have three models for your intermediate
19   containerboard products and three models for your
20   final containerboard products?
21   A.   Yes.
22   Q.   You would then calculate, I take
23   it, this monthly value for the log of the net
24   price for whatever the group of products were for
25   that particular model; correct?

[Page 100]

1    A.   Yes.
2    Q.   So that if I look at the model for
3    intermediate containerboard products, it's going
4    to be the price value that you calculated based on
5    pricing for containerboard and sheets; correct?
6    A.   Yes.
7    Q.   Similarly, if I looked at the final
8    containerboard products model it would be the
9    price variable that you calculated with respect to
10   the boxes and the package, the corrugated
11   packaging and the displays; correct?
12   A.   Yes.
13   Q.   How did you determine the monthly
14   percentage change of net prices?  And for this
15   purpose -- let me back up.
16        Did you use -- I don't want to
17   repeat this for both intermediate and final all
18   the way.
19        Did you basically use the same
20   approach for calculating the price variable for
21   the intermediate product models and for the final
22   product models?
23   A.   Yes, I did.
24   Q.   Okay.  Can you describe for me how
25   you did that?

[Page 101]

A.   The starting point was the -- within one of those product classes, I identified individual customer product combinations and the mobile price for each of those customer product combinations for a given month.  Those are the starting prices that go into the calculations.

Then I looked for consecutive months where I had seen an observation on price, at least one observation on price in two consecutive months for that first given customer and product as I define them.

So then the log difference is what I used as the approximate percentage change for that customer product combination from one month to the next.

Q.   If I am a customer and I purchase ten products from one of the defendants and I purchase them, all ten two months in a row, would there then be ten entries for me in this process?

A.   Yes, there would.

Q.   Now, if I purchased only two products and I purchased them in both months and -- let's say January to February, and the price of one product went up 6 percent from January to February and the price of the other

**[Page 102]**

product went down 2 percent, so it was a negative 2, is the product -- or price, as its entered into your calculation, 2 percent, the average between those?

A.   It is, the average percentage change.

Q.   So even though one of my products went down by 2 percent, there's a positive price change recorded in the model; correct?

A.   As long as the average was positive, yes.

Q.   Did you average across all customers -- all customer product groupings; is that correct?

A.   Yes, within each of those sets of products, intermediate and final containerboard products.

Q.   Let's look at Exhibit 10.

A.   Okay.

Q.   Exhibit 10 is the result of a regression model that you ran; is that correct?

A.   Yes, one for each product class.

Q.   What was your dependent variable for this regression model?

A.   For each regression model the

**[Page 103]**

dependent variable was the aggregate price that we were discussing, in one case, the final containerboard product, in another case intermediate containerboard product.

Q.   So it's the same monthly value that we were talking about before; correct?

A.   Yes.

Q.   Now, for this particular regression, do I understand correctly that basically you have three independent variables, each being a lag of the PPW Index?

A.   Yes.

Q.   And you're showing what the coefficient in what the statistical results are with respect to each of those for the FCP collection and the ICP group; is that correct?

A.   That's correct.

Q.   Do I also read this such that if there were a 10 percent increase in PPW price, this suggests that there would only be a 5 percent increase in the price of these products?

A.   I haven't worked that out.  The regression results show that the increase in the PPW Index would in this analysis phase in over three months.  It would accumulate over three

**[Page 104]**

months.  I haven't added up what that net effect would be.

Q.   But if you wanted to see what the net effect would be from the three months, you would add your three coefficients; correct?

A.   I think it would be somewhat -- that's approximate, but there would be additional effects beyond that.

Q.   But those other effects, whatever they are, are not captured by your independent variables here; is that correct?

A.   They are.

Q.   Where?

A.   Just in the dynamics of it.  So if there was an increase in the PPW Index, this would result, for instance, in the intermediate containerboard product index, yet 24 percent of that would be passed on immediately.

And then, that's right.  Then -- then in the second month, an additional 39 percent would accumulate, so it would accumulate over -- over three months and then start to dissipate.

Q.   So that after three months there would be roughly what, 63 percent in the intermediate containerboard products?

**[Page 105]**

**[27]   (Pages 102 to 105)**

1    A.  That's right, and then it would
2    start to decay.
3    Q.  Do you know why it decays?
4    MR. GOLDBERG:  By "know," you mean
5    does he have a hypothesis?
6    MR. McKEOWN:  Correct.
7    THE DEPONENT:  In this
8    specification, a permanent increase in the PPW
9    Index would have a permanent effect on these -- on
10   these price series.
11   BY MR. McKEOWN:
12   Q.  Let's talk a little bit about the
13   final containerboard products and intermediate
14   containerboard products.
15   We discussed them briefly before,
16   but did you ever run any economic analysis to
17   determine whether you could define a relevant
18   product market for these separate groups?
19   A.  No, I didn't do a relevant product
20   analysis.
21   Q.  Have you ever done a relevant
22   product market for any of the products within
23   either FCP or ICP?
24   MR. GOLDBERG:  By "ever" you mean
25   in terms of investigation in this case?

[Page 106]

1    MR. McKEOWN:  Correct.
2    THE DEPONENT:  No, I have not.
3    BY MR. McKEOWN:
4    Q.  Outside of this case, have you ever
5    done anything in the containerboard industry on
6    what the relevant product market is?
7    A.  No, I haven't.
8    Q.  Have you done anything to study the
9    relevant geographic market for this case?
10   A.  Aside from reviewing documents in
11   this case that focus on North America being a
12   market to study, that is studied and considered as
13   a whole market, I haven't done anything beyond
14   that.
15   Q.  What do you believe to be the
16   relevant geographic market for the products in
17   this case?
18   A.  In this case, I believe that the
19   relevant geographic market is to the United States.
20   Q.  If there are mills in Mexico, are
21   they not included within the relevant market?  And
22   by "mills," I mean containerboard mills.
23   MR. GOLDBERG:  Object to the form
24   of the question.
25   THE DEPONENT:  In terms of a

[Page 107]

1    relevant geographic market, it would be where --
2    I'm referring to where transactions take place,
3    and that might be best to interpret as where
4    delivery takes place, so Mexican mills that are
5    supplying customers in the U.S. would be
6    considered as part of the relevant market.
7    BY MR. McKEOWN:
8    Q.  So you would -- if there's a
9    containerboard mill in Mexico, you would consider
10   the portion of the containerboard production
11   that's sold into the United States to be part of
12   the market and the part that was sold into Mexico
13   not to be part of the market; is that correct?
14   A.  I haven't been asked to render an
15   opinion on relevant market, but as I sit here
16   today, that seems reasonable to me.
17   Q.  Would the same be true for mills in
18   Canada?
19   A.  Yes.
20   Q.  In your report, Exhibit 13, on
21   Page 21, Paragraph 57, about seven lines down, and
22   this is in the section talking about the damages,
23   multiple regression analysis.  It says:
24   "This typically involves
25   the specification and estimation

[Page 108]

1    of the equation relating class
2    member prices to economic factors
3    affecting price."
4    Do you see that?
5    A.  Yes, I do.
6    Q.  Now, does specification relate to
7    selecting the format of the model?
8    A.  I think that's a reasonable synonym
9    for it.
10   Q.  I'm trying to distinguish what's
11   specification and what's estimation.
12   Is estimation when you run the
13   model and specification when you set up the model?
14   A.  That's disenchanting.
15   Q.  Okay.  And do you believe that
16   specification is an important part of the model?
17   A.  Yes.
18   Q.  You want to make sure that you have
19   considered the factors that are important to the
20   particular market; is that correct?
21   A.  That's correct.
22   Q.  Okay.  In the last sentence of
23   Paragraph 57, you say:
24   "These economic factors
25   function as controls - their

[Page 109]

[28]  (Pages 106 to 109)

1    influence on prices is taken
2    to be independent of the
3    alleged conspiracy."
4        Do you see that?
5    A. Yes, I do.
6        Q. Is that referring to the factors
7    that would be included within the model as part of
8    your specification process?
9    A. Yes.
10        Q. So that if you left out an
11    important economic factor that might explain some
12    of the change in price, it's possible that that
13    change in price would be attributed to the dummy
14    variable for conspiracy; correct?
15    A. That's possible.
16        Q. If you could take a look at
17    Exhibit 11, and if you have Exhibit 12 out, get
18    both of them out at the same time.
19        MR. GOLDBERG: I'm going to have to
20    open my -- the copies you gave us did not have
21    Exhibit 12 sheets. I have it because I came
22    prepared.
23        MR. STEMWEDEL: You can have that.
24        MR. GOLDBERG: That's great. Thank
25    you very much. I'll use this one.

**[Page 110]**

1    Q. I'm sorry. You used the same
2    methodology, AICC, BIC and 10PC?
3    A. Correct.
4        Q. And then if I look at the far right
5    column which says "average," where we look at, for
6    example, the final containerboard products,
7    Overcharge line says 2.92 percent.
8        Do you see that?
9    A. Yes, I do.
10        Q. Is that just a straight average
11    across the three column results?
12    A. Yes, it is.
13        Q. You're not going to weight it or
14    change it in any way?
15    A. No.
16        Q. Similarly for the ICP, where we see
17    the 3.81 percent in the Average, that's just the
18    straight average across those three columns;
19    correct?
20    A. Correct.
21        Q. Now, when we go to Exhibit 12 --
22    and this is Exhibit 12 to your report as well;
23    correct?
24    A. Yes, it is.
25        Q. If we look in the far right column,

**[Page 112]**

1    BY MR. McKEOWN:
2        Q. Dr. Dwyer, have you found Exhibits
3    11 and 12?
4    A. I have.
5        Q. So let's look first at Exhibit 11,
6    and in this chart, top half of the chart relates
7    to FCP, or final containerboard products; correct?
8    A. That's correct.
9        Q. Bottom half to ICP, or intermediate
10    containerboard products; correct?
11    A. Yes.
12        Q. Which we've discussed before. Then
13    there are columns going across, AICC, BIC, 10PC
14    and average; correct?
15    A. Yes.
16        Q. Is it correct that for the FCP
17    grouping of data, the final containerboard
18    products, you ran three multiple regression
19    models, the AICC, BIC and 10PC?
20    A. Yes, it is.
21        Q. Is it also correct that you ran the
22    same three models with the intermediate
23    containerboard product data?
24    A. Similar. I used the same
25    methodology.

**[Page 111]**

1    the second and third line, there's one for -- a
2    row for all defendants, ICP, which comes out with
3    an overcharge average of 3.81 percent, and that
4    came from the 3.81 percent we saw in Exhibit 11 in
5    the Average; is that correct?
6    A. That's correct.
7        Q. Similarly, the 2.29 percent for
8    final containerboard products, that was taken from
9    Exhibit 11 in the Average column; is that correct?
10    A. Yes.
11        Q. At the top where it's 3.08 percent,
12    what is that?
13    A. That's the dollar weighted average
14    of the -- of these prior two numbers, 2.92 and
15    3.81.
16        Q. And did you get the weighted
17    average by merely adding up what the purchases
18    were and what the damage estimates were and
19    calculating a percentage, or did you run it
20    separately?
21    A. It's using that methodology, that
22    average methodology you described.
23        Q. Now, you also list below that each
24    of the individual defendants with a percentage
25    overcharge.

**[Page 113]**

**[29] (Pages 110 to 113)**

1        What is that?
2        A.  That's using a similar methodology
3    applying a 2.92 percent overcharge to each
4    defendant's final containerboard product sales and
5    3.81 percent overcharge to the intermediate
6    containerboard product sales to class members and
7    then combining those based on dollar weighting to
8    get an overall overcharge percentage.
9        Q.  So the reason why different
10   defendants have different percentages in the
11   overcharge percentage is because they sold
12   different relative proportions of final
13   containerboard products versus intermediate
14   containerboard products; is that correct?
15       A.  That's correct.
16       Q.  And that's the only reason for the
17   distinction here; correct?
18       A.  Yes.
19       Q.  You did not run a separate
20   regression across the data for each defendant?
21       A.  That's correct.
22       Q.  Now, if we look in your report on
23   Page 22 --
24       MR. GOLDBERG:  We're back to
25   Exhibit 13?

**[Page 114]**

1        Q.  And those 150 are what are going to
2    go into your principal components analysis; is
3    that right?
4        A.  That's right.
5        Q.  Now, I noticed on, going back to
6    Exhibit 11 for just a moment, that the observations
7    under both the FCP section of the chart and the
8    ICP section of the chart listed 144.
9        Do you see that?
10       A.  Yes, I do.
11       Q.  Is that because there were 144
12   months within the period that you were studying?
13       A.  Yes, it does.
14       Q.  And you've got an observation or a
15   price calculation for each of those 144 months;
16   correct?
17       A.  That's right.
18       Q.  So that means that you actually had
19   more variables than you had observations in your
20   regression models; true?
21       MR. GOLDBERG:  Object to the form.
22       THE DEPONENT:  I have more
23   explanatory variables in my empirical analysis
24   than observations, yes.
25   ///

**[Page 116]**

1        MR. McKEOWN:  We are.
2    BY MR. McKEOWN:
3        Q.  -- you list four groups of economic
4    factors that you are considering for purposes of
5    your model; is that right?
6        A.  Yes.
7        Q.  So that Paragraph 61 appears to
8    describe what you have as the economic factors
9    measuring downstream demand; correct?
10       A.  That's correct.
11       Q.  And Paragraph 62 appears to be cost
12   factors; is that correct?
13       A.  That's correct.
14       Q.  Paragraph 63 addresses the need for
15   inflation; is that right?
16       A.  Yes.
17       Q.  And then Paragraph 64 addresses
18   your view that there's a need for an indicator to
19   adjust for seasonality; is that correct?
20       A.  That's correct.
21       Q.  Is it also correct that if I were
22   to count all the variables that you have plus
23   their various leg numbers, I would come up with
24   about 150 variables?
25       A.  Yes, it is.

**[Page 115]**

1    BY MR. McKEOWN:
2        Q.  Have you run regressions before
3    where you've had more explanatory variables than
4    observations in your regressions?
5        MR. GOLDBERG:  Same objection.
6        THE DEPONENT:  I've used principal
7    components before and I don't recall, sitting
8    here, whether -- whether there were more factors,
9    more economic factors being combined than
10   observations.
11   BY MR. McKEOWN:
12       Q.  Let me ask you a different
13   question.
14       Was the reason why you included all
15   these various factors that we see in Paragraphs 61
16   through 64 of your report because you wanted to
17   include all the factors that you thought might
18   influence price during this period?
19       A.  Yes.
20       Q.  Was it the case that you wanted to
21   include both factors from the supply side and from
22   the demand side in your model?
23       A.  Yes.
24       Q.  It appears from the work papers
25   that you provided that some of the factors, the

**[Page 117]**

**[30]  (Pages 114 to 117)**

1    measures are squared as opposed to just the
2    straight number being put in, suggesting that
3    there was some kind of quadratic relationship
4    anticipated.
5              Who made that choice?
6         A.  I did.
7         Q.  And what was the reason why you
8    might use quadratic functional form as opposed to
9    something else?
10        A.  Quadratic is a simple way to
11   capture a relationship that is not completely
12   linear between explanatory variable and a
13   dependent variable, a variable and timely model
14   but price in this context.
15             So I didn't use the quadratics in
16   place of the linear terms but in addition to them.
17        Q.  So you have both linear factor plus
18   the quadratic factor as variables?
19        A.  That's correct.
20        Q.  You also have some factors where it
21   appears you use the log of value; is that correct?
22        A.  Yes, that's correct.
23        Q.  Again, was that a choice that you
24   made?
25        A.  Yes, it was.

**[Page 118]**

1         Q.  In that case, did you include both
2    the original value plus the log or just the logs?
3         A.  Just the logs.
4         Q.  What was your reason for electing
5    to use the logs rather than the actual values?
6         A.  That's a very common technique that
7    is used to -- often to mitigate something called
8    heteroskedasticity, which refers to the potential
9    that there is variation from month to month in the
10   unexplained portion of it, of an analysis.
11             Oftentimes, that can be mitigated
12   by converting to law versus linear relationships.
13   It also provides a percentage with linkage
14   between explanatory variables and dependent
15   variables as opposed to some absolute level
16   relationship between them.  I find percentage
17   changes to be more compelling than absolute level
18   changes.
19   BY MR. McKEOWN:
20        Q.  So you made the choice in those
21   situations to use the log of value; correct?
22        A.  That's correct.
23        Q.  Is it also correct that within your
24   regression model you apply a principal components
25   analysis and a stepwise regression model?

**[Page 119]**

1         A.  I use a principal components
2    analysis and I use a model selection procedure
3    that has a step function to it.  Stepwise can
4    sometimes have a particular meaning that would be
5    inappropriate here.
6         Q.  And that wasn't intending to
7    suggest any particular meaning by "stepwise," but
8    let me -- I want to distinguish between -- one
9    could have the principal components model and not
10   use a progression with a step function; is that
11   correct?
12        A.  One could use principal components
13   and take alternative approaches to model selection
14   other than what I took, yes.
15        Q.  And similarly, one could use a
16   model with a step function but not use the
17   principal components analysis; also true?
18        A.  Yes, that's true.
19        Q.  Now, I want to direct your
20   attention to Paragraph 66, and -- well, let me
21   start with the second line.  It says:
22             "I use a stepwise model
23        selection procedure."
24             So should that be a model selection
25   procedure with a step function as opposed to a

**[Page 120]**

1    stepwise?
2         A.  There I need to get a more general
3    context, yeah.
4         Q.  Okay.  That's actually not the
5    sentence I was interested in, but given your last
6    answer, I'm sorry.
7             The -- I'm interested in the
8    sentence that starts at the end of the third line.
9    It says:
10            "In this way, the model
11        selection process is fully
12        reproducible and is not
13        influenced by subjective
14        determinations nor by
15        implications with respect to
16        the estimated conspiracy
17        effect of the selection of
18        some economic factors versus
19        others."
20            Do you see that?
21        A.  Yes, I do.
22        Q.  Does that sentence relate to your
23   model with the step function, the principal
24   components analysis or both?
25        A.  That relates to both.

**[Page 121]**

**[31]  (Pages 118 to 121)**

1  Q.  Did you in this case ever run and
2  reject a regression model that did not include
3  both the principal components and a model with a
4  step function?
5         MR. GOLDBERG:  Object to the form
6  of the question.
7         THE DEPONENT:  No, I did not.
8  BY MR. McKEOWN:
9  Q.  Is it correct that the reason why
10  you used the principal components analysis was
11  because you were concerned about collinearity
12  issues across your independent variables?
13  A.  That's correct.
14  Q.  What is the most common approach to
15  solving a collinearity problem across variables?
16         MR. GOLDBERG:  Object to the form
17  of the question.
18         THE DEPONENT:  I'm not sure what
19  the most common one would be, or if there is a
20  most common approach.
21  BY MR. McKEOWN:
22  Q.  Did you consider collinearity a
23  serious issue here?
24         MR. GOLDBERG:  Object to the form
25  of the question.

**[Page 122]**

1         THE DEPONENT:  I considered it a
2  significant issue that I wanted to address.
3  BY MR. McKEOWN:
4  Q.  Did you consider collinearity in
5  the model that you ran here something that you
6  needed to correct for by one means or another?
7         MR. GOLDBERG:  Object to the form
8  of the question.
9         THE DEPONENT:  Yes, and I believe
10  it's generally corrected for in most empirical
11  work.
12  BY MR. McKEOWN:
13  Q.  Let's talk about the principal
14  components analysis.
15         Is it correct that the values for
16  the 150 variables are entered into the principal
17  components analysis and then the computer selects
18  or creates a variable that explains the most
19  covariance across those variables?
20  A.  The computer computes a whole set
21  of principal components.  The first one has the
22  most variance -- explains the most variance across
23  those variables.
24  BY MR. McKEOWN:
25  Q.  Maybe I didn't explain.  So if

**[Page 123]**

1  the -- let me try again, and I'm going to try to
2  use your language.
3         The values for these 150 variables,
4  you enter them into the software; correct?
5  A.  Yes.
6  Q.  The software then determines what
7  explains the most covariance across those 150
8  variables; is that correct?
9  A.  That's correct.
10  Q.  And the software then creates a
11  principal components variable number one; is that
12  correct?
13  A.  Yes.
14  Q.  Okay.  And I think in your model it
15  was like PCA, underscore, CD, underscore, and then
16  a number?
17  A.  That may be how they were
18  numerated, yes.
19  Q.  Okay.  After the program has
20  selected this first variable, it then goes across
21  the remaining variance that exists across your 150
22  variables and tries to determine what explains the
23  next largest amount of variance; is that correct?
24  A.  That's correct.
25  Q.  Now, it -- let's assume for the

**[Page 124]**

1  moment that the nomenclature that was given by
2  your program was PCA, underscore, CD, underscore,
3  1 for the first, PCA_CD_2, PCA_CD_3, et cetera,
4  okay?  So we're talking about it.  That variable
5  PCA_CD_1, what does that represent?
6  A.  It's a linear combination.  It's a
7  weighted average in the sense of the underlying
8  explanatory variables.
9  Q.  Is it tied to any particular
10  subgroup of the variables?
11         MR. GOLDBERG:  Object to the form
12  of the question.
13         THE DEPONENT:  It generally would
14  include weights on all of the variables.
15  BY MR. McKEOWN:
16  Q.  So it would -- it would come up
17  with a variable that gives some weight to a large
18  number, if not all, of the 150 variables; is that
19  correct?
20  A.  Yes, it is.
21  Q.  But looking at that variable,
22  looking at the coefficient on that variable is not
23  going to tell me anything about the effect of a
24  particular factor on price --
25         MR. GOLDBERG:  Object to the form

**[Page 125]**

**[32]  (Pages 122 to 125)**

1    of the --
2    BY MR. McKEOWN:
3        Q.   -- is that true?
4            MR. GOLDBERG:  Object to the form
5    of the question.
6            THE DEPONENT:  Not in itself, no.
7    BY MR. McKEOWN:
8        Q.   And let me give you an example in
9    another context to see -- see if I understand this
10   right.
11           If, for example, we were running a
12   regression in a wage discrimination case, one of
13   the independent variables you might use is level
14   of education and another one might be experience,
15   and you would have some expectation going in as to
16   whether there would be a positive or negative
17   coefficient on those specific variables.
18           Would you agree with that
19   generally?
20       A.   There could be sample selection
21   issues, but putting those aside, I would agree
22   with that.
23       Q.   And is it the case that with the
24   principal components variable, I'm not going to be
25   able to take any particular significance from

**[Page 126]**

1    them, and in my experience, in this case and in
2    other cases, I have not found that there are more
3    principal components identified than observations.
4        Q.   In this case, it appears that you
5    ended up with fewer principal components than 150;
6    is that correct?
7        A.   That's correct.
8        Q.   About 133, does that sound about
9    right?
10       A.   Yes, it does.
11       Q.   Here's my question:  How did it
12   become determined that it stopped after 133?  Is
13   that something you did?  Is that something the
14   computer did?  Is that something you set the
15   computer so that it did?  Why do we have 133 of
16   these PCA variables?
17       A.   It's not a -- I have not looked
18   into whether that selection is something that I
19   have control over.  I'm using a default program to
20   compute principal components.
21           There's a -- there's a number that
22   summarizes the -- and allows you to rank by this
23   number the principal components in terms of the
24   variance.  Did they explain that?  It's called an
25   eigenvalue.  As that declines, there's some point

**[Page 128]**

1    whether a particular PCA variable is a positive or
2    negative coefficient?
3        A.   Not in itself.
4        Q.   When you say "not in itself," what
5    do you mean?
6        A.   That the principal components
7    procedure reports the weights that are assigned to
8    the underlying variables in creating the first
9    principal component.
10           So multiplying those weights by the
11   coefficient you could recover the implied
12   coefficient on the original variable.
13       Q.   Have you done that in this case?
14       A.   No.
15       Q.   Have you ever done that with a
16   principal components analysis?
17       A.   Sitting here, I'm not sure.  I may
18   have done it in some of my prior casework.
19       Q.   Well, let's -- we have the PCA
20   analysis and it's going to run PCA_CD_1, PCA_CD_2,
21   PCA_CD_3.  Theoretically, it could go up to
22   PCA_CD_150; is that right?
23       A.   I'm not sure.  There is a
24   significant literature on having more factors than
25   observations and using the components to combine

**[Page 127]**

1    at which the program determines that it's
2    sufficiently close to zero that it cannot -- it
3    would not estimate another principal component
4    based on that.
5        Q.   So you use the default set up in
6    the software; is that correct?
7        A.   That's right.
8        Q.   And again, going back to your
9    report in Paragraph 66, when you say that the
10   "model selection process is fully reproducible and
11   is not influenced by subjective determinations,"
12   you didn't make the determination as to where to
13   cut it off; is that right?
14       A.   That's right.
15       Q.   And are you comfortable with the
16   PCA program cutting it off where it did?
17       A.   Yes, I am.
18       Q.   Did you make any testing to see if
19   you should include more variables than what the
20   PCA program included?
21       A.   No, I didn't.
22       Q.   Now, it's possible, isn't it, that
23   some of the ones that were cut off and not
24   included of the PCA variables could be correlated
25   with your dependent variable in your regression;

**[Page 129]**

**[33]  (Pages 126 to 129)**

1  correct?
2       A.  Sitting here, I don't know that
3  they are recoverable or -- so I don't know.
4       Q.  You wouldn't know unless you had
5  those variables and ran them across the price
6  dependent variable; correct?
7       A.  I don't know whether there --
8  whether I can have those variables.  I don't know
9  whether they can be computed.
10      Q.  You don't know if the default can
11 be changed so you can find out what they were?
12      A.  That's right, or even if there is a
13 default beyond machine precision.
14      Q.  So we had the 150 variables, they
15 went into the software for the PCA, we come out
16 with these 133 PCA variables; correct?
17      A.  That's correct.
18      Q.  You're going to use those 133 PCA
19 variables and put them into your regression model
20 with the step function; is that correct?
21      A.  Yes.
22      Q.  Now, when I look at Exhibit 11,
23 and, specifically, let's look at the top half,
24 final containerboard products.  The third row says
25 "regressors."  It says under the AICC model, 65;

[Page 130]

1  on the AICC fitting, and then I look at the top
2  ten principal components in terms of P-value,
3  which was 6, and estimated the model just based on
4  those and the remaining factors in the final AICC
5  model.
6       Q.  And the reason why the regressor is
7  20 as opposed to 10 in the 10PC is because you
8  have a variety of dummy variables in principal; is
9  that correct?
10      A.  And the inflation variables.
11      Q.  Was the 10PC model run as a
12 regression without any step function?
13      A.  That's correct.
14      Q.  So you took what the step function
15 told you from the AICC, included the inflation
16 variables, included your dummy variables, and
17 included the top 10 most influential PCA variables
18 and you ran a straight regression on that for the
19 10PC; is that correct?
20      A.  Yes, that's correct.
21      MR. GOLDBERG:  Whenever you have a
22 good time to stop.
23      MR. McKEOWN:  This is fine.
24      MR. GOLDBERG:  I'm very impressed,
25 by the way.

[Page 132]

1  under the BIC model, 108; and under the 10PC
2  model, 20.
3       Do you see that?
4       A.  Yes, I do.
5       Q.  Is the reason why the regressors
6  listed here is less than 133 because the step
7  program determined which regressors to include in
8  your model?
9       A.  Yes, it is.
10      Q.  It's not the case that you put
11 fewer than the 133 into any of these models;
12 correct?
13      MR. GOLDBERG:  Object to the form.
14 BY MR. McKEOWN:
15      Q.  Let me back up.
16      It's not the case that you put
17 fewer than 133 into the AICC or the BIC model; is
18 that correct?
19      A.  That's correct.
20      Q.  The 10PC model is the top 10 ranked
21 PCA.  Why don't you tell me what went into the --
22      A.  Sure.  The top 10 is taking -- is
23 an exercise in the -- seeing what happens with a
24 smaller set of regressors, and so I just went to
25 the smallest set I had available, which was based

[Page 131]

1       THE VIDEOGRAPHER:  Going off the
2  record at 11:55.
3       (Whereupon, a recess was held
4       from 11:55 a.m. to 12:12 p.m.)
5       THE VIDEOGRAPHER:  We are back on
6  the record at 12:12.  This is Disc 3 of the
7  deposition of Dr. Mark Dwyer.
8  BY MR. McKEOWN:
9       Q.  Dr. Dwyer, if you could pull your
10 report out again, Exhibit 13.  I want to talk a
11 little bit about the regression model with the
12 step function.
13      Am I describing that properly as
14 opposed to stepwise model?
15      A.  That's fine.
16      Q.  Looking at your report at Page 23,
17 there's a Footnote 35.  It says:
18      "This procedure is
19      implemented in the Stata
20      statistical software."
21      Do you see that?
22      A.  Yes, I do.
23      Q.  Do you know what version of the
24 Stata statistical software you used?
25      A.  I used Stata 13.

[Page 133]

[34]  (Pages 130 to 133)

1      Q.  Stata, I'm sorry.  I pronounced it
2   wrong.
3          And is there other software that
4   would also run a comparable program?
5      A.  I -- I imagine so, but...
6      Q.  You're not aware of any?
7      A.  No.
8      Q.  I'm sorry?
9      A.  No, I'm not aware.  I wouldn't be
10  surprised.
11         MR. GOLDBERG:  By other software,
12  you mean other statistical software packages.
13         MR. McKEOWN:  Correct, that one
14  that could run a --
15         MR. GOLDBERG:  SAS or something
16  like that.
17  BY MR. McKEOWN:
18     Q.  Something like that, yeah.
19         But you're not aware of any others;
20  is that right?
21     A.  I'm not aware of whether they do or
22  do not.
23     Q.  There's an article cited there from
24  Lindsey and Simon.
25         Do you see that?

**[Page 134]**

1      A.  Yes.
2      Q.  What was the purpose for citing
3   that article?
4      A.  That article describes the
5   procedure in Stata that I used.
6      Q.  Is it correct that the way the
7   Stata software works is that all of the variables
8   that are put into -- independent variables that
9   are put into the software package, that the
10  computer program selects the variable that appears
11  to explain most variations of dependent variable?
12     A.  Yes.
13     Q.  And once it has selected the first
14  variable, it moves and sees which variable
15  attributes most of the next amount of variation to
16  that variable?
17         MR. GOLDBERG:  Object to the form.
18         THE DEPONENT:  Yes.
19  BY MR. McKEOWN:
20     Q.  Is it the case that the software
21  essentially moves in order such that each
22  successive variable that is added explains the
23  most of what's remaining variation and the
24  dependent variable that hasn't been explained by a
25  variety of variables?

**[Page 135]**

1      A.  That's correct.
2      Q.  So as the economist running this
3   program, you take the results of the PCA analysis
4   and you determine what other variables you're
5   going to include in the step program, and then the
6   computer selects the variables; is that correct?
7          MR. GOLDBERG:  Object to the form.
8          THE DEPONENT:  That's the program
9   running on the computer, yes.
10  BY MR. McKEOWN:
11     Q.  And the program -- as we look at
12  Exhibit 11 again, it appears that the AICC program
13  selected 65 variables; is that correct?
14     A.  Yes.
15     Q.  And is it the fact that the
16  computer makes these selections why you view this
17  approach as not influenced by subjective
18  determinations?
19     A.  Yes, it is.
20     Q.  The end of Paragraph 66 also says:
21         "Nor by implications
22         with respect to the estimated
23         conspiracy effect of the
24         selection of some economic
25         factors versus others."

**[Page 136]**

1          What did you mean by that?
2      A.  That in a -- in an alternative
3   procedure where one started with a set of
4   candidate explanatory variables and then arrived
5   at a regression model with fewer factors in it,
6   where the process of determining those factors
7   isn't clearly spelled out or reproducible in
8   this -- in this systematic way, it's not clear
9   whether some of the selection was done with an eye
10  towards the final conspiracy effect or not, or the
11  effected interest in general.
12     Q.  So you wanted to put every
13  potentially explanatory variable into the mix and
14  let the computer besides you with your PCA or the
15  step program how to evaluate that variable; is
16  that right?
17     A.  I put in the ones that I -- through
18  my own economic training and through my review of
19  the discovery documents indicated were relevant,
20  economic variables and then allowed the computer
21  to make the final decision.
22     Q.  What's the difference between a
23  forward selection and a backward elimination step
24  pump?
25     A.  A forward selection starts with a

**[Page 137]**

**[35]  (Pages 134 to 137)**

1  core model in which the variables that are
2  entering into the model selection are absent and
3  considers adding a variable one step at a time, as
4  we described earlier, building up a model, until a
5  certain -- until none of the remaining factors
6  meet a certain threshold of explanatory power.
7          The backward selection starts with
8  a model with many factors in it and then looks for
9  the least significant factor, and that -- that is
10  subject to a certain criteria, and eliminates
11  factors until all the remaining factors pass that
12  same threshold of significance of explanatory
13  power.
14      Q.  In this case, did you use a forward
15  selection or backward elimination model?
16      A.  I used a forward selection.
17      Q.  So that at some point the reason
18  why we have fewer than 133 regressors is because
19  the Stata software package determined that
20  anything that was left didn't meet some certain
21  threshold of explanatory power; is that right?
22      A.  That's correct.
23      Q.  Do you know what that threshold of
24  explanatory power is?
25      A.  It's determined by the different

[Page 138]

1  what they're meant them to do.  They have certain
2  optimality properties, in terms of dealing with
3  this issue about what is the correct set of
4  regressors to use, how many correct regressors to
5  use, how many correct factors, explanatory factors
6  to use to capture and to explain movements in a
7  dependent variable.
8  BY MR. McKEOWN:
9      Q.  And when you say "explain movements
10  in" independent -- independent or dependent
11  variable?
12      A.  Dependent.
13      Q.  Dependent.
14          Okay.  So it was, if the step
15  program drops off a variable, basically it's
16  saying that that variable has too little
17  explanatory value for an economist to worry about;
18  is that right?
19      A.  Yes.  And it's related to the
20  sample size -- the explanatory power and the
21  number of factors that are in the model at that
22  point.
23      Q.  You were -- when was the last time
24  you looked at the results of your step program
25  regressions?

[Page 140]

1  criteria used here.  One is the AICC refers to a
2  particular way of calculating that threshold, and
3  BIC is another way of calculating that threshold.
4      Q.  And that's not an issue with the
5  10PC model; correct, because you're only taking
6  the top 10 components?
7      A.  That's correct.  That's correct.
8      Q.  Now, with the AICC and BIC, these
9  are two different methodologies for determining
10  when you have reached that threshold of
11  explanatory power?
12      A.  Yes.
13      Q.  Other than defining that threshold,
14  is there any other difference between those two
15  models if you're using the forward selection step?
16      A.  No.
17      Q.  Why should a court be comfortable
18  that if you drop off the variables that the AICC
19  or BIC program says it doesn't need to include,
20  should not in fact be included?
21          MR. GOLDBERG:  Object to the form.
22          THE DEPONENT:  I would say that the
23  court would be comfortable or a researcher such as
24  myself would be comfortable with that because of
25  the properties of the model selection criteria and

[Page 139]

1      A.  As summarized in this exhibit?
2      Q.  Yes.
3      A.  I just looked at them.
4      Q.  Maybe I was not clear.
5          Looking at the work papers that you
6  supplied to us, it appears that one of the
7  variables that the step program did not include
8  for the AICC or the BIC is PCA_CD_1, the very
9  first of the PCA variables selected.  Why
10  shouldn't that variable be included within the
11  step program?
12      A.  The -- one potential reason is I
13  haven't -- I haven't looked at what's been
14  selected or what hasn't been selected, but the --
15  that first principal component is capturing a
16  dominant movement across all of the explanatory
17  variables, the supply and demand cost factors and
18  so on, and one of the variables I maintain in the
19  model is an inflation correction, producer price
20  index, and so I would not be surprised if a first
21  measure of variability in the explanatory
22  variables is highly aligned with overall level of
23  inflation because we're talking about prices,
24  so...
25      Q.  So even though it comes up as

[Page 141]

[36]  (Pages 138 to 141)

1    PCA_CD_1, the fact that the step program from
2    Stata says that you can exclude that variable,
3    you're comfortable as an economist that that
4    variable isn't going to affect the dependent
5    variable?
6            MR. GOLDBERG: Object to the form.
7            THE DEPONENT: I'm comfortable it's
8    being appropriately excluded.
9    BY MR. McKEOWN:
10           Q.   What's the distinction between
11   being appropriately excluded and whether or not it
12   affects the dependent variable?
13           A.   In the regressions I've run, I'm
14   including inflation factors that are not part of
15   the variable selection process, and so in the
16   absence of those inflation factors that first
17   principal component could very well have a strong
18   explanatory role for aggregate prices as the
19   inflation factor does.
20           So it's my -- one potential
21   interpretation of its being dropped is that it's
22   essentially capturing the role of inflation
23   effect, which is already in the analysis, which is
24   why it's being dropped.
25           Q.   And if we look at, for example, the

**[Page 142]**

1    BIC model for final containerboard products, of
2    that 108 regressors, do you know how many are
3    dummy variables that you require to be in the
4    model?
5            A.   Well, I'm requiring the inflation
6    effects, and there are, I believe, five, including
7    lags of the Producer Price Index, and then there's
8    the conspiracy effect that I'm measuring, so
9    that's six. So I believe that they're -- that --
10   and then there's -- I think those are the -- there
11   would be 102 that would be selected by the BIC
12   criterion. There are six both in the AICC and the
13   BIC that are maintained.
14           Q.   So the step program determined that
15   there were 102 variables that had more influence
16   on the variation in the change in price dependent
17   variable than PCA1; is that correct?
18           A.   Yes, given that the inflation
19   factor is already in the model.
20           Q.   Okay. And are you assuming, then,
21   in that hypothetical that the inflation factor is
22   more highly correlated with the change in price
23   such that it gets selected before PCA1?
24           MR. GOLDBERG: Object to the form
25   of the question.

**[Page 143]**

1            THE DEPONENT: The inflation
2    factors aren't part of the selection process.
3    They're maintained as regressors throughout the
4    selection process.
5    BY MR. McKEOWN:
6            Q.   So the fact that PCA1 is excluded
7    as an economist does not cause you to have any
8    less confidence in your opinion that the step
9    program appropriately excluded whatever variables
10   could be excluded?
11           A.   Not sure how many negatives were in
12   there, but I have no -- no cause for concern that
13   PCA1 was excluded.
14           Q.   And similarly, any other variable
15   that gets excluded from the step program, you have
16   no concern that the fact that that is excluded by
17   the step program; is that correct?
18           A.   That's correct.
19           Q.   Going back to the original category
20   of variables that were in those four paragraphs of
21   your complaint -- or of your report, Paragraph 61,
22   62, 63, 64, did you believe that each of the
23   variables that you included was something that
24   needed to be included?
25           MR. GOLDBERG: Object to the form.

**[Page 144]**

1    BY MR. McKEOWN:
2            Q.   Let me ask it a different way.
3            What was the threshold by which you
4    decided whether or not you needed to include a
5    variable within the entry point into the PCA
6    analysis?
7            MR. GOLDBERG: Object to the form.
8            THE DEPONENT: As an economist, I
9    looked for supply and demand factors that would be
10   relevant to pricing in this industry, and as I
11   turned to documents that I -- I reviewed, I found
12   that these were all represented there.
13           I'm not aware -- there may have
14   been some factors that were not connected to
15   pricing that I did not include, but I believe if
16   that were the case, it was because of data
17   limitation issues.
18   BY MR. McKEOWN:
19           Q.   Do you remember any specifically
20   that you excluded due to data limitation issues?
21           A.   I believe one of the energy
22   variables. I think it might have been referred to
23   as a bunker oil, maybe a Number 6 bunker oil where
24   the series was interrupted or discontinued by the
25   EIA or some other agency that put it together.

**[Page 145]**

**[37]  (Pages 142 to 145)**

| | |
|---|---|
| 1   Q.  If you had failed to include a cost | 1   used, that would be a variable cost of a mill; |
| 2   factor in your regression, could that have the | 2   correct? |
| 3   result of whatever portion of a price change is | 3       A.  It would be an off -- an offset. |
| 4   explained by that cost factor being contributed to | 4       Q.  An offset to the variable cost? |
| 5   the conspiracy dummy instead? | 5       A.  Cost. |
| 6       MR. GOLDBERG:  Object to the form | 6       Q.  So it would reduce your variable |
| 7   of the question. | 7   cost by having this tax credit; correct? |
| 8       THE DEPONENT:  There's certain | 8       A.  That -- that seems correct. |
| 9   situations where that could happen. | 9       Q.  Did you at any time include in your |
| 10  BY MR. McKEOWN: | 10  model -- strike that. |
| 11      Q.  Well, let's say, for example, the | 11      Were you familiar that the black |
| 12  federal government levies a tax on the fuel used | 12  liquor tax credit expired during the class period? |
| 13  at mills, so it raises the costs of operating the | 13      A.  I am familiar with that. |
| 14  mill for the fuel to be used, is that change in | 14      Q.  Did you at any time include any |
| 15  cost something that should be included in your | 15  type of dummy variable for the -- either the time |
| 16  model? | 16  that the black liquor tax credit was in place or |
| 17      A.  I don't know whether that would | 17  the time after it expired to attempt to capture |
| 18  have a material effect or not. | 18  any difference in cost by the black liquor tax |
| 19      Q.  How large would the cost change | 19  credit? |
| 20  need to be to have a material effect? | 20      A.  I didn't -- I didn't include such a |
| 21      MR. GOLDBERG:  Object to the form | 21  variable, and I don't know that it would be an |
| 22  of the question. | 22  appropriate model.  It has marginal effect on a |
| 23      THE DEPONENT:  I don't think it's a | 23  variable cost to use a dummy variable on that. |
| 24  matter of size; I think it's a matter in part of | 24      Q.  Why wouldn't it be appropriate to |
| 25  timing and its relationship to other factors that | 25  use a dummy variable? |

| **[Page 146]** | **[Page 148]** |
|---|---|

| | |
|---|---|
| 1   are present in the model. | 1       A.  Because this is a variable -- it's |
| 2   BY MR. McKEOWN: | 2   a cost to offset that's a variable at the level of |
| 3       Q.  Are you familiar with black liquor? | 3   an input that's being used.  A dummy variable is |
| 4       A.  I'm -- I've heard the term. | 4   simply a constant that turns on for a period of |
| 5       Q.  What is black liquor? | 5   time. |
| 6       A.  My understanding is that black | 6       So if there are fluctuations in the |
| 7   liquor is a byproduct of the pulping process, the | 7   intensity of which the black liquor is being used |
| 8   process of making the ingredient that goes into | 8   or the amount of credit, then we have rather core |
| 9   mills to make linerboard and medium and that it's | 9   approximations for those. |
| 10  used as fuel. | 10      Q.  What would be the appropriate way |
| 11      Q.  Are you familiar with the black | 11  to include some consideration of the black liquor |
| 12  liquor tax credit? | 12  tax credit if you wanted to include it in the |
| 13      A.  I have some familiarity with it. | 13  model? |
| 14      Q.  What is your understanding of the | 14      MR. GOLDBERG:  Object to the form. |
| 15  black liquor tax credit? | 15      THE DEPONENT:  I -- I haven't |
| 16      A.  That it was considered by the | 16  considered it, but I would expect that it would be |
| 17  federal government as a biofuel, and so by the | 17  something related to the amount of black liquor |
| 18  industry using black liquor it could qualify for | 18  consumed over some sub period. |
| 19  some tax credit for reasons... | 19  BY MR. McKEOWN: |
| 20      Q.  And did you understand that the | 20      Q.  Would you consider a $10 million |
| 21  credit for the use of the black liquor was based | 21  tax credit a significant amount of money? |
| 22  on the amount of fuel used? | 22      MR. GOLDBERG:  Object to the form |
| 23      A.  I didn't, but that seems | 23  of the question. |
| 24  reasonable. | 24      THE DEPONENT:  Personally, $10 |
| 25      Q.  And if it was on the amount of fuel | 25  million is a significant amount of money.  In |

| **[Page 147]** | **[Page 149]** |
|---|---|

**[38]  (Pages 146 to 149)**

1 terms of the industry, I don't -- I don't know.
2 BY MR. McKEOWN:
3     Q.  So you don't know whether a $10
4 million change in cost would be sufficient in your
5 mind to cause perhaps some increase in price?
6     A.  No, no, I don't.
7     Q.  You included a dummy variable for
8 seasonality; is that correct?
9     A.  A set of them, yes.
10     Q.  I think actually, correct.  You had
11 11 dummy variables; correct?
12     A.  Correct.
13     Q.  Did they account for January
14 through November or February through December when
15 you assigned the 1 through 11?
16     A.  I don't recall.
17     Q.  Okay.  But the idea was that there
18 would be some seasonality factors that might have
19 a different relationship between the various
20 explanatory factors in price at different parts of
21 the year; is that correct?
22     A.  That they would capture systematic
23 differences in different parts of the year when
24 prices change.
25     Q.  Did you consider those systematic

[Page 150]

1 general issue.  There may have been certain months
2 mentioned but nothing about why those months were
3 important.
4     Q.  So from an economics perspective,
5 you don't have a particular supply factor or a
6 particular demand factor that you're trying to
7 capture with these series of seasonality dummy
8 variables; is that true?
9     A.  That's right.
10     Q.  Is it correct that the dummy
11 variables for the various months were included in
12 the regression program but that the program was
13 not required to select them as a variable for the
14 final model?
15     A.  Yes, it is.
16     Q.  So that the model could say that
17 the explanatory value of a dummy variable for a
18 particular month didn't meet that threshold
19 explanatory criterion; correct?
20     A.  Yes, that's correct.
21     Q.  Is it also correct, then, that you
22 are comfortable excluding that dummy variable in
23 reliance on the program and the AICC and BIC
24 software?
25     A.  Yes.

[Page 152]

1 differences to be caused by supply factors, by
2 demand factors or by both?
3     A.  By both.
4     Q.  What were the supply factors that
5 you considered?
6     A.  I didn't -- I didn't enumerate a
7 set of supply factors that would drive
8 seasonality.  I knew seasonality in place of any
9 additional supply and demand factors that would
10 have had those effects.
11     Q.  What about the demand factors.
12 Same true; that you did not assign or consider
13 particular demand factors for the seasonality
14 dummy variable?
15     A.  No, if I had, I wouldn't have
16 needed to use the seasonal factors.
17     Q.  What was your basis for believing
18 that you needed seasonal factors?
19     A.  Got documents that I reviewed from
20 the -- literature from the production that
21 indicate that seasonality was an issue.
22     Q.  Do you remember anything more about
23 why seasonality was at issue than that?
24     A.  No, they didn't, what I recall were
25 documents that talked about seasonality as a

[Page 151]

1     Q.  You did not include a variable for
2 industry concentration in your regression model,
3 did you?
4     A.  No, I didn't.
5     Q.  Why not?
6     A.  My review of the academic
7 literature on concentration suggests or indicates
8 that it doesn't have a -- it's more likely to have
9 an effect on the degree of collusion in the
10 industry rather than on the direct effect on
11 prices that ended in collusion.
12         So to include it would be
13 potentially including something that we compounded
14 with the effect of the conspiracy effect.
15     Q.  So your understanding is that an
16 increase in concentration could lead to a higher
17 likelihood of collusion, but it is not likely to
18 lead to higher prices absent collusion; is that
19 correct?
20     A.  That's correct.  Up to a certain
21 threshold, about three firms, and there, even in
22 the absence of collusion, prices can be elevated.
23     Q.  Did you testify in the SRAM case
24 that industry concentration is a significant
25 factor for pricing?

[Page 153]

1      A.  I don't recall.
2      Q.  Is it possible?  I mean are you
3  saying you don't recall one way or the other
4  whether you may have testified in the SRAM case
5  that industry concentration is a factor that can
6  affect pricing?
7      A.  I don't recall sitting here whether
8  I did or not.
9      Q.  So if court documents or opinions
10  suggest that you gave that opinion, you're not
11  recalling it in any way?
12      A.  Well, if I were shown documents, I
13  wouldn't dispute them.  I just don't recall
14  whether I gave testimony in that regard.
15      MR. GOLDBERG:  Do you have
16  documents?
17      MR. McKEOWN:  We have something.
18      MR. GOLDBERG:  Do you have
19  documents you can show him?
20      MR. McKEOWN:  We'll get there.
21      MR. GOLDBERG:  I just want to make
22  sure.  I mean because we're all -- we're all
23  professionals here and we all know that we -- we
24  have to have documents that we actually can use
25  that is not subject to privilege or confidentiality

**[Page 154]**

1  to ask these questions.
2      So I feel comfortable asking you:
3  Do you have such documents that you can use?
4  Because if you do, it would be fair to show it to
5  him and maybe it would refresh his recollection.
6  If it does, that's fine; if it doesn't, that's
7  also fine.
8  BY MR. McKEOWN:
9      Q.  Let me go back to the first
10  question.
11      Do you believe that -- let me make
12  sure I understand your opinion in this case.
13      Industry concentration is not a
14  structural factor that affects price; is that
15  correct?
16      MR. GOLDBERG:  Object to the form
17  of the question.  That's actually not what he
18  testified to.
19      THE DEPONENT:  My review of a
20  literature that I examined here indicates that
21  industry concentration is likely to affect price
22  through collusion as opposed to independently of
23  collusion.
24  BY MR. McKEOWN:
25      Q.  And let me be clear, then.  Is it

**[Page 155]**

1  your testimony that absent collusion, an increase
2  in industry concentration is not likely to have an
3  effect on price?
4      A.  That's correct.
5      Q.  You did not include a variable for
6  nondurable goods; is that correct?
7      A.  A variable for what aspect of
8  nondurable goods?
9      Q.  Demand for nondurable goods,
10  production of nondurable goods?
11      A.  No.
12      Q.  In your review of the documents
13  produced by defendants, did you see that some of
14  the defendants looked at nondurable good production
15  as a predictor of pricing?
16      A.  I don't recall that.
17      Q.  If the defendants did look at
18  nondurable good production as a predictor of
19  pricing, do you think that's a factor that should
20  have been included in your regression model?
21      A.  If that were the case, I'd have to
22  assess it with respect to the factors that I
23  already have in the model.  It could be included.
24      Q.  You did not include a variable for
25  mill operating rates; is that correct?

**[Page 156]**

1      A.  That's correct.
2      Q.  Why not?
3      A.  The -- the allegations as I
4  understand them are about supply and capacity
5  restrictions that for a given level of demand
6  would have a direct effect on operating rates.
7      So that seems like a variable to me
8  that would be directly related to the alleged
9  conspiracy.
10      Q.  Is that the same reason why you did
11  not include a variable for capacity?
12      A.  Yes.
13      Q.  Did you examine whether any changes
14  in capacity were potentially caused outside or
15  completely independent of the alleged conspiracy?
16      MR. GOLDBERG:  Would you read the
17  question back to me.
18      (The record was read as follows:
19      Q.  Did you examine whether any
20      changes in capacity were
21      potentially caused outside or
22      completely independent of the
23      alleged conspiracy?)
24      THE DEPONENT:  No, I didn't.
25  ///

**[Page 157]**

**[40]  (Pages 154 to 157)**

BY MR. McKEOWN:

Q.   If there were a change in capacity by a nondefendant, would that be something exogenous to the conspiracy, in your view, such that it could be a potential factor for the regression?

A.   I'd have to review the complaint, I suppose, to see whether there's an issue about cocospirators or not, but absent that, I would think that I would consider it.

Capacity is, in my view, something that operates with long and variable, somewhat long and delayed effects on prices, so it might be challenging to include directly in a regression analysis.

Q.   If the allegations of the complaint were solely an alleged conspiracy to fix prices rather than curtail supply, would capacity be a relevant variable that you would include in your regression analysis?

A.   I'm not sure.  I think that their technical challenges would include capacity of explanatory variables in pricing models.

Q.   So does that mean that to the extent that pricing was changed as a result to

[Page 158]

some nonconspiratorial change in capacity, you don't think that can be captured by the model?

MR. GOLDBERG:  Object to the form.

THE DEPONENT:  Could I have that question read back, please.

(The record was read as follows:

Q.   So does that mean that to the extent that pricing was changed as a result to some nonconspiratorial change in capacity, you don't think that can be captured by the model?)

THE DEPONENT:  I view the model as capturing already changes in capacity that are due to variations in supply and demand factors affecting the industry.  Whether it would not capture and does not distinguish between changes in capacity that are due to the alleged collusion and idiosyncratic changes in the alleged capacity that are unrelated to supply and demand factors in the industry.

Q.   If there's a change in capacity because Hurricane Katrina put some mills out of business for a period of time, do you consider that a factor that could affect price?

[Page 159]

A.   Under certain circumstances it could.

Q.   Isn't it true that nothing in your regression model would capture the effect of that change in capacity on price?

A.   I don't know that that's the case.  Hurricane Katrina had an effect on many economic variables, including many of the ones I included in the regression.  Whether a separate effect on mills would be identifiable, I don't know.

Q.   You haven't looked at it; correct?

A.   That's correct.

Q.   If Hurricane Katrina affected production from a number of mills because they were shut down for some period of time due to the hurricane, would that affect the price for containerboard or corrugated products?

A.   Under certain circumstances it would.

Q.   What are the circumstances?

A.   I think it would depend upon overall economic conditions, what the available supply is from mills that weren't affected, what the prevailing operating rate was.

Q.   And --

[Page 160]

A.   And whether the shut downs were coordinated using Hurricane Katrina as a pretext or whether they were legitimate -- legitimate outages caused by structural damage.

Q.   Let's assume legitimate outages caused by structural damage.  Then to the extent any effect by Hurricane Katrina is captured in your model is purely by accident from the other variables included; correct?

MR. GOLDBERG:  Object to the form.

THE DEPONENT:  To the extent that it's captured, it's captured by the high level of collinearity that I see and supply and demand factors that have been enumerated as being relevant to this industry and the economic factors in the analysis.

BY MR. McKEOWN:

Q.   What if there was an explosion at a mill that shut down the mill for six months eliminating, then, capacity and production; is that a factor that could result in an increase in price in your view?

A.   I think, again, it would depend upon a number of factors, such as how big that mill was, how unique its geographic distribution

[Page 161]

1  was and so on.
2      Q.  If you were to assume that the
3  operating rates were high in the industry and a
4  mill shut down for an explosion clearly not caused
5  by a conspiracy, would you expect that reduction
6  of production to have resulted in increase in
7  price?
8      A.  I think it would depend on how
9  coincident that was with changes in the demand.
10     Q.  Nothing in your model would account
11  for that explosion in the mill; correct?
12     A.  I wouldn't think, too, that that
13  would be attributed to a conspiracy effect over --
14  over several years.
15     Q.  Could it be attributed to a
16  conspiracy effect in one portion of the years?
17     A.  I'm measuring the effect of the
18  conspiracy over the class period.  If I measured
19  multiple conspiracy created affects for small
20  periods of time, I would imagine something like
21  Hurricane Katrina or an explosion in the mill
22  might affect one of those measurements.  I
23  wouldn't expect it to affect measurements over
24  several years.
25     Q.  So the fact that something only

[Page 162]

1  affects some subset period of time you don't think
2  would have an affect on the outcome across your
3  period; is that correct?
4      A.  I think it's unlikely.  It could
5  have an affect, but it's unlikely.
6      Q.  So that if we were to cut out one
7  year of your class period, would you expect to
8  still have the same results or substantially the
9  same results from your regression model?
10         MR. GOLDBERG:  Object to the form
11  of the question.
12         By "cut out" you mean take out a
13  year?
14         MR. McKEOWN:  Take out a year.
15         MR. GOLDBERG:  Take out a year, not
16  take out 12 random months.
17         MR. McKEOWN:  Correct, take out a
18  year.
19         MR. GOLDBERG:  Somebody decides I'm
20  going to take out year 2006.
21         MR. McKEOWN:  Correct.
22         THE DEPONENT:  The explanatory
23  factors enter with lags as well as their
24  contemporary needs effects, so I would see cutting
25  out a year as having a major disruption on the

[Page 163]

1  expected relationships which are, which are
2  dynamic relationships between explanatory
3  variables and aggregate prices.
4          So I would expect the cutting out a
5  year for that reason might have a significant
6  effect on results.  That would be expected.
7          And a second aspect of that is that
8  observations differ in the amount of explanatory
9  information that contain given -- given
10 variability, so cutting out a set of variable -- a
11 set of observations removes information for
12 identifying parameters, identifying.  That can be
13 a lot of information or a little information,
14 depending upon where the cut was made.
15     Q.  Based on your prior testimony, if I
16 ran a regression with price as my dependent
17 variable and a variety of independent variables
18 including capacity and operating rates during some
19 portion of the class period, is it correct that
20 you don't think that regression is reliable
21 because it's during the alleged conspiracy period?
22     A.  I don't think the conspiracy effect
23 is measuring the full extent of the conspiracy.
24 If those factors were in there, they could be
25 compounding it.

[Page 164]

1      Q.  Looking at Exhibit 11, you've had
2  the AICC model and the BIC model.  Was there any
3  reason why you didn't adopt any other models for
4  determining where the step program would cut off
5  the variables?
6      A.  There are two parts of that.  One
7  is that AIC, the AICC -- the by is corrected,
8  information criteria and the base information
9  criteria, and the BIC had been paired in the
10 literature before on model selection criteria
11 because they represent different approaches, so
12 they're sort of complimentary.
13         The AICC has a property of acetonic
14 efficiency, trying to minimize deviations from a
15 correct model and enlarged samples, and the basic
16 information criterion is a property of
17 consistency; that in sufficiently large samples it
18 should be converging to the correct -- correct
19 measure of the information in the data.  So
20 they're complimentary in that sense.
21         They're also built into the
22 software that I used.  I think that there's one
23 more -- there are other model selection criteria
24 and they typically fall into one of those two
25 approaches, either acetonic efficiency or

[Page 165]

1  consistency, but the two that I'm aware of is
2  being built into the software, these two, and a
3  third one is an adjusted R-squared criterion.  I
4  believe that's built in, and that one is -- I'm
5  not aware of any statistical foundations for it
6  from a theoretical point of view.
7      Q.  Do you believe that the AICC, the
8  BIC or the 10PC, that one is better than the
9  other?
10      A.  No, I don't.
11      Q.  And are you offering the opinion
12  that the overcharges here could not be the result
13  of oligopoly pricing?
14      A.  I'm -- here I'm estimating -- I'm
15  demonstrating feasibility of estimating aggregate
16  damages, but without making a finding one way or
17  the other about whether there was in fact
18  collusion affecting prices I'm finding the prices
19  were anonymously high as consistent with the
20  alleged conspiracy.
21      Q.  It could also be consistent with
22  oligopoly pricing; correct?
23      A.  I don't see that as a particularly
24  plausible scenario.
25      Q.  Is it possible that they're higher

[Page 166]

1  let's look at the overcharge number, the average
2  for final containerboard products, 2.92 percent.
3          You're assuming 2.92 percent across
4  the entire class period; is that correct?
5      A.  Yes.
6      Q.  You're not saying that the number
7  is 4 percent in '04 and only 2 percent in '06 or
8  anything like that; you're just going across the
9  board at 2.9 percent; correct?
10      A.  This is across the whole class
11  period.
12      Q.  And I think we established earlier
13  that it's not telling me the amount of damage for
14  any individual customer; correct?
15      A.  That's correct.
16      MR. McKEOWN:  Why don't we break
17  here for lunch.
18      MR. GOLDBERG:  Okay.
19      THE VIDEOGRAPHER:  Going off the
20  record at 1:04.
21      (Whereupon, a luncheon recess was
22      held from 1:04 p.m. to 1:53 p.m.)
23  ///
24  ///
25  ///

[Page 168]

1  is consistent with oligopoly pricing?
2      A.  I'm not sure how to interpret the
3  word "possible" as to something with what sort of
4  probability associated with it.
5      Q.  Well, you said in your report that
6  you thought they were consistent with the
7  plaintiffs' allegations but they could also be
8  consistent with oligopoly pricing?
9      A.  I don't recall saying that I
10  thought they could be consistent with oligopoly
11  pricing.
12      Q.  No, I didn't say you said they
13  could be consistent with oligopoly pricing.  You
14  said they could be consistent with plaintiff's
15  allegation of collusion.  My question is:  They
16  could also be consistent with oligopoly pricing;
17  isn't that correct?
18      A.  That's not apparent to me.
19      MR. GOLDBERG:  Same thing, at some
20  point when you would have a place to break.
21      MR. McKEOWN:  Let's go about five
22  minutes.
23      MR. GOLDBERG:  That's fine.
24  BY MR. McKEOWN:
25      Q.  Your damage model in Exhibit 11,

[Page 167]

1          LOS ANGELES, CALIFORNIA
2          TUESDAY, AUGUST 12, 2014
3              1:53 P.M.
4              ---o0o---
5
6      THE VIDEOGRAPHER:  We're back on
7  the record at 1:53.  This is Disc 4 of the
8  deposition of Dr. Mark Dwyer.
9
10      EXAMINATION (Resumed)
11  BY MR. McKEOWN:
12      Q.  Good afternoon, Dr. Dwyer.
13      A.  Good afternoon.
14      Q.  If you would take your report,
15  Exhibit 13, I'd like to direct your attention to
16  Section II, which starts on Page 6.
17      A.  All right.
18      Q.  And that goes from Paragraph 15 --
19  or I think Paragraph 15 on Page 19; is that right?
20      A.  That's correct.
21      Q.  This is the section in which you
22  describe various analyses you used on the question
23  of common impact; correct?
24      A.  That's correct.
25      Q.  Let's look at Section II.B.

[Page 169]

[43]  (Pages 166 to 169)

1  A. Okay.
2  Q. You have that. That's an analysis
3 of PPW pricing; is that correct?
4  A. Yes, it is.
5  Q. And is it correct that if we go
6 back to Paragraph 11 on Page 5 --
7  A. Yes.
8  Q. Actually, let's go back to Page 4.
9 I apologize.
10  If we look at Paragraph 7 on
11 Page 4, is what's referred to there the analysis
12 that we find in your Exhibit 6?
13  A. Yes.
14  Q. And when I look at Paragraph 11 on
15 Page 5, it starts:
16  "In summary, all four of
17  these measures of impact show
18  that all or nearly all class
19  members paid higher prices,"
20  etc.
21  Do you see that?
22  A. Yes.
23  Q. The four measures of impact that
24 you were talking about, are those what we see
25 described in Paragraphs 7, 8, 9 and 10 as

[Page 170]

1  "Further, given that
2  much evidence ties corrugated
3  prices to the PPW Index, the
4  results of this examination
5  with PPW Index provides
6  indirect evidence that the
7  defendants' price increase
8  announcements had a class-wide
9  impact on class-members
10  purchase prices for these
11  corrugated containerboard
12  products as well."
13  Do you see that sentence?
14  A. Yes.
15  Q. Now, when you say "indirect
16 evidence," is that because it is not based on
17 transactional data?
18  A. I think here what I meant by
19 indirect evidence is that the PPW Index is a price
20 from linerboard as opposed to corrugated products,
21 and I'm saying that because -- the index -- the
22 evidence here that the defendant announcements
23 drive the PPW Index, that the next step in that
24 analysis is that since corrugated product prices
25 are largely driven by PPW Index for linerboard,

[Page 172]

1 reflected in Exhibits 6, 7, 8 and 9? And pull out
2 the exhibits. I'm just trying to sort what goes
3 where.
4  A. Yes, it is.
5  Q. So am I correct, then, that when I
6 look at II.B., the section that starts in
7 Paragraph 19, that particular section through
8 Paragraph 30 is not one of your four measures that
9 you describe in Paragraph 11?
10  A. That's correct.
11  Q. Do you view what you're doing in
12 II.B. as something that you do to support your
13 opinion that was based on your other studies; is
14 that right?
15  MR. GOLDBERG: Object to the form.
16  THE DEPONENT: The four measures
17 are all focused on the transactions data, the
18 class member transactions data, where this is
19 offering additional evidence of class-wide impact
20 based on a market index -- market price index.
21 BY MR. McKEOWN:
22  Q. And if I look at Paragraph 30 on
23 Page 12 --
24  A. Yes.
25  Q. -- about four lines down, it says:

[Page 171]

1 different product, that they, too, are impacted by
2 the price increase analysis.
3  Q. Now, are you offering the opinion
4 that the analysis you did on PPW prices is by
5 itself sufficient to demonstrate common impact in
6 your view?
7  A. I'm offering a variety of evidence
8 of common impact. This is one piece of it. I
9 think what is sufficient is for the court to
10 decide, has been decided and has evolved
11 historically, but at this present point in time my
12 understanding is that this is not sufficient on
13 its own, but it may have been in an earlier time
14 for a demonstration of common impact, though it is
15 corroborative of common impact.
16  Q. And are you viewing what is
17 sufficient to show common impact as a legal
18 question rather than an economics question?
19  A. I believe that a standard of
20 showing is determined legally economic evidence
21 and bears on the question of whether there's
22 common impact or not. Economic analysis can offer
23 evidence on that issue, but the ultimate threshold
24 is a legal question.
25  Q. As a matter of economics, if you

[Page 173]

1  had undertaken the analysis shown in Paragraphs 19
2  through 30 with PPW but not done any of the work
3  that we see reflected on Exhibits 6, 7, 8 and 9,
4  would you view that as sufficient to show common
5  impact?
6        MR. GOLDBERG: Would this be
7  sufficient to support his economic opinion?
8        MR. McKEOWN: Yes. I thought I
9  started it with "As a matter of economics."
10       MR. GOLDBERG: I just wanted to
11  confirm.
12       THE DEPONENT: I'm not sure that as
13  an economic matter there is a unique definition of
14  common impact. It certainly would satisfy some
15  definition of -- economic definition of common
16  impact.
17  BY MR. McKEOWN:
18       Q. Looking at Exhibits 6, 7, 8 and 9,
19  was there a particular reason why you selected
20  these four types of analyses to look at common
21  impact questions?
22       A. I thought that these were the best
23  analyses of common impact that were most
24  appropriate to the data and the questions at hand.
25       Q. Did you undertake any other forms

**[Page 174]**

1  of analyses of common impact and then reject them
2  after you saw the results?
3        A. No.
4        MR. GOLDBERG: Objection to the
5  form.
6        THE DEPONENT: I did not.
7  BY MR. McKEOWN:
8        Q. And when I say "you," I'm including
9  anything that your team may have prepared for you
10  and presented to you and you rejected it.
11       Is that how you're interpreting my
12  question?
13       A. Yes.
14       MR. GOLDBERG: Same objection.
15  BY MR. McKEOWN:
16       Q. If you could pull out --
17       A. I would qualify that to be anything
18  they've done at my direction. I don't think I can
19  speak to work that they may have -- that I'm not
20  aware of.
21       Q. I'm not asking you any work that
22  you're not aware of or that wasn't presented to
23  you.
24       If you could pull out Exhibit 3
25  again.

**[Page 175]**

1        A. Yes.
2        Q. We looked at this briefly earlier
3  today.
4        Was this the chart that was
5  prepared at your direction?
6        A. Yes, it was.
7        Q. Was there a reason why no
8  containerboard manufacturer other than the
9  defendants in this case is listed for the time of
10  price increase announcements?
11       A. This is an exhibit of the price
12  increase announcements for the defendants, so to
13  include a nondefendant would not fit that
14  characterization.
15       Q. Did you review price increase
16  announcements by nondefendants?
17       A. I don't recall seeing any. No, I
18  don't believe so.
19       Q. Did you in any of your regression
20  work include any pricing information for
21  nondefendants?
22       A. No, my data doesn't show
23  nondefendants.
24       Q. Did you view any price changes by
25  nondefendants as relevant to your analysis?

**[Page 176]**

1        A. No.
2        Q. Looking at your report, which is
3  Exhibit 13, on Page 8, Paragraph 21.
4        A. Yes.
5        Q. Beginning on the second line is the
6  statement:
7        "The first place to
8        examine class-wide impact
9        is with a review of readily
10       available, comprehensive,
11       industry-wide measures of
12       prices."
13       Do you see that?
14       A. Yes.
15       Q. Is this a reference to the RISI
16  PPW pricing information?
17       A. Yes.
18       Q. Were you looking at any other
19  industry-wide measures in prices other than the
20  RISI PPW pricing information?
21       A. I think we looked at the official
22  boards, market indices, indexes, and another RISI
23  index called -- it's also a linerboard price
24  produced in their -- we refer to as PPM. I think
25  it's paper packaging monitor. It's another price

**[Page 177]**

1  series.
2      Q.  Did you rely on either of those
3  pricing measures in your work in this matter?
4      A.  No.
5      Q.  You say in the report that it's a
6  comprehensive industrywide measure of prices.
7          What is your understanding as to
8  how many -- well, what do you mean by
9  "comprehensive"?  Let me start by that.
10     A.  Comprehensive.  By that, I mean
11 that the RISI PPW Index surveys buyers and sellers
12 focusing largely on class members and defendants
13 to get a consensus price on -- on where the market
14 is.
15         So comprehensive means industrywide
16 and is synonymous with, or complimentary to
17 industrywide measure, market-wide and reflective
18 of buyers and sellers who are in the stock market,
19 the noncontractual market for containerboard.
20     Q.  So for example, the RISI PPW survey
21 would not include any transactions between
22 affiliated parties; correct?
23     A.  That's correct.
24     Q.  And would not include any
25 transactions in which there was a trade between

[Page 178]

1  two containerboard manufacturers; is that correct?
2      A.  That's my understanding.
3      Q.  And that's true whether the two
4  containerboard manufacturers are defendants in
5  this case or it's another containerboard
6  manufacturer.  Either way it's not in RISI's PPW
7  numbers; correct?
8      A.  That's correct.
9      Q.  Is it also the case that the PPW
10 survey would not include any customer that had a
11 long-term contract?
12     A.  My understanding is that that would
13 not include prices that were determined under
14 long-term contracts.
15     Q.  Would it include any sales other
16 than one-time sales?
17         MR. GOLDBERG:  Object to the form
18 of the question.
19         MR. McKEOWN:  That's a good
20 objection.
21         MR. GOLDBERG:  Thank you.  I get at
22 least one in the afternoon.
23         MR. McKEOWN:  That's actually --
24 oh, okay.  You had one this morning, too.
25 ///

[Page 179]

1  BY MR. McKEOWN:
2      Q.  PPW pricing survey goes only to
3  containerboard; correct?
4      A.  That I'm aware of, yes.
5      Q.  The entities that are surveyed are
6  being asked about the containerboard's pricing;
7  correct?
8      A.  Yes.
9      Q.  They're not being asked about box
10 prices; correct?
11     A.  In that survey, no.
12     Q.  They're not being asked about sheet
13 prices in the RISI PPW survey; correct?
14     A.  Correct.
15     Q.  So we're looking at liner and
16 medium; correct?
17     A.  Yes.
18     Q.  And isn't it the case that if
19 someone had a contract that purchased
20 containerboard over some period of time, say over
21 one year or two years, that individual would not
22 be eligible for the RISI PPW survey?
23     A.  My review of their methodology
24 indicates that a particular transaction, that that
25 would -- the contract -- the purchases that are

[Page 180]

1  governed by that contract would not be part of the
2  survey; however, if someone who had a contract
3  went out, needed to make a spot purchase, that
4  might be included.
5      Q.  So spot purchases would be included
6  in the RISI PPW survey, to your knowledge?
7      A.  That's my recollection.
8      Q.  Do you know what proportion of any
9  of the defendants' containerboard sales to third
10 parties are to entities who are eligible to
11 respond to the PPW survey?
12         MR. GOLDBERG:  Read the question
13 back to me, please.
14         (The record was read as follows:
15     Q.  Do you know what proportion
16         of any of the defendants'
17         containerboard sales to third
18         parties are to entities who are
19         eligible to respond to the PPW
20         survey?)
21         MR. GOLDBERG:  Object to the form
22 of the question.
23         THE DEPONENT:  I recall seeing a
24 Smurfit-Stone document that seemed to suggest that
25 50 percent of containerboard sales were to -- were

[Page 181]

1  covered by contract and that 50 percent were not,
2  to third parties.  So that would be one estimate,
3  but outside of that I don't know.
4  BY MR. McKEOWN:
5      Q.  When you said "50 percent," you
6  mean 50 percent of their open market
7  containerboard sales?
8          MR. GOLDBERG:  Object to the form.
9          THE DEPONENT:  My recollection is
10  that it was a reference to nonself-supply sales.
11  I don't recall whether it included other
12  cross-defendant sales or not.
13  BY MR. McKEOWN:
14      Q.  In your understanding from this
15  document was that 50 percent of those sales were
16  sales to entities that RISI PPW might survey for
17  their pricing survey?
18          MR. GOLDBERG:  Object to the form.
19          THE DEPONENT:  I would interpret
20  that document as putting that number bound on the
21  dollar amount of sales that would be to economic
22  entities who would be eligible to respond to the
23  PPW survey.
24  BY MR. McKEOWN:
25      Q.  I think you may have answered this

**[Page 182]**

1  contracts that are indexed to a PPW or other
2  benchmark.  Put aside the PPW survey for the
3  moment in terms of who PPW asks.
4          With respect to contracts that are
5  tied or indexed in any way to a PPW or other price
6  index, do you have any sense of what proportion of
7  the containerboard contracts are covered by such
8  provisions?
9      A.  The proportion of contracts or
10  sales?
11      Q.  Either.
12      A.  My --
13          MR. GOLDBERG:  Object to the form.
14          THE DEPONENT:  My reading of that
15  Smurfit-Stone document would be about 50 percent
16  of sales are covered by such contracts.
17  BY MR. McKEOWN:
18      Q.  Do you know how many contracts or
19  what percentage of contracts?
20      A.  No.
21      Q.  Do you have any sense of how many
22  members of the class fall within the group that
23  would be potentially surveyed by RISI for the PPW
24  price survey?
25      A.  No, I don't.

**[Page 184]**

1  in an end of a prior question, but is it correct
2  that you don't know with respect to any other
3  defendant what portion of their sales are
4  potentially covered by the PPW survey?
5          MR. GOLDBERG:  Object to the form
6  of the question.
7          THE DEPONENT:  My interpretation of
8  the Smurfit-Stone document is that it was
9  referring to the industry not Smurfit-Stone.
10  BY MR. McKEOWN:
11      Q.  Apart from how many entities might
12  be surveyed by RISI for their pricing survey, do
13  you have any understanding as to what portion of
14  the containerboard contracts from the defendants
15  are covered with a PPW pricing index provision?
16          MR. GOLDBERG:  Object to the form.
17          THE DEPONENT:  Referring back to
18  that same document, I -- I -- that would lead me
19  to believe that 50 percent of their sales are
20  covered by contracts that are indexed to PPW or
21  another industry benchmark.
22  BY MR. McKEOWN:
23      Q.  I want to make sure that we're not
24  mixing apples and oranges here.
25          Let's look first at the question of

**[Page 183]**

1      Q.  Have you undertaken any study to
2  compare the RISI price per ton to the actual price
3  per ton charged by any of the defendants to a
4  containerboard customer?
5          MR. GOLDBERG:  Object to the form
6  of the question.
7          THE DEPONENT:  My Exhibit 10
8  compares the RISI price to the aggregate price
9  measure which is based on the and derived from and
10  represents transaction prices that defendants
11  charged.  Particularly, intermediate
12  containerboard product price series is built from
13  transactions data.
14  BY MR. McKEOWN:
15      Q.  Now, your Exhibit 10, it measured
16  changes in the price from month to month; correct?
17      A.  Yes.
18      Q.  That was not my question.  My
19  question was:  Have you undertaken any study that
20  compares if RISI, for example, publishes a price
21  in their survey of $500 a ton for 42-pound
22  linerboard, what the transaction price is from a
23  particular defendant to a customer for that
24  product?
25          MR. GOLDBERG:  Object to the form.

**[Page 185]**

**[47]  (Pages 182 to 185)**

1        THE DEPONENT:  I'm not sure what
2    such a study would consist of, so, no, I don't
3    think so.
4    BY MR. McKEOWN:
5        Q.  So you don't know whether if RISI
6    publishes at $500 per ton for 42-pound
7    containerboard price, whether a customer of
8    international paper, for example, is buying at 500
9    and 490 and 450 per ton?
10       A.  Any particular customer, no.
11       Q.  Do you know on average for the
12   customers what they're paying?
13       A.  I know that where I've examined
14   this issue, when the PPW Index moves, the vast
15   majority of customers' prices move.
16       Q.  I wasn't asking about any movement;
17   I was asking about the absolute dollar per ton.
18           Have you done any analysis of that?
19           MR. GOLDBERG:  Object to the form.
20           THE DEPONENT:  No, I haven't.
21   BY MR. McKEOWN:
22       Q.  If we turn to Page 10 of your
23   report, which is Exhibit 13 --
24       A.  Yes.
25       Q.  -- there is a graph there right

[Page 186]

1    above Paragraph 25 showing PPW transaction price
2    index -- indexes, indices.
3           Do you see that?
4       A.  Yes.
5       Q.  Is what you are plotting there the
6    prices that are published by RISI for each of
7    those various products listed on the right-hand
8    side?
9       A.  Yes.
10       Q.  None of what we see in this
11   particular chart reflects transactional data;
12   correct?
13       A.  Certain surveys -- each of these
14   are based on a survey of transactions data, but
15   they're reflective of it in that sense, and in the
16   second sense, many transactions are tied to the
17   index so it's reflective of transactions in the
18   sense that many are tied to these.
19       Q.  Let me rephrase my question.
20           When you prepared this chart, you
21   did not look at any transactional data; correct?
22       A.  That's correct.
23       Q.  You looked merely at what the PPW
24   Index was for the various products; correct?
25       A.  Yes, and that's listed in the

[Page 187]

1    source there.
2       Q.  And you don't know to what extent
3    any of the prices that are shown on this graph
4    reflect the actual transactional price for a given
5    sale to a member of the class?
6       A.  That's correct.
7       Q.  Now, in Paragraph 26 on the top of
8    Page 11, you reference that specifically 9 of 15
9    of the defendants' price increase announcements
10   are reflected by increases in the PPW Index after
11   the effective date of those announced increases.
12           Do you see that?
13       A.  Yes.
14       Q.  To determine whether or not
15   something increased, you were just looking at the
16   PPW price in months immediately after the price
17   announcement; is that correct?
18       A.  I was comparing the PPW Index from
19   before the effective month to after the effective
20   month.
21       Q.  And you used a range of three to
22   four months to determine how far afterwards you
23   would look at the price impact; is that right?
24       A.  For this statement, I believe this
25   is a reference to the Exhibit 3 and that's always

[Page 188]

1    taking the month following the implementation
2    month, following the last implementation month if
3    there was any variation, which there usually
4    isn't, but -- so it's the very next month.
5       Q.  Now, 6 out of 15 times that the
6    defendants announced price increases there was no
7    movement upward in the PPW price; correct?
8       A.  That's correct.
9       Q.  So would that suggest that 40
10   percent of the time this methodology does not tie
11   to the defendants' price increases?
12           MR. GOLDBERG:  Object to the form.
13           THE DEPONENT:  Would you rephrase
14   the question?
15   BY MR. McKEOWN:
16       Q.  Six out of 15 times that there is a
17   price increase among those listed on Exhibit 3,
18   there isn't a PPW price increase; correct?
19       A.  That's correct.
20       Q.  So does that mean that 40 percent
21   of the time there isn't an increase?
22       A.  I would have to get out a
23   calculator, but 6 out of 15 times there is an
24   increase in the PPW Index.
25       Q.  And do you have any idea whether

[Page 189]

[48]  (Pages 186 to 189)

1  the number of times that the PPW Index -- strike
2  that.
3        Do you have any sense whether 9 out
4  of 15 times going up after a defendant's price
5  announcement is a greater or lower percentage than
6  the number of PPW price increases in periods
7  outside the class period?
8        A.  Let's see.  I have here in
9  Paragraph 28 that there were 11 increases in the
10  index during the class period, during the 82
11  months of the class period.
12        Your -- I'm sorry.  What was your
13  question?
14        Q.  Okay.  What's the significance to
15  you that 9 of the 15 price increase announcements
16  were followed by an increase in PPW, if any?
17        A.  That the defendants' price increase
18  announcements do move market prices.
19        Q.  On 9 out of 15 occasions; is that
20  right?
21        A.  Yes.
22        Q.  Does the fact that they do not move
23  price measures in 6 out of 15 have any impact on
24  your analysis?
25        A.  Actually, the other -- no, not in

[Page 190]

1  this regard.  The fact that there were 11
2  increases, 9 of which correspond to defendant
3  price increase announcements, is relevant to my
4  analysis.
5        Q.  This is Paragraph 28?
6        A.  Yes.
7        Q.  What's the significance of the two
8  increases when there was no defendant price
9  announcement?
10        A.  Those were in the months
11  immediately following announcements, so I would
12  interpret those as also being tied to the
13  defendants' announcements.
14        Q.  So you're tying all 11 to the
15  defendants' announcements?
16        A.  Effectively, yes.
17        Q.  What's the significance to you of
18  the ten decreases in PPW Price Index?
19        A.  I'd have to review my report,
20  perhaps, but I don't recall that in terms of this
21  issue of whether price increases by the defendants
22  impact class members, I don't think I treated it
23  with any significance to the 10 PPW price
24  differing.
25        Q.  Is it your understanding that

[Page 191]

1  during the class period there were only 11
2  occasions on which class members had an increase
3  in price of the products they were purchasing from
4  defendants?
5        A.  No.
6        Q.  So there could be a number of
7  occasions in addition to the 11 when a customer
8  received a price increase from the defendants; is
9  that correct?
10        A.  Yes.
11        Q.  Conversely, is it also your
12  understanding that there could be more than ten
13  occasions when a member of the class received a
14  price decrease from one of the defendants?
15        A.  Yes.
16        Q.  And when I say "number of
17  occasions," I don't mean like ten different people
18  got a price decrease at the same time, but
19  stretched out over time, it would be more than ten
20  different time periods where there might be a
21  price decrease.
22        MR. GOLDBERG:  And your question is
23  is that how he --
24        MR. McKEOWN:  Is that how you
25  interpret it?

[Page 192]

1        MR. GOLDBERG:  Is that how he
2  understood your question?
3        MR. McKEOWN:  Yes.
4        THE DEPONENT:  I was interpreting
5  your question with respect to the heterogeneity of
6  customers when they're in the market and when
7  they're out of the market that they're going to
8  experience price change at different points of
9  time.
10  BY MR. McKEOWN:
11        Q.  And there could be lots of
12  different price increases or price decreases other
13  than the 11 instances of increases reflected in
14  PPW and the ten instances of decreases reflected
15  in PPW; correct?
16        A.  There are at least two mechanisms I
17  can think of; one is where there are delays when
18  someone is out of the market when a price increase
19  comes and so it comes in a subsequent month and
20  they come back into the market to buy more
21  containerboard.
22        So I could see delays as generating
23  more dates in which we would see price changes,
24  and I can see that there are other factors,
25  potentially, than there can be changes in people's

[Page 193]

[49]  (Pages 190 to 193)

1  circumstances which would bring price changes as
2  well.
3        MR. GOLDBERG:  Let me know.  I have
4  an objection to the previous question Dr. Dwyer
5  just answered.  I didn't get it in time,
6  unnotably.
7  BY MR. McKEOWN:
8        Q.  What are the circumstances by which
9  you think there could also be price changes?
10       A.  A customer changes the product that
11 they're using for their application.  That could
12 have a price change.  They may change the volume
13 of purchases or they may not meet a certain
14 payment condition.
15       Q.  Would you also expect that there
16 might be a price decrease if the customer's
17 contract for corrugated products is expiring and
18 they're taking the work back out to bid?
19       A.  That's possible.
20       Q.  Could be a price decrease then;
21 correct?
22       A.  Yes.
23       Q.  So there would be a lot more price
24 increases than price decreases than just the 21
25 reflected in your report?

**[Page 194]**

1        MR. GOLDBERG:  Object to the form
2  of the question.
3        THE DEPONENT:  Yes, I expect that
4  there are more price changes for individual
5  customers than those reflected in the PPW Index.
6  BY MR. McKEOWN:
7        Q.  You look at Paragraph 29.  About
8  four lines down you have a statement:
9           "Over the 82 months of
10          the class period, the probability
11          of a PPW Index increase is
12          1180 seconds or 13.4 percent."
13       Do you see that?
14       A.  Yes.
15       Q.  That's the level of math I can do.
16 I want to ask you about the next one.
17       MR. GOLDBERG:  I don't subscribe to
18 that.
19 BY MR. McKEOWN:
20       Q.  "The probability that
21          the nine PPW Index price
22          increases that we observe in
23          the defendants' implementation
24          months of Exhibit 3 are a
25          matter of chance is less than

**[Page 195]**

1  one-hundredth of one percent
2  (0.0054 percent)."
3        You see that?
4        A.  Yes.
5        Q.  Can you tell me how you calculated
6  that 0.00054?  And I'm not asking to actually do
7  the calculation on paper now.  Just tell me what
8  gets multiplied by what to get there.
9        A.  Sure.  I'm looking at, on average,
10 an expectation that for a given month -- for a
11 price increase to occur in a given month is about
12 13.4 percent, we would expect to see.  That's the
13 probability that we would expect to see a price
14 increase in a given month.
15       Then looking at the sample of
16 months where we see these nine increases that
17 these are coincident with defendants' price
18 increase implementation months, and so taking that
19 as the sample, the sample is where do we see the
20 defendants making announcements?  When are those
21 announcements effective?
22       And the question here is:  If those
23 announcements were ineffective in moving the PPW
24 Index, then the probability that we see the
25 actual -- the index actually move there -- so

**[Page 196]**

1  there's really no causal connection between
2  them.
3        Then the likelihood of seeing
4  increases in those nine months, rather, were
5  announcements or implementations announced would
6  roughly be comparable to the 13.4 percent, but
7  instead we see this coincidence where in all of
8  those months of announcements, you see that the
9  price was going up.
10       Q.  So mathematically, are you taking
11 11 over 82 times 11 over 82 times 11 over 82, or
12 how are you getting to this 0.0054 percent?
13       A.  I'm using a binomial distribution,
14 with a probability of exactly being 11 over 82.
15       And I'm -- I believe it's the case
16 that I'm basing that on the sample determined by
17 when the defendants made increases, they made
18 price increase announcements.  Putting that into
19 my sample size, and then computing a number of
20 successes as being nine in that sample.
21       Q.  Are you also including in that
22 sample the six times that there was not a price
23 increase after a price announcement by defendants?
24       A.  I believe I am, yes.
25       Q.  And what value are you putting in

**[Page 197]**

**[50]  (Pages 194 to 197)**

1  for those months?

2     A.  The same, that on average any month

3  unconditionally had the 13.4 percent probability

4  of being a price increase.

5     MR. GOLDBERG:  That clarified it

6  for you, didn't it?

7     MR. McKEOWN:  Perfectly.

8     MR. GOLDBERG:  Okay.

9     MR. McKEOWN:  We may return to this

10  document after the next break.

11     (Laughter.)

12  BY MR. McKEOWN:

13     Q.  So you are concluding as a result

14  here in Paragraph 29 that any conventional -- at

15  any conventional level of significance, this

16  result provides a statistical rejection of any

17  assertion that the defendants' price increases are

18  unrelated to the increases observed in the PPW

19  Index; is that right?

20     A.  Yes.

21     Q.  Is it possible that some other

22  factor could be leading to the price increases

23  that result in a -- let me strike that.

24     Let's assume that there is an

25  increase in price that matches perfectly to an

**[Page 198]**

1  increase in cost that the defendants have.  If, as

2  a result, defendants announce price increases, PPW

3  picks up that price increase announcement and

4  reflects a higher price for the product, are you

5  suggesting that there isn't a cost justification

6  in that hypothetical, or are you just suggesting

7  that PPW price is going to reflect what the

8  defendants charge?

9     MR. GOLDBERG:  Object to the form.

10     THE DEPONENT:  This is just a

11  statement that the PPW Index was moved by the

12  defendants' price increase announcement.

13  BY MR. McKEOWN:

14     Q.  Is it moved by the defendants'

15  announcements or is it moved by the acceptance of

16  the price increase in the market?

17     MR. GOLDBERG:  Object to the form.

18     THE DEPONENT:  Based on the PPW

19  methodology, I assume that it is moved by the

20  acceptance of the price increases on the market,

21  within the market.

22  BY MR. McKEOWN:

23     Q.  Let's take a look at your Exhibit 4.

24     Do you have that there?

25     A.  Yes, I do.

**[Page 199]**

1     Q.  And there are six products listed

2  on this index and a correlation listed for each of

3  the six; is that correct?

4     A.  That's correct.

5     Q.  Does this chart reflect the

6  correlation for the PPW price for each of these

7  particular products as listed here to the 42-pound

8  unbleached craft linerboard for delivery east of

9  the Rocky's price?

10     A.  Yes, it does.

11     Q.  And that's simply the correlation

12  between these various indices; correct?

13     A.  Yes.

14     Q.  That brings us to Exhibit 5.

15     A.  I have it.

16     Q.  In Exhibit 5, you have combined a

17  number of the price increases into what you call

18  Price Increase Implementation Events; correct?

19     A.  Yes.

20     Q.  And so the find price increase

21  announcements that we found on Exhibit 3 that

22  resulted in -- strike that.

23     Let me make sure I've got this.  In

24  Exhibit 3 there were nine price increase

25  announcements that within a month or so after the

**[Page 200]**

1  announcement of the effective date there was an

2  increase in the PPW survey price; correct?

3     A.  Correct.

4     Q.  Are those nine the nine that are

5  reflected here on the top of page -- of Exhibit 5?

6     A.  Yes, they are.

7     Q.  So the six instances when there was

8  an announcement by one or more of the defendants

9  to increase price but the PPW price did not

10  change, none of those incidents were carried over

11  to Exhibit 5; correct?

12     A.  That's correct.

13     Q.  On Exhibit 5 you grouped these

14  together so that we have five groupings, although

15  two of them are only a single price increase

16  announcement; correct?

17     A.  That's correct.

18     Q.  Three and four are each a single

19  price increase announcement; correct?

20     A.  Yes.

21     Q.  If we look at PIIE 2, it appears

22  that the -- as we go across, it has a prior --

23  because there are three price increase

24  announcements grouped together, it uses a prior

25  month of September of 2005 and a following month

**[Page 201]**

1    of May 2006; is that right?
2        A.   That's right.
3        Q.   So that you're looking at whether
4    someone had a higher price in May of 2006 than
5    they did in September of 2005; is that correct?
6        A.   That's correct.
7        Q.   Both of the start date and the end
8    date of September of '05 and May of '06 are within
9    the class period; correct?
10       A.   Yes.
11       Q.   And similarly, you looked at prices
12   three, six and nine months after May in your
13   analysis; correct?
14       A.   That's correct.
15       Q.   Those months would also be within
16   the class period; correct?
17       A.   That's correct.
18       Q.   So is it your view that the price
19   in September of 2005 is or is not a price that
20   reflects a conspiratorial effect?
21       A.   It's my view that it does reflect a
22   conspiratorial effect.
23       Q.   So what does it tell you about the
24   price increases if both the pre price and the post
25   price you view as conspiratorial prices?

**[Page 202]**

1    defendants announced and -- announce an
2    implementation month for a price increase and how
3    widespread do we see that in higher prices for
4    class members.
5            And I started with the PPW Index
6    because that is an overall measure of price
7    movements in the -- in the market.
8        Q.   So are you not interested in the
9    price increase announcements that did not have a
10   subsequent PPW Price Index reflecting an increase?
11           MR. GOLDBERG:  By "not interested,"
12   you mean not interested for this analysis?
13           MR. McKEOWN:  For his common impact
14   analysis, yes.
15           THE DEPONENT:  I viewed this aspect
16   of a common impact analysis as moving from what we
17   see as aggregate industrywide movements in price
18   down to a customer's specific level.
19           So the starting point is you see in
20   the PPW Index the market moves, and the question
21   is how uniform is that, how diffuse is that?  Do
22   we see an increase throughout the class or not?
23           So the predicate of this analysis
24   is we see the market move first, and then we see
25   how diffuse that is or whether it affects

**[Page 204]**

1        A.   This is telling me, in the context
2    of the impact analysis, that for the vast majority
3    of class members, when the defendants chose to
4    raise prices, that those pricing -- that those
5    resulted in higher prices for class members.
6        Q.   It's not examining, for example,
7    whether or not there was some other factor that
8    caused what, in your view, may have been an
9    inflated price in September of '05 to become a
10   higher price in May of '06; is that correct?
11       A.   It's not looking beyond the
12   defendants' announcements for causal effect,
13   that's true.
14       Q.   Is it looking at anything other
15   than the price that's being charged?
16       A.   I'm just looking at customer
17   prices, class member prices.
18       Q.   Let's look at Exhibit 6, if you
19   could.  Actually, before you put Exhibit 5 too far
20   away, why didn't you include the six price
21   increase announcements that were not subsequently
22   reflected in RISI PPW surveys on Exhibit 5?
23       A.   It's -- Exhibit 5 is moving towards
24   the impact analysis as Exhibit 6, 7, 8 reflect,
25   and I'm asking the question as to when the

**[Page 203]**

1    everybody.
2        Q.   For that analysis, if there is
3    movement in price after price announcements that
4    are not subsequently picked up by the PPW RISI
5    survey, is that relevant to your analysis?
6            MR. GOLDBERG:  Object to the form.
7            THE DEPONENT:  It wasn't relevant
8    to my analysis.
9    BY MR. McKEOWN:
10       Q.   Why not?
11       A.   I'm looking at common impact in a
12   two-stage process.  The first one is to see
13   whether an aggregate measure of prices moved, and
14   that's reflected in the PPW Index, based on the
15   defendants' announcements.
16           But starting with the defendants'
17   intention to move prices, do I see that in a
18   marketwide measure of price, and I do in nine
19   cases, at least.
20           And then I look over from that to
21   see what -- how common and uniform that is across
22   class members.  That was the methodology that I
23   employed.
24   BY MR. McKEOWN:
25       Q.   Let's go to Exhibit 6.  Let's just

**[Page 205]**

**[52]  (Pages 202 to 205)**

1  start across the columns here. The first column
2  lists which group of defendants or individual
3  defendant. Second is type of product. And when
4  you have in here under Type, the first row is All.
5      Do you see that under all
6  defendants?
7      A. Yes.
8      Q. The second is Corrugated.
9      Do you see that?
10     A. Yes.
11     Q. And the third is Roll Stock;
12 correct?
13     A. Yes.
14     Q. Where are sheets?
15     A. In this exhibit, sheets would be
16 under Corrugated.
17     Q. Why did you include sheets under
18 Corrugated here but under Intermediate Corrugated
19 or Containerboard Products for your regression?
20     A. In this context, this is looking at
21 individual customer products one at a time for
22 price increases, so I'm looking at sheets
23 effectively separately from corrugated and
24 separate from liner and separate from medium.
25 Everything is aggregated in this analysis.

[Page 206]

1      I put in this category simply to
2  summarize it as corrugated versus roll stock.
3      Q. If you look at the third column,
4  number of assessed customers for all
5  defendants for the type All, it says 78,224.
6      Do you see that?
7      A. Yes, I do.
8      Q. What does that represent?
9      A. That's the number of customer
10 identifications for whom, for a given product.
11 I'm able to match a purchase prior to one of these
12 price increase of limitation events to one after
13 both of those events.
14     Q. To be included within the 78,224,
15 does it need to be the exact same product to the
16 same customer?
17     A. Yes.
18     Q. So that if I were a customer and I
19 bought 26-pound medium in the pre-event period and
20 bought 42-pound linerboard in the post-event
21 period, and those are the only two products I
22 bought, I would not be included in the 78,224;
23 correct?
24     A. That's correct.
25     Q. Now, this 78,224 compares to the

[Page 207]

1  possible number of 230,000; is that right?
2      A. That's right.
3      Q. So that there are roughly a 150,000
4  customers for which you cannot tie a pre- and
5  post-product sale; is that right?
6      A. Customer identifications, yes.
7      Q. Fair enough. It could be the case
8  that the customer's using a different name or you
9  don't have the same product; correct?
10     MR. GOLDBERG: Object to the form.
11     THE DEPONENT: That's -- that's
12 correct.
13 BY MR. McKEOWN:
14     Q. Because when you say customer
15 identification, there are -- this was in Footnote
16 20 of your report, 230,884 is the potential upper
17 limit of the number of customer identifications;
18 correct?
19     A. Yes.
20     Q. And here in Exhibit 6, you're
21 looking at 78,224 of that 230,000 that you've
22 identified; correct?
23     A. That's correct.
24     Q. If we look at the fourth column in
25 Exhibit 6, customers with post-event price

[Page 208]

1  increases, the increase customers will receive a
2  72,030.
3      What does that represent?
4      A. Those are customers for whom I
5  detect a price increase across the price increase
6  event.
7      Q. If I am a customer that purchases
8  18 products and I have a price-increase event for
9  one of my 18 products, do all 18 get counted here
10 or just the one with the price increase?
11     A. This is a customer account, so
12 you'd count it once.
13     Q. So in the 78,224 I'm only counted
14 once even though I may have numerous products
15 purchased; is that correct?
16     A. That's correct.
17     Q. But for a customer with a
18 post-event price increase, if I buy 18 products
19 and 17 of them do not have a price increase but
20 one product does, do I count within the 72,030?
21     A. Yes, I do.
22     Q. Even though it was only one out of
23 my 18 products that had a price increase; is that
24 correct?
25     A. Yes.

[Page 209]

1    Q.   For purposes of determining whether
2  or not I had a price increase, I believe you used
3  something called the modal net price; is that
4  right?  I'm looking at Paragraph 37 on the top of
5  Page 15.
6    A.   Yes.
7    Q.   What is the modal net price?
8    A.   The modal net price is the most
9  frequently observed price for that customer
10  product in that time.
11    Q.   Why did you pick the modal rather
12  than the average?
13    A.   An average may not be an actual
14  transaction price.
15    Q.   Why not?
16    A.   Just to take a simple example of
17  averaging one and three, you get an average of
18  two, and so a purchase was made for one dollar and
19  a purchase was made for three dollars, but the
20  average price is two.
21         So averaging picks a point in
22  between two prices or a set of prices.  It may not
23  be an actual transaction price.
24    Q.   So similarly, if I had purchased at
25  $2, $2, $2, $2 and $3 in the pre period, your

**[Page 210]**

1  modal net price for the pre period would be $2;
2  correct?
3    A.   That's correct.
4    Q.   If you look at Exhibit 5 again,
5  keep Exhibit 5 handy, because we've got some
6  questions about these.  I'm not sure if they're
7  pies or PIIEs or what we call them, Price Increase
8  Implementation Events.
9         If we look at Price Increase
10  Implementation Event Number 2, which we talked
11  about before, where the prior month is September
12  of '05 and the following month was May of
13  '06, to find a match for purposes of this study
14  you did in Exhibit 6, is it correct that for the
15  pre period you might go back as far as six months
16  prior to September of 2005 to try to find a match
17  for that product?
18    A.   Yes, I believe that's correct.
19    Q.   And when you look at the post-event
20  price, you look at that in the three, six and nine
21  months following the implementation period date;
22  is that right?
23    A.   That's right.
24    Q.   So for Price Increase Implementation
25  Event Number 2, that would be August, November and

**[Page 211]**

1  February; correct?
2    A.   That's correct.
3    Q.   So you could potentially be
4  comparing a price from March of '05 to February of
5  '07 under Price Increase Implementation Event
6  Number 2; is that correct?
7    A.   I think that's correct, yes.
8    Q.   And if in that time period as a
9  customer all of my prices for my products remain
10  the same except for one, I would be counted as a
11  customer with a post-event price increase on
12  Exhibit 6 in this fourth column; correct?
13    A.   That's correct.
14    Q.   If I continue on Exhibit 6, the
15  fifth column, Increase Customers as a Percent of
16  Assessed Customers, 92 percent, is that simply the
17  72,030 divided by 70,224?
18    A.   Yes, it is.
19    Q.   Next column says Total Post-Events
20  Purchase Dollars Assessed in Millions.  We have a
21  number that is about 14.6 billion there.
22         Do you see that?
23    A.   Yes, I do.
24    Q.   What does that represent?
25    A.   That's a measure of the purchase

**[Page 212]**

1  dollars for a given customer and product in a
2  post-event month where the price is observed and a
3  comparison is being made to a pre-event price.
4    Q.   Let's take my hypothetical again
5  where I'm going to purchase product, and I
6  purchase a variety of products but my products
7  that match up pre and post I only buy in months
8  three but not in months six or nine after the
9  postdate, but I buy other products in months six
10  and nine.
11         Do you count in this column my
12  purchases in months three, six and nine or just my
13  purchases in month three?
14    A.   Just the purchases in month three
15  of the product that's being compared.
16    Q.   Well, let's say, again, that I buy
17  18 products and 17 of them the price is constant,
18  one of them the price went up.  I, therefore,
19  would be included as a customer with a post-event
20  price increase; is that correct?  I think we
21  handled this before.
22    A.   Yes.  Yes.
23    Q.   So when we get to the Total
24  Post-Event Purchase Dollars Assessed, does that
25  include the purchases for all of my 18 products or

**[Page 213]**

**[54]  (Pages 210 to 213)**

| | |
|---|---|
| 1 | just for the one where the price went up? |
| 2 | A. It includes, assuming that third |
| 3 | 18 all had -- could all be measured in that third |
| 4 | month after the event, it would include all those |
| 5 | dollars. |
| 6 | Q. Even though for 17 of them the |
| 7 | price did not go up? |
| 8 | A. That's correct. |
| 9 | Could I take a two-minute break? |
| 10 | MR. McKEOWN: Absolutely. Why |
| 11 | don't we take a break now. You just have to wait |
| 12 | until he says going on break. |
| 13 | THE VIDEOGRAPHER: Going off the |
| 14 | record at 2:58. |
| 15 | (Whereupon, a recess was held |
| 16 | from 2:58 p.m. to 3:16 p.m.) |
| 17 | THE VIDEOGRAPHER: We are back on |
| 18 | the record at 3:16. This is Disc 5 in the |
| 19 | deposition of Dr. Mark Dwyer. |
| 20 | BY MR. McKEOWN: |
| 21 | Q. Dr. Dwyer, looking again at your |
| 22 | report on Exhibit 13, if you could go back for a |
| 23 | moment to Page 12. |
| 24 | A. Yes. |
| 25 | Q. Paragraph 29. We talked earlier |

**[Page 214]**

| | |
|---|---|
| 1 | fair questions and it's certainly proper for you |
| 2 | to ask him from his memory but -- and this is not |
| 3 | an assertion on my part; this is a question: You |
| 4 | did in fact get the backup data for -- this |
| 5 | included a backup data for this calculation. |
| 6 | MR. McKEOWN: I'm not sure of the |
| 7 | expenses calculation. |
| 8 | MR. GOLDBERG: All right. That's |
| 9 | why I said it as a question and not an assertion. |
| 10 | MR. McKEOWN: I don't believe so. |
| 11 | BY MR. McKEOWN: |
| 12 | Q. With respect to those six |
| 13 | price-increase announcements that were not |
| 14 | followed by a change or an increase in PPW price |
| 15 | survey, was there any impact to customers as a |
| 16 | result of those price-increase announcements? |
| 17 | A. I haven't examined that. |
| 18 | Q. Would you expect there to be any |
| 19 | impact to customers from price-increase |
| 20 | announcements that did not have a RISI PPW price |
| 21 | increase followed in time? |
| 22 | A. I don't know. |
| 23 | Q. No opinion one way or the other? |
| 24 | A. No opinion. |
| 25 | Q. No hypothesis? |

**[Page 216]**

| | |
|---|---|
| 1 | about how 11 over 82 was 13.4 percent, and you -- |
| 2 | MR. GOLDBERG: Something we can |
| 3 | all -- we all agree we understood that part. |
| 4 | MR. McKEOWN: You'll stipulate to |
| 5 | that part? |
| 6 | BY MR. McKEOWN: |
| 7 | Q. And we looked farther on where you |
| 8 | had a probability referenced of 0.0054 percent. |
| 9 | Do you see that again? |
| 10 | A. Yes, I do. |
| 11 | Q. And you explained earlier how you |
| 12 | went about that. |
| 13 | Can you tell me how many episodes |
| 14 | are used in order to get to the -- in |
| 15 | the binomial equation to the 0.054 percent? |
| 16 | A. My recollection is that I used the |
| 17 | 15 price-increase events of the defendants as the |
| 18 | sample size that I was looking at, and that I |
| 19 | measured the nine successes in a bi -- trinomial |
| 20 | context with respect to that sample size. |
| 21 | Q. So you weren't looking at some |
| 22 | broader period such as over the 144 months; is |
| 23 | that right? |
| 24 | A. That's not my recollection. |
| 25 | MR. GOLDBERG: Those questions are |

**[Page 215]**

| | |
|---|---|
| 1 | A. I would expect there'd be some |
| 2 | impact. |
| 3 | Q. Why? |
| 4 | A. I would expect that in the process |
| 5 | of price negotiation between a defendant and a |
| 6 | purchaser, some purchasers may not be looking at |
| 7 | the index. They may not be cognizant of it. They |
| 8 | may not use it as a negotiating tool, and so it |
| 9 | might be easier, depending upon who the customer |
| 10 | is, to say, "Look, we're rolling with a price |
| 11 | increase" and they'll take it, even though the |
| 12 | broader market is not. |
| 13 | Q. I believe we were looking at |
| 14 | Exhibit 6 before we broke and we had gotten over |
| 15 | to the column on Exhibit 6 that would be Total |
| 16 | Post-Event Purchase Dollars Assessed. |
| 17 | Do you see that? |
| 18 | A. Yes. |
| 19 | Q. The next column says Total |
| 20 | Post-Event Purchase Dollars Paid by Increased |
| 21 | Customers, and on the first row for All Defendants |
| 22 | and Type All, it says, roughly, $14.4 billion. |
| 23 | What does that number represent? |
| 24 | A. That number represents the -- it's |
| 25 | a subset of a total post-event purchase dollars, |

**[Page 217]**

1 and it's those dollars that were spent by
2 customers who showed impact in this analysis,
3 showed a price increase for some product.
4 Q. Is it the case that if the customer
5 showed an increase in price for any of the
6 products for that customer, that all of the
7 purchases by that customer would be included in
8 this number?
9 A. Yes.
10 Q. The next column says Percent of
11 Assessed Post-Event Purchase Dollars Paid by
12 Increased Customers, and here it says 99 percent.
13 Is that simply the 14.4 billion over the 14.6
14 billion?
15 A. Yes.
16 Q. The next column Total Post-Event
17 Purchase Dollars Showing Price Increases, and
18 there's a number there reflecting approximately
19 11.8 billion.
20 What does that represent?
21 A. Those are the monthly purchases
22 that actually show the price increases on a
23 product -- by product by customer level.
24 Q. So in my example before where I buy
25 18 products and for 17 of them the price remains

[Page 218]

1 constant and for one the price goes up, what gets
2 picked up in this column, Total Post-Event
3 Purchase Dollars Showing Price Increases?
4 A. The one product that showed the
5 price increase.
6 Q. The 17 would not be picked up?
7 A. That's right.
8 Q. So that if we look at the last
9 column, that's the math dividing the 11,000,842
10 into which number?
11 A. That is measured relative to those
12 customers who showed price increases, so a
13 customer showed in a sense on average, customers
14 have showed impact what percentage of their
15 dollars or purchases were impacted, 82 percent.
16 Q. Perhaps my question wasn't clear
17 because I'm not sure I followed it.
18 If I want to get 82 percent, I'd
19 take the 11.8 billion, and do I divide it by the
20 14.4 billion or the 14.6 billion?
21 A. 14.4.
22 Q. Why not the 14.6?
23 A. Well, you could do that calculation
24 as well. This is -- I'm calculating this for the
25 increase customers to show how pervasive in the

[Page 219]

1 dollar sense the impact was for those customers.
2 Q. So looking at this top row, All
3 Products, this is suggesting that 82 percent of
4 the purchases reflected increase in price over
5 this period, of the customer identified products?
6 A. I think it's slightly different.
7 It's saying that -- and it first establishes that
8 92 percent of customers that were able to be
9 measured showed impact, and in this last column
10 it's saying for those customers which share of
11 their purchases that were assessed were impacted
12 on a dollar-rated basis, and that's 82 percent.
13 Q. So it's 82 percent relating to the
14 72,000 customers not the 78,000 customers;
15 correct?
16 A. That's correct.
17 Q. And with respect to that 82
18 percent, if I purchase a product in the
19 pre period, and the price is higher in months
20 three and six but not in nine, does this 82
21 percent include my purchases in three, six and
22 nine or just in three and six?
23 A. Just in three and six.
24 Q. Why did you select three months,
25 six months and nine months, by the way?

[Page 220]

1 A. Obviously corresponded to quarters
2 and quarters are referenced in the discovery
3 documents as relevant to contracts and relevant to
4 renegotiation windows, so I was looking within
5 those three -- those seem like reasonable periods
6 for assessment.
7 Q. Why not 12 months?
8 A. 12 months, I think I would run into
9 overlap between the events that I'm looking at,
10 the five events, which -- the motivation for
11 consolidating events into five is to allow me room
12 to look for price increase with some delay after
13 announcement, as reflected in Exhibit 5.
14 That's why I've consolidated these
15 price-increase announcements, so that I can know
16 what I'm effectively looking at in terms of what
17 am I measuring a response with respect to. I
18 think if I went out 12 months, I might have run
19 into subsequent events.
20 Q. Do you have reason to believe that
21 you need to go more than six months to pick up any
22 lag in the price impact after a price announcement?
23 A. I do. I've seen documents that
24 talk about national accounts being reset on an
25 annual basis, so I may have missed those. I may

[Page 221]

1   have missed some customers.
2       Q.  Did you do any study or analysis as
3   to how long a lag would exist between a reduction
4   in capacity and when you might expect to see an
5   effect on prices?
6       A.  No, I did not.
7       Q.  Want to turn to your report, which
8   is Exhibit 13, Paragraph 7.
9           MR. GOLDBERG:  7?
10          MR. McKEOWN:  7.
11  BY MR. McKEOWN:
12      Q.  In the fourth line -- let me back
13  up.  Paragraph 7 is the paragraph that relates to
14  Exhibit 6; correct?  I think we talked about that
15  before.
16      A.  Yes, that's right.
17      Q.  In the fourth line, it starts using
18  widely-accepted econometric methods.
19          Do you see that?
20      A.  Yes.
21      Q.  What were the econometric methods
22  that were used?
23      A.  This is referring to using a low
24  price for comparisons.
25      Q.  Okay.  There's -- just to make

[Page 222]

1   clear, when I see econometric, I think regression,
2   which may be wrong.
3           There's no regression in Exhibit 6,
4   or underlined in Exhibit 6; correct?
5       A.  That's correct.
6       Q.  So when you say "econometric
7   methods," you picked the modal price?
8       A.  I'm using a well-established
9   statistic.
10      Q.  I may have asked you this before,
11  but you have done no analysis as to whether or not
12  any of the price increases within the class period
13  were actually caused by an increase in costs; is
14  that correct?
15          MR. GOLDBERG:  On this analysis.
16  BY MR. McKEOWN:
17      Q.  In the analysis represented in
18  Exhibit 6, 7, 8 and 9?
19      A.  That's correct.
20      Q.  When I look in Exhibit 6 and also
21  looking at Exhibit 5, the fourth column says
22  Customers With Post-Event Price Increases, and we
23  covered this before, but I think the example I
24  used was under Price Increase Implementation Event
25  Number Two, if I were a customer and I had a price

[Page 223]

1   increase in either the three, six or nine months
2   for a single product, I would get picked up as
3   part of that 72,000; is that correct?
4       A.  Yes.
5       Q.  Is it also the case that if I were
6   a customer and I had no price increase in PIIE 1,
7   2, 3 or 4 but had one with respect to
8   price-increase implementation event five for one
9   product, I would get picked up in the 72,000
10  customers?
11      A.  That's correct.
12      Q.  And for the other 150,000 customer
13  identification items to get us to the 230,000, you
14  can't run any analysis comparable to Exhibit 6; is
15  that right?
16      A.  That's right.
17      Q.  Looking at Exhibit 6 again, you
18  have a number of assessed customers, I want to
19  walk through a variety of situations and
20  understand whether or not the particular
21  hypothetical customer would be an assessed
22  customer.  Okay?
23      A.  Okay.
24      Q.  So let's assume we have a customer
25  who only purchased in a single month of the class

[Page 224]

1   period.  They would not be picked up in any way in
2   the assessed customers; correct?
3       A.  Correct.
4       Q.  Because they didn't have purchases
5   before and after; correct?
6       A.  Right.
7       Q.  And similarly, if somebody
8   purchased in one of the months that does not fall
9   into your windows before or after the five
10  price-increase implementation events we see on
11  Exhibit 5, those customers would not be within the
12  universe of assessed customers; correct?
13      A.  That's correct.
14      Q.  Is it also true that if a customer
15  only purchased during the pre period for various
16  price increase implementation events, they would
17  not be picked up as an assessed customer?
18      A.  That's correct.
19      Q.  In fact, it would also be the case
20  that if you bought only in the pre period or the
21  month of implementation, you would not be picked
22  up; correct?
23      A.  That's correct.
24      Q.  If you bought within the pre period
25  but then bought in months one, two, four, five,

[Page 225]

1   seven or eight of the post period, would you be
2   picked up in the assessed customers list?
3        A.  Yes.
4        Q.  You just wouldn't be able to
5   identify an increase for those customers?
6        A.  The three, six and nine are maximum
7   windows.  It's up to three months, up to six
8   months and up to nine months that I'm looking to
9   measure prices.
10       Q.  So if there's any match of product
11  for a customer within that nine-month window,
12  you're going to match it to any purchase of a
13  product in the prior six-month window?
14       A.  That's right.
15       Q.  But for the dollars on Exhibit 6,
16  you're only including the dollars from months
17  three, six and nine; is that correct?
18       A.  No, it's the dollars for where I
19  detect a purchase.  So if I detected a purchase in
20  month two, I would count those dollars, but three,
21  six and nine are just linked, or just maximum
22  verizons in a sense.  First I look within three
23  months for a purchase, then six months, then nine
24  months.
25       Q.  If you look within three months and

[Page 226]

1   find a purchase but there's no price increase, do
2   you still look within six to see if there's a
3   price increase for another purchase?
4        A.  Yes.
5        Q.  Do you still look within nine if
6   there's no price increase within the first six for
7   a price increase?
8        A.  Yes.
9        Q.  If you go to month three and
10  there's a price increase for the product, do you
11  still go after month three to see if there's a
12  change in that price?
13       A.  Yes.
14       Q.  If there's a change in the price
15  between month three and month six, say the price
16  goes down, do you make a comparison between those
17  two prices, or are you still comparing month six
18  to the pre-period price?
19       A.  To the pre-period price.
20       Q.  So if my only matching purchase was
21  in month four, would the dollars reflected on
22  Exhibit 6 represent my purchases in month four as
23  opposed to month three, six or nine?
24       A.  Yes.
25       Q.  Okay.  So they wouldn't reflect my

[Page 227]

1   month three purchases because I didn't buy a
2   product but they'd reflect all my purchases for
3   month four?
4        A.  For that product.  The product gets
5   matched to a pre-event purchase.
6        Q.  Well, let's go to my 18 products
7   again, and I've got 18 products that I buy.  Only
8   one goes up.  It goes up in month four after the
9   price announcement.  Is it the case, then, that my
10  total sales or purchases for month four for all 18
11  products are what gets included into the total
12  post-event purchase dollars?
13       A.  So long as there's a price observed
14  for the other 17, yes.
15       Q.  What if there is no price observed
16  for the other 17 in that month; then do you go to
17  month tree or month six?
18       A.  In this hypothetical, there are 18
19  products observed for a given customer prior to
20  the event, and I observed a price for one in month
21  four of the 18.
22       Q.  You observe a price for all 18
23  after the price announcement?
24       A.  Right.
25       Q.  But you only observe a price

[Page 228]

1   increase for one product in month four?
2        A.  All right.
3        MR. GOLDBERG:  What happens if
4   price increases for the other 17 products occur?
5        MR. McKEOWN:  Let's assume, at
6   least for this stage of the hypothetical, that
7   they do not.  They carry all the way out through
8   nine months and there's no price increase.
9        MR. GOLDBERG:  I'm sorry.  I asked
10  the wrong question.  When do you observe the
11  price --
12       MR. McKEOWN:  Increase in price in
13  four.
14       MR. GOLDBERG:  When do you observe
15  prices for the other 17 after the -- when do you
16  observe purchases?
17       MR. McKEOWN:  Oh, throughout --
18  throughout the nine months.
19       MR. GOLDBERG:  Including --
20  including in month four?
21       MR. McKEOWN:  Except month four.
22       MR. GOLDBERG:  Except month four.
23  Okay.  That's all.
24       THE DEPONENT:  So in this
25  hypothetical, I don't observe -- after the event,

[Page 229]

1  I don't observe any prices for these 18 products
2  in months one, two or three.  Then in month four,
3  I observe a price for one of the products, and
4  then if I go out past that, I observe prices
5  through the nine months for all of the 18
6  products.
7  BY MR. McKEOWN:
8      Q.  But the other products do not
9  increase in price?
10      A.  Well, the -- in terms of total
11  post-event purchase dollars, that would include
12  the one product for month four, purchased in month
13  four and then all the other ones from month five
14  through nine.
15      Q.  From the next time they were
16  purchased for a single month or would it include
17  their purchases for five through nine?
18      A.  Five through nine.  Well, I'm
19  sorry.  No, that's not right.
20          I take the last -- I'm taking the
21  last observed price within each of those windows,
22  so -- yeah, let me re -- correct that there.
23          So let's see.  The first one is
24  observed at four, so I actually -- for that one
25  product that showed a price increase in month

[Page 230]

1  four, I actually wouldn't be looking at that
2  price.  I would be looking at a six-month price,
3  because I looked at the last price within
4  that observed -- the last monthly price observed
5  within that window.
6          So I don't know but that dollar
7  amount would be counted.  So within each of those
8  windows I observed a customer product price just
9  once, but if there's any purchase within that
10  window, I observe it.
11      Q.  And then you take the six-month or
12  the four-month revenues?
13      A.  The six month.  The one that goes
14  with the price I'm using.  For the other 17, I
15  would be picking up their six-month price, and
16  then I would be picking up all the nine-month --
17  Sorry.  I pick up all the six-month dollars and
18  the nine-month dollars and measure it in all those
19  months.
20      Q.  If a customer purchased only in the
21  post announcement period, they would not get
22  picked up as an assessed customer on Exhibit 6;
23  correct?
24      A.  That's correct.
25      Q.  If they purchased only in the month

[Page 231]

1  of the announcement's effective date or the post
2  period, they would not be picked up as an assessed
3  customer on this chart; correct?
4      A.  That's correct.
5      Q.  Are there other categories of
6  customers that would not get picked up, given the
7  assessed customer list?
8      A.  Those with different customer
9  identifications, I won't be able to match, or
10  where they're essentially buying the same product
11  but the product identification code has changed.
12  The information I was given on the product has
13  changed, even though it's the same product,
14  essentially.
15      Q.  Let's look at Exhibit 7, and I'm
16  really hoping there's a pattern here so I can pick
17  up the speed.
18          Dr. Dwyer, do you have Exhibit 7
19  before you?
20      A.  I do.
21      Q.  Exhibit 7 has the heading Weighted
22  Average Offered Product Prices Before and After
23  Defendant Price Increase Implementations; is that
24  correct?
25      A.  Yes.

[Page 232]

1      Q.  And if we look at the third column,
2  Number of Assessed Customers, that appears to
3  track exactly the same number of customers that we
4  saw in Exhibit 6; correct?
5      A.  That's correct.
6      Q.  So we started with the same
7  universe of assessed customers; correct?
8      A.  Yes.
9      Q.  Then we have Number of Customers
10  with Post-Event Weighted Average Price Increases,
11  and Increase Customers, and here we have a
12  different number than we had on Exhibit 6.
13          How does one qualify as a customer
14  with a Post-Event Weighted Average Price Increase
15  for purposes of Exhibit 7?
16      A.  Exhibit 7, rather than using the
17  modal price, I'm using the monthly weighed average
18  price.
19      Q.  When you say "the monthly weighted
20  average price," is that the weighted average for
21  each individual product or across a basket of
22  products?
23      A.  In this exhibit it's for each
24  individual product.
25      Q.  So if we go back to my hypothetical

[Page 233]

[59]  (Pages 230 to 233)

1 with the 18 products, you would look at the
2 average pre-announcement and the average
3 post-price increase implementation event and
4 determine whether the average price in the --
5 pre period for product one was less than the
6 average price for product one in the post period;
7 correct?
8     A.  That's right.  There would be 18
9 comparisons.
10     Q.  That's where I was headed next.
11 Thank you.
12         If it were the case that only one
13 of those weighted averages was higher in the
14 post period than the pre period, all 18 would fall
15 within the 72,639 that we see as post-event
16 weighted average price increases; correct?
17     A.  The count would be just one, but
18 that's because the hypothetical is for one
19 customer.
20     Q.  My fault.  Yes, but --
21         And then if we go over -- I'm
22 jumping an extra column.  When we go to the Total
23 Adjusted Post-Event Purchase Dollars Assessed
24 that's 14.5 billion, that would include the
25 purchases for all 18 of my products; correct?

**[Page 234]**

1     A.  Yes, I do.
2     Q.  Do you have a belief as to whether
3 there's some minimum number that you need in this
4 far right column to be able to conclude that there
5 is a common impact?
6         MR. GOLDBERG:  Minimum number of?
7         MR. McKEOWN:  Minimum percent.
8         MR. GOLDBERG:  Minimum percentage
9 of dollars showing higher prices per increase.
10         MR. McKEOWN:  Right.
11         MR. GOLDBERG:  Because these are
12 dollars as opposed to the customers, which are 92,
13 93 and 97.
14         THE DEPONENT:  No, I don't.
15 BY MR. McKEOWN:
16     Q.  Do you have any belief in terms of
17 whether there's a bottom threshold for number of
18 customers percentagewise that need to be included?
19     A.  I don't have a numerical threshold.
20 I based my opinion on the set of analyses that
21 I've done collectively.
22     Q.  Have you testified in any case as
23 to what you would consider a bottom threshold for
24 the percentage of customers that need to be
25 affected by price increase for a common impact to

**[Page 236]**

1     A.  Yes.
2     Q.  If we move to the next column Total
3 Adjusted Purchase Dollars Paid by Increase
4 Customers, is that again for my 18 products as
5 opposed to my one product?
6     A.  Yes, it is.
7     Q.  Is it correct, by the way, that the
8 percentages here, the 93 percent in Column 5, the
9 99 percent in the third column from the right and
10 the 81 percent in the far right column, are the
11 same mathematical calculations you made on
12 Exhibit 6?
13     A.  Yes, they are.
14     Q.  The Total Adjusted Post-Event
15 Purchase Dollars Showing Price Increases, the
16 11.6 billion, what does that represent?
17     A.  That is the dollar volume of
18 purchases where weighted average prices increased.
19 It's measuring it in the month in which the
20 increase was measured for a given customer-product
21 combination.
22     Q.  I notice here that for the All
23 products it's 81 percent, and for the All
24 Defendants Corrugated Product it's 79 percent.
25         Do you see that?

**[Page 235]**

1 be found?
2     A.  I don't think so.
3     Q.  Let's look at Exhibit 8.
4     A.  All right.
5     Q.  Do you have Exhibit 8?
6     A.  I do.
7     Q.  This is a chart that's in somewhat
8 of a similar format to Exhibit 6 and 7; correct?
9     A.  Yes.
10     Q.  And at this point we see, looking
11 at the -- the first two columns appear to be the
12 same; is that correct?
13     A.  Yes.
14     Q.  The third column, Number of
15 Assessed Customers, looking at the row All
16 Defendants for All types of product, 94,161; is
17 that right?
18     A.  That's right.
19     Q.  And that's about 16,000 hired in
20 what we saw in Exhibits 6 and 7; is that correct?
21     A.  Yes.
22     Q.  What's the reason for the increase
23 or what accounts for the increase of the 16,000?
24     A.  In this exhibit I'm taking a
25 weighted average price across products per

**[Page 237]**

**[60]  (Pages 234 to 237)**

1 customer.
2     Q.  So is it the case that you don't
3 need to match a specific product to the pre and
4 post period in Exhibit 8?
5     A.  That's right.
6     Q.  So that if I bought 36-pound
7 linerboard in the pre period and 42-pound
8 linerboard in the post period, I would be an
9 assessed customer?
10     A.  Yes.
11     Q.  Is it also the case, then, that a
12 42-pound linerboard is typically more expensive
13 than 36-pound linerboard, that this assessment
14 would count me as having a price increase as a
15 result of the product I'm purchasing?
16     A.  It could be due to the product
17 purchased, yes.
18     Q.  It could also be due to having a
19 different combination of products that you
20 purchased in the pre period than the post period;
21 correct?
22     A.  Yes.
23     Q.  For Exhibit 8, during what month
24 did you select the product collection for your
25 average price?

[Page 238]

1     A.  It would follow the same rule that
2 I used for the other exhibits, so it would be
3 the -- for the pre-event price it would be the
4 latest month in which I had purchases for that
5 customer prior to the event.
6     Q.  Going back up to six months?
7     A.  Up to six months, yeah.
8     Q.  So that if in the pre period I
9 purchased different products in each of those six
10 months of the pre period, you'd only be looking at
11 what was my average price for that month closest
12 to the price announcement; correct?
13     A.  That's right.
14     Q.  In the post period, so that if we
15 were to look at price-increase implementation
16 event number two, which ends in May of '06, would
17 you be looking at the products purchased in June
18 of 2006 or would you be looking at the products
19 purchased three months after May, which I think
20 would be August of '06?
21     A.  I would first look for that
22 customer to see if they had purchases in August.
23 If they didn't, then -- and they had earlier
24 purchases, then I would use those earlier
25 purchases.

[Page 239]

1     Q.  If they did not have earlier
2 purchases and they did not have purchases in
3 August, would you then go out to the six-month
4 period?
5     A.  Yes.
6     Q.  Would you go to the six-month mark
7 even if there were purchases in the three-month
8 mark?
9     A.  Yes.
10     Q.  So that you would after each
11 price-increase implementation event be looking at
12 three distinct times for an increase in the
13 weighted average of the products purchased?
14     A.  Yes.
15     Q.  When you look at Exhibit 8 with
16 respect to the Dollars Assessed for the Post-Event
17 Purchase Dollars where we see here 20 billion is
18 the number for the All Defendants, All in
19 Exhibit 8, is that limited to the month that you
20 are finding the weighted average weighted price?
21     A.  Yes, it is.  No, sorry.  It's
22 limited to the months in which I measured.  It may
23 not be higher, this column Total -- are we talking
24 about Total Post-Event Purchase Dollars?
25     Q.  Yes.

[Page 240]

1     A.  Yes.  So that may be a higher or
2 lower price, but it's the one that I was able
3 to -- the weighted average price I was able to
4 calculate, either -- at each of those Windows,
5 three, six or nine, or failing those earlier
6 months when I was available.
7     Q.  So if there weren't numbers for
8 month six, you would go back and look at months
9 four or five, then; correct?
10     A.  That's correct.
11     Q.  And then would you include in the
12 Post-Event Purchase Dollars Assessed month five's
13 revenues from that product?
14     A.  Yes.
15     Q.  Was the order, if month six exists,
16 take month six, if month six does not exist, take
17 month five before you go to month four?
18     A.  Yes.
19     Q.  Going back to my example of my 18
20 products that I purchased again, for purposes of
21 Exhibit 8, would there just be a single comparison
22 as opposed to 18 comparisons?
23     A.  Yes.
24     Q.  And do we read the remaining
25 columns on Exhibit 8 comparable to how we read

[Page 241]

1    Exhibits 6 and 7?
2      A.  Yes.
3      Q.  Let's take a look at Exhibit 9.
4       How did you define annual payment
5    shares?
6      A.  Annual payment shares I defined by
7    summing up credits or other payments to a given
8    customer that were not line specific on invoices
9    and then summing them up over a calendar year and
10    then dividing them by the total purchases of that
11    customer.
12      Q.  When you look at Exhibit 9, let's
13    go across the first row, All Defendants, All
14    product types?
15      A.  Yes.
16      Q.  The third column is Overall Share
17    With No Significant APS Increase and it says 96
18    percent.
19      What does that mean?
20      A.  That reflects the share of
21    customers with purchases in and out of the class
22    period, which has been adjusted for this purpose
23    to be -- to align with calendar year so that it
24    has at least some purchases up in the benchmark
25    period and some in the period 2004 through 2010.

**[Page 242]**

1    It's the share of those who either show no
2    increase in APS during the class period or the
3    fluctuations in APS are not significantly --
4    significantly higher than those fluctuations in
5    the base period at a 5 percent level of
6    significance.
7      Q.  Is essentially what you're trying
8    to do with Exhibit 9 is determine whether or not
9    there are higher annual payment shares during the
10    class than outside the class period?
11      A.  Yes.
12      Q.  The fourth and fifth columns are
13    both under a common heading of At Most One APS In
14    and Out of Class Period?
15      A.  Yes.
16      Q.  And then the last two columns are
17    Multiple APS In or Out of Class Period.
18      Why did you separate those into one
19    APS or multiple APS?
20      A.  The first two columns I essentially
21    got one data point that I'm examining. I've got
22    one annual measure outside the class period and
23    one -- and one annual measure inside the class
24    period, so there's no statistical comparison, just
25    a comparison as to whether or not the APS went up

**[Page 243]**

1    or not for this -- for these columns under One APS
2    In or Out of Class Period.
3      For the last two columns there's
4    variability in one or the other, so there's --
5    there are multiple APS observations, either in the
6    class period or multiple APS observations in the
7    base period or both, and so I'm making a statistical
8    test as to whether on average annual payment
9    shares went up in those last two columns.
10      Q.  And are you making that statistical
11    comparison by customer or across all customers?
12      A.  By customer.
13      Q.  So for each customer you are
14    determining whether or not there's a statistical
15    difference between the APS level they received
16    during class period as compared to before or
17    after?
18      A.  That's correct.
19      Q.  When you say At Most One APS In or
20    Out of Class Period, does that mean you have one
21    APS within the class period and one in one of the
22    pre or post periods, or you only have one through
23    the entire period?
24      A.  It means that there's -- in this
25    context for these columns an APS can be zero, so

**[Page 244]**

1    it means that there are purchases both within and
2    outside the class periods.
3      So if there are no discounts or
4    rebates for that customer, the APS would be zero.
5    And there may be multiple years in which zero is
6    observed. That would fall into this category as
7    well because there's no variability to measure for
8    a statistical analysis.
9      Q.  When you identified the customers,
10    the 56,556 under the At Most One APS and the
11    54,659 in the multiple APS, is there any overlap
12    within those customers?
13      A.  No.
14      Q.  Are the numbers for the various
15    defendants listed underneath specific to what you
16    found for those particular defendants?
17      A.  Yes.
18      Q.  So that, for example, for
19    International Paper and Weyerhaeuser combined,
20    there were 18,962 class members who received some
21    APS?
22      A.  The 18,962 would be the set of IP,
23    Weyerhaeuser customers for whom there is a -- some
24    variability in APS measure, either inside the
25    class period or outside the class period.

**[Page 245]**

**[62]  (Pages 242 to 245)**

1    Q.  For those 18,962, they had at least
2  two annual payment programs?
3    A.  That's correct.
4    Q.  And for another -- looking over a
5  column under the At Most One, there's 24,135
6  customers of IP or Weyerhaeuser who at one time,
7  maybe inside the class period, maybe outside the
8  class period, had an APS program; correct?
9    A.  Or they may never have had an APS.
10    Q.  Or they never had an APS.
11    A.  But they purchased in both periods.
12    Q.  Looking at Exhibit 8, this was the
13  Weighted Average Monthly Net Price chart?
14    A.  Yes.
15    Q.  Did you do anything to compare
16  whether there were changes in the combinations of
17  products that were purchased in the pre period and
18  the post period?
19    A.  No, that was addressed in exhibits
20  6 and 7.
21    MR. GOLDBERG:  Let me get my
22  objection in to the -- again, the question you
23  asked that already answered, I want to put my
24  objection in, and let me see if I can -- when
25  you -- in that question you were seeking to

[Page 246]

1    A.  Correct.
2    Q.  It could also be the case, couldn't
3  it, that depending on the basket of products one
4  purchases in the pre period or the post period,
5  one could get a false positive or a false negative
6  in terms of whether or not there has been a change
7  in price using the methodology in Exhibit 8;
8  correct?
9    MR. GOLDBERG:  Objection to the
10  form.
11    THE DEPONENT:  There could be
12  compositional changes in each direction that would
13  be driving price differences.
14  BY MR. McKEOWN:
15    Q.  My question is:  Did you do
16  anything to analyze or test the nature of those
17  differences in the composition of the purchases in
18  the pre and post period with respect to what you
19  looked at in Exhibit 8?
20    A.  No.
21    Q.  Did you include anything in your
22  study to attempt to control for such changes?
23    A.  Yes, Exhibits 6 and 7.
24    Q.  Looking at your report, Exhibit 13,
25  and Footnote 26, I believe on Page 17.

[Page 248]

1  determine whether Dr. Dwyer made any investigation
2  to see whether there were compositional changes in
3  the products in the comparison periods.
4    MR. McKEOWN:  That's a good way to
5  start it, sure.
6  BY MR. McKEOWN:
7    Q.  What I want to know is whether --
8  putting aside Exhibit 6 and 7.  For Exhibit 8, you
9  compared these weighted average prices, the pre
10  period and the post period; correct?
11    A.  That's right.
12    Q.  I gave you the hypothetical before
13  you could have purchased only 36-pound linerboard
14  in the pre period and 42-pound linerboard in the
15  post period; correct?
16    A.  That's correct.
17    Q.  You would expect under that
18  hypothetical that the statistics on Exhibit 8
19  would indicate there would be an increase in
20  price.
21    A.  Yes.
22    Q.  But that increase would have
23  actually been caused by a different product being
24  purchased as it distinguished from some other
25  factor in terms of pricing; correct?

[Page 247]

1    A.  Yes.
2    Q.  The second sentence says:
3      "The weighted average
4      prices would be somewhat lower
5      than product-specific
6      comparisons" --
7      Excuse me.  Let me rephrase that.  I
8  misread that.
9      The second sentence says:
10      "That weighted average
11      prices would be somewhat lower
12      than product-specific comparisons
13      is consistent with an economic
14      substitution effect."
15      Do you see that?
16    A.  Yes.
17    Q.  Have you done anything to analyze
18  whether such substitution occurred?
19    A.  No, I haven't.
20    Q.  Does your data allow you to analyze
21  whether or not such substitution occurred?
22    A.  For corrugated products or for the
23  final product category, I don't think so.  There
24  may be something I could do in terms of
25  intermediate, or roll stock, the liner, medium on

[Page 249]

[63]  (Pages 246 to 249)

1   that, but not the corrugated.
2     Q.  Do you have a view as to what
3  lower-grade containerboard products are
4  substitutes for higher-grade containerboard
5  products?
6     MR. GOLDBERG:  Object to the form.
7     THE DEPONENT:  No, I would expect
8  that it might be application specific.
9  BY MR. McKEOWN:
10    Q.  When you made your adjustments in
11  Exhibits 7, 8 and 9, were you attempting to
12  account for rebates or other discounts that
13  customers might receive?
14     MR. GOLDBERG:  Object to the form.
15     THE DEPONENT:  In Exhibits 7 and 9,
16  I was attempting to control for -- well, all of --
17  all of the exhibits are based on net prices as a
18  starting point, and so that it would include
19  discounts that are -- that are recognized in the
20  data at the time, so I believe that that was
21  accounted for in all of the exhibits.
22     Then Exhibits 6 to Exhibit 7, 7 is
23  taking into account discounts that may or may not
24  have been applied, so it is addressing that in a
25  second stage.

**[Page 250]**

1     And then Exhibit 9 is addressing
2  that in the third iteration looking at
3  non-line-specific credits and discounts.
4    Q.  Was the reason that you looked at
5  these various permutations of your common impact
6  analysis because you wanted to consider various
7  factors that might have affected the price so that
8  you didn't have an apples-to-apples price?
9     MR. GOLDBERG:  Object to the form.
10     THE DEPONENT:  I think in each
11  exhibit for each analysis I have a common
12  definition that I'm using in comparison.
13  BY MR. McKEOWN:
14    Q.  Well, you didn't make any
15  adjustment in any of your charts on the
16  common-impact front for changes in cost; is that
17  correct?
18    A.  Cost to -- to whom?
19    Q.  Cost to the containerboard notes?
20    A.  No.
21    Q.  In your regression model you
22  considered cost a significant enough factor that
23  you included cost variables to help explain
24  difference in price; correct?
25    A.  Correct.

**[Page 251]**

1    Q.  But you didn't include it in your
2  common impact; is that right?
3    A.  That's correct.
4    Q.  Did you make any attempt to isolate
5  what portion of any price increase was
6  attributable to costs in your common impact
7  analysis?
8     MR. GOLDBERG:  Is your question
9  production costs?
10     MR. McKEOWN:  Production costs.
11     THE DEPONENT:  No, I did not.
12  BY MR. McKEOWN:
13    Q.  Did you make any attempt to
14  estimate what portion of any change in price in
15  your common impact analysis was attributable to
16  anything other than possible collusion?
17     MR. GOLDBERG:  Object to the form.
18     THE DEPONENT:  Could you restate
19  the question, please.
20  BY MR. McKEOWN:
21    Q.  In your common-impact analysis, as
22  you've explained it, if a customer paid a dollar
23  for a product in the pre-price increase
24  implementation of that period and paid a dollar
25  one in the post-increase implementation period,

**[Page 252]**

1  you would count that as someone who has suffered
2  an impact for purposes of your analysis; correct?
3    A.  That's correct.
4    Q.  You would consider that person to
5  have suffered an impact regardless of whether
6  costs went up 5 cents; is that correct?
7    A.  Sure, yes.
8    Q.  You would consider that an impact
9  even if there was some change in demand that
10  caused an increase in price; correct?
11    A.  I'm focused on these particular
12  events where the defendants are announcing price
13  increases, so I'm not looking behind their
14  announcements to see what the motivation for it
15  was in any impact analysis or price increase
16  analysis.
17    Q.  You're not adjusting for inflation,
18  are you?
19    A.  No.
20    Q.  So that in your regression model
21  you included five variables for inflation;
22  correct?
23    A.  That's correct.
24    Q.  But in your price model for common
25  impact, if some portion of any price increase is

**[Page 253]**

1  attributable to inflation generally, you're not
2  factoring that out; correct?
3      A.  That's correct.
4      Q.  Have you made any analysis of
5  whether the cost would exceed the increases in
6  price in your common impact analysis?
7      A.  No.
8      Q.  Would you expect a firm to attempt
9  to maintain some level of margins on its products
10 that it sells?
11     A.  I suppose.
12     Q.  Is it also correct that you haven't
13 done anything to evaluate whether or not changes
14 in prices from the pre period to the post period
15 in your common impact analysis are explained by
16 maintaining margins?
17     A.  That's correct.
18     Q.  Would you expect a company would
19 try to stay in compliance with a stack of bank
20 covenants?
21     A.  I would assume it would.
22     Q.  So that if there were covenants
23 that required specified levels of liquidity or
24 minimum debt equity ratios, that might put
25 pressure on that company to raise prices; correct?

**[Page 254]**

1  I'm not following the finance
2  there.  Can you restate that?
3  BY MR. McKEOWN:
4      Q.  Sure.  Would you expect that if a
5  company needed to satisfy certain liquidity ratios
6  that it might have price increases driven by the
7  need to maintain or meet those liquidity ratios as
8  distinguished from any effective collusion?
9      A.  If price increases increased
10 liquidity, I suppose.
11     Q.  But your analysis for common impact
12 is essentially that if any customer has a one-cent
13 higher price in the post period than in the
14 pre period, you would consider them someone you
15 would count within your common impact group; is
16 that correct?
17     A.  Yes.
18         MR. McKEOWN:  Why don't we take a
19 short break.
20         MR. GOLDBERG:  You bet.
21         THE VIDEOGRAPHER:  Going off the
22 record at 4:14.
23     (Whereupon, a recess was held
24     from 4:14 p.m. to 4:27 p.m.)
25         THE VIDEOGRAPHER:  We are back on

**[Page 255]**

1  the record at 4:27.  This is Disc 6 of the
2  deposition of Dr. Mark Dwyer.
3
4          EXAMINATION
5  BY MR. HERBISON:
6      Q.  Dr. Dwyer, good afternoon.  My name
7  is Jim Herbison again and I represent RockTenn CP,
8  LLC, which is the entity formally known as
9  Smurfit-Stone Container.
10         Before I begin, just for the
11 record, counsel -- Mr. McKeown, I believe,
12 omitted, I would like to designate the transcript
13 as highly confidential.
14         MR. GOLDBERG:  All right.  And the
15 same thing that I said with respect to
16 Dr. Harris's, if you will do me the courtesy of
17 sending me a letter, that will make it easier for
18 me to circulate that information to everybody.
19         MR. HERBISON:  Absolutely.
20         MR. GOLDBERG:  Thanks a lot.
21 BY MR. HERBISON:
22     Q.  Dr. Dwyer, are you aware that
23 Smurfit-Stone Container Corporation filed a
24 voluntary petition for relief under Chapter 11,
25 the United States Bankruptcy Code, on January 26,

**[Page 256]**

1  2009?
2      A.  No.
3      Q.  Are you aware that Smurfit-Stone
4  Container Corporation continued to operate as a
5  debtor in possession under the oversight of the
6  U.S. Bankruptcy Court until June 30, 2010?
7      A.  I think I'm aware of that time
8  frame from the emergence from the bankruptcy.
9      Q.  And you were aware at the time of
10 the emergence that Smurfit did emerge with a
11 court-approved and authorized realization plan?
12     A.  I would say yes.
13     Q.  And at their time of emergence that
14 they had a discharge of debt for certain claims?
15     A.  No.
16     Q.  Does your empirical analysis to
17 assess class-wide impact include any price
18 increase implemented by Smurfit-Stone Container
19 during the period from January 26, 2009 through
20 June 29, 2010?
21     A.  I'm sorry.  What were those dates
22 again?
23     Q.  January 26, 2009 through June 29,
24 2010.
25     A.  Yes, it does.

**[Page 257]**

**[65]  (Pages 254 to 257)**

1        Q.  Does your empirical analysis
2 include any restrictions in supply implemented by
3 Smurfit-Stone Container during the period from
4 January 26, 2009 through June 29, 2010?
5        A.  It doesn't include it as an
6 explicit factor, but it's -- looking at that
7 period, it is looking at that period of time.
8        Q.  Did you observe any restrictions in
9 supply implemented by Smurfit-Stone Container
10 after June 30, 2010?
11        A.  I have not looked at that.
12        Q.  Did you do any empirical analysis
13 to assess class-wide impact for a period beginning
14 June 30, 2010 as a result of any price increase
15 implemented after June 30, 2010?
16        MR. GOLDBERG:  Object to the form.
17        THE DEPONENT:  Can you reread the
18 question?
19        (The record was read as follows:
20        Q.  Did you do any empirical
21        analysis to assess class-wide
22        impact for a period beginning
23        June 30, 2010 as a result of
24        any price increase implemented
25        after June 30, 2010?)

**[Page 258]**

1        THE DEPONENT:  No, I did not.
2 BY MR. HERBISON:
3        Q.  Does your Damages Multiple
4 Regression Analysis include class purchases from
5 Smurfit-Stone Container prior to June 30, 2010?
6        A.  Yes, it does.
7        Q.  Does your Damages Multiple
8 Regression Analysis include class purchases from
9 Smurfit-Stone Container for the period from
10 January 26, 2009 through June 29, 2010?
11        A.  Yes, it does.
12        Q.  Did you do any empirical analysis
13 to assess damages on a class-wide basis for the
14 period beginning on June 30, 2010 through
15 November 8, 2010?
16        MR. GOLDBERG:  Object to the form
17 of the question.
18        THE DEPONENT:  My damages analysis
19 for area class damages includes that period.
20 BY MR. HERBISON:
21        Q.  But does your damages begin -- did
22 you do any analysis on a class-wide basis for
23 damages beginning on June 30, 2010?
24        A.  My damages analysis, no.
25        Q.  Sir, earlier today you testified

**[Page 259]**

1 that you could not recall one way or the other
2 whether you may have testified that industry
3 concentration can affect industry pricing;
4 correct?
5        MR. GOLDBERG:  Object to the form
6 of the question.
7        THE DEPONENT:  I couldn't recall
8 whether I had testified that industry concentration
9 could affect industry pricing aside from through
10 collusive channels.
11 BY MR. HERBISON:
12        Q.  And sir, you were an expert in the
13 SRAM case; correct?
14        A.  That's correct.
15        Q.  And you submitted an opinion in
16 that case; correct?
17        A.  That's correct.
18        Q.  And do you recall in that case
19 whether or not you used or opined regarding
20 industry concentration as a factor in your
21 analysis?
22        A.  I don't recall.
23        Q.  I'd like to mark that as next in
24 order, whatever's next.
25        MR. GOLDBERG:  I'm just going to

**[Page 260]**

1 ask -- it's a question.  I don't know the answer.
2 Do you know whether this report is subject to a
3 protective order?
4        MR. HERBISON:  This particular
5 report was pulled directly off the PACER.
6        MR. GOLDBERG:  All right.  That's
7 fine.
8        (Whereupon, Dwyer Exhibit 17 was
9        marked for identification by the
10        deposition reporter and is attached
11        hereto.)
12 BY MR. HERBISON:
13        Q.  Sir, I've handed you what's been
14 marked as Exhibit 17.  Do you recognize --
15        MR. GOLDBERG:  This document which
16 says at the bottom of the page "Expert Report of
17 Mark Dwyer, Ph.D., documents submitted under
18 seal"?
19        MR. HERBISON:  I'll represent to
20 you, Counsel, I pulled it myself off of PACER,
21 so...
22        MR. GOLDBERG:  Everybody here is
23 just making a record.  It's as simple as that.
24        THE DEPONENT:  I'm sorry.  What was
25 the question?

**[Page 261]**

**[66]  (Pages 258 to 261)**

1   BY MR. HERBISON:
2       Q.  The question was, sir:  Do you
3   recognize what's been shown to you as Exhibit 17?
4       A.  I -- yes, it looks familiar.
5       Q.  Is this your expert report
6   submitted in the SRAM case?
7           MR. GOLDBERG:  I'm going to make
8   the same offer of stipulation.  If you want him to
9   go through each one of these pages carefully,
10  that's fine; otherwise, if there is an issue with
11  respect to copying or whether this turns out to be
12  a redacted report, we will make the record clear
13  afterwards.
14          Is that all right?  It's all right
15  with us.
16          THE DEPONENT:  Understood.
17          MR. GOLDBERG:  Okay.
18          THE DEPONENT:  Yes, it appears to
19  be a declaration report, yes.
20  BY MR. HERBISON:
21      Q.  And that's your signature on
22  Page 20 of the report?
23      A.  Yes.
24      Q.  And you signed that under penalty
25  of perjury on January 29, 2009?

**[Page 262]**

1   methods, especially multiple
2   regression analysis."
3       Q.  Do you see that, sir?
4       A.  Yes.
5       Q.  Is that your writing?
6       A.  Best I can recall, yes.
7       Q.  And you believed that at the time?
8       A.  Yes.
9       Q.  The next sentence:
10          "Multiple regression
11      analysis has been used widely
12      in estimated overcharges in
13      part precisely because it
14      provides such a mechanism for
15      controlling for factors
16      influencing prices beyond the
17      conspiracy itself."
18          Again, is that your sentence you
19  wrote?
20      A.  Yes, it is.
21      Q.  And you believed it at the time?
22      A.  Yes.
23      Q.  I'd like to direct your attention,
24  then, to Paragraph 26 on the next page, Page 7.
25      A.  Okay.

**[Page 264]**

1       A.  That's correct.
2       Q.  Sir, I'd like to direct your
3   attention to Page 6, Paragraph 21 of that report.
4       A.  I'm sorry.  Paragraph 21?
5       Q.  Correct.
6       A.  Okay.
7       Q.  In the paragraph it states that:
8           "Several factors are
9       likely to have influenced
10      prices for specific SRAM
11      products in addition to the
12      alleged conspiracy.  The product
13      features, purchase terms,
14      life cycle, aggregate demand,
15      SRAM market concentration and
16      input costs."
17          Do you see that?
18      A.  Yes, I do.
19      Q.  And did you write that, sir?
20      A.  Yes, I did.
21      Q.  Did you believe that at the time?
22      A.  Yes, I did.
23      Q.  The next sentence says:
24          "These factors can readily
25      be controlled for via econometric

**[Page 263]**

1       Q.  It states:
2           "Fifth changes in the
3       concentration of firms
4       providing SRAM components
5       could affect product prices."
6           Do you see that, sir?
7       A.  Yes, I do.
8       Q.  And is that your sentence?
9       A.  Yes, it is.
10      Q.  And is that your opinion in the
11  case?
12      A.  Yes, it was.
13      Q.  Next sentence:
14          "As industries become
15      more concentrated, economic
16      theory predicts that prices
17      will rise."
18          Did you write that, sir?
19      A.  I did.
20      Q.  The next sentence:
21          "The Herfindahl-Hirschman
22      Index (HHI), is often used by
23      economists to measure the
24      concentration of suppliers in
25      a given industry."

**[Page 265]**

**[67]  (Pages 262 to 265)**

1    Is that your sentence, sir?
2    A.  Yes, it is.
3    Q.  "Such a measure would be
4    used here to track changes in
5    the relative market shares of
6    SRAM manufacturers, and to
7    examine the significance of
8    any such concentration effect."
9    Was that your sentence, sir?
10    A.  Yes.
11    Q.  Was that your opinion in the case?
12    A.  Yes, it was.
13    Q.  Have you included industry
14    concentration as a variable in any other work that
15    you have done other than SRAM?
16    A.  I don't recall.
17    Q.  In this case, sir, in your opinion,
18    you did not consider industry concentration in
19    your analysis; correct?
20    A.  That's correct.
21    Q.  And you did not use industry
22    concentration as a variable in your empirical
23    analysis; correct?
24    A.  That's correct.
25    MR. HERBISON:  Sir, I have no

**[Page 266]**

1    further questions.  I pass the witness to
2    Georgia-Pacific.
3
4    EXAMINATION
5    BY MR. SHORES:
6    Q.  Good afternoon, Dr. Dwyer.  I'm
7    Ryan Shores.  I'm with Hunton & Williams and I
8    represent Georgia-Pacific in this case, and I'm
9    going to ask you a few questions.
10    Dr. Dwyer, I want to focus on the
11    event windows in your impact model.
12    How do you define the pre-event
13    windows in your impact model?
14    A.  Those were defined based --
15    starting with the month prior to the implementation
16    month up to six months prior to the event.
17    Q.  Okay.  And did you use PPW Index
18    prices to limit that six-month period in any way?
19    A.  I believe that I did.
20    Q.  Can you explain how?
21    A.  I was looking for periods of
22    stability.  My intention was to look within
23    windows that were stable with respect to the PPW
24    Index.
25    My recollection was that I only

**[Page 267]**

1    considered pre-event windows where the PPW Index
2    was not moving.
3    Q.  So my understanding, Dr. Dwyer, and
4    correct me if I'm wrong, is that you went out six
5    months or if the PPW Index changed, you cut off
6    that six months at that point and didn't consider
7    that period; is that your understanding?
8    A.  That's my recollection, yes.
9    Q.  And why did you choose six months
10    as your presumptive starting point?
11    A.  As a maximum starting point.  There
12    was no analysis beyond that except in the sense I
13    didn't want to go back too far.  I thought there
14    was some sense in which crisis becomes stale after
15    a certain period of time.
16    Q.  Based on what economic principle
17    did you decide to use six months as opposed to
18    three months?
19    A.  There wasn't any specific economic
20    principal, just economic experience.
21    Q.  And what economic experience did
22    you use that you used six months rather than three
23    months?
24    A.  It was a review of some of the
25    transactions data where I saw stability in prices

**[Page 268]**

1    for extended periods of time, and also the PPW
2    Index itself, which shows a lack of variability
3    for significantly long periods of time, much more
4    so than three months.  I thought that six months
5    was much more reflective of the kinds of stability
6    I saw in market prices.
7    Q.  And then the post period, and I'm
8    talking about the post-event windows, you define
9    that by nine months; is that correct?
10    A.  The maximum window, yes.
11    Q.  And you could have chosen a
12    12-month window; is that correct?
13    A.  I think I would have run into
14    subsequent events had I gone to a 12-month window.
15    MR. SHORES:  Okay.  Let's mark this
16    as Exhibit -- I've lost track what number it is.
17    MR. GOLDBERG:  Many loaves for the
18    defendants, just one loaf for the plaintiff.
19    (Whereupon, Dwyer Exhibit 18 was
20    marked for identification by the
21    deposition reporter and is attached
22    hereto.)
23    BY MR. SHORES:
24    Q.  Dr. Dwyer, I'll give you a second
25    to look this over and I'll represent to you that

**[Page 269]**

**[68]  (Pages 266 to 269)**

1  this is drawn from two pieces of your backup data.
2  The first six columns starting with YM and
3  extending to EndWin9 are drawn from your backup
4  data that describes your event windows.
5       Are you familiar with the data in
6  those six columns?
7       A. This looks familiar.
8       Q. Okay. The last two columns, YM and
9  liner_mid, we added that, and that represents the
10 PPW price that you used to define the pre-event
11 windows as reflected in your backup.
12      A. Okay.
13      Q. Okay. So I want to focus your
14 attention on Price Increase Implementation Event,
15 which I'll just call PIIE, for ease, 1, and the
16 pre-event window is December 2003 and January
17 2004; is that correct?
18      A. That's correct.
19      Q. And the reason you didn't include
20 August of 2003 through November of 2003 is that
21 the PPW Index changed between November 2003 and
22 December 2003; is that correct?
23      A. That's correct.
24      Q. And it's higher in November 2003
25 than it is in December 2003; correct?

[Page 270]

1  included all six months in the pre-event window;
2  is that correct?
3       A. Is this -- is this shaded in blue?
4       Q. It is.
5       A. Okay. It looks like my start
6  window here is -- oh, I'm sorry. Yes, that's
7  right, it's six months.
8       Q. And the final price increase
9  implementation event, the fifth one is shaded in
10 yellow.
11      Do you see that?
12      A. Yes I do.
13      Q. And you've included September 2009
14 to December 2009 in your pre-event window; is that
15 correct?
16      A. That's correct.
17      Q. And you excluded July and August
18 2009 because the price, PPW price changed in that
19 period; correct?
20      A. That's correct.
21      Q. Why, Dr. Dwyer, did you exclude
22 periods in which the PPW Index changed?
23      A. Changes in the PPW Index may be due
24 to supply and demand factors, and I'm trying to
25 make as consistent comparison as possible without

[Page 272]

1       A. It is higher.
2       Q. Okay. And if you look at PIIE
3  Number 2, the pre-event window is August 2009 --
4  I'm sorry -- August 2005 and September 2005.
5       Do you see that?
6       A. Yes, I do.
7       Q. And you've excluded from the
8  pre-event window April 2005 to July 2005; is that
9  correct?
10      A. That's correct.
11      Q. And that is because the price in
12 July 2005 was $405 and the price in August of 2005
13 was $395 representing the change; is that correct?
14      A. That's right. The index wasn't
15 stable.
16      Q. And if you look at PIIE Number 3,
17 which is shaded in red on this exhibit, you've
18 included all six months in the pre-event window;
19 is that correct?
20      A. That's correct.
21      Q. And that's because the price, the
22 PPW price was $515 throughout; is that correct?
23      A. That's correct.
24      Q. And if you look at the fourth price
25 increase implementation of that, again you've

[Page 271]

1  coloring the price change by -- effects other than
2  the price increase announcements.
3       Q. Have you done an examination of any
4  of the price changes in the PPW Index and
5  determined that they were caused by supply or
6  demand factors?
7       MR. GOLDBERG: For this analysis.
8       MR. SHORES: Correct.
9       THE DEPONENT: No, I have not.
10 BY MR. SHORES:
11      Q. Now, Dr. Dwyer, every month that
12 you excluded from the pre-event window, the PPW
13 Index price was higher than the month that you
14 included; correct?
15      A. For those implementation events
16 where it's truncated from six months?
17      Q. That's correct?
18      A. That appears to be the case.
19      Q. Do you believe transaction prices
20 generally are correlated with PPW prices?
21      A. Yes.
22      Q. So you believe transaction prices
23 were generally higher in the months that you
24 excluded than the months you included in your
25 pre-event windows; is that correct?

[Page 273]

1      A.  Yeah.
2      Q.   And if a customer purchased at a
3  higher transaction price, all else being equal,
4  you're less likely to find impact in the
5  post-event window; is that correct?
6          MR. GOLDBERG:  Object to the form.
7          THE DEPONENT:  If -- I -- all else
8  equal, if someone's transaction price is higher --
9  well, I'm not -- I'm not sure about that at an
10  individual level.
11          If someone's pre-event price is
12  higher, there's no reason for -- as opposed to
13  another customer, there's no reason for that to
14  color their probability of impact in the
15  post-event window.
16  BY MR. SHORES:
17      Q.   Well, all else being equal, if my
18  price is $2 relative to $1, it's more likely
19  you're going to find an impact in the post period;
20  is that correct?
21          MR. GOLDBERG:  Object to the form.
22          THE DEPONENT:  I think -- I
23  don't -- I'd have to have more clarity as to what
24  the relative to $1 is.  Who are we comparing it
25  to?

                                    **[Page 274]**

1  not directly.  Does it measure impact indirectly
2  with respect to that customer?
3      A.   The analysis is looking at
4  classwide impact, and so the preponderance of
5  impact across those for whom I can measure, using
6  this methodology, leads me to conclude that the
7  impact would have applied to virtually all
8  customers.
9      Q.   And why is that?
10      A.   Because of the high proportion of
11  customers for whom I can measure it where I see
12  impact.
13      Q.   With respect to the customers that
14  you weren't able to measure impact, have you done
15  any examination of those customers?
16      A.   No, I have not.
17      Q.   And do you know if the customers
18  for whom you did measure impact are representative
19  of the customers for which you didn't assess
20  impact?
21          MR. GOLDBERG:  Objection to the
22  form.
23          THE DEPONENT:  I have no reason to
24  believe that they're not representative.
25  ///

                                    **[Page 276]**

1  BY MR. SHORES:
2      Q.   Dr. Dwyer, I'd like to direct your
3  attention to this chart to the month of September
4  of 2005.
5      A.   Okay.
6      Q.   Now, I believe you testified before
7  that if a customer only purchased in one month,
8  that customer would not be assessed according to
9  your impact analysis; is that correct?
10      A.   That's correct.
11      Q.   So if I'm a customer and I only
12  purchase in September of 2005 and no other month
13  during this class period, your impact analysis
14  doesn't assess me; is that correct?
15      A.   That's correct.
16      Q.   So what, if anything, does your
17  impact model tell us about a customer who
18  purchases only in September of 2005?
19      A.   It doesn't measure prices for them
20  at all.
21      Q.   Does it measure impact for them at
22  all?
23      A.   No, not directly.
24      Q.   Dr. Dwyer, I'd like to direct your
25  attention to -- well, before we go on, you said

                                    **[Page 275]**

1  BY MR. SHORES:
2      Q.   Do you have any reason to believe
3  that they are representative?
4      A.   Yes.
5      Q.   And why?
6      A.   They're in the same market, they're
7  purchasing from the same defendants, similar
8  points in time.
9          So the fact that one customer has
10  repeat business that aligns with these events
11  doesn't indicate to me that there's any systematic
12  difference from somebody who's purchasing at a
13  different frequency.
14      Q.   Have you done any economic analysis
15  of the customers that you didn't assess to
16  determine whether they are similar to customers
17  that you did assess?
18          MR. GOLDBERG:  Object to the form.
19          THE DEPONENT:  Customers who I was
20  not able to assess in the common impact analysis
21  do come into the damages analysis, or may come
22  into the damages analysis so long as they had
23  purchased the same product in successive months.
24  It would be contributing to those prices.
25  ///

                                    **[Page 277]**

                        **[70]  (Pages 274 to 277)**

1     BY MR. SHORES:
2         Q.  What do you mean by "damages
3     analysis"?
4         A.  The damages -- the damages analysis
5     in Part 3 of my report.
6         Q.  Okay, Dr. Dwyer, I'm just asking
7     you about Part 2 of your report on impact.
8         Have you done any analysis --
9     economic analysis of the customers you did not
10    assess to determine whether they are similar to
11    the customers that you did assess?
12        MR. GOLDBERG:  Same objection.
13        THE DEPONENT:  What I -- what I
14    found was that when I constructed aggregate prices
15    that included customers who may have been excluded
16    from the impact analysis, that I -- the aggregate
17    prices are very well explained by the PPW Index,
18    so I find that that is a corroborating evidence
19    that those customers are not systematically
20    different.  If they were, I would expect those
21    prices them to differ from the...
22        Q.  So you analyzed the relationship
23    between the nonassessed customers' prices and the
24    PPW Index price?
25        A.  I analyzed the relationship between

[Page 278]

1     all customers' prices which includes those who are
2     not assessable in the impact analysis and the PPW
3     Index.
4         Q.  And that allows you to conclude
5     that your impact analysis with respect to the
6     customers you assessed also applies to the
7     customers you did not assess?
8         A.  Best evidence supporting that, so
9     that would be yes.
10        Q.  Dr. Dwyer, I'd like to direct your
11    attention to July of 2005.
12        A.  Okay.
13        Q.  And I want you to assume that I'm a
14    customer that purchased only in July of 2005.
15        A.  Okay.
16        Q.  I wouldn't be an assessed customer
17    under your analysis; is that correct?
18        A.  That's correct.
19        Q.  And if I asked you why your
20    analysis with respect to the customers you did
21    assess applied also to me, would you give me the
22    same answer that you just gave?
23        A.  Yes.
24        MR. SHORES:  That's all the
25    questions I have.

[Page 279]

1         MR. GOLDBERG:  Any other takers?
2         MR. McKEOWN:  Probably not.
3         MR. GOLDBERG:  Can we have a short
4     break?
5         THE VIDEOGRAPHER:  Going off the
6     record at 4:54.
7         (Whereupon, a recess was held
8          from 4:54 p.m. to 5:04 p.m.)
9         THE VIDEOGRAPHER:  We are back on
10    the record at 5:04.
11        MR. GOLDBERG:  We have no
12    cross-examination.  We'll read and sign.
13        MR. McKEOWN:  Thank you.
14        THE VIDEOGRAPHER:  This concludes
15    today's deposition of Dr. Mark Dwyer at 5:05.
16
17        (Whereupon, AT THE HOUR OF
18         5:05 p.m., the proceedings
19         were concluded.)
20         ---o0o---
21
22
23
24
25

[Page 280]

1     State of California  )
                          )ss
2     County of Los Angeles)
3
4
5
6         Deponent's Declaration
7
8
9         I certify under penalty of perjury that
10    the foregoing is true and correct.
11
12
13
14
15    Executed at _____ on _____.
16
17
18
19    _____
               (Signature of Deponent)
20
21
22
23
24
25

[Page 281]

[71]  (Pages 278 to 281)

HIGHLY CONFIDENTIAL

```
 1    State of California  )
                          )ss
 2    County of Los Angeles)

 3

 4        I, KRISTI CARUTHERS, Certified Shorthand

 5    Reporter, Certificate Number 10560, for the State

 6    of California, hereby certify:

 7        The foregoing proceedings were taken

 8    before me at the time and place therein set forth,

 9    at which time the deponent was placed under oath

10    by me;

11        The testimony of the deponent and all

12    objections made at the time of the examination

13    were recorded stenographically by me and were

14    thereafter transcribed;

15        The foregoing transcript is a true and

16    correct transcript of my shorthand notes so taken;

17        I further certify that I am neither

18    counsel for nor related to any party to said

19    action, nor in any way interested in the outcome

20    thereof.

21        IN WITNESS WHEREOF, I have hereunto

22    subscribed my name this 25th day of August, 2014.

23

24

25    _____
```

**[Page 282]**

```
 1

 2        E R R A T A   S H E E T

 3    I, MARK J. DWYER, PH.D, do hereby certify that I

 4    have read the foregoing transcript of my testimony, and

 5    further certify that it is a true and accurate record

 6    of my testimony (with the exception of the corrections

 7    listed below).

 8    PAGE  LINE          CORRECTION

 9    ____ ____  _____

10    ____ ____  _____

11    ____ ____  _____

12    ____ ____  _____

13    ____ ____  _____

14    ____ ____  _____

15    ____ ____  _____

16    ____ ____  _____

17    ____ ____  _____

18    ____ ____  _____

19    ____ ____  _____

20    ____ ____  _____

21    ____ ____  _____

22    ____ ____  _____

23    ____ ____  _____

24

         _____    _____
25    Date             MARK J. DWYER, PH.D.
```

**[72]  (Pages 282 to 283)**

**HIGHLY CONFIDENTIAL**
**PURSUANT TO PROTECTIVE ORDER**

[Page 1]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


KLEEN PRODUCTS LLC, et al.,      )
individually and on behalf       )
of all those similarly           )
situated,                        )
                                 )
          Plaintiffs,            )
                                 )
     v.                          ) Civil Case No:
                                 ) 1:1-cv-05711
PACKAGING CORPORATION OF         )
AMERICA, et al.,                 )
                                 )
          Defendants.            )


     (PURSUANT TO PROTECTIVE ORDER, THE FOLLOWING
      TRANSCRIPT IS DESIGNATED HIGHLY CONFIDENTIAL.)


    VIDEOTAPED DEPOSITION OF  MICHAEL J. HARRIS, PH.D.


                July 22, 2014


                  9:03 a.m.


              350 South Grand Avenue
              Los Angeles, California


     REPORTED BY:
     Kristi Caruthers, CLR, CSR No. 10560

```
1
2
3
4
5          VIDEOTAPED DEPOSITION OF MICHAEL J.
6    HARRIS, PH.D., held at the Law Office of
7    Mayer Brown LLP, 350 South Grand Avenue,
8    25th Floor, Los Angeles, California, pursuant to
9    agreement before Kristi Caruthers, a California
10   Shorthand Reporter of the State of California.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              [Page 2]
```

```
1    A P P E A R A N C E S:
2
3    FOR THE PLAINTIFFS:
4        JOSH RISSMAN, ESQ.
         DANIEL HEDLUND, ESQ.
5        4 Gustafson Gluek LLC
         Canadian Pacific Plaza
6        120 South 6th Street
         Suite 2600
7        Minneapolis, Minnesota 55402
         612.333.8844
8        dhedlund@gustafsongluek.com
         jrissman@gustafsongluek.com
9        (NOT PRESENT)
10       ROBERT WOZNIAK, ESQ.
         FREED KANNER LONDON & MILLEN LLC
11       2201 Waukegan Road
         Suite 130
12       Bannockburn, Illinois 60015
         224.632.4500
13       rwozniak@fklmlaw.com
         (NOT PRESENT)
14
15
16   ON BEHALF OF THE PLAINTIFFS AND THE DEPONENT:
17       JOSEPH GOLDBERG, ESQ.
         VINCENT J. WARD, ESQ.
18       FREEDMAN BOYD HOLLANDER GOLDBERG
         URIAS & WARD, P.A.
19       20 First Plaza
         Suite 700
20       Albuquerque, New Mexico  87102
         505.842.9960
21       jg@fbdlaw.com
         vjw@fbdlaw.com
22
23
24
25
                                              [Page 3]
```

```
1    A P P E A R A N C E S (Continued):
2
3    FOR THE PLAINTIFFS:
4        DANIEL J. MOGIN, ESQ.
         THE MOGIN LAW FIRM, P.C.
5        707 Broadway
         Suite 1000
6        San Diego, California  92101
         619.687.6611
7
8
9    FOR THE DEFENDANT PACKAGING CORPORATION OF
     AMERICA:
10       ANDY SCRAG, ESQ.
         KIRKLAND & ELLIS LLP
11       300 N. LaSalle Street
         Chicago, Illinois 60654
12       312.862.2000
         andy.schrag@kirkland.com
13       (NOT PRESENT)
14
15   FOR THE DEFENDANT TEMPLE-INLAND, INC.:
16       ANDREW S. MAROVITZ, ESQ.
         MATTHEW PROVANCE, ESQ.
17       MAYER BROWN LLP
         71 South Wacker Drive
18       Chicago, Illinois 60606-4637
         312.701.7116
19       amarovitz@mayerbrown.com
         mprovance@mayerbrown.com
20
21
22
23
24
25
                                              [Page 4]
```

```
1    A P P E A R A N C E S (Continued):
2
3    FOR THE DEFENDANT GEORGIA-PACIFIC:
4        D. BRUCE HOFFMAN, ESQ.,
         HUNTON & WILLIAMS LLP
5        2200 Pennsylvania Avenue, N.W.
         Washington, D.C.  20037
6        202.955.1619
         bhoffman@hunton.com
7
8    -- AND --
9        MARY K. McLEMORE, ESQ.
         GEORGIA-PACIFIC
10       133 Peachtree Street, N.E.
         Atlanta, Georgia  30348-5605
11       404.652.4598
12
13   FOR THE DEFENDANT CASCADES, INC. AND NORAMPAC
     HOLDINGS, US, INC.:
14       SCOTT M. MENDEL, ESQ.
         K&L GATES, LLP
15       70 West Madison
         Suite 3100
16       Chicago, Illinois 60602-4207
         312.807.4252
17       scott.mendel@klgates.com
18
19   FOR THE DEFENDANT ROCKTENN CP, LLC:
20       JAMES F. HERBISON, ESQ.
         WINSTON & STRAWN, LLP
21       35 W. Wacker Drive
         Chicago, Illinois 60601
22       312.558.5909
         jherbison@winston.com
23
24
25
                                              [Page 5]
```

[2]   (Pages 2 to 5)

1    A P P E A R A N C E S (Continued):
2
3    FOR THE DEFENDANT INTERNATIONAL PAPER:
4        JAMES T. MCKEOWN, ESQ.
         FOLEY & LARDNER LLP
5        777 East Wisconsin Avenue
         Milwaukee, Wisconsin 53202-5306
6        414.297.5530
         jmckeown@foley.com
7
8
9    ALSO PRESENT:
10       GUSTAVO BAMBERGER, COMPASS LEXECON

         TONY BLOODWORTH, VIDEOGRAPHER
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**[Page 6]**

---

1                    INDEX TO EXHIBITS
2                 MICHAEL J. HARRIS, PH.D.
3                  Tuesday, July 22, 2014
4            Kristi Caruthers, CLR, CSR 10560
5
6    MARKED:          DESCRIPTION:          PAGE:
7    Harris 1    Notice of Taking Videotaped   15
8                Deposition of Dr. Michael
9                Harris
10   Harris 2    Declaration of Michael J.     17
11               Harris, Ph.D. in Support
12               of Plaintiffs' Motion for
13               Class Certification, June 11,
14               2014
15   Harris 3    (Revised July 17, 2014)       19
16               Declaration of Michael J.
17               Harris, Ph.D. in Support
18               of Plaintiffs' Motion for
19               Class Certification,
20               June 11, 2014
21   Harris 4    Revisions to Harris           20
22               Declaration (7-17-2014)
23   Harris 5    Exhibit 2 Works Cited         21
24
25

**[Page 8]**

---

1               INDEX TO EXAMINATION
2    WITNESS:  MICHAEL J. HARRIS, PH.D.
3    EXAMINATION                PAGE
4    By Mr. Hoffman           11, 391
5        (AFTERNOON SESSION)       208
6    By Mr. Marovitz          245, 415
7    By Mr. Herbison            409
8    By Mr. Goldberg           413
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**[Page 7]**

---

1                    INDEX TO EXHIBITS
2                 MICHAEL J. HARRIS, PH.D.
3                  Tuesday, July 22, 2014
4            Kristi Caruthers, CLR, CSR 10560
5
6    MARKED:          DESCRIPTION:          PAGE:
7    Harris 6    (Revised July 17, 2014)       22
8                Declaration of Michael
9                J. Harris, Ph.D. in
10               Support of Plaintiffs'
11               Motion for Class
12               Certification
13   Harris 7    Expert Report of Michael      57
14               J. Harris, Ph.D., Redacted
15               Version
16   Harris 8    Declaration of Michael J.     63
17               Harris in Support of
18               Indirect Purchaser
19               Plaintiffs' Motion for
20               Class Certification
21   Harris 9    Consolidated and Amended      96
22               Complaint for Violation
23               of the Sherman Act, Jury
24               Trial Demand
25

**[Page 9]**

**[3]  (Pages 6 to 9)**

**HIGHLY CONFIDENTIAL**
**PURSUANT TO PROTECTIVE ORDER**

```
 1              INDEX TO EXHIBITS
 2         MICHAEL J. HARRIS, PH.D.
 3           Tuesday, July 22, 2014
 4        Kristi Caruthers, CLR, CSR 10560
 5
 6   MARKED:      DESCRIPTION:      PAGE:
 7   Harris 10    Amendments to Plaintiffs'    96
 8               Consolidated and Amended
 9               Complaint
10   Harris 11    Plaintiffs' Memorandum of    151
11               Law in Support of Motion
12               for Class Certification
13   Harris 12    1995 Tonnage Balance Bates    197
14               labeled GP-KLEEN00249209 -
15               535
16   Harris 13    2007 SOP Bates labeled    210
17               GP-KLEEN00468702-9034
18   Harris 14    E-mail chain, the last    210
19               dated August 30, 2008 from
20               Jeff Doyle to Mathew
21               Blanchard and Mark Polivka
22   Harris 15    Amended and Restated    223
23               Contract for Sale of
24               Containerboard Bates labeled
25               GP-KLEEN00033830 - 835
```
**[Page 10]**

```
 1              INDEX TO EXHIBITS
 2         MICHAEL J. HARRIS, PH.D.
 3           Tuesday, July 22, 2014
 4        Kristi Caruthers, CLR, CSR 10560
 5
 6   MARKED:      DESCRIPTION:      PAGE:
 7   Harris 16    Working Paper, Breaking    237
 8               up is Hard to Do:
 9               Determinants of Cartel
10               Duration
11   Harris 17    2006 Nominal Trade Plan    397
12               Bates labeled WY0108926
13               - 941
14   Harris 18    E-mail chain, the last    401
15               dated August 7, 2006
16               from Freddie Bareh to
17               Mathew Blanchard Bates
18               labeled SSCC 00365429 -
19               431
20
21
22
23   QUESTIONS UNANSWERED BY DEPONENT:
24               (NONE)
25
```
**[Page 11]**

```
 1         LOS ANGELES, CALIFORNIA
 2         TUESDAY, JULY 22, 2014
 3               9:03 A.M.
 4               ---o0o---
 5
 6         THE VIDEOGRAPHER:  We're on the
 7   record.  Today's date is July 22nd, 2014.  The
 8   time is approximately 9:03 a.m.
 9         Today's deposition is taking place
10   at 350 South Grand Avenue on the 25th Floor in
11   Los Angeles, California.
12         My name is Tony Bloodworth.  I'm a
13   video specialist representing U.S. Legal.
14         Civil action number in this case is
15   1:1-cv-05711 in the U.S. District Court, Northern
16   District of Illinois, Eastern Division.
17         The matter is "Kleen Products, LLC,
18   et al., versus Packaging Corporation of America,
19   et al."  The deponent is Dr. Michael Harris.
20         The video deposition was requested
21   by the law offices of Mayer Brown.
22         Would all counsel please identify
23   yourselves and state whom you represent.
24         MR. HOFFMAN:  Bruce Hoffman from
25   Hunton & Williams representing Georgia-Pacific.
```
**[Page 12]**

```
 1         MR. MAROVITZ:  Andy Marovitz and
 2   Matt Provance for Mayer Brown.
 3         MR. BAMBERGER:  Gustavo Bamberger,
 4   Compass Lexecon.
 5         MS. McLEMORE:  Mary McLemore,
 6   in-house counsel for Georgia-Pacific.
 7         MR. McKEOWN:  Jim McKeown, Foley &
 8   Lardner, for International Paper.
 9         MR. MENDEL:  Scott Mendel, K&L
10   Gates, for Cascades and Norampac.
11         MR. HERBISON:  Jim Herbison from
12   Winston & Strawn on behalf of RockTenn CP, LLP.
13         MR. MOGIN:  Dan Mogin for the
14   plaintiffs.
15         MR. Ward:  Vince Ward of Friedman
16   Boyd on behalf of plaintiffs.
17         MR. GOLDBERG:  Joe Goldberg for the
18   plaintiffs, and I'll be representing Dr. Harris.
19         MR. MAROVITZ:  Kristi, I said I'm
20   from Mayer Brown, but I don't think I said I
21   represent Temple-Inland.
22         THE VIDEOGRAPHER:  Will the court
23   reporter please swear in the witness.
24   ///
25   ///
```
**[Page 13]**

**[4]  (Pages 10 to 13)**

1       MICHAEL J. HARRIS, PH.D.,
2   called as a deponent and sworn in by
3   the deposition reporter, was examined
4       and testified as follows:
5
6       DEPOSITION REPORTER:  Right hand,
7   please.
8       Do you solemnly swear that the
9   testimony you are about to give in this matter
10  shall be the truth, the whole truth, and nothing
11  but the truth, so help you God?
12      THE DEPONENT:  Yes, I do.
13      DEPOSITION REPORTER:  Please
14  commence.
15
16      EXAMINATION
17  BY MR. HOFFMAN:
18      Q.  Good morning, Dr. Harris.
19      How are you doing today?
20      A.  Very good, thank you.
21      Q.  I know that you've been deposed on
22  a number of occasions, so I'm going to be
23  relatively brief on the preliminaries.
24      MR. HOFFMAN:  Also, let me
25  provisionally designate this transcript deposition

[Page 14]

1   as highly confidential, and we can revisit that at
2   the end if there's any need to adjust it.
3       (Whereupon, Harris Exhibit 1 was
4       marked for identification by the
5       deposition reporter and is attached
6       hereto.)
7   BY MR. HOFFMAN:
8       Q.  Dr. Harris, you have in front of
9   you a set of documents that we've marked as the
10  initial set of exhibits.  You can just look at the
11  first one for right now.
12      The document we've marked as
13  Harris 1, which is the Notice of Taking Videotaped
14  Deposition of Dr. Michael Harris, and, frankly,
15  sir, this is just a formality.
16      With regards to this particular
17  exhibit, I'm just going to ask you if you
18  understand that you are here to testify in the
19  case that was identified at the beginning of this
20  transcript.
21      A.  Yes, I am.
22      Q.  And you understand that you're
23  under oath and have an obligation to testify
24  truthfully and accurately?
25      A.  Yes, I do.

[Page 15]

1       Q.  And is there any reason that today
2   you would not be able to testify truthfully or
3   accurately, for example, you're taking medication,
4   anything like that?
5       A.  No.
6       Q.  Okay.  As I said, I know you've
7   been deposed numerous times.
8       You understand that you need to
9   answer verbally as opposed to using nonverbals,
10  nods of the head, and so forth?
11      A.  Yes, I do.
12      Q.  Okay.  If at any point you don't
13  understand a question I ask -- which, frankly, is
14  fairly likely since you're an economist and I'm
15  not and I will ask questions that I think make
16  sense and you probably don't think make sense --
17  let me know.
18      A.  I will do that.
19      Q.  If you don't tell me you don't
20  understand a question, then I and anyone else who
21  reviews this transcript will assume you did.
22      Do you understand?
23      A.  Yes, I do.
24      Q.  If there's an objection from your
25  counsel at any point, you should go ahead and

[Page 16]

1   answer my question anyway, unless you're
2   specifically told not to, okay?
3       A.  Okay.
4       MR. HOFFMAN:  Okay.  Now, I've gone
5   ahead and marked a series of documents.  You can
6   put the Harris 1 aside.  We won't look at it any
7   more today.
8       I've marked a series of documents
9   and I'm just going to go through what each of them
10  are.
11      (Whereupon, Harris Exhibit 2 was
12      marked for identification by the
13      deposition reporter and is attached
14      hereto.)
15  BY MR. HOFFMAN:
16      Q.  Exhibit Harris 2 is the declaration
17  that you provided in this case on June 11, 2014.
18      Do you see that?
19      A.  Yes, I do.
20      Q.  Do you recognize it?
21      A.  Yes, I do.
22      Q.  Is this in fact a copy of your
23  declaration?  I should say this also includes the
24  four exhibits that you provided with your
25  declaration at the end, and feel free to take a

[Page 17]

**[5]  (Pages 14 to 17)**

1  moment to look through it.
2          MR. GOLDBERG:  Let me stop you
3  here.
4          In these depositions, I, as a
5  standard practice, offer the following
6  stipulation, which is that there are copying
7  errors.  You won't want him to go through and
8  check every single page, but if there are copying
9  errors, we can agree that we can administer the
10  correct exhibit.
11          MR. HOFFMAN:  That's fine.
12          MR. GOLDBERG:  Okay.
13  BY MR. HOFFMAN:
14      Q.  Is Exhibit 2 a copy of your
15  declaration?
16      A.  Yes, it appears to be.
17      Q.  Okay.  And that was a document that
18  you swore to under oath?
19          MR. GOLDBERG:  Object to the form.
20          THE DEPONENT:  Yes, I signed the
21  declaration, yes.
22  BY MR. HOFFMAN:
23      Q.  Okay.  Technically, "under penalty
24  of perjury" is the term.
25      A.  Correct.

[Page 18]

1          (Whereupon, Harris Exhibit 3 was
2          marked for identification by the
3          deposition reporter and is attached
4          hereto.)
5  BY MR. HOFFMAN:
6      Q.  Okay.  Exhibit 3, if you turn to
7  that -- and this document, Exhibit 3, is one you
8  may want to put to the side because we'll be
9  coming back to it quite a bit today -- is a copy
10  of the revised declaration that you provided
11  July 17th.
12          Do you see that?
13      A.  Yes, I do.
14      Q.  And is that a document that you
15  prepared?
16      A.  Yes, it is.
17      Q.  It's also a document that you
18  signed under penalty of perjury for this action?
19      A.  I did -- I did not sign this
20  document.  I was just provided the revision.
21      Q.  Okay.  So let me ask you this:  Is
22  Harris 3 your testimony, your declaration in this
23  case?
24      A.  Yes, it is.
25      Q.  Okay.  Would you affirm that this

[Page 19]

1  is your testimony under penalty of perjury as a
2  declaration?
3      A.  Yes, I would.
4      Q.  Okay.  If you look for -- as I
5  said, you may want to set that one aside.  We'll
6  be coming back to it.  We also, from time to time,
7  will come back to Harris 2 because three of the
8  four exhibits to Harris 2 were not changed in the
9  declaration, so we'll be using those exhibits.
10          Do you understand that?
11      A.  Yes, I do.
12          (Whereupon, Harris Exhibit 4 was
13          marked for identification by the
14          deposition reporter and is attached
15          hereto.)
16  BY MR. HOFFMAN:
17      Q.  Okay.  If you look at Harris 4,
18  you'll see that this is a document entitled
19  Revisions to Harris Declaration.
20          Do you see that?
21      A.  Yes, I do.
22      Q.  Do you recognize it?
23      A.  Yes, I do.
24      Q.  What is this?
25      A.  It identifies the revisions to my

[Page 20]

1  initial declaration, the revisions to the various
2  footnotes.
3          (Whereupon, Harris Exhibit 5 was
4          marked for identification by the
5          deposition reporter and is attached
6          hereto.)
7  BY MR. HOFFMAN:
8      Q.  Okay.  Harris 5 is a document
9  entitled Exhibit 2 Works Cited.
10          Do you see that?
11      A.  Yes, I do.
12      Q.  This is the one exhibit that was
13  revised with your revised declaration, as I
14  understand it.
15          Is that -- is that your
16  understanding?
17      A.  That's correct.
18      Q.  And I think that here you made some
19  changes in the numbers and also added some things
20  to the list of materials reviewed; is that
21  correct?
22      A.  That is correct.
23  ///
24  ///
25  ///

[Page 21]

**[6]  (Pages 18 to 21)**

1  (Whereupon, Harris Exhibit 6 was
2  marked for identification by the
3  deposition reporter and is attached
4  hereto.)
5  BY MR. HOFFMAN:
6      Q.  Okay.  And then, last, and we're
7  going to spend a couple of minutes on this next
8  one, you'll see Harris 6 is a document -- it's a
9  version of Harris 3, but this time it has a
10 redline, and this was provided to us by
11 Plaintiffs' counsel.
12      Have you seen this before?
13      A.  Yes, I have.
14      Q.  Okay.  Do you understand what it
15 is?
16      A.  Yes.  It was a corrected copy meant
17 to highlight the corrections in my initial
18 declaration.
19      Q.  Okay.  Now, I'd like, Doctor, to
20 turn your attention to Page 15, please, of
21 Harris 6.
22      A.  Yes.
23      Q.  If you look on Page 15 near the
24 bottom in Paragraph F(1), you'll see that the
25 following language was stricken from the

[Page 22]

1  the source in time to file this.
2      Q.  You're confident this is true, but
3  you couldn't identify any support for it?
4      A.  I'm confident this document exists
5  and the statement is true.  I just can't find the
6  documents.
7      Q.  Okay.  Let's go to Page 42.
8      Let me ask this before we go to
9  Page 42:  How long did you look for the missing
10 support for this language that was deleted from
11 Page 15?
12      A.  Hours and hours.
13      Q.  Comprehensive and thorough search?
14      A.  As best I could, yes.
15      Q.  But you couldn't find it.
16      A.  I could not find it.
17      Q.  All right.  Let's go to Page 42.
18      Near the top of Page 42, the last
19 sentence of Paragraph 8, which read:
20      "PCA assisted with a mill
21      outage of IP in 2011."
22      Footnote 170 was also deleted.
23      What prompted you to delete this
24 language?
25      A.  The same reason as the prior

[Page 24]

1  declaration:
2      "The volume of this
3      inter-defendant trading was
4      significant.  For example, the
5      volume of containerboard sold by
6      Smurfit" -- S-m-u-r-f-i-t -- "to
7      the other defendants was
8      comparable to the total volume
9      sold to independent converting
10     facilities.  Footnote 46."
11     That language was deleted; do you
12 see that?
13     A.  Yes.
14     Q.  What prompted you to delete that
15 language from the declaration?
16     A.  Because I learned that the footnote
17 didn't correctly reference the documents that
18 supports this statement.  The statement is
19 correct; I simply don't have the document to
20 support the statement, so I removed it.
21     Q.  Okay.  You didn't identify some
22 other source to support the statement and simply
23 substitute the source?
24     A.  I looked for -- I looked for the
25 source.  I know it exists.  I just couldn't find

[Page 23]

1  deletion.
2      Q.  And what was that reason?
3      A.  The document referenced was
4  incorrect, and I couldn't find the document that
5  had this statement in it.  Again, the statement is
6  correct, but I just could not locate the document.
7      Q.  And you also conducted a
8  comprehensive search for hours and hours looking
9  for support for the statement but couldn't find
10 it?
11     A.  Yes, I did.
12     Q.  But you're still confident that it
13 exists somewhere?
14     A.  Yes, I've seen it.  I had it at one
15 point.  I've simply misplaced the document.
16     Q.  Okay.
17     A.  I'm dealing with thousands and
18 thousands of documents sometimes.  A few get lost.
19     Q.  Okay.  Given that these statements
20 are deleted from your declaration, are you --
21 strike that.
22     Let me ask this:  So, Doctor, you
23 have now reviewed the declaration that you filed
24 on June 11th, you reviewed, revised and corrected.
25     Is the version that you provided on

[Page 25]

**[7]  (Pages 22 to 25)**

1  July 17, Harris 3, your final declaration in this
2  matter on class certification?
3      A.  Yes, it is.
4          MR. GOLDBERG:  Object --
5  BY MR. HOFFMAN:
6      Q.  Are you comfortable --
7          MR. GOLDBERG:  Let me get my
8  objection in:  Object to the form.
9  BY MR. HOFFMAN:
10     Q.  Are you comfortable with the facts
11 stated in it?
12     A.  Yes, I am.
13     Q.  You're confident that it represents
14 your thorough review of the facts?
15     A.  Yes, it represents my review of the
16 facts at this point.
17     Q.  When were you first contacted about
18 this matter?
19     A.  I was first contacted sometime in
20 the summer of 2009.
21     Q.  Okay.  I actually want to go back
22 for one second.
23         A minute ago when you answered my
24 question about whether you're confident about the
25 facts, you said it represents your review of the

**[Page 26]**

1  facts at this point.
2          Are you conducting any further
3  review of the facts in this matter?
4      A.  Yes.  We have, like I said,
5  thousands and thousands of documents.  That review
6  continues.  Discovery is ongoing.
7          I expect to review additional
8  documents that perhaps either support my opinions
9  in this declaration or form more opinions based on
10 the evidence that I review.
11     Q.  For what purpose would you be
12 supporting the opinions in the declaration or
13 forming more?
14     A.  Well, as I said, there are many
15 documents.  The opinions that I've expressed in
16 this declaration are supported with the documents
17 and the footnotes.  There are many other documents
18 that I've reviewed that support those same
19 opinions.
20         We continue to review the discovery
21 in this case -- it's rather large -- and I would
22 expect to come across additional documents to
23 support the opinions in this declaration.
24     Q.  Do you think there's any chance you
25 might come across documents that don't support or

**[Page 27]**

1  negate the opinions that you expressed in this
2  declaration?
3      A.  Sure, that's possible.
4      Q.  What portion of the document record
5  in this case that exists to date have you reviewed
6  as part of preparing this declaration?
7      A.  If you're asking me for the
8  proportion of documents, I would not know.  We
9  literally reviewed thousands and thousands of
10 documents.  I don't know what that represents out
11 of the total database.
12     Q.  Do you have any sense of whether
13 it's 90 percent, 50 percent, 10 percent?
14     A.  I -- I really don't.
15     Q.  You have no idea?
16     A.  No, I don't.
17     Q.  Do you have any sense of how many
18 documents remain to be reviewed that are currently
19 in the possession of your firm?
20     A.  I don't.
21     Q.  Any sense of the number of
22 documents that are not yet reviewed by you or your
23 firm that are in the possession of the plaintiffs'
24 lawyers?
25     A.  I don't.

**[Page 28]**

1      Q.  You have no idea what the magnitude
2  of the discovery record is that you have not yet
3  reviewed?
4      A.  That's correct.  I don't know the
5  magnitude of discovery outstanding and what
6  proportion we've actually reviewed.  We've done
7  our best to conduct a thorough examination, but
8  it's a very large set of documents.
9      Q.  Okay.  You said the "discovery
10 outstanding," and I want to make sure that the
11 record's clear.
12         The questions I'm asking you relate
13 to the discovery that has been conducted where the
14 documents and data have been produced as opposed
15 to requests that may be outstanding that have not
16 yet been produced.
17         Do you understand that?
18     A.  Yes, I do.
19     Q.  Is that what you meant to refer to
20 in your prior answers?
21     A.  Yes.
22     Q.  Obviously, you haven't reviewed
23 things that haven't been produced?
24     A.  That's correct.
25     Q.  Okay.  But you don't know how much

**[Page 29]**

**[8]  (Pages 26 to 29)**

**HIGHLY CONFIDENTIAL**
**PURSUANT TO PROTECTIVE ORDER**

1   of what has been produced you've actually
2   reviewed?
3         A.   That's right.  I don't know the
4   exact proportion of the documents.
5         Q.   Is that true for data as well?
6         A.   Well, if you're talking about
7   transactional data, that's -- is your reference to
8   the defendants' transactional data?
9         Q.   Sure.
10        A.   No.  All of that's been reviewed.
11        Q.   By whom?
12        A.   By my firm and by Dr. Dwyer.
13        Q.   Did you review any of the
14   defendants' transactional data here?
15        A.   Yes, I have.
16        Q.   How?
17        A.   Well, early on when the data came
18   in, we had a number of issues, what we call
19   cleaning the data, standardizing the data, trying
20   to understand what it represents.  There are a
21   number of people in my firm that were working on
22   the data sets to standardize them.
23            We drafted lengthy correspondences
24   with the defendants' lawyers to seek clarification
25   on many of the data issues.  I was involved in

**[Page 30]**

1   that process, so I was aware of what was in the
2   data sets, some of the problems, some of the
3   clarifications that we needed and, throughout, you
4   know, working with the data, I became more
5   familiar.
6         Q.   This is pretty standard when data
7   is produced?  There's a lot of work that goes into
8   cleaning it up and making it feasible?
9         A.   Yeah.  This case, though, turned
10   out to be rather work intensive.  The way the data
11   was provided was not in the form that we usually
12   receive it in, and it was very difficult to
13   standardize and clean it.  It took some time.
14        Q.   Okay.  I'm going to go back to this
15   later, but let me go back to your contacts.
16            So you were contacted in 2009, I
17   think you said?
18        A.   That's correct.
19        Q.   By whom?
20        A.   By Mr. Mogin.
21        Q.   Okay.  And when were you retained
22   in this matter?
23            MR. GOLDBERG:  Object to the form.
24            THE DEPONENT:  That would have -- I
25   signed a -- Mr. Mogin signed a retention agreement

**[Page 31]**

1   I believe in early 2011.
2   BY MR. HOFFMAN:
3         Q.   Okay.  So a year and a half to two
4   years after you were first contacted?
5         A.   Uh-huh.
6         Q.   Did you do any work on this matter
7   between --
8            MR. GOLDBERG:  You have to say yes
9   or no.
10            THE DEPONENT:  I'm sorry.  Yes.
11            MR. HOFFMAN:  Thanks, Counsel.
12   BY MR. HOFFMAN:
13        Q.   Did you do any work on this matter
14   between the time when you were first contacted and
15   the time you were retained?
16        A.   Yes.
17        Q.   What did you do?
18        A.   I was looking at -- Mr. Mogin had
19   contacted me and asked me to review some economic
20   analysis that was performed by an in-house
21   economist and to provide him a sense of my opinion
22   of the analysis, what it showed, so on and so
23   forth.
24        Q.   Who was the in-house economist?
25        A.   A gentleman by the name of Nick

**[Page 32]**

1   Hunter.
2         Q.   And where is he in-house?
3         A.   He was with Mr. Mogin.
4         Q.   Where is he now?
5         A.   He's passed away.
6         Q.   And what was the purpose of your
7   review of his analysis?
8         A.   Mr. Mogin just wanted me to look at
9   the data.  At the time, I believe he was in the
10   midst of considering or actually drafting the
11   complaint and wanted me to look at the allegations
12   to see if the date of the analysis was plausible
13   in support of the allegations.
14        Q.   What was the data you were
15   reviewing?
16        A.   I was reviewing a great deal of
17   data publicly available:  AFPA, data I believe
18   from RISI, from PPW, articles on the industry.  It
19   was a rather large set of data.
20        Q.   What opinion did you provide on
21   that?
22            MR. GOLDBERG:  Object to the form
23   of the question.  I also think your -- I think
24   your questioning up till now has been on the
25   borderline of the stipulation but fair, but you're

**[Page 33]**

**[9]   (Pages 30 to 33)**

1 right up against the border of the stipulation
2 agreed to by counsel and entered into by the court
3 with respect to the scope of discovery of experts.
4         Please repeat the question, Madam
5 Court Reporter.
6         (The record was read as follows:
7     Q.  What opinion did you provide
8 on that?)
9         MR. GOLDBERG:  Go ahead.
10 BY MR. HOFFMAN:
11    Q.  You can answer.
12    A.  Yeah, I think "opinion" might be
13 too strong a word.  I was simply offering
14 Mr. Mogin my thoughts on whether the allegations
15 would be plausible based on the data that I had
16 seen in the analysis that was conducted.
17    Q.  And what were your thoughts?
18    A.  Yes, I thought that the
19 allegations -- the date of the analysis, what I've
20 observed was consistent with the allegations.
21    Q.  And what were the allegations that
22 you were considering?
23    A.  At the time, that the defendants
24 had engaged in a conspiracy to restrict supply and
25 by the means to stabilize and increase prices for

**[Page 34]**

1     Q.  Were those the same as the ones
2 that are described in your declaration?
3    A.  Yeah, should be.
4    Q.  Something close to that, anyway?
5    A.  Yes.
6    Q.  But you don't recall the total
7 amount of the billings at that time?
8    A.  Not at that time, no.
9    Q.  Okay.  So then you were retained
10 in -- I forget the exact date -- sometime in 2011
11 to work on this matter?
12    A.  Yes.
13    Q.  By whom?
14    A.  By Mr. Mogin.
15    Q.  And at that point, you signed a
16 retainer letter or an engagement letter of some
17 form?
18    A.  Yes, we signed a retention
19 agreement.
20    Q.  Okay.  But there was no retention
21 agreement in effect from the period from 2009 to
22 2011 that we've been discussing?
23    A.  No, no.  It was just an informal
24 work process.
25    Q.  Did you -- let me go back for one

**[Page 36]**

1 containerboard.
2    Q.  Did you provide those thoughts or
3 that opinion in writing or orally?
4    A.  Orally.
5    Q.  Okay.  Did you provide anything in
6 writing to Mr. Mogin or anybody else?
7    A.  No.
8         MR. GOLDBERG:  At that time.
9         MR. HOFFMAN:  Fair point.
10 BY MR. HOFFMAN:
11    Q.  At that time.
12    A.  At that time, correct.
13    Q.  Who compiled the materials that you
14 reviewed during this period between when you were
15 contacted and when you were retained?
16    A.  That would be both Nick Hunter and
17 myself and probably my staff.
18    Q.  Were you paid for the time that you
19 spent conducting this analysis?
20    A.  Yes.
21    Q.  How much?
22    A.  I don't recall.
23    Q.  Were you and your firm paid at your
24 customary hourly rates?
25    A.  Yes.

**[Page 35]**

1 second to that period.
2         Did you make suggestions or
3 comments on what particular allegations should
4 be -- or allegations should be made?
5    A.  No.
6    Q.  Were you asked your thoughts on any
7 particular allegations that were considered?
8         MR. GOLDBERG:  Again, I'm going to
9 interpose an objection.  The stipulation is fairly
10 clear about conversations between lawyers and
11 experts, and I'm going to instruct the witness in
12 answering the question not to reveal conversations
13 that he may have had with Mr. Mogin, a lawyer in
14 this case.
15         And I will state again for the
16 record I believe you are now trespassing on the
17 restrictions in the stipulation.
18         MR. HOFFMAN:  Just for the record,
19 the witness has testified that he wasn't retained
20 at this time, so it's unclear to me why or how the
21 stipulation would apply.
22         MR. GOLDBERG:  Are you -- if you
23 want to -- if you want me to argue with you about
24 my reading of the stipulation on this record, I'm
25 very happy to do that, but I don't think that's

**[Page 37]**

**[10]  (Pages 34 to 37)**

1  going to get us anywhere.  You can make your
2  argument to the judge, I will make my argument to
3  the judge, and the judge will rule.
4        MR. HOFFMAN:  Let me go back and
5  re-ask the question.
6  BY MR. HOFFMAN:
7       Q.  Did you work -- strike that.
8           Were you asked to provide input on
9  the particular allegations that could be made
10 against the defendants?
11       MR. GOLDBERG:  Now, Dr. Harris, my
12 same instruction to you:  In answering your
13 question, I don't want you to reveal any
14 conversations that you had with Mr. Mogin.
15       THE DEPONENT:  The answer is no.
16 BY MR. HOFFMAN:
17       Q.  Did you provide any such comments
18 on specific allegations?
19       MR. GOLDBERG:  Same instruction.
20 BY MR. HOFFMAN:
21       Q.  Go ahead.
22       A.  No.
23       Q.  Okay.  Let's go to the period after
24 you were retained.
25           Let me start with this:  How many

[Page 38]

1  total hours have you spent on this case from the
2  period when you were retained to present?
3       MR. GOLDBERG:  Dr. Harris
4  personally?
5       MR. HOFFMAN:  Yes.
6       THE DEPONENT:  I don't know what
7  the number would be.  It would certainly be, I
8  would think, well over a thousand.
9  BY MR. HOFFMAN:
10       Q.  And how about for your firm?
11       A.  Again, I don't know the total
12 hours.  It would be in the thousands.
13       Q.  Okay.  How much in terms of dollars
14 has your firm billed to date from the time of
15 retention to present on this matter?
16       A.  Through the end of May -- our June
17 invoices aren't out -- our billings would be a
18 little under 1.7 million.
19       Q.  Okay.  And how much have you been
20 paid?  How much have you received of that
21 1.7 million?
22       A.  Everything with the exception of I
23 think a little under 500,000, for which we have a
24 payment plan.
25       Q.  Okay.  So you've been paid about

[Page 39]

1  1.2 million, you have a payment plan for 500,000,
2  and then you have ongoing bills that are being
3  incurred that will be sent?
4       A.  That's correct.
5       Q.  So 500,000 of the 1.7 million has
6  not been paid?
7       A.  That's correct.
8       Q.  In connection with your
9  declaration, and you can -- I'll refer to the
10 Harris 2, the original one, and Harris 3, the
11 revised version collectively -- did you interview
12 anyone other than counsel in order to gather
13 facts?
14       MR. GOLDBERG:  Object to the form
15 of the question.
16       THE DEPONENT:  Well, not facts that
17 are expressed in the declaration, but, yes, I've
18 interviewed a number of people.
19 BY MR. HOFFMAN:
20       Q.  Who?
21       A.  One gentleman by the name of
22 Steve Read, and another gentleman by the name of
23 Frank Perkowski.
24       Q.  If you can spell any of those, that
25 would be helpful.

[Page 40]

1       A.  Steve Read.  It would be S-t-e-v-e,
2  last name, R-e-a-d.  Frank, F-r-a-n-k, Perkowski,
3  P-e-r-k-o-w-s-k-i.
4       Q.  Anyone else?
5       A.  Yes, I've spoken with class
6  representatives.
7       Q.  All of them?
8       A.  No.
9       Q.  Who?
10       A.  I don't recall the names.  I
11 believe it was a gentleman by the name of Clay,
12 and that would have been at Chandra Packaging, a
13 gentleman, first name Michael, I want to say
14 Mighty Pac, and a woman.  I do not recall her name,
15 and I believe she was with Distributors Packaging.
16       MR. McKEOWN:  Dr. Harris, could you
17 speak a little louder for us down the table.
18       THE DEPONENT:  Yes, certainly.
19       MR. HOFFMAN:  It's a long room.
20 BY MR. HOFFMAN:
21       Q.  Who is Steve Read?
22       A.  Steve Read?  I'd characterize him
23 as an industry expert and someone who at one point
24 was in the industry.
25       Q.  Who does he work for?

[Page 41]

**[11]  (Pages 38 to 41)**

1      A.  At this point, I don't know.
2      Q.  Who did he work for at the time you
3  spoke to him?
4      A.  I believe he had his own firm, a
5  corrugating plant.
6      Q.  I'm sorry.  He owned a corrugating
7  plant?
8      A.  I believe so, yes, or a mill.  I
9  don't recall.
10     Q.  Where was it?
11     A.  I don't know.
12     Q.  Where did you meet with him?
13     A.  I met with him once in Los Angeles,
14  and we had a number of phone calls after that.
15     Q.  How much time, total, do you
16  remember spending with him?
17     A.  Probably not more than eight hours.
18     Q.  In general terms, what did he tell
19  you?
20     A.  He just gave me an overview of the
21  industry, what happens with the mills, what
22  happens at the box plants, the sorts of products,
23  distribution channels, pricing, things of that
24  sort.
25     Q.  Where did you get his name?

[Page 42]

1      A.  I would assume from one of the
2  attorneys.
3      Q.  Did you reach out to him or did he
4  reach out to you?
5      A.  Neither.  We just met at a meeting
6  that was attended by lawyers.
7      Q.  Somebody else organized the meeting
8  and you both attended?
9      A.  Yes.
10     Q.  Who organized the meeting?
11     A.  I don't know.
12     Q.  Who is Frank Perkowski?
13     A.  Again, he's a gentleman that's in
14  the industry.  I believe he has his own consulting
15  firm, consults to the industry and nonindustry,
16  and we had a discussion about boxes, box types,
17  materials, process, pricing, things of that sort.
18     Q.  How much time did you spend
19  speaking with Mr. Perkowski?
20     A.  Probably 8 to 16.
21     Q.  Hours?
22     A.  Uh-huh.
23     Q.  In person?
24     A.  No.
25     Q.  Was this partially in person,

[Page 43]

1  partially on the phone?
2      A.  No, all on the phone.
3      Q.  What did he tell you?
4      A.  Again, just gave me an overview of
5  the industry about the different styles of boxes,
6  performance characteristics, the market, who
7  purchases the boxes, pricing, things of that sort.
8      Q.  Do you remember the name of his
9  firm?
10     A.  I believe it's Business Development
11  Advisory, but I could be incorrect.
12     Q.  Who does he normally provide
13  consulting services to?
14     A.  I have no idea.
15     Q.  And sorry if I asked this before.
16  I don't think I did, but I may have forgotten:
17  How did you find him?
18     A.  Again, that would have probably
19  been through counsel.
20     Q.  Did you identify either Mr. Read or
21  Mr. Perkowski in the exhibit to your declaration
22  where you identified the sources on which you've
23  relied?
24     A.  No, because I didn't rely on them.
25     Q.  When you say you didn't rely on

[Page 44]

1  them, what do you mean?
2      A.  I mean they were background
3  information.  I've done a lot of background
4  research, including YouTube videos, mills and box
5  plants, reading of books and articles, stuff to
6  familiarize myself with the industry, but not
7  stuff that I actually relied on in the
8  declaration.
9      Q.  Okay.  You identified three class
10  representatives that you spoke to; is that
11  correct?
12     A.  Yes.
13     Q.  What did you learn from them?
14     A.  You know, we had some discussions
15  about who were they purchasing from, which
16  defendants, what sort of products, pricing issues.
17  Would have been probably a discussion of their
18  customers.  It was a whole list of questions that
19  we put together.
20     Q.  How did you determine which of the
21  class representatives to speak to?
22     A.  Well, I, at some point, probably
23  made a request to the attorneys and said as many
24  as possible, and they set up the interviews.
25     Q.  And it was three, total?

[Page 45]

**[12]  (Pages 42 to 45)**

1      A.   Yes.
2      **Q.**  Okay.  How long in total did you
3  spend interviewing the class representatives?
4      A.   Each call was scheduled for about
5  an hour.
6      **Q.**  And these are just phone calls?
7      A.   Yes.
8      **Q.**  One call per class representative?
9      A.   Uh-huh.
10     **Q.**  About an hour each?
11     A.   Uh-huh.
12     **Q.**  Did either Mr. Read, Mr. Perkowski
13  or any of the class representatives provide you
14  with any documents or data?
15     A.   No.
16     **Q.**  Ever?
17     A.   No, I don't think so.
18     **Q.**  Did you or your firm obtain data
19  from any of the class representatives for use in
20  either your analysis or Dr. Dwyer's analysis?
21     A.   No.
22     **Q.**  Did you obtain documents, you or
23  your firm obtain documents from any of the class
24  representatives for use in preparing your
25  declaration or Dr. Dwyer's declaration?

                                    **[Page 46]**

1      A.   No.
2      **Q.**  Okay.  Have you spoken with anybody
3  else about this case?
4      A.   No.
5      **Q.**  Did Plaintiffs' counsel assist you
6  or provide you with any facts to rely on in this
7  case?
8      A.   No.
9      **Q.**  Did they provide any specific
10  suggestions for things you should inquire about?
11     A.   No.
12     **Q.**  Did they provide you any conclusions
13  to use?
14     A.   No.
15     **Q.**  Did you learn of any evidence
16  that's inconsistent with the opinions asserted in
17  your declaration, Harris 3?
18     A.   No.
19     **Q.**  Everything you saw was consistent
20  with your opinions?
21     A.   Yes.
22     **Q.**  Out of all the thousands of pages
23  of materials you looked at?
24     A.   Yes.
25     **Q.**  Okay.  If you look at Harris 5,

                                    **[Page 47]**

1  this is exhibit -- this is your amended list of
2  work cited.
3          Is this an accurate list of all the
4  documents you relied on in preparing your
5  declaration?
6      A.   Yes, to the best of my knowledge.
7      **Q.**  And the depositions?
8      A.   Well, actually, as I'm sitting here
9  now, I see that the -- I've also reviewed the
10  plaintiffs' depositions, and the amount included
11  under Exhibit 2, so it should be in Exhibit 2.
12     **Q.**  Okay.  So Exhibit 2 should be
13  modified to include the plaintiffs -- the
14  depositions of the plaintiffs?
15     A.   Yes, correct.
16     **Q.**  Anyone else?
17     A.   I see one deposition there for the
18  plaintiff, but there are other depositions as
19  well.
20     **Q.**  So the only missing depositions on
21  this list would be plaintiffs'?
22     A.   No, I think there's some additional
23  depositions that should be on here.  This list
24  appears to be too short.
25     **Q.**  Okay.  How did you decide which

                                    **[Page 48]**

1  documents to review for this case?
2      A.   Well, it was a -- a process that I
3  sort of engineered with my -- with my office and
4  with the attorneys.
5          I worked with both -- Mr. Hunter.
6  I worked with some of the lawyer teams.  I
7  instructed my staff on the concepts that I would
8  like to see, documents from discovery.  They would
9  go out and literally draw batches of documents
10  that they thought met the either key words that I
11  had suggested or the concepts that I had outlined,
12  and would develop large batches of documents for
13  me to review, and I would go through those
14  documents.
15     **Q.**  Okay.  Was there anything that you
16  wanted to review that wasn't made available to
17  you?
18     A.   I would -- at some point, I was
19  looking for some additional data on inventories
20  and operating rates, and that didn't seem to be
21  available, but beyond that, nothing.
22     **Q.**  Who did you ask for that data?
23     A.   Would have been the attorneys.
24     **Q.**  When did you ask for it?
25     A.   I don't recall.  It would have been

                                    **[Page 49]**

                    **[13]  (Pages 46 to 49)**

1  in the process of drafting the declaration months
2  ago.
3          Q.  Do you recall anything else about
4  what the data was that you wanted but didn't get?
5          A.  Excuse me.  Can you repeat the
6  question?
7          Q.  Do you recall anything else about
8  what the data was that you wanted but didn't get?
9          A.  No.
10         Q.  Okay.  Attached as Exhibit 1 to
11 Harris 2, which is your original declaration here,
12 is a CV for you; is that accurate?
13         A.  Yes, it is.
14         Q.  Anything in it that's inaccurate?
15         A.  Not to my knowledge.
16         Q.  Okay.  Now, you're currently
17 president of Harris Economics Group; correct?
18         A.  That's correct.
19         Q.  And how do you get compensated at
20 Harris Economics Group?
21         A.  I pay myself a base salary, and at
22 the end of the year, I -- my accountant develops
23 what's called a K-1, which represents net income
24 of the company, and that is flowed to me.
25         Q.  Are you the sole owner of Harris

[Page 50]

1  Economics Group?
2          A.  Yes, I am.
3          Q.  So your compensation in addition to
4  your salary also includes the profits from the
5  operations of Harris Economics Group?
6          A.  Correct.
7          Q.  So to be clear, your compensation
8  would also include some share of the revenue
9  generated by Dr. Dwyer's work?
10         MR. GOLDBERG:  Object to the form.
11         THE DEPONENT:  Yes.
12 BY MR. HOFFMAN:
13         Q.  Okay.  How long have you worked
14 with Dr. Dwyer?
15         A.  We've worked together since our
16 time in a firm called EconOne Research.  I started
17 with EconOne Research in, I believe, 2000 or 2001,
18 and Dr. Dwyer joined the firm in -- I'm not
19 sure -- 2004 or 2005.
20         Q.  Okay.  And then you hired him at
21 Harris Economics Group?
22         A.  Yes.
23         Q.  Okay.  How long have you been
24 serving as an expert in litigation matters?
25         A.  Since 1993.

[Page 51]

1          Q.  In that time, have you ever
2  testified that a class should not be certified?
3          A.  Yes.
4          Q.  When?
5          A.  A few years back.  It was a case
6  involving a class action against the State of
7  California.
8          Q.  Over what?
9          A.  The State of California Fish & Game
10 Departments had to poison a lake in a place called
11 Lake Davis in order to kill an invasive species,
12 and to do so, they had to literally shut the lake
13 down, and it was popular among fishermen and
14 recreational enthusiasts, and a class action was
15 brought on behalf of business owners, the City of
16 Portola, and I believe property owners.
17         Q.  Why did you testify the class there
18 should not be certified?
19         A.  Because it shouldn't have.
20         Q.  Why?
21         A.  Because there was no causal
22 connection between the allegations and impacting
23 the class members.
24         Q.  Was your testimony that impact in
25 that case could not be shown by common means?

[Page 52]

1          A.  Yes, and that in fact there would
2  have been no impact.
3          Q.  So there was no impact and,
4  therefore, the class should not be certified.
5          A.  That's correct.
6          Q.  No causation, so the class should
7  not be certified.
8          MR. GOLDBERG:  Object to the form
9  of the question.
10 BY MR. HOFFMAN:
11         Q.  Okay.  In an antitrust case -- how
12 many antitrust cases have you testified in?
13         A.  I don't know the number.  They're
14 on my CV.  It would be a number of them.  I don't
15 know the exact number.
16 BY MR. HOFFMAN:
17         Q.  Roughly?
18         A.  Most of these are price-fixing
19 cases, so I don't know.  Eight, nine.
20         Q.  Always on class certification in
21 those cases?
22         MR. GOLDBERG:  Object to the form
23 of the question.
24         THE DEPONENT:  No.  No.
25 ///

[Page 53]

**[14]  (Pages 50 to 53)**

BY MR. HOFFMAN:

Q.  Okay.  How many class certification antitrust cases?

A.  Well, if I could look at my CV.

Q.  Strike that.  Let me ask you a different question.

In antitrust cases, have you testified that a class should not be certified?

A.  No, I have not.

Q.  Now, you have testified about damages in antitrust cases; correct?

A.  Yes.

Q.  And I think in some of your prior work you've actually, econometrically, estimated damage models in the antitrust cases; right?

A.  Yes.

Q.  After -- we talked earlier about cleaning up data, processing the data.

Thinking about your work as a damages expert or doing damages estimation in antitrust cases, can you describe how, after you cleaned up the data, you would estimate a model?  What would the steps be?

A.  Well, normally, after you've cleaned the data, standardized it, have a complete

[Page 54]

understanding of what's in the data, if the task is to determine if there was a conspiratorial overcharge, typically, you would estimate what's called a regression model.

Your -- the objective is to explain the variation in the price in question, the price for which the conspiracy has been impacted.  You'd want to explain that variation through various supply and demand factors.  And after controlling for those factors, also include variables that would capture the effect of the conspiracy.

Q.  Would you include cost variables in the variables you put together?

A.  Yes.

Q.  Any other kinds of variables?

A.  Oh, it depends on the industry.  It depends on the industry and the market.  When I say supply and demand, it would include a whole range of cost factors, demand factors.  Could be a number of them.

Q.  Let me give you a hypothetical.

Suppose that a price-fixing conspiracy is alleged in an industry where a single homogenous product is sold.  Suppose the average price during the alleged conspiracy was $9

[Page 55]

and the average price after the conspiracy ended was 8.

Would you conclude that the damage was $1 per unit?

A.  Can you repeat your hypothetical?

Q.  Single homogenous product, price-fixing conspiracy.  Price during the conspiracy was $9, price after the conspiracy, 8.

Is the damage $1 per unit?

A.  No, not necessarily.  There could have been something else that also caused the increase of $1.

Q.  Would it matter to your analysis if cost or demand conditions were different during the conspiracy period and then after?

A.  Yes, that's what I'm -- when I talk about controlling for those effects, that's what you want to do; you want to isolate the impact, if any, of the conspiracy, and unless you control for relevant supply and demand factors, you haven't done that.

Q.  Now, you've also previously testified in antitrust cases concerning how to show impact on a common basis; correct?

A.  Correct.

[Page 56]

MR. HOFFMAN:  All right.  I'm going to go ahead and mark Harris 7, which I'll have to go get, if you'll hold on one second.

(Whereupon, there was a brief pause in the proceedings.)

(Whereupon, Harris Exhibit 7 was marked for identification by the deposition reporter and is attached hereto.)

BY MR. HOFFMAN:

Q.  So, Doctor, Harris 7 is an expert report that you filed in a case called In Re Static Random Access Memory (SRAM) Antitrust Litigation, and the declaration was dated -- it's got a filed stamp date of January 29th, 2009, which is also the date, if you look at the last page, Page 40 of the declaration.

Do you recognize that?

A.  Yes, I do.

Q.  Now, in this case, you were testifying about an alleged conspiracy in static random access memory, and specifically you were testifying about whether there was common impact or whether impact could be shown on a common basis to a proposed class of indirect purchasers.

[Page 57]

| 1 | Do you understand that? |
| 2 | A.  Yes, I do. |
| 3 | Q.  Is that correct? |
| 4 | A.  That's correct. |
| 5 | Q.  Okay.  And indirect purchasers, |
| 6 | just to be clear, are people who are buying |
| 7 | products that contain the products that were the |
| 8 | subject of the conspiracy, like in this case, |
| 9 | people who bought computers that contained SRAM; |
| 10 | is that correct? |
| 11 | MR. GOLDBERG:  Object to the form |
| 12 | of the question. |
| 13 | THE DEPONENT:  Yes. |
| 14 | BY MR. HOFFMAN: |
| 15 | Q.  Anything wrong in my description? |
| 16 | MR. GOLDBERG:  Object to the form |
| 17 | of the question. |
| 18 | THE DEPONENT:  No.  An indirect |
| 19 | purchaser would be someone as you described, |
| 20 | someone that purchases a computer with a component |
| 21 | in it that might have been subject to a |
| 22 | conspiracy. |
| 23 | BY MR. HOFFMAN: |
| 24 | Q.  Okay.  Well, at least that was the |
| 25 | kind of indirect purchaser you were testifying |

[Page 58]

| 1 | Q.  That was your testimony? |
| 2 | A.  Yes. |
| 3 | Q.  And what do you mean by the |
| 4 | anti-competitive overcharge was passed through? |
| 5 | A.  The anti-competitive overcharge of |
| 6 | the defendants to the direct purchasers was passed |
| 7 | through to the indirect purchasers. |
| 8 | Q.  And what does that mean? |
| 9 | A.  It means the conspiracy among the |
| 10 | defendants was to increase the price of SRAM to |
| 11 | direct purchasers, who then turned around and |
| 12 | resold it to an indirect purchaser, and the issue |
| 13 | was whether that overcharge was passed through, |
| 14 | either all or a portion. |
| 15 | Q.  And in layman's terms, by pass |
| 16 | through, what you mean is if the conspiracy was an |
| 17 | SRAM and it raised the price of SRAM, did somebody |
| 18 | who bought a computer actually pay a higher price |
| 19 | because of that conspiracy in the upstream |
| 20 | product; right? |
| 21 | A.  Just roughly, yes. |
| 22 | Q.  Okay.  And you were trying to |
| 23 | figure out can that pass-through be shown in order |
| 24 | to show there's common impact? |
| 25 | A.  Correct. |

[Page 60]

| 1 | about in this case? |
| 2 | A.  Yes. |
| 3 | Q.  Okay.  Now, if you turn to Page 27 |
| 4 | of this exhibit, Paragraph 57, your testimony |
| 5 | there was as follows, as I understand it: |
| 6 | "The present issue is to |
| 7 | determine whether impact can be |
| 8 | demonstrated, and ultimately |
| 9 | qualified, by applying a common |
| 10 | set of facts, evidence in a |
| 11 | generalized analytical framework |
| 12 | to the indirect purchaser class. |
| 13 | More specifically, the issue is |
| 14 | whether there is a plausible |
| 15 | methodology to demonstrate that |
| 16 | the antitrust injury can be |
| 17 | proven on a classwide basis.  At |
| 18 | the crux of the matter is whether |
| 19 | one would expect and can show |
| 20 | that the anti-competitive |
| 21 | overcharge to the defendants was |
| 22 | passed through and paid by the |
| 23 | class members." |
| 24 | Do you see that? |
| 25 | A.  Yes. |

[Page 59]

| 1 | Q.  And in order to show there's a |
| 2 | common impact, you need to show that that |
| 3 | pass-through occurred; correct? |
| 4 | A.  For the -- |
| 5 | MR. GOLDBERG:  Object to the form. |
| 6 | BY MR. HOFFMAN: |
| 7 | Q.  Go ahead. |
| 8 | A.  For the indirect purchaser class, |
| 9 | yes. |
| 10 | Q.  Okay.  Now, if you go to Page 29, |
| 11 | and, Doctor, here you have a fairly lengthy |
| 12 | discussion of a tax incidence theory -- |
| 13 | A.  Uh-huh. |
| 14 | Q.  -- but what I want to direct your |
| 15 | attention to is the language near the top in |
| 16 | Paragraph 60 where you say: |
| 17 | "The ultimate impact and |
| 18 | thus incidence of the tax depends |
| 19 | on the relative elasticity of the |
| 20 | intermediaries' supply and demand |
| 21 | curves." |
| 22 | You see that? |
| 23 | A.  Yes. |
| 24 | Q.  Is that -- was that a correct |
| 25 | statement at the time? |

[Page 61]

**[16]  (Pages 58 to 61)**

1     A.  Yes.
2     Q.  Do you agree with that statement
3  today?
4     A.  Yes.
5     Q.  And then in Paragraph 61, you
6  state -- again, skipping some of the language:
7          "The consumers will bear the
8      brunt of a unit tax if either
9      supply is very elastic relative
10     to demand or demand is very
11     inelastic relative to supply."
12         Do you see that?
13     A.  Yes.
14     Q.  That's a condition -- or those are
15  conditions by which pass-through would occur in --
16  for indirect purchasers where the conspiracy
17  upstreams on a component?
18     A.  Yes, that's one of the issues you'd
19  want to look at, yes.
20     Q.  Okay.  It is important to you to
21  look at that issue; correct?
22     A.  Yes.
23     Q.  Okay.  And on Page 30 in
24  Paragraph 64, you provide a list of five factors
25  based on an article by Harris and Sullivan to

**[Page 62]**

1  evaluate the rate of pass-through, including
2  temporal relationships, pricing practices,
3  directness of effective costs, supply and demand.
4          Do you see that?
5     A.  Yes.
6     Q.  Okay.  And you -- that was your
7  sworn testimony in that case?
8     A.  That's correct.
9     Q.  And you agree with that today?
10     A.  Yes, I do.
11     Q.  Did you analyze those five factors
12  in this case?
13     A.  No, I did not.
14     Q.  Did Dr. Dwyer?
15     A.  No.
16         MR. HOFFMAN:  I'm going to go ahead
17  and mark Exhibit 8.  You can set that aside.
18         (Whereupon, Harris Exhibit 8 was
19         marked for identification by the
20         deposition reporter and is attached
21         hereto.)
22  BY MR. HOFFMAN:
23     Q.  So, Doctor, while you're looking at
24  this, Harris 8 is a declaration that you filed
25  in -- or on July 10th of 2007 in a case called In

**[Page 63]**

1  Re Dynamic Random Access Memory (DRAM) Antitrust
2  Litigation in the Indirect Purchaser Action.
3          Do you see that?
4     A.  Yes.
5     Q.  Was this your sworn testimony in
6  that case?
7     A.  Yes, it was.
8     Q.  And this was another indirect
9  purchaser component class like the one we were
10  discussing in SRAM; correct?
11     A.  Correct.
12     Q.  Where, again, here the class you're
13  talking about is a class of people who bought a
14  product which contained a component that was
15  allegedly subject to a conspiracy to restrict
16  supply or raise price; is that correct?
17     A.  That's correct.
18     Q.  And you were testifying about
19  whether common -- among other things, whether
20  common impact could be shown to that class of
21  indirect purchasers of a product containing a
22  component that was allegedly affected by the
23  conspiracy?
24     A.  That's correct.
25     Q.  Okay.  Now, if you turn to Page 16,

**[Page 64]**

1  I want to direct your attention to Paragraph 31.
2  And if you look at the second sentence of
3  Paragraph 31, you wrote:
4          "However, the question that
5      arises in the context of common
6      proof is whether one might have
7      some portion of class members
8      that transact in a corner of the
9      market that somehow differs from
10     the broader market or where the
11     class members themselves could
12     somehow be considered distinct,
13     and as a result, where high
14     pass-through rates would not be
15     expected - or perhaps in the
16     extreme, where pass-through is
17     zero."
18         Do you see that?
19     A.  Yes.
20     Q.  That was your sworn testimony?
21     A.  Yes, it was.
22     Q.  And then in the next paragraph is I
23  think an example of a situation where that such a
24  corner of the market that would be different might
25  exist.  You state, I think -- I'll quote it:

**[Page 65]**

**[17]  (Pages 62 to 65)**

1          "One would not expect to
2     find some region of the country,
3     for example, where firms use
4     different production
5     technologies, have drastically
6     different pricing policies or
7     were somehow able to avoid the
8     overcharge."
9          Do you see that?
10     A.  Yes.
11     Q.  And that was your testimony about
12  examples of cases in which there might be parts of
13  a proposed class of indirect purchasers who would
14  be subject to different or no impacts than the
15  rest of the class; correct?
16          MR. GOLDBERG:  Object to the form
17  of the question.
18  BY MR. HOFFMAN:
19     Q.  You can answer.
20     A.  Yes.
21     Q.  Did you conduct an analysis in this
22  case about whether any such corners of the market
23  existed?
24     A.  Not for direct purchases, no.
25     Q.  For anything?

[Page 66]

1     A.  No.  It wasn't relevant.
2     Q.  Did Dr. Dwyer?
3     A.  No.
4     Q.  For anybody?
5     A.  No.
6     Q.  Now, let's turn back -- you can put
7  that aside.  Let's turn back to Harris 3, and as I
8  said, you might want to keep that one out to the
9  side.
10          If you turn to Page 34 of Harris 3,
11  at Paragraph -- I think it's Roman numeral VI.3,
12  you note that, "Defendants operate" -- let me make
13  sure I have the right page.  Yeah.  The first
14  sentence says:
15          "The defendants operate in
16     what economists call an
17     oligopolistic market."
18          That was your assessment; correct?
19     A.  Yes.
20     Q.  Now, in a nonconspiracy oligopoly,
21  firms are or can be interdependent; correct?
22     A.  Yes, they are.
23     Q.  That means that they make
24  decisions -- and I think this was kind of your
25  wording -- they make decisions based on

[Page 67]

1  conjectures about how the other firms will react;
2  correct?
3     A.  That's correct.
4     Q.  And in fact you elaborate on that
5  in the declaration, you're aware of, maybe in
6  contrast to, for example, a perfectly competitive
7  market where every seller is really tiny and they
8  simply react to the market, and oligopolistic
9  market firms try to look at and guess what their
10  competitors are going to do and make their
11  decisions based on what they think their
12  competitors will do; correct?
13     A.  That's -- that's correct.  But you
14  can also have a very competitive oligopolistic
15  market.
16          MR. HOFFMAN:  Move to strike as
17  nonresponsive.
18  BY MR. HOFFMAN:
19     Q.  Oligopolies exist in many different
20  industries; correct?
21     A.  That's correct.
22     Q.  Now, let's go back to Harris 3,
23  your declaration, at Pages 5 and 6.  And this
24  actually occurs in a number of places throughout
25  the declaration, and what I wanted to talk to you

[Page 68]

1  about right now is terminology, a terminology
2  issue.
3          So if you look at Pages 5 and 6,
4  Doctor, you use terms collude, collusion,
5  collective action, and you distinguish between
6  noncoordinated behavior -- you use the term
7  noncoordinated behavior and presumably coordinated
8  behavior.
9          Elsewhere, for example, on Page 48,
10  you use the term collusive behavior.
11          On Page 3, you use the term --
12          MR. GOLDBERG:  Hold on for a
13  second.
14          MR. HOFFMAN:  Go ahead.  I'm sorry.
15          MR. GOLDBERG:  Hold on for a
16  second.  Let's give him and me a chance to look.
17          MR. HOFFMAN:  Sure.
18          MR. GOLDBERG:  Page 48?
19          MR. HOFFMAN:  Page 48.
20          MR. GOLDBERG:  Paragraph 5?
21          MR. HOFFMAN:  Yes.  And these are
22  just examples.  The terms occur throughout.
23          MR. GOLDBERG:  Sure.  I just want
24  to see them, that's all.
25  ///

[Page 69]

[18]  (Pages 66 to 69)

BY MR. HOFFMAN:

Q. Yes. Page 48, you use the term collusive behavior.

And then I want to flip all the way back to Page 3, and here you use the term -- couple terms.

You use -- in Paragraph B(1), you use the term conspiracy?

A. Uh-huh.

Q. And in Paragraph B(2) you use the term coordinated supply constraints.

A. Uh-huh.

Q. So my question is: Are you using these terms, conspiracy, collusion, collusive, collective, coordinated interchangeably, or are you using them to have different meanings?

A. No, they're interchangeable.

Q. They all mean the same thing to you?

A. Yeah, they all mean collective action, yes.

Q. How would you define these terms? Can you give me one definition that I could use for all these different terms you use?

A. That the defendants have a common

**[Page 70]**

understanding and a common purpose to take collective action, reducing prices, raising prices, coordinating interactions in a way that's against their self-interest.

Q. In a way that's against their self-interest in the short-term, long-term, under all conditions?

A. Against their self-interest, their unilateral self-interest in all cases.

Q. Okay. It's against their unilateral self-interest even if they assume that the other defendants behaved the same way?

A. It's against their self-interests. They have to be assured that the other defendants will act in the same way, not just believe the defendants will act in the same way.

Q. Could they gain such assurance by experimenting and seeing what the reactions of the other defendants were?

A. Well, I'm certain that that takes place in this market, though. What I observed are the use of focal points on industry operating rates and inventory and actions to reduce inventories, increase operating rates that weren't really experiments. They appeared very much to be

**[Page 71]**

collective action, guided collective action.

MR. HOFFMAN: Move to strike as nonresponsive.

BY MR. HOFFMAN:

Q. Let me ask the question again.

Could the defendants gain the assurance about each other's behavior that you were describing by experimenting and seeing what the other defendants' reactions were?

A. No --

MR. GOLDBERG: Object to the form of the question.

THE DEPONENT: No, I don't think so. I think the costs of not getting that assurance would be rather high.

BY MR. HOFFMAN:

Q. In every case?

A. Yes.

Q. Okay. Now, I want to be very clear about the opinions you're offering.

So when you use the terms that we talked about a minute ago that you're using interchangeably, are you using them to mean that the defendants actually reached an agreement that had specific and particular terms, such as by how

**[Page 72]**

much capacity would be reduced, when, by whom, how much prices would be raised, when and by whom, how the parties to the agreement would be compensated or punished, in other words, agreement on specific terms, or are you using them to mean that the defendants' acts were based on their views and conclusions about what other defendants might do, including acts that wouldn't be in their short-run interest unless everybody acted the same way?

MR. GOLDBERG: Object to the form of the question.

THE DEPONENT: That was a long question, and I would say I have no evidence of an explicit agreement. I wouldn't expect to find one in discovery documents that you describe on price or the amount of capacity.

These conspiracies are by their nature to be hidden, and I doubt very much there would be an explicit document that says, "We are agreeing to this, this and this."

I believe part of your question was could this just be the result of conjectures of a normal oligopoly market, and my answer is no.

It appears to be a collective and coordinated action. The defendants clearly have a

**[Page 73]**

**[19]  (Pages 70 to 73)**

1 common understanding and a common purpose and are
2 acting on that, acting on it in the belief that
3 the other defendants will do the same.
4     MR. HOFFMAN:  Move to strike as
5 nonresponsive.
6     Let me go back to some of the
7 things you said.
8 BY MR. HOFFMAN:
9     Q.  Are you offering the opinion as an
10 expert economist that conspiracies are by their
11 nature to be hidden?
12     A.  Most conspiracies are hidden, yes.
13     Q.  That's not my question.
14     My question is:  Are you offering
15 an opinion, an economic opinion as an expert
16 economist that conspiracies are by their nature to
17 be hidden?
18     MR. GOLDBERG:  Object to the form
19 of the question.
20     THE DEPONENT:  Well, if we're
21 talking about illegal conspiracies, conspiracies
22 that reflect explicit agreements that it's my
23 understanding are per se illegal, I doubt very
24 much defendants in any industry would seek to
25 publicize that conspiracy.

**[Page 74]**

1 BY MR. HOFFMAN:
2     Q.  Are you offering a legal or an
3 economic opinion?
4     A.  I cannot offer a legal opinion.
5 Any opinion that I offer here today will be an
6 economic opinion, and this opinion is more common
7 sense than anything, but I doubt very much that I
8 would see an explicit agreement publicized for an
9 illegal conspiracy.
10     Q.  Okay.  Are you offering an economic
11 opinion that conspiracies are to be hidden?
12     A.  I'm not quite sure what you mean by
13 "to be hidden."  I'm simply saying that we would
14 expect conspiracies to be hidden.  That would be
15 the objective of the conspirators.
16     Q.  Are you offering an opinion today
17 that the defendants in this case reached an
18 agreement that had actual terms in it, such as how
19 much capacity would be reduced by whom and when,
20 and that any such conclusion could be proved with
21 common evidence?
22     MR. GOLDBERG:  Repeat the question
23 back to me, please, Madam Court Reporter.
24     (The record was read as follows:
25     Q.  Are you offering an opinion

**[Page 75]**

1 today that the defendants in this
2 case reached an agreement that
3 had actual terms in it, such as
4 how much capacity would be
5 reduced by whom and when, and
6 that any such conclusion could be
7 proved with common evidence?)
8     MR. GOLDBERG:  Object to the form
9 of the question.
10     THE DEPONENT:  As I said, I have no
11 evidence of an explicit agreement.  I wouldn't
12 expect to find evidence of an explicit agreement.
13 It might be in the documents.  It might be there.
14 I just haven't found it.
15     I'm not offering -- without that
16 evidence, I can't offer an opinion that such an
17 agreement exists.
18     But, furthermore, the whole concept
19 of agreement is a legal issue and not necessarily
20 an economic issue.  How the court views the form
21 of the agreement is up to the court.
22     I can simply say that the behavior
23 that I observed appears collective, coordinated,
24 the defendants have a common purpose and they act
25 on that.

**[Page 76]**

1 BY MR. HOFFMAN:
2     Q.  Are you offering the opinion that
3 the collective coordinated behavior included an
4 agreement on any particular term, such as who
5 would cut capacity, when and by how much?
6     MR. GOLDBERG:  Object to the form
7 of the question.
8     THE DEPONENT:  Are you asking me
9 based on an explicit written agreement?
10 BY MR. HOFFMAN:
11     Q.  No, I'm asking you if there is any
12 agreement -- that you're offering an expert
13 opinion there is any agreement that had any
14 specific term in it, such as who would cut
15 capacity, when, by how much, who would raise
16 price, when, by how much, or any specific term.
17     MR. GOLDBERG:  Object to the form
18 of the question.
19     THE DEPONENT:  Again, I think
20 you're talking about an explicit agreement and my
21 answer stands.
22 BY MR. HOFFMAN:
23     Q.  Well, I want to be very clear.  I'm
24 not differentiating between an explicit agreement
25 and whatever other kind of agreement there might

**[Page 77]**

**[20]  (Pages 74 to 77)**

| | |
|---|---|
| 1 be. | 1 THE DEPONENT: Again, I have no |
| 2 My question is: Are you offering | 2 evidence of explicit written agreements. |
| 3 the opinion that there is an agreement that | 3 BY MR. HOFFMAN: |
| 4 contains specific terms, such as Defendant A will | 4 **Q.** Okay. Let me try again. |
| 5 reduce capacity in 2005 in January by closing a | 5 Are you offering the opinion that |
| 6 mill? | 6 there is any such agreement, written or otherwise? |
| 7 MR. GOLDBERG: Object to the form. | 7 MR. GOLDBERG: Same objection. |
| 8 THE DEPONENT: Again, I don't know | 8 THE DEPONENT: Again, it appears to |
| 9 how you could have such an agreement without being | 9 me that the defendants communicated intentions for |
| 10 explicit. You're saying an agreement that some | 10 the use of focal points, facilitating practices. |
| 11 individual is going to take a certainly | 11 That could be an agreement. That could be an |
| 12 specific act at a very specific time. That, to | 12 agreement. As an economist, it might be an |
| 13 me, strikes me as an explicit written agreement. | 13 agreement. I don't know. I'm not a lawyer. |
| 14 BY MR. HOFFMAN: | 14 BY MR. HOFFMAN: |
| 15 **Q.** So you're not offering any opinion | 15 **Q.** Are you offering the opinion that |
| 16 that any such agreement exists, written or | 16 any such agreement existed that contained explicit |
| 17 otherwise? | 17 terms, written or otherwise? |
| 18 MR. GOLDBERG: Object to the form. | 18 MR. GOLDBERG: Object to the form |
| 19 THE DEPONENT: All I'm saying, | 19 of the question. |
| 20 Defendants acted with a common understanding for a | 20 THE DEPONENT: I'm not aware of |
| 21 common purpose and did so with the belief that the | 21 any. |
| 22 other defendants would do just that. I have no | 22 BY MR. HOFFMAN: |
| 23 evidence of an explicit written agreement on any | 23 **Q.** Okay. How does coordinated |
| 24 of those topics. | 24 behavior, to you, any of the terms that you're |
| 25 /// | 25 using, differ from oligopolistic interdependence? |
| **[Page 78]** | **[Page 80]** |
| 1 BY MR. HOFFMAN: | 1 A. It's not coordinated. You're |
| 2 **Q.** Okay. Let me ask again. I'm not | 2 literally drawing up a conjecture of a competitor |
| 3 limiting this to a written agreement. | 3 and making a decision about what you think they |
| 4 Are you offering an opinion that | 4 will do, and you have a response to that. It is |
| 5 there was an agreement among any of the defendants | 5 not coordinated with that individual. |
| 6 as to any specific term, such as who would cut | 6 **Q.** Okay. I'm not quite sure I |
| 7 capacity, when and by how much? | 7 understand your answer. Let me go back and unpack |
| 8 MR. GOLDBERG: Object to the form | 8 it a little bit. |
| 9 of the question. | 9 What's not coordinated, |
| 10 THE DEPONENT: I just don't know | 10 oligopolistic interdependence or coordinated |
| 11 how you would have such an agreement on such | 11 behavior? |
| 12 specifics. The defendants can certainly | 12 A. Oligopolistic interdependence. |
| 13 communicate intentions, use focal points, | 13 It's based on conjectures. You see the firm do |
| 14 facilitating practices. Whether the court views | 14 something, you have a reaction to that. |
| 15 that as an agreement, I don't know. I'm an | 15 By coordinated, I mean you're |
| 16 economist; I'm not a lawyer. | 16 coordinating with the belief that someone else is |
| 17 BY MR. HOFFMAN: | 17 going to do exactly that, and if they -- if they |
| 18 **Q.** Are you offering an opinion that | 18 don't, there are repercussions to your firm. |
| 19 there is any agreement of the sort we've been | 19 **Q.** Okay. So in your view, there's a |
| 20 describing -- | 20 difference between coordinated behavior -- strike |
| 21 MR. GOLDBERG: Object to the form | 21 that. |
| 22 of the question. | 22 You cite in your declaration the |
| 23 BY MR. HOFFMAN: | 23 Department of Justice and Federal Trade Commission |
| 24 **Q.** -- written or otherwise, yes or no? | 24 2010 merger guidelines; correct? |
| 25 MR. GOLDBERG: Same objection. | 25 A. Yes. |
| **[Page 79]** | **[Page 81]** |

**[21]  (Pages 78 to 81)**

1  **Q.** Do you know what the Department of
2  Justice and the Federal Trade Commission call
3  oligopolistic interdependence issues in the merger
4  guidelines and which term they use for it?
5  **A.** I don't recall.
6  **Q.** Does the term "coordinated
7  interaction" ring any bells?
8  **A.** It doesn't.
9  **Q.** Have you read the merger
10 guidelines?
11 **A.** At some point, yes.
12 **Q.** Now, just briefly, I want to look
13 at the conclusions on Pages 5 to 6 of your
14 declaration.
15 **A.** Yes.
16 **Q.** For each of those conclusions, are
17 you offering an opinion that the defendants'
18 conduct results from a conspiracy, an explicit
19 agreement, written or otherwise, as to the terms?
20 MR. GOLDBERG: Object to the form
21 of the question.
22 THE DEPONENT: I think we're back
23 to the other -- the previous question. Again, I
24 have no evidence of an explicit agreement.
25 ///

[Page 82]

1  BY MR. HOFFMAN:
2  **Q.** Can you identify any specific act
3  that was the subject of a common understanding
4  among the defendants, a specific act of any
5  defendant?
6  **A.** I think the act of driving
7  operating rates up, inventory levels down, the use
8  of downtime all collectively point toward
9  collective action.
10 **Q.** Okay. But so your -- is it your
11 opinion -- are you offering the opinion -- strike
12 that.
13 Are you offering the opinion that,
14 for example, the decision of a particular
15 defendant in a particular year to increase its
16 operating rates was the result of an agreement
17 with any other defendant?
18 MR. GOLDBERG: Object to the form
19 of the question.
20 THE DEPONENT: Again, I think it's
21 part of a common understanding and common purpose.
22 It's a focal point. Each defendant knows that
23 it's important to increase that operating rate to
24 achieve an industry ride -- excuse me -- an
25 industrywide very high operating rate.

[Page 83]

1  BY MR. HOFFMAN:
2  **Q.** Okay. Let's turn to your
3  understanding of what -- of the claim in this
4  case.
5  Does the claim here -- well,
6  actually, let me cover another terminology point
7  first.
8  When I use the term
9  "containerboard," I'm going to use it to mean
10 rolls of liner and medium paper, and I'm going to
11 use "corrugated products" to mean everything made
12 out of those rolls, such as sheets, boxes, display
13 cases, so forth.
14 Does that clear it up?
15 **A.** Yes.
16 **Q.** And the reason I want to be
17 specific about that is I think in your declaration
18 at one point you suggest or you seem to be using
19 sheets, or containerboard to refer to sheets, and
20 I'm not going to do that.
21 I'm going to refer to sheets as a
22 corrugated product, okay?
23 MR. GOLDBERG: So container -- just
24 so it's clear, containerboard is liner and
25 medium --

[Page 84]

1  MR. HOFFMAN: Rolls of paper.
2  MR. GOLDBERG: -- rolls of paper,
3  and corrugated board is -- you're calling it the
4  corrugated product.
5  BY MR. HOFFMAN:
6  **Q.** Corrugated products is everything
7  else.
8  Is that clear?
9  **A.** Yes, it is.
10 **Q.** Does the claim in this case, in
11 your understanding, involve a conspiracy or an
12 agreement with respect to the supply of
13 containerboard?
14 **A.** Yes, it does.
15 **Q.** Okay. Does it involve a conspiracy
16 with respect to the price of containerboard?
17 **A.** Yes, it does.
18 **Q.** Now, can you turn to -- if you look
19 at Harris 2, Exhibit 4.
20 MR. GOLDBERG: Harris 2?
21 MR. HOFFMAN: Yeah.
22 THE DEPONENT: Yes.
23 BY MR. HOFFMAN:
24 **Q.** This is a list of defendants' price
25 increase announcements.

[Page 85]

[22]  (Pages 82 to 85)

1    Do you see that?
2         MR. GOLDBERG:  Yeah, let me get
3    there.
4         MR. HOFFMAN:  It's the very last
5    page.
6         MR. GOLDBERG:  Well, let me get
7    there.  Got it.
8         MR. HOFFMAN:  Got it?
9         MR. GOLDBERG:  Yes.
10   BY MR. HOFFMAN:
11        Q.   Doctor, this lists 15 price
12   increase announcements by the defendants during
13   the class period; correct?
14        A.   Yes.
15        Q.   Which of these were part of the
16   conspiracy, as you understand it?
17        A.   All of them.
18        Q.   Every single one?
19        A.   Yes.
20        Q.   Okay.  Now, does the claim, as you
21   understand it, involve a conspiracy with respect
22   to the supply of corrugated products, such as
23   boxes, packaging, display cases?
24        A.   Well, once you've restricted the
25   supply of containerboard, you have pretty much, by

[Page 86]

1    there is evidence, economic evidence available on
2    a common basis to show that there is a conspiracy,
3    an agreement among the defendants with respect to
4    a supply of corrugated products as opposed to the
5    containerboard?
6         MR. GOLDBERG:  Object to the form
7    of the question.
8         THE DEPONENT:  No.
9    BY MR. HOFFMAN:
10        Q.   So the opinion you're offering as
11   to a conspiracy relates to containerboard supply?
12        A.   Yes.  All the conduct metrics that
13   I've analyzed in the declaration relate to how you
14   define containerboard.
15        Q.   Okay.  And is that also true for
16   price; that your opinion relates to price of
17   containerboard as opposed to corrugated products?
18        A.   No.  That's -- we evaluate the
19   price of the containerboard and corrugated
20   products.
21        Q.   Okay.  But let me be clear what I'm
22   asking.  I'm not asking what effects you look at.
23        What I'm asking is:  Are you
24   offering an opinion that the evidence -- the
25   economic evidence shows on a common basis that

[Page 88]

1    definition, restricted the supply of corrugated
2    products.
3         Q.   Right, but my question is very
4    specific and I want to be very clear about this.
5         Do you understand the claim in this
6    case to include an agreement among the defendants
7    with respect to the supply of those corrugated
8    products, boxes and whatnot, or is it your
9    understanding that the claim involves an agreement
10   of some sort, the sort you were describing
11   earlier, with respect to containerboard, and then
12   that would affect the supply of boxes and other
13   corrugated products?
14        MR. GOLDBERG:  Object to the form.
15        THE DEPONENT:  Well, I think if you
16   read the complaint -- complaints, it uses the term
17   "containerboard" to include everything.  So the
18   complaint alleges conspiracy across all of those
19   products.
20        I think as a practical matter what
21   it means is once you've restricted the supply of
22   containerboard, linerboard and medium, you have,
23   by definition, restricted the supply of boxes.
24   BY MR. HOFFMAN:
25        Q.   Are you offering the opinion that

[Page 87]

1    there is a conspiracy and agreement among the
2    defendants with respect to the price of corrugated
3    products as opposed to with respect to the price
4    of containerboard, which would then affect the
5    price of corrugated products?
6         MR. GOLDBERG:  Object to the form
7    of the question.
8         THE DEPONENT:  Yes.  The empirical
9    models look at the price of the corrugated
10   products and containerboards and show prices above
11   competitive levels.
12   BY MR. HOFFMAN:
13        Q.   Okay.  But my question, again --
14   let me try this again.
15        My question is whether you're
16   offering an opinion that there's actually an
17   agreement among the defendants with respect to the
18   price of corrugated products, or that rather
19   you're offering the opinion that economic evidence
20   shows there's an agreement with respect to the
21   price of containerboard, which in turn would
22   affect the price of corrugated products?
23        MR. GOLDBERG:  Object to the form.
24   BY MR. HOFFMAN:
25        Q.   In other words, I'm asking you:

[Page 89]

**[23]  (Pages 86 to 89)**

1  What is the agreement -- what level is the
2  agreement that you're offering an opinion about?
3  Is it at the containerboard level, or is that at
4  the corrugated products level?
5      MR. GOLDBERG:  I'm sorry.  Object
6  to the form of question.
7      THE DEPONENT:  Again, we have
8  issues with the term "agreement," but it would be
9  at the level of containerboard products.
10  BY MR. HOFFMAN:
11      Q.  Okay.  Now, we're using a different
12  term.  Let's go back to my terms, just so the
13  record's clear.
14      When you say "containerboard
15  products," are you referring to what I described
16  as the rolls of paper?
17      A.  Yeah, I'm sorry, roll stock.
18      Q.  Okay.  Not the corrugated products,
19  like boxes and whatnot?
20      A.  Right.  The effect of the
21  conspiracy was manifested in the price of those
22  products, but the conduct that I evaluate is for
23  rolled stock.
24      Q.  Okay.  And just to be clear, you
25  are offering the opinion today and in your

**[Page 90]**

1  declaration that common economic evidence can
2  establish the existence of a conspiracy as opposed
3  to -- I'll use the term collusion or oligopolistic
4  interdependence, or as the Department of Justice
5  and the Federal Trade Commission say, coordinated
6  interaction with respect to containerboard?
7      MR. GOLDBERG:  Object to the form
8  of the question.
9      THE DEPONENT:  Can you repeat the
10  question?
11  BY MR. HOFFMAN:
12      Q.  Yeah, that was a really ugly
13  question.  Strike it.
14      What conduct of the defendant is
15  only consistent with an actual conspiracy or an
16  agreement as opposed to legal oligopolistic
17  interaction?
18      MR. GOLDBERG:  Object to the form
19  of the question.
20      THE DEPONENT:  Well, what I've done
21  in the declaration is identified conduct that is
22  consistent with -- with collective and coordinated
23  action.  There certainly could be behavior among
24  the defendants that reflects interdependent
25  oligopolistic behavior, but not over the class

**[Page 91]**

1  period.
2  BY MR. HOFFMAN:
3      Q.  So is it your testimony that all
4  the conduct of the defendants in terms of their
5  supply and price decisions with respect to
6  containerboard was only consistent with a
7  conspiracy as opposed to legal oligopolistic
8  interaction?
9      A.  When the conspiracy was effective
10  and there were a number of price announcements
11  that didn't succeed, likely that the collusive
12  activity became unstable, that they could have
13  reverted to some interdependent behavior, but for
14  successful price increases, it represents
15  concerted collective action.
16      Q.  Okay.  So your testimony, as I
17  understand it, is where the price increases
18  succeeded, that was conspiratorial; when they
19  failed, it wasn't.
20      A.  I really don't have a reason for
21  why they failed.  I just proffered up an
22  explanation --
23      Q.  Okay.
24      A.  -- that economists know that
25  cartels are unstable, both for their duration and

**[Page 92]**

1  within periods in which they're colluding.
2      And one of the reasons that you
3  could have price announcements not stick is some
4  instability in the cartel.
5      Q.  Okay.  Let me just go back to my
6  original question here.
7      Are you offering the opinion that
8  any conduct of the defendants during the class
9  period is only consistent with conspiracy as
10  opposed to legal oligopolistic interaction?
11      A.  Yes.  At those times that I've
12  evaluated, it's consistent with collective action,
13  yes.
14      Q.  Okay.  By collective action, again,
15  are you talking about in the illegal agreement or
16  oligopolistic interaction?
17      MR. GOLDBERG:  Object to the form
18  of the question.
19      THE DEPONENT:  The illegal
20  agreement, as you put it.
21  BY MR. HOFFMAN:
22      Q.  And so your testimony is -- let me
23  try to make sure I understand.
24      Your answer previously was at those
25  times I evaluated, it's consistent with

**[Page 93]**

**[24]  (Pages 90 to 93)**

1  collective action.  Let me try to ask the question
2  again to make sure we get this clear.
3         What conduct of the defendants
4  during the class period are you testifying today
5  is only consistent with illegal conspiracy?
6         MR. GOLDBERG:  Object to the form
7  of the question.
8         THE DEPONENT:  Well, I haven't
9  evaluated all of the conduct of the defendants.
10  What I've done is provide examples of that conduct
11  that I've observed in the discovery.
12         I don't know, sitting here, that I
13  can tell you a list of the conduct of each
14  defendant over the entire class period that would
15  fall into one camp or the other.
16  BY MR. HOFFMAN:
17      Q.  Okay.  So if we look at Harris --
18  at Exhibit 4 to Harris 2, the 15 price increase
19  announcements, which ones of those -- which price
20  increase announcements there are only consistent
21  with illegal conspiracy in your testimony?
22         MR. GOLDBERG:  Object to the form
23  of the question.
24         THE DEPONENT:  All of them could
25  be.  All of them could be.  I simply pointed out

[Page 94]

1  testimony only with illegal conspiracy and not
2  with legal oligopolistic coordinated interaction?
3      A.  I believe I've been clear on each
4  instance that I've discussed that my conclusion is
5  that it reflects concerted action and not
6  unilateral self-interest.
7         MR. GOLDBERG:  Is it okay with you
8  if we take a break?
9         MR. HOFFMAN:  Sure.  That's fine.
10         THE VIDEOGRAPHER:  Off the record
11  at 10:15.
12         (Whereupon, a recess was held
13         from 10:15 a.m. to 10:29 a.m.)
14         (Whereupon, Harris Exhibit 9 and
15         10 were marked for identification
16         by the deposition reporter and are
17         attached hereto.)
18         THE VIDEOGRAPHER:  We're back on
19  the record at 10:29 a.m.
20  Counsel may proceed.
21  BY MR. HOFFMAN:
22      Q.  Doctor, did you read the complaint
23  in this case?
24      A.  Yes, I did.
25      Q.  And have you looked at the

[Page 96]

1  that the ones that have failed, in particular, one
2  in 2007 where a number of defendants didn't
3  participate, it could be a sign the cartel became
4  unstable.
5  BY MR. HOFFMAN:
6      Q.  But what opinion are you
7  offering, Doctor?  Are you offering the opinion
8  that all of these were illegal or part of an
9  illegal conspiracy or not?
10      A.  Yes, they were all a part of a
11  collusive activity.  Whether they succeeded or not
12  was dependent on the stability of the cartel.
13      Q.  Okay.  What about the -- let me ask
14  this.
15         So you're not offering an opinion
16  that the conduct of the defendants is more
17  consistent with conspiracy and collusion; you're
18  offering the opinion that it's only consistent
19  with conspiracy; is that correct?
20      A.  Sort of the -- the examples of
21  conduct that I evaluated, yes, it appears
22  consistent with collective action, not unilateral
23  self-interest.
24      Q.  Okay.  So every example that you
25  provide in your declaration is consistent in your

[Page 95]

1  consolidated amended complaint and then the
2  amendments to that?
3      A.  Yes, I have.
4      Q.  Okay.  We put in front of you
5  what's been marked as Exhibits 9 and 10, or
6  Harris 9 and Harris 10, which are the consolidated
7  and amended complaint filed in this case, and then
8  a document entitled Amendments to Plaintiffs'
9  Consolidated and Amended Complaint.
10         Those are documents you previously
11  reviewed?
12      A.  Yes.
13      Q.  Now, I want to direct your
14  attention to Paragraphs 6 -- or Paragraph 6 of
15  Exhibit 9, and you'll see that Paragraph 6 of
16  Exhibit 9 starts with the sentence:
17         "Beginning in 2005, the
18         containerboard products industry
19         was faced with decreasing profit
20         margins, rising product demand,
21         and a promising macroeconomic
22         outlook."
23         The second sentence reads:
24         "Nevertheless, defendants
25         began a coordinated

[Page 97]

1    across-the-board imposition of
2    capacity restraints, leading to a
3    subsequent restriction in the
4    supply of containerboard products
5    on the market."
6        Do you see that?
7    A.  Yes.
8    Q.  Now, if you look at Harris 10,
9    you'll see there's a paragraph entitled
10   Paragraph 6 -- it's actually the second paragraph
11   on the first page -- which, according to this
12   document, is identical, except it says, "Beginning
13   in or about 2004," instead of beginning in 2005.
14       Do you see that?
15   A.  Yes, I do.
16   Q.  And, actually, if you look at
17   Paragraph 1, or you compare Paragraph 1 of the two
18   documents, you'll see that in Paragraph 1 of
19   Harris 9, which is the consolidated complaint, the
20   last sentence defines the class period as
21   commencing August 2005, whereas, if you look at
22   Paragraph 1 of Harris 10, it defines the class
23   period as commencing February 15th, 2004 and then
24   ending November 8th, 2010.
25       Do you see that?

[Page 98]

1    A.  Yes.
2    Q.  Why did the beginning date change
3    from 2005 to 2004?
4        MR. GOLDBERG:  Object to the form
5    of the question.
6        THE DEPONENT:  I received a call
7    one time from Mr. Mogin indicating they were
8    contemplating --
9        MR. GOLDBERG:  Hold on for a
10   second.
11       Again, the conversations between
12   the lawyers and Dr. Harris are addressed in the
13   stipulation governing expert discovery, and so I'm
14   going to instruct Dr. Harris in answering this
15   question to not reveal any conversations that he
16   had between the lawyers and himself.
17   BY MR. HOFFMAN:
18   Q.  Go ahead.
19   A.  Yes.  I was made aware that the
20   class period was to change.  I consulted with
21   Dr. Dwyer, asked him questions about data issues
22   of whether that would have any impact.  I sort of
23   felt all along that these economics suggested an
24   earlier date.  That's pretty much it.
25   Q.  Let's unpack that.

[Page 99]

1        First, did you rely on the call
2    from Mr. Mogin describing the date change in the
3    beginning date of the class period in forming the
4    opinions that you've offered in this case?
5    A.  Well, we had to evaluate the new
6    class period, so it wasn't the phone call; it was
7    the fact that the class period changed.
8    Q.  You relied on the change in the
9    date.
10   A.  Yes, I had to.
11   Q.  Okay.  Now, what questions did you
12   ask Dr. Dwyer about the data issues of whether
13   that change in the class period would have an
14   impact?
15       Let me ask it this way:  What kind
16   of impact were you asking him about, impact on
17   what?
18   A.  It wasn't impact in the sense of
19   common impact; it was sort of a practical issue,
20   and, actually, I think he might have raised it
21   with me, is to -- it changes our benchmark period
22   in the class period, and that's something from an
23   economic perspective that we need to take into
24   account.  I just wanted to be sure that we were on
25   firm ground.

[Page 100]

1    Q.  When you say "firm ground," what do
2    you mean?
3    A.  I mean, number one, that the models
4    had sufficient data to be estimated and we could
5    achieve reliable results.
6    Q.  Okay.  So the questions you were
7    asking Dr. Dwyer were, "Do we have the data to do
8    an analysis using this different before period?"
9    A.  Yes.
10   Q.  Okay.  Did you ask him any other
11   questions about the data?
12   A.  Not that I recall.
13   Q.  Okay.  You said also that you felt
14   all along that the economics suggested an earlier
15   date.
16       When did you reach that conclusion?
17   A.  I don't know when I reached it,
18   but, certainly, as I was looking at the data on
19   demand and prices, operating rates and
20   inventories, it seemed to be consistent to have --
21   it seemed to -- a class period beginning in 2004
22   seemed -- seemed to fit the facts better.
23   Q.  Why?
24   A.  Because that's when you see an
25   upturn in both pricing, an upturn in demand

[Page 101]

[26]  (Pages 98 to 101)

1  indicators, capacity cuts, increases in operating
2  rates, owed inventories.  A change in behavior.
3      **Q.**  And your testimony is that you were
4  observing that those factors appeared to change in
5  2004 as opposed to 2005, or there was some -- some
6  difference -- strike that.  Let me go back to it
7  this way.
8      So your testimony is that you had
9  already concluded that there was more of a change
10 in 2004 as opposed to 2005 supporting the claim of
11 a conspiracy here?
12     MR. GOLDBERG:  Object to the form
13 of the question.
14     THE DEPONENT:  Yes.  I wouldn't say
15 more of a change.  It was simply an observation.
16 It wasn't a finding.  It was simply an observation
17 looking at the data that a class period beginning
18 in 2004 seems to fit the facts pretty good.
19 BY MR. HOFFMAN:
20     **Q.**  And is that because 2004 looked
21 different from 2003 as opposed to looking very
22 different from 2005?
23     MR. GOLDBERG:  Object to the form.
24     THE DEPONENT:  Yeah.  I mean it
25 certainly looked different than 2003.  I mean if

[Page 102]

1  you look at measures of profit margins, profit
2  margins were falling 2002 to 2003.  They increased
3  2004.  You had successful price increases.  Demand
4  was increasing, capacity cuts were taking place,
5  increases in operating rates.  Inventories were
6  being lowered.  So it seemed as though there was a
7  change in the economic fundamentals in 2004.
8  BY MR. HOFFMAN:
9      **Q.**  Okay.  And all those things were a
10 change in the -- in the characteristics you
11 described compared to 2003?
12     **A.**  Yeah.
13     **Q.**  Okay.
14     **A.**  I -- I should say a shift.
15     **Q.**  What do you mean by that?
16     **A.**  I simply mean that things seemed to
17 turn in the directions more consistent with
18 economic fundamentals showing increases in
19 operating rates, declines in inventories,
20 successful price increases, things of that sort.
21     **Q.**  Okay.  And that was in 2004 versus
22 2003?
23     MR. GOLDBERG:  Object to the form.
24     THE DEPONENT:  Yes.
25 ///

[Page 103]

1  BY MR. HOFFMAN:
2      **Q.**  And before the amendment was
3  provided by Plaintiffs, the Harris 10 document,
4  did you have the view that the defendants' conduct
5  in 2004 could only be explained by a conspiracy?
6      **A.**  It looked to be consistent with
7  collective action in 2004 where you had increasing
8  demand and cuts in capacity.  Doesn't look to be
9  consistent with independent unilateral self-interest.
10     We certainly saw increases in
11 operating rates and lower inventories industrywide.
12     So, yes, it reflects coordinated
13 action, collective action.
14     **Q.**  It's only consistent with
15 conspiracy.  And, again, I want to be clear.  I'm
16 talking about conspiracy as opposed to legal
17 oligopolistic interdependence, or coordinated
18 interaction, as the Department of Justice uses the
19 term.
20     MR. GOLDBERG:  Object to the form
21 of the question.
22     THE DEPONENT:  The problem I have
23 with the question is it seems as though you want
24 me to answer a question based on all of the
25 conduct of the defendants for every month, for

[Page 104]

1  every week, for every year, and I didn't set out
2  to do that; I simply set out to get an example of
3  the evidence that's common to the class that shows
4  the collective nature of the defendants' actions.
5  BY MR. HOFFMAN:
6      **Q.**  In what year did you first conclude
7  that 2004 was a better start date than 2005?
8      **A.**  I don't recall.  I never looked at
9  it as a better start date; I simply said I
10 observed.
11     **Q.**  But I take it that you were not the
12 one who suggested the change in dates?
13     **A.**  No.
14     **Q.**  Okay.  Now, would your opinions in
15 this case change if the class period began in
16 August of 2005 as opposed to February of 2004?
17     **A.**  No.
18     **Q.**  After you received the amendments
19 to the plaintiffs' consolidated amended
20 complaint -- strike that.
21     After you were told or you
22 discovered that the date for the class period was
23 going to change, did you do any work to
24 specifically examine the new period to determine
25 if you could offer the opinion -- or the opinions

[Page 105]

1  that you've provided in your declaration for that
2  period?
3          MR. GOLDBERG:  Object to the form
4  of the question.
5          THE DEPONENT:  Can you repeat the
6  question, please?
7  BY MR. HOFFMAN:
8      Q.  Yeah.  Let me try it in maybe a
9  more coherent way.
10         After you discovered that the date
11 of the -- the beginning date of the conspiracy
12 was -- the alleged conspiracy was going to change,
13 did you subsequently do work to determine whether
14 you could offer opinions relating to the new
15 period, in other words, the extended period?
16     A.  Yes.
17         MR. GOLDBERG:  By this question,
18 work specifically directed at the change in dates.
19         MR. HOFFMAN:  Correct.  Correct.
20         THE DEPONENT:  Yeah, we -- I was
21 certainly looking for conduct measures and some of
22 the economic fundamentals that would correspond to
23 2004 rather than 2005, yes.
24 BY MR. HOFFMAN:
25     Q.  Okay.  Did you rely upon any

[Page 106]

1  particular materials from the period prior to
2  August 2005 running back to February of 2004?
3      A.  Just everything in discovery, all
4  the documents, transactional data, everything.
5      Q.  So it would be described -- if you
6  relied on it, it would be described in Exhibit 2
7  to your declaration, the amended version, which is
8  Harris 5 here?
9      A.  Yes.
10     Q.  Okay.  Now, you claim that
11 industry -- as I understand what you're saying,
12 you're saying that industry fundamentals changed
13 dramatically from the period 2000, 2003 to the
14 period of 2004 to 2010.  I think this is also at
15 Pages 21 and 22 of your declaration, Harris 3?
16     A.  Yes.
17         MR. GOLDBERG:  Object to the form
18 of the question.
19 BY MR. HOFFMAN:
20     Q.  What were those industry
21 fundamentals that changed?
22     A.  As I said, if you look at
23 production over that period, it was -- production
24 was -- was increasing.  You saw in fact throughout
25 this period capacity being cut from 2000 to 2004,

[Page 107]

1  but you also saw box shipments falling over this
2  period.
3          You saw somewhat low operating
4  rates from 2000 on from the low '80s to the '90s.
5  Inventories were higher, up to five weeks of
6  supply, and, clearly, you saw prices falling from
7  2000, 2004, as I note in the declaration, from 460
8  to 360.
9          Then from 2004 to 2010, you see a
10 shift.  You see an acceleration of the capacity
11 cuts, and instead of box shipments falling, box
12 shipments are actually increasing.  You see demand
13 measures increasing, and in spite of this, we see
14 capacity being cut.
15         Clearly, operating rates were
16 increasing through this period.  In some cases, I
17 note that it went up to 98 percent.  I think if
18 you look at some of the data, some of the data
19 shows it up to a hundred percent.
20         And inventory levels certainly fell
21 significantly, and if you look at any graphs of
22 inventory over a multiyear period, 2004 to 2010 is
23 by and far much lower than any of the other
24 earlier periods.
25         And, again, clearly, if you look

[Page 108]

1  from a price perspective, prices rose rather
2  dramatically, from $360 to upwards of $610 before
3  the recession, so those economic fundamentals
4  seemed to shift in the class period.
5      Q.  Okay.  I want to go back to one --
6  one of the things you said.
7          You said that while capacity was
8  falling from 2000 to 2004, box shipments were also
9  falling; correct?
10     A.  Yes.
11     Q.  Okay.  And then after 2004,
12 capacity fell but box shipments rose; is that
13 correct?
14     A.  Box shipments and industrial
15 production of nondurable goods was -- was trending
16 up, yes, from roughly -- I don't know -- latter
17 part of 2003 right through to the onset of the
18 recession.
19     Q.  Okay.  But I want to focus
20 specifically on box shipments.
21         So you're saying that from 2004 to
22 2010, box shipments were rising while capacity was
23 falling?  Let me be clear.
24         Containerboard capacity was falling
25 while box shipments were rising; is that correct?

[Page 109]

[28]  (Pages 106 to 109)

1    A.  Yes.
2        Q.  And so the distinction between the
3    period 2004 on -- or prior to 2004 is not that the
4    capacity's falling, but rather what was happening
5    with box shipments, in your view?
6        A.  Yeah.  You would suspect the
7    capacity -- when you look at industrial nondurable
8    production, it's clear that demand is falling, so
9    it's not unheard of to have mills close during
10   that period.
11       But when you look from 2004 on, the
12   demand measures are increasing, but capacity cuts
13   are still taking place, to the point where you
14   have very, very high operating rates.
15       Q.  Okay.  Was the total quantity of
16   boxes being produced or being supplied from 2004
17   on rising?
18       A.  I don't know about the volume.
19       Q.  Okay.  But you said box shipments
20   were rising.
21       Doesn't that mean that the quantity
22   was rising?
23       A.  Yes.  I don't know what the measure
24   is in the graph that -- that I'm thinking of in my
25   mind, but, yes, box shipments, I'm assuming it to

1    be some quantity level were increasing.
2        Q.  Okay.  Did you -- when you were
3    looking at industry fundamentals, did you look at
4    any subsets of the alleged class period to see
5    whether there were changes in fundamentals
6    during -- within the class period?
7        A.  Yeah, I -- I think I note in a
8    number of areas in the declaration that, clearly,
9    with the onset of the recession, 2008 through
10   2010, there was a rather dramatic decline in
11   demand for corrugated products.
12       Q.  What would you expect to happen
13   when the demand for corrugated products fell
14   starting in 2008?
15       A.  Any number of things.  It depends
16   on the configuration of the industry.
17       Q.  That was kind of a bad question.
18   Let me try it differently.
19       What would you expect the
20   defendants to do at capacity when the demand for
21   corrugated products is falling?
22       A.  Well, it depends.  If you're a
23   nonconspiratorial firm, you might use that as an
24   opportunity to run your plants all out to gain
25   additional market share to compete against the

1    other firms in the market.
2        You might keep that capacity
3    online, or you might decide the demand has fallen
4    so significantly that you need to take some
5    downtime, perhaps idle a plant.
6        Q.  You might increase your operating
7    rates during the fall and decline -- or, I'm
8    sorry -- fall in demand?
9        A.  It's possible, yes, if you're
10   trying to gain some additional market share.
11       Q.  And you might increase your
12   capacity during a significant fall in demand, such
13   as in the great recession?
14       A.  Well, again, it depends on the
15   configuration at the time.  I -- you would
16   increase your capacity if you assumed the decline
17   was temporary and the long-term forecast was
18   favorable.
19       Q.  Might you also reduce your
20   capacity?
21       A.  Yes.  As I noted, that would be one
22   decision one might make.
23       Q.  Okay.  If you look at Page 33 of
24   Harris 3, you talk about structural characteristics
25   of the containerboard industry?

1        A.  Uh-huh.
2        Q.  And this -- actually, there's a
3    number of places where you address this throughout
4    your declaration, so I won't try to tabulate them
5    all.  But they include market share, barriers to
6    entry, product homogeneity.  Some of the ones that
7    are mentioned here specifically, such as trade
8    associations, frequent interaction, trades among
9    firms.
10       Did you compare any of those
11   structural characteristics in the period prior to
12   February 15th, 2004 with the existence of this
13   characteristics -- or those characteristics during
14   the class period?
15       A.  Yes, indirectly, and I think one
16   could argue that the market was concentrated
17   before 2004 and there were barriers to entry, and
18   the product was a commodity in elasticities.
19       Q.  Okay.  Were the -- were any of the
20   structural characteristics that you described that
21   we talked about a minute ago different prior to
22   February 15th, 2004 than they were after that
23   date?
24       A.  No.  I mean with the exception,
25   perhaps, activity trade associations, which I

1  didn't look at per se.
2       But, no, those structural
3  characteristics would have been similar.  I mean
4  oligopolistic markets are defined by these sorts
5  of features.
6       If at some point firms decide to
7  get together and collude, doesn't mean that you
8  had a change in the structure that prompts the
9  collusion.  It certainly could, but it's not a
10 necessary condition.
11      Q.  Okay.  So the market -- these
12 structural characteristics in your testimony were
13 basically the same before and after the start of
14 the conspiracy, the alleged conspiracy, or the
15 class period, I should say?
16      A.  There were certainly some
17 differences.  There was less concentration, but I
18 think, by and large, they were very similar, yes.
19      Q.  What concentration in -- what was
20 the increase in concentration during the alleged
21 class period?
22      A.  Well, if you look back to 2003, the
23 concentration levels were a little bit lower than
24 during the class period.  I chose 2007 as a year
25 to compare concentration.  Probably the same for

[Page 114]

1  the box market as well.
2       Q.  Okay.  Now, at Page 22 of your
3  declaration --
4       MR. GOLDBERG:  Still Exhibit 3?
5       MR. HOFFMAN:  Yes.  I'm sorry.
6  We're still on Exhibit 3.
7  BY MR. HOFFMAN:
8       Q.  -- you say in the middle of
9  Paragraph 2 --
10      A.  I'm sorry.  Which page are you on?
11      MR. GOLDBERG:  22.
12      MR. HOFFMAN:  Page 22.
13 BY MR. HOFFMAN:
14      Q.  In the middle of Paragraph 2, you
15 say:
16      "The most dramatic changes
17      over this period was in prices."
18      It's four lines from the bottom of
19 the paragraph.
20      Do you see that?
21      A.  Yes.
22      Q.  I take it you mean that there was
23 an increase in price?  That's what the following
24 sentence says?
25      A.  Yes.

[Page 115]

1       Q.  Does an increase in price allow you
2  to infer the existence of a conspiracy from an
3  economic standpoint?
4       A.  Not in and of itself, no.
5       Q.  What about a decrease?
6       A.  Not in and of itself.  You need to
7  look at a number of economic factors to have an
8  opinion about that, including conduct.  I mean
9  price increases can happen in any market and can
10 be cost driven or demand driven.
11      Q.  Okay.  There's a lot of references
12 in your declaration to something called the PPW
13 index.
14      What is that?
15      A.  It's an index used by the industry.
16 It's published the third week of the month, and
17 publish prices for a number of grades of
18 linerboard and medium.  It's referenced throughout
19 the industry, but for containerboard sells, liner
20 and medium and also boxes.
21      Q.  So it's a monthly index of certain
22 prices for containerboard?
23      A.  Yes.
24      Q.  Okay.  How many months was the
25 class period?  Let me help you out.

[Page 116]

1       As I understand it, the class
2  period's 82 months.
3       Does that sound right?
4       A.  I'll take your word for it.
5       Q.  Okay.  Do you know how many times
6  during that class period the PPW index rose?
7       A.  Yeah.  I believe that's a statistic
8  that was cited by Dr. Dwyer, I believe 11 --
9  something on the order of 11 times.
10      Q.  Okay.  And do you know how many
11 times it fell?
12      A.  I don't recall, but wouldn't be
13 surprised if it was probably around nine, maybe.
14      Q.  It's ten.
15      A.  Okay.
16      Q.  So there were 21 changes in the
17 index.  11 were increases and 10 were decreases.
18      Is that consistent with your
19 understanding?
20      A.  I think that's consistent with what
21 the data says, yes.
22      Q.  Okay.  Have you seen any evidence
23 suggesting that there might have been a conspiracy
24 prior to February 15th, 2004?
25      A.  I don't rule out a conspiracy prior

[Page 117]

**[30]  (Pages 114 to 117)**

1   to 2004, but I don't have any evidence of it.
2       Q.  Okay.  Can you describe today --
3   well, strike that.
4           Did you do any economic analysis of
5   when the conspiracy ended?  Let me put a little
6   more context around that.
7           In the amendments to the complaint,
8   Harris 10, there's an end date of -- now I'm going
9   to strain my memory -- November 8, 2010 put on the
10  class period.  That's in the first paragraph on
11  Page 1 of Harris 10.
12      A.  Yes.
13      Q.  Did you do any economic analysis
14  of -- or that would support that end date?
15          MR. GOLDBERG:  Object to the form.
16          THE DEPONENT:  No.  I conducted no
17  analysis to support that end date.
18          Our -- Dr. Dwyer's empirical model
19  certainly suggests that some prices were elevated
20  over a class period and ending on that date, but I
21  believe that date reflects the amended complaint
22  that was filed on November 8th, 2010 and for which
23  has a -- a class consisting of all customers
24  purchasing directly from the defendants as early
25  as August 2005 until the present, so present would

[Page 118]

1   have been November 8th, 2010.
2   BY MR. HOFFMAN:
3       Q.  Okay.  We were talking a few
4   minutes ago about industry fundamentals.
5           Have you done any comparison of
6   industry fundamentals in the period from
7   November 8, 2010 on to the fundamentals during the
8   class period?
9       A.  Well, I've certainly looked at
10  documents and some of the price increases
11  post-class-period.
12      Q.  Which ones?
13      A.  I don't -- I don't recall.  I
14  looked at thousands of documents.
15      Q.  What price increases have there
16  been after the class period?
17      A.  If I recall correctly, there was a
18  price increase in 2012, I believe.  But for two
19  years after class period, nothing.
20      Q.  Are you testifying that this price
21  increase in 2012 was the result of the conspiracy?
22      A.  I don't have an opinion about it.
23      Q.  No opinion on that price increase
24  at all?
25      A.  Right.

[Page 119]

1       Q.  Okay.  Have you done any other
2   comparison of industry fundamentals in the period
3   post-class-period to the class period?
4           MR. GOLDBERG:  Object to the form.
5           THE DEPONENT:  Other than what I
6   just described, I looked at a number of documents
7   that have data that go beyond the class period.  I
8   don't recall which documents, specifically.
9   BY MR. HOFFMAN:
10      Q.  Was there any difference in
11  industry fundamentals in the post-class-period
12  relative to the class period?
13      A.  I don't recall what the findings
14  were.
15      Q.  Are you offering an opinion as to
16  whether there's any difference in industry
17  fundamentals in the post-class-period compared to
18  the class period?
19      A.  I don't have an opinion.
20      Q.  We also used -- we talked about the
21  structural characteristics of the containerboard
22  industry, and I'll just ask you the same question
23  about that.
24          Did you do any comparison of the
25  industry's structural characteristics

[Page 120]

1   post-class-period with the structural
2   characteristics during the class period?
3       A.  Again, I've looked at data.  There
4   are some comparisons there.  I think the market
5   has become more concentrated rather than -- rather
6   than less.  Clearly, the same trade barriers entry
7   exist.  The same commodity nature of the product
8   exists.
9       Q.  Are you -- are you offering the
10  opinion that there's any material change in the
11  structural characteristics of the industry in the
12  post-class-period relative to the class period?
13      A.  I don't include anything in my
14  declaration on the post-class-period on structural
15  characteristics.
16      Q.  Okay.  But are you offering that
17  opinion today?
18      A.  No, I'm not.
19      Q.  Are you planning to offer that
20  opinion?
21      A.  I don't know.  I haven't thought
22  about it.
23      Q.  Okay.  If you haven't thought about
24  it, you're probably not planning to do so.
25          Am I right about that?

[Page 121]

**[31]  (Pages 118 to 121)**

1    MR. GOLDBERG:  Object to the form
2  of the question.
3        THE DEPONENT:  Well, like I said,
4  I've looked at documents.  I understand -- I've
5  looked at industry fundamentals post-class-period.
6  I just did not include it in my declaration.
7  BY MR. HOFFMAN:
8    Q.  Okay.  So do you have an opinion as
9  to whether industry fundamentals changed
10 post-class-period relative to during the class
11 period?
12   A.  I don't.
13   Q.  Have you seen any evidence
14 suggesting that the -- economic evidence
15 suggesting that the alleged conspiracy extended
16 past November 8th, 2010?
17   A.  No.  Again, it could have extended
18 beyond.  I don't have any evidence of it.
19   Q.  Okay.  Is there any other analysis
20 that you did related to the duration of the
21 conspiracy period that you haven't described?
22   A.  No.
23   Q.  Okay.  Now, I want to go back to
24 something you said earlier.  Can you -- strike
25 that.

[Page 122]

1    A.  I do not.
2    Q.  How about nondefendant corrugated
3  product manufacturer?
4    A.  Same answer.  I do not.
5    Q.  Any understanding, short of an
6  opinion, on either of those?
7        MR. GOLDBERG: Suspicion.
8  BY MR. HOFFMAN:
9    Q.  Anything.
10   A.  You're asking me do I have a
11 suspicion that a nondefendant, either mill or box
12 plant, could potentially be a defendant?
13   Q.  No.  Let me -- let me ask it
14 differently.
15       Are you aware of any economic
16 evidence that would cause you to believe that a
17 nondefendant was part of the conspiracy that
18 you've offered opinions on?
19   A.  I don't rule it out, but I haven't
20 seen any economic evidence that would suggest any
21 particular nondefendant.
22   Q.  Have you conducted any analysis
23 relating to any nondefendant, either a
24 containerboard manufacturer or a corrugated
25 product manufacturer, to assess whether they were

[Page 124]

1  part of the alleged conspiracy?
2    A.  Well, that would be difficult,
3  given the discovery only covers the defendants.  I
4  don't have discovery on nondefendants or
5  transactional data, for that matter.
6    Q.  Are you aware of the full scope of
7  discovery in this case?
8    A.  I understand it includes
9  transactional data and documents.
10   Q.  Did you ask for discovery of
11 nondefendants to facilitate your analysis?
12   A.  I did not.
13   Q.  Anybody offer you any such
14 discovery?
15   A.  No.
16   Q.  Were the nondefendants affected
17 differently by the industry's structural
18 characteristics?
19   A.  No.
20   Q.  Everybody was affected the same
21 way?
22       MR. GOLDBERG:  Object to the form.
23       THE DEPONENT:  Well, I don't know
24 what you mean by "affected."  It's a concentrated
25 market.  There are barriers to entry for

[Page 125]

1        I think you testified earlier
2  that -- well, actually, you know what?  Let's go
3  off the record for a minute.
4        THE VIDEOGRAPHER:  Off the record
5  at 10:56.  This marks the end of Video Media
6  Number 1 in the deposition of Dr. Michael Harris.
7        (Whereupon, a recess was held
8        from 10:56 a.m. to 11:03 a.m.)
9        THE VIDEOGRAPHER:  Going back on
10 the record at 11:03 a.m.
11       Counsel may proceed.
12 BY MR. HOFFMAN:
13   Q.  Doctor, does your economic analysis
14 allow you to determine which firms were part of
15 the conspiracy?
16   A.  What I've done is gone through the
17 discovery documents and have provided examples of
18 conduct of some of the defendants, not all of the
19 defendants, showing behavior that reflects what I
20 call collective or coordinated activity that would
21 only result if all defendants were engaged in an
22 activity.
23   Q.  Do you have an opinion as to
24 whether any nondefendant containerboard
25 manufacturer was part of the alleged conspiracy?

[Page 123]

1  homogenous products. That applies to
2  nondefendants as well. They operated in a
3  concentrated market.
4  BY MR. HOFFMAN:
5      Q. Okay. Is that true in container
6  work product -- or I'm sorry, corrugated products?
7  I have to get my terminology right, too.
8      A. Yes, it's true. I cite
9  concentration in the corrugated products. It's
10 concentrated as well, by virtue of the fact that
11 these defendants are highly integrated, both from
12 the mill through the box plants.
13     Q. What's the HHI in the corrugated
14 products market?
15     A. I don't know what that would be.
16     Q. Have any idea?
17     A. No. I know market shares -- it
18 would be rather high. I believe in my declaration
19 I cite a market share. I'm sure assuming joint
20 contact would put it over 5,000.
21     Q. Well, okay. Over 5,000 assumes
22 that all of the allegedly conspiring defendants
23 were acting like one firm; correct?
24     A. Correct.
25     Q. What would be the -- strike that.

[Page 126]

1  I'll take the answer, but I don't have a further
2  question on that.
3      Are nondefendant price
4  announcements relevant to your analysis at all?
5      A. No, I don't -- I don't think
6  they -- they would be. I think the focus should
7  be on the defendants' price announcements and
8  timing magnitudes, things of that sort.
9      I would expect the nondefendants in
10 many cases simply to follow the defendants' lead
11 in announcing price increases.
12     Q. As opposed to -- well, let me ask
13 you this: So you would expect it would be in the
14 individual interest, then, of the nondefendants
15 when the defendants have announced price increases
16 to simply follow those, as opposed to selling more
17 product and undercutting the price increase?
18     A. Yeah, their economic -- it depends
19 on how they're situated in the market and whether
20 they have surplus capacity. They may not want to
21 follow the price increase, but if the market has
22 high operating rates, low inventories, they are
23 likely to want to enjoy a higher price and
24 probably match that.
25     In some cases, if they didn't,

[Page 127]

1  would probably end up with operating rates
2  individually of a hundred percent.
3      Q. Okay. So did you conduct any
4  analysis of the operating rates of the
5  nondefendants?
6      A. I didn't have that data available.
7      Q. Did you conduct any analysis of the
8  inventories of the nondefendants?
9      A. I didn't have that data available.
10     Q. You said a minute ago that if the
11 market has high operating rates or low inventory,
12 than the nondefendants would be likely to want to
13 enjoy higher prices and probably match that.
14     MR. GOLDBERG: Object to form.
15 BY MR. HOFFMAN:
16     Q. What about if an individual
17 nondefendant did not have high operating rates or
18 had high inventory.
19     What would their incentive be in
20 that case?
21     MR. GOLDBERG: Object to the form.
22     THE DEPONENT: Again, it depends on
23 how much excess capacity they have. Their
24 objective might be to -- to not match the price
25 increase and sell more product to increase the

[Page 128]

1  utilization of their mill. But up to a point,
2  once they've reached that maximum utilization,
3  they probably don't want to increase prices.
4  BY MR. HOFFMAN:
5      Q. Okay. So for any of the
6  nondefendants to determine whether it would be in
7  their interest to follow the price increase or
8  not, we'd have to look at their particular
9  circumstances, the inventory, operating rates,
10 their particular incentives?
11     A. Those are some of the things you'd
12 want to look at.
13     I mean, by and large, they would
14 have a strong economic incentive to follow the
15 price increase. Just regardless, they would want
16 to follow the price increase.
17     Q. Okay. So their unilateral
18 independent economic interest would be generally
19 to follow the price increase?
20     A. At small firms, yes.
21     Q. Okay. How small are these firms?
22     A. Well, I've looked at -- many times
23 in the presentations of the defendants, things are
24 all lumped together. I don't have the market
25 share information. I have seen some documents.

[Page 129]

1   There are quite a few of them and some of them are
2   rather small.
3       **Q.** What was their ability -- did
4   you -- let me ask this: Did you do any analysis
5   of the nondefendants' ability to increase their
6   operating rates?
7       **A.** Again, I didn't have data for the
8   nondefendants.
9       **Q.** Did you do any analysis of the
10  nondefendants' ability to increase their capacity?
11      **A.** Again, I did not have any data
12  available or discovery documents for the
13  nondefendants.
14      **Q.** Did you do any analysis of
15  situations where a nondefendant led a price
16  increase?
17      **A.** I have not.
18      **Q.** Are you aware of any situation
19  where a nondefendant led a price increase during
20  the class period?
21      **A.** I am not aware of that.
22      **Q.** Are you aware of any circumstances
23  where nondefendants announced that they were
24  following price increases prior to defendants?
25      **A.** Again, I have no data or discovery,

[Page 130]

1   so, no, I have no opinion of that.
2       **Q.** Doesn't matter in any way to your
3   opinions about the common evidence of conspiracy --
4   strike that.
5           The conduct of the nondefendants is
6   irrelevant to your opinions about the common
7   evidence of conspiracy?
8       **A.** They're a small portion of the
9   market and they're very small firms. The
10  conspiracy was made of very large firms in a very
11  concentrated market. The actions that they took,
12  the concerted actions, common understanding,
13  common purpose reflects conduct against their
14  self-interest. You wouldn't say that for a very
15  small firm on the fringe.
16      **Q.** Are you aware of the term "critical
17  loss"?
18      **A.** I've probably heard it before. Not
19  sure.
20      **Q.** You're not sure what it is?
21      **A.** No.
22      **Q.** I take it you didn't do any kind of
23  critical loss analysis of any of the price
24  increases here to determine what the results would
25  be if a nondefendant didn't go along with it?

[Page 131]

1       **A.** Again, I didn't have the data, so I
2   couldn't do a loss analysis.
3       **Q.** And you don't know what it is,
4   either?
5       **A.** Well, I think I've heard the term.
6   I don't know how you're referring to it.
7       **Q.** Okay. If a nondefendant reduced
8   its capacity during the class period, would that
9   have been in its independent economic interest?
10      **A.** Yes, it could have been.
11      **Q.** How would you tell?
12      **A.** Well, these are small firms.
13  They're not going to have a measurable impact on
14  industrywide capacity. If they're making that
15  decision, it's probably due to obsolescence or a
16  decrease in demand. It would have been in their
17  interest.
18      **Q.** So your testimony is that if a
19  firm's individual decision to reduce capacity is
20  not going to affect the overall market price, then
21  by doing so, that's suggests that its decision was
22  motivated by its independent economic interest?
23          MR. GOLDBERG: Object to the form.
24          THE DEPONENT: Yeah. It just means
25  that a small firm doesn't have to be part of

[Page 132]

1   conspiracy. The larger firms don't need that
2   smaller firm to be part of their conspiracy. It's
3   easier to coordinate with fewer firms rather than
4   more firms.
5           So I would expect when I see a
6   small mill closing the mill that it's likely a
7   business strategy and it's in its self-interest.
8   BY MR. HOFFMAN:
9       **Q.** Because, by itself, the small firm
10  completing a small mill is not going to change
11  market pricing?
12          MR. GOLDBERG: Object to the form.
13          THE DEPONENT: That's correct.
14  BY MR. HOFFMAN:
15      **Q.** Whereas, if that firm by closing
16  that mill had the ability to affect market price,
17  then it would be what?
18      **A.** Along with other defendants, yes.
19      **Q.** Okay. Well, wait. I'm not sure I
20  understand.
21          So if everyone reduces capacity,
22  that's obviously going to affect market price;
23  correct?
24      **A.** Correct.
25      **Q.** If one entity reduces capacity,

[Page 133]

**[34]  (Pages 130 to 133)**

**HIGHLY CONFIDENTIAL**
**PURSUANT TO PROTECTIVE ORDER**

1  let's say one of these nondefendants, is it your
2  testimony that that's going to necessarily not
3  affect the market price?
4      A.  No.  I think on the margin it could
5  perhaps affect the market price, but it's going to
6  be negligible.  By definition, they're a small
7  part of the market, and what you want are the
8  larger firms cutting capacities where it makes a
9  meaningful reduction in supply.
10      All I'm saying is the
11  nondefendants, when they reduce that capacity, it
12  would be a meaningful reduction in supply, enough
13  to affect market price in and of itself.
14      Q.  Have you done any analysis of how
15  much reduction in supply would be necessary to
16  raise market price?
17      A.  No.  What -- what I've done is look
18  at the reduction in supply, the impact on
19  operating rates and subsequent increases in prices.
20      Q.  Okay.  So, in essence, your
21  testimony is that the nondefendants' conduct,
22  whether they were raising price, reducing
23  capacity, reducing inventory or increasing
24  operating rates, are all consistent with their
25  independent self-interest?

[Page 134]

1      A.  No, not if they've done it
2  throughout the class period, no.
3      Q.  So that behavior by the
4  nondefendants is not consistent with their
5  independent self-interest?
6      A.  Okay.  I think I'm a bit confused
7  on the question.
8      Q.  Did you get the last one wrong?
9      MR. GOLDBERG:  Lot of -- object to
10  the form.  Lot of nots in there.
11  BY MR. HOFFMAN:
12      Q.  Let's try again.
13      Is it your testimony that
14  reductions in capacity, increases in price,
15  reductions in inventory or increases in operating
16  rates by nondefendants during the class period
17  were all consistent with those firms' independent
18  economic interest?
19      MR. GOLDBERG:  Object to the form
20  of the question.
21      THE DEPONENT:  I mean I don't
22  know -- if I had access to discovery or data, it
23  might turn out that it was against their
24  self-interest and they're part of the conspiracy.
25  I don't know that.

[Page 135]

1      I'm simply saying that many of
2  these firms are very, very small.  If they're not
3  part of the conspiracy, it doesn't make any
4  economic sense for them to close a plant in the
5  hopes of increasing market price.  It would not be
6  in their -- it would not be in their interest.
7  BY MR. HOFFMAN:
8      Q.  I'm still trying to understand the
9  relevance of the size of the nondefendants'
10  analysis that you're citing here.  I just want to
11  make sure I have it right.
12      What is it about the nondefendants'
13  size that would allow you or incline you to view
14  their decisions as more likely to be in their
15  independent economic interest as opposed to
16  conspiratorial?
17      A.  Again, I don't know, without
18  looking at documents about their conduct, whether
19  it's their independent unilateral self-interest or
20  part of -- part of a conspiracy.
21      All I'm saying is that from a
22  structural perspective, from an economic
23  perspective, you expect the larger firms in the
24  market to engage in collective action, because by
25  doing so, it's going to have a positive impact on

[Page 136]

1  market price.
2      If we're looking at an individual
3  firm and assuming they're not part of the
4  conspiracy, then we wouldn't expect them to reduce
5  capacity in some hopes of impacting market price.
6  They're likely doing that for a business reason or
7  business strategy.  Many of these firms are very,
8  very small.
9      Q.  Is there some particular size at
10  which a firm becomes more likely to become part of
11  a conspiracy than not?
12      A.  No, there's no central threshold,
13  but all defendants are fairly large in size.
14      And in fact you look at the size --
15  composition of the defendants relative to all the
16  other firms -- and there are a number of documents
17  that show this -- it's rather markedly -- the
18  defendants are much, much larger than all of the
19  remaining nondefendants' companies.
20      Q.  Is every defendant larger than
21  every nondefendant?
22      A.  I don't recall what the
23  presentation shows, so I can't say for sure.
24      Q.  You don't know?
25      A.  I don't know.

[Page 137]

**[35]  (Pages 134 to 137)**

**Page 138**

1      Q.   Okay.
2      A.   I think the answer is yes, but I --
3  I don't recall.
4      Q.   Do you know or not?
5      A.   Sitting here, no, I do not.
6      Q.   You said that a nondefendant might
7  have closed a mill because of a business reason or
8  strategy.
9          Could that also be true for a
10 defendant?
11     A.   Yes, there could be a reason for a
12 mill closure.  I'm sure your economic expert will
13 point those out.
14     Q.   Okay.  You're an optimist.
15         MR. GOLDBERG:  You don't want me to
16 answer that question.
17 BY MR. HOFFMAN:
18     Q.   Let me ask you a -- I'm still
19 struggling a little bit with this question about
20 decisions to close capacity or raise price.
21         Is the date on which the decision
22 is made relevant to when you think the
23 conspiratorial act occurs, or is it when the act
24 actually happens?
25         So if I -- just let me explain.

**Page 139**

1          If I decide to close a mill on
2  Date X, whether I'm a defendant or a nondefendant,
3  whatever I am, is that the conspiratorial act, or
4  is it the actual closure, or is it both?
5          MR. GOLDBERG:  Object to the form
6  of the question.
7          THE DEPONENT:  Yeah, I don't know.
8  It seems to be a legal issue.
9          All I can say is I have to look at
10 when the conspiracy is manifested in market prices
11 or some other industry fundamental.
12         I don't know when, as you put it,
13 the agreement was made to close something and when
14 you actually had an effect.
15 BY MR. HOFFMAN:
16     Q.   If you'd turn back to Harris 3 and
17 look at Pages 5 to 6.  If I count correctly, there
18 are five opinions stated there.
19         It's a little bit hard because of
20 the bullets and subpoints and whatnot, but what I
21 want to ask is -- and I'm looking at Summary and
22 Conclusions, Paragraph 1, then you've got three
23 bullets, Paragraph 2, Paragraph 3?
24         What I want to ask is:  Are those
25 the opinions you're offering in this case.

**Page 140**

1          MR. GOLDBERG:  Which those?
2          MR. HOFFMAN:  Pages 5 to 6, C(1),
3  the three bullets, and then Paragraphs 2 and 3 on
4  Page 6.
5          THE DEPONENT:  Yes.  The Number 1,
6  the three bullets and 2 and 3.
7  BY MR. HOFFMAN:
8      Q.   Now, on Page 4 of Paragraph 4, or
9  of Paragraph 3 --
10     A.   Page 4 of Paragraph 4?
11     Q.   Right.  It's a lot easier if you
12 number your paragraphs consecutively, just as an
13 editorial comment.
14     A.   I'll keep that in mind.
15         MR. GOLDBERG:  Shockingly, you're
16 not the first person to say that.
17         MR. HOFFMAN:  I had a feeling that
18 might be so.
19 BY MR. HOFFMAN:
20     Q.   You say that you -- this is near
21 the bottom of the paragraph.
22         You say that you employed a
23 structure, conduct, performance paradigm.
24         That's what you're doing here in
25 your analysis?

**Page 141**

1      A.   Yes.
2      Q.   You didn't do any econometric work
3  in this matter, did you?
4      A.   I did not.
5      Q.   Okay.  You just reviewed with
6  Dr. Dwyer's econometric work?
7      A.   Yes.
8      Q.   Did you help him do that work?
9      A.   No.  I certainly had conversations,
10 but I didn't help him with the work.
11     Q.   Okay.  Did you give him any
12 information or premises to rely on?
13         MR. GOLDBERG:  Object to the form.
14         THE DEPONENT:  No, nothing to rely
15 on.
16         I know at some point he might have
17 asked me what do the documents say about how
18 defendants might -- what variables they select.
19         He did his own investigation, and
20 he might have asked me, "Do you have any other
21 documents that would shed some light on this," and
22 I might have pointed him to some documents.
23 BY MR. HOFFMAN:
24     Q.   Did you review his assumptions or
25 variables?

**[36]  (Pages 138 to 141)**

| | |
|---|---|
| 1    A.  Yes. | 1    A.  They can be pegged to PPW, and |
| 2    Q.  Did you change any of his variables? | 2    there's another one, OBM.  There might be a third, |
| 3    A.  No. | 3    but PPW is clearly probably the most relied on. |
| 4    Q.  Did you add to any of his variables? | 4    Q.  Okay.  What's the second one? |
| 5    A.  No. | 5    A.  It's OBM, I believe.  It's called |
| 6    Q.  Okay.  There are a lot. | 6    OBM.  I don't recall what the acronym stands for. |
| 7    A.  Yeah. | 7    MR. HOFFMAN:  Okay.  LiveNote's not |
| 8    Q.  Did you subtract from his | 8    working now. |
| 9    variables? | 9    (Whereupon, a discussion was held |
| 10    A.  I -- I made no change whatsoever to | 10    off the stenographic record.) |
| 11    his model.  That would not be allowed by | 11    MR. HOFFMAN:  There we go. |
| 12    Dr. Dwyer. | 12    BY MR. HOFFMAN: |
| 13    MR. HOFFMAN:  Why don't we go off | 13    Q.  What is PPW? |
| 14    the record briefly so we can change the tape. | 14    A.  As an index -- it's both a |
| 15    THE VIDEOGRAPHER:  This marks the | 15    publication and a price index.  It's a publication |
| 16    end of Media Number 1 in the deposition of | 16    that reports on the containerboard industry, you |
| 17    Dr. Mark Harris.  We're off the record at | 17    know, capacity, production, what's happening, |
| 18    11:21 a.m. | 18    acquisitions.  It's -- it's a newsletter for those |
| 19    (Whereupon, a recess was held | 19    in the industry. |
| 20    from 11:21 a.m. to 11:34 a.m.) | 20    They also publish a number of |
| 21    THE VIDEOGRAPHER:  Going back on | 21    statistics, including the price indices that we |
| 22    the record at 11:34 a.m.  This marks the beginning | 22    discussed before for liner and medium and other |
| 23    of Video Media Number 2 in the deposition | 23    liner and medium products. |
| 24    of Dr. Michael Harris being taken at 350 South Grand | 24    Q.  Okay.  Liner, medium meaning the |
| 25    Avenue, Los Angeles, California. | 25    liner and medium products being containerboard? |
| **[Page 142]** | **[Page 144]** |
| 1    My name is Tony Bloodworth.  I'm a | 1    A.  Yes. |
| 2    legal video specialist here on behalf of | 2    Q.  Okay.  In terms of the price index, |
| 3    U.S. Legal. | 3    part of PPW, I take it that's what you're |
| 4    Counsel may proceed. | 4    referring to when you say the transactions were |
| 5    BY MR. HOFFMAN: | 5    pegged to an index and not to the other parts of |
| 6    Q.  Dr. Harris, if you look at Page 6, | 6    the publication? |
| 7    Paragraph 3 of Harris 3, your revised declaration, | 7    A.  That's -- that's true. |
| 8    you state that you've reviewed the empirical | 8    Q.  Okay.  How does the price index in |
| 9    analysis undertaken by Dr. Dwyer, that his methods | 9    PPW work? |
| 10    and models are sound, well-accepted and widely | 10    A.  Well, it works -- it's a survey of |
| 11    used by economists, and so forth. | 11    industry participants on the prices that they sold |
| 12    Is that still your testimony today? | 12    or bought containerboard -- excuse me -- |
| 13    A.  Yes, it is. | 13    linerboard or medium at.  PPW's staff takes that |
| 14    Q.  Okay.  Now, I want to turn to | 14    information and publishes a price, transaction |
| 15    Page 33 of Harris 6 -- or Harris 3.  Getting | 15    price, and at some point in the past, also |
| 16    myself mixed up with the numbering here. | 16    published what was called the list price. |
| 17    On Page 33 at the very bottom, the | 17    Q.  Okay.  What transactions are the |
| 18    last line, you say, "The fact the transactions are | 18    PPW prices based on? |
| 19    pegged to indices," and then you go on and mention | 19    A.  Based on prices to independent -- |
| 20    a couple of other things that you say buttress a | 20    independent parties, nonintegrated companies. |
| 21    finding of common impact, are you talking about | 21    Could be a self-integrated, but it has to be to an |
| 22    the PPW index there? | 22    independent. |
| 23    A.  Or any index. | 23    Q.  And what kind of transactions? |
| 24    Q.  What indexes are transactions | 24    A.  It's going to be roll stocks -- I'm |
| 25    pegged to? | 25    sorry, what you refer to as roll stock earlier, |
| **[Page 143]** | **[Page 145]** |

**[37]  (Pages 142 to 145)**

1  liner and medium.
2    Q.  Okay.  Are any adjustments made to
3  the prices by the PPW staff?
4    A.  I suppose there could be, yes.
5    Q.  Do you know?
6    A.  I know generally how the process
7  works.  It's based on transactional data.  I
8  assume they might exercise some editorial judgment
9  in determining the price.
10   Q.  Okay.  When you say the contracts
11 are pegged to PPW, what do you mean by "pegged"?
12   A.  I mean the price provisions of the
13 contracts, whether it's for linerboard or
14 containerboard, as I discussed in my declaration,
15 many of the contracts that I've observed and also
16 presentations that I've seen from the defendants
17 indicate that these sells are made at PPW, or are
18 adjusted per PPW, changes in the PPW index.
19   Q.  Are all those adjustments the same
20 in every contract?
21   A.  Not necessarily.
22   Q.  Are they different?
23   A.  Well, I just said they're not the
24 same, so I guess the answer would be they could be
25 different, yes.

[Page 146]

1    Q.  That would seem to follow.
2        Have you done any analysis as to
3  whether there's any systematic difference between
4  the contract pegging provisions, in other words,
5  they reliably are an adjustment up, an adjustment
6  down, an adjustment within a certain band,
7  anything like that?
8        MR. GOLDBERG:  Objection to form.
9        THE DEPONENT:  I haven't, but
10 Dr. Dwyer has done something very similar to that
11 in looking at the comparison between actual
12 transaction prices and PPW, and finds a very --
13 very, very high correlation.
14 BY MR. HOFFMAN:
15   Q.  Okay.  Now, tell me about OBM.
16       What's that?
17   A.  I believe it stands for Official
18 Boards Market, and they also publish a price.  I'm
19 not familiar with how this index is created.
20   Q.  How many contracts are pegged to
21 the OBM index?
22   A.  I wouldn't know that answer and I
23 wouldn't know it for PPW, either.  There are a lot
24 of contracts.
25       I looked at a representative sample

[Page 147]

1  and, again, looked at the presentation of the
2  defendants where they themselves indicate that a
3  large portion of their transactions are pegged,
4  using their word, to the indices.
5    Q.  But you don't know the percentage,
6  either?
7    A.  Of contracts?
8    Q.  Yeah.
9    A.  Well, as I note in one Smurfit
10 document, they indicated that 92, luckily, percent
11 of their transactions are pegged to an index, so
12 that would suggest to me that it's a rather high
13 number.
14   Q.  Per Smurfit?
15   A.  Per Smurfit.  But there's also
16 indications from the other defendants that they
17 heavily rely on the index.
18   Q.  Okay.  Now, in this particular
19 paragraph of your declaration, continuing over to
20 Page 34, this is Harris 3, you also mentioned most
21 favored nations clauses, MFNs.
22       Do you see that?
23   A.  Yes.
24   Q.  What percentage of customers -- the
25 defendants' customers have MFNs in their contracts?

[Page 148]

1    A.  Again, I couldn't give you a
2  percentage.  I haven't looked at each and every
3  contract of the defendants to calculate that
4  percentage.
5    Q.  Have you looked at whether
6  corrugated product customers have MFNs in their
7  contracts?
8    A.  I don't recall the sample of
9  contracts that I looked at, if that included just
10 liner and medium or corrugated or both.
11   Q.  Okay.  We'll come back to that.
12       Do you have any sense of who asked
13 for the MFNs, whether it was the customers or the
14 sellers?
15   A.  I have no idea.  That would be
16 based on the signing of the contract, which I
17 wouldn't have been present at.
18   Q.  Do you have any understanding of
19 whether or how the MFNs here were supposed to be
20 monitored and enforced?
21   A.  No, and I don't think I could.
22   Q.  Do you have any analysis of the
23 rates or frequency of which they were enforced?
24   A.  No.  Again, that data would not be
25 available.

[Page 149]

**[38]  (Pages 146 to 149)**

1  Q.  How would you determine which
2  customer contract had MFNs and how and whether
3  they were enforced?
4      MR. GOLDBERG:  Object to the form
5  of the question.
6      THE DEPONENT:  Well, hypothetically,
7  if you could review all of the contracts to
8  determine how many had MFNs and then seek data
9  from the defendants and all the customers as to
10 how they were applied --
11 BY MR. HOFFMAN:
12     Q.  Have you done that?
13     A.  No, I haven't viewed all the
14 contracts.
15     Q.  Okay.  Have you ever worked for a
16 containerboard company?
17     A.  No, I haven't.
18     Q.  Corrugated products company?
19     A.  No.
20     Q.  Paper company of any sort?
21     A.  I've been an economist all my life.
22     Q.  Have you ever done any consulting,
23 economic consulting for any of those kinds of
24 company?
25     A.  I have not.

[Page 150]

1      MR. HOFFMAN:  Let's go ahead and
2  mark Harris 11.
3      (Whereupon, Harris Exhibit 11 was
4      marked for identification by the
5      deposition reporter and is attached
6      hereto.)
7  BY MR. HOFFMAN:
8      Q.  While you're looking at this,
9  Doctor, Harris 11 is the Plaintiffs' Memorandum of
10 Law in Support of Motion for Class Certification.
11     A.  Uh-huh.
12     Q.  I'm not going to ask you a lot of
13 questions about this, at least not right now, but
14 very briefly, have you ever seen this before?
15     A.  Yes, I have.
16     Q.  Okay.  I want you to turn to
17 Page 17, please.  If you go to the bottom of the
18 page, the very last three words, you'll see that
19 it reads "During the period," and then it carries
20 over to the next page and says:
21     "In and before 2003 to '04,
22     Defendants' conduct verged on the
23     competitive."
24     And then it goes on from there.
25     Do you see that?

[Page 151]

1      A.  Yes.
2      Q.  Do you agree with class plaintiffs'
3  statement in the brief that during the period in
4  and before 2003 and 2004, Defendants' conduct
5  verged on the competitive?
6      A.  Well, if you look at pricing over
7  that period, prices were certainly falling, so if
8  they were part of a conspiracy, I would say it was
9  a rather poor one.
10     Q.  Okay.  So do you agree with the
11 statement?
12     A.  Yes, and I think if you look also
13 at industry analyst reports, and I cite a number
14 of them, industry analysts themselves talk about
15 the destructive behavior -- excuse me --
16 destructive behavior of containerboard producers.
17     Q.  Okay.  You talk at a number of
18 points -- you can set that aside.
19     You talk at a number of points in
20 your declaration about commodity products.  Let me
21 ask you a couple questions about that.
22     Even where products are physically
23 similar, firms can be differentiated based on a
24 number of factors; correct?
25     A.  You mean the firms or the product?

[Page 152]

1      Q.  The product.  For the sales of the
2  product by the firm to customers.
3      A.  Yeah, I --
4      MR. GOLDBERG:  Object to the form
5  of the question.
6  BY MR. HOFFMAN:
7      Q.  Go ahead.
8      A.  Yeah, I don't know exactly what you
9  mean, but I'll give you the answer.  The --
10     MR. HOFFMAN:  I don't know what I
11 mean, either, so I'll take your answer.
12     THE DEPONENT:  Mr. Goldberg is
13 going to get very angry at me.  If I don't
14 understand the question, I shouldn't give an
15 answer.  But I think I know what you're after in
16 terms of the product.
17     A product can have numerous
18 dimensions to it.  Is that what you're referring
19 to?
20 BY MR. HOFFMAN:
21     Q.  Yes.
22     A.  Okay, yes.  No, I don't know of a
23 commodity with only one dimension.  Perhaps the
24 hypothetical widget, but commodities differ by
25 specifications, by their size, by the speed at

[Page 153]

[39]  (Pages 150 to 153)

1  which they operate and, for example, I'm talking
2  about computer chips, but, nonetheless, they're
3  still commodities.
4      Q.  Okay.  But let's go a little
5  further with that.
6          So a firm might sell a physically
7  undifferentiated product, but nevertheless be
8  differentiated from the perspective of customers
9  by things like location, proximity, service
10 levels, brand, reputation, other things like that;
11 correct?
12     A.  Well, then I did misunderstand your
13 question, because you're referring to firms.
14 Firms can differ by location.
15 That's clearly the case.  It doesn't mean that the
16 product that they're providing is not a commodity.
17 They certainly could differ due to, I suppose,
18 service, and I forget some of the other dimensions
19 that you highlighted.
20         In reading the depositions of the
21 class plaintiffs, though, all of them simply look
22 at it as a function of price and admit that if
23 customer service was an issue, they simply
24 wouldn't transact with that party, but find
25 customer service to be satisfactory, quality

[Page 154]

1  control to be satisfactory.
2          So, yes, firms can differ by those
3  attributes, but it doesn't make it anything other
4  than a commodity.
5      Q.  Are any of the class plaintiffs a
6  multinational fresh produce company?
7          MR. GOLDBERG:  That question begs
8  for an answer.
9          THE DEPONENT:  I don't recall the
10 businesses of all the class plaintiffs.
11 BY MR. HOFFMAN:
12     Q.  Are any of the class plaintiffs a
13 major consumer products company?
14     A.  Not that I'm aware of.
15     Q.  Are any of the class plaintiffs a
16 major appliance manufacturer?
17     A.  Not that I'm aware.
18     Q.  Are any of the class plaintiffs a
19 major electronics manufacturer?
20     A.  Not that I'm aware.
21     Q.  Are any of the class plaintiffs a
22 supermarket chain?
23     A.  Not that I'm aware.
24     Q.  Is it your testimony that -- strike
25 that.

[Page 155]

1      Are you familiar with the term
2  "differentiated Bertrand"?
3      A.  Both terms, yes.
4      Q.  Are you familiar with the use of
5  them together?
6      A.  Yes, vaguely.
7      Q.  Vaguely.
8          Have you ever encountered a
9  situation where a competition in a commodity
10 industry was modeled using differentiated Bertrand
11 models?
12     A.  I'm not aware of it, no.
13     Q.  Do you have any -- well, never
14 mind.  Stricken.  I'll move on.
15         MR. GOLDBERG:  There will be a quiz
16 at the end of the deposition.
17 BY MR. HOFFMAN:
18     Q.  If the defendants -- if, from the
19 customer perspective, the defendants and
20 nondefendant producers were differentiated, would
21 that affect any of your analysis or opinions?
22     A.  If there was something significant
23 about a particular defendant that couldn't be
24 mimicked by another defendant, it could.
25     Q.  Where there's a group or a type of

[Page 156]

1  customers for whom the defendants and
2  nondefendants were significantly differentiated,
3  in other words, would that kind of customer,
4  buying what they buy from the defendants, they'd
5  perceive the defendants as being differentiated,
6  would that affect your analysis?
7      A.  Well, I don't know what you mean.
8  How would they -- how would they assess them or
9  consider them to be differentiated, and from what?
10     Q.  Regardless of how or what, if it
11 were the case that, from the perspective of a
12 group of customers the defendants and the
13 nondefendant producers were differentiated, would
14 that affect any of your analysis?
15         MR. GOLDBERG:  Object to the form.
16         THE DEPONENT:  I would need to know
17 what form of a differentiation it is and how
18 strongly the customers feel about that level of
19 differentiation and whether it would override
20 their imperative to buy the product at the
21 cheapest price.
22 BY MR. HOFFMAN:
23     Q.  What are the inputs used to make
24 boxes?
25     A.  Linerboard and medium.

[Page 157]

**[40]  (Pages 154 to 157)**

1    Q.  Is that it?
2    A.  You can also put wax coating on a
3  box.  You can print a box.  They differ based on
4  performance characteristics.  There's different
5  styles of boxes.
6    Q.  There's subsets of boxes that have
7  different characteristics or different inputs?
8    A.  I'd say different dimensions,
9  different attributes.
10    Q.  Are the costs associated with
11  producing these different kinds of boxes generally
12  the same?
13    MR. GOLDBERG:  Object to the form.
14    THE DEPONENT:  In the box plants?
15  BY MR. HOFFMAN:
16    Q.  Yeah.
17    A.  The cost to produce a different
18  box?  Yes, a larger box costs more to produce than
19  a smaller box.
20    Q.  Okay.  Is the cost of a wax-coated
21  box the same as the cost of a box that doesn't
22  have wax coating?
23    A.  Clearly, you're making -- you're
24  adding something additional to the box, which
25  would increase the cost.

[Page 158]

1  what is the significance of your statement --
2  let's see.  I'm sorry.  It's on Page 11.
3    What's the significance of your
4  statement at the top of Page 11 that Koch
5  Industries acquired Georgia-Pacific for
6  $13.2 billion?
7    A.  Nothing.  Just informational
8  background.
9    Q.  Irrelevant to the market?
10    A.  It's just --
11    MR. GOLDBERG:  Object to the form
12  of the question.
13    THE DEPONENT:  It's just discussing
14  an acquisition.
15  BY MR. HOFFMAN:
16    Q.  Okay.  Did it affect concentration?
17    A.  No.
18    Q.  Okay.  Doctor, are you aware of any
19  changes in the way in which containerboard or --
20  well, in the way containerboard was produced and
21  sold over the class period?
22    A.  I've done --
23    MR. GOLDBERG:  Object to the form
24  of the question.
25    THE DEPONENT:  I've done a

[Page 160]

1    Q.  What is the percentage of cost --
2  typical percentage of cost for a wax box of the
3  wax?
4    A.  Sitting here, I couldn't tell you.
5    Q.  What about a plastic-coated box?
6    A.  Same answer.
7    Q.  Okay.  What about a display case?
8    A.  What about it?
9    Q.  Is the cost of a display case the
10  same -- or all the costs of all display cases the
11  same?
12    A.  I would think if we're looking at
13  the individual unit cost of the box, the cost to
14  produce an individual box that has different
15  dimensions, perhaps printing or perhaps a wax
16  coating, will differ by some marginal amount.
17    Q.  When you say "some marginal
18  amount," do you have any idea what the relative
19  proportion of cost of the different component
20  inputs for display cases is?
21    A.  Sitting here, no, I don't.
22    Q.  Okay.  If you look at Page 10 --
23    A.  Are we on Exhibit 3.
24    Q.  I'm sorry.  I was going to get
25  there.  I was going slow -- Page 10 of Harris 3,

[Page 159]

1  significant amount of research on the production
2  of containerboard, the process for kraftliner or
3  for test liner, the inputs, but sitting here, I
4  don't know of any particular change in the
5  production technology or inputs.
6  BY MR. HOFFMAN:
7    Q.  Have you ever heard of
8  lightweighting?
9    A.  Yes, I have.
10    Q.  What is it?
11    A.  To my understanding, it's making a
12  similar-strength product with lighter weight
13  materials.
14    Q.  Did that happen during the class
15  period?
16    A.  I think, yes, I've seen some
17  graphs.  I think it's, as I understand it, fairly
18  significant in Europe, not so much in the U.S.,
19  but it has occurred.
20    Q.  Are you aware of the total net
21  effect on annual tonnage of containerboard of
22  lightweighting in the United States, annual
23  tonnage to produce?
24    A.  No, I am not.
25    Q.  Have you done anything to control

[Page 161]

**[41]  (Pages 158 to 161)**

| | |
|---|---|
| 1  in any assessments of production for lightweighting? | 1  more items for shipment. |
| 2     A. Well, based on -- from my | 2     Q. What are wraparound cases? |
| 3  declaration, no. It would be irrelevant. | 3     A. It's sort of a style of a box. In |
| 4     Q. Do you know if Dr. Dwyer did? | 4  addition to the regular slotted container, it |
| 5     A. I'm unaware. | 5  seems like a style of a box. |
| 6     Q. You don't know? | 6     There are numerous categories of |
| 7     A. I don't know. | 7  boxes. It can be a full overlap, a one-sided, a |
| 8     Q. That's what unaware means today. | 8  telescope. It's just terminology used within the |
| 9     A. Okay. | 9  industry. |
| 10     Q. Got it. Okay. | 10     Q. Okay. Did you do any examination |
| 11     Looking at Pages 9 through 11 of | 11  as to -- with regards to which kinds of these |
| 12  Harris 3, you list all the defendants. I'm going | 12  products are sold by the defendants? |
| 13  to look -- well, want to talk a little bit about | 13     A. No, that was not possible because |
| 14  what the defendants make and their customers, so | 14  the defendants didn't give us sufficient |
| 15  let's actually flip back to Page 8. | 15  information to identify products at that level. |
| 16     MR. GOLDBERG: I'm sorry. Are we | 16     Q. Did you ask for it? |
| 17  still on -- | 17     A. Yes. |
| 18     MR. HOFFMAN: Page 8 of Harris 3. | 18     Q. What makes you think that the |
| 19  Sorry. That was a really confusing segue, and my | 19  defendants didn't give it to you as opposed to as |
| 20  apologies for that. | 20  requested? |
| 21  BY MR. HOFFMAN: | 21     A. We requested it and never received |
| 22     Q. In the middle of the page, Doctor, | 22  it, so I have to assume it wasn't given. |
| 23  you'll see those corrugated products. | 23     Q. Is it your view that there's some |
| 24     A. Uh-huh. | 24  outstanding discovery request that hasn't yet been |
| 25     Q. And you list boxes -- this is at | 25  responded to? |
| **[Page 162]** | **[Page 164]** |
| 1  Paragraph B(1) -- boxes, but also displays, bulk | 1     A. I don't handle discovery. I just |
| 2  bins, wraparound cases, et cetera? | 2  put my request to the lawyers and wait for it to |
| 3     What's in the et cetera? | 3  come. If it doesn't come, I don't have it. |
| 4     MR. GOLDBERG: Objection. | 4     Q. Okay. So what you're saying is you |
| 5     THE DEPONENT: It could be -- I've | 5  requested this from the plaintiffs' lawyers and |
| 6  heard about palettes. They're things that are | 6  you never got it? |
| 7  made -- separators within boxes to protect | 7     A. No. I'm saying this was requested, |
| 8  products, things of that sort, but by and large, | 8  and there's correspondence we talked about earlier |
| 9  boxes are the corrugated market. | 9  that occurred over months and months asking for |
| 10  BY MR. HOFFMAN: | 10  product identifications and never receiving them. |
| 11     Q. Right. Like box of wine, there | 11     Q. Okay. So you directly asked the |
| 12  might be those little things in it to keep the | 12  defendants for this information? |
| 13  bottles from smashing into each other? | 13     A. I -- |
| 14     A. Correct. | 14     MR. GOLDBERG: Object to the form. |
| 15     Q. Is that made out of containerboard? | 15     THE DEPONENT: I was one of the |
| 16     A. Yes, in some cases, but that, I | 16  individuals drafting the correspondences, so I was |
| 17  guess, can also be made out of something else, | 17  involved in that process, as were other people in |
| 18  but containerboard. | 18  my firm. |
| 19     Q. Like what? | 19  BY MR. HOFFMAN: |
| 20     A. I read in a deposition -- someone | 20     Q. But the absence of that information |
| 21  mentioned a product that thought was inferior and | 21  didn't prevent you from offering the opinions you |
| 22  more expensive, so moved to containerboard, but I | 22  offered? |
| 23  assume there's other ways to separate product. | 23     A. No. For my opinions, no. |
| 24     Q. What are bulk bins? | 24     Q. So as you sit here, you don't know |
| 25     A. Again, just larger bins to include | 25  the product mix -- the corrugated product mix of |
| **[Page 163]** | **[Page 165]** |

**[42] (Pages 162 to 165)**

1   the defendants?
2     A. Other than what the documents
3   showed, that the majority are boxes and commodity
4   boxes.
5     Q. Okay. And so your testimony is
6   that the majority of the defendants' corrugated
7   product sales are, quote, "commodity boxes," close
8   quote?
9     A. Well, again, I've cited to a GP
10   document that notes that the integrated producers,
11   which include the defendants, produce 28 of the
12   33 million tons of North American boxes and
13   produce a considerably higher portion of commodity
14   boxes, so I think that applies to all of them.
15     Q. Okay. What's a commodity box?
16     A. Undifferentiated brown box, a
17   regular slotted container. Any box --
18     Q. Are you aware --
19     A. -- used for shipment.
20     Q. I'm sorry. Go ahead.
21     A. Any box used for shipment.
22     Q. Are you aware of any strategy by
23   any defendant to move away from the production of,
24   quote, unquote, "commodity boxes" during the class
25   period?

**[Page 166]**

1     A. I've seen references to what are
2   called specialty boxes, a small part of the
3   markets, yes.
4     Q. Okay. That wasn't quite my
5   question.
6     My question was: Are you aware of
7   any strategy by any of the defendants to move away
8   from the production of commodity boxes during the
9   class period?
10     MR. GOLDBERG: Object to the form
11   of the question.
12     THE DEPONENT: All that I could say
13   is I'm not aware of a specific strategy document
14   that specifically lays that out. What I am saying
15   is I've seen some documents where individuals talk
16   about specialty boxes, and that can include simply
17   boxes with a different print on it.
18   BY MR. HOFFMAN:
19     Q. Okay. Would a defendant's decision
20   to move away from producing commodity boxes affect
21   your opinions at all if that had happened during
22   the class period?
23     A. No, given the majority of commodity
24   boxes. They certainly now produce the majority of
25   commodity boxes during the class period.

**[Page 167]**

1     Q. Why would the defendants have
2   chosen to reduce its capacity in commodity boxes
3   in order to sell more specialty boxes?
4     A. I suppose, but, again, as I look at
5   the documents, these what are called specialty
6   boxes are a tiny portion of the market.
7     Q. You're just reading documents?
8     A. What else would I do?
9     Q. Well, do you have any data on the
10   production of specialty reviewed commodity boxes?
11     A. No. Again, this comes back to the
12   transactional data issues that we had. We cannot
13   identify specialty boxes. We can't identify the
14   various box types.
15     Q. Okay. If you look over at Page 9,
16   Paragraph 3(a)(2) of Harris 3, you'll see that
17   you're describing different kinds of accounts of
18   PCA, regional, local, national.
19     Are you aware of any standard
20   categorizations of box or other corrugated product
21   customers like national accounts, produce, those
22   sorts of things?
23     MR. GOLDBERG: Object to the form.
24     THE DEPONENT: I don't understand
25   the question.

**[Page 168]**

1   BY MR. HOFFMAN:
2     Q. What kind of customers did the
3   defendants have?
4     MR. GOLDBERG: Object to the form.
5     THE DEPONENT: Again, they have --
6   they have national customers and regional
7   customers.
8     National customers can be, for
9   example, like Proctor & Gamble, who buys from
10   numerous box facilities, or it can be a regional
11   company, a small firm that only operates out of
12   Chicago buying boxes and sometimes the same boxes.
13   BY MR. HOFFMAN:
14     Q. Right, or a company like GE or
15   Whirlpool?
16     A. Could be, yes.
17     Q. Or Chiquita?
18     A. Yes, it could be.
19     Q. Let's go back to the commodity box
20   thing for a minute.
21     Is there any print on a commodity
22   box?
23     A. I suppose there can be, yes.
24     Q. What are the sizes of a commodity
25   box?

**[Page 169]**

**[43] (Pages 166 to 169)**

1     A.   They range to whatever the customer
2   needs.
3     Q.   So regardless of the size, it's
4   still a commodity box?
5     A.   Yes.  It can be produced by for
6   multiple defendants.  It's purchased primarily
7   based on price.
8     Q.   Who are the ten biggest corrugated
9   product customers for each defendant; do you know?
10     A.   I certainly have seen in documents
11   identification of customers, but sitting here, I
12   couldn't list the ten for each defendants.
13     Q.   Do you know for each defendant what
14   kind of corrugated products their largest
15   customers buy?
16     A.   Again, I've seen the documents,
17   references to purchases and boxes, but sitting
18   here, I couldn't tell you.
19     Q.   Well, not just boxes.  I mean, you
20   know, these also include displays, bulk bins,
21   wraparounds and et cetera, according to your
22   declaration.
23         Do you have any sense of what mix
24   of those things each defendant's largest customers
25   buy?

[Page 170]

1     A.   I don't have that in front of me.
2     Q.   Do you have it anywhere?
3     A.   No, I don't.
4     Q.   Do the defendants' different
5   customers buy different mixes of products?
6     A.   I would assume that defendants'
7   customers buy whatever they need, and that could
8   include different products, different size boxes,
9   boxes with printing, perhaps boxes with wax
10   coating.
11     Q.   Do you think it's likely that
12   Chiquita, Whirlpool and Proctor & Gamble buy the
13   same kind of boxes?
14     A.   They could, but I would think that
15   the boxes that you want to put bananas in might
16   differ from a box that you would put a washing
17   machine in.
18     Q.   Did you do any analysis of whether
19   there's any difference in the potential
20   substitutes available to the different customers
21   of defendants for the different kinds of boxes
22   they use?
23     A.   Just based on the documents
24   produced by the defendants, it appears there are
25   no relevant substitutes for those customers.

[Page 171]

1     Q.   Really.  Even for, for example,
2   produce?  There's no relevant substitute for
3   wax-coated boxes for produce?
4     A.   There's references to, I believe,
5   plastic or some sort of container, but they
6   recognize that it's -- doesn't really penetrate
7   the market.  It's not a threat.
8     Q.   And your assessment of that is
9   based purely on reading defendants' documents?
10     A.   I think that's a pretty good
11   source, yes.  If they say that it's not a
12   substitute, I would have to conclude that it's not
13   a substitute.
14     Q.   Okay.  Regardless of whether you
15   think it's a good source or not, my question is:
16   Is that the sole source on which you relied for
17   that opinion?
18         MR. GOLDBERG:  Object to the form
19   of the question.
20         THE DEPONENT:  Yes.  My opinions
21   are based on the documents produced in discovery.
22   BY MR. HOFFMAN:
23     Q.   Based on your reading of those
24   documents?
25     A.   Correct.

[Page 172]

1     Q.   Did you do any economic analysis of
2   the substitutes for different corrugated products,
3   for example, looking at cross-elasticities or
4   anything like that?
5         MR. GOLDBERG:  Object to the form
6   of the question.
7         THE DEPONENT:  I didn't develop a
8   model for cross-pricing elasticities in demand for
9   corrugated products.
10   BY MR. HOFFMAN:
11     Q.   Did you do any economic -- well,
12   strike that.
13         Page 30 to 31 of Harris 3, if you
14   look at Paragraph 2, which is the carryover
15   paragraph, you'll see a sentence that says:
16         "I have reviewed a sample of
17         the defendants' contracts for
18         containerboard and corrugated
19         containers and have found these
20         provisions to be quite common."
21         This is referring to most favored
22   nations and other price-matching provisions that
23   you described a little bit earlier.
24         Do you see that?
25     A.   Yes.

[Page 173]

**[44]  (Pages 170 to 173)**

1      **Q.** How many contracts did you review
2  in your sample?
3      A. Probably upwards of 25.
4      **Q.** How many of them were for
5  containerboard?
6      A. I don't recall the split.
7      **Q.** You don't know how many were for
8  corrugated products, then, I would suppose?
9      A. That's correct.
10     **Q.** What were the types of the
11 customers?
12     A. I don't recall if they were
13 regional or national.
14     **Q.** Were they all the same, different?
15 Do you have any idea?
16     A. I would assume they're different.
17     **Q.** Do you know?
18     A. Well, there are different contracts
19 for different customers. I assume the customer is
20 different.
21     **Q.** Do you know if there is a
22 systematic difference between the customers whose
23 contracts you reviewed?
24     MR. GOLDBERG: Object to form.
25     THE DEPONENT: No.

[Page 174]

1      A. No, I just wanted a random sample.
2      **Q.** Did you use like a random generator
3  to pick them?
4      A. No, I didn't.
5      **Q.** How did you -- what do you mean by
6  random? How did you decide it was random?
7      A. There's -- I would just pick this
8  contract and that contract, this defendant pick
9  that contract.
10     **Q.** How many contracts were you picking
11 out of the sample that you had available?
12     A. As I said, probably around 25.
13     **Q.** And -- okay. Let me ask that
14 question again.
15       My question was not how many did
16 you review; it was how many did you have to pick
17 from to review. I know you picked 25. I'm trying
18 to figure out 25 out of what.
19     A. I don't know out of what. We
20 received the bulk of our contracts very late in
21 the case; in fact, some arrived after the
22 declaration and some in May, so I don't know the
23 size of the pool from which I pulled.
24     **Q.** I'm not asking how many you
25 received later; what I'm just asking is: How many

[Page 176]

1  BY MR. HOFFMAN:
2      **Q.** Let me strike that. Let me ask
3  this, then.
4        Were the contracts you reviewed all
5  for national customers?
6      A. As I said, I don't know what that
7  split was.
8      **Q.** Do you have any idea whether the
9  contracts you reviewed were proportional to the
10 defendants' customer mix?
11     A. No.
12     **Q.** Okay. Who selected the sample?
13     A. I did.
14     **Q.** How?
15     A. At the time, we had a limited
16 number of contracts, and I literally drew out
17 roughly 25 contracts and just reviewed them.
18     **Q.** You had a pile of them and you just
19 grabbed 25 of them?
20     A. Well, yes, electronically, yes.
21     **Q.** Effectively, you had an electronic
22 pile and you electronically grabbed 25 of them?
23     A. Correct.
24     **Q.** Did you use any methodology to
25 determine which one to draw?

[Page 175]

1  did you have in front of you to pick from at the
2  time.
3        You don't recall?
4      A. I do not recall.
5      **Q.** Okay. Was the method by which you
6  selected the contracts to review consistent with
7  accepted statistical methodologies for determining
8  representative samples?
9      A. Could have been. I just picked a
10 random sample, meaning, as I just described, look
11 at a number of contracts from this pool of
12 contracts.
13     **Q.** It could have been in the sense
14 that if we went and we canvassed the literature
15 and statistics, you might randomly find somebody
16 who said this is the way in which you might select
17 a random sample?
18     MR. GOLDBERG: Object to the form.
19 BY MR. HOFFMAN: --
20     **Q.** You have no idea --
21     A. I didn't apply any statistical
22 criteria to the selection of a sample.
23     **Q.** Okay. You had no idea if the way
24 you selected it was consistent with the accepted
25 methodology for selecting a representative sample?

[Page 177]

**[45] (Pages 174 to 177)**

1     A.  It could be, but it might not be.
2     Q.  You have no idea?
3         MR. GOLDBERG:  Object to the form.
4         THE DEPONENT:  That's correct.
5   BY MR. HOFFMAN:
6     Q.  Okay.  What percentage of
7   Defendants' total contracts does your sample
8   represent?
9     A.  I have no idea.
10    Q.  How many different forms of
11  contracts does each defendant use?
12    A.  Well, I don't know what you mean by
13  form, but when you look at the contracts, they
14  seem to be, many of them, sort of boilerplate,
15  template contracts, pricing provisions, corrugated
16  provisions and the additional provisions.
17    Q.  The ones you looked at?
18    A.  There were some that are -- that
19  could be different, but by and large, they seemed
20  to include the same provisions.  I don't know if I
21  would suggest that they're identical, but
22  certainly seemed similar.
23    Q.  These are the ones you looked at?
24    A.  Yes.
25    Q.  Do any of the defendants use oral

[Page 178]

1   of the moment.
2         What were the terms of -- let me
3   ask it this way:  How would you determine what the
4   terms of oral agreements, gentlemen's agreements
5   were?
6     A.  Well, if we're talking about a
7   purchase and sale, I assume it would be, "I want
8   to sell you X square feet or X tons at this price
9   for delivery here; do you agree," and they -- if
10  he agrees, then shake hands and the transaction's
11  consummated.
12    Q.  Let me apologize for the bad
13  question and ask it a different way.
14        Sitting here, in order to determine
15  what -- for you to determine what the terms were
16  of oral agreements between a given defendant and a
17  given customer, how would you do that?
18    A.  Well, essentially, in order to do
19  that, you have to interview the defendants and the
20  person on the other side of the transaction, if I
21  understand you correctly.
22    Q.  Okay.  Are you aware of any
23  contracts between the defendants and their
24  customers that lock in prices for a period of
25  time?

[Page 180]

1   agreements to sell to the their customers?
2     A.  Well, I think what you're asking
3   me, are some of the defendants' customers don't
4   have contracts, and I think the answer is yes.
5     Q.  Yes.
6     So that -- that could be an oral
7   agreement.
8         MR. GOLDBERG:  Proving the fact
9   that he's an economist and not a lawyer.
10  BY MR. HOFFMAN:
11    Q.  Do you -- you ever heard of a
12  gentleman's agreement?
13    A.  Yes, sir.
14    Q.  What is it in this industry?
15    A.  I don't know what it means in this
16  industry.  My sort of layman's view of it is just
17  an agreement to agree to do something.
18    Q.  I take it you haven't reviewed a
19  sample of Defendants' oral agreements and
20  gentlemen's agreements with their customers?
21    A.  I don't know how I would do that,
22  but, no, I have not.
23    Q.  I don't either.
24    A.  Who's writing these questions?
25    Q.  I'm coming up with them on the spur

[Page 179]

1     A.  I -- yes, there are some contracts
2   that last for more than a month, yes.
3     Q.  Is that relevant to your analysis
4   at all?
5     A.  It's relevant -- it's relevant to
6   my analysis and it's relevant to Dr. Dwyer's
7   analysis.
8     Q.  Okay.  How so?
9         MR. GOLDBERG:  Object to the form.
10        THE DEPONENT:  Well, one issue is
11  related to if there is a price increase, when will
12  that customer be impacted.  You could have a price
13  increase be implemented and a customer could be
14  protected from that price increase until the next
15  point at which that contract is renegotiated or
16  renewed.
17  BY MR. HOFFMAN:
18    Q.  And are you aware of any contracts
19  that limit or cap the amount of price increases
20  during a specific period?
21    A.  Yes.  I've seen some contracts that
22  limit increases over certain periods of time, yes.
23    Q.  Would those be relevant to your
24  analysis in the same way as locked-in price
25  contracts would be?

[Page 181]

**[46]  (Pages 178 to 181)**

1      A.  Not so much, because, essentially,
2  the customer is being impacted by some portion of
3  the price increase because the issue here is
4  whether customers were impacted by the conduct of
5  the defendants.
6      Q.  Are you aware of any containerboard
7  product -- I'm sorry -- corrugated product
8  contracts that tie prices to triggers other than
9  the two entities we talked about earlier?
10      A.  What do you mean by a trigger?
11      Q.  If they have a -- an index to
12  something other than those two price indices, or I
13  think you used the term pegged, they're pegged to
14  something other than the two price indices.
15      A.  I haven't observed any.  Doesn't
16  mean there might not be.
17      Q.  Would those be relevant to your
18  analysis if they existed?
19      A.  Well, I would want to know how --
20  what those provisions were and what they were
21  pegged to.  I would assume that in this industry
22  you would be pegging it to something relevant for
23  the industry, not to sunspots or global warming or
24  anything like that.
25      Q.  Do you know?

[Page 182]

1      A.  I haven't reviewed every contract,
2  so, no, I can't say that.
3      Q.  If you turn to Page 19 of Harris 3,
4  you state that -- in Paragraph 5, you state that
5  all the contracts in the sample of contracts that
6  you reviewed had pricing tied to public industries.
7          I believe -- I counted, and I could
8  have gotten this wrong, but I think you reviewed
9  13 contracts; is that correct?
10      A.  Yes.
11      Q.  Did you select that sample?
12      A.  Yeah, uh-huh.  Yes, I did.
13      Q.  Do you do it using the same
14  methodology we discussed earlier?
15      A.  Yeah.  It was just me going through
16  what was available and taking them out and taking
17  a look at them.
18      Q.  Okay.  Have you made any attempt to
19  make statistically significant estimates about the
20  prevalence of these kinds of provisions in
21  Defendants' contract?
22      A.  Not statistically, no.
23      Q.  Okay.  Do you have any idea how
24  many sales contracts the defendants had during
25  this period?

[Page 183]

1      A.  I believe you asked me that before
2  and, no, I don't know the total number of
3  contracts.
4      Q.  So here we had 13, and in the prior
5  sample you had 25, so whatever the proportion of
6  that 25 contracts was to all defendants'
7  contracts, this is about half of them; in other
8  words, this is a much smaller sample set than even
9  the 25 you looked at earlier; correct?
10      A.  Yeah, it's a smaller set.
11      Q.  13 would be smaller than 25 today?
12      A.  Correct.
13          MR. GOLDBERG:  It was --
14          MR. HOFFMAN:  You see, I worked
15  hard to avoid math during my higher education, but
16  some parts I still remember.
17          MR. GOLDBERG:  In all relevant
18  times, 13 is smaller than 25.
19  BY MR. HOFFMAN:
20      Q.  For the contracts that had pricing
21  formulas, in order to determine how a change in
22  the index price would affect that customer, you'd
23  actually have to calculate -- you'd have to run
24  the calculation that's in the contract; correct?
25      A.  Yeah.  For a specific customer, if

[Page 184]

1  you wanted to know the exact price impact, you
2  would have to know the nature of the provision,
3  yes.
4      Q.  Okay.  Do you know if the
5  defendants covered their cost of capital in
6  containerboard and corrugated products during the
7  class period?
8      A.  I don't know about during the class
9  period.  I looked at industry reports indicating
10  that they were not earning their cost of capital
11  prior to class period.
12      Q.  You don't know about during?
13      A.  I don't.  I've looked at the net
14  profit data, and it shows from roughly 2003 or '4
15  through 2007 that prices -- or, excuse me --
16  profit margins increased for all the defendants,
17  but I didn't know the cost capital, specifically.
18      Q.  Okay.  What about in the after
19  class period?
20      A.  I haven't looked.
21      Q.  Do you know what the black liquor
22  tax credit is?
23      A.  Yes, I'm familiar with it --
24      Q.  What --
25      A.  -- but Dr. Dwyer is more familiar

[Page 185]

**[47]  (Pages 182 to 185)**

1  with it.
2        **Q.**  What is it?
3        **A.**  It's -- I don't know enough to
4  describe it, but I'm aware of the credit.
5        **Q.**  Can you tell me what you know about
6  it?
7        **A.**  I've seen it in the documents.  I
8  believe it's related to some tax provision in the
9  use of some product.  Beyond that, I don't know.
10       **Q.**  What's black liquor in this
11  industry?
12       **A.**  I believe it's an input.  I -- I'm
13  not sure.
14       **Q.**  I'm sorry?
15       **A.**  I'm not sure.
16       **Q.**  You say believe it's an input?  Are
17  you retracting that and saying you just don't know
18  what it is?
19       **A.**  Yeah, I don't know what it is.
20       **Q.**  What affect did this have on the
21  defendants' capacity?
22       **A.**  I couldn't say.
23       **Q.**  What about the nondefendants'
24  capacity?
25       **A.**  I couldn't say.

1        **Q.**  Have you done anything to analyze
2  productivity gains of the defendants' containerboard
3  mills?
4        **A.**  I have not.
5        **Q.**  Have you done anything to analyze
6  any changes in laws or regulations that might have
7  affected the industry?
8        **A.**  I have not.
9        **Q.**  Okay.  If you turn to Page 14 of
10  Harris 3, you say:
11            "There's been a gradual
12        decline in inventory since the
13        year 2000."
14            This is Paragraph 4(c)(2).
15            Do you see that?
16       **A.**  On what page?
17       **Q.**  14.
18       **A.**  Yes.
19       **Q.**  What inventory --
20            MR. GOLDBERG:  I'm not there.
21            MR. HOFFMAN:  Sorry.
22            MR. GOLDBERG:  I'm not there yet.
23            MR. HOFFMAN:  I'm sorry, Counsel.
24  Let me know when you're there.  It's the first
25  sentence of Paragraph 2.

1            MR. GOLDBERG:  Got it.  I'm there
2  now.
3  BY MR. HOFFMAN:
4        **Q.**  Okay.  What inventory is this
5  referring to, containerboard or corrugated
6  products?
7        **A.**  Containerboard.
8        **Q.**  Okay.  Do you know what happened
9  to -- well, how are you measuring inventory here?
10       **A.**  Well, I'm not.  These are documents
11  that show inventory in weeks of supply, either at
12  the mill or at the box plant, I believe.
13       **Q.**  Okay.  This is weeks of supply and
14  not tons?
15       **A.**  Well, they also have the data in
16  tons, but it's also expressed in weeks of supply.
17       **Q.**  Okay.  Is it declining in both
18  measures?
19       **A.**  Yes.
20       **Q.**  Over the entire period?
21            MR. GOLDBERG:  Object to the form.
22            THE DEPONENT:  When you -- if you
23  look at this document, from 2000 forward, yes,
24  there's a -- there's a trend down in both absolute
25  inventories and weeks of supply.

1  BY MR. HOFFMAN:
2        **Q.**  Okay.  But did it decline in every
3  period?
4            MR. GOLDBERG:  Object to the form.
5            THE DEPONENT:  There's some
6  variation.  All I'm saying is a matter of a trend
7  down.  It's been trending down since 2000.  If you
8  look at the inventory data, there are -- there are
9  spikes in the inventory data.
10  BY MR. HOFFMAN:
11       **Q.**  Did the trend accelerate after
12  2003?
13       **A.**  I think if you look at it and you
14  were to draw a trend line, yes; that post-2003,
15  2004 was demonstrably lower than the prior period.
16       **Q.**  Was that true for nondefendants as
17  well as defendants?
18       **A.**  Well, this is a measure of
19  industry -- industry inventories.  I don't have a
20  date on the specific nondefendants.
21       **Q.**  Did you do an analysis of each
22  defendant's inventory?
23       **A.**  No, I did not.
24       **Q.**  Did you do analysis of each
25  nondefendant's inventory?

| | |
|---|---|
| 1     A.  I did not. | 1     your topic. |
| 2     Q.  Did you do any analysis, like a | 2     Many of the documents -- I don't |
| 3   correlation analysis or anything like that, to | 3   know the words they used, but they use something |
| 4   correlate the inventory declined in a conspiracy | 4   similar to that, either chasing demand, running |
| 5   period or conspiratorial event? | 5   full out, and that's what was considered |
| 6     A.  Well, I think if you look in | 6   destructive behavior.  That was independent of |
| 7   particular at this document, it correlates rather | 7   inventory levels.  That was just a desire to |
| 8   nicely. | 8   increase mill utilization. |
| 9     Q.  Okay.  You're just reading the | 9     Q.  Okay.  So you are not familiar with |
| 10  document? | 10  the defendants' run to demand strategy, I take it? |
| 11     A.  Yes, I'm reading the document, and | 11     A.  Well, if you mean to -- to pare |
| 12  if you look at the data in the graph, it is both | 12  back production in line with demand? |
| 13  trended down and shifted down throughout the class | 13     Q.  I'm just asking if you're familiar |
| 14  period. | 14  from your review of the thousands of documents in |
| 15     Q.  What's the correlation coefficient | 15  this case, are you aware of a switch by at least |
| 16  between the conspiratorial events and the | 16  some of the defendants to a strategy called run to |
| 17  inventory? | 17  demand and what that strategy was? |
| 18     MR. GOLDBERG:  Object to the form. | 18     A.  I don't know enough about it to |
| 19     THE DEPONENT:  First off, I don't | 19  speak to it at this point. |
| 20  know what you mean by conspiratorial events, and I | 20     Q.  Can you describe it at all, other |
| 21  didn't draw a correlation.  I'm simply pointing | 21  than what you already said? |
| 22  out if you look at the graph, the inventories are | 22     A.  What I already said was the |
| 23  down throughout the class period relative to the | 23  documents talk about destructive behavior in terms |
| 24  prior period. | 24  of chasing demand, and this was destructive for |
| 25  /// | 25  the group. |
| **[Page 190]** | **[Page 192]** |
| 1  BY MR. HOFFMAN: | 1     If you mean running to demand |
| 2     Q.  Are you familiar with the term | 2  meaning trying to match your production with |
| 3  "Granger causality"? | 3  demand, including inventory, no, I'm not aware of |
| 4     A.  Yes. | 4  that. |
| 5     Q.  Did you do a Granger causality | 5     Q.  Okay.  Did you do any study of |
| 6  analysis to compare the price announcements and | 6  equilibrium or "but for" inventory levels? |
| 7  the inventory levels? | 7     A.  I did not. |
| 8     A.  I did not. | 8     Q.  Do you have any opinion as to how |
| 9     Q.  Are you aware that at least some of | 9  much inventory each defendant should have |
| 10  the defendants in the late 1990s changed their | 10  sustained? |
| 11  business strategy to something called run to | 11     A.  No.  I mean based on my review of |
| 12  demand? | 12  the documents, it's clear the defendants think |
| 13     A.  I've heard of that phrase before, | 13  lower inventories are better.  There's no |
| 14  yes. | 14  discussion that I could find as to why that should |
| 15     Q.  Is it possible that running to | 15  be done for cost purposes.  It's only done as a |
| 16  demand would, at least in part, account for a | 16  means to increase price. |
| 17  decline in inventory? | 17     Q.  Did you do any study or analysis of |
| 18     A.  Well, as I see it, in that period | 18  cost-related inventories? |
| 19  and even after, if you look at some of the | 19     A.  No, I did not. |
| 20  industry presentation, it's that sort of conduct | 20     Q.  Do you know what the defendants' |
| 21  that caused a problem for the industry.  I don't | 21  carrying costs are for inventory are? |
| 22  know if it's linked to changes in inventory. | 22     A.  No, but I've seen no reference to |
| 23     Q.  How would run to demand cause | 23  the carrying costs in any of the documents. |
| 24  problems in the industry? | 24     Q.  So, again, you're reading documents |
| 25     A.  Well, maybe I'm confusing your -- | 25  and you don't find that in the documents you've |
| **[Page 191]** | **[Page 193]** |

**[49]  (Pages 190 to 193)**

1  read?
2      A.  That's true.  All documents where
3  there's discussion of inventory, it's almost
4  exclusively related to the impact on price.
5      Q.  How many documents were produced in
6  this case?
7      A.  I think we talked about this
8  before.  I don't know the total number.
9      Q.  Tens of thousands, hundreds of
10 thousands?
11     A.  It's a large number.
12     Q.  Billions?
13     A.  It's a large number.
14     Q.  How many did you read?
15     A.  Thousands.  I don't know the exact
16 number.
17     Q.  What percentage of the documents
18 that were produced did you read?
19     A.  As I said before, I don't know what
20 that proportion is.
21     Q.  And you supplied no statistical
22 methodology to determine which of the documents to
23 read?
24     A.  I selected documents based on
25 subjects and issues that were important to me.

[Page 194]

1      Q.  Okay.  Is it ever the case that
2  keeping of low inventory would be cost effective?
3      A.  No.  I don't disagree that prudent
4  inventory management isn't important.  All firms
5  do that.  If you look in the business literature,
6  there's fairly lengthy discussions of -- of
7  optimizing costs and lowering inventories.
8          But you do that both from a cost
9  basis and the tradeoff of customer service, and
10 what's clear from the documents is the defendants
11 clearly don't care about customer service, and it
12 doesn't appear as though they're lowering
13 inventories just from a cost perspective.
14     Q.  Are you offering the economic
15 opinion that the defendants don't care about
16 customer service?
17     A.  Well, I'm saying the documents that
18 I've reviewed, particularly in conduct, shows that
19 they are willing to jeopardize customer service
20 while trying to achieve lower inventories, yes.
21     Q.  So based on reading documents,
22 you're implying that the defendants didn't care
23 about customer service?
24     A.  I didn't say they didn't care about
25 customer service.  Clearly, all firms have to care

[Page 195]

1  about customer service.  But in those times where
2  it was important to constrain inventories, they
3  would do so at the risk of poor customer service.
4      Q.  Well, I think your word-for-word
5  testimony, sir, was:
6          "What's clear from the
7          documents is the defendants
8          clearly don't care about customer
9          service."
10         Are you saying that that statement
11 was incorrect?
12     A.  Well, I didn't mean it as a general
13 proposition; I meant it with respect to
14 inventories and some of their inventory decisions.
15     MR. HOFFMAN:  All right.  Let's
16 mark -- I'm going to mark simultaneously
17 Exhibits 12 and 13, and let me just say a quick
18 word about why I'm doing this.
19         These are very big documents.
20 These are two SOP reports from Georgia-Pacific,
21 and one of them is -- Exhibit 12 is the one that
22 you cite in your report.  Exhibit 13 is the -- is
23 the 2007 one, to be specific.  Exhibit 13 is the
24 same one, except it was the version from the
25 Travis Ballard deposition, and the reason I'm

[Page 196]

1  doing that is that the PDF copy that you cited is
2  actually, I think, frankly, a lot harder to read,
3  but I think the document sort of is identical, and
4  I want you to be able to look at both of them for
5  the purpose of answering my questions so that I
6  can clearly understand what you're looking at in
7  the answer.
8      MR. GOLDBERG:  So just so I
9  understand, the substance of the two exhibits you
10 think are -- should be the same, and you're
11 providing two exhibits because one is more legible
12 than the other.
13     MR. HOFFMAN:  Correct.  These are
14 printing big spreadsheets, and strange things
15 happen sometimes.
16     MR. GOLDBERG:  Okay.  I understand.
17     (Whereupon, Harris Exhibits 12 and
18      13 were marked for identification
19      by the deposition reporter and are
20      attached hereto.)
21     MR. HOFFMAN:  Okay.  Let's just
22 take a second while I get this out.
23     (Whereupon, there was a brief
24      pause in the proceedings.)
25     MR. HOFFMAN:  This is Harris 12,

[Page 197]

1  the moment you've all been waiting for, and this
2  is Harris 13.
3          MR. GOLDBERG:  We are dealing with
4  the paper industry.  I take it Exhibit 13 is the
5  more legible.
6          MR. HOFFMAN:  That's my view.
7  Frankly, I find all of them a little hard to read.
8          THE DEPONENT:  Well, if I had my
9  reading glasses, it might be legible.
10 BY MR. HOFFMAN:
11     Q.  Do you have your reading glasses
12 with you?
13     A.  I do not.
14     Q.  I can lend you mine.
15     A.  I might need them, yes.
16     Q.  It's more important that you read
17 it than that I read it.
18     A.  Okay.  Tell me what page I need.
19         MR. HOFFMAN:  Well -- so are we on
20 the record?
21     (Deposition Reporter nodded.)
22 BY MR. HOFFMAN:
23     Q.  Doctor, let me first ask you.  I
24 think we've authenticated these as exhibits, but
25 let me just ask you:  In terms of Exhibit 12, do

[Page 198]

1  you recognize Harris 12 as one of the SOP reports
2  that are cited in your report?
3     A.  Yes.
4     Q.  And I think this is at Page 39.
5     A.  You're asking me if -- the specific
6  Bates number of 439, I'm confused.
7     Q.  Yeah, I'm asking you if that is one
8  of the documents that you cited and relied upon in
9  your report?
10         MR. GOLDBERG:  Well, hold on.  Hold
11 on.  This starts with Bate number -- last four
12 digits, 9209.
13 BY MR. HOFFMAN:
14     Q.  By the way, why it has 1995 at the
15 beginning, I don't know, but if you go in a few
16 pages, you'll find 2007.
17     A.  I really can't tell.  I mean this
18 looks similar to some of the information that was
19 contained in that spreadsheet, but the way this is
20 formatted, and I'm used to looking at spreadsheet
21 tabs, and this has no tabs.
22     Q.  Right.  Well, let me ask you.  Take
23 a look at maybe Exhibit 13, which is -- is exactly
24 why we did this.  I think this obviously has
25 different numbers but different print.

[Page 199]

1          Can you read that?
2     A.  Yeah, I can make out some of the
3  numbers.
4     Q.  Okay.  Does this look more like the
5  SOPs that you reviewed?
6     A.  Yes, it does.
7     Q.  I take it you probably reviewed
8  them electronically?
9     A.  Yes.
10    Q.  Okay.  Let me ask this:  What --
11        MR. HOFFMAN:  Go ahead.
12        MR. GOLDBERG:  I just need to make
13 a record here.  I don't -- I don't see that the
14 substance of Exhibit 12 is the same as the
15 substance of Exhibit 13.  I just want the record
16 to reflect that, and since I -- since I asked the
17 question and got an affirmative answer.
18        But I just note that, as an
19 example, the very first spreadsheet that's in
20 Exhibit 13 is just entirely different from the
21 first spreadsheet on Exhibit 12.
22        MR. HOFFMAN:  Yes.  As you flip
23 through Exhibit 12, what you'll find, I think is,
24 for some reason, there's a bunch of 1995 stuff at
25 the beginning of it, but then it gets to the same

[Page 200]

1  content as Exhibit 13.
2          But regardless of that, the fact of
3  the matter is these are both printed from
4  spreadsheets and we're going to have to do this.
5          MR. GOLDBERG:  It is what it is.
6          MR. HOFFMAN:  It's challenging.
7          MR. GOLDBERG:  They are what they
8  are.
9  BY MR. HOFFMAN:
10     Q.  So -- and my question is this,
11 Dr. Harris:  What source did you rely on to
12 interpret -- strike that.
13         Let me try it this way:  In your
14 declaration, you reference six Georgia-Pacific SOP
15 reports.
16     A.  Uh-huh.
17     Q.  And then you have a paragraph
18 talking about them, which I think is Paragraph 2
19 on Page 39 carrying over to paragraph -- well the
20 discussion's all on that page.
21         Do you see that?
22     A.  Yes.
23     Q.  What source did you rely on in
24 order to interpret these reports?
25     A.  You know, just me, just the reading

[Page 201]

**[51]  (Pages 198 to 201)**

1  of the spreadsheets.
2      **Q.** Okay. What is your understanding
3  of the purpose of the reports?
4      **A.** Well, I would think for planning
5  purposes, perhaps an historical lookback, looking
6  forward, seeing the balance of the system.
7      **Q.** Okay. A minute ago, I asked you
8  what source did you rely on in order to interpret
9  the reports, and in the transcript it says "Just
10  means the reading of the report," but I think your
11  answer was it was just you reading the report; is
12  that correct?
13      **A.** That's correct.
14      **Q.** You didn't go to any witness,
15  document, deposition or anything like that in
16  order to get an understanding of what an SOP
17  report was, did you?
18      **A.** No, I might have -- I might have
19  read about the SO reports in depositions, I don't
20  recall, but for my purposes, I literally just
21  reviewed the spreadsheets and took the language
22  in -- language in the spreadsheets at face value.
23      **Q.** Okay. Now, you make a statement in
24  your declaration that -- and this is in the middle
25  of Paragraph 2:

[Page 202]

1      **A.** Well, if you look, for example, on
2  the -- roughly the third page of Exhibit 13, you
3  will see some rows -- I can hand you back your
4  glasses.
5      **Q.** Okay. I'm going to need them.
6  Thank you.
7      **A.** -- on the bottom of the spreadsheet
8  that notes packaging inventory target, weeks of
9  supply on hand, OH.
10      **Q.** Uh-huh.
11      **A.** It would have been that area.
12      **Q.** Okay. So you were comparing the
13  targeted weeks of supply on hand to the actual
14  weeks of supply on hand?
15      **A.** Correct.
16      **Q.** And so, for example, on this one on
17  the third page of the exhibit, we see the first
18  column has 4.4 target -- I'm really struggling to
19  read these. I'm doing my best -- 4.4 target and
20  3.5 is the actuals?
21      **A.** That's correct.
22      **Q.** Okay. And so your testimony is for
23  every period in every one of the six reports --
24  well, in all the months covered by the SOP reports
25  that Georgia-Pacific provided that its actual

[Page 204]

1      "In all the months covered
2      by the SOP reports, GP's actual
3      inventory" --
4      **MR. GOLDBERG:** Where are you
5  reading?
6      **MR. HOFFMAN:** I'm sorry. It's
7  right in the middle of Paragraph 2, Counsel, on
8  Page 39.
9      **MR. GOLDBERG:** Go ahead. I'm
10  there.
11      **MR. HOFFMAN:** You see it?
12      **MR. GOLDBERG:** I'm there. All
13  right.
14  BY MR. HOFFMAN:
15      **Q.** And the quote is:
16      "In all the months covered
17      by the SOP reports, GP's actual
18      inventory levels were below their
19      targeted levels."
20      And my question is -- there's no
21  cite for that proposition. What were you relying
22  on for that statement?
23      **A.** That they were below their targeted
24  levels?
25      **Q.** Yeah.

[Page 203]

1  inventory levels were below the targeted level.
2      That's your statement; correct?
3      **A.** That's correct.
4      **Q.** Now, I notice that you cited six
5  years' worth of SOP reports in Footnote 156;
6  correct?
7      **A.** Yes.
8      **Q.** Is that -- well, I will tell you --
9  well, let me ask you this: How many years was the
10  class period?
11      **A.** Six -- four, five, six, seven,
12  eight -- seven.
13      **Q.** So you cite six years, but the
14  class period is seven?
15      **A.** Yeah.
16      **Q.** Do you know what year you omitted?
17      **A.** I don't think I omitted it. I
18  don't know that I had an SOP for that year. It
19  might have been I think 2009, and I believe I
20  might have had the file, but it was corrupted.
21      **Q.** Did you ask for -- I will tell you
22  it's 2008.
23      **A.** Okay.
24      **Q.** And -- well, I'll ask this: Did
25  you ask to get a noncorrupted version?

[Page 205]

**[52] (Pages 202 to 205)**

1     A.  No, now I -- I take that back.  It
2  wasn't corrupted; it was a different file.  It
3  didn't have this sort of information in there.  It
4  had information, SOP information, but not this
5  inventory information.
6     **Q.**  Okay.
7           MR. GOLDBERG:  When you have a good
8  time, I'll note it is 12:35.  So when you have a
9  good time, let's --
10          MR. HOFFMAN:  Yeah, I think
11 there's -- okay.  I think we can take a break now.
12          MR. GOLDBERG:  Great.  When do you
13 want to resume?
14          MR. HOFFMAN:  Off the record.
15          THE VIDEOGRAPHER:  Off the record
16 at 12:34 p.m.
17          (Whereupon, a luncheon recess was
18          held from 12:34 p.m. to 1:22 p.m.)
19 ///
20 ///
21 ///
22
23
24
25
                              **[Page 206]**

1           LOS ANGELES, CALIFORNIA
2           TUESDAY, JULY 22, 2014
3                 1:22 P.M.
4                 ---o0o---
5
6           THE VIDEOGRAPHER:  Going back on
7  the record at 11:22 p.m.
8           Counsel may proceed.
9           MR. HOFFMAN:  1:22; right?
10          THE VIDEOGRAPHER:  Excuse me.
11 1:22 p.m.
12          MR. GOLDBERG:  Before we start, I
13 have a question.  I just want to ask some
14 questions about Exhibit 13.  I note that --
15          MR. HOFFMAN:  Okay.  Actually, I'd
16 prefer not to do that now.  If you want to do that
17 on your time, but we're short on time here.  So we
18 can have a conversation about the exhibit off the
19 record or you can do it on your time.
20          MR. GOLDBERG:  Well, I'm happy --
21          MR. HOFFMAN:  Otherwise, I'm just
22 going to proceed with my questions.
23          MR. GOLDBERG:  I'm happy to do --
24 well, it's up to you, but you've introduced the
25 exhibit, so you've got to say something about the
                              **[Page 207]**

1  exhibit.
2           MR. HOFFMAN:  I'm done with that
3  exhibit for quite some time.  I'm happy to talk
4  about it off the record or --
5           MR. GOLDBERG:  I'll go off the
6  record and then we'll make a record.
7           MR. HOFFMAN:  All right.  Let's go
8  off the record.
9           THE VIDEOGRAPHER:  Off the record
10 at 1:23.
11          (Whereupon, a discussion was held
12          off the record.)
13          THE VIDEOGRAPHER:  Going back on
14 the record at 1:25.
15          Counsel may proceed.
16
17          EXAMINATION (Resumed)
18 BY MR. HOFFMAN:
19    **Q.**  Okay.  Doctor, before we broke for
20 lunch, a little while before, you had talked about
21 margins increasing during the period I think
22 between '03 to '07.
23          I don't recall your exact
24 testimony, but do you remember talking about
25 margins?
                              **[Page 208]**

1     A.  Yes.
2     **Q.**  I just wanted to ask you a couple
3  questions about that.
4           Which margins were you referring
5  to?
6     A.  It was margins for the defendants.
7     **Q.**  In containerboard or --
8     A.  Yes.
9     **Q.**  I'm sorry -- or corrugated products
10 or both?
11    A.  Both.
12    **Q.**  Okay.  And was it over the entire
13 period or just '03 versus '07?
14    A.  It was '03, '04, and I think
15 through perhaps '08.
16    **Q.**  Okay.  Did margins increase in '05
17 and '06?
18    A.  I don't recall exactly the numbers;
19 I just recall that if you looked at it from point
20 to point, they increased from 2003 to 2007 for all
21 the defendants.
22    **Q.**  So it was a point-to-point
23 comparison that you were referring to?
24    A.  Uh-huh, yeah, yes.
25    **Q.**  Okay.  And what was the source that
                              **[Page 209]**

**[53]  (Pages 206 to 209)**

1　you used to make that conclusion about margins?
2　　　　A.　There was a number of -- if I
3　recall, it's been some time, but it would have
4　included the annual reports, 10-Ks, perhaps some
5　additional sources.
6　　　　Q.　Okay.  Are those identified in
7　Exhibit -- your revised Exhibit 2, which I think
8　we have as Harris 5?
9　　　　A.　No, because I didn't include them
10　in my declaration.
11　　　　Q.　Okay.  So your declaration doesn't
12　say anything about margins, but you have observed
13　that defendants' margins were higher in '07 than
14　they were in '03?
15　　　　A.　Correct.
16　　　　　MR. HOFFMAN:  Okay.  Now, let's go
17　ahead and mark what I think is Harris 14.
18　　　　　(Whereupon, Harris Exhibit 14 was
19　　　　　marked for identification by the
20　　　　　deposition reporter and is attached
21　　　　　hereto.)
22　BY MR. HOFFMAN:
23　　　　Q.　So, Doctor, while you look at this,
24　this is an E-mail exchange, the top E-mail of
25　which is from Jeff Doyle dated Saturday,

[Page 210]

1　　　　A.　-- look at my declaration.
2　　　　Q.　It's on Page 40 of your
3　declaration.
4　　　　A.　Thank you.
5　　　　(Document reviewed by deponent.)
6　　　　THE DEPONENT:  Yes.
7　BY MR. HOFFMAN:
8　　　　Q.　Now, one of the options that you
9　quote, which was, "You could run our orders on
10　time and keep us supplied in paper," you then
11　state:
12　　　　　"Demonstrates a firm willing
13　　　　　to jeopardize performance (and
14　　　　　ultimately customer satisfaction)
15　　　　　for a goal of lowering
16　　　　　inventories and so forth."
17　　　　Do you see that?
18　　　　A.　Yes.
19　　　　Q.　So are you opining that by writing
20　"You could run our orders on time," Mr. Lingle was
21　referring to a company policy to not run orders on
22　time, or just incompetent order for something?
23　　　　A.　No, I think that this --
24　　　　　MR. GOLDBERG:  Objection to the
25　form of the question.

[Page 212]

1　August 30th, 2008 to Mathew Blanchard and Mark
2　Polivka regarding paper supply bearing Bates
3　numbers SSCC00354240 to 41.
4　　　　Do you see that?
5　　　　A.　Yes.
6　　　　Q.　And in fact you cited this E-mail
7　correspondence in your declaration; correct?
8　　　　A.　Yes, I did.
9　　　　Q.　And, specifically, if you turn to
10　the second page of it, the Bates number 41,
11　actually, the line at the bottom and then carrying
12　over, you quoted, I think, the statement:
13　　　　　"This cannot continue.  We
14　　　　　have a few options."
15　　　　Then there's a list of the four
16　options; do you remember that?
17　　　　A.　Yes.
18　　　　Q.　Okay.  Now, you specifically -- the
19　only option you quoted was Option 2:
20　　　　　"You could run our orders on
21　　　　　time and keep us supplied in
22　　　　　paper."
23　　　　Correct?
24　　　　A.　If I could --
25　　　　Q.　Absolutely.

[Page 211]

1　　　　　THE DEPONENT:  No, I think that
2　this simply shows the rationing down of
3　inventories and inability to provide product to
4　the box plant so they could meet their customers'
5　needs.
6　BY MR. HOFFMAN:
7　　　　Q.　Well, he's referring to running
8　orders on time.
9　　　　Where does this say anything about
10　inventory?
11　　　　A.　Well, it says "and keep us supplied
12　in paper."  So, essentially, the mills are not
13　providing the required paper to the box plants,
14　which would be a result of low inventories.
15　　　　Q.　Okay.  From not running their
16　orders on -- let me just ask it this way:  You're
17　making an assessment of what he meant by this
18　statement?
19　　　　A.　Well, I'm reading it for what it
20　is, yes.  It's clearly they're running out of
21　paper, they need paper, the mills are not
22　providing it.
23　　　　Q.　Okay.  All right.  Let's -- you can
24　put that aside.
25　　　　Now, I want to turn, Doctor, to

[Page 213]

**[54]  (Pages 210 to 213)**

1  Exhibit 4 to Harris 2.  If you recall, this is way
2  back in the beginning, but it's your original
3  declaration where you had the exhibits that were
4  not changed?
5       MR. GOLDBERG:  This is Exhibit 2.
6       MR. HOFFMAN:  Correct.  It's
7  Exhibit 4 to Harris 2 --
8       MR. GOLDBERG:  Got it.
9       MR. HOFFMAN:  -- which I know is
10 confusing, but --
11      MR. GOLDBERG:  No.  Okay.  I got
12 it, I got it.
13      THE DEPONENT:  Yes.
14 BY MR. HOFFMAN:
15      Q.  So I want to direct your attention
16 to the last line of that exhibit.
17          Do you see that?
18      A.  Yes.
19      Q.  Okay.  So this is a price increase
20 announcement in August of 2010.
21          Do you see that?
22      A.  Yes.
23      Q.  And this one failed; correct?
24      A.  Yes.  It wasn't fully implemented,
25 yes.

[Page 214]

1       Q.  How would you determine which
2  purchasers had a price increase as a result of
3  this?
4       A.  You would need to look at the
5  transactions data.
6       Q.  Yeah.  So for each purchaser, you'd
7  to look at their data?
8       A.  You'd have to look at the data,
9  yes.
10      Q.  For each person?
11      A.  Well, transaction data includes
12 transactions for all purchasers, so you'd have to
13 look at all of those, yes.
14      Q.  Okay.
15      A.  Not any one individual.
16      Q.  But to determine if any particular
17 purchaser was impacted, I'd have to look at their
18 particular data?
19      A.  Correct.
20      Q.  Okay.  Now, in the "but for" world,
21 is it your opinion that there would have been no
22 price increases during this period?
23      A.  No, and I don't think Dr. Dwyer's
24 model indicates that.
25      Q.  Well, I'm not talking about

[Page 216]

1       Q.  Okay.  You show non-PPW -- I'm
2  sorry -- net PPW increase 0 per ton and 0 percent;
3  correct?
4       A.  Correct.
5       Q.  Now, if I'm a purchaser and I
6  bought only, say, in August or September of 2010,
7  was I impacted?
8       MR. GOLDBERG:  Object to the form
9  of the question.
10      THE DEPONENT:  Well, to the extent
11 your actual transaction price has increased, yes.
12 BY MR. HOFFMAN:
13      Q.  Okay.  Has my transaction price
14 increased, according to this?
15      A.  Well, you wouldn't know from this.
16 This is a reflection of what's happening to PPW,
17 and to the extent PPW does not go up and you're
18 tied to PPW, it would be your increase.  This
19 doesn't mean that transaction prices for some
20 customers couldn't have increased some amount.
21      Q.  Okay.  So if somebody wasn't
22 connected to PPW, they might have had a price
23 increase, but if they were connected to PPW, they
24 wouldn't?
25      A.  Perhaps, yes.

[Page 215]

1  Dr. Dwyer's model; I'm talking about your opinion.
2  You described these price increase analysis, you
3  described price increases.
4          Is it your opinion that in the "but
5  for" world there would have been no price
6  increases over the class period?
7       A.  I mean I -- that opinion has to be
8  based on Dr. Dwyer's empirical model which
9  controls for supply and demand factors, and his
10 model doesn't indicate that the conspiratorial
11 overcharge is in every single one of these price
12 increases.  There's some portion of these that was
13 a result of supply and demand factors.
14      Q.  Okay.  But you don't have any
15 opinion yourself as to what the price increases
16 would have been in the "but for" world?
17      A.  No, because I did not do the
18 empirical analysis.  Dr. Dwyer did.
19      Q.  Okay.  Leaving empirical analyses
20 aside, though, do you have an opinion as to
21 whether the defendants might have increased price
22 without a conspiracy during the class period?  Had
23 there been no conspiracy, prices might have gone
24 up?
25          Do you have any opinion one way or

[Page 217]

**[55]  (Pages 214 to 217)**

1  the other on that?
2      A.  I don't without doing an empirical
3  analysis, no.
4      Q.  Okay.  In the "but for" world, do
5  you have any opinion as to whether there would
6  have been fewer price increases than there were?
7      A.  Well, again, if you look just as a
8  comparison, the number, the magnitude, the
9  closeness of the price increases during the class
10  period, I don't have the exact set of data for the
11  pre-class period, but as clearly prices were
12  falling, it suggests the conspiracy probably did
13  give rise to more frequent price increases.
14      Q.  So it's your opinion that in "but
15  for" world there would have been fewer price
16  increases?
17      A.  Well, again, you wouldn't know that
18  unless you actually ran a model to determine what
19  was driving prices during that period.  I did not
20  develop that model.
21      Q.  So you don't have an opinion as to
22  whether there would have been fewer price
23  increases in the "but for" world?
24      A.  I'm saying just as a matter of
25  economics, given we have a conspiracy during the

[Page 218]

1  competitive market you're not going to see price
2  increases announced with some proximity to each
3  other?  That's your economic opinion?
4      A.  It's less likely to see them, yes,
5  that close together without any justification.
6      Q.  Are you offering an opinion that
7  any of these particular price increases resulted
8  from a conspiracy?
9      A.  I'm saying throughout the class
10  period, these price increases are a manifestation
11  of a conspiracy.  I don't speak to each individual
12  one of them, other than to say those that failed
13  could be indicative of an instability in the
14  cartel.
15      Q.  Is it your opinion that these price
16  increases were actually the subjects of the
17  conspiracy or that they simply were made possible
18  by the capacity restrictions?
19      MR. GOLDBERG:  Object to the form.
20      THE DEPONENT:  Could be both.
21  BY MR. HOFFMAN:
22      Q.  Okay.  Which is it?
23      A.  I say it could be both.  Clearly,
24  the reduction in capacity gave rise to conditions
25  that allowed for price increases.

[Page 220]

1  class period and you have fairly rapid price
2  increase announcements, that it's -- in all
3  likelihood, you probably would have had fewer.
4      Q.  So is that your opinion that you're
5  offering today?
6      A.  Yes.  I mean when you look at the
7  price increases just by themselves, some of them
8  occur right on the heels of each other.  That
9  cannot be explained likely from a shift in cost or
10  demand.
11      So, yes, it points to collusive
12  behavior.  But you look at that and you look at
13  all the other factors.
14      Q.  Which of these price increases
15  would not have occurred absent a conspiracy, in
16  your opinion?
17      A.  Again, I didn't develop an
18  empirical model, so I can't say that definitively.
19  All I'm simply pointing to is that fact that in
20  some of these cases, there were price increases
21  very close to each other, and you wouldn't
22  normally expect to see that in a competitive
23  market where cost and supply and demand factors
24  are driving prices.
25      Q.  It's your testimony that in a

[Page 219]

1      Again, this gets back to evidence
2  of an explicit agreement to raise prices.  I don't
3  have it.  It might exist in the documents, but I
4  mean as economists, we have to look for it as sort
5  of the telltale signs of a conspiracy, and
6  clearly, the conditions were ripe for these such
7  price increases.
8      Q.  So you can't offer an opinion that
9  any particular one of these price increases either
10  resulted from a conspiracy or didn't?
11      A.  Yeah.  As I said, the conduct over
12  this period and the reduction in supply gave rise
13  to conditions that led to these price increases,
14  so these price increases are part of the
15  conspiracy --
16      Q.  All --
17      A.  -- all are collusive, collective.
18      Q.  All of them?
19      A.  Yes, all of them, and those that
20  failed could simply reflect an instability of the
21  colluding parties.
22      Q.  Okay.  How many, if any of
23  the price -- how many more, if any of the price
24  increase analysis, would have been effective in
25  the "but for" world?

[Page 221]

**[56]  (Pages 218 to 221)**

1     A. I don't have an answer to that.

2     Q. Did the different defendants have

3 different pricing philosophies over the course of

4 the period?

5     A. I don't know what you mean by

6 philosophy.

7     Q. Pricing strategies?

8     A. Again, I don't know what you mean

9 by pricing strategy, but I should say some of the

10 documents that I was interested in looking for

11 were exactly those sorts of documents, how do the

12 defendants view price increases, what are their

13 strategies, and there was a complete lack of those

14 sorts of documents.

15     Q. You didn't find any documents about

16 pricing strategies for defendants?

17     A. No, I did not. Not on the global

18 scale, not at the mill level.

19     Q. Okay. Do you know the amount of

20 the overcharge that Dr. Dwyer has opined occurred?

21     A. On a percentage basis, I think it's

22 roughly 4 percent.

23     Q. Over a seven-year period?

24     A. Yes, I believe that's correct.

25     Q. Did you do any analysis of

[Page 222]

1 recollection, and maybe you can help me find it.

2     I will say that it had to do with

3 the use of contract provisions to propagate the

4 impact of collusion.

5     Do you remember that part of your

6 declaration?

7     A. Uh...

8     Q. Oh, I got it. It's on Page 30.

9     A. Okay. Yes.

10     Q. And if you look at that page,

11 you'll see you actually quote pricing provisions

12 of this document on Page 33831.

13     Do you see that?

14     A. Yes.

15     Q. Okay. Now, the contract language

16 that you quote here gives Georgia-Pacific ten days

17 to decide whether to meet an offer from a third

18 party to sell this customer specific rates at a

19 price lower than Georgia-Pacific's contract price.

20     Do you see that?

21     A. Yes, I do.

22     Q. How does that allow Georgia-Pacific

23 to propagate the impact of price collusion? Is

24 this just allowing it to match lower prices

25 offered by anybody to this customer?

[Page 224]

1 transactional price increases or decreases, or was

2 that all Dr. Dwyer?

3     A. That's all Dr. Dwyer.

4     Q. MR. HOFFMAN: Let's go ahead and

5 mark the next exhibit, which I think is Harris 15,

6 actually.

7     (Whereupon, Harris Exhibit 15 was

8     marked for identification by the

9     deposition reporter and is attached

10     hereto.)

11 BY MR. HOFFMAN:

12     Q. So Harris 15 is a contract between

13 Georgia-Pacific and Lacorr Packaging bearing Bates

14 number GP-KLEEN00033830 and running through Bates

15 number 33835.

16     Do you recognize that document?

17     A. Well, I recognize it as a contract.

18     Q. Okay. Do you recall citing this

19 document in your declaration?

20     A. It doesn't appear to be in the

21 footnote. It references the contracts that were

22 reviewed for the purposes of looking at indices.

23     Q. That's because that's not what you

24 cited. However, I am attempting to find the page

25 on which you cited it, that's to refresh your

[Page 223]

1     A. Just a moment.

2     (Document reviewed by deponent.)

3     THE DEPONENT: Well, this would

4 appear to be one-sided.

5 BY MR. HOFFMAN:

6     Q. And so the answer is what?

7     A. Just a moment, please.

8     (Document reviewed by deponent.)

9     THE DEPONENT: Well, if you look at

10 the first paragraph, it states:

11     "For sales of containerboard

12     of light grade and quality,

13     primarily mill suppliers, which

14     shall be mutually agreeable to by

15     parties from time to time, after

16     giving due consideration to like

17     sellers containerboard sold to

18     other -- to like third-party

19     purchasers and to prices of like

20     containerboard purchased by the

21     buyer."

22     So it's essentially referencing the

23 prevailing market price of sellers to other third

24 parties who would be the basis of a negotiation.

25     Q. Okay. You can set that aside.

[Page 225]

**[57] (Pages 222 to 225)**

1    I want to go back to Harris 2, your
2  Exhibit 3.
3         Is this a list of all the mill
4  closures that occurred during the period that you
5  claim are part of the conspiracy?
6         MR. GOLDBERG:  You're talking about
7  Exhibit 3 to Harris 2.
8         MR. HOFFMAN:  Correct.
9         THE DEPONENT:  Well, this
10 represents the mill closures in a Smurfit
11 document.
12        There could have been actually more
13 mill closures, because in some cases, the data,
14 both from some of the defendant documents, AFPA
15 and PPW, conflicted with each other, and I think
16 it's because some plants would be idled and later
17 shut or sometimes would be idled and later brought
18 back online.
19        So when you look at the list of
20 mill closures, sometimes there can be differences.
21 I chose to use this exhibit from Smurfit because
22 it seemed to be the most comprehensive.
23 BY MR. HOFFMAN:
24     Q.  Okay.  Well, let me ask a maybe
25 more general question.

[Page 226]

1    price increases.
2     Q.  Okay.  But there you're reading
3  defendants' documents.
4         I'm asking whether you did any
5  economic analysis of whether there was any
6  correlation or any other connection between the
7  events where capacity was reduced and the price
8  increases, other than reading defendants'
9  documents.
10        MR. GOLDBERG:  Object to the form
11 of the question.  Do you mean an economic analysis
12 or an empirical analysis?
13 BY MR. HOFFMAN:
14     Q.  Go ahead.
15     A.  Well, in an economic analysis, I
16 would include the defendant documents.  If you're
17 talking about empirical analysis, all the
18 empirical analysis was done by Dr. Dwyer.
19     Q.  Okay.  Did you do any analysis of
20 any kind other than reading the defendants'
21 documents to test for any causal or temporal
22 connection between the defendants' capacity
23 reductions and the price increases?
24     A.  Well, again, you've used the word
25 "test."  Test is a statistical notion, and we

[Page 228]

1    Did you do any analysis to test for
2  correlation between capacity reductions and price
3  increases?
4     A.  No, but you wouldn't expect to see
5  a tight correlation.  I mean there's going to be
6  some lagged effect.
7         Mills are lumpy affairs.  It's
8  going to be difficult to say that a closure on
9  this date's going to affect price on this date by
10 a certain amount.  It's the cumulative effect of
11 the reductions applied that puts upper pressure on
12 prices.
13     Q.  Did you do any analysis -- strike
14 that.
15        You, however, did not do any
16 analysis to determine whether there was any
17 correlation between the capacity reductions and
18 the price increases?
19     A.  Well, what we know, and, again,
20 based on defendant documents, they cite the mill
21 closures as the reasons for operating rate
22 increases, and, further, they track the operating
23 rate increases with price increases.
24        So, yes, there is analysis that
25 ties the mill closures to operating rates and to

[Page 227]

1    needed an empirical model, and as I described, I
2  did not develop an empirical model.
3     Q.  Is the only analysis you did about
4  any connection between the capacity reductions and
5  the price increases reading the defendants'
6  document?
7     A.  Yes, the defendants' documents and
8  all the presentations in their analysis.
9     Q.  Okay.  6 out of the 15 PPW price
10 increases failed.
11        Why?
12     A.  Again, they're -- as I said before,
13 economists -- there's a lot been written on the
14 stability of cartels, both why they fail and fail
15 for long periods of time, and why they sort of wax
16 and wane during periods of conspiracy.
17        One possible explanation is the
18 conspiracy was having trouble at that particular
19 time and they couldn't effectively get a price
20 increase through.
21     Q.  If a purchaser bought only during a
22 period when the conspiracy was failing or
23 struggling, were they impacted?
24     A.  Well, for the most part, these
25 customers -- and this is more in the area of

[Page 229]

**[58]  (Pages 226 to 229)**

1  Dr. Dwyer -- these customers have bought
2  throughout the class period and, therefore, if
3  they didn't -- if they were buying at a price
4  increase that didn't go through, they were likely
5  buying a product at one of the price announcements
6  that were effective.
7         MR. HOFFMAN:  Move to strike as
8  nonresponsive.
9  BY MR. HOFFMAN:
10        Q.  Let me ask the question again.
11        If a purchaser bought only during a
12  period where the conspiracy was failing or
13  struggling, were they impacted?
14        A.  Well, if by definition there was no
15  movement in prices, they wouldn't have been
16  impacted by that price increase; however, they
17  would have been paying prices reflective of the
18  prior increases.
19  BY MR. HOFFMAN:
20        Q.  What about a purchaser who bought
21  only when prices went down?
22        A.  Same answer.  Prices can be going
23  down, but they can still be elevated due to the
24  conspiracy.
25        Q.  Okay.  Let's talk briefly about the

[Page 230]

1  interdependent communications.
2         Did you do any analysis to
3  correlate the frequency of those communications
4  with the price increases?
5         A.  I did not.
6         Q.  With successful price increases?
7         A.  I did not.
8         Q.  Did you compare the frequency of
9  communications during the class period with
10  communications at times outside of the class
11  period?
12        A.  I did not.
13        Q.  Did you do anything to compare the
14  frequency of communications between the defendants
15  as opposed to between nondefendants?
16        A.  Well, I didn't have data for the
17  nondefendants, so I can't talk about the frequency
18  of their communication.
19        Q.  What about any analysis to compare
20  the frequency of communications between defendants
21  versus communications defendants and nondefendants?
22        A.  No, I did not.
23        Q.  Let's talk about trade
24  associations.
25         Would you agree that trade

[Page 231]

1  associations can serve procompetitive purpose?
2         A.  I don't know about procompetitive.
3  They certainly can serve a valid purpose.
4         Q.  Legitimate business purposes?
5         A.  Yes.
6         Q.  Do you know what "procompetitive"
7  means?
8         A.  No.  Please define it.
9         Q.  Rather than spend the time doing
10  that, let me just ask this:  What do you mean by
11  legitimate business purpose?
12        A.  I mean trade associations can help
13  with regulation.  They can lobby on behalf of
14  industry participants.  They can communicate
15  useful information, things going on with
16  legislature, things like that.
17        Q.  Best practices?
18        A.  I suppose.
19        Q.  Anything else?
20        A.  Nothing comes to mind.
21        Q.  Have you done anything to exclude
22  the possibility that the trade association
23  participation here served only those purposes?
24        A.  Repeat the question, please.
25        Q.  Have you done any analysis to

[Page 232]

1  exclude the possibility that the defendants'
2  participation in trade associations in this case
3  that you refer to in your declaration served only
4  those legitimate business purposes?
5         A.  No.  I think what I'm saying is I
6  believe that there were some legitimate business
7  purposes.  I'm not suggesting that these trade
8  associations meetings were all anticompetitive
9  environments.
10        Q.  Were any of them?
11        A.  Well, it's clear that they were
12  using them to communicate, and that's an
13  opportunity to share information and a part of a
14  conspiracy that provides an opportunity.
15        Q.  Well, isn't it, sir, a fact or true
16  that if you're at a trade association meeting
17  you're probably communicating?
18        A.  Yes, you could be, but it depends
19  on what you're communicating about.  It's giving
20  you an opportunity to communicate across a wide
21  range of subjects.
22        Q.  Do you have any evidence of any
23  communications between any of the defendants at
24  any trade association meeting that were for any
25  competitive purposes?

[Page 233]

**[59]  (Pages 230 to 233)**

1     A.  What I have on communication to
2  trade associations is contained in the
3  declaration.
4     Q.  Okay.  So are there any specific
5  communications that you can reference that were
6  anticompetitive, anything anywhere in the
7  declaration?
8     A.  No, these were simply opportunities
9  for the defendants to get together and discuss
10  anything about the topics.
11     Q.  So your opinion about trade
12  associations is simply that the defendants were at
13  them so they could have communicated and it could
14  have been anticompetitive?
15     A.  Yeah.  It's well-known in economics
16  and in fact the cite that I gave to the American
17  Bar Association that these are opportunities for
18  firms to get together and collude.
19     Q.  Well, let's talk about that a
20  little bit.
21     So you say it's well-known in
22  economics and you cite the American Bar
23  Association.
24     Is the American Bar Association a
25  an economics organization?

[Page 234]

1     A.  No, it's not.
2     Q.  Okay.  And you actually
3  specifically cited to a publication or a -- set
4  of materials provided by the Young Lawyers
5  Division of the American Bar Association.  It's on
6  Page 32 of your declaration.  It's offered by --
7  authored, sorry.  Let's see if I can find it here.
8  Yeah, I'm not sure if we have it.
9     But in any event, let me ask this:
10  Do you know who wrote this?
11     A.  No.  I just saw the presentation.
12     Q.  Okay.  And what was this
13  presentation?
14     A.  It was a presentation on trade
15  associations.
16     Q.  And were any of the authors
17  economists?
18     A.  Likely not.  I believe they were
19  lawyers, but I mean if you look at any trade
20  association meetings, one of the first things they
21  do, and I've been to a number of them, is there's
22  an entire discussion of what to be careful of.
23  They recognize that these can be opportunities to
24  communicate and they warn the participants about
25  unlawful communication.

[Page 235]

1     Q.  Do you know what sources the young
2  lawyers who wrote this Young Lawyers Division
3  PowerPoint or whatever it was that you're citing
4  were relying on for that statement?
5     A.  I do not.
6     Q.  Okay.  Do expert economists
7  routinely cite the Young Lawyers Division
8  PowerPoints in their economic work?
9     A.  Sure.  Why not.
10     Q.  So if I went and I read economics
11  texts, I'll find cites to the Young Lawyers
12  Division in it?
13     A.  You might.  You might.
14     Q.  Have you ever done -- can you cite
15  to me a single example of any economist who has
16  ever -- in a published work or a declaration
17  submitted for litigation ever citing any
18  publication of the Young Lawyers Division?
19     A.  I don't know if anyone has or has
20  not.  It was simply a general comment that is
21  well-known at trade associations that this
22  activity can take place, both by lawyers and by
23  nonlawyers.  I didn't think it was that
24  controversial.
25     Q.  Okay.  Now, you also cite

[Page 236]

1  Levenstein and Suslow -- this is at Page 32 of
2  your declaration -- the proposition that it's
3  well-documented that trade associations tend to
4  facilitate collusive conduct.
5     Do you see that?
6     A.  Yes.
7     MR. HOFFMAN:  Okay.  Let's go ahead
8  and mark the next exhibit.
9     (Whereupon, Harris Exhibit 16 was
10     marked for identification by the
11     deposition reporter and is attached
12     hereto.)
13  BY MR. HOFFMAN:
14     Q.  Okay.  Dr. Harris, while you're
15  looking at that --
16     MR. GOLDBERG:  Is this 16?
17     MR. HOFFMAN:  16.
18  BY MR. HOFFMAN:
19     Q.  Exhibit 16 is a working paper by
20  Levenstein and Suslow entitled "Breaking Up is
21  Hard to Do, Determinants of Cartel Duration" from
22  the University of Michigan.
23     Is this the paper you were citing?
24     A.  Yes, I believe so.
25     Q.  Okay.  Now, the page you cite

[Page 237]

**[60]  (Pages 234 to 237)**

1    specifically -- well, you don't actually cite a
2    specific page, but can you point me to the
3    statement in here that supports the proposition
4    that it's well-documented that trade associations
5    tend to facilitate collusive conduct?
6        A.  Yes.  Just a moment.
7        Q.  And I think, Doctor, by the way,
8    that this was a working paper which was
9    subsequently published and you may have cited the
10   subsequent publication.
11       A.  Okay.  Well, I believe the
12   statement that you're looking for is on Page 4,
13   the first paragraph, roughly -- one, two, three,
14   four, five -- six lines down:
15           "We find cartels that rely
16       on trade associations are less
17       likely to die a natural death."
18       Q.  Right.  And to be clear, Doctor,
19   though, this is a working paper and there's an
20   earlier date than what you cited.
21           This is in fact the paper that you
22   relied on in content?
23       A.  I don't recall exactly.  I'd have
24   to look through my documents to make sure the date
25   is correct.  But this appears to be it.

[Page 238]

1        Q.  Do you have any reason to think
2    it's different in any material way?
3        A.  I don't.
4        Q.  Do you recall reading this entire
5    paper?
6        A.  I skimmed through it.  I don't know
7    that I read the entire thing.
8        Q.  Who are Levenstein and Suslow?
9        A.  Well, they're research scientists
10   in super-social research.  And Valerie Suslow is a
11   Professor of Business Economics.
12       Q.  At the University of Michigan?
13       A.  Yes.
14       Q.  What were they doing in this paper?
15       A.  Well, they were looking at a
16   cartel, the length of cartel duration and the fact
17   was it effective.
18       Q.  So this was a source that is
19   sufficiently reliable for you to cite it, or a
20   subsequent publication version of it, in your
21   paper?
22       A.  Yes, but this is noncontroversial.
23   This issue of trade associations and their ability
24   to facilitate collusive behavior is not found just
25   in this one article but in other texts and other

[Page 239]

1    articles.
2        Q.  All right.  Can you turn to
3    Page 22, please.  I want you to look at the
4    paragraph in the middle starting with 31 percent,
5    and I'd like you to read into the record that
6    paragraph starting from the word "Of" in the third
7    line to the end of the paragraph.
8        A.  "Of the 26 cartels in our
9        sample with trade association
10       involvement, not one involved a
11       U.S. trade association."
12       Q.  Go ahead.
13       A.  "The majority of cases
14       involved preexisting European
15       trade association whose
16       activities in facilitating
17       collusion probably predate
18       recent changes in EU law and
19       enforcement policies which have
20       made the legal environment much
21       more hostile to price fixing than
22       in years past.  Thus, it appears
23       that American trade associations
24       have learned to refrain from
25       involvement in such

[Page 240]

1        conspiracies."
2            MR. HOFFMAN:  You thought I talked
3    fast.
4            THE DEPONENT:  Sorry.
5    BY MR. HOFFMAN:
6        Q.  Did you read that paragraph when
7    you were citing this paper?
8        A.  Yeah, I probably did.  I read
9    through this article, I -- what I published in
10   there.  There was some of the -- the mathematics
11   of it.
12       Q.  So the authors concluded that not a
13   single one of the cartels involved a U.S. trade
14   association?
15       A.  Yes, for this document written in
16   2010.
17       Q.  Okay.  But that's the document that
18   you cite the proposition that trade associations
19   tend to facilitate collusive conduct?
20       A.  Yes.
21       Q.  Anything about reading that
22   paragraph that says not one U.S. trade association
23   did such a thing change your conclusions?
24       A.  No, it doesn't.
25       Q.  Okay.

[Page 241]

**[61]  (Pages 238 to 241)**

**HIGHLY CONFIDENTIAL**
**PURSUANT TO PROTECTIVE ORDER**

1    MR. HOFFMAN: Why don't we take a
2  short break.
3         MR. GOLDBERG: You bet.
4         THE VIDEOGRAPHER: Off the record
5  at 2:00 p.m. This marks the end of Video Media
6  Number 2.
7         (Whereupon, a recess was held
8         from 2:00 p.m. to 2:09 p.m.)
9         THE VIDEOGRAPHER: Back on the
10 record at 2:09 p.m. This marks the beginning of
11 Video Media Number 3 in the deposition of
12 Dr. Michael Harris being taken at 350 South Grand
13 Avenue in Los Angeles, California. My name is
14 Tony Bloodworth. I'm the video specialist here on
15 behalf of U.S. Legal.
16        Counsel may proceed.
17 BY MR. HOFFMAN:
18    Q. Doctor, you've mentioned several
19 times today periods of instability or periods that
20 the cartel or the conspiracy may have failed
21 temporarily.
22        Do you recall that?
23    A. Yes.
24    Q. Okay. During those periods, is it
25 possible that the prices were reverted to the

[Page 242]

1    Q. Okay. Because they're included in
2  the aggregate numbers of his model, but do you
3  know if there's any specific analysis of whether
4  the prices during those periods were at or above
5  or below the "but for" price?
6    A. You'd have to ask Dr. Dwyer. I
7  don't know if he conducted that sort of analysis.
8    Q. You had no analysis on that.
9    A. As I said before, I did not develop
10 an empirical model.
11        MR. HOFFMAN: Okay. I'll pass the
12 witness.
13        MR. MAROVITZ: Let's go off the
14 record for a second.
15        THE VIDEOGRAPHER: Off the record
16 at 2:11 p.m.
17        (Whereupon, a recess was held
18        from 2:12 p.m. to 2:13 p.m.)
19        THE VIDEOGRAPHER: Going back on
20 the record at 2:13.
21        Counsel may proceed.
22        MR. MAROVITZ: Thank you.
23 ///
24 ///
25 ///

[Page 244]

1  competitive level or fell to the competitive
2  level?
3    A. No. If you look generally at the
4  prices, they seem to be cumulative. There are
5  decreases, but it doesn't appear as though the
6  prices went back to pre-class period levels, no.
7    Q. Well, when I say the competitive
8  level, I don't mean the pre-class level; what I
9  mean is the level that would have prevailed in the
10 "but for" world.
11        Did you do any analysis to
12 determine what the "but for" world price would
13 have been?
14    A. I did not. Dr. Dwyer did and found
15 that the prices were elevated over the entire
16 class period.
17    Q. But during the periods where the
18 cartel or collusion or conspiracy, as you put it,
19 might have been unstable or failing, did either
20 you or Dr. Dwyer do any analysis to see whether
21 the price at those times was elevated above the
22 "but for" world price?
23    A. I don't know if Dr. Dwyer parsed
24 out specific periods like that, but they are
25 certainly included in his model.

[Page 243]

1         EXAMINATION
2  BY MR. MAROVITZ:
3    Q. Dr. Harris, again, my name is Andy
4  Marovitz. Good afternoon.
5    A. Good afternoon.
6    Q. In Plaintiffs' complaint,
7  Paragraph 36, which appears on Page 13, Plaintiffs
8  define containerboard products to include
9  linerboard, corrugated medium, corrugated sheets,
10 corrugated products, including corrugated boxes,
11 and other corrugated containers; correct?
12    A. Yes.
13    Q. Is it your opinion that there is a
14 single economic product market comprised of
15 containerboard products as defined by Plaintiffs?
16    A. They're certainly all part of the
17 same market. For modeling purposes, the customers
18 of linerboard medium, even sheets, tend to be
19 different than the purchasers of corrugated boxes,
20 but for purpose of the economic analysis,
21 Dr. Dwyer certainly separated out those two
22 markets. For purpose of describing the market, I
23 separated them out.
24    Q. And I'm focused here on what you
25 did, not on what Dr. Dwyer did.

[Page 245]

**[62]  (Pages 242 to 245)**

1      For what you did, is it your
2  opinion that there's a single economic product
3  market that's comprised of containerboard products
4  in the manner in which economists define a product
5  market?
6      A.  Well, yes, but with a caveat.  I
7  mean linerboard and medium are inputs to
8  corrugated boxes.  They're not -- they're not
9  substitutes.  When economists look at product
10  markets, they're looking for substitutes for a
11  particular product.  Corrugated products, as
12  defined here, includes the inputs to one of the
13  outputs.  But --
14      Q.  Just to be clear, Doctor, I'm
15  asking you about containerboard products in this
16  question, not corrugated products.
17      So the plaintiffs define
18  containerboard products in Paragraph 36 of their
19  complaint.
20      I'm asking you whether or not there
21  is a single economic product market called
22  containerboard products?
23      A.  Well, again, if you're asking for
24  the economist definition of a product market, you
25  establish a product market by looking at potential

[Page 246]

1  substitutes.  These are not substitutes, but
2  they're part of the same market.  Liner and medium
3  are inputs to corrugated product, so it envolops
4  all one market.
5      Q.  So is the answer to my question no?
6      A.  Well, if you're thinking in the
7  strict terms of an economic product market where
8  economists look to substitutes, linerboard is not
9  a substitute for corrugated product.  They're one
10  and the same market, essentially.
11      Q.  Your opinion is that linerboard and
12  corrugated products are one and the same market?
13      A.  In the sense that one is an input
14  to the other, they have to be part of the same
15  market.
16      Q.  Is it your opinion there is a
17  single economic product market comprised only of
18  containerboard?
19      A.  Isn't that the same question you
20  just answered -- just asked?
21      Q.  No, it's not.
22      A.  And, again, containerboard includes
23  liner, medium, sheets and corrugated boxes?
24      Q.  No, no.  Just containerboard.
25      A.  Oh, linerboard and medium.

[Page 247]

1      Q.  No.
2      Let me ask it this way:  Is it your
3  opinion there is a single economic product market
4  comprised only of liner?
5      A.  I suppose there could be, but you
6  want to include the medium in that.  If you're
7  looking for --
8      Q.  Let me ask a favor of you.  If I
9  ask if I would like to know whether there could be
10  something, I will ask you.  If I ask you whether
11  there is one, I'd appreciate it if you just tell
12  me there is one, and if you don't know, that's
13  fine.
14      So let me ask again:  Is it your
15  opinion that there is a single economic product
16  market comprised only of liner?
17      A.  No.
18      Q.  Is it your opinion there is a
19  single economic product market comprised only of
20  medium?
21      A.  No.
22      Q.  Is it your opinion that there's a
23  single economic product market comprised only of
24  sheets?
25      A.  No.

[Page 248]

1      Q.  Is it your opinion that there is a
2  single economic product market comprised only of
3  corrugated products?
4      MR. GOLDBERG:  Object to the form.
5      THE DEPONENT:  No.
6  BY MR. MAROVITZ:
7      Q.  And is it your opinion that there
8  is a single economic product market that
9  economists find comprised of containerboard
10  products?
11      MR. GOLDBERG:  Object to the form.
12      THE DEPONENT:  If we're talking
13  about the inputs and outputs, yes.
14  BY MR. MAROVITZ:
15      Q.  How about if we're talking about
16  substitutes?
17      A.  Well, again, if we're talking about
18  substitutes, you're talking about something
19  outside of containerboard markets, something that
20  competes with containerboard products.
21      Q.  Let me ask it this way:  Doctor,
22  please define the relevant product market in this
23  case that's the subject of your structure,
24  conduct, performance analysis.
25      A.  I focus -- I focus on the liner and

[Page 249]

**[63]  (Pages 246 to 249)**

1  medium and look at conduct for those two products,
2  but as I said before, as a practical or economic
3  matter, if you have a shortage in supply of those
4  two products, you will have a shortage and supply
5  of corrugated products.
6        So you're essentially looking at
7  them together.
8      Q.  Do you define, then, liner and
9  medium together as a relevant product market as an
10 economist would?
11     A.  Yes, you could, if you were just
12 looking at those two things, yes.
13     Q.  Not what you could; did you, in
14 terms of coming up with your opinions?
15     A.  Well, no, because this is an
16 integrated market and this is -- the allegations
17 were with entire containerboard products.
18     Q.  Do you agree with the proposition
19 that you can't establish that a market has factors
20 that favor collusion unless you know what the
21 market is?
22     A.  You certainly need to understand
23 the structure of the market and the products
24 included, yes.
25        MR. MAROVITZ:  I'm going to move to

[Page 250]

1  strike as nonresponsive.
2  BY MR. MAROVITZ:
3      Q.  Apart from whether you need to know
4  what the structure of the market is, do you agree
5  with the proposition that you cannot establish
6  that a market has factors that favor collusion
7  unless you know what the market is?
8        MR. GOLDBERG:  Object to the form
9  of the question.
10       THE DEPONENT:  Well, certainly.
11 You need to identify the structure of the market,
12 the extent of the market, the barriers to entry,
13 what products we're talking about, whether they're
14 commodities.
15 BY MR. MAROVITZ:
16     Q.  What accepted economic methodology
17 have you applied to determine the appropriate
18 market definition on which to base your opinions
19 here?
20     A.  Well, first, certainly, the
21 U.S. Department of Justice has identified liner
22 and medium as a relevant market, and as an
23 economic matter, you would expect, given
24 integration of this market, any collusive activity
25 in liner and medium would be reflected in

[Page 251]

1  corrugated box prizes.
2      Q.  Where did the Department of Justice
3  define liner and medium as a relevant product
4  market?
5      A.  I believe if you look in their
6  review of the Temple-Inland acquisition, they
7  define liner and medium or containerboard as a
8  relevant product market.
9      Q.  Do economists consider a
10 cross-elasticity study to be a generally-accepted
11 methodology to define a relevant market?
12     A.  It can be, yes.  In many cases,
13 though, empirically estimating the source of
14 models is very, very difficult.
15     Q.  You testified earlier that you did
16 not conduct a cross-elasticity study here;
17 correct?
18     A.  I did not.  I mean I think that the
19 documents are pretty clear that there are no
20 substitutes.
21        MR. MAROVITZ:  I'm going to move to
22 strike everything after "I did not."
23 BY MR. MAROVITZ:
24     Q.  Do you contend that any data
25 necessary to conduct a cross-elasticity study was

[Page 252]

1  withheld from you?
2      A.  No, it was not withheld; it was
3  simply not available.
4      Q.  And on what basis do you say it was
5  not available?
6      A.  Well, if you're -- if you have a
7  product in mind, you'd need to get pricing and
8  quantity and other relevant economic information
9  for that product in question, and I did not have
10 that available, and I feel that that sort of
11 empirical study would be necessary.
12     Q.  Are SRAMS and PCs one market?
13     A.  No.
14     Q.  Aren't SRAMS an input into PCs?
15     A.  A very small input, yes.
16     Q.  Does the size of the input
17 depend -- does it drive whether or not it's part
18 of one product market?
19     A.  Yes, it could, very much.  SRAM is
20 a tiny component of the device that it's put in.
21     Q.  What generally-accepted economic
22 test could we apply to confirm your conclusion
23 that linerboard and medium comprise their own
24 single product market?
25     A.  Well, as you said, you could do a

[Page 253]

**[64]  (Pages 250 to 253)**

1  cross-price elasticity study of a product that you
2  have in mind.  You could certainly look for any
3  substitutes that are used by consumers of liner
4  and medium products.
5      Q.  Now, you use the phrase "corrugated
6  products" to describe not only boxes but also
7  displays, bulk bins, wraparound cases, et cetera.
8  I think you discussed that with co-counsel earlier
9  today.
10         Do you remember that?
11     A.  Yes.
12     Q.  Have you conducted any economic
13  analysis indicating that all of these different
14  corrugated products exist in a single economic
15  product market?
16     A.  Well, they're all made of
17  containerboard, and containerboard is the number
18  one input to all of these products.
19         So, yes, you would expect the
20  pricing across these products to be very highly
21  correlated.
22     Q.  So as an economist, your conclusion
23  about what's in the same market depends upon
24  whether something is an input of something else;
25  is that right?

[Page 254]

1  to make a margin analysis, but the data was not
2  given to us, data that would allow us to identify
3  products at that level.
4         And, further, the notion of a
5  cross-price elasticity between a bin and a display
6  is somewhat misguided because you're asking
7  whether one product is a substitute for another.
8  Those products are not substitutes; they're a
9  different form of a corrugated product.
10     Q.  Precisely.  Isn't that the hallmark
11  of what's in the same product market,
12  substitution?
13     A.  That's what I've been saying, yes.
14     Q.  You state that while a box plant
15  needs to manufacture to a customer's particular
16  box specifications, the vast majority of box
17  plants can manufacture to that same customer's box
18  specification.
19         Do you remember that?
20     A.  Yes.
21     Q.  For definitional purposes and for a
22  clear record, I want to see if we can be sure we
23  agree on this.
24         When you opine about box plants,
25  are you distinguishing between box plants on the

[Page 256]

1      A.  Well, as a practical economic
2  matter, yes, you essentially have to.  When you
3  make containerboard, that is the input to the box.
4  The only thing left is to fold the box.
5      Q.  Are crude oil and gasoline in the
6  same product market?
7      A.  No.
8      Q.  You didn't test whether or not, for
9  instance, displays and bulk bins and wraparound
10  cases through some cross-product price elasticity
11  test are in the same product market; correct?
12     A.  I did not.
13     Q.  What are the different margins, for
14  example, a customized glossy display versus a
15  brown cardboard shipping box?
16     A.  I don't know.
17     Q.  What margin analyses have you done,
18  if any, of the containerboard products?
19     A.  None, because we wouldn't be able
20  to.  The data didn't provide us that level of
21  detail.
22     Q.  Was any data withheld from you in
23  connection with any effort you wished to make
24  about a margin analysis?
25     A.  Well, I'm not saying that I wished

[Page 255]

1  one hand and other facilities that make boxes,
2  like sheet feeders and sheet plants, or when you
3  say box plants are you including what are
4  traditionally known as box plants, sheet feeders
5  and sheet plants?
6      A.  Sheet plants and box plants, yes.
7      Q.  You put them all together as box
8  plants for purposes of your declaration; correct?
9      A.  Yes.
10     Q.  So I'm going to do that in this
11  examination, if that's okay.
12     A.  Sure.
13     Q.  Is it the case that you're offering
14  no structure, conduct, performance analysis of box
15  plants?
16     A.  Well, as I said before, if you look
17  at the structure of the industry, the defendants
18  have the largest share of liner and medium, and
19  given the fact that they are integrated
20  downstream, they also have the largest share
21  within -- within box plants, but the analysis
22  focuses more on liner and medium.
23     Q.  You're not offering any opinions
24  about structure, conduct and performance analysis
25  with respect to box plants?

[Page 257]

**[65]  (Pages 254 to 257)**

1   A. I -- the examples of evidence that
2 I provide are related to mills, not to box plants.
3   Q. On Page 29 of your declaration, and
4 we marked that as Harris Exhibit 3 --
5   MR. GOLDBERG: Are we done with
6 this exhibit?
7   MR. MAROVITZ: Yes.
8   THE DEPONENT: I'm sorry. What
9 page?
10   MR. MAROVITZ: 29.
11 BY MR. MAROVITZ:
12   Q. You cite the testimony of the Fibre
13 Box Association's Rachel Kenyon in support of your
14 point that:
15   "While a box plant needs to
16   manufacture to a customer's
17   particular box specifications,
18   the vast majority of box plants
19   can manufacture to the same
20   customer's box specifications."
21   Right?
22   A. Correct.
23   Q. And you state that box customers
24 routinely multisource across box plants to
25 diversify their supply chain and minimize risk of

**[Page 258]**

1 disruption or shortages; correct?
2   A. Correct.
3   Q. Other than Ms. Kenyon's testimony,
4 do you have any support for your statement that
5 the vast majority of box plants can manufacture to
6 that same customer's box specification?
7   A. Well, yes. In the -- either the
8 Plaintiffs' deposition -- class representatives'
9 depositions or in the conversations with them,
10 they note that they can go to different suppliers
11 for this same box and choose based on price.
12   In addition, I think there are
13 documents within discovery that show Defendants
14 having some of the same customers.
15   There's, I believe also, some
16 documents -- I'll end the answer there.
17   Q. And you didn't disclose those in
18 either your declaration or your revised
19 declaration; correct?
20   A. No, but I didn't seek to include
21 every document that I've gone across that supports
22 every one of these points. In fact, there are
23 many other documents that supports these points
24 that are not cited in the declaration. These are
25 just examples.

**[Page 259]**

1   Q. Can Defendants make every kind of
2 corrugated product at every one of their box
3 plants?
4   A. No.
5   MR. GOLDBERG: Read the question
6 back.
7 BY MR. MAROVITZ:
8   Q. Okay. Can Defendants make every
9 kind of corrugated product at every one of their
10 box plants?
11   A. No. I would -- I think that
12 perhaps some of the sheet plants might make a
13 different range of products, but by and large,
14 particularly when it comes to regular slotted
15 container, you know, brown, undifferentiated
16 boxes, they can be pretty much in box plants.
17   Q. Have you analyzed the physical
18 machine properties at individual box plants to
19 determine whether the majority of them could
20 manufacture boxes to a single specification?
21   MR. GOLDBERG: Object to the form
22 of the question.
23   THE DEPONENT: As I said before,
24 I've done some research, YouTube research and
25 elsewhere, looking at the machinery in box plants,

**[Page 260]**

1 and it seems as though from my reading that they
2 can routinely manufacture boxes to different
3 specifications.
4   There might be the need to -- I
5 don't know if the correct word is to retool, but
6 they have the capability to produce a wide range
7 of boxes.
8 BY MR. HOFFMAN:
9   Q. That's not quite my question.
10   My question was: Have you analyzed
11 the physical machine properties at individual box
12 plants to determine whether the majority of them
13 could manufacture boxes to a single specification?
14   A. No. I did not have data on
15 individual box plant technical abilities.
16   Q. Have you conducted a study or a
17 survey to determine whether the majority of box
18 plants can manufacture to a single customer's box
19 specification?
20   A. I have not.
21   Q. What opinions have you reached
22 whether defendants can substitute the machinery in
23 a plant to manufacture one kind of corrugated
24 product instead of another?
25   A. Well, I don't know what you mean by

**[Page 261]**

**[66] (Pages 258 to 261)**

1   one corrugated product versus another.  Are we --
2   are we taking a different size box, a printing
3   versus die cut, glue, anything?
4        **Q.**  So those are all so different that
5   you can't answer the question as posed; is that
6   right?
7            MR. GOLDBERG:  Object to the form
8   of the question.
9            THE DEPONENT:  No.  I just would
10  like to understand what you mean by different
11  product.
12           MR. MAROVITZ:  Different corrugated
13  product, the term that you use in your
14  declaration.
15           THE DEPONENT:  Well, if we're
16  talking about a different corrugated product by
17  specification, whether it's large or small, no, I
18  would think that most box plants can make that
19  change.
20  BY MR. MAROVITZ:
21       **Q.**  And you say you would think that.
22           What's the -- other than watching a
23  few YouTube videos, what's the basis of that
24  conclusion?
25           MR. GOLDBERG:  Object to the form

[Page 262]

1   that supports your view that a majority of box
2   plants can manufacture to a single customer's box
3   specification?
4            MR. GOLDBERG:  Do you want to
5   change your answer?
6            THE DEPONENT:  No.
7            No, as I said, what I've cited
8   is -- is what I know about box plants.
9   BY MR. MAROVITZ:
10       **Q.**  And you have nothing more to add to
11  that?
12       A.  Nothing more.
13       **Q.**  Please identify for us all of the
14  instances that you are aware of in which one of
15  the defendants substituted equipment within a
16  plant to manufacture a different kind of box than
17  it had previously made.
18           MR. GOLDBERG:  Read the -- read the
19  question back, please.
20           (The record was read as follows:
21       **Q.**  Please identify for us all
22       of the instances that you are
23       aware of in which one of the
24       defendants substituted equipment
25       within a plant --)

[Page 264]

1   of the question.
2            THE DEPONENT:  Well, again, if you
3   read the depositions of the class representatives,
4   the discussions I had with them, they certainly
5   seem to think that they can multisource their
6   boxes in different specifications and place orders
7   for different types of boxes relatively easily.
8   BY MR. MAROVITZ:
9        **Q.**  Have you seen anything in any
10  defendant deposition or in any defendant document
11  that supports your view that a majority of box
12  plants can manufacture to a single customer's box
13  specification?
14       A.  Well, as I've noted before, the
15  industry seems to think that the integrateds
16  produce the vast majority of what they call
17  commodity boxes.  Commodity boxes differ by size
18  and a few other features, so that tells me, yes, a
19  large portion of the industry can manufacture to
20  the same customer's box specifications.
21           MR. MAROVITZ:  That's not
22  responsive at all.  I -- I move to strike.
23  BY MR. MAROVITZ:
24       **Q.**  Have you seen anything in any
25  defendant deposition or in any defendant document

[Page 263]

1            MR. GOLDBERG:  That's enough.
2   That's fine.
3   BY MR. MAROVITZ:
4        **Q.**  Go ahead.
5        A.  I don't have any evidence of
6   equipment changes.
7        **Q.**  Is it your testimony that all the
8   class representatives are buying the same kinds of
9   boxes as all other proposed class members, like
10  GE, Proctor & Gamble, Chiquita and Safeway?
11       A.  No, that's not my...
12       **Q.**  Do you agree that some defendants
13  sold products that are referred to as customized
14  boxes during the alleged class period?
15       A.  Well, by customized box, it could
16  be customized to a particular customer's
17  specification, and that would be size and whether
18  it's printed.
19       **Q.**  And it could also refer to quality
20  and strength and moisture resistance and coating
21  and color; correct?
22       A.  All of those things that other box
23  plants can do, yes.
24       **Q.**  What study have you made to
25  determine the percentage of customized box sales

[Page 265]

**[67]  (Pages 262 to 265)**

1  relative to noncustomized box sales?
2      A.  My view of customized is simply
3  producing a box to a customer's specification.  I
4  have done no study of how many plants can do that.
5  I would think the vast majority of them, because
6  it's simply a change in specification, whether
7  it's size or printing or otherwise.  They're in
8  the business to produce and sell boxes, and
9  customers have different specification needs.
10     Q.  What study have you made to
11 determine the percentage of potential class
12 members who purchase the customized boxes?
13     A.  Again, based on my definition of
14 custom, probably the vast majority of those class
15 members.  They all have different needs.  They all
16 have needs for different size boxes and to put
17 printing on.
18         I rejected the notion that there's
19 some special category of boxes called customized.
20 If by customized you simply mean differences in
21 specifications, well, you would expect that fairly
22 widespread across all the class members.
23     Q.  So is it your opinion that there's
24 no difference between commodity boxes and
25 customized boxes?

[Page 266]

1      A.  As I've described it, no.  We
2  talked earlier about --
3      Q.  Sorry.  Let me interrupt because I
4  asked you a question with a negative in it, and so
5  I want to make sure that we're communicating.  I
6  apologize.
7          MR. GOLDBERG:  He gave you the
8  answer.
9  BY MR. MAROVITZ:
10     Q.  I'm going to try to ask the same
11 question but without the negative.
12         Is it your opinion that there is a
13 difference between commodity boxes and customized
14 boxes?
15     A.  No.  If by customization we mean
16 simply building a box to a customer's
17 specification based on size, and it could be a
18 different basis, weight or printing, that's a
19 commodity box.
20     Q.  You've offered a number of thoughts
21 about what box plants can and cannot do.
22         Have you been to a box plant?
23     A.  No, but I'd sure like to.
24     Q.  And do you have -- are there any
25 class plaintiffs --

[Page 267]

1          MR. GOLDBERG:  Are you going to
2  invite him?
3  BY MR. MAROVITZ:
4      Q.  -- in this case who are box plant
5  owners?
6      A.  One of the gentlemen that we
7  interviewed had some facilities; others were --
8  the way he characterized it, were brokers, but
9  nothing on the order of the size of an integrated
10 box right now.
11     Q.  And when you say, "One of the
12 gentlemen that we interviewed had some
13 facilities," you mean he had a box plant?
14     A.  Yes.
15     Q.  Have you ever been to a
16 containerboard mill?
17     A.  No, but, again, I'd certainly like
18 to see.
19     Q.  Isn't it true that some of the
20 large nondefendant box makers like Pratt and
21 U.S. Corrugated ship more boxes than several of
22 the named defendants in this case?
23     A.  I don't have any bead on that.
24     Q.  Dr. Harris, please define for us
25 the relevant geographic scope of the market or

[Page 268]

1  markets in this case that's the subject of your
2  structure, conduct, performance analysis?
3      A.  That would be the United States.
4      Q.  Does not include Canada?
5      A.  It does not.
6      Q.  And does not include Mexico?
7      A.  No.
8      Q.  What economic modeling or
9  calculations have you performed to determine
10 whether the entire United States is the
11 appropriate geographic scope for your structure,
12 conduct, performance analysis?
13     A.  Well, again, it's the accepted
14 geographic definition by the Department of
15 Justice.  It's clear that there are very little
16 imports, not a great deal of exports, and it's
17 what defendants call a leakproof market.
18     Q.  And when you say that it's the
19 accepted definition by the Department of Justice,
20 again, what's the source for that?
21     A.  Again, it would be the valuation of
22 the Temple-Inland acquisition.
23     Q.  By International Paper?
24     A.  Correct.
25     Q.  And that occurred after the class

[Page 269]

**[68]  (Pages 266 to 269)**

1  period; correct?
2      A.  Correct.
3      Q.  Do you have any source for either
4  the product market or the geographic market
5  definition during class period?
6      A.  Not from the department of justice,
7  no, I believe you can look -- it's -- no, I don't.
8      Q.  And you've relied on the Department
9  of Justice for that conclusion.
10      Does that mean that you have not
11  yourself done any empirical modeling or
12  calculation to determine what the proper
13  geographic market is for this case?
14      A.  I think by definition the U.S. has
15  to be the proper geographic market for this, given
16  the fact that we don't have large-scale imports or
17  large-scale exports.  It's one market in and of
18  itself.
19      Q.  And do you exclude the possibility
20  that there could be geographic markets within the
21  United States?
22      A.  No.  If you look at the planning
23  documents of the defendants, I see no segmentation
24  across regions.  There certainly can be some
25  regional price variance, but when prices are

[Page 270]

1  increased, they are increased across the entire
2  U.S.
3      Q.  When you say you see no
4  segmentation across regions, are you suggesting
5  that the defendants, when they plan their business
6  operations, they look entirely across the
7  United States instead of focusing on specific
8  regions within the U.S.?
9      A.  No.  I'm saying as a matter of
10  pricing, if you look at pricing, particularly the
11  prices we talked about before for PPW for
12  East Coast or West Coast, they're highly
13  correlated, which tells me the prices in these
14  markets.  They could be divided regionally for
15  business purposes, but as an economic matter, they
16  all move together.
17      Q.  In fact, prices are divided
18  regionally, aren't they --
19      A.  Yes.
20      Q.  -- in the containerboard products
21  market?
22      A.  Yes.
23      Q.  There are different prices in
24  different regions of the country; correct?
25      A.  Correct.

[Page 271]

1      Q.  What economic analysis of shipping
2  costs have you done with respect to
3  containerboard?
4      A.  Shipping cost to where, to exports
5  or --
6      Q.  To anywhere.
7      Have you done any economic analysis
8  at all with respect to shipping costs?
9      A.  I just want to be clear what you
10  mean by shipping costs.
11      Are we talking from the box plant
12  to a customer, put them on a container ship to go
13  to another country, for another country to ship to
14  here?
15      Q.  Fair enough.  Let's begin from a
16  mill to a box plant.
17      A.  The transactional data certainly
18  shows shipping costs from mills to customers, as
19  does, I believe, the data on box plants.  I myself
20  have not done an analysis per se of those shipping
21  costs.
22      I know generally that customers for
23  a box plant are within 150 miles of the plant, due
24  primarily to significant freight costs.
25      Q.  Yeah.  You're -- you in fact agreed

[Page 272]

1  with the statement that:
2      "Most corrugated products
3      are custom manufactured to the
4      customer's specifications.
5      Corrugated producers generally
6      sell within a 150-mile radius of
7      their plants and compete with
8      other corrugated producers in
9      their local market.  In fact, the
10      Fibre Box Association tracks
11      industry data by 47 distinct
12      market regions."
13      Do you agree with that statement?
14      A.  As long as we agree that
15  customization means simply to a different
16  well-known specifications of the box, yes.
17  Customers of the box plants are within a fairly
18  specified region of the -- excuse me -- the
19  customers from box plants are within a roughly, I
20  believe, 150-mile radius.
21      Q.  What generally-accepted economic
22  test could we apply to determine whether you're
23  right that there's a single geographic market
24  comprised of the entire United States with respect
25  to the sale of containerboard products?

[Page 273]

**[69]  (Pages 270 to 273)**

**[Page 274]**

1      A.   Well, you would certainly want to
2 see the impact of imports if they were increased
3 enough. If prices are increased in the U.S. and
4 there was dramatic substitution to imports, that
5 would tell you that the market is much larger than
6 the U.S. In fact, we don't see very much in terms
7 of imports. It's a tiny amount.
8      So there's no real threat to
9 defendants' increasing prices in the U.S. There's
10 nothing -- there's nowhere for customers to go for
11 additional product.
12      Q.   Right, but you've identified
13 something that I would look at to test whether or
14 not the market is larger than the United States.
15      I'm asking you: Is there a test,
16 not just factors we'd look at, but a test to
17 determine whether the geographic market is not the
18 United States, whether smaller or larger?
19      A.   Well, again, the question is were
20 prices to increase in this area, would there be
21 substitution outside of that area.
22      Q.   Have you performed that test?
23      A.   No, because there's very little in
24 terms of imports. I already know there's not much
25 trade into the United States.

**[Page 275]**

1      Q.   And the import question only goes
2 to whether or not the geographic market would be
3 bigger than the United States; correct?
4      A.   That's true, but we see prices
5 within the United States track each other. That
6 tells us something about the geographics being --
7 geographic areas being highly correlated in part
8 of the same markets.
9      Q.   What test have you performed to
10 determine whether or not the prices within
11 different regions actually track each other that
12 makes them be located in the same geographic
13 market, other than simply eyeballing them?
14      A.   Well, I think you can look at the
15 question for Dr. Dwyer, but I believe he has an
16 exhibit that shows just that and shows the
17 correlations.
18      Q.   And, again, I'm simply asking what
19 you've done.
20      Have you done that test?
21      A.   I have not done that test.
22      Q.   Do containerboard sellers in
23 New York compete with containerboard sellers in
24 California for containerboard sales in California?
25      A.   Probably not.

**[Page 276]**

1      Q.   Do corrugated product sellers in
2 California compete with corrugated product sellers
3 in Chicago for corrugated product sales in
4 Chicago?
5      A.   Probably not, but you could
6 certainly engage in trades and swaps, I suppose,
7 and -- to enter a market. I think you're -- I've
8 answered.
9      MR. MAROVITZ: Okay. I'm going to
10 move to strike the second half of that answer.
11 BY MR. MAROVITZ:
12      Q.   Are all gasoline stations in the
13 United States in the same market?
14      A.   I haven't studied the gasoline
15 market. I would think there might be some
16 rigidities. Some markets would be isolated from
17 others, to some extent, to some degree.
18      Q.   Do you have an opinion whether a
19 corrugated product purchaser in California would
20 pay the same corrugated product price, all else
21 equal, as a similar corrugated product purchaser
22 in Chicago?
23      A.   No. It's sort of an irrelevant
24 question. The question isn't working.
25      Q.   Again, I get to ask the questions

**[Page 277]**

1 and to decide what I think is relevant and is not
2 relevant. It's -- I'm happy to have you answer my
3 questions fully, but to tell me a question is
4 irrelevant is -- I would move to strike that.
5      MR. GOLDBERG: Sure. But, also,
6 let's let him finish answering your question. You
7 asked the question. You didn't like the part of
8 the answer that he started to give.
9      Finish the answer to the question.
10 Do you want to have it read back?
11      THE DEPONENT: Yes, please.
12      MR. GOLDBERG: Would you read back
13 the question and the fragment of the answer before
14 he was interrupted.
15      (The record was read as follows:
16      Q.   Do you have an opinion
17      whether a corrugated product
18      purchaser in California would pay
19      the same corrugated product
20      price, all else equal, as a
21      similar corrugated product
22      purchaser in Chicago?)
23      THE DEPONENT: And my answer is
24 those prices could differ, and I was about to say
25 the relevant question is whether they move

together and are undermined by the same economic
processes.
BY MR. MAROVITZ:
    Q.  Do you have an opinion -- move to
strike.
        Do you have an opinion whether a
corrugated product price change in California will
impact customers who buy similar corrugated
product in Chicago?
    A.  Yes, it certainly could.
    Q.  I'm not asking you whether it
could; I'm asking you whether you have an opinion
in this case whether it does.
    A.  I'm saying as an economic matter,
you wouldn't expect prices in one region to
diverge over a long period of time over prices in
another region.  There would be some sort of
substitution.
    Q.  Now, you've already testified that
the -- I think you called it the OBM, periodical
reported pricing in the United States; correct?
    A.  Correct.
    Q.  And are you familiar with the
phrase The Yellow Sheet?
    A.  Yes, I am.

    Q.  And what is The Yellow Sheet?
    A.  It's just a source for price
information.
    Q.  Is it related to the OBM?
    A.  I believe it is.  I have actually
never seen The Yellow Sheet.  I've heard some
references to it.
    MR. GOLDBERG:  Can I ask you both
to slow down just a little bit for the old man.
    MR. MAROVITZ:  I'm very slow.
    MR. GOLDBERG:  Thank you.
BY MR. MAROVITZ:
    Q.  It's the case, Dr. Harris, is it
not, The Yellow Sheet pricing index tracks no
fewer than four different regions for
containerboard pricing in the United States?
    A.  I don't know the answer to that.
    Q.  What analysis have you done to
determine the regional variation for
containerboard indices over the alleged class
period?
    A.  I have not.  I have not done the
empirical modeling.
    Q.  What work did you do to determine
whether the structure, conduct, performance of

corrugated producers was similar or different by
region for purposes of your analysis?
    A.  I didn't break it up by region.
Viewed it as one market.
    Q.  Let's go back to your declaration,
which is Exhibit --
    MR. GOLDBERG:  3.
BY MR. MAROVITZ:
    Q.  -- 3.  And I'd like to go to
Page 55.
        On Page 55 in Paragraph 15 at the
bottom, you write:
        "Only by restricting supply
      can prices be increased, that is,
      supply discipline needs to be
      heeded by the large firms."
        That's your opinion; right?
    A.  Well, it's a statement about what's
being discussed in the excerpt in Paragraph 14.
In any market, no, it's not just by restriction of
supply.  You can have an increase in demand and
have static supply and the prices increase.
    Q.  For purposes of your work in this
case, as opposed to any market, this is your
opinion; correct?

    A.  No, it's a statement about the
discussion between Mr. Denton and Mr. Wilde about
the importance of supply restrictions.
    Q.  So these last two sentences that
I've just read of Paragraph 15, that is not your
opinion?
    A.  It's not a general opinion about
the only way to increase prices.
    Q.  Okay.  Is it your view in this case
that the restriction of supply of containerboard
is a necessary part of what you believe to be an
understanding between the defendants?
    A.  Yes.  A restriction of supply both
in cutting capacity or reducing inventories,
taking downtime, anything that would restrict
supply, yes.
    Q.  Is it your view that that
restriction of supply would need to be heeded by
the large firms in order to be effective?
    A.  It would need to be heeded by
enough of the firms, not necessarily large, but
enough of the firms to make a difference.
    Q.  And how many is enough in this
case?
    A.  I don't know what the magical

**[71]  (Pages 278 to 281)**

1    number is.  What we know is the supply was
2    restricted and high operating rates were achieved.
3        Q.  Which of the defendants in this
4    case were necessary to achieve that understanding?
5        A.  Well, all of the defendants would
6    be necessary to achieve that understanding.
7        Q.  And which of the nondefendants in
8    this case would be necessary to achieve that
9    understanding?
10        A.  I don't have an opinion about the
11    nondefendants.
12        Q.  What analysis have you done, if
13    any, to determine that all of the defendants would
14    be necessary in terms of supply discipline for
15    prices to be increased?
16        A.  Well, they're all fairly large
17    producers, and if any one of them were to deviate,
18    that would weaken the collusive outcome.
19        Q.  Did you do any other analysis
20    besides what you just stated?
21        A.  I haven't done an empirical
22    analysis of the critical amount of capacity or
23    downtime to be taken, no.
24        Q.  Does your identification of all of
25    the defendants apply to the entire class period?

[Page 282]

1        A.  Yes.
2        Q.  Doctor, you agree that a reduction
3    in excess capacity is consistent with noncollusive
4    behavior; connect?
5        A.  Yes, it can be.
6        Q.  And if firms cut supply to
7    correspond to reduced demand, that's also
8    consistent with noncollusive behavior?
9        A.  Yes, it can be.
10        Q.  You agree that one way a firm could
11    lower cost is by closing high-cost production
12    facilities?
13        A.  Yes, of course.
14        Q.  And if a supplier closed a mill but
15    expanded an existing facility or opened a new one
16    with equal or greater capacity, that wouldn't
17    cause a reduction in capacity, either, would it?
18        A.  As long as it's an equivalent to
19    additions, the withdrawal.
20        Q.  You agree that in order to
21    facilitate super-competitive pricing, capacity has
22    to be reduced below would market conditions would
23    otherwise dictate?
24        A.  That, or inventories are drawn down
25    or more additional downtime is taken.  Yes, reduce

[Page 283]

1    supply below a level of demand to protect the
2    pressure on price.
3        Q.  Your opinion cites capacity data
4    indicating that since 2004, 31 containerboard
5    mills have been closed, representing 5,967 tons;
6    correct?
7        A.  Yes.
8        Q.  Would you agree that capacity
9    additions during that period would also be
10    relevant to your opinion?
11        A.  Overall, and I cite statistics
12    showing overall capacity, yes.
13        Q.  When you say you cite those
14    statistics, that's in Table 1 of your --
15        A.  Yes.
16        Q.  -- report?
17        Anywhere else?
18        A.  No.
19        Q.  Your report states capacity in
20    tons.
21        Why did you choose that measure?
22        A.  Because it's the way it was
23    reported.
24        Q.  Did you look at any other measure
25    of capacity?

[Page 284]

1        A.  I don't recall.
2        Q.  Do you know if capacity is reported
3    in any other measure?
4        A.  Capacity's reported in a number of
5    measures, short tons, long tons.
6        Q.  But you chose tons.
7        A.  I probably chose whatever was
8    represented in the documents that I had.
9        Q.  And you're not saying now that the
10    only measure that was reported in the documents
11    you had was tons; correct?
12        A.  That's correct.
13        Q.  I want to ask you some questions
14    about your Exhibit 3, which appears in your
15    original declaration, Deposition Exhibit Number 2.
16        MR. GOLDBERG:  I take it Exhibit 3
17    is Exhibit 2.
18        MR. MAROVITZ:  Correct.
19        THE DEPONENT:  Okay.
20    BY MR. MAROVITZ:
21        Q.  Did you create Exhibit 3 yourself?
22        MR. GOLDBERG:  Hold on.  Let me get
23    there.
24        THE DEPONENT:  No.  Actually --
25        MR. GOLDBERG:  Again, same thing.

[Page 285]

[72]  (Pages 282 to 285)

1    Please let me get there. Okay. I'm there.
2        THE DEPONENT: No. This comes from
3    a Smurfit document.
4    BY MR. MAROVITZ:
5        Q.    But I understand the source which
6    you're referring to, I presume, is on the second
7    page, SSCC00083396; is that right?
8        A.    That's correct.
9        Q.    Yeah. My question is: How did
10    that source document become what you've attached
11    as Exhibit 3 to your revised declaration?
12        A.    Someone on my staff probably took a
13    snapshot of the spreadsheet and included the
14    header and footer.
15        Q.    This exhibit identifies mill
16    closures.
17        When you arrived at your opinions,
18    you had available to you information about
19    capacity additions; correct?
20        A.    Probably through AFPA, yes.
21        Q.    And none of those capacity
22    additions are identified on Exhibit 3; right?
23        A.    That's correct.
24        Q.    Have you reviewed the underlying
25    Smurfit-Stone document that was the source for

[Page 286]

1        Q.    Do you know whether the
2    Smurfit-Stone document contains accurate
3    information about mill closures?
4        A.    I would assume it -- it does. It's
5    used by Smurfit.
6        Q.    What do you -- why do you say it's
7    used by Smurfit -- strike that.
8        In what sense does Smurfit use this
9    document?
10        A.    I don't know, but they certainly
11    rely on it to some extent. And it's not as if
12    this document is entirely different from the other
13    information that we've seen.
14        By -- the discussion earlier
15    referred to the fact that when you look at some of
16    the AFPA or PPW, it doesn't cover the same time
17    span, and there are overlaps where there could be
18    differences, and it wasn't clear whether it was
19    because mills were idled or closed and brought
20    back on line. This one had sort of a continuous
21    series.
22        Q.    Did you do anything yourself to
23    satisfy yourself that the information contained in
24    your Exhibit 3, your revised declaration was
25    indeed accurate?

[Page 288]

1    this Exhibit 3?
2        A.    I don't recall. I certainly have
3    reviewed this.
4        Q.    When you say "this," you mean
5    Exhibit 3?
6        A.    Yes.
7        Q.    And you're not sure whether you
8    reviewed the source document for Exhibit 3?
9        A.    I'm sure I did, but I'm just saying
10    that I referred to this table in that source
11    documents.
12        Q.    Do you know who authored the
13    Smurfit-Stone source document?
14        A.    I don't.
15        Q.    Do you know when it was prepared?
16        A.    I don't. I think sometime -- I
17    don't have an answer. I don't know.
18        Q.    You mentioned earlier in response
19    to Mr. Hoffman's questions that there were a
20    number of documents in the discovery record that
21    you received that discussed capacity, but that
22    this document, the Smurfit-Stone document, seemed
23    to have it all in one place.
24        Do you remember that?
25        A.    Yes.

[Page 287]

1        A.    Yes, by looking at other documents
2    and noting that, for certain periods of time, the
3    data here is consistent with the data elsewhere.
4        Q.    So you're satisfied it is accurate?
5        A.    Again, as I pointed out, there seem
6    to be some contradictions between the various
7    sources. I assume that it's correct, in fact,
8    Smurfit uses this document, but there might be
9    some mills that are missing from this.
10        Q.    As you sit here today, can you
11    identify any of those inaccuracies?
12        A.    No. Again, it was a matter of
13    trying to reconcile numerous sources. It becomes
14    difficult when you don't have continuous time
15    series.
16        Q.    What analysis, Dr. Harris, have you
17    performed to determine whether each specific
18    capacity closure identified on Exhibit 3 to your
19    revised declaration attributed to a particular
20    defendant is consistent or inconsistent with
21    inclusive behavior?
22        A.    We talked about this before. I
23    take it in total that these reductions were part
24    of common purpose and a common understanding to
25    reduce supply. I don't have an opinion about any

[Page 289]

**[73]  (Pages 286 to 289)**

1 mill closure in particular.
       Q.   So if I were to ask you about a
specific mill closure that appears on Exhibit 3,
you could not tell me whether that specific mill
closure is either consistent with collusive
behavior or inconsistent with collusive behavior;
is that correct?
       A.   I think they're all consistent with
collusive behavior.  If we're talking about a mill
closure -- strike that.  That's the end of my
answer.
       Q.   Okay.  In a world absent an alleged
conspiracy, which of the mill closures appearing
on Exhibit 3 would have occurred?
       A.   I don't know.
       Q.   You made no analysis of that;
correct?
       A.   No.
       Q.   Have you made an analysis of that?
I asked you another question with a "no" in it,
which is my fault.
       So have you made any analysis of,
in the absence of an alleged conspiracy, which of
the mill closures appearing on Exhibit 3 would
have occurred?

[Page 290]

       A.   I have done no specific analysis
such as that.
       Q.   What economic analysis have you
made to determine whether a box plant closure in
California has any impact on the price of boxes
sold in Illinois?
       A.   I have done no such analysis.
       Q.   What economic analysis have you
undertaken to understand whether the shutdown of a
specific mill affected box plants that require
paper not produced by that mill?
       A.   Would you read that back to me,
please?
       Q.   What economic analysis have you
undertaken to understand whether the shutdown of a
specific mill affected box plants that require
paper not produced by that mill?
       MR. GOLDBERG:  Do you have it?
       THE DEPONENT:  Well, I can simply
say I've done no such specific analysis.
BY MR. MAROVITZ:
       Q.   What opinions have you reached
about defendants' ability to make every grade or
type of containerboard at any mill?
       A.   I've done no such analysis to

[Page 292]

       A.   No, I have not.
       Q.   What economic analysis have you
made to determine whether a mill closure in
Kentucky impacts supply to a box plant in
California?
       A.   I've done no analysis to determine
those regional connections.
       Q.   Which economic analysis have you
made to determine whether a mill closure in
Kentucky impacts price paid by a box plant in
California?
       A.   I have done no such analysis.
       Q.   What economic analysis have you
made to determine whether a box plant closure in
California has any impact on the supply of boxes
in Illinois?
       A.   Are you talking about box plants or
mills?
       Q.   I'm talking about box plants now.
       A.   I'm sorry.  Can you repeat the
question?
       Q.   Sure.  What economic analysis have
you made to determine whether a box plant closure
in California has any impact upon the supply of
boxes in Illinois?

[Page 291]

determine the grade that can be produced at each
and every mill in the country.
       Q.   Have you done any analysis or
reached any opinions about whether defendants can
substitute the machinery in a mill to manufacture
one kind of containerboard instead of another?
       A.   What was your question?  Have I
done any analysis?
       Q.   Yes.
       A.   I've done no such analysis.
       Q.   Are you aware of any instances in
which one of the defendants substituted equipment
within its mill to manufacture a different kind of
containerboard than it made previously?
       A.   Well, certainly when you look at
the documents, there are references to the changes
at the mill and new products being offered.
       MR. MAROVITZ:  Move to strike.  I
don't think that's responsive.
BY MR. MAROVITZ:
       Q.   I'm asking you about a substitution
of equipment.
       MR. GOLDBERG:  Object to the --
object to the form of the question.
       ///

[Page 293]

**[74]  (Pages 290 to 293)**

BY MR. MAROVITZ:

Q. Do you understand my question?

A. Yes, I do.

Q. Okay.

A. As I said, I believe I've come across documents that discuss mills modifying equipment. I don't know if it's equivalent to your term substitute equipment, but modifying equipment, perhaps adding new equipment to produce certain grades of containerboard.

Q. How frequently does that occur?

A. This is just anecdotal. Looked through documents. I see that occurs.

Q. And you've not disclosed any analysis of what mills would have been closed between 2004 and 2010 in the absence of an alleged cartel, have you?

A. I have not.

Q. How much containerboard capacity do you claim was reduced in furtherance of the alleged cartel?

A. I don't have a specific number. I certainly cite the number of closures. What's clear is the capacity was reduced over this period and operating rates were increased.

[Page 294]

Q. What analysis do you make -- strike that.

What analysis did you make to determine whether any of the mill closures that appear on Exhibit 3 of your revised declaration were low-cost production facilities?

A. I have done no such analysis.

Q. If mills were closed to increase efficiency, reduce costs over the long run and increase profits, would your structure, conduct, performance analysis characterize those closures as consistent with cartelization?

A. Well, the way you've defined it, the mill was closed for pure business reasons, and if there's a justified business reason, it wouldn't be part of the cartel; it would be a normal business decision.

Q. What analysis did you make to determine how many mills during the class period were closed in an effort to increase efficiency, reduce costs over the long run and increase profits?

A. I have done no such analysis.

Q. Is it your opinion that defendants closed low-cost capacity mills in order to

[Page 295]

increase prices?

A. Well, no, it's not my opinion that they closed. There's certainly discussion in some of the GP documents about this concept of diffusion where they take downtime on low-cost mills as a means to increase prices.

Q. There's discussion about it in the documents; right?

A. Correct.

Q. And my question to you is: Have you reached a conclusion that defendants closed low-cost capacity mills in order to increase prices?

A. Well, if we're talking about a permanent closure, I've done no such analysis. The documents refer to taking downtime at low-cost facilities. It's my understanding that in fact did happen.

Q. How much and to what extent did that happen?

A. Well, the only document I have that addresses that -- well, there are actually a number of documents, but the only document that I have is the GP documents describing when it has occurred over a particular time period. It's not

[Page 296]

a continuous series of when that occurred over the class period.

Q. Can you identify any of them, other than the specific statements that you've made in your declaration?

A. No. The statements made in the declaration are based on the GP documents, and there are also some other documents by defendants noting how some producers are taking downtime in what they call the first and second quartile of the supply curve.

Q. And do you have an opinion about which closures on Exhibit 3 involved high-cost facilities, which I gather are those third and fourth quartile producers, and which involved low-cost facilities, which are the first and second quartile producers?

A. I don't have that information.

Q. Did the Georgia-Pacific documents that discuss diffusion say that Georgia-Pacific took downtime at low-cost mills?

A. I don't recall it was included in the first and second quartile. I believe GP does have some of the low-cost analysis versions of the quartile.

[Page 297]

**[75]  (Pages 294 to 297)**

1      Q.  I think I'm asking you a different
2   question.  Let me read it to you again.
3            Did the Georgia-Pacific document
4   that discussed diffusion say that Georgia-Pacific
5   took downtime at low-cost mills?
6      A.  I don't recall.
7      Q.  Your Exhibit 3 identifies mill
8   closures.
9            Have you studied the reason that
10  any particular defendant closed or idled specific
11  machines within any of the mills that are listed
12  on Exhibit 3?
13     A.  I have not.
14     Q.  What analysis have you made to
15  determine whether low-cost facilities accounted
16  for a disproportional share of defendants'
17  downtime?
18           MR. GOLDBERG:  Object to the form
19  of the question.
20           THE DEPONENT:  Well, I don't know
21  exactly what you mean by disproportional, if it's
22  disproportional -- well, let me ask you:  Can you
23  help me out with the concept of disproportional?
24  BY MR. MAROVITZ:
25     Q.  Did you use that phrase in your

[Page 298]

1   declaration?
2      A.  I did.  It's from one of the
3   documents.
4      Q.  So how did you understand the
5   phrase when you used it in your declaration?
6      A.  Well, it could be one of two
7   things.  It could be disproportional to a
8   defendant themselves or disproportionate to other
9   defendants.
10     Q.  And which way did you understand it
11  when you wrote your declaration?
12     A.  It could have been either.
13     Q.  You're not sure?
14     A.  I'm not sure.  The document's
15  unclear.
16     Q.  Have you conducted an analysis with
17  either definition to determine whether or not
18  low-cost facilities accounted for a
19  disproportional share of defendants' downtime?
20     A.  No, I did not.
21     Q.  Going back to the GP document, did
22  the cost quartiles in the GP document you just
23  mentioned adjust for freight costs?
24     A.  I don't recall.
25     Q.  Have you made any analysis of

[Page 299]

1   production rates across different containerboard
2   product categories during the alleged conspiracy?
3      A.  No, I didn't.  I didn't have that
4   data available.
5      Q.  Have you made any analysis of
6   pricing across different containerboard product
7   categories during the alleged conspiracy?
8      A.  Well, again, I didn't do any
9   empirical analysis.  If that was done, it would be
10  done by Dr. Dwyer.
11     Q.  In reaching your opinions, did you
12  perform any analysis of whether, in reducing
13  capacity, defendants shifted production to
14  higher-margin corrugated products to maximize
15  profits?
16     A.  Can you repeat the question,
17  please?
18     Q.  Sure.  In reaching your opinions,
19  did you perform any analysis of whether, in
20  reducing capacity, defendants shifted production
21  to higher-margin corrugated products to maximize
22  the profits?
23     A.  No, I've done no such analysis, but
24  that's, from a diffusion standpoint, exactly what
25  is being described.

[Page 300]

1      Q.  In reaching your opinions, did you
2   perform any analysis of whether, in reducing
3   capacity, defendants shifted production to
4   facilities that generated higher-margin
5   containerboard products to maximize their profits?
6      A.  I did not.
7            MR. MAROVITZ:  Do you want to take
8   a break?
9            THE DEPONENT:  If it's good for
10  you.
11           MR. MAROVITZ:  Just ask if you need
12  one.  Anytime is fine.
13           The witness has asked for a break.
14  Let's take a break.
15           THE VIDEOGRAPHER:  Off the record
16  at 3:12 p.m.
17           (Whereupon, a recess was held
18           from 3:12 p.m. to 3:26 p.m.)
19           THE VIDEOGRAPHER:  Back on the
20  record at 3:26 p.m.
21           Counsel may proceed.
22  BY MR. MAROVITZ:
23     Q.  Dr. Harris, is it your
24  understanding that every containerboard mill can
25  make any kind of containerboard a customer

[Page 301]

**[76]  (Pages 298 to 301)**

1  requests?
2      A.  No.  There are differences across
3  mills.  There are mills that make linerboard,
4  there are mills that make medium, and there are
5  probably mills that make only certain types of
6  linerboard.
7      Q.  What analysis have you made of the
8  cost associated with each mill operated by each
9  defendant?
10     A.  I have undertaken no such analysis.
11     Q.  Are there any defendants that did
12  not shut down mills between 2004 and 2010?
13     A.  Yes.  If you look on Exhibit 3, I
14  think you'll find GP is not on that list.
15     Q.  Any others?
16     A.  That's Exhibit 3; correct?
17     MR. GOLDBERG:  Right.
18     MR. MAROVITZ:  Yes.  It's Exhibit 3
19  of your revised declaration.  It's attached,
20  remember, to your original declaration, which is
21  when you originally received it.
22     THE DEPONENT:  Oh, here it is.
23  BY MR. MAROVITZ:
24     Q.  No, that's the revised one.
25     A.  Oh, no, the original.  It's right

[Page 302]

1  in front of me.
2      MR. GOLDBERG:  Exhibit 2?
3      MR. MAROVITZ:  It's Exhibit 3 to
4  Deposition Exhibit 2.
5  BY MR. MAROVITZ:
6      Q.  And just to refresh, the question
7  is whether, other than GP, there are any
8  defendants that did not shut down mills between
9  2004 and 2010.
10     A.  Temple-Inland.
11     Q.  Are there any defendants who
12  announced a mill closure after January of 2010?
13     A.  I don't recall.  There certainly
14  could be.
15     Q.  If there is one, would it be listed
16  on your Exhibit 3 to your declaration?
17     A.  No, because this only runs through
18  2010; in fact, the first quarter of 2010.
19     Q.  Okay.  As you sit here today, are
20  you aware of any?
21     A.  I don't recall.
22     Q.  Let's take a look at your revised
23  declaration at Page 12.
24     MR. GOLDBERG:  That would be
25  Exhibit 3.

[Page 303]

1      MR. MAROVITZ:  It's Deposition
2  Exhibit 3.
3  BY MR. MAROVITZ:
4      Q.  The top line of Table 1 in your
5  declaration reprints RISI statistics addressing
6  North American capacity over the period 2002 to
7  2010; correct?
8      A.  Yes.
9      Q.  Have you examined capacity data
10  addressing 2000 through 2002 in support of your
11  opinions?
12     A.  I don't recall.
13     Q.  Have you examined capacity data
14  addressing 2010 through 2014 in support of your
15  opinions?
16     A.  I haven't.  And if I could correct
17  my earlier answer, I think I've seen documents
18  reporting capacity prior to 2002.  I don't know
19  about after 2002.
20     Q.  Okay.  Have you made any analysis
21  other than simply seeing those documents?
22     A.  No.
23     Q.  Okay.  And you certainly haven't
24  disclosed any analysis in either of your
25  declarations to the defendants on this point;

[Page 304]

1  correct?
2      A.  That's correct.
3      MR. GOLDBERG:  By either of the
4  declarations, you mean the declarations that he's
5  issued?
6      MR. MAROVITZ:  I do.
7      MR. GOLDBERG:  Okay.
8  BY MR. MAROVITZ:
9      Q.  Which country statistics are
10  included in the top line of this Table 1 that says
11  North America?
12     A.  That would be Canada and the U.S.
13     Q.  So it does not include Mexico?
14     A.  I don't believe so.
15     Q.  Does U.S. capacity correlate
16  one-to-one with North American capacity?
17     A.  It's the bulk of the capacity.
18     Q.  Huh?
19     A.  It's the bulk of the capacity.
20     Q.  But does it correlate one-to-one?
21     MR. GOLDBERG:  Object to the form
22  of the question.
23     THE DEPONENT:  Yeah, I haven't
24  looked at a correlation between those two.
25  ///

[Page 305]

**[77]  (Pages 302 to 305)**

BY MR. MAROVITZ:

Q. The first year that plaintiffs allege a conspiracy existed is in the year 2004; correct?

A. Correct.

Q. It's true, is it not, that beginning in 2004 and with the exception of 2006, North American capacity increased for every year of the alleged conspiracy until the year 2009, the year after the great recession started; correct?

A. That's correct.

Q. And for the 2005 to 2006 period, isn't it true that North American capacity fell only a little under 1.5 percent in 2006?

A. It's a small drop, yes.

Q. Have you analyzed the reasons that capacity fell between 2005 and 2006?

A. No, I have not.

Q. In your opinion, were there any reductions in industry capacity for any year between 2004 and 2010 that were not the results of the alleged conspiracy?

A. I think we talked about this before. There certainly could be a legitimate reason to close a plant, but by and large, it

[Page 306]

looks as though capacity was cut in order to increase prices.

Q. On a micro level as opposed to the macro level to which you just answered, were there any specific reductions in industry capacity for any year between 2004 and 2010 that were not the result, in your opinion, of the alleged conspiracy?

A. I don't have information to make that opinion, to draw that opinion.

Q. North American capacity decreased between 2009 and 2010; correct?

A. Yes.

Q. Have you analyzed the reasons for this decrease in North American capacity between 2009 and 2010?

A. Not specifically, no.

Q. Let's examine the years before the alleged conspiracy.

Did North American containerboard capacity increase or decrease from 2002 to 2003, before the alleged conspiracy?

A. It declined.

Q. Is the decrease in 2003 indicative of collusive behavior in the industry?

[Page 307]

A. It could be, but it's also during the period of decline in demand.

Q. Do you have an opinion as to whether or not the decrease in 2003 is indicative of collusive behavior in the industry?

A. No. I'm simply pointing out that collusion could have occurred during this period. I don't have any evidence of it, and the decline seems to be consistent with decline in demand during that period.

Q. So you don't know?

A. No.

Q. Your Table 1 also prints RISI data showing that capacity increased in Europe, Asia, Latin America, Africa and the Middle East between 2002 and 2010; correct?

A. Correct.

Q. What analysis have you done to determine why containerboard capacity increased in each of those regions?

A. I have done no such analysis.

Q. What analysis have you made of any macroeconomic factors in each of the regions to see whether they applied similarly in the containerboard industry in those regions as in the

[Page 308]

United States?

A. I have done no such analysis or comparison between North America and non-North American regions.

Q. Do you have an opinion what defendants' overall capacity of containerboard would have been between 2004 and 2010 in the absence of a cartel?

A. No, I do not have that.

Q. Do you have an opinion what defendants' overall production of containerboard would have been between 2004 and 2010 in the absence of a cartel?

A. No, I've done no such empirical work.

Q. Do you have an opinion what defendants' overall production of corrugated products would have been between 2004 and 2010 in the absence of a cartel?

A. No, I've done no such empirical work.

Q. Is it your view that each defendant's "but for" capacity and production between the year 2000 and January 2004 equaled its actual capacity and production during that period?

[Page 309]

[78]  (Pages 306 to 309)

1       A.  No.  Again, as I've said, there
2   could have been collusive activity during that
3   period.  I don't have evidence of that, but it
4   certainly could have been.
5       Q.  And for your opinion you don't need
6   to know the answer to that question?
7       A.  Well, I just don't have -- as I
8   look at that period, you have declining capacity
9   in terms of demand.  It looks consistent with a
10  market with firms that are withdrawing capacity in
11  response to a decrease in demand.
12      Q.  For your opinion, do you need to
13  know the answer to that question?
14          MR. GOLDBERG:  That question being
15  the "but for" question?
16          MR. MAROVITZ:  Yes.
17          THE DEPONENT:  Can you repeat the
18  question, please?
19  BY MR. MAROVITZ:
20      Q.  Sure.  Is it your view -- strike
21  that.
22          For your opinion, do you need to be
23  able to answer the question of whether each
24  defendant's "but for" capacity in production
25  between 2000 and January 2004 equaled its actual

[Page 310]

1   capacity in production?
2       A.  No, I don't need that.
3       Q.  And you have not attempted to
4   answer that question; correct?
5       A.  I have not.
6       Q.  Is it your view that each
7   defendant's "but for" capacity in production
8   between November of 2010 and 2014 equaled its
9   actual capacity in production during that period?
10      A.  I don't have an opinion about that.
11      Q.  And just so I'm clear, you have not
12  analyzed any empirical data with respect to
13  nondefendants' production or capacity of any kind;
14  correct?
15      A.  That is correct.
16      Q.  Now, you agree that a producer
17  taking downtime might be a rational response to
18  slowing market conditions?
19      A.  That's what I said in the
20  declaration, yes.
21      Q.  You also agreed that it may be
22  rational for a producer to move productive
23  capacity from a mill by idling the paper-making
24  machines during slowing market conditions?
25      A.  Yes, it could be.

[Page 311]

1       Q.  Absent the alleged conspiracy, is
2   it your testimony the defendants would have taken
3   no downtime during 2008 to 2010?
4       A.  No, I think during the recession
5   there was a rather sharp decrease in demand, and
6   it's likely that they would have.
7       Q.  How much?
8       A.  I have no idea.
9       Q.  You have not analyzed that
10  question?
11      A.  I have not.
12      Q.  Dr. Dwyer hasn't analyzed that
13  question, has he?
14      A.  I think you should probably ask
15  him.
16      Q.  You've read his report?
17      A.  Excuse me?
18      Q.  You've read his report?
19      A.  Yes.
20      Q.  You reviewed his work?
21      A.  Yes.
22      Q.  You endorsed his work in full?
23      A.  Yes.
24      Q.  You would make no corrections to
25  his variables or to his conclusions; right?

[Page 312]

1       A.  Yes.
2       Q.  Let me ask you again:  Isn't it the
3   case that Dr. Dwyer has not analyzed whether or
4   not defendants would have taken no downtime during
5   2008 to 2010?
6       A.  Well, he might have analyzed it and
7   not reported it in his declaration.
8       Q.  But it does not appear in his
9   declaration anywhere; correct?
10      A.  That's correct, but that wasn't
11  your question.
12      Q.  Your structure, conduct,
13  performance model cannot tell us how much downtime
14  would have been taken in 2008 through at least the
15  end of 2009, absent the conspiracy; correct?
16      A.  No, the structure, conduct,
17  performance model isn't designed to be an
18  empirical model to measure something such as that.
19      Q.  And it certainly can't tell us how
20  much downtime an individual company would have
21  taken during the time period; correct?
22      A.  That's correct.
23      Q.  You've analyzed instances of
24  downtime by certain of the defendants.
25          I think it's IP and GP; correct?

[Page 313]

[79]  (Pages 310 to 313)

1    A.  Correct.
2    Q.  And you say in your report that
3  IP's downtime and GP's downtime are not fully
4  justified -- those are the words you used -- by
5  market conditions.
6        Do you recall that?
7    A.  Can you point me to the page where
8  I used --
9    Q.  Sure.  Page 44, your Paragraph 5
10 and then your Paragraph 6.
11   A.  Yes, I see it.
12   Q.  What does it mean that IP's and
13 GP's downtime are not fully justified?
14   A.  It's just a qualifier just based on
15 what I see in the -- in the documents.  It's not
16 meant to be anything specific.  It's just pointing
17 out that there seems to be a contradiction to take
18 downtime.  When you have the increase in demand or
19 take downtime, you can't meet your open market
20 demand.
21   Q.  How much of IP's downtime was not
22 justified by market conditions at that particular
23 time?
24   A.  I couldn't say.  I didn't analyze
25 this 2004, 2005 period empirically at that level

[Page 314]

1  of detail.
2    Q.  And how much of GP's downtime was
3  not justified by market conditions?
4    A.  I wouldn't know.  Just simply
5  pointing out that they were slowing back equipment
6  when they couldn't meet market demand.
7    Q.  How much of the downtime of any
8  particular defendant, in your view, was not
9  justified by market conditions?
10   A.  I have not done that analysis.
11   Q.  Now, you cite a few examples of
12 capacity closures, downtime and idling in your
13 declaration.
14        Do you stand by all of the examples
15 you cite as supportive of your opinions?
16   A.  And can you tell me where you're
17 reading from?
18   Q.  Sure.  So one of them appears on
19 Page 36 of your declaration.
20   A.  I don't see it.
21   Q.  If you look at the bottom of 35 and
22 top of 36, this is your section on mill closures,
23 and at the bottom top there, you say:
24     "In addition to the
25     permanent closures, the

[Page 315]

1  defendants also indefinitely
2  idled numerous facilities during
3  the class period."
4        And you have an example there in
5  Footnote 143.
6        Do you see that?
7    A.  Yes.
8    Q.  And I guess you've got other
9  examples as well.
10        My question is simply whether you
11 simply stand by all the examples you cite in
12 support of your opinions?
13   A.  Yes.
14   Q.  You mentioned in your declaration
15 that you made a preliminary assessment of GP and
16 IP's downtime, and you understand when I say GP, I
17 mean Georgia-Pacific, and IP, I mean International
18 Paper?
19   A.  Yes.
20   Q.  Okay.  You did not make an
21 assessment of any other defendants' downtime, did
22 you?
23   A.  No, I didn't.  As I said, these
24 were meant to be examples of the sort of evidence
25 that one could point to to draw these sorts of

[Page 316]

1  conclusions.  I didn't do it for all of the
2  defendants.
3    Q.  And because you've made no --
4  strike that.
5        Because you've made no assessment
6  of the other defendants' downtime, you're not
7  expressing any opinion that one or more of those
8  other defendants' decisions to take downtime was
9  in furtherance of a cartel; is that correct?
10   A.  Well, again, these are examples.
11 There are other documents in the discovery that
12 discussed the other defendants.  I didn't include
13 those.  At some point, I might, but in this
14 declaration, I simply gave some examples.
15        MR. MAROVITZ:  Right.  I'd move to
16 strike.  I think that's nonresponsive.
17 BY MR. MAROVITZ:
18   Q.  My question to you is:  Because
19 you've made no assessment of the other defendants'
20 downtime, you're not expressing any opinion that
21 one or more of those other defendants' positions
22 to take down time was in furtherance of a cartel;
23 correct?
24   A.  Well, it's clear that the
25 defendants -- all the defendants were taking

[Page 317]

**[80]  (Pages 314 to 317)**

| | |
|---|---|
| 1  downtime.  Again, these are examples of specific | 1  A.  I think we established that GP and |
| 2  instances. | 2  Temple-Inland did not close any mills, according |
| 3       I think as a general statement, | 3  to Exhibit 3. |
| 4  it's clear that defendants used downtime to | 4  Q.  So is it your testimony they did |
| 5  throttle back supply, or restrict supply and | 5  not reduce capacity? |
| 6  increase prices. | 6  A.  Well, if Exhibit 3 is a correct |
| 7       Q.  Where can I find an analysis, | 7  reflection of mill closures over this period and |
| 8  Dr. Harris, of how it is that Temple-Inland's | 8  they're not on that exhibit, that would suggest |
| 9  alleged use of downtime was in furtherance of a | 9  that they did not close mills over the class |
| 10  cartel in your declaration or your revised | 10  period. |
| 11  declaration? | 11  Q.  And did not reduce capacity? |
| 12       A.  As I've said, I have not done such | 12  A.  Did not reduce capacity. |
| 13  an analysis for each of the defendants.  I simply | 13  Q.  Did each defendant increase |
| 14  looked to the evidence to provide examples of | 14  containerboard capacity at some time or times |
| 15  events where downtime was taken that appears to be | 15  during the alleged conspiracy? |
| 16  against their self-interest and were consistent | 16  A.  There were some capacity additions. |
| 17  with -- according to action. | 17  Q.  Did you analyze in support of your |
| 18       Q.  I -- Let me be sure that we're | 18  opinions whether any defendant or defendants |
| 19  understanding each other. | 19  increased market share during the alleged |
| 20       I'm not asking you to tell me | 20  conspiracy? |
| 21  whether or not there may be some document out | 21  A.  Well, yes.  We know through mergers |
| 22  there that discusses downtime taken by a defendant | 22  and acquisitions that market share did increase. |
| 23  other than IP and GP. | 23  Q.  How about through mechanisms other |
| 24       I'm simply asking you whether or | 24  than mergers and acquisitions? |
| 25  not you've made an assessment of downtime taken by | 25  A.  No. |
| **[Page 318]** | **[Page 320]** |
| 1  other defendants besides IP and GP that that | 1  Q.  "No" meaning you did not conduct |
| 2  downtime was in furtherance of a cartel. | 2  such an analysis? |
| 3       A.  The downtime I reported was for GP | 3  A.  That is correct. |
| 4  and IP only in this declaration. | 4  Q.  If a defendant gained market share |
| 5       Q.  Okay.  Have you conducted any | 5  during the course of the alleged conspiracy other |
| 6  analysis of whether one defendants' downtime | 6  than through mergers and acquisitions, would that |
| 7  affected customers of a different defendant? | 7  be consistent with noncollusive behavior? |
| 8       A.  I've done no such analysis. | 8  A.  Yes, it could be. |
| 9       Q.  Have you expressed any opinion of | 9  Q.  Could be or it would be? |
| 10  downtime -- I apologize if I've asked you this | 10  A.  It could be.  It could also be |
| 11  already, but I'm going to be sure. | 11  consistent with collusive behavior. |
| 12       Have you expressed any opinion of | 12  Q.  And are you not wanting to say it |
| 13  downtime that would have been taken but for the | 13  would be consistent with noncollusive behavior? |
| 14  existence of the alleged cartel? | 14  A.  I'm saying it could be.  It could |
| 15       A.  I have done no "but for" study of | 15  also be consistent with collusive behavior. |
| 16  downtime. | 16  Q.  And I understand you're trying to |
| 17       Q.  Is each defendant's downtime | 17  say that it could be consistent with either |
| 18  atypical of the downtime taken by the | 18  collusive or noncollusive behavior. |
| 19  nondefendants over the course of the alleged | 19  I'm asking you whether there's a |
| 20  conspiracy? | 20  distinction in your mind between it could be or it |
| 21  A.  I don't know if downtime was taken | 21  would be consistent. |
| 22  of the nondefendants. | 22  A.  Well -- |
| 23  Q.  Did each defendant reduce | 23  MR. GOLDBERG:  Repeat the question |
| 24  containerboard capacity during the alleged | 24  back, please. |
| 25  conspiracy? | 25  /// |
| **[Page 319]** | **[Page 321]** |

1    (The record was read as follows:
2    **Q.** And I understand you're
3    trying to say that it could be
4    consistent with either collusive
5    or noncollusive behavior.
6        I'm asking you whether
7    there's a distinction in your
8    mind between it could be or it
9    would be consistent.)
10       THE DEPONENT: Well, by would, I --
11   if you're meaning it's only consistent with
12   noncollusive behavior, I would say no. It's
13   consistent with both.
14   BY MR. MAROVITZ:
15       **Q.** How would increased share as a
16   result of increased sales be consistent with
17   collusion?
18       **A.** In many cartels, there can be
19   increases in market share in side payments among
20   colluding firms to offset the increase in market
21   share.
22       **Q.** Have you seen evidence -- strike
23   that.
24       Identify for us in this industry,
25   based upon your study here, any side payments,

[Page 322]

1    specifically, that you think occurred.
2        **A.** I have no direct evidence of side
3    payments. There are interdependent sales at
4    market prices which economists view as potential
5    side payments. I don't know if they are side
6    payments, but they can be used for that purpose.
7        **Q.** But you don't know here whether
8    they were?
9        **A.** That's correct.
10       **Q.** Did you compare the capacity
11   reduction for containerboard that you observed
12   against box shipments over the same period?
13       **A.** Yes.
14       **Q.** What did you find?
15       **A.** Box shipments were trending up
16   during the class period and trending down prior to
17   class period.
18       **Q.** Could you repeat that?
19       **A.** I think if you look at the data,
20   you see box shipments increasing during the class
21   period and declining prior to class period.
22       **Q.** Have you investigated how many box
23   plants were closed or opened in the United States
24   during the alleged conspiracy?
25       **A.** No, I did not.

[Page 323]

1        **Q.** Is the closure of box plants
2    relevant to your structure, conduct, performance
3    analysis at all?
4        **A.** No. What's most important are the
5    mills. You would expect, once you cut capacity,
6    that there would be some box closures; otherwise,
7    they'd simply be underutilized.
8        **Q.** Have you expressed any opinion that
9    defendants' closure of some box plants reduced
10   available supply of containerboard?
11       **A.** No, but I believe you mean
12   corrugated products rather than containerboard.
13       **Q.** I don't, actually.
14       **A.** Okay. No.
15       **Q.** Thank you.
16       MR. GOLDBERG: Next question is why
17   not.
18   BY MR. MAROVITZ:
19       **Q.** Box shipments were steadily
20   trending up from 2001 and 2002 through 2008 before
21   the impact of the U.S. recession in 2008; correct?
22       **A.** I think they were trending up a
23   little bit later, from I think 2003.
24       **Q.** Let's take a look at your
25   declaration, the revised declaration, which is

[Page 324]

1    Deposition Exhibit 3 at Page 35 -- no, it's 142.
2    So read us what you wrote there.
3        **A.** Yes, you're correct. Page 13 shows
4    box shipments trending up from 2001 and '02 to
5    2008.
6        **Q.** Did you conduct any analysis that
7    would allow you to conclude that, absent
8    defendants' alleged conduct, overall box sales
9    would have increased more than they did from the
10   beginning of the class period to the great
11   recession?
12       **A.** I did not.
13       **Q.** If capacity had not been curtailed
14   before the great recession, how many more boxes
15   would have been produced on an annual basis?
16       **A.** I don't know the answer to that.
17       **Q.** You made no such analysis; correct?
18       **A.** That's correct.
19       **Q.** What box manufacturers would have
20   received additional containerboard that would have
21   allowed them to make more boxes if capacity of
22   containerboard had not been curtailed before the
23   great rescission?
24       **A.** I don't know which individual box
25   plant owners would have received more

[Page 325]

**[82]  (Pages 322 to 325)**

1  containerboard.
2      **Q.**  You don't know how any additional
3  containerboard would have been distributed;
4  correct?
5      A.  That's correct.
6      **Q.**  You don't know whether any
7  additional containerboard would have been
8  distributed to certain kind of box makers instead
9  of others; correct?
10      A.  That's correct.
11      **Q.**  Are you familiar with a particular
12  grade of linerboard referred to as white top?
13      A.  Yes.
14      **Q.**  Did white top production increase
15  or decrease during the alleged conspiracy?
16      A.  I didn't look at production numbers
17  for white top.
18      **Q.**  What analysis have you made in
19  support of your opinion to determine whether, from
20  2001 to the beginning of the class period,
21  containerboard manufacturers were producing
22  sufficient containerboard to satisfy demand from
23  box manufacturers?
24      A.  I've done no such analysis.
25      **Q.**  What analysis have you made in

    **[Page 326]**

1  support of your opinion of the equilibrium
2  production of containerboard at any point during
3  the class period?
4      A.  I haven't done any analysis of
5  equilibrium production.
6      **Q.**  What analysis have you made in
7  support of your opinion of any individual
8  defendant's equilibrium supply of containerboard
9  at any point during the class period?
10      A.  Nothing for individual suppliers.
11      **Q.**  What shortages depriving customers
12  of containerboard have you identified in support
13  of your opinion?
14      A.  Shortages to specific box plants?
15      **Q.**  Yes.
16      A.  Well, we certainly have discussions
17  between the integrated container division and the
18  mills if they need additional supply, but beyond
19  that, I didn't do a specific analysis of specific
20  box plants desiring more containerboard.
21      **Q.**  What analysis, if any, have you
22  performed to identify customers who are unable to
23  purchase containerboard because of reduced
24  inventories?
25      A.  No such analysis.

    **[Page 327]**

1      **Q.**  What analysis have you performed to
2  identify customers who are unable to purchase
3  corrugated products because of reduced
4  inventories?
5      A.  No such analysis.
6      **Q.**  Now, you've been engaged by the
7  lawyers for the named plaintiffs for the class;
8  correct?
9      A.  Correct.
10      **Q.**  Which of those named plaintiffs was
11  unable to purchase containerboard or boxes due to
12  limited supply?
13      A.  I'm not aware of any of them.
14      **Q.**  You found that box customers
15  routinely multisource multiple box plants as a way
16  to diversify their supply chain and minimize risk
17  of disruptions or shortages; correct?
18      A.  Correct.
19      **Q.**  Why is it important to your
20  analysis that confidence routinely multisource
21  multiple box plants?
22      A.  Well, it just suggests that these
23  are commodities and can be produced from multiple
24  locations.
25      **Q.**  Now, your declaration cites the

    **[Page 328]**

1  deposition testimony of the first named class
2  representative in this case, Kleen Products, to
3  support that opinion; correct?
4      A.  Can you tell me what page you're
5  on?
6      **Q.**  Sure.  Declaration at Page 29 and,
7  in particular, your Paragraph 6 --
8      A.  Yes.
9      **Q.**  -- Note 121.
10      A.  Yes.
11      **Q.**  Okay.  Which company or companies
12  supplied Kleen Products, LLC, the first named
13  plaintiff in this case, with corrugated products
14  between 2006 and 2010?
15      A.  I don't recall the companies.
16      **Q.**  Do you know whether it was more
17  than one company?
18      A.  Yes I believe so.
19      **Q.**  Okay.  Do you know if there was --
20  do you know how many companies supplied them?
21      A.  I don't.
22      **Q.**  Do you know with respect to at
23  least one other company whether it was more than
24  one or two shipments?
25      A.  I don't know that.

    **[Page 329]**

**[83]  (Pages 326 to 329)**

1    **Q.**  Do you know how many potential --
2    strike that.
3        Do you know how many potential
4    class members fall into the category of only
5    purchasing containerboard from one particular
6    supplier?
7    **A.**  I don't know that number.
8    **Q.**  Let's switch topics.
9        All else equal, an increase in
10   demand for containerboard or corrugated products
11   would cause the price to rise; correct?
12   **A.**  Assuming there's no excess
13   capacity, yes.
14   **Q.**  It's your opinion that demand
15   increased year over year between 2004 and 2008;
16   correct?
17   **A.**  Well, I say year over year.
18   Industrial production of nondurable goods
19   certainly trended up over that period.
20   **Q.**  Right.  And demand for -- excuse
21   me -- containerboard and corrugated, in your view,
22   tracked demand for nondurable goods; right?
23   **A.**  It's an important driver of demand,
24   yes.
25   **Q.**  What are the other drivers?

[Page 330]

1    **A.**  Could be durable production.  I
2    forget some of the others, but nondurable is a big
3    portion.
4    **Q.**  Okay.  What methodology did you use
5    to quantify demand during the class period?
6    **A.**  Again, looking at some of the
7    documents produced in the case by outside
8    consultants, by RISI, by some of the defendants,
9    they seem to track nondurable and durable
10   production in a few other categories.
11   **Q.**  So you simply reviewed documents as
12   opposed to conducting your own empirical analysis?
13   **A.**  No, that's including Dr. Dwyer's
14   analysis.
15   **Q.**  When you say "no," do you mean
16   that -- let me ask it again because I think we
17   understand each other, but I want to make sure the
18   record's clear.
19       Isn't it true that you simply
20   reviewed documents about demand as opposed to
21   conducting your own empirical analysis?
22   **A.**  Yeah, documents used by the
23   defendants to assess demand, that's correct.
24   **Q.**  Does your opinion about successful
25   price increase announcements that occurred in 2004

[Page 331]

1    through 2008 and in 2010 account for the impact of
2    rise and demand?
3    **A.**  Can you repeat the question,
4    please?
5    **Q.**  Sure.  Does your opinion about
6    successful price increase announcements that
7    occurred in between 2004 and 2008 and also in 2010
8    account for the impact of rising demand?
9    **A.**  Well, I don't know what you mean by
10   does it account for a rising demand.  I certainly
11   recognize that rising demand can affect price, and
12   in fact Dr. Dwyer's model has variables to control
13   for that.
14   **Q.**  And why are you struggling with the
15   notion that accounting for rising demand in
16   connection with successful price increases is
17   difficult?
18   **A.**  I don't -- I don't understand your
19   question.  There were certainly successful price
20   increases, and I don't discount that some price
21   increases in part reflect the changes in cost or
22   demand.  I don't rule that out.
23   **Q.**  Are there any specific price
24   increases between 2004 and 2008 and also in 2010
25   where you say with certainty based upon your

[Page 332]

1    analysis that the demand at the time did not
2    justify that price increase?
3    **A.**  No.  But, again, and I've repeated
4    this, I did no empirical analysis.  That was
5    Dr. Dwyer's area of expertise.  He was the one
6    that controlled for demand, supply and demand
7    factors, and it would be difficult to look to one
8    specific price increase and try to disentangle the
9    effects of all the various variables.
10   **Q.**  Now, let's go back to what we
11   talked about a minute ago in terms of demand and
12   the driver for demand.
13       People don't generally just buy
14   boxes to have them lying around; right?
15   **A.**  They use them for something.
16   **Q.**  You put -- you put something in a
17   box.
18   **A.**  I would agree with that.
19   **Q.**  Does demand for boxes differ by
20   specific type of box?
21   **A.**  Well, I suppose it could.  We've
22   talked earlier about wax boxes and bananas and
23   things like that.  There's probably a seasonal
24   component to when certain types of boxes are
25   needed.  I assume that could occur for other

[Page 333]

**[84]  (Pages 330 to 333)**

1  customers needing certain types of boxes at
2  certain times of the year.
3      Q.  And you're not expressing an
4  opinion that the demand for all types of boxes was
5  the same during the class period, are you?
6      A.  No, I'm saying the overall demand
7  for boxes comes from a wide range of customers who
8  have different needs for different types of boxes.
9      Q.  What analysis have you made, if
10  any, of the demand for specific types of boxes
11  during the class period?
12      A.  I've done no such analysis for
13  specific times of boxes.
14      Q.  You're not expressing an opinion or
15  conducted any analysis of production shifts that
16  might occur for boxes that are more profitable
17  than others to sell; correct?
18      A.  No, I've done no such analysis.
19      Q.  Let's take a look at your revised
20  declaration at Page 3.  In particular, in
21  Paragraph 2, you say:
22          "Plaintiffs allege that
23      beginning in 2004, the
24      defendants, during a period of
25      stable or increasing demand,

[Page 334]

1  those demand drivers and surmise that demand
2  seemed to be falling off in 2008 through sometime
3  in 2009.  I don't recall the exact period.
4      Q.  Do you exclude the possibility that
5  the great recession also affected demand in 2010?
6      A.  No, I think it probably did.
7      Q.  It probably did affect demand in
8  2010?
9      A.  If you look again at the drivers
10  for demand, they seemed to be lower in 2010 than
11  if you look prior to 2008.  I don't know the exact
12  numbers, but...
13      Q.  Okay.  It's your understanding,
14  Dr. Harris, that the defendants made collective
15  capacity and supply management decisions during
16  the alleged conspiracy that pushed operating rates
17  to all-time highs; correct?
18      A.  Correct.
19      Q.  And for your opinions on
20  defendants' operating rates, you relied upon AF
21  and PA containerboard statistics for 2001 through
22  2011; correct?
23      A.  That's correct.
24      Q.  Those are industrywide statistics;
25  right?

[Page 336]

1      imposed coordinated supply
2      constraints, including the
3      shutting of capacity and
4      coordinated price increases, in
5      order to fix, raise, maintain and
6      stabilize the prices of
7      containerboard products above the
8      competitive levels they otherwise
9      they would have been during the
10     class period."
11     Do you see that?
12     A.  Yes, I do.
13     Q.  Now, the entire alleged class
14  period from February 2004 until November 2010 was
15  not a period of stable or increasing demand, was
16  it?
17     A.  No.  As I've pointed out, if you
18  look at drivers for demand, clearly during the
19  great recession, there were -- there was a
20  reduction in demand.
21     Q.  And just to be clear so we're all
22  on the same page, tell us your understanding of
23  the period of time that the great recession
24  affected containerboard.
25     A.  To be honest, I can only look at

[Page 335]

1      A.  They are.
2      Q.  Does your opinion rely on any
3  individual defendant's operating rates?
4      A.  There are certainly documents that
5  show a defendant's specific operating rates, and
6  they tend to mimic what you see in the AFPA data.
7      Q.  Right.  That's -- that's not my
8  question.
9          My question is:  Does your opinion
10  rely on any individual defendant's operating
11  rates, not whether there are document that may or
12  may not say that.
13         MR. GOLDBERG:  Object to the form
14  of the question.
15         THE DEPONENT:  It relies on the
16  AFPA data that seems to be consistent with what I
17  see in the defendants' documents.
18  BY MR. MAROVITZ:
19     Q.  Okay.  So you're not relying upon
20  the defendants' documents, other than the AF and
21  PA data; correct?
22     A.  And it corroborates what I see in
23  the AFPA data.
24     Q.  But I -- I understand your point
25  about it corroborating.  I'm not quarreling with

[Page 337]

**[85]  (Pages 334 to 337)**

1   you. I want to understand what you're relying
2   upon for your opinions.
3        So are you also relying upon those
4   documents or not?
5        A. Just the AFPA, as it stated in the
6   declaration.
7        Q. On that point, you've mentioned
8   throughout this deposition that there are certain
9   documents that you may have looked at in the
10  record that are consistent with your opinions.
11       Is it the case that everything that
12  you rely upon for your opinions is contained
13  either in your declaration or your revised
14  declaration?
15       A. Yes, for these examples. My point
16  was simply to say that this isn't -- the support
17  for these statements isn't just from the documents
18  in the declaration. There are other documents out
19  there that support that same opinion. For what
20  I'm relying on, they are included in Exhibit 2.
21       Q. Right. No, I'm asking you a
22  broader question, actually.
23       My question is that throughout this
24  deposition you've discussed some examples that
25  you've included, specific examples, but you've on

[Page 338]

1   occasion said there were other things in other
2   documents, and I just want the record to be
3   crystal clear.
4        If you're expressing an opinion,
5   everything in support of that opinion that you
6   relied upon is identified in either your
7   declaration or your revised declaration; correct?
8        A. That's correct.
9        Q. If I understand your opinion, the
10  operating rate of the industry is calculated by
11  dividing containerboard production by
12  containerboard capacity; is that right?
13       A. Correct.
14       Q. What's your definition of
15  containerboard production?
16       A. The production of containerboard,
17  whatever metric you're talking about, a month or a
18  quarter or a year.
19       Q. Do you have one of those that you
20  use?
21       A. Well, the AFPA cites it in monthly
22  terms. It's available on a monthly basis.
23       Q. And so your definition of
24  containerboard production is based upon the AF and
25  PA definition?

[Page 339]

1        A. Correct.
2        Q. What's your definition of
3   containerboard capacity?
4        A. Again, that would be from the AFPA
5   documents that calculate these operating rates.
6        Q. Do you attempt to define operating
7   rates for corrugated products?
8        A. Are we talking about boxes?
9        Q. Anything that you define as a
10  corrugated product, which would include boxes.
11       A. Yeah. No, the operating rates are
12  for mills.
13       Q. Not for corrugated products?
14       A. That's correct.
15       Q. Are you opining that operating
16  rates for liner were at higher than competitive
17  levels during the class period?
18       A. Yes, I do. The restriction in
19  supply, the cuts in capacity, downtime,
20  increased operating rates. They would have been,
21  yes.
22       Q. Are you opining that operating
23  rates for medium were also at higher than
24  competitive levels during the class period?
25       A. Yes.

[Page 340]

1        Q. Do you have any opinion whether
2   operating rates for sheets manufactured by
3   defendants were higher than competitive levels?
4        A. I didn't have data on that.
5        Q. And is the same thing true for
6   finished boxes?
7        A. I thought that was your previous
8   question on corrugated boxes, and the answer is
9   the same.
10       Q. And when you say that you didn't
11  have data, are you suggesting that the defendants
12  didn't produce it, or you just didn't have it?
13       A. Probably both. You would have to
14  have production at all the box plants and the
15  capabilities of all the box plants. I did not
16  have that data.
17       Q. Okay. I think we missed in the
18  night. Let me try it again.
19       MR. GOLDBERG: It's just late
20  afternoon.
21       MR. MAROVITZ: Yeah.
22       MR. GOLDBERG: Getting later, I
23  might add.
24  BY MR. MAROVITZ:
25       Q. You've suggested that you didn't

[Page 341]

**[86] (Pages 338 to 341)**

1  have certain data, and my question to you is
2  whether you know if the defendants produced
3  documents or information that contained those
4  data.
5      A.  I don't believe that they did.
6      Q.  How do you know that?
7      A.  Well, I'm -- we were looking
8  through the data, the transactional data, and,
9  otherwise, I think I would have seen it.
10     Q.  But now you're talking about the
11  transactional data.
12         Could it have appeared also in
13  other documents provided by defendants?
14     A.  It could have.
15     Q.  And you just don't know; correct?
16     A.  I don't know.
17     Q.  If the defendant was increasing its
18  operating rate while at roughly the same time
19  increasing production, would that have been
20  conducive to cartelization?
21         MR. GOLDBERG:  Hold on.
22         Okay.  Go ahead.
23         THE DEPONENT:  Would you repeat the
24  question?
25  ///

**[Page 342]**

1  the class period.  That suggests that -- on a
2  performance measure that the collusion was
3  effective throughout the class period.
4      Q.  So now you're relying upon
5  Dr. Dwyer.  I'm asking you about your own opinion.
6         Is it your own opinion -- did you
7  want to interject, Joe?
8         MR. GOLDBERG:  No.
9  BY MR. MAROVITZ:
10     Q.  Okay.  Is it your own opinion that
11  defendants' operating rates were higher than they
12  would have been but for the alleged conspiracy?
13     A.  Yes.
14     Q.  And is it your own opinion that
15  that was true every day of the class period?
16     A.  Well, if you've restricted
17  capacity, you've taken capacity off the market as
18  part of the conspiracy, that capacity would have
19  been on the market absent the conspiracy, so by
20  definition, your operating rate would be
21  different.
22     Q.  We'll come back to that.
23         What analysis have you done of the
24  effect of operating rates that are higher in one
25  region of the country on price than in another

**[Page 344]**

1  BY MR. MAROVITZ:
2      Q.  If a defendant was increasing its
3  operating rate roughly while at the same
4  time increasing production, would that be
5  conducive to cartelization?
6      A.  Yes, it could be, if at the time
7  they're restricting capacity and increasing
8  production.  You're still elevating the operating
9  rate.
10     Q.  Would it also be consistent with
11  noncollusive behavior?
12     A.  It could be, yes.
13     Q.  What quantitative study did you
14  make of this?
15     A.  I made no such study.
16     Q.  Did you make any -- strike that.
17         At what time during the class
18  period is it your opinion that defendants'
19  operating rates were higher than they would have
20  been but for the alleged conspiracy?
21     A.  I think throughout the class
22  period.
23     Q.  Every day?
24     A.  Well, again, Dr. Dwyer's model
25  shows an elevated price in overcharge throughout

**[Page 343]**

1  region of the country?
2      A.  I've done no such analysis.
3      Q.  Do you rely for your opinions on
4  operating rates that are any more specific than
5  industrywide U.S. nationally-reported rates?
6      A.  No.
7      Q.  In a given year, if one defendant
8  reduces capacity and another defendant does not
9  but raises its operating rates and reduces its
10  inventory, what happens to the second defendant's
11  sales?
12     A.  Can you repeat the question,
13  please?
14     Q.  Sure.  In a given year, if one
15  defendant reduces capacity and another does not
16  but raises its operating rates and reduces its
17  inventory, what happens to the second defendant's
18  sales?
19     A.  Well, in your hypothetical, their
20  production is increased but the capacities remain
21  the same?
22     Q.  Sure.
23     A.  Well, if they're producing more,
24  they're either -- you're asking what happens to
25  their inventory levels?

**[Page 345]**

**[87]  (Pages 342 to 345)**

1      Q.  Sales.
2      A.  They could go up or remain flat.
3      Q.  And what would happen to its
4  profits?
5      A.  If they sold more, they would
6  probably make more money.  If they didn't sell
7  more, they wouldn't make any more money.
8      Q.  Let's go back to Table 2 in your
9  declaration, which is at Page 13.
10      A.  Yes.
11      Q.  Start with 2001.  The operating
12  rate there is 85.9.
13          Do you see that?
14      A.  Yes.
15      Q.  Is the operating rate that's listed
16  there the same, higher, or lower than the
17  operating rate would have been but for an alleged
18  cartel?
19      A.  Again, I'm not making an opinion
20  whether there was collusion prior to the class
21  period.  If we assume that this was a competitive
22  benchmark, that would be the actual "but for"
23  operating rate.
24      Q.  Okay.  Now, that's a big assumption
25  you've just made; right?  You just assumed that

[Page 346]

1  I've already stated.
2      Q.  Okay.  And the same thing is true
3  for all the years between 2004 and 2010; right?
4      A.  That's correct.
5      Q.  Do you know whether Dr. Dwyer has
6  done a "but for" analysis of operating rates?
7      A.  It's not reported in his
8  declaration.
9      Q.  Does your analysis assume a single
10  operating rate across all defendants?
11      A.  No.  In fact, when you look at the
12  data, there are differences across operating
13  rates.
14      Q.  Does your analysis assume a single
15  "but for" operating rate across all defendants?
16      A.  No.  That could differ as well.
17      Q.  And as you sit here, you could not
18  tell us whether the "but for" operating rate for
19  any particular defendant was higher or lower than
20  any other defendant; correct?
21      A.  Correct.
22      Q.  Does your analysis assume a single
23  operating rate across all a the specific
24  defendant's mills?
25      A.  It does not.

[Page 348]

1  2001 is the competitive benchmark.
2      A.  Yes.  That's what we used in our
3  modeling.
4      Q.  Right.  Let's start with 2004,
5  then.
6          Is the operating rate of 95.38 in
7  2004 same, higher, or lower than the operating
8  rate would have been but for the alleged cartel?
9      A.  Higher.
10      Q.  What was the "but for" operating
11  rate in 2004?
12      A.  I think we've discussed this.  I
13  didn't calculate the "but for" operating rate.
14      Q.  Okay.  And let's do one more just
15  so we're clear on this.
16          We'll go all the way to 2010.  The
17  operating rate in 2010 is 95.88.
18          Is the operating rate in 2010 that
19  you've put on your Table 2 same, higher, or
20  lower than the operating rate would have been in
21  the "but for" market?
22      A.  It's higher.
23      Q.  And what is the -- what is the "but
24  for" operating rate in 2010?
25      A.  I don't have that for the reasons

[Page 347]

1      Q.  And you have not made any analysis
2  of a "but for" operating rate across a specific
3  defendant's mills; have you?
4      A.  That's correct.
5      Q.  Do different machines in different
6  mills have different efficient operating rates?
7      A.  I don't know what you mean by
8  "efficient operating rates."
9      Q.  Are there some machines that run
10  better when they run at certain levels than other
11  machines?
12      A.  I am not aware of that.
13      Q.  Have you ever heard the phrase
14  "sweet spot" when used in connection with the
15  containerboard industry?
16      A.  I've seen that term in some of the
17  documents, yes.
18      Q.  What do you understand that to
19  mean?
20      A.  I don't have an opinion about it.
21  There wasn't enough information for me to develop
22  an opinion.
23      Q.  When you say you don't have an
24  opinion, do you not have an understanding of what
25  the term means?

[Page 349]

**[88]  (Pages 346 to 349)**

1  A.  I -- I don't.  I sort of take it at
2  face value.  It's probably a desirable place to
3  be.
4  Q.  Isn't it true that low operating
5  rates can deter market entry?
6  A.  Yes.
7  Q.  If operating rates are low,
8  incumbents have excess capacity to meet spikes in
9  demand; correct?
10  A.  That's correct.
11  Q.  Have you ever testified as an
12  expert in an antitrust litigation that low
13  operating rates or excess capacity was itself
14  conducive to cartelization?
15  A.  You're talking about just the
16  effect on potential entrants.  That doesn't have a
17  great deal of relevance in the market where entry
18  is already difficult.
19  But if you're suggesting that
20  there's a market where entry is possible, yes,
21  excess capacity can afford entry.
22  Q.  And, actually, I'm asking you a
23  simpler question.
24  Have you ever testified as an
25  expert in antitrust litigation that low operating

[Page 350]

1  rates or excess capacity was itself conducive to
2  cartelization?
3  A.  I don't recall.
4  Q.  You're not sure if you did and
5  you're not sure if you didn't.
6  A.  That's correct.
7  Q.  Can you rule it out?
8  A.  I just don't recall ever making
9  that sort of a statement.
10  Q.  You agree that operating rates and
11  inventories are proxies for supply and demand
12  conditions in the industry; correct?
13  A.  Yes, very important ones.
14  Q.  By itself, an operating rate can't
15  tell you whether supply or demand is driving
16  economic conditions; right?
17  A.  That's -- that's true.  Operating
18  rates can increase because of increases in demand,
19  all other things held constant.
20  Q.  Increased operating rates can be
21  consistent with either increased demand or reduced
22  supply; right?
23  A.  Or both.
24  Q.  And demand was increasing during
25  the same period, 2004 to 2008, when operating

[Page 351]

1  rates were high; correct?
2  A.  Yes, at the same time capacity was
3  being cut, yes.
4  Q.  Defendants' inventories were
5  reduced during the same period as increased
6  demand; correct?
7  A.  Inventory rates, yes, were going
8  down lower.
9  Q.  In which years of the class period
10  did defendants who did not reduce capacity reduce
11  their inventories?
12  A.  You're asking about GP and
13  Temple-Inland, and I don't know which years they
14  did not reduce their inventories.
15  Q.  How about any others, other than
16  just GP and Temple-Inland?
17  MR. GOLDBERG:  Any other
18  defendants?
19  MR. MAROVITZ:  Yes.
20  THE DEPONENT:  The question, again,
21  please?
22  BY MR. MAROVITZ:
23  Q.  Sure.  In which years of the class
24  period did defendants who did not reduce capacity
25  during those years reduce their inventories?

[Page 352]

1  A.  Okay.  You're asking --
2  Q.  If you know.
3  A.  For the firms who did not reduce
4  capacity, that would be Temple-Inland and GP.
5  MR. GOLDBERG:  That's the same
6  question you asked before.
7  MR. MAROVITZ:  No, it's -- it's not
8  intended to be.
9  MR. GOLDBERG:  So ask it again.
10  BY MR. MAROVITZ:
11  Q.  My question is by year.
12  If a defendant did not reduce
13  capacity, in which of the years of the class
14  period did that defendant reduce its inventories?
15  A.  Okay.  I understand your question.
16  It's year by year.  I don't have that information.
17  Q.  A high operating rate also allows a
18  firm to operate efficiently by spreading fixed
19  costs over more output; correct?
20  A.  Well, that's true of any capital
21  intensive industry, yes.
22  Q.  Isn't it true that per-unit
23  production costs go down as operating rates go up?
24  A.  Yeah, I mean you want to -- there's
25  certainly a tradeoff, but as utilization increases

[Page 353]

**[89]  (Pages 350 to 353)**

1  you cover more of your fixed costs, your average
2  fixed costs at the time.
3      Q.  And in that sense, high operating
4  costs can be consistent with noncollusive
5  behavior; correct?
6      A.  They can to the extent you can
7  adequately service current demand and projected
8  demand, yes.
9      Q.  Now, you offer an opinion that to
10 the extent high operating rates result in forced
11 outages, it also puts the defendants at risk of
12 meeting the current demand of their customers.
13     A.  Yes.
14     Q.  Are you aware of any instances
15 where high operating rates actually led to more
16 outages?
17     A.  I am not.
18     Q.  Are you yourself an expert in
19 containerboard product operating rates?
20     A.  No.  I'm an economist.
21     Q.  Have you compared frequency or
22 duration of defendants' maintenance outages during
23 the alleged conspiracy period versus before and
24 after?
25     A.  I did not.

[Page 354]

1      MR. MAROVITZ:  I hear we have to
2  change the tape, so let's take a break.
3      THE VIDEOGRAPHER:  This marks the
4  end of Media Number 3 in the deposition of
5  Dr. Michael Harris.  We're off the record at
6  4:23 p.m.
7      (Whereupon, a recess was held
8      from 4:23 p.m. to 4:36 p.m.)
9      THE VIDEOGRAPHER:  Back on the
10 record at 4:36 p.m.  This marks the beginning of
11 Video Media Number 4 in the deposition of
12 Dr. Michael Harris being taken at 350 South Grand
13 Avenue in Los Angeles.
14     My name is Tony Bloodworth.  I'm a
15 video specialist here on behalf of U.S. Legal.
16     Counsel may proceed.
17 BY MR. MAROVITZ:
18     Q.  Doctor, I'm going to ask you some
19 questions about your opinions with respect to
20 industry concentration.
21     A.  Okay.
22     Q.  In analyzing concentration, you
23 examined the containerboard industry's Kirkendall
24 Hirschman Index, or HHI; is that correct?
25     A.  I looked at one document by RISI,

[Page 355]

1  who -- they calculated the HHI for the industry.
2      Q.  Did you prepare your own HHI
3  analysis in addition to looking at the HHI
4  analysis prepared by Mr. Waghorn of RISI?
5      A.  Not one that reflects that
6  independent conduct, no.
7      Q.  When you say "independent conduct,"
8  you mean your own?
9      A.  No, I mean the graph assumes no
10 collusion among producers.  It reflects the HHI
11 for an industry, assuming that they're all
12 competitive.
13     Q.  Oh, I think you've answered a
14 question I haven't asked.
15     My only question was whether or not
16 you've prepared any HHI analysis, other than
17 relying upon the one by Mr. Waghorn of RISI?
18     A.  I have not.
19     Q.  And you agree that Mr. Waghorn's
20 HHI analysis relates only to containerboard, not
21 to corrugated products?
22     A.  I -- yes.
23     Q.  Now, let's take a look at his
24 table, which -- I guess his PowerPoint slide,
25 which you reprint on Page 24 of your revised

[Page 356]

1  declaration.
2      Do you have that?
3      A.  Yes, I do.
4      Q.  2003 is the first year before the
5  alleged conspiracy period; correct?
6      A.  Correct.
7      Q.  What happens to industry
8  concentration during the four years following
9  2003?
10     A.  Well, based on Mr. Waghorn's
11 calculation, it appears to drop somewhat.
12     Q.  So what does your structure,
13 conduct, performance analysis tell you about a
14 concentration's role in determining whether the
15 market was more conducive to conspiracy between
16 2004 and 2007 than it was in 2003?
17     MR. GOLDBERG:  Object to the form
18 of the question.
19     THE DEPONENT:  Well, can you repeat
20 the question?
21 BY MR. MAROVITZ:
22     Q.  Sure.  What does your SCP analysis
23 tell you about concentration's role in determining
24 whether the market was more conducive to
25 conspiracy between 2004 and 2007 than it was in

[Page 357]

1  2003?
2           MR. GOLDBERG:  Object to the form
3  of the question.
4           THE DEPONENT:  It was concentrated
5  in both, both time periods.
6  BY MR. MAROVITZ:
7       Q.  And so the difference in
8  concentration is irrelevant to your SCP analysis;
9  is that your testimony?
10          MR. GOLDBERG:  Object to the form
11 of the question.
12          THE DEPONENT:  No, differences in
13 concentration are important.  I'm simply
14 suggesting that these seem to be relatively small
15 changes in the concentration of the industry.
16 BY MR. MAROVITZ:
17      Q.  What's the threshold change in
18 industry concentration that you would find
19 sufficient to lead to a conclusion that
20 concentration's playing a meaningful role in your
21 SCP analysis?
22      A.  Well, there's really not a
23 particular threshold.  There have been a number of
24 things written about concentration above
25 50 percent.

[Page 358]

1           The DOJ, of course, has what they
2  consider to be a moderately-concentrated market,
3  or a highly-concentrated market depending on HHI,
4  but there's not a fast and tight number that one
5  uses to indicate that the market is concentrated.
6           You look at not only concentration,
7  but other elements of the market structure,
8  including barriers to entry and commodity and
9  nature of product and so on.
10      Q.  So there's no number that you have
11 in mind?
12      A.  No.  Economists just look at both
13 the concentration of the market and the other
14 factors of the market and arrive at an opinion
15 about potential conduct.
16      Q.  And how does one economist evaluate
17 another economist's opinion about the role of
18 concentration in an SCP analysis if he can't test
19 it through a number to be assigned to its result?
20      A.  Well, here I think it's sort of an
21 irrelevant question, given the market
22 concentration for the market share of the
23 defendants upwards of 70 to 80 percent.  I don't
24 think there's an economist anywhere that would
25 suggest that that is not a concentrated industry.

[Page 359]

1           I should say your expert likely
2  will, but for the most part, most economists
3  consider that a concentrated industry.
4       Q.  Now, other than speculating what
5  some expert may or may not say in the future,
6  let's focus on what you've done.
7           You say that concentration goes --
8  strike that.
9           The chart that you rely upon shows
10 that concentration goes up to a little under 1400
11 in 2008; correct?
12      A.  Correct.
13      Q.  Do you have an understanding of why
14 that happens?
15      A.  Why the HHI increased?
16      Q.  Yep.
17      A.  Increased consolidation.  HHI is
18 going to be a function of the market shares of the
19 individual firms.  As firms get larger, the --
20 their contribution of the HHI becomes larger.
21      Q.  Right, and what was the specific
22 concentration that led to the higher HHI?
23      A.  I don't know if there's a specific
24 graph in that particular bar.
25      Q.  In 2009, the chart you rely upon

[Page 360]

1  shows that concentration tops out at about 1400;
2  correct?
3       A.  Correct.
4       Q.  1400 is the highest level at any
5  point during the alleged conspiracy period; isn't
6  it?
7       A.  That's correct.
8       Q.  And then in 2010, the last year of
9  the alleged conspiracy, concentration declines to
10 around 1300; correct?
11      A.  According to the graph, yes.
12      Q.  So is it your testimony that
13 concentration is more important to your SCP
14 analysis in 2008 through '10 than it is in 2004
15 through '7?
16      A.  It's equally important.
17      Q.  And your declaration nowhere
18 quantifies its importance differently at different
19 points in time; correct?
20      A.  No, because the market was heavily
21 concentrated throughout the class period.
22      Q.  So there's no meaningful way to
23 quantify the importance of consolidation for
24 purposes of your SCP analysis during the relevant
25 class period; is that correct?

[Page 361]

**[91]  (Pages 358 to 361)**

1          MR. GOLDBERG:  Object to the form
2    of the question.
3          THE DEPONENT:  Well, concentration
4    is a qualitative factor just like barriers to
5    entry.  You certainly want to determine what
6    barriers exist, but it's not an empirical,
7    detailed analysis.  The structure conduct
8    performance paradigm simply looks at market
9    structure, and the hypothesis is that more
10   concentrated markets lead to less competitive
11   outcomes.
12   BY MR. MAROVITZ:
13        Q.  And whether it is or isn't
14   quantitative, you haven't performed any
15   quantitative analysis of it; correct?
16        A.  I performed an analysis determining
17   the market share of the defendants, yes.
18        Q.  But not a quantitative analysis of
19   different point in time in which consolidation
20   mattered more for SCP than other points in time?
21        A.  No, I did not.
22        Q.  Now, in 2011, after the alleged
23   conspiracy, the concentration level increases to
24   approximately 2008 levels; correct?
25        A.  Looks to be about that, yes.

[Page 362]

1          Q.  In fact, concentration is much
2    higher in 2011, a year that you assume is not part
3    of the conspiracy, than in 2004 through '7 and
4    2010, years that you believe are part of the
5    conspiracy; correct?
6          A.  Correct.
7          Q.  By the way, putting aside the
8    increases and decreases in concentration levels,
9    what do these levels of concentration between 1000
10   and 1400 tell you as an economist as to whether
11   this industry is unconcentrated, moderately
12   concentrated or highly concentrated?
13        A.  Well, the HHI certainly suggests,
14   according to the DOJ, it's a moderately
15   concentrated market, and if you look at not just
16   the HHI but the market share of the defendants,
17   it's clear that they controlled a large portion of
18   the market, and were they to collude, would likely
19   be successful in raising market prices.
20        Q.  Now, in fact your report refers to
21   the thresholds that the DOJ uses when considering
22   whether an industry is highly concentrated;
23   correct?
24        A.  Yes.
25        Q.  I think you cite the merger

[Page 363]

1    guidelines on Page 25, Note 93 of your report;
2    right?
3          A.  Correct.
4          Q.  And you cited those guidelines and
5    those thresholds because, in your view, they are
6    reliable indicators of market concentration;
7    right?
8          A.  They're a major of market
9    concentration, yes.
10        Q.  Fair enough.
11             They are a reliable measure of
12   market concentration.
13        A.  It's something that the Department
14   of Justice uses to evaluate mergers, yes.
15        Q.  Right.  And I'm asking you whether
16   you find it reliable.
17        A.  Yes.
18        Q.  In fact, the U.S. Department of
19   Justice frequently approves mergers when the
20   concentration levels are below highly
21   concentrated; correct?
22        A.  Yes.
23        Q.  And the U.S. Department of Justice
24   also routinely approves mergers when the
25   concentration levels are below moderately

[Page 364]

1    concentrated; correct?
2          A.  Yes, they do.
3          Q.  Do you assume that the Weyerhaeuser
4    merger would have increased the price of
5    containerboard in the "but for" world?
6          A.  I can't speak to that specific
7    acquisition and its impact on market price.  I've
8    done no such detailed analysis.
9          Q.  Would you agree that the
10   Weyerhaeuser acquisition by International Paper
11   was a meaningful instance of consolidation in the
12   marketplace?
13        A.  Yes, it was.
14        Q.  You opine that defendants increased
15   integration levels as a means to lower their open
16   market tonnage; correct?
17        A.  That's what's reported from
18   industry analysts.
19        Q.  Does a high level of -- which --
20   sorry, strike that.
21             Which industry analysts said that
22   defendants increased their integration levels as a
23   means to lower their open market tonnage?
24        A.  That would have been Deutsche Bank,
25   Wilde, maybe.

[Page 365]

**[92]  (Pages 362 to 365)**

1   Q.  Okay.  And you actually mentioned
2   in your report that Dr. Wilde was someone who the
3   defendants all thought was a highly persuasive and
4   reliable analyst; right?  Do I have that right?
5       A.  I don't know that I said those
6   exact words.  Clearly, there's documents within IP
7   that -- I believe it's IP.  I'd have to look at
8   the report, but indicate that they consider him
9   influential.
10      In addition, if you look through
11  discovery documents, you find that exact Deutsch
12  publication across some defendants.  I don't know
13  if it's all of them, but he's clearly someone who
14  reports on the industry quite often.
15      Q.  Your point is that some defendants
16  had a copy of that publication?
17      A.  Correct.
18      Q.  My question is a little different.
19      My question is whether or not it's
20  your opinion as you sit here that each of the
21  defendants in this case found Dr. Wilde's
22  opinions, as expressed in his -- the reports he
23  issued under the name Dr. Paper, to be reliable.
24      A.  I don't have evidence for each
25  defendant, no.

[Page 366]

1   testimony about specific deponents' use of
2   Dr. Wilde?
3       A.  I've read quite a few deposition
4   transcripts.  I don't recall the discussion of
5   Dr. Wilde.
6       Q.  You don't remember it coming up in
7   any deposition that you've read?
8       A.  It could have.  I simply don't
9   recall.  I've read far too many.
10      Q.  During periods of cartel
11  instability, are defendants acting as a single
12  firm?
13      A.  No.  By definition, there's
14  deviation from the collusive objective.
15      Q.  Let me go back to integration.
16      Does a high level of vertical
17  integration in an industry indicate the presence
18  of anticompetitive behavior?
19      A.  No.  There are economic reasons why
20  an industry might possess a high level of vertical
21  integration.
22      Q.  Is a high level of integration in
23  an industry consistent with cartelization?
24      A.  It could be presence for a
25  cartelization, yes.

[Page 368]

1       Q.  Okay.  And do you have evidence for
2   any particular defendant, not just that they had
3   it or that they talked about it, but that in fact
4   that defendant perceived Dr. Wilde's opinions to
5   be reliable?
6       A.  I don't have documents that say
7   specifically, "We think Dr. Wilde's opinions are
8   reliable."  I --
9       Q.  Have you seen any -- I'm sorry.
10  Please.
11      A.  I cite the document where they note
12  that he's influential.  That, to me, says he's --
13  they respect his opinion and it means a lot in the
14  industry.
15      Q.  So if someone is influential,
16  according to you, that person's opinion is to be
17  respected?
18      A.  Well, I think in the context of
19  that one document, if that person wasn't
20  considered reliable, I don't know why the
21  individual would say, "Hey, here's this.  This
22  guy's pretty in influential."  But they would have
23  some favorable impression of that person and his
24  research.
25      Q.  Have you had a chance to review any

[Page 367]

1       Q.  And a high level of integration in
2   an industry also can be present in a competitive
3   oligopoly; correct?
4       A.  That's correct.
5       Q.  A high level of vertical
6   integration exists in a number of industries;
7   correct?
8       A.  Vertical integration differs by
9   industry.  Some are more vertically integrated
10  than others.
11      Q.  And there are many industries that
12  are as vertically integrated as the containerboard
13  industry; aren't there?
14      A.  I don't have the figures in my head
15  to speak to that exact question, but I
16  suspect there are industries that are fairly
17  vertically integrated.
18      Q.  How long have you been an
19  economist?
20      A.  Quite a long time.
21      Q.  And you've studied a lot of
22  different industries; correct?
23      A.  Correct.
24      Q.  You've surely seen other industries
25  in your studies that are either as vertically

[Page 369]

1  integrated or more vertically integrated than the
2  containerboard industry; correct?
3     A.  All I can say is I'm aware that
4  there is, in some industries, high levels of
5  vertical integration.  I do not disagree with
6  that.
7     Q.  Isn't it true that the economic
8  literature supports the view that vertical
9  integration is procompetitive under a fairly wide
10  array of circumstances?
11        MR. GOLDBERG:  Object to the form
12  of the question.
13        THE DEPONENT:  You'd need to point
14  me to what that literature is.  I'm sure there's
15  economic literature that describes the benefits of
16  vertical integration, the reduction of transaction
17  cost, perhaps increases in efficiency, and also
18  literature that discusses vertical integration and
19  consequences of collusion.
20  BY MR. MAROVITZ:
21     Q.  Have you applied any models or
22  conducted any economic analysis to determine
23  whether vertical integration in the containerboard
24  industry is procompetitive?
25     A.  I have not.

**[Page 370]**

1  exceed zero, wouldn't vertical integration be a
2  rational strategy for a company to pursue?
3        MR. GOLDBERG:  Same objection.
4        THE DEPONENT:  Well, I suppose it
5  depends.  By vertically integrating, you could be
6  increasing your costs, the cost of coordination.
7  There could be other costs associated with that.
8  It's not just as simple as trying to capture a
9  downstream margin.
10  BY MR. MAROVITZ:
11     Q.  That's true.
12        Now, let's suppose all end margins
13  of finished boxes exceeds zero, okay?  So I've
14  tried to assume away these additional costs.
15        Wouldn't it be a rational strategy
16  for a company to pursue vertical integration of
17  box plants?
18        MR. GOLDBERG:  Object to the form
19  of the question.
20        THE DEPONENT:  In your
21  hypothetical, if there's sort of money on the
22  sidewalk to be picked up, if that were the case,
23  not only would I expect a high level of vertical
24  integration; I would expect a hundred percent
25  integration, but we don't.

**[Page 372]**

1     Q.  Do you disagree that margins on
2  corrugated products generally are higher than
3  margins on containerboard?
4     A.  I don't have information to draw a
5  conclusion about that.
6     Q.  If margins on finished boxes are
7  higher, wouldn't vertical integration be a
8  strategy for a company to pursue?
9     A.  No, I don't know that they would.
10        If the margin is higher, you could
11  certainly be just a box company and buy it on the
12  open market.  Either linerboard has a value or it
13  doesn't.  Vertical integration doesn't change the
14  value of the linerboard or medium.
15     Q.  How about for a company that starts
16  as a linerboard company.
17        Would it make sense if the margin
18  on finished boxes exceeded zero, wouldn't vertical
19  integration be a rational strategy for a company
20  to pursue?
21        MR. GOLDBERG:  Object to the form.
22        THE DEPONENT:  Can you please
23  repeat the question?
24  BY MR. MAROVITZ:
25     Q.  Sure.  If margins on finished boxes

**[Page 371]**

1  BY MR. MAROVITZ:
2     Q.  And there are some defendants in
3  this case whose vertical integration approaches
4  100 percent, aren't there?
5     A.  Some defendants do have a high
6  level of integration, yes.
7     Q.  Can't vertical integration lead to
8  lower costs of production of its finished product?
9     A.  I don't rule it out.  Sitting here,
10  I don't know what those decreased costs would be.
11        The process to produce linerboard
12  is different than to produce a box.  I don't know
13  what you get by combining those two operations
14  that's going to be cost-saving.
15     Q.  Are you aware of any instances
16  where -- strike that.
17        Have you conducted any analysis of
18  whether vertical integration leads to lower cost
19  of production of the finished product?
20     A.  No, I do not.
21     Q.  Vertical integration is also
22  consistent with an increase in a firm's market
23  share; is it not?
24     A.  No, not necessarily.
25     Q.  Do you agree that vertical

**[Page 373]**

**[94]  (Pages 370 to 373)**

**[Page 374]**

1  integration has the potential to reduce a
2  company's uncertainty regarding the availability
3  or price of a very important input into the
4  manufacture of boxes?
5      A.  No, I disagree with that for a
6  number of reasons.
7          One is, there's going to be a
8  market price of linerboard and medium.  It's not
9  as if -- and an opportunity cost, if you're a
10  mill, provides that at a cost below the market
11  value.
12          So there's nothing free there.  You
13  don't get away from the market realities of
14  purchasing containerboard.
15          And there was a second part to your
16  question that I don't recall.
17      Q.  But you disagree with it anyway?
18  (Laughter.)
19          MR. MAROVITZ:  No, I'm kidding.
20  Late in the afternoon.  I'll strike the second
21  part of the question in fairness to us both.  You
22  have to have a little fun every now and then.
23          MR. GOLDBERG:  (Inaudible.)
24  BY MR. MAROVITZ:
25      Q.  Do you agree that vertical

**[Page 375]**

1  integration has the potential to reduce
2  transaction costs and increase production?
3      A.  I already mentioned that could be
4  one of the reasons why a firm might vertically
5  integrate.
6      Q.  Do you agree with the proposition
7  that collusion becomes harder to maintain as the
8  products subject to collusion become more
9  differentiated?
10      A.  Oh, yeah.  That's a fairly standard
11  finding in the economic literature; that collusion
12  is easier among commodity products and more
13  difficult among differentiated products.
14      Q.  Can we agree that finished
15  corrugated products are more differentiated than
16  containerboard?
17      A.  I don't know that -- well, it
18  depends on the specifications.  If we're talking
19  about a brown box, you're looking at size, and I
20  don't know that it's any different than linerboard
21  and medium.
22          If we're looking at a box that
23  could be distinguished by size, wax, prints, then
24  it would appear that the wax attributes, the print
25  attributes might not be on the linerboard or

**[Page 376]**

1  medium, so in that case there are more ways to
2  specify the product but no more differentiated in
3  the commodities incident.
4      Q.  Well, let me use the terms that you
5  use in your declaration.  I want to compare
6  containerboard and corrugated products as you
7  define them.
8      A.  Okay.
9      Q.  Can we agree that finished
10  corrugated products are more differentiated than
11  containerboard?
12      A.  I guess I -- if I can short term
13  "differentiated," I would agree that there are
14  more attributes to a box.  It doesn't mean it's
15  more differentiated; it just simply means there's
16  more attributes to that box.  If we can agree on
17  that, then I would agree that there are more
18  attributes to the box.
19      Q.  The number -- in your opinion, the
20  number of attributes to a box do not have anything
21  to do with differentiation?
22          MR. GOLDBERG:  Object to the form.
23          THE DEPONENT:  Differentiation in
24  an economic term means if you have to
25  differentiate the product, it's no longer a

**[Page 377]**

1  commodity.
2  BY MR. MAROVITZ:
3      Q.  And is it your opinion that all
4  corrugated products are commodities?
5      A.  Yes, it is.
6      Q.  Was vertical integration during
7  2000 to 2003 economically efficient?
8      A.  I don't know.  I didn't conduct the
9  study of economic efficiency and vertical
10  integration for the 2000 to 2003.
11      Q.  Now, you opined that the level of
12  vertical integration also buttresses a finding of
13  common impact.
14          Do you remember that?
15      A.  Yes.
16      Q.  Does your opinion mean that
17  vertical integration, standing alone, would
18  support a finding of common impact?
19      A.  Perhaps not alone, but it certainly
20  is favorable to common impact, yes.
21      Q.  So -- but my question is
22  understanding alone.  Let me ask it again.
23          Does your opinion mean that
24  vertical integration, standing alone, would
25  support a finding of common impact?

**[95]  (Pages 374 to 377)**

1      A.  If we didn't have a conspiracy and
2  prices were increasing, no, the vertical
3  integration would have no bearing on common
4  impact.
5      Q.  What is the level of integration
6  that that's necessary to, to use your word,
7  buttress a finding of common impact?
8      A.  My discussion in that part of the
9  declaration is just a recognition that it would
10  not be rational for the defendants to increase
11  prices for the linerboard without having a similar
12  increase in box prices.
13      In fact, when you look at the
14  documents, you find that these linerboard and
15  medium increases are reflected in box prices, and
16  the level of integration assists that.  It's their
17  product.
18      Q.  Are you able to assign a value
19  quantitatively to the level of integration when
20  you consider it as part of your SCP analysis?
21      A.  No, other than to say it's high in
22  this industry.  It's recognized as being high.
23      Q.  Are you saying that pass-through
24  rates at vertically-integrated firms are
25  100 percent?

1  you saying that pass-through rates -- strike that.
2      Other than the documents, what
3  source of your economic training do you draw upon
4  to say that pass-through rates are vertically
5  integrated -- at vertically-integrated firms are
6  100 percent?
7      That's a terrible question.  Let me
8  try it again.  Sorry.
9      Other than the documents you've
10  just mentioned, what well-established economic
11  principle do you draw upon for your opinion that
12  pass-through rates at vertically-integrated firms
13  are 100 percent?
14      MR. GOLDBERG:  Object to the form.
15      THE DEPONENT:  I don't know that
16  you could say it would be a 100 percent.  There's
17  an entire literature on pass-through.  I was
18  simply citing documents that show containerboard
19  price increases being reflected in box price
20  increases.
21  BY MR. MAROVITZ:
22      Q.  Would a customer of a box producer
23  that bought all of its containerboard on the open
24  market be impacted differently than a customer of
25  a box producer that produced all of its

1      A.  I'm saying --
2      MR. GOLDBERG:  Object to the form
3  of the question.
4      THE DEPONENT:  I'm saying some of
5  the documents say exactly that.
6  BY MR. MAROVITZ:
7      Q.  Which documents say that?
8      A.  Well, I've cited one.  It relates
9  to the Temple-Inland document.
10      Q.  Are there any others that you rely
11  upon for your opinions?
12      A.  And to be sure, I'm not sure if I
13  cite that document in discussion of vertical
14  integration; it's just a discussion of how
15  containerboard prices are reflected in box prices.
16      Q.  And Temple-Inland, by the way, is
17  extremely integrated; correct?
18      A.  That's correct.
19      Q.  It's pretty close to 100 percent
20  integrated?
21      A.  That's correct.
22      Q.  Now, I know that you've cited
23  documents in your discussions of vertical
24  integration.
25      I'm asking you as an economist, are

1  containerboard internally?
2      A.  I'm sorry.  It is getting late.
3  Can you please repeat the question?
4      Q.  Sure.  Would a customer of a box
5  producer that bought all of its containerboard on
6  the open market be impacted differently than a
7  customer of a box producer that produced all of
8  its containerboard internally?
9      A.  Okay.  So in the first case, you
10  have a customer of a box plant that buys its
11  containerboard on the open market.
12      Q.  Right.
13      A.  The second situation, you have a
14  customer of a box plant that produces all of its
15  containerboard internally.
16      Q.  Correct.
17      A.  And what is the question?
18      Q.  Whether there's a different impact
19  felt by those two customers.
20      A.  No, I wouldn't think so.
21      Q.  Why do you say there would not be?
22      A.  Well, you'd expect the prices for
23  those two products to move in a similar fashion.
24  There's no reason -- if in the case of the firm
25  that's purchasing on the open market, they would

1   want to pass through that increase the price of
2   linerboard.  That's -- that's impacted both for
3   the vertically-integrated firm and for the firm
4   that buys on the open market.
5          Economics sort of dictate that we
6   see some sort of price equilibrium in the
7   downstream market.
8       Q.  You do agree, Dr. Harris, that the
9   defendants in this case possessed substantially
10  different levels of vertical integration during
11  the alleged class period; correct?
12      A.  There are differences in vertical
13  integration, yes.
14      Q.  I want to ask you a few questions
15  about input costs, okay?
16      A.  Okay.
17      Q.  I think you opine in your -- in
18  your declaration and revised declaration that
19  virgin fiber, energy and fuel, transportation,
20  paper-making chemicals and labor are all input
21  costs for the production of containerboard; is
22  that correct?
23          I don't have a cite for that here,
24  so why don't you tell me, apart from whether
25  you -- that's in your declaration, tell me whether

[Page 382]

1       Q.  And do you know when, as you sit
2   here?
3       A.  I think it would be -- it
4   was probably -- there was a spike in 2008.
5       Q.  Transportation?
6       A.  I don't recall.
7       Q.  Paper-making chemicals?
8       A.  I don't recall.  I'm trying to
9   look -- think back on one of the documents that I
10  cite, and there was fluctuations in all of these
11  prices.
12      Q.  And labor?
13      A.  Again, I don't recall.
14      Q.  Now, it's your opinion in this case
15  that prices adjusted independent of these input
16  costs; correct?
17      A.  Well, it's not just my opinion;
18  it's the analysis of the defendants that show
19  comparisons between prices of the -- of products
20  and average costs, and, yes, it clearly shows in
21  their analysis that prices move independent of
22  cost.
23          It doesn't mean they're totally
24  disentangled, but certainly there are price
25  increases far exceeding the need for costs.

[Page 384]

1   you agree or disagree with that.
2       A.  I've seen documents discuss those
3   types of inputs, yes.
4       Q.  Okay.  And for the record, those
5   may be some input costs that are cited by
6   Dr. Dwyer, okay?  I don't want to -- I don't want
7   to mislead you about things.
8       A.  Okay.
9       Q.  But you would agree that all those
10  are input costs for the production of
11  containerboard?
12      A.  Yes.
13      Q.  Which of these categories of input
14  costs for containerboard did not increase over the
15  course of the alleged conspiracy?
16      A.  I --
17      Q.  I'll give them to you again:
18  virgin fiber -- maybe we'll do them one at a time.
19          Virgin fiber, did it increase or
20  not increase during the course of the alleged
21  conspiracy, if you know?
22      A.  I don't know.
23      Q.  Energy and fuel?
24      A.  I think there were periods of
25  increases but also decreases.

[Page 383]

1       Q.  So based on what you've reviewed,
2   the defendants' documents uniformly support the
3   proposition that price is adjusted independent of
4   input costs; is that correct?
5       A.  I don't know uniformly.  All I'm
6   pointing to are documents that I recall that
7   compare prices to cost, and we see a divergence
8   between price and cost.
9          What I'll say is I've never seen a
10  document where prices move in perfect tandem with
11  costs.
12      Q.  Right.  So I just want to be clear.
13          Is it your opinion that costs play
14  any role in the price of containerboard between
15  2004 and 2010?
16      A.  Yeah, absolutely.  I mean that's
17  exactly why Dr. Dwyer put it in his model.
18      Q.  Other than Dr. Dwyer's analysis, do
19  you have any independent opinion about the
20  magnitude of that role?
21      A.  No.  In order to have an opinion
22  about the magnitude, you'd have to have an
23  empirical model, and I don't have that.
24          What I should say, again referring
25  back to defendant documents, they themselves

[Page 385]

**[97]  (Pages 382 to 385)**

1  quantify the impact of cost on price, and it is
2  relatively small.
3         **Q.**  And are there any defendant
4  documents that you're relying upon that are not
5  identified in your revised declaration for that
6  point?
7         **A.**  No, there's some that I've cited in
8  the revised declaration.
9         **Q.**  And as you sit here, you can't
10 remember seeing any documents that go the other
11 way?
12        **A.**  "The other way" meaning --
13        MR. GOLDBERG:  Object to the form
14 of the question.
15 BY MR. MAROVITZ:
16        **Q.**  Let me -- let me be clear.
17        You can't recall, as you sit here,
18 remember seeing any documents that show a
19 relationship between pricing and cost --
20        MR. GOLDBERG:  Object to the form
21 of the question.
22 BY MR. MAROVITZ:
23        **Q.**  -- in the defendants' documents?
24        MR. GOLDBERG:  Object to the form
25 of the question.

[Page 386]

1         THE DEPONENT:  Well, I think they
2  all show a relationship between price and cost.
3  My point is simply that prices can diverge from
4  costs.  What I haven't seen are documents that
5  show prices in lockstep and in tandem with costs.
6  BY MR. MAROVITZ:
7         **Q.**  And when you say "in lockstep and
8  in tandem," do you mean directionally or do you
9  mean same percentage in increase in cost would
10 lead to the same percentage increase in price?
11        **A.**  Anything.  Show me a graph of cost
12 and price and let's see what the correlation is.
13 If it's 99, I have not seen any of those
14 documents.
15        **Q.**  Have you seen any documents that
16 show any correlation at all, a positive
17 correlation between an increase in cost and an
18 increase in price?
19        **A.**  Yes, absolutely.  I do not disagree
20 with the premise that costs do impact price.
21        **Q.**  Okay.  Have you cited any of those
22 documents in your declaration?
23        **A.**  Yes, I have some of the IP
24 documents that discuss the role of cost, and I
25 think the graph that I'm sort of describing to you

[Page 387]

1  from my recollection.
2         **Q.**  Which of the price increase
3  announcements during the class period would have
4  occurred even in the absence of an alleged
5  conspiracy as a result of increasing input cost?
6         **A.**  I have done no analysis to
7  determine which of those were fully justified by
8  an increase cost.  I would hazard a guess that
9  probably none of them.
10        **Q.**  But that's a guess?
11        **A.**  Yes.
12        **Q.**  Doctor, have you reached any
13 opinions in this matter that are not disclosed in
14 your declaration?
15        **A.**  No.
16        **Q.**  Have you performed any analysis in
17 support of your opinions that are not disclosed in
18 your declaration?
19        **A.**  No.
20        **Q.**  Have you been asked to perform any
21 additional work with respect to class certification
22 in this matter?
23        **A.**  I have not.
24        **Q.**  Based on anything that's occurred
25 from 2009 when you were first contacted to

[Page 388]

1  5:14, p.m., right now, do you intend to perform
2  any additional work with respect to class
3  certification in this manner?
4         **A.**  No, not as I sit here, I don't
5  anticipate.
6         **Q.**  You've hypothesized that the
7  structure, conduct and performance of this
8  industry lead you to conclude that defendants
9  acted with a common understanding to cartelize
10 containerboard; correct?
11        MR. GOLDBERG:  Object to the form
12 of the question.
13        MR. MAROVITZ:  And if I haven't
14 said it right, I hope you'll -- I'm not trying to
15 trick you on this.  I just want to make sure I
16 understand what it is that your hypothesis is.
17        MR. GOLDBERG:  Object to the form.
18        THE DEPONENT:  I mean the opinion
19 is that the economic evidence shows that
20 defendants had the motive, opportunity and means
21 to collude, and if they wanted to do so, they
22 would have been successful.
23        And review of the conduct indicates
24 that -- in my opinion, that it reflects concerted,
25 collective action, not the independent, unilateral

[Page 389]

**[98]  (Pages 386 to 389)**

1    self-interests of the defendants.
2    BY MR. MAROVITZ:
3         Q.   What's the most important
4    structure, conduct and performance factor of all
5    the ones we've discussed today that leads you to
6    that conclusion?
7         A.   All of them.  I don't think you can
8    parse this out and say one is more important than
9    the other.  You need them all.
10        If you have all of them except
11   barriers to entry, you won't have a successful
12   cartel.  If you have everything except commodity,
13   it's unlikely to have a successful, stable cartel.
14   So it's all of these together should be viewed.
15        Q.   So they all have to be together?
16        A.   Yes.
17        Q.   Is there anything that you rely
18   upon that you didn't disclose -- strike that.
19        Is there anything that you rely
20   upon for your opinions in this matter that you
21   have not disclosed in either your declaration or
22   your revised declaration?
23        A.   No.
24        MR. MAROVITZ:  Let's go off the
25   record.

[Page 390]

1         THE VIDEOGRAPHER:  Off the record
2    at 5:13 p.m.
3         (Whereupon, a recess was held
4         from 5:13 p.m. to 5:27 p.m.)
5         THE VIDEOGRAPHER:  Going back on
6    the record at 5:27 p.m.
7         Counsel may proceed.
8
9         EXAMINATION
10   BY MR. HOFFMAN:
11        Q.   Dr. Harris, this is Bruce Hoffman
12   again representing Georgia-Pacific.  I don't have
13   a lot of questions for you for the remainder of
14   the day, which I'm sure you're happy to hear, but
15   let's go through them.
16        I've asked you to take a look at
17   Exhibit 6 from earlier today, and I just want to
18   redirect your attention to Page 42.  We talked
19   about this.
20        This is one of the edits that you
21   made?
22        A.   Yes.
23        Q.   You deleted the language saying:
24        "PCA assisted with the mill
25        outage of IP in 2011."

[Page 391]

1         Do you see that?
2         A.   Yes.
3         Q.   Now, earlier today you testified
4    that you were confident that statement was
5    correct, but you could not find the document that
6    supported it.
7         Do you recall that?
8         A.   Yes.
9         Q.   Okay.  So I want to ask you a
10   slightly different question, which is:  Separate
11   and apart from the document, how did PCA assist IP
12   with the mill outage?
13        A.   I believe it was by providing
14   product to IP, linerboard and medium.
15        Q.   Do you know how much product?
16        A.   I don't.
17        Q.   Do you know why PCA provided that
18   product to IP?
19        A.   Presumably, to help out IP during
20   the mill outage getting new product.
21        Q.   Do you have any sense of why PCA
22   might have done that?
23        A.   No.
24        Q.   Have you reviewed any documents
25   that provide any reasons as to why PCA did that?

[Page 392]

1         A.   I don't recall any such documents.
2         Q.   Okay.  Throughout your -- you can
3    put that exhibit away.
4         Throughout your declaration, and I
5    want you to think about or focus on Exhibit 3
6    here, you talk about interdependent trades in a
7    number of places.  I made a list, but it's quite a
8    lot of them.  It's all through.
9         Let me ask you a few questions
10   about that.
11        First, did trades between the
12   defendants occur for both containerboard and
13   corrugated products?
14        A.   I think it was primarily for
15   containerboard.
16        Q.   Was it ever for corrugated
17   products?
18        A.   I -- I don't recall.  It could have
19   been, but I just don't recall.
20        Q.   Okay.  Did you do any analysis of
21   which containerboard products were traded?
22        A.   Not analysis, other than review of
23   the documents that identified which products were
24   being traded.
25        Q.   Okay.  Can there be legitimate

[Page 393]

**[99]  (Pages 390 to 393)**

1  business reasons for firms to engage in trades?
2      A.  Yes.  I believe I discussed that in
3  the declaration.
4      Q.  And trades could be observed in a
5  competitive market; correct?
6      A.  Correct.
7      Q.  Now, did you do any analysis here
8  as to whether there was any asymmetry in the trade
9  patterns between various defendants?
10         MR. GOLDBERG:  Object to the form
11  of the question.
12         THE DEPONENT:  The answer is no.  I
13  didn't have all of the trade data that would allow
14  me to say anything about asymmetries.
15  BY MR. HOFFMAN:
16      Q.  No, you didn't do any such
17  analysis?
18      A.  That's correct.
19      Q.  Okay.  Let me ask you a couple of
20  related questions to that.
21         Did you do any analysis of any
22  asymmetry into the value of the trades between any
23  of the defendants?
24         MR. GOLDBERG:  Same objection.
25         THE DEPONENT:  No analysis.  I

[Page 394]

1  me -- the review of the documents.
2      Q.  And what -- did you draw a
3  conclusion as to how the defendants priced trades
4  between them, based on your review of the
5  documents?
6      A.  Many of them were based upon the
7  prices.
8      Q.  Okay.  Are you offering any opinion
9  as to what the price terms were in the product
10  trades between defendants?
11         MR. GOLDBERG:  Object to the form
12  of the question.
13         THE DEPONENT:  No, other than I
14  highlight the fact that trades at market prices
15  can be an indicator of collusion if used as side
16  payments, but I think we've established that I
17  have no evidence that those were actually side
18  payments.
19  BY MR. HOFFMAN:
20      Q.  Okay.  And, actually, you don't
21  offer any opinion that the trades here were in
22  fact used as side payments; correct?
23      A.  Correct.
24      Q.  Okay.  Now, did you do any analysis
25  of the use of trades before the class period

[Page 396]

1  observed those documents, discussions of
2  differences in prices, but no analysis.
3  BY MR. HOFFMAN:
4      Q.  Okay.  Do you provide any
5  conclusion anywhere in your declaration as to
6  whether any defendant came out net ahead or net
7  behind at any time as a consequence of trades?
8      A.  Not on that specific point, no.
9      Q.  Okay.  Did you do any analysis on
10  that point?
11      A.  I did not.
12      Q.  Okay.  Did you do any analysis as
13  to whether any defendants received a net financial
14  benefit from trades?
15      A.  I did not.
16      Q.  And did you do any analysis as to
17  whether any defendant suffered a net financial
18  detriment to trades?
19      A.  I did not.
20      Q.  Did you do any analysis of how the
21  defendants priced the trades between them?
22      A.  No analysis per se.  I'm talking
23  about empirical analysis now.
24      Q.  Any analysis at all?
25      A.  No.  It's just based on -- excuse

[Page 395]

1  compared to during the class period?
2      A.  I did not.
3      Q.  Did you do any analysis of the use
4  of trades after the class period compared to the
5  class period?
6      A.  I did not.
7      Q.  Do you do any analysis of trades
8  between defendants and nondefendants?
9      A.  I did not.
10      Q.  Did you do any analysis of trades
11  between nondefendants?
12      A.  I did not.
13         MR. HOFFMAN:  Let's mark
14  Exhibit 17.
15         (Whereupon, Harris Exhibit 17 was
16         marked for identification by the
17         deposition reporter and is attached
18         hereto.)
19         MR. HOFFMAN:  And while you're
20  looking at Harris 17, I'll state for the record
21  that this is a document bearing Bates number
22  WY0108926, titled 2006 Nominal Trade Plan, Tons
23  Per Month.  It's a multipage document.  The
24  concluding Bates number is 8941.
25  ///

[Page 397]

[100]  (Pages 394 to 397)

BY MR. HOFFMAN:

Q. And, Doctor, this document's cited in your declaration, but it's late in the day and I actually can't find the page where it's cited; otherwise, I wouldn't have marked it. I would have just used the declaration cite.

But my question is pretty simple: So this document lists a number of firms with whom Weyerhaeuser was conducting trades.

Do you see that?

A. Yes, I do.

Q. How many of -- which of those firms are not defendants?

A. Well, if we're looking on the first page, it would be seven.

Q. Okay. And how many were not?

A. That's the number. Seven were not defendants.

Q. How many were defendants?

A. Four.

Q. So the majority of the trading partners, separate and apart from volume, which would have adding a lot of numbers here, were nondefendants, at this time?

A. Yes, but the volume differences are

[Page 398]

fairly large.

Q. Okay. Yeah, I think you've already answered this, but really quick: Is there any difference in the trading pattern that you're aware of for Weyerhaeuser in this document which occurred during the class period as compared to its trading pattern prior to the class period?

A. I don't have this document prior to the class period, so I couldn't speak to that.

Q. Okay. Were trade prices typically made at the same price that was charged to customers in the open market?

A. I've seen evidence that they were based on market prices, so I suppose the answer to that would be yes.

Q. Okay. And what's -- I'm sorry -- what is the evidence that forms the basis for that conclusion?

A. Documents that I've seen that indicate that trades are to be priced, for example, off of PPW.

Q. Okay. But you've done no actual study or analysis of the prices at which the trades were made?

A. Not of all trades, no.

[Page 399]

Q. Or of any trades?

A. No, other than what I've seen in the documents.

Q. Okay. So just sort of episodically, there might have been a trade or two where you saw the price, but you don't know what the prices overall were in aggregate or on average were?

A. That's correct.

Q. Okay. Let's leave trades aside for a moment.

If you could go back to Harris 3 and turn to Page 57, please.

At the top of 57 in your numbered Paragraph 3 in support of a section of your declaration concerning direct communications among the defendants about competitive and nonpublic information, you reference an E-mail exchange between the Smurfit-Stone -- well, you reference an E-mail exchange involving Smurfit and Georgia-Pacific?

A. Correct.

Q. Do you know what the product was that that exchange related to?

A. I don't recall.

[Page 400]

Q. Do you know if it's a product that's at issue in this case?

A. I don't recall.

MR. HOFFMAN: All right. Well, let's go ahead and mark Harris 18.

(Whereupon, Harris Exhibit 18 was marked for identification by the deposition reporter and is attached hereto.)

MR. HOFFMAN: And here what I have for the record is the E-mail exchange along with a document that was produced in native form attached to it, which I understand to be the -- you reference a pricing matrix that was attached, and I believe, subject to correction by anyone, that the matrix that's been attached is in fact that native file document that was included.

MR. GOLDBERG: That's your understanding. That's what you're representing.

MR. HOFFMAN: Correct.

MR. GOLDBERG: Okay. It is what it is. We're taking your representation.

MR. HOFFMAN: And it's the best I've got for you.

///

[Page 401]

[101] (Pages 398 to 401)

**HIGHLY CONFIDENTIAL**
**PURSUANT TO PROTECTIVE ORDER**

1     (Whereupon, there was a discussion
2     held off the stenographic record.)
3     BY MR. HOFFMAN:
4        Q.   Okay.  Have you had a chance --
5     well, for the record, this is a document bearing
6     Bates numbers SSCC00365429 through 5431, and then
7     the native file that was produced I think had the
8     production Bates number, although this is not
9     reflected on the document, of SSCC00365432.
10          Have you had a chance to look at
11    the document, Doctor?
12       A.   Yes.
13       Q.   So if you turn to the third page,
14    which has Bates number 31 --
15       A.   Yes.
16       Q.   -- three lines from the top, you'll
17    see a line that states:
18          "The product is 90-pound
19          uncoated cup stock 7 point."
20          Do you see that?
21       A.   Yes.
22       Q.   What is cup stock?
23       A.   I don't know.
24       Q.   So you don't know whether it's a
25    product that's at issue in this case?

[Page 402]

1        A.   Well, I'm somewhat perplexed why an
2     E-mail would be produced for a product not in this
3     case, but sitting here, I don't know if cup stock
4     specifically is in the case.
5        Q.   I'll tell you that stranger things
6     have happened in the sausage-making process of
7     discovery productions.
8           But you don't have any idea?
9        A.   I do not.
10       Q.   Okay.  Let's talk about imports and
11    exports just a little bit.  This has been covered
12    to some extent today, and I'll be brief.
13          Do you have any opinion as to what
14    the equilibrium amount of imports or exports
15    should be in this industry?
16       A.   I -- no, I don't know that one
17    could determine what the equilibrium value would
18    be.
19       Q.   Did you do any analysis as to what
20    the competitive results of import and exports
21    would be?
22       A.   I did not.
23       Q.   Did you do any analysis to compare
24    import and export levels during the pre- and
25    post-conspiracy periods versus the conceived

[Page 403]

1     alleged class period?
2        A.   I did not.
3        Q.   Have you done any kind of
4     sensitivity analysis or quantitative analysis to
5     determine the effect that imports or exports have
6     on price?
7        A.   No.
8        Q.   Have you done any kind of analysis
9     to determine which firms are, in your opinion,
10    using imports or exports as a tool to control
11    domestic supply?
12       A.   No analysis, no.
13       Q.   Have you done any -- have you
14    undertaken any analysis to determine the effects,
15    the quantitative effects of any such efforts?
16       A.   I have not.
17       Q.   Are you offering any opinion as to
18    what those effects were?
19       A.   I have not developed an empirical
20    model that would tell me those answers, so, no.
21       Q.   So, no?
22       (Deponent shook head.)
23    BY MR. HOFFMAN:
24       Q.   Okay.  Have you done any analysis
25    to determine whether exports actually caused any

[Page 404]

1     customers to be unable to get any product they
2     wanted?
3        A.   No, I have not.
4        Q.   In Harris 3 at Page 17 --
5        A.   Yes.
6        Q.   -- on the bottom, the last couple
7     lines of the text here, you reference an E-mail
8     exchange from Mark Polivka, whose name I'm
9     probably massacring.
10          Do you know who that is?
11       A.   I do not.
12       Q.   Do you know who he worked for?
13       A.   I believe Smurfit.  Smurfit
14    document.
15       Q.   Okay.  And you quote his document
16    as saying that he was:
17          "Working with sales to
18          deliver as much export as
19          possible to offset consumption
20          shortfalls and drive inventory
21          levels lower."
22          Do you see that?
23       A.   Yes.
24       Q.   Are you opining on what he meant by
25    that?

[Page 405]

[102]  (Pages 402 to 405)

A.435

1     A.  Other than my statement above that
2  firms use exports as an economic tool to control
3  domestic supply?
4     Q.  Okay.  So your opinion is that this
5  is evidence that Smurfit was using exports to
6  control domestic supply?
7     A.  Certainly as a means to drive
8  inventory levels lower, yes.
9     Q.  Okay.  What's a consumption
10  shortfall?
11     A.  I don't know what it means in this
12  context.  I would take it to mean a reduction in
13  demand.
14     Q.  Okay.  If demand was falling from
15  Smurfit's perspective, would it be a legitimate
16  business strategy for them to take some of their
17  excess inventory and export it?
18     A.  Depending on the economics of the
19  export market, it might be.
20     Q.  Isn't that entirely consistent with
21  this E-mail that you quote?
22     A.  It could be, yes.
23     Q.  Have you done anything to rule out
24  the possibility that this was simply referring to
25  a perfectly legitimate business strategy when

**[Page 406]**

1  self-interest to export products in order to
2  increase or maintain domestic prices?
3     A.  If the firm is exporting as a means
4  to reduce domestic supply at increased prices
5  knowing that other firms will do the same, that's
6  anticompetitive.
7        If you have a hypothetical where
8  you have a firm that's so large they already have
9  market power, it's in their self-interest, by
10  definition, they're going to maximize profits, and
11  that's what they'll do.
12     Q.  Are any of the firms in this
13  industry large enough where, by unilaterally
14  reducing supply, they could cause market price to
15  rise?
16     A.  No.  As I've pointed out, there's
17  some IP documents that suggest that, individually,
18  they do not have market power.
19     Q.  Okay.  Now, could a firm also
20  rationally export and see if others do the same?
21     A.  I suppose so, yes.
22     Q.  Would that be illegal?
23        MR. GOLDBERG:  Object to the form.
24        THE DEPONENT:  Well, it sounds like
25  you're in an oligopolistic market where people are

**[Page 408]**

1  facing falling demand and rising inventories, to
2  export some of the inventory?
3     A.  I don't know how I could rule that
4  out with data I have.
5     Q.  So you haven't done anything to
6  rule that out?
7     A.  I have not.
8     Q.  Okay.  You can put that aside.
9        How does the volume of
10  containerboard exports as a percentage of
11  production compare to other industries that have
12  low weight-to-value ratios?
13     A.  I don't know the answer to that.
14     Q.  You don't know?
15     A.  I don't know.
16     Q.  How about -- can you make the same
17  comparison, the volume of containerboard exports
18  as a percentage of production compared to
19  industries that do not have any alleged cartels or
20  collusion?
21     A.  I don't know what that comparison
22  would be.
23     Q.  You have no idea?
24     A.  I don't.
25     Q.  Is it inconsistent with a firm's

**[Page 407]**

1  developing conjectures, and you might observe what
2  other firms are doing in the export market.
3  That's interdependent market.
4  BY MR. HOFFMAN:
5     Q.  That's perfectly consistent with
6  what an economist would call a noncooperative
7  oligopoly; right?
8     A.  Yes, if they're independent
9  conjectures, yes.
10     Q.  Okay.
11        MR. HOFFMAN:  That's all I have.
12        Pass the witness.
13        We should go off the record.
14        THE VIDEOGRAPHER:  Off the record
15  at 5:46.
16        (Whereupon, there was a brief
17        pause in the proceedings.)
18        THE VIDEOGRAPHER:  Back on the
19  record at 5:47.
20        Counsel may proceed.
21
22        EXAMINATION
23  BY MR. HERBISON:
24     Q.  Good evening, Dr. Harris.  My
25  name's Jim Herbison.  Again, I represent

**[Page 409]**

1    RockTenn CP, LLC, the entity formally known as
2    Smurfit Stone Container Corporation, and I
3    literally just have a handful of questions for
4    you, Doctor.
5        Dr. Harris, for empirical findings
6    of classwide impact and damages, you reviewed the
7    analysis of Dr. Dwyer; correct?
8        A.   That's correct.
9        Q.   And you found Dr. Dwyer's analysis
10   to be sound and consistent with your findings;
11   correct?
12       A.   That's correct.
13       Q.   And Dr. Dwyer analyzed classwide
14   impact by determining whether announcements of
15   price increases by the defendants resulted in
16   increases in PPW index after the effective dates;
17   correct?
18       A.   Yes, and the correlation between
19   the actual transaction prices and PPW.
20       Q.   And, sir, turn your attention again
21   to Exhibit 2, which is your declaration, and
22   Exhibit 4 to that exhibit.
23       A.   Yes.
24       Q.   And, sir, directing your attention
25   to the bottom line, Announcement Number 15.

[Page 410]

1        Do you see that?
2        A.   Yes, I do.
3        Q.   And are you aware of any classwide
4    impact being reflected in the PPW index during the
5    class period resulting from the price increase
6    announced by defendants effective August 2010?
7        A.   As indicated here, there was no
8    increase in the PPW index, and as I've discussed
9    before, that doesn't mean that transaction prices
10   for some customers could have increased.
11       Q.   But with respect to the August 2010
12   price increase, there was no classwide impact
13   reflected in the PPW index; correct?
14       A.   There was no -- there was increase
15   in the PPW index, correct.
16       Q.   I'd like to direct your attention
17   to Exhibit 11, which is Plaintiffs' class brief
18   which you were shown earlier today.
19       A.   Yes.
20       Q.   Page 20, Doctor.  I'd like to
21   direct your attention to the chart on Page 20 and
22   specifically the last line with respect to the
23   August 2010 effective date.
24       Do you see that?
25       A.   Yes, I do.

[Page 411]

1        Q.   And is this chart consistent with
2    your understanding of the dates on which the
3    defendants announced price increases?
4        A.   I don't recall.  These months on
5    Exhibit 4 are implementation months.  I don't
6    recall the exact day in which these announcements
7    were made for all the defendants.
8        Q.   Do you have any reason to dispute
9    that Georgia-Pacific announced a price increase on
10   June 29th, 2010?
11       A.   Well, that's certainly what the
12   table indicates.
13       Q.   Or that IP announced a price
14   increase on June 29th, 2010?
15       A.   Again, that's what the table
16   reflects.
17       Q.   That Temple-Inland announced on
18   June 30th, 2010?
19       A.   That's correct.
20       Q.   Or that Smurfit-Stone announced on
21   July 1st, 2010?
22       A.   That's what the table says.
23       Q.   That Ranpak announced on
24   July 8th, 2010?
25       A.   Again, that's what the table

[Page 412]

1    indicates.
2        Q.   Or that PC announced sometime
3    before July 14th, 2010?
4        A.   That's again what the table
5    indicates.
6        MR. HERBISON:  I have no further
7    questions.
8        MR. McKEOWN:  Nothing for me.
9        MR. HERBISON:  Anybody else?
10       MR. MENDEL:  No.
11       MR. HERBISON:  Thank you for your
12   time, Doctor.  I have no further questions.
13       MR. MAROVITZ:  The deposition will
14   continue to have the highly confidential
15   designation.
16       MR. GOLDBERG:  I have one area of
17   cross-examination.
18       MR. MAROVITZ:  Oh.  Sorry, Joe.
19       MR. GOLDBERG:  So let's do it right
20   now.
21
22       EXAMINATION
23   BY MR. GOLDBERG:
24       Q.   Dr. Harris, one area.
25       Do you remember towards the end of

[Page 413]

**[104]  (Pages 410 to 413)**

1    your questions and answers with Mr. Marovitz he
2    asked you about whether, in your structure,
3    conduct, performance analysis, any particular
4    facet was more important than the others?  Do you
5    remember that line of questioning?
6        A.  Yes, I do.
7        Q.  And my recollection is that he
8    asked you to identify which was the most important
9    factor.
10       Do you remember that?
11       A.  Yes, I do.
12       Q.  And in your answer, I want to make
13   sure that the record is clear.
14       Why don't you explain what you
15   intended to convey in your answer.
16       MR. MAROVITZ:  Objection to form.
17       THE DEPONENT:  Simply that it's
18   necessary not to just focus on any one of those
19   factors but to look at all of them in their
20   totality.  Simply that.
21   BY MR. GOLDBERG:
22       Q.  In your answer, were you intending
23   to imply that any one of those factors was
24   indispensable to your analysis?
25       MR. MAROVITZ:  Objection to form.

[Page 414]

1    And I wanted to convey that in the original answer
2    and thought that I did.
3        Q.  So if you did convey it in the
4    original answer, we can take you at your word that
5    the original answer is what we can rely upon for
6    purposes of this case; correct?
7        A.  You can rely on what I've just
8    testified to.
9        Q.  And when you say "just testified
10   to," are you saying we can't rely upon the answer
11   that you gave before the break?
12       A.  That's correct.
13       Q.  Are there any other answers to
14   questions that you gave that we cannot rely upon
15   anymore?
16       A.  No.
17       Q.  Okay.  Was the testimony that you
18   gave before the break, in your opinion, any more
19   or less under oath than the testimony after the
20   break?
21       A.  No.
22       Q.  Was the testimony that you offered
23   before the break on this topic false?
24       A.  Not in my mind, no.  I was
25   answering the question as I thought I was

[Page 416]

1        THE DEPONENT:  No, I was not.
2        MR. GOLDBERG:  Thank you.  No
3    further questions.
4        MR. MAROVITZ:  I do.
5
6        EXAMINATION
7    BY MR. MAROVITZ:
8        Q.  Dr. Harris, Andy Marovitz for
9    Temple-Inland.
10       With respect to the questions that
11   Mr. Goldberg just asked you, are you changing your
12   testimony from the testimony that you gave me
13   before the break until now, the testimony you've
14   just given after the break?
15       A.  I'm just clarifying my testimony.
16       What I meant to indicate was that
17   you simply don't look at one of these factors in
18   isolation; you should look at all of them in their
19   totality.  That's what I was trying to convey.
20       Q.  So are you changing your testimony?
21       A.  I'm clarifying my testimony.
22       Q.  I understand that you're clarifying
23   it.  I'm asking you if you're changing it.
24       A.  If you take that to mean a change,
25   then it's a change.  I look at it as clarification.

[Page 415]

1    answering, to simply suggest that all these
2    factors should be looked at in their totality, and
3    if I conveyed that I meant to suggest that there
4    was some importance attached to any one of these,
5    and that was not my intention.
6        Q.  Well, I understand you're
7    testifying as to your intention now.  My question
8    is about your actual testimony.
9        Was the testimony you gave before
10   the break on this topic false?
11       A.  No, it was not.  It simply could be
12   conveyed better, as I've just done.
13       MR. MAROVITZ:  I have nothing
14   further.
15       MR. GOLDBERG:  Gentlemen?
16       MR. MENDEL:  No.
17       MR. McKEOWN:  No.
18       MR. GOLDBERG:  Okay.  Now I
19   interrupted you, Andy.  You were reaffirming that
20   you were -- at least in the interim, you want this
21   as highly confidential.
22       MR. MAROVITZ:  I think that's
23   right.  The transcript will be highly
24   confidential.  The exhibits will retain whatever
25   confidentiality designation that they originally

[Page 417]

[105]  (Pages 414 to 417)

1  had.

2         MR. GOLDBERG:  Just if you don't

3  mind, it's been my experience, since not everybody

4  is here and since there will be a -- it may be a

5  while -- if somebody would just send me, send it

6  to me, send me a letter very briefly saying

7  exactly what you said, then that way, I'll make

8  sure I can circulate that to everybody.

9         Fair enough?

10        MR. MAROVITZ:  Sure.

11        MR. GOLDBERG:  I just don't want

12  people to get the deposition transcript, not open

13  it up and inadvertently violate the expectations.

14        MR. McKEOWN:  Can we go off the

15  record now?

16        THE VIDEOGRAPHER:  Off the record?

17        MR. GOLDBERG:  Adios.  Thank you

18  very much.  Thanks for lunch, by the way.

19        THE VIDEOGRAPHER:  This concludes

20  today's proceeding in the deposition of

21  Dr. Michael Harris.  We've used four video media.

22  Going off the record at 5:56.

23  ///

24  ///

25  ///

**[Page 418]**

1  State of California  )

              )ss

2  County of Los Angeles)

3

4         I, KRISTI CARUTHERS, Certified Shorthand

5  Reporter, Certificate Number 10560, for the State

6  of California, hereby certify:

7         The foregoing proceedings were taken

8  before me at the time and place therein set forth,

9  at which time the deponent was placed under oath

10  by me;

11        The testimony of the deponent and all

12  objections made at the time of the examination

13  were recorded stenographically by me and were

14  thereafter transcribed;

15        The foregoing transcript is a true and

16  correct transcript of my shorthand notes so taken;

17        I further certify that I am neither

18  counsel for nor related to any party to said

19  action, nor in any way interested in the outcome

20  thereof.

21        IN WITNESS WHEREOF, I have hereunto

22  subscribed my name this 29th of July, 2014.

23

24

25  _____

**[Page 420]**

1

2

3         (Whereupon, at the hour of

4         5:56 p.m., the proceedings

5         were concluded.)

6         ---o0o---

7

8

9

10

11  _____

        (Signature of Deponent)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**[Page 419]**

1         I have read the foregoing transcript of

2  my deposition given on July 22, 2014, and

3  it is true, correct and complete, to the best

4  of my knowledge, recollection and belief,

5  except for the corrections noted hereon

6  and/or list of corrections, if any, attached

7  on a separate sheet herewith.

8

9

10

11

12  _____

13         MICHAEL J. HARRIS, PH.D.

14

15

16

17  Subscribed and sworn to

18  before me this _____ day

19  of _____, 2014.

20

21

22  _____

23  Notary Public

24

25

```
 1
 2          E R R A T A  S H E E T
 3      I, MICHAEL J. HARRIS, PH.D., do hereby certify that I
 4   have read the foregoing transcript of my testimony, and
 5   further certify that it is a true and accurate record
 6   of my testimony (with the exception of the corrections
 7   listed below).
 8   PAGE  LINE              CORRECTION
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24
     _____    _____
25   Date          MICHAEL J. HARRIS, PH.D.
```

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of August, 2015, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case, including the counsel identified below, are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

W. Joseph Bruckner
Brian D. Clark
Devona L. Wells
LOCKRIDGE GRINDAL NAUEN
100 Washington Avenue S., Ste. 2200
Minneapolis, MN 55401

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
FREED KANNER LONDON
& MILLEN LLC
2201 Waukegan Road, Ste. 130
Bannockburn, IL  60015

Daniel J. Mogin
Jodie Williams
THE MOGIN LAW FIRM, P.C.
707 Broadway, Ste. 1000
San Diego, CA  92101

*Counsel for All Plaintiffs-Appellees*

  /s/ Miguel A. Estrada
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com