Nos. 15-2385, 15-2386

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

KLEEN PRODUCTS LLC, *et al.*,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

v.

INTERNATIONAL PAPER CO., *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 1:10-cv-05711, The Honorable Harry D. Leinenweber, District Judge

## BRIEF FOR PLAINTIFFS-APPELLEES

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
FREED KANNER LONDON
   & MILLEN LLC
2201 Waukegan Road
Suite 130
Bannockburn, IL 60015
(224) 632-4500

Daniel J. Mogin
Jodie Williams
THE MOGIN LAW FIRM, P.C.
707 Broadway
Suite 1000
San Diego, CA 92101
(619) 687-6611

*Co-Lead Counsel for Plaintiffs-Appellees*

September 24, 2015

Aaron M. Panner
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN,
   TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Plaintiffs-Appellees*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS

Statements pursuant to Rule 26.1 of this Court follow for each attorney on this brief.  Each statement refers to a separate attachment that identifies (as requested by Item 2 of this Court's standard form) all law firms whose partners or associates have appeared for Plaintiffs-Appellees in this case.  Because the attachments are identical, a single copy appears at the end.

Date:  September 24, 2015

*s/ Aaron M. Panner*
Aaron M. Panner
KELLOGG, HUBER, HANSEN,
  TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Plaintiffs-Appellees*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385 & 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kleen Products LLC; Ferraro Foods of North Carolina, LLC; MTM Packaging Solutions of Texas, LLC;

Ferraro Foods, Inc.; RHE Hatco, Inc.; R.P.R. Enterprises, Inc.; Chandler Packaging, Inc.; Mighty Pac, Inc.

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See attachment.

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

RHE Hatco, Inc. (parent: Pro Equine Group); Chandler Packaging, Inc. (parent: TransPak, Inc.)

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None (this applies to all parties listed in Item 1)

Attorney's Signature:  s/ Aaron M. Panner          Date:  July 22, 2015

Attorney's Printed Name:  Aaron M. Panner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  ☒   **No** _____

Address:  Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.

1615 M Street, N.W., Suite 400, Washington, D.C. 20036

Phone Number:  202-326-7900          Fax Number:  202-326-7999

E-Mail Address:  apanner@khhte.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385 & 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kleen Products LLC; Ferraro Foods of North Carolina, LLC; MTM Packaging Solutions of Texas, LLC;

Ferraro Foods, Inc.; RHE Hatco, Inc.; R.P.R. Enterprises, Inc.; Chandler Packaging, Inc.; Mighty Pac, Inc.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See attachment.

(3) If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

RHE Hatco, Inc. (parent: Pro Equine Group); Chandler Packaging, Inc. (parent: TransPak, Inc.)

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None (this applies to all parties listed in Item 1)

Attorney's Signature:  s/  Gregory G. Rapawy          Date: September 9, 2015

Attorney's Printed Name:  Gregory G. Rapawy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ✕

Address:  Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.

1615 M Street, N.W., Suite 400, Washington, D.C. 20036

Phone Number:  (202) 326-7900            Fax Number:  (202) 326-7999

E-Mail Address:  grapawy@khhte.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385 & 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kleen Products LLC; Ferraro Foods of North Carolina, LLC; MTM Packaging Solutions of Texas, LLC;

Ferraro Foods, Inc.; RHE Hatco, Inc.; R.P.R. Enterprises, Inc.; Chandler Packaging, Inc.; Mighty Pac, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See attachment.

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

RHE Hatco, Inc. (parent: Pro Equine Group); Chandler Packaging, Inc. (parent: TransPak, Inc.)

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None (this applies to all parties listed in Item 1)

Attorney's Signature: s/ Michael J. Freed    Date: July 22, 2015

Attorney's Printed Name: Michael J. Freed

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ✕

Address: Freed Kanner London & Millen LLC

2201 Waukegan Road, Suite 130, Bannockburn, IL 60015

Phone Number: (224) 632-4500    Fax Number: (224) 632-4521

E-Mail Address: mfreed@fklmlaw.com

iv

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-2385 & 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kleen Products LLC; Ferraro Foods of North Carolina, LLC; MTM Packaging Solutions of Texas, LLC;

Ferraro Foods, Inc.; RHE Hatco, Inc.; R.P.R. Enterprises, Inc.; Chandler Packaging, Inc.; Mighty Pac, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See attachment.

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

RHE Hatco, Inc. (parent: Pro Equine Group); Chandler Packaging, Inc. (parent: TransPak, Inc.)

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

None (this applies to all parties listed in Item 1)

Attorney's Signature:  s/  Steven A. Kanner    Date: September 24, 2015

Attorney's Printed Name:  Steven A. Kanner

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    _____    No  ☒

**Yes**   Address:  Freed Kanner London & Millen LLC

2201 Waukegan Road, Suite 130, Bannockburn, IL 60015

Phone Number:  (224) 632-4500    Fax Number:  (224) 632-4521

E-Mail Address:  skanner@fklmlaw.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>15-2385 & 15-2386</u>

Short Caption: <u>Kleen Products LLC, et al. v. International Paper Company, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[    ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

<u>Kleen Products LLC; Ferraro Foods of North Carolina, LLC; MTM Packaging Solutions of Texas, LLC;</u>

<u>Ferraro Foods, Inc.; RHE Hatco, Inc.; R.P.R. Enterprises, Inc.; Chandler Packaging, Inc.; Mighty Pac, Inc.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>See attachment.</u>

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any; and

<u>RHE Hatco, Inc. (parent: Pro Equine Group); Chandler Packaging, Inc. (parent: TransPak, Inc.)</u>

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

<u>None (this applies to all parties listed in Item 1)</u>

Attorney's Signature: <u>s/  Robert J. Wozniak</u>    Date: <u>July 22, 2015</u>

Attorney's Printed Name: <u>Robert J. Wozniak</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** _✗_

Address:    <u>Freed Kanner London & Millen LLC</u>

<u>2201 Waukegan Road, Suite 130, Bannockburn, IL 60015</u>

Phone Number: <u>(224) 632-4500</u>    Fax Number: <u>(224) 632-4521</u>

E-Mail Address: <u>rwozniak@fklmlaw.com</u>

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385 & 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[    ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kleen Products LLC; Ferraro Foods of North Carolina, LLC; MTM Packaging Solutions of Texas, LLC;

Ferraro Foods, Inc.; RHE Hatco, Inc.; R.P.R. Enterprises, Inc.; Chandler Packaging, Inc.; Mighty Pac, Inc.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See attachment.

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any; and

RHE Hatco, Inc. (parent: Pro Equine Group); Chandler Packaging, Inc. (parent: TransPak, Inc.)

ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

None (this applies to all parties listed in Item 1)

---

Attorney's Signature: s/  Daniel J. Mogin                                Date: July 22, 2015

Attorney's Printed Name: Daniel J. Mogin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ☒

Address: The Mogin Law Firm, P.C.

707 Broadway, Suite 1000, San Diego, CA 92101

Phone Number: (619) 687-6611                    Fax Number: (619) 687-6610

E-Mail Address: dmogin@moginlaw.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-2385 & 15-2386

Short Caption: Kleen Products LLC, et al. v. International Paper Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Kleen Products LLC; Ferraro Foods of North Carolina, LLC; MTM Packaging Solutions of Texas, LLC;

Ferraro Foods, Inc.; RHE Hatco, Inc.; R.P.R. Enterprises, Inc.; Chandler Packaging, Inc.; Mighty Pac, Inc.

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

See attachment.

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

RHE Hatco, Inc. (parent: Pro Equine Group); Chandler Packaging, Inc. (parent: TransPak, Inc.)

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

None (this applies to all parties listed in Item 1)

---

Attorney's Signature:  s/  Jodie Williams    Date: July 22, 2015

Attorney's Printed Name:  Jodie Williams

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ☒

Address:  The Mogin Law Firm, P.C.

707 Broadway, Suite 1000, San Diego, CA 92101

Phone Number: (619) 687-6611    Fax Number: (619) 687-6610

E-Mail Address: jwilliams@moginlaw.com

rev. 01/15 GA

## ATTACHMENT TO APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

<u>Item 2</u> – The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.; Freed Kanner London & Millen LLC; The Mogin Law Firm, P.C.; Lockridge Grindal Nauen P.L.L.P.; Kesselman Brantly Stockinger LLP; Hagens Berman Sobol Shapiro; Saveri & Saveri, Inc.; Law Offices of Charles P. Goodwin; Scott+Scott LLP; Berman DeValerio; Gustafson Gluek PLLC; NastLaw LLC; Langer, Grogan & Diver, P.C.; Berger & Montague, P.C.; Freedman Boyd Hollander Goldberg Urias & Ward, P.A.; Lowenstein & Weatherwax LLP; Lite DePalma Greenberg, LLC; Grant & Eisenhofer P.A.; Heins Mills & Olson, P.L.C.; Shaffer Lombardo Shurin; Glancy Prongay & Murray LLP; Miller Law LLC

## TABLE OF CONTENTS

Page

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS.................................................. i

TABLE OF AUTHORITIES ........................................................................ xiii

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES .................................................................. 1

INTRODUCTION ................................................................................ 2

STATEMENT OF THE CASE.................................................................... 4

I.     Factual Background ..................................................................... 4

       A.     The Containerboard Industry Generally.................................... 4

       B.     Industry Conditions and Practices from 2004 to 2010 ........................ 8

       C.     Communications Among and Within Defendants ................................ 10

II.    Procedural History ...................................................................... 14

       A.     Preliminary Proceedings..................................................... 14

       B.     Separate Proceedings Involving RockTenn............................... 15

       C.     Class Certification ......................................................... 16

              1.     The Parties' Submissions ........................................... 16

              2.     The District Court's Ruling ........................................ 19

                     a.     Predominance................................................. 19

                     b.     Superiority .................................................. 21

                     c.     RockTenn..................................................... 22

SUMMARY OF ARGUMENT ................................................................... 23

STANDARD OF REVIEW ...................................................................... 27

ARGUMENT ...................................................................................... 28

I.   The District Court Did Not Abuse Its Discretion by Finding
     Predominance.......................................................................... 28

     A.   Conspiracy Is an Undisputedly Common Issue .................... 28

     B.   Impact Is a Common Issue.................................................... 29

          1.   Record Evidence Shows That Impact Is a Common
               Issue ............................................................................ 31

          2.   Industry Structure Shows That Impact Is a Common
               Issue ............................................................................ 32

          3.   Expert Analysis of Movement of the PPW Index
               Shows That Impact Is a Common Issue ..................... 37

     C.   Class-wide Damages Are a Common Issue ........................... 44

          1.   Aggregate Damages Are a Common Issue ................. 44

          2.   Plaintiffs' Damages Model Was Reliable.................... 48

     D.   Defendants' Procedural Arguments Fail.............................. 51

II.  A Class Action Is Superior to Individual Actions ........................... 54

     A.   The District Court Had Sound Reasons for Finding Class
          Adjudication Superior in This Price-Fixing Case ................. 54

     B.   Defendants Fail To Show That Individualized Defenses
          Defeat Predominance or Superiority.................................... 55

          1.   The *Linerboard* Releases Do Not Defeat Superiority ............... 56

          2.   Other Contractual Provisions Do Not Defeat
               Superiority .................................................................. 58

          3.   The District Court Did Not Err by Stating That It
               Would Revisit Manageability Issues Later ................ 59

III.   RockTenn's Bankruptcy Discharge Poses No Obstacle to Class
       Certification...................................................................................... 59

       A.    RockTenn's Liability for Conspiracy Is a Common Issue .................... 59

       B.    Evidence of Impact and Damages Will Be Common to All
             Defendants........................................................................... 61

       C.    Class Adjudication of Plaintiffs' Claims Against RockTenn
             Is Manageable ...................................................................... 66

CONCLUSION........................................................................................ 68

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Ameritech Servs., Inc.*, 231 F.3d 414 (7th Cir. 2000) ................................. 36

*Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003),
    *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ........................................................................ 45

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ...................................... 27

*American Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010) .................... 52, 53

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184
    (2013) ........................................................................................ 28, 60

*Automotive Parts Antitrust Litig., In re*, 2013 WL 2456010
    (E.D. Mich. June 6, 2013) ................................................................ 63

*BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011) ..................... 32

*Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014) .............................. 66

*Blue Cross & Blue Shield v. Marshfield Clinic*, 152 F.3d 588
    (7th Cir. 1998) ............................................................................. 39

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ............... 29, 45, 46, 47,
    49, 51, 59

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004)................................. 45

*Chicago Teachers Union, Local No. 1 v. Board of Educ.*, --- F.3d ---,
    2015 WL 4667904 (7th Cir. Aug. 7, 2015)........................................... 29

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ................................. 19, 21, 25, 39,
    46, 47, 49

*Corrugated Container Antitrust Litig., In re*, 661 F.2d 1145 (7th Cir.
    1981), *aff'd sub nom. Pillsbury Co. v. Conboy*, 459 U.S. 248
    (1983) ........................................................................................ 7

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)........................... 18, 25, 53

*Dextone Co. v. Building Trades Council*, 60 F.2d 47 (2d Cir. 1932) ......................... 62

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)...................................... 28

*EQT Prod. Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014) ............................... 66

*Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    256 F.R.D. 82 (D. Conn. 2009) .......................................................... 42

*Folding Carton Antitrust Litig., In re*, 687 F. Supp. 1223 (N.D. Ill. 1988)................. 7

*Grayson v. K Mart Corp.*, 79 F.3d 1086 (11th Cir. 1996) ........................... 52

*Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003) ........................... 66

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ........................ 30

*Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549 (7th Cir. 1980)........................... 61

*High Fructose Corn Syrup Antitrust Litig., In re*, 295 F.3d 651
    (7th Cir. 2002) ....................................................... 31, 32, 33, 34, 42,
                                                                            48, 54, 59

