Nos. 15-2385 & 15-2386

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

KLEEN PRODUCTS LLC, ET AL.,
individually, and on behalf of all others similarly situated,

*Plaintiffs – Appellees,*

*v.*

INTERNATIONAL PAPER CO., ET AL.

*Defendants – Appellants.*

On Appeal From The United States District Court
For The Northern District Of Illinois
Case No. 1:10-cv-05711 – Hon. Harry D. Leinenweber

**REPLY BRIEF OF DEFENDANTS-APPELLANTS
INTERNATIONAL PAPER COMPANY, GEORGIA-PACIFIC LLC,
WEYERHAEUSER COMPANY, AND TEMPLE-INLAND INC.**

<div style="display:flex"><div>

James T. McKeown
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
(414) 297-5530

Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL  60604
(312) 660-7600

*Counsel for Defendant-Appellant
International Paper Company*

</div><div>

Miguel A. Estrada
  *Counsel of Record*
Jonathan C. Bond
Jesenka Mrdjenovic
Lindsay S. See
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

*Counsel for Defendant-Appellant
Georgia-Pacific LLC*

</div></div>

*[Additional counsel listed on inside cover]*

Andrew S. Marovitz
Britt M. Miller
Joshua Yount
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
(312) 782-0600

Michael B. Kimberly
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C.  20006
(202) 263-3127

*Counsel for Defendant-Appellant
Temple-Inland Inc.*


Margaret H. Warner
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 756-8000

*Counsel for Defendant-Appellant
Weyerhaeuser Company*

Ryan A. Shores
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Beth A. Wilkinson
Alexandra M. Walsh
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street, N.W.
Washington, D.C.  20006
(202) 223-7300

*Counsel for Defendant-Appellant
Georgia-Pacific LLC*


Stephen Y. Wu
Michelle S. Lowery
MCDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Suite 4400
Chicago, IL  60606
(312) 372-2000

*Counsel for Defendant-Appellant
Weyerhaeuser Company*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

ARGUMENT ......................................................................................... 3

    I.    Individualized Issues Of Impact And Damages Defeat
    Predominance ................................................................................ 3

        A.    Plaintiffs Presented No Reliable, Classwide Proof
        Of Impact ......................................................................... 3

            1.    Plaintiffs' Purported Conspiracy Evidence
            Cannot Prove Classwide Antitrust Impact ........................ 4

            2.    Harris's Structure-Conduct-Performance
            Analysis Is Incapable Of Proving Common
            Antitrust Impact ................................................................ 6

            3.    Dwyer's PPW And Matching Analyses
            Cannot Prove Impact ......................................................... 9

            4.    Common Impact Must Be Proved, Not
            Presumed ........................................................................... 13

        B.    Individualized Damages Issues Will Overwhelm
        Any Common Questions ..................................................... 15

            1.    The Need For Individualized Damages
            Inquiries Dooms Predominance ........................................ 15

            2.    Rough Estimates Of Aggregate Damages Are
            Insufficient ....................................................................... 17

            3.    Plaintiffs' Manipulated Damages Model Is
            Unreliable ......................................................................... 21

        C.    The District Court Failed To Conduct A Rigorous
        Analysis ............................................................................ 23

    II.    Plaintiffs Failed To Prove That A Class Action Is Superior ................ 24

        A.    Plaintiffs Bore The Burden To Prove That A Class
        Action Is Superior Despite Diverse Defenses ........................... 24

**TABLE OF CONTENTS**
***(continued)***

**Page**

B.    The *Linerboard* Releases And Other Highly
Individualized Contract-Based Defenses Defeat
Superiority ................................................................................... 26

CONCLUSION ................................................................................................ 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Honda Motor Co.* v. *Allen*,
    600 F.3d 813 (7th Cir. 2010).................................................................. 24

*Andrews* v. *Chevy Chase Bank*,
    545 F.3d 570 (7th Cir. 2008).................................................................. 25

*Atl. Richfield Co.* v. *USA Petrol. Co.*,
    495 U.S. 328 (1990)................................................................................. 4

*Berger* v. *Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001).................................................................. 21

*Bigelow* v. *RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946)............................................................................... 21

*In re Blood Reagents Antitrust Litig.*,
    783 F.3d 183 (3d Cir. 2015).................................................................. 23

*Blue Cross & Blue Shield United of Wis.* v. *Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998).................................................................. 9

*Bridge* v. *Phx. Bond & Indem. Co.*,
    553 U.S. 639 (2008)............................................................................... 17

*Butler* v. *Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013)................................................... 16, 17, 19

*Carrera* v. *Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013)............................................................. 20, 21

*In re Chocolate Confectionary Antitrust Litig.*,
    __ F.3d __, 2015 WL 5332604 (3d Cir. Sept. 15, 2015)......................... 5

*Cimino* v. *Raymark Indus., Inc.*,
    151 F.3d 297 (5th Cir. 1998).................................................................. 18

*Comcast Corp.* v. *Behrend*,
    133 S. Ct. 1426 (2013).............................. 1, 2, 5, 8, 9, 16, 21, 23, 25

*Espenscheid* v. *DirectSat USA, LLC*,
    705 F.3d 770 (7th Cir. 2013).................................................................. 27

**TABLE OF AUTHORITIES**
*(continued)*

**Cases** *(continued)*                                                          **Page(s)**

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ................................................................ 21

*Greater Rockford Energy & Tech. Corp.* v. *Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) ........................................................ 4, 15

*Hansberry* v. *Lee*,
    311 U.S. 32 (1940) .......................................................................... 20

*Harzewski* v. *Guidant Corp.*,
    489 F.3d 799 (7th Cir. 2007) ........................................................ 25

*Healix Infusion Therapy, Inc.* v. *Heartland Home Infusions, Inc.*,
    733 F.3d 700 (7th Cir. 2013) ........................................................ 19

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ...................................................... 4, 7

*Hohider* v. *United Parcel Serv., Inc.*,
    574 F.3d 169 (3d Cir. 2009) .......................................................... 27

*In re Hotel Tel. Charges*,
    500 F.2d 86 (9th Cir. 1974) .......................................................... 18

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) ............................................................ 5

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) .................................................. 25

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002) ............................................................ 5

*Loeb Indus., Inc.* v. *Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ........................................................ 21

*Mason* v. *Ashland Expl., Inc.*,
    965 F.2d 1421 (7th Cir. 1992) ...................................................... 19

*McLaughlin* v. *Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) .................................................... 17, 18

