**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KLEEN PRODUCTS LLC, *et al*. individually and on behalf of all those similarly situated, | ) ) ) | |
| | ) | Case No. 1:10-cv-05711 |
| Plaintiffs, | ) ) | Hon. Harry D. Leinenweber |
| v. | ) ) | |
| PACKAGING CORPORATION OF AMERICA, *et al*., | ) ) ) | ***FILED UNDER SEAL*** |
| Defendants. | ) ) | |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDMENTS TO**
**PLAINTIFFS' CONSOLIDATED AND AMENDED COMPLAINT**

Plaintiffs respectfully move for leave to file amendments to their Consolidated and Amended Complaint ("CAC") pursuant to Federal Rule of Civil Procedure 15(a) to allege a Class Period beginning on February 15, 2004. Based on substantial documentary evidence produced by Defendants to date, Plaintiffs recently determined that this date is the most appropriate starting date for the proposed Class Period. In addition, allowing these amendments is just and will not cause any undue delay, will not prejudice any party to this litigation, and is not the product of bad faith or repeated failure to cure. Therefore, Plaintiffs respectfully request that the Court grant this motion.

**I.    BACKGROUND.**

On November 8, 2010, Plaintiffs, individually and on behalf of all others similarly situated, filed the CAC against Defendants. (ECF No. 65.) Defendants moved to dismiss on January 14, 2011 and the Honorable Milton I. Shadur denied the motion in its entirety on April 11, 2011. *See* Memorandum Opinion and Order (ECF No. 193). The Defendants subsequently answered the CAC on May 2, 2011. (ECF Nos. 194-200.)

On May 3, 2011, Plaintiffs began propounding discovery in this case. To date, Plaintiffs have served two sets of interrogatories and two sets of document requests on all Defendants, with additional discovery having been served on certain Defendants individually, and taken over 30 depositions of Defendants and third parties. Defendants are responding to Plaintiffs' discovery requests on a rolling basis, with the first responses produced on June 6, 2011, and the most recent responses produced in late March 2014. Having reviewed millions of pages of documentary and data evidence, Plaintiffs recently concluded that the appropriate date for the beginning of the Class Period is February 15, 2004, as opposed to "at least as early as August 2005" as currently alleged in the CAC. *See* CAC, ¶28.

Discovery in this case does not conclude until December 2014. *See* Second Amended Scheduling Order (ECF No. 614). Plaintiffs' motion for class certification and supporting materials are to be filed on June 11, 2014, with Defendants' opposition due approximately three months later, on September 10, 2014. (*Id.*) Depositions of Plaintiffs' class certification experts are to be taken by July 30, 2014, while depositions of Defendants' experts are to be taken by October 31, 2014. (*Id.*) The close of fact discovery is currently December 1, 2014. (*Id.*)

In light of the recent determination of the appropriate starting date for the class by Plaintiffs and the amount of time remaining to conduct discovery, Plaintiffs seek leave of this Court to file amendments to the CAC extending the Class Period to February 15, 2004, attached hereto as Exhibit A.

## II.    LEGAL ARGUMENT.

The Federal Rules of Civil Procedure permit parties to seek leave of the court to amend their pleadings at any time, and direct courts to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Seventh Circuit liberally allows amendments of pleadings. *See Videojet Systems Int'l. v. Inkjet, Inc.*, Case No. 91 C 6284, 1996 U.S. Dist. LEXIS 14372 at *7-8 (N.D.Ill. Sept. 30, 1996). The leave sought, in this case leave to amend the complaint, should be given absent "any apparent or declared reason – such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed,

undue prejudice to that opposing party by virtue of an allowance of the amendment, futility of the amendment, etc." *Foman v, Davis*, 371 U.S, 178, 182 (1962). *See also Areola v. Godinez*, 546 F.3d 788, 796 (7th Cir. Ill. 2008); *Hess v. Gray*, 85 F.R.D. 15 (N.D.Ill. 1979). Slight changes to class definition that are a product of recent changes to Plaintiffs' case are proper amendments. *See* Order Resolving Cross-Motions for Summary Judgment; Granting Motion to Amend Class Definition; Denying Motion for Leave to File Motion for Reconsideration, *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, Case No. C 09-1967 CW, at pp. 42-43 (N.D.Cal. Apr. 11, 2014) (ECF No. 1025) (attached hereto as Exhibit B). The relief sought here is not the result of undue delay, bad faith, or dilatory motives on behalf of Plaintiffs, and Defendants will not be prejudiced if leave is granted.

Plaintiffs' motion should be granted because "justice so requires." Plaintiffs have literally reviewed millions of pages of documents and data produced by Defendants in reaching the conclusion that the appropriate date for the beginning of the Class Period should be February 14, 2004. Plaintiffs could not have amended the Class Period sooner, as the information necessary to make this determination was only discovered through careful analysis of Defendants' discovery responses, which continued to be produced until as recently as March 2014. These amendments will not be futile, as Plaintiffs currently-alleged Class Period already withstood Defendants' motions to dismiss and the proposed amendments are well supported by Defendants' own documentary evidence. *See* Exhibit A.

Defendants will not be prejudiced by Plaintiffs' amendments expanding the Class Period. This Court ordered that Plaintiffs could conduct discovery into Defendants' conduct dating back to 2003 [*see* Memorandum Opinion and Order at p. 18-20 (ECF No. 449)], which effectively put Defendants on notice that the alleged Class Period could be expanded. Further, the expansion of the Class Period to 2004 will not alter the legal basis of Plaintiffs' claims in any way. Plaintiffs are not changing or adding a new claim or legal theory to this case, merely expanding the time frame in which Defendants' conduct affected Class members. Plaintiffs' amendments do not implicate statute of limitations issues, as this Court has already determined that Plaintiffs

3

sufficiently pled fraudulent concealment. *See* Memorandum Opinion and Order (ECF No. 193). In addition, Defendant Packaging Corporation of America ("PCA") does not oppose granting Plaintiff leave to file the proposed amendments. *See* Stipulation Relating to Proposed Amendments to Complaint, filed April 16, 2014.

Allowing the proposed amendments should not change the current pretrial schedule. As noted above, discovery in this case does not close until December 2014. Expert depositions do not have to be completed for months, and Defendants have ample time to conduct discovery into Plaintiffs' new allegations should they so choose.

**III.    CONCLUSION.**

None of the grounds for denial of a motion for leave to amend the CAC are implicated by Plaintiffs' proposed amendments. Since Plaintiffs did not delay in seeking leave to amend and the amendments are not otherwise the product of bad faith, the circumstances here warrant that the requested leave be granted by allowing Plaintiffs to extend the Class Period to February 15, 2004. Plaintiffs therefore respectfully request that the Court grant their motion for leave to file the requested amendments, attached in Exhibit A hereto.

Dated: April 16, 2014                    Respectfully submitted,

*/s/ Michael J. Freed*
Michael J. Freed                         Daniel J. Mogin
Robert J. Wozniak                        Jodie Williams
**FREED KANNER LONDON**                  **THE MOGIN LAW FIRM, P.C.**
**& MILLEN LLC**                         707 Broadway, Suite 1000
2201 Waukegan Road, Suite 130            San Diego, CA 92101
Bannockburn, IL 60015 USA                T: 619-687-6611
T: 224-632-4500                          F: 619-687-6610
F: 224-632-4521

*Co-Lead Counsel for the Proposed Class*

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KLEEN PRODUCTS LLC, *et al*. individually and on behalf of all those similarly situated, | ) ) ) | |
| | ) | Case No. 1:10-cv-05711 |
| Plaintiffs, | ) ) | Hon. Harry D. Leinenweber |
| v. | ) ) | |
| PACKAGING CORPORATION OF AMERICA, *et al*., | ) ) ) | ***FILED UNDER SEAL*** |
| Defendants. | ) | |

<u>**INDEX OF EXHIBITS**</u>

**Exhibit A**:     Proposed Amendments to Plaintiffs' Consolidated and Amended Complaint

**Exhibit B**:     *In Re NCAA Student-Athlete Name & Likeness Licensing Litigation* Order

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KLEEN PRODUCTS LLC, *et al.*  ) <br> individually and on behalf of all  ) <br> those similarly situated,  ) <br>   ) <br>          Plaintiffs,  ) <br>   ) <br>     v.  ) <br>   ) <br> PACKAGING CORPORATION  ) <br> OF AMERICA, *et al.*,  ) <br>   ) <br>          Defendants.  ) | Case No. 1:10-cv-05711 <br><br> Hon. Harry D. Leinenweber <br><br><br> *FILED UNDER SEAL* |

**[PROPOSED] AMENDMENTS TO PLAINTIFFS'
CONSOLIDATED AND AMENDED COMPLAINT**

        Plaintiffs hereby request that the Consolidated and Amended Consolidated Complaint be

amended as follows:

        ¶1.    This case is an antitrust class action brought to recover for the injuries sustained

by Plaintiffs and the members of the Plaintiff Class as a result of Defendants' violations of

Section 1 of the Sherman Act, 15 U.S.C. §1 and seeks treble damages, injunctive relief, costs of

suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure.  The Plaintiff class, defined

more fully below in Paragraph 28, consists of all persons and entities that purchased

Containerboard Products directly from Defendants between ***February 15, 2004 and November

8, 2010*** (the "Class Period").[1]

        ¶6.    Beginning ***in or about 2004***, the Containerboard Products industry was faced with

decreasing profit margins, rising product demand, and a promising macroeconomic outlook.

Nevertheless, Defendants began a coordinated across-the-board imposition of capacity restraints,

---

[1]   The paragraph numbers correspond to the paragraph numbers in the Consolidated Amended
Complaint, ECF #65.  Unless noted otherwise, Plaintiffs' proposed amendments are in italics and
bolded throughout this pleading to indicate the amended language only.

leading to a subsequent restriction in the supply of Containerboard Products on the market. The goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the Class Period. Defendants' conspiracy included a scheme to impose capacity **and supply** constraints which had the effect of creating an artificial shortage of Containerboard Products in the United States during a time of stable of increasing demand, thereby allowing Defendants to charge supra-competitive prices to the Plaintiff Class. As detailed below, the conspiracy was effected, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in massive and unprecedented idling of production and capacity, reduced production and near simultaneous across-the-board price increases.

¶28.    Each Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

> All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as **February 15, 2004 through November 8, 2010**.

> Specifically excluded from this Class are the Defendants; officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

¶64.    The unprecedented industry consolidation detailed in paragraphs 43-45 created an environment conducive to collusion. Further, at or about the onset of the Class Period, the Containerboard Products industry was experiencing decreased profit margins, rising product demand, and a promising economic outlook. Additionally, shortly before **and near the beginning of** the Class Period, the Containerboard Products industry **experienced price decreases and at least one failed price increase attempt**. Specifically, on May 31, 2003,

Official Board Markets reported that a $35/ton price increase in both linerboard and corrugated medium failed, noting "[n]ot only is this attempt a failure, but discounting prevails." While prices steadily increased in 2004, *due at least in part to the two successful coordinated price increases implemented by Defendants*, by early 2005 they again began to erode, bottoming out in spring 2005. On May 31, 2005, Official Board Markets reported that Defendant International Paper announced a $50/ton price increase; but due to other Defendants not backing the price increase with a "firm stance," the end result was a failed increase. In June 2005, "it became apparent that industry-wide price hikes weren't sticking. Instead of rising about 10%, prices on the thick paper used to make corrugated containers slipped as inventories of boxes inched higher."[11] These factors acted together as the catalyst for Defendants to *redouble their coordinated* capacity restraints in order to reduce available supplies and thereby fix, raise, stabilize and maintain the prices of Containerboard Products.

¶66.    The period of *2004 – 2010* witnessed an exceptional number of containerboard plant closings, capacity reductions, and price increases that can only be explained by concerted effort by the Defendants and their co-conspirators. Defendants increased Containerboard Product prices *ten times between March 2004 and August 2010*. Over that period, Containerboard Product prices have increased over fifty percent (50%) despite the economic downturn during the latter half of the Class Period. Each of these price increases was implemented by the Defendants nearly simultaneously and was facilitated by reductions in supply and production capacity. In the face of increasing demand, these reductions make no economic sense absent conspiracy and collusion. Norampac's 2005 20-F filing illustrates these phenomena:

> In 2005, industry box shipments decreased by 0.4% in North America while North American containerboard operating rates were approximately 95%. Containerboard producers in the United States reduced their inventories and drove

---

[11] *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05,* Crain's Chicago Bus., June 27, 2005, at p.4 (emphasis in original Consolidated Amended Complaint).

a US$30/ton increase on linerboard in October following a US$55ton decrease in the first three quarters of the year…

The market share of the top five containerboard producers increased from 48% in 1995 to 64% in 2005. This consolidation has helped accelerate the rationalization of inefficient containerboard mill capacity. In 2005, a total of over 1.5 million tons of North American containerboard capacity was permanently closed. Furthermore, the industry has generally adopted a model of balancing supply with current demand as opposed to maximizing capacity utilization. As a result, operating rates in the industry in recent years more closely reflect the current economic environment. Overall, market consolidation and rationalization have helped to create a less volatile and more stable industry pricing environment.

¶67.    Demand for Containerboard Products is tied to overall consumer demand and spending. ***Beginning in 2004*** and continuing thereafter through 2007, consumer demand, including demand for Containerboard Products in the U.S., was relatively stable and industry expectations were that demand would increase, yet Defendants cut capacity, ***restricted supply*** and raised prices. These actions were contrary to Defendants' unilateral economic interests because, given market conditions and expectations that demand was increasing, in a competitive market capacity would, at minimum, be maintained if not expended, in order to enhance volumes, revenues, profits and market share. During the second half of 2008, consumer demand in the United States plummeted, yet Defendants continued to raise prices. In August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%; and notwithstanding fears of deflation in the general economy, increased prices an unprecedented three times in 2010 to all-time highs, without any underlying cost justifications. This led one market commentator to note that the series of historic price increases "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies." The same commentator noted the similarity of the present conduct of Defendants to the conduct in the prior *Linerboard* cases.

