*Filed Under Seal – Contains Information Subject to Protective Order*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

<table>
<tr>
<td>

KLEEN PRODUCTS LLC; R.P.R.
ENTERPRISES, INC.; MIGHTY PAC,
INC., FERRARO FOODS, INC.;
FERRARO FOODS OF NORTH
CAROLINA, LLC; DISTRIBUTORS
PACKAGING GROUP, LLC; RHE
HATCO, INC.; THULE, INC.; and
CHANDLER PACKAGING, INC,
individually and on behalf of all those
similarly situated,

       **Plaintiffs,**

    v.

PACKAGING CORPORATION OF
AMERICA; INTERNATIONAL PAPER;
CASCADES CANADA, INC.;
NORAMPAC HOLDINGS U.S. INC.;
WEYERHAEUSER COMPANY;
GEORGIA-PACIFIC LLC; TEMPLE-
INLAND INC.; TIN INC.; and
SMURFIT-STONE CONTAINER
CORPORATION

       **Defendants.**

</td>
<td>

Case No. 1:10-cv-05711


<u>CLASS ACTION</u>


Hon. Harry D. Leinenweber

</td>
</tr>
</table>

## DEFENDANT GEORGIA-PACIFIC LLC'S
## ANSWER AND AFFIRMATIVE DEFENSES TO THE
## <u>SECOND CONSOLIDATED AND AMENDED COMPLAINT</u>

Defendant Georgia-Pacific LLC ("GPLLC") hereby answers as set forth below the

Consolidated and Amended Complaint filed by Plaintiffs[†] on November 8, 2010 ("Complaint"),

---

[†]    As used herein, the term "Plaintiffs" refers to Kleen Products LLC; R.P.R. Enterprises, Inc.; Mighty Pac, Inc.; Ferraro Foods, Inc.; Ferraro Foods of North Carolina, LLC; Distributors Packaging Group, LLC; RHE Hatco, Inc.; and Chandler Packaging Group, Inc.  While originally included in the Complaint, Thule, Inc. filed for voluntarily dismissal on April 5, 2011, which the Court granted on April 8, 2011.  *See* Docket Nos. 190, 192.

along with the Amendments to Plaintiffs' Consolidated and Amended Complaint filed on June 3,

2014 (Docket No. 648) (together with the Complaint, the "Second CAC"). GPLLC denies the

allegations in the Complaint except as specifically admitted, denies any allegations as to which

there is no specific response, denies all titles, headings, footnotes, subheadings, and any other

material not contained in numbered paragraphs, and denies that it violated the antitrust laws in

any way.

1.      This case is an antitrust class action brought to recover for the injuries sustained by Plaintiffs and the members of the Plaintiff Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure. The Plaintiff Class, defined more fully below in Paragraph 28, consists of all persons and entities that purchased Containerboard Products directly from Defendants between February 15, 2004 and November 8, 2010 (the "Class Period").

**ANSWER:** GPLLC admits that Plaintiffs purport to bring an action as described in

Paragraph 1, but denies that it engaged in any violations of law. GPLLC admits that Plaintiffs

purport to bring this action as a class action, but denies that a class should be certified.

2.      Containerboard, which includes both linerboard and corrugating medium, is the principal raw material used to manufacture corrugated products such as boxes and other types of corrugated containers. Linerboard is used as the facing to which corrugating medium is fluted and laminated to produce sheets. The containerboard sheets are subsequently printed, cut, folded and glued to produce corrugated products. As used herein, "Containerboard Products" includes linerboard, corrugated medium, corrugated sheets and corrugated products, including boxes and other containers. Defendants are integrated producers of the Containerboard Products sold to the Plaintiff Class.

**ANSWER:** GPLLC admits that containerboard is used to manufacture certain

corrugated containerboard products, and that linerboard and corrugated medium are components

of containerboard. GPLLC admits that Plaintiffs purport to define "Containerboard Products."

As to the last sentence of Paragraph 2, GPLLC denies that it produced or sold linerboard,

corrugated medium, containerboard, or corrugated products during the period from February

2004 through November 8, 2010, but admits that separate legal entities in the GP family have

produced or sold those products.‡  GPLLC is without knowledge or information sufficient to

form a belief as to whether any other Defendant produced or sold any linerboard, corrugated

medium, containerboard, or corrugated products to any Plaintiff during the period from February

2004 through November 8, 2010.

      3.     Various Containerboard Products manufacturers, including multiple Defendants
herein and their predecessors, have been subject to governmental investigations and civil
lawsuits concerning their engagement in anticompetitive conduct over the past two decades.  The
Containerboard Products industry is highly susceptible to collusive behavior and anticompetitive
conduct due to a small number of manufacturers, inelastic product demand, the commodity-like
nature of the products, and an inability of any single manufacturer to unilaterally control supply
and price.

    **ANSWER:**  GPLLC admits that civil plaintiffs have in the past alleged that at least some

linerboard, corrugated medium, containerboard, or corrugated products manufacturers and their

predecessors engaged in anticompetitive conduct, and that some of the alleged conduct has also

been the target of government investigations.  GPLLC further states that neither it, nor any GP

entity, has ever admitted guilt or been found guilty by a judge or jury for a violation of the

antitrust laws over the past two decades.  GPLLC denies the remaining allegations of

Paragraph 3.

      4.     The consolidation of the containerboard industry has further concentrated the
industry and exacerbated the conditions that led to the anticompetitive conduct at issue in this
complaint.

    **ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding the "industry."  Insofar as the allegations are directed at

GPLLC, GPLLC denies the allegations of Paragraph 4.

---

‡ In connection with the submission of its original Answer, GPLLC advised Plaintiffs'
counsel that GPLLC is a holding company separate from the GP operating businesses that
actually produce or sell linerboard, corrugated medium, containerboard, or corrugated products.
GPLLC is prepared to make appropriate arrangements with Plaintiffs' counsel for the
substitution of these GP operating entities as defendants.

5.     Defendants employ various acts and practices to facilitate the combination or conspiracy alleged herein.  Defendants' opportunities and ability to engage in anticompetitive practices are also fostered through the frequent meetings and events held by industry trade organizations led by officers and/or board members who simultaneously serve as the Defendants' employees.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at

GPLLC, GPLLC denies the allegations of Paragraph 5.

6.     Beginning in or about 2004, the Containerboard Products industry was faced with decreasing profit margins, rising product demand, and a promising macroeconomic outlook.  Nevertheless, Defendants began a coordinated across-the-board imposition of capacity restraints, leading to a subsequent restriction in the supply of Containerboard Products on the market.  The goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the Class Period.  Defendants' conspiracy included a scheme to impose capacity and supply constraints which had the effect of creating an artificial shortage of Containerboard Products in the United States during a time of stable or increasing demand, thereby allowing Defendants to charge supra-competitive prices to the Plaintiff Class.  As detailed below, the conspiracy was effected, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in massive and unprecedented idling of production capacity, reduced production and near simultaneous across-the-board price increases.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding the "industry" or other Defendants.  Insofar as the allegations

are directed at GPLLC, GPLLC denies the allegations of Paragraph 6.

7.     Defendants' anticompetitive conduct cannot be explained away as independent parallel behavior.  As multiple Defendants confirm in their own quarterly reports, market demand for Containerboard Products remained stable or was expected to increase during the period of coordinated production capacity restriction.  Similarly, no significant lasting changes in production costs account for the Defendants' repeated price increases. In fact, during the Class Period, price increases outpaced cost increases by over fifty percent (50%).  Although basic economics holds that manufacturers in a competitive market faced with similar demand conditions as evidenced here would be expected to increase production to satisfy market demand and gain market share, each Defendant refrained.  In sum, Defendants' conduct, individually and collectively, evidences a restriction of freedom and sense of obligation associated with an agreement.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies the allegations of Paragraph 7.

8.     The market impacts of Defendants' scheme on the Plaintiff Class have been, and continue to be, substantial. As a result of Defendants' market domination and their coordinated restriction of production and operations capacity, direct purchasers of Containerboard Products were forced to pay substantially higher prices during the conspiracy period than they would have paid in a competitive market.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding "the Plaintiff Class," "direct purchasers" of linerboard,

corrugated medium, containerboard, or corrugated products, or other Defendants. Insofar as the

allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 8.

9.     Giving a voice to those impacted by Defendants' coordinated actions, on July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "*3rd Containerboard Increase puts the Integrity of Our Industry on the Line.*" The article notes that in light of the manufacturing capacity cuts, as well as the absence of cost drivers, yet another price increase, the third for 2010, beyond already historic highs "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies" and noted the similarity of the present situation to "the years 1994-1995, [when] six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak" which resulted in allegations of collusion, government investigations, a consent decree and over $200 million paid in settlements.

**ANSWER:** GPLLC admits that the text quoted in Paragraph 9 appears in the cited

statement by the Association of Independent Corrugated Converters ("AICC"). GPLLC lacks

knowledge or information sufficient to form a belief as to the truth of the allegations regarding

other Defendants, the "industry," or "major players." Insofar as the allegations are directed at

GPLLC, GPLLC denies the remaining allegations of Paragraph 9.

## JURISDICTION AND VENUE

10.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Plaintiff

Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.

**ANSWER:** GPLLC admits that Plaintiffs purport to bring an action as described in Paragraph 10. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants or Plaintiffs. Insofar as the allegations are directed at GPLLC, GPLLC denies that it engaged in any violations of law and denies the remaining allegations of Paragraph 10.

11.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

**ANSWER:** GPLLC admits that this Court has jurisdiction as described in Paragraph 11 to the extent that the Complaint alleges injuries arising from purchases of products sold in the United States, and to the extent the purported class members have not entered into supply and sales agreements with one or more of the Defendants that contain mandatory arbitration clauses. GPLLC denies the remaining allegations of Paragraph 11.

12.    Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC admits that venue is proper in this District as described in Paragraph 12 to the extent that the Complaint alleges injuries arising from purchases of products sold in the United States, and to the extent that purported class members have not entered into supply and sales agreements with one or more of the Defendants that contain forum-selection clauses mandating that claims be adjudicated in a forum other than this court. GPLLC denies the remaining allegations of Paragraph 12.

13.    The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at GPLLC, GPLLC denies that it produced or sold linerboard, corrugated medium, containerboard, or corrugated products during the period from February 2004 through November 8, 2010, but admits that separate legal entities in the GP family have produced or sold those products. GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 13.

## PARTIES

14.    During the Class Period, each of the Plaintiffs purchased Containerboard Products directly from one or more of the Defendants and thereby suffered injury to their business or property:

a.    Plaintiff Kleen Products LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Minnetonka, Minnesota;

b.    Plaintiff R.P.R. Enterprises, Inc. is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in Kansas City, Missouri;

c.    Plaintiff Mighty Pac, Inc. is a corporation organized and existing under the laws of the State of an Illinois, with its principal place of business in Palatine, Illinois;

d.    Plaintiff Ferraro Foods, Inc. is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Piscataway, New Jersey;

e.    Plaintiff Ferraro Foods of North Carolina, LLC is a limited liability company organized and existing under the laws of the State of North Carolina, with its principal place of business in High Point, North Carolina;

f.    Plaintiff Distributors Packaging Group LLC is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business in Carrollton, Texas;

g.     Plaintiff Thule, Inc. is a corporation organized and existing under the laws of the State of Connecticut with its principal pace of business in Seymour, Connecticut;

h.     Plaintiff RHE Hatco, Inc. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Garland, Texas; and,

i.     Plaintiff Chandler Packaging, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Diego, California.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14 to the extent they are directed at other Defendants or relate to the corporate background of Plaintiffs.  GPLLC denies that it sold linerboard, corrugated medium, containerboard, or corrugated products directly to any Plaintiffs during the period from February 2004 through November 8, 2010.  GPLLC denies the remaining allegations of Paragraph 14.

15.     Defendant Packaging Corporation of America ("PCA") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. During the Class Period, PCA and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

**ANSWER:**  As to the first sentence of Paragraph 15, GPLLC admits that Plaintiffs purport to define "PCA."  As to the second sentence of Paragraph 15, on information and belief, GPLLC admits that PCA or entities affiliated with it sold linerboard, corrugated medium, containerboard, or corrugated products during the period from February 2004 through November 8, 2010.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 15.

16.     Defendant International Paper ("International Paper") is a New York corporation with its principal place of business in Memphis, Tennessee. During the Class Period, International Paper and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

**ANSWER:**  As to the first sentence of Paragraph 16, GPLLC admits that Plaintiffs purport to define "International Paper."  As to the second sentence of Paragraph 16, on

8

information and belief, GPLLC admits that International Paper or entities affiliated with it sold

linerboard, corrugated medium, containerboard, or corrugated products during the period from

February 2004 through November 8, 2010. GPLLC lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations of Paragraph 16.

17.     Defendant Norampac U.S. Holdings Inc. ("Norampac") is a Canadian corporation
with its principal place of business in Saint-Bruno, Quebec, Canada. Norampac Inc. was formed
in 1997 as a joint venture by Cascades Inc. ("Cascades Inc.") and Domtar Corporation and
became a wholly-owned and controlled subsidiary division of Cascades Inc. and/or Cascades
Canada Inc. in December 2006. Norampac Holdings US Inc. is a Delaware corporation with
residency in Delaware. Norampac Industries Inc. is a New York Corporation with a place of
business in Niagara Falls, New York and which lists it Principal Executive Office as "c/o
Cascades Inc." in Montreal, Quebec, Canada. These and other businesses engaged in the
Containerboard Products business using the Norampac name, as detailed below, and are
collectively referred to hereafter as "Norampac". During the Class Period, Norampac and/or its
predecessors, wholly-owned or controlled subsidiaries or affiliates, including by and through its
corporate parent, Cascades Canada, Inc., sold Containerboard Products in interstate commerce
directly to purchasers in the United States. Norampac's (and Cascades Canada, Inc.) subsidiaries
and divisions in Canada serviced customers in the United States by selling Containerboard
Products directly to them as alleged above. Norampac's subsidiaries and divisions located in the
United States including Norampac Industries, Inc. Lancaster Division in Lancaster, New York
(corrugated packaging containers) and Niagara Falls Division in Niagara Falls, New York
(corrugated medium); Norampac New England, Inc., Thompson Division in Thompson,
Connecticut (corrugated packaging containers) and Leominster Division in Leominster,
Massachusetts (corrugated products) Norampac New York City Inc., Maspeth, New York
(corrugated products) and Norampac Schenectady Inc. (corrugated packaging) also sold
Containerboard Products in interstate commerce directly to purchasers in the United States.

**ANSWER:** As to the first, second, third, fourth, and fifth sentences of Paragraph 17,

GPLLC admits that Plaintiffs purport to define "Norampac." As to the remaining sentences of

Paragraph 17, on information and belief, GPLLC admits that Norampac or entities affiliated with

it sold linerboard, corrugated medium, containerboard, or corrugated products during the period

from February 2004 through November 8, 2010. GPLLC lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of Paragraph 17.

18.     Defendant Cascades Canada Inc. ("Cascades") is a Canadian corporation with its
principal place of business in Kingsley Falls, Quebec, Canada. Cascades describes Norampac as
both a subsidiary and a division of Cascades and represents that its Containerboard Group
conducts business under the name Norampac. Plaintiffs are informed and believe that Cascades

uses the Norampac name or brand in connection with certain of its Containerboard Products businesses that are not owned, directly or indirectly, by Norampac. During the Class Period, Cascades and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including, but not limited to Defendant Norampac, sold Containerboard Products in interstate commerce directly to purchasers in the United States.

**ANSWER:** As to the first sentence of Paragraph 18, GPLLC admits that Plaintiffs

purport to define "Cascades." As to the remaining sentences of Paragraph 18, on information

and belief, GPLLC admits that Cascades or entities affiliated with it sold linerboard, corrugated

medium, containerboard, or corrugated products during the period from February 2004 through

November 8, 2010. GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 18.

19.    Defendant Weyerhaeuser Company ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington. During the Class Period, Weyerhaeuser and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

**ANSWER:** As to the first sentence of Paragraph 19, GPLLC admits that Plaintiffs

purport to define "Weyerhaeuser." As to the second sentence of Paragraph 19, on information

and belief, GPLLC admits that Weyerhaeuser or entities affiliated with it sold linerboard,

corrugated medium, containerboard, or corrugated products during the period from February

2004 through the date of International Paper's acquisition of Weyerhaeuser's packaging

business. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations of Paragraph 19.

20.    Defendant Georgia-Pacific LLC ("Georgia-Pacific") is a Georgia corporation with its principal place of business in Atlanta, Georgia. During the Class Period, Georgia-Pacific and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

**ANSWER:** As to the first sentence of Paragraph 20, GPLLC admits that Plaintiffs

purport to define "GP," denies that it is a Georgia corporation, and admits that its principal place

of business is in Atlanta, Georgia.  As to the second sentence of Paragraph 20, GPLLC denies

that it sold linerboard, corrugated medium, containerboard, or corrugated products in the United

States during the period from February 2004 through November 8, 2010, but admits that separate

legal entities in the GP family have sold those products.

21.    Defendant Temple-Inland, Inc. ("Temple-Inland") is a Delaware corporation with
its principal place of business at Austin, Texas.  During the Class Period, Temple-Inland and/or
its predecessors, wholly-owned or controlled subsidiaries or affiliates, including Defendant TIN,
Inc. sold Containerboard Products in interstate commerce directly to purchasers in the United
States (Defendant Temple-Inland, Inc. and Defendant TIN, Inc. are collectively referred to
hereafter as "Temple-Inland").

**ANSWER:**  As to the first sentence of Paragraph 21, GPLLC admits that Plaintiffs

purport to define "Temple-Inland."  As to the second sentence of Paragraph 21, on information

and belief, GPLLC admits that Temple-Inland or entities affiliated with it sold linerboard,

corrugated medium, containerboard, or corrugated products during the period from February

2004 through November 8, 2010.  GPLLC lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations of Paragraph 21.

22.    Defendant Smurfit-Stone Container Corporation ("Smurfit-Stone") is a Delaware
corporation with its principal place of business at Chicago, Illinois.  During the Class Period,
Smurfit-Stone and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold
Containerboard Products in interstate commerce directly to purchasers in the United States. On
or about January 26, 2009, Smurfit-Stone filed a voluntary Chapter 11 petition in the United
States Bankruptcy Court for the District of Delaware; effective June 30, 2010, Smurfit-Stone was
discharged under a plan of reorganization.  However, many of Smurfit-Stone's most senior
executives, including those with responsibility for Containerboard Products, continued with the
company substantially throughout the conspiracy alleged herein, including through the inception
of bankruptcy proceedings and after the discharge became effective, such as Patrick J. Moore,
Chief Executive Officer and John Knudsen, Senior Vice President.  After its discharge for
bankruptcy, Smurfit-Stone knowingly and intentionally joined the conspiracy.  This complaint
seeks to recover damages from Smurfit-Stone for post-discharge conduct only, and in no way
seeks to violate any Orders of the above-referenced Bankruptcy Court.  Specific post-discharge
actions by Smurfit-Stone in furtherance of the conspiracy as alleged, *inter alia*, in paragraphs
168-172 and 174-178 are consistent with the actions taken by all of the Defendants throughout
the Class Period and that it is part of the ongoing antitrust conspiracy to and including the date of
the filing of this complaint.  [Plaintiff Thule, Inc. alleges that Smurfit-Stone participated as co-
conspirator with the other Defendants and has performed acts and made statements in

furtherance of the conspiracy, however, does not join in the allegations naming Smurfit-Stone as a Defendant.]

**ANSWER:**  As to the first sentence of Paragraph 22, GPLLC admits that Plaintiffs purport to define "Smurfit-Stone."  As to the second sentence of Paragraph 22, on information and belief, GPLLC admits that Smurfit-Stone or entities affiliated with it sold linerboard, corrugated medium, containerboard, or corrugated products during the period from February 2004 through the date of its acquisition by Rock-Tenn Company.  As to the bracketed allegation, Thule, Inc. is no longer a plaintiff in this action and, therefore, no response is required.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 22.

23.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Containerboard Products manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold Containerboard Products in interstate commerce directly to purchasers in the United States during the Class Period.

**ANSWER:**  GPLLC admits that Plaintiffs purport to define "Defendant" or "Defendants."  As set forth above, GPLLC's Answer is solely on behalf of Georgia-Pacific LLC. GPLLC denies the remaining allegations of Paragraph 23.

24.     To the extent that subsidiaries and divisions within Defendants' corporate families sold or distributed Containerboard Products to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this complaint because Defendants wished to ensure that the prices paid for such Containerboard Products would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein.  Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing and collecting monies from Plaintiffs and the members of the Plaintiff Class for Containerboard Products was known to and approved by their respective corporate parent named as a Defendant in this complaint.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy, denies the allegations of Paragraph

24, and further states that its Answer is solely on behalf of Georgia-Pacific LLC.

## CO-CONSPIRATORS

25.     Various other persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants or other "persons, firms and corporations."

Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any

conspiracy and denies the allegations of Paragraph 25.

26.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

**ANSWER:**  GPLLC admits that Plaintiffs purport to define an "act of any corporation,"

and further states that its Answer is solely on behalf of Georgia-Pacific LLC.  GPLLC denies the

remaining allegations of Paragraph 26.

27.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at

GPLLC, GPLLC denies the allegations of Paragraph 27.

## CLASS ACTION ALLEGATIONS

28.     Each Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010.

Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

**ANSWER:** GPLLC admits that Plaintiffs purport to bring this suit as a class action, but denies that class certification is appropriate or that the class as stated in Paragraph 28 is properly defined. GPLLC denies the remaining allegations of Paragraph 28.

29.     Class Identity:  The Plaintiff Class is readily identifiable and is one for which records should exist.

**ANSWER:** GPLLC denies the allegations of Paragraph 29.

30.     Numerosity:  Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members as above described, the exact number and their identities being known to Defendants and their co-conspirators.

