**FILED UNDER SEAL PURSUANT TO COURT ORDER**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KLEEN PRODUCTS LLC, *et al.*, individually
and on behalf of all others similarly situated,

    Plaintiffs,

    v.

PACKAGING CORPORATION OF
AMERICA, *et al.*,

    Defendants.

No. 1:10-cv-05711

Hon. Harry D. Leinenweber

### ANSWER OF DEFENDANT INTERNATIONAL PAPER COMPANY TO
### AMENDED CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

Defendant International Paper Company ("IP"), hereby answers the Amended Consolidated and Amended Class Action Complaint ("Amended Complaint") filed by Kleen Products LLC; R.P.R. Enterprises, Inc.; Mighty Pac, Inc.; Ferraro Foods, Inc.; Ferraro Foods of North Carolina, LLC; Distributors Packaging Group, LLC; RHE Hatco Inc.; and Chandler Packaging Group, Inc. (collectively, "Plaintiffs"). IP denies the allegations in the Amended Complaint except as specifically admitted, denies any allegations as to which there is no specific response, denies all titles, headings, footnotes, subheadings, and any other material not contained in numbered paragraphs, and denies that it violated the antitrust laws in any way. IP further responds that it does not admit the authenticity, accuracy, completeness, or admissibility of any document cited or purportedly quoted by Plaintiffs in the Amended Complaint and affirmatively states that the contents of any such documents speak for themselves.

FILED UNDER SEAL PURSUANT TO COURT ORDER

**RESPONSES TO SPECIFIC ALLEGATIONS**

The introductory paragraph of the Amended Complaint states: Plaintiffs Kleen Products LLC; R.P.R. Enterprises, Inc.; Mighty Pac, Inc.; Ferraro Foods, Inc.; Ferraro Foods of North Carolina, LLC; Distributors Packaging Group, LLC; RHE Hatco Inc.; Thule, Inc. and Chandler Packaging Group, Inc. individually and on behalf of a class of all those similarly situated, bring this action for treble damages under the antitrust laws of the United States against Defendants, and demands a trial by jury.

ANSWER:    IP admits that this action is styled as a putative class action and seeks to certify a class of plaintiffs and admits that the action is brought by: Kleen Products LLC; R.P.R. Enterprises, Inc.; Mighty Pac, Inc.; Ferraro Foods, Inc.; Ferraro Foods of North Carolina, LLC; Distributors Packaging Group, LLC; RHE Hatco Inc.; and Chandler Packaging Group, Inc.  IP denies that the action is brought by Thule, Inc. subsequent to its dismissal from this action on April 8, 2011, and otherwise denies the allegations of the introductory paragraph of the Amended Complaint.

Paragraph 1 of the Amended Complaint states: This case is an antitrust class action brought to recover for the injuries sustained by Plaintiffs and the members of the Plaintiff Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure. The Plaintiff Class, defined more fully below in Paragraph 28, consists of all persons and entities that purchased Containerboard Products directly from Defendants between February 15, 2004 and November 8, 2010 (the "Class Period").

ANSWER: IP admits that Plaintiffs purport to bring an action as described in Paragraph 1, but denies that IP violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  IP admits that Plaintiffs purport to bring this action as a class action, but denies that a class should be certified.  IP otherwise denies the allegations of Paragraph 1.

Paragraph 2 of the Amended Complaint states: Containerboard, which includes both linerboard and corrugating medium, is the principal raw material used to manufacture corrugated products such as boxes and other types of corrugated containers. Linerboard is used as the facing to which corrugating medium is fluted and laminated to produce sheets. The containerboard sheets are subsequently printed, cut, folded and glued to produce corrugated products. As used herein, "Containerboard Products" includes linerboard, corrugated medium,

FILED UNDER SEAL PURSUANT TO COURT ORDER

corrugated sheets and corrugated products, including boxes and other containers. Defendants are integrated producers of the Containerboard Products sold to the Plaintiff Class.

ANSWER: IP admits that linerboard and corrugating medium are types of containerboard, that containerboard is used to manufacture certain containers and boxes, that linerboard is used as the facing to which corrugating medium is fluted and laminated to produce sheets, and that corrugated sheets can be printed, cut, folded and glued to produce corrugated products. IP admits that Plaintiffs purport to define "Containerboard Products," but denies that this definition is accurate or appropriate for use in this case. As to the last sentence in Paragraph 2, IP admits that it produces linerboard, corrugating medium, and various products manufactured from containerboard and that it directly sold linerboard, corrugating medium and various products created from containerboard to direct purchasers, but denies that a class should be certified. Upon information and belief, IP admits that the other defendants or their affiliates have sold linerboard, corrugating medium and some products created from containerboard to direct purchasers, but denies that a class should be certified. IP otherwise denies the allegations of Paragraph 2.

Paragraph 3 of the Amended Complaint states: Various Containerboard Products manufacturers, including multiple Defendants herein and their predecessors, have been subject to governmental investigations and civil lawsuits concerning their engagement in anticompetitive conduct over the past two decades. The Containerboard Products industry is highly susceptible to collusive behavior and anticompetitive conduct due to a small number of manufacturers, inelastic product demand, the commodity-like nature of the products, and an inability of any single manufacturer to unilaterally control supply and price.

ANSWER: IP admits that civil plaintiffs have in the past alleged that at least some containerboard manufacturers, including some Defendants and their predecessors, have engaged in anticompetitive conduct, and that, upon information and belief, some containerboard manufacturers, including some Defendants and their predecessors, may have been subject to governmental investigations. IP otherwise denies the allegations of Paragraph 3.

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 4 of the Amended Complaint states: The consolidation of the containerboard industry has further concentrated the industry and exacerbated the conditions that led to the anticompetitive conduct at issue in this complaint.

ANSWER: IP admits that some containerboard manufacturers have purchased some other containerboard manufacturers or their assets. IP otherwise denies the allegations of Paragraph 4.

Paragraph 5 of the Amended Complaint states: Defendants employ various acts and practices to facilitate the combination or conspiracy alleged herein. Defendants' opportunities and ability to engage in anticompetitive practices are also fostered through the frequent meetings and events held by industry trade organizations led by officers and/or board members who simultaneously serve as the Defendants' employees.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5 regarding other Defendants. IP otherwise denies the allegations of Paragraph 5.

Paragraph 6 of the Amended Complaint states: Beginning in or about 2004, the Containerboard Products industry was faced with decreasing profit margins, rising product demand, and a promising macroeconomic outlook. Nevertheless, Defendants began a coordinated across-the-board imposition of capacity restraints, leading to a subsequent restriction in the supply of Containerboard Products on the market. The goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the Class Period. Defendants' conspiracy included a scheme to impose capacity and supply constraints which had the effect of creating an artificial shortage of Containerboard Products in the United States during a time of stable or increasing demand, thereby allowing Defendants to charge supra-competitive prices to the Plaintiff Class. As detailed below, the conspiracy was effected, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in massive and unprecedented idling of production capacity, reduced production and near simultaneous across-the-board price increases.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 6 regarding other Defendants. IP otherwise denies the allegations of Paragraph 6.

Paragraph 7 of the Amended Complaint states: Defendants' anticompetitive conduct cannot be explained away as independent parallel behavior. As multiple Defendants confirm in their own quarterly reports, market demand for Containerboard Products remained stable or was expected to increase during the period of coordinated production capacity restriction. Similarly, no significant lasting changes in production costs account for the

FILED UNDER SEAL PURSUANT TO COURT ORDER

Defendants' repeated price increases. In fact, during the Class Period, price increases outpaced cost increases by over fifty percent (50%). Although basic economics holds that manufacturers in a competitive market faced with similar demand conditions as evidenced here would be expected to increase production to satisfy market demand and gain market share, each Defendant refrained. In sum, Defendants' conduct, individually and collectively, evidences a restriction of freedom and sense of obligation associated with an agreement.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7 regarding the conduct of other Defendants. IP otherwise denies the allegations of Paragraph 7.

Paragraph 8 of the Amended Complaint states: The market impacts of Defendants' scheme on the Plaintiff Class have been, and continue to be, substantial. As a result of Defendants' market domination and their coordinated restriction of production and operations capacity, direct purchasers of Containerboard Products were forced to pay substantially higher prices during the conspiracy period than they would have paid in a competitive market.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the putative Plaintiff Class, "direct purchasers of Containerboard Products", or other Defendants. IP otherwise denies the allegations of Paragraph 8.

Paragraph 9 of the Amended Complaint states: Giving a voice to those impacted by Defendants' coordinated actions, on July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "*3rd Containerboard Increase puts the Integrity of Our Industry on the Line.*" The article notes that in light of the manufacturing capacity cuts, as well as the absence of cost drivers, yet another price increase, the third for 2010, beyond already historic highs "calls into question the integrity of our industry" and "call[s] into question the pricing activities of the major companies" and noted the similarity of the present situation to "the years 1994-1995, [when] six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak" which resulted in allegations of collusion, government investigations, a consent decree and over $200 million paid in settlements.

ANSWER: IP admits that Paragraph 9 purports to quote from a July 13, 2010 statement by the Association of Independent Corrugated Converters. IP otherwise denies the allegations of Paragraph 9.

Paragraph 10 of the Amended Complaint states: This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries

FILED UNDER SEAL PURSUANT TO COURT ORDER

sustained by Plaintiffs and the members of the Plaintiff Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.

ANSWER: IP admits that Plaintiffs purport to bring an action as described in Paragraph 10, but denies that IP violated Section 1 of the Sherman Act, 15 U.S.C. §1. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10 regarding the conduct of other Defendants. IP otherwise denies the allegations of Paragraph 10.

Paragraph 11 of the Amended Complaint states: This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

ANSWER: IP admits that this Court has jurisdiction to the extent that the Complaint alleges injuries arising from purchases of any products sold in the United States. IP otherwise denies the allegations of Paragraph 11.

Paragraph 12 of the Amended Complaint states: Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

ANSWER: IP admits that it transacted business in this District and admits that venue is appropriate in this district as to the specifically named plaintiffs to the extent that the Complaint alleges injuries arising from purchases of products sold in the United States. IP otherwise denies the allegations of Paragraph 12 and alleges affirmatively that this venue is improper for any purported class member that is subject to an arbitration agreement, a forum selection clause, or other contractual term that requires a different forum or venue.

Paragraph 13 of the Amended Complaint states: The activities of the Defendants and their coconspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

6

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

ANSWER: IP admits that it sold products in the United States. IP lacks

knowledge or information sufficient to form a belief as to the truth of the allegations regarding

other Defendants. IP otherwise denies the allegations of Paragraph 13.

Paragraph 14 of the Amended Complaint states: During the Class Period, each of
the Plaintiffs purchased Containerboard Products directly from one or more of the Defendants
and thereby suffered injury to their business or property:

a.    Plaintiff Kleen Products LLC is a limited liability company organized and
existing under the laws of the State of Delaware, with its principal place of business in
Minnetonka, Minnesota;

b.    Plaintiff R.P.R. Enterprises, Inc. is a corporation organized and existing
under the laws of the State of Missouri, with its principal place of business in Kansas
City, Missouri;

c.    Plaintiff Mighty Pac, Inc. is a corporation organized and existing under the
laws of the State of an Illinois, with its principal place of business in Palatine, Illinois;

d.    Plaintiff Ferraro Foods, Inc. is a corporation organized and existing under
the laws of the State of New Jersey, with its principal place of business in Piscataway,
New Jersey;

e.    Plaintiff Ferraro Foods of North Carolina, LLC is a limited liability
company organized and existing under the laws of the State of North Carolina, with its
principal place of business in High Point, North Carolina;

f.    Plaintiff Distributors Packaging Group LLC is a limited liability company
organized and existing under the laws of the State of Texas, with its principal place of
business in Carrollton, Texas;

g.    Plaintiff Thule, Inc. is a corporation organized and existing under the laws
of the State of Connecticut with its principal pace of business in Seymour, Connecticut;

h.    Plaintiff RHE Hatco, Inc. is a corporation organized and existing under the
laws of the State of Texas, with its principal place of business in Garland, Texas; and,

i.    Plaintiff Chandler Packaging, Inc. is a corporation organized and existing
under the laws of the State of California, with its principal place of business in San
Diego, California.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in subparagraphs a-i of Paragraph 14 as they relate to Plaintiffs' corporate

organization and their principal places of businesses. IP admits that Kleen Products LLC, R.P.R.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

Enterprises, Inc., Mighty Pac, Inc., Distributors Packaging Group LLC, and RHE Hatco, Inc. or

their affiliates purchased products containing linerboard and corrugating medium from IP at least

some point during the period from February 15, 2004 to November 8, 2010. IP states that Thule,

Inc. is no longer a Plaintiff in this action subsequent to its dismissal from this action on April 8,

2011. IP lacks knowledge or information sufficient to form a belief as to the truth of the

allegations regarding other Defendants. IP otherwise denies the allegations of Paragraph 14.

<u>Paragraph 15 of the Amended Complaint states:</u> Defendant Packaging
Corporation of America ("PCA") is a Delaware corporation with its principal place of business
in Lake Forest, Illinois. During the Class Period, PCA and/or its predecessors, wholly-owned or
controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly
to purchasers in the United States.

<u>ANSWER:</u> IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in the first sentence of Paragraph 15 as they relate to Packaging

Corporation of America's corporate organization and its principal place of business. Upon

information and belief, IP admits that Packaging Corporation of America or one or more of its

affiliates has a facility in Lake Forest, Illinois. IP further admits that Plaintiffs purport to give

the term "PCA" the definition set forth in the first sentence of Paragraph 15. Upon information

and belief, IP further admits that Packaging Corporation of America or entities affiliated with it

sold containerboard (linerboard and corrugated medium) and products made from containerboard

in the United States in interstate commerce within the period at issue in the Amended Complaint.

IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 15.

<u>Paragraph 16 of the Amended Complaint states:</u> Defendant International Paper
("International Paper") is a New York corporation with its principal place of business in
Memphis, Tennessee. During the Class Period, International Paper and/or its predecessors,
wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate
commerce directly to purchasers in the United States.

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP admits that International Paper Company is a New York corporation with its principal place of business in Memphis, Tennessee and admits that International Paper Company sold containerboard (linerboard and corrugated medium) and products made from containerboard in the United States in interstate commerce within the period at issue in the Amended Complaint. IP otherwise denies the allegations in Paragraph 16.

Paragraph 17 of the Amended Complaint states: Defendant Norampac U.S. Holdings Inc. ("Norampac") is a Canadian corporation with its principal place of business in Saint-Bruno, Quebec, Canada. Norampac Inc. was formed in 1997 as a joint venture by Cascades Inc. ("Cascades Inc.") and Domtar Corporation and became a wholly-owned and controlled subsidiary division of Cascades Inc. and/or Cascades Canada Inc. in December 2006. Norampac Holdings US Inc. is a Delaware corporation with residency in Delaware. Norampac Industries Inc. is a New York Corporation with a place of business in Niagara Falls, New York and which lists it Principal Executive Office as "c/o Cascades Inc." in Montreal, Quebec, Canada. These and other businesses engaged in the Containerboard Products business using the Norampac name, as detailed below, and are collectively referred to hereafter as "Norampac". During the Class Period, Norampac and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including by and through its corporate parent, Cascades Canada, Inc., sold Containerboard Products in interstate commerce directly to purchasers in the United States. Norampac's (and Cascades Canada, Inc.) subsidiaries and divisions in Canada serviced customers in the United States by selling Containerboard Products directly to them as alleged above. Norampac's subsidiaries and divisions located in the United States including Norampac Industries, Inc. Lancaster Division in Lancaster, New York (corrugated packaging containers) and Niagara Falls Division in Niagara Falls, New York (corrugated medium); Norampac New England, Inc., Thompson Division in Thompson, Connecticut (corrugated packaging containers) and Leominster Division in Leominster, Massachusetts (corrugated products) Norampac New York City Inc., Maspeth, New York (corrugated products) and Norampac Schenectady Inc. (corrugated packaging) also sold Containerboard Products in interstate commerce directly to purchasers in the United States.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 17 as they relate to Norampac U.S. Holdings Inc.'s corporate organization and its principal place of business. IP further admits that Plaintiffs purport to give the term "Norampac" the definition set forth in the first sentence of Paragraph 17. Upon information and belief, IP further admits that Norampac U.S. Holdings Inc. or entities affiliated with it sold containerboard (linerboard and corrugated medium) and products made from containerboard in the United States in interstate commerce within the period at issue

9

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

in the Amended Complaint. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 17.

Paragraph 18 of the Amended Complaint states: Defendant Cascades Canada Inc. ("Cascades") is a Canadian corporation with its principal place of business in Kingsley Falls, Quebec, Canada. Cascades describes Norampac as both a subsidiary and a division of Cascades and represents that its Containerboard Group conducts business under the name Norampac. Plaintiffs are informed and believe that Cascades uses the Norampac name or brand in connection with certain of its Containerboard Products businesses that are not owned, directly or indirectly, by Norampac. During the Class Period, Cascades and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates, including, but not limited to Defendant Norampac, sold Containerboard Products in interstate commerce directly to purchasers in the United States.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 18 as they relate to Cascades Canada Inc.'s corporate organization and its principal place of business. Upon information and belief, IP admits that Cascades Canada Inc. or one or more of its affiliates has a facility in Kingsley Falls, Quebec, Canada. IP further admits that Plaintiffs purport to give the term "Cascades" the definition set forth in the first sentence of Paragraph 18. Upon information and belief, IP further admits that Cascades Canada Inc. or entities affiliated with it sold containerboard (linerboard and corrugated medium) and products made from containerboard in the United States in interstate commerce within the period at issue in the Amended Complaint. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18.

Paragraph 19 of the Amended Complaint states: Defendant Weyerhaeuser Company ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington. During the Class Period, Weyerhaeuser and/or its predecessors, wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

ANSWER: IP admits that Weyerhaeuser Company is a Washington corporation with its principal place of business in Federal Way, Washington and admits that Weyerhaeuser sold containerboard (linerboard and corrugated medium) and products made from containerboard

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

in the United States in interstate commerce between February 2004 and August 2008. IP further

admits that Plaintiffs purport to give the term "Weyerhaeuser" the definition set forth in the first

sentence of Paragraph 19. IP lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 19.

> Paragraph 20 of the Amended Complaint states: Defendant Georgia-Pacific LLC
> ("Georgia-Pacific") is a Georgia corporation with its principal place of business in Atlanta,
> Georgia. During the Class Period, Georgia-Pacific and/or its predecessors, wholly-owned or
> controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly
> to purchasers in the United States.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in the first sentence of Paragraph 20 as they relate to Georgia-Pacific

LLC's corporate organization and its principal place of business. Upon information and belief,

IP admits that Georgia-Pacific LLC or one or more of its affiliates has a facility in Atlanta,

Georgia. IP further admits that Plaintiffs purport to give the term "Georgia-Pacific" the

definition set forth in the first sentence of Paragraph 20. Upon information and belief, IP further

admits that Georgia-Pacific LLC or entities affiliated with it sold containerboard (linerboard and

corrugated medium) and products made from containerboard in the United States in interstate

commerce within the period at issue in the Amended Complaint. IP lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph

20.

> Paragraph 21 of the Amended Complaint states: Defendant Temple-Inland, Inc.
> ("Temple-Inland") is a Delaware corporation with its principal place of business at Austin,
> Texas. During the Class Period, Temple-Inland and/or its predecessors, wholly-owned or
> controlled subsidiaries or affiliates, including Defendant TIN, Inc. sold Containerboard Products
> in interstate commerce directly to purchasers in the United States (Defendant Temple-Inland,
> Inc. and Defendant TIN, Inc. are collectively referred to hereafter as "Temple-Inland").

ANSWER: IP admits that Temple-Inland Inc. is a Delaware corporation and

admits that during the time period at issue, Temple-Inland Inc. had its principal place of business

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

in Austin, Texas. IP admits that as of February 13, 2012, Temple-Inland Inc.'s principal place of

business changed to Memphis, Tennessee. IP further admits that Plaintiffs purport to give the

term "Temple-Inland" the definition set forth in the first sentence of Paragraph 21. IP further

admits that Temple-Inland, Inc. or entities affiliated with it sold containerboard (linerboard and

corrugated medium) and products made from containerboard in the United States in interstate

commerce within the period at issue in the Amended Complaint. IP denies the remaining

allegations in Paragraph 21.

      Paragraph 22 of the Amended Complaint states: Defendant Smurfit-Stone
Container Corporation ("Smurfit-Stone") is a Delaware corporation with its principal place of
business at Chicago, Illinois. During the Class Period, Smurfit-Stone and/or its predecessors,
wholly-owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate
commerce directly to purchasers in the United States. On or about January 26, 2009, Smurfit-
Stone filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District
of Delaware; effective June 30, 2010, Smurfit-Stone was discharged under a plan of
reorganization. However, many of Smurfit-Stone's most senior executives, including those with
responsibility for Containerboard Products, continued with the company substantially throughout
the conspiracy alleged herein, including through the inception of bankruptcy proceedings and
after the discharge became effective, such as Patrick J. Moore, Chief Executive Officer and John
Knudsen, Senior Vice President. After its discharge for bankruptcy, Smurfit-Stone knowingly
and intentionally joined the conspiracy. This complaint seeks to recover damages from Smurfit-
Stone for post-discharge conduct only, and in no way seeks to violate any Orders of the above-
referenced Bankruptcy Court. Specific post-discharge actions by Smurfit-Stone in furtherance of
the conspiracy as alleged, *inter alia*, in paragraphs 168-172 and 174-178 are consistent with the
actions taken by all of the Defendants throughout the Class Period and that it is part of the
ongoing antitrust conspiracy to and including the date of the filing of this complaint. [Plaintiff
Thule, Inc. alleges that Smurfit-Stone participated as coconspirator with the other Defendants
and has performed acts and made statements in furtherance of the conspiracy, however, does not
join in the allegations naming Smurfit-Stone as a Defendant.]

      ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in the first sentence of Paragraph 22 as they relate to Smurfit-Stone

Container Corporation's corporate organization and its principal place of business. Upon

information and belief, IP admits that Smurfit-Stone Container Corporation or one or more of its

affiliates has a facility in Chicago, Illinois. IP further admits that Plaintiffs purport to give the

term "Smurfit-Stone" the definition set forth in the first sentence of Paragraph 22. Upon

FILED UNDER SEAL PURSUANT TO COURT ORDER

information and belief, IP further admits that Smurfit-Stone Container Corporation or entities

affiliated with it sold containerboard (linerboard and corrugated medium) and products made

from containerboard in the United States in interstate commerce within the period at issue in the

Amended Complaint.  IP lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 22.

Paragraph 23 of the Amended Complaint states: "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Containerboard Products manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold Containerboard Products in interstate commerce directly to purchasers in the United States during the Class Period.

ANSWER: IP admits that Plaintiffs purport to define "Defendant" or

"Defendants," but denies that this definition is accurate or appropriate for use in this matter.  IP

otherwise denies the allegations of Paragraph 23.

