**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| KLEEN PRODUCTS LLC, *et al*., individually and on behalf of all those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PACKAGING CORPORATION OF AMERICA, *et al*., <br><br> Defendants. | Case No. 1:10-cv-05711 <br><br> Hon. Harry D. Leinenweber <br><br> ***FILED UNDER SEAL*** |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................ 1

II.   FACTUAL BACKGROUND ................................................. 6

    A. CONTAINERBOARD PRODUCTS ................................... 6

    B. CONTAINERBOARD PRODUCTS ARE UNDIFFERENTIATED COMMODITIES ................................. 7

    C. CONTAINERBOARD PRODUCTS ARE PRICED IN A UNIFORM MANNER ................................................. 8

    D. MARKET STRUCTURE ................................................ 11

    E. THE ALLEGED CONSPIRACY .................................... 16

III.  ARGUMENT ...................................................................... 42

    A. HORIZONTAL CONSPIRACY CLAIMS ARE COMMONLY CERTIFIED AS CLASS ACTIONS AND ARE AN IMPORTANT MEANS OF ENFORCING THE ANTITRUST LAWS ..................................... 42

    B. STANDARD OF REVIEW ............................................. 44

    C. THE CLASS IS ASCERTAINABLE AND RULE 23(a) IS SATISFIED .......... 44

        1. The Class is Ascertainable ........................................... 44

        2. The Proposed Class Satisfies All Requirements Under Rule 23(a) ............... 45

            a. Numerosity is Satisfied .......................................... 45

            b. Commonality is Satisfied ....................................... 45

            c. Typicality is Satisfied ........................................... 46

            d. Adequacy is Satisfied ........................................... 48

    D. PLAINTIFFS SATISFY RULE 23(b)(3)'s PREDOMINANCE REQUIREMENT ................................. 49

        1. The Alleged Conspiracy is a Central Common Issue ................. 50

# TABLE OF CONTENTS

**PAGE**

    2.  Plaintiffs Can Prove Causation on a Common Basis ..................................... 52

       a.  Defendants' Statements Can Be Used to Establish Causation .................. 53

       b.  Plaintiffs Will Show Causation Through Expert Analyses
          and Opinions ........................................................................... 54

    3.  Plaintiffs Will Prove Class-Wide Damages on a Common Basis ................. 57

  E.  A CLASS ACTION IS THE SUPERIOR METHOD FOR
     ADJUDICATING THE CLAIMS AT ISSUE .................................................. 60

IV.   CONCLUSION ............................................................................................ 61

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                 **PAGE(S)**

*Allan v. RealComp II, Ltd*., No. 10-cv-14046 (E.D. Mich. Mar. 30, 2013) ............................................50

*In re Aluminum Phosphide Antitrust Litig.,* 160 F.R.D. 609 (D. Kan. 1995) .........................46, 53

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..........................................................2, 49

*Amgen v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) ......................................5, 50

*In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000)................................43, 53

*In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222 (E.D. Pa. 2012) ......................................46

*In re Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897,
    MDL 997, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994) ........................................................43

*In re Bromine Antitrust Litig.*, 203 F.R.D. 403 (S.D. Ind. 2001)................................................43

*In re Bulk (Extruded) Graphite Products Antitrust Litig.*,
    No. Civ. 02-6030 (WHW), 2006 WL 891362 (D.N.J. Apr. 4, 2006).............43, 54, 55, 56, 59

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ...................................................61

*In re Carbon Black Antitrust Litig.*, No. Civ. A. 03-10191-DPW,
    MDL No. 1543, 2005 WL 102966  (D. Mass. Jan. 18, 2005) .........................43, 51, 53, 54, 55

*In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229 (M.D. Fla. 1993) ....................................43

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 326 (E.D. Mich. 2001) .............................................................................43, 48

*Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir. 2004) ........................................61

*In re Catfish Antitrust Litig.,* 826 F. Supp. 1019 (N.D. Miss. 1993) .........................43, 47, 51, 53

*In re Citric Acid Antitrust Litig.*, No. 95-1092, C-95-2963 FMS,
    1996 WL 655791 (N.D. Cal. Oct. 2, 1996)................................................................43, 50, 51

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013).................................................................................5, 49, 50, 60

*In re Commercial Tissue Antitrust Litig.*, 183 F.R.D. 589 (N.D. Fla. 1998)...............................43

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
   216 F.R.D. 197 (D. Me. 2003) ...................................................................43

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   906 F.2d 432, 447 (9 Cir. 1990)...............................................................54

*In re Currency Conversion Fee Antitrust Litig.*, Nos. MDL 1409, M 21-95,
   2004 WL 2327938 (S.D.N.Y. Oct. 15, 2004) .......................................43

*DeLoach v. Philip Morris*, 206 F.R.D. 551 (M.D.N.C. 2002)....................43, 55

*In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996) .....................43

*In re Domestic Air Transportation Antitrust Litig.*, 137 F.R.D. 677 (N.D. Ga. 1991)..................43

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   Case No. 02-1486, 2006 WL 1530166 (N.D. Cal. June 5, 2006)................43, 55, 59

*In re Electronic Books Antirust Litig.*, No. 11 MD 2293,
   2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ......................................49

*In re EPDM Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009) ...................43, 54

*In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999) ..........43, 52, 55, 59

*In re Foundry Resins Antitrust Litig.*, Case No. 2:04-md-1638,
   2007 WL 1299211 (S.D. Ohio May 2, 2007) ...............................43, 53, 59

*Fox v. Riverview Realty Partners*, No. 12 C 9350,
   2014 U.S. Dist. LEXIS 55260 (N.D. Ill. Apr. 22, 2014) ......................49, 50

*General Leaseways, Inc. v. National Truck Leasing Association*,
   744 F.2d 588 (7th Cir. 1984) .....................................................3, 52

*General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ....................44

*In re Glassine and Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302 (E.D. Pa. 1980)..............48

*Harman v. Lyphomed, Inc.*, 122 F.R.D. 522 (N.D. Ill. 1988)........................48

*Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972)........................................42

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th 2002)...................... *passim*

*In re High Fructose Corn Syrup Antitrust Litig.*, 936 F. Supp. 530 (C.D. Ill. 1996) ...................43

*In re High-Tech Employee Antitrust Litig.*, 86 Fed. R. Serv. 3d 1459 (N.D. Cal. 2013) ...............2

*In re Infant Formula Antitrust Litig.*, Dkt. No. 878,
    1992 WL 503465 (N.D. Fla. Jan 13, 1992) ..........................................................................43

*In re K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir. 2012)...........................................................50

*Kohen v. Pacific Investment Management Company LLC*,
    571 F.3d 672 (7th Cir. 2009) .........................................................................................4, 48, 58

*In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001) .........................................43, 47

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002).............................................. *passim*

*In re Linerboard Antitrust Litig.,* MDL1261, 2008 WL 4542669
    (E.D. Pa. Oct. 3, 2008) ...............................................................................................................12

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ..................................................5

*In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001)...........................43

*Lumco Industries, Inc. v. Jeld-Wen Inc.*, 171 F.R.D. 168 (E.D. Pa. 1997)....................................43

*In re Magnetic Audiotape Antitrust Litig.*, No. 99 CIV. 1580 (LMM),
    2001 WL 619305 (S.D.N.Y. June 6, 2001) ..............................................................................43

*In re Master Key Antitrust Litig.,* 528 F.2d 5 (2d Cir. 1975).........................................................53

*In re Medical X-Ray Film Antitrust Litig.*, No. CV-93-5904,
    1997 WL 33320580 (E.D.N.Y. Dec. 26, 1997) ........................................................................43

*In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003).............................................43

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 801 (7th Cir. 2012) ......................... *passim*

*In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79 (E.D. Pa. 2003)........................43

*In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001)........................43

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ..................................................................43, 46, 49, 51, 56

*In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418
   (E.D. Pa. Aug. 3, 2007).............................................................................2, 43, 52, 55

*Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.,*
   231 F.R.D. 280 (N.D. Ill. 2005).....................................................................46

*Paper Sys. Inc. v. Mitsubishi Corp.,* 193 F.R.D. 601 (E.D. Wisc. 2000) ....................................43

*In re Plastic Cutlery Antitrust Litig.*, No. CIV. A. 96-CV-728,
   1998 WL 135703 (E.D. Pa. Mar. 20, 1998).............................................43

*In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231 (E.D.N.Y. 1998)..........................................43

*In re Polyester Staple Antitrust Litig.,*
   2007 WL 2111380 (W.D.N.C. July 19, 2007)...................................43, 55, 56, 58

*In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18 (N.D. Ga. 1997) ...........................43

*In re Polyurethane Foam Antitrust Litig.*, MDL No. 2196 (N.D. Ohio Apr.16, 2014 Order) .................50

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995) ....................................53

*In re Pressure Sensitive Labelstock Antitrust Litig.,*
   2007 WL 4150666 (M.D. Pa. Nov. 19, 2007) ....................................43, 55

*In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005)...............42, 47, 51, 55

*Saltzman v. Pella Corp.*, 257 F.R.D. 471 (N.D. Ill. 2009)................................6, 45, 46, 47, 48, 50

*Schmidt v. Smith & Wollensky LLC,* 268 F.R.D. 323 (N.D. Ill. 2010) ...........................................45

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008)...............................3, 6, 44, 52, 60

*Sebo v. Rubenstein*, 188 F.R.D. 310 (N.D. Ill. 1999) ....................................43

*In re Sugar Industry Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976) ...........................................55

*In re Sulfuric Acid Antitrust Litig.*, MDL No. 1356,
   2007 WL 898600 (N.D. Ill. Mar. 21, 2007)............................................43

*Sullivan v. DB Investments*, 667 F.3d 273 (3d Cir. 2011) ................................42, 43, 49

*Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672 (7th Cir. 2001) ..............................44

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010)...............43, 55, 58

*In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318,
    2013 WL 4110501 (D. Md. Aug. 14, 2013) ..........................................................54

*Thillens, Inc. v. Community Currency Exchange Association,*
    97 F.R.D. 668 (N.D. Ill. 1983)...........................................................................46

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
    209 F.R.D. 159 (C.D. Cal. 2002) ..................................................................43, 55

*In re Universal Service Fund Tel. Billing Practices Litig.,*
    219 F.R.D. 661 (D. Kan. 2004).......................................................................43, 55

*In re Urethane [Polyester Polyols] Antitrust Litig.,*
    237 F.R.D. 440 (D. Kan. 2006)..........................................................55, 56, 60, 61

*In re Urethane [Polyether Polyols] Antitrust Litigation,*
    251 F.R.D. 629 (D. Kan. 2008)..................................................................... *passim*

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002) ...................................43, 49, 51, 55

*Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541 (2011) ....................................5, 44, 46

**FEDERAL STATUTES AND RULES**                    **PAGE(S)**

Fed. R. Civ. P. 23 ..............................................................................4, 5, 42, 61

Fed. R. Civ. P. 23(a) .................................................................1, 45, 46, 47, 48

Fed. R. Civ. P. 23(b)(3)............................................................1, 49, 50, 51, 60

Fed. R. Civ. P. 23(c)(1)(B) ...............................................................................44

15 U.S.C. § 1.........................................................................................................1

**MISCELLANEOUS**                                 **PAGE(S)**

6 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 18.28 (4th ed. 2002) .........51, 60

7 Charles Alan Wright, Arthur R. Miller & Mary Kane,
    *Federal Practice & Procedure* § 1781 (3d ed. 2005) ...........................................51

*Manual for Complex Litigation* § 21.222 (4th ed. 2005)...............................................44

## I. **INTRODUCTION**

Plaintiffs seek certification of a class of all persons or entities that purchased Containerboard Products directly from any of the Defendants[1] or their subsidiaries or affiliates for use or delivery in the United States from February 15, 2004 through November 8, 2010.[2] Plaintiffs allege a conspiracy among Defendants to artificially inflate prices of Containerboard Products, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs' central allegation is that the conspiracy was facilitated by agreements to restrict the supply of containerboard by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory, all of which set the stage for coordinated price increases of all Containerboard Products.

At class certification, Plaintiffs need to satisfy Rule 23(a) (numerosity, commonality, typicality and adequacy) and establish "predominance" and "superiority" under Rule 23(b)(3). *See* Fed. R. Civ. P. 23. Here, as in most antitrust cases, Rule 23(a) and superiority of class proceedings are readily satisfied. The dispute will likely focus on predominance, which requires a showing that the key elements of Plaintiffs' case—antitrust conspiracy, causation (variously known as "antitrust injury", "fact of damage" or "impact"), and aggregate damages—can be

---

[1] Defendants are International Paper ("IP"); Cascades Canada, Inc. and Norampac Holdings U.S. Inc. ("Norampac"); Weyerhaeuser Co. ("WY"); Georgia-Pacific LLC ("GP"); Temple-Inland Inc. ("TIN"); RockTenn CP, LLC (f/k/a Smurfit-Stone Container Corp.) ("Smurfit" or "SSCC"); and Packaging Corporation of America ("PCA"). Plaintiffs and PCA entered into a settlement agreement, preliminarily approved by the Court. *See* Order Preliminarily Approving Settlement, Conditionally Certifying the Settlement Class, Appointing Class Counsel for the Settlement Class, Approving Notice Plan, and Setting a Final Approval Hearing (ECF #634).

[2] The Class definition is identical to the Settlement Class recently certified by the Court. *See* Order Preliminarily Approving Settlement, Conditionally Certifying the Settlement Class, Appointing Class Counsel for the Settlement Class, Approving Notice Plan, and Setting a Final Approval Hearing, at ¶3.2 (ECF #634).

established using common proof at trial. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012).

"[I]n antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification." *Id.* (internal citation and quotes omitted); *see also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."). Most antitrust cases involve a "common nucleus of operative facts and issues"—the touchstone for predominance. *Messner*, 669 F.3d at 815. *See also In re High-Tech Employee Antitrust Litig.*, 86 Fed. R. Serv. 3d 1459, at *13 (N.D. Cal. 2013) (citing *Messner* and *Amchem*). Class certification is particularly appropriate in cases alleging collusive supply restriction. *See In re Linerboard Antitrust Litig*, 305 F.3d 145, 152-53 (3d Cir. 2002) ("*Linerboard*") (explaining economics of supply restriction and affirming class certification on similar facts involving the same industry and same defendants); *see also In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007). Class certification is warranted here.

First, as in most antitrust class actions, the alleged conspiracy is a common and predominating issue. *See, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("proof of the conspiracy is a common question that is thought to predominate") (internal citation omitted); *see also* Declaration of Michael J. Harris, Ph.D. In Support of Plaintiffs' Motion for Class Certification, ¶¶ I.C.1, at 5-6, VIII.1, 3., at 59-60 ("Harris Decl.") (summarizing economic opinions that evidence common to Class supports the conclusion that Defendants engaged in collusion to restrict supply and raise prices above competitive levels).[3]

---

[3] Dr. Harris is Class Plaintiffs' economics expert, offering opinions on liability and common impact. He is a distinguished Ph.D. in economics, specializing in Industrial Organization (sometimes referred to as

Any trial in this matter will concentrate on common facts relating to whether Defendants conspired.

Second, Plaintiffs will establish antitrust impact using common proof at trial. Antitrust impact is a causation inquiry. *See, e.g., In re Urethane [Polyether Polyols] Antitrust Litig.*, 251 F.R.D. 629, 634-36 (D. Kan. 2008) (impact "can be likened to the causation element in a negligence cause of action" and the "legal inquiry is whether, as a result of defendants' alleged price-fixing conspiracy, the putative class plaintiffs paid a price that was artificially high"). In an antitrust case involving supply restrictions, the basic law of supply and demand makes causation common across class members. Restraining supply invariably causes prices to rise for all or almost all purchasers—a point the Third Circuit emphasized in affirming class certification in the most recent prior case involving Containerboard Products. *Linerboard*, 305 F.3d at 152 ("A reduction in supply will cause prices to rise."); *see also Messner*, 669 F.3d at 816 (establishing common impact is "relatively simple" in cases involving straightforward theories of "supply and demand"); *General Leaseways, Inc. v. National Truck Leasing Assoc.*, 744 F.2d 588, 594 (7th Cir. 1984) (when "firms restrict output directly, price will as mentioned rise") (Posner, J.).

Plaintiffs will establish causation at trial using several independent categories of common evidence, all having class-wide application, including:

- ***Statements and Documents.*** Defendants' executives stated repeatedly that containerboard capacity and production cuts caused higher prices and profits for the industry as a whole. This evidence is powerful common proof of causation.

- ***Expert Testimony on Market Structure.*** Economic analysis shows that the structure of the industry was ripe for collusion and that restricting containerboard supplies and

---

"antitrust economics"), with a wealth of experience testifying in state and federal courts on issues pertinent to this case. Harris Decl., ¶¶ I.A., at 1-2.

coordinated price increases caused class-wide impact. *See* Harris Decl., ¶¶ V.I.1-3, at 33 (summarizing findings on market structure and concluding that "this industry structure provides to Defendants a powerful motive to collude . . . [and] that any collusion by the Defendants would ultimately be broadly and generally successful . . . having a widespread impact across all or nearly all customers.").

- *Pricing Data.* Prices of Containerboard Products followed similar trends during the relevant period—across Defendants—indicating common impact for all direct purchasers. *See* Report of Mark Dwyer, Ph.D. ¶ 24, at 9-10, and chart entitled "PPW Transaction Price Indexes" ("Dwyer Rep.") (showing that prices of Containerboard Products "move in strikingly similar patterns.").[4]

- *Econometric Evidence.* Econometric analysis shows that class members paid higher prices for Containerboard Products than they would have paid in a competitive market. This too is Class-wide proof of impact. *See* Dwyer Rep. *passim;* Harris Decl., ¶ I.C.3, at 6 (Dr. Dwyer's "empirical analyses reliably shows that all, or nearly all, class members were impacted by the price increases implemented during the class period.").

Each of these categories is common, probative and independently reliable proof of causation, which can be used on behalf of all class members at trial.

"[P]laintiffs' burden at the class certification stage" is "only to demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class." *Messner*, 669 F.3d at 818 (emphasis in original) (internal citations and quotes omitted). It is not whether Plaintiffs *have* in fact established impact though common evidence. *Messner*, 669 F.3d at 818-19; *Kohen v. Pacific Investment Management Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009) (rejecting argument that class certification requires proof of injury for every class member and cautioning against "putting the cart before the horse" at this stage). While "a court's class certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at

---

[4] Dr. Dwyer is Class Plaintiffs' econometrics expert, offering opinions on common impact and damages. He is a distinguished Ph.D. in economics with a specialty in econometrics and a wealth of experience testifying in state and federal courts on issues such as those here. Dwyer Rep., ¶ 5, at 3.

the certification stage." *Amgen v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) and noting further that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

To certify the class, the Court need not resolve Defendants' inevitable challenges to Plaintiffs' case on the merits; nor is it necessary for the Court to accept the opinion(s) of either side's expert(s) on the merits. Rather, the Court should scrutinize the record rigorously, including the parties' expert reports, making only those factual findings necessary to determine whether Plaintiffs' common proof is the type of proof on which a jury could rely. *Id.*; *see also Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D. Ill. 2009); *Linerboard*, 305 F.3d at 152. That standard is met here, as the foregoing categories of evidence can be used to establish antitrust causation and injury on a class-wide basis at trial.

Third, Plaintiffs can use econometric modeling to establish impact and antitrust damages on a class-wide basis. *See, e.g., Scrap Metal*, 527 F.3d at 532-34; *see generally Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 491-93 (7th Cir. 2002) (explaining standard for proving antitrust damages); *see also* Dwyer Rep., ¶¶ 59-70, at 21-25 (multiple regression analyses reliably producing preliminary estimation of Class-wide damages). Dr. Dwyer's preliminary multiple regression analysis provides common, empirical proof of antitrust impact and damages, supporting Plaintiffs' motion for class certification. The model measures damages from the alleged conspiracy on a Class-wide basis using a common methodology applicable to all Class members and corresponds directly to Plaintiffs' theory of liability. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430, 1433 (2013).

## II. FACTUAL BACKGROUND

### A. CONTAINERBOARD PRODUCTS

"Containerboard Products" are linerboard, corrugated medium, containerboard sheets and corrugated containerboard products, including boxes and other containers. Some 90% of the goods shipped in the United States are shipped in corrugated containerboard boxes.[5] As of 2010, the Containerboard Products industry was 75-80% vertically-integrated,[6] with Defendants' own vertical integration ranging from 70% to 93%.[7] To make Containerboard Products, wood pulp is first made into linerboard,[8] a flat paperboard.[9] Approximately 80% of the linerboard produced in the U.S. is unbleached kraft linerboard ("UK"), most commonly produced in the 42 pound grade.[10] When fluted or crimped, linerboard becomes corrugated medium.[11] Linerboard and medium are produced in mills, where they are spooled onto rolls. A sheet feeder machine then laminates medium to linerboard, with linerboard serving as the inner and outer facings, to

---

[5] Ex. 1 (Temple-Inland 00024456) at 467; Norton Associates Power Point Presentation, by Sarilee Norton, dated July 2011, "Implications for Containerboard Producers – Lightweight Containerboard." Available at: http://www.aiccbox.org/education/PDF/11_Implication_Lightweighting.pdf.

[6] Ex. 2 (GP-KLEEN01074003) at 009 ("75-80% of domestic box volume is manufactured by vertically-integrated firms which produce containerboard and then convert it to boxes."). *See also* Ex. 3 (GP-KLEEN0038872) at slide 45 (as of September 2008, "[t]op 5 producers highly integrated and recent consolidation patterns predict that integration levels will continue to increase.").

[7] Ex. 2 at 015; *see also* Ex. 4 (IP0995216).

[8] Ex. 2 at 008. There are two source of wood pulp—virgin fibers and recycled corrugated that is "re-pulped", also known as Old Corrugated Containers ("OCC"). For most of the proposed Class Period, Defendants relied primarily on virgin fiber, but their reliance on OCC has increased over time. RockTenn Company, which acquired Defendant Smurfit-Stone (subsequently renamed RockTenn CP, LLC) after the lawsuit was filed, used mostly OCC.

[9] Ex. 2 at 008; Ex. 1 at 467.

[10] Ex. 5 (AFPA_ESI_01358.0001) at 006, 008.

[11] Ex. 2 at 008; Ex. 1 at 467.

produce containerboard.[12] Containerboard is then converted into corrugated containers (boxes) at box plants.[13]

## B. CONTAINERBOARD PRODUCTS ARE UNDIFFERENTIATED COMMODITIES

Containerboard Products are interchangeable commodities, with few (if any) substitutes.[14] *See* Harris Decl., ¶¶ V.D.1-5, at 27-29 (Containerboard Products are commodities and "[c]ommodity markets are more susceptible to collusive activity than markets with highly differentiable products"). Defendants admit that containerboard (liner and medium) are commodities in their contemporaneous business records, including SEC filings.[15] "[M]ost buyers really don't care whose name is on the paper (or board) as long as it prints well and doesn't jam the equipment."[16] The Department of Justice considers containerboard to be a commodity.[17]

GP refers to itself as "a 'commodity' box maker"[18] that produces "undifferentiated brown boxes."[19] Temple-Inland produces "generic" boxes.[20] The other Defendants' contemporaneous documents agree,[21] as do documents and testimony from Defendants' trade organizations,

---

[12] *Id.*

[13] Ex. 2 at 008, 009; Ex. 1 at 467.

[14] *See, e.g.,* Ex. 6 (Temple-Inland 00080408) at 413 ("No viable product substitutes exist or have been developed that significantly threaten current markets for corrugated."); Ex. 7 (IP143772) at IP143814 (noting " NA supply & demand is not impacted by imports or substitution."). *See also* Ex. 8 (FBAKP0000126) at 157-158.

[15] Ex. 9 (2005 PCA 10-K excerpt) ("Containerboard is a generally considered a commodity-type product and can be purchased from numerous suppliers."); Ex. 10 (2009 Temple-Inland 10-Q excerpt) ("Given the commodity nature of our manufactured products, we have little control over market pricing or market demand"). *See also* Ex. 11 (Affidavit of Matthew T. Denton), ¶5.

[16] Ex. 12 (GP-KLEEN01015352) at 368.

[17] Department of Justice, Antitrust Division, *United States v. International Paper Company, et al.*, Proposed Final Judgment and Competitive Impact Statement (DOJ Statement) IV. The Relevant Market. http://www.gpo.gov/fdsys/pkg/FR-2012-02-22/pdf/2012-3975.pdf.

[18] Ex. 13 (GP-KLEEN01870531) at 74.

[19] Ex. 14 (GP-KLEEN00478369) at 3.

[20] *See* Ex. 15 (Temple-Inland 00337660); Ex. 16 (Temple-Inland 00054688); Ex. 17 (Temple-Inland 00160509) at 510.

[21] Ex. 18 (SSCC00838344) at 4 ("packaging is viewed as a highly commoditized business as most packaging companies can provide essential services"); *see id.* at 12, 28 & 39; Ex. 19 (PCoA000025127)

including the Fibre Box Association ("FBA").[22] Compliance with FBA standards is a customary requirement in purchase contracts for "generic boxes."[23]

Defendants' transactional data reveals that box customers routinely source boxes from multiple manufacturers.[24] The proposed class representatives view boxes as commodities and order the same boxes from multiple sources[25]: "a box basically is a box, so we could get it from different suppliers, and price is what was a driving factor."[26] "There isn't a difference in the design whatsoever."[27] Even so-called "specialty boxes" are identical except for printing on the outside.[28]

## C. CONTAINERBOARD PRODUCTS ARE PRICED IN A UNIFORM MANNER

As commodities, Containerboard Products are priced in a uniform manner. This Court has correctly recognized that the "prices of corrugated products are of course tied directly to the

---

at slides 4 & 10 (PCA box plants offer "little differentiation" and "differentiation is difficult"); Ex. 4 ("[l]imited no. of corrugated [manufacturing] plants and converters offering similar products."); Ex. 20 (NORAMPAC00045387) at 22 ("85% of our market is considered as commodity"); Ex. 21 (James R. Keller Dep.) at 175:1-19 (Weyerhaeuser corporate representative agreeing that "generally the boxes made by your large integrated competitor[s] … are interchangeable with Weyerhaeuser boxes."); Ex. 22 (Thomas Gideon Dep. at 97:2-102:24) (testifying that bulk of Weyerhaeuser box converting plants were general, not specialty, plants).

[22] Ex. 23 (Rachel Kenyon Dep.) at 151:13-19 (Fibre Box Association corporate representative testifying that while boxes are customizable, those manufacturers competing for customers in various industries can all manufacture for their customer's needs); Ex. 24 (FBAKP0003147) at 175 (industry will qualify for "Commodity Check-Off Program" with "Products of Forestry" and "Products Processed or Manufactured From the Products of Forestry"); Ex. 25 (IP345687) ("boxes are essentially commodity items used in well established markets.").

[23] See, e.g., Ex. 26 (Temple-Inland 00053142) at 53169 (supply agreement for "generic boxes"); Ex. 27 (GP-KLEEN01066047) at 053-054 ("The linerboard products of each firm are close substitutes because of industry standards."); Harris Decl., ¶¶ V.D.1-5, at 27-30 (explaining that evidence of standardization supports conclusion that boxes are commodity).

[24] Harris Decl., ¶¶ V.D.1-5, at 27-30.

[25] Ex. 28 (George Howell Dep.) at 85:2-17, 162:8-19, 174:2-11; see also Harris Decl., ¶¶ V.D.1-5, at 27-30 (discussing that box customers source boxes across multiple box plants).

[26] Ex. 29 (David Westphal Dep.) at 73:23-25.

[27] Ex. 30 (Robert Ramm Dep.) at 48-49; see also id at 47:21-25 (testifying that Plaintiff RPR Enterprises would simply provide sample box when purchasing from new supplier).

[28] See also Ex. 29 (Wesphal Dep.) at 104:2-17 ("specialty box" does not vary from other boxes in size, quality, or material—only in printing); Ex. 30 (Ramm Dep.) at 45:3-9.

price of containerboard."[29] The box business is characterized by "commodity pricing," even when orders have custom components.[30] "Prices [are] [h]inged to a [c]ommodity."[31] Defendants' contemporaneous documents show that most sales prices of containerboard and boxes are pegged to published commodity price indices, in particular the price of 42 lb. kraft liner in Pulp and Paper Weekly ("PPW"),[32] including inter-Defendant deals.[33]  In its 2010 bankruptcy proceeding, Smurfit-Stone submitted an Affidavit stating: "The contract prices for many sales of containerboard and corrugated containers are linked to the Linerboard Index Price.  However, these contracts have price movement mechanisms that lag the movement of the Linerboard Index Price."[34] Norampac's general manger for containerboard sales put it succinctly: "We all know that we are going to be following the index, so we all have access to the index and we see what's happening."[35]  Both contract and non-contract prices follow changes in the "42 liner index posted in … PPW" as "[l]iner price changes are passed through in the box pricing"

---

[29] Order Denying Motions to Dismiss (ECF #193) at p. 6.

[30] *See* Ex. 31 (Temple-Inland 00079045).

[31] Ex. 19 (PCoA000025127) at slide 4.

[32] Ex. 4; Ex. 2 at 015 ("In practice, box prices are often linked to the published containerboard indices."); Ex. 32 (Temple-Inland 00012904) ("Most of our box prices are either directly, or indirectly influenced by adjustments in published liner board prices."); Ex. 33 (SSCC 00101201) at 32 (2010 presentation by Smurfit estimating 92% of containerboard box sales tied to PPW price); Ex. 34 (Robert Lanthier Dep.) at 115:6-12 ("Will Norampac always make an adjustment if Pulp & Paper reflects a price increase?  [A.] There is [sic] instances where we have not increased, but these are exceptions.  But technically we always move according to Pulp & Paper movement."); Ex. 21 (Keller Dep.) at 280:22-281:22 ("I said in an integrated supply chain we move with our customers together, containerboard and boxes"); Ex. 22 (Gideon Dep.) at 136:5-139:14 (containerboard is "key driver" of box prices and box prices typically followed increase in containerboard price); Ex. 35 (Douglas Munn Dep.) at 44:3-7 ("Containerboard is the biggest input cost that an individual box plant would have, so it is the biggest influence—biggest single factor influencing the selling price of a corrugated carton."). *See also* Harris Decl., ¶ V.E.1, at 30 ("Contracts, for both containerboard and corrugated containers, often either peg the price of the product to a widely observed price index and/or call for periodic updating based on prevailing market conditions."); Dwyer Rep., ¶ 26, at 10-11 (discussing empirical analysis showing that Containerboard Prices are highly statistically linked to PPW Indexes.).

[33] *See e.g.*, Ex. 36 (SSCC 00630966) at 630975; Ex. 34 (Lanthier Dep.) at 141:17 to 144:13 (prices for Norampac's direct purchases tied to PPW index for 42-pound unbleached Kraft).

[34] Ex. 11 (Denton Aff.) at p.4.

[35] Ex. 34 (Lanthier Dep.) at 116:24 to 118:2.

and "[b]ox and liner prices have trended together closely over the long term."[36] Box customers' requests for quotations seek quotes based on the PPW index.[37] Box contracts tie price to published indices.[38] According to Temple-Inland, a "box price increase follows 100% of the time" after a containerboard increase.[39] Defendants frequently congratulated themselves on the success of price increases and their ability to impose containerboard price increases on box customers.[40]

Increases in the PPW index price for linerboard are passed through to box prices. A Smurfit sales manager explained that a 3.46% price increase on box prices "is based on 70% of the change [in the PPW linerboard index] from $405 to $425."[41] Defendants' contemporaneous documents and testimony suggest that the pass-through rate is uniformly 65–75%.[42]

In sum, product characteristics, pricing dynamics, contract conventions, Defendants' contemporaneous business documents, statements and current testimony, as well as customers'

---

[36] Ex. 37 (GP-KLEEN00545853) at 856.

[37] *See, e.g.*, Ex. 38 (PCoA000017862) at 864; Ex. 39 (PCoA000018015) at 817; Ex. 40 (IP749762) at Tabs "Protocol" and "Deal Worksheet"; Ex. 41 (SSCC 00351599).

[38] Ex. 42 (Temple-Inland 00051818); Ex. 43 (Temple-Inland 00051798); Ex. 44 (Temple-Inland 00051775); Ex. 45 (Temple-Inland 00051770); Ex. 46 (Temple-Inland 00051757); Ex. 47 (Temple-Inland 00051688) at 691; Ex. 48 (PCoA000197041); Ex. 49 (PCoA000166161); Ex.50 (IP089891); Ex. 51 (IP043351) at 353; Ex. 52 (IP009997) at 998; Ex. 53 (GP-KLEEN00362591) at 592.

[39] Ex. 54 (Temple-Inland 00072964) at 2; Ex. 55 (Temple-Inland 00072377) ("intent [is] to raise box prices after a successful containerboard increase"); Ex. 2 at 009 ("the key for integrated containerboard & box companies is the change in box prices"); Ex. 56 (GP-KLEEN01057817) at 820 ("Packaging year over year price increase of $35/ton resulting from a pass through of the Containerboard price increase, Commercial Excellence and National Account price improvements.").

[40] *See, e.g.*, Ex. 311 (GP-KLEEN00946774); Ex. 312 (GP-KLEEN00635848); Ex. 313 (Temple-Inland 00247652) (largest linerboard price increase in history fully implemented in July 2008 and passed through to boxes); Ex. 314 (IP532110).

[41] Ex. 57 (SSCC 00500275); *see* Ex. 58 (Steve Strickland Dep.) at 132-134, 153-154 (testifying that linerboard is 70% of cost of box and therefore 70% of linerboard increase passed through to box price); *see id.* at 124-25,143; Ex. 59 (SSCC 00505109); Ex. 60 (SSCC 00505113); Ex. 61 (SSCC 00450532).

[42] *See, e.g.*, Ex. 62 (Barry Baker Dep.) at 147-48 (Temple-Inland pass-through at 65-70%); Ex. 47 (Temple-Inland 00051688) at 691 (contract showing 68% pass-through); Ex. 63 (GP-KLEEN00310660) (GP pass-through at 65%). *See also* Harris Decl., ¶ V.E.1, at 30; Dwyer Rep., ¶ 26, at 9.

statements and buying behavior, establish that the relevant Containerboard Products are interchangeable, undifferentiated, homogenous commodities, readily susceptible to the alleged price-fixing conspiracy.[43]

### D. MARKET STRUCTURE

Market structure is probative of the existence and efficacy of an anticompetitive scheme. *See* Harris Decl., ¶¶ V.1, at 22, and V.I.1, at 33 ("[t]he structural characteristics of this industry . . . above are consistent with and would facilitate successful collusion among the Defendants. . . [and] provides to Defendants a powerful motive to collude."). Defendants are the principal integrated North American producers of Containerboard Products, in several senses of that term. As shown above, they are highly vertically integrated. Defendants have also integrated horizontally creating a market structure favorable to their continued collusion. They have accomplished this through actual consolidation, like mergers and acquisitions, as well as by actions that defendants' self-describe as "virtual integration,"[44] that is, measures taken to treat jointly their supply and inventories. This "virtual integration" amounts to *de facto* horizontal consolidation. Defendants have created joint ventures linking their businesses. They are also the primary sources of supply for each other, either through trades or purchases such that Defendants are the largest customers of other Defendants. This *de facto* consolidation provides opportunities to communicate concerning price and supply, as well as to monitor one another's prospective pricing and supply decisions. The extent of Defendants' structural interdependence goes far beyond a typical oligopolistic market structure, instead they have purposefully created a market environment that restrains unilateral competitive behavior and supports collusion.

---

[43] *See, e.g.* Ex. 64 (IP263040 at 263117) ("[m]ost empirical studies of market structure confirm the existence of a relationship between price and concentration, which is at least suggestive of market power increasing with concentration."); Ex. 27 (GP-KLEEN01066047) at 054 ("the US linerboard industry may have a certain degree of oligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.").

[44] *See, e.g.*, Ex. 65 (IP1124228) at slides 2, 6, 9.

Industry history is one facet of market structure. *See* Harris Decl., ¶ VI.H.1, at 57-58 (discussing history of antitrust violations in wood products industry). The forest products and paper industries and the Containerboard Products industry in particular, have lengthy histories of being the subject of antitrust charges.[45] Most recently, in the *Linerboard* action and related FTC proceedings, which concerned the years 1993-1995,[46] the Defendants here (other than Cascades/Norampac) were alleged to have engaged in coordinated supply restrictions to support price increases.[47] The *Linerboard* case resulted in payments of hundreds of millions of dollars to impacted purchasers[48] and Stone Container (a predecessor of Smurfit-Stone) resolved the FTC case by entering into a restrictive consent decree with the United States government.[49]

At that time, the top five containerboard producers had a collective market share of approximately 50%.[50] Since the *Linerboard* case, the North American containerboard industry has become increasingly concentrated. Defendants' market share increased to 75% of total box production in 2005,[51] and rose again to 81% two years later.[52] As detailed in the Plaintiffs' Complaint and admitted in Defendants' Answers, among other transactions, GP was acquired by Koch Industries in 2005, while IP acquired Weyerhaeuser's containerboard business in 2008.[53]

---

[45] *See* Complaint (ECF #65), ¶¶ 57-63.

[46] *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 148-49 (3rd Cir. 2002).

[47] *In re Linerboard Antitrust Litig.*, MDL1261, 2008 WL 4542669, *1 (E.D. Pa. Oct. 3, 2008) ("Class plaintiffs … alleged that [defendants] conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/ or curtailing inventories.").

[48] *Id.* at *2 (detailing settlement figures each defendant entered into with class plaintiffs).

[49] *In the Matter of Stone Container Corp.*, FTC File No. 9510006, Agreement Containing Consent Order to Cease and Desist. http://www.ftc.gov/sites/default/files/documents/cases/1998/02/9510006.agr_.htm (last visited June 9, 2014).

[50] *See* Ex. 66 (IP0967371) at slide 97.

[51] Ex. 1 at 467.

[52] Ex. 67 (IP0954335) at slide 14.

[53] Ex. 68 (IP065315). *See also* Ex. 69 (WY0056608) at 619. IP acquired Temple-Inland in 2012, giving it a current market share of approximately 37%. *See* http://www.reuters.com/article/2012/02/10/us-templeinland-internationalpaper-antit-idUSTRE8191FF20120210 (last visited June 5, 2014).

This growing consolidation both facilitates Defendants' collusion and means that the supply restrictions – and commensurate price increases – impact the vast majority of box customers.

Beyond mergers, Defendants have created numerous joint venture box and sheet plants.[54] In early 2005, SSCC's CEO even proposed a joint venture with IP and WY—the "Top 3 integrated packaging companies" at the time—involving their entire box plant system because the joint venture would "establish[] one entity with nearly 50% market share, hence significant pricing control" and "eliminate irrational pricing behavior."[55] The proposal touted eliminating competition that undermined box plant "rationalization."[56] A PCA document also explains that joint ventures "reduce[ ] the potential outlets for paper supply and boxes…,"[57] thereby enhancing a collusive market structure.

As another form of *de facto* consolidation, Defendants sold and traded high volumes of containerboard among themselves. Subsequent to the *Linerboard* period, Defendants became the largest suppliers of their competitors.[58] The volume of SSCC's inter-Defendant sales were comparable to its total sales to independent converters.[59] Inter-Defendant purchases provided GP with an eighth or more of the containerboard that it supplied to its purchasers and box plants, and allowed it to chronically under-produce.[60] In turn, GP became PCA's largest liner supplier in the West.[61] Temple-Inland characterized Smurfit-Stone as its "largest open market

---

[54] *See e.g.*, Ex. 70 (RockTenn Resp. to Pls.' Second Set of Interrog., 9/27/2013) at 25-26; Ex. 71 (NORAMPAC00062283).

[55] Ex. 72 (SSCC 00840592) at 599, 601.

[56] *Id.* at 599 ("Redundancy in box plant system in new JV would spur significant box plant rationalization, but without/less poaching common to current rationalization tactics").

[57] Ex. 73 (PCoA000034921) at 922.

[58] Ex. 74 (PCoA0000028453) ("Georgia Pacific: They continue to be our largest West supplier with 5-7,000 tons of liner shipping to LA and SLC").

[59] Ex. 75 (SSCC 0095121).

[60] *See, e.g.*, Ex. 76 (Ballard Dep. Exhibits C, E-K).

[61] *See, e.g.*, Ex. 74.

provider,"[62] and IP's Trades Manager testified that IP and Smurfit-Stone had "a strong business partnership."[63] Norampac's trading partners included: Smurfit-Stone, Temple-Inland, and IP.[64]

Instead of increasing their own capacity and capabilities to compete, Defendants relied on competitor trades and sales to create a *de facto* industry-wide inventory.[65] Tellingly, SSCC testimony suggests Defendants considered each other as customers for purposes of sales and trades, rather than competitors.[66] SSCC offered to assist GP with a trade to avoid extra capacity in the market that would be caused if GP used its swing capacity to produce more of a particular grade of containerboard (e.g., linerboard vs. medium).[67] Norampac traded with IP for Kraft liner rather than produce its own.[68] Defendants directly shipped traded production to each other's customers[69] and even agreed not to compete for each other's customers.[70] Despite being "competitors," IP and SSCC gave each other better prices under purchase-supply agreements than were offered to their own customers.[71] A Weyerhaeuser executive admitted that leading a prior price increase "did stagnate our growth" in part because "we would not participate in bids unless it was protecting an incumbent position"[72] – again not competing. Trades were even contemplated as a means of sanctioning producers that did not increase price: a Temple Inland

---

[62] Ex. 77 (Temple-Inland 00140312).

[63] Ex. 78 (Donna Lajeunesse Dep.) at 242:16-24.

[64] *See* Ex. 79 (NORAMPAC00057612) at 630. Norampac uses the terms "swaps" and "trades" synonymously. *See* Ex. 34 at 85.

[65] *See* Ex. 80 (WY0054682) at slides 8, 13 (20% of trades to "inventory-constrained locations"); Ex. 81 (WY0062605); Ex. 82 (Brian McGurk Dep.) at 235-236 (Smurfit trades if regional plant closed).

[66] Ex. 83 (Mark Polivka 30(b)(6) Dep.) at 79, 201.

[67] Ex. 84 (GP-KLEEN1057796) at 805.

[68] *See* Ex. 34 Lanthier Dep. at 90:3-9. *See also* Ex. 80 at slide 8 (justifying trades to "obtain products we do not produce").

[69] Ex. 85 (GP-KLEEN00075629/30) (sending trades directly to Smurfit Stone's customers).

[70] Ex. 86 (Temple-Inland 00615658) (Temple-Inland non-compete with GP agreeing Temple-Inland sells to existing customers as long as supply purchased from GP); Ex. 87 (Temple-Inland 00462324) (Weyerhaeuser agrees to "push" Weyerhaeuser customers to "agree to extend the contract to IP" when IP hired a former Weyerhaeuser "sales guy").

[71] *See* Ex. 88 (IP473391).

[72] Ex. 89 (IP0986544) at 545.

-14-

executive pondered "if anyone will drop their trades with them" when U.S. Corrugated did not raise prices in 2010.[73]

Defendants planned their capacity reductions with the assurance they would be supplied by other Defendants.[74] They relied on their competitors to supply them in geographic areas where they had closed, reduced or never established capacity.[75] In some instances, Defendants did not even attempt to compete for customers.[76] As Dr. Harris concluded in reviewing Defendants' trading activities: "The Defendants were able to maintain and lower inventories through their use of trades between each other. . . . This is a type of cooperative behavior not generally observed in competitive markets. In a competitive market, firms with higher inventory would use that inventory to gain market share from the firm lacking inventory rather than use that inventory to strengthen its competitor." Harris Decl., ¶ VI.B.4, at 40-41.

As expected, inter-Defendant transactions provided frequent opportunities to exchange proprietary information about capacity, including downtime and closures, so that they could ensure industry supply remained static or dropped. IP's Trades Manager testified that IP's antitrust policies "absolutely" prohibited disclosing non-public containerboard mill expansion plans to competitors.[77] Yet, she admitted that IP did exactly that when discussing trades with PCA.[78] Similarly, she testified that separating the trade pricing process from open market pricing was "critical" to antitrust adherence,[79] but then admitted the same person oversaw pricing for all IP sales.[80] Temple-Inland shared its proprietary "Overall Supply/Demand balance" with

---

[73] Ex. 90 (Temple-Inland 00420487).

[74] Ex. 81; Ex. 82 at 235-236.

[75] *See* Ex. 88; Ex. 81; Ex. 82 at 235-236.

[76] *See, e.g.,* Ex. 91 (SSCC 00625355/56); Ex. 80 at 197-98; Ex. 92 PCoA000710668.

[77] Ex. 78 at 181:13-184:3.

[78] *Id.* at 189:9-190:6; Ex. 93 (Lajeunesse Dep. Ex. 114) at 3 ("IP is exploring options to produce world class, white-top linerboard at our mill in Pensacola, FL and phasing out production in Mansfield, LA.").

[79] Ex. 78 at 324:13-17, 324:23-325:13.

[80] *Id.* at 13:5-15:11 (Landau negotiates pricing in competitor agreements), 39:20-40:17 (Landau responsible for approving pricing for open market sales, *i.e.*, non-competitor sales).

Smurfit-Stone.[81]     Weyerhaeuser notified competitor trade partners of future maintenance downtime.[82] And, a Norampac document evinces it knew about Smurfit's future price increases.[83]

While Defendants justify these trades and swaps as saving freight costs or maintaining inventory "balance,"[84] one Temple-Inland employee frankly admitted that "[f]rom an integrated perspective it generally doesn't make sense to buy from the outside."[85]  The evidence above shows that competitor-Defendants used "virtual integration" to monitor, facilitate and enforce their conspiratorial conduct.

Taken together, Defendants actual and *de facto* horizontal consolidation, the extreme degree of vertical and virtual integration, and inter-Defendant transactions make the Containerboard Products industry highly susceptible to output restrictions and price-fixing.[86]

## E.     THE ALLEGED CONSPIRACY

Plaintiffs allege that Defendants conspired to raise prices for Containerboard Products, facilitated by a variety of mechanisms to restrict the supply of containerboard. Complaint, ¶¶ 6, 66, 69.  Throughout the Class Period, Defendants concurrently announced and implemented price increases while reducing output through: (a) capacity closures; (b) downtime; (c) "slowbacks"; (d) inventory restraints; (e) public and private pronouncements concerning future output reductions, (f) exchanging crucial information regarding output, pricing, and inventory

---

[81] Ex. 94 (Ron Zimbelman Dep.) at 250:6-25, 247-249; Ex. 95 (SSCC 00160071).

[82] Ex. 21 at 229:12-230:7.  Defendants also used the same two consultants to facilitate their joint ventures. *See, e.g.,* Ex. 73; Ex. 65 at slide 10; Ex. 96 (SSCC 00225490) (Senior V.P. M. Blanchard reporting to CEO P. Moore that LA Corr, a CSI-entity funded by IP, had just advised SSCC of an IP price increase); Ex. 97 (IP504133) (email noting joint venture partner, TexCorr, informed IP of a SSCC price increase).

[83] Ex. 98 (NORAMPAC00065728) ("Smurfit *will* announce and maintain a price increase….").

[84] *See, e.g.*, Ex. 82 at 235:11-21; Ex. 34 (Lanthier Dep.) at 93:11-23; Ex. 99 (Hilliard Dep.) at 56:18-57:4.

[85] Ex. 100 (Temple-Inland 00167429).

[86] Complaint, ¶ 41 (citing Li, Haizheng and Jifeng Luo. *Industry Consolidation and Price in the US Linerboard Industry.*  Journal of Forest Economics 14 (2008) at 98 ("the US linerboard industry may have a certain degree of oligopolistic structure such that leading producers can exercise some pricing power, for example, through either barometric price leadership or collusive price leadership.")).

targets; (g) inter-Defendant transactions; and (h) permanent closures of mills. Consultants advised company directors to adopt "correlate with competitors" strategies and framed pricing as a communication, not with customers, but with competitors. Subpoenaed records show numerous telephone calls occurred between numbers identified with Defendants' senior executives (in some cases CEOs) at or around the times of price increases. Defendants also used earnings calls and Wall Street reports as tools to disclose and monitor each other's compliance with price increases, strategy decisions, and output levels. As a result of an FTC consent decree (discussed below), and the subsequent antitrust class actions against most of them, Defendants developed a common scheme that they could claim was within the interstices of the conduct restrictions imposed by the consent decree against one of their members, Stone Container Corporation, a predecessor to Defendant SSCC. Defendants' trade association activities provided another venue for coordination and often coincided with significant price and output events. As Judge Shadur observed in denying Defendants' motions to dismiss, "It is striking that all Defendants repeatedly—twice in each of 2005 and 2006 and once in each of 2007 and 2008—raised their prices soon after an industry event. . . . , belonging to a trade association or attending industry events and exchanging price information is 'not illegal in itself' but 'facilitates price fixing.' Where price increases are consistently and closely timed soon after industry gatherings, significant weight is lent to allegations of a conspiracy."[87]

While class certification is not a time to litigate the merits of Plaintiffs' conspiracy claims, a sampling of the evidence developed to date provides useful context for the Court's analysis. Every piece of evidence described below is common to all Class members and will assist every Class member in proving its case.

In the years leading up to the beginning of the Class Period, demand for Containerboard Products was steady, prices were low and production capacity was abundant. During the period

---

[87] Order Denying Motions to Dismiss (ECF #193) at 18 (internal citations omitted).

in and before 2003-04, Defendants' conduct verged on the competitive, despite the fact that "[f]rom the 1930s onward the containerboard industry has been subject to extensive antitrust litigation and other charges of unfair competition."[88]  At this time, SSCC was subject to a 1998 FTC consent decree.[89]  The FTC charged that Stone had attempted to effect a coordinated price increase for linerboard and found that, similar to the conspiracy here, Stone had communicated plans to take downtime, reduce production, and drawdown inventory levels while buying linerboard from competitors, believing that these actions would support an industry-wide price increase.[90]

Toward the end of 2003, prior expectations of steady demand were replaced by forecasts of moderate growth.  In the third quarter of 2003, SSCC renounced its recent history of competitive behavior and trumpeted a plan to curtail its supply "enough … to force price increases throughout the industry."[91]  The company vowed not to add capacity, even if demand improved.[92]  Wall Street expressed skepticism that this would be enough to boost profits. Overall, Defendants had sufficient capacity to readily increase production to meet demand growth.  But Defendants' behavior changed after SSCC's proclamation. *See* Harris Decl., ¶¶ IV.K.1 and 2, at 21-22 (describing changes in industry fundamentals between pre-Class period (2000-03) and Class period (2004-2010)).

---

[88] *Id*. at p. 7.

[89] Pursuant to the consent decree, Stone Container (and by virtue of its acquisition, SSCC) was ordered to cease and desist from "[r]equesting, suggesting, urging, or advocating that any manufacturer or seller of linerboard raise, fix, or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties" and from "entering into… any combination, conspiracy, agreement, understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties." *In the Matter of Stone Container Corporation*.  FTC DOCKET NO. C-3806, Decision and Order, May 18, 1998.  The Order terminates on May 18, 2018.  Available at: http://www.ftc.gov/sites/default/files/documents/cases/1998/02/9510006.agr_.htm

[90] *See id.*

[91] Ex. 101 (GP-KLEEN01017202).

[92] *Id*.

First, as the table below summarizes, Defendants announced 15 containerboard price increases between 2004 and 2010.[93] Defendants announced their price increases within days of each other for almost simultaneous implementation, and nine were fully implemented as announced.

| Effective Date for Price Increase | 1st to announce | 2nd to announce | 3rd to announce | 4th to announce | 5th to announce | 6th to announce | 7th to announce |
|---|---|---|---|---|---|---|---|
| **February/ March 2004** | WY (01/5/04) $40 | IP (01/16/04) $50 | PCA (01/16/04) $50 | TIN (01/19/04) $50 | SSCC (01/21/04) $50 | Norampac (01/22/04) $50 | GP (01/22/04) $50 |
| **June 2004** | WY (04/12/04) $50 | PCA (04/26/04) $50 | TIN (04/26/04) $50 | GP (04/26/04) $50 | IP (04/26/04) $50 | Norampac (05/12/04) $50 | SSCC (05/12/04) $50 |
| **March/ April 2005*** | IP (02/14/05) $50 | SSCC (02/23/05) $50 | GP (02/23/04) $50 | WY (02/24/05) $50 | PCA (02/25/05) $50 | TIN (02/25/05) $50 | Norampac (04/11/05) $50 |
| **October 2005** | SSCC (09/8/05) $30 | PCA (09/8/05) $30 | IP (09/12/05) $30 | TIN (09/13/05) $30 | Norampac (09/13/05) $40 | GP (09/13/05) $30 | WY (09/14/05) $30 |
| **January 2006** | WY (11/28/05) $40 | PCA (11/28/05) $40 | TIN (11/30/05) $40 | Norampac (12/01/05) $40 | GP (12/01/05) $40 | IP (12/02/05) $40 | SSCC (12/02/05) $40 |
| **March/ April 2006** | GP (02/10/06) $50 | SSCC (02/14/06) $50 | IP (02/17/06) $50 | Norampac (02/17/06) $50 | WY (02/20/06) $50 | PCA (02/21/06) $50 | TIN (by 02/24/06) $50 |
| **January 2007*** | WY (10/26/06) $40 | IP (11/01/06) $40 | TIN (11/03/06) $40 | GP (11/27/06) $40 east $50 west | SSCC (12/01/06) $40 | PCA (12/01/06) $40 | Norampac (12/4/06) $40 |
| **April/ May 2007*** | IP (03/28/07) $40 | PCA (04/23/07) $40 | TIN (mid. April 07) $40 | Other Defendants currently unknown | | | |

---

[93] Table Source:  Exs. 102-151.

| Effective Date for Price Increase | 1st to announce | 2nd to announce | 3rd to announce | 4th to announce | 5th to announce | 6th to announce | 7th to announce |
|---|---|---|---|---|---|---|---|
| **August 2007** | WY (06/25/07) $40 east $50 west | SSCC (07/2/07) $40 | PCA (07/3/07) $40 east $50 west | IP (07/06/07) $40 | TIN (07/5/07) $40 east $50 west | GP (07/5/07) $40 east $50 west | Norampac (current date unknown) $40 |
| **March 2008*** | SSCC (01/29/08) $50 | IP (02/04/08) $50 | TIN (02/07/08) $50 | GP (02/08/08) $50 | PCA (02/11/08) $50 | WY (02/11/08) $50 | Norampac (2/14/08) $50 |
| **July 2008** | GP (05/28/08) $55 | SSCC (05/28/08) $55 | IP (05/29/08) $55 | WY (05/30/08) $55 | TIN (06/02/08) $55 | PCA (before 06/3/08) $55 | Norampac (before 06/3/08) $55 |
| **October 2008*** | IP (09/2/08) $60 | TIN (09/04/08) $60 | GP (9/5/08) $60 | SSCC (9/5/08) $60 | PCA, (09/10/08) $60 | Norampac (9/10/08) $60 | |
| **January 2010** | GP (11/23/09) $50 east & $70 west | IP (11/30/09) $50 east & $70 west | TIN (12/01/09) $50 east & $70 west | SSCC (12/02/09) $50 east & $70 west | PCA (Before 12/12/09) $50 east & $70 west | Norampac (Before 12/12/09) $50 | |
| **April 2010** | IP (02/22/10) $60 | GP (02/24/10) $60 | TIN (02/26/10) $60 | Norampac (03/02/10) $60 | SSCC (3/02/10) $60 | PCA (03/05/10) $60 | |
| **August 2010*** | GP (06/29/10) $60 | IP (6/29/10) $60 | TIN (06/30/10) $60 | SSCC (07/01/10) $60 | Norampac (7/8/10) $60 | PCA (before 7/14/10) $60 | |

*  *Indicates price increase announced but not fully implemented per announcement.*

Second, Defendants restricted output through capacity reductions and diminished production through downtime, "slowbacks," or other mechanisms, antecedent to or concurrent with the price increases. The table below summarizes Defendants' output reductions throughout the course of the Class Period.[94]

---

[94] Table Sources: Exs. 2, 152-159. The table does not include box plant closures. Nor does it include slowbacks such as those taken by GP before and after it was leading an industry price increase first reported on May 28, 2008. *See* discussion *infra*.

| Year | Quarter | Event |
|------|---------|-------|
| 2003 | Q4 | • SSCC shuts 515,000 tons/year of containerboard capacity |
| 2004 | Q1 | • *March 2004 Price Increase.* |
|  | Q2 | • SSCC shuts 160,000 tons/year of containerboard capacity. |
|  |  | • IP shuts 300,000 tons/year of containerboard capacity. |
|  |  | • *June 2004 Price Increase.* |
|  | Unknown | • IP shuts 85,000 tons/year of containerboard capacity IP shuts 150,000 tons/year of containerboard capacity |
| 2005 | Q1 | • PCA shuts 65,000 tons/year of containerboard capacity. |
|  |  | • *March 2005 Price Increase.* |
|  | Q3 | • SSCC shuts 681,000 tons of containerboard capacity |
|  |  | • IP shuts 100,000 tons/year of containerboard capacity. |
|  | Q4 | • Norampac shuts 150,000 tons/year of containerboard capacity. |
|  |  | • Weyerhaeuser shuts 350,000 tons/year of containerboard capacity. |
|  |  | • *October 2005 Price Increase.* |
| 2006 | Q1 | • *January 2006 Price Increase.* |
|  |  | • IP/SSCC shut 144,000 tons/year of joint venture containerboard capacity. |
|  | Q2 | • *April 2006 Price Increase.* |
|  | Q4 | • Norampac shuts 300,000 tons/year of containerboard capacity. |
| 2007 | Q1 | • *January 2007 Price Increase.* |
|  | Q2 | • *Spring 2007 Price Increase.* |
|  | Q3 | • SSCC shuts 200,000 tons/year of containerboard capacity. |
|  |  | • *August 2007 Price Increase.* |
|  | Q4 | • IP shuts 590,000 tons/year of containerboard capacity. |
| 2008 | Q1 | • *March 2008 Price Increase.* |
|  | Q3 | • *July 2008 Price Increase.* |
|  | Q4 | • Defendants do not implement the $60/ton price increase, announced on August 29-September 10th. |
|  |  | • SSCC shuts 135,000 tons of containerboard capacity. |
|  |  | • IP idled 676,000 tons/year of containerboard capacity. |
| 2009 | Q4 | • IP permanently shuts approximately 1.4 million tons/year of containerboard capacity. |
|  |  | • SSCC shuts approximately 900,000 tons/year of containerboard capacity. |
| 2010 | Q1 | • *January 2010 Price Increase.* |
|  | Q2 | • *April 2010 Price Increase.* |
|  | Q3 | • *August 2010 Price Increase.* |

Despite anticipating and realizing increasing demand in 2004,[95] Defendants eliminated product from the market.  Rather than meeting increased demand through increased production, in April-May 2004, all Defendants announced that they would be raising prices, and then reduced capacity.[96]  These closures came while inventories were at "an extremely lean level."[97] The supply restrictions were irrational as unilateral actions, but led to the two waves of industry-wide price increases in 2004. *See* Harris Decl., ¶¶ VI.A.1-9, at 35-39 (discussing mill closures and finding that "[s]hutting capacity in the circumstances Defendants faced during the class period is both a facilitating practice and a potential 'plus factor' used to evaluate collusive behavior. . . . The actions undertaken by the Defendants to close capacity do not appear to be consistent with their unilateral self-interests.  Rather, it is only rational in the context of coordinated collective action.").

The same month that the 2004 price increase was implemented, Defendants IP, PCA, and SSCC each internally circulated similar "battle cry" memoranda.  IP CEO John Faraci informed the company's Board of Directors that "excess capacity in North America may have to be rationalized."[98]  PCA's Executive Vice President of Corrugated Products demanded at least three additional $40-$50 industry-wide price increases over the next 18 months, citing to "historically low inventory, "heavy" mill downtime, and capacity reductions and the need to appease Wall Street.[99]  SSCC sought to "impact industry pricing through our actions on both the packaging and board side," noting its leadership in "creat[ing] industry discipline."[100]  Two months later, Georgia-Pacific's Executive Vice President of Packaging Christian Fisher circulated another

---

[95] *See* Ex. 160 (2004 IP Form 10-Q) at 14, 19; Ex. 161 (GP-KLEEN00477477) at 7; Ex. 162 (Temple-Inland 00291545).

[96] *See* Ex. 12; Ex. 163 (IP112019) at 107; Ex. 164 (SSCC 00298351); Ex. 165 (GP-KLEEN01017172/74); Ex. 166 (GP-KLEEN01441611).

[97] Ex. 167 (SSCC 00347633).

[98] Ex. 163 at 107.

[99] Ex. 168 (PCoA000026178).

[100] Ex. 164.

similar memo explaining that a "tight market" and a "second price increase" would help increase Georgia-Pacific's 2004 profits, "but they alone will not get us there."[101]

Meanwhile, Defendants' high-level executives attended trade association meetings in and around March 2004 where proposed changes to the trade associations' collection and reporting of statistics were discussed.[102] In May 2004, Deutsche Bank analyst Mark Wilde gave a presentation entitled "A New Ball Game: A Review of the Containerboard & Corrugated Packaging Business," wherein he applauded the industry for improving "fundamentals" (such as lower inventories, capacity rationalization and industry consolidation) that would "restore margins" and asked, with fundamentals improving, "how do we react?"[103]

Although they stabilized prices at their inflated levels, Defendants' initial rounds of closures were not enough to support further price increase attempts in early 2005. In response to a "surplus of board sloshing around in the market",[104] Defendants next closed enough mills to reduce overall capacity by over 1 million tons, and brought inventory to "record low levels."[105] SSCC publicly announced the closure of three mills reducing capacity by 681,000 tons.[106] Weyerhaeuser publicly explained that the company was going to take "the actions necessary" to ensure that it was not overproducing and announced that it would shutter a plant producing 350,000 tons.[107] Norampac announced the closures of one mill machine and two corrugated products plants[108] and its CEO said, "[i]f everyone would remove the same amount of capacity percentage-wise as we have, I think our business would look a lot better. You have to be ready

---

[101] Ex. 166.

[102] Ex. 169 (SSCC 00307454/55) at 457, 468. The project was subsequently tabled to provide time for a "comprehensive legal review of all statistical reports to quell any antitrust concerns." *Id.*

[103] *See* Ex. 165.

[104] Ex. 170 (Temple-Inland 00022278).

[105] *See* Ex. 171 (GP-KLEEN01025183) at 184.

[106] Ex. 172 (SSCC 00505136); Ex. 173 (IP1023693).

[107] Ex. 174 (WY0141600) at 612. *See also* Ex. 154 (GP-KLEEN01024985) at 987.

[108] Ex. 152 (SSCC 0083396). *See also* Ex. 175 (Cascades/Norampac Responses to Pls.' Second Set of Interrogs.) at 26-28.

to let go of business if you want to keep the price up."[109]   IP idled three machines, announced the closure of two mills (one operated jointly with SSCC), and took 51,000 tons of downtime.[110] In total, Defendants removed just under one million tons of production capacity from the market in 2005.

Output reductions continued after the mill closures of 2005.  In February 2006, PCA CEO Paul Stecko gave an industry presentation explaining that "essentially no additional capacity is scheduled to come on line in the foreseeable future."[111]   That same month, Weyerhaeuser closed 350,000 tons of production (announced November 2005).[112]  On February 1, 2006, Temple-Inland wrote that "operating rates [are] high and inventories [are] at lowest levels in 12 years.  Prices got to go up!!!!!" [113]  That same month it announced a price increase of $50 per ton (as did Defendants GP, IP, Norampac, SSCC, PCA and Weyerhaeuser).   In November, SSCC suggested trading additional medium to Temple-Inland, as opposed to Temple-Inland increasing production.[114]   Norampac concluded the year by closing 300,000 thousand tons of capacity.[115]  In December 2006, Weyerhaeuser closed another mill.[116]  In sum, Defendants removed just under 800,000 tons of capacity from the market for a total reduction of 1.78 million tons/year of production in 2005 and 2006.

Having implemented three price increases in ten months between October 2005 and August 2006, Defendants announced another three price increases in 2007, although only one would be fully implemented.  All told, Defendants' four price increases in under two years had

---

[109] Complaint, ¶ 88.

[110] *See* Ex. 176 (IP927195); Ex. 155 (GP-KLEEN01072241) at 12; Ex. 177 (IP155126).  *See also* Ex. 178 (Michael Exner Dep.) at 142:9-22.

[111] Ex. 179 (PCoA000063730) at slide 8.

[112] Ex. 180 (Temple-Inland 00192908).

[113] Ex. 181 (Temple-Inland 00072367).

[114] Ex. 182 (SSCC 00625981).

[115] *See* Ex. 152; Ex. 175 at 28.

[116] Ex. 183 (WY0061101). Weyerhaeuser then closed its Plymouth, North Carolina machine in early 2007.  Ex. 184 (WY0138835) at 836, 839.

raised containerboard prices by $160 per ton, or by approximately 41%. The first 2007 increase, slated for January, was announced in October-December 2006. Shortly after its announcement, IP CEO John Faraci explained to his Board that IP would continue to take downtime "to keep operating rates where they need to be to maintain pricing."[117] The first increase of 2007 was not fully implemented. Weyerhaeuser explained that "there is too much capacity in our industry and yes more rationalization needs to occur before pricing and margins can improve for the industry."[118] Accordingly, Defendants again reduced capacity. In April 2007, SSCC announced the closure of two mills, reducing its capacity by 192,000 tons per year,[119] and PCA CEO Paul Stecko announced that the company's containerboard inventories were down approximately 2000 tons as compared to 2006 year-end levels.[120] In May 2007, IP CEO John Faraci publicly stated that taking additional downtime was "entirely possible"[121] and, within two weeks, the company announced a 190,000 ton per year mill closure.[122] Defendants pushed for another price increase through April and May 2007,[123] which ultimately was not implemented. One IP executive suggested that SSCC's participation was needed for the price increase to succeed.[124] The third 2007 price increase attempt, which was fully implemented, was first announced in late June 2007, five days after Defendants' high-level executives, including CEOs, appear to have

---

[117] Ex. 185 (IP098220) at 222.

[118] Ex. 186 (WY0068378).

[119] See Ex. 70 at 22.

[120] Ex. 187 (Temple-Inland 00034708) at 3.

[121] Ex. 188 (WY0046755) at 771.

[122] See http://www.prnewswire.com/news-releases/international-paper-announces-closure-date-for-terre-haute-mill-57943822.html (last visited June 3, 2014). See also Ex. 152.

[123] See Ex. 123 (IP498100); Ex. 189 (GP-KLEEN00640487); Ex. 190 (Temple-Inland 01358789). Telephone records obtained by Plaintiffs in discovery indicate that PCA CEO Paul Stecko called Deutsche Bank analyst Mark Wilde four days prior to the company announcing its May 2007 price increase.

[124] See Ex. 191 (IP323609).

attended an Association of Independent Corrugated Converters ("AICC") industry trade meeting.[125]

In late 2007, the general economy began to falter, first sinking into recession, then collapsing in the second half of 2008 and continuing to decline through the middle of 2009, when an anemic recovery commenced. Notwithstanding the grim economic climate, Defendants tried to raise prices six times between 2008 and 2010, three of which were fully implemented. On May 12, 2008, GP forecasted that "[p]rice call is flat for the rest of 2008" and noted that the company did not fully implement the March price increase – GP "lost 20k tons of non-contract domestic volume as customers sought other alternatives."[126] Then, on May 28, 2008, notwithstanding its own projections and declining demand, GP led a round of price increases, informing customers of a $55/ton increase, effective July 1, 2008.[127] GP justified the $55 increase on a $4/ton increase in costs as well as GP's low inventories and "[u]nscheduled and scheduled downtime."[128] GP's efforts to raise prices came during a year when the company was taking slowback or downtime and falling short of its demand projections during every single month of the year.[129]

Plaintiffs' ongoing review of telephone records obtained in discovery demonstrates that, immediately following GP's price increase announcement, there were numerous telephone calls and faxes between Defendants, including calls from GP to TIN's Barry Baker and the assistant for SSCC Senior Vice President John Knudsen, a call from IP's Glenn Landau to SSCC's Mathew Blanchard, calls from TIN to IP and PCA, and faxes from TIN to PCA, SSCC, WY, and Norampac. In addition, extensive fax and telephone communications between Defendants

---

[125] *See* Ex. 192 (AICC000001173).

[126] Ex. 193 (GP-KLEEN01372191) at 2197.

[127] Ex. 110 (GP-KLEEN00631148). GP's interrogatory responses state that it announced the July 1, 2008 increase "[o]n or around June 20, 2008," but the increase was clearly made public on May 28, 2008. Ex. 102 (GP Supp. Responses to Pls' Second Set of Interrogs.) at 15.

[128] Ex. 194 (GP-KLEEN01767714).

[129] *See* Ex. 195 (GP-KLEEN01467984) at 990, 996.

-26-

occurred the morning of May 28, including a call between TIN's VP of Supply and IP's Dennis Colley, numerous faxes from GP to PCA and SSCC, and faxes from TIN to GP, IP, PCA, and SSCC. A series of phone calls and emails the morning of May 28 also took place between SSCC's John Haudrich, TIN's Chris Mathis, IP's Tom Cleves and Deutsche Bank's Mark Wilde, including emails by both Mr. Haudrich and Mr. Mathis to Mr. Wilde offering thanks and suggesting they owed Mr. Wilde a beer.[130]

Within hours of GP's price increase announcement, SSCC announced an identical price increase of $55.[131] On May 29, 2008, International Paper followed suit; the day after, Weyerhaeuser joined; and, by June 3, 2008, PCA, Norampac and Temple-Inland had announced.[132]

PCA's contemporaneous business records reveal that the Fall 2008 price increase was collusive, as it explained that it did not "want to be the company that throws cold water on IP's increase."[133] The AICC publicly asserted that the Fall 2008 price increase announcements, "coming as they do within 90 days of the $55 per ton increase in July, are unjustified based on current economic indicators and inputs. We believe they even border on collusion."[134]

Officially, the Great Recession ended and economic growth renewed in mid-2009. Nevertheless, in the second half of the year, IP announced the permanent closure of 1.4 million tons of containerboard capacity.[135] SSCC took downtime and permanently closed its Missoula and Ontonagon mills, which had a combined production capacity of 902,282 tons,[136] SSCC later

---

[130] Ex. 196 (DBSI00001345); Ex. 197 (DBSI00001347); Ex. 198 (ATT-SW003463); Ex. 199 (DBSI00003407).

[131] Ex. 200 (GP-KLEEN00006512) at 6512.

[132] *See* price increase table above.

[133] Ex. 201 (PCoA000048972).

[134] Ex. 202 (AICC000001060).

[135] *See* Ex. 203 (Temple-Inland 00439923).

[136] *See* Ex. 204 (SSCC 00205385) (explaining that SSCC's increase in inventory "will not help the market place" and that the company needed to take downtime "ASAP"); Ex. 205 (SSCC 00467587) at.2, 19.

admitted that its motivation for closing the mills was to "keep the tons out of the market and get the money back through price increase."[137] Temple-Inland took more than 40,000 tons of market downtime throughout 2009.[138]

Defendants' 2009 closures set the stage for a $50 price hike in January 2010 (announced between November 23 and December 12, 2009), notwithstanding the generally depressed economy.[139] Noting that IP and GP, among others, were taking a "firm stance,"[140]SSCC joined the January 2010 price increase with an enthusiastic comment: "[t]ime to have some fun!!!!!"[141] One SSCC executive later observed that "[t]he only way to get paid is to have a 1994-95 situation where the tide rises for all boats"[142]—an overt reference to the FTC consent decree and *Linerboard* litigation time period. Upon learning of GP's January 2010 price increase announcement, Temple-Inland informed its employees that "[e]veryone should begin getting their people ready for the first of what may be the next round of price increases."[143] IP internally circulated SSCC's January 2010 price increase announcement with the caption "Game On."[144]

Just one month later, IP announced another containerboard price increase of $60 per ton, effective April 1, 2010.[145] Two days later, GP announced an identical price increase, followed

---

SSCC reported taking a total of 1.029 million tons of containerboard market-related downtime in 2009, as compared with 245,000 tons in 2008. Ex. 206 (SSCC 00105079).

[137] Ex. 207 (SSCC 00216739).

[138] Ex. 208 (TIN Response to Pls.' Second Set of Interrogs.) at 31. *See also* Ex. 209 (Temple-Inland 00054893).

[139] *See* Ex. 210 (GP-KLEEN01433518); Ex. 211 (IP143746); Ex. 105 (TIN Supp. Responses to Pls.' Second Set of Interrogs.) at 23; Ex. 108 (GP-KLEEN00328735); Ex. 212 (SSCC 00341662); Ex. 213 (IP499465); Ex. 214 (SSCC 00341669). In seeking authorization for the price increase, IP noted that Longview Fibre and GP had announced price increases as well. Ex. 211.

[140] Ex. 215 (SSCC 00558708).

[141] Ex. 216 (SSCC 00541685).

[142] Ex. 217 (SSCC 00461402).

[143] Ex. 218 (Temple-Inland 00460864).

[144] Ex. 219 (IP375876).

[145] Ex. 220 (IP143747); Ex. 103 (IP Supp. Responses to Pls.' Second Set of Interrogs.) at Table 4.

by similar announcements from Temple-Inland, Norampac, SSCC, and PCA.[146] Prior to PCA announcing its April 2010 price increase, business records demonstrate that SSCC called the company directly to "see if pca [sic] announced."[147]

Defendants tried to raise prices a third time in 2010 but, according to Wall Street, the effort was thwarted by this litigation.[148] The AICC said that the third price increase of 2010 "calls into question the integrity of our industry", explicitly comparing defendants actions to the price increases of *Linerboard* years and allegations of inventory collusion.[149]

Defendants' synchronous price increases and capacity reductions, often undertaken in the face of contrary economic trends, are not the only evidence of their unlawfully concerted action. The record, even at this juncture, contains substantial contemporaneous evidence that tends to exclude the possibility that Defendants acted independently. *See e.g., In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 661 (7th Cir. 2002).

**Defendants Acted Against Unilateral Self-Interest**.  In general, reducing supply in the face of increasing demand, as Defendants did from 2004 into 2007, is contrary to unilateral independent self-interest,[150] as is announcing price increases when demand is plummeting, as Defendants did in 2008–2009.  Aside from these fundamental acts against individual self-interest, the following examples reflect additional actions against self-interest:

- IP "left a lot of money (7 figures+ at Vicksburg) on the table that we could have avoided" and "almost destroyed the local supply chain" with the amount of "surprise" downtime it took in the summer of 2005.[151]

---

[146] Ex. 102 at 15; Ex. 105 at 23; Ex. 221 (RockTenn Supp. Responses to Pls.' Second Set of Interrogs.) at 6-8; Ex. 143 (SSCC 00436551); Ex. 132 (PCoA000573450).  *See also* Ex. 222 (SSCC 00083034). Around the same time that Defendants were announcing their price increases, evidence suggests that Temple-Inland held an internal "antitrust discussion."  *See* Ex. 223 (Temple-Inland 01056628).

[147] Ex. 224 ( SSCC 00461427).

[148] *See* Ex. 225 (GP-KLEEN00142215) (Deutsche Bank reported that this litigation may have had a "cooling impact on price discipline").

[149] Ex. 226 (Temple-Inland 00312232).

[150] *See* Harris Decl., ¶¶ VI.A.1-9, at 35-39.

[151] *See* Ex. 227 (IP505217) at 2.

- Defendants' capacity reductions created a shortage of product in 2005, putting their ability to supply their customers at "great risk" because "[b]ottom line there is no paper, not only in our system, but with all of our trade partners."[152]

- With respect to the January 2006 price increase, several of Defendants lost business by "holding firm on the price increase."[153]

- Weyerhaeuser documented in 2006 that it was "constraining that Demand and may inadvertently be slowing back [its] mills."[154] The company further noted that "[l]owering prices to get volume (as opposed to protecting our existing business) will be the beginning of the end."[155]

- In 2007, Weyerhaeuser explicitly stated that it needed to "back up our strong pricing stance by walking away from business and taking the corresponding capacity (and subsequent costs) out."[156]

- IP's Marianne Parrs publicly announced in a November 2007 earnings call that "[w]e've intentionally passed on volume in favor of balancing our capacity with customers demand and this has enabled us to realize higher average selling prices."[157] During the same earnings call, CEO John Faraci publicly acknowledged that the company had "passed on volume in favor of balancing [its] capacity", in order to "realize higher average selling prices."[158]

- In 2008, when Weyerhaeuser closed an Iowa mill ostensibly due to a "flooding emergency,"[159] SSCC told Weyerhaeuser that it was "prepared to be very flexible and available to support Weyerhaeuser in any way you should be in need," rather than capitalize on an opportunity to gain more customers.[160]

---

[152] *See* Ex. 228 (Temple-Inland 00171025).

[153] *See* Ex. 229 (Temple-Inland 00993412) (estimating loss of approximately 9 million tons of box business, possibly due to "holding firm" on price increase); Ex. 230 (Lind Dep.) at 96:2-11 (testifying that Weyerhaeuser lost business by retaining the price increase); Ex. 231 (Vandiver Dep.) at 158:19-25; 159:1-9 (testifying that SSCC retained the price increase, despite losing volume).

[154] Ex. 232 (WY0218873).

[155] *Id.*

[156] Ex. 233 (WY0060881); Ex. 234 (WY0060738).

[157] Ex. 235 (IP839269).

[158] *Id.*

[159] Ex. 236 (Temple-Inland 00229927) (Citi Group reported that the mill was not damaged due to the flooding, but explained that the longer it was down, the "more it could become a factor in helping the price increase to stick").

[160] Ex. 237 (SSCC 00358651) at 653.

- Internal GP documents suggest that, while the company was raising prices in 2008, it had created a shortage of product and, as a result "[w]e are missing on business out West due to lead times."[161]

- Defendants' capacity cuts in 2009 artificially created a severe shortage of product. Inventories were reportedly the "lowest level on record", and at least one trade publication observed that some orders may be canceled due to the supply shortage.[162] Internal IP business records expressed similar concern.[163]  For example a production scheduler explained that that the company was "struggling" to fill orders.[164]

- PCA internally noted that its downtime planned for 2010 "leaves us with less tons to produce for [customers] for a short period of time in June and July."[165]

- In early 2010, SSCC worried over its low inventory numbers and its CEO publicly stated that it would "be difficult to contract much further"; nonetheless, the company "need[ed] to dump every legit ton [it] can."[166]

**Wall Street**.  Wall Street provided Defendants with a means to have ongoing discussions with each other about pricing and output levels.  Reports from, and informal contacts with, Wall Street analysts – particularly Mark Wilde, formerly of Deutsche Bank[167] – concerning contemporaneous price increases and output restrictions facilitated Defendants' monitoring of each other's behavior to ensure that each was acting in-line with the conspiracy.  Rather than focus on the usual analyst topics of valuations, margins, and earnings, Wall Street spent an inordinate amount of time communicating about the granular details of prices and supply of containerboard.  *See* Harris Decl., ¶¶ VI.E.1-16, at 49-55 (analyzing conduct of industry

---

[161] Ex. 238 (GP-KLEEN00329753) at 755.

[162] Ex. 239 (GP-KLEEN00002107).

[163] Ex. 240 (IP378165) (the company was "[n]ot sure what can be done, I know we are robbing Peter to pay Paul at this point. With the new 100K+ tons just beginning to ramp up and an expected slight uptick in the economy, we may be headed for a train wreck."); *see also* Ex. 241 ( IP378169).

[164] *See* Ex. 242 (IP494993).

[165] Ex. 243 (PCoA000378709).

[166] *See* Ex. 244 (SSCC 00181579); Ex. 245 (SSCC 00116657). Despite CEO Patrick Moore's comments, SSCC internally conveyed pleasure over increasing backlogs and backorders, writing that "[i]t just keeps getting better! Donald, we are living the dream…" Ex. 246 (SSCC 00543896).

[167] Notably, in 2006, Deutsche Bank went from owning no stock in SSCC to being the company's fourth-largest shareholder.  *See* Ex. 247  (SSCC, Schedule 14A, April 3, 2007) at 8 (Deutsche Bank AG listed as owning 7.11% of common stock).

consultants as "focal points" that both "facilitated coordinated behavior . . . [and] provided to Defendants a means to collude.").

Expert testimony from Stephen R. Read, former CEO and President of independent producer Shiffenhaus Company, during SSCC's 2010 bankruptcy proceedings is startling.[168]  Mr. Read explained that industry analysts could discuss pricing among the containerboard companies, whereas people working at the individual companies could not.[169]  When asked by the presiding judge, "They [the analysts] could collude for you?" Mr. Read replied, "That's exactly right . . . the analysts, they have this unique position in life where they can go out and – and talk to everybody."[170]

Indeed, Defendants used Wall Street coverage to publicly comment on the industry and capacity positions.  For instance, as noted above, PCA CEO Paul Stecko stated that no additional capacity was expected "in the foreseeable future."[171]  Equally, through Mr. Wilde, IP CEO John Faraci gave a presentation to eleven "clients" concerning "industry and competitive behavior – capacity management."[172]  Further, Defendants repeatedly referenced analyst reports, Mr. Wilde's in particular, to justify price increases.  Additional examples of Wall Street's role follow:

**2004**

- At the start of the Class Period, Mr. Wilde presented "A New Ball Game: A Review of the Containerboard & Corrugated Packaging Business," emphasizing that the industry had improved its "fundamentals" through lower inventories, rationalized capacity and

---

[168] SSCC filed for Chapter 11 bankruptcy protection in 2009, due to $4 billion in company debt, decline in demand, a soft economy, and frozen credit markets.  Ex. 248 (SSCC 00761773) at 7.  SSCC emerged from bankruptcy in 2010.

[169] *See* Ex. 249 (S. Read testimony, Smurfit-Stone bankruptcy proceeding) at 28-29.

[170] *Id.*

[171] Ex. 179 at slide 8.

[172] Ex. 250 (IP107512) at 513.

consolidation.[173]  These "fundamentals," Wilde observed, would "restore margins." He asked: "How do we react?"[174]

- Following Defendants' 2003 and early 2004 output restrictions, Mr. Wilde announced that inventories were at "an extremely lean level",[175] enabling Defendants to implement their June 2004 price increase.

**2005**

- In April, Mr. Wilde told Defendants that operating rates and inventory levels were not "strong enough to truly 'drive' a spring price hike initiative," explaining their apparent inability to implement a Spring price increase.[176]  Defendants SSCC, IP, and Norampac then undertook capacity reductions.[177]

- Mr. Wilde signaled that Weyerhaeuser's announcement of a 2005 mill closure will make it "significantly easier to push through the price hikes that the industry desperately needs to offset rising input costs."[178]  Citigroup similarly wrote that, "[w]ith the US c'bd market at historically-tight levels in terms of inventories, … it is rather likely that another containerboard price increase will be announced in coming weeks with an effective date in January or February."[179]  Defendants announced the January 2006 price increase promptly after these reports were issued.

- In May 2005, SSCC proposed using outside consultants as a conduit to increase pricing transparency, creating a platform for a Defendant-controlled pricing index.[180]  SSCC also suggested merging the top three integrated companies' box plant assets into a single joint-venture that would hold nearly 50% of the market share and "hence significant pricing control."[181]

- Just three months later, in August 2005, SSCC and its outside consultants prepared a report for the SSCC Board of Directors that framed pricing as a communication, not with customers, but with competitors and recommended "correlate with competitors strategies (e.g. mill closings)[.]"[182]  Weyerhaeuser announced a similar initiative that September.[183]

---

[173] *See* Ex. 165.

[174] *See id*. (emphasis added).

[175] Ex. 167.  Mr. Wilde opined that the June 2004 price increase would "go down as the biggest single year price gain in the containerboard history." Ex. 251 (Temple-Inland 00018722).

[176] Ex. 252 (Temple-Inland 00023652).

[177] Discussed *supra*.

[178] Ex. 180.

[179] Ex. 253 (GP-KLEEN01018281).

[180] Ex. 72 at 595.

[181] *Id*. at 601 ( top three integrated companies participating in the joint venture were SSCC, WY and IP).

[182] Ex. 254 (SSCC 00368155) at 16, 18.

Like SSCC, Weyerhaeuser engaged outside consultants to "help us identify where we want to be and what we must do to get there."[184]  The goal was for Weyerhaeuser to "fundamentally change our business."[185]  The Weyerhaeuser and SSCC reorganizations were so similar that one Weyerhaeuser employee noted: "[l]ooks like some folks took a page out of our playbook."[186]

## 2007

- Credit Suisse circulated to Defendants an annual report (entitled the "Holy Grail") that emphasizes that "[g]roup behavior matters more than individual behavior, and CEOs need to build their strategies with an eye toward encouraging constructive (rather than destructive) group behavior."[187]  At Weyerhaeuser, Vice President Carl Bohm internally distributed the Holy Grail.[188]  International Paper CEO John Faraci forwarded the Holy Grail to his team, writing "This piece is not scripture, but is thoughtful, and worth reading."[189]  One month later, Defendants collectively attempted to raise prices.

- By October, Wall Street wondered aloud whether Defendants would raise prices in the first quarter of 2008.[190]  Within a month, IP built a $40 per ton price increase into its 2008 budget, a scenario worth "about $20 million for 2008 for IP[ ]."[191]  Two months after that, SSCC began contemplating a Spring 2008 price increase.[192]

## 2008

- Following the unimplemented Spring price increase, Mr. Wilde specifically recommended that "big integrated producers" "sacrifice volume and adopt new pricing policies."[193]  Defendants responded accordingly and, by June 2008, Wall Street reported

---

[183] Ex. 255 (WY0123247).

[184] *Id.*

[185] *Id.*

[186] Ex. 256 (WY0062505).

[187] Ex. 257 (IP195308) at 339.

[188] Ex. 258 (WY0212169).

[189] Ex. 259 (IP331824).

[190] Ex. 260 (Temple-Inland 00036509). In response to Mr. Wilde's report, Weyerhaeuser commented that it was "interesting how they hammered us for trying a price increase in the first quarter, saying you don't get increases that time of year, and now they are suggesting an increase for 1st Q '08. These folks are just slimy." Ex. 261 (WY0210300).

[191] Ex. 262 (IP361760).

[192] Ex. 263 (SSCC 00568150).

[193] Ex. 264 (NORAMPAC00056349).

that industry capacity was down (inventories had dropped by approximately 2%), while operating rates hovered around 95%.[194]

- Wall Street reported that the "current market dynamics" suggest that a price increase for summer 2008.[195] The **next** day, Defendants began announcing the July 2008 price increase.

**2009**

- In October, Mr. Wilde reported that the market needed to announce permanent capacity closures, and hinted that IP and SSCC would be announcing such closures immediately.[196] Telephone records obtained by Plaintiffs during discovery show that approximately one week earlier, on September 24, 2009, Mr. Wilde had three telephone calls with IP's Vice President of Investor Relations, Tom Cleves.

When Defendants did not fully realize their October 2008 price increase, Mr. Wilde called for and predicted additional capacity reductions.[197] That prediction proved accurate as reflected in Defendants' supply reductions throughout 2009.

**Discipline**. Defendants' frequent use of the term "discipline" and the contexts in which it appears suggest that it is a signal for and a monitor of "good (*i.e.*, non-competitive) conduct" that facilitated the alleged conspiracy. SSCC explained that it had created "industry discipline" as the market leader,[198] whereas "[u]ndiscplined pricing behavior undermines the integrated business model."[199] The April 2006 price increase, according to Norampac, required "serious discipline" in order for it to be implemented.[200] Defendants' capacity closure announcements were "also known as 'market discipline'."[201]

---

[194] Ex. 265 (IP507211). Market conditions were reportedly "the perfect storm" for obtaining containerboard and box price increases. Ex. 266 (SSCC 00697545).

[195] Ex. 267 (NORAMPAC00056357).

[196] Ex. 268 (Temple-Inland 01309468/70).

[197] Ex. 269 (IP337685) at 689.

[198] *See* Ex. 164.

[199] Ex. 72 at 593.

[200] Ex. 270 (NORAMPAC00037977).

[201] Ex. 271 (PCoA000049619).

Wall Street spread Defendants' messages of "discipline" and "good conduct." In the 2004 edition of its Holy Grail publication, Credit Suisse proclaimed that that containerboard producers, as a group, "arguably demonstrat[e] the most discipline among all the major grades [of paper products]" as "[s]everal producers [ ] have taken action to address the recent capacity imbalance."[202] In its "Cashing In On Consolidation" publication, McKinsey announced that, among other things, "[m]arket leaders may be equally interested in promoting good conduct by reigning in excess capacity, but misaligned profiles on the cost curve can make the cost of that good conduct prohibitive particularly if another significant player does not follow the leadership actions."[203] Mr. Wilde reported that IP "may still have to show discipline on the supply side to ensure success on this hike", referring to IP's announcement that it would increase prices in October 2008.[204]

**Trade Association Meetings**. Trade association meetings, such as those organized by the American Forest and Paper Association ("AF&PA") and Fibre Box Association ("FBA"), provided opportunities for Defendants to meet in person to discuss and effectuate the conspiracy throughout the Class Period. As SSCC informed Temple-Inland, attending the meetings, as well as the "ramp up" and "post [meeting] dialogue", "creates considerable energy and opportunities for all companies involved."[205] *See* Harris Decl., ¶ V.H.1, at 32 ("It is well documented that trade associations tend to facilitate collusive conduct.").

Defendants' attendance at trade association coincided with several significant events. For example:

- As discussed above, in and around March 2004, high-level executives from Defendants attended AF&PA meetings to discuss, among other things, proposed changes to the trade associations' collection of statistics.[206] Around the same time, Defendants SSCC, PCA,

---

[202] *See* Ex. 272 (SSCC 00121719).

[203] Ex. 273 (GP-KLEEN00141864) at 870.

[204] *See* Ex. 274 (GP-KLEEN00630665).

[205] Ex. 275 (SSCC 00625963).

[206] *See* Ex. 169. The meetings were also attended by Deutsche Bank analyst Mark Wilde. *See id.* at 456.

IP and, later, GP circulated remarkably similar internal "battle cry" memoranda, calling for price increases, increased downtime and capacity reductions.[207]

- In October 2004, the AF&PA circulated draft antitrust guidelines for its members – not for itself. Therein, it advised Defendants to implement "changes" that "reduce the risk of antitrust litigation."[208] The guidelines frankly state that they were intended to "make the industry less vulnerable to lawsuits" and were sent to Defendants' CEOs to distribute to their "troops."[209] They warned Defendants not to say things like, "[t]he industry needs to show some discipline to get prices up", or "[w]e all need to recognize that there is too much capacity and we need to do something about it",[210] and were endorsed for use by all members during the October 30, 2004, AF&PA Board of Directors meeting, attended by CEOs from IP, Temple-Inland, SSCC, and Weyerhaeuser.[211] Shortly after the March 2005 price increase attempt, in April, Defendants attended an AF&PA seminar entitled "Are You Vulnerable to Lawsuits?", specifically referring to antitrust litigation.[212]

- As Defendants were announcing their Spring 2005 price increases, company representatives attended a Paperboard Packaging Alliance meeting.[213] As noted above, Defendants did not fully implement this price increase, conduct high-level executives from GP, IP, SSCC, Temple-Inland, and Weyerhaeuser could discuss while attending the ICCA annual Management Conference in April 2005.[214]

- After GP, IP, SSCC, Temple-Inland and PCA personnel attended an AF&PA Executive Committee meeting,[215] Defendants began announcing the January 2007 price increase.

- Shortly after high-level executives from Norampac, SSCC and Weyerhaeuser, along with Deutsche Bank analyst Mark Wilde, were to attend an ICCA meeting,[216] IP, PCA and Temple-Inland announced their intentions to raise prices in the Spring of 2007.

- Just prior to announcing the March 2008 price increase, representatives from SSCC, GP, Weyerhaeuser, Temple-Inland, Norampac and IP attended an FBA meeting.[217] This price

---

[207] *See* Ex. 163; Ex. 168; Ex. 164; Ex. 166.

[208] Ex. 276 (PCoA000218626).

[209] *Id*. at 627-628.

[210] *Id.* at 631.

[211] Ex. 277 (SSCC 00305730).

[212] *See* Complaint, ¶ 63.

[213] Ex. 278 (AFPA_ESI_00702).

[214] Ex. 279 (ICCAKP0001536).

[215] *See* Ex. 280 (AFPA-P-CF-00998).

[216] *See* Ex. 281 (NORAMPAC00009806). Notably, one month earlier, John Faraci of IP and Kenny Jastrow of Temple-Inland were elected as 2007 Officers of the AF&PA Board. Ex. 282 (AFPA-P-CF-01003) at 01005.

[217] Ex. 283 (AFPA_ESI_00017).

increase was also not completely implemented, which executives from GP, IP, SSCC, Temple-Inland, PCA and Weyerhaeuser had the opportunity to discuss while attending an AF&PA meeting held around the same time.[218]

- While Defendants were announcing the April 2010 price increase, representatives from IP, SSCC, PCA and Temple-Inland attended a Corrugated Packaging Alliance meeting.[219]

- At the same time that the August 2010 price increases were being announced, Bill Hoel, International Paper's box division Vice President, attended an AF&PA meeting in Chicago with the CEO of Temple-Inland and other Vice Presidents from SSCC, Georgia-Pacific, Rock-Tenn and PCA.[220]

As noted above, Judge Shadur found it "striking" that price increases at issue in this case often came "soon after industry gatherings" and gave this evidence "significant weight" in denying Defendants' motion to dismiss.[221]

**Inter-Defendant Communications**.    In addition to all of the above, evidence demonstrates that Defendants directly communicated with each other, including Defendants' CEOs.  Aside from the communications listed below, a canvas of available telephone records reveals numerous calls between telephone numbers associated with Defendants' CEOs and high level executives that coincide with Defendants' price increase initiatives.

- SSCC CEO Patrick Moore and PCA CEO Paul Stecko appear to have met the same month that Defendants announced the February/March 2004 price increase, and again one week before PCA announced the June 2004 price increase (SSCC had also yet to announce its price increase at that time).[222]  Telephone records obtained during discovery suggest that the CEOs spoke on January 30 and February 7, 2007, and that Mr. Moore spoke with WY CEO Steve Rogel on February 2, 2007, all of which followed the unimplemented January 2007 price increase.

- "Tom Haymen of Weyerhaeuser called" SSCC by February 24, 2005 to inform it of its price increase.[223]

---

[218] Ex. 284 (AFPA_ESI_01982).

[219] *See* Ex. 285 (PCoA000050903).

[220] Ex. 286 (IP132212).

[221] Order Denying Motions to Dismiss (ECF #193) at 18.

[222] *See* Ex. 287 (SSCC 00171404) at 409, 414.

[223] Ex. 141 (SSCC 00362042).

- On April 12, 2006, IP CEO John Faraci appears to have met with new GP President Joe Moeller for a private lunch, shortly after a price increase was implemented.[224]

- In September 2006, two senior containerboard executives from SSCC and Weyerhaeuser appear to have had dinner together.[225]

- SSCC's Brian McGurk emailed Temple-Inland in 2006 that he was "[l]ooking forward to seeing both of you on Wednesday in Chicago @3:00pm in the Marriott. We have a meeting room booked and I will forward you the specifics shortly."[226]

- As noted above, IP led the April/May 2007 price increase. Telephone records obtained during discovery demonstrate that IP CEO John Faraci called CEOs from Temple-Inland and WY while the price increase was being announced and implemented. These same records also show that PCA CEO Paul Stecko called WY CEO Steve Rogel around this time period as well.

- A December 2007 internal SSCC email entitled "IP Opportunity" suggested that Mathew Blanchard contact or meet with "Glen" to develop his "relationship with him" and "maybe [] get some straight answers about what they are doing", among other things.[227] Defendants began announcing the March 2008 price increase the next month.

- Seven days after Temple-Inland implemented its July 2008 price increase, SSCC CEO Patrick Moore left a voice message for its CEO, Doyle Simons, "following up on the discussion we had at dinner in Seattle" and attempting to plan another dinner to "get caught up on some things."[228]

- In the midst of implementing capacity cuts in 2009, IP CEO Faraci spoke directly with GP CEO James Hannan, first regarding "our project" and later to see "where we are."[229] The two appear to have spoken again shortly after the January 2010 price increase was implemented.[230]

- The day before SSCC had joined the January 2010 price increase, it arranged an in-person meeting with IP in San Diego.[231]

---

[224] Ex. 288 (IP334071).

[225] Ex. 289 (SSCC 00359808/09).

[226] Ex. 182.

[227] Ex. 290 (SSCC 00357029).

[228] Ex. 291 (Temple-Inland 00269382).

[229] Ex. 292 (GP-KLEEN00945138) at 141; Ex. 293 (IP340330). *See also* Ex. 294 (GP-KLEEN00981469) at 470; Ex. 295 (GP-KLEEN00981452); Ex. 296 (IP337574).

[230] Ex. 297 (IP338348).

[231] Ex. 298 (SSCC 00126523).

- In December 2009, Jerry Pearlman of Ameritech sent an email to SSCC CEO Patrick Moore wherein he referred to himself (and others) as "future stockholders" and told CEO Moore that "[i]t would be terrific if GP would [ ] do something about capacity."[232]

**Inter-Defendant Trades and Exchanges**.     Trades also provided Defendants with a means to communicate directly concerning the conspiracy. *See* Harris Decl., ¶ VI.B.5, at 41 ("The use of trades between Defendants as well as inter-Defendant sales of product also provided the opportunity for communication between the Defendants.   Not only were the Defendants discussing their trade needs but also the downtime and closures of their mills."). As noted above, trades were one mechanism through which Defendants achieved *de facto* consolidation, serving as each other's largest customers.   Under the guise of a trade relationship, Defendants also discussed their anticompetitive schemes, including pricing and capacity decisions.   Examples of inter-Defendant communications, ostensibly concerning "trades", are listed below:

- In September 2007, SSCC met with Temple-Inland concerning their trading of white top.[233]   Notes taken by SSCC during this meeting reveal that Temple-Inland shared capacity information concerning its ability to produce medium. [234]

- Discussion notes from a trade meeting between SSCC and IP demonstrate that one of SSCC's true objectives was to "[g]et info on what IP is doing & where they are going."[235]

- SSCC gave IP a "high level overview of its 2008 position relative to swing capacity" in the context of a trade discussion.[236]

- Weyerhaeuser testified in this litigation that it notified competitors who were also trading partners of its future maintenance downtime.[237]

- SSCC executive Brian McGurk directly informed Temple-Inland of its August 2010 price increase.[238]   Mr. McGurk testified in this litigation and could not explain why he

---

[232] Ex. 299 (SSCC 00219326).

[233] Ex. 300 (SSCC 00355574). *See also* Ex. 301 (Mark Polivka Dep.) at 96-97.

[234] *See* Ex. 300 at 575.

[235] Ex. 302 (SSCC 00356678).

[236] Ex. 93 at 073.

[237] Ex. 21 (James Keller Dep.) at 212:1–4.

[238] Ex. 303 (SSCC 00518759).

informed Temple-Inland, a trade partner, of the price increase before it was public information.[239]

- Although IP's antitrust policy ensured that personnel involved in trades only had access to trade pricing (and not pricing for open market containerboard sales),[240] in reality the same person who set trade pricing for IP oversaw pricing for all of IP's containerboard sales.[241]

**Incestuous Hiring of Senior Executives**. Senior personnel moved between companies, revealing the common nature of operations among these producers and fostering collegial behavior and exchange of information among these "rivals." For instances:

- In 2006, SSCC filled three executive positions with hires from GP: Steven Klinger, Steve Strickland, and Matt Denton.[242] Mr. Klinger became SSCC's Chief Operating Officer, Mr. Strickland the Senior Vice President of Sales for the Container Division, and Mr. Denton the Senior Vice President of Business Analysis.[243]

- In early 2010, Mike Exner officially joined SSCC as the company's Senior Vice President and General Manager of the Containerboard Mill division, after working at IP 17 years.[244] IP agreed to release Mr. Exner from his non-compete agreement to facilitate the move.[245]

- Internal SSCC documents suggest that the company gained propriety information concerning other Defendants from these and similar hires.[246]

All of the evidence accumulated thus far and detailed above is common among Class members as proof of Defendants' liability under the antitrust laws. Defendants engaged in simultaneous price increases and waves of output reductions, and their contemporaneous business records reveal that, *inter alia*, they undertook numerous actions against their unilateral

---

[239] Ex. 304 (McGurk 30(b)(6) Dep.) at 98.

[240] Ex. 78 at 324:13-325:13.

[241] *Id*. at 13:5-15:11; 39:20-40:17; 105:23-106:21.

[242] Ex. 305 (SSCC 00479424) at 59, 61.

[243] *Id.*.

[244] *Id*. at 60.

[245] Ex. 178 at 282-84.

[246] *See, e.g.*, Ex. 306 (SSCC 00366286) (noting use of Matt Denton's knowledge of GP during trade negotiations); Ex. 307 (SSCC 00366322) (using former IP employee to analyze most likely mill closures by IP); Ex. 308 (SSCC 00134511) (suggesting that a business analyst make use of recent hire Senior VP of Mill Division Michael Exner's knowledge of IP).

self-interest, often communicated directly with one another, and used Wall Street to transmit messages concerning price, output and "discipline." Common proof demonstrates that throughout the Class Period Defendants were acting collusively and not as would be expected from rational, individual profit-maximizing firms.

## III.   ARGUMENT

### A. HORIZONTAL CONSPIRACY CLAIMS ARE COMMONLY CERTIFIED AS CLASS ACTIONS AND ARE AN IMPORTANT MEANS OF ENFORCING THE ANTITRUST LAWS

Over 40 years ago, the Supreme Court recognized the importance of private litigation in enforcing federal antitrust laws:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. . . . Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation. By offering potential litigants the prospect of recovery of three times the amount of their damages, Congress encouraged these persons to serve as "private attorneys general." . . . Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture.

*Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (citation omitted).

In recent years, federal courts have certified classes in dozens of antitrust conspiracy cases involving a wide range of products and industries, reflecting the fact that these cases are "particularly well suited" for class treatment under Rule 23. *See, e.g., Urethane*, 251 F.R.D. at 635; *Messner*, 669 F.3d at 815; *Sullivan v. DB Investments*, 667 F.3d 273, 298 (3d Cir. 2011) (en banc); *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) (". . . a class-action lawsuit is the most fair and efficient means of enforcing the law where antitrust violations have been continuous, widespread, and detrimental to as yet unidentified consumers.")

(citations omitted).[247]  The conduct of defendants, the showing of impact, and the measurement

of damages are central issues in antitrust conspiracy cases.  *See Urethane*, 251 F.R.D. at 635;

*Sullivan*, 667 F.3d at 298. Here, Plaintiffs meet all the requirements for class certification under

Rule 23.

---

[247] Some of the many cases granting or affirming class certification in antitrust actions include: *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291 (N.D. Cal. 2010), *abrogated on other grounds by In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012); *In re EPDM Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009); *Scrap Metal*, 527 F.3d 517; *In re Pressure Sensitive Labelstock Antitrust Litig.*, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007); *In re Polyester Staple Antitrust Litig.*, 2007 WL 2111380 (W.D.N.C. July 19, 2007); *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393 (S.D. Ohio 2007); *In re Sulfuric Acid Antitrust Litig.*, MDL No. 1356, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007);  *OSB*, 2007 WL 2253418; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166 (N.D. Cal. June 5, 2006); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, 2006 WL 891362 (D.N.J. Apr. 4, 2006); *In re Carbon Black Antitrust Litig.*, 2005 WL 102966  (D. Mass. Jan. 18, 2005); *In re Currency Conversion Fee Antitrust Litig.*, 2004 WL 2327938 (S.D.N.Y. Oct. 15, 2004); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661 (D. Kan. 2004); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003); *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79 (E.D. Pa. 2003); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159 (C.D. Cal. 2002); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.D.C. 2002); *DeLoach v. Philip Morris*, 206 F.R.D. 551 (M.D.N.C. 2002); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3d Cir. 2002); *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305 (S.D.N.Y. June 6, 2001); *In re Bromine Antitrust Litig.*, 203 F.R.D. 403 (S.D. Ind. 2001); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001); *In re Monosodium Glutamate Antitrust Litig.*, 205 F.R.D. 229 (D. Minn. 2001); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162 (S.D.N.Y. 2000); *Paper Sys., Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601 (E.D. Wisc. 2000); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999); *Sebo v. Rubenstein*, 188 F.R.D. 310 (N.D. Ill. 1999); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231 (E.D.N.Y. 1998); *In re Plastic Cutlery Antitrust Litig.*, 1998 WL 135703 (E.D. Pa. Mar. 20, 1998); *In re Commercial Tissue Antitrust Litig.*, 183 F.R.D. 589 (N.D. Fla. 1998); *In re Medical X-Ray Film Antitrust Litig.*, 1997 WL 33320580 (E.D.N.Y. Dec. 26, 1997); *Lumco Indus., Inc. v. Jeld-Wen Inc.*, 171 F.R.D. 168 (E.D. Pa. 1997); *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18 (N.D. Ga. 1997); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996); *In re Citric Acid Antitrust Litig.*, No. 95-1092, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996); *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996); *In re High Fructose Corn Syrup Antitrust Litig.*, 936 F. Supp. 530 (C.D. Ill. 1996);*In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993); *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229 (M.D. Fla. 1993); *In re Infant Formula Antitrust Litig.*, 1992 WL 503465 (N.D. Fla. Jan. 13, 1992); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677 (N.D. Ga. 1991).

## B.  STANDARD OF REVIEW

The inquiry at class certification centers on whether predominantly common proof can be presented to support a plaintiff's allegations. *Messner*, 669 F.3d at 818; *Saltzman*, 257 F.R.D. at 475.  Plaintiffs need not prove their case on the merits at the class certification stage.  *Id*.  In deciding class certification, courts perform a "rigorous analysis" under Rule 23. *Dukes*, 131 S. Ct. at 2551 (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001). Such an analysis requires courts to "probe beyond the pleadings," scrutinize the record presented (including the expert reports), and determine whether Plaintiffs' claims are susceptible to common proof at trial. *Szabo*, 249 F.3d at 677.

## C.  THE CLASS IS ASCERTAINABLE AND RULE 23(a) IS SATISIFIED

### 1.  **The Class is Ascertainable**

Plaintiffs' proposed Class definition satisfies the threshold requirement that a class definition be ascertainable.  *See* Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class[.]"); *Manual for Complex Litigation* § 21.222, at 270 (4th ed. 2005) ("The definition must be precise, objective, and presently ascertainable.").  Here, the proposed Class is defined as:

> All persons that purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010.
>
> Specifically excluded from this Class are the Defendants; officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from this Class are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

This definition is sufficiently precise and includes all direct purchasing customers of Containerboard Products identified in sales data produced by Defendants. The products at issue include containerboard (linerboard and medium), containerboard sheets, and corrugated products (including boxes), all of which are commodity products produced by all Defendants. *See* Harris Decl., ¶ II.B.1., at 8; ¶ V.D.1-6, at 27-30 (Containerboard Products are commodities). The proposed Class Period has clear beginning and ending dates, and the class is limited to purchases of Containerboard Products directly from Defendants for delivery in the United States. For these reasons, the Class is properly defined and Class members can be identified (and notified) with the use of Defendants' sales records. *See Saltzman*, 257 F.R.D. at 476; *Urethane*, 251 F.R.D. at 632 (approving similar class definition). This Class definition is precisely the same as that certified by this Court as a result of Plaintiffs' settlement agreement with PCA.[248]

## 2.   The Proposed Class Satisfies All Requirements Under Rule 23(a)

### a.  Numerosity is Satisfied

The first Rule 23(a) requirement is that the proposed class is so numerous that joinder is "impracticable." Fed. R. Civ. P. 23(a)(1). The electronic sales data produced by Defendants in discovery identifies many thousands of direct purchasers of Containerboard Products, which easily establishes numerosity. *See* Dwyer Rep., ¶ 32, at 11, fn. 20 (describing analysis of thousands of customers and hundreds of thousands of class products transactions). *See also Schmidt v. Smith & Wollensky LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010) ("a class of more than 40 members is generally believed to be sufficiently numerous") (citation omitted).

### b.  Commonality is Satisfied

Second, Rule 23(a) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must show that resolution of an issue of fact or law "is central

---

[248] *See* Order Preliminarily Approving Settlement, Conditionally Certifying the Settlement Class, Appointing Class Counsel for the Settlement Class, Approving Notice Plan, and Setting a Final Approval Hearing, dated May 6, 2014, at ¶3.2 (ECF #634).

to the validity of each" class member's claim and "[e]ven a single [common] question will" satisfy the commonality requirement. *Dukes*, 131 S. Ct. at 2551, 2556 (internal citation omitted). Here, the common issues include:

- Whether Defendants participated in an unlawful conspiracy to fix, raise, maintain, and/or stabilize prices for Containerboard Products in violation of Sherman Act §1 ;

- The duration and extent of the unlawful conspiracy;

- Whether Defendants' conduct in fact caused damages to the Class arising from their purchases of Containerboard Products;

- The appropriate measure of damages to the Class; and

- Whether the Class is entitled to injunctive and other equitable relief.

All of these issues are central to Class members' claims, and any one of them establishes commonality under Rule 23(a). Courts routinely find that cases involving conspiracy allegations present common questions. *See, e.g.*, *Thillens, Inc. v. Cmty. Currency Exch. Ass'n*, 97 F.R.D. 668, 677 (N.D. Ill. 1983) ("the overriding common issue of law is to determine the existence of a conspiracy"); *NASDAQ*, 169 F.R.D. at 509 (same); *see also In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222, 233 (E.D. Pa. 2012); *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 613 (D. Kan. 1995).

### c. Typicality is Satisfied

Rule 23(a)'s third requirement is that class representatives' claims be "typical" of the proposed class's claims. Fed. R. Civ. P. 23(a)(3). Typicality "is closely related to commonality and should be liberally construed." *Saltzman*, 257 F.R.D. at 479. When "the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory", factual differences among class members do not defeat typicality. *Id.* (citation omitted). Typicality is a "low hurdle", requiring "neither complete coextensivity nor even substantial identity of claims." *Owner-Operator Indep. Drivers' Ass'n v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 282 (N.D. Ill. 2005).

In antitrust cases, typicality is satisfied where "plaintiffs and all class members alleg[e] the same antitrust violations by defendants." *Rubber Chemicals*, 232 F.R.D. at 351 (quotation marks omitted); *see also Urethane*, 251 F.R.D. at 640 ("[t]ypicality refers to the nature of the claims … not the individual characteristics of the plaintiff") (citation omitted). Where "it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical[.]" *Linerboard*, 203 F.R.D. at 207 (quoting *Catfish*, 826 F. Supp. at 1035).

The proposed Class representatives here are the named Plaintiffs: Kleen Products LLC; Mighty Pac, Inc.; RHE Hatco, Inc.; Chandler Packaging, Inc.; R.P.R. Enterprises, Inc.; Distributors Packaging Group, LLC;[249] and Ferraro Foods, Inc./Ferraro Foods of North Carolina, LLC. Like all members of the proposed Class, each representative purchased Containerboard Products (containerboard sheets and/or containerboard boxes) directly from at least one named Defendant during the proposed Class Period and paid higher prices as a result of Defendants' collusion. Dwyer Rep., ¶ 50, at 19 (explaining that "defendants price increases not only caused market-wide price increases, but that these price increases were disseminated to all or nearly all class members.").

All the named Plaintiffs and proposed Class members allege that Defendants conspired to restrict containerboard supply and raise prices of Containerboard Products during the relevant period. The claims arise from the same events or course of conduct, are based on the same legal theory, seek the same remedy, and thus satisfy typicality under Rule 23(a). *See Saltzman*, 257 F.R.D. at 479.

---

[249] The assets of Distributors Packaging Group, LLC ("DPG") were sold in 2013, but the rights and obligations relating to this litigation were specifically excluded and reserved to MTM Packaging Solutions of Texas, LLC. ("MTM"). The former owner of DPG and current owner of MTM continues to prosecute this action and recently testified at deposition. Plaintiffs intend to seek leave of Court to substitute MTM for DPG.

### d. Adequacy is Satisfied

Finally, Rule 23(a) requires that the proposed class representatives fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a)(4). Adequacy is a two-part test: (i) the named Plaintiffs cannot have claims in conflict with other class members, and (ii) the named Plaintiffs and proposed class counsel must demonstrate their ability to litigate the case vigorously and competently on behalf of named and absent class members alike. *See Kohen,* 571 F.3d at 679; *Urethane*, 251 F.R.D. at 644.

Here, the named Plaintiffs have no conflicts with other members of the putative Class. Rather, their interests are aligned because they, like all direct purchasers, have been injured by the same alleged conduct – a conspiracy to raise prices – and they, like all direct purchasers, share a strong interest in establishing Defendants' liability under the antitrust laws and maximizing class-wide damages. The first prong of the adequacy requirement is satisfied. *See Harman v. Lyphomed, Inc.*, 122 F.R.D. 522, 528 (N.D. Ill. 1988); *see also Cardizem CD*, 200 F.R.D. at 306 ("Defendants' arguments about potential conflicts of interest are thus insufficient to deny class certification.").

Plaintiffs are represented by counsel with substantial antitrust and class action litigation experience. *See* ECF Nos. 100, 101 (Memorandum in Support of Motion to Appoint the Mogin Law Firm, P.C. and Freed Kanner London & Millen LLC as Interim Co-Lead Class Counsel and Joint Declaration of Daniel J. Mogin and Michael J. Freed). Throughout the pendency of this case, both the named Plaintiffs and Class Counsel have pursued the matter vigorously and competently on behalf of the putative Class, most recently in reaching a settlement with Defendant Packaging Corporation of America, which Plaintiffs submit is an excellent result for all proposed Class members. Accordingly, "there is no ground for supposing that plaintiffs will not adequately represent the class" going forward. *In re Glassine and Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 306 (E.D. Pa. 1980).

### D.  PLAINTIFFS SATISFY RULE 23(b)(3)'s PREDOMINANCE REQUIREMENT

Plaintiffs must also satisfy the "predominance" and "superiority" requirements under Rule 23(b)(3) by showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As to predominance, "[c]onsiderable overlap exists between the court's determination of commonality and a finding of predominance.  A finding of commonality will likely satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts."  *Saltzman*, 257 F.R.D. at 484.  Every issue in the case need not be common; the question, rather, is whether substantial common issues predominate.  *See Messner*, 669 F.3d at 815; *NASDAQ*, 169 F.R.D. at 517 (predominance is satisfied unless "it is clear that individual issues will overwhelm the common questions").  Predominance typically is met where "there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis[.]" *Vitamins*, 209 F.R.D. at 262.  Predominance is "readily met" in many antitrust cases.  *Amchem*, 521 U.S. at 625.

Plaintiffs establish predominance if common proof may be used at trial to support the key elements of their claims – here, whether Defendants conspired, whether the conspiracy impacted prices and the measure of damages.  *See, e.g., Messner*, 669 F.3d at 815; *Sullivan*, 667 F.3d at 298-301 (predominance is met because antitrust conspiracy claims necessarily turn on Defendants' common course of conduct and a common theory of market impact); *Fox v. Riverview Realty Partners*, No. 12 C 9350, 2014 U.S. Dist. LEXIS 55260, at **16-24 (N.D. Ill. Apr. 22, 2014) (distinguishing *Comcast*, 133 S. Ct. 1426, and finding that plaintiffs' proposed damages methodology satisfied the predominance requirement under Rule 23).[250]

---

[250] Defendants may argue that the Supreme Court's *Comcast* requires presentation of a final formal damages study at the class certification stage, but several courts have rejected an overbroad reading of *Comcast* in antitrust cases that have been certified as class actions, including *In re Electronic Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293, at *26 (S.D.N.Y. Mar. 28, 2014) (noting that

The Supreme Court instructs that Rule 23(b)(3) requires a finding that questions common to a proposed class predominate, not a determination of those questions on the merits. *See Amgen*, 133 S. Ct. at 1191. Defendants in antitrust conspiracy cases invariably contend that pricing dispersion or product variation preclude a finding of predominance, but "[t]he issue for Rule 23(b)(3) purposes is not whether there are individualized issues—there are some individualized issues in virtually every situation in which class certification is sought—but rather whether common issues predominate over any individualized issues." *Fox v. Riverview Realty*, 2014 U.S. Dist. LEXIS at *17; *see also Citric Acid,* 1996 WL 655791 at *7 ("Contentions of infinite diversity of product[s], marketing practices, and pricing have been made in numerous cases and rejected."); *accord In re K-Dur Antitrust Litig*., 686 F.3d 197, 221-22 (3d Cir. 2012) (price variations not sufficient to defeat predominance), *vacated by Upsher-Smith Labs v. Louisiana Wholesale Drug*., 133 S. Ct. 2849, *reinstated as to class cert.*, 2013 WL 5180857 (3d Cir. Sept. 9, 2013).

## 1.  <u>The Alleged Conspiracy is a Central Common Issue</u>

A trial in this case will involve common proof of conspiracy—through witness testimony, documents, email and phone records, and other evidence relating to Defendants' conduct. In addition, there is the economic evidence common to the class. Class Plaintiffs' economics expert, Dr. Harris, conducted a standard structure-conduct-performance analysis[251] of the Containerboard industry and concluded: "The structure, conduct and performance of this industry support my economic opinion that the Defendants engaged in collusive behavior rather

---

"although [defendant] cites *Comcast* [] no fewer than ten times in its briefing of its motion to exclude [expert's] opinions, it seems to have overlooked the Court's recognition that, in an antitrust case, damages 'calculations need not be exact.'") (quoting *Comcast*); *Allan v. RealComp II, Ltd*., No. 10-cv-14046 (E.D. Mich. Mar. 30, 2013) (slip op. attached as Ex. 309) ("*Comcast* is distinguishable. . . . Here, Plaintiffs have alleged a single, unified theory, and the expert model accounts for it." *Id*. at 23 n.4); and, most recently, *In re Polyurethane Foam Antitrust Litig.*, MDL No. 2196 (N.D. Ohio) (April 9, 2014 opinion sealed; April 16, 2014 Order attached as Ex. 310).

[251] Dr. Harris describes a structure-conduct-performance analysis as a "paradigm . . . utilized by economists to understand economic outcomes." Harris Decl., ¶ V.1, at 22.

than independent behavior. The Defendants had the motive, opportunity and means to collude." Harris Decl., ¶ VIII.1, at 59. Dr. Harris found that the economic structure of the industry was one that was "consistent with and would facilitate successful collusion among the Defendants." *Id*., ¶ V.I.1, at 33. He further found that his preliminary review of defendants' conduct was "more consistent with collusion than with independent economic decision-making, with each Defendant exhibiting conduct that was contrary to its unilateral self interest, acting independently. The conduct only makes economic sense if the Defendants were engaged in collective action[.]" *Id.*, ¶ I.C.1, at 6.[252] Finally, Dr. Harris reviewed the empirical analyses of Dr. Dwyer, found them to be reliable and concluded that they showed that the performance of this industry was "indicative of collusion among Defendants and is to be expected based on the structural attributes of the industry and the conduct of the Defendants." *Id.*, ¶ VII.2, at 59.

Such common proof is precisely why the issue of conspiracy "is a common question that is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)."[253]

---

[252] As Dr. Harris explains:

> [T]he economic evidence shows that Defendants' behavior with respect to mill closures, inventory levels, downtime and trades all were contrary to their independent self-interests and made economic sense only in the context of concerted behavior. Further, the Defendants conduct included the use of signaling, focal points and use of consultants that were both facilitative of collusion and constituted means of carrying out collusion. Finally, Defendants direct communications of competitive information and persistent monitoring of their competitors was consistent with maintenance, monitoring and policing a collusive agreement.

*Id.*, ¶ VI.I.1, at 58.

[253] 7 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1781 at 228 (3d ed. 2005); *see also* 6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18.28 at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions."); *Messner*, 669 F.3d at 815 ("common nucleus of operative facts" generally satisfies predominance); *Scrap Metal*, 527 F.3d at 535 ("proof of the conspiracy" is the central common issue "that is thought to predominate"); *Rubber Chemicals*, 232 F.R.D. at 352-53; *Carbon Black*, 2005 WL 102966, at *15; *NASDAQ*, 169 F.R.D. at 517; *Citric Acid*, 1996 WL 655791, at *6; *Catfish*, 826 F. Supp. at 1039 ("If proven, evidence of any meetings . . . telephone conversations, or other electronic communications in pursuit and furtherance of the alleged conspiracy would be the most relevant evidence that could be introduced"); *Vitamins*, 209 F.R.D. at 264-65 (rejecting defendants' argument that the complexity,

## 2.  **Plaintiffs Can Prove Causation on a Common Basis**

Causation, also known as antitrust impact or injury in fact, can be shown here through common proof.  Impact turns on whether the alleged conspiracy caused higher market prices. The record is filled was with common proof that the containerboard industry is structurally prone to collusion.  *See* Harris Decl., ¶ V.I.1., at 33 ("[t]he structural characteristics of this industry . . . are consistent with and would facilitate successful collusion among the Defendants").  It is an established economic view that, in such an industry, agreements among producers to restrict output will typically cause higher prices.  *See, e.g., Fructose*, 295 F.3d at 656 (explaining structural conditions under which collusion is likely to "have an effect on price").  Concerted action to restrict supply will raise prices throughout the market under the basic law of supply and demand, as Judge Posner had explained:

> An agreement on output also equates to a price-fixing agreement. . . . <u>[If] firms restrict output directly, price will as mentioned rise</u> in order to limit demand to the reduced supply.  Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effect.

*Gen'l Leaseways*, 744 F.2d at 594-95 (emphasis added).  *See also Linerboard,* 305 F.3d at 152.

Based on this economic reality, courts routinely find that causation can be shown through common proof in antitrust conspiracy cases—particularly cases involving supply restrictions of basic commodities to facilitate higher prices.  *See Linerboard*, 305 F.3d at 155 (supply restriction); *OSB*, 2007 WL 2253418, at *2 (same); *Messner*, 669 F.3d at 816 (establishing common impact is "relatively simple" in cases involving straightforward theories of "supply and demand").[254]

---

fragmented nature, and diversity of the product markets negated predominance where the alleged industry-wide conspiracy was the overriding issue) (collecting cases); *Flat Glass*, 191 F.R.D. at 484 (same).

[254] *See generally Urethane*, 251 F.R.D. at 636-37 ("there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market.")

The following additional common proof strongly supports a finding that causation can be established on a Class-wide basis: (1) statements and documents from Defendants' top management; (2) expert testimony on market structure and common impact; (3) pricing data; and (4) econometric evidence showing that Class members did, in fact, pay higher prices as a result of Defendants' supply restriction. This showing easily satisfies Rule 23. *See Linerboard*, 305 F.3d at 153 (characterizing a lesser showing as "belt and suspenders" proof under Rule 23).

### a. Defendants' Statements Establish Causation

The record here includes numerous statements from Defendants' top executives and actions designed to limit supply and facilitate price increases. Defendants were all aware of the impact of their supply restrictions and coordinated price increases. *See* Harris Decl., ¶ VI.F.3., at 55-56 (noting that "[f]irms within the industry evaluated downtime by firm and, importantly, which producers should take downtime to 'optimize' the industry cost curve"). How they communicated their intentions to each other, whether directly or otherwise, is immaterial.[255]

---

(citations and internal quotation marks omitted); *Aluminum Phosphide*, 160 F.R.D. at 614-15 ("If successful on this [collusion] claim, it is likely that each plaintiff would have experienced the same impact of paying more for aluminum phosphide products than they would have paid in a truly competitive market.") (citation omitted); *Catfish*, 826 F. Supp. at 1040-41 ("In an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price."); *Foundry Resins*, 242 F.R.D. at 409 ("Where, as here, Plaintiffs have alleged a conspiracy to fix-prices and allocate markets, courts have presumed class-wide impact.") (citing *Carbon Black*, 2005 WL 102966, at *15); *Auction Houses*, 193 F.R.D. at 166 ("Price fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services."); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 695 (D. Minn. 1995) ("[B]ecause the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market."); *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975) ("[I]f the appellees establish . . . that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each appellee.").

[255] *See, e.g., In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9 Cir. 1990) ("the form of an exchange . . . should not be determinative of its legality) (internal citation omitted); *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 4110501, at *28

### b. Plaintiffs Will Show Causation Through Expert Analyses and Opinions

In addition to showing causation using Defendants' own statements, Class Plaintiffs will establish causation through the analyses and opinions of both their experts, Drs. Harris and Dwyer. Those analyses and opinions constitute, and are based on, evidence common to the Class. *See* Harris Decl., ¶ VIII.3., at 60; Dwyer Rep., ¶ 7, at 4; ¶ 12, at 5-6.

Both of Class Plaintiffs' experts offer consistent opinions on common impact—that all or nearly all class members would have been harmed by Defendants collusive conduct, as alleged by the plaintiffs. Dr. Harris based his opinion on his economic analysis that showed that the structure, conduct and performance of the containerboard industry were not only consistent with collusion (*see* Harris Decl., ¶ VIII.1, at 59) but also that any collusion would have been "broadly and generally successful . . . affect[ing] prices throughout the entire industry [and] having a widespread impact across all or nearly all customers." *Id.*, ¶ V.I.3., at 33. It is widely accepted that structural conditions such as those found in this industry facilitate more effective collusion, rendering common impact likely and class certification appropriate. *See generally Fructose*, 295 F.3d at 656-57 (explaining structural conditions that facilitate successful collusion).[256]

Dr. Harris notes that industry-level supply is tracked carefully by Defendants and other industry participants. *Id.*, ¶¶ VI.F.1-4, at 55-56. In economic terms, Dr. Harris explains that

---

(D. Md. Aug. 14, 2013) (at summary judgment, crediting plaintiffs' proffered evidence that industry consultant served as information conduit in alleged conspiracy); *Urethane*, 251 F.R.D. at 638-39 (crediting "documents from the defendants showing that the defendants viewed their allegedly collusive behavior as successful").

[256] *See, e.g., EPDM*, 256 F.R.D. at 95 (impact a common issue where expert opined that market structure was ripe for effective collusion); *Urethane*, 251 F.R.D. at 637 (same); *Linerboard*, 305 F.3d at 153-55 (same); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *12-14 (same); *Carbon Black*, 2005 WL 102966, at *15-19 (same). *See generally Fructose*, 295 F.3d at 655 (surveying structural conditions of a collusion-prone market).

cartels are more likely to occur and succeed in basic commodity industries since reaching and policing agreements is easier and restricting commodity output necessarily causes widespread market impact. *Id.*, at 34-35.; *see also Fructose*, 295 F.3d at 657 (product standardization facilitates a more "successful conspiracy"). Indeed, antitrust impact is routinely found to be a common issue in cases involving undifferentiated or commodity goods.[257]

Cartels commonly collude at the commodity input level to raise prices for the finished downstream goods that they sell. *See, e.g. Linerboard*, 305 F.3d at 153 (certifying class where defendants restricted supply of primary input); *OSB*, 2007 WL 2253418 (same); *Flat Glass*, 191 F.R.D. 472 (certifying class where primary input cartel impacted various end products); *Urethane*, 251 F.R.D. at 630 (same); *TFT-LCD*, 267 F.R.D. 291 (same); *Vitamins*, 209 F.R.D. at 256 (same); *cf. In re Sugar Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978) ("to deny recovery in this instance. . . would allow the price-fixer of a basic commodity to escape the reach of a treble-damage penalty simply by incorporating the tainted element into another product").

Dr. Dwyer based his common impact opinion on statistical analyses of industry pricing. First he performed a standard econometric analysis that compared prices paid by class members for class products both before and after the price increases announced by Defendants during the

---

[257] *See, e.g., Messner*, 669 F.3d at 816 (proof of common impact is "relatively simple" in cases involving "supply and demand" for a commodity); *Polyester Staple*, 2007 WL 2111380 , at *21 (emphasizing interchangeable nature of products); *Linerboard*, 305 F.3d at 153 (affirming certification where expert emphasized "fungible nature of the products"); *Pressure Sensitive Labelstock*, 2007 WL 4150666, at *12-13 (crediting expert opinion on commodity issue); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 450-51 (D. Kan. 2006) (certifying class where expert opined that "the products are fungible commodity products"); *DRAM*, 2006 WL 1530166, at *8 (common proof of impact is possible because "DRAM is a commodity"); *Graphite*, 2006 WL 891362, at *12 (certifying class where expert found "that extruded graphite products can be considered undifferentiated commodities"); *Rubber Chemicals*, 232 F.R.D. at 354 n.3 ("Rubber Chemicals are highly fungible"; class certified); *Carbon Black*, 2005 WL 102966, at *19 (class certified where "carbon black is a commodity-like product"); *Universal Serv. Fund*, 219 F.R.D. at 678 (class certified where "product is a fungible, homogeneous product"); *Thomas & Thomas*, 209 F.R.D. at 166-67 (same); *DeLoach*, 206 F.R.D. at 562-63 (same); *Vitamins*, 209 F.R.D. at 267 (same).

class period (2004-2010).   He made these comparisons using both (1) industry-wide representations of prices paid by class members and (2) prices paid by Class members as reflected in Defendants sales transaction data.   Both sets of comparisons showed that Class members systematically paid higher prices for Containerboard Products after the price increase announcements examined.  Dwyer Rep., ¶¶ 19-50, at 7-19.

In his analysis using industry-wide prices, Dr. Dwyer examined whether the PPW Index, a well-recognized survey of prices charged and paid for Containerboard Products,[258] rose after the 15 price increases announced by Defendants during the Class Period.  He found that these industry-wide prices rose after 9 of the 15 price increase announcements.  *Id.*, ¶ 26, at 10-11.  As Dr. Dwyer stated: "That a market-wide price index, which is both a survey largely oriented towards the inclusion of class member Containerboard Product purchases and a determinant of class member Containerboard Product prices, reflects these 9 announcements is evidence that these events impacted class Containerboard Product purchase prices." *Id.*

In his empirical analysis of the prices actually paid as reflected in Defendants own sales transaction data Dr. Dwyer found that "the overwhelming number of class members examined

---

[258] As Dr. Dwyer showed, the PPW index is closely focused on Containerboard Products prices, is used by Defendants themselves in analyzing prices in the market and is used as a reference for price adjustments in Containerboard Product contracts. *Id.*, ¶ 23, at 9.  Dr. Dwyer also showed that the PPW index prices moved over time in almost identical patterns with the prices of key Containerboard Products. *Id.* ¶ 24, at 9-10.  Pricing evidence of this nature can be used as common proof of impact. *See, e.g., Linerboard*, 305 F.3d at 153 (affirming class certification where pricing for class products "behaved similarly over time"); *Urethane*, 237 F.R.D. at 50-51 (crediting similar evidence); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *13 (same).  Moreover, "[n]either a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally." *NASDAQ*, 169 F.R.D. at 523.  *See also Urethane*, 251 F.R.D. at 638 ("individualized negotiations and a diversity of prices paid do not" defeat class certification where "the alleged antitrust violation has caused widespread injury to the class as a whole"); *Polyester Staple*, 2007 WL 2111380, at *22-23 (rejecting argument that different transaction prices defeat common proof of impact); *DRAM*, 2006 WL 1530166, at *9 (certification appropriate "regardless whether some members of the class negotiated price individually").

(92%), constituting almost all of the dollar volume of class purchases examined (more than 99%), and the bulk of transactions examined (82%) were impacted, that is, showed elevated prices following [at least one price increase announcement]. These results were consistent across Defendants and product groups. Overall, this analysis shows that these Defendants' price increase implementations systematically pervade class member purchases, supporting the conclusion that all or nearly all class members were impacted." *Id.*, ¶¶ 31-38, at 12-15.[259]   Dr. Dwyer also based his opinion on common impact on the multiple regression damages model he specified. *Id.*, ¶ 14, at 5 ("The results of this regression analysis are consistent with the allegations of cartel behavior. Also, these results are consistent with, and corroborate, my impact conclusions drawn from the price increase implementation analysis summarized above.").

Dr. Harris's and Dr. Dwyer's opinions provide relevant, probative and common evidence on the element of impact.  See *Fructose*, 295 F.3d at 660-61 (expert's statistical analysis held admissible to establish class-wide impact at trial).  In short, the element of causation (or antitrust "impact") can be established on a Class-wide basis.

### 3.  Plaintiffs Will Prove Class-Wide Damages on a Common Basis

Dr. Dwyer also has expressed his opinion that class-wide damages arising from the Defendants' collusive conduct as alleged by the plaintiffs can be estimated, using evidence that is common to the class.  Dwyer Rep., ¶ 12 at 5 ("Finally, I have employed standard econometric methods, multiple regression analysis, on a class-wide basis to demonstrate, preliminarily, that

---

[259] Dr. Dwyer's analysis of Defendants' own sales transaction price data in reaching his opinion on common impact was based on net prices—that is prices after discounts and rebates.  Dwyer Rep., ¶ 33, at 13.  Dr. Dwyer also took into consideration the potential for discounts and rebates that were not clearly given as reflected in Defendants sales transaction databases and for lump-sum payments not identified to particular purchases and found that neither of these undermined his opinion of common impact. *Id.*, ¶¶ 39-50, at 13-16.

such methods may be used to quantify aggregate overcharge damages to the class."). While a formal econometric model is not required at this stage of the case, *see Kohen*, 571 F.3d at 676, "courts have accepted multiple regression and correlation analyses as means of proving antitrust injury and damages on a class-wide basis." *TFT-LCD*, 267 F.R.D. at 313; *see also Polyester Staple*, 2007 WL 2111380, at *26-27 (expert regression analysis accepted as common proof of impact).

In his damages analysis, Dr. Dwyer compared prices charged to Class members for Containerboard Products in the Class Period (2004-2010) to prices during a benchmark period before and after the alleged conspiracy, during which it is presumed that prices were not affected by collusion. *Id.*, ¶¶ 55-56, at 20-21. Consistent with textbook econometrics,[260] Dr. Dwyer accounted for the factors influencing price in a competitive marketplace—using market data to estimate what competitive prices should have been during the class period, absent the alleged conspiracy:

> "This preliminary regression analysis explains the movements in aggregate Containerboard Product prices in response to supply and demand factors over two periods: a benchmark period in which there is no allegation that the defendants colluded, and the class period, within which it is alleged that the defendants colluded. The regression analysis includes variables to account for the effects of important competitive (supply and demand) factors on the observed prices, thus allowing me to isolate the direct price effects of the alleged collusion. This analysis also included an indicator (dummy) variable for measuring the extent of price elevation during the class period not explained by the competitive factors controlled for. This regression analysis produces estimates of the percentage increase in aggregate prices due to the measured collusive effects."[261]

---

[260] Dwyer Rep., ¶ 57, at 21 ("In comparing prices between a benchmark period and the class period, I employ standard econometric methods to adjust for non-conspiratorial factors that may distinguish prices in these two periods.").

[261] Dr. Dwyer specified separate models for two groupings of Containerboard Products: (1) a grouping which he calls Intermediate Containerboard Products ("ICP") (linerboard, medium and corrugated sheets) and (2) a grouping he calls Final Containerboard Products ("FCP") (boxes and other finished corrugated products). *Id.*, ¶ 52, at 19-20; ¶ 67, at 23-24. After specifying these preliminary models, Dr. Dwyer then

*Id.*, ¶ 12, at 5-6.  These estimated overcharges amount to 3.81% for ICP and 2.92% for FCP.[262]

Dr. Dwyer then applied these percentage overcharges to the total dollar volume of relevant class purchases to arrive at a calculation of aggregate Class-wide damages. *Id.*, ¶ 69, at 24-25. Based on these multiple regression analyses of the relevant market data, Dr. Dwyer determined that putative class members were injured by an overcharge of $3.792 billion.  *Id* .

Multiple regression modeling, as Dr. Dwyer proposes, is a well-established tool for estimating antitrust damages on a Class-wide basis [s*ee, e.g., Scrap Metal*, 527 F.3d at 532-34; *Fructose*, 295 F.3d at 660-61] that numerous courts have accepted at the class certification stage for establishing the element of damages.[263]  Plaintiffs' damages methodology "need not be exact," but "must be consistent with [Plaintiffs'] liability case." *Comcast*, 133 S. Ct. at 1433. Here, Dr. Dwyer's methodology ties directly to Plaintiffs' liability theories.  The estimated overcharge stems from Defendant's containerboard supply restrictions, which facilitated the alleged price-fixing. Dwyer Rep., ¶ 12, at  5 ("The regression analysis includes variables to account for the effects of important competitive (supply and demand) factors on the observed prices, thus allowing me to isolate the direct price effects of the alleged collusion.").

---

modified the specifications somewhat, resulting in two additional sets of additional models, in order to show the robustness of the basic specification.  This exercise showed that his models were robust. *Id*., ¶¶ 67, 68, at 20-22.

[262] These estimated overcharges are the averages across the specifications described above.

[263] *See Foundry Resins*, 242 F.R.D. at 411 (characterizing multiple regression models as "reasonable damage methodologies"); *DRAM*, 2006 WL 1530166, at *10 ("other courts have already upheld [multiple regression models] as valid means for proving damages on a class-wide basis, and this court has found no reason to reject them at this stage of the proceedings.") (collecting cases); *Bulk (Extruded) Graphite*, 2006 WL 891362, at *15 (proposed regression "methods are widely accepted"); *Flat Glass*, 191 F.R.D. at 485-87 ("[t]here is no dispute that when used properly multiple regression analysis is one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation"); *Urethane*, 237 F.R.D. at 452 ("damages are also likely susceptible to class-wide proof" using multiple regression analysis); *Linerboard*, 305 F.3d at 153-55 (same); *Newberg on Class Actions* § 18:53 at 177 (4th ed. 2002).

### E.  A CLASS ACTION IS THE SUPERIOR METHOD FOR ADJUDICATING THE CLAIMS AT ISSUE

Rule 23(b)(3) provides that certification is warranted if a class-wide trial is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Class certification is more efficient than any other procedure available for resolving the relevant factual and legal issues raised here.  *See Messner* 669 F.3d at 815 n.5 ("There are so many common issues of law and fact relating to the issue of [liability], however, that the superiority requirement likely poses no serious obstacle to class certification here.").  The record to date—showing that Plaintiffs can establish their claims on a Class-wide basis using predominantly common proof—underscores the manageability of this case.

Denying class certification would be inefficient and unfair, potentially leading to duplicative and wasteful litigation or, alternatively, claims abandoned due not to merit, but rather to their relatively small individual size of potential individual recovery relative to the high costs of complex antitrust litigation.  In finding superiority satisfied, courts have explained that an alternative—litigating hundreds or thousands of lawsuits individually—would be wasteful, inefficient and infeasible for many plaintiffs:

> Here, the obvious alternative to a class action would be for plaintiffs to bring individual suits against defendants. This would be grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation.  The hundreds, and perhaps thousands, of class members are dispersed across the country, each with relatively similar claims.  Certainly, the most feasible way for these plaintiffs to pursue their claims is by way of a class action.

*Urethane*, 237 F.R.D. at 453. *See also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("the more claimants there are, the more likely a class action is to yield substantial economies in litigation") (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir.

2004)). This reasoning applies here and class treatment is the superior way for this case to proceed.

## IV.   <u>CONCLUSION</u>

For all the reasons set forth above, Plaintiffs respectfully submit that they meet all requirements under Rule 23 and request that the Court certify the proposed Class, appoint the named Plaintiffs as Class Representatives, and confirm Michael J. Feed of Freed Kanner London & Millen LLC and Daniel J. Mogin of The Mogin Law Firm, P.C. as Co-Lead Class Counsel.


Dated:   June 11, 2014                    Respectfully submitted,


                                          */s/ Michael J. Freed*
                                          Michael J. Freed
                                          Robert J. Wozniak
                                          FREED KANNER LONDON & MILLEN LLC
                                          2201 Waukegan Road, Ste. 130
                                          Bannockburn, IL 60015
                                          Tel: (224) 632-4500


                                          Daniel J. Mogin
                                          THE MOGIN LAW FIRM, P.C.
                                          707 Broadway, Ste. 1000
                                          San Diego, CA 92101
                                          Tel: (619) 687-6611

                                          ***Interim Co-Lead Counsel for Plaintiffs
                                          and the Proposed Class***

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| KLEEN PRODUCTS LLC, *et al.*, individually and on behalf of all those similarly situated, | Case No. 1:10-cv-05711 |
| Plaintiffs, | Hon. Harry D. Leinenweber |
| v. | *FILED UNDER SEAL* |
| PACKAGING CORPORATION OF AMERICA, *et al.*, | |
| Defendants. | |

### INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---|---|---|
| 1. | September 23, 2005, JP Morgan market analysis, Paper and Forest Products 101 | Temple-Inland 00024456 |
| 2. | Deutsche Bank Dr. Paper's Containerboard Check-Up, August 15, 2010 (excerpt) | GP-KLEEN01074003 |
| 3. | September 16, 2008 Poyry presentation, "Market Environment: Containerboard" (excerpt) | GP-KLEEN00388772 |
| 4. | Corporate Sales & Marketing, Pricing Interview, June 13, 2005 | IP0995216 |
| 5. | American Forest & Paper Association 2010 Statistics For Time Series Analysis, Actual And Seasonally Adjusted Data By Month For The U.S. Containerboard Industry for the Years 2000-2010. (excerpt) | AFPA_ESI_01358.0001 |
| 6. | Temple-Inland Business Outlook (excerpt) | Temple-Inland 00080408 |
| 7. | October 2009 "Containerboard Market Analysis" (excerpt) | IP143772 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---|---|---|
| 8. | Corrugated Forecast 2007-2011, Global Executive Summary and North America Full Report (excerpt) | FBAK0000126 |
| 9. | 2005 PCA Securities and Exchange Commission 10K (excerpt) | PCoA000234684 |
| 10. | Temple-Inland Form 10Q, May 2009 (excerpt) | |
| 11. | Affidavit of Matthew T. Denton (excerpt) | |
| 12. | Credit Suisse Paper Products/Packaging equity research, February 25, 2004 (excerpt) | GP-KLEEN01015352 |
| 13. | Containerboard & Packaging Strategy Project Leadership Team Update, March 15, 2000 (excerpt) | GP-KLEEN01870531 |
| 14. | Georgia-Pacific Containerboard & Packaging's Demand Driven Strategy, May 9, 2000 (excerpts) | GP-KLEEN00478369 |
| 15. | Temple-Inland 2009 Call Reports (excerpt) | Temple-Inland 00337660 |
| 16. | Third Amendment to Schedule of Terms Between The American Bottling Company and Tempe-Inland, January 1, 2009 | Temple-Inland 00054688 |
| 17. | April 3, 2007 email re: monthly status report for March 2007 (excerpt) | Temple-Inland 00160509/10 |
| 18. | Smurfit-Stone's Strategic Reassessment Script, November 7, 2005 | SSCC00838344 |
| 19. | Industry Assessment, Production Managers Meeting, 2008 (excerpt) | PCoA000025127 |
| 20. | Be Better At What We Do, Corrugated Products – Norampac Inc. presentation, March 3, 2005 (excerpt) | NORAMPAC00045387 |
| 21. | Excerpts from Deposition of James R. Keller, January 17, 2014. | |
| 22. | Excerpts from Deposition of Thomas Gideon, January 31, 2014. | |
| 23. | Excerpts from Deposition of Rachel Kenyon, April 16, 2014. | |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---|---|---|
| 24. | Fibre Box Association Executive Committee Meeting Minutes, August 17, 2010, Atlanta, Georgia | FBAKP0003147 |
| 25. | World Containerboard Organization December 2009 newsletter | IP345687 |
| 26. | Second Amendment to Product Agreement Between Conagra Foods, Inc. and Temple-Inland, November 1, 2008 | Temple-Inland 00053142 |
| 27. | January 5, 2009 email string re: interesting study on linerboard industry (excerpt) | GP-KLEEN01066047 |
| 28. | Excerpts from Deposition of George Howell, April 16, 2014. | |
| 29. | Excerpts from Deposition of David Westphal, March 26, 2014. | |
| 30. | Excerpts from Deposition of Robert P. Ramm, April 24, 2014. | |
| 31. | Temple-Inland, Inc. Form 10-K For the Fiscal Year Ended January 3, 2004 (excerpt) | Temple-Inland 00079045 |
| 32. | Temple-Inland Q2 2010 Earnings Conference Call Transcript, July 27, 2010 (excerpt) | Temple-Inland 00012904 |
| 33. | Director Orientation Overview of SSCC, Apr. 26 2010 presentation (excerpt) | SSCC 00101201 |
| 34. | Excerpts from Deposition of Robert Lanthier, February 27, 2014. | |
| 35. | Excerpts from Deposition of Douglas Munn, February 27, 2014. | |
| 36. | Smurfit-Stone/Norampac Supply Agreement (excerpt) | SSCC 00630966 |
| 37. | Georgia-Pacific Packaging POV, May 16, 2007 (excerpt) | GP-KLEEN00545853 |
| 38. | Nautilus Inc. RFP for Corrugated Items | PCoA000017862 |
| 39. | HJ Heinz Request for Quotation | PCoA000018015 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 40. | International Paper National Accounts spreadsheet (Protocol & Deal Worksheet tabs) | IP749762 |
| 41. | Smurfit-Stone Container Division Midwest, Description of Movement Mechanics (excerpt) | SSCC 00351599 |
| 42. | Service Agreement Between Asurion Insurance Services, Inc. and Temple-Inland, August 1, 2009 (excerpt) | Temple-Inland 00051818 |
| 43. | Supply Agreement Between Temple-Inland and Dairy Farmers of America, Inc. May 1, 2006 (excerpt) | Temple-Inland 00051798 |
| 44. | Supply Agreement Between Temple-Inland and G.O. Fresh, April 1, 2010 | Temple-Inland 00051775 |
| 45. | Supply Agreement Between Temple-Inland and HJ Heinz USA, August 1, 2009 | Temple-Inland 00051770 |
| 46. | Box Supply Agreement Between Temple-Inland and AFA Foods, January 1, 2010 | Temple-Inland 00051757 |
| 47. | Memorandum of Understanding, January 1, 2009 | Temple-Inland 00051688 |
| 48. | Stanley Master Purchase Agreement | PCoA000197041 |
| 49. | Tharco Containerboard Supply Agreement | PCoA000166161 |
| 50. | Containerboard Supply Agreement | IP089891 |
| 51. | Container Supply Agreement (excerpt) | IP043351 |
| 52. | Containerboard Supply and Purchase Agreement (excerpt) | IP009997 |
| 53. | Norampac Cascades/Color-Box LLC Paper Purchase Agreement | GP-KLEEN00362591 |
| 54. | Temple-Inland Industry Overview (excerpt) | Temple-Inland 00072964 |
| 55. | April 30, 2007 email re: Containerboard price increase | Temple-Inland 00072377 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 56. | Georgia-Pacific 4th Quarter Review, Packaging Segment, Board of Managers Meeting, February 26, 2008 (excerpt) | GP-KLEEN01057817 |
| 57. | March 30, 2004 email attaching letter to Victory Packaging re: price increase | SSCC 00500275 |
| 58. | Excerpts from Deposition of Steve Strickland, December 12, 2013. | |
| 59. | Letter from Smurfit-Stone to John Rothrock of Victory Packaging re: price increase, July 2, 2004 | SSCC 00505109 |
| 60. | Letter from Smurfit-Stone to John Rothrock of Victory Packaging re: price increase, August 2, 2004 | SSCC 00505113 |
| 61. | July 29, 2010 email string re: price increase | SSCC 00450532 |
| 62. | Excerpts from Deposition of Barry Baker, December 18, 2013. | |
| 63. | Georgia-Pacific $10/ton price increase scenario data (March 29, 2006 spreadsheet) | GP-KLEEN00310660 |
| 64. | International Paper Analysis of Global Markets and Pricing for Linerboard, Unbleached Kraft Pulp and OCC (excerpt) | IP263040 |
| 65. | Industrial Packaging Group Presentation, November 3, 2003 (excerpt) | IP1124228 |
| 66. | Discussion on Corporate Strategy Options, John Faraci (excerpt) | IP0967371 |
| 67. | International Paper presentation (excerpt) | IP0954335 |
| 68. | UBS Investment Research, March 18, 2008 | IP065315 |
| 69. | Weyerhaeuser Annual Report and 10-K (excerpt) | WY0056608 |
| 70. | Defendant RockTenn's Objections & Responses to Plaintiffs' Second Set of Interrogatories Directed to All Defendants (excerpt) | |
| 71. | Internal Press Release: Norampac enters into joint venture with Jamestown Container and Smurfit -Stone | NORAMPAC00062283 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 72. | Smurfit-Stone presentation, Concepts to Address Key Issues, May 20, 2005 (excerpt) | SSCC 00840592 |
| 73. | Letter re: partnerships among independents and integrateds | PCoA000034921 |
| 74. | Containerboard Summary, April 28, 2008 | PCoA0000028453 |
| 75. | September 10, 2010 email re: telephone call with RockTenn | SSCC 00095121 |
| 76. | Excerpts from Deposition of Travis Ballard, August 14, 2013. | |
| 77. | March 26, 2008 email string re: white paper cost | Temple-Inland 00140312 |
| 78. | Excerpts from Deposition of Donna Lajeunesse, September 25, 2013. | |
| 79. | Norampac Inc. Transfer Pricing Review for the Years Ended December 31, 2005 and  2006 (excerpt) | NORAMPAC00057612 |
| 80. | CBPR Sales & Operations Planning, Management Business Review, January 24, 2007 (excerpt) | WY0054682 |
| 81. | CBPR Portfolio Optimization, Project Penguin West, November 18, 2005 (excerpt) | WY0062605 |
| 82. | Excerpts from Deposition of Brian McGurk, January 7, 2014. | |
| 83. | Excerpts from 30(b)(6) Deposition of Mark Polivka, January 30, 2014. | |
| 84. | Georgia-Pacific 2nd Quarter Review, Packaging Segment, Board of Managers Meeting, August 28, 2008 (excerpt) | GP-KLEEN01057796 |
| 85. | Oct. 22, 2008 email re: full contract year 2007-2008 w/ attachment (Hilliard Dep. Ex. 177) | GP-KLEEN00075629/30 |
| 86. | March 29, 2004 email string re: Consumer Packaging | Temple-Inland 00615658 |
| 87. | July 29, 2008 email string re: NutriSystem analysis | Temple-Inland 00462324 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 88. | July 29, 2008 email re: Smurfit-Stone and International Paper's price increase implementation | IP473391 |
| 89. | February 23, 2005 email re: business recap of 2002 - 2005 | IP0986544 |
| 90. | August 30, 2010 email string re: Deutsche Bank equity research on US Corrugated price increase | Temple-Inland 00420487 |
| 91. | Price Change Instructions and Competitive Activity, June 12, 2008 | SSCC 00625355/56 |
| 92. | December 12, 2008 email re: PCA orders | PCoA000710668 |
| 93. | IP/PCA Partnership Meeting, May 26, 2010 (Lajeunesse Dep. Ex. 114) | IP174228 |
| 94. | Excerpts from Deposition of Ron Zimbelman, April 1, 2014. | |
| 95. | International Paper & Temple-Inland 2008 Agreement Negotiation Summary, October 19, 2007 | SSCC 00160071 |
| 96. | September 2, 2008 email re: IP Price increase | SSCC 00225490 |
| 97. | January 30, 2008 email re: Smurfit-Stone's price increase announcement | IP504133 |
| 98. | Norampac Inc. Mississauga Division Cost Review, February 14, 2007 | NORAMPAC00065728 |
| 99. | Excerpts from Deposition of Mollie Hilliard, December 12, 2013. | |
| 100. | June 26, 2008 email re: external purchases | Temple-Inland 00167429 |
| 101. | September 10, 2004 email string re: St. Louis Post-Dispatch article on change in packaging | GP-KLEEN01017202 |
| 102. | Defendant Georgia-Pacific LLC's Supplemental Objections and Responses to Interrogatories 5, 6, and 7 of Plaintiff's Second Set of Interrogatories Directed to All Defendants (excerpt) | |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 103. | Defendant International Paper's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants (excerpt) | |
| 104. | Defendants Cascades Canada ULC and Norampac U.S. Inc.'s Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants (excerpt) | |
| 105. | Defendant Temple-Inland's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants (excerpt) | |
| 106. | Defendant Weyerhaeuser Company's Supplemental Responses & Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants (Exhibit A) | |
| 107. | July 3, 2007 email string re: Smurfit-Stone price increase | DBSI 00001063 |
| 108. | Deutsche Bank Paper & Forest Products Industry Alert, December 2, 2009 | GP-KLEEN00328735 |
| 109. | July 14, 2010 email re: Packaging Corporation of America price increase announcement | GP-KLEEN00528361 |
| 110. | May 28, 2008 email string re: Georgia-Pacific price increase announcement | GP-KLEEN00631148 |
| 111. | January 29, 2008 email string re: Smurfit-Stone price increase | GP-KLEEN00634156 |
| 112. | July 3, 2007 email string re: Deutsche Bank equity research on Packaging Corporation of America price increase | GP-KLEEN00636722 |
| 113. | Dr. Paper's Weekly Wrap-Up, Deutsche Bank Report, Dec. 1, 2006 | GP-KLEEN00638885/86 |
| 114. | February 24, 2006 email string re: containerboard price increase announcements | GP-KLEEN00642439 |
| 115. | February 21, 2006 email re: Packaging Corporation of America price increase announcement | GP-KLEEN00642598 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---|---|---|
| 116. | February 17, 2006 email re: Norampac price increase announcement | GP-KLEEN00642629 |
| 117. | February 14, 2006 email re: Georgia-Pacific and Smurfit-Stone price increases | GP-KLEEN00642811 |
| 118. | September 8, 2005 email re: CONTAINERBOARD – SSCC Announces $30/ton Oct. price increase; a positive for producers (Goldman Sachs) | GP-KLEEN01025142 |
| 119. | International Paper Pricing Change Proposal | IP143740 |
| 120. | December 12, 2009 email re: weekly update from RISI, Inc. | IP318743/48 |
| 121. | April 24, 2007 email string re: Deutsche Bank equity research on Packaging Corporation of America price increase | IP338552 |
| 122. | December 2005 chart of National Containerboard Price Increase Announcements | IP350501 |
| 123. | June 26, 2007 email string re: price increase among International Paper and Weyerhaeuser | IP498100 |
| 124. | July 6, 2007 email re: price increase announcements | IP498647 |
| 125. | National Containerboard Price Increase Announcements, Sept. 12, 2008 | IP673256 |
| 126. | June 3, 2008 email re: National Containerboard price increase announcements | IP754507 |
| 127. | National Containerboard Price Increase Announcements, Feb. 6, 2004 | IP1131608 |
| 128. | National Containerboard Price Increase Announcements, Feb. 15, 2008 | IP1679991 |
| 129. | May 13, 2004 email string re: price increases | IP1777550 |
| 130. | April 11, 2005 email re: April price list | NORAMPAC00044483 |
| 131. | September 8, 2005 Email re: Packaging Corporation of America's $40/ton increase in containerboard. | PCoA000354315 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 132. | March 8, 2010 email string re: Containerboard: Most integrateds now out with $60/ton hike–but face fight with box buyers | PCoA000573450 |
| 133. | July 1, 2010 email string re: RISI article on International Paper and Temple-Inland price increase announcements | SSCC 00090777 |
| 134. | December 1, 2006 email string re: customer mailing list for price increase announcement | SSCC 00131595 |
| 135. | July 8, 2010 email re: Smurfit-Stone and Norampac's price increase | SSCC 00138890 |
| 136. | May 28, 2008 email re: for containerboard | SSCC 00229889 |
| 137. | December 2, 2009 email string re: Temple-Inland price increase announcement | SSCC 00341677 |
| 138. | Pulp & Paper Week, Pulp and Paper Market News for North America, Vol. 26, No. 16, April 26, 2004 | SSCC 00352370 |
| 139. | February 25, 2005 email re: price increases | SSCC 00361964 |
| 140. | February 24, 2005 email re: price increases | SSCC 00361976 |
| 141. | February 25, 2005 email string re: price increases | SSCC 00362042 |
| 142. | December 4, 2006 email re: From Paperloop.com – Norampac announces | SSCC 00373470 |
| 143. | March 3, 2010 email string re: FYI – from Paperloop.com with attachment Pulp Monthly | SSCC 00436551 |
| 144. | April 22, 2004 Email re: Temple-Inland Price Increase | Temple-Inland 00131080 |
| 145. | January 16, 2004 email string re: price increases | Temple-Inland 00149975 |
| 146. | September 14, 2005 email string re: price increases | Temple-Inland 00150869 |
| 147. | November 28, 2005 email re: Deutsche Bank Market Bulletin on Dr. Paper's Pulse on Pricing | Temple-Inland 00192843 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 148. | November 23, 2009 email string re: Deutsche Bank's Dr. Paper's Pulse on Pricing report | Temple-Inland 00220011 |
| 149. | March 2, 2010 email re: RISI article announcement of Smurfit-Stone's price increase by April 1, 2010 | Temple-Inland 00323080 |
| 150. | February 11, 2006 email string re: price increase | WY0063801 |
| 151. | Pulp & Paper Week Market News for North America, Vol. 30, No. 05, February 11, 2008 (excerpt) | WY0091907 |
| 152. | April 8, 2010 email string attaching Capacity Closures and Additions spreadsheet | SSCC 00083394/96 |
| 153. | Deutsche Bank Paper & Packaging Dr. Paper's Quarterly, July 1, 2011 (excerpt) | No Bates: As Produced by Deutsche Bank |
| 154. | Credit Suisse's "How Big Are All These Closures" equity research report, December 1, 2005 | GP-KLEEN01024985 |
| 155. | Georgia-Pacific 2006 Packaging Planning Process Discussion Document, January 2006 (excerpt) | GP-KLEEN01072241 |
| 156. | Deutsche Bank Paper & Packaging global markets research report, November 18, 2008 | Temple-Inland 00041477 |
| 157. | Pulp & Paper Week Market News for North America | IP100337 |
| 158. | December 14, 2009 email string re: Smurfit-Stone announces permanent capacity closures with attachment | SSCC 00145228 |
| 159. | November 5, 2010 email attaching Smurfit-Stone Macroeconomic Indicators & Containerboard Market Fundamental Final Draft Presentation (excerpt) | SSCC 00179942 |
| 160. | 2004 IP Form 10-Q | |
| 161. | Packaging Corporation of America Company Profile, January 2005 (excerpt) | GP-KLEEN00477477 |
| 162. | Temple-Inland Presentation (excerpt) | Temple-Inland 00291545 |
| 163. | International Paper Discussion on Corporate Strategy Options (excerpt) | IP112019 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 164. | Integration Strategies and Opportunities Working Document | SSCC 00298351 |
| 165. | May 10, 2004 email attaching Deutsche Bank's "A Review of the Containerboard & Corrugated Packaging Business" research report (excerpt) | GP-KLEEN01017172/74 |
| 166. | May 12, 2004 email string re: profit improvement draft | GP-KLEEN01441611 |
| 167. | Deutsche Bank Securities Inc. Market Bulletin, May 19, 2004 | SSCC 00347633 |
| 168. | Price Increase Justification Memo from Bill Sweeney, March 9, 2004 | PCoA000026178 |
| 169. | American Forest & Paper Association, 127th Paper Week Meeting Memorandum to Containerboard Group Executive Committee, March, 2004 (excerpt) | SSCC 00307454/55 |
| 170. | Deutsche Bank Securities Inc. Bulletin, January 23, 2005 | Temple-Inland 00022278 |
| 171. | January 9, 2004 email string re: December 2003 Flash – Containerboard & Packaging Segment | GP-KLEEN01025183 |
| 172. | August 4, 2005 email string re: closures of New Richmond and Bathurst paper mills | SSCC 00505136 |
| 173. | August 4, 2005 email re: International Paper's new technology implementations and initiatives | IP1023693 |
| 174. | Second quarter, 2005 Weyerhaeuser Co. earning conference call, July 21, 2005 (excerpt) | WY0141600 |
| 175. | Defendants Cascades Canada ULC and Norampac Holdings U.S. Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories Directed to All Defendants (excerpt) | |
| 176. | International Paper second quarter conference call transcript, July 26, 2005 (excerpt) | IP927195 |
| 177. | International Paper Internal Memorandum | IP155126 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 178. | Excerpts from Deposition of Michael Exner, March 20, 2014 | |
| 179. | Morgan Stanley Basic Materials Conference 2006 (excerpt) | PCoA000063730 |
| 180. | Deutsche Bank Company Bulletin on Weyerhaeuser, November 29, 2005 | Temple-Inland 00192908 |
| 181. | February 1, 2006 email string re: December industry statistics | Temple-Inland 00072367 |
| 182. | November 6, 2006 email re: SSCC Thinking for 2007 and Beyond | SSCC 00625981 |
| 183. | 2007 Gate 5 Project List | WY0061101 |
| 184. | Final Transcript, fourth quarter 2006, conference call, February 9, 2007 (excerpt) | WY0138835 |
| 185. | International Paper October 2006 Financial Results | IP098220 |
| 186. | April 11, 2007 email string re: transcript from Smurfit-Stone New York presentation (excerpt) | WY0068378 |
| 187. | Packaging Corporation of America Q1 2007 Earnings Conference Call (excerpt) | Temple-Inland 00034708 |
| 188. | Final transcript, first quarter, 2007, International Paper conference call, May 3, 2007 (excerpt) | WY0046755 |
| 189. | April 24, 2007 email string re: Deutsche Bank equity research on Packaging Corporation of America price increase | GP-KLEEN00640487 |
| 190. | April 30, 2007 email string re: Containerboard price increase | Temple-Inland 01358789 |
| 191. | May 15, 2007 email string re: price increase | IP323609 |
| 192. | 2007 Corrugated Industry Fly-In, Schedule of Events, June 18-20, 2007 | AICC000001173 |
| 193. | Georgia-Pacific Packaging Segment Business Update, May 12, 2008 (excerpt) | GP-KLEEN01372191 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 194. | May 27, 2008 email re: Containerboard price increase announcement | GP-KLEEN01767714 |
| 195. | Containerboard Sales Meeting, 2009 Plan, December 4-5, 2008 (excerpt) | GP-KLEEN01467984 |
| 196. | Deutsche Bank's Mark Wilde/Smurfit-Stone's John Haudrich May 28, 2008 email string re: beer | DBSI00001345 |
| 197. | Deutsche Bank's Mark Wilde/Smurfit-Stone's John Haudrich May 28, 2008 email string re: 2 beers | DBSI00001347 |
| 198. | AT&T Phone Records List for (314) 656-5373, January 1, 2003 through December 31, 2010 | ATT-SW003463 |
| 199. | Deutsche Bank's Mark Wilde/Temple-Inland's Chris Mathis email re: 2 six-packs of beer | DBSI00003407 |
| 200. | Official Board Markets, Board Producers (Again) Try for Price Increase, May 31, 2008 (excerpt) | GP-KLEEN00006512 |
| 201. | October 3, 2008 email string re: International Paper's price increase | PCoA000048972 |
| 202. | Statement of the Association of Independent Corrugated Converters in Opposition to Recently Announced Increases in Containerboard Prices | AICC000001060 |
| 203. | RISI Top PPI Pulp & Paper Week stories | Temple-Inland 00439923 |
| 204. | March 5, 2009 email string re: Feb Final Inventory | SSCC 00205385 |
| 205. | May 12, 2009 The Levin Group Presentation re: SSCC Strategic Review (excerpt) | SSCC 00467587 |
| 206. | March 9, 2010 email string re: SSCE | SSCC 00105079 |
| 207. | February 15, 2010 email string re: Jack Schwarz | SSCC 00216739 |
| 208. | Temple-Inland's Responses and Objections to Plaintiffs' Second Set of Interrogatories (excerpt) | |
| 209. | Corrugated Packaging Spreadsheets: 2005 – 2010 (excerpt) | Temple-Inland 00054893 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 210. | Georgia-Pacific November 23, 2009 letter re: price increase | GP-KLEEN01433518 |
| 211. | Pricing Change Proposal, February 22, 2010 | IP143746 |
| 212. | December 3, 2009 email string re: FYI – from Paperloop.com (SSCC & 4 others announce) | SSCC 00341662 |
| 213. | December 3, 2009 email re: RockTenn price increase | IP499465 |
| 214. | December 3, 2009 email string re: FYI – from Paperloop.com (RockTenn announces CB hike) | SSCC 00341669 |
| 215. | December 3, 2009 email re: Price Increase | SSCC 00558708 |
| 216. | November 17, 2009 email string re: Longview – Price Increase $50 January 1st | SSCC 00541685 |
| 217. | December 2, 2009 email string re: Price Increase/Feedback | SSCC 00461402 |
| 218. | November 23, 2009 email string re: UBS US/Global Paper & Forest equity research | Temple-Inland 00460864 |
| 219. | December 2, 2009 email re: Deutsche Bank equity research relating to Containerboard price increase | IP375876 |
| 220. | International Paper Pricing Change Proposal | IP143747 |
| 221. | RockTenn's Supplemental Objections & Responses to Plaintiffs' Second Set of Interrogatories Directed to All Defendants (excerpt) | |
| 222. | Deutsche Bank - Global Markets Research, Paper & Packaging, February 26, 2010 | SSCC 00083034 |
| 223. | Ron Zimbelman February 19, 2010 calendar entry re: antitrust discussion | Temple-Inland 01056628 |
| 224. | March 3, 2010 email string re: Packaging Corporation of America | SSCC 00461427 |
| 225. | September 21, 2010 email re: Deutsche Bank Dr. Paper's Pulse on Pricing | GP-KLEEN00142215 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 226. | July 15, 2010 email re: RISI article relating to Containerboard price increase | Temple-Inland 00312232 |
| 227. | March 14, 2008 email re: reduce box shipments | IP505217 |
| 228. | November 21, 2005 email string re: Georgia-Pacific orders | Temple-Inland 00171025 |
| 229. | Temple-Inland February 14, 2006 memorandum re: January 2006 operating highlights | Temple-Inland 00993412 |
| 230. | Excerpts of Deposition of Roy Lind, April 16, 2014. | |
| 231. | Excerpts from Deposition of Wayne Vandiver, March 11, 2014. | |
| 232. | September 26, 2006 email string re: weekly consumption for September 2006 | WY0218873 |
| 233. | July 26, 2007 email string re: domestic containerboard price increase | WY0060881 |
| 234. | July 24, 2007 email string re: domestic containerboard price increase | WY0060738 |
| 235. | International Paper third quarter 2007 conference call transcript, November 2, 2007 (excerpt) | IP839269 |
| 236. | June 15, 2008 email string re: Citigroup Containerboard investment research | Temple-Inland 00229927 |
| 237. | June 15, 2008 email string re: medium for June | SSCC 00358651 |
| 238. | July 28, 2008 email string re: West slow back | GP-KLEEN00329753 |
| 239. | RISI PPI Pulp & Paper Week, March 19, 2010 (excerpt) | GP-KLEEN00002107 |
| 240. | March 5, 2010 email re: paper shortage | IP378165 |
| 241. | March 5, 2010 email re: Schwarz volume | IP378169 |
| 242. | March 19, 2010 email string re: paper shortage | IP494993 |
| 243. | May 16, 2010 email re: Kraft linerboard demand | PCoA000378709 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 244. | July 1, 2010 email string re: Smurfit-Stone Emerges From Bankruptcy, Lists on NYSE | SSCC 00181579 |
| 245. | June 29, 2010 email string re: Corrugated Division Inventory | SSCC 00116657 |
| 246. | July 29, 2010 email string re: Mill conference call info | SSCC 00543896 |
| 247. | Smurfit-Stone Container Corporation, Schedule 14A, April 3, 2007 (excerpt) | |
| 248. | Pat Moore Keynote – 2010 Leadership Meeting (excerpt) | SSCC 00761773 |
| 249. | Testimony of Stephen R. Read, April 29, 2010, Smurfit-Stone bankruptcy proceeding (excerpt) | |
| 250. | International Paper Investor Call Report, January 12, 2006 | IP107512 |
| 251. | Deutsche Bank Paper & Forest Products Containerboard Monitor, June 16, 2004 | Temple-Inland 00018722 |
| 252. | Deutsche Bank Securities Inc. Market Bulletin, April 15, 2005 | Temple-Inland 00023652 |
| 253. | Citigroup Paper & Forest Products Industry Note, November 16, 2005 | GP-KLEEN01018281 |
| 254. | Smurfit-Stone Project Update, Dean & Company Strategy Consultants, August 17, 2005 (excerpt) | SSCC 00368155 |
| 255. | Message from Jim Keller, Update on CBPR Supply Chain Redesign, September 2005 | WY0123247 |
| 256. | November 11, 2005 email string re: Smurfit-Stone Presentation. | WY0062505 |
| 257. | Credit Suisse Research: The Holy Grail (excerpt) | IP195308 |
| 258. | May 7, 2007 email string re: Holy Grail report | WY0212169 |
| 259. | February 19, 2007 email attaching Credit Suisse equity research relating to Paper Products (excerpt) | IP331824 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---|---|---|
| 260. | Deutsche Bank Paper & Packaging Containerboard Monitor, October 16, 2007 | Temple-Inland 00036509 |
| 261. | October 17, 2007 email string re: Deutsche Bank Securities Inc. research | WY0210300 |
| 262. | November 15, 2007 email string re: price increase | IP361760 |
| 263. | January 2, 2008 internal correspondence re: Price Increase Analysis | SSCC 00568150 |
| 264. | Deutsche Bank Securities Inc. Research, Probable Summer Price Initiative, May 12, 2008 | NORAMPAC00056349 |
| 265. | June 17, 2008 email re: containerboard figures from American Forest & Paper Association | IP507211 |
| 266. | July 12, 2008 email re: price increase announcements with attachments (excerpt) | SSCC 00697545 |
| 267. | May 27, 2008 email re: Dr. Paper's Pulse on Pricing | NORAMPAC00056357 |
| 268. | Oct. 4, 2009 email attaching Dr. Paper's Weekly Wrap-Up (Oct. 2, 2009), Deutsche Bank Report | Temple-Inland 01309468/70 |
| 269. | April 29, 2009 email re: MeadWestvaco Q1 2009 Financial Results | IP337685 |
| 270. | November 28, 2006 email re: price decrease | NORAMPAC00037977 |
| 271. | AICC Editorial: Paper Producers Leaning on their Independent Customers for Subsidies now that Black Liquor Credit is Ending | PCoA000049619 |
| 272. | Credit Suisse Paper Products/Packaging equity research report, February 25, 2004 (excerpt) | SSCC 00121719 |
| 273. | McKinsey Cashing In On Consolidated Article, 2002 | GP-KLEEN00141864 |
| 274. | Deutsche Bank Paper & Forest Products Industry Alert, September 2, 2008 | GP-KLEEN00630665 |
| 275. | October 19, 2006 email string re: Smurfit-Stone/Temple-Inland meeting follow-up | SSCC 00625963 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---|---|---|
| 276. | October 5, 2004 email re: draft memo, Efforts to Reduce the Risk of Antitrust Litigation | PCoA000218626 |
| 277. | American Forest & Paper Association Board of Directors Meeting Minutes (excerpt) | SSCC 00305730 |
| 278. | Paperboard Packaging Alliance, Board of Advisor, Meeting Minutes, February 24, 2005 | AFPA_ESI_00702 |
| 279. | 2005 ICCA Management Conference Attendance List | ICCAKP0001536 |
| 280. | American Forest & Paper Association, Executive Committee, Meeting Minutes, September 21, 2006 | AFPA-P-CF-00998 |
| 281. | International Corrugated Case Association Board of Directors Meeting, March 15, 2007 | NORAMPAC00009806 |
| 282. | American Forest & Paper Association, Board of Directors Meeting, Summit Review, February 8, 2007 | AFPA-P-CF-01003 |
| 283. | Fibre Box Association Sustainability Committee, Meeting Minutes, January 24, 2008 | AFPA_ESI_00017 |
| 284. | American Forest & Paper Association, Containerboard/Kraft Sector, Meeting Minutes, March 26, 2008 | AFPA_ESI_01982 |
| 285. | Minutes of Corrugated Packaging Alliance Meeting, March 3, 2010, AF&PA Offices (excerpt) | PCoA000050903 |
| 286. | Minutes – Paper and Packaging Check-Off Panel Meeting, June 30, 2010 | IP132212 |
| 287. | Calendar entries for Smurfit-Stone's CEO, Patrick J. Moore (excerpts) | SSCC 00171404 |
| 288. | May 26, 2010 email re: April 12, 2006 meeting with Georgia-Pacific | IP334071 |
| 289. | September 1, 2006 email attaching Weyerhaeuser / Smurfit-Stone meeting agenda | SSCC 00359808/09 |
| 290. | December 12, 2007 email re: IP Opportunity | SSCC 00357029 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 291. | Transcript of Voice Message from Smurfit-Stone's Pat Moore, July 8, 2008 | Temple-Inland 00269382 |
| 292. | Georgia-Pacific/International Paper July 2, 2009 email string re: Consumer Packaging Group historical financials for Lazard | GP-KLEEN00945138 |
| 293. | October 23, 2009 email re: conversation between International Paper's Cato Ealy and Georgia-Pacific's David Park | IP340330 |
| 294. | Georgia-Pacific/International Paper October 27, 2009 email string re: Project Duke | GP-KLEEN00981469 |
| 295. | Georgia-Pacific/International Paper November 23, 2009 email string re: follow-up | GP-KLEEN00981452 |
| 296. | May 27, 2009 email re: conversation with Koch and Georgia-Pacific | IP337574 |
| 297. | February 3, 2010 email re: scheduling call between International Paper's John Faraci and Georgia-Pacific's James Hannan | IP338348 |
| 298. | November 30, 2009 email string re: December 1, 2009 visit if you are available to meet | SSCC 00126523 |
| 299. | December 1, 2009 email string re: Price Increase | SSCC 00219326 |
| 300. | September 28, 2007 email string re: Temple-Inland meeting notes | SSCC 00355574 |
| 301. | Excerpts from Deposition of Mark Polivka, April 25, 2014. | |
| 302. | December 13, 2007 email attaching IP discussion notes | SSCC 00356677/78 |
| 303. | July 1, 2010 email re: price increase | SSCC 00518759 |
| 304. | Excerpts from 30(b)(6) Deposition of Brian McGurk, January 7, 2014. | |
| 305. | May 11, 2010 Smurfit-Stone Presentation re: Presentation to Standard & Poor's (excerpt) | SSCC 00479424 |

| EXHIBIT | DESCRIPTION | DOCUMENT NO. |
|---------|-------------|--------------|
| 306. | June 19, 2006 email string re: GP, June 2006.xls | SSCC 00366286 |
| 307. | September 3, 2006 email string re: International Paper Medium | SSCC 00366322 |
| 308. | March 2, 2010 email string re: review of past International Paper LP model runs | SSCC 00134511 |
| 309. | *Allan v. RealComp II, Ltd.*, No. 10-cv-14046 (E.D. Mich. Mar. 30, 2013) (slip op.) | |
| 310. | *In re Polyurethane Foam Antitrust Litig.*, MDL No. 2196 (N.D. Ohio) (April 9, 2014 opinion sealed; April 16, 2014 Order) | |
| 311. | July 19, 2008 email re: Containerboard, kraft paper and folding carton price increase update | GP-KLEEN00946774 |
| 312. | September 21, 2007 email re: Short update | GP-KLEEN00635848 |
| 313. | Corrugated Packaging Industry Fundamentals | Temple-Inland 00247652 |
| 314. | January 23, 2010 email re: US containerboard market turns tight in January, producers pushing through announced $50/ton increase | IP532110 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

KLEEN PRODUCTS LLC,

                          Plaintiff,

          v.

PACKAGING CORPORATION OF
AMERICA

                          Defendants.

Case No. 1:10-cv-05711

<u>CLASS ACTION</u>

**DECLARATION OF MICHAEL J. HARRIS, PH.D.
IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

**Harris Economics Group
June 11, 2014**

400 North Brand Blvd. Suite 970
Glendale, CA 91203

1

I.   Introduction

    A.   Background and Qualifications

        1. I am President of Harris Economics Group (HEG).  HEG is an economic consulting firm.   I have been a consulting economist for leading management and economic consulting firms for the last twenty-seven years.  I have provided economic research and consulting across a diverse set of industries and an equally diverse set of issues including market power, anti-competitive conduct, pricing, asset valuation, trade secrets, competitive bidding, class certification, compensatory and punitive damages, and regulation, including deregulation.

        2. I hold a Ph.D. in economics from the University of Washington with specializations in industrial organization and applied microeconomics.  I have been retained as an economic expert in over sixty cases on a range of topics before state and federal Courts, the Federal Energy Regulatory Commission (FERC), numerous State Regulatory Commissions, the Ontario Energy Board, and the Alberta Energy and Utilities Board.  In many of these engagements, I have been retained to address issues related to class certification and the quantification of class-wide damages.

        3. With respect to class certification, I have been retained and provided opinions in the following cases:

- In Re: Natural Gas Commodities Litigation

- Natural Gas Antitrust Cases I, II, III, and IV

- Stand Energy Corporation v. Columbia Gas Transmission et al

- Petro Computer Systems, Inc. et al v. Micron Technology Inc. et al

- In Re Western States Wholesale Natural Gas Antitrust Litigation

      o   Fairhaven Power Company v. Encana Power Corporation

      o   Arandell Corporation v. Xcel Energy et al

      o   Heartland Regional Medical Center v. Oneok Inc. et al

     ○ Learjet Inc. et al v. Oneok Inc. et al

     ○ Breckenridge Brewery Of Colorado, LLC et al v. Oneok Inc. et al

- In Re Static Random Access Memory Antitrust Litigation
- In Re Ira A. Adams, et al. v. State of California
- Michael Shames, et al v. The Hertz Corp, et al

4. In addition to the above assignments, I have also provided substantial consulting support on numerous additional class actions involving direct and indirect purchasers. My curriculum vitae and list of testimony is attached as Exhibit 1

B. Assignment

1. I was asked by attorneys for the class Plaintiffs to determine whether there is economic evidence common to the class that supports Plaintiffs' allegation that the Defendants engaged in a conspiracy the goal of which was to increase the price of Containerboard Products above competitive levels.[1] I was also asked to determine if there is economic evidence common to the class that Defendants' conduct, if proved, would have impacted all, or nearly all, class members.

2. Plaintiffs allege that beginning in 2004 the Defendants, during a period of stable or increasing demand, imposed coordinated supply constraints, including the shutting of capacity and coordinated price increases in order to fix, raise, maintain and stabilize the prices of Containerboard Products above competitive levels they otherwise would have been during the Class period.[2]

---

[1] (Plaintiffs' Complaint) p.4 The Complaint defines Containerboard Products as "linerboard, corrugated medium, corrugated sheets and corrugated products including corrugated boxes and other corrugated containers." For purposes of this declaration, I use the term "Containerboard" to mean linerboard and corrugated medium and containerboard sheets. The term "corrugated products" refers to all the products produced from containerboard, including corrugated boxes and other corrugated containers. Citations throughout the declaration will be in abbreviated form. The full citation is provided in Works Cited in Exhibit 2.

[2] (Plaintiffs' Complaint) p.4, ¶6 (Amendments to Plaintiffs' Consolidated and Amended Complaint), ¶ 6

3. The proposed class consists of direct purchasers of Containerboard
Products from the Defendants and includes:

> All persons who purchased Containerboard Products directly from
> any of the Defendants or their subsidiaries or affiliates for use or
> delivery in the United States from at least as early as February 15,
> 2004 through November 8, 2010. Specifically excluded from this
> Class are the Defendants; the officers, directors, or employees of
> any Defendant; any entity in which any Defendant has a controlling
> interest; and any affiliate, legal representative, heir or assign of any
> Defendant. Also excluded from this Class are any federal, state, or
> local government entities, any judicial officer presiding over this
> action and the members of his/her immediate family and judicial staff,
> and any juror assigned to this action.[3]

4. Industrial organization (IO) is a discipline within economics that seeks to
understand how the productive activities of firms are matched with the
demand for goods and services and the relationship between firms and
markets. IO also seeks to understand under which conditions markets
operate efficiently and conversely under which conditions they fail.
Anticompetitive conduct such as that alleged by the Plaintiffs is an example
of a market failure. Thus, the assignment I have been given is one
commonly carried out by economists. Economists regularly evaluate
markets with the objective of characterizing behavior as competitive or anti-
competitive. Given collusion is illegal and thus often hidden, economists
must evaluate the structural and behavioral features of markets, draw
inferences, and ultimately determine if firms have the motive, opportunity
and means to collude. To evaluate the containerboard industry, I employ
a structure-conduct-performance paradigm to draw inferences. This is a
widely accepted approach and dates back to work done in the 1930s by
Edward S. Mason of Harvard and refined by numerous scholars
subsequently.[4]

---

[3] (Amendments to Plaintiffs' Consolidated and Amended Complaint), ¶ 29
[4] (Scherer & Ross, 1990), p. 4. The Structure Conduct Performance (SCP) paradigm is used extensively by antitrust economists and was refined most notably by Joe S. Bain in 1959 and described in his book Industrial Organization. The SCP method is taught to economics students and presented in numerous texts. The U.S. Department of Justice

5. In examining the economic evidence, the questions I address are the following:

   a. Are the structure, conduct, and performance of the industry consistent with, and likely to facilitate, collusive conduct, thereby providing a motive to collude and suggesting that any collusion would be broadly successful?

   b. Was the Defendants' conduct over the class period consistent with concerted action or their unilateral self interest?

   c. Would the alleged collusive conduct of the Defendants likely be successful on a generalized basis and have an impact on all, or nearly all, class members?

   d. Are the answers to the questions above based on economic evidence that is common to the class?

   e. Is the empirical analysis of impact and damages, as set forth in the report of Dr. Mark Dwyer,[5] sound and consistent with the other economic evidence and findings?

6. I have relied on numerous documents and case materials. Exhibit 2 contains the material that I have relied on.

7. For my work in this matter, I am being compensated at the rate of $460 per hour and those of my staff from $115 to $360 per hour. My fee is not contingent on the outcome of this case.

C. Summary and Conclusions

1. Based on my evaluation of the economic evidence, common to the class, and the discovery produced thus far, I have concluded that:

   • the economic evidence shows that Defendants had the motive, opportunity, and means to collude and were they to do so, as alleged by the Plaintiffs, they would have succeeded;

---

and the Federal Trade Commission utilize structural measures to evaluate proposed mergers. See (U.S. Department of Justice and the Federal Trade Commissions, 2010).

[5] I am also working with Dr. Mark Dwyer, the class Plaintiffs' expert on damages and impact. Dr. Dwyer has submitted a declaration that reports his empirical findings regarding class wide impact and damages.

- as a preliminary matter, the economic evidence shows that the conduct of the Defendants was more consistent with collusion than with independent economic decision-making, with each Defendant exhibiting conduct that was contrary to its unilateral self interest, acting independently. The conduct only makes economic sense if the Defendants were engaged in collective action; and

- the empirical evidence, common to the class, indicates that the Defendants were able to successfully elevate prices above the level one would expect from non-coordinated behavior.

2. I have also concluded, based on the economic evidence common to the class, that the collusive conduct of the Defendants would have been broadly and generally successful, elevating prices above what they would have been without collusion, thus impacting all, or nearly all, class members. The empirical evidence also supports this finding.

3. I have reviewed the empirical analysis undertaken by Dr. Dwyer. His methods and models are sound, well-accepted and widely used by economists. I find his empirical results to be consistent with my economic analysis. His empirical analyses reliably shows that all, or nearly all, class members were impacted by the price increases implemented during the class period. He has also developed a preliminary class-wide damage model that reliably estimates the economic damages suffered by the class, showing that the performance of this industry was consistent with collusion.

D.  Organization

1.  The remainder of this Declaration is divided into seven further sections.  In Section II, I provide an overview of Containerboard Products. In Section III, I provide brief summaries of the Defendants. In Section IV, I provide an overview of the industry.  In Section V, I provide an economic assessment of the structural characteristics of this industry. In Section VI, I present my preliminary evaluation and findings with respect to the Defendants' conduct.  In Section VII, I discuss the empirical findings with respect to performance measures achieved by the Defendants.  In Section VIII, I summarize my opinions.

II.  Class Products Overview

A.  Containerboard

1.  Containerboard is the raw material used to manufacture corrugated products.  Containerboard includes both linerboard and medium. Linerboard is used as the inner and outer facings of containerboard sheets while medium is the fluted sheet sandwiched between the linerboard. The combination is called containerboard.  It is used to make corrugated boxes, among other products.

2.  Large containerboard machines are used to convert essentially a fibre slurry at one end of the machine (the wet end) to a finished roll of linerboard or medium on the other (dry end).   The finished sheets of linerboard and medium are then rolled onto cores, subsequently trimmed into smaller rolls and shipped to converting locations.  To produce a containerboard sheet it is necessary to first crimp the medium sheet and then laminate it to the outer and inner liner sheets.  The machine responsible for this process is called a corrugator.   The finished sheets are then packaged for direct shipment to converting plants ("sheet plants"), or die-cut, printed, folded and glued in packaging plants for ultimate delivery to end retail customers.[6]

---

[6] GP-KLEEN01074008

3. Containerboard may be manufactured from either "virgin" fibers (kraft linerboard) or from recycled fibers from used corrugated containers (often referred to as old corrugated containers (OCC)) and trim waste from converting operations. Kraft linerboard is made predominantly from softwoods like pine whereas semi-chemical corrugating medium is made from hardwoods such as oak.

4. Linerboard is made in a range of grades or basis weights. Almost 80% of the linerboard produced in the U.S. in 2010 was unbleached kraft linerboard, and the most common grade was 42 lb.  Basis weight represents the weight in pounds per thousand square feet of linerboard. Producers also market linerboard by performance characteristics, appearance and color. The fluting in medium comes in a variety of profiles. Generally, larger flute sizes determine vertical compression strength and cushioning.  The most common grade of medium is 26 lb.

B.  Corrugated Products

1. Corrugated products include, most importantly, boxes but also displays, bulk bins, wrap around cases, etc.  By far, the vast majority of corrugated products by sales volume and revenue are commodity boxes.[7]  The most common form of box is the regular slotted container (RSC).

2. A box is generally defined by its inner dimensions of length, width, and depth.  Boxes can also be defined as to whether they include "joints" or are die-cut.  Joints are required to join panels to form the box. Joints can be glued or stapled.  A die-cut box does not have joints but instead is a one-piece panel that has been scored and then folded together.

3. While boxes may vary, the industry recognizes them as standardized. The Manufacturer's Certification Stamp is affixed to each box and identifies whether the containerboard is single-, double-, or triple-walled.  It certifies the Mullen Bursting Test or the Edge Crush Test.  The latter measures the

---

[7] In a GP POV summary presentation (GP00917132) it is noted that "Integrated producers (see page 5) produce 28 of the 33 million tons of North American boxes (84%) and produce a considerably higher proportion of commodity boxes. In a script for an investor call, Smurfit-Stone notes that: "Clearly, most of our customers are looking for a basic box to protect their goods.  There is little need for high end packaging services or solutions and the box is not an essential part of their marketing process." (SSCC 00838344)

linerboard stacking strength while the former measures the bursting strength of the linerboard.[8]  The industry recognizes that box types may be categorized into eight groupings, as recognized in the "International Fibreboard Case Code".[9]

III.  The Defendants

   A.  Packaging Corporation of America (PCA)

     1. In 2005, PCA described itself as the sixth largest producer of containerboard and corrugated products in the United States.[10]  PCA produced approximately 2.3 million tons of containerboard (kraft linerboard and semi-chemical medium) -of which 82% was consumed in its own corrugated products plants, 13% was sold to domestic customers and the remaining 5% sold on the export market.  PCA had four mills located in the U.S. with a combined capacity of approximately 2.426 million tons.[11]  PCA operated 68 corrugated manufacturing operations in 2005.[12]  Of these 68 plants, 40 were corrugated plants and the remaining 28 sheet plants.  PCA operated in 27 states.

     2. PCA sells to over 8,300 customers of which 65-70% is regional or local accounts, the remaining 30% to 35% are national accounts.

   B.  International Paper (IP)

     1. In 2005, IP described itself as the third largest manufacturer of containerboard in the U.S.  During this period IP produced approximately 4,600 tons of containerboard in the U.S.  Of this amount, about 70% was consumed in its own corrugated facilities.  IP operated 6 mills in the U.S., 9 in total with a combined capacity of 4.8 million tons.[13]

     2. IP operated 67 container plants.   IP's Industrial Packaging Division produces a number of corrugated products such as bulk packaging, produce packaging, protein packaging, retail displays, retail ready

---

[8] (Dixon Container Company, 2014)
[9] (Pinnington, 2009)
[10] (Packaging Corporation of America - Annual Report, 2005)
[11] (Packaging Corporation of America 10-K, 2005)
[12] Ibid. p.6
[13] (International Paper 10-K, 2005), GP-KLEEN00388772

packaging, transport packaging and wax and wax alternatives.[14]  IP's plants are located throughout the United States.  In 2008, IP acquired Weyerhaeuser's containerboard and packaging businesses making it the largest Containerboard Products manufacturer in the US. In 2012, IP closed on its acquisition of Temple Inland further securing its role as the largest manufacturer of containerboard.[15]

C.  Norampac (NP)

1. NP was the 7th largest containerboard and linerboard company in 2002 according with combined liner board capacity of 2,101,000 tons.[16] NP was created as part of a partnership between Cascades and Domtar.  Today, NP operates five containerboard mills, has 19 corrugated plants and three folding carton plants.[17]

D.  Weyerhaueser (WY)

1. In 2006, WY described itself as the second largest producer of corrugated products in the North America. With 9 mills in the U.S. and Mexico, the company produces about 6.2 million short tons of containerboard per year with the majority of that is converted to packaging in its own manufacturing facilities.[18]

2. Weyerhaeuser had 75 packaging plants in the U.S. As mentioned, IP acquired Weyerhaeuser's Containerboard packaging business in 2008.[19]

E.  Georgia Pacific (GP)

1. In fiscal year 2005, GP owned and operated 4 containerboard plants in North America with a capacity of 3.7 million tons.  Of that containerboard capacity, GP's converting facilities consume between 70 and 75% of the containerboard they produce.[20] Koch Industries acquired GP for $13.2 billion.

---

[14] (International Paper, 2014)
[15] (Merced & Cane, 2011)
[16] (Goldman Sachs, 2004)
[17] (Norampac, 2011)
[18] (Weyerhaeuser Co. 10K, 2006)
[19] GP-KLEEN00388772, p. 86
[20] (Georgia-Pacific Corporation, 2005)

F.  Temple Inland (TIN)

1. In its 2005 Annual Report, TIN described itself as the third largest producer of corrugated packaging in the U.S. The Company produced approximately 3.4 million tons of containerboard in their 6 liner board corrugating medium mills.[21] TIN also has 67 converting and other facilities. Combined, the mills had an annual capacity of 3.5 million tons. Approximately 92% of the containerboard produced was converted in the company's corrugated facilities with the remainder sold in the domestic and export markets.[22]

2. TIN had 72 converting facilities producing a range of products from commodity brown boxes to die cut containers. The company served about 7,100 packaging customers in a variety of industries including food, paper, glass containers, chemical, appliance and plastics.

G. Smurfit-Stone (Smurfit) (now known as RockTenn CP LLC, a subsidiary of third-party RockTenn (RTC))

1. In 2005, Smurfit operated 19 combined paper mills with a paperboard production capacity on the order of 7,200 thousand tons. Historically, Smurfit was the second largest North American containerboard and corrugated box producer in North America.[23]

2. RTC acquired Smurfit for $3.5 billion in 2011.[24]

IV.  Market/Industry Overview

1. In evaluating the structural characteristics of this industry there are a number of relevant economic characteristics. These include capacity, operating rates, inventory, demand, integration, inter-Defendants transactions, input costs, imports/exports, distribution channels, pricing, and industry fundamentals prior to, and during, the class period.

A.  Capacity

1. Resource System Information, Inc. (RISI) reports annual containerboard capacity data for six global regions: North America, Europe, Asia &

---

[21] (Temple Inland 10-K, 2005) p. 6
[22] Ibid, pp. 6, 12 and 25
[23] (Smurfit Stone Container Corp 10-K, 2005)
[24] (Spector, 2011)

Oceania, Latin America, Africa, and the Middle East. The table below shows capacity over the period 2000-2011:

**Table 1[25]**

|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| North America | 36,649 | 35,906 | 35,774 | 35,884 | 35,360 | 35,434 | 36,139 | 36,032 | 34,254 |
| Europe | 28,616 | 29,263 | 29,607 | 30,873 | 31,616 | 32,256 | 32,545 | 32,401 | 33,378 |
| Asia & Oceania | 39,773 | 42,805 | 46,016 | 49,697 | 53,615 | 58,934 | 64,302 | 68,215 | 71,498 |
| Latin America | 6,743 | 7,124 | 7,541 | 7,760 | 8,125 | 8,561 | 8,955 | 8,981 | 9,271 |
| Africa | 1,741 | 1,866 | 2,056 | 2,075 | 2,060 | 2,215 | 2,450 | 2,457 | 2,561 |
| Middle East | 673 | 783 | 888 | 1,038 | 1,223 | 1,373 | 1,450 | 1,540 | 1,802 |

2. Notably, over the period 2002 to 2010 every region, with the exception of North America, has shown substantial increases in aggregate containerboard capacity. Asia & Oceania added over 32 million tons of capacity reflecting the enormous growth experienced in China. Other than North America, Europe experienced the lowest level of growth but still added capacity, with capacity in 2010 approximately 117% of the level in 2002. The capacity level in the U.S., on the other hand, not only did not increase but, in fact, contracted by more than six percent over this period. In contrast, both industrial production of nondurable goods and foods, both considered drivers of box shipments, were increasing year over year from 2002 until the onset of the recession in 2008 as were box shipments.[26]

3. The decline in capacity in North America is a reflection, in part, of the closing of mills across the industry. Since 2000, there have been approximately 47 closures for a combined reduction of 8,646 thousand tons of capacity.[27] The declining level of U.S capacity has had a direct impact on operating rates of US containerboard mills.

---

[25] RISI
[26] (Waghorne, pp. 8, 9, 11, and 13)
[27] SSCC 00476500

B.  Operating Rates

1. Operating rates are closely monitored by firms in this industry, including Defendants, as important to price levels.  The higher the operating rates, the more likely higher prices may be maintained.  The trend in operating rates of North American containerboard mills has risen over the relevant time period. With the exception of the recessionary years of 2008 and 2009 (but with a very quick and strong recovery in 2010), the operating rates have trended up since 2000.  Operating rates hovered around 80-85% in 2000 but have steadily increased since.

**Table 2**[28]

| Year | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|------|------|------|------|------|------|------|------|
| Op Rate | 85.9 | 90.9 | 91.0 | 95.38 | 93.94 | 97.01 | 97.04 | 91.95 | 85.06 | 95.88 | 94.92 |

2. The operating rate of the industry is calculated by dividing containerboard production by containerboard capacity.  The increase in operating rate is consistent with declining capacity over this period.  Even assuming constant absolute capacity but increasing demand, the amount of capacity relative to demand would shrink thus pushing up operating rates.

C.  Inventory

1. The level of containerboard inventory is closely watched and pushed to lower and lower levels, and as will be discussed later, without regard to customer service. There is an inverse relationship between inventory levels and containerboard price. Similar to operating rates, it appears that firms see an "optimal" inventory level as it relates to price to be something on the order of less than four weeks of supply and ideally less than 3.5, recognizing that the industry has the power to raise prices when inventories fall below 3.5 weeks.[29] Again, like operating rate targets, specific inventory

---

[28] Source: AFPA Containerboard Statistics.  Annual rates reflect average of monthly rates reported by AFPA.
[29] IP037102, p.15 and GP-KLEEN01074003 at 019

level targets provide an economic focal point for the industry, as will be discussed in Section VI.E.

2. From the year 2000 forward there has been a gradual decline in inventory being held either at mills or box plants. In a Smurfit presentation on "containerboard fundamentals," it was noted that, "[h]istorically, inventory levels at or below 2.5MM tons and/or 4.2 weeks of supply support price movements." In this slide of the presentation there is also a graph depicting inventory level by quarter by year back to 1995. It is clear from the graph that inventory levels have trended down. The presentation goes on to state, "May 2010 inventories were 1.93MM tons and 4.1 weeks of supply; both represent **the lowest levels of any month since at least the early 1980s.**"[30] Smurfit's observation is also borne out by data published by the American Forest and Paper Association (AFPA). In January 2000 inventories reported by AFPA were approximately 3.1 million short tons and trended down to 2.3 million in December 2010.[31]

D. Demand

1. Containerboard has no intrinsic value, so its demand is derived. Only after it is converted into packaging material (or display, partition, etc.) does containerboard represent a commercial product. Containerboard production is either exported or sold (or transferred) to a domestic converting facility.[32]

2. Citing 2004 data published by The Fibre Box Association (FBA), PCA's 2004 10-K reported that the value of corrugated products manufactured from containerboard was $23.7 billion.[33] Non-durable production drives the bulk of demand for corrugated products and has increased in importance. In 2000 roughly 22.0 percent of corrugated was accounted for by durable

---

[30] SSCC 00080167, p.17 [emphasis added]
[31] American Forest Paper Association, 2010 Statistics for Time Series, September 2011, p.8
[32] Of course, containerboard production can also be used to increase inventories but the inventories will ultimately be drawn down and used to produce packaging materials.
[33] (Packaging Corporation of America 10-K, 2005), p.5

goods. That proportion consistently fell over the years so that in 2009 it had shrunk to only 10.0 percent.[34]

E. Integration

1. I examine the level of vertical integration in the industry between containerboard production and box plants. A measure of integration is the proportion of containerboard production consumed by a firm's box plants. By any measure, the level of integration in this industry is significant. According to various research reports the level of integration among the majors was as follows: IP (70%), Smurfit (73%), TIN (93%), PCA (80%), WY (83%*), and GP (73%*).[35] The higher the level of integration the less containerboard a firm sells on the open market to third party converters. It has been reported that in some cases, firms (IP and TIN) were actively increasing their level of integration as a means to lower their open market tonnage.[36]

F. Inter-Defendant Trades and Sales

1. The Defendants are intertwined by virtue of the significant volume of containerboard bought, sold, and traded among each other – in some cases one Defendant acting as another's largest supplier.[37] The documents evidence, for example, trades between PCA and GP, TIN and Smurfit.[38] Smurfit traded with TIN, IP, PCA, WY.[39] WY in turn traded with Smurfit, TIN and IP.[40] The volume of this inter-Defendant trading was significant. For example, the volume of containerboard sold by Smurfit to the other Defendants was comparable to the total volume sold to independent converting facilities.[41] For an integrated firm trading allows it to minimize freight costs from its mill to its converting facilities and to obtain

---

[34] SSCC 00080167, p.8
[35] With the exception of GP and WY, GP01074015. For GP and WY, GP-KLEEN00388772, p.45 (*estimates based on graph information)
[36] GP-KLEEN01074015
[37] PCoA0000028453, "Georgia Pacific: They continue to be our largest West supplier with 5-7,000 tons of liner shipping to LA and SLC."
[38] PCoA000162246-162254, PCoA0000032218
[39] SSCC0625696, IP473391, WY0108926
[40] WY0108926
[41] SSCC 0095120

incremental supply when it is incapable of supplying the entire need of its converting facilities.

2. The Defendants are also intertwined by virtue of numerous joint venture box plants that they have created. A PCA document explains that joint ventures "reduce[ ] the potential outlets for paper supply and boxes…,"[42] In early 2005, Smurfit's CEO proposed a joint venture with IP and WY – the "Top 3 integrated packaging companies" at the time – involving their entire box plant systems to "establish[] one entity with nearly 50% market share, hence significant pricing control" and "eliminate irrational pricing behavior." The proposal spoke of eliminating competition that undermined box plant "rationalization."[43]

G. Input Costs

1. There are essentially two types of containerboard mills. There are those that produce containerboard using virgin kraft fibre and those that utilize recycled fiber from old corrugated containers (OCC). The other inputs of both types of mills are similar. In the case of a recycled mill, OCC accounts for roughly 22 percent of the cost of production. For an unbleached kraftliner mill, wastepaper and virgin fiber account for roughly 35 percent of the cost of production. The remaining input costs for the recycled and unbleached kraftliner mills are similar but account for differing proportional amounts of the overall production cost.

H. Imports and Exports

1. The volume of imports or exports of corrugated containers is not large.[44] In December of 2010, there were approximately 56 thousand short tons of containerboard imported into the U.S. and 2.78 million tons produced.[45] By far, the largest volume imported comes from Canada, which represents about 93 percent of imported volume.[46] There are also trace amounts

---

[42] PCoA000034921 at 922
[43] SSCC 00840598-601
[44] (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. ), p.4
[45] AFPA, U.S. Containerboard Statistics, December 2010, AFPA-P2-JH-E-00764
[46] Ibid., In December 2010 Canada accounted for 52 of the 56 thousand tons of imported containerboard.

imported from Mexico, South America, Spain, China, and other Asian countries.

3. The volume of containerboard exports is, relatively speaking, much greater than imports, although still comparatively small in relation to total production. In December 2010, U.S. mills exported approximately 369 thousand short tons of containerboard representing about 13 percent of all containerboard produced.[47]

4. Due to higher transportation costs, oversupply, volatile export demand, increased global competition and capacity additions, export markets tend to offer lower net prices and margins.[48] Although, as a proportion of total production, the volume of exports is modest, the impact on market prices can be significant. It is clear that there is significantly more volatility in exports relative to imports. In a GP document showing imports and exports over the period January 2007 to January 2010, imports are shown to be fairly constant and in the range of approximately 50 to 90 short tons whereas exports oscillate significantly from month to month. The document indicates the ten year export minimum at 189,500 tons and the maximum at 406,000 tons.[49] That firms use exports as an economic tool to control domestic supply is evidenced by industry insiders and analysts. In discussing a potential price hike, a research report interviewed industry executives about market conditions and was told, "There has been dumping [of CTB supply] to South America to keep prices high."[50] In a 2007 email exchange, Mark Polivka sent the Supply Chain report and notes, "working with sales to deliver as much export as possible to offset consumption shortfalls and drive inventory levels lower."[51]

---

[47] Ibid.
[48] (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. ), p.4
[49] GP-KLEEN01424599, p.18
[50] (Franklin, 2012)f , p.13
[51] SSCC00362902, emphasis added

I.  Distribution Channels

1. Liner and medium are converted into corrugated packaging via two channels.  The bulk of the liner and medium produced is sent directly to box plants where it is converted into corrugated containers.  Alternatively, the liner and medium can be sold to an independent sheetfeeder who then combines the liner and medium and sells the finished board to a sheet plant, which then converts the already combined sheets into corrugated containers.  A 2011 GP document reported that out of the 34 million tons of liner and medium produced by the entire industry, 4 million tons went to exports and 1 million tons to other uses and inventory.  Out of the remaining 29 million tons of liner and medium combined, 82 percent was shipped directly to box plants while the remaining 18 percent was shipped to sheetfeeders who in turn sold to sheet plants.[52]

J.  Pricing

1. There are a number of features about how containerboard and boxes are priced that deserve attention.  These features include the use and reliance on public indices for pricing of Containerboard Products, the relationship between actual transaction prices and published indices, the lag between price announcements, implementation, and the means by which increases in the price of containerboard translate into higher prices for corrugated products (i.e., boxes), and the relationship of input costs to prices.

2. The vast majority of sales of both Containerboard Products are pegged to published price indices.  The price posted for 42# Kraft liner in Pulp and Paper Weekly (PPW) is widely referenced, as evidenced in Defendant presentations, investor reports, the contracts between Defendants and their customers, testimony of industry executives and experts, and Requests For Quotations (RFQ) issued by corrugated customers.[53]

3. Containerboard customers understand and accept that prices are tied to an index. My review of RFQs reveals that customers seek standardization

---

[52] GP-KLEEN01100218
[53] A 2010 presentation by Smurfit estimated that 92% of container boxes are tied to PPW, with the remaining 8% "tied to market." [SSCC00101201, p.32]   In describing how "new prices" are determined an IP Pricing Manager  first noted

(including pricing terms) in how corrugated manufacturers bid on potential business. For example, a Nautilus RFQ had the following language: "For the bidding event, prices for each SKU should be based on the going market rate (monthly) of US Linerboard 42# unbleached Kraft East per Pulp & Paper Week as per the latest edition at the time of the bidding event."[54] Similar language is found in a HJ Heinz RFQ.[55]

4. Finally, not only do the Defendants price with reference to the published index, they also utilize the index when trading with each other and their downstream corrugating facilities. A PCA memo discussing "Mill Market Adjustments"notes: "The beginning point is Pulp and Paper midpoint List price for the respective regional location of each plant (the differentiation being east or west). This List price is predicated on 42# linerboard and 26# corrugating medium."[56] In her testimony, Ms. Mollie Hilliard of GP affirmed that "trades were typically priced off of indices reported in Pulp & Paper Week."[57]

5. I have reviewed a sample of contracts between a number of the Defendants and their customers. Without exception all of the contracts in the sample had pricing tied to public indices.[58]

6. Some of the Defendants track and compare their actual transactions prices to published indices. Those documents reflect a high degree of correlation between actual transaction prices and the published indices.[59]

---

that "most prices are based on our 42# kraft liner and that they take into account pulp and paper pricing (presumably published), current market conditions, a customer's current pricing, etc." [IP0995216] In a 2010 investor conference call, the Chairman and Chief Executive Officer for Temple-Inland stated, "Most of our box prices are either directly or indirectly influenced by adjustments in published linerboard prices." [Temple-Inland 00553966] In its 2010 bankruptcy proceeding, Smurfit submitted an Affidavit stating: "The contract prices for many sales of containerboard and corrugated containers are linked to the Linerboard Index Price. However, these contracts have price movement mechanisms that lag the movement of the Linerboard Index Price." [ (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. ), p. 4]. In an investor report, Dr. Mark Wilde, of Deutsche Bank, stated: "In practice, box prices are often linked to the published containerboard indices…" [GP-KLEEN01074003 at 015]
[54] PCoA000017862 at 864
[55] PCoA000018015 at 017
[56] PCoA000045086
[57] Hilliard Dep. Tr. at p. 67, Lines 3-5
[58] Temple Inland 00051818, Temple Inland 00051798, Temple Inland 00051775, Temple Inland 00051770, Temple Inland 00051757, Temple Inland 00051692, PCoA 000197041, PCoA 000166161, IP089891, IP043351 at 353, IP009997 at 998, IP012123, GP-KLLEN00362591 at 592
[59] See, for example, GP-KLEEN01018364

7. The industry also recognizes that prices, while still tied to indices, may lag any price changes in those indices. The length of lag will differ for small versus large customers and perhaps other dimensions but will ultimately track the change in the published index.[60]

8. Box prices increase in response to containerboard prices through mathematical formulas spelled out in supply agreements. For example, PCA described its formula to its customer: a 7.5 percent increase in box prices based on a $55/ton increase in liner and medium. The calculation starts with the "baseline composite index price" which is a weighted average price of the pre-increase price of liner ($555) and medium ($535). From there the proportion increase was the ratio of the increase amount ($55) multiplied by 75 percent and divided by the composite index price ($547) to arrive at 7.5 percent.[61] Regardless of mathematical formulas, the Defendants recognize that containerboard price increases translate into box price increases. In a TIN presentation, it is noted, "Supply and demand is driving the linerboard increase – box prices increase follows 100% of the time.[62]

9. It is recognized in the industry that input cost is not the principle driver of prices. IP, for example, found that "59 percent of the variance in 42# Kraft Liner pricing can be explained by the variance in supply and demand, including inventory and 41 percent of the variance can be explained by the variance in cost."[63] Under the title "supply and demand," IP notes that Inventory accounts for 28 percent with the remaining 31 percent accounted for by Operating Rate.[64] A March 2008 McKinsey & Company presentation discusses how industry prices and margins have been boosted, noting that, "roughly 55% was due to prudent capacity management…and the

---

[60] GP-KLEEN01074015
[61] Baseline Composite Index Price: (60% x $555) + (40% x 535) = $547 per short ton; Box price increase: (75% x $55)/$547 = 7.5%, PCoA 000428673
[62] Temple-Inland00072964, p.2
[63] IP105350
[64] IP037102, p.13

remaining 45% was due to differential manufacturing cost escalation, particularly of the marginal producers."[65]

10. As an economic matter, changes in input costs must have some impact on pricing at least over some long term horizon.  Costs cannot rise above prices for any length of time without an adjustment in prices.  However, when viewed side by side it is apparent that prices of Containerboard Products adjust independent of changes in costs. Documents showing the relationship between pricing and cost all show a disconnect between changes in costs and changes in prices.  In one GP document the 42# Liner price is compared with Average Cost for the period 1991 to 2009.  There appears to be a weak relationship between cost and price.[66] In another graphical analysis by IP, price increases over the 2007 to 2009 period are compared with cost increases.  The graph makes it clear that the price increases vastly exceeded the cost increases.[67]  Finally, in an IP document the short- and long-run relationship between US 42# Kraft Liner and US 26# Medium prices are compared with cost over the period 1992-2009, showing that there is little relationship between prices and cost but interestingly, this same document shows that a comparison between the price and cost of European 175 gram Kraft Liner for the short- and long-run reveals a close relationship between European price and cost.[68]

K.  Trends in Industry Fundamentals

1. 2000-2004: Following the bursting of the "Dot-Com" bubble[69] in early 2000, production of containerboard declined to 2,680 tons in June of that year but steadily and gradually increased to 2,922 tons in February of 2004.[70]  During this period, operating rates for virgin and recycled containerboard fluctuated but rose from the low 80% to the low 90%.[71]  Inventories

---

[65] IP268609, p.6
[66] GP-KLEEN00395006, p.9
[67] IP0954335, p.33 (note: the labels on the graph indicating "Market" and "Cost" are reversed)
[68] IP259277
[69] (Wikipedia Commons, n.d.)
[70] American Forest & Paper Association 2010 Statistics For Time Series Analysis, p. 1 of 18. (seasonally adjusted figures)
[71] IP579512, p.47

fluctuated as well but, for the most part, stayed within a band of 4.0 to 5 weeks of supply.   In February 2000 transaction prices for unbleached kraft linerboard 42lb. East stood at $460.  From that point forward prices trended noticeably down until reaching a low of $360 in February 2004.[72]

2. 2004-2010: Industry fundamentals changed dramatically.  While monthly production of containerboard continued to fluctuate, it stayed in a band of 2800-2900 tons until the effects of the great recession started to manifest in November 2008.[73]  Operating rates started out in the mid to high 90% in 2004 and, while varying slightly, stayed strong and consistently in the high 90s reaching upwards of 98% until the onset of the great recession.[74] Beginning in 2004, containerboard inventories were around 4 weeks of supply.  With the exception of a few months, inventories never rose above 4.5 weeks and generally trending down and at times as low as 3.5 weeks.[75] The most dramatic change over this period was in prices.  With the exception of a period in 2005, prices for unbleached kraft linerboard 42lb. East rose steadily from the low of $360 in February 2004 to a high of $610 right before the impact of the great recession.[76]

V.   Economic Assessment

1. Economists seek to identify characteristics that influence economic performance.   The structure-conduct-performance paradigm is utilized by economists to understand economic outcomes.  The performance (e.g., market prices) is dependent on the conduct of the sellers (i.e., competition versus cooperation), which in turn depends on the structure of the industry, which itself can reflect the economic features of the market and the voluntary actions of the incumbent firms (i.e., mergers, acquisitions and

---

[72] RISI – 00001674 (prices reflect mid-points)
[73] American Forest & Paper Association 2010 Statistics For Time Series Analysis, p. 1 of 18. (seasonally adjusted figures)
[74] IP579512, p.47
[75] IP579512, p.46
[76] RISI – 00001674 (prices reflect mid-points)

consolidation).[77]   I now assess a number of relevant features of the containerboard industry.

A. Market Share/Concentration

1. Economists look to market share and market concentration because both affect the possibility and success of collusion.[78] It is well accepted in economics that collusion among firms is much more likely to occur in concentrated markets with relatively few firms.

2. The North American containerboard and corrugated industries, of which the U.S. constitutes almost 94 percent,[79] have historically exhibited high and increasing levels of market concentration.[80] Underlying the increase in concentration were ongoing acquisitions.  From 1990 to 2003 ten firms were merged into six firms with a combined North American market share of 72 percent.[81]  By 2007 these six firms had become five with a combined market share of 74 percent.[82] In 1995 the top 3 and top 6 containerboard producers had a market share of 27 and 50 percent, respectively.[83] By 2003 the combined market share of the top 3 containerboard producers almost equaled the market share of the top 6 in 1995, at 49 percent.[84]  By 2007 the top 5 producers had a combined market share of 74 percent.[85]

3. As the combined market share of the large integrated firms increases so does market concentration as measured by the Herfindahl-Hirschman Index (HHI).[86]   In an April 2011 presentation by Ken Waghorne, Vice

---

[77] (Sherer & Ross, 1990), pp. 4-5
[78] (Tirole, 1995), p. 243
[79] Of the total North American capacity of 34,254 thousand tons shown in Table 1, U.S. accounted for 32,088 thousand tons.
[80] The Defendants in their analysis and presentations for the most part discuss and report on the North American containerboard industry rather than the U.S. alone.  However, the bulk of the industry by any measure is U.S.  For example, of the 34.25 million tons of North American capacity reported in 2010, 32.09 million tons were located in the U.S.
[81] GP-KLEEN00404231, p.9
[82] IP0954335, p.15
[83] IP0954335, p.15
[84] IP307902, p.38
[85] IP0954335, p.15
[86] The HHI is a measure of the size of firms in relation to the industry and is used as an indicator of the amount of competition among them.  It is a measure employed by antitrust economists and the U.S. Department of Justice (DOJ) when assessing mergers.  (U.S. Department of Justice and the Federal Trade Commissions, 2010), pp.18-19

President of RISI, the HHI of the containerboard industry was depicted on the graph below:[87]



4. The graph shows the increase in concentration as depicted by the rising HHI.   The trend in concentration was upward and significantly higher in 2011 compared to 1993-1995.  Second, the concentration of the industry during the class period was over double that observed during the class period (1993-1995) of the last Linerboard Antitrust Litigation. Finally, it depicts the focus that firms within the industry and industry observershave on the consolidation and increased concentration of the containerboard industry.  The graph is titled: "Increased Containerboard Consolidation is Providing Producers With More Pricing Power."  The entities recognize what economists know well --- increased market concentration, all other things constant, creates an environment that is conducive to price increases.   In short, increased market concentration confers what economists call market power on incumbent firms.  The HHI presented in the RISI analysis reflects an HHI assuming independent conduct not joint conduct.  If the Defendants collude and essentially mirror the behavior of a single firm, the HHI calculation would be vastly higher thus reflecting an even greater market power.  For example, in 2007 the combined market share of just IP, Smurfit, GP, TIN, and PCA was 74 percent.  Acting as a single firm, this market share would contribute 5476 to the HHI calculation

---

[87] (Waghorne, 2011)

even before adding in the market shares of the remaining firms in the industry.  A market with an HHI of 5476 is over twice the HHI threshold for which the DOJ considers "highly concentrated."[88]

5. The concentration observed with containerboard production is also mirrored in the corrugated box industry.  In 1986 the top 6 firms had a combined market share of 41.8%.  In 1997 the top 6 firms had a combined market share of 58.8% and by 2007 the top 6 had a combined market share of 81%.  In just over twenty years the combined market share of the top 6 firms almost doubled.[89]

B. Barriers to Entry

1. High profits in a market serve as a signal to other firms to enter the market. To enjoy the supra-normal profits from collusion, colluding firms must be free of the threat of entry by other firms.[90]  Barriers to entry allow colluding firms in a concentrated market to successfully exploit their market power to raise prices by constraining the entry of new firms into the market who then might compete away the gains achieved by the colluding incumbents.

2. A barrier to entry is a substantial advantage to incumbent firms that can be overcome only by an entrant making large expenditures and efforts. Examples of barriers to entry include brand loyalty, intellectual property rights, and high fixed costs of capital facilities

3. In terms of fixed costs, the paper industry is considered to be the "most capital intensive industry" in North America, and mills and plants can take years to construct and cost over $1 billion.[91] In an April 2008 presentation, Colleen Walker of the Center for Paper Business and Industry Studies (CPBIS) stated, "A new mill hasn't been built in last 12+ years.  Even with zoning, environmental & regulatory clearances, the cost would be economically prohibitive for major players."[92]

---

[88] (U.S. Department of Justice and the Federal Trade Commissions, 2010), p.19
[89] IP0954335, p.14
[90] (Tirole, 1995), p. 305
[91] Temple-Inland 00024456
[92] (Walker, McNutt, & Cenatempo, 2013), p.4;  see also (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. ), p.3

4. Imports generally are not considered a significant threat as a form of entry. An IP presentation on "North American Industry Dynamics," headlined that the "Threat of Imports is Currently Low."  Among the reasons given was that, "85% of N.A. industry is leak proof due to integrated suppliers," and "[i]ndependent corrugators make up the remaining 15% of converting capacity."[93] In another presentation it was noted that, "[i]mports are not a significant threat to North America due to production and transportation costs."[94]

5. The data bears out the limited role of imports.  As noted in Section IV.I, in December 2010 only 56 thousand tons on containerboard was imported to augment the 2.78 million tons produced in the U.S. in that month. The same is true for boxes.  In an April 2010 Affidavit Mr. Denton of Smurfit notes that "[t]here is not material exporting or importing of containers."[95]

C.  Demand Elasticities

1. The price responsiveness of demand influences the success of collusive conduct on prices.  If demand for a product is highly sensitive to price changes, it is unlikely that a group of firms colluding could effectively raise prices.[96]   The elasticity of a product is a function of the availability of substitutes to that product.  In the presence of substitute products, if a group of firms attempted to increase prices, their customers would simply reduce purchases of the exploited product and purchase the alternative substitute products.   Thus, the ability to maintain the price above competitive levels would be constrained, undermining a motive to collude.

2. The containerboard industry recognizes that there is no widespread substitute for containerboard. A TIN presentation noted that, "[r]eusable shipping containers have not significantly penetrated the market due to an uncompetitive value proposition for most potential buyer (sic)." It also notes that, "[n]o viable product substitutes exist or have been developed that

---

[93] IP107342 at 354
[94] GP-KLEEN01017026, p.18
[95] (Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. )p.4, ¶7
[96] (Viscusi, Vernon, & Joseph E. Harrington, 2000), p. 259

significantly threaten current markets for corrugated." [97]An IP presentation noted that, "N.A. supply & demand is not impacted by imports or substitution."[98]

3. Analysis of the containerboard market confirms empirically the low elasticity of demand. A study conducted by the research firm Poyry found low short- and long-run elasticities of demand. The study concluded that Kraftliner "demand appears rather inelastic."[99] The study showed the same for Testliner, which is containerboard made with recycled product. Interestingly, in evaluating the period 1987-2003 the study showed very little difference between short and long-run elasticities. That the short and long-run elasticities were almost identical strongly suggests that substitution opportunities were minimal. Economists expect long run elasticities to be more responsive than short run elasticities because in the short run there can be transaction costs and other impediments that prevent customers from substituting to other products.[100] However, over time transactions costs usually will become less onerous and any other impediments less significant. Thus, customers will be more likely to switch in the face of increasing prices.

D. Product Homogeneity

1. Product homogeneity implies that the products of all sellers are alike and thus are substitutes for each other. The primary dimension, in which sellers compete, then, is price. Product homogeneity makes collusion easier.[101]

2. When products are substitutes for each other they are called commodities. An example is wheat. A particular wheat variety grown by one farmer is indistinguishable and hence perfectly substitutable with the same variety of another farmer. In commodity markets the processes that determine prices (including collusive activity) typically are common across the incumbent firms in that market. Commodity markets are more susceptible to collusive

---

[97] Temple-Inland 00080408, p. 6
[98] IP066785 at 786
[99] IP263040 at 124
[100] (Pindyck 1989), p. 282
[101] (Scherer & Ross, 1990), p. 279

activity than markets with highly differentiable products.[102] It is widely acknowledged in the containerboard industry that containerboard is a "commodity."

3. For example, Credit Suisse put it succinctly: "Like it or not, most buyers really don't care whose name is on the paper (or board) as long as it prints well and doesn't jam the equipment."[103] The Defendants themselves acknowledge this fact. PCA's 2005 10-K filing noted: "Containerboard is generally considered a commodity-type product and can be purchased from numerous suppliers."[104] An IP presentation on North American Industry Dynamics stated: "While Containerboard is a Global Commodity, North America has Regional Dynamics."[105] GP's internal documents confirm that containerboard is viewed as a commodity. In a January 2008 "Containerboard Price Point of View-Methodology" the notion of a "tool" called the "Industry Cost Curve analytical framework" was discussed. The authors noted that "[t]he tool is used in commodity-based manufacturing industries."[106] Finally, the DOJ also views containerboard as a commodity that is undifferentiated and substantially the same from producer to producer.[107]

4. Corrugated products manufactured from the containerboard are also considered commodities. As noted in Section II.B., there are a variety of box types. However, by far the most common form of box is the regular slotted container. A wide swath of corrugated packaging is characterized as "undifferentiated brown boxes."[108] In an assessment of the potential acquisition of TIN by IP in 2010, it is noted: "*Boxes are a commodity* and not difficult to manufacture."[109] IP's Pricing Manager noted that there are a "[l]imited [number] of corrugated mfg. plants and converters offering

---

[102] (Scherer & Ross, 1990), p. 279
[103] GP-KLEEN01015368
[104] (Packaging Corporation of America - Annual Report, 2005), p.10
[105] IP010952
[106] GP-KLEEN00375366, p. 8
[107] Department of Justice, Antitrust Division, United States v. International Paper Company et al,; Proposed Final Judgment and Competitive Impact Statement, (DOJ Statement) IV. The Relevant Market
[108] GP-KLEEN00478369, p.3
[109] EVERCORE00014511 [emphasis added]

similar products."[110]  Outside analysts outlining the threats to corrugated and folding carton markets noted: "Increased commoditization of **core** packaging business."[111] Another presentation discussing the North American Corrugated Packaging Industry notes that the business has a "commodity product."[112]   A PCA presentation discussing industry characteristics noted: "Prices [are] Hinged to a Commodity" and "Box Plants – Little Differentiation."[113]

5. While a box plant needs to manufacture to a customer's particular box specifications, the vast majority of box plants can manufacture to that same customer's box specification.  This is confirmed by Ms. Rachel Kenyon of the FBA. When asked "And so those member competitors can each customize boxes for the food service industry, right?" Ms. Kenyon responds "Yes." When asked about other categories, she responds, "It could be for any one of these or anyone that is not listed here."[114] This is also well recognized in the industry because box customers routinely multi-source across multiple box plants as a way to diversify their supply chain and minimize risk of disruptions or shortages.

6. The proposed class representatives have testified that they view boxes as commodities and order the same boxes from multiple sources.[115]  David Westphal testified that: "Price is a very important thing and a box basically is a box, so we could get it from different suppliers, and price is what was a driving factor."[116] Robert Ramm testified that: "[p]rimarily price" drove the choice, "[t]here isn't a difference in the design whatsoever."[117] Westphal

---

[110] IP0995216.  Notes of interview with Rebecca Dupuy, Containerboard Pricing Manager
[111] Dean_000050 (emphasis added)
[112] Evercore 00014508
[113] PCoA000025127
[114] Video Deposition of 30 (b) (6) and 45 Witness For Fibre Box Association, Rachel Kenyon, April 16, 2014, Tr. at p.151, line 13 to p.152, line 3.
[115] See Deposition of George Howell of Kleen Products, p. 85, at 2-17, p. 162, at 8-19, p. 174, at 2-11
[116] Deposition of David Westphal (RHE Hatco) at 73:23-25.
[117] Deposition of Robert Ramm (RPR) at 48-49

and Ramm testified that even so-called "specialty boxes" are identical except for printing on the outside.[118]

### E. Contract Provisions

1. Contract provisions, such as the most favored nation provision which tie prices of one customer to another can affect the likelihood and extent of successful collusive behavior.[119]  Contracts, for both containerboard and corrugated containers, often either peg the price of the product to a widely observed price indexand/or call for periodic updating based on prevailing market conditions.  In addition, contracts often include provisions that tie the renegotiated price to the prices observed in transactions between the seller and other purchasers and/or the prices observed in transactions between the purchaser and other sellers, such as the following:

> Pricing for Containerboard delivered hereunder shall be the prevailing market prices and established quarterly no later than the 15th day of the previous month for sales of Containerboard of like grade and quality from primary mill suppliers, which shall be mutually agreed to by the parties from time-to-time, **after giving due consideration to prices of Seller's Containerboard sold to like third party purchasers and to the prices of like Containerboard purchased by Buyer from other primary mill suppliers**.[120]

> In the event Buyer presents Seller with a bona fide offer from a third party to sell Buyer one or more specific grades and/or basis weights of Containerboard being provided by Seller under this Contract, at a price or prices lower than Seller's then current price, Seller shall have ten (10) days to decide whether it will meet such third party offer.[121]

2. These provisions connect the most recent negotiated prices to other prices. Thus, these provisions serve to propagate the impact of the collusion from one buyer to many. I have reviewed a sample of the Defendants' contracts

---

[118] David Westphal (RHE Hatco) at 104:2-17 ("specialty box" does not vary from other boxes in size, quality, or material only in printing); Deposition of Robert Ramm (RPR) at 45:3-9
[119] See: (Department of Justice, 2012). A 2012 workshop by the DOJ and FTC discussing the competitive implications of MFN provisions.
[120] PCoA000035024, emphasis added
[121] GP-KLEEN000033831

for containerboard and corrugated containers and have found these provisions to be quite common.

F.  Frequency of Interactions

1.  The frequency of interactions between firms speaks to the success or failure of collusive conduct.[122] When firms participate in very infrequent public bids for large orders, there tends to be less success in collusive activities.  This results because the motivation to cheat on the collusive price and win the bid is very high.

2.  The frequency of interaction is determined by both the actual frequency with which a firm transacts with any particular customer and the number of customers of that firm and others in the market.  Given customers, for the most part, do not transact at the same time, firms in the market will be frequently interacting with each other and their customers.

3.  The Defendants' have thousands of customers and transact frequently.  Contracts with customers span months and longer.  Because contract dates are staggered, the Defendants are constantly facing off with their customers and by extension with each other.

4.  The Defendants trade significant volumes of containerboard between themselves. As a result, they are in frequent interaction.  The trade in containerboard provides an instrument to punish firms that might stray from a collusive agreement and thus supports collusive outcomes.  In addition, trades and swaps also provide a source of pricing information among and across the Defendants which facilitates collusive behavior.

5.  As previously discussed in Section IV.F the Defendants are also engaged in numerous joint ventures.  In addition to their effect on supply, such joint ventures also provide an additional source of communication between the Defendants and a means to exact retaliation against firms deviating from a collusive arrangement.

G.  Market Transparency

---

[122] (Ivaldi, Jullien, Rey, Seabright, & Tirole, 2003), p.19 or (Scherer & Ross, 1990), p. 306.

1. Market transparency serves to prevent cheating on the cartel or at least imposes a high cost on the firm who cheats from the collusive agreement.[123]  More frequent and observable price adjustments make it easier for firms to identify cheating and thus easier to punish the cheating firm, thus promoting the success of collusion.

2. In the case of containerboard and corrugated containers there is market transparency.  The publicly available price indices (e.g., PPW) that track transaction prices provide transparency.  As was previously discussed, the contracts of the Defendants include provisions that tie the current price to prices observed elsewhere in the market.  In addition, the Defendants actively seek out market intelligence from their customers, analysts or their "trading partners", including other Defendants.[124]  In all, the Defendants have a very good sense of prevailing transaction prices across their markets.

3. The AF&PA also provides extensive reports and monthly statistics of the containerboard industry.  For example, the AF&PA monthly and annual statistical summaries provide production for domestic and export, operating rates, box plant consumption, and inventories at mill and box plants.[125]

H.  Trade Associations

1. It is well documented that trade associations tend to facilitate collusive conduct.[126]  The Young Lawyers Division of the American Bar Association has observed that: "[m]ost 'price-fixing' and other per se illegal conspiracies happen in trade associations."[127]

2. There are two principal trade associations that are utilized by the Defendants.  First, there is the Fibre Box Association (FBA).  The FBA holds at least three meetings each year where executives and other representatives of the Defendants have the opportunity to meet and

---

[123] (Ivaldi, Jullien, Rey, Seabright, & Tirole, 2003)p. 22
[124] Section VI.F below will discuss how the Defendants conduct market intelligence
[125] See for example, Annual Statistical Summary and Statistics for Time Series Analysis, 2004.  The American Forest & Paper Association, Containerboard Group.
[126] (Levenstein & Suslow, 2011)
[127] (Walker, McNutt, & Cenatempo, 2013), p.3   See also, (Posner, 2001), ch. 6 at p. 170

communicate as well as dozens of networking events. Currently, employees from a number of the Defendants serve on FBA's Executive Committee and Board of Directors.[128]

3. In addition to the FBA, there is the American Forest & Paper Association (AFPA). Similar to the FBA, the AFPA holds meetings several times a year, which provide the Defendants opportunities to meet and communicate.

4. The Defendants use the meetings to communicate with each other. On October 3, 2006 the AF&PA held its Containerboard Division Membership Meeting.[129] An October 19, 2006, email from Smurfit's Brian McGurk to TIN references in-person meetings as a pre-curser to the Containerboard Division Membership Meeting: "As you both know, the ramp up to[] the actual meetings and post San Diego dialogue creates considerable energy and opportunities for all companies involved."[130] Mr. McGurk continued: "As both Larry and I re-iterated in our Austin visit, we value the long term relationship with Temple Inland."[131]

I.    Conclusion

1. The structural characteristics of this industry described above are consistent with and would facilitate successful collusion among the Defendants. Therefore, as is well recognized among economists, this industry structure provides to Defendants a powerful motive to collude.

2. In addition, certain of these structural characteristics – presence of trade associations, frequency of interactions and trades among the firms – provide to Defendants ample opportunity to collude

3. Further, these structural characteristics also provide substantial support for the conclusion that any collusion by the Defendants would ultimately be broadly and generally successful. Successful collusion would affect prices throughout the entire industry having a widespread impact across all or nearly all customers. The fact that transactions are pegged to indices, the

---

[128] (Fibre Box Association, 2014)
[129] AFPA-P-GS-00643, AFPA-P-GS-00644
[130] McGurk Ex. 134/SSCC 00625963
[131] McGurk Ex. 134/SSCC 00625963

use of most-favored-nations provisions in customer contracts, and the level of vertical integration also buttress a finding of common impact.

VI.    Preliminary Assessment of Defendants' Conduct

1. In this section I evaluate the Defendants' conduct across a number of relevant dimensions including: mill closures, operating rates/inventories/trades, downtime/slowback, coordinated pricing, the use of focal points, monitoring inter-firm behavior, direct communications among them, and prior antitrust violations. The nature of the Defendants' conduct in each of these areas sheds light on whether their behavior should be viewed as independent or is more reflective of coordinated action.

2. The Plaintiffs allege that as a means to fix, raise, and maintain the price of containerboard products, Defendants engaged in a coordinated effort to restrain supply. The effect of such restraints was to create an artificial shortage. Operationally, a shortage in supply is manifested in high operating rates and low inventories. High operating rates can result from reductions in capacity in the face of constant or increasing demand. A reduction in capacity in turn can be the result of permanently shutting capacity or temporarily idling capacity by taking downtime. Inventory levels are in direct control of the Defendants.

3. The Defendants operate in what economists call an oligopolistic market. Such markets are characterized by the presence of a small number of dominant firms offering similar products. In an oligopolistic market firms are interdependent.[132] That is, each firm, even when acting unilaterally, develops "conjectures" of what other firms will do in response to its actions.[133] For example, the price a firm sets is dependent on what it expects other firms will do in response. If one firm leads with a price increase, the other firms can either follow and propose similar increases or maintain their current price. From the incumbent firms' perspective, an

---

[132] (Scherer & Ross, 1990), p. 199.
[133] In contrast, firms in a purely competitive market do not respond to other firms in the market. They simply produce and sell that amount of output until the marginal cost of the last unit produced is equivalent to the market price, which they take as given. (Pindyck & Rubinfeld, 1989), p. 255.

ideal equilibrium would have all firms setting their prices consistent with that achieved by a hypothetical monopolist.[134]   This price would yield the highest profits for that market.

4. Whether firms can increase and maintain prices in an oligopolistic market above what would normally be achieved through independent actions depends on the level of coordination and cooperation. Because illegal cartels very often form in secret, economists must evaluate the economic evidence and draw inferences as to whether market prices are the result of collusion.   In evaluating a market, economists look to whether the incumbent firms have the motive, opportunity, and means to collude and whether the observed conduct reflects unilateral independent self interest or is only rational in the context of collective action.[135]

5. As discussed in Section IV, and consistent with the allegations of Plaintiffs' complaint in this case, during the alleged class period, capacity and inventories in this industry were reduced and operating rates increased. This was done during periods of constant or increasing demand.   The Defendants during this time sought to reduce supply.   In the remainder of this Part of the Declaration, I turn to an economic evaluation of the Defendants' conduct in this regard, to determine, consistent with well-accepted economic principles, whether that conduct is more consistent with unilateralactions by Defendants or by collusion among them.

A. Mill Closures

1. Exhibit 3 lists the mill closures since 2000.  Since 2004, 31 mills have been closed with a combined capacity of 5,967 thousand tons. The Defendants were responsible for 83 percent of the total capacity closed during this period. Further, the mill closures occurred during periods of increasing box shipments.[136]  The figures cited accounts only for permanent closures.  In addition to the permanent closures, the Defendants also "indefinitely idled"

---

[134] (Scherer & Ross, 1990), pp 114-117.
[135] For a discussion of "action contrary to self interest" see Werden pp.745-751.
[136] See: (Waghorne, 2011), p.13 shows box shipments steadily trending up from 2001/2 through 2008 before the impact of the U.S. recession in 2008.

numerous facilities during the class period.[137] The question is whether such closures were in the unilateral self-interest of each Defendant or were they economically rational only if done as a result of coordination by the Defendants.

2. In a competitive market capacity can be used to strategically gain market share when rival firms attempt to increase prices.[138] Thus, closing capacity limits competitive options of firms to respond to increases in customer demand.  In a market where firms coordinate actions as a means to increase prices (a cartel), it is desirable to eliminate the possibility that firms will cheat on the collusion and attempt to grab market share as prices increases.  A firm can signal to rival firms that it wants to move to a less competitive pricing regime by closing capacity.[139]  By removing capacity, the firm is signaling that it will not be able to undercut and outmaneuver its rivals.  The closing of capacity becomes what economists sometimes call a "facilitating practice,"[140] which is an activity that makes collusion more likely and more effective, either by making coordination easier or making it easier to sustain a collusive agreement.[141]

3. Shutting capacity in the circumstances Defendants faced during the class period is both a facilitating practice and a potential "plus factor" used to evaluate collusive behavior.  Plus factors are "additional evidence" beyond just parallel conduct that helps distinguish concerted action among firms from unilateral decision making.[142]

4. The economic literature distinguishes between a reduction in supply (which would follow from capacity curtailments) during a trough in a business cycle and a reduction in supply at the peak of economic activity.   An article on plus factors recognizes:

---

[137] For example, IP indefinitely idled a plant in Albany Oregon in October 2008, Smurfit did the same to three locations in 2008, GP idled two locations in 2009 (GP-KLEEN01074003 at 016)
[138] (Scherer & Ross, 1990), p.296
[139] (Tirole, 1995),  p.328
[140] For a discussion of facilitating practices see, (Hay, 2005)
[141] (Harrington, 2011), p.154
[142] (Werden, 2004), pp. 745-756

"Restriction in supply by subsets of firms when demand is strong, profits are high, and prices are relatively high, however, leads to the strong inference of collusion—namely, it is a super plus factor – for two reasons. First, there are substantial foregone profits from restricting supply when demand is strong. Second, buyers will take measures to resist price increases in such an environment, and it is quite unlikely that unilateral conduct by sellers would not take advantage of the opportunity to sell incremental units at higher prices."[143]

5. The capacity cuts by Defendants in this case were undertaken during periods of strong growth in box demand. By each Defendant cutting capacity, the Defendants effectively increased industry operating rates and reduced their ability to capture incremental market share both at the time and in the future. Attempts at capturing incremental market share at all costs would be what one investor analysis would term "destructive behavior." A February 2004 report notes: "As we see it, the destructive behavior of containerboard producers in aggregate is the result of almost entirely rational behavior by individual producers. If individuals acting rationally create destructive behavior, then there is something wrong with the group, not the individuals."[144] What the Defendants did was consistent with coordinate group behavior but not unilateral self-interest.

6. The fact that the curtailment of capacity in general would not be in the unilateral self interest of a single producer can also be found in some of the analysis undertaken by IP. In a presentation IP evaluated the impact of capacity closures and downtime under two scenarios. Under the first scenario all firms undertook the capacity closures and downtime and in the second scenario only IP undertook the capacity closure and downtime. The results show that under scenario two where IP alone undertakes the action, the impact on price is minimal but the negative impact on margins very significant. By all firms acting together in a coordinated fashion, there would be a significant positive impact on price and large positive increase

---

[143] (Kovacic, Marshall, Marx, & Halbert L. White, 2011), p. 421
[144] (Connelly, Cha, & McGovern, 2004), p. 35.

in net margins.  Acting alone, on the other hand, generates large negative margins.[145]

7.  In internal documents at the time, Smurfit also recognized that shutting capacity through mill closures left Smurfit without "the capacity to benefit from market demand..."[146]  In early 2004, even outside investors were questioning Smurfit capacity closures: "Why have you taken a disproportional amount of mill rationalizations."[147]  An economically rational firm would not be willing to risk not meeting future demand or close a "disproportional" share of its mill unless it has great confidence that other firms will coordinate and engage in similar cooperative behavior.

8.  After IP acquired WY in August 2008, IP idled and closed the facilities that WY had expressly anticipated were needed to remain open.[148]   An economically rational firm would not purchase assets valued in the millions simply to close them.  A firm would not pursue such a strategy unless it understood that other firms would not bring idled capacity on line or increase utilization. Therefore, such conduct should be viewed as a super plus factor.  A highly regarded Industrial Organization economist has noted that, "One example of a **socially perverse effect** is that the incumbent may buy the entrant's capacity and scrap part of it…"[149]  The discussion related to how an incumbent firm treats a potential entrant.  This perverse effect also applies to an acquisition of an incumbent firm by another.  In fact, it is worse when the acquisition is of an incumbent firm because when an incumbent firm purchases a new entrant and then scraps its capacity, market concentration remains unchanged.  However, an acquisition of an existing firm and subsequent scrapping of its capacity will lead to higher market concentration.

---

[145] IP307902, pp. 44-45
[146] SSCC 00185811
[147] SSCC 00834559
[148] IP idled the Valiant Mill and the Albany plant, Keller Deposition, pp. 90-91
[149] (Tirole, 1995), p. 321 (emphasis added)

9. The actions undertaken by the Defendants to close capacity do not appear to be consistent with their unilateral self-interests. Rather, it is only rational in the context of coordinated collective action.

B. Operating Rates/Inventories/Trades

1. With the exception of the recessionary years of 2008-2009, the Defendants successfully increased industry operating rates into the upper 90s, which was a marked difference from the years preceding 2004. Through their decisions to cut capacity, the Defendants achieved high operating rates. For the same reasons that such conduct is not in their self interest from a capacity perspective so too it is inconsistent with unilateral self interest from an operating rate perspective. High operating rates limit the firm's ability to respond to positive changes in market conditions. In addition, in most industries high operating rates translate into more physical stress on machines resulting in more maintenance and a higher risk of outages. The latter is particularly problematic. High operating rates limits the ability of the Defendants to respond to future growth in demand, particularly spikes in demand. To the extent high operating rates result in forced outages it also puts the Defendants at risk of meeting the current demand of their customers. This is not economically rationale behavior when viewed through the prism of unilateral self interest.

2. The effort to reduce inventories also appears economically counter to the unilateral self interest of the Defendants. For example, GP provided SOP reports.[150] The SOP reports detailed the demand, supply, and planned and actual inventory levels in the GP system on monthly basis. I have reviewed the SOPs. In all the months covered by the SOP reports, GP's actual inventory levels were below their targeted levels. This placed GP at risk in meeting the needs of their customers. Presumably, GP accepted this risk because there was an offsetting benefit--- i.e., higher prices due to low inventories. However, higher prices can be achieved only if all the

---

[150] GP-KLEEN00264372, GP-KLEEN00335687. GP-KLEEN00257983, GP-KLEEN00249209, GP-KLEEN00279893, GP-KLEEN00961373

Defendants collectively reduce inventories. The inventory behavior of GP is not reflective of a firm pursuing its unilateral self interest.

3. IP similarly recognized that its reduction in inventories was putting it "close to the edge" in meeting customers' needs.[151] It would not be economically rational for an individual firm to risk the loss of customers due to inadequate inventory levels unless that action provided some benefit. Given that IP, alone, cannot lower aggregate industry inventory levels, the benefit has to accrue from collective action. Smurfit recognized that reduction in inventories put them at risk in supplying customers: "Someone way smarter than I am needs to tell me how to satisfy our customers and grow our business without the #1 ingredient for boxes,"[152] In December 2009 a Smurfit executive stated: "There is nowhere to go with ANY orders. I honestly think of this disaster as a career limiting event. We really have to shed orders – which is next to impossible in trying to keep inventory down." In another exchange between the container division and the mills from John Lingle to Jeff Doyle, it is stated that: "We need something to change. This cannot continue. We have few options." It lists the options with one being, "You could run our orders on time -  and keep us supplied in paper…"[153] This demonstrates a firm willing to jeopardize performance (and ultimately customer satisfaction) for a goal of lowering inventories, which if done by Smurfit alone would have no impact on market prices.

4. The Defendants were able to maintain and lower inventories through their use of trades between each other. If one firm was faced with very low inventories in one location and somewhat higher inventories in another, it could engage in a trade and supplement the low inventories at the one location and reduce the higher inventories at the other. The importance of this is that it does not have to produce more to alleviate the low inventories and thus aggregate industry inventory levels remain the same. This is a type of cooperative behavior not generally observed in competitive

---

[151] IP663709
[152] SSCC 00109900 at 901
[153] SSCC  00354240

markets.   In a competitive market, firms with higher inventory would use that inventory to gain market share from the firm lacking inventory rather than use that inventory to strengthen its competitor.

5. The use of trades between Defendants as well as inter-Defendant sales of product also provided the opportunity for communication between the Defendants.  Not only were the Defendants discussing their trade needs but also the downtime and closures of their mills.  In the deposition of James R. Keller, he noted that WY would report the maintenance downtime to trade partners but not the market downtime.[154] A review of downtime for WY from 2000-2008 shows that in 2000 WY took total downtime of 332,000 of which 62,000 was maintenance and 270,000 was market downtime.  By 2008, the total was 118,795 but comprised entirely of maintenance downtime.[155] There is evidence that downtime was identified as maintenance when, if fact, it was market downtime.  In a 2007 WY email exchange, Lenard Mutz is describing why certain downtime should be "coded" as maintenance.  John Yerke responds: "This was mkt downtime that we extended by about two days to do some maint.  The whole thing is mkt related. W/O soft mkts this would not have been…"[156]

6. Smurfit communicated downtime (market and maintenance), closures, production capacity and swing capacity to its competitor trading partners. In some cases, Smurfit would learn of capacity closures before they were announced. For example, Smurfit learned of an IP mill closure in August 2009 although the closure was not announced until October 2009.[157]

7. The Defendants had a cooperative and close relationship with their trading partners.  PCA described GP as their "largest West supplier" and having an "extremely strong trade relationship with IP."[158]   Smurfit noted that it

---

[154] Keller Deposition, Tr. p. 229, lines 12-20
[155] KellerDeposition, Ex. 24 tab 27
[156] WY0003211
[157] McGurk Deposition Tr. p.103 and Exhibit 121
[158] PCoA000028453

"values the long term relationship with TIN" and has a "strong business partnership" with IP.[159]

8. The strong relationships led to cooperation rather than competition between the Defendants. In July 2008 WY had a mill outage. Although Mathew Blanchard of Smurfit wanted to target WY's customers, instead Smurfit ended up supplying containerboard to WY.[160] Smurfit extended the same courtesy to IP during a 2008 outage. Rather than charging IP a high price for containerboard, Smurfit provided price protection on a significant volume of containerboard.[161] PCA assisted with a mill outage of IP in 2011.[162]

9. The Defendants planned the closure of mills with the assurance they could engage in trades with other Defendants to make up shortages. In assessing the closure of its Plymouth, N.C. and Hueneme mills, WY evaluated the options via its "Containerboard Supply Restructuring" plan which included potential trades with IP, Smurfit, and TIN.[163] Smurfit did the same when it contemplated closing its Missoula mill. In his deposition Brian McGurk testified that trades were an option to replace the output of the mill.[164]

10. The economic literature views inter-firm sales as indicative of collusion. In their paper on Plus Factors and Agreement in Antitrust Law, the authors note: "Cartels will often need to redistribute gains and losses to maintain their agreements. In some circumstances, the observation that one seller buys output from another seller at market prices leads to a **strong inference of collusion**, such as when each seller has excess capacity, the product made by each seller is **physically identical**, and the value-to-weight ratio of the product is high."[165]

---

[159] SSCC 00625963 and IP473391
[160] SSCC 00625355 and SSCC 00625356
[161] IP473391 and McGurk Deposition Tr. p. 197
[162] PCoA000710668
[163] WY0062605
[164] McGurk Deposition, Tr. p. 235-236
[165] (Kovacic, Marshall, Marx, & Halbert L. White, 2011), p.423 [emphasis added]

11. The target and achievement of high operating rates and low inventory levels to the detriment of customer service and competitive advantage is not the behavior of a firm pursuing its unilateral self interest but rather only rational for a firm coordinating its actions with other firms. Similarly, the use of trades provided a vehicle to communicate between the Defendants and intertwines the business operations of the Defendants. Finally, the cooperative behavior observed and the reliance on trades as an outright substitution for mill production is not the behavior of competitive firms pursuing their independent self-interest.

## C. Downtime/Slowback

1. In addition to permanent shutdowns of capacity, it is also possible to slow or temporarily stop the productive capabilities of a mill. There are a number of terms for this, including downtime, market downtime, economic downtime, slowback, etc. but the effect is the same—the removal of productive capacity and thus the ability to supply the market, causing prices to rise or stabilize.

2. Downtime might be a rational response to slowing market conditions. That is, if a firm anticipates a significant and prolonged downturn in orders, it might make economic sense to take downtime rather than incur the ongoing costs of an underutilized mill. On the other hand, in a competitive market, one would expect firms to compete vigorously, typically through prices, as a means to increase mill utilization. Which decision is made would depend on the economic environment at the time. One of the reasons for taking downtime in this industry was to reduce inventory levels, which is one of the most important drivers of price. A 2006 WY presentation notes: "Slowback and/or extended maintenance outages instituted at all containerboard mills for remainder of year to manage inventory to safe levels…"[166] The same strategy was employed by others including Smurfit.[167] Defendants recognized that a goal of downtime was

---

[166] WY0080309
[167] SSCC00204172

to put upward pressure on prices: "IP is taking a disproportionate amount of downtime in an effort to maximize our price."[168]

4. The action of taking a "disproportionate" amount of downtime is in itself an act that is contrary to the unilateral self-interest of IP. Taking excess downtime, without coordinating with its competitors, puts IP in a vulnerable position with respect to the other mills. IP would expect that the other mills, also facing underutilization, would seek out with lower prices IP's customers to gain market volume and increase their own mill usage. Assuming a competitive market, unilateral downtime puts the firm at a disadvantage by effectively allowing IP's competitors an upper hand in responding to increased competition from competitors or an increase in demand.

5. IP's downtime is not fully justified as a response to slowing market conditions.  For example, the sales volumes of the Industrial Packaging unit of IP rose by 6 percent from 2004 to 2005.  However, a comparison of downtime taken in the first four months of 2004 and 2005 reveals that downtime increased from 48 thousand tons in April 2004 to 850 thousand tons in April 2005.[169]

6. Similar to IP, an examination of GP's downtime shows that it is not fully justified by economic conditions.  For example, GP provided documents on mill production and downtime.  A review of the data shows that on numerous occasions GP slowed back equipment while at the same time purchasing containerboard on the open market to meet demand.[170]  It is not clear why a firm would constrain its productive capability during a period in which it could not satisfy demand for their product unless this action had beneficial consequences in some other economic dimension.  A 2008 email

---

[168] IP103745. This document also reported the downtime of other producers.  The document reflects that in the year in question IP, SSCC, GP, Temple-Inland, and PCA took combined downtime of 84 percent of the industry total. Absent the collective downtime of the other Defendants, and assuming IP has no market power IP would not be in a position to have any impact on price.  Thus, IP is placing itself in a vulnerable position for which there is little to no economic value unless collectively, the other major firms follow suit.

[169] IP832857, slides 5-6
[170] GP-KLEEN00264372, GP-KLEEN00335687. GP-KLEEN00257983, GP-KLEEN00249209, GP-KLEEN00279893, GP-KLEEN00961373

exchange among GP employees suggests that favorable economic dimension.   In the email one individual is complaining that GP is missing out on spot orders from regular accounts in the West because it lacks product—the result of constraining productive capabilities and reducing inventories.   The author then discusses the possibility of engaging in "East/West" trades to provide more tons in the West.  The individual who started the email finally requests:  "Formally, let's take slow back off."  At that point, Mr. Mike Adams who is identified as "Pres. CTBD &Kraft" enters the discussion and states, "I want to ensure we have looked at all trade options before we take slowback off in Toledo.  Long term we still need to take tons out in our system."[171] From the exchange it is clear that to GP the goal of taking "tons out of system" outweighed the risks of failing to satisfy customer orders.   From an economic perspective, "taking tons out of system" is another way of saying reducing supply in order to have a beneficial impact on price.  Given that GP's supply decisions alone would have little or no impact on price, GP derives a benefit only if the industry collectively acts to reduce supply.  Thus, GP is engaged in an act that is beneficial from a collective perspective but not if acting in its unilateral self interest.

7. GP's perspective on supply restrictions is also found in a number of documents discussing the concept of "diffusion."  GP defines diffusion as, "% of downtime taken by producers left of the demand curve."[172]  GP states that, "High diffusion rate means more producers left of the demand curve are taking downtime, mitigating the negative impact on price."    The terminology used in the documents is not standard economic jargon but the concept is clear.  "Left of the demand curve" refers to that portion of the supply curve representing all firms with marginal costs equal to or less than the prevailing market price. These would then be firms that are enjoying relatively higher profits from their sales and hence not firms one would

---

[171] GP-KLEEN00329753-756
[172] GP-KLEEN00055869 at 871

expect to be taking downtime if acting in their unilateral self-interest. In economics the highest cost firm providing the last unit of supply is termed the "marginal" firm. All firms with marginal costs less than the highest cost firm are termed "infra-marginal." The concept of diffusion is illustrated in a number of spreadsheets where GP quantified the impact of diffusion.[173] In one spreadsheet, GP ranks all the production facilities by cash cost and calculates cumulative capacity up the cash cost ranking. There were 78 facilities in the ranking with the lowest cost coming in at $229 and the highest at $519. The Defendants are represented all along the ranking. These 78 facilities were capable of meeting a market demand of 24,396 tons. GP used this information to identify at what cost (price) market demand would intersect with industry supply (and thus cost). For example, the spreadsheet shows that the industry can meet a market demand of 21,469 at a cost (price) of $401. Similarly, if market demand falls to 20,884 the market price (as dictated by the industry supply curve) would fall to $368. This simply reflects the fact that as price falls below cash cost the marginal facilities would shut down. GP's view of diffusion and its ability to "mitigate" price declines is rooted not in the marginal firms shutting down but rather the infra-marginal firms shutting down. In short, prices can be supported if some lower cost firms take downtime. The goal is to keep the higher cost facilities operating and thus prop up market prices.

8. Diffusion, as used by GP, would require that all lower cost firms simultaneously take downtime in the same proportion. From an economic perspective once a firm observes lower demand it would naturally shut down the highest cost facilities and move production to the lower cost facilities. Granted, there may be reasons why it might be desirable for a firm to keep a higher cost facility operating (e.g., freight costs, product mix, etc.). However, it is highly unlikely that all firms in the industry (or at least those with major capacity holdings) would face the same sets of reasons. Taking downtime at lower cost facilities while operating higher cost facilities

---

[173] See, for example, GP-KLEEN00958242, Tab: Diffusion Adjusted MPBE

is not efficient and would be contrary to a firm's unilateral self interest. This scheme can only be supported if other firms engage in the same behavior.

9. As a preliminary matter, the economic evidence shows that the Defendants knowingly employed downtime as a means to either increase or support prices and did so in a manner inconsistent with their unilateral self-interests, suggesting coordinated rather than independent action on the part of the Defendants.

## D. Coordinated Pricing

1. Exhibit 4 highlights the announcement date, implementation date, and amount of increase for each of the Defendants.  The Defendants' future price increases are made known to the public (and to each other).  As was the case with capacity cuts, in the context of a market susceptible to collusion the use of future price announcements is considered a facilitating device.[174]  The use of price announcements supports, in part, a type of collusion called "price signaling."[175]  By giving advance notice, a firm is signaling its desire to increase prices and is afforded the opportunity to watch what the other firms in the industry do.  Other firms can respond with similar announcements or may not respond at all.

2. From 2004 to 2010 the Defendants were successful in full implementation of price increases on nine occasions.  In each instance the Defendants announced within weeks of each other and for similar, and in most cases identical, amounts.  In some instances subsequent price increase announcements were issued within months of a previous increase.[176]  The quick succession of price increaseswas not justified on a cost or demand basis.  In what appears to be an IP presentation developed around 2007, there is a slide comparing box demand and price.  The title of this slide is, "In today's market, Box demand not the key driver of price."[177]

---

[174] (Hay, 2005), p.16
[175] (Harrington), pp.144-147
[176] For example, March 2004 and June 2004 and October 2005 and January 2006.
[177] IP0954463

3. The price announcements also often came not long after trade group meetings. On November 16, 2005 there was a meeting of FBA's Board of Directors. Within two weeks WY and PCA announced price increases effective January 1, 2006. Interestingly, in 2007 in an earnings conference call, the Chairman of PCA noted that since consolidation took hold in the industry inventories had trended down. He noted that the historically it would not have been a normal time to achieve a price increase.[178] There was an FBA Executive Committee meeting on March 14, 2006. In early April Defendants raised prices. In June 18, 2007 there was a joint AFPA, Associated of Independent Corrugated Converters, and the FBA meeting. Not long after WY announced a price increase which was followed by the other Defendants. From March 30 to April 2, 2008 the AFPA held its Annual Paper Week convention. By the latter part of May and early June the Defendants had announced price increases.

4. Defendants appear to have shared information about price increases before they were made public. On July 8, 2010 Smurfit announced a price increase to be effective August 1. However, on July 1 Brian McGurk of Smurfit sent an email to Barry Baker of TIN informing him of the price increase.[179] On December 1, 2009, McGurk emailed Robert Lantheir of NP with its January 1 price-increase announcement one day before the increase was publicly announced.[180] Additionally, McGurk emailed TI's Barry Baker announcing a July 1, 2010, price increase for a trade to TIN.[181]

5. As a whole, the timing and equivalence in the dollar amounts of the price increases is consistent with collusive behavior. When viewed individually the inference of coordination is reinforced. On May 28, 2008 GP

---

[178] Transcript of Q1 2007 PCoA Earnings Call, April 18, 2007, at p.6
[179] McGurk Ex. 108/SSCC 00518759
[180] McGurk Ex. 118/SSCC 00514885
[181] Ex. 108/SSCC00518759

announced a price increase of $55 to be effective July 1, 2008. In six days all the Defendants announced identical price increases and effective dates. By mid 2008 box shipments had plummeted due to the impending deep recession in the U.S. economy and operating rates had been on the decline. While box shipments improved in 2010 relative to 2008 they were still significantly below pre-2008 levels. Despite the soft box market, Defendants succeeded in pushing a price increase through in January and April 2010. Raising prices at a time when surplus exists has been considered a "plus factor" when evaluating potential conspiracies.[182] If the Defendants could coordinate price increases during a period a prolonged recessionary slump in the period 2008-2010, they certainly could do so from 2004 to 2008 when their collective capacity and supply management decisions pushed operating rates to all time highs.

6. The price increase announcements themselves act to facilitate coordinated behavior. The timing, amounts, and economic conditions in which the price increases were implemented are consistent with collusive behavior.

E. Focal Points: Role of Outside Consultants and Targets

1. The Defendants have received a steady drumbeat of advice on the structural and operational targets that should be reached in order to successfully raise prices. These targets serve as what economists and game theorists call focal points --a type of facilitating device.[183] Coordination among firms requires that individual firms have a degree of certainty that other firms will follow their actions. Absent certainty and confidence, firms have an incentive to deviate and undermine the collusive arrangement. Actions taken to reduce uncertainty are called "facilitating practices" or "facilitating devices."[184] Focal points serve to strengthen coordination among firms. The common focal point is price ceilings. It has been demonstrated that regardless of whether the price ceiling is binding

---

[182] (Werden, 2004), p. 746
[183] (Harrington, 2011), pp. 145-155
[184] For a discussion of facilitating practices see: (Hay, 2005)

49

firms tend to price in accordance with the price ceiling.[185] An operating rate or inventory "weeks of supply" target, as is found repeatedly in this industry, can serve as a focal point.

2. Consultants to the containerboard industry have provided extensive guidance to industry participants. Numerous outside consultants circulated economic and price increase strategy among Defendants. A 2002 article by McKinsey & Company (McKinsey) titled, "Cashing In On Consolidation," sums up the fundamentals of achieving higher product prices in the forest products industry. The article provides a fairly detailed roadmap and includes the following thoughts:

- "Many attempts to raise prices are met with failure because the market structures are not supportive."[186]
- "We have found that market leaders need three structural preconditions to fully benefit from their past consolidation efforts to create value through good conduct"[187].
- "The first is that a market segment must be relatively leak-tight from both the supply and demand side. Some are too leaky, or vulnerable to new sources of supply, for any **leadership curtailment** to be effective…. Before attempting capacity curtailment and pricing actions, leaders must understand the dynamics of current and prospective sources of supply leaks. …If customers react strongly enough, it can undermine suppliers' attempts to reduce slack. Our research has shown that many forest products market segments are relatively leak-tight with a specified geography and segment definition"[188]
- "Assuming a defined market is not vulnerable to significant leaks, and many are not, the second precondition is that **market leaders must be able to curtail sufficient supply to effectively bridge demand volatility**… For example, in North American containerboard, the three natural market leaders can effectively straddle excess capacity and expected demand volatility by idling less than 10 percent of their assets."[189]
- "Having the ability to take leadership actions is not sufficient: the third precondition is that the right incentives to do so must be in place."[190]

---

[185] (Knittel & Stango, 2003)

[187] GP-KLEEN00141864 at 867
[188] GP-KLEEN00141864 at 867-8 [emphasis added]
[189] GP-KLEEN00141864 at 868 [emphasis added]
[190] GP-KLEEN00141864 at 868

3. The article concludes with a "Market Leadership Segment Assessment" matrix. On the left axis is whether (i.e., yes or no) the segment is "leak-tight" and on the right whether "market leaders have ability and incentive to lead." Of the eight segments in North America and Europe only two are in the upper-right quadrant of the matrix that directs these segments to "exploit full potential." These segments were Containerboard and Newsprint-North America.[191]

4. Two years after the McKinsey article, a report by Credit Suisse First Boston titled, "The Holy Grail Secular Headwinds: Structure-Behavior Performance," echoed many of the McKinsey article's conclusions.

- "As we see it, the destructive behavior of containerboard producers in aggregate is the result of almost entirely rational behavior by individual producers. If individuals acting rationally create destructive group behavior, then there is something wrong with the group, not the individuals."[192]
- "Structure doesn't drive performance: structure drives behavior. We have often used containerboard as an example of a troubled industry structure, and activity of the last couple of years helps illustrates our point. Several of the industry's top ten producers have been engaged in a major effort to keep production in line with demand. A few large producers haven't bought in, but most have to some extent."[193] (note: based on date of report, "last couple of years" would reflect 2002 and 2003)
- "Consolidation changes an industry's structure and those changes, large or small, change the operating parameters of the business. Every change in structure affects behavior, if only to change the number of decision makers of capital available to be deployed."[194]
- "Containerboard is easily the grade with the best evidence of active, focused leadership and yet it has some of the toughest challenges too, which make that focus less valuable than it might be otherwise."[195]

---

[191] GP-KLEEN00141864 at 874
[192] GP-KLEEN01015352 at 386
[193] GP-KLEEN01015352 at 386
[194] GP-KLEEN01015352 at 386
[195] GP-KLEEN01015352 at 399

5.  Just one year later in 2005 the consultancy Deloitte Development prepared a presentation for the forest products industry titled, "Pricing Opportunities in the Forest Products Industry." The presenter noted that:

- "Pricing improvement is an untapped opportunity for most forecast product companies."[196]

6.  Under the section on "Strategic pricing common issues and obstacles," the presenter noted:
    - "Limited understanding of competitor capabilities"
    - "Underestimating competitor's desire to raise prices"
    - "Underestimating customer switching costs"[197]

7.  Under the section on "price execution common issues & obstacles," the presenter notes:

- "History of unsustainable price increases"
- "Steadily declining margins"[198]

8.  The strategytouted by these industry consultants and observers went beyond simply suggesting capacity reductions, discipline and leadership to concrete economic targets. For example, in a 2010 report by Dr. Mark Wilde of Deutsche Bank titled, "Going For A Hat Trick—Dr. Containerboard's Check-Up", he includes a section on "What drives containerboard & box pricing?" He has a number of pronouncements including:
    - "In the end, we're back in Econ 101: supply & demand. The supply/demand balance in the containerboard market is the most critical factor in our view. During the current upswing, the story has hinged heavily on supply --- especially, supply reductions."[199]

---

[196] (Sinoway, 2005), p.2
[197] Ibid., p.5
[198] Ibid., p.7
[199] GP-KLEEN01074003 at 016

9. Just following the above quote, he highlights the nineteen capacity closures from 2007-2010. He goes on to identify the impact that such closures have had on the economics of the industry.

- "Among the best proxies for supply/demand balance are operating rates and inventory levels. Historically, we've regarded an operating rate in the 92-94% range as indicative of a market in which balance. Anything above that level has indicated a tight market with 'pricing power' for producers…. Like operating rates, inventory levels have always been a proxy for the supply/demand balance…. In recent years, producers have become more adept at managing demand and maintaining inventories."[200]
- "Price hikes typically failed when OCC costs were more stagnant, and inventory levels were above 3.5 weeks of supply."

10. Dr. Wilde also includes a table depicting "failed" and "successful" price initiatives and comparing each to the linerboard operating rate and weeks of supply of inventory. The report thus provides two distinct metrics for firms in the industry to strive for.

11. The Defendants thought highly of Dr. Wilde and heeded the advice. In a June 2009 email exchange in which Dr. Wilde's research report was circulated, Carol Roberts of IP had this to say, "Wilde is pretty influential. Very encouraging. Up in Chicago visiting box plants. All very concerned about having and getting board. Know we have tried to turn up production. From your end are you comfortable we can and are meeting box plant needs. **Know we are intentionally playing close to the edge. Driving inventories down was vitally important.**"[201]

12. The 2002 article referenced previously by McKinsey titled, "Cashing In On Consolidation" was the result of a collaboration between McKinsey &Company and IP. IP retained McKinsey in 2002 to consult on pricing and capacity management.[202] McKinsey was also retained in 2004, 2005, 2006

---

[200] GP-KLEEN01074003 at 018
[201] IP663709 [emphasis added]
[202] IP107724

and 2008.[203] Moreover, McKinsey's work was not limited to just IP. The firm also provided consulting services to at least GP.[204]

13. There are also numerous documents studying and forecasting two of the most important targets of price in the industry – operating rates and inventory levels. The Defendants are keen to know when operating rates and inventory levels hit their optimal values--- i.e., values that support price increases.[205] John Sims of IP testified that he developed analysis showing the linkages between operating rates and inventory levels and price and developed appropriate thresholds to determine when IP had pricing power.[206] The Defendants are also aware of each other's capacity at the mill and product level as well as who is shutting down capacity or taking downtime.[207] They also have a sense of who is "willing to manage capacity" and the need for "prudent capacity management."[208] Finally, the Defendants are aware of the importance, impact, and role of taking downtime on maintaining price.[209]

14. A July 2003 email exchange between Matthew Denton of GP and Mark Wilde of Deutsche Bank in 2003 (after a failed price hike) highlights the knowledge the industry has about the underlying economic fundamentals and what needs to be done. Mr. Wilde had emailed Mr. Denton with the inquiry, "Could we (see) something this autumn." Mr. Wilde responds, "yes" and starts discussing various economic factors and adds:

> "we had those economics behind the spring increase and that didn't happen, partially due to seasonally soft demand but also due to the apparent stupidity and a lack of understanding of incremental economics…one competitor allegedly stated that they were using the price increase opportunity to increase volume and market share, and, ironically, their returns have struggled significantly"[210]

---

[203] IP651704, IP096084, IP111906, IP096155, IP195892, IP213946, IP107059, IP161711, IP089004, IP138224, IP130449, IP812903
[204] GP-KLEEN00141726
[205] For example, see GP-KLEEN01017026, pp.7-8; IP579512, pp.46-47; IP259270 at 274
[206] (Sims Deposition), Tr. at 157-158, 162
[207] For example, see GP-KLEEN00375469, p.10
[208] For example, see IP579512, p.55; IP268609
[209] IP105350 at 354
[210] GP-KLEEN01501856

15. The exchange (that took place prior to the class period) highlights Mr. Denton's knowledge of how prices are determined at the margin based on the industry demand and supply curves and that trying to push more supply on the market (as was done by the "stupidity" of the competitor) is not the means by which price increases are sustained. Only by restricting supply can prices be increased. That is, supply discipline needs to be heeded by the large firms.

16. The drumbeat of advice by industry consultants provided a clear common focal point for the Defendants --- a focal point that facilitated coordinated behavior. The consultants thereby provided to Defendants a means to collude.

F. Monitoring

1. Monitoring by firms to a collusive arrangement is necessary to ensure that no one firm deviates from the agreed upon operational and pricing parameters. The Defendants expended considerable effort to monitor the actions and operational status of ostensibly competing firms in this industry.

2. The Defendants possess a detailed picture of the cost structures, capacities, planned capacity reductions, and use of downtime in the industry. Not only did GP know the cash cost plus freight of the other firms in North America, it knew that cost by specific input (e.g., wood, pulp, chemicals, energy, personnel, etc.), as reflected in an internal spreadsheet.[211] The spreadsheet noted the location and capacity of each mill and rank ordered the firms by cash cost plus freight. The analysis also denoted the "price call" which purportedly is where North American demand meets the marginal supplier. This spreadsheet was part of a more comprehensive presentation discussing the economics of the industry.

3. Firms within the industry evaluated downtime by firm and, importantly, which producers should take downtime to "optimize" the industry cost

---

[211] GP-KLEEN00025732

curve.[212] A document on downtime noted that, "Who takes downtime is extremely important."  Specifically, it argued that "1st and 2nd quartile producers change the shape of the cost curve.   It turns out that the 1st and 2nd quartile producers are the lowest cost producers.  In essence, what the author is arguing is that by reducing the supply of lower cost producers, you effectively push demand to higher cost mills, thereby increasing price.

4. Not surprisingly, the Defendants knew the capacity and products at the mill level along with shutdowns and downtime.[213]  There is also evidence that the Defendants knew whether each other are "short" or "long" specific products.[214]

G.  Direct Communications Among Defendants

1. There are numerous instances in which the Defendants have communicated competitive information directly with each other and/or shared non-public information.   On January 1, 2010, after 17 years with IP, Mike Exner joined Smurfit as Senior Vice President.[215]  IP released Mr. Exner from a non-compete agreement so he could make the move.[216]  Mr. Exner brought with him a thumb drive containing IP documents including a November 18, 2008 presentation.[217]  In March 2010, Mr. Exner emailed Smurfit executives that he had some "very very reliable" information about IP's plan to convert machinery.[218]  Later he informed executives that IP had actually trialed new production.[219]

2. On October 16, 2007, Smurfit trading representatives notified IP employees that Smurfit would have "numerous mill maintenance outages four to six months in the future."[220] The next day, Smurfit's Brian McGurk prepared a status report of the company's trade negotiations with TIN and IP, wherein

---

[212] See IP037102, p.22 for downtime by firm,GP-KLEEN00958242for illustration of cost curve and GP-KLEEN00395006, p.12 for perspective on who should take downtime.  See also GP-KLEEN00387869
[213] See for example, IP130489
[214] GP-KLEEN00310659
[215] SSCC 00479424 at 60
[216] Exner Dep. Tr. at 282-84
[217] ExnerDep Tr. at 345]
[218] Exner Ex. 10/SSCC 00466044
[219] Exner Ex. 11/SSCC 00178118
[220] SSCC 00347406

he noted that Smurfit "gave International Paper a high level overview of its 2008 position relative to swing capacity."[221]

3. On August 7, 2006, a SSCC sales representative forwarded to Senior Vice President of Sales Mathew Blanchard an email from David Parry at GP "looking to get pricing from [SSCC] as soon as possible".[222] GP's pricing matrix was attached to the email.[223]

4. In addition to direct communication, Defendants could communicate indirectly through industry analysts. Smurfit admitted that the use of analysts heavily influenced the industry. Smurfit's Steve Dunning testified that he used analysts' forecasts to develop his own pricing forecasts for the following year.[224] Stephen R. Read testified at Smurfit's bankruptcy confirmation hearing that industry analysts could go to each containerboard company and discuss pricing, whereas people working at the individual companies could not.[225] When the judge asked, "They could collude for you?" Read replied, "That's exactly right . . . the analysts, they have this unique position in life where they can go out and—and talk to everybody."[226]

H. Prior Antitrust Violations

1. The foregoing discussion should also be placed in the context of history. The Defendants are no strangers to antitrust violations. It began with a consent decree entered on April 23, 1940 and followed by a finding in 1969 that Defendants violated Section 1 of the Sherman Act after being charged with conspiring to restrain price competition in the sale of corrugated containers in the Southeastern United States from 1955- 1963. Many of the Defendants in this case were also alleged to have participated in a price fixing cartel from 1964-1975. With the exception of one Defendant in that case, the remainder settled either before trial or before a verdict. The

---

[221] McGurk Ex. 133/SSCC 00353564; SSCC 00353565 at 567
[222] Blanchard Ex. 10/SSCC 00365429
[223] SSCC 00365432
[224] Dunning Depo. at 229:24-235:9, 273:1-15; see also Dunning Ex. 18/SSCC004825894
[225] Read Testimony, In re Smurfit-Stone Container Corp., No. 09-10235, at 28-29 (Bankr. Del. Apr. 29, 2010).
[226] Read Testimony, In re Smurfit-Stone Container Corp., No. 09-10235, at 28-29 (Bankr. Del. Apr. 29, 2010).

remaining Defendant was found liable. Thus, a jury finding that a cartel existed to fix corrugated container prices—a cartel with many of the same firms in this case.  In 1998 Stone Container Corporation entered into a consent agreement with the Federal Trade Commission in which it agreed to refrain from "entering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement understanding, plan or program with any manufacturer or sell of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with regard to sales of linerboard to third parties.[227] Furthermore, the conduct the Federal Trade Commission took issue with was similar to the conduct in this case: taking and communicating downtime; purchasing significant volumes of linerboard from competitors; and using downtime as a means to drive inventory levels lower.[228]

I.   Conclusion

1. This review, thus far[229] of the economic evidence of Defendants' conduct supports my preliminary opinion that the Defendants' conduct is more consistent with collusion than independent behavior.  The economic evidence shows that Defendants' behavior with respect to mill closures, inventory levels, downtime and trades all were contrary to their independent self-interests and made economic sense only in the context of concerted behavior.  Further, the Defendants conduct included the use of signaling, focal points and use of consultants that were both facilitative of collusion and constituted means of carrying out collusion.  Finally, Defendants direct communications of competitive information and persistent monitoring of their competitors was consistent with maintenance, monitoring and policing a collusive agreement.

VII.   Defendants' Economic Performance

1. I have reviewed the analysis undertaken by Dr. Dwyer with respect to common impact and class-wide damages.  His methods and models are

---

[227] (Plaintiffs' Complaint), ¶ 57
[228] (In the Matter of Stone Container Corporation, a corporation, 1998)
[229] It is my understanding that discovery continues and as such so too will my investigation.

sound, well-accepted and widely used by economists. I find his empirical results to be entirely consistent with my economic analysis of common impact. His empirical analyses reliably show that all, or nearly all, class members were impacted by the price increases implemented during the class period.

2. He has developed preliminary class-wide damages models that reliably estimates the economic damages suffered by the class. He has concluded that prices in the containerboard industry were above the level one would expect absent collusion. This performance measure is indicative of collusion among Defendants and is to be expected based on the structural attributes of the industry and the conduct of the Defendants.

VIII.  Conclusion

1. The structure, conduct and performance of this industry support my economic opinion that the Defendants engaged in collusive behavior rather than independent behavior. The Defendants had the motive, opportunity and means to collude. Any attempt at collusion would have been broadly and generally successful given the economic characteristics of the industry. As a preliminary matter and based on the discovery produced thus far I further conclude that the conduct of the Defendants is more consistent with collusion than independent decision-making.

2. I have also concluded, based on the economic evidence I have described, that the conduct of the Defendants would have impacted all, or nearly all, class members. The empirical analysis on common impact performed by Dr. Dwyer is consistent with my economic findings. He has also demonstrated that it is possible to construct econometric models capable of reliably measuring class-wide damages. His results showing elevated prices during the class period is also consistent with my finding that the Defendants were engaged in conduct that had the effect of increasing prices above levels one would expect absent collusion.

3. These opinions are all based on evidence that is common to the class. They do not require inquiry into individual class members' behaviors or circumstances.


I declare under penalty of perjury the foregoing is true and correct. Executed at Glendale, California

Dated: June 11, 2014

Michael J. Harris

**EXHIBIT 1**

**Dr. MICHAEL HARRIS**
**President**
**Harris Economics Group**
**Glendale, California**
**818-241-2388**

Dr. Harris has been a consulting economist for the last twenty six years. He has worked across a diverse set of industries but has a significant amount of experience in the energy industry. He has provided testimony, economic research and consulting on matters related to pricing, price manipulation, competitive bidding, regulation, antitrust, compensatory and punitive damages, and class certification. He has analyzed market power, anticompetitive conduct, alternative forms of price regulation, and studied the evolution of industry deregulation and restructuring.

**EDUCATION**

      Ph.D., Economics, University of Washington, Seattle
      B.A., Economics, University of Colorado, Boulder

**WORK EXPERIENCE**

      President, Harris Economics Group, September 2007-Present
      Econ One Research, Inc., Senior Economist, 2000-2007
      Navigant Consulting, Principal, 1993-2000
      Arlon Tussing & Associates, Economist, 1988-1993

**SAMPLE OF RELEVANT TESTIMONY AND CONSULTING EXPERIENCE:**

*Antitrust and Competition*

- Testified regarding a price fixing conspiracy in the market for static random access memory
- Testified regarding competition in natural gas storage markets
- Submitted an Affidavit on the effect of merger in industrial gas market
- Testified regarding market power in the patronage advertising market
- Submitted testimony regarding natural gas pipeline market power
- Testified regarding the manipulation of natural gas price indices
- Testified regarding competition between steam and natural gas
- Testified regarding framework for evaluating competitiveness of markets
- Developed model to assess competitiveness of California crude oil market
- Conducted market power evaluation of California natural gas pipelines

**Dr. Michael Harris**
**Page 2 of 3**

_Class Certification_

- Submitted declarations and testified in support of certification of a class of purchasers of NYMEX natural gas futures contracts
- Submitted a declaration opposing certification of a class of residents allegedly impacted by the actions of a state agency.
- Submitted declarations in support of certification of a class of purchasers of dynamic random access memory
- Submitted declarations in support of certification of a class of purchasers of static random access memory
- Submitted declarations in support of a class of purchasers of natural gas in a number of Midwest states
- Submitted declaration in support of certification of a class of purchasers of natural gas in California

_Valuation, Economic Loss and Damages_

- Testified regarding damages stemming breach of a retail product license agreement
- Testified regarding the economic basis for punitive damages
- Testified regarding access and valuation of utility assets
- Submitted testimony regarding proper oil royalty valuation standard

_Contract Disputes_

- Submitted an expert report and provided deposition testimony regarding damages stemming from a breach-of-contract between two firms in the semi-conductor industry
- Testified regarding the appropriateness of the natural gas pricing provisions in a long-term electric supply contract
- Submitted testimony regarding reformation of long-term contracts
- Testified regarding breach of licensing agreement
- Testified regarding outcome of competitive bidding process

_The Economics of Regulated Industries:_

- Testified on the appropriateness of FERC gas cost filings
- Submitted testimony regarding manipulation of natural gas price indices
- Testified regarding price stabilization strategies
- Testified regarding utility prudence
- Testified regarding incentive ratemaking
- Testified regarding rate of return
- Testified regarding utility demand forecasts

_Market Studies_

- Conducted evaluation of Alberta natural gas storage market
- Conducted overview of the business and financial risk of the U.S interstate pipeline industry.
- Developed a comprehensive study of the North American natural gas market.
- Developed due diligence studies of new pipeline projects.

**Dr. Michael Harris**
**Page 3 of 3**

**ENGAGED AS AN EXPERT IN CASES BEFORE THE FOLLOWING COURTS AND ADMINISTRATIVE AGENCIES:**

- (10) United States District Courts
- (5) State Courts
- Numerous Arbitration Panels
- The Federal Energy Regulatory Commission
- The Ontario Energy Board
- The Alberta Energy and Utilities Board
- The Corporation Commission of the State of Oklahoma
- The Massachusetts Department of Telecommunications & Energy
- The State of Rhode Island Public Utilities Commission
- The Connecticut Department of Public Utility Control
- The Corporation Commission of the State of Kansas
- The Public Service Commission of Wisconsin
- The New Mexico Public Service Utility Commission

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**

President

Harris Economics Group

Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 1. Buccaneer Energy v. Gunnison Energy Corporation | United States District Court For The District of Colorado | Civil Action No. 1:12-cv-01618 | Declaration | September 2013 | Plaintiff |
| 2. Michael Shames, et al v. The Hertz Corporation, et all | United States District Court Southern District of California | Case No. 07CV2174 MMA | Expert Report | April 2011 | Plaintiffs |
| 3. In Re Carbon Processing and Reclamation, LLC, et al. v. Valero Marketing and Supply, Co., et al. | In The United States District Court for the Western District of Tennessee Western Division | Case No. 2:09-CV-02127-STA-CGC | Expert Report | October 2010 | Plaintiffs |
| 4. In Re Dynegy Marketing and Trade v. Multiut Corporation, Nachson Draman, and Future Associates | In The United States District Court for the Northern District of Illinois Eastern Division | No. 02 C 7446 | Affidavit | May 2010 | Plaintiffs |
| 5. In Re Ira A. Adams, et al. v. State of California, acting by and through the Department of Fish and Game, John McCamman, Ed Pert, and Randy Kelley | Superior Court of the State of California, County of Plumas | Case No.CV09-00065 | Declaration (2) | November 2009 | Defendants |

---

[1] In some instances case captions have been abbreviated

[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| *6.* In Re Energy Transfer Partners Natural Gas Litigation | In The United States District Court Southern District of Texas Houston Division | Civil Action No.4:07-cv-3349 | Affidavit | April 2009 | Plaintiffs |
| *7.* In Re Static Random Access Memory (SRAM) Antitrust Litigation | In The United States District Court Northern District of California Oakland Division | No. M: 07-CV-01819-CW MDL No. 1819 | Expert Report (2), Declaration, Deposition Testimony (2), Reply Declaration, Reply Report (2) | January 2009- June 2010 | Plaintiffs |
| 8. In Re Western States Wholesale Natural Gas Antitrust Litigation *Breckenridge Brewery Of Colorado, LLC et al v. Oneok Inc. et al* | In The United States Court District of Nevada | CV-S-03-1431-PMP (PAL) *Case 2:06-cv-01351-PMP-PAL* | Declaration (3), Deposition Testimony, Affidavit, Reply Declaration (4) | October 2008-October 2009 | Plaintiffs |
| 9. In Re Western States Wholesale Natural Gas Antitrust Litigation *Learjet Inc., et al v. Oneok Inc. et al* | In The United States Court District of Nevada | CV-S-03-1431-PMP (PAL) *Civil Action No. 05-cv-1500* | Declaration (3), Deposition Testimony, Affidavit, Reply Declaration (4) | October 2008-October 2009 | Plaintiffs |
| 10. In Re Western States Wholesale Natural Gas Antitrust Litigation *Heartland Regional Medical Center et al v. Oneok Inc. et al* | In The United States Court District of Nevada | CV-S-03-1431-PMP (PAL) *Case No. 07BU-CV01316* | Declaration (3), Deposition Testimony, Affidavit, Reply Declaration (4) | October 2008-October 2009 | Plaintiffs |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| <u>Case (Issue)</u>[1] | <u>Court/Commission/ Agency</u> | <u>Case/Docket</u> | <u>Form of Testimony</u> | <u>Date</u>[2] | <u>Behalf Of</u> |
|---|---|---|---|---|---|
| 11. In Re Western States Wholesale Natural Gas Antitrust Litigation: *Arandell Corp. et al v. Xcel Energy Inc. et al* | In The United States Court District of Nevada: | CV-S-03-1431-PMP (PAL) *Case No. 07-C-0076-C* | Declaration (3), Deposition Testimony, Affidavit, Reply Declaration (4) | October 2008-October 2009 | Plaintiffs |
| 12. In Re Western States Wholesale Natural Gas Antitrust Litigation *Fairhaven Power Company v. Encana Power Corp. et al* | In The United States Court District of Nevada | CV-S-03-1431-PMP (PAL) *Case No 2:05-CV-00243…* | Declaration (2) | May 2008-October 2008 | Plaintiffs |
| 13. Centerpoint Energy Inc., et al v. Angela Sullivan Engledowl and Railroad Commission of Texas | In The District Court of Travis County, Texas, 261st Judicial District | No. D-1-GN-07-001939 | Affidavit | February 2008 | Plaintiffs |
| 14. Ergon West-Virgina v. Dynegy Marketing & Trade | In The United States District Court Southern District of Mississipi Jackson Division | No. 3:06CV714 | Expert Report, Deposition Testimony | October 2007 | Plaintiff |
| 15. Gulf South Pipeline Company, LP v. Roaring Creek, LP. | In The County Court of the Second Judicial District of Jasper County Mississippi Special Court of Eminent Domain | Cause No. 27-0050 | Affidavit | September 2007 | Plaintiff |

---

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 16. Petro Computer Systems, Inc., et al. v. Micron Technology, Inc., et al. | In The United States District Court Northern District Of California San Francisco Division | M-02-1486-PJH | Declarations (2), Deposition Testimony, Letter to Judge | June 2007-June, 2011 | Plaintiffs |
| 17. Michael Scott Anderson and Robert J. Hewitt v. Houston Pipeline Company, L.P., Energy Transfer Partners | In The District Court Of Victoria County, Texas | Cause No. 07-3-65,478-D | Trial Testimony | March 2007 | Plaintiffs |
| 18. Cherokee County Cogeneration v. Dynegy Marketing (Breach of Contract) | In The District Court Of Harris County, Texas 291st Judicial District | 2006-07706 | Expert Report, Supplemental Report (2), Affidavit | December 2006-November 2010 | Plaintiff |
| 19. In Re CMS Energy Securities Litigation (Market Manipulation) | United States District Court Eastern District of Michigan | Civ. No 02 CV 72004 (GCS) | Expert Report, Deposition Testimony | August 2006 | Plaintiffs |
| 20. Advanced Research Chemicals, Inc. v. Praxair, Inc. (Compensatory and Punitive Damages | United States District Court For The Northern District Of Oklahoma | 03-CV-867-EA (C) | Expert Report (2), Affidavit, Deposition Testimony | December 2005 | Plaintiffs |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 21. Stand Energy Corporation v. Columbia Gas Transmission, et al (Class Certification and Damages) | United States District Court For The Southern District Of West Virginia | 2:04-0867 | Declaration (2), Deposition Testimony (3), Supplemental Declaration, Revised Supplemental Declaration, Expert Report, Reply Report (2), Supplemental Report | November 2005-January 2009 | Plaintiffs |
| 22. Natural Gas Anti-Trust Cases I,II, III, and IV (Class Certification and Damages) | Superior Court Of The State of California, County of San Diego | J.C.C. Proceedings Nos. 4221, 4224, 4226 and 4228 | Declaration (3) | November 2005-August 2006 | Plaintiffs |
| 23. California Department of Water Resources v. Sempra Energy Resources (Damages) | American Arbitration Association | 74 y 198 00193 04 VSS | Trial Testimony Expert Report, Rebuttal Report, Declaration, Deposition Testimony | May 2005 | Plaintiffs |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| Case (Issue)[1] | Court/Commission/ Agency | Case/Docket | Form of Testimony | Date[2] | Behalf Of |
|---|---|---|---|---|---|
| 24. In re: Natural Gas Commodities Litigation (Class Damages) | United States District Court For The Southern District Of New York | 03-CV6186 (VM), Class Action | Declaration (4), Reply Declaration, Affidavit, Reply Affidavit Deposition Testimony, Expert Report | January 2005-January 2006 | Plaintiffs |
| 25. In re: Calpine Corporation Securities Litigation (Securities Violations) | United States District Court Northern District Of California Oakland Division | C-02-12000 SBA, Class Action | Affidavit, Declaration (2), Expert Report, Supplemental Report, Reply Report, Deposition Testimony | November 2004 | Plaintiffs |
| 26. Structural Dynamics, L.L.C. v. Tech Transfer, Inc. and Geoff Anderson (Trade Secret s) | District Court Of Harris County Texas 80th Judicial District | 2004-00086 | Expert Report | July 2004 | Defendants |
| 27. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Evaluation of gas cost filings) | United States Of America Federal Energy Regulatory Commission | EL00-95-045 EL00-98-042 | Declaration, Technical Conference Presentation | May 2003 | The California Parties |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**

President

Harris Economics Group

Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 28. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Gas price manipulation) | United States Of America Federal Energy Regulatory Commission | EL00-95-000 EL00-95-045 EL00-95-075 | Prepared Rebuttal Testimony | April 2003 | The California Parties |
| 29. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Gas price manipulation) | United States Of America Federal Energy Regulatory Commission | EL00-95-000 EL00-95-045 EL00-95-075 | Prepared Testimony | March 2003 | The California Parties |
| 30. California Electricity Oversight Board v. Sellers Of Energy and Capacity (Evaluation of long-term contracts) | United States Of America Federal Energy Regulatory Commission | EL02-62-003 | Prepared Rebuttal Testimony, Deposition Testimony | December 2002 | California Electricity Oversight Board |
| 31. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Gas price manipulation) | United States Of America Federal Energy Regulatory Commission | EL00-95-045 | Declaration | October 2002 | The California Parties |
| 32. Fun 4 All Corporation v. MGA Entertainment (Compensatory damages resulting from breach of contract) | United States Of America District Court Southern California: Arbitration | | Expert Report, Trial Testimony | June 2002 | Plaintiff |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**

President

Harris Economics Group

Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 33. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Marginal gas cost analysis) | United States Of America Federal Energy Regulatory Commission | EL00-95-053 EL00-95-045 | Declaration | June 2002 | The California Parties |
| 34. San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services (Marginal gas cost analysis) | United States Of America Federal Energy Regulatory Commission | EL00-95-045 EL00-98-042 | Prepared Rebuttal Testimony, Trial Testimony | March 2002 | The California Parties |
| 35. In the Matter of a Application by ATCO Gas for the Transfer of the Carbon Storage Facility (Market power evaluation) | Alberta Energy and Utilities Board | 1237639 | Expert Report, Rebuttal Testimony, Response, Trial Testimony (2) | March 2002 | ATCO Gas |
| 36. Complaint of Enogex Inc. Concerning Competitive Bidding (Bidding evaluation) | Corporation Commission of the State of Oklahoma | PUD 20000339 | Responsive Testimony, Rebuttal Testimony, Trial Testimony | October 2001 | Oklahoma Natural Gas Company |
| 37. Weld Air Alaska, Inc., v. Airgas, Inc. (Antitrust) | United States District Court For The District Of Alaska | A01-195 Civ. (HRH) | Affidavit, Reply Affidavit | July 2001 | Plaintiff |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 38. Application To Require Oklahoma Natural Gas to Inform Commission Regarding Appropriate Methods To Lesson Price Volatility (Price stabilization strategies) | Corporation Commission of the State Of Oklahoma | PUD 200100097 | Direct Testimony, Trial Testimony | 2001 | Oklahoma Natural Gas Company |
| 39. Application To Review Oklahoma Natural Gas' Least Cost Procurement Practices (Prudency review) | Corporation Commission of the State of Oklahoma | PUD 200100057 | Responsive Testimony, Trial Testimony | May 2001 | Oklahoma Natural Gas Company |
| 40. Department of Conservation and Natural Resources v. Exxon Corporation (Punitive damages) | Circuit Court of Montgomery Alabama | CV-99-2368 | Deposition Testimony, Trial Testimony | March 2001 | State of Alabama |
| 41. For Waiver From Certain Provisions of OAC: 165:45-19 to Provide Downstream Unbundling | Corporation Commission of the State of Oklahoma | PUD 200100111 | Direct Testimony | March 2001 | Oklahoma Natural Gas Company |
| 42. Perry Minton and Dean Allen v. Amalgamated Acme Affiliates (Antitrust) | County Court at Law Travis County Texas | 99-12045-A | Deposition Testimony, Trial Testimony | February 2001 | Defendant |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 43. Lloyd Tanner and Shaw Industries v. Miliken & Company (Trade Secrets) | United States of America District Court Central District of California | CV-00-02763 MMM (RCx) | Expert Report | 2001 | Plaintiff |
| 44. Application of Proposed Modification to Wisconsin Gas Co.'s Existing Gas Cost Recovery Mechanism (Incentive ratemaking) | Public Service Commission of Wisconsin | 6630-GR-101 | Direct Testimony | June 2000 | WEGO |
| 45. In The Matter of Wisconsin Gas Company's Proposed Gas Cost Incentive (Incentive ratemaking) | Public Service Commission of Wisconsin | 6650-GR-116 | Direct Testimony | April 2000 | Wisconsin Gas Company |
| 46. In The Matter of Northern Border Pipeline Company's Appropriate Return on Equity (Return on equity) | United States of America Federal Energy Regulatory Commission | RP99-322-000 RP96-45-000 | Direct Testimony, Answering Testimony | January 2000 | Pan Alberta Canada |
| 47. In The Matter of the Appropriate Return on Equity for the Transco and Disco Business Operations of Ontario Hydro Services Company (Return on equity) | Ontario Energy Board | EST99-03374 | Expert Report (co-authored), Trial Testimony | January 1999 | Ontario Energy Board |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**

President

Harris Economics Group

Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 48. In The Matter of the Economic Evaluation of Natural Gas Clearinghouse's Capacity Contract with El Paso Natural Gas Company (Market power evaluation) | United States of America Federal Energy Regulatory Commission | RP97-287-010 | Affidavit | March 1998 | Amoco Energy Trading |
| 49. Application of the Wisconsin Electric Power Company For Authority to Increase Rates for Steam Services (Electric dispatch analysis) | Public Service Commission of Wisconsin | 6639-UR-110 | Direct Testimony, Trial Testimony | January 1998 | Wisconsin Gas Company |
| 50. Cablevision of Boston v. Boston Edison (Pricing of utility assets) | Massachusetts Department of Telecommunications & Energy | 97-82 | Direct Testimony, Trial Testimony | December 1997 | Boston Edison Company |
| 51. In The Matter of the Commission's Investigation of the Rates for Gas Service of PNM Gas Services (Incentive ratemaking) | New Mexico Public Service Utility Commission | 2762 | Direct Testimony | October 1997 | Public Service Company of New Mexico |
| 52. In The Matter of Gas Rates for Providence Gas Company (Demand forecasts) | Rhode Island Public Utility Commission | | Direct Testimony, Trial Testimony | 1997 | Providence Gas Company |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**

President

Harris Economics Group

Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 53. E.M. Lovelace v. Amerada Hess Corporation (Class settlement) | Circuit Court of Escambia County Alabama | CV-96-297 | Affidavit | 1997 | E.M. Lovelace |
| 54. In The Matter of Wisconsin Gas Company's Proposed Gas Cost Incentive Mechanism (Incentive ratemaking) | Public Service Commission of Wisconsin | 6650-GR-113 | Rebuttal Testimony, Trial Testimony | June 1997 | Wisconsin Gas Company |
| 55. In The Matter of Competition Implementation Issues (Market evaluation standards) | Public Service Commission of Wisconsin | 05-GI-108 (Phase III) | Direct Testimony, Rebuttal Testimony, Trial Testimony | 1996 | Wisconsin Gas Company |
| 56. In The Matter of Gas Cost Recovery Mechanisms (Incentive ratemaking) | Public Service Commission of Wisconsin | 05-GI-106 | Direct Testimony, Rebuttal Testimony, Trial Testimony | 1996 | Wisconsin Gas Company |
| 57. In The Matter of Wisconsin Power and Lights Gas Sales Forecast (Demand forecasting) | Public Service Commission of Wisconsin | 6680-UR-110 | Rebuttal Testimony, Trial Testimony | November 1996 | Wisconsin Power and Light |
| 58. In The Matter of Northern Border's Appropriate Return on Equity (Return on equity) | United States of America Federal Energy Regulatory Commission | RP96-45-000 | Direct Testimony, Rebuttal Testimony | 1996 | Canadian Association of Petroleum Producers |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

**CASE LIST OF MICHAEL J. HARRIS, Ph.D.**
President
Harris Economics Group
Glendale, CA

| | | | | | |
|---|---|---|---|---|---|
| 59. In The Matter of DPUC Review of the Purchased Gas Adjustment Clause (Incentive ratemaking) | Connecticut Department of Public Utility Control | 96-01-28 | Direct Testimony, Trial Testimony | 1996 | Southern Connecticut Gas Company |
| 60. In The Matter of Providence Gas Company's Rates and Demand Forecast (Demand forecasting) | Rhode Island Public Utility Commission | | Direct Testimony, Trial Testimony | 1995 | Providence Gas Company |
| 61. In The Matter of the Application of Kansas Pipeline to Increase Rates (Return on equity; acquisition premium) | Corporation Commission of the State of Kansas | 190, 362-U | Direct Testimony, Trial Testimony | 1994 | Missouri Gas Energy |

[1] In some instances case captions have been abbreviated
[2] Date corresponding to the submission (provision) of initial written (oral) testimony

# Exhibit 2

## Works Cited

### *External Sources*

Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al. , Case No. 09-10235 (BLS) (United States Bankruptcy Court For The District of Delaware).

Amendments to Plaintiffs' Consolidated and Amended Complaint, 1:10-cv-05711 (U.S. District Court June 3, 2014).

Connelly, M. W., Cha, D., & McGovern, S. (2004). *The Holy Grail: Secular Headwinds, Structure, Behavior, Performance.* Credit Suisse.

Department of Justice. (2012, August 17). *Press Releases 2012.* Retrieved from U.S. Department of Justice:
http://www.justice.gov/atr/public/press_releases/2012/286144.htm

Dixon Container Company. (2014). *Box Basics.* Retrieved March 1, 2014, from dixoncontainer.com: http://dixoncontainer.com/box%20basics.html

Fibre Box Association. (2014). *Executive Committee*. Retrieved from Fibre Box Association: http://www.fibrebox.org/ViewPage.aspx?ContentID=316

Franklin, D. (2012, May 10). *Containerboard Price Hike for the Fall Unlikely to Stick.* Retrieved from Blueshift Ideas:
http://blueshiftideas.com/reports/051205ContainerboardPriceHikefortheFallUnlikelytoStick.pdf

Georgia-Pacific Corporation. (2005). *Form 10-K.* Atlanta.

Goldman Sachs. (2004, February). Packaging and Newsprint. *Confidential Memorandum*.

Harrington, J. (2011, June 29). *Lectures on Collusive Practices.* Athens: CRESSE. Retrieved from John Hopkins University:
www.yumpu.com/en/s/9MDKhPb6lZY1NSxv

Hay, G. A. (2005). *Facilitating Practices.* Ithaca: Cornell Lagal Studies Research Paper No. 05-029.

In the Matter of Stone Container Corporation, a corporation, Docket No. C-3806 (United States of America, Before Federal Trade Commission May 8, 1998).

International Paper 10-K. (2005). *Annual Report.* Washington, D.C.: Securities and Exchange Commissions.

International Paper. (2014, June). *Containerboard & Saturating Kraft*. Retrieved from International Paper:
http://www.internationalpaper.com/us/en/Products/Containerboard/index.html

Ivaldi, M., Jullien, B., Rey, P., Seabright, P., & Tirole, J. (2003, March 3). *European Commission > Competition.* Retrieved from European Commission:
http://ec.europa.eu/competition/mergers/studies_reports/the_economics_of_tacit_collusion_en.pdf

Knittel, C. R., & Stango, V. (2003). Price Ceilings as Focal Points for Tacit Collusion: Evidence from Credit Cards. *American Economic Review.*

Kovacic, W. E., Marshall, R. C., Marx, L. M., & Halbert L. White, J. (2011). Plus Factors and Agreement in Antitrust Law. *Michigan Law Review, Vol. 110, No. 3*, 421.

Levenstein, M. C., & Suslow, V. Y. (2011). Breaking Up Is Hard to Do: Determinants of Cartel Duration. *The Journal of Law and Economics*.

Merced, M. J., & Cane, J. (2011, September 6). Dealbook - International Paper Wins Temple-Inland. *The New York Times*. New York, YY.

Murray, M., Swindell, J., & Ewing, K. (2007, December 19). *American Bar Association Presentation - Antitrust for Trade Associations.* Retrieved from Americanbar.org: apps.americanbar.org/antitrust/at.../at.../AntitrustforTradeAssociations.ppt

Norampac. (2011). *History and Structure*. Retrieved from Norampac: http://www.norampac.com/en/profil-norampac/historique-et-structure

Oak Packaging and Supply. (2010). *Corrugated Basics.* Retrieved 03 01, 2014, from http://www.oakpackaging.com: http://www.oakpackaging.com/include/assets/Corrugated_Basics.pdf

Pacific Container Corp. (n.d.). *Pacific Container - Box Basics*. Retrieved March 1, 2014, from pccbox.com: http://pccbox.com/box-basics.html

Packaging Corporation of America - Annual Report. (2005, December 31). 2005. *Annual Report*.

Packaging Corporation of America 10-K. (2005). *Form 10-K 2005.*

Pindyck, R. S., & Rubinfeld, D. L. (1989). *Microeconomics.* New York: Macmillan Publishing Company.

Pinnington, T. (2009). *The Corrugated Industry – In Pursuit of Excellence.* (M. Brunton, Ed.) Andover: Brunton Technical Publications.

Plaintiffs' Complaint, Plaintiff v. Packaging Corporation of America, et. al 1:10-cv-05711 (United States District Court Northern District of Illinois December 2010).

Posner, R. A. (2001). *Antitrust Law, Second Edition.* Chicago: University of Chicago Press.

Scherer, F. M., & Ross, D. (1990). *Industrial Market Structure and Economic Performance.* Boston: Houghton Mifflin Company.

Sinoway, M. (2005). Pricing opportunities in the Forest Products Industry. *PIMA's Leadership Conference* (p. 2). Nashville: Deloitte.

Smurfit Stone Container Corp 10-K. (2005). *Annual Report.* Washington, D.C.: Securities and Exchange Commission.

Spector, C. M. (2011, January 24). Surfit Deal is Set. *The Wall Street Journal*.

Temple Inland 10-K. (2005). *Temple Inland Annual Report.* Washington, D.C.: Securities and Exchange Commission.

Tirole, J. (1995). *The Theory of Industrial Organization.* Cambridge: The MIT Press.

U.S. Department of Justice and the Federal Trade Commissions. (2010). *Horizontal Merger Guidelines*.

Viscusi, W. K., Vernon, J. M., & Joseph E. Harrington, J. (2000). *Economics of Regulation and Antitrust.* Cambridge: The MIT Press.

Waghorne, K. (2011). *US Corrugated Box and Container Board Outllok.* RISI.

Walker, C., McNutt, J., & Cenatempo, D. (2013). *Speaker Presentations.* Retrieved from University of Maine Pulp and Paper Foundation: http://www.mainepulpaper.org/openhouse/speakerpresentations/ColleenWalker.pdf

Werden, G. J. (2004). Economic Evidence on the Existence of Collusion: Reconciling Antitrust Law with Oligopoly Theory. *Antitrust Law Journal, Vol. 71 No. 3*, 745-756.

Weyerhaeuser Co. 10K. (2006). *Annual Report.* Washington, D.C.: Securities and Exchange Commission.

Wikipedia Commons. (n.d.). *Dot-com bubble*. Retrieved from Wikipedia: http://en.wikipedia.org/wiki/Dot-com_bubble

Yagalla, M. (2013, July 2013). *Who Knew Containerboard Was Such a Great Business*. Retrieved from The Motley Fool: http://beta.fool.com/aseanmark/2013/07/23/who-knew-containerboard-was-such-a-great-business/41149/

## *DEFENDANT AND THIRD PARTY PRODUCTION SOURCES*

| | |
|---|---|
| AFPA_ESI_01352 | GP-KLEEN00958242 |
| AFPA-P-GS-00643 | GP-KLEEN00961373 |
| AFPA-P-GS-00644 | GP-KLEEN01015352 |
| DEAN_000047 | GP-KLEEN01017026 |
| EVERCORE00014504 | GP-KLEEN01018364 |
| GP-KLEEN 01015352 | GP-KLEEN01074003 |
| GP-KLEEN 01074015 | GP-KLEEN01074015 |
| GP-KLEEN00025732 | GP-KLEEN01424599 |
| GP-KLEEN00033830 | GP-KLEEN01501856 |
| GP-KLEEN00055869 | IP009997 |
| GP-KLEEN00141726 | IP010952 |
| GP-KLEEN00141864 | IP012123 |
| GP-KLEEN00249209 | IP037012 |
| GP-KLEEN00257983 | IP037102 |
| GP-KLEEN00264372 | IP043351 |
| GP-KLEEN00279893 | IP066785 |
| GP-KLEEN00310659 | IP089004 |
| GP-KLEEN00329753 | IP089891 |
| GP-KLEEN00335687 | IP0954335 |
| GP-KLEEN00362591 | IP0954463 |
| GP-KLEEN00375366 | IP096084 |
| GP-KLEEN00375469 | IP096155 |
| GP-KLEEN00387869 | IP0995216 |
| GP-KLEEN00388772 | IP103745 |
| GP-KLEEN00395006 | IP105350 |
| GP-KLEEN00404231 | IP107059 |
| GP-KLEEN00478369 | IP107342 |

IP107724
IP111906
IP130449
IP130489
IP138224
IP161711
IP195892
IP213946
IP259270
IP259277
IP263040
IP268609
IP307902
IP473391
IP579512
IP651704
IP663709
IP812903
IP832857
PC0A000017862
PC0oA000197041
PcoA0000028453
PCoA000018015
PCoA000025127
PCoA000028453
PCoA000032218
PCoA000034921
PCoA000035024
PCoA000045086
PCoA000162246
PCoA000166161
PCoA000428673
PCoA000710668
SSCC  00354240
SSCC 00080167
SSCC 00101201
SSCC 00109900
SSCC 00178118
SSCC 00185811
SSCC 00204172
SSCC 00347406
SSCC 00353564
SSCC 00353565

SSCC 00362902
SSCC 00365429
SSCC 00365432
SSCC 00466043
SSCC 00476500
SSCC 00479424
SSCC 00514885
SSCC 00518759
SSCC 00518759
SSCC 00625355
SSCC 00625356
SSCC 00625963
SSCC 00625963
SSCC 00625963
SSCC 00770710
SSCC 0080167
SSCC 00834559
SSCC 00840592-601
SSCC 0095106
SSCC 0625696
Temple-Inland 00024456
Temple-Inland 00051692
Temple-Inland 00051757
Temple-Inland 00051770
Temple-Inland 00051775
Temple-Inland 00051798
Temple-Inland 00051818
Temple-Inland 00072964
Temple-Inland 00080408
Temple-Inland 00553966
WY0003211
WY0062605
WY0080309
WY0108926
WY0108926

| Company | Timing | Location | PMs | Liner Kraft | Liner Recycled | Medium Semi-Chem | Medium Recycled | SUM |
|---|---|---|---|---|---|---|---|---|
| SSCC | 4Q98 | Alton, IL | 2 | | | | 246 | 246 |
| | | Circleville, OH | 1 | | | | 121 | 121 |
| | | Jacksonville, FL | 1 | 393 | | | | 393 |
| | | Port Wentworth, GA | 1 | 375 | | | | 375 |
| | 1Q00 | York, PA | 2 | | | | 130 | 130 |
| | 4Q02 | Missoula, MT #1 | 1 | 180 | | | | 180 |
| | 4Q03 | Seminole (Jacksonville, FL) [1] | 0 | | 360 | | (270) | 90 |
| | 1Q04 | Thunder Bay, ONT | 1 | | | | 160 | 160 |
| | 3Q05 | Bathurst, NB | 1 | | | | 243 | 243 |
| | | Fernandina Beach, FL #2 | 1 | 203 | | | | 203 |
| | | New Richmond, QUE | 1 | 235 | | | | 235 |
| | 2Q07 | Carthage, IN | 1 | | | | 52 | 52 |
| | | Vernon, CA (L.A.) | 1 | | | | 148 | 148 |
| | 4Q08 | Snowflake, AZ | 1 | | | | 135 | 135 |
| | 4Q09 | Ontonagon, MI | 2 | | | 280 | | 280 |
| | 1Q10 | Missoula, MT | 2 | 620 | | | | 620 |
| *SSCC Total* | | | *19* | *2,006* | *360* | *280* | *965* | *3,611* |
| Intl Paper / Union Camp | 4Q98 | Gardiner, OR | 1 | 321 | | | | 321 |
| | 2Q01 | Savanah, GA #2 | 1 | 175 | | | | 175 |
| | 1Q02 | Oswego, NY | 1 | | 100 | | | 100 |
| | 2Q04 | Roanoke Rapids, NC #4 | 1 | 300 | | | | 300 |
| | 3Q05 | FT Madison, IA | 1 | | | 100 | | 100 |
| | 4Q07 | Terre Haute, IN | 1 | | | 200 | | 200 |
| | 4Q09 | Albany, OR | 2 | 576 | | | | 576 |
| | | Pineville, LA | 1 | 390 | | | | 390 |
| | | Valliant, OK #3 | 1 | 206 | | 224 | | 430 |
| *Intl Paper / Union Camp Total* | | | *10* | *1,968* | *100* | *524* | | *2,592* |
| IP / Weyerhaeuser / Wilamette | 3Q01 | Springfield, OR (#1) | 1 | 243 | | | | 243 |
| | 2Q02 | Plymouth, NC | 1 | | | 215 | | 215 |
| | 3Q02 | Hawesville, KY | 1 | | | | 200 | 200 |
| | 4Q02 | Sturgeon Falls, ONT | 1 | | | | 100 | 100 |
| | 4Q03 | North Bend, OR | 1 | | | | 275 | 275 |
| | 1Q06 | Plymouth, NC (#1) | 1 | | 350 | | | 350 |
| *IP / Weyerhaeuser / Wilamette Total* | | | *6* | *243* | *350* | *215* | *575* | *1,383* |
| Temple-Inland / Gaylord | 2Q98 | Newark, CA | 1 | | | | 74 | 74 |
| | 2Q02 | Bogalusa, LA (#5 & 6) | 2 | 115 | | | | 115 |
| | 3Q02 | Antioch, CA | 1 | | 425 | | | 425 |
| *Temple-Inland / Gaylord Total* | | | *4* | *115* | *425* | | *74* | *614* |
| Stone / Four M Corp | 3Q98 | Port St Joe, FL (Stone Four M) | 2 | 519 | | | | 519 |
| *Stone / Four M Corp Total* | | | *2* | *519* | | | | *519* |
| *Norampac* | *3Q05* | *Red Rock, ONT (#1)* | *1* | *150* | | | | *150* |
| | 4Q06 | Red Rock, ONT (#2) | 1 | 300 | | | | 300 |
| *Norampac Total* | | | *2* | *450* | | | | *450* |
| Groveton Paperboard | 1Q06 | Groveton, NH | 1 | | | 150 | | 150 |
| *Groveton Paperboard Total* | | | *1* | | | *150* | | *150* |
| PCA | 1Q05 | Tomahawk, WI (#3) | 1 | | | 65 | | 65 |
| *PCA Total* | | | *1* | | | *65* | | *65* |
| Longview Fiber | 3Q01 | Longview, WA #1 | 1 | 135 | | | | 135 |
| | 4Q01 | Longview, WA #3 | 1 | | | | | - |
| | 1Q07 | Longview, WA #4 | 1 | | | 82 | | 82 |
| *Longview Fiber Total* | | | *3* | *135* | | *82* | | *217* |
| Menasha | 3Q05 | Ostego, MI | 2 | | | | 305 | 305 |
| *Menasha Total* | | | *2* | | | | *305* | *305* |
| Bay State Paper | 2Q04 | Boston, MA | 2 | | 51 | | 52 | 103 |
| *Bay State Paper Total* | | | *2* | | *51* | | *52* | *103* |
| West Fraser (Eurocan) | 1Q10 | Kitamat, BC | 1 | 370 | | | | 370 |
| *West Fraser (Eurocan) Total* | | | *1* | *370* | | | | *370* |
| Pomona Paper Co | 4Q02 | Pomona, CA | 1 | | | | 72 | 72 |
| *Pomona Paper Co Total* | | | *1* | | | | *72* | *72* |
| Banner Fibreboard | 3Q07 | Wellsburg, WV | 1 | | 20 | | | 20 |

Exhibit 3 - pg 1

Exhibit 3
Mill Closures

| Company | Timing | Location | PMs | Liner Kraft | Liner Recycled | Medium Semi-Chem | Medium Recycled | SUM |
|---|---|---|---|---|---|---|---|---|
| *Banner Fibreboard Total* | | | *1* | | *20* | | | *20* |
| American Tissue | 2Q01 | Harriman, TN | 1 | | | | 80 | 80 |
| *American Tissue Total* | | | *1* | | | | *80* | *80* |
| Catalyst (formerly Norske) | 4Q08 | Elk Falls Mill, BC | 1 | 144 | | | | 144 |
| *Catalyst (formerly Norske) Total* | | | *1* | *144* | | | | *144* |
| | | | *57* | *5,951* | *1,306* | *1,316* | *2,123* | *10,695* |

Source: SSCC 00083396

Exhibit 3 - pg 2

# 15 Defendant Price Increase Announcements

| Announcement | Year | Implementation Year and Month | | | | | | | Target Increase ($ / ton) | Prior Month | Following Month | Net PPW Increase ($ / ton) | Net PPW Increase (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | GP | PCA | IP | WY | TI | NP | SSCC | | | | | |
| 1 | 2004 | MAR | MAR | FEB | MAR | MAR | FEB | FEB | 40-50 | JAN | APR | 45 | 13% |
| 2 | 2004 | JUN | JUN | JUN | JUN | JUN | JUN | JUN | 50 | MAY | JUL | 50 | 11% |
| 3 | 2005 | APR | APR | APR | APR | APR | APR | MAR | 50 | FEB | MAY | -15 | -3% |
| 4 | 2005 | OCT | OCT | OCT | OCT | OCT | OCT | OCT | 30-40 | SEP | NOV | 30 | 8% |
| 5 | 2006 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | DEC | FEB | 40 | 9% |
| 6 | 2006 | MAR | MAR | APR | APR | APR | APR | APR | 50 | FEB | MAY | 50 | 11% |
| 7 | 2007 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | DEC | FEB | 0 | 0% |
| 8 | 2007 | N/A | MAY | APR | N/A | MAY | N/A | N/A | 40 | MAR | JUN | 0 | 0% |
| 9 | 2007 | AUG | AUG | AUG | AUG | AUG | AUG | AUG | 40-50 | JUL | SEP | 40 | 8% |
| 10 | 2008 | MAR | MAR | MAR | MAR | MAR | MAR | MAR | 40-50 | FEB | APR | 0 | 0% |
| 11 | 2008 | JUL | JUL | JUL | JUL | JUL | JUL | JUL | 55 | JUN | AUG | 55 | 10% |
| 12 | 2008 | OCT | OCT | OCT | * | OCT | OCT | OCT | 60 | SEP | NOV | 0 | 0% |
| 13 | 2010 | JAN | JAN | JAN | * | JAN | JAN | JAN | 50 | DEC | FEB | 50 | 9% |
| 14 | 2010 | APR | APR | APR | * | APR | APR | APR | 60 | MAR | MAY | 60 | 10% |
| 15 | 2010 | AUG | AUG | AUG | * | AUG | AUG | AUG | 60 | JUL | SEP | 0 | 0% |

*Acquired by IP

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KLEEN PRODUCTS LLC, et al. individually and on behalf of all those similarly situated,<br><br>              Plaintiffs,<br>   v.<br><br>PACKAGING CORPORATION OF AMERICA, et al.,<br>              Defendants. | Case No. 1:10-cv-05711<br><br>Hon. Harry D. Leinenweber<br><br><u>CLASS ACTION</u> |

**REPORT OF MARK JOSEPH DWYER, PH.D.
IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

**Harris Economics Group
June 11, 2014**

Mark Dwyer, Ph.D.                                      Case No. 1:10-cv-05711

# I.    Introduction

## I.A.    Assignment

1.  I have been retained by the class plaintiffs in the above captioned matter with regard to two issues. The first is to determine whether reliable empirical methods, common to the class, exist to assess class-wide impact due to the unlawful collusion alleged to have been entered into by the defendants.[1] Second, I have been asked to determine whether reliable empirical methods, common to the class, exist to measure aggregate damages to the class should the trier of fact determine that unlawful collusion took place.[2]

2.  Taken together, my assignment is to determine the feasibility of conducting empirical studies to assess and quantify the impact on the class of the alleged anticompetitive behavior. The econometric analyses that I have utilized to accomplish this assignment are well-accepted in the discipline for these purposes and allow for the determination of whether all or nearly all class members were impacted by the collusion alleged. They also demonstrate that an econometric model can be employed to estimate the amount of damages sustained by the class and hence to quantify the impact to the class as a whole.[3]

3.  My empirical analysis and the methodology employed are neutral – they do not assume that plaintiffs are correct in their allegations. Nor do my analyses or methodology assume that there was impact or the amount of damages. This does not mean, however, that the results of my analyses are irrelevant to the answers to these questions or to plaintiffs' allegations. The results of

---

1   The defendants are referred to below with 2 to 4 letter abbreviations: as International Paper ("IP"); Weyerhauser ("WY"); Temple-Inland ("TI"); Georgia Pacific ("GP"); Norampac / Cascades ("NP"); Smurfit Stone Container Corporation ("SSCC"); and Packaging Corporation of America ("PCA").

2   The class is defined as "All persons who purchased Containerboard Products directly from any of the Defendants or their subsidiaries or affiliates for use or delivery in the United States from at least as early as February 15, 2004 through November 8, 2010." "Amendments to Plaintiffs' Consolidated and Amended Complaint ," p. 2, filed June 3, 2014.

3   For a discussion of econometric methods applied to antitrust litigation, see for example, Baker, J. and D. Rubinfeld "Empirical Methods Used in Antitrust Litigation" *American Law and Economics Review,* Vol. 1, No. 1 & 2, 1999, pp. 386-435.

Mark Dwyer, Ph.D.                                               Case No. 1:10-cv-05711

the damages model are consistent with plaintiffs' allegations of collusion.

4.      The materials I have relied upon are listed in Exhibit 1. The facts and data on which I base the opinions reflected in this report are of a type reasonably relied upon by experts in the field of econometrics. I have utilized standard and widely accepted empirical methods on a class-wide basis to assess the extent to which any impact from the alleged collusion was widespread and to provide a preliminary measure of the but-for competitive prices for Containerboard Products and the aggregate damages to the class. These measures demonstrate the ability to apply such common empirical methods on a class-wide basis to assess common impact and estimate damages.

## I.B.     Background

5.      My name is Mark Dwyer. I am an economic consultant with Harris Economics Group, LLC in Glendale, California. I earned a PhD in economics with a specialization in econometrics from the University of Rochester. Since then I have been a professional economist specializing in econometric issues for the last 19 years. For the last 13 years, I have focused on econometric issues in civil litigation consulting. Prior to that, I taught econometric methods at the graduate and undergraduate levels for 6 years at UCLA. My CV is attached as Exhibit 2. I have provided deposition testimony in state and federal court. In federal court, I have provided testimony on empirical evidence regarding common impact and on the estimation of class-wide damages in antitrust class actions. Harris Economics Group is being compensated for the time I spend on this matter at its normal and customary rate of $360 per hour.

## I.C.     Allegations

6.      The Consolidated Amended Complaint alleges that "[t]he goal of the conspiracy was to fix, raise, maintain and stabilize the price at which Containerboard Products were sold during the class period."[4] I understand that the proposed class period begins February 15, 2004 and continues

---

4   Amendments to Plaintiffs' Consolidated and Amended Complaint at p. 2.

Mark Dwyer, Ph.D.                                              Case No. 1:10-cv-05711

through at least November 8, 2010. Containerboard Products, as defined in the Consolidated Amended Complaint include linerboard, corrugating medium, containerboard sheets, boxes, and other corrugated containers.[5]

## I.D.    Summary of Conclusions

7.    Plaintiffs allege that defendants colluded to restrain supply in order to raise or maintain prices. The plaintiffs also allege that the alleged collusive restrictions in supply were employed by the defendants to support announced price increases for the Class Products during the class period. Using widely-accepted econometric methods, I investigate whether these announced price increases were effective, employing evidence that is common to the class. I find that all or nearly all members of the proposed class were impacted by price increases implemented by the defendants. This conclusion is based on systematic, empirical comparisons of net prices paid by class members for Containerboard Products before and after price increase implementation dates previously announced by the defendants.[6] These results show that price increase implementations were widespread and broadly effective, causing all or nearly all class members to pay higher prices after the implementations than before.

8.    Further, I found all or nearly all class members to be impacted even after accounting for not only net prices but also after accounting for additional possible or "offered" discounts reflected in the defendants' sales transactions data – i.e., potential discounts that defendants' data do not clearly reflect were paid to class members. Even had these additional discounts been provided to class members, they would not have altered the conclusion that price increases implemented by the defendants were widespread and broadly effective, thereby impacting all or nearly all class members.

---

5    For brevity, I refer to linerboard (both kraft and recycled) and corrugating medium (both semichemical and recycled) collectively as "roll stock" and to corrugated sheets, boxes and other containers as "corrugated products".

6    By net price, I am referring to transaction prices paid by class members net of discounts that the defendants' sales transaction data indicated were paid to class members for a specified product (line item) within a specified purchase (invoice) on a specified date.

Mark Dwyer, Ph.D.                                                    Case No. 1:10-cv-05711

9.    Additionally, I considered a broader sample of class members by comparing weighted average prices across products for each class member before and after defendant price increase implementation months. On the basis of this measure as well, price increases implemented by the defendants were widespread and broadly effective, thereby impacting all or nearly all class members.

10.   Finally, I accounted for lump-sum payments to some class members, reflected in the sales transactions data but not identified to particular purchase transactions.[7] My review shows that these payments were not larger in aggregate during the class period than they were outside the class period and therefore did not offset the price increases implemented by the defendants. Hence, these lump-sum payments would not affect the conclusion that all or nearly all class members were impacted by the announced price increases.

11.   In summary, all four of these measures of impact show that all or nearly all class members paid higher prices as a result of price increases announced and implemented by the defendants and alleged by the plaintiffs to be facilitated by the collusive restriction in supply.

12.   Finally, I have employed standard econometric methods, multiple regression analysis, on a class-wide basis to demonstrate, preliminarily, that such methods may be used to quantify aggregate overcharge damages to the class. This preliminary regression analysis explains the movements in aggregate Containerboard Product prices in response to supply and demand factors over two periods: a benchmark period in which there is no allegation that the defendants colluded, and the class period, within which it is alleged that the defendants colluded. The regression analysis includes variables to account for the effects of important competitive (supply and demand) factors on the observed prices, thus allowing me to isolate the direct price effects of the alleged collusion. This analysis also included an indicator (dummy)

---

7   The defendants did not provide their sales transaction databases. Instead the defendants provided extracts of various fields from these databases.

Mark Dwyer, Ph.D.                          Case No. 1:10-cv-05711

variable for measuring the extent of price elevation during the class period not explained by the competitive factors controlled for. This regression analysis produces estimates of the percentage increase in aggregate prices due to the measured collusive effects. I am able to apply this estimated percentage overcharge to the dollar volume of purchases of Containerboard Products during the class period and thereby estimate aggregate damages to the class.

13. I estimated aggregate price percentage overcharges separately for Intermediate Containerboard Products (roll stock and sheets) and for Final Containerboard Products (e.g., corrugated containers and displays). This preliminary analysis shows statistically significant overcharges of 3.81% for Intermediate Containerboard Products and of 2.92% for Final Containerboard Products, which when applied to the approximately $21 billion in Intermediate Containerboard Product class purchases and $102 billion in Final Containerboard Product class purchases results in damages of approximately $3.8 billion.

14. The results of this regression analysis are consistent with the allegations of cartel behavior. Also, these results are consistent with, and corroborate, my impact conclusions drawn from the price increase implementation analysis summarized above.

## II.      Class-wide Empirical Evidence of Common Impact

### II.A.     Objectives & Methods

15. Plaintiffs allege that defendants colluded to restrict the supply of Containerboard Products in order to raise and stabilize prices for Containerboard Products from February 15, 2004 through at least November 8, 2010. These supply restrictions are alleged to have ultimately facilitated the implementation of coordinated price increases announced and implemented by the defendants.

16. Plaintiffs' allegations identify the means by which the allegedly collusive

restrictions in supply injured the class members; and that is through a number of price increases announced and implemented by the defendants during the class period. These price increase implementations occurred as and after the alleged coordinated restraints in supply took place. I can then assess how widespread the impact on class members was by systematically examining and comparing both industry-wide reflections of price and actual prices paid by class members before and after these announced price increases, which I refer to as Price Increase Implementation Events ("PIIEs").

17. Section II.B describes the defendants' price increase announcements and evidence of the class-wide impact of those announcements as reflected in industry wide price measures.

18. Section II.C considers evidence of class-wide impact by examining actual prices paid by class members, as reflected in the sales transactions data provided by the defendants. Section II.C.1 describes the identification of class members and the measurement of net prices from these defendant data. Section II.C.2 describes the relevant PIIEs. Section II.C.3 presents impact results – that impact to the class is widespread, affecting all or nearly all class members. Section II.D examines the sensitivity of these results to alternative measures of customer prices and finds that class-wide impact is robust. Section II.E evaluates payments, including off-invoice, lump-sum payments, made by some defendants to certain class members. I find that such payments do not alter the conclusions based on the other empirical analyses I described and hence do not alter my opinion of common impact.

## II.B.      The Defendants' Price Increase Announcements and Assessment of Class-Wide Impact Based on Industry-Wide Price Data

19. The defendants' documents describe 15 price increase announcements for

Mark Dwyer, Ph.D.                                         Case No. 1:10-cv-05711

Containerboard Products during the class period.[8] These announcements are listed in Exhibit 3. These announcements nearly all follow similar patterns. For 14 of the 15 announcements, all 7 defendants participated.[9] For each announcement, the month in which the price increase was to be implemented for each defendant is listed. For 11 of the 15 announcements, the implementation month for every defendant is the same.

20. Not only were the announced price increases intended to be implemented coincidentally, they were nearly uniform in the amounts. All 15 price increases included linerboard and corrugating medium products generally. Exhibit 3 lists the announced price increases for 42lb. eastern unbleached kraft linerboard. For 12 of the 15 announcements, the amount of this increase is identical across the 7 defendants. For the remaining 3 announcements, the announced increases were within $10/ton of each other, i.e., within about +/- 2% of each other relative to the average price of this linerboard grade.[10]

21. Given the lock-step nature of these price increase announcements and their implementations, a first place to examine class-wide impact is with a review of readily available, comprehensive, industry-wide measures of prices. The extent to which the defendants' price increase announcements are reflected – both in timing and in magnitude – in a published price index for linerboard is indicative of impact on prevailing market prices and therefore of the class-wide price impact of such announcements.

---

8   See GP-KLEEN: 00074419, 00075247, 00086753, 00328735, 00528361, 00559646, 00630642, 00633894, 00634058, 00634156, 00636722, 00638883, 00638886, 00638903, 00642439, 00642598, 00642618, 00642629, 00642811, 00643582, 00644502, 00644782, 00652056, 00679172, 00679229, 01025029, 01025142, 01456220; IP: 0955004, 0985657, 1131608, 1131863, 1242597, 1316324, 143739, 143740, 143741, 143742, 143743, 143746, 143747, 318743, 323609, 338552, 350501, 352950, 498100, 498647, 499465, 657888, 673256, 679991, 680889, 754507, 754509; SSCC: 00090777, 00131595, 00135050, 00138890, 00145950, 00178251, 00188584, 00192004, 00229889, 00341677, 00361964, 00361976, 00361976, 00362042, 00373470, 00436551; TIN: 00131080, 00149975, 00150869, 00192831, 00192843, 00220011, 00323080, 00353457, 00457605, 00457710, 00506823, 01358789, 01358789, 01362307; WY: 0061835, 0063801, 0072206, 0080561, 0091907; DBSI: 00001063, 00003408; NORAMPAC: 00044483, 00171117; PCoA: 000354315, 000573450.

9   For Announcement 8 (Apr/May 2007) TI, IP, and PCA participated.

10  Over the class period, the average of the PPW Index (midpoint) is $520/ton. $10 is about 2% of this amount.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

II.B.1.    Evidence of Class-wide Impact in Published Market Price Index

22.  A private publisher – RISI[11] – produces a weekly survey of prices that includes the containerboard industry. This weekly survey is called Pulp & Paper Weekly ("PPW"). This weekly survey has been published for more than 30 years and was published continuously throughout the class period. Every third week of the month, PPW publishes price indexes for a variety of paper products including linerboard and corrugating medium. These transaction price indexes are based on surveys of buyers and sellers of a particular containerboard grade. RISI included in the prices it published in its surveys only those related to "transactions between non-affiliated parties."[12] Internal transfers and trades between producers were excluded. PPW also excludes transactions that were contractually tied to a price index.[13] These filters make the indexes more representative of the prices class members actually paid.

23.  For Containerboard Products, one price index series is prominent – the transaction price index for 42lb. unbleached kraft linerboard for delivery east of the Rocky Mountains ("PPW Index"). This is a class product. The PPW Index is used as the industry linerboard price in the defendants' own analysis of industry pricing.[14] One reason for the prominence of the PPW Index is its pervasive role as a reference price for contracts. This index serves as a reference price for contracts not just for linerboard, but for semichemical medium and generally, for other Containerboard Products as well.[15]

24.  Another reason for the prominence of this price index is that transaction prices, as reflected in these transaction price indexes for other grades of Containerboard Products move in strikingly similar patterns. These series are plotted below. PPW publishes monthly transaction price indexes for 4 other

---

11  http://www.risiinfo.com/

12  "'Transaction' price estimates reflect regular transactions between mills (and in some cases brokers) and independent converters on regular size orders." RISI-00001549.

13  RISI-00001548-52. Many roll stock prices may vary with the PPW indexes themselves. Such prices contain no independent assessment of market conditions by buyers and sellers and so provide no additional information upon which to base an index value.

14  See       GP-KLEEN01017053-071;       GP-KLEEN00141844-45;       IP107771;       IP107791;    GP-KLEEN01067374.

Mark Dwyer, Ph.D.                                        Case No. 1:10-cv-05711

linerboard grades and 2 semichemical medium grades. During the class period, correlations of these 6 other grade price indexes with the PPW Index all exceed 0.990, indicating that these prices move virtually in lock-step with the transaction prices reflected in the PPW Index.[16] See Exhibit 4.



25. Another reason for its prominence is the broad geography over which the survey is conducted. The PPW Index incorporates transactions across the country, including "prices in the Northeast, Southeast, Midwest, and South Central sections of the country."[17] Because the PPW Index surveys transactions for domestic delivery, it excludes non-class foreign sales.

26. For all of these reasons, the PPW Index is reflective of class member transaction prices for Containerboard Products. As Exhibit 3 indicates,

15 Deposition of Todd K. Petracek, March 19, 2014, pp. 141-142, 198-199; Temple-Inland_00370892; PCoA000585718; PCoA000026236; PCoA00059432; Temple Inland 00051818, Temple Inland 00051798, Temple Inland 00051775, Temple Inland 00051770, Temple Inland 00051757, Temple Inland 00051691, PCoA 000197041, PCoA 000166161, IP089891, IP 043353, IP009998, IP12123, GP-KLLEN00362592; Affidavit of Matthew T. Denton In Support of Confirmation of the Debtors' Joint Plan of Reorganization, In re: Smurfit-Stone Container Corporation, et al, United States Bankruptcy Court For The District of Delaware, Case No. 09-10235 (BLS), (Denton Affidavit), p.4; Declaration of Stephen R. Read, In re: Smurfit-Stone Container Corporation, et al, United States Bankruptcy Court For The District of Delaware, Case No. 09-10235 (BLS), p.6; GP-KLEEN 01074015.

16 Two variables are positively correlated when the variables tend to move in the same direction and when one increases the other increases as well. When two variables have no (linear) relationship, their correlation is 0.0. When the two variables are exactly positively linearly related the correlation coefficient is +1.00.

17 RISI-00001549.

Mark Dwyer, Ph.D.                                        Case No. 1:10-cv-05711

following most price increase announcements issued by the defendants during the class period, price rises were reflected in increases in the PPW Index. Specifically 9 of 15 of the defendants' price increase announcements are reflected by increases in the PPW Index after the effective dates of those announced increases.[18] That a market-wide price index, which is both a survey largely oriented towards the inclusion of class member Containerboard Product purchases and a determinant of class member Containerboard Product prices, reflects these 9 announcements is evidence that these events broadly impacted class Containerboard Product purchase prices.

27.  Additionally, in all 9 of these cases, the dollar amounts of the increases in the PPW Index match the defendants' announced price increases That the dollar amounts of the PPW Index align with the defendants' announced increases is evidence that the increases were uniform across class members. The PPW Index weights responses from surveys of market participants (i.e., buyers and sellers of 42lb. unbleached kraft linerboard). If a substantial portion of survey participants had reported that they did not experience a price increase, the PPW Index would not reflect an increase identical to what the defendants had announced.[19]

28.  The effectiveness of the defendants' price increase announcements in raising class-wide prices, as reflected in the PPW Index is even more apparent when the direction of the movements of the PPW Index during the class period are considered. During the 82 months of the class period, the PPW Index changed 21 times. Of these 11 were increases in the index while 10 were declines. Thus, as captured by this PPW Index of linerboard transaction prices, more than 80% (i.e., 9 out of 11) of all price increases during the class period are

---

18 The implementation months for these 9 price increases are: Feb/Mar 2004; Jun 2004; Oct 2005; Jan 2006; Mar/Apr 2006; Aug 2007; Jul 2008; Jan 2010; and Apr 2010. See Exhibit 5.
19 The PPW Index is reported as a range. Throughout the class period, the spread between the high and low values of the range was stable at $10/ton. Exhibit 5 reports the midpoint of this range. Changes to the midpoint reflect equal changes to both endpoints of the reported range. That the range does not widen around the defendants' implementation months is additional evidence that the increases were uniform across linerboard purchasers.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

coincident with the defendants' price increase announcements.

29. This is an unlikely coincidence. If the defendants' announcements were ineffective in raising class member prices, one would expect the probability of an increase in the PPW Index to be about the same in months where the defendants implemented a price increase as it is over the whole class period. Over the 82 months of the class period, the probability of a PPW Index increase is 11/82 or 13.4%. The probability that the 9 PPW Index price increases that we observe in the defendants' implementation months of Exhibit 3 are a matter of chance is less than one-hundredth of one percent (0.0054%). This shows that the relationship of the price increases reflected in the PPW Index to the defendants' price increase announcements is statistically significant. At any conventional level of significance, this result provides a statistical rejection of any assertion that the defendants' price increases are unrelated to the increases observed in the PPW Index.

30. In summary, the prices for linerboard and medium reflected in the PPW Index increased for 9 of the 15 PIIEs during the class period. The timing, direction, and magnitude of PPW Index movements supports the conclusion of class-wide impact for purchasers of linerboard and medium. Further, given that much evidence ties corrugated prices to the PPW Index, the results of this examination of the PPW index provides indirect evidence that the defendants' price increase announcements had a class-wide impact on class-members purchase prices for these corrugated Containerboard Products as well. These results are sufficiently significant and robust to support my opinion that all or nearly all class members were impacted by the defendants' collusive behavior as alleged by the plaintiffs.

## II.C.   Assessing Common Impact Based on Sales Transactions Price Data

31. In this section I extend the preceding impact analysis based on market-level price data, to consider whether examination of prices actually paid by class members supports or is inconsistent with the conclusion of pervasive,

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

class-wide impact described in Section II.B above. I start with an overview of the methods I used in examining each of the defendants' sales transaction data to identify class members, Containerboard Products, and to compute net product prices (in Section II.C.1). I then turn to my examination of the relevant price data, again for each defendant, and find that all or nearly all of the class members examined in that defendant's data paid higher prices on transactions after the effective dates of the price increase announcements alleged by plaintiffs to be facilitated by the collusive supply restrictions (Sections II.C.2, II.C.3, II.D.1, and II.D.2 ).

II.C.1.    Identifying Class Members and Net Product Prices

32. To identify transactions by those customers who are class members, I removed from the defendants' transactions data inter-defendant trades, within-defendant transfers, sales designated as exports, and foreign sales.[20] I further removed transactions that were not for Containerboard Products.

33. Similarly, I identified class members' net prices in the defendants' sales transaction data. Net prices are defined by incorporating any applicable discounts or adjustments to the price, indicated as being on the invoice line item in the defendants' sales transactions data.

II.C.2.    Price Increase Implementation Events ("PIIEs")

34. The response of the PPW Index to the defendants' price increase implementations in section II.B.1 above supports the conclusion that the majority of those price increase implementations resulted in increases in that overall market price, thus impacting all or nearly all class members. In this section, I compare class member net product prices before and after each PIIE to see whether class member net prices for that Containerboard Product systematically increased after the PIIE, thus also supporting the conclusion

_____

20 Across defendant datasets, the total number of class member identifications is 230,884. For almost all defendants, no information was provided to unify separate customer identifiers (e.g., customer numbers) when those customers were part of the same company. This is but one reason why class member counts are likely overstated here, and why the share of class members showing evidence of impact is likely understated.

Mark Dwyer, Ph.D.                                          Case No. 1:10-cv-05711

that all or nearly all class members were impacted by the collusive conduct alleged by plaintiffs.

35. Exhibit 5 lists the PIIEs associated with the defendants' price increase announcements between February 2004 and August 2010 that showed market-wide price increases as reflected in increases in the PPW Index. Several of these PIIEs occur in successive quarters. Defendants' documents indicate that price increase implementations may take a number of months to impact class members, depending on what type of contracts different class members have and when those contracts come up for renewal.[21] For this reason, when an implementation month of one PIIE falls within 4 months of an implementation month in the following PIIE, the two events are combined.

   1) The February/March 2004 and June 2004 PIIEs are treated as one combined PIIE.

   2) The October 2005, January 2006, and March/April 2006 PIIEs are treated as one combined PIIE.

   3) The January 2010 and April 2010 PIIEs are treated as one combined PIIE.

   Together with the stand-alone PIIEs of August 2007 and July 2008 these consolidations result in the 5 PIIEs numbered in Exhibit 5. Exhibit 5 also reflects the total increase in the PPW Index corresponding to each (combined) PIIE.

36. Exhibit 5 also shows that these PIIEs had comparable effects across the PPW price indexes for the other grades of linerboard and medium. This offers further corroboration of the market-wide impact of these price increases, and of their reach across all Containerboard Products.

II.C.3.    The Impact of Defendant Price Increase Implementations on Class
           Member Net Prices

37. I compare the net prices paid by a class member for a specific product in the month before the effective date of the announced price increase to the price paid for that class member for the same product after the effective date. I

---

21 See IP134689, SSCC00101201, GP-KLEEN 01074015.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

considered the modal net price paid by a class member in that month as the monthly net price.[22] The pre-event price is the monthly net price in the closest month up to (and including) the month prior to the PIIE as listed in Exhibit 5. The comparisons then are to the monthly net prices for that same product within 3 months, 6 months, and 9 months after the PIIE.[23] These post-PIIE windows were selected to reflect the potential that contracts or other negotiations may have delayed the implementation of a given price increase for some months for some class members.

38. Exhibit 6 presents the results of these systematic comparisons. These results show that the overwhelming number of class members examined (92%), constituting almost all of the dollar volume of class purchases examined (more than 99%), and the bulk of transactions examined (82%) were impacted, that is, showed elevated prices following a PIIE. These results were consistent across defendants and product groups. Overall, this analysis shows that these Defendants' price increase implementations systematically pervade class member purchases, supporting the conclusion that all or nearly all class members were impacted.[24]

---

22 For the definition of net price used, see ¶33. Across the defendants' sales transaction data, more than 80% of monthly net product prices are unique. Those unique monthly prices are modal prices. For those monthly product prices that are not unique, the modal price is the price for a given class member, product, and month that occurs most frequently.

23 Since two of the 5 PIIEs occur within 12 months of one another, I limited my examination to at most 9 months following the PIIE. Where there is a subsequent increase in the PPW Index in months following a PIIE, I limit the period after the PIIE to exclude that subsequent increase.

24 The impact percentages presented above (and below) are almost certainly conservative. Within each defendant's sales transactions data, customers need not have a unique identifier across different defendant computer systems, or in some cases even across plants from which products were shipped. This means that a single class member can be represented as different customers both within and across the defendants' datasets. Nor is there a feasible way to identify class members' purchases across defendants, as each defendant uses different methods to identify a class member. It is likely that some of those class members assessed in Exhibit 6 for whom no price increase was measured were in fact impacted with a price increase but under a different customer identification, either within the same defendant's data or in another defendant's data.

Mark Dwyer, Ph.D.                                          Case No. 1:10-cv-05711

## II.D.  Alternative Price Measures & Impact

### II.D.1.  Weighted Average Containerboard Product Prices & Offered Discounts

39.  Defendants' sales transaction data identify "offered" discounts and rebates but are unclear whether those potential discounts or rebates were in fact provided to class members. In Exhibit 7 I report the results of the price comparison analysis described above and reported in Exhibit 6, but taking into account the additional "offered" discounts that class members may or may not have received.

40.  In order to examine how, if at all, such offered discounts or rebates might affect the analysis of price increases identified above, I assumed that such "offered" discounts in fact were given. The set of class members for whom these price changes can be assessed is identical to that in Exhibit 6. The total assessed dollars in Exhibit 7 are reduced by the total value of offered discounts. Comparison of the difference in these assessed dollars between Exhibits 7 and 6 shows that offered discounts for the class as a whole are quite small. The defendant with the highest percentage value of offered discounts is SSCC, at 0.96%.

41.  Price increase results reported in Exhibit 7 are quite similar to those in Exhibit 6. The overall share of tested class members showing price increases is 93%. Similar levels of impact hold at the defendant and product type levels. Class members who show impact here account for virtually all the dollar volume measurable for price changes. In the event that such offered discounts or rebates were in fact given, they show no evidence of having impeded or offset the price increase implementations of Exhibit 5. From these results, I conclude that the class-wide impact results of Exhibit 6 are not materially affected by the incorporation of potential (i.e., "offered") discounts and do not require modification of my opinion of common impact.

### II.D.2.  Weighted Average Customer Prices

42.  The two impact analyses above focus on price movements at the product

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

level. To examine the robustness of these impact results to the definition of products as I was able to identify them from the defendants' sales data, in this section I examine the monthly weighted average price for all products that a class member purchased from a given defendant.[25]

43.  Exhibit 8 assesses price movements around PIIE events for about 16,000 additional class member identifications, as compared to Exhibits 6 and 7. On this price measure, 94% of assessable roll stock class members and 87% of assessable corrugated product class members show monthly price increases following at least one PIIE. Across defendants, the share of class members paying higher weighted average monthly prices ranges from 83% to 91%.[26] Overall, these class members paying higher weighted average monthly prices accounted for about 97% of the dollar value of assessable purchases. As in Exhibits 6 and 7, impacted class members account for virtually all class purchases that could be analyzed. In summary, the results of these weighted average monthly price comparisons are consistent with and supportive of the conclusions of the more precise comparisons made at the customer-product level in Exhibits 6 and 7, that all or nearly-all class members were affected by higher prices following the defendants PIIEs.

## II.E.    Payments to Class Members

44.  The defendants' production data also indicate payments or credits to class members that are not associated with a sales invoice line-item and are therefore not tied to particular product purchases.

45.  To see what effect, if any, these payments may have on the conclusion that all or nearly all class members were impacted by the defendants' conduct, I examine these additional payments as a percentage of defendants' sales

---

25 I computed and compared customer weighted average monthly prices separately for corrugated Class Products and for roll stock Class Products.

26 Comparable figures when product prices are matched range from 90% to 95%, as indicated in Exhibit 6. That weighted average prices would be somewhat lower than product-specific comparisons is consistent with an economic substitution effect. When faced with price increases, some class members may have substituted from higher grade Containerboard Products to lower grade Containerboard Products.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

outside and during the class period.[27] Exhibit 9 summarizes these results. Class members are included in this comparison if they made purchases in both the class period and outside the class period. For each class member for whom such a comparison can be made, I compute annual payment shares ("APS"), that is, the share of total annual payments from a given defendant as a share of the class member's total annual purchases from that defendant.

46. 96% of class members did not receive APS during the class period that were significantly higher (in a statistical sense) from APS paid outside the class period. This result is consistent across product types (i.e., corrugated vs. roll stock) and across defendants.

47. I also examined the sensitivity of these results to two different APS scenarios found in the defendants' data. In the first scenario, I include class members who received either no APS or at most one APS within and outside the class period. Over 56,000 class member identifications fit within this category. Across defendants and product types, 95% of these class members either have no APS at all, or have an APS within the class period that is no higher than the APS received outside the class period. Similar results (ranging from 92% to 98%) hold for corrugated products and roll stock separately and for each defendant considered separately.

48. Under the second scenario, Exhibit 9 describes those class member identifications (over 54,000) for whom more than one APS were received either within the class period, outside the class period or both. Here the exhibit compares the average APS within the class period to the average APS outside the class period. Overall, 97% of these class members did not receive statistically significantly higher APS during the class period. Across product types (roll stock and corrugated) and across defendants similar percentages of these class members (ranging from 92% to 99%) did not receive statistically significantly higher APS during the class period.

49. These results confirm that defendants' annual payments to class members do

---

27 As this analysis compares annual payments received to annual purchases, for this exhibit "class period" refers to the calendar years 2004 through 2010.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

not weaken the conclusion of common impact.

50.  In summary, all of the analyses above, based on evidence common to the class, indicate that the defendants' price increases not only caused market-wide price increases, but that these price increases were disseminated to all or nearly all class members.

# III.     Estimating Damages on a Class-wide Basis

## III.A.     Introduction

51.  In this section I assess whether damages may be reliably estimated on a class-wide basis through the use of well-accepted empirical methods. I conduct a preliminary analysis that demonstrates the feasibility of reliably estimating damages on a class-wide basis through the use of one such method, multiple regression analysis. Section III.B describes the measures of aggregate prices used in this preliminary damages analysis. Section III.C describes the benchmark period used and the reasons why that benchmark period was selected. Section III.D describes the variables used to control for other economic factors affecting prices. Section III.E presents the results of this regression analysis of aggregate prices. Section III.F combines the overcharges from these regression results with class purchases for a preliminary estimate of aggregate, class-wide damages.

## III.B.     Aggregate Price Measures

52.  To measure aggregate, class-wide prices, I first compute monthly percentage changes in net prices for each class member and product combination where a monthly price is observed in successive months.[28] I rolled up these monthly percentage price changes into two product categories or levels – Intermediate Containerboard Products ("ICP") (consisting of roll stock and

---

28 In any given month, for customer – product combinations that lack a purchase in the prior month, I consider purchases up to 3 months prior. I then compute the average percentage change in monthly price. For example if a customer purchased a given product in January for $110 and then again in March for $120, the average monthly percentage price increase would be $10/$110/2 = 4.55%. Percentage price changes are actually measured as average monthly log price differences.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

corrugated sheets) and Final Containerboard Products ("FCP") (consisting of all other Containerboard Products). For each of these two product types, I then arrived at an aggregate price series.

III.B.1.    Aggregate Class Prices Follow the PPW Index

53. These ICP and FCP aggregate class price series can be compared to the PPW Index. Exhibit 10 provides the results of such aggregate class price regressions. For both the ICP and FCP class prices, more than 97% of the variation in aggregate class prices is explained by these regressions. The PPW Index terms in both regressions are statistically significant at all conventional significance levels.

54. These regressions corroborate the impact of the defendants PIIEs reported in Exhibit 5. These PIIEs were fully reflected in the PPW Index. These regressions indicate that the PPW Index has a strong statistical relationship to the aggregate Containerboard Product prices that I use in my damages regressions.

III.C.    Use of a Benchmark Period

55. The estimation of economic damages attributable to cartel behavior, like that alleged here, reflects the difference between prices class members paid and the prices they would have paid "but for" the alleged collusion. Often this comparison involves prices paid during the class period to prices paid during a period believed not to be affected by the alleged collusion, a "benchmark" period. The difference between these prices, controlling for changes in otherwise competitive conditions, is the overcharge and may constitute a reliable measure of damages (per purchase unit) caused by the alleged collusion.

56. Benchmark periods may be drawn from before the class period, after the class period, or both before and after the class period.[29] Given defendant

---

29 In some circumstances benchmarks may coincide with the class period and be based on a different geographic market or a similar, but distinct product market.

Mark Dwyer, Ph.D.                                              Case No. 1:10-cv-05711

sales transaction data availability, I consider here a benchmark period that includes months before and after the class period.

## III.D.    Damages Multiple Regression Analysis

57.  In comparing prices between a benchmark period and the class period, I employ standard econometric methods to adjust for non-conspiratorial factors that may distinguish prices in these two periods. By controlling for such factors, these methods isolate any price effects during the class period that are due to the alleged collusion. In my experience, the most common econometric method used to control for non-conspiratorial factors affecting price is multiple regression analysis. This typically involves the specification and estimation of an equation relating class member prices to economic factors affecting price. These economic factors function as controls – their influence on prices is taken to be independent of the alleged conspiracy.

58.  I estimate multiple regression models over the entire set of available data, spanning both the class period and the benchmark period.

59.  To capture changes in prices during the class period that are not attributable to these control factors, I add an indicator (dummy) variable. A positive estimated effect for this dummy variable indicates that prices during the class period are higher than can be explained by the economic factors serving as controls and therefore supports the inference that the elevation is attributable to the collusion alleged by plaintiffs.

60.  In this way the regression equation explains changes between prices as observed in the benchmark period and prices observed in the class period. When prices are elevated during the class period in a way that is unrelated to the effect of supply and demand factors that normally explain price movements, the regression model provides a measure of the effect on prices of the additional factor alleged to be elevating prices during the class period, namely the alleged cartel.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

III.D.1.  Economic Factors for the Damages Multiple Regression Analysis

61.  The economic factors I consider in these preliminary damages regressions can be grouped into four categories. The first category consists of economic factors measuring downstream (i.e., final product) demand, including indicators of overall economic activity and the business cycle. Here I consider: corrugated box shipments, linerboard consumption (i.e., the difference between linerboard production and the change in linerboard inventories), the S&P 500 stock market index, the University of Michigan Index of Consumer Sentiment, M2 money supply, initial unemployment insurance claims, new housing permits, non-farm employment, manufacturing hours, industrial production, a corporate bond rate index, and the Institute of Supply Management Purchase Managers Index.[30]

62.  The second category of economic factors address costs of Containerboard Product production and delivery. This category consists of recycled corrugated prices (old corrugated containers, "OCC"), pulp prices, a chemical cost index, labor costs, natural gas, crude oil, heating oil, electricity, coal, and diesel.[31]

63.  The third category consists of an overall measure of inflation. I use the

---

30 For example references regarding the role of such demand factors in pricing, see GP-KLEEN 01074014, GP-KLEEN01074016-KLEEN01074019, GP-KLEEN01074023. For example references regarding the role of box shipments in pricing see GP-KLEEN01017053, GP-KLEEN01067346, IP115517, GP-KLEEN01074017, GP-KLEEN01074023. For an example reference regarding the S&P 500 index see SSCC 00083999; regarding the consumer sentiment index see IP010499 (slide 9); regarding the M2 money supply see SSCC 00084000, IP1102785, and IP1168908; regarding unemployment see LAZ_0035720, SSCC 00476500; regarding new housing permits see IP107770, SSCC 00476500; regarding non-farm employment see SSCC 00476500; regarding manufacturing hours see PCoA000430898; regarding industrial production see GP-KLEEN00141649, GP-KLEEN01017053, IP115517; regarding the corporate bond rate see IP107770; regarding the purchase manager's index see LAZ_0035723, 3 May 2006 issue of Deutsche Bank "Paper & Packaging" pp. 1-2. For linerboard consumption see http://www.risiinfo.com/pages/abo/methodology/forecasting/.

31 For example references regarding the role of costs in Containerboard Product pricing see GP-KLEEN01017067, GP-KLEEN01070419, IP107770. For an example reference regarding OCC see SSCC 00841533, GP-KLEEN01070419, SSCC 00476500, SSCC 00080167; regarding fiber costs see IP107762, SSCC 00841533, SSCC 00476500, SSCC 00080167; regarding the chemical cost index see SSCC 00476500; regarding energy costs see IP107770, GP-KLEEN01070419, SSCC 00476500; regarding natural gas see SSCC 00476500, SSCC 00080167. Also see the 8 October 2007 issue of Deutsche Bank's "Paper & Packaging" regarding relevance of chemical costs, hourly wages, energy costs, natural gas, transportation costs. See SSCC 00476500 regarding prices for crude oil, heating oil, electricity, coal, and diesel.

Mark Dwyer, Ph.D.                                        Case No. 1:10-cv-05711

Producer Price Index published by the BLS.[32]

64. The final category consists of monthly indicator variables that control for possible systematic variations in pricing based on the season.[33]

65. All variables are measured monthly. For most of the economic factors listed above, I sought to include variables that would capture the delayed price responses to these factors through the current quarter and that could account for year-on-year effects. In the aggregate class price regression equations, I have included these economic factors using a technique known as principal components to ameliorate colinearity among these factors.[34]

66. In order to determine which of the economic factors identified above best explain prices, I use a stepwise model selection procedure to identify principal components with the most explanatory power.[35] In this way, the model selection process is fully reproducible and is not influenced by subjective determinations, nor by implications with respect to the estimated conspiracy effect of the selection of some economic factors versus others.

## III.E.    Regression Model Results

67. Results for the ICP and FCP aggregate price regressions are given in Exhibit 11. Two regression models were fitted – one for ICP (Intermediate Corrugated Products) and one for FCP (Final Corrugated Products).[36] I considered three specifications of each regression. The first two specifications use different model selection criteria to select those factors with the most explanatory power for each aggregate price.[37] Under the first procedure ("AICC") for the ICP regression model, the overcharge (as reflected by the conspiracy dummy variable) was 4.05%. Using that same model selection criterion, the

---

32 For references regarding the role of the PPI in pricing see, e.g., IP107770, SSCC 00841533, SSCC 00476500.

33 For example references regarding the role of seasonal factors in pricing see KLEEN01017067, IP107766, SSCC 00476500.

34 For a discussion of principal components in regression analysis, and how they can be used to reduced colinearity, see Jolliffe, I. *Principal Component Analysis, 2nd ed.*, Springer 2002.

35 This procedure is implemented in the Stata statistical software. See Lindsey, Charles and Simon Sheather "Variable Selection in Linear Regression," *The Stata Journal* 10, 4, pp. 650-669, (2010) "(Lindsey & Sheather 2010)". Available at http://bit.ly/1pzqOCL.

36 See ¶52.

Mark Dwyer, Ph.D.                                    Case No. 1:10-cv-05711

overcharge estimate for the the FCP regression model was 3.61%. Under the second model selection criterion ("BIC"), the ICP overcharge estimate is 4.04% while the FCP overcharge estimate is 2.38%.

68. I considered another model specification based on these results. As a way of assessing robustness of the overcharge estimates to the number or principal components included in each aggregate price regression, I considered only the 10 principal components in the AICC specifications with the most explanatory power. The final specifications in Exhibit 11 consider regressions with just these 10 principal components.[38] These specifications imply an ICP overcharge of 3.33% and an FCP overcharge of 2.78%. For both price regressions, the conspiracy effects are statistically significant at all conventional levels of significance, across all three specifications.[39] These damage regression results are consistent with plaintiffs' allegations of collusion. The average overcharge across these three specifications, is 3.81% for ICP and 2.92% for FCP. I use these averages in the damages estimates below.

## III.F.    Estimated Damages

69. To compute preliminary measures of class-wide damages, I multiplied the average ICP and FCP overcharges of Section III.E by class purchases.[40] These average overcharges are given in Exhibit 11 as 3.81% for ICP and 2.92% for FCP. Exhibit 12 presents these preliminary damages results. For ICP class purchases of $21.06 billion, this 3.81% average overcharge implies damages

---

37 These two alternative model selection procedures are known as the "Bias-Corrected Akaike Information Criterion", or "AICC" and the "Bayesian Information Criterion", or "BIC". See Hurvich, Clifford and Chih-Ling Tsai "Regression and time series model selection in small samples", *Biometrika,* 76, 2, pp. 297-307 (1989) and Schwarz, G. "Estimating the Dimension of a Model," *The Annals of Statistics,* 6, pp. 461-464 (1978).

38 These specifications also include the monthly dummies determined by the AICC criterion, the maintained price inflation controls, and the conspiracy effect.

39 These statistics have been corrected for the possible presence of heteroskedasticity and residual serial correlation.

40 Class purchases are measured from March 1, 2004 through October 31, 2010. Defendants did not identify purchases that were governed by fixed price contracts initiated prior to the start of the class period. Even so, I have attempted to reduce class purchases for such products.

Mark Dwyer, Ph.D.                                        Case No. 1:10-cv-05711

of $801.27 million. For FCP class purchases of $102.25 billion, the 2.92% average overcharge implies preliminary damages of $2.991 billion. Combining these figures yields total preliminary class-wide damages of $3.792 billion. Across both FCP and ICP, the preliminary overall overcharge percentage is 3.08%.

70. This preliminary damages estimate, based on sales transactions data provided by the defendants, provides a demonstration of the feasibility of computing class-wide damages.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Glendale, California.

Dated: Wednesday, June 11, 2014

Mark Dwyer

Exhibit 1

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 1 of 14 PageID #:16883
Case: 15-2385      Document: 56-14      Filed: 10/27/2015      Pages: 212

# List of Documents Relied Upon

**DBSI**
· DBSI 00001063
· DBSI 00003408

**GP-KLEEN**
· GP-KLEEN 01074015
· GP-KLEEN00074419
· GP-KLEEN00075247
· GP-KLEEN00086753
· GP-KLEEN00141646
· GP-KLEEN00141647
· GP-KLEEN00141648
· GP-KLEEN00141649
· GP-KLEEN00328735
· GP-KLEEN00528361
· GP-KLEEN00559646
· GP-KLEEN00630642
· GP-KLEEN00633894
· GP-KLEEN00634058
· GP-KLEEN00634156
· GP-KLEEN00636722
· GP-KLEEN00638883
· GP-KLEEN00638886
· GP-KLEEN00638903
· GP-KLEEN00642439
· GP-KLEEN00642598
· GP-KLEEN00642618
· GP-KLEEN00642629
· GP-KLEEN00642811
· GP-KLEEN00643582
· GP-KLEEN00644502
· GP-KLEEN00644782
· GP-KLEEN00652056
· GP-KLEEN00679172
· GP-KLEEN00679229
· GP-KLEEN01017053
· GP-KLEEN01017054
· GP-KLEEN01017060
· GP-KLEEN01017061
· GP-KLEEN01017067
· GP-KLEEN01025029
· GP-KLEEN01025142
· GP-KLEEN01067346
· GP-KLEEN01067346
· GP-KLEEN01067371
· GP-KLEEN01070419
· GP-KLEEN01074014
· GP-KLEEN01074016-KLEEN01074019
· GP-KLEEN01074023
· GP-KLEEN01456220
· GP-KLLEN00362592

**IP**
· IP009998
· IP010499
· IP043353
· IP089891
· IP095108
· IP0985657
· IP107762
· IP107766
· IP107770
· IP1102785
· IP1131608
· IP1131863
· IP115517
· IP1168908
· IP12123
· IP1242597
· IP1316324
· IP134689
· IP143739
· IP143740
· IP143741
· IP143742
· IP143743
· IP143746
· IP143747
· IP1777550
· IP318743
· IP323609
· IP338552
· IP350501
· IP352950
· IP498100
· IP498100
· IP498647
· IP499465
· IP582203
· IP657888
· IP673256
· IP679991
· IP680889
· IP754507
· IP754509
· IP955004

**LAZ**
· LAZ_0035720
· LAZ_0035723

**NP**
· NP 00044483
· NP 00171117

**PCoA**
· PCoA 000354315
· PCoA 000166161
· PCoA 000197041
· PCoA 000430898
· PCoA 000573450

**RISI**
· 00001548-52
· 00001674

**SSCC**
· SSCC 00080167
· SSCC 00083400
· SSCC 00083999
· SSCC 00090777
· SSCC 00101201
· SSCC 00131595
· SSCC 00135050
· SSCC 00138890
· SSCC 00145950
· SSCC 00178251
· SSCC 00188584
· SSCC 00192004
· SSCC 00229889
· SSCC 00341677
· SSCC 00361964
· SSCC 00361976
· SSCC 00362042
· SSCC 00373470
· SSCC 00436551
· SSCC 00476500
· SSCC 00841533

**TIN**
· Temple-Inland 00051770
· Temple-Inland 00051691
· Temple-Inland 00051757
· Temple-Inland 00051775
· Temple-Inland 00051798
· Temple-Inland 00051818
· Temple-Inland 00131080
· Temple-Inland 00149975
· Temple-Inland 00150869
· Temple-Inland 00192831
· Temple-Inland 00192843
· Temple-Inland 00220011
· Temple-Inland 00323080
· Temple-Inland 00353457
· Temple-Inland 00457605
· Temple-Inland 00457710
· Temple-Inland 00506823
· Temple-Inland 01358789
· Temple-Inland 01362307

CONFIDENTIAL
HEG
6/10/2014

Exhibit 1

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 2 of 14 PageID #:16884
Case: 15-2385     Document: 56-1     Filed: 10/27/2015     Pages: 212

**WY**
·WY0061835
·WY0063801
·WY0072206
·WY0080561
·WY0091907

**Other**
·2013.12.20 GP's Supplemental R&O to Plaintiffs Interrogatories 5, 6, 7.pdf
·2013/06/21 TI letter to Charles Goodwin
·2013/07/19 GP letter to Charles Goodwin (OMS/DW)
·2013/07/31 GP letter to Charles Goodwin (Panther)
·2013/08/06 of PCA letter to Charles Goodwin (mills), page 24
·2013/08/06 PCA letter to Charles Goodwin (converters), page 24
·2013/10/28 call with GP (SMDW, BVP)
·2013/11/15 IP letter to Charles Goodwin (CRS, IFREEWAY)
·2014/01/06 SSCC letter to Charles Goodwin, page 12
·3 May 2006 issue of Deutsche Bank's "Paper and Packaging" (20060503.pdf)
·8 October 2007 issue of Deutsche Bank's "Paper & Packaging" (20071008 A.pdf)
·Baker, J. and D. Rubinfeld "Empirical Methods Used in Antitrust Litigation" *American Law and Economics Review,* Vol. 1, No. 1 & 2, 1999, pp. 386-435.
·Consolidated Amended Complaint filed November 8 2010 p. 11.
·Declaration of Stephen R. Read, In re: Smurfit-Stone Container Corporation, et al, United States Bankruptcy Court For The District of Delaware, Case No. 09-10235 (BLS)
·Denton Affidavit
·http://www.risiinfo.com/pages/abo/methodology/forecasting/
·Hurvich, Clifford and Chih-Ling Tsai "Regression and time series model selection in small samples " *Biometrika* 76, 2, pp. 297-307
·IP Data Definition Tables (BOARDS, UNISIS, SAP, POWERCUBE)
·IP SUPPLEMENTAL RESPONSE TO 2D INTERROGATORIES DIRECTED AT DEFENDANTS.PDF
·Jolliffe, I. *Principal Component Analysis, 2 $^{nd}$ ed.* , Springer 2002
·Lindsey, Charles and Simon Sheather "Variable Selection in Linear Regression," The Stata Journal 10, 4, pp. 650-669, (2010) "(Lindsey & Sheather 2010)". Available at http://bit.ly/1pzqOCL.
·Noramapc Supplemental Responses to Plaintiffs 2nd Set of Interrogatories....pdf
·RockTenn's Supplemental Responses to Nos. 5-7 of Pltfs' Second set of rogs to all Defts (00041254).pdf
·Supplemental Response to Interrogatory 6 - Exhibit A.PDF
·Supplemental Response to Interrogatory 7 - Exhibit B.PDF
·Temple-Inland Supplemental Responses to Plaintiffs Second Interrogatorie....pdf
·WY Supplemental Responses & Objection to Second Set of Interrogatories t...

**Exhibit 2**

**MARK J. DWYER, Ph.D**
Economist
Tel: 213. 621. 7636
mdwyer@harrisecongroup.com



**EDUCATION**

Ph.D. in Economics, University of Rochester, 1995
      Fields: Econometrics, General Equilibrium Theory
M.A. in Economics, University of Rochester, 1994
M.A. in Finance, The Wharton School, 1989
B.A. in Physics, University of Pennsylvania, 1984


**EXPERIENCE**

Harris Economics Group
      *Consultant to the Firm, April 2008 – Present*
Econ One Research, Inc.
      *Consultant to the Firm, July 2013 – Present*
      *Senior Economist, January 2006 – July 2013*
      *Economist, May 2001 – December 2005*
UCLA
      *Extension Instructor, Economics 2012 – Present*
      *Assistant Professor, Economics Department July 1995 – April 2001*
Rice University
      *Visiting Lecturer, Economics Department 1995*
University of Virginia
      *Guest Lecturer, Economics Department 1995*
Australian National University
      *Visiting Fellow, Dept. of Statistics & Econometrics 1994*


**PRIOR TESTIMONY**

In Re: Static Random Access Memory (SRAM) Antitrust Litigation MDL No. 1819
      U.S. District Court, Northern District of California, Oakland Division
      Reply Report, June 28, 2010
      Deposition, May 12, 2010
      Corrected Report, May 5, 2010
      Reply Declaration, July 2, 2009
      Deposition, April 2, 2009
      Declaration in Support of Plaintiffs' Motion for Class Certification, January 29, 2009

In Re: Touchstone Cardiovascular Resources, Inc. v. Dr. Daniel Martinez et al.
      CAUSE NO.  2008-12-6480-D
      U.S. District Court Cameron County, Texas
      Deposition: January 12, 2010
      Report, October 28 2009

**Exhibit 2**

**PRIOR TESTIMONY** (continued)

In Re: Western States Wholesale Natural Gas Antitrust Litigation,
    MDL No. 1566,
    CV-S-03-1431-PMP (PAL)
    U.S. District Court, District of Nevada
    Reply Declaration in Support of Plaintiffs' Motion for Class Certification, October 30, 2009
    Declaration, August 12, 2009
    Deposition, March 12, 2009
    Declaration in Support of Class Plaintiffs' Motion for Class Certification, October 17, 2008

In Re: DVD CCA v. Kaleidescape, 1-04-CV-031829
    Superior Court, State of California, Santa Clara County
    Deposition, March 20, 2007

In Re: Natural Gas Commodities Litigation, 03-CV6186(VM)
    U.S. District Court, Southern District of New York
    Report, October 23, 2006
    Declaration, February 1, 2006
    Declaration, January 5, 2006
    Reply Declaration in Support of Plaintiffs' Motion for Class Certification, May 9, 2005
    Deposition, March 4, 2005
    Declaration in Support of Plaintiffs' Motion for Class Certification, January 24, 2005


**AFFILIATIONS**

American Economic Association
American Finance Association
Econometric Society
Antitrust Law Section of the American Bar Association (Associate)

Exhibit 3

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 5 of 14 PageID #:16887
Case: 15-2385    Document: 56-1    Filed: 10/27/2015    Pages: 212

# 15 Defendant Price Increase Announcements

| Announcement | Year | GP | PCA | IP | WY | TI | NP | SSCC | Target Increase ($ / ton) | Prior Month | Following Month | Net PPW Increase ($ / ton) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Implementation Year and Month | | | | | | | | |
| 1 | 2004 | MAR | MAR | FEB | MAR | MAR | FEB | FEB | 40-50 | JAN | APR | 45 |
| 2 | 2004 | JUN | JUN | JUN | JUN | JUN | JUN | JUN | 50 | MAY | JUL | 50 |
| 3 | 2005 | APR | APR | APR | APR | APR | APR | MAR | 50 | FEB | MAY | -15 |
| 4 | 2005 | OCT | OCT | OCT | OCT | OCT | OCT | OCT | 30-40 | SEP | NOV | 30 |
| 5 | 2006 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | DEC | FEB | 40 |
| 6 | 2006 | MAR | MAR | APR | APR | APR | APR | APR | 50 | FEB | MAY | 50 |
| 7 | 2007 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 | DEC | FEB | 0 |
| 8 | 2007 | N/A | MAY | APR | N/A | MAY | N/A | N/A | 40 | MAR | JUN | 0 |
| 9 | 2007 | AUG | AUG | AUG | AUG | AUG | AUG | AUG | 40-50 | JUL | SEP | 40 |
| 10 | 2008 | MAR | MAR | MAR | MAR | MAR | MAR | MAR | 50 | FEB | APR | 0 |
| 11 | 2008 | JUL | JUL | JUL | JUL | JUL | JUL | JUL | 55 | JUN | AUG | 55 |
| 12 | 2008 | OCT | OCT | OCT | * | OCT | OCT | OCT | 60 | SEP | NOV | 0 |
| 13 | 2010 | JAN | JAN | JAN | * | JAN | JAN | JAN | 50 | DEC | FEB | 50 |
| 14 | 2010 | APR | APR | APR | * | APR | APR | APR | 60 | MAR | MAY | 60 |
| 15 | 2010 | AUG | AUG | AUG | * | AUG | AUG | AUG | 60 | JUL | SEP | 0 |

*Acquired by IP

`

CONFIDENTIAL
HEG
6/11/2014

Exhibit 4

# PPW Transaction Price Series Correlations with Linerboard Index ("PPW Index")

| Index | Correlation |
| --- | --- |
| 42lb unbleached kraft linerboard for delivery west of the Rocky Mountains | 0.998 |
| 35-36 lb high performance linerboard for delivery east of the Rocky Mountains | 0.995 |
| 42 lb white top liner for delivery east of the Rocky Mountains | 0.990 |
| 42 lb white top liner for delivery west of the Rocky Mountains | 0.990 |
| 26 lb semichemical corrugating medium for delivery east of the Rocky Mountains | 0.997 |
| 26 lb semichemical corrugating medium for delivery west of the Rocky Mountains | 0.995 |

CONFIDENTIAL
HEG
6/9/2014

Exhibit 5

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 7 of 14 PageID #:16889
Case: 15-2385    Document: 56-14    Filed: 10/27/2015    Pages: 212

# 5 Defendant Price Increase Implementation Events ("PIIEs")

| PIIE | Year | \multicolumn{7}{c}{Implementation Year and Month} | Target Increase ($ / ton) | Prior Month | Following Month | Net PPW ($ / ton) | Net PPW Increase (%) |
|------|------|-----|-----|-----|-----|-----|-----|------|-----|-----|-----|-----|

| PIIE | Year | GP | PCA | IP | WY | TI | NP | SSCC | Target Increase ($ / ton) | Prior Month | Following Month | Net PPW ($ / ton) | Net PPW Increase (%) |
|------|------|-----|-----|-----|-----|-----|-----|------|------|------|------|------|------|
| 1 | 2004 | MAR | MAR | FEB | MAR | MAR | FEB | FEB | 40-50 | JAN | JUL | 95 | 27% |
|   | 2004 | JUN | JUN | JUN | JUN | JUN | JUN | JUN | 50 |  |  |  |  |
| 2 | 2005 | OCT | OCT | OCT | OCT | OCT | OCT | OCT | 30-40 | SEP | MAY | 120 | 30% |
|   | 2006 | JAN | JAN | JAN | JAN | JAN | JAN | JAN | 40 |  |  |  |  |
|   | 2006 | MAR | MAR | APR | APR | APR | APR | APR | 50 |  |  |  |  |
| 3 | 2007 | AUG | AUG | AUG | AUG | AUG | AUG | AUG | 40-50 | JUL | SEP | 40 | 8% |
| 4 | 2008 | JUL | JUL | JUL | JUL | JUL | JUL | JUL | 55 | JUN | AUG | 55 | 10% |
| 5 | 2010 | JAN | JAN | JAN | * | JAN | JAN | JAN | 50 | DEC | MAY | 110 | 21% |
|   | 2010 | APR | APR | APR | * | APR | APR | APR | 60 |  |  |  |  |

*Acquired by IP

# PPW Transaction Price Series Increases at Defendant PIIEs

| # | Index | \multicolumn{5}{c}{Price Increase Implementation Event (PIIE)} |
|---|-------|-----|-----|-----|-----|-----|

| # | Index | 1 | 2 | 3 | 4 | 5 |
|---|-------|-----|-----|-----|-----|-----|
|   |       | \multicolumn{5}{c}{Net PPW Increase ($ / Ton)} |
| 1 | 42lb unbleached kraft linerboard for delivery east of the Rocky Mountains ("PPW Index") | $95 | $120 | $40 | $55 | $110 |
| 2 | 42lb unbleached kraft linerboard for delivery west of the Rocky Mountains | $95 | $120 | $45 | $55 | $130 |
| 3 | 35-36 lb high performance linerboard for delivery east of the Rocky Mountains | $95 | $120 | $40 | $55 | $110 |
| 4 | 42 lb white top liner for delivery east of the Rocky Mountains | $70 | $90 | $40 | $55 | $110 |
| 5 | 42 lb white top liner for delivery west of the Rocky Mountains | $70 | $90 | $45 | $55 | $130 |
| 6 | 26 lb semichemical corrugating medium for delivery east of the Rocky Mountains | $110 | $120 | $40 | $55 | $110 |
| 7 | 26 lb semichemical corrugating medium for delivery west of the Rocky Mountains | $110 | $120 | $45 | $55 | $130 |

Exhibit 6

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 8 of 14 PageID #:16890
Case: 15-2385    Document: 56-14    Filed: 10/27/2015    Pages: 212

# Comparison of Class Member Net Product Prices
# Before and After Defendant Price Increase Implementations

| Defendant | Type | Number of Assessed Customers | Customers with Post-Event Price Increases ("Increase Customers") | Increase Customers as Percent of Assessed Customers | Total Post-Event Purchase Dollars Assessed ($ Millions) | Total Post-Event Purchase Dollars Paid by Increase Customers ($ Millions) | Percent of Assessed Post-Event Purchase Dollars Paid by Increase Customers | Total Post-Event Purchase Dollars Showing Price Increases ($ Millions) | Percent of Post-Event Dollars Showing Higher Prices for Increase Customers |
|---|---|---|---|---|---|---|---|---|---|
| All Defendants | All | 78,224 | 72,030 | 92% | 14,619.5 | 14,456.8 | 99% | 11,842.3 | 82% |
| All Defendants | Corrugated | 77,134 | 70,980 | 92% | 12,548.9 | 12,393.9 | 99% | 9,936.1 | 80% |
| All Defendants | Roll Stock | 1,090 | 1,050 | 96% | 2,070.6 | 2,062.9 | 100% | 1,906.2 | 92% |
| | | | | | | | | | |
| GP | All | 3,455 | 3,237 | 94% | 3,021.9 | 2,987.7 | 99% | 2,479.8 | 83% |
| IP/WY | All | 38,029 | 34,378 | 90% | 5,216.7 | 5,123.7 | 98% | 4,325.1 | 84% |
| NP | All | 1,930 | 1,745 | 90% | 146.3 | 143.5 | 98% | 108.2 | 75% |
| PCA | All | 16,748 | 15,729 | 94% | 1,569.6 | 1,559.8 | 99% | 1,309.1 | 84% |
| SSCC | All | 9,467 | 8,784 | 93% | 2,197.9 | 2,182.5 | 99% | 1,673.6 | 77% |
| TI | All | 8,595 | 8,157 | 95% | 2,467.1 | 2,459.6 | 100% | 1,946.6 | 79% |

The Pre-Event Price for a particular customer and product is the latest modal monthly price prior to the month of the implementation date for the announced price increase.

The Post-Event Price for a particular customer and product is the latest modal monthly price within 3 or 6 or 9 months following the month of the implementation date for the announced price increase.

"Corrugated" refers to Box plant, corrugator, and sheet feeder corrugated products.

"Roll Stock" refers to liner and medium products.

CONFIDENTIAL
HEG
6/10/2014

Exhibit 7

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 9 of 14 PageID #:16891
Case: 15-2385     Document: 56-14     Filed: 10/27/2015     Pages: 212

# Comparison of Class Member Weighted Average Offered Product Prices
# Before and After Defendant Price Increase Implementations

| Defendant | Type | Number of Assessed Customers | Number of Customers with Post-Event Weighted Average Price Increases (Increase Customers) | Increase Customers as Percent of Assessed | Total Adjusted Post-Event Purchase Dollars Assessed ($ Millions) | Total Adjusted Post-Event Purchase Dollars Paid by Increase Customers ($ Millions) | Percent of Adjusted Assessed Post-Event Purchase Dollars Paid by Increase Customers | Total Adjusted Post-Event Purchase Dollars Showing Price Increases ($ Millions) | Percent of Adjusted Post-Event Dollars Showing Higher Prices for Increase Customers |
|---|---|---|---|---|---|---|---|---|---|
| All Defendants | All | 78,224 | 72,639 | 93% | 14,538.5 | 14,425.9 | 99% | 11,646.1 | 81% |
| All Defendants | Corrugated | 77,134 | 71,581 | 93% | 12,478.1 | 12,369.2 | 99% | 9,740.9 | 79% |
| All Defendants | Roll Stock | 1,090 | 1,058 | 97% | 2,060.4 | 2,056.6 | 100% | 1,905.2 | 93% |
| | | | | | | | | | |
| GP | All | 3,455 | 3,207 | 93% | 3,021.9 | 3,012.6 | 100% | 2,076.6 | 69% |
| IP/WY | All | 38,029 | 34,573 | 91% | 5,173.7 | 5,093.4 | 98% | 4,353.9 | 85% |
| NP | All | 1,930 | 1,759 | 91% | 146.1 | 143.7 | 98% | 114.3 | 80% |
| PCA | All | 16,748 | 15,992 | 95% | 1,568.1 | 1,561.8 | 100% | 1,348.8 | 86% |
| SSCC | All | 9,467 | 8,915 | 94% | 2,176.8 | 2,168.8 | 100% | 1,733.2 | 80% |
| TI | All | 8,595 | 8,193 | 95% | 2,451.9 | 2,445.6 | 100% | 2,019.4 | 83% |

The Pre-Event Price for a particular customer and product is the latest monthly weighted average offered price prior to the month of the implementation date for the announced price increase.

The Post-Event Price for a particular customer and product is the latest monthly weighted average offered price within 3 or 6 or 9 months following the month of the implementation date for the announced price increase.

"Corrugated" refers to Box plant, corrugator, and sheet feeder corrugated products.

"Roll Stock" refers to liner and medium products.

Exhibit 8

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 10 of 14 PageID #:16892
Case: 15-2385    Document: 56-14    Filed: 10/27/2015    Pages: 212

## Comparison of Class Member Weighted Average Monthly Net Prices
## Before and After Defendant Price Increase Implementations

| Defendant | Type | Number of Assessed Customers | Number of Customers with Post-Event Price Increases ("Increase Customers") | Increase Customers as Percent of Assessed Customers | Total Post-Event Purchase Dollars Assessed ($ Millions) | Total Post-Event Purchase Dollars Paid by Increase Customers ($ Millions) | Percent of Assessed Post-Event Purchase Dollars Paid by Increase Customers | Total Post-Event Purchase Dollars Showing Price Increases ($ Millions) | Percent of Post-Event Dollars Showing Higher Prices for Increase Customers |
|---|---|---|---|---|---|---|---|---|---|
| All Defendants | All | 94,161 | 82,347 | 87% | 20,253.9 | 19,697.0 | 97% | 15,049.8 | 76% |
| All Defendants | Corrugated | 92,903 | 81,168 | 87% | 17,642.7 | 17,107.4 | 97% | 12,929.6 | 76% |
| All Defendants | Roll Stock | 1,258 | 1,179 | 94% | 2,611.2 | 2,589.6 | 99% | 2,120.3 | 82% |
| | | | | | | | | | |
| GP | All | 3,752 | 3,112 | 83% | 3,447.4 | 3,310.8 | 96% | 2,460.5 | 74% |
| IP/WY | All | 44,404 | 37,846 | 85% | 7,085.1 | 6,808.1 | 96% | 5,277.2 | 78% |
| NP | All | 2,166 | 1,790 | 83% | 166.6 | 160.2 | 96% | 122.0 | 76% |
| PC | All | 20,044 | 18,084 | 90% | 2,165.1 | 2,129.8 | 98% | 1,731.3 | 81% |
| SSCC | All | 14,138 | 12,897 | 91% | 4,278.2 | 4,220.1 | 99% | 3,292.4 | 78% |
| TI | All | 9,657 | 8,618 | 89% | 3,111.6 | 3,067.9 | 99% | 2,166.4 | 71% |

The Pre-Event Price for a particular customer is the latest weighted average monthly price prior to the month of the implementation date for the announced price increase.

The Post-Event Price for a particular customer is the latest weighted average monthly price within 3 or 6 or 9 months following the month of the implementation date for the announced price increase.

"Corrugated" refers to Box plant, corrugator, and sheet feeder corrugated products.

"Roll Stock" refers to liner and medium products.

CONFIDENTIAL
HEG
6/10/2014

Exhibit 9

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 11 of 14 PageID #:16893
Case: 15-2385    Document: 56-14    Filed: 10/27/2015    Pages: 212

# Defendant Annual Payment Shares (APS) to Class Members By Defendant and Product Type

| Defendant | Type | Overall Share With No Significant APS Increase | At Most One APS In or Out of Class Period[1] | | Multiple APS In or Out of Class Period | |
|---|---|---|---|---|---|---|
| | | | Number of Class Members Compared | Share with No APS Increase in Class Period | Number of Class Members Compared | Share With No Significant APS Increase In Class Period[2] |
| All Defendants | All | 96% | 56,556 | 95% | 54,659 | 97% |
| All Defendants | Corrugated | 96% | 55,702 | 95% | 53,216 | 97% |
| All Defendants | Roll Stock | 92% | 854 | 92% | 1,443 | 92% |
| | | | | | | |
| GP | All | 96% | 4,223 | 92% | 4,426 | 99% |
| IP/WY | All | 96% | 24,135 | 95% | 18,962 | 97% |
| NC | All | 97% | 2,006 | 98% | 913 | 96% |
| PCA | All | 96% | 15,345 | 96% | 12,048 | 97% |
| SSCC | All | 95% | 6,341 | 93% | 13,385 | 96% |
| TI | All | 97% | 4,506 | 96% | 4,925 | 98% |

1. As this analysis compares annual payments received to annual purchases, for this exhibit "class period" refers to the calendar years 2004 through 2010.
2. Significance level is set at 5%.

CONFIDENTIAL
HEG
6/10/2014

Exhibit 10

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 12 of 14 PageID #:16894
Case: 15-2385     Document: 56-14     Filed: 10/27/2015     Pages: 212

# Regressions of Aggregate Prices on PPW Index

| Regression Variable | FCP | ICP |
|---|---|---|
| PPW Index | | |
| Lag 1 | 0.034 | 0.243 |
| | (0.526) | (0.000) |
| Lag 2 | 0.234 | 0.394 |
| | (0.000) | (0.000) |
| Lag 3 | 0.190 | -0.038 |
| | (0.000) | (0.169) |
| | | |
| Constant | -2.765 | -3.630 |
| | (0.000) | (0.000) |
| | | |
| Observations | 141 | 141 |
| Adjusted R-squared | 0.976 | 0.977 |
| Joint test PPW (p-value) | (0.000) | (0.000) |

P-values (in parentheses) are based on HAC standard errors.

FCP: Final Containerboard Products
ICP: Intermediate Containerboard Products

CONFIDENTIAL
HEG
6/11/2014

Exhibit 11

# Preliminary Damage Regression Model Results
## Alternative Model Selection Methods

|  | AICC | BIC | 10 PC [2] | Average |
|---|---|---|---|---|
| **FCP [3]** |  |  |  |  |
| Overcharge | 3.61% | 2.38% | 2.78% | 2.92% |
| P-value [1] | 0.000 | 0.000 | 0.000 | 0.000 |
| Regressors | 65 | 108 | 20 | 64 |
| Observations | 144 | 144 | 144 | 144 |
| Adjusted R-squared | 99.6% | 99.9% | 96.7% | 98.7% |
| **ICP [4]** |  |  |  |  |
| Overcharge | 4.05% | 4.04% | 3.33% | 3.81% |
| P-value [1] | 0.000 | 0.000 | 0.000 | 0.000 |
| Regressors | 62 | 104 | 18 | 61 |
| Observations | 144 | 144 | 144 | 144 |
| Adjusted R-squared | 99.2% | 99.8% | 95.5% | 98.2% |

[1] P-values are based on HAC standard errors.

[2] 10 principal components with highest absolute t statistics

[3] FCP = Final Containerboard Products

[4] ICP = Intermediate Containerboard Products

CONFIDENTIAL
HEG
6/11/2014

Exhibit 12

Case: 1:10-cv-05711 Document #: 658-5 *SEALED* Filed: 06/11/14 Page 14 of 14 PageID #:16896
Case: 15-2385    Document: 56-1    Filed: 10/27/2015    Pages: 212

# Preliminary Class Damages Estimates

| Defendant | Type | Class Purchases Billion $ | Damages Million $ | Overcharge % |
|---|---|---|---|---|
| All Defendants | All | 123.31 | 3,792.08 | 3.08% |
| | | | | |
| All Defendants | ICP | 21.06 | 801.27 | 3.81% |
| All Defendants | FCP | 102.25 | 2,990.81 | 2.92% |
| | | | | |
| GP | All | 21.48 | 671.32 | 3.13% |
| IP/WY | All | 44.23 | 1,343.24 | 3.04% |
| PCA | All | 12.94 | 394.23 | 3.05% |
| NP | All | 0.51 | 18.08 | 3.57% |
| SSCC | All | 25.51 | 793.06 | 3.11% |
| TI | All | 18.64 | 572.15 | 3.07% |

These preliminary estimates are net of potential legacy fixed price contracts.

FCP: Final Containerboard Products
ICP: Intermediate Containerboard Products

CONFIDENTIAL
HEG
6/10/2014