## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KLEEN PRODUCTS LLC, *et al*., individually and on behalf of all others similarly situated, | No. 1:10-cv-05711 |
| Plaintiffs, | Hon. Harry D. Leinenweber |
| v. | **FILED UNDER SEAL – CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER** |
| PACKAGING CORPORATION OF AMERICA, *et al*., | |
| Defendants. | |

## DEFENDANT ROCKTENN CP, LLC'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Defendant RockTenn CP, LLC (formerly known as Smurfit-Stone Container Corporation in this action, and hereinafter "Smurfit") urges this Court to deny class certification on additional and separate grounds to those raised by the other Defendants.[1]  Plaintiffs' claims against Smurfit are unique in that the Amended Complaint alleges that Smurfit did not join the conspiracy until after its discharge from bankruptcy, effective June 30, 2010, and do not seek damages for pre-discharge conduct.  *See* Consol. & Am. Compl. ("CAC"), ¶ 22.  Citing the Amended Complaint, Judge Shadur ruled that "Smurfit-Stone can be held liable only for its actions taken post discharge."  *See* April 8, 2011 Mem. Op. & Order, at 22, Dkt. No. 193.  In effect, Plaintiffs have alleged a shorter class period against Smurfit for which they have offered no economic evidence of any antitrust injury or price impact common to a class of direct purchasers.

There is, however, a greater class action deficiency.  The only named Plaintiff proposed to represent the class that purchased containerboard products from Smurfit in the abbreviated class period from June 30, 2010, through November 8, 2010, Ferraro Foods, Inc., did not pay a higher price to Smurfit than it did before June 30, 2010.  Therefore, this purported class action against Smurfit fails on both Federal Rule of Civil Procedure 23(a)(3) and 23(b)(3) grounds.

## BACKGROUND

Smurfit filed for voluntary Chapter 11 bankruptcy protection on January 26, 2009, due, in large part, to an "unprecedented decline in demand" for the company's products, declining liquidity, covenant violations in several credit agreements, and significant debt maturities.  *See* Affidavit of Matthew T. Denton in Support of Confirmation, ¶ 24, *In re: Smurfit-Stone Container Corp.*, Case No. 09-10235-BLS, attached as Exhibit A.  It remained in bankruptcy for more than 17 months until it was ultimately discharged on June 30, 2010 under an approved plan

---

[1]     Concurrent with the filing of this Supplemental Opposition, Smurfit also joins and adopts, to the extent applicable, the arguments set forth in the accompanying Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification.

of reorganization.  *See* CAC, ¶ 22.  That discharge released Smurfit of any claims pre-dating June 30, 2010, including Plaintiffs' antitrust claims.  *See* Confirmation Order, June 21, 2010, ¶¶ 51, 53 (ordering as of June 30, 2010, all persons who hold a discharged claim are "permanently, forever and completely stayed, restrained, prohibited, barred and enjoined" from commencing any suit, action or other proceeding based on a discharged claim), attached as Exhibit B.

In their Amended Complaint filed on November 8, 2010, Plaintiffs made specific allegations and unique claims with respect to the Smurfit bankruptcy.  *See* CAC, ¶ 22. Specifically, Plaintiffs allege that: "[a]fter its discharge for bankruptcy, Smurfit-Stone knowingly and intentionally joined the conspiracy.  This complaint ***seeks to recover damages from Smurfit-Stone for post-discharge conduct only***, and in no way seeks to violate any Orders of the above-referenced Bankruptcy Court."  *Id.* (emphasis added).  In limiting their claims against Smurfit, however, Plaintiffs have made no effort in their class certification motion to establish, let alone prove, class-wide antitrust impact or injury for this abbreviated class period against Smurfit. Hence, their motion for class certification should be denied as to Smurfit.

## ARGUMENT

**I.     Plaintiffs Have Alleged A Separate And Distinct Claim Against Smurfit Based On An Abbreviated Proposed Class Period, And Failed To Move For Class Certification**

Plaintiffs' claim against Smurfit is limited to the abbreviated, four-month post-discharge period, from June 30, 2010 through November 8, 2010.  To avoid running afoul of the bankruptcy discharge order, Plaintiffs reaffirmed in their Amended Complaint (*see* ¶ 22) and to both this Court and the U.S. Bankruptcy Court that their claim against Smurfit "is based on post-discharge conduct" only and that Plaintiffs are not "seeking to hold Smurfit-Stone liable for any pre-discharge conduct."  Class Plfs' Notice of Nov. 19, 2010 Filing By Def. Smurfit-Stone

Container Corp., Nov. 23, 2010, at 2-3, Dkt. No. 91; *see also* Order Dismissing Adversary Proceeding, at 2, Dkt. No. 103-1 (dismissing Smurfit's adversary bankruptcy proceeding and noting that the Complaint seeks to recover damages against Smurfit "for post-discharge conduct only" and that Plaintiffs "are going to be held to that" in this Court).

Judge Shadur agreed with Plaintiffs, and made this the law of the case.  Citing to the Plaintiffs' Amended Complaint, Judge Shadur ruled that: "[a]s this Court has made plain, and as neither side now disputes, Smurfit-Stone can be held liable _only_ for its actions taken post-discharge."  April 8, 2011 Mem. Op. & Order, at 21-22, Dkt. No. 193 (emphasis added).  *See Pepper v. United States*, 131 S. Ct. 1229, 1250 (2011) (law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); *Brengettcy v. Horton*, 423 F.3d 674, 680-81 (7th Cir. 2005) (prior ruling should not have been disrupted, as law of the case doctrine "reflects the rightful expectation of litigants that a change of judges mid-way through a case will not mean going back to square one," and successor judge must have a "compelling reason" to alter prior rulings, not "merely because he has a different view of the law or facts from the first judge").

In the process, Judge Shadur also recognized that based on the Amended Complaint, a different class period applied to Smurfit, stating "[a]lthough the class period is defined in Paragraph 1 of the complaint as running from May 2005 to the present day, and that is true as to all other defendants, that is, *all defendants other than Smurfit-Stone*, the provision of Paragraph 22 of the complaint cannot be more clear. . . ."  Nov. 24, 2010 Hrg. Tr. at 7, Dkt. 108, attached as Exhibit C.  The Judge further stated that "I can assure you of one thing, and that is that plaintiffs are going to be held to that in my court."  *Id.*  As the Court explained, "the consequence of their ... having stood on the side is that they have no ability to advance a claim based on the

-3-

predischarge conduct. That is the consequence. They are stuck." *Id.* at 19.[2] In addition, Judge Shadur clarified that "whatever happened during that earlier [pre-discharge] period *may* be relevant" but only "to the extent that it bears upon Smurfit-Stone's potential liability from the time of discharge forward." *Id.* at 14 (emphasis added). Consequently, as is now the law of the case, Plaintiffs' separate claim against Smurfit only extends for an abbreviated and shorter period than the other Defendants, from June 30, 2010 through November 8, 2010.

Despite the limited claim being asserted against Smurfit, Plaintiffs have never moved to certify a class for the specific time period relating to that claim. In a class action involving different causes of action or separate theories of liability, plaintiffs are required to satisfy their Rule 23 burden for *each* separate claim. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) ("at the class certification stage (as at trial) any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anti-competitive effect of the violation").[3] And when a plaintiff fails to meet its burden of establishing Rule 23's requirements as to *specific claims* or *specific defendants*, courts will not grant class certification against those defendants. *See, e.g.*, *Piazza v. EBSCO Indus., Inc.*, 273 F.3d 1341, 1349 (11th Cir. 2001) (reversing class certification against one defendant where claim was barred, and remanding for further proceedings claims against other defendants). In this case, however, Plaintiffs never moved for class certification – and have not satisfied their burden

---

[2]    In holding Plaintiffs to their word, Judge Shadur was clear that "[n]ot in my court are they going to be in a position to do what you characterize as pursue a claim [for pre-discharge conduct]. There is one way to pursue a claim, and that is to seek to obtain a judgment ... They are clearly not going to get any kind of relief, any kind of judgment that stands – that is based upon – predischarge conduct." *Id.* at 15-16. The Judge further noted that "I am going to be very careful, I can assure you, to separate out any prospect of seeking liability for pre – for predischarge conduct." *Id.* at 16.

[3]    *See also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441 (4th Cir. 2003) ("Rule 23's predominance requirement is met by examining *each cause of action* independently of one another, not the entire lawsuit."); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38-43 (1st Cir. 2003) (reversing decertification on two of three claims, affirming decertification on third claim); *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279, 289 (D.N.J. 1997) (separate certification analysis for each claim).

-4-

under Rule 23 – with respect to their shortened class period against Smurfit. Thus, class certification should be denied as to Plaintiffs' claim against Smurfit.

## II.     Plaintiffs Failed To Provide Any Model Establishing Class-Wide Impact Or Damages During The Abbreviated Class Period Against Smurfit

Plaintiffs also failed to offer an antitrust impact model to support their abbreviated claim and class period against Smurfit. Irrespective of the length of the class period, Plaintiffs must affirmatively establish compliance with Rule 23, and thus "questions of law or fact common to class members predominate over any questions affecting only individual members" relating to the essential elements of their antitrust claim: (1) a violation of Sherman Act, § 1, (2) individual injury resulting from that violation (antitrust impact), and (3) measurable damages. *See* Fed. R. Civ. P. 23(b)(3); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-52 (2011); *Comcast*, 133 S. Ct. 1426, 1432-33. In "antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009). Without a reliable method to prove classwide antitrust impact for the abbreviated class period, common issues of fact cannot predominate and certification must be denied. *See, e.g.*, *Comcast*, 133 S. Ct. at 1433; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013) ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact.").

Here, Plaintiffs failed to offer any model to show that class members in the abbreviated class period – from June 30, 2010 through November 8, 2010 – suffered antitrust impact resulting from the alleged antitrust violation. Drs. Mark Dwyer and Michael Harris, Plaintiffs' class experts, admittedly never even tried to assess the impact of a price increase for the period after Smurfit emerged from bankruptcy on June 30, 2010, and allegedly "joined" the conspiracy:

> Q.    Did you do any empirical analysis to assess classwide impact for a period beginning June 30, 2010 as a result of any price increase implemented after June 30, 2010?
>
> * * *
>
> A.    No, I did not.

Dwyer Dep. at 258-59.  *See also* Harris Dep. at 217 ("I did not do the empirical analysis. Dr. Dwyer did.") (Defs. Opp. Exs.)  Dwyer's analysis was limited to examining the impact that price increase announcements had from February 2004 to April 2010 – prior to when Smurfit allegedly "joined" the conspiracy.[4]  *See* Dwyer Report, at 11 n.18 & Ex. 5, Dkt. 658-4, 658-5.  He never proffered a single impact model for any price increase that was announced after April 2010.  *Id.*

This failure dooms Plaintiffs' separate claim against Smurfit.  Plaintiffs cannot meet their class certification burden without offering a viable impact model for the abbreviated four-month class period in which Smurfit is a Defendant.  *See, e.g.*, *Rail Freight*, 725 F.3d 244, 255 ("Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance – the rule commands it."); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008) (plaintiffs are required to present a model that "must include some means of determining that each member of the class was in fact injured").

Such a model simply does not exist – there were no price increases successfully implemented after April 2010.  *See* Dwyer Report, at 11 n.18 & Ex. 5 (showing no price increase implementation events after April 2010).  Nor was there any increase in the PPW Index after June 30, 2010, which under Plaintiffs' own theory, admittedly proves there was no price impact

---

[4]    Dwyer measured whether each price increase announcement successfully resulted in the implementation of the price increase based on whether a weekly survey known as *Pulp & Paper Weekly* ("PPW") reflected the price increase in its published price index ("PPW Index").  *See* Dwyer Report, at ¶¶ 22-26.  Specifically, Dwyer's impact theory was that "all or nearly all class members paid higher prices as a result of *price increases* announced and implemented by the defendants and alleged by the plaintiffs to be facilitated by the collusive restriction in supply." *Id.* at ¶ 11 (emphasis added).

on class members after June 30, 2010. *Id.* at Ex. 3; *see also* Harris Dep. at 214-15. Harris conceded the lack of such class-wide impact after June 30, 2010. *See id.* at 411.

Further, notwithstanding Plaintiffs' allegations that the "collusive restrictions in supply were employed by the defendants to support announced price increases for the Class Products during the class period" (Dwyer Report at ¶ 7), there is *no* evidence showing that Smurfit or any defendant closed a mill after June 30, 2010,[5] or that Smurfit took any economic downtime after June 30, 2010. There is simply no evidence at all showing that any purchasers were impacted by an alleged conspiracy between June 30, 2010 and November 8, 2010. Without a model showing common impact between June 30, 2010 and November 8, 2010, the question of antitrust impact is an individualized issue that cannot be determined with common proof.

Because Plaintiffs have provided no model to assess antitrust impact or injury from a price increase announcement after Smurfit allegedly joined the conspiracy, class certification should be denied as to Smurfit. *See Comcast*, 133 S. Ct. 1426, 1433 (holding antitrust claims cannot be certified under Rule 23(b)(3) unless plaintiffs present a model showing antitrust impact and damages attributable to the alleged antitrust violation are capable of being proven by evidence common to the class); *Rail Freight*, 725 F.3d 244, 253 ("No damages model, no predominance, no class certification."); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 593 (N.D. Ill. 2009) (denying class certification where expert's regression model did not demonstrate plaintiffs could prove antitrust impact to each class member with evidence common to class).

### III. Plaintiffs' Only Proposed Class Representative That Purchased Containerboard Products From Smurfit Cannot Represent the Class Because It Did Not Sustain Any Injury

---

[5] Smurfit closed two containerboard mills during bankruptcy – Missoula, Montana and Ontonagon, Michigan – that were addressed with the bankruptcy court and approved by the Official Committee of Unsecured Creditors. *See* Disclosure Statement for the Joint Plan of Reorganization for Smurfit-Stone Container Corp. and its Debtor Subsidiaries, January 27, 2010, at 80, attached as Exhibit D.

Plaintiffs have also failed to proffer a viable class representative for its limited claim against Smurfit. Only one proposed class representative purchased any containerboard products from Smurfit during the abbreviated class period of June 30, 2010 to November 8, 2010. However, this proposed representative is not typical nor adequate, and class certification must therefore be denied. *See, e.g., Ret. Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599 (7th Cir. 1993) (subclasses must satisfy class action requirements before they may be certified).

In order to satisfy Rule 23's typicality and adequacy requirements, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982). These criteria are exacting – "[t]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011). Such is the case here.

The only named plaintiff proposed to represent the class that purchased containerboard products from Smurfit in the abbreviated class period, Ferraro Foods, is neither typical nor adequate. Specifically, Ferraro did not pay a higher price to Smurfit for the same product than it did before June 30, 2010. During the period of June 30, 2010 to November 8, 2010, Ferraro's business records (confirmed by Smurfit's sales data) reveal it purchased a specific sized pizza box (16 E, File #59385) from Smurfit on seven occasions between July 2 and July 23, 2010, each invoiced to Ferraro at $232 per thousand boxes. *See* FERR0000105-18, attached as Exhibit E; Ferraro 30(b)(6) Dep. at 80, 190-91 (authenticating business records), attached as Exhibit F. Notably, Ferraro purchased the exact same sized pizza boxes from Smurfit on three occasions between June 21 and June 25, 2010, each invoiced to Ferraro at $232 per thousand boxes. *See*

*id.* at FERR0000122-26. In short, Ferraro Foods paid the same price for containerboard products purchased from Smurfit during the alleged shortened class period and before it.

As a result, Ferraro Foods could not and did not suffer any antitrust injury or damage as a result of Smurfit's alleged conduct, and therefore is not a proper class representative. Without any other named class representative for the abbreviated class period, class certification must be denied. *See East Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977) (named plaintiffs did not "possess the same interest and suffer the same injury as class members" thus were "simply not eligible to represent a class of persons who allegedly did suffer injury"); *Abram v. United Parcel Service of America, Inc.*, 200 F.R.D. 424, 433-34 (N.D. Ill. 2001) (denying certification where "named plaintiffs are inadequate class representatives because the statistics fail to show that they possess the same interest and suffer the same injury as the class members."); *Perovich v. Humphrey*, 1997 WL 674975 at *6 (N.D. Ill. Oct. 28, 1997) (denying certification where class representatives had "shown no monetary injury" and thus "are inadequate class representatives"); *Young v. Lehigh Corp.*, 1989 WL 117960, at *17 (N.D. Ill. Sept. 28, 1989) (denying class certification of Sherman Act Section 1 claim where plaintiff did not suffer antitrust injury and therefore was not an appropriate representative).

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' Memorandum In Opposition To Plaintiffs' Motion For Class Certification, Smurfit respectfully requests that this Court deny class certification with respect to the separate class period alleged against it.

Dated:  September 19, 2014                    Respectfully submitted,

                                                                   ROCKTENN CP, LLC

                                                                   By: /s/ Matthias A. Lydon
                                                                        One of its Attorneys

Matthias A. Lydon
James F. Herbison
Michael P. Mayer
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700
mlydon@winston.com
mmayer@winston.com
jherbison@winston.com

*Attorneys for Defendant RockTenn CP, LLC*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on September 19, 2014, I caused a true and correct copy of the foregoing **Defendant RockTenn CP, LLC's Supplemental Opposition to Plaintiffs' Motion for Class Certification** to be served by email on all counsel identified on the attached Service List.

<u>/s/ Matthias A. Lydon</u>

## SERVICE LIST

Michael J. Freed
Steven A. Kanner
Robert J. Wozniak
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
T: 224.632.4500
F: 224.632.4521
mfreed@fklmlaw.com
skanner@fklmlaw.com
rwozniak@fklmlaw.com

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
T: 619.687.6611
F: 619.687.6610
dmogin@moginlaw.com

*Lead Counsel for the Proposed Class*

Nathan P. Eimer
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
T: 312.660.7600
F: 312.692.1718
neimer@eimerstahl.com

James T. McKeown
Brett H. Ludwig
FOLEY & LARDNER LLP
777 East Wisconsin Ave.
Milwaukee, WI 53202
T: 414.297.5530
jmckeown@foley.com
bludwig@foley.com

*Attorneys for International Paper*

Andrew S. Marovitz
Britt M. Miller
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606
T:  312.782.0600
F:  312.701.7711
amarovitz@mayerbrown.com
bmiller@mayerbrown.com

*Attorney for Temple-Inland Inc.*


Scott M. Mendel
John E. Susoreny
Lauren N. Norris
K&L GATES LLP
70 W. Madison, Suite 3100
Chicago, IL  60602
T:  312.372.1121
F:  312.827.8000
scott.mendel@klgates.com
john.susoreny@klgates.com
lauren.norris@klgates.com

*Attorneys for Cascades, Inc. and Norampac Industries*


David Marx Jr.
Stephen Wu
McDermott Will & Emery LLP
227 W. Monroe Street
Chicago, IL  60606
T:  312.372.2000
F:  312.984.7700
dmarx@mwe.com
swu@mwe.com

*Attorneys for Weyerhaeuser*

James R. Figliulo
Stephanie D. Jones
FIGLIULO & SILVERMAN
10 S. LaSalle Street, Suite 3600
Chicago, IL  60603
T:  312.251.4600
F:  312.251.4610
jfigliulo@fslegal.com
sjones@fslegal.com

Stephen Neuwirth
Deborah Brown
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, Suite 2200
New York, NY  10010
T:  212.849.7000
F:  212.849.7100
stephenneuwirth@quinnemanuel.com
deborahbrown@quinnemanuel.com

D. Bruce Hoffman
Ryan A. Shores
HUNTON & WILLIAMS LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
T: 202.955.1500
F: 202.778.2201
bhoffman@hunton.com
rshores@hunton.com

*Attorneys for Georgia Pacific LLC*

-14-

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KLEEN PRODUCTS LLC, *et al.*, individually and on behalf of all others similarly situated, <br><br>         Plaintiffs, <br><br>   v. <br><br> PACKAGING CORPORATION OF AMERICA, *et al.*, <br><br>         Defendants. | No. 1:10-cv-05711 <br><br> Hon. Harry D. Leinenweber <br><br> **FILED UNDER SEAL – CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER** |

## INDEX OF EXHIBITS TO DEFENDANT ROCKTENN CP, LLC'S SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**Exhibit A:**      Affidavit of Matthew T. Denton in Support of Confirmation, *In re: Smurfit-Stone Container Corp., et al.*, Case No. 09-10235-BLS, Dkt. 7066, April 18, 2010 (D. Del. Bankr.)

**Exhibit B:**      Confirmation Order, *In re: Smurfit-Stone Container Corp., et al.*, Case No. 09-10235-BLS, Dkt. 8107, June 21, 2010 (D. Del. Bankr.)

**Exhibit C:**      November 24, 2010 Hearing Transcript, *Kleen Products LLC, et al. v Packaging Corp. of America, et al.*, No. 1:10-cv-05711 (N.D. Ill.)

**Exhibit D:**      Disclosure Statement for the Joint Plan of Reorganization for Smurfit-Stone Container Corp. and its Debtor Subsidiaries, January 27, 2010, *In re: Smurfit-Stone Container Corp., et al.*, Case No. 09-10235-BLS, Dkt. 4446, 4446-1 (D. Del. Bankr.)

**Exhibit E:**      Invoices for sales by Smurfit-Stone to Ferraro Foods, Bates labeled FERR000000105 – FERR000000126, produced by Plaintiffs in *Kleen Products LLC, et al. v Packaging Corp. of America, et al.*, No. 1:10-cv-05711 (N.D. Ill.)

**Exhibit F:**      Excerpts from Rule 30(b)(6) Deposition of Ferraro Foods, June 18, 2014, *Kleen Products LLC, et al. v Packaging Corp. of America, et al.*, No. 1:10-cv-05711 (N.D. Ill.)

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 09-10235 (BLS) |
| SMURFIT-STONE CONTAINER CORPORATION, et al.,[1] | Jointly Administered |
| Debtors. | |

### AFFIDAVIT OF MATTHEW T. DENTON IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN OF REORGANIZATION

| | | |
|---|---|---|
| STATE OF MISSOURI | ) | |
| | ) | ss: |
| COUNTY OF ST. LOUIS | ) | |

MATTHEW T. DENTON being duly sworn, deposes and states:

1.      I am the Senior Vice President of Business Planning and Analysis of Smurfit-Stone Container Corporation ("SSCC"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors" or the "Company").  SSCC is a holding company that conducts its business operations through its wholly-owned subsidiary Smurfit-Stone Container Enterprises, Inc. ("SSCE").  SSCE is the direct or indirect parent company of all of the other Debtors herein and their respective non-debtor affiliates.  I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records.  In addition, I am familiar

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, LLC (8169), SLP Finance II, LLC (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 222 North LaSalle Street, Chicago, Illinois 60601.

with the Financial Projections (as defined below) and was one of the persons responsible for
their creation.

2.       I joined the Company in June 2006, as Vice President of Business
Transformation, in support of the creation of the detailed scaling plan for the Container Division.
In January 2007, I was appointed Vice President of Business Planning and Analysis.  In February
2010, I was promoted to Senior Vice President of Business Planning and Analysis, a position
that I still hold.  Prior to joining the Company, I was employed by Georgia-Pacific Corporation
from 1992 to 2006, where I held positions of increasing responsibility including Vice President
of Strategic Sourcing for Georgia-Pacific's North American consumer products and bleached
pulp and paper operations, and Vice President of Finance for the containerboard and packaging
segment and pulp division.  I have twenty-three years of packaging, paperboard and recycling
industry experience with three different companies.

3.       I submit this affidavit (the "<u>Affidavit</u>") in support of Confirmation of the
Joint Plan of Reorganization for Smurfit-Stone Container Corporation and Its Debtor
Subsidiaries, dated January 29, 2010 (as the same may be amended or modified, the "<u>Plan</u>")
[Docket No. 4442, as amended by Docket No. 4500].[2]  Unless otherwise specified, all capitalized
terms not expressly defined herein shall have the meaning ascribed to such terms in the Plan.

---

[2]   On March 19, 2010, the Debtors filed with the Bankruptcy Court the Plan Supplement (as amended, modified or
supplemented from time to time, the "<u>Plan Supplement</u>") [Docket No. 6044] which consisted of the following
exhibits to the Plan: (1) Amended and Restated By-Laws of Reorganized SSCC; (2) Amended and Restated
Certificate of Incorporation of Reorganized SSCC; (3) Management Incentive Plans; (4) Directors and Officers and
Creditor Representative of Reorganized SSCC; (5) Directors and Officers of Reorganized Debtors Other than
Reorganized SSCC; (6) Asset Purchase Agreement (Canadian Asset Sale); (7) Canadian Newco Partnership
Agreement; (8) Canadian Holdco Articles of Association; (9) Canadian Holdco Memorandum of Association; (10)
List of Previously Assumed Unexpired Leases to be Assigned to Canadian Newco in Connection with the Canadian
Asset Sale; (11) List of Executory Contracts and Unexpired Leases to be Assumed and Assigned to Canadian
Newco in Connection with the Canadian Asset Sale; (12) Employee Benefit Plans; (13) Employment and Retirement
Benefit Agreements; (14) Restructuring Transactions; and (15) Exit Facility Documentation.

4.      I am authorized to make this Affidavit on the Debtors' behalf.  Except as otherwise indicated, all of the facts set forth in this Affidavit are based on my personal knowledge, my experience and knowledge of the Debtors' operations and financial condition, or upon information supplied to me by other members of the Debtors' management team and/or the professionals retained by the Debtors.  If called to testify, I could and would testify competently as to the facts set forth herein.

## BACKGROUND OF THE DEBTORS' BUSINESS AND INDUSTRY

### Overview of the Debtors' Industry

5.      Containerboard is a pure commodity.  For the most part, containerboard manufacturers cannot differentiate their product from their competitors' products along any metric but price.  As such, there has always been substantial price competition in the containerboard industry.  In addition, containerboard production is a capital-intensive process with high fixed costs.  The combination of substantial price competition and high fixed costs cause volatility in the industry.  There is no dominant firm in the containerboard market.  Instead the market is comprised of several large, vertically integrated companies as well as numerous smaller companies.

6.      The corrugated container market is also highly competitive. Manufacturers, however, are able to obtain higher margins for corrugated containers than for containerboard because corrugated containers are manufactured according to customer specifications.  Customers specify the size, shape, color stacking strength and order quantity of the corrugated containers that they purchase.  To produce containers to meet a customer's specifications requires specialized "tooling" equipment, which includes both cutting and printing dies.  Each set of customer specifications requires its own set of tooling equipment.  Plants

generally only have tooling equipment that meets the specifications of existing customers; tooling equipment that meets the specifications of new customers must be specially manufactured.  As such, there are switching costs for container customers, which enable manufacturers to obtain a higher margin for containers than they do for containerboard.  To take advantage of these higher margins, many containerboard manufacturers also manufacture containers, and are highly vertically integrated.

7.      For several reasons, including higher transportation costs, oversupply, volatile demand, increased global competition and capacity additions, export markets generally offer lower pricing and margins on containerboard sales than domestic markets.  This is particularly true today, as the industry experiences increasing global capacity and competition from Eastern Europe, China and other countries with growing manufacturing sectors.  There is no material exporting or importing of containers.  However, lower price spot export markets represent roughly 10% of domestic containerboard production.

8.      Resource Information Systems, Inc. ("RISI") is the leading source for industry forecasts and analysis; in its newsletter Pulp & Paper Week ("PPW"), RISI publishes a containerboard price index.  The price index ("Linerboard Index Price") reflects the prices for linerboard that containerboard manufacturers have obtained in the U.S. for the current month and is based on a survey conducted by the editors of PPW of both buyers and sellers of linerboard. The contract prices for many sales of containerboard and corrugated containers are linked to the Linerboard Index Price.  However, these contracts have price movement mechanisms that lag the movement of the Linerboard Index Price.

9.      Historically, the North American containerboard industry was cyclical. Cycles were driven by supply and demand, which also were affected by the general economy.

4

The industry cycled through brief periods of high demand which resulted in high prices and high profits. Large capacity growth followed, resulting in increased supply. Eventually supply overtook demand and prices collapsed.

10.     The industry has not cycled recently. However, from 1999 to 2009, demand for containerboard has generally been flat to declining, decreasing by approximately 13%. The continual decline has been so significant that 2009 industry box shipments were below 1993 levels. Exhibit 1, incorporated by reference, is a true and correct copy of a chart that the Company created that details industry-wide domestic corrugated box shipments since 1999. The Company prepared this document based on information the Company acquired from the Fiber Box Association. This document shows that corrugated box shipments have decreased from 405 billion square feet in 1999 to 345 billion square feet in 2009, which reflects the decrease in demand over that time.

11.     During this time period, manufacturers have ceased operating more than fifty containerboard paper machines in North America, permanently removing some ten million tons of capacity. Exhibit 2, incorporated by reference, is a true and correct copy of a document that the Company created on in order to chronicle industry capacity reduction since 1998. As shown on pages 2, 4 and 6 of Exhibit 2, the Company relied upon several external sources to create this document, including the AF&PA Capacity Survey, Pulp & Paper Global Price & Fact Book, RISI, and Lockwood-Post Directory. Page 6 of Exhibit 2 shows that 57 containerboard paper machines are no longer operating. Page 2 of Exhibit 2 shows that the industry has removed 10.7 million tons of capacity. As shown on page 4 of Exhibit 2, over seventy percent of this capacity reduction occurred before the fourth quarter of 2008, which indicates that the global

economic downturn of the past year and a half is merely a continuation of the systemic ten-year

industry demand decline.

**Overview of the Debtors Business**

      12.     SSCE is one of the largest integrated manufacturers of paperboard and

paper-based packaging in North America and one of the world's largest paper recyclers.  The

Company's primary products include containerboard, corrugated containers, market pulp, kraft

paper, and reclaimed and brokered fiber.  The Company also sells bleached linerboard and

foodboard.

      13.     The Company is comprised of three business divisions—the Mill,

Container and Reclamation Divisions—and a Corporate Group.  The Mill Division operates

twelve mills which produce a full line of containerboard products, including corrugating

medium, linerboard and white top linerboard.  Each mill varies in its operations and operating

costs.  Some mills produce only one product, while others produce multiple products.  Moreover,

the mix of products produced at each mill (whether liner, medium, white top, kraft bag, market

pulp and foodboard) varies.  Different mills use different amounts and types of input

commodities depending upon the products that the mills produce and the type of paper machines

that they have (e.g. some machines use only wood fiber, other machines use only recovered

fiber, while some use a combination of the two).  Finally, the price at which each mill obtains

many of its most important input commodities varies depending upon the location of that mill

(e.g. wood fiber is cheaper in some areas of the country than in others).

      14.     The Mill Division sells the majority of its containerboard internally to the

Company's Container Division, which uses it to produce corrugated containers.  In total, the

Container Division operates 108 box plants.  The Reclamation Division procures recovered fiber

and sells it to the Company's paper mills and to other containerboard producers.  It also sells double-lined kraft corrugated cuttings ("DLK") that are left over from the production of corrugated boxes in the Container Division's box plants.  The Reclamation Division operates thirty recycling facilities that collect, sort, grade and bale recovered paper.

**Multi-Year Transformational Program to Improve Scale (2006-2009)**

15.     From 2006 through 2009, the Company engaged in an extensive scaling and transformational program in its Container Division designed to increase box plant production volume, or "throughput," to competitive levels and reduce costs.  For many years, the Company had invested in headcount rather than in improving its box plant technology.  After an extensive benchmark study of some of its competitors, the Company determined that the throughput of each box plant could be greatly increased by automating many of its tasks.  This in turn allowed the Company to close many of its box plants, and thus obtain savings from reduced headcount and fixed costs, without suffering significant reduction in total container sales.

16.     The Company proceeded to invest in targeted box plants, focusing on rebuilding and upgrading existing machines, and automating facilities through ancillary additions.  Other box plants were closed.  Ultimately, the Company closed 47 of its 155 box plants from 2006 to 2009 and invested $449 million in the remainder in order to maintain throughput.  The Company expects the scaling initiatives to generate an EBITDA increase of $282.3 million from 2008 through 2010.

**Footprint Reduction Through Mill Closures/Divestitures**

17.     While the Company was engaged in this extensive scaling and transformational program in its Container Division, it restructured its Mill Division footprint and cost structure in response to declining market demand.  Due to declining market demand and

7

resulting declining economics, from 2005 through 2010, the Company closed 8 mills, one

machine in an existing mill and sold its Brewton mill.  Exhibit 3, incorporated by reference, is a

true and correct copy of a document that the Company created in order to track the effect on

EBITDA, revenue, and mill capacity of the mill closures and divestitures that have occurred

since 2005.  Exhibit 3 shows that machine and mill closures and facility sales have significantly

reduced mill capacity volume from 9.1 million tons in 2005 to 6.7 million tons in 2010, and

significantly reduced remaining earnings potential.

        18.     Although the Company forecasts that its total mill capacity will increase

from 6.7 million tons in 2010 to 6.95 million tons in 2014, the Company's footprint, as measured

by its total mill capacity, will remain significantly smaller than it was in 2005, when the

Company had a total mill capacity of 9,109,000 tons.  As is shown in Exhibit 3, adjusting the

Company's historical EBITDA to the current footprint reduces its 2007 recent peak EBITDA

from $755.0 million to $580.9 million, with the forecasted EBITDAs representing levels in

excess of the company's historical adjusted levels.

        19.     Even while reducing the size of its footprint, the Company increased its

per-mill productivity, since the mills that were shut down had below average productivities.  The

Company's average tons produced per mill increased year-over-year from 2006 through 2010

while its total mill capacity declined.  Thus, even though the Company closed or sold many of its

mills in response to declining industry demand, it continued to work towards maximizing the

efficiency and productivity of its remaining mill footprint.

        20.     During this same time period, the Company reduced headcount in the Mill

Division as well.  Based on a separate benchmark study of the mills of some of its competitors

and industry cost benchmarking studies, the Company determined that the headcount at most of

its mills was above what was necessary to operate the mills competitively.  In response, the Company eliminated unnecessary positions.

21.     The Company also made capital investments of several hundred million dollars in the Mill Division during this time period.  Generally, the Company spent this money on basic maintenance of the mills, as opposed to scaling initiatives.  The containerboard industry, like the rest of the paper industry generally, is very capital intensive.  Because the mills run continuously, there is a constant need for the Company to engage in maintenance and upkeep projects.  Maintenance and upkeep investments in the mills maintain uptime and waste levels, which allow the Company to maintain existing productivity.  The Company calculates a return on these investments by comparing existing productivity to the productivity that *would be lost* were the investments not made.

22.     In connection with preparation for the Confirmation Hearing, I reviewed the GLC/Sanabe report concerning the Company's EBITDA, "normalized" for 2005 through 2009.  GLC/Sanabe claims that the Company's "normalized" EBITDA is $567 million.  GLC/Sanabe calculated normalized EBITDA by multiplying the 2005-2009 average revenue by the 2005-2009 average EBITDA margin.

23.     During my review, I noticed that GLC/Sanabe did not account for the fact that mill and machine closures and divestitures have substantially reduced the Company's footprint over the last 5 years.  I computed the Company's "normalized" EBITDA using GLC/Sanabe's methodology for the Company's current footprint.  Taking the reduced footprint into account, the Company's five year average revenue was $6,505 million and its five year average EBITDA margin was 6.5%.  Using these figures, the Company's "normalized" EBITDA

under the GLC/Sanabe methodology would be $421 million, not the $567 million in the GLC/Sanabe report.

**Circumstances Leading to the Commencement of these Chapter 11 Cases**

24.     Despite EBITDA gains from the scaling and transformational process, the Debtors filed chapter 11 petitions on January 26, 2009 (the "Petition Date").  A number of factors precipitated the filing, all connected to the 2008-2009 global economic downturn.  First, there was an unprecedented decline in demand for the Company's products in the fourth quarter 2008.  The combination of low demand and high supply within the industry depressed prices for the Company's products.  The dramatic downturn in the industry and the general economy exerted significant downward pressure on the Company's operating income and liquidity.  Second, the Company's declining liquidity violated covenants in several of its credit agreements.  Third, the Company had significant debt maturities in 2009 but was unable to refinance in the dwindling to non-existent credit markets.  With diminished liquidity and no opportunity to secure additional financing, the Company was forced to commence the chapter 11 proceedings.

**Continuation of the Scaling Effort While in Reorganization**

25.     The Company faced significant challenges in 2009 because of both the bankruptcy process and the poor economic climate.  From its peak in November 2008 through September 2009, Linerboard Index Price fell $80 per ton.  Prices for corrugated containers declined a similar amount, but at a slower rate.  As would be expected in this type of economic environment, the Company's adjusted year-end EBITDA was down nearly $80 million from the previous year ($439 million to $362.2 million).  However, 2009 actual results were 95.3% of the Company's forecasted 2009 debtor-in-possession budget.

10

26.     Nevertheless, the Company was still able to build upon the efforts that it had made prior to the Petition Date in transforming its cost structure, footprint, and sales/manufacturing processes.  The Company continued to implement scaling initiatives within its Container Division, which allowed the Company to close eleven additional box plants in 2009 without suffering any reduction in capacity.  The Mill Division also reduced its headcount by approximately 400 employees, because of both the temporary (which has now become permanent) closure of the Ontonagon, Michigan and Missoula, Montana mills, and the Company's initiative to reduce mill headcount to competitive levels.  The Reclamation Division implemented a strategic growth initiative that focuses on developing sort systems, providing value-added services to improve volume and margins, entering into synergistic partnerships with wastepaper providers, and growing their export business.  The Corporate Group achieved  a nearly $12 million reduction in expenses in 2009 over 2008, primarily driven by decreases in the expense associated with human resources and benefits, building services, IT and targeted management actions.  In addition, the Company took advantage of certain provisions of chapter 11 to reject approximately 63 unexpired leases and approximately 360 unexpired contracts which were burdensome and/or no longer beneficial.

## FORMATION OF THE BUSINESS PLAN

27.     During the reorganization, the Company developed a long term business and financial model to be used to support the bankruptcy process requirements, develop required financial projections, support normal company budgeting processes, and support refinancing efforts and requirements.  Beginning in June 2009, the Company and its advisors developed a detailed operational plan which set forth a strategy for maximizing the Company's value over the plan period following emergence (the "Business Plan").  In August and September 2009, the

11

Company presented the Business Plan to the Committee of Unsecured Creditors (the

"Committee"), the Ad Hoc Group of Prepetition Noteholders, the CCAA Monitor, and the

Prepetition Lenders, which helped the Company make substantial progress towards a consensual

plan of reorganization.

28.    In developing its five-year business plan, the Company assumed that

demand for its corrugated containers would increase by approximately 8% from 2009 to 2014 (or

1.5% per year), based on the Company's targeted customer and segment growth.  The Company

based these assumptions on its belief that the national and global economies would begin to

improve and that this would cause the containerboard and corrugated container market to

improve as well.  In addition, the Company found a favorable comparison to the RISI forecast,

which predicted a similar increase in demand over the five year period.  RISI forecasts U.S. box

shipments to increase by approximately 8% from 2009 to 2014 (or 1.5% per year).

29.    The Company also assumed that the containerboard industry would be

disciplined, only producing enough containerboard to meet demand.  The Company found

evidence to support this assumption from the extensive initiatives to reduce supply that the entire

industry had undertaken for much of the previous decade, described above.  In addition, the

Company assumed that there would not be any significant increase in the industry's

containerboard production capacity.  With supply and demand in balance, the Company assumed

that it would be able to pass its costs on to customers.  The Company recognized, however, that

if supply and demand are not in balance, whether because demand does not grow as predicted,

replicating the industry's historical decline, or because supply is in excess of demand, then it will

not be able to pass on costs.  Based on these assumptions, the Company developed specific

strategies for each of its three business divisions to improve EBITDA.

**Mill Division Business Plan**

30.      The Mill Division's business plan is predicated on increasing EBITDA through sales growth, improved product and channel mix and cost reductions.  The Mill Division plans to increase total production and sales of containerboard by approximately 7% from 2009 to 2014 (or 1.3% per year).  In addition, the Mill Division expects to obtain a higher margin on these sales by improving its product and channel mix.  Product and channel mix refer to the Company's strategies with respect to the volume of each its products that it will manufacture, and which markets it will sell these products in, respectively.  With respect to product mix, the Company generally obtains a higher return from white top than from other varieties of linerboard.  As such, the Mill Division plans to increase production and sales of white top by approximately 28% from 2009 to 2014 (or 5.1% per year).  With respect to channel mix, the Company obtains a higher return from internal sales of containerboard than from domestic sales, and export sales generally offer the lowest margin.  The Mill Division plans to improve its market channel mix by reducing its exposure to low margin, spot markets, such as those in the Middle East and Asia, and increasing sales in the more profitable Latin American market.  The Mill Division projects that annual containerboard exports to Latin America will increase by approximately 31% by 2014 (or 5.6% per year).

31.      The Mill Division plans to generate net cost savings of $79.1 million from the permanent closure of two mills.  The Company has closed its highest cost linerboard mill in Missoula, Montana, and its highest cost medium mill in Ontonagon, Michigan.

32.      Despite the closure of these two facilities, the Business Plan calls for an increase in containerboard production by 393,000 tons from 2009 to 2012 in order to take advantage of the division's sales growth efforts.  Two factors drive this increase in volume.

13

First, the Company will increase capital expenditures in the mills for the maintenance, repair and replacement of aging or worn out machinery and equipment. The Company projects that these capital expenditures will increase uptime and reduce waste. Second, the Company plans to take advantage of the expertise of Mike Exner, who was hired away from International Paper to run the Company's Mill Division. The Company projects that the combined effect of these two factors will be greater production.

**Container Division Business Plan**

33.    The Container Division plans to increase EBITDA through sales growth, improved customer mix and cost reduction. The Container Division plans to increase sales to its existing customers. In addition, the Container Division will attempt to generate sales growth by focusing on the pizza and produce segments, by increasing business with large, national account customers and by promoting its value-added services such as Image Pac, the Company's program for developing creative marketing and packaging displays for consumer goods. Overall, the Company predicts that these initiatives will increase sales by 318,000 tons from 2009 to 2012, at which point sales growth will stabilize, along with demand.

34.    The Container Division also plans to increase its profitability through remaining cost-reduction initiatives. The Container Division will reduce costs substantially by consolidating three Richmond, Virginia plants into a single facility (the "Richmond Consolidation"), which completes the scaling initiative program. The increased capacity from the Richmond Consolidation will also allow the Company to close its Wilson, North Carolina box plant. The Richmond Consolidation will cost $32.0 million and will result in $16.6 million in annual headcount and fixed savings, providing a 1.9 year payback. In large part, this will complete the Company's implementation of its transformational and scaling strategy begun in

14

2006. With the conclusion of the scaling initiative, the Container Division plans to significantly

reduce capital spending to only that necessary for maintaining existing levels of production and

supporting existing customer requirements.

**Reclamation Division Business Plan**

        35.     The Reclamation Division intends to improve EBITDA through sales

growth and cost reductions. The Reclamation Division has also begun implementing a strategic

growth initiative to improve sort systems, develop new partnerships with third parties, expand

sales in the global market, and increase volume and margins of value-added services, such as

waste management services and non-fiber material marketing. The Reclamation Division plans

to recover business that it lost during the restructuring process. Because long-term forecasts

indicate flat domestic demand, the Division plans to double its export volumes of recycled fiber,

from approximately one million tons in 2009 to two million tons in 2012. This includes a

300,000 ton increase in recycled fiber export in both 2010 and 2011, and a 400,000 ton increase

in 2012.

        36.     The Reclamation Division will invest $46 million to improve sort systems

and make opportunistic acquisitions, increasing the number of recycling facilities from 30 to 45

by 2012. The Company anticipates that the additional facilities and the improved sort systems

will contribute approximately $30 million annually to EBITDA, by 2012.

        37.     Since the Company implemented its strategic growth strategy, the number

of countries to which the Company exports recycled fiber has increased from three to thirteen.

To continue this growth in the export market, the Reclamation Division plans to develop and

increase sales and procurement of recovered fiber in China and India, as well as in emerging

markets such as Eastern Europe and Latin America. The Company predicts that these actions will improve both sales volume and margins.

38.     The Company plans to improve profits at existing plants by improving recovered fiber procurement techniques and reducing material costs as a percentage of sales. Processing costs per ton are budgeted to decrease through 2014. A number of factors will drive this decrease, including improving throughput via enhanced sorting capabilities and reduced downtime, reducing operating costs via corrective actions resulting from continued and regular facility audits, and taking advantage of economies of scale through the successful execution of the growth strategy.

**Capital Expenditures**

39.     To maintain sufficient liquidity despite its substantial pension obligations, the Company limited its capital spending budget for 2009 through 2014 to $210 million per year. From 2009 through 2011, the Company will focus its capital spending on maintaining, repairing and replacing aging or worn out machinery and equipment in its mills to meet the 393,000 ton increase in containerboard demand that the Company has forecasted through 2012.

## FORMATION OF THE FINANCIAL PROJECTIONS

40.     After creating its Business Plan, the next step for the Company in the reorganization process was to forecast the Business Plan's operational and financial impact. The purpose of the Financial Projections was to evaluate whether the Business Plan would provide the Company with sufficient cash flow and/or value to (a) make all payments and other distributions required under the Plan, (b) service all debt obligations contemplated by the Plan, (c) satisfy pension contribution requirements and (d) maintain business operations following emergence. In connection with this, the Company had to generate a multi-year forecast of the

16

Company's consolidated EBITDA, balance sheet, cash flow statement, and income statement. The Company began developing the Financial Projections shortly after entering chapter 11.

41.     In August 2009, the Company created financial projections for 2009 by month and 2010 to 2012.  Subsequently, both the Committee and the exit financing lenders requested that the Company prepare projections for 2010 through 2014.  In December 2009, the Company prepared financial projections for 2010 through 2014 in connection with the initial filing of the Plan.  Following price and cost increases, described below, the Company updated these projections again in March 2010.  The revised March projections forecast 2010 by month and 2011 through 2014 (the "Projection Period"), issued on or around March 23, 2010 (the "Financial Projections").  The Financial Projections are set forth as Exhibit F to the Disclosure Statement.  They encompass the fully-informed and sound business judgment of the Debtors and are the Debtors' best estimate of the future performance of the Reorganized Debtors.  Exhibit 4, incorporated by reference, is a true and correct copy of the Financial Projections set forth as Exhibit F to the Disclosure Statement.

**The Model**

42.     Each of the Company's divisions, and the Company's senior management team ("Management"), had extensive experience forecasting annual budgets and revised forecasts.  In fact, the Company's debtor-in-possession 2009 EBIDTA budget of $380 million was within 95.3% of 2009 actual EBITDA of $362.2 million.  In addition, pursuant to the Court's approval in April 2009, the Company retained The Levin Group ("TLG") to assist with collecting, assembling and modeling the information necessary to prepare the Financial Projections.  TLG is a strategic and financial advisory service firm with extensive experience in the containerboard and packaging industry.  TLG specializes in detailed strategic, operational

17

and financial analysis and modeling as the foundation for transactional and corporate advisory

assignments.  TLG was familiar with the Company's business because it had been previously

retained by the Company in connection with the sale of the Company's 500,000 ton Brewton

mill, the disposition of the 250,000 ton Pontiac mill, operational projects in the Mill and

Container Divisions, and major potential M&A transactions.  Based on TLG's prior

performance, the Company was confident that TLG had the expertise to assist with the

development of an accurate and comprehensive integrated model.

        43.     In the course of its earlier engagements with the Company, and especially

in connection with a major potential pre-filing merger transaction, TLG, in close coordination

with the Company, had already constructed a predecessor detailed operating and financial model

of the Company's business.  In continued close cooperation with the Company, TLG completed

the comprehensive operating and financial model (the "Model") that analyzed, supported and

presented the Company's Plan of Reorganization.  TLG communicated extensively with

Company personnel to ensure that the Model could take into account every relevant operational

and financial characteristic of the Company.  TLG completed an initial version of the Model in

September 2009.  This version of the Model provided monthly forecasts for the remainder of

2009, annual forecasts for 2010 and 2011, and a steady state forecast, assuming no material

changes, for 2012.  After discussions with the Committee and the exit financing lenders, the

Company decided that a three-year forecast was insufficient for the Plan of Reorganization

process.  The Committee requested that the Company create a five-year operating forecast.  In

September 2009, the Company requested that TLG develop another version of the Model,

capable of forecasting through 2014.  The Company used this version of the Model to develop

the Financial Projections.

44.    The Model forecasts 2011-2014 operational results for each one of the Company's North American operational facilities.  The forecasts are based on 2010 data.  In so doing, the Model takes into account the unique operational characteristics of each facility. For example, each mill forecast takes into account that mill's unique product, channel and cost mix. The same is true for the Company's box plants.  The Model then consolidates the facility results by division and ultimately aggregated Company-wide.

**Populating the Model**

45.    The Company supplied all of the inputs that the Model used to generate the Financial Projections.  The Company provided TLG with the 2010 operating budgets of the Mill and Container Divisions; the 2010-2014 operating forecast of the Reclamation Division; and volume projections, pricing differentials and commodity price inflation assumptions for the years 2011 through 2014.  From these inputs, the Model generated an operating forecast for the Company through 2014, which included the Model's projections for containerboard transaction prices.  The Company and TLG reviewed the Model's facility line-item detailed output in good faith to ensure that it was consistent with the divisional operating budgets and cost assumptions.

46.    As Senior Vice President of Business and Analysis, I coordinated the Company's collection of the requisite data, the delivery of that data to TLG, and the review of the detailed output that the Model generated based on that data.  Early on in the process, before the Model was fully developed, the Company and TLG engaged in a collaborative process of simultaneously building and populating the Model.  This allowed the Company to see the effect that its data inputs had in the Model, which enabled the Company to verify the Model's functionality.

**Mill Division Input**

47.     The first step in the Company's data collection process was the development of a 2010 operating budget for each of the Company's twelve mills based on the Mill Division's business plan, described more fully above.  The Controller at each mill was responsible for developing the budget.  However, countless individuals assisted in the process.  Each mill's budget contained detailed monthly data reflecting projected sales volumes, broken out by product and market.  In addition, the budget contained detailed, itemized data regarding cost-of-goods-sold; selling, general, and administrative expenses; and all other costs and expenses.  The budget also included the division's capital expenditures for 2010.

48.     The budgets also specified the prices at which the Mill Division would sell its products in 2010.  For market pulp, the Mill Division estimates that the average annual sales price will be $592 per ton.  For kraft bag, the division estimates that the price will be $509 per ton.

49.     Prices for the Mill Division's line of containerboard products—linerboard, medium, white top— are tied to the Linerboard Index Price.  In nearly all of the Company's contracts, the contract price is defined as a differential from the Linerboard Index Price.  If the market price increases or decreases then the contract price will increase or decrease the same amount.  Typically, contracts have a built in lag mechanism, insulating the contract price from movements in the index price for some set period of time.  Most of the contract prices move the 1st day of the following month that the index price moves.  For a few contracts, there will be a lag of anywhere from a month to 60 days between a market price movement and a contract price movement.

50. For 2010, the Mill Division expects to sell linerboard at a discount of $139 per ton from the Linerboard Index Price. It expects to sell medium at a discount of $181 per ton. Finally, the Company will sell white top at a premium of $124 per ton from the Linerboard Index Price, which equates to a premium of $263 per ton from the Company's price for domestic linerboard.

51. Each mill input its budget into the Model. The Model then consolidated all of the mill budgets into a single division-level operating forecast. The Mill Division then incorporated division-level expenses into this consolidated forecast. These expenses included the salaries and expenses of persons running the Mill Division, costs associated with the procurement of fiber, ongoing expenses associated with closed mills, and expenses related to the marketing and sales of products to non-Company purchasers.

52. In addition to creating its 2010 budget, the Mill Division also created certain assumptions for the 2011 through 2014 period for the Model. First, the Mill Division forecasted supply and demand, and channel mix for each of its products for 2011 to 2014. The Mill Division also projected the 2011-2014 pricing differentials for its containerboard line of products. Likewise, the Mill Division also projected the 2011 through 2014 prices for its non-containerboard products, including market pulp, kraft paper, and foodboard. The Mill Division also forecasted division-level expenses for the remainder of the Projection Period. Finally, the Mill Division projected its capital expenditures for 2011 to 2014, including expenditures associated with the projected 393,000 ton increase in containerboard mill production and the white top product mix strategy. TLG incorporated all of the information described above into the Model.

53.     Although the Model only forecasted from actual and budgeted data from 2010, the Mill Division provided historical operating and financial data from the period 2004 through 2009 as well.  The inclusion of the historical data allowed the Company to compare its budgets and the Model's forecasts with historical results.

**Container Division Input**

54.     The Container Division's data collection process mirrored that of the Mill Division.  The Container Division developed a 2010 operating budget for each plant in accordance with its business plan.  The Area Controllers were responsible for forecasting the budget.  However, countless individuals assisted in the process.  Like the mill budgets, each plant budget contained detailed, itemized information specific to that plant's operations, including every individual line item of cost.  The Container Division also specified the prices at which it would sell its corrugated containers in 2010.  Like the price of containerboard products, the Container Division has also linked its contract prices for corrugated containers to the Linerboard Index Price.  If the index price increases or decreases then the contract price for corrugated containers will increase or decrease.  The timing of contract price change for the Container Division will generally lag a change in the Linerboard Index Price by an agreed-to amount (e.g., 30 days or 60 days) or based on a calendar-related schedule (e.g., quarterly, semi-annual or annual).  For 2010, the Container Division will sell containers for an average premium of $366 per ton.

55.     The Model consolidated the plants budgets by area, then by region, and ultimately by division.  The Company also populated the Model with division-level expenses, as well as with budgets associated with non-box manufacturing activity and the division's operations in China.  The Container Division also collected and input historical data on each of

these categories as well, in order to compare its budgets and the Model's forecasts with historical results.

56.     In addition to creating its 2010 budget, the Container Division also created certain assumptions for the 2011 through 2014 period for the Model.  First, the Container Division forecasted demand and customer mix for each of its products for 2011 through 2014.  The Container Division also projected the 2011 to 2014 container premiums versus the Linerboard Index Price based on sales contracts.  Finally, the Container Division also projected its capital expenditures for 2011 to 2014, along with estimates of return on investment for major projects, including the Richmond Consolidation.  TLG incorporated all of the information described above into the Model.

**Reclamation Division 2010-2014 Forecast**

57.     The Reclamation Division also created a forecast for the Model.  Unlike the Mill and Container Divisions, however, the Reclamation Division created its own forecast through 2014, which was incorporated in whole into the Model.  There are two reasons why the Company did not rely on the Model to generate a 2010-2014 forecast for the Reclamation Division.  First, the recycling industry is relatively simple.  It turns on sales volume and sales margin, both of which the Reclamation Division has experience forecasting.  Second, the Reclamation Division created its five-year budget prior to the Financial Projections process, in connection with a July 2009 presentation to the Company's Board of Directors to approve certain capital expenditures associated with the strategic growth plan.

58.     The Reclamation Division's forecast was based upon its business plan and long-term strategy, described above.  To prepare its forecast, the Recycling first created a 2010 budget, with monthly data reflecting projected sales volumes for recovered fiber, broken out by

channel, as well as detailed, itemized data regarding costs-of-goods-sold; selling, general and administrative expenses; and all other costs or expenses. The budget was prepared at the plant level, then consolidated by region and ultimately by division.

59. The Reclamation Division then estimated the 2011 through 2014 pricing for recovered fiber, volume growth and channel mix, and capital expenditures. For input costs besides recovered fiber, the Reclamation Division relied upon the commodity cost inflation forecasts of the Company's "commodity owners," described below. Based on all of this information, the Reclamation Division generated an operational forecast for 2011 through 2014, which was incorporated into the Model.

**Input Cost Inflation Forecast**

60. Finally, the Company generated assumptions about cost inflation for the Projection Period for every relevant cost element of the Company's business, including, by general category, fiber, energy, chemicals, freight, labor and other. Each general category of costs was further broken out into more detailed components of that input. For example, the Company relies on several sources of energy, including oil, fuel oil #6, natural gas, coal, and electricity. The chemical category includes mill-specific pulping chemicals (e.g. caustic soda, soda ash, salt cake, sodium sulfite, carbon dioxide, lime, defoamer, molten sulfur), bleaching chemicals (sodium chlorate, sulfuric acid, chlorine, methanol, hydrogen peroxide, caustic soda), paper machine chemicals (alum, sulfuric acid, polyAcrylamide, defoamer, silica, starch, calcium carbonate, caustic soda) and non-productive chemicals (alum, sulfuric acid, caustic soda, chlorine, rock salt, defoamer, caustic tall oil, carbon dioxide).

61. The task of making these forecasts fell on the Company's "commodity owners," who are the persons in the Company responsible for the procurement of these

commodities during the ordinary course of business.  Exhibit 5, incorporated by reference, is a

true and correct copy of the Debtors' Responses to Common Owners' Interrogatories, prepared

by the Debtors with the assistance of counsel on or about March 4, 2010.  Exhibit A of the

Interrogatories provides the identity and title of each commodity owner.  The commodity owners

had experience projecting these costs for previous Company forecasts and budgets.  In

developing the cost assumptions, the commodity owners referenced forecast market pricing,

industry data and other available sources, as appropriate for the commodity at issue.  Exhibit 6,

incorporated by reference, is a true and correct copy of a document that the Company created in

March 2010, which contains a comparison between the cost assumptions in the March Financial

Projections versus the cost assumptions from the earlier December financial projections.  Exhibit

6 describes the sources that the commodity owners relied upon for each of their forecasts.  The

cost assumptions for wood and recovered fiber were primarily based on the commodity owners'

personal estimation of future market activity and costs.  They also consulted the forecasts of RISI

and, for the price of recovered fiber, Moore & Associates, a leading paper recycling consulting

firm.  To prepare the other cost assumptions, the commodity owners relied upon a variety of

third-party reports and data.  Because the Company in the regular course of operations procures

billions of dollars in goods and services and engages in extensive logistical planning and

optimization activities, these persons have extensive experience in assessing and forecasting its

cost of goods.  The following discusses the Company's cost assumptions as set forth in Exhibit 6.

Labor Cost Assumptions

       62.    The Corporate Group's Human Resources Department was responsible for

forecasting labor costs.  The Company has a number of labor agreements that expire between

2010 and 2012.  The Company based its labor cost forecast on how well it expected to do it its

negotiations of new contracts. The Company also took into account the fact that labor costs in 2009 are lower than usual because of a freeze on certain benefits. The Company projects that labor cost increases due to wage, salary and benefits cost increases will total approximately 13% from 2009 to 2014 (or 2.6% per year).

<u>Wood (Virgin) Fiber Cost Assumptions</u>

63.     The Company's Forest Resources Group was responsible for forecasting inflation in the cost of virgin fiber. Although the cost of virgin fiber varies depending upon where it is obtained, the Forest Resources Group assumed that inflation would affect all virgin fiber markets identically. The Company estimates that the cost of virgin fiber will increase 25% during the Projection Period, from $37.11 per ton in 2009 to $46.57 per ton in 2014. This forecast is based on the Company's determination that government subsidies for using wood as biomass energy as well as the revival of the sawmill and oriented-strand board ("OSB") industries will keep demand for virgin fiber high throughout the Projection Period. The Company's view is directionally consistent with RISI, although RISI forecasted even greater inflation in the cost of virgin fiber. RISI forecasted the cost of virgin fiber to rise 28% from 2009 to 2014.

<u>Recovered Fiber Cost Assumptions</u>

64.     The Reclamation Division was responsible for forecasting inflation in the cost of recovered fiber, which includes both old corrugated containers ("<u>OCC</u>") and DLK. Prices of recovered fiber skyrocketed in 2010, in large part because of an extreme shortage in supply and increased demand due to higher wood fiber and containerboard costs. The Company projects that increased recovered fiber generation over the next few years will moderate the shortage that is currently driving price increases. Because the Company also expects domestic

demand to stay relatively constant, the Company projects that prices for recovered fiber will

stabilize in 2010 and will decrease in both 2011 (to $173.45 per ton) and 2012 (to $154.50 per

ton).  There are two caveats, however, to this forecast of falling recovered fiber prices.  First, any

increase in containerboard price will cause upward pressure on the price of recovered fiber.

Second,  worldwide demand for recovered fiber may increase, pulling supply from the domestic

market, which will create pressure on both the domestic and export price of virgin fiber.  The

Company projects that the price of recovered fiber will begin rising again in 2013 ($165.91 per

ton) and 2014 ($187.06 per ton).  To check the reasonableness of its recovered fiber assumptions,

the Company consulted RISI  The Company's forecast was comparable; RISI forecasted the cost

of recovered fiber to rise approximately 166% from 2009 to 2014 versus the Company forecast

increase of approximately 147% (10.7% per year and 8.0% per year, respectively).

Energy Cost Assumptions

          65.     The Energy Department of the Company's Procurement Group was

responsible for forecasting the costs of each of the Company's energy inputs, which include

natural gas, #6 fuel oil, coal, electricity, and diesel fuel.  The Company projects that the price of

natural gas, including the cost of transport, will increase from $5.81 per MMBTU in 2010 to

$7.49 per MMBTU in 2014.  The Company's projection is based on the forecasts of several third

party analysts, including Fellon-McCord ("FM"), an energy management and procurement

advisory service; the Energy Information Administration of the U.S. Department of Energy

("EIA"); PIRA, an international energy consulting firm; and Societe Generale ("SG").

          66.     To estimate inflation in the price of #6 fuel oil, the Company used the

price of crude oil as a proxy based on the fact that the price of #6 fuel oil has historically fallen

between 89% to 92% of the price of crude oil.  To determine the cost of crude oil, the Company

relied on several third-party forecasts of inflation in the West Texas Intermediate spot market.

The Company used twelve third-party forecasts to estimate inflation for 2011, including

forecasts from the Bank of Montreal, EIA, JPMorgan Chase, RISI, PIRA and SG. The Company

averaged the forecast price from each of these third-party sources, after removing the high and

low prices. To forecast inflation for 2012, the Company used the same methodology and relied

on eight sources similar to those listed above. To forecast inflation for 2013 and 2014, the

Company averaged the crude oil price forecasts from five sources and four sources, respectively,

including EIA, RISI, PIRA and SG. Based on this analysis, the Company projects that the cost

of #6 fuel oil will steadily increase throughout the Projection Period, from $74.04 per barrel in

2010 to $95.02 per barrel in 2014.

       67.     The Company projects that the price of coal will increase from $95.29 per

ton in 2010 to $114.73 per ton in 2014. The Company's forecast is based on RISI's estimates of

the annual percentage increase in the price of coal.

       68.     To forecast electricity price inflation, the Company relied on several third

party forecasts, including PIRA, RISI, and EIA. The Company projects that the price of

electricity will increase from $0.0611 per MKWH in 2010 to $0.0672 per MKWH in 2014.

       69.     The Company also forecasts that the price of diesel fuel will increase by

more than $1.00 per gal during the Projection Period, from $2.9767 per gallon in 2010 to

$3.9776 per gallon in 2014. To make this projection, the Company relied upon the same sources

and methodology as it did to forecast the price of crude oil.

Chemical Cost Assumptions – Mill Division

       70.     The Company's mills use several chemicals in order to create

containerboard, including sulfuric acid, caustic soda, and sodium chlorate. The Chemicals

Department of the Company's Procurement Department was responsible for forecasting the costs of these chemicals. From 2009 to 2010, the price of sulfuric acid dropped more than $25 per ton ($122.06 per ton to $96.35 per ton). The Company projects, however, that the cost of sulfuric acid will increase annually reaching $129.35 per ton by 2014. The Company based this estimate on the forecast of the Tampa Green Market, which is a market sulfur-based market index.

71.     To forecast the price of caustic soda, the Company relied on projections by Chemical Market Associates, Inc. ("CMAI"). CMAI projects that the price of caustic soda will increase from $358.72 per ton in 2010 to $443.54 per ton in 2014.

72.     Through January 2012, the Company is partly protected from increases in the cost of sodium chlorate by contractual pricing caps. The Company projects that the price will increase from $464.67 in 2010 to $550.15 in 2014. This forecast is based on the likely increased demand and cost escalation in the electrical markets and in the cost of other raw materials that produce sodium chlorate. In addition, rising transportation costs will also impact the price of sodium chlorate.

Chemical Cost Assumptions – Container Division

73.     The Company's box plants use starch and wax to produce corrugated containers. The Process Chemical Department of the Company's Procurement Division forecasted the costs for starch and wax based, in part, on discussions with key Company suppliers. With respect to the cost of starch, the Company projects that there will be an increase from $12.29 per M Cwt in 2010 to $16.36 per M Cwt in 2014. This forecast was based on projected inflation in the price of corn, as well as inflation in processing fees, the cost of freight, and the cost of bagging.

74.     The Company projects that the cost of wax will increase from $0.747 per pound in 2010 to $0.995 per pound in 2014, as wax refineries close or reduce their operating rates.

**The Pricing Forecast**

75.     The Company provided TLG with its projected prices for a number of its products, including market pulp, kraft bag, and foodboard, for the Projection Period.  However, the Company did not provide TLG with a forecast of the publication prices of containerboard. Instead, the Company provided TLG with a pricing methodology to be implemented by the Model that assumes that price movements will, in the aggregate, maintain approximate equilibrium with cost movements.  In addition, the Company provided TLG with projected premiums or discounts for linerboard, white top, medium and corrugated containers over or below the linerboard index price.

76.     This methodology is based upon two assumptions.  First, the Company assumes that it will be able to pass on any increase in containerboard input costs to customers by charging higher prices.  This assumption is premised on the Company's belief that demand will not continue to decline as it has historically and that containerboard supply will not outstrip demand.  Were the Company wrong in this regard, then the price of containerboard could fall to a level below what would be necessary for the Company to pass on all of its costs.  Second, the Company assumes that containerboard prices cannot increase independent of cost for any substantial period of time.  This second assumption has an economic and a historical foundation. The containerboard market is a commodity market with a highly-fungible, low-margin product. Such markets are typically subject to intense price competition, which makes it very difficult for

price to greatly outstrip cost for any extended period of time. In recent history, the Company has never witnessed price outperform cost on a sustained basis.

77.     Once the Company's estimates of costs and cost inflation were input, the Model forecasts prices by setting the annual aggregate price changes (by mill, by product and by channel), with lags, to roughly equal the aggregate cost increases for each year from 2011 through 2014. The prices in the Model are actual transaction prices for each product, which include the Company's forecasts of discounts or premiums. The Model takes into account the lag that the Company has built into its customer contracts, which insulates its contract price from movements in containerboard index prices by some set period of time.

78.     To ensure the functionality of the Model's pricing forecast, the Company compared the Model's forecasted prices with those of RISI. The Company used RISI as a comparison because RISI is widely considered to be the leading and only industry source among industry participants. Moreover, RISI's long-term pricing forecast has historically been the most accurate due to RISI's proficiency at forecasting the relationship between price and cost inflation over an extended period.

**The Model's Output**

79.     Once complete, the Mill and Container Divisions' 2010 budgets, the Reclamation Division's 2010-2014 projections, and the Company's cost assumptions were all incorporated into the Model. Also incorporated into the Model were the Mill and Container Divisions' forecasts with respect to supply and demand, production capacity, mix of business, capital expenditures and price differentials for 2011 through 2014. The Model then generated a 2011-2014 operating forecast broken out by division, region, and mill/plant (the "Operating Forecast"). The Operating Forecast contained an annual projection of all of the line-item data

relating to sales, costs, and expenses that was present in the divisional budgets, broken out to the facility level.  The Operating Forecast projected annual EBITDA, operating cash, and net income for each division.

**Review of the Operating Forecast**

80.     The Model's Operating Forecast was reviewed by the individuals at each division, such as plant/mill controllers, divisional directors, and commodity owners, who had been responsible for collecting and preparing the data that populated the Model.  Each division reviewed only that section of the Operating Forecast that was pertinent to it.  Individuals in my department and I coordinated this process and collectively reviewed the entire Operating Forecast.

81.     The review process involved the line-by-line, facility-by-facility examination of the Operating Forecast, to ensure that it accurately reflected the content of the divisional budgets and the cost assumptions.  Special attention was paid to the divisional EBITDA forecast and the Pricing Forecast.  To the extent that there were variances between the Operating Forecast and the Company's inputs, TLG and the Company jointly resolved them.

**Creating the Consolidated Financial Projections**

82.     After the Company and TLG finished the review process, the Operating Forecast was sent to the Company's Corporate Group's Accounting Department.  The Corporate Group  worked with PricewaterhouseCoopers to consolidate the Model.  The group added all corporate expenses, including interest, tax and pension expenses.  The Corporate Group also reconciled and consolidated all inter-company transactions.  The Corporate Group then converted the Operating Forecast into GAAP-compliant consolidated financial statements for the

entire Company. These financial statements were included in the Disclosure Statement as the Financial Projections.

**Updating the Financial Projections**

83.     Throughout the reorganization, the Company and TLG would revise the Model's inputs as forecasted results became actual and to reflect changes in input costs and price assumptions. In accordance with the process described above, the Company created 2010-2012 financial projections in August 2009. Subsequently, both the Committee and the exit financing lenders requested that the Company prepare projections for 2010 through 2014. In December 2009, the Company prepared financial projections for 2010 through 2014 in connection with the initial filing of the Plan of Reorganization. These projections were also prepared in accordance with the process described above. These projections forecasted that there would be a $40 increase in the price of linerboard in May 2010.

84.     In January 2010, there was a $50 per ton increase in Linerboard Index Price. Subsequently, the Company, along with the rest of the industry, announced that there would be an additional price increase in April 2010. Accordingly, in March 2010, the Company decided to revise its projections in order to ensure that these price increases were properly reflected. This exercise resulted in the Financial Projections being issued on or around March 23, 2010. The March 23, 2010 Financial Projections represent the fully-informed and sound business judgment of Management, and are the most up to date and best estimate of the future performance of the Company.

85.     In revising its pricing forecast, the Company focused on cost inflation. Given the relationship between price and cost in the containerboard industry, updating the Company's projections based on price increases alone would be inaccurate as it would only tell

33

half the story.  Exhibit 7, incorporated by reference, is a true and correct copy of the Company's

2009-14 POR Forecast Presentation to the Financial Advisors of the Committee of Unsecured

Creditors and Prepetition Lenders, prepared on or before March 23, 2010.  As reflected in

Exhibit 7, pages 2 through 6,  the Company recognized that cost inflation, particularly in the

price of fiber, had led to the price increase of $50 per ton in January 2010 over the December

2009 price of $535 per ton versus the $40 May increase reflected in the December POR.  The

Company further recognized that continued cost inflation had led to the industry-wide

announcement of an additional $60 per ton increase in April.  Because the Company forecasts

that the price of recovered fiber will decrease $50 per ton in the second half of 2010, the

Company projects that the April containerboard price increase would have a net EBITDA impact

of $30 per ton, which is the difference between the actual increase and the fact that recovered

fiber cost would not decline as forecasted, since both are driven by the same industry demand

and economics.  The Company also projects that further erosion in input cost will lead to a

reduction in price of $25 per ton in the first quarter of 2011.

## THE FINANCIAL PROJECTIONS

86.     Along every relevant metric, the Financial Projections show that the

Company will accomplish the goals of its Business Plan, improve EBITDA, and be in better

health in 2014 than it was in 2009.  As shown in Exhibit 4, page 1, total sales of containerboard

and corrugated packaging are expected to improve from 5.8 million tons in 2009 to 6.1 million

tons in 2011 and to hold steady through 2014.  This increase in sales reflects the Company's

prediction that demand for containerboard, corrugated containers, and recovered fiber will

increase over the next five years.

87.     The Company also predicts that its gross profit margin will improve during the Projection Period.  As shown in Exhibit 4, page 2, the Company estimates that its net income will increase from $8.4 million in 2009 to $132.3 million in 2014.  The Company also projects that its adjusted EBITDA will increase from $362.2 million in 2009 to $666.4 million in 2014.  The cost of sales is projected to improve from 90.1% of sales in 2009 to 86.3% of sales in 2014.

88.     As shown in Exhibit 7, page 9, the Financial Projections predict that the annual average linerboard transaction price will decrease to $605 per ton in 2011, and then steadily increase, eventually reaching $684 per ton in 2014.  The Company projects a higher price increase over this span then RISI.  RISI forecasts that the price will increase from $627 per ton in 2011 to only $662 per ton in 2014.

89.     The Company also projects that it will sell linerboard at an aggregate discount of $139 per ton in 2010 in the domestic market, growing to $143 per ton in 2014.  On the other hand, the Company projects that the premium it charges for white top will be $124 per ton from the Linerboard Index Price, which equates to a premium of $263 per ton from the Company's price for domestic linerboard, and grow to $132 and $275 respectively  in 2014.  The Company projects that it will be able to sell corrugated containers for a premium of $366 per ton over the price of linerboard in 2010, growing to $371 per ton in 2014.  Generally, the Company expects to obtain lower prices in the aggregate for all of its products sold in the export markets.

90.      Importantly, however, the Company does not believe that forecasted increases in the containerboard prices will improve its gross margin.  Any such price increase are expected to be almost entirely offset by concomitant cost increases.  Instead, higher margins can be traced to a series of Management initiatives.  First, the Company's channel mix strategy,

which focuses on increasing sales of higher margin white top and reducing exposure to less profitable export markets in favor of Latin America, will increase profits.  Second, the Company will begin to realize the full cost-savings of its scaling and transformational initiatives in 2010.  Third, the reduction in headcount and fixed costs associated with the closure of the Ontonagon and Missoula mills in 2010 will further drive down costs.

91.     Similarly, sales, general and administrative expenses are projected to decrease from 10.2% of sales in 2009 to 8.8% of sales in 2014.  The reduction in SG&A expenses will be driven by a reduced pension expense and by the completion of three current, ongoing large IT projects in 2012: KIWI; Compass; and improvements to the box plants maintenance systems.

92.     The Company forecasts that it will spend $210 million per year on capital projects during the Projection Period.  To meet the 393,000 ton increase in containerboard demand projected through 2012, the Company will increase its capital expenditures in the mills for the maintenance, repair and replacement of aging or warn out machinery and equipment.  Because the Business Plan does not contemplate further increases in demand, starting in 2012, the Company will focus its capital spending on measures designed to replace existing assets and maintain constant production levels.

93.     The Company projects that during 2011 through 2014, it will spend between $248.8 and $321.4 million annually in net pension expense and contributions, which will limit the amount of cash available for capital expenditures during the Projection Period.  As a result, the Company plans to focus its capital spending on maintenance as opposed to longer term projects that would not generate cash during the Projection Period.

94.     The Company's projected operational and financial performance following emergence compares very favorably to the Company's historical performance.  The Company has not had an adjusted EBITDA greater than the $666.4 million adjusted EBITDA that the Financial Projections forecast for 2014.   Although 2006 and 2007 had EBITDA of $707 million and $755 million respectively, the Company's Mill Division had much greater capacity than it does now and market demand was significantly higher.  As shown in Exhibit 3, if the 2006 and 2007 figures are adjusted to remove EBITDA from closed or divested mills, EBITDA falls to $449.7 million and $580.9 million respectively.

95.     For the foregoing reasons, I respectfully submit that the Plan should be confirmed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 16, 2010

Matthew T. Denton

Senior Vice President of Business Planning and
Analysis of Smurfit-Stone Container Corporation

Sworn to and subscribed before me this
16th day of _APRIL_____, 2010.

Notary Public

JACQUELINE C. BROCKELMEYER
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis County
My Commission Expires: September 01, 2013
Commission Number: 09527922

# EXHIBIT
# 1

# TOTAL CORRUGATED SHIPMENTS

**Source: Fiber Box Assoc.**

**Million Sq Ft per Month**

|       | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|-------|------|------|------|------|------|------|------|------|------|------|------|------|
| Jan | 32,823 | 33,220 | 32,842 | 31,742 | 31,812 | 31,891 | 32,510 | 33,354 | 32,979 | 32,765 | 27,785 | 27,352 |
| Feb | 31,802 | 32,421 | 29,315 | 28,965 | 29,019 | 29,830 | 29,717 | 30,692 | 29,384 | 29,756 | 26,015 | 0 |
| Mar | 35,895 | 36,154 | 32,261 | 30,540 | 31,267 | 33,544 | 33,042 | 34,088 | 33,760 | 31,555 | 29,576 | 0 |
| Apr | 34,420 | 33,384 | 32,474 | 33,481 | 32,627 | 34,331 | 33,598 | 31,968 | 32,836 | 33,425 | 28,405 | 0 |
| May | 31,589 | 33,582 | 32,175 | 31,989 | 31,183 | 31,576 | 31,375 | 34,271 | 33,132 | 31,671 | 28,017 | 0 |
| Jun | 34,088 | 34,067 | 31,899 | 31,670 | 31,609 | 33,610 | 33,109 | 34,642 | 33,371 | 32,243 | 30,906 | 0 |
| Jul | 34,025 | 32,797 | 31,894 | 32,876 | 32,942 | 34,069 | 32,241 | 31,636 | 32,885 | 33,240 | 30,150 | 0 |
| Aug | 34,363 | 34,336 | 32,745 | 32,854 | 31,269 | 32,798 | 33,263 | 34,202 | 33,551 | 32,054 | 29,003 | 0 |
| Sep | 33,764 | 32,595 | 30,699 | 31,675 | 32,122 | 32,683 | 33,135 | 32,481 | 32,006 | 31,434 | 29,958 | 0 |
| Oct | 36,040 | 36,392 | 34,777 | 34,993 | 35,909 | 34,928 | 36,063 | 34,852 | 35,428 | 32,438 | 29,923 | 0 |
| Nov | 32,841 | 31,681 | 30,031 | 29,855 | 29,176 | 30,659 | 31,712 | 31,074 | 30,722 | 26,321 | 27,096 | 0 |
| Dec | 33,436 | 30,691 | 28,472 | 28,809 | 30,973 | 30,609 | 31,607 | 31,582 | 29,446 | 27,882 | 28,290 | 0 |
| Total | 405,086 | 401,320 | 379,584 | 379,449 | 379,908 | 390,528 | 391,372 | 394,842 | 389,500 | 374,784 | 345,124 | 0 |

HIGHLY CONFIDENTIAL

SMS-EH338600

# EXHIBIT
# 2

Closures

## Permanent Containerboard Mill Shutdowns/Conversions Since 1998
### [All Figures: 1,000 TPY]

| Company | Mill | Timing | Source | Number of PMs | Liner Kraft | Liner Recycled | Medium Semi-Chem | Medium Recycled | Total |
|---|---|---|---|---|---|---|---|---|---|
| SSCC | Alton, IL | 4Q98 | A | 2 | | | | 246 | 246 |
| | Jacksonville, FL | 4Q98 | A | 1 | 393 | | | | 393 |
| | Circleville, OH | 4Q98 | A | 1 | | | | 121 | 121 |
| | Port Wentworth, GA | 4Q98 | A | 1 | 375 | | | | 375 |
| | York, PA | 1Q00 | A | 2 | | | | 130 | 130 |
| | Missoula, MT #1 | 4Q02 | A | 0 | 180 | | | | 180 |
| | Seminole (Jacksonville, FL) [1] | 4Q03 | A | 1 | | 360 | | (270) | 90 |
| | Thunder Bay, ONT | 1Q04 | B | 1 | | | | 160 | 160 |
| | Fernandina Beach, FL #2 | 3Q05 | B | 1 | 203 | | | | 203 |
| | New Richmond, QUE | 3Q05 | B | 1 | 235 | | | | 235 |
| | Bathurst, NB | 3Q05 | A | 1 | | | | 243 | 243 |
| | Vernon, CA (L.A.) | 2007 | A | 1 | | | | 148 | 148 |
| | Carthage, IN | 2007 | A | 1 | | | | 52 | 52 |
| | Snowflake, AZ | 4Q08 | A, C | 1 | | | | 135 | 135 |
| | Ortonagon, MI | 4Q09 | A, C | 2 | | | 280 | | 280 |
| | Missoula, MT | 1Q10 | A, C | 2 | 620 | | | | 620 |
| Stone / Four M Corp | Port St. Joe, FL | 3Q98 | A | 2 | 519 | | | | 519 |
| | **SSCC Total** | | | **21** | **2,525** | **360** | **280** | **965** | **4,130** |
| Groveton Paperboard (SSCC @ 63% & IP @ 37%) | Groveton, NH | 1Q06 | A | 1 | | | 150 | | 150 |
| Intl Paper / Union Camp | Gardiner, OR | 4Q98 | A | 1 | 321 | | | | 321 |
| | Savanah, GA #2 | 2001 | A | 1 | 175 | | | | 175 |
| | Oswego, NY | 1Q02 | A | 1 | | | 100 | | 100 |
| | Roanoke Rapids, NC #4 | 2004 | A | 1 | 300 | | | | 300 |
| | FT Madison, IA | 3Q05 | A | 1 | | 100 | | | 100 |
| | Terre Haute, IN | 4Q07 | A | 1 | | | 200 | | 200 |
| | Valiant, OK #3 | 4Q09 | A, C | 2 | 206 | | 224 | | 430 |
| | Albany, OR | 4Q09 | A, C | 1 | 576 | | | | 576 |
| | Pineville, LA | 4Q09 | A, C | 1 | 390 | | | | 390 |
| | **IP Total** | | | **10** | **1,968** | **100** | **524** | **0** | **2,592** |
| IP / Weyerhaeuser / Willamette | Springfield, OR (#1) | 3Q01 | A | 1 | 243 | | | | 243 |
| | Plymouth, NC | 2002 | A | 1 | | | 215 | | 215 |
| | Hawesville, KY | 3Q02 | A | 1 | | | | 200 | 200 |
| | North Bend, OR | 4Q03 | B | 1 | | | | 275 | 275 |
| | Sturgeon Falls, ONT | 4Q02 | A | 1 | | | | 100 | 100 |
| | Plymouth, NC (#1) | 1Q06 | A | 1 | | 350 | | | 350 |
| | **Way Total** | | | **6** | **243** | **350** | **215** | **575** | **1,383** |
| Temple-Inland / Gaylord | Newark, CA | 2Q98 | A | 1 | | | | 74 | 74 |
| | Bogalusa, LA (#5 & 6) | 2002 | A | 2 | 115 | | | | 115 |
| | Antioch, CA | 3Q02 | A | 1 | | 425 | | | 425 |
| | **TI Total** | | | **4** | **115** | **425** | **0** | **74** | **614** |

Page 1 of 9

HIGHLY CONFIDENTIAL

Closures

## Permanent Containerboard Mill Shutdowns/Conversions Since 1998
### [All Figures: 1,000 TPY]

| | | Timing | Source | Number of PMs | Liner Kraft | Liner Recycled | Medium Semi-Chem | Medium Recycled | Total |
|---|---|---|---|---|---|---|---|---|---|
| PCA | Tomahawk, WI (#3) | 1Q05 | A | 1 | | | 65 | | 65 |
| PCA Total | | | | 1 | 0 | 0 | 65 | 0 | 65 |
| American Tissue | Harriman, TN | 2Q01 | A | 1 | | | | 80 | 80 |
| Pomona Paper Co | Pomona, CA | 4Q02 | A | 1 | | | | 72 | 72 |
| Bay State Paper | Boston, MA | 2Q04 | A | 2 | | 51 | | 52 | 103 |
| Menasha | Otsego, MI | 3Q05 | A | 2 | | | | 305 | 305 |
| Norampac | Red Rock, ONT (#1) | 3Q05 | C | 1 | 150 | | | | 150 |
| Norampac | Red Rock, ONT (#2) | 4Q06 | C | 1 | 300 | | | | 300 |
| Banner Fibreboard | Wellsburg, WV | 3Q07 | C | 1 | | 20 | | | 20 |
| Longview Fiber | Longview, WA #1 | 3Q01 | A | 1 | 135 | | | | 135 |
| Longview Fiber | Longview, WA #3 | 4Q01 | A | 1 | | | | | |
| Longview Fiber | Longview, WA #4 | 1Q07 | A | 1 | | | 82 | | 82 |
| Catalyst (formerly Norske) | Elk Falls Mill, BC | 4Q08 | C | 1 | 144 | | | | 144 |
| West Fraser (Eurocan) | Kitamat, BC | 1Q10 | C | 1 | 370 | | | | 370 |
| North American Total | | Tonnage | | | 5,951 | 1,306 | 1,316 | 2,123 | 10,695 |
| | | # of PMs | | 24 | 5 | 9 | 19 | | 57 |

Information Sources: **A:** AF&PA Capacity Survey; **B:** Pulp & Paper Global Price & Fact Book; **C:** RISI / Pulp & Paper Week; **D:** Lockwood-Post Directory

[1] SSCC conversion of #2 from liner to medium.

HIGHLY CONFIDENTIAL

SMS-EH338605

## Permanent Containerboard Closures

| | Timing | | | | | | Tons Recap by Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| **SSCC** | | | | | | | | | | | | | | |
| Afton, IL | 4Q98 | 246 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jacksonville, FL | 4Q98 | 393 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Circleville, OH | 4Q98 | 121 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Port Wentworth, GA | 4Q98 | 375 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| York, PA | 1Q00 | 0 | 0 | 130 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missoula, MT #1 | 4Q02 | 0 | 0 | 0 | 0 | 180 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Seminole (Jacksonville, FL) [1] | 4Q03 | 0 | 0 | 0 | 0 | 0 | 90 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Thunder Bay, ONT | 1Q04 | 0 | 0 | 0 | 0 | 0 | 0 | 160 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fernandina Beach, FL #2 | 3Q05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Richmond, QUE | 3Q05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 203 | 0 | 0 | 0 | 0 | 0 |
| Bathurst, NB | 3Q05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 235 | 0 | 0 | 0 | 0 | 0 |
| Vernon, CA (L.A.) | 2Q07 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 243 | 0 | 0 | 0 | 0 | 0 |
| Carthage, IN | 2Q07 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Snowflake, AZ | 4Q08 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 148 | 0 | 0 | 0 |
| Ontonagon, MI | 4Q09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 52 | 135 | 0 | 0 |
| Missoula MT | 1Q10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 280 | 0 |
| | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 620 |
| **Stone / Four M Corp** | | | | | | | | | | | | | | |
| Port St Joe, FL | 3Q98 | 519 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SSCC Total | | | | | | | | | | | | | | |
| **Groveton Paperboard** | | | | | | | | | | | | | | |
| (SSCC @ 83% & IP @ 37%) | | | | | | | | | | | | | | |
| Groveton, NH | 1Q06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 150 | 0 | 0 | 0 | 0 |
| **Int'l Paper / Union Camp** | | | | | | | | | | | | | | |
| Gardiner, OR | 4Q98 | 321 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Savanah, GA #2 | 2001 | 0 | 0 | 0 | 175 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oswego, NY | 1Q02 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Roanoke Rapids, NC #4 | 2Q04 | 0 | 0 | 0 | 0 | 0 | 0 | 300 | 0 | 0 | 0 | 0 | 0 | 0 |
| FT Madison, IA | 3Q05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 |
| Terre Haute, IN | 4Q07 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 200 | 0 | 0 | 0 |
| Valliant, OK #3 | 4Q09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 430 | 0 |
| Albany, OR | 4Q09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 578 | 0 |
| Pineville, LA | 4Q09 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 390 | 0 |
| IP Total | | | | | | | | | | | | | | |
| **IP / Weyerhaeuser / Willamette** | | | | | | | | | | | | | | |
| Springfield, OR (#1) | 3Q01 | 0 | 0 | 0 | 243 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plymouth, NC | 2Q02 | 0 | 0 | 0 | 0 | 215 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawesville, KY | 3Q02 | 0 | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Bend, OR | 4Q03 | 0 | 0 | 0 | 0 | 0 | 275 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sturgeon Falls, ONT | 4Q02 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plymouth NC (#1) | 1Q06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 350 | 0 | 0 | 0 | 0 |
| Wey Total | | | | | | | | | | | | | | |
| **Temple-Inland / Gaylord** | | | | | | | | | | | | | | |
| Newark, CA | 2Q98 | 74 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bogalusa, LA (#5 & 6) | 2Q02 | 0 | 0 | 0 | 0 | 115 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Antioch, CA | 3Q02 | 0 | 0 | 0 | 0 | 425 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TI Total | | | | | | | | | | | | | | |

Page 3 of 9

HIGHLY CONFIDENTIAL
SMS-EH338606

Permanent Container[b]

Closures

| | | Timing | | Tons Recap by Year | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
| PCA | Tomahawk, WI (#3) | 1Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 65 | 0 | 0 | 0 | 0 | 0 |
| | PCA Total | | | | | | | | | | | | | | | |
| American Tissue | Harriman, TN | 2Q01 | 2001 | 0 | 0 | 0 | 80 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pomona Paper Co | Pomona, CA | 4Q02 | 2002 | 0 | 0 | 0 | 0 | 72 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bay State Paper | Boston, MA | 2Q04 | 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 103 | 0 | 0 | 0 | 0 | 0 | 0 |
| Menasha | Otsego, MI | 3Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 305 | 0 | 0 | 0 | 0 | 0 |
| Norampac | Red Rock, ONT (#1) | 3Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 150 | 0 | 0 | 0 | 0 | 0 |
| | Red Rock, ONT (#2) | 4Q06 | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 300 | 0 | 0 | 0 | 0 |
| Barner Fibreboard | Wellsburg, WV | 3Q07 | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 0 | 0 | 0 |
| Longview Fiber | Longview, WA #1 | 3Q01 | 2001 | 0 | 0 | 0 | 135 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Longview, WA #3 | 4Q01 | 2001 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Longview, WA #4 | 1Q07 | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 82 | 0 | 0 | 0 |
| Catalyst (formerly Norske) | Elk Falls Mill, BC | 4Q08 | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 144 | 0 | 0 |
| West Fraser (Eurocan) | Kitamat, BC | 1Q10 | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 370 |
| North American Total | | | | | | | | | | | | | | | | |
| | | | Total by Year | 2,049 | 0 | 130 | 633 | 1,407 | 365 | 563 | 1,301 | 800 | 502 | 279 | 1,676 | 990 |
| | | | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |

Grand Total 10,695

Information Sources: **A:** AF&PA Capacity Survey, **B:** Pulp & Paper Global Pri

[1] SSCC conversion of #2 from liner to medium.

HIGHLY CONFIDENTIAL

SMS-EH338607

HIGHLY CONFIDENTIAL

## Permanent Container b

Closures

**Paper Machine Recap by Year**

| | Timing | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Liner Kraft | Liner Recy | Medium S-C | Medium Recy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SSCC** | | | | | | | | | | | | | | | | | | | |
| Alton, IL | 4Q98 | 1998 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| Jacksonville, FL | 4Q98 | 1998 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Circleville, OH | 4Q98 | 1998 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Port Wentworth, GA | 4Q98 | 1998 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| York, PA | 1Q00 | 2000 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Missoula, MT #1 | 4Q02 | 2002 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Seminole (Jacksonville, FL) [1] | 4Q03 | 2003 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Thunder Bay, ONT | 1Q04 | 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Fernandina Beach, FL #2 | 3Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| New Richmond, QUE | 3Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Bathurst, NB | 3Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Vernon, CA (L.A.) | 2Q07 | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Carthage, IN | 2Q07 | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Snowflake, AZ | 4Q08 | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 |
| Ontonagon, MI | 4Q09 | 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 |
| Missoula, MT | 1Q10 | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| **SSCC Total** | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Stone / Four M Corp** | | | | | | | | | | | | | | | | | | | |
| Port St Joe, FL | 3Q98 | 1998 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| | | | | | | | | | | | | | | | | | | | |
| **Groveton Paperboard** | | | | | | | | | | | | | | | | | | | |
| **(SSCC @ 63% & IP @ 37%)** | | | | | | | | | | | | | | | | | | | |
| Groveton, NH | 1Q06 | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | | | | | | | | | | | | | | | | | |
| **Int'l Paper / Union Camp** | | | | | | | | | | | | | | | | | | | |
| Gardiner, OR | 4Q98 | 1998 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Savanah, GA #2 | 2Q01 | 2001 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Oswego, NY | 1Q02 | 2002 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Roanoke Rapids, NC #4 | 2Q04 | 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| FT Madison, IA | 3Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Terre Haute, IN | 4Q07 | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Valliant, OK #3 | 4Q09 | 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| Albany, OR | 4Q09 | 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 |
| Pineville, LA | 4Q09 | 2009 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| **IP Total** | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **IP / Weyerhaeuser / Willamette** | | | | | | | | | | | | | | | | | | | |
| Springfield, OR (#1) | 3Q01 | 2001 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Plymouth, NC | 2Q02 | 2002 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawesville, KY | 3Q02 | 2002 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Bend, OR | 4Q03 | 2003 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sturgeon Falls, ONT | 4Q02 | 2002 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Plymouth, NC (#1) | 1Q06 | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| **Wey Total** | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | |
| **Temple-Inland / Gaylord** | | | | | | | | | | | | | | | | | | | |
| Newark, CA | 2Q98 | 1998 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 |
| Bogalusa, LA (#5 & 6) | 2Q02 | 2002 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Antioch, CA | 3Q02 | 2002 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| **TI Total** | | | | | | | | | | | | | | | | | | | |

Page 5 of 9

SMS-EH338608

Closures

## Permanent Containerb

| | | Timing | | Paper Machine Recap by Year | | | | | | | | | | | | | Liner | | Medium | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Kraft | Recy | S-C | Recy |
| PCA | Tomahawk, WI (#3) | 1Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| PCA Total | | | | | | | | | | | | | | | | | | | | |
| American Tissue | Harriman, TN | 2Q01 | 2001 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Pomona Paper Co | Pomona, CA | 4Q02 | 2002 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Bay State Paper | Boston, MA | 2Q04 | 2004 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Menasha | Ostego, MI | 3Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Norampac | Red Rock, ONT (#1) | 3Q05 | 2005 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | Red Rock, ONT (#2) | 4Q06 | 2006 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Banner Fibreboard | Wellsburg, WV | 3Q07 | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Longview Fiber | Longview, WA #1 | 3Q01 | 2001 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | Longview, WA #3 | 4Q01 | 2001 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | Longview, WA #4 | 1Q07 | 2007 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Catalyst (formerly Norske) | Elk Falls Mill, BC | 4Q08 | 2008 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| West Fraser (Eurocan) | Kitamat, BC | 1Q10 | 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| **North American Total** | | | | 9 | 0 | 2 | 5 | 9 | 1 | 4 | 8 | 3 | 5 | 2 | 6 | 3 | 24 | 5 | 9 | 19 |

**Information Sources: A:** AF&PA Capacity Survey, **B:** Pulp & Paper Global Ph | Total by Year | 9 | 0 | 2 | 5 | 9 | 1 | 4 | 8 | 3 | 5 | 2 | 6 | 3

[1] SSCC conversion of #2 from liner to medium.

Grand Total 57

Page 8 of 9

HIGHLY CONFIDENTIAL                                                                 SMS-EH338609

# EXHIBIT

# 3

**SSCC**
**Operating Revenue/Profit / EBITDA / Mill Tons**
**2005-2014**

**Revenue ($MMs)**

| Segment Revenue | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total SSCC Segment Revenue | 8,398.0 | 7,944.0 | 7,420.0 | 7,042.0 | 5,574.0 | 6,192.6 | 6,334.9 | 6,509.5 | 6,700.6 | 6,902.7 |
| Less Consumer | (1,584.0) | (787.0) | - | - | - | - | - | - | - | - |
| Total SSCC Segment Revenue w/o Consumer | 6,812.0 | 7,157.0 | 7,420.0 | 7,042.0 | 5,574.0 | 6,192.6 | 6,334.9 | 6,509.5 | 6,700.6 | 6,902.7 |
| Less Sold & Closed Facilities: | | | | | | | | | | |
| Bathurst | (13.3) | | | | | | | | | |
| Brewton | (186.5) | (232.3) | (190.7) | | | | | | | |
| Missoula | (27.9) | (36.3) | (81.0) | (46.0) | (33.3) | (0.0) | | | | |
| New Richmond | (5.9) | | | | | | | | | |
| Ontonagon | (1.4) | (1.2) | (4.0) | (14.9) | (0.2) | | | | | |
| Snowflake | (12.4) | (19.4) | (20.1) | (12.0) | (3.4) | | | | | |
| Pontiac | (110.4) | (127.3) | (142.0) | (118.8) | | | | | | |
| Cartrage | | (0.0) | | | | | | | | |
| LA | (12.0) | (13.8) | (15.6) | | | | | | | |
| **Adjusted Segment Revenue** | 6,442.3 | 6,726.8 | 6,966.6 | 6,851.3 | 5,537.1 | 6,192.6 | 6,334.9 | 6,509.5 | 6,700.6 | 6,902.7 |

**EBITDA ($MMs)**

| EBITDA | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total SSCC DS EBITDA | 605 | 707.0 | 755.0 | 439.0 | 362.2 | 513.5 | 547.5 | 640.2 | 669.5 | 666.4 |
| Less Consumer | (126.0) | (43.0) | - | - | - | - | - | - | - | - |
| Total SSCC DS EBITDA w/o Consumer | 479.0 | 664.0 | 755.0 | 439.0 | 362.2 | 513.5 | 547.5 | 640.2 | 669.5 | 666.4 |
| Less Sold & Closed Facilities: | | | | | | | | | | |
| Bathurst | (1.6) | (1.8) | (0.8) | 1.1 | 1.0 | 0.2 | | | | |
| Brewton | (58.7) | (87.5) | (62.1) | (0.3) | 0.0 | | | | | |
| Missoula | (31.4) | (62.1) | (52.0) | (54.9) | (19.5) | 4.6 | | | | |
| New Richmond | (0.7) | 3.0 | 1.5 | 1.6 | 1.0 | (0.1) | | | | |
| Ontonagon | (13.1) | (32.8) | (25.8) | (26.7) | 9.1 | 3.1 | | | | |
| Snowflake | (2.4) | (12.6) | (4.1) | (2.1) | 0.0 | | | | | |
| Pontiac | 2.6 | 3.1 | (8.7) | 1.7 | 2.0 | 0.3 | | | | |
| Cartrage | (2.0) | (6.5) | (1.7) | 0.1 | 0.0 | | | | | |
| LA | (4.4) | (17.1) | (20.4) | (0.7) | (0.0) | | | | | |
| **Adjusted DS EBITDA** | 367.3 | 449.7 | 580.9 | 358.7 | 355.9 | 521.6 | 547.5 | 640.2 | 669.5 | 666.4 |

**Mill Capacity Tons (000s)**

| Mill Capacity Tons | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Mill Capacity Tons | 9,109 | 8,460 | 8,637 | 7,990 | 7,680 | 6,747 | 6,943 | 6,945 | 6,945 | 6,945 |
| Less Sold & Closed Facilities: | | | | | | | | | | |
| Bathurst - Closed 8/2005 & Sold 1/2010 | (243) | | | | | | | | | |
| Brewton - Sold 9/2007 | (490) | (488) | (367) | | | | | | | |
| Fernandina PM2 - Idled 4/2001 | (190) | | | | | | | | | |
| Missoula - Closed 1/2010 | (563) | (585) | (627) | (520) | (616) | | | | | |
| New Richmond - Closed 8/2005 & Sold 2/2010 | (234) | | | | | | | | | |
| Ontonagon - Closed 9/2009 | (266) | (264) | (276) | (280) | (260) | | | | | |
| Snowflake - Closed 10/2008 | (123) | (126) | (135) | (105) | | | | | | |
| Pontiac - Closed 11/2008 & Sold 1/2010 | (245) | (245) | (264) | (210) | | | | | | |
| Cartrage - Closed 6/2007 & Sold 5/2009 | (48) | (48) | (23) | | | | | | | |
| LA - Closed 6/2007 & Sold 12/2007 | (145) | (144) | (72) | | | | | | | |
| **Adjusted Mill Capacity tons** | 6,561 | 6,560 | 6,873 | 6,775 | 6,784 | 6,747 | 6,943 | 6,945 | 6,945 | 6,945 |

| SSCC Containerboard Tons Produced | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| Total SSCC Containerboard Tons Produced | 7,215 | 7,402 | 7,336 | 6,853 | 6,033 | 6,227 | 6,423 |
| % Change | | 2.6% | -0.9% | -6.6% | -12.0% | 3.2% | 3.1% |

**Notes / Comments:**
* Operating Profit excludes working capital interest

Draft - Personal and Confidential
- Attorney/Client Privileged Communication

SMS-EH338603

# EXHIBIT
# 4

**EXHIBIT F**

**Financial Projections**

**Financial Projections**

Management prepared the Financial Projections for the years 2010 through 2014 (the "Projection Period"). The Financial Projections are based on a number of assumptions made by management with respect to the future performance of the Reorganized Debtors' operations. Although management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtor can provide no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' financial results and must be considered. The Financial Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes set forth within.

1.     General

   a.     Methodology – The Financial Projections are based upon the Debtors' detailed operating forecast for 2010, which includes two months of actual results and a forecast for the last ten months of the year. For 2010 – 2014, the Financial Projections incorporate management's assumptions and initiatives, including the impact of the Debtors' operating restructuring initiatives.

   b.     Plan Consummation – The operating assumptions assume that the Plan effective date will be April 30, 2010.

   c.     Macroeconomic and Industry Environment – The Financial Projections are based on management's view of the North America containerboard market supply and demand balance, and corresponding operating rates and pricing, and changes in all cost inputs and expenses. Management's view considered and is fairly consistent with current global forest products industry information and forecast provider, general Wall Street equity research consensus views and/or third party commodity analysts for major macroeconomic and industry cost drivers.

2.     Projected Statements of Operations

   a.     Sales – Consolidated sales include the sales of corrugated packaging, containerboard, kraft paper, market and fluff pulp, solid bleached board and liner, and recycled materials. The Financial Projections assume total external containerboard and corrugated packaging sales of approximately 5.8 million tons in 2009 growing to 6.1 million tons in 2011; in addition to these sales tons, the company also sells market and fluff pulp, kraft paper, solid bleached board and liner and recycled materials. The Financial Projections reflect the January actual and an assumed April Pulp & Paper Week linerboard transaction price movements in 2010, and related contractual lags and movements, with the annual publication pricing increasing steadily from approximately $535 per ton in December 2009 to $684 per ton in 2014.

b.  Cost of Sales – Cost of Sales is projected to improve from 90.1% of sales in 2009 to 86.3% of sales by 2014, driven primarily by the forecasted improving market demand and price, offset somewhat by inflation.

c.  Selling, General, & Administrative Expenses – Selling, General & Administrative ("SG&A") expenses are projected to improve from 10.2% of sales in 2009 to 8.8% of sales in 2014, driven primarily by the forecasted improving market demand and price, and management actions, offset somewhat by inflation.

d.  Net income (loss) – Net income (loss) is expected to improve from net income of $8.4 million in 2009 to net income of $132.3 million in 2014, as market demand and price improve, offset somewhat by increased commodity inflation and other costs.

e.  Adjusted EBITDA – Adjusted EBITDA is expected to improve from $362.2 million in 2009 to $513.5 million in 2010, and improve further to $666.4 million in 2014.  2010 adjusted EBITDA benefits versus 2009 from the permanent mill closures, the full year benefit of scaling cost reductions and investments, improving demand, and improving business conditions, offset somewhat by inflation net of hedges.

f.  Reorganization Items – The 2009 and 2010 Reorganization Items consist of actual and estimated postpetition fees for professional advisors and bank fees directly attributable to the bankruptcy filing and related capital restructuring. Reorganization Items exclude adjustments that may be approved by the bankruptcy court related to the Company's Plan of Reorganization.

g.  Interest Expense – For 2010 through 2014, interest expense projections are based on the Company's proposed debt structure assuming the Company emerges from bankruptcy effective April 30, 2010.

h.  Income Taxes – It is assumed that in connection with our emergence from Chapter 11, our U.S. and Canadian net operating losses will be substantially reduced or eliminated due to the cancellation of indebtedness income. For 2010 through 2014, income tax provisions were projected at the applicable statutory tax rate in the countries in which we operate.

3.  Pension Plan Contributions

At December 31, 2009, the qualified defined benefit retirement plans maintained by the Company were under funded by approximately $1,020 million.  Assuming that the plan of reorganization confirmed by the Bankruptcy Courts provides for the assumption of the defined benefit retirement plans, we will likely be required to make significant cash contributions to these plans under applicable U.S. and Canadian laws over the next several years following emergence from bankruptcy, which will significantly impact future cash flows that might otherwise be available for repayment of debt, capital expenditures, and other corporate purposes. We currently estimate that these cash contributions under the United States and Canadian plans will be approximately $80 million in 2010, and potentially up to approximately $110 million depending upon how unpaid Canadian contributions for 2009 are impacted by the plan of

HIGHLY CONFIDENTIAL                                                    SMS-EH283415

reorganization. For future years, we currently estimate that these contributions will potentially be in the range of approximately $290 to $340 million annually in 2011 through 2014, and will then fall to approximately $240 million in 2015, approximately $190 million in 2016, and approximately $100 million in 2017, at which point almost all of the under funding would be required to be amortized under existing laws and regulations. The actual required amounts and timing of such future cash contributions will be highly sensitive to changes in the applicable discount rates, and to a lesser extent, returns on plan assets, and could also be impacted by future changes in the laws and regulations applicable to plan funding.

4.     Projected Balance Sheets and Statements of Cash Flow

The Company's projected Consolidated Balance Sheets set forth the projected consolidated financial position of the Company, after giving effect to the Proposed Reorganization. The projected Consolidated Balance Sheets were developed based upon the Company's February 28, 2010 balance sheet as adjusted for the Plan and projected results of operations and cash flows over the Projection Period. These Financial Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The projected Consolidated Balance Sheets reflect the current forecasted impact of "fresh start" accounting, which could result in further material change to the projected values of assets and liabilities.

The projected Consolidated Balance Sheets contain certain pro forma adjustments as a result of the Plan Consummation. They also include the debt and other obligations that will continue to remain outstanding and will be paid in the ordinary course of operations. The projected cash balances reflect the effects of anticipated changes in working capital related items. On the Effective Date, actual cash may vary from cash reflected in the projected Consolidated Balance Sheets because of variances in the Financial Projections and potential changes in cash needs to consummate the Plan.

3

**Smurfit-Stone Container Corporation**
**Consolidated Statements of Income**
**($ in thousands)**
**PROJECTED INCOME STATEMENT**

| | 2009 Actual | Q1 2010 Forecast | Q2 2010 Forecast | Q3 2010 Forecast | Q4 2010 Forecast | 2010 Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $5,574,036 | $1,437,874 | $1,563,568 | $1,629,091 | $1,562,051 | $6,192,585 | $6,334,873 | $6,509,460 | $6,700,553 | $6,902,736 |
| Costs and expenses | | | | | | | | | | |
| Cost of goods sold | 5,022,733 | 1,342,576 | 1,446,843 | 1,374,369 | 1,318,314 | 5,482,103 | 5,530,340 | 5,608,135 | 5,779,955 | 5,957,193 |
| Selling and administrative expenses | 568,985 | 151,967 | 144,000 | 141,500 | 139,533 | 577,000 | 590,000 | 605,000 | 595,000 | 604,000 |
| Restructuring (income) expense | 318,900 | (4,400) | 5,000 | 5,000 | 5,000 | 10,600 | 20,000 | 20,000 | 20,000 | 20,000 |
| (Gain) Loss on disposal of assets | 3,203 | 80 | - | - | - | 80 | - | - | - | - |
| Other Operating (Income) Expense | (632,900) | - | - | - | - | - | - | - | - | - |
| Income from operations | $293,115 | ($52,349) | ($32,275) | $108,222 | $99,204 | $122,802 | $185,533 | $276,325 | $305,598 | $321,543 |
| Other income (expense) | | | | | | | | | | |
| DIP financing cost | (63,096) | | | | | | | | | |
| Interest expense, Net | (264,855) | (12,467) | (19,959) | (23,699) | (23,646) | (79,771) | (87,273) | (90,261) | (99,088) | (105,257) |
| Loss on early extinguishment of debt | (19,777) | 0 | | | | 0 | - | - | - | - |
| Foreign currency exchange gains (losses) | (14,600) | 700 | | | | 700 | - | - | - | - |
| Other, net | 13,877 | 1,490 | | | | 1,490 | | | | |
| Income (loss) before reorganization items and income taxes | ($55,336) | ($62,626) | ($52,234) | $84,523 | $75,558 | $45,221 | $98,260 | $186,064 | $206,510 | $216,286 |
| Reorganization items | 40,752 | (24,250) | (10,000) | | | (34,250) | | | | |
| Loss before income taxes | ($14,584) | ($86,876) | ($62,234) | $84,523 | $75,558 | $10,971 | $98,260 | $186,064 | $206,510 | $216,286 |
| (Provision for) benefit from income taxes | 23,000 | (200) | 800 | (2,800) | (3,500) | (5,700) | (39,000) | (73,000) | (80,000) | (84,000) |
| Net income (loss) | $8,416 | ($87,076) | ($61,434) | $81,723 | $72,058 | $5,271 | $59,260 | $113,064 | $126,510 | $132,286 |
| Preferred stock dividends | (11,231) | (2,012) | (671) | | | (2,683) | | | | |
| Net income (loss) available to common stockholders | ($2,815) | ($89,088) | ($62,105) | $81,723 | $72,058 | $2,588 | $59,260 | $113,064 | $126,510 | $132,286 |
| Adjusted EBITDA | $362,245 | $35,105 | $89,803 | $198,640 | $189,993 | $513,541 | $547,549 | $640,195 | $669,468 | $666,413 |

4

SMS-EH283417

**Smurfit-Stone Container Corporation**
**Consolidated Balance Sheets**
**($ in thousands)**

PROJECTED BALANCE SHEET

| | 2009 Actual | Q1 2010 Forecast | Q2 2010 Forecast | Q3 2010 Forecast | Q4 2010 Forecast | 2010 Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash | $705,908 | $674,546 | $209,414 | $335,650 | $479,079 | $479,079 | $413,881 | $486,656 | $512,980 | $543,344 |
| Restricted Cash | 8,697 | 22,391 | 701,144 | 717,982 | 654,569 | 654,569 | 650,560 | 678,569 | 606,569 | 731,569 |
| Receivables | 673,984 | 686,299 | 583,890 | 578,890 | 573,890 | 573,890 | 558,890 | 543,890 | 543,890 | 543,890 |
| Inventories | 451,954 | 468,890 | - | - | - | - | - | - | - | - |
| Refundable Income Taxes | 22,805 | 25,023 | 9,523 | 9,523 | 9,523 | 9,523 | 9,523 | 9,523 | 9,523 | 9,523 |
| Prepaid Expense & Other | 43,390 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 |
| **Total Current Assets** | **$1,904,738** | **$1,935,603** | **$1,562,425** | **$1,700,480** | **$1,775,515** | **$1,775,515** | **$1,690,794** | **$1,766,969** | **$1,811,893** | **$1,877,256** |
| Property, Plant & Equipment (inc Timberland), Net | $3,083,241 | $3,035,479 | $3,028,850 | $2,999,259 | $2,942,882 | $2,942,882 | $2,814,252 | $2,646,443 | $2,528,633 | $2,390,823 |
| PP&E / Intangible Step-Up | - | - | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 |
| Deferred Debt Issuance Costs | 631 | 8,742 | 51,736 | 49,080 | 46,423 | 46,423 | 35,798 | 25,173 | 14,548 | 3,923 |
| Deferred Income Taxes | 22,977 | 21,765 | - | - | - | - | - | - | - | - |
| Other Assets | 65,488 | 49,671 | 49,670 | 49,669 | 49,668 | 49,668 | 49,668 | 39,368 | 39,368 | 26,868 |
| **Total Assets** | **$5,077,075** | **$5,051,260** | **$5,987,805** | **$6,093,611** | **$6,109,613** | **$6,109,613** | **$5,875,637** | **$5,793,077** | **$5,689,566** | **$5,593,995** |
| Current Maturities of Long-Term Debt | $1,352,880 | $1,352,483 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable | 387,333 | 469,177 | 465,635 | 491,730 | 461,652 | 461,652 | 513,652 | 551,652 | 564,652 | 589,652 |
| Accrued Wages & Related Taxes | 144,781 | 134,774 | 147,204 | 155,799 | 164,374 | 164,374 | 160,774 | 160,774 | 160,774 | 160,774 |
| Interest Payable | 12,339 | 13,001 | 68,481 | 59,679 | 54,427 | 54,427 | 54,427 | 54,427 | 54,427 | 54,427 |
| Other Current liabilities | 163,656 | 137,691 | - | - | - | - | - | - | - | - |
| **Total Current Liabilities** | **$2,061,057** | **$2,108,026** | **$681,320** | **$707,208** | **$680,453** | **$680,453** | **$730,853** | **$766,853** | **$779,853** | **$804,853** |
| Long-Term Debt | $879 | $879 | $1,206,987 | $1,203,987 | $1,200,987 | $1,200,987 | $1,062,151 | $1,049,527 | $1,036,006 | $1,024,349 |
| Other Long-Term Liabilities | 116,510 | 112,676 | 1,413,249 | 1,407,060 | 1,372,673 | 1,372,673 | 1,114,873 | 805,873 | 484,473 | 174,173 |
| Deferred Income Taxes | - | 200 | 713,200 | 715,500 | 718,500 | 718,500 | 748,500 | 813,500 | 883,500 | 933,500 |
| **Total Liabilities Not Subject to Compromise** | **$2,178,446** | **$2,221,781** | **$4,014,756** | **$4,033,755** | **$3,972,613** | **$3,972,613** | **$3,656,377** | **$3,435,753** | **$3,184,732** | **$2,936,875** |
| Total Liabilities Subject to Compromise | $4,272,308 | $4,286,865 | - | - | - | - | - | - | - | - |
| **Total Liabilities** | **$6,450,754** | **$6,508,646** | **$4,014,756** | **$4,033,755** | **$3,972,613** | **$3,972,613** | **$3,656,377** | **$3,435,753** | **$3,184,732** | **$2,936,875** |
| Common Stock | $2,540 | $2,540 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Preferred Stock | 105,481 | 105,481 | - | - | - | - | - | - | - | - |
| Additional Paid in Capital | 4,083,596 | 4,085,258 | 1,993,700 | 1,998,785 | 2,003,870 | 2,003,870 | 2,026,870 | 2,051,870 | 2,072,870 | 2,092,870 |
| Retained Deficit | (4,885,702) | (4,973,219) | (20,651) | 61,072 | 133,130 | 133,130 | 192,590 | 305,454 | 431,964 | 564,250 |
| Other Comprehensive Income | (679,153) | (677,446) | - | - | - | - | - | - | - | - |
| **Total Stockholders' Equity** | **($1,373,679)** | **($1,457,386)** | **$1,973,049** | **$2,059,857** | **$2,137,000** | **$2,137,000** | **$2,219,260** | **$2,357,324** | **$2,504,834** | **$2,657,120** |
| **Total Liabilities & Stockholders' Equity** | **$5,077,075** | **$5,051,260** | **$5,987,805** | **$6,093,611** | **$6,109,613** | **$6,109,613** | **$5,875,637** | **$5,793,077** | **$5,689,566** | **$5,593,995** |

5

SMS-EH283418

**Smurfit-Stone Container Corporation**
**Consolidated Statement of Cash Flows**
($ in thousands)
PROJECTED STATEMENT OF CASH FLOWS

| | 2009 Actual | Q1 2010 Forecast | Q2 2010 Forecast | Q3 2010 Forecast | Q4 2010 Forecast | 2010 Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Income/(Loss) | $8,416 | ($897,076) | ($61,434) | $81,723 | $72,058 | $5,271 | $59,260 | $113,064 | $126,510 | $132,286 |
| (Gain) loss on Disposal of Asset | 3,203 | | | | | 80 | | | | |
| (Gain) loss on sale of Disc Segment | 19,777 | | | | | | | | | |
| Loss on Early Pay off of Debt | | | | | | | | | | |
| Depreciation | 364,957 | 84,564 | 85,178 | 85,418 | 85,789 | 340,969 | 342,017 | 343,870 | 343,870 | 343,870 |
| DD&C Amortization | 5,870 | 105 | 1,806 | 2,656 | 2,656 | 7,224 | 110,625 | 110,625 | 110,625 | 110,625 |
| Debt-in-Possession Debt Issuance Costs | 63,096 | | | | | | | | | |
| Qualified Pension Benefits | 108,903 | 27,825 | 2,249 | (6,188) | (4,386) | (10,500) | (248,800) | (309,000) | (321,400) | (316,300) |
| Non Qualified Pension/Retiree Medical | (24,530) | 1,662 | 6,520 | 5,085 | 5,085 | 18,352 | (9,000) | | | |
| Stock Compensation Expense | 8,489 | 5,700 | 1,900 | | | 7,600 | 23,000 | 25,000 | 21,000 | 20,000 |
| 2009 LTIP Emergence Plan | | (100) | 930 | 1,395 | 1,375 | 3,600 | | | | |
| Incentives | | | | | 3,000 | 30,000 | (3,606) | | | |
| Fresh Start Accounting Inventory Write-Up | (26,131) | (2,244) | 14,200 | 2,300 | 3,000 | 17,256 | | | | |
| Deferred Taxes | 14,600 | (700) | | | | (700) | 39,523 | 65,000 | 70,000 | 50,000 |
| Foreign Currency Translation (Gains) Losses | | (3,505) | (7,310) | (6,302) | (2,752) | | | | | |
| Equity Loss (Income) | | 9,250 | 7,532 | | | (19,869) | | | | |
| Non-cash Impairment and Restructuring Charge | 249,825 | 1,165 | | | | 9,250 | 10,000 | 10,000 | 10,000 | 10,000 |
| Reorganization Item - Non-Cash for Executory Contracts | 66,566 | | | | | 8,697 | | | | |
| Change in Restricted Cash | (8,697) | | | | | 8,697 | | | | |
| Decrease (Increase) in Net Working Capital | 363,983 | (17,548) | (18,295) | 19,791 | 43,871 | 27,819 | 60,613 | 25,549 | (11,660) | (16,660) |
| Reversal of Post Petition Unsecured Interest Expense | (165,573) | | | | | | | | | |
| Proceeds from TNH, Net | | 15,491 | | | | 15,491 | | | | |
| Non-cash Hedges | 54,105 | | | | | | | | | 12,500 |
| Other, net (Includes Actual Hedges) | (4,935) | (6,676) | | | | (6,676) | (6,676) | 10,304 | | |
| **Cash Provided by (Used For) Operating Activities** | **$1,094,131** | **$28,033** | **$63,277** | **$185,878** | **$176,606** | **$453,865** | **$283,638** | **$294,799** | **$249,545** | **$252,921** |
| Capital Expenditures | ($172,610) | ($84,208) | ($82,793) | ($56,662) | ($30,247) | ($210,000) | ($210,000) | ($210,000) | ($210,000) | ($210,000) |
| Sale of Assets | 48,055 | 6,084 | | | | 6,084 | | | | |
| Advances to Affiliates | (14,542) | | | | | | | | | |
| **Cash Provided By (Used for) Investing Activities** | **($139,104)** | **($34,214)** | **($82,793)** | **($56,662)** | **($30,247)** | **($203,916)** | **($210,000)** | **($210,000)** | **($210,000)** | **($210,000)** |
| **Cash flow for Debt Paydown** | **$955,027** | **($56,201)** | **($19,516)** | **$122,216** | **$146,449** | **$249,949** | **$73,638** | **$84,799** | **$39,545** | **$42,921** |
| Proceeds from Long-Term Debt | $440,000 | $0 | | $0 | $0 | $0 | | | | |
| Mandatory debt additions (retirements) | (369,432) | (410) | 1,200,000 | | | 1,193,594 | (138,836) | (12,624) | (12,221) | (12,557) |
| Voluntary debt additions (retirement) | | | (1,346,375) | | | (1,346,375) | | | | |
| Change in Restricted Cash | | (14,839) | 14,839 | | | | | | | |
| Deferred Debt Issuance Costs | (63,706) | (8,217) | | | | (8,217) | | | | |
| Preferred Stock Dividends Paid | | | | | | | | | | |
| Bankruptcy Emergence Payments | | | (314,100) | | | (314,100) | | | | |
| Repurchase of Accounts Receivable | (385,073) | | | | | | | | | |
| **Cash Provided by (Used For) Financing Activities** | **($377,621)** | **($23,486)** | **($445,616)** | **($3,000)** | **($3,000)** | **($475,102)** | **($138,836)** | **($12,624)** | **($12,621)** | **($12,557)** |
| Effect of Exchange Rate Changes on Cash | 443 | 325 | | | | 325 | | | | |
| **Net Change in Cash** | **$577,849** | **($29,362)** | **($465,132)** | **$126,216** | **$143,449** | **($224,828)** | **($65,198)** | **$72,175** | **$26,924** | **$30,364** |
| Cash Beginning of Period | 126,059 | 703,908 | 674,546 | 209,413 | 335,630 | 703,908 | 479,079 | 413,881 | 486,055 | 512,980 |
| End of Period | 703,908 | 674,546 | 209,413 | 335,630 | 479,079 | 479,079 | 413,881 | 486,055 | 512,980 | 543,343 |

6

HIGHLY CONFIDENTIAL
SMS-EH283419

# EXHIBIT
# 5

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, <u>et</u> <u>al.</u>, [1] | Case No. 09-10235-BLS |
| Debtors. | Jointly Administered |

**DEBTORS' RESPONSES AND OBJECTIONS TO COMMON OWNERS'
<u>FIRST SET OF DOCUMENT REQUESTS TO THE DEBTORS</u>**

Pursuant to Federal Rules of Civil Procedure 26 and 34 and Federal Rules of Bankruptcy

Procedure 7026 and 7034, Smurfit-Stone Container Corp., *et. al.* (the "<u>Debtors</u>") hereby respond

to Common Owners' ("<u>Common Owners</u>") First Set of Document Requests to the Debtors (the

"<u>Requests</u>" or "<u>Request</u>").

**<u>GENERAL OBJECTIONS</u>**

The following General Objections apply to each of the Requests and shall have the same

force and effect as if set forth in full response to each individually numbered Request.

1.    The Debtors object to these Requests as duplicative of Certain Equity Holders'

First Request for the Production of Documents From the Debtors, dated January 8, 2010 ("<u>Equity</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (803 8), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (TBD), Francobec Company (7735), and 605681 N.B. Inc. (1898).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 150 North Michigan Avenue, Chicago, Illinois 60601.

Requests"), and incorporate their responses thereto.  Pursuant to the parties' meet and confer

teleconference on February 2, 2010, the Debtors have been producing to the Common Owners

documents responsive to the Equity Requests.  The Common Owners agreed to promptly notify

the Debtors if they believe specific documents have been requested in these Requests that are not

included in such productions.

2.      The Debtors also provided the Common Owners with the Debtors' production in

response to Mariner Investment Group, LLC's First Request for the Production of Documents,

dated October 28, 2009 ("Mariner's Requests").  To the extent the Common Owners' Requests

are duplicative of Mariner's Requests, the Debtors will not reproduce documents previously

produced in response to Mariner's Requests.

3.      The Debtors object to Request Nos. 1(h) and 1(i) to the extent they seek the

production of all documents and communications concerning mergers and acquisitions or

proposed sale inquiries.  These documents, to the extent any exist, reflect undisclosed business

strategies, including the potential synergies and business plans associated with potential

transactions with certain counter parties, the premature production of which will cause the

Debtors severe harm and therefore are protected by the business strategy privilege.  The Debtors

will produce all expressions of interest, including any offers or term sheets, following the

expiration of ten business days or any other applicable notice period to the affected counter

parties.  Any mergers and acquisitions documents will be produced subject to the Confidentiality

Agreement dated January 19, 2010.

4.      The Debtors object to each of the Requests to the extent that they are overly

broad, unduly burdensome, seek irrelevant information or are not reasonably calculated to lead to

the discovery of admissible evidence.

2

5.      The Debtors object to the Requests to the extent that they seek information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the joint defense or common interest privilege, or any other applicable privilege or protection.  The Debtors will not produce documents containing such information or will produce such documents only in redacted form.  Any disclosure of information protected from discovery by any applicable privilege or protection is inadvertent and does not constitute a waiver.

6.      The Debtors object to the Requests to the extent that they call for information or documents containing confidential or proprietary information.  The Debtors will only produce such information pursuant to the protective order dated October 23, 2009.

7.      The Debtors object to the Requests to the extent that they purport to impose obligations broader than those imposed by Rules 26 and 34 of the Federal Rules of Civil Procedure and Rules 7026 and 7034 of the Federal Rules of Bankruptcy Procedure.

8.      The Debtors object to the Requests to the extent that they seek information solely in the possession, custody or control of the Common Owners, and to the extent they seek information that is publicly available or that is available to Common Owners from another source more convenient, less burdensome or less expensive.  The Debtors will produce responsive, non-privileged documents responsive to these requests to the extent they exist and can be located in the Debtors' files after a good faith search.

9.      The Debtors object to each of the Requests to the extent that they seek documents that are unnecessarily cumulative or duplicative of documents sought by other Requests.

10.     The Requests for "all" documents are overbroad, unduly burdensome and not calculated to lead to the discovery of admissible evidence.  The Debtors will produce documents

3

that can be located with reasonable diligence.  The Debtors also object to each of the Requests to

the extent that they require a comprehensive search of electronic documents, including email.

Undertaking such a search would entail excessive expense and constitutes an undue burden.  The

Debtors will search electronic documents of custodians who are likely to have responsive

documents, but will not undertake a plenary review of the Debtors' entire electronic database.

11.     The Debtors object to the Requests as overbroad, unduly burdensome and not

calculated to lead to the discovery of admissible evidence because they seek documents dating

from June 1, 2008 to the present.  The Debtors will search for and produce responsive

documents, including email, as set forth in General Objection 10, from January 1, 2009 to the

present.  The Debtors will also produce hard copy documents and electronic documents other

than email containing financial analyses or valuations of the Debtors from June 1, 2008 to the

present to the extent that such documents can be readily identified.

12.     To the extent that the Debtors agree to produce documents in response to a

particular Request, the Debtors do not represent that any documents responsive to the Request do

in fact exist, but only that responsive documents will be produced if they exist, can be located

with reasonable diligence, and are not otherwise protected from disclosure.

13.     The Debtors reserve the right to amend or supplement these responses and

objections, reserve the right to request the return of any inadvertently-produced document, and

do not concede the relevancy or admissibility of any document requested or produced.

## <u>OBJECTIONS TO DEFINITIONS</u>

The following Objections to Definitions apply to each of the Requests and shall have the

same force and effect as if set forth in full response to each individually numbered Request.

14.     The Debtors object to the definition of "Debtors" or "SSCC" in paragraph 6 of the Requests as "the Smurfit-Stone Container Corporation and its debtor and non-debtor affiliates" as vague, ambiguous, and inconsistent with the Common Owners' definition of "Debtors" in the introductory paragraph of the Requests.  The Debtors further object to the definition of "Debtors" or "SSCC" to the extent it includes "non-debtor affiliates."  The Debtors will interpret "Debtors" or "SSCC" to mean SSCC and its debtor subsidiaries as identified in Footnote 1.

15.     The Debtors object to the definition of "Disclosure Statement" in paragraph 8 of the Requests as vague and ambiguous.  The Debtors interpret the phrase "Disclosure Statement" to mean the Disclosure Statement for the Joint Plan of Reorganization for Smurfit-Stone Container Corporation and Its Debtor-Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors, as approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on January 29, 2010 [Docket No. 4534], and entered on the Docket on February 4, 2010 [Docket No. 4735].

16.     The Debtors object to the definition of "Exit Financing" in paragraph 10 of the Requests as vague and ambiguous.  The Debtors interpret "Exit Financing" to mean the Exit Term Loan Facility that the Bankruptcy Court authorized the Debtors to enter on February 16, 2010 [Docket No. 5055], as well as the ABL Exit Facility, for which the Bankruptcy Court authorized the Debtors to Enter into a Commitment Letter and Fee Letters on February 16, 2010 [Docket No. 5056].

17.     The Debtors object to the definition of "Financial Projections" in paragraph 11 of the Requests as vague and ambiguous.  The Debtors interpret "Financial Projections" to mean the Projected Financial Information annexed to the Disclosure Statement as Exhibit C.  The

5

Debtors further object to the definition of "Financial Projections" in paragraph 11 of the
Requests because the phrase "anything else used" is undefined, vague and ambiguous.  The
Debtors also object to "anything else used" as overbroad and burdensome, and to the extent it
calls for a determination of what the Debtors' financial advisors "used," information outside the
Debtors' knowledge.

18.     The Debtors object to the definition of "Financial Statements" in paragraph 12 of
the Requests because the phrase "any other report" is vague and ambiguous.

19.     The Debtors object to the definition of "Management Compensation" in
paragraph 14 of the Requests as vague and ambiguous.  The Debtors interpret "Management
Incentive Plan" and "Management Emergence Equity Grants" to mean the Management
Incentive Plans annexed to the Plan as Exhibit 3.  The Debtors interpret "Patrick Moore's Special
Annual Incentive and Change in Control Payments" to mean Patrick Moore's Employment
Agreement, as described on pages 28-29 of the Disclosure Statement.  The Debtors interpret
"Employment Agreements" to mean the Employment Agreements annexed to the Plan as Exhibit
13.

20.     The Debtors object to the definition of "Pension Plan" in paragraph 15 of the
Requests as vague and ambiguous.  The Debtors interpret "Pension Plan" to mean the pension
plans described on page 54 of the Disclosure Statement.

21.     The Debtors object to the definition of "Plan" in paragraph 16 of the Requests as
vague and ambiguous.  The Debtors also object to the phrase "its equivalent in Canada" as
vague, ambiguous, overbroad, and requiring a legal conclusion.  The Debtors interpret the term
"Plan" to have the meaning given to that term on page 4 of the Disclosure Statement.

22.     The Debtors object to the definitions of "Reorganized SSCC" and "Reorganized Debtors" in paragraph 17 of the Requests as vague and ambiguous.  The Debtors interpret the phrases "Reorganized SSCC" and "Reorganized Debtors" to have the respective meanings given to those phrases on page 64 of the Disclosure Statement.

23.     The Debtors object to the definition of "Tax Attributes" in paragraph 19 of the Requests as vague and ambiguous.  The Debtors interpret "Tax Attributes" to have the meaning given to that term on page 245 of the Disclosure Statement.

24.     The Debtors object to the definition of "Total Enterprise Value" in paragraph 20 of the Requests as vague and ambiguous.  The Debtors interpret "Total Enterprise Value" to have the meaning given to the term "Enterprise Value" on page 227 of the Disclosure Statement.  The Debtors further object to the definition of "Total Enterprise Value" because the phrase "anything else used" is undefined, vague and ambiguous.  The Debtors also object to the phrase "anything else used" as overbroad and burdensome, and to the extent it calls for a determination of what the Debtors' financial advisors "used," information outside the Debtors' knowledge.

25.     The Debtors object to the definition of "Valuation" in paragraph 21 of the Requests as vague and ambiguous.  The Debtors interpret "Valuation" to mean the valuation analysis described on pages 227-32 of the Disclosure Statement.   The Debtors further object to the definition of "Valuation" because the phrase "anything else used" is undefined, vague and ambiguous.  The Debtors also object to the phrase "anything else used" as overbroad and burdensome, and to the extent it calls for a determination of what the Debtors' financial advisors "used," information outside the Debtors' knowledge.

## SPECIFIC OBJECTIONS AND RESPONSES

**REQUEST NO. 1(a):**      All documents and Communications, specifically including e-mails, concerning or relating to the Financial Projections.

**RESPONSE NO. 1(a):**      Subject to the foregoing specific and general objections, the

Debtors will produce responsive, non-privileged documents to the extent they exist and can be

located after a good faith search.

**REQUEST NO. 1(b):**      All documents and Communications, specifically including e-mails, concerning or relating to The Valuation.

**RESPONSE NO. 1(b):**      The Debtors object to this Request to the extent it is

duplicative of Request Nos. 1(d), 1(e) and 1(f) and incorporate their Responses to Request Nos. 1

(d), 1(e) and 1(f).  Subject to the foregoing general and specific objections, the Debtors will

produce responsive, non-privileged documents to the extent they exist and can be located after a

good faith search.

**REQUEST NO. 1(c):**      All documents and Communications, specifically including e-mails, concerning or relating to the Common Stock.

**RESPONSE NO. 1(c):**      The Debtors object to this Request as vague, ambiguous

and unintelligible.  The Debtors further object to this Request as overbroad, unduly burdensome

and not calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 1(d):**      All documents and Communications, specifically including e-mails, concerning or relating to The Total Enterprise Value.

**RESPONSE NO. 1(d):**      The Debtors object to this Request to the extent it is

duplicative of Request Nos. 1(b), 1(e) and 1(f) and incorporate their Responses to Request Nos.

1(b), 1(e) and 1(f).  Subject to the foregoing general and specific objections, the Debtors will

produce responsive, non-privileged documents to the extent they exist and can be located after a good faith search.

**REQUEST NO. 1(e):**       All documents and Communications, specifically including e-mails, concerning or relating to The Debt Capacity.

        **RESPONSE NO. 1(e):**       The Debtors object to this Request to the extent it is duplicative of Request Nos. 1(b), 1(d) and 1(f) and incorporate their Responses to Request Nos. 1(b), 1(d) and 1(f).  Subject to the foregoing general and specific objections, the Debtors will produce responsive, non-privileged documents to the extent they exist and can be located after a good faith search.

**REQUEST NO. 1(f):**       All documents and Communications, specifically including e-mails, concerning or relating to The Financial Statements.

        **RESPONSE NO. 1(f):**       The Debtors object to this Request to the extent it is duplicative of Request Nos. 1(b), 1(d) and 1(e) and incorporate their Responses to Request Nos. 1(b), 1(d) and 1(e).  Subject to the foregoing general and specific objections, the Debtors will produce responsive, non-privileged documents to the extent they exist and can be located after a good faith search.

**REQUEST NO. 1(g):**       All documents and Communications, specifically including e-mails, concerning or relating to The Tax Attributes.

        **RESPONSE NO. 1(g):**       The Debtors object to this Request to the extent it is duplicative of Request Nos. 1(a), 1(b), 1(d) and 1(f) and incorporate their Responses to Request Nos. 1(a), 1(b), 1(d) and 1(f).  Subject to the foregoing general and specific objections, the Debtors will produce responsive, non-privileged documents to the extent they exist and can be located after a good faith search.

9

**REQUEST NO. 1(h):**        All documents and Communications, specifically including e-mails, concerning or relating to M&A.

      **RESPONSE NO. 1(h):**        The Debtors object to this Request to the extent it is duplicative of Request No. 1(i) and incorporate their Response to Request No. 1(i).  The Debtors further object to the Request to the extent it seeks the production of documents and communications concerning merger and acquisition activity, as set forth in General Objection 3.  Subject to the foregoing general and specific objections, the Debtors will produce responsive, non-privileged documents concerning expressions of interest, including any offers or term sheets, of counter parties in any merger and acquisition inquiry to the extent they exist and can be located after a good faith search, and following the expiration of ten business days or any other applicable notice period to the affected counter parties.

**REQUEST NO. 1(i):**        All documents and Communications, specifically including e-mails, concerning or relating to synergies.

      **RESPONSE NO. 1(i):**        The Debtors object to this Request to the extent it is duplicative of Request No. 1(h) and incorporate their Response to Request No. 1(h).  The Debtors further object to the Request as vague in that it fails to identify any parties with whom synergies occur.  The Debtors also object to the Request to the extent it seeks the production of documents and communications concerning merger and acquisition activity, as set forth in General Objection 3.  Subject to the foregoing general and specific objections, the Debtors will produce responsive, non-privileged documents concerning expressions of interest, including any offers or term sheets, of counter parties in any merger and acquisition inquiry to the extent they exist and can be located after a good faith search, and following the expiration of ten business days or any other applicable notice period to the affected counter parties.

**REQUEST NO. 1(j):**        All documents and Communications, specifically including e-mails, concerning or relating to The Management Compensation.

      **RESPONSE NO. 1(j):**        The Debtors object to this Request as overly broad and not

calculated to lead to the discovery of admissible evidence.  Subject to the foregoing general and

specific objections, the Debtors will produce responsive, non-privileged documents to the extent

they exist and can be located after a good faith search.

**REQUEST NO. 1(k):**        All documents and Communications, specifically including e-mails, concerning or relating to The Pension Plan.

      **RESPONSE NO. 1(k):**        The Debtors object to this Request as overbroad and

burdensome to the extent it seeks everything concerning the Debtors' pension obligations.

Subject to the foregoing general and specific objections, the Debtors will produce responsive,

non-privileged documents to the extent they exist and can be located after a good faith search.

**REQUEST NO. 1(l):**        All documents and Communications, specifically including e-mails, concerning or relating to The Exit Financing.

      **RESPONSE NO. 1(l):**        The Debtors object to this Request as overly broad, unduly

burdensome and not calculated to lead to the discovery of admissible evidence.  Subject to the

foregoing general and specific objections, the Debtors will produce responsive, non-privileged

documents to the extent they exist and can be located after a good faith search.

Dated: March 3, 2010                    Respectfully submitted,


                                        By: __/s Richard B. Kapnick _____
                                        SIDLEY AUSTIN LLP
                                        Richard B. Kapnick
                                        Matthew A. Clemente
                                        One South Dearborn Street
                                        Chicago, Illinois  60603
                                        Telephone:  (312) 853-7000
                                        Facsimile:  (312) 853-7036

<u>**CERTIFICATE OF SERVICE**</u>

        I, Ashley K. Martin, an attorney, hereby certify that I have caused a true and correct copy of the foregoing **Debtors' Responses And Objections To Common Owners' First Set of Document Requests to the Debtors** to be served on counsel listed below by electronic mail on this 3rd day of March, 2010.


David S. Rosner
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019



                       ___/s/ _Ashley K. Martin_____
                       Attorney Signature



**SIDLEY AUSTIN LLP**
ONE SOUTH DEARBORN STREET
CHICAGO, IL 60603
(312) 853 7000
(312) 853 7036 FAX

kpecoraro@sidley.com
(312) 853 7372

| | |
|---|---|
| BEIJING | NEW YORK |
| BRUSSELS | PALO ALTO |
| CHICAGO | SAN FRANCISCO |
| DALLAS | SHANGHAI |
| FRANKFURT | SINGAPORE |
| GENEVA | SYDNEY |
| HONG KONG | TOKYO |
| LONDON | WASHINGTON, D.C. |
| LOS ANGELES | |
| | |
| FOUNDED 1866 | |

March 26, 2010

**By Email**

Kara F. Headley
Kasowitz, Benson, Torres, & Friedman LLP
1633 Broadway
New York, New York 10019

      Re:     <u>In re Smurfit-Stone Container Corp.</u>

Dear Kara:

      I write in response to your email today requesting that the Debtors update their Responses to the Common Owners' Interrogatories.

      The Debtors' Response to Interrogatory No. 4 is supplemented as follows: The Debtors updated or changed the information contained in the Financial Projections on March 23, 2010, as reflected in Equity Deposition Exhibit 2.

      The Debtors' Response to Interrogatory No. 5 is supplemented as follows: SMS-EH334351-334357 supplements Exhibit B referenced in the Response to Interrogatory No. 5.

      Very truly yours,

      */s/ Kevin C. Pecoraro*

KP:lar

| From: | Denton, Matt <MDENTON@SMURFIT.COM> |
|---|---|
| Sent: | Wednesday, March 24, 2010 7:59 PM (GMT) |
| To: | Moore, Patrick J. <PMOORE@SMURFIT.COM>; Klinger, Steven J. <SKLINGER@SMURFIT.COM>; Hunt, Craig <CHUNT@SMURFIT.COM>; Bill Levin <bill@tlglp.com> |
| Cc: | Oswald, Mike <MOSWALD@SMURFIT.COM>; Lundberg, Bob <BLUNDBER@SMURFIT.COM>; Harrison, David P. <DHarrison@SMURFIT.COM>; Krueger, William J. <WKRUEGER@SMURFIT.COM>; Burke, Peter <PBurke@SMURFIT.COM>; Exner, Mike <MExner@SMURFIT.COM> |
| Subject: | Inflation Price Trends 2009-14 (March POR vs Dec POR).pdf |
| Attach: | Inflation Price Trends 2009-14 (March POR vs Dec POR).pdf |

Attached are the commodity assumptions forecast changes between the December 2009 vs March 2010 POR by major commodity:

All commodity assumption forecasts were provided the commodity owners in our company responsible for procurement of these commodities, and they also referenced the same commodity forecast sources for both PORs. Changes in our commodity cost assumptions forecast reflect actual changes in the market since December, and external sources are reflecting similar changes in their long-term forecasts. The people, sources and process for the March 2010 was the same as the December 2009 commodity assumptions forecast, and the differences are merely due to actual changes and changes in external forecasts; the industry and economic drivers of our demand and price have had a similar impacts on our costs.

Thanks!

Matt Denton
SVP - Business Planning & Analysis
Smurfit-Stone Container Corporation
Six CityPlace Drive
10th Floor
Creve Coeur, MO 63141-7167
Office:   314-656-5688
Cell:     314-941-2498
Home:  314 485-1109
Fax:     314-787-6162

**HIGHLY CONFIDENTIAL**                                                                                                                    **SMS-EH334351**

# EXHIBIT
# 6

# Inflation Assumptions: 2009-14
## March 2010 POR vs. December 22 POR
### Excluding the Impact of Hedges

| | UOM | Volume 2010 | Cost per UOM Assumptions | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Fiber** | | | | | | | | |
| Wood | $ per Green Ton | | | | | | | |
| December POR | | 16,720 | $37.08 | $36.88 | $38.97 | $40.22 | $43.24 | $45.83 |
| March POR | | 16,911 | $37.11 | $38.35 | $40.27 | $43.29 | $43.29 | $46.57 |
| Variance | | | ($0.03) | ($1.47) | ($1.30) | ($3.07) | ($0.05) | ($0.74) |

Comments: RISI used as reference for our base. No one predicted the sharp rise at the end of 2009 / beginning of 2010, which was partially caused by the push for virgin fiber due to Black liquor credits, decreased supply and increased demand, and especially versus secondary fiber. Inventories lowered just as an exceedingly wet winter hampered harvest and pushed up stumpage prices, and added freight miles. 2011 – 2012 overall looks similar, but catches up to the previous forecast in 2013 vs 2012. All indications are still that virgin fiber will be in high demand, due to the sawmill and OSB industries starting to make a comeback, and the government subsidized push for biomass energy from wood. This will keep wood costs above inflation.

| | UOM | Volume 2010 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| Recovered Fiber (mill avg delivered) | $ per Ton | | | | | | | |
| December POR | | 2,391 | $99.06 | $134.06 | $142.84 | $147.84 | $137.84 | $147.84 |
| March POR | | 2,413 | $98.84 | $185.24 | $173.45 | $154.50 | $165.91 | $187.06 |
| Variance | | | $0.22 | ($51.18) | ($30.61) | ($6.66) | ($28.07) | ($39.22) |

Comments: Price acceleration in early 2010 (due to low domestic recovery rates, China exports, stronger domestic demand, etc.), supported by higher containerboard pricing as well as higher wood fiber costs; support level would be exacerbated by an April PPW containerboard movement. Over 2011–2014, domestic demand will remain relatively constant, while recovery rates will increase slightly; however, worldwide demand will pull supply and continue to increase pressure on U.S. exports and domestic pricing. Industry forecasts call for the current economic upturn to continue through 2011, with prices moderating over the next 18 months as the cycle upturn creates additional recovered paper generation, eliminating the current extreme shortages and resulting in moderating prices in 2011. Thereafter, in 2012, as the world economy is forecasted to weaken somewhat, including the withdrawal of the extensive government stimuli, market conditions for recovered paper will weaken, somewhat; however, the downturn is expected to be mild and by 2013, and recovered paper prices are projected to be back on an upward track. Forecast close to RISI.

| | UOM | Volume 2010 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| DLK (Container) (container avg) | $ per Ton | | | | | | | |
| December POR | | 523 | $64.08 | $109.13 | $116.21 | $119.78 | $112.64 | $119.78 |
| March POR | | 524 | $63.33 | $152.80 | $152.49 | $137.40 | $146.88 | $164.21 |
| Variance | | | ($0.75) | $43.67 | $36.28 | $17.62 | $34.24 | $44.43 |

Comments: See "Recovered Fiber" comments above.

HIGHLY CONFIDENTIAL

SMS-EH334352

# Inflation Assumptions: 2009-14
## March 2010 POR vs. December 22 POR
### Excluding the Impact of Hedges

| | UOM (Proxy) | | Volume 2010 | Cost per UOM Assumptions | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Memo: Crude Oil (Proxy)** | | | | | | | | | |
| WTI Spot | $ per BBL | December POR | n/a | $61.87 | $78.67 | $89.00 | $83.00 | $100.00 | $104.00 |
| | | March POR | n/a | $61.66 | $81.90 | $85.15 | $90.75 | $100.48 | $106.76 |
| | | Variance | | $0.21 | ($3.23) | $3.85 | ($7.75) | $0.48 | ($2.76) |
| | | Comments: | Changes based on 3rd party forecasts. 2011 - Used 12 sources for forecast (BOM, EIA, JPM, MAC, RISI, SOCG) Removed high low and averaged to reach $85.15. 2012 - Used 8 sources similar to above with average excluding H/L = $90.75. 2013 - Used 5 sources. 2014 - Used 4 sources (EIA, PIRA, RISI, SOCG). | | | | | | |
| **Energy - Mills** | | | | | | | | | |
| Natural Gas [1] | $ per MMBTU | December POR | 15,156 | $4.607 | $6.355 | $6.650 | $6.800 | $6.950 | $7.150 |
| | | March POR | 15,749 | $4.625 | $5.808 | $6.700 | $6.970 | $7.440 | $7.490 |
| | | Variance | | ($0.018) | $0.547 | ($0.050) | ($0.170) | ($0.490) | ($0.340) |
| | | Comments: | Changes based on 3rd party forecasts. 2011 - Used 11 sources for fcst (BOM, FM, GS, JPM, SOCG, WEEDED, EIA, C.Suisse, PIRA). NYMEX $6.00 plus $.70 basis & transport = $6.70. 2012 - Used 7 sources for fcst (FM, JPM, SOCG, Weeden, C Suisse EIA, PIRA). NYMEX $6.25 plus $.72 basis & transport = $6.97. 2013 - Used 5 sources (FM, JPM, SOCG, EIA, PIRA). NYMEX $6.70 plus basis & transport = $7.44. 2014 - Used 4 sources (FM, SOCG, EIA, PIRA). NYMEX $6.73 plus basis & transport = $7.49. | | | | | | |
| #6 Fuel Oil | $ per BBL | December POR | 1,172 | $50.07 | $73.21 | $70.80 | $72.92 | $75.80 | $78.85 |
| | | March POR | 1,196 | $49.73 | $74.04 | $77.49 | $81.68 | $89.43 | $95.02 |
| | | Variance | | $0.34 | ($0.83) | ($6.69) | ($8.76) | ($13.63) | ($16.17) |
| | | Comments: | Prices for 6 oil based on the historical ratio to crude oil of 89-92%. Sources forecast the ratio will remain at this level due to decrease in 6 oil demand for power generation. | | | | | | |
| Coal | $ per Ton | December POR | 631 | $103.19 | $94.72 | $107.40 | $108.65 | $113.10 | $119.55 |
| | | March POR | 631 | $102.95 | $95.29 | $100.21 | $104.43 | $109.79 | $114.73 |
| | | Variance | | $0.24 | ($0.57) | $7.19 | $4.22 | $3.31 | $4.82 |
| | | Comments: | Changes per RISI. Coal prices forecast based on RISI at 4.9%, 5.0%, 6.2% and 5.2% 2011 - 2014. Freight forecast based on RISI at 6.0%, 2.7%, 1.6% and 3.0% 2011 - 2014. | | | | | | |

Page 2 of 6

HIGHLY CONFIDENTIAL

SMS-EH334353

# Inflation Assumptions: 2009-14
## March 2010 POR vs. December 22 POR
### Excluding the Impact of Hedges

|  | UOM |  | Volume 2010 | Cost per UOM Assumptions | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| Electricity [1] | $ per MKWH | December POR | 2,526 | $0.0578 | $0.0610 | $0.0625 | $0.0639 | $0.0665 | $0.0706 |
|  |  | March POR | 2,534 | $0.0580 | $0.0611 | $0.0617 | $0.0631 | $0.0646 | $0.0672 |
|  |  | Variance |  | ($0.0002) | ($0.0001) | $0.0008 | $0.0008 | $0.0019 | $0.0034 |
|  |  | Comments: | Changes based on 3rd party forecasts. Used % change from various sources (PIRA, RISI, EIA), which reflect increases in NG prices and increasing renewable energy costs. | | | | | | |

[1] Container Division prices for natural gas & electricity track mill trends.

## Freight - Total

|  | UOM |  | Volume 2010 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|
| Diesel [2] | Cents per Gallon | December POR | 42,000 | 246.70 | 294.13 | 293.00 | 310.00 | 319.00 | 329.00 |
|  |  | March POR | 42,200 | 246.36 | 297.67 | 317.24 | 338.11 | 374.36 | 397.76 |
|  |  | Variance |  | $0.34 | ($3.54) | ($24.24) | ($28.11) | ($55.36) | ($68.76) |
|  |  | Comments: | Consistent with the crude oil forecast noted above. | | | | | | |

[2] Diesel price impact on Fuel Surcharge is formula-driven and varies between truck & rail.

**HIGHLY CONFIDENTIAL**

SMS-EH334354

## Inflation Assumptions: 2009-14
## March 2010 POR vs. December 22 POR
Excluding the Impact of Hedges

| Chemicals - Mills | UOM | Volume 2010 | Cost per UOM Assumptions | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Sulfuric Acid** | $ per Ton | | | | | | | |
| December POR | | 109.5 | $122.06 | $90.87 | $133.94 | $137.96 | $142.10 | $146.36 |
| March POR | | 113.4 | $122.06 | $96.35 | $116.30 | $118.63 | $121.12 | $129.35 |
| Variance | | | $0.00 | ($5.48) | $17.64 | $19.33 | $20.98 | $17.01 |

Comments: Some of our contracts have sulfur-related pricing escalation clauses. 2010 forecast pricing tied to an unscheduled $16/ton increase in sulfur not protected by contracts. 2011-14 pricing based on assumed annual increases in sulfur cost based on current Tampa Green Market (sulfur-based market index); change from December POR based on revised Tampa Green Market forecast.

| | UOM | Volume 2010 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| **Caustic Soda** | $ per Ton | | | | | | | |
| December POR | | 100.9 | $333.53 | $341.00 | $430.85 | $443.77 | $457.08 | $470.80 |
| March POR | | 104.2 | $331.56 | $358.72 | $391.22 | $406.57 | $415.11 | $443.54 |
| Variance | | | $1.97 | ($17.72) | $39.63 | $37.20 | $41.97 | $27.26 |

Comments: CMAI forecasts show higher rise in 2010 than originally forecasted in December and then higher for years 2011-2014 – Caustic is expected to stabilize and will increase slightly (increase has been adjusted down slightly as compared to December POR). All major producers have announced pricing increases to the open market within the past month. CMAI now shows the long-range forecast as decreasing slightly down from Q2-2010 in subsequent periods.

| | UOM | Volume 2010 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| **Sodium Chlorate** | $ per Ton | | | | | | | |
| December POR | | 47.0 | $461.11 | $464.81 | $478.75 | $493.11 | $507.91 | $523.14 |
| March POR | | 48.6 | $460.75 | $464.67 | $494.63 | $504.52 | $515.12 | $550.15 |
| Variance | | | $0.36 | $0.14 | ($15.88) | ($11.41) | ($7.21) | ($27.01) |

Comments: Forecast for 2010 stayed flat – but 2011 – 2014 is expected to increase slightly more than the December POR, due mainly to forecasted increased demand & cost escalation in the electrical markets and other raw materials. As well, transportation costs / fuel surcharges will continue to impact the delivered cost of the sodium chlorate. ERCO announced a price increase for beginning of March. This did not directly affect our current pricing, but will be a factor once our pricing caps expire in Jan 2012.

HIGHLY CONFIDENTIAL

SMS-EH334355

# Inflation Assumptions: 2009-14
## March 2010 POR vs. December 22 POR
### Excluding the Impact of Hedges

## Chemicals - Corrugated

| | UOM | Volume 2010 | Cost per UOM Assumptions | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| **Starch** | $ per M Cwt | | | | | | | |
| December POR | | 1,974 | $19.88 | $17.45 | $21.52 | $22.16 | $22.83 | $23.51 |
| March POR | | 1,976 | $19.88 | $12.29 | $14.75 | $15.50 | $15.95 | $16.36 |
| Variance | | | $0.00 | $5.16 | $6.77 | $6.66 | $6.88 | $7.15 |

Comments: CBOT Corn - 2010 baseline corn of $3.82 forecasted to increase to $4.15, 4.20, 4.20 and 4.30 / b 2011 thru 2014. Co-Product credits expected be unchanged for 2011 but down from 45% to 42.5%. Process fees on average will increase from $4.75 2010 composite to $5.00, 5.25, 5.50 and 5.75 for 2011 - 2014. Average frt of $2.54 from 2010 forecasted to increase 3% / year 2011-20:4. Bagging up 2.5% / yr.

| | UOM | Volume 2010 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Wax** | $ per Lb | | | | | | | |
| December POR | | 33,634 | $0.645 | $0.730 | $0.766 | $0.835 | $0.910 | $0.992 |
| March POR | | 33,670 | $0.645 | $0.747 | $0.825 | $0.905 | $0.955 | $0.995 |
| Variance | | | $0.000 | ($0.017) | ($0.059) | ($0.070) | ($0.045) | ($0.003) |

Comments: Wax market is expected to be in very tight supply for the period 2011-2012 due to reduced refinery operation rates in China (worlds' largest wax producer) and refinery closures particularly in Canada (Shell Canada and Imperial Oil). China's Fushun refinery, one of the worlds largest wax producing refineries, is down to 50% capacity (500ma# vs. 900ma# capacity) into 2012, which will exert near double digit price increases through 2012 with a let up in 2013 and beyond when supplies improve.

HIGHLY CONFIDENTIAL

SMS-EH334356

# Inflation Assumptions
## 3rd Party Sources of Information / Forecasts

| Source of Information | | Commodities referenced: |
|---|---|---|
| BOM | Bank of Montreal | Crude oil, natural gas |
| C Suisse | Credit Suisse | Natural gas |
| CBOT | Chicago Board of Trade | Corn starch |
| CMAI | Chemical Market Associates, Inc | Caustic soda |
| EIA | Energy Information Administration (Department of Energy) | Crude oil, natural gas, electricity |
| FM | Fellon-McCord: Energy management, procurement, risk management and advisory services. | Natural gas |
| GS | Goldman Sachs | Natural gas |
| JPM | JPMorgan Chase | Crude oil, natural gas |
| MAC | Macquarie Group: Macquarie Group (Macquarie) is a global provider of banking, financial, advisory, investment and funds management services. | Crude oil |
| NYMEX | New York Mercantile Exchange | Natural gas |
| PIRA | International energy-consulting firm offering data, analysis, and forecasting on international oil, natural gas, and electricity markets. | Crude oil, natural gas, electricity |
| RISI | Resource Information Systems Inc | Wood, crude oil, natural gas, electricity |
| SOCG | Société Générale | Crude oil, natural gas |
| WEEDEN | Weeden and Co: Energy Trading | Natural gas |

Page 6 of 6

HIGHLY CONFIDENTIAL

SMS-EH334357

# EXHIBIT
# 7



SMURFIT-STONE
solving it from all sides

**2009-14 POR Forecast**

Presentation to Financial Advisors of the
Committee of Unsecured Creditors
and Prepetition Lenders

**March 23, 2010**

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

For Internal Use Only – Do Not Share Externally

www.smurfit-stone.com

**HIGHLY CONFIDENTIAL**                                        **SMS-EH283420**



Even though we adjusted our final POR/2010 Budget versus our initial POR to reflect the run-up in secondary fiber realized in December, secondary fiber pricing has continued to significantly outpace the increase reflected in our final POR. However, our current forecast reflects a ($50)/ton decline in OCC/DLK between May and December, which is contingent on an easing of industry dynamics.

**SMURFIT-STONE**
*solving it from all sides*

| | Dec 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Final POR/Budget** | $ 80 | $ 90 | $ 100 | $ 100 | $ 90 | $ 80 | $ 80 | $ 100 | $ 100 | $ 100 | $ 90 | $ 90 | $ 80 |
| **March Forecast** | $ 80 | $ 110 | $ 140 | $ 175 | $ 175 | $ 175 | $ 155 | $ 155 | $ 155 | $ 155 | $ 135 | $ 125 | $ 125 |
| **Monthly Variance** | | $ 20 | $ 40 | $ 75 | $ 85 | $ 95 | $ 75 | $ 55 | $ 55 | $ 55 | $ 45 | $ 35 | $ 45 |
| | | | | | | | | | | | | | |
| **Final POR/Budget** | | | | $ 97 | | | $ 83 | | | $ 100 | | | $ 87 |
| **March Forecast** | | | | $ 142 | | | $ 168 | | | $ 155 | | | $ 128 |
| **Quarterly Variance** | | | | $ 45 | | | $ 85 | | | $ 55 | | | $ 42 |
| | | | | | | | | | | | | | |
| **Final POR/Budget** | | | | | | | $ 90 | | | | | | $ 93 |
| **March Forecast** | | | | | | | $ 155 | | | | | | $ 142 |
| **Half Year Variance** | | | | | | | $ 65 | | | | | | $ 48 |
| | | | | | | | | | | | | | |
| **Final POR/Budget** | | | | | | | | | | | | | $ 92 |
| **March Forecast** | | | | | | | | | | | | | $ 148 |
| **Annual Variance** | | | | | | | | | | | | | $ 56 |



| | Dec 2009 | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Final POR/Budget | $80 | $90 | $100 | $100 | $90 | $80 | $80 | $100 | $100 | $100 | $90 | $90 | $80 |
| March Forecast | $80 | $110 | $140 | $175 | $175 | $175 | $155 | $155 | $155 | $155 | $135 | $125 | $125 |

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

3

**SMURFIT-STONE**
*solving it from all sides*

## Total SSCC
## 2009-10 Inflation
### Deflation / <Inflation>

Inflation is forecast to impact 2010 by <$253.4 MM>, <$92.9MM> worse than Budget of <$160.6MM>, nearly reversing the deflation impact of $276.7MM in 2009.

| $ Millions | 2009 Actual | Budget | 2010 Forecast | Variance |
|---|---|---|---|---|
| **Fiber** | | | | |
| Wood | $59.7 | $3.3 | (21.5) | (24.9) |
| Recovered Fiber | $73.3 | ($60.1) | (160.4) | (100.3) |
| **Total Fiber** | $132.9 | ($56.8) | (181.9) | (125.1) |
| Energy [1] | $100.1 | ($47.7) | (36.1) | 11.6 |
| Transportation [1] | $76.9 | ($27.7) | (28.2) | (0.5) |
| Chemicals | $11.6 | $6.6 | 27.8 | 21.2 |
| Comp / Benefits | ($42.4) | ($29.9) | (29.9) | 0.0 |
| General Inflation | ($2.4) | ($5.1) | (5.1) | 0.0 |
| **Pure Inflation Total** | $276.7 | ($160.6) | ($253.4) | ($92.9) |

[1] Excluding impact of hedges.

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

SMS-EH283422

SMURFIT-STONE

*solving it from all sides*

4

**Key driver of 2010 forecast inflation is fiber – with higher prices for wood & recovered fiber (net of DLK revenue) impacting 2010 by <$181.9MM>.**

## 2010 Inflation vs. 2009
### Budget vs. Actual / Forecast
Deflation / <Inflation>

| ($ Millions) | Budget | Full-Year 2010 Forecast [1] | Variance |
|---|---|---|---|
| **Fiber** | | | |
| Wood | 3.3 | (21.5) | (24.9) |
| Recovered Fiber | (60.1) | (160.4) | (100.3) |
| **Total Fiber** | (56.8) | (181.9) | (125.1) |
| Energy [2] | (47.7) | (36.1) | 11.6 |
| Transportation [2] | (27.7) | (28.2) | (0.5) |
| Chemicals | 6.6 | 27.8 | 21.2 |
| Comp & Benefits | (29.9) | (29.9) | 0.0 |
| General (PPI) | (5.1) | (5.1) | 0.0 |
| **Pure Inflation** | **(160.6)** | **(253.4)** | **(92.9)** |

[1] March Forecast.
[2] Excluding the impact of Hedges.

## Key Drivers – Variance vs. Budget:

- Fiber variance of <$125.1MM>: higher recovered fiber prices to the mills of <$123.5MM> and higher wood prices of <$24.9MM> partly offset by higher DLK revenue to the Container Div of +$23.2MM.

- Energy variance of $11.6MM: driven primarily by lower natural gas prices of $9.0MM and lower prices for fuelwood of $3.1MM partly offset by higher prices for #6 fuel oil of <$0.9MM>, coal of <$0.4MM> and electricity of <$0.3MM>.

- Transportation variance of <$0.5MM>: higher average diesel prices driving fuel surcharges of <$1.7MM> nearly offset by contract extensions / savings of $1.2MM.

- Chemicals variance of $21.2MM: key drivers are lower prices for starch of $10.7MM, caustic soda of $6.2MM and sulfuric acid of $3.8MM.

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

HIGHLY CONFIDENTIAL

SMS-EH283423

Case: 1:10-cv-... Case: 09-10235-BLS #: Doc: 7066 ALE... Filed 04/18/19 04/18/19 Page 85 of 85 of 107 108 PageID #:19155

Case: 15-2385     Document: 56-2     Filed: 10/27/2015     Pages: 547

5



**SMURFIT-STONE**
*solving it from all sides*

## The Container Division will fully realize the January 2010 PPW movement price increase by January 2011, and resulting in a total realization of $46.69 vs $50:

| | | Local | | National | | Overall | | $ (MM's) vs Budget | Cumulative $'s vs budget |
|---|---|---|---|---|---|---|---|---|---|
| Act | Feb/Ton | $ | 3.64 | $ | 1.85 | $ | 2.81 | $ 0.9 | $ 0.9 |
| | Feb/Msf | $ | 0.22 | $ | 0.11 | $ | 0.17 | | |
| Fcst | Mar/Ton | $ | 34.45 | $ | 12.09 | $ | 23.87 | $ 8.7 | $ 9.6 |
| | Mar/Msf | $ | 2.08 | $ | 0.73 | $ | 1.44 | | |
| Fcst | Apr/Ton | $ | 44.83 | $ | 23.10 | $ | 34.75 | $ 12.0 | $ 21.7 |
| | Apr/Msf | $ | 2.71 | $ | 1.40 | $ | 2.10 | | |
| Fcst | May/Ton | $ | 47.92 | $ | 28.98 | $ | 38.66 | $ 13.1 | $ 34.7 |
| | May/Msf | $ | 2.90 | $ | 1.75 | $ | 2.34 | | |
| Fcst | Jun/Ton | $ | 48.03 | $ | 29.12 | $ | 39.17 | $ 11.5 | $ 46.3 |
| | Jun/Msf | $ | 2.91 | $ | 1.76 | $ | 2.37 | | |
| Fcst | Jul/Ton | $ | 48.03 | $ | 38.02 | $ | 43.19 | $ 5.1 | $ 51.4 |
| | Jul/Msf | $ | 2.91 | $ | 2.30 | $ | 2.61 | | |
| Fcst | Aug/Ton | $ | 48.81 | $ | 38.83 | $ | 43.99 | $ 4.0 | $ 55.4 |
| | Aug/Msf | $ | 2.95 | $ | 2.35 | $ | 2.66 | | |
| Fcst | Sep/Ton | $ | 49.44 | $ | 38.84 | $ | 44.33 | $ 3.7 | $ 59.1 |
| | Sep/Msf | $ | 2.99 | $ | 2.35 | $ | 2.68 | | |
| Fcst | Oct/Ton | $ | 50.70 | $ | 40.11 | $ | 44.60 | $ 3.8 | $ 62.9 |
| | Oct/Msf | $ | 3.07 | $ | 2.43 | $ | 2.76 | | |
| Fcst | Nov/Ton | $ | 51.36 | $ | 40.12 | $ | 45.90 | $ 3.8 | $ 66.7 |
| | Nov/Msf | $ | 3.11 | $ | 2.43 | $ | 2.78 | | |
| Fcst | Dec/Ton | $ | 51.36 | $ | 40.12 | $ | 45.90 | $ 3.7 | $ 70.4 |
| | Dec/Msf | $ | 3.11 | $ | 2.43 | $ | 2.78 | | |
| Fcst | Jan/Ton | $ | 51.50 | $ | 41.66 | $ | 46.69 | | |
| | Jan/Msf | $ | 3.12 | $ | 2.52 | $ | 2.82 | | |

DRAFT – Personal & Confidential – Attorney–Client Privileged Communication

HIGHLY CONFIDENTIAL

SMS-EH283424

6

So far this year, cost and price have kept pace with each other versus budget, and have been driven by the same industry dynamics; resulting in no net improvement to our 2010 budget from known increases in price versus cost inflation, and assuming a 2H10 decline in OCC/DLK.

**SMURFIT-STONE** 
*solving it from all sides*

All Figures: $ Million

| Inflation vs POR/Budget | Jan-10 | Feb-10 | Mar-10 | 1Q10 | Apr-10 | 1H10 | 2010 |
|---|---|---|---|---|---|---|---|
| Wood | $ (4.2) | $ (2.5) | $ (3.9) | $ (10.7) | $ (4.8) | $ (21.3) | $ (24.9) |
| Secondary Fiber - Mills | $ (2.5) | $ (6.4) | $ (15.2) | $ (24.1) | $ (15.2) | $ (70.0) | $ (123.5) |
| DLK - Container | $ 0.7 | $ 1.5 | $ 3.0 | $ 5.2 | $ 3.1 | $ 14.4 | $ 23.2 |
| Energy | $ 0.1 | $ 1.5 | $ 2.7 | $ 4.2 | $ 1.0 | $ 7.2 | $ 11.6 |
| Transportation | $ 0.2 | $ 0.4 | $ 0.1 | $ 0.7 | $ (0.1) | $ 0.2 | $ (0.5) |
| Chemicals | $ 2.3 | $ 2.3 | $ 2.3 | $ 6.9 | $ 1.9 | $ 12.3 | $ 21.2 |
| Comp/Benefits | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| General Inflation | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Inflation Variance | $ (3.5) | $ (3.3) | $ (11.1) | $ (17.8) | $ (14.2) | $ (57.3) | $ (92.9) |

| Price Increase vs POR/Budget | Jan-10 | Feb-10 | Mar-10 | 1Q10 | Apr-10 | 1H10 | 2010 |
|---|---|---|---|---|---|---|---|
| Rollstock Outside | $ 0.1 | $ 2.4 | $ 3.7 | $ 6.2 | $ 3.7 | $ 15.7 | $ 21.8 |
| Container | $ - | $ 0.9 | $ 8.7 | $ 9.6 | $ 12.0 | $ 46.3 | $ 70.4 |
| Price Increase Variance | $ 0.1 | $ 3.3 | $ 12.4 | $ 15.8 | $ 15.7 | $ 62.0 | $ 92.2 |

| Net Impact - Inflation vs Price | Jan-10 | Feb-10 | Mar-10 | 1Q10 | Apr-10 | 1H10 | 2010 |
|---|---|---|---|---|---|---|---|
| | $ (3.4) | $ - | $ 1.3 | $ (2.0) | $ 1.5 | $ 4.7 | $ (0.7) |

| Currency/FX - Operating Cash: | Jan-10 | Feb-10 | Mar-10 | 1Q10 | Apr-10 | 1H10 | 2010 |
|---|---|---|---|---|---|---|---|
| Mills | $ (2.2) | $ (2.5) | $ (2.0) | # $ (6.7) | $ (2.2) | $ (12.4) | $ (24.2) |
| Container | $ 1.6 | $ 1.6 | $ 1.7 | # $ 4.9 | $ 1.6 | $ 11.5 | $ 24.2 |
| Price Increase Variance | $ (0.6) | $ (0.9) | $ (0.3) | $ (1.8) | $ (0.6) | $ (0.9) | $ - |

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication



Full Year 10 Budget vs. Full Year 10 Fcst, DS EBITDA increases $63.4MM primarily due to: $92.2MM PPW price improvement; ($24.9MM) wood price; ($123.5MM) secondary fiber price; $23.2MM DLK price; $11.8MM Reclamation; $21.2MM chemical negotiation; and $70.6MM potential net impact of an April PPW movement.

HIGHLY CONFIDENTIAL

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

SMS-EH283426



HIGHLY CONFIDENTIAL

SMS-EH283427



SMURFIT-STONE
*solving it from all sides*

# 2009 thru 2014 Annual Sales Price & Volume Assumptions

| | 2009 Actual | 2010 March Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|
| **PRICE ($/Ton)** | | | | | | |
| Linerboard PPW transaction | 553 | 608 | 605 | 631 | 653 | 684 |
| Kraft Bag transaction | 440 | 509 | 559 | 568 | 556 | 607 |
| Market Pulp transaction | 454 | 592 | 660 | 728 | 585 | 639 |
| **VOLUME (MM Tons)** | | | | | | |
| Total Mill Tons Produced (All Products) | 6.567 | 6.747 | 6.943 | 6.945 | 6.945 | 6.945 |
| Containerboard tons produced | 6.033 | 6.227 | 6.423 | 6.426 | 6.426 | 6.426 |
| White top tons produced (excl. Brewton) | 0.794 | 0.978 | 1.018 | 1.020 | 1.020 | 1.020 |
| Containerboard Latin American sales | 0.404 | 0.510 | 0.546 | 0.530 | 0.530 | 0.530 |
| Containerboard external sales | 1.773 | 1.798 | 1.835 | 1.724 | 1.724 | 1.724 |
| Container tons consumed | 4.406 | 4.537 | 4.605 | 4.697 | 4.697 | 4.697 |
| Container external sales tons | 4.033 | 4.203 | 4.266 | 4.351 | 4.351 | 4.351 |
| **DOWNTIME (MM Tons)** | | | | | | |
| Maintenance | 0.158 | 0.177 | 0.177 | 0.177 | 0.177 | 0.177 |
| Economic | 1.056 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |

9

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

HIGHLY CONFIDENTIAL     SMS-EH283428

Case: 1:10-cv-00235-SJD Doc #: 153-27 Filed 04/18/19 Page 90 of 107 PageID #: 19160
Case: 15-2385    Document: 56-2    Filed: 10/27/2015    Pages: 547

10



# 2009 thru 2014 Annual Manufacturing Cost & Usage Assumptions

## SMURFIT-STONE
*solving it from all sides*

| | 2009 Actual | 2010 March Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|
| **WOOD FIBER (MM Tons)** | | | | | | |
| Internal usage | 17.6 | 16.9 | 17.3 | 17.3 | 17.3 | 17.3 |
| Internal price ($ per Green Ton) | 37.11 | 38.35 | 40.27 | 43.29 | 43.29 | 46.57 |
| **RECYCLED FIBER (MM Ton)** | | | | | | |
| Internal mill usage | 2.0 | 2.4 | 2.5 | 2.5 | 2.5 | 2.5 |
| Container DLK Sales | 0.497 | 0.524 | 0.532 | 0.542 | 0.542 | 0.542 |
| OCC Southeast OBM ($ per Ton) | 58 | 148 | 133 | 113 | 123 | 143 |
| **ENERGY USAGE** | | | | | | |
| Natural gas (MM MMBTU) | 15.7 | 15.7 | 15.6 | 15.7 | 15.7 | 15.7 |
| Natural gas price ($ per MMBTU) [1] | 4.625 | 5.808 | 6.700 | 6.970 | 7.440 | 7.490 |
| Fuel Oil (MMBL) | 1.3 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 |
| Fuel Oil price SSCC ($ per BBL) [1] | 49.73 | 74.04 | 77.49 | 81.68 | 89.43 | 95.02 |
| Oil price WTI Spot Proxy ($ per BBL) | 61.66 | 81.90 | 85.15 | 90.75 | 100.48 | 106.76 |
| Coal (MM Tons) | 0.64 | 0.63 | 0.65 | 0.65 | 0.65 | 0.65 |
| Coal price ($ per Ton) | 102.95 | 95.29 | 100.21 | 104.43 | 109.79 | 114.73 |
| Electricity (Billion KWH) | 2.4 | 2.5 | 2.6 | 2.6 | 2.6 | 2.6 |
| Electricity price ($ per MKWH) | 0.0580 | 0.0611 | 0.0617 | 0.0631 | 0.0646 | 0.0672 |
| Diesel (MM Gallons proxy) | 41.0 | 42.2 | 43.1 | 43.5 | 43.5 | 43.5 |
| Diesel price (Cents per Gallon) [1] | 246.36 | 297.67 | 317.24 | 338.11 | 374.36 | 397.76 |
| **HEDGE IMPACTS ($000,000s)** | | | | | | |
| Natural Gas | (23.1) | | | | | |
| Fuel Oil | (20.8) | (0.7) | | | | |
| Transportation | 0.2 | | | | | |
| Currency | (10.7) | | | | | |
| Reclamation | 0.3 | | | | | |

[1] Excludes hedge impact.

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

HIGHLY CONFIDENTIAL

SMS-EH283429

11



## SMURFIT-STONE
*solving it from all sides*

**Corporate Expense – In addition to the management actions and initiatives in 2009, 2009 thru 2014: 2013 corporate expenses decline due to the completion of the 3 current ongoing large IT projects related to Container. The 3 projects are KIWI (production scheduling), Compass (order entry, billing and inventory control) and Maintenance.**

| | 2008A | 2009A | 2010E | 2011E | 2012E | 2013E | 2014E |
|---|---|---|---|---|---|---|---|
| Human Resources & Benefits | $12.3 | $8.6 | $9.1 | $9.6 | $9.8 | $9.9 | $10.1 |
| Bldg Services | $10.5 | $8.4 | $5.7 | $6.2 | $6.3 | $6.3 | $6.3 |
| Treasury | $0.8 | $0.8 | $1.1 | $1.1 | $1.2 | $1.2 | $1.2 |
| Credit | $2.2 | $1.9 | $2.0 | $2.3 | $2.6 | $2.6 | $2.7 |
| Risk Management | $0.0 | $0.0 | $0.0 | ($0.0) | ($0.0) | ($0.0) | ($0.0) |
| Inv Relations | $0.7 | $0.5 | $0.6 | $0.6 | $0.6 | $0.6 | $0.6 |
| Business Planning & Analysis | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 | $0.9 |
| Corp Accounting | $2.2 | $2.2 | $2.2 | $2.1 | $2.2 | $2.2 | $2.2 |
| Finance | $4.5 | $4.7 | $4.8 | $4.3 | $4.3 | $4.3 | $4.4 |
| Int'l Audit | $1.4 | $1.3 | $1.4 | $1.4 | $1.4 | $1.5 | $1.5 |
| Tax | $4.4 | $3.1 | $2.9 | $2.9 | $3.0 | $3.0 | $3.0 |
| Shared Services Finance | $4.3 | $5.0 | $6.3 | $7.3 | $8.7 | $8.9 | $9.0 |
| Legal | $2.9 | $3.2 | $3.2 | $3.1 | $3.2 | $3.2 | $3.2 |
| Environmental Affairs | $2.7 | $2.8 | $2.9 | $2.9 | $3.0 | $3.1 | $3.1 |
| Executive | $18.2 | $24.0 | $18.4 | $15.3 | $15.3 | $15.3 | $15.4 |
| Aviation | $0.5 | $0.5 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 |
| Communication | $3.6 | $1.4 | $2.1 | $2.2 | $2.2 | $2.3 | $2.3 |
| Gov't Affairs | $2.0 | $1.1 | $1.1 | $1.2 | $1.2 | $1.2 | $1.2 |
| FEX | $1.9 | $0.8 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| IT | $79.8 | $72.4 | $72.4 | $74.2 | $71.7 | $72.4 | $73.1 |
| Projects (IT) | $8.5 | $11.3 | $15.1 | $28.1 | $30.8 | $12.8 | $10.9 |
| Corporate Projects | $0.0 | $4.1 | $5.2 | $0.5 | $0.5 | $0.5 | $0.6 |
| Shared Services Benefits & Help Desk | $1.7 | $2.2 | $2.5 | $2.5 | $2.6 | $2.7 | $2.7 |
| Supply / Order Management | $3.9 | $3.3 | $3.0 | $3.0 | $3.0 | $3.1 | $3.2 |
| Traffic & Transportation | $4.7 | $4.7 | $4.7 | $4.8 | $4.9 | $5.0 | $5.1 |
| Procurement | $6.9 | $6.6 | $5.6 | $6.2 | $6.4 | $6.5 | $6.6 |
| Innovation | $0.9 | $0.6 | $0.6 | $0.6 | $0.6 | $0.6 | $0.7 |
| Marketing & Packaging Solutions | $5.5 | $2.8 | $4.0 | $4.0 | $4.1 | $4.1 | $4.2 |
| Research & Development | $3.2 | $3.0 | $5.0 | $5.3 | $5.4 | $5.5 | $5.6 |
| **Total Corporate Overhead** | **$193.9** | **$182.2** | **$182.9** | **$192.8** | **$196.1** | **$180.0** | **$180.0** |

DRAFT – Personal & Confidential – Attorney–Client Privileged Communication

**SMURFIT-STONE**
*solving it from all sides*



# Corporate Other – 2009 thru 2014 corporate other is primarily driven by pension.

**$'s in Millions**
**Expense (Income)**

| | 2008A | 2009A | 2010E | 2011E | 2012E | 2013E | 2014E |
|---|---|---|---|---|---|---|---|
| Pension | $ (9.7) | $ 78.7 | $ 41.2 | $ 20.3 | $ (0.1) | $ (24.6) | $ (47.2) |
| Stock Compensation Expense | 3.3 | 8.5 | 18.4 | 23.0 | 25.0 | 21.0 | 20.0 |
| 2009 Emergergence LTIP Plan | | | 7.6 | | | | |
| Incentives | | | 3.8 | | | | |
| SIP/TOP HAT | 10.0 | 8.8 | 3.2 | 0.7 | 0.4 | 0.5 | 0.5 |
| Hedge - Energy MTM | 13.0 | (13.5) | | | | | |
| Hedge - Interest Rate Swap MTM | 12.0 | | | | | | |
| LTD & LTD IBNR Reserve | (1.5) | | | | | | |
| Workers Compensation | 2.1 | 2.0 | | | | | |
| Retiree Medical - FAS 106 | 0.2 | (6.8) | | | | | |
| Inv In Woodland Holdings Amortization | (2.9) | (1.9) | 4.0 | 6.2 | 6.4 | 6.4 | 6.4 |
| Securitization Expense -- SRC & MBI | 17.2 | (3.0) | (1.2) | (1.6) | (0.7) | (0.7) | (0.7) |
| SRC -- Calpine Bad Debt Reserve Adj | 17.5 | 0.5 | | | | | |
| SRC -- Calpine Rebate Receivable Adj | 4.5 | | | | | | |
| Group Insurance and IBNR | (5.0) | (4.8) | | | | | |
| Project Wheel Expenses | 9.3 | | | | | | |
| Consultants | 5.4 | | | | | | |
| Other Corp Other | 10.6 | 2.5 | 2.7 | 2.4 | 2.4 | 2.4 | 2.3 |
| **Total Other Corporate Expense (Income)** | $ 86.0 | $ 71.6 | $ 79.7 | $ 51.0 | $ 33.4 | $ 5.0 | $ (18.7) |

DRAFT – Personal & Confidential – Attorney–Client Privileged Communication

HIGHLY CONFIDENTIAL

SMS-EH283431

**SMURFIT-STONE**
*solving it from all sides*

# Qualified Pension Expense, Income & Contributions – 2009 thru 2014

($'s in 000)
Income (Expense)

| SSCC Consolidated | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Pension Income (Expense) | (108,800) | (69,400) | (48,500) | (28,100) | (3,600) | 19,000 |
| Contributions | (7,900) | (79,900) | (297,300) | (337,100) | (325,000) | (291,300) |
| Cash Flow Statement, Net | 100,900 | (10,500) | (248,800) | (309,000) | (321,400) | (310,300) |

Notes:
1. Pension information for 2010-2014 based upon data as of January 31, 2010 provided by Mercer
2. U.S. - discount rate assumed to be 5.90%; long term rate of return on assets assumed to be 8.5%
3. Canada - discount rate assumed = 5.85%; long term rate of return on assets assumed approximately 6.3%

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

HIGHLY CONFIDENTIAL

SMS-EH283432

14

# Restructuring – 2009 thru 2014



**SMURFIT-STONE**
*solving it from all sides*

(Expense)/Income

| | 2009 YTD Actual | | | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|
| | Cash | Non-Cash | Total | Forecast | Forecast | Forecast | Forecast | Forecast |
| **General company-wide restructuring (1)** | $ | $ | $ | $ (14,480) | $ (20,000) | $ (20,000) | $ (20,000) | $ (20,000) |
| 2010 Container Closures | | | | (4,784) | | | | |
| 2009 Container Closures | (13,625) | (19) | (13,644) | (584) | | | | |
| 2008 Container Closures | (547) | (291) | (838) | (146) | | | | |
| Container - Scaling and Other | (7,806) | (2,454) | (10,260) | (843) | | | | |
| Property Sales | 565 | 4,146 | 4,711 | 11,257 | | | | |
| *Mill Division* | | | | | | | | |
| Missoula & Ontonagon Closures (2) | (37,232) | (245,123) | (282,355) | (625) | | | | |
| Mill - Other | (8,463) | (2,490) | (10,953) | (336) | | | | |
| **Other** | (1,967) | (3,594) | (5,561) | (59) | | | | |
| **Total Restructuring (Expense)/Income** | $ (69,075) | $ (249,825) | $ (318,900) | $ (10,600) | $ (20,000) | $ (20,000) | $ (20,000) | $ (20,000) |

(1) 2011 - 2014 forecasted restructuring expense based on historical rationalization. Includes $10,000 cash and $10,000 non-cash expense each year.
(2) Cash outlay related to Mill closures expected to occur primarily in 2010.

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

HIGHLY CONFIDENTIAL

SMS-EH283433



**SMURFIT-STONE**
solving it from all sides

# Fresh Start Accounting

- Fresh start accounting is similar to purchase accounting for an acquisition. We are required to fair value all assets and liabilities at the date of emergence.

- Pro-forma financial statements assume an emergence date of May 1, 2010. Adjustments to record the effects of the plan of reorganization and the fair value adjustments are included in the April 2010 balance sheet and cash flow statements.

- The pro-forma financial statements use approximately $2.0 billion as the assumed equity value and $1.2 billion as long term debt upon emergence. Historical equity balances are written-off. Existing debt of approximately $146 million is paid off at emergence.

- Cash emergence disbursements are approximately $314 million, excluding debt repayments.

- Pension and retiree medical liabilities totaling approximately $1.3 billion are reclassed from liabilities subject to compromise to other long term liabilities.

- There are two fresh start inventory accounting adjustments including: a) write-off LIFO reserve of approximately $120 million and b) write-up finished goods and roll stock inventory to fair value for $30 million. The $30 million inventory write-up of finished goods and roll stock inventory will be expensed through the 2010 P&L as inventory is sold.

- Fixed assets and intangible assets will be fair valued by a third party. The fair value assigned to fixed assets and intangible assets will be impacted by the equity valuation.

- A deferred tax liability estimate of approximately $705 million has been established in fresh start accounting for book/tax timing differences related to fixed assets, pension and inventory items.

DRAFT – Personal & Confidential – Attorney–Client Privileged Communication

# SMURFIT-STONE
solving it from all sides

## Taxes – 2010 thru 2014

- We currently project that Cancellation of Indebtedness income (COD) will significantly reduce Net Operating Loss (NOL) carry-forwards, available at 1/1/2011. Based on current COD projections, SSCC does not anticipate any impact to income tax credits (both general business and AMT tax credits), capital loss carry-forwards, and the tax basis of its corporate assets (including depreciable fixed assets).

- Income tax provisions included in projected financials primarily represents taxes computed on pre-tax net income at a blended federal/state and federal/provincial rate. A blended rate of 39% was used for U.S. income and a blended 29% rate was used for Canadian income. For tax purposes, other foreign income was assumed to be $0 for all years. Any differences in computed provision amounts relate to permanent book/tax differences.

- A deferred tax cash flow benefit of $14 million and $9 million was reported in April 2010 and 2011, respectively. The benefit in 2010 is primarily due to an anticipated refund claim for previously remitted AMT taxes paid in 2006 and 2007. Based upon the provisions of the Worker, Homeownership, and Business Assistance Act of 2009 (Pub. Law No. 111-92), SSCC plans to carry-back AMT NOLs incurred in 2008 to the years ended December 31, 2006 and 2007. The benefit in 2011 is primarily due to accelerated use of AMT tax credits under Section 168(k) and other anticipated tax refunds.

- The annual deferred tax cash flow benefits reported in 2012 – 2014 relate to differences between the computed tax provision amounts and the projected cash tax amounts for each year. The difference in these amounts is due to utilization of NOL carry-forwards, AMT tax credits, and book/tax timing differences primarily related to prior installment sales of timberlands, depreciation, and current projected pension funding.

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

SMS-EH283435

# 2010 Budget Monthly & Quarterly Manufacturing Cost & Usage Assumptions

**SMURFIT-STONE** *solving it from all sides*

## 2010 Forecast - Month & Quarter

| | January Actual | February Actual | March | 1st Quarter | April | May | June | 2nd Quarter | July | August | September | 3rd Quarter | October | November | December | 4th Quarter |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PRICE ($/Ton)** | | | | | | | | | | | | | | | | |
| Linerboard PPW transaction | 585 | 585 | 585 | 585 | 585 | 585 | 585 | 585 | 615 | 615 | 615 | 615 | 615 | 615 | 615 | 615 |
| Kraft Bag transaction | 448 | 446 | 506 | 467 | 504 | 523 | 526 | 518 | 523 | 526 | 524 | 525 | 524 | 523 | 527 | 525 |
| Market Pulp transaction | 563 | 595 | 612 | 592 | 632 | 640 | 640 | 637 | 627 | 599 | 573 | 600 | 549 | 531 | 530 | 537 |
| **VOLUME (MM Tons)** | | | | | | | | | | | | | | | | |
| Total Mill Tons Produced (All Products) | 0.578 | 0.530 | 0.589 | 1.696 | 0.523 | 0.553 | 0.569 | 1.645 | 0.563 | 0.581 | 0.554 | 1.698 | 0.550 | 0.554 | 0.574 | 1.708 |
| Containerboard tons produced | 0.537 | 0.492 | 0.543 | 1.572 | 0.479 | 0.509 | 0.525 | 1.513 | 0.518 | 0.536 | 0.514 | 1.567 | 0.514 | 0.510 | 0.530 | 1.574 |
| White top tons produced (excl. Brewton) | 0.081 | 0.080 | 0.089 | 0.250 | 0.076 | 0.076 | 0.081 | 0.233 | 0.084 | 0.082 | 0.083 | 0.249 | 0.079 | 0.083 | 0.084 | 0.246 |
| Containerboard Latin sales | 0.049 | 0.044 | 0.041 | 0.134 | 0.043 | 0.042 | 0.041 | 0.126 | 0.035 | 0.034 | 0.043 | 0.112 | 0.045 | 0.045 | 0.048 | 0.138 |
| Containerboard external sales | 0.174 | 0.168 | 0.140 | 0.482 | 0.146 | 0.145 | 0.149 | 0.440 | 0.143 | 0.141 | 0.153 | 0.437 | 0.154 | 0.145 | 0.140 | 0.439 |
| Container tons consumed | 0.355 | 0.351 | 0.396 | 1.102 | 0.373 | 0.361 | 0.400 | 1.135 | 0.384 | 0.398 | 0.387 | 1.169 | 0.388 | 0.375 | 0.349 | 1.131 |
| Container external sales tons | 0.313 | 0.321 | 0.364 | 0.998 | 0.347 | 0.338 | 0.374 | 1.059 | 0.360 | 0.371 | 0.363 | 1.094 | 0.362 | 0.348 | 0.342 | 1.052 |
| **DOWNTIME (MM Tons)** | | | | | | | | | | | | | | | | |
| Maintenance | 0.010 | 0.008 | 0.025 | 0.042 | 0.025 | 0.029 | 0.000 | 0.055 | 0.024 | 0.007 | 0.015 | 0.046 | 0.008 | 0.014 | 0.013 | 0.035 |
| Economic | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| **WOOD FIBER (MM Tons)** | | | | | | | | | | | | | | | | |
| Internal usage | 1.5 | 1.3 | 1.5 | 4.3 | 1.3 | 1.4 | 1.4 | 4.1 | 1.4 | 1.5 | 1.4 | 4.2 | 1.4 | 1.4 | 1.4 | 4.3 |
| Internal price ($ per Green Ton) | 40.21 | 39.51 | 40.38 | 40.05 | 40.09 | 38.58 | 38.37 | 38.99 | 37.56 | 37.07 | 36.77 | 37.13 | 37.01 | 37.30 | 37.18 | 37.23 |
| **RECYCLED FIBER (MM Tons)** | | | | | | | | | | | | | | | | |
| Internal mill usage | 0.21 | 0.19 | 0.21 | 0.61 | 0.19 | 0.20 | 0.20 | 0.59 | 0.21 | 0.21 | 0.20 | 0.61 | 0.21 | 0.19 | 0.21 | 0.60 |
| Container OLX Sales | 0.044 | 0.045 | 0.051 | 0.139 | 0.043 | 0.041 | 0.045 | 0.130 | 0.043 | 0.044 | 0.043 | 0.130 | 0.043 | 0.041 | 0.041 | 0.125 |
| OCC Southeast OBM ($ per Ton) | 110 | 140 | 175 | 142 | 175 | 175 | 155 | 168 | 155 | 155 | 155 | 155 | 135 | 125 | 125 | 128 |
| **ENERGY USAGE** | | | | | | | | | | | | | | | | |
| Natural gas (MM MMBTU) | 1.5 | 1.5 | 1.8 | 4.8 | 1.4 | 1.2 | 1.1 | 3.6 | 1.1 | 1.1 | 1.1 | 3.4 | 1.2 | 1.4 | 1.4 | 3.9 |
| Natural gas price ($ per MMBTU) [1] | 6.357 | 6.179 | 5.454 | 5.959 | 5.344 | 5.377 | 5.318 | 5.405 | 5.610 | 5.671 | 5.698 | 5.660 | 5.787 | 6.110 | 6.418 | 6.117 |
| Fuel Oil (MMBL) | 0.13 | 0.14 | 0.12 | 0.38 | 0.11 | 0.10 | 0.08 | 0.29 | 0.08 | 0.08 | 0.08 | 0.25 | 0.08 | 0.09 | 0.11 | 0.28 |
| Fuel Oil price SSCC ($ per BBL) [1] | 73.36 | 71.25 | 71.63 | 72.09 | 72.40 | 72.77 | 72.84 | 72.65 | 73.40 | 73.37 | 78.49 | 74.95 | 78.47 | 77.06 | 76.49 | 77.29 |
| Oil price WTI Spot Proxy ($ per BBL) | 78.33 | 76.45 | 80.00 | 78.26 | 82.00 | 84.00 | 84.00 | 83.33 | 83.00 | 83.00 | 82.00 | 82.67 | 83.00 | 83.00 | 84.00 | 83.33 |
| Coal (MM Tons) | 0.06 | 0.05 | 0.05 | 0.16 | 0.05 | 0.06 | 0.05 | 0.15 | 0.05 | 0.05 | 0.05 | 0.15 | 0.05 | 0.05 | 0.16 | 0.16 |
| Coal price ($ per Ton) | 96.07 | 96.53 | 96.52 | 96.37 | 93.96 | 94.89 | 95.18 | 94.71 | 95.13 | 94.89 | 95.47 | 95.15 | 94.71 | 94.99 | 94.88 | 94.86 |
| Electricity (Billion KWH) | 0.21 | 0.19 | 0.21 | 0.61 | 0.21 | 0.21 | 0.21 | 0.63 | 0.22 | 0.22 | 0.21 | 0.65 | 0.22 | 0.21 | 0.22 | 0.64 |
| Electricity price ($ per MWHR) | 0.0553 | 0.0552 | 0.0572 | 0.0559 | 0.0630 | 0.0630 | 0.0619 | 0.0633 | 0.0634 | 0.0625 | 0.0621 | 0.0627 | 0.0628 | 0.0629 | 0.0629 | 0.0629 |
| Diesel (MM Gallons proxy) | 3.5 | 3.3 | 3.6 | 10.4 | 3.5 | 3.4 | 3.6 | 10.5 | 3.5 | 3.6 | 3.5 | 10.7 | 3.6 | 3.5 | 3.5 | 10.6 |
| Diesel price (Cents per Gallon) [1] | 284.50 | 278.50 | 287.00 | 283.33 | 295.00 | 301.00 | 304.00 | 300.00 | 303.50 | 303.50 | 303.00 | 303.33 | 303.50 | 304.00 | 304.00 | 304.00 |
| **HEDGE IMPACTS ($000,000s)** | | | | | | | | | | | | | | | | |
| Natural Gas | (0.4) | (0.3) | | (0.7) | | | | | | | | | | | | |
| Fuel Oil | | | | | | | | | | | | | | | | |
| Transportation | | | | | | | | | | | | | | | | |
| Currency | | | | | | | | | | | | | | | | |
| Reclamation | | | | | | | | | | | | | | | | |

[1] Excludes hedge impact.

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication



# Projected EBITDA

($ in thousands)

SMURFIT-STONE
solving it from all sides

## PROJECTED EBITDA

| | 2009 Actual | Q1 2010 Forecast | Q2 2010 Forecast | Q3 2010 Forecast | Q4 2010 Forecast | 2010 Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | $8,416 | ($87,076) | ($61,434) | $81,723 | $72,058 | $5,271 | $59,260 | $113,064 | $126,510 | $132,286 |
| Income Taxes | (23,000) | 200 | (800) | 2,800 | 3,500 | 5,700 | 39,000 | 73,000 | 80,000 | 84,000 |
| Interest Expense | 264,855 | 12,467 | 19,959 | 23,699 | 23,646 | 79,771 | 87,273 | 90,261 | 99,088 | 105,257 |
| Depreciation Depletion & Amortization | 364,057 | 84,584 | 85,178 | 85,418 | 85,789 | 340,969 | 342,017 | 343,870 | 343,870 | 343,870 |
| Fresh Start Accounting; Inventory Write-Up | - | 30,000 | 30,000 | - | - | 30,000 | | | | |
| Rev of Post Bankruptcy Filing Unsecured Interest Expense | (163,573) | | | | | | | | | |
| **EBITDA** | **$450,755** | **$30,175** | **$72,903** | **$193,640** | **$184,993** | **$461,711** | **$527,549** | **$620,195** | **$649,468** | **$665,413** |
| | | | | | | | | | | |
| SRC & S-MH Discount Expense | 535 | | | | | | | | | |
| Non-Cash Foreign Exchange (Gain) Loss | 14,600 | (700) | | | | (700) | | | | |
| Restructuring Charges | 318,900 | (4,400) | 5,000 | 5,000 | 5,000 | 10,600 | 20,000 | 20,000 | 20,000 | 20,000 |
| Loss on Early Extinguishment of Debt | 19,777 | | | | | | | | | |
| Non-Cash Income & Gains | 1,458 | | | | | | | | | |
| (Gain) Loss on Sale of Fixed Assets | 3,203 | 80 | | | | 80 | | | | |
| DIP Financing Fees | 63,096 | | | | | | | | | |
| Energy Tax Credit | (632,900) | | | | | | | | | |
| 2009 LTIP Emergence Plan | | 5,700 | 1,900 | | | 7,600 | | | | |
| Chapter 11/CCAA Expenses: | | | | | | | | | | |
| Professional Fees | 56,225 | 15,000 | 10,000 | | | 25,000 | | | | |
| Accounts Payable Settlement Gain | (11,104) | (1,650) | | | | (1,650) | | | | |
| Provision for Rejected Leases and Contracts | 77,700 | 10,900 | | | | 10,900 | | | | |
| Other | | | | | | | | | | (19,000) |
| Non-cash Pension Income | | | | | | | | | | |
| **DS EBITDA** | **$362,245** | **$35,105** | **$89,803** | **$198,640** | **$189,993** | **$513,541** | **$547,549** | **$640,195** | **$669,468** | **$666,413** |

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

SSCC has reduced capacity historically to meet declining industry demand, and sold the Brewton facility in September 2009. Adjusting historical EBITDA for these closures and facility sales provides a historical EBITDA comparable to SSCC current and forecasted footprint.

# SMURFIT-STONE
*solving it from all sides*

## Segment Profit ($000)

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total SSCC Segment Profit | 365.0 | 545.0 | 603.7 | 317.3 | 243.2 | 426.6 | 449.3 | 525.8 | 510.6 | 502.9 |
| Less Consumer | (86.0) | (23.0) | - | - | - | - | - | - | - | - |
| Total SSCC Segment Profit w/o Consumer | 279.0 | 522.0 | 603.7 | 317.3 | 243.2 | 426.6 | 449.3 | 525.8 | 510.6 | 502.9 |
| **Less Sold & Closed Facilities:** | | | | | | | | | | |
| Bathurst | 2.2 | (1.7) | (0.7) | 1.2 | 1.1 | 0.2 | | | | |
| Brewton | (43.7) | (71.4) | (49.4) | (0.3) | 0.0 | - | | | | |
| Missoula | (13.3) | (43.4) | (33.1) | (35.8) | 0.1 | 4.6 | | | | |
| New Richmond | 4.0 | 3.1 | 1.7 | 1.7 | 1.2 | (0.1) | | | | |
| Ontonagon | (6.9) | (26.5) | (18.8) | (20.3) | 15.9 | 3.1 | | | | |
| Snowflake | (2.1) | (12.2) | (3.7) | (1.8) | 0.0 | - | | | | |
| Pontiac | 4.7 | 5.1 | (6.5) | 3.4 | 2.1 | 0.3 | | | | |
| Carthage | (1.8) | (6.3) | (1.6) | 0.1 | 0.0 | - | | | | |
| LA | (3.6) | (16.4) | (20.0) | (0.7) | (0.0) | - | | | | |
| **Adjusted Segment Profit** | 218.5 | 352.4 | 471.4 | 265.0 | 263.7 | 434.7 | 449.3 | 525.8 | 510.6 | 502.9 |

## EBITDA ($MM)

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total SSCC DS EBITDA | 605 | 707.0 | 755.0 | 439.0 | 362.2 | 513.5 | 547.5 | 640.2 | 669.5 | 666.4 |
| Less Consumer | (126.0) | (43.0) | - | - | - | - | - | - | - | - |
| Total SSCC DS EBITDA w/o Consumer | 479.0 | 664.0 | 755.0 | 439.0 | 362.2 | 513.5 | 547.5 | 640.2 | 669.5 | 666.4 |
| **Less Sold & Closed Facilities:** | | | | | | | | | | |
| Bathurst | (1.6) | (1.8) | (0.8) | 1.1 | 1.0 | 0.2 | | | | |
| Brewton | (58.7) | (87.5) | (62.1) | (0.3) | 0.0 | - | | | | |
| Missoula | (31.4) | (62.1) | (52.0) | (54.9) | (19.5) | 4.6 | | | | |
| New Richmond | (0.7) | 3.8 | 1.5 | 1.6 | 1.0 | (0.1) | | | | |
| Ontonagon | (11.1) | (23.8) | (25.8) | (26.7) | 9.1 | 3.1 | | | | |
| Snowflake | (2.4) | (12.6) | (4.1) | (2.1) | 0.0 | - | | | | |
| Pontiac | 2.6 | 3.1 | (8.7) | 1.7 | 2.0 | 0.3 | | | | |
| Carthage | (2.0) | (6.5) | (1.7) | 0.1 | 0.0 | - | | | | |
| LA | (4.4) | (17.1) | (20.4) | (0.7) | (0.0) | - | | | | |
| **Adjusted DS EBITDA** | 367.3 | 449.7 | 580.9 | 358.7 | 355.9 | 521.6 | 547.5 | 640.2 | 669.5 | 666.4 |

## Mill Capacity Tons (000)

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Mill Capacity Tons | 9,109 | 8,460 | 8,637 | 7,990 | 7,680 | 6,747 | 6,943 | 6,945 | 6,945 | 6,945 |
| **Less Sold & Closed Facilities:** | | | | | | | | | | |
| Bathurst - Closed 8/2005 & Sold 1/2010 | (243) | | | | | | | | | |
| Brewton - Sold 9/2007 | (490) | (488) | (367) | | | | | | | |
| Fernandina - Idled 4/2001 | (160) | | | | | | | | | |
| Missoula - Closed 1/2010 | (563) | (585) | (627) | (620) | (616) | | | | | |
| New Richmond - Closed 8/2005 & Sold 2/2010 | (234) | | | | | | | | | |
| Ontonagon - Closed 9/2009 | (266) | (264) | (276) | (280) | (280) | | | | | |
| Snowflake - Closed 10/2008 | (123) | (126) | (135) | (105) | | | | | | |
| Pontiac - Closed 11/2008 & Sold 1/2010 | (245) | (245) | (284) | (210) | | | | | | |
| Carthage - Closed 6/2007 & Sold 5/2009 | (48) | (48) | (23) | | | | | | | |
| LA - Closed 6/2007 & Sold 12/2007 | (145) | (144) | (72) | | | | | | | |
| **Adjusted Mill Capacity tons** | 6,561 | 6,560 | 6,873 | 6,775 | 6,784 | 6,747 | 6,943 | 6,945 | 6,945 | 6,945 |

## SSCC Containerboard Tons Produced

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| Total SSCC Containerboard Tons Produced | 7,215 | 7,402 | 7,336 | 6,853 | 6,033 | 6,227 | 6,423 |
| % Change | | 2.6% | -0.9% | -6.6% | -12.0% | 3.2% | 3.1% |

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

19

HIGHLY CONFIDENTIAL  SMS-EH283438

# Projected Income Statement

($ in thousands)

## SMURFIT-STONE
*solving it from all sides*

PROJECTED INCOME STATEMENT

| | 2009 Actual | Q1 2010 Forecast | Q2 2010 Forecast | Q3 2010 Forecast | Q4 2010 Forecast | 2010 Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $5,574,036 | $1,437,874 | $1,563,568 | $1,629,091 | $1,562,051 | $6,192,585 | $6,334,873 | $6,509,460 | $6,700,553 | $6,902,736 |
| Costs and expenses | | | | | | | | | | |
| Cost of goods sold | 5,022,733 | 1,342,576 | 1,446,843 | 1,374,369 | 1,318,314 | 5,482,103 | 5,539,340 | 5,608,135 | 5,779,955 | 5,957,193 |
| Selling and administrative expenses | 568,985 | 151,967 | 144,000 | 141,500 | 139,533 | 577,000 | 590,000 | 605,000 | 595,000 | 604,000 |
| Restructuring (income) expenses | 318,900 | (4,400) | 5,000 | 5,000 | 5,000 | 10,600 | 20,000 | 20,000 | 20,000 | 20,000 |
| (Gain) Loss on disposal of assets | 3,203 | 80 | - | - | - | 80 | - | - | - | - |
| Other Operating (Income) Expense | (632,900) | | | | | | | | | |
| Income from operations | $293,115 | ($52,349) | ($32,275) | $108,222 | $99,204 | $122,802 | $185,533 | $276,325 | $305,598 | $321,543 |
| Other income (expense) | | | | | | | | | | |
| DIP financing cost | (63,096) | | | | | | | | | |
| Interest expense, Net | (264,855) | (12,467) | (19,959) | (23,699) | (23,646) | (79,771) | (87,273) | (90,261) | (99,088) | (105,257) |
| Loss on early extinguishment of debt | (19,777) | 0 | - | - | - | 0 | - | - | - | - |
| Foreign currency exchange gains (losses) | (14,600) | 700 | - | - | - | 700 | - | - | - | - |
| Other, net | 13,877 | 1,490 | - | - | - | 1,490 | - | - | - | - |
| Income (loss) before reorganization items and income taxes | ($55,336) | ($62,626) | ($52,234) | $84,523 | $75,558 | $45,221 | $98,260 | $186,064 | $206,510 | $216,286 |
| Reorganization items | 40,752 | (24,250) | (10,000) | | | (34,250) | | | | |
| Loss before income taxes | ($14,584) | ($86,876) | ($62,234) | $84,523 | $75,558 | $10,971 | $98,260 | $186,064 | $206,510 | $216,286 |
| (Provision for) benefit from income taxes | 23,000 | (200) | 800 | (2,800) | (3,500) | (5,700) | (39,000) | (73,000) | (80,000) | (84,000) |
| Net income (loss) | $8,416 | ($87,076) | ($61,434) | $81,723 | $72,058 | $5,271 | $59,260 | $113,064 | $126,510 | $132,286 |
| Preferred stock dividends | (11,231) | (2,012) | (671) | | | (2,683) | | | | |
| Net income (loss) available to common stockholders | ($2,815) | ($89,088) | ($62,105) | $81,723 | $72,058 | $2,588 | $59,260 | $113,064 | $126,510 | $132,286 |

DRAFT – Personal & Confidential – Attorney–Client Privileged Communication

HIGHLY CONFIDENTIAL

SMS-EH283439

21



# SMURFIT-STONE
*solving it from all sides*

# Projected Balance Sheet
($ in thousands)

## PROJECTED BALANCE SHEET

| | 2009 Actual | Q1 2010 Forecast | Q2 2010 Forecast | Q3 2010 Forecast | Q4 2010 Forecast | 2010 Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash | $703,908 | $674,546 | $209,414 | $335,630 | $479,079 | $479,079 | $413,881 | $486,056 | $512,980 | $543,344 |
| Restricted Cash | 8,607 | 22,391 | | | | | | | | |
| Receivables | 673,984 | 686,299 | 701,144 | 717,982 | 654,569 | 654,569 | 659,569 | 678,569 | 696,569 | 731,569 |
| Inventories | 451,954 | 468,890 | 583,890 | 578,890 | 573,890 | 573,890 | 558,890 | 543,890 | 543,890 | 543,890 |
| Refundable Income Taxes | 22,805 | 25,023 | 9,523 | 9,523 | 9,523 | 9,523 | 0 | 0 | 0 | 0 |
| Prepaid Expense & Other | 43,390 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 | 58,454 |
| **Total Current Assets** | **$1,904,738** | **$1,935,603** | **$1,562,425** | **$1,700,480** | **$1,775,515** | **$1,775,515** | **$1,690,794** | **$1,766,960** | **$1,811,893** | **$1,877,256** |
| Property, Plant & Equipment (inc Timberland), Net | $3,081,241 | $3,035,479 | $3,028,850 | $2,999,259 | $2,942,882 | $2,942,882 | $2,804,252 | $2,666,443 | $2,528,635 | $2,390,823 |
| PP&I / Intangible Step-Up | | | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 | 1,295,124 |
| Deferred Debt Issuance Costs | 631 | 8,742 | 51,736 | 49,080 | 46,423 | 46,423 | 35,798 | 25,173 | 14,548 | 3,923 |
| Deferred Income Taxes | 22,977 | 21,765 | | | | | | | | |
| Other Assets | 65,488 | 49,671 | 49,670 | 49,669 | 49,668 | 49,668 | 49,668 | 39,368 | 39,368 | 26,868 |
| **Total Assets** | **$5,077,075** | **$5,051,260** | **$5,987,805** | **$6,093,611** | **$6,109,613** | **$6,109,613** | **$5,875,637** | **$5,793,077** | **$5,689,566** | **$5,593,995** |
| Current Maturities of Long-Term Debt | $1,352,889 | $1,352,483 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable | 387,333 | 469,177 | 465,635 | 491,730 | 461,652 | 461,652 | 515,652 | 551,652 | 564,652 | 589,652 |
| Accrued Wages & Related Taxes | 144,781 | 134,774 | 147,204 | 155,799 | 164,374 | 164,374 | 160,774 | 160,774 | 160,774 | 160,774 |
| Interest Payable | 12,308 | 13,901 | | | | | | | | |
| Other Current Liabilities | 163,656 | 137,691 | 68,481 | 59,679 | 54,427 | 54,427 | 54,427 | 54,427 | 54,427 | 54,427 |
| **Total Current Liabilities** | **$2,061,057** | **$2,108,026** | **$681,320** | **$707,208** | **$680,453** | **$680,453** | **$730,853** | **$766,853** | **$779,853** | **$804,853** |
| Long-Term Debt | $879 | $879 | $1,206,987 | $1,203,987 | $1,210,987 | $1,210,987 | $1,062,151 | $1,049,527 | $1,036,906 | $1,024,349 |
| Other Long-Term Liabilities | 116,510 | 112,676 | 1,413,249 | 1,407,060 | 1,372,673 | 1,372,673 | 1,114,873 | 865,873 | 484,473 | 174,173 |
| Deferred Income Taxes | | 200 | 713,200 | 715,500 | 718,500 | 718,500 | 748,500 | 813,500 | 883,500 | 933,500 |
| **Total Liabilities Not Subject to Compromise** | **$2,178,446** | **$2,221,781** | **$4,014,756** | **$4,033,755** | **$3,972,613** | **$3,972,613** | **$3,656,377** | **$3,435,753** | **$3,184,732** | **$2,936,875** |
| Total Liabilities Subject to Compromise | $4,272,308 | $4,286,865 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total Liabilities** | **$6,450,754** | **$6,508,646** | **$4,014,756** | **$4,033,755** | **$3,972,613** | **$3,972,613** | **$3,656,377** | **$3,435,753** | **$3,184,732** | **$2,936,875** |
| Common Stock | $2,540 | $2,540 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Preferred Stock | 105,130 | 105,481 | | | | | | | | |
| Additional Paid in Capital | 4,083,596 | 4,085,258 | 1,993,700 | 1,998,785 | 2,003,870 | 2,003,870 | 2,026,870 | 2,051,870 | 2,072,870 | 2,092,870 |
| Retained Deficit | (4,885,792) | (4,973,219) | (20,651) | 61,072 | 133,130 | 133,130 | 192,390 | 305,454 | 431,964 | 564,250 |
| Other Comprehensive Income | (679,153) | (677,446) | | | | | | | | |
| **Total Stockholders' Equity** | **($1,373,679)** | **($1,457,386)** | **$1,973,049** | **$2,059,857** | **$2,137,000** | **$2,137,000** | **$2,219,260** | **$2,357,324** | **$2,504,834** | **$2,657,120** |
| **Total Liabilities & Stockholders' Equity** | **$5,077,075** | **$5,051,260** | **$5,987,805** | **$6,093,612** | **$6,109,613** | **$6,109,613** | **$5,875,637** | **$5,793,077** | **$5,689,566** | **$5,593,995** |

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

22

# Projected Capital Spending 2009 – 2014



SMURFIT-STONE
solving it from all sides

| Capital By Division ($MM) | 2007 | 2008 | 2009 | 2010F | 2011F | 2012F | 2013F | 2014F |
|---|---|---|---|---|---|---|---|---|
| Container Division | 209.2 | 228.1 | 62.5 | 60.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| Mill Division (Including Ontonagon & Missoula) | 139.5 | 127.3 | 66.0 | 136.4 | 135.0 | 142.6 | 142.6 | 142.6 |
| Reclamation Division | 12.9 | 11.2 | 11.0 | 15.7 | 30.9 | 22.2 | 22.2 | 22.2 |
| Division Sub-Total | 361.6 | 366.6 | 139.5 | 212.1 | 215.9 | 214.8 | 214.8 | 214.8 |
| Less Ontonagon & Missoula | - | - | - | (15.4) | (11.0) | (21.0) | (21.0) | (21.0) |
| Division Capital W/O Ontonagon & Missoula | 361.6 | 366.6 | 139.5 | 196.7 | 204.9 | 193.8 | 193.8 | 193.8 |
| Corporate / IT | 22.2 | 27.1 | 33.1 | 25.8 | 32.0 | 19.1 | 19.1 | 19.1 |
| Total | 383.8 | 393.7 | 172.6 | 222.5 | 236.9 | 212.9 | 212.9 | 212.9 |
| Less Capital Review | | | | (12.5) | (26.9) | (2.9) | (2.9) | (2.9) |
| Net Total | 383.8 | 393.7 | 172.6 | 210.0 | 210.0 | 210.0 | 210.0 | 210.0 |

| Capital By Project Type w/o Ontonagon & Missoula ($MM) | 2007 | 2008 | 2009 | 2010F | 2011F | 2012F | 2013F | 2014F |
|---|---|---|---|---|---|---|---|---|
| Defensive | 77.6 | 91.4 | 53.4 | 133.4 | 150.9 | 147.1 | 147.1 | 147.1 |
| Environmental | 48.4 | 8.3 | 6.9 | 9.4 | 10.6 | 9.1 | 9.1 | 9.1 |
| Cost Savings | 45.7 | 19.8 | 15.1 | 8.0 | 6.8 | 8.8 | 8.8 | 8.8 |
| Scaling & Transformational (strategy) | 188.7 | 242.2 | 79.1 | 56.4 | 55.1 | 34.3 | 34.3 | 34.3 |
| Growth | 23.4 | 32.0 | 18.1 | 15.3 | 13.5 | 13.6 | 13.6 | 13.6 |
| Total | 383.8 | 393.7 | 172.6 | 222.5 | 236.9 | 212.9 | 212.9 | 212.9 |
| Less Capital Review | | | 0 | (12.5) | (26.9) | (2.9) | (2.9) | (2.9) |
| Net Total | 383.8 | 393.7 | 172.6 | 210.0 | 210.0 | 210.0 | 210.0 | 210.0 |

| Capital Spending As A % Of Depreciation | 2007 | 2008 | 2009 | 2010F | 2011F | 2012F | 2013F | 2014F |
|---|---|---|---|---|---|---|---|---|
| Depreciation | 360.0 | 357.0 | 364.0 | 341.0 | 342.0 | 343.9 | 343.9 | 343.9 |
| Capital As A % Of Depreciation | 107% | 110% | 47% | 62% | 61% | 61% | 61% | 61% |

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication



# SMURFIT-STONE
*solving it from all sides*

# Exit Financing

- **$650MM ABL**
  - Tenor: 4 Years
  - Rate: Libor + 3.50%
    - Libor Floor: none
  - Unutilized Fee: .75%
  - Fees: 3.0% (includes arranger fees and fees to market/OID)

- **$1.2B Term Loan**
  - Tenor: 6 Years
  - Rate: Libor + 4.75%
    - Libor Floor: 2%
  - Principal Amortization
    - 1% annually, paid quarterly ($3MM) beginning 9/30/10 with bullet maturity
  - Fees: 2.25% (includes arranger fees and fees to market/OID)

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

Case: 1:10-cv-05711-BSJ Document 75-2 Filed 04/18/19 Page 104 of 507 PageID #:19174
Case: 15-2385   Document: 56-2   Filed: 10/27/2015   Pages: 547

24

# Illustrative Consolidated Claims Summary
($ in millions)

**SMURFIT-STONE**
*solving it from all sides*

## CONSOLIDATED LIABILITIES IN ORDER OF ILLUSTRATIVE ABSOLUTE PRIORITY

| Estimated As of April 30, 2010 | Amount |
|---|---|
| Cash (a) | $658.7 |
| **DIP (b)** | |
| U.S Term Loan (DIP) | $0.0 |
| Canadian Term Loan (DIP) | 0.0 |
| **Total DIP** | **$0.0** |
| **Pre-Petition Secured Debt** | |
| U.S. Revolving Facility ($640mm) (c) | $341.7 |
| Canadian Revolving Facility ($360mm) (d) | 198.2 |
| U.S Tranche B Term Loan | 136.8 |
| Canadian Tranche C Term Loan | 287.8 |
| Canadian Tranche C-1 Term Loan | 72.9 |
| Stevenson Drawn LOC | 129.2 |
| SBA Loan | 0.4 |
| S&I Indian Agreement Termination | 39.4 |
| **Total Pre-Petition Secured Debt** | **$1,362.4** |
| **Other** | |
| Mechanics Liens | $3.0 |
| **Total Other** | **$3.0** |
| **Calpine/Cameo** | |
| Calpine-Scured Debt | $41.4 |
| Pre-Petition Unsecured Debt - Cameo | 1.0 |
| Pre-Petition Unsecured Debt - Calpine | 3.8 |
| **Total Calpine/Cameo** | **$46.2** |
| **Administrative Claims** | |
| 503(b)(9) Claims | $25.1 |
| Wilmington Trust Claim | 1.5 |
| Professional Fees | 38.8 |
| Other Administrative Claims | 6.9 |
| **Total Administrative Claims (e)** | **$69.3** |
| **Total Priority Claims** | **$1.7** |
| **Total Before Unsecured Claims** | **$1,482.5** |
| **Unsecured Debt** | |
| 8.375% Unsecured Notes | $400.0 |
| 8.250% Unsecured Notes | 700.0 |
| 7.50% Unsecured Notes | 300.0 |
| 8.00% Unsecured Notes | 675.0 |
| 7.375% Unsecured Notes | 200.0 |
| IRBs | 163.8 |
| **Total Unsecured Notes (f)** | **$2,440.8** |
| **Other Unsecured** | |
| Pre-Petition Accounts Payable | $187.3 |
| Pre-Petition Unsecured Interest | 43.0 |
| Rejected Executory Contracts and Leases | 73.0 |
| Employee (U.S.) | 103.2 |
| Other (g) | 29.7 |
| SSCC | |
| SSCC - Trade | 23.0 |
| SSCC - Employee | 12.2 |
| S-ABH | |
| S-ABH - Trade | 23.0 |
| S-ABH - Employee | 0.0 |
| **Total Other Unsecured** | **$499.4** |
| **Total Unsecured Debt** | **$2,940.2** |
| **Total Obligations** | **$4,422.7** |

### SOURCES

| | |
|---|---|
| Cash | $658.7 |
| Exit Facility (h) | 1,200.0 |
| Equitized Unsecured Claims | 2,883.0 |
| **Total Sources** | **$4,741.6** |

### USES

| | |
|---|---|
| Estimated Cash | $198.2 |
| Secured Debt (j) | 1,362.0 |
| SBA Loan | 0.4 |
| Calpine & Cameo | 46.2 |
| Administrative Claims | 69.3 |
| Priority Claims | 1.7 |
| Mechanics liens | 3.0 |
| Taxes | 2.4 |
| Convenience Claims | 50.0 |
| Assumed Contracts | 10.0 |
| SSCC (Illustrative) | 19.5 |
| S-ABH (Illustrative) | 29.5 |
| Other | 66.5 |
| Equitized Unsecured Claims (i) | 2,883.0 |
| **Total Uses** | **$4,741.6** |

### TOTAL AVAILABILITY

| | |
|---|---|
| Cash | $198.2 |
| RCF | 680.0 |
| Less: LOCs | (101.7) |
| **Total Availability** | **$776.5** |

**Source:** Company Summary of Claims as of 9/22/10

**Note:**
(a) Excludes intercompany claims, medical and certain pension claims. Excludes $7.4mm of Chinese debt and capital leases.
(a) Includes $7.3mm of restricted cash for utilities deposits and $145mm for post-petition LOC funding reversed in April 2010.
(c) Excludes approximately $14.6mm in LCs on U.S. RCF.
(c) Excludes approximately $86.7mm in LCs.
(c) Excludes approximately $0.4mm in LCs. Includes $141mm in SSCC borrowings.
(d) Company estimate.
(f) Includes $41.3mm Hopewell 2015, $30.0mm Coshocton 2013, $58.1mm Hodge 2024, $20.0mm Snowflake 2026, $14.6mm Snowflake 2027, and accrued interest.
(g) Includes $8.0mm environmental, $16.4mm litigation, $0.6mm non-priority tax, $3.0mm hedging agreements, and $1.8mm pension/retirement claims.
(h) Excludes $102mm in total pre/postpetition LCs.
(h) Excludes SBA Loan.
(i) Excludes $23.0mm in SSCC trade payables, $22.0mm in S-ABH trade payables, and $12.2mm in SSCC employee claims.

DRAFT – Personal & Confidential – Attorney–Client Privileged Communication

25



SMURFIT-STONE
solving it from all sides

# Illustrative Cash Summary
($ in millions)

| ESTIMATED AS OF 4/30/10 | |
|---|---|
| **Cash** | |
| **Total Cash** | **$658.7** |
| | |
| **Claims** | |
| Calpine Secured Debt | $43.4 |
| SBA Loan | 0.4 |
| Administrative Claims | 69.3 |
| Priority Claims | 1.7 |
| Mechanics Liens | 3.0 |
| Taxes | 2.4 |
| **Total Claims** | **$120.2** |
| | |
| **Potential Cash Obligations** | |
| Cameo Unsecured | $1.0 |
| Calpine Unsecured | 1.8 |
| Convenience Claims | 50.0 |
| Assumed Contracts | 10.0 |
| SSCCI | 19.5 |
| S-MBI | 29.5 |
| Other | 66.5 |
| Prepetition Paydown | 162.0 |
| **Total Potential Cash Obligations** | **$340.3** |
| | |
| **End Cash Balance** | **$198.2** |

Source: As per Company summary of claims dated 3/22/10

DRAFT – Personal & Confidential – Attorney-Client Privileged Communication

**HIGHLY CONFIDENTIAL**    **SMS-EH283444**



**SMURFIT-STONE**
solving it from all sides

# Working Capital – 2009 thru 2014

- Working capital is forecasted to improve through the forecast period, with management actions for $55 million in 2011 and $45 million in 2012 and improvements from 2009 metrics.

- Annual DSO will be negatively impacted by price increases in the forecast.

- Annual DPO improves due to extending payable terms more consistent with historical practices and realization.

- Inventory improves approximately $15 million in 2011 and 2012, due primarily to the companies' intensive working capital initiatives referred to above; with targeted inventory reductions in rollstock, finished goods inventory, and MRO over the entire forecast horizon. Specific teams with targeted reductions will be directly accountable for these improvements and cash flow delivery.

DRAFT – Personal & Confidential – Attorney–Client Privileged Communication

HIGHLY CONFIDENTIAL                                                                SMS-EH283445

Case: 1:10-cv-00735-BbLS-# Doc #: 56-27 Filed 04/18/19 Page 107 of 108 PageID #:19177
Case: 15-2385   Document: 56-27   Filed: 10/27/2015   Pages: 547

27

# Projected Cash Flows

($ in thousands)



**SMURFIT-STONE**
*solving it from all sides*

PROJECTED STATEMENT OF CASH FLOWS

| | 2009 Actual | Q1 2010 Forecast | Q2 2010 Forecast | Q3 2010 Forecast | Q4 2010 Forecast | 2010 Forecast | 2011 Forecast | 2012 Forecast | 2013 Forecast | 2014 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Income/(Loss) | $8,416 | $(887,076) | $(561,454) | $81,723 | $72,958 | $5,271 | $59,260 | $113,064 | $126,510 | $132,286 |
| (Gain) loss on Disposal of Asset | 3,203 | 80 | | | | 80 | | | | |
| (Gain) loss on sale of Disc Segment | | | | | | | | | | |
| Loss on Early Ext of Debt | 10,777 | | | | | | | | | |
| Depreciation | 344,037 | 84,384 | 85,178 | 85,418 | 85,789 | 340,969 | 342,017 | 343,870 | 343,870 | 343,870 |
| DPOC Amortization | 5,830 | 105 | 1,866 | 2,656 | 2,656 | 7,224 | 10,625 | 10,625 | 10,625 | 10,625 |
| Debtor-in-Possession Debt Issuance Costs | 63,096 | | | | | | | | | |
| Qualified Pension Benefits | 100,906 | 27,825 | 2,249 | (6,188) | (34,386) | (10,500) | (248,880) | (396,000) | (321,400) | (311,300) |
| Non-Qualified Pension/Retiree Medical | (24,530) | | | | | | (9,080) | | | |
| Stock Compensation Expense | 8,489 | 1,662 | 6,320 | 3,085 | 3,385 | 18,352 | 23,000 | 23,000 | 21,000 | 20,000 |
| 2009 LTIP Emergence Plan | | 3,700 | 1,960 | | | 7,660 | | | | |
| Incentives | | (100) | 930 | 1,395 | 1,375 | 3,600 | (3,600) | | | |
| Fresh Start Accounting Inventory Write-Up | | | 30,000 | | | 30,000 | | | | |
| Deferred Taxes | (25,131) | (2,344) | 14,200 | 2,300 | 3,060 | 17,256 | 39,523 | 65,000 | 70,000 | 50,000 |
| Foreign Currency Translation (Gains) Losses | 11,600 | (700) | | | | (700) | | | | |
| Equity Loss (Income) | | | | | | | | | | |
| Non-cash Impairment and Restructuring Charge | 249,825 | (3,505) | (7,510) | (6,302) | (2,752) | (19,869) | 10,000 | 10,000 | 10,000 | 10,000 |
| Reorganization Item - Non-Cash for Executory Contracts | 65,596 | 9,250 | | | | 9,250 | | | | |
| Change in Restricted Cash | (8,697) | 1,165 | 7,532 | | | 8,697 | | | | |
| Decrease (Increase) in Net Working Capital | 363,083 | (17,348) | (18,295) | 19,791 | 43,871 | 27,819 | 60,613 | 25,940 | (11,060) | (16,360) |
| Reversal of Fixed Pension Unsecured Interest Expense | (160,573) | | | | | | | | | |
| Proceeds from DNL Net | | | | | | | | | | |
| Non-cash Hedges | 54,105 | 15,491 | | | | 15,491 | | 10,360 | | 12,360 |
| Other, net (Includes - Actual Hedges) | (1,915) | (6,676) | | | | (6,676) | | | | |
| **Cash Provided By (Used For) Operating Activities** | **$1,094,131** | **$28,013** | **$63,277** | **$185,878** | **$176,596** | **$453,865** | **$283,638** | **$294,799** | **$249,545** | **$252,921** |
| Capital Expenditures | $(172,624) | $(40,298) | $(82,793) | $(56,662) | $(30,247) | $(210,000) | $(210,000) | $(210,000) | $(210,000) | $(210,000) |
| Sale of Assets | 48,655 | 6,084 | | | | 6,084 | | | | |
| Advances to Affiliates | (14,549) | | | | | | | | | |
| **Cash Provided By (Used for) Investing Activities** | **$(139,104)** | **$(34,214)** | **$(82,793)** | **$(56,662)** | **$(30,247)** | **$(203,916)** | **$(210,000)** | **$(210,000)** | **$(210,000)** | **$(210,000)** |
| Cash Flow for Debt Paydown | $955,027 | $(6,201) | $(19,516) | $129,216 | $146,449 | $249,949 | $73,638 | $84,799 | $39,545 | $42,921 |
| Proceeds from Long-Term Debt | $440,000 | $0 | $0 | $0 | $0 | $0 | | | | |
| Mandatory debt additions (retirements) | (360,432) | (419) | 1,200,900 | (3,004) | (3,340) | 1,193,500 | (188,836) | (12,624) | (12,621) | (12,557) |
| Voluntary debt additions (retirements) | | | (1,346,375) | | | (1,346,375) | | | | |
| Change in Restricted Cash | | (14,859) | 14,859 | | | | | | | |
| Deferred Debt Issuance Costs | (63,096) | (8,217) | | | | (8,217) | | | | |
| Preferred Stock Dividends Paid | | | | | | | | | | |
| Bankruptcy Emergence Payments | | | (314,100) | | | (314,100) | | | | |
| Repurchase of Accounts Receivable | (385,035) | | | | | | | | | |
| **Cash Provided by (Used For) Financing Activities** | **$(377,623)** | **$(23,486)** | **$(445,616)** | **$(3,004)** | **$(3,340)** | **$(475,116)** | **$(188,836)** | **$(12,624)** | **$(12,621)** | **$(12,557)** |
| Effect of Exchange Rate Changes on Cash | 443 | 325 | | | | 325 | | | | |
| **Net Change in Cash** | **$577,849** | **$(29,362)** | **$(465,132)** | **$126,216** | **$143,449** | **$(224,828)** | **$(65,198)** | **$72,175** | **$26,924** | **$30,364** |
| Cash Beginning of Period | 126,059 | 703,908 | 674,546 | 209,413 | 335,630 | 703,908 | 479,079 | 413,881 | 486,055 | 512,980 |
| End of Period | 703,908 | 674,546 | 209,413 | 335,630 | 479,079 | 479,079 | 413,881 | 486,055 | 512,980 | 543,343 |
| Pension Expense | 108,800 | 29,025 | 17,349 | 11,512 | 11,514 | 69,400 | 48,850 | 28,100 | 3,600 | (19,189) |
| Pension Contributions | (7,900) | (1,200) | (15,100) | (17,700) | (45,300) | (79,900) | (297,300) | (352,100) | (325,100) | (291,300) |
| **Net Expense (Contribution) (1)** | **100,900** | **27,825** | **2,249** | **(6,188)** | **(34,386)** | **(10,500)** | **(248,800)** | **(300,000)** | **(321,400)** | **(310,300)** |

(1) Excludes multi-employer plans which recognize pension expense as contributions are made to the respective plans.

DRAFT – Personal & Confidential – Attorney–Client Privileged Communication

HIGHLY CONFIDENTIAL

SMS-EH283446

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, et al.,[1] | Case No. 09-10235  (BLS) |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. 4734** |

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING THE JOINT PLAN OF REORGANIZATION FOR SMURFIT-STONE CONTAINER CORPORATION AND ITS DEBTOR SUBSIDIARIES AND PLAN OF COMPROMISE AND ARRANGEMENT FOR SMURFIT-STONE CONTAINER CANADA INC. AND AFFILIATED CANADIAN DEBTORS

WHEREAS, Smurfit-Stone Container Corporation and its subsidiaries, the

debtors and debtors-in-possession in the above-captioned jointly administered cases

(collectively, the "Debtors" and, as reorganized entities after emergence, the "Reorganized

Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code") on January 26, 2009 (the "Petition Date") in the United

States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on the Petition Date, following the commencement of the Chapter 11

Cases, certain of the Debtors -- including Smurfit-Stone Container Canada Inc. ("SSC Canada"),

a wholly-owned subsidiary of SSCE, and certain of its affiliates (collectively, the "Canadian

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, LLC (8169), SLP Finance II, LLC (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 222 North LaSalle Street, Chicago, Illinois 60601.

Debtors")[2] – applied for protection from their creditors in Canada pursuant to the Companies'

Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA") in the Ontario

Superior Court of Justice (Commercial List) (the "Canadian Bankruptcy Court");

   WHEREAS, on or about March 10, 2009, the Bankruptcy Court and the Canadian

Bankruptcy Court approved the Cross-Border Insolvency Protocol, which facilitates coordination

between the Chapter 11 Cases and the CCAA Proceedings (collectively, the "Proceedings") in

order to effectuate an orderly and efficient administration of the Proceedings;

   WHEREAS, the Debtors proposed the Joint Plan of Reorganization for Smurfit-

Stone Container Corporation and Its Debtor Subsidiaries and Plan of Compromise and

Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors, dated

January 29, 2010 (as the same has been or may be further amended, supplemented or modified,

the "Plan");[3]

   WHEREAS, on January 29, 2010 the Bankruptcy Court entered an Order: (I)

Approving the Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation

of Votes to Accept or Reject the Debtors' Joint Plan of Reorganization, (III) Scheduling a

Hearing to Consider Confirmation of the Debtors' Joint Plan of Reorganization and Establishing

Notice and Objection Procedures in Respect Thereof, and (IV) Granting Related Relief [Docket

---

[2] The Canadian Debtors are Smurfit-Stone Container Canada Inc., 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc. Smurfit-MBI and SLP Finance General Partnership also received protection from their creditors pursuant to the CCAA Initial Order (as defined below) but instead sought recognition of their respective Chapter 11 Cases in the Canadian Bankruptcy Court under Section 268 of the Bankruptcy and Insolvency Act, R.S.C. 1985 c. B-3.
[3] Capitalized terms and phrases used but not otherwise defined herein have the meanings given to them in the Plan. The rules of interpretation set forth in Article 1.2 of the Plan apply to this Findings of Fact, Conclusions of Law, and Order Confirming the Joint Plan of Reorganization for Smurfit-Stone Container Corporation and Its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors. In addition, in accordance with Article 1.1 of the Plan, any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. A copy of the Plan (without the exhibits thereto) is attached hereto as Exhibit [C] to the Confirmation Order and incorporated herein by reference.

CH1 5349862v.3

No. 4534] (the "Solicitation Order"), by which the Bankruptcy Court, among other things, (i) approved the Disclosure Statement for the Plan [Docket No. 4735] (the "Disclosure Statement"), (ii) established procedures for the solicitation and tabulation of votes to accept or reject the Plan, (iii) established March 29, 2010 at 4:00 p.m. (Eastern Time) as the deadline by which all Ballots and Master Ballots must have been submitted and received by the Voting Agent (the "Voting Deadline"), (iv) established March 29, 2010 at 4:00 p.m. (Eastern Time) as the deadline by which any objection to Confirmation of the Plan must have been filed with the Court and received by certain parties listed in the Solicitation Order (the "Plan Objection Deadline"), and (v) scheduled a hearing to consider Confirmation of the Plan to commence on April 15, 2010 at 10:00 a.m. (Eastern Time) (the "Confirmation Hearing");

WHEREAS, on February 10, 2010, the Canadian Bankruptcy Court issued a Plan and Meeting Order (the "Plan and Meeting Order") which accepted the filing of the Plan and authorized and directed the Canadian Debtors to convene a meeting of their Creditors (the "Canadian Creditors' Meeting") to consider and vote on the Plan;

WHEREAS, the Canadian Creditors Meeting was held at the Metro Toronto Convention Centre, Constitution Hall, Room 107, North Building, 255 Front Street West, Toronto, Ontario on Tuesday, April 6, 2010 at 2:00 p.m;

WHEREAS, on April 2, 2010, Stephanie Kjontvedt, Vice President and Senior Consultant of Epiq Bankruptcy Solutions LLC ("Epiq") executed an affidavit of service (which was filed with the Bankruptcy Court on April 10, 2010 [Docket No. 6789]) regarding the mailing of notice of the Confirmation Hearing (the "Confirmation Hearing Notice") and solicitation materials in respect of the Plan in accordance with the Solicitation Order (the "Solicitation and Confirmation AOS"). In addition, affidavits of service with respect to publication of the

3

Confirmation Hearing Notice (the form of which was previously approve by the Bankruptcy

Court) were executed by (i) Antoinette Chase, principal clerk of USA Today, on March 3, 2010,

and (ii) Erin Ostenson, Advertising Clerk of The Wall Street Journal, on March 3, 2010

(collectively, the "Publication AOS"), and filed with the Bankruptcy Court on March 4, 2010

and March 10, 2010, respectively [Docket Nos. 5619 and 5755, respectively];

WHEREAS, on February 16, 2010, the Bankruptcy Court entered an Order (I)

Granting Authority to (a) Enter into Exit Term Loan Credit Facility and (b) Execute, Deliver and

Perform all Obligations Under the Related Credit Facility Documents and (II) Approving Certain

Indemnification, Cost Reimbursement and Fee Obligations as an Administrative Expense Claim

[Docket No. 5055] (the "Term Loan Order");

WHEREAS, on April 14, 2010, the Bankruptcy Court entered an Order (I)

Granting Authority to (a) Enter into Exit ABL Revolving Credit Facility and (b) Execute,

Deliver and Perform all Obligations under the Related Credit Facility Documents and (II)

Approving Certain Indemnification, Cost Reimbursement and Fee Obligations as an

Administrative Expense Claim [Docket No. 6968] (the "ABL Order");

WHEREAS, on March 19, 2010, the Debtors filed with the Bankruptcy Court  the

Plan Supplement (as amended, modified or supplemented from time to time) [Docket No. 6044]

which consisted of the following Exhibits to the Plan: (1) Amended and Restated By-Laws of

Reorganized SSCC; (2) Amended and Restated Certificate of Incorporation of Reorganized

SSCC; (3) Management Incentive Plans; (4) Directors and Officers and Creditor Representative

of Reorganized SSCC; (5) Directors and Officers of Reorganized Debtors other than

Reorganized SSCC; (6) Asset Purchase Agreement (Canadian Asset Sale); (7) Canadian Newco

Partnership Agreement; (8) Canadian Holdco Articles of Association; (9) Canadian Holdco

4

Memorandum of Association; (10) List of Previously Assumed Unexpired Leases to be Assigned

to Canadian Newco in Connection with the Canadian Asset Sale; (11) List of Executory

Contracts and Unexpired Leases to be Assumed and Assigned to Canadian Newco in Connection

with the Canadian Asset Sale; (12) Employee Benefit Plans; (13) Employment and Retirement

Benefit Agreements; (14) Restructuring Transactions; and (15) Exit Facility Documentation;

WHEREAS, on March 19, 2010, Deloitte & Touche Inc. (the "Monitor") issued

the Thirteenth Report of the Monitor which was filed in these Chapter 11 Cases on April 9, 2010

[Docket No. 6770] (the "Monitor Report");

WHEREAS, on March 23, 2010, the Debtors filed the Omnibus Motion of the

Debtors and Debtors-in-Possession For an Order Authorizing the Assumption of Certain

Executory Contracts and Unexpired Leases [Docket No. 6145] (the "Assumption Motion")

which contained a list of the executory contracts and unexpired leases[4] the Debtors seek to

assume pursuant to the Plan, along with the proposed cure amounts related thereto;

WHEREAS, on March 25, 2010 the Debtors filed updated projected financial

information relating to the Reorganized Debtors. See Exhibit A to Notice of Filing of Updated

Projected Financial Information in Connection with Certain Litigation with Respect to

Confirmation of the Joint Plan of Reorganization for Smurfit-Stone Container Corporation and

its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container

Canada Inc. and Affiliated Canadian Debtors [Docket No. 6260] (the "Updated Financial

Information");

WHEREAS, on March 26, 2010, the Debtors filed the Twenty-Second Omnibus

Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Executory

---

[4] The Debtors supplemented the list of executory contracts and unexpired leases appearing on Exhibits A through D of the Assumption Motion on April 8, 2010 [Docket No. 6729].

Contracts and Unexpired Leases Pursuant to section 365 of the Bankruptcy Code [Docket No.

6302] (the "<u>Rejection Motion</u>") which contained a list of executory contracts and unexpired

leases the Debtors seek to reject pursuant to the Plan;

WHEREAS, the Debtors received 30 objections to Confirmation of the Plan filed

on or before the Plan Objection Deadline, and one limited objection filed subsequently in

accordance with an extension granted by the Debtors (collectively, the "<u>Objections</u>") by: (i) Pee

Dee Electric Cooperative [Docket No. 4734] (the "<u>Pee Dee Objection</u>"); (ii) Texas Comptroller

of Public Accounts [Docket No. 5727] (the "<u>Texas Comptroller Objection</u>"); (iii) Internal

Revenue Service [Docket No. 6015] (the "<u>IRS Objection</u>"); (iv) Richard Carroll [Docket No.

6168]; (v) County of Ontonagon, Township of Ontonagon and Village of Ontonagon [Docket

No. 6272]; (vi) Gexa Energy, LP [Docket No. 6329] (the "<u>Gexa Objection</u>"); (vii) California

Self-Insurers' Security Fund (limited objection) [Docket No. 6331]; (viii) The Dow Chemical

Company and Rohm and Haas Canada LP [Docket No. 6338]; (ix) Caterpillar Financial Services

Corporation [Docket No. 6344] (the "<u>CAT Objection</u>"); (x) Union Bank of California [Docket

No. 6349] (the "<u>UBC Objection</u>"); (xi) Certain Claimants Represented by Baron & Budd, P.C.

[Docket No. 6354] (the "<u>Baron Objection</u>"); (xii) State of Oregon [Docket No. 6355] (the

"<u>Oregon Objection</u>"); (xiii) the United States Department of Justice [Docket No. 6356] (the

"<u>DOJ Objection</u>"); (xiv) Fort Worth ISD, Arlington ISD and Eagle Mountain-Saginaw ISD

[Docket No. 6357] (the "<u>Fort Worth Objection</u>"); (xv) Andritz Inc. [Docket No. 6359] (the

"<u>Andritz Objection</u>"); (xvi) Montana Department of Revenue [Docket No. 6364] (the "<u>Montana

DOR Objection</u>"); (xvii) Missoula Area Economic Development Corporation [Docket No. 6371]

(the "<u>Missoula Objection</u>"); (xviii) Attorney General of the State of Montana (joinder to the

Missoula Objection) [Docket No. 6376]; (xix) Acting United States Trustee [Docket No. 6372];

6

(xx) Manufacturers & Traders Trust Company [Docket No. 6377] (the "M&T Objection"); (xxi)
IFCO Systems, N.A. [Docket No. 6378]; (xxii) Catalyst Paper Inc. [Docket No. 6379]; (xxiii) the
Stone FinCo II Fund Managers ("Aurelius") [Docket No. 6383] (the "Aurelius Objection" and
together with the M&T Objection, the "Stone FinCo II Objections"); (xxiv) Bond Safeguard
Insurance Co. and Lexon Insurance Co. [Docket No. 6385] (the "Surety Bond Objection"); (xxv)
The CIT Group/Equipment Financing Inc. [Docket No. 6388] (the "CIT Objection"); (xxvi) PPL
EnergyPlus LLC [Docket No. 6389]; (xxvii) Mark W Mayer, Larry C. Welsh and Brandi Young
[Docket No. 6403] (the "ERISA Objection"); (xxviii) Local Texas Tax Authorities [Docket No.
6413] (the "Texas Taxing Authorities Objection"; (xxix) the People of the State of California
[Docket No. 6538]; (xxx) Henry L. Fernandez Jr. [Docket  No. 6540]; and (xxxi) U.S. Bank
Trust, National Association, as Indenture Trustee [Docket No. 6613].[5]  The Debtors also
received non-valuation related objections to the Plan by (i) Mariner Investment Group LLC and
Senator Investment Group LP [Docket No. 6629] and (ii) certain holders SSCC common stock
[Docket No. 6632] on April 6, 2010, in accordance with the briefing schedule agreed to by the
parties.

WHEREAS, on April 13, 2010, the Debtors received valuation-related objections
to the Plan by (i) Mariner Investment Group LLC and Senator Investment Group LP [Docket No.
6855] and (ii) certain holders of SSCC common stock [Docket No. 6854] (collectively, the
"Valuation Objections");

WHEREAS, on April 13, 2010, Epiq filed its Declaration of Stephanie Kjontvedt
On Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots

---

[5] In addition, the Debtors received numerous filed and informal letters/objections to the Plan from Holders of
Common Stock objecting to the cancellation of the common stock.  Additionally, the Court has received hundreds of
letters from members of the Ontonagon community regarding the status of the Ontonagon Mill.

7

Accepting and Rejecting the Joint Plan of Reorganization for Smurfit-Stone Container
Corporation and its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-
Stone Container Canada Inc. and Affiliated Canadian Debtors [Docket No. 6875] (the "Epiq
Voting Affidavit");

      WHEREAS, on April 13, 2010, the Monitor issued its Fifteenth Report (the
"Monitor Voting Report") which was attached to the Epiq Voting Affidavit as Exhibit D thereto;

      WHEREAS, on April 13, 2010, the Debtors filed a Notice of Technical
Modifications of the Plan and Certain Plan Supplement Documents [Docket No. 6880], which
consisted of technical modifications to the Plan and the following Exhibit to the Plan: Exhibit 6
(Asset Purchase Agreement – Canadian Asset Sale) (the "Initial Plan Modifications"), and on
May 12, 2010, the Debtors filed a Second Notice of Technical Modifications of the Plan and
Certain Plan Supplement Documents [Docket No. 7600], which consisted of additional technical
modifications to the Plan and the following Exhibits to the Plan: Exhibit 3 (Management
Incentive Plans) and Exhibit 13 (Employment and Retirement Benefit Agreements) (the
"Subsequent Plan Modifications" and together with the Initial Plan Modifications, the "Modified
Plan Documents");

      WHEREAS, on April 13, 2010, the Debtors filed their memorandum of law in
support of Confirmation of the Plan and reply in response to certain of the non-valuation related
Objections [Docket No. 6881] (the "Memorandum of Law");

      WHEREAS, on April 15, 2010, the Debtors filed their memorandum of law and
reply to the Stone FinCo II Objections [Docket No. 7016] (the "Stone FinCo II Brief"), on April
17, 2010, the Debtors filed their memorandum of law in support of Confirmation of the Plan and
reply in response to the Valuation Objections [Docket No. 7063] (the "Valuation Brief"), on May

8

12, 2010 the Debtors filed their Post-Hearing Memorandum of Law in Support of Confirmation [Docket No. 7609] (the "Post-Trial Brief");

   WHEREAS, on May 12, 2010, the Debtors and the Committee submitted their Proposed Findings of Fact and Conclusions of Law with respect to the Valuation Objections and the Stone FinCo II Objections [Docket No. 7613], and on May 18, 2010 the Debtors filed their (a) Rebuttal Post-Hearing Memorandum of Law in Support of Confirmation [Docket No. 7668] (the "Debtors' Rebuttal Memorandum") and (b) Rebuttal Findings of Fact and Conclusions of Law to (I) Aurelius Capital Management, LP And Columbus Hill Capital Management, L.P.'S Proposed Findings of Fact and Conclusions of Law in Support of their Objection to Confirmation of the Plan and (II) Manufacturers and Traders Trust Company, as Indenture Trustee's Limited Proposed Findings of Fact and Conclusions of Law to Debtors' Plan [Docket No. 7666] (the "Debtors' Rebuttal Findings") and the Plan Proponents filed their Rebuttal Submission to Equity Objectors' Proposed Findings of Fact and Conclusions of Law [Docket No. 7670] (the "Plan Proponents' Rebuttal Findings" and together with the Memorandum of Law, Stone FinCo II Brief, Valuation Brief, Post-Trial Brief, Debtors' Rebuttal and Debtors' Rebuttal Findings, the "Confirmation Briefs");

   WHEREAS, the affidavits of (i) Craig A. Hunt, Senior Vice President, General Counsel and Secretary of Smurfit-Stone Container Corporation [Docket No. 6872] (the "Hunt Affidavit"), (ii) Cyrus N. Pardiwala, Principal in the Restructuring & Recovery Services Group at PricewaterhouseCoopers, LLC [Docket No. 6873] (the "PWC Affidavit"), (iii) Joseph E. Miller, III, Director in the Financial Restructuring Group of Lazard Freres & Co., LLC [Docket No. 7067] (the "Lazard Affidavit"), (iv) Matthew T. Denton, Senior Vice President of Business Planning and Analysis of Smurfit-Stone Container Corporation [Docket No. 7066] (the "Denton

9

<u>Affidavit</u>"), (v) William Levin, Managing Director of The Levin Group, L.P. [Docket No. 7065]

(the "<u>Levin Affidavit</u>") and together with various exhibits and attachments thereto, and the

Declaration of William Levin filed on May 1, 2010 [Docket No. 7381] (the "<u>Levin Rebuttal</u>

<u>Declaration</u>") and all exhibits and attachments thereto, were submitted in support of the Plan

(collectively, the "<u>Affidavits in Support of Confirmation</u>");

   WHEREAS, the Bankruptcy Court held the Confirmation Hearing on April 15,

19-23, 26, 29 and May 3 – 4, 2010;

   WHEREAS, on April 19, 2010, the Debtors and Union Bank of California, N.A.

("<u>Union Bank</u>") entered into a stipulation resolving the UBC Objection [Docket No. 7278] (the

"<u>Union Bank Stipulation</u>");

   WHEREAS, on May 4, 2010, the Debtors and CIT Group/Equipment Finance,

Inc. ("<u>CIT</u>") entered into a stipulation resolving the CIT Objection [Docket No. 7445] (the "<u>CIT</u>

<u>Stipulation</u>");

   WHEREAS, the Canadian Court held a hearing on the CCAA Sanction Order on

May 3, 2010, and issued the CCAA Sanction Order dated May 13, 2010 sanctioning and

approving the Plan;

   WHEREAS, on May 27th, 2010, the Debtors filed a Motion for the Entry of an

Order (I) Approving the Settlement with Equity Objectors (the "<u>Equity Settlement</u>"), (II)

Authorizing Debtors to Make Certain Related Modifications to Joint Plan of Reorganization

Pursuant to section 1127(a) of the Bankruptcy Code, and (III) Finding that (A) Such

Modifications are Non-Material or (B) The Debtors Have Satisfied the Requirements of section

1127(C), (D) and (F) of the Bankruptcy Code With Respect to Such Modifications [Docket No.

7772] (the "<u>Settlement Motion</u>");

CH1 5349862v.3

WHEREAS, on May 26th, 2010, the Debtors filed an Emergency Motion to Approve Form, Manner and Scope of Notice of Motion for the Entry of an Order (I) Approving Settlement Agreement With Equity Objectors, (II) Authorizing Debtors to Make Certain Modifications to Joint Plan of Reorganization Pursuant to section 1127(a) of the Bankruptcy Code, and (III) Finding That (A) Such Modifications Are Non-Material or (B) the Debtors Have Satisfied the Requirements of sections 1127(c), (d) and (f) of the Bankruptcy Code With Respect to Such Modifications [Docket No. 7748] ("the "Settlement Procedures Motion");

WHEREAS, on May 26, 2010, the Debtors filed Further Proposed Modifications to the Plan which reflected the terms of the Equity Settlement [Docket No. 7758] (the "Settlement Plan Modifications");

WHEREAS, in the Settlement Procedures Motion the Debtors proposed to send notices (the "Settlement Notices") to (i) Holders of Claims in Classes 1D and 2E informing them of the Equity Settlement and the Settlement Motion and providing them with the opportunity to change their vote on the Plan, or, if they did not previously submit a Ballot, to cast a vote to accept or reject the Plan, as Modified by the Settlement Plan Modifications; (ii) Holders of SSCC Preferred Interests (Class 1F) informing them of the Equity Settlement and the Settlement Motion and providing them with the opportunity to cast a vote to accept or reject the Plan, as Modified by the Settlement Plan Modifications; and (iii) Holders of SSCC Common Interests (Class 1G) informing them of the Equity Settlement and the Settlement Motion (the "Settlement Procedures");

WHEREAS, on May 28th, 2010, the Bankruptcy Court held a hearing on the Settlement Procedures Motion (the "Settlement Procedures Hearing") and entered an Order Approving the Settlement Procedures Motion [Docket No. 7843] (the "Settlement Procedures

Order"), and set June 21, 2010 as the date of the hearing to consider the Settlement Motion (the "Settlement Motion Hearing");

WHEREAS, in the Settlement Procedures Order the Court found, *inter alia*, that (i) the Settlement Notices constituted good and sufficient notice of the Settlement Motion, the Equity Settlement, the Settlement Plan Modifications and the hearing to consider the Settlement Motion to Holders of Claims in Class 2E (including the Holders of Claims that were previously in Class 1D), Holders of SSCC Preferred Interests, Holders of SSCC Common Interests and others parties in interest; and (ii) the Settlement Motion and the Settlement Notices provided adequate information to Holders of Claims in Class 2E (including the Holders of Claims that were previously in Class 1D), Equity Holders and parties in interest regarding the Settlement Motion and Settlement Plan Modifications and complies with the requirements of section 1125 and 1127(c) and (f), to the extent applicable; and (iii) no further or other notice was needed or required;

WHEREAS, on June 8th, 2010, Epiq executed an affidavit of service [Docket No. 7907]) regarding the mailing of the Settlement Notices (the "Settlement Notice AOS");

WHEREAS, on June 11, 2010, the Bankruptcy Court entered an Order overruling the Stone FinCo II Objections, with the exception of the objection relating to whether a reserve must be established on account of the Intercompany Claim [Docket No. 7967] (the "Aurelius Order");

WHEREAS, on June 15, 2010, the Debtors filed the Statement of the Debtors Concerning Memorandum Opinion and Order of Court Dated June 11, 2010 [Docket No. 8019] (the "Statement") informing the Court that on June 10, 2010, the Canadian Supreme Court

CHI 5349862v.3

dismissed the application for leave to appeal the Canadian Bankruptcy Court's ruling on the Intercompany Claim, which was filed by Aurelius in the CCAA Proceedings;

WHEREAS, on June 16, 2010, United States Debt Recovery LLC filed an objection to the Settlement Motion [Docket No. 8024] (the "Settlement Objection");

WHEREAS, on June 17, 2010, Epiq filed its Supplemental Declaration of [INSERT] On Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Plan of Reorganization for Smurfit-Stone Container Corporation and its Debtor Subsidiaries and plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors [Docket No. ] (the "Supplemental Epiq Voting Affidavit");

NOW, THEREFORE, based upon the Court's review of the Plan, the Plan Supplement, the Updated Financial Information, the Disclosure Statement, the Solicitation Order, the Epiq Voting Affidavit, the Supplemental Epiq Voting Affidavit, Monitor Voting Report, the Affidavits in Support of Confirmation, the Union Bank Stipulation, the CIT Stipulation, the Settlement Motion, the Objections, the Confirmation Briefs and upon (i) all of the evidence proffered or adduced and arguments of counsel made at the Confirmation Hearing and (ii) the entire record of these Chapter 11 Cases, and after due deliberation thereon, discussions made on the record at the Confirmation Hearing and good cause appearing therefor, this Court hereby makes and issues the following Findings of Fact, Conclusions of Law and Orders with respect to Confirmation of the Plan (the "Confirmation Order");

CH1 5349862v.3

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[6]

     A.     JURISDICTION AND VENUE. On the Petition Date, the Debtors commenced these Chapter 11 Cases in good faith by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Each Debtor was and is qualified to be a debtor under section 109 of the Bankruptcy Code. The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). The Court has subject matter jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed. Venue was proper as of the Petition Date and continues to be proper before this Court as of the date hereof pursuant to 28 U.S.C. §§ 1408 and 1409.

     B.     TECHNICAL MODIFICATIONS TO THE PLAN. Except for the Settlement Plan Modifications which are addressed in paragraph D below, the technical modifications included in the Modified Plan Documents (including the Exhibits thereto), as well as any modifications to the Plan described or set forth herein constitute technical changes or changes with respect to particular Claims by agreement with Holders of such Claims, and do not materially or adversely affect or change the treatment of any other Claims or Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

---

[6] The Confirmation Order constitutes the Bankruptcy Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable herein by Bankruptcy Rules 7052 and 9014. Any finding of fact shall constitute a finding of fact even if it is referred to as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is referred to as a finding of fact.

C.    CLASSES AFFECTED BY THE SETTLEMENT PLAN

MODIFICATIONS.  The only classes affected by the Settlement Plan Modifications are Holders

of General Unsecured Claims against SSCE (Class 2E) (which includes the Holders of General

Unsecured Claims previously in Class 1D) and the Holders of SSCC Interests (Classes 1F and

1G) (the "Affected Classes").

D.    SETTLEMENT PLAN MODIFICATIONS.  Either the Settlement Plan

Modifications constitute non-material modifications to the Plan, or the Debtors have complied

with all applicable requirements set forth in sections 1125 and 1127 of the Bankruptcy Code with

respect to the Settlement Plan Modifications. Such Settlement Plan Modifications shall be

deemed to be incorporated in, and are part of, the Plan and the Debtors are not required to take

further action to implement the Settlement Plan Modifications.

E.    EQUITY SETTLEMENT.  The Equity Settlement described in the

Settlement Motion and Settlement Plan Modifications (i) was negotiated at arms length and in

good faith between the Settling Parties (as that term is defined in the Settlement Motion), (ii) is

fair and reasonable and satisfies the standards under Bankruptcy Rule 9019 and 11 U.S.C. § 363,

and (iii) is in the best interests of the Debtors' estates, creditors and equity holders.

F.    SETTLEMENT NOTICES.  The description of the Plan Modifications

and the Equity Settlement set forth in the Settlement Notices and Settlement Motion constitutes

adequate information pursuant to 11 U.S.C. § 1125.

G.    SUPPLEMENTAL VOTING RESULTS.  Holders of Claims that

previously submitted a valid Ballot, and that did not submit a Ballot pursuant to the Settlement

Procedures are deemed to have voted on the Plan, as modified by the Settlement Plan

Modifications, in the same manner as their previously submitted Ballot.  As evidenced by the

15

Supplemental Epiq Voting Affidavit, the Holders of Claims in Affected Classes that participated

in the voting pursuant to the Settlement Procedures voted overwhelmingly to accept the Plan

(the "Supplemental Voting Results"). After combining the Supplemental Voting Results with

the voting results in the Epiq Voting Affidavit, Holders of Claims in Class 2E (including Holders

of Claims that were previously in Class 1D) and Holders of Interest in Class 1F, voted to accept

the Plan.

    H. <u>JUDICIAL NOTICE</u>. The Bankruptcy Court takes judicial notice of (and

deems admitted into evidence) the docket of these Chapter 11 Cases and all related adversary

proceedings maintained by the clerk of the Court and/or its duly-appointed agent, including,

without limitation, all pleadings and other documents filed, all orders entered, all hearing

transcripts and all evidence and arguments made, proffered or adduced at the hearings held

before the Bankruptcy Court during these Chapter 11 Cases, including, without limitation, the

hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing.

Any resolutions of objections to Confirmation explained on the record at the Confirmation

Hearing are hereby incorporated by reference. All unresolved objections, statements, and

reservations of rights are hereby overruled on the merits.

    I. <u>BURDEN OF PROOF</u>. The Debtors, as proponents of the Plan, have the

burden of proving the elements of subsections 1129(a) and (b) of the Bankruptcy Code by a

preponderance of the evidence and the Debtors have met that burden as further found and

determined herein.

    J. <u>SOLICITATION AND NOTICE</u>. To obtain the requisite acceptance of

the Plan, on or about February 12, 2010, the Debtors began solicitation of acceptances and

rejections of the Plan by distributing the Disclosure Statement and related materials to Holders of

Claims classified in Impaired Classes entitled to vote under the Plan as required by the
Solicitation Order. As evidenced by the Solicitation and Confirmation AOS, and as required by
the Solicitation Order, the Debtors transmitted: (i) a CD-ROM containing the Disclosure
Statement together with the Plan and all other exhibits annexed thereto; (ii) the Solicitation
Order, excluding exhibits annexed thereto; (iii) the Confirmation Hearing Notice; (iv) a Ballot,
as appropriate, together with a return envelope; and (v) the Committee statement in support of
the Plan, as appropriate (collectively, the "Solicitation Packages"), to all Holders of Claims as of
February 5, 2010 in each Impaired class of Claims entitled to vote to accept or reject the Plan.

      K.     In addition, Holders of Claims or Interests in Classes that were not entitled
to vote to accept or reject the Plan were provided with certain non-voting materials approved by
the Bankruptcy Court in compliance with the Solicitation Order. Finally, as evidenced by the
Solicitation and Confirmation AOS and as required by the Solicitation Order, the Debtors
transmitted (a) the CD-ROM containing the Disclosure Statement, together with the Plan and
other exhibits annexed thereto; (b) the Solicitation Order, excluding exhibits annexed thereto;
and (c) the Confirmation Hearing Notice to: (i) the Office of the United States Trustee; (ii) the
United States Securities and Exchange Commission; (iii) the Office of the United States
Attorney for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to the
Committee; (vi) counsel to the agents for the Debtors' prepetition loan facilities; (vii) counsel to
the agents for the Debtors' post-petition lenders; (viii) the indenture trustees for each series of
the Debtors' pre-petition notes; and (ix) those parties entitled to receive notice pursuant to
Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b).

      L.     The Plan and the Solicitation Packages were transmitted and served as
evidenced by the Solicitation and Confirmation AOS, and such transmittal and service of the

Solicitation Packages constitutes due and sufficient notice of the Plan, the Confirmation Hearing,

and the deadlines for (i) submitting Ballots accepting or rejecting the Plan and (ii) filing

objections to Confirmation of the Plan, and such notice was adequate and sufficient under the

circumstances, was given in compliance with Bankruptcy Rules 2002, 3017 and 3020 and the

Solicitation Order, and no other or further notice is or shall be required.  All parties in interest

had a full and fair opportunity to appear and be heard at the Confirmation Hearing.

        M.     NOTICE OF EQUITY SETTLEMENT/SETTLEMENT PLAN

MODIFICATIONS.  Based upon, among other things, the Settlement Procedures Order and the

Settlement Notice AOS, this Court finds that, under the circumstances due and proper notice of

the Settlement Motion, the Equity Settlement and the Settlement Plan Modifications was

provided and no further or other notice is required.

        N.     PUBLICATION NOTICE.  In accordance with Bankruptcy Rules 2002(1)

and 3017(d) and the Solicitation Order, and as evidenced by the Publication AOS, the Debtors

published a form of the Confirmation Hearing Notice once each in the USA Today and The Wall

Street Journal on March 3, 2010.

        O.     ADEQUACY OF NOTICE.  The Disclosure Statement, the Plan, the

Ballots the Confirmation Hearing Notice, and the Settlement Notices were transmitted and

served in compliance with section 1125 of the Bankruptcy Code, the Solicitation Order and the

Bankruptcy Rules and such transmittal and service constituted adequate and sufficient notice for

the Confirmation Hearing and the Settlement Motion Hearing.  Furthermore, the Plan

Supplement and the Modified Plan Documents, including any amendments or modifications

thereto or to the Plan (including the Settlement Plan Modifications), were filed and served in

compliance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

All parties in interest had a full and fair opportunity to appear and be heard at the Confirmation Hearing and at the Settlement Motion Hearing and no other or further notice is or shall be required.

P.     BAR DATE/503(B)(9) PROCEDURES.  On June 22, 2009, the Court entered an order (the "Bar Date Order") [Docket No. 1109] establishing August 28, 2009 as the deadline to file proofs of claim for all Claims (including claims by governmental units) against the Debtors that arose prior to the Petition Date.  A notice of the Bar Date Order (the "Bar Date Notice") and the Proof of Claim form was served on all known creditors of the Debtors by being deposited in first-class U.S. mail no later than June 29, 2009.  Furthermore, on August 6, 2009, the Debtors filed a notice of publication of entry of the Bar Date Order in the August 3, 2009 editions of the Wall Street Journal and USA Today (the "Bar Date Publication Notice") [Docket 1435].

Q.     On March 10, 2009, the Court entered an Order (the "503(b)(9) Order") establishing and implementing exclusive procedures for the allowance and treatment of all Section 503(b)(9) Claims filed against the Debtor.

R.     On June 25, 2009 the Canadian Court entered the Claims Procedure Order (the "Canadian Bar Date Order") [Court File No. CV-09-7966-000L] establishing August 28, 2009 as the deadline to file proofs of claim for all Claims against the Cross-Border Debtors that arose prior to the Petition Date.

S.     GOOD FAITH SOLICITATION, NO REQUIREMENT FOR RESOLICITATION.  Votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Solicitation Order, Settlement Procedures Order, all

19

other applicable provisions of the Bankruptcy Code and all other applicable rules, laws and

regulations.  Based on the record in these Chapter 11 Cases, the Debtors, the Reorganized

Debtors, the members of the Unsecured Creditors Committee, the Prepetition Lenders, the

Prepetition Agents, Prepetition Facing Agent, the Prepetition Noteholders, the Prepetition Notes

Indenture Trustees, the Industrial Revenue Bondholders, the Industrial Revenue Bond Indenture

Trustees, and each of their respective Related Persons have acted in "good faith" within the

meaning of section 1125(e) of the Bankruptcy Code and Bankruptcy Rules in compliance with

all of their respective activities relating to the solicitation of acceptances of the Plan and their

participation in the activities described in section 1125 of the Bankruptcy Code and, accordingly,

such parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code

and the exculpation provisions set forth in <u>Article</u> X of the Plan.  Based upon the Court's review

of the amendments, modifications and/or supplementation embodied in the Plan, the Plan

Supplement, the Modified Plan Documents, Settlement Notices, and the Settlement Plan

Modifications, no further solicitation or resolicitation of any holders of Claims or Interests is

necessary.

        T.     <u>MONITOR REPORT</u>.  The Monitor Report thoroughly reviewed the

Plan's treatment of and proposed recoveries for the creditors of SSC Canada and SMBI, as well

as the terms of the Canadian Asset Sale, and recommended that the Affected Secured Creditors,

as well as the Affected Unsecured Creditors of SSC Canada and SMBI vote in favor of the Plan.

(Monitor Report at ¶ 65(i) – (iii).)

        U.     <u>PROPRIETY OF VARIOUS AGREEMENTS AND DOCUMENTS</u>

<u>RELATING TO THE PLAN</u>.  In light of all of the circumstances and the record in these Chapter

11 Cases, and the CCAA proceedings, each of the Restructuring Transactions, each of the other

CH1 5349862v.3

transactions in connection with the implementation of the Plan, as identified in <u>Articles</u> V and VI

of the Plan including, without limitation, the Canadian Asset Sale to Canadian Newco, and each

of the transactions contemplated by or referenced in the Plan, the Plan Supplement, the Modified

Plan Documents, the Settlement Plan Modifications, and/or any other document or agreement

that is necessary to implement the Plan, is integral to the terms, conditions and settlements

contained in the Plan and is critical to the effectuation of the purposes of the Plan.  All contracts,

instruments, releases, agreements and documents related to, or necessary to implement,

effectuate and consummate, the Plan, including all transactions contemplated in the Plan

Supplement, Modified Plan Documents, and Settlement Plan Modifications, are valid, proper and

reasonable under the circumstances and due and sufficient notice thereof has been provided in

connection with, among other things, approval of the Disclosure Statement and Confirmation of

the Plan.

V.   <u>COMPROMISES AND SETTLEMENTS EMBODIED IN THE PLAN</u>.

Based upon the Confirmation Briefs, the Affidavits in Support of Confirmation, the

representations and arguments of counsel for the Debtors and all other testimony given or

proffered at the Confirmation Hearing or prior hearing and the full record of these Chapter 11

Cases, the findings and conclusions of which are hereby incorporated by reference as if fully set

forth herein, the Court hereby finds that, pursuant to section 1123(b) of the Bankruptcy Code and

Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under

the Plan, the provisions of the Plan, including the Settlement Plan Modifications and each of the

injunctions, releases, exculpations, indemnifications and discharges set forth in <u>Article</u> X of the

Plan, constitute a good faith compromise and settlement of all claims or controversies relating to

21

the rights that a holder of a Claim or Interest may have with respect to any Claim or Interest or

any distribution to be made pursuant to the Plan on account of any Allowed Claim or Interest.

        W.    ASSUMPTION OF EXECUTORY AND POSTPETITION

CONTRACTS AND UNEXPIRED LEASES.  The assumption by the Debtors of all existing

executory and postpetition contracts and unexpired leases, with the sole exception of any

contracts or leases (i) previously rejected by the Debtors, (ii) rejected pursuant to any order

approving the Rejection Motion, or (iii) previously expired or terminated in accordance with its

terms is both beneficial and necessary to the Debtors', Reorganized Debtors' and Canadian

Newco's business operations upon and subsequent to emergence from chapter 11.  The

assumption of each of these executory and postpetition contracts and unexpired leases pursuant

to sections 365 and 1123 of the Bankruptcy Code and the Plan is a sound exercise of the

Debtors' independent business judgment and is in the best interest of the Debtors, their estates

and their creditors.  The assumption by, assignment to, and revesting in, each relevant

Reorganized Debtor or Canadian Newco of the applicable Assumed Contracts and Assumed

Leases (and the rights and obligations thereunder) of each relevant Debtor, pursuant to section

365 of the Bankruptcy Code, the terms of the Plan and the Assumption Motion, is also a sound

exercise of the Debtors' business judgment and is in the best interest of the Debtors, their estates

and their creditors.  The assumption or rejection of any executory contract or unexpired lease

pursuant to the Plan, Assumption Motion or Rejection Motion, and this Confirmation Order shall

be legal, valid, and binding upon the applicable Debtor, Reorganized Debtor or Canadian Newco

and all parties to such executory contract or unexpired lease to the same extent as if such

assumption or rejection has been effectuated pursuant to an order of the Court entered before the

Confirmation Date.

22

X.    <u>EXEMPTIONS FROM SECURITIES LAWS</u>.  The issuance, distribution, transfer or exchange of (a) the New SSCC Common Stock; and (b) any other stock, options, warrants, conversion rights, rights of first refusal or other related rights, contractual, equitable or otherwise, issued, authorized or reserved under or in connection with the Plan, shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable non-bankruptcy law and under bankruptcy law, including, without limitation, section 1145(a) of the Bankruptcy Code.  Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, each of the Exhibits to the Plan (filed with the Plan Supplement), the Modified Plan Documents, the Settlement Plan Modifications, the Canadian Asset Sale, and the Restructuring Transactions, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.

Y.    <u>APPROVAL OF THE DISCHARGES, RELEASES, INJUNCTIONS, INDEMNIFICATIONS AND EXCULPATIONS PROVIDED UNDER THE PLAN</u>.  In light of all of the circumstances and the record in these Chapter 11 Cases, pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9010(a), the settlements, compromises, releases, discharges, exculpations and injunctions set forth in <u>Sections</u> 10.1, 10.2, 10.3, 10.5 and 10.8 of the Plan are fair, equitable, reasonable and in the best interests of the Debtors, the Reorganized Debtors and their Estates, creditor and equity holders, and are supported by good and valuable consideration, the adequacy of which is hereby confirmed.  The releases of non-Debtors under the Plan are fair to holders of Claims and Interests and are necessary to the proposed reorganization, thereby satisfying the requirements of <u>In re Continental Airlines, Inc.</u>, 203 F.3d

23

203, 214 (3d Cir. 2000), and In re Zenith Electronics Corp., 241 B.R. 92, 110-11 (Bankr. D. Del. 1999). The record of the Confirmation and these Chapter 11 Cases is sufficient to support the releases, exculpations and injunctions provided for in Article X of the Plan and herein.

Z.     VOTING CERTIFICATIONS. As evidenced by the Epiq Voting Affidavit, Monitor Voting Report and Supplemental Epiq Voting Affidavit, all procedures used to distribute solicitation materials to the applicable holders of Claims entitled to vote on the Plan, including the Affected Creditors, and to tabulate the Ballots (or proxy/Ballots, as applicable), Master Ballots and votes at the Canadian Creditors' Meeting were fair and conducted in accordance with the Solicitation Order, the Settlement Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the District of Delaware, and all other applicable rules, laws and regulations.

AA.     As set forth in the Plan, Disclosure Statement and Solicitation Order, Holders of Claims in the following Classes are eligible to vote on the Plan (the "Voting Classes"):

| Description of Class | Class Designation |
| --- | --- |
| Union Bank Claims | 4C |
| CIT Group Claims | 4D |
| Prepetition Lenders Claims | 1C, 2C |
| Prepetition Canadian Lender Claims | 15C, 16C, 17C, 20C, 21C |
| Convenience Claims | 2D |
| Preferred Interests | 1F |
| General Unsecured Claims | 2E, 3C, 4E, 5C, 15D, 16D, 19C, 20D |
| Other Secured Claims | 15B, 16B, 17B, 19B, 20B, 21B |

BB.     In addition, Holders of Claims and Interests in the following Classes are Unimpaired and deemed to accept the Plan, and therefore, are not entitled to vote to accept or reject the Plan:

24

CH1 5349862v.3

| Description of Class | Class Designation |
|---|---|
| Priority Non-Tax Claims | 1A – 17A, 19A – 25A |
| Other Secured Claims | 1B-14B, 22B through 25B |
| Interests | 2G, 3E, 5E, 6E through 14E, 17F, 19E, 21F, 22E through 25E |

CC.     Holders of Claims and Interests in the following Classes (the "Deemed

Rejecting Classes") are deemed to reject the Plan and, therefore, are not entitled to vote to accept

or reject the Plan:

| Description of Class | Class Designation |
|---|---|
| General Unsecured Claims | 6C-14C, 17D, 21D, 22C-25C |
| Common Interests | 1G |
| Interests | 4G, 15G, 16F, 20F |
| Intercompany Claims | 15F |

DD.     As evidenced by the Epiq Voting Affidavit and Monitor Voting Report,

Holders of Claims in Classes 4C and 4D (together with the Deemed Rejecting Classes, the

"Rejecting Classes") voted to reject the Plan.  The Holders of Claims in Classes 4C and 4D have

agreed to change their vote pursuant to the CIT Stipulation and Union Bank Stipulation upon

entry of the Confirmation Order, and, as a result, such Classes have voted to accept the Plan.  As

further evidenced by the Voting Affidavits, all other Voting Classes voted to accept the Plan (the

"Impaired Accepting Classes").

EE.     Pursuant to the Settlement Procedures Order and Settlement Plan

Modifications, Class 1F was entitled to vote to either accept or reject the Plan.  In addition,

holders of Claims in Class 2E, including holders of claims that were originally scheduled or

asserted against Class 1D, were entitled to either change or cast new votes to either accept or

reject the Plan.  As evidenced by the Supplemental Epiq Voting Affidavit, both Classes voted to

accept the Plan, as modified by the Settlement Plan Modifications.

FF.     THE CIT STIPULATION AND UNION BANK STIPULATION.  The terms of the CIT Stipulation and Union Bank Stipulation are fair, reasonable and in the best interest of the Debtors' estates, and no party in interest has opposed their approval.

GG.     SATISFACTION OF CONDITIONS TO CONFIRMATION.  Each of the conditions precedent to Confirmation of the Plan, as set forth in <u>Section</u> 9.1 of the Plan, has been satisfied and/or waived.  Furthermore, each of the conditions precedent to the occurrence of the Effective Date, as set forth in <u>Section</u> 9.2 of the Plan, has been satisfied, is reasonably likely to be satisfied or is reasonably likely to be waived in accordance with <u>Section</u> 9.3 of the Plan on or prior to the Effective Date.

**<u>Compliance with the Requirements of Section 1129 of the Bankruptcy Code.</u>**

HH.     <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the requirements for confirmation set forth in subsections 1129(a) and (b) of the Bankruptcy Code.

II.     <u>Section 1129(a)(1) – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>.  The Plan complies with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123 of the Bankruptcy Code.  Moreover, the Plan fully complies with each requirement of section 1123(a) of the Bankruptcy Code.

JJ.     <u>Sections 1122 and 1123(a)(1)-(4) — Classification and Treatment of Claims and Interests</u>.  The Plan constitutes a separate plan of reorganization for each of the Debtors.  (Plan § 3.1.1(b))  In accordance with section 1122(a) of the Bankruptcy Code, <u>Article</u> III of the Plan classifies each Claim against and Interest in the Debtors into a Class containing only substantially similar Claims or Interests.  (Plan Art. III.)

26

KK.    In accordance with section 1123(a)(1) of the Bankruptcy Code, <u>Article</u> III of the Plan properly classifies all Claims and Interests that require classification.  In particular, <u>Article</u> III of the Plan segregates into separate classes with respect to each applicable Debtor Priority Non-Tax Claims (Classes 1A through 17A and 19A through 25A); Other Secured Claims (Classes 1B through 17B and 19B through 25B); Prepetition Lender Claims (Classes 1C and 2C); Union Bank Claims (Class 4C); CIT Group Claims (Class 4D); Prepetition Canadian Lender Claims (Classes 15C through 17C, 20C, 21C); General Unsecured Claims (Classes 2E, 3C, 4E, 5C through 14C, 15D through 17D, 19C, 20D, 21D, 22C through 25C); Convenience Claims (Class 2D); Intercompany Claims (Classes 1E, 2F, 3D, 4F, 5D through 14D, 15E through 17E, 19D, 20E, 21E, 22D through 25D); Stone FinCo II Intercompany Claims (Class 15F); SSCC Preferred Interests (Class 1F); SSCC Common Interests (Class 1G); and Interests (Classes 2G, 3E, 4G, 5E through 14E, 15G, 16F, 17F, 19E, 20F, 21F, 22E through 25E).  The number of classes reflects the diverse classification of those Claims against and Interests in the various Debtors, and the legal rights under the Bankruptcy Code of each of the holders of Claims or Interests within that Class.

LL.    In accordance with section 1123(a)(2) of the Bankruptcy Code, <u>Article</u> III of the Plan identifies and describes each Class of Claims or Interests that is not impaired under the Plan.  In particular, <u>Article</u> III of the Plan indicates that Claims and Interests in Classes 1A through 25A (Priority Non-Tax Claims), 1B through 14B and 22B-25B (Other Secured Claims), and 2G, 3E, 5-14E, 17F, 19E, 21F and 22E-25E (Subsidiary Interests) are not impaired under the Plan.  (Plan Art. III.)

MM.    In accordance with section 1123(a)(3) of the Bankruptcy Code, <u>Article</u> III of the Plan identifies and describes any Class of Claims or Interests that is impaired under the

27

Plan. In particular, Article III of the Plan specifies that Claims in Class 2D (Convenience

Claims), 1C, 2C (Prepetition Lender Claims), 2E, 3C, 4E, 5-15C, 15D, 16D, 17D, 19C, 20D,

21D, 22-25C (General Unsecured Claims), 15-17B, 19-21B (Other Secured Claims), 1E, 2F, 3D,

4F, 5-14D, 15E, 16E, 17E, 19D, 20E, 21E, 22-25D (Intercompany Claims), 4G, 15G, 16F, 20F

(Subsidiary Interests), 4C (Union Bank Claims), 4D (CIT Group Claims), 15-17C, 20C, 21C

(Prepetition Canadian Lender Claims), 1F (SSCC Preferred Interests), 1G (SSCC Common

Interests), and 15F (Stone FinCo II Intercompany Claims) are impaired under the Plan. (Plan

Art. III.)

        NN.    In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan

provides the same treatment for each Claim or Interest of a particular Class unless the holder of

such a Claim or Interest agrees to less favorable treatment. (Plan § 3.2.)

        OO.    Accordingly, the Plan satisfies the requirements of sections 1122 and

1123(a)(1)-(4) of the Bankruptcy Code.

        PP.    Section 1123(a)(5) — Adequate Means for Implementation of the Plan. In

accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan, including Article VI of the

Plan, provides adequate means for its implementation, including, among other things: (i) except

as otherwise provided under the Plan or the Restructuring Transactions, the continued corporate

existence of the Debtors and the vesting of assets in the Reorganized Debtors under Section 6.6

of the Plan; (ii) the adoption of the corporate constituent documents that will govern the

Reorganized Debtors and the identification of the initial boards of directors of the Reorganized

Debtors as provided in Sections 6.2.1 and 6.2.2 of the Plan, respectively; (iii) the issuance of new

securities for distribution in accordance with the terms of the Plan, as detailed in Section 6.3 of

the Plan; (iv) the entry by the Debtors into the Exit Facility Documentation, as detailed in

28

Section 6.5 of the Plan; (v) the cancellation of credit documents, debt instruments and interests (in each case, to the extent provided in the Plan as detailed in Section 6.9); (vi) the consummation of any Restructuring Transactions in connection with Section 6.14 of the Plan, including the Restructuring Transactions set forth in Exhibit 14 of the Plan (filed with the Plan Supplement); (vii) the cancellation of any Lien securing any Other Secured Claim (to the extent provided for in the Plan), as detailed in Section 6.10 of the Plan; (viii) the retention of certain rights of action by the Reorganized Debtors pursuant to Section 10.7 of the Plan; (ix) the various discharges, releases, injunctions, indemnifications and exculpations provided in Article X of the Plan; (x) the continuation of certain Employee Benefit Plans, the entry or continuation of the Employment and Retirement Benefit Agreements and the adoption of the Management Incentive Plans, as described in Sections 6.11, 6.12, and 6.13 of the Plan; and (xi) the assumption, assumption and assignment or rejection of executory contracts and unexpired leases to which any Debtor is a party, as stated in Article VII of the Plan. Accordingly, the provisions in the Plan comply with section 1123(a)(5) of the Bankruptcy Code.

QQ.     Section 1123(a)(6) — Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities. In accordance with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors' charters, bylaws or similar constituent documents (including those set forth as Exhibits 1 and 2 to the Plan (filed with the Plan Supplement)) contain provisions prohibiting the issuance of nonvoting equity securities, provide for the appropriate distribution of voting power among all classes of equity securities authorized for issuance, and otherwise comply with the requirements of section 1123(a)(6) of the Bankruptcy Code.

CH1 5349862v.3

RR.     Section 1123(a)(7) — Selection of Directors and Officers in a Manner
Consistent with the Interests of Creditors and Equity Security Holders and Public Policy.  In
accordance with section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and the
Reorganized Debtors' charters, bylaws and similar constituent documents regarding the manner
of selection of officers and directors of the Reorganized Debtors are consistent with the interests
of creditors and equity security holders and with public policy.  In accordance with Section 6.2.2
of the Plan and as listed in Exhibit 4 of the Plan (filed with the Plan Supplement), the initial
board of directors of Reorganized SSCC shall consist of the following eleven (11) directors: (i)
Patrick J. Moore (Chief Executive Officer), (ii) Steven J. Klinger (President and Chief Operating
Officer), (iii) Ralph F. Hake (Chairman), (iv) James J. O'Connor, (v) Timothy J. Bernlohr, (vi)
Terrell K. Crews, (vii) Eugene I. Davis, (viii) Michael E. Ducey, (ix) Jonathan F. Foster, (x)
Ernst A. Haberli and (xi) Arthur W. Huge.  As required by section 1123(a)(7) of the Bankruptcy
Code, (i) the initial officers and directors of the Reorganized Debtors were selected in a manner
consistent with the interests of Holders of Claims and Interests and with public policy, and (ii)
the manner in which successor officers and directors will be chosen as set forth in the Amended
and Restated Certificate of Incorporation and Amended and Restated By-Laws is also consistent
with those interests and with such public policy.

SS.     Section 1123(b) Permissible Plan Provisions.  Section 1123(b) of the
Bankruptcy Code describes certain other permissible plan provisions, of which several are
included in the Plan, including, without limitation, (a) Article VII of the Plan which provides for
the assumption of the Debtors' executory contracts and unexpired leases; and (b) Section 10.2.1
of the Plan which provides for releases by the Debtors, as of the Effective Date, of, among other
things, certain claims, rights and causes of action that the Debtors may have against, among

CH1 5349862v.3

others, the present and former officers and directors of the Debtors, and the attorneys, accountants, investment bankers, restructuring consultants and financial advisors of each of the Debtors. Such provisions, and all other provisions of the Plan, are consistent with the Bankruptcy Code in accordance with section 1123(b)(6) of the Bankruptcy Code.

TT.     The Plan Complies With Bankruptcy Rule 3016. The Plan is dated and identifies the entities submitting it as proponents, thereby satisfying Bankruptcy Rule 3016(a). Other than conduct otherwise enjoined by the Bankruptcy Code, the Plan describes in specific and conspicuous language all acts to be enjoined and identifies the entities subject to such injunction, in accordance with Bankruptcy Rule 3016(c).

UU.     Section 1129(a)(2) — Compliance with Applicable Provisions of the Bankruptcy Code. The Debtors, as proponents of the Plan, complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1125, 1126 and 1127, as applicable, of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018. The Disclosure Statement and the procedures by which the Ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with sections 1125, 1126 and 1127, as applicable, of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Solicitation Order and any and all other applicable rules, laws and regulations. Votes with respect to the Plan were solicited in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Order. Accordingly, the requirements of section 1129(a)(2) have been satisfied.

VV.     Based on the record before the Court, the Debtors, the Reorganized Debtors, the members of the Unsecured Creditors Committee, the Prepetition Lenders, the Prepetition Agents, Prepetition Facing Agent, the Prepetition Noteholders, the Prepetition Notes

Indenture Trustees, the Industrial Revenue Bondholders, the Industrial Revenue Bond Indenture

Trustees, and each of their respective Related Persons, have solicited votes on the Plan and/or

participated in the activities described in section 1125 of the Bankruptcy Code in good faith,

within the meaning of section 1125(e) of the Bankruptcy Code, and in compliance with the

applicable provisions of the Solicitation Order, the Bankruptcy Code, and the Bankruptcy Rules

and all other applicable rules, laws and regulations, and are entitled to the protections afforded

by section 1125(e) of the Bankruptcy Code and the exculpation and limitation of liability

provisions in <u>Section</u> 10.5 of the Plan and this Confirmation Order.

      WW.   <u>Section 1129(a)(3) — Proposal of the Plan in Good Faith</u>. The Debtors

have proposed the Plan in good faith and not by any means forbidden by law. Consistent with

the overriding purpose of chapter 11 of the Bankruptcy Code, the Plan is designed to allow each

of the Debtors to reorganize on a going concern basis while maximizing recoveries to their

creditors and providing the Reorganized Debtors with a capital structure that will allow the

Reorganized Debtors to satisfy their obligations with sufficient liquidity and capital reserves and

to fund necessary capital expenditures and otherwise conduct their business in the ordinary

course. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has

examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the

Plan itself, the process leading to its formulation, and the solicitation of votes in support of the

Plan. Accordingly, the Plan satisfies the "good faith" requirement of section 1129(a)(3) of the

Bankruptcy Code.

      XX.   Moreover, the Plan itself and the arm's length negotiations among the

Debtors, the members of the Unsecured Creditors Committee, the Prepetition Lenders, the Ad

Hoc Group of Common Holders, the Ad Hoc Group of Preferred Holders, the Prepetition

CH1 5349862v.3

Agents, Prepetition Facing Agent, the Prepetition Noteholders, the Prepetition Notes Indenture

Trustees, the Industrial Revenue Bondholders, the Industrial Revenue Bond Indenture Trustees,

and each of their respective Related Persons, leading to the Plan's formulation, reflect the result

of these arm's length negotiations, embody the best interests of all the constituencies of the

Debtors' estates and provide independent evidence of the Debtors' good faith in proposing the

plan.

       YY.    Section 1129(a)(4) — Court Approval of Certain Payments as Reasonable.

In accordance with section 1129(a)(4) of the Bankruptcy Code, no payment for services or costs

and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and

incidental to the Chapter 11 Cases, including Claims for professional fees, has been or will be

made by a Debtor other than payments that have been authorized by order of the Bankruptcy

Court.  Section 2.1 of the Plan provides for the payment of various Administrative Claims,

including Claims for professional fees, which are subject to Bankruptcy Court approval and the

standards of the Bankruptcy Code.  (Plan § 2.1.)  In addition, the Prepetition Notes Indenture

Trustee Fees, Industrial Revenue Bond Indenture Trustee Fees, and the Professional Fees of the

Ad Hoc Noteholders, the Ad Hoc Group of Preferred Holders, and the Ad Hoc Group of

Common Holders, which are payable by the Debtors pursuant to Sections 12.10 and 12.11 of the

Plan will be subject to a "reasonableness" standard.  (Plan §§ 12.10 and 12.11.).  Accordingly,

the provisions in the Plan comply with section 1129(a)(4) of the Bankruptcy Code.

       ZZ.    Section 1129(a)(5) — Disclosure of Identity of Proposed Management,

Compensation of Insiders and Consistency of Management Proposals with the Interests of

Creditors and Public Policy.  In the Disclosure Statement, the Plan, the Hunt Affidavit and

Exhibits 4 and 5 to the Plan (filed with the Plan Supplement, or otherwise at or prior to the

CH1 5349862v.3

Confirmation Hearing), the Debtors have disclosed all necessary information regarding the

Debtors' and Reorganized Debtors' officers and directors, including for those directors and

officers who may constitute insiders, and the applicable compensation paid or to be paid as of the

Effective Date. The appointment or continuance of the proposed directors and officers is

consistent with the interests of the holders of Claims and Interests and with public policy.

      AAA.  <u>Section 1129(a)(6) — Approval of Rate Changes</u>.  The Debtors' current

businesses do not involve the establishment of rates over which any regulatory commission has

or will have jurisdiction after Confirmation.

      BBB.  <u>Section 1129(a)(7) — Best Interests of Holders of Claims and Interests</u>.

Each Holder of an Impaired Claim that has not accepted the Plan will on account of such Claim,

as demonstrated by the liquidation analysis included as <u>Exhibit D</u> to the Disclosure Statement,

receive or retain property under the Plan having a value, as of the Effective Date, that is not less

than the amount that such Holder would so receive or retain if the Debtors were liquidated under

chapter 7 of the Bankruptcy Code on the Effective Date.

      CCC.  The liquidation analysis annexed to the Disclosure Statement as <u>Exhibit F</u>

(as updated in the PWC Affidavit, the "<u>Liquidation Analysis</u>"), including the methodology used

and estimations and assumptions made therein, and the evidence related thereto that was

proffered at the Confirmation Hearing, (a) are persuasive and credible as of the dates such

evidence was prepared, presented or proffered, (b) have not been controverted by other

persuasive evidence and have not been challenged, (c) are based upon reasonable and sound

assumptions, and (d) provide a reasonable estimate of the liquidation value of each of the

Debtors' Estates upon a conversion to a chapter 7 proceeding.  Therefore, the Plan satisfies the

requirements of section 1129(a)(7) of the Bankruptcy Code.

DDD.   Section 1129(a)(8) — Acceptance of the Plan by Each Impaired Class.  As indicated in Article III of the Plan and as set forth in the Epiq Voting Affidavit and Monitor Voting Report, Classes 1A through 17A and 19A through 25A (Priority Non-Tax Claims), Classes 1B through 14B and 22B through 25B (Other Secured Claims), and Classes 2G, 3E, 5E, 6E – 14E, 17F, 19E, 21F, 22E – 25E (Interests) are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  As further indicated in the Epiq Voting Affidavit and Monitor Voting Report, each Impaired Class of Claims entitled to vote to accept or reject the Plan has voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code, except for Classes 4C and 4D.  The Holders of Claims in Classes 4C and 4D have agreed to change their vote pursuant to the CIT Stipulation and Union Bank Stipulation upon entry of the Confirmation Order, and, as a result, such Classes have voted to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code.

EEE.   Because the Plan provides that the Holders of Claims and Interests in Classes 4G, 6C through 14C, 15F, 15G, 16F, 17D, 20F, 21D and 22C through 25C will not receive any distributions or retain any property under the Plan, such Classes are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Pursuant to the Settlement Procedures Order, the Settlement Plan Modifications and the Settlement Notices, Class 1G was not provided the opportunity to vote to accept or reject the Plan, and is deemed to reject the Plan.  As provided below, the Plan satisfies the requirements of section 1129(b) with respect to Classes  1G, 4C, 4D, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 20F, 21D, and 22C through 25C as a matter of law.

FFF.   Section 1129(a)(9) — Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.  The Plan provides for treatment of Allowed Claims

entitled to priority pursuant to section 507(a)(2)-(8) of the Bankruptcy Code in the manner required by section 1129(a)(9) of the Bankruptcy Code.

GGG.  Section 1129(a)(10) — Acceptance By at Least One Impaired, Non-Insider Class.  As evidenced by the Epiq Voting Affidavit and Monitor Voting Report, and as reflected in the record of the Confirmation Hearing, at least one Impaired Class of Claims has voted in sufficient number and amount to accept the Plan, determined without including the acceptance by any insider, with respect to every Debtor, except for the non-operating subsidiary Debtors which are either being dissolved or merged into the Reorganized Debtors on the Effective Date.  Accordingly, the Court hereby finds and determines that section 1129(a)(10) has been satisfied in connection with each of the Debtors.

HHH.  Section 1129(a)(11) — Feasibility of the Plan.  The Plan is feasible.  The Debtors have demonstrated, through, among other things, the Updated Financial Information and the evidence proffered or adduced at the Confirmation Hearing, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization, of the Debtors, the Reorganized Debtors or any successor to the Reorganized Debtors.  The Plan, therefore, complies with section 1129(a)(11) of the Bankruptcy Code.

III.  Section 1129(a)(12) — Payment of Bankruptcy Fees.  Section 12.9 of the Plan provides that all fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  (Plan § 12.9.)

JJJ.  Section 1129(a)(13) — Retiree Benefits.  In accordance with section 1129(a)(13) of the Bankruptcy Code, Section 6.11 of the Plan provides that except and to the extent previously assumed by an order of the Bankruptcy Court, as of the Confirmation Date, but

CH1 5349862v.3

subject to the occurrence of the Effective Date, all Employee Benefit Plans, including the

Employment and Retirement Benefit Agreements, of the Debtors, as amended or modified,

including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered

into before, on or after the Petition Date and not since terminated, shall be deemed to be, and

shall be treated as though they are, executory contracts that are assumed by the Debtors and

assigned to the Reorganized Debtors, except for (i) executory contracts or plans specifically

rejected pursuant to the Plan, and (ii) executory contracts or plans that have previously been

rejected, are the subject of a motion to reject or have been specifically waived by the

beneficiaries of any plans or contracts; provided, however, that (x) the Debtors shall pay all

"retiree benefits" (as defined in section 1114(a) of the Bankruptcy Code), and (y) the Debtors

shall amend those certain Employment and Retirement Benefit Agreements attached as Exhibit

13 of the Plan (filed with the Plan Supplement) prior to (or upon) the assumption thereof by the

Debtors (and assignment thereof to the Reorganized Debtors) to provide that the implementation

of the restructuring in accordance with the Plan shall not alone constitute "Good Reason" or

"Good Cause" (or provide any other similar basis) for any employee of the Debtors or the

Reorganized Debtors to terminate his or her employment nor constitute a "Change in Control"

that would result in any obligation of the Debtors or Reorganized Debtors to provide any

payments or other benefits to any employee.

       KKK.   Section 1129(b) — Confirmation of the Plan Over the Nonacceptance of

an Impaired Class.  Based upon the Confirmation Briefs, the Affidavits, the representations and

arguments of counsel for the Debtors and all other testimony given or proffered at the

Confirmation Hearing or prior hearing and the full record of these Chapter 11 Cases,

notwithstanding the fact that the Rejecting Classes have voted not to accept the Plan or are

deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the

Bankruptcy Code because: (a) the Impaired Accepting Classes have voted to accept the Plan; and

(b) the Plan does not unfairly discriminate and is fair and equitable with respect to the Rejecting

Classes. Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests

in the Rejecting Classes. As a result, the Plan satisfies the requirements of section 1129(b) of the

Bankruptcy Code. Thus, the Plan may be confirmed even though section 1129(a)(8) of the

Bankruptcy Code is not satisfied. After entry of the Confirmation Order and upon the

occurrence of the Effective Date, the Plan shall be binding upon members of the Rejecting

Classes.

     LLL.  Section 1129(d) — Purpose of Plan. The principal purpose of the Plan is

not the avoidance of taxes or the avoidance of the requirements of section 5 of the Securities Act

of 1933, and there has been no filing by any governmental unit or any other party asserting such

avoidance. Therefore, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy

Code.

## ORDERS

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, DECREED AND DETERMINED THAT:**

     1.  CONFIRMATION OF THE PLAN. The Plan (a copy of which is

annexed hereto as Exhibit A), is approved and confirmed under section 1129 of the Bankruptcy

Code. The terms of each of the documents in the Plan, the Plan Supplement, the Modified Plan

Documents (subject to further modifications by the Debtors, which modifications shall not be

inconsistent with the Plan or this Confirmation Order), and the Settlement Plan Modifications are

approved, and are incorporated by reference into, and are an integral part of the Plan.

Notwithstanding the foregoing, if there is any direct conflict or inconsistency between the terms

CH1 5349862v.3

of the Plan, the Plan Supplement, the Modified Plan Documents, the Settlement Plan
Modifications, or any Exhibit or schedule attached thereto, and the terms of this Confirmation
Order, the terms of this Confirmation Order shall control.

        2.      APPROVAL OF MODIFICATIONS TO PLAN AND PLAN
SUPPLEMENT.  The technical supplementation of the Plan and certain Plan Supplement
documents filed with the Bankruptcy Court on April 13, 2010 and May 12, 2010, (i) do not
materially or adversely change the treatment of any Holders of Claims or Interests under the
Plan, (ii) do not require additional disclosure under section 1125 of the Bankruptcy Code or the
resolicitation of acceptances or rejections of the Plan under section 1126 of the Bankruptcy
Code, (iii) do not require that Holders of Claims and Interests be afforded an opportunity to
change previously cast acceptances or rejections of the Plan, and (iv) is hereby approved
pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019.

        3.      APPROVAL OF THE SETTLEMENT MOTION, SETTLEMENT
PROCEDURES MOTION AND THE SETTLEMENT PLAN MODIFICATIONS.[7]  For the
reasons stated herein and on the record at the Settlement Hearing, the Settlement Procedures
Hearing and the Confirmation Hearing, the Settlement Objection is overruled and the relief
requested in the Settlement Motion is granted and the terms of the Equity Settlement, as
described in the Settlement Motion and on the record are approved.  Further, the Settlement Plan
Modifications are approved and the Debtors are not required to take further action to modify the
Plan to include the Settlement Plan Modifications.  In addition, the Settlement Procedures are
hereby approved, and the delivery of the Settlement Notices to the Affected Creditors was

---

[7] For purposes of paragraphs 3 and 4 only, capitalized terms shall have the meaning ascribed to such terms in the Settlement Motion.

effectuated in accordance with the Settlement Procedures, the Settlement Procedures Order and the applicable provisions of the Bankruptcy Code.

        4.      <u>AFFECTED CREDITORS/SSCC PREFERRED INTEREST HOLDERS</u>. Affected Creditors who previously voted to accept or reject the Plan are deemed to have accepted or rejected the Plan, as modified by the Settlement Plan Modifications, as applicable, except to the extent that an Affected Creditor has affirmatively elected to change its vote or to submit a vote on the Plan, as modified by the Settlement Plan Modifications pursuant to the instructions set forth in the Settlement Notices.    To the extent that a Holder of SSCC Preferred Interests has not affirmatively elected to submit a vote pursuant to the instructions set forth in the Settlement Notice, such Holder is not deemed to have accepted or rejected the Modified Plan for purposes of 11 U.S.C. § 1126.

        5.      <u>EFFECTS OF CONFIRMATION</u>.  In accordance with section 1141(a) of the Bankruptcy Code and <u>Section</u> 12.17 of the Plan, and notwithstanding any otherwise applicable law, immediately upon the satisfaction and/or waiver (as applicable) of each of the conditions set forth in <u>Section</u> 9.2 of the Plan, the terms of the Plan and this Confirmation Order shall be binding upon all Persons, including the Debtors, the Reorganized Debtors, Canadian Newco, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are Impaired under the Plan or whether the Holders of such Claims or Interests accepted, rejected, or are deemed to have accepted or rejected the Plan), any and all non-debtor parties to executory contracts and unexpired leases with any of the Debtors, and any and all Persons who are parties to or are subject to the settlements, compromises, releases, waivers, discharges and injunctions described herein or in the Plan, and the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys,

40

beneficiaries, guardians, successors or assigns, if any, of any of the foregoing. The Plan Supplement, the Modified Plan Documents, the Settlement Plan Modifications, and all Exhibits and schedules attached thereto, and any other document or agreement necessary to implement the Plan, substantially in the form as they exist at the time of the entry of this Confirmation Order are ratified and approved in all respects and shall bind all parties thereto as of the entry of this Confirmation Order, whether or not such agreements are actually issued, delivered or recorded on the Effective Date or thereafter.

6.      MODIFICATION AND EXECUTION OF PLAN DOCUMENTS. The Debtors are hereby authorized to amend or modify the Plan, the Plan Supplement, the Modified Plan Documents, the Settlement Plan Modifications or other documents or agreements necessary to implement the Plan at any time prior to the substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Section 12.15 of the Plan. In addition, without the need for a further order or authorization of the Bankruptcy Court or further notice to any Persons, but subject to the express provisions of this Confirmation Order and Section 12.15 of the Plan, the Debtors shall be authorized and empowered to make modifications to the documents filed with the Bankruptcy Court, including the Plan Supplement, the Modified Plan Documents, the Settlement Plan Modifications, or any other document forming part of the evidentiary record at the Confirmation Hearing, consistent with the terms of such documents in their reasonable business judgment as may be necessary.

7.      BAR DATE FOR CERTAIN ADMINISTRATIVE EXPENSE CLAIMS. All applications for final allowance of compensation or reimbursement of the expenses incurred by any Professional, and all other requests for the payment of Administrative Expense Claims, including all requests for the allowance of any Administrative Expense Claim pursuant to section

41

503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in these Chapter 11 Cases (but expressly excluding all requests for the payment of obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in Section 12.19 of the Plan not later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Any request for the payment of an Administrative Expense Claim that is not timely filed and served shall be discharged and forever barred and the Holder of such Administrative Expense Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim. The Debtors and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims.

       8.      BAR DATE FOR REJECTION DAMAGES CLAIMS. If the rejection by a Debtor, pursuant to the Plan, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or Reorganized Debtor, or the properties of any of them, unless a Proof of Claim is filed with the Claims Agent (as defined in the Plan) and served upon counsel to the Debtors or the Reorganized Debtors (as the case may be) at the address specified in Section 12.19 of the Plan by the earlier of (i) thirty (30) days after the Effective Date or (ii) thirty (30) days after entry of a Final Order rejecting any executory contract or unexpired lease.

       9.      PAYMENT OF CERTAIN PROFESSIONAL FEES AND EXPENSES. Pursuant to the terms of Sections 12.10, 12.11, 12.12 and 12.13 of the Plan, payment of certain and reasonable professional fees and expenses, including the fees and expenses of the Fee Auditor, the Prepetition Notes Indenture Trustee, and the Industrial Revenue Bond Indenture

Trustee is hereby approved. Further, based upon the record at the Confirmation Hearing,

including the facts set forth in the Hunt Affidavit, the reasonable professional fees of counsel for

the Ad Hoc Noteholders satisfies the standards for payment set forth in section 503(b) of the

Bankruptcy Code provided, that such fees shall not exceed $250,000, and provided further that

counsel for the Ad Hoc Noteholders shall submit a fee statement to the United States Trustee, the

Committee and the Debtors and payment of such fees shall be subject to the review of such

parties. Payment of the reasonable fees and expenses pursuant to Sections 12.10, 12.11, 12.12

and 12.13 does not violate any provision of the Bankruptcy Code.

10.     PAYMENT OF CERTAIN FEES OF AD HOC EQUITY GROUPS.

Pursuant to the terms of Sections 12.11.2 and 12.11.3, payment of the reasonable and actual

professional fees and expenses incurred prior to the Effective Date by the Ad Hoc Group of

Preferred Holders and the Ad Hoc Group of Common Holders is hereby approved pursuant to

Rule 9019 of the Bankruptcy Rules as to the Debtors, the Committee, and all Holders of Claims

and Interests as provided for in the Plan and section 1129(a)(4) of the Bankruptcy Code, and

notwithstanding anything to the contrary in the Plan, the reasonable and actual professional fees

and expenses incurred prior to the Effective Date by the Ad Hoc Group of Preferred Holders and

the Ad Hoc Group of Common Holders, who the Debtors acknowledge actively participated in

negotiations on the terms of the Plan, who settled their Objections to Confirmation enabling the

Plan to be confirmed on a consensual basis as to the SSCC Interests, and who provided other

consideration to the Debtors and the Holders of Claims and Interests of the Estates, shall be paid

in cash as soon as reasonably practicable after the Effective Date, (i) to the Ad Hoc Group of

Preferred Holders in an amount not to exceed the Ad Hoc Group Fee Cap and (ii) to the Ad Hoc

Group of Common Holders in an amount not to exceed the Ad Hoc Group Fee Cap, minus the

CHI 5349862v.3

amount of the Ad Hoc Committee of Preferred Holders Reimbursement Claim, provided, however, that all such payments shall be conditioned upon (a) receipt by the Debtors, the Committee, and the United States Trustee of (i) engagement letters for professionals retained by the Ad Hoc Group of Preferred Holders and the Ad Hoc Group of Common Holders, and (ii) invoices with supporting fee and expense detail in sufficient detail for reasonable review, which may be redacted as necessary to protect any privileged information, provided that experts retained on a flat fee shall only be required to detail expenses on or as soon as practicable after the Effective Date and (b) a good faith review of the foregoing items by the Debtors, the United States Trustee and the Committee (collectively, the "Review Parties") on or as soon as practicable after the Effective Date.  Notwithstanding anything to the contrary in this Confirmation Order (including, without limitation, Paragraph 7 hereof) the engagement letters and invoices shall be maintained by the Review Parties on a confidential basis and neither of the Ad Hoc Group of Preferred Holders or the Ad Hoc Group of Common Holders, nor their respective professionals shall be required or expected to file any application for Court approval of such fees and expenses or to seek review or consent from other parties.  Further, neither the fee and expense detail, nor the United States Trustee's review of such fee and expense detail shall be subject to the United States Trustee's fee review guidelines or the Local Rules.

          11.     ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.  By Section 7.1 of the Plan, the Assumption Motion and this Confirmation Order, except as provided for in any order approving the Rejection Motion and below, the Debtors are seeking authority to assume all of their executory contracts and unexpired leases.  Pursuant to the order approving the Assumption Motion, and the terms of the Plan, the Debtors shall pay any monetary cure amounts listed on Exhibits A and C to any order approving

the Assumption Motion (as may be amended, the "Assumption Order") on or as soon as practicable after the Effective Date of the Plan or at such other time as the Debtors and the parties to such executory contracts and unexpired leases shall agree. In the event, as of the Effective Date of the Plan, a dispute remains regarding (a) the amount of any cure payment, (b) the ability of the Reorganized Debtors, Canadian Newco or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (c) any other matter pertaining to assumption, the executory contract or unexpired lease in dispute shall be assumed, and cure payments with respect to such executory contract or unexpired lease in dispute shall be assumed, and cure payments with respect to such executory contract or unexpired lease required by section 365(b)(1) of the Bankruptcy Code shall be made, following the entry of a Final Order resolving the dispute and approving the assumption and cure amount. Pending the Court's ruling on such motion, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtors unless otherwise ordered by the Court; provided, however, that the Debtors reserve the right to amend the cure amount with respect to any such executory contract or unexpired lease or reject any such executory contract or unexpired lease prior to or upon the entry of a Final Order resolving the dispute and approving the assumption and cure amount. To the extent not approved pursuant to the Assumption Order, or any other order of this Court, entry of this Confirmation Order by the Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease shall revest in and be fully enforceable by the applicable Reorganized Debtor or Canadian Newco in accordance with its terms of the Plan, Assumption Order, or any order of the Court authorizing and providing for its assumption or applicable federal law.

12.     To the extent an executory contract or unexpired lease has not been assumed pursuant to the Assumption Order, or rejected pursuant to the Rejection Order, such executory contract or unexpired lease shall hereby be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. With respect to executory contracts or unexpired leases that are not included in the exhibits to the Assumption Order and that have not or are not otherwise being rejected by the Debtors or addressed in any order approving the Rejection Motion (or the Rejection Motion itself) or this Confirmation Order, all parties to such executory contracts or unexpired leases are hereby deemed to have (i) waived any claim of default such parties may have against the Debtors under the applicable executory contract or unexpired lease, and (ii) consented to the assumption of the applicable executory contract or unexpired lease to which they are a party with the Debtors, and the assignment of such executory contract or unexpired lease to the applicable Reorganized Debtor or Canadian Newco in accordance with and pursuant to Article VII of the Plan.  Entry of this Confirmation Order shall constitute approval of such assumption pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

13.     Other than the Cure Amounts fixed by the Court in the Assumption Order or this Confirmation Order each non-debtor counterparty to an assumed contract or lease shall be barred from asserting any claims that arose or may have arisen on or before the date of the entry of the Assumption Order or this Confirmation Order, as applicable, against any of the Debtors, Reorganized Debtors, Canadian Newco, or their respective successors or assigns, or any of their respective assets.

14.     ASSUMPTION OF INDEMNIFICATION OBLIGATIONS.  All respective obligations of SSCC and the other Debtors to indemnify and reimburse persons who

46

are or were at any time directors, officers, managers, or employees and agents of the Debtors on

the Petition Date or at any time thereafter, whether pursuant to certificates or articles of

incorporation, codes of regulation, by-laws, limited liability company agreements, limited

liability partnership agreements, applicable state or non-bankruptcy law, or specific agreement or

any combination of the foregoing, shall be treated as if they are executory contracts that are

assumed pursuant to section 365 of the Bankruptcy Code as of the Effective Date, and such

obligations shall survive confirmation of the Plan, shall remain unaffected by the Plan, and shall

not be discharged or impaired by the Plan, irrespective of whether the indemnification or

reimbursement obligation is owed in connection with any event occurring before, on or after the

Petition Date, it being understood that all indemnification provisions in place on and prior to the

Effective Date for directors, officers, managers, or employees and agents of the Debtors shall

survive the effectiveness of the Plan for claims related to or in connection with any actions,

omissions, or transactions prior to the Effective Date (including prior to the Petition Date).

15.     INSURANCE POLICIES CONSIDERED TO BE EXECUTORY

CONTRACTS.  Section 7.4 of the Plan, regarding the assumption of insurance policies and

agreements, is hereby approved in all respects.  Without limiting the foregoing and in accordance

with the Plan, any insurance policies issued to, or insurance agreements entered into by, the

Debtors prior to the Petition Date (including, without limitation, any policies covering directors'

or officers' conduct) shall continue in full force and effect after the Effective Date.

Notwithstanding anything to the contrary in this Confirmation Order or the Plan, nothing in this

Confirmation Order or Plan shall in any way operate to impair the legal, equitable or contractual

rights, if any, of any insurance policy issued to, or insurance agreements entered into by, the

Debtors prior to the Petition Date.  To the extent that such insurance policies or agreements

47

(including, without limitation, any policies covering directors' or officers' conduct) are

considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan,

the Plan shall constitute a motion to assume or ratify such insurance policies and agreements,

and, subject to the occurrence of the Effective Date, (i) the entry of this Confirmation Order shall

constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a

finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor

and its Estate and (ii) the entry of the CCAA Sanction Order shall constitute approval of such

ratification. Unless otherwise determined by the Bankruptcy Court or the Canadian Bankruptcy

Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no

payments shall be required to cure any defaults of the Debtors existing as of the Confirmation

Date with respect to each such insurance policy or agreement.  Moreover, the Debtors reserve the

right to seek (i) the rejection of such insurance policy consistent with the terms of the Plan or this

Confirmation Order or (ii) other available relief.

        16.     Notwithstanding the foregoing, nothing in the Plan, the Confirmation

Order, any Exhibit to the Plan, Plan Supplement or any other Plan document (including any

provision that purports to be preemptory or supervening) shall in any way operate to, or have the

effect of, expanding the scope of, altering, or impairing in any respect the prepetition legal,

equitable or contractual rights, obligations and defenses of the insured or insurer with respect to

any of the Debtors' insurance policies and related insurance agreements under the policies,

related agreements, and applicable non-bankruptcy law; and the Debtors' insurers shall retain

any and all defenses to coverage that such insurers may have, including the right to contest

and/or litigate with any party, including the Debtors and Reorganized Debtors, the existence,

primacy and/or scope of available coverage under any alleged applicable policy and related

agreements. The rights and obligations of the insured and the insurer shall be determined under the insurance policies and related agreements, including all terms, conditions, limitations and exclusions thereof, which shall remain in full force and effect, and any applicable non-bankruptcy law. Any insurance policies issued by ACE American Insurance Company, Pacific Employers Insurance Company, or any other member of the ACE group of companies, or Zurich American Insurance Company, or The Travelers Indemnity Company, or any of their affiliates or subsidiaries, any of their predecessors or successors (collectively, the "Insurers") and/or any related agreements between the Debtors and the Insurers ("Policies and Agreements"), to the extent that they are considered executory, are assumed by the Debtors and assigned to the Reorganized Debtors. Regardless of whether the Policies and Agreements are executory or not, after the Effective Date, the Reorganized Debtors and the Insurers will perform their respective obligations under the Policies and Agreements, including any that remain unperformed as of the Effective Date of the Plan, and such obligations and liabilities are not discharged or released.

17.     ASSUMPTION OF COLLECTIVE BARGAINING AGREEMENTS. Upon the occurrence of the Effective Date, all Collective Bargaining Agreements (other than the Non-Transferred Canadian Collective Bargaining Agreements) shall be deemed to have been assumed or ratified and assigned to Reorganized SSCC, or, in the case of the Canadian Collective Bargaining Agreement, assumed or ratified and assigned to Canadian Newco in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.

18.     Section 7.3 of the Plan provides in relevant part that "[a]ll Collective Bargaining Agreements shall be deemed to have been assumed or ratified by the Debtors party thereto upon the occurrence of the Effective Date" and that "[e]ntry of the Confirmation Order

shall constitute the Bankruptcy Court's approval of the pertinent Debtor's assumption of each

Collective Bargaining Agreement to which it is a party for the remaining term of agreement of

each such Collective Bargaining Agreement as in effect on the Effective Date, except to the

extent that such agreements have already been assumed prior to the Effective Date." All

capitalized terms in the preceding sentence shall have the meaning set forth in the Plan.  In

connection with the assumption of the foregoing Collective Bargaining Agreements authorized

by this Confirmation Order, the Debtors shall assume and provide, in the ordinary course, (i) any

and all accrued but unpaid obligations payable to employees covered by the terms of such

Collective Bargaining Agreements, including but not limited to accrued but unpaid vacation, sick

leave, pension benefits, medical benefits and/or other benefits, (ii) any and all obligations

payable to the Unions, including but not limited to any and all accrued but unpaid Union dues or

other payments and obligations to the Unions, and (iii) other amounts withheld from employee

payroll pursuant to the Collective Bargaining Agreements.  In addition, (i) the grievance and

arbitration process contained in the applicable Collective Bargaining Agreement shall apply to

any grievance that is either pending as of the date of the assumption of the Collective Bargaining

Agreement or that involves an alleged breach of the Collective Bargaining Agreement that

occurred prior to the assumption of the Collective Bargaining Agreement and (ii) the Debtors

shall comply with the terms of any settlement entered by the parties or remedy ordered by an

arbitrator acting pursuant to the Collective Bargaining Agreement (subject to any right of

review); provided however, that the parties, including the Debtors and Reorganized Debtors,

retain all rights and defenses otherwise available to them in connection with any such matter.

The foregoing commitment shall apply to any grievance which is the subject of any proceeding

pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, with

CHI 5349862v.3

the understanding that the parties retain all rights and arguments in connection with any such matter. Further, it is understood that the commitments addressed herein relating to the Debtors' obligations upon the occurrence of the Effective Date apply to all Union-represented bargaining units, including those bargaining units where the prior collective bargaining agreement is expired and the employees are working under existing terms and conditions of employment, provided that the parties, including the Debtors and Reorganized Debtors, retain all rights and defenses otherwise available to them.

19.     MATTERS RELATING TO THE CANADIAN ASSET SALE. Based upon, among other things, the Confirmation Briefs, the Affidavits in Support of Confirmation, the representations and arguments of counsel for the Debtors and all other testimony given or proffered at the Confirmation Hearing or prior hearing and the full record of these Chapter 11 Cases, and the voting results, the Canadian Asset Sale is approved in all respects. On the Effective Date, and pursuant to this Confirmation Order, the CCAA Sanction Order and the CCAA Vesting Order, the Canadian Assets shall transfer to Canadian Newco free and clear of all Liens, Claims, interests and encumbrances other than those liabilities expressly assumed by Canadian Newco in accordance with the terms of the Asset Purchase Agreement. The consideration provided by Canadian Newco for the purchase of the Canadian Assets (a) is fair and reasonable and (b) constitutes "reasonably equivalent value" and "fair consideration" (as such terms are used in each of the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and section 548 of the Bankruptcy Code). The Debtors may sell the Canadian Assets free and clear of all Interests or Claims because the Holders of Claims against SSC Canada and Smurfit-MBI have consented to the Canadian Asset Sale pursuant to Bankruptcy Code section 1123(b).

20.    <u>ACTIONS IN FURTHERANCE OF THE PLAN</u>.  Pursuant to sections

1123 and 1142 of the Bankruptcy Code, section 303 of the Delaware General Corporation Law,

and any comparable provisions of the business corporation law of any other state (collectively,

the "<u>Reorganization Effectuation Statutes</u>"), without further action by the Bankruptcy Court or

the stockholders, members, managers, or board of directors of any Debtor, Reorganized Debtor

or Canadian Newco, each of the Debtors, Reorganized Debtors or Canadian Newco, as well as

the chairman of the board of directors of SSCC, Chief Executive Officer, President, Executive

Vice President, Chief Financial Officer, Chief Operating Officer, Executive Vice President,

Senior Vice President, any Vice President or any other appropriate officer of the appropriate

Debtor, Reorganized Debtor or Canadian Newco (collectively, the "<u>Responsible Officers</u>"), is

hereby authorized to: (a) take any and all actions necessary or appropriate to implement,

effectuate and consummate the Plan, the Plan Supplement, the Modified Plan Documents, the

Settlement Plan Modifications, the Confirmation Order and each of the transactions

contemplated thereby or hereby, including, without limitation, the Canadian Asset Sale, each of

the Restructuring Transactions, each of the other transactions identified in <u>Article</u> VI of the Plan

and each of the transactions contemplated by or referenced in any document or agreement

necessary to implement the Plan; and (b) enter into, execute and deliver, assign, adopt, or amend,

as the case may be, each of the Plan Supplement documents, or any other documents otherwise

referenced in or contemplated by the Plan or any of the foregoing documents, in accordance with

their respective terms.  In furtherance of the Plan and transactions contemplated under the Plan,

the Debtors may take such actions as they deem appropriate with respect to Intercompany Claims

that are not receiving any distribution under the Plan, including, without limitation, extinguishing

such Intercompany Claims, reinstating such Intercompany Claims in full or in part, or offsetting

Intercompany Claims held by a Debtor against Intercompany Claims owed to such Debtor by other Debtors.

21.      To the extent that, under applicable non-bankruptcy law, any of the actions, transactions, documents or other matters set forth in the Plan or this Confirmation Order, would otherwise require the consent or approval of the stockholders, directors, members or managers of any of the Debtors, Reorganized Debtors or Canadian Newco, or any other consent or approval under otherwise applicable non-bankruptcy law, this Confirmation Order shall, pursuant to sections 1123(a)(5) and 1142 of the Bankruptcy Code and the Reorganization Effectuation Statutes, constitute such consent or approval, and any such actions, transactions, documents and other matters shall hereby be deemed to have been taken by unanimous action of the stockholders, directors, members or managers of the appropriate Debtor, Reorganized Debtor or Canadian Newco without any requirement of further action or consent by any such stockholder, directors, members or managers of the Debtors, Reorganized Debtors or Canadian Newco.

22.      In furtherance of Section 8.10 of the Plan, the Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate, in the Reorganized Debtors' reasonable discretion, to comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority.  Among other things, the Reorganized Debtors may (i) arrange for the sale of a portion of the New SSCC Common Stock otherwise distributable to any current or former employee or retiree ("Applicable Holder") on account of his or her Allowed Claim, on behalf of such Applicable Holder, and (ii) use the cash proceeds of such sale to fund the tax withholding requirements related to such Applicable Holder's receipt of New SSCC Common Stock pursuant to the Plan.  To facilitate the

53

foregoing sales on behalf of Applicable Holders and compliance with withholding requirements,
the Reorganized Debtors may distribute in multiple disbursements that portion of the New SSCC
Common Stock to which an Applicable Holder is entitled under the Plan and which is not sold
for withholding purposes as described in the preceding sentence.

23.     <u>AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
AND BY-LAWS</u>.  On the Effective Date, the Amended and Restated By-Laws and the Amended
and Restated Certificate of Incorporation substantially in the form as set forth in <u>Exhibit</u> 1 and
<u>Exhibit</u> 2 to the Plan (filed with the Plan Supplement), respectively, and in a form reasonably
acceptable to the Committee, shall be made effective.  The certificates or articles of
incorporation, by-laws, limited liability company agreements, and partnership agreements, as
applicable, of each Reorganized Debtor other than Reorganized SSCC shall be amended as
necessary to (a) include director and officer liability exculpation and indemnity provisions
(including advancement of expenses) for those individuals who are or were directors or officers
of the Debtors or the Reorganized Debtors on or after the Petition Date in accordance with, and
to the fullest extent authorized by, the law of such Reorganized Debtor's state of reorganization
and (b) satisfy the provisions of the Plan and the Bankruptcy Code.  After the Effective Date, the
Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-
laws, limited liability company agreements and partnership agreements, as applicable, in
accordance with applicable law.

24.     <u>CORPORATE ACTION</u>.  It is hereby ordered that, on the Effective Date,
the adoption of the Amended and Restated Certificate of Incorporation or similar constituent
documents, the adoption of the Amended and Restated By-Laws, the selection of directors and
officers for Reorganized SSCC and the other Reorganized Debtors, and all other corporate

54

actions contemplated by the Plan, including the formation of Canadian Newco pursuant to
Section 5.1.1 of the Plan, shall be deemed to have been authorized and approved in all respects
(subject to the provisions of the Plan). All matters provided for in the Plan involving the entity
structure of the Debtors or the Reorganized Debtors, and any entity action required by the
Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely
occurred in accordance with applicable law and shall be in effect, without any requirement of
further action by the security holders, directors, officers, managers, partners or shareholders of
SSCC, Reorganized SSCC, any of the other Debtors or Reorganized Debtors, or Canadian
Newco. On the Effective Date, the appropriate directors and officers of Reorganized SSCC
and/or of the other Reorganized Debtors and/or Canadian Newco shall be authorized and
directed to issue, execute and deliver the agreements, documents, securities and instruments
contemplated by the Plan in the name of and on behalf of Reorganized SSCC and/or the other
Reorganized Debtors and/or Canadian Newco (including, without limitation, (a) each of the
Amended and Restated Certificate of Incorporation of Reorganized SSCC, Amended and
Restated By-Laws of Reorganized SSCC; (b) the Exit Facility Documentation; (c) the Employee
Benefit Plans, the Employment and Retirement Benefit Agreements; (d) the Management
Incentive Plans; and (e) each of the contracts, instruments, agreements and documents to be
executed and delivered in connection with the Restructuring Transactions.

      25.    RESTRUCTURING TRANSACTIONS. Pursuant to section 303 of Title
8 of the Delaware Code and other appropriate provisions of applicable state laws governing
corporations or other legal entities and sections 1123 (including, without limitation, sections
1123(a)(5)(B), (a)(5)(C), and (a)(5)(J)), 1141 and 1142(b) of the Bankruptcy Code, the Debtors
and the Reorganized Debtors, as the case may be, are hereby authorized to enter into the

55

Restructuring Transactions contemplated by <u>Section</u> 6.14 of the Plan and described in <u>Exhibit</u> 14

to the Plan. The Debtors and Reorganized Debtors are authorized to take such actions as may be

necessary or appropriate to effect the relevant Restructuring Transactions as set forth in the Plan

and <u>Exhibit</u> 14 of the Plan, including, without limitation, (a) the execution and delivery of

appropriate agreements or other documents of merger, consolidation, dissolution or

reorganization containing terms that are consistent with the terms of the Plan and that satisfy the

requirements of applicable law (the "<u>Restructuring Documents</u>"); (b) the execution and delivery

of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any

property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the

filing of appropriate certificates of incorporation, merger, dissolution, or consolidation with the

appropriate governmental authorities under applicable law; and (d) all other actions that such

Debtors or the Reorganized Debtors, including Reorganized SSCC, and Canadian Newco

determine are necessary or appropriate in connection with the relevant Restructuring

Transactions, including, without limitation, the making of appropriate filings and/or recordings

in respect of such Restructuring Transactions. Each and every federal, state, and local

governmental agency or department is hereby directed to accept for filing and recording any and

all documents and instruments necessary or appropriate to consummate the transactions

contemplated by the Restructuring Transactions.

     26.   <u>DIRECTORS AND OFFICERS OF THE REORGANIZED DEBTORS</u>.

The appointment of (i) the initial directors and officers of Reorganized SSCC, in accordance

with <u>Section</u> 6.2.2 of the Plan and as set forth on <u>Exhibit</u> 4 of the Plan (filed with the Plan

Supplement) and (ii) the initial directors and officers of each of the Reorganized Debtors other

than Reorganized SSCC, in accordance with <u>Section</u> 6.2.4 of the Plan and as set forth on <u>Exhibit</u>

56

5 of the Plan (filed with the Plan Supplement), as of and immediately following the Effective

Date, is hereby approved.

        27.      <u>COMPENSATION AND BENEFIT PROGRAMS</u>.  The Employee

Benefit Plans and Employment and Retirement Benefit Agreements, as contemplated by <u>Section</u>

6.11 and <u>Exhibits</u> 12 and 13 of the Plan and as determined in accordance with the provisions

thereof, are hereby approved.

        28.      Notwithstanding anything to the contrary contained in the Plan, any Order

confirming the Plan, the CCAA Plan or the CCAA Sanction Order, any contingent Claims of the

Central States, Southeast and Southwest Area Pension Fund (the "<u>Central States Pension Fund</u>"),

a "multi-employer plan" as that term is defined by 29 U.S.C. § 1301 (a)(3), against the Debtors

or any third-party for withdrawal liability under 29 U.S.C. §§ 1383 and 1385, are left unimpaired

under the Plan, the Order confirming the Plan, the CCAA Plan and the CCAA Sanction Order

(collectively, the "<u>Confirmation Documents</u>"), and shall not be discharged and shall continue

unaltered by the Confirmation Documents, and no third-party shall be released pursuant to the

terms of the Confirmation Documents from any Claim that the Central States Pension Fund may

have against such third-party as a result of any one or more of the Debtors' participation in the

Central States Pension Fund.  For the avoidance of doubt, the claims of Central States Pension

Fund embodied in proofs of claim nos. 13883 - 13907 are not contingent and shall be treated

under and discharged by the Plan, provided that no third parties shall be released pursuant to the

terms of the Confirmation Documents from these Claim Nos. 13883 - 13907.

        29.      <u>MANAGEMENT INCENTIVE PLANS</u>.  The Management Incentive

Plans and the equity grants thereunder, as contemplated by <u>Section</u> 6.13 and <u>Exhibit 3</u> of the Plan

and as determined in accordance with the provisions thereof, are hereby approved.  On or after

CH1 5349862v.3

the Effective Date, without any further action in or by the Bankruptcy Court or any other court,

tribunal, agency or administrative proceeding, any further action or consent by its directors,

officers, stockholders, or any other third parties, or any other notice, action, court order or

process of any kind, the Debtors shall be authorized to take any and all actions or steps that they

deem necessary or appropriate to adopt and implement the Management Incentive Plans, and any

transactions, agreements or actions referenced therein, contemplated thereby or ancillary thereto,

each substantially in the form attached as <u>Exhibit</u> 3 to the Plan (filed with the Plan Supplement)

pursuant to which (among other things) (i) eight percent (8%) of the fully diluted New SSCC

Common Stock shall be reserved for issuance pursuant to the Plan (including shares reserved for

issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution

Reserve as of the Effective Date).

        30.    <u>CANCELLATION OF LIENS</u>.  Except as otherwise provided in the Plan,

it is hereby ordered that, on the Effective Date, in consideration for the distributions to be made

on the Effective Date pursuant to the Plan, (i) all Liens, charges, encumbrances and rights related

to any Claim or Interest, including, without limitation, those existing under the Prepetition Credit

Documents, the Calpine Corrugated Credit Agreements, and the DIP Facility Credit Agreement

and the DIP Facility Order, and any other Order of this Court shall be terminated, null and void

and of no effect, and (ii) any Lien securing any Other Secured Claim (other than a Lien securing

an Other Secured Claim that is Reinstated pursuant to the Plan) shall be deemed released and the

Holder of such Other Secured Claim shall be authorized and directed to release any collateral or

other property of any Debtor (including any cash collateral) held by such Holder and to take such

actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to

evidence the release of such Lien, including the execution, delivery, and filing or recording of

such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

      31.    <u>EXEMPTIONS FROM TAXATION</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, it is hereby ordered that, (a) the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, including, without limitation, New SSCC Common Stock, New SSCC Preferred Stock, and any New SSCC Common Stock (or other equity interests, grants, rights or other options) issued under or in connection with the Plan or Management Incentive Plans; (b) the creation, termination or cancellation of any mortgage, deed of trust, Lien, pledge or other security interest, including, without limitation, any mortgage, deed of trust, Lien, pledge or other security interest under or in connection with the Exit Facility Documentation or the Plan; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, assignments and transfer of tangible property executed in connection with the Plan, this Confirmation Order or the CCAA Sanction Order, or the CCAA Vesting Order shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee or other similar tax or governmental assessment, to the fullest extent provided for under the Bankruptcy Code and the appropriate state or local government officials or agents are hereby directed to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

59

32.   <u>EXEMPTIONS FROM SECURITIES LAWS</u>.  The issuance, distribution,

transfer or exchange of (a) the New SSCC Common Stock; and (b) any other stock, options,

warrants, conversion rights, rights of first refusal or other related rights, contractual, equitable or

otherwise, issued, authorized or reserved under or in connection with the Plan, shall be, and shall

be deemed to be, exempt from registration under any applicable federal or state securities laws to

the fullest extent permissible under applicable non-bankruptcy law and under bankruptcy law,

including, without limitation, section 1145(a) of the Bankruptcy Code.  Without limiting the

effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments

entered into on or as of the Effective Date contemplated by or in furtherance of the Plan,

including, without limitation, each of the Exhibits to the Plan (filed with the Plan Supplement),

the Modified Plan Documents, the Settlement Plan Modifications, any other document related to

the Plan or implementation thereof, the Canadian Asset Sale, and the Restructuring Transactions,

shall become effective and binding in accordance with their respective terms and conditions

upon the parties thereto.

33.   <u>DISTRIBUTIONS TO HOLDERS OF CLAIMS AND CLAIMS

RECONCILIATION</u>.  In accordance with <u>Section</u> 1.1.110 of the Plan, the Distribution Record

Date for purposes of determining the Holders of Allowed Claims that are entitled to distributions

that are required to be made under the Plan on the Effective Date or as otherwise provided under

the Plan shall be the date on which the clerk of the Bankruptcy Court enters the Confirmation

Order on its docket, or any other date that has been or will be established by the Debtors;

<u>provided</u>, <u>however</u>, that the Distribution Record Date for purposes of determining the Holders of

Allowed Claims on account of SSCE's guarantee of the 7.375% Notes due 2014 issued by Stone

FinCo II shall be five (5) days after the date on which the clerk of the Bankruptcy Court enters

60

the Confirmation Order on its docket (or the next business day if the fifth day falls on a weekend

or holiday) (the "RD Noteholder Record Date"), and the payment date on account of such

distributions shall be five (5) days after the RD Noteholder Record Date (or the next business

day if the fifth day falls on a weekend or holiday). Moreover, the provisions in Articles VI and

VIII of the Plan governing distributions and for resolving and treating Disputed Claims under the

Plan are hereby approved in all respects and found to be fair and reasonable. Except as

otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors shall

have sole responsibility and authority for administering, disputing, objecting to, compromising

and settling, or otherwise resolving and making distributions (if any) with respect to all Claims,

including all Administrative Expense Claims, without notice to any other party or approval of, or

notice to the Court; provided, however, that the foregoing shall not apply to any objections to

Claims filed by the Committee prior to the Effective Date; provided, further, however, that the

Reorganized Debtors or the Committee (if applicable) shall not be authorized to compromise,

settle, or resolve any Claim, including any Administrative Expense Claim, if the Allowed

amount of such Claim would exceed the Creditor Representative Threshold amount, without the

consent of the Creditor Representative in accordance with Section 12.14 of the Plan.

      34.   DISTRIBUTIONS TO INTEREST HOLDERS. Pursuant to Section 8.7.4

of the Plan, for the purposes of making distributions to the Holders of Allowed SSCC Interests

under the Plan, the Disbursing Agent and its agent shall be entitled to recognize and deal for all

purposes herein with only those Holders that have elected to surrender, or have been deemed to

surrender, as applicable, such SSCC Interests on or after the Effective Date. There is no

obligation to surrender SSCC Interests in order to receive a distribution on account of an SSCC

Interest. Any SSCC Interest positions on the register maintained by the stock transfer agent that

have not yet been surrendered at the time any Class 1F and Class 1G distributions are effected by

DTC shall be deemed surrendered at the time of such distributions.

35.     TREATMENT OF INTERCOMPANY CLAIMS AGAINST THE

CANADIAN DEBTORS.  Nothing in the Plan or the Confirmation Order shall be deemed to

affect or extinguish the Allowed Intercompany Claims in Sections 3.8.5, 3.9.5, 3.10.5 3.12.4,

3.13.5, 3.14.5 and 3.15.5 of the Plan.

36.     MODIFICATION TO SECTION 3.15.4(B) OF THE PLAN (GENERAL

UNSECURED CLAIMS AGAINST THE NON-OPERATING DEBTORS (CANADA)).

Section 3.15.4(b) of the Plan shall be replaced in its entirety with the following:

> "Treatment: Holders of General Unsecured Claims against the Non-Operating Debtors
> (Canada) shall not be entitled to receive or retain any monetary distributions or other
> property on account of such Claims under the Plan.  For purposes of the Chapter 11
> Cases, pursuant to the Plan, all Allowed General Unsecured Claims against the Non-
> Operating Debtors (Canada), other than 605681 N.B. Inc., shall be deemed settled,
> cancelled and extinguished on the Effective Date.  For purposes of the CCAA
> Proceedings, all General Unsecured Claims against the Non-Operating Debtors (Canada)
> shall be deemed to be Excluded Claims."

37.     MODIFICATION TO SECTION 6.7 OF THE PLAN.  Section 6.7 of the

Plan shall be replaced in its entirety with the following:

> "If the CCAA Plan is approved by each Class of Affected Creditors, then from and after
> the Confirmation Date and through to August 31, 2010 or such other date as SSC Canada,
> Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 3083527
> Nova Scotia Company, 639647 British Columbia Ltd. and Specialty Containers Inc. may
> select, in consultation with the Monitor (the "Dissolution Date"), such Canadian Debtors
> shall continue in existence and each then current officer and director of such Debtors
> shall continue to serve in his or her respective capacity through the earlier of the date
> such Debtors are dissolved pursuant to this Plan and the date such officer or director
> resigns, is replaced, or is terminated.  On the Dissolution Date, except as otherwise set
> forth in the CCAA Vesting Order, to the extent that the Canadian Assets are transferred
> to Canadian Newco and the SSC Canada Distribution Reserve and the Smurfit-MBI
> Distribution Reserve are established, SSC Canada, Smurfit-MBI, MBI Limited, B.C.
> Shipper Supplies Ltd., Francobec Company, 3083527 Nova Scotia Company, 639647
> British Columbia Ltd. and Specialty Containers Inc. shall be deemed dissolved for all

purposes without the necessity for any other or further action by or on behalf of Debtors
or any payments to be made in connection therewith; provided, however, that the Debtors
or the Reorganized Debtors shall file with the appropriate public office certificates of
dissolution for SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd.,
Francobec Company, 3083527 Nova Scotia Company, 639647 British Columbia Ltd. and
Specialty Containers Inc. to the extent required by applicable non-bankruptcy law.  From
and after the Dissolution Date, neither the Debtors nor the Reorganized Debtors shall be
required to file any document, or take any other action, to withdraw the business
operations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd.,
Francobec Company, 3083527 Nova Scotia Company, 639647 British Columbia Ltd. or
Specialty Containers Inc. from any state or province in which such Debtors previously
conducted their business operations."

     38. <u>MODIFICATION TO SECTION 3.3.4(c) OF THE PLAN</u>.  The last

sentence of <u>Section</u> 3.3.4(c) of the Plan shall be deleted and replaced in its entirety with the

following:

    "Unless expressly agreed to otherwise by the Debtors, all Convenience Claim Elections
    submitted before the Voting Deadline shall be final and irrevocable."

     39. <u>MODIFICATION TO SECTION 6.2.1(a) OF THE PLAN</u>.  <u>Section</u>

6.2.1(a) of the Plan shall be deleted in its entirety and restated as follows:

    "On the Effective Date, the Amended and Restated By-Laws and the Amended and Restated
    Certificate of Incorporation, in substantially the forms of <u>Exhibit 1</u> and <u>Exhibit 2</u> to this Plan
    (as filed with the Plan Supplement), respectively, and in a form reasonably acceptable to the
    Committee, shall become effective.  The Amended and Restated Certificate of Incorporation
    and the Amended and Restated By-Laws shall include, among other things, (i) provisions
    authorizing the issuance of 150,000,000 shares of New SSCC Common Stock, of which
    100,000,000 shares shall initially be issued or reserved for issuance pursuant to the Plan;
    provided, however, that shares representing eight percent (8%) on a fully diluted basis of the
    New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan
    (including shares reserved for issuance pursuant to the Management Incentive Plans and
    shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares
    of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent
    Management Incentive Plans, with initial equity-based grants made to certain officers and
    other employees of the Reorganized Debtors pursuant to the applicable Management
    Incentive Plan(s) at, and as of, such times as are set forth in <u>Exhibit 3</u> to this Plan; (ii)
    provisions authorizing the issuance of 10,000,000 shares of New SSCC Preferred Stock;
    provided, however, that no shares of the New SSCC Preferred Stock shall be issued on the
    Effective Date; and (iii) provisions, to the extent necessary or appropriate, giving effect to the
    terms of this Plan.  Consistent with Section 1123(a)(6) of the Bankruptcy Code, the Amended

63

and Restated Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities in contravention of the Bankruptcy Code."

40.     MODIFICATION TO SECTION 6.3.1 OF THE PLAN.  Section 6.3.1 of the Plan shall be deleted in its entirety and restated as follows:

"Issuance of New SSCC Common Stock.  On the Effective Date, Reorganized SSCC shall reserve for issuance 100,000,000 shares of New SSCC Common Stock and all related instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order or rule; provided, however, that shares representing eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the pertinent Management Incentive Plan(s) at, and as of, such times as are set forth in Exhibit 3 to this Plan."

41.     MODIFICATION TO SECTION 8.7.1 OF THE PLAN.  Section 8.7.1 of the Plan shall be deleted in its entirety and restated as follows:

"The Reorganized Debtors and the other Disbursing Agents shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Interest or Proven Claim that occurs after the close of business on the applicable Distribution Record Date, and shall be entitled for all purposes hereof to recognize and make distributions only to those Holders of Allowed Claims or Interests or Proven Claims that actually held such Claims or Interests as of the close of business on the applicable Distribution Record Date.  The Reorganized Debtors and the other Disbursing Agents shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as stated on the official claims register in the Chapter 11 Cases, or as reflected in the CCAA Monitor's records, as of the close of business on the Distribution Record Date."

42.     MODIFICATION TO SECTION 8.7.3 OF THE PLAN.  Section 8.7.3 of the Plan shall be deleted in its entirety and restated as follows:

"Distributions to Holders of Allowed Industrial Revenue Bond Claims, and Hodge Industrial Revenue Bond Claims, whether administered by an Industrial Revenue Bond Indenture Trustee or any other Disbursing Agent, shall be made to the account of, or at the direction of, the respective Industrial Revenue Bond Indenture Trustee and, subject to

64

the rights of each respective Industrial Revenue Bond Indenture Trustee to assert its Industrial Revenue Bond Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of DTC, as and to the extent practicable, and the Distribution Record Date shall not apply to such distributions. The Industrial Revenue Bond Indenture Trustee, or the Debtors or Reorganized Debtors, or the applicable Disbursing Agent, shall be authorized to and shall deliver instructions to DTC instructing DTC to effect distributions in accordance with the Plan with respect to all applicable Industrial Revenue Bond Claims and/or Hodge Industrial Revenue Bond Claims."

43.    PRESERVATION OF RIGHTS OF ACTION AND LITIGATION CLAIMS. Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims. The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims. The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Litigation Claims against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Litigation Claims upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not file, commence or pursue any claim, right or cause of action under section 547 of the Bankruptcy Code or seek to disallow any Claim to the extent it may be avoidable thereunder. Nothing in this paragraph shall be deemed to affect the validity of any release or waiver by the Debtors set forth in the Plan.

44.    CANCELLATION OF CREDIT DOCUMENTS, DEBT INSTRUMENTS AND INTERESTS. On the Effective Date, after giving effect to the distributions to be made on

65

the Effective Date pursuant to the Plan and except as otherwise provided in the Confirmation

Order, the obligations of the Debtors under all (a) Prepetition Credit Documents, Calpine

Corrugated Credit Agreements, Prepetition Notes, Prepetition Notes Indentures, Industrial

Revenue Bonds (other than the Stevenson Industrial Revenue Bonds and the St. Louis County

Bonds), Industrial Revenue Bond Indentures (other than the Hodge Industrial Revenue Bond

Indenture or other documents relating thereto), SSCC Interests, all other Interests that are

Impaired under the Plan, and any other notes, bonds, indentures, stockholders agreements,

stockholders rights agreements (including, without limitation, the Stockholder Rights Plan),

registration rights agreements, repurchase agreements and repurchase arrangements, or other

instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that

relate to Claims or Interests that are Impaired under the Plan, shall be cancelled, and (b) except

for the Hodge Industrial Revenue Bond Indenture or other documents relating thereto, any

agreements, stockholders agreements, stockholders rights agreements (including, without

limitation, the Stockholder Rights Plan), registration rights agreements, repurchase agreements

and repurchase arrangements, or indentures (including the Prepetition Notes Indentures and the

Industrial Revenue Bond Indentures) governing the Prepetition Notes, the Industrial Revenue

Bonds, the SSCC Interests, and any other notes, bonds (other than the Stevenson Industrial

Revenue Bonds and the St. Louis County Bonds), indentures, or other instruments or documents

evidencing or creating any Claims or Interests against a Debtor that relate to Claims or Interests

that are Impaired under the Plan shall be discharged.  Notwithstanding the foregoing and

anything contained in the Plan, (1) the respective obligations of SSCC to compensate, reimburse

and indemnify the applicable Prepetition Notes Indenture Trustee under Section 7.07 of each of

the Prepetition Notes Indentures shall survive the Effective Date and confirmation of the Plan

and shall be assumed by and be binding on the Reorganized Debtors, provided, however, that SSCC shall have no obligation to compensate, reimburse and indemnify the Prepetition Note Indenture Trustee for the 7.375% Notes due 2014 for fees and expenses incurred after May 10, 2010, related to the prosecution of the Intercompany Claim or Contribution Claim or any other related claims, actions or liabilities of the Debtors or their Related Persons unless otherwise ordered by the Bankruptcy Court; (2) the relevant rights of the Prepetition Notes Indenture Trustees under the Prepetition Notes Indentures (including, but not limited to, their respective rights under Sections 6.09, 7.01, 7.02, 7.04 and 7.07 thereof), and any other applicable provisions of the Prepetition Notes Indentures (but subject to the release and exculpation of the Prepetition Notes Indenture Trustees under Article X of the Plan), shall continue in effect, notwithstanding the discharge of the Prepetition Notes Indentures, with respect to any act taken at any time or omitted to be taken by the Prepetition Notes Indenture Trustees in connection with, relating to, or arising out of the Chapter 11 Cases, the CCAA Proceedings, the Plan or any contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken by the Prepetition Notes Indenture Trustees in connection with or in contemplation of the restructuring of any of the Debtors, including (i) in their capacity as Disbursing Agent(s), to make distributions pursuant to the Plan on account of the Prepetition Noteholder Claims under the respective Prepetition Notes Indentures, (ii) to assert the Prepetition Notes Indenture Trustee Charging Lien, (iii) to appear in the Chapter 11 Cases and the CCAA Proceedings, including, without limitation, in connection with any contested matter or adversary proceeding to which such Prepetition Notes Indenture Trustee is a party, and (iv) to perform any functions that are necessary in connection with the foregoing clauses (i) through (iv); (3) the Industrial Revenue Bond Indentures (other than the

67

Hodge Industrial Revenue Bond Indenture and the indentures governing the Stevenson Industrial
Revenue Bonds and the St. Louis County Bonds) shall continue in effect solely to the extent
necessary to (i) allow the applicable Disbursing Agent(s) to make distributions pursuant to the
Plan on account of the Industrial Revenue Bond Claims under the respective Industrial Revenue
Bond Indentures, (ii) permit the relevant Industrial Revenue Bond Indenture Trustee to assert its
Industrial Revenue Bond Indenture Trustee Charging Lien, (iii) permit the Industrial Revenue
Bond Indenture Trustees to appear in the Chapter 11 Cases and the CCAA Proceedings,
including, without limitation, in connection with any contested matter or adversary proceeding to
which such Industrial Revenue Bond Indenture Trustee is a party, and (iv) permit the applicable
Industrial Revenue Bond Indenture Trustee to perform any functions that are necessary in
connection with the foregoing clauses (i) through (iii); and (4) the Stevenson Industrial Revenue
Bonds and the St. Louis County Bonds shall continue in effect.  For the avoidance of doubt, (i)
the Hodge Industrial Revenue Bond Indenture shall remain outstanding, provided that the Hodge
Industrial Revenue Bonds shall be cancelled; and (ii) the obligations of Stone FinCo II under the
Stone FinCo II Indenture shall not be cancelled or discharged under the Plan and the Stone
FinCo II Indenture shall continue in effect, provided that, SSCE's obligations under the Stone
FinCo II Indenture shall be cancelled and discharged.  As of the Effective Date, any SSCC
Interest that has been authorized to be issued but that has not been issued shall be deemed
cancelled and extinguished without any further action of any party.

45.    ISSUANCE OF NEW SSCC COMMON STOCK.  All New SSCC
Common Stock issued pursuant to the Plan shall, upon issuance, be duly authorized and validly
issued, fully paid and non-assessable, and the conditions precedent to the issuance thereof shall
be deemed satisfied.

68

CH1 5349862v.3

46.    <u>PAYMENTS DEEMED TO BE MADE ON THE INITIAL</u>

<u>DISTRIBUTION DATE</u>. All payments and distributions made pursuant to the terms of the Plan

within thirty (30) days after the Effective Date shall be deemed to have been made on the Initial

Distribution Date.

47.    <u>MODIFICATION TO SECTION 1.1.200 OF THE PLAN</u>. Section

1.1.200 of the Plan shall be deleted and replaced in its entirety with the following:

> <u>Quarterly Distribution Date</u> means each date that is not later than thirty (30) calendar
> days after the conclusion of each calendar quarter ending in March, June, September and
> December during which a Disputed Claim becomes an Allowed Claim between the Initial
> Distribution Date and the Final Distribution Date.

48.    <u>EXIT FACILITIES</u>. The authority to enter into the Exit Facility

Documentation and the transactions contemplated thereby, as previously granted to the Debtors

pursuant to the Term Loan Order and the ABL Order, is hereby affirmed. Furthermore, on the

Effective Date, without any further action by the Court or the directors, officers or stockholders

of any Reorganized Debtor and Canadian Newco, each applicable Reorganized Debtor and

Canadian Newco shall be, and hereby is, (i) authorized to execute, deliver, file and record any

such other contracts, instruments, agreements, guaranties or other documents executed or

delivered in connection with the Exit Facility Documentation (the "<u>Other Related Credit</u>

<u>Documents</u>"); (ii) perform or continue to perform all of its obligations under the Exit Facility

Documentation and the Other Related Credit Documents; and (iii) take all such other actions as

any of the responsible officers of such Reorganized Debtor may determine as necessary,

appropriate or desirable in connection with the consummation of the transactions contemplated

by the Exit Facility Documentation and the Other Related Credit Documents.

49.    The guaranties, mortgages, pledges, liens and other security interests

granted pursuant to the Exit Facility Documentation and the Other Related Credit Documents are

CH1 5349862v.3

granted in good faith as an inducement to the lenders to provide credit thereunder and shall be,

and hereby are, deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not

otherwise be subject to avoidance, and the priorities of such guaranties, mortgages, pledges, liens

and other security interests shall be as set forth in the Exit Facility Documentation and the Other

Related Credit Documents (including, without limitation, any intercreditor agreements executed

in connection therewith).

           50.     <u>RELEASES AND INJUNCTIONS RELATED TO RELEASES</u>.  Each of

the Plan release and injunction provisions as set forth in, among others, <u>Section</u> 10.2 of the Plan

is hereby approved in all respects, is incorporated herein in its entirety, is so ordered and shall be

immediately effective on the Effective Date of the Plan without further action or notice by the

Bankruptcy Court, any of the parties to such releases, or any other party.  Notwithstanding any

provision of the Plan to the contrary, the Plan shall not release or otherwise bar the prosecution

of claims for willful misconduct or gross negligence as determined by a Final Order.  Without

limiting the foregoing, it is hereby ordered, adjudged and decreed that:

      a)   **Except as otherwise expressly provided in the Plan, the Confirmation Order, or
a CCAA Sanction Order, on the Effective Date, for good and valuable
consideration, to the fullest extent permissible under applicable law, each of the
Debtors and Reorganized Debtors on its own behalf and as a representative of its
respective Estate, and each of its respective Related Persons, shall, and shall be
deemed to, completely and forever release, waive, void, extinguish and discharge
unconditionally, each and all of the Released Parties of and from any and all
Claims and Causes of Action (including, without limitation, Avoidance Actions),
any and all other obligations, suits, judgments, damages, debts, rights, remedies,
causes of action and liabilities of any nature whatsoever, and any and all
Interests or other rights of a Holder of an equity security or other ownership
interest, whether liquidated or unliquidated, fixed or contingent, matured or
unmatured, known or unknown, foreseen or unforeseen, then existing or
thereafter arising, in law, equity or otherwise that are or may be based in whole
or part on any act, omission, transaction, event or other circumstance taking
place or existing on or prior to the Effective Date (including prior to the Petition
Date) in connection with or related to any of the Debtors, the Reorganized
Debtors, Canadian Newco, or their respective assets, property and Estates, the**

Chapter 11 Cases or the Plan, the Disclosure Statement, the Canadian Asset
Sale, or the Restructuring Transactions that may be asserted by or on behalf of
any of the Debtors, the Reorganized Debtors or their respective Estates;
provided, however, that nothing in this paragraph shall be construed to release
any party from willful misconduct or gross negligence as determined by a Final
Order.

b)   Except as otherwise expressly provided in the Plan, this Confirmation Order, or
a CCAA Sanction Order, on the Effective Date, for good and valuable
consideration, to the fullest extent permissible under applicable law, each Person
that has held, currently holds or may hold a Claim or any other obligation, suit,
judgment, damages, debt, right, remedy, cause of action or liability of any
nature whatsoever, or any Interest, or other right of a Holder of an equity
security or other ownership interest that is terminated, and each of its respective
Related Persons, shall, and shall be deemed to, completely and forever release,
waive, void, extinguish and discharge unconditionally each and all of the
Released Parties of and from any and all Claims, any and all other obligations,
suits, judgments, damages, debts, rights, remedies, causes of action and liabilities
of any nature whatsoever (including, without limitation, those arising under the
Bankruptcy Code), and any and all Interests or other rights of a Holder of an
equity security or other ownership interest, whether liquidated or unliquidated,
fixed or contingent, matured or unmatured, known or unknown, foreseen or
unforeseen, then existing or thereafter arising, in law, equity or otherwise that
are or may be based in whole or part on any act, omission, transaction, event or
other circumstance taking place or existing on or prior to the Effective Date
(including prior to the Petition Date) in connection with or related to any of the
Debtors, the Reorganized Debtors or their respective assets, property and
Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement, the
Restructuring Transactions, or the Canadian Asset Sale; provided, however,
that nothing in this paragraph shall be construed to release any party from
willful misconduct or gross negligence as determined by a Final Order provided
further, however, that (i) each Person that has submitted a Ballot may elect, by
checking the appropriate box on its Ballot, not to grant the releases set forth in
this Paragraph 39(b) or Section 10.2.2 of the Plan with respect to those Released
Parties other than the Debtors, the Reorganized Debtors, Canadian Newco, and
their respective predecessors, successors and assigns (whether by operation of
law or otherwise), and (ii) Stone FinCo II shall not grant the releases set forth in
this paragraph and in Section 10.2.2 of the Plan with respect to those Released
Parties other than the Debtors, the Reorganized Debtors, Canadian Newco, and
their respective predecessors, successors and assigns (whether by operation of
law or otherwise).  For the avoidance of doubt, the releases described in this
paragraph and in Section 10.2.2 of the Plan with respect to those Released
Parties other than the Debtors, the Reorganized Debtors, Canadian Newco, and
their respective predecessors, successors and assigns (whether by operation of
law or otherwise) shall not be applicable to (i) any Holders of Claims or Interests
that are not entitled to vote to accept or reject the Plan, (ii) any Holders in voting

Classes that (a) do not vote, or (b) submit a Ballot and "opt-out" by marking the appropriate box on the Ballot, nor (iii) Stone FinCo II.

c)  Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to Section 10.2 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.2 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the CCAA Sanction Order.

d)  Notwithstanding anything to the contrary contained in Section 10.2 of the Plan, each of the Settlement Released Parties shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the other Settlement Released Parties of and from, as applicable, any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, properties and Estates, the Chapter 11 Cases or the Plan, the Disclosure Statement, the Restructuring

72

Transactions, the Canadian Asset Sale, the Settlement Motion and the settlement contemplated therein; provided, however, that the foregoing shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Ad Hoc Group of Preferred Holders, Ad Hoc Group of Common Holders, or their respective members or Related Persons, to enforce the provisions of the Plan including, without limitation, Sections 3.2.6, 3.2.7, 9.1.2, 9.2.2, 12.11.2, 12.11.3 and 12.15.

e)   Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, the Settlement Released Parties, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.2.7(a) of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the CCAA Sanction Order.

51.    **DISCHARGE OF CLAIMS**.  It is hereby ordered, adjudged and decreed that, as of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Interests, or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors, the Reorganized Debtors, Canadian Newco, or any of their respective assets,

73

CH1 5349862v.3

property and Estates, or interests of any nature whatsoever, including any interest accrued

on such Claims from and after the Petition Date, and regardless of whether any property

shall have been distributed or retained pursuant to the Plan on account of such Claims or

other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or

liabilities, or Interests or other rights of a Holder of an equity security or other ownership

interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be

deemed discharged under section 1141(d)(1)(A) of the Bankruptcy Code and applicable

provisions of the CCAA and released from any and all Claims and any other obligations,

suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any

Interests or other rights of a Holder of an equity security or other ownership interest, of

any nature whatsoever, including, without limitation, liabilities that arose before the

Effective Date (including prior to the Petition Date), and all debts of the kind specified in

sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of

Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy

Code, (b) a Claim based upon such debt is deemed to be an Allowed Claim in the Chapter

11 Cases or a Proven Claim in the CCAA Proceedings (or is otherwise resolved), or (c) the

Holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and

cancel all rights of any equity security Holder in any of the Debtors and all Interests,

including, without limitation, the SSCC Interests.

52.     Pursuant to section 1141(d)(3) of the Bankruptcy Code, this

Confirmation Order shall not discharge SSC Canada, Smurfit-MBI, Stone FinCo II, MBI

Limited, B.C. Shipper Supplies Ltd., or Francobec Company from any Claims and other

debts or obligations that arose prior to the Petition Date.

CHI 5349862v.3

53.      **DISCHARGE INJUNCTION.  It is hereby ordered, adjudged and decreed that, except as provided in the Plan, this Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or any of their respective assets, property and Estates, the Reorganized Debtors, or Canadian Newco that is discharged pursuant to Section 10.1.1 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors, Canadian Newco, any of their respective property and their respective Related Persons, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any**

75

amount against any liability or obligation that is discharged under <u>Section 10.1.1</u> of this

Plan; and (v) commencing or continuing in any manner, in any place of any judicial,

arbitration or administrative proceeding in any forum, that does not comply with or is

inconsistent with the provisions of the Plan, this Confirmation Order or the CCAA

Sanction Order.

      54.    <u>**SUPPLEMENTAL INJUNCTION.**</u>  In order to preserve and promote

the settlements contemplated by and provided for in the Plan, and to supplement, where

necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the

Bankruptcy Code and as described in this Article, except as otherwise expressly provided

in the Plan or the Confirmation Order, it is hereby ordered, adjudged and decreed that all

Persons and any Person claiming by or through them, which have held or asserted, which

currently hold or assert or which may hold or assert any Claims or any other obligations,

suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any

nature whatsoever, and all Interests, or other rights of a Holder of an equity security or

other ownership interest, against any of the Released Parties based upon, attributable to,

arising out of or relating to any Claim against or Interest in any of the Debtors, whenever

and wherever arising or asserted, whether in the United States, Canada, or anywhere else

in the world, whether sounding in tort, contract, warranty or any other theory of law,

equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained

and enjoined from taking any action against any of the Released Parties for the purpose of

directly or indirectly collecting, recovering or receiving any payment or recovery with

respect to any such Claims or other obligations, suits, judgments, damages, debts, rights,

remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an

76

equity security or other ownership interest, arising prior to the Effective Date (including

prior to the Petition Date), including, but not limited to: (a) commencing or continuing in

any manner any action or other proceeding of any kind with respect to any such Claims or

other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or

liabilities, and all Interests, or other rights of a Holder of an equity security or other

ownership interest, against any of the Released Parties or the assets or property of any

Released Party; (b) enforcing, attaching, collecting or recovering, by any manner or means,

any judgment, award, decree or order against any of the Released Parties or the assets or

property of any Released Party with respect to any such Claims or other obligations, suits,

judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests

or other rights of a Holder of an equity security or other ownership interest; (c) creating,

perfecting or enforcing any Lien of any kind against any of the Released Parties or the

assets or property of any Released Party with respect to any such Claims or other

obligations, suits, judgments, damages, debts, rights, remedies, causes of action or

liabilities, and all Interests or other rights of a Holder of an equity security or other

ownership interest; (d) except as otherwise expressly provided in the Plan, the

Confirmation Order, or the CCAA Sanction Order, asserting, implementing or

effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any

kind against any obligation due to any of the Released Parties or against the property of

any Released Party with respect to any such Claims or other obligations, suits, judgments,

damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other

rights of a Holder of an equity security or other ownership interest; and (e) taking any act,

in any manner, in any place whatsoever, that does not conform to, or comply with, the

77

CH1 5349862v.3

provisions of the Plan, the Plan Related Documents, this Confirmation Order, or the CCAA Sanction Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.

55.     **EXCULPATION.**  It is hereby ordered, adjudged and decreed that no Released Party shall have or incur any liability to (i) any Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) any other party in interest, (iii) any Person claiming by or through any of the foregoing entities, or (iv) any of the Related Persons of any of the foregoing entities, from (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken at any time or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the Disclosure Statement, the Restructuring Transactions, the Canadian Asset Sale, the Exit Facilities, or any other contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence, and each Released Party in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities under the Plan.

78

56.     It is hereby ordered, adjudged and decreed that, notwithstanding any other provision herein, (i) no Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) no other party in interest, (iii) no Person claiming by or through any of the foregoing entities, and (iv) none of the Related Persons of any of the foregoing entities, shall, or shall be deemed to, have any Claim or right of action whatsoever against any Released Party for, or on account of or relating to (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the Disclosure Statement, the Confirmation Order, the Restructuring Transactions, the Canadian Asset Sale, the Exit Facilities, or any other contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence.

57.     REVESTING OF ASSETS.  Pursuant to section 1141(b) of the Bankruptcy Code, Section 10.6 of the Plan, and any applicable provisions of the CCAA, all property of the respective Estate of each Debtor, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtor or Canadian Newco on the Effective Date (subject to

79

the effects of the Restructuring Transactions and the Canadian Asset Sale). Thereafter, the

Reorganized Debtors and Canadian Newco may operate their businesses and may use, acquire

and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules

and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor and

Canadian Newco shall be free and clear of all Liens, Claims and Interests, except as specifically

provided in the Plan, the Confirmation Order, or the CCAA Sanction Order. Without limiting

the generality of the foregoing, each Reorganized Debtor and Canadian Newco may, without

application to or approval by the Bankruptcy Court, pay fees that it incurs after the Effective

Date for professional services and expenses.

58.     DISSOLUTION OF THE UNSECURED CREDITORS COMMITTEE.

The Committee shall continue in existence until the Effective Date. On the Effective Date, the

appointment of the Committee shall terminate, and the Committee shall be dissolved, provided,

however, that following the Effective Date, the Committee shall continue to have standing and a

right to be heard solely with respect to: (i) Claims and/or applications for compensation by

Professionals and requests for allowance of Administrative Expense Claims for substantial

contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the

Confirmation Order that remain pending as of the Effective Date; (iii) any adversary proceedings

or contested matter as of the Effective Date to which the Committee is a party; (iv) responding to

creditor inquiries for one hundred and twenty (120) days following the Effective Date; and (v) its

good faith review of the materials provided by the Ad Hoc Group of Common Holders and the

Ad Hoc Group of Preferred Holders with respect to the professional payments described in

Sections 12.11.2 and 12.11.3 of the Plan. All reasonable fees and expenses incurred by the

Professionals retained by the Committee in connection therewith shall be paid by the

Reorganized Debtors without the requirement of any further order of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, on the Effective Date, the Committee shall be dissolved and the members of the Committee shall be released and discharged of and from all duties, responsibilities and obligations related to or arising from or in connection with the Chapter 11 Cases.

59.     ST. LOUIS COUNTY BONDS AND STEVENSON INDUSTRIAL REVENUE BONDS.  Nothing in the Plan or this Confirmation Order shall be deemed to alter the Debtors and Reorganized Debtors rights or obligations under the Stevenson Industrial Revenue Bonds and the St. Louis County Bonds.

60.     SETOFF.  Notwithstanding anything to the contrary herein or in the Plan, parties may assert any valid, enforceable setoff rights under applicable law to the extent allowed under section 553 of the Bankruptcy Code.

61.     RESOLUTION OF CERTAIN OBJECTIONS TO CONFIRMATION. Certain Objections to Confirmation, to the extent not satisfied by a separate agreement, are hereby resolved on the terms and subject to the conditions set forth below.  Accordingly, each of the formal or informal objections listed in paragraphs a through paragraph n below have been, and shall be deemed to have been, withdrawn by the respective objecting party at or prior to the Confirmation Hearing or, with respect to the Valuation Objections, on the Effective Date.  The compromises and settlements contemplated by each such resolution to an Objection are fair, equitable and reasonable, are in the best interests of the Debtors and their respective Estates and creditors and are hereby expressly approved pursuant to Bankruptcy Rule 9019.

a)    Environmental Protection Agency

As to the United States, its agencies, departments, or agents (collectively, the "United States"), nothing in this Confirmation Order or the Plan discharges, releases, or precludes: (i) any environmental liability to the United States that is not a Claim; (ii) any environmental Claim of the United States arising on or after the Confirmation Date; (iii) any environmental liability to the United States on the part of any entity as the owner or operator of real property after the Confirmation Date (provided, however, that nothing in this clause (iii) shall be construed to deny a discharge, release or preclusion of any Claim with respect to such real property for: (a) response costs, oversight costs or other monetary costs incurred prior to the Confirmation Date or (b) penalties for all days of alleged violation of law prior to the Confirmation Date); or (iv) any environmental liability to the United States on the part of any Person other than the Debtors or Reorganized Debtors. Nor shall anything in this Order or the Plan enjoin or otherwise bar the United States from asserting or enforcing, outside this Court, any liability described in this paragraph. Notwithstanding any other provision in this Order or the Plan, the Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by the United States are discharged or otherwise barred by this Order, the Plan, or the Bankruptcy Code.

b)    The Gexa Objection

Notwithstanding any provision in the Plan or Confirmation Order, the proof of claim filed by Gexa Energy LP shall be deemed timely filed. Further, claim number 13611 by Gexa Energy LP shall be deemed an Allowed Claim.

c)    DOJ Objection/IRS Objection

Notwithstanding any provision to the contrary in the Plan, the Confirmation Order, or any implementing or supplementing Plan documents, the setoff rights, as set forth in

82

section 553 of the Bankruptcy Code, and recoupment rights of the United States, including the

Internal Revenue Service ("IRS"), shall be preserved and are unaffected.

Further, no provision of the plan, including but not limited to the exculpation

provisions in Article X, is to have the effect of limiting any right of the IRS to assess or collect

taxes, interest, or penalties from any non-debtor.

d)    CAT Objection

Nothing herein shall deemed to affect Caterpillar Financial Services

Corporation's security interest granted pursuant to the Leases (as defined in the CAT Objection)

in the Equipment (as defined in the CAT Objection) in the possession of the Debtors,

Reorganized Debtors or Canadian Newco.

e)    Andritz Objection

The SSCE Distribution Reserve shall include a reserve of $1,314,347.33 for

Andritz Inc.'s rejection damage claim (Claim No. 13877) (the "Andritz Claim"), provided

however, the Debtors and/or Reorganized Debtors' right to object to the Andritz Claim on any

and all grounds is expressly preserved.

f)    Montana DOR Objection

If the Debtors fail to cure a default with respect to a tax payment owed to the

Montana Department of Revenue (the "Montana DOR") that is not the subject of a bona fide

dispute within ten (10) days after service of a written notice of such default from the Montana

DOR, then the Montana DOR may (a) enforce the entire amount of its undisputed claim, (b)

exercise any and all rights and remedies under applicable nonbankruptcy law, and (c) seek such

relief as may be appropriate in this Court.

Further, nothing in the Plan or the Confirmation Order shall, or shall be deemed

to, release, discharge, nullify, enjoin or preclude the enforcement or assessment by Montana

83

DOR of any liability, in the appropriate court or administrative body, against any non-Debtor

entity or person subject to liability for taxes owed to the Montana DOR, subject to any defenses

that such non-debtor entity or person may have under applicable law and facts.

> g)    Surety Bond Objection

The SSCE Distribution Reserve shall include a reserve of $2,080,000 for Bond

Safeguards' claim (Claim No. 10503) (the "Bond Safeguard Claim"), provided, however, the

Debtors and/or Reorganized Debtors' right to object to the Bond Safeguard Claim on any and all

grounds is expressly preserved.

> h)    ERISA Objection

Notwithstanding anything to the contrary in the Plan or this Confirmation Order,

neither the entry of the Confirmation Order nor the occurrence of the Effective Date of the Plan

shall, or shall be deemed to, prejudice, release, waive, discharge, enjoin or otherwise impair the

rights of or belonging to the ERISA Objectors (as defined in the ERISA Objection)

against SSCE, SSSC, and the defendants named in the action brought by the ERISA Objectors in

the United States District Court for the Northern District of Illinois (Case No. 09-cv-02984) (the

"ERISA Action") with respect to any insurance policies or insurance proceeds which may be

available or may afford coverage with respect to the putative claims or causes of action asserted

in (i) the ERISA Action or (ii) the proofs of claims filed against SSCE and SSSC on behalf of or

belonging to the ERISA Objectors.

> i)    Texas Taxing Authorities Objection/Fort Worth Objection

Notwithstanding any language in the Plan to the contrary, to the extent that the

Local Texas Tax Authorities (as defined in the Texas Taxing Authorities Objection) or FWISD

et al. (as defined in the Fort Worth Objection, and together with the Local Texas Tax Authorities,

the "Texas Taxing Authorities") hold an Allowed Other Secured Claim, then (i) such Allowed

Other Secured Claim shall be paid in full in Cash pursuant to the Plan, together with any unpaid

interest thereon accruing from the Petition Date through the date of payment at the rate

determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code,

(ii) the accrued taxes for the 2010 tax year owed to the Texas Taxing Authorities shall be paid

timely pursuant to applicable nonbankruptcy law without the necessity of the Texas Taxing

Authorities filing an administrative expense claim or request for payment, and (iii) to the extent

that any valid Liens securing such Allowed Other Secured Claim or for post-petition 2010 taxes

exist as of the Effective Date (a "Tax Lien"), such Tax Liens shall not be cancelled, released,

subordinated or otherwise affected pursuant to the Plan pending satisfaction of any such Allowed

Other Secured Claim and payment of post-petition 2010 taxes.

> j)     Montana Department of Environmental Quality

As to the Montana Department of Environmental Quality ("MDEQ") , nothing in

this Confirmation Order or the Plan discharges, releases, or precludes: (i) any environmental

liability to the MDEQ that is not a Claim; (ii) any environmental Claim of the MDEQ arising on

or after the Confirmation Date; (iii) any environmental liability to the MDEQ on the part of any

entity as the owner or operator of real property in the state of Montana after the Confirmation

Date (provided, however, that nothing in this clause (iii) shall be construed to deny a discharge,

release or preclusion of any Claim with respect to such real property for: (a) response costs,

oversight costs or other monetary costs incurred prior to the Confirmation Date or (b) penalties

for all days of alleged violation of law prior to the Confirmation Date); or (iv) any environmental

liability to the MDEQ on the part of any Person other than the Debtors or Reorganized Debtors.

Nor shall anything in this Order or the Plan enjoin or otherwise bar the MDEQ from asserting or

enforcing, outside this Court, any liability described in this paragraph.  Notwithstanding any

other provision in this Order or the Plan, the Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by the MDEQ are discharged or otherwise barred by this Order, the Plan, or the Bankruptcy Code.

k)      Baron and Budd Claimants

Nothing in the Plan, including Article X thereof, or in the Confirmation Order shall or shall be deemed to release, discharge, exculpate, nullify, enjoin or preclude the enforcement of any claims of the Baron and Budd Claimants against any non-debtor entity subject to liability for such claims, subject to any defenses that any such non-debtor entity may have under applicable law.

In addition, nothing in the Plan or the Confirmation Order shall impair or modify the rights of the Baron & Budd Claimants from exercising their rights to liquidate their Claims against any Reorganized Debtor in a non-bankruptcy court of competent jurisdiction as provided by 28 U.S.C. § 157(b)(2)(B) and nothing in the Plan or the Confirmation Order shall be deemed to modify the rights of any Baron & Budd Claimant against any defendant, including any Reorganized Debtor, in any such proceeding.

The Reorganized Debtors and Baron & Budd have agreed that the Claims of the Baron & Budd Claimants shall be liquidated on an expedited basis no later than sixty (60) days after the Effective Date pursuant to the terms of the pre-petition letter agreement between Baron & Budd and Smurfit-Stone (the "Letter Agreement"). Any Claims of Baron & Budd Claimants upon which agreement cannot be reached between the parties shall be submitted to non-binding mediation in a single mediation conducted by a mediator from the state of Louisiana who is mutually acceptable to Baron & Budd and the Reorganized Debtors. The costs of such mediation will be borne fifty percent (50%) by the Reorganized Debtors and fifty percent (50%)

86

by the Baron & Budd Claimants. The purpose of such mediation is to liquidate the Claim being mediated and determine the amount, if any, the Claimant should receive in satisfaction of the Claim. Any differences in interpretation of the Letter Agreement also shall be determined by the mediator.

Once liquidated, claims of the Baron & Budd Claimants shall be treated in accordance with the provisions of the Plan. Upon liquidation of a Claim of a Baron & Budd Claimant, stock distributed in satisfaction of the Claim shall be issued to Baron & Budd pursuant to the Power of Attorney granted to Baron & Budd by the Claimant or to a fund or designee designated by Baron & Budd for purposes of receiving such stock.

### l)     M&T Objection

Notwithstanding Section 12.10 of the Plan, the Debtors shall pay Manufacturers and Traders Trust Company ("M&T") in full, in cash, all of its reasonable fees and expenses through May 10, 2010 on account of its actions as Prepetition Notes Indenture Trustee on behalf of the 7.375% Notes Due 2014. With respect to any and all fees and expenses of M&T for the period after May 10, 2010, (i) the Debtors will pay in full, in cash, all of M&T's reasonable fees and expenses related to any distributions to Holders of the 7.375% Notes Due 2014 pursuant to the Plan, and (ii) that the Debtors will not pay any fees and expenses of M&T related to the prosecution of the Intercompany Claim or Contribution Claim or any other related claims, actions or liabilities of the Debtors or their Related Persons, provided that such fees and expenses may be added to the claim of the Holders of the 7.375% Notes Due 2014 against Stone FinCo II and may be asserted as part of the Stone FinCo II Contribution Claim.

87

m)    <u>CIT Objection</u>

The CIT Stipulation is hereby approved. The first sentence of <u>Section</u> 3.5.4(b) of the Plan (Class 4D: CIT Group Claims Against Calpine Corrugated) is hereby deemed amended to add the following language to the end thereof: ", plus the further sum of $750,000 in settlement and compromise of CIT's claims for payment of default rate interest in excess of non-default rate interest accruing under the CIT Credit Agreement through the Effective Date and, in the event that the Effective Date has not occurred on or before July 15, 2010, CIT shall also receive payment of interest accruing at the default rate under the CIT Credit Agreement from July 15, 2010 through the Effective Date." Notwithstanding anything to the contrary herein or in the Plan, on the Effective Date, Calpine Containers, Inc. shall be authorized to assert any valid and enforceable setoff rights against Calpine Corrugated, LLC under applicable law to the extent allowed under section 553 of the Bankruptcy Code.

n)    <u>UBC Objection</u>

The Union Bank Stipulation is hereby approved. The first sentence of <u>Section</u> 3.5.3(b) of the Plan (Class 4C: Union Bank Claims Against Calpine Corrugated) is hereby deemed amended to add the following language to the end thereof: ", plus the further sum of $125,000 in settlement and compromise of Union Bank's claims for payment of default rate interest in excess of non-default rate interest accruing under the Union Bank Credit Agreement through the Effective Date."

62.    <u>OVERRULING OF CERTAIN OBJECTIONS TO CONFIRMATION</u>. All Objections, including the Stone FinCo II Objections, which was overruled pursuant to the Aurelius Order, not otherwise addressed herein or previously settled or withdrawn are hereby

overruled for the reasons set forth on the record at the Confirmation Hearing and in this Confirmation Order.

63.     RETENTION OF EXCLUSIVE JURISDICTION BY THE BANKRUPTCY COURT AND THE CANADIAN BANKRUPTCY COURT.  The retention of jurisdiction provisions set forth in Article XI of the Plan are approved.

64.     INJUNCTIONS AND STAYS REMAIN IN EFFECT UNTIL THE EFFECTIVE DATE.  All injunctions or stays that are in effect in the Chapter 11 Cases or the CCAA Proceedings on the Confirmation Date, whether by operation of law (including, without limitation, section 362 of the Bankruptcy Code) or by order of the Bankruptcy Court or the Canadian Bankruptcy Court (including, without limitation, the CCAA Initial Order and all subsequent extension orders), shall continue and remain in full force and effect through and including the Effective Date.

65.     FAILURE TO FILE A TIMELY PROOF OF CLAIM.  Any person or entity (including, without limitation, any individual, partnership, joint venture, corporation, limited liability company, estate, trust or governmental unit) that was required to file a timely proof of claim in the form and manner specified by the Bar Date Order, Canadian Bar Date Order or 503(b)(9) Order and failed to do so on or before the bar date associated with such claim, shall be forever barred, stopped and enjoined from asserting such claim against the Debtors or Reorganized Debtors and shall not receive or be entitled to receive any payment or distribution of property from the Debtors or their successors or assigns with respect to such claim.

66. <u>SUBSTANTIAL CONSUMMATION</u>. The substantial consummation of the Plan, within the meaning of section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

67. <u>PAID-IN CAPITAL OF CORPORATE REORGANIZED DEBTORS</u>. On the Effective Date, after all other transactions necessary to effect this Plan have been consummated, the Paid-in Capital, as such term is defined in section 1.80(j) of the Illinois Business Corporation Act of 1983, 805 ILCS 5/1.01, *et seq.* (the "<u>BCA</u>"), of each corporate Reorganized Debtor shall, pursuant to Section 9.20(a)(2) of the BCA, be reduced to the following amounts (such reduced amounts to be referred to individually and collectively as the "<u>Section 64 Paid-in Capital Amount</u>" and "<u>Section 64 Paid-in Capital Amounts</u>," respectively): (i) in the case of Reorganized SSCC its Paid-in Capital shall be reduced to the aggregate par value, if any, of Reorganized SSCC's issued and outstanding shares of capital stock plus such amount as is recorded on Reorganized SSCC's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles, and (ii) in the case of each other corporate Reorganized Debtor its Paid-in Capital shall be reduced to the aggregate par value, if any, of each such other Reorganized Debtor's issued and outstanding shares of capital stock plus such amount as is recorded on each such other Reorganized Debtor's financial statements as paid in capital or additional paid in capital under its fresh start accounting in accordance with Generally Accepted Accounting Principles. The amount required to reduce the Paid-in Capital of each corporate Reorganized Debtor to its Section 64 Paid-in Capital Amount shall be treated as a reduction in Paid-in Capital under Section 9.20(a)(2) of the BCA. Any capital of each corporate Reorganized Debtor remaining in excess of its Section 64 Paid-in Capital Amount shall not be treated as Paid-in

90

Capital for purposes of the BCA. For purposes of this <u>Section 64</u>, the term "corporate" refers to a corporation as defined in Sections 1.80(a) or (b) of the BCA.

68. <u>REFERENCE TO AND VALIDITY AND ENFORCEABILITY OF PLAN PROVISIONS</u>. The failure to reference any particular provision of the Plan in this Confirmation Order shall have no effect on the binding effect, enforceability or legality of such provisions and such provisions shall have the same binding effect, enforceability or legality as every other provision of the Plan. Each term and provision of the Plan, as it may have been altered or interpreted by this Court, is valid and enforceable pursuant to its terms.

69. <u>INJUNCTIONS AND STAYS REMAIN IN EFFECT UNTIL THE EFFECTIVE DATE</u>. All injunctions and stays in effect on the date of the entry of the Confirmation Order, pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise, shall remain in full force and effect until the Effective Date of the Plan (except that nothing herein shall bar the filing of financing statement in connection with the implementation of the Exit Facility Documentation or the taking of such other actions as are necessary to effectuate the transactions contemplated by the Plan or this Confirmation Order) and thereafter shall be annulled, except as provided for in the Plan or this Confirmation Order.

70. <u>NOTICE OF ENTRY OF CONFIRMATION ORDER</u>. Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Debtors and the Reorganized Debtors, as the case may be, are hereby directed to serve, within a reasonable time period after the occurrence of the Effective Date, a notice of the entry of the Confirmation Order, which shall include notice of any bar dates established by the Plan and the Confirmation Order and notice of the Effective Date (the "<u>Confirmation Notice</u>"), on all parties that received notice of the Confirmation Hearing.

71.     If any or all of the provisions of the Confirmation Order are hereafter

reversed, modified or vacated by subsequent order of this Court or any other court, such reversal,

modification or vacatur shall not affect the validity of the acts or obligations incurred or

undertaken under or in connection with the Plan or the Confirmation Order prior to the Debtors'

or other applicable person's receipt of written notice of any such order.  Notwithstanding any

such reversal, modification, or vacatur of the Confirmation Order, any such act or obligation

incurred or undertaken pursuant to, and in reliance on, the Confirmation Order prior to the

effective date of such reversal, modification or vacatur shall be governed in all respects by the

provisions of the Confirmation Order and the Plan or any amendments or modifications thereto.

72.     As soon as practicable after the entry of the Confirmation Order, the

Debtors shall make copies of this Confirmation Order and the Confirmation Notice available on

the Debtors' website at http://chapter11.epiqsystems.com/smurfit.

73.     This Confirmation Order is a final order and the period in which an appeal

must be filed shall commence upon the entry hereof.  Notwithstanding Bankruptcy Rules 7062 or

3020(e), this Confirmation Order shall be effective and enforceable immediately upon entry.

Pursuant to Bankruptcy Rules 6004(h), 6006(d) and 7062, the Court hereby expressly finds that

there is no just reason for delay in the implementation of this Confirmation Order, and this order

shall be effective immediately upon entry.

Dated:   Wilmington, Delaware
          June 21, 2010

Brendan L. Shannon
United States Bankruptcy Judge

92

# EXHIBIT C

1           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   KLEEN PRODUCTS LLC, et al.,    )  No. 10 C 5711
                           )
4              Plaintiffs,   )  Chicago, Illinois
                           )  November 24, 2009
5                         )  9:30 o'clock a.m.
   -vs-                   )
6                           )
                           )
7   PACKAGING CORPORATION OF       )
   AMERICA, et al.,           )
8                           )
             Defendants.   )
9

10             TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MILTON I. SHADUR
11
   APPEARANCES:
12   For the Plaintiffs:     FREED KANNER LONDON & MILLEN LLC
                       2201 Waukegan Road, Suite 130
13                       Bannockburn Illinois 60015
                       BY:  MR. STEVEN A. KANNER
14                           MR. MICHAEL J. FREED
                            and
15                       THE MOGIN LAW FIRM
                       707 Broadway, Suite 1000
16                       San Diego, California  92101
                       BY:  MR. DANIEL J. MOGIN
17
   For Plaintiff Thule:   MILLER LAW LLC
18                       115 South LaSalle Street, Suite 2910
                       Chicago, Illinois 60603
19                       BY:  MR. MARVIN A. MILLER
                            and
20                       ROBBINS GELLER RUDMAN & DOWD LLP
                       655 West Broadway, Suite 1900
21                       San Diego, California
                       BY:  MS. ALEXANDRA S. BERNAY
22

23   Court Reporter:        ROSEMARY SCARPELLI
                       219 South Dearborn Street
24                       Room 1412
                       Chicago, Illinois  60604
25                       (312) 435-5815

1   APPEARANCES:   (Continued)

2   For Defendant              KIRKLAND & ELLIS LLP
    Packaging Corporation      300 North LaSalle Street
3   of America:               Chicago Illinois 60654
                              BY:  MR. DANIEL E. LAYTIN
4
    For Defendant              GIBSON DUNN & CRUTCHER LLP
5   International Paper:        555 Mission Avenue, Suite 3000
                              San Francisco California 94105
6                             BY:  MR. GEORGE A. NICOUD, III
                                       and
7                             EIMER STAHL KLEVORN & SOLBERG
                              224 South Michigan Avenue
8                             Suite 1100
                              Chicago, Illinois 60604
9                             BY:  MR. NATHAN P. EIMER
                                   MR. JOHN K. THEIS
10
    For Defendant              K&L GATES LLP
11  Cascades, Inc. and         70 West Madison Street, Suite 3100
    Norampac Industries:       Chicago Illinois 60602
12                            BY:  MR. SCOTT M. MENDEL

13  For Defendant              McDERMOTT WILL & EMERY
    Weyerhaeuser Company:      227 West Monroe Street, Suite 4400
14                            Chicago, Illinois 60606
                              BY:  MS JENNIFER A. DIVER
15
    For Defendant              FIGLIULO & SILVERMAN
16  Georgia Pacific:           Ten South LaSalle Street, Suite 3600
                              Chicago, Illinois 60603
17                            BY:  MR. JAMES R. FIGLIULO
                                       and
18                            QUINN EMANUEL URQUHART
                              & SULLIVAN LLP
19                            51 Madison Avenue, 22nd Floor
                              New York, New York 10010
20                            BY:  MR. STEPHEN R. NEUWIRTH

21  For Defendant              MAYER BROWN LLP
    Temple-Inland, Inc.:       71 South Wacker Drive
22                            Chicago, Illinois 60606
                              BY:  MR. ANDREW S. MAROVITZ
23

24

25

1    APPEARANCES:    (Cont.)

2    For Smurfit-Stone          WINSTON & STRAWN LLP
     Container Corporation:     35 West Wacker Drive
3                               Chicago, Illinois 60601
                                BY:   MR. R. MARK McCAREINS
4                                     MR. JAMES F. HERBISON

5    ALSO PRESENT:              SIDLEY & AUSTIN LLP
                                One South Dearborn Street
6                               Chicago, Illinois 60603
                                BY:   MR. MATTHEW A. CLEMENTE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  This is 10 C 5711, Kleen Products

2    versus Packaging Corporation of America.

3          THE COURT:  If there are more persons than one out

4    on the phone, first identify yourselves, if you would, for

5    the record.  And then if you have an occasion to talk again,

6    make sure that you give your name up front so that our court

7    reporter can match it with what is -- what is being said with

8    who says it.  Okay?

9          MR. NEUWIRTH:  Thank you, your Honor.  This is

10   Stephen Neuwirth from Quinn Emanuel Urquhart & Sullivan for

11   defendant Georgia Pacific.

12         THE COURT:  And you are the only one on the phone?

13         MR. THEIS:  No, your Honor.  This is Jack Theis

14   from Eimer Stahl Klevorn & Solberg on behalf of International

15   Paper.

16         THE COURT:  Okay.  And then --

17         MS. BERNAY:  Good morning, your Honor, Alexandra

18   Bernay from Robbins Geller Rudman & Dowd on behalf of

19   plaintiff Thule.

20         THE COURT:  Okay.  And that is it on the phone?

21         MR. MOGIN:  Good morning, your Honor, this is

22   Daniel Mogin on behalf of the other plaintiffs.

23         THE COURT:  Okay.  Now I guess we have to go from

24   left to right as I have it and the court reporter has it, and

25   so let's do that.

                  MR. KANNER:  Good morning, your Honor, Steve Kanner

 1      from the Freed Kanner firm in Chicago here on behalf of the

 2      plaintiffs.

 3

 4                MR. MILLER:  Good morning, your Honor, Marvin

 5      Miller on behalf of Thule.

 6                MR. FREED:  Good morning, your Honor, Michael Freed

 7      on behalf of class plaintiffs other than Thule.

 8                MR. McCAREINS:  Good morning, your Honor, Mark

 9      McCareins and Jim Herbison on behalf of Smurfit Stone.

10                MR. EIMER:  Good after -- good morning, your Honor,

11      Nate Eimer on behalf of International Paper.

12                MR. NICOUD:  Good morning, your Honor, Trey Nicoud

13      also on behalf of International Paper.

14                MS. DIVER:  Good morning, your Honor, Jennifer

15      Diver on behalf of Weyerhaeuser Company.

16                MR. FIGLIULO:  Good morning, Jim Figliulo on behalf

17      of Georgia Pacific.

18                MR. MENDEL:  Scott Mendel on behalf of defendants

19      Cascades and Norampac.

20                MR. MAROVITZ:  Good morning, your Honor, Andy

21      Marovitz on behalf of Temple-Inland.

22                MR. LAYTIN:  Dan Laytin for PCA.

23                THE COURT:  Well, good morning to all of you.  As

24      always, I shudder when I try to figure out the total hourly

25      rate that we are looking at here, but put that aside.  And I

1  am very appreciative for all of you making yourselves

2  available on short notice, but -- and there is no reason you

3  have to be standing around for this.  I want to tell you

4  where I am and why I have called this meeting.  Okay?  So you

5  can all be seated, if you will.

6  This request that I have made has been occasioned

7  by my having reviewed the submissions that were made in the

8  Bankruptcy Court in Delaware, although I didn't get a chance

9  to read the most recent one that just got tendered to me.

10  But I don't know if that may be another copy of the November

11  19th reply brief which I had already received.  So if that is

12  the thing that got delivered physically, I have already read

13  that.  Okay.

14  And that in turn caused me to review once again the

15  Consolidated Complaint in this antitrust case.  If I may be

16  blunt, counsel for Smurfit-Stone are seeking to obtain an

17  order from the Bankruptcy Court that I believe it has no

18  jurisdiction to entertain, and I would be remiss if I were

19  not to order counsel for Smurfit-Stone and plaintiffs'

20  counsel who are before me to apprise the bankruptcy judge of

21  why I have concluded that.

22  Let me explain.  It is just flat-out misleading to

23  characterize the lawsuit before me as seeking relief from

24  Smurfit-Stone that is at odds with its discharge in

25  bankruptcy.  That I do not regard as accurate and I think --

1   although I don't like to say this, I think that

2   Smurfit-Stone's counsel really ought to know that. Although

3   the class period is defined in Paragraph 1 of the complaint

4   as running from May 2005 to the present day, and that is true

5   as to all other defendants, that is, all defendants other

6   than Smurfit-Stone, the provision of Paragraph 22 of the

7   complaint cannot be more clear. After reciting the facts, as

8   it does, about Smurfit-Stone's entry into and its emergence

9   from Chapter 11 proceedings with a discharge, the complaint

10  says this: "This complaint seeks to recover damages from

11  Smurfit-Stone for post-discharge conduct only and in no way

12  seeks to violate any orders of the above-referenced

13  Bankruptcy Court," and then goes on to identify some specific

14  post charge -- post-discharge actions that were allegedly

15  taking place in furtherance of a conspiracy.

16          Now that disclaimer, I suggest, could not be more

17  express. And I can assure you of one thing, and that is that

18  the plaintiffs are going to be held to that in my court. And

19  what do I get offered up in the way of responses from

20  Smurfit-Stone? What I view as inaccurate and impermissible

21  arguments, based on all the allegations of the complaint that

22  speak, it is true, of Smurfit-Stone's predischarge conduct.

23          Now why do I say that that is really misleading?

24  It is because that contention, I believe, impermissibly

25  conflates evidence with claims. It is an ironic coincidence

1    that all of you were, I guess, sitting in court when I just

2    was talking to the young lady about the employment

3    discrimination case and made exactly that distinction.  And I

4    will -- I certainly wouldn't expect all you gurus in the

5    antitrust field to be generalists, as used to be the case in

6    ancient days, and to know, for example, about employment

7    discrimination, but that is exactly the same proposition,

8    that is, the conduct that was present, or allegedly present

9    -- I shouldn't be misunderstood as making any findings.  I am

10   not.

11            But things that would be predischarge that could be

12   considered, for example, on the issue whether Smurfit-Stone

13   was possessed of the prohibited intent that might be an

14   element of the antitrust claim of fixing prices in restraint

15   of trade are certainly permissible.  And the fact that

16   Smurfit-Stone has been washed clean of any potential for

17   damages on that score does not alter the fact that those

18   allegations may well be considered by the Court.

19            Again, you know, it is -- as I say, it was really

20   ironic because I hadn't anticipated when I asked you to come

21   in that I was going to be dealing with precisely the same

22   phenomenon in a case in another area of the law.  But it is

23   just the same, that is, the idea that liability does not

24   control -- or the lack of liability does not control, the

25   appropriateness of allegations that are in the -- that are in

1    the complaint that deal with a time period for which

2    Smurfit-Stone no longer has any potential liability of the

3    type that the Bankruptcy Court could deal with appropriately.

4           Now my colleagues and I are constantly

5    encountering, I will say, misguided defense lawyers who

6    sometimes move, for example, to strike allegations relating

7    to the earlier time frame, the same sort of thing that I

8    dealt with not ten minutes before all of you stepped up here.

9    That is wrong.  And it is equally wrong here.

10          Now I can tell you I don't have any desire to

11   create a tug of war or any kind of conflict with the

12   bankruptcy judge in Delaware.  But what you are asking the

13   judge to do is to enjoin litigation that addresses, so far as

14   Smurfit-Stone is concerned, only a period over which the

15   Bankruptcy Court has no jurisdiction.  Now every federal

16   judge has an affirmative duty to police jurisdiction.  As I

17   know all the practitioners in this district are aware, I

18   regularly address sua sponte cases in which federal

19   jurisdiction is absent, either dismissing or remanding those

20   cases, as the case may be.

21          There is no lesser duty, as I view it, to protect

22   and preserve jurisdiction where it clearly exists, as it does

23   here.  If injunctive relief is indeed called for, I suppose

24   that I ought to have no hesitancy in acting to enjoin

25   Smurfit-Stone from the effort to impede this Court's

1   jurisdiction.

2            Anyway, so much for my unkind comments.  But I felt

3   compelled to deal with that because, as I understand it, you

4   know, you people have teed up in front of the bankruptcy

5   judge in Delaware something that urges the bankruptcy judge

6   to do something that I think is inappropriate and that is, as

7   I would emphasize again, outside of the jurisdiction of that

8   court.  The Bankruptcy Court would have no business, of

9   course, enjoining or stopping this proceeding to the extent

10  that it seeks post-discharge responsibility on

11  Smurfit-Stone's part.

12           So with my having said that, I suppose I would like

13  to ask Smurfit-Stone what -- now, I read your stuff, but I've

14  got to tell you I found it unpersuasive.  But maybe you have

15  got something that would overcome what I have just said.

16           MR. McCAREINS:  Your Honor, Mark McCareins on

17  behalf of Smurfit-Stone in the antitrust case.  Two comments.

18  First, since there is no motion pending before your Honor on

19  this point, how would you envision memorializing your Court's

20  ruling which you just gave?

21           THE COURT:  I have specifically delivered it to you

22  orally, and there is a record of that.  And when you want to

23  know about memorializing it, the Court's statement is

24  memorialized.  And I've got to tell you I did this quite

25  deliberately.

1          Again, when I said I don't want to create a tug of

2    war, I don't want a -- I don't want to get a bankruptcy

3    judge's nose out of joint out of the sense that I have

4    intermeddled with the Bankruptcy Court's jurisdiction,

5    because I haven't.  But I would also be remiss, as I say, if

6    the bankruptcy judge didn't have before him the views of this

7    Court in connection with what is -- has been tendered there

8    as a request for preliminary injunctive relief that I think

9    is out of bounds.  And so that is -- I didn't -- you know, I

10   haven't -- although I am -- as you know, I am not hesitant to

11   commit myself to paper, and it is not just the fact that my

12   secretary happens to be away in Hawaii on vacation.  That is

13   not really the issue.

14         But I felt that it would be most appropriate, given

15   what I understand to be the timetable and the fact that the

16   issues have been posed to the Bankruptcy Court, at a minimum

17   I think that report should be made to the Bankruptcy Court

18   about the views that I have just expressed.

19         Now, I am not -- you know, I am not going to order

20   the Bankruptcy Court to do anything.  Of course not.  But I

21   do have power over the litigants, and so if I were to say,

22   "Smurfit-Stone, subside," I would expect they wouldn't want

23   to run the risk of contempt over here.  But who wants -- who

24   wants to do something like that?  I don't.  But again, you

25   know, I thought through this thing, as you might gather, and

1   I read through the Complaint, and it confirmed exactly what I

2   had thought from day one.

3             And somehow the -- what I consider misguided is the

4   effort to sort of scrap the allegations in the Complaint that

5   it is quite true do not serve as a basis for liability for

6   Smurfit-stone because it is discharged, it is washed clean of

7   anything in terms of potential liability for those earlier

8   acts, if they occurred.  Don't misunderstand, if they

9   occurred.  But to say those don't belong in the Complaint

10  because of the fact that there is no liability is a

11  misunderstanding, I think, of what the law is and ought to

12  be.  And you could not -- you know, we are dealing with good

13  lawyers on all sides here.  And I don't think that the

14  Consolidated Complaint could have been more precise and more

15  obvious and more clear and more accurate in what I just read

16  than it has been.

17            So that is -- that is my message to you, and I

18  would hope that a word to the many wise ones here would be

19  sufficient.

20            MR. McCAREINS:  One other thought.  I am not

21  counsel to Smurfit in the bankruptcy matter.

22            THE COURT:  Yeah.

23            MR. McCAREINS:  Matt Clemente from Sidley & Austin

24  is here who represents Smurfit in the bankruptcy proceeding.

25            MR. CLEMENTE:  Good morning, your Honor.

```
1    MR. McCAREINS:  And, Matt, would you like to
2    address any of these issues?
3    THE COURT:  Sure.
4    MR. CLEMENTE:  I would.  Thank you, your Honor.
5    For the record, Matt Clemente, Sidley Austin, on behalf of
6    Smurfit-Stone Container Corporation.  And, your Honor, I do
7    appreciate your comments.  And just as an initial matter, we
8    will be certain to inform Judge Shannon of your comments
9    today.  So rest assured we will absolutely take care to do
10   that.
11   Your Honor, as you may or may not know, I have been
12   counsel to Smurfit throughout its Chapter 11 reorganization
13   proceedings which concluded on June 30, 2010, with the entry
14   of a confirmation order, a key provision of which, as your
15   Honor is aware, is a discharge and a discharge injunction.
16   THE COURT:  Right.  And you are out.  Okay.
17   MR. CLEMENTE:  Well, we are out.  However, your
18   Honor, I was slightly disturbed by what I heard your Honor
19   say today for obvious reasons.  Are you suggesting that we
20   are out, but we are not really out?
21   THE COURT:  Oh, no, on the contrary.  What I am
22   saying -- you know, here:  For example, Smurfit-Stone clearly
23   has to respond to discovery.  The fact that it is discharged
24   from liability for that doesn't say that it is -- that from
25   the beginning of the world to the date of June 30th has
```

1    vanished from the scene.  It hasn't.  It existed.  And

2    whatever happened during that earlier period may be relevant

3    in this action to the extent that it bears upon

4    Smurfit-Stone's potential liability from the time of

5    discharge forward.  If --

6            MR. CLEMENTE:  That is where, your Honor, we would

7    have a slight disagreement.

8            THE COURT:  Suppose that somebody murdered somebody

9    else and then has -- and then a conviction is vacated for

10   that.  And then the person comes along and kills somebody

11   else afterwards.  The idea that the Court should put on

12   blinders in terms of sentencing and say, "Oh, well, that

13   never existed," is just unrealistic.  You know, in the

14   criminal field as well we often look at situations in which

15   there is no potential for punishment or for sanctions or

16   anything else in an earlier time, and yet we are aware of the

17   matter and take it into account.  No different, really.

18           MR. CLEMENTE:  Your Honor, I would actually

19   respectfully disagree with that, although I --

20           THE COURT:  You can.

21           MR. CLEMENTE:  Although I believe reorganization

22   proceedings are crucially important, it is clearly not on the

23   level of murder proceedings.  I wouldn't purport to suggest

24   that.

25           But what we have here, your Honor, is a situation

1  where a group of plaintiffs who have not disputed the notice

2  of the bankruptcy process, have not disputed the things that

3  give rise to a claim that accrued prior to the discharge,

4  made a decision to wait until after the discharge was entered

5  to prosecute this particular proceeding.  And then they are

6  using --

7             THE COURT:  So what is wrong with that?

8             MR. CLEMENTE:  I am going to get to that, your

9  Honor.  Then they are using the strength of allegations

10  related to predischarge conduct.  Your Honor, we also

11  examined the Complaint, including the speaking notice that

12  was filed yesterday in front of your Honor.  And if I might

13  quote:  "Such allegations are clearly relevant to this

14  antitrust case; however, since they provide background

15  concerning Smurfit-Stone's participation in an illegal

16  conspiracy, which knowledge was carried over by senior

17  executives to Smurfit-Stone in its post bankruptcy conduct."

18  Your Honor, what they are trying to do is they are trying to

19  say, "We had a claim prior to the discharge.  We chose not to

20  pursue it.  Now we are going to pursue that very same claim

21  and say, you know what, we are just going to limit liability

22  for post-discharge conduct, but we are going to bootstrap" --

23             THE COURT:  Not in my court are they going to be in

24  a position to do what you characterize as pursue a claim.

25  There is one way to pursue a claim, and that is to seek to

1    obtain a judgment.  That is how you pursue a claim.  They are

2    clearly not going to get any kind of relief, any kind of

3    judgment that stands -- that is based upon -- predischarge

4    conduct.  That is a very different phenomenon from the one

5    that I talked about, and that is that predischarge conduct

6    may well be taken into account.  And by the way, you know, I

7    read their response.  I wasn't -- I was not taken by the fact

8    that they chose to rehash early on all of the substantive

9    part because that is really -- I am talking about their

10   response in the Bankruptcy Court.

11              MR. CLEMENTE:  I understand, your Honor.

12              THE COURT:  Because that, as far as I am concerned,

13   was really irrelevant.  They are not -- they are not proving

14   their case before the Bankruptcy Court in Delaware.

15              MR. CLEMENTE:  I understand, your Honor.

16              THE COURT:  And they shouldn't try.  But again I

17   think that what you have said really does not face up to the

18   points that I have made, and that is that -- that I am going

19   to be very careful, I can assure you, to separate out any

20   prospect of seeking liability for pre -- for predischarge

21   conduct.

22              But the notion that, as I say, the Court should don

23   blinders and not take matters into his -- suppose -- again,

24   you know, it really is a parallel.  If there is -- if what we

25   have as a necessary ingredient of an antitrust claim is bad

1  intent, okay, and bad intent can be manifested by earlier

2  conduct that creates inferences about current intent -- that

3  happens all the time and it does not get in the way of

4  404(b), incidentally, because it is one of the things that

5  404(b) quite expressly excludes from the notion of

6  inadmissibility.

7         So again I think we are functioning somewhat at

8  cross-purposes, because I know you have got -- you know, you

9  have got a mindset that is -- that is a proper advocate's

10  mindset.  But I've got to tell you I am not bringing an

11  advocate's point of view to this one.  I am bringing what is

12  an objective and, I trust, judicial -- and I trust as well

13  judicious -- point of view to the point that I am dealing

14  with.

15         So you people go ahead and -- but I've got to tell

16  you, I would urge that given the characterization that I have

17  just placed, it is not well-considered to be seeking an

18  injunction against their proceeding on a post-discharge

19  theory of liability against Smurfit-Stone and to place that

20  before a Bankruptcy Court that really has no jurisdiction.

21  Once the discharge is made, that is out.

22         And indeed there are a number of cases that they

23  cited that basically say that a party that has been

24  discharged from bankruptcy is not then insulated from

25  post-discharge responsibility for whatever conduct that might

1   be actionable.  That is all we are going to be looking at

2   here.

3            Again I can assure you I am not going to permit

4   anything other than the representation that they have made

5   here in the paragraph that I read as establishing any

6   predicate for a potential liability on the part of

7   Smurfit-Stone.

8            But if it is engaged indeed in a conspiracy, the

9   notion that it should not be responsible, when the alleged

10  co-conspirators are, would I think really offend the justice

11  system.  Why should -- why should you be -- go clean, if that

12  is true -- and again I emphasize I am not making any findings

13  -- when everybody else may be on the hook?  It is just not

14  right, and it is not the law.

15           MR. CLEMENTE:  Your Honor, if I may, the only

16  distinction that I would continue to urge your Honor to

17  consider is, again, had this claim been brought in a

18  bankruptcy context as an initial matter, like we believe it

19  should have been, there would have been an adjudication,

20  perhaps in front of a nonbankruptcy forum.  I am not

21  suggesting it would have been Judge Shannon ultimately making

22  that adjudication.  But what would have not have happened if

23  -- had that claim been adjudicated and dealt with in the

24  bankruptcy process, three months later an additional

25  complaint could have been filed alleging pre-petition --

1    predischarge conduct being relevant to that post-discharge

2    claim that they are alleging.  That is the point that we are

3    trying to make, your Honor.  There is a distinction there

4    that they cannot stand on the sidelines while the bankruptcy

5    process goes forward, okay, and then arise three months later

6    and say --

7              THE COURT:  The consequence -- the consequence of

8    their, as you put it, having stood on the side is that they

9    have no ability to advance a claim based on the predischarge

10   conduct.  That is the consequence.  They are stuck.  Okay?

11   But the idea that you should somehow ease yourself out of

12   this lawsuit on that basis is just wrong.

13             And I know that we all get boring when we repeat

14   ourselves, and I am no exception to that.  But I've got to

15   tell you that you really have not -- I think you may have

16   lost your moorings on that one, because you haven't really

17   thought through what the effect is of, as you put it, their

18   not having presented that to the Bankruptcy Court.  Suppose

19   they had.  What would have happened is exactly the same thing

20   that has happened now, and that is the Bankruptcy Court would

21   have rejected it as one of the claims --

22             MR. CLEMENTE:  Correct.

23             THE COURT:  -- and it is gone as a claim.  Again,

24   that doesn't go to the issue --

25             MR. CLEMENTE:  And it would have been dealt with in

1    the bankruptcy context and it would have been treated in
2    accordance with the bankruptcy plan.  What we have now here,
3    your Honor, is a post -- an alleged post-discharge claim that
4    is being proven -- or allegedly being proven based on
5    predischarge conduct that would allow collection of monies to
6    advance on top of --
7              THE COURT:  Did you ever see Cool Hand Luke?
8              MR. CLEMENTE:  Part of it, I must admit, your
9    Honor.
10             THE COURT:  "What we have here is a failure to
11   communicate."  And you just haven't gotten it.
12             MR. CLEMENTE:  No, your Honor, I do get where you
13   are coming from, your Honor.
14             THE COURT:  I guess not.  But I really have said
15   all that I have to say this morning.
16             I thought it was important to get the message over
17   to everybody, because it affects this Court's jurisdiction.
18   And this Court has just as much of an obligation, as I say,
19   to preserve its jurisdiction as it does to reject
20   jurisdiction if it doesn't exist.  So that is where we are.
21   Okay?
22             Thank you all.
23             MR. CLEMENTE:  Thank you, your Honor.
24             MR. McCAREINS:  Thank you, your Honor.
25             MR. EIMER:  Have a nice holiday.

```
 1          THE COURT:  Pardon?

 2          MR. EIMER:  Have a nice holiday.

 3          THE COURT:  Thank you.  You too.

 4          MR. EIMER:  Thank you.

 5          THE COURT:  I guess all but Smurfit-Stone.

 6       (Which were all the proceedings heard.)

 7                      CERTIFICATE

 8       I certify that the foregoing is a correct transcript

 9    from the record of proceedings in the above-entitled matter.

10

11    s/Rosemary Scarpelli/        Date:  November 24, 2010

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT D

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, et al.,[1] | Case No. 09-10235 (BLS) |
| | Jointly Administered |
| Debtors. | **Ref. Docket No. 3374** |

### NOTICE OF FILING OF PROPOSED REVISIONS TO (I) DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION FOR SMURFIT-STONE CONTAINER CORPORATION AND ITS DEBTOR SUBSIDIARIES AND PLAN OF COMPROMISE AND ARRANGEMENT FOR SMURFIT-STONE CONTAINER CANADA INC. AND AFFILIATED CANADIAN DEBTORS AND (II) CERTAIN EXHIBITS THERETO

**PLEASE TAKE NOTICE** that on December 22, 2009, the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed the Disclosure Statement for Joint Plan of Reorganization for Smurfit-Stone Container Corporation and Its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors [Docket No. 3374] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 1 is a blackline reflecting certain proposed revisions to the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 2 and Exhibit 3, respectively, are proposed revised versions of Exhibit B-2 (Anticipated Post-Effective

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 222 North LaSalle Street, Chicago, Illinois 60601.

Date Corporate Structure Charts) and Exhibit D (Liquidation Analysis) to the Disclosure

Statement.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to seek approval

of the Disclosure Statement at the hearing (the "Hearing") currently scheduled for January 29,

2010 at 11:30 a.m. (ET).  The Debtors reserve the right to further revise the Disclosure Statement

prior to the Hearing.

Dated: Wilmington, Delaware
          January 27, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP
James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
Brian J. Lohan
Matthew G. Martinez
One South Dearborn Street
Chicago, Illinois  60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

                 -and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____/s/ Robert F. Poppiti, Jr._____
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION

DB02:9192852.1                                                                                            068063.1001

**EXHIBIT 1**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, et al.,[1] | Case No. 09-10235 (BLS) |
| Debtors. | Jointly Administered |

**DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR SMURFIT-STONE CONTAINER CORPORATION AND ITS DEBTOR SUBSIDIARIES AND PLAN OF COMPROMISE AND ARRANGEMENT FOR SMURFIT-STONE <u>CONTAINER CANADA INC. AND AFFILIATED CANADIAN DEBTORS</u>**

SIDLEY AUSTIN LLP
James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

STIKEMAN ELLIOTT LLP
Sean F. Dunphy
Alexander D. Rose
5300 Commerce Court West
199 Bay Street
Toronto, Ontario M5L 1B9
Telephone: (416) 869-5261
Facsimile: (416) 947-0866

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware, 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 222 North LaSalle Street, Chicago, Illinois 60601.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY OTHER PURPOSE UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO
 SECTION 1125 OF THE BANKRUPTCY CODE.

---

### IMPORTANT DATES

- Date by which Ballots and Master Ballots must be received: [_____]

- Date by which objections to Confirmation of the Plan must be filed and served: [_____]

- Hearing on Confirmation of the Plan: [_____] at [   --.m.] (Prevailing Eastern Time)

---

## TABLE OF CONTENTS

DISCLAIMER ................................................................................... 1

I. INTRODUCTION ......................................................................... 4

    **A.**    **Overviews of Chapter 11 and CCAA Proceedings.**............ 5

        **1.**    **Chapter 11 Proceedings.**........................................ 5

        **2.**    **CCAA Proceedings.**............................................... 6

    **B.**    **Overview of Voting Procedures and Plan Confirmation in Chapter 11 Proceedings.**................................................. 7

        **1.**    **Parties Entitled to Vote on the Plan.**.................... 7

        **2.**    **Solicitation Package.**............................................ 8

        **3.**    **Voting Procedures, Ballots, and Voting Deadline.**............... 9

        **4.**    **Plan Confirmation Hearing.**............................... 10

        **5.**    **Objections to Confirmation.**............................... 10

    **C.**    **Overview of Solicitation and Voting on the Plan in the CCAA Proceedings.**.............................................. 11

II. OVERVIEW OF THE PLAN AND CCAA PLAN ........................ 12

    **A.**    **General Overview.**............................................... 12

    **B.**    **Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors and Canadian Debtors Under the Plan.**................... ~~14~~13

    **C.**    **Canadian Asset Sale.**............................................ ~~17~~20

    **D.**    **Executive Compensation:  Management Incentive Plans and Employment Agreements.**............................... ~~20~~23

        **1.**    **Management Incentive Plans.**............................ ~~20~~23

        **2.**    **Executive Employment Agreements.**................. ~~23~~26

III.  GENERAL INFORMATION .................................................. ~~23~~31

    **A.**    **The Debtors' Businesses and Properties.**............... ~~27~~31

        **1.**    **Company Overview.**........................................... ~~27~~31

2.      Properties. ................................................................ 27 31

B.      Operational Structure of the Debtors. ........................... 27 31

1.      Products and Materials. ................................... 28 32

2.      Materials. ........................................................ 29 33

3.      Customers. ...................................................... 29 33

4.      Employees. ...................................................... 30 34

5.      Recent Operations. .......................................... 30 34

6.      Corporate History and Business Acquisitions. ................ 31 35

C.      Management of Debtors. ................................................ 32 36

1.      Board of Directors. .......................................... 32 36

2.      Biographies of Directors. ................................. 32 36

3.      Committees of the Board of Directors. ................ 34 37

4.      Compensation of Directors. ............................. 34 38

5.      Executive Officers. .......................................... 35 38

6.      Biographies of the Senior Executive Officers. ........ 35 39

7.      Executive Compensation. ................................. 39 43

D.      Compensation and Benefits Programs. ........................... 39 43

1.      Historical Incentive Programs Prior to the Chapter 11 Cases. ........ 40 44

2.      Short-Term and Long-Term Incentive Compensation Plans Approved During the Chapter 11 Cases. ........ 41 44

3.      Executive Agreements. ..................................... 46 50

4.      Retirement Plans. ............................................ 47 51

5.      Other Post-Retirement Benefit Programs. ........... 48 52

E.      Pre-Petition Debt and Capital Structure of the Company. ........ 49 53

1.      Pre-Petition Secured Debt Under the Pre-Petition Credit Agreement. ........ 49 53

2.    Senior Note Debt. ................................................................ 51 55

3.    Securitization Facilities. ....................................................... 51 55

4.    Utility and Industrial Revenue Bonds and Other Debt
Obligations. ......................................................................... 52 56

5.    Intercompany Debt. .............................................................. 53 57

6.    Trade Debt. ........................................................................... 57 61

7.    Equity of SSCC. .................................................................... 57 61

F.    **Restructuring Transactions and** Post-Effective Date Debt and Capital
Structure of the Company. ............................................................ 57 61

1.    **Restructuring Transactions.** ................................................ 61

2.    Post-Effective Date Equity in Reorganized SSCC. ......................... 58 62

2. 3.    Exit ~~Financing for~~ Facilities of Reorganized Debtors. ........................... 58 62

G.    **Pending Litigation Against the Debtors.** ......................................... 58 63

H.    **Events Leading up to Chapter 11.** .................................................. 59 64

IV.  EVENTS DURING THE PROCEEDINGS ................................................. 59 64

A.    **First-Day Relief in the Chapter 11 Cases.** ...................................... 60 64

1.    Utility Services. .................................................................... 60 65

2.    Payment of Federal, State and Local Taxes. ............................ 60 65

3.    Shippers, Warehousemen and Other Lien Claimants. ............... 61 65

4.    Critical Trade Vendor Treatment and Payment of Priority
Claims. ................................................................................ 61 66

5.    Continuation and Payment of Prepetition Insurance. ............... 61 66

6.    Customer Programs. ............................................................. 62 66

7.    Employee Compensation and Benefits. ................................... 62 66

8.    Cash Management. ................................................................ 62 67

9.    Use of Cash Collateral. ......................................................... 63 67

       **10.**     **Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs.** ........................................ 63 67

**B.**    **Relief in CCAA Proceedings.** ........................................................... 63 68

**C.**    **Debtor-in-Possession Financing.** .................................................. 65 70

       **1.**     **Post-Petition Financing Needs.** .......................................... 65 70

       **2.**     **The DIP Financing Motion and Orders.** ............................. 65 70

       **3.**     **The DIP Facility.** ................................................................ 65 70

**D.**    **Appointment of Creditors' Committee.** ....................................... 67 71

**E.**    **Professional Retention.** ................................................................ 67 72

**F.**    **Cross-Border Insolvency Protocol.** ............................................. 69 73

**G.**    **Substantive Matters in the Proceedings.** ..................................... 69 74

       **1.**     **Exclusive Procedures for Section 503(b)(9) Claims.** ......... 69 74

       **2.**     **Claims Reconciliation** ......................................................... 74

       **3.**     **Extension of Time to Remove Actions.** ............................... 69 74

       **3. 4.**     **Executory Contracts and Unexpired Leases.** ...................... 69 74

       **4. 5.**     **Asset Sales.** ......................................................................... 70 75

       **6.**     **Ontonagon, MI and Missoula, MT Mill Closures.** .............. 77

       **5. 7.**     **Hodge Trustee's Motion for Payment of Administrative Expenses.** .......................... 72 **and Disclosure Statement Objection.** 78

       **6. 8.**     **Georgia Pacific Litigation.** ................................................. 73 78

       **7. 9.**     **i2i Europe, ltd. Adversary Proceeding.** ........................... 73 80

       **8. 10.**     **Caspian Capital Advisors' Motion for Appointment of Official Committee of Equity Security Holders.** ........................... 74 81

       **11.**     **7.375% Notes Due 2014 and Related Claims and Pleadings.** ............. 82

       **10. 12.**  **Motions to Lift or Modify the Automatic Stay.** ............... 76 87

       **13.**     **Approval of the Exit Term Loan Facility Arrangement Motion.** ........ 87

CH1 5118439 5168368v.41

H.     Administrative Matters in the Proceedings. ............................... 76 88

    1.     Schedules of Assets and Liabilities; Statements of Financial
           Affairs. ...................................................................... 76 88

    2.     Filing Claims and Bar Date. ............................................. 76 89

    3.     Bankruptcy Rule 2015.3 Reports. ...................................... 78 90

    4.     Exclusivity Period. ......................................................... 78 91

I.     Avoidance Actions. .................................................................. 79 92

    1.     Preference Actions. ........................................................ 79 92

    2.     Fraudulent Transfer and Conveyance Actions. .................... 79 92

J.     The Plan and Disclosure Statement ......................................... 93

    1.     Bond Safeguard Insurance Co. and Lexon Insurance Co.
           ("Bond Safeguard"). ...................................................... 94

    2.     ACE American Insurance Company, Pacific Employers
           Insurance Company, and Possibly Other Members of the ACE
           Group of Companies ("ACE"). .......................................... 94

    3.     Henry L. Fernandez, Jr. .................................................. 95

    4.     The County of Ontonagon, the Township of Ontonagon and the
           Village of Ontonagon ("Ontonagon"), The Flower Garden,
           LLC ("Flower Garden"), Aspirus Ontonagon Hospital
           ("Aspirus"), Missoula Area Economic Development
           Corporation ("MAEDC") and the Attorney General of the
           State of Montana ("Montana"). ......................................... 95

    5.     Mariner Investment Group, LLC and Senator Investment
           Group LP ("Mariner"). .................................................... 95

    6.     Certain Holders of Smurfit-Stone Container Corporation's
           Common Stock. .............................................................. 97

    7.     Aurelius Capital Management, LP and Columbus Hill Capital
           Management, L.P. ........................................................... 98

    8.     U.S. Bank Trust National Association as Indenture Trustee. ...... 98

    9.     Concrete Restoration Services Ltd. (objection filed by Specialty
           Construction Products Ltd.) ("Concrete Restoration"). .......... 98

V.  THE PLAN OF REORGANIZATION......................................................................8098

    **A.**    **Classification and Allowance of Claims & Equity Interests Generally.**.....8199

    **B.**    **Treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases.**....................................8199

        **1.**    **Administrative Expense Claims.**.....................................................8199

        **2.**    **No Double Payment of Administrative Expense Claims.**.............82100

        **3.**    **DIP Facility Claims.**.........................................................................82100

        **4.**    **Priority Tax Claims.**.........................................................................83101

    **C.**    **Classification and Treatment of Claims Against and Interests in the Debtors in the Chapter 11 Cases.**.............................................................83101

        **1.**    **Summary of Classification and Treatment of Classified Claims and Interests.**.................................................................................83101

        **2.**    **Classification and Treatment of Claims Against and Interests in SSCC.**..................................................................................................88106

        **3.**    **Classification and Treatment of Claims Against and Interests in SSCE.**..................................................................................................92110

        **4.**    **Classification and Treatment of Claims Against and Interests in Cameo Container.**..................................................................................97115

        **5.**    **Classification and Treatment of Claims Against and Interests in Calpine Corrugated.**..............................................................................100118

        **6.**    **Classification and Treatment of Claims Against and Interests in SSPRI.**..................................................................................................104122

        **7.**    **Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (United States).**..............................106124

        **8.**    **Classification and Treatment of Claims Against and Interests in SSC Canada.**............................................................................................109127

        **9.**    **Classification and Treatment of Claims Against and Interests in Smurfit-MBI.**...........................................................................................113132

        **10.**    **Classification and Treatment of Claims Against and Interests in MBI Limited.**.............................................................................................117135

11.     Classification and Treatment of Claims Against and Interests in Stone FinCo II..........................................................~~120~~139

12.     Classification and Treatment of Claims Against and Interests in B.C. Shipper Supplies Ltd. .............................................~~123~~142

13.     Classification and Treatment of Claims Against and Interests in Francobec Company. ......................................................~~126~~144

14.     Classification and Treatment of Claims Against and Interests in 3083527 Nova Scotia Company. ....................................~~129~~148

15.     Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (Canada) .................................~~132~~151

16.     Acceptance or Rejection of the Plan by Classes of Claims and Interests. ..........................................................................~~135~~154

D.     Classification and Treatment of Affected Claims Against the Canadian Debtors in the CCAA Proceedings..........................................~~136~~155

    1.     Purpose and Effect of the CCAA Plan. .......................~~136~~155

    2.     Classification of Creditors. ........................................~~137~~155

    3.     Treatment of Affected Secured Claims, CCAA Charges and Priority Tax Claims. .............................................~~139~~157

    4.     Treatment of Affected Unsecured Claims ~~140~~.................................. 158

    5.     Conditions Precedent to Implementation of CCAA Plan...........~~141~~160

    6.     CCAA Creditors' Meeting...........................................~~141~~160

    7.     General. ....................................................................~~144~~162

E.     The Canadian Asset Sale. ....................................................~~146~~164

    1.     Sale of the Canadian Assets to Canadian Newco. ......................~~146~~164

F.     Means For Implementation of the Plan. ................................~~149~~167

    1.     Procedural Consolidation. ...........................................~~149~~167

    2.     Corporate Governance and Corporate Actions.........................~~149~~168

    3.     Issuance and Distribution of New Securities and Related Matters. ....................................................................~~151~~170

4.      Listing on the New York Stock Exchange or the NASDAQ
        Stock Market. ................................................................ ~~152~~171

5.      Exit Facilities. ............................................................... ~~153~~172

6.      Continued Corporate Existence and Vesting of Assets in the
        Reorganized Debtors. .................................................... ~~153~~172

7.      Dissolution of ~~SSC Canada, Smurfit-MBI, Francobec
        Company, and Stone FinCo II. ............... 153~~Certain Canadian Debtors.      172

8.      Vesting of the Canadian Assets in Canadian Newco. ............... ~~154~~173

9.      Cancellation of Credit Documents, Debt Instruments, and
        Interests. ..................................................................... ~~154~~173

10.     Cancellation of Liens. .................................................. ~~155~~174

11.     Employee Compensation and Benefit Programs. ..................... ~~155~~174

12.     Canadian Pension Plans. .............................................. ~~156~~175

13.     Management Incentive Plans. ......................................... ~~157~~176

14.     Restructuring Transactions. .......................................... ~~157~~176

15.     Additional Transactions Authorized Under the Plan. ............. ~~158~~177

16.     Cash-Out Auction for Eligible Cash-Out Participants. ............. ~~158~~177

G.      Treatment of Executory Contracts and Unexpired Leases in the
        Chapter 11 Cases and the CCAA Proceedings. ...................... ~~161~~180

        1.      Assumption/Ratification of Executory Contracts and
                Unexpired Leases. .............................................. ~~161~~180

        2.      Cure of Defaults Under Assumed/Ratified Executory Contracts
                and Unexpired Leases. ......................................... ~~161~~180

        3.      Assumption of Collective Bargaining Agreements. ..................... ~~161~~180

        4.      Insurance Policies and Agreements. ............................ ~~162~~181

        5.      Rejection Damages Bar Date. .................................. ~~162~~181

        6.      Post-Petition Contracts and Leases. ............................ ~~162~~181

H.      Provisions Governing the Distributions Under the Plan. ...................... ~~162~~181

| | | | |
|---|---|---|---|
| | 1. | **General Provisions on Distributions under the Plan.** | ~~162~~182 |
| | 2. | **No Interest on Claims Unless Otherwise Provided in the Plan.** | ~~163~~182 |
| | 3. | **Distributions by Disbursing Agents.** | ~~163~~182 |
| | 4. | **Delivery of Distributions – Chapter 11 Cases.** | ~~164~~183 |
| | 5. | **Delivery of Distributions – CCAA Proceedings.** | ~~165~~184 |
| | 6. | **Undeliverable and Unclaimed Distributions.** | ~~165~~184 |
| | 7. | **Record Date for Distributions.** | ~~166~~185 |
| | 8. | **Assignment of Claims.** | ~~167~~186 |
| | 9. | **Means of Cash Payment.** | ~~167~~186 |
| | 10. | **Withholding and Reporting Requirements.** | ~~167~~186 |
| | 11. | **Allocation of Plan Distributions Between Principal and Interest.** | ~~168~~187 |
| | 12. | **Setoff and Recoupment.** | ~~168~~187 |
| | 13. | **Fractional Shares.** | ~~168~~187 |
| | 14. | **Compromises and Settlements.** | ~~168~~187 |
| | 15. | **Claims Administration Responsibility – Chapter 11 Cases.** | ~~168~~187 |
| | 16. | **Procedures for Treating and Resolving Disputed Claims – Chapter 11 Cases.** | ~~169~~188 |
| | 17. | **Distribution Reserve– CCAA Proceedings.** | ~~172~~190 |
| I. | | **Confirmation and Consummation of the Plan.** | ~~173~~191 |
| | 1. | **Conditions to Confirmation.** | ~~173~~191 |
| | 2. | **Conditions to Occurrence of the Effective Date.** | ~~173~~192 |
| | 3. | **Waiver of Conditions.** | ~~174~~192 |
| | 4. | **Consequences of Non-Occurrence of Effective Date.** | ~~174~~193 |
| | 5. | **Notice of Effective Date.** | ~~174~~193 |
| J. | | **Injunctions, Releases And Discharge.** | ~~174~~193 |

CH1 ~~5118439~~5168368v.~~41~~

1.  **Discharge.** ........................................................................ ~~174~~193

2.  **Releases.** ........................................................................ ~~177~~195

3.  **Supplemental Injunction.** ........................................... ~~179~~198

4.  **Disallowed Claims.** ........................................................ ~~180~~199

5.  **Exculpation.** ................................................................... ~~181~~199

6.  **Revesting of Assets.** ...................................................... ~~182~~200

7.  **Preservation of Litigation Claims.** ........................... ~~182~~201

8.  **Survival of Indemnification Obligations.** ................. ~~182~~201

K.   **Retention of Jurisdiction.** ................................................ ~~183~~202

1.  **Jurisdiction of the Bankruptcy Court and the Canadian
    Bankruptcy Court.** ...................................................... ~~183~~202

L.   **Miscellaneous.** .................................................................. ~~186~~205

1.  **Surrender of Instruments.** ......................................... ~~186~~205

2.  **Dissolution of the Committee.** ................................... ~~187~~205

3.  **Pre-Effective Date Injunctions or Stays.** ................. ~~187~~206

4.  **Post-Confirmation Date Retention of Professionals.** ......... ~~187~~206

5.  **Payment of the Fee Auditor's Fees and Expenses.** ...... ~~187~~206

6.  **Bar Date for Certain Administrative Expense Claims.** ......... ~~188~~206

7.  **Effectuating Documents and Further Transactions.** ......... ~~188~~207

8.  **Exemption from Transfer Taxes.** ............................... ~~188~~207

9.  **Payment of Statutory Fees.** ........................................ ~~188~~207

10. **Payment of Prepetition Notes Indenture Trustee Fees and
    Industrial Revenue Bond Indenture Trustee Fees.** ...... ~~189~~207

11. ~~**Proofs of Claim Filed by**~~ **Payment of Professional Fees of the Ad
    Hoc Group of** Prepetition ~~**Notes Indenture Trustees.**~~ ....~~189~~**Noteholders.** 208

12. **Proofs of Claim Filed by** ~~**Industrial Revenue Bond**~~ **Prepetition
    Notes** Indenture Trustees. ........................................... ~~189~~208

CH1 ~~5118439~~5168368v.~~4~~1

**13.** **Proofs of Claim Filed by Industrial Revenue Bond Indenture Trustees.** ................................................................ 208

**14.** Creditor Representative Duties and Payment of Fees ............... ~~189~~208

~~14.~~**15.** Amendment or Modification of the Plan. .................... ~~189~~209

~~15.~~**16.** Severability of Plan Provisions. .................... ~~190~~209

~~16.~~**17.** Binding Effect; Successors and Assigns. .................... ~~190~~209

~~17.~~**18.** Revocation, Withdrawal or Non-Consummation. .................... ~~190~~209

~~18.~~**19.** Notice. .................... ~~190~~210

~~19.~~**20.** Governing Law. .................... ~~191~~210

~~20.~~**21.** Reservation of Rights. .................... ~~191~~210

VI. VOTING PROCEDURES AND REQUIREMENTS .................... ~~192~~211

    **A.** **Voting Procedures/Solicitation in the Chapter 11 Proceedings.** ............. ~~192~~211

        **1.** Voting Deadline. .................... ~~192~~211

        **2.** Vote Required for Acceptance by a Class of Claims. .................. ~~193~~212

        **3.** Voting Procedures. .................... ~~193~~212

    **B.** **Canadian Voting Procedures.** .................... ~~194~~213

        **1.** Voting and Acceptance of Plan in CCAA Proceedings. .............. ~~194~~213

        **2.** Solicitation in CCAA Proceedings. .................... ~~194~~213

VII. CONFIRMATION OF THE PLAN .................... ~~196~~215

    **A.** **Confirmation in Chapter 11 Cases.** .................... ~~196~~215

        **1.** Confirmation Hearing. .................... ~~196~~215

        **2.** Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases. .................... ~~197~~216

    **B.** **Canadian Requirements for Sanction of CCAA Plan.** .................... ~~202~~221

VIII. PROJECTED FINANCIAL INFORMATION ~~202~~ AND VALUATION ANALYSIS ................................................................ 221

**A.**    **Projected Financial Information.**................................................................ 221

**B.**    **Valuation Analysis.**................................................................................. 223

      **1.**    **Overview.**...................................................................................... 223

      **2.**    **Valuation Methodology.**............................................................. 225

IX. DESCRIPTION OF CAPITAL STOCK OF REORGANIZED DEBTORS................. ~~204~~228

X.  CERTAIN RISK FACTORS TO BE CONSIDERED .................................................. ~~204~~229

    **A.**    **Certain Bankruptcy Considerations.**........................................................ ~~205~~229

      **1.**    **Failure to Obtain Confirmation of the Plan May Result in
Liquidation or Alternative Plan on Less Favorable Terms.**......... ~~205~~229

      **2.**    **Undue Delay in Confirmation of the Plan May Disrupt the
Debtors' Operations.**..................................................................... ~~206~~230

      **3.**    **Failure of Occurrence of the Effective Date May Result in
Liquidation or Alternative Plan on Less Favorable Terms.**......... ~~206~~230

    **B.**    **Risks Relating to the Reorganized Debtors' Financial Results and
Condition.** ..................................................................................................... ~~206~~231

      **1.**    **The Reorganized Debtors' Failure to Achieve Their Projected
Financial Results May Affect Their Ability to Pay Obligations.** ~~206~~231

      **2.**    **The Debtors' Financial Projections Are Based on Assumptions
and Subject to Uncertainty.**......................................................... ~~207~~232

      **3.**    **Assumptions Regarding Value of the Debtors' Assets May
Prove Incorrect.** ........................................................................... ~~207~~232

      **4.**    **Historical Financial Information May Not Be Comparable.**....... ~~208~~232

    **C.**    **Risks Relating to the Reorganized Debtors' Business.**............................ ~~208~~232

      **1.**    **Global Economic Conditions and Credit Tightening Materially
and Adversely Affect the Reorganized Debtors' Business.**.......... ~~208~~232

      **2.**    **The Reorganized Debtors May Be Required to Record
Impairment On Their Long-Lived Assets.**.................................. ~~208~~233

      **3.**    **The Reorganized Debtors' Capital Structure.** ............................ ~~209~~233

4.    The Reorganized Debtors' Exit Financing Credit Facility May
      Limit Their Ability to Plan For or Respond to Changes in Their
      Business. .................................................................... 209233

5.    The Debtors' Industry is Cyclical and May Experience Periods
      of Overcapacity. ....................................................... 209234

6.    The Debtors' Industry is Highly Competitive. ...................... 210234

7.    The Debtors' Pension Plans Are Underfunded and Will Require
      Additional Cash Contributions. ..................................... 210235

8.    Fluctuations in Energy, Transportation and Raw Materials
      Prices Could Adversely Affect Reorganized Debtors'
      Manufacturing Costs. .................................................. 211235

9.    Factors Beyond the Reorganized Debtors' Control Could
      Hinder Their Ability to Service Debt and Meet Operating
      Requirements. ........................................................... 211236

10.   Cost of Compliance with Government Regulation May
      Adversely Affect the Reorganized Debtors' Financial Results. .... 212236

11.   Failure to Maintain Customer Relationships May Adversely
      Affect Financial Results. .............................................. 212237

12.   Failure to Attract and Retain Employees May Adversely Affect
      Financial Results. ....................................................... 212237

13.   Foreign Currency Risks and Exchange Rate Fluctuations Could
      Hinder the Results of the Reorganized Debtors' Canadian
      Operations. ............................................................... 213237

14.   Work Stoppages and Other Labor Relations Matters May Have
      an Adverse Effect on the Reorganized Debtors' Financial
      Results. .................................................................... 213238

D.    Risks Relating to the New SSCC Common Stock. ................. 213238

1.    A Liquid Trading Market for the New SSCC Common Stock
      May Not Develop. ...................................................... 213238

2.    Certain Holders May be Restricted Under Applicable Securities
      Laws in Their Ability to Sell or Transfer New SSCC Common
      Stock. ...................................................................... 214238

3.    The Market Price of Shares of New SSCC Common Stock May
      Fluctuate Significantly. ................................................ 214239

4.      Sales of a Substantial Number of Shares of New SSCC Common
        Stock Could Depress Stock Prices..................................215239

5.      Value of New SSCC Common Stock May be Diluted.................215239

6.      Lack of Dividends on New SSCC Common Stock May
        Adversely Affect Liquidity. ............................................215240

XI.   CERTAIN TAX CONSEQUENCES OF THE PLAN................................215240

      A.      U.S. Federal Income Tax Consequences to the Debtors........................216241

      B.      U.S. Federal Income Tax Consequences to the Holders of Claims. ........218243

      C.      Certain Canadian Federal Income Tax Consequences of the Plan. .......223247

      D.      Importance of Obtaining Professional Tax Assistance. ...........................227251

      E.      Reservation of Rights. ........................................................227252

XII.  CERTAIN U.S. FEDERAL AND STATE, CANADIAN AND FOREIGN
      SECURITIES LAW CONSIDERATIONS................................................227252

      A.      Exemption From Registration Requirements. ........................................227252

      B.      Subsequent Transfers of Securities...........................................228252

      C.      Canadian Securities Law Considerations.....................................229253

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
      PLAN AND CCAA PLAN..........................................................229254

      A.      Continuation of the Chapter 11 Cases..........................................229254

      B.      Liquidation Under Chapter 7 or Chapter 11. ........................................230255

      C.      Alternatives in CCAA Proceedings................................................230255

XVXIV.  CONCLUSION AND RECOMMENDATION...........................................230255

## INDEX OF EXHIBITS

Exhibit A          Debtors' Joint Plan of Reorganization and Plan of Compromise and Arrangement

Exhibit B-1        Petition Date Corporate Structure Chart

Exhibit B-2        Anticipated Post-Effective Date Corporate Structure Charts

Exhibit C          Projected Financial Information

Exhibit D          Liquidation Analysis

Exhibit E          Selected Historical Financial Statements: Smurfit-Stone Container Corporation
                   Quarterly Report on Form 10-Q For the Quarterly Period Ended September 30,
                   2009

CH1 5118439 5168368v. 4 1

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN (AS DEFINED BELOW) AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY INCOMPLETENESS OF ANY SUMMARY OR STATEMENT MADE IN THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.  CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW) AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF CANADA OR ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

CH1 5118439 5168368v.4 1

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

EXCEPT FOR THE HISTORICAL INFORMATION CONTAINED IN THIS DOCUMENT, CERTAIN MATTERS DISCUSSED HEREIN CONTAIN FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  ALTHOUGH THE DEBTORS BELIEVE THAT, IN MAKING ANY SUCH STATEMENTS, THEIR EXPECTATIONS ARE BASED ON REASONABLE ASSUMPTIONS, ANY SUCH STATEMENTS MAY BE INFLUENCED BY FACTORS THAT COULD CAUSE ACTUAL OUTCOMES AND RESULTS TO BE MATERIALLY DIFFERENT FROM THOSE CONTAINED IN SUCH FORWARD-LOOKING STATEMENTS.  WHEN USED IN THIS DOCUMENT, THE WORDS "ANTICIPATES," "BELIEVES," "EXPECTS," "INTENDS" AND SIMILAR EXPRESSIONS AS THEY RELATE TO THE DEBTORS, THEIR OPERATIONS OR THEIR MANAGEMENT ARE INTENDED TO IDENTIFY SUCH FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO NUMEROUS RISKS AND UNCERTAINTIES. THERE ARE IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN FORWARD-LOOKING STATEMENTS, CERTAIN OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THESE FACTORS, RISKS AND UNCERTAINTIES ARE DISCUSSED BELOW IN ARTICLE X OF THIS DISCLOSURE STATEMENT.

THE DEBTORS' ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENT COULD DIFFER MATERIALLY FROM THOSE EXPRESSED IN, OR IMPLIED BY, THESE FORWARD-LOOKING STATEMENTS. ACCORDINGLY, THE DEBTORS CAN GIVE NO ASSURANCES THAT ANY OF THE EVENTS ANTICIPATED BY THE FORWARD-LOOKING STATEMENTS WILL TRANSPIRE OR OCCUR OR, IF ANY OF THEM DO SO, WHAT IMPACT THEY WILL HAVE ON THE DEBTORS' RESULTS OF OPERATIONS OR FINANCIAL CONDITION.  THE DEBTORS EXPRESSLY DECLINE ANY OBLIGATION TO PUBLICLY REVISE ANY FORWARD-LOOKING STATEMENTS THAT HAVE BEEN MADE TO REFLECT THE OCCURRENCE OF EVENTS AFTER THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS, IN CONSULTATION WITH THE DEBTORS' PROFESSIONAL ADVISORS, PREPARED THE PROJECTIONS (AS DEFINED BELOW) PROVIDED IN THIS DISCLOSURE STATEMENT.  THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO

CH1 5118439 5168368v.4 1

SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT BE CORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

# I.  INTRODUCTION

On January 26, 2009 (the "Petition Date"),[2] Smurfit-Stone Container Corporation ("SSCC") and its subsidiaries Smurfit-Stone Container Enterprises, Inc. ("SSCE"), Calpine Corrugated, LLC, Cameo Container Corporation, Lot 24D Redevelopment Corporation, Atlanta & Saint Andrews Bay Railway Company, Stone International Services Corporation, Stone Global, Inc. Stone Connecticut Paperboard Properties, Inc., Smurfit-Stone Puerto Rico, Inc., Smurfit Newsprint Corporation, SLP Finance I, Inc., SLP Finance II, Inc., SMBI Inc., Smurfit-Stone Container Canada Inc., Stone Container Finance Company of Canada II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc. (collectively with SSCC, the "Debtors" or the "Company") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (collectively, the "Chapter 11 Cases").

On the Petition Date, following the commencement of the Chapter 11 Cases, certain of the Debtors – including Smurfit-Stone Container Canada Inc. ("SSC Canada"), a wholly-owned subsidiary of SSCE, and certain of its affiliates (collectively, the "Canadian Debtors")[3] – applied for protection from their creditors in Canada pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-~~36~~36, as amended (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Bankruptcy Court").  On the Petition Date, the Canadian Bankruptcy Court issued an order that, *inter alia*, imposed a stay of all proceedings (the "CCAA Stay") against the Canadian Debtors and their property (as amended and restated on January 28, 2009, the "CCAA Initial Order").  The proceedings before the Canadian Bankruptcy Court are referred to herein as the "CCAA Proceedings," and together with the Chapter 11 Cases as the "Proceedings").

On December 22, 2009, the Debtors filed their Joint Plan of Reorganization and Plan of Compromise and Arrangement (as the same may be amended from time to time, the "Plan") with the Bankruptcy Court.  The Plan provides for a coordinated restructuring and compromise of all Claims against and Interests in the Debtors, including the Canadian Debtors, in both the Chapter 11 Cases and the CCAA Proceedings.  Article IV of the Plan, together with the incorporated definitions and other generally applicable provisions, shall also serve as the plan of compromise and arrangement (the "CCAA Plan") to be proposed in the CCAA Proceedings to each Class of Affected Claims against the Canadian Debtors.  A copy of the Plan is attached hereto as Exhibit A.  The Debtors hereby submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to the Holders of certain Claims against the Debtors in connection with (i) the solicitation of

---

[2] Unless otherwise defined elsewhere in this Disclosure Statement, capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Bankruptcy Code.

[3] The Canadian Debtors are Smurfit-Stone Container Canada Inc., Stone Container Finance Company of Canada II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc.  Smurfit-MBI and SLP Finance General Partnership ~~did not apply for~~also received protection ~~under~~from their creditors pursuant to the CCAA Initial Order (as defined below) but instead sought recognition of their respective Chapter 11 Cases in the Canadian Bankruptcy Court under Section 268 of the Bankruptcy and Insolvency Act, R.S.C. 1985 c. B-3.

acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan scheduled for [_____], commencing at [ ] --.m. prevailing Eastern Time. In advance of the hearing on confirmation, the Debtors will file a Plan Supplement containing certain exhibits to the Plan that were not filed with the Plan.

The Plan constitutes a separate plan of reorganization for each Debtor in the Chapter 11 Cases and the CCAA Plan constitutes a separate plan of compromise and arrangement for each Canadian Debtor in the CCAA Proceedings. The Debtors reserve the right to withdraw the Plan or the CCAA Plan with respect to one or more Debtors or Canadian Debtors, as applicable, while seeking confirmation or approval of the Plan or the CCAA Plan with respect to all other Debtors or Canadian Debtors, as applicable.

The purpose of this Disclosure Statement is to describe the Plan, including the CCAA Plan, and the provisions thereof, provide certain information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims who will have the right to vote to accept or reject the Plan so that they can make an informed decision in doing so, and to urge such creditors to vote to accept the Plan. Holders of Claims entitled to vote to accept or reject the Plan will receive a ballot ("Ballot") together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of these Proceedings. This Disclosure Statement also contains information respecting significant events that have occurred during these Proceedings, including the formulation and development of the Plan. In addition, an overview of the Plan is included, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

By order dated [_____], the Bankruptcy Court approved this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims should not rely on any information relating to the Debtors and their businesses, other than the information contained in this Disclosure Statement, the Plan, and all exhibits and appendices hereto and thereto.

The Debtors may supplement and/or amend this Disclosure Statement or any Exhibits attached thereto, including filing the Exhibits referenced herein, at any time prior to the hearing to approve this Disclosure Statement.

## A.    Overviews of Chapter 11 and CCAA Proceedings.

### 1.    Chapter 11 Proceedings.

CH1 51184395168368v.41

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity security holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of the claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to certain Holders of Claims against and Interests in each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

## 2.    CCAA Proceedings.

Over the last twenty-five years, the CCAA has emerged as the principal Canadian statute for carrying out major insolvency restructurings. Similar to chapter 11, the CCAA is "debtor-in-possession" legislation. The CCAA creates a Court-supervised process that allows the debtor to carry on business and maintain control over its assets while it negotiates, and seeks approval for, a plan of compromise and arrangement acceptable to its creditors. The consummation of a plan of compromise and arrangement is the CCAA's principal objective.

Where a plan is proposed between a debtor company and its secured or unsecured creditors, or any class thereof, the Canadian Bankruptcy Court may (but is not obligated to) order a meeting of creditors or class of creditors. The Canadian Bankruptcy Court order calling the meeting will approve the process for creditors to vote on the proposed plan and will also, among other things, establish classes of creditors for plan voting purposes. While the debtor has the ability to define the classes of creditors subject to the proposed plan, they remain subject to the Canadian Bankruptcy Court's approval. In evaluating proposed classes, courts will consider (a) the commonality of interest of creditors who share a class, and (b) the purposes of the CCAA.

A plan must be approved by a majority in number representing two-thirds of the value of the creditors, or the class of creditors, as the case may be, voting at the meeting held for that purpose in person or by proxy. The Canadian Bankruptcy Court may, but is not obligated to, sanction a plan that has received the requisite creditor vote.

Following sanction by the Canadian Bankruptcy Court, the plan becomes binding on the debtor and on all classes of creditors that (i) are affected by the plan and (ii) accepted the plan. The plan will ordinarily provide that all claims against the debtor (except for certain unaffected claims) shall be settled in accordance with the terms of the plan if the class of such claims accepts the plan, and the ability of the holder of any such claim to proceed against the debtor is forever discharged and any proceedings relating to such claims are stayed.

While certain references are made to the CCAA Proceedings below, creditors of the Canadian Debtors should make reference to the reports filed with the Canadian Bankruptcy Court by the CCAA Monitor and available on its website: www.deloitte.com/ca/smurfitstonecanada (the "Monitor's Reports") and the materials included in the "Canadian Solicitation Package" described below in addition to reviewing this Disclosure Statement.

**CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORTS AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".**

**B.      Overview of Voting Procedures and Plan Confirmation in Chapter 11 Proceedings.**

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE VI, "VOTING PROCEDURES AND REQUIREMENTS."

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN IN THE CANADIAN PROCEEDINGS, SEE SECTION I.C, "OVERVIEW OF SOLICITATION AND VOTING ON THE PLAN IN THE CCAA PROCEEDINGS" AND SECTION VI.B, "CANADIAN VOTING PROCEDURES."

**1.      Parties Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. Creditors or equity interest holders whose claims or interests are impaired by the Plan, but will receive no distribution under the Plan, are also not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. For a discussion of these matters, see Article VI, "Voting Procedures and Requirements" and Article VII, "Confirmation of the Plan."

The following sets forth which classes are entitled to vote on the Plan and which are not:

- The Debtors are seeking votes from the Holders of Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19B, 19C, 20B, 20C, 20D, 21B and 21C.

- The Debtors are not seeking votes from Holders of Claims and Interests in Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C because those Claims and Interests are impaired under the Plan and the Holders are receiving no distribution on account of such Claims and Interests. These Holders will be deemed to have voted to reject the Plan.

- The Debtors are not seeking votes from Holders of Claims and Interests in Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, 19B, 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E because those Claims and Interests are unimpaired under the Plan, and the Holders of Claims and Interests in each of these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

- The Debtors, as the Plan Proponents, and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims; provided, however, if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article V, Sections B, C, D and E.

### 2.     Solicitation Package.

Accompanying this Disclosure Statement (which is provided on CD-ROM) to Holders of Claims in Classes voting to accept or reject the Plan is a package of materials called the "Solicitation Package."  The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving this Disclosure Statement and procedures for soliciting and tabulating votes on the Plan (the "Voting Procedures Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the Voting Deadline, sets out the procedures for distributing Solicitation Packages to the Holders of Claims against and Interests in the Debtors, establishes the procedures for tabulating Ballots used in voting on the Plan, and sets the deadline for objecting to confirmation of the Plan (the Voting Procedures Order will also be on the CD-ROM containing this Disclosure Statement);

- the notice of Confirmation Hearing and entry of the Voting Procedures Order; and

- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Plan), which will be used by Holders of Claims who are entitled to vote on the Plan; and

- the Committee statement of support.

### 3.     Voting Procedures, Ballots, and Voting Deadline.

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan, and, in the case of Holders of Claims in Class 2E (that are not Holders of Prepetition Noteholder Claims, Industrial Revenue Bond Claims or Hodge Industrial Revenue Bond Claims) indicate whether or not you choose to make the Convenience Claim Election or the Cash-Out Election. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided (only original signatures will be accepted). Please return your completed Ballot to the Voting Agent, unless you are a beneficial holder of a Claim in one of the series of Prepetition Notes or Industrial Revenue Bonds (each as defined below) who receives a Ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), in which case you must return the Ballot to such Voting Nominee. Ballots should not be sent to the Debtors or to each Prepetition Notes Indenture Trustee.

**If you are a beneficial holder of a Prepetition Note or Industrial Revenue Bond who receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is received no later than [_____] at 4:00 p.m. (prevailing Eastern time) (the "Voting Deadline"). If you are the Holder of any other type of Claim, in order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent") no later than the Voting Deadline. Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors. Do not return any debt instruments or equity securities with your Ballot.**

**Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent, at (877) 264-9638 (for U.S. calls) or (503) 597-7694 (for Non-U.S. calls).

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain at your own expense an additional copy of this Disclosure Statement and its appendices and exhibits, please contact the Voting Agent.

Before voting on the Plan, each Holder of a Claim in Classes that are entitled to vote on the Plan should read, in its entirety, this Disclosure Statement, the Plan, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the Ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

### 4.      Plan Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. The Bankruptcy Court has scheduled the Confirmation Hearing on [_____], [_____] at [__:__.m.] (prevailing Eastern time) before the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom No. 1, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

### 5.      Objections to Confirmation.

Any objection to Confirmation of the Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code and Bankruptcy Rule 9014 and be filed with the Court, together with proof of service, and served so that they are received **on or before [_____] at 4:00 p.m., prevailing Eastern Time,** by the following parties:

**Counsel to the Debtors:**

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Facsimile: (312) 853-7036
Attn: Matthew A. Clemente

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Facsimile:  (302) 571-1253
Attn: Robert S. Brady

**The U.S. Trustee:**

U.S. Trustee
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, Delaware 19801
Facsimile: (302) 573-6497
Attn: David M. Klauder

**Counsel to the Official Committee of Unsecured Creditors:**

Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attn: Thomas Moers Mayer

## C.     Overview of Solicitation and Voting on the Plan in the CCAA Proceedings.

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, all creditors of the Canadian Debtors who are Affected Creditors are entitled to vote on the CCAA Plan. Any Class of Affected Creditors that does not vote to approve the CCAA Plan shall not be bound by the CCAA Plan for purposes of the CCAA Proceedings. The votes of Holders of Claims against Canadian Debtors that are entitled to vote in the Chapter 11 Cases and are also Affected Creditors to accept or reject entitled to vote on the CCAA Plan will be counted once for the purposes of both the CCAA Proceedings and the Chapter 11 Cases. Such creditors will be allowed to vote using a Ballot received as part of the Solicitation Package that will also serve as a proxy for purposes of voting in the CCAA Proceedings (a "Ballot/Proxy"). If such creditors prefer to vote in person at the CCAA Creditors' Meeting (as defined below), their vote for purposes of both the Chapter 11 Cases and the CCAA Proceedings will be as recorded at the CCAA Creditors' Meeting.

The Affected Claims against each Canadian Debtor are divided into the following two (2) Classes: (a) Affected Secured Claims (consisting of the Prepetition Canadian Lender Claims and all Other Secured Claims, as applicable,) against SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company), and (b) Affected Unsecured Claims (consisting of all General Unsecured Claims) against SSC Canada, Smurfit-MBI, and Stone FinCo II).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or receive distributions provided for, under and pursuant to the CCAA Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

As described above, the process for Affected Creditors to vote on the CCAA Plan is established by order of the Canadian Bankruptcy Court, which has the discretion to order a meeting of creditors to vote on the CCAA Plan (the "CCAA Creditors' Meeting"). The Canadian Bankruptcy Court issued a CCAA Plan Filing and Meeting Order on [_____] (the "CCAA Creditors' Meeting Order"). The CCAA Creditors' Meeting Order provides, among other things, that:

- The CCAA Plan is accepted for filing with the Canadian Bankruptcy Court and the Canadian Debtors are authorized to seek its approval in the manner prescribed in the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to modify and/or supplement the CCAA Plan in accordance with the terms of the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to call, hold and conduct ~~a meeting of Affected~~the CCAA Creditors' Meeting for the purpose of voting (in person or by proxy) on, with or without variation, a resolution to approve the CCAA Plan;

- For purposes of voting on the CCAA Plan, Affected Claims against each of the Canadian Debtors shall be separated into classes, as described in the CCAA Creditors' Meeting Order;

- The CCAA Monitor shall make available on its website or send copies of certain documents (collectively, the "Canadian Solicitation Package") in accordance with the CCAA Creditors' Meeting Order, including the following:

  (a)    ~~The~~the CCAA Creditors' Meeting Order and Notice of Creditors' Meeting; ~~and~~

  (b)    ~~The~~the Disclosure Statement, Plan, and Voting Procedures Order~~, including the form of proxy~~; and

  (c)    the Ballot ~~) for use at the Creditors' Meeting~~/Proxy.

- If the CCAA Plan is accepted by the Required Majority of ~~a Class~~the Classes of Affected Secured Claims, the Canadian Debtors shall bring a motion seeking an order sanctioning the CCAA Plan with respect to such Claims on [_____], or such later date as the Canadian Bankruptcy Court may set.

CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORT AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".

## II. OVERVIEW OF THE PLAN AND CCAA PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. The Debtors, moreover, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

FOR A MORE DETAILED DESCRIPTION OF THE TERMS AND PROVISIONS OF THE PLAN AND CCAA PLAN, SEE ARTICLE V OF THIS DISCLOSURE STATEMENT, "THE PLAN OF REORGANIZATION."

**A.    General Overview.**

Between the Petition Date and filing of the Plan and Disclosure Statement, the Debtors have undertaken a careful review of their business operations and implemented various restructuring efforts, in an effort to improve the Company's business results and financial condition. At the same time, the Debtors engaged in ongoing discussions with the Official Committee of Unsecured Creditors (the "Committee") appointed in these Chapter 11 Cases,

CH1 ~~5118439~~5168368v.~~4~~1

regarding the terms of its equity and capital structure, and the formulation and implementation of an advantageous capital structure for the Reorganized Debtors.

At its core, the Plan, a copy of which is also attached as <u>Exhibit A</u> to this Disclosure Statement, provides that (i) Holders of the Allowed Prepetition Lender Claims will receive 100% recovery in the form of cash, (ii) CIT Group Claims and Union Bank Claims will receive a 100% recovery in the form of cash, (iii) Holders of General Unsecured Claims against SSCE will receive their Pro Rata Share of the New SSCC Common Stock Pool to be issued pursuant to the Plan,[4] Holders of General Unsecured Claims against Cameo Container, Calpine Corrugated and SSPRI will receive a 100% recovery in the form of cash, (iv) Holders of General Unsecured Claims against SSCC and Holders of General Unsecured Claims against Non-Operating Debtors (United States) will be extinguished and receive no recovery, and (v) SSCC Interests will be extinguished.

The Plan and also provides that the Canadian Assets will be sold <u>if certain conditions are met</u>. If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI vote to accept the Plan, the Canadian Assets will be transferred to Canadian Newco and the unsecured creditors of SSC Canada and Smurfit-MBI will receive their Pro Rata Share of the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, respectively. On the other hand, if the Classes of General Unsecured Claims against SSC Canada or Smurfit-MBI do not approve the Plan, the Canadian Assets will be sold pursuant to a process ordered by the Canadian Bankruptcy Court. Affected Creditors will be treated as follows: (i) Holders of the Allowed Prepetition Canadian Lender Claims will receive 100% recovery in the form of cash, (ii) if they vote to accept the Plan, Holders of General Unsecured Claims against SSC Canada and Smurfit-MBI will receive their Pro Rata Share of cash from the SSC Canada Distribution Pool and Smurfit-MBI Distribution Pool, respectively, and Holders of General Unsecured Claims against B.C. Shippers Supplies and Francobec Company will receive a 100% recovery in the form of cash, (iii) Holders of General Unsecured Claims against Stone FinCo II will receive their Pro Rata Share of the Stone FinCo II Settlement Distribution if they vote to accept the plan, (iv) Holders of General Unsecured Claims against MBI Limited, 3083527 Nova Scotia Company and Non-Operating Debtors (Canada) will be extinguished and receive no recovery, and (v) SSC Canada Interests, Smurfit-MBI Interests and Francobec Company Interests will be extinguished.

~~Notwithstanding the fact that the Plan provides for an internal reorganization of the Debtors which equitizes the Prepetition Noteholder Claims and certain other Claims, if not later than ten (10) days prior to the hearing to approve this Disclosure Statement a third party purchaser determined to be credible by the Debtors expresses an interest, and demonstrates the wherewithal, to (i) purchase all or a substantial portion of the New SSCC Common Stock for the Full Payment~~

---

[4] Pursuant to the Plan, a Holder of a General Unsecured Claim against SSCE may be eligible to receive cash on account of its claim by either (i) electing Convenience Class treatment described below in Section V.C.3(d) of this Disclosure Statement or (ii) participating in the Cash-Out Auction described below in Section V.F.16 of this Disclosure Statement. Alternatively, such Holder has the option of selling its Claim for cash to a claims buyer. This liquid market provides Holders an alternative to participating in the reorganization process. If a Holder decides to sell its Claim, however, it will not be entitled to any further recovery on account of the Claim (other than the cash received from the sale), and it will no longer have any rights in the Chapter 11 Cases arising from that Claim. Holders may find further information on selling their Claims, along with a list of potential claims buyers that have either appeared in these Chapter 11 Cases or have expressed an interest in buying and selling General Unsecured Claims in these cases, can be found on the Smurfit-Stone Creditors Committee website at: www.smurfitcreditorscommittee.com.

~~Amount,[5] or (ii) purchase all of the assets of the Debtors for the Full Payment Amount and satisfy all other obligations provided for in the Plan, the Debtors reserve the right, in consultation with the Committee and the CCAA Monitor, to modify the Plan and this Disclosure Statement, including by seeking approval of appropriate sale or other procedures, in a manner necessary to allow such a transaction to be pursued, and appropriate management incentive compensation and other terms and conditions of employment in the event of such a transaction.[6]~~

## B.    Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors and Canadian Debtors Under the Plan.

The following charts summarize the projected distributions to Holders of Allowed Claims against and Interests in each of the Debtors and Canadian Debtors under the Plan.  Although every reasonable effort was made to be accurate, the projections of estimated recoveries in the Summary Chart are only an estimate.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court and in the CCAA Proceedings, as applicable.  As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received.  In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to Confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement.  The recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS – UNITED STATES DEBTORS | | | | |
|---|---|---|---|---|
| Class ~~& Description~~ | Description | Estimated Allowed Claims | Treatment | ~~Treatment and~~ Estimated Recovery |
| ~~DIP Facility~~ | DIP Facility | $~~[0]~~[2] | Unimpaired | ~~Unimpaired –~~ 100% ( See |

---

[5] ~~"Full Payment Amount" means an amount of cash sufficient to satisfy all Allowed Claims against the Debtors (including, without limitation, all Allowed Administrative Expense Claims and all Allowed General Unsecured Claims) in full, plus all post-petition interest, fees and costs that are Allowed against any Debtor under applicable law.~~
[6] ~~In addition, the Committee shall have consultation rights with respect to whether any potential third party purchaser is credible.~~
[7] ~~On September 9, 2009, SSCE made a voluntary $250 million prepayment on the $400 million U.S. term loan under the DIP Facility.  Following the prepayment, there was approximately $137 million outstanding under the U.S. term loan and $35 million outstanding under the Canadian term loan under the DIP Facility.  The Company continues to have zero borrowings outstanding under revolving credit facilities under the DIP Facility Credit Agreement and it anticipates that all existing borrowings under the U.S. term loan and the Canadian term loan will be repaid in full prior to the Effective Date.~~
[5] On September 9, 2009, SSCE made a voluntary $250 million prepayment on the $400 million U.S. term loan under the DIP Facility.  Following the prepayment, there was approximately $137 million outstanding under the U.S. term

CH1 ~~5118439~~5168368v.4~~1~~

| | | | | |
|---|---|---|---|---|
| ~~Claims:~~N/A | Claims | | | Section V.B.3) |
| ~~Administrative Expense Claims:~~N/A | Administrative Expense Claims | $~~[62.6]~~65.8 million | Unimpaired | ~~Unimpaired —~~100% (See Section V.B.1) |
| ~~Priority Tax Claims:~~N/A | Priority Tax Claims | $~~[1.7]~~1.65 million | Unimpaired | ~~Unimpaired —~~100% (See Section V.B.4) |
| ~~Priority Non~~1A ~~-Tax Claims:~~14A | Priority Non-Tax Claims | $~~[0]~~ | Unimpaired | ~~Unimpaired —~~100% (See Sections V.C.2(a)-7(a)) |
| ~~Other Secured Claims:~~ 1B-14B | Other Secured Claims | $~~[3.5]~~4.8 million | Unimpaired | ~~Unimpaired —~~100% in the form of cash, reinstatement, or surrender of collateral (See Sections V. C.2(b)-7(b)) |
| ~~Prepetition Lender Claims:~~ 1C, 2C | Prepetition Lender Claims | $~~[969.1]~~ million | Impaired | ~~Impaired —~~100% in the form of cash (See Sections V.C.2(c) and V.C.3(c)) |
| ~~Union Bank Claims:~~4C | Union Bank Claims | $~~[8.6]~~ million | Impaired | ~~Impaired —~~100% in the form of cash (See Section V.C.5(c)) |
| ~~CIT Group Claims:~~ 4D | CIT Group Claims | $~~[34.9]~~ million | Impaired | ~~Impaired —~~100% in the form of cash (See Section V. C.5(d)) |
| ~~General Unsecured Claims:~~ 2E | General Unsecured Claims: | $~~[2.9]~~2.8-3.1 billion | Impaired | ~~SSCE: Impaired — Less than 100~~64-71%[7] in the form of a Pro Rata Share of New SSCC Common |

loan and $35 million under the Canadian term loan under the DIP Facility. The Company continues to have zero borrowings outstanding under revolving credit facilities under the DIP Facility Credit Agreement and it anticipates that all existing borrowings under the U.S. term loan and the Canadian term loan will be repaid in full prior to the Effective Date.

[7] This estimated recovery percentage range is based upon a $1.987 billion midpoint Equity Value (as defined below) of the Reorganized Debtors, which is discussed below in Lazard's valuation analysis in Section VIII.B.

| | | | | |
|---|---|---|---|---|
| | SSCE | ~~$[11.2] million~~<br><br>~~$[4] million[6]~~ | | Stock. (See Section V.C.3.(e))[8]<br><br>~~SSCC and Non-Operating Debtors (United States): Impaired—0%.~~<br><br>~~Cameo Container, Calpine Corrugated and SSPRI: Impaired—100% in the form of cash.~~ |
| 1D, 6C-14C | General Unsecured Claims:<br><br>SSCC and Non-Operating Debtors (United States) | $11.2 million | Impaired | 0% (See Sections V.C.2(d) and V.C.7(c)) |
| 3C, 4E, 5C | General Unsecured Claims:<br><br>Cameo Container, Calpine Corrugated and SSPRI | $4 million | Impaired | 100% in the form of cash (See Sections V.C.4(c), V.C.5(e) and V.C.6(c)) |
| ~~Convenience Claims:~~2D | Convenience Claims | $~~[~~25-30~~]~~ million | Impaired | ~~Impaired—~~100% in the form of cash (See Section V.C.(3)(d)) |
| ~~Intercompany Claims:~~1E, 2F, | Intercompany | N/A[9] | Impaired | ~~Impaired—~~0% (See Sections V.C.2(e), |

---

[6] The Debtors continue to analyze whether or not to assume or reject certain executory contracts and unexpired leases. Upon assumption of certain of these agreements, the Debtors currently estimate that between $30 and $35 million of these Class 2E General Unsecured Claims will be paid as cure amounts, and will result in a corresponding reduction of the Estimated Allowed Claims in Class 2E.

[8] Provided, however, that any Eligible Cash-Out Participant that makes the Cash-Out Election may, to the extent any Cash-Out Payments are made pursuant to Section 6.16 of the Plan, receive on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, its Allowed General Unsecured Claim against SSCE, the Cash-Out Percentage of such Allowed Claim payable in cash on the Initial Distribution Date.

[9] A summary chart in Section III.E.5 below provides additional detail on the Intercompany Claims.

| 3D, 4F, 5D-14D | Claims | | | V.C.3(f), V.C.4(d), V.C.5(f), V.C.6(d), V.C.7(d)) |
|---|---|---|---|---|
| ~~SSCC~~1F, ~~Interests:~~1G | SSCC Interests | N/A | Impaired | ~~Impaired~~ 0% (See Sections V.C.2(f) and (g)) |
| 2G, 3E, 5E-14E | Subsidiary Interests: SSCE, Cameo Container, SSPRI and the Non-Operating Debtors | N/A | Unimpaired | Retained (See Sections V.C.3(g), V.C.4(e), V.C.6(e), V.C.7(e)) |
| ~~Subsidiary Interests:~~ 4G | Subsidiary Interests: Calpine Corrugated | ~~N/A~~ N/A | Impaired | ~~SSCE, Cameo Container, SSPRI and the Non-Operating Debtors (United States): Unimpaired — retained~~0% (See Section V. ~~Calpine Corrugated: Impaired — 0%~~C.5(g)) |

| | SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS – CANADIAN DEBTORS | | | |
|---|---|---|---|---|
| Class ~~&~~ ~~Description~~ | Description | Estimated Allowed Claims | Treatment | ~~Treatment and~~ Estimated Recovery |
| ~~DIP Facility Claims:~~N/A | DIP Facility Claims | $~~[0]~~[10] | Unimpaired | ~~Unimpaired —~~100% ( See Section V.B.3) |
| ~~Administrative Expense Claims:~~N/A | Administrative Expense Claims | $~~[8]~~8.3 million | Unimpaired | ~~Unimpaired —~~100% (See Section V.B.1) |
| ~~Priority Tax~~ | Priority Tax | $~~[0]~~ | Unimpaired | ~~Unimpaired —~~100% (See |

---

[10] See footnote ~~7,~~5, *supra*.

| ~~Claims:~~N/A | Claims | | | Section V.B.4) |
|---|---|---|---|---|
| ~~Priority Non~~15A ~~Tax Claims:~~25A | Priority Non-Tax Claims | $~~[0]~~ | Unimpaired | ~~Unimpaired~~100% (See Sections V.B.8(a)-15(a)) |
| 15B -17B, 19B-21B | Other Secured Claims: SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company and 3083527 Nova Scotia Company | $2.05 million | Impaired | 100% in the form of cash (See Sections V.B.8(b)-10(b), V.B.12(b)-14(b)) |
| ~~Other Secured Claims:~~ 18B, 22B-25B | Other Secured Claims: Stone FinCo II and Non-Operating Debtors (Canada) | $~~[1.05] million~~ $~~[1.00] million~~0 | Unimpaired | ~~SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company: Impaired 100% in the form of cash.~~ ~~Stone FinCo II, B.C. Shipper Supplies Ltd. and Non-Operating Debtors (Canada): Unimpaired~~100% in the form of cash, reinstatement, or surrender of collateral (See Sections V.B.11(b), V.B.15(b)) |
| ~~Prepetition Canadian Lender Claims:~~15C-17C, | Prepetition Canadian Lender Claims | $~~[393]~~ million | Impaired | ~~Impaired~~100% in the form of cash (See Sections V.B.8(c)-10(c), V.B.13(c), V.B.14(c)) |

CH1 ~~5118439~~5168368v.~~4~~1

| | | | | |
|---|---|---|---|---|
| 20C-21C | | | | |
| 15D | General Unsecured Claims: SSC Canada | $57 million | Impaired | (i) if Classes 15D and 16D accept the Plan, [    ]% in the form of cash, or (ii) if Classes 15D or 16D reject the Plan, such recovery, if any, shall depend on the outcome of the sale described below in Section II.C. (See Section V.B.8(d)) |
| 16D | General Unsecured Claims: Smurfit-MBI | $29 million | Impaired | (i) if Classes 15D and 16D accept the Plan, [    ]% in the form of cash, or (ii) if Classes 15D or 16D reject the Plan, such recovery, if any, shall depend on the outcome of the sale described below in Section II.C. (See Section V.B.9(d)) |
| 17D, 21D, 22C-25C | General Unsecured Claims: MBI-Limited, 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada) | $0 | Impaired | 0% (See Sections V.B.10(d), V.B.14(d), V.B.15(d)) |
| ~~General Unsecured Claims:~~18C | General Unsecured Claims: Stone FinCo II | $~~[57]~~200 million | Impaired | ~~SSC Canada: Impaired — (i) if Class accepts the Plan, [    ]% in the form of cash, or (ii) if Class rejects the Plan, such recovery, if any, shall depend on the~~ |

| | | | | |
|---|---|---|---|---|
| | | $[29] million | | outcome of the sale described below in Section II.C. |
| | | | | |
| | | | | **Smurfit-MBI: Impaired** – (i) if Class accepts the Plan, [__]% in the form of cash, or (ii) if Class rejects the Plan, such recovery, if any, shall depend on the outcome of the sale described below in Section II.C. |
| | | $[0] million | | |
| | | $[295,000] | | **MBI Limited, 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada): Impaired – 0%.** |
| | | $[0] | | **Stone FinCo II: Impaired –** (i) if Class accepts the Plan, [__]%, or (ii) if Class rejects the Plan, 0%.[11] (See Section V.B.11(c)) |
| | | | | **B.C. Shipper Supplies** |

---

[11] If (ia) the Class of General Unsecured Claims against Stone FinCo II votes to rejectaccept the Plan orand (ii) either the Bankruptcy Court orb) the Canadian Bankruptcy Court shall havehas not determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or Interest in SSC Canadaan Interest in SSC Canada, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution. On the other hand, if the foregoing conditions are not satisfied as of the Effective Date, then the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall not be entitled to receive any distributions under the Plan in the Chapter 11 Cases unless the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is an Allowed Claim, in which case the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive be entitled to receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of any shares of the New SSCC Common Stock or other distributions that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim and/or the Stone FinCo II Intercompany Claim; provided, however, that (x) the distributions to any Holder of a General Unsecured Claim against Stone FinCo II shall not exceed, when combined with all other distributions that such Holder is receiving under the Plan, 100% of its Allowed General Unsecured Claim against Stone FinCo II; and (y) if the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan, General Unsecured Claims against Stone FinCo II shall be deemed to be Excluded Claims for purposes of the CCAA Plan.

CH1 51184395168368v.41

| | | | | |
|---|---|---|---|---|
| | | | | ~~Ltd., Francobec Company: Impaired — 100% in the form of cash.~~ |
| 19C, 20D | General Unsecured Claims: B.C. Shipper Supplies Ltd. and Francobec Company | $0 | Impaired | 100% in the form of cash (See Sections V.B.12(c), V.B.13(d)) |
| 15E, 16E | Intercompany Claims: SSC Canada and Smurfit-MBI | N/A[12] | Impaired | 0% (See Sections V.B.8(e), V.B.9(e)) |
| 17E, 19D, 20E-21E, 22D-25D | Intercompany Claims: MBI Limited, B.C. Shipper Supplies Ltd., Francobec Co., 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada) | N/A | Impaired | 0% (See Sections V.B.10(e), V.B.12(d), V.B.13(e), V.B.15(d)) |
| ~~Intercompany Claims:~~ 18D | Intercompany Claims: Stone FinCo II | ~~N/A[12]~~ <br><br> ~~N/A~~ <br><br> N/A | Impaired | ~~SSC Canada and Smurfit-MBI: Impaired — 0%~~ (See Section V ~~.B.8(e), V.B.9(e))~~ <br><br> ~~MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 3083527 Nova Scotia Company and the Non-Operating Debtors~~ |

---

[12] See footnote 9, *supra.*

~~[12] See footnote 9, supra.~~

CH1 ~~5118439~~5168368v.4~~1~~

| | | | | |
|---|---|---|---|---|
| | | | | ~~(Canada): Impaired — 0%.~~ <br><br> ~~Stone FinCo II: Impaired – 0%. B.11(d))~~ |
| ~~Stone FinCo II Intercompany Claim:~~ 15F | Stone FinCo II Intercompany Claim | $[200.7] million | Impaired | ~~Impaired — 0%~~ (See Section V.B.8(f)) |
| 15G, 16F, 20F | Subsidiary Interests: <br><br> SSC Canada, Smurfit-MBI and Francobec Company | N/A | Impaired | 0% (See Sections V.B.8(g), V.B.9(f), V.B.13(f)) |
| ~~Subsidiary Interests:~~ 18E | Subsidiary Interests: <br><br> Stone FinCo II | ~~N/A~~ <br><br> ~~N/A~~ <br><br> N/A | Impaired | ~~SSC Canada, Smurfit-MBI and Francobec Company: Impaired — 0%.~~ <br><br> ~~Stone FinCo II: Impaired — 0%.~~[13] 0%[13] <br><br> ~~MBI Limited, B.C. Shipper Supplies Ltd., 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada): Unimpaired — retained.~~ (See Section V.B.11(e)) |
| 17F, 19E, 21F, 22E-25E | Subsidiary Interests: <br><br> MBI Limited, B.C. Shipper Supplies, Ltd., 3083527 Nova | N/A | Unimpaired | Retained (See Sections V.B.10(f), V.B.12(e), V.B.14(f), V.B.15(e)) |

---

[13] SSCE, as the sole Holder of Interests in Stone FinCo II, shall receive 100% of any cash or other property remaining in the Estate of Stone FinCo II after the Holders of General Unsecured Claims against Stone FinCo II have received distributions under the Plan (whether from Stone FinCo II or any other Debtor) with a value equaling 100% of their Allowed Claims.

CH1 ~~5118439~~5168368~~v.4~~1

| Scotia Company and the Non-Operating Debtors (Canada) | | | |
|---|---|---|---|

**C.**   **Canadian Asset Sale.**

Prior to the Effective Date, the Debtors (in consultation with the Committee and the CCAA Monitor) shall establish (a) Canadian Newco ~~(including, without limitation, one or more intermediate holding companies formed for the purpose of holding SSCE's equity interests in~~as a wholly-owned, direct subsidiary of Canadian ~~Newco)~~Holdco and (b) Canadian Holdco as a wholly-owned, direct or indirect, subsidiary of SSCE.  On or prior to the Effective Date, the Canadian Newco ~~Certificate of Incorporation and the Canadian Newco By-Laws,~~ Partnership Agreement (in substantially the ~~forms~~form of Exhibit 7 ~~and Exhibit 8 to the Plan (to be filed with the Plan Supplement), respectively,~~to the Plan, to be filed with the Plan Supplement), the Canadian Holdco Articles of Association (in substantially the form of Exhibit 8 to the Plan), and the Canadian Holdco Memorandum of Association (in substantially the form of Exhibit 9 to the Plan) shall become effective.  From and after the Effective Date, Canadian ~~Newco~~Holdco shall be a wholly-owned subsidiary of Reorganized SSCC and Canadian Newco shall continue to be a wholly-owned subsidiary of Canadian Holdco.

Pursuant to the Plan, Canadian Newco shall be deemed to have made an offer to purchase the Canadian Assets on the Effective Date, free and clear of all Liens, Claims, interests and encumbrances other than those liabilities that are expressly assumed by Canadian Newco in accordance with the terms of the Asset Purchase Agreement, upon and in consideration for (i) the payment to the Prepetition Agent of cash in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and all other amounts payable in connection therewith under this Plan, (ii) the payment of cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) the payment of cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned to Canadian Newco is in default, (iv) the assumption by Canadian Newco of certain liabilities of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company as set forth in the Asset Purchase Agreement, including, without limitation, all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans, and (v) the payment of cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, which shall be

available for distribution to Affected Unsecured Creditors of SSC Canada and Smurfit-MBI in accordance with Article IV of the Plan. For the avoidance of doubt, the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Affected Unsecured Claims if the Classes of Affected Unsecured Claims against either SSC Canada or Smurfit-MBI fail to accept the Plan. Prior to or on the Effective Date, the Debtors or the Reorganized Debtors shall transfer to Canadian Newco the cash necessary to consummate the Canadian Asset Sale.

Pursuant to the Asset Purchase Agreement, Canadian Newco shall assume certain liabilities of the Canadian Debtors. Such assumed liabilities shall include, without limitation: (i) all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Pension Plans (including all unfunded liabilities thereunder) and the Canadian Employee Benefit Plans, (ii) all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Collective Bargaining Agreements, (iii) allcertain existing and future obligations of SSC Canada, Smurfit-MBI or, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company to their current employees, as set forth in the Asset Purchase Agreement, but excluding any obligations of such Canadian Debtors with respect to Non-Qualified Employee Benefit Plans, (iv) all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under executory contracts or unexpired leases that are assigned to Canadian Newco pursuant to the Asset Purchase Agreement, and (v) all obligations to vendors, suppliers and customers arising in the ordinary course of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., or Francobec Company's operations from and after the Petition Date, to the extent such obligations are deemed to be Allowedconstitute Post-Filing Claims andthat are not otherwise satisfied or discharged pursuant to the Plan. For the avoidance of doubt, the liabilities assumed by Canadian Newco shall not include any existing or future obligations of any Canadian Debtor under any Non-Qualified Employee Benefit Plans.

Canadian Newco shall be entitled to receive a CCAA Vesting Order from the Canadian Bankruptcy Court, which shall provide for the transfer and assignment to Canadian Newco of, among other things: (i) the unexpired leases that were previously assumed by SSC Canada or Smurfit-MBI, as set forth in Exhibit 910 to the Plan (to be filed with the Plan Supplement), and (ii) the executory contracts and unexpired leases set forth in Exhibit 1011 to the Plan (to be filed with the Plan Supplement). Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such transfer and/or assignment for purposes of the Chapter 11 Cases. Entry of the CCAA Vesting Order shall constitute the Canadian Bankruptcy Court's approval of such transfer and/or assignment for purposes of the CCAA Proceedings. Canadian Newco shall assume and perform all obligations of SSC Canada or Smurfit-MBI under each of the executory contracts and unexpired leases that shall be assigned to Canadian Newco.

If the CCAA Plan is approved by the Required Majority of the Affected Secured Creditors and the Affected Unsecured Creditors of both SSC Canada and Smurfit-MBI, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the CCAA Vesting Order, the Confirmation Order, and the CCAA Sanction Order. The Affected Secured Creditors and the Affected Unsecured Creditors shall be deemed to have consented to such transfer.

Should the CCAA Plan not be approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, members of such Classes shall be deemed thereafter to be Unaffected Creditors for all purposes of the CCAA Plan.  If (x) the CCAA Plan is not approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, or should(y) the Plan failfails to be sanctioned by the Canadian Bankruptcy Court with respect to any Class of Affected Creditors, or (z) the Debtors so choose at any time prior to the Confirmation Hearing in consultation with the Committee, (i) the Debtors, in consultation with the Committee and the CCAA Monitor, shall be permitted (with the assistance and under the supervision of the CCAA Monitor) to pursue a marketing process for the Canadian Assets pursuant to sale procedures that may be approved by the Canadian Bankruptcy Court and/or the Bankruptcy Court (the "Sale Procedures") at any time prior to or at the Confirmation Hearing and (ii) Canadian Newco's offer for the Canadian Assets under Section 5.1.2 of the Plan shall be modified to exclude the cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool.  If no Competing Bids are submitted on or before any applicable deadline for the submission of Competing Bids that shall be established pursuant to the Sale Procedures (the "Competing Bid Deadline"), the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.

If any Competing Bids for the Canadian Assets are submitted on or before the Bid Deadline, the Canadian Bankruptcy Court shall determine whether any such Competing Bid constitutes a Superior Competing Bid.  Each Competing Bid shall be in writing, shall not be subject to any contingencies (financing or otherwise), and shall consist of  (i) cash payable to the Preptition Agent in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and all other amounts payable in connection therewith under this Plan, (ii) cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada and Smurfit-MBI in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned by the Canadian Debtors is in default,  and (iv) an unconditional commitment to assume all existing and future obligations of SSC Canada and Smurfit-MBI under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans.  Competing Bids may, but shall not be required to, provide additional consideration for the Canadian Assets that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI. If no Competing Bid is determined by the Canadian Bankruptcy Court to constitute a Superior Competing Bid, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.  If the Canadian Bankruptcy Court determines that at least one Competing Bid constitutes a Superior Competing Bid, the Debtors shall conduct an auction for the Canadian Assets, under the supervision of the CCAA Monitor and in accordance with the Sale

Procedures, between Canadian Newco and the Person(s) that submitted such Superior Competing Bid(s). Canadian Newco shall be entitled to participate in the bidding and auction process and may, but shall not be required to, revise its bid to include cash or other consideration that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI.

**D.     Executive Compensation:  Management Incentive Plans and Employment Agreements.**

      **1.     Management Incentive Plans.**

On the Effective Date, the Reorganized SSCC shall adopt and assume (as applicable) each of the Management Incentive Plans (including the forms of the stock option and restricted stock unit award agreements) substantially in the forms set forth in Exhibit 3 to the Plan.

These Management Incentive Plans include the Equity Incentive Plan, pursuant to which Reorganized SSCC will make grants of equity-based compensation to certain officers and other employees, including on the Effective Date.  Eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans.  Four and one tenth percent (4.1%) of New SSCC Common Stock (or approximately half of the number of shares reserved) will be granted to officers and other employees at, and as of, the times set forth in Exhibit 3 to the Plan (the "Emergence Equity Grants") pursuant to the Equity Incentive Plan. Emergence Equity Grants of restricted stock units will be made on the Effective Date, and Emergence Equity Grants of stock options will be made on the first date on which the New SSCC Common Stock is listed for trading.

Management Incentive Plans also include the 2009 Long-Term Incentive Plan (the "2009 LTIP") and the annual short-term Management Incentive Plan for 2010 (the "2010 MIP") (both of which previously were approved by the Bankruptcy Court subject to the development of certain performance goals and are described in Section III.D.2 of this Disclosure Statement) which will have the financial performance goals and (as applicable) restructuring goals, and will provide for such payments to participants, as set forth in Exhibit 3 to the Plan, notwithstanding any prior order issued by the Bankruptcy Court with respect thereto.

The 2009 LTIP, 2010 MIP and Equity Incentive Plan, together in the aggregate, will provide appropriate incentives and create competitive, market-based compensation opportunities for the Company's management team in the short term as the Company emerges from its Chapter 11 cases that will continue in the long-term.

(a)    Equity Incentive Plan.

As a result of the Company's Chapter 11 cases, the Company has not had the ability to make any equity-based awards that provide appropriate long-term incentives for Company growth. Upon emergence, however, the Reorganized Debtors (as defined herein) again will have equity-based compensation vehicles to provide its executive management and other members of its management team with appropriate, market-based, long-term incentive compensation opportunities that will be substantially dependent on performance. Consistent with its historical practice, Reorganized SSCC will be reestablishing an equity-based long-term incentive plan – the Equity Incentive Plan – to align the interest of executive management and other employees with the interests of Reorganized SSCC's shareholders in creating additional shareholder value in the long term and to retain the management team.

Eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of New SSCC Common Stock) shall be reserved for issuance pursuant to the Equity Incentive Plan and other Management Incentive Plans. Awards under the Equity Incentive Plan will be made in stock options, restricted stock units, and/or other equity-based interests (a) to certain officers and other employees at, and effective as of, such times as are set forth in Exhibit 3 to the Plan and described below as the Emergence Equity Grants, and (b) to officers, other employees, and directors from time to time on or after the Effective Date as determined by the compensation committee of the board of directors of Reorganized SSCC in such committee's discretion. Awards under the Equity Incentive Plan generally are subject to a three-year ratable vesting schedule, subject to full accelerated vesting in the event of a change of control of the Reorganized Debtors or the termination of a participant's employment without cause, a resignation for Good Reason, death, incapacity, and retirement (except in the case of the Emergence Equity Grants which are subject to special vesting conditions as described below).

(b)    Emergence Equity Grants Totaling 4.1% of New SSCC Common Stock.

The Company's Plan provides that a group of the Company's key executives and managers designated by the Company prior to the Effective Date will receive grants of equity in Reorganized SSCC pursuant to an applicable award agreement(s) and the Equity Incentive Plan. The Emergence Equity Grants will total four and one-tenth percent (4.1%) of New SSCC Common Stock, which means that Reorganized SSCC will grant approximately half of the 8% total reservation of New SSCC Common Stock under the Plan (as described above) as Emergence Equity Grants. Providing initial grants of equity will provide an immediate and meaningful incentive for management to continue to enhance the value of the Reorganized Debtors post-emergence.

The following table shows the percentage of the New SSCC Common Stock that will be allocated and granted upon emergence to the Company's current President/Chief Operating Officer ("COO") individually and to the remaining participants in the aggregate:

| Participant | Percent of Shares Granted | Approx. Percentage of Shares Granted in Restricted Stock Units | Approx. Percentage of Shares Granted in Stock Options |
|---|---|---|---|
| President and COO | 0.90% | 0.22% | 0.68% |
| Remaining Participants (in the aggregate) | 3.20% | 0.78% | 2.42% |
| Total Percent of Shares | 4.10% | 1.00% | 3.10% |

The Company's current Chief Executive Officer will not receive an Emergence Equity Grant, but rather will receive certain cash compensation in lieu of receiving such an equity grant as described in Section III.D.2 below.

With respect to each Emergence Equity Grant, the award will be granted to participants using two equity vehicles – restricted stock units and options. One percent (1%) on a fully diluted basis of New SSCC Common Stock (or approximately 24% of the Emergence Equity Grants) will be granted in the form of restricted stock units on and as of the Effective Date.

Three and one-tenth percent (3.1%) on a fully diluted basis of New SSCC Common Stock (or approximately 76% of the Emergence Equity Grants) will be granted in the form of options ("Emergence Options") on and as of the first date after the Effective Date on which New SSCC Common Stock becomes listed for trading on the NYSE or the NASDAQ (the "Listing Date"). Each Emergence Option will have a seven-year term and a strike price equal to the average of the closing transaction prices of the New SSCC Common Stock for the thirty (30) calendar day period beginning on the Listing Date.

To preserve the potential value of the Emergence Options (and the performance-based incentives associated therewith) in the event of an offer to purchase Reorganized SSCC prior to the option grants or calculation of the option strike price, in the event that a bona fide offer for the acquisition of Reorganized SSCC (a "Transaction") is announced after the Listing Date but before the end of such thirty (30) calendar day period, and the option strike price exceeds the per share value of the New SSCC Common Stock as of the Effective Date determined by using the Debtors' Average Bond Trading Price (as defined in Exhibit 3 to the Plan) (such per share value, the "Effective Date Value"), then, in addition to retaining all of the Emergence Options, each optionee will receive a cash payment from the Reorganized Debtors, in an amount equal to the number of shares of New SSCC Common Stock subject to the optionee's outstanding Emergence Options multiplied by the lesser of (i) the excess of the strike price over the Effective Date Value or (ii) the excess of the per share consideration received by holders of New SSCC Common Stock in such Transaction over the Effective Date Value, with the applicable amount payable upon the closing of such Transaction. Similarly, in the event that a Transaction is announced and closes on or before the date on which the New SSCC Common Stock has become listed, then in lieu of the Emergence Options grants, each prospective recipient of Emergence Options will receive a cash payment from the Reorganized Debtors equal difference between the value of the number of shares of New SSCC Common Stock that would have been subject to the employee's Emergence Option grant in such Transaction and the value of those shares based upon the Effective Date Value, with such amount payable upon the closing of such Transaction.

Consistent with awards that will be made under the Equity Incentive Plan generally, the Emergence Equity Grants will be subject to a three-year, ratable vesting schedule subject to full accelerated vesting upon a change in control, a termination of employment without cause, a resignation for Good Reason, death, disability, and retirement, except that if the employment of a participant terminates without Cause, for Good Reason, or due to retirement within the first 12 months after the Effective Date, only 33.3% of the participant's Emergence Equity Grant would become fully vested, and the remaining 66.7% would remain unvested and would be canceled (in all circumstances subject to any different vesting terms and conditions provided in an employment agreement or award agreement).  A summary of the vesting schedule with respect to the Emergence Equity Grants is contained in Exhibit 3 to the Plan under certain conditions.

### 2.    Executive Employment Agreements.

The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management.  These agreements will be substantially in the forms contained in Exhibit ~~12~~13 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.  Described below are some of the key terms of these agreements.

*Patrick J. Moore's Employment Agreement*

The Company will enter into, as of the Confirmation Date, an amended and restated employment agreement with Mr. Moore (the "Moore Employment Agreement").  This agreement will be substantially in the form contained in Exhibit ~~12~~13 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan. Described below are some of the key terms of Mr. Moore's employment agreement.

Mr. Moore's Employment Agreement requires him to devote substantially all of his business time to the Reorganized Debtors' operations through ~~a specified post-emergence retirement date (with the specific date still to be determined but in any event, not later than one year after~~the nine-month anniversary of the Effective Date~~)~~, at which time he will retire from his employment with Reorganized SSCC, unless his retirement date is accelerated due to Mr. Moore's voluntary resignation for Good Reason or death, or due to the Company's termination of his employment without Cause (or his employment otherwise terminates sooner in accordance with the provisions of ~~his~~the Moore Employment Agreement).  He will continue in his position as Chief Executive Officer until his retirement.  During his employment, Mr. Moore will receive a base salary and will be eligible to participate in the Reorganized Debtors' annual incentive bonus plan and receive other benefits and perquisites as are made available to their senior executives generally.

Upon his retirement from Reorganized SSCC, Mr. Moore is eligible, pursuant to the terms of his Employment Agreement, to receive, among other things, (i) a retirement benefit determined under the benefit formula contained in the  Company's supplemental income pension plan in which he had participated as a senior executive of the Company; (ii) a special incentive bonus payment of $3,500,000 in lieu of Mr. Moore's participation in the Reorganized SSCC Equity Incentive Plan (in which all other senior executives except Mr. Moore will participate) that is designed to provide market-based ~~long-term~~ incentive compensation to Mr. Moore during his

employment preceding his retirement, which payment is subject to reduction by the portion of his target level incentive bonus under the 2009 LTIP that is based on the Company's financial performance (and not any restructuring goals) and will be earned in 2010; (iii) to the extent Mr. Moore's retirement date is accelerated, to a date earlier than December 31, 2010, certain additional amounts that represent the difference between one year of Mr. Moore's annual base salary and incentive bonus amounts and the base salary and incentive bonus amounts already paid to him prior to his retirement date; and (iv) certain other benefits including continued health coverage until the earlier of the three-year anniversary of his retirement date and the date on which he becomes eligible for coverage through another employer, and secretarial support and office space through the end of the second year after his retirement (which will cease earlier if he becomes employed full-time by another employer).  His Employment Agreement does not provide for any additional benefits if his employment terminates prior to the ~~specified post-emergence retirement date~~nine-month anniversary of the Effective Date; however, he will remain eligible to receive certain of the payments and benefits described above depending on the circumstances of his termination of employment.  Additionally, payment of any benefits provided to Mr. Moore upon his retirement is conditioned upon, among other things, his execution of a valid release of claims and his compliance with post-employment obligations under his employment agreement. If, at any time, the payments and benefits described above would be "excess parachute payments" as defined in Section 280G of the Internal Revenue Code, with the effect that Mr. Moore is liable for the payment of an excise tax, then Reorganized SSCC will pay the executive an additional amount to "gross up" the executive for such excise tax (provided that such payments to Mr. Moore will be reduced to the extent necessary to avoid such excise tax if the aggregate of such payments is less than 110% of the amount that would result in the payment of such excise tax).

Because Mr. Moore is not participating in the Reorganized SSCC Equity Incentive Plan, the Employment Agreement provides that he is eligible to receive a cash incentive payment in the event of that Reorganized Debtors receive, prior to the cessation of his employment, an offer to acquire them (or otherwise engage in a transaction) that results in a Change in Control prior to ~~prior to the end of the six-month period following the cessation of his employment~~ the fifteen-month anniversary of the Effective Date, provided that Mr. Moore has participated in the efforts to attempt to sell the Reorganized Debtors (or to engage in such other transaction).  The cash payment will be ~~determined based upon~~equal to the monetary value of the equity-based compensation that that the individual holding the positions of President and Chief Operating Officer ("COO") of Reorganized SSCC as of the Effective Date would receive if all of the equity-based compensation that such President and COO received in accordance with the Company's Plan ~~of Reorganization~~ (i.e., 0.9% of the common shares of the New SSCC Common Stock ~~on a fully diluted basis~~ issued on the Effective Date on a fully diluted basis, allocated in a restricted stock unit award with respect to 0.22% of such common shares and in an award granting options to acquire 0.68% of such common shares) were fully vested and liquidated upon the acquisition of the Reorganized Debtors, reduced by the amount of the $3,500,000 special incentive bonus payment described above paid to Mr. Moore.

Mr. Moore's Employment Agreement also prohibits him from: (i) disclosing Reorganized SSCC's confidential information, inventions or developments; (ii) diverting any business opportunities or prospects from Reorganized SSCC that are presented to him in his capacity as an employee of the Company; (iii) during his employment, competing with any business conducted

30

by Reorganized SSCC or any of its affiliates (or with any material new line of business), within the United States, Canada, Mexico, or China or soliciting any employees, customers or suppliers of the Reorganized SSCC or any of its affiliates; (iv) for a period of two years following the termination of his employment, competing with any business conducted by Reorganized SSCC or any of its affiliates as of the termination of his employment (or with any material new line of business in which Reorganized SSCC or its affiliates engage within the one-year period following the termination of his employment); and (v) for a period of two years following the termination of his employment, soliciting employees, customers, or suppliers of Reorganized SSCC or its affiliates to terminate their relationships with Reorganized SSCC or its affiliates.

*Steven J. Klinger's Employment Agreement and Retirement Agreement*

The Company will enter into, as of the Confirmation Date, an amended and restated employment agreement, and an amended and restated retirement agreement, with Mr. Klinger (respectively, the "<u>Klinger Employment Agreement</u>" and "<u>Klinger Retirement Agreement</u>"). Each of these agreements will be substantially in the forms contained in <u>Exhibit 12</u><u>13</u> to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.  Described below are some of the key terms of these agreements.

The Klinger Employment Agreement requires Mr. Klinger to devote substantially all of his business time to the Reorganized Debtors' operations through the term of his employment and is subject to automatic renewal for successive two-year terms unless sooner terminated by either party in accordance with the provisions of the Klinger Employment Agreement.  The Klinger Employment Agreement also provides that he shall be eligible to participate in any annual performance bonus plans, long-term incentive plans, and/or equity-based compensation plans established or maintained by the Reorganized Debtors for their senior executive officers, including the MIP and the Equity Incentive Plan, and provides that he will receive an Emergence Equity Grant of 0.9% of the shares of New SSCC Common Stock (on a fully diluted basis) issued as set forth in the Plan and <u>Exhibits 3</u> and <u>12</u> to the Plan.

Pursuant to the Klinger Employment Agreement, no later than the earlier of nine-month anniversary of the Effective Date and thirty days after Reorganized SSCC receives notice of the current CEO's termination of employment (the "Promotion Date"), Reorganized SSCC will consider Mr. Klinger for employment as its CEO.  Any offer from Reorganized SSCC to Mr. Klinger to become CEO will be subject to good faith negotiations between them prior to the Promotion Date.  If Reorganized SSCC does not offer Mr. Klinger the position of CEO prior to the Promotion Date on mutually acceptable terms, or if they cannot agree on a mutually acceptable form of an employment agreement (or if Reorganized SSCC designates an executive chairperson of the board but does not offer such position to Mr. Klinger), Mr. Klinger has the right to voluntarily terminate his employment for "good reason" and receive the severance benefits described below (but, at the option of Reorganized SSCC, would remain employed for up to six months thereafter to transition his duties).

The Klinger Employment Agreement also provides that if Reorganized SSCC terminates the executive's employment "without cause" or the executive terminates his employment with "good reason", Reorganized SSCC will pay as severance, in a lump sum, a multiple of two times (which multiple will increase to 2.99 times if he is CEO) the sum of his base salary and the highest

of higher of the Executive's (x) average annual incentive bonus for the three fiscal years preceding the effective termination date of his employment; and (y) actual annual incentive bonus paid with respect to the fiscal year immediately preceding the effective termination date of his employment, provided that in the event that Mr. Klinger's employment terminates ~~within the first 12 months following the Effective~~ prior to the Promotion Date "without cause" or for "good reason", then he is entitled to receive the greater of $5 million and the foregoing severance pay. In particular, Mr. Klinger will be eligible to resign for "good reason" and receive the greater of $5 million and the foregoing severance pay in the event he is not ~~promoted to CEO, upon such terms and conditions as Mr. Klinger and Reorganized SSCC shall in good faith negotiate, after the retirement of the current~~ offered the position of CEO as described above. In addition to the foregoing severance pay, Reorganized SSCC also will: (i) continue the executive's coverage under the its medical, dental, life, disability, pension, profit-sharing and other executive benefit plans and perquisites for two (2) years after the termination of his employment (which will increase to three (3) years if he becomes CEO); (ii) pay him the supplemental retirement benefit he would have received had he remained employed and retired at such time as set forth in the Employment Agreement; (iii) cause accelerated vesting of 33.3% of any unvested equity-based awards if the termination of his employment or resignation for "good reason" occurs within the first 12 months after the Effective Date, and full ~~accelerate~~ accelerated vesting of such awards if such termination occurs after the first 12 months following the Effective Date; and (iv) provide outplacement services. ~~If, at any time, his employment terminates "without cause" or for "good reason" within 24 months following a "change of control" of Reorganized SSCC, he will receive the foregoing benefits and in addition, if~~ Upon a Change in Control, Mr. Klinger is entitled to full accelerated vesting of his Emergence Equity Awards but is not entitled to receive any severance or other benefits solely due a Change in Control. If, at any time, the payments and benefits described above would be "excess parachute payments" as defined in Section 280G of the Internal Revenue Code, with the effect that the executive is liable for the payment of an excise tax, then Reorganized SSCC will ~~in certain circumstances~~ pay the executive an additional amount to "gross up" the executive for such excise tax. ~~Payment of any severance benefits provided to Mr. Klinger is conditioned upon, among other things, his execution of a valid release of claims~~ (provided that such payments to Mr. Klinger will be reduced to the extent necessary to avoid such excise tax if the aggregate of such payments is less than 110% of the amount that would result in the payment of such excise tax).

Mr. Klinger's Employment Agreement also prohibits him from: (i) disclosing ~~the~~ Reorganized Debtors' confidential information, inventions or developments; (ii) diverting any business opportunities or prospects from the Reorganized Debtors; ~~and~~ (iii) during his employment ~~and for a period of up to two years following termination of his employment~~, competing with any business conducted by ~~the~~ Reorganized ~~Debtors~~ SSCC or any of their affiliates (or with any material new line of business), within the United States, Canada, Mexico, or China, or soliciting any employees, customers or suppliers of the Reorganized Debtors ~~within the United States, Canada, Mexico, or China~~; (iv) for a period of two years following the termination of his employment, competing with any business conducted by Reorganized SSCC or any of its affiliates as of the termination of his employment (or with any material new line of business in which Reorganized SSCC or its affiliates engage within the one-year period following the termination of his employment); and (v) for a period of two years following the termination of his employment soliciting employees, customers, or suppliers of Reorganized SSCC or its affiliates to terminate their relationships with Reorganized SSCC or its affiliates.

*Mr. Klinger's Retirement Agreement*

Prior to the commencement of the Chapter 11 Cases, the Company and Mr. Klinger were parties to an Executive Retirement Agreement that provides certain retirement-related benefits to Mr. Klinger. Pursuant to the Plan, Reorganized SSCC will be assuming the Klinger Retirement Agreement upon emergence from bankruptcy. The Klinger Retirement Agreement was designed to provide a target benefit to Mr. Klinger. Service is earned while he is employed by the Company. The benefit formula is 50% of final average earnings less the annuity equivalent of the benefit earned under his previous employer's pension plan and benefits earned under any Company sponsored retirement plans excluding accruals attributable to salary deferrals and matching employer contributions. Earnings include basic salary and annual incentive bonuses, but exclude compensation under long-term incentive plans and any other bonus or incentive compensation. Final average earnings are the average of the highest four consecutive years of earnings out of the last 10 years prior to termination. Mr. Klinger is immediately vested in his benefit. Prior to completing 15 years of service with the Company, the benefit will be prorated by the ratio of service at termination to 15. Mr. Klinger is entitled to a full retirement benefit after completion of 15 years of service. Benefits commence on the first day of the seventh month following termination, if he has completed at least 15 years of service, or on the first day of the seventh month following age 62 if he has not completed 15 years of service. The normal form of payment is a single-life annuity. The value of the single-life annuity benefit is converted and paid in five equal annual installments.

*Other Executives' Employment Agreements*

The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management. These agreements will be substantially in the forms contained in Exhibit ~~12~~13 to the Plan (which forms will be filed with the Plan Supplement) and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.

*Employment Security Agreements*

The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management. These agreements will be substantially in the forms contained in Exhibit ~~12~~13 to the Plan (which forms will be filed with the Plan Supplement) and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.

## III. GENERAL INFORMATION

**A.    The Debtors' Businesses and Properties.**

**1.      Company Overview.**

Based in Creve Coeur, Missouri, and Chicago, Illinois, the Company is one of the leading integrated manufacturers of paperboard and paper-based packaging in North America and one of the world's largest paper recyclers. The Company sells a broad range of paper-based packaging products, including containerboard, corrugated containers, kraft paper and point of purchase displays, to a broad range of manufacturers of industrial and consumer products. The Company also has a complete line of graphics capabilities for packaging. As of the Petition Date, the Company held approximately 18% of the North American containerboard market capacity.

As of the Petition Date, the Company operated 159 manufacturing facilities located primarily in the United States and Canada. The Company's operations span all phases of the container industry including: 14 paper mills which produce containerboard; 117 corrugated container facilities which convert containerboard into corrugated containers that are sold to a wide array of customers, principally in the food and beverage consumer product industries; and 26 reclamation plants which process recyclable materials to be sold to the Company's mills or third-party customers. In addition, the Company operated one wood products plant and one lamination plant. The Company also owned approximately one million acres of timberland in Canada and operates wood harvesting facilities in the United States. The Company employed approximately 21,250 employees as of the Petition Date.

## 2. Properties.

The current corporate headquarters of the Company are located at 222 North LaSalle Street, Chicago, Illinois 60601.[14] As of September 30, 2009 the Company's operations included 14 paper mills, 109 corrugated container facilities, 27 reclamation plants and one lamination plant, in addition to owning and leasing several other properties in connection with operating the Company's businesses. The general character, location and approximate size of the principal physical properties used by the Company as of the Petition Date are listed in the Company's Schedules of Assets and Liabilities filed with the Bankruptcy Court on April 6, 2009.

## B. Operational Structure of the Debtors.

SSCC is a non-operating holding company that primarily conducts its business operation through its wholly-owned subsidiary SSCE. SSCE is the direct or indirect parent company of all of the other Debtors and non-debtor affiliates. A chart depicting the Company's corporate structure as of the Petition Date is annexed hereto as Exhibit B-1.

### 1. Products and Materials.

#### (a) Paper Products

---

[14] Pursuant to the Debtors' Tenth Omnibus Motion Of The Debtors For Entry Of An Order Authorizing Rejection Of Certain Executory Contracts And Unexpired Leases Pursuant To Section 365 Of The Bankruptcy Code filed on June 19, 2009 and the Court's subsequent entry of an Order Authorizing Rejection of Certain Executory Contracts and Unexpired Leases Pursuant To Section 365 of the Bankruptcy Code on July 9, 2009, the Debtors changed corporate headquarters from 150 N. Michigan Avenue, Chicago Illinois 60601 to 222 North LaSalle Street, Chicago, Illinois 60601 as of August 31, 2009.

The Company also produces a full range of high-quality, corrugated containers designed to protect, ship, store and display products.  Corrugated containers are used to transport such diverse products as home appliances, electric motors, small machinery, grocery products, produce, books, and furniture.  The containers are made to the merchandising and distribution specifications of the Company's customers and are sold to a broad range of consumer goods manufacturers.  The Company also manufactures and sells a variety of retail-ready, point-of-purchase displays and a full line of specialty products, including pizza boxes, corrugated clamshells for the food industry, Cordeck® recyclable pallets, and custom die-cut products to display merchandise on the sales floor.  In 2008, the container division generated approximately 63% of the Company's net sales.

The Company also produces a full line of containerboard, which is used primarily in the production of corrugated packaging.  Sixty-nine percent of the Company's containerboard production that is comprised of linerboard and medium is consumed internally.  In 2008, the containerboard operations generated approximately 20% of the Company's net sales.  The Company also produces market pulp, including southern hardwood pulp, bleached southern softwood pulp, and fluff pulp, kraft paper, and other specialty products.  Market pulp is sold to manufacturers of paper products as well as those within the printing and writing sectors.  The Company's kraft paper is used in consumer and industrial bags, grocery and other types of shopping bags, counter rolls, handle stock, and refuse bags.

(b)      Paper and Corrugated Container Manufacturing Process

Several steps are necessary to manufacture paper suitable for paper-based packaging.  To begin, pulpwood is debarked and sent through a chipper.  The resulting chips are then placed into a pressure cooker with specified chemicals that separates the wood fiber.  This fiber is washed to remove additional chemicals.  Black liquor results from the washing and is put in recovery boilers to create steam.  Other byproduct materials created in the papermaking process such as bark, sawdust and wastewater treatment solids are put into power boilers to also create steam.  The pulp is then moved to a decker (a machine used to thicken fibers), where a disc refiner brushes and cuts the fibers to increase strength.  This mixture then travels to a machine tank, where it is diluted with water.  Chemicals may also be added, depending on the requirements of the finished paper.  The pulp then moves to the paper machine headbox, which distributes the material on a wire mesh conveyor to remove excess water.  The paper then moves through a dryer section.  Finally, the paper is rolled, cut and shipped to customers, including corrugated converting plants, where it can then be transformed into paper-based packaging.  In addition to the use of virgin fiber as described above, the Company also utilizes waste paper fiber in the papermaking process as additional raw material with the virgin fiber.

Producing corrugated containers also involves several steps.  Production begins with medium, a containerboard component, being inserted into a machine, where it is heated, moistened and formed into a fluted pattern and bonded to the inside of single-face linerboard, the other component of containerboard.  Single-face board is then fed into a machine where the outside paper, or double-face linerboard, is affixed to the fluted medium to form single-wall corrugated board.  Hot plates remove excess moisture and help set starch-based glue.  The board is then fed into a device that trims the board to appropriate widths and adds lines for later folding.  Knives cut the board to the required length.  These cut-to-size sheets are stacked in preparation for finishing.

Finishing then cuts, prints, folds, and glues the sheets into the finished product. Finally, flat boxes are bundled, stacked into units and banded for shipment.

(c)      Reclamation Facilities

The Company's reclamation operations procure fiber resources for its containerboard mills as well as for other producers. The Company currently operates 27 reclamation facilities in the United States that collect, sort, grade and bale recovered paper. The Company also collects aluminum, glass and plastic materials for resale to manufacturers that utilize such materials. In addition, the Company operates a nationwide brokerage system whereby it purchases and resells reclaimed paper to its recycled paper mills and other producers of recycled products on a regional and national contract basis. The Company's waste reduction services operation extracts additional recyclables from the waste stream by partnering with customers to reduce their waste expenses and increase recycling. Brokerage contracts provide bulk purchasing, often resulting in lower prices and cleaner reclaimed paper. Many of the Company's reclamation facilities are located close to the recycled paper mills to ensure availability of supply with minimal shipping costs.

2.      **Materials.**

(a)      Raw Materials

The products that the Company produces require wood fiber and reclaimed fiber as the principal raw materials. The Company satisfies the majority of its demand for wood fiber through purchases on the open market or under supply agreements with certain providers. Approximately 90% of the Company's wood fiber needs are purchased in the open market. The remaining 10% comes directly from individual landowners. The Company satisfies essentially all of its need for reclaimed fiber through its reclamation facilities and nationwide brokerage system.

(b)      Supplier Exchanges

The Company is also party to several different exchange agreements with certain paper manufacturers. These agreements create a reciprocal relationship in which the Company requires a quantity of containerboard from certain suppliers. In consideration, the Company exchanges its internally produced containerboard with these suppliers. The exchanges under these agreements reduce costs (primarily freight costs), maximize paper machine efficiencies, and allow the Company to obtain grades of paper which it does not produce.

3.      **Customers.**

The Company obtains new customers and maintains long-term customer relationships through various sales, marketing, and distribution channels. The Company's marketing strategy is based on selling a broad range of paper-based packaging products to manufacturers of industrial and consumer products. This strategy has created a broad customer base which consists of sales directly to end users and converters as well to resellers. To serve its customer base, the Company has centralized its marketing and sale of containerboard and pulp to third parties in the Company's board sales group located in Chicago, Illinois, and West Point, Virginia. The Company's corrugated container sales organization is centralized with sales responsibilities for all converting facilities.

36

The Company greatly values its diversified and high-quality customer base. The Company produces paper products and containerboard for some of the world's largest consumer products companies. The Company's top customers include Kellogg Company, PepsiCo Inc., Unilever, and Smithfield Foods Inc. In addition to these high-volume customers, the Company is also able to efficiently and economically serve local and regional customers. No single customer accounted for more than three percent (3%) of the Company's sales during the twelve months ending September 2009. During that time period, the Company's top fifteen customers represented approximately twenty percent (20%) of the Company's total sales.

### 4.      Employees.

The Company currently employs approximately 20,000 active employees (the "Employees"), of whom approximately 14,200 are hourly and 5,800 are salaried. Approximately 11,640, or more than fifty-eight percent (58%), of these Employees are represented by unions and covered under one of the approximately 120 collective bargaining agreements. The collective bargaining agreements expire at various times between 2009 and 2013. While the terms of the collective bargaining agreements may vary, the material terms of such agreements are customary for the industry, the type of facility, the classification of the employees, and the geographic location covered thereby.

### 5.      Recent Operations.

As of September 30, 2009, the Company reported total assets having a net book value of approximately $5.276 billion and total liabilities of approximately $6.600 billion. In addition, the Company had net sales of approximately $7.042 billion for the year ending December 31, 2008. For the nine months ended September 30, 2009, the Company had net sales of approximately $4.195 billion. The Company's financial position had been adversely impacted by the recent downturn in the global economy, substantial price competition and volatility in the pulp and paper industry, and recent volatility in the cost of energy and raw materials.

During 2009, the Company has received refunds related to an allowance of an excise tax credit for alternative fuel mixtures produced for sale or for use as a fuel in a taxpayer's trade or business. This credit is scheduled to expire on December 31, 2009. On May 6, 2009, the Company was notified that its registration as an alternative fuel mixer was approved by the Internal Revenue Service. The Company submitted refund claims of approximately $473 million for the nine months ended September 30, 2009 related to production at ten of its U.S. mills and has received refund claims of approximately $415 million for such period. During the nine months ended September 30, 2009, the Company recorded other operating income of $455 million, net of fees and expenses, in its consolidated statements of operations related to this matter.

For the nine months ended September 30, 2009, the Company had net income attributable to common stockholders of $3 million, or $0.01 per diluted share, compared to net income of $6 million, or $0.02 per diluted share, for the same period last year. The 2009 results benefited from the alternative fuel tax credit income of $455 million, but were negatively impacted by debtor-in-possession debt issuance costs of $63 million, reorganization items of $109 million, lower segment operating profits of $80 million, higher interest expense of $30 million and loss on early extinguishment of debt of $20 million. The 2008 results benefited from the resolution of

certain Canadian income tax examination matters and higher non-cash foreign currency exchange gains, but were negatively impacted by a charge of $22 million to fully reserve for all amounts due from Calpine Corrugated, LLC and litigation charges of $8 million. The segment operating results for the nine months ended September 30, 2009 were negatively impacted by lower sales volume for containerboard and corrugated containers and lower average selling prices for containerboard and corrugated containers. The 2009 nine month results benefited from lower energy and reclaimed fiber costs compared to the comparable period in 2008.

### 6.   Corporate History and Business Acquisitions.

Jefferson Smurfit Group plc, an Ireland-based packaging conglomerate, formed Jefferson Smurfit Corporation ("JSC") in 1983 as a holding company for its U.S. interests. In the years following its formation, JSC acquired several container companies and operations, including Container Corporation of America and Alton Boxboard Company. By 1997, JSC had achieved sales of more than $3 billion.

Stone Container Corporation ("Stone") was founded in 1926 as J.H. Stone and Company in Chicago, Illinois, and incorporated in 1945 under the name Stone Container Corporation. Following this formation, Stone expanded throughout the Midwest, both building and buying corrugated container plants. Stone continued this expansion by purchasing mills throughout the U.S. and establishing an international presence in Canada, Latin America, Asia and Europe.

In, 1998, JSC, now known as SSCC, completed a merger with Stone and Stone became a wholly-owned subsidiary of SSCC (the "Merger"). In 2004, a subsequent internal reorganization transaction resulted in Stone being renamed SSCE. SSCC continues to own 100% of the equity interest of SSCE.

This combined Company then focused on strategic expansion, elimination of unnecessary facilities and operations, and cost reduction. In the years following the Merger, the Company closed 10 containerboard mills, a market pulp mill and 82 container plants, including 47 such closures since 2005. As the initial phase of its divestiture strategy in 1999-2000, the Company sold its U.S. timberlands, newsprint mills, its ownership position in Abitibi-Consolidated, Inc. and a pulp mill. The Company's strategy for expansion entailed acquiring corporations that would enable it to improve efficiency levels, broaden its high-quality containerboard offerings, and meet the growing demand for value-added packaging. As part of this strategy, in May 2000, the Company acquired Montreal-based St. Laurent Paperboard, Inc., a major manufacturer, supplier, and converter of high-quality, value-added paperboard products including containerboard and food board. Additionally, in September 2002, the Company acquired a large corrugated medium mill and related assets located in Stevenson, Alabama, and sold its industrial packaging operations. In March 2003, the Company completed a transaction with Jefferson Smurfit Group involving (a) the sale of the Company's European operations to the Jefferson Smurfit Group plc and (2) the Company's purchase of the Jefferson Smurfit Group's 50% ownership in Smurfit-MBI, a Canadian packaging business. This transaction gave the Company 100% ownership of Smurfit-MBI and effectively ended its manufacturing presence in Europe. In 2006, the Company sold its consumer packaging business, which allowed it to be solely focused on its core business of containerboard, corrugated containers and recycling, and in 2007 the Company sold its Brewton, Alabama white top linerboard and solid bleached sulfate mill. In July 2008, the Company acquired

38

a 90% ownership in Calpine Corrugated, LLC, which enabled the Company to accelerate the optimization of its Northern California business unit and improve its position in the agricultural market segment.

## C.    Management of Debtors.

### 1.    Board of Directors.

The board of directors of the Company (the "Board of Directors") currently consists of nine (9) members.  Seven of the nine members are independent directors.  Set forth below are the directors of the Company as of the date of this Disclosure Statement.

### 2.    Biographies of Directors.

*James R. Boris, Board Member*

James R. Boris was first elected as a Director in 2003. He is the retired Chairman and Chief Executive Officer of EVEREN Capital Corporation and its primary subsidiary EVEREN Securities, Inc. (now known as Wachovia Securities, Inc.). Mr. Boris is the non-executive Chairman of the Board of Integrys Energy Group, Inc., and lead director of the Chicago Board Options Exchange.

*Connie K. Duckworth, Board Member*

Connie K. Duckworth was first elected as a Director in 2004. She has been President and Chairman of Arzu, Inc. since August 2003. She was a partner of Circle Financial Group, LLC from January 2003 to December 2004. Ms. Duckworth retired from Goldman, Sachs & Co. as Advisory Director in 2001. Ms. Duckworth is a director of Northwestern Mutual Life Insurance Company, DNP Select Fund, and Russell Investment Group.

*Steven J. Klinger, President and Chief Operating Officer*

Steven J. Klinger joined Smurfit-Stone as President and Chief Operating Officer in May 2006.  He was appointed to the Board of Directors on December 11, 2008.  Prior to joining Smurfit-Stone, Mr. Klinger was employed by Georgia-Pacific Corporation for 23 years, most recently as Executive Vice President of Packaging from February 2003 to May 2006, and President, Packaging and Containerboard Sales/Logistics from August 2001 to January 2003.  He is a graduate of Georgia State University, with a degree in accounting, and Duke University's Advanced Management Program. In June 2008, Mr. Klinger was appointed to the board of directors of Navistar International Corporation.

*William T. Lynch, Jr., Board Member*

William T. Lynch was first elected as a Director in 2003. He has been President and Chief Executive Officer of Liam Holdings, LLC since April 1997. He is the retired President and Chief Executive Officer of Leo Burnett Company. Mr. Lynch is also a director of Pella Corporation.

*Patrick J. Moore, Chairman and Chief Executive Officer*

CH1 5118439 5168368v.4 1

Patrick J. Moore has served as Chairman and Chief Executive Officer since May 2006.  He had been Chairman, President and Chief Executive Officer since May 2003, and prior to that he was President and Chief Executive Officer since January 2002, when he was also elected as a director of the Company.  He was Vice President and Chief Financial Officer from November 1998 until January 2002.  Mr. Moore is the lead director for Archer Daniels Midland Company and serves on the board of directors of DePaul University in Chicago.  He also serves on the Nasdaq CEO Council, J.P. Morgan's National Advisory Board, and the boards of the YMCA of Greater St. Louis, Boys Hope Girls Hope, and Big Shoulders in Chicago.

*James J. O'Connor, Board Member*

 James J. O'Connor was first elected as a Director in 1998 and serves as the Lead Independent Director. He is the former Chairman and Chief Executive Officer of Unicom Corporation and its subsidiary, Commonwealth Edison Company. He is a director of Armstrong World Industries, Inc., Corning Incorporated and UAL Corporation.

*Jerry K. Pearlman, Board Member*

Jerry K. Pearlman was first elected as a Director in 1998. He is the retired Chairman of the Board and Chief Executive Officer of Zenith Electronics Corporation. Mr. Pearlman is a director of Nanophase Technologies Corporation, and from 1984 to 1998 served as a director of Stone Container Corporation, a predecessor of the Company.

*Thomas A. Reynolds, III, Board Member*

Thomas A. Reynolds was first elected as a Director in 1997. He has been a Partner with Winston & Strawn LLP, a law firm that has regularly represented the Company on numerous matters, since 1984, and is a member of Winston & Strawn LLP's executive committee.

*William D. Smithburg, Board Member*

William D. Smithburg was first elected as a Director in 2003. He is the retired Chairman, President and Chief Executive Officer of The Quaker Oats Company. He is a director of Abbott Laboratories, Barry Wehmiller Companies, Inc., Northern Trust Corporation, and Corning Incorporated.

**3.     Committees of the Board of Directors.**

SSCC's Board of Directors has four committees: (i) the Audit Committee, (ii) the Compensation Committee, (iii) the Nominating and Governance Committee, and (iv) the Strategy and Finance Committee.  The Audit Committee assists the Board of Directors in fulfilling its oversight responsibilities with respect to auditing, financial reporting, internal control systems, and compliance with legal and regulatory requirements.  The members of the Audit Committee are Mr. Boris, Mr. O'Connor, and Mr. Pearlman (Chair).  The Compensation Committee has the responsibility for (i) annually appraising the performance of the executive officers of the Company and reviewing and establishing the annual salary and incentive plan participation levels and bases of participation, (ii) administering, reviewing, and subject to board approval, approving any changes to incentive compensation plans for executive officers, (iii) reviewing and approving

CH1 51184395168368v.41

payments, as appropriate, under incentive compensation plans for executive officers, (iv) administering, reviewing and, subject to Board approval, approving any changes to stock option and any other stock-based compensation plans in which executive officers participate, and (v) reviewing and, subject to Board approval, approving employment, severance and compensation agreements with individual executive officers.  The members of the Compensation Committee are Ms. Duckworth, Mr. Lynch, Mr. Pearlman, and Mr. Smithburg (Chair).  The Nominating and Governance Committee assists the Board of Directors by identifying individuals qualified to become Board members, recommending to the Board the director nominees to be proposed for election by the stockholders and recommending to the Board the corporate governance guidelines and procedures applicable to the Company.  The members of the Nominating and Governance Committee are Mr. Lynch, Mr. O'Connor (Chair) and Mr. Smithburg.  The Strategy and Finance Committee was established to provide guidance on major strategic initiatives and financing strategies and to review the Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans' administration, investment and management of the Company's retirement plans and plan assets.  The members of the Strategy and Finance Committee are Mr. Boris (Chair), Ms. Duckworth, Mr. Lynch, and Mr. Reynolds.

4.     **Compensation of Directors.**

Each independent director is entitled to receive an annual fee of $120,000 as compensation for serving on the board.  Independent Directors also receive a fee of $1,500 per board and committee meeting attended, plus travel expenses.  The Chairman of the Audit Committee receives an additional fee of $10,000 annually, and the Chairmen of the Compensation Committee, the Nominating and Governance Committee, and the Strategy and Finance Committee receive an additional fee of $7,500 annually.  Mr. O'Connor, as Lead Independent Director, also receives a fee of $20,000 annually for his service in that capacity.  The Company also maintains a matching gift program for charitable donations of up to $7,500 per year made by independent directors.  Mr. Moore and Mr. Klinger do not receive any additional compensation by reason of their membership on, or attendance at meetings of, the Board.

5.     **Executive Officers.**

Set forth below are the senior executive officers of SSCC as of the date of this Disclosure Statement and each officer's position within SSCC.

| Name | Position |
| --- | --- |
| Patrick J. Moore | Chairman of the Board and Chief Executive Officer |
| Steven J. Klinger | President and Chief Operating Officer |
| John R. Murphy | Senior Vice President and Chief Financial Officer |
| Craig A. Hunt | Senior Vice President, Secretary and General Counsel |
| Ronald D. Hackney | Senior Vice President, Human Resources |

| Susan M. Neumann | Senior Vice President of Corporate Communications and Public Affairs |
| Mark R. O'Bryan | Senior Vice President of Strategic Initiatives and Chief Information Officer |
| Mathew J. Blanchard | Senior Vice President and General Manager, Board Sales |
| Michael P. Exner | Senior Vice President and General Manager, Containerboard Mill Division (effective January 1, 2010) |
| Paul K. Kaufmann | Senior Vice President and Corporate Controller |
| John L. Knudsen | Senior Vice President of Corporate Strategy |
| Michael R. Oswald | Senior Vice President and General Manager, Recycling Division |
| Steven C. Strickland | Senior Vice President, Container Operations |

**6.      Biographies of the Senior Executive Officers.**

*Patrick J. Moore, Chairman of the Board and Chief Executive Officer*

See Section III.C.2 – "Biographies of Directors"

*Steven J. Klinger, President and Chief Operating Officer*

See Section III.C.2 – "Biographies of Directors"

*John R. Murphy, Senior Vice President and Chief Financial Officer*

John R. Murphy is senior vice president and chief financial officer for Smurfit-Stone Container Corporation. Mr. Murphy joined Smurfit-Stone in May 2009.  Prior to joining Smurfit-Stone, he served as president and chief executive officer, and as a member of the board of directors of Accuride Corporation of Evansville, IN.  During his 10-year tenure with Accuride, Mr. Murphy served as president and chief operating officer; chief financial officer; and executive vice president.  Mr. Murphy also held key leadership positions with North American Stainless, Inc., Armco, Inc. and Corning, Inc. He began his career with PricewaterhouseCoopers. Mr. Murphy currently serves on the board of directors and holds committee positions with O'Reilly Automotive, Inc., of Springfield, MO.  He holds a bachelor's degree in accounting from Pennsylvania State University, an MBA from the University of Colorado, and is a certified public accountant.

*Craig A. Hunt, Senior Vice President, Secretary and General Counsel*

Craig A. Hunt is senior vice president, general counsel and secretary for Smurfit-Stone Container Corporation. He is also a member of the Company's executive committee.  Mr. Hunt

joined the former Jefferson Smurfit Corporation in November 1990 as staff counsel. In 1993, he began serving as senior counsel and assistant secretary. He assumed his current post in 1998. Mr. Hunt practiced general corporate law for several years in the corporate finance section of the Shook, Hardy & Bacon law firm in Kansas City. He earned a bachelor's degree in economics and a Juris Doctor degree from the University of Kansas.

*Ronald D. Hackney, Senior Vice President, Human Resources*

Ronald D. Hackney is senior vice president of human resources for Smurfit-Stone Container Corporation, a post he assumed in 2003. He is also a member of the company's executive committee. A 32-year veteran in human resources management, Mr. Hackney joined one of Smurfit-Stone's predecessor companies, Container Corporation of America, in 1976. He served as corporate labor relations manager from 1986 to 1995 and held regional human resources posts in the container and mill operations divisions prior to that. From 1995 to 2003, Mr. Hackney served as human resources manager for the company's Mill division. Mr. Hackney earned a bachelor's degree from Berea College in Kentucky and a master's degree in business administration from Ball State University in Indiana.

*Susan M. Neumann, Senior Vice President of Corporate Communications and Public Affairs*

Susan M. Neumann is senior vice president of corporate communications and public affairs for Smurfit-Stone Container Corporation and is a member of the company's executive committee. Ms. Neumann has more than 25 years of corporate communications experience in the retail food/drug and manufacturing industries. Before joining Smurfit-Stone in 2006, Ms. Neumann was senior vice president of corporate communications and education for Albertsons, Inc., one of the nation's largest food and drug retailers. Prior to the acquisition by Albertsons, she was vice president of communications for the former American Stores Company. Ms. Neumann also held positions of increasing responsibility at Whirlpool Corporation, including director of corporate communications for the company's North American Appliance Group. Ms. Neumann earned a bachelor's degree in political science and journalism, and a master's degree in organizational communications from Western Michigan University in Kalamazoo, MI. She was appointed to serve on the Economic Development Council for the City of Creve Coeur, MO, and is a member of the St. Louis Forum and the St. Louis Executive Leadership Team of Go Red for Women. Ms. Neumann serves on the board of directors of Webster University in St. Louis and the Western Michigan University Alumni Association.

*Mark R. O'Bryan, Senior Vice President of Strategic Initiatives and Chief Information Officer*

Mark R. O'Bryan is senior vice president of strategic initiatives and chief information officer for Smurfit-Stone Container Corporation. He is also a member of the company's executive committee. He previously served as vice president of operational improvement for the company's former Consumer Packaging division. Mr. O'Bryan joined the company in October 1999 as vice president of procurement. He was appointed to his current role in July 2005. Mr. O'Bryan has 13 years' experience with General Electric Company (GE), holding senior-level positions in sourcing

43

and materials management at several GE manufacturing businesses, and serving as manager of global materials and sourcing for GE Aircraft Engines in Evendale, OH. Prior to that, he held similar posts with GE Plastics in Pittsfield, MA, and a GE Power Systems operation in Florence, Italy.  Mr. O'Bryan holds bachelor's and master's degrees in mechanical engineering from the University of Dayton.

*Mathew J. Blanchard, Senior Vice President and General Manager, Board Sales*

Mathew J. Blanchard is senior vice president and general manager of board sales for Smurfit-Stone Container Corporation – a post he assumed in 2000.  He joined the company in 1995 and has earned positions of increasing responsibility within the board sales group.  Mr. Blanchard served as vice president of supply chain operations for the former St. Laurent Paperboard Inc., which Smurfit-Stone acquired in 2000.  He served as both vice president and director of operations planning for several St. Laurent facilities. Prior to that, he held a variety of positions with Avenor Inc.  Mr. Blanchard received a bachelor's degree from Dalhousie University in Halifax, Nova Scotia.

*Michael P. Exner, Senior Vice President and General Manager, Containerboard Mill Division*

Michael P. Exner was appointed senior vice president and general manager of the Containerboard Mill division of Smurfit-Stone Container Corporation, effective as of January 1, 2010. Mr. Exner will join the Company from International Paper Company where he was vice president of manufacturing for containerboard since 2003.  Prior to that he was director of manufacturing for its commercial printing and imaging papers division from 1997 to 2003, and mill manager of two of its paper mills from 1992 to 1997.  Mr. Exner received his bachelor's degree in Chemistry from Lawrence University and a master's degree from The Institute of Paper Chemistry.

*Paul K. Kaufmann, Senior Vice President and Corporate Controller*

Paul K. Kaufmann is senior vice president and corporate controller for Smurfit-Stone Container Corporation. Mr. Kaufmann assumed his current position in 1998.  Mr. Kaufmann joined the former Jefferson Smurfit Corporation (JSC) in 1990 as a corporate accounting manager and was promoted to director of corporate accounting in 1991. He was controller of the Mill division from 1993 to 1998.   Prior to his employment with JSC, Mr. Kaufmann was a senior manager at Ernst & Young, where he worked from 1978 to 1990.  Mr. Kaufmann earned a bachelor's degree from the University of Iowa and a master's degree in business administration from the University of Illinois.

*John L. Knudsen, Senior Vice President of Corporate Strategy*

John L. Knudsen is senior vice president of corporate strategy and is responsible for developing and executing the company's overall capital investment strategy, as well as leading key manufacturing and strategic services. Mr. Knudsen has more than 20 years of experience in operations management and strategic planning for the Container division. He served from October 2005 until November 2008 as senior vice president of manufacturing. Previous positions included vice president of strategic planning and vice president and regional manager of the Container division. Prior to that, Mr. Knudsen held positions of increasing responsibility, including general manager, area production manager, regional quality assurance manager and production manager. He began his career with the former Container Corporation of America, a predecessor company to Smurfit-Stone, in 1986 as a production supervisor. Mr. Knudsen is a graduate of Michigan Technological University with a degree in civil engineering. He obtained a degree in accounting from Northern Michigan University and a master's degree in business administration from the University of Michigan. Currently he is a board member of the Fibre Box Association.

*Michael R. Oswald, Senior Vice President and General Manager, Recycling Division*

Michael R. Oswald is senior vice president and general manager for the Recycling division of Smurfit-Stone Container Corporation. He assumed his current position in 2005 after serving as vice president of operations for the division from 1997 to 2005. Mr. Oswald has 30 years' experience in the recycling industry and began his career at Smurfit-Stone as a fiber coordinator. He has held a variety of operational, sales and management positions, including general manager, regional manager of operations, and vice president and regional manager of East Coast operations. Mr. Oswald earned a bachelor's degree from the University of Missouri–Columbia and a master's degree in business administration from Washington University in St. Louis. He is a member of the American Forest & Paper Association (AF&PA) Recovered Fiber Executive Committee.

*Steven C. Strickland, Senior Vice President, Container Operations*

Steven C. Strickland is senior vice president of container operations for the Container division of Smurfit-Stone Container Corporation and is responsible for the division's sales and manufacturing activities. He joined the company in 2006 as senior vice president of container sales after gaining more than 30 years of experience in executive and sales leadership roles for packaging manufacturers. Mr. Strickland previously served as senior vice president of packaging and facility supplies for Unisource, a distributor of commercial printing and imaging paper, packaging systems and facility supplies. Prior to that, Mr. Strickland served as senior vice president of operations–East, and vice president of national sales. Before joining Unisource, Mr. Strickland spent 19 years with Georgia-Pacific, where he served in various sales management roles for the containerboard, packaging and consumer products businesses.

7.    **Executive Compensation.**

Compensation of the Company's named executive officers (the "NEOs") is defined in Item 402(a) of Regulation S-K promulgated under the Securities Exchange Act of 1934, as amended, for the fiscal year 2008 is reflected in the summary compensation table set forth below.

| Name & Principal Position | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($)[15] | Non-equity Incentive Plan Compensation ($) | Change in Pension Value & Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Patrick J. Moore - Chairman & CEO | 1,089,000 | 0 | 1,032,284 | (349,067) | 553,500 | 63,285 | 93,527 | 2,482,529 |
| Charles A. Hinrichs- Senior Vice President and Chief Financial Officer.[16] | 415,875 | 0 | 129,914 | (78,053) | 130,000 | 75,410 | 11,840 | 684,986 |
| Steven J. Klinger - President and Chief Operating Officer | 783,750 | 0 | 1,035,643 | (90,447) | 397,500 | 108,966 | 11,022 | 2,246,434 |
| Craig A Hunt - Senior Vice President, General Counsel and Secretary | 403,875 | 0 | 111,094 | (31,223) | 204,250 | 70,660 | 11,403 | 770,059 |
| Steven C. Strickland – Senior Vice President- Container Operations | 349,000 | 65,000 | 199,963 | (41,490) | 129,000 | 0 | 7,750 | 709,223 |

D.    **Compensation and Benefits Programs.**

The Compensation Committee determines the compensation of all of the Company's executive officers. There are several elements to the compensation package, including a base salary, annual incentives based on corporate, division and operating performance, long term incentives in the form of stock options and restricted stock units, customary benefits such as group insurance and savings plans, and pension plans.[17] Historically and in the ordinary course of its business, the Company has implemented various compensation and benefits programs that are designed to incentivize future performance, align management incentives with those of

[15] Because the vesting requirements for certain options were not met, the value recorded for those options in 2006 and 2007 was reversed in 2008.
[16] On the Petition Date, Charles A. Hinrichs was Senior Vice President and Chief Financial Officer for the Company. Mr. Hinrichs' employment with the Company ended as of May 18, 2009, and John R. Murphy became Senior Vice President and Chief Financial Officer on that date.
[17] All of the executive officers hired by the Company prior to January 1, 2006 participate in the Company's qualified and non-qualified pension plans for salaried employees. Salaried employees hired after January 1, 2006 are not eligible to participate in the pension plans.

CH1 5118439 5168368 v. 41

Company's other stakeholders through equity-based compensation, provide employees with market-based, competitive compensation opportunities and benefits packages, and reward its management employees for excellent service. The Company also has entered into various employment and other similar agreements with certain of its senior executives.

Certain of these employee compensation and benefits programs and agreements are generally described below, with the blanket exception of insured and self-insured programs (e.g., health plans), and customary fringe benefit policies (e.g., vacation, sick leave). The list of programs, descriptions, and agreements set forth below is not, and is not intended to be, exhaustive or comprehensive. In the event the Company substantially modifies or terminates any compensation or benefit programs or employment agreements prior to the Confirmation Date, it will file an amendment to Exhibits ~~11 and~~3, 12 or 13 to the Plan, as applicable.

### 1. Historical Incentive Programs Prior to the Chapter 11 Cases.

(a) The Company's Annual Management Incentive Plan.

The Company historically has provided market-based, annual incentive bonus opportunities to more than 3,650 management employees pursuant to its Management Incentive Plan and other similar annual incentive bonus plans (collectively, the "MIP"). The purpose of the MIP is to ensure that annual incentive awards were based on achievement of corporate, division and individual performance objectives. The MIP remains an important element of the Company's continued efforts to further align management interests with other Company stakeholders, provide its management-level employees with market-based, competitive incentive bonus compensation opportunities and, ultimately, to reward superior performance.

(b) The Company's Long-Term Incentive Plan.

The Company also has a long history of granting long-term incentive awards in the form of stock options, restricted stock units, and other equity-based vehicles, which were designed to align the long-term interests of executive officers with those of the stockholders of the Company to increase long-term Company value. The long-term incentives typically included multi-year vesting requirements to encourage executive officers to remain employed with the Company. When making such awards, the Compensation Committee considered the value of the long-term incentives and the impact of long-term incentives on total compensation of the executive officers relative to appropriate paper and pulp and general industry peer groups to provide market-based compensation opportunities for management.

### 2. Short-Term and Long-Term Incentive Compensation Plans Approved During the Chapter 11 Cases.

The Company's compensation philosophy of providing appropriate, market-based financial incentives to enhance Company performance continued through the Company's Chapter 11 cases. On March 19, 2009, the Company filed the Motion of the Debtors for Entry of an Order Authorizing, But Not Directing, the Debtors to Implement Their Short-Term and Long-Term Incentive Compensation Plans wherein the Company requested authorization to continue their

historical practice of providing employees performance-based short-term and long-term incentive compensation.

On April 22, 2009, the Bankruptcy Court entered an order approving performance-based, annual and long-term cash incentive programs in the form of the Company's 2009 Management Incentive Plan ("2009 MIP"), 2010 Management Incentive Plan ("2010 MIP"), and 2009 Long-Term Incentive Plan ("2009 LTIP") (such order, the "Incentive Plan Order"). These plans were designed to drive the Company's financial performance and, in the case of the 2009 LTIP, restructuring objectives, during the Chapter 11 cases. Pursuant to the Incentive Plan Order, the Company was authorized to implement its 2010 MIP on the same terms as its 2009 MIP, subject only to the development of a 2010 budget to provide the objective financial performance metrics.

      (a)     2009 MIP and 2010 MIP.

The more than 3,650 management employees who historically participated in the MIP in 2009 will continue to participate in 2010. These MIP participants are divided into four tiers: Tier I is comprised of 13 senior executives; Tier II includes approximately 100 additional management employees who are critical to the Company's performance and successful reorganization efforts; Tier III includes approximately 850 managerial employees with corporate or division-specific responsibilities; and Tier IV includes approximately 2,600 employees whose responsibilities significantly impact the Company's ability to meet its budgeted financial targets at the Company and divisional levels.

Each MIP participant has an annual target incentive bonus potential that is expressed as a percentage of his or her base salary. On April 28, 2009, the Compensation Committee established the Company's NEOs' target level incentive bonuses for 2009 and 2010 consistent with the Incentive Compensation Order (expressed as a percentage of the participant's annual base salary) as follows:

| **Named Executive Officer** | **Target** |
|---|---|
| Patrick J. Moore, Chairman and Chief Executive Officer | 125% |
| Steven J. Klinger, President and Chief Operating Officer | 125% |
| John R. Murphy,* Senior Vice President and Chief Financial Officer | 100% |
| Craig A. Hunt Senior Vice President, Secretary and General Counsel | 100% |
| Steven C. Strickland, Senior Vice President of Container Operations | 100% |

48

\* Mr. Murphy joined the Company on May 18, 2009, and was not eligible to participate in the 2009 MIP for the first semi-annual performance period (as described below). He is, however, eligible to participate in the second semi-annual and annual performance periods on a pro-rated basis. Mr. Murphy's predecessor, Charles A. Hinrichs, participated in the 2009 MIP from January 1, 2009 until the cessation of his employment on May 18, 2009, and received a pro-rata award under the MIP as a result.

The MIP plan years are from January 1 through December 31 for 2009 and 2010, and are comprised of three performance periods: two six-month, semi-annual performance periods and one annual performance period. Accordingly, consistent with the Incentive Plan Order, a MIP participant is eligible to receive a semi-annual award after the end of each semi-annual performance period and an annual award after the end of the annual performance period, subject to the Company's achievement of the financial and/or operational goals for the applicable performance period. The percentages of the target incentive bonus payouts attributable to each performance period for each MIP participant (except certain Tier IV participants as described below) are as follows:

| Performance Targets Evaluation Date | Percentage Payout of Target Bonus |
|---|---|
| June 30 (based on semi-annual performance) | 40% of annual target bonus (based on semi-annual performance – January 1 through June 30) |
| December 31 (based on semi-annual performance) | 30% of annual target bonus (based on semi-annual performance – July 1 through December 31) |
| December 31 (based on annual performance) | 30% of annual target bonus (based on annual performance – January 1 through December 31) |

Certain Tier IV B MIP Participants, however, are eligible to receive a quarterly award pursuant to the 2009 MIP and 2010 MIP after the end of each calendar quarter, consistent with the Company's past practice and the Incentive Plan Order.

With the exception of certain participants in Tier IV whose performance targets are based upon plant or area key performance indicators, the Company's objective financial performance targets applicable under the MIP are based on a corporate EBITDAR metric and a divisional EBITDA metric. The Company previously established the 2009 MIP performance targets and has developed the budgeted 2010 EBITDAR that will be used as the 2010 MIP Performance Targets, which isas set forth in Exhibit 3 of the Plan.

Because the MIP performance targets are entirely performance-based, actual earned incentive bonuses will vary depending on the extent to which the Company achieves the established performance targets. Like the 2009 MIP, the 2010 MIP establishes a threshold level of

49

performance (85% of the performance target) at which 50% of the target incentive bonus will be paid (and below which level no bonus payment will be made), a target level of performance at which 100% of the target incentive bonus will be paid, and a maximum level of performance (140% of the performance target) at which a maximum level bonus payment will be paid (175% of the target incentive bonus), provided that any above-target incentive bonus amount earned with respect to the first six-month semi-annual performance period is scheduled to be paid after the end of the MIP plan year. Additionally, only Tier I and II participants are eligible to earn any above-target level payments under the MIP.

In the event that the Company has not implemented the 2010 MIP prior to the Confirmation Date as authorized by the Incentive Plan Order, it will adopt and implement it on the Confirmation Date pursuant to the terms of the Plan. Additionally, pursuant to the Plan, the 2010 MIP will be assumed by the Reorganized Company and will remain in effect after the Effective Date.

## MIP Awards for the First 2009 Semi-annual Performance Period[18]

For the first semi-annual performance period from January 1, 2009 through June 30, 2009 (the only performance period that has been completed as of the filing of this Disclosure Statement).2009, the Company exceeded the corporate and divisional 2009 MIP EBITDAR performance targets. As a result, each of the Tier I and II participants (including the NEOs) earned the maximum 175% of his or her target level incentive bonus for the first semi-annual performance period. However, because the amount of the payout for the first semi-annual performance period is capped at 40% of the annual target, the balance of the earned bonus was carried over and will be paid to such participants after the end of the 2009 MIP year, consistent with the Incentive Plan Order.

The value of the award paid for the first semi-annual performance period is set forth below and expressed as a percentage of annual base salary. The amount carried over and to be paid after the end of the 2009 MIP year is also set forth below. Total awards earned under the 2009 MIP for the first semi-annual performance period amounted to approximately $22 million, with approximately $3.8 million of such amount being awarded to executive officers.

| Named Executive Officer | Target | Value of Award Paid for First Semi-Annual Performance Period | Earned Award Carried Over for Payment in 2010 |
|---|---|---|---|
| Patrick J. Moore, Chairman and Chief Executive Officer | 125% | $553,500 (50% of salary) | $415,125 |
| Steven J. Klinger, President and Chief Operating Officer | 125% | $397,500 (50% of salary) | $298,125 |

---

[18] Although the second semi-annual and annual performance periods have been completed, as of the filing of this Disclosure Statement, the earned incentive bonus amounts for those performance periods have not yet been determined. The Company will file additional information regarding such bonus amounts in the Plan Supplement.

CH1 51184395168368v.41

| John R. Murphy,* Senior Vice President and Chief Financial Officer | 0% | $0 (0% of salary) | $0 |
|---|---|---|---|
| Charles A. Hinrichs,** Former Senior Vice President and Chief Financial Officer | 80% | $89,173 (21.3% of salary) | $0 |
| Steven C. Strickland, Senior Vice President - Container Operations | 100% | $142,800 (40% of salary) | $107,100 |
| Craig A. Hunt Senior Vice President, Secretary and General Counsel | 100% | $163,400 (40% of salary) | $122,550 |

\*  Mr. Murphy joined the Company on May 18, 2009, and was not eligible to participate in the 2009 MIP for the first semi-annual performance period.
\*\* Mr. Hinrichs' employment with the Company ended as of May 18, 2009, and he earned a pro-rata award under the 2009 MIP for the period from January 1, 2009 through May 18, 2009.

>    (b)    The 2009 LTIP.

The 2009 LTIP approved by the Incentive Plan Order provides market-based, potential cash incentive bonuses for a group of approximately 50 employees whose top-level performance is critical to the Company's success through the Chapter 11 cases (the "2009 LTIP Participants"). The 2009 LTIP is based upon a two-year plan cycle that runs from January 1, 2009 through December 31, 2010 as set forth in the Incentive Plan Order, provided that the Company will pay out earned 2009 LTIP incentive bonus as of the Effective Date, as described below. In the event that the Company has not implemented the 2009 LTIP prior to the Confirmation Date as authorized by the Incentive Plan Order, it will adopt and implement it on the Confirmation Date pursuant to the terms of the Plan.

Each 2009 LTIP Participant is eligible to receive a long-term cash incentive bonus target award expressed as a percentage of base salary. Consistent with the Incentive Plan Order, the Company's NEOs' target level bonuses under the 2009 LTIP (expressed as a percentage of base salary) are as follows:

| **Named Executive Officer** | **Target** |
|---|---|
| Patrick J. Moore, Chairman and Chief Executive Officer | 375% |
| Steven J. Klinger, President and Chief Operating Officer | 375% |
| John R. Murphy,* Senior Vice President and Chief Financial Officer | 100% |

51

| | |
|---|---|
| Craig A. Hunt | 150% |
| Senior Vice President, Secretary and General Counsel | |
| | |
| Steven C. Strickland, | 120% |
| Senior Vice President of Container Operations | |

\*  Mr. Murphy joined the Company on May 18, 2009, and is eligible to participate in the 2009 LTIP on a pro-rated basis based upon factors including his length of service during the plan cycle and the discretion of the Compensation Committee.  Mr. Murphy's predecessor, Mr. Hinrichs, is not eligible to participate in the 2009 LTIP due to the cessation of his employment on May 18, 2009.

Under the 2009 LTIP "payout curve" as approved pursuant to the Incentive Plan Order, 2009 LTIP Participants will receive an award at 50% of target for 85% "threshold" achievement of the performance objectives; 100% of target payout or 100% of "target" level achievement of the performance objectives; and 175% of target payout for 140% "maximum" achievement of the performance objectives.

The 2009 LTIP "Performance Target" will be comprised of (i) the average of the Debtors' actual performance over the two-year plan cycle compared to the Debtors' combined Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year) and (ii) achievement of restructuring goals that will be substantially comprised of total enterprise value or a substantially similar financial metric as provided in the Incentive Plan Order.  Fifty percent (50%) of each 2009 LTIP Participant's 2009 LTIP Performance Target will be based solely on the Debtors' performance relative to the combined Budgeted EBITDAR, and the remaining 50% will be solely based on the Debtors' achievement of restructuring goals.

(i)     Budgeted EBITDAR Performance Target.

The 2009 LTIP Performance Target that is based on the combined Budgeted EBITDAR for 2009 and 2010 is~~as~~ set forth in Exhibit 3 of the Plan.  Any earned awards based on the Company's performance relative to the Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year) will be paid at the end of the two-year plan cycle, unless the Confirmation Date occurs prior to the end of such plan cycle, in which case, the Company will pay, on the Effective Date, the pro-rata amount of the financial performance portion of each participant's 2009 LTIP Incentive Bonus (determined by the number of completed calendar days between January 1, 2009 and the Effective Date) based on the achievement as of the Confirmation Date of the Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year).

(ii)     Restructuring Goal Performance Target.

The restructuring goal portion of the 2009 LTIP Performance Target will be based upon improvements in the trading price of the Company's bonds relative to the trading prices of those bonds on the date that the Company commenced its chapter 11 cases (approximately $0.13) and

52

CH1 ~~5118439~~5168368~~v.4~~1

the date that the Bankruptcy Court entered the Incentive Plan Order approving the 2009 LTIP (approximately $0.25).

Each 2009 LTIP Participant will be entitled to receive a full maximum payment (without pro-ration) with respect to the restructuring goal portion of their LTIP incentive bonus, provided that the average trading price of the Company's bonds in the 30-day period prior to the Confirmation Date ("Average Bond Trading Price")[18][19] is not less than $0.50. All earned LTIP incentive bonus payments will be made on the Effective Date or at such later time as set forth in the 2009 LTIP.

### 3.    Executive Agreements.

The Company's Board of Directors historically has approved customary employment agreements for certain senior executives of the Company, including the Chairman and Chief Executive Officer, the President and Chief Operating Officer, and for the former Senior Vice President and Chief Financial Officer, whose retention has been critical to the success of the Company.

These employment agreements generally provided that the executives will devote substantially all of their business time to the Company's operations through the term of each executive's respective Employment Agreement, unless sooner terminated by either party in accordance with the provisions thereof. The executive is prohibited from disclosing the confidential information of the Company, diverting business opportunities or prospects from the Company; and, for two years following the termination of employment, competing with any business conducted by the Company or its affiliates, or soliciting any employees, customers or suppliers of the Company within the United States. If the Company terminated the executive's employment "without cause" or if the executive terminated his employment with "good reason", the Company would (i) pay the executive his expected compensation for the remainder of the term, (ii) continue the coverage under group insurance, pension, and other executive benefit plans through the end of the term, (iii) provide certain perquisites, (iv) continue to count the period through the end of the term for purposes of determining the executive's age and service with the Company for the benefit plans and vesting of equity-based compensation awards, and (v) provide outplacement services. Furthermore, if the executive's employment is terminated "without cause" or the executive terminates his employment "for good reason" within twenty-four months following a "change of control" of the Company, the Company would make certain payments within the ten days following the termination of the employment

Recognizing the key roles of its senior vice presidents, generally, the Board of Directors also historically approved Employment Security Agreements which, among other things, provided lump-sum payments under certain circumstances following a "change of control" of the Company. These agreements were beneficial to the Company by providing for the continuity of service by these executive officers in the critical period surrounding a change of control transaction.

### 4.    Retirement Plans.

---

[18][19] The Average Bond Trading Price will be calculated using the weighted average of the closing trading prices of the Company's series of five publicly traded bonds over the 30-calendar-day period preceding the Effective Date.

CH1 5118439 5168368 v.4 1

Retirement benefits are provided to employees through savings and pension plans, which are generally described below.

(a)     Employee Savings Plans.

In the ordinary course of business the Company maintains a number of 401(k) savings plans (the "Employee Savings Plans") for the benefit of its United States employees. Additionally, the Company maintained savings plans for the benefit of the Canadian employees. These Employee Savings Plans generally provide for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating employee's paycheck. Approximately 18,400 employees are eligible to participate in the Employee Savings Plans, and they contributed approximately $48 million of their own funds into the Employee Savings Plans during 2008. The Company also makes varying contributions, which are indexed to employee contributions to the Employee Saving Plans for certain participating employees. During 2008, the Company made contributions to the Employee Savings Plans in the amount of approximately $17 million.

(b)     Pension Plans.

The Company maintained two (2) defined benefit pension plans for United States employees and former employees. The Company further maintained four (4) non-qualified pension plans for United States employees and former employees. In Canada, the Company maintained six (6) registered pension plans and four (4) non-registered pension plans for the benefit of its Canadian employees and former employees.

The Company also makes contributions to ten (10) multi-employer pension plans pursuant to the collective bargaining agreements governing approximately thirty (30) of its facilities in the United States and Canada (the "Multi-Employer Plans"). The Company's Multi-Employer Plan contribution requirements vary by collective bargaining agreement and are generally based on a percentage of earnings as calculated on a shift, hourly, or weekly basis. The Multi-Employer Plan contributions are paid on a monthly basis, and the Company paid approximately $4 million in total contributions in such plans in 2008.

At December 31, 2008, the qualified defined benefit retirement plans maintained by the Company were under funded by approximately $900 million. The Company estimates that this level of under funding increased by approximately $140 million during the nine months ended September 30, 2009, due primarily to decreases in the discount rate assumptions used to determine the amount of plan benefit obligations, which were less than fully offset by positive returns on plan assets. The Reorganized Debtors will likely be required to make significant cash contributions to these plans under applicable U.S. and Canadian laws over the next several years following emergence from bankruptcy in order to amortize the existing under funding and satisfy current service obligations under the plans. These contributions will significantly impact future cash flows that might otherwise be available for repayment of debt, capital expenditures, and other corporate purposes. The Company currently estimates that these cash contributions under the United States and Canadian qualified plans will be approximately $75 million in 2010, and potentially up to approximately $105 million depending upon how unpaid Canadian contributions for 2009 are impacted by the Plan. The Company currently estimates that these contributions will

potentially be in the range of approximately $275 million to $325 million annually in 2011 through 2014, and will then decrease to approximately $220 million in 2015 and approximately $130 million in 2016, at which point almost all of the shortfall would be funded. The actual required amounts and timing of such future cash contributions will be highly sensitive to changes in the applicable discount rates and returns on plan assets, and could also be impacted by future changes in the laws and regulations applicable to plan funding.

**5.      Other Post-Retirement Benefit Programs.**

(a)      Health Care and Life Insurance Continuation

The Company maintains a self-insured plan that provides different levels of medical, dental and prescription drug programs to approximately 6,800 retired non-union and union former employees and approximately 60 retired former employees that receive such benefits through HMOs (collectively, the "Retiree Medical Benefits"). The Retiree Medical Benefits are administered though Blue Cross Blue Shield. The Company also maintains a retiree life insurance plan that is provided by a third party insurer (the "Retiree Life Insurance" and together with the Retiree Medical Benefits, the "Retiree Benefits"). The Retiree Life Insurance provides benefits to approximately 13,900 retired non-union and union former employees. The Company spends an average of $1.6 million on Retiree Medical Benefits per month and pays a monthly premium of $215,000 for the Retiree Life Insurance.

(b)      Severance Benefits.

Prior to the Petition Date and in the ordinary course of business, the Company maintained severance plans in the United States and allocated severance in Canada in accordance with Canadian law (the "Severance Programs") for all active, full-time non-union salaried employees and certain active, full-time hourly employees. Pursuant to the Severance Programs, employees become eligible for severance payments and benefits ("Severance") if (i) their employment was terminated without cause; and (ii) the employee has worked for the Company for at least thirty (30) days prior to termination. In the U.S., employees entitled to Severance generally receive one week of salary for each year of service with the Company, plus four additional weeks. In Canada, Severance varies depending on the employee's location, years of service and job responsibilities. The amount and duration of the employee's Severance depends on whether the employee signs a company-provided agreement containing, among other things, a waiver and release of claims.

In addition to the employees included in the Company's Severance Programs, the Company's union employees typically obtain severance payment and/or payments during specified notice periods prior to termination and heath care benefits (the "CBA Severance") pursuant to agreements (the "CBA Severance Agreements") negotiated between the Debtors and the unions in accordance with the governing collective bargaining agreements. The Company currently is providing CBA Severance pursuant to six (6) CBA Severance Agreements.

On February 23, 2009, the Bankruptcy Court entered an order permitting the Debtors to continue the Severance Programs in the ordinary course of business (the "Severance Continuation Order"). The Severance Continuation Order authorized the Debtors to pay for and provide all prepetition Severance relating to the Severance Programs in accordance with the Debtors'

prepetition policies and practices, and further authorized the Debtors to continue the Severance Programs in the ordinary course of business. The Severance Continuation Order did impose certain limitations, however. The Debtors are required to first seek Court approval before making any payment under the Severance Programs to an insider, as defined in the Bankruptcy Code, that would be subject to section 503(c)(2) of the Bankruptcy Code, and the Severance Continuation Order does not apply to any employees that are party to an executive severance plan or individual employment agreements or similar agreements that provide for severance.

### E.     Pre-Petition Debt and Capital Structure of the Company.

Prior to the Petition Date, the Debtors funded their operations with four different types of debt financing. First, the Debtors arranged senior secured bank financing comprised of term loans and revolving credit facilities (the "Pre-Petition Secured Debt"). The aggregate amount of Pre-Petition Secured Debt outstanding as of the Petition Date was approximately $1.2 billion. Second, the Debtors issued long-term debt comprised of five series of unsecured notes, which had an aggregate principal amount outstanding of $2.275 billion (the "Senior Note Debt") as of the Petition Date. Third, the Debtors established two accounts receivable securitization facilities (the "Securitization Facilities") – one in the United States (the "U.S. Securitization Facility") and one in Canada (the "Canadian Securitization Facility"). As of the Petition Date, receivables sold by the Debtors (in which the Debtors have a residual interest) secured approximately $350 million and $30 million in obligations related to the U.S. Securitization Facility and the Canadian Securitization Facility, respectively.[1920] Finally, as of the Petition Date, the Debtors were obligated on approximately $284 million of tax-exempt utility systems bonds, industrial revenue bonds and similar bonds. Each of the Debtors' four primary types of pre-petition financing and the Debtors' other pre-petition obligations are described in greater detail below.

### 1.     Pre-Petition Secured Debt Under the Pre-Petition Credit Agreement.

Prior to the Petition Date, SSCE and its wholly-owned subsidiary, SSC Canada, were borrowers under that certain Credit Agreement, dated as of November 1, 2004, with JPMorgan Chase Bank and several other financial institutions (as amended, restated or modified from time to time, the "Prepetition Credit Agreement"), which established the Pre-Petition Secured Debt. The Prepetition Credit Agreement provided for (i) a revolving credit facility of $600 million to SSCE and (ii) a revolving credit facility of $200 million to SSCE and SSC Canada. The Prepetition Credit Agreement also provided for a Tranche B term loan to SSCE in the aggregate principal amount of $975 million, a Tranche C term loan to SSC Canada in the aggregate principal amount of $300 million, and a Tranche C-1 term loan to SSC Canada in the aggregate principal amount of $90 million. Certain letters of credit (for both U.S. and Canada) were issued under the Pre-Petition Credit Agreement.

In addition, the Prepetition Credit Agreement provided for a deposit funded facility (the "Prepetition Revolving Facility Letters of Credit") for approximately $120 million relating to the

---

[1920] After the Petition Date, the Debtors applied proceeds from the DIP Facility, as defined below, to defease the outstanding notes under the Securitization Facilities in order to regain ownership of the receivables.

variable rate industrial revenue bonds issued by SSCE relating to the Stevenson Facility (the "Stevenson Notes").[20][21]

As of the Petition Date, the Debtors were indebted under the Prepetition Credit Agreement (a) on account of loans made to SSCE, in the approximate aggregate principal amount of not less than approximately $746 million plus letters of credit issued in the approximate aggregate stated amount of not less than approximately $252.8 million,[21][22] plus, in each case, interest accrued and accruing, costs, expenses, fees, other charges, and other obligations, including, without limitation, on account of certain swap agreements (the "Pre-Petition U.S. Obligations"), and (b) on account of loans made to SSC Canada, in the approximate aggregate principal amount of not less than approximately $366 million, plus letters of credit in the approximate aggregate stated amount of not less than approximately $27.6 million, plus, in each case, interest accrued and accruing, costs, expenses, fees, other charges, and obligations, including, without limitation, on account of certain Swap agreements (the "Pre-Petition Canadian Obligations").

Pursuant to the Prepetition Credit Agreement, certain of the Debtors executed Guarantee Agreements and Security Documents (as defined in the Pre-Petition Credit Agreement) to secure the Pre-Petition Secured Debt. SSCE's Pre-Petition U.S. Obligations were unconditionally guaranteed by SSCC.[22][23] SSC Canada's Pre-Petition Canadian Obligations were unconditionally guaranteed by MBI Limited/Limitée, Smurfit-MBI, 3083527 Nova Scotia Company and Francobec Company (the "Pre-Petition Canadian Guarantors"), as well as SSCE and SSCC. Certain of the Debtors also granted security interests, mortgages and liens (the "Pre-Petition Liens") on personal and real property and the proceeds thereof (as described and defined as "Collateral"). The Pre-Petition U.S. Obligations are secured by those Pre-Petition Liens granted by SSCC and SSCE, as well as by the capital stock of SSCE and 65% of the capital stock of SSC Canada. The Pre-Petition Canadian Obligations are secured by those Pre-Petition Liens granted by SSC Canada and the Pre-Petition Canadian Guarantors, pledges of all of the capital stock of the Pre-Petition Canadian Guarantors, and the liens and stock pledges securing the Pre-Petition U.S. Obligations.

## 2.    Senior Note Debt.

SSCE is obligated under five separate series of unsecured notes (the "Prepetition Notes") with an aggregate principal amount of $2.275 billion:

(i) 8.375% unsecured notes in the aggregate principal amount of $400 million, due on July 1, 2012;

---

[20][21] After the Petition Date, the indenture trustee of the Stevenson Notes drew on the Prepetition Revolving Facility Letters of Credit to fully repay the Stevenson Notes. SSCE's obligations under the Stevenson Notes are described below in Section III.E.4.

[21][22] As of the Petition Date, none of the issued letters of credit had been drawn on.

[22][23] The Prepetition Credit Agreement also required SSCE's material domestic subsidiaries to guarantee SSCE's obligations under the agreement. However, as of the Petition Date, none of SSCE's domestic subsidiaries were deemed material for purposes of the agreement and none are obligated on a guaranty of SSCE's obligations under the agreement.

(ii) 8.25% unsecured notes in the aggregate principal amount of $700 million, due on October 1, 2012;

(iii) 7.50% unsecured notes in the aggregate principal amount of $300 million, due on June 1, 2013;

(iv) 7.375% unsecured notes in the aggregate principal amount of $200 million, due on July 15, 2014; and

(v) 8.00% unsecured notes in the aggregate principal amount of $675 million, due on March 15, 2017.

The 7.375% unsecured notes were issued by Stone FinCo II and were guaranteed by SSCE. Each of the other four series of Prepetition Notes was issued directly by SSCE or by a predecessor of SSCE.

### 3.    Securitization Facilities.

Prior to the Petition Date SSCE participated in the $475 million U.S. Securitization Facility, pursuant to which it sold, on an ongoing basis and without recourse, certain of its accounts receivable to Stone Receivables, LLC ("SRC"), a wholly-owned non-consolidated subsidiary of SSCE. SRC then transferred the receivables to a non-consolidated subsidiary, SSCE Funding, LLC (the "Securitization Issuer"). The Securitization Issuer in turn issued notes to third-party investors, pursuant to (a) that certain Master Indenture, dated as of November 23, 2004 (the "Indenture"), between the Securitization Issuer and Deutsche Bank Trust Company Americas, as Indenture Trustee (in such capacity, the "Securitization Trustee"), (b) that certain Series 2004-1 Indenture Supplement to Master Indenture, dated as of November 23, 2004 (the "Indenture Supplement"), between the Securitization Issuer and the Securitization Trustee, and (c) that certain Series 2004-2 Indenture Supplement to Master Indenture, dated as of November 23, 2004, between the Securitization Issuer and the Securitization Trustee, in each case, as amended, restated, modified or waived from time to time. The notes issued pursuant to the Series 2004-2 Indenture Supplement have since been defeased. The U.S. Securitization Facility was scheduled to mature on November 15, 2009. As of the Petition Date, more than $485 million of receivables sold by SSCE into the U.S. Securitization Facility secured approximately $350 million in outstanding notes issued by the Securitization Issuer under the Indenture.

Additionally, prior to the Petition Date, SSCE, through its wholly-owned subsidiary Smurfit-MBI, also participated in the $70 million Canadian Securitization Facility, pursuant to which it sold, on an ongoing basis and without recourse, certain of its Canadian accounts receivable to an asset-backed commercial paper conduit (the "Canadian CP Conduit").[2324] The Canadian Securitization Facility was scheduled to mature on March 31, 2009. As of the Petition Date, over $52 million of receivables sold by SSCE into the Canadian Securitization Facility secured approximately $30.4 million in indebtedness and other obligations outstanding under the Canadian Securitization Facility.

---

[2324] The sale occurred pursuant to that certain Receivables Purchase Agreement, dated as of March 30, 2004, among MBI Limited/Limitée, as general partner of Smurfit-MBI, and certain other parties.

After the Petition Date, the Debtors applied certain of the proceeds of the DIP Facility (as defined below) to defease the outstanding notes under the Securitization Facilities, as authorized by the Court in an interim order approving the DIP Facility entered on January 27, 2009, in order to regain ownership of the receivables.

4.    **Utility and Industrial Revenue Bonds and Other Debt Obligations.**

SSCE is an obligor on approximately $284 million in aggregate principal amount of tax-exempt utility bonds, environmental improvement bonds, industrial revenue bonds and similar bonds issued by local government entities:

(i)    certain Series 1986 revenue bonds issued by the Industrial Development Board of the City of Stevenson (the "Stevenson IDB") in the aggregate principal amount of $7,165,000 due on November 1, 2016;

(ii)   certain Series 1996 revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on January 1, 2031;

(iii)  certain Series 1997 revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on June 1, 2032;

(iv)   certain Series 1998B revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on April 1, 2033;

(v)    certain Series 1998C revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $8,000,000 due on November 1, 2033;

(vi)   certain Series 1998D revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $4,950,000 due on November 1, 2011;

(vii)  certain Series 1999A revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $15,000,000 due on February 1, 2034;

(viii) certain Series 2000A revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $10,000,000 due on October 1, 2035;

(ix)   certain Series 2003 revenue bonds issued by the Village of Hodge, Louisiana in the aggregate principal amount of $58,085,000, due on March 1, 2024;

(x)    certain Series 2005 revenue bonds issued by the City of Coshocton, Ohio in the aggregate principal amount of $30,000,000, due on August 1, 2013;

(xi)   certain Series 2005 revenue bonds issued by the Industrial Development Authority of the City of Hopewell, Virginia in the aggregate principal amount of $41,340,000, due on June 1, 2015;

(xii) certain Series 1996 revenue bonds issued by the Industrial Development
Authority of the County of Navajo, Arizona (the "Navajo IDA") in the
aggregate principal amount of $20,000,000, due on April 1, 2026; and

(xiii) certain Series 1997 revenue bonds issued by the Navajo IDA in the aggregate
principal amount of $14,500,000, due on June 1, 2027.

The industrial revenue bonds described above in (i) through (vii) are secured by the
Prepetition Revolving Facility Letters of Credit.

Additionally, in conjunction with its July 29, 2008 acquisition of Calpine Corrugated, LLC
("Calpine") – an independent corrugated container producer in Fresno, California, for which
SSCC is the primary containerboard supplier – SSCE agreed to guarantee Calpine's outstanding
funded bank debt. As of the Petition Date, Calpine's aggregate amount of debt guaranteed by
SSCE was approximately $46 million.

5.        **Intercompany Debt.**

In the normal operations of the Company's businesses, the Debtors and certain of their
non-debtor affiliates engage in various intercompany transactions. Certain receivables and
payables among the Debtors and the Debtors and non-debtor subsidiaries of SSCC are
evidenced by intercompany notes (the "Intercompany Note Claims"). In addition to Intercompany
Note Claims, the Debtors and/or the Debtors and non-debtor subsidiaries of SSCC engaged in
intercompany trading transactions which give rise to Claims between Debtors and/or Debtors and
non-Debtor subsidiaries (the "Intercompany Trade Claims", and together with the Intercompany
Note Claims, the "Intercompany Claims"). As a result, on any given date, there are numerous
Intercompany Claims that reflect intercompany receivables and payables made and/or accrued in
the ordinary course between and among the Debtors and between and among the Debtors and
certain of their non-debtor affiliates (the "Intercompany Transactions"). These Intercompany
Transactions include, but are not limited to:

Accounts Receivable, Accounts Payable and Payroll. In the ordinary course of
business, the Debtors contribute cash and process disbursements through a
centralized cash management system. Each of the Debtors, with the exception of
Cameo Container Corporation, maintains its own separate accounts, all of which
are managed at the corporate level. Occasionally, SSCE will fund disbursements
and collect accounts on behalf of the other debtors, resulting in Intercompany
Claims between the Debtors. The Debtors' accounts reflect the net position of both
receipts and disbursements received or made on behalf of each Debtor. Prior to the
Petition Date, such accounts were never settled in cash. From and after the Petition
Date, such accounts, with the exception of the balance owing between SSCE and
Cameo, are settled in cash on a monthly basis.

Centrally Billed Expenses. In the ordinary course of business, the Debtors and
Stone Container de Mexico S. de R.L. de C. V. ("Stone Container Mexico"), a
wholly-owned non-debtor subsidiary of SSCE, incur centrally billed expenses,
such as employee medical costs, insurance premiums, certain taxes (including real

estate, franchise, sales taxes, etc.) and leased equipment. These charges are allocated among the Debtors and Stone Container Mexico and are reflected in the intercompany accounts.

<u>Corporate Expense Allocation.</u> Charges for corporate expenses provided by SSCE to the other Debtors are allocated among the Debtors based upon the cost of service provided, directly identifiable costs, and other allocation methods, in addition to a services fee payable to SSCE.

<u>Containerboard Sales.</u> In the ordinary course of business, SSC Canada sells containerboard from its mills to SSCE, with such sales resulting in a corresponding Intercompany Claim. Prior to the Petition Date, SSC Canada had a large Intercompany Claim owing from SSCE which was never settled in cash. From and after the Petition Date, such sales are settled in cash on a monthly basis.

<u>Containerboard Purchases.</u> In the ordinary course of business, SSCE sells containerboard, including that purchased from SSC Canada to certain of its Debtor and non-debtor affiliates, with such sales resulting in a corresponding Intercompany Claim. For example, SSCE regularly sells containerboard to Smurfit-Stone Puerto Rico, Inc., Stone Container Mexico, and Smurfit-MBI. The prices for such containerboard are determined by SSCE based on the prices applicable to certain third parties that purchase containerboard from SSCE on an arm's-length basis. Prior to the Petition Date, such intercompany purchases resulted in a corresponding Intercompany Claim which was never settled in cash. From and after the Petition Date, the Debtors have settled all such intercompany purchases in cash on a monthly basis.

Below is a summary of the net receivables or payables comprising, as applicable, the Intercompany Claims for each Debtor as of the Petition Date.

**Net I/C Balances (US$) as of January 25, 2009**

| U.S. Debtors Net I/C Balances | I/C Note Receivable/ (Payable) (1) | Other I/C Transactions Receivable/ (Payable) | Total Net Receivable/ (Payable) |
|---|---|---|---|
| Cameo Container Corporation | (76,899,599) | 118,956,524 | 42,056,925 |
| Smurfit-Stone Puerto Rico, Inc. | - | (8,229,063) | (8,229,063) |
| Smurfit Newsprint Corporation | - | 51,821 | 51,821 |
| Smurfit-Stone Container Enterprises, Inc. (SSCE) | **112,607,660** | **(214,697,924)** | **(102,090,264)** |
| *(To) From Stone de Mexico* | 35,506,929 | (322,804) | 35,184,125 |
| *(To) From SSC Canada* | (50,000,000) | (193,797,070) | (243,797,070) |
| *(To) From SMBI* | - | 27,057,213 | 27,057,213 |
| *(To) From Cameo* | 76,899,599 | (118,956,524) | (42,056,925) |

61

| | | | |
|---|--:|--:|--:|
| *(To) From Calpine* | 50,201,132 | (6,840,899) | 43,360,233 |
| *(To) From Smurfit Newsprint Corporation* | - | (51,821) | (51,821) |
| *(To) From Smurfit-Stone Puerto Rico, Inc.* | - | 8,229,063 | 8,229,063 |
| *(To) From Stone International Services Corp* | - | 3,876,850 | 3,876,850 |
| *(To) From Stone Finance Company of Canada II* | - | 66,108,068 | 66,108,068 |
| Calpine Corrugated LLC | (50,201,132) | 6,840,899 | (43,360,233) |
| Stone International Services Corporation | - | (3,876,850) | (3,876,850) |
| **Total US Debtor Net I/C Balances** | **(14,493,071)** | **(100,954,593)** | **(115,447,664)** |
| | | | |
| **Canadian Debtors Net I/C Balances** | | | |
| SLP Partnership | 427,474,132 | - | 427,474,132 |
| Smurfit-Stone Container Canada Inc. (SSCCI) | **(257,557,534)** | **206,913,663** | **(50,643,871)** |
| *(To) From Nova Scotia* | 209,252,768 | 11,423,695 | 220,676,463 |
| *(To) From Smurfit-MBI* | (89,336,170) | - | (89,336,170) |
| *(To) From SSCE* | 50,000,000 | 193,797,070 | 243,797,070 |
| *(To) From Francobec* | - | 303,036 | 303,036 |
| *(To) From  605861 N B Inc.* | - | 1,389,862 | 1,389,862 |
| *(To) From Stone Finance Company of Canada II* | - | - | - |
| *(To) From SLP Partnership* | (427,474,132) | - | (427,474,132) |
| B.C. Shipper Supplies Ltd. | - | (1,696,793) | (1,696,793) |
| Specialty Containers Inc. | - | (408,374) | (408,374) |
| 605861 N B Inc. | - | (1,389,862) | (1,389,862) |
| Smurfit-MBI | **89,336,170** | **(24,952,046)** | **64,384,124** |
| *(To) From SSC Canada* | 89,336,170 | - | 89,336,170 |
| *(To) From SSCE* | - | (27,057,213) | (27,057,213) |
| *(To) From BC Shippers* | - | 1,696,793 | 1,696,793 |
| *(To) From Specialty Containers Inc.* | - | 408,374 | 408,374 |
| 3083527 Nova Scotia Company | (209,252,768) | (11,423,695) | (220,676,463) |
| Francobec Company | - | (303,036) | (303,036) |
| Stone Container Finance Co of Canada II | - | (66,108,068) | (66,108,068) |

| | | | |
|---|---|---|---|
| ***Total Canadian Debtors Net I/C Balances*** | **50,000,000** | **100,631,789** | **150,631,789** |
| | | | |
| ***Non-Debtors Net I/C Balances*** | **(35,506,929)** | **322,804** | **(35,184,125)** |
| | | | |
| **Consolidated Intercompany Balances** | - | (0) | (0) |

*\* The balances above do not reflect an amount of $200,677,778 issued by Stone FinCo II to SSC Canada in the form of equity.*

Below is a summary of Intercompany Claims entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code.

**Intercompany 503(b)(9) Claims**

| Creditor | Debtor | Description | 503(B)(9) Amount |
|---|---|---|---|
| SSC Canada (La Tuque) | SSCE | Shipments from the La Tuque Mill received by SSCE container plants and warehouses | 1,873,481 |
| SSC Canada (La Tuque) | SSCE | Shipments from the La Tuque Mill received by SMBI container plants and warehouses (via CBM) | 341,166 |
| **SSCCI** | **SSCE** | | **2,214,647** |
| | | | |
| SSCE (CBM) | SMBI | Shipments from SSC Canada mills received by SMBI container plants and warehouses | 341,166 |
| SSCE (Mills) | SMBI | Shipments from SSCE mills to SMBI container plants | 14,087,733 |
| SSCE (Plants) | SMBI | Shipments from SSCE plants to SMBI plants | 595,086 |
| **SSCE** | **SMBI** | | **15,023,985** |
| | | | |
| SMBI | SSCE | Shipments from SMBI container plants to SSCE container plants | 625,572 |
| SMBI | SSCE | Shipments from SMBI container plants to SSCE Reclamation Division | 83,122 |
| **SMBI** | **SSCE** | | **708,693** |

6.     **Trade Debt.**

As of the Petition Date, the Debtors had accrued approximately $[365.0] million in trade debt (excluding amounts for payments by check dishonored post-petition and goods shipped or

services rendered pre-petition, but invoiced post-petition).[24][25]  These amounts, for goods and services, constitute a relatively small percentage of the Debtors' prepetition debt profile.

### 7.    Equity of SSCC.

SSCC currently has two classes of equity interests.  SSCC's common stock has a par value of $0.01 per share with 400,000,000 shares authorized.  As of September 30, 2009, SSCC had 256,658,958 shares of common stock issued and outstanding.  SSCC's preferred stock is 7% Series A Cumulative Exchangeable Redeemable Convertible Preferred Stock with a par value of $0.01.  As of September 30, 2009, 25,000,000 preferred shares were authorized, 4,599,300 preferred shares were issued and outstanding, and the aggregate liquidation preference was $116.  The 7% Series A Cumulative Exchangeable Redeemable Convertible Preferred Stock is defined as an SSCC Preferred Interest under the Plan.  The Plan contemplates that the SSCC Preferred Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged, and that the Holders of SSCC Preferred Interests will not receive any distribution on account of such SSCC Preferred Interests pursuant to the Plan (see Section V.C.2(f) below).

## F.    Restructuring Transactions and Post-Effective Date Debt and Capital Structure of the Company.

### 1.    Restructuring Transactions.

On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in the Plan.  Through such Restructuring Transactions, SSCC will be merged into SSCE (the "SSCC/SSCE Merger"), which will survive the merger and become Reorganized SSCC under the Plan ("Reorganized SSCC") and continue to be the ultimate parent company of each of the remaining reorganized Debtors (collectively, the "Reorganized Debtors") and of each of the remaining non-debtor subsidiaries of the Debtors.  In addition to the SSCC/SSCE Merger, the Restructuring Transactions may include one or more other mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transaction for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Debtors or Reorganized Debtors.  In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided by applicable law or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations.  Exhibit 13 14 to the Plan (to be filed with the Plan Supplement) shall set forth a detailed description

---

[24][25] This amount does not include certain prepetition trade debt that has been satisfied through payments made pursuant to one of the "first day" motions described below in Section IV.A, "First-Day Relief in the Chapter 11 Cases."

of the actions and steps required to implement the Restructuring Transactions. A chart depicting the Company's planned post-Effective Date corporate structure is annexed hereto as <u>Exhibit B-2</u>.

### 2.    Post-Effective Date Equity in Reorganized SSCC.

Pursuant to the Plan, Reorganized SSCC will authorize the issuance of 150,000,000 shares, and will issue ~~approximately 1000,000,000~~<u>100,000,000</u> shares, of new common stock (the "<u>New SSCC Common Stock</u>") for distribution to creditors as set forth herein, with eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of New SSCC Common Stock) reserved for issuance pursuant to the pertinent Management Incentive Plans. The New SSCC Common Stock will be subject to dilution as a result of further issuances thereof, including with respect to shares that may be issued under a management incentive plan. Reorganized SSCC will also authorize the issuance of 10,000,000 shares of preferred stock (the "<u>New SSCC Preferred Stock</u>").

As soon as practicable after the Effective Date, Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of the New SSCC Common Stock for trading on the New York Stock Exchange ("<u>NYSE</u>") or the NASDAQ Stock Market but will incur no liability if it is unable to do so.[~~25~~26]

### 3.    Exit Facilities of Reorganized Debtors.

~~In order to, among other things, facilitate the consummation of the Plan, and to provide working capital for the business operations and general corporate purposes of the Reorganized Debtors, on or prior to the Effective Date, certain of the Debtors shall enter into such financing agreements and commitments as the Debtors, in consultation with the Committee and the CCAA Monitor, shall have arranged on or prior to the Effective Date, including term loans and revolving credit facilities (the "Exit Facilities"). The Exit Facilities may include back-to-back letters of credit that will be used to replace any unexpired letters of credit outstanding under the DIP Facility. Definitive documentation for the Exit Facilities will be filed in substantially the form attached as Exhibit 14 to the Plan, which shall be filed with the Plan Supplement.~~<u>Securing exit financing will be a key component of the Plan and the Debtors' emergence from bankruptcy. The Debtors intend to use the exit financing to fund cash obligations under the Plan and for working capital for the Reorganized Debtors. The Debtors currently contemplate entering into an approximately $1.2 billion term loan facility (the "Exit Term Loan Facility") and an approximately $650 million revolving credit facility (the "Exit Revolving Facility" and with the Exit Term Loan Facility, the "Exit Facilities"), with funding under both Exit Facilities to occur on the Effective Date.</u>

<u>As described in Section V.G.13 below, the Bankruptcy Court authorized the Debtors to enter into the Arrangement Letter for the Exit Term Loan Facility on January 14, 2010. The</u>

---

[~~25~~26] Effective as of the opening of business on February 4, 2009, SSCC's common stock and preferred stock were delisted from the NASDAQ Global Select Market and the trading of these securities was suspended. SSCC's common stock and preferred stock are now quoted on the Pink Sheets Electronic Quotation Service under the ticker symbols "SSCCQ.PK" and "SSCJQ.PK," respectively.

Arrangement Letter provides that certain financial institutions party thereto will use commercially reasonable efforts to structure, arrange and syndicate the $1.2 billion Exit Term Loan Facility and will assist in obtaining commitments from prospective lenders in respect of the Exit Term Loan Facility. It is anticipated that the Exit Term Loan Facility will have a six-year term and will be secured by first and second liens on substantially all of the Debtors' assets. Various other key terms and provisions of the Exit Term Loan Facility are set forth in the Term Sheet filed with the Bankruptcy Court on January 12, 2010 [Docket No. 4097]. Since the January 14 hearing, the Debtors have been negotiating the definitive documentation for the Exit Term Loan Facility with the prospective lenders and expect to seek authority to execute the definitive documents, including a credit agreement, in February, 2010. The definitive documentation for the Exit Facilities also will be filed as Exhibit 15 to the Plan, which will be filed with the Plan Supplement.

The Debtors also are in discussions with prospective lenders in connection with the Exit Revolving Facility. The Debtors expect to return to the Bankruptcy Court in the weeks following approval of this Disclosure Statement to seek authority related to the Exit Revolving Facility.

## G.    Pending Litigation Against the Debtors.

As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to section 362 of the Bankruptcy Code.[26][27]

The Company is involved in various legal proceedings arising in the ordinary course of business, as well as certain litigation and tax matters. The Company periodically assesses its liabilities and contingencies in connection with these matters based upon the latest information available to it. Based on its review of the latest information available, the Company believes its ultimate liability in connection with pending or threatened legal proceedings will not have a material effect on its results of operations, cash flows or financial position.

As of the Petition Date, the Company had approximately 21 employment-related actions filed against it, 70 employment-related administrative charges, as well as 11 environmental actions, 19 personal injury actions, and several other workers' compensation, union grievance, contract, tax, and asbestos- related actions. A list of the litigation pending prior to the Petition

---

[26][27] On June 18, 2009, the Debtors filed a verified complaint in the Bankruptcy Court [Adv. Pro. No. 09-51067] against the plaintiffs in an ERISA lawsuit (the "ERISA Action") filed against certain key executives and officers of the Debtors seeking to hold them liable for alleged violations of their fiduciary duties in connection with the administration of the Company's employee savings plans. The Debtors' verified complaint sought an extension of the automatic stay to the defendants in the ERISA Action, and in conjunction therewith, or in the alternative, temporary and preliminary injunctive relief with respect to the ERISA Action. At a hearing on November 4, 2009, the Court ordered that the automatic stay be extended to protect the Debtors' executives and officers named as defendants in the ERISA Action. The Court stayed the ERISA Action for a period of 120 days and ordered a status hearing immediately prior to the conclusion of that period to consider whether the stay should remain in effect. On January 19, 2010, Mark W. Mayer, Larry C. Welsh and Brandi Young (the "ERISA Objectors") filed a DS Objection (as defined below) seeking clarification with respect their voting rights and the applicability of certain releases under the Plan and objecting to Plan treatment of Class 1D. The Voting Procedures Order addresses the ERISA Objectors' concern relating to Ballot classification and amount. Moreover, the Plan and Disclosure Statement make it clear that the third-party releases are optional, and to the extent that the ERISA Objectors choose to opt-out of such releases, they will not apply to them. Treatment of the Class 1D Claims is a plan confirmation objection.

CH1 5118439 5168368v.4 1

Date is included in the Debtors' Schedules of Assets and Liabilities filed with the Bankruptcy Court on April 6, 2009.

The Debtors anticipate that, to the extent any of the pending litigation is not resolved prior to the Effective Date of the Plan or removed by the Debtors to federal court consistent with their powers under the Bankruptcy Code, such litigation will continue after the Effective Date in the forum(s) in which it was initiated. Any adverse judgment in any of these actions would constitute a Claim that will be treated in accordance with the provisions of the Plan, so long as such Claim was otherwise allowable because it complied with the applicable requirements of these Chapter 11 Cases and the Bankruptcy Code.

**H.**     **Events Leading up to Chapter 11.**

The Company's financial performance depends primarily upon the market demand for its products and the prices that it receives for such products. The recent downturn in the global economy resulted in an unprecedented decline in demand for the Company's products, leading to increased inventory levels and downward pressure on the Company's operating income. At the same time, substantial price competition and volatility in the pulp and paper industry resulted in decreased prices for the Company's products which, coupled with the Company's leveraged financial position and the recent volatility in energy prices and the cost of raw materials, have adversely impacted the Company's financial performance. In addition dramatic changes in the capital markets adversely impacted the Company's prospects for refinancing its revolving credit and securitization facilities. Because of these factors, the Debtors found it necessary to commence these Chapter 11 Cases.

## IV. EVENTS DURING THE PROCEEDINGS

On the Petition Date, the Debtors filed voluntary petitions for reorganization under the Bankruptcy Code in the Bankruptcy Court. The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Brendan L. Shannon and have been administratively consolidated under case number 09-10235 (BLS). Also on the Petition Date, following the commencement of the Chapter 11 Cases, certain of the Debtors – including SSC Canada, a wholly-owned subsidiary of SSCE, and the other Canadian Debtors – applied for protection from their creditors in Canada pursuant to the CCAA in the Canadian Bankruptcy Court. The CCAA Proceedings have been assigned to Justice Pepall and are being administered under court file number CV-09-7966-00CL.

**A.**     **First-Day Relief in the Chapter 11 Cases.**

On the Petition Date, the Debtors also filed "first day" motions seeking authority to, among other things, (i) prohibit utility companies from discontinuing, altering, or refusing service, (ii) make tax payments to federal, state and local taxing authorities on an uninterrupted basis, (iii) pay certain pre-petition claims of shippers, warehousemen and other lien claimants; (iv) make payments to certain pre-petition creditors that are critical to the Debtors' uninterrupted operations; (v) continue pre-petition insurance programs and pay all premium installments outstanding in connection therewith; (vi) honor prepetition obligations to certain customers and brokers and continue customer programs; (vii) pay pre-petition wages and other benefits to their employees; (viii) continue use of their existing cash management system, bank accounts and business forms;

(ix) for authority to continue using cash collateral, and (x) extend time to file schedules of assets and liabilities.  All of the Debtors' first-day motions were granted by the Bankruptcy Court in substantially the manner requested by the Debtors on an interim or final basis.

## 1.  Utility Services.

In connection with the operation of their business and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telephone service, data service, fiber transmission, waste disposal and other similar services (the "Utility Services").  Because uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts, the Debtors requested entry of (i) an interim order and (ii) a final order (a) prohibiting utility providers from altering, refusing, or discontinuing utility services, (b) providing that utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtors' establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtors' estimated monthly cost of Utility Services, and (c) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the utility providers (the "Utility Motion").  The Bankruptcy Court entered the interim order on January 27, 2009 and entered the final order on February 23, 2009.

## 2.  Payment of Federal, State and Local Taxes.

In the ordinary course of business, the Debtors incur certain sales, use, property, and other taxes and governmental charges (collectively, the "Taxes") that are payable directly to various state, local and foreign taxing authorities (collectively, the "Taxing Authorities") as such payments become due.  On the Petition Date, the Debtors filed a motion seeking authority to pay the relevant Taxing Authorities (i) any pre-petition Taxes that have accrued, but were not yet due and owing or were not paid in full, as of the Petition Date and (ii) any pre-petition Taxes that arose prior to the Petition Date that become due and owing during the pendency of the cases in the ordinary course of business (the "Tax Motion").  The order, signed January 27, 2009, granted the Debtors the authority to pay any accrued and outstanding pre-petition Taxes up to an aggregate amount of $23,100,000.

## 3.  Shippers, Warehousemen and Other Lien Claimants.

The Debtors' supply and delivery system depends upon the use of reputable common carriers, dedicated carriers, rail carriers, less-than-truckload carriers, freight-forwarders, ocean carriers, parcel carriers, and non-asset based carriers (collectively, the "Shippers") as well as a network of third-party warehousemen who store goods in transit on behalf of the Debtors (the "Warehousemen").  In addition, the Debtors utilize the services of customs agents to facilitate the shipment of goods into and out of the United States.  On the Petition Date, the Debtors sought authority to pay certain pre-petition claims held by Shippers and Warehousemen in amounts necessary or appropriate to (i) obtain releases of critical or valuable goods or equipment that may be subject to liens, (ii) maintain a reliable, efficient and smooth distribution system, and (iii) induce critical Shippers and Warehousemen and other lien claimants to continue to carry goods and equipment and make timely deliveries thereof.  By an order dated January 27, 2009, the

Bankruptcy Court granted the Debtors the authority to satisfy the pre-petition claims of the Shippers and Warehousemen in an amount not to exceed $33 million.

4.    **Critical Trade Vendor Treatment and Payment of Priority Claims.**

On the Petition Date, the Debtors sought the authority to pay the pre-petition claims of critical vendors that delivered essential goods or provided essential services to the Debtors prior to the Petition Date (the "Critical Vendor Motion"). The ability to pay critical vendors is essential because the Debtors need to ensure that they can continue to receive such goods and services to continue operating their businesses. The Bankruptcy Court entered an interim order dated January 27, 2009 granting the Critical Vendor Motion and authorizing the Debtors to pay critical vendors in a total amount not to exceed $50 million. The Court entered a final order dated February 23, 2009 (the "Critical Vendor Order"). Pursuant to the Critical Vendor Order, in return for payment of their pre-petition claims, such Critical Vendors were required to continue providing the Debtors with goods or services according to customary trade terms, or such other favorable trade terms as mutually agreed upon.

5.    **Continuation and Payment of Prepetition Insurance.**

On the Petition Date, the Debtors filed a motion requesting the authority to continue performing their obligations under prepetition insurance policies and premium financing agreements (the "Insurance Motion"). By order dated January 27, 2009, the Bankruptcy Court authorized the Debtors to (i) make all post-petition installment payments under certain pre-petition insurance premium finance agreements as such installment payments come due, (ii) continue all of the Debtors' prepetition insurance programs in the ordinary course of business, and (iii) pay all prepetition obligations in respect thereof. The ability to continue payments under their policies was necessary to ensure that the Debtors maintained insurance coverage with respect to their business activities.

6.    **Customer Programs.**

Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation with their customers and in the marketplace for their products (collectively, the "Customer Programs"). Additionally, the Debtors utilized the services of several independent brokers or broker groups (collectively, the "Brokers") in order to obtain new customers and maintain long-term customer relationships for certain of their products through various sale and distribution channels. Accordingly, the Debtors requested the entry of an order granting them the authority to (i) perform their pre-petition obligations related to the Customer Programs, (ii) continue, renew, replace, modify and/or terminate any of the Customer Programs without further application to this Court, (iii) maintain their relationships with the Brokers, and (iv) perform and pay certain pre-petition obligations the Debtors owe to the Brokers (the "Customer Motion"). The Bankruptcy Court granted the relief requested in the Customer Motion on January 27, 2009.

7.    **Employee Compensation and Benefits.**

On the Petition Date, the Debtors filed a motion seeking court authority to (i) pay all prepetition wages, salaries, commissions and other compensation owed to the Debtors'

employees, (ii) pay all prepetition compensation owed to individuals who work regularly as the Debtors' independent contractors and temporary workers, (iii) reimburse all prepetition business expenses to employees, (iv) make all payments for which pre-petition payroll and tax deductions were made, (v) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course, and (vi) honor workers' compensation obligations, (vii) make all payments to third parties relating to the foregoing payments and contributions (the "Employee Wage Motion"). The Debtors sought this relief to minimize the personal hardship that the employees, independent contractors, and temporary workers will suffer if the pre-petition employee-related obligations are not paid when due, as well as to maintain morale and an essential workforce. By order entered on January 27, 2009, the Bankruptcy Court granted the relief requested in the Employee Wage Motion in substantially the manner requested, except that the Bankruptcy Court held a hearing and authorized the Debtors to continue their severance plans on February 23, 2009.

### 8.  Cash Management.

Prior to the Petition Date, the Debtors utilized a centralized cash management system to collect funds from their operations and to pay operating and administrative expenses (the "Centralized Cash Management System"). In order to, among other things, avoid administrative inefficiencies, the Debtors moved the Bankruptcy Court for an order (i) authorizing the continued use of the Centralized Cash Management System, (ii) authorizing continued use of existing bank accounts and business forms, (iii) authorizing the continuation of certain intercompany transactions, (iv) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis, and (v) granting administrative expense status to post-petition intercompany transactions (the "Cash Management Motion"). By an interim order signed January 27, 2009, and a final order entered on February 23, 2009, the Bankruptcy Court approved the Cash Management Motion and waived the requirements of section 345(b) on an interim basis.

### 9.  Use of Cash Collateral.

In order to continue running its business in the ordinary course throughout the Chapter 11 Case, the Debtors sought an interim order on the Petition Date (i) authorizing Calpine, one of the Debtors herein, to use cash collateral in accordance with the terms of the budget set forth therein and (ii) granting adequate protection to pre-petition lenders pursuant to section 363 of the Bankruptcy Code (the "Calpine Cash Collateral Motion"). The relief sought in the Calpine Cash Collateral Motion was necessary as Calpine had an immediate and critical need to use the cash to maintain its business and pay related expenses. The relief requested in the Calpine Cash Collateral motion was granted on an interim basis on January 27, 2009, a second interim order was entered on February 23, 2009 and a final order was entered on March 10, 2009. On January 4, 2010, the Bankruptcy Court entered an order approving a stipulation extending Calpine's authority to use cash collateral through and including January 30, 2010.

### 10.  Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs.

On the Petition Date, the Debtors sought entry of an order granting the Debtors an extension of thirty (30) days (in addition to the thirty (30) day extension under Local Rule

1007-1(b)) to file their Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"), allowing the Debtors a total of sixty (60) days from the Petition Date to file their Schedules and Statements. The Bankruptcy Court granted the requested relief on January 27, 2009 and the Debtors filed their Schedules and Statements on April 6, 2009.

On August 26, 2009, SSCE filed an amended Schedule F. On October 10, 2009, SSCC, SSC Canada and Calpine Corrugated, LLC each filed an amended Schedule F. On October 15, 2009, SSCE again filed an amended Schedule F.

## B.     Relief in CCAA Proceedings.

On the Petition Date, certain of the Canadian Debtors brought a motion seeking the CCAA Initial Order. The CCAA Initial Order provides that the Canadian Debtors shall remain in possession and control of their current and future property and grants the CCAA Stay, which precludes any proceeding or enforcement process in any court or tribunal from being commenced or continued in respect of the Canadian Debtors or the CCAA Monitor (as defined below) or affecting the business or property, and stays and suspends any such proceedings currently under way, during the specified stay period (the "CCAA Stay Period"). By order of the Canadian Bankruptcy Court, the CCAA Stay Period has been extended to December 24, 2009. Among other things, the CCAA Initial Order also:

- appointed Deloitte and Touche Inc. to act as monitor for the Canadian Debtors (the "CCAA Monitor"). The CCAA Monitor is an officer of the Canadian Bankruptcy Court charged with monitoring the Canadian Debtors' property and the conduct of their business. The CCAA Monitor has the powers and obligations set out in the CCAA and in the CCAA Initial Order;

- authorizes the Canadian Debtors to continue to retain and employee their employees, consultants, agents, experts, accountants and counsel ("Assistants") with liberty to retain such further Assistants as deemed reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of the CCAA Initial Order;

- authorizes the Canadian Debtors to continue to utilize the Centralized Cash Management System;

- entitles, but does not require, the Canadian Debtors to pay certain expenses (whether incurred prior to or after the Petition Date), including (i) all outstanding future wages, salaries, employee and pension benefits and contributions, vacation pay, bonuses and expenses payable on or after the Petition Date, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements; (ii) the fees and disbursements of any Assistants retained in respect of the CCAA proceedings; and (iii) amounts owing for goods and services actually supplied to the Canadian Debtors, or to obtain the release of goods contracted for, prior to the date of the CCAA Initial Order, (A) by railways, trucking companies and other carriers and customs brokers, with the consent of the CCAA Monitor and the Canadian DIP Agent, and (ii) with the

consent of the CCAA Monitor and the Canadian DIP Agent, up to $11.6 million by other critical vendors;

- entitles, but does not require, the Canadian Debtors to pay all reasonable expenses incurred by them in carrying on the business in the ordinary course and in carrying out the provisions of the CCAA Initial Order;

- directs the Canadian Debtors to pay, until the delivery of written notice of repudiation, all amounts constituting rent under real property leases or as otherwise may be negotiated between the Canadian Debtors and the relevant landlords;

- directs the Canadian Debtors, except as permitted in the CCAA Initial Order or in the DIP Credit Agreement and other documents, until further order of the Canadian Bankruptcy Court: (i) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Canadian Debtors to any of their creditors as of the date of the CCAA Initial Order; (ii) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of their property; and (iii) to not grant creditor or incur liabilities except in the ordinary course of business;

- permits the Canadian Debtors, subject to the DIP Documents, to pursue an orderly restructuring of the business by (i) within certain limits, permanently or temporarily ceasing, downsizing or shutting down any of their business or operations and disposing of redundant or non-material assets; (ii) terminating the employment of such of their employees or temporarily laying off such of their employees as deemed appropriate; (iii) subject to the terms of the CCAA Initial Order, vacating, abandoning or quitting the whole but not part of any leased premises and/or repudiating any real property lease; (iv) repudiating such of their arrangements or agreements of any nature whatsoever, whether oral or written, as the Canadian Debtors deem appropriate; and (v) pursuing all avenues of refinancing and offers for material parts of the business or property, subject to prior Court approval before any material refinancing or sale;

- precludes any person during the CCAA Stay Period from discontinuing, failing to honor, altering, interfering with, repudiating, terminating or ceasing to perform any right, renewal right, contract, agreement, license or permit in favor of or held by the Canadian Debtors;

- restrains, during the CCAA Stay Period, all persons having oral or written agreements with a Canadian Debtor from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Canadian Debtors, subject to the terms set forth in the CCAA Initial Order; and

- authorized the Canadian Debtors to enter into the DIP Credit Agreement to borrow up to $350 million thereunder.

C.    **Debtor-in-Possession Financing.**

1.    **Post-Petition Financing Needs.**

The Debtors required additional working capital financing in order to preserve and maintain their business.  The level of necessary additional borrowing was not limited to the Debtors' need for incremental working capital.  The Debtors also sought to replace the Securitization Facilities because both facilities would automatically "unwind" as a result of the Debtors' bankruptcy filings, and the Debtors would be denied access to the proceeds of approximately $537 million in accounts receivable unless and until the Securitization Facilities were satisfied.

2.    **The DIP Financing Motion and Orders.**

On the Petition Date, the Debtors requested entry of an order (i) authorizing Debtors to obtain post-petition financing; (ii) granting liens, including priming liens, and superpriority claims pursuant to 11 U.S.C. § 364; (iii) authorizing use of proceeds to effectuate payout of the Securitization Facilities; (iv) authorizing use of cash collateral pursuant to 11 U.S.C. § 363; and (v) granting adequate protection pursuant to 11 U.S.C. §§ 363 and 364.   The immediate access to sufficient post-petition financing and access to cash collateral was vital to the preservation of the Debtors' business and the success of the Debtors' reorganization.  On January 27, 2009, the Bankruptcy Court entered an interim order granting the relief requested and entered a final order on February 23, 2009.  On December 23, 2009, the Debtors filed a motion seeking the entry of an agreed order authorizing the continued use of pre-petition secured parties' cash collateral following the expiration of DIP Facility.  The Bankruptcy Court entered the agreed order on January 14, 2010.

3.    **The DIP Facility.**

Prior to initiating their pursuit of debtor-in-possession ("DIP") financing, the Debtors, with the assistance of their advisors, had pursued out-of-court financing.  Toward the end of 2008, the Debtors' advisors initially contacted approximately twenty-five (25) potential lenders regarding possible out-of-court financing.  It soon became apparent that the Debtors would not be able to secure out-of-court financing in the then current lending market in the time period available to the Debtors, particularly in light of their liquidity position and their significant leverage.  The Debtors and their advisors then pursued DIP financing.  The number of potential lenders who could meet their DIP financing requirements was limited due to the size and complexity (given the cross-border and securitization components) of the requested facility and because the DIP facility would require the priming of the prepetition Debt.

The Debtors determined that a proposed financing arrangement (the "DIP Facility") was the best, and only available and viable option.  The DIP Facility was established pursuant to that certain Credit Agreement (as amended, modified or supplemented in accordance with the terms of the Interim Order, the "DIP Credit Agreement") by and between SSCE and SSC Canada, SSCC, the other Loan Parties thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (the "U.S. DIP Agent"), JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian administrative agent and Canadian collateral agent ("Canadian DIP Agent", collectively with the

U.S. DIP Agent, the "DIP Agents"), and the Lenders party thereto (the "DIP Lenders", collectively with the DIP Agents, the "DIP Secured Parties").  The DIP Facility was established to provide the Debtors with much needed liquidity to fund their operating, working capital, and capital expenditure needs during the course of the Chapter 11 Cases, as well as the retirement of obligations owing in connection with the Securitization Facilities.

The DIP Credit Agreement provided for borrowings up to an aggregate amount of US$750 million, consisting of (i) a US$400 million U.S. term loan for borrowings by SSCE; (ii) a US$35 million Canadian term loan for borrowings by SSC Canada; (iii) a US$250 million U.S. revolving loan for borrowings by SSCE and/or SSC Canada; and (iv) a US$65 million Canadian revolving loan for borrowings by SSCE and/or SSC Canada.  SSCE and the U.S. Debtors (other than SMBI, Inc.) (collectively, the "U.S. Guarantors") and SSC Canada guaranteed all of the obligations under the DIP Facility and the Canadian Debtors (other than SSC Canada) and SMBI, Inc. (collectively, the "Canadian Guarantors") guaranteed the obligations of SSC Canada as borrower under the DIP Facility.

The DIP Facility grants, inter alia, (i) with respect to SSCE, the U.S. Guarantors and SSC Canada, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim for all of the obligations under the DIP Facility payable from and having recourse to all pre-petition and post-petition property of the estates of SSCE, the U.S. Guarantors and SSC Canada and all proceeds thereof; and (ii) with respect to the Canadian Guarantors, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim for all of the Canadian obligations under the DIP Facility payable from and having recourse to all pre-petition and post-petition property of the estates of Canadian Guarantors and all proceeds thereof.  The Debtors granted a perfected first priority lien on all unencumbered property of the Debtors and granted a perfected junior lien on all property of the Debtors that is subject to valid, perfected and unavoidable liens in existence on the petition Date.  Additionally, the Debtors granted a perfected first priority, senior priming lien an all property of the Debtors that is subject to existing liens which secure the obligations of the Debtors under the Pre-Petition Credit Agreement and other liens, obligations, or indebtedness junior to the Pre-Petition Credit Agreement.

**D.     Appointment of Creditors' Committee.**

On February 5, 2009, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee.  The Committee is comprised of the following parties: (i) Wilmington Trust Company, as Successor Indenture Trustee; (ii) United Steelworkers; (iii) Pension Benefit Guaranty Corporation; (iv) UMB Bank, N.A.; (v) Aegon USA Investment Management; (vi) Corn Products International; and (vii) Voith Paper Fabrics US Sales, Inc.  On or about April 27, 2009, Wilmington Trust Company determined that it had to resign as indenture trustee for the 7 3/8/7.375% Senior Notes due July 15, 2004 and, upon its resignation, Manufacturers and Traders Trust Company ("M&T") was appointed as successor indenture trustee for the 7 3/8/7.375% Notes effective May 7, 2009.  M&T was thereafter appointed as an *ex officio* member of the Committee.

The Committee applied for an order authorizing the retention of Kramer Levin Naftalis & Frankel, LLP ("Kramer Levin") as its counsel under section 328(a) and 1103 of the Bankruptcy Code on March 5, 2009.  The order approving Kramer Levin's retention was entered on March 23,

2009.  In addition, the Committee also filed an application to retain Pachulski Stang Ziehl & Jones LLP ("PSZJ") as Delaware bankruptcy co-counsel on March 10, 2009.  The order approving PSZJ's retention was signed on or about April 2, 2009.  To further assist them in carrying out their duties, the Committee also retained the following professionals with the Bankruptcy Court's approval: (i) FTI Consulting, Inc., as financial advisors; (ii) Houlihan Lokey Howard & Zukin Capital, Inc., as financial advisors and investment banker; and (iii) Bennett Jones, LLP, as Canadian Counsel.

On March 6, 2009, the Committee filed a motion to: (i) limit creditor access to confidential information *nunc pro tunc* to February 5, 2009; (ii) establish related procedures pursuant sections 105(a), 1102(b)(3) and 1103(c) of the Bankruptcy Code; and (iii) to retain Kurtzman Carson Consultants LLC as website administrative agent (the "Information Protocol Motion").  The order approving the Information Protocol Motion was entered on March 23, 2009.

**E.    Professional Retention.**

The Debtors applied for an order authorizing the retention of Sidley Austin LLP ("Sidley") as their general reorganization and bankruptcy counsel under section 327(a) of the Bankruptcy Code on February 5, 2009 (the "Sidley Retention").  The order approving the Sidley Retention was entered on February 23, 2009.

The Debtors also filed an application to retain Young Conaway Stargatt & Taylor, LLP ("YCST") as Delaware bankruptcy co-counsel in these Chapter 11 Cases (the "YCST Retention"). The YCST Retention was filed on February 19, 2009 and the application was approved by an order entered on March 6, 2009.

Additionally, the Debtors filed an application to retain Armstrong Teasdale, LLP as special counsel to the Debtor.  The application was filed on February 5, 2009 and the application was approved by an order entered on February 23, 2009.

The Debtors filed an application to retain Lazard Fréres & Co., LLC ("Lazard") as their investment banker and financial advisors (the "Lazard Retention") on February 5, 2009.  The order approving the Lazard Retention was entered on February 23, 2009.

To further assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors also retained the following professionals with the Bankruptcy Court's approval: (i) Epiq Bankruptcy Solutions, LLC, as claims, noticing, and Balloting agent; (ii) PricewaterhouseCoopers, LLP, as financial advisors and tax advisors; (iii) Ernst & Young LLP, as auditors, tax advisors, and risk advisory services provider; (iv) Hewitt Associates LLC, as compensation consultants; (v) State Tax Solutions LLC, as special counsel for the recovery and recoupment of excessive tax payments; (vi) The Levin Group LP, as strategic and financial advisors; (vii) Studley, Inc., as real estate broker; (viii) Grubb & Ellis Co., as real estate broker; and (ix) KPMG LLP, as fresh start valuation consultants.  The Debtors have retained Stikeman Elliott LLP as their Canadian Counsel.

In addition, the Debtors filed a motion seeking authorization to retain, employ, and compensate certain professionals utilized in the ordinary course of the Debtors' business (the

"Ordinary Course Motion"). The Ordinary Course Motion was approved by order entered
February 23, 2009.

On June 19, 2009, the Bankruptcy Court entered an order (i) appointing Warren H. Smith
& Associates, P.C. as the fee auditor, effective *nunc pro tunc* as of May 19, 2009, to act as special
consultant to the Bankruptcy Court for professional fee and expense review and analysis and (ii)
establishing uniform procedures for the review, allowance and payment of fees and expenses of (a)
all professionals employed pursuant to section 327, 328, 1103 or 1106 of the Bankruptcy Code,
including professionals retained by the Debtors and by the Committee, (b) all members of the
official committees, and (c) any claims for reimbursement of professional fees and expenses under
section 503(b) of the Bankruptcy Code, to ensure compliance with section 330 of the Bankruptcy
Code and other applicable rules and guidelines.

On December 16, 2009, the Bankruptcy Court entered an order approving the Debtors'
retention of Spencer Stuart as search consultant under section 327(a) and 328(a) of the Bankruptcy
Code, nunc pro tunc to October 2, 2009 (the "Spencer Stuart Retention). As the unsecured
creditors will be the future owners of the reorganized Debtors, the Committee and the Debtors
have agreed to allow certain members of the Committee to actively participate in identifying,
interviewing and selecting qualified candidates for the board of directors of Reorganized SSCC.
Spencer Stuart will assist the Debtors and Committee in their search for seven independent
directors to serve on the board of directors of Reorganized SSCC. The identity of the seven
independent directors will be disclosed in a Plan Supplement. On or promptly after the Effective
Date, the initial Board of Directors of Reorganized SSCC shall select a non-executive Chairman of
the Board of Directors of Reorganized SSCC; provided, however, that nothing in the Plan or in the
Amended and Restated Certificate of Incorporation shall prohibit any officer of Reorganized
SSCC from serving as an executive Chairman of the Board of Directors of Reorganized SSCC
after the Effective Date.

## F.     Cross-Border Insolvency Protocol.

To facilitate coordination between the Chapter 11 Cases and the CCAA Proceedings, the
Debtors filed a motion seeking approval of a Cross-Border Insolvency Protocol (the "Protocol").
The Bankruptcy Court entered an order approving the Protocol on March 10, 2009. The Canadian
Debtors also submitted the Protocol to the Canadian Bankruptcy Court, and the CCAA Monitor
recommended that the Canadian Bankruptcy Court approve the Protocol on March 6, 2009. The
Protocol provides that its purpose is to effectuate an orderly and efficient administration of the
Chapter 11 Cases and CCAA Proceedings (collectively, the "Proceedings") and to maintain the
respective independent jurisdiction of the Canadian Bankruptcy Court and the Bankruptcy Court.
The Canadian Bankruptcy Court shall have sole and exclusive jurisdiction over the CCAA
Proceedings, and the Bankruptcy Court shall have sole and exclusive jurisdiction over the Chapter
11 Cases. The Bankruptcy Court and the Canadian Bankruptcy Court may coordinate activities,
communicate with one another and conduct joint hearings. The Protocol provides that any
creditors or other interested parties have the right to be heard in the Canadian Bankruptcy Court or
the Bankruptcy Court as if the party was domiciled in the forum country, subject to any local rules
or regulations generally applicable to all parties appearing in the forum, provided, however, that
any appearance or filing may subject a creditor or interested party to the jurisdiction of the relevant

court.  An appearance by the Committee in the CCAA Proceedings, however, shall not form a basis for personal jurisdiction in Canada over the members of the Committee.

**G.    Substantive Matters in the Proceedings.**

    **1.    Exclusive Procedures for Section 503(b)(9) Claims.**

    By its order dated March 10, 2009, the Bankruptcy Court entered an order establishing and implementing exclusive, global procedures for the allowance of claims under 11 U.S.C § 503(b)(9) relating to goods received within 20 days prior to the Petition Date (the "503(b)(9) Order").  Pursuant to the 503(b)(9) Order, all creditors asserting claims under 11 U.S.C. § 503(b)(9) must have done so prior to the Bar Date (defined below).  The Debtors have filed initial responses to the majority of asserted 503(b)(9) claims and continue to work with claimants to resolve disputes.

    **2.    Claims Reconciliation.**

    The Debtors continue to actively reconcile and respond to claims in the Chapter 11 Cases and CCAA Proceedings.  In the Chapter 11 Cases, the Debtors have filed their first (non-substantive), second (non-substantive), third (non-substantive), fourth (substantive), fifth (non-substantive), sixth (substantive), seventh (non-substantive) and eighth (substantive) omnibus objections to claims on September 18, 2009, October 19, 2009, November 18, 2009, December 15, 2009 and January 15, 2010.  Furthermore, in the CCAA Proceedings, the CCAA Monitor continues to distribute Notices of Revision or Disallowance with respect to claims.

    **3.    ~~2.~~ Extension of Time to Remove Actions.**

    Pursuant to an order entered on May 5, 2009, the Bankruptcy Court extended the time within which the Debtors may seek to remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rules 9027 and 9006 (the "Removal Period") through August 24, 2009.  On August 21, 2009, the Debtors filed a motion seeking to further extend the Removal Period, and on September 9, 2009, the Bankruptcy Court entered an order further extending the Removal Period through December 22, 2009.  On December 21, 2009, the Debtors filed their third motion to further extend the Removal Period.  ~~This motion is set to be heard by the~~The Bankruptcy Court ~~at the~~approved such motion on January 14, ~~2010 omnibus hearing.~~2010.

    **4.    ~~3.~~ Executory Contracts and Unexpired Leases.**

    On February 23, 2009, the Bankruptcy Court entered an order approving the Debtors' first omnibus motion to reject executory contracts and unexpired leases, which authorized the rejection of approximately sixty-nine (69) executory contracts and twelve (12) leases of vacant office and plant space, resulting in annual cost savings to the Debtors of over $3 million.  Since that time, the Bankruptcy Court has entered orders approving the Debtors' second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth~~and~~, sixteenth, seventeenth and eighteenth omnibus motions to reject executory contracts and unexpired leases, on March 10, 2009, March 23, 2009, April 7, 2009, April 21, 2009, May 5, 2009, May 20, 2009, June 4, 2009, June 19, 2009 July 8, 2009, August 17, 2009, September 8, 2009, September 30, 2009, October 19, 2009, November 16, ~~2009 and~~2009, December 16, ~~2009,~~2009, December 28,

2009 and January 12, 2010, respectively, resulting in the rejection of approximately seventy-nine (79) additional unexpired leases and the rejection of approximately one hundred ~~nine (109~~forty eight (148) additional executory contracts~~.~~, thus far, with the rejection of an additional six (6) unexpired leases and thirteen (13) executory contracts set for hearing on January 29, 2010.

On April 15, 2009, Debtors filed a motion requesting a ninety (90) day extension of the deadline for the Debtors to assume or reject their remaining leases of nonresidential real property. The Bankruptcy Court approved the motion by order entered on May 7, 2009 and extended the time to assume or reject leases of nonresidential real property through and including August 24, 2009. On August 19, 2009 the Bankruptcy Court entered an order authorizing the Debtors to assume approximately one hundred twenty (120) unexpired leases of non-residential real property.

**5.** ~~4.~~ **Asset Sales.**

(a)     1424 S. Raymond Avenue, Fullerton, California

On June 5, 2009, the Debtors filed a motion seeking the Bankruptcy Court's approval of the sale of that certain real property located at 1424 S. Raymond Avenue, Fullerton, California (the "Fullerton Property"), free and clear of all liens, claims and encumbrances (except for certain permitted exceptions) to Western Realco, LLC for $8,250,000.00, or to any bidder who presented a higher and better offer. The Fullerton Property was owned by SSCE and was no longer being used in the Debtors' business operations. The Fullerton Property consists of 14.91 acres and contains approximately 192,500 square feet of existing structures in addition to several concrete loading platforms, all of which would require demolition. The purchase agreement between Western Realco, LLC and SSCE provided that Western Realco, LLC would pay $8,250,000 in cash for the Fullerton Property. The Debtors established procedures whereby other parties could submit higher and better bids for the Fullerton Property, however no other parties submitted bids for the property. The Bankruptcy Court entered an order approving the sale of the Fullerton Property on July 6, 2009, and entered an amended order approving the sale on July 8, 2009.

(b)     Canadian Timberlands

On July 30, 2009, the Debtors filed a motion seeking (i) the Bankruptcy Court's approval of a sale of approximately 962,204 acres of timberlands located in Québec, Canada (the "Timberlands") and (ii) authorization to (a) enter into and perform all of the Debtors' obligations under the asset purchase agreement, (b) assume and assign certain executory contracts and unexpired leases, (c) share a portion of the sale proceeds with AbitibiBowater Inc. ("Abitibi"), (d) enter into a wood fiber supply agreement with Abitibi, (e) pay all related transaction costs, and (f) reject certain existing wood supply agreements with Abitibi (the "Timberlands Motion"). SSC Canada, the owner of the Timberlands, proposed to sell the Timberlands and certain related assets and operations, free and clear of all rights, claims, liens, security interests and other encumbrances, to Société générale de financement du Québec, an investment arm of the provincial government of Québec for CAD$60,400,000 (based on the exchange rate reported for July 29, 2009, approximately US$55,374,720). The Canadian Debtors also sought approval of this transaction in the CCAA Proceedings on July 30, 2009.

78

The purchase agreement for the Timberlands required the Debtors to terminate the existing cutting and harvesting agreements between the Debtors and Abitibi and required Abitibi to release the Debtors from all obligations going forward. To replace the terminated agreements, SSCE, SSC Canada and Abitibi proposed to enter into a wood fiber supply agreement to ensure a supply of wood fiber for SSC Canada's paper mill located in La Tuque, Québec. Additionally, the Debtors proposed to share with Abitibi fifty percent (50%) of the net proceeds of the sale derived from a portion of the Timberlands representing approximately ninety-eight percent (98%) of the total surface area (approximately CAD$28 million). Abitibi held a right of first refusal in connection with a sale of that portion of the Timberlands, and agreed to waive the right of first refusal in exchange for a share of the sale proceeds attributable to that portion of the Timberlands. The Bankruptcy Court entered an order approving the Timberlands Motion on August 14, 2009, and the Canadian Bankruptcy Court approved the Timberlands Motion on August 17, 2009. The sale of the Timberlands closed on September 11, 2009, and the proceeds of the sale were received on October 23, 2009, except for $1 million held in escrow pending the satisfaction of certain title matters relating to a small number of parcels included in the transaction, which is expected to be released by the end of January 2010. The proceeds were then applied on October 26, 2009 to pay down portions of the Canadian term loan issued under the DIP Facility.

(c)    De Minimis Asset Sales

In order to establish a framework to effect sales and other dispositions of relatively modest value, the Debtors filed a motion to set procedures for the sale, transfer or abandonment of de minimis assets ("De Minimis Sales Motion"). Pursuant to an order of the Bankruptcy Court approving the procedures set forth in the De Minimis Sales Motion, dated March 11, 2009 (the "De Minimis Sales Order"), the Debtors have pursued several such asset sales.[2728] The De Minimis Sales Order provides that, for transactions with a selling price equal to or less than $500,000, the Debtors are authorized to consummate the sale without providing notice to interested parties and without the need for any further authorization from the Bankruptcy Court so long the Debtors determine that the transaction is in the best interests of their estates and otherwise complies with the De Minimis Sales Order, and so long as the sale is consistent with the terms of the DIP Facility.

The De Minimis Sales Order further provides that, for transactions with a selling price greater than $500,000 but less than or equal to $5 million, the Debtors are authorized to consummate the sale without further authorization of the Bankruptcy Court after the Debtors provide at least five business days written notice of each sale to certain notice parties. If there are no written objections filed within the five business day notice period, the Debtors are authorized to immediately consummate such sale after the entry of an order approving such sale under certification of counsel. If written objections are filed, the sale will only proceed upon either the consensual resolution of the objection or further order of the Bankruptcy Court after notice and a hearing.

The Debtors filed their quarterly reports of such sales on April 22, 2009, July 30, 2009, and October 30, 2009. As reported in the first quarterly report, second quarterly report and third quarterly report, the Debtors have reported fifty-four (54) sales of equipment, trailers, a

[2728] The CCAA Initial Order similarly provides for the sale, transfer or abandonment of de minimis assets, not to exceed CAD$2,000,000 for any one transaction or CAD$25,000,000 in the aggregate.

warehouse, and other assets pursuant to the procedures for transactions with a selling price equal to or less than $500,000. Additionally, the Debtors have sold certain property pursuant to the procedures for transactions with a selling price greater than $500,000 but less than or equal to $5 million. Under such procedures, the Debtors sold or have received authority to sell the following assets: (i) a mill in Carthage, Indiana, (ii) real property in St. Joseph, Missouri, (iii) Coastal Particulate Matter less than 10 microns (PM10) Short Term Emission Reduction Credits, (iv) real property in Fresno, California, (v) a sawmill business in Homerville, GA, (vi) real property in New Richmond, Quebec, Canada; (vii) real property in Portage-du-Fort, Quebec, Canada, (viii) real property in Edmonton, Alberta, Canada, (ix) real property in Bathurst, New Brunswick, Canada, and (x) real property in Whitby, Ontario, Canada. The Debtors are in the process of obtaining authority from the Bankruptcy Court to sell real property in Murfreesboro, Tennessee pursuant to these procedures.

### 6.     Ontonagon, MI and Missoula, MT Mill Closures.

In December, 2009, the Debtors announced they would be closing their medium mill in Ontonagon, Michigan (the "Ontonagon Mill") and their linerboard mill in Missoula, Montana (the "Missoula Mill"), effective as of the end of 2009. The Ontonagon Mill was already temporarily shut down at the time of the announcement, and the Missoula Mill ceased production in early January. In the weeks following the announcement of the Ontonagon Mill closure, the Bankruptcy Court received several hundred letters from employees, Ontonagon residents and government officials regarding the closure and expressing concern over the economic and environmental ramifications of the closure, and the possibilities for future use of the remaining land and structure.

The Ontonagon Mill and Missoula Mill closures were ordinary course transactions which did not require Bankruptcy Court approval. However, in response to the numerous letters received, on January 14, 2010, a status conference was held regarding the Ontonagon Mill closure. At the status conference, the Debtors explained that during the course of the chapter 11 cases, the Debtors conducted a series of successive temporary mill shutdowns, including at the Ontonagon Mill. As part of this overall strategy, the Ontonagon Mill was shut down for a significant portion of 2009. The Ontonagon Mill and the Missoula Mill were two of the highest cost mills in the Debtors' system. The Debtors, after exercising their business judgment, determined that it was in the best interests of the Debtors' estates that the Ontonagon Mill and the Missoula Mill be permanently closed because of the significant positive impact of such closures on future earnings, which are incorporated into the Debtors' Projections set forth in this Disclosure Statement. The Committee concurred that the closures were an appropriate exercise of the Debtors' business judgment. The Debtors will continue to consider and explore alternative transactions with respect to the Ontonagon Mill and the Missoula Mill post confirmation of the Plan. The Committee supports the Debtors' efforts to explore alternative transactions. The Debtors do not believe that the sale of either facility is critical to the Plan.

The Debtors have worked closely with the Michigan and Montana environmental regulatory agencies since officially announcing the closures of these mills. The Debtors have developed plans to ensure that all measures were taken so that no adverse environmental consequences result from the closures, and are in the process of completing all necessary activities in that regard.

In addition to discussions with the environmental regulators the Debtors have had conversations with various federal, state and local elected officials in both Michigan and Montana to ensure that full information was provided regarding the closure.  The Debtors also conducted negotiations with the United Steelworkers Union regarding closure, ultimately reaching an agreement regarding severance and other benefits at both facilities.

The Debtors received disclosure statement objections from the County of Ontonagon, Township of Ontonagon and Village of Ontonagon [Docket No. 4224], The Flower Garden, LLC [Docket No. 4264], Aspirus Ontonagon Hospital [Docket No. 4404] and Ontonagon County Historical Society regarding the closure of the Ontonagon Mill.  Furthermore, the Debtors received an objection from the Missoula Area Economic Development Corporation [Docket No. 4376], which was joined by the Attorney General of the State of Montana [Docket No. 4403] and a number of letters from Missoula-area citizens regarding the closure of the Missoula Mill.  These objections and letters generally requested that the Debtors provide their creditors with fulsome information regarding the decision to close the Ontonagon Mill and the Missoula Mill.  The Debtors have inserted this section IV.G.6 in response to these objections.

### 7.   5. Hodge Trustee's Motion for Payment of Administrative Expenses and Disclosure Statement Objection.

On April 24, 2009, U.S. Bank Trust National Association, as Indenture Trustee (the "Hodge Trustee") for the Village of Hodge Louisiana Combined Utility System Bonds filed a motion (the "Hodge Admin Motion") seeking entry of an order (i) allowing an administrative expense priority claim against SSCE's estate in the amount of not less than $17,599,249.23; and (ii) compelling the Debtors to immediately pay the outstanding obligations due and owing associated with the administrative expense claim.

The Debtors operate a paper manufacturing facility located in Hodge, Louisiana (the "Hodge Mill").  In connection with the manufacturing operations of the Hodge Mill, the Debtors use large amounts of electricity, steam, water, and treatment and disposal services for sewage and industrial waste (the "Contract Services").  The Debtors receive the Contract Services pursuant to the terms of a Utility Contract dated as of March 1, 1972, by and between SSCE and the Village of Hodge, as amended on January 1, 1990, and December 1, 2003 (the "Utility Contract").  In consideration offor receiving the Contract Services, the Debtors are required to pay the Village of Hodge the amounts set forth underin the Utility Contract.  The Hodge Trustee asserts that the Debtors have refused to pay the amounts that have come due after the Petition Date under the Utility Contract.

On May 14, 2009, the Debtors filed an opposition to the Hodge Trustee'sAdmin Motion.  The Debtors submit that the Debtors have continuedbelieve they have paid and continue to pay all of the costs relating to the actual operation and maintenance of the utility facilities.  The Debtors have not paid the debtor service portions of the utility contract that are for the benefit of the bondholders certain of the obligations owed under the Utility Contract , because the Debtors believe that such amounts are not administrative expenses and do not benefit the estate.  The Hodge Trustee disputes the contentions of the Debtors.  The Bankruptcy Court entered a Scheduling Order applying to this contested matterthe Hodge Admin Motion on July 7, 2009.  On November 13, 2009, the Debtors filed a motion for summary judgment on this matter.  On

81

November 23, 2009, the Hodge Trustee filed a cross-motion for summary judgment ~~on this matter~~. On December 2, 2009, the Bankruptcy Court entered an Agreed Revised Scheduling Order ~~with respect to this matter~~.  On December 8, 2009 the Debtors filed a brief opposing the Hodge Trustee's cross-motion for summary judgment and in support of their brief for summary judgment. On December 15, 2009, the Hodge Trustee filed a reply brief in further support of its cross-motion for summary judgment.  A hearing on the parties' cross-motions for summary judgment ~~will be~~was conducted on January 6, 2010.  The Bankruptcy Court has yet to issue a ruling on this matter.

On January 22, 2010, the Hodge Trustee filed an objection to the Disclosure Statement, asserting, among other things, that the Disclosure Statement lacks an adequate description of the Debtors' intention to assume or reject the Utility Contract, and fails to adequately describe how the Debtors intend to treat any potential Claims relating to the Utility Contract.  In addition, the Hodge Trustee raises certain plan confirmation objections relating to the cancellation and surrender of the Hodge Industrial Revenue Bonds and the Debtors' procedures establishing the amount of the SSCE Distribution Reserve.  The Hodge Trustee believes that such procedures impermissibly establish a cap on Disputed Claims, including contract rejection damages Claims, at an amount estimated by the Debtors.

With respect to the Hodge Trustee's request for further information regarding the Debtors' intent with respect to the Utilities Contract, the Debtors intend to reject the Utility Contract and negotiate a potential new utility agreement with the Village of Hodge.  The Hodge Trustee reserves all rights in connection with any rejection of the Utility Contract and the negotiations regarding a potential new contract.  Furthermore, the Debtors assert that any Allowed Industrial Revenue Bond Claims, including any Allowed Claims arising from the rejection of the Utility Agreement, are General Unsecured Claims against SSCE and the Debtors have modified Plan to make it clear that the Hodge Utility Bonds are not terminated or cancelled by operation of the Plan and that the Plan will not require the Hodge Utility Bonds to be surrendered .  Finally, the Debtors disagree that the Plan establishes a de facto cap on Disputed Claims.  In fact, the Plan obligates the Debtors to file a notice with the reserve amounts of any Disputed Claim if that reserve is less than the amount set forth in the underlying Proof of Claim, or for any contingent, unliquidated or disputed Claim.  Upon receipt of such notice, the Holders have an opportunity to object.  Only after notice and a failure to object would the Disputed Claim be "capped" at that amount.  To resolve this issue the Debtors agree that to the extent that any claim asserted by the Hodge Trustee is a Disputed Claim (the "Hodge Disputed Claim") and the Debtors and the Hodge Trustee dispute the estimation of such Disputed Claim for purposes of the SSCE Distribution Reserve, and such dispute is not resolved prior to the Effective Date, then for purposes of the SSCE Distribution Reserve the Hodge Disputed Claim shall be estimated at the  amount stated in the Hodge Trustee's proof of claim, or an amount set by order of this Court entered on or prior to the Effective Date (the "Reserved Hodge Disputed Claim Amount"); provided however, that the Reserved Hodge Disputed Claim Amount may be adjusted based upon a subsequent order  of this Court.

## 8. ~~6.~~ Georgia Pacific Litigation.

On July 23, 2008, Georgia-Pacific Corrugated I, LLC and GNN Investor, LLC (collectively "Georgia-Pacific") and SSCE entered into a purchase agreement wherein SSCE agreed to purchase and Georgia-Pacific agreed to sell that certain parcel of real property located at 210 Grove Street, Franklin, Norfolk County, Massachusetts and certain personal property associated therewith for a purchase price of $15 million. In connection with that purchase agreement, SSCE entered into an escrow agreement and deposited $1 million with Land America Title Insurance Company as earnest money to be applied against the agreed purchase price at closing. Georgia-Pacific and SSCE never closed the contemplated transaction.

On January 15, 2009, Georgia-Pacific filed a complaint for breach of contract in the Superior Court of Fulton County, Georgia against SSCE in the action styled *Georgia Pacific Corrugated I, LLC et al. v. Smurfit-Stone Container Enterprises, Inc.*, Civil Action No., 2009 CV 163117. Subsequent to the Petition Date, on May 4, 2009, an order was entered staying the action pending in state court. On June 1, 2009, Georgia-Pacific instituted an adversary proceeding in this Bankruptcy Court by filing a complaint for breach of contract and seeking declaratory and injunctive relief against SSCE. On September 11, 2009, SSCE filed a motion seeking the Bankruptcy Court's approval of the settlement agreement reached between Georgia-Pacific and SSCE. The settlement agreement provided that the parties would direct the escrow agent to disburse $700,000 of the $1 million to Georgia-Pacific and to disburse the remaining funds, including any accrued interest, to SSCE. The settlement agreement shall not constitute an admission of liability as to the facts alleged in the actions or an admission as to whether the funds held in escrow were property of the estate. Furthermore, the settlement agreement provides that Georgia-Pacific and SSCE agree that after the funds are disbursed, any and all claims arising from the purchase agreement , escrow agreement, and settlement agreement will be waived and released, provided, however, that the settlement agreement should not be interpreted to waive, release, or settle any other claims between or among Georgia-Pacific and Smurfit. The action pending in state court and the adversary proceeding will be dismissed with prejudice. The Bankruptcy Court approved the Georgia-Pacific and SSCE settlement agreement in an order entered on October 13, 2009.

## 9. ~~7.~~ i2i Europe, ltd. Adversary Proceeding.

i2i Europe, ltd. ("i2i Europe") is a United Kingdom corporation that operates a design center in United Kingdom, and is a joint venture between SSCE and Weedon Holdings Ltd. ("Weedon Holdings"). i2i Europe was formed on October 24, 2005, by the execution of three agreements: the Shareholders Agreement, Sales Broker Agreement and Noncompetition Agreement, each of which is governed by English law.

On September 11, 2009, the Debtors filed the Thirteenth Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code (the "Rejection Motion"), formally seeking to reject the Noncompetition Agreement and Sales Broker Agreement. i2i Europe filed an objection to the Rejection Motion on September 23, 2009. On the same day, i2i Europe initiated an adversary proceeding by filing a complaint seeking entry of an order enjoining SSCE from soliciting i2i Europe's customers and misappropriating trade secret information in alleged

83

violation of the Noncompetition Agreement. i2i Europe also filed a motion seeking entry of a temporary restraining order and preliminary injunction enjoining SSCE from soliciting i2i Europe's customers and misappropriating trade secret information.

On October 5, 2009, SSCE filed a motion seeking authority pursuant to section 554(a) of the Bankruptcy Code for SSCE to abandon SSCE's shares of i2i Europe (the "Abandonment Motion"). i2i Europe objected to the Abandonment Motion on October 15, 2009. At the October 20, 2009 hearing, the Bankruptcy Court adjourned the matter until a hearing on October 27, 2009.

At the October 27, 2009 hearing, the Court entered an order approving the terms of a settlement agreement between the Debtors and i2i Europe. The result of such settlement agreement, generally, was that the Debtors transferred their ownership interest in i2i Europe to Weedon Holdings in addition to paying Weedon Holdings $290,000. Simultaneously, Weedon Holdings paid $45,000 to an Asian subsidiary of SSCE to settle ordinary course business balances. Finally, all agreements among and between the Debtors, i2i Europe and Weedon Holdings were terminated and all pleadings in the Bankruptcy Court related to such agreements and parties were withdrawn.

**10. 8. Caspian Capital Advisors' Motion for Appointment of Official Committee of Equity Security Holders.**

Caspian Capital Advisors ("Caspian") filed a motion for an order appointing an official committee of equity security holders (an "Equity Committee") of SSCC (the "Equity Committee Motion") on August 20, 2009. The Equity Committee Motion followed a letter dated August 7, 2009, that Caspian sent to the U.S. Trustee requesting the appointment of an Equity Committee. In the Equity Committee Motion, Caspian asserted that it was an investment manager on behalf of certain entities and currently held shares of SSCC in excess of fourteen percent (14%) of the issued and outstanding 7% Series A Preferred Stock of SSCC. Caspian argued that the shareholders of SSCC will not be adequately represented in the Debtors' Chapter 11 Cases without the appointment of an official committee. Caspian further argued that the Debtors' financial outlook was improving, that the common stock and preferred stock of SSCC were widely held and actively traded, that the complexity of the Chapter 11 Cases warranted the appointment of an Equity Committee, that the request was timely, and that the need for adequate representation of shareholders outweighed the costs associated with an official Equity Committee. Fiduciary Counselors Inc. filed a joinder to the Equity Committee Motion on September 21, 2009. On September 28, 2009, Smith Management LLC filed a statement in support of the Equity Committee Motion.

The Debtors, the Committee, and the U.S. Trustee each filed objections to the Equity Committee Motion. The Debtors argued Caspian failed to establish that there was a substantial likelihood that the equity holders would receive a meaningful distribution or that equity holders' interests were not represented without an official equity committee. Furthermore, the Debtors argued that the significant costs associated with an official Equity Committee would not justify the minimal benefit, if any, in appointing an Equity Committee. Mariner Investment Group, LLC filed a reply to the objections of the U.S. Trustee, the Committee, and the Debtors, and the Bankruptcy Court held a hearing on the Equity Committee Motion on September 30, 2009. The Bankruptcy Court held that the moving parties had not met the heavy burden required to

demonstrate the need to appoint an Equity Committee, but the Bankruptcy Court adjourned the matter until the December 4, 2009 hearing to allow for a more substantive hearing.

After further briefing, and submission by Caspian of the report of Moelis & Company (the "Moelis Report") and by the Debtors of the rebuttal report of Lazard in opposition to the Equity Committee Motion (the "Lazard Report"), on December 4, 2009, the Bankruptcy Court heard further oral arguments on this matter. On December 10, 2009, the Bankruptcy Court entered a memorandum order denying the relief requested in the Equity Committee Motion (the "Equity Order"). In the Equity Order, the Court found the aggregate secured and unsecured Claims in the Proceedings to total at least $5.627 billion, and cited the "comparable company" and "precedent transaction" analyses in the Lazard Report in finding that the estimated range of values for the Debtors "falls (at best) between $700 million and $900 million short of the point at which distributable value is likely to be available for shareholders."

~~9.      Stone FinCo II Motion.~~

**11.      7.375% Notes Due 2014 and Related Claims and Pleadings.**

(a)      Stone FinCo II Claims

One of the five series of Prepetition Notes described in Section III.E.2 above – the 7.375% unsecured notes in the aggregate principal amount of $200 million, due on July 15, 2014 (the "7.375% Notes Due 2014") – were issued by Stone FinCo II and were guaranteed by SSCE (the "SSCE Guarantee"). The holders of the Stone FinCo II Notes (the "Stone FinCo II Noteholders") therefore have direct claims against both Stone FinCo II and SSCE.

Section 3.3.5(e) of the Plan provides for the Allowance of the direct claims of the Stone FinCo II Noteholders against SSCE in the amount of $200 million (plus any accrued but unpaid interest thereon as of the Petition Date). This Allowed Claim will give the Stone FinCo II Noteholders their Pro Rata Share of the New SSCC Common Stock Pool – the same distribution that all of the other holders of Prepetition Notes will receive under the Plan. Such distribution will give the Stone FinCo II Noteholders a recovery of approximately 64-71% based upon the Debtors' recovery estimates.

Section 3.11.3(d) of the Plan provides for the Allowance of the direct claims of the Stone FinCo II Noteholders against Stone FinCo II in the amount of $200 million (plus any accrued but unpaid interest thereon as of the Petition Date). The Stone FinCo II Noteholders are the only known holders of General Unsecured Claims against Stone FinCo II. The Stone FinCo II Noteholders would therefore share Pro Rata with holders of Intercompany Claims any assets of Stone FinCo II remaining after the payment of any priority and secured claims against Stone FinCo II. The Debtors do not anticipate that any significant priority or secured claims will be allowed against Stone FinCo II.

*Assets of Stone FinCo II*

Stone FinCo II has two potential assets, both of which are Intercompany Claims. The Stone FinCo II Contribution Claim is a potential Intercompany Claim against SSCE, and the Stone FinCo II Intercompany Claim is a potential Intercompany Claim against SSC Canada. As detailed

in Section IV.G.11(b), two Stone FinCo II Noteholders – Aurelius Capital Management, LP ("Aurelius") and Columbus Hill Capital Management, L.P. ("Columbus Hill") – have engaged in extensive litigation in both the U.S. Bankruptcy Court and the Canadian Bankruptcy Court in connection with these two claims.

The Stone FinCo II Contribution Claim is based upon Stone FinCo II's status as an unlimited liability company incorporated under the *Companies Act (Nova Scotia)* and SSCE's status as the sole member of Stone FinCo II.  Aurelius and Columbus Hill have asserted that notwithstanding the SSCE Guarantee and the distribution to be made directly by SSCE to the Stone FinCo II Noteholders on account thereof, SSCE is obligated under the *Companies Act (Nova Scotia)* to make a further contribution of funds to Stone FinCo II to fully satisfy the obligations of Stone FinCo II (i.e., Stone FinCo II's obligations to the Stone FinCo II Noteholders).  This obligation of SSCE, if any, would be an unsecured obligation of SSCE.  Therefore, if Allowed, the Stone FinCo II Contribution Claim would entitle Stone FinCo II to a Pro Rata Share of the New SSCC Common Stock Pool.  See § 3.3.6 of the Plan.  Such Pro Rata Share of the New SSCC Common Stock Pool would, in turn, be distributed to the Stone FinCo II Noteholders.  See § 3.11.3 of the Plan.

The Stone FinCo II Intercompany Claim against SSC Canada arises under a loan agreement between Stone FinCo II and SSC Canada pursuant to which Stone FinCo II advanced $200 million to SSC Canada.  As detailed in Section IV.G.11(b) below, issues surrounding the Stone FinCo II Intercompany Claim have been extensively litigated before the Canadian Bankruptcy Court and a ruling is pending.  In that litigation, SSC Canada took the position that the Stone FinCo II Intercompany Claim should be treated as equity rather than debt because, among other reasons, the terms of the Loan Agreement require repayment in equity upon an event of default.  Aurelius, Columbus Hill and the indenture trustee for the Stone FinCo II Notes took the position that the Stone FinCo II Intercompany Claim should properly be classified as debt and cited facts that allegedly supported such a classification.  The Plan will recognize the ruling of the Canadian Bankruptcy Court regarding the Stone FinCo II Intercompany Claim and will treat the Stone FinCo II Intercompany Claim in accordance with such ruling. See § 3.8.6 of the Plan.

Aurelius and Columbus Hill have also asserted in various pleadings that the Debtors and their directors and officers have violated their fiduciary duties in connection with the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim.  The Debtors believe that these assertions completely lack merit.  Further information regarding the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim can be found in various pleadings filed in the Canadian Bankruptcy Court (available on the Monitor's website) and the Bankruptcy Court.[29]

*Treatment of the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim Under the Plan*

Potential Settlement Distribution.  The Plan provides for a potential settlement of all Intercompany Claims held by Stone FinCo II, including the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim.  Section 3.11.3 provides that the Stone FinCo II General Unsecured Claims Class (comprised entirely of the Stone FinCo II Noteholders) can settle

---

[29] See, e.g., Docket Nos. 4003, 4092, 4107 and 4350.

all of Stone FinCo II's Intercompany Claims in return for a distribution of $[_____] in cash by accepting the Plan. Such distribution would be in addition to Stone FinCo II Noteholders' Pro Rata Share of the New SSCC Common Stock Pool on account of the SSCE Guarantee. However, the Plan further provides that this settlement will no longer be offered in the event that the Canadian Bankruptcy Court rules that the Stone FinCo II Intercompany Claim should be treated as equity rather than debt.

Potential Recovery Scenarios If No Settlement. Absent the settlement described in the preceding paragraph, the Stone FinCo II Noteholders (in addition to the direct recovery from SSCE on account of the SSCE Guarantee) and the holders of Intercompany Claims against Stone FinCo II will share Pro Rata any proceeds received by Stone FinCo II on account of the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim (after satisfaction of any priority and secured claims against Stone FinCo II).

(1) If the Canadian Bankruptcy Court rules that the Stone FinCo II Intercompany Claim should be treated as equity, not debt, then Stone FinCo II will not receive any distribution from SSC Canada on account of such equity interest. In the event that the Canadian Bankruptcy Court has not ruled prior to the Confirmation Hearing that the Stone FinCo II Intercompany Claim should be treated as equity, then either (a) there shall be a determination made by the Canadian Bankruptcy Court and the Bankruptcy Court at the Confirmation hearing that the value of the secured claims against SSC Canada exceeds the value of the property of SSC Canada, thereby entitling Stone FinCo II to no distribution on account of the Stone FinCo II Intercompany Claim, or (b) if no such determination is made, then the Plan of SSC Canada may nevertheless be confirmed and the validity of the Stone FinCo II Intercompany Claim and any entitlement (if any) on account of such claim shall be resolved post-Effective Date. If the Canadian Bankruptcy Court subsequently determines that the Stone FinCo II Intercompany Claim should be treated as debt and the Canadian Bankruptcy Court further determines that a distribution should be made on account of such claim, such distribution shall be paid by SSC Canada and/or Reorganized SSCE.

(2) If the Bankruptcy Court rules that the Stone FinCo II Contribution Claim is an Allowed Claim against SSCE, then Stone FinCo II will receive a Pro Rata Share of the New SSCC Common Stock Pool based upon the Allowed amount of the Stone FinCo II Contribution Claim. If the Bankruptcy Court rules that the Stone FinCo II Contribution Claim is not an Allowed Claim, then Stone FinCo II will receive nothing on account of such claim. In the event the Bankruptcy Court has not ruled on the Stone FinCo II Contribution Claim in advance of the Confirmation Hearing, then the Plan shall nevertheless be confirmed and the validity of the Stone FinCo II Contribution Claim shall be determined post-Effective Date and the Debtors shall reserve New SSCC Common Stock on account of such claim in accordance with Article VIII of the Plan.

The rulings on the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim could impact the other unsecured creditors at SSCE and SSC Canada, respectively. For example, a ruling that either such claim is an Allowed Claim would increase the unsecured claims pools at SSCE or SSC Canada, as applicable, and could result in a corresponding dilution of recoveries to unsecured creditors of the applicable Debtor. However, the maximum

aggregate recovery that the Stone FinCo II Noteholders could receive on account of all claims is payment in full under the Stone FinCo II Notes and thus the maximum dilution that could occur would be limited to the difference between (a) payment in full of the principal amount of the Stone FinCo II Notes (plus any accrued but unpaid interest thereon as of the Petition Date) and (b) the value received by the Stone FinCo II Noteholders on account of the SSCE Guarantee.

*Aurelius and Columbus Hill*

As noted above, Aurelius and Columbus Hill are the two Stone FinCo II Noteholders that have been involved in the litigation surrounding the Stone FinCo II Contribution Claim, the Stone FinCo II Intercompany Claim and related issues.

(b)     Stone FinCo II Fund Managers' Pleadings

On October 7, 2009, Aurelius Capital Management, LP and Columbus Hill Capital Management, L.P., fund managers for funds holding a majority of the 7 3/87.375% Notes Due 2014 (together, the "Stone FinanceFinCo II Fund Managers"), brought a motion before the Canadian Bankruptcy Court with the support of the indenture trustee, M&T.  Referencing (amongst other things) the fact that the proceeds of the issuance of the 7 3/8% Notes were advanced to SSC Canada pursuant to an intercompany loan agreement dated July 20, 2004, the Stone Finance II Fund Managers soughtseeking, among other things, an order: (a) declaring that the interests of the officers and directors of Stone FinCo II, the Canadian Monitor and counsel to the Canadian Debtors conflict irreconcilably with the interests of Stone FinCo II; (b) declaring that counsel to the Canadian Debtors cannotcould not continue to act for Stone FinCo II; (c) directing the officers and directors of Stone FinCo II to file an assignment in bankruptcy under the *Bankruptcy and Insolvency Act,* R.S.C. 1985, c. B-3, as amended, in respect of Stone FinCo II; and (d) discharging the Canadian Monitor vis-à-vis Stone FinCo II.  This motion was supported by M&T, the indenture trustee for the 7.375% Notes Due 2014.

The Canadian Debtors opposed the motion with the support of the Canadian Monitor and the Committee and, on October 20, 2009, the Canadian Bankruptcy Court released its endorsement, dismissing the motion.  In its endorsement, the Canadian Bankruptcy Court directedinvited the parties to address the issue of the proper characterization of Stone FinCo II's intercompany claim against SSC Canada.  TheSSC Canada and the other Applicants subsequently brought a motion to resolve the characterization and amount of the Stone FinCo II intercompany claim, which the Canadian Bankruptcy Court heard on December 11, 2009, and which relief2009. The motion was supported by the Canadian Monitor and the Committee and opposed by the Stone FinCo II Fund Managers and M&T.  The Canadian Bankruptcy Court's decision on the Applicants' motion is currently under reserve. has taken the matter under advisement and a ruling is pending.

As discussed in more detail below in Section IV.H.4., the Stone FinCo II Fund Managers filed an objection to the Debtors' motion, filed on December 28, 2009, seeking an extension of the exclusive periods within which the Debtors may file a Chapter 11 plan and solicit acceptances of such plan.  On January 14, 2010, the Bankruptcy Court overruled this objection and entered an order extending the Debtors' exclusive periods.  On January 12, 2010, the Stone Finance II Fund Managers filed a motion to convert the chapter 11 case of Stone FinCo II to a case under chapter 7

88

of the Bankruptcy Code.  The motion to convert was originally scheduled to be heard on January 29, 2010.  At a teleconference on January 26, 2010, the Bankruptcy Court scheduled the motion for hearing on February 22, 2010.  On January 22, 2010, the Stone FinCo II Fund Managers filed a request for adjournment of the hearing on the Disclosure Statement, which request was subsequently withdrawn.

On January 21, 2010, the Stone FinCo II Fund Managers filed an objection to the Disclosure Statement (the "Fund Managers' DS Objection").[30]  The Fund Managers' DS Objection asserts that the Disclosure Statement lacks adequate information in certain areas.  The Debtors have responded to certain of those assertions by providing the additional information set forth above in Section IV.G.11(a), "Stone FinCo II Claims."

In addition to these requests for further information which the Debtors have address herein, the Fund Managers' DS Objection also asserts that the Plan is patently unconfirmable as to Stone FinCo II, and that the Debtors should not be able to solicit votes on such Plan until such infirmities are remedied.  The Stone FinCo II Fund Managers believe that the Stone FinCo II Plan cannot be confirmed for the following reasons:

- The Plan was not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.  The Debtors disagree with this assertion, and believe that the Plan is the product of arm's length, good faith negotiations and thus satisfies 1129(a)(3).

- The Plan does not disclose the proposed officers and directors for the reorganized Debtor after the Effective Date, and thus violates section 1129(a)(5) of the Bankruptcy Code.  Such information will be provided in the Plan Supplement, which shall be filed ten (10) days prior to the Voting Deadline, and thus 1129(a)(5) will not prohibit confirmation of the Plan.

- The Plan violates the "best interests" test under section 1129(a)(7) of the Bankruptcy Code because, the Stone Finance II Fund Managers believe, the creditors of Stone FinCo II would receive a greater recovery on their claims in a liquidation than under the Plan.  The Debtors disagree, and believe that the Liquidation Analysis attached hereto as Exhibit D reflects the Plan's compliance under 1129(a)(7).

- There will not be a non-insider, impaired voting Class that votes to accept the Plan, and thus the Debtors will be unable to satisfy section 1129(a)(10).  This is a plan confirmation objection and may be moot after solicitation on the Plan has been completed.

- The Debtors will be unable to "cram down" the dissenting Classes of Stone FinCo II claims because the Plan unfairly discriminates and is not fair and equitable as required by section 1129(b) of the Bankruptcy Code.  Whether these classes will

[30] In addition, M&T filed an objection to the Disclosure Statement, joining in the Fund Manager' DS Objection.  The Debtors believe that their added disclosure related to the Fund Managers' DS Objection adequately addresses the M&T DS Objection as well.

CH1 5118435168368v.41

need to be crammed down can only be determined after solicitation on the Plan is complete and in any event the Debtors believe that they will be able to satisfy 1129(b) if necessary.

- The Plan incorporates impermissible discharge, release, injunction and exculpation provisions. The Debtors believe that such provisions are appropriate under applicable law and are prepared to make that showing at the Plan confirmation hearing. The Debtors therefore do not believe that such provisions will have any impact on their ability to confirm the Plan.

More information regarding the Fund Managers' likely objections to the Plan can be found in the Fund Managers' DS Objection. [See Docket No. 4286]. The Debtors do not believe any of the Fund Managers' objections will render the Plan unconfirmable or present any roadblock to confirmation of the Plan. Although the Stone FinCo II Fund Managers stated at a January 26, 2010 teleconference that they would not raise their "patently unconfirmable" argument at the January 29, 2010 Disclosure Statement hearing, if necessary, the Debtors will be prepared to successfully address each of the foregoing at the Plan confirmation hearing.

### 12.   10.   Motions to Lift or Modify the Automatic Stay.

Numerous motions have been filed seeking to lift or modify the automatic stay under section 362 of the Bankruptcy Code. Movants have sought to modify the automatic stay for reasons consisting of, but not limited to, continuing pre-petition litigation outside of the Bankruptcy Court, filing actions in state court to perfect pre-petition mechanics' liens, compelling the Debtors to assume or reject executory contracts and effectuating setoffs of pre-petition payables and receivables. The Debtors have generally cooperated with movants in stipulating to mutually agreeable orders allowing limited relief from the automatic stay in these matters. In a few instances, automatic stay lift motions have been withdrawn without the need for stipulation by the Debtors.

### 13.   Approval of the Exit Term Loan Facility Arrangement Motion.

On January 2, 2010, the Debtors filed a motion seeking authority to (i) enter into an exit term loan facility Engagement and Arrangement Letter (the "Arrangement Letter") and Arrangement Fee Letter (the "Arrangement Fee Letter"), (ii) pay associated fees and expenses, and (iii) furnish related indemnities (the "Exit Term Loan Facility Arrangement Motion"). The Arrangement Fee Letter was filed with the Exit Term Loan Facility Arrangement Motion and the Fee Letter was filed under seal. The Bankruptcy Court approved the Exit Term Loan Facility Arrangement Motion on January 14, 2010.

On January 12, 2010, the Debtors filed a term sheet (the "Term Sheet") containing the anticipated terms of the Exit Term Loan Facility [Docket No. 4097]. Although the terms contained in the Term Sheet are not definitive, various key terms are summarized below:

- SSCE will be the borrower under the Exit Term Loan Facility, which will be a 6-year senior secured term loan facility in an aggregate principal amount of $1.2 billion.

Case: 1:10-Case 09-11236-BLS #: Doc 56-44SEALED Filed 06/27/2019 Page 091 of 278281 PageID
Case: 15-2385    Document: 56-2#:19404    Filed: 10/27/2015    Pages: 547

- The Exit Term Loan Facility will be arranged by J.P. Morgan Securities Inc., Deutsche Bank Securities Inc. and Banc of America Securities LLC, with JPMorgan Chase Bank, N.A. as the administrative agent and Deutsche Bank Securities Inc. as the syndication agent.

- The term loans made under the Exit Term Loan Facility (the "Term Loans") will be repayable in equal quarterly installments of 25 basis points for five years and nine months in an aggregate amount equal to 1.0% annually of its original principal amount, with the balance payable at maturity.

- The Exit Term Loan Facility will be guaranteed by each existing and future direct and indirect domestic Material Subsidiary (as defined in the Term Sheet).

- Interest on the Term Loans will accrue on a per annum basis, at the option of the company, at (i) up to the LIBOR rate (for the applicable interest period, subject to a floor of 2.00%) plus 5.00% or (ii) up to the ABR rate (highest of the prime rate, the federal funds rate plus 0.5% and the one month Libor rate plus 1.00%, subject to a floor of 3.00%) plus 4.00%.

- The Term Loans (together with cash management services and designated hedging obligations) will be secured by (a) a first priority lien on substantially all assets of the company and each domestic Material Subsidiary (other than accounts receivable, inventory and related assets) and a pledge of capital stock of all Material Subsidiaries (limited to 65% in the case of first-tier foreign subsidiaries) and (b) a second priority lien on the accounts receivable, inventory and related assets of the company and each domestic Material Subsidiary.

The Debtors expect to return to the Bankruptcy Court and seek authority to execute the definitive documents for the Exit Term Loan Facility in February, 2010.

In their objection to the Disclosure Statement, Mariner Investment Group LLC and Senator Investment Group LP asserted that this Disclosure Statement contains no discussion of the risk that the Debtors will be unable to secure exit financing on terms that will enable them to operate outside of bankruptcy. The Debtors do not believe there is a material risk that they will be unable to secure exit financing on acceptable terms.

**H.    Administrative Matters in the Proceedings.**

**1.    Schedules of Assets and Liabilities; Statements of Financial Affairs.**

On April 6, 2009, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with respect to each of the Debtors. Among other things, the Debtors' Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such Claims. The Debtors' Statements provide information including, among other things, payments or other transfers of property made by the Debtors to creditors on or within 90 days before the Petition Date or, in the case of "insiders", payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

91

CH1 5118439 5168368v.4 1

On August 26, 2009, SSCE filed its amended Schedule F to its Schedules [Docket No. 1765], which lists creditors holding unsecured nonpriority claims. On October 10, 2009, SSCC, SSC Canada and Calpine Corrugated, LLC each filed an amended Schedule F to the Schedules [Docket Nos. 2214, 2217 and 2216, respectively]. On October 15, 2009, SSCE again filed an amended Schedule F to its Schedules [Docket No. 2313].

### 2.    Filing Claims and Bar Date.

On June 12, 2009, the Debtors filed the Motion of the Debtors for an Order Pursuant to Bankruptcy Rule 3003(c)(3), and Local Rule 2002-1(e) Establishing Certain Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Motion"). In the Bar Date Motion, the Debtors requested that the Bankruptcy Court establish certain deadlines for filing Proofs of Claim (as defined in the Bar Date Motion). Specifically, the Debtors requested that the Bankruptcy Court (i) establish August 28, 2009, at 4:00 p.m. (prevailing Eastern Time) (the "Bar Date") as the deadline for all persons and entities, including governmental units (as such term is defined in the Bankruptcy Code) holding a claim against any of the Debtors to file a proof of such claim in the Chapter 11 Cases, except as otherwise provided in the Bar Date Motion; (ii) except where a claim has previously been included in the Schedules (as defined in the Bar Date Motion) as disputed, contingent, or unliquidated, establish the later of (a) the Bar Date or (b) twenty (20) days after the holder of such claim is served with notice of the applicable amendment or supplement to the Schedules as the bar date for filing a Proof of Claim with respect to such amended claim; and (iii) except as otherwise set forth in any order authorizing rejection of an executory contract or unexpired lease, establish the later of (y) the Bar Date or (z) thirty (30) days after the entry of any order authorizing the rejection of an executory contract or unexpired lease, as the bar date by which a Proof of Claim for any damages resulting from the Debtors' rejection of such executory contract or unexpired lease must be filed.

The Bankruptcy Court approved the Bar Date Motion on June 22, 2009, and set August 28, 2009 at 4:00 p.m. prevailing Eastern Time as the Bar Date for filing proofs of claim against the Debtors in the Chapter 11 Cases on account of claims arising, or deemed to have arisen pursuant to section 501(d) of the Bankruptcy Code, prior to the Petition Date (the "Pre-petition Claims"). Each person or entity asserting a Pre-petition Claim against one or more of the Debtors was required to file a separate proof of claim that substantially complies with Official Bankruptcy Form 10 against each such Debtor so as to be actually received on or before the Bar Date by Epiq Bankruptcy Solutions, LLC; provided, however, proofs of claim filed against Canadian Debtors were accepted and considered timely in the Chapter 11 Cases if received by the CCAA Monitor prior to the expiration of the Canadian Bar Date (as defined below), and pursuant to the claims procedures established in the CCAA Proceedings.

On June 25, 2009, the Canadian Bankruptcy Court issued an order approving certain notice procedures and procedures for filing proofs of claim against the Canadian Debtors (the "Canadian Claims Procedure Order"). In the Canadian Claims Procedure Order, the Canadian Bankruptcy Court set the bar date for filing proofs of claim in respect of pre-petition claims against the Canadian Debtors ("Claims") as August 28, 2009 (the "Canadian Bar Date") and the bar date for filing claims arising as a result of or in connection with the repudiation, termination or restructuring of any contract, lease or other agreement after the Petition Date ("Subsequent Claims") as the later of the Canadian Bar Date and the date established for such purpose by the

Canadian Bankruptcy Court or the Bankruptcy Court ("Canadian Subsequent Claims Bar Date"). Holders of Claims or Subsequent Claims against the Canadian Debtors must have filed their proofs of claim with the CCAA Monitor so that they are actually received by the CCAA Monitor by the Canadian Bar Date or Canadian Subsequent Claims Bar Date, as the case may be. Proofs of claim filed against the Canadian Debtors in the Chapter 11 Cases are deemed Claims or Subsequent Claims timely filed in the CCAA Proceedings ("Deemed Canadian Claims") if the proofs of claim were properly and timely filed in accordance with the procedures established for filing claims in the Chapter 11 Cases.

On November 6, 2009, the Canadian Bankruptcy Court issued an order approving certain procedures for reviewing and determining the classification and amount of Claims and Subsequent Claims (the "Canadian Claims Determination Order"). Among other things, the Canadian Claims Determination Order directs the Canadian Debtors and the CCAA Monitor to review each proof of claim and determine whether to accept, revise or disallow each Claim or Subsequent Claim in the CCAA Proceedings. Any holder of a Claim or Subsequent Claim that disputes the classification or amount of its Claim or Subsequent Claim may deliver a Notice of Dispute, at which time the Canadian Debtors and the CCAA Monitor may (a) attempt to consensually resolve the classification and amount of the Claim or Subsequent Claim, (b) send the dispute to a "Claims Officer", or (c) schedule a motion with the Canadian Bankruptcy Court to resolve the Claim or Subsequent Claim.

Despite the foregoing, the Canadian Debtors and the CCAA Monitor have the ability, subject to objection by the creditor, to elect to resolve Deemed Canadian Claims in the Chapter 11 Proceedings by objecting to the Claim or Subsequent Claim in those proceedings rather than in the CCAA Proceedings. Deemed Canadian Claims resolved in the Chapter 11 Proceedings shall be deemed to have been accepted as proven claims in the CCAA Proceedings on those terms. If the holder of a Claim or Subsequent Claim objects to the choice of forum and the issue cannot be resolved consensually, a joint hearing may be requested under the Protocol to resolve the choice of forum.

As of the Bar Date, the Debtors' Claims Agent and the CCAA Monitor received approximately 13,800 timely filed Proofs of Claim that totaled, along with the scheduled Claims against the Debtor, approximately $64 billion. However, the Debtors believe that many of the Claims filed in the Chapter 11 Cases are invalid, untimely, duplicated and/or overstated. The Debtors are in the process of evaluating the Proofs of Claim and anticipate that they will continue filing objections to many of the Proofs of Claim. The Debtors believe that, following reconciliation of filed and scheduled Claims, the estimated Allowed Amount of Claims in each Class will be as set forth in the summary chart included in Section II.B of this Disclosure Statement.

### 3.      Bankruptcy Rule 2015.3 Reports.

The Debtors are required to comply with new Bankruptcy Rule 2015.3 ("Rule 2015.3") which became effective on December 1, 2008. Pursuant to Rule 2015.3, the Debtors are required to file certain reports with the Bankruptcy Court, which provide additional financial reporting for non-Debtor entities in which the Debtors hold a "controlling or substantial" interest (the "2015.3 Reports"). The Debtors hold a direct ownership interest of at least fifty percent (50%) in nine (9)

non-debtor entities and hold direct ownership interests of between twenty percent (20%) and fifty percent (50%) in nineteen (19) non-debtor entities. Because of the nature of the Debtors' interest in these entities, compliance with Rule 2015.3 and the production of the 2015.3 Reports presented challenges to the Debtors in terms of, among other things, achieving workable reporting mechanics. On February 19, 2009, the Debtors filed a motion seeking additional time to file their initial 2015.3 Reports or seek a modification of such reporting requirements and subsequently on March 19, 2009, filed an additional motion requesting another extension of time to file their 2015.3 Reports (the "2015.3 Extension Motions"). On April 22, 2009, the Debtors filed a motion to approve a modification of the Rule 2015.3 reporting requirements. The Debtors requested that the reporting requirements be (i) modified for non-Debtor entities in which the Debtors maintained a direct ownership of at least fifty percent (50%) of the interests and (ii) waived for all other non-Debtor entities. This matter has been adjourned until the ~~January 14,~~February 16, 2010 hearing.

### 4.    Exclusivity Period.

On May 1, 2009, the Debtors filed a motion requesting an extension of the Debtors' exclusive period within which to file a chapter 11 plan and solicit acceptances thereto (the "Exclusivity Motion"). In the Exclusivity Motion, the Debtors requested an extension of the exclusivity period through and including September 23, 2009, and the extension of the exclusive right to solicit acceptance of such plan through and including November 23, 2009. By order entered May 20, 2009, the Bankruptcy Court granted the relief requested in the Exclusivity Motion.

On August 24, 2009, the Debtors filed a motion requesting a further extension of the Debtors' exclusive period within ~~in~~ which to file a chapter 11 plan and solicit acceptances thereto (the "Second Exclusivity Motion"). In the Second Exclusivity Motion, the Debtors requested an extension of the exclusivity period through and including January 21, 2010, and the extension of the exclusive right to solicit acceptance of such plan through and including March 23, 2010. On September 9, 2009, the Bankruptcy Court granted the relief requested in the Second Exclusivity Motion without prejudice to the ~~Debtor's~~Debtors' right to seek further extensions of the exclusivity period and the extension of the exclusive right to solicit acceptances of the plan. ~~The Debtors anticipate seeking a further extension of the exclusivity periods before January 21, 2010.~~

On December 28, 2009, the Debtors filed a motion requesting a further extension of the Debtors' exclusive periods within which to file a chapter 11 plan and solicit acceptances thereof (the "Third Exclusivity Motion"). In the Third Exclusivity Motion, the Debtors requested an extension of the exclusivity period through and including May 21, 2010, and the extension of the exclusive right to solicit acceptance of such plan through and including July 21, 2010. The Stone Finance II Fund Managers filed an objection to the Third Exclusivity Motion as it applied to Stone FinCo II on January 7, 2010 (the "Exclusivity Objection") and the Debtors filed a reply to the Exclusivity Objection on January 12, 2010. On January 14, 2010, the Bankruptcy Court (i) granted the relief requested in the Third Exclusivity Motion for all Debtors without prejudice to the Debtors' right to seek further extensions of the exclusivity period and the extension of the exclusive right to solicit acceptances of the plan and (ii) overruled the Exclusivity Objection.

### I.    Avoidance Actions.

Certain transactions that occurred prior to the Petition Date may have given rise to claims, including preference actions, fraudulent transfers, and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law.

### 1.    Preference Actions.

Under section 547 of the Bankruptcy Code, a debtor may seek to avoid and receive certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (i) was made when the debtor was insolvent and (ii) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code where the transfer had not been made.  Transfers made to a creditor that was not an "insider" of the debtor are subject to these provisions generally only if the payment was made within 90 days prior to the debtor's filing a petition under chapter 11 of the Bankruptcy Code (the "Preference Period").  Under section 547 of the bankruptcy Code, certain defenses, in addition to the solvency of the debtor at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought.  Among other defenses, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor.  The debtor has the initial burden of demonstrating the existence of all the elements of a preference and is presumed to be insolvent during the Preference Period.  The creditor has the initial burden of proof as to the aforementioned defenses.

### 2.    Fraudulent Transfer and Conveyance Actions.

Under sections 548 and 544 of the Bankruptcy Code, a debtor may seek to recover certain fraudulent transfers and conveyances.  Generally, a conveyance or transfer is fraudulent if (i) it was made with the actual intent to hinder, delay, or defraud a creditor (i.e., an intentional fraudulent conveyance or (ii) reasonably equivalent value was not received by the transferee in exchange for the transfer and (a) the debtor was insolvent at the time of the transfer, (b) was rendered insolvent as a result of the transfer or (c) was left with insufficient capitalization as a result of the transfer (i.e., a constructive fraudulent conveyance).  Two primary sources of fraudulent conveyances law exist in a chapter 11 case.

The first source of fraudulent conveyance law in a chapter 11 case is section 548 of the Bankruptcy Code under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers that were made or incurred within two years before the date the bankruptcy case was filed.

The second source of fraudulent conveyance law in a chapter 11 case is section 544 of the Bankruptcy Code – the so-called strong arm provision – under which the debtor in possession (or creditors with bankruptcy court permission) may have the rights of a creditor under state law to avoid transfers as fraudulent.  State fraudulent conveyance laws generally have statutes of limitations longer than two years and are applicable in a bankruptcy proceeding pursuant to section 544 of the Bankruptcy Code if the statute of limitations with respect to a transfer has not expired prior to the filing of the bankruptcy case.  If such statute of limitations has not yet expired, the debtor in possession (or creditors with bankruptcy court permission) may bring the fraudulent

conveyance claim within the time period permitted by section 546 of the Bankruptcy Code notwithstanding whether the statute of limitations period expires prior to the expiration of such time.

**J.      The Plan and Disclosure Statement**

On December 1, 2009, the Debtors filed their Joint Amended Plan of Reorganization for Smurfit Stone Container Corporation and its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors [Docket No. 2914] (as subsequently amended, the "Plan") and accompanying Disclosure Statement for the Plan [Docket No. 2915] (as subsequently amended, the "Disclosure Statement").  On December 22, 2009, the Debtors filed revised versions of the Plan and Disclosure Statement and the Notice of Hearing to Consider Approval of Disclosure Statement for the Plan [Docket No. 3376] (the "Disclosure Statement Hearing Notice").  The Disclosure Statement Hearing Notice was served upon all of the Debtors' creditors pursuant to Bankruptcy Rule 2002(b) on or about December 23, 2009.  The Disclosure Statement Hearing Notice set January 29, 2010 for a hearing on the Disclosure Statement, and established January 21, 2010 as the deadline to object to the Disclosure Statement.

On January 14, 2009, the Debtors filed their Motion of the Debtors for an Order (i) Approving the Disclosure Statement, (ii) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Plan of Reorganization, (iii) Scheduling a Hearing to Consider Confirmation of the Debtors' Joint Plan of Reorganization and Establishing Notice and Objection Procedures in Respect Thereof, and (iv) Granting Related Relief [Docket No. 4151] (the "Solicitation Motion").  The Solicitation Motion seeks to establish, among other things, April 14, 2010 as the date of the Confirmation Hearing.  The Solicitation Motion will be heard at the Disclosure Statement Hearing.

The Debtors received approximately twenty-eight (28) objections and informal comments to the Disclosure Statement (the "DS Objections"), and filed their Omnibus Response to Objections to Approval of the Disclosure Statement for the Joint Plan of Reorganization Proposed by the Debtors on January 27, 2010 (the "DS Response").  The Debtors have added additional disclosures throughout this Disclosure Statement in order to address concerns raised in certain of the DS Objections.  The added disclosure, along with the corresponding DS Objections, are described in the summary chart of the DS Objections attached as Exhibit A to the DS Response.  As noted in the DS Response, the Debtors have reached agreement with many of the objecting parties on such additional language.  In instances where the Debtors and the objecting parties did not agree on the added language, the Debtors have either (a) added language that they believe provides "adequate information" as that term is defined in section 1125 of the Bankruptcy Code, or (b) discussed in the DS Response why adding add additional language is unnecessary.

In addition to the various additions throughout the Disclosure Statement, the Debtors describe some of the DS Objections and the certain concerns raised therein below.

CH1 5118439 5168368v. 4 1

**1.      Bond Safeguard Insurance Co. and Lexon Insurance Co. ("Bond Safeguard").**

Bond Safeguard asserts in its DS Objection that additional information is needed in the Disclosure Statement regarding the Debtors' intention with respect to Bond Safeguard's existing surety bonds and indemnity agreement (the "Bond Safeguard Contracts").  In response, and in satisfaction of Bond Safeguard's DS Objection, the Debtors have added the following clarifying language.  To date, one or more beneficiaries of surety bonds issued by Bond Safeguard on behalf of the Debtors (a "Bond Safeguard Bond") have drawn on such bonds, and as a result, Bond Safeguard has a Claim against the Debtors for any such drawn amounts (to the extent not otherwise satisfied).  Certain other Bond Safeguard Bonds remain outstanding.  It is possible that these outstanding Bond Safeguard Bonds may expire by their terms and/or be replaced by Bond Safeguard or another surety bond provider.  It also is possible that the beneficiaries of such outstanding Bond Safeguard Bonds may draw down on such bonds in the future, in which case Bond Safeguard's aggregate unsecured claim against the Debtors may increase.  At this time, the Debtors have not reached definitive conclusions regarding their future intentions with respect to the Bond Safeguard Contracts.

**2.      ACE American Insurance Company, Pacific Employers Insurance Company, and Possibly Other Members of the ACE Group of Companies ("ACE").**

ACE objects to, among other things, a lack of specific information regarding the Debtors' treatment of the various policies and agreements in place between the Debtors and ACE.  Pursuant to an agreement between the Debtors and ACE under which ACE will withdraw its DS Objection, the Debtors have added the following language:[31]

> Nothing in the Plan, the Confirmation Order, any Exhibit to the Plan, Plan Supplement or any other Plan document (including any provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, expanding the scope of, altering, or impairing in any respect the prepetition legal, equitable or contractual rights, obligations and defenses of the insured or insurer with respect to any of the Debtors' insurance policies and related insurance agreements under the policies, related agreements, and applicable non-bankruptcy law; and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy and related agreements.  The rights and obligations of the insured and insurer shall be determined under the insurance policies and related agreements, including all terms, conditions, limitations and exclusions thereof, which shall remain in full force and effect, and any applicable non-bankruptcy law.  To the extent that any insurance policies issued by ACE American Insurance Company, Pacific Employers Insurance Company, Zurich American Insurance Company, Travelers Insurance, their predecessors or successor in interest, or any other members of the ACE group of companies

---

[31] The Debtors also received requests from Zurich American Insurance Company and Travelers Insurance requesting that they be included in the language agreed to between the Debtors and ACE.  The Debtors agreed to add these parties to the agreed disclosure as well.

CH1 5118439 5168368 v.4 1

(collectively, the "Insurers") and/or any related agreements between the Debtors and the Insurers ("Policies and Agreements") are considered executory, they will be assumed by the Debtors and assigned to the Reorganized Debtors. Regardless of whether the Policies and Agreements are executory or not, after the Effective Date the Reorganized Debtors and the Insurers will perform their respective obligations under the Policies and Agreements including any that remain unperformed as of the Effective Date of the Plan.

**3.      Henry L. Fernandez, Jr.**

Mr. Fernandez filed a DS Objection asserting that additional disclosure is required in order for holders of workers' compensation claims against the Debtors to be able to understand how their claims will be treated under the Plan. Pursuant to the Employee Wage Motion, described above in Section IV.A.7, the Debtors have continued their workers' compensation plans in the ordinary course of business, and do not intend to affect such plans though the Plan. Further, section 1.1.106 of the Plan defines "Employee Benefit Plans" to mean "any . . . workers compensation . . . plan, agreement or arrangement for the benefit of the current or former directors, officers or employees (whether salaried or hourly, active or retired) of the applicable Debtor . . . ". Section 6.11.1 of the Plan contemplates that all of the Employees Benefit Plans will be deemed to be and treated as executory contracts and assumed by the Debtors and assigned to the Reorganized Debtors on the Effective unless otherwise rejected pursuant to the Plan. As a result, unless a specific workers' compensation plan is rejected pursuant to the Plan, the Debtors will assume such plans in accordance with the Plan, and claimants with valid workers' compensation claims under workers' compensation plans, agreements or arrangements assumed by the Debtors would receive payment of any valid claims and such claims would not be, as queried by Mr. Fernandez, Class 1D General Unsecured Claims.

**4.      The County of Ontonagon, the Township of Ontonagon and the Village of Ontonagon ("Ontonagon"), The Flower Garden, LLC ("Flower Garden"), Aspirus Ontonagon Hospital ("Aspirus"), Missoula Area Economic Development Corporation ("MAEDC") and the Attorney General of the State of Montana ("Montana").**

See the description of, and additional language addressing, the Ontonagon, Flower Garden, Aspirus, MAEDC and Montana DS Objections above in Section IV.G.7 of this Disclosure Statement.

**5.      Mariner Investment Group, LLC and Senator Investment Group LP ("Mariner").**

Mariner filed a DS Objection (the "Mariner DS Objection") listing various additional disclosures that it contends are necessary in order for the Debtors' Disclosure Statement to satisfy section 1125 of the Bankruptcy Code. The Debtors address many of Mariner's "adequate information" objections herein, including the added valuation section below in Article VIII and the added description of the Exit Facility above in Sections III.F.3 and IV.G.13. Additionally, Mariner has raised other objections which the Debtors believe are Plan confirmation issues and/or do not require additional language in the Disclosure Statement. In order to provide maximum

information to their creditors and other stakeholders, the Debtors have described the additional objections below.[32]

- Mariner does not believe that the Debtors are using current assumptions in their Projections, that such Projections are "not in line with industry analysts' and market expectations" and do not properly consider price trends, and that the Debtors' EBITDA projections likely materially understate the value of the Company because, among other reasons, the Debtors do not take into account the cyclical nature of their industry. The Debtors disagree with these assertions.

- Mariner asserts that the Debtors have undervalued their assets, and overstated their liabilities. The Debtors disagree with these assertions.

- Mariner asserts that the Debtors' description of Intercompany Claims in this Disclosure Statement and treatment under the Plan is vague, and may implicate the Debtors' ability to comply with the "best interests" test under section 1129(a)(7) of the Bankruptcy Code. The Debtors disagree with each of these assertions.

- Mariner asserts that more disclosure is needed to support the need for the proposed compensation being paid to certain of the Debtors' senior executives. The Debtors strongly believe that such compensation is warranted and that no further disclosure (except as noted in the DS Response) is required.

- Mariner asserts that the Debtors should be required to disclose any potential recoveries from retained Litigation Claims and discuss any potential value of the released Avoidance Actions. The Debtors are still determining which, if any, Litigation Claims to pursue, and have not formally determined which Avoidance Actions to release. The Debtors believe, however, that neither any retained Litigation Claims nor the potential release of Avoidance Actions will impact the zero recovery to Holders of SSCC Interests pursuant to the Plan, including Mariner.

- Mariner asserts that the releases, injunctions, exculpation and discharge provisions in the Plan are too broad and thus not permitted, and could impact the Debtors' ability to confirm their Plan. The Debtors have added language to section 10.2 of the Plan and Section V.J.2 below, further clarifying the existing opt-out provision with respect to the third-party releases, and believe that such releases are otherwise appropriate and will not interfere with their ability to confirm the Plan. To the extent necessary these issues will be addressed at the Confirmation Hearing.

- Mariner asserts that the Debtors' Plan more closely resembles a "pot plan" or a substantively consolidated plan because of features allowing the Debtors to advance funds to other Debtors, and requests additional information as of the Effective Date with respect

---

[32] This list is not meant to be exclusive, as many of the objections raised in the Mariner DS Objection have been addressed elsewhere in this Disclosure Statement or in the DS Response. The summary chart attached as Exhibit A to the DS Response contains a full description of each of Mariner's "adequate information" and plan confirmation objections in the Mariner DS Objection, and the Debtors' corresponding responses and/or additions.

to the cash balances of the Debtors.  Mariner also requests additional information  in connection with the Smurfit-Stone Container Corporation and Smurfit-Stone Container Enterprises merger.  The Debtors believe that the Plan and Disclosure Statement contain adequate information with respect to these points.  To the extent necessary, these issues will be addressed at the Confirmation Hearing.

- Mariner asserts that the Debtors will not be able to "cramdown" the Holders of SSCC Interests because, Mariner asserts, the Plan is not fair and equitable with respect to these non-accepting classes as certain creditors "will likely receive in excess of 100% recovery on account of their claim . . . ", as required by section 1129(b) of the Bankruptcy Code. Mariner also notes that the Plan is not fair and equitable because Subsidiary Interests in certain of the Debtors are being retained, while Holders of General Unsecured Claims against those Debtors will not receive any distribution.  The Debtors disagree with these contentions, and do not anticipate significant confirmation risk from having to cramdown certain Classes under section 1129(b) of the Bankruptcy Code.

## 6.     Certain Holders of Smurfit-Stone Container Corporation's Common Stock.

In addition to Mariner, a separate ad hoc group (the "Certain Holders," together with Mariner, the "Ad Hoc Committees") has filed a DS Objection objecting to, among other things, the Debtors' lack of a valuation calculating total enterprise value and the vintage of the Projected Financial Information.  As noted above, the Debtors have added a valuation section to this Disclosure Statement, thus satisfying most of the Certain Holders' DS Objection.  Similar to Mariner, the Certain Holders object to the Debtors' Projections, calling the Projections stale and in need of certain adjustments to react to industry developments.  As discussed above, the Debtors disagree that their Projected Financial Information is not current and sufficient for purposes of soliciting votes on the Plan.  The Certain Holders also believe that Debtors' valuation will be challenged at the Confirmation Hearing, and that such challenge is likely to be successful and show that the Plan provides more than a 100% recovery to the SSCE General Unsecured Claims. The Debtors disagree with this view, and any valuation objections will be heard at the Confirmation Hearing, and not in connection with the approval of this Disclosure Statement.

In addition to these "adequate information" objections in their DS Objection, the Certain Holders request additional language be added to the Disclosure Statement, Plan confirmation notice, and the notice of deemed rejecting class non-voting status.  Because the Holders of SSCC Interests will receive the notice of deemed rejecting class non-voting status, the Debtors have agreed to add certain language to the appropriate notice of deemed rejecting status that will be sent to Holders of SSCC Common Interests, on the condition that the Certain Holders provide the information required by Bankruptcy Rule 2019, although they strenuously disagree with the valuation and legal commentary contained in the proposed language (which is described in the DS Response).

## 7.     Aurelius Capital Management, LP and Columbus Hill Capital Management, L.P.

See the description of, and additional language addressing, the Fund Managers' DS Objection above in Section IV.G.11(b) of this Disclosure Statement.

**8.      U.S. Bank Trust National Association as Indenture Trustee.**

See the description of, and additional language addressing, Hodge Trustee DS Objection above in Section IV.G.7 of this Disclosure Statement.

**9.      Concrete Restoration Services Ltd. (objection filed by Specialty Construction Products Ltd.) ("Concrete Restoration").**

Concrete Restoration asserts in its DS Objection that has a registered security by way of a builder's lien.  To the extent that Concrete Restoration does, in fact, have a valid builder's lien under applicable law, Concrete Restoration's Claim shall be treated as a Other Secured Claim against the applicable Debtor under the Plan.

## V.  THE PLAN OF REORGANIZATION

The following sections describe and summarize the proposed Plan for the resolution of outstanding Claims against and Interests in the Debtors.  The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor. Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in the Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate Chapter 11 plan for each such Debtor.  The Plan shall also serve as the CCAA Plan for the Canadian Debtors in the CCAA Proceedings.

The Plan provides for the coordinated restructuring and compromise of all Claims against and Interests in the Debtors in both the Chapter 11 Cases and the CCAA Proceedings.  The effectiveness of the Plan in the Chapter 11 Cases is conditioned upon the effectiveness and implementation of the CCAA Plan in the CCAA Proceedings, and the effectiveness of the CCAA Plan in the CCAA Proceedings is conditioned upon the effectiveness and implementation of the Plan in the Chapter 11 Cases.  The Debtors will seek the confirmation of the Plan by the Bankruptcy Court and the sanction of the CCAA Plan by the Canadian Bankruptcy Court.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN.  THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.  THE BANKRUPTCY COURT AND THE CANADIAN BANKRUPTCY COURT HAVE NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY.  IF THE BANKRUPTCY COURT AND THE CANADIAN BANKRUPTCY COURT DO CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.**

**CAPITALIZED TERMS USED IN THIS ARTICLE V OF THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED IN THIS ARTICLE V OF**

THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

## A.     Classification and Allowance of Claims & Equity Interests Generally.

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates numerous "Classes" of Claims and Interests.  These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors.  Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests.  Only holders of Allowed Claims are entitled to vote on and receive distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

## B.     Treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims have not been classified for purposes of the Chapter 11 Cases and therefore are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases is set forth below.

### 1.     Administrative Expense Claims.

Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, on either: (i) the latest to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Distribution Date after such Administrative Expense Claim becomes an Allowed Claim, and (c) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) on such other date as the Bankruptcy Court may order, (x) cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (y) such other treatment as the Debtors and the Holder of such Administrative Expense Claim shall have agreed; provided, however, that (aa) Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of the

Reorganized Debtors' business operations and in accordance with the terms and conditions of the particular agreements or applicable non-bankruptcy law governing such obligations; and (bb) Allowed Administrative Expense Claims against SSC Canada or Smurfit-MBI that are not yet due on the Effective Date, or that represent obligations incurred by SSC Canada or Smurfit-MBI in the ordinary course of their business operations after the Petition Date, shall be assumed by Canadian Newco pursuant to the Asset Purchase Agreement and shall be paid or performed by Canadian Newco when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements or applicable non-bankruptcy law governing such obligations.

If all Classes of Impaired Claims against a particular Debtor vote to accept the Plan, such Debtor may agree to waive, and may not receive any distributions under the Plan on account of, any Post-Petition Intercompany Claims held by such Debtor.  On the other hand, if any Class of Impaired Claims against a particular Debtor votes to reject the Plan, any Post-Petition Intercompany Claims held by such Debtor shall be paid in full in cash on the latest to occur of (i) the Effective Date and (ii) the date on which such Post-Petition Intercompany Claim becomes payable in the ordinary course of the Debtors' business operations; provided, however, that any Post-Petition Intercompany Claim may be cancelled, waived, subordinated or reinstated, in full or in part, in the Debtors' sole discretion, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liability, or for any other reason.

2.      **No Double Payment of Administrative Expense Claims.**

To the extent that an Administrative Expense Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Administrative Expense Claim.  In addition, to the extent any obligation that would otherwise constitute an Administrative Expense Claim is paid in full as a CCAA Charge in the CCAA Proceedings, the payment of such CCAA Charge in the CCAA Proceedings shall be the only payment on account of such Administrative Expense Claim under the Plan.

3.      **DIP Facility Claims.**

The DIP Facility Claims shall be Allowed on the Effective Date pursuant to the Plan.  In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Debtors shall pay all Allowed DIP Facility Claims (if any) in full in cash on the Effective Date.  In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall either be (i) returned to the issuer undrawn and marked canceled, (ii) cash collateralized with cash in an amount equal to 105% of the face amount of such outstanding letter of credit, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such outstanding letter of credit and in form and substance acceptable to the issuer thereof.

4.      **Priority Tax Claims.**

Except to the extent that the Debtors and the Holder of an Allowed Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable

on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the Debtors' sole discretion, either (i) cash equal to the amount of such Allowed Priority Tax Claim on the later of the Initial Distribution Date (or as soon as is reasonably practicable thereafter) and the first Distribution Date after such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, or (ii) pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Priority Tax Claim. All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the applicable non-bankruptcy law governing such Claims.

**C.      Classification and Treatment of Claims Against and Interests in the Debtors in the Chapter 11 Cases.**

      **1.      Summary of Classification and Treatment of Classified Claims and Interests.**

            (a)      General

                  (i)      Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims against and Interests in the Debtors are classified for all purposes, including, without express or implied limitation, voting, confirmation and distributions pursuant to the Plan, as set forth in the Plan and described in this Disclosure Statement. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. If there are no Claims or Interests in a particular Class, then such Class of Claims or Interests shall not exist for any purposes under the Plan.

                  (ii)      The Plan does not provide for substantive consolidation of the Estates and, on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes of the Plan. Unless otherwise provided in the Plan or the Confirmation Order, Allowed Claims against a particular Debtor shall be satisfied solely from the cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor by any of the other Debtors solely for purposes of consummating the Plan. Except as specifically set forth in the Plan, nothing in the Plan or this Disclosure Statement shall constitute or be deemed to constitute an admission that any Debtor is liable for any Claims against any other Debtor. Claims that are asserted against multiple Debtors shall be treated as separate Claims against

each applicable Debtor for all purposes (including, but not limited to, voting and distributions), provided that (i) there shall only be a single recovery on account of such Claims and the aggregate distributions to the Holders of such Claims shall not exceed the largest Allowed amount of any such Claim against any particular Debtor, (ii) any distributions from a particular Estate on account of such Claims shall take into account the distributions to be made on account of such Claims by the other Estates, and (iii) such Claims shall be administered and treated in the manner set forth in the Plan and described below.

(iii)    All Claims against SSCE that are held by a single Holder as of the Record Date shall be deemed to be aggregated and shall be treated as a single Claim for purposes of classification and treatment as a Convenience Claim under the Plan, regardless of whether or not any such Claim is subsequently assigned, in whole or in part, to any other Person or Entity.

(iv)    For purposes of brevity and convenience, but with the same legal force and effect as if set forth at length in the Plan, the classification and treatment of Claims against and Interests in the Debtors under the Plan has been set forth in the following groups: (i) SSCC (Debtor 1), (ii) SSCE (Debtor 2), (iii) Cameo Container (Debtor 3), (iv) Calpine Corrugated (Debtor 4), (v) SSPRI (Debtor 5), (vi) the Non-Operating Debtors (United States) (Debtors 6 through 14), (vii) SSC Canada (Debtor 15); (viii) Smurfit-MBI (Debtor 16), (ix) MBI Limited (Debtor 17), (x) Stone FinCo II (Debtor 18), (xi) B.C. Shipper Supplies Ltd. (Debtor 19), (xii) Francobec Company (Debtor 20), (xiii) 3083527 Nova Scotia Company (Debtor 21), and (xiv) the Non-Operating Debtors (Canada) (Debtors 22 through 25).

(b)    Identification of Classes of Claims Against and Interests in the Debtors.

(i)    The following chart assigns a letter to each Class of Claims against or Interests in SSCC (Debtor 1) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | SSCC Preferred Interests[28][33] |
| G | SSCC Common Interests |

---

[28][33] The Debtors reserve the right, if and as appropriate, to classify any potential Subordinated Securities Claim against SSCC as either an SSCC Preferred Interest or an SSCC Common Interest, depending on the SSCC Interest on which such Subordinated Securities Claim is based, or in a separate Class of Subordinated Securities Claims.

(ii)      The following chart assigns a letter to each Class of Claims against or Interests in SSCE (Debtor 2) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Lender Claims |
| D | Convenience Claims |
| E | General Unsecured Claims |
| F | Intercompany Claims |
| G | Interests |

(iii)      The following chart assigns a letter to each Class of Claims against or Interests in Cameo Container (Debtor 3) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(iv)      The following chart assigns a letter to each Class of Claims against or Interests in Calpine Corrugated (Debtor 4) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Union Bank Claims |
| D | CIT Group Claims |
| E | General Unsecured Claims |
| F | Intercompany Claims |
| G | Interests |

(v)      The following chart assigns a letter to each Class of Claims against or Interests in SSPRI (Debtor 5) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

CH1 5118439 5168368v. 41

(vi)    The following chart assigns a letter to each Class of Claims against or Interests in the Non-Operating Debtors (United States) (Debtors 6 through 14) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(vii)    The following chart assigns a letter to each Class of Claims against or Interests in SSC Canada (Debtor 15) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Stone FinCo II Intercompany Claim |
| G | Interests |

(viii)    The following chart assigns a letter to each Class of Claims against or Interests in Smurfit-MBI (Debtor 16) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(ix)    The following chart assigns a letter to each Class of Claims against or Interests in MBI Limited (Debtor 17) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(x)     The following chart assigns a letter to each Class of Claims against
or Interests in Stone FinCo II (Debtor 18) for purposes of identifying such
Class:

CLASS     CLAIM OR INTEREST
A         Priority Non-Tax Claims
B         Other Secured Claims
C         General Unsecured Claims
D         Intercompany Claims
E         Interests

(xi)    The following chart assigns a letter to each Class of Claims against
or Interests in B.C. Shipper Supplies Ltd. (Debtor 19) for purposes of
identifying such Class:

CLASS     CLAIM OR INTEREST
A         Priority Non-Tax Claims
B         Other Secured Claims
C         General Unsecured Claims
D         Intercompany Claims
E         Interests

(xii)   The following chart assigns a letter to each Class of Claims against
or Interests in Francobec Company (Debtor 20) for purposes of identifying
such Class:

CLASS     CLAIM OR INTEREST
A         Priority Non-Tax Claims
B         Other Secured Claims
C         Prepetition Canadian Lender Claims
D         General Unsecured Claims
E         Intercompany Claims
F         Interests

(xiii)  The following chart assigns a letter to each Class of Claims against
or Interests in 3083527 Nova Scotia Company (Debtor 21) for purposes of
identifying such Class:

CLASS     CLAIM OR INTEREST
A         Priority Non-Tax Claims
B         Other Secured Claims
C         Prepetition Canadian Lender Claims
D         General Unsecured Claims
E         Intercompany Claims
F         Interests

(xiv)    The following chart assigns a letter to each Class of Claims against or Interests in the Non-Operating Debtors (Canada) (Debtors 22 through 25) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

**2.      Classification and Treatment of Claims Against and Interests in SSCC.**

(a)      Class 1A: Priority Non-Tax Claims Against SSCC

(i)      Classification:  Class 1A consists of all Priority Non-Tax Claims against SSCC.

(ii)      Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 1A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 1A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 1A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 1A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 1A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)      Voting:  Priority Non-Tax Claims in Class 1A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claim in Class 1A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Class 1B: Other Secured Claims Against SSCC.

(i)      Classification:  Class 1B consists of all Other Secured Claims against SSCC.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 1B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 1B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Class 1B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 1B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 1C: Prepetition Lender Claims Against SSCC.

(i)     Classification:  Class 1C consists of all Prepetition Lender Claims against SSCC.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit Agreement Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized

in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Lender Claims in Class 1C are Impaired.  Each Holder of an Allowed Prepetition Lender Claim in Class 1C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Lender Claims in Class 1C shall be Allowed pursuant to the Plan in the aggregate principal amount of $969.1 millionthereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.2.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 1D: General Unsecured Claims Against SSCC.

(i)     Classification:  Class 1D consists of all General Unsecured Claims against SSCC.

(ii)     Treatment:  Holders of General Unsecured Claims against SSCC shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed General Unsecured Claims against SSCC shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)     Voting:  General Unsecured Claims in Class 1D are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 1D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)     Class 1E: Intercompany Claims Against SSCC.

(i)     Classification:  Class 1E consists of all Intercompany Claims against SSCC.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against SSCC shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the

111

Plan, all Allowed Intercompany Claims against SSCC shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against SSCC may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSCC or any Reorganized Debtor, or for any other reason.

(iii)     Voting:  Intercompany Claims in Class 1E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 1E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 1E.

(f)     Class 1F: SSCC Preferred Interests.

(i)     Classification:  Class 1F consists of all SSCC Preferred Interests.

(ii)     Treatment:  On the Effective Date, all SSCC Preferred Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of SSCC Preferred Interests shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.[2934]

(iii)     Voting:  SSCC Preferred Interests are Impaired.  Each Holder of an SSCC Preferred Interest in Class 1F shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(g)     Class 1G: SSCC Common Interests.

(i)     Classification:  Class 1G consists of all SSCC Common Interests.

(ii)     Treatment:  On the Effective Date, all SSCC Common Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of SSCC Common Interests shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  SSCC Common Interests are Impaired.  Each Holder of an SSCC Common Interest in Class 1G shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

---

[2934] In the event that the Debtors separately classify any Subordinated Securities Claims against SSCC, any such Claims shall be extinguished, cancelled and discharged as of the Effective Date, and any Holders thereof shall receive no distribution in respect of such Claims, pursuant to section 1129(b)(2)(C) of the Bankruptcy Code.

3.      **Classification and Treatment of Claims Against and Interests in SSCE.**

(a)      Class 2A: Priority Non-Tax Claims Against SSCE.

(i)      Classification:  Class 2A consists of all Priority Non-Tax Claims against SSCE.

(ii)      Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 2A has agreed to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 2A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 2A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 2A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 2A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)      Voting:  Priority Non-Tax Claims in Class 2A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claim in Class 2A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Class 2B: Other Secured Claims Against SSCE.

(i)      Classification:  Class 2B consists of all Other Secured Claims against SSCE.

(ii)      Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 2B shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid

113

under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 2B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)    Voting:  Other Secured Claims in Class 2B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 2B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)    Class 2C: Prepetition Lender Claims Against SSCE.

(i)    Classification:  Class 2C consists of all Prepetition Lender Claims against SSCE.

(ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit AgreementDocuments and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

114

(iii)     Voting:  Prepetition Lender Claims in Class 2C are Impaired.  Each Holder of an Allowed Prepetition Lender Claim in Class 2C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Lender Claims in Class 2C shall be Allowed pursuant to the Plan in the aggregate principal amount of $969.1 millionthereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.3.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 2D: Convenience Claims Against SSCE.

(i)     Classification:  Class 2D consists of all Convenience Claims against SSCE.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Convenience Claim against SSCE becomes an Allowed Claim, each Holder of an Allowed Convenience Claim against SSCE shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Convenience Claim, the payment of one hundred percent (100%) of such Allowed Convenience Claim in cash.

(iii)     Convenience Class Election:  Each Holder of a Claim against SSCE that (i) is in an amount greater than $10,000 and (ii) would otherwise be classified as a General Unsecured Claim (other than a Prepetition Note Claim, an Industrial Revenue Bond Claim or a Hodge Industrial Revenue Bond Claim) against SSCE may elect to have its Claim treated as a Convenience Claim against SSCE by making such election on the Ballot to be provided to the Holders of Impaired Claims entitled to vote to accept or reject the Plan and returning such Ballot to the address specified therein before the Voting Deadline.  Any Convenience Class Election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.  All Convenience Claim Elections submitted before the Voting Deadline shall be final and irrevocable.

(iv)     Voting:  Convenience Claims in Class 2D are Impaired.  Each Holder of an Allowed Convenience Claim in Class 2D shall be entitled to vote to accept or reject the Plan.

(e)     Class 2E: General Unsecured Claims Against SSCE.

(i)     Classification:  Class 2E consists of all General Unsecured Claims against SSCE.

115

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against SSCE becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSCE shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the New SSCC Common Stock Pool; provided, however, that any Eligible Cash-Out Participant that makes the Cash-Out Election may, to the extent any Cash-Out Payments are made pursuant to Section 6.16 of the Plan, receive on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, its Allowed General Unsecured Claim against SSCE, the Cash-Out Percentage of such Allowed Claim payable in cash on the Initial Distribution Date.

(iii)    Cash-Out Election:  Each Eligible Cash-Out Participant may elect to participate in the Cash-Out Auction pursuant to the procedures set forth in Section 6.16 of the Plan by making such election on the Ballot to be provided to the Holders of Impaired Claims entitled to vote to accept or reject the Plan and returning such Ballot to the address specified therein before the Voting Deadline.  Any Cash-Out Election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim. All Cash-Out Elections submitted before the Voting Deadline shall be final and irrevocable.

(iv)    Voting:  General Unsecured Claims in Class 2E Claims are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 2E shall be entitled to vote to accept or reject the Plan.

(v)    Allowance:  The Prepetition Noteholder Claims in Class 2E shall be Allowed pursuant to the Plan in the aggregate principal amount of $2.275 billion (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset.  The Industrial Revenue Bond Claims in Class 2E shall also be Allowed pursuant to the Plan, in the aggregate principal amount of $105.840 million (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset.  All other General Unsecured Claims in Class 2E (including, without limitation, the Hodge Industrial Revenue Bond Claims) shall be allowed or disallowed in accordance with Article VIII of the Plan and applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

(f)    Class 2F: Intercompany Claims Against SSCE.

(i)    Classification:  Class 2F consists of all Intercompany Claims against SSCE.  If the Bankruptcy Court determines pursuant to a Final

Order that the Stone FinCo II Contribution Claim is an Allowed Claim, the Stone FinCo II Contribution Claim shall be classified and treated as an Allowed Intercompany Claim in Class 2F.

(ii)    Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against SSCE shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against SSCE shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against SSCE may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSCE or any Reorganized Debtor, or for any other reason; (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims that any Debtor (or any purchaser of the Canadian Assets) holds against SSCE shall be treated as Allowed General Unsecured Claims against SSCE for purposes of the Plan and any Debtor (or any purchaser of the Canadian Assets) holding such Intercompany Claim shall receive its Pro Rata Share of the New SSCC Common Stock Pool in full and complete satisfaction, settlement, release and discharge of such Intercompany Claim on the Initial Distribution Date; and (iii) if the Bankruptcy Court determines pursuant to a Final Order that the Stone FinCo II Contribution Claim is an Allowed Claim against SSCE, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall receive its Pro Rata Share of the New SSCC Common Stock Pool on account of the Stone FinCo II Contribution Claim in full and complete satisfaction, settlement, release and discharge of such Claim.  Notwithstanding the foregoing provisions, if (x) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (y) ~~neither the Bankruptcy Court nor~~ the Canadian Bankruptcy Court has not determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, Stone FinCo II shall receive the Stone FinCo II Settlement Distribution on the Effective Date in full and complete satisfaction, settlement, compromise, release and discharge of any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim).

(iii)    Voting:  Intercompany Claims in Class 2F are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 2F, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 2F.  Notwithstanding the foregoing,  if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to

have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

(g)     Class 2G:  Interests in SSCE.

(i)     Classification:  Class 2G consists of all Interests in SSCE.

(ii)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in SSCE shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in Class 2G are Unimpaired.  Each Holder of an Allowed Interest in Class 2G shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance:  All Interests in SSCE shall be Allowed pursuant to the Plan.

**4.      Classification and Treatment of Claims Against and Interests in Cameo Container.**

(a)     Class 3A: Priority Non-Tax Claims Against Cameo Container.

(i)     Classification:  Class 3A consists of all Priority Non-Tax Claims against Cameo Container.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 3A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 3A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 3A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 3A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 3A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

118

    (iii)    Voting:  Priority Non-Tax Claims in Class 3A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 3A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

    (b)    Class 3B:  Other Secured Claims Against Cameo Container.

    (i)    Classification:  Class 3B consists of all Other Secured Claims against Cameo Container.

    (ii)    Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 3B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 3B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

    (iii)    Voting:  Other Secured Claims in Class 3B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 3B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

    (c)    Class 3C: General Unsecured Claims Against Cameo Container.

    (i)    Classification:  Class 3C consists of all General Unsecured Claims against Cameo Container.

    (ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date

after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Cameo Container shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)     Voting:  General Unsecured Claims in Class 3C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 3C shall be entitled to vote to accept or reject the Plan.

(d)     Class 3D: Intercompany Claims Against Cameo Container.

(i)     Classification:  Class 3D consists of all Intercompany Claims against Cameo Container.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against Cameo Container shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against Cameo Container shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against Cameo Container may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Cameo Container or any Reorganized Debtor, or for any other reason.

(iii)     Voting:  Intercompany Claims in Class 3D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 3D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 3D.

(e)     Class 3E:  Interests in Cameo Container.

(i)     Classification:  Class 3E consists of all Interests in Cameo Container.

(ii)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in Cameo Container shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in Class 3E are Unimpaired.  Each Holder of an Allowed Interest in Class 3E shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  All Interests in Cameo Container shall be Allowed
pursuant to the Plan.

**5.    Classification and Treatment of Claims Against and Interests in Calpine
Corrugated.**

(a)    Class 4A: Priority Non-Tax Claims Against Calpine Corrugated.

(i)    Classification:  Class 4A consists of all Priority Non-Tax Claims
against Calpine Corrugated.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim
in Class 4A has agreed in writing to a different treatment (in which event
such other writing will govern), each Holder of an Allowed Claim in Class
4A that is due and payable on or before the Effective Date shall receive, on
account of, and in full and complete settlement, release and discharge of
and in exchange for, such Claim, at the election of the Debtors, (i) cash
equal to the amount of such Allowed Claim in Class 4A in accordance with
section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective
Date (or as soon as reasonably practicable thereafter) and (b) the first
Distribution Date after such Priority Non-Tax Claim in Class 4A becomes
an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other
treatment required to render such Allowed Priority Non-Tax Claim
Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed
Claims in Class 4A which are not due and payable on or before the
Effective Date shall be paid by the Reorganized Debtors when such claims
become due and payable in the ordinary course of business in accordance
with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 4A are Unimpaired.
Each Holder of an Allowed Priority Non-Tax Claims in Class 4A shall be
conclusively deemed to have accepted the Plan pursuant to section 1126(f)
of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to
accept or reject the Plan.

(b)    Class 4B:  Other Secured Claims Against Calpine Corrugated.

(i)    Classification:  Class 4B consists of all Other Secured Claims
against Calpine Corrugated.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest
to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date
after such Other Secured Claim becomes an Allowed Other Secured Claim,
each Holder of an Allowed Other Secured Claim in Class 4B, if any, shall
receive, on account of, and in full and complete settlement, release and
discharge of and in exchange for such Allowed Other Secured Claim, at the
election of the Debtors, either (a) Reinstatement of such Allowed Other
Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b)

payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to the allowance of any Other Secured Claim in Class 4B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)    Voting:  Other Secured Claims in Class 4B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 4B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)    Class 4C: Union Bank Claims Against Calpine Corrugated.

(i)    Classification:  Class 4C consists of all Union Bank Claims against Calpine Corrugated.

(ii)    Treatment:  On the Effective Date, each Holder of an Allowed Union Bank Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Union Bank Claim, payment of the principal amount of such Allowed Union Bank Claim in full in cash, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Union Bank Credit Agreement.  In addition, the reasonable fees and expenses of counsel and financial advisors to Union Bank that were incurred prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors not later than thirty (30) days after the Effective Date.

(iii)    Voting:  Union Bank Claims in Class 4C are Impaired.  Each Holder of an Allowed Union Bank Claim in Class 4C shall be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  The Union Bank Claims in Class 4C shall be Allowed pursuant to the Plan in the aggregate principal amount thereof as of the Petition Date, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Union Bank Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 4D: CIT Group Claims Against Calpine Corrugated.

(i)     Classification:  Class 4D consists of all CIT Group Claims against Calpine Corrugated.

(ii)     Treatment:  On the Effective Date, each Holder of an Allowed CIT Group Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed CIT Group Claim, payment of the principal amount of such Allowed CIT Group Claim in full in cash, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the CIT Group Credit Agreement.  In addition, the reasonable fees and expenses of counsel and financial advisors to CIT Group that were incurred prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors not later than thirty (30) days after the Effective Date.

(iii)     Voting:  CIT Group Claims in Class 4D are Impaired.  Each Holder of an Allowed CIT Group Claim in Class 4D shall be entitled to vote to accept or reject the Plan.

(iv)     Allowance:  The CIT Group Claims in Class 4D shall be Allowed pursuant to the Plan in the aggregate principal amount thereof as of the Petition Date, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the CIT Group Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(e)     Class 4E:  General Unsecured Claims Against Calpine Corrugated.

(i)     Classification:  Class 4E consists of all General Unsecured Claims against Calpine Corrugated.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Calpine Corrugated shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)     Voting:  General Unsecured Claims in Class 4E are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 4E shall be entitled to vote to accept or reject the Plan.

(f)     Class 4F:  Intercompany Claims Against Calpine Corrugated.

(i)     Classification:  Class 4F consists of all Intercompany Claims against Calpine Corrugated.

123

(ii)    Treatment:  Holders of Allowed Intercompany Claims against Calpine Corrugated shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and, pursuant to the Plan, all Allowed Intercompany Claims against Calpine Corrugated shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against Calpine Corrugated may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Calpine Corrugated or any Reorganized Debtor, or for any other reason; and (ii) notwithstanding anything to the contrary in the Plan, Reorganized SSCC, as the successor in interest to SSCE (the Holder of an Intercompany Claim against Calpine Corrugated), shall receive 100% of the New Calpine Corrugated Interests on the Effective Date in full and complete satisfaction, settlement, release and discharge of such Intercompany Claim.

(iii)    Voting:  Intercompany Claims in Class 4F are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 4F, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 4F.

(g)    Class 4G: Interests in Calpine Corrugated.

(i)    Classification:  Class 4G consists of all Interests in Calpine Corrugated.

(ii)    Treatment:  On the Effective Date, all Interests in Calpine Corrugated that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Calpine Corrugated shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)    Voting:  Interests in Calpine Corrugated are Impaired.  Each Holder of an Interest in Calpine Corrugated shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance.  All Interests in Calpine Corrugated shall be Allowed pursuant to the Plan.

**6.    Classification and Treatment of Claims Against and Interests in SSPRI.**

(a)    Class 5A: Priority Non-Tax Claims Against SSPRI.

(i)    Classification:  Class 5A consists of all Priority Non-Tax Claims against SSPRI.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 5A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 5A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Allowed Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 5A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 5A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 5A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 5A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 5A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 5B:  Other Secured Claims Against SSPRI.

(i)     Classification:  Class 5B consists of all Other Secured Claims against SSPRI.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 5B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 5B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim

is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Class 5B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 5B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 5C: General Unsecured Claims Against SSPRI.

(i)     Classification:  Class 5C consists of all General Unsecured Claims against SSPRI.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSPRI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)     Voting:  General Unsecured Claims in Class 5C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 5C shall be entitled to vote to accept or reject the Plan.

(d)     Class 5D: Intercompany Claims Against SSPRI.

(i)     Classification:  Class 5D consists of all Intercompany Claims against SSPRI.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against SSPRI shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against SSPRI shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against SSPRI may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSPRI or any Reorganized Debtor, or for any other reason.

(iii)     Voting:  Intercompany Claims in Class 5D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 5D, shall be deemed to have accepted the Plan and votes to accept or

reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 5D.

(e)     Class 5E: Interests in SSPRI.

(i)     Classification:  Class 5E consists of all Interests in SSPRI.

(ii)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in SSPRI shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in SSPRI are Unimpaired.  Each Holder of an Allowed Interest in SSPRI shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

## 7.     Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (United States).

(a)     Classes 6A through 14A: Priority Non-Tax Claims Against the Non-Operating Debtors (United States).

(i)     Classification:  Classes 6A through 14A consist of all Priority Non-Tax Claims against the Non-Operating Debtors (United States).

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Classes 6A through 14A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Classes 6A through 14A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Classes 6A through 14A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Classes 6A through 14A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Classes 6A through 14A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Classes 6A through 14A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Classes 6A through 14A shall be conclusively deemed to have accepted the

Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Classes 6B through 14B:  Other Secured Claims Against the Non-Operating Debtors (United States).

(i)     Classification:  Classes 6B through 14B consist of all Other Secured Claims against the Non-Operating Debtors (United States).

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Classes 6B through 14B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Classes 6B through 14B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Classes 6B through 14B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Classes 6B through 14B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan

(c)     Classes 6C through 14C:  General Unsecured Claims Against the Non-Operating Debtors (United States).

(i)     Classification:  Classes 6C through 14C consist of all General Unsecured Claims against the Non-Operating Debtors (United States).

(ii)     Treatment:  Holders of General Unsecured Claims against the Non-Operating Debtors (United States) shall not be entitled to receive or

128

retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed General Unsecured Claims against the Non-Operating Debtors (United States) shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)   Voting: General Unsecured Claims in Classes 6C through 14C are Impaired. Each Holder of an Allowed General Unsecured Claim in Classes 6C through 14C shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)   Classes 6D through 14D: Intercompany Claims Against the Non-Operating Debtors (United States).

(i)   Treatment: Holders of Allowed Intercompany Claims against the Non-Operating Debtors (United States) shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Intercompany Claims against the Non-Operating Debtors (United States) shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against the Non-Operating Debtors (United States) may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by the Non-Operating Debtors (United States) or any Reorganized Debtor, or for any other reason.

(ii)   Voting: Intercompany Claims in Classes 6D through 14D are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 6D through 14D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Classes 6D through 14D.

(e)   Classes 6E through 14E: Interests in the Non-Operating Debtors (United States).

(i)   Classification: Classes 6E through 14E consist of all Interests in the Non-Operating Debtors (United States).

(ii)   Treatment: As of the Effective Date, each Holder of an Allowed Interest in the Non-Operating Debtors (United States) shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)   Voting: Interests in the Non-Operating Debtors (United States) are Unimpaired. Each Holder of an Allowed Interest in the Non-Operating Debtors (United States) shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

**8.      Classification and Treatment of Claims Against and Interests in SSC Canada.**

(a)      Class 15A: Priority Non-Tax Claims Against SSC Canada.

　　(i)      Classification:  Class 15A consists of all Priority Non-Tax Claims against SSC Canada.

　　(ii)      Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 15A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 15A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 15A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 15A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 15A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

　　(iii)      Voting:  Priority Non-Tax Claims in Class 15A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 15A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Class 15B: Other Secured Claims Against SSC Canada.

　　(i)      Classification:  Class 15B consists of all Other Secured Claims against SSC Canada.

　　(ii)      Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 15B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

       (iii)    Voting:  Other Secured Claims in Class 15B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 15B shall be entitled to vote to accept or reject the Plan.

(c)    Class 15C: Prepetition Canadian Lender Claims Against SSC Canada.

       (i)    Classification:  Class 15C consists of all Prepetition Canadian Lender Claims against SSC Canada.

       (ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit ~~Agreement~~Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

       (iii)    Voting:  Prepetition Canadian Lender Claims in Class 15C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 15C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

       (iv)    Allowance:  The Prepetition Canadian Lender Claims in Class 15C shall be Allowed pursuant to the Plan in the aggregate principal amount ~~of $392.9 million~~thereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.8.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)    Class  15D: General Unsecured Claims Against SSC Canada.

(i)     Classification:  Class 15D consists of all General Unsecured Claims against SSC Canada.

(ii)     Treatment:  If the Plan is accepted by the Classes of General Unsecured Claims against each of SSC Canada and Smurfit-MBI, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date and (ii) the first Distribution Date after such General Unsecured Claim against SSC Canada becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the SSC Canada Distribution Pool. If the Plan is not accepted by the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI, (a) the Holders of Allowed General Unsecured Claims against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of such Allowed General Unsecured Claims, their Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court or the Canadian Bankruptcy Court to be properly allocable to SSC Canada and (b) all General Unsecured Claims against SSC Canada shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  For the avoidance of doubt, if the Plan is not accepted by the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI, the SSC Canada Distribution Pool shall not be available for distribution to the Holders of Allowed General Unsecured Claims against SSC Canada.

(iii)     Voting:  General Unsecured Claims in Class 15D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 15D shall be entitled to vote to accept or reject the Plan.

(e)     Class 15E: Intercompany Claims Against SSC Canada.

(i)     Classification:  Class 15E consists of all Intercompany Claims against SSC Canada.

(ii)     Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against SSC Canada shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against SSC Canada shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against SSC Canada may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSC Canada or any Reorganized Debtor, or for any other reason, and (ii) if the

132

Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims against SSC Canada (including the Stone FinCo II Intercompany Claim, to the extent it is deemed to be an Allowed Intercompany Claim against SSC Canada) shall be treated as Allowed General Unsecured Claims against SSC Canada for purposes of the Plan and the Debtor holding such Intercompany Claim shall receive, in full and complete satisfaction, settlement, release and discharge of such Claim, its Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court.

(iii)     Voting:  Intercompany Claims in Class 15E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 15E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 15E.

(f)     Class 15F: Stone FinCo II Intercompany Claim Against SSC Canada.

(i)     Classification:  Class 15F consists of the Stone FinCo II Intercompany Claim against SSC Canada.

(ii)     Treatment:  If (i) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (ii) neither the Bankruptcy Court nor the Canadian Bankruptcy Court has not determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, Stone FinCo II shall receive the Stone FinCo II Settlement Distribution on the Effective Date in full and complete satisfaction, settlement, compromise, release and discharge of any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Intercompany Claim).  On the other hand, if the foregoing conditions are not satisfied as of the Effective Date, then the Stone FinCo II Intercompany Claim shall be entitled to the following treatment:  (a) if the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, then (x) the Stone FinCo II Intercompany Claim shall be treated as a Subordinated Securities Claim against SSC Canada and shall be subordinated to all other Claims against SSC Canada, including, without limitation, all General Unsecured Claims and all other Intercompany Claims against SSC Canada, (y) Stone FinCo II, as the Holder of the Stone FinCo II Intercompany Claim, shall not be entitled to receive any distributions on account of such Claim under the Plan, and (z) the Stone FinCo II Intercompany Claim shall be deemed settled, cancelled and extinguished on the Effective Date; or (b) if the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as an Allowed Intercompany Claim against SSC Canada, then (x)

CH1 5118439 5168368 v.4 1

the Stone FinCo II Intercompany Claim shall be treated as an Allowed Intercompany Claim against SSC Canada if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, or (y) if the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Stone FinCo II Intercompany Claim shall be entitled to such treatment as the Canadian Bankruptcy Court shall determine on or prior to the Confirmation Date.

(iii)    Voting:  Stone FinCo II Intercompany Claims in Class 15F are Impaired.  Stone FinCo II, as the Holder of the Stone FinCo II Intercompany Claims, shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(g)    Class 15G:  Interests in SSC Canada.

(i)    Classification:  Class 15G consists of all Interests in SSC Canada.

(ii)    Treatment:  On the Effective Date, all Interests in SSC Canada that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in SSC Canada shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)    Voting:  Interests in SSC Canada are Impaired.  Each Holder of an Interest in SSC Canada shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance.  All Interests in SSC Canada shall be Allowed pursuant to the Plan.

**9.    Classification and Treatment of Claims Against and Interests in Smurfit-MBI.**

(a)    Class 16A: Priority Non-Tax Claims Against Smurfit-MBI.

(i)    Classification:  Class 16A consists of all Priority Non-Tax Claims against Smurfit-MBI.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 16A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 16A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 16A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the

Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 16A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. All Allowed Claims in Class 16A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 16A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 16A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 16B: Other Secured Claims Against Smurfit-MBI.

(i)    Classification:  Class 16B consists of all Other Secured Claims against Smurfit-MBI.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 16B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

(iii)    Voting:  Other Secured Claims in Class 16B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 16B shall be entitled to vote to accept or reject the Plan.

(c)    Class 16C: Prepetition Canadian Lender Claims Against Smurfit-MBI.

(i)    Classification:  Class 16C consists of all Prepetition Canadian Lender Claims against Smurfit-MBI.

(ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit AgreementDocuments and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such

Holder under the Prepetition Credit Documents.  In addition, (i) on the
Effective Date, each Prepetition Canadian Revolving Facility Letter of
Credit shall, in the Debtors' discretion, in consultation with the Committee
and the CCAA Monitor, either be (x) returned to the issuer undrawn and
marked canceled, (y) cash collateralized in accordance with the terms of the
Prepetition Credit Agreement with cash in an amount equal to 105% of the
face amount of such Prepetition Canadian Revolving Facility Letter of
Credit, or (z) collateralized with back-to-back letters of credit issued under
the Exit Facilities in an amount equal to 105% of the face amount of such
Prepetition Canadian Revolving Facility Letter of Credit and in form and
substance acceptable to the issuer thereof and the Prepetition Agent; and (ii)
the reasonable fees and expenses of counsel and financial advisors to the
Prepetition Agent that were incurred prior to the Effective Date in
accordance with the terms of the DIP Facility Order shall be paid not later
than thirty (30) days after the Effective Date.

(iii)    Voting:  Prepetition Canadian Lender Claims in Class 16C are
Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim
in Class 16C shall be entitled to vote (excluding, for voting purposes only,
any Claim for unreimbursed fees, costs and expenses) to accept or reject the
Plan.

(iv)    Allowance:  The Prepetition Canadian Lender Claims in Class 16C
shall be Allowed pursuant to the Plan in the aggregate principal amount of $
392.9 millionthereof, plus any accrued but unpaid interest thereon payable
at the non-default interest rate under the Prepetition Credit Agreement and
other amounts set forth in section 3.9.3(b) of the Plan, and shall not be
subject to objection, challenge, deduction or offset.

(d)    Class  16D: General Unsecured Claims Against Smurfit-MBI.

(i)    Classification:  Class 16D consists of all General Unsecured Claims
against Smurfit-MBI.

(ii)    Treatment:  If the Plan is accepted by the Classes of General
Unsecured Claims against each of Smurfit-MBI and SSC Canada, on or as
soon as reasonably practicable after the latest to occur of (i) the Initial
Distribution Date or (ii) the first Distribution Date after such General
Unsecured Claim against Smurfit-MBI becomes an Allowed Claim, each
Holder of an Allowed General Unsecured Claim against Smurfit-MBI shall
receive, on account of, and in full and complete satisfaction, settlement,
release and discharge of, and in exchange for, such Allowed General
Unsecured Claim, its Pro Rata Share of the Smurfit-MBI Distribution Pool.
If the Plan is not accepted by the Class of General Unsecured Claims
against either Smurfit-MBI or SSC Canada, (a) the Holders of Allowed
General Unsecured Claims against Smurfit-MBI shall receive, on account
of, and in full and complete satisfaction, settlement, release and discharge

of such Allowed General Unsecured Claims, their Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court or the Canadian Bankruptcy Court to be properly allocable to Smurfit-MBI and (b) all General Unsecured Claims against Smurfit-MBI shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  For the avoidance of doubt, if the Plan is not accepted by the Class of General Unsecured Claims against either Smurfit-MBI or SSC Canada, the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Allowed General Unsecured Claims against Smurfit-MBI.

(iii)    Voting:  General Unsecured Claims in Class 16D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 16D shall be entitled to vote to accept or reject the Plan.

(e)    Class 16E: Intercompany Claims Against Smurfit-MBI.

(i)    Classification:  Class 16E consists of all Intercompany Claims against Smurfit-MBI.

(ii)    Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against Smurfit-MBI shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against Smurfit-MBI shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against Smurfit-MBI may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Smurfit-MBI or any Reorganized Debtor, or for any other reason, and (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims against Smurfit-MBI shall be treated as Allowed General Unsecured Claims against Smurfit-MBI for purposes of the Plan and the Debtor holding such Intercompany Claim shall receive, in full and complete satisfaction, settlement, release and discharge of such Claim, its Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court.

(iii)    Voting:  Intercompany Claims in Class 16E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 16E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 16E.

(f)    Class 16F: Interests in Smurfit-MBI.

(i)      Classification:  Class 16F consists of all Interests in Smurfit-MBI.

(ii)      Treatment:  On the Effective Date, all Interests in Smurfit-MBI that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Smurfit-MBI shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)      Voting:  Interests in Smurfit-MBI are Impaired.  Each Holder of an Interest in Smurfit-MBI shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)      Allowance.  All Interests in Smurfit-MBI shall be Allowed pursuant to the Plan.

**10.      Classification and Treatment of Claims Against and Interests in MBI Limited.**

(a)      Class 17A: Priority Non-Tax Claims Against MBI Limited.

(i)      Classification:  Class 17A consists of all Priority Non-Tax Claims against MBI Limited.

(ii)      Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 17A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 17A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 17A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 17A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 17A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)      Voting:  Priority Non-Tax Claims in Class 17A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 17A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Class 17B: Other Secured Claims Against MBI Limited.

       (i)     Classification:  Class 17B consists of all Other Secured Claims against MBI Limited.

       (ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 17B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

       (iii)   Voting:  Other Secured Claims in Class 17B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 17B shall be entitled to vote to accept or reject the Plan.

  (c)      Class 17C: Prepetition Canadian Lender Claims Against MBI Limited.

       (i)     Classification:  Class 17C consists of all Prepetition Canadian Lender Claims against MBI Limited.

       (ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit Agreement Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Canadian Lender Claims in Class 17C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 17C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Canadian Lender Claims in Class 17C shall be Allowed pursuant to the Plan in the aggregate principal amount ~~of $392.9 million~~thereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.10.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 17D: General Unsecured Claims Against MBI Limited.

(i)     Classification:  Class 17D consists of all General Unsecured Claims against MBI Limited.

(ii)     Treatment:  Holders of General Unsecured Claims against MBI Limited shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against MBI Limited shall be deemed settled, cancelled and extinguished on the Effective Date.  For purposes of the CCAA Proceedings, all General Unsecured Claims against MBI Limited shall be deemed to be Excluded Claims.

(iii)     Voting:  General Unsecured Claims in Class 17D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 17D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)     Class 17E: Intercompany Claims Against MBI Limited.

(i)     Classification:  Class 17E consists of all Intercompany Claims against MBI Limited.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against MBI Limited shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against MBI Limited shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against MBI Limited may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by MBI Limited or any Reorganized Debtor, or for any other reason.

140

(iii)     Voting:  Intercompany Claims in Class 17E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 17E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 17E.

(f)     Class 17F: Interests in MBI Limited.

(i)     Classification:  Class 17F consists of all Interests in MBI Limited.

(ii)     Treatment:  Treatment:  As of the Effective Date, each Holder of an Allowed Interest in MBI Limited shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in MBI Limited are Unimpaired.  Each Holder of an Allowed Interest in MBI Limited shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in MBI Limited shall be Allowed pursuant to the Plan.

**11.     Classification and Treatment of Claims Against and Interests in Stone FinCo II.**

(a)     Class 18A: Priority Non-Tax Claims Against Stone FinCo II.

(i)     Classification:  Class 18A consists of all Priority Non-Tax Claims against Stone FinCo II.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 18A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 18A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 18A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 18A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 18A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

141

(iii)    Voting:  Priority Non-Tax Claims in Class 18A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 18A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 18B: Other Secured Claims Against Stone FinCo II.

(i)    Classification:  Class 18B consists of all Other Secured Claims against Stone FinCo II.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 18B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 18B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)    Voting:  Other Secured Claims in Class 18B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 18B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)    Class 18C: General Unsecured Claims Against Stone FinCo II.

(i)    Classification:  Class 18C consists of all General Unsecured Claims against Stone FinCo II.

(ii)    Treatment:  If (a) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (b) neither the Bankruptcy

142

Court nor the Canadian Bankruptcy Court has not determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution. On the other hand, if (i) the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan or (ii) either the Bankruptcy Court or the Canadian Bankruptcy Court shall have determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or Interest in SSC Canada, then (x) the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive any distributions under the Plan in the Chapter 11 Cases unless the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is an Allowed Claim, in which case the foregoing conditions are not satisfied as of the Effective Date, then the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall be entitled to receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of any shares of the New SSCC Common Stock or other distributions that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim and/or the Stone FinCo II Intercompany Claim; provided, however, that (x) the distributions to any Holder of a General Unsecured Claim against Stone FinCo II shall not exceed, when combined with all other distributions that such Holder is receiving under the Plan, 100% of its Allowed General Unsecured Claim against Stone FinCo II; and (y) if the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan, General Unsecured Claims against Stone FinCo II shall be deemed to be Excluded Claims for purposes of the CCAA Plan. If the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is a Disallowed Claim, the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and all Allowed General Unsecured Claims against Stone FinCo II shall, for purposes of the Chapter 11 Cases, be deemed settled, cancelled and extinguished on the Effective Date.

(iii)     Voting:  General Unsecured Claims in Class 18C are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 18C shall be entitled to vote to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Noteholder Claims against Stone FinCo II arising under or evidenced by the 7.375% Notes Due 2014 shall be Allowed pursuant to this Plan in the aggregate principal amount of $200

million (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset.

(d)    Class 18D: Intercompany Claims Against Stone FinCo II.

(i)    Classification:  Class 18D consists of all Intercompany Claims against Stone FinCo II.

(ii)    Treatment:  If the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and receives the Stone FinCo II Settlement Distribution, the Holders of Intercompany Claims against Stone FinCo II shall not be entitled to receive any distributions under the Plan on account of such Claims.  If the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan and the Bankruptcy Court and/or the Canadian Bankruptcy Court determines that the Stone FinCo II Contribution Claim and/or the Stone FinCo II Intercompany Claim shall be an Allowed Claim, the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of the shares of New SSCC Common Stock or other distributions that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim and/or the Stone FinCo II Intercompany Claim.  If the Stone FinCo II Contribution Claim is and the Stone FinCo II Intercompany Claim are deemed to be a Disallowed Claim Claims, the Holders of Intercompany Claims against Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and all Allowed Intercompany Claims against Stone FinCo II shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)    Voting:  Intercompany Claims in Class 18D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 18D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 18D.

(e)    Class 18E: Interests in Stone FinCo II.

(i)    Classification:  Class 18E consists of all Interests in Stone FinCo II.

(ii)    Treatment:  On the Effective Date, all Interests in Stone FinCo II that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan; provided, however, that Holders of Interests in Stone FinCo II shall receive 100% of any cash or other property remaining in the Estate of Stone FinCo II after the Holders of General

Unsecured Claims against Stone FinCo II have received distributions under the Plan (whether from Stone FinCo II or any other Debtor) with a value equaling 100% of their Allowed Claims.

(iii)    Voting:  Interests in Stone FinCo II are Impaired.  Each Holder of an Interest in Stone FinCo II shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance.  All Interests in Stone FinCo II shall be Allowed pursuant to the Plan.

12.    **Classification and Treatment of Claims Against and Interests in B.C. Shipper Supplies Ltd.**

(a)    Class 19A: Priority Non-Tax Claims Against B.C. Shipper Supplies Ltd.

(i)    Classification:  Class 19A consists of all Priority Non-Tax Claims against B.C. Shipper Supplies Ltd.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 19A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 19A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 19A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 19A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 19A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 19A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 19A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 19B: Other Secured Claims Against B.C. Shipper Supplies Ltd.

(i)    Classification:  Class 19B consists of all Other Secured Claims against B.C. Shipper Supplies Ltd.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 19B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of an in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 19B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral).

(iii)     Voting:  Other Secured Claims in Class 19B are UnimpairedImpaired.  Each Holder of an Allowed Other Secured Claim in Class 19B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 19C:  General Unsecured Claims Against B.C. Shipper Supplies Ltd.

(i)     Classification:  Class 19C consists of all General Unsecured Claims against B.C. Shipper Supplies Ltd.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against B.C. Shipper Supplies Ltd. shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)     Voting:  General Unsecured Claims in Class 19C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 19C shall be entitled to vote to accept or reject the Plan.

(d)    Class 19D: Intercompany Claims Against B.C. Shipper Supplies Ltd.

(i)    Classification:  Class 19D consists of all Intercompany Claims against B.C. Shipper Supplies Ltd.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against B.C. Shipper Supplies Ltd. shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against B.C. Shipper Supplies Ltd. shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against B.C. Shipper Supplies Ltd. may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by B.C. Shipper Supplies Ltd. or any Reorganized Debtor, or for any other reason.

(iii)    Voting:  Intercompany Claims in Class 19D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 19D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 19D.

(e)    Class 19E: Interests in B.C. Shipper Supplies Ltd.

(i)    Classification:  Class 19E consists of all Interests in B.C. Shipper Supplies Ltd.

(ii)    Treatment:  As of the Effective Date, each Holder of an Allowed Interest in B.C. Shipper Supplies Ltd. shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in B.C. Shipper Supplies Ltd. are Unimpaired. Each Holder of an Allowed Interest in B.C. Shipper Supplies Ltd. shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance.  All Interests in B.C. Shipper Supplies Ltd. shall be Allowed pursuant to the Plan.

**13.    Classification and Treatment of Claims Against and Interests in Francobec Company.**

(a)    Class 20A: Priority Non-Tax Claims Against Francobec Company.

(i)    Classification:  Class 20A consists of all Priority Non-Tax Claims against Francobec Company.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 20A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 20A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 20A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 20A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 20A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 20A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 20A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 20B: Other Secured Claims Against Francobec Company.

(i)     Classification:  Class 20B consists of all Other Secured Claims against Francobec Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 20B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

(iii)     Voting:  Other Secured Claims in Class 20B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 20B shall be entitled to vote to accept or reject the Plan.

(c)     Class 20C: Prepetition Canadian Lender Claims Against Francobec Company.

(i)      Classification:  Class 20C consists of all Prepetition Canadian Lender Claims against Francobec Company.

(ii)      Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit ~~Agreement~~Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)      Voting:  Prepetition Canadian Lender Claims in Class 20C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 20C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)      Allowance:  The Prepetition Canadian Lender Claims in Class 20C shall be Allowed pursuant to the Plan in the aggregate principal amount ~~of $392.9 million~~thereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.13.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)      Class 20D:  General Unsecured Claims Against Francobec Company.

(i)      Classification:  Class 20D consists of all General Unsecured Claims against Francobec Company.

(ii)      Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date

149

after such General Unsecured Claim becomes an Allowed Claim, each
Holder of an Allowed General Unsecured Claim against Francobec
Company shall receive, on account of, and in full and complete satisfaction,
settlement, release and discharge of, and in exchange for, such Allowed
General Unsecured Claim, the payment of one hundred percent (100%) of
such Allowed General Unsecured Claim in cash.

(iii)     Voting:  General Unsecured Claims in Class 20D are Impaired.
Each Holder of an Allowed General Unsecured Claim in Class 20D shall be
entitled to vote to accept or reject the Plan.

(e)     Class 20E: Intercompany Claims Against Francobec Company.

(i)     Classification:  Class 20E consists of all Intercompany Claims
against Francobec Company.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against
Francobec Company shall not be entitled to receive or retain any monetary
distributions or other property on account of such Claims under the Plan.
Pursuant to the Plan, all Allowed Intercompany Claims against Francobec
Company shall be deemed settled, cancelled and extinguished on the
Effective Date; provided, however, that any Allowed Intercompany Claim
against Francobec Company may be Reinstated, in full or in part, to the
extent the Debtors determine to be advisable in order to avoid the
incurrence of any past, present or future tax or similar liabilities by
Francobec Company or any Reorganized Debtor, or for any other reason.

(iii)     Voting:  Intercompany Claims in Class 20E are Impaired.  The
Debtors, as the Plan Proponents and the Holders of Intercompany Claims in
Class 20E, shall be deemed to have accepted the Plan and votes to accept or
reject the Plan shall not be solicited from the Debtors in their capacities as
the Holders of Intercompany Claims in Class 20E.

(f)     Class 20F: Interests in Francobec Company.

(i)     Classification:  Class 20F consists of all Interests in Francobec
Company.

(ii)     Treatment:  On the Effective Date, all Interests in Francobec
Company that are outstanding as of the Effective Date shall be
extinguished, cancelled and discharged.  Holders of Interests in Francobec
Company shall not be entitled to receive or retain any monetary
distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  Interests in Francobec Company are Impaired.  Each
Holder of an Interest in Francobec Company shall be conclusively deemed
to have rejected the Plan and, accordingly, shall not be entitled to vote to
accept or reject the Plan.

150

(iv)    Allowance.  All Interests in Francobec Company shall be Allowed pursuant to the Plan.

14.    **Classification and Treatment of Claims Against and Interests in 3083527 Nova Scotia Company.**

(a)    Class 21A: Priority Non-Tax Claims Against 3083527 Nova Scotia Company.

(i)    Classification:  Class 21A consists of all Priority Non-Tax Claims against 3083527 Nova Scotia Company.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 21A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 21A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 21A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 21A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 21A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 21A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 21A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 21B: Other Secured Claims Against 3083527 Nova Scotia Company.

(i)    Classification:  Class 21B consists of all Other Secured Claims against 3083527 Nova Scotia Company.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 21B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any

accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

(iii)    Voting:  Other Secured Claims in Class 21B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 21B shall be entitled to vote to accept or reject the Plan.

(c)    Class 21C: Prepetition Canadian Lender Claims Against 3083527 Nova Scotia Company.

(i)    Classification:  Class 21C consists of all Prepetition Canadian Lender Claims against 3083527 Nova Scotia Company.

(ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit ~~Agreement~~Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)    Voting:  Prepetition Canadian Lender Claims in Class 21C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 21C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)    Allowance:  The Prepetition Canadian Lender Claims in Class 21C shall be Allowed pursuant to the Plan in the aggregate principal amount ~~of $392.9 million~~thereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and

152

other amounts set forth in section 3.14.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 21D: General Unsecured Claims Against 3083527 Nova Scotia Company.

(i)     Classification: Class 21D consists of all General Unsecured Claims against 3083527 Nova Scotia Company.

(ii)     Treatment: Holders of General Unsecured Claims against 3083527 Nova Scotia Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against 3083527 Nova Scotia Company shall be deemed settled, cancelled and extinguished on the Effective Date. For purposes of the CCAA Proceedings, all General Unsecured Claims against 3083527 Nova Scotia Company shall be deemed to be Excluded Claims.

(iii)     Voting: General Unsecured Claims in Class 21D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 21D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)     Class 21E: Intercompany Claims Against 3083527 Nova Scotia Company.

(i)     Classification: Class 21E consists of all Intercompany Claims against 3083527 Nova Scotia Company.

(ii)     Treatment: Holders of Allowed Intercompany Claims against 3083527 Nova Scotia Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against 3083527 Nova Scotia Company shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against 3083527 Nova Scotia Company may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by 3083527 Nova Scotia Company or any Reorganized Debtor, or for any other reason.

(iii)     Voting: Intercompany Claims in Class 21E are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 21E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 21E.

(f)     Class 21F: Interests in 3083527 Nova Scotia Company.

(i)  Classification:  Class 21F consists of all Interests in 3083527 Nova Scotia Company.

(ii)  Treatment:  Treatment:  As of the Effective Date, each Holder of an Allowed Interest in 3083527 Nova Scotia Company shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)  Voting:  Interests in 3083527 Nova Scotia Company are Unimpaired.  Each Holder of an Allowed Interest in 3083527 Nova Scotia Company shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)  Allowance.  All Interests in 3083527 Nova Scotia Company shall be Allowed pursuant to the Plan.

**15.  Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (Canada) .**

(a)  Classes 22A through 25A: Priority Non-Tax Claims Against the Non-Operating Debtors (Canada).

(i)  Classification:  Classes 22A through 25A consist of all Priority Non-Tax Claims against the Non-Operating Debtors (Canada).

(ii)  Treatment:  Except to the extent that a Holder of an Allowed Claim in Classes 22A through 25A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in 22A through 25A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Classes 22A through 25A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Classes 22A through 25A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Classes 22A through 25A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)  Voting:  Priority Non-Tax Claims in Classes 22A through 25A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Classes 22A through 25A shall be conclusively deemed to have accepted

the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Classes 22B through 25B: Other Secured Claims Against the Non-Operating Debtors (Canada).

(i)      Classification: Classes 22B through 25B consist of all Other Secured Claims against the Non-Operating Debtors (Canada).

(ii)      Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Classes 22B through 25B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. The Debtors' failure to object to the allowance of any Other Secured Claim in Classes 22B through 25B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)      Voting: Other Secured Claims in Classes 22B through 25B are Unimpaired. Each Holder of an Allowed Other Secured Claim in Classes 22B through 25B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan

(c)      Classes 22C through 25C: General Unsecured Claims Against the Non-Operating Debtors (Canada).

(i)      Classification: Classes 22C through 25C consist of all General Unsecured Claims against the Non-Operating Debtors (Canada).

(ii)      Treatment: Holders of General Unsecured Claims against the Non-Operating Debtors (Canada) shall not be entitled to receive or retain

155

any monetary distributions or other property on account of such Claims under the Plan. For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against the Non-Operating Debtors (Canada) shall be deemed settled, cancelled and extinguished on the Effective Date. For purposes of the CCAA Proceedings, all General Unsecured Claims against the Non-Operating Debtors (Canada) shall be deemed to be Excluded Claims.

(iii)    Voting: General Unsecured Claims in Classes 22C through 25C are Impaired. Each Holder of an Allowed General Unsecured Claim in Classes 22C through 25C shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)    Classes 22D through 25D: Intercompany Claims Against the Non-Operating Debtors (Canada).

(i)    Treatment: Holders of Allowed Intercompany Claims against the Non-Operating Debtors (Canada) shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against the Non-Operating Debtors (Canada) shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against the Non-Operating Debtors (Canada) may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by the Non-Operating Debtors (Canada) or the Reorganized Non-Operating Debtors (Canada), or for any other reason.

(ii)    Voting: Intercompany Claims in Classes 22D through 25D are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Classes 22D through 25D.

(e)    Classes 22E through 25E: Interests in the Non-Operating Debtors (Canada).

(i)    Classification: Classes 22E through 25E consist of all Interests in the Non-Operating Debtors (Canada).

(ii)    Treatment: As of the Effective Date, each Holder of an Allowed Interest in the Non-Operating Debtors (Canada) shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting: Interests in the Non-Operating Debtors (Canada) are Unimpaired. Each Holder of an Allowed Interest in the Non-Operating

Debtors (Canada) shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

**16.     Acceptance or Rejection of the Plan by Classes of Claims and Interests.**

(a)     Impaired Classes of Claims Entitled to Vote on the Plan.

Holders of Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19B, 19C, 20B, 20C, 20D, 21B and 21C are Impaired and shall be entitled to vote as a Class separate Classes to accept or reject the Plan.

(b)     Acceptance by Impaired Classes of Claims.

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that actually vote have timely and properly voted to accept the Plan.

(c)     Presumed Acceptance by Holders of Intercompany Claims.

The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims.

(d)     Presumed Acceptance by Unimpaired Classes.

Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, 19B, 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E are Unimpaired under the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

(e)     Presumed Rejection by Impaired Classes.

Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C are Impaired under the Plan, but the Holders of Claims and Interests in such Classes shall not receive or retain any property under the Plan on account of such Claims or Interests.  Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in such Classes are conclusively presumed to have rejected the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

(f)     Voting for Purposes of the CCAA Plan.

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, Affected Creditors shall be entitled to vote on the CCAA Plan as described in Article IV of the Plan.

**D.** **Classification and Treatment of Affected Claims Against the Canadian Debtors in the CCAA Proceedings.**

**1.** **Purpose and Effect of the CCAA Plan.**

(a)     Purpose.

For purposes of the CCAA Proceedings, Article IV of the Plan (together with the incorporated definitions and other related provisions) constitutes the CCAA Plan to be proposed to each Class of Affected Claims described below.

(b)     Affected Persons.

The CCAA Plan will be implemented under the CCAA and, subject to its terms, will become effective on, and be binding on and after, the Effective Date on the Canadian Debtors and the Classes of Affected Creditors that have voted in favor of its acceptance by the Required Majority, providing it has been sanctioned by the Canadian Bankruptcy Court by CCAA Sanction Order(s) in form and substance satisfactory to the Canadian Debtors. The only Classes of Affected Creditors that shall be required to have accepted the CCAA Plan by the Required Majority shall be the Affected Secured Creditors.

(c)     Unaffected Persons.

For the avoidance of doubt, Affected Creditors in any Class that fails to accept the CCAA Plan by the Required Majority, or in respect of which the CCAA Plan is not sanctioned by the Canadian Bankruptcy Court, shall be deemed to be Unaffected Creditors for the purposes of the CCAA Plan.

**2.** **Classification of Creditors.**

(a)     Affected Creditors.

For purposes of voting on and receiving distributions under the CCAA Plan, Affected Creditors are divided into the following Classes:

(i)     Affected Secured Creditors.

(1) Affected Secured Creditors of SSC Canada;

(2) Affected Secured Creditors of Smurfit-MBI;

(3) Affected Secured Creditors of MBI Limited;

(4) Affected Secured Creditors of Francobec Company; and

(5) Affected Secured Creditors of 3083527 Nova Scotia Company.

(ii)     Affected Unsecured Creditors.

(1) Affected Unsecured Creditors of SSC Canada;

(2) Affected Unsecured Creditors of Smurfit-MBI; and

(3) Affected Unsecured Creditors of Stone FinCo II.

(iii)     Affected Creditors shall be entitled to prove their respective Affected Claims, vote in respect of the CCAA Plan, and receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

(b)     Excluded Claims.

For purposes of the CCAA Proceedings, the CCAA Plan shall not affect the following types of Claims (each, an "Excluded Claim" and, collectively, the "Excluded Claims"):

(i)   the indebtedness, liabilities and obligations secured by the Administration Charge;

(ii)   the indebtedness, liabilities and obligations secured by the DIP Lenders' Charge;

(iii)   the indebtedness, liabilities and obligations secured by the Directors' Charge;

(iv)   any amounts owing to employees and officers employed by, and directors of, the Canadian Debtors on the Petition Date that are entitled to priority in payment under the CCAA, including any Claims for wages, salary, benefits, unreimbursed expenses, and amounts owing for accrued but unpaid vacation pay as of the Petition Date that are entitled to priority in payment under the CCAA, but expressly excluding all Non-Qualified Employee Benefit Claims;

(v)   any Post-Filing Claim;

(vi) any Administrative Expense Claim against a Canadian Debtor;

(vii)  any Other Secured Claim against a Canadian Debtor;

(viiviii) any Priority Tax Claim against a Canadian Debtor;

(viiiix)  any Claim of a Person who was an officer, director or employee of any Canadian Debtor as of the Petition Date for indemnification and/or contribution with respect to such officer's, director's, or employee's service to such Canadian Debtor, pursuant (and subject) to applicable laws and the policies and procedures of such Canadian Debtor (provided that all such

159

indemnification and/or contribution Claims shall be assumed by Canadian Newco);

(ixx)  any General Unsecured Claim against a Canadian Debtor other than SSC Canada, Smurfit-MBI, and Stone FinCo II;

(x)  any Secured Claim against a Canadian Debtor other than SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company, and 3083527 Nova Scotia Company; (xi)  any Intercompany Claim; and

(xii)  Affected Claims in any Class that fails to accept the CCAA Plan by the Required Majority or in respect of which the CCAA Plan is not sanctioned by the Canadian Bankruptcy Court, from and after the date of such rejection or non-approval by the Canadian Bankruptcy Court (as the case may be).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or to receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.  Nothing in the CCAA Plan shall affect the rights and defenses of any Canadian Debtor, either legal or equitable, with respect to any Excluded Claim, including any rights arising under or pursuant to the CCAA Plan or any rights with respect to legal or equitable defenses or entitlements to setoff or recoupment against such Excluded Claims; provided, however, that the Debtors reserve the right to seek confirmation of the Plan in the Chapter 11 Cases pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Affected Claims that has failed to accept the Plan, in which case the Holders of such Claims shall receive the treatment set forth in Article III of the Plan and shall be subject to all applicable provisions of the Plan for purposes of the Chapter 11 Cases.

3.      **Treatment of Affected Secured Claims, CCAA Charges and Priority Tax Claims.**

(a)     Affected Secured Claims.

(i)     Voting:  Affected Secured Creditors shall be entitled to vote on the CCAA Plan in accordance with the CCAA Creditors' Meeting Order.

(ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit AgreementDocuments and 100% of all unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled,

(y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(b)     Treatment of CCAA Charges.

The Canadian Debtors shall satisfy, in full and in cash, all obligations secured by the CCAA Charges on the Effective Date.

(c)     Treatment of Priority Tax Claims Against the Canadian Debtors.

Except to the extent that the Canadian Debtors and the Holder of a Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of a Priority Tax Claim against any of the Canadian Debtors that is a Proven Claim and is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Priority Tax Claim, cash equal to the amount of such Priority Tax Claim on the later of (i) the Initial Distribution Date (or as soon as is reasonably practicable thereafter) and (ii) the first Distribution Date after such Priority Tax Claim becomes a Proven Claim, or as soon thereafter as is reasonably practicable.  All Priority Tax Claims against any of the Canadian Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business after the Effective Date in accordance with the applicable non-bankruptcy law governing such Claims.

**4.     Treatment of Affected Unsecured Claims.**

The treatment of Affected Unsecured Claims under the CCAA Plan depends on the identity of the Canadian Debtor against which such Affected Unsecured Claims are asserted.

(a)     Affected Unsecured Claims Against SSC Canada.

If:

(i)     the Classes of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI approve the CCAA Plan by the Required Majority,

(ii)     the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class, and

(iii) the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1 of the Plan,

161

then, on or as soon as reasonably practicable after the latest to occur of (i) the Initial
Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against
SSC Canada becomes a Proven Claim, each Holder of a General Unsecured Claim against SSC
Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and
discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata Share of the SSC
Canada Distribution Pool.

      (b)    Affected Unsecured Claims Against Smurfit-MBI.

If:

      (i)    the Classes of Affected Unsecured Creditors of SSC Canada and
Smurfit-MBI approve the CCAA Plan by the Required Majority,

      (ii)    the CCAA Plan is sanctioned by the Canadian Bankruptcy Court
with respect to each such Class, and

      (iii)    the Canadian Assets are transferred to Canadian Newco in
accordance with Section 5.1 of the Plan,

then, on or as soon as reasonably practicable after the latest to occur of (i) the Initial
Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against
Smurfit-MBI becomes a Proven Claim, each Holder of a General Unsecured Claim against
Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release
and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata Share of the
Smurfit-MBI Distribution Pool.

      (c)    Affected Unsecured Claims Against Stone FinCo II.

If:

      (i)    the Class of Affected Unsecured Creditors of Stone FinCo II
approves the CCAA Plan by the Required Majority,

      (ii)    ~~neither the Bankruptcy Court nor~~ the Canadian Bankruptcy Court
has ~~not~~ determined that the Stone FinCo II Intercompany Claim should be
treated as a Subordinated Securities Claim or an Interest in SSC
Canada,

      (ii)    the CCAA Plan is sanctioned by the Canadian Bankruptcy Court
with respect to such Class, and

      (iii)    the Canadian Assets are transferred to Canadian Newco in
accordance with Section 5.1.5 of the Plan,

then, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full
and complete satisfaction, settlement, compromise, release and discharge of such General
Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other

Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution.

**5.      Conditions Precedent to Implementation of CCAA Plan.**

In addition to any other approvals and receipt of the CCAA Sanction Order described above, the implementation of the CCAA Plan shall be conditioned upon the fulfillment or satisfaction of the following conditions on or before the Effective Date, each of which may be waived by the relevant Canadian Debtors:

(a)      The Classes of Affected Secured Creditors approve the CCAA Plan by the Required Majority;

(b)      The CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class;

(c)      Execution and delivery of all such agreements, resolutions, indentures, documents and other instruments which are necessary to be executed and delivered by the Canadian Debtors to implement the CCAA Plan and perform their obligations hereunder;

(d)      In respect of the CCAA Sanction Orders described above, the expiry of the applicable appeal periods and, in the event of an appeal or application for leave to appeal, final determination by the applicable appellate tribunal;

(e)      The Plan shall have become effective in the Chapter 11 Cases in accordance with the terms of Section 9.2 of the Plan.

**6.      CCAA Creditors' Meeting.**

The CCAA Creditors' Meeting shall be held in accordance with the CCAA Plan, the CCAA Creditors' Meeting Order, and any further order which the Canadian Bankruptcy Court may enter from time to time for the purposes of considering and voting on the CCAA Resolution or any other matters to be considered at the CCAA Creditors' Meeting.

(a)      Severance.

The CCAA Plan shall be severable such that it may be voted upon and approved by each Class of Affected Creditors separately.

(b)      Voting by Creditors.

The Canadian Debtors are seeking approval of the CCAA Plan by the affirmative vote of the Required Majorities of each of the Classes of Affected Creditors. Except for the CCAA Resolution, which shall be decided by the Required Majorities on a vote by ballot, any other matter submitted for a vote at the CCAA Creditors' Meeting shall be decided by a majority of votes cast on a vote by a show of hands, unless the CCAA Meeting Chair decides, in his or her sole discretion, to hold such vote by way of ballot.

The result of any vote at the CCAA Creditors' Meeting shall be binding on all Affected Claims of the applicable Class, regardless of whether or not the Holder of such Affected Claim was present and voting (in person or by proxy) at the CCAA Creditors' Meeting.

(c)     Claims for Voting Purposes.

Each Holder of a Voting Claim shall be entitled to one (1) vote and the weight attributed to such vote (for the purposes of determining the Required Majorities) shall be equal to the aggregate United States dollar amount of such Voting Claim. Voting Claims shall not include fractional numbers and shall be rounded to the nearest whole United States dollar amount, in accordance with the CCAA Creditors' Meeting Order.

For the purposes of determining the value of Affected Claims denominated in currencies other than United States dollars for voting and distribution purposes under the CCAA Plan, such Affected Claims shall be converted to United States dollars ~~at the conversion rate set forth in~~as prescribed by paragraph 20 of the CCAA Bar Date Order.

If the amount of any Affected Claim is not resolved for voting purposes ~~at least five (5) Business Days prior to the CCAA Creditors' Meeting~~by the Record Date in accordance with the CCAA Claims Determination Order ~~and the CCAA Creditors' Meeting Order~~, the Affected Creditor shall be entitled to vote at the CCAA Creditors' Meeting ~~based on that portion of its Affected Claim that has been accepted for voting purposes by the Canadian Debtors and the CCAA Monitor~~in accordance with the procedures provided for in the CCAA Creditors' Meeting Order, without prejudice to any rights of such Affected Creditor or the Canadian Debtors with respect to the final determination of such Affected Claim for distribution purposes in accordance with the terms of the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

(d)     Claims Bar Date.

If any Person required by the CCAA Bar Date Order and the CCAA Claims Determination Order to file a Proof of Claim by the Claims Bar Date has failed to do so (and is not deemed to have filed a Proof of Claim by the Claims Bar Date pursuant to the CCAA Bar Date Order or the CCAA Claims Determination Order), that Person shall not be permitted to vote at the CCAA Creditors' Meeting and shall not be entitled to receive any distribution under the Plan.

(e)     CCAA Creditors' Meeting Chair.

The CCAA Creditors' Meeting Chair shall decide all matters relating to procedure at the CCAA Creditors' Meeting that are not otherwise set out in the CCAA Creditors' Meeting Order.

(f)     Application for CCAA Sanction Order(s).

If the Classes of Affected Secured Claims approve the CCAA Plan, the Canadian Debtors shall apply for a Sanction Order in respect of each Class that has approved the CCAA Plan, providing, inter alia, that:

CH1 5118439<del>5168368</del>v.4.1

(i)      the compromises and arrangements effected by the CCAA Plan are approved, binding and effective on all Classes of Affected Claims that approved the CCAA Plan;

(ii)      consent is given to the assignment of the Canadian Assets to Canadian Newco; and

(iii)      no Person who is a party to an obligation or agreement with the Canadian Debtors shall, following the Effective Date, accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder, or enforce or exercise any right (including any right of set-off, dilution or other remedy) or make any demand under or in respect of such obligation or agreement, by reason:

> (1)      of any event(s) which occurred on or prior to the Effective Date that would have entitled any other Person thereto to enforce those rights or remedies (including defaults or events of default arising as a result of the insolvency of the Canadian Debtors);

> (2)      of the fact that the Canadian Debtors have sought or obtained relief under the CCAA of Chapter 11 of the Bankruptcy Code or that the reorganization has been implemented by the Canadian Debtors;

> (3)      of the effect on the Canadian Debtors of the completion of any of the transactions contemplated by the CCAA Plan; or

> (4)      of any compromises or arrangements effected pursuant to the CCAA Plan.

(g)      Further Stay.

The Canadian Debtors may apply for an interim order extending the CCAA stay period so that the application for the CCAA Sanction Orders may be made before the stay period expires and the stay period shall not expire until the Effective Date.

**7.      General.**

(a)      CCAA Releases.

On the Effective Date, all Affected Creditors subject to the CCAA Plan as sanctioned by the Canadian Bankruptcy Court, any other Persons asserting such Claims, and each of their respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally the applicable Canadian Debtors, the CCAA Monitor, and each of their respective Related Persons (collectively, the "CCAA Released Parties") from any and all demands, Claims, actions (including any class actions or proceedings before an administrative tribunal), causes of action, grievances, obligations, counterclaims, suits, debts, sums of money, accounts, covenants, damages, remedies, judgments, expenses, executions, liens

and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any such Person may be entitled to assert, including, without limitation, any and all claims for accounting, reconciliation, contribution or indemnity, restitution or otherwise, as well as any Claims in respect of potential statutory liabilities of the former and present directors and officers of the Canadian Debtors, whether known or unknown, matured or unmatured, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, dealing, termination, disclaimer, rescission or repudiation of any contract, lease or other agreement, whether written or oral, or other occurrence existing or taking place on or prior to the Effective Date relating to, arising out of or in connection with any Claim, trust, constructive trust or deemed trust, the business and affairs of the Canadian Debtors, the CCAA Plan, the Canadian Asset Sale, or the CCAA Proceedings, provided that nothing in the Plan shall release or discharge (i) any CCAA Released Party if such CCAA Released Party is adjudged by the express terms of a judgment rendered on a final determination on the merits to have committed fraud or (ii) any director of a Canadian Debtor for a Claim excluded by Section 5.1(2) of the CCAA.

(b)     Amendments to the CCAA Plan.

The Canadian Debtors may (in consultation with the Committee and the CCAA Monitor) alter, amend, modify and/or supplement the CCAA Plan at any time prior to or after the entry of the CCAA Saction Order, provided that:

(i)     The Canadian Debtors reserve the right, at any time and from time to time, to (in consultation with the Committee and the CCAA Monitor) amend, modify and/or supplement the CCAA Plan, or to waive in whole or in part any condition, provided that any such alteration, amendment, modification, or supplement must be in a written document which that is: (i) filed with the Canadian Bankruptcy Court; and (ii) communicated to the Affected Creditors in such manner, if any, as may be required by the Canadian Bankruptcy Court. Any supplement or amendment to the CCAA Plan so filed with the Canadian Bankruptcy Court shall, for all purposes, be and be deemed to be a part of and incorporated in the CCAA Plan.deemed appropriate by the Canadian Debtors and the CCAA Monitor;

(ii)     Anyany such alteration, amendment, modification, supplement or waiver may be made following the entry of the CCAA Sanction Order unilaterally by the Canadian Debtors, provided that it concerns a matter that, in the opinion of the Canadian Debtors, acting reasonably, is of an administrative nature required to better give effect to the implementation of the CCAA Plan and the CCAA Sanction Order and is not adverse to the financial or economic interestdoes not materially or adversely change the treatment of any Class of Affected Creditors.; and

(iii)     Any supplementary plan or plans of compromise or arrangementany such alteration, amendment, modification or supplement filed with the Canadian Bankruptcy Court shall, for all purposes, be and be deemed to be a part of and incorporated in the CCAA Plan.

(c)    Further Assurances.

Notwithstanding that the transactions and events set out in the CCAA Plan shall be deemed
to occur without any additional act or formality other than as set out in the CCAA Plan, each of the
Persons affected hereby shall make, do and execute or cause to be made, done or executed all such
further acts, deeds, agreements, transfers, assurances, instruments, documents or discharges as
may be reasonably required by the Canadian Debtors in order to better implement the CCAA Plan.

(d)    Paramountcy.

From and after the Effective Date, any conflict between the CCAA Plan and the covenants,
warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of
any contract, credit document, agreement for sale, by-laws of the Canadian Debtors subject to the
CCAA Plan, lease or other agreement, written or oral, and any and all amendments or supplements
thereto, existing between one or more of the Affected  Creditors and the Canadian Debtors subject
to the CCAA Plan as of the Effective Date, shall be deemed to be governed by the terms,
conditions and provisions of this CCAA Plan and any applicable CCAA Sanction Order, which
shall take precedence and priority.  From and after the Effective Date, any conflict between the
terms of Article III of the Plan and the CCAA Plan shall be resolved by the Bankruptcy Court and
the Canadian Bankruptcy Court in accordance with the terms of the Cross-Border Insolvency
Protocol.

(e)    Termination.

At any time until the Effective Date, the Canadian Debtors may determine not to proceed
with the CCAA Plan, notwithstanding any prior approval given at the CCAA Creditors' Meeting.

(f)    Successors and Assigns.

The CCAA Plan and any compromise effected by the CCAA Plan shall be binding upon
and shall ~~inure~~ enure to the benefit of the heirs, administrators, executors, representatives,
successors and assigns of any Person named or referred to in, or affected by, the Plan for all
purposes, as of the Effective Date.

(g)    Deeming Provisions.

In the CCAA Plan, the deeming provisions are not rebuttable and are conclusive and
irrevocable.

## E.    **The Canadian Asset Sale.**

### 1.    **Sale of the Canadian Assets to Canadian Newco.**

(a)    Formation of Canadian Newco.

Prior to the Effective Date, the Debtors (in consultation with the Committee and the CCAA
Monitor) shall establish (a) Canadian Newco ~~(including, without limitation, one or more
intermediate holding companies formed for the purpose of holding SSCE's equity interests in~~ as a

167

CH1 ~~5118439~~5168368~~v.4~~1

wholly-owned, direct subsidiary of Canadian ~~Newco)~~Holdco and (b) Canadian Holdco as a wholly-owned, direct or indirect, subsidiary of SSCE. On or prior to the Effective Date, the Canadian Newco ~~Certificate of Incorporation and the Canadian Newco By-Laws,~~ Partnership Agreement (in substantially the ~~forms of Exhibit 7 and Exhibit 8 to the Plan (to be filed with the Plan Supplement), respectively,~~ form of Exhibit 7 to the Plan, to be filed with the Plan Supplement), the Canadian Holdco Articles of Association (in substantially the form of Exhibit 8 to the Plan), and the Canadian Holdco Memorandum of Association (in substantially the form of Exhibit 9 to the Plan) shall become effective. From and after the Effective Date, Canadian ~~Newco~~Holdco shall be a wholly-owned subsidiary of Reorganized SSCC~~.~~ and Canadian Newco shall continue to be a wholly-owned subsidiary of Canadian Holdco.

(b)      Offer to Purchase the Canadian Assets.

Pursuant to the Plan, Canadian Newco shall be deemed to have made an offer to purchase the Canadian Assets on the Effective Date, free and clear of all Liens, Claims, interests and encumbrances other than those liabilities that are expressly assumed by Canadian Newco in accordance with the terms of the Asset Purchase Agreement, upon and in consideration for (i) the payment to the Prepetition Agent of cash in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and all other amounts payable in connection therewith under the Plan, (ii) the payment of cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) the payment of cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned to Canadian Newco is in default, (iv) the assumption by Canadian Newco of certain liabilities of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company as set forth in the Asset Purchase Agreement, including, without limitation, all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans, and (v) the payment of cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, which shall be available for distribution to Affected Unsecured Creditors of SSC Canada and Smurfit-MBI in accordance with Article IV of the Plan. For the avoidance of doubt, the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Affected Unsecured Claims if the Classes of Affected Unsecured Claims against either SSC Canada or Smurfit-MBI fail to accept the Plan. Prior to or on the Effective Date, the Debtors or the Reorganized Debtors shall transfer to Canadian Newco the cash necessary to consummate the Canadian Asset Sale.

(c)      Assumption of Certain Liabilities by Canadian Newco.

Pursuant to the Asset Purchase Agreement, Canadian Newco shall assume certain liabilities of the Canadian Debtors. Such assumed liabilities shall include, without limitation: (i)

all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Pension Plans (including all unfunded liabilities thereunder) and the Canadian Employee Benefit Plans, (ii) all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Collective Bargaining Agreements, (iii) ~~all~~certain existing and future obligations of SSC Canada, Smurfit-MBI~~, or~~, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company to their current employees as set forth in the Asset Purchase Agreement, but excluding any obligations of such Canadian Debtors with respect to Non-Qualified Employee Benefit Plans, (iv) all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under executory contracts or unexpired leases that are assigned to Canadian Newco pursuant to the Asset Purchase Agreement, and (v) all obligations to vendors, suppliers and customers arising in the ordinary course of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., or Francobec Company's operations from and after the Petition Date, to the extent such obligations ~~are deemed to be Allowed~~constitute Post-Filing Claims ~~and~~that are not ~~otherwise~~ satisfied ~~or discharged~~ pursuant to the Plan.  For the avoidance of doubt, the liabilities assumed by Canadian Newco shall not include any existing or future obligations of any Canadian Debtor under any Non-Qualified Employee Benefit Plans.

    (d)    Assignment of Executory Contracts and Unexpired Leases to Canadian Newco.

Canadian Newco shall be entitled to receive a CCAA Vesting Order from the Canadian Bankruptcy Court, which shall provide for the transfer and assignment to Canadian Newco of, among other things: (i) the unexpired leases that were previously assumed by SSC Canada or Smurfit-MBI, as set forth in Exhibit ~~9~~10 to the Plan (to be filed with the Plan Supplement), and (ii) the executory contracts and unexpired leases set forth in Exhibit ~~10~~11 to the Plan (to be filed with the Plan Supplement).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such transfer and/or assignment for purposes of the Chapter 11 Cases.  Entry of the CCAA Vesting Order shall constitute the Canadian Bankruptcy Court's approval of such transfer and/or assignment for purposes of the CCAA Proceedings.  Canadian Newco shall assume and perform all obligations of SSC Canada or Smurfit-MBI under each of the executory contracts and unexpired leases that shall be assigned to Canadian Newco.

    (e)    Consensual Transfer of the Canadian Assets to Canadian Newco.

If the CCAA Plan is approved by the Required Majority of the Affected Secured Creditors and the Affected Unsecured Creditors of both SSC Canada and Smurfit-MBI, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the CCAA Vesting Order, the Confirmation Order, and the CCAA Sanction Order.  The Affected Secured Creditors and the Affected Unsecured Creditors shall be deemed to have consented to such transfer.

    (f)    Sale of the Canadian Assets if Affected Unsecured Creditors of SSC Canada and Smurfit-MBI Do Not Approve the CCAA Plan.

Should the CCAA Plan not be approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, members of such Classes shall be deemed thereafter to be Unaffected Creditors for all purposes of the CCAA Plan.  If (x) the CCAA

Plan is not approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, or should(y) the Plan failfails to be sanctioned by the Canadian Bankruptcy Court with respect to any Class of Affected Creditors, or (z) the Debtors so choose at any time prior to the Confirmation Hearing in consultation with the Committee, (i) the Debtors shall be permitted (in consultation with the Committee and with the assistance and under the supervision of the CCAA Monitor) to pursue a marketing process for the CCAA Assets pursuant to sale procedures that may be approved by the Canadian Bankruptcy Court and/or the Bankruptcy Court (the "Sale Procedures") at any time prior to or at the Confirmation Hearing and (ii) Canadian Newco's offer for the Canadian Assets under Section 5.1.2 of the Plan shall be modified to exclude the cash in the amounts required to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool. If no Competing Bids are submitted on or before any applicable deadline for the submission of Competing Bids that shall be established pursuant to the Sale Procedures (the "Competing Bid Deadline"), the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.

If any Competing Bids for the Canadian Assets are submitted on or before the Bid Deadline, the Canadian Bankruptcy Court shall determine whether any such Competing Bid constitutes a Superior Competing Bid. Each Competing Bid shall be in writing, shall not be subject to any contingencies (financing or otherwise), and shall consist of (i) cash payable to the Prepetition Agent in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and all other amounts payable in connection therewith under the Plan, (ii) cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada and Smurfit-MBI in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned by the Canadian Debtors is in default, and (iv) an unconditional commitment to assume all existing and future obligations of SSC Canada and Smurfit-MBI under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans. Competing Bids may, but shall not be required to, provide additional consideration for the Canadian Assets that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI. If no Competing Bid is determined by the Canadian Bankruptcy Court to constitute a Superior Competing Bid, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order. If the Canadian Bankruptcy Court determines that at least one Competing Bid constitutes a Superior Competing Bid, the Debtors shall conduct an auction for the Canadian Assets, under the supervision of the CCAA Monitor and in accordance with the Sale Procedures, between Canadian Newco and the Person(s) that submitted such Superior Competing Bid(s). Canadian Newco shall be entitled to participate in the bidding and auction process and may, but shall not be required to, revise its bid to include cash or other consideration that would be

170

available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI.

**F.     Means For Implementation of the Plan.**

**1.     Procedural Consolidation.**

The Plan is a joint plan that does not provide for substantive consolidation of the Estates, and on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes of the Plan.  Unless otherwise provided by the Plan or the Confirmation Order, Allowed Claims held against any Debtor shall be satisfied solely from the cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by any of the other Debtors.  Except as specifically set forth in the Plan and Disclosure Statement, nothing in the Plan or this Disclosure Statement shall constitute, or be deemed to constitute, an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.  A Claim against multiple Debtors shall be treated as a separate Claim against each Debtor for all purposes (including, but not limited to, voting and distributions); provided, however, that there shall only be a single recovery on account of any such Claim, any distributions from a Debtor on account of such a Claim shall take into account the Distributions to be made by the other Debtors on account of such Claim pursuant to the Plan, and such Claims shall be administered and treated in the manner provided in the Plan and described in this Disclosure Statement.

**2.     Corporate Governance and Corporate Actions.**

(a)     Amended and Restated Certificate of Incorporation and By-Laws.

(i)     On the Effective Date, the Amended and Restated By-Laws and the Amended and Restated Certificate of Incorporation, in substantially the forms of Exhibit 2 and Exhibit 1 to the Plan (to be filed with the Plan Supplement), respectively, and in a form reasonably acceptable to the Committee, shall become effective.  The Amended and Restated Certificate of Incorporation and the Amended and Restated By-Laws shall include, among other things, (i) provisions authorizing the issuance of 150,000,000 shares of New SSCC Common Stock, of which up to 100,000,000 shares shall initially be issued and outstanding as of the Effective Date; provided, however, that shares representing eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the applicable Management Incentive Plan(s) at, and as of, such times as are set forth in Exhibit 3 to the Plan; (ii) provisions authorizing the issuance of 10,000,000 shares of New SSCC Preferred Stock; provided, however,

that no shares of the New SSCC Preferred Stock shall be issued on the Effective Date; and (iii) provisions to the extent necessary or appropriate, giving effect to the terms of the Plan. Consistent with section 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities in contravention of the Bankruptcy Code.

(ii)     The certificates or articles of incorporation, by-laws, limited liability company agreements, and partnership agreements, as applicable, of each Reorganized Debtor other than Reorganized SSCC shall be amended as necessary to (a) include director and officer liability exculpation and indemnity provisions (including advancement of expenses) for those individuals who are or were directors or officers of the Debtors or the Reorganized Debtors on or after the Petition Date in accordance with, and to the fullest extent authorized by, the law of such Reorganized Debtor's state of organization and (b) satisfy the provisions of the Plan and the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, limited liability company agreements and partnership agreements, as applicable, in accordance with applicable law.

(b)     Directors and Officers of Reorganized SSCC.

As of the Effective Date, the initial directors of Reorganized SSCC shall be the persons identified in Exhibit 4 to ~~the~~this Plan (to be filed with the Plan Supplement). The term of any current members of the board of directors of SSCC or SSCE not identified as members of the initial Board of Directors of Reorganized SSCC shall expire on the Effective Date. **The number of members of the initial Board of Directors of Reorganized SSCC shall** ~~consist of ____ (__) directors, including~~**be disclosed in the Plan Supplement. The members of the initial Board of Directors of Reorganized SSCC shall include** (a) Patrick J. Moore, the Chief Executive Officer of Reorganized SSCC and (b) Steven J. Klinger, the President and Chief Operating Officer of Reorganized SSCC. On or promptly after the Effective Date, the initial Board of Directors of Reorganized SSCC shall select a non-executive Chairman of the Board of Directors of Reorganized SSCC, who shall not be an officer of Reorganized SSCC; provided, however, that nothing in ~~the~~this Plan or in the Amended and Restated Certificate of Incorporation shall prohibit any officer of Reorganized SSCC from serving as an executive Chairman of the Board of Directors of Reorganized SSCC after the Effective Date.

In accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in Exhibit 4 to the Plan (to be filed with the Plan Supplement) the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized SSCC, and to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person. Each director of Reorganized SSCC shall serve from and after the Effective Date pursuant to the terms of the Amended and Restated Certificate of Incorporation, the Amended and Restated By-Laws, and applicable law. As set forth in Exhibit 4 to the Plan, all existing executive officers of SSCC are currently expected to serve as officers of Reorganized SSCC in their existing capacities from and after the Effective Date and, where applicable, pursuant to the terms and

conditions of the Employment and Retirement Benefit Agreements to which such executive officers are party on the Effective Date, as set forth in Exhibit <del>12</del>13 to the Plan.

(c)     Management of Reorganized Debtors Other Than Reorganized SSCC.

The board of directors of each Reorganized Debtor other than Reorganized SSCC shall consist of such officers or employees of Reorganized SSCC or the other Reorganized Debtors as shall be designated by the Chief Executive Officer of Reorganized SSCC. All existing executive officers of Reorganized Debtors other than Reorganized SSCC are currently expected to continue to serve in their existing capacities from and after the Effective Date.

(d)     Corporate Action.

On the Effective Date, the adoption of the Amended and Restated Certificate of Incorporation or similar constituent documents, the adoption of the Amended and Restated By-Laws, the selection of directors and officers for Reorganized SSCC and the other Reorganized Debtors, and all other corporate actions contemplated by the Plan, including the formation of Canadian Newco pursuant to Section 5.1.1 of the Plan, shall be deemed to have been authorized and approved in all respects (subject to the provisions of the Plan). All matters provided for in the Plan involving the entity structure of the Debtors or the Reorganized Debtors, and any entity action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders, directors, officers, managers, partners or shareholders of SSCC, Reorganized SSCC, or any of the other Debtors or Reorganized Debtors. On the Effective Date, the appropriate directors and officers of Reorganized SSCC and/or of the other Reorganized Debtors shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of Reorganized SSCC and/or the other Reorganized Debtors.

**3.     Issuance and Distribution of New Securities and Related Matters.**

(a)     Issuance of New SSCC Common Stock.

On the Effective Date, Reorganized SSCC shall issue <del>up to</del> 100,000,000 shares of New SSCC Common Stock and all related instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order or rule; provided, however, that shares representing eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the pertinent Management Incentive Plan(s) at, and as of, such times as are set forth in Exhibit 3 to the Plan.

The issuance and distribution of the New SSCC Common Stock under or in connection with the Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable non-bankruptcy

law and under the Bankruptcy Code, including, without limitation, section 1145(a) of the Bankruptcy Code.  Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.  In addition, all of the shares of New SSCC Common Stock issued pursuant to the Plan shall be deemed to be fully paid, non-assessable and freely tradable to the fullest extent permissible under section 1145 of the Bankruptcy Code.

(b)     Distribution of New SSCC Common Stock.

On or as soon as reasonably practicable after the Effective Date, all of the shares of the New SSCC Common Stock to which any Holder of a Claim shall become entitled pursuant to the Plan shall be made by delivery of one or more certificates representing such shares as described in the Plan or issued in the name of such Holder or DTC or its nominee or nominees, in accordance with DTC's book-entry exchange procedures, as contemplated by Section 8.7.2 of the Plan, subject to the terms and conditions of the Plan.  In the period pending distribution of the New SSCC Common Stock to any Holder of an Allowed Claim entitled to receive such distribution, such Holder shall be entitled to exercise any voting rights and shall be entitled to receive dividends or other distributions payable in respect of such Holder's New SSCC Common Stock (including, without limitation, receiving any proceeds of any permitted transfer of such New SSCC Common Stock), and to exercise all other rights in respect of the New SSCC Common Stock (so that such Holder shall be deemed for tax purposes to be the owner of any shares of the New SSCC Common Stock issued in the name of such Holder pursuant to the Plan).

(c)     Issuance of New Calpine Corrugated Interests.

On the Effective Date, Reorganized Calpine Corrugated shall issue 100% of the New Calpine Corrugated Interests to Reorganized SSCC (as the successor in interest to SSCE) without the necessity of any further act or action under applicable law, regulation, order or rule.

**4.     Listing on the New York Stock Exchange or the NASDAQ Stock Market.**

As soon as practicable after the Effective Date, Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of the New SSCC Common Stock for trading on the New York Stock Exchange ("NYSE") or the NASDAQ Stock Market ("NASDAQ") but will incur no liability if it is unable to do so.  Persons receiving distributions of New SSCC Common Stock, by accepting such distributions, shall be deemed to have agreed to cooperate with Reorganized SSCC's reasonable requests to assist Reorganized SSCC in its efforts to list the New SSCC Common Stock on the NYSE or NASDAQ, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized SSCC who satisfy the independence and other requirements of the NYSE or NASDAQ and establishing committees of the board of directors of Reorganized SSCC and cooperating with any other requirements of listing on the NYSE or NASDAQ.

5.      **Exit Facilities.**

On or prior to the Effective Date, certain of the Debtors shall enter into the Exit Facility
Documentation and execute all other necessary and appropriate documentation in connection with
the Exit Facilities.  As discussed above in section IV.G.13, the Debtors received Bankruptcy Court
authority to enter into the Arrangement Letter and Arrangement Fee Letter.  The Debtors are
currently negotiating the terms of the Exit Facilities, which will be embodied in the Exit Facility
Documentation.  The proceeds of the Exit Facilities shall be used, among other things, to make
cash payments required under the Plan and to provide working capital for the business operations
and general corporate purposes of the Reorganized Debtors.

6.      **Continued Corporate Existence and Vesting of Assets in the Reorganized
        Debtors.**

On and after the Effective Date, after giving effect to each of the Restructuring
Transactions contemplated under the Plan, each of the Reorganized Debtors and Canadian Newco
shall continue to exist as separate entities in accordance with the applicable law in the respective
jurisdictions in which they are organized and pursuant to their respective certificates or articles of
incorporation and by-laws, limited liability company agreements or partnership agreements in
effect prior to the Effective Date, except to the extent such documents are to be amended pursuant
to the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, subject to the effect
of the Restructuring Transactions contemplated under the Plan, the Reinstated Claims and
Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall
remain the obligations solely of such Debtor or Reorganized Debtor and shall not become
obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases,
or otherwise.  Except as otherwise provided in the Plan, on and after the Effective Date, all
property of the Estates of the Debtors, including all Claims, rights and Causes of Action and any
property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan,
shall vest in the Reorganized Debtors and Canadian Newco free and clear of all Claims, Liens,
charges, remedies and other encumbrances.  On and after the Effective Date, the Reorganized
Debtors and Canadian Newco may operate their businesses and may use, acquire and dispose of
property and compromise or settle any Claims without supervision of or approval by the
Bankruptcy Court or the Canadian Bankruptcy Court and free and clear of any restrictions of the
Bankruptcy Code or the Bankruptcy Rules, with the sole exception of any restrictions expressly
imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized
Debtors shall be authorized to pay the charges that they incur on or after the Effective Date for
professionals' fees, disbursements, expenses or related support services without the need for any
application to the Bankruptcy Court or the Canadian Bankruptcy Court.

7.      **Dissolution of** ~~SSC Canada, Smurfit-MBI, Francobec Company, and Stone
        FinCo II~~**Certain Canadian Debtors**.

If the CCAA Plan is approved by each Class of Affected Creditors, then from and after the
Confirmation Date and through the Effective Date, SSC Canada, Smurfit-MBI, MBI Limited, B.C.
Shipper Supplies Ltd., Francobec Company, 639647 British Columbia Ltd., Specialty Containers
Inc., 605681 N.B. Inc. and Stone FinCo II shall continue in existence and each then current officer
and director of such Debtors shall continue to serve in his or her respective capacity through the

earlier of the date such Debtors are dissolved pursuant to the Plan and the date such officer or director resigns, is replaced, or is terminated.  On the Effective Date, to the extent that the Canadian Assets are transferred to Canadian Newco and the SSC Canada Distribution Reserve and the Smurfit-MBI Distribution Reserve are established, SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 639647 British Columbia Ltd., Specialty Containers Inc., 605681 N.B. Inc. and Stone FinCo II shall be deemed dissolved for all purposes without the necessity for any other or further action by or on behalf of Debtors or any payments to be made in connection therewith; provided, however, that the Debtors or the Reorganized Debtors shall file with the appropriate public office certificates of dissolution for SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 639647 British Columbia Ltd., Specialty Containers Inc., 605681 N.B. Inc. and Stone FinCo II, to the extent required by applicable non-bankruptcy law.  From and after the Effective Date, neither the Debtors nor the Reorganized Debtors shall be required to file any document, or take any other action, to withdraw the business operations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, and 639647 British Columbia Ltd., Specialty Containers Inc., 605681 N.B. Inc., or Stone FinCo II from any state or province in which such Debtors previously conducted their business operations.

## 8.     Vesting of the Canadian Assets in Canadian Newco.

To the extent that the Canadian Assets are transferred to Canadian Newco on the Effective Date, they shall be transferred to and vest in Canadian Newco free and clear of all Liens, Claims, interests and encumbrances of any kind (except as otherwise set forth in the CCAA Vesting Order or in the Plan).  From and after the Effective Date, Canadian Newco shall operate and may use, acquire and dispose of any Canadian Assets free of any restrictions of the Bankruptcy Code, the CCAA, the Bankruptcy Court, or the Canadian Bankruptcy Court.

The transfer of the Canadian Assets to Canadian Newco on the Effective Date and the assignment of any executory contracts, unexpired leases, licenses or permits to Canadian Newco in connection with the Canadian Asset Sale, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under the section 1146(a) of the Bankruptcy Code.

## 9.     Cancellation of Credit Documents, Debt Instruments, and Interests.

On the Effective Date, after giving effect to the distributions to be made on the Effective Date pursuant to the Plan and except as otherwise provided in the Plan, the obligations of the Debtors under all (a) Prepetition Credit Documents, Calpine Corrugated Credit Agreements, Prepetition Notes, Prepetition Notes Indentures, Industrial Revenue Bonds, Industrial Revenue Bond Indentures (other than the Hodge Industrial Revenue Bond Indenture), SSCC Interests, all other Interests that are Impaired under the Plan, and any other notes, bonds, indentures, stockholders agreements, stockholders rights agreements (including, without limitation, the Stockholder Rights Plan), registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under the Plan, shall be cancelled, and (b) the obligations of the Debtors under any agreements, stockholders agreements, stockholders rights agreements (including, without limitation, the Stockholder Rights Plan),

registration rights agreements, repurchase agreements and repurchase arrangements, or indentures (including the Prepetition Notes Indentures and the Industrial Revenue Bond Indentures) governing the Prepetition Notes, the Industrial Revenue Bonds, the SSCC Interests, and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims or Interests against a Debtor that relate to Claims or Interests that are Impaired under the Plan shall be discharged.  Notwithstanding the foregoing and anything contained in the Plan, (x) the Prepetition Notes Indentures shall continue in effect solely to the extent necessary to (i)  allow the applicable Disbursing Agent(s) to make distributions pursuant to the Plan on account of the Prepetition Noteholder Claims under the respective Prepetition Notes Indentures, (ii) permit the relevant Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien, (iii) permit the Prepetition Notes Indenture Trustees to appear in the Chapter 11 Cases and the CCAA Proceedings, including, without limitation, in connection with any contested matter or adversary proceeding to which such Prepetition Notes Indenture Trustee is a party, and (iv) permit the applicable Prepetition Notes Indenture Trustee to perform any  functions that are necessary in connection with the foregoing clauses (i) through (iii); and (y) the Industrial Revenue Bond Indentures (other than the Hodge Industrial Revenue Bond Indenture) shall continue in effect solely to the extent necessary to (i) allow the applicable Disbursing Agent(s) to make distributions pursuant to the Plan on account of the Industrial Revenue Bond Claims under the respective Industrial Revenue Bond Indentures, (ii) permit the relevant Industrial Revenue Bond Indenture Trustee to assert its Industrial Revenue Bond Indenture Trustee Charging Lien, (iii) permit the Industrial Revenue Bond Indenture Trustees to appear in the Chapter 11 Cases and the CCAA Proceedings, including, without limitation, in connection with any contested matter or adversary proceeding to which such Industrial Revenue Bond Indenture Trustee is a party, and (iv) permit the applicable Industrial Revenue Bond Indenture Trustee to perform any functions that are necessary in connection with the foregoing clauses (i) through (iii).  As of the Effective Date, any SSCC Interest that has been authorized to be issued but that has not been issued shall be deemed cancelled and extinguished without any further action of any party.

**10.     Cancellation of Liens.**

Except as otherwise provided in the Plan, on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to the Plan, (i) all Liens, charges, encumbrances and rights related to any Claim or Interest, including, without limitation, those existing under the Prepetition Credit Documents and the Calpine Corrugated Credit Agreements, shall be terminated, null and void and of no effect, and (ii) any Lien securing any Other Secured Claim (other than a Lien securing an Other Secured Claim that is Reinstated pursuant to the Plan) shall be deemed released and the Holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

**11.     Employee Compensation and Benefit Programs.**

Except and to the extent previously assumed pursuant to an order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Employee

Benefit Plans and Employment and Retirement Benefit Agreements (as set forth in Exhibit 1213 to the Plan), as amended or modified pursuant to the Plan or otherwise, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before, on or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed by the Debtors and assigned to the Reorganized Debtors on the Effective Date, except for (i) any executory contracts or plans specifically rejected pursuant to the Plan, and (ii) any executory contracts or plans that have previously been rejected or are the subject of a motion to reject as of the Confirmation Date; provided, however, that (x) the Debtors and the Reorganized Debtors shall pay all "retiree benefits" (as defined in section 1114(a) of the Bankruptcy Code) and (y) to the extent applicable, each of the Employment and Retirement Benefit Agreements (as set forth in Exhibit 1213 to the Plan) shall be amended prior to (or upon) the assumption thereof by the Debtors (and assignment thereof to the Reorganized Debtors) to provide that the implementation of the restructuring in accordance with the Plan shall not alone constitute "Good Reason" or "Good Cause" (or provide any other similar basis) for any employee of the Debtors or the Reorganized Debtors to terminate his or her employment nor constitute a "Change in Control" that would result in any obligation of the Debtors or Reorganized Debtors to provide any payments or other benefits to any employee.

With respect to the Employment and Retirement Benefit Agreements that the Debtors have not entered into prior to the Confirmation Date, as identified in Exhibit 1213 to the Plan, the pertinent Debtor shall be deemed to have entered into each such Employment and Retirement Benefit Agreement with the applicable employee(s) on the Confirmation Date pursuant to the Plan. Such Employment and Retirement Benefit Agreements shall become binding in all respects on the Debtors and the applicable employee(s) on the Effective Date and shall be assigned by the Debtors to the Reorganized Debtors on the Effective Date.

On the Effective Date, Reorganized SSCC and any other Reorganized Debtor, whose employees are covered by any of the U.S. Pension Plans shall assume and continue the U.S. Pension Plans, satisfy the minimum funding standards under the U.S. Pension Plans pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the U.S. Pension Plans in accordance with their terms and the provisions of ERISA; and nothing in the Plan shall be construed in any way as discharging, releasing or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from liability imposed under any law or regulatory provision with respect to the U.S. Pension Plans.

On and after the Effective Date, Reorganized SSCC and any other Reorganized Debtor whose employees are covered by any Multi-Employer Pension Plan shall continue to perform their respective obligations under such Multi-Employer Pension Plan as such obligations may exist as of the Effective Date; provided, however, that nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' rights or obligations with respect to such Multi-Employer Pension Plan.

**12.  Canadian Pension Plans.**

To the extent that the Canadian Assets are transferred to Canadian Newco, then, on the Effective Date, the Canadian Pension Plans shall be assigned to Canadian Newco pursuant to the terms of the CCAA Vesting Order, the Plan, the Confirmation Order, and the CCAA Sanction

Order.  From and after the Effective Date, Canadian Newco shall assume and continue the Canadian Pension Plans, satisfy the minimum funding standards thereunder pursuant to applicable Canadian law, and administer the Canadian Pension Plans in accordance with their terms and the provisions of applicable Canadian law.  Nothing in the Plan shall be construed in any way as discharging, releasing or relieving Canadian Newco from liability imposed under any law or regulatory provision with respect to the Canadian Pension Plans.

**13.    Management Incentive Plans.**

On the Effective Date, Reorganized SSCC shall adopt and assume (as applicable) each of the Management Incentive Plans (including the form award agreements) substantially in the form as set forth in <u>Exhibit 3</u> to the Plan.

Eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans.  Reorganized SSCC shall deliver (a) the stock option, restricted stock, and/or other equity-based awards to certain officers and other employees in such allocations, at and effective as of such times as set forth in <u>Exhibit 3</u> to the Plan and in such forms as set forth in <u>Exhibit 3</u> to the Plan, pursuant to the Management Incentive Plans and (b) such additional stock options, restricted stock unit grants and/or other equity-based awards pursuant to the Management Incentive Plans, from time to time on or after the Effective Date, as determined by the compensation committee of the board of directors of Reorganized SSCC in such committee's discretion.  On and after the Effective Date, eligible officers and other employees who earn or receive incentive bonus, equity-based awards, and/or other benefits under such Management Incentive Plans shall be entitled to such payments, awards, and other benefits as provided in <u>Exhibit 3</u> to the Plan, on the terms and conditions provided for therein, including the applicable award agreements provided pursuant to such Management Incentive Plans and in Section IV.C of the "Summary of Management Incentive Plans for Smurfit-Stone Container Corporation and its Subsidiaries" as set forth in <u>Exhibit 3</u> to the Plan.  As of the Effective Date, all equity-based awards granted by a Debtor prior to the Petition Date shall terminate and cease to be binding on such Debtor.

The Debtors' 2009 Long-Term Incentive Plan and 2010 Management Incentive Plan, which were previously approved by the Bankruptcy Court, shall have the financial performance goals and (as applicable) restructuring goals, and shall provide for such payments to participants, as set forth in <u>Exhibit 3</u> to the Plan, notwithstanding any prior order issued by the Bankruptcy Court with respect thereto.

**14.    Restructuring Transactions.**

On, prior to, or after the Effective Date, any Debtor or Reorganized Debtor may enter into or undertake any Restructuring Transactions and may take such actions as may be determined by such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring Transactions.  Such Restructuring Transactions will include the merger of SSCC into SSCE (the "SSCC/SSCE Merger"), which will ~~survive~~occur on or before the Effective Date, with SSCE

surviving the merger and ~~become~~becoming Reorganized SSCC under the Plan.  The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms in the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms in the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions.  In addition to the SSCC/SSCE Merger, the Restructuring Transactions may include one or more other mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate to effect  the purposes of such Restructuring Transaction for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Debtors or Reorganized Debtors.  In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided by applicable law or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations.  Exhibit ~~13~~14 to the Plan, to be filed with the Plan Supplement, shall set forth a detailed description of the actions and steps required to implement the Restructuring Transactions.  On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section ~~6.13~~6.14 of the Plan.  The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code without any further notice, action, or process of any kind.

### 15.    Additional Transactions Authorized Under the Plan.

In accordance with the provisions of the Plan and the Confirmation Order, on or prior to the Effective Date, the Debtors shall be authorized to take such actions as may be necessary or appropriate to Reinstate certain Claims or Interests or to render certain Claims or Interests not Impaired in accordance with the terms of the Plan.

### 16.    Cash-Out Auction for Eligible Cash-Out Participants.

(a)      General.

Each Eligible Cash-Out Participant may elect to participate in the Cash-Out Auction by making the Cash-Out Election on its timely-submitted Ballot.  Each Eligible Cash-Out Participant shall be entitled to make the Cash-Out Election regardless of whether such Eligible

Cash-Out Participant has voted in favor of the Plan. All Eligible Cash-Out Participants that choose not to make the Cash-Out Election shall receive shares of the New SSCC Common Stock on account of their Allowed Claims and shall not be subject to the terms and conditions set forth in Section 6.16 of the Plan. Any Eligible Cash-Out Participant holding a Disputed Claim as of the Voting Deadline shall be entitled, but not required, to participate in the Cash-Out Auction, provided that all Eligible Cash-Out Participants must hold Allowed General Unsecured Claims against SSCE on or before the Initial Distribution Date in order to receive a Cash-Out Payment. Any Eligible Cash-Out Participant that holds a Disputed Claim as of the Initial Distribution Date that is deemed to be an Allowed Claim after the Initial Distribution Date shall receive shares of the New SSCC Common Stock on account of its Allowed Claims and shall not be entitled to receive a Cash-Out Payment. THE DEBTORS, IN CONSULTATION WITH THE COMMITTEE, RESERVE THE RIGHT TO CANCEL THE CASH-OUT AUCTION AT ANY TIME PRIOR TO THE EFFECTIVE DATE BY FILING A WRITTEN NOTICE OF SUCH CANCELLATION WITH THE BANKRUPTCY COURT. If the Cash-Out Auction is cancelled by the Debtors, all Eligible Cash-Out Participants that made the Cash-Out Election on their timely-submitted Ballots shall receive their Pro Rata Share of the New SSCC Common Stock Pool on account of their Allowed Claims.

    (b)    Cash-Out Auction.

    Pursuant to the Cash-Out Election, each Eligible Cash-Out Participant may elect to forego its Pro Rata Share of the New SSCC Common Stock Pool, which it otherwise would have received under the Plan on account of its Allowed General Unsecured Claims against SSCE, in exchange for receiving a payment in cash equal to the Cash-Out Percentage of such Allowed Claim (the "Cash-Out Payment") on the Initial Distribution Date, in full and complete satisfaction, settlement, release and discharge of such Allowed Claim. Each Eligible Cash-Out Participant that receives a Cash-Out Payment shall be deemed to have irrevocably waived its right to receive any shares of the New SSCC Common Stock under the Plan. The process for determining which Eligible Cash-Out Participants may be entitled to receive Cash-Out Payments on account of their Allowed Claims in accordance with the procedures set forth in Section 6.16.3 of the Plan and described below is referred to in the Plan as the "Cash-Out Auction."

    (c)    Cash-Out Auction Procedures.

    The Debtors will administer the Cash-Out Auction in accordance with the following procedures:

    (i)    Participation: In order to participate in the Cash-Out Auction, the Eligible Cash-Out Participant must specify on its timely-submitted Ballot the percentage of its Claim (if and when it is deemed to be an Allowed Claim) that such Eligible Cash-Out Participant is willing to receive in cash (the "Cash-Out Percentage") in lieu of its Pro Rata Share of the New SSCC Common Stock Pool. The Cash-Out Percentage must be set forth in whole numbers and clearly marked on a timely-submitted Ballot. Eligible Cash-Out Participants who fail to comply with the foregoing requirements shall not be eligible to receive a Cash-Out Payment.

181

(ii)    Successful Cash-Out Participants:  Following the Voting Deadline, the Debtors will examine all timely-submitted Ballots and will identify the Eligible Cash-Out Participants who made the Cash-Out Election.  All Eligible Cash-Out Participants who specified the same Cash-Out Percentage (in whole numbers) on their timely-submitted Ballots shall be grouped together (each such group, a "Cash-Out Percentage Group") by the Debtors for purposes of the Cash-Out Auction.  The Cash-Out Percentage Groups will be ranked by the Debtors from the lowest Cash-Out Percentage to the highest Cash-Out Percentage.

(iii)    Cash-Out Distribution Pool:  If the Cash-Out Auction is not cancelled by the Debtors prior to the Effective Date, the Cash-Out Distribution Pool will be distributed as follows:  (i) the Eligible Cash-Out Participants in the Cash-Out Percentage Group with the lowest Cash-Out Percentage will be entitled to receive a Cash-Out Payment on the Initial Distribution Date if sufficient cash is available in the Cash-Out Distribution Pool to make a Cash-Out Payment to all Eligible Cash-Out Participants in such Cash-Out Percentage Group; (ii) if insufficient cash is available in the Cash-Out Distribution Pool to fund a Cash-Out Payment to each Eligible Cash-Out Participant in the Cash-Out Percentage Group with the lowest Cash-Out Percentage, such Eligible Cash-Out Participants shall not be entitled to receive any portion of the Cash-Out Distribution Pool and will instead receive their Pro Rata Share of the New SSCC Common Stock Pool on the Initial Distribution Date in full and complete satisfaction, settlement, release and discharge of their Allowed Claims; (iii) once the Eligible Cash-Out Participants in the Cash-Out Percentage Group with the lowest Cash-Out Percentage have received their Cash-Out Payments, the Debtors will move to the Cash-Out Percentage Group with the second-lowest Cash-Out Percentage and will repeat the procedures set forth in subclauses (i) and (ii) hereof until insufficient funds remain in the Cash-Out Distribution Pool to allow the Debtors to fund a Cash-Out Payment to each Eligible Cash-Out Participant in the applicable Cash-Out Percentage Group, at which point any remaining funds in the Cash-Out Distribution Pool will be returned to the Reorganized Debtors (and all Eligible Cash-Out Participants who did not receive a Cash-Out Payment will receive their Pro Rata Share of the New SSCC Common Stock Pool on account of their Allowed Claims).

(iv)    Additional Procedures: The Debtors or the Reorganized Debtors (in consultation with the Committee) shall be authorized to adopt any additional procedures for administering the Cash-Out Auction that are not inconsistent with the procedures set forth in Section 6.16 of the Plan and are reasonably necessary to efficiently administer the Cash-Out Auction in accordance with the terms of the Plan.  The Reorganized Debtors shall send a written notice prior to the Initial Distribution Date to each Eligible Cash-Out Participant that the Reorganized Debtors reasonably believe will be entitled to receive a Cash-Out Payment under the Plan.

**G.      Treatment of Executory Contracts and Unexpired Leases in the Chapter 11 Cases and the CCAA Proceedings.**

> **1.      Assumption/Ratification of Executory Contracts and Unexpired Leases.**

Upon the occurrence of the Effective Date, all executory contracts or unexpired leases of the Debtors shall (i) be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and (ii) be deemed ratified by the Canadian Debtor that is a party to such executory contract or unexpired lease, unless such executory contract or unexpired lease (a) was previously assumed or rejected by the Debtors in the Chapter 11 Cases or repudiated by the Canadian Debtors in the CCAA Proceedings, (b) previously expired or terminated in accordance with its terms, or (c) is subject to the Assumption/Rejection Motion in the Chapter 11 Cases.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of each such assumption pursuant to sections 365(a) and 1123 of the Bankruptcy Code in the Chapter 11 Cases.  Entry of the CCAA Sanction Order by the Canadian Bankruptcy Court shall constitute approval of each such ratification in the CCAA Proceedings.  Each executory contract and unexpired lease assumed pursuant to this Article VI shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, the terms of the Confirmation Order or the CCAA Sanction Order, as applicable, or applicable law.  Except as otherwise set forth in the Plan, (x) all Employee Benefit Plans shall be deemed to have been assumed by the Debtors on the Effective Date and (y) all Non-Qualified Employee Benefit Plans shall be deemed to have been rejected by the Debtors, and to have been terminated with the approval of the Bankruptcy Court pursuant to the Bankruptcy Code, on the Effective Date.

> **2.      Cure of Defaults Under Assumed/Ratified Executory Contracts and Unexpired Leases.**

Any monetary amounts by which each executory contract and unexpired lease to be assumed or ratified pursuant to the Plan is in default shall be satisfied by payment of the default amount in cash on the Effective Date or on such other terms as the parties to such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption or ratification of such contract or lease , the cure payments required shall be made following the entry of a Final Order resolving the dispute and approving the assumption or ratification, as applicable.  Pending the entry of such Final Order, the executory contract or unexpired lease at issue shall be deemed assumed or ratified by the Debtors, as applicable, unless otherwise ordered by the Bankruptcy Court or the Canadian Bankruptcy Court.

> **3.      Assumption of Collective Bargaining Agreements.**

All Collective Bargaining Agreements shall be deemed to have been assumed or ratified by the Debtors party thereto upon the occurrence of the Effective Date, provided that the Canadian Collective Bargaining Agreements shall be assigned to Canadian Newco on the Effective Date if the Canadian Asset Sale is consummated.  Entry of the Confirmation Order shall constitute the

Bankruptcy Court's approval of the pertinent Debtor's assumption of each Collective Bargaining Agreement to which it is a party for the remaining term of agreement of each such Collective Bargaining Agreement as in effect on the Effective Date, except to the extent that such agreements have already been assumed prior to the Effective Date.

###### 4.     Insurance Policies and Agreements.

Insurance policies issued to, or insurance agreements entered into by, the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date. To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, (i) the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate and (ii) the entry of the CCAA Sanction Order shall constitute approval of such ratification. Unless otherwise determined by the Bankruptcy Court or the Canadian Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement. To the extent that the Bankruptcy Court or the Canadian Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Debtors reserve the right to seek the rejection of such insurance policy or agreement or other available relief.

###### 5.     Rejection Damages Bar Date.

If the rejection by a Debtor (or repudiation by a Canadian Debtor) of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor unless a Proof of Claim with respect to such Claim is filed with the Claims and Noticing Agent and served upon counsel to the Debtors or the Reorganized Debtors (as the case may be) by the earlier of (i) thirty (30) days after the Effective Date or (ii) thirty (30) days after entry of a Final Order rejecting such executory contract or unexpired lease.

###### 6.     Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date (including, without limitation, all Employment and Retirement Benefit Agreements entered into by any Debtor after the Petition Date and on or before the Confirmation Date, as set forth in Exhibit ~~12~~13 of the Plan) shall be deemed to have been assumed by the Debtors and assigned to the Reorganized Debtors on the Effective Date.

##### H.     Provisions Governing the Distributions Under the Plan.

###### 1.     General Provisions on Distributions under the Plan.

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court or to the extent that any Holder of an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the

CCAA Proceedings agrees to different treatment, distributions to be made on account of Claims that are Allowed Claims or Proven Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable. Notwithstanding anything in the Plan to the contrary, distributions on account of (i) Administrative Expense Claims that are Allowed Claims as of the Effective Date and (ii) CCAA Charges shall be made on, or as soon as practicable after, the Effective Date, with no action to enforce a right to such payment until at least thirty (30) days after the Effective Date. Distributions on account of any Claim that first becomes an Allowed Claim or a Proven Claim after the Effective Date shall be made on the first Distribution Date after such Claim becomes an Allowed Claim or a Proven Claim, as applicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

Notwithstanding any other provision of the Plan to the contrary, no distributions shall be made on account of any Disputed Claims unless and until such Claim has become an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings. Prior to the Effective Date, Disputed Claims in the CCAA Proceedings shall be dealt with in accordance with the terms of the CCAA Claims Determination Order. Following the Effective Date, the resolution of Disputed Claims in the CCAA Proceedings shall continue to be dealt with in accordance with the terms of the CCAA Claims Determination Order.

## 2. No Interest on Claims Unless Otherwise Provided in the Plan.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or any other order of the Bankruptcy Court (including, without limitation, the DIP Financing Order), or as otherwise required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to the payment of interest accruing on or after the Petition Date on any Claim.

## 3. Distributions by Disbursing Agents.

Except as specifically provided in the Plan, the Disbursing Agent shall make all distributions required to be made under the Plan. The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to assist in or make the distributions required by the Plan. The Prepetition Agent shall be the Disbursing Agent for all distributions to the Holders of Prepetition Lender Claims under the Prepetition Credit Agreement and Prepetition Canadian Lender Claims under the Prepetition Credit Agreement, and all such distributions shall be made subject to and in accordance with the Prepetition Credit Documents. The Prepetition Notes Indenture Trustees shall be the Disbursing Agents for all distributions to the Holders of Prepetition Noteholder Claims. The Disbursing Agents for all distributions to the Industrial Revenue Bondholders shall be either the applicable Industrial Revenue Bond Indenture Trustee, the Reorganized Debtors, or any Person or Entity retained by the Reorganized Debtors for the purpose of making distributions under the Plan to the Industrial Revenue Bondholders. Other than as specifically set forth in the Plan, distributions to be made on account of Prepetition Noteholder Claims or, Industrial Revenue Bond Claims or Hodge Industrial Revenue Bond Claims shall be made in accordance with the terms of the applicable Prepetition Notes Indenture or Industrial Revenue Bond Indenture, or in accordance with the Plan if such Prepetition Notes Indenture or Industrial Revenue Bond Indenture is silent.

4.     **Delivery of Distributions – Chapter 11 Cases**.

The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Allowed Claims in the Chapter 11 Cases.

(a)     Delivery of Distributions in General.

Distributions to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (i) at the address set forth in the Schedules if no Proof of Claim was filed with respect to such Allowed Claim; (ii) at the address set forth in the last-filed Proof of Claim with respect to such Allowed Claim; (iii) at the address set forth in any written notice of address change delivered to the Claims and Noticing Agent at least five (5) Business Days prior to the applicable Distribution Date; or (iv) in accordance with Section 8.8 of the Plan, at the address set forth in any notice of transfer received at least ten (10) Business Days prior to the applicable Distribution Date.

(b)     Distributions to Holders of Prepetition Lender Claims.

On the Effective Date, the Reorganized Debtors shall deliver to the Prepetition Agent, for distribution on behalf of the Debtors to the Holders of Prepetition Lender Claims (and, in the case of Claims in respect of Prepetition Swap Agreements, to the Holders thereof), any distributions that the Debtors are required to make to such Holders pursuant to Article III of the Plan.

(c)     Distributions to Holders of Union Bank Claims and CIT Group Claims.

On the Effective Date, the Reorganized Debtors shall deliver to Union Bank and CIT Group, for distribution on behalf of Calpine Corrugated, the cash distributions that Calpine Corrugated is required to make to such Holders pursuant to Article III of the Plan.

(d)     Distributions to Holders of General Unsecured Claims Against SSCE.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver shares of the New SSCC Common Stock to the applicable Disbursing Agent for distribution to the Holders of Allowed General Unsecured Claims against SSCE in accordance with the procedures set forth in Sections 8.4 and 8.7 of the Plan.  If the Cash-Out Auction has not been cancelled by the Debtors prior to the Effective Date, the Reorganized Debtors shall deliver the Cash-Out Payments to the applicable Eligible Cash-Out Participants in accordance with the procedures set forth in Sections 8.4 and 8.7 of the Plan.

(e)     Distributions to Holders of Convenience Claims.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall distribute cash to the Holders of Allowed Convenience Claims against SSCE in accordance with the procedures set forth in Sections 8.4 and 8.7 of the Plan.

(f)     Distributions to Holders of General Unsecured Claims Against Cameo Container and Calpine Corrugated.

186

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver to the Holders of Allowed General Unsecured Claims against Cameo Container and Calpine Corrugated the cash distributions that Cameo Container and Calpine Corrugated are required to make to such Holders pursuant to Article III of the Plan.

**5.      Delivery of Distributions – CCAA Proceedings.**

The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Proven Claims in the CCAA Proceedings.

(a)      Delivery of Distributions in General.

Distributions to Holders of Proven Claims shall be made by the applicable Disbursing Agent (i) at the address set forth in the Schedules if no Proof of Claim was filed with respect to such Proven Claim; (ii) at the address set forth in the last-filed Proof of Claim with respect to such Proven Claim; (iii) at the address set forth in any written notice of address change delivered to the CCAA Monitor or the Claims and Noticing Agent at least five (5) Business Days prior to the applicable Distribution Date; or (iv) in accordance with Section 8.8 of the Plan, at the address set forth in any notice of transfer received at least ten (10) Business Days prior to the applicable Distribution Date.

(b)      Distributions to Holders of Prepetition Canadian Lender Claims.

On the Effective Date, the Reorganized Debtors shall deliver to the Prepetition Agent, for distribution on behalf of the Debtors to the Holders of Prepetition Canadian Lender Claims (and, in the case of Claims in respect of Prepetition Swap Agreements, to the Holders thereof), any distributions that the Debtors are required to make to such Holders pursuant to Article III and Article IV of the Plan.

(c)      Distributions to Holders of General Unsecured Claims Against SSC Canada and Smurfit-MBI.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver cash and/or shares of New SSCC Common Stock to the Holders of Allowed General Unsecured Claims against SSC Canada and Smurfit-MBI in accordance with the procedures set forth in Sections 8.5 and 8.7 of the Plan.

**6.      Undeliverable and Unclaimed Distributions.**

(a)      Holding and Investment of Undeliverable and Unclaimed Distributions.

If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent is notified in writing of such Holder's then current address, at which time all previously-missed distributions shall be made to such Holder without interest.

(b)      Failure to Claim Undeliverable Distributions.

Amounts in respect of undeliverable distributions made in cash shall be retained by the Reorganized Debtors until such distributions are claimed. Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed distribution within six (6) months after the Effective Date shall be deemed to have forfeited its rights to such undeliverable or unclaimed distribution and shall be forever barred and enjoined from seeking the payment of any such undeliverable or unclaimed distribution from the Debtors or the Reorganized Debtors. In such cases, any cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any shares of New SSCC Common Stock returned to the Debtors and not claimed within one (1) year of return shall irrevocably revert to the Reorganized Debtors and shall be cancelled, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the Holder of the Allowed Claim with respect to which the check was originally issued. Any Claim in respect of a voided check shall be made on or before the six (6) month anniversary of the date of issuance of such check. After such date, all Claims and respective voided checks on account thereof shall be discharged and forever barred and the Reorganized Debtors shall retain all moneys related thereto notwithstanding any federal or state escheat laws to the contrary.

7.        **Record Date for Distributions.**

The Reorganized Debtors and the other Disbursing Agents shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Proven Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes hereof to recognize and make distributions only to those Holders of Allowed Claims or Proven Claims that actually held such Claims as of the close of business on the Distribution Record Date. The Reorganized Debtors and the other Disbursing Agents shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as stated on the official claims register in the Chapter 11 Cases, or as reflected in the CCAA Monitor's records, as of the close of business on the Distribution Record Date.

Distributions to Holders of Allowed Prepetition Noteholder Claims administered by each Prepetition Notes Indenture Trustee shall be made to the account of, or at the direction of, the respective Prepetition Notes Indenture Trustee and subject to the rights of each respective Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the Distribution Record Date shall not apply to such distributions. In connection with such book-entry exchange, each Prepetition Notes Indenture Trustee shall deliver instructions to the DTC instructing the DTC to effect distributions in accordance with the Plan with respect to all applicable Prepetition Noteholder Claims.

Distributions to Holders of Allowed Industrial Revenue Bond Claims administered by any Industrial Revenue Bond Indenture Trustee or any other Disbursing Agent shall be made to the account of, or at the direction of, the respective Industrial Revenue Bond Indenture Trustee and subject to the rights of each respective Industrial Revenue Bond Indenture Trustee to assert its Industrial Revenue Bond Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the Distribution Record Date shall not apply to such distributions. In connection with such book-entry exchange, each Industrial Revenue Bond Indenture Trustee shall deliver instructions to the DTC instructing the DTC to effect distributions in accordance with the Plan with respect to all applicable Industrial Revenue Bond Claims.

8.    **Assignment of Claims.**

For purposes of determining entitlement to receive any distribution pursuant to the Plan, the Debtors, the Reorganized Debtors and the applicable Disbursing Agent, and each of their respective agents, successors and assigns, shall have no obligation to recognize any transfer of a Claim unless and until notice of the transfer or assignment from either the transferor, assignor, transferee or assignee, together with evidence showing ownership, in whole or in part, of such Claim and that such transfer or assignment was valid under applicable law, has been received by the Debtors, the Reorganized Debtors, or the applicable Disbursing Agent, as the case may be, at least ten (10) Business Days prior to the applicable Distribution Date.

9.    **Means of Cash Payment.**

Unless otherwise set forth in the Plan, all payments of cash made pursuant to the Plan shall be in United States dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfer from a bank selected by the Reorganized Debtors; provided that cash payments made to the Prepetition Agent, Union Bank and CIT Group shall be made in immediately available funds by wire transfer. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

10.    **Withholding and Reporting Requirements.**

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Holders of Allowed Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan, each Person or Entity that has received any distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

**11.      Allocation of Plan Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest thereon.

**12.      Setoff and Recoupment.**

The Reorganized Debtors may, but shall not be required to, setoff or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan in respect of such Allowed Claim, Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may assert against the Holder of such Allowed Claim; provided, however, that neither the failure to assert such rights of setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any Claim that the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim.

**13.      Fractional Shares.**

No fractional shares of New SSCC Common Stock shall be distributed.  Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New SSCC Common Stock or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New SSCC Common Stock.  The total number of shares of New SSCC Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding in the Plan.

**14.      Compromises and Settlements.**

Up to and including the Effective Date, the Debtors may compromise and settle, in accordance with Bankruptcy Rule 9019(a), any and all Claims against them.  On the Effective Date, such right to compromise and settle Claims shall pass to the Reorganized Debtors as contemplated in Section 8.15 of the Plan, and the Reorganized Debtors shall thereafter be authorized (subject to the Creditor Representative's approval when necessary under Section 12.11 of the Plan) to compromise and settle any Disputed Claim and execute all necessary documents, including a stipulation of settlement or release, in their sole discretion, without notice to any party, and without the need for further approval of the Bankruptcy Court.

**15.      Claims Administration Responsibility – Chapter 11 Cases.**

(a)      Sole Responsibility of the Reorganized Debtors.

From and after the Effective Date, the Reorganized Debtors shall have sole responsibility and authority for administering, disputing, objecting to, compromising and settling, or otherwise resolving and making distributions (if any) with respect to all Claims, including all Administrative Expense Claims; provided, however, that the foregoing shall not apply to any objections to Claims filed by the Committee prior to the Effective Date; provided, further, however that the

190

Reorganized Debtors or the Committee (if applicable) shall not be authorized to compromise, settle, or resolve any Claim, including any Administrative Expense Claim, if the Allowed amount of such Claim would exceed the Creditor Representative Threshold Amount, without the consent of the Creditor Representative in accordance with Section 12.11 of the Plan.

(b)     Objections to Claims.

Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if the Debtors or the Reorganized Debtors effect service of such objection in any of the following manners:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable in the Chapter 11 Cases by Bankruptcy Rule 7004; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory to the applicable Proof of Claim or other representative identified in the proof of claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

(c)     Determination of Allowed Claims.

Except as otherwise agreed to by the Debtors in writing or as set forth in the Plan, the Allowed amount of any Claim as to which a Proof of Claim was timely filed in the Chapter 11 Cases, and which Claim is subject to an objection filed by the Debtors or the Reorganized Debtors before the Claims Objection Deadline, will be determined and liquidated pursuant to a Final Order of the Bankruptcy Court.  Upon such determination, the Claim shall become an Allowed Claim and will be satisfied in accordance with the Plan.  Any Claim that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, shall be deemed Allowed for purposes of the Plan unless otherwise ordered by the Bankruptcy Court.

**16.     Procedures for Treating and Resolving Disputed Claims – Chapter 11 Cases.**

(a)     No Distributions Pending Allowance.

Except as otherwise set forth in the Plan, no distributions shall be made with respect to any portion of a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim; provided, however, that where (i) any portion of a Claim is listed in the Schedules as neither contingent, unliquidated or disputed or (ii) the Debtors, in good faith, reasonably dispute the allowance of no more than 50% of any Claim, the Reorganized Debtors shall make a distribution on the Initial Distribution Date on account of the higher of (a) any portion of such Claim that is listed in the Schedules as neither contingent, unliquidated or disputed and (b) any portion of such Claims that is not a Disputed Claim.  All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)     SSCE Distribution Reserve.

On the Effective Date, the Reorganized Debtors shall issue and hold in the SSCE Distribution Reserve shares of the New SSCC Common Stock in such amount as the Reorganized

Debtors reasonably determine is necessary to enable them to make the distributions required to be made to the Holders of Allowed General Unsecured Claims against SSCE once the allowance or disallowance of each Disputed Claim, including any filed or anticipated Rejection Damages Claims, is ultimately determined.  To the extent that the SSCE Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors shall file a list of such affected Disputed Claims with the Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan.  To the extent that the SSCE Distribution Reserve incorporates Rejection Damages Claim arising from the rejection of any executory contracts or unexpired leases under the Plan, the Debtors shall, at such time as they file the Assumption/Rejection Motion, identify the amount of the SSCE Distribution Reserve allocated for the putative Rejection Damages Claims arising from the rejection of such executory contracts or unexpired leases.  Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court sustaining such objection, the Debtors' estimation of each Disputed Claim for purposes of the SSCE Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim, once Allowed, than the pro rata distribution it would have received based on the Debtors' estimation.  Shares of the New SSCC Common Stock held in the SSCE Distribution Reserve pending the resolution of all Disputed Claims shall be deemed to have been voted in the same proportion as the shares of New SSCC Common Stock issued on the Initial Distribution Date.  Any transfer or surrender of shares out of the SSCE Distribution Reserve shall be accompanied by any distributions or proceeds received in respect of such shares while in the SSCE Distribution Reserve.

(c)     Distributions After Allowance.

Except as otherwise set forth in the Plan with respect to General Unsecured Claims against SSCE, promptly after a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors or the Disbursing Agent, as applicable, will distribute on the next succeeding Distribution Date to the Holder of such Allowed Claim any cash or other property that would have been distributed to the Holder of such Allowed Claim on the dates Distributions were previously made to Holders of other Allowed Claims had such Claim been an Allowed Claim on such dates.  After a Final Order has been entered, or other resolution has been reached, with respect to any Disputed Claim that is a General Unsecured Claim against SSCE for less than the amount of the SSCE Distribution Reserve for such Disputed Claim, the excess remaining shares of New SSCC Common Stock in the SSCE Distribution Reserve shall either be distributed on a pro rata basis to the Holders of Allowed General Unsecured Claims against SSCE on the Final Distribution Date or irrevocably surrendered to Reorganized SSCC (together with any dividends, distributions or proceeds received in respect thereof); provided, however, that if more than [~~————~~]1,000,000 shares of the New SSCC Common Stock remain in the SSCE Distribution Reserve after the Final Distribution Date, such remaining shares shall be distributed on a pro rata basis to the Holders of Allowed General Unsecured Claims against SSCE who had previously received distributions of the New SSCC Common Stock under the Plan.  All Distributions under the Plan on account of Allowed Claims will be made together with any dividends, payments, or other distributions made on account of the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims in such Class.

(d)     No Recourse.

No Holder of a Disputed Claim shall have any recourse against the Debtors, the Estates, the Reorganized Debtors, the Committee, the Prepetition Agent, the Prepetition Lenders, the Prepetition Notes Indenture Trustees, or the Industrial Revenue Bond Indenture Trustees, or any of their respective directors, officers, employees, agents, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors, in the event that the SSCE Distribution Reserve is insufficient to provide a sufficient distribution on account of any Disputed Claim that becomes an Allowed Claim.

(e)     Unliquidated and Contingent Claims.

Any Claim that is filed or scheduled as an unliquidated or contingent Claim shall be disallowed as of the Confirmation Date unless the Holder thereof files a motion seeking the allowance or estimation of such Claim at least twenty (20) days prior to the Confirmation Hearing. In addition, the Debtors may, at any time prior to the Confirmation Hearing, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to the allowance of such Claim.

**17.     Distribution Reserve– CCAA Proceedings.**

(a)     SSC Canada Distribution Reserve.

If the CCAA Plan is approved by the Required Majority of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, then, on the Effective Date, the Reorganized Debtors shall fund the SSC Canada Distribution Pool.  The CCAA Monitor shall hold the SSC Canada Distribution Pool in one or more segregated accounts and shall disburse funds from the SSC Canada Distribution Pool in accordance with the terms of the Plan.  Prior to the Initial Distribution Date, the CCAA Monitor (in consultation with the Reorganized Debtors) shall establish the SSC Canada Distribution Reserve for the purpose of holding cash from the SSC Canada Distribution Pool in the aggregate amount sufficient to distribute to each Holder of a Disputed Claim against SSC Canada the amount of cash that such Holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim against SSC Canada as of the Initial Distribution Date.  To the extent that the SSC Canada Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors or the CCAA Monitor shall file a list of such affected Disputed Claims with the Bankruptcy Court and the Canadian Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan.  Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court or the Canadian Bankruptcy Court sustaining such objection, the Debtors' or CCAA Monitor's estimation of each Disputed Claim for purposes of the SSC Canada Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim than the pro rata distribution it would have received based on such estimation.  Any funds remaining in the SSC Canada Distribution Reserve following the resolution of the final Disputed Claim against SSC Canada and the payment of any

fees and expenses incurred by the CCAA Monitor in connection therewith shall be transferred from the SSC Canada Distribution Reserve to Reorganized SSCC.

    (b)    **Smurfit-MBI Distribution Reserve.**

If the CCAA Plan is approved by the Required Majority of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, then, on the Effective Date, the Reorganized Debtors shall fund the Smurfit-MBI Distribution Pool. The CCAA Monitor shall hold the Smurfit-MBI Distribution Pool in one or more segregated accounts and shall disburse funds from the Smurfit-MBI Distribution Pool in accordance with the terms of the Plan. Prior to the Initial Distribution Date, the CCAA Monitor (in consultation with the Reorganized Debtors) shall establish the Smurfit-MBI Distribution Reserve for the purpose of holding cash from the Smurfit-MBI Distribution Pool in the aggregate amount sufficient to distribute to each Holder of a Disputed Claim against Smurfit-MBI the amount of cash that such Holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim against Smurfit-MBI as of the Initial Distribution Date. To the extent that the Smurfit-MBI Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors or the CCAA Monitor shall file a list of such affected Disputed Claims with the Bankruptcy Court and the Canadian Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court or the Canadian Bankruptcy Court sustaining such objection, the Debtors' or CCAA Monitor's estimation of each Disputed Claim for purposes of the Smurfit-MBI Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim than the pro rata distribution it would have received based on such estimation. Any funds remaining in the Smurfit-MBI Distribution Reserve following the resolution of the final Disputed Claim against SSC Canada and the payment of any fees and expenses incurred by the CCAA Monitor in connection therewith shall be transferred from the Smurfit-MBI Distribution Reserve to Reorganized SSCC.

## I.    <u>Confirmation and Consummation of the Plan.</u>

    **1.**    **Conditions to Confirmation.**

The following are conditions precedent to the occurrence of the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Section 9.3 of the Plan:

    (a)    The Bankruptcy Court shall have entered a Final Order, in a form reasonably acceptable to the Debtors and the Committee, approving the adequacy of this Disclosure Statement.

    (b)    The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall (i) have been entered and (ii) be in form and substance reasonably acceptable to the Debtors and the Committee.

194

(c)     The conditions precedent for implementation of the CCAA Plan, as set forth in Section 4.6 of the Plan, shall have been satisfied.

**2.     Conditions to Occurrence of the Effective Date.**

The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of the Plan:

(a)     All conditions to Confirmation in Section 9.1 of the Plan shall have been either satisfied or waived in accordance with Section 9.3 of the Plan.

(b)     The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors and the Committee.

(c)     Each CCAA Sanction Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors and the Committee.

(d)     Each document, instrument, or agreement to be executed in connection with the Plan shall be reasonably acceptable to the Debtors.

(e)     The transactions contemplated by Article V of the Plan shall have occurred or shall have been waived by the Debtors in accordance with the terms of the Plan.

**3.     Waiver of Conditions.**

Notwithstanding anything to the contrary in Section 9.1 or Section 9.2 of the Plan, the Debtors (in consultation with the Committee and the CCAA Monitor) may waive in writing the occurrence of any of the foregoing conditions precedent to the Confirmation of the Plan and/or occurrence of the Effective Date or modify any such conditions precedent~~, other than the conditions set forth in Sections 9.2.2 and 9.2.3 of the Plan~~.  Any such written waiver or modification of a condition precedent may be effected at any time without notice, without leave or order of the Bankruptcy Court or the Canadian Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in the manner set forth above, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

4.     **Consequences of Non-Occurrence of Effective Date.**

If the Effective Date has not occurred within one hundred and twenty (120) days of the Confirmation Date (as such date may be extended by the Debtors in consultation with the Committee and the CCAA Monitor), upon notice to such parties in interest as the Bankruptcy Court may direct, the Debtors will request that the Bankruptcy Court enter an order vacating the Confirmation Order.  If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume, assign or reject executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated.

5.     **Notice of Effective Date.**

The Debtors shall file with the Bankruptcy Court and the Canadian Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3 of the Plan.

J.     **Injunctions, Releases And Discharge.**

1.     **Discharge.**

(a)     Discharge of Claims and Termination of Interests.

(i)     As of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Interests, or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors, the Reorganized Debtors, Canadian Newco, or any of their respective assets, property and Estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Interests or other rights of a Holder of an equity security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed discharged under section 1141(d)(1)(A) of the Bankruptcy Code and applicable provisions of the CCAA and released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest, of any nature

whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is deemed to be an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings (or is otherwise resolved), or (c) the Holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security Holder in any of the Debtors and all Interests, including, without limitation, the SSCC Interests.

(ii)      As of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all Persons and Entities shall be precluded from asserting against the Debtors and their respective assets, property and Estates, the Reorganized Debtors, Canadian Newco, and each of their respective Related Persons, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as expressly provided in the Plan, the Confirmation Order, or the CCAA Sanction Order, the Confirmation Order and the CCAA Sanction Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest and termination of all rights of any equity security Holder in any of the Debtors and all Interests, including the SSCC Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code and applicable provisions of the CCAA, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors or Canadian Newco, or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any equity security Holder in any of the Debtors or terminated Interest, including, without limitation, an SSCC Interest.

(iii)      Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order shall not discharge SSC Canada, Smurfit-MBI or Stone FinCo II from any Claims and other debts or obligations that arose prior to the Petition Date.

(b)      Discharge Injunction.

Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or any of their respective assets, property and Estates, the Reorganized Debtors, or Canadian Newco that is discharged pursuant to Section 10.1.1 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors, Canadian Newco, any of their respective property and their respective Related Persons, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.1.1 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order or the CCAA Sanction Order.

(c)     Integral to Plan.

Each of the discharges and injunctions provided in Section 10.1 of the Plan is an integral part of the Plan and is essential to its implementation. Each of the Debtors, the Reorganized Debtors, and Canadian Newco shall have the right to independently seek the enforcement of the discharge and injunction set forth in Section 10.1 of the Plan.

**2.     Releases.**

(a)     Releases by Debtors and Estates.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors on its own behalf and as a representative of its respective Estate, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims and Causes of Action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or

198

otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors, Canadian Newco, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, this Disclosure Statement, the Canadian Asset Sale, or the Restructuring Transactions that may be asserted by or on behalf of any of the Debtors, the Reorganized Debtors or their respective Estates.

(b)     Releases by Holders of Claims and Interests.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest, or other right of a Holder of an equity security or other ownership interest that is terminated, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, this Disclosure Statement, the Restructuring Transactions, or the Canadian Asset Sale; provided, however, that each Person that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in Section 10.2.2 of the Plan with respect to those Released Parties other than the Debtors, the Reorganized Debtors, Canadian Newco, and their respective predecessors, successors and assigns (whether by operation of law or otherwise).

(c)     Injunction Related to Releases.

Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to Section 10.2 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding

(including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.2 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the CCAA Sanction Order.

(d)     Integral to Plan.

Each of the releases and injunctions provided in Section 10.2 of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties and any other Persons protected by the releases and injunctions set forth in Section 10.2 of the Plan shall have the right to independently seek the enforcement of such releases and injunctions.

(e)     Deemed Consent.

By submitting a Ballot and not electing to withhold consent to the releases of the applicable Released Parties set forth in Section 10.2.2 of the Plan by marking the appropriate box on the Ballot, each Holder of a Claim or Interest in a voting Class shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 10.2.2 of the Plan.  For the avoidance of doubt, the releases set forth in Section 10.2.2 of the Plan shall not be applicable to (i) any Holders of Claims or Interests that are not entitled to vote to accept or reject the Plan, nor (ii) any Holders in voting Classes that (a) do not vote, or (b) submit a Ballot and "opt-out" by marking the appropriate box on the Ballot.

(f)     No Waiver.

Notwithstanding anything to the contrary contained in Section 10.2 of the Plan, the releases and injunctions set forth in Section 10.2  of the Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors or Canadian Newco to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by the Reorganized Debtors or Canadian Newco pursuant to the Plan.

**3.     Supplemental Injunction.**

In order to supplement the injunctive effect of the Discharge Injunction, the Confirmation Order and the CCAA Sanction Order shall provide for the following injunctions to take effect as of the Effective Date.

(a)     Terms.  In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in this Article, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and

any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the United States, Canada, or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(i)        commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;

(ii)       enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;

(iii)      creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;

(iv)       except as otherwise expressly provided in the Plan, the Confirmation Order, or the CCAA Sanction Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest; and

201

(v)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Related Documents, the Confirmation Order, or the CCAA Sanction Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.

(b)     Bankruptcy Rule 3016 Compliance. The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(c)     Integral to Plan.

Each of the injunctions provided in Section 10.3 of the Plan is an integral part of the Plan and is essential to its implementation. Each of the Released Parties and any other Persons protected by the injunctions set forth in Section 10.3 of the Plan shall have the right to independently seek the enforcement of such injunctions.

**4.     Disallowed Claims.**

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any Order disallowing any Claim or Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (a) disallowing all Claims to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

**5.     Exculpation.**

(a)     No Released Party shall have or incur any liability to (i) any Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) any other party in interest, (iii) any Person claiming by or through any of the foregoing entities, or (iv) any of the Related Persons of any of the foregoing entities, from (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken at any time or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting,

confirming or consummating the Plan, this Disclosure Statement, the
Restructuring Transactions, the Canadian Asset Sale, the Exit Facilities, or
any other contract or instrument, release or other agreement or document
created or entered into in connection with the Plan or any other act taken or
omitted to be taken in connection with or in contemplation of the
restructuring of any of the Debtors, with the sole exception of willful
misconduct or gross negligence, and each Released Party in all respects
shall be entitled to reasonably rely upon the advice of counsel with respect
to its duties and responsibilities under the Plan.

(b)     Notwithstanding any other provision in the Plan, (i) no Person that has held,
currently holds or may hold a Claim or any other obligation, suit, judgment,
damages, debt, right, remedy, cause of action or liability of any nature
whatsoever, or any Interest or other right of a Holder of an equity security or
other ownership interest, (ii) no other party in interest, (iii) no Person
claiming by or through any of the foregoing entities, and (iv) none of the
Related Persons of any of the foregoing entities, shall, or shall be deemed
to, have any Claim or right of action whatsoever against any Released Party
for, or on account of or relating to (x) any and all claims and causes of
action arising on or after the Petition Date, and (y) any and all claims and
causes of action relating to any act taken or omitted to be taken in
connection with, relating to, or arising out of, the Chapter 11 Cases, the
CCAA Proceedings, or the formulating, negotiating, preparing,
disseminating, implementing, administering, soliciting, confirming or
consummating the Plan, this Disclosure Statement, the Confirmation Order,
the Restructuring Transactions, the Canadian Asset Sale, the Exit Facilities,
or any other contract or instrument, release or other agreement or document
created or entered into in connection with the Plan or any other act taken or
omitted to be taken in connection with or in contemplation of the
restructuring of any of the Debtors, with the sole exception of willful
misconduct or gross negligence.

## 6.     Revesting of Assets.

Pursuant to section 1141(b) of the Bankruptcy Code and any applicable provisions of the
CCAA, all property of the respective Estate of each Debtor, together with any property of each
Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan,
shall revest in the applicable Reorganized Debtor on the Effective Date (subject to the effects of
the Restructuring Transactions). Thereafter, the Reorganized Debtors may operate their
businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy
Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of
each Reorganized Debtor shall be free and clear of all Liens, Claims and Interests, except as
specifically provided in the Plan, the Confirmation Order, or the CCAA Sanction Order. Without
limiting the generality of the foregoing, each Reorganized Debtor may, without application to or
approval by the Bankruptcy Court, pay fees that it incurs after the Effective Date for professional
services and expenses.

### 7.  Preservation of Litigation Claims.

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims.  The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims.  The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Litigation Claims against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Litigation Claims upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

### 8.  Survival of Indemnification Obligations.

(a)     Prepetition Indemnification and Reimbursement Obligations.

For purposes of the Plan, all respective obligations of SSCC and the other Debtors to indemnify and reimburse persons who are or were directors, officers, managers or employees and agents of the Debtors on the Petition Date or at any time thereafter, whether pursuant to certificates or articles of incorporation, codes of regulation, by-laws, limited liability company agreements, limited liability partnership agreements, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall be treated as if they are executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan as of the Effective Date, and such obligations shall survive confirmation of the Plan, shall remain unaffected by the Plan, and shall not be discharged or impaired by the Plan, irrespective of whether the indemnification or reimbursement obligation is owed in connection with any event occurring before, on or after the Petition Date, it being understood that all indemnification provisions in place on and prior to the Effective Date for directors, officers, managers or employees and agents of the Debtors shall survive the effectiveness of the Plan for claims related to or in connection with any actions, omissions or transactions prior to the Effective Date (including prior to the Petition Date).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and the Debtors' assumption, of each of the Debtors' director and officer liability insurance policies.  Additionally, the Debtors shall obtain (at market-based premiums) prior to the Effective Date insurance policies providing coverage for claims (as defined in such policies) made for any wrongful acts (as defined in such policies) or other covered conduct, acts or omissions occurring prior to the Effective Date (also referred to as "tail coverage") with coverage (in scope and substance) and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the date of entry of the Confirmation Order, which insurance policies shall be described in greater detail in the Plan Supplement.

(b)     Integral Part of Plan.

Each of the provisions set forth in Section 10.8 of the Plan is an integral part of the Plan and is essential to its implementation.  Each Person entitled to indemnification and insurance pursuant

204

to Section 10.8 of the Plan shall have the right to independently seek the enforcement of each of the terms of Section 10.8 of the Plan.

**K.**     **Retention of Jurisdiction.**

    **1.**     **Jurisdiction of the Bankruptcy Court and the Canadian Bankruptcy Court.**

       Subject to the Cross-Border Insolvency Protocol, the Bankruptcy Court and the Canadian Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, the CCAA Proceedings, and the Plan, pursuant to sections 105(c) and 1142 of the Bankruptcy Code and applicable provisions of the CCAA, to the fullest extent permitted by law, including, among other things, jurisdiction to:

    (a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

    (b)    grant or deny any applications for allowance of compensation or reimbursement of expenses for periods ending on or before the Effective Date;

    (c)    resolve any matters related to the assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or the Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

    (d)    ensure that distributions to Holders of Allowed Claims or Proven Claims are accomplished pursuant to the provisions of the Plan;

    (e)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

    (f)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Confirmation Order, the CCAA Sanction Order, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, this Disclosure Statement, the Confirmation Order, or the CCAA Sanction Order;

    (g)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or

CH1 5118439 5168368v.41

any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)    reconcile any inconsistency between the terms of the Confirmation Order and the terms of the CCAA Sanction Order;

(i)    approve any modification of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and applicable provisions of the CCAA or approve any modification of this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement, the Confirmation Order, or the CCAA Sanction Order, in such manner as may be necessary or appropriate to consummate the Plan;

(j)    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to the order of the Bankruptcy Court, provided, however, that (i) the fees and expenses of Professionals retained by the Reorganized Debtors, including counsel fees, that are incurred after the Effective Date, (ii) the fees and expenses of Professionals retained by the Committee, including counsel fees, that are incurred after the Effective Date and payable by the Debtors in accordance with the terms of the Plan, and (iii) the fees and expenses of agents for or external counsel to any Prepetition Notes Indenture Trustee or Industrial Revenue Bond Indenture Trustee that are incurred after the Effective Date and payable by the Debtors in accordance with the terms of the Plan, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(k)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(l)    hear and determine any Causes of Action by or on behalf of the Debtors or the Reorganized Debtors;

(m)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(n)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan are enjoined or stayed;

(o)     determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, this Disclosure Statement, the Confirmation Order or the CCAA Sanction Order;

(p)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases and the CCAA Proceedings;

(q)     hear and determine all matters related to (i) the property of the Estates from and after the Confirmation Date and (ii) the activities of the Reorganized Debtors;

(r)     hear and determine all claims, rights or disputes arising under or in connection with the Asset Purchase Agreement and related agreements;

(s)     hear and determine any disputes with respect to requests for the allowance of compensation and reimbursement of expenses incurred by any Professional;

(t)     hear and determine such other matters as may be provided in the Confirmation Order or the CCAA Sanction Order, or as may be authorized under the Bankruptcy Code or the CCAA;

(u)     resolve and finally determine all disputes that may relate to, have an impact on, or arise in connection with the Plan;

(v)     hear any other matter consistent with the provisions of the Bankruptcy Code or the CCAA, as the case may be;

(w)     enter an order closing the Chapter 11 Cases; and

(x)     enter an order winding up the CCAA Proceedings.

CH1 5118439 5168368v.41

L.    **Miscellaneous.**

1.    **Surrender of Instruments.**

As a condition to participation under the Plan, the Holder of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness shall surrender such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that if a claimant is a Holder of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the beneficial holder of such a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness shall be deemed to have surrendered such Holder's Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness upon the surrender of such global security by DTC or such other securities depository or custodian thereof, or in the event the DTC or such other securities depository or custodian does not surrender such global security on the Effective Date or as soon as practicable thereafter, then the Debtors may waive any requirement of surrender of such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness.  Except as otherwise provided in Section 12.1.1 of the Plan, if no surrender of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance satisfactory to the Debtors, that such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim or Interest is based on such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness.  The Debtors or the Reorganized Debtors (as the case may be) shall make subsequent distributions only to the persons who surrender the securities for exchange (or their assignees) and the record Holders of such securities shall be those Holders of record as of the Effective Date.

2.    **Dissolution of the Committee.**

The Committee shall continue in existence until the Effective Date.  On the Effective Date, the appointment of the Committee shall terminate, and the Committee shall be dissolved, provided, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard solely with respect to: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date; (iii) any adversary proceedings or contested matter as of the Effective Date to which the Committee is a party; and (iv) responding to creditor inquiries for one hundred and twenty (120) days following the Effective Date.  All reasonable fees and expenses incurred by the Professionals retained by the Committee in connection therewith shall be paid by the Reorganized Debtors without the requirement of any further order of the Bankruptcy Court.  Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, the Committee shall be dissolved and the members of the

Committee shall be released and discharged of and from all duties, responsibilities and obligations related to or arising from or in connection with the Chapter 11 Cases.

**3.      Pre-Effective Date Injunctions or Stays.**

All injunctions or stays that are in effect in the Chapter 11 Cases or the CCAA Proceedings on the Confirmation Date, whether by operation of law (including, without limitation, section 362 of the Bankruptcy Code) or by order of the Bankruptcy Court or the Canadian Bankruptcy Court (including, without limitation, the CCAA Initial Order), shall continue and remain in full force and effect through and including the Effective Date.

**4.      Post-Confirmation Date Retention of Professionals.**

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

**5.      Payment of the Fee Auditor's Fees and Expenses.**

Following the Effective Date, the Reorganized Debtors shall pay in cash, within thirty (30) days of receipt by the Reorganized Debtors of an invoice from the Fee Auditor, all reasonable fees and expenses of the Fee Auditor that are incurred after the Effective Date, without the need for any further authorization from the Bankruptcy Court.  In the event that the Reorganized Debtors object to payment of such invoice from the Fee Auditor for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by the Reorganized Debtors.

**6.      Bar Date for Certain Administrative Expense Claims.**

All applications for final allowance of compensation or reimbursement of the expenses incurred by any Professional, and all other requests for the payment of Administrative Expense Claims, including all requests for the allowance of any Administrative Expense Claim pursuant to section 503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in these Chapter 11 Cases (but expressly excluding all requests for the payment of obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in Section 12.16 of the Plan not later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Any request for the payment of an Administrative Expense Claim that is not timely filed and served shall be discharged and forever barred and the Holder of such Administrative Expense Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim.  The Debtors and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims.

**7.      Effectuating Documents and Further Transactions.**

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

**8.      Exemption from Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents under the Plan; (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest under the Plan; (c) the making or assignment of any lease or sublease pursuant to the Plan; or (d) the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, assignments, and transfers of tangible property executed in connection with the Plan, the Confirmation Order or the CCAA Sanction Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee or similar tax, charge or expense to the fullest extent provided for under the Bankruptcy Code.

**9.      Payment of Statutory Fees.**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

**10.     Payment of Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees.**

Notwithstanding anything to the contrary in the Plan, the Prepetition Notes Indenture Trustee Fees and the Industrial Revenue Bond Indenture Trustee Fees that are incurred prior to the Effective Date shall be paid in full, in cash, on the Effective Date; provided, however, that such amounts shall exclude (a) any Industrial Revenue Bond Indenture Trustee Fees that are incurred by the Hodge Industrial Revenue Bond Indenture Trustee and (b) any fees or expenses incurred by any Prepetition Notes Indenture Trustee or Industrial Revenue Bond Indenture Trustee in connection with any (i) objections to approval of this Disclosure Statement, (ii) objections to Confirmation of the Plan, (iii) any requests to convert any of the Chapter 11 Cases into cases under Chapter 7 of the Bankruptcy Code, (iv) any requests to convert any of the CCAA Proceedings into proceedings under the BIA, or (v) any other actions that may interfere with or delay Confirmation of the Plan. The Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees that are incurred after the Effective Date (other than any Industrial Revenue Bond Indenture Trustee Fees that are incurred by the Hodge Industrial Revenue Bond Indenture Trustee) shall be paid in full, in cash, by the Reorganized Debtors in the ordinary course of business after the Effective Date.

**11.     Payment of Professional Fees of the Ad Hoc Group of Prepetition Noteholders.**

Notwithstanding anything to the contrary in the Plan, the reasonable fees and expenses incurred by Paul, Weiss, Rifkind, Wharton & Garrison LLP prior to the Effective Date in its capacity as counsel to the ad hoc group of certain Prepetition Noteholders who actively participated in negotiations on the terms of the Plan shall be paid in cash, in an aggregate amount not to exceed $250,000, on or as soon as practicable after the Effective Date.

**12.   11. Proofs of Claim Filed by Prepetition Notes Indenture Trustees.**

Consistent with Bankruptcy Rule 3003(c), the Debtors or the Reorganized Debtors, as applicable, shall recognize any Proofs of Claim filed by the Prepetition Notes Indenture Trustees with respect to the Prepetition Noteholder Claims. If any Prepetition Notes Indenture Trustee files a Proof of Claim in respect of the Prepetition Noteholder Claims and a Prepetition Noteholder also files a Proof of Claim with respect to any Prepetition Noteholder Claim included in the Proof of Claim filed by the Prepetition Notes Indenture Trustee, only the Proof of Claim of the Prepetition Notes Indenture Trustee shall be Allowed.

**13.   12. Proofs of Claim Filed by Industrial Revenue Bond Indenture Trustees.**

Consistent with Bankruptcy Rule 3003(c), the Debtors or the Reorganized Debtors, as applicable, shall recognize any Proofs of Claim filed by the Industrial Revenue Bond Indenture Trustees with respect to the Industrial Revenue Bond Claims. If any Industrial Revenue Bond Indenture Trustee files a Proof of Claim in respect of the Industrial Revenue Bond Claims and an Industrial Revenue Bondholder also files a Proof of Claim with respect to any Industrial Revenue Bond Claim included in the Proof of Claim filed by the Industrial Revenue Bond Indenture Trustee, only the Proof of Claim of the Industrial Revenue Bond Indenture Trustee shall be Allowed.

**14.   13. Creditor Representative Duties and Payment of Fees**

The Committee, in consultation with the Debtors, shall select the Creditor Representative, whose identity shall be disclosed in the Plan Supplement. From and after the Effective Date, the Creditor Representative, with the assistance of counsel, shall be responsible for (i) approving the settlement or allowance of any Claim where the Allowed amount would exceed the Creditor Representative Threshold Amount and (ii) enforcing the terms of the Plan. The reasonable fees and expenses of the Creditor Representative (including the reasonable fees and expenses of counsel retained by the Creditor Representative) shall be paid by the Reorganized Debtors after the Effective Date without the need for approval by the Bankruptcy Court, provided that such fees and expenses shall not exceed $[_____]500,000 in the aggregate.

**15.   14. Amendment or Modification of the Plan.**

Subject to section 1127 of the Bankruptcy Code and applicable provisions of the CCAA, the Debtors may alter, amend, modify or supplement the Plan, Plan Supplement or the Plan Exhibits at any time prior to or after the Confirmation Date but prior to the Substantial Consummation of the Plan. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed

alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such Holder.

### **16.** ~~15.~~ **Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### **17.** ~~16.~~ **Binding Effect; Successors and Assigns.**

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and all other parties in interests in these Chapter 11 Cases and the CCAA Proceedings and the respective successors and assigns of each of the foregoing, including, without limitation, the Reorganized Debtors. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### **18.** ~~17.~~ **Revocation, Withdrawal or Non-Consummation.**

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

### **19.** ~~18.~~ **Notice.**

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

CH1 ~~5118439~~5168368v.~~4~~1

Smurfit-Stone Container Corporation
222 North LaSalle Street
Chicago, IL 60601
Attention:  General Counsel
Telephone:
Facsimile:

with a copy to:

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Attention: James F. Conlan
           Matthew A. Clemente
           Dennis M. Twomey
           Bojan Guzina
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

### **20.** ~~**19.**~~ **Governing Law.**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law of the United States is applicable to the Plan in the Chapter 11 Cases, or to the extent that an Exhibit to the Plan or any relevant document provides otherwise, the rights and obligations arising under the Plan in the Chapter 11 Cases shall be governed by, and construed and enforced in accordance with, the laws of the United States and the State of Delaware, without giving effect to the principles of conflicts of laws thereof.  Except to the extent that the CCAA or other federal law of Canada is applicable to the CCAA Plan, or to the extent that an Exhibit to the Plan or any relevant document provides otherwise, the rights and obligations arising under the CCAA Plan shall be governed by, and construed and enforced in accordance with, the laws of Canada and the Province of Ontario, without giving effect to the principles of conflicts of laws thereof.

### **21.** ~~**20.**~~ **Reservation of Rights.**

Except as expressly set forth in the Plan, the Plan shall have no force and effect unless (i) the Bankruptcy Court has entered the Confirmation Order and (ii) the Canadian Bankruptcy Court has entered the CCAA Sanction Order.  The filing of the Plan, this Disclosure Statement, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to any Holders of Claims against or Interests in the Debtors.

# VI. VOTING PROCEDURES AND REQUIREMENTS

A. **Voting Procedures/Solicitation in the Chapter 11 Proceedings.**

If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims. If you are entitled to vote and did not receive a Ballot, received a damaged Ballot or lost your Ballot please call the Voting Agent at (877) 264-9638 (for U.S. calls) or (503) 597-7694 (for Non-U.S. calls).

1.     **Voting Deadline.**

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE **ACTUALLY RECEIVED BY** THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE OF 4:00 P.M. PREVAILING EASTERN TIME ON [_____ __], 2010 (THE "VOTING DEADLINE"). ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:

**FOR FIRST CLASS MAIL:**

SMURFIT-STONE CONTAINER CORPORATION BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
FDR STATION, P.O. BOX 5014
NEW YORK, NEW YORK
10150-5014

**FOR OVERNIGHT MAIL AND HAND DELIVERY:**

SMURFIT-STONE CONTAINER CORPORATION BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NEW YORK 10017

Votes cannot be transmitted orally, by facsimile or by electronic mail. Accordingly, you are urged to return your signed and completed Ballot promptly. Any executed Ballot received that does not indicate either an acceptance or rejection of the Plan shall be deemed to constitute an acceptance of the Plan.

THE DEBTORS INTEND TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN IN THE CHAPTER 11 CASES UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY CLASS DEEMED TO REJECT, OR AS TO ANY CLASS THAT VOTES TO REJECT, THE PLAN,

214

CH1 5118439 5168368v.4 1

AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF
SUCH SECTION.

**2.       Vote Required for Acceptance by a Class of Claims.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in
amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted
on the Plan in accordance with the Solicitation Order.

**3.       Voting Procedures.**

(a)       Ballots.

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by
properly submitting the duly competed and executed form of Ballot designated for such Class.
Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance
with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or
"Reject the Plan." Holders of Claims in Class 2E (that are not Holders of Prepetition Noteholder
Claims, Industrial Revenue Bond Claims or Hodge Industrial Revenue Bond Claims) should
indicate whether or not you choose to make the Convenience Claim Election or the Cash-Out
Election.

Ballots must be delivered to the Voting Agent, at its address set forth above, and actually
received by the Voting Deadline.  THE METHOD OF SUCH DELIVERY IS AT THE
ELECTION AND RISK OF THE VOTER.  If such delivery is by mail, it is recommended that
voters use an air courier with a guaranteed next day delivery or registered mail, properly insured,
with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely
delivery.

In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with
the amount of the Allowed Claim for voting purposes (if the Claim is a contested Claim, this
amount may not be the amount ultimately allowed for purposes of Distribution) and the Class into
which the Claim has been placed under the Plan.

In addition, each Holder of a Claim entitled to vote on the Plan may elect, by checking the
appropriate box on the Ballot, not to grant the releases contained in Section 10.2 of the Plan and the
related injunction.  All Holders of Claims who submit a Ballot without such box checked will be
deemed to consent to the releases set forth in Section 10.2 of the Plan and the related injunction to
the fullest extent permitted by applicable law.

If you are a beneficial holder of a Prepetition Note or Industrial Revenue Bond who
receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be
completed in accordance with the voting instructions on the Ballot and received by the Voting
Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent
so that it is actually received no later than the Voting Deadline.  If you are the Holder of any other
type of Claim, in order for your vote to be counted, your Ballot must be properly completed in
accordance with the voting instructions on the Ballot and returned to the Voting Agent so that it is

215

CH1 5118439 5168368v.4 1

received no later than the Voting Deadline. Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors.

**If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth in this Disclosure Statement.**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

(b)     Withdrawal or Change of Votes on the Plan.

After the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors, which consent shall be given in the Debtors' sole discretion.

Any Holder who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Voting Agent prior to the voting deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines was the last to be received.

**B.     Canadian Voting Procedures.**

**1.     Voting and Acceptance of Plan in CCAA Proceedings.**

As noted above, in addition to confirmation of the Plan by the Bankruptcy Court, the CCAA Plan will need to be sanctioned by the Canadian Bankruptcy Court as the CCAA Plan pertains to the Canadian Debtors. The voting procedures for approval of the CCAA Plan in the CCAA Proceedings are described in the CCAA Creditors' Meeting Order.

A class of creditors shall have agreed to the CCAA Plan in the CCAA Proceedings if it is accepted by a majority in number representing two-thirds (⅔) in value of the creditors present and voting in person or by proxy on a class-by-class basis. The CCAA Plan is binding only against creditors of those classes which vote to accept the proposal. Classes that reject the CCAA Plan are not bound thereunder.

**2.     Solicitation in CCAA Proceedings.**

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, all creditors of the Canadian Debtors who are Affected Creditors are entitled to vote on the CCAA Plan. Any Class of Affected Creditors that does not vote to approve the CCAA Plan shall not be bound by the CCAA Plan for purposes of the CCAA Proceedings. The votes of Holders of Claims against Canadian Debtors that are entitled to vote in the Chapter 11 Cases and are also Affected Creditors ~~to accept or reject~~ entitled to vote on the CCAA Plan will be counted once for the

purposes of both the CCAA Proceedings and the Chapter 11 Cases.  Such creditors will be allowed to vote on the Ballot/Proxy received as part of the Solicitation Package that will also serve as proxy for purposes of voting in the CCAA Proceedings.  If such creditors prefer to vote in person at the CCAA Creditors' Meeting, their vote for purposes of both the Chapter 11 Cases and the CCAA Proceedings will be as recorded at the CCAA Creditors' Meeting.

The Affected Claims against each Canadian Debtor are divided into the following two (2) Classes:  (a) Affected Secured Claims (consisting of the Prepetition Canadian Lender Claims and all Other Secured Claims, as applicable,) against SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company), and (b) Affected Unsecured Claims (consisting of all General Unsecured Claims) against SSC Canada, Smurfit-MBI, and Stone FinCo II).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

As described above, the process for Affected Creditors to vote on the CCAA Plan is established by order of the Canadian Bankruptcy Court, which has the discretion to order a meeting of creditors to vote on the CCAA PlanCCAA Creditors' Meeting.  The Canadian Bankruptcy Court issued a CCAA Plan Filing and Meeting Order on [_____] (the "CCAA Creditors' Meeting Order").  The CCAA Creditors' Meeting Order provides, among other things, that:

- CCAA Plan is accepted for filing with the Canadian Bankruptcy Court and the Canadian Debtors are authorized to seek its approval in the manner prescribed in the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to modify and/or supplement CCAA Plan in accordance with the terms of the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to call, hold and conduct a meeting of Affectedthe CCAA Creditors' Meeting for the purpose of voting (in person or by proxy) on, with or without variation, a resolution to approve CCAA Plan;

- For purposes of voting on CCAA Plan, Affected Claims against each of the Canadian Debtors shall be separated into classes, as described in the CCAA Creditors' Meeting Order;

- The CCAA Monitor shall make available on its website or send copies of certain documents (collectively, the "Canadian Solicitation Package") in accordance with the CCAA Creditors' Meeting Order, including the following:

    (a)    Thethe CCAA Creditors' Meeting Order and Notice of Creditors' Meeting; and

(b)     ~~The~~the Disclosure Statement, Plan, and Voting Procedures Order~~, including the form of proxy~~; and

(c)     the Ballot~~) for use at the Creditors' Meeting~~/Proxy.

- If the CCAA Plan is accepted by the Required Majority of ~~a Class~~the Classes of Affected Secured Claims, the Canadian Debtors shall bring a motion seeking an order sanctioning the CCAA Plan with respect to such Claims on [_____], or such later date as the Canadian Bankruptcy Court may set.

CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORT AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".

## VII.  CONFIRMATION OF THE PLAN

### A.     Confirmation in Chapter 11 Cases.

####     1.     Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [_____~~,~~ ] ~~20~~ 2010 at [__ _.m.], prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom No. 1, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the  objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before [_____~~~~], 2010 at 4:00 p.m., prevailing Eastern Time** by the following parties:

Counsel to the Debtors:

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Facsimile: (312) 853-7036
Attn:  James F. Conlan
        Matthew A. Clemente
        Dennis M. Twomey
        Bojan Guzina

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Facsimile: (302) 571-1253
Attn:  Robert S. Brady
        Edmon L. Morton

The United States Trustee:

U.S. Trustee
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, Delaware 19801
Facsimile: (302) 573-6497
Attn: David M. Klauder

Counsel to the Official Committee of
Unsecured Creditors:

Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attn: Thomas Moers Mayer

Objections to confirmation of the Plan are governed by Rule 9014 of the Bankruptcy Rules. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## 2.    Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all Classes of Claims and Interests or, if rejected by an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (ii) is in the "best interests" of Holders of Claims and Interests impaired under the Plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

(a)    Acceptance.

Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19B, 19C, 20B, 20C, 20D, 21B and 21C are impaired under the Plan, and, therefore, must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes. As stated above, impaired Classes of Claims will

219

have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have noted to accept or reject the Plan.

Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, ~~19B,~~ 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E are unimpaired under the Plan, and the Holders of Allowed Claims in each of these Classes are conclusively presumed to have accepted the Plan.

Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C are impaired and the Holders of such Claims and Interests will not receive or retain any property under the Plan. Accordingly, these classes are deemed not to have accepted the Plan and confirmation of the Plan will require application of the "fair and equitable test," described below.

The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims; <u>provided, however,</u> if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

(b)    Fair and Equitable Test.

The Debtors will seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of the Plan by any impaired Class of Claims or Interests. To obtain such confirmation, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to on account of its claims or interests. The Debtors believe that the Plan satisfies these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(i)    <u>Secured Creditors</u>. Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens

220

attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(ii)     <u>Unsecured Creditors</u>.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(iii)     <u>Interest Holders</u>.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

**THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN).  ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.**

(c)     Feasibility.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan.  This condition is often referred to as the "feasibility" of the Plan.  The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the financial advisors of the Debtors have analyzed the Debtors' ability to meet their obligations under the Plan. As part of that analysis, the Debtors have prepared consolidated projected financial results for each of the years ending December 31, 2009 through and including 2014.  These financial projections, and the assumptions on which they are based, are annexed hereto as <u>Exhibit C</u> (the "<u>Projections</u>"). Based upon the Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  The Debtors also believe that they will be able to repay or refinance on commercially reasonable terms any and all of the indebtedness under the Plan at or prior to the maturity of such indebtedness.

The Debtors have prepared the Projections based upon certain assumptions that they believe to be reasonable under the current circumstances.  Those assumptions the Debtors considered to be significant are described in the notes which are part of the Projections.  The Projections have not been examined or compiled by independent accountants.  Many of the assumptions on which the Projections are based are subject to significant uncertainties.  Inevitably,

some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore the actual results achieved throughout the period covered by the Projections may vary from the projected results, and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based in evaluating the Plan.

(d)   Best Interests Test.

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of impaired claims or impaired interests receive property with a value not less than the amount such holder would receive in a Chapter 7 liquidation. As indicated above, the Debtors believe that under the Plan, Holders of Impaired Claims and Impaired Interests will receive property with a value equal to or in excess of the value such Holders would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code. The Chapter 7 liquidation analysis set forth below demonstrates that the Plan satisfies the requirements of the "best interests" test.

To estimate potential returns to Holders of Claims and Interests in a Chapter 7 liquidation, the Debtors determined, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code. The Debtors considered many factors and data and have assumed that the liquidation of all assets would be conducted in an orderly manner and, as such, the bids received for the Debtors' significant assets would be, at most, materially no different from the bids that the Debtors have received from sales and inquiries in recent months. The liquidation proceeds available for distribution to Holders of Claims against and Interests in the Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any other cash that the Debtors held and generated during the assumed holding period stated in the Plan and after deducting the incremental expenses of operating the business pending disposition.

In general, as to each entity, liquidation proceeds would be allocated in the following priority:

- first, to the Claims of secured creditors to the extent of the value of their collateral;

- second, to the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases, including tax liabilities;

- third, to the unpaid Administrative Expense Claims;

- fourth, to Priority Tax Claims and other Claims entitled to priority in payment under the Bankruptcy Code;

- fifth, to Unsecured Claims;  and

- sixth, to Interests.

The Debtors' liquidation costs in a Chapter 7 case would include the compensation of a bankruptcy trustee, as well as compensation of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the Debtors' operation during the pendency of the Chapter 7 cases and all unpaid Administrative Expense Claims that are allowed in the Chapter 7 case. The liquidation itself might trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate Claims or, in the case of taxes, make it likely that the Internal Revenue Service would assert all of its claims as Priority Tax Claims rather than asserting them in due course as is expected to occur under the Chapter 11 Cases. These Priority Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, Chapter 7 costs of administration and other Administrative Expense Claims, and before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

The following Chapter 7 liquidation analysis is provided solely to discuss the effects of a hypothetical Chapter 7 liquidation of the Debtors and is subject to the assumptions set forth below. The Debtors cannot assure you that these assumptions would be accepted by a Bankruptcy Court. The Chapter 7 liquidation analysis has not been independently audited or verified.

        (e)     Liquidation Analysis.

A liquidation analysis is attached to this Disclosure Statement as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>"). This analysis is based upon a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the Debtors' control. Accordingly, while the analyses contained in the Liquidation Analysis are necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized if the Debtors were in fact liquidated, nor can the Debtors assure you that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

**ACTUAL LIQUIDATION PROCEEDS COULD BE MATERIALLY LOWER OR HIGHER THAN THE AMOUNTS SET FORTH IN <u>EXHIBIT D</u>. NO REPRESENTATION OR WARRANTY CAN OR IS BEING MADE WITH RESPECT TO THE ACTUAL PROCEEDS THAT COULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS. THE LIQUIDATION VALUATIONS HAVE BEEN PREPARED SOLELY FOR PURPOSES OF ESTIMATING PROCEEDS AVAILABLE IN A CHAPTER 7 LIQUIDATION OF THE ESTATE AND DO NOT REPRESENT VALUES THAT MAY BE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THESE VALUATIONS IS INTENDED TO OR MAY BE ASSERTED TO CONSTITUTE A CONCESSION OR ADMISSION OF THE DEBTORS FOR ANY OTHER PURPOSE.**

The Liquidation Analysis is based upon the Debtors' balance sheets as of September 30, 2009, and assumes that the actual September 30, 2009 balance sheets are conservative proxies for the balance sheets that would exist at the time the Chapter 7 liquidation would commence.

Under section 704 of the Bankruptcy Code, a Chapter 7 trustee must, among other duties, collect and convert the property of a debtor's estate to Cash and close the estate as expeditiously as

is compatible with the best interests of the parties-in-interest. Consistent with these requirements, it is assumed for purposes of the Liquidation Analysis that a liquidation of the Debtors would commence under the direction of a Chapter 7 trustee appointed by the Bankruptcy Court and would continue for a period of nine (9) months, during which time all of the Debtors' major assets would either be sold or conveyed to their respective lien holders, and the Cash proceeds of such sales, net of liquidation-related costs, would then be distributed to the Debtors' creditors. Although the liquidation of some assets might not require nine months to accomplish, other assets would be more difficult to collect or sell and hence would require a liquidation period substantially longer than nine (9) months.

As set forth in detail on the Liquidation Analysis attached hereto as <u>Exhibit D</u>, the Debtors believe that the Plan will produce a greater recovery for the Holders of Claims than would be achieved in a Chapter 7 liquidation. Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' businesses, will provide a substantially greater ultimate return to the Holders of Claims than would a Chapter 7 liquidation.

**B.**     **Canadian Requirements for Sanction of CCAA Plan.**

Section 6 of the CCAA provides that the Canadian Bankruptcy Court may ~~section~~<u>sanction</u> a plan that has received the requisite creditor vote. However, the Canadian Bankruptcy Court does not have to sanction the plan even if approved by the requisite majority of creditors. While there is no statutory test for the exercise of the Canadian Bankruptcy Court's discretion, courts have held that the person applying to have the plan sanctioned must meet three tests: (1) there has been compliance with all statutory requirements and adherence to previous orders of the Canadian Bankruptcy Court; (2) nothing has been done or purported to be done that is not authorized by the CCAA; and (3) the plan is fair and reasonable. In determining whether a plan is fair and reasonable, the Canadian Bankruptcy Court has discretion to consider whatever factors it determines are relevant. Common considerations may include (a) the proper classification of claims, (b) anticipated receipts in liquidation or bankruptcy, and (c) the public interest.

## VIII. PROJECTED FINANCIAL INFORMATION <u>AND VALUATION ANALYSIS</u>

### <u>A.</u>     <u>Projected Financial Information.</u>

The Debtors have prepared the projected financial information contained in this Disclosure Statement relating to the Reorganized Debtors, including the consolidated pro forma financial statements attached to this Disclosure Statement as <u>Exhibit C</u>, in connection with the development of the Plan.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and in the Plan in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in SSCC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, SSCC's Quarterly Report on Form 10-Q for the third quarter ending September 30, 2009, and other reports filed by SSCC with the SEC filed prior to the Bankruptcy Court's approval of this Disclosure Statement. These filings are available by visiting the SEC's website at http://www.sec.gov or the Debtors' website at http://www.smurfit.com.

The Debtors prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of Reorganized Debtors. The Debtors do not, as a matter of course, publish their business plans, strategies, projections, or their anticipated results of operations or financial condition. Accordingly, the Debtors and the Reorganized Debtors do not intend to update or otherwise revise the Projections, or to include such information in documents required to be filed with the SEC or otherwise make such information public to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE ARTICLE X, "CERTAIN RISK FACTORS TO BE CONSIDERED."

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE

REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE
PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

**B.     Valuation Analysis.**

    In order to provide information to parties in interest regarding the possible range of values
of their distributions under the Plan, the Debtors have been advised by Lazard, their investment
banker and financial advisor, with respect to the estimated consolidated value of the Reorganized
Debtors on a going-concern basis.

    THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE
CONTAINED IN THIS SECTION VIII.B DO NOT REFLECT VALUES THAT COULD BE
ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.  THE IMPUTED ESTIMATE OF THE
RANGE OF EQUITY VALUE OF THE COMPANY ASCRIBED IN THE ANALYSIS DOES
NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET
TRADING VALUE.  ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT
FROM THE IMPUTED ESTIMATE OF EQUITY VALUE RANGE FOR THE COMPANY
ASSOCIATED WITH LAZARD'S VALUATION ANALYSIS.  THE VALUATION
INFORMATION CONTAINED IN THIS SECTION IS NOT A PREDICTION OR
GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED
THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.

**1.     Overview.**

    Lazard has estimated the consolidated value of the Reorganized Debtors as of an assumed
Effective Date of March 31, 2010.  Lazard has undertaken this valuation analysis to determine the
value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze
the relative recoveries to such holders thereunder.  The estimated total value available for
distribution to holders of Allowed Claims (the "Distributable Value") consists of the estimated value
of the Reorganized Debtors' operations on a going concern basis (the "Enterprise Value") plus the
estimated cash balance at the assumed Effective Date plus the value of potential asset dispositions
plus the potential value of investments in certain non-consolidated affiliates. The valuation analysis
assumes that the Plan becomes effective on March 31, 2010 and is based on Projections provided
by the Debtors' management for 2009 – 2014 (the "Projection Period"), which are attached to this
Disclosure Statement as Exhibit C.

    Based on these Projections and solely for purposes of the Plan, Lazard estimates that the
Enterprise Value of the Reorganized Debtors falls within a range from approximately $2,900 to
$3,200 million.  Adding the estimated cash balance at the assumed Effective Date of
approximately $125.5 million, the value of potential asset dispositions of approximately $6.3
million, and the potential additional value of investments in non-consolidated affiliates of
approximately $5.8 million to the Enterprise Value range of $2,900 to $3,200 million yields a
range of Distributable Value of the Reorganized Debtors of $3,037.6 million to $3,337.6 million
with a mid-point estimate of $3,187.6 million.

    Based on an estimated gross debt balance of approximately $1,200.0 million projected as
of the assumed Effective Date, Lazard's mid-point estimate of Distributable Value implies a value

for the New Common Stock of the Reorganized Debtors (the "Equity Value") of approximately $1,987.6 million. These values do not give effect to the potentially dilutive impact of any shares issued upon exercise of options or restricted shares that may be granted under a long-term incentive plan, which the Board of Directors of the Reorganized Debtors may authorize for management of the Reorganized Debtors.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF MARCH 31, 2010, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD CURRENTLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS, HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.

Lazard assumed that the Projections prepared by the management of the Debtors were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins, earnings and cash flow as projected. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have materially positive impact on Enterprise Value.

In estimating the hypothetical range of the Enterprise Value of the Reorganized Debtors, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years; (b) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Reorganized Debtors' business and its prospects; (c) met with and discussed the Debtors' operations and future prospects with the senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating business; (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate, and (g) considered recent precedent transactions in the paper packaging industry. Although Lazard reviewed the Reorganized Debtors' business, operating assets and liabilities and business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Reorganized Debtors as well as publicly available information.

In addition, Lazard did not independently verify the Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims thereunder.

Lazard's estimated Enterprise Value of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Lazard's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Reorganized Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Reorganized Debtors' industry and economic conditions generally, and other factors which generally influence the prices of securities.

As noted above, the estimate of the hypothetical range of Enterprise Values consists of the aggregate Enterprise Value of the Reorganized Debtors on a going-concern basis. The Plan is premised upon complete deconsolidation of the Debtor entities. As such, the values of the individual Debtors and the Allowed Claims against such Debtors may affect what is available for distribution to the creditors of each separate Debtor.

**2.     Valuation Methodology.**

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for the Reorganized Debtors. Lazard's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

(a)     Discounted Cash Flow Analysis

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the

CH1 5118439 5168368v.4 1

"Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The Enterprise Value of the firm is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period known as the terminal value. The terminal value is derived by applying a multiple to the Reorganized Debtors' projected earnings before interest, taxes, depreciation and amortization ("EBITDA") and earnings before interest, taxes, depreciation, amortization and pension expense ("EBITDAP") in the final year of the Projection Period, discounted back to the assumed date of emergence by the Discount Rate.

To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term debt-to-total capitalization ratio. Lazard calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard estimated what would be the Reorganized Debtors' blended cost of debt based on the current assumed pricing on the Reorganized Debtors' proposed exit financing. In determining EBITDA and EBITDAP terminal multiples, Lazard relied upon various analyses including a review of trading multiples for comparable companies operating in the paper packaging and paper sectors. Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples.

In applying the above methodology, Lazard utilized management's detailed Projections for the period beginning March 31, 2010, and ending December 31, 2014, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as capital expenditures, cash taxes and changes in working capital. These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using a range of Discount Rates calculated in a manner described above to arrive at a range of Enterprise Values.

(b)     Comparable Company Analysis

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value) and minority interest. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly EBITDA. Lazard also examined enterprise values for each selected public company by including the pension underfunding of each company in enterprise value and then expressing those enterprise values as multiples of EBITDAP. In addition, each of the selected public company's operational performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios are calculated to apply to the Reorganized Debtors' actual

and projected operational performance.  Lazard focused primarily on EBITDA and EBITDAP multiples of the selected comparable companies to value the Reorganized Debtors.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors.  Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations.  The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

Lazard selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Reorganized Debtors in one or more of the factors described above: Cascades, Inc., MeadWestvaco Corporation, Packaging Corporation of America, Rock-Tenn Co., Smurfit-Kappa Group PLC, Temple-Inland Inc., International Paper Co, Boise, Inc., Domtar Corporation, Stora Enso Corp., and UPM-Kymmene Oyj.

Lazard calculated market multiples for the Peer Group based on 2009-2011 estimated EBITDA and EBITDAP by dividing the appropriate enterprise value of each comparable company as of January 2010 by the mean projected 2009-2011 EBITDA and EBITDAP as estimated by equity research analysts.  In determining the applicable EBITDA and EBITDAP multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue, EBITDA and capital expenditure amounts, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines.  Lazard then applied the range of multiples described above to the Reorganized Debtors' 2009E, 2010E and 2011E EBITDA and EBITDAP to determine a range of Enterprise Values.

(c)      Precedent Transactions Analysis

The precedent transactions analysis estimates value by examining public merger and acquisition transactions.  The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial results.  These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Reorganized Debtors.  Since precedent transaction analysis reflects aspects of value other than the intrinsic value of a company, there are limitations as to its applicability in determining the Enterprise Value.  Nonetheless, Lazard reviewed recent M&A transactions involving paperboard and containerboard companies.  Many of the transactions analyzed occurred in different fundamental, credit and other market conditions from those prevailing in the marketplace and therefore may not be the best indication of value in the current market.  Lazard focused mainly on EBITDA multiples in comparing the valuations of the selected companies involved in the relevant precedent transactions.

(d)      Other Assets/ Liabilities Valuation

In determining a range for Distributable Value for the Reorganized Debtors, Lazard used an estimated cash balance at the Assumed Effective Date of approximately $125.5 million based

on a review of the Reorganized Debtors' business plan and emergence costs assumptions including restructuring costs and professional fees. Lazard, with the assistance of management, estimated the value of the potential asset dispositions to be approximately $6.3 million and the potential additional value of investments in non-consolidated Canadian affiliates to be approximately $5.8 million.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE REORGANIZED DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

## IX. DESCRIPTION OF CAPITAL STOCK OF REORGANIZED DEBTORS

Pursuant to the Plan, Reorganized SSCC will authorize the issuance of 150,000,000 shares, and will issue approximately 100,000,000 shares, of New SSCC Common Stock for distribution to creditors as set forth herein, with no less than eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of New SSCC Common Stock) reserved for issuance pursuant to the pertinent Management Incentive Plans. The New SSCC Common Stock will be subject to dilution as a result of further issuances thereof, including with respect to shares that may be issued under a management incentive plan. Reorganized SSCC will authorize the issuance of 10,000,000 shares New SSCC Preferred Stock.

The Amended and Restated Certificate of Incorporation of Reorganized SSCC, to be filed as Exhibit 2 to the Plan, provides that Reorganized SSCC will have authorized shares of New SSCC Common Stock in the numbers set forth therein, $.001 par value per share and authorized shares of New SSCC Preferred Stock in the numbers set forth therein, $.001 par value per share. Each share of New SSCC Common Stock will have one vote upon all matters to be voted on by the holders of New SSCC Common Stock, and shall be entitled to participate equally in all dividends payable with respect to the New SSCC Common Stock. The Board of Directors of Reorganized SSCC will be elected by the affirmative vote of a majority of the New SSCC Common Stock present and entitled to vote on such matter. Each share of New SSCC Common Stock will share equally, in all assets of Reorganized SSCC, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of Reorganized SSCC, or upon any distribution of the assets of the Reorganized SSCC. Holders of the New SSCC Common Stock will not have preemptive rights. Voting of the New SSCC Common Stock will not be cumulative. The New SSCC Preferred Stock may be issued in one or more classes or series, with each such class or series

having such voting powers, full or limited, or no voting powers, and such distinctive designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions, as may be fixed by the Board of Directors in accordance with the by-laws of Reorganized SSCC.  Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall prohibit the issuance of non-voting equity securities.  To the extent that there is any inconsistency between this summary and the Certificate of Incorporation, the terms of the Certificate of Incorporation shall control.

## X.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), INCLUDING THE DISCLAIMERS SET FORTH ABOVE, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

**A.      Certain Bankruptcy Considerations.**

**1.      Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.**

Although the Debtors believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code and sanction under the CCAA, there can be no assurance that the Bankruptcy Court and the Canadian Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or sanction or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.

The Plan provides that the Debtors reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C.  In the event that any Class of Claims entitled to vote fails to accept the Plan in accordance with sections 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section 12.14 thereof.  While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  In addition, there can be no assurance that any challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan.

Similarly, under the CCAA, the Canadian Bankruptcy Court is not required to sanction the CCAA Plan even if it has been approved by the requisite creditor vote. While the Debtors believe that the CCAA Plan is "fair and reasonable", there can be no assurance that the Canadian Bankruptcy Court will reach the same conclusion.

In addition, confirmation of the Plan is subject to certain conditions as described in Article IX of the Plan. Failure to meet any of these conditions could result in the Plan not being confirmed.

If the Plan is not confirmed there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan. Likewise, in Canada, if the CCAA Plan is not sanctioned, there can be no assurance that the CCAA Proceedings will continue or that any alternative plan would provide terms as favorable as the CCAA Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

## 2. Undue Delay in Confirmation of the Plan May Disrupt the Debtors' Operations.

Although the Plan is designed to minimize the length of the Proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed. The continuation of the Chapter 11 Cases or the CCAA Proceedings, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could materially adversely affect operations and relationships with customers, vendors, service providers, employees, regulators and partners. For example, negative events or publicity associated with the Proceedings could adversely affect the Debtors' sales and relationships with their customers, particularly if the Proceedings are protracted. Also, transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court and/or the Canadian Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, if confirmation, sanction and consummation of the Plan do not occur expeditiously, the Proceedings could result in, among other things, increased costs for professional fees and similar expenses.

## 3. Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.

Although the Debtors believe that the Effective Date may occur as soon as ten (10) Business Days after the Confirmation Date, there can be no assurance as to such timing. The occurrence of the Effective Date is subject to certain conditions precedent as described in Articles IV and IX of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign

or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Proceedings will continue rather than be converted into liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

**B.     Risks Relating to the Reorganized Debtors' Financial Results and Condition.**

**1.     The Reorganized Debtors' Failure to Achieve Their Projected Financial Results May Affect Their Ability to Pay Obligations.**

The Debtors have prepared the projected financial information contained in this Disclosure Statement relating to the Reorganized Debtors, including the consolidated pro forma financial statements attached as Exhibit C to this Disclosure Statement, in connection with the development of the Plan. The Projections are qualified by the introductory paragraphs thereto and the accompanying assumptions, and must be read in conjunction with such introductory paragraphs and assumptions, which constitute an integral part of the Projections.

The Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow and financial condition of the Reorganized Debtors for the periods indicated. The Projections are based upon a variety of assumptions as set forth therein, and the Reorganized Debtors' future operating results are subject to and likely to be affected by a number of factors, including significant business, economic and competitive uncertainties, many of which will be beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations. Accordingly, the Reorganized Debtors' actual operating results may vary materially from the operating results shown in the Projections.

Failure of the Reorganized Debtors to achieve projected revenue or cash flow levels may materially adversely affect the ability of the Reorganized Debtors to continue operating their businesses consistent with the Projections after the Effective Date and to pay the obligations owing to certain Holders of Claims entitled to distributions under the Plan and other indebtedness incurred after confirmation of the Plan.

2.     **The Debtors' Financial Projections Are Based on Assumptions and Subject to Uncertainty.**

The Projections are based on a variety of assumptions that are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.  Moreover, the Debtors believe that the industries in which the Reorganized Debtors will be operating are volatile due to numerous factors, all of which make accurate forecasting very difficult.  Accordingly, the Projections should not be regarded as a representation, guaranty or other assurance by the Debtors, the Reorganized Debtors or any other person that the Projections will be achieved.

In addition, the Projections assume that all aspects of the Plan will be successfully implemented on the terms set forth in this Disclosure Statement and that the publicity associated with the Proceedings contemplated by the Plan will not adversely affect the Reorganized Debtors' operating results.  There can be no assurance that these assumptions are accurate, and the failure of the Plan to be successfully implemented, or adverse publicity, could have a materially detrimental effect on the Reorganized Debtors' results of operations and financial condition.

3.     **Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect.**

It has been generally assumed in the preparation of the Projections that the historical book value of the Debtors' assets approximates those assets' fair value, except for specific adjustments. For financial reporting purposes, the fair value of the Debtors' assets must be determined as of the Effective Date.  This determination will be based on an independent valuation.  Although the Debtors do not presently expect this valuation to result in values that are materially greater or less than the values assumed in the preparation of the Projections, the Debtors can make no assurances with respect thereto.

4.     **Historical Financial Information May Not Be Comparable.**

As a result of the consummation of the Plan and the transactions contemplated thereby, the results of operations and financial condition of the Reorganized Debtors from and after the Effective Date may not be comparable to results of operations and financial condition reflected in the Debtors' historical financial statements.

C.     **Risks Relating to the Reorganized Debtors' Business.**

1.     **Global Economic Conditions and Credit Tightening Materially and Adversely Affect the Reorganized Debtors' Business.**

The Debtors' business has been materially and adversely affected by changes in regional, national and global economic conditions. Such changes have included or may include reduced consumer spending, reduced availability of capital, inflation, deflation, adverse changes in interest rates, reduced energy availability and increased energy costs and government initiatives to manage economic conditions.  Continuing instability in financial markets and the deterioration of other national and global economic conditions may have further materially adverse effects on the

Reorganized Debtors' operations, financial results or liquidity. For example, the financial stability of the Reorganized Debtors' customers or suppliers may be compromised, which could result in additional bad debts for the Reorganized Debtors or non-performance by suppliers, and one or more of the financial institutions that make available the exit financing credit facility may become unable to fulfill their funding obligations, which could materially and adversely affect the Reorganized Debtors' liquidity.

Uncertainty about current economic conditions may cause consumers of the Reorganized Debtors' products to postpone or refrain from spending in response to tighter credit, negative financial news, declines in income or asset values, or other adverse economic events or conditions, which could materially reduce demand for the Reorganized Debtors' products and materially and adversely affect the Reorganized Debtors' results of operations and financial condition. Further deterioration of economic conditions would likely exacerbate these adverse effects, result in wide-ranging, adverse and prolonged effects on general business conditions, and materially and adversely affect the Reorganized Debtors' operations, financial results and liquidity.

**2.     The Reorganized Debtors May Be Required to Record Impairment On Their Long-Lived Assets.**

If the Reorganized Debtors are unable to generate sufficient cash flows from operations, they may be required to record impairment on tangible assets such as facilities and equipment, which would have a negative impact on their financial results.

**3.     The Reorganized Debtors' Capital Structure.**

Although the Plan will result in the elimination of debt, the Reorganized Debtors will continue to have a significant amount of indebtedness that could have significant consequences. For example, a substantial portion of the Reorganized Debtors' cash flow from operations may be needed to meet the payment of principal and interest on their indebtedness and other obligations and may not be available for their working capital, capital expenditures and other general corporate purposes. In addition, the Reorganized Debtors' level of debt may make them more vulnerable to economic downturns and may reduce their operational and business flexibility in responding to changing business and economic conditions and opportunities, including obtaining additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes important to their growth and productivity improvement programs. To the extent that the Reorganized Debtors are more highly leveraged than their competitors, this may place them at a competitive disadvantage.

**4.     The Reorganized Debtors' Exit Financing Credit Facility May Limit Their Ability to Plan For or Respond to Changes in Their Business.**

The Reorganized Debtors' exit financing credit facility may include [financial and other] covenants that impose restrictions on their financial and business operations. These covenants may have a material adverse impact on the Reorganized Debtors' operations. The Reorganized Debtors' failure to comply with any of these covenants could result in an event of default that, if not cured or waived, could result in the Reorganized Debtors being required to repay the borrowings under the exit financing credit facility before their due date. The exit financing credit

facility may also contain other events of default customary for similar financings[, including cross defaults to certain other material indebtedness and certain change of control events].  If the Reorganized Debtors were unable to repay or otherwise refinance their borrowings when due (as a result of acceleration or otherwise), the lenders could foreclose on the Reorganized Debtors' assets. If the Reorganized Debtors were unable to refinance these borrowings on favorable terms, their costs of borrowing could increase significantly.

There can be no assurance that Reorganized Debtors will have sufficient liquidity to repay or refinance borrowings under the exit financing credit facility if such borrowings were accelerated upon an event of default. In addition, an event of default or declaration of acceleration under the exit financing credit facility could also result in an event of default under other indebtedness agreements.

> **5.     The Debtors' Industry is Cyclical and May Experience Periods of Overcapacity.**

The Debtors' operating results reflect general cyclical pattern of the industry in which the Debtors operate. The Debtors' industry is also capital intensive, which leads to high fixed costs. These conditions have contributed to substantial price competition and volatility in the industry. The majority of the Debtors' products can be subject to extreme price competition. Future decreases in prices would adversely affect the Reorganized Debtors' financial results.  In addition, some segments of the Debtors' industry also experience production overcapacity, which may require the Reorganized Debtors to take downtime periodically to reduce inventory levels during periods of weak demand. Decreases in prices for the Reorganized Debtors' products, coupled with their highly leveraged financial position, may adversely impact their ability to respond to competition and to other market conditions or to otherwise take advantage of business opportunities.

> **6.     The Debtors' Industry is Highly Competitive.**

The paperboard and packaging products industries are highly competitive and are particularly sensitive to price fluctuations as well as other factors including innovation, design, quality and service, with varying emphasis on these factors depending on the product line. To the extent that one or more of the Reorganized Debtors' competitors become more successful with respect to any key competitive factor, the Reorganized Debtors' ability to attract and retain customers could be materially adversely affected. Many of the Debtors' competitors are less leveraged, have financial and other resources greater than those which the Reorganized Debtors will have and are more capable to withstand the adverse nature of the business cycle. In addition, the Debtors' filing the Chapter 11 Cases and the CCAA Proceedings and the associated risks and uncertainties may be used by competitors in an attempt to divert the Debtors' existing customers or may discourage future customers from purchasing the Reorganized Debtors' products under long-term arrangements.  If the Reorganized Debtors facilities are not as cost efficient as those of their competitors, the Reorganized Debtors may need to temporarily or permanently close such facilities and suffer a consequent reduction in their revenues.

CH1 5118439 5168368 v.4 1

7.    **The Debtors' Pension Plans Are Underfunded and Will Require Additional Cash Contributions.**

The Debtors have made substantial contributions to their pension plans in the past five years and may be required to make substantial contributions in the coming years in order to ensure that their funding levels remain adequate in light of projected liabilities and to meet the requirements of the Pension Protection Act of 2006.  Future contributions to the Reorganized Debtors' pension and other postretirement plans will be dependent on future regulatory changes, future changes in discount rates, the earnings performance of the Reorganized Debtors' plan assets, and the impact of the Proceedings. These contributions reduce the amount of cash available for the Reorganized Debtors to repay indebtedness or make capital investments.

At December 31, 2008, the qualified defined benefit retirement plans maintained by the Debtors were under funded by approximately $900 million.  The Debtors estimate that this level of under funding increased by approximately $140 million during the nine months ended September 30, 2009, due primarily to decreases in the discount rate assumptions used to determine the amount of plan benefit obligations, which were less than fully offset by positive returns on plan assets. The Reorganized Debtors will likely be required to make significant cash contributions to these plans under applicable U.S. and Canadian laws over the next several years following emergence from bankruptcy in order to amortize the existing under funding and satisfy current service obligations under the plans.  These contributions will significantly impact future cash flows that might otherwise be available for repayment of debt, capital expenditures, and other corporate purposes.  The Debtors currently estimate that these cash contributions under the United States and Canadian qualified plans will be approximately $75 million in 2010, and potentially up to approximately $105 million depending upon how unpaid Canadian contributions for 2009 are impacted by the Plan.  The Debtors currently estimate that these contributions will potentially be in the range of approximately $275 million to $325 million annually in 2011 through 2014, and will then decrease to approximately $220 million in 2015 and approximately $130 million in 2016, at which point almost all of the shortfall would be funded.  The actual required amounts and timing of such future cash contributions will be highly sensitive to changes in the applicable discount rates and returns on plan assets, and could also be impacted by future changes in the laws and regulations applicable to plan funding.

8.    **Fluctuations in Energy, Transportation and Raw Materials Prices Could Adversely Affect Reorganized Debtors' Manufacturing Costs.**

The cost of producing and transporting the Debtors' products is highly sensitive to the price of energy.  Energy prices, in particular oil and natural gas, have experienced significant volatility in recent years, with a corresponding effect on the Debtors' production and transportation costs.  Energy prices may continue to fluctuate and may rise to higher levels in future years.  This could materially adversely affect the Reorganized Debtors' production costs and results of operations.

Wood fiber and reclaimed fiber, the principal raw materials used in the manufacture of the Debtors' paper products, are purchased in highly competitive, price-sensitive markets, which have historically exhibited price and demand cyclicality.  Adverse weather, conservation regulations

and the shutdown of a number of sawmills have caused, and will likely continue to cause, a decrease in the supply of wood fiber and higher wood fiber costs in some of the regions in which the Debtors procure wood fiber. Fluctuations in supply and demand for reclaimed fiber, particularly export demand from Asian producers, have occasionally caused supplies of reclaimed fiber to be limited. At such times, the Reorganized Debtors may experience an increase in the cost of fiber or may temporarily have difficulty obtaining adequate supplies of fiber. If the Reorganized Debtors are not able to obtain wood fiber at favorable prices or at all, their results of operations may be materially adversely affected.

9.      **Factors Beyond the Reorganized Debtors' Control Could Hinder Their Ability to Service Debt and Meet Operating Requirements.**

The ability of the Reorganized Debtors to meet their obligations and to comply with the financial covenants contained in their debt instruments will largely depend on their future performance. The Reorganized Debtors' performance will be subject to financial, business and other factors. Many of these factors will be beyond Reorganized Debtors' control, such as: the state of the economy; the financial markets; demand for, and selling prices of, the Reorganized Debtors' products; performance of the Reorganized Debtors' major customers; costs of raw materials and energy; hurricanes and other major weather-related disruptions; and legislation and other factors relating to the paperboard and packaging products industries generally or to specific competitors.

If operating cash flows, net proceeds from borrowings, divestitures or other financing sources do not provide the Reorganized Debtors with sufficient liquidity to meet the Reorganized Debtors' operating and debt service requirements, they will be required to pursue other alternatives to repay debt and improve liquidity. Such alternatives may include: sales of assets; cost reductions; deferral of certain discretionary capital expenditures and benefit payments; and amendments or waivers to debt instruments.

The Reorganized Debtors might not successfully complete any of these measures or such measures may not generate the liquidity that the Reorganized Debtors require to operate their business and service their obligations.

10.     **Cost of Compliance with Government Regulation May Adversely Affect the Reorganized Debtors' Financial Results.**

The Debtors are subject to various federal, state, provincial, foreign, and local laws and regulations that affect the conduct of their operations. For example, environmental requirements, particularly those relating to air and water quality, are a significant factor in the Debtors' business. There can be no assurance that compliance with these laws and regulations or the adoption of modified or additional laws and regulations will not require large expenditures by the Reorganized Debtors or otherwise have a significant effect on the Reorganized Debtors' results of operations or financial condition. In particular, compliance with existing environmental laws, as well as complying with requirements imposed by new or changed environmental laws, such as proposed legislation intended to mitigate the impacts of industrial activity on climate change, may require capital expenditures for compliance. In addition, ongoing remediation costs and future remediation liability at sites where the Reorganized Debtors may be a potentially responsible party

(PRP) for cleanup activity under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) and analogous state and other laws may materially adversely affect the Reorganized Debtors' results of operations and financial condition. Among other laws, a change in the tax laws of the United States could materially affect the consequences of the Plan as described herein to the Reorganized Debtors and the holders of Claims and Interests. See Article XI, "Certain Tax Consequences of the Plan."

### 11. Failure to Maintain Customer Relationships May Adversely Affect Financial Results.

The loss of one or more major customers, or a material reduction in sales to these customers as a result of competition from other packaging manufacturers, would have a material adverse effect on the Reorganized Debtors' results of operations and financial condition.

### 12. Failure to Attract and Retain Employees May Adversely Affect Financial Results.

Among the Debtors' most valuable assets are their highly skilled professionals who have the ability to leave the Debtors and so deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations. Although the Debtors have tried to maintain the confidence and dedication of their personnel through the pendency of the Proceedings, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such personnel with comparable personnel. In addition, the Debtors cannot be sure that such key personnel will not leave after consummation of the Plan and emergence from chapter 11 and CCAA. Further attrition may hinder the Reorganized Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

### 13. Foreign Currency Risks and Exchange Rate Fluctuations Could Hinder the Results of the Reorganized Debtors' Canadian Operations.

The Debtors' assets and liabilities outside the United States are primarily located in Canada. Their principal foreign exchange exposure is the Canadian dollar. The functional currency for their Canadian operations is the U.S. dollar. The Reorganized Debtors' net income could be reduced to the extent they have un-hedged positions, their hedging procedures do not perform as planned or the Canadian dollar strengthens. The financial performance of the Reorganized Debtors will be directly affected by exchange rates because certain of their products will be manufactured in Canada, but sold in U.S. dollars, and the monetary assets and liabilities of their Canadian operations are translated into U.S. dollars for financial reporting purposes.

**14.     Work Stoppages and Other Labor Relations Matters May Have an Adverse Effect on the Reorganized Debtors' Financial Results.**

A significant number of the Debtors' employees in North America are governed by collective bargaining agreements that have either already expired or will do so before 2013. Expired North American contracts are in the process of renegotiation.  The Reorganized Debtors may not be able to successfully negotiate new union contracts covering their employees at various sites without work stoppages or labor difficulties.  If the Reorganized Debtors are unable to successfully renegotiate the terms of any of their agreements or an industry association is unable to successfully negotiate a national agreement when they expire, or if the Reorganized Debtors experience any extended interruption of operations at any of their facilities as a result of strikes or other work stoppages, the Reorganized Debtors' results of operations and financial condition could be materially adversely affected.

**D.     Risks Relating to the New SSCC Common Stock.**

**1.     A Liquid Trading Market for the New SSCC Common Stock May Not Develop.**

There can be no assurance that an active market for the New SSCC Common Stock will develop, nor can any assurance be given as to the prices at which such securities might be traded. Although the Company has agreed that as soon as practicable after the Effective Date Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of New SSCC Common Stock for trading on the NYSE or the NASDAQ Stock Market, there can be no assurance that Reorganized SSCC will be able to obtain this listing or, even if such listing is obtained, that an active or liquid trading market will develop for such securities.

**2.     Certain Holders May be Restricted Under Applicable Securities Laws in Their Ability to Sell or Transfer New SSCC Common Stock.**

The New SSCC Common Stock to be issued under the Plan has not been registered under the Securities Act of 1933 (as amended, together with the rules and regulations promulgated thereunder, the "Securities Act"), any state securities laws or "blue sky" laws or the laws of any other jurisdiction.  Absent such registration, the New SSCC Common Stock may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws.  As explained in more detail in Article XII of this Disclosure Statement ("Certain U.S. Federal and State, Canadian and Foreign Securities Law Considerations"), in general, recipients of the New SSCC Common Stock will be able to resell the New SSCC Common Stock without registration under the Securities Act pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. Holders of New SSCC Common Stock who are deemed to be "underwriters" within the meaning of section 1145(b) of the Bankruptcy Code will be restricted in their ability to resell their shares of New SSCC Common Stock.

The New SSCC Common Stock to be issued under the Plan to any Canadian residents is being issued under an exemption from the prospectus requirements under applicable Canadian

securities laws.  Any resale of such New SSCC Common Stock may be subject to resale
restrictions under applicable Canadian securities laws.

### 3. The Market Price of Shares of New SSCC Common Stock May Fluctuate Significantly.

There can be no assurance as to the prices at which shares of New SSCC Common Stock
might be traded.  The market price at which New SSCC Common Stock trades may fluctuate
significantly, depending on many factors, some of which may be beyond Reorganized SSCC's
control and may not be directly related to its operating performance.  These factors include: price
and volume fluctuations in the overall stock market from time to time; changes in earnings or
variations in operating results; Reorganized SSCC's capital structure, including the amount of its
indebtedness; the depth and liquidity of the market for Reorganized SSCC's common stock;
Reorganized SSCC's dividend policy; investor perception of Reorganized SSCC and its business;
operating performance of companies comparable to Reorganized SSCC; general economic trends
and other external factors; and the impact of the factors referred to elsewhere in this Disclosure
Statement.

In addition, the stock market regularly experiences significant price and volume
fluctuations. This volatility has had a significant impact on the market price of securities issued by
many companies, including SSCC and other companies in SSCC's industry.  The changes
frequently appear to occur without regard to the operating performance of the affected companies.
Hence, the price of the New SSCC Common Stock may fluctuate based upon factors that have
little or nothing to do with Reorganized SSCC, and these fluctuations could materially reduce
Reorganized SSCC's share price.

### 4. Sales of a Substantial Number of Shares of New SSCC Common Stock Could Depress Stock Prices.

Shares of New SSCC Common Stock distributed by Reorganized SSCC pursuant to the
Plan, other than shares distributed to "underwriters" within the meaning of section 1145(b) of the
Bankruptcy Code and shares that may be subject to resale restrictions under applicable Canadian
securities laws, will generally be eligible for resale in the public market.  It is likely that some
stockholders will sell shares of New SSCC Common Stock for various reasons, including the fact
that Reorganized SSCC's business profile or market capitalization does not fit their investment
objectives.  Any sales of substantial amounts of New SSCC Common Stock in the public market,
or the perception that such sales might occur, could cause declines in the market price of New
SSCC Common Stock.  SSCC is unable to predict whether significant amounts of New SSCC
Common Stock will be sold in the open market following its issuance pursuant to the Plan or
whether a sufficient number of buyers will be in the market at that time.

### 5. Value of New SSCC Common Stock May be Diluted.

The Certificate of Incorporation of Reorganized SSCC will authorize the issuance of up to
a total of 150,000,000 shares of New SSCC Common Stock.  The issuance of additional shares of
New SSCC Common Stock, or any security convertible into or exchangeable for shares of New
SSCC Common Stock, in the future would dilute the ownership percentage represented by the

shares of New SSCC Common Stock to be issued pursuant to the Plan.  In addition, the New SSCC Common Stock will be subject to dilution with respect to shares that will be issued under the Management Incentive Plan.

**6.      Lack of Dividends on New SSCC Common Stock May Adversely Affect Liquidity.**

SSCC does not anticipate that cash dividends or other distributions will be made by Reorganized SSCC with respect to the New SSCC Common Stock in the foreseeable future. Further, such restrictions on dividends may have an adverse impact on the market demand for New SSCC Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

## XI.  CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax and Canadian federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion of U.S. federal income tax is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

The discussion of Canadian federal income tax is based on the current provisions of the Income Tax Act (Canada), as amended (the "ITA"), the regulations promulgated thereunder, and the published administrative practices and assessing policies of the Canada Revenue Agency (the "CRA") publicly released prior to the date hereof. This discussion also takes into account all specific proposals to amend the ITA and the regulations promulgated thereunder publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof. This discussion is not exhaustive of all possible Canadian federal income tax considerations, and except for the forgoing, this discussion of Canadian federal income tax consequences does not take into account or anticipate any changes in law, whether by way of legislative, judicial or administrative action or interpretation, nor does it address any provincial, territorial or foreign tax considerations.

No ruling has been requested or obtained from the U.S. Internal Revenue Service (the "IRS") or the CRA with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax or Canadian federal income tax consequences described herein.

*        *        *        *

Any discussion of U.S. or Canadian federal income tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary.  Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. or Canadian federal income tax penalties that may be imposed on such person.  Each Holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

*      *      *      *

### A.      U.S. Federal Income Tax Consequences to the Debtors.

#### Cancellation of Indebtedness Income

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt.  For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor.  COD Income is not required to be recognized, however, if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 and the discharge is granted, or is effected pursuant to a plan approved, by the court (the "Bankruptcy Exception").  Instead, the debtor is required to reduce certain of its tax attributes by the amount of COD Income, generally in the following order:  any net operating loss for the taxable year and carryovers to such year ("NOLs"), general business and minimum tax credit carryforwards, capital losses for the taxable year and carryovers to such year, the tax basis of the debtor's assets and foreign tax credit carryforwards (collectively, "Tax Attributes").  Generally, the reduction in the tax basis of assets cannot exceed the excess of the total tax bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Floor Rule").  A debtor may elect to first apply any portion of the reduction to the tax basis of the debtor's depreciable assets, with any remaining balance applied to the debtor's other Tax Attributes in the order stated above.  The Floor Rule does not apply to any reduction in tax basis by reason of this election.

Generally, debtors that realize COD Income in 2009 or 2010 may, in lieu of the rules described above, elect to take into taxable income the COD Income with respect to discharged debt in equal installments in 2014 through 2018 (i.e., the debtor would report 20% of the COD Income in each such year).  This election to defer COD Income is made separately with respect to each debt instrument on which COD Income is realized and must be made on the debtor's tax return for the year that includes the transaction that creates the COD Income.

Special rules apply to COD Income realized by a debtor corporation that is a member of a group filing a consolidated U.S. federal income tax return (the "Consolidated Attribute Reduction Rules").  The Consolidated Attribute Reduction Rules generally provide that the Tax Attributes attributable to the debtor member are the first to be reduced.  For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member, and also include the tax basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above.  To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the

244

consolidated Tax Attributes attributable to other members of the consolidated group (including the portion of the consolidated NOLs attributable to other members, but not including the tax basis of property of other members) must be reduced.  In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can be applied against by Tax Attributes attributable to other members of the consolidated group.  In addition, to the extent the debtor member is required to reduce its tax basis in the stock of another group member, that lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member.  Any required Tax Attribute reduction takes place after the consolidated group has determined its taxable income, and any U.S. federal income tax liability, for the taxable year in which the COD Income is realized

The Company expects to realize substantial COD Income as a result of the implementation of the Plan.  The precise amount of COD Income will depend on, among other things, the fair market value of the New SSCC Common Stock, which cannot be known with certainty until after the Effective Date.  Assuming, however, that the New SSCC Common Stock is valued consistently with the ~~valuation assumption~~estimate of Equity Value mentioned in Article ~~IV~~VIII of this Disclosure Statement, the Company estimates that it will realize COD Income in the United States ~~between~~of approximately $[___] billion and $[___]1.1 billion for U.S. federal income tax purposes.  Pursuant to the Bankruptcy Exception, this COD Income will not be recognized as taxable income, but the Debtor that realizes the COD Income will have to reduce its Tax Attributes after calculating the tax for the taxable year of discharge.  The Company does not expect to make the elections described above to reduce the tax basis of depreciable property first or to defer COD Income to 2014-2018.

<u>Net Operating Losses and Other Tax Attributes</u>.

As of December 31, 2008, the U.S. consolidated group of which SSCC is the common parent (the "<u>SSCC U.S. Group</u>") had approximately $[___]616 million of NOLs.  In addition, the SSCC U.S. Group expects that it will generate approximately $[___]510 million in additional NOLs in 2009 due primarily to the worthlessness of its equity interest in Smurfit-Stone Container Canada Inc. and approximately $[___]550 million in capital losses in 2010 due to the worthlessness of its equity interests in certain other Canadian subsidiaries.  These NOLs and capital losses have not been examined or approved by the IRS and remain subject to adjustment or disallowance.

As a general rule, an NOL incurred by a debtor during a taxable year can be carried back and deducted from its taxable income generated within the two preceding taxable years (five preceding taxable years in the case of qualifying NOLs generated in 2008 and 2009) and the remainder can be carried forward and deducted from the debtor's taxable income over the 20 succeeding taxable years.  Capital losses of corporations can only be used to offset capital gains and generally can be carried back three years or forward five years for such purposes.

The Company expects that the COD Income realized by the SSCC U.S. Group will exceed its NOLs and general business credits and minimum tax credits (which credits are reduced 33⅓ cents for each dollar of COD Income) and thus that these Tax Attributes will be eliminated.  However, the Company expects that it will have sufficient capital losses to absorb any remaining COD Income and thus that no reduction in the basis of assets (including the stock of subsidiaries)

will be necessary.  This result depends upon a number of assumptions, including the amount of COD Income and the available NOLs and capital losses, which, as noted above, have not been examined or approved by the IRS.  If these assumptions are incorrect, the SSCC U.S. Group might have to reduce its basis in assets.

**B.     U.S. Federal Income Tax Consequences to the Holders of Claims.**

The U.S. federal income tax consequences of the transactions contemplated by the Plan to holders of Claims or Interests that are United States Persons will depend upon a number of factors.  For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States; (2) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof; (3) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (4) that is a trust (a) over the administration of which a United States Person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control, or (b) that has validly elected to continue to be treated as a United States Person for U.S. federal income tax purposes.  In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership.  United States Persons who are partners in a partnership should consult their tax advisors.  A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person.  For purposes of the following discussion and unless otherwise noted below, the term "Holder" means a beneficial owner of a Claim or Interest that is a United States Person.  The general U.S. federal income tax consequences to holders of Allowed Claims or Interests that are Non-United States Persons are discussed below under Section XI.B of this Disclosure Statement.

The U.S. federal income tax consequences to Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for U.S. federal income tax purposes.  Certain holders of Claims or Interests (such as Non-United States Persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary.  There also may be state, local and/or foreign income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests, which are not addressed herein.  EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN

General.

A Holder who receives cash or other consideration (including, without limitation, New SSCC Common Stock) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors reserve the right, to the extent consistent with the Plan, to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a Holder receives less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Plan by Holders of Claims or Interests who hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

If not otherwise so required, a Holder who receives New SSCC Common Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of the New SSCC Common Stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but which was not included in income because of the application of the cash method of accounting.

<u>Market Discount</u>.

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition. If a Holder has accrued market discount with respect to its Claims and such Holder

realizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. Holders who have accrued market discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

<u>Holders of Prepetition Lender Claims</u>.

A Holder of a Prepetition Lender Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of cash it receives. The Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange.

<u>Holder of General Unsecured Claims Against SSCE</u>.

A Holder of a General Unsecured Claim against SSCE who exchanges it for New SSCC ~~Common~~Common Stock will realize gain or loss for U.S. federal income tax purposes equal to the difference between (i) the adjusted tax basis in the Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the New SSCC Common Stock it receives in the exchange.

The tax consequences to a Holder of a General Unsecured Claim against SSCE depend on whether its Claim is a "security" for U.S. federal income tax purposes. See "Definition of 'Security'" below. If the Claim does not constitute a "security" for U.S. federal income tax purposes, then the exchange of the Claim for New SSCC Common Stock will be a taxable transaction, and the Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a Holder's initial tax basis in the New SSCC Common Stock it receives in the exchange will equal the fair market value of such New SSCC Common Stock on the Effective Date, and its holding period in its New SSCC Common Stock would commence on the day after the Effective Date.

If a Holder's General Unsecured Claim against SSCE constitutes a "security" for U.S. federal income tax purposes, then the exchange of the Claim for New SSCC Common Stock will be treated as a tax-free transaction for U.S. federal income tax purposes. In such a case, the Holder should not recognize any gain or loss realized for U.S. federal income tax purposes with respect to the exchange, the Holder's initial tax basis in the New SSCC Common Stock it receives in exchange for its Claim should equal its adjusted tax basis in such Claim, and the Holder's holding period in the New SSCC Common Stock it receives in the exchange will include its holding period in the Claim surrendered.

A Holder of a General Unsecured Claim against SSCE who exchanges it for a Cash-Out Payment will realize gain or loss for U.S. federal income tax purposes as a result of the confirmation of the Plan equal to the difference between (i) the adjusted tax basis in the Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of the Cash-Out Payment. The Holder of such Claim will be required to recognize the full amount of it gain or loss realized on the exchange.

<u>Holder of Claims Against Calpine Corrugated, Cameo Container, and SSPRI</u>.

A Holder of a Union Bank Claim, CIT Group Claim or General Unsecured Claim against Calpine Corrugated, Cameo Container, or SSPRI will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of cash it receives.  The Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange.

<u>Holder of General Unsecured Claims Against SSCC and General Unsecured Claims Against Non-Operating Debtors</u>.

Pursuant to the Plan, all General Unsecured Claims against SSCC and General Unsecured Claims Against Non-Operating Debtors, will be cancelled, annulled and extinguished as of the Effective Date, and Holders of such Claims will receive nothing in exchange for such Claims.  As a result, each Holder of such Claims generally should recognize a loss for U.S. federal income tax purposes equal to the Holder's tax basis in such Claims extinguished under the Plan unless the Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

<u>Holders of Convenience Claims</u>.

A Holder of a Convenience Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of cash it receives.  The Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange.

<u>Holders of SSCC Interests and Calpine Corrugated Interests</u>.

Pursuant to the Plan, all SSCC  Interests and Calpine Corrugated Interests will be cancelled, annulled and extinguished as of the Effective Date, and Holders of such Interests will receive nothing in exchange for such Interests.  As a result, each Holder of such Interests generally should recognize a loss for U.S. federal income tax purposes equal to the Holder's tax basis in such Interests extinguished under the Plan unless the Holder previously claimed a loss with respect to such Interests under its regular method of accounting.

<u>Definition of "Security"</u>.

The term "security" is not defined in the IRC or in the United States Treasury regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances.  Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument.  These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security.  Treatment of an instrument with an initial term between five and ten years is generally unsettled.  Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness

of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

## C.    **Certain Canadian Federal Income Tax Consequences of the Plan.**

The following discussion identifies certain Canadian federal income tax considerations that are relevant to Holders of Claims under the Plan. This discussion also describes certain Canadian federal income tax considerations relevant to the Debtors arising in connection with the CCAA Plan.

For the purposes of the following discussion, the term "Canadian Holder" means a Holder that, for purposes of the ITA, (i) is resident or deemed resident in Canada and (ii) deals at arm's length with and is not affiliated with any Debtors for the purposes of the ITA. This discussion is not applicable to a Canadian Holder that is a "financial institution" (as defined in the ITA for purposes of the mark-to-market rules).

All amounts, including the cost of, interest or dividends received and accrued on, and proceeds of disposition from, any Claim, Interest or any New SSCC Common Stock must be determined in Canadian dollars at applicable exchange rates for the purposes of the ITA.

### Canadian Debt Forgiveness Rules.

The ITA contains rules (the "debt forgiveness rules") which may affect certain Debtors as a result of the implementation of the CCAA Plan. These rules generally apply where a "commercial debt obligation" (as defined for these purposes in the ITA) is settled or extinguished without any payment or by the payment of an amount less than the principal amount of the debt.

In general, the debt forgiveness rules provide that the amount by which the principal amount of a debt (including, generally, accrued and unpaid interest thereon) exceeds the amount paid in satisfaction of such principal amount (such excess being referred to in this discussion as the "forgiven amount") is to be applied to reduce, in the following order, the debtor's (i) non-capital losses of prior taxation years, (ii) net capital losses of prior taxation years, (iii) capital cost and undepreciated capital cost of depreciable property, (iv) cumulative eligible capital and (v) adjusted cost base of certain other capital property. Generally, one-half of any remaining unapplied portion of the forgiven amount is included in computing the income of the debtor in the year the debt is settled. Although the debt forgiveness rules are applied on a legal entity basis, in certain circumstances a debtor may elect to transfer any unapplied forgiven amount to another entity within a corporate group. In addition, corporations resident in Canada are allowed a deduction (the "insolvency deduction") which effectively offsets any income inclusion under the debt forgiveness rules to the extent that such inclusion exceeds twice the fair market value of the corporation's net assets at the end of the taxation year (as determined under the applicable provisions of the ITA) in which the settlement or extinguishment occurs.

Where pursuant to the CCAA Plan a Claim that is a commercial debt obligation is settled or extinguished without any payment or by the payment of an amount less than the principal amount of such Claim, the debt forgiveness rules will generally apply to the relevant Debtor. Depending on the circumstances of the Debtor, the insolvency deduction may be available to fully or partially offset any income inclusion arising pursuant to the debt forgiveness rules. Different rules may apply to the settlement of debts accrued to suppliers of inventory and certain other trade debts.

<u>Certain Canadian Tax Consequences of Canadian Asset Sale.</u>

The sale of the Canadian Assets to Canadian Newco by SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company (the "Seller Group") may give rise to taxable capital gains or losses or ordinary income or loss to ~~SSC Canada, Smurfit-MBI and Francobec Company~~the Seller Group. For Canadian tax purposes, Canadian Newco should generally acquire the Canadian Assets at a cost equal to the price at which such assets are acquired from ~~SSC Canada, Smurfit-MBI and Francobec Company~~the Seller Group, subject to certain adjustments under the ITA applicable in respect of transfers of assets between affiliated corporations (including any adjustments pursuant to section 69 of the ITA, which deems certain transfers of property between persons not dealing at arm's length to occur at fair market value for purposes of the ITA).

<u>Amounts Received by a Canadian Holder on Account of Interest.</u>

The Debtors reserve the right, to the extent consistent with the Plan, to allocate the consideration paid pursuant to the Plan with respect to a Claim first to the principal amount of such Claim and then to accrued but unpaid interest, if any, with respect to such Claim. However, such allocation will not be binding on the CRA and the CRA may assert an alternative allocation.

A Canadian Holder who receives cash or other consideration (including New SSCC Common Stock) in satisfaction of a Claim may realize ordinary income or loss to the extent that any portion of such consideration is characterized as interest.

The income tax consequences arising as a result of the non-payment of interest owing to a Canadian Holder will be dependent on the particular circumstances of the Canadian Holder, including the method followed in computing its income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such interest.

<u>Canadian Trade Creditors.</u>

The following portion of this summary is applicable to a Canadian Holder whose Claim arose in the course of a business carried on by it, and who has included an amount in income for the year or a previous year in respect of such Claim (a "Canadian Trade Creditor").

The Canadian income tax consequences to a Canadian Trade Creditor of receiving cash or other property (including New SSCC Common Stock) in satisfaction of a Claim will depend on its particular circumstances, including the method regularly followed in computing income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such Claim.

Where a Canadian Trade Creditor has previously claimed a bad or doubtful debt deduction in respect of a Claim and receives cash, New SSCC Common Stock or other property in satisfaction of such Claim, the Canadian Trade Creditor may be required to include in computing its income (in the taxation year in which such property is received) an amount equal to the aggregate fair market value of such property.

It is the published administrative position of the CRA that where property (including a security such as the New SSCC Common Stock) is accepted by a Canadian Trade Creditor in settlement of a trade debt of a kind that would qualify for a deduction under paragraph 20(1)(p) of the ITA, and the fair market value of the property at the time it is acquired by the Canadian Trade Creditor is less than the amount of the trade debt, the difference will be deductible by the Canadian Trade Creditor as a bad debt.

It is the published administrative position of the CRA that where a trade debt of a taxpayer is satisfied by the issuance of property (including a security such as the New SSCC Common Stock), if the property is retained by the taxpayer for a period of time which, in the circumstances, indicates that it was held as an investment, any subsequent disposition will be considered to be the disposition of a capital property and will be subject to the rules relating to capital gains and capital losses (see "Taxation of Capital Gains and Capital Losses", below). However, if the property is disposed of in circumstances indicating that the taxpayer did not have the intention of retaining it as an investment, then the profit or loss arising on the disposition will constitute income or loss from business.

<u>Canadian Holders Disposing of Claims Held as Capital Property.</u>

The following portion of this summary is applicable to a Canadian Holder whose Claim is held as capital property for the purposes of the ITA.

A Canadian Holder who receives cash or other property in satisfaction of the principal amount of a Claim held as capital property will be considered to have disposed of such Claim for proceeds of disposition equal to the amount of cash plus the fair market value of any other property

252

received. Generally, such Canadian Holder will realize a capital gain (or capital loss) for Canadian federal income tax purposes equal to the amount by which the proceeds of disposition, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base of the Claim, determined immediately prior to the Effective Date.

A Canadian Holder of a Claim held as capital property that is extinguished without payment should generally realize a capital loss for Canadian federal income tax purposes equal to the Canadian Holder's adjusted cost base in such Claim extinguished under the Plan.

<u>Canadian Holders Disposing of SSCC Interests Held as Capital Property.</u>

The following portion of this summary is applicable to a Canadian Holder whose SSCC Interests are held as capital property for the purposes of the ITA.

Pursuant to the Plan, all SSCC Interests will be cancelled, annulled and extinguished as of the Effective Date, and all Holders of SSCC Interests will receive nothing in exchange for such Interests. As a result, a Canadian Holder should generally realize a capital loss for Canadian federal income tax purposes equal to the Canadian Holder's adjusted cost base in such Interest extinguished under the Plan. The general tax consequences to a Canadian Holder of an SSCC Interest held as capital property realizing a capital loss are described below under "Taxation of Capital Gains and Capital Losses".

<u>Tax Consequences of Holding and Disposing of New SSCC Common Stock.</u>

Dividends, if any, received by a Canadian Holder on New SSCC Common Stock acquired pursuant to the Plan will be required to be included in computing the Canadian Holder's income for the purposes of the ITA. Such dividends received by a Canadian Holder who is an individual will not be subject to the gross-up and dividend tax credit rules in the ITA. A Canadian Holder that is a corporation will not be entitled to deduct the amount of such dividends in computing its taxable income. A Canadian Holder that is throughout the relevant taxation year a Canadian-controlled private corporation may be liable to pay Additional Refundable Tax (defined below) on such dividends. Subject to the detailed rules in the ITA, a Canadian Holder may be entitled to a foreign tax credit or deduction for any foreign withholding tax paid with respect to dividends received on account of New SSCC Common Stock acquired pursuant to the Plan.

A Canadian Holder will be considered to have acquired any New SSCC Common Stock received under the Plan at a cost equal to its fair market value on the Effective Date. A Canadian Holder who holds New SSCC Common Stock as capital property will generally realize a capital gain (or capital loss) on the disposition or deemed disposition of such New SSCC Common Stock equal to the amount, if any, by which the Canadian Holder's proceeds of disposition of such New SSCC Common Stock, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base of the New SSCC Common Stock to the Canadian Holder immediately before the disposition. The general tax consequences to a Canadian Holder of realizing a capital gain or capital loss are described below under "Taxation of Capital Gains and Capital Losses". The Canadian Holder may be entitled to claim a foreign tax credit or deduction in respect of any foreign tax payable by the Canadian Holder on any capital gain realized on such disposition or deemed disposition.

<u>Taxation of Capital Gains and Capital Losses.</u>

In general, under the current provisions of the ITA, one-half of any capital gain (a "taxable capital gain") realized in a taxation year will be included in a Canadian Holder's income for the year, and one-half of the amount of any capital loss (an "allowable capital loss") realized in a taxation year is deducted from income for the year to the extent of any taxable capital gains realized in the year.  Allowable capital losses in excess of taxable capital gains for the taxation year of disposition may generally be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent taxation year against net taxable capital gains realized in such years, to the extent and under the circumstances specified in the ITA.

A Canadian Holder that throughout the taxation year is a "Canadian-controlled private corporation" (as defined in the ITA) may be liable to pay an additional refundable tax of 6 $^{2}/_{3}$% ("Additional Refundable Tax") on certain investment income, including an amount in respect of taxable capital gains.

<u>Non-Canadian Holders.</u>

The following is a summary of certain Canadian federal income tax considerations generally applicable to a Holder who, at all relevant times, for purposes of the ITA (a) is not and is not deemed to be resident in Canada, (b) holds any relevant Claim as capital property, (c) deals at arm's length and is not affiliated with any Debtor, and (d) does not use or hold the Claim and is not deemed to use or hold the Claim in the course of carrying on a business in Canada (a "Non-Canadian Holder").  This summary does not address the considerations relevant to a Non-Canadian Holder (a) that is an insurer carrying on business in Canada and elsewhere, or (b) to whom the relevant Claim constitutes "taxable Canadian property" (as defined in the ITA).  This summary also assumes that no amounts are paid or payable to a non-Canadian Holder on account of "participating debt interest" (as defined in the ITA).

A Non-Canadian Holder will not realize any Canadian federal income tax consequences as a result of the settlement of a Claim pursuant to the Plan.

**D.    <u>Importance of Obtaining Professional Tax Assistance.</u>**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. AND CANADIAN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND CANADIAN FEDERAL, PROVINCIAL, TERRITORIAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**E.    <u>Reservation of Rights.</u>**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XI and the other tax related sections of the Plan up to ten (10) days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XII. CERTAIN U.S. FEDERAL AND STATE, CANADIAN AND FOREIGN SECURITIES LAW CONSIDERATIONS

### A. <u>Exemption From Registration Requirements.</u>

Upon consummation of the Plan, the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New SSCC Common Stock from the registration requirements of the Securities Act and of any state securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan. The Debtors believe that Reorganized SSCC is a successor to SSCC under the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the New SSCC Common Stock under the Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

### B. <u>Subsequent Transfers of Securities.</u>

In general, recipients of the New SSCC Common Stock will be able to resell the New SSCC Common Stock without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, the New SSCC Common Stock generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of the New SSCC Common Stock issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(a)(11) of the Securities Act. Under Section 2(a)(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New SSCC Common Stock under the Plan are deemed to be "underwriters," the resale of the New SSCC Common Stock by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or

other applicable laws except for certain trading transactions. The Debtors believe that sales by any persons deemed to be underwriters of such New SSCC Common Stock or other securities without registration pursuant to certain provisions of Rule 144 under the Securities Act would constitute such exempt trading transactions. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

Certain persons may have rights to require Reorganized SSCC to register shares of New SSCC Common Stock held by such person for resale pursuant to a registration statement filed and effective under the Securities Act in accordance with the terms and conditions of the Registration Rights Agreement.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW SSCC COMMON STOCK OF REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF COMMON STOCK OF REORGANIZED DEBTORS ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## C.      **Canadian Securities Law Considerations.**

Canadian securities laws provide for a specific statutory exemption from the prospectus requirements when securities are issued or distributed in connection with a reorganization or arrangement that is under a statutory procedure. The Canadian securities regulatory authorities interpret the phrase "statutory procedure" broadly; it includes any statute of a jurisdiction or foreign jurisdiction under which the entities involved have been incorporated or created and exist or under which the transaction is taking place. The Debtors believe that the issuance and distribution of the New SSCC Common Stock under the Plan to any Canadian-resident holders of Claims would constitute trades made in connection with a reorganization or arrangement that is under a statutory procedure and would therefore be exempt from the prospectus requirements under applicable Canadian securities laws.

~~Any~~Further, any resale or trade of ~~the~~such New SSCC Common Stock ~~acquired under an exemption from the prospectus requirements~~ must be made in accordance with applicable Canadian securities laws~~, which may require resales to be made in accordance with~~.

Such New SSCC Common Stock would, except for "control distributions" (as defined under applicable Canadian securities laws), be generally freely tradeable in Canada provided (i) the issuer of the security is and has been a reporting issuer in a jurisdiction of Canada for the four months immediately preceding the trade, (ii) no unusual effort is made to prepare the market or to create a demand for the security that is the subject of the trade, (iii) no extraordinary commission or consideration is paid to a person or company in respect of the trade, and (iv) if the selling security holder is an insider or an officer of the issuer, the selling security holder has no reasonable grounds to believe that the issuer is in default of securities legislation. While SSCC is currently a reporting issuer in a number of jurisdictions of Canada, there is no guarantee that Reorganized

256

SSCC will be a reporting issuer in such jurisdictions following the SSCC/SSCE Merger.  On or prior to, or as soon as practicable after, the Effective Date, Reorganized SSCC currently intends to take such steps as it may deem necessary or appropriate, acting reasonably, to confirm its status and/or seek to be designated as a reporting issuer in a jurisdiction of Canada.

In the event that Reorganized SSCC's status as a reporting issuer has not been confirmed or designated, or the conditions described in the preceding paragraph are not satisfied, resales or trades of New SSCC Common Stock will be subject to applicable prospectus requirements or will have to be made in compliance with exemptions from the prospectus requirements. These resale restrictions may in some circumstances apply to resales of the New SSCC Common Stock outside of Canada. therefrom.   Where Reorganized SSCC is not a reporting issuer, a prospectus exemption may be available for resales or trades of the New SSCC Common Stock through an exchange or a market, or to a person or company, outside of Canada provided residents of Canada do not own more than 10% of the outstanding New SSCC Common Stock and do not represent more than 10% of the total number of owners of such securities. Other exemptions from the prospectus requirements may also be available to holders of New SSCC Common Stock.

Canadian-resident holders of New SSCC Common Stock are advised to seek legal advice prior to any resale or trade of the New SSCC Common Stock. Such holders should also seek legal advice concerning any dealer registration requirements under applicable Canadian securities laws.

## XIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN AND CCAA PLAN

If the Plan is not confirmed, the alternatives for the Chapter 11 Cases include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

### A.     Continuation of the Chapter 11 Cases.

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could continue as viable going concerns in protracted chapter 11 cases.  The Debtors could have difficulty operating with the high costs, operating financing and the eroding confidence of their customers and trade vendors, if the Debtors remained in chapter 11.  If the Debtors were able to obtain financing and continue as a viable going concern, the Debtors (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Debtors under chapter 7 or chapter 11.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### B.     Liquidation Under Chapter 7 or Chapter 11.

257

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

The Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. The assets available for distribution to creditors and equity holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7. Thus, chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distributions to the Holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially.

**C.    Alternatives in CCAA Proceedings.**

As in the Chapter 11 Cases, in the CCAA Proceedings if CCAA Plan is not approved by creditors in the CCAA Proceedings or is not sanctioned by the Canadian Bankruptcy Court, the Canadian Debtors would not automatically lose control of the CCAA Proceedings (i.e., have a trustee appointed to oversee its assets). It is possible for the Canadian Debtors to submit a new or amended plan and, during the intervening period, continue to operate under the CCAA. In the event that CCAA Plan is not accepted, however, the Canadian Debtors' significant creditors may seek to lift the CCAA Stay to exercise their remedies against the debtor that are otherwise available.

## XVXIV.  CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation of the Plan in the Chapter 11 Cases and sanction of CCAA Plan in the CCAA Proceedings is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to Holders of Claims against any of the Debtors. In addition, any alternative to confirmation of the Plan in the Chapter 11 Cases and/or sanction of CCAA Plan in the CCAA Proceedings could result in extensive delays and increased administrative expenses, or the ultimate liquidation of certain or all of the Debtors.

Accordingly, the Debtors urge all Holders of Claims entitled to vote on the Plan to vote to accept the Plan in the Chapter 11 Cases and/or approve CCAA Plan in the CCAA Proceedings.

Dated: December 22, 2009January 27, 2010

CH1 5118439 5168368v.41

Respectfully submitted,

SMURFIT-STONE CONTAINER CORPORATION
(for itself and on behalf of each of the other Debtors)


By: /s/ Craig A. Hunt_____.
Name: Craig A. Hunt
Title: Senior Vice President, Secretary and General
Counsel

SIDLEY AUSTIN LLP

James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

STIKEMAN ELLIOTT LLP
Sean F. Dunphy
Alexander D. Rose
5300 Commerce Court West
199 Bay Street
Toronto, Ontario M5L 1B9
Telephone:  (416) 869-5261
Facsimile:  (416) 947-0866

Counsel to the Debtors and Debtors in Possession

# EXHIBIT E



**IDS** INTEGRATED DISTRIBUTION SOLUTIONS, LLC.

Open Invoice Maintenance

Store 2010

Type choices, press Enter.                                                      Mode:   CHANGE

Company Number . . .            1
Vendor Number . . . .                    STO001
Invoice Number . . .        0139453195

Division/Location . .           2      2
Invoice Date . . . .              7232010          Terms . . .        .0200  /  10 Net  30
Invoice Amount . . .              16889.60

---

**FERRARO FOODS , INC.**  287 S. Randolphville Road, Piscataway, N.J. 08854

                                                                              166579

|                | VENDOR #<br>STO001 |        | VENDOR NAME<br>SMURFIT-STONE CONTAINER |           |          |
|----------------|--------------------|--------|----------------------------------------|-----------|----------|
| INVOICE #      | INV DATE           | INVOICE DESCRIPTION | GROSS AMT | DISCOUNT | AMT PAID |
| 0139453195     | 07232010           |        | 16,889.60                              | 337.79    | 16,551.81 |

|                |                |           |          |           |
|----------------|----------------|-----------|----------|-----------|
| 07292010       | 166579         | 16,889.60 | 337.79   | 16,551.81 |
| CHECK DATE     | CHECK #        | GROSS AMT | DISCOUNT | AMT PAID  |

FERR000000105
CONFIDENTIAL

# SMURFIT-STONE

solving it from all sides

**Smurfit-Stone Container**

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

JUL 2 6 RECD

| Invoice | |
|---|---|
| NUMBER | **0139453195** |
| DATE | 07/23/10 |

**CUSTOMER COPY**

**IMPORTANT**

PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

**S O L D T O**

FERRARO FOODS INC

287 SO RANDOLPHVILLE RD
PISCATAWAY NJ 08854

**S H I P T O**

FERRARO FOODS INC
287 SO RANDOLPHVILLE RD
PISCATAWAY, NJ 08854

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 453195 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555783 083821A | 16 X 16 X 1 3/4 E FILE # 59385 | 72800 | C | 232.00 | M | 16889.60 |

```
                    16,889.60 x
                        2.%
     Discount      337.79*

                    16,889.60+
                      337.79-
         000
                    16,551.81*
```

**PLEASE REMIT TO**

SMURFIT-STONE CONTAINER
14079 COLLECTIONS CNTR DR
CHICAGO, IL 60693

SELLER REPRESENTS THAT WITH RESPECT TO
THE PRODUCTION OF THE ARTICLES AND/OR THE
PERFORMANCE OF THE SERVICES COVERED BY
THE INVOICE IT HAS FULLY COMPLIED WITH
SECTIONS 6, 7 AND 12 OF THE FAIR LABOR
STANDARDS ACT OF 1938 AS AMENDED

DISCOUNT OF $ 161.97   IF PAYMENT
RECEIVED ON OR BEFORE   08/02/10
IN CORRESPONDENCE WITH TERMS.

| INVOICE TOTAL | |
|---|---|
| $ | 16889.60 |

**DISCOUNT NOT ALLOWED
ON FREIGHT OR DIES**

TO INSURE CORRECT POSTING, PLEASE
INCLUDE YOUR INVOICE NO. AND ANY
SUPPORTING DOCUMENTS WHEN REMITTING
OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**

**0139453195**

FERR000000106
CONFIDENTIAL

**IDS** INTEGRATED DISTRIBUTION SOLUTIONS, L.L.C.

Open Invoice Maintenance

Type choices, press Enter.                                    Mode:    CHANGE

Company Number ...          1
Vendor Number ....          STO001
Invoice Number ...          0139453128

Division/Location ..        2    2
Invoice Date ....           7202010         Terms ...     .0200 / 10 Net  30
Invoice Amount              16889.60

**FERRARO FOODS , INC.**  287 S. Randolphville Road, Piscataway, N.J. 08854

|                | VENDOR #<br>STO001 | | VENDOR NAME<br>SMURFIT-STONE CONTAINER | | 166473 |
| --- | --- | --- | --- | --- | --- |
| INVOICE # | INV DATE | INVOICE DESCRIPTION | GROSS AMT | DISCOUNT | AMT PAID |
| 0139453128 | 07202010 | | 16,889.60 | 337.79 | 16,551.81 |

| 07272010 | 166473 | | 16,889.60 | 337.79 | 16,551.81 |
| --- | --- | --- | --- | --- | --- |
| CHECK DATE | CHECK # | | GROSS AMT | DISCOUNT | AMT PAID |

FERR000000107
CONFIDENTIAL

Case: 1:10-cv-05711 Document #: 753-6 *SEALED* Filed: 09/19/14 Page 5 of 23 PageID
Case #:19578  Filed: 10/27/2015  Pages: 547
Document: 56-2  #:19578

# SMURFIT-STONE
*solving it from all sides*

**CUSTOMER COPY**

JUL 23 RECD

**Smurfit-Stone Container**

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

| Invoice | |
|---|---|
| NUMBER | **0139453128** |
| DATE | 07/20/10 |

**IMPORTANT**
PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

| S O L D T O | S H I P T O |
|---|---|
| FERRARO FOODS INC | FERRARO FOODS INC |
| 287 SO RANDOLPHVILLE RD | 287 SO RANDOLPHVILLE RD |
| PISCATAWAY NJ 08854 | PISCATAWAY, NJ 08854 |

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 453128 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555782 083820A | 16 X 16 X 1 3/4 FILE # 59385 E | 72800 | C | 232.00 | M | 16889.60 |

16,889.60 x
2.%
~~Discount~~ 337.79 *

16,889.60 +
337.79 -
000
16,551.81 *

**PLEASE REMIT TO**

SMURFIT-STONE CONTAINER
14079 COLLECTIONS CNTR DR
CHICAGO, IL 60693

SELLER REPRESENTS THAT WITH RESPECT TO
THE PRODUCTION OF THE ARTICLES AND/OR THE
PERFORMANCE OF THE SERVICES COVERED BY
THE INVOICE IT HAS FULLY COMPLIED WITH
SECTIONS 6, 7 AND 12 OF THE FAIR LABOR
STANDARDS ACT OF 1938 AS AMENDED

DISCOUNT OF $ 161.97  IF PAYMENT
RECEIVED ON OR BEFORE  07/30/10
IN CORRESPONDENCE WITH TERMS.

| INVOICE TOTAL | |
|---|---|
| $ | 16889.60 |

**DISCOUNT NOT ALLOWED
ON FREIGHT OR DIES**

TO INSURE CORRECT POSTING, PLEASE
INCLUDE YOUR INVOICE NO. AND ANY
SUPPORTING DOCUMENTS WHEN REMITTING
OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**
**0139453128**

hrinv.ps 041803

**FERR000000108
CONFIDENTIAL**

**IDS Power View**    File  Edit

**IDS** INTEGRATED DISTRIBUTION SOLUTIONS, LLC.

Open Invoice Maintenance

Type choices, press Enter.                                    Mode:    CHANGE

Company Number . . .          1
Vendor Number . . . .          STO001
Invoice Number . . .          0139453068

Division/Location . .          2      2
Invoice Date . . . .          7152010              Terms . . .        .0200  /  10 Net  30
Invoice Amount . . .              16889.60
Non Discount Amount .              .00
Invoice Description .

**FERRARO FOODS , INC.**  287 S. Randolphville Road, Piscataway, N.J. 08854      **166225**

|                |            | VENDOR #<br>STO001      | VENDOR NAME<br>SMURFIT-STONE CONTAINER |           |           |
|----------------|------------|-------------------------|-----------|-----------|-----------|
| INVOICE #      | INV DATE   | INVOICE DESCRIPTION     | GROSS AMT | DISCOUNT  | AMT PAID  |
| 0139453068     | 07152010   |                         | 16,889.60 | 337.79    | 16,551.81 |

| CHECK DATE | CHECK #  |  | GROSS AMT | DISCOUNT | AMT PAID  |
|------------|----------|--|-----------|----------|-----------|
| 07202010   | 166225   |  | 16,889.60 | 337.79   | 16,551.81 |

FERR000000109
CONFIDENTIAL

**SMURFIT-STONE**
*solving it from all sides*

Smurfit-Stone Container

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

JUL 19 2010

**CUSTOMER COPY**

| Invoice | |
|---|---|
| NUMBER | **0139453068** |
| DATE | 07/15/10 |

**IMPORTANT**

PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

S
O    FERRARO FOODS INC
L
D    287 SO RANDOLPHVILLE RD
     PISCATAWAY  NJ  08854
T
O

S
H    FERRARO FOODS INC
I    287 SO RANDOLPHVILLE RD
P    PISCATAWAY, NJ  08854
T
O

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 453068 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555781 083819A | 16  X  16  X  1 3/4  E   FILE #   59385 | 72800 | C | 232.00 | M | 16889.60 |

16,889.60x
2.%
Discount 337.79*

16,889.60+
337.79-

000

16,551.81*

**PLEASE REMIT TO**

SMURFIT-STONE CONTAINER
14079 COLLECTIONS CNTR DR
CHICAGO, IL 60693

SELLER REPRESENTS THAT WITH RESPECT TO
THE PRODUCTION OF THE ARTICLES AND/OR
THE PERFORMANCE OF THE SERVICES COVERED BY
THIS INVOICE IT HAS FULLY COMPLIED WITH
SECTIONS 6, 7 AND 12 OF THE FAIR LABOR
STANDARDS ACT OF 1938 AS AMENDED.

DISCOUNT OF $ 161.97    IF PAYMENT
RECEIVED ON OR BEFORE   07/25/10
IN CORRESPONDENCE WITH TERMS.

| INVOICE TOTAL |
|---|
| $   16889.60 |

**DISCOUNT NOT ALLOWED**
**ON FREIGHT OR DIES**

TO INSURE CORRECT POSTING, PLEASE
INCLUDE YOUR INVOICE NO. AND ANY
SUPPORTING DOCUMENTS WHEN REMITTING
OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**

**0139453068**

hrinv.ps 041803

**FERR000000110**
**CONFIDENTIAL**

**IDS Power View**                                                    _ □ X

File  Edit

**IDS** INTEGRATED
DISTRIBUTION
SOLUTIONS, L.L.C.              Open Invoice Maintenance

Type choices, press Enter.                              Mode:  CHANGE

Company Number ...        1
Vendor Number ....        STO001
Invoice Number ...        0139453032

Division/Location ..      2    2
Invoice Date ....          7132010          Terms ...      .0200  /  10 Net  30
                           16889.60

**FERRARO FOODS , INC.**  287 S. Randolphville Road, Piscataway, N.J. 08854

                    VENDOR #              VENDOR NAME                    166173
                    STO001                SMURFIT-STONE CONTAINER
----------------------------------------------------------------------
INVOICE #     INV DATE   INVOICE DESCRIPTION    GROSS AMT   DISCOUNT    AMT PAID
----------------------------------------------------------------------
0139453032   07132010                           16,889.60    337.79    16,551.81


    07192010        166173                16,889.60    337.79    16,551.81
 CHECK DATE        CHECK #                GROSS AMT   DISCOUNT    AMT PAID

FERR000000111
CONFIDENTIAL

# SMURFIT-STONE
solving it from all sides

**Smurfit-Stone Container**

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

CUSTOMER COPY

| Invoice | |
|---|---|
| NUMBER | **0139453032** |
| DATE | 07/13/10 |

**IMPORTANT**
PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

S
O  FERRARO FOODS INC
L
D  287 SO RANDOLPHVILLE RD
   PISCATAWAY  NJ  08854
T
O

S
H  FERRARO FOODS INC
I  287 SO RANDOLPHVILLE RD
P  PISCATAWAY, NJ  08854
T
O

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 453032 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555780 083817A | 16  X  16  X  1 3/4 E   FILE #   59385 | 72800 | C | 232.00 | M | 16889.60 |

```
                              16•889•60x
    Discount                       2•%
                                 337•79*

                              16•889•60+
                                 337•79-
        000
                              16•551•81*
```

| PLEASE REMIT TO | | |
|---|---|---|
| SMURFIT-STONE CONTAINER 14079 COLLECTIONS CNTR DR CHICAGO, IL 60693 | SELLER REPRESENTS THAT WITH RESPECT TO THE PRODUCTION OF THE ARTICLES AND/OR THE PERFORMANCE OF THE SERVICES COVERED BY THE INVOICE IT HAS FULLY COMPLIED WITH SECTIONS 6, 7 AND 12 OF THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED | DISCOUNT OF $ 161.97   IF PAYMENT RECEIVED ON OR BEFORE   07/23/10 IN CORRESPONDENCE WITH TERMS. |

| INVOICE TOTAL |
|---|
| $  16889.60 |

DISCOUNT NOT ALLOWED
ON FREIGHT OR DIES

TO INSURE CORRECT POSTING, PLEASE
INCLUDE YOUR INVOICE NO. AND ANY
SUPPORTING DOCUMENTS WHEN REMITTING
OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**
**0139453032**

hrinv.ps 041803

**FERR000000112**
**CONFIDENTIAL**

# IDS INTEGRATED DISTRIBUTION SOLUTIONS, L.L.C.

## Open Invoice Maintenance

Type choices, press Enter.                                    Mode:   CHANGE

Company Number . . .           1
Vendor Number . . . .          STO001
Invoice Number . . .       0139452986

Division/Location . .      2      2
Invoice Date . . . .       7122010          Terms . . .    .0200 / 10 Net 30
Invoice Amount . . .       16889.60
Non Discount Amount .           .00

---

**FERRARO FOODS , INC.**   287 S. Randolphville Road, Piscataway, N.J. 08854

| | VENDOR #<br>STO001 | VENDOR NAME<br>SMURFIT-STONE CONTAINER | | | **166131** |
|---|---|---|---|---|---|
| INVOICE # | INV DATE | INVOICE DESCRIPTION | GROSS AMT | DISCOUNT | AMT PAID |
| 0139452986 | 07122010 | | 16,889.60 | 337.79 | 16,551.81 |

| 07162010 | 166131 | | 16,889.60 | 337.79 | 16,551.81 |
|---|---|---|---|---|---|
| CHECK DATE | CHECK # | | GROSS AMT | DISCOUNT | AMT PAID |

FERR000000113
CONFIDENTIAL

# SMURFIT-STONE

*solving it from all sides*

|  | **Invoice** |
|---|---|
| | NUMBER **0139452986** |
| | DATE    07/12/10 |

**IMPORTANT**
PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

Smurfit-Stone Container
MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

| S O L D T O | FERRARO FOODS INC<br><br>287 SO RANDOLPHVILLE RD<br>PISCATAWAY  NJ  08854 | S H I P T O | FERRARO FOODS INC<br>287 SO RANDOLPHVILLE RD<br>PISCATAWAY, NJ  08854 |
|---|---|---|---|

PAGE 1

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 452986 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO.<br>OUR ORDER NO.<br>QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555779<br>  083815A | 16   X   16   X   1 3/4<br>E          FILE #   59385 | √ 72800 | C | √ 232.00 | M | √16889.60 |

16,889.60×
2.%
337.79×

16,889.60+
337.79-

000

16,551.81×

| PLEASE REMIT TO<br>SMURFIT-STONE CONTAINER<br>14079 COLLECTIONS CNTR DR<br>CHICAGO, IL 60693 | SELLER REPRESENTS THAT WITH RESPECT TO THE PRODUCTION OF THE ARTICLES AND/OR THE PERFORMANCE OF THE SERVICES COVERED BY THIS INVOICE IT HAS FULLY COMPLIED WITH SECTIONS 6, 7 AND 12 OF THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED | DISCOUNT OF $ 161.97   IF PAYMENT<br>RECEIVED ON OR BEFORE    07/22/10<br>IN CORRESPONDENCE WITH TERMS. | INVOICE TOTAL<br><br>$  √ 16889.60 |
|---|---|---|---|

DISCOUNT NOT ALLOWED
ON FREIGHT OR DIES

TO INSURE CORRECT POSTING, PLEASE
INCLUDE YOUR INVOICE NO. AND ANY
SUPPORTING DOCUMENTS WHEN REMITTING
OTHER THAN THE AMOUNT SHOWN

INVOICE NO.

**0139452986**

FERR000000114
CONFIDENTIAL

IDS Power View

Ile Edit

**INTEGRATED
DISTRIBUTION
SOLUTIONS, LLC.**

Open Invoice Maintenance

Type choices, press Enter.                                    Mode:   CHANGE

Company Number . . .          1
Vendor Number . . . .              STO001
Invoice Number . . .      0139452915

Division/Location . .         2    2
Invoice Date . . . .       7072010          Terms . . .       .0200  /  10 Net  30
Invoice Amount . . .           16889.60

**FERRARO FOODS , INC.**  287 S. Randolphville Road, Piscataway, N.J. 08854

**166044**

|                | VENDOR #            | VENDOR NAME               |            |          |           |
|                | STO001             | SMURFIT-STONE CONTAINER   |            |          |           |
| INVOICE #      | INV DATE | INVOICE DESCRIPTION | GROSS AMT | DISCOUNT | AMT PAID  |
| 0139452915     | 07072010 |                     | 16,889.60 | 168.90   | 16,720.70 |

| CHECK DATE | CHECK #  |  | GROSS AMT | DISCOUNT | AMT PAID  |
| 07142010   | 166044   |  | 16,889.60 | 168.90   | 16,720.70 |

FERR000000115
CONFIDENTIAL

# SMURFIT-STONE
*solving it from all sides*

JUL 09 2010

| | Invoice | |
|---|---|---|
| **NUMBER** | **0139452915** | **IMPORTANT** |
| **DATE** | 07/06/10 | PLEASE REFERENCE ENTIRE INVOICE NO. ON REMITTANCE |

Smurfit-Stone Container

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

S
O    FERRARO FOODS INC
L
D    287 SO RANDOLPHVILLE RD
     PISCATAWAY   NJ   08854
T
O

S
H    FERRARO FOODS INC
I    287 SO RANDOLPHVILLE RD
P    PISCATAWAY, NJ   08854
T
O

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L. NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 452915 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555777<br>083814A | 16   X   16   X   1 3/4<br>E          FILE #   59385 | ✓ 72800 | C | ✓ 232.00 | M | ✓16889.60 |

```
                    16·889·60×
      Discount         2·0%
                     337·79×

                    16·889·60÷
                     337·79-
         000
                    16,551·81×
```

| | | |
|---|---|---|
| **PLEASE REMIT TO** | SELLER REPRESENTS THAT WITH RESPECT TO THE PRODUCTION OF THE ARTICLES AND/OR THE PERFORMANCE OF THE SERVICES COVERED BY THE INVOICE IT HAS FULLY COMPLIED WITH SECTIONS 6, 7 AND 12 OF THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED. | DISCOUNT OF $ 161.97   IF PAYMENT RECEIVED ON OR BEFORE    07/16/10 IN CORRESPONDENCE WITH TERMS. |
| SMURFIT-STONE CONTAINER 14079 COLLECTIONS CNTR DR CHICAGO, IL 60693 | | **INVOICE TOTAL**  $ ✓ 16889.60 |

**DISCOUNT NOT ALLOWED ON FREIGHT OR DIES**

TO INSURE CORRECT POSTING, PLEASE INCLUDE YOUR INVOICE NO. AND ANY SUPPORTING DOCUMENTS WHEN REMITTING OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**
**0139452915**

hntinv.ps 041893

**FERR000000116**
**CONFIDENTIAL**

# IDS INTEGRATED DISTRIBUTION SOLUTIONS, LLC.

## Open Invoice Maintenance

Type choices, press Enter.                                             Mode:   CHANGE

Company Number ...          1
Vendor Number ....              STO001
Invoice Number ...       0139452887

Division/Location ..        2      2
Invoice Date ....            7022010         Terms ...        .0200  /  10 Net  30
Invoice Amount ...          16889.60
Non Discount Amount .            .00

---

**FERRARO FOODS , INC.**  287 S. Randolphville Road, Piscataway, N.J. 08854

                                                                          **165851**

|  | VENDOR # | VENDOR NAME | | |
|---|---|---|---|---|
|  | STO001 | SMURFIT-STONE CONTAINER | | |

| INVOICE # | INV DATE | INVOICE DESCRIPTION | GROSS AMT | DISCOUNT | AMT PAID |
|---|---|---|---|---|---|
| 0139452887 | 07022010 |  | 16,889.60 | 337.79 | 16,551.81 |

| CHECK DATE | CHECK # | | GROSS AMT | DISCOUNT | AMT PAID |
|---|---|---|---|---|---|
| 07082010 | 165851 | | 16,889.60 | 337.79 | 16,551.81 |

FERR000000117
CONFIDENTIAL

**SMURFIT-STONE**
solving it from all sides

Smurfit-Stone Container

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

JUL 06 REC'D

| Invoice | |
|---|---|
| **NUMBER** | **0139452887** |
| **DATE** | 07/02/10 |

**IMPORTANT**
PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

S O L D T O
FERRARO FOODS INC

287 SO RANDOLPHVILLE RD
PISCATAWAY NJ 08854

S H I P T O
FERRARO FOODS INC
287 SO RANDOLPHVILLE RD
PISCATAWAY, NJ 08854

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 452887 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555775 083813A | 16 X 16 X 1 3/4 FILE # 59385 E | 72800 | C | 232.00 | M | 16889.60 |

```
                           16,889.60×
                                2·%
          Discount      337·79*

                           16,889·60÷
                              337·79-
      000
                           16,551·81*
```

| PLEASE REMIT TO | | |
|---|---|---|
| SMURFIT-STONE CONTAINER 14079 COLLECTIONS CNTR DR CHICAGO, IL 60693 | SELLER REPRESENTS THAT WITH RESPECT TO THE PRODUCTION OF THE ARTICLES AND/OR THE PERFORMANCE OF THE SERVICES COVERED BY THE INVOICE IT HAS FULLY COMPLIED WITH SECTIONS 6, 7 AND 12 OF THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED | DISCOUNT OF $ 161.97 IF PAYMENT RECEIVED ON OR BEFORE 07/12/10 IN CORRESPONDENCE WITH TERMS. |

**INVOICE TOTAL**
$ 16889.60

DISCOUNT NOT ALLOWED ON FREIGHT OR DIES

TO INSURE CORRECT POSTING, PLEASE INCLUDE YOUR INVOICE NO. AND ANY SUPPORTING DOCUMENTS WHEN REMITTING OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**
**0139452887**

hrinv.pa 041803

**FERR000000118**
**CONFIDENTIAL**

IDS Power Viewer — □ ×
File  Edit

INTEGRATED
DISTRIBUTION
SOLUTIONS, L.L.C.

Open Invoice Maintenance

Type choices, press Enter.                                        Mode:   CHANGE

Company Number . . .            1
Vendor Number . . . .          STO001
Invoice Number . . .       0139452773

Division/Location . .         2     2
Invoice Date . . . .        6282010              Terms . . .       .0200  /  10 Net   30
Invoice Amount . . .        18547.20
Non Discount Amount .            .00

**FERRARO FOODS , INC.**   287 S. Randolphville Road, Piscataway, N.J. 08854

| | VENDOR # | | VENDOR NAME | | | 165719 |
|---|---|---|---|---|---|---|
| | STO001 | | SMURFIT-STONE CONTAINER | | | |
| INVOICE # | INV DATE | INVOICE DESCRIPTION | | GROSS AMT | DISCOUNT | AMT PAID |
| 0139452773 | 06282010 | | | 18,547.20 | 370.94 | 18,176.26 |
| 0139452774 | 06282010 | | | 21,748.95 | 434.98 | 21,313.97 |

| CHECK DATE | CHECK # | | GROSS AMT | DISCOUNT | AMT PAID |
|---|---|---|---|---|---|
| 07062010 | 165719 | | 40,296.15 | 805.92 | 39,490.23 |

FERR000000119
CONFIDENTIAL

# SMURFIT-STONE

Smurfit-Stone Container Enterprises, Inc.

CUSTOMER COPY

**Invoice**

| NUMBER | 0139452773 |
|---|---|
| DATE | 06/28/10 |

JUL 01 REC'D

**IMPORTANT**

PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

S O L D   T O

FERRARO FOODS INC

287 SO RANDOLPHVILLE RD
PISCATAWAY NJ 08854

S H I P   T O

FERRARO FOODS INC
287 SO RANDOLPHVILLE RD
PISCATAWAY, NJ 08854

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 452773 | 30 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 557738  524301A | 12"E STOCK (2C)  FILE # 54911 | √100800 | C | √184.00 | M | √18547.20 |

~~Discount~~

```
                    18,547.20*
                         2.%
                      370.94*

                    18,547.20+
                      370.94-
          000
                    18,176.26*
```

| PLEASE REMIT TO | | |
|---|---|---|
| SMURFIT-STONE CONTAINER 14079 COLLECTIONS CNTR DR CHICAGO, IL 60693 | SELLER REPRESENTS THAT WITH RESPECT TO THE PRODUCTION OF THE ARTICLES AND/OR THE PERFORMANCE OF THE SERVICES COVERED BY THIS INVOICE IT HAS FULLY COMPLIED WITH SECTIONS 6,7 AND 12 OF THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED | DISCOUNT OF $ 177.87  IF PAYMENT RECEIVED ON OR BEFORE  07/08/10 IN CORRESPONDENCE WITH TERMS. |

**INVOICE TOTAL**

$ √ 18547.20

DISCOUNT NOT ALLOWED
ON FREIGHT OR DIES

TO INSURE CORRECT POSTING, PLEASE
INCLUDE YOUR INVOICE NO. AND ANY
SUPPORTING DOCUMENTS WHEN REMITTING
OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**

**0139452773**

hvinv.ps 041802

FERR000000120
CONFIDENTIAL

# SMURFIT-STONE

**Smurfit-Stone Container Enterprises, Inc.**

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

CUSTOMER COPY

| Invoice | |
|---|---|
| **NUMBER** | 0139452774 |
| **DATE** | 06/28/10 |

**IMPORTANT**
PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

S O L D T O

FERRARO FOODS INC

287 SO RANDOLPHVILLE RD
PISCATAWAY NJ 08854

S H I P T O

FERRARO FOODS INC
287 SO RANDOLPHVILLE RD
PISCATAWAY, NJ 08854

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L. NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 452774 | 30 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 557737 524201A | 10"E STOCK (2C) FILE # 54910 | 142150 | C | 153.00 | M | 21748.95 |

```
                              21,748.95 x
                                  2.%
Discount                        434.98 *

                              21,748.95 +
                                 434.98 -
          000                 21,313.97 *
```

**PLEASE REMIT TO**

SMURFIT-STONE CONTAINER
14079 COLLECTIONS CNTR DR
CHICAGO, IL 60693

SELLER REPRESENTS THAT WITH RESPECT TO THE PRODUCTION OF THE ARTICLES AND/OR THE PERFORMANCE OF THE SERVICES COVERED BY THE INVOICE IT HAS FULLY COMPLIED WITH SECTIONS 6, 7 AND 12 OF THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED

DISCOUNT OF $ 208.57 IF PAYMENT
RECEIVED ON OR BEFORE 07/08/10
IN CORRESPONDENCE WITH TERMS.

| INVOICE TOTAL |
|---|
| $ 21748.95 |

**DISCOUNT NOT ALLOWED ON FREIGHT OR DIES**

TO INSURE CORRECT POSTING, PLEASE INCLUDE YOUR INVOICE NO. AND ANY SUPPORTING DOCUMENTS WHEN REMITTING OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**
0139452774

hrlsv.ps 041802

FERR000000121
CONFIDENTIAL

**IDS Power View**

File   Edit

# IDS
INTEGRATED
DISTRIBUTION
SOLUTIONS, L.L.C.

## Open Invoice Maintenance

Type choices, press Enter.                                    Mode:   CHANGE

Company Number . . .            1
Vendor Number . . . .              STO001
Invoice Number . . .        0139452752

Division/Location . .          2    2
Invoice Date . . . .          6252010          Terms . . .        .0200  /  10 Net  30
Invoice Amount . . .            16889.60

**FERRARO FOODS , INC.**  287 S. Randolphville Road, Piscataway, N.J. 08854

|                | VENDOR #<br>STO001 | VENDOR NAME<br>SMURFIT-STONE CONTAINER |          |          | 165622    |
|----------------|--------------------|----------------------------------------|----------|----------|-----------|
| INVOICE #      | INV DATE           | INVOICE DESCRIPTION                    | GROSS AMT | DISCOUNT | AMT PAID |
| 0139452752     | 06252010           |                                        | 16,889.60 | 337.79   | 16,551.81 |

| 07012010<br>CHECK DATE | 165622<br>CHECK # | | 16,889.60<br>GROSS AMT | 337.79<br>DISCOUNT | 16,551.81<br>AMT PAID |
|---|---|---|---|---|---|

FERR000000122
CONFIDENTIAL

# ☆SMURFIT-STONE

**Smurfit-Stone Container Enterprises, Inc.**

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

JUN 28 REC'D

**CUSTOMER COPY**

| Invoice | |
|---|---|
| NUMBER | **0139452752** |
| DATE | 06/25/10 |

**IMPORTANT**
PLEASE REFERENCE ENTIRE INVOICE NO. ON REMITTANCE

S O L D T O

FERRARO FOODS INC

287 SO RANDOLPHVILLE RD
PISCATAWAY NJ 08854

S H I P T O

FERRARO FOODS INC
287 SO RANDOLPHVILLE RD
PISCATAWAY, NJ 08854

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 452752 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555774 083812A | 16 X 16 X 1 3/4 E FILE # 59385 | 72800 | C | 232.00 | M | 16889.60 |

```
                              16,889.60 *
          Discount              2.0 %
                               337.79 *

                              16,889.60 +
                               337.79 -
            000
                              16,551.81 *
```

| PLEASE REMIT TO | | |
|---|---|---|
| SMURFIT-STONE CONTAINER 14079 COLLECTIONS CNTR DR CHICAGO, IL 60693 | SELLER REPRESENTS THAT WITH RESPECT TO THE PRODUCTION OF THE ARTICLES AND/OR THE PERFORMANCE OF THE SERVICES COVERED BY THE INVOICE IT HAS FULLY COMPLIED WITH SECTIONS 6, 7 AND 12 OF THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED | DISCOUNT OF $ 161.97    IF PAYMENT RECEIVED ON OR BEFORE   07/05/10 IN CORRESPONDENCE WITH TERMS. |

| | INVOICE TOTAL |
|---|---|
| | $ 16889.60 |

**DISCOUNT NOT ALLOWED ON FREIGHT OR DIES**

TO INSURE CORRECT POSTING, PLEASE INCLUDE YOUR INVOICE NO. AND ANY SUPPORTING DOCUMENTS WHEN REMITTING OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**
**0139452752**

hrinv.ps 041802

**FERR000000123**
**CONFIDENTIAL**

IDS Power View

File  Edit

**INTEGRATED DISTRIBUTION SOLUTIONS, LLC.**

Open Invoice Maintenance

Type choices, press Enter.                                      Mode:    CHANGE

Company Number ...          1
Vendor Number ....              STO001
Invoice Number ...        0139452715

Division/Location ..        2    2
Invoice Date ....          6232010              Terms ...        .0200 /  10 Net  30
Invoice Amount ...            16889.60
Non Discount Amount .              .00
Invoice Description .

**FERRARO FOODS , INC.**  287 S. Randolphville Road, Piscataway, N.J. 08854                    **165564**

                    VENDOR #              VENDOR NAME
                    STO001                SMURFIT-STONE CONTAINER

| INVOICE # | INV DATE | INVOICE DESCRIPTION | GROSS AMT | DISCOUNT | AMT PAID |
|-----------|----------|---------------------|-----------|----------|----------|
| 0139452687 | 06212010 | | 16,889.60 | 337.79 | 16,551.81 |
| 0139452715 | 06232010 | | 16,889.60 | 337.79 | 16,551.81 |

|  06302010  |   165564   |  |  33,779.20  |  675.58  |  33,103.62  |
| CHECK DATE | CHECK # | | GROSS AMT | DISCOUNT | AMT PAID |

FERR000000124
CONFIDENTIAL

**SMURFIT-STONE**

Smurfit-Stone Container Enterprises, Inc.

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

CUSTOMER COPY

| Invoice | |
|---|---|
| NUMBER | 0139452715 |
| DATE | 06/23/10 |

**IMPORTANT**
PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

S O L D T O

FERRARO FOODS INC

287 SO RANDOLPHVILLE RD
PISCATAWAY NJ 08854

S H I P T O

FERRARO FOODS INC
287 SO RANDOLPHVILLE RD
PISCATAWAY, NJ 08854

PAGE 1

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 452715 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO. OUR ORDER NO. QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555772  083811A | 16 X 16 X 1 3/4  FILE # 59385  E | 72800 | C | 232.00 | M | 16889.60 |

16,889.60×
Discount 2.%
337.79*

16,889.60+
337.79-
000
16,551.81*

PLEASE REMIT TO

SMURFIT-STONE CONTAINER
14079 COLLECTIONS CNTR DR
CHICAGO, IL 60693

SELLER REPRESENTS THAT WITH RESPECT TO
THE PRODUCTION OF THE ARTICLES AND/OR THE
PERFORMANCE OF THE SERVICES COVERED BY
THIS INVOICE IT HAS FULLY COMPLIED WITH
SECTIONS 6, 7 AND 12 OF THE FAIR LABOR
STANDARDS ACT OF 1938 AS AMENDED

DISCOUNT OF $ 161.97    IF PAYMENT
RECEIVED ON OR BEFORE    07/03/10
IN CORRESPONDENCE WITH TERMS.

$ 16889.60

| INVOICE TOTAL |
|---|
| 16889.60 |

DISCOUNT NOT ALLOWED
ON FREIGHT OR DIES

TO INSURE CORRECT POSTING, PLEASE
INCLUDE YOUR INVOICE NO. AND ANY
SUPPORTING DOCUMENTS WHEN REMITTING
OTHER THAN THE AMOUNT SHOWN

INVOICE NO.

**0139452715**

lvrinv.ps 041802

FERR000000125
CONFIDENTIAL

# SMURFIT-STONE

**Smurfit-Stone Container Enterprises, Inc.**

MANSFIELD, MA (508)339-3601
NEW HARTFORD, NY (315)733-2363
SPRINGFIELD, MA (413)543-2311
WAKEFIELD, MA (781)245-8600

JUN 2 4 RECD

| Invoice | |
|---|---|
| **NUMBER** | 0139452687 |
| **DATE** | 06/21/10 |

CUSTOMER COPY

**IMPORTANT**

PLEASE REFERENCE
ENTIRE INVOICE NO.
ON REMITTANCE

| S O L D T O | SHIP TO |
|---|---|
| FERRARO FOODS INC<br><br>287 SO RANDOLPHVILLE RD<br>PISCATAWAY NJ 08854 | FERRARO FOODS INC<br>287 SO RANDOLPHVILLE RD<br>PISCATAWAY, NJ 08854 |

**PAGE 1**

| ROUTING | F.O.B. | FREIGHT | B.L.NO. | SLSMN. | CUSTOMER | TERMS |
|---|---|---|---|---|---|---|
| OUR TRUCK | Destinati | PPD | 452687 | 50 | 61245 | 1% 10 DAYS-NET-30 |

| YOUR ORDER NO.<br>OUR ORDER NO.<br>QUANTITY ORDER | DESCRIPTION | QUANTITY SHIPPED | P/C | PRICE | PER | AMOUNT |
|---|---|---|---|---|---|---|
| 555771<br>083810A | 16  X  16  X  1 3/4<br>E     FILE #  59385 | 72800 | C | 232.00 | M | 16889.60 |

```
                        16,889.60 x
          Discount         2.0 %
                         337.79 *

                        16,889.60 +
                         337.79 -
          000            16,551.81 *
```

| PLEASE REMIT TO | | |
|---|---|---|
| SMURFIT-STONE CONTAINER<br>14079 COLLECTIONS CNTR DR<br>CHICAGO, IL 60693 | SELLER REPRESENTS THAT WITH RESPECT TO THE PRODUCTION OF THE ARTICLES AND/OR THE PERFORMANCE OF THE SERVICES COVERED BY THE INVOICE IT HAS FULLY COMPLIED WITH SECTIONS 6, 7 AND 12 OF THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED | DISCOUNT OF $ 161.97  IF PAYMENT<br>RECEIVED ON OR BEFORE  07/01/10<br>IN CORRESPONDENCE WITH TERMS. |

**INVOICE TOTAL**

$ 16889.60

**DISCOUNT NOT ALLOWED ON FREIGHT OR DIES**

TO INSURE CORRECT POSTING, PLEASE
INCLUDE YOUR INVOICE NO. AND ANY
SUPPORTING DOCUMENTS WHEN REMITTING
OTHER THAN THE AMOUNT SHOWN

**INVOICE NO.**

0139452687

hrinv.ps 041802

FERR000000126
CONFIDENTIAL

# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS


Case No. 1:1-cv-05711

KLEEN PRODUCTS LLC, et al, individually       :

and on behalf of all those similarly          :

situated,                                     :

                                              :

        Plaintiffs,                           :

                                              :

                                              :

        vs.                                   :

                                              :

                                              :

                                              :

                                              :

PACKAGING CORPORATION OF AMERICA, et al,      :

                                              :

        Defendants.                           :

                                              :

                                              :

                                              :


-------------------------------------

VIDEOTAPED

DEPOSITION UNDER ORAL EXAMINATION OF:

DEAN BARCELONA

30(b)(6)

June 18, 2014

-----------

REPORTED BY:  JENNIFER L. WIELAGE, CCR, RPR, CRR

------------

**[Page 78]**

1  conclusion that Ferraro Foods did not purchase
2  corrugated products from those suppliers?
3      A.    Barring any archiving issues with the
4  computer system -- it just indicates that we had no
5  records in our computers to indicate that we made the
6  purchases.
7      Q.    So if Ferraro Foods is bringing a
8  lawsuit against the named -- or the defendants in
9  this case, correct?
10     A.    Yes.
11     Q.    But we're unable to tell at this
12 point what purchases Ferraro Foods made from those
13 defendants?
14         MS. EISLER:  Objection to form.
15 BY MS. LOWERY:
16     Q.    How can we establish that?
17     A.    We've provided documentation based on
18 the document request that we were able to ascertain
19 and recover at this point in time.
20     Q.    And for the document -- for the
21 purchaser -- I'm sorry, for the defendants for whom
22 Ferraro Foods provided no invoices, no documentation
23 whatsoever of purchases from those documents, you
24 can't conclude that there were no purchases from
25 those defendants?

**[Page 79]**

1      A.    We can only conclude that we weren't
2  able to produce documents for the period that you've
3  spoken about.
4      Q.    Okay.  Is there anyone at Ferraro
5  Foods who would know if documents were destroyed?
6      A.    As far as I know, all the documents
7  have been retained.
8      Q.    Okay.  So all the documents have been
9  retained, all the invoices have been produced, the
10 computer system was searched and everything was
11 produced, and not a single thing was produced with
12 respect to purchases from Weyerhaeuser?
13         MS. EISLER:  Counsel, we'll stipulate
14 to that.
15         MS. LOWERY:  Thank you.  Okay.
16         MS. EISLER:  I'm sorry, we'll
17 stipulate to that.
18         MR. DIMARE:  I've been doing it every
19 five minutes.
20         MS. EISLER:  I don't like to see
21 anybody suffer.
22         MS. LOWERY:  I mean, can we stipulate
23 that there are no purchases by Ferraro Foods by
24 Weyerhaeuser between 2003 and 2010?
25         MS. EISLER:  I can stipulate that we

**[Page 80]**

1  haven't produced any records of those purchases.
2          MS. LOWERY:  You have no records,
3  let's put it that way.  That's better phrased.
4          THE WITNESS:  That's what I've been
5  saying.
6          MS. EISLER:  I know.
7          MS. LOWERY:  And we can stipulate
8  that there's no records of any purchases from
9  Temple-Inland between 2003 and 2010.
10         MS. EISLER:  We can stipulate that we
11 don't have any records of any purchases from any
12 defendants in that time period that have not already
13 been produced.
14         MS. LOWERY:  Okay.
15 BY MS. LOWERY:
16     Q.    I'm going to hand you what the court
17 reporter is going to mark as Exhibit 13.
18         (Exhibit 13, FF-E000003906 through
19         FF-E000003913, was marked for Identification
20         by the court reporter.)
21 BY MS. LOWERY:
22     Q.    Exhibit 13 is Bates number FF-E3906
23 through 3913 and it appears to be a Supply Purchase
24 Confidentiality and Noncircumvention Agreement
25 between Ferraro Foods and Bay Ridge Corrugated and

**[Page 81]**

1  Pratt Industries dated July 1, 2006.
2      A.    Yes.
3      Q.    Do you recognize this document?
4      A.    I've never seen it.
5      Q.    Who at Ferraro Foods would see a
6  document like this?
7      A.    Our in-house counsel.
8      Q.    Who else?
9      A.    Apparently, according to this
10 document, the president of our company and a CFO from
11 the supplier.
12     Q.    And did you -- did you speak to the
13 president of your company in preparation for this
14 deposition?
15     A.    I did not.
16     Q.    If you turn to the page ending in
17 3908, and if you look at Paragraph 9 and just read
18 the first sentence.
19     A.    Commencing on the date hereof and
20 continuing for a period of three years thereafter,
21 Pratt agrees to supply and the company agrees to
22 purchase from Pratt not less than 85 percent,
23 parentheses, per centum, of the company's corrugated
24 purchases and direct ship account purchases.
25     Q.    So between 2006 and 2009, the three

**[21]  (Pages 78 to 81)**

| | |
|---|---|
| 1    Q.   So all purchases from Smurfit-Stone | 1    going on between Stone and Smurfit-Stone; companies |
| 2   would have originated at Ferraro's New Jersey | 2   changed. I don't know what the catalyst was for |
| 3   location; is that correct? | 3   that. |
| 4    A.   The purchasing department is housed | 4    Q.   I think that might be something |
| 5   in New Jersey. | 5   different. Are you aware, though, of -- that Smurfit |
| 6    Q.   In 2010, did Ferraro purchase | 6   was discharged from Smurfit-Stone's bankruptcy on |
| 7   products from Smurfit-Stone? | 7   June 30, 2010? |
| 8    A.   I don't know for sure without looking | 8    A.   Discharged? |
| 9   at the documentation. | 9    Q.   Discharged from bankruptcy. |
| 10     MR. WOLFF: I'm going to introduce an | 10    A.   What do you mean by that? |
| 11   exhibit here. I'm going to ask the court reporter to | 11     MS. EISLER: Are you aware of it? |
| 12   mark this as Exhibit 34. | 12     THE WITNESS: No. |
| 13     (Exhibit 34, FERR00000119 through | 13   BY MR. WOLFF: |
| 14     FERR00000126, was marked for Identification | 14    Q.   Are you aware whether or not Ferraro |
| 15     by the court reporter.) | 15   filed any claims in Smurfit-Stone's bankruptcy |
| 16   BY MR. WOLFF: | 16   proceeding? |
| 17    Q.   This is Exhibit 34. For the record, | 17    A.   I don't know. |
| 18   Bates number FERR119 through 126, which appear to be | 18    Q.   If Ferraro had filed a claim in |
| 19   invoices for purchases -- Ferraro's purchases from | 19   Smurfit's bankruptcy proceeding, who would have been |
| 20   Smurfit in June 2010. | 20   the person at Ferraro who would have authorized that |
| 21     Mr. Barcelona, do you recognize these | 21   claim? |
| 22   documents -- this exhibit? | 22    A.   A claim for what? |
| 23    A.   Yes. | 23    Q.   A claim against -- a claim for -- a |
| 24    Q.   What is it? | 24   claim to recover against Smurfit-Stone in connection |
| 25    A.   The first sheet is a screen shot of | 25   with Smurfit's bankruptcy? |
| **[Page 190]** | **[Page 192]** |
| 1   the vendor I.D. information. The bottom portion is a | 1    A.   I would rely on in-house counsel for |
| 2   check stub for a payment against some of those | 2   guidance in that area. |
| 3   invoices. | 3    Q.   Do you know? |
| 4    Q.   Are there invoices, too, in this | 4    A.   I don't. |
| 5   exhibit. | 5     MS. EISLER: Does he -- does he know |
| 6    A.   120 is an invoice. 121 is an | 6   what? |
| 7   invoice. | 7   BY MR. WOLFF: |
| 8    Q.   Do these invoices reflect purchases | 8    Q.   Do you know who -- do you know who |
| 9   that Ferraro made from Smurfit-Stone in June 2010? | 9   would have authorized -- specifically who would have |
| 10    A.   Yes. | 10   authorized the filing of a claim? |
| 11    Q.   Are these documents true and accurate | 11    A.   We would have had a discussion with |
| 12   copies of the invoices Ferraro received from | 12   in-house counsel and be guided by his |
| 13   Smurfit-Stone in June 2010? | 13   recommendations. |
| 14    A.   Yes. | 14    Q.   Okay. I'd like to turn briefly back |
| 15    Q.   Did Ferraro purchase any corrugated | 15   to Exhibit 25, if you have that handy. |
| 16   products from Smurfit before June but still in the | 16     Now, Exhibit 25 was an e-mail from |
| 17   year 2010? | 17   David B. Goldstein who appears to be at Smurfit-Stone |
| 18    A.   I don't know. | 18   with the subject Price Increase where the text of the |
| 19    Q.   Mr. Barcelona, are you aware that | 19   e-mail states that Pulp & Paper Week did not come out |
| 20   Smurfit-Stone filed for bankruptcy protection on or | 20   this week with a $40 per ton -- did come out this |
| 21   about January 26, 2009? | 21   week, excuse me, with a $40 per ton decrease in |
| 22    A.   I didn't -- wasn't aware of that. | 22   linerboard. This will result in no increase. |
| 23    Q.   Well, are you aware that Smurfit was | 23     Do you recall seeing this document |
| 24   discharged from bankruptcy on June 30, 2010? | 24   earlier in the day? |
| 25    A.   I know there was mergers or something | 25    A.   Earlier today, yes. |
| **[Page 191]** | **[Page 193]** |

**[49]  (Pages 190 to 193)**