*Hospital Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986)................................... 32

*Hughes v. Kore of Indiana Enter.*, 731 F.3d 672 (7th Cir. 2013) ............................... 48

*IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599 (7th Cir. 2014) ............. 46, 47

*Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336
    (9th Cir. 1970) ........................................................................... 62

*IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226 (S.D.N.Y. 2012)....................... 55

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698
    (7th Cir. 1984) ........................................................................... 33

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775
    (7th Cir. 1999) ........................................................................... 33

*Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009)................................. 30

*Kress v. CCA of Tennessee, LLC*, 694 F.3d 890 (7th Cir. 2012)................................. 27

*Linerboard Antitrust Litig., In re*, 305 F.3d 145 (3d Cir. 2002) ................................... 7

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ................... 21, 49

*MCI Communications Corp. v. AT&T Co.*, 708 F.2d 1081
    (7th Cir. 1983) ........................................................................... 42

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008)......................... 48

*Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802
(7th Cir. 2012) ........................................................................ 21, 30, 47, 53, 54

*Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) ................... 32, 33, 34

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) ......................................................................... 57

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015) .............................. 44, 46

*New Motor Vehicles Canadian Exp. Antitrust Litig., In re*,
522 F.3d 6 (1st Cir. 2008) ......................................................................... 43

*O'Loghlin v. County of Orange*, 229 F.3d 871 (9th Cir. 2000)................................... 63

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629
(7th Cir. 2002) ......................................................................... 61

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) ................... 28, 30, 51-52, 65, 66

*Pharmaceutical Indus. Average Wholesale Price Litig.*,
582 F.3d 156 (1st Cir. 2009) ......................................................................... 44

*Pigee v. Israel*, 670 F.2d 690 (7th Cir. 1982)......................................................... 43

*Polyurethane Foam Antitrust Litig., In re*, --- F. Supp. 3d ---,
2015 WL 507141 (N.D. Ohio Feb. 6, 2015)..................................................... 64

*Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355
(3d Cir. 2001)......................................................................... 57, 58

*Public Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*,
277 F.R.D. 97 (S.D.N.Y. 2011) ......................................................................... 55

*Rail Freight Fuel Surcharge Antitrust Litig., In re*, 725 F.3d 244
(D.C. Cir. 2013) ......................................................................... 47

*Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004) ................. 43, 44

*Scrap Metal Antitrust Litig., In re*, 527 F.3d 517 (6th Cir. 2008)............................. 48

*Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981)......................................................... 52

*Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32
(1st Cir. 2003)......................................................................... 55

*Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877
(N.D. Ill. 2009) .................................................................................. 33

*Stone Container Corp., In re*, 125 F.T.C. 853 (1998) .................................... 7

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) ................................. 30

*Tagatz v. Marquette Univ.*, 861 F.2d 1040 (7th Cir. 1988) ........................................ 38

*Text Messaging Antitrust Litig., In re*, 782 F.3d 867 (7th Cir. 2015) .................. 33, 34

*Travel Agent Comm'n Antitrust Litig., In re*, 583 F.3d 896
(6th Cir. 2009) ........................................................... 63, 64, 67, 68

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000) ............................................ 31

*United States v. Benson*, 79 F. App'x 813 (6th Cir. 2003) ......................................... 62

*United States v. Castillo*, 814 F.2d 351 (7th Cir. 1987) ............................................ 62

*United States v. Container Corp. of Am.*, 393 U.S. 333 (1969) .................................... 7

*United States v. Ellerman*, 411 F.3d 941 (8th Cir. 2005) .......................................... 62

*United States v. Gravier*, 706 F.2d 174 (6th Cir. 1983) ............................................ 62

*United States v. International Paper Co.*, 457 F. Supp. 571
(S.D. Tex. 1978) ......................................................................... 7

*United States v. Shelton*, 669 F.2d 446 (7th Cir. 1982) ............................................. 62

*Uranium Antitrust Litig., In re*, 617 F.2d 1248 (7th Cir. 1980) ............................... 61

*Urethane Antitrust Litig., In re*, 768 F.3d 1245 (10th Cir. 2014) .................. 42, 43, 44

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................................ 29

*West v. Prudential Sec., Inc.*, 282 F.3d 935 (7th Cir. 2002) ....................................... 52

*Williams v. General Elec. Capital Auto Lease, Inc.*, 159 F.3d 266
(7th Cir. 1998) ............................................................................ 58

*WorldCom, Inc., In re*, 546 F.3d 211 (2d Cir. 2008) .................................................. 64

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ............. 29-30, 49

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. art. III ................................................................. 30

Rules Enabling Act, 28 U.S.C. §§ 2071-2077 ....................................... 47, 67

Sherman Act § 1, 15 U.S.C. § 1 ................................................. 14, 61, 64

Federal Rules of Civil Procedure:

     Rule 23 ................................................................. 18, 18, 30, 66

     Rule 23(a) .................................................................. 19

     Rule 23(b) .................................................................. 19

     Rule 23(b)(3) .............................................................. 28

## OTHER MATERIALS

2A Phillip E. Areeda et al., *Antitrust Law* (4th ed. 2014) .......................... 48

Frank H. Easterbrook, *Workable Antitrust Policy*, 84 Mich. L. Rev. 1696 (1986) ........................................................................ 35

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) ....................................................................... 6, 48

1 *McLaughlin on Class Actions* (11th ed.) ....................................... 52

*Newberg on Class Actions* (5th ed.) ............................................... 55

Richard A. Posner, *Antitrust Law* (2d ed. 2001) ................................. 33, 35

Richard A. Posner, *The Chicago School of Antitrust Analysis*, 127 U. Penn. L. Rev. 925 (1979) .................................................... 35

## JURISDICTIONAL STATEMENT

Defendants' jurisdictional statements are complete and correct.

## STATEMENT OF THE ISSUES

**1.** Whether the district court abused its discretion in certifying as a class action this suit under the federal antitrust laws to recover damages from a conspiracy to fix prices in the market for containerboard products, where plaintiffs will rely on (1) common proof of conspiracy; (2) common proof (through expert testimony and other evidence) that the conspiracy affected all or nearly all purchasers; and (3) a common methodology to prove aggregate damages.

**2.** Whether the district court abused its discretion in rejecting defendants' assertions that potential contractual defenses to certain class members' claims would render a class proceeding unmanageable.

**3.** Whether the district court abused its discretion in refusing to carve out a single defendant from this class action solely because of that defendant's assertion of a defense based on its bankruptcy discharge.

## INTRODUCTION

The district court certified a class of purchasers ("Plaintiffs") who seek damages for overcharges resulting from a conspiracy of integrated containerboard manufacturers ("Defendants") to fix prices. The conspiracy involved 15 lockstep price increase announcements – nine fully implemented – during the class period. To facilitate those increases, Defendants imposed a number of output restrictions, including some in the face of rising demand, and some shortly before price increases. Defendants' coordinated conduct occurred in a concentrated, commoditized market, with no viable substitutes or substantial import competition, frequent high-level communications among Defendants, and various other factors that made profitable cartel behavior feasible – as confirmed by the industry's long history of price-fixing cases. The district court reasonably found that if Defendants' alleged agreement succeeded in raising prices, all or nearly all class members (purchasers of containerboard products) were affected.

The district court's certification order was based on a painstaking review of a voluminous and detailed record. To prove that Defendants engaged in an unlawful conspiracy, Plaintiffs rely on price announcements suspiciously timed near trade association meetings or supply-restriction events; phone calls and meetings among Defendants' top executives; signaling through speeches, earnings calls, and other public statements; trades and other inter-Defendant transactions; documents showing that Defendants knew of each other's price increases before they were publicly announced; and documents indicating that Defendants used an industry

2

analyst to convey inter-Defendant communications.  To prove that the conspiracy had class-wide impact, Plaintiffs rely on expert economic and statistical analysis, including an evaluation of the industry's structure and dynamics; an analysis of the pricing provisions in class members' contracts; and examinations of the relationship between Defendants' price increase announcements and prices in the industry, based on Defendants' transactional data.  And to establish aggregate damages suffered by the class, Plaintiffs rely on an econometric model that reasonably estimates the effects of the conspiracy by comparing prices during the period of the conspiracy to those before and after and controlling for other economic factors.  All this evidence is common to the class and supports certification.

Defendants do not dispute that whether the conspiracy existed can only be answered with common evidence.  And Defendants' arguments that Plaintiffs' experts failed to demonstrate that impact and damages are subject to common proof cannot be squared with the record or precedent.  Plaintiffs' experts showed (1) that the market for containerboard products was structured in a way that a conspiracy to raise prices could succeed and harm purchasers market wide; (2) that Defendants' coordinated price increases measurably harmed all or nearly all purchasers; and (3) that an econometric model estimated overcharges attributable to the conspiracy, which are Plaintiffs' aggregate damages.  The district court did not err in finding that those opinions, together with extensive record evidence showing that Defendants increased the base price for containerboard products, established that common issues will predominate.

The district court was also within its discretion in holding that Defendants failed to show that any potential defenses based on past releases and other contractual provisions that (they say) disqualify some class members would make the case unmanageable. And Defendant RockTenn's argument that it is protected from class certification by its bankruptcy discharge not only ignores basic conspiracy law, which renders RockTenn liable for the full harm caused by the conspiracy if RockTenn participated in that conspiracy – as Plaintiffs will prove – *after* its discharge, but also puts the merits cart before the class-certification horse.

Because questions about the existence of the price-fixing conspiracy and its effects on purchasers predominate over any individual issues, it makes eminent sense to try this case as a class action. This Court should affirm.

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     The Containerboard Industry Generally

"Containerboard" is a material used to make corrugated products – mostly boxes, but also other products, such as displays and partitions. SA2; A180-81 & n.8; A191.[1] Containerboard consists of "sheets" fabricated from "linerboard," the smooth layer used for the outsides of a containerboard sheet; and "corrugated medium," the fluted layer inside the sheet. A180. Those components are made in large, expensive

---

[1] Citations to "A__" indicate the Appendix filed by Defendants; to "SA__," the Short Appendix filed by Defendants; and to "PSA__," Plaintiffs' Supplemental Appendix filed together with this brief.

"mills"; some cost more than a billion dollars to build. A198. As of 2008, no new mills had been built in the United States for more than 12 years. *Id.*

Containerboard sheets are cut and folded into finished products such as boxes at box plants and other similar conversion facilities. A191. The containerboard industry is dominated by vertically integrated producers: most conversion facilities are owned, and most containerboard products produced, by the same companies that produce containerboard itself. A188; A547-48; A888-89. In this case, Plaintiffs purchased "containerboard products" – a term that Plaintiffs use to include linerboard, corrugated medium, containerboard sheets, boxes, and other final containerboard products – directly from containerboard producers. A68.

Containerboard is a commodity, sold with standardized characteristics such as composition and weight. A200-01; PSA2 (Temple-Inland SEC filing describing the "commodity nature of [the company's] manufactured products"); PSA4 (affidavit from executive of Smurfit-Stone, now known as RockTenn, describing containerboard as a "pure commodity"). The most important final containerboard products are also commodities, such as the "regular slotted container," a standardized box. A181; A201-03; PSA6 (internal Georgia-Pacific strategy presentation describing the company as a "'commodity' box maker"); PSA8 (testimony of Weyerhaeuser executive that boxes "produced in . . . nonspecialty plants" were "[g]enerally . . . interchangeable" with those of "large integrated competitor[s]"); PSA13 (trade association's description of report finding that "boxes are essentially commodity items used in well established markets"). As of 2010,

most (80%) linerboard produced in the United States was unbleached kraft linerboard, the most common grade of which weighed 42 pounds per thousand square feet. A181.

Pulp & Paper Week ("PPW"), an industry periodical, publishes weekly price indices that include a price for 42-lb. unbleached kraft linerboard for delivery east of the Rocky Mountains, based on a survey of reported market prices. A143. That 42-lb. PPW index price is widely used within the containerboard industry as a pricing benchmark for containerboard products, including products made of different types of linerboard; the pricing terms of most contracts and spot transactions are explicitly linked to the index. A143; A191-93; A880-81; PSA232-33 (chart summarizing contract review); PSA19 (statement by Temple-Inland CEO that "[m]ost of our box prices are either directly[] or indirectly influenced by adjustments in published liner board prices"); PSA21 (presentation by Smurfit-Stone CEO showing 78% of all sales, and 92% of box sales, linked to index); PSA178 (testimony by International Paper executive that a "large percentage of our customers are on a[n] index pricing mechanism"). There is a tight correlation $(R \geq 0.99)$[2] between the index price for eastern-delivered 42-lb. unbleached kraft linerboard and six other PPW index prices for containerboard. A143-44; A165.

A small group of firms produces most of the containerboard sold in North America, and the market has become more concentrated over time. As of 1997, the

---

[2] R denotes the "correlation coefficient," a number between 0 and 1 that "measures the association between two variables." Federal Judicial Center, *Reference Manual on Scientific Evidence* 262 (3d ed. 2011) ("*Reference Manual*").

five largest firms in the market – all Defendants or their predecessors – were responsible for 41% of North American containerboard production. PSA33. By 2007, Defendants or their predecessors – including Georgia-Pacific LLC, Weyerhaeuser Co., International Paper Co., Temple-Inland Inc., and Smurfit-Stone Container Corp. – were responsible for 74% of production. A196-97; *see also* PSA35 (chart from International Paper showing increasing concentration in "North America Box Industry" over time). The two next largest producers – Packaging Corporation of America ("PCA") and Norampac Holdings U.S. Inc., representing about 10% of the market, *see* A570 – were dismissed from this case after reaching a settlement.