**TABLE OF AUTHORITIES**
*(continued)*

**Cases** *(continued)*                                                    **Page(s)**

*Messner* v. *Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012)................................................................. 17

*Minn-Chem, Inc.* v. *Agrium Inc.*,
    683 F.3d 845 (7th Cir. 2012)................................................................... 7

*Mullins* v. *Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015)........................................................... 18, 19

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008) ..................................................................... 14

*Parko* v. *Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014)......................................................... 12, 21

*Phillips Petrol. Co.* v. *Shutts*,
    472 U.S. 797 (1985)............................................................................... 20

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
    261 F.3d 355 (3d Cir. 2001) ................................................................. 26

*Pub. Emps.' Ret. Sys. of Miss.* v. *Merrill Lynch & Co.*,
    277 F.R.D. 97 (S.D.N.Y. 2011)............................................................. 25

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013)................................................................. 3

*Republic Tobacco Co.* v. *N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004)................................................................... 8

*In re Rhone-Poulenc Rorer Inc.*,
    51 F.3d 1293 (7th Cir. 1995)................................................................ 19

*Robinson* v. *Tex. Auto. Dealers Ass'n*,
    387 F.3d 416 (5th Cir. 2004)................................................................ 14

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008)................................................................ 18

*Smilow* v. *Sw. Bell Mobile Sys., Inc.*,
    323 F.3d 32 (1st Cir. 2003) .................................................................. 25

# TABLE OF AUTHORITIES
## *(continued)*

**Cases *(continued)*** **Page(s)**

*Tagatz* v. *Marquette Univ.*,
    861 F.2d 1040 (7th Cir. 1988).................................................................... 9

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015)..................................................................... 5

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014).............................................................. 13

*Wal-Mart Stores, Inc.* v. *Dukes*,
    131 S. Ct. 2541 (2011)............................................................... 5, 8, 17

*Windham* v. *Am. Brands, Inc.*,
    565 F.2d 59 (4th Cir. 1977)..................................................................... 18

*Wolfert* v. *Transamerica Home First, Inc.*,
    439 F.3d 165 (2d Cir. 2006) .................................................................. 21

**Rules**

Fed. R. Civ. P. 23 .................................................. 1, 2, 5, 14, 15, 16, 19, 20, 24, 25, 27

**Other Authorities**

Frank H. Easterbrook, *Workable Antitrust Policy*,
    84 Mich. L. Rev. 1696 (1986).................................................................... 6

Joshua D. Wright, *The Antitrust/Consumer Protection Paradox: Two
Policies at War with Each Other*, 121 Yale L.J. 2216 (2012) ............................... 6

Timothy J. Muris, *Improving the Economic Foundations of Competition
Policy*, 12 Geo. Mason L. Rev. 1 (2003)................................................................ 6

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' case for class certification is a sandcastle of platitudes and infer-ences, with assumption piled on top of shaky assumption but no factual or legal foundation. Despite nominally disavowing the district court's erroneous view that classwide antitrust impact can be *presumed*, in reality plaintiffs urge the same thing: They claim that common issues predominate based on common allegations of collusion, from which (they say) impact can be "infer[red]." Plaintiffs' Br. 43. In-deed, because they have no evidence of any explicit price-fixing agreement, plain-tiffs bootstrap from parallel pricing in a concentrated industry (which is lawful) to conspiracy, all the way to classwide antitrust impact, by *assuming* that the hypoth-esized conspiracy succeeded. That is not how Rule 23 works. Plaintiffs must estab-lish predominance "through evidentiary proof," *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1432 (2013), not self-serving speculation that if they prove one ele-ment of their claims, other elements are probably satisfied, too.

Plaintiffs' contention that impact can be assumed is especially implausible here, where they sought certification of claims covering *both* unfinished inputs *and* thousands of unique finished products. Plaintiffs paper over this diversity, portray-ing all containerboard products as "commodities." But they never explain how mas-sive rolls of unprocessed linerboard, boxes for shipping bananas, and retail floor displays are remotely interchangeable. This diversity demands a strong showing that impact can be proved classwide. Yet plaintiffs offer no evidence capable of proving that alleged collusion *caused* harm to anyone, let alone the entire class.

Plaintiffs dilute Rule 23 further by contending that individualized damages issues are irrelevant to predominance—a proposition *Comcast* rejected, 133 S. Ct. at 1433—and that a rough estimate of "aggregate" damages based on a supposedly "average" injury suffices. Plaintiffs' Br. 44-45. That approach violates defendants' substantive rights, and plaintiffs' own authority *rejects* it in this context. It also abridges absent class members' rights, a problem plaintiffs suggest sweeping under the rug because the aggrieved class members are not here to complain.

The district court overlooked these shortcomings because it failed to scrutinize the expert evidence rigorously. Indeed, as plaintiffs admitted, the court pretermitted *most* of the criticisms of plaintiffs' experts as merits questions for trial, which the Supreme Court has made clear is improper.

Plaintiffs' broken-record invocations of efficiency cannot overcome these defects. Efficiency is a *necessary*, not a *sufficient*, condition for certification; Rule 23 permits the shortcut of class litigation only if *all* the Rule's prerequisites are satisfied. Moreover, there is nothing efficient about trying to untangle in one suit the releases and disqualifying clauses that bar or restrict thousands of claims in divergent ways. Plaintiffs' failure to explain *how* a class trial could cope with these problems reflects that even plaintiffs have no idea.

Plaintiffs' approach would make certification automatic based on allegations of parallel conduct and ordinary inter-defendant communications in concentrated industries. They halfheartedly deny this ambition, but that is what they are selling. This Court should not buy it.

## ARGUMENT

## I.     Individualized Issues Of Impact And Damages Defeat Predominance.

Plaintiffs conceded below that establishing predominance required them to demonstrate "that the key elements of [their] case"—conspiracy, antitrust impact, and damages—"can be established using common proof at trial."  D.E.658, at 1-2.[1] Plaintiffs now backpedal, contending that common proof (really a "common" *claim*) of conspiracy *alone* suffices, or at least gets them within inches of the end zone, and that inferences based on the alleged conspiracy and market structure do the rest. That is not the law.  Defendants' Br. 18-19.  Plaintiffs' fallback position—that impact and damages can actually be proved classwide despite stark differences among the products and customers—falls apart upon inspection.