¶69.    Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity and, in turn, supply.  As a result of Defendants' conduct as alleged herein, their production capacity of Containerboard Products was significantly reduced while their prices increased by approximately 50% *between 2004 and 2010*:

[Graphical Depiction of Containerboard Capacity, Prices, and Demand]

### *2004*

*¶70.a. Demand for Containerboard Products began to rise in 2004.  Defendant International Paper forecasted increased earnings in the second quarter of 2004 as a result of increased demand, previously announced price increases, and "improved manufacturing operations."[A1] Defendant PCA reported in May 2004 that its corrugated products demand remained very strong, and that April 2004 shipments were up 9.3% as compared to one year earlier.[A2]  Defendant Temple-Inland projected that the industry's box shipments would increase by approximately 3.7% for the second half of 2004, based on demand for the first half of the year.[A3]*

---

[A1]  International Paper Q1 2004 Form 10-Q, filed May 6, 2004, at p. 14, 19.  International Paper further noted that "price increases in containerboard, certain bleached board grades and boxes announced in the first quarter, together with improved manufacturing operations, will have a positive impact on operating results."  International Paper Q1 2004 Form 10-Q, *supra*, at p. 19.

[A2]  GP-KLEEN00477477, *Packaging Corporation of America Company Profile*, dated January 2005, at slide 26.

[A3]  Temple-Inland 00291545, *Temple-Inland Investment Presentation,* dated May 7, 2004.  In contrast, historical demand growth from 1980 – 2003 was approximately 2%.  *Id*.  *See also* Temple-Inland 00348444, Email from Paul Recht (Temple-Inland) to Sharon Fuss (Temple-Inland) Re:  FW:  April 1st, 2004 Box Price Increase – Justification Documents, dated February 25, 2004, with attachment Temple-Inland 00348456, *Why is there a price increase*, author and date unknown (in justifying increasing containerboard prices by over 8% in March 2004, the author explained that January 2004 box shipments rose 10.5% year-over-year and that inventories were "at their lowest level since 1994").

*¶70.b. In response to "strong demand", all Defendants increased prices for Containerboard Products while simultaneously reducing capacity by idling machines and taking downtime.*[A4]  *The first 2004 price increase was implemented by all Defendants by March 1, 2004.*[A5]  *Defendant Weyerhaeuser was the first company to announce the price increase in early January 2004.*[A6]  *Association of Independent Corrugated Converters ("AICC") documents explained that "everyone is behind [the price increase] but no one else has announced."*[A7]  *Defendant International Paper quickly followed with its January 16, 2004, announcement that it would also be increasing liner and medium prices by $50/ton.*[A8]

---

[A4]  The alleged conspiracy began at a time presently unknown to Plaintiffs.  However, Plaintiffs allege that the Class Period begins on February 15, 2004, the date that the first price increase for 2004 became effective.

[A5]  *See* IP095108 at 95119, *Domestic Business Team Meeting*, dated February 18, 2004. International Paper identified the following additional companies as participating in the price increase:  Defendant Smurfit-Stone (price increase implemented on February 15, 2004); Defendant Norampac (price increase implemented February 23, 2004); Defendant Georgia-Pacific (price increase implemented March 1, 2004); Defendant Temple-Inland (price increase implemented on March 1, 2004); Defendant PCA (price increase implemented on March 1, 2004; and Defendant Weyerhaeuser (price increase implemented on March 1, 2004).  (Non-parties MeadWestvaco and Pratt also implemented price increases on March 1, 2004.)

Prior to the first 2004 price increase, in October 2003, Defendant Smurfit-Stone announced a massive restructuring plan with, admittedly, the ultimate goal of reducing capacity. *See* GP-KLEEN01017202 at 1017203, Email from Bill Caesar (McKinsey) to Christian Fischer (McKinsey) and Matthew Denton (Georgia-Pacific), Re:  Interesting Article, dated September 10, 2004 (forwarding an August 2004 article from the St. Louis Post-Dispatch discussing Smurfit-Stone's restructuring plan).  Smurfit-Stone explained to the St. Louis Post-Dispatch that the company would no longer be adhering to the industry's former practice of running mills as fast as they could, independent of changes in demand. GP-KLEEN01017202 at 1017203, *supra*. Rather, it planned to "cut supply enough at Smurfit to force price increases throughout the industry".  GP-KLEEN01017202 at 1017203, *supra*.

[A6]  Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto.  *See also* RT00000875 at p. 1-2.

[A7]  RT 00000875 at p.1.

[A8]  *See* SSCC 00361942, Email from Daniel Moore (International Forest Products Corp.) to "Market Watch" Re:  IP, dated January 16, 2004 (informing recipients that "IP announced a

*International Paper's price increase was effective February 16, 2004.[A9] Internal International Paper documents circulated in February 2004 confirm that its price increase would be followed by "our competitors [who] will implement [the price increase] on March 1".[A10] On January 19, 2004, Defendant Temple-Inland announced that it would be increasing prices by $50/ton, effective March 1, 2004.[A11] Internal Temple-Inland documents infer that the company raised prices, at least in part, because all other Defendants were raising prices.[A12] On January 22, 2004, Defendant Georgia-Pacific announced that it would also be increasing prices by $50/ton, effective March 1, 2004.[A13] By that time, all other Defendants had announced similar price increases.[A14]*

---

price increase today on all containerboard grades. $50 for all order [sic] place [sic] Feb [sic] 15 or later").

[A9] IP095108 at 95110.

[A10] IP095108 at 95110.

[A11] Temple-Inland 00149975.

[A12] Temple-Inland 00348444.

[A13] GP-KLEEN00546219. *See also* Defendant Georgia-Pacific LLC's Objections and Responses to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increases effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6, dated December 20, 2013.

[A14] *See* GP-KLEEN00546217,. *See also* Temple-Inland 00149975; IP095108 at IP095119,; Defendant Weyerhaeuser Company's Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6, dated September 11, 2013; Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto, dated December 20, 2013; Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6, dated September 27, 2013; Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6, dated December 20, 2013.

¶70.c.  *Around the same time that the first 2004 price increase was being implemented, Credit Suisse provided Defendants Georgia-Pacific, International Paper, Temple-Inland, and Smurfit-Stone with its publication entitled The Holy Grail:  Secular Headwinds.[A15]  The Holy Grail emphasized that "every decision the market leaders make needs to be carefully guided by a goal of increasingly clear economic alignment of incentives".[A16]  It promoted "rational decision making" about capacity and stressed that "bad outcomes" can result if "rational producers in a commodity business decide to row in different directions".[A17]  The Holy Grail likewise instructed that "consolidation does tend to help make industry behavior healthier"[A18] and that "discipline" and "capacity rationalization" were necessary in order to "avert[] pricing collapse and sustain[] higher levels of pricing and cash flow."[A19]  The message of The*

---

Internal Norampac documents infer that a price increase for whitetop planned for around the same time might not have happened because all Defendants had not agreed to participate in the price increase.  In an email from Robert Lanthier to Francois Guite sent in February 2004, Mr. Lanthier explained:  "The price increase on whitetop may not happen since it has been confirmed by different sources that Smurfit Stone is not announcing any increase on their whitetop.  For sure, we will not push for a price increase if the rest of our competitors are not doing it."  NORAMPAC00038698.

[A15] GP-KLEEN01015352; IP289887; SSCC 00481565; Temple-Inland 00017529.

[A16] GP-KLEEN01015352 at 1015372.  *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529.  Credit Suisse further noted that the "key is not to worry about driving [free-riders] out of business … but rather, to work toward a business model where interests tend to align rather than collide.  Industry consolidation is one obvious example of how that can happen, but it is far from the only one."  GP-KLEEN01015352 at 1015372.

[A17] GP-KLEEN01015352 at 1015371. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529.

[A18] GP-KLEEN01015352 at 1015374. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529.

[A19]  GP-KLEEN01015352 at 1015377. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529.  Credit Suisse published *Holy Grail* articles at various times throughout the Class Period, which it circulated among Defendants and continued to emphasize the need for "discipline".  *See The Holy Grail – Rising Risk*, Credit Suisse Equity Research, dated June 24, 2010, found at IP356757, Temple-Inland 00476330, and PCoA000339518 ("Impressive production discipline has many asking whether industry consolidation is necessary, or whether

8

*Holy Grail was remarkably similar to the advice contained in McKinsey's Chasing In On Consolidation, written for Defendant International Paper in 2002,[A20] and distributed to Defendant Georgia-Pacific in September 2004.[A21] Like The Holy Grail, Cashing In On Consolidation emphasized that North American Containerboard producers needed to show leadership through "good conduct",[A22] which was only possible where multiple market leaders aligned "incentives" and "actions" in order to "enjoy the benefits of higher prices".[A23]*

*¶70.d. In early March 2004, Defendant International Paper CEO John Faraci announced to the company's Board of Directors that "excess capacity in North America may have to be rationalized".[A24] A few days later, Defendant PCA circulated an internal call to arms, in which an Executive Vice President demanded at least three additional, $40-$50*

---

the industry's biggest issues are behind us"). Evidence that Defendants highly regarded *The Holy Grail* can be found in International Paper's internal documents. For instance, Thomas Cleves explained to John Faraci in 2008 that "[w]e should take advantage of the Holy Grail it [sic] is a thoughtful analysis of our industry and it helps us to understand how major sell-side and buy-side players think about our industry and International Paper." IP551322, Memo from Thomas A. Cleves (International Paper) to J. Faraci (International Paper) Re: Thoughts on the 2008 Holy Grail, dated February 19, 2008.

[A20] IP108305, *Cashing In On Consolidation*, McKinsey on Paper, dated 2002.

[A21] GP-KLEEN00141863, Email from Bill Ceasar (McKinsey) to Matthew Denton (Georgia-Pacific) and Christian Fischer (Georgia Pacific) Re: McK article on consolidation in Pulp & Paper, dated September 15, 2004, with attachment GP-KLEEN00141864, *Cashing In On Consolidation*, McKinsey on Paper, dated 2002. In sending *Cashing In On Consolidation* to Georgia-Pacific, McKinsey underscored its conclusion that "NA Containerboard is a 'leak-tight' segment where market leaders have the ability and incentive to lead – basically that this was a place where industry leadership mattered." GP-KLEEN00141863, *supra*.

[A22] IP108305 at 108314.

[A23] IP108305 at 108309-311.

[A24] IP112019 at 112107, *Discussion on Corporate Strategy Options*, John Faraci, undated (presentation given on March 9-10 [year unknown, but appears to be from 2004 based on presentation materials], discussing statistics from 2003 through February 2004).

*industry-wide price increases over the next 18 months.*[A25]  *This executive cited to "historically low inventory, "heavy" mill downtime, capacity reductions to "more closely align[] supply with demand", industry consolidation, and increased demand as justification for the price increases.*[A26]  *Two months after that, Defendant Georgia-Pacific circulated a memorandum similar to PCA's.*[A27]  *Therein, Executive Vice President of Packaging Christian Fisher requested that Georgia-Pacific employees "identify, develop, and capture every profit-improvement opportunity we can – starting now."*[A28]  *Mr. Fischer further explained that a "tight market" and a "second price increase" would help increase Georgia-Pacific's 2004 profits, "but they alone will not get us there.  We have to find and execute on every opportunity possible to reach our goal."*[A29]

*¶70.e.  By April 26, 2004, Defendants PCA, Georgia-Pacific, Temple-Inland, and Weyerhaeuser had announced the second price increase for 2004, increasing Containerboard Products prices by $50/ton, effective June 1, 2004.*[A30]  *Defendants Norampac, International*

---

[A25]  PCoA000026178.

[A26]  PCoA000026178.

[A27]  GP-KLEEN01441611, Email from Christian Fischer (via Linda Brown) (Georgia-Pacific) to Georgia-Pacific Employees, Re:  Profit Improvement Draft, dated May 12, 2004.

[A28]  GP-KLEEN01441611.

[A29]  GP-KLEEN01441611.

[A30]  *See* SSCC 00352370, Pulp and Paper Weekly Report, dated April 26, 2004 ("PCA and Weyerhaeuser as well as Georgia-Pacific Corp. and Temple-Inland Inc. plan $50/ton increases on their linerboard and corrugated medium for the open market, for June 1.  If implemented, it would be the second increase"); Temple-Inland 00131080, Email from Arif Ali (Temple-Inland) to "GO_BJD_DIRECT_REPORTS" (Temple-Inland) Re:  Paper Price Increase ("Temple Inland is announcing today another $50/ton price increase to its paperboard customer effective June 1.  This follows the similar announcement by GP, WY and PCA"); IP091972, Letter from Carl Bohm (Weyerhaeuser) to Rick Start (Richwood & Laminating) Re:  Containerboard Price Increase Announcement, dated April 8, 2004 (confirming Weyerhaeuser's "recent discussion" with Richwood & Laminating that Weyerhaeuser will be increasing prices for liner and medium by $50 per ton, effective June 1, 2004); IP352950, *National Containerboard Price Increase Announcements*, no author, dated May 14, 2004 (listing participants in the June 2004 price

*Paper, and Smurfit-Stone participated in the price increase as well.*[A31] *Defendant Temple-Inland reported that the price increase was "met with no resistance in marketplace", as customers were more concerned about obtaining sufficient product than paying higher prices.*[A32] *Defendants experienced higher EBIDTA and EBIT margins in large part due to the two 2004 price increases.*[A33]

---

increase and providing the date the price increase was announced, the date the increase was effective and by how much Defendants increased liner and medium prices). *See also* Defendant Georgia-Pacific LLC's Objections and Responses to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increase effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 ("In early May 2004, GP announced a $50/ton price increase effective June 1, 2004"), dated December 20, 2013; Defendant Weyerhaeuser Company's Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increase effective March 1, 2004 and June 1, 2004), dated September 11, 2013; Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto (identifying an April 12, 2004 announcement of a $50/ton price increase, effective June 1, 2004), dated December 20, 2013; IP0955004, Deutsche Bank Equity report from Mark Wilde, dated April 12, 2004 (reporting that Defendant Weyerhaeuser had announced a price increase of $50/ton in containerboard, effective June 1, 2004, and explaining that "[t]his breaks the normal seasonal pattern of containerboard hikes in late summer/early autumn").