**ANSWER:** GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 30.

31.     Typicality:  Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because each Plaintiff purchased Containerboard Products directly from one or more of the Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

**ANSWER:** GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 31.

32.     Common Questions Predominate:  There are questions of law and fact common to the Class, including, but not limited to:

a.      Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Containerboard Products sold in interstate commerce in the United States;

     b.      The identity of the participants of the alleged conspiracy;

     c.      The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

     d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

     e.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Plaintiff Class;

     f.      The effect of Defendants' alleged conspiracy on the prices of Containerboard Products sold in the United States during the Class Period; and,

     g.      The appropriate class-wide measure of damages.

**ANSWER:**  GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 32.

33.     These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

**ANSWER:**  GPLLC denies the allegations of Paragraph 33.

34.     Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

**ANSWER:**  GPLLC denies the allegations of Paragraph 34.

35.     Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

**ANSWER:**  GPLLC denies the allegations of Paragraph 35.

## TRADE AND COMMERCE

### Containerboard Products

36.     Containerboard is the principal raw material used to manufacture corrugated products.  Containerboard includes both corrugating medium and linerboard.  Linerboard is a flat wood-fiber paperboard. Corrugated medium is a type of fluted paperboard made from the same material as linerboard.  Linerboard is used as the inner and outer facings, or liners, of corrugated products.  Corrugating medium is fluted and laminated to linerboard in corrugator plants to produce corrugated sheets.  The sheets are subsequently printed, cut, folded and glued to produce corrugated products, mostly boxes and other containers.  As used herein, "Containerboard Products" includes linerboard, corrugated medium, corrugated sheets and corrugated products including corrugated boxes and other corrugated containers.

**ANSWER:**  GPLLC admits that containerboard is used to manufacture corrugated

products, admits that linerboard and corrugating medium are components of containerboard,

admits that wood-fiber, along with other materials, can be used to make linerboard, admits that

corrugating medium is fluted and can be laminated to linerboard to produce corrugated sheets,

and admits that containerboard sheets can be printed, cut, folded, and glued to produce

corrugated products.  GPLLC admits that Plaintiffs purport to define "Containerboard Products."

GPLLC denies the remaining allegations of Paragraph 36.

37.     Defendants and their co-conspirators manufacture and sell linerboard, corrugated medium, containerboard and corrugated boxes and other corrugated containers.

**ANSWER:**  On information and belief, GPLLC admits that other Defendants or entities

affiliated with them sold at least some linerboard, corrugated medium, containerboard, or

corrugated products during the period from February 2004 through November 8, 2010.  GPLLC

denies that it produced or sold linerboard, corrugated medium, containerboard, or corrugated

products during the period from February 2004 through November 8, 2010, but admits that

separate legal entities in the GP family have produced or sold those products.  GPLLC denies

that it was part of any conspiracy.  GPLLC lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations of Paragraph 37.

38.     Containerboard Products is a multi-billion dollar industry.  During the relevant time period, annual sales of Containerboard Products were in the tens of billions of dollars.

**ANSWER:**  GPLLC admits that tens of billions of dollars of containerboard and

products made from containerboard were sold each year from February 2004 through November

8, 2010.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 38.

39.     The containerboard industry is heavily concentrated. As of 2010, Defendants had a combined share of approximately 83% of the containerboard market, controlling nearly thirty million tons of annual production.  Collectively, Defendants and their co-conspirators control an even greater proportion of the supply of Containerboard Products in the market.

**ANSWER:**  GPLLC denies that it was part of any conspiracy.  GPLLC lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

39.

40.     The price of corrugated medium is tied to the price of linerboard.  As a result, the price of containerboard is directly tied to the price of corrugated medium and linerboard. Likewise, because containerboard is used in the manufacture of corrugated containers, a rise in the price of containerboard results in a similar rise in the price of corrugated containers. Collectively, Defendants and their co-conspirators utilize most of the linerboard and medium they manufacture to produce containerboard and corrugated containers that they sell to the Plaintiff Class.  In some instances, Defendants sell the manufactured linerboard and corrugated medium to other Defendants or independent converters who in turn produce containerboard sheets and corrugated products.  Corrugated products are generally viewed as interchangeable commodities because most manufacturers are able to supply the product needs of most customers.

**ANSWER:**  GPLLC denies the first, second, third, and last sentences of Paragraph 40.

GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the

allegations regarding other Defendants.  Insofar as the allegations are directed at GPLLC,

GPLLC denies that it produced or sold linerboard, corrugated medium, containerboard, or

corrugated products during the period from February 2004 through November 8, 2010, but

admits that separate legal entities in the GP family have produced or sold those products.

GPLLC denies that it was part of any conspiracy and denies the remaining allegations of

Paragraph 40.

### The Structure of the Containerboard Products Industry

41.    Economists Haizheng Li and Jifeng Luo (hereinafter "Li and Luo") of the Georgia Institute of Technology have thoroughly examined the containerboard industry and concluded that the characteristics of the containerboard industry make it highly susceptible to horizontal price-fixing and output restrictions:

> The linerboard industry is very capital intensive and thus entry is restricted because of the large amount of capital and the long-term nature of investment... Firms may have similar cost curves if the equipment used is similar. Additionally, the demand for containerboard is relatively inelastic because of no major substitutes. Therefore, the US linerboard industry may have a certain degree of oligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.[1]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 41 appears in the cited

article authored by Haizheng Li and Jifeng Luo.  GPLLC denies that the cited article drew the

conclusion alleged in the first sentence of Paragraph 41.  GPLLC lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

41.

42.    Antitrust law and economics have identified several factors which make markets susceptible to price-fixing. Those factors include: relatively few firms with a large share of the market; high barriers to entry into the market; lack of close substitutes/commodity nature of the good; inelastic demand; and inability of any single firm to control supply and price unilaterally. The Containerboard Products industry demonstrates all of these factors.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the first and second sentences of Paragraph 42.  GPLLC denies the remaining allegations

of Paragraph 42.

43.    Relatively Few Firms:  Historically, Containerboard Products has been considered a concentrated industry.  In the last decade, however, a series of mergers and acquisitions have

---

[1]    Li, Haizheng and Jifeng Luo, *Industry consolidation and price in the US linerboard industry*, Journal of Forest Economics 14 (2008) at 98.

led to a significant increase in market concentration.  In 1995, the top five firms controlled approximately 42% of the containerboard market and the top 10 firms had a combined 66% market share.  During the relevant time period of this complaint, the containerboard industry endured considerable consolidation resulting in the top five firms controlling approximately 72.5%, of the containerboard market while the Defendants' combined share reached approximately 83%.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 43.

44.    The consolidation of the Containerboard Products industry involving Defendants and their co-conspirators both during the Class Period and immediately preceding it has been substantial.  The following are examples of transactions that lead to such concentration:

a.    In 1999, PCA acquired the containerboard and corrugated packaging products business of Pactiv Corporation, formerly known as Tenneco Packaging;

b.    In 2001, Temple-Inland acquired the corrugated packaging operations of Chesapeake Corporation and Elgin Corrugated Box Company and ComPro Packaging LLC;

c.    In 2002, Weyerhaeuser acquired Williamette Industries, including its Containerboard Products businesses

d.    In 2002 Temple-Inland acquired Gaylord Container Corporation;

e.    In September 2002, Smurfit-Stone purchased the Stevenson Mill containerboard mill and the related corrugated container assets;

f.    In March 2003, Smurfit-Stone acquired complete control of Smurfit-MBI which operated 15 corrugated container plants in Canada;

g.    In February 2004, PCA purchased Acorn Corrugated Box Co.;

h.    In March 2004, Georgia-Pacific bought the assets of Temple-Inland's corrugated box plants;

i.    In July 2004, International Paper acquired Box USA ;

j.    In April 2005, PCA acquired Midland Container Corp.;

k.    In September 2005, the Jefferson Smurfit Group merged with Kappa Packaging;

l.    In October 2005, Norampac acquired three Standard Paper box plants;

m.    In December 2005, privately-held Koch Industries, Inc., purchased Georgia-Pacific for $21 billion;

n.    In April 2006, Georgia-Pacific acquired Smurfit-Stone's Brewton, Alabama linerboard mill;

o.    In March 2008, International Paper announced its acquisition of Weyerhaeuser's Packaging Business for $6 billion;

p.    In April 2008, Smurfit-Stone acquired Calpine Corrugated LLC; and,

q.    In 2008 Temple-Inland acquired a 50% interest in PBL, a joint venture that manufactures containerboard.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 44 and, to the extent they concern other Defendants, the truth of the allegations in the second sentence of Paragraph 44. Insofar as the allegations in the second sentence of Paragraph 44 are directed at GPLLC, GPLLC denies the allegations. As to sub-paragraph (h), GPLLC admits that in March 2004, Georgia-Pacific Corporation purchased two box plants from Temple-Inland. As to sub-paragraph (m), GPLLC admits that in December 2005, Koch Industries, Inc. acquired Georgia-Pacific Corporation, but states that the allegations do not set forth the complete terms of that transaction. As to sub-paragraph (n), GPLLC denies that it acquired Smurfit Stone's Brewton, Alabama mill, admits that another GP entity did acquire that mill, but states that the acquisition was completed in September 2007. GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 44.

45.    In 2009, Temple-Inland presented the following graphic illustration of the changes brought about by the consolidation of the Containerboard Products industry:



**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 45.

46.    <u>Barriers to Entry</u>:  There are two significant barriers to entry to the
Containerboard Products industry:  1) capital-intensive start-up costs; and 2) high transportation
costs.  The equipment used to manufacture Containerboard Products is both highly specialized
and very expensive.  Li and Luo conclude that the "linerboard industry is very capital intensive...
entry is restricted because of the large amount of capital and the long-term nature of investment."
Another industry report affirmed that "the industry is capital-intensive."[2]  Consequently, large
capital investments prohibit new entrants.  At a 2005 industry trade conference attended by
Defendants' officers, employees or representatives, presenter Deloitte Development LLC
instructed the audience not to overestimate "the threat of new entrants into the market,"
indicating that entry into the containerboard market was highly unlikely.[3]

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in the first two sentences of Paragraph 46.  GPLLC admits that the text

---

[2]    Hoover's Industry Profile: Paper Products Manufacture.

[3]    Sinoway, Mike, "Pricing Opportunities in the Forest Products Industry," June 28,
2005, Deloitte Development LLC.

quoted in the third sentence of Paragraph 46 appears in the document cited in footnote 1, an

article authored by Haizheng Li and Jifeng Luo.  GPLLC admits that the text quoted in the fourth

sentence of Paragraph 46 appears in the cited Hoover's Industry Profile report, but notes that the

quotation describes "[t]he United States paper products manufacturing industry."  GPLLC admits

that the text quoted in the last sentence of Paragraph 46 appears in the cited Deloitte

Development LLC report.  As to the last sentence, to the extent Plaintiffs are referring to the

June 2005 Paper Industry Management Association ("PIMA") 2005 Leadership Conference in

Nashville, Tennessee, GPLLC admits that employees of Georgia-Pacific Corporation attended

PIMA meetings in the 2005 timeframe, but lacks knowledge or information sufficient to form a

belief as to the truth of the specific meeting referenced in Paragraph 46.  GPLLC lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of Paragraph 46.

47.    <u>Manufacturers Have Similar Costs</u>:  Defendants and their co-conspirators share
relatively similar costs.  The technology and process of containerboard manufacturing are well
known and Defendants and their co-conspirators employ the same types of equipment and
processes in the production process.

**ANSWER:**  GPLLC denies that it was part of any conspiracy.  GPLLC lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

47.

48.    Moreover, the fewer the number of firms in an industry, the more similar costs
become for the remaining firms.  Accordingly, the recent consolidation of the Containerboard
Products industry has in turn driven Defendants' costs to be even more similar.  Further, paper
manufacturing has relatively few economies of scale.  Industry reports state that "Large and
small producers operate the same kinds of plants –large producers just have more of them."[4]  The
combination of these industry facts – consolidation, similar plants, and technology – indicates
that the Defendants have very similar cost structures.

---

[4]  See PCA Form 10-K, filed February 20, 2008 at p.11.

**ANSWER:** GPLLC denies that the text quoted in the fourth sentence of Paragraph 48 appears in the cited PCA 10-K, though it does appear in the Hoover's Industry Profile report cited in footnote 5. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 48.

49.    Because Containerboard Products are bulky and cumbersome to transport, long-distance shipping is expensive. Consequently, there are geographic entry barriers to the Containerboard Products industry as well. One industry report stated that "[t]he effective sales area for corrugated boxes, for example, is only about 150 miles from the production plant."[5] High start-up costs and shipping costs make entry into the containerboard market very difficult.

**ANSWER:** GPLLC admits that the text quoted in the third sentence of Paragraph 49 appears in the cited Hoover's Industry Profile report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 49.

50.    No Close Substitutes/Commodity Nature of the Products: Containerboard Products do not have close substitutes in the market. The closest substitutes for corrugated containers are plastic containers, which comprise a very small portion of the container or packaging market. Likewise, containerboard and corrugated packaging are commodities because containerboard and corrugated containers made by any one of the Defendants are interchangeable with that of any of the other Defendants. In its 2007 10-K filing, PCA acknowledged this fact, noting "[c]ontainerboard is generally considered a commodity-type product and can be purchased from numerous suppliers."[6]

**ANSWER:** GPLLC admits that the text quoted in the last sentence of Paragraph 50 appears in the cited PCA 10-K. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 50.

51.    Inelastic Demand: The demand for Containerboard Products is very inelastic. Li and Luo estimated the price elasticity of demand for linerboard to be 0.18. This means that a one percent increase in linerboard price would result in just a 0.18% decrease in the quantity demanded. When elasticity is this low, concerted price increases are likely to be profitable and

---

[5]    Hoover's Industry Profile: Paper Products Manufacture; see also, PCA Form 10-K, filed February 20, 2008, at p. 11, noting, "[c]orrugated producers generally sell within a 150-mile radius of their plants."

[6]    See PCA Form 10-K, filed February 20, 2008, at p. 11.

sustainable since purchasers will continue to buy nearly the same quantity of containerboard despite price increases.[7]

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 51.

52.    <u>No Firm With Sufficient Unilateral Market Power</u>:  While the Defendants and their co-conspirators collectively comprise approximately 83% of the containerboard market, no single firm has sufficient market power to unilaterally control supply and price.  For example, PCA's 10-K for the year ending December 31, 2006, states that "PKG [stock symbol for PCA] operates in an industry that is highly competitive, with no single containerboard or corrugated packaging producer having a dominant position."  Similarly, Temple-Inland's 10-K for the year ending December 31, 2006, states "[g]iven the commodity nature of our manufactured products, we have little control over market pricing or market demand.  No single company is dominant in any of our industries."[8]  As a result, when single manufacturers have attempted to raise prices without the agreement of other firms, customers are able to resist the unilateral price increase by turning to other manufacturers.

**ANSWER:**  GPLLC admits that, with the exception of the bracketed text, the text quoted

in the second sentence of Paragraph 52 appears in the cited PCA 10-K and that the text quoted in

the third sentence of Paragraph 52 appears in the cited Temple-Inland 10-K.  GPLLC denies that

it was part of any conspiracy.  GPLLC lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations of Paragraph 52.

**Industry and Trade Association Membership**

53.    The Fibre Box Association ("FBA") is a Containerboard Products trade organization.  Its members include Defendants PCA, International Paper, Norampac, Georgia-Pacific, Temple-Inland and Smurfit-Stone.  According to its 2007 tax records, Thomas A. Hassfurther, PCA's current Executive Vice President, served as FBA's 1st Vice Chairman, and its board of directors includes representatives from Temple-Inland, Georgia-Pacific, International Paper, Weyerhaeuser, and Smurfit-Stone.  The FBA holds at least three meetings each year where executives and other representatives of the Defendants and their co-conspirators have an opportunity to meet and talk with one another, including communicating about supply and prices.  Further, the FBA holds dozens of networking events each year which give the Defendants and their co-conspirators additional opportunities to communicate with one another.  Further, the FBA publishes a set of antitrust guidelines that it distributes to its members.  Notably

---

[7]  See N. Gregory Mankiw, PRINCIPLES OF ECONOMICS (5th ed. 2009), at p. 94.

[8]  See Temple-Inland Form 10-K, filed February 23, 2007, at p. 10.

absent from these guidelines are prohibitions on communicating or agreeing with other containerboard product manufacturers concerning output, supply or capacity decisions.

**ANSWER:** GPLLC admits that the Fibre Box Association ("FBA") is a non-profit organization representing corrugated manufacturers and that it meets periodically. GPLLC admits that GP, PCA, International Paper, Norampac, Temple-Inland, and Smurfit-Stone are among the many members of the FBA. As to the sixth sentence of Paragraph 53, GPLLC admits that the FBA publishes a set of antitrust guidelines. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 53.

54. The American Forest & Paper Association ("AF&PA") is a trade organization representing forest and building product industries as well as pulp, paper and paperboard manufacturers. Its members include PCA, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland and Smurfit-Stone. During the Class Period, its officers have included James Hannan, President and CEO of Georgia-Pacific and John Faraci, Chairman and CEO of International Paper and its board of directors has included Daniel S. Fulton, President & CEO of Weyerhaeuser, Patrick J. Moore, Chairman & CEO of Smurfit-Stone, Doyle R. Simons, Chairman & CEO of Temple-Inland, and Paul T. Stecko, Chairman & CEO of PCA. The AF&PA holds several meetings a year where executives and other representatives of the Defendants have an opportunity to meet and talk with one another, including communicating about supply and prices. As described below, AF&PA forums have included instructions on steps to conceal anticompetitive communications between firms.

**ANSWER:** GPLLC admits that the American Forest & Paper Association ("AF&PA") is a national trade association of the forest, pulp, paper, paperboard, and wood products industry. GPLLC admits that the AF&PA meets periodically and that GPLLC, PCA, International Paper, Weyerhaeuser, Temple-Inland, and Smurfit-Stone are among its many members. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC admits that James Hannan has served as an officer of the AF&PA. GPLLC denies the remaining allegations of Paragraph 54.

55.    RISI (founded as Resource Information Systems Inc.) is an information provider to the global forest products industry and provides market news and information.  RISI hosts conferences regarding containerboard every two years, bringing together companies in the containerboard industry.  Executives of all Defendants attended both the 2006 and 2008 conferences.

**ANSWER:**  GPLLC admits that RISI provides information for the global forest products industry and that it hosts conferences periodically.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 55.

56.    The International Corrugated Case Association ("ICCA") is an international trade association that serves to "promote and protect the general welfare of the worldwide corrugated container industry" by, among other things, collecting and disseminating information about corrugated products, issues, services and resources around the world. Every year, ICCA members participate in a global summit.  Defendants Georgia-Pacific, Smurfit-Stone, International Paper and Temple-Inland are all members of the ICCA.

**ANSWER:**  GPLLC admits that the International Corrugated Case Association ("ICCA") is a trade association serving the corrugated container industry, that it meets periodically, and that GP, Smurfit-Stone, International Paper, and Temple-Inland are among its many members. GPLLC admits that the text quoted in the first sentence of Paragraph 56 appears on the ICCA's website.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 56.

### History of Anticompetitive Conduct and Acts of Concealment

57.    The Defendants and their co-conspirators have a prior history of anticompetitive horizontal agreements with one another.  For decades, the paper and pulp industry has consistently demonstrated cartelization and anticompetitive behavior.  In particular, the linerboard, corrugated, containerboard and corrugated products segments of the industry have a history of antitrust violations.  A consent decree was entered on April 23, 1940, in the action entitled *United States of America, Plaintiff, against National Container Association, et al., Defendants* (SDNY Civil Action No. 8-318) and in *United States v. Container Corporation of America, et al.*, 393 US 333 (1969) the defendants (including certain predecessors of Defendants herein) were found to have violated Section 1 of the Sherman Act after being charged with

26

conspiring to restrain price competition in sale of corrugated containers in the Southeastern
United States from January 1, 1955, to October 14, 1963.[9]

      **ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of

Paragraph 57.

      58.    International Paper, Weyerhaeuser, PCA and Georgia-Pacific were also
defendants in an alleged nationwide price-fixing conspiracy among manufacturers of folding
cartons from 1960 to 1974. *See In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727 (N.D. Ill.
1977), 557 F. Supp. 1091, 1093 (N.D. Ill. 1983) and 687 F. Supp. 1223 (N.D. Ill. 1988). On
September 19, 1979, prior to trial, the class action parts of the case were settled for
approximately $200 million.

      **ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC admits that Georgia-Pacific Corporation was named as a defendant in the

litigation referenced in Paragraph 58, and that one of the decisions cited in Paragraph 58

indicates that "various defendant manufacturers of folding cartons agreed to pay approximately

$200,000,000 into a settlement fund." *In re Folding Carton Antitrust Litig.*, 687 F.Supp. 1223,

1224 (N.D. Ill. 1988). GPLLC denies that it participated in any alleged nationwide price-fixing

conspiracy.

      59.    In 1978, a federal grand jury in the Southern District of Texas indicted 14
companies and 26 individuals, including International Paper, Weyerhaeuser and Stone Container
Corporation (predecessor to Smurfit-Stone) for participating in a conspiracy east of the Rocky
Mountains to fix prices of corrugated containers and sheets. *See United States v. International
Paper Co.*, No. H-78-11 and *United States v. Boise Cascade Corp.*, No. H-78-12. International
Paper, Weyerhaeuser and Stone Container Corporation and almost all of the other defendants
pleaded *nolo contendere*; those that did not were acquitted at trial.

---

    [9]  *See U.S. v. Container Corp. of America*, 273 F.Supp. 18, (M.D.N.C. Aug 31, 1967)
and *U.S. v. Container Corp. of America*, 1970 WL 513, 1970 Trade Cases P 73,217 (M.D.N.C.
May 19, 1970) (on remand).

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 59.

60.    In a related case, PCA, International Paper, Stone Container and Georgia-Pacific were also involved in a price fixing cartel over corrugated containers and corrugated cardboard sheets from 1964-1975. Those firms that did not settle went to trial and most settled before a verdict was rendered; the sole defendant remaining at the time of the verdict was found liable for participating in a price fixing conspiracy over corrugated containers and corrugated sheets from 1964-1975. *See In re Corrugated Container Antitrust Litigation*, 556 F.Supp. 1117, 1125 (.S.D.Tex.1982).