Paragraph 24 of the Amended Complaint states: To the extent that subsidiaries and divisions within Defendants' corporate families sold or distributed Containerboard Products to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this complaint because Defendants wished to ensure that the prices paid for such Containerboard Products would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing and collecting monies from Plaintiffs and the members of the Plaintiff Class for Containerboard Products was known to and approved by their respective corporate parent named as a Defendant in this complaint.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.   IP otherwise denies the allegations of

Paragraph 24.

Paragraph 25 of the Amended Complaint states: Various other persons, firms and corporations, not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 25 regarding other Defendants or other "persons, firms and

corporations." IP otherwise denies the allegations of Paragraph 25.

Paragraph 26 of the Amended Complaint states: Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

ANSWER: IP admits that Plaintiffs purport to define an "act of any corporation."

IP otherwise denies the allegations of Paragraph 26.

Paragraph 27 of the Amended Complaint states: Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 27 regarding the actions of other Defendants. IP otherwise

denies the allegations of Paragraph 27.

Paragraph 28 of the Amended Complaint states: Each Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class:

All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010.

Specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

ANSWER:    IP admits that Plaintiffs purport to bring this suit as a class action, but denies that a class should be certified or that the purported class as stated in Paragraph 28 is properly defined.  IP otherwise denies the allegations of Paragraph 28.

Paragraph 29 of the Amended Complaint states: Class Identity: The Plaintiff Class is readily identifiable and is one for which records should exist.

ANSWER: IP admits that it has certain records of purchases of its products during the time period alleged, but otherwise denies the allegations of Paragraph 29.

Paragraph 30 of the Amended Complaint states: Numerosity: Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands of Class members as above described, the exact number and their identities being known to Defendants and their co-conspirators.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30 regarding other Defendants.  IP otherwise denies the allegations of Paragraph 30.

Paragraph 31 of the Amended Complaint states: Typicality: Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class because each Plaintiff purchased Containerboard Products directly from one or more of the Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

ANSWER: IP admits that Kleen Products LLC, R.P.R. Enterprises, Inc., Mighty Pac, Inc., Distributors Packaging Group LLC, and RHE Hatco, Inc. or their affiliates purchased products containing linerboard and corrugating medium from IP at some point during the period from February 15, 2004 to November 8, 2010.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31 regarding other Defendants.  IP denies the remaining allegations of Paragraph 31.

Paragraph 32 of the Amended Complaint states: Common Questions Predominate: There are questions of law and fact common to the Class, including, but not limited to:

FILED UNDER SEAL PURSUANT TO COURT ORDER

   a.  Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Containerboard Products sold in interstate commerce in the United States;

   b.  The identity of the participants of the alleged conspiracy;

   c.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

   d.  Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

   e.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Plaintiff Class;

   f.  The effect of Defendants' alleged conspiracy on the prices of Containerboard Products sold in the United States during the Class Period; and,

   g.  The appropriate class-wide measure of damages.

   ANSWER: IP denies the allegations of Paragraph 32.

   Paragraph 33 of the Amended Complaint states: These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Plaintiff Class.

   ANSWER: IP denies the allegations of Paragraph 33.

   Paragraph 34 of the Amended Complaint states: Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

   ANSWER: IP lacks knowledge or information sufficient to form a belief at to the

allegations of Paragraph 34.

   Paragraph 35 of the Amended Complaint states: Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of repetitious litigation. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the

FILED UNDER SEAL PURSUANT TO COURT ORDER

delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

ANSWER: IP denies the allegations of Paragraph 35.

Paragraph 36 of the Amended Complaint states: Containerboard is the principal raw material used to manufacture corrugated products. Containerboard includes both corrugating medium and linerboard. Linerboard is a flat wood-fiber paperboard. Corrugated medium is a type of fluted paperboard made from the same material as linerboard. Linerboard is used as the inner and outer facings, or liners, of corrugated products. Corrugating medium is fluted and laminated to linerboard in corrugator plants to produce corrugated sheets. The sheets are subsequently printed, cut, folded and glued to produce corrugated products, mostly boxes and other containers. As used herein, "Containerboard Products" includes linerboard, corrugated medium, corrugated sheets and corrugated products including corrugated boxes and other corrugated containers.

ANSWER: IP admits that containerboard is used to manufacture corrugated products, admits that linerboard and corrugating medium are components of containerboard, admits that wood-fiber, along with other materials, can be used to make linerboard, admits that corrugating medium can be combined with linerboard to produce corrugated sheets, and admits that corrugated sheets can be printed, cut, folded and glued to produce corrugated products.  IP admits that Plaintiffs purport to define "Containerboard Products," but denies that this definition is accurate or appropriate for use in this case.  IP otherwise denies the allegations of Paragraph 36.

Paragraph 37 of the Amended Complaint states: Defendants and their co-conspirators manufacture and sell linerboard, corrugated medium, containerboard and corrugated boxes and other corrugated containers.

ANSWER: IP admits it manufactured and sold linerboard, corrugating medium, containerboard, corrugated boxes and other corrugated containers during the period from February 15, 2004 to the present. Upon information and belief, IP admits that the other Defendants or entities affiliated with them have sold linerboard, corrugating medium, and certain products made from containerboard.  IP otherwise denies the allegations of Paragraph 37.

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 38 of the Amended Complaint states: Containerboard Products is a multi-billion dollar industry. During the relevant time period, annual sales of Containerboard Products were in the tens of billions of dollars.

ANSWER: IP admits that more than a billion dollars of containerboard and products made from containerboard were sold each year since 2004. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 38.

Paragraph 39 of the Amended Complaint states: The containerboard industry is heavily concentrated. As of 2010, Defendants had a combined share of approximately 83% of the containerboard market, controlling nearly thirty million tons of annual production. Collectively, Defendants and their co-conspirators control an even greater proportion of the supply of Containerboard Products in the market.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 39 regarding the other Defendants. IP otherwise denies the allegations of Paragraph 39.

Paragraph 40 of the Amended Complaint states: The price of corrugated medium is tied to the price of linerboard. As a result, the price of containerboard is directly tied to the price of corrugated medium and linerboard. Likewise, because containerboard is used in the manufacture of corrugated containers, a rise in the price of containerboard results in a similar rise in the price of corrugated containers. Collectively, Defendants and their co-conspirators utilize most of the linerboard and medium they manufacture to produce containerboard and corrugated containers that they sell to the Plaintiff Class. In some instances, Defendants sell the manufactured linerboard and corrugated medium to other Defendants or independent converters who in turn produce containerboard sheets and corrugated products. Corrugated products are generally viewed as interchangeable commodities because most manufacturers are able to supply the product needs of most customers.

ANSWER: IP denies the first three sentences of Paragraph 40. IP admits that it utilizes a portion of the linerboard and corrugating medium it manufactures to produce corrugated containers. IP further admits that it sells a portion of the linerboard and medium it manufactures to other entities that produce corrugated containers for sale. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40 regarding other Defendants and entities. IP otherwise denies the allegations of Paragraph 40.

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 41 of the Amended Complaint states: Economists Haizheng Li and Jifeng Luo (hereinafter "Li and Luo") of the Georgia Institute of Technology have thoroughly examined the containerboard industry and concluded that the characteristics of the containerboard industry make it highly susceptible to horizontal price-fixing and output restrictions:

> The linerboard industry is very capital intensive and thus entry is restricted because of the large amount of capital and the long-term nature of investment... Firms may have similar cost curves if the equipment used is similar. Additionally, the demand for containerboard is relatively inelastic because of no major substitutes. Therefore, the US linerboard industry may have a certain degree of obligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.[1]

ANSWER: IP admits that Paragraph 41 purports to quote from an article authored by Haizheng Li and Jifeng Luo. IP otherwise denies the allegations of Paragraph 41.

Paragraph 42 of the Amended Complaint states: Antitrust law and economics have identified several factors which make markets susceptible to price-fixing. Those factors include: relatively few firms with a large share of the market; high barriers to entry into the market; lack of close substitutes/commodity nature of the good; inelastic demand; and inability of any single firm to control supply and price unilaterally. The Containerboard Products industry demonstrates all of these factors.

ANSWER: IP denies the allegations in the last sentence of Paragraph 42. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 42.

Paragraph 43 of the Amended Complaint states: Relatively Few Firms: Historically, Containerboard Products has been considered a concentrated industry. In the last decade, however, a series of mergers and acquisitions have led to a significant increase in market concentration. In 1995, the top five firms controlled approximately 42% of the containerboard market and the top 10 firms had a combined 66% market share. During the relevant time period of this complaint, the containerboard industry endured considerable consolidation resulting in the top five firms controlling approximately 72.5%, of the containerboard market while the Defendants' combined share reached approximately 83%.

ANSWER: IP admits that there have been mergers and acquisitions in the containerboard industry, including but not limited to the last decade. IP lacks knowledge or

---

[1] Li, Haizheng and Jifeng Luo, *Industry consolidation and price in the US linerboard industry*, Journal of Forest Economics 14 (2008) at 98.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

43.

    <u>Paragraph 44 of the Amended Complaint states:</u> The consolidation of the Containerboard Products industry involving Defendants and their co-conspirators both during the Class Period and immediately preceding it has been substantial. The following are examples of transactions that lead to such concentration:

    a.    In 1999, PCA acquired the containerboard and corrugated packaging products business of Pactiv Corporation, formerly known as Tenneco Packaging;

    b.    In 2001, Temple-Inland acquired the corrugated packaging operations of Chesapeake Corporation and Elgin Corrugated Box Company and ComPro Packaging LLC;

    c.    In 2002, Weyerhaeuser acquired Williamette Industries, including its Containerboard Products businesses

    d.    In 2002 Temple-Inland acquired Gaylord Container Corporation;

    e.    In September 2002, Smurfit-Stone purchased the Stevenson Mill containerboard mill and the related corrugated container assets;

    f.    In March 2003, Smurfit-Stone acquired complete control of Smurfit-MBI which operated 15 corrugated container plants in Canada;

    g.    In February 2004, PCA purchased Acorn Corrugated Box Co.;

    h.    In March 2004, Georgia-Pacific bought the assets of Temple-Inland's corrugated box plants;

    i.    In July 2004, International Paper acquired Box USA;

    j.    In April 2005, PCA acquired Midland Container Corp.;

    k.    In September 2005, the Jefferson Smurfit Group merged with Kappa Packaging;

    l.    In October 2005, Norampac acquired three Standard Paper box plants;

    m.    In December 2005, privately-held Koch Industries, Inc., purchased Georgia-Pacific for $21 billion;

    n.    In April 2006, Georgia-Pacific acquired Smurfit-Stone's Brewton, Alabama linerboard mill;

FILED UNDER SEAL PURSUANT TO COURT ORDER

o.    In March 2008, International Paper announced its acquisition of Weyerhaeuser's Packaging Business for $6 billion;

p.    In April 2008, Smurfit-Stone acquired Calpine Corrugated LLC; and,

q.    In 2008 Temple-Inland acquired a 50% interest in PBL, a joint venture that manufactures containerboard.

ANSWER: IP admits that IP acquired Box USA in July 2004 and admits that IP announced its acquisition of Weyerhaeuser's Containerboard, Packaging and Recycling business for $6 billion in March 2008. IP further admits that Weyerhaeuser acquired Willamette Industries in 2002. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether consolidation in the "Containerboard Products industry" during the time period at issue and immediately preceding it has been "substantial." IP also lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 44 regarding the conduct of other Defendants. IP otherwise denies the allegations of Paragraph 44.

Paragraph 45 of the Amended Complaint states: In 2009, Temple-Inland presented the following graphic illustration of the changes brought about by the consolidation of the Containerboard Products industry:

[GRAPHIC OMITTED]

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45.

Paragraph 46 of the Amended Complaint states: Barriers to Entry: There are two significant barriers to entry to the Containerboard Products industry: 1) capital-intensive start-up costs; and 2) high transportation costs. The equipment used to manufacture Containerboard Products is both highly specialized and very expensive. Li and Luo conclude that the "linerboard industry is very capital intensive... entry is restricted because of the large amount of capital and the longterm nature of investment." Another industry report affirmed that "the industry is capital intensive."[2] Consequently, large capital investments prohibit new entrants. At a 2005 industry trade conference attended by Defendants' officers, employees or representatives, presenter Deloitte Development LLC instructed the audience not to overestimate "the threat of new

_____

[2] Hoover's Industry Profile: Paper Products Manufacture.

21

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

entrants into the market," indicating that entry into the containerboard market was highly unlikely.[3]

> ANSWER: IP denies the allegations in the first two sentences of Paragraph 46. IP admits that Paragraph 46 purports to quote from an article authored by Haizheng Li and Jifeng Luo. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 46 regarding other Defendants. IP otherwise denies the allegations of Paragraph 46.

> Paragraph 47 of the Amended Complaint states: Manufacturers Have Similar Costs: Defendants and their co-conspirators share relatively similar costs. The technology and process of containerboard manufacturing are well known and Defendants and their co-conspirators employ the same types of equipment and processes in the production process.

> ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47 regarding the conduct of other Defendants. IP otherwise denies the allegations of Paragraph 47.

> Paragraph 48 of the Amended Complaint states: Moreover, the fewer the number of firms in an industry, the more similar costs become for the remaining firms. Accordingly, the recent consolidation of the Containerboard Products industry has in turn driven Defendants' costs to be even more similar. Further, paper manufacturing has relatively few economies of scale. Industry reports state that "Large and small producers operate the same kinds of plants – large producers just have more of them.[4] The combination of these industry facts – consolidation, similar plants, and technology – indicates that the Defendants have very similar cost structures.

> ANSWER: IP admits that Paragraph 48 purports to quote from a PCA Form 10-K, but denies that the text quoted in the fourth sentence of Paragraph 48 appears in the cited PCA Form 10-K. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48.

> Paragraph 49 of the Amended Complaint states: Because Containerboard Products are bulky and cumbersome to transport, long-distance shipping is expensive.

---

[3] Sinoway, Mike, "Pricing Opportunities in the Forest Products Industry," June 28, 2005, Deloitte Development LLC.
[4] See PCA Form 10-K, filed February 20, 2008 at p. 11.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

Consequently, there are geographic entry barriers to the Containerboard Products industry as well. One industry report stated that "[t]he effective sales area for corrugated boxes, for example, is only about 150 miles from the production plant.[5]  High start-up costs and shipping costs make entry into the containerboard market very difficult.

  ANSWER:  IP admits that Paragraph 49 purports to quote from a Hoover's

Industry Profile.  IP otherwise denies the allegations of Paragraph 49.

  Paragraph 50 of the Amended Complaint states: No Close Substitutes/Commodity Nature of the  Products: Containerboard Products do not have close substitutes in the market. The closest substitutes for corrugated containers are plastic containers, which comprise a very small portion of the container or packaging market. Likewise, containerboard and corrugated packaging are commodities because containerboard and corrugated containers made by any one of the Defendants are interchangeable with that of any of the other Defendants. In its 2007 10-K filing, PCA acknowledged this fact, noting "[c]ontainerboard is generally considered a commodity-type product and can be purchased from numerous suppliers.[6]

  ANSWER:  IP admits that Paragraph 50 purports to quote from PCA's 2007 10-K

filing and admits that plastic containers can be substitutes for corrugated containers for some

applications.  IP otherwise denies the allegations of Paragraph 50.

  Paragraph 51 of the Amended Complaint states: Inelastic Demand: The demand for Containerboard Products is very inelastic. Li and Luo estimated the price elasticity of demand for linerboard to be 0.18. This means that a one percent increase in linerboard price would result in just a 0.18% decrease in the quantity demanded. When elasticity is this low, concerted price increases are likely to be profitable and sustainable since purchasers will continue to buy nearly the same quantity of containerboard despite price increases.[7]

  ANSWER:  IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in the second sentence of Paragraph 51.   IP otherwise denies the

allegations of Paragraph 51.

  Paragraph 52 of the Amended Complaint states: No Firm With Sufficient Unilateral Market Power: While the Defendants and their co-conspirators collectively comprise approximately 83% of the containerboard market, no single firm has sufficient market power to unilaterally control supply and price. For example, PCA's 10-K for the year ending December 31, 2006, states that "PKG [stock symbol for PCA] operates in an industry that is highly competitive, with no single containerboard or corrugated packaging producer having a dominant

---

[5] Hoover's Industry Profile:  Paper Products Manufacture; see also, PCA Form 10-K, filed February 20, 2008, at p. 11, noting, "[c]orrugated producers generally sell within a 15-mile radius of their plants."
[6] See PCA Form 10-K, filed February 20, 2008, at p. 11.
[7] See N. Gregory Mankiw, PRINCIPLES OF ECONOMICS (5th ed. 2009), at p. 94.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

position." Similarly, Temple-Inland's 10-K for the year ending December 31, 2006, states "[g]iven the commodity nature of our manufactured products, we have little control over market pricing or market demand. No single company is dominant in any of our industries.[8] As a result, when single manufacturers have attempted to raise prices without the agreement of other firms, customers are able to resist the unilateral price increase by turning to other manufacturers.

ANSWER: IP admits that Paragraph 52 purports to quote from PCA's 10-K for

the year ending December 31, 2006. IP lacks knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 52 regarding other Defendants. IP otherwise

denies the allegations of Paragraph 52.

Paragraph 53 of the Amended Complaint states: The Fibre Box Association ("FBA") is a Containerboard Products trade organization. Its members include Defendants PCA, International Paper, Norampac, Georgia-Pacific, Temple-Inland and Smurfit-Stone. According to its 2007 tax records, Thomas A. Hassfurther, PCA's current Executive Vice President, served as FBA's 1st Vice Chairman, and its board of directors includes representatives from Temple-Inland, Georgia-Pacific, International Paper, Weyerhaeuser, and Smurfit-Stone. The FBA holds at least three meetings each year where executives and other representatives of the Defendants and their coconspirators have an opportunity to meet and talk with one another, including communicating about supply and prices. Further, the FBA holds dozens of networking events each year which give the Defendants and their co-conspirators additional opportunities to communicate with one another. Further, the FBA publishes a set of antitrust guidelines that it distributes to its members. Notably absent from these guidelines are prohibitions on communicating or agreeing with other containerboard product manufacturers concerning output, supply or capacity decisions.

ANSWER: IP admits that the FBA is an organization whose members include

companies that manufacture containerboard (linerboard and corrugating medium) and products

made from containerboard and admits IP was an FBA member during the time period at issue.

Upon information and belief, IP admits that PCA, Norampac, Georgia-Pacific, Temple-Inland,

Smurfit-Stone, and Weyerhaeuser were FBA members during the time period at issue. IP admits

that the FBA periodically holds meetings, and admits that the FBA publishes a set of antitrust

guidelines that it makes available to its members. IP lacks knowledge or information sufficient

to form a belief regarding the FBA's 2007 tax records and what they reflect about the FBA's

---

[8] See Temple-Inland Form 10-K filed February 23, 2007, at p. 10.

FILED UNDER SEAL PURSUANT TO COURT ORDER

Chairman or board of directors. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 53 regarding other Defendants. IP otherwise denies the allegations of Paragraph 53.

Paragraph 54 of the Amended Complaint states: The American Forest & Paper Association ("AF&PA") is a trade organization representing forest and building product industries as well as pulp, paper and paperboard manufacturers. Its members include PCA, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland and Smurfit-Stone. During the Class Period, its officers have included James Hannan, President and CEO of Georgia-Pacific and John Faraci, Chairman and CEO of International Paper and its board of directors has included Daniel S. Fulton, President & CEO of Weyerhaeuser, Patrick J. Moore, Chairman & CEO of Smurfit-Stone, Doyle R. Simons, Chairman & CEO of Temple-Inland, and Paul T. Stecko, Chairman & CEO of PCA. The AF&PA holds several meetings a year where executives and other representatives of the Defendants have an opportunity to meet and talk with one another, including communicating about supply and prices. As described below, AF&PA forums have included instructions on steps to conceal anticompetitive communications between firms.

ANSWER: IP admits that the AF&PA is an association that represents manufacturers of pulp, paper, paper-based packaging and wood building materials, that IP was an AF&PA member during at least a portion of the time period at issue admits that John Faraci previously served as an officer of the AF&PA. Upon information and belief, IP admits that PCA, Georgia-Pacific, Temple-Inland, Smurfit-Stone, and Weyerhaeuser were members of the AF&PA during at least a portion of the time period at issue, that James Hannan has served as an officer of the AF&PA, and that Patrick J. Moore has served on AF&PA's board of directors. IP further admits that the AF&PA holds meetings. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Daniel S. Fulton, Doyle R. Simons and Paul T. Stecko have served on AF&PA's board of directors. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 54 regarding other Defendants. IP otherwise denies the allegations of Paragraph 54.

Paragraph 55 of the Amended Complaint states: RISI (founded as Resource Information Systems Inc.) is an information provider to the global forest products industry and provides market news and information. RISI hosts conferences regarding containerboard every

two years, bringing together companies in the containerboard industry. Executives of all Defendants attended both the 2006 and 2008 conferences.

ANSWER: IP admits that RISI is an information provider for the global forest products industry, that it provides market news and information, that it hosts conferences periodically, and that IP employees attended conferences hosted by RISI in 2006 and 2008. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 55 regarding other Defendants. IP otherwise denies the allegations of Paragraph 55

Paragraph 56 of the Amended Complaint states: The International Corrugated Case Association ("ICCA") is an international trade association that serves to "promote and protect the general welfare of the worldwide corrugated container industry" by, among other things, collecting and disseminating information about corrugated products, issues, services and resources around the world. Every year, ICCA members participate in a global summit. Defendants Georgia-Pacific, Smurfit-Stone, International Paper and Temple-Inland are all members of the ICCA.

ANSWER: IP admits that the International Corrugated Case Association ("ICCA") is an international trade association, that ICCA's website states that one of its objectives is to "[p]romote and protect the general welfare of the worldwide corrugated container industry," that ICCA gathers, has compiled and distributed corrugated shipment and production data, and that IP was an ICCA member during the relevant time period. Upon information and belief, IP admits that Georgia-Pacific, Smurfit-Stone, and Temple-Inland were ICCA members during the relevant time period. IP otherwise denies the allegations of Paragraph 56.

Paragraph 57 of the Amended Complaint states: The Defendants and their co-conspirators have a prior history of anticompetitive horizontal agreements with one another. For decades, the paper and pulp industry has consistently demonstrated cartelization and anticompetitive behavior. In particular, the linerboard, corrugated, containerboard and corrugated products segments of the industry have a history of antitrust violations. A consent decree was entered on April 23, 1940, in the action entitled *United States of America, Plaintiff, against National Container Association, et al., Defendants* (SDNY Civil Action No. 8-318) and in *United States v. Container Corporation of America, et al.*, 393 US 333 (1969) the defendants (including certain predecessors of Defendants herein) were found to have violated Section 1 of the Sherman Act after being charged with conspiring to restrain price competition in sale of

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

corrugated containers in the Southeastern United States from January 1, 1955, to October 14, 1963.[9]

  ANSWER: IP admits that there was a consent decree entered on April 23, 1940, and admits that there was a finding of a Section 1 violation in *United States v. Container Corporation of America, et al.*, 393 U.S. 333 (1969).  IP otherwise denies the allegations of Paragraph 57.