The containerboard industry has historically been the subject of much antitrust litigation, including criminal prosecutions, administrative enforcement proceedings, and private class actions such as this one. *See, e.g.*, *United States v. Container Corp. of Am.*, 393 U.S. 333 (1969); *United States v. International Paper Co.*, 457 F. Supp. 571 (S.D. Tex. 1978); *In re Corrugated Container Antitrust Litig.*, 661 F.2d 1145 (7th Cir. 1981), *aff'd sub nom. Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983); *In re Folding Carton Antitrust Litig.*, 687 F. Supp. 1223 (N.D. Ill. 1988). The previous antitrust litigation most relevant to this case is the *Linerboard* litigation. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) (affirming class certification in litigation against several current Defendants and their predecessors based on conspiracy from 1993 to 1995); *In re Stone Container Corp.*, 125 F.T.C. 853 (1998) (consent order involving same facts).

**B.      Industry Conditions and Practices from 2004 to 2010**

The class period in this case runs from at least as early as February 15, 2004, through November 8, 2010.  SA2.  Defendants attempted 15 price increases for containerboard products with effective dates during that time.  A141-42; *see* A164. With one exception, all price increases were joined by all Defendants.  A142 & n.9. Defendants usually (11 times out of 15) all implemented the announced increases in the same month.  A142.  They all increased prices by identical amounts (12 times out of 15) or with differences of less than 2% of the average price (the remaining three times).  *Id.*  Nine of the 15 announced price increases were followed within two months after the last Defendant's implementation by increases in the PPW index that matched the announced increases.  A144-45; A164.  Those nine successful price increases were the only times the PPW index increased during the class period.  A761-62 & fig. 1.  When successful, Defendants' price increases translated into price increases for boxes and other containerboard products through provisions in customer supply agreements.  A191-93; A899; A923.

During the class period, the industry's capacity to produce containerboard declined by more than 6%.  A185.  North America was the only region in the world where capacity declined:  in Europe, capacity increased by 17%, and every other region grew faster.  *Id.*  The decline occurred even though demand for containerboard was generally constant or increasing over the class period.  A208 & n.142; A210; A903-05.  As a result, operating rates for containerboard mills (production divided by capacity) increased during the class period.  *See* A186

8

(annual operating rates above 95% in 2004 and 2010 and 97.04% in 2007; compare to 85.9% in 2001).  Although rates fell in 2008 and 2009 as a result of the recession – reaching in 2009 a low comparable to pre-class-period levels – a "very quick and strong" increase to 95.88% followed in 2010 when the economy recovered.  *Id.* (Plaintiffs' expert's analysis).  Despite the recession, Defendants attempted three concerted price increases in 2008 and 2009, of which one succeeded; they also attempted three concerted price increases in 2010, of which two succeeded.  A256.

Inventory levels (relative to demand, measured in weeks of supply) generally decreased over the class period; by mid-2010, one Defendant noted that inventories were at "the lowest levels of any month since at least the early 1980s."  A187.  Some Defendants experienced difficulties filling orders, and customers expressed unhappiness with those difficulties.  A213; A907-08; PSA172 (internal Georgia-Pacific e-mail:  "We certainly understand the importance of working towards a price increase, but we may not have customers left to raise our prices to if we do not get some paper."); PSA70-71 (internal International Paper e-mail warning of potential "impact[]" on "key customers" from potential for "missing . . . orders"; comment that International Paper "may be headed for a train wreck").

Defendants restricted supply (that is, caused decreases in capacity and constrained inventories) through a number of methods.  One was closing mills: from 2004 to 2010, Defendants closed mills with a combined annual capacity of more than 6.1 million tons.  A897 & n.82.  Other methods included indefinitely idling mills, A208-09 & n.143; temporarily idling mills ("downtime"), A216-17; and

reducing production rates ("slowback"), A217-18.  On several occasions, Defendants implemented significant supply restrictions shortly before lockstep price increases. Thus, Defendants announced mill closures removing 931,000 tons of capacity from the market in the third quarter of 2005, A254, just before a successful price increase of $30/ton in October of that year, A256.  They similarly announced mill closures removing 1.7 million tons of capacity in the fourth quarter of 2009, A254, just before a successful price increase of $60/ton in January 2010, A256.

### C.    Communications Among and Within Defendants

Defendants communicated with one another about price increases, supply restrictions, and related topics.  Their external and internal communications show that they coordinated to increase prices and profits.

**1.    Trade Associations.**  Defendants communicated with one another at trade association events.  A205-06.  Several lockstep price increases occurred close in time to such events – a pattern that the district court described as "striking" when it denied Defendants' motions to dismiss.  A128.  Defendants' executives have testified that it was a "common practice" to "socialize" at trade associations, PSA189, and "not uncommon" to "arrange to meet up with [their] . . . contact[s] at . . . other compan[ies]," PSA211.  Most such communications were private; a notable public example occurred in April 2007 when the COO of Georgia-Pacific gave a speech at a trade group meeting in which he reportedly urged "[p]roducers [to] learn to say 'no' on deals when they are not profitable."  PSA227.  The speech came

amidst an unsuccessful price increase; a few months later, a successful one followed.  A256.

**2.     Phone Calls and Meetings.**  Defendants – including their high-level executives – communicated by phone or in person at or near the times of price increases.  Examples include February 2008, when the CEOs of International Paper and Temple-Inland spoke (ostensibly about a merger in which Temple-Inland had no interest) one day after International Paper had increased its prices and two days before Temple-Inland increased its own, PSA195-96; and May 2008, when a senior Smurfit-Stone executive made or participated in three calls with Georgia-Pacific (at least one with a senior Georgia-Pacific executive) within one day of a simultaneous price increase announcement, PSA182; PSA205; PSA206-08.

Further, in December 2007, shortly before Defendants began announcing the February 2008 price increase, an internal Smurfit-Stone e-mail suggested that a Smurfit-Stone executive meet with a counterpart at International Paper because recent events had provided a "perfect excuse" to do so, because a call would be a "good opportunity to develop your relationship with him," and to "get some straight answers about what [International Paper was] doing."  PSA72.  And, in October 2009, shortly before Defendants began announcing the January 2010 price increase, the COO of Smurfit-Stone approved a presentation to PCA (again in connection with ostensible merger talks) that disclosed Smurfit-Stone's plans to close two containerboard mills, adding:  "all this info will help when this [merger] doesn[']t go thru."  PSA203; *see* PSA200-02; PSA156 (COO's admission it was "not . . . likely" the

11

merger would succeed).  Plaintiffs' filings in the district court (Dkt. Nos. 658, at 38-40, and 826, at 29-31) contain many more examples of direct communications between Defendants at important times.

3.    **Advance Knowledge of Price Moves.**  Defendants had advance knowledge of their competitors' pricing behavior.  A March 2004 memorandum from a senior PCA executive predicted that "the industry will need at least three $40-$50 increases over the next 18 months," PSA50 (emphasis omitted); increases followed almost exactly as predicted, *see* A256.  An internal Temple-Inland communication in November 2009, written shortly after Georgia-Pacific had raised prices, advised recipients to "begin getting their people ready for the first of what may be the next round of price increases."  PSA65.  Shortly before PCA announced a price increase in April 2010, an executive at Smurfit-Stone directed a colleague to "call . . . and see if [PCA] announced."  PSA67.  Smurfit-Stone also informed Temple-Inland of a planned August 2010 price increase before that information became public, purportedly because Temple-Inland was a customer.  PSA48; PSA73.

4.    **Supply Restrictions.**  Defendants publicly announced supply restrictions and called for other members of the industry to do likewise, often linking supply discipline to increased prices.  An August 2004 report of an interview with Smurfit-Stone's CEO describes an October 2003 restructuring as part of his "plan [to] continue[] . . . to cut supply enough at Smurfit to force price increases throughout the industry."  PSA45.  In October 2005, Norampac's CEO told an industry periodical:  "If everyone would remove the same amount of capacity

12

percentage-wise as we have, I think our business would look a lot better.  You have to be ready to let go of business if you want to keep the price up."  A30; *see also* PSA55 (presentation by CEO of PCA stating that "essentially no additional capacity [is] scheduled to come on line in the foreseeable future"); PSA69 (CFO of International Paper on earnings call:  "We've intentionally passed on volume in favor of balancing our capacity with customers' demand and this has enabled us to realize higher average selling prices."); A33 (CEO of PCA on earnings call: "inventories have trended down" and PCA "g[o]t a price increase" at what "would historically not be a normal time").

Internal statements by Defendants' employees drew similar links:  one International Paper executive told another in 2008 that adding more capacity by restarting a closed mill might "spoil the containerboard party."  PSA149; *see also* PSA58 (International Paper CEO describing expected "market related downtime . . . to keep operating rates where they need to be to maintain pricing"); PSA63 (Smurfit-Stone internal e-mail expressing desire to "keep the tons" from two closed mills "out of the market and get the money back through price increases"); PSA171 (International Paper e-mail referring to the closure of a large mill as a "big prize").

**5.   Trades and Swaps.**  Defendants frequently bought, sold, and swapped containerboard with each other; for example, at one point Georgia-Pacific was PCA's largest western supplier, A188 & n.41.  In doing so, they exchanged competitively sensitive information about capacity.  A214-15; *see also* PSA37-38, 41

13

(Smurfit-Stone and International Paper); PSA39-40, 42 (Smurfit-Stone and Temple-Inland); PSA10 (Weyerhaeuser and various trade partners).

**6.    Indirect Communications.**  Defendants communicated indirectly through other methods.  Industry analyst Mark Wilde of Deutsche Bank on several occasions received sensitive pricing or capacity information from one Defendant and passed it to another.  *See*, *e.g.*, PSA229 (Temple-Inland executive reporting a "[r]umor in the market" via analyst Wilde and another source that International Paper would announce a price increase); PSA230 (Wilde suggesting to International Paper executive that International Paper "[t]ake [its] time" restarting a closed plant and adding that PCA was also "taking [d]owntime/slowback" in the same quarter).  On the day of an initial announcement by Georgia-Pacific that led to a successful coordinated price increase, employees of Smurfit-Stone and Temple-Inland separately e-mailed Wilde, to suggest each owed him a beer.  PSA60-62.

## II.    Procedural History

### A.    Preliminary Proceedings

On September 9, 2010, Plaintiffs filed this action in the Northern District of Illinois, alleging that Defendants had conspired to fix prices in the market for containerboard products, and so violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs sought to represent a class of purchasers of those products.  The action was consolidated with other, similar putative class actions.  The case was initially assigned to Judge Shadur, who designated interim lead class counsel and heard Defendants' motions to dismiss.  On April 8, 2011, the district court denied

those motions.  It reasoned that Plaintiffs had sufficiently alleged both "conscious

parallelism" in the form of Defendants' coordinated price increases and capacity

reductions, A120-23, and sufficient "additional contextual factors [to] support a

plausible inference of an agreement" between Defendants, A123-31, including cuts

to capacity in the face of rising demand, A124-27; price increases that were

"consistently and closely timed soon after industry gatherings," A128; and the

industry's "consolidated nature," "inelasticity of demand," and "commodity-like

products," A130.  Discovery commenced, and Plaintiffs filed two amendments to

their consolidated complaint.  *See* A67-89.  The case was reassigned to Judge

Leinenweber, who issued the order under review.

### B.    Separate Proceedings Involving RockTenn

Among Defendants is RockTenn CP, LLC, a successor-in-interest to Smurfit-

Stone Container Corporation.  (This brief uses the term "RockTenn" to refer to the

current Defendant and to describe its arguments, but – in line with the documents –

generally uses "Smurfit-Stone" to refer to its historical conduct.)  Like other

Defendants, Smurfit-Stone engaged in lockstep price increases, plant closures, and

other supply restrictions throughout the class period.  *See*, *e.g.*, A23; A28-30; A39;

A41; A42-44; A47-51; A71; A76-77; A87-89; A254; A256.

On January 26, 2009, Smurfit-Stone filed a Chapter 11 petition for

bankruptcy.  RockTenn Br. 5.  It received its discharge from bankruptcy on June 30,

2010.  *See id.* at 5-6.  After its discharge, it continued to participate in meetings

with other Defendants, PSA240, and in coordinated price increases, A256; PSA243-

45.  Based on those actions, Plaintiffs have charged that it continued to participate in the conspiracy after its discharge and is liable for that post-discharge conduct. A87-89.  After its discharge, Smurfit-Stone filed an Adversary Proceeding in the bankruptcy court seeking to enjoin this action, which the bankruptcy court dismissed.  PSA234-36; *see also* A95 (statement by Judge Shadur during hearing that it was "just flat-out misleading to characterize [this] lawsuit . . . as seeking relief from Smurfit-Stone that is at odds with its discharge in bankruptcy").

### C.    Class Certification

#### 1.    The Parties' Submissions

Plaintiffs moved for class certification, supporting their motion with extensive record evidence and two expert reports:  one from Michael J. Harris and the other from Mark Joseph Dwyer.  Harris analyzed the structure of the containerboard industry and Defendants' conduct based on evidence from discovery. He found that the structure of the industry – including its concentration, A196-98; the commoditized nature of Defendants' products, A200-03; and the widespread use of contracts with prices tied to the index prices for linerboard, A203-04 – made it likely that a conspiracy among Defendants could succeed in increasing prices for all or nearly all purchasers of containerboard products.  A206-07; *see also* A230 (discussing industry's "history" of "antitrust violations" as another supporting factor).  Harris further opined that Defendants' conduct would not make sense as unilateral action in a competitive market.  A231.