### A.     Plaintiffs Presented No Reliable, Classwide Proof Of Impact.

Plaintiffs admit (at 23) that, to show that impact is a common issue, they had to show that "common proof" can establish that "the conspiracy had an impact on all or nearly all purchasers of containerboard products."  *Accord In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013).  That is a tall order in a case involving diverse unprocessed inputs *and* thousands of finished products purchased at different times with different, often individually negotiated prices and terms.  Yet none of plaintiffs' evidence can establish the crucial causal link between alleged collusion and their purported injuries.  Defendants' Br. 20-32.  Plaintiffs repackage their arguments and evidence and insist (at 31) that they *can* show

---

[1]  Abbreviations herein have the same meanings as in the parties' principal briefs.

"impact" for "everyone" in the class. But the basic flaw remains: Plaintiffs have no reliable, classwide method to show that class members paid higher prices *because of* alleged collusion.

### 1.    Plaintiffs' Purported Conspiracy Evidence Cannot Prove Classwide Antitrust Impact.

Plaintiffs pay only lip service (at 32) to the principle that they must show not only a "violation" but also that, "'but for' the violation, the injury would not have occurred." *Greater Rockford Energy & Tech. Corp.* v. *Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993); *accord Atl. Richfield Co.* v. *USA Petrol. Co.*, 495 U.S. 328, 344 (1990). Despite purporting to respect the "difference between proving the 'existence of a conspiracy' and proving 'its efficacy,'" Plaintiffs' Br. 32 (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002)), their position would obliterate it.

No one disputes that the "same evidence" sometimes can be relevant to different elements of a claim. Plaintiffs' Br. 31-32. But plaintiffs fail to explain how that principle helps them here. Their theory is that evidence of conspiracy can be *assumed* to establish impact because no one would risk liability unless the scheme was sure to succeed. That is simply another way of saying that proving conspiracy necessarily establishes impact; it is not an argument that the probative force of evidence establishes two elements, but a claim that proving one element excuses a plaintiff from proving another. That contravenes controlling law requiring plaintiffs *also* to prove that the alleged violations caused them harm. And it contradicts basic economic theory, as explained by their experts, *see* A.357 ("economists know

that cartels are unstable"), and the reality of this case: *Forty percent* of the price-increase announcements *failed*. S.A.33-35.

Bootstrapping from a purported conspiracy to its assumed success is especially indefensible here. There is undisputedly no "evidence of express collusion." *Cf. In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015). Plaintiffs thus will ask the factfinder to *infer* collusion from parallel conduct in a concentrated industry, which is *not* unlawful absent an "agreement," *id.* at 873-74, 879, and "plus" factors like participation in industry groups and a history of unproven antitrust suits commenced decades ago. *See also In re Chocolate Confectionary Antitrust Litig.*, __ F.3d __, 2015 WL 5332604, at *8-9 (3d Cir. Sept. 15, 2015). Those factors *at most* show opportunity and propensity, not collusion. Indeed, *settled* suits—including *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir. 2002), settled years before the Third Circuit adopted the strict view of Rule 23 later embraced in *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541 (2011), and *Comcast, see In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309-27 (3d Cir. 2008)—show only that this industry is prey to repeated *claims* with *in terrorem* consequences. While the sufficiency of such evidence to establish a conspiracy may present a common question, plaintiffs cannot help themselves to an inference of impact by assuming the *answer* to that question. Otherwise, alleging parallel pricing alone would suffice to secure class certification.

### 2.    Harris's Structure-Conduct-Performance Analysis Is Incapable Of Proving Common Antitrust Impact.

**a.**    Plaintiffs' primary "evidence" of classwide impact—Harris's structure-conduct-performance analysis, Plaintiffs' Br. 32-37—is the same question-begging "inference" in a different guise. Even taken at face value, that paradigm shows only "whether 'the structure, conduct, and performance of [the] industry was consistent with, and likely to facilitate, collusive conduct.'" S.A.25-26 (brackets omitted) (quoting A.178). It sheds no light on whether purported collusion *caused any plaintiff injury*.

Plaintiffs try to rehabilitate Harris's reliance on the "structure-conduct-performance" paradigm to prove impact, claiming (at 34-35) that it was rejected merely as support for "government-backed measures to reduce industry concentration." But as they acknowledge (*ibid.*), the *reason* it was rejected is that empirical evidence disproved its premise that concentrated market structure implies anticompetitive behavior and harm to consumers. *See* Frank H. Easterbrook, *Workable Antitrust Policy*, 84 Mich. L. Rev. 1696, 1697-98 (1986) (empirical "results show[ed] that concentration in an industry does not increase profit and that efficient firms grow"); Joshua D. Wright, *The Antitrust/Consumer Protection Paradox: Two Policies at War with Each Other*, 121 Yale L.J. 2216, 2234-35 (2012) (research "demonstrated that most marketplace conduct was procompetitive and, indeed, proconsumer"); Timothy J. Muris, *Improving the Economic Foundations of Competition Policy*, 12 Geo. Mason L. Rev. 1, 9-10 (2003) ("case studies, particularly involving antitrust cases," showed that, "although some industries appeared to have market

structures favorable for the existence and exercise of substantial market power, the industries were, nonetheless, quite competitive").

Whatever light structure-conduct-performance analysis can shed on whether market "'characteristics predispose [defendants] toward price-fixing,'" Plaintiffs' Br. 35 (citation omitted), it proves nothing about *antitrust impact*. Plaintiffs admit (*ibid.*) that one cannot assume from a concentrated market structure that "supra-competitive pricing" will "inevitably" result—which is why (as plaintiffs concede) the paradigm was rejected. Yet their own impact theory rests on that very premise. *See id.* at 34 ("firms exhibit oligopolistic interdependence precisely where, by following one another's pricing, they can charge greater-than-competitive prices").[2]

**b.** Plaintiffs have no answer to the fact that Harris's indefensible market definition—encompassing *all* containerboard products (inputs *and* finished products) across the entire continent—independently renders his analysis of that purported market meaningless. Defendants' Br. 24-26. Plaintiffs try (at 5) to make his definition seem plausible through sleight of hand, using "containerboard products" (which they call a "commodity") to refer to *all* products, from linerboard to boxes, and citing a handful of documents describing *some* boxes as interchangeable. That meager anecdotal evidence is hardly a substitute for empirical analysis, which Harris never conducted. Indeed, despite acknowledging well-accepted methods for test-

---

[2] Contrary to plaintiffs' claim (at 34), *High Fructose* did not hold that market structure can demonstrate common impact; it viewed market structure as possibly "suggestive" of a *conspiracy*, not *impact*. 295 F.3d at 655. And *Minn-Chem, Inc.* v. *Agrium Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc), addressed (as relevant) only whether a foreign cartel had a sufficient connection to domestic commerce to be actionable under U.S. law. *Id.* at 856.

ing and proving the product market, Harris used *none*.  A.397-98.  He merely assumed that "Defendants' vertical integration allow[ed] them to pass on to purchasers of containerboard products price increases for containerboard itself," without any empirical investigation.  Plaintiffs' Br. 36; A.350-51.