[A31] Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increases effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendants Cascades Canada ULC and Norampac U.S. Inc.'s Supplemental Responses and Objections to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 (identifying a $50 price increase for linerboard and corrugated medium, effective June 1, 2004), dated December 20, 2013; IP352950, *National Containerboard Price Increase Announcements*, dated May 14, 2004 (identifying Defendants Weyerhaeuser, Georgia-Pacific, Temple-Inland, International Paper, PCA, and Smurfit-Stone as increasing liner and medium prices by $50/ton, effective June 1, 2004).

[A32] Temple-Inland 00569157, Email from Pat Maley (Temple-Inland) to Kenny Jastrow (Temple-Inland), Re: May Operating Highlights, dated June 14, 2004 ("The domestic $50/ton price increase proposed for June 1 has met with no resistance in marketplace. Customers are more concerned about supply availability than the increase").

¶70.f.  *Defendants also reduced mill capacity, took downtime and idled machines both temporarily and permanently throughout 2004.  Weyerhaeuser announced in late 2003 that it would be permanently closing a 270,000 ton medium mill in North Bend, Oregon,[A34] only to announce on January 13, 2004, that it would be increasing liner and medium prices.  Around the same time as the price increase announcement, Weyerhaeuser reduced Containerboard Products by approximately 21,000 tons through "market downtime".[A35]  Similarly, Temple-Inland's January 19, 2004 price increase announcement was followed by the company's January 26, 2004, announcement that it was closing its Dallas, Texas plant.[A36]  Defendant Smurfit-Stone, which implemented its price increase in February 2004, permanently closed its medium mill in Thunder Bay, Ontario in the first quarter of 2004, removing approximately 160,000 tons of medium from the market.[A37]  After announcing its price increase on January 16, Defendant International Paper closed a Roanoke Rapids, North Carolina machine during the second quarter of 2004, effectively removing nearly 300,000 tons of liner from the market.[A38]  In January 2004, Defendant Georgia-Pacific announced its price increase, but*

---

[A33] Norampac0036222, *Memorandum Re Competitor Benchmarking Fourth quarter 2004*, Norampac, dated February 22, 2005 ("All manufacturers experienced a higher EBITDA and EBIT margins mainly due to the two price increases occurred in 2004").

[A34] *See* SSCC 00083396, Excel Spreadsheet, Tab "Closures" (listing, by company, all liner and medium closures in North America from 1998 – 2010).  *See also* GP-KLEEN01012988, at 1013005, *Containerboard & Packaging Segment 2004 Annual Business Plan*, Georgia-Pacific – January 27, 2004 (table demonstrating announced closed or idled Containerboard Products machines from 2002 – 2004).

[A35] Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27.

[A36] *See* Temple-Inland 00348962, Email from Paul Recht (Temple-Inland), Re:  Dallas Plant Closing, dated January 27, 2004.

[A37] SSCC 00083396.   *See also* SSCC 00863598, Excel Spreadsheet, Tab "CB Summary – by Month" (demonstrating monthly change in containerboard production from 1988- 2010).

[A38]  IP579040, *North American Containerboard Review*, International Paper, dated June 2006.  *See also* SSCC 00083396; GP-KLEEN01012988, at 1013005.

*also took downtime to remove Containerboard Products from the market and brought inventory levels to "record low levels."[A39]  In March 2004, the same month that Georgia-Pacific implemented the price increase, it took additional downtime to remove Containerboard Products from the market.[A40]  In total, it is estimated that approximately 563 million tons of containerboard products were removed from the market in 2004.[A41]*

*¶70.g.  By April 26, all Defendants had announced the second 2004 price increase. In April 2004, Weyerhaeuser presented a Mill System Operating Strategy wherein it recommended that Containerboard inventories be "managed at much lower levels during 2004".[A42]  Under Weyerhaeuser's proposed inventory management system, box inventories exceeding 440,000 tons would trigger selective downtime.[A43]  From March through May 2004, Weyerhaeuser also effectively reduced its Containerboard Products by approximately 50,000 tons through maintenance downtime.[A44]  Weyerhaeuser's total downtime in 2004 resulted in*

---

[A39]  GP-KLEEN00106864, *Georgia-Pacific Downtime 2004*, Tab Summary by Machine Month 2004, dated September 9, 2008; GP-KLEEN01025183, Internal Georgia-Pacific Email from Matthew Denton, Re:  December 2003 Flash – Containerboard & Packaging Segment (Preliminary due to LIFO), dated January 9, 2004.

On May 19, 2004, Defendant Norampac publicly announced that it was closing its Concord, Ontario box plant.  The plant officially closed on March 31, 2005.  Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 8 (identifying Norampac box plant and mill closures that occurred between 2003 - 2010), dated September 27, 2013.

[A40]  GP-KLEEN00106864.

[A41]  SSCC 00083396.

[A42]  WY0090805 at p.8, *Mill System Operating Strategy*, dated April 14, 2004.

[A43]  WY0090805 at p.8.

[A44]  Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27, *supra,* n.48.  In March 2004, Weyerhaeuser removed approximately 29,000 tons of product through downtime.  It removed approximately 17,000 tons of product through downtime in April 2004, and approximately 4,000 tons of product through downtime in June

removing approximately 124,000 tons of Containerboard Product from the market.[A45] Defendant Georgia-Pacific likewise removed containerboard product from the market in April 2004 by taking downtime.[A46]    Similar to Weyerhaeuser, Georgia-Pacific removed approximately 148,644 tons of containerboard products from the market in 2004 through downtime.[A47]

¶70.h.  On May 19, 2004, Deutsche Bank analyst Mark Wilde reported that inventories were at "an extremely lean level."[A48]  Noting that operating rates were at 94.4%, total industry inventories for mills and box plants stood at 3.6 weeks of supply, and that box shipments increased 4.2% YTD, Mr. Wilde doubted that "fundamentals … could get any stronger".[A49] Mr. Wilde further explained that "[i]t's been years since the containerboard numbers looked so positive" and that the June 2004 price increase, if successful, would "go down as the biggest single year price gain in the containerboard history."[A50]

¶70.i.  Against the backdrop of the April 2004 price increase announcements, executives from Defendants and their co-conspirators, including Steven Klinger, Executive Vice President of Packaging for Georgia-Pacific, Ron Zimbleman, Vice President of Sales and Marketing for Containerboard for Temple-Inland, Dennis Colley, then the Vice President of

---

2004.  Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27, *supra*.

[A45] *See* Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27 (adding the total maintenance downtime taken in 2004 to the total market downtime taken in 2004).

[A46] GP-KLEEN00106864.

[A47] GP-KLEEN00490370 at p.25, Georgia-Pacific Sales & Marketing Presentation, undated.

[A48]  SSCC 00347633, Memo from Mark Wilde of Deutsche Bank Securities, Inc. Re: Containerboard Monitor, dated May 19, 2004.

[A49]  SSCC 00347633.

[A50]  SSCC 00347633.

*Containerboard for International Paper, Bill Wandmacher, Vice President and General Manager of the Containerboard Mill Division for Smurfit-Stone, Gerry Greeter, Vice President and General Manager of Containerboard Sales for PCA, Carl Bohm, Vice President of Containerboard for Weyerhaeuser, and Jim Keller, Senior Vice President of Containerboard for Weyerhaeuser, attended an AF&PA Executive Committee Containerboard Group meeting at AF&PA headquarters on March 22, 2004.*[A51]  *During this meeting, International Paper Vice President and General Manager of its containerboard business Dennis Colley was elected vice chair of the Containerboard Group Executive Committee,*[A52] *and Deutsche Bank analyst Mark Wilde provided an "economic outlook covering the paper packaging industry".*[A53]  *The committee also approved Terry Serie's, Vice President of Statistics for AF&PA, request to form a "task force of Containerboard Group members who would work toward developing a long range plan."*[A54]  *Just weeks later, on April 6, 2004, representatives from Defendants and their co-conspirators attended a Containerboard Division Membership meeting held by the AF&PA in Charleston, North Carolina.*[A55]

---

[A51]  AFPA_ESI_01897, *Minutes of the Meeting*, Executive Committee Containerboard Group, dated March 22, 2004 (identifying the persons listed as attendees during roll call).  Mr. Zimbleman is identified as attending on behalf of Inland Paperboard & Packaging.  Inland Paperboard & Packaging is the largest subsidiary of Temple-Inland.  *See* http://www.risiinfo.com/db_area/archive/p_p_mag/1997/9703/copro.htm (last viewed March 7, 2014).

[A52]  AFPA_ESI_01897 (noting that Mr. Colley's term will begin at the conclusion of the Fall Meeting 2005).

[A53]  AFPA_ESI_01897.

[A54]  AFPA_ESI_01897.

[A55]  AFPA-P-GS-00341 at p.2-3, *Minutes of the Meeting*, Containerboard Division Membership Containerboard Group, AF&PA, dated April 6, 2004 (listing the following persons as attendees during roll call:  Jane Cowan and Mollie Hilliard from Georgia-Pacific; Tom Benefield and Melissa Murphy from International Paper; Kathleen Lents and Heidi Patton from PCA; Jack Greenshields and Scott Spurgeon from Rock-Tenn; Wayne Cameron from Smurfit-Stone; Barry Baker and Kent McFerran from Temple-Inland; and Jenny Iranon and Anne Olsen from Weyerhaeuser).

70.j.    On May 2, 2004, executives from Defendants Norampac, Temple-Inland, PCA, *Georgia-Pacific, Weyerhaeuser and International Paper attended an FBA Board of Directors meeting.*[A56] *Around the same time, Deutsche Bank analyst Mark Wilde gave a presentation to the FBA entitled "A New Ball Game:  A Review of the Containerboard & Corrugated Packaging Business".*[A57]    *Therein, Mr. Wilde applauded the industry for improving "fundamentals" that would "restore margins", including lower inventories, capacity rationalization, and industry consolidation.*[A58]    *Mr. Wilde concluded the presentation by asking "[n]ow, with Fundamentals Improving … how do we react?"*[A59]

70.k.    *In early July 2004, International Paper CEO John Faraci appears to have had a telephone call with Lee Thomas, President and Chief Operating Officer for Georgia-Pacific, ostensibly on AF&PA business.*[A60]    *Shortly thereafter, on July 17, 2004, representatives from Defendants Weyerhaeuser, Rock-Tenn, Smurfit-Stone, and Georgia-Pacific attended a*

---

[A56]    FBAKP0001176, *Minutes of Meeting from Board of Directors Meeting*, Fibre Box Association, dated May 2, 2004 (listing the following persons as members and attending:  Marc-Andre Depin from Norampac, Bart Doney from Temple-Inland, Tom Hassfurther (for William Sweeney) from PCA, Steven Klinger from Georgia-Pacific, Daniel Pyne from Weyerhaeuser, and Carol Roberts from International Paper).

[A57]    GP-KLEEN01017172, Email from Matthew Denton, (Georgia-Pacific) Re:  FW:  A Whole New Ballgame?  A Review of the Containerboard & Corrugated Packaging Business, dated May 10, 2004, with attachment GP-KLEEN01017174, *A New Ball Game A Review of the Containerboard & Corrugated Packaging Business*, Mark Wilde of Deutsche Bank Securities Inc., dated May 5, 2004, Exhibit 33 to Mark Wilde Deposition Transcript.  *See also* RT 00001035, Email from Mark Wilde (Deutsche Bank) Re:  A Whole New Ball Game?  A Review of the Containerboard & Corrugated Packaging Business, dated May 10, 2004, with attachment RT 00001036, *A New Ballgame A Review of the Containerboard & Corrugated Packaging Business*, Mark Wilde of Deutsche Bank Securities, Inc., dated May 5, 2004.

[A58]    GP-KLEEN01017174 at 1017177, 1017187-88.

[A59]    GP-KLEEN01017174 at 1017189.  Defendant Smurfit-Stone appears to have announced its participation in the June 2004 price increase approximately three days after Mr. Wilde posed this question.  *See* IP352950.

[A60]    IP333836.

*Paperboard Packaging Alliance Board of Advisors meeting in Washington, D.C.[A61] In late September 2004, executives from Defendants, including Steven Klinger from Georgia-Pacific, Marc-Andre Depin from Norampac, Daniel G. Pyne from Weyerhaeuser, and Carol Roberts from International Paper, attended another FBA Executive Committee meeting.[A62]   In October 2004, AF&PA circulated antitrust compliance guidelines to Defendants, instructing them on how to implement "changes" to "reduce the risk of antitrust litigation".[A63]  The draft guidelines warned Defendants not to say things like, "[t]he industry needs to show some discipline to get prices up", or "[w]e all need to recognize that there is too much capacity and we need to do something about it."[A64]  The guidelines were endorsed by the AF&PA for use by all members during the October 30, 2004, AF&PA Board of Directors meeting, which was attended by executives from Defendants.[A65]  That same month, the AF&PA CEO Statistics Committee met to discuss, among other things, the "Long-Term Vision and Goals Plan for Domestic and International Statistics."[A66]  The attendees included Smurfit-Stone CEO Patrick Moore, David Dreilbelbis on behalf of James Rubfight for Rock-Tenn, PCA CEO Paul Stecko,*

---

[A61]  AFPA_ESI_00705, *Minutes of Meeting*, Paperboard Packaging Alliance Board of Advisors, dated June 17, 2004 (identifying the following persons as members and attending the meeting in roll call:  Dick Dudley from Weyerhaeuser, Nick George from Rock-Tenn, Nat Holmes from Smurfit-Stone, and George Wurtz from Georgia-Pacific).

[A62]  FBAKP0002635, *Minutes of Meeting*, FBA Executive Committee, dated September 28, 2004 (identifying the persons listed as attending the meeting).

[A63]  . GP-KLEEN01061118; AFPA-P2-AT-00058.

[A64]  GP-KLEEN01061118; AFPA-P2-AT-00058.

[A65]  SSCC 00305730, *Minutes*, American Forest & Paper Association Board of Directors Meeting, dated October 30, 2004.  The following persons were identified as being present during for all or part of the meeting:  John Faraci, CEO of International Paper; Kenny Jastrow, CEO of Temple-Inland; Patrick Moore, CEO of Smurfit-Stone; and Steve Rogel, CEO of Weyerhaeuser.