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC admits that Georgia-Pacific Corporation was named as a defendant in the litigation referenced in Paragraph 60, and that it settled the lawsuit. GPLLC denies that it participated in any alleged nationwide price-fixing conspiracy.

61.    In 1998, Stone Container Corp. (now known as Smurfit-Stone) entered into a consent agreement with the Federal Trade Commission ("FTC") in which it pledged to refrain from "entering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties." *See In the Matter of Stone Container Corp.*, Docket No. C-8306, Decision and Order, May 18, 1998.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 61.

62.    Smurfit-Stone, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland, and PCA participated in a price-fixing cartel over containerboard from 1993-1995. See *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002). As part of the conspiracy, these firms increased the "downtime" of linerboard machines, reducing production and inventory. At the same time, they purchased substantial amounts of containerboard from one another, protecting market shares, causing an artificial shortage and an increase in the price of linerboard. At the peak of the cartel's efficacy in 1995, the price of linerboard peaked at $530/ton. The class action claims were settled in 2003 when the defendants agreed to pay their

customers over $200 million, however, lawsuits brought by plaintiffs opting out of the class proceeded.

> **ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC admits that Georgia-Pacific Corporation was named as a defendant in the litigation referenced in Paragraph 62, but denies the remaining allegations of Paragraph 62, including Plaintiffs' characterization of the claims in that litigation.

63.     As a result of their exposure to prior antitrust lawsuits, Defendants have taken steps to conceal their anticompetitive communications with one another. For example, at the American Forest & Paper Association's 128th Annual Paper Week held in New York City in April 2005, Defendants attended a seminar entitled "Are You Vulnerable to Lawsuits?" aimed at reducing vulnerability to antitrust litigation.[10] Because the Defendants have received training on how to avoid getting caught communicating with one another regarding price and output decisions, the amount of conspiratorial evidence that can be obtained from public sources and without access to internal records and testimony is highly limited. Nevertheless, the existence of an agreement is unambiguously evidenced by Defendants' coordinated conduct during the Class Period.

> **ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC admits that employees of Georgia-Pacific Corporation attended AF&PA meetings in the 2005 timeframe, but lacks knowledge or information sufficient to form a belief as to the truth of allegations relating to this particular meeting or the specific seminar referenced. GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 63.

## VIOLATIONS ALLEGED

64.     The unprecedented industry consolidation detailed in paragraphs 43-45 created an environment conducive to collusion. Further, at or about the onset of the Class Period, the Containerboard Products industry was experiencing decreased profit margins, rising product demand, and a promising economic outlook. Additionally, shortly before and near the beginning

---

[10]   *Are You Vulnerable to Lawsuits?* Official Board Markets, April 23, 2005.

of the Class Period, the Containerboard Products industry experienced price decreases and at least one failed price increase attempt. Specifically, on May 31, 2003, Official Board Markets reported that a $35/ton price increase in both linerboard and corrugated medium failed, noting "[n]ot only is this attempt a failure, but discounting prevails." While prices steadily increased in 2004, due at least in part to the two successful coordinated price increases implemented by Defendants, by early 2005 they again began to erode, bottoming out in spring 2005. On May 31, 2005, Official Board Markets reported that Defendant International Paper announced a $50/ton price increase; but due to other Defendants not backing the price increase with a "firm stance," the end result was a failed increase. In June 2005, "it became apparent that industry-wide price hikes weren't sticking. Instead of rising about 10%, prices on the thick paper used to make corrugated containers slipped as inventories of boxes inched higher."[11] These factors acted together as the catalyst for Defendants to redouble their coordinated capacity restraints in order to reduce available supplies and thereby fix, raise, stabilize and maintain the prices of Containerboard Products.

**ANSWER:** GPLLC admits that the text quoted in the fourth sentence of Paragraph 64 appears in the cited May 31, 2003 Official Board Markets article, regarding kraft linerboard and semichemical medium prices. GPLLC denies that the text quoted in the sixth sentence of Paragraph 64 appears in the cited May 31, 2005 Official Board Markets report, though it does appear in a May 21, 2005 Official Board Markets report. GPLLC admits that the text quoted in the seventh sentence of Paragraph 64 appears in the cited Crain's Chicago Business article. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants or the "industry." Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 64.

65.    In October 2003, Smurfit-Stone announced a massive restructuring plan intended "to reduce [containerboard] capacity."[12] According to its Chief Executive Officer Pat Moore, the designed goal was "to cut supply enough at Smurfit [-Stone] to force price increases throughout the industry."[13] After the failed May 2005 price increase, Smurfit-Stone recognized that their independent action to reduce containerboard capacity could not force industry prices upward unless Defendants supported both the capacity reduction and subsequent price increases.

---

[11]    *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05*, Crain's Chicago Bus., June 27, 2005, at p. 4.

[12]    *Clayton, Mo., Packaging Firm Smurfit-Stone Container Thinks Outside the Box, St. Louis Dispatch*, Aug. 22, 2004, at p. 1.

[13]    *Ibid.*

**ANSWER:** GPLLC admits that the text quoted in the first and second sentences of

Paragraph 65 appears in the cited St. Louis Dispatch article. GPLLC lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

65.

66.    The period of 2004-2010 witnessed an exceptional number of containerboard
plant closings, capacity reductions, and price increases that can only be explained by concerted
effort by the Defendants and their co-conspirators. Defendants increased Containerboard
Products prices ten times between March 2004 and August 2010. Over that period,
Containerboard Product prices have increased over fifty percent (50%) despite the economic
downturn during the latter half of the Class Period. Each of these price increases was
implemented by the Defendants nearly simultaneously and was facilitated by reductions in
supply and production capacity. In the face of increasing demand, these reductions make no
economic sense absent conspiracy and collusion. Norampac's 2005 20-F filing illustrates these
phenomena:

> In 2005, industry box shipments decreased by 0.4% in North America while
> North American containerboard operating rates were approximately 95%.
> Containerboard producers in the United States reduced their inventories and drove
> a US$30/ton increase on linerboard in October following a US$55/ton decrease in
> the first three quarters of the year...

> The market share of the top five containerboard producers increased from 48% in
> 1995 to 64% in 2005. This consolidation has helped accelerate the rationalization
> of inefficient containerboard mill capacity. In 2005, a total of over 1.5 million
> tons of North American containerboard capacity was permanently closed.
> Furthermore, the industry has generally adopted a model of balancing supply with
> current demand as opposed to maximizing capacity utilization. As a result,
> operating rates in the industry in recent years more closely reflect the current
> economic environment. Overall, market consolidation and rationalization have
> helped to create a less volatile and more stable industry pricing environment.

**ANSWER:** GPLLC admits that Paragraph 66 includes two quotes from the cited

Norampac 20-F, but the quotes are from different pages nine pages apart and are quoted out of

order. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the

allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC,

GPLLC admits that the U.S. economy was in recession during a portion of the period from

March 2004 to August 2010. GPLLC denies that it was part of any conspiracy and denies the

remaining allegations of Paragraph 66.

67.    Demand for Containerboard Products is tied to overall consumer demand and spending. Beginning in 2004 and continuing thereafter through 2007, consumer demand, including demand for Containerboard Products in the U.S., was relatively stable and industry expectations were that demand would increase, yet Defendants cut capacity, restricted supply and raised prices. These actions were contrary to Defendants' unilateral economic interests because, given market conditions and expectations that demand was increasing, in a competitive market capacity would, at minimum, be maintained if not expanded, in order to enhance volumes, revenues, profits and market share. During the second half of 2008, consumer demand in the United States plummeted, yet Defendants continued to raise prices. In August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%; and notwithstanding fears of deflation in the general economy, increased prices an unprecedented three times in 2010 to all-time highs, without any underlying cost justifications. This led one market commentator to note that the series of historic price increases "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies." The same commentator noted the similarity of the present conduct of Defendants to the conduct in the prior *Linerboard* cases.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC admits that the U.S. economy was in recession for a portion of the period from

February 2004 through November 8, 2010. GPLLC denies that it was part of any conspiracy and

denies the remaining allegations of Paragraph 67.

68.    Defendants and their co-conspirators were also able to facilitate the conspiracy in part by causing artificially inflated, supra-competitive prices to be published in trade publications which served to indicate and index prices or to function as list prices for Containerboard Product purchasers. Certain supply and purchase contracts between Defendants and purchasers were tied to the prices listed in those trade publications.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies the allegations of Paragraph 68.

69.    Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply. As a result of Defendants' conduct as alleged herein, their production capacity of Containerboard Products was significantly reduced while their prices increased by approximately 50% between 2004 and 2010:

32

## Containerboard Capacity and Prices





**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 69.

70.    Defendants profited substantially from these price increases. In a December 2005 presentation by International Paper's Executive Vice President and Chief Financial Officer, Marianne Parrs, one slide titled *Strong Leverage to Improving Prices: Price Sensitivity of U.S. Businesses* showed that there would be a $0.15 earnings per share increase for every $50 change in the price of containerboard.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 70.

## 2004

70.a.    Demand for Containerboard Products began to rise in 2004. Defendant International Paper forecasted increased earnings in the second quarter of 2004 as a result of increased demand, previously announced price increases, and "improved manufacturing operations."[A1] Defendant PCA reported in May 2004 that its corrugated products demand remained very strong, and that April 2004 shipments were up 9.3% as compared to one year earlier.[A2] Defendant Temple-Inland projected that the industry's box shipments would increase by approximately 3.7% for the second half of 2004, based on demand for the first half of the year.[A3]

---

[A1]    International Paper Q1 2004 Form 10-Q, filed May 6, 2004, at p. 14, 19. International Paper further noted that "price increases in containerboard, certain bleached board grades and boxes announced in the first quarter, together with improved manufacturing operations, will have a positive impact on operating results." International Paper Q1 2004 Form 10-Q, supra, at p. 19.

[A2]    GP-KLEEN00477477, *Packaging Corporation of America Company Profile*, dated January 2005, at slide 26.

[A3]    Temple-Inland 00291545, *Temple-Inland Investment Presentation,* dated May 7, 2004. In contrast, historical demand growth from 1980 – 2003 was approximately 2%. *Id. See also* Temple-Inland 00348444, Email from Paul Recht (Temple-Inland) to Sharon Fuss (Temple-Inland) Re: FW: April 1st, 2004 Box Price Increase – Justification Documents, dated February 25, 2004, with attachment Temple-Inland 00348456, *Why is there a price increase*, author and date unknown (in justifying increasing containerboard prices by over 8% in March 2004, the author explained that January 2004 box shipments rose 10.5% year-over-year and that inventories were "at their lowest level since 1994").

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 70.a.

70.b.    In response to "strong demand", all Defendants increased prices for Containerboard Products while simultaneously reducing capacity by idling machines and taking downtime.[A4]  The first 2004 price increase was implemented by all Defendants by March 1, 2004.[A5]  Defendant Weyerhaeuser was the first company to announce the price increase in early January 2004.[A6]  Association of Independent Corrugated Converters ("AICC") documents explained that "everyone is behind [the price increase] but no one else has announced."[A7]  Defendant International Paper quickly followed with its January 16, 2004, announcement that it would also be increasing liner and medium prices by $50/ton.[A8]  International Paper's price

_____

[A4]    The alleged conspiracy began at a time presently unknown to Plaintiffs. However, Plaintiffs allege that the Class Period begins on February 15, 2004, the date that the first price increase for 2004 became effective.

[A5]    *See* IP095108 at 95119, *Domestic Business Team Meeting*, dated February 18, 2004. International Paper identified the following additional companies as participating in the price increase: Defendant Smurfit-Stone (price increase implemented on February 15, 2004); Defendant Norampac (price increase implemented February 23, 2004); Defendant Georgia-Pacific (price increase implemented March 1, 2004); Defendant Temple-Inland (price increase implemented on March 1, 2004); Defendant PCA (price increase implemented on March 1, 2004; and Defendant Weyerhaeuser (price increase implemented on March 1, 2004). (Nonparties MeadWestvaco and Pratt also implemented price increases on March 1, 2004.)

Prior to the first 2004 price increase, in October 2003, Defendant Smurfit-Stone announced a massive restructuring plan with, admittedly, the ultimate goal of reducing capacity.  *See* GP-KLEEN01017202 at 1017203, Email from Bill Caesar (McKinsey) to Christian Fischer (McKinsey) and Matthew Denton (Georgia-Pacific), Re: Interesting Article, dated September 10, 2004 (forwarding an August 2004 article from the St. Louis Post-Dispatch discussing Smurfit-Stone's restructuring plan). Smurfit-Stone explained to the St. Louis Post-Dispatch that the company would no longer be adhering to the industry's former practice of running mills as fast as they could, independent of changes in demand.  GP-KLEEN01017202 at 1017203, *supra*. Rather, it planned to "cut supply enough at Smurfit to force price increases throughout the industry".  GP-KLEEN01017202 at 1017203, *supra*.

[A6]    Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto.  *See also* RT00000875 at p. 1-2.

[A7]    RT 00000875 at p.1.

[A8]    *See* SSCC 00361942, Email from Daniel Moore (International Forest Products Corp.) to "Market Watch" Re: IP, dated January 16, 2004 (informing recipients that "IP announced a price increase today on all containerboard grades. $50 for all order [sic] place [sic] Feb [sic] 15 or later").

increase was effective February 16, 2004.[A9] Internal International Paper documents circulated in February 2004 confirm that its price increase would be followed by "our competitors [who] will implement [the price increase] on March 1".[A10] On January 19, 2004, Defendant Temple-Inland announced that it would be increasing prices by $50/ton, effective March 1, 2004.[A11] Internal Temple-Inland documents infer that the company raised prices, at least in part, because all other Defendants were raising prices.[A12] On January 22, 2004, Defendant Georgia-Pacific announced that it would also be increasing prices by $50/ton, effective March 1, 2004.[A13] By that time, all other Defendants had announced similar price increases.[A14]

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations of Paragraph 70.b are directed at GPLLC, GPLLC denies those allegations; however, GPLLC admits that on or

---

[A9]   IP095108 at 95110.

[A10]   IP095108 at 95110.

[A11]   Temple-Inland 00149975.

[A12]   Temple-Inland 00348444.

[A13]   GP-KLEEN00546219. *See also* Defendant Georgia-Pacific LLC's Objections and Responses to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increases effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6, dated December 20, 2013.

[A14]   *See* GP-KLEEN00546217,. *See also* Temple-Inland 00149975; IP095108 at IP095119,; Defendant Weyerhaeuser Company's Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6, dated September 11, 2013; Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto, dated December 20, 2013; Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6, dated September 27, 2013; Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6, dated December 20, 2013.

Internal Norampac documents infer that a price increase for whitetop planned for around the same time might not have happened because all Defendants had not agreed to participate in the price increase. In an email from Robert Lanthier to Francois Guite sent in February 2004, Mr. Lanthier explained: "The price increase on whitetop may not happen since it has been confirmed by different sources that Smurfit Stone is not announcing any increase on their whitetop. For sure, we will not push for a price increase if the rest of our competitors are not doing it." NORAMPAC00038698.

around January 12, 2004, separate legal entities in the GP family announced a $50 per ton price increase on linerboard and medium, effective March 1, 2004.

70.c.    Around the same time that the first 2004 price increase was being implemented, Credit Suisse provided Defendants Georgia-Pacific, International Paper, Temple-Inland, and Smurfit-Stone with its publication entitled The Holy Grail: Secular Headwinds.[A15]  The Holy Grail emphasized that "every decision the market leaders make needs to be carefully guided by a goal of increasingly clear economic alignment of incentives".[A16]  It promoted "rational decision making" about capacity and stressed that "bad outcomes" can result if "rational producers in a commodity business decide to row in different directions".[A17]  The Holy Grail likewise instructed that "consolidation does tend to help make industry behavior healthier"[A18] and that "discipline" and "capacity rationalization" were necessary in order to "avert[] pricing collapse and sustain[] higher levels of pricing and cash flow."[A19]  The message of The Holy Grail was remarkably similar to the advice contained in McKinsey's Chasing In On Consolidation, written for Defendant International Paper in 2002,[A20] and distributed to Defendant Georgia-Pacific in September 2004.[A21]  Like The Holy Grail, Cashing In On Consolidation emphasized that North

---

[A15]  GP-KLEEN01015352; IP289887; SSCC 00481565; Temple-Inland 00017529.

[A16]  GP-KLEEN01015352 at 1015372. See also IP289887, SSCC 00481565 and Temple-Inland 00017529. Credit Suisse further noted that the "key is not to worry about driving [free-riders] out of business … but rather, to work toward a business model where interests tend to align rather than collide. Industry consolidation is one obvious example of how that can happen, but it is far from the only one." GP-KLEEN01015352 at 1015372.

[A17]  GP-KLEEN01015352 at 1015371. See also IP289887, SSCC 00481565 and Temple-Inland 00017529.

[A18]  GP-KLEEN01015352 at 1015374. See also IP289887, SSCC 00481565 and Temple-Inland 00017529.

[A19]  GP-KLEEN01015352 at 1015377. See also IP289887, SSCC 00481565 and Temple-Inland 00017529. Credit Suisse published Holy Grail articles at various times throughout the Class Period, which it circulated among Defendants and continued to emphasize the need for "discipline". See The Holy Grail – Rising Risk, Credit Suisse Equity Research, dated June 24, 2010, found at IP356757, Temple-Inland 00476330, and PCoA000339518 ("Impressive production discipline has many asking whether industry consolidation is necessary, or whether the industry's biggest issues are behind us"). Evidence that Defendants highly regarded The Holy Grail can be found in International Paper's internal documents. For instance, Thomas Cleves explained to John Faraci in 2008 that "[w]e should take advantage of the Holy Grail it [sic] is a thoughtful analysis of our industry and it helps us to understand how major sell-side and buy-side players think about our industry and International Paper." IP551322, Memo from Thomas A. Cleves (International Paper) to J. Faraci (International Paper) Re: Thoughts on the 2008 Holy Grail, dated February 19, 2008.

[A20]  IP108305, Cashing In On Consolidation, McKinsey on Paper, dated 2002.

American Containerboard producers needed to show leadership through "good conduct",[A22] which was only possible where multiple market leaders aligned "incentives" and "actions" in order to "enjoy the benefits of higher prices".[A23]

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 70.c.; however, GPLLC admits that at some point in time a separate GP entity received a copy of Credit Suisse's publication entitled The Holy Grail:  Secular Headwinds.  GPLLC admits that the text quoted in the second, third and fourth sentences appears in the Credit Suisse publication.  GPLLC also admits that on September 15, 2004, Georgia-Pacific Corporation received from McKinsey an article that McKinsey had written a couple years prior entitled Cashing in on Consolidation.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegation that this article was "written for Defendant International Paper."  GPLLC admits that the text quoted in the sixth sentence appears in the McKinsey article.

70.d.    In early March 2004, Defendant International Paper CEO John Faraci announced to the company's Board of Directors that "excess capacity in North America may have to be rationalized".[A24]  A few days later, Defendant PCA circulated an internal call to arms, in which an executive Vice President demanded at least three additional, $40-$50 industry-wide price increases over the next 18 months.[A25]  This executive cited to "historically" low inventory,

---

[A21]    GP-KLEEN00141863, Email from Bill Ceasar (McKinsey) to Matthew Denton (Georgia-Pacific) and Christian Fischer (Georgia Pacific) Re: McK article on consolidation in Pulp & Paper, dated September 15, 2004, with attachment GP-KLEEN00141864, Cashing In On Consolidation, McKinsey on Paper, dated 2002. In sending Cashing In On Consolidation to Georgia-Pacific, McKinsey underscored its conclusion that "NA Containerboard is a 'leak-tight' segment where market leaders have the ability and incentive to lead – basically that this was a place where industry leadership mattered." GP-KLEEN00141863, supra.

[A22]    IP108305 at 108314.

[A23]    IP108305 at 108309-311.

[A24]    IP112019 at 112107, Discussion on Corporate Strategy Options, John Faraci, undated (presentation given on March 9-10 [year unknown, but appears to be from 2004 based on presentation materials], discussing statistics from 2003 through February 2004).

[A25]    PCoA000026178.

"heavy" mill downtime, capacity reductions to "more closely align[] supply with demand", industry consolidation, and increased demand as justification for the price increases.[A26]  Two months after that, Defendant Georgia-Pacific circulated a memorandum similar to PCA's.[A27]  Therein, Executive Vice President of Packaging Christian Fisher requested that Georgia-Pacific employees "identify, develop, and capture every profit-improvement opportunity we can – starting now."[A28]  Mr. Fischer further explained that a "tight market" and a "second price increase" would help increase Georgia-Pacific's 2004 profits, "but they alone will not get us there.  We have to find and execute on every opportunity possible to reach our goal."[A29]

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  GPLLC admits that on May 12, 2004,

Christian Fischer sent an email (through Linda Brown) to certain Georgia-Pacific employees, but

denies that the email is "a memorandum similar to PCA's" or "an internal call to arms."  GPLLC

admits that the text quoted in the fifth and sixth sentences appears in Mr. Fischer's email.

GPLLC denies the remaining allegations in Paragraph 70.d.

70.e.    By April 26, 2004, Defendants PCA, Georgia-Pacific, Temple-Inland, and Weyerhaeuser had announced the second price increase for 2004, increasing Containerboard Products prices by $50/ton, effective June 1, 2004.[A30]  Defendants Norampac, International

---

[A26]  PCoA000026178.

[A27]  GP-KLEEN01441611, Email from Christian Fischer (via Linda Brown) (Georgia-Pacific) to Georgia-Pacific Employees, Re: Profit Improvement Draft, dated May 12, 2004.

[A28]  GP-KLEEN01441611.

[A29]  GP-KLEEN01441611.