  Paragraph 58 of the Amended Complaint states:  International Paper, Weyerhaeuser, PCA and Georgia-Pacific were also defendants in an alleged nationwide price-fixing conspiracy among manufacturers of folding cartons from 1960 to 1974. *See In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727 (N.D. Ill. 1977), 557 F. Supp. 1091, 1093 (N.D. Ill. 1983) and 687 F. Supp. 1223 (N.D. Ill. 1988). On September 19, 1979, prior to trial, the class action parts of the case were settled for approximately $200 million.

  ANSWER: IP admits that International Paper Company, Weyerhaeuser, PCA, and Georgia-Pacific were named as a defendants in the litigation referenced in Paragraph 58, and that one of the decisions cited in Paragraph 58 indicates that "various defendant manufacturers of folding cartons agreed to pay approximately $200,000,000 into a settlement fund."  IP denies that it participated in any alleged price-fixing conspiracy among manufacturers of folding cartons from 1960 to 1974.  IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations regarding other Defendants.  IP otherwise denies the allegations of Paragraph 58.

  Paragraph 59 of the Amended Complaint states: In 1978, a federal grand jury in the Southern District of Texas indicted 14 companies and 26 individuals, including International Paper, Weyerhaeuser and Stone Container Corporation (predecessor to Smurfit-Stone) for participating in a conspiracy east of the Rocky Mountains to fix prices of corrugated containers and sheets. *See United States v. International Paper Co.*, No. H-78-11 and *United States v. Boise Cascade Corp.*, No. H-78-12. International Paper, Weyerhaeuser and Stone Container Corporation and almost all of the other defendants pleaded *nolo contendere*; those that did not were acquitted at trial.

---

[9] See *U.S. v. Container Corp. of America*, 273 F. Supp. 18, (M.D.N.C. Aug. 31, 1967) and *U.S. v. Container Corp. of America*, 1970 WL 513, 1970 Trade Cases P 73,217 (M.D.N.C. May 19, 1970)  (on remand).

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

ANSWER: IP admits that a grand jury in the Southern District of Texas indicted International Paper Company for a Section 1 violation and that International Paper Company pleaded *nolo contendere* in connection with the indictment. IP denies that it participated in any conspiracy east of the Rocky Mountains to fix prices of corrugated containers and sheets. IP lacks knowledge or information sufficient to form a belief regarding the truth of allegations in Paragraph 59 regarding other companies and individuals. IP otherwise denies the allegations of Paragraph 59.

Paragraph 60 of the Amended Complaint states: In a related case, PCA, International Paper, Stone Container and Georgia-Pacific were also involved in a price fixing cartel over corrugated containers and corrugated cardboard sheets from 1964-1975. Those firms that did not settle went to trial and most settled before a verdict was rendered; the sole defendant remaining at the time of the verdict was found liable for participating in a price fixing conspiracy over corrugated containers and corrugated sheets from 1964-1975. *See In re Corrugated Container Antitrust Litigation*, 556 F.Supp. 1117, 1125 (S.D.Tex. 1982).

ANSWER: IP admits that International Paper Company was named as a defendant in the litigation referenced in Paragraph 60 and that it settled the lawsuit. IP denies that it participated in any alleged price-fixing conspiracy over corrugated containers and corrugated sheets from 1964-1975. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants or entities. IP otherwise denies the allegations of Paragraph 60.

Paragraph 61 of the Amended Complaint states: In 1998, Stone Container Corp. (now known as Smurfit-Stone) entered into a consent agreement with the Federal Trade Commission ("FTC") in which it pledged to refrain from "entering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties." *See In the Matter of Stone Container Corp.*, Docket No. C-8306, Decision and Order, May 18, 1998.

ANSWER: Upon information and belief, IP admits that Stone Container Corp. entered into a consent agreement with the Federal Trade Commission and that Paragraph 61

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

purports to quote the May 18, 1998 Decision and Order from the Federal Trade Commission. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 61.

  Paragraph 62 of the Amended Complaint states: Smurfit-Stone, International Paper, Georgia-Pacific, Weyerhaeuser, Temple-Inland, and PCA participated in a price-fixing cartel over containerboard from 1993-1995. See *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002). As part of the conspiracy, these firms increased the "downtime" of linerboard machines, reducing production and inventory. At the same time, they purchased substantial amounts of containerboard from one another, protecting market shares, causing an artificial shortage and an increase in the price of linerboard. At the peak of the cartel's efficacy in 1995, the price of linerboard peaked at $530/ton. The class action claims were settled in 2003 when the defendants agreed to pay their customers over $200 million, however, lawsuits brought by plaintiffs opting out of the class proceeded.

  ANSWER: IP admits that International Paper Company, Smurfit-Stone, Georgia-Pacific, Weyerhaeuser, PCA, and two predecessors to Temple-Inland were named as a defendants in the litigation referenced in Paragraph 62, that IP settled the class action claims, and that lawsuits were brought by plaintiffs which opted out of the referenced class action. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations regarding other Defendants. IP otherwise denies the allegations of Paragraph 62.

  Paragraph 63 of the Amended Complaint states: As a result of their exposure to prior antitrust lawsuits, Defendants have taken steps to conceal their anticompetitive communications with one another. For example, at the American Forest & Paper Association's 128th Annual Paper Week held in New York City in April 2005, Defendants attended a seminar entitled "Are You Vulnerable to Lawsuits?" aimed at reducing vulnerability to antitrust litigation.[10] Because the Defendants have received training on how to avoid getting caught communicating with one another regarding price and output decisions, the amount of conspiratorial evidence that can be obtained from public sources and without access to internal records and testimony is highly limited. Nevertheless, the existence of an agreement is unambiguously evidenced by Defendants' coordinated conduct during the Class Period.

  ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. IP also lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the purported attendance of

---

[10] *Are You Vulnerable to Lawsuits?* Official Board Markets, April 23, 2005.

unidentified IP representatives at the AF&PA's 128th Annual Paper Week.  IP otherwise denies

the allegations of Paragraph 63.

      <u>Paragraph 64 of the Amended Complaint states:</u>  The unprecedented industry consolidation detailed in paragraphs 43-45 created an environment conducive to collusion. Further, at or about the onset of the Class Period, the Containerboard Products industry was experiencing decreased profit margins, rising product demand, and a promising economic outlook. Additionally, shortly before and near the beginning of the Class Period, the Containerboard Products industry experienced price decreases and at least one failed price increase attempt. Specifically, on May 31, 2003, Official Board Markets reported that a $35/ton price increase in both linerboard and corrugated medium failed, noting "[n]ot only is this attempt a failure, but discounting prevails." While prices steadily increased in 2004, due at least in part to the two successful coordinated price increases implemented by Defendants, by early 2005 they again began to erode, bottoming out in spring 2005. On May 31, 2005, Official Board Markets reported that Defendant International Paper announced a $50/ton price increase; but due to other Defendants not backing the price increase with a "firm stance," the end result was a failed increase. In June 2005, "it became apparent that industry-wide price hikes weren't sticking. Instead of rising about 10%, prices on the thick paper used to make corrugated containers slipped as inventories of boxes inched higher.[11]  These factors acted together as the catalyst for Defendants to redouble their coordinated capacity restraints in order to reduce available supplies and thereby fix, raise, stabilize and maintain the prices of Containerboard Products.

      <u>ANSWER:</u>  IP admits that Paragraph 64 purports to quote from a May 31, 2003

Official Board Markets article regarding kraft linerboard and semichemical medium prices.  IP

lacks knowledge or information sufficient to form a belief as to the truth of the allegation of the

second and third sentences of Paragraph 64.  IP lacks knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 64 regarding other Defendants.  IP

otherwise denies the allegations of Paragraph 64.

      <u>Paragraph 65 of the Amended Complaint states:</u>  In October 2003, Smurfit-Stone announced a massive restructuring plan intended "to reduce [containerboard] capacity.[12] According to its Chief Executive Officer Pat Moore, the designed goal was "to cut supply enough at Smurfit [Stone] to force price increases throughout the industry.[13] After the failed May 2005 price increase, Smurfit-Stone recognized that their independent action to reduce

---

[11] *Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05,* Crain's Chicago Bus., June 27, 2005, at p. 4.

[12] Clayton, Mo., Packaging Firm Smurfit-Stone Container Thinks Outside the Box, St. Louis Dispatch, Aug. 22, 2004, at p. 1.

[13] Ibid.

containerboard capacity could not force industry prices upward unless Defendants supported both the capacity reduction and subsequent price increases.

ANSWER: IP admits that Paragraph 65 purports to quote from a St. Louis Dispatch article. IP denies that the article attributes the quoted statements to Smurfit-Stone's Chief Executive Officer Pat Moore. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 65.

Paragraph 66 of the Amended Complaint states: The period of 2004-2010 witnessed an exceptional number of containerboard plant closings, capacity reductions, and price increases that can only be explained by concerted effort by the Defendants and their co-conspirators. Defendants increased Containerboard Products prices ten times between March 2004 and August 2010. Over that period, Containerboard Product prices have increased over fifty percent (50%) despite the economic downturn during the latter half of the Class Period. Each of these price increases was implemented by the Defendants nearly simultaneously and was facilitated by reductions in supply and production capacity. In the face of increasing demand, these reductions make no economic sense absent conspiracy and collusion. Norampac's 2005 20-F filing illustrates these phenomena:

> In 2005, industry box shipments decreased by 0.4% in North America while North American containerboard operating rates were approximately 95%. Containerboard producers in the United States reduced their inventories and drove a US$30/ton increase on linerboard in October following a US$55/ton decrease in the first three quarters of the year...

> The market share of the top five containerboard producers increased from 48% in 1995 to 64% in 2005. This consolidation has helped accelerate the rationalization of inefficient containerboard mill capacity. In 2005, a total of over 1.5 million tons of North American containerboard capacity was permanently closed. Furthermore, the industry has generally adopted a model of balancing supply with current demand as opposed to maximizing capacity utilization. As a result, operating rates in the industry in recent years more closely reflect the current economic environment. Overall, market consolidation and rationalization have helped to create a less volatile and more stable industry pricing environment.

ANSWER: IP denies the allegations in the first sentence of Paragraph 66. IP admits that between March 2004 and August 2010, IP both increased and decreased the prices of certain of its products to certain customers. IP further admits that Paragraph 66 purports to quote

from Norampac's 2005 Form 20-F, but notes that the quotes are from different pages nine pages

apart and are quoted out of order. IP lacks knowledge or information sufficient to form a belief

as to the truth of the allegations regarding other Defendants. IP otherwise denies the allegations

of Paragraph 66.

Paragraph 67 of the Amended Complaint states: Demand for Containerboard
Products is tied to overall consumer demand and spending. Beginning in 2004 and continuing
thereafter through 2007, consumer demand, including demand for Containerboard Products in
the U.S., was relatively stable and industry expectations were that demand would increase, yet
Defendants cut capacity, restricted supply and raised prices. These actions were contrary to
Defendants' unilateral economic interests because, given market conditions and expectations that
demand was increasing, in a competitive market capacity would, at minimum, be maintained if
not expanded, in order to enhance volumes, revenues, profits and market share. During the
second half of 2008, consumer demand in the United States plummeted, yet Defendants
continued to raise prices. In August 2008, Defendants and their co-conspirators raised prices of
containerboard by 9%; and notwithstanding fears of deflation in the general economy, increased
prices an unprecedented three times in 2010 to all-time highs, without any underlying cost
justifications. This led one market commentator to note that the series of historic price increases
"calls into question the integrity of our industry" and "call[s] into question the pricing activities
of the major companies." The same commentator noted the similarity of the present conduct of
Defendants to the conduct in the prior *Linerboard* cases.

ANSWER: IP admits that there was an economic recession in the United States

during a portion of the period from March 2004 and August 2010 and that consumer demand

declined. IP admits that Paragraph 67 purports to quote from an Association of Independent

Corrugated Converters statement issued on July 13, 2010. IP lacks knowledge or information

sufficient to form a belief as to the truth of the allegations regarding other Defendants. IP

otherwise denies the allegations of Paragraph 67.

Paragraph 68 of the Amended Complaint states: Defendants and their co-
conspirators were also able to facilitate the conspiracy in part by causing artificially inflated,
supra-competitive prices to be published in trade publications which served to indicate and index
prices or to function as list prices for Containerboard Product purchasers. Certain supply and
purchase contracts between Defendants and purchasers were tied to the prices listed in those
trade publications.

ANSWER: IP admits that some of its contracts with purchasers of linerboard,

corrugating medium, and products containing linerboard and corrugating medium reference price

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

changes listed in trade publications. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. IP otherwise denies the allegations of Paragraph 68.

Paragraph 69 of the Amended Complaint states: Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply. As a result of Defendants' conduct as alleged herein, their production capacity of Containerboard Products was significantly reduced while their prices increased by approximately 50% between 2004 and 2010:

**[GRAPHIC OMITTED]**

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. IP otherwise denies the allegations of Paragraph 69.

Paragraph 70 of the Amended Complaint states: Defendants profited substantially from these price increases. In a December 2005 presentation by International Paper's Executive Vice President and Chief Financial Officer, Marianne Parrs, one slide titled Strong Leverage to Improving Prices: Price Sensitivity of U.S. Businesses showed that there would be a $0.15 earnings per share increase for every $50 change in the price of containerboard.

ANSWER: IP admits that that there appears to be a presentation with a slide titled "Strong Leverage to Improving Prices: Price Sensitivity of U.S. Businesses." IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 70 regarding other Defendants. IP otherwise denies the allegations of Paragraph 70.

**2004**

Paragraph 70.a. of the Amended Complaint States: Demand for Containerboard Products began to rise in 2004. Defendant International Paper forecasted increased earnings in the second quarter of 2004 as a result of increased demand, previously announced price increases, and "improved manufacturing operations." [A1] Defendant PCA reported in May 2004 that its corrugated products demand remained very strong, and that April 2004 shipments were up 9.3% as compared to one year earlier. [A2] Defendant Temple-Inland projected that the

---

[A1] International Paper Q1 2004 Form 10-Q, filed May 6, 2004, at p. 14, 19. International Paper further noted that "price increases in containerboard, certain bleached board grades and boxes announced in the first quarter, together with improvied manufacturing operations, will have a positive impact on operating results." International Paper Q1 2004 Form 10-Q, *supra*, at p. 19.

[A2] GP-KLEEN00477477, *Packaging Corporation of America Company Profile*, dated January 2005, at slide 26.

FILED UNDER SEAL PURSUANT TO COURT ORDER

industry's box shipments would increase by approximately 3.7% for the second half of 2004, based on demand for the first half of the year. [A3]

ANSWER:  IP admits that IP's Form 10Q for the first Quarter of 2004 states IP's belief that demand for most paper and packing products had begun to increase at the end of the first quarter of 2004.  IP further admits the second sentence of Paragraph 70.a. purports to quote from IP's Form 10Q for the first Quarter of 2004.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  IP otherwise denies the allegations of Paragraph 70.a.

Paragraph 70.b. of the Amended Complaint States:  In response to "strong demand", all Defendants increased prices for Containerboard Products while simultaneously reducing capacity by idling machines and taking downtime. [A4] The first 2004 price increase was implemented by all Defendants by March 1, 2004. [A5] Defendant Weyerhaeuser was the first company to announce the price increase in early January 2004. [A6] Association of Independent Corrugated Converters ("AICC") documents explained that "everyone is behind [the price

---

[A3] Temple-Inland 00291545, *Temple-Inland Investment Presentation*, dated May 7, 2004.  In contrast, historical demand growth from 1980-2003 was approximately 2%.  *See also* Temple-Inland 00348444, Email from Paul Recht (Temple-Inland) to Sharon Fuss (Temple-Inland) Re: FW: April 1st, 2004 Box Price Increase-Justification Documents, dated February 25, 2004, with attachment Temple-Inland 00348456, Why is there a price increase, author and date unknown (in justifying increasing containerboard prices by over 8% in March 2004, the author explained that January 2004 box shipments rose 10.5% year-over-year and that inventories were "at their lowest level since 1994").

[A4] The alleged conspiracy began at a time presently unknown to Plaintiffs. However, Plaintiffs allege that the Class Period begins on February 15, 2004, the date that the first price increase for 2004 became effective.

[A5] *See* IP095108 at 95119, *Domestic Business Team Meeting,* dated February 18, 2004. International Paper identified the following additional companies as participating in the price increase: Defendant Smurfit-Stone (price increase implemented on February 15, 2004); Defendant Norampac (price increase implemented February 23, 2004); Defendant Georgia-Pacific (price increase implemented March 1, 2004); Defendant Temple-Inland (price increase implemented on March 1, 2004); Defendant PCA (price increase implemented on March 1, 2004; and Defendant Weyerhaeuser (price increase implemented on March 1, 2004). (Non parties MeadWestvaco and Pratt also implemented price increases on March 1, 2004.)

  Prior to the first 2004 price increase, in October 2003, Defendant Smurfit-Stone announced a massive restructuring plan with, admittedly, the ultimate goal of reducing capacity. *See* GP-KLEEN01017203 at 1017203, Email from Bill Caesar (McKinsey) to Christian Fischer (McKinsey) and Matthew Denton (Georgia-Pacific), Re: Interesting Article, dated September 10, 2004 (forwarding an August 2004 article from the St. Louis Post-Dispatch discussing Smurfit-Stone's restructuring plan). Smurfit-Stone explained to the St. Louis Post-Dispatch that the company would no longer be adhering to the industry's former practice of running mills as fast as they could, independent of changes in demand. GP-KLEEN01017202 at 1017203, *supra.* Rather, it planned to "cut supply enough at Smurfit to force price increases throughout the industry". GP-KLEEN01017202 at 1017203, *supra.*

[A6] Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto. *See also* RT00000875 at p. 1-2.

FILED UNDER SEAL PURSUANT TO COURT ORDER

increase] but no one else has announced." [A7] Defendant International Paper quickly followed with its January 16, 2004, announcement that it would also be increasing liner and medium prices by $50/ton. [A8] International Paper's price increase was effective February 16, 2004. Internal International Paper documents circulated in February 2004 confirm that its price increase would be followed by "our competitors [who] will implement [the price increase] on March 1". [A9] On January 19, 2004, Defendant Temple-Inland announced that it would be increasing prices by $50/ton, effective March 1, 2004. [A10] Internal Temple-Inland documents infer that the company raised prices, at least in part, because all other Defendants were raising prices. [A11] On January 22, 2004, Defendant Georgia-Pacific announced that it would also be increasing prices by $50/ton, effective March 1, 2004. [A12] By that time, all other Defendants had announced similar price increases. [A13]

  ANSWER:  IP admits that the seventh sentence of Paragraph 70.b. contains an incomplete quotation from a document entitled "Domestic Business Team Meeting" dated February 18, 2004 and bearing bates number IP095108 and that this document appears to suggest that IP notified certain of its customers of a price increase during 2004.  IP lacks knowledge or

---

[A7] RT 00000875 at p. 1

[A8] *See* SSCC 00361942, Email from Daniel Moore (International Forest Products Corp.) to "Market Watch" Re: IP, dated January 16, 2004 (informing recipients that "IP announced a price increase today on all containerboard grades.  $50 for all order [sic] place [sic] Feb [sic] 15 or later").

[A9] IP095108 at 95110

[A10] IP095108 at 95110

[A11] Temple-Inland 00149975

[A12] GP-KLEEN00546219. *See also* Defendant Georgia-Pacific LLC's Objections and Responses to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increases effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6, dated December 20, 2013.

[A13] *See* GP-KLEEN00546217. *See also* Temple-Inland 00149975; IP095108 at IP095119, Defendant Weyerhaeuser Company's Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6, dated September 11, 2013; Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto, dated December 20, 2013; Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6, dated September 27, 2013; Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6, dated December 20, 2013.  Internal Norampac documents infer that a price increase for whitetop planned for around the same time might not have happened because all Defendants had not agreed to participate in the price increase. In an email from Robert Lanthier to Francois Guite sent in February 2004, Mr. Lanthier explained: "The price increase on whitetop may not happen since it has been confirmed by different sources that Smurfit Stone is not announcing any increase on their whitetop. For sure, we will not push for a price increase if the rest of our competitors are not doing it." NORAMPAC00038698.

FILED UNDER SEAL PURSUANT TO COURT ORDER

information sufficient to form a belief as to the truth of the allegations regarding other

Defendants.  IP otherwise denies the allegations of Paragraph 70.b.

Paragraph 70.c. of the Amended Complaint States:  Around the same time that the first 2004 price increase was being implemented, Credit Suisse provided Defendants Georgia-Pacific, International Paper, Temple-Inland, and Smurfit-Stone with its publication entitled The Holy Grail: Secular Headwinds. [A14]  The Holy Grail emphasized that "every decision the market leaders make needs to be carefully guided by a goal of increasingly clear economic alignment of incentives." [A15]  It promoted "rational decision making" about capacity and stressed that "bad outcomes" can result if "rational producers in a commodity business decide to row in different directions". [A16]  The Holy Grail likewise instructed that "consolidation does tend to help make industry behavior healthier" [A17] and that "discipline" and "capacity rationalization" were necessary in order to "avert[] pricing collapse and sustain[] higher levels of pricing and cash flow." [A18]  The message of The Holy Grail was remarkably similar to the advice contained in McKinsey's Chasing In On Consolidation, written for Defendant International Paper in 2002, [A19] and distributed to Defendant Georgia-Pacific in September 2004. [A20]  Like The Holy Grail, Cashing In On Consolidation emphasized that North American Containerboard producers needed to show leadership through "good conduct", [A21] which was only possible where multiple market leaders aligned "incentives" and "actions" in order to "enjoy the benefits of higher prices". [A22]

---

[A14] GP-KLEEN01015352; 1P289887; SSCC 00481565; Temple-Inland 00017529

[A15] GP-KLEEN01015352 at 1015372. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529. Credit Suisse further noted that the "key is not to worry about driving [free-riders] out of business ... but rather, to work toward a business model where interests tend to align rather than collide. Industry consolidation is one obvious example of how that can happen, but it is far from the only one." GP-KLEEN01015352 at 1015372

[A16] GP-KLEEN01015352 at 1015371. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529

[A17] GP-KLEEN01015352 at 1015374. *See also* IP289887, SSCC 00481565 and Temple-Inland 00017529

[A18] GP-KLEEN01015352 at 1015377.  See also IP289887, SSCC00481565 and Temple-Inland 00017529.  Credit Suisse published Holy Grail articles at various times throughout the Class Period, which it circulated among Defendants and continued to emphasize the need for "discipline". See The Holy Grail — Rising Risk, Credit Suisse Equity Research, dated June 24, 2010, found at IP356757, Temple-Inland 00476330, and PCoA000339518 ("Impressive production discipline has many asking whether industry consolidation is necessary, or whether the industry's biggest issues are behind us"). Evidence that Defendants highly regarded The Holy Grail can be found in International Paper's internal documents. For instance, Thomas Cleves explained to John Faraci in 2008 that "[w]e should take advantage of the Holy Grail it [sic] is a thoughtful analysis of our industry and it helps us to understand how major sell-side and buy-side players think about our industry and International Paper." IP551322, Memo from Thomas A. Cleves (International Paper) to J. Faraci (International Paper) Re: Thoughts on the 2008 Holy Grail, dated February 19, 2008.