Dwyer performed several statistical and econometric analyses. He examined movements in the PPW index to show that (as summarized earlier, *supra* p. 8) it usually moved up in response to Defendants' lockstep price increases; and, when it did move up, matched Defendants' increases exactly. A141-46. He compared the actual prices paid by a sample of class members before and after Defendants' price increases and found that in almost all cases (92%) those prices increased. A149. Dwyer also constructed a regression model to estimate aggregate damages to the class from Defendants' conspiracy. He estimated that the class paid "statistically significant overcharges" of approximately 3.08% for containerboard products – in the aggregate, "approximately $3.8 billion" in damages. A140; A158-59.

Defendants opposed class certification, submitting their own record evidence and expert reports from Dennis W. Carlton and Janusz A. Ordover. Both defense experts contested Harris's analysis of Defendants' conduct, contending that Defendants' pricing behavior could be explained by "oligopolistic interdependence," that is, unilateral actions based on the decisions of other market actors. A448-50 (Carlton); A564-66 (Ordover). Both defended Defendants' supply restrictions as rational under the circumstances, A452-55 (Carlton); A585-90 (Ordover); claimed that Dwyer had failed to distinguish the price impact of the conspiracy from other factors that might also affect price, A495-99 (Carlton); A619-21 (Ordover); and criticized the methodology Dwyer used to calculate aggregate damages, A503-09 (Carlton); A604-14 (Ordover). Defendants did not move to exclude either expert

under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but "'expressly reserve[d]'" the right to do so later.  SA5 (alteration in original).

RockTenn filed a separate opposition, arguing that Plaintiffs had effectively alleged a shorter class period against RockTenn and were required separately to satisfy Rule 23 as to that different, shorter class period.

Plaintiffs replied to Defendants' oppositions.  Both Dwyer and Harris submitted declarations that replied to Carlton and Ordover.  Harris addressed Ordover's criticism that he had not reviewed a large enough sample of customer contracts by explaining that his earlier review had been based on the relatively small number of contracts Defendants had then produced in discovery; as they produced more, he reviewed more, and found price links to the PPW index in almost all of them (96%).  A880; PSA232-33.  Harris and Dwyer also responded to criticisms that their analyses did not adequately account for non-conspiratorial factors influencing price and capacity, *see* A892-905 (Harris); A795-810 (Dwyer); and that their methodologies were unreliable, *see* A874-92 (Harris); A823-43 (Dwyer).  Plaintiffs also submitted a report from a new expert, Douglas Zona, providing additional responses to Carlton and Ordover.

Defendants moved to strike portions of Dwyer's reply report as containing new material.  *See* SA8.  They also moved to strike Zona's report entirely.  *See id*. Defendants did not move to strike any part of Harris's reply and did not, as a group, seek leave to submit sur-reply briefs or declarations.  RockTenn sought and was granted an individual sur-reply.  *See* SA7.

## 2.    The District Court's Ruling

The district court granted class certification.  It began by explaining its

obligation to consider whether Plaintiffs had "'satisf[ied] through evidentiary proof'

each of Rule 23's elements" and to conduct a "'rigorous analysis'" for that purpose.

SA4 (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)).  It explained

that, because Defendants did not file *Daubert* motions, it would not rule on the

"admissibility" of Harris's or Dwyer's reports, but it noted that Defendants had

"vigorously challenge[d] Plaintiffs' experts' methodology and conclusions," SA5, and

addressed those challenges in detail.  It determined that an evidentiary hearing

was unnecessary.  SA6-7.  It denied Defendants' motion to strike as to Dwyer, SA9-

12, but granted it as to Zona, relying on Plaintiffs' concession that Zona's report was

unnecessary to satisfy Rule 23, SA12-13.

The district court observed that Defendants had "[e]ssentially . . . conceded"

the Rule 23(a) requirements of typicality, commonality, and adequacy "so long as

Plaintiffs have adequately proven predominance," and that the potential class

"numbers in the thousands," which was sufficient for numerosity.  SA13-14.

Defendants do not challenge those parts of the district court's ruling.

### a.    Predominance

The district court's predominance analysis under Rule 23(b) began by

observing that Plaintiffs' proof of liability turned on their ability to establish a

conspiracy using "documents, emails, phone records, and other indirect evidence"

that would be the same for "virtually all class members."  SA17.  The district court

found that impact would likewise be proved or disproved by common evidence, including much of the same evidence that would prove or disprove the conspiracy. SA20-39.  It observed that, although Defendants had "concentrated their impact arguments on the expert evidence," it would look to "all the evidence" in determining whether impact was capable of proof on a class-wide basis – including record evidence that would be "common to the class" on both sides.  SA24.  It examined Harris's opinion in detail, discussing his analysis of industry characteristics, SA26-28, and his findings that Defendants' lockstep price increases and supply reductions despite "strong growth in box demand" were likely collusive. SA28-29.  The court then rejected Defendants' challenges to Harris's methodology and conclusions, finding that he had properly defined the market, SA29-31; and permissibly looked at Defendants' conduct in its totality, SA31-32.

The court examined Dwyer's analysis of correlations between Defendants' lockstep price increases and the "corresponding movement of the PPW index." SA33.  It found that record evidence supported Dwyer's premise that "Defendants . . . rely upon the PPW index in setting their prices for Containerboard Products[ and] negotiating prices in individual contracts."  SA34.  It rejected Defendants' claim that Dwyer's analysis did not establish a causal relationship, SA36, and found that, even if a factfinder might agree with Defendants that the PPW index is irrelevant, that finding would still be "based on class-wide evidence," SA38.

The district court observed that, to show predominance concerning damages, Plaintiffs would need to "produce a reliable method of measuring class-wide

damages based on common proof," SA39, but that "'the presence of individualized questions regarding damages does not prevent certification'" and the lack of predominance concerning damages would not necessarily defeat certification. SA39-40 (quoting *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012)). It then considered Dwyer's damages model to determine whether it "only seeks to prove damages that flow from the harm alleged," SA43 (citing *Comcast*, 133 S. Ct. at 1435). It examined the variables that Dwyer included in his regression model, SA46, the method by which he selected controls, SA47, and the results of his analysis, *id*. It carefully considered each of Defendants' challenges to Dwyer's model (most of which have not been renewed on appeal). SA48-52. Ultimately, it found that Dwyer had produced a "'reasonable approximation'" of the class's damages, SA54 (quoting *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002)).

Finally, the district court concluded that any individual damages issues that might remain did not defeat class certification because of the "key, overwhelming common questions" it had found in other parts of the case. *Id*. It left open the door for Defendants to "seek to decertify the class or modify the class" if further discovery should show that individual damages questions would threaten to overwhelm common issues. *Id*.

### b.    Superiority

The district court also found that a class action was superior to other methods of adjudication. It reasoned that the "overarching" questions whether

Defendants had conspired and whether their conspiracy had caused impact were sufficiently broad and important that it was fairer and more efficient to resolve them in a single trial. SA55. It rejected Defendants' arguments that superiority was defeated by individualized affirmative defenses – whether based on releases signed by some class members as part of individual or opt-out settlements in the earlier *Linerboard* litigation, or on provisions such as mediation or arbitration clauses in some class members' contracts. It concluded that the releases would not have the effect Defendants claimed, SA55-58, and that other provisions should not impede certification but could be dealt with by later motions practice, SA58-60.

### c.    RockTenn

The district court likewise rejected RockTenn's separate arguments based on its bankruptcy. The court emphasized that, as Plaintiffs conceded, they could prevail on their claims against RockTenn only if they were able to prove its participation in the conspiracy *after* its discharge. But the court rejected RockTenn's claim that, even if it had participated in the conspiracy post-discharge, it could limit its liability for that unlawful conduct, or that it was entitled to a different class period beginning with its discharge from bankruptcy. SA60. The district court explained that it could ensure that a jury would consider only post-discharge conduct in evaluating liability by providing a limiting instruction and noted that it could address this trial-administration issue later if necessary. SA66.

* * * * *

Defendants sought leave to appeal, which this Court granted.

22

## SUMMARY OF ARGUMENT

**I.**     The district court acted within its discretion in finding that common issues predominate over individual ones.

**A.**     The most important question at trial will be whether Defendants conspired – that is, whether Defendants' lockstep price increases were the result of an agreement.  Conspiracy is an undisputedly common issue to which only common proof is relevant:  Defendants' practices, their communications concerning those practices, and the circumstances (including industry structure) that show that Defendants' conduct makes sense only if they had an agreement.  Without more, that provides substantial support for certification.

**B.**     Plaintiffs' showing that the conspiracy had an impact on all or nearly all purchasers of containerboard products likewise depends on common proof. Plaintiffs will establish impact by showing that Defendants intended to increase prices on a market-wide basis throughout the class period, and used facilitating practices (such as collusive supply restraints) that made sense only as means to achieve that end; that they acted in a structural environment conducive to successful collusion; that their coordinated price increases more often than not succeeded in moving the benchmark price index (the PPW index) that reflected overall market pricing; and that during the time when the conspiracy was in effect, the prices class members actually paid were higher.  In addition, the vast majority of class members' contracts expressly tied purchase price to the PPW index, greatly strengthening the inference of class-wide impact.

Contrary to Defendants' assertions, Plaintiffs are not required to show that literally every purchaser suffered antitrust impact, or to exclude the theoretical possibility that a few unidentified purchasers were able to avoid harm. In any event, a jury could find that every purchaser in the market suffered impact from a successful conspiracy. Even in a case brought by a single purchaser of containerboard products, the plaintiff would have to rely on similar industry-wide analyses to establish that Defendants' industry-wide conduct injured them individually by raising prices industry-wide.

Contrary to Defendants' arguments, Plaintiffs' experts' methodology establishes that impact will be subject to common proof. Harris's report was consistent with the analyses this Court and other courts have applied to determine whether the structural characteristics of an industry make a successful cartel likely – and likely to have market-wide impact. Dwyer's analysis showed correlations between Defendants' lockstep price increases and the price of containerboard – correlations that both Dwyer and the district court properly treated as evidence helping to establish a causal link. The district court did not err in finding that both experts' reports, combined with Plaintiffs' other evidence, would provide a basis for proving impact on a class-wide basis.

**C.**     Although common proof of conspiracy and impact is sufficient to support class certification, Plaintiffs went further and showed that they had a reasonable methodology to prove aggregate damages. That methodology – using a regression to calculate aggregate overcharges throughout the class period – is well

24

supported by authority.  In the specific context of antitrust, such a method is sufficient to carry a plaintiff's limited burden, that is, to show that a reasonable approximation of damages can be established on a common basis.  Many courts, including this one, have approved its use for that purpose.  That authority is untouched by *Comcast v. Behrend*, 133 S. Ct. 1426 (2013), which turned on a mismatch between liability proof and damages model that is not present here.

Dwyer's damages model relied on accepted means for estimating aggregate damages resulting from Defendants' unlawful agreement, including (contrary to Defendants' claims) a reliable method for distinguishing the effects of the conspiracy from other economic effects.  The district court was entitled to reject Defendants' complaints about Dwyer's model as reflecting misunderstandings (or, at most, reasonable disagreement) about his methodology – especially at this stage, where Plaintiffs were not required to prevail on the merits, but only to establish a basis for proceeding as a class.

**D.**    The procedure that the district court adopted for resolving class certification was well within its discretion.  It was not required to hold an evidentiary hearing, and it gave fair and thorough consideration to Defendants' challenges to Plaintiffs' expert evidence, despite Defendants' express request that any *Daubert* ruling be reserved for later.

**II.**    The district court was also well within its discretion to find one class proceeding superior to thousands of individual proceedings as a means for resolving this controversy.  It is fair and efficient for Plaintiffs' costs of document discovery,

witness depositions, and expert testimony to be paid once and shared by the class. Defendants can fairly and efficiently present their only substantial defenses – that the conspiracy never happened or did not work – on a class-wide basis.

Any individualized affirmative defenses asserted in these cases do not defeat superiority by rendering the case unmanageable. The general rule is that affirmative defenses do not render cases unsuitable for class treatment. Defendants have offered no reason to depart from that rule here. Defendants overstate the factual and legal merits of their purported individualized defenses and did not show that those defenses will hamper effective litigation of these cases on a class basis. The district court did not err by determining that Defendants' present showing did not bar class certification or by leaving open the possibility of revisiting the issue later.

III. RockTenn's discharge from bankruptcy provides no independent basis for declining class certification because the only unique issue – whether RockTenn participated in the conspiracy after its discharge – can likewise be tried on a class-wide basis. There is no question of impact or damages that is unique to RockTenn, because if it participated in the conspiracy after its bankruptcy discharge, it is liable for all the harm caused by the conspiracy as a whole: all proof of impact and damages that applies to the other Defendants applies to RockTenn as well. The evidence establishing RockTenn's participation in the conspiracy after discharge is common to the class, and any dispute over whether that evidence is sufficient to

prove RockTenn's participation is essentially irrelevant to whether common questions predominate.

RockTenn's contrary arguments – that it is entitled to a different class period; that Plaintiffs must demonstrate that its post-discharge conduct had impact or caused damages distinct from the rest of the conspiracy; that imposition of liability based on harm caused by conspirators' pre-discharge conduct would violate the discharge – conflict with bedrock conspiracy law and find no support in any principle of bankruptcy law.  Like any other discharged debtor, RockTenn is liable for its conduct after confirmation of its bankruptcy plan.

## STANDARD OF REVIEW

This Court "review[s] the district court's decision regarding class certification for an abuse of discretion because 'the law gives broad leeway to district courts in making [such] decisions.'"  *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 892 (7th Cir. 2012) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 630 (1997)).