Plaintiffs similarly fail to justify Harris's definition of the geographic market—all of North America.  He relied on a document noting the "low threat of imports."  A.892.  Even if that supported *excluding* overseas products from the definition, it hardly supports assuming that the market *includes* the entire continent.  Regional differences—including (as Harris admitted) "localized supply and demand conditions, difference in freight costs, proximity to mills, etc."—could prevent buyers from turning to other regions.  *Ibid*.  Harris conceded, for example, that "significant freight costs" typically limit box sales to a 150-mile radius of plants.  A.402.

Plaintiffs urge the Court (at 36) to ignore the flaws in Harris's market definition, spinning its validity as a "common issue" to be decided at trial.  That does not wash.  *See Comcast*, 133 S. Ct. at 1433 (rejecting claim that "*any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be").  The *reliability* of Harris's analysis hinges on whether he was examining an appropriate market.  *See Republic Tobacco Co.* v. *N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004).  That evaluating Harris's definition may overlap with the merits "cannot be helped"; trial is too late to discover that plaintiffs' impact evidence cannot generate reliable, "'common answers.'"  *Wal-Mart*, 131 S. Ct. at 2551 (citation omitted).

### 3. Dwyer's PPW And Matching Analyses Cannot Prove Impact.

Plaintiffs are left with Dwyer's quantitative "impact" analyses—his PPW analysis and before-and-after matching exercise. Plaintiffs' Br. 37-42. The flaws in those analyses are legion, but most fundamentally they "fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining," and so "do not provide a rational basis for a judgment." *Blue Cross & Blue Shield United of Wis.* v. *Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998); *see also Comcast*, 133 S. Ct. at 1434.

a. Plaintiffs claim (at 37) that the purported correlation Dwyer found between price-increase announcements and increases in the PPW Index "provided common evidence that Defendants moved prices in the market as a whole." But the relevant question is not whether increases in the PPW Index were caused by *price-increase announcements*; it is whether class members paid higher prices because of alleged *collusion*. Dwyer's PPW analysis cannot answer that question. It assumes that price-increase announcements were collusive. If other, lawful factors such as market forces explain a price-increase announcement, any link between that announcement and the PPW Index is irrelevant, and Dwyer's analysis cannot prove *anything* on a classwide basis.

Dwyer's correlation, moreover, cannot even prove that price-increase announcements caused the PPW Index increases. "Correlation is not causation," and failing to control for factors that "*can* be controlled for" renders analysis of correlation "essentially worthless." *Tagatz* v. *Marquette Univ.*, 861 F.2d 1040, 1044-45 (7th

Cir. 1988).  Dwyer admitted as much, A.805, and did not pretend that controlling for other factors was impossible; indeed, his damages regression purported to do so.  A.139-40, 155-57.  Plaintiffs wisely do not rely on that regression to prove impact, which they concede (at 51) "assum[es]," rather than *proves*, "impact."  *See also* A.622.  They rejoin instead (at 38) that correlation sometimes *is* good enough if "the correlation is tight"—which they never define—"and is combined with a plausible causal mechanism."  But correlation plus *conjecture* still does not equal *causation*.

Even if Dwyer's analysis could explain what caused changes in the Index, plaintiffs fail to show how that establishes harm to *class members*.  Plaintiffs portray the Index as a "price list," Plaintiffs' Br. 42 (citing price-list cases), but it is nothing of the sort.  There are no "price lists" in the industry—for containerboard, boxes, or displays—and manufacturers did not use the Index for that purpose.  Instead, the Index is a synthetic metric—based on normalized survey data and complex exclusion criteria—intended to reflect the price of one product, in one geographic market, in certain types of transactions.  Defendants' Br. 28-29.  Indeed, because it reflects just one *input*, it proves nothing about prices of all finished products.  *Id.* at 29.

Plaintiffs rejoin (at 41) that many contracts "tied pricing to the PPW index." Their contention rests on Harris's review of 738 contracts with "identifiable pricing provisions," P.S.A.232-33, from which he claimed that the "vast majority" of class-period sales were tied to the Index, A.191.  That claim rests on sand.  Harris never explained why the contracts he reviewed are representative of the entire class.  It

blinks reality to assume that hundreds of thousands of purchases over six years, by thousands of different customers that bought different products—ranging from unprocessed inputs to diverse finished products—were governed by just 738 contracts. Plaintiffs themselves cite evidence that International Paper based about "*half* of its local sales on 'handshake' agreements *rather than written contracts*."  Plaintiffs' Br. 41 (emphases added).  Harris also put his thumb on the scale by excluding contracts without "identifiable pricing provisions," P.S.A.232-33—which presumably do not "ti[e] pricing" (Plaintiffs' Br. 41) to *anything*, much less the PPW Index.

Even where contracts were tied to the Index, increases in the Index did not necessarily result in increased prices.  Some customers "refus[ed] to take the price increase," and others obtained rebates.  A.573.  And Harris admitted that some contracts locked in prices for various periods or capped price increases.  A.379.  Plaintiffs dismiss such provisions, claiming (at 41) that they would only "cause lags in the implementation of price increases but" would not shield class members "from supracompetitive prices."  This is more question-begging:  Plaintiffs' response again *assumes* that earlier alleged collusion caused elevated prices that injured class members.  But that is precisely what plaintiffs must *prove*.  They must show how they would demonstrate with common evidence that alleged collusion *caused* elevated prices (and that the price *remained* elevated at the time class members made purchases).

Plaintiffs offer the same circular reasoning to discount the fact that many class members purchased when the Index was *flat or falling*.  *Cf.* Defendants' Br.

31.  A factfinder, they speculate (at 38-39), could somehow find that those purchasers were paying at already-"elevated" prices.  But plaintiffs offer zero proof—only the hope that they might find some before trial.  And "if intentions (hopes, in other words) were enough, predominance, as a check on casting lawsuits in the class action mold, would be out the window."  *Parko* v. *Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014).