[A66]  SSCC 00159174, *Minutes*, AF&PA CEO Statistics Committee, dated Friday, October 29, 2004.

*Bob Amen from International Paper, Sonny Jackson from Smurfit-Stone, Richard Taggart from Weyerhaeuser, and Lyn Withey from International Paper.*[A67] *Executives from Defendants met on at least one more occasion in 2004. Steve Klinger from Georgia-Pacific, Paul Brown (for Carol Roberts) from International Paper, James Davis from Smurfit-Stone, Marc-Andre Depin from Norampac, Daniel Pyne from Weyerhaeuser, and William Sweeney from PCA attended a Fibre Box Association Board of Directors meeting on November 16, 2004, in Chicago, Illinois.*[A68]

¶76. As previously alleged, ***beginning in 2004***, Defendants were experiencing decreased profit margins and historically high demand. In that context, in June 2005, high level executives and other representatives from each of the Defendants and their co-conspirators, including Pete Correll, Chairman and CEO of Georgia-Pacific, David A. Spraley, Vice President of Georgia-Pacific, C. Richard Larrick, General Manager of Georgia-Pacific, Russell Bishop, Chief Information Officer of Weyerhaeuser, Dick Thomas, Vice President of Weyerhaeuser, Ronnie Cosper, Papermill Superintendent for Smurfit-Stone, and others were reported as attending the PIMA 2005 Leadership Conference in Nashville, Tennesee.[14] The theme of this conference was "Success through Collaborative Teamwork." Topics discussed included "Effective Collaboration through Teamwork" and "Price Execution in the Forest Products Industry."

¶179. Further, the price of both linerboard and corrugated medium rose at exactly the same time by exactly the same per-ton amounts. This identical and simultaneous across-the-

---

[A67] SSCC 00159174.

[A68] FBAKP0001228, *Minutes of Meeting*, Fibre Box Association Board of Directors, dated November 16, 2004 (identifying the persons listed above as attending the meeting). The minutes indicate that Mr. Klinger was Chairman of the association.

[14] The Paper Industry Management Association, or "PIMA", describes itself as "the premier association for management professionals in the paper and pulp industry" with the goal of contributing "to the strength of the international pulp and paper community by providing the means for our members to address relevant industry issues and to develop their management and leadership skills."

board price increase on multiple products can only be explained by concerted and coordinated behavior by the Defendants.



Dated: April 16, 2014                    Respectfully submitted,


*/s/ Michael J. Freed*
Michael J. Freed                    Daniel J. Mogin
Robert J. Wozniak                   Jodie Williams
**FREED KANNER LONDON**             **THE MOGIN LAW FIRM, P.C.**
**& MILLEN LLC**                    707 Broadway, Suite 1000
2201 Waukegan Road, Suite 130       San Diego, CA 92101
Bannockburn, IL 60015 USA           T: 619-687-6611
T: 224-632-4500                     F: 619-687-6610
F: 224-632-4521

*Co-Lead Counsel for the Proposed Class*

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

No. C 09-1967 CW

IN RE NCAA STUDENT-ATHLETE
NAME & LIKENESS LICENSING
LITIGATION

ORDER RESOLVING
CROSS-MOTIONS FOR
SUMMARY JUDGMENT;
GRANTING MOTION TO
AMEND CLASS
DEFINITION;
DENYING MOTION FOR
LEAVE TO FILE
MOTION FOR
RECONSIDERATION
(Docket Nos. 898,
911, 933, 998)

_____/

Plaintiffs, a group of current and former college athletes,
bring this antitrust class action against Defendant National
Collegiate Athletic Association (NCAA).  They initially brought
claims against Collegiate Licensing Company (CLC) and Electronic
Arts Inc. (EA), as well, but agreed in September 2013 to settle
those claims.  Plaintiffs now move for summary judgment on all
antitrust class claims against the NCAA.  The NCAA opposes the
motion and cross-moves for summary judgment on those claims.
Amici curiae, Fox Broadcasting Company and Big Ten Network, LLC
(collectively, Networks), filed a brief supporting the NCAA's
summary judgment motion.  After considering the parties'
submissions and oral argument, the Court grants in part
Plaintiff's motion for summary judgment and denies it in part and
denies the NCAA's cross-motion for summary judgment.  In addition,
the Court grants Plaintiffs' motion to amend the class definition
and denies their motion for leave to seek reconsideration of the
Court's class certification order.

United States District Court
For the Northern District of California

BACKGROUND

Plaintiffs are twenty-four current and former student-athletes who played for NCAA men's football or basketball teams between 1953 and the present. All played at the Division I level, the highest level of collegiate athletic competition,[1] and many went on to play professionally, as well. In the present case, four of the Plaintiffs (Right-of-Publicity Plaintiffs) allege that the NCAA misappropriated their names, images, and likenesses in violation of their statutory and common law rights of publicity. The other twenty Plaintiffs (Antitrust Plaintiffs) allege that the NCAA violated federal antitrust law by conspiring with EA and CLC to restrain competition in the market for the commercial use of their names, images, and likenesses. The instant motions address only the latter set of claims, which arise under the Sherman Antitrust Act, 15 U.S.C. §§ 1 et seq.

Antitrust Plaintiffs[2] initiated the first of these consolidated actions in 2009 and filed the operative Third Amended Consolidated Class Action Complaint (3CAC) in July 2013. Docket No. 832. They allege that the NCAA engaged in anti-competitive conduct by conspiring to sell or license the names, images, and likenesses of Division I men's football and basketball players, without their consent, for use in live television broadcasts, archival game footage, and NCAA-branded videogames featuring

---

[1] As noted in prior orders, Division I was known as the "University Division" prior to 1973. In college football, the division now consists of two subdivisions known as the "Division I Football Bowl Subdivision" (FBS) and the "Division I Football Championship Subdivision" (FCS). For the sake of simplicity, this order refers generally to all of these divisions as "Division I."

[2] Unless otherwise noted, all subsequent references to "Plaintiffs" in this order are meant to denote the twenty Antitrust Plaintiffs.

player-avatars modeled after real student-athletes. They accuse the NCAA, EA, and CLC of engaging "in an overarching conspiracy to: (a) fix the amount current and former student-athletes are paid for the licensing, use, and sale of their names, images, and likenesses at zero; and (b) foreclose current and former student-athletes from the market for the licensing, use, and sale of their names, images, and likenesses." 3CAC ¶ 14.

In 2012, Plaintiffs moved to certify a class of current and former Division I football and basketball players to pursue declaratory and injunctive relief. In particular, they sought an injunction barring the NCAA from enforcing any rules, bylaws, or organizational policies that prohibit current and former student-athletes from seeking compensation for the commercial use of their names, images, or likenesses. According to Plaintiffs, these rules, bylaws, and policies form an integral part of the NCAA's price-fixing conspiracy and operate to restrain competition in two distinct but related markets: (1) the "college education" market, in which Division I colleges and universities compete to recruit the best student-athletes to play football or basketball; and (2) the "group licensing" market, in which broadcasters and videogame developers compete for group licenses to use the names, images and likenesses of all student-athletes on particular Division I football and basketball teams in live game broadcasts, archival footage, and videogames. Id. ¶ 391.

Plaintiffs also moved to certify a subclass of current and former student-athletes to pursue monetary damages. Specifically, they sought compensation for the unauthorized use of student-athletes' names, images, and likenesses in broadcast footage and

United States District Court
For the Northern District of California

1   videogames after July 2005, which is the earliest date on which

2   Plaintiffs could recover damages under the Sherman Act's four-year

3   statute of limitations.  See 15 U.S.C. § 15b.

4       In September 2013, while their class certification motion was

5   pending, Plaintiffs reached a settlement in principle with EA and

6   CLC.  The parties represented that this settlement would resolve

7   all of Plaintiffs' pending antitrust and right-of-publicity claims

8   against EA and CLC.  Based on this representation, the Court

9   vacated EA and CLC's remaining discovery and dispositive motion

10  deadlines in October 2013 so that they could finalize the terms of

11  their agreement and Plaintiffs could move for preliminary

12  settlement approval.  Docket No. 870.  As of this date, the

13  parties have yet to finalize their agreement and move for

14  preliminary approval.

15      In November 2013, this Court issued its class certification

16  order.  Docket No. 893, Nov. 8, 2013 Order, at 23-24.  The Court

17  granted Plaintiffs' request to certify the injunctive relief class

18  but denied their request to certify a damages subclass, citing

19  various barriers to class manageability.

20      On November 15, 2013, one week after the class certification

21  order issued, Plaintiffs filed the instant motion for summary

22  judgment.  The NCAA cross-moved for summary judgment one month

23  later.  While these motions were pending, Plaintiffs moved for

24  leave to seek partial reconsideration of the class certification

25  order and moved to amend the class definition in the class

26  certification order.

27

28

United States District Court
For the Northern District of California

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential

United States District Court
For the Northern District of California

element of its claim or defense to carry its
ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d
1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an
absence of evidence to support an essential element of a claim or
defense, it is not required to produce evidence showing the
absence of a material fact on such issues, or to support its
motion with evidence negating the non-moving party's claim.  <u>Id.</u>;
<u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990);
<u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If
the moving party shows an absence of evidence to support the non-
moving party's case, the burden then shifts to the non-moving
party to produce "specific evidence, through affidavits or
admissible discovery material, to show that the dispute exists."
<u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an
essential element of the non-moving party's claim or defense, it
must produce affirmative evidence of such negation.  <u>Nissan</u>, 210
F.3d at 1105.  If the moving party produces such evidence, the
burden then shifts to the non-moving party to produce specific
evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of
production by either method, the non-moving party is under no
obligation to offer any evidence in support of its opposition.
<u>Id.</u>  This is true even though the non-moving party bears the
ultimate burden of persuasion at trial.  <u>Id.</u> at 1107.

6

DISCUSSION

I.   Cross-Motions for Summary Judgment

     A.   Legal Standard under the Section 1 of the Sherman Act

     Section 1 of the Sherman Act makes it illegal to form any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  To prevail on a claim under this section, a plaintiff must show "'(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'"  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir. 2001) (citing Hairston v. Pacific 10 Conference, 101 F.3d 1315, 1318 (9th Cir. 1996)).  For reasons explained in prior orders, Plaintiffs' claims in this case must be analyzed under the rule of reason rather than a per se rule of illegality. See Docket No. 151, Feb. 8, 2010 Order, at 9–10.

     "A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects." Tanaka, 252 F.3d at 1063.  Courts typically rely on a burden-shifting framework to conduct this balancing.  Under that framework, the "plaintiff bears the initial burden of showing that the restraint produces 'significant anticompetitive effects' within a 'relevant market.'"  Id. (citing Hairston, 101 F.3d at 1319).  If the plaintiff satisfies this initial burden, "the defendant must come forward with evidence of the restraint's procompetitive effects."  Id.  Finally, if the defendant produces this evidence, the plaintiff must "show that 'any legitimate

objectives can be achieved in a substantially less restrictive manner.'" Id. (citing Hairston, 101 F.3d at 1319).

Plaintiffs urge the Court to engage in a "quick look" rule of reason analysis rather than applying the more comprehensive burden-shifting framework described above. A "quick look" analysis is an abbreviated form of the rule of reason analysis which presumes that the challenged restraint is unlawful and "in effect shifts to a defendant the burden to show empirical evidence of procompetitive effects." FTC v. Actavis, Inc., 133 S. Ct. 2223, 2237 (2013) (internal citations and quotation marks omitted). The Ninth Circuit has explained that a "truncated rule of reason or 'quick look' antitrust analysis may be appropriately used where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1134 (9th Cir. 2011) (citing Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999)). However, "if an arrangement 'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,' then a 'quick look' form of analysis is inappropriate." Harris, 651 F.3d at 1134 (citing Cal. Dental, 526 U.S. at 771).

Here, the challenged restraint is the set of NCAA rules and practices which prevent student-athletes from selling group licenses for the use of their names, images, and likenesses. Because courts have found that the NCAA's general restrictions on student-athlete compensation could conceivably enhance

8

competition,[3] a "quick look" analysis is not appropriate here.

Indeed, the parties have submitted such a large and diverse volume

of competing economic analyses that any starting presumption --

whether of legality[4] or illegality -- would do little to help

resolve the ultimate question in this case: that is, what impact

the challenged restraint has on competition in the relevant

markets.  See Board of Regents, 468 U.S. at 104 ("[W]hether the

ultimate finding is the product of a presumption or actual market

analysis, the essential inquiry remains the same -- whether or not

the challenged restraint enhances competition.").  The rule of

reason analysis here will therefore follow the traditional burden-

shifting framework rather than the "quick look" approach proposed

by Plaintiffs.

B.    Anti-Competitive Effects of Challenged Restraint

As noted above, the plaintiff bears the initial burden of

showing that the challenged restraint "produces 'significant

anticompetitive effects' within a 'relevant market.'"  Tanaka, 252

F.3d at 1063 (citing Hairston, 101 F.3d at 1319).  To meet this

burden, Plaintiffs in the present case must produce evidence to

show that the NCAA's prohibition on student-athlete compensation

---

[3] See, e.g., NCAA v. Board of Regents of Univ. of Oklahoma, 468
U.S. 85, 101-02 (1984) (noting in dicta that the NCAA's ban on student-
athlete pay helps "preserve the character and quality" of its product).
This Court has previously explained why Board of Regents -- which does
not examine the NCAA's ban on student-athlete compensation under the
rule of reason -- does not control the outcome of this case.  See Docket
No. 876, Oct. 25, 2013 Order, at 8-16.

[4] Although the NCAA contends that a "quick look" analysis is
inappropriate, it argues that the eligibility rules challenged by
Plaintiffs should nevertheless be presumed to be procompetitive because
they are essential for the NCAA to produce a unique product."  Docket
No. 926, NCAA Cross-Mot. Summ. J., at 8.  Such a presumption is not
useful here for the same reasons that Plaintiffs' requested presumption
is not useful.

United States District Court
For the Northern District of California

for the use of their names, images, and likenesses harms competition in the two markets they have identified -- namely, the "college education" market and the "group licensing" market.