[A30]  *See* SSCC 00352370, Pulp and Paper Weekly Report, dated April 26, 2004 ("PCA and Weyerhaeuser as well as Georgia-Pacific Corp. and Temple-Inland Inc. plan $50/ton increases on their linerboard and corrugated medium for the open market, for June 1. If implemented, it would be the second increase"); Temple-Inland 00131080, Email from Arif Ali (Temple-Inland) to "GO_BJD_DIRECT_REPORTS" (Temple-Inland) Re: Paper Price Increase ("Temple Inland is announcing today another $50/ton price increase to its paperboard customer effective June 1.  This follows the similar announcement by GP, WY and PCA"); IP091972, Letter from Carl Bohm (Weyerhaeuser) to Rick Start (Richwood & Laminating) Re: Containerboard Price Increase Announcement, dated April 8, 2004 (confirming Weyerhaeuser's "recent discussion" with Richwood & Laminating that Weyerhaeuser will be increasing prices for liner and medium by $50 per ton, effective June 1, 2004); IP352950, *National Containerboard Price Increase Announcements*, no author, dated May 14, 2004 (listing participants in the June 2004 price increase and providing the date the price increase was announced, the date the increase was effective and by how much Defendants increased liner and medium prices). *See also* Defendant Georgia-Pacific LLC's Objections and Responses to

Paper, and Smurfit-Stone participated in the price increase as well.[A31]  Defendant Temple-Inland reported that the price increase was "met with no resistance in marketplace", as customers were more concerned about obtaining sufficient product than paying higher prices.[A32]  Defendants experienced higher EBIDTA and EBIT margins in large part due to the two 2004 price increases.[A33]

      **ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  Insofar as the allegations of Paragraph 70.e.

---

Plaintiff's Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increase effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 ("In early May 2004, GP announced a $50/ton price increase effective June 1, 2004"), dated December 20, 2013; Defendant Weyerhaeuser Company's Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increase effective March 1, 2004 and June 1, 2004), dated September 11, 2013; Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto (identifying an April 12, 2004 announcement of a $50/ton price increase, effective June 1, 2004), dated December 20, 2013; IP0955004, Deutsche Bank Equity report from Mark Wilde, dated April 12, 2004 (reporting that Defendant Weyerhaeuser had announced a price increase of $50/ton in containerboard, effective June 1, 2004, and explaining that "[t]his breaks the normal seasonal pattern of containerboard hikes in late summer/early autumn").

[A31]  Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increases effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendants Cascades Canada ULC and Norampac U.S. Inc.'s Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 (identifying a $50 price increase for linerboard and corrugated medium, effective June 1, 2004), dated December 20, 2013; IP352950, *National Containerboard Price Increase Announcements*, dated May 14, 2004 (identifying Defendants Weyerhaeuser, Georgia-Pacific, Temple-Inland, International Paper, PCA, and Smurfit-Stone as increasing liner and medium prices by $50/ton, effective June 1, 2004).

[A32]  Temple-Inland 00569157, Email from Pat Maley (Temple-Inland) to Kenny Jastrow (Temple-Inland), Re: May Operating Highlights, dated June 14, 2004 ("The domestic $50/ton price increase proposed for June 1 has met with no resistance in marketplace. Customers are more concerned about supply availability than the increase").

[A33]  Norampac0036222, *Memorandum Re Competitor Benchmarking Fourth quarter 2004*, Norampac, dated February 22, 2005 ("All manufacturers experienced a higher EBITDA and EBIT margins mainly due to the two price increases occurred in 2004").

are directed at GPLLC, GPLLC denies those allegations, but admits that on or around April 21,

2004, Georgia-Pacific Corporation announced a $50 per ton price increase effective June 1,

2004.

      70.f.    Defendants also reduced mill capacity, took downtime and idled machines both temporarily and permanently throughout 2004. Weyerhaeuser announced in late 2003 that it would be permanently closing a 270,000 ton medium mill in North Bend, Oregon,[A34] only to announce on January 13, 2004, that it would be increasing liner and medium prices. Around the same time as the price increase announcement, Weyerhaeuser reduced Containerboard Products by approximately 21,000 tons through "market downtime".[A35] Similarly, Temple-Inland's January 19, 2004 price increase announcement was followed by the company's January 26, 2004, announcement that it was closing its Dallas, Texas plant.[A36] Defendant Smurfit-Stone, which implemented its price increase in February 2004, permanently closed its medium mill in Thunder Bay, Ontario in the first quarter of 2004, removing approximately 160,000 tons of medium from the market.[A37] After announcing its price increase on January 16, Defendant International Paper closed a Roanoke Rapids, North Carolina machine during the second quarter of 2004, effectively removing nearly 300,000 tons of liner from the market.[A38] In January 2004, Defendant Georgia-Pacific announced its price increase, but also took downtime to remove Containerboard Products from the market and brought inventory levels to "record low levels."[A39]

---

[A34]   *See* SSCC 00083396, Excel Spreadsheet, Tab "Closures" (listing, by company, all liner and medium closures in North America from 1998 – 2010). *See also* GP-KLEEN01012988, at 1013005, *Containerboard & Packaging Segment 2004 Annual Business Plan*, Georgia-Pacific – January 27, 2004 (table demonstrating announced closed or idled Containerboard Products machines from 2002 – 2004).

[A35]   Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27.

[A36]   *See* Temple-Inland 00348962, Email from Paul Recht (Temple-Inland), Re: Dallas Plant Closing, dated January 27, 2004.

[A37]   SSCC 00083396. *See also* SSCC 00863598, Excel Spreadsheet, Tab "CB Summary – by Month" (demonstrating monthly change in containerboard production from 1988- 2010).

[A38]   IP579040, *North American Containerboard Review*, International Paper, dated June 2006. *See also* SSCC 00083396; GP-KLEEN01012988, at 1013005.

[A39]   GP-KLEEN00106864, *Georgia-Pacific Downtime 2004*, Tab Summary by Machine Month 2004, dated September 9, 2008; GP-KLEEN01025183, Internal Georgia-Pacific Email from Matthew Denton, Re: December 2003 Flash – Containerboard & Packaging Segment (Preliminary due to LIFO), dated January 9, 2004.

      On May 19, 2004, Defendant Norampac publicly announced that it was closing its Concord, Ontario box plant. The plant officially closed on March 31, 2005. Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 8

In March 2004, the same month that Georgia-Pacific implemented the price increase, it took additional downtime to remove Containerboard Products from the market.[A40]  In total, it is estimated that approximately 563 million tons of containerboard products were removed from the market in 2004.[A41]

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  Insofar as the allegations of Paragraph 70.f.

are directed at GPLLC, GPLLC denies those allegations.  By way of further response, Georgia-

Pacific Corporation took approximately 11,500 tons of market-related downtime in January

2004, and did not take any other downtime in 2004, except for maintenance of machines.

GPLLC admits that the text quoted in the seventh sentence appears in a January 9, 2004 email

from Matthew Denton to various Georgia-Pacific employees.

70.g.    By April 26, all Defendants had announced the second 2004 price increase.  In April 2004, Weyerhaeuser presented a Mill System Operating Strategy wherein it recommended that Containerboard inventories be "managed at much lower levels during 2004".[A42]  Under Weyerhaeuser's proposed inventory management system, box inventories exceeding 440,000 tons would trigger selective downtime.[A43]  From March through May 2004, Weyerhaeuser also effectively reduced its Containerboard Products by approximately 50,000 tons through maintenance downtime.[A44]  Weyerhaeuser's total downtime in 2004 resulted in removing approximately 124,000 tons of Containerboard Product from the market.[A45]  Defendant Georgia-Pacific likewise removed containerboard product from the market in April 2004 by taking

---

(identifying Norampac box plant and mill closures that occurred between 2003 - 2010), dated September 27, 2013.

[A40]    GP-KLEEN00106864.

[A41]    SSCC 00083396.

[A42]    WY0090805 at p.8, *Mill System Operating Strategy*, dated April 14, 2004.

[A43]    WY0090805 at p.8.

[A44]    Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27, *supra*, n.48. In March 2004, Weyerhaeuser removed approximately 29,000 tons of product through downtime. It removed approximately 17,000 tons of product through downtime in April 2004, and approximately 4,000 tons of product through downtime in June 2004.  Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27, *supra*.

[A45]    *See* Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27 (adding the total maintenance downtime taken in 2004 to the total market downtime taken in 2004).

downtime.[A46]  Similar to Weyerhaeuser, Georgia-Pacific removed approximately 148,644 tons of containerboard products from the market in 2004 through downtime.[A47]

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  Insofar as the allegations of Paragraph 70.g. are directed at GPLLC, GPLLC denies those allegations.  By way of further response, Georgia-Pacific Corporation took approximately 5,400 tons of downtime in April 2004 for the maintenance of machines.

70.h.    On May 19, 2004, Deutsche Bank analyst Mark Wilde reported that inventories were at "an extremely lean level."[A48]  Noting that operating rates were at 94.4%, total industry inventories for mills and box plants stood at 3.6 weeks of supply, and that box shipments increased 4.2% YTD, Mr. Wilde doubted that "fundamentals … could get any stronger".[A49]  Mr. Wilde further explained that "[i]t's been years since the containerboard numbers looked so positive" and that the June 2004 price increase, if successful, would "go down as the biggest single year price gain in the containerboard history."[A50]

**ANSWER:**  GPLLC admits that on May 19, 2004 Deutsche Bank published a Market Bulletin entitled Paper & Forest Products:  Containerboard Monitor, which indicates it was prepared by Mark Wilde, David Martin, Christopher Chun, and Anoja Persad.  GPLLC admits that the text quoted in the first and second sentences appears in the May 19, 2004 Deutsche Bank Market Bulletin.  GPLLC denies that this Market Bulletin states that "the June 2004 price increase, if successful, would 'go down as the biggest single year price gain in the containerboard history.'"  GPLLC also denies the remaining allegations of Paragraph 70.h.

70.i.    Against the backdrop of the April 2004 price increase announcements, executives from Defendants and their co-conspirators, including Steven Klinger, Executive Vice President

---

[A46]    GP-KLEEN00106864.

[A47]    GP-KLEEN00490370 at p.25, Georgia-Pacific Sales & Marketing Presentation, undated.

[A48]    SSCC 00347633, Memo from Mark Wilde of Deutsche Bank Securities, Inc. Re: Containerboard Monitor, dated May 19, 2004.

[A49]    SSCC 00347633.

[A50]    SSCC 00347633.

of Packaging for Georgia-Pacific, Ron Zimbleman, Vice President of Sales and Marketing for Containerboard for Temple-Inland, Dennis Colley, then the Vice President of Containerboard for International Paper, Bill Wandmacher, Vice President and General Manager of the Containerboard Mill Division for Smurfit-Stone, Gerry Greeter, Vice President and General Manager of Containerboard Sales for PCA, Carl Bohm, Vice President of Containerboard for Weyerhaeuser, and Jim Keller, Senior Vice President of Containerboard for Weyerhaeuser, attended an AF&PA Executive Committee Containerboard Group meeting at AF&PA headquarters on March 22, 2004.[A51]  During this meeting, International Paper Vice President and General Manager of its containerboard business Dennis Colley was elected vice chair of the Containerboard Group Executive Committee,[A52] and Deutsche Bank analyst Mark Wilde provided an "economic outlook covering the paper packaging industry".[A53]  The committee also approved Terry Serie's, Vice President of Statistics for AF&PA, request to form a "task force of Containerboard Group members who would work toward developing a long range plan."[A54]  Just weeks later, on April 6, 2004, representatives from Defendants and their co-conspirators attended a Containerboard Division Membership meeting held by the AF&PA in Charleston, North Carolina.[A55]

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  Insofar as the allegations of Paragraph 70.i. are directed at GPLLC, GPLLC denies those allegations.  GPLLC admits that the text quoted in the second and third sentences appears in the March 22, 2004 AF&PA meeting minutes.

---

[A51]  AFPA_ESI_01897, *Minutes of the Meeting*, Executive Committee Containerboard Group, dated March 22, 2004 (identifying the persons listed as attendees during roll call). Mr. Zimbleman is identified as attending on behalf of Inland Paperboard & Packaging. Inland Paperboard & Packaging is the largest subsidiary of Temple-Inland.  *See* http://www.risiinfo.com/db_area/archive/p_p_mag/1997/9703/copro.htm (last viewed March 7, 2014).

[A52]  AFPA_ESI_01897 (noting that Mr. Colley's term will begin at the conclusion of the Fall Meeting 2005).

[A53]  AFPA_ESI_01897.

[A54]  AFPA_ESI_01897.

[A55]  AFPA-P-GS-00341 at p.2-3, *Minutes of the Meeting*, Containerboard Division Membership Containerboard Group, AF&PA, dated April 6, 2004 (listing the following persons as attendees during roll call: Jane Cowan and Mollie Hilliard from Georgia-Pacific; Tom Benefield and Melissa Murphy from International Paper; Kathleen Lents and Heidi Patton from PCA; Jack Greenshields and Scott Spurgeon from Rock-Tenn; Wayne Cameron from Smurfit-Stone; Barry Baker and Kent McFerran from Temple-Inland; and Jenny Iranon and Anne Olsen from Weyerhaeuser).

70.j.    On May 2, 2004, executives from Defendants Norampac, Temple-Inland, PCA, Georgia-Pacific, Weyerhaeuser and International Paper attended an FBA Board of Directors meeting.[A56]  Around the same time, Deutsche Bank analyst Mark Wilde gave a presentation to the FBA entitled "A New Ball Game: A Review of the Containerboard & Corrugated Packaging Business".[A57]  Therein, Mr. Wilde applauded the industry for improving "fundamentals" that would "restore margins", including lower inventories, capacity rationalization, and industry consolidation.[A58]  Mr. Wilde concluded the presentation by asking "[n]ow, with Fundamentals Improving … how do we react?"[A59]

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  Insofar as the allegations of Paragraph 70.i. are directed at GPLLC, GPLLC denies those allegations.  GPLLC admits that the text quoted in the third and fourth sentences appears in the Deutsche Bank presentation entitled "A New Ball Game:  A Review of the Containerboard & Corrugated Packaging Business."

70.k.    In early July 2004, International Paper CEO John Faraci appears to have had a telephone call with Lee Thomas, President and Chief Operating Officer for Georgia-Pacific, ostensibly on AF&PA business.[A60]  Shortly thereafter, on July 17, 2004, representatives from Defendants Weyerhaeuser, Rock-Tenn, Smurfit-Stone, and Georgia-Pacific attended a

---

[A56]  FBAKP0001176, *Minutes of Meeting from Board of Directors Meeting*, Fibre Box Association, dated May 2, 2004 (listing the following persons as members and attending: Marc-Andre Depin from Norampac, Bart Doney from Temple-Inland, Tom Hassfurther (for William Sweeney) from PCA, Steven Klinger from Georgia-Pacific, Daniel Pyne from Weyerhaeuser, and Carol Roberts from International Paper).

[A57]  GP-KLEEN01017172, Email from Matthew Denton, (Georgia-Pacific) Re: FW: A Whole New Ballgame? A Review of the Containerboard & Corrugated Packaging Business, dated May 10, 2004, with attachment GP-KLEEN01017174, *A New Ball Game A Review of the Containerboard & Corrugated Packaging Business*, Mark Wilde of Deutsche Bank Securities Inc., dated May 5, 2004, Exhibit 33 to Mark Wilde Deposition Transcript.  *See also* RT 00001035, Email from Mark Wilde (Deutsche Bank) Re: A Whole New Ball Game?  A Review of the Containerboard & Corrugated Packaging Business, dated May 10, 2004, with attachment RT 00001036, *A New Ballgame A Review of the Containerboard & Corrugated Packaging Business*, Mark Wilde of Deutsche Bank Securities, Inc., dated May 5, 2004.

[A58]  GP-KLEEN01017174 at 1017177, 1017187-88.

[A59]  GP-KLEEN01017174 at 1017189. Defendant Smurfit-Stone appears to have announced its participation in the June 2004 price increase approximately three days after Mr. Wilde posed this question. *See* IP352950.

[A60]  IP333836.

45

Paperboard Packaging Alliance Board of Advisors meeting in Washington, D.C.[A61]  In late September 2004, executives from Defendants, including Steven Klinger from Georgia-Pacific, Marc-Andre Depin from Norampac, Daniel G. Pyne from Weyerhaeuser, and Carol Roberts from International Paper, attended another FBA Executive Committee meeting.[A62]  In October 2004, AF&PA circulated antitrust compliance guidelines to Defendants, instructing them on how to implement "changes" to "reduce the risk of antitrust litigation".[A63]  The draft guidelines warned Defendants not to say things like, "[t]he industry needs to show some discipline to get prices up", or "[w]e all need to recognize that there is too much capacity and we need to do something about it."[A64]  The guidelines were endorsed by the AF&PA for use by all members during the October 30, 2004, AF&PA Board of Directors meeting, which was attended by executives from Defendants.[A65]  That same month, the AF&PA CEO Statistics Committee met to discuss, among other things, the "Long-Term Vision and Goals Plan for Domestic and International Statistics."[A66]  The attendees included Smurfit-Stone CEO Patrick Moore, David Dreilbelbis on behalf of James Rubfight for Rock-Tenn, PCA CEO Paul Stecko,Bob Amen from International Paper, Sonny Jackson from Smurfit-Stone, Richard Taggart from Weyerhaeuser, and Lyn Withey from International Paper.[A67]  Executives from Defendants met on at least one more occasion in 2004. Steve Klinger from Georgia-Pacific, Paul Brown (for Carol Roberts) from International Paper, James Davis from Smurfit-Stone, Marc-Andre Depin from Norampac, Daniel Pyne from Weyerhaeuser, and William Sweeney from PCA attended a Fibre Box Association Board of Directors meeting on November 16, 2004, in Chicago, Illinois.[A68]

---

[A61]    AFPA_ESI_00705, *Minutes of Meeting*, Paperboard Packaging Alliance Board of Advisors, dated June 17, 2004 (identifying the following persons as members and attending the meeting in roll call: Dick Dudley from Weyerhaeuser, Nick George from Rock-Tenn, Nat Holmes from Smurfit-Stone, and George Wurtz from Georgia-Pacific).

[A62]    FBAKP0002635, *Minutes of Meeting*, FBA Executive Committee, dated September 28, 2004 (identifying the persons listed as attending the meeting).

[A63]    GP-KLEEN01061118; AFPA-P2-AT-00058.

[A64]    GP-KLEEN01061118; AFPA-P2-AT-00058.

[A65]    SSCC 00305730, *Minutes*, American Forest & Paper Association Board of Directors Meeting, dated October 30, 2004. The following persons were identified as being present during for all or part of the meeting: John Faraci, CEO of International Paper; Kenny Jastrow, CEO of Temple-Inland; Patrick Moore, CEO of Smurfit-Stone; and Steve Rogel, CEO of Weyerhaeuser.

[A66]    SSCC 00159174, *Minutes*, AF&PA CEO Statistics Committee, dated Friday, October 29, 2004.

[A67]    SSCC 00159174.

[A68]    FBAKP0001228, *Minutes of Meeting*, Fibre Box Association Board of Directors, dated November 16, 2004 (identifying the persons listed above as attending the meeting). The minutes indicate that Mr. Klinger was Chairman of the association.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants and third parties. By way of further response, according to AF&PA meeting minutes, George Wurtz attended a June 17, 2004 Paperboard Packaging Alliance Board of Advisors meeting in Washington D.C.; according to FBA meeting minutes, on September 28, 2004, Steve Klinger attended a FBA Executive Committee meeting; and according to FBA meeting minutes, on November 16, 2004, Steve Klinger attended a FBA Board of Directors meeting in Chicago, IL. GPLLC admits that the text quoted in the fourth and fifth sentences appears in the AF&PA's Antitrust Compliance Guidelines for the Forest and Paper Industry. Insofar as the remaining allegations of Paragraph 70.k. are directed at GPLLC, GPLLC denies those allegations.

## 2005

71.    In the 1st Quarter of 2005, having previously indicated its intent to force price increases through the industry by cutting its capacity, Defendant Smurfit-Stone closed its 203,000 tons-per-year Fernandina Beach, Florida containerboard plant. Notwithstanding the closure of this plant, on May 5, 2005, Smurfit-Stone reported in its SEC Form 10-Q filing that "[w]e expect our profitability to improve in the 2nd Quarter of 2005 as a result of stronger demand and high sales prices for containerboard and corrugated containers."

**ANSWER:** GPLLC denies that the text quoted in the second sentence of Paragraph 71, as quoted, appears in the cited Smurfit-Stone 10-Q, though it does state: "We expect our profitability to improve in the second quarter of 2005 as a result of stronger demand and higher sales prices for containerboard and corrugated containers . . . ." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 71.

72.    During the 1st Quarter of 2005, Defendant PCA idled 65,000 tons per year of production capacity by taking off-line one of its three paper machines at its containerboard plant in Tomahawk, Wisconsin.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 72.

73. Defendant Weyerhaeuser likewise reported strong demand for Containerboard Products during the 1st Quarter of 2005 in its 3rd Quarter 2005 Form 10-Q, stating that:

> Containerboard sales increased $36 million. Unit shipments increased 45,000 tons, or approximately 18 percent, and price realizations, which include freight and are net of normal sales deductions, increased $71 per ton, or approximately 22 percent in the first quarter of 2005, compared to the same period of 2004. These increases were mainly due to an improvement in demand for corrugated packaging in U.S. markets.

**ANSWER:** GPLLC admits that the block-quoted text at the end of Paragraph 73 appears in the cited Weyerhaeuser 10-Q. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 73.

74. Similarly, Defendant International Paper reported in its May 6, 2005 Form 10-Q that "2nd Quarter earnings normally benefit from seasonally higher containerboard and box demand."

**ANSWER:** GPLLC admits that the text quoted in Paragraph 74 appears in the cited International Paper 10-Q. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 74.