[A19] IP108305, *Cashing In On Consolidation,* McKinsey on Paper, dated 2002

[A20] GP-KLEEN00141863, Email from Bill Ceasar (McKinsey) to Matthew Denton (Georgia-Pacific) and Christian Fischer (Georgia Pacific) Re: McK article on consolidation in Pulp & Paper, dated September 15, 2004, with attachment GP-KLEEN00141864, *Cashing In On Consolidation,* McKinsey on Paper, dated 2002. In sending *Cashing In On Consolidation* to Georgia-Pacific, McKinsey underscored its conclusion that "NA Containerboard is a 'leak-tight' segment where market leaders have the ability and incentive to lead — basically that this was a place where industry leadership mattered." GP-KLEEN00141863, *supra.*

[A21] IP108305 at 108314

[A22] IP108305 at 108309-311

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP admits that Paragraph 70.c. purports to quote from an article published by Credit Suisse and that this publication was received by some IP personnel. IP further admits that certain IP personnel received a copy of a McKinsey presentation bearing bates number IP0108305. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. IP otherwise denies the allegations of Paragraph 70.c.

Paragraph 70.d. of the Amended Complaint States: In early March 2004, Defendant International Paper CEO John Faraci announced to the company's Board of Directors that "excess capacity in North America may have to be rationalized". [A23] A few days later, Defendant PCA circulated an internal call to arms, in which an Executive Vice President demanded at least three additional, $40-$50 industry-wide price increases over the next 18 months. [A24] This executive cited to "historically" low inventory, "heavy" mill downtime, capacity reductions to "more closely align[] supply with demand", industry consolidation, and increased demand as justification for the price increases. [A25] Two months after that, Defendant Georgia-Pacific circulated a memorandum similar to PCA'S. [A26] Therein, Executive Vice President of Packaging Christian Fisher requested that Georgia-Pacific employees "identify, develop, and capture every profit-improvement opportunity we can — starting now." [A27] Mr. Fischer further explained that a "tight market" and a "second price increase" would help increase Georgia-Pacific's 2004 profits, "but they alone will not get us there. We have to find and execute on every opportunity possible to reach our goal. [A28]

ANSWER: IP admits that the first sentence in Paragraph 70.d. purports to contain a partial quotation from an IP PowerPoint deck. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. IP otherwise denies the allegations of Paragraph 70.d.

Paragraph 70.e. of the Amended Complaint States: By April 26, 2004, Defendants PCA, Georgia-Pacific, Temple-Inland, and Weyerhaeuser had announced the second price increase for 2004, increasing Containerboard Products prices by $50/ton, effective June 1,

---

[A23] IP112019 at 112107, *Discussion on Corporate Strategy Options,* John Faraci, undated (presentation given on March 9-10 [year unknown, but appears to be from 2004 based on presentation materials], discussing statistics from 2003 through February 2004).
[A24] PCoA000026178.
[A25] PCoA000026178
[A26] GP-KLEEN01441611, Email from Christian Fischer (via Linda Brown) (Georgia-Pacific) to Georgia-Pacific Employees, Re: Profit Improvement Draft, dated May 12, 2004.
[A27] GP-KLEEN01441611
[A28] GP-KLEEN01441611

FILED UNDER SEAL PURSUANT TO COURT ORDER

2004.[A29] Defendants Norampac, International Paper, and Smurfit-Stone participated in the price increase as well.[A30]  Defendant Temple-Inland reported that the price increase was "met with no resistance in marketplace", as customers were more concerned about obtaining sufficient product than paying higher prices.[A31]  Defendants experienced higher EBIDTA and EBIT margins in large part due to the two 2004 price increases.[A32]

ANSWER:  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  IP otherwise denies the allegations of Paragraph 70.e.

---

[A29] See SSCC 00352370, Pulp and Paper Weekly Report, dated April 26, 2004 ("PCA and Weyerhaeuser as well as Georgia-Pacific Corp. and Temple-Inland Inc. plan $50/ton increases on their linerboard and corrugated medium for the open market, for June 1. If implemented, it would be the second increase"); Temple-Inland 00131080, Email from Arif Ali (Temple-Inland) to "GO_BJD_DIRECT_REPORTS" (Temple-Inland) Re: Paper Price Increase ("Temple Inland is announcing today another $50/ton price increase to its paperboard customer effective June 1. This follows the similar announcement by GP, WY and PCA"); IP091972, Letter from Carl Bohm (Weyerhaeuser) to Rick Start (Richwood & Laminating) Re: Containerboard Price Increase Announcement, dated April 8, 2004 (confirming Weyerhaeuser's "recent discussion" with Richwood & Laminating that Weyerhaeuser will be increasing prices for liner and medium by $50 per ton, effective June 1, 2004); IP352950, National Containerboard Price Increase Announcements, no author, dated May 14, 2004 (listing participants in the June 2004 price increase and providing the date the price increase was announced, the date the increase was effective and by how much Defendants increased liner and medium prices). See also Defendant Georgia-Pacific LLC's Objections and Responses to Plaintiff's Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increase effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 ("In early May 2004, GP announced a $50/ton price increase effective June 1, 2004"), dated December 20, 2013; Defendant Weyerhaeuser Company's Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increase effective March 1, 2004 and June 1, 2004), dated September 11, 2013; Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 and Exhibit A attached thereto (identifying an April 12, 2004 announcement of a $50/ton price increase, effective June 1, 2004), dated December 20, 2013; IP0955004, Deutsche Bank Equity report from Mark Wilde, dated April 12, 2004 (reporting that Defendant Weyerhaeuser had announced a price increase of $50/ton in containerboard, effective June 1, 2004, and explaining that "[t]his breaks the normal seasonal pattern of containerboard hikes in late summer/early autumn").

[A30] Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 6 (identifying price increases effective March 1, 2004 and June 1, 2004), dated September 27, 2013; Defendants Cascades Canada ULC and Norampac U.S. Inc.'s Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Supplemental Response to Interrogatory No. 6 (identifying a $50 price increase for linerboard and corrugated medium, effective June 1, 2004), dated December 20, 2013; IP352950, *National Containerboard Price Increase Announcements,* dated May 14, 2004 (identifying Defendants Weyerhaeuser, Georgia-Pacific, Temple-Inland, International Paper, PCA, and Smurfit-Stone as increasing liner and medium prices by $50/ton, effective June 1, 2004).

[A31] Temple-Inland 00569157, Email from Pat Maley (Temple-Inland) to Kenny Jastrow (Temple-Inland), Re: May Operating Highlights, dated June 14, 2004 ("The domestic $50/ton price increase proposed for June 1 has met with no resistance in marketplace. Customers are more concerned about supply availability than the increase").

[A32] Norampac0036222, *Memorandum Re Competitor Benchmarking Fourth quarter 2004,* Norampac, dated February 22, 2005 ("All manufacturers experienced a higher EBITDA and EBIT margins mainly due to the two price increases occurred in 2004").

Paragraph 70.f. of the Amended Complaint States: Defendants also reduced mill capacity, took downtime and idled machines both temporarily and permanently throughout 2004. Weyerhaeuser announced in late 2003 that it would be permanently closing a 270,000 ton medium mill in North Bend, Oregon, [A33] only to announce on January 13, 2004, that it would be increasing liner and medium prices. Around the same time as the price increase announcement, Weyerhaeuser reduced Containerboard Products by approximately 21,000 tons through "market downtime". [A34] Similarly, Temple-Inland's January 19, 2004 price increase announcement was followed by the company's January 26, 2004, announcement that it was closing its Dallas, Texas plant. [A35] Defendant Smurfit-Stone, which implemented its price increase in February 2004, permanently closed its medium mill in Thunder Bay, Ontario in the first quarter of 2004, removing approximately 160,000 tons of medium from the market. [A36] After announcing its price increase on January 16, Defendant International Paper closed a Roanoke Rapids, North Carolina machine during the second quarter of 2004, effectively removing nearly 300,000 tons of liner from the market. [A37] In January 2004, Defendant Georgia-Pacific announced its price increase, but also took downtime to remove Containerboard Products from the market and brought inventory levels to "record low levels." [A38] In March 2004, the same month that Georgia-Pacific implemented the price increase, it took additional downtime to remove Containerboard Products from the market. [A39] In total, it is estimated that approximately 563 million tons of containerboard products were removed from the market in 2004. [A40]

ANSWER: IP admits that it took downtime at its containerboard mills during 2004 and that it discontinued manufacturing containerboard at its Roanoke Rapids mill during 2004. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants. IP otherwise denies the allegations of Paragraph 70.f.

---

[A33] See SSCC 00083396, Excel Spreadsheet, Tab "Closures" (listing, by company, all liner and medium closures in North America from 1998 — 2010). See also GP-KLEEN01012988, at 1013005, Containerboard & Packaging Segment 2004 Annual Business Plan, Georgia-Pacific —January 27, 2004 (table demonstrating announced closed or idled Containerboard Products machines from 2002 — 2004)

[A34] Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2014, and Ex. 24 thereto at Tab 27.

[A35] See Temple-Inland 00348962, Email from Paul Recht (Temple-Inland), Re: Dallas Plant Closing, dated January 27, 2004.

[A36] SSCC 00083396. See also SSCC 00863598, Excel Spreadsheet, Tab "CB Summary – by Month" (demonstrating monthly change in containerboard production from 1988-2010).

[A37] IP579040, North American Containerboard Review, International Paper, dated June 2006. See also SSCC00083396; GP-KLEEN01012988, at 1013005.

[A38] P-KLEEN00106864, Georgia-Pacific Downtime 2004, Tab Summary by Machine Month 2004, dated September 9, 2008; GP-KLEEN01025183, Internal Georgia-Pacific Email from Matthew Denton, Re: December 2003 Flash — Containerboard & Packaging Segment (Preliminary due to LIFO), dated January 9, 2004. On May 19, 2004, Defendant Norampac publicly announced that it was closing its Concord, Ontario box plant. The plant officially closed on March 31, 2005. Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants, Response to Interrogatory No. 8 (identifying Norampac box plant and mill closures that occurred between 2003 - 2010), dated September 27, 2013.

[A39] GP-KLEEN00106864

[A40] SSCC 00083396

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 70.g. of the Amended Complaint States:  By April 26, all Defendants had announced the second 2004 price increase. In April 2004, Weyerhaeuser presented a Mill System Operating Strategy wherein it recommended that Containerboard inventories be "managed at much lower levels during 2004". [A41]  Under Weyerhaeuser's proposed inventory management system, box inventories exceeding 440,000 tons would trigger selective downtime.[A42]  From March through May 2004, Weyerhaeuser also effectively reduced its Containerboard Products by approximately 50,000 tons through maintenance downtime. [A43] Weyerhaeuser's total downtime in 2004 resulted in removing approximately 124,000 tons of Containerboard Product from the market. [A44]  Defendant Georgia-Pacific likewise removed containerboard product from the market in April 2004 by taking downtime. [A45]  Similar to Weyerhaeuser, Georgia-Pacific removed approximately 148,644 tons of containerboard products from the market in 2004 through downtime. [A46]

ANSWER:  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  IP otherwise denies the allegations of 70.g.

Paragraph 70.h. of the Amended Complaint States:  On May 19, 2004, Deutsche Bank analyst Mark Wilde reported that inventories were at "an extremely lean level."[A47] Noting that operating rates were at 94.4%, total industry inventories for mills and box plants stood at 3.6 weeks of supply, and that box shipments increased 4.2% YTD, Mr. Wilde doubted that "fundamentals ... could get any stronger".[A48]  Mr. Wilde further explained that "it's been years since the containerboard numbers looked so positive" and that the June 2004 price increase, if successful, would "go down as the biggest single year price gain in the containerboard history.[A49]

ANSWER:  IP admits that Paragraph 70.h. purports to quote from what appear to be publications of Deutche Bank.  IP otherwise denies the allegations of Paragraph 70.h.

Paragraph 70.i. of the Amended Complaint States:  Against the backdrop of the April 2004 price increase announcements, executives from Defendants and their co-conspirators, including Steven Klinger, Executive Vice President of Packaging for Georgia-Pacific, Ron Zimbleman, Vice President of Sales and Marketing for Containerboard for Temple-Inland, Dennis Colley, then the Vice President of Containerboard for International Paper, Bill

---

[A41] WY0090805 at p.8, *Mill System Operating Strategy*, dated April 14, 2004.

[A42] WY0090805 at p. 8.

[A43] Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2004, and Ex. 24 thereto at Tab 27, *supra*, n.48.  In March 2004, Weyerhaeuser removed approximately 29,000 tons of product through downtime.  It removed approximately 17,000 tons of product through downtime in April 2004, and approximately 4,000 tons of product through downtime in June

[A44] *See* Weyerhaeuser 30(b)(6) Deposition of James R. Keller, taken January 31, 2004, and Ex. 24 thereto at Tab 27 (adding the total maintenance downtime taken in 2004 to the total market downtime taken in 2004).

[A45] GP-KLEEN00106864

[A46] GP-KLEEN00490370 at p. 25, Georgia-Pacific Sales & Marketing Presentation, undated.

[A47] SSCC 00347633, Memo from Mark Wilde of Deutsche Bank Securities, Inc. Re: Containerboard Monitor, dated May 19, 2004.

[A48] SSCC 00347633

[A49] SSCC 00347633

FILED UNDER SEAL PURSUANT TO COURT ORDER

Wandmacher, Vice President and General Manager of the Containerboard Mill Division for Smurfit-Stone, Gerry Greeter, Vice President and General Manager of Containerboard Sales for PCA, Carl Bohm, Vice President of Containerboard for Weyerhaeuser, and Jim Keller, Senior Vice President of Containerboard for Weyerhaeuser, attended an AF&PA Executive Committee Containerboard Group meeting at AF&PA headquarters on March 22, 2004. [A50]   During this meeting, International Paper Vice President and General Manager of its containerboard business Dennis Colley was elected vice chair of the Containerboard Group Executive Committee, [A51] and Deutsche Bank analyst Mark Wilde provided an "economic outlook covering the paper packaging industry". [A52]   The committee also approved Terry Serie's, Vice President of Statistics for AF&PA, request to form a "task force of Containerboard Group members who would work toward developing a long range plan. [A53]   Just weeks later, on April 6, 2004, representatives from Defendants and their co-conspirators attended a Containerboard Division Membership meeting held by the AF&PA in Charleston, North Carolina. [A54]

ANSWER:  IP admits that Dennis Colley attended meetings of the AF&PA, but denies having information sufficient to confirm or deny whether Mr. Colley attended the alleged meeting referred to in Paragraph 70.i.  IP lacks knowledge or information sufficient to form a belief as to whether Mr. Colley was elected vice chair of the Containerboard Group Executive Committee of the AF&PA in March of 2004.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the details of trade association meetings that took place ten years ago and any allegations concerning other Defendants.  IP otherwise denies the allegations of Paragraph 70.i.

Paragraph 70.j. of the Amended Complaint States:  On May 2, 2004, executives from Defendants Norampac, Temple-Inland, PCA, Georgia-Pacific, Weyerhaeuser and International Paper attended an FBA Board of Directors meeting. [A55]   Around the same time,

---

[A50] AFPA_ESI_01897, *Minutes of the Meeting,* Executive Committee Containerboard Group, dated March 22, 2004 (identifying the persons listed as attendees during roll call). Mr. Zimbleman is identified as attending on behalf of Inland Paperboard & Packaging. Inland Paperboard & Packaging is the largest subsidiary of Temple-Inland. *See* http://www.risiinfo.com/db_area/archive/p_p_maW1997/9703/copro.htm (last viewed March 7, 2014).

[A51] AFPA_ESI_01897 (noting that Mr. Colley's term will begin at the conclusion of the Fall Meeting 2005)

[A52] AFPA_ESI_01897

[A53] AFPA_ESI_01897

[A54] AFPA-P-GS-00341 at p.2-3, *Minutes of the Meeting,* Containerboard Division Membership Containerboard Group, AF&PA, dated April 6, 2004 (listing the following persons as attendees during roll call: Jane Cowan and Mollie Hilliard from Georgia-Pacific; Tom Benefield and Melissa Murphy from International Paper; Kathleen Lents and Heidi Patton from PCA; Jack Greenshields and Scott Spurgeon from Rock-Tenn; Wayne Cameron from Smurfit-Stone; Barry Baker and Kent McFerran from Temple-Inland; and Jenny Iranon and Anne Olsen from Weyerhaeuser).

[A55] FBAKP0001176, *Minutes of Meeting from Board of Directors Meeting,* Fibre Box Association, dated May 2, 2004 (listing the following persons as members and attending: Marc-Andre Depin from Norampac, Bart Doney

FILED UNDER SEAL PURSUANT TO COURT ORDER

Deutsche Bank analyst Mark Wilde gave a presentation to the FBA entitled "A New Ball Game: A Review of the Containerboard & Corrugated Packaging Business". [A56] Therein, Mr. Wilde applauded the industry for improving fundamentals" that would "restore margins", including lower inventories, capacity rationalization, and industry consolidation. [A57] Mr. Wilde concluded the presentation by asking "[n]ow, with Fundamentals Improving ... how do we react?" [A58]

       ANSWER: IP admits that IP representatives attended meetings of the FBA. IP lacks knowledge or information sufficient to form a belief as to whether any IP representatives attended the alleged meeting referred to in Paragraph 70.j. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the details of trade association meetings that took place ten years ago and any allegations concerning other Defendants. IP otherwise denies the allegations of Paragraph 70.j.

       Paragraph 70.k. of the Amended Complaint States: In early July 2004, International Paper CEO John Faraci appears to have had a telephone call with Lee Thomas, President and Chief Operating Officer for Georgia-Pacific, ostensibly on AF&PA business. [A59] Shortly thereafter, on July 17, 2004, representatives from Defendants Weyerhaeuser, Rock-Tenn, Smurfit-Stone, and Georgia-Pacific attended a Paperboard Packaging Alliance Board of Advisors meeting in Washington, D.C. [A60] In late September 2004, executives from Defendants, including Steven Klinger from Georgia-Pacific, Marc-Andre Depin from Norampac, Daniel G. Pyne from Weyerhaeuser, and Carol Roberts from International Paper, attended another FBA Executive Committee meeting. [A61] In October 2004, AF&PA circulated antitrust compliance guidelines to Defendants, instructing them on how to implement "changes" to "reduce the risk of antitrust

---

from Temple-Inland, Tom Hassfurther (for William Sweeney) from PCA, Steven Klinger from Georgia-Pacific, Daniel Pyne from Weyerhaeuser, and Carol Roberts from International Paper).

[A56] GP-KLEEN01017172, Email from Matthew Denton, (Georgia-Pacific) Re: FW: A Whole New Ballgame? A Review of the Containerboard & Corrugated Packaging Business, dated May 10, 2004, with attachment GP-KLEEN01017174, A New Ball Game A Review of the Containerboard & Corrugated Packaging Business, Mark Wilde of Deutsche Bank Securities Inc., dated May 5, 2004, Exhibit 33 to Mark Wilde Deposition Transcript. See also RT 00001035, Email from Mark Wilde (Deutsche Bank) Re: A Whole New Ball Game? A Review of the Containerboard & Corrugated Packaging Business, dated May 10, 2004, with attachment RT 00001036, A New Ballgame A Review of the Containerboard & Corrugated Packaging Business, Mark Wilde of Deutsche Bank Securities, Inc., dated May 5, 2004.

[A57] GP-KLEEN01017174 at 1017177, 1017187-88

[A58] GP-KLEEN01017174 at 1017189. Defendant Smurfit-Stone appears to have announced its participation in the June 2004 price increase approximately three days after Mr. Wilde posed this question. See IP352950

[A59] IP333836

[A60] AFPA_ESI_00705, Minutes of Meeting, Paperboard Packaging Alliance Board of Advisors, dated June 17, 2004 (identifying the following persons as members and attending the meeting in roll call: Dick Dudley from Weyerhaeuser, Nick George from Rock-Tenn, Nat Holmes from Smurfit-Stone, and George Wurtz from Georgia-Pacific).

[A61] FBAKP0002635, Minutes of Meeting, FBA Executive Committee, dated September 28, 2004 (identifying the persons listed as attending the meeting).

FILED UNDER SEAL PURSUANT TO COURT ORDER

litigation".[A62]  The draft guidelines warned Defendants not to say things like, "[t]he industry needs to show some discipline to get prices up", or "[w]e all need to recognize that there is too much capacity and we need to do something about it."[A63]  The guidelines were endorsed by the AF&PA for use by all members during the October 30, 2004, AF&PA Board of Directors meeting, which was attended by executives from Defendants.[A64]  That same month, the AF&PA CEO Statistics Committee met to discuss, among other things, the "Long-Term Vision and Goals Plan for Domestic and International Statistics."[A65]  The attendees included Smurfit-Stone CEO Patrick Moore, David Dreilbelbis on behalf of James Rubfight for Rock-Tenn, PCA CEO Paul Stecko, Bob Amen from International Paper, Sonny Jackson from Smurfit-Stone, Richard Taggart from Weyerhaeuser, and Lyn Withey from International Paper.[A66]  Executives from Defendants met on at least one more occasion in 2004. Steve Klinger from Georgia-Pacific, Paul Brown (for Carol Roberts) from International Paper, James Davis from Smurfit-Stone, Marc-Andre Depin from Norampac, Daniel Pyne from Weyerhaeuser, and William Sweeney from PCA attended a Fibre Box Association Board of Directors meeting on November 16, 2004, in Chicago, Illinois.[A67]

ANSWER: IP admits that an electronic calendar invitation indicates that IP Chairman and CEO John Faraci was scheduled to have a conference call with Mr. Thomas of defendant Georgia Pacific to discuss the "EPP portion of AF&PA Bd. Mtg." on July 8, 2004.  IP further admits that IP personnel attended AF&PA and FBA meetings and that both the AF&PA and FBA have stringent antitrust compliance guidelines and policies and that IP personnel abided by those guidelines and policies.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the details of trade association meetings that took place ten years ago and any allegations concerning other Defendants.   IP otherwise denies the allegations of Paragraph 70.k.

Paragraph 71 of the Amended Complaint states: In the 1st Quarter of 2005, having previously indicated its intent to force price increases through the industry by cutting its

---

[A62] GP-KLEEN01061118; AFPA-P2-AT-00058

[A63] GP-KLEEN01061118; AFPA-P2-AT-00058

[A64] SSCC 00305730, *Minutes,* American Forest & Paper Association Board of Directors Meeting, dated October 30, 2004. The following persons were identified as being present during for all or part of the meeting: John Faraci, CEO of International Paper; Kenny Jastrow, CEO of Temple-Inland; Patrick Moore, CEO of Smurfit-Stone; and Steve Rogel, CEO of Weyerhaeuser.

[A65] SSCC 00159174, *Minutes,* AF&PA CEO Statistics Committee, dated Friday, October 29, 2004.