# ARGUMENT

## I.  The District Court Did Not Abuse Its Discretion by Finding Predominance

The district court acted well within its discretion when it found – taking into account all the elements Plaintiffs must prove and all the defenses Defendants have said they will assert – that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "To gain certification under Rule 23(b)(3)," a class representative need not "establish that it will win the fray." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013); *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) ("the question is not whether the plaintiff or plaintiffs . . . will prevail on the merits"). Rather, "[p]redominance . . . , like the other requirements for certification of a suit as a class action, goes to the efficiency of a class action as an alternative to individual suits." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Because conspiracy, impact, and damages can all be resolved on a common basis – and because trying such issues individually would put an impossible burden on the parties and the court – class certification was appropriate.

### A.  Conspiracy Is an Undisputedly Common Issue

The most important issue at any trial will be whether Defendants' conduct during the class period – including lockstep price increases, supply restraints, trades and information exchanges of all sorts – reflected an unlawful agreement to fix prices. All legal questions and facts relevant to this key issue are common: what Defendants did, *supra* pp. 8-10; what they said to others and among

themselves about what they were doing, *supra* pp. 10-14; what about their industry shows that their words and actions point to a hidden agreement, *supra* pp. 4-7, 16; and, ultimately, whether they did agree. The district court correctly described the industry-wide conspiracy alleged here as "the prototypical example of an issue where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence." SA17-18.

Defendants do not challenge that finding on appeal. It alone provides substantial support for the district court's ruling. *See*, *e.g.*, *Chicago Teachers Union, Local No. 1 v. Board of Educ.*, --- F.3d ---, 2015 WL 4667904, at *14 (7th Cir. Aug. 7, 2015) (reversing denial of class certification because "the key question upon which all of the litigation rises or falls can be answered for every plaintiff"); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (explaining that "predominance requires a qualitative assessment" of the "relative importance" of issues and "[a]n issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment") (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).

### B.     Impact Is a Common Issue

Plaintiffs also must prove at trial that Defendants did what they set out to do – that is, increased prices that class members paid for containerboard products. That element of a private antitrust case is often called "impact"; it is also referred to as "fact of damage," as distinct from the "amount" of damage. *E.g.*, *Zenith Radio*

*Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).  To secure certification, Plaintiffs need not show that the conspiracy actually did affect the class, but only that they can "use . . . common evidence and [a] common methodology to prove" impact.  *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 819 (7th Cir. 2012).

Defendants contend that Plaintiffs must prove that literally "every class member" suffered impact, either under Article III or Rule 23, but, as they ultimately concede (at 19-20), this Court has held otherwise.  *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) (rejecting as "wrong" the proposition that "no class can be certified until proof exists that every member has been harmed"); *Parko*, 739 F.3d at 1084-85; *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) (explaining that the "possibility or indeed inevitability" that a class "will . . . include persons who have not been injured by [a] defendant's conduct . . . does not preclude class certification"); *cf. Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) (noting in the securities context that certification is not blocked by a defendant's "attempt[s] to pick off the occasional class member here or there through individualized rebuttal").  Problems arise only where "'a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct.'"  *Sturm*, 764 F.3d at 758 (quoting *Messner*, 669 F.3d at 824).  Defendants cannot claim that any such difficulty is present here.

Although Plaintiffs do not bear the burden Defendants seek to impose, they could meet it on this record.  The evidence before the district court showed that Plaintiffs could establish on a common basis that Defendants' conspiracy successfully elevated market-wide prices, with the consequence that everyone who purchased containerboard products from any of the Defendants during the class period suffered at least some impact.

### 1.    Record Evidence Shows That Impact Is a Common Issue

In finding that Plaintiffs had made the required showing, the district court correctly looked to "all the evidence," including not only expert opinion but also "a large amount of record evidence relevant to impact."  SA24.

For example, Defendants' numerous lockstep price increases made sense only if Defendants believed that, together, they had the ability to move the market price for containerboard.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) ("*HFCS*") (observing that "secret price fixing" is only "worth attempting" in a market where it "might actually have an effect on price").  Defendants' supply restrictions – especially those imposed in the face of constant or increasing demand – made sense only if Defendants believed that they would "raise[] prices by reducing supply below demand."  *United States v. Andreas,* 216 F.3d 645, 667 (7th Cir. 2000).  That connection is strengthened by instances in which price increases quickly followed supply restrictions, and by Defendants' repeated statements that restrictions were necessary to support increases.  *See supra* pp. 10, 12-13.  Defendants' actions and statements are common evidence to

31

support an inference that their actions were rational, their statements were true, and they were jointly extracting higher prices from class members.

Defendants err in contending (at 22) that Plaintiffs' "evidence purportedly demonstrating an unlawful agreement" is "irrelevant to impact." Although there is a difference between proving the "existence of a conspiracy" and proving "its efficacy," *HFCS*, 295 F.3d at 656, the same evidence can be (and here is) relevant to both. If Plaintiffs can show that Defendants conspired over a space of six years – exposing themselves to criminal liability – that will tend to show that they actually were obtaining a benefit from doing so. *Cf. BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 757-60 (7th Cir. 2011) (evidence that defendants packed municipal auction rooms for six years would support a finding that they obtained a greater share of the tax lien bids that were the "object of their conspiracies").

## 2. Industry Structure Shows That Impact Is a Common Issue

a. The district court also properly relied on expert testimony showing that a successful conspiracy would have market-wide impact. Harris's analysis of the containerboard industry's structure, conduct, and performance addressed numerous characteristics that courts and scholars have recognized as relevant to the likely success of collusion – all of which Plaintiffs will prove with common evidence. Those factors include:

- concentration among manufacturers, A196-98; *see, e.g.*, *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 860 (7th Cir. 2012) (en banc) ("highly concentrated" world market for potash supported inference of effect on United States commerce); *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986) ("concentration of the market" supported FTC's

conclusion that a hospital acquisition was "likely to foster collusive practices, harmful to consumers");

- vertical integration, A188; *see, e.g.*, *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710-11 (7th Cir. 1984) (although vertical integration alone is not suspect, "some economists believe that monopolistic firms might integrate vertically in order to . . . make it more costly for new firms to enter the market . . . or to facilitate price fixing with their competitors"); Richard A. Posner, *Antitrust Law* 74 (2d ed. 2001) ("vertical integration" can support collusive pricing by "increas[ing] the length of time required for new entry to take place");

- a capital-intensive manufacturing process that would delay new entry, A198-99; *see, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015) ("If few firms can or want to enter the relevant market, a higher price generating higher profits will not be undone by the output of new entrants.");

- weak competition from imported containerboard, A189-90; A199; *see, e.g.*, *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 899 (N.D. Ill. 2009) (relying on the inability of imported steel to "fill[] the void created by [domestic] production curtailments" to support an inference of conspiracy);

- no viable substitutes for containerboard, A199-200; *see, e.g.*, *HFCS*, 295 F.3d at 657 (the absence of "close substitutes" favors an "attempt to raise price above cost");

- a low elasticity of demand, A200; *see, e.g.*, *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 777 (7th Cir. 1999) (where "demand . . . is inelastic," the "effect of price competition would be to diminish profits," so that sellers "have much to gain by eliminating competition among themselves"); and

- a standardized, commoditized product, A200-02; *see, e.g.*, *Minn-Chem*, 683 F.3d at 859 (higher prices in a "commoditized and cartelized" industry, absent cheating or new entry, supported an inference that the "cartel would succeed in pushing prices up across all of its markets"); *HFCS*, 295 F.3d at 656-57 (collusion more likely with a "highly standardized" product).

Further, Defendants' own experts, though attacking Harris on practically

every point, offered analyses that tended to support Plaintiffs' ability to show class-

wide impact. Both Ordover and Carlton contended that the containerboard industry was "oligopolistic in nature," A564 (Ordover), as part of their effort to contend that Defendants' lockstep price increases could be explained by "non-conspiratorial oligopolistic interdependence," A448-50 (Carlton) – that is, by each Defendant's strategic motive to follow other Defendants' pricing in a concentrated market, without express agreement. But firms exhibit oligopolistic interdependence precisely where, by following one another's pricing, they can charge greater-than-competitive prices. *See Text Messaging*, 782 F.3d at 871-72. Accordingly, the defense experts' argument that Defendants may have colluded only tacitly (which Plaintiffs will rebut at summary judgment or trial) only strengthens the inference, at class certification, that an express agreement to collude was likely to move the market price of containerboard products.

     **b.** Defendants provide no reason to disregard Harris's economic analysis. *First*, Defendants (at 22-23) accuse Harris of relying on an unreliable method in reviewing the structure, conduct, and performance of the containerboard industry, claiming that "the 'structure-conduct-performance paradigm' . . . was 'successfully debunked . . . in the 1970s' by the 'Chicago School.'" But Harris's analysis turns on characteristics of industry structure and inferences drawn from the conduct of industry participants that are fully consistent with this Court's decisions such as *Text Messaging, Minn-Chem,* and *HFCS*, *see supra* pp. 32-33, and that (as Harris explained) economists and government agencies use today, *see* A177 & n.4; A881-85.

Defendants' focus on Harris's description of that accepted method as a "structure-conduct-performance" analysis puts labels over substance.

Further, Defendants have their history wrong. The academic dispute to which they refer involved a critique of the use of structural analysis to argue for government-backed measures to reduce industry concentration (such as breaking up large companies, or strong constraints on horizontal mergers) based on the premise that concentration led inevitably to supra-competitive pricing – that is, that oligopolies inherently harmed consumers. *See* Frank H. Easterbrook, *Workable Antitrust Policy*, 84 Mich. L. Rev. 1696, 1697-98 (1986); Richard A. Posner, *The Chicago School of Antitrust Analysis*, 127 U. Penn. L. Rev. 925, 944-48 (1979). The "Chicago" side of that debate was far from hostile to the project of "identifying those markets whose characteristics predispose them toward price fixing," Posner, *Antitrust Law* 55, as Harris did here.

*Second*, Defendants mischaracterize (at 23-24) Harris's work as being purely theoretical rather than empirically grounded, and therefore incapable of proving impact. Harris studied and relied on the factual record in the course of preparing his opinion, *see* A869, as any fair reading of his declarations (and their extensive charts, tables and footnotes) shows. Defendants quote Harris out of context when they contend that he did not "'do the empirical analysis'" necessary to "opine 'as to what the price increases would have been in the "but for" world.'" Defs.' Br. 24 (quoting A388). In context, Harris was responding to the question whether he could say that "in the 'but for' world there would have been *no* price increases over the

35

class period." A388 (emphasis added). He shortly afterward clarified his opinion that, "in all likelihood, you probably would have had fewer" price increases without the conspiracy. A389 (explaining that "some of [the increases] occur right on the heels of each other," which "cannot be explained likely from a shift in cost or demand"). Further, even if Harris's work had been purely theoretical (it was not), Plaintiffs could still rely on a theoretical framework *together* with their extensive record evidence and Dwyer's findings, because "[n]o one piece of evidence has to prove every element of the plaintiffs' case." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000).

*Third*, Defendants quarrel (at 24-26) with Harris's use of a market definition that included both intermediate containerboard products (linerboard, medium, roll stock, and sheets) and final ones (such as boxes and displays), and that was geographically national. Leaving aside that market definition is plainly a common issue, Defendants' criticisms lack merit. Contrary to their assertions that Harris did not analyze those issues, he addressed both, *see* A888-92, and the district court reasonably found his explanations persuasive, *see* SA29-31.

Harris reasoned that it was unnecessary to analyze separate markets for intermediate and final containerboard products because containerboard has no economically viable use other than to be made into and sold as final containerboard products, *see* A889; A891; and because Defendants' vertical integration allows them to pass on to purchasers of containerboard products price increases for containerboard itself, *see* A889. That reasoning is reinforced by the very high

percentage (96%) of class-member contracts that Harris found contained pricing provisions that were tied to the PPW index, A880; PSA232-23; by Dwyer's regression showing that changes in the PPW index explained almost all of the changes in actual transaction prices paid by class members, A153-54; and by record evidence that the prices for containerboard and final containerboard products moved together. *See*, *e.g.*, PSA24 (Georgia-Pacific presentation: "[b]ox and liner prices have trended together closely over the long term"); PSA26 (Temple-Inland memorandum: "Supply and demand is driving the linerboard price increase – box price increase follows 100% of the time.").

Harris also concluded that it was appropriate to treat the North American market as the relevant market based on industry documents showing that Defendants themselves treat North America as a single market. *See* A891-92. That conclusion is reinforced by Dwyer's finding that prices for the same types of linerboard and medium correlate almost perfectly to the price for 42-lb. unbleached kraft linerboard regardless of whether delivery was for east or west of the Rocky Mountains. A165. The district court could reasonably credit all of this.

### 3. Expert Analysis of Movement of the PPW Index Shows That Impact Is a Common Issue

**a.** Dwyer's analysis of the PPW index and its movements in response to Defendants' price increases likewise provided common evidence that Defendants moved prices in the market as a whole. That evidence included his findings that Defendants' price increases were more often than not followed (9 times out of 15) by a movement in the PPW index, A144-46; that such movements, when they occurred,

matched exactly the amount of Defendants' increase, A145; that there were no increases in that index that did not follow one of Defendants' increases, either immediately or with a short lag, A761; and that the PPW index for 42-lb. unbleached kraft linerboard and the PPW indices for other containerboard products correlated nearly perfectly, A143-44; A165. Those findings tended to show that Defendants' price increase announcements affected Plaintiffs on a class-wide basis.

Defendants argue (at 26-28) that Dwyer's analysis of the movements in the PPW index and of their relationship to Defendants' lockstep price increases proves only correlation, not causation. But, although correlation and causation are different, evidence of correlation is relevant to prove causation, especially where the correlation is tight and is combined with a plausible causal mechanism. *See Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988) ("Correlations can be suggestive of causality; scientific induction *means* inferring causality from correlation."). Here, the record evidence and Harris's structural analysis provide the backdrop against which the district court reasonably concluded that Dwyer's analysis of correlation could show a class-wide causal relationship.