Plaintiffs also claim that Dwyer's regression showed that the Index explains "97% of variation in *aggregate* prices."  Plaintiffs' Br. 40 (emphasis added).  But the "aggregate price" he examined "rolled up" into one metric purported average prices of many different products bought by different purchasers.  A.153 & n.28.  Dwyer could not even "speculate at" the "relationship between" that "aggregate price" and prices individual consumers paid.  A.279.  Dwyer's analysis thus glosses over the intra-class variation with which predominance is concerned.

**b.**     Plaintiffs rely (at 39) on Dwyer's matching exercise, but it, too, concededly controlled for nothing.  Defendants' Br. 31.  Plaintiffs argue (at 39) that lack of controls is irrelevant because the analysis was not offered to "estimat[e] damages."  But without any controls to account for potential lawful causes of price increases, it cannot prove that purchasers were "affected" (*ibid.*) by *anything* to *any* extent.

Plaintiffs' defense of Dwyer's sample—those who happened to purchase the same product before and after a price-increase announcement, which constituted less than half of the class—is equally illogical.  Plaintiffs claim (at 40) that whether the sample was representative is irrelevant to Dwyer's "purpose" of "show[ing] that

the concerted price increase announcements affected actual transaction prices." But plaintiffs' burden is not to show that price-increase announcements caused higher prices for *some* class members, but that *nearly all* class members were injured by the alleged conspiracy.

Plaintiffs also do not dispute the many false positives the analysis generates. They concede (at 40) that it shows more than *one-third* of the purchasers examined by Dwyer experienced price increases after *failed* price-increase announcements or when the alleged conspiracy was not in effect. Plaintiffs try (*ibid.*) to spin that damning result into *confirmation* of antitrust impact, claiming that it shows fewer class members paid higher prices absent alleged collusion. But a purported method to prove classwide impact that has a margin of error of nearly 40%—and finds "impact" for many class members that alleged collusion *cannot* explain—flunks any standard of reliability.

### 4.    Common Impact Must Be Proved, Not Presumed.

Cognizant that their purported impact evidence is not even in the ballpark, plaintiffs urge that this Court, like the district court, *presume* impact. To be sure, plaintiffs purport (at 43) to distance themselves from that label, denying that the district court applied any presumption. But what plaintiffs are peddling is the same.

Relying on *In re Urethane Antitrust Litigation*, 768 F.3d 1245 (10th Cir. 2014), *petition for cert. filed*, No. 14-1091 (Mar. 9, 2015), plaintiffs assert that impact can be "infer[red]" from "facts about the industry and the market," and that

"movement in a list price *alone* can establish" impact. Plaintiffs' Br. 42-43 (emphasis added). This case does *not* involve a "list price" (or even a "standard market price" (S.A.22)). *See supra* p. 10. In any event, inferring impact from price-list movement violates Rule 23, the Rules Enabling Act, and due process. Defendants' Br. 33. Plaintiffs never answer these problems.

Presuming impact is also wildly unrealistic where, as here, prices are often individually negotiated. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008); *Robinson* v. *Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 423-24 (5th Cir. 2004). Plaintiffs try (at 43-44) but fail to distinguish these cases. *New Motor Vehicles* rejected the claim that the plaintiffs could "rely on an inference that any upward pressure on national pricing would necessarily raise the prices actually paid by individual consumers." 522 F.3d at 29. Even if the plaintiffs could show "when [national] prices were affected" by the conspiracy, the court could not "presum[e] that all purchasers of those affected cars paid higher retail prices" because "[t]oo many factors play into an individual negotiation." *Ibid.* *Robinson* similarly refused to infer common impact in light of individually negotiated prices. 387 F.3d at 423-24.

This Court should reject plaintiffs' presumption (or "inference") for the same reasons. Not only were individual prices negotiated here, but other intervening factors also break any causal chain: Contractual provisions eliminate or limit the relevance of the PPW Index. And plaintiffs' experts admittedly *never analyzed* whether

and to what extent the price of the single input the Index examines is *passed on* in the prices of finished products.  Defendants' Br. 29-31.

Diluting the impact standard as plaintiffs urge carries significant costs. "Given the potential scope of antitrust violations and the availability of treble damages," "an over-broad reading of [the Clayton Act] could result in 'overdeterrence,' imposing ruinous costs on antitrust defendants, severely burdening the judicial system and possibly chilling economically efficient competitive behavior."  *Greater Rockford*, 998 F.2d at 394.  Plaintiffs' "inference" yields the same harmful consequences, enabling virtually automatic certification of class actions in concentrated industries.

**B.    Individualized Damages Issues Will Overwhelm Any Common Questions.**

The district court's predominance finding is independently erroneous because determinations of class members' damages would dwarf any purportedly common questions.  Defendants' Br. 35-43.  Plaintiffs' responses to this freestanding obstacle are unavailing.

**1.    The Need For Individualized Damages Inquiries Dooms Predominance.**

Plaintiffs reprise the district court's assertion that damages issues are irrelevant to certification, S.A.54, contending that "common proof of conspiracy and impact is sufficient to support class certification," Plaintiffs' Br. 24.  *Comcast* refutes that misreading of Rule 23:  The Third Circuit had ruled that both conduct and impact could be proved with common evidence; without disturbing those conclusions,

the Supreme Court overturned class certification because the plaintiffs' damages model "f[ell] far short of establishing that damages are capable of measurement on a classwide basis," and thus the plaintiffs "c[ould] not show Rule 23(b)(3) predominance." 133 S. Ct. at 1433.  Antitrust plaintiffs, *Comcast* held, must proffer a reliable, classwide method for proving damages, *unless* they show that individualized damages adjudications will *not* "overwhelm questions common to the class." *Ibid.*

Plaintiffs try to cabin *Comcast*, claiming (at 46) that it addresses only mismatches between class plaintiffs' antitrust-violation theories and damages models, but has no bearing where (as here) plaintiffs "produced no reliable [damages] model at all." *Ibid.*  That invented limitation turns *Comcast*'s holding on its head.  The *Comcast* plaintiffs did tender a damages model, but it did not reliably measure damages from the only viable antitrust-violation theory.  *See* 133 S. Ct. at 1433-45.  The same is true here.  If plaintiffs' contrary reading were correct, the mismatch *Comcast* found between the damages model and liability theory *would not have mattered*—since *no* damages model would have been needed.