With respect to the "college education" market, Plaintiffs rely on various expert reports to show that the NCAA undermines Division I schools' efforts to compete freely for the best football and basketball recruits. See, e.g., Docket No. 898, 1st Scherrer Decl., Ex. 12, Sept 2013 Noll Report, at 36-59 (describing competition among Division I schools for top Division I football and basketball recruits). Other courts in this circuit have recognized that NCAA rules which impede Division I schools' ability to compete for student-athletes may give rise to a Sherman Act violation. See, e.g., White v. NCAA, Civil Case No. 06-999, Docket No. 72, slip op. at 3 (C.D. Cal. Sept. 20, 2006) (holding that former college football and basketball players stated a valid antitrust claim against the NCAA by alleging that its limits on financial aid for student-athletes restrained competition in markets where "colleges and universities compete to attract student-athletes"); In re NCAA I-A Walk-On Football Players Litig., 398 F. Supp. 2d 1144, 1150 (W.D. Wash. 2005) (holding that former college football players stated a valid antitrust claim by alleging that NCAA restrictions on the number of full scholarships that Division I schools may offer restrain competition in the "market in which NCAA member schools compete for skilled amateur football players").

According to Plaintiffs' experts, the NCAA restrains competition in this market by preventing Division I schools from offering their recruits a portion of the revenue they receive from

United States District Court
For the Northern District of California

1   football- and basketball-related broadcasting and videogame

2   licenses.  These schools are thus deprived of a tool that they

3   could otherwise use to recruit the top student-athletes.

4   Plaintiffs allege that student-athletes are harmed by this

5   restraint because it prevents them from receiving compensation --

6   specifically, for the use of their names, images, and

7   likenesses -- that they would receive in an unrestrained market.

8   1st Scherrer Decl., Ex. 12, Sept. 2013 Noll Report, at 113.  Thus,

9   because Plaintiffs' evidence supports an inference that this

10  restraint has an anticompetitive effect on the "college education"

11  market, it is sufficient to satisfy their initial summary judgment

12  burden.

13      With respect to the "group licensing" market, Plaintiffs rely

14  on the same expert evidence to show that the NCAA prevents

15  videogame developers and broadcasters from competing freely for

16  group licenses to use student-athletes' names, images, and

17  likenesses.  Plaintiffs' experts examined how broadcasters and

18  videogame developers compete to obtain group licenses for the use

19  of professional athletes' names, images, and likenesses and

20  concluded that the NCAA prevents similar competition from taking

21  place in the market for the use of college athletes' names,

22  images, and likenesses.  See id., Sept. 2013 Noll Report, at 59-

23  72, 84; Docket No. 651, Aug. 2012 Noll Report, at 37-45.[5]  These

24  experts' analyses offer sufficiently plausible evidence of

25  anticompetitive effects in the "group licensing" market and, thus,

26

27      [5] While some of this expert evidence was only submitted with

28  Plaintiffs' class certification motion, Plaintiffs' expert, Dr. Noll,
    has incorporated it by reference in his latest report.

satisfy Plaintiffs' initial summary judgment burden to show harm
to competition in that market.

The NCAA contends that Plaintiffs have not shown harm to
competition in the market for <u>former</u> student-athletes' group
licensing rights. It highlights Plaintiffs' failure to identify
any NCAA bylaws that specifically prohibit former student-athletes
from licensing their names, images, and likenesses after they stop
playing Division I sports. But Plaintiffs do not need to identify
any such bylaws to meet their summary judgment burden here. It is
enough that they have presented evidence suggesting that the NCAA
continues to license the names, images, and likenesses of former
student-athletes, without their consent, long after they stopped
competing in college. The record contains evidence that certain
NCAA-branded videogames depict entire teams of former Division I
basketball players who stopped competing years earlier. The NCAA
does not dispute that most of these players were never compensated
for the use of their likenesses in those videogames nor does it
dispute that, as a practical matter, former student-athletes are
not likely to receive any money for their appearances in those
videogames or in rebroadcasts of past games. <u>See</u> Docket No. 1007,
Feb. 20, 2014 Hrg. Tr. 9:4-12:21. As discussed at the hearing,
the NCAA sells the rights to record and broadcast Division I
football and basketball games while the student-athletes who
participate in those games are still bound by its eligibility
rules, including the restrictions on compensation. As a result,
student-athletes are prevented from selling or negotiating
licenses for the use of their names, images, and likenesses at the
exact moment when those licenses are most valuable. By the time

**United States District Court**
For the Northern District of California

these student-athletes have stopped participating in college
sports -- and are no longer bound by NCAA rules -- they have
effectively lost whatever bargaining power they once had in the
group licensing market because the NCAA has already sold the
recording and broadcasting rights for the games in which they
played.  Thus, even if the NCAA bylaws do not prohibit former
student-athletes from licensing their names, images, and
likenesses, the NCAA can still preclude these student-athletes
from participating fully in the group licensing market through a
combination of its compensation rules and licensing practices.

The NCAA next contends that Plaintiffs' request for an
injunction to prevent the unauthorized use of their names, images,
and likenesses in videogames is moot because the NCAA has not
renewed its licensing agreement with EA.  Docket No. 925, C.
Luedtke Decl., Ex. 24, J. Isch Decl. ¶ 19.  Even without this
specific licensing agreement, however, the NCAA could still enter
into licensing agreements with other videogame developers.  It
could also facilitate such an agreement between a videogame
developer and specific NCAA member schools and conferences.
Accordingly, because the NCAA has not shown that it will never
seek to enter into or facilitate another videogame licensing
agreement, Plaintiffs' injunctive relief claim regarding
videogames is not moot.  See Nanoexa Corp. v. Univ. of Chicago,
2010 WL 3398532, at *3 (N.D. Cal.) (Koh, J.) (finding that the
termination of a licensing agreement between parties in a patent-
licensing dispute was not sufficient to render moot the
plaintiff's claims for injunctive relief because the defendant was
still able to "partner with other companies").

13

United States District Court
For the Northern District of California

Finally, the NCAA contends that most of the named Plaintiffs' damages claims are time-barred because they are based on alleged violations that occurred more than four years before this action was filed. See 15 U.S.C. § 15b (establishing four-year statute of limitations). This Court previously recognized that the continuing violations doctrine applied to Plaintiffs' claims in this case because Plaintiffs alleged that the NCAA committed certain overt acts after July 2005 which revived Plaintiffs' antitrust claims. See Feb. 8, 2010 Order at 11-12 (citing Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 237 (9th Cir. 1987)). Although Plaintiffs have failed to identify any evidence of those overt acts here, they may nevertheless proceed to trial on their claims. Plaintiffs have yet to notify the Court which individuals will be asserting damages claims at trial and what the basis of those claims will be. The parties agreed that Plaintiffs could disclose this information after the summary judgment hearing. Accordingly, in light of this agreement and the fact that Plaintiffs have yet to identify the specific basis for their individual damage claims, Plaintiffs will not be required to present evidence of a continuing violation until trial. At trial, however, Plaintiffs will need to establish a continuing antitrust violation by showing that the NCAA committed some overt act after July 2005 to further its unlawful conduct. Pace Indus., 813 F.2d at 237 ("[E]ven when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act.").

C.   Existence of a Relevant Market

As explained in the October 25, 2013 order, Plaintiffs'
evidence of a "group licensing" market rests on the assumption
that student-athletes, absent the challenged restraint, would be
able to assert cognizable right-of-publicity claims against
broadcasters who depict them in live game broadcasts or archival
game footage without a group license or consent.  If student-
athletes could not protect their publicity rights in this way,
then broadcasters would have no reason to purchase group licenses
from them (or otherwise obtain their consent) for the use of their
names, images, or likenesses in game broadcasts.  Thus, to
establish the existence of a "group licensing" market, Plaintiffs
must show that, absent the NCAA's restraint on student-athlete
pay, student-athletes would have cognizable rights of publicity in
the use of their names, images, and likenesses in live game
broadcasts and archival game footage.[6]

The NCAA and the Networks, as <u>amici</u>, contend that Plaintiffs
cannot make this showing.  They argue that live broadcasts of
college football and basketball games are a form of protected
speech and that broadcasters' First Amendment right to televise
these games trumps whatever rights of publicity the student-
athletes might otherwise assert.  The Networks further argue that

---

[6] As previously noted, this order addresses only the Antitrust
Plaintiffs' claims and not the Right-of-Publicity Plaintiffs' claims.
Although the following sections discuss the scope of student-athletes'
publicity rights, the discussion focuses on whether those rights could,
absent the challenged restraint, give rise to a market for group
licenses.  The Court does not analyze the viability of Right-of-
Publicity Plaintiffs' claims, which remain stayed pending EA's petition
for certiorari.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

archival game footage, including highlights and rebroadcasts of old games, is also protected.

The Supreme Court has never specifically considered whether or not the First Amendment prevents an athlete from asserting a right-of-publicity claim against a defendant who used footage of the athlete's entire performance without his or her consent. However, its decision in Zacchini v. Scripps–Howard Broadcasting Co., 433 U.S. 562 (1977), provides useful guidance in balancing a performer's right of publicity against First Amendment considerations. In Zacchini, the Court held that a television station was not entitled to First Amendment protection for broadcasting the entire fifteen-second "human cannonball" act of a performer at an Ohio county fair. Id. at 563-64. The Court explained that the First Amendment did not shield the station from right-of-publicity liability because it chose to broadcast the performer's entire act without his consent and, in so doing, undermined his economic interests by reducing demand for his live show. Id. at 574-76 ("Wherever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent.").

The Court's reasoning in Zacchini strongly suggests that the First Amendment does not guarantee media organizations an unfettered right to broadcast entire sporting events without regard for the participating athletes' rights of publicity. In fact, the Court specifically analogized the performer's "human cannonball" act in Zacchini to the athletic performances at issue

in two earlier right-of-publicity cases decided by lower federal
courts.  In one of those cases, <u>Ettore v. Philco Television Broad.</u>
<u>Corp.</u>, 229 F.2d 481 (3d Cir. 1956), the Third Circuit held that a
television network had violated a professional boxer's right of
publicity by broadcasting one of his old fights without his
consent.  Similarly, in <u>Pittsburgh Athletic Co. v. KQV Broad. Co.</u>,
24 F. Supp. 490 (W.D. Pa. 1938), a district court held that a
radio station had violated a baseball team owner's rights to
disseminate, sell, or license broadcasting rights for its games by
broadcasting certain baseball games without the owner's consent.
Although neither <u>Ettore</u> nor <u>Pittsburgh Athletic</u> specifically
considered whether sports broadcasts constitute protected speech,
the Supreme Court's reliance on these cases in <u>Zacchini</u>
nevertheless implies that sports broadcasters are not entitled to
any special First Amendment protections against right-of-publicity
liability.  <u>See</u> 433 U.S. at 575 ("The Constitution no more
prevents a State from requiring respondent to compensate
petitioner for broadcasting his act on television than it would
privilege respondent . . . to film and broadcast a prize fight or
a baseball game, where the promoters or the participants had other
plans for publicizing the event.").

Zacchini's logic applies in this case even though sports
broadcasters are not solely responsible for depriving Division I
student-athletes of compensation for their athletic performances.
The NCAA's challenged rules obviously play a key role in ensuring
that student-athletes are not paid for their performances in
televised games.  But, absent those rules, student-athletes would
have an economic interest in being able to sell group licenses for

**United States District Court**
For the Northern District of California

the rights to broadcast their games. Under those circumstances, the First Amendment would not empower broadcasters to undermine the student-athletes' economic interests by televising their games without group licenses any more than it allowed the television station in <u>Zacchini</u> to broadcast the county fair performer's "human cannonball" act without his consent. The student-athletes' economic interests in this case are determined by the value their athletic performances would have in an unrestrained market -- not by their value in a market from which they have been allegedly excluded.

The Seventh Circuit recently relied on <u>Zacchini</u> in holding that a news organization did not have an absolute First Amendment right to stream entire high school sporting events on its website. In <u>Wisconsin Interscholastic Athletic Association v. Gannett Co., Inc.</u>, 658 F.3d 614, 615 (7th Cir. 2011), a high school athletic association sought declaratory judgment that it had a right to grant an exclusive license to a regional television network to broadcast certain sporting events that it helped organize. <u>Id.</u> at 618. The association filed the suit against a local newspaper which had streamed four postseason football games on its website without the regional network's consent. <u>Id.</u> After the district court granted summary judgment to the association,[7] the newspaper appealed, arguing that the exclusive broadcasting license was invalid because it violated the newspaper's "First Amendment right

---

[7] Although the athletic association was technically a state actor, the Seventh Circuit made clear that this fact did not change its First Amendment analysis because the association was "functioning as the creator and disseminator of content," not as a regulator. 658 F.3d at 622-24.

to broadcast entire [game] performances" and prevented it from

covering high school sports.   <u>Id.</u> at 616.

    The Seventh Circuit rejected this argument.   It held that the

newspaper's "theory that coverage and broadcast are identical is

both analytically flawed and foreclosed by <u>Zacchini</u>."   <u>Id.</u>

Addressing the analytical flaws in the newspaper's theory, the

court explained,

> Interpreting the First Amendment to provide
> the media with a right to transmit an entire
> performance or to prohibit performers from
> charging fees would take us back centuries, to
> a time when artists or performers were unable
> to capture the economic value of a
> performance.  Over the long run, this would
> harm, not help, the interests of free speech.
> The First Amendment requires no such folly.

<u>Id.</u> at 624.  The court then turned to <u>Zacchini</u>, noting that

<u>Zacchini</u> established "two propositions" which undercut the

newspaper's argument: "First, [<u>Zacchini</u>] distinguishes between the

media's First Amendment right to 'report on' and 'cover' an event

and its lack of a right to broadcast an 'entire act.'  Second,

<u>Zacchini</u> makes clear that the producer of entertainment is

entitled to charge a fee in exchange for consent to broadcast."

<u>Id.</u>  Relying on these principles, the <u>Wisconsin Interscholastic</u>

court concluded that the newspaper's First Amendment rights did

not trump the athletic association's right to grant an exclusive

license to broadcast high school sporting events.