75. Nevertheless, in the 2nd Quarter of 2005, International Paper took approximately 530,000 tons of containerboard downtime compared with approximately 215,000 of downtime in the 2nd Quarter of 2004. In its 10-Q filed on August 5, 2005, Defendant explained that this was "market related downtime" which was "taken to balance internal supply with demand to help manage inventory levels." However, when a manufacturing plant is idled during "downtime", the firm must continue to pay fixed costs, which are very high in the Containerboard Products industry. Smurfit-Stone acknowledged this fact in its SEC Form 10-K for the 2006 fiscal year, stating "the industry is capital intensive, which leads to high fixed costs and has historically resulted in continued production as long as prices are sufficient to cover marginal costs." Accordingly, "market related downtime" is very costly and is economically irrational from a single-firm's point of view during periods of strong demand, such as the 2nd Quarter of 2005.

**ANSWER:** GPLLC denies that the text quoted in the second sentence of Paragraph 75, as quoted, appears in the cited International Paper 10-Q, but, rather, states: "taken to balance internal supply with customer demand to help manage inventory levels." GPLLC admits that the

text quoted in the fourth sentence of Paragraph 75 appears in the cited Smurfit-Stone 10-K.

GPLLC denies the allegations in the last sentence of Paragraph 75. GPLLC lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

75.

76.     As previously alleged, beginning in 2004, at the onset of the Class Period,
Defendants were experiencing decreased profit margins and historically high demand. In that
context, in June 2005, high level executives and other representatives from each of the
Defendants and their co-conspirators, including Pete Correll, Chairman and CEO of Georgia-
Pacific, David A. Spraley, Vice President of Georgia-Pacific, C. Richard Larrick, General
Manager of Georgia-Pacific, Russell Bishop, Chief Information Officer of Weyerhaeuser, Dick
Thomas, Vice President of Weyerhaeuser, Ronnie Cosper, Papermill Superintendent for Smurfit-
Stone, and others were reported as attending the PIMA 2005 Leadership Conference in
Nashville, Tennessee.[14] The theme of this conference was "Success through Collaborative
Teamwork." Topics discussed included "Effective Collaboration through Teamwork" and "Price
Execution in the Forest Products Industry."

**ANSWER:** As to the second sentence, GPLLC admits that employees of Georgia-

Pacific Corporation attended PIMA meetings in the 2005 timeframe and that Messrs. Correll,

Spraley, and Larrick were Georgia-Pacific Corporation employees at that time, but GPLLC lacks

knowledge or information sufficient to form a belief as to the truth of allegations relating to the

specific meeting referenced in Paragraph 76. GPLLC lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations regarding other Defendants. Insofar

as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and

denies the remaining allegations of Paragraph 76.

77.     During this conference, Deloitte Consulting LLP gave a presentation called
"Pricing Opportunities in the Forest Products Industry." Deloitte began its presentation by
stating that the industry was "rich in competitive intelligence, which facilitates strategic pricing
analysis." The presentation also included a discussion regarding the several factors which made

---

[14] The Paper Industry Management Association, or "PIMA," describes itself as "the
premier association for management professionals in the paper and pulp industry" with the goal
of contributing "to the strength of the international pulp and paper community by providing the
means for our members to address relevant industry issues and to develop their management and
leadership skills."

coordinated price increases possible, such as "underestimating competitor's desire to raise prices" and "overestimating the threat of new entrants into the market."[15]

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 77.

78.    Immediately before this conference, on June 27, 2005, Smurfit-Stone reported that it "has no immediate plans to close down plants."[16]  But only days later, on July 1, 2005, Deutsche Bank, which monitors the containerboard industry and issues regular reports on developments within the industry, reported that "[t]here has been a lot of 'chatter' suggesting that one or more of the big integrated producers will soon shutter capacity."[17]

**ANSWER:** GPLLC admits that the text quoted in the first sentence of Paragraph 78 appears in the cited *Crain's Chicago Business* article and that the text quoted in the second sentence of Paragraph 78 appears in the cited Deutsche Bank report.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 78.

79.    On July 19, 2005, Deutsche Bank reported "IP [International Paper] capacity withdrawals will help uncoated and CB [containerboard] producers. Among the names: DTC [Domtar], PKG [Packaging Corporation of America], TIN [Temple-Inland]."[18]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 79 appears in the cited Deutsche Bank report.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 79.

80.    Beginning in early 2005 and continuing throughout the remainder of the year, Defendant Temple-Inland closed containerboard converting facilities in Antioch, California, Newark, Delaware, Atlanta, Georgia, and Louisville, Kentucky.  This reduced the supply of corrugated containers and aided in the overall scheme to increase the price of Containerboard Products.  Temple-Inland closed these facilities despite acknowledging in its May 10, 2005 10-Q

---

[15]    Sinoway, Mike, "Pricing Opportunities in the Forest Products Industry," June 28, 2005, Deloitte Development LLC.

[16]    *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05*, Crain's Chicago Bus., June 27, 2005, at p. 4.

[17]    *050701 Containerboard & Boxes -- Boxed in*, Deutsche Bank – Equity Research

[18]    *050719 IP Thoughts on Restructuring*, Deutsche Bank – Equity Research

that "market demand strengthened, resulting in higher prices for most of our product offerings." The closures were against Temple-Inland's unilateral economic self-interest because they were made during a period of increasing demand and prices.

**ANSWER:**  GPLLC admits that the text quoted in the third sentence of Paragraph 80

appears in the cited Temple-Inland 10-Q.  GPLLC lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations of Paragraph 80.

81.    In the 3rd Quarter of 2005, Smurfit-Stone permanently closed two more of its containerboard mills as part of what the company called "its ongoing assessment and restructuring efforts."  Smurfit-Stone closed mills in New Richmond, Quebec and Bathurst, New Brunswick.  It closed these mills despite acknowledging in its 10-Q, filed with the SEC on August 8, 2005, that "in the third quarter of 2005, we expect seasonably strong demand for containerboard and corrugated containers."  All together, these mills accounted for approximately 274,000 tons per year of containerboard.  According to its 2007 Annual Report, in 2005 Smurfit-Stone shut down 8.5% of its total capacity.  The closures were against Smurfit-Stone's unilateral economic self-interest because they were made during a period of increasing demand and prices.

**ANSWER:**  GPLLC admits that the text quoted in the first and third sentences of

Paragraph 81 appear in the cited Smurfit-Stone 10-Q.  GPLLC admits that Smurfit-Stone's 2007

Annual Report states that its "containerboard manufacturing capacity was reduced by 700,000

tons, or 8.5%" in 2005.  GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of Paragraph 81.

82.    Despite Smurfit-Stone's disclaimer regarding plant closures only a few weeks before, on August 4, 2005 Deutsche Bank reported:

> Smurfit-Stone today announced a number of permanent capacity closures ... a bit more capacity than we expected, a bit earlier than we expected. They amount to 480K tons...or about 1.3% NA capacity... With Smurfit having done a good deal of "heavy lifting", we'll be watching the behavior of other major competitors like International Paper and Weyerhaeuser ... the outlook of demand has also improved remarkably in recent weeks.[19]

---

[19]  *050804 Bigger - Sooner - Enough -- Smurfit Announces Mill Shuts*, Deutsche Bank – Equity Research

**ANSWER:** GPLLC admits that the text quoted in Paragraph 82 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 82.

83.    The following day, the St. Louis Post-Dispatch reported that Smurfit-Stone stated that "the closures are part of its restructuring efforts and will reduce its container-board manufacturing capacity by about 700,000 tons."[20] Approximately one month later, on September 7, 2005, Smurfit-Stone announced a price increase of $30/ton to take effect on October 1, 2005. On September 17, 2005, Defendant PCA followed with the announcement of a $30 per ton price increase also effective October 1, 2005.

**ANSWER:** GPLLC admits that the text quoted in the first sentence of Paragraph 83 appears in the cited St. Louis Post-Dispatch article. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 83.

84.    During the 2nd quarter of 2005, Georgia-Pacific reduced the number of its containerboard shipments "due to slowback and maintenance downtime."[21] A slowback is another form of output restriction in lieu of completely shutting a machine or mill down. Georgia-Pacific did both in 2005, scheduling all major maintenance downtime across its mills in the fourth quarter of 2005 while announcing price increases of $30 per ton on linerboard medium, and 8% on boxes to be effective during that quarter.[22]

**ANSWER:** GPLLC admits that the text quoted in the first sentence of Paragraph 84 appears in the cited Canada NewsWire article. GPLLC denies the remaining allegations of Paragraph 84.

85.    In the 3rd Quarter of 2005, International Paper also announced the closing of its 100,000 ton-per-year mill in Fort Madison, Iowa.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 85.

---

[20]    Smurfit-Stone plans to close plants, lay off 565, ST. LOUIS POST-DISPATCH, August 5, 2005, p. C3.

[21]    *Georgia-Pacific Reports Second quarter Results*, Canada NewsWire, July 28, 2005, at p. 4.

[22]    *Q3 2005 Georgia-Pacific Earnings Conference Call – Final*, FD (Fair Disclosure) Wire, Oct. 27, 2005, at p. 6.

86.    On September 20, 2005, Deutsche Bank reported that containerboard prices were moving up but that "[w]hether prices can rise further without more supply reductions remains an open question."[23]

**ANSWER:**  GPLLC admits that the text quoted in Paragraph 86 appears in the cited Deutsche Bank report.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 86.

87.    That same month, September 2005, Defendant Norampac permanently closed one of its two 150,000 tons-per-year paper machines at its Red Rock, Ontario containerboard mill. Additionally, in 2005, Norampac took "market related downtime" equal to 6.7% of its North American capacity despite increasing prices and demand.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 87.

88.    In October 2005, Norampac CEO Marc-Andre Depin commented on the September 2005 machine shut down by noting, "[i]f everyone would remove the same amount of capacity percentage-wise as we have, I think our business would look a lot better.  You have to be ready to let go of business if you want to keep the price up."[24]  In its 2005 Form 20-F, Norampac also noted, "continued industry consolidation, rationalization of inefficient containerboard mill capacity and market-related downtime have helped to better balance supply with demand and create a less volatile pricing environment."[25]

**ANSWER:**  GPLLC admits that the text quoted in the first sentence of Paragraph 88 appears in the cited *Official Board Markets* article and that the text quoted in the second sentence of Paragraph 88 appears in the cited Norampac 20-F.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 88.

89.    On September 27, 2005, members of the FBA again met in Atlanta, Georgia at Georgia-Pacific's offices for the Corrugated Packaging Alliance Meeting.[26]  Just days later, on

---

[23]    051017 *Deutsche Bank - September Containerboard Monitor*, Deutsche Bank – Equity Research.

[24]    Arzoumanian, M. *Board Increase Flies Through*, Official Board Markets, Volume 81, Issue 44, Oct. 29, 2005.

[25]    See Norampac Form 20-F for year ending December 31, 2005, at p. 16.

[26]    The Corrugated Packaging Alliance, or "CPA," states its mission is in part "to provide a coordinated industry forum that effectively acts on competing materials matters that could not be accomplished by individual members."

October 1, 2005, Defendants and their co-conspirators raised prices on linerboard by 7% ($30/ton) from $450/ton to $480/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 7% ($30/ton) from $420/ton to $450/ton. Notably, the effective date of the price increase, as well as the amount of price increase, was implemented uniformly throughout the industry and mirrored the increase announced by Smurfit-Stone and PCA just weeks prior. On October 3, 2005, Deutsche Bank reported that all major containerboard producers were now supporting the price increase.[27]

**ANSWER:** As to the first sentence, GPLLC admits that a CPA meeting was held at Georgia-Pacific Corporation's offices in Atlanta, Georgia in September 2005, but states, on information and belief, that the meeting occurred on September 28, 2005, not September 27, 2005. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 89.

90.     Just one month later, on October 27, 2005, Deutsche Bank reported on another expected price increase: "Chemical producers do it, metal producers do it ... maybe CB producers can do it too. Two CB price hikes in 60 days is quite unusual. A December price hike is unprecedented."[28] Defendants were able to accomplish the across-the-board price increases by sharing supply and capacity curtailment information with one another in order to coordinate supply restrictions substantial enough to force and sustain a Containerboard Products price increase.

**ANSWER:** GPLLC admits that the text quoted in Paragraph 90 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding "producers" or other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 90.

91.     On November 16, 2005, there was a meeting of the FBA's Board of Directors. That same day, Deutsche Bank reported that containerboard "[i]nventory numbers dropped steeply in October, much more than typical... inventories down to 2.18 million tons, lowest level

---

[27] *051003 Dr Paper's Pulse on Pricing, Deutsche Bank* – Equity Research

[28] *051027 Deutsche Bank - Smurfit-Stone Container*, Deutsche Bank – Equity Research

since 1994."[29]  Notably, the last time that containerboard inventories were reported to be this low was during a horizontal output restriction conspiracy that ran from 1993-1995.  *See In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir.2002).

**ANSWER:**  As to the first sentence of Paragraph 91, GPLLC admits that employees of

Georgia-Pacific Corporation have attended FBA meetings in the 2005 timeframe, but lacks

knowledge or information sufficient to form a belief as to the truth of allegations relating to this

particular meeting.  GPLLC admits that the text quoted in the second sentence of Paragraph 91

appears in the cited Deutsche Bank report.  GPLLC lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations regarding "containerboard inventories."

Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of

Paragraph 91.

92.     Less than two weeks after the meeting of the FBA's Board of Directors, on or about November 28, 2005, Weyerhaeuser and PCA announced a 40$/ton price hike, effective January 1, 2006.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 92.

93.     Regarding these announced price hikes, on November 28, 2005 Deutsche Bank reported that they "are likely to be joined by others before long."[30]  Deutsche Bank also reported that:

> Industry sources report that 2 of North America's 6 largest containerboard producers (Weyerhaeuser, PCA) are talking with customers about a price hike on January 1.  It would appear that the increases are in the $40/ton range ... Because January and early February tends to be one of the slowest periods of the year, a January price hike is unusual...Box plant inventories fell 208K in October and have fallen 356K in 2 months.  Measured in terms of days of supply, box plant inventories are at only 2.8 weeks - the lowest level we can find in our 20+yrs of

---

[29]  *051116 Deutsche Bank - October Containerboard Monitor and Numbers*, Deutsche Bank – Equity Research

[30]  *051128 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research

data...Further supply reductions could heat the market even further over the next month or two.[31]

**ANSWER:** GPLLC admits that the text quoted in the first sentence of Paragraph 93 appears in the cited *Dr. Paper's Pulse on Pricing* Deutsche Bank report and that the text quoted in the second sentence of Paragraph 93 appears in the cited *Paper and Packaging* Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 93.

94.     The following day, Weyerhaeuser announced its intent to indefinitely idle its 350,000 tons-per-year linerboard machine in Plymouth, North Carolina. On November 29, 2005, Deutsche Bank reported that "[t]he shutdown removes nearly 1% of US containerboard capacity at a point when the market has begun to tighten rapidly. Containerboard was already a tight market."[32]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 94 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 94.

95.     On December 3, 2005, Official Board Markets reported that Weyerhaeuser was informing its customers about the $40 price increase and that "Packaging Corp. of America, Smurfit-Stone Container Corp. and Temple-Inland are telling their customers the same thing."

**ANSWER:** GPLLC admits that the text quoted in Paragraph 95 appears in the cited *Official Board Markets* article. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 95.

96.     In total, Defendants and their co-conspirators shut down nearly 1 million tons of containerboard capacity in 2005, or over 3% of total market capacity. Their conduct cannot be reconciled with the strong demand the industry anticipated throughout 2005 and thereafter. Defendants and their co-conspirators did not have economic justification to unilaterally cull capacity or reduce production of corrugated containers. As demand and prices were increasing, independent firms acting in their unilateral self-interest had an incentive to refrain from reducing capacity in order to produce sufficient containerboard to meet the strong demand for corrugated containers, not to restrain output as they did.

---

[31]  *051128 Deutsche Bank - Paper and Packaging*, Deutsche Bank – Equity Research

[32]  *051129 Deutsche Bank – Weyerhaeuser*, Deutsche Bank – Equity Research

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 96.

## 2006

97. The Defendants and their co-conspirators also anticipated strong demand for Containerboard Products in 2006. For example, in its 10-K for the year ending December 31, 2005, International Paper reported that "[w]e see favorable signs of positive momentum for the remainder of 2006. We anticipate that demand in North America for both uncoated paper and industrial packaging products will be stronger."

**ANSWER:** GPLLC admits that the text quoted in Paragraph 97 appears in the cited International Paper 10-K. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 97.

98. Effective on or about January 1, 2006, Defendants and their co-conspirators again raised prices on linerboard by 8% ($40/ton) from $480/ton to $520/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 9% ($40/ton) from $450/ton to $490/ton. These price increases, deemed "unusual" by Deutsche Bank just weeks before (see ¶¶ 91 and 93, *supra*), occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time. In 2007, PCA Chairman and CEO, Paul Stecko, commented on the January 2006 price hike, noting "since consolidation began, inventories have trended down and we did get a price increase last January. So that would historically not be a normal time."[33]

**ANSWER:** GPLLC admits that the text quoted in the last two sentences of Paragraph 98 appears in the cited PCA earnings call transcript. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as

---

[33] Transcript of Q 1 2007 PCA Earnings Conference Call, April 18, 2007, at p. 6.

the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and

denies the remaining allegations of Paragraph 98.

99.    That same month, in January 2006, the Corrugated Packaging Alliance Action Team met at Georgia-Pacific's headquarters in Atlanta, Georgia. Despite the record low containerboard and corrugated container inventories and rising containerboard product prices, over the course of the following year Defendants and co-conspirators continued to reduce capacity of Containerboard Products. In its Form 20-F for fiscal year ending December 31, 2005, Norampac noted, "[i]n the first quarter of 2006, the situation was positive. In particular, several North American producers announced capacity reductions or closures and some of them have also reduced their box making capacity."

**ANSWER:**  As to the first sentence, GPLLC admits that employees of various GP

entities have attended CPA meetings and that some trade association meetings have been held at

GP's offices in Atlanta, but GPLLC lacks knowledge or information sufficient to form a belief as

to the truth of allegations relating to the specific meeting referenced in Paragraph 99. GPLLC

admits that the text quoted in the third and fourth sentences of Paragraph 99 appears in the cited

Norampac 20-F. GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations regarding other Defendants. Insofar as the allegations are

directed at GPLLC, GPLLC denies that it was part of any conspiracy and lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

99.

100.    In the 1st Quarter of 2006, Weyerhaeuser closed its 350,000 tons-per-year Plymouth, North Carolina containerboard plant. This plant shutdown was not in Weyerhaeuser's economic self-interest as it came at a time of rising prices and record low inventories, as evidenced by its 2006 1st Quarter 10-Q wherein Weyerhaeuser reported that:

The company anticipates improvement in earnings for the Containerboard, Packaging and Recycling segment in the second quarter primarily due to implementation of previously announced price increases for both containerboard and corrugated packaging and a seasonal increase in demand for corrugated packaging.

**ANSWER:** GPLLC admits that the text quoted in the second sentence of Paragraph 100 appears in the cited Weyerhaeuser 10-Q. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 100.

101.     On February 13, 2006, Deutsche Bank reported that containerboard "[p]rices are rising - even faster than expected. Transaction prices on U.S. kraft linerboard and corrugating medium rose $40/ton in January - fully reflecting the price hike. Spot prices have reportedly risen further."[34]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 101 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 101.

102.     On February 21, 2006, Deutsche Bank reported that containerboard inventories "remain at historically lean levels" and characterized containerboard prices as "rapidly rising."[35] Deutsche Bank also noted that: "A $50/ton price hike has been announced for late March/early April. A $40/ton January increase on linerboard & corrugated medium appears to have taken hold with relative ease. A $30/ton October hike also went in with ease.[36] On March 4, 2006, Official Board Markets noted:

> "Other integrateds that have announced recently (all up $50 per ton) include Weyerhaeuser (April 1), Norampac (March 20), and Packaging Corp. of America (March 21) ... ¶ ... Last month, Georgia-Pacific announced a $50 per ton increase is scheduled to take effect April 1...¶...If this latest increase is fully implemented it will mean that containerboard prices have risen 33 percent since mid-October.

**ANSWER:** GPLLC denies that the text quoted in the first and second sentences of Paragraph 102, as quoted, appears in the cited Deutsche Bank report, but, rather, it says: "rising rapidly" and "corrugating medium." GPLLC denies that the block-quoted text at the end of Paragraph 102, as quoted, appears in the cited *Official Board Markets* article, but, rather, it says: "Last month, Georgia-Pacific announced a $50 per ton increase to go into effect March 11 while Smurfit-Stone Container Corp.'s $50 per ton increase is scheduled to take effect April 1."

---

[34]  *060213 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research

[35]  *060221 Deutsche Bank - January Containerboard*, Deutsche Bank – Equity Research

[36]  *Ibid.*

GPLLC denies that it made price announcements concerning linerboard, corrugated medium,

containerboard, or corrugated products in February 2006.  GPLLC lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

102.

103.    On March 6, 2006, International Paper filed its Form 10-K for year ending
December 31, 2005. In its Executive Summary discussing the outlook for 2006, it was noted that
"...operating rates should improve in 2006 reflecting announced industry capacity reductions in
uncoated papers and containerboard.[37]

**ANSWER:**  GPLLC admits that the text quoted in Paragraph 103 appears in the cited

International Paper 10-K.  GPLLC lacks knowledge or information sufficient to form a belief as

to the truth of the remaining allegations of Paragraph 103.

104.    On March 14, 2006, the FBA's Executive Committee met.  Approximately three
weeks later, in early April 2006, Defendants and their co-conspirators raised prices on linerboard
again, this time by nearly 10% ($50/ton) from $520/ton to $570/ton.  At the same time,
Defendants and their co-conspirators raised the price of corrugated medium by over 10%
($50/ton) from $490/ton to $540/ton.  These price increases occurred across-the-board and were
imposed by all Defendants and their co-conspirators at or about the same time.

**ANSWER:**  As to the first sentence, GPLLC lacks knowledge or information sufficient

to form a belief as to the truth of allegations relating to the specific meeting referenced in

Paragraph 104.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations regarding other Defendants.  Insofar as the allegations are directed

at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations

of Paragraph 104.