[A66] SSCC 00159174

[A67] FBAKP0001228, *Minutes of Meeting,* Fibre Box Association Board of Directors, dated November 16, 2004 (identifying the persons listed above as attending the meeting). The minutes indicate that Mr. Klinger was Chairman of the association,

FILED UNDER SEAL PURSUANT TO COURT ORDER

capacity, Defendant Smurfit-Stone closed its 203,000 tons-per-year Fernandina Beach, Florida containerboard plant. Notwithstanding the closure of this plant, on May 5, 2005, Smurfit-Stone reported in its SEC Form 10-Q filing that "[w]e expect our profitability to improve in the 2nd Quarter of 2005 as a result of stronger demand and high sales prices for containerboard and corrugated containers."

ANSWER: IP denies that the second sentence of Paragraph 71 contains an accurate quote from the document cited in that sentence and therefore denies the allegations in that sentence. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 71.

Paragraph 72 of the Amended Complaint states: During the 1st Quarter of 2005, Defendant PCA idled 65,000 tons per year of production capacity by taking off-line one of its three paper machines at its containerboard plant in Tomahawk, Wisconsin.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 72.

Paragraph 73 of the Amended Complaint states: Defendant Weyerhaeuser likewise reported strong demand for Containerboard Products during the 1st Quarter of 2005 in its 3rd Quarter 2005 Form 10-Q, stating that:

> Containerboard sales increased $36 million. Unit shipments increased 45,000 tons, or approximately 18 percent, and price realizations, which include freight and are net of normal sales deductions, increased $71 per ton, or approximately 22 percent in the first quarter of 2005, compared to the same period of 2004. These increases were mainly due to an improvement in demand for corrugated packaging in U.S. markets.

ANSWER: IP admits that Paragraph 73 purports to quote Weyerhaeuser's 3rd Quarter 2005 Form 10-Q. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 73.

Paragraph 74 of the Amended Complaint states: Similarly, Defendant International Paper reported in its May 6, 2005 Form 10-Q that "2nd Quarter earnings normally benefit from seasonally higher containerboard and box demand."

ANSWER: IP admits that Paragraph 74 purports to quote from IP's May 6, 2005 Form 10-Q. IP otherwise denies the allegations of Paragraph 74.

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 75 of the Amended Complaint states: Nevertheless, in the 2nd Quarter of 2005, International Paper took approximately 530,000 tons of containerboard downtime compared with approximately 215,000 of downtime in the 2nd Quarter of 2004. In its 10-Q filed on August 5, 2005, Defendant explained that this was "market related downtime" which was "taken to balance internal supply with demand to help manage inventory levels." However, when a manufacturing plant is idled during "downtime", the firm must continue to pay fixed costs, which are very high in the Containerboard Products industry. Smurfit-Stone acknowledged this fact in its SEC Form 10-K for the 2006 fiscal year, stating "the industry is capital intensive, which leads to high fixed costs and has historically resulted in continued production as long as prices are sufficient to cover marginal costs." Accordingly, "market related downtime" is very costly and is economically irrational from a single-firm's point of view during periods of strong demand, such as the 2nd Quarter of 2005.

ANSWER: IP admits that Paragraph 75 purports to quote from a Smurfit-Stone

Form 10-K. IP otherwise denies the allegations of Paragraph 75.

Paragraph 76 of the Amended Complaint states: As previously alleged, beginning in 2004, Defendants were experiencing decreased profit margins and historically high demand. In that context, in June 2005, high level executives and other representatives from each of the Defendants and their coconspirators, including Pete Correll, Chairman and CEO of Georgia-Pacific, David A. Spraley, Vice President of Georgia-Pacific, C. Richard Larrick, General Manager of Georgia-Pacific, Russell Bishop, Chief Information Officer of Weyerhaeuser, Dick Thomas, Vice President of Weyerhaeuser, Ronnie Cosper, Papermill Superintendent for Smurfit-Stone, and others were reported as attending the PIMA 2005 Leadership Conference in Nashville, Tennessee.[14] The theme of this conference was "Success through Collaborative Teamwork." Topics discussed included "Effective Collaboration through Teamwork" and "Price Execution in the Forest Products Industry."

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 76.

Paragraph 77 of the Amended Complaint states: During this conference, Deloitte Consulting LLP gave a presentation called "Pricing Opportunities in the Forest Products Industry." Deloitte began its presentation by stating that the industry was "rich in competitive intelligence, which facilitates strategic pricing analysis." The presentation also included a discussion regarding the several factors which made coordinated price increases possible, such as

---

[14] The Paper Industry Management Association, or "PIMA," describes itself as "the premier association for management professionals in the paper and pulp industry" with the goal of contributing "to the strength of the international pulp and paper community by providing the means for our members to address relevant industry issues and to develop their management and leadership skills."

FILED UNDER SEAL PURSUANT TO COURT ORDER

"underestimating competitor's desire to raise prices" and "overestimating the threat of new entrants into the market.[15]

> ANSWER:    IP lacks knowledge or information sufficient to form a belief as to

the truth of the allegations of Paragraph 77.

> Paragraph 78 of the Amended Complaint states: Immediately before this conference, on June 27, 2005, Smurfit-Stone reported that it "has no immediate plans to close down plants.[16]  But only days later, on July 1, 2005, Deutsche Bank, which monitors the containerboard industry and issues regular reports on developments within the industry, reported that "[t]here has been a lot of 'chatter' suggesting that one or more of the big integrated producers will soon shutter capacity.[17]

> ANSWER:    IP admits that Paragraph 78 purports to quote from a *Crain's*

*Chicago Business* article.  IP further admits that Paragraph 78 purports to quote from a Deutsche

Bank report, and admits that Deutsche Bank issues reports regarding containerboard

manufacturers. IP otherwise denies the allegations of Paragraph 78.

> Paragraph 79 of the Amended Complaint states: On July 19, 2005, Deutsche Bank reported "IP [International Paper] capacity withdrawals will help uncoated and CB [containerboard] producers. Among the names: DTC [Domtar], PKG [Packaging Corporation of America], TIN [Temple Island].[18]

> ANSWER:    IP admits that Paragraph 79 purports to quote from a Deutsche

Bank report.  IP otherwise denies the allegations of Paragraph 79.

> Paragraph 80 of the Amended Complaint states: Beginning in early 2005 and continuing throughout the remainder of the year, Defendant Temple-Inland closed containerboard converting facilities in Antioch, California, Newark, Delaware, Atlanta, Georgia, and Louisville, Kentucky. This reduced the supply of corrugated containers and aided in the overall scheme to increase the price of Containerboard Products. Temple-Inland closed these facilities despite acknowledging in its May 10, 2005 10-Q that "market demand strengthened, resulting in higher prices for most of our product offerings." The closures were against Temple-Inland's unilateral economic self-interest because they were made during a period of increasing demand and prices.

---

[15] Sinoway, Mike, "Pricing Opportunities in the Forest Products Industry, "June 28, 2005, Deloitte Development, LLC.

[16] Flat pricing boxes in Smurfit; Investors bail out as price hike fails; corrugated maker looks for better half of '05, Crain's Chicago Bus., June 27, 2005, at p. 4.

[17] 150701 Containerboard & Boxes – Boxed in, Deutsche Bank – Equity Research

[18] 050719 IP Thoughts on Restructuring, Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP admits that Paragraph 80 purports to quote from a Temple-Inland 10-Q. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 80 regarding Temple-Inland. IP otherwise denies the allegations of Paragraph 80.

Paragraph 81 of the Amended Complaint states: In the 3rd Quarter of 2005, Smurfit-Stone permanently closed two more of its containerboard mills as part of what the company called "its ongoing assessment and restructuring efforts." Smurfit-Stone closed mills in New Richmond, Quebec and Bathurst, New Brunswick. It closed these mills despite acknowledging in its 10-Q, filed with the SEC on August 8, 2005, that "in the third quarter of 2005, we expect seasonably strong demand for containerboard and corrugated containers." All together, these mills accounted for approximately 274,000 tons per year of containerboard. According to its 2007 Annual Report, in 2005 Smurfit-Stone shut down 8.5% of its total capacity. The closures were against Smurfit-Stone's unilateral economic self-interest because they were made during a period of increasing demand and prices.

ANSWER: IP admits that Paragraph 81 purports to quote from Smurfit-Stone's 10-Q for the second quarter of 2005. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 81.

Paragraph 82 of the Amended Complaint states: Despite Smurfit-Stone's disclaimer regarding plant closures only a few weeks before, on August 4, 2005 Deutsche Bank reported: Smurfit-Stone today announced a number of permanent capacity closures ... a bit more capacity than we expected, a bit earlier than we expected. They amount to 480K tons...or about 1.3% NA capacity.... With Smurfit having done a good deal of "heavy lifting", we'll be watching the behavior of other major competitors like International Paper and Weyerhaeuser ... the outlook of demand has also improved remarkably in recent weeks.[19]

ANSWER: IP admits that Paragraph 82 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 82.

Paragraph 83 of the Amended Complaint states: The following day, the St. Louis Post-Dispatch reported that Smurfit-Stone stated that "the closures are part of its restructuring efforts and will reduce its container-board manufacturing capacity by about 700,000 tons.[20] Approximately one month later, on September 7, 2005, Smurfit-Stone announced a price

---

[19] 050804 Bigger – Sooner – Enough – Smurfit Announces Mill Shuts, Deutsche Bank – Equity Research
[20] *Smurfit-Stone plans to close plants, lay off* 565, ST. LOUIS POST-DISPATCH, August 5, 2005, p. C3.

FILED UNDER SEAL PURSUANT TO COURT ORDER

increase of $30/ton to take effect on October 1, 2005. On September 17, 2005, Defendant PCA followed with the announcement of a $30 per ton price increase also effective October 1, 2005.

ANSWER: IP admits that Paragraph 83 purports to quote from a St. Louis Post-Dispatch article. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 83.

Paragraph 84 of the Amended Complaint states: During the 2nd quarter of 2005, Georgia-Pacific reduced the number of its containerboard shipments "due to slowback and maintenance downtime.[21] A slowback is another form of output restriction in lieu of completely shutting a machine or mill down. Georgia-Pacific did both in 2005, scheduling all major maintenance downtime across its mills in the fourth quarter of 2005 while announcing price increases of $30 per ton on linerboard medium, and 8% on boxes to be effective during that quarter.[22]

ANSWER: IP admits that Paragraph 84 purports to quote from a Canada NewsWire article. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 83.

Paragraph 85 of the Amended Complaint states: In the 3rd Quarter of 2005, International Paper also announced the closing of its 100,000 ton-per-year mill in Fort Madison, Iowa.

ANSWER: IP admits that it announced its plans to close the 100,000 ton-per-year mill in Fort Madison, Iowa mill in the third quarter of 2005. Insofar as the use of the word "also" in Paragraph 85 incorporates other allegations in the Complaint or suggests that IP's announcement related to what any other company did, IP denies the remaining allegations of Paragraph 85.

Paragraph 86 of the Amended Complaint states: On September 20, 2005, Deutsche Bank reported that containerboard prices were moving up but that "[w]hether prices can rise further without more supply reductions remains an open question.[23]

---

[21] Georgia-Pacific Reports Second quarter Results, Canada NewsWire, July 28, 2005, at p. 4.
[22] Q3 2005 Georgia-Pacific Earnings Conference Call – Final, FD (Fair Disclosure) Wire, Oct. 27, 2005, at p. 6.
[23] Q51017 Deutsche Bank – September Containerboard Monitor, Deutsche Bank – Equity Research.

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP admits that Paragraph 86 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 86.

Paragraph 87 of the Amended Complaint states: That same month, September 2005, Defendant Norampac permanently closed one of its two 150,000 tons-per-year paper machines at its Red Rock, Ontario containerboard mill. Additionally, in 2005, Norampac took "market related downtime" equal to 6.7% of its North American capacity despite increasing prices and demand.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 87.

Paragraph 88 of the Amended Complaint states: In October 2005, Norampac CEO Marc-Andre Depin commented on the September 2005 machine shut down by noting, "[i]f everyone would remove the same amount of capacity percentage-wise as we have, I think our business would look a lot better. You have to be ready to let go of business if you want to keep the price up.[24] In its 2005 Form 20-F, Norampac also noted, "continued industry consolidation, rationalization of inefficient containerboard mill capacity and market-related downtime have helped to better balance supply with demand and create a less volatile pricing environment.[25]

ANSWER: IP admits that Paragraph 88 purports to quote from an *Official Board Markets* article and from Norampac's 2005 20-F. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 88.

Paragraph 89 of the Amended Complaint states: On September 27, 2005, members of the FBA again met in Atlanta, Georgia at Georgia-Pacific's offices for the Corrugated Packaging Alliance Meeting.[26] Just days later, on October 1, 2005, Defendants and their co-conspirators raised prices on linerboard by 7% ($30/ton) from $450/ton to $480/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 7% ($30/ton) from $420/ton to $450/ton. Notably, the effective date of the price increase, as well as the amount of price increase, was implemented uniformly throughout the industry and mirrored the increase announced by Smurfit-Stone and PCA just weeks prior. On October 3, 2005, Deutsche Bank reported that all major containerboard producers were now supporting the price increase.[27]

---

[24] Arzoumanian, M. *Board Increase Flies Through*, Official Board Markets, Volume 81, Issue 44, Oct. 29, 2005
[25] See Norampac Form 20-F for year-ending December 31, 2005, at p. 16.
[26] The Corrugated Packaging Alliance, or "CPA," states its missions is in part "to provide a coordinated industry forum that effectively acts on competing materials matters that could not be accomplished by individual members"
[27] 051003 *Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP admits that Paragraph 89 purports to quote from an October 3, 2005, Deutsche Bank report.  IP lacks knowledge or information sufficient to form a belief with regard to the allegations of Paragraph 89 of the Complaint regarding other Defendants.  IP otherwise denies the allegations of Paragraph 89 of the Complaint.

Paragraph 90 of the Amended Complaint states: Just one month later, on October 27, 2005, Deutsche Bank reported on another expected price increase: "Chemical producers do it, metal producers do it ... maybe CB producers can do it too. Two CB price hikes in 60 days is quite unusual. A December price hike is unprecedented."[28] Defendants were able to accomplish the across-the-board price increases by sharing supply and capacity curtailment information with one another in order to coordinate supply restrictions substantial enough to force and sustain a Containerboard Products price increase.

ANSWER: IP admits that Paragraph 90 purports to quote from a Deutsche Bank report.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 90 regarding other Defendants.  IP otherwise denies the allegations of Paragraph 90.

Paragraph 91 of the Amended Complaint states: On November 16, 2005, there was a meeting of the FBA's Board of Directors. That same day, Deutsche Bank reported that containerboard "[i]nventory numbers dropped steeply in October, much more than typical... inventories down to 2.18 million tons, lowest level since 1994.[29] Notably, the last time that containerboard inventories were reported to be this low was during a horizontal output restriction conspiracy that ran from 1993-1995. See In re Linerboard Antitrust Litigation, 305 F.3d 145 (3rd Cir.2002).

ANSWER:  IP admits that there was a meeting of the FBA's Board of Directors on November 16, 2005. IP admits that Paragraph 91 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 91.

Paragraph 92 of the Amended Complaint states: Less than two weeks after the meeting of the FBA's Board of Directors, on or about November 28, 2005, Weyerhaeuser and PCA announced a 40$/ton price hike, effective January 1, 2006.

---

[28] 051027 Deutsche Bank – Smurfit –Stone Container, Deutsche Bank – Equity Research
[29] 051116 Deutsche Bank – October Containerboard Monitor and Numbers, Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations of Paragraph 92.

Paragraph 93 of the Amended Complaint states: Regarding these announced price

hikes, on November 28, 2005 Deutsche Bank reported that they "are likely to be joined by others

before long.[30] Deutsche Bank also[31] reported that:

> Industry sources report that 2 of North America's 6 largest
> containerboard producers (Weyerhaeuser, PCA) are talking with
> customers about a price hike on January 1. It would appear that the
> increases are in the $40/ton range ... Because January and early
> February tends to be one of the slowest periods of the year, a
> January price hike is unusual ... Box plant inventories fell 208K in
> October and have fallen 356K in 2 months. Measured in terms of
> days of supply, box plant inventories are at only 2.8 weeks - the
> lowest level we can find in our 20+yrs of data.  Further supply
> reductions could heat the market even further over the next month
> or two 32

ANSWER: IP admits that the first sentence of Paragraph 93 purports to quote

from a November 28, 2005 *Dr. Paper's Pulse on Pricing* Deutsche Bank report. IP otherwise

lacks knowledge or information sufficient to form a belief as to the truth of the allegations of

Paragraph 93.

Paragraph 94 of the Amended Complaint states: The following day,

Weyerhaeuser announced its intent to indefinitely idle its 350,000 tons-per-year linerboard

machine in Plymouth, North Carolina. On November 29, 2005, Deutsche Bank reported that

"[t]he shutdown removes nearly 1% of US containerboard capacity at a point when the market

has begun to tighten rapidly. Containerboard was already a tight market.[33]

ANSWER:  IP lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations of Paragraph 94.

Paragraph 95 of the Amended Complaint states: On December 3, 2005, Official

Board Markets reported that Weyerhaeuser was informing its customers about the $40 price

increase and that "Packaging Corp. of America, Smurfit-Stone Container Corp. and Temple-

Inland are telling their customers the same thing."

---

[30] 051128 *Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[31] 051128 *Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[32] 051128 Deutsche Bank – Paper and Packaging, Deutsche Bank – Equity Research
[33] 051129 *Deutsche Bank – Weyerhaeuser*, Deutsche Bank – Equity Research

ANSWER: IP admits that Paragraph 95 purports to quote from an *Official Board Markets* article. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 95.

Paragraph 96 of the Amended Complaint states: In total, Defendants and their co-conspirators shut down nearly 1 million tons of containerboard capacity in 2005, or over 3% of total market capacity. Their conduct cannot be reconciled with the strong demand the industry anticipated throughout 2005 and thereafter. Defendants and their co-conspirators did not have economic justification to unilaterally cull capacity or reduce production of corrugated containers. As demand and prices were increasing, independent firms acting in their unilateral self-interest had an incentive to refrain from reducing capacity in order to produce sufficient containerboard to meet the strong demand for corrugated containers, not to restrain output as they did.

ANSWER: IP denies having knowledge or information sufficient to form a belief with regard to the allegations of the first sentence of Paragraph 96 regarding other Defendants. IP otherwise denies the allegations of Paragraph 96.

Paragraph 97 of the Amended Complaint states: The Defendants and their co-conspirators also anticipated strong demand for Containerboard Products in 2006. For example, in its 10-K for the year ending December 31, 2005, International Paper reported that "[w]e see favorable signs of positive momentum for the remainder of 2006. We anticipate that demand in North America for both uncoated paper and industrial packaging products will be stronger."

ANSWER: IP admits that its 10-K for the year ending December 31, 2005 contains the text quoted in Paragraph 97, and that, as of March 6, 2006, IP anticipated that demand in North America for both uncoated paper and industrial packaging products would be stronger for the remainder of 2006. IP lacks knowledge or information sufficient to form a belief with regard to the allegations of Paragraph 97 regarding other Defendants. IP otherwise denies the allegations of Paragraph 97.

Paragraph 98 of the Amended Complaint states: Effective on or about January 1, 2006, Defendants and their co-conspirators again raised prices on linerboard by 8% ($40/ton) from $480/ton to $520/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 9% ($40/ton) from $450/ton to $490/ton. These price increases, deemed "unusual" by Deutsche Bank just weeks before (see ¶¶ 91 and 93, *supra*), occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time. In 2007, PCA Chairman and CEO, Paul Stecko, commented on the January 2006

FILED UNDER SEAL PURSUANT TO COURT ORDER

price hike, noting "since consolidation began, inventories have trended down and we did get a price increase last January. So that would historically not be a normal time.[34]

      ANSWER: IP lacks knowledge or information sufficient to form a belief with regard to the allegations of Paragraph 98 of the Complaint regarding other Defendants. IP otherwise denies the allegations of Paragraph 98.

      Paragraph 99 of the Amended Complaint states: That same month, in January 2006, the Corrugated Packaging Alliance Action Team met at Georgia-Pacific's headquarters in Atlanta, Georgia. Despite the record low containerboard and corrugated container inventories and rising containerboard product prices, over the course of the following year Defendants and coconspirators continued to reduce capacity of Containerboard Products. In its Form 20-F for fiscal year ending December 31, 2005, Norampac noted, "[i]n the first quarter of 2006, the situation was positive. In particular, several North American producers announced capacity reductions or closures and some of them have also reduced their box making capacity."

      ANSWER: IP admits that Paragraph 99 purports to quote Norampac's 2005 Form 20-F. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations regarding other Defendants. IP otherwise denies the allegations of Paragraph 99.

      Paragraph 100 of the Amended Complaint states: In the 1st Quarter of 2006, Weyerhaeuser closed its 350,000 tons-per-year Plymouth, North Carolina containerboard plant. This plant shutdown was not in Weyerhaeuser's economic self-interest as it came at a time of rising prices and record low inventories, as evidenced by its 2006 1st Quarter 10-Q wherein Weyerhaeuser reported that:

> The company anticipates improvement in earnings for the Containerboard, Packaging and Recycling segment in the second quarter primarily due to implementation of previously announced price increases for both containerboard and corrugated packaging and a seasonal increase in demand for corrugated packaging.

      ANSWER: IP admits that the second sentence of Paragraph 100 purports to quote from Weyerhaeuser's 2006 1st Quarter 10-Q. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 100 regarding other Defendants. IP otherwise denies the allegations of Paragraph 100.

---

[34] Transcript of Q 1 2007 PCA Earnings Conference Call, April 18, 2007, at p. 6.

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 101 of the Amended Complaint states: On February 13, 2006, Deutsche Bank reported that containerboard "[p]rices are rising - even faster than expected. Transaction prices on U.S. kraft linerboard and corrugating medium rose $40/ton in January - fully reflecting the price hike. Spot prices have reportedly risen further."[35]

ANSWER: IP admits that Paragraph 101 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to truth of the allegations of Paragraph 101.

Paragraph 102 of the Amended Complaint states: On February 21, 2006, Deutsche Bank reported that containerboard inventories "remain at historically lean levels" and characterized containerboard prices as "rapidly rising."[36] Deutsche Bank also noted that: "A $50/ton price hike has been announced for late March/early April. A $40/ton January increase on linerboard & corrugated medium appears to have taken hold with relative ease.[37] A $30/ton October hike also went in with ease." On March 4, 2006, Official Board Markets noted:

> "Other integrateds that have announced recently (all up $50 per ton) include Weyerhaeuser (April 1), Norampac (March 20), and Packaging Corp. of America (March 21) ... ¶ ... Last month, Georgia-Pacific announced a $50 per ton increase is scheduled to take effect April 1...¶...If this latest increase is fully implemented it will mean that containerboard prices have risen 33 percent since mid-October.

ANSWER: IP admits that Paragraph 102 purports to quote from a February 22, 2006 Deutsche Bank report and a March 4, 2006, Official Board Markets article, but notes that the latter is inaccurately quoted in a manner that changes the meaning of the quoted text. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 102.