Defendants also claim (at 31) that Dwyer's analysis cannot establish impact as to class members who purchased when the PPW index was "flat or falling." (Emphasis omitted.) But if Plaintiffs prove (as they will) that Defendants engaged in a conspiracy to increase prices, and that the conspiracy managed to make most of its price increases stick, a factfinder will be able to find injury during periods when

38

the price was not increasing because the price was still elevated by Defendants' previous and continuing conduct.

> **b.** Plaintiffs further submitted extensive evidence confirming that increases in the PPW index translated into actual impact on class members – all of which lays to rest Defendants' contention (at 30) that Plaintiffs failed to show the PPW index was representative.

*First*, Dwyer examined actual transaction prices paid by certain class members before and after increases in the PPW index linked to Defendants' lockstep price increase announcements and found that nearly all "showed elevated prices following" an increase. A149. Defendants' argument (at 31) that Dwyer "identifie[d] damages that [were] not the result of the wrong" and therefore ran afoul of *Comcast*, 133 S. Ct. at 1434, misses the mark. In his before-and-after analysis, Dwyer was not estimating damages (the *amount* of class members' injuries), but showing that enough class members were affected by particular price increases to support an inference that the conspiracy had an impact on all or nearly all of them. His finding that 92% of the class experienced increases after Defendants' announcements, A149, accomplished that. *Blue Cross & Blue Shield v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998), is inapposite for the same reason as *Comcast*: *Blue Cross* involved requirements for making a "responsible estimate of damages," *id.* at 593, which Dwyer was not doing in his before-and-after analysis.

Defendants' argument (at 32) that because many class members did not have purchases that permitted the kind of comparison that Dwyer carried out, his

analysis could not show class-wide impact again misstates the purpose of Dwyer's analysis, which was to show that the concerted price increase announcements affected actual transaction prices. There is likewise no merit to Defendants' claim (at 32) that Dwyer's analysis produced too many "false positive[]" results to be persuasive because applying the same approach would have suggested that 36% to 39% class members would have suffered "impact" even without any collusive price increase. That shows only that, when Defendants were not collectively announcing price increases, most class members did *not* experience increases individually. By contrast, when Defendants *did* collectively announce such increase, almost all class members saw individual prices go up. The two findings are fully consistent with (and, as Dwyer pointed out on reply, A786-93, tend to support) Plaintiffs' position.

*Second*, Dwyer performed a regression analysis comparing class-wide aggregate prices to the PPW index and found that more than 97% of variation in aggregate prices is explained by changes in the index. A153-54. That result demonstrates that, even though most class members were not buying the benchmark 42-lb. unbleached kraft linerboard and some prices for containerboard products may have been individually negotiated, the PPW index is representative of actual transaction prices. Moreover, Dwyer showed that the PPW index for 42-lb. unbleached kraft linerboard is very tightly correlated with other indexed prices, A143-44; A165, permitting a conclusion that when Defendants moved the PPW index for that particular product, they moved the market as a whole.

*Third*, Harris reviewed 738 contracts – all "[l]egible Bates numbered documents with identifiable pricing provisions" – and found that 705 (96%) of them contained provisions that tied pricing to the PPW index. PSA232-33; A880; *cf.* Defs.' Br. 8-9 & n.2 (suggesting, incorrectly, that Harris reviewed only 25 such contracts). Defendants, who have full access to all their customer contracts, never submitted any analysis of pricing provisions to the district court to cast doubt on Harris's finding. They conjecture (at 30-31) that other types of contract provisions might break the link between the PPW index and the contract price, but provide no persuasive examples of such provisions. Most-favored-nation provisions, as Harris explained, were likely to "propagate the impact of . . . collusion from one buyer to many." A203-04. Seasonal lock-ins and price caps, on which Defendants also rely, might cause lags in the implementation of price increase but ultimately would not protect purchasers who negotiated within the period of the conspiracy from supracompetitive prices; at most they would affect individual damages.

Further, Defendants' evidence that individual negotiations were a significant feature of this market was remarkably thin. Their record citations about individual negotiations (at 30) consist of two deponents who stated that (1) Temple-Inland would give "occasional" volume discounts on large purchases of small-sized rolls of linerboard, PSA78; (2) Temple-Inland would make bids to sell boxes based on "cost," PSA80; and (3) International Paper based about half of its local sales on "handshake" agreements rather than written contracts, PSA85. None of that

41

rebutted Plaintiffs' thorough showing that the market price of linerboard and medium was a major factor in the price of final containerboard products.

This Court has accepted less as proof of impact: a movement in a list price alone can establish an effect on the market, where the list price serves as a "starting point for . . . bargaining" and a "guide to likely transaction prices." *HFCS*, 295 F.3d at 656 (discussing similar roles played by posted list prices); *see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) (upholding a district court's finding that "parallel issuance of similar product price lists and price-increase announcements" created a "baseline" through which "price-fixing would have affected the entire market"); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009) (recognizing evidence of "lock-step increases of national price lists in an oligopolistic market" as "common proof . . . to show class-wide impact"). Plaintiffs' evidence of direct links between the PPW index and market transaction prices – including the very common use of the index as an express pricing term – thus went far beyond what was required.

**c.** Plaintiffs' expert analyses, along with their record evidence, support the district court's finding that common proof of impact would predominate over the details of individual contracts or negotiations – especially because impact can be proved by showing *some* effect on price without necessarily showing *how much*. *See MCI Communications Corp. v. AT&T Co.*, 708 F.2d 1081, 1167 n.122 (7th Cir. 1983) (explaining that although "[i]n a private treble damage action impact or 'fact of

damage' is a necessary element of proving liability," it is a "distinct concept[]" from "'amount of damage'").

In reaching that conclusion, the district court did not (as Defendants contend, at 32-24) apply any "presumption," in the sense of a mandatory inference that shifts the burden of persuasion or of production. *See Pigee v. Israel*, 670 F.2d 690, 692-93 (7th Cir. 1982). Instead, it drew reasonable inferences about the feasibility of a class-wide impact determination from facts about the industry and the market involved in this case; and made analogies to cases, such as *Urethane*, 768 F.3d 1245, in which other courts drew similar inferences from similar facts. *See* SA21-23 (discussing additional cases).

Neither *In re New Motor Vehicles Canadian Export Antitrust Litigation,* 522 F.3d 6 (1st Cir. 2008), nor *Robinson v. Texas Automobile Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004), on which Defendants rely (at 33-34), is to the contrary. *New Motor Vehicles* involved a "novel theory" of impact (unlike the classic price-fixing here), and an expert who did no more than assert "in a purely conclusory manner" that he could distinguish "the effects of any permissible vertical restraints from the effects of the alleged impermissible horizontal conspiracy." 522 F.3d at 26, 27. Although "the validity of plaintiffs' theory [was] a common disputed issue," the district court had not abused its discretion in finding that plaintiffs had failed to explain "*how* the pivotal evidence behind [their] theory can be established." *Id.* at 29. There is no comparable failure here.

43

*Robinson* reversed certification of a class of car purchasers in a case involving a specific, allegedly unlawful surcharge, based on evidence that many purchasers conducted negotiations so as to make that surcharge irrelevant to their bottom-line price. *See* 387 F.3d at 423 & n.23 (decision based on the "realities of the haggling that ensues in the American market when one buys a vehicle," and describing record evidence). There was no comparable evidence here; and the characteristics of the market for containerboard products, including the commodity nature of the product, distinguish it from the market for cars.

### C. Class-wide Damages Are a Common Issue

The district court – after "rigorously screen[ing]" Dwyer's report "to ensure that [his] damages model only seeks to prove damages that flow from the harm alleged," SA43 – properly determined that Plaintiffs had shown that "class-wide" or "aggregate" damages can be proved using common evidence.

#### 1. Aggregate Damages Are a Common Issue

a.     The use of aggregate damage calculations in class actions has often and recently been approved by courts of appeals, including this Court. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670 (7th Cir. 2015) (discussing class certification where "the total amount of damages can be determined in the aggregate"); *Urethane*, 768 F.3d at 1269 (rejecting a Seventh Amendment challenge because the defendant had "no interest in the method of distributing the aggregate damages award among the class members"); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009) ("The use of aggregate

damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."). Contrary to Defendants' assertion (at 38), the district court could reasonably reserve the question of how to allocate any award among the class, and whether limited individual inquiry might be needed. *See* SA54; *Butler*, 727 F.3d at 801; *cf. Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1258-59 (11th Cir. 2003) (affirming a defendant's right to participate in certain individual proceedings after an aggregate damage award), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).

Defendants have no standing to argue (at 39-40) that such an approach abridges the rights of class members, nor does that argument have any force. The class action mechanism recognizes that for class members who suffer (in Defendants' examples, at 39) $1000 or $100 in damages, individual litigation is no alternative. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("[O]nly a lunatic or a fanatic sues for $30."). Class members can sensibly decide to accept a reasonably apportioned share of a class recovery rather than seek to prove individual damages. Other members may opt out of the class; if they do, their purchases will not figure into the aggregate damages calculation, and Defendants have nothing to complain about.

Defendants' arguments (at 40-41) that the calculation of aggregate damages will cause Defendants to overpay or abridge Defendants' right to present defenses are likewise incorrect. Plaintiffs intend to establish the average class-wide overcharge and apply it to class purchases. If the average is a reasonable estimate

(and it is, as discussed below), the calculation of the aggregate overcharge will represent a reasonable estimate of Defendants' aggregate damages liability. Defendants may seek to present to the jury whatever valid alternative calculations they choose to argue that aggregate damages are lower.

**b.** There is no merit to Defendants' argument (at 36-38) that *Comcast* bars the district court's finding that aggregate damages are a common issue. *Comcast* did not forbid the use of aggregate damages calculated with a regression model – on the contrary, it observed that the regression there at issue, *see* 133 S. Ct. at 1431 (describing the model), "might have been sound, and might have produced commonality of damages," but failed to match the theory of class-wide antitrust liability. *Id.* at 1434. There is no comparable problem here: Defendants' (meritless) position is not that Dwyer produced a reliable model that failed to measure damages from the appropriate antitrust violation (as in *Comcast*), but that he produced no reliable model at all. *Comcast* did not change the law in any way relevant to this case.

This Court has observed that *Comcast* rested on the failure of the class representatives in that case to produce "a theory of loss that matched the theory of liability." *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014); *Butler*, 727 F.3d at 799 ("*Comcast* holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges."); *see also Mullins*, 795 F.3d at 672 n.4. Defendants' argument (at 37) that *Comcast* should be read to permit class

certification only where proof of damages is common or where "each class member's damages can be ascertained through simple arithmetic" – seeking to limit *Butler* arbitrarily to its facts – has no support in authority.

The D.C. Circuit's opinion in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 725 F.3d 244 (D.C. Cir. 2013), is not in conflict with *IKO Roofing* or *Butler*, and does not support Defendants' novel "simple arithmetic" rule. To the contrary, citing with approval this Court's pre-*Comcast* decision in *Messner*, the D.C. Circuit in *Rail Freight* made clear that it was "not . . . say[ing] th[at] plaintiffs must be prepared at the certification stage to demonstrate through common evidence the precise amount of damages incurred by each class member." *Id.* at 252. Instead, *Rail Freight* reasoned that where plaintiffs use a regression model to show the feasibility of proving class-wide impact, *Comcast* requires the district court to assess that model for reliability at the certification stage. *See id.* at 255 (remanding for such inquiry). Whether or not that reading of *Comcast* is correct, it is not implicated here. As the district court observed, Plaintiffs have a number of ways other than Dwyer's regression of showing impact on a class-wide basis, SA20-38; in any event, the court did address Defendants' challenges to Dwyer's model, SA41-53, and correctly rejected them.

**c.** Defendants' contention that it would violate due process and the Rules Enabling Act for the district court to rely on Dwyer's model is likewise incorrect. The cases on which they rely (at 39) concerned the device sometimes called a "cy pres" award or "fluid recovery," which "awards to a charity the money that would

otherwise go to the members of the class as damages, if distribution to the class members is infeasible." *Hughes v. Kore of Indiana Enter.*, 731 F.3d 672, 675-76 (7th Cir. 2013); *cf.* Defs.' Br. 39 (relying on *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), and similar cases). Plaintiffs here are not seeking a fluid recovery – they seek to prove aggregate damages, a determination that would be final and binding on the class. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008) (rejecting a similar defense argument that "confuse[d] the concept of fluid recovery with aggregate damages," and explaining the difference).

### 2. Dwyer's Model Was Reliable

**a.** Dwyer's damages model in this case was reasonable, reliable, and sufficient to illustrate Plaintiffs' ability to prove aggregate damages using common evidence. He used a multiple regression analysis to estimate the effect of the conspiracy on the price of containerboard, A153-59; A171-73, as is frequently done in antitrust cases. *See*, *e.g.*, *HFCS*, 295 F.3d at 660 (discussing a similar model); 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 399 (4th ed. 2014) (discussing the use of regression models in proving antitrust damages); *Reference Manual* 305 (same).

Dwyer compared prices during the period of the conspiracy to a benchmark incorporating data from before and after that period. A154-55. He made separate estimates for intermediate and final containerboard products. A157-58. He controlled for factors other than the conspiracy that might influence price, such as demand, costs, inflation, and seasonal variation. A155-57. Over the class period as a whole, Dwyer found "statistically significant overcharges" to the class of 3.81% for

intermediate products and 2.92% for final products that amounted to "approximately $3.8 billion" in aggregate damages.  A140; A158-59.