Contrary to plaintiffs' assertion (at 46-47), *Butler* v. *Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), does not support their rewriting of *Comcast*.  *Butler* explained that, "[i]f the issues of liability are genuinely common issues, *and the damages of individual class members can be readily determined* in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not *identical* across all class members should not preclude class certification." *Id.* at 801 (emphases added).  *Butler* expected that determining individual damages

in that case would be easy, that any "individual hearings would be brief," and that subclasses could address intra-class variation. *Id.* at 798, 801-02. *Butler*'s analysis would be inexplicable if damages were entirely irrelevant to predominance.[3]

### 2.    Rough Estimates Of Aggregate Damages Are Insufficient.

These principles doom plaintiffs' case for predominance.  Plaintiffs abandon any pretense that Dwyer's regression can demonstrate any individual class member's damages.  And they do not dispute that holding thousands of damages hearings would overwhelm any common issues.  Plaintiffs argue instead (at 44-48) that a classwide estimate of *aggregate* damages suffices.  They are incorrect.

**a.**    Plaintiffs' proposal of "establish[ing] the average class-wide overcharge and apply[ing] it to class purchases" (Plaintiffs' Br. 45)—*without* allowing defendants to challenge the validity and amount of individual claims and assert individualized defenses—is forbidden "Trial by Formula," *Wal-Mart*, 131 S. Ct. at 2561, and contravenes defendants' and class members' rights.  *See McLaughlin* v. *Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge* v. *Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).  Plaintiffs (at 48) write off *McLaughlin* and other "fluid recovery" cases because plaintiffs here seek an up-front determination of total damages.  But the infringement of defendants' rights is the same: Allowing a putative class to recover based on a "roug[h] estimat[e]" of "the gross damages to the class as a whole" "alter[s] defendants' substantive right to pay dam-

---

[3]  Similarly, *Messner* v. *Northshore University HealthSystem*, 669 F.3d 802 (7th Cir. 2012), concluded that the class proponents *did* establish a common method to demonstrate classwide damages.  *Id.* at 818-19; Defendants' Br. 37-38.

ages reflective of their actual liability." *McLaughlin*, 522 F.3d at 231; *accord In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974) ("allowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights under the antitrust statutes"); *Windham* v. *Am. Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977). And it violates the Seventh Amendment by depriving defendants of a jury determination of their liability to each claimant. *See Cimino* v. *Raymark Indus., Inc.*, 151 F.3d 297, 319-20 (5th Cir. 1998); Defendants' Br. 39-41.[4]

Plaintiffs misleadingly assert (at 44-45) that this Court has already blessed their approach, citing *Mullins* v. *Direct Digital, LLC*, 795 F.3d 654, 670 (7th Cir. 2015). *Mullins* did no such thing. Addressing the distinct requirement of *ascertainability*, *Mullins* posited in dictum that aggregate damages may be awarded where "[t]he addition or subtraction of individual class members affects neither the defendant's liability nor the total amount of damages it owes to the class." 795 F.3d at 670. For example, *Mullins* explained, if a known sum is embezzled from a pension fund, and the total sum stolen can be proved independently, each claimant's share is irrelevant to *classwide* damages. *Ibid.* *Mullins* made clear, however, that "the defendant's due process interest *is* implicated" where the "calculation of each class members' damages" *does* "affec[t] the total amount of damages it owes to the class." *Id.* at 671 (emphasis added). In such cases, "the defendant *must* be given

---

[4] *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 (6th Cir. 2008), permitted proof of aggregate damages where the plaintiffs *did* present "'a means to distribute damages to injured class members in the amount of their respective damages,'" which were in fact "distribute[d]" "*equally* across class members." *Id.* at 534 (emphasis added) (citation omitted).

the opportunity to raise individual defenses *and* to challenge the calculation of damages awards for particular class members." *Ibid.* (emphases added).

This case falls squarely into the latter category. The total "aggregate" harm here does not stem from a single loss like embezzlement from a common fund; it is the sum of individual class members' purported injuries. Defendants' due-process (and Seventh Amendment) rights therefore are implicated. Indeed, *Mullins* cited *Comcast* to illustrate cases where use of aggregate damages is inappropriate, and explained that the fact that classwide damages in such cases depend on individual damages is "*why*" *Comcast* had held that "the method of determining damages must match plaintiff's theory of liability and be sufficiently reliable." 795 F.3d at 671 (emphasis added).[5]

**b.** Plaintiffs' proposal (at 45) to "apply" their supposed "average class-wide overcharge" to all class members also violates *class members*' rights. Defendants' Br. 39-40. Indeed, plaintiffs' averaging approach drives a wedge between class members who allegedly suffered less than the "average" and those who suffered more—undermining plaintiffs' adequacy as representatives, Fed. R. Civ. P. 23(a)(4).

Plaintiffs respond (at 45) that claimants who think they can beat the regression-based "average" will simply opt out. Yet in the same breath plaintiffs argue

---

[5] Plaintiffs also cite *Butler*, 727 F.3d 796, but it did not address aggregate damages at all. The allusions in *Butler*, *id.* at 800, and *Mullins*, 795 F.3d at 671, to issues classes also do not help plaintiffs. Plaintiffs never proposed that approach, forfeiting any such argument. *See Healix Infusion Therapy, Inc.* v. *Heartland Home Infusions, Inc.*, 733 F.3d 700, 703 (7th Cir. 2013); *Mason* v. *Ashland Expl., Inc.*, 965 F.2d 1421, 1425 (7th Cir. 1992). Given the overlap between liability (including the *fact* of injury) and damages (the *amount*), "divid[ing]" those "issues between separate trials" would violate the Seventh Amendment. *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1302-03 (7th Cir. 1995).

that opting out is unrealistic for many given the cost of litigating alone. *Ibid.* Plaintiffs, moreover, offer no reliable method for determining *how much* to reduce the aggregate damages for each opt-out plaintiff. If those who opt out are those with *above*-average claims, reducing the aggregate award pro rata using the "average" amount will yield a systematically overstated class award. And individualized determinations of opt-out claims' values would create a host of other problems— starting with the district court's lack of jurisdiction to adjudicate claims of non- parties. In any event, that some class members may "accept" the average (*ibid.*) does not mean their rights are not violated, but merely that they elect not to bring their own suits. That the named plaintiffs here are untroubled by that result shows the disconnect between their interests and those of the class they seek to represent.