    These principles compel a similar conclusion here: the First

Amendment does not guarantee media organizations an unlimited

right to broadcast entire college football and basketball games.

Indeed, if the First Amendment did guarantee such a right, then it

would cast doubt on the NCAA's ability to issue exclusive licenses to specific broadcasters.  There is no principled reason why the First Amendment would allow the NCAA to restrict press access to college football and basketball games (via exclusive licensing agreements) but, at the same time, prohibit student-athletes from doing the same (via right-of-publicity actions).  This is precisely why the court in Wisconsin Interscholastic equated the athletic association's right to issue exclusive broadcasting licenses with the "human cannonball" performer's right of publicity in Zacchini.  Zacchini itself also appeared to equate the publicity rights of "promoters" and "participants" in sporting events.  433 U.S. at 575 (stating that the First Amendment did not immunize media from right-of-publicity liability for broadcasting a sporting event "where the promoters or the participants had other plans for publicizing the event").  As far as the First Amendment is concerned, these rights stand on equal footing.

Thus, taken together, Zacchini and Wisconsin Interscholastic make clear that the First Amendment does not create a right to broadcast an entire athletic performance without first obtaining a license or consent from all of the parties who hold valid

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

ownership rights in that performance.[8]   Whether Division I

student-athletes hold any ownership rights in their athletic

performances does not depend on the scope of broadcasters' First

Amendment rights but, rather, on whether the student-athletes

themselves validly transferred their rights of publicity to

another party.  Because the current record does not demonstrate

that all Division I student-athletes validly transferred all of

these rights, the First Amendment does not preclude student-

athletes from asserting rights of publicity in live broadcasts or

re-broadcasts of entire games.  Accordingly, the First Amendment

does not preclude the existence of a market for group licenses to

use student-athletes' names, images, and likenesses in those

broadcasts.

     The NCAA and the Networks contend that <u>Zacchini</u> and <u>Wisconsin</u>
<u>Interscholastic</u> are not applicable here and urge the Court to rely

instead on several other cases, which rejected athletes' rights-

of-publicity claims on First Amendment grounds.  All of the cases

they cite, however, are inapposite because they do not address

claims based on footage of the athletes' entire athletic

---

     [8] In its reply brief, the NCAA cites <u>Washington v. Nat'l Football</u>
<u>League</u>, 880 F. Supp. 2d 1004, 1008 (D. Minn. 2012), to argue that any
dispute between the NCAA and the student-athletes regarding profits from
game rebroadcasts is a dispute over performance ownership rights and,
thus, "is a royalties issue, not an antitrust issue."  This statement,
however, is only partially true.  While some student-athletes may be
entitled to recover royalties from the NCAA based on their appearances
in certain game re-broadcasts, those royalty claims would not preclude
student-athletes from challenging the alleged price-fixing plan that
excluded them from the group licensing market in the first place.
Whatever individual harms might be redressed through royalties claims,
antitrust law remains a vehicle for challenging harms to competition
more broadly.

United States District Court
For the Northern District of California

performance, that is, entire games.[9] What's more, many of the cases they cite were decided based on First Amendment considerations that are not relevant to full-game broadcasts. For instance, in Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 972 (10th Cir. 1996), the Tenth Circuit rejected a group of professional baseball players' right-of-publicity claims based on "cartoons and caricatures" of their likenesses in "parody trading cards." Id. at 969. The court held that the card company's use of the players' likenesses was protected because its "interest in publishing its parody trading cards implicates some of the core concerns of the First Amendment." Id. at 969, 972 (explaining that "parody, both as social criticism and a means of self-expression, is a vital commodity in the marketplace of ideas"). Game broadcasts are not a form of parody and, thus, do not raise the same concerns.

The Eighth Circuit's decision in C.B.C. Distribution & Marketing, Inc. v. Major League Baseball Advanced Media, L.P., 505 F.3d 818, 823 (8th Cir. 2007), was also based on First Amendment concerns that do not apply to full-game broadcasts. In that case, a group of professional baseball players alleged that a website had misappropriated their publicity rights by using their names

---

[9] See, e.g., Gionfriddo v. Major League Baseball, 94 Cal. App. 4th 400 (2001) (holding that professional baseball league's use of retired players' "names, voices, signatures, photographs and/or likenesses" in websites and video clips was protected under the First Amendment); Montana v. San Jose Mercury News, Inc., 34 Cal. App. 4th 790, 794 (1995) (holding that "full page newspaper accounts of Super Bowls XXIII and XXIV" featuring photographs of the 49ers' star quarterback, Joe Montana, were "entitled to First Amendment protection"); Dora v. Frontline Video, Inc., 15 Cal. App. 4th 536 (1993) (holding that a documentary featuring audio interview, photographs, and video clips of a retired surfer was constitutionally protected).

and playing statistics in a fantasy baseball game without their

consent.  The Eighth Circuit held that the website's use of the

players' names and statistics was protected because, among other

reasons, the information was "readily available in the public

domain, and it would be strange law that a person would not have a

first amendment right to use information that is available to

everyone."  Id. at 823.  This rationale does not justify a First

Amendment right to broadcast entire Division I football and

basketball games, which are not available in the public domain.

Plaintiffs argue that, in addition to the reasons discussed

above, full-game broadcasts are not protected by the First

Amendment because they constitute commercial speech.  As

previously explained, Oct. 25, 2013 Order at 19-20, footage of

athletic performances is not protected by the First Amendment if

it is used for "strictly commercial" purposes.  Pooley v. Nat'l

Hole-In-One Ass'n, 89 F. Supp. 2d 1108, 1113-14 (D. Ariz. 2000)

("[W]hen the purpose of using a person's identity is strictly to

advertise a product or a service, as it is here, the use is not

protected by the First Amendment."); see also Dryer, 689 F. Supp.

2d at 1116 ("The threshold inquiry is whether the films are, as

the NFL argues, expressive works entitled to the highest

protection under the First Amendment, or commercial speech

entitled to less protection, as Plaintiffs contend.").  The Ninth

Circuit defines commercial speech as "'speech that does no more

than propose a commercial transaction.'"  Hunt v. City of Los

Angeles, 638 F.3d 703, 715 (9th Cir. 2011) (citing United States

v. United Foods, Inc., 533 U.S. 405, 409 (2001)).

**United States District Court**
For the Northern District of California

23

Applying this test to the present case, it is clear that broadcasts of entire Division I football and basketball games do not constitute commercial speech.  To the extent that these broadcasts propose commercial transactions, they do so largely during commercial breaks or other stoppages in game play.  This is analogous to a newspaper or magazine setting aside certain pages for advertisements and is not sufficient to render the entire broadcast commercial.  See Ad World, Inc. v. Township of Doylestown, 672 F.2d 1136, 1139 (3d Cir. 1982) ("The fact that a publication carries advertisements . . . does not render its speech commercial for first amendment purposes.").  Although many game broadcasts also feature corporate logos and slogans during the course of play, these elements of the broadcast are not sufficient to convert the entire broadcast into commercial speech. See Transp. Alternatives, Inc. v. City of New York, 340 F.3d 72, 78 (2d Cir. 2003) ("Notwithstanding the presence of minor commercial elements, such as display of corporate logos, this speech [i.e., a city-sponsored biking tour] was a far distance from commercial speech undertaken to solicit a commercial transaction.").  Furthermore, the fact that some of the game broadcasters' programming decisions are motivated by a desire for profit does not establish that the rest of the broadcast is commercial.  See Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 960 (9th Cir. 2012) ("[E]conomic motive in itself is insufficient to characterize a publication as commercial.").  Plaintiffs' assertion that broadcasts of entire college football and basketball games are commercial must therefore be rejected.

With respect to broadcasts or recordings that feature only
clips or highlight footage of games -- that is, <u>partial</u> athletic
performances -- neither <u>Zacchini</u> nor <u>Wisconsin Interscholastic</u> is
directly on point.  The handful of federal district courts to
address whether the First Amendment precludes athletes from
asserting rights of publicity in clips or highlights of their
athletic performances have relied on the commercial speech test
outlined above to decide the issue.  <u>See</u> <u>Dryer</u>, 689 F. Supp. 2d at
1116; <u>Pooley</u>, 89 F. Supp. 2d at 1113-14.  Some state courts have
taken a similar approach.  <u>See, e.g.</u>, <u>Gionfriddo</u>, 94 Cal. App. 4th
at 412 (concluding that "minor historical references to plaintiffs
within game programs and Web sites and in videos documenting
baseball's past" were protected by the First Amendment because
they did not constitute commercial speech).

Here, the NCAA has not presented evidence to show that there
can be no market for clips and highlight footage of Division I
football and basketball players because such clips are used
exclusively to produce protected, non-commercial speech.
Plaintiffs, likewise, have not presented evidence to define a
clear market for clips and highlight footage of these student-
athletes to produce unprotected, commercial speech.  Thus, the
Court can neither summarily adjudicate that the First Amendment
precludes a market for clips and highlight footage nor can it
conclude that, absent the challenged restraint, such a market
would actually exist.  Accordingly, neither party is entitled to
summary judgment on the question of whether the group licensing
market includes a market for clips and highlight footage.

**United States District Court**
For the Northern District of California

In sum, <u>Zacchini</u> and <u>Wisconsin Interscholastic</u> make clear that the First Amendment does not bar Division I student-athletes from selling group licenses to use their names, images, and likenesses in live or recorded broadcasts of entire college football and basketball games.[10]  Plaintiffs' evidence is therefore sufficient to support an inference that, in the absence of the NCAA's restrictions on student-athlete pay, a market would exist for these group licenses.  If Plaintiffs seek to prove that a similar market would exist for group licenses to use student-athletes' names, images, and likenesses in clips and highlight footage, they will have to prove that there would be a demand for these clips and highlight footage specifically for use in commercial speech that is not protected by the First Amendment.

D.    Scope of Relevant Market

The NCAA contends that, even if a group licensing market would exist absent the challenged restraint, the named Plaintiffs could not participate in that market because their rights of publicity would not be cognizable in the states where they are currently domiciled.  This argument is not persuasive for two reasons.

---

[10] This is not to suggest that any individual student-athlete would be able to prevent a broadcaster from televising his team's games merely by withholding his consent.  To create a group licensing market such as the one that Plaintiffs have identified, individual student-athletes would have to transfer their rights of publicity to some representative entity -- such as their school or conference -- as a condition of their participation in Division I athletics so that the representative entity could license the right to televise their games.  Thus, broadcasters would obtain group licenses to use every participating student-athlete's name, image, and likeness as part of the general licenses they would acquire from every school or conference whose games they wished to broadcast.

First, the NCAA has not shown that each of the named
Plaintiffs is, in fact, domiciled in a state that refuses to
recognize an athlete's right of publicity in live broadcasts of
sporting events.  Two of the named Plaintiffs, for instance, are
domiciled in Minnesota, where the scope of the common law right of
publicity remains unsettled.  See generally Hillerich & Bradsby Co.
v. Christian Bros., Inc., 943 F. Supp. 1136, 1141 (D. Minn. 1996)
("Although the Minnesota state courts have not explicitly
recognized (or rejected) this cause of action, the federal courts
in this circuit and district have concluded that it exists in
Minnesota.").  The NCAA has not cited any cases that preclude
athletes from asserting right-of-publicity claims in Minnesota[11]
and recent case law suggests that athletes may bring such claims
under Minnesota law to recover for the unauthorized use of their
names and images in at least certain kinds of broadcast footage.
See Dryer, 689 F. Supp. 2d at 1123.

Second, even if the named Plaintiffs were precluded from
bringing right-of-publicity claims in their states of domicile,
the NCAA has not adequately explained why they could not bring
these claims in other states.  As the Court previously explained
in its order denying the NCAA's motion to dismiss,

> Plaintiffs allege harm to a national market
> for the licensing rights to their names,
> images, and likenesses in game broadcasts.  To
> disprove the existence of this market at the
> pleading stage, the NCAA would have to
> identify a law or set of laws that precludes

---

[11] The NCAA cites only one Minnesota case, Lake v. Wal-Mart Stores,
Inc., 582 N.W.2d 231, 235-36 (Minn. 1998), which does not include any
discussion of athletes' publicity rights.  Moreover, the NCAA only cited
this case in a footnote to an improperly filed appendix to its brief.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

> student-athletes from asserting publicity
> rights to game broadcasts in every state.

Oct. 25, 2013 Order at 17-18 (emphasis in original).  Although the

NCAA argues that states "generally apply the law of the

plaintiff's domicile for right of publicity claims, regardless of

the location of the alleged infringement," NCAA Cross-Mot. Summ.

J. at 7, it provides scant support for that assertion.  Its only

support comes from section 153 of the <u>Restatement (Second) of

Conflict of Laws</u>, which describes how courts typically resolve

choice-of-law disputes regarding invasion-of-privacy claims.  Even

assuming that most courts would apply section 153 to the named

Plaintiffs' right-of-publicity claims -- and there is good reason

to believe many would not[12] -- this <u>Restatement</u> provision still

would not justify finding that the named Plaintiffs are excluded

from the national group licensing market because the provision

does not represent a <u>universal</u> rule.  Rather, it represents the

approach that courts "usually" take when resolving choice-of-law

disputes.  <u>Id.</u>  Not every jurisdiction follows this approach.

<u>See, e.g.</u>, <u>Donovan v. Bishop</u>, 2010 WL 4062370, at *5 (S.D. Ind.)

("The Indiana Rights of Publicity Statute . . . 'applies to an act

or event that occurs within Indiana, regardless of a personality's

domicile, residence, or citizenship.'" (citing Ind. Code § 32-36-

1-1)); <u>Bi-Rite Enterprises, Inc. v. Bruce Miner Poster Co., Inc.</u>,

616 F. Supp. 71, 74 (D. Mass. 1984) (finding that "the situs of

the right of publicity is where the 'commercial value' of one's

persona is exploited" and that, while "the plaintiff's domicile

---

[12] <u>See</u> <u>Zacchini</u>, 433 U.S. at 571 (noting that the tort of invasion
of privacy is an "entirely different tort from the 'right of publicity'"
under Ohio state law).

may be a relevant factor," it is not determinative), aff'd, 757
F.2d 440 (1st Cir. 1985). Thus, section 153 does not govern
choice-of-law disputes in every jurisdiction where the named
Plaintiffs could conceivably assert a right-of-publicity claim.
As such, it does not preclude them from participating in the
"group licensing" market that they have alleged.