105.    In sum, between October 2005 and April 2006, the Defendants and their co-
conspirators raised prices in concert three times, October 2005, January 2006, and April 2006.
By April 2006, the price of linerboard had reached prices of $560-570/ton – its highest level

---

[37]    International Paper Form 10-K for year ending December 31, 2005, filed March 6,
2006, at p. 11.

since 1995. A trade journal reported, "[s]ince October 2005, board prices have risen 33%. The quickness of the jump is unprecedented.[38]

**ANSWER:** GPLLC denies that the text quoted in the third sentence of Paragraph 105, as quoted, appears in the cited *Paperboard & Packaging* article, but, rather, it says: "late October" and "price jump." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 105.

106. The price increases in containerboard and its components caused corrugated container prices to rise as well. As reported by Deutsche Bank: "It appears that most of the first two containerboard price hikes have made their way into box prices. Producers are now trying to push this spring's $50/ton hike downstream to boxes. There are encouraging early signs in the corrugated sheet & local box markets."[39]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 106 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 106.

107. Defendants' costs, however, did not increase during this period. In discussing the increasing profit margins enjoyed by the industry in the first quarter of 2006, Deutsche Bank noted "[h]igher prices and a moderation of cost pressures were the key drivers."[40] Thus, increased costs cannot explain Defendants' price increases. Notably, in April 2006, containerboard prices reached their highest peak since 1995 – which was also during a period of known collusion. *See In re Linerboard Antitrust Litigation.*

**ANSWER:** GPLLC admits that the text quoted in Paragraph 107 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to

---

[38]    Paperboard and Packaging, April 2006, at p. 16.

[39]    *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research

[40]    *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research

the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies the allegations of Paragraph 107.

108.    In its May 9, 2006 10-Q, International Paper reiterated its bullish outlook for demand, noting that "[e]ntering the 2nd quarter, we expect operating profits to be somewhat higher than in the 1st quarter. Product demand and projects sales volumes are solid across all of our key platform businesses."

**ANSWER:** GPLLC admits that the text quoted in Paragraph 108 appears in the cited

International Paper 10-Q. GPLLC lacks knowledge or information sufficient to form a belief as

to the truth of the remaining allegations of Paragraph 108.

109.    Strong demand throughout 2006, combined with the capacity cuts and output restrictions imposed by the Defendants and their co-conspirators, resulted in significantly higher prices for Containerboard Products. As stated in Weyerhaeuser's 2006 2nd Quarter 10-Q: "The increasing price realizations for containerboard and corrugated packaging resulted from an increase in industry demand for corrugated packaging, coupled with high containerboard mill operating rates and low inventory levels." Despite an increase in demand which began at least in 2005, in early 2006, Weyerhaeuser closed its 350,000 ton-per-year containerboard machine at its Plymouth, N.C., mill.

**ANSWER:** GPLLC admits that the text quoted in Paragraph 109 appears in the cited

Weyerhaeuser 10-Q. GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations

of Paragraph 109.

110.    On June 8, 2006, Deutsche Bank reported on the effect of recent tightening of supply by Defendants:

> Most containerboard companies reported q/q [quarter over quarter] margin gains in Q1 2006. Higher prices and a moderation of cost pressures were the key drivers... Published estimates for linerboard price have risen $120/ton since September, reaching $515/ton - - - the highest level since October 1995... Supply discipline has been an essential part of the equation. Since early 2005, 1.67MM tons of capacity have been closed.[41]

---

[41]    *060608 Deutsche Bank Report - Dr. Paper's Containerboard Quarterly*, Deutsche Bank – Equity Research

**ANSWER:** GPLLC admits that the text quoted in Paragraph 110 appears in the cited

Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies the remaining allegations of Paragraph 110.

111.    On June 15, 2006, Deutsche Bank confirmed the price increases resulted in higher corrugated container prices to the Plaintiff Class: "The strong box volume and lower inventories in May enhance the odds that producers will get full pass through of the CB hike into boxes... [t]he May figures show very solid demand and an inventory level reviving from upward climb."[42]

**ANSWER:** GPLLC admits that the cited Deutsche Bank report states that "[t]he strong

box volumes and lower inventories in May enhance the odds that producers will get full pass-

through of the containerboard hike into boxes," but denies that the remaining part of the quoted

text appears in the report. GPLLC lacks knowledge or information sufficient to form a belief as

to the truth of the allegations regarding unidentified "producers." Insofar as the allegations are

directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 111.

112.    On July 18, 2006, Deutsche Bank reported that "[PCA] says that April hike is now essentially fully into boxes."[43]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 112 appears in the cited

Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of Paragraph 112.

113.    On July 25, 2006, Deutsche Bank reported that Weyerhaeuser's "box prices were up 5.3%."[44]

---

[42]    *060615 Deutsche Bank Report - May Containerboard & Box Numbers Big Volumes*, Deutsche Bank – Equity Research

[43]    *060718 Deutsche Bank Report - COMPANY ALERT - Packaging Corp. of America*, Deutsche Bank – Equity Research

[44]    *060725 Deutsche Bank Report - COMPANY ALERT – Weyerhaeuser, Deutsche Bank* – Equity Research

**ANSWER:** GPLLC admits that the text quoted in Paragraph 113 appears in the cited

Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of Paragraph 113.

114.    On August 7, 2006, Deutsche Bank reported that "[c]ompany earnings announcements to date show the 3rd price hike is being passed in the form of higher box prices."[45]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 114 appears in the cited

Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of Paragraph 114.

115.    Despite the substantially increased prices already brought about by a constriction of capacity and supply, in the 3rd Quarter of 2006, Norampac closed its 300,000 tons-per-year Ontario, Canada plant. On August 31, 2006, the *Toronto Sun* reported the closure, noting that Norampac cited "unfavourable economic factors" as the reason for the closure.[46] The Ontario plant was 20% of Norampac's total containerboard capacity and nearly 1% of total North American containerboard capacity. Norampac blamed the closure on high energy and input costs. However, as recently as June 2006, the trade press had indicated that Containerboard Products producers' margins were increasing due in part to a moderation of costs. In response to the plant closing, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement. Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%."[47] This plant shutdown was not in Norampac's unilateral economic self-interest as it came at a time of rising containerboard prices, tight supply and high plant operating rates; however, as alleged above, Norampac had previously urged the industry to "remove the same amount of capacity percentage-wise" as Norampac so that the "business would look a lot better," because, as its CEO committed to the industry, "You have to be ready to let go of business if you want to keep the price up."

**ANSWER:** GPLLC admits that the cited *Toronto Sun* article stated that "Forestry

products maker Norampac will close its linerboard mill in Red Rock in northern Ontario

indefinitely due to 'unfavorable economic factors.'" GPLLC admits that the text quoted in the

---

[45]    *060807 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research

[46]    *N. Ontario Mill To Shut Down*, THE TORONTO SUN, August 31, 2006, at p. 54.

[47]    *060830 Deutsche Bank Report - Norampac closing Red Rock*, Deutsche Bank – Equity Research

sixth sentence of Paragraph 115 appears in the cited Deutsche Bank report. GPLLC lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of Paragraph 115.

116.    On October 9, 2006, Deutsche Bank reported that containerboard "[d]emand
remains solid."[48]

**ANSWER:** GPLLC admits that the cited Deutsche Bank report stated that "[d]emand

remains solid and pricing news from box mkts remains unchanged." GPLLC lacks knowledge or

information sufficient to form a belief as to the truth of the allegations regarding "containerboard

'demand.'" Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining

allegations of Paragraph 116.

117.    On October 18, 2006, Deutsche Bank reported that PCA had record earnings per
share in the 3rd Quarter of 2006, which reflected the hikes in containerboard prices. Deutsche
Bank also reported that PCA was "trimming output @ pt when mkt appears to be easing. [sic]
They're not 'free riding' & not delaying – encouraging signs ... 4Q impact of mill outages will
remove 12K tons from system... production cut-backs by a player often viewed as industry 'free
rider' are constructive."[4950] PCA was contributing to the cartel by taking downtime and reducing
containerboard output while demand remained strong. Under competitive market conditions,
PCA's downtime would not have been in its unilateral interest; rather, it would have continued as
a free rider on the output reductions of the other Defendants. PCA's downtime under then-
current market conditions and expectations made economic sense only pursuant to an agreement
or understanding with its competitors that they would also restrict supply.

**ANSWER:** GPLLC admits that the text quoted in Paragraph 117 appears in the cited

Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies the remaining allegations of Paragraph 117.

118.    This was confirmed by PCA's 10-K for the year ending December 31, 2006:

---

[48]  *061009 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank -
Equity Research

[49]  *061018 Deutsche Bank Report - PKG in 100 Words No more 100% operating rates?*
Deutsche Bank - Equity Research

Industry supply and demand trends were favorable throughout 2006. Industry shipments of corrugated products increased 1.3% during 2006 compared to 2005, on a per workday basis. During this same period, industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2006 at its second lowest level in the past 25 years, on a weeks of supply basis. Since September 2005, linerboard prices have increased $120 per ton, or approximately 30%, as reported by industry publications.

**ANSWER:** GPLLC admits that the text quoted in Paragraph 118 appears in the cited PCA 10-K. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 118.

119.    Just one week after reporting that PCA was taking downtime to further reduce any slack in the supply constraint, on October 25, 2006, Deutsche Bank reported: "Best news may be SSCC's [Smurfit-Stone] Q4 'maintenance' downtime. With markets appearing to slow, throttling back on supply could help pricing environment."[50]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 119 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 119.

120.    In October 2006, Weyerhaeuser and International Paper announced a price increase effective on January 1, 2007.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 120.

121.    The unprecedented across-the-board increases in containerboard prices were due to a concerted effort by the Defendants and their co-conspirators to restrict output and capacity. Industry trade journals reported that the "linerboard market began to tighten in the fourth quarter of 2005 and containerboard dropped to an unusually low level of 2.2 million tons."[51] Another trade journal noted that "capacity reductions... may be the most important overall factor behind the strong price gains" and that "[w]ith supplies short, mills were in the drivers' seat and began to aggressively push up prices."[52]

---

[50] *061025 Deutsche Bank Report - SSCC Q3 in 100 Words*, Deutsche Bank - Equity Research

[51] Pulp & Paper (Jan. 2007) at p. 15.

[52] Paper Age (September/October 2006) at p. 15.

**ANSWER:** GPLLC admits that the text quoted in the second sentence of Paragraph 121 appears in the cited *Pulp & Paper* article and that the text quoted in the third sentence of Paragraph 121 appears in the cited *Paper Age* article. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 121.

122.    All together, between 1st Quarter 2005 and 3rd Quarter 2006, Defendants and their co-conspirators shut down nearly 1.7 million tons worth of containerboard capacity. In comparison, the conspiracy among a similar set of defendants in 1993-1995 was executed by shutting down only 300,000-350,000 tons of capacity. *See In re Linerboard Antitrust Litigation*, 305 F.3d at p. 154. These massive shutdowns were part of the Defendants and their co-conspirators' concerted effort to stabilize and raise the price of Containerboard Products.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 122.

## 2007

123.    In 2007, Defendants and their co-conspirators continued to shut down capacity in furtherance of their conspiracy. In late January 2007, International Paper took 74,000 tons of containerboard capacity offline. In April, PCA reported that it took unspecific downtime in the 1st and 2nd Quarters of 2007.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 123.

124.    On April 18, 2007, PCA Chairman and CEO, Paul Stecko, stated the following with respect to industry-wide inventories during PCA's 1st Quarter earnings conference call:

Our containerboard inventories at the end of the first quarter were down about 2000 tons compared the year-end 2006 levels. I should also note that yesterday

the Fibre Box Association released industry statistics for the month of March and in our opinion these statistics are very encouraging. Corrugated products demand was up 3.4% per workday and containerboard inventories fell by 75,000 tons to 2.472 million tons or 4.1 weeks of supply. This is 200,000 tons lower than the average March containerboard inventory for the past ten years and on a weeks of supply basis, this is the lowest March ending inventory on record. So pretty healthy statistics.

**ANSWER:** GPLLC denies that the block-quoted text at the end of Paragraph 124, as quoted, appears in the cited PCA earnings call transcript, but, rather, it says: "compared to year-end." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 124.

125.    In June 2007, Smurfit-Stone closed down two plants, a 148,000 tons-per-year plant in Vernon, California and a 52,000 tons-per-year plant in Carthage, Indiana.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 125.

126.    On June 18-20, 2007, there was a Joint AF&PA, AICC and FBA Washington Fly-In meeting in Washington, DC. Shortly thereafter, Weyerhaeuser announced a $40/ton price hike, effective August 1, 2007.

**ANSWER:** As to the first sentence, GPLLC admits that employees of various GP entities attended AF&PA, AICC, and FBA meetings in the 2007 timeframe, but lacks knowledge or information sufficient to form a belief as to the truth of allegations relating to the specific meeting referenced in Paragraph 126. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 126.

127.    In early July 2007, PCA and Smurfit-Stone also announced a $40/ton containerboard price hike, also effective August 1, 2007.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 127.

128.    Regarding whether these announced price hikes would work, Deutsche Bank commented that "the global containerboard backdrop remains just about as favorable as any we

have seen in over 20 yrs."[53]  On July 6, 2007, Deutsche Bank reported that "[v]irtually all major containerboard producers have slated $40-50/ton hikes for August."[54]

**ANSWER:**  GPLLC admits that the text quoted in the first sentence of Paragraph 128

appears in the cited Deutsche Bank report and that the text quoted in the second sentence of

Paragraph 128 appears in the cited Deutsche Bank report.  GPLLC lacks knowledge or

information sufficient to form a belief as to the truth of the allegations regarding other

Defendants and unidentified "containerboard producers."  Insofar as the allegations are directed

at GPLLC, GPLLC denies the remaining allegations of Paragraph 128.

129.    On or about August 1, 2007, Defendants and their co-conspirators raised prices on containerboard again, this time by over 7% ($40/ton) from $570/ton to $610/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 7% ($40/ton) from $540/ton to $580/ton.  These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations

of Paragraph 129.

130.    On September 4, 2007, Deutsche Bank reported that the "full $40/ton price hike initiative for August was reflected in the trade papers and most of our trade reports suggest uncharacteristic discipline from the big integrateds."[55]

**ANSWER:**  GPLLC admits that the text quoted in Paragraph 130 appears in the cited

Deutsche Bank report.  GPLLC lacks knowledge or information sufficient to form a belief as to

---

[53]  *070703 Deutsche Bank Report - August Containerboard Price Hike*, Deutsche Bank - Equity Research

[54]  *070706 Deutsche Bank Report - Dr. Paper's Weekly Wrap Up (7/6/07)*, Deutsche Bank - Equity Research

[55]  *070904 Deutsche Bank Report - Dr. Paper's Pulse on Pricing*, Deutsche Bank - Equity Research

the truth of the allegations regarding the "big integrateds." Insofar as the allegations are directed

at GPLLC, GPLLC denies the remaining allegations of Paragraph 130.

131.    On September 6, 2007, Norampac announced that it had entered into a joint venture with two other Containerboard Products manufacturers, including Smurfit-Stone, to establish a new company called Niagara Sheet LLC. Commenting on the transaction, Marc-André Dépin, President and CEO of Norampac, noted "[t]he participation of Norampac in this joint venture follows the trend of our investment strategy which aims to consolidate our expansion in the United States and enable us to ensure the quality of our products and the satisfaction of our customers."

**ANSWER:** GPLLC admits that the text quoted in Paragraph 131 is attributed to Marc-

André Dépin in a September 6, 2007 *Lexedon* article titled "Norampac enters into a joint venture

with Jamestown Container and Smurfit-Stone." GPLLC lacks knowledge or information

sufficient to form a belief as to the truth of the allegations of Paragraph 131.

132.    October 2007, International Paper closed down its 200,000 tons-per-year containerboard plaint in Terra Haute, Indiana.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 132.

133.    PCA's 2007 10-K reported that the company's gross profits as a percentage of net sales increased from 20.3% to 22.7% "primarily due to the increased sales prices" of its corrugated products and that from 2006 to 2007, "industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2007 at its second-lowest level in the past 25 years, on a weeks-of-supply basis."

**ANSWER:** GPLLC admits that the text quoted in Paragraph 133 appears in the cited

PCA 10-K. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations of Paragraph 133.

134.    Temple-Inland reported in its 2007 10-K that "[i]n 2007, corrugated packaging prices and linerboard prices moved higher as a result of price increases implemented in 2006 and 2007. In 2006, corrugated packaging and linerboard prices moved higher reflecting price increases implemented in late 2005 and in 2006." Notably, Temple-Inland also reported that prices for other paper products – specifically, gypsum wallboard – had decreased in the same period.

**ANSWER:** GPLLC admits that the text quoted in the first and second sentences of Paragraph 134 appears in the cited Temple-Inland 10-K. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 134.

135.    Defendants and their co-conspirators did not have independent economic justification to cut capacity or reduce production of corrugated containers in the face increasing demand and prices. To the contrary, independent firms acting competitively and in their unilateral self-interest had an incentive to refrain from such acts.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 135.

## 2008

136.    On February 1, 2008, Deutsche Bank reported that "plant inventories fell from 3.1 to 3.0 weeks, one of the lowest levels in history."[56]

**ANSWER:** GPLLC denies that the text quoted in Paragraph 136, as quoted, appears in the cited Deutsche Bank report, but, rather, it says: "plant inventories fell from 3.1 to 3.0, one of the lowest levels in history." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 136.

137.    On or about March 17, 2008, International Paper announced that it was purchasing Weyerhaeuser. This merger made International Paper the single largest containerboard producer with 11.5 million tons per year of global containerboard capacity. As indicated above, prior to the merger announcement, International Paper had been idling and reducing its capacity.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 137.

---

[56]    *080201 Deutsche Bank Report - January Containerboard Monitor*, Deutsche Bank - Equity Research

138.    On March 24-26, 2008, the FBA's Annual Meeting 2008, was held at the J.W. Marriott Desert Springs in Palm Desert, California.  At this Annual Meeting, the FBA's Board of Directors meeting was also held.

**ANSWER:**  On information and belief, GPLLC admits the allegations of Paragraph 138.

139.    On March 30-April 2, 2008, the American Forest & Paper Association held its Annual Paper Week convention in New York, New York.

**ANSWER:**  On information and belief, GPLLC admits the allegations of Paragraph 139.

140.    On or about May 5, 2008, International Paper's purchase of Weyerhaeuser was approved.  As a result of the merger, the top seven containerboard producers made up a combined market share of approximately 80%.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 140.

141.    On or about May 10, 2008, Georgia-Pacific announced an increase on containerboard prices by $55/ton, effective July 1, 2008, and new reports stated that "within hours after this announcement, Smurfit-Stone ... told its customers the same price increase details."[57]  Shortly thereafter, International Paper, Weyerhaeuser, PCA and Norampac also instituted identical price increases.[58]

**ANSWER:**  GPLLC denies that the text quoted in the first sentence of Paragraph 141, as quoted, appears in the cited *Official Board Markets* article, but, rather, it says: "Within hours, Smurfit-Stone Container Corp. (SSCC), Chicago, told its customers the same price increase details."  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 141.

142.    On May 16, 2008, Deutsche Bank reported that containerboard inventory was the "second-lowest April level in 20 years."[59]

---

[57]    Board producers again try for price increase; $55 per ton," Official Board Markets, May 31, 2008 (citing an earlier May 10, 2008 article).

[58]    "More Integrateds Want Increase." Official Board Markets, June 7, 2008.

[59]    *080516 Deutsche Bank Report - April Containerboard Monitor*, Deutsche Bank - Equity Research

**ANSWER:** GPLLC admits that the text quoted in Paragraph 142 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding "containerboard inventory." Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 142.

143.    On May 28, 2008, Deutsche Bank reported that both Smurfit-Stone and Georgia-Pacific recently announced a $50/ton price hike, effective July 1, 2008.[60]

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 143.

144.    On June 16, 2008, in a report primarily focusing on International Paper and Smurfit-Stone, Deutsche Bank reported: "IP's Packaging head, Carol Roberts, acknowledged that IP's number one priority was increasing prices. Roberts argued that independent boxmakers would welcome a disciplined push on containerboard and box prices as it would provide them with an opportunity to restore margins. They are showing some leadership. IP has recently announced an 11% box price increase effective July 1. Smurfit's Chuck Hinrich's [sic] noted that "we understand urgency around current price increase." Deutsche Bank further noted that in terms of "more capacity rationalization in containerboard and boxes . . . both IP and [Smurfit-Stone] acknowledged the need to maintain a balanced supply/demand situation."[61]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 144 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 144.

145.    On or about July 1, 2008, despite the effects of an economic recession felt throughout the United States, Defendants and their co-conspirators raised prices on linerboard yet again, this time by over 9% ($55/ton) from $610/ton to $665/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($40/ton) from $580/ton to $635/ton. The Defendants quickly followed the price increases in containerboard and corrugated medium by announcing an 11 % increase in the price of finished boxes.[62] These price increases occurred across-the-board and were imposed by all Defendants

---

[60]    *080528 Deutsche Bank Report - July Price Hike,* Deutsche Bank - Equity Research

[61]    June 16, 2008 Deutsche Bank Paper & Packaging report, at 3.

[62]    P. Scott Vallely, *Update on Containerboard Grades: Notes from Deutsche Bank Research Paper.* (June 17, 2008)

and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the regarding other Defendants. Insofar as the allegations are directed at GPLLC,

GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 145.

146. On July 16, 2008, Buckingham Research Group stated that "we are bullish on containerboard given low inventories, high operating rates, recent outages and closures . . .we believe that the July containerboard $55/ton price increase has gained traction and will be reflected in the trade journals this weekend."[63]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 146 appears in the cited

Buckingham Research Group report. GPLLC lacks knowledge or information sufficient to form

a belief as to the truth of the remaining allegations of Paragraph 146.