Paragraph 103 of the Amended Complaint states: On March 6, 2006, International Paper filed its Form 10-K for year ending December 31, 2005. In its Executive Summary discussing the outlook for 2006, it was noted that "...operating rates should improve in 2006 reflecting announced industry capacity reductions in uncoated papers and containerboard.[38]

---

[35] 060213 *Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[36] 060221 Deutsche Bank – January Containerboard, Deutsche Bank – Equity Research
[37] Ibid.
[38] International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p. 11.

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP admits that it filed its Form 10-K for the year ending December 31, 2005 on March 6, 2006, and that Paragraph 103 purports to quote the Executive Summary section of its Form 10-K for the year ending December 31, 2005. IP otherwise denies the allegations of Paragraph 103.

Paragraph 104 of the Amended Complaint states: On March 14, 2006, the FBA's Executive Committee met. Approximately three weeks later, in early April 2006, Defendants and their coconspirators raised prices on linerboard again, this time by nearly 10% ($50/ton) from $520/ton to $570/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 10% ($50/ton) from $490/ton to $540/ton. These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time.

ANSWER: IP admits that members of the FBA's Executive Committee met on March 14, 2006. IP lacks knowledge or information sufficient to form a belief with regard to the allegations of Paragraph 104 regarding other Defendants. IP otherwise denies the allegations of Paragraph 104.

Paragraph 105 of the Amended Complaint states: In sum, between October 2005 and April 2006, the Defendants and their coconspirators raised prices in concert three times, October 2005, January 2006, and April 2006. By April 2006, the price of linerboard had reached prices of $560-570/ton – its highest level since 1995. A trade journal reported, "[s]ince October 2005, board prices have risen 33%. The quickness of the jump is unprecedented.[39]

ANSWER: IP admits that the third sentence of Paragraph 105 purports to quote from a *Paperboard & Packaging* article. IP lacks knowledge or information sufficient to form a belief with regard to the allegations of Paragraph 105 regarding other Defendants and entities. IP otherwise denies the allegations of Paragraph 105.

Paragraph 106 of the Amended Complaint states: The price increases in containerboard and its components caused corrugated container prices to rise as well. As reported by Deutsche Bank: "It appears that most of the first two containerboard price hikes have made their way into box prices. Producers are now trying to push this spring's $50/ton hike downstream to boxes. There are encouraging early signs in the corrugated sheet & local box markets."[40]

---

[39] Paperboard and Packaging, April 2006, at p. 16.
[40] 060608 Deutsche Bank Report – Dr. Paper's Containerboard Quarterly, Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP admits that Paragraph 106 purports to quote from a Deutsche Bank

report.  IP lacks knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 106 regarding other Defendants.  IP otherwise denies the allegations of

Paragraph 106.

Paragraph 107 of the Amended Complaint states: Defendants' costs, however, did
not increase during this period. In discussing the increasing profit margins enjoyed by the
industry in the first quarter of 2006, Deutsche Bank noted "[h]igher prices and a moderation of
cost pressures were the key drivers.[41]  Thus, increased costs cannot explain Defendants' price
increases. Notably, in April 2006, containerboard prices reached their highest peak since 1995–
which was also during a period of known collusion. See In re Linerboard Antitrust Litigation.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants.  IP admits that Paragraph 107 purports to

quote from a Deutsche Bank report.  IP otherwise denies the allegations of Paragraph 107.

Paragraph 108 of the Amended Complaint states: In its May 9, 2006 10-Q,
International Paper reiterated its bullish outlook for demand, noting that "[e]ntering the 2nd
quarter, we expect operating profits to be somewhat higher than in the 1st quarter. Product
demand and projects sales volumes are solid across all of our key platform businesses."

ANSWER: IP admits that Paragraph 108 purports to quote from IP's May 9, 2005

10-Q.  IP otherwise denies the allegations of Paragraph 108 of the Complaint.

Paragraph 109 of the Amended Complaint states: Strong demand throughout
2006, combined with the capacity cuts and output restrictions imposed by the Defendants and
their co-conspirators, resulted in significantly higher prices for Containerboard Products. As
stated in Weyerhaeuser's 2006 2nd Quarter 10-Q: "The increasing price realizations for
containerboard and corrugated packaging resulted from an increase in industry demand for
corrugated packaging, coupled with high containerboard mill operating rates and low inventory
levels." Despite an increase in demand which began at least in 2005, in early 2006,
Weyerhaeuser closed its 350,000 ton-per-year containerboard machine at its Plymouth, N.C.,
mill.

ANSWER:  IP  admits  that  Paragraph  109  purports  to  quote  from  a

Weyerhaeuser's 2006 2nd Quarter 10-Q.  IP lacks knowledge or information sufficient to form a

---

[41] 060608 Deutsche Bank Report – Dr. Paper's Containerboard Quarterly, Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

belief as to the truth of the remaining allegations regarding other Defendants. IP otherwise

denies the allegations of Paragraph 109.

<u>Paragraph 110 of the Amended Complaint states:</u> On June 8, 2006, Deutsche
Bank reported on the effect of recent tightening of supply by Defendants:
> Most containerboard companies reported q/q [quarter over quarter]
> margin gains in Q1 2006. Higher prices and a moderation of cost
> pressures were the key drivers... Published estimates for linerboard
> price have risen $120/ton since September, reaching $515/ton - - -
> the highest level since October 1995... Supply discipline has been
> an essential part of the equation. Since early 2005, 1.67MM tons of
> capacity have been closed.[42]

<u>ANSWER:</u> IP admits that Paragraph 110 purports to quote from a June 8, 2006

Deutsche Bank *Containerboard Quarterly* report. IP lacks knowledge or information sufficient

to form a belief as to the truth of the allegations of Paragraph 110 regarding other Defendants.

IP otherwise denies the allegations of Paragraph 110.

<u>Paragraph 111 of the Amended Complaint states:</u> On June 15, 2006, Deutsche
Bank confirmed the price increases resulted in higher corrugated container prices to the Plaintiff
Class: "The strong box volume and lower inventories in May enhance the odds that producers will
get full pass through of the CB hike into boxes... [t]he May figures show very solid demand and
an inventory level reviving from upward climb.[43]

<u>ANSWER:</u> IP admits that Paragraph 111 purports to quote from a June 15, 2006

*Paper & Packaging* Deutsche Bank report. IP otherwise lacks knowledge or information

sufficient to form a belief as to the truth of the allegations of Paragraph 111.

<u>Paragraph 112 of the Amended Complaint states:</u> On July 18, 2006, Deutsche
Bank reported that "[PCA] says that April hike is now essentially fully into boxes.[44]

<u>ANSWER:</u> IP admits that Paragraph 112 purports to quote from a Deutsche Bank

report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of

the allegations of Paragraph 112.

---

[42] 060608 Deutsche Bank Report – Dr. Paper's Containerboard Quarterly, Deutsche Bank – Equity Research
[43] 060615 Deutsche Bank Report – May Containerboard & Box Numbers Big Volumes, Deutsche Bank – Equity Research
[44] 060718 Deutsche Bank Report – COMPANY ALERT – Packaging Corp. of America, Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 113 of the Amended Complaint states: On July 25, 2006, Deutsche Bank reported that Weyerhaeuser's "box prices were up 5.3%[45]

ANSWER: IP admits that Paragraph 113 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 113.

Paragraph 114 of the Amended Complaint states: On August 7, 2006, Deutsche Bank reported that "[c]ompany earnings announcements to date show the 3rd price hike is being passed in the form of higher box prices.[46]

ANSWER: IP admits that Paragraph 114 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 114.

Paragraph 115 of the Amended Complaint states: Despite the substantially increased prices already brought about by a constriction of capacity and supply, in the 3rd Quarter of 2006, Norampac closed its 300,000 tons-per-year Ontario, Canada plant. On August 31, 2006, the *Toronto Sun* reported the closure, noting that Norampac cited "unfavourable economic factors" as the reason for the closure.[47] The Ontario plant was 20% of Norampac's total containerboard capacity and nearly 1% of total North American containerboard capacity. Norampac blamed the closure on high energy and input costs. However, as recently as June 2006, the trade press had indicated that Containerboard Products producers' margins were increasing due in part to a moderation of costs. In response to the plant closing, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement. Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%.[48] This plant shutdown was not in Norampac's unilateral economic self-interest as it came at a time of rising containerboard prices, tight supply and high plant operating rates; however, as alleged above, Norampac had previously urged the industry to "remove the same amount of capacity percentage-wise" as Norampac so that the "business would look a lot better," because, as its CEO committed to the industry, "You have to be ready to let go of business if you want to keep the price up."

ANSWER: IP admits that Paragraph 115 purports to quote from an August 31, 2006 *Toronto Sun* article and from a Deutsche Bank report. IP lacks knowledge or information

---

[45] 060725 Deutsche Bank Report – COMPANY ALERT – Weyerhaeuser, Deutsche Bank – Equity Research
[46] 060807 Deutsche Bank Report – Dr. Paper's Pulse on Pricing, Deutsche Bank – Equity Research
[47] *N. Ontario Mill to Shut Down*, THE TORONTO SUN, August 31, 2006, at p. 54.
[48] 060830 Deutsche Bank Report – Norampac closing Red Rock, Deutsche Bank – Equity Research

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

sufficient to form a belief as to the truth of the allegations regarding other Defendants. IP

otherwise denies the allegations of Paragraph 115.

      <u>Paragraph 116 of the Amended Complaint states:</u> On October 9, 2006, Deutsche Bank reported that containerboard "[d]emand remains solid.[49]

      <u>ANSWER:</u> IP admits that Paragraph 116 purports to quote from an October 9,

2006 *Paper & Forest Products* Deutsche Bank report. IP otherwise lacks knowledge or

information sufficient to form a belief as to the truth of the allegations of Paragraph 116.

      <u>Paragraph 117 of the Amended Complaint states:</u> On October 18, 2006, Deutsche Bank reported that PCA had record earnings per share in the 3rd Quarter of 2006, which reflected the hikes in containerboard prices. Deutsche Bank also reported that PCA was "trimming output @ pt when mkt appears to be easing. [sic] They're not 'free riding' & not delaying – encouraging signs ... 4Q impact of mill outages will remove 12K tons from system... production cut-backs by a player often viewed as industry 'free rider' are constructive."[50] PCA was contributing to the cartel by taking downtime and reducing containerboard output while demand remained strong. Under competitive market conditions, PCA's downtime would not have been in its unilateral interest; rather, it would have continued as a free rider on the output reductions of the other Defendants. PCA's downtime under then-current market conditions and expectations made economic sense only pursuant to an agreement or understanding with its competitors that they would also restrict supply.

      <u>ANSWER:</u> IP admits that Paragraph 117 purports to quote from a Deutsche Bank

report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of

the allegations of Paragraph 117.

      <u>Paragraph 118 of the Amended Complaint states:</u> This was confirmed by PCA's 10-K for the year ending December 31, 2006: Industry supply and demand trends were favorable throughout 2006. Industry shipments of corrugated products increased 1.3% during 2006 compared to 2005, on a per workday basis. During this same period, industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2006 at its second lowest level in the past 25 years, on a weeks of supply basis. Since September 2005, linerboard prices have increased $120 per ton, or approximately 30%, as reported by industry publications.

---

[49] 061009 Deutsche Bank Report – Dr. Paper's Pulse on Pricing, Deutsche Bank – Equity Research
[50] 061018 Deutsche Bank Report – PKG in 100 Words No more 100% operating rates? Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER:  IP admits that Paragraph 118 purports to quote from PCA's 10-K for the year ending December 31, 2006.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding other Defendants.  IP otherwise denies the allegations of Paragraph 118.

Paragraph 119 of the Amended Complaint states: Just one week after reporting that PCA was taking downtime to further reduce any slack in the supply constraint, on October 25, 2006, Deutsche Bank reported: "Best news may be SSCC's [Smurfit-Stone] Q4 'maintenance' downtime. With markets appearing to slow, throttling back on supply could help pricing environment."[51]

ANSWER:  IP admits that Paragraph 119 purports to quote from Deutsche Bank report.  IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 119.

Paragraph 120 of the Amended Complaint states: In October 2006, Weyerhaeuser and International Paper announced a price increase effective on January 1, 2007.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 120 regarding Weyerhaeuser. IP otherwise denies the allegations of Paragraph 120.

Paragraph 121 of the Amended Complaint states: The unprecedented across-the-board increases in containerboard prices were due to a concerted effort by the Defendants and their co-conspirators to restrict output and capacity. Industry trade journals reported that the "linerboard market began to tighten in the fourth quarter of 2005 and containerboard dropped to an unusually low level of 2.2 million tons[52]  Another trade journal noted that "capacity reductions... may be the most important overall factor behind the strong price gains" and that "[w]ith supplies short, mills were in the drivers' seat and began to aggressively push up prices.[53]

ANSWER: IP admits that Paragraph 121 purports to quote from a Pulp & Paper article and a Paper Age article.  IP lacks knowledge or information sufficient to form a belief as

---

[51] 061025 Deutsche Bank Report – SSCC Q3 in 100 Words, Deutsche Bank – Equity Research
[52] Pulp & Paper (Jan. 2007) at p. 15.
[53] Paper Age (September/October 2006) at p. 15.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

to the truth of the allegations of Paragraph 121 regarding other Defendants.  IP otherwise denies

the allegations of Paragraph 121.

> Paragraph 122 of the Amended Complaint states: All together, between 1st Quarter 2005 and 3rd Quarter 2006, Defendants and their co-conspirators shut down nearly 1.7 million tons worth of containerboard capacity. In comparison, the conspiracy among a similar set of defendants in 1993-1995 was executed by shutting down only 300,000-350,000 tons of capacity. *See In re Linerboard Antitrust Litigation*, 305 F.3d at p. 154. These massive shutdowns were part of the Defendants and their coconspirators' concerted effort to stabilize and raise the price of Containerboard Products.

> ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding other Defendants. IP otherwise denies the allegations of

Paragraph 122.

> Paragraph 123 of the Amended Complaint states: In 2007, Defendants and their co-conspirators continued to shut down capacity in furtherance of their conspiracy. In late January 2007, International Paper took 74,000 tons of containerboard capacity offline. In April, PCA reported that it took unspecific downtime in the 1st and 2nd Quarters of 2007.

> ANSWER: IP lacks knowledge or information sufficient to form a belief with

regard to the allegations of Paragraph 123 regarding other Defendants and entities.  IP admits

that effective October 1, 2007, it closed its Terre Haute, Indiana paper mill.  IP otherwise denies

the allegations of Paragraph 124.

> Paragraph 124 of the Amended Complaint states: On April 18, 2007, PCA Chairman and CEO, Paul Stecko, stated the following with respect to industry-wide inventories during PCA's 1st Quarter earnings conference call:  Our containerboard inventories at the end of the first quarter were down about 2000 tons compared the year-end 2006 levels. I should also note that yesterday the Fibre Box Association released industry statistics for the month of March and in our opinion these statistics are very encouraging. Corrugated products demand was up 3.4% per workday and containerboard inventories fell by 75,000 tons to 2.472 million tons or 4.1 weeks of supply. This is 200,000 tons lower than the average March containerboard inventory for the past ten years and on a weeks of supply basis, this is the lowest March ending inventory on record. So pretty healthy statistics.

> ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 124.

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 125 of the Amended Complaint states: In June 2007, Smurfit-Stone closed down two plants, a 148,000 tons-per-year plant in Vernon, California and a 52,000 tons-per-year plant in Carthage, Indiana.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 125.

Paragraph 126 of the Amended Complaint states: On June 18-20, 2007, there was a Joint AF&PA, AICC and FBA Washington Fly-In meeting in Washington, DC. Shortly thereafter, Weyerhaeuser announced a $40/ton price hike, effective August 1, 2007.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 126.

Paragraph 127 of the Amended Complaint states: In early July 2007, PCA and Smurfit-Stone also announced a $40/ton containerboard price hike, also effective August 1, 2007.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 127.

Paragraph 128 of the Amended Complaint states: Regarding whether these announced price hikes would work, Deutsche Bank commented that "the global containerboard backdrop remains just about as favorable as any we have seen in over 20 yrs."[54] On July 6, 2007, Deutsche Bank reported that "[v]irtually all major containerboard producers have slated $40-50/ton hikes for August.[55]

ANSWER: IP admits that Paragraph 128 purports to quote from a July 3, 2007 Deutsche Bank report and a July 6, 2007 Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 128.

Paragraph 129 of the Amended Complaint states: On or about August 1, 2007, Defendants and their co-conspirators raised prices on containerboard again, this time by over 7% ($40/ton) from $570/ton to $610/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 7% ($40/ton) from $540/ton to $580/ton. These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

---

[54] 070703 Deutsche Bank Report – August Containerboard Price Hike, Deutsche Bank – Equity Research
[55] 070706 Deutsche Bank Report – Dr. Paper's Weekly Wrap Up (7/6/07), Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP lacks knowledge or information sufficient to form a belief with

regard to the allegations of Paragraph 129 regarding other Defendants. IP otherwise denies the

allegations of Paragraph 129.

Paragraph 130 of the Amended Complaint states: On September 4, 2007,
Deutsche Bank reported that the "full $40/ton price hike initiative for August was reflected in the
trade papers and most of our trade reports suggest uncharacteristic discipline from the big
integrated.[56]

ANSWER: IP admits that Paragraph 130 purports to quote the cited Deutsche

Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 130.

Paragraph 131 of the Amended Complaint states: On September 6, 2007,
Norampac announced that it had entered into a joint venture with two other Containerboard
Products manufacturers, including Smurfit-Stone, to establish a new company called Niagara
Sheet LLC. Commenting on the transaction, MarcAndré Dépin, President and CEO of
Norampac, noted "[t]he participation of Norampac in this joint venture follows the trend of our
investment strategy which aims to consolidate our expansion in the United States and enable us
to ensure the quality of our products and the satisfaction of our customers."

ANSWER: IP admits that Paragraph 131 purports to quote a September 6, 2007

Lexedon article. IP lacks knowledge or information sufficient to form a belief with regard to the

remaining allegations of Paragraph 131.

Paragraph 132 of the Amended Complaint states: October 2007, International
Paper closed down its 200,000 tons-per-year containerboard plaint in Terra Haute, Indiana.

ANSWER: IP admits that it closed its 200,000 ton-per-year containerboard mill in

Terra Haute, Indiana in October 2007.

Paragraph 133 of the Amended Complaint states: PCA's 2007 10-K reported that
the company's gross profits as a percentage of net sales increased from 20.3% to 22.7%
"primarily due to the increased sales prices" of its corrugated products and that from 2006 to
2007, "industry containerboard inventory levels remained at historically low levels, with
inventory at the end of December 2007 at its second-lowest level in the past 25 years, on a
weeks-of-supply basis."

---

[56] 070904 Deutsche Bank Report – Dr. Paper's Pulse on Pricing, Deutsche Bank – Equity Research

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

<u>ANSWER:</u> IP admits that Paragraph 133 purports to quote from PCA's 2007 10-K, but notes that the quotation does not appear to be accurate.  IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 133.

<u>Paragraph 134 of the Amended Complaint states:</u> Temple-Inland reported in its 2007 10-K that "[i]n 2007, corrugated packaging prices and linerboard prices moved higher as a result of price increases implemented in 2006 and 2007. In 2006, corrugated packaging and linerboard prices moved higher reflecting price increases implemented in late 2005 and in 2006." Notably, Temple-Inland also reported that prices for other paper products – specifically, gypsum wallboard – had decreased in the same period.

<u>ANSWER:</u>  IP admits that Paragraph 134 purports to quote from Temple-Inland's 2007 10-K report.  IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 134.

<u>Paragraph 135 of the Amended Complaint states:</u> Defendants and their co-conspirators did not have independent economic justification to cut capacity or reduce production of corrugated containers in the face increasing demand and prices. To the contrary, independent firms acting competitively and in their unilateral self-interest had an incentive to refrain from such acts.

<u>ANSWER:</u> IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 135 regarding other Defendants.  IP otherwise denies the allegations of Paragraph 135.

<u>Paragraph 136 of the Amended Complaint states:</u> On February 1, 2008, Deutsche Bank reported that "plant inventories fell from 3.1 to 3.0 weeks, one of the lowest levels in history."[57]

<u>ANSWER:</u> IP admits that Paragraph 136 purports to quote from a Deutsche Bank report, with the exception of the word "weeks."  IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 136.

<u>Paragraph 137 of the Amended Complaint states:</u> On or about March 17, 2008, International Paper announced that it was purchasing Weyerhaeuser. This merger made International Paper the single largest containerboard producer with 11.5 million tons per year of

---

[57] 080201 Deutsche Bank Report – January Containerboard Monitor, Deutsche Bank – Equity Research

global containerboard capacity. As indicated above, prior to the merger announcement, International Paper had been idling and reducing its capacity.

ANSWER: IP admits that on March 17, 2008, it announced that it signed an agreement to acquire Weyerhaeuser's Containerboard, Packaging and Recycling business, and that, after closing, the acquisition would provide IP with approximately 11.5 million tons per year of containerboard capacity, more than any other producer in the United States. IP otherwise denies the allegations of Paragraph 137.

Paragraph 138 of the Amended Complaint states: On March 24-26, 2008, the FBA's Annual Meeting 2008, was held at the J.W. Marriott Desert Springs in Palm Desert, California. At this Annual Meeting, the FBA's Board of Directors meeting was also held.

ANSWER: Upon information and belief, IP admits the allegations of Paragraph 138.

Paragraph 139 of the Amended Complaint states: On March 30-April 2, 2008, the American Forest & Paper Association held its Annual Paper Week convention in New York, New York.

ANSWER: Upon information and belief, IP admits the allegations of Paragraph 139.

Paragraph 140 of the Amended Complaint states: On or about May 5, 2008, International Paper's purchase of Weyerhaeuser was approved. As a result of the merger, the top seven containerboard producers made up a combined market share of approximately 80%.

ANSWER: IP admits that its acquisition of Weyerhaeuser's Containerboard, Packaging and Recycling business was consummated on August 4, 2008. IP lacks knowledge or information sufficient to form a belief as to the truth of the market share allegations in Paragraph 140. IP otherwise denies the remaining allegations of Paragraph 140.

Paragraph 141 of the Amended Complaint states: On or about May 10, 2008, Georgia-Pacific announced an increase on containerboard prices by $55/ton, effective July 1, 2008, and new reports stated that "within hours after this announcement, Smurfit-Stone ... told its

FILED UNDER SEAL PURSUANT TO COURT ORDER

customers the same price increase details. [58] Shortly thereafter, International Paper, Weyerhaeuser, PCA and Norampac also instituted identical price increases.[59]

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 141 regarding other Defendants. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 141.

Paragraph 142 of the Amended Complaint states: On May 16, 2008, Deutsche Bank reported that containerboard inventory was the "second-lowest April level in 20 years.[60]

ANSWER: IP admits that Paragraph 142 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142.

Paragraph 143 of the Amended Complaint states: On May 28, 2008, Deutsche Bank reported that both Smurfit-Stone and Georgia-Pacific recently announced a $50/ton price hike, effective July 1, 2008.[61]

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 143.