Because it uses a reliable method of controlling for factors *other* than Defendants' conspiracy that might have affected the price of containerboard products, Dwyer's analysis "measure[s] damages resulting from the particular antitrust injury on which" – if Plaintiffs prevail – Defendants' "liability in this action [will be] based." *Comcast*, 133 S. Ct. at 1433.  This is not a case, as was *Comcast*, involving multiple "theories of liability" where only some of those theories are "capable of classwide proof."  *Id.* at 1434.  Rather, it involves a "single, central, common issue of liability," *Butler*, 727 F.3d at 801 (reaffirming class certification after *Comcast*) – whether Defendants were acting as conspirators.  If so, then Dwyer's model reasonably estimates the damage their conspiracy caused to class members.

Such a reasonable estimate is all that antitrust law requires.  *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 490 (7th Cir. 2002) ("It is certainly acceptable through expert economic testimony to make a reasonable estimation of actual damages through probability and inferences."); *see also Zenith Radio*, 395 U.S. at 123-24 (permitting a jury to draw a "just and reasonable inference" from price movements "not shown to be attributable to other causes").  Even in an individual case, the damages of any particular purchaser probably would be calculated using a regression model like Dwyer's.  The district court was not required (or permitted) to demand more.

**b.**     Defendants accuse Dwyer (at 41-43) of "manipulat[ing] . . . the regression model" to "caus[e] it to attribute to collusion damages that have other causes." That accusation refers to a dispute between the experts over model specifications – in particular, Dwyer's use of a process called a "forward selection" procedure, sometimes also called a "stepwise" procedure, for selecting the independent variables in his regression needed to control for influences on price other than the conspiracy. One method of selecting such control variables, which Ordover advocated, A604-06; A609, would be to start with a theoretical model of the industry. Another, which Dwyer used, was to identify a large number of potentially relevant variables and use forward selection to pick the control variables with the most explanatory power. A157; A296-97; A841-42. Dwyer explained his choice by noting that forward selection has advantages when there are many potentially relevant variables to pick from and when economic theory does not clearly show which ones to pick. *See* A839-42. Defendants do not argue on appeal that the "forward selection" or "stepwise" method itself was unreliable. When they argued that to the district court, Dwyer explained why they were wrong, A841-42, and the court reasonably agreed, SA49-50.

Defendants contend (at 42-43) that Dwyer should have used forward selection procedure to determine whether to include in his model an independent variable measuring *the conspiracy itself*. They claim that doing so would have resulted in excluding the conspiracy variable and that this is evidence that the conspiracy had no effect on prices. That argument ignores the purpose of the regression, which was

50

to estimate damages *on the assumption* that Plaintiffs succeed in demonstrating liability – that is, conspiracy and impact. As Dwyer explained, running a regression without the conspiracy measurement would have produced no result (positive or negative) about the relationship between the conspiracy variable and prices. *See* A842-43 ("[I]t is appropriate and sensible to retain the effect that one wants to estimate in a regression specification."). The district court did not err in crediting that explanation. SA51-52.

* * * * *

At the present procedural stage, Dwyer's model was (at a minimum) sufficient to establish that Plaintiffs could reasonably estimate aggregate damages, and therefore sufficient to support class certification. The district court was measured in its ruling on this subject: it left open the possibility that if Defendants could show greater difficulties in the future they could move to decertify or limit the class. SA54; *cf. Butler*, 727 F.3d at 800 (approving certification of liability issue only). That careful approach was no abuse of discretion.

### D.     Defendants' Procedural Arguments Fail

Defendants' contention (at 43-48) that the district court failed to conduct a "rigorous analysis" of Plaintiffs' class certification motion and expert evidence cannot be squared with the district court's lengthy and detailed opinion. The court acknowledged and carried out its perhaps "'painful'" duty to "rigorously screen expert evidence when certifying a class." SA43. Indeed, Defendants cannot point to any issue to which the district failed to respond in detail. *Cf. Parko*, 739 F.3d at

1086 (remanding because district court failed to address defendants' challenge to plaintiffs' expert hydrologist). Their quarrel is not with the thoroughness of its analysis, but with the unfavorable result.

Defendants complain (at 44-45, 47-48) that the district court did not hold an evidentiary hearing, but cite no authority that obliged it to do so. This Court has rejected a "per se rule requiring an evidentiary hearing in every instance disposing of the class certification issue." *Simer v. Rios*, 661 F.2d 655, 671 n.27 (7th Cir. 1981). The cases on which Defendants rely recognize that an evidentiary hearing must be held "if *necessary*," *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (emphasis added), and that "a district court must make whatever factual and legal inquiries are *necessary* to ensure that requirements for class certification are satisfied," *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (emphasis added). The determination whether an evidentiary hearing is necessary in any particular case is within the district court's "broad discretion," 1 *McLaughlin on Class Actions* § 3:13 (11th ed.) (collecting authority), and will not be reversed "'unless the parties can show that the hearing, if held, would have affected their rights substantially,'" *id.* (quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1099 (11th Cir. 1996)). Defendants have made no such showing here.

Defendants also say (at 47) that an evidentiary hearing was warranted because it was unfair for the district court to deny them "any chance to answer" purportedly new arguments raised in Dwyer's and Harris's reply reports. But the reports were submitted on a schedule to which Defendants stipulated in the district

court, PSA74-75, which they must have known at the time would give them no

opportunity as of right to respond to reply reports – as was appropriate, because

Plaintiffs bore the burden of proof and were entitled to the last word.  Nor did

Defendants seek leave for any sur-reply responding to the purportedly new material

in Dwyer's and Harris's replies.  They did move to strike parts of Dwyer's reply, and

the district court denied that motion in relevant part, finding Dwyer had merely

"respond[ed] to Defendants' experts' criticisms in defending his initial conclusions."

SA12.  That was no abuse of discretion.

Defendants' complaint (at 45-47) that the district court did not rule on their

challenges to Harris and Dwyer is likewise unfounded.  Where Defendants raised

specific challenges to the methodologies that Harris and Dwyer employed, or to

their application of those methodologies, the district court addressed and rejected

those challenges.  *See* SA29-32; SA35-38; SA48-54.  Further, Defendants waived any

right to a ruling on admissibility at the class certification stage by "'expressly

reserv[ing] their right to move to exclude [Plaintiffs' experts] under *Daubert* and

Rule 702,'" SA5 (second alteration in district court opinion), at a later stage of the

proceedings.  *Cf. Messner*, 669 F.3d at 812 (holding that "a district court must make

a conclusive ruling on *any challenge* to [an] expert's qualifications or submissions

before it may rule on a motion for class certification") (emphasis added); *American

Honda*, 600 F.3d at 815-16 (similar language).  No decision of this Court required

the district court to make an express *Daubert* ruling immediately when Defendants

said they wanted one later; and, in light of the court's thorough analysis of

Defendants' contentions, there is no reason to think anything would have changed.

## II.    A Class Action Is Superior to Individual Actions

### A.    The District Court Had Sound Reasons for Finding Class Adjudication Superior in This Price-Fixing Case

The district court appropriately concluded that this controversy would be

better litigated as a class action than as thousands of individual actions.  The

common proof needed to establish liability requires documentary discovery and

depositions of an entire defense group, as well as at least two costly plaintiff-side

expert reports (and depositions of defense experts).  Those expenditures are in the

interests of the whole class, but it would likely be irrational for individual class

members to undertake them alone.  The class action mechanism, which spreads

those costs across the entire injured group on a contingent basis, is the only fair and

efficient means (if not the only feasible means) to resolve this controversy.

Because antitrust class actions often have such characteristics – especially a

"garden-variety price-fixing conspiracy," *HFCS*, 295 F.3d at 661 – they are

frequently suitable for class certification.  *See Messner*, 669 F.3d at 815 ("[I]n

antitrust cases, Rule 23, when applied rigorously, will frequently lead to

certification."), *quoted in* SA15.  As the district court clarified, the frequent

suitability of antitrust cases for class certification "does not . . . make class

certification automatic."  SA15.  It does make the result here unsurprising.

**B.    Defendants Fail To Show That Individualized Defenses Defeat Predominance or Superiority**

The district court did not err in finding that neither purported releases of antitrust claims nor purportedly disqualifying provisions in certain class members' contracts defeat class certification.  Its ruling accords with authority under which "[c]ourts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members."  *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39-40 (1st Cir. 2003) (explaining that it is better to use "procedural mechanisms" like subclasses or exclusion of class members); *Newberg on Class Actions* § 4:55 (5th ed.) (collecting cases, and stating generally that affirmative defenses only "defeat predominance . . . [where] the affirmative defenses are, for some reason, unusually important").

Further, where a defendant seeks to use an affirmative defense to defeat the certification of a plaintiff class, it is the defendant who must point to evidence that the defense will actually make the case unsuitable for class treatment.  *See*, *e.g.*, *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 238 (S.D.N.Y. 2012) (explaining that "[i]n order to defeat predominance on th[e] basis" of an affirmative defense of investor knowledge, "defendants must provide evidence that certain class members had differing levels of knowledge"); *Public Emps.' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 119 (S.D.N.Y. 2011) (rejecting defendants' argument about individualized issues concerning the discovery of false representations as "[s]heer conjecture" without "admissible evidence").  Here,

Defendants fail to show that any affirmative defenses are unusually important or
will render class proceedings unmanageable.

### 1.     The *Linerboard* Releases Do Not Defeat Superiority

The district court correctly rejected Defendants' argument based on releases
signed by some class members as part of opt-out litigation in the earlier *Linerboard*
controversy.  The releases themselves are not in the record; only Defendants'
summary of them is.  PSA86-124.  Based on that summary, it appears that
Defendants' selectively presented figures overstate the releases' significance.
Defendants say (at 49) that "39 different settlement agreements" are at issue, but
many of those agreements have overlapping parties, because the same class
members released different Defendants in different agreements.  *See* PSA86-124.
They assert that "almost 10,000" claims are "affect[ed]" by the releases; it appears
that they are adding up *all* of the purported releases in Defendants' summary to
yield a total of 7,735, and then rounding up.  *See id.*  Because most class members
who signed releases released more than one Defendant, that figure gives an
exaggerated impression of the actual number of class members who signed releases
(which Defendants do not provide).

Defendants' figure also implies without justification that each class member
who signed a release signed it *after* the events giving rise to their present claim or
claims.  That assumption is unlikely to be true because the releases are heavily
distributed toward the beginning of the class period (which runs from no later than
February 15, 2004, to November 8, 2010).  Based on Defendants' summary of the

7,735 asserted releases at issue, 3,274 (42.3%) were dated on or before March 24, 2004, *see* PSA113-15; PSA120-24; 5,705 (73.8%) on or before August 30, 2005, *see* PSA87-88; PSA93; PSA96-97; PSA106-08; PSA116-19; and 7,476 (96.7%) on or before January 26, 2006, *see* PSA89-92; PSA94-95; PSA109-10. (These calculations use effective dates where available from PSA86-124; otherwise, execution dates. They also correct an apparent typo in PSA120: "3/24/2014" for "3/24/2004.")

Defendants also overstate the legal significance of the releases, which arose from different facts in another time period. Because "a prospective waiver of a party's right to pursue statutory remedies for antitrust violations" is "against public policy," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985), the releases cannot immunize Defendants for later damages. At most, any enforceable releases could be given effect simply by barring recovery by particular class members for damages before the release. Doing so would be far superior to the result Defendants advocate: requiring a full separate trial for every class member, including the majority that signed no release.

Defendants argue that barring recovery for pre-release injuries would not be enough, and that each Defendant should be entitled to exclude from any trial against it any *evidence* of acts before the release, which they say would make the case unmanageable. They point to no language in the contract releases that would prevent any class member from relying on pre-release evidence to support post-release claims. And they cite only one case: *In re Prudential Insurance Co. of America Sales Practice Litigation*, 261 F.3d 355 (3d Cir. 2001), which does not help

57

them. *Prudential* involved members of a class who, after a class settlement, sought to pursue litigation on related (pre-release, not post-release) claims in another jurisdiction. In doing so, they violated an injunction; the district court then further enjoined them from, among other things, using any evidence relevant to the settled claims. The Third Circuit's affirmance did not establish any general rule that a release gives a defendant the right to exclude evidence related to released claims from a later trial of non-released claims. Furthermore, as the district court observed, the type of release and class settlement at issue in *Prudential* can bar only claims arising from an "identical factual predicate" with the settled claims. SA57; *see Williams v. General Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 273 (7th Cir. 1998) (same rule). Defendants do not argue that standard is met here.

### 2. Other Contractual Provisions Do Not Defeat Superiority

The district court likewise correctly rejected Defendants' arguments based on an assortment of other contractual provisions, such as arbitration clauses, mediation clauses, forum-selection provisions, and contractual statutes of limitations. As the court found, and Defendants do not contest, none of those provisions purported to restrict the right of the contracting party to participate in class actions. SA58. Further, the provisions on which Defendants rely apply to a small part of the class. Defendants identify 190 affected members. PSA125-47. By comparison, there were more than 100,000 notices sent for the PCA and Norampac settlements; and Defendants themselves have divided the affected members into a manageable number of groups (based on the different types of clauses) whose rights could be resolved by reasonable motions practice. Even if Defendants succeeded in

dismissing the claims of all 190 members, that would not materially affect the superiority of a class action over individual litigation.

### 3.    The District Court Did Not Err by Stating That It Would Revisit Manageability Issues Later

It was likewise within the district court's discretion to permit Defendants to file a motion to modify the class based on purportedly disqualifying clauses at some later time. SA59-60. The district court could reasonably find that the sparse record Defendants had made was insufficient to show which (if any) members should be excluded from the class; also, some members might opt out regardless, which would simplify the inquiry. This Court has left more important decisions to the ongoing discretion of district courts overseeing complex litigation. *See Butler*, 727 F.3d at 802 (leaving to the district court whether to create subclasses); *HFCS*, 295 F.3d at 666 (suggesting, but not ordering, that the district court bifurcate liability and damages phases). The same approach is appropriate here.