Plaintiffs urge the Court (at 45) to ignore this problem because (they say) de- fendants lack standing to invoke class members' rights. But defendants are entitled to object to an unlawful class-action procedure—especially one designed to evade predominance. Plaintiffs' new defense of the aggregating approach on appeal also undermines their adequacy as representatives, which defendants indisputably can challenge—both under Rule 23 and because it bears on whether any judgment *binds* absent class members. "When class members are not adequately represented by the named plaintiff, they are not bound by the judgment." *Carrera* v. *Bayer Corp.*, 727 F.3d 300, 310 (3d Cir. 2013) (citing *Hansberry* v. *Lee*, 311 U.S. 32, 42 (1940)); *cf. Phillips Petrol. Co.* v. *Shutts*, 472 U.S. 797, 804 (1985) (defendant may "assert the rights of" class members to challenge court's jurisdiction over them). Putative class

members who claim that they were not adequately represented may try to "collaterally attack" the class-action judgment. *Wolfert* v. *Transamerica Home First, Inc.*, 439 F.3d 165, 171-75 (2d Cir. 2006) (collecting cases). Defendants have a "substantial interest in ensuring this does not happen." *Carrera*, 727 F.3d at 310.

In any event, the district court—as the "protector of the absentees' interests, in a sort of fiduciary capacity"—was obligated to assure itself that the named plaintiffs are "appropriate representative[s]." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995); *see also Berger* v. *Compaq Computer Corp.*, 257 F.3d 475, 480 (5th Cir. 2001). It could not certify a class based on an averaging approach that causes the named plaintiffs' interests and those of other class members to diverge.

### 3. Plaintiffs' Manipulated Damages Model Is Unreliable.

Plaintiffs' aggregate-damages approach also cannot save the district court's predominance finding because plaintiffs' model fails to isolate damages "attributable to [their] theory" of conspiracy. *Comcast*, 133 S. Ct. at 1433. Plaintiffs respond (at 49) that "a reasonable estimation" of damages can suffice, *Loeb Indus., Inc.* v. *Sumitomo Corp.*, 306 F.3d 469, 490 (7th Cir. 2002), but that is a rule about computing *individual* damages, and does not allow awarding class *or* individual damages "based on speculation or guesswork," *Bigelow* v. *RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). Courts must "investigat[e] the *realism* of the plaintiffs' injury and damage model," including whether it accurately identifies harm *caused by* the alleged unlawful conduct. *Parko*, 739 F.3d at 1085-86 (emphasis added). Even a cur-

21

sory investigation shows that plaintiffs' model is unreliable because Dwyer admittedly put his thumb on the scale by forcing his supposedly neutral stepwise program to include a conspiracy variable.  Defendants' Br. 42-43.

Plaintiffs repeat the district court's erroneous conclusion that "running a regression without the conspiracy measurement would have produced no result." Plaintiffs' Br. 51.  But Dwyer did not simply run an ordinary regression; he chose a stepwise method, the *whole point* of which was (purportedly) to allow the program to determine objectively which variables to include based on their explanatory power.  Defendants' Br. 42.  And Dwyer's program, when *not* manipulated, did *not* select the conspiracy variable in *any* of the finished-products regressions—which account for 80% of alleged damages—meaning that *other* factors provided better explanations for the prices he observed.  *Ibid.*  Plaintiffs cannot have it both ways:  Either the conspiracy variable lacks the explanatory power Dwyer attributed to it, *or* Dwyer's entire stepwise methodology is unreliable.

Plaintiffs' further response that Dwyer's model was intended "to estimate damages *on the assumption* that Plaintiffs succeed in demonstrating ... conspiracy *and impact*" (Plaintiffs' Br. 51 (second emphasis added)) gives the game away.  It is one thing to assume a conspiracy's *existence* in measuring its effects.  But it is the definition of bootstrapping to assume that a conspiracy *caused* price increases *in a model offered to measure the price increases caused by that conspiracy.*

22

### C.    The District Court Failed To Conduct A Rigorous Analysis.

Plaintiffs fare no better in defending the district court's failure to analyze the expert evidence rigorously or even to hold a hearing at which it could adequately be tested.  *Cf.* Defendants' Br. 43-48.  Despite acknowledging that defendants had "vigorously challenge[d] Plaintiffs' experts' methodology and conclusions," the court declined to rule conclusively on those challenges because they were not "based on Rule 702 or *Daubert*." S.A.5.  But as *Comcast* emphasized, how a challenge to the reliability of expert evidence is *styled* is irrelevant.  *See* 133 S. Ct. at 1431-32 n.4; *see also In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 & n.9 (3d Cir. 2015).

Plaintiffs' rejoinder (at 51, 53) that the court adequately addressed every challenge to their expert evidence is false.  On many issues the court either uncritically accepted their experts' assertions or ignored defendants' criticisms altogether. As plaintiffs candidly acknowledged in opposing the Rule 23(f) petition, the district court refused to address "the large majority" of defendants' challenges because it believed that whether price increases resulted from "a conspiracy to raise/maintain prices, or instead resulted from a non-collusive cause," was a "merits" question that the court "did not need to resolve in ruling on class certification."  Plaintiffs' Resp. to Joint Rule 23(f) Pet. 2-3 (internal quotation marks omitted).  But if plaintiffs' experts cannot distinguish between lawful market forces and unlawful collusion, their models are worthless.  And a district court cannot properly refuse to examine at the class-certification stage whether plaintiffs' experts have addressed the correct ques-

tion by punting to the trial.  That was precisely the error for which the Supreme Court reversed the Third Circuit in *Comcast*.

Plaintiffs' defense of the court's refusal even to hold an evidentiary hearing rings equally hollow.  They concede that hearings are required when "'necessary to ensure that requirements for class certification are satisfied.'"  Plaintiffs' Br. 52 (emphasis omitted) (quoting *Am. Honda Motor Co.* v. *Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (per curiam)).  If the scale and complexity of the claims and evidence in this case did not necessitate a hearing, it is unclear what *would*.  A hearing was especially warranted because the court allowed plaintiffs to tender entirely new analyses in "reply" expert reports that defendants were never able to test.  Defendants' Br. 47-48.[6]

## II.    Plaintiffs Failed To Prove That A Class Action Is Superior.

The district court's class-certification ruling independently must be reversed because plaintiffs never carried their burden of proving that a class action is superior.  Defendants' Br. 48-55.  Their counterarguments distort the law and disregard the complexities of their claims that create insurmountable obstacles to class litigation.