    E.   Procompetitive Justifications for the Challenged
        Restraint

    The NCAA has identified five potential procompetitive
justifications for its rules prohibiting student-athletes from
receiving compensation for the use of their names, images, and
likenesses. These justifications include (1) the preservation
of amateurism in college sports; (2) promoting competitive balance
among Division I teams; (3) the integration of education and
athletics; (4) increased support for women's sports and less
prominent men's sports; and (5) greater output of Division I
football and basketball. Each of these justifications is examined
below.

    1.   Amateurism

    The NCAA asserts that the challenged restraint increases the
popularity of Division I sports by promoting amateurism. For
support, it relies on the expert reports of Dr. Daniel Rubinfeld,
an economist, and Dr. J. Michael Dennis, a public opinion
researcher. Dr. Rubinfeld analyzed several consumer surveys
conducted over the past twelve years and concluded that "consumers
generally favor the amateur nature of college sports." Luedtke
Decl., Ex. 29, Sept. 2013 Rubinfeld Report ¶ 79. Dr. Dennis
conducted his own consumer survey and reached the same conclusion.

29

He observed that 68.9% of survey respondents were opposed to paying college football and basketball players.[13]  Id., Ex. 37, Nov. 2013 Dennis Report ¶ 28.  Among respondents who identified themselves as college football or basketball fans (i.e., those who watched, listened to, or attended more than thirty games over the previous twelve months), fifty-one percent were opposed to paying college athletes.  Id.  Dr. Dennis also noted that thirty-eight percent of all survey respondents stated that they would be less likely to watch, listen to, or attend college football and basketball games if student-athletes were paid $20,000 per year; forty-seven percent stated that they would be less likely to watch, listen to, or attend games if student-athletes were paid $50,000 per year; and fifty-three percent stated that they would be less likely to watch, listen to, or attend games if student-athletes were paid $200,000 per year.  Id. ¶ 31.  In contrast, fewer than five percent stated that they would be more likely to watch, listen to, or attend games if student-athletes were paid these amounts.  Id. ¶ 32.

Plaintiffs highlight several deficiencies in the NCAA's survey evidence.  For instance, they note that Dr. Dennis's survey questions failed to distinguish between pay-for-play compensation and compensation for the use of student-athletes' names, images,

---

[13] Plaintiffs move to strike Dr. Dennis's report (and any portions of Dr. Rubinfeld's rebuttal report which rely on it) because the NCAA failed to make timely expert disclosures under Rule 26(a).  Because this Rule 26 violation was ultimately harmless, Plaintiffs' motion is denied.  See Fed. R. Civ. P. 37(c)(1) (providing that a Rule 26 violation should not result in the exclusion of evidence if the violation was harmless).  Plaintiffs not only deposed Dr. Dennis but also submitted their own expert report criticizing his survey results.  Accordingly, they will not be prejudiced by the admission of this evidence.

and likenesses.  See Docket No. 898, 1st Scherrer Decl., Ex. 19,
Nov. 2013 Poret Report ¶¶ 11-32 (criticizing survey evidence
submitted by the NCAA).  They also note that Dr. Dennis's results
summary focused more heavily on the opinions of the general
population rather than actual college sports fans.  In this
regard, Dr. Dennis's failure to specify how many college sports
fans would be less likely to watch college sports if student-
athletes were paid is especially noteworthy.

Still, despite these shortcomings in Dr. Dennis's report, a
reasonable fact-finder could conclude from his survey results that
the NCAA's ban on student-athlete compensation serves a
procompetitive purpose.  Accordingly, Plaintiffs are not entitled
to summary judgment on this issue.  See Clicks Billiards, Inc. v.
Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001) (noting
that "considering conflicting evidence and deciding what weight to
accord the survey [evidence]" is "the proper role for a trier of
fact" and "not the role of a district court at the summary
judgment stage").

Nor is the NCAA entitled to summary judgment on this issue.
Plaintiffs have presented sufficient evidence to support an
inference that the preservation of the NCAA's definition of
amateurism serves no procompetitive purpose.  They have submitted
several expert reports attacking the NCAA's survey evidence and
highlighting other evidence which suggests that the popularity of
college sports is not tied to the NCAA's efforts to promote
amateurism.  One of Plaintiffs' experts, economist Dr. Roger Noll,
notes in his report that the NCAA has changed its definition of
amateurism several times over the years without significantly

31

affecting consumer demand for its product.  1st Scherrer Decl.,

Ex. 12, Sept. 2013 Noll Report, Exs. 1A, 1B, 1C (documenting

various changes between 1967 and 2005 to NCAA rules governing

athletic scholarships, financial aid grants, athletic performance

awards, travel expenses, non-athletic employment pay, and other

forms of student-athlete compensation).  Dr. Noll also observes

that other popular sporting event sponsors which once restricted

participation to unpaid amateurs, such as the Olympics, eliminated

these restrictions without undermining their popularity or

marketability.  Id., Sept. 2013 Noll Report, at 129-33.  Finally,

Dr. Noll notes in his report that, in recent years, national

television ratings for popular FBS football teams did not suffer

when the NCAA sanctioned them for violating its amateurism rules.

1st Scherrer Decl., Ex. 12, Sept. 2013 Noll Report at 127-29.

Another one of Plaintiffs' experts, Dr. Daniel Rascher, a

professor of sports management, reached the same conclusions as

Dr. Noll after examining similar developments in other sports.

Docket No. 957, 2d Scherrer Decl., Ex. 8, Nov. 2013 Rascher

Report, at 66-70.  Taken together, this evidence could lead a

reasonable fact-finder to conclude that amateurism, as defined by

the NCAA, does not contribute to the popularity of Division I

football and basketball.

     Thus, in light of the conflicting expert evidence regarding

the alleged procompetitive benefits of the NCAA's definition of

amateurism, neither party is entitled to summary judgment on this

issue.

2.    Competitive Balance

The NCAA's second asserted justification for the challenged restraint is that it promotes competitive balance among Division I football and basketball teams and, thus, makes these sports more marketable.  Numerous courts, including the Supreme Court, have recognized that promoting competitive balance among sports teams serves a "legitimate" procompetitive purpose and may justify the imposition by sports leagues of certain restraints on competition. See Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 204 (2010) ("We have recognized, for example, 'that the interest in maintaining a competitive balance' among 'athletic teams is legitimate and important.'" (citing Board of Regents, 468 U.S. at 117)).

Here, the NCAA contends that its rules restricting student-athlete pay enhance competitive balance by preventing teams with greater financial resources from using those resources to gain an advantage in recruiting.  It has submitted declarations from various Division I conference commissioners and university administrators who assert that providing student-athletes with a share of schools' broadcast and other licensing revenue would jeopardize competitive balance between large schools and small schools.  See Luedtke Decl., Exs. 1-21A.  The NCAA also submitted a declaration from Dr. Rubinfeld asserting the same thing.  Id., Ex. 27, D. Rubinfeld Decl. ¶¶ 33-38.

This evidence does not establish that the NCAA's restrictions on student-athlete compensation promote competitive balance among Division I football and basketball teams.  As an initial matter, none of the declarations from conference commissioners and

33

**United States District Court**
For the Northern District of California

1   university administrators is based on empirical evidence, factual

2   data, or expertise in economic analysis.  Furthermore, all of

3   these declarations are self-serving because Division I conferences

4   and universities stand to lose a significant portion of their

5   current licensing revenue should Plaintiffs ultimately prevail in

6   this suit.  See FTC v. Publishing Clearing House, Inc., 104 F.3d

7   1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit,

8   lacking detailed facts and any supporting evidence, is

9   insufficient to create a genuine issue of material fact.").  Most

10   importantly, none of these witnesses has even attempted to

11   identify what level of competitive balance is actually necessary

12   to maintain existing consumer demand for Division I football and

13   basketball.  And, even if they had, they have not cited any

14   evidence to suggest that the NCAA's restrictions on student-

15   athlete compensation -- the specific restraint challenged in this

16   case -- actually help the NCAA achieve that level of competitive

17   balance.[14]

18       While Dr. Rubinfeld has asserted generally that allowing

19   Division I schools to pay student-athletes would lead to

---

20         [14] The Court notes that both parties have failed to submit any
21   meaningful statistical analyses of competitive balance here.
    Statisticians and sports economists have developed numerous methods for
22   measuring competitive balance among sports teams.  See generally Rodney
    Fort, "Competitive Balance in North American Professional Sports," in
23   Handbook of Sports Economics Research 190, 194 (John Fizel ed., 2006)
    (noting that there are "many measures [of competitive balance] to choose
24   from").  Given the wealth of publicly available historical data
    regarding Division I teams' win-loss records, national rankings,
25   recruiting class quality, box scores (which document game-by-game point
    differentials), and betting lines, the parties could have used any
26   number of methods to examine competitive balance among Division I teams
    and to evaluate its impact on consumer demand.  While no method for
27   measuring competitive balance is perfect, almost any statistically based
    measure would have been superior to the collection of selectively culled
28   facts, figures, and non-expert opinions that the parties rely on here.

recruiting disparities between high-revenue and low-revenue

schools, he has not provided any statistical support for that

claim.  Moreover, he specifically admitted that such disparities

already exist.  1st Scherrer Decl., Ex. 1, Sept. 2013 Rubinfeld

Report ¶ 97 (acknowledging that "high-revenue schools may have

recruiting advantages in the current world (better training

facilities, coaches, etc)").  The NCAA's own staff has likewise

acknowledged that the current "disparity in expense budgets" among

Division I schools has likely contributed to "a significant

disparity in competition" among Division I football and basketball

teams.  Id., Ex. 27, Aug. 2011 NCAA Presidential Retreat, Paper on

"Division I Financial Sustainability," at 911-12.  Although it is

possible that the NCAA's restrictions on student-athlete

compensation prevents these disparities from growing even larger,

the NCAA has not provided any evidence to suggest that this is the

case.  It has not explained, for instance, why the restriction on

student-athlete compensation would deter high-revenue schools from

using their resources to gain a recruiting advantage in other

ways, such as by building superior athletic facilities or hiring

better coaches.  Nor has the NCAA explained why it could not use

less restrictive means of maintaining competitive balance, such as

those used by professional sports leagues.

Nevertheless, because the NCAA has presented some evidence

that the challenged restraint promotes competitive balance,

Plaintiffs are not entitled to summary judgment on this issue.  In

order to prevail on this issue at trial, however, the NCAA will

have to present evidence that the challenged restraint promotes a

level of competitive balance that (1) contributes to consumer

35

demand for Division I football and basketball and (2) could not be achieved through less restrictive means.  See Tanaka, 252 F.3d at 1063.

### 3.    Integration of Education and Athletics

The NCAA's third stated justification for the challenged restraint is that it promotes the integration of education and athletics.  The NCAA contends that the integration of education and athletics not only improves the educational experiences of student-athletes but also advances the educational mission of colleges.

While these may be worthwhile goals, they are not procompetitive.  The Supreme Court has made clear that antitrust defendants cannot rely on these types of social welfare benefits to justify anticompetitive conduct under the Sherman Act.  FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 424 (1990) ("The social justifications proffered for respondents' restraint of trade thus do not make it any less unlawful." (citing National Society of Professional Engineers v. United States, 435 U.S. 679, 695 (1978))).  Rather, to justify a challenged restraint under the rule of reason, an antitrust defendant must show that it actually promotes competition in a relevant market.  Here, the NCAA has not provided evidence that improving the educational experiences of student-athletes or advancing the educational mission of colleges ultimately promotes its product: namely, college sports.

The NCAA argues that "improv[ing] the quality of education" and "promoting socio-economic diversity" at institutions of higher education are legitimate procompetitive justifications under United States v. Brown University, 5 F.3d 658, 669 (3d Cir. 1993).

36

In Brown University, the Third Circuit held that an agreement among several selective colleges to adopt a need-blind financial aid system and to match each other's financial aid grants did not violate the Sherman Act.  The court rejected the plaintiff's argument that the agreement created a purely social good, reasoning that the agreement "not only serves a social benefit, but actually enhances consumer choice" by expanding educational opportunities for "qualified students who are financially 'needy' and would not otherwise be able to afford the high cost of education."  Id. at 677 (emphasis added) ("Thus, rather than suppress competition, [the agreement] may in fact merely regulate competition in order to enhance it, while also deriving certain social benefits.").

Unlike the colleges in Brown University, the NCAA has not explained how the challenged restraint in this case -- which limits, rather than increases, the financial benefits provided to college students -- would enhance consumer choice in the markets Plaintiffs have identified.  It has also failed to present any evidence showing that the integration of athletics and education actually benefits Division I college sports fans or student-athletes.  Instead, it has submitted a collection of declarations from university administrators describing how the challenged restraint benefits other college students.  See, e.g., Luedtke Decl., Ex. 19, K. Starr Decl. ¶ 7 (asserting that "paying student-athletes in men's basketball and football would have a corrosive effect on University culture at Baylor and elsewhere, would be demoralizing to numerous other students, and would create an elitist group of paid athletes whose separateness from other

students could interfere with their relationships with other students and faculty" (emphasis added)); <u>id.</u>, Ex. 16, C. Plonsky Decl. ¶ 15 ("Paying any student athlete for the use of their name, image, and likeness would upset the balance within our education system by paying some but not all students for extracurricular activities."). These declarations do not support an inference that the NCAA's restriction on student-athlete compensation contributes to the integration of education and athletics or that such integration actually serves a procompetitive purpose.

Thus, if the NCAA seeks to argue at trial that the challenged restraint promotes the integration of education and athletics, it must present evidence to show that (1) the ban on student-athlete compensation actually contributes to the integration of education and athletics and (2) the integration of education and athletics enhances competition in the "college education" or "group licensing" market.

####        4.    Viability of Other Sports

The NCAA's fourth asserted justification for the challenged restraint is that it increases NCAA member schools' athletic budgets and, therefore, enables them to provide greater financial support to women's sports and less prominent men's sports.