147. In late August, International Paper, whose "number one priority was increasing prices" by means of a "disciplined push" as detailed above, in fact showed its "leadership" and announced a price increase of $60 per ton, effective October 1, 2008.[64] Shortly thereafter, Smurfit-Stone, Temple-Inland and Georgia-Pacific also announced identical price increases and on September 8, 2008 it was reported that Citigroup had confirmed that Temple-Inland, Smurfit-Stone and Georgia-Pacific "have followed International Paper's move to raise containerboard prices by $60/ton. They point out that this means that at least 70% of the US capacity have announced an October increase."[65]

**ANSWER:** GPLLC admits that the text quoted in the second sentence of Paragraph 147

appears in the cited Theflyonthewall.com document. GPLLC denies that the text quoted in the

third sentence of Paragraph 147, as quoted, appears in the cited Theflyonthewayll.com

document. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of

the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC,

GPLLC denies the remaining allegations of Paragraph 147.

---

[63]  July 16, 2008 Buckingham Research Group analyst report, International Paper, at 3.

[64]  *IP Wants yet More for Board: Will Others Follow?*, Official Board Markets, September 6, 2008.

[65]  "SSCC, TIN, IP: Recommendations," Theflyonthewall.com, Sept. 8, 2008.

148.    On August 20, 2008, Deutsche Bank reported that "[d]espite sluggish demand, the [July] containerboard [price] hike succeeded, supported by rising input costs, high operating rates, lean inventories (aided by outages at large mills owned by IP & [Weyerhaeuser]), and strong export markets.  The next stop is the related box price hike, which will play out over the next few months.  Producers are looking to get more than a simple pass-through of higher containerboard costs."  Regarding input prices Deutsche Bank reported "while prices are rising, some important input costs appear to be rolling over. OCC costs have been declining steadily since the March high, and energy costs are falling sharply.  Longer-term, we view the increased consolidation created by IP's acquisition of WY's packaging business as positive for the industry."[66]

   **ANSWER:**  GPLLC denies that the text quoted in Paragraph 148, as quoted, appears in

the cited Deutsche Bank report, but, rather, it says: "The next step is."  GPLLC lacks knowledge

or information sufficient to form a belief as to the truth of the allegations regarding "producers"

or other Defendants.  Insofar as the allegations are directed at GPLLC, GPLLC denies the

remaining allegations of Paragraph 148.

149.    The AICC objected to the October price increases because "[the] announcements by International Paper and other integrated producers, coming as they do within 90 days of the $55 per ton increase in July, are unjustified based on current economic indicators and inputs.  We believe they even border on collusion.  Containerboard products, using their increasing market share in what one analyst called 'the hammer,' have in this announcement exhibited an unbridled arrogance toward their independent customers and a blatant disregard for the users of corrugated boxes."  In fact, price increases in the face of soft demand are inconsistent with unilateral economic interests and are counter-intuitive without collective and coordinated decreases in production capacity.[67]

   **ANSWER:**  GPLLC denies that the text quoted in Paragraph 149, as quoted, appears in

the cited *Official Board Markets* article, but, rather, it says: "Containerboard producers, using."

GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the

allegations regarding other Defendants.  Insofar as the allegations are directed at GPLLC,

GPLLC denies the remaining allegations of Paragraph 149.

---

[66]   August 20, 2008 Deutsche Bank Paper & Packaging industry analyst report, at 64, 68

[67]   *AICC Strongly Opposes $60 per ton Board Price Increase:  Borders on Collusion*, Official Board Markets, September 20, 2008.

150.    October 2008, Smurfit-Stone shut down its 135,000 tons-per-year corrugated medium plant in Snowflake, Arizona.  That same month, International Paper began idling its 250,000 tons-per-year containerboard plant in Albany, Oregon.  Less than a month later, in November 20008, International Paper shut down its 430,000 tons-per-year linerboard plant in Valiant, Oklahoma.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 150.

151.    In November 2008, Smurfit-Stone announced temporary closures of several containerboard mills:  (i) Smurfit-Stone temporarily shut down its 550 ton-per-year Missoula, Montana linerboard machine (from November 10, 2008 through the end of 2008); (ii) Smurfit-Stone also temporarily shut down its linerboard machine at its containerboard mill in Hodge, Louisiana (from November 24, 2008 to December 11, 2008);[68] (iii) Smurfit-Stone temporarily closed its 800 tons-per-day containerboard mill in Ontonagon, Michigan (from November 24, 2010 through at least the end of the year);[69] and (iv) Smurfit-Stone temporarily shut down its Panama City, Florida containerboard mill (from November 22, 2008 through the end of 2008).[70] Between fourth quarter of 2008 and first quarter of 2009, over 800,000 tons per year of capacity was idled by Defendants.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 151.

152.    In the 4th quarter of 2008:

a.      Smurfit-Stone idled plants in Matane, Quebec (174,000 tpy), Missoula, Montana (171,000 tpy), and Jacksonville, Florida (170,000 tpy).

b.      Georgia-Pacific idled plants in Cedar Springs, Georgia (265,000 tpy); Palatka, Florida (40,000 tpy) and announced the temporary closure of its corrugating medium mill in Toledo, Oregon from December 23, 2008 to December 30, 2008.[71]

---

[68]  *SSCC Shuts Down two Board Machines: In Louisiana and Montana*, Official Board Markets, November 15, 2008.

[69]  *SSCC to Close Michigan Mill: May Reopen in January*, Official Board Markets, November 22, 2008.

[70]  *CC Will Shut Down Florida Mill: More Layoffs Coming*, Official Board Markets, November 22, 2008.

[71]  *GP Will Close Oregon Mill: For one Week*, Official Board Markets, December 6, 2008.

c.    PCA engaged in significant mill downtime or slowbacks in the fourth quarter of 2008.[72]

d.    Temple-Inland took "108,000 tons market related" and "22,000 tons maintenance related" downtime 2008, despite rising prices and inventories were the "lowest year entering level in 3 years."

e.    International Paper announced plans to close its containerboard mills in Pineville, Louisiana and Albany, Oregon and that it would permanently shut down its previously idled machine in its Valliant, Oklahoma containerboard mill. These permanent shutdowns reduced International Paper's North American paper and board capacity by 2.1 million tons.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 152.

153.    Outlining the history of containerboard price increases imposed during much of the Class Period, Temple-Inland reported in its 2008 10-K that "[i]n 2008, corrugated packaging prices were up as a result of price increases implemented in 2007 and mid-2008... In 2007, corrugated packaging prices and paperboard prices moved higher as a result of price increases implemented in 2006 and 2007. In 2006, corrugated packaging and paperboard prices moved higher reflecting price increases implemented in late 2005 and in 2006."[73] In a related presentation Temple-Inland revealed that it had taken "108,000 tons market related" and "22,000 tons maintenance related" downtime during 2008, which according to the same presentation saw TIC's average box prices increase by $29 per ton. The presentation also noted that inventories were at the "lowest year entering level in 3 years."

**ANSWER:** GPLLC admits that the text quoted in the first, second, and third sentences of Paragraph 153 appear in the cited Temple-Inland 10-K. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 153.

---

[72]    PCA Slows Board Production: Lower Earnings, Official Board Markets, December 13, 2008.

[73]    Temple-Inland 2008 10-K, filed Feb. 23, 2009, at 25; TIC Nov. 4, 2008 10-Q, at 19.

**2009**

154.    On February 27, 2009, Deutsche Bank reported that "in recent months, containerboard demand has been off sharply, but published containerboard prices have remained remarkably 'sticky,'" commenting that, "[w]ith extremely weak demand, lower input costs and a stronger US$, the modest erosion in domestic pricing appears a victory for producers. Production discipline has kept inventories in check and limited domestic pricing erosion . . . the industry has done an impressive job to date in keeping prices relatively stable," and "[t]he industry is taking an unprecedented amount of market downtime to keep the market in balance. IP alone took 700K tons in 4Q. "[74]

**ANSWER:**  GPLLC admits that the text quoted in Paragraph 154 appears in the cited

Deutsche Bank report, but states that the ellipsis in the quoted text represents a span of seven

pages of the report.  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding "the industry."  Insofar as the allegations are directed at

GPLLC, GPLLC denies the remaining allegations of Paragraph 154.

155.    In the same report, Deutsche Bank commented on Temple-Inland's containerboard and box business: "This business should show reasonable resiliency in an economic downturn, because of (1) recent industry consolidation, (2) recent industry capacity rationalization, (3) end markets weighted toward non-discretionary items such as food and beverages, and (4) an easing trend in some important input costs such as energy, recycled fiber, and transportation."

**ANSWER:**  GPLLC admits that the text quoted in Paragraph 155 appears in the cited

Deutsche Bank report.  GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of Paragraph 155.

156.    In 2009, John Geenan, a Senior Vice-President of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), explained that the containerboard industry aggressively managed capacity in order to maintain or increase pricing and that whenever prices threaten to decrease the industry rapidly removed capacity.

---

[74]  February 27, 2009 Deutsche Bank Paper & Packaging industry analyst report, at 39, 61, and 68.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding "the containerboard industry." Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 156.

157.    During an investor presentation in February, 2009, Temple-Inland stated that it had "centralized pricing decision making" and a "structured and disciplined approach to the market." The same presentation included a slide titled "*North American Corrugated Packaging Industry Fundamentals*," noting the "Consolidating industry... Significant capacity rationalization and downtime . . . [and] Improved pricing." Temple-Inland continued that "[i]mproved industry fundamentals has led to higher average prices and reduced volatility" in linerboard pricing, and referred to remarkable "industry discipline".[75]

**ANSWER:** GPLLC denies that the text quoted in Paragraph 157, as quoted, appears in the cited Temple-Inland investor presentation, but, rather, it says: "approach to market." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 157.

158.    Deutsche Bank commented on June 2, 2009, "we're impressed that prices have not fallen further. Besides very weak domestic demand, the industry is also coping with sharply lower export volumes . . . the supply discipline to date has been impressive."

**ANSWER:** GPLLC admits that the text quoted in Paragraph 158 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding "the industry." Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 158.

159.    On December 7, 2009, Deutsche Bank described a "notable effort" by containerboard producers to increase prices, stating that "[i]n recent weeks, most major producers have announced $50-70/ton hikes for January 1. We are surprised by the timing, because this is a seasonally weak period." The same report emphasized that a January 1 price increase was "somewhat unusual timing because the market is entering a seasonally weak period, but we expect the larger producers to support the hike," and also noted that despite declining prices in the prior year, "the wonder is how the industry kept prices from falling further, given extremely weak demand and low input costs."

---

[75]    TIC Feb. 2009 Investor Presentation, at 22 and 25 – 26.

**ANSWER:** GPLLC admits that the text quoted in Paragraph 159 appears in the cited

Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the allegations regarding "containerboard producers." Insofar as the allegations are

directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 159.

160.    On December 14, 2009, Smurfit-Stone announced the permanent closure of its
Containerboard Products mills in Missoula, Montana (620,000 tons of linerboard annually) and
Ontonagon, Michigan (280,000 tons of medium annually) effective December 31, 2009. In
response to the Missoula mill closure, Montana state senator Cliff Larson sent a letter to Judge
Brendan L. Shannon, presiding Judge in Smurfit-Stone's Chapter 11 Bankruptcy proceedings,
stating:

> "We are told that Smurfit-Stone does not want the plant to run because they want
> to control 'the market.' Well, what about competition? What about gathering in
> cash for investors and creditors? With electric generating capacity of about
> seventeen megawatts setting idle, trained plant workers willing to work and
> generate that biomass energy source we have a ready source of green energy sadly
> not generated. Another income source - not actualized."

According to Smurfit-Stone's Disclosure Statement, the Ontonagon Mill and Missoula Mill
closures were "ordinary course transactions" which did not require Bankruptcy Court approval.

**ANSWER:** GPLLC admits that the block-quoted text of Paragraph 160 appears in the

cited letter and that the text quoted in the last sentence of Paragraph 160 appears in the cited

Smurfit-Stone disclosure statement. GPLLC lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations of Paragraph 160.

## 2010

161.    As the U.S. economy began to emerge from the recession, Defendants and their
co-conspirators again raised prices on linerboard by over 8% ($50/ton) from $585/ton to
$635/ton, effective on or about January 1, 2010. At the same time, Defendants and their co-
conspirators raised the price of corrugated medium by over 8% ($50/ton) from $555/ton to
$605/ton. This price increase occurred across-the-board and was imposed by all Defendants and
their co-conspirators at or about the same time. Deutsche Bank commented on the January price
increase, "It is hard to recall another hike being so readily passed through during a seasonally-
weak period."[76]

---

[76]    February 8, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1.

**ANSWER:** GPLLC admits that the text quoted in the last sentence of Paragraph 161 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC admits that the U.S. economy was in recession for a portion of the period from February 2004 through November 8, 2011, but denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 161.

162.    Less than a month later, several Defendants, including International Paper, began to discuss an additional price increase for March or April in various forums.[77] Deutsche Bank reported "[w]e give this second containerboard hike a good chance of success," in part because "[International Paper] is the clear industry leader, with about 30 percent of the domestic market."[78]

**ANSWER:** GPLLC admits that the text quoted in the second sentence of Paragraph 162 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 162.

163.    Effective on or about April 1, 2010, Defendants and their co-conspirators again raised prices on linerboard by over 9% ($60/ton) from $635/ton to $695/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($60/ton) from $605/ton to $665/ton. This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 163.

---

[77] *More Board Makers want Price Increase*, Official Board Markets, March 6, 2010.

[78] *IP Leads off Second Board Price Increase Attempt*, Official Board Markets, February 27, 2010.

164.    As a result of the January and April price increase, total containerboard prices increased by $110 per ton.  In presenting its earnings for the first quarter of 2010, Temple-Inland looked forward and anticipated higher prices in the third quarter.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants or "total containerboard prices."  Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 164.

165.    On May 5, 2010, PCA stated in its 10-Q for the second quarter that "[r]eported industry containerboard inventories at the end of March 2010 were at their lowest level in nearly 30 years..."[79]

**ANSWER:**  GPLLC admits that the text quoted in Paragraph 165 appears in the cited PCA 10-Q, which is for the first quarter, not the second quarter.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 165.

166.    On May 17, 2010, Deutsche Bank presciently wrote of more price hikes to come based upon "a host of recent conversations across the trade," stating, "we are increasingly convinced of the third price hike attempt in 2010 [for containerboard].  Hikes in Jan & Apr added $110/ton to domestic list prices.  We expect the next attempt to be in the $40-50/ton range with implementation slated between July 15th and Sep 1st.  Industry fundamentals remain strong....a spring corrugated box hike appears to be going in with relative ease, and a host of recent conversations across the trade point to a growing sense of 'when,' not 'if' the next initiative will appear."[80]

**ANSWER:**  GPLLC admits that the text quoted in Paragraph 166 appears in the cited Deutsche Bank report.  GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 166.

167.    As predicted by Deutsche Bank, "based upon conversations across the trade" on June 30, 2010, Defendants International Paper and Georgia-Pacific informed its customers of another $60/ton price hike effective August 1, 2010.  In fact, announcements from other Defendants soon followed, including Defendants PCA, Smurfit-Stone and Norampac.

---

[79]    PCA May 5, 2010 10-Q, at 16.80 PCA May 5, 2010 10-Q, at 16.

[80]    May 17, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 167.

168.    After its discharge from bankruptcy, Smurfit-Stone joined the conspiracy, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in further idling of production capacity, reduced production and another near simultaneous across-the-board price increase.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 168.

169.    In a July 1, 2010, investor presentation, Smurfit-Stone's CEO Pat Moore and President & COO Steve Klinger reported that between 2005 and 2010, the company had closed 54 container plants.[81] Smurfit-Stone described the industry's "permanent capacity adjustments" of a total of 2,365,000 tons of containerboard capacity since the end of 2008, and also described the steadily declining industry inventory rates over the prior decade.[82]

**ANSWER:** GPLLC denies that the text quoted in Paragraph 169, as quoted, appears in the cited Smurfit-Stone presentation, though the presentation includes a heading titled "Permanent Capacity Adjustments." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 169.

170.    On July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "3rd Containerboard Increase puts the Integrity of Our Industry on the Line." In light of the significant manufacturing capacity cuts, as well as the absence of cost drivers, the article recognizes that a third price increase in 2010 in that environment "calls into question the integrity of our industry." The article goes on to forewarn of serious repercussions:

This third increase is rightfully calling into question the pricing activities of the major companies. During the years 1994-1995, six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak of $525-535/ton. These actions rightfully caused corrugated users to seek alternative packaging and

---

[81]    Smurfit-Stone "Targeted Accelerated Performance Improvement" presentation, July 1, 2010, at 18.

[82]    *Id.* at pp 27-28.

reduce their corrugated purchases – witness the growth of returnable plastic container use in the mid-1990s. A far more serious result was an inventory collusion allegation and subsequent class action lawsuit brought by the corrugated industry's customer base that cost containerboard makers over $210 million in settlements.

**ANSWER:** GPLLC admits that on or about July 13, 2010, the AICC published an article entitled "*3rd C'Board Increase puts the Integrity of Our Industry on the Line.*" GPLLC admits that the text quoted in Paragraph 170 appears in the cited AICC article. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the "industry" or "major players." Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 170.

171. On or about August 3, 2010, Defendant Smurfit-Stone conducted an 'earnings call" to discuss their financial results for second quarter of 2010. In response to a question about scheduled downtime, Steven J. Klinger, President and COO, stated that the company had completed "42% of [its] related downtime and expect in the back half of the year a very similar level to what we took in all of second quarter. So just over the back half of the year, about the same amount that we took in the second quarter" and "the second half of the year should see maintenance downtime from a [tons] standpoint at levels about consistent with what we incurred in the second quarter alone".[83] In fact, however, Smurfit-Stone forecast this downtime despite "historic low" inventory and rising prices.[84]

**ANSWER:** GPLLC denies that the text quoted in Paragraph 171, as quoted, appears in the cited Smurfit-Stone earnings call transcript, but, rather, it says: "and we expect." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 171.

172. During the August 3, 2010 "earnings call" Smurfit-Stone revealed that it had "maintained market share during not only a challenging environment from an industry standpoint, but clearly in our extremely challenging environment for us internally" and "our customers, particularly in our container business and in our mill business, were quite loyal during this [while in Chapter 11] and we improved some of our business with them." In fact, Smurfit-Stone's August 3, 2010 earnings press release reported "higher average prices," "higher selling

---

[83]   Final Transcript 8/3/10 Earnings Conf. Call, pp 7-8.

[84]   Final Transcript 8/3/10 Earnings Conf. Call, p. 10

prices" and "improved selling prices" at the same time that it announced plans to close three more converting plants.

**ANSWER:** GPLLC admits that the text quoted in Paragraph 172 appears in the cited

Smurfit-Stone earnings call. GPLLC lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations of Paragraph 172.

173.    During an August 11, 2010 analyst conference call, Norampac President and CEO Marc-Andre Depin stated that the "dynamic of [the containerboard sector] are really, really positive for price increase implementation. So we are going one after the other. So we will see about the next one. But I think the dynamics are all there for a price increase and having good backlogs of finished product, which is regular boxes and folding cartons and containerboard and CRB grades.... as I mentioned, Q3, Q4, for sure we have prices increase... the market has been really, really tight."[85]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 173 appears in the cited

Norampac analyst call. GPLLC lacks knowledge or information sufficient to form a belief as to

the truth of the allegations regarding other Defendants or "the containerboard sector." Insofar as

the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph

173.

174.    On or about September 13, 2010, the Gerson Lehman Group stated matters bluntly, "for the 3rd price increase within a year by major paper mills to work, it must be supported by major paper converters... these include: TIN, Temple-Inland, IP International Paper; SSCC Smurfit-Stone Corrugated Container; PKG Packaging Company of America; GP Georgia- Pacific; ... & others."[86]

**ANSWER:** GPLLC denies that the text quoted in Paragraph 174, as quoted, appears in

the cited Gerson Lehman Group publication, but, rather, it says: "The third pricing increase

within a year has just been announced by major paper mills . . . but for the increase to work."

GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the

---

[85]    August 11, 2010 Cascades, Inc. Q2 2010 Earnings Conference Call, at 11.

[86]    http://www.glgroup.com/News/The-third-price-increase-in-less-than-a-year%E2%80%A6when-will-they-ever-learn--50520.html

allegations regarding other Defendants or "major paper mills." Insofar as the allegations are

directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 174.

175.    On or about September 15, 2010, Smurfit-Stone participated in the UBS Global
Paper & Forest Products conference call. When asked about its "pricing power" if inventory
levels were to rise CEO Patrick Moore responded that "as long as we continue to see a demand
environment that we're operating in today - again, very stable, reasonably steady growth, unless
we have a major dislocation in the demand side of things or unless pricing levels really begin to
attract a lot of supply.... inventory levels [will] continue to be very low." Smurfit-Stone further
reported that it had "fully implemented" its January and April 2010 price increases and that it
was "[a]ggressively pursuing all three 2010 price increases".

**ANSWER:**  GPLLC denies that the text quoted in Paragraph 175, as quoted, appears in

the cited UBS Global Paper & Forest Products conference call, but, rather, it says: "all of the

price increases that have been announced so far this year."  GPLLC lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

175.

176.    It is hardly consistent with competition that a company such as Smurfit-Stone in a
Chapter 11 proceeding or just emerging from Chapter 11 could simultaneously maintain its
pricing power, maintain or increase its market share and raise prices.  As Gerson Lehman
indicated, such pricing power could only be accomplished if "supported" by its competitors.  Nor
is it consistent with competition that a company in such circumstances would engage in
substantial downtime in the face of low inventories and rising prices.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at

GPLLC, GPLLC denies the allegations of Paragraph 176.

177.    The Defendants and their co-conspirators raised the price of containerboard in
order to cause an increase in the price of corrugated containers.  Because Defendants convert 81
% of the containerboard they manufacture into corrugated containers, Defendants reduced
containerboard capacity and jointly increased containerboard prices in order to artificially drive
up the price of corrugated containers and increase their profits.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of

Paragraph 177.