Paragraph 144 of the Amended Complaint states: On June 16, 2008, in a report primarily focusing on International Paper and Smurfit-Stone, Deutsche Bank reported: "IP's Packaging head, Carol Roberts, acknowledged that IP's number one priority was increasing prices. Roberts argued that independent boxmakers would welcome a disciplined push on containerboard and box prices as it would provide them with an opportunity to restore margins. They are showing some leadership. IP has recently announced an 11% box price increase effective July 1. Smurfit's Chuck Hinrich's [sic] noted that "we understand urgency around current price increase." Deutsche Bank further noted that in terms of "more capacity rationalization in containerboard and boxes. . . both IP and [Smurfit-Stone] acknowledged the need to maintain a balanced supply/demand situation.[62]

---

[58] Board producers again try for price increase; $55 per ton," Official Board Markets, May 31, 2008 (citing an earlier May 10, 2008 article).
[59] "more Integrateds Want Increase." Official Board Markets, June 7, 2008.
[60] 080516 Deutsche Bank Report – April Containerboard Monitor, Deutsche Bank – Equity Research
[61] 080528 Deutsche Bank Report – July Price Hike, Deutsche Bank – Equity Research
[62] June 16, 2008 Deutsche Bank Paper & Packaging report, at 3.

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER:  IP admits that Paragraph 144 purports to quote from a June 16, 2008

Deutsche Bank article.  IP otherwise lacks knowledge or information sufficient to form a belief

as to the truth of the allegations of Paragraph 144.

Paragraph 145 of the Amended Complaint states:  On or about July 1, 2008, despite the effects of an economic recession felt throughout the United States, Defendants and their co-conspirators raised prices on linerboard yet again, this time by over 9% ($55/ton) from $610/ton to $665/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($40/ton) from $580/ton to $635/ton. The Defendants quickly followed the price increases in containerboard and corrugated medium by announcing an 11 % increase in the price of finished boxes.[63]  These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

ANSWER:  IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 145 regarding other Defendants.  IP otherwise denies the

allegations of Paragraph 145.

Paragraph 146 of the Amended Complaint states:  On July 16, 2008, Buckingham Research Group stated that "we are bullish on containerboard given low inventories, high operating rates, recent outages and closures. . .we believe that the July containerboard $55/ton price increase has gained traction and will be reflected in the trade journals this weekend."[64]

ANSWER:  IP admits that Paragraph 146 purports to quote from a Buckingham

Research Group report.  IP otherwise lacks knowledge or information sufficient to form a belief

as to the truth of the allegations of Paragraph 146.

Paragraph 147 of the Amended Complaint states:  In late August, International Paper, whose "number one priority was increasing prices" by means of a "disciplined push" as detailed above, in fact showed its "leadership" and announced a price increase of $60 per ton, effective October 1, 2008.[65] Shortly thereafter, Smurfit-Stone, Temple-Inland and Georgia-Pacific also announced identical price increases and on September 8, 2008 it was reported that Citigroup had confirmed that Temple-Inland, Smurfit-Stone and Georgia-Pacific "have followed International Paper's move to raise containerboard prices by $60/ton. They point out that this means that at least 70% of the US capacity have announced an October increase.[66]

---

[63] P. Scott Vallely, Update on Containerboard Grades:  Notes from Deutsche Bank Research Paper, (June 17, 2008)
[64] July 16, 2008 Buckingham Research Group analyst report, International Paper, at 3.
[65] IP Wants yet More for Board:  Will Others Follow?, Official Board Markets, September 6, 2008
[66] "SSCC, TIN, IP:  Recommendations," TheFlyonthewall.com, Sept. 8, 2008.

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER:  IP admits that Paragraph 147 purports to quote from an Official

Board Markets article and from TheFlyonthewall.com.  IP lacks knowledge or information

sufficient to form a belief with regard to the allegations of Paragraph 147 regarding other

Defendants.  IP otherwise denies the allegations of Paragraph 147.

Paragraph 148 of the Amended Complaint states: On August 20, 2008, Deutsche
Bank reported that "[d]espite sluggish demand, the [July] containerboard [price] hike succeeded,
supported by rising input costs, high operating rates, lean inventories (aided by outages at large
mills owned by IP & [Weyerhaeuser]), and strong export markets. The next stop is the related
box price hike, which will play out over the next few months. Producers are looking to get more
than a simple pass-through of higher containerboard costs." Regarding input prices Deutsche
Bank reported "while prices are rising, some important input costs appear to be rolling over.
OCC costs have been declining steadily since the March high, and energy costs are falling
sharply. Longer-term, we view the increased consolidation created by IP's acquisition of WY's
packaging business as positive for the industry.[67]

ANSWER: IP admits that Paragraph 148 purports to quote from a Deutsche Bank

report.  IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of

the allegations of Paragraph 148.

Paragraph 149 of the Amended Complaint states: The AICC objected to the
October price increases because "[the] announcements by International Paper and other
integrated producers, coming as they do within 90 days of the $55 per ton increase in July, are
unjustified based on current economic indicators and inputs. We believe they even border on
collusion. Containerboard products, using their increasing market share in what one analyst
called 'the hammer,' have in this announcement exhibited an unbridled arrogance toward their
independent customers and a blatant disregard for the users of corrugated boxes." In fact, price
increases in the face of soft demand are inconsistent with unilateral economic interests and are
counterintuitive without collective and coordinated decreases in production capacity.[68]

ANSWER: IP admits that Paragraph 149 purports to quote from a September 20,

2008 *Official Board Markets* article.  IP otherwise lacks knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 149.

Paragraph 150 of the Amended Complaint states: In October 2008, Smurfit-Stone
shut down its 135,000 tons-per-year corrugated medium plant in Snowflake, Arizona. That same

---

[67] August 20, 2008 Deutsche Bank Paper & Packaging industry analyst report, at 64, 68.
[68] AICC Strongly Opposed $60 per ton Board Price Increase:  Borders on Collusion, Official Board Markets,
    September 20, 2008.

FILED UNDER SEAL PURSUANT TO COURT ORDER

month, International Paper began idling its 250,000 tons-per-year containerboard plant in Albany, Oregon. Less than a month later, in November 2008, International Paper shut down its 430,000 tons-per-year linerboard plant in Valiant, Oklahoma.

ANSWER: IP admits that on October 5, 2008, it indefinitely shut down the No. 2 paper machine at its mill in Albany, Oregon, which produced approximately 250,000 tons annually of containerboard, and, on November 1, 2008, it indefinitely shut down the No. 3 paper machine at its mill in Valliant, Oklahoma, which produced approximately 430,000 tons annually of containerboard. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 150 regarding other Defendants. IP otherwise denies the allegations of Paragraph 150.

Paragraph 151 of the Amended Complaint states: In November 2008, Smurfit-Stone announced temporary closures of several containerboard mills: (i) Smurfit-Stone temporarily shut down its 550 ton-per-year Missoula, Montana linerboard machine (from November 10, 2008 through the end of 2008); (ii) Smurfit-Stone also temporarily shut down its linerboard machine at its containerboard mill in Hodge, Louisiana (from November 24, 2008 to December 11, 2008),[69] (iii) Smurfit-Stone temporarily closed its 800 tons-per-day containerboard mill in Ontonagon, Michigan (from November 24, 2010 through at least the end of the year);[70] and (iv) Smurfit-Stone temporarily shut down its Panama City, Florida containerboard mill (from November 22, 2008 through the end of 2008)[71]. Between fourth quarter of 2008 and first quarter of 2009, over 800,000 tons per year of capacity was idled by Defendants.

ANSWER: IP lacks knowledge or information sufficient to form a belief with regard to the allegations of Paragraph 151 regarding other Defendants. IP otherwise denies the allegations of Paragraph 151.

Paragraph 152 of the Amended Complaint states: In the 4th quarter of 2008:

a.      Smurfit-Stone idled plants in Matane, Quebec (174,000 tpy), Missoula, Montana (171,000 tpy), and Jacksonville, Florida (170,000 tpy).

---

[69] SSCC Shuts Down two Board Machines: In Louisiana and Montana, Official Board Markets, November 15, 2008
[70] SSCC to Close Michigan Mill: May Reopen in January, Official Board Members, November 22, 2008.
[71] CC Will Shut Down Florida Mill: More Layoffs Coming, Official Board Markets, November 22, 2008.

FILED UNDER SEAL PURSUANT TO COURT ORDER

     b.    Georgia-Pacific idled plants in Cedar Springs, Georgia (265,000 tpy); Palatka, Florida (40,000 tpy) and announced the temporary closure of its corrugating medium mill in Toledo, Oregon from December 23, 2008 to December 30, 2008.[72]

     c.    PCA engaged in significant mill downtime or slowbacks in the fourth quarter of 2008.[73]

     d.    Temple-Inland took "108,000 tons market related" and "22,000 tons maintenance related" downtime 2008, despite rising prices and inventories were the "lowest year entering level in 3 years."

     e.    International Paper announced plans to close its containerboard mills in Pineville, Louisiana and Albany, Oregon and that it would permanently shut down its previously idled machine in its Valliant, Oklahoma containerboard mill. These permanent shutdowns reduced International Paper's North American paper and board capacity by 2.1 million tons.

    <u>ANSWER:</u> IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 152 as to other Defendants.    IP otherwise denies the allegations of Paragraph 152.

    <u>Paragraph 153 of the Amended Complaint states:</u> Outlining the history of containerboard price increases imposed during much of the Class Period, Temple-Inland reported in its 2008 10-K that "[i]n 2008, corrugated packaging prices were up as a result of price increases implemented in 2007 and mid-2008.. In 2007, corrugated packaging prices and paperboard prices moved higher as a result of price increases implemented in 2006 and 2007. In 2006, corrugated packaging and paperboard prices moved higher reflecting price increases implemented in late 2005 and in 2006."[74] In a related presentation Temple-Inland revealed that it had taken "108,000 tons market related" and "22,000 tons maintenance related" downtime during 2008, which according to the same presentation saw TIC's average box prices increase by $29 per ton. The presentation also noted that inventories were at the "lowest year entering level in 3 years."

    <u>ANSWER:</u> IP admits that Paragraph 153 purports to quote from Temple-Inland's 2008 10-K report.  IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 153.

    <u>Paragraph 154 of the Amended Complaint states:</u> On February 27, 2009, Deutsche Bank reported that "in recent months, containerboard demand has been off sharply, but

---

[72] *GP Will Close Oregon Mill:  For one Week*, Official Board Markets, December 6, 2008.
[73] *PCA Slows Board Production:  Lower Earnings*, Official Board Markets, December 13, 2008.
[74] Temple-Inland 2008 10-K, filed Feb. 23, 2009, at 25; TIC Nov. 4, 2008 10-Q, at 19.

published containerboard prices have remained remarkably 'sticky,'" commenting that, "[w]ith extremely weak demand, lower input costs and a stronger US$, the modest erosion in domestic pricing appears a victory for producers. Production discipline has kept inventories in check and limited domestic pricing erosion. . . the industry has done an impressive job to date in keeping prices relatively stable," and "[t]he industry is taking an unprecedented amount of market downtime to keep the market in balance. IP alone took 700K tons in 4Q"[75]

ANSWER: IP admits that Paragraph 154 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 154.

Paragraph 155 of the Amended Complaint states: In the same report, Deutsche Bank commented on Temple-Inland's containerboard and box business: "This business should show reasonable resiliency in an economic downturn, because of (1) recent industry consolidation, (2) recent industry capacity rationalization, (3) end markets weighted toward non-discretionary items such as food and beverages, and (4) an easing trend in some important input costs such as energy, recycled fiber, and transportation."

ANSWER: IP admits that Paragraph 155 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 155.

Paragraph 156 of the Amended Complaint states: In 2009, John Geenan, a Senior Vice-President of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), explained that the containerboard industry aggressively managed capacity in order to maintain or increase pricing and that whenever prices threaten to decrease the industry rapidly removed capacity.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 156.

Paragraph 157 of the Amended Complaint states: During an investor presentation in February, 2009, Temple-Inland stated that it had "centralized pricing decision making" and a "structured and disciplined approach to the market." The same presentation included a slide titled "*North American Corrugated Packaging Industry Fundamentals*," noting the "Consolidating industry... Significant capacity rationalization and downtime. .. [and] Improved pricing." Temple-Inland continued that "[i]mproved industry fundamentals has led to higher average prices and reduced volatility" in linerboard pricing, and referred to remarkable "industry discipline".[76]

---

[75] February 27, 2009 Deutsche Bank Paper & Packaging Industry analyst report, at 39, 61, and 68.
[76] TIC Feb. 2009 Investor Presentation, at 22 and 25 – 26.

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 157.

Paragraph 158 of the Amended Complaint states: Deutsche Bank commented on June 2, 2009, "we're impressed that prices have not fallen further. Besides very weak domestic demand, the industry is also coping with sharply lower export volumes. . . the supply discipline to date has been impressive."

ANSWER: IP admits that Paragraph 158 purports to quote from a Deutsche Bank

report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of

the remaining allegations of Paragraph 158.

Paragraph 159 of the Amended Complaint states: On December 7, 2009, Deutsche Bank described a "notable effort" by containerboard producers to increase prices, stating that "[i]n recent weeks, most major producers have announced $50-70/ton hikes for January 1. We are surprised by the timing, because this is a seasonally weak period." The same report emphasized that a January 1 price increase was "somewhat unusual timing because the market is entering a seasonally weak period, but we expect the larger producers to support the hike," and also noted that despite declining prices in the prior year, "the wonder is how the industry kept prices from falling further, given extremely weak demand and low input costs."

ANSWER: IP admits that Paragraph 159 purports to quote from a Deutsche Bank

report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of

the allegations of Paragraph 159.

Paragraph 160 of the Amended Complaint states: On December 14, 2009, Smurfit-Stone announced the permanent closure of its Containerboard Products mills in Missoula, Montana (620,000 tons of linerboard annually) and Ontonagon, Michigan (280,000 tons of medium annually) effective December 31, 2009. In response to the Missoula mill closure, Montana state senator Cliff Larson sent a letter to Judge Brendan L. Shannon, presiding Judge in Smurfit-Stone's Chapter 11 Bankruptcy proceedings, stating:

"We are told that Smurfit-Stone does not want the plant to run because they want to control 'the market.' Well, what about competition? What about gathering in cash for investors and creditors? With electric generating capacity of about seventeen megawatts setting idle, trained plant workers willing to work and generate that biomass energy source we have a ready source of green energy sadly not generated. Another income source - not actualized." According to Smurfit-Stone's Disclosure Statement, the Ontonagon Mill and Missoula Mill closures were "ordinary

FILED UNDER SEAL PURSUANT TO COURT ORDER

course transactions" which did not require Bankruptcy Court approval.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 160.

Paragraph 161 of the Amended Complaint states: As the U.S. economy began to emerge from the recession, Defendants and their co-conspirators again raised prices on linerboard by over 8% ($50/ton) from $585/ton to $635/ton, effective on or about January 1, 2010. At the same time, Defendants and their coconspirators raised the price of corrugated medium by over 8% ($50/ton) from $555/ton to $605/ton. This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time. Deutsche Bank commented on the January price increase, "It is hard to recall another hike being so readily passed through during a seasonally-weak period."[77]

ANSWER: IP admits that the Paragraph 161 purports to quote from a Deutsche

Bank report.  IP lacks knowledge or information sufficient to form a belief as to the truth of

allegations of Paragraph 161 regarding other Defendants.  IP otherwise denies the allegations of

Paragraph 161.

Paragraph 162 of the Amended Complaint states: Less than a month later, several Defendants, including International Paper, began to discuss an additional price increase for March or April in various forums.[78]  Deutsche Bank reported "[w]e give this second containerboard hike a good chance of success," in part because "[International Paper] is the clear industry leader, with about 30 percent of the domestic market.[79]

ANSWER: IP admits that Paragraph 162 purports to quote from a February 27,

2010 article from Official Board Markets that attributes the quoted statement to a Deutsche Bank

analyst.  IP lacks knowledge or information sufficient to form a belief as to the truth of

allegations of Paragraph 162 regarding other Defendants.  IP otherwise denies the allegations in

Paragraph 162.

Paragraph 163 of the Amended Complaint states: Effective on or about April 1, 2010, Defendants and their co-conspirators again raised prices on linerboard by over 9% ($60/ton) from $635/ton to $695/ton. At the same time, Defendants and their co-conspirators

---

[77] February 8, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1.
[78] *More Board Makers want Price Increase*, Official Board Markets, March 6, 2010.
[79] IP Leads off Second Board Price Increase Attempt, Official Board Markets, February 27, 2010.

FILED UNDER SEAL PURSUANT TO COURT ORDER

raised the price of corrugated medium by over 9% ($60/ton) from $605/ton to $665/ton.[80] This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of allegations of Paragraph 163 regarding other Defendants. IP otherwise denies the allegations of Paragraph 163.

Paragraph 164 of the Amended Complaint states: As a result of the January and April price increase, total containerboard prices increased by $110 per ton. In presenting its earnings for the first quarter of 2010, Temple-Inland looked forward and anticipated higher prices in the third quarter.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 164 regarding other Defendants. IP otherwise denies the allegations of Paragraph 164.

Paragraph 165 of the Amended Complaint states: On May 5, 2010, PCA stated in its 10-Q for the second quarter that "[r]eported industry containerboard inventories at the end of March 2010 were at their lowest level in nearly 30 years."[81]

ANSWER: IP admits that Paragraph 165 purports to quote from PCA's 10-Q report for the first quarter of 2010. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 165.

Paragraph 166 of the Amended Complaint states: On May 17, 2010, Deutsche Bank presciently wrote of more price hikes to come based upon "a host of recent conversations across the trade," stating, "we are increasingly convinced of the third price hike attempt in 2010 [for containerboard]. Hikes in Jan & Apr added $110/ton to domestic list prices. We expect the next attempt to be in the $40-50/ton range with implementation slated between July 15th and Sep 1st. Industry fundamentals remain strong .... a spring corrugated box hike appears to be going in with relative ease, and a host of recent conversations across the trade point to a growing sense of 'when,' not 'if' the next initiative will appear.[82]

---

[80] February 8, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1
[81] PCA May 5, 2010 10-Q, at 16.
[82] May 17, 2010 Deutsche Bank Paper & Packaging industry analyst report, at 1.

FILED UNDER SEAL PURSUANT TO COURT ORDER

ANSWER: IP admits that Paragraph 166 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 166.

Paragraph 167 of the Amended Complaint states: As predicted by Deutsche Bank, "based upon conversations across the trade" on June 30, 2010, Defendants International Paper and Georgia-Pacific informed its customers of another $60/ton price hike effective August 1, 2010. In fact, announcements from other Defendants soon followed, including Defendants PCA, Smurfit-Stone and Norampac.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 167.

Paragraph 168 of the Amended Complaint states: After its discharge from bankruptcy, Smurfit- Stone joined the conspiracy, in part, by calls-to-arms and pledges by and between Defendants that were followed by actions that resulted in further idling of production capacity, reduced production and another near simultaneous across-the-board price increase.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 168 as to other Defendants. IP otherwise denies the allegations of Paragraph 168.

Paragraph 169 of the Amended Complaint states: In a July 1, 2010, investor presentation, Smurfit-Stone's CEO Pat Moore and President & COO Steve Klinger reported that between 2005 and 2010, the company had closed 54 container plants.[83] Smurfit-Stone described the industry's "permanent capacity adjustments" of a total of 2,365,000 tons of containerboard capacity since the end of 2008, and also described the steadily declining industry inventory rates over the prior decade.[84]

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 169.

Paragraph 170 of the Amended Complaint states: On July 13, 2010, the Association of Independent Corrugated Converters ("AAIC") published an article entitled "3rd Containerboard Increase puts the Integrity of Our Industry on the Line." In light of the significant manufacturing capacity cuts, as well as the absence of cost drivers, the article recognizes that a third price increase in 2010 in that environment "calls into question the integrity of our industry." The article goes on to forewarn of serious repercussions:

---

[83] Smurfit-Stone "Targeted Accelerated Performance Improvement" presentation, July 1, 2010, at 18.
[84] Id. At pp 27-28.

FILED UNDER SEAL PURSUANT TO COURT ORDER

This third increase is rightfully calling into question the pricing activities of the major companies. During the years 1994-1995, six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak of $525-535/ton. These actions rightfully caused corrugated users to seek alternative packaging and reduce their corrugated purchases – witness the growth of returnable plastic container use in the mid-1990s. A far more serious result was an inventory collusion allegation and subsequent class action lawsuit brought by the corrugated industry's customer base that cost containerboard makers over $210 million in settlements.

ANSWER: IP admits that Paragraph 170 purports to quote from an Association of Independent Corrugated Converters ("AICC") statement. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 170 regarding other Defendants. IP otherwise denies the allegations contained in Paragraph 170.

Paragraph 171 of the Amended Complaint states: On or about August 3, 2010, Defendant Smurfit-Stone conducted an 'earnings call" to discuss their financial results for second quarter of 2010. In response to a question about scheduled downtime, Steven J. Klinger, President and COO, stated that the company had completed "42% of [its] related downtime and expect in the back half of the year a very similar level to what we took in all of second quarter. So just over the back half of the year, about the same amount that we took in the second quarter" and "the second half of the year should see maintenance downtime from a [tons] standpoint at levels about consistent with what we incurred in the second quarter alone.[85] In fact, however, Smurfit-Stone forecast this downtime despite "historic low" inventory and rising prices.[86]

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 171.

Paragraph 172 of the Amended Complaint states: During the August 3, 2010 "earnings call" Smurfit-Stone revealed that it had "maintained market share during not only a challenging environment from an industry standpoint, but clearly in our extremely challenging environment for us internally" and "our customers, particularly in our container business and in our mill business, were quite loyal during this [while in Chapter 11] and we improved some of our business with them." In fact, Smurfit Stone's August 3, 2010 earnings press release reported "higher average prices," "higher selling prices" and "improved selling prices" at the same time that it announced plans to close three more converting plants.

---

[85] Final Transcript 8/3/10 Earnings Conf. Call, pp 7-8.
[86] Final Transcript 8/3/10 Earnings Conf. Call, p. 10.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

ANSWER: IP admits that the second sentence of Paragraph 172 purports to quote from an August 3, 2010 Smurfit-Stone press release. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 172.

Paragraph 173 of the Amended Complaint states: During an August 11, 2010 analyst conference call, Norampac President and CEO Marc-Andre Depin stated that the "dynamic of [the containerboard sector] are really, really positive for price increase implementation. So we are going one after the other. So we will see about the next one. But I think the dynamics are all there for a price increase and having good backlogs of finished product, which is regular boxes and folding cartons and containerboard and CRB grades.... as I mentioned, Q3, Q4, for sure we have prices increase... the market has been really, really tight.[87]

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 173.

Paragraph 174 of the Amended Complaint states: On or about September 13, 2010, the Gerson Lehman Group stated matters bluntly, "for the 3rd price increase within a year by major paper mills to work, it must be supported by major paper converters... these include: TIN, Temple-Inland, IP International Paper; SSCC Smurfit-Stone Corrugated Container; PKG Packaging Company of America; GP Georgia-Pacific; ... & others.[88]

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 174.