## III.    RockTenn's Bankruptcy Discharge Poses No Obstacle to Class Certification

RockTenn offers no reason that the district court erred in certifying the class as to it because (1) whether RockTenn participated in the conspiracy after its bankruptcy discharge is a common question and (2) the remaining questions of impact and damages are the same for RockTenn as for the other Defendants.

### A.    RockTenn's Liability for Conspiracy Is a Common Issue

Plaintiffs' claim against RockTenn presents but one issue that is distinct from its claim against the rest of the Defendants: whether it participated in the conspiracy *after* its discharge from bankruptcy. As with the other Defendants,

however, the question whether RockTenn participated in an unlawful conspiracy is a common question. The evidence that Plaintiffs have proffered to demonstrate the existence of a conspiracy, and RockTenn's participation in that conspiracy after it emerged from bankruptcy, is common across the class. *See supra* pp. 28-29.

RockTenn does not seriously argue otherwise. Instead, despite the district court's finding that "Plaintiffs have provided evidence that RockTenn participated in the alleged conspiracy post-bankruptcy," SA62, RockTenn disputes (at 25-26) the strength and significance of that evidence. As with Defendants' joint arguments, such arguments shed no light on whether class or individual litigation is the "'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently,'" *Amgen*, 133 S. Ct. at 1191. On the contrary, the strength of Plaintiffs' evidence is itself a common question to be resolved at summary judgment or trial.

There is, in any event, substantial evidence that RockTenn – then still called Smurfit-Stone, and led by some of the same executives that participated in the conspiracy before discharge – continued after its discharge to participate in the conspiracy. For example, on June 29 and June 30, 2010 – the day before the discharge and the day of the discharge itself – three co-conspirators (Georgia-Pacific, International Paper, and Temple-Inland) announced a $60 price increase, effective in August 2010. PSA243-45. Also on June 30, Smurfit-Stone's Senior Vice President – a hold-over from pre-bankruptcy days – attended a trade association meeting with senior executives of those same three-conspirators. PSA240. That evening, Smurfit-Stone's President and COO sent an internal e-mail forwarding a

message about the announced increases and adding: "I am assuming we are announcing tomorrow." PSA244. On July 1, Smurfit-Stone did indeed announce its own identical price increase to certain customers, including Temple-Inland, PSA73; it announced that increase to the public a few days later, PSA48.

### B. Evidence of Impact and Damages Will Be Common to All Defendants

**1.** Because RockTenn, if found liable, will be liable to the same extent as any other co-conspirator, it has no separate ground for challenging the district court's determination that impact and damages are subject to common proof. Once a defendant's participation in a price-fixing conspiracy is established, it is "liable for the cartel's entire overcharge," even if "the plaintiffs did not buy from [a particular co-conspirator] directly, or at all." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 634 (7th Cir. 2002); *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257 (7th Cir. 1980) (defendants in antitrust action are jointly and severally liable under Section 1 for any injury suffered by plaintiffs). A conspiracy's impact is just that – the impact of *the conspiracy* – and need not be proven conspirator-by-conspirator. Defs.' Br. 19 (arguing that Plaintiffs must show "that all class members were in fact injured *by the alleged conspiracy*").

That principle applies, furthermore, irrespective of when any particular Defendant joined the conspiracy. *See Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) ("[A] co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators.")

(citing *Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970)).  This principle is not unique to antitrust law, but applies generally to unlawful conspiracies:  "[a]ny member of a conspiracy is liable for the acts of another co-conspirator if done in furtherance of the agreed upon conspiracy, even if acts may have been performed before the member joined the conspiracy." *United States v. Castillo*, 814 F.2d 351, 355 (7th Cir. 1987) (citing *United States v. Shelton*, 669 F.2d 446, 454 (7th Cir. 1982)); *see also United States v. Ellerman*, 411 F.3d 941, 948 (8th Cir. 2005) ("By joining the conspiracy, [the defendant] participated in, and is liable for, all prior co-conspirators' actions that furthered the conspiracy."); *Dextone Co. v. Building Trades Council*, 60 F.2d 47, 48 (2d Cir. 1932) (declaring it "clearly correct" that "every person who participates in a conspiracy is liable for everything done during the period of its existence regardless of the exact time at which he becomes a member or the extent of his participation"); *United States v. Benson*, 79 F. App'x 813, 822 (6th Cir. 2003) ("A co-conspirator can generally be held liable for 'actions done in furtherance of a conspiracy before [the particular co-conspirator] joined.'") (quoting *United States v. Gravier*, 706 F.2d 174, 177-78 (6th Cir. 1983)) (alteration in original).  RockTenn's assertion (at 24) that Plaintiffs must show that "RockTenn's post-discharge actions caused post-discharge, classwide injury" – to the extent RockTenn means to say that it gets a free pass for the pre-discharge harms caused by the conspiracy in which it participated post-discharge – conflicts with basic conspiracy law.

62

**2.**     The fact that RockTenn (as Smurfit-Stone) received a discharge from bankruptcy in June 2010 does nothing to alter these principles.  The effect of a bankruptcy discharge is to give the debtor a "clean slate."  If the reorganized entity subsequently violates the law, however, it is liable for its conduct to the same extent as any other wrongdoer.  "[A] successfully reorganized debtor under Chapter 11 of the Bankruptcy Code is liable for any independent conduct that arises after confirmation of its bankruptcy plan."  *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009).  This is because "[a] 'fresh start' means only that; it does not mean a continuing licen[s]e to violate the law."  *O'Loghlin v. County of Orange*, 229 F.3d 871, 875 (9th Cir. 2000).  The discharge provides RockTenn no relief from the weight of liability incurred by participating in a price-fixing conspiracy *post*-discharge – whether that weight is "crushing," as RockTenn asserts (at 29), or not.

RockTenn, if found liable, will thus be in no different position from any other potential defendant who might have joined the conspiracy after June 30, 2010.  As the district court observed:

> It would be a windfall to [RockTenn] to allow them to join a conspiracy post-bankruptcy, with the perfect knowledge and intent to continue causing damages to vast numbers of consumers, and then refuse to enforce joint and several liability while the remaining co-conspirators are all subject to such liability.  If RockTenn did in fact choose to rejoin the alleged conspiracy, it cannot be heard to complain that it may be on the hook for all the damages the conspiracy caused.

SA65; *see also*, *e.g.*, *In re Automotive Parts Antitrust Litig.*, 2013 WL 2456010, at *4, *6 (E.D. Mich. June 6, 2013) (holding that, where a defendant made sales after

bankruptcy that "allegedly involved an unlawfully inflated price," that "conduct . . . after bankruptcy confirmation may fall within the ambit of the conspiracy" with accompanying "'potential for joint and several co-conspirator liability'"); *In re Polyurethane Foam Antitrust Litig.*, --- F. Supp. 3d ---, 2015 WL 507141, at *15-17 (N.D. Ohio Feb. 6, 2015) (permitting antitrust plaintiffs to proceed against post-bankruptcy defendant on the basis of "overt acts" that the defendant committed after its asset sale and to seek "damages flowing from the time the conspiracy began"). In arguing to the contrary, RockTenn cites (at 11, 23, 28-29) cases involving exclusively pre-discharge conduct in furtherance of the conspiracy. *E.g.*, *Travel Agent*, 583 F.3d at 902 (United committed its "final act to effectuate th[e] conspiracy . . . long before [it] emerged from bankruptcy"); *In re WorldCom, Inc.*, 546 F.3d 211, 221 (2d Cir. 2008) (bankruptcy discharge precluded claims where plaintiff "d[id] not allege any relevant post-confirmation acts by" the defendant).

RockTenn's argument (at 16-19) that, as a result of the discharge, Plaintiffs somehow seek to pursue a claim against RockTenn that is distinct from their claim against the other Defendants is also incorrect. The claim against all Defendants is the same – that they violated Section 1 of the Sherman Act by fixing prices for containerboard products. To be sure, Plaintiffs will need to demonstrate that each Defendant participated in the conspiracy – in the case of RockTenn, after June 30, 2010 – but the need to establish each Defendant's liability, common to all conspiracy cases, does not have the effect of dividing the case into separate "claims" or "theories of liability," as RockTenn asserts.

RockTenn's similar arguments that it is somehow subject to a different "class period" or that a separate analysis is required to establish impact or damages after June 30, 2010, all fail for the same reasons. The fact that different conspirators may join a conspiracy at different times does not entitle each co-conspirator to an individually tailored class period; the class period matches the duration of the conspiracy. And because RockTenn (if it participated in the conspiracy post-bankruptcy) is liable for the harm caused by the conspiracy – including the harm that occurred prior to its discharge from bankruptcy – evidence of impact and damages caused by the conspiracy applies to RockTenn as it does to co-Defendants. Contrary to RockTenn (at 19-20), this does not mean that it is held liable for pre-discharge conduct. Rather, it will be liable only for its post-discharge decision to participate in an unlawful conspiracy.

**3.**     RockTenn thus gains no more support from *Comcast* than do the other Defendants. Unlike in that case, there is no mismatch here between Plaintiffs theory of liability and Plaintiffs' proposed method of proving damages. Plaintiffs seek to prove that, post-bankruptcy, RockTenn participated in a price-fixing conspiracy; that the conspiracy harmed all or nearly all members of the class; and that aggregate damages can be proved class-wide. *See also supra* pp. 45-47.

The other cases RockTenn cites in support of its argument that Plaintiffs have advanced a distinct "theory of liability" against it are inapposite for similar reasons. *Parko* involved plaintiffs who experienced different levels of contamination by different polluters causing different harm to property values, making it unclear

65

whether plaintiffs had even "*identified* a common issue." 739 F.3d at 1086. *EQT Production Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014), involved five separate classes of plaintiffs, in five distinct lawsuits that had been consolidated, some but not all of which alleged improper remittance of royalty payments, three of which were against one defendant and two of which against another, some of which involved plaintiffs who had entered lease agreements with defendants and others of which did not, and where the members of the various classes were not readily identifiable. Unsurprisingly, the Fourth Circuit held that separate Rule 23 analyses were in order. *Id.*; *accord Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441 (4th Cir. 2003) (claims involved four separate causes of action, two of which – negligent misrepresentation and fraud – required individualized proof of reliance, an element not susceptible to class-wide proof); *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068-70 (9th Cir. 2014) (four different legal claims based on five versions of challenged rental agreement; different plaintiffs allegedly exposed to different deceptive practices).

### C.    Class Adjudication of Plaintiffs' Claims Against RockTenn Is Manageable

The district court also correctly determined that class adjudication of Plaintiffs' claims against RockTenn is manageable. *See* SA66. RockTenn raises no proper challenge to that determination, but instead argues (at 29) that it should be given a separate trial from its co-Defendants lest there be confusion about the legal significance of RockTenn's pre-discharge conduct. That is a matter of trial administration that has nothing to do with class certification.

Even if RockTenn's stated concern were pertinent, it is unpersuasive on its own terms. The district court addressed any potential confusion caused by the presence of allegations and evidence of pre-bankruptcy conduct – including knowledge of and participation in the conspiracy before it was discharged from bankruptcy – by indicating that the court could give a limiting instruction, explaining that, "in order to determine whether RockTenn violated antitrust laws, [the jury] must only consider RockTenn's post-discharge conduct and determine whether that conduct violated the law." SA66. (The court further indicated that it could revisit this question if the case proceeded to trial.)

This approach was well within the district court's discretion. RockTenn itself recognized in its filings before the district court that "there would need to be an appropriate limiting instruction at trial" to make clear that evidence of pre-discharge conduct is admissible for limited purposes, such as "the issue of intent," rather than to demonstrate that RockTenn is liable for joining the conspiracy through such conduct. PSA247.

Nor, as RockTenn contends, does the district court's approach "permit[] pre-discharge conduct to serve as the basis for post-discharge liability," in violation of the Rules Enabling Act. Br. 28-29 (citing *Travel Agent*, 583 F.3d at 902). Instead, the district court repeatedly made clear that RockTenn would be liable only if the evidence showed it participated in the conspiracy post-discharge. And the district court further made clear that it would take steps at trial to ensure the jury *did not* consider pre-bankruptcy activities in determining liability, except to the extent

those activities are relevant to the issues of RockTenn's intent, or to demonstrate how the conspiracy operated with respect to the other Defendants.  In accordance with *Travel Agent*, RockTenn will only be liable if it engaged in unlawful conduct after emerging from bankruptcy.

## CONCLUSION

The Court should affirm the class certification order.

Dated:  September 24, 2015

Respectfully submitted,

 s/ *Aaron M. Panner*

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
FREED KANNER LONDON
   & MILLEN LLC
2201 Waukegan Road
Suite 130
Bannockburn, IL 60015
(224) 632-4500

Daniel J. Mogin
Jodie Williams
THE MOGIN LAW FIRM, P.C.
707 Broadway
Suite 1000
San Diego, CA 92101
(619) 687-6611

*Co-Lead Counsel for Plaintiffs-Appellees*

Aaron M. Panner
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN,
   TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and Circuit Rule 32(b), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief was prepared using a proportionally spaced typeface (Century Schoolbook, 12 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), and in accordance with the Court's August 18, 2015, order granting Appellees permission to file a brief of up to 18,000 words, this brief contains 16,924 words.  This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2013) used to prepare this brief.


September 24, 2015                                  *s/ Aaron M. Panner*
                                                   Aaron M. Panner

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 24, 2015, I electronically filed the foregoing Brief for Plaintiffs-Appellees with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/ *Aaron M. Panner*
Aaron M. Panner