### A.    Plaintiffs Bore The Burden To Prove That A Class Action Is Superior Despite Diverse Defenses.

Plaintiffs claim that class treatment is superior simply because this is an antitrust case where evidence concerning the alleged conspiracy is common.  Plaintiffs' Br. 54.  That view reads the superiority requirement out of Rule 23.  Plaintiffs' bur-

---

[6]   The briefing schedule plaintiffs cite said nothing about new *expert reports*.  P.S.A.74.

den was to show that class litigation is superior *despite* the extensive variance among their claims. *See Andrews* v. *Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008). "Using a class action to resolve a multitude of individual, varied … claims is neither 'economical' nor 'efficient' in any sense of those terms." *Ibid.*

Plaintiffs cannot meet their burden, so they try to offload it, contending that affirmative defenses ordinarily do not preclude class certification and that it is *defendants'* burden to show otherwise. Plaintiffs' Br. 55. That contradicts *Comcast*, which held that the party seeking class certification must "satisfy through evidentiary proof" Rule 23(b)'s requirements—including superiority. 133 S. Ct. at 1432.

*Smilow* v. *Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32 (1st Cir. 2003), lends plaintiffs no support. It addressed predominance—not superiority—and explained that "'affirmative defenses *should be* considered in making class certification decisions.'" *Id.* at 39 (emphasis added) (citation omitted). The First Circuit held that a potential waiver defense did not undermine predominance because the defense *itself* "present[ed] common issues." *Ibid.* Plaintiffs cannot plausibly contend that the diverse contract-based defenses here present common questions.[7]

---

[7] Plaintiffs also cite two district-court cases—which, as this Court "tirelessly but futilely remind[s] the bar, are not precedents," *Harzewski* v. *Guidant Corp.*, 489 F.3d 799, 806 (7th Cir. 2007). Both held that the defendants offered only speculation that individualized defenses could create problems. *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 238 (S.D.N.Y. 2012); *Pub. Emps.' Ret. Sys. of Miss.* v. *Merrill Lynch & Co.*, 277 F.R.D. 97, 119 (S.D.N.Y. 2011). The district court here did not question that the releases or disqualifying clauses *exist*; it discounted them because it misunderstood their significance. Defendants' Br. 50-51, 53-54.

**B.　The *Linerboard* Releases And Other Highly Individualized Contract-Based Defenses Defeat Superiority.**

When they finally confront the releases and disqualifying clauses that variously bar, limit, or otherwise complicate many claims, plaintiffs have little to say. They quibble (at 56) over how many claims the *Linerboard* releases affect, but do not deny that dozens of releases cutting off thousands of claims at varying dates must be untangled. The relevant question is not *how many* claims are barred, but *how the court could manage* a class trial that requires sorting out so many overlapping complications. Similarly, plaintiffs' speculation (at 56-57) that some class members may have claims post-dating their releases only underscores the complexity that the releases introduce.

Plaintiffs also argue that the releases affect only damages, based on a crabbed reading of *In re Prudential Insurance Company of America Sales Practice Litigation*, 261 F.3d 355, 367 (3d Cir. 2001). *Prudential*'s point is simple: Settling plaintiffs cannot circumvent their settlement by dressing up settled claims as new ones or tacking on post-settlement facts. *See ibid.* Each claimant must show that its damages stem from acts that its settlement does not bar it from challenging. Sorting out what if any damages each settling claimant can recover from each defendant would make a class trial completely intractable.

Plaintiffs have even less to say about the disqualifying clauses. They repeat (at 58) the district court's irrelevant observation that the clauses do not address class actions specifically. But they ignore that many clauses have the same effect— *e.g.*, those who agreed to arbitrate cannot litigate their claims *at all*, much less *en*

*masse*; and those who agreed to shorter limitations periods may not be able to pursue their claims *anywhere*.  Nor do plaintiffs offer any response to the immense procedural complications other clauses impose—from jury waivers to forum-selection clauses to mandatory mediation.  The problems are compounded by the diversity among the provisions and the laws that govern them.  Defendants' Br. 52-53.

Plaintiffs *still* offer no plan for trying their claims despite these difficulties.  Requiring plaintiffs to present a "specific plan for litigating the case" is a "reasonable request," *Espenscheid* v. *DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013), but one plaintiffs have spurned.  "[I]f class counsel is incapable of proposing a feasible litigation plan though asked to do so, the judge's duty is at an end." *Id.* at 776.

The district court here, however, failed even to *ask* plaintiffs to explain how the case could be tried.  Instead, it punted, reviving conditional certification in all but name, and counting on mid-litigation (perhaps mid-trial) class-definition surgery to solve any problems.  S.A.59.  That, with respect, is an abdication of the district court's duty.  *See Hohider* v. *United Parcel Serv., Inc.*, 574 F.3d 169, 202 (3d Cir. 2009) (court abused its discretion by "deferr[ing]" determination whether manageable trial plan existed).  Rule 23 requires courts to ensure that the prerequisites to class certification *are* satisfied—not that someday, somehow, they *might* be.

## CONCLUSION

The district court's class-certification ruling should be reversed, or, alternatively, vacated and remanded for the court to conduct the rigorous analysis that Rule 23 requires.

Dated:  October 19, 2015

James T. McKeown
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
(414) 297-5530

Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL  60604
(312) 660-7600

*Counsel for Defendant-Appellant*
*International Paper Company*

Andrew S. Marovitz
Britt M. Miller
Joshua Yount
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
(312) 782-0600

Michael B. Kimberly
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C.  20006
(202) 263-3127

*Counsel for Defendant-Appellant*
*Temple-Inland Inc.*

Margaret H. Warner
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 756-8000

*Counsel for Defendant-Appellant*
*Weyerhaeuser Company*

Respectfully submitted,

  /s/ Miguel A. Estrada
Miguel A. Estrada
  *Counsel of Record*
Jonathan C. Bond
Jesenka Mrdjenovic
Lindsay S. See
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

Ryan A. Shores
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
(202) 955-1500

Beth A. Wilkinson
Alexandra M. Walsh
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street, N.W.
Washington, D.C.  20006
(202) 223-7300

*Counsel for Defendant-Appellant*
*Georgia-Pacific LLC*

Stephen Y. Wu
Michelle S. Lowery
MCDERMOTT WILL & EMERY LLP
227 W. Monroe Street
Suite 4400
Chicago, IL  60606
(312) 372-2000

*Counsel for Defendant-Appellant*
*Weyerhaeuser Company*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,**
**TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because this brief contains 6,995 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12-point New Century Schoolbook font.


Dated:  October 19, 2015                    /s/ Miguel A. Estrada
                                            Miguel A. Estrada
                                            GIBSON, DUNN & CRUTCHER LLP
                                            1050 Connecticut Avenue, N.W.
                                            Washington, D.C.  20036
                                            (202) 955-8500
                                            mestrada@gibsondunn.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of October, 2015, I electronically filed the foregoing reply brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

  /s/ Miguel A. Estrada
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mestrada@gibsondunn.com