This is not a legitimate procompetitive justification. The Supreme Court has explained that competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy." <u>United States v. Topco Associates, Inc.</u>, 405 U.S. 596, 610

(1972).[15]  It is "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." <u>Sullivan v. Nat'l Football League</u>, 34 F.3d 1091, 1112 (1st Cir. 1994).  Thus, the NCAA cannot restrain competition in the "college education" market for Division I football and basketball recruits or in the "group licensing" market for Division I football and basketball teams' publicity rights in order to promote competition in those markets for women's sports or less prominent men's sports.  To the extent that the NCAA contends that supporting women's sports and less prominent men's sports serves a broader social purpose -- beyond merely increasing output in those markets -- this justification is precluded for reasons outlined in the previous section of this order.  <u>See</u> <u>Trial Lawyers Ass'n</u>, 493 U.S. at 424 (holding that "social justifications" cannot support an otherwise unlawful restraint of trade).

This justification also fails because the NCAA could provide support for women's sports and less prominent men's sports through less restrictive means.  <u>See</u> <u>Tanaka</u>, 252 F.3d at 1063 (stating that, if a defendant meets its burden to identify a procompetitive

---

[15] The Ninth Circuit has questioned whether <u>Topco</u> would preclude an antitrust defendant from justifying a challenged restraint with evidence that the restraint enhances competition in a "closely related" market. <u>Paladin Associates, Inc. v. Montana Power Co.</u>, 328 F.3d 1145, 1157 (9th Cir. 2003) ("[P]erhaps that language from <u>Topco</u> is not controlling because it is a dictum or incomplete or obsolete or because the case of such closely related markets as those for transport of natural gas and the natural gas itself might be distinguished.  In any event, we need not and do not reach this issue on the permissible bounds of rule of reason inquiry.").  Nevertheless, it has never expressly distinguished <u>Topco</u> on this ground and, even if it had, the NCAA has not presented any evidence here to suggest that the market for Division I football and basketball is "closely related" to the market for women's sports or less prominent men's sports.

**United States District Court**
For the Northern District of California

justification for a restraint, the "plaintiff must then show that 'any legitimate objectives can be achieved in a substantially less restrictive manner'"). For instance, the NCAA could mandate that Division I schools and conferences redirect a greater portion of the licensing revenue generated by football and basketball to these other sports. Dr. Rubinfeld acknowledges in his report that the NCAA already encourages, but does not require, its member conferences to redistribute the revenue generated from the NCAA Division I men's basketball tournament to sports other than football and basketball. Luedtke Decl., Ex. 29, Sept. 2013 Rubinfeld Report ¶ 127. The NCAA has not explained why it could not adopt more stringent revenue-sharing rules.

Accordingly, the challenged restraint is not justified by the NCAA's claimed desire to support women's sports or less prominent men's sports. Plaintiffs are entitled to summary adjudication of this issue.

### 5. Increased Output Benefits

The NCAA's fifth asserted justification for the challenged restraint is that it increases the total "output" of Division I football and basketball, as measured by the total number of teams, players, scholarships, and games. According to Dr. Rubinfeld, the NCAA's restraint on student-athlete compensation generates additional revenue for NCAA member schools to spend on more scholarships and other costs associated with competing at the Division I level. Dr. Rubinfeld asserts that this revenue-sharing plan provides support to low-revenue schools which might not otherwise be able to compete in Division I. Luedtke Decl., Ex. 29, Sept. 2013 Rubinfeld Report ¶ 143 ("By increasing the number

of schools participating, the NCAA helps to increase the total number of student-athletes and the number of scholarships available for men's FBS football and Division I men's basketball student-athletes.").

Unlike the financial support provided to women's sports or less prominent sports, the revenue provided to football and basketball teams at low-revenue schools is potentially procompetitive because it increases output in the relevant market. Thus, a reasonable fact-finder could conclude from Dr. Rubinfeld's report that the challenged restraint enhances consumer demand for Division I football and basketball.

Plaintiffs dispute that the challenged restraint actually increases the amount of revenue that is shared among Division I football and basketball teams. They cite Dr. Noll's opening expert report, in which he asserts that the NCAA's revenue-sharing system may hurt demand for its product by increasing the number of Division I teams and players and thereby decreasing the overall quality of play or reducing competitive balance. 1st Scherrer Decl., Ex. 12, Sept. 2013 Noll Report, at 44-45 ("Revenue sharing redistributes wealth from players to teams, at a cost in terms of lower quality of play and, perhaps, less competitive balance."). This evidence is sufficient to create a material factual dispute as to whether or not the increased output benefits the NCAA has identified are legitimately procompetitive. In light of this factual dispute, neither Plaintiffs nor the NCAA is entitled to summary adjudication of this issue.

## II.   Motion to Amend the Class Definition

After the summary judgment hearing, Plaintiffs moved to amend the current class definition to bring it into conformity with the class definition that they proposed in their 3CAC.  They note that the current class definition is that which they requested in their class certification motion rather than the one that they requested in their 3CAC.

The discrepancy between the two class definitions stems from the unique procedural history of this case.  As explained in prior orders, Plaintiffs were granted leave to amend their complaint in July 2013 -- after they moved for class certification -- because their class certification motion made clear that they intended to pursue a theory of antitrust liability which they had not clearly plead in their prior complaint.  Rather than forcing Plaintiffs to withdraw their class certification motion, which had already been briefed and argued, the Court directed Plaintiffs to file an amended complaint articulating their new theory of antitrust liability.  Defendants were then given an opportunity to challenge Plaintiffs' new theory with another round of motions to dismiss.[16] See Docket Nos. 856, 857, 858.  After the Court denied Defendants' motions to dismiss in October 2013, it turned back to Plaintiffs' pending class certification motion.  In November 2013, it granted that motion in part and denied it in part.  The class certification order adopted the class definition set forth in Plaintiffs' motion.

---

[16] Defendants had previously sought to challenge Plaintiffs' new theory in a joint motion to strike the motion for class certification. See Docket No. 639.  The Court denied the motion to strike in January 2013.  Docket No. 673.

The slight differences between that class definition and the class definition in the 3CAC are a product of the recent changes in Plaintiffs' theory of the case. The NCAA received ample notice of these changes and had an opportunity to challenge Plaintiffs' new theory after the 3CAC was filed. Thus, it will not be prejudiced by the adoption of the class definition proposed in the 3CAC. Indeed, the NCAA itself noted at the summary judgment hearing that the class definition Plaintiffs seek was "stated in their complaint crystal clear." Feb. 20, 2014 Hrg. Tr. 97:16–:18.

Accordingly, the current class definition shall be amended to reflect the class definition set forth in the 3CAC, the text of which is reproduced in the conclusion of this order.

### III. Plaintiffs' Motion for Leave to File Motion for Reconsideration

Plaintiffs seek leave to file a motion for reconsideration of part of the November 2013 class certification order. Specifically, they seek reconsideration of the Court's decision not to certify the damages subclass.

Under Civil Local Rule 7–9(b), a party seeking leave to file a motion for reconsideration must show (1) that "a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought"; (2) the "emergence of new material facts or a change of law occurring after the time of such order"; or (3) a "manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." Here, Plaintiffs' motion is based on the emergence of new material facts and the Court's

1  purported failure to consider dispositive legal arguments and

2  material facts presented with their class certification motion.

3  None of these grounds provides justification for reconsidering the

4  class certification order.

5       The new material facts which Plaintiffs cite come from Dr.

6  Rubinfeld's November 2013 expert report, which was produced four

7  months after the class certification hearing.  Plaintiffs contend

8  that this report shows that the "substitution effect" among

9  Division I athletes -- which the Court identified as one of the

10 barriers to class manageability -- is de minimis.  This evidence,

11 however, had already been presented to the Court before the class

12 certification hearing.  As Plaintiffs themselves concede in their

13 brief, the analysis of substitution effects in Dr. Rubinfeld's

14 November 2013 report is essentially the same as the analysis in

15 his earlier report.  See Docket No. 911, Mot. Leave File Mot.

16 Reconsid., at 2 (noting that "Rubinfeld reached the same

17 conclusion" in both of his expert reports regarding student-

18 athletes who left college early for the NBA).  It therefore does

19 not justify reconsideration of the prior order.

20      Further, even if Dr. Rubinfeld's latest report did contain

21 new information about the substitution effect among student-

22 athletes, it would still be insufficient to justify

23 reconsideration.  The substitution effect among Division I

24 student-athletes was only one of the barriers to class

25 manageability that the Court identified in the class certification

26 order.  Another barrier was the "related substitution effect among

27 Division I schools."  Nov. 8, 2013 Order at 19-20 (emphasis

28 added).  The Court specifically noted that, in Plaintiffs' but-for

scenario, "increased competition for student-athletes, combined
with the potentially higher costs of recruiting and retaining
those student-athletes, would have likely driven some schools into
less competitive divisions, thereby insulating entire teams from
the specific harms that Plaintiffs allege in this suit." Id. at
20.  Plaintiffs have not cited any new evidence to justify
reconsideration of this part of the Court's prior ruling.

    With respect to Plaintiffs' second ground for seeking
reconsideration -- a manifest failure to consider dispositive
legal arguments previously presented to the Court -- Plaintiffs
rely on two Seventh Circuit cases and one case decided by another
court in this district: Butler v. Sears, Roebuck & Co., 727 F.3d
796 (7th Cir. 2013); Messner v. Northshore Univ. HealthSystem, 669
F.3d 802 (7th Cir. 2012); and In re Cathode Ray Tube (CRT)
Antitrust Litig., MDL 1917, 2013 WL 5391159 (N.D. Cal.).  None of
these cases is binding on this Court.  Furthermore, Plaintiffs
only cited one of these cases, Messner, in their class
certification briefs.[17]  The Court considered Messner and concluded
that it was not analogous to this case.

    Plaintiffs' newly cited cases are, like Messner, inapposite.
These cases stand for the general proposition that class
certification should not be denied based on minor flaws in the
plaintiff's proposed methodology for calculating damages.  But
this principle has no bearing on the present case because

_____

    [17] What's more, Plaintiffs cited Messner without discussion in a
footnote listing other out-of-circuit precedents.  The other two cases
Plaintiffs cite here -- Butler and In re CRT Antitrust Litig. -- were
decided after class certification briefing was completed but Plaintiffs
did not submit a statement of recent decision concerning either of them.

45

1   Plaintiffs did not simply propose a flawed method for calculating

2   damages; rather, they failed to propose any method whatsoever for

3   dealing with problems -- namely, substitution effects -- which

4   their own expert identified in his report.  See Nov. 8, 2013 Order

5   at 19-20 ("Plaintiffs have not proposed any method for addressing

6   this substitution effect among individual student-athletes.  Nor

7   have they proposed any method for addressing the related

8   substitution effect among Division I schools.").  The cases

9   Plaintiffs cite do not provide any compelling reasons to

10   reconsider this aspect of the class certification order.

11        Finally, Plaintiffs argue that the Court failed to consider

12   certain material facts in issuing its class certification order.

13   In particular, they point to certain EA company documents which,

14   they contend, provide a means for determining on a class-wide

15   basis which student-athletes were actually depicted in EA's

16   videogames.  They assert that the Court overlooked this evidence

17   when it found that the discrepancy between the size of football

18   team rosters in EA's videogames and the size of actual Division I

19   football rosters posed a significant barrier to class

20   manageability.  See Class Cert. Order 21 ("[T]he number of

21   student-athletes depicted in NCAA-licensed videogames is

22   considerably smaller than the number of student-athletes who

23   actually played for a Division I football team during the class

24   period.  Plaintiffs have not offered a feasible method for

25   determining on a class-wide basis which student-athletes are

26   depicted in these videogames and which are not.").

27        The documents Plaintiffs have identified -- a collection of

28   unlabeled and undated spreadsheets listing the physical attributes

of certain football players -- do not solve the problem the Court

highlighted in its order.  See Docket No. 749, S. Gosselin Supp.

Decl., Ex. 4.  The spreadsheets contain the names of fewer than

forty student-athletes out of the many thousands who played

Division I football during the proposed class period; as such,

they cannot identify every class member depicted in the

videogames.  Furthermore, Plaintiffs have not presented any

evidence to suggest that EA actually used the names, images, and

likenesses of the student-athletes listed in the spreadsheets to

create the player avatars in its videogames.  Without this

evidence, the spreadsheets are not probative of anything.

Thus, because Plaintiffs have failed to identify any evidence

or case law that would justify reconsideration of the class

certification order, their motion must be denied.

CONCLUSION

For the reasons set forth above, Plaintiffs' motion for

summary judgment (Docket No. 898) is GRANTED in part and DENIED in

part and Defendant's cross-motion for summary judgment (Docket No.

933) is DENIED.  Plaintiffs are entitled to summary judgment that

the NCAA's fourth asserted justification for the challenged

restraint -- increased support for women's sports and less

prominent men's sports -- is not legitimately procompetitive.

Accordingly, the NCAA may not rely on this justification at trial.

Plaintiffs' motion to amend the class definition (Docket No.

998) is GRANTED.  The class definition is hereby amended to read

as follows:

> All current and former student-athletes
> residing in the United States who compete on,
> or competed on, an NCAA Division I (formerly

United States District Court
For the Northern District of California

known as "University Division" before 1973)
college or university men's basketball team or
on an NCAA Football Bowl Subdivision (formerly
known as Division I-A until 2006) men's
football team and whose images, likenesses
and/or names may be, or have been, included or
could have been included (by virtue of their
appearance in a team roster) in game footage
or in videogames licensed or sold by
Defendants, their co-conspirators, or their
licensees.

Plaintiffs' motion for leave to file a motion for partial
reconsideration (Docket No. 911) is DENIED.

A final pretrial conference will be held at 2:00 p.m. on May
28, 2014 and a jury trial will commence at 8:30 a.m. on June 9,
2014. In the joint pretrial statement, Plaintiffs must identify
which Antitrust Plaintiffs intend to proceed to trial on their
individual damages claims and which specific uses of their names,
images, and likenesses will serve as the basis for their damages
claims.

IT IS SO ORDERED.

Dated: 4/11/2014

CLAUDIA WILKEN
United States District Judge