178.    To accomplish the unprecedented price increases during the Class Period, the Defendants and their co-conspirators needed to reduce capacity in a concerted fashion. No single Defendant could reduce capacity enough to cause an industry-wide price increase. Accordingly, the Defendants reduced capacity in concert to prevent any one Defendant from bearing the brunt of the capacity shutdown. Defendants' coordinated efforts to restrict containerboard supply substantially reduced the inventory available for sale to Plaintiff Class:[87]





---

[87]    M. Wilde, Deutche Bank, Containerboard Market Overview, Apr. 15, 2010, at p. 5.



**Industry Containerboard Inventory & Pricing**

Sources: Industry Inventory: Fiber Box Association and American Forest & Paper Association; Linerboard Prices: Industry Publications

     **ANSWER:** GPLLC admits that the first two charts reproduced in Paragraph 178 appear in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants or the third chart reproduced in Paragraph 178. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 178.

     179.    Further, the price of both linerboard and corrugated medium rose at exactly the same time by exactly the same per-ton amounts. This identical and simultaneous across-the-board price increase on multiple products can only be explained by concerted and coordinated behavior by the Defendants.



**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants or the chart reproduced in Paragraph 179. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 179.

### There Are No Innocent Explanations for the Coordinated Price Increases

180.    Despite the unprecedented price increases implemented in the Containerboard Products industry during the Class Period, there were no sustained significant changes in production costs which could account for those price increases or Defendants' coordinated reduction in manufacturing capacity and product supply. During the Class Period, prices increased at over double the rate of corresponding manufacturing costs.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 180.

181.    There are four main costs which are responsible for the bulk of the total cost to manufacture and produce Containerboard Products. They are: 1) raw material costs; 2) labor costs; 3) energy costs; and 4) environmental compliance costs. As explained below, there were no significant or sustained changes in any of these types of costs during the Class Period.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 181.

182.    Raw Material Costs: Pulpwood (woodchips used to produce various paper products) is the main input for linerboard. Consequently, it is by far the most significant portion of linerboard cost, representing approximately 40-50%. Alternately, other factors including energy and labor cumulatively represent only about 25%. Because pulpwood prices represent such a large portion of linerboard cost, significant changes in the former may be detected in changes in the latter. The price of pulpwood has increased at a constant rate since the middle of 2001 (an average of roughly 6% per year). As a result, there are no major fluctuations in pulpwood price that correspond to the fluctuations in Containerboard Products.

**ANSWER:** GPLLC admits that woodchips can be used to make linerboard. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 182.

183.    Labor costs: According to PCA's executives: "[l]abor costs in a well run containerboard mill run $30-$40/ton cash cost, which is a relatively small part of the overall manufacturing cost..."[88] Average weekly earnings for production workers at paperboard mills has remained flat during the Class Period. Additionally, the 2005 annual report for Smurfit-Stone stated that both post-retirement healthcare and life insurance benefits were reduced in 2005. Therefore, labor costs can largely be dismissed as an explanation for Containerboard Products price increases.

---

[88]    Paul Stecko, *Creating Shareholder Value in Containerboard Markets,* PULP & PAPER 63 (March 1, 2005).

**ANSWER:** GPLLC denies that the text quoted in the first sentence of Paragraph 183, as quoted, appears in the cited *Pulp & Paper* article, but, rather, it says: "mill can run." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 183.

184.   Energy Costs:  Studies by economists have found no significant effect of energy costs on containerboard prices.[89]  Additionally, International Paper, the largest producer of containerboard, stated in its 2005 10-K that, "[w]hile energy, wood and raw material price movements are mixed, their impact for the quarter is expected to be flat." In reference to the first few months of 2006, it was further added, "[w]e are starting to see some reductions in natural gas and southern wood costs that, if the trend continues, should benefit operations as the year progresses."[90]  Despite some volatility in the natural gas mark since that time, natural gas prices in 2010 are at or below the natural gas prices existing at the beginning of the Class Period.

**ANSWER:** GPLLC admits that the text quoted in the second sentence of Paragraph 184 appears in the cited International Paper 10-K. GPLLC denies that the text quoted in the third sentence of Paragraph 184, as quoted, appears in the cited International Paper 10-K, but, rather, it says: "are also starting." GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants, "energy costs," or "natural gas prices." Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 184.

185.   Despite the absence of any lasting cost increases, Defendants have nevertheless attempted to blame increasing costs as the reason for their capacity restrictions and increases in Containerboard Products prices.  Specifically, in the third quarter of 2006, the President and CEO of Norampac attempted to explain the closure of Norampac's 300,000 tons-per-year Ontario mill as follows:  "[t]his decision was taken to mitigate the negative impacts of several economic factors such as growing fiber supply costs, rising energy costs and the strengthening of the Canadian dollar."[91]  However, as this explanation does not comport with the relevant market

---

[89]   *See e.g.* Li, H. and Luo, J. Industry Consolidation and Price in the US Linerboard Industry. Journal of Forest Economics 14 (2008), pp. 93-115.

[90]   International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p.11.

[91]   http://timview.blogspot.com/2006/09/red-rock-mill-shut.html

data, it serves as little more than a pretense for collusive activity. *See In re Linerboard Antitrust Litigation*, 504 F.Supp.2d 38, 53 (E.D.Pa. 2007) ("[t]he Third Circuit has long recognized that evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action' by an alleged conspirator. [Citations].")

**ANSWER:** GPLLC admits that the text quoted in the second sentence of Paragraph 185 appears in the cited document. GPLLC admits that the quoted material in the parenthetical at the end of Paragraph 185 appears in the cited case. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the remaining allegations of Paragraph 185.

186.    In response to Norampac's announcement, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement. Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%."[92]

**ANSWER:** GPLLC admits that the text quoted in Paragraph 186 appears in the cited Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 186.

187.    There is no consistent observable relationship between the price of natural gas (the predominant source of energy for the Containerboard Products industry) and the price of Containerboard Product. For example, although there was a brief uptick in the price of natural gas in the 4th Quarter 2005, the increased prices during the same period outpaced any corresponding manufacturing cost increase. Moreover, the price of natural gas fell nearly 40% from December 2005 to April 2006 without any corresponding price decrease in Containerboard Products. In fact, in April 2006, well after the 40% drop in natural gas prices, Defendants and their co-conspirators again raised prices by over 10%. If energy costs were responsible for price changes (as explained by Defendants to their customers) a 40% decrease in energy costs should result in a lower containerboard price, not a 10% increase. Similarly, from April 2006 through June 2007, the price of natural gas declined by approximately 7%. However, in August 2007, the Defendants and their co-conspirators raised containerboard prices by 7%. These increases in the prices for Containerboard Products cannot be explained by changes in energy costs.

---

[92]    *060830 Deutsche Bank Report - Norampac closing Red Rock*, Deutsche Bank – Equity Research

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of

Paragraph 187.

188.    Deutsche Bank reported that PCA reduced its natural gas usage "to barely over
3% of purchased fuels (was 9% year ago)."[93] On April 18, 2006, Deutsche Bank doubted the
ability of the Defendants and their co-conspirators to push further price increases through noting
that "raw material costs for natural gas & wastepaper have fallen."[94] This is further indication
that neither natural gas costs nor raw material costs had a significant impact on costs associated
with producing Containerboard Products.

**ANSWER:** GPLLC admits that the text quoted in the first sentence of Paragraph 188

appears in the cited *Packaging Corp's 4Q in 100 words* Deutsche Bank report and that the text

quoted in the second sentence of Paragraph 188 appears in the cited *Dr. Paper's Pulse on*

*Pricing* Deutsche Bank report. GPLLC lacks knowledge or information sufficient to form a

belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are

directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining

allegations of Paragraph 188.

189.    Environmental Costs: The Defendants' public filings report that "Compliance
with environmental standards should not adversely effect our competitive position or operating
results."[95] Accordingly, compliance with environmental regulations cannot explain the
extraordinary increase in price of containerboard during the Class Period.

**ANSWER:** GPLLC denies that the text quoted in the first sentence of Paragraph 189, as

quoted, appears in the cited Smurfit-Stone 10-K, but, rather, it says: "adversely affect our."

GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the

---

[93] *060124 Deutsche Bank - Packaging Corp's 4Q in 100 words*, Deutsche Bank – Equity
Research

[94] *060418 Dr Paper's Pulse on Pricing*, Deutsche Bank – Equity Research

[95] *See e.g.* Smurfit-Stone Form 10-K, filed March 06, 2006 at p. 7.

allegations regarding other Defendants.  Insofar as the allegations are directed at GPLLC,

GPLLC denies the remaining allegations of Paragraph 189.

190.    The elimination of cost explanations supports an inference of conspiracy.  Both the capacity reductions and the price increases of the period beginning summer 2005 were record breaking in magnitude.  In early 2006, one trade journal reported, "Since October 2005, board prices have risen 33%.  The quickness of the jump is unprecedented."[96]  In regards to capacity reductions during this period, another trade journal called them "unprecedented."  By the end of 2006, the Defendants had successfully driven inventory to their lowest levels in twenty five years.  In addition, demand for Containerboard Products is tied to overall consumer demand and spending.  In about the second half of 2008, general consumer demand in the United States plummeted.  Yet, in August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%.  Even though the U.S. economy has continued to be weak with fears of deflation being expressed by economists and policymakers in 2009-2010, during 2010 Defendants and their co-conspirators raised Containerboard Product prices an unprecedented three times in one year to all time highs.  Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.

**ANSWER:**  GPLLC denies that the text quoted in the third and fourth sentences of

Paragraph 190, as quoted, appears in the cited *Paperboard and Packaging* report, but, rather, it

says: "late October" and "price jump."  GPLLC lacks knowledge or information sufficient to

form a belief as to the truth of the allegations regarding other Defendants or in the fourth

sentence of Paragraph 190.  Insofar as the allegations are directed at GPLLC, GPLLC denies that

it was part of any conspiracy and denies the remaining allegations of Paragraph 190.

191.    The unprecedented reduction in North American containerboard supply was not the result of the closure of one producer's machines but rather concerted effort by the Defendants and their co-conspirators to reduce capacity in an effort to raise and stabilize prices of Containerboard Products to supra-competitive levels.

**ANSWER:**  GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of

Paragraph 191.

---

[96]    Paperboard and Packaging. (April 2006) at 16.

94

## ACTIVE CONCEALMENT

192.     Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively, actively and fraudulently concealed their unlawful conduct from Plaintiffs and the Plaintiff Class. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases, including that energy and raw material cost increases were responsible for the price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. In addition to the various pretexts and false justifications detailed above, Defendants also maintain, and in some instances, disseminated directly to their customers or posted on their websites "codes of ethics" which among other things, expressed their strict adherence to the antitrust laws. In the latter part of the Class Period, Defendants also falsely attempted to blame the demise of the "black liquor" tax credit for the increase in prices at a time when prices for other paper products which would have been similarly impacted, decreased.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC admits that the U.S. economy was in recession for a portion of the period from February 2004 through November 8, 2010, but denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 192.

193.     Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants or what Plaintiffs did or could have discovered. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of Paragraph 193.

194.     As a result of the concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of

Paragraph 194.

## ANTITRUST IMPACT AND DAMAGES

195. Defendants' unlawful conspiracy has had at least the following effects:

a. Prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Containerboard Products were artificially fixed, raised, stabilized and maintained at artificially inflated and supra-competitive levels in the United States;

b. Plaintiffs and the other members of the Class paid more for Containerboard Products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

c. Competition in the sale of Containerboard Products was restrained, suppressed and eliminated in the United States; and,

d. As a direct and proximate result of Defendants' illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured in their respective businesses and property, in amounts according to proof at trial.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding the Plaintiffs, putative Class members, or other Defendants.

Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any

conspiracy and denies the allegations of Paragraph 195.

## CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

196. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER:** GPLLC incorporates by reference its responses to the above paragraphs as if

fully set forth herein.

197. Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Containerboard Products in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of

Paragraph 197.

198.    The contract, combination or conspiracy has resulted in an agreement,
understanding or concerted action between and among the Defendants and their co-conspirators
in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained,
and/or stabilized prices for Containerboard Products in the United States. Such contract,
combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in
any event, an unreasonable and unlawful restraint of trade.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of

Paragraph 198.

199.    The Defendants' contract, combination, agreement, understanding or concerted
action with the co-conspirators occurred in or affected interstate commerce. The Defendants'
unlawful conduct was through mutual understandings, combinations or agreements by, between
and among the Defendants and other unnamed co-conspirators. These other co-conspirators
have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful
restraint of trade alleged herein.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. Insofar as the allegations are directed at

GPLLC, GPLLC denies that it was part of any conspiracy and denies the allegations of

Paragraph 199.

200.    The contract, combination or conspiracy has had the following effects, among
others:

    a.    Prices charged to Plaintiffs and Class members for Containerboard Products were
fixed or stabilized at higher, artificially derived, supra-competitive levels;

    b.    Plaintiffs and Class members have been deprived of the benefits of free, open and
unrestricted competition in the market for Containerboard Products; and

    c.      Competition in establishing the prices paid, customers of, and territories for Containerboard Products has been unlawfully restrained, suppressed and eliminated.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Plaintiffs, putative Class members, or other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies the allegations of Paragraph 200.

    201.    As a proximate result of the Defendants' unlawful conduct, Plaintiffs and Class members have suffered injury in that they have paid supra-competitive prices for Containerboard Products. Plaintiffs and Class members will continue to be injured in their business and property by paying more for Containerboard Products purchased directly from the Defendants and their co-conspirators than they would pay in the absence of the contract, combination or conspiracy.

**ANSWER:** GPLLC lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the Plaintiffs, putative Class members, or other Defendants. Insofar as the allegations are directed at GPLLC, GPLLC denies that it was part of any conspiracy and denies the remaining allegations of Paragraph 201.

## AFFIRMATIVE DEFENSES

As stated in its Answer above, GPLLC does not admit any liability, that Plaintiffs have been injured or damaged in any way, or that Plaintiffs are entitled to any relief whatsoever. Nevertheless, GPLLC pleads in the alternative the following affirmative defenses, but by so doing GPLLC does not assume the burden of proof for any issue as to which applicable law places the burden upon Plaintiffs. GPLLC has insufficient knowledge or information upon which to form a basis as to whether it may have additional, as yet unstated, separate defenses available. GPLLC reserves the right to amend this Answer to add, supplement, or modify defenses based upon legal theories that may be or will be divulged through clarification of the Second CAC, through discovery, or through further factual or legal analysis of Plaintiffs' allegations, contentions, and positions in this litigation. GPLLC incorporates by reference any

defenses applicable to it that are asserted by any other defendant to the Second CAC as if fully set forth herein.

## FIRST DEFENSE

To the extent the Complaint alleges injuries arising from purchases of any products outside of the United States, Plaintiffs and the members of the purported plaintiff class lack standing to sue for the alleged injuries pursuant to 15 U.S.C. § 6a and, therefore, this Court is without subject matter jurisdiction to hear those claims.

## SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations in the Clayton Act, 15 U.S.C. § 15b (2011), and/or by contractual provisions in some supply and sales agreements between one or more of the Defendants and members of the purported plaintiff class requiring that any claim be brought within a specified period after accrual of the claim. Plaintiffs filed this action on September 9, 2010.  If and to the extent there was a violation of Section 1 of the Sherman Act prior to September 9, 2006, which GPLLC denies, Plaintiffs failed to bring this action within four years after the cause of action accrued as required by the Clayton Act.

## THIRD DEFENSE

On information and belief, some supply and sales agreements between one or more of the Defendants and members of the purported plaintiff class contain mandatory arbitration clauses. This court lacks jurisdiction to adjudicate any claim subject to those agreements.

## FOURTH DEFENSE

If and to the extent that Plaintiffs and the members of the purported plaintiff class have been damaged, which GPLLC denies, the amount of damages that Plaintiffs and the members of the purported plaintiff class allege to have suffered is too remote or speculative to allow

recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

## FIFTH DEFENSE

If and to the extent Plaintiffs and the members of the purported plaintiff class have been damaged, which GPLLC denies, Plaintiffs and members of the purported plaintiff class, by the exercise of reasonable diligence, could have mitigated their damages by purchasing substitute products or purchasing from alternative suppliers. Plaintiffs and members of the purported plaintiff class did not mitigate their damages and therefore are barred from recovery. Alternatively, any damages sustained by Plaintiffs and members of the purported plaintiff class, which GPLLC denies, must be reduced by the amount that such damages would have been reduced had Plaintiffs and the members of the purported plaintiff class exercised reasonable diligence in mitigating their damages.

## SIXTH DEFENSE

If and to the extent Plaintiffs and the members of the purported plaintiff class have been damaged, which GPLLC denies, Plaintiffs and members of the purported plaintiff class are barred from recovery under the doctrine of set-off to the extent that they owe outstanding debts to GPLLC. Alternatively, any damages sustained by Plaintiffs and members of the purported plaintiff class, which GPLLC denies, must be reduced by the amount that Plaintiffs and the members of the purported plaintiff class owe outstanding debts to GPLLC.

## SEVENTH DEFENSE

If and to the extent that Plaintiffs and the members of the purported plaintiff class have been damaged, which GPLLC denies, Plaintiffs' claims for equitable relief are barred because Plaintiffs and members of the purported plaintiff class have an adequate remedy at law through damages.

## EIGHTH DEFENSE

If and to the extent certain Plaintiffs and/or members of the putative plaintiff class have settled and released certain of their claims against GPLLC, those Plaintiffs and members of the putative class are barred from pursuing those settled and released claims.

## NINTH DEFENSE

Plaintiffs' claim is barred, in whole or in part, by the doctrines of estoppel and laches.

## TENTH DEFENSE

Some supply and sales agreements between one or more of the Defendants and certain Plaintiffs and/or members of the purported plaintiff class contain a dispute resolution procedure that must be exhausted prior to initiation of a lawsuit. Any claim subject to those agreements must be dismissed unless and until that dispute resolution procedure is exhausted.

## ELEVENTH DEFENSE

Some supply and sales agreements between one or more of the Defendants and certain Plaintiffs and/or members of the purported plaintiff class contain forum-selection clauses mandating that claims be adjudicated in a forum other than this court. Any claim subject to any such agreement(s) must be severed and transferred to the court indicated by the forum-selection clause.

## TWELFTH DEFENSE

Some supply and sales agreements between one or more of the Defendants and certain Plaintiffs and/or members of the purported plaintiff class contain jury waiver clauses. Any claim by any purported class member that is subject to any such agreement(s) cannot be adjudicated by a jury.

**THIRTEENTH DEFENSE**

If and to the extent that Plaintiffs and the members of the purported plaintiff class have been damaged, which GPLLC denies, their recoverable damages are limited by some supply and sales agreements between one or more of the Defendants and members of the purported plaintiff class.

**PRAYER FOR RELIEF**

WHEREFORE, GPLLC respectfully prays for relief as follows:

(1)    That the Court dismiss the Complaint with prejudice and enter judgment in favor of GPLLC and against Plaintiffs;

(2)    That class certification be denied;

(3)    That the Plaintiffs and putative Class members recover nothing;

(4)    That the Court award GPLLC its reasonable costs incurred in defending this action, including reasonable attorneys' fees; and

(5)    That the Court grant GPLLC such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

GPLLC hereby demands trial by jury on all issues so triable.

DATED:   New York, New York
         June 4, 2014

                              QUINN EMANUEL URQUHART &
                              SULLIVAN, LLP

                              By: /s/ Stephen R. Neuwirth
                                  Stephen R. Neuwirth
                                  Michael B. Carlinsky
                                  Deborah K. Brown

                                  51 Madison Avenue, 22nd Floor
                                  New York, New York 10010
                                  Tel.:  (212) 849-7000
                                  Fax:  (212) 849-7100
                                  stephenneuwirth@quinnemanuel.com

                              FIGLIULO & SILVERMAN, P.C.

                                  James R. Figliulo
                                  10 South LaSalle Street, Suite 3600
                                  Chicago, Illinois 60603
                                  Tel.:  (312) 251-4600
                                  Fax:  (312) 251-4610
                                  jfigliulo@fslegal.com

                                  *Attorneys for Defendant Georgia-Pacific LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 4, 2014, I caused a true and correct copy of

the foregoing to be served on all parties to this proceeding by electronic mail to the following:

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015 USA
Telephone: (224) 632-4500
Facsimile: (224) 632-4521

mfreed@fklmlaw.com
skanner@fklmlaw.com
rwozniak@fklmlaw.com

*Co-lead Counsel for Class Plaintiffs*

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610
dmogin@moginlaw.com

*Co-lead Counsel for Class Plaintiffs*

Scott M. Mendel
Lauren N. Norris
K&L GATES LLP
70 West Madison Street
Suite 3100
Chicago, IL 60602-4207
Telephone: (312) 372-1121
Facsimile: (312) 827-8000
scott.mendel@klgates.com
lauren.norris@klgates.com

*Attorneys for Defendants Cascades, Inc. &
Norampac Industries, Inc.*

Andrew S. Marovitz
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
amarovitz@mayerbrown.com
bmiller@mayerbrown.com

*Attorneys for Defendant Temple-Inland Inc.*

Michael P. Mayer
James F. Herbison
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
mmayer@winston.com
jherbison@winston.com

*Attorneys for Defendant RockTenn CP, LLC*

Nathan P. Eimer
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604-2516
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
neimer@eimerstahl.com

Jim McKeown
FOLEY & LARDNER LLP
777 E. Wisconsin Ave.
Milwaukee, WI  53202-5367
Telephone: (414) 297-5530
Facsimile: (414) 297-4900
jmckeown@foley.com

*Attorneys for Defendant International Paper
Company*

David Marx, Jr.
Stephen Wu
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
dmarx@mwe.com
jdiver@mwe.com

*Attorneys for Defendant Weyerhaeuser
Company*

Douglas J. Kurtenbach
Daniel E. Laytin
Barack S. Echols
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
douglas.kurtenbach@kirkland.com
daniel.laytin@kirkland.com
barack.echols@kirkland.com

*Attorneys for Defendant Packaging
Corporation of America*

/s/ Deborah K. Brown
_____

Deborah K. Brown