Paragraph 175 of the Amended Complaint states: On or about September 15, 2010, Smurfit-Stone participated in the UBS Global Paper & Forest Products conference call. When asked about its "pricing power" if inventory levels were to rise CEO Patrick Moore responded that "as long as we continue to see a demand environment that we're operating in today - again, very stable, reasonably steady growth, unless we have a major dislocation in the demand side of things or unless pricing levels really begin to attract a lot of supply.... inventory levels [will] continue to be very low." Smurfit-Stone further reported that it had "fully implemented" its January and April 2010 price increases and that it was "[a]ggressively pursuing all three 2010 price increases".

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 175.

---

[87] August 11, 2010 Cascades, Inc. Q2 2010 Earnings Conference Call, at 11.

[88] http://www.glgroup.com/News/The-third-price-increase-in-less-than-a-year%E2%80%A6when-will-they-everlear--50520.html

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 176 of the Amended Complaint states: It is hardly consistent with competition that a company such as Smurfit-Stone in a Chapter 11 proceeding or just emerging from Chapter 11 could simultaneously maintain its pricing power, maintain or increase its market share and raise prices. As Gerson Lehman indicated, such pricing power could only be accomplished if "supported" by its competitors. Nor is it consistent with competition that a company in such circumstances would engage in substantial downtime in the face of low inventories and rising prices.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 176 regarding other Defendants. IP otherwise denies the allegations of Paragraph 176.

Paragraph 177 of the Amended Complaint states: The Defendants and their co-conspirators raised the price of containerboard in order to cause an increase in the price of corrugated containers. Because Defendants convert 81% of the containerboard they manufacture into corrugated containers, Defendants reduced containerboard capacity and jointly increased containerboard prices in order to artificially drive up the price of corrugated containers and increase their profits.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 177 regarding other Defendants. IP otherwise denies the allegations of Paragraph 177.

Paragraph 178 of the Amended Complaint states: To accomplish the unprecedented price increases during the Class Period, the Defendants and their co-conspirators needed to reduce capacity in a concerted fashion. No single Defendant could reduce capacity enough to cause an industry-wide price increase. Accordingly, the Defendants reduced capacity in concert to prevent any one Defendant from bearing the brunt of the capacity shutdown. Defendants' coordinated efforts to restrict containerboard supply substantially reduced the inventory available for sale to Plaintiff Class.[89]

ANSWER: IP lacks knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 178 regarding other Defendants. IP otherwise denies the allegations of Paragraph 178.

Paragraph 179 of the Amended Complaint states: Further, the price of both linerboard and corrugated medium rose at exactly the same time by exactly the same per-ton amounts. This identical and simultaneous across-the-board price increase on multiple products can only be explained by concerted and coordinated behavior by the Defendants.

---

[89] M. Wilde, Deutsche Bank, Containerboard Market Overview, Apr. 15, 2010, at . 5.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

[GRAPHIC OMITTED]

      <u>ANSWER:</u> IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 179 regarding other Defendants. IP otherwise denies the allegations of Paragraph 179.

      <u>Paragraph 180 of the Amended Complaint states:</u> Despite the unprecedented price increases implemented in the Containerboard Products industry during the Class Period, there were no sustained significant changes in production costs which could account for those price increases or Defendants' coordinated reduction in manufacturing capacity and product supply. During the Class Period, prices increased at over double the rate of corresponding manufacturing costs.

      <u>ANSWER:</u> IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 180 regarding other Defendants. IP otherwise denies the allegations of Paragraph 180.

      <u>Paragraph 181 of the Amended Complaint states:</u> There are four main costs which are responsible for the bulk of the total cost to manufacture and produce Containerboard Products. They are: 1) raw material costs; 2) labor costs; 3) energy costs; and 4) environmental compliance costs. As explained below, there were no significant or sustained changes in any of these types of costs during the Class Period.

      <u>ANSWER:</u> IP admits that raw material costs, labor costs, energy costs, and environmental compliance costs are among the costs involved in the manufacture of linerboard and corrugating medium. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 181 regarding other Defendants. IP otherwise denies the allegations of Paragraph 181.

      <u>Paragraph 182 of the Amended Complaint states: Raw Material Costs:</u> Pulpwood (woodchips used to produce various paper products) is the main input for linerboard. Consequently, it is by far the most significant portion of linerboard cost, representing approximately 40-50%. Alternately, other factors including energy and labor cumulatively represent only about 25%. Because pulpwood prices represent such a large portion of linerboard cost, significant changes in the former may be detected in changes in the latter. The price of pulpwood has increased at a constant rate since the middle of 2001 (an average of roughly 6% per year). As a result, there are no major fluctuations in pulpwood price that correspond to the fluctuations in Containerboard Products.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

  ANSWER: IP admits that woodchips can be used to produce certain types of linerboard. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 182 regarding other Defendants.  IP otherwise denies the allegations of Paragraph 182.

  Paragraph 183 of the Amended Complaint states: Labor costs: According to PCA's executives: "[l]abor costs in a well-run containerboard mill run $30-$40/ton cash cost, which is a relatively small part of the overall manufacturing cost.[90]  Average weekly earnings for production workers at paperboard mills has remained flat during the Class Period. Additionally, the 2005 annual report for Smurfit-Stone stated that both post-retirement healthcare and life insurance benefits were reduced in 2005. Therefore, labor costs can largely be dismissed as an explanation for Containerboard Products price increases.

  ANSWER: IP admits that Paragraph 183 purports to quote from a PULP & Paper article.  IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 183.

  Paragraph 184 of the Amended Complaint states: Energy Costs: Studies by economists have found no significant effect of energy costs on containerboard prices.[91] Additionally, International Paper, the largest producer of containerboard, stated in its 2005 10-K that, "[w]hile energy, wood and raw material price movements are mixed, their impact for the quarter is expected to be flat." In reference to the first few months of 2006, it was further added, "[w]e are starting to see some reductions in natural gas and southern wood costs that, if the trend continues, should benefit operations as the year progresses."[92] Despite some volatility in the natural gas mark since that time, natural gas prices in 2010 are at or below the natural gas prices existing at the beginning of the Class Period.

  ANSWER: IP admits that Paragraph 184 purports to quote from IP's 2005 10-K. IP denies having information and knowledge regarding the truth of the first sentence in Paragraph 184.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 184 regarding other Defendants.  IP otherwise denies the allegations of Paragraph 184.

---

[90] Paul Steeko, Creating Shareholder Value in Containerboard Markets, PULP & PAPER 63 (March 1, 2005)

[91] *See e.g.* Li, H. and Luo, J. Industry Consolidation and Price in the US Linerboard Industry, Journal of Forest Economics 14 (2008), pp. 93-115.

[92] International Paper Form 10-K for year ending December 31, 2005, filed March 6, 2006, at p. 11.

FILED UNDER SEAL PURSUANT TO COURT ORDER

   <u>Paragraph 185 of the Amended Complaint states:</u> Despite the absence of any lasting cost increases, Defendants have nevertheless attempted to blame increasing costs as the reason for their capacity restrictions and increases in Containerboard Products prices. Specifically, in the third quarter of 2006, the President and CEO of Norampac attempted to explain the closure of Norampac's 300,000 tons-per-year Ontario mill as follows: "[t]his decision was taken to mitigate the negative impacts of several economic factors such as growing fiber supply costs, rising energy costs and the strengthening of the Canadian dollar."[93] However, as this explanation does not comport with the relevant market data, it serves as little more than a pretense for collusive activity. *See In re Linerboard Antitrust Litigation*, 504 F.Supp.2d 38, 53 (E.D.Pa. 2007) ("[t]he Third Circuit has long recognized that evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action' by an alleged conspirator. [Citations].")

   <u>ANSWER:</u> IP admits that Paragraph 185 purports to quote the district court opinion *In re Linerboard Antitrust Litigation*, 504 F. Supp.2d 38, 53 (E.D. Pa. 2007). IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 185 regarding other Defendants. IP otherwise denies the allegations of Paragraph 185.

   <u>Paragraph 186 of the Amended Complaint states:</u> In response to Norampac's announcement, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement. Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%[94]

   <u>ANSWER:</u> IP admits that Paragraph 186 purports to quote from a Deutsche Bank report. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 186.

   <u>Paragraph 187 of the Amended Complaint states:</u> There is no consistent observable relationship between the price of natural gas (the predominant source of energy for the Containerboard Products industry) and the price of Containerboard Product. For example, although there was a brief uptick in the price of natural gas in the 4th Quarter 2005, the increased prices during the same period outpaced any corresponding manufacturing cost increase. Moreover, the price of natural gas fell nearly 40% from December 2005 to April 2006 without any corresponding price decrease in Containerboard Products. In fact, in April 2006, well after the 40% drop in natural gas prices, Defendants and their co-conspirators again raised prices by over 10%. If energy costs were responsible for price changes (as explained by Defendants to their customers) a 40% decrease in energy costs should result in a lower containerboard price,

---

[93] http://timview.blogspot.com/2006/09/red-rock-mill-shut.html
[94] 060830 Deutsche Bank Report – Norampac closing Red Rock, Deutsche Bank – Equity Research

FILED UNDER SEAL PURSUANT TO COURT ORDER

not a 10% increase. Similarly, from April 2006 through June 2007, the price of natural gas declined by approximately 7%. However, in August 2007, the Defendants and their co-conspirators raised containerboard prices by 7%. These increases in the prices for Containerboard Products cannot be explained by changes in energy costs.

      ANSWER: IP denies that it conspired with the Defendants, denies that the description of gas prices in Paragraph 187 is accurate, and denies that the description of containerboard prices in Paragraph 187 is accurate. IP otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 187.

      Paragraph 188 of the Amended Complaint states: Deutsche Bank reported that PCA reduced its natural gas usage "to barely over 3% of purchased fuels (was 9% year ago)"[95] On April 18, 2006, Deutsche Bank doubted the ability of the Defendants and their co-conspirators to push further price increases through noting that "raw material costs for natural gas & wastepaper have fallen."[96] This is further indication that neither natural gas costs nor raw material costs had a significant impact on costs associated with producing Containerboard Products.

      ANSWER: IP admits that Paragraph 188 purports to quote from a January 24, 2006 Deutsche Bank report and an April 18, 2006 Deutsche Bank report. IP denies the allegations in the last sentence of Paragraph 188. IP lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 188.

      Paragraph 189 of the Amended Complaint states: Environmental Costs: The Defendants' public filings report that "Compliance with environmental standards should not adversely effect our competitive position or operating results."[97] Accordingly, compliance with environmental regulations cannot explain the extraordinary increase in price of containerboard during the Class Period.

      ANSWER: IP admits that Paragraph 189 purports to quote from a Smurfit-Stone 2005 10-K. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 189 regarding other Defendants. IP otherwise denies the allegations of Paragraph 189.

---

[95] 060124 Deutsche Bank – Packaging Corp's 4Q in 100 words, Deutsche Bank – Equity Research
[96] 060418 *Dr. Paper's Pulse on Pricing*, Deutsche Bank – Equity Research
[97] *See e.g.* Smurfit-Stone Form 10-K, filed March 6, 2006 at p. 7.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

   <u>Paragraph 190 of the Amended Complaint states:</u> The elimination of cost explanations supports an inference of conspiracy. Both the capacity reductions and the price increases of the period beginning summer 2005 were record breaking in magnitude. In early 2006, one trade journal reported, "Since October 2005, board prices have risen 33%. The quickness of the jump is unprecedented."[98]  In regards to capacity reductions during this period, another trade journal called them "unprecedented." By the end of 2006, the Defendants had successfully driven inventory to their lowest levels in twenty five years. In addition, demand for Containerboard Products is tied to overall consumer demand and spending. In about the second half of 2008, general consumer demand in the United States plummeted. Yet, in August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%. Even though the U.S. economy has continued to be weak with fears of deflation being expressed by economists and policymakers in 2009-2010, during 2010 Defendants and their co-conspirators raised Containerboard Product prices an unprecedented three times in one year to all time highs. Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.

   <u>ANSWER:</u> IP admits Paragraph 190 purports to quote from a *Paperboard and Packaging* article, but notes that two words have been omitted from the quotation.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegation that "[i]n regards to capacity reductions during this period, another trade journal called them 'unprecedented.'"  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegation that by the end of 2006, inventories were at their lowest levels in twenty five years and denies that IP coordinated or conspired with other Defendants.  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegation that "[i]n addition, demand for Containerboard Products is tied to overall consumer demand and spending."  IP lacks knowledge or information sufficient to form a belief as to the truth of the allegation that "[i]n about the second half of 2008, general consumer demand in the United States plummeted." IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 190 regarding other Defendants.  IP otherwise denies the allegations of Paragraph 190.

---

[98] Paperboard and Packaging (April 2006) at 16.

FILED UNDER SEAL PURSUANT TO COURT ORDER

Paragraph 191 of the Amended Complaint states: The unprecedented reduction in North American containerboard supply was not the result of the closure of one producer's machines but rather concerted effort by the Defendants and their co-conspirators to reduce capacity in an effort to raise and stabilize prices of Containerboard Products to supra-competitive levels.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 191 regarding other Defendants. IP denies the allegations of Paragraph 191.

Paragraph 192 of the Amended Complaint states: Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively, actively and fraudulently concealed their unlawful conduct from Plaintiffs and the Plaintiff Class. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their coconspirators publicly provided pretextual and false justifications regarding their price increases, including that energy and raw material cost increases were responsible for the price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. In addition to the various pretexts and false justifications detailed above, Defendants also maintain, and in some instances, disseminated directly to their customers or posted on their websites "codes of ethics" which among other things, expressed their strict adherence to the antitrust laws. In the latter part of the Class Period, Defendants also falsely attempted to blame the demise of the "black liquor" tax credit for the increase in prices at a time when prices for other paper products which would have been similarly impacted, decreased.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 192 regarding other Defendants. IP otherwise denies the allegations of Paragraph 192.

Paragraph 193 of the Amended Complaint states: Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their coconspirators were violating the antitrust laws as alleged herein until shortly before this litigation was commenced.

ANSWER: IP denies that it violated the antitrust laws. IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 193 regarding other Defendants. IP otherwise denies the allegations of Paragraph 193.

FILED UNDER SEAL PURSUANT TO COURT ORDER

       Paragraph 194 of the Amended Complaint states: As a result of the concealment of the conspiracy by Defendants and their coconspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

       ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 194 regarding other Defendants.   IP otherwise denies the allegations of Paragraph 194.

       Paragraph 195 of the Amended Complaint states: Defendants' unlawful conspiracy has had at least the following effects:

       a.    Prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for Containerboard Products were artificially fixed, raised, stabilized and maintained at artificially inflated and supra-competitive levels in the United States;

       b.    Plaintiffs and the other members of the Class paid more for Containerboard Products than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

       c.    Competition in the sale of Containerboard Products was restrained, suppressed and eliminated in the United States; and,

       d.    As a direct and proximate result of Defendants' illegal combination, contract or conspiracy, Plaintiffs and the members of the Class have been injured in their respective businesses and property, in amounts according to proof at trial.

       ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 195 regarding other Defendants.  IP otherwise denies the allegations of Paragraph 195.

       Paragraph 196 of the Amended Complaint states: Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

       ANSWER: IP incorporates by reference its responses to the preceding paragraphs of this Complaint as if fully set forth herein.  IP otherwise denies the allegations of Paragraph 196.

       Paragraph 197 of the Amended Complaint states: Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement,

combination and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Containerboard Products in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 197 regarding other Defendants. IP otherwise denies the allegations of Paragraph 197.

Paragraph 198 of the Amended Complaint states: The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, and/or stabilized prices for Containerboard Products in the United States. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 198 regarding other Defendants. IP otherwise denies the allegations of Paragraph 198.

Paragraph 199 of the Amended Complaint states: The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among the Defendants and other unnamed coconspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

ANSWER: IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 199 regarding other Defendants. IP otherwise denies the allegations of Paragraph 199.

Paragraph 200 of the Amended Complaint states: The contract, combination or conspiracy has had the following effects, among others:

a. Prices charged to Plaintiffs and Class members for Containerboard Products were fixed or stabilized at higher, artificially derived, supra-competitive levels;

b. Plaintiffs and Class members have been deprived of the benefits of free, open and unrestricted competition in the market for Containerboard Products; and

c. Competition in establishing the prices paid, customers of, and territories for Containerboard Products has been unlawfully restrained, suppressed and eliminated.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

<u>ANSWER:</u> IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 200 regarding other Defendants. IP otherwise denies the allegations of Paragraph 200.

<u>Paragraph 201 of the Amended Complaint states:</u> As a proximate result of the Defendants' unlawful conduct, Plaintiffs and Class members have suffered injury in that they have paid supra-competitive prices for Containerboard Products. Plaintiffs and Class members will continue to be injured in their business and property by paying more for Containerboard Products purchased directly from the Defendants and their co-conspirators than they would pay in the absence of the contract, combination or conspiracy.

<u>ANSWER:</u> IP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 201 regarding other Defendants. IP otherwise denies the allegations of Paragraph 201.

## <u>AFFIRMATIVE DEFENSES</u>

As stated in its Answer above, International Paper does not admit any liability, that Plaintiffs have been injured or damaged in any way, or that Plaintiffs are entitled to any relief whatsoever; nevertheless, pleads in the alternative the following affirmative defenses, but by so doing IP does not assume the burden of proof for any issue as to which applicable law places the burden upon Plaintiffs. IP has insufficient knowledge or information upon which to form a basis as to whether it may have additional, as yet unstated, separate defenses available. IP reserves the right to amend this Answer to add, supplement, or modify defenses based upon legal theories that may be or will be divulged through clarification of the Complaint, through discovery, or through further factual or legal analysis of Plaintiffs' allegations, contentions, and positions in this litigation. IP incorporates by reference any defenses applicable to it that are asserted by any other defendant to the Complaint as if fully set forth herein.

## <u>FIRST DEFENSE</u>

To the extent the Complaint alleges injuries arising from purchases of any products outside of the United States, Plaintiffs and the members of the purported plaintiff class lack

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

standing to sue for the alleged injuries pursuant to 15 U.S.C. § 6a and, therefore, this Court is without subject matter jurisdiction to hear those claims.

## SECOND DEFENSE

Plaintiffs' claim is barred, in whole or in part, by the applicable statute of limitations in the Clayton Act, 15 U.S.C. § 15b (2011), and/or by contractual provisions in supply or sales agreements between one or more of the Defendants and members of the purported class requiring that any claim be brought within a contractually specified time period. Plaintiffs filed this action on September 9, 2010. If and to the extent there was a violation of Section 1 of the Sherman Act prior to September 9, 2006, which IP denies, Plaintiffs failed to bring this action within four years after the cause of action accrued.

## THIRD DEFENSE

On information and belief, some supply and sales agreements between one or more of the Defendants and members of the purported plaintiff class contain mandatory arbitration clauses. This court lacks jurisdiction and/or is not the appropriate forum to adjudicate any claim pertaining to those agreements and any customer with an arbitration clause must be excluded from any class.

## FOURTH DEFENSE

Certain Plaintiffs and/or members of the putative plaintiff class have settled and released certain of their claims against International Paper or other defendants for all or part of the purportedly relevant period and are barred from pursuing those settled and released claims or from relying in this litigation on acts allegedly occurring prior to the release dates.

## FIFTH DEFENSE

If and to the extent that Plaintiffs and the members of the purported plaintiff class have been damaged, which IP denies, the amount of damages that Plaintiffs and the members of the purported plaintiff class allege to have suffered is too remote or speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

### SIXTH DEFENSE

If and to the extent Plaintiffs and the members of the purported plaintiff class have been damaged, which IP denies, Plaintiffs and members of the purported plaintiff class, by the exercise of reasonable diligence, could have mitigated their damages by purchasing substitute products or purchasing from alternative suppliers. Plaintiffs and members of the purported plaintiff class did not mitigate their damages and therefore are barred from recovery. Alternatively, any damages sustained by Plaintiffs and members of the purported plaintiff class, which IP denies, must be reduced by the amount that such damages would have been reduced had Plaintiffs and the members of the purported plaintiff class exercised reasonable diligence in mitigating their damages.

### SEVENTH DEFENSE

If and to the extent Plaintiffs and the members of the purported plaintiff class have been damaged, which IP denies, Plaintiffs and members of the purported plaintiff class are barred from recovery under the doctrine of set-off to the extent that they owe outstanding debts to IP. Alternatively, any damages sustained by Plaintiffs and members of the purported plaintiff class, which IP denies, must be reduced by the amount that Plaintiffs and the members of the purported plaintiff class owe outstanding debts to IP.

### EIGHTH DEFENSE

If and to the extent that Plaintiffs and the members of the purported plaintiff class have been damaged, which IP denies, Plaintiffs' claims for equitable relief are barred because Plaintiffs and members of the purported plaintiff class have an adequate remedy at law through damages.

### NINTH DEFENSE

Plaintiffs attempt to allege a conspiracy spanning five or more years that purportedly manifested itself in increased prices, without alleging any facts related to specific revelation to plaintiffs or others of the existence of, or IP's alleged participation in, any conspiracy.

89

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

Plaintiffs have pleaded no facts whatsoever to explain or justify why this lawsuit was filed when it was. Having elected to wait until late 2010 to bring this suit, to the extent Plaintiffs could have brought essentially the same suit years earlier, Plaintiffs are barred from pursuing all or part of such a claim by the doctrine of estoppel and laches.

**TENTH DEFENSE**

Plaintiffs are estopped by their prior inconsistent pleadings.

**ELEVENTH DEFENSE**

To the extent supply and sales agreements between one or more of the Defendants and certain Plaintiffs and/or members of the purported class contain dispute resolution, forum-selection or jury waiver provisions, any claims by such Plaintiff or purported class member cannot be adjudicated as part of the class.

**JURY DEMAND**

Pursuant to Federal Rules of Civil Procedure, Rule 38(b), IP hereby demands trial by jury on all issues so triable.

DATED: June 4, 2014                    Respectfully submitted,

                                       / s /   N a t h a n   P .   E i m e r

                                       Nathan P. Eimer
                                       Susan Razzano
                                       EIMER STAHL LLP
                                       224 South Michigan Avenue, Suite 1100
                                       Chicago, IL 60604-2516
                                       (312) 660-7600
                                       neimer@eimerstahl.com
                                       James T. McKeown
                                       Brett H. Ludwig
                                       Trent M. Johnson
                                       FOLEY & LARDNER LLP
                                       777 East Wisconsin Ave.
                                       Milwaukee, WI 53202
                                       (414) 271-2400
                                       jmckeown@foley.com

**FILED UNDER SEAL PURSUANT TO COURT ORDER**

tjohnston@foley.com

-and-

Joanne Lee
FOLEY & LARDNER LLP
321 N. Clark. St., Ste. 2800
Chicago, IL 60654
(312) 832-4500
jlee@foley.com

**Counsel for International Paper Company**

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 4, 2014, a true and correct copy of the foregoing

**Answer of Defendant International Paper Company to Amended Consolidated and
Amended Class Action Complaint** was electronically filed with the Clerk of the Court for the

Northing District of Illinois using the Court's CM/ECF system, which will send a notice of

electronic filing to all counsel of record.

*/s/ Nathan P. Eimer*
Nathan P. Eimer
An Attorney for Defendant International Paper Company