# Exhibit 11

IBISWorld Procurement Report: 14602020

# Paperboard & Packaging Papers



**Jesse Chiang**
October 2013

## About this Report

This report is intended to help buyers of paperboard and packaging papers. Paperboard and packaging papers are made from layered paper and include bleached and unbleached paperboard, boxboard, containerboard, packaging paper and fiberboard, which are used as primary materials for conversion into finished packaging products. This report excludes tissue, laminated paper and finished packaging products, such as cardboard boxes. Suppliers include manufacturers of paperboard and paper-related products.

## Table of Contents

2  At a Glance

3  Executive Summary

4  Price Environment
4  Price Fundamentals
   4    Benchmark Price
   5    Pricing Model
5  Price Drivers
   5    Input Cost Drivers
   7    External Demand Drivers
8  Recent Price Trend
9  Price Forecast

10  Product Characteristics
10  Product Life Cycle

10  Total Cost of Ownership
11  Product Specialization
11  Related Goods
12  Substitute Goods
12  Regulation
13  Quality Control

14  Supply Chain & Vendors
14  Supply Chain Dynamics
    14    Supply Chain Risk
    15    Geographic Locations
    15    Imports
16  Competitive Environment
    16    Market Share Concentration
    16    Vendor Company Types
18  Vendor Financial Benchmarks

19  Switching Cost

20  Purchasing Process
20  Buying Basics
    20    Buying Lead Time
    20    Selection Process
    20    Buying-Decision Scorecard
21  Key RFP Elements

23  Negotiation Questions

24  Buyer Power Score Components

25  Jargon & Glossary

WWW.IBISWORLD.COM

# At a Glance

## Recent Price



**2.0%**

2010-2013

Despite falling demand from major end users during the period, prices for paperboard and packaging papers trended upward due to rising wood pulp prices.

## Market Characteristics

Availability of Substitutes



**HIGH**

Market Share Concentration

**MEDIUM**

Product Specialization

**LOW**

Switching Costs

**LOW**

## Forecast Price



**1.7%**

2013-2016

Renewed industrial activity and rising consumer spending will fuel growth in market prices. Low price volatility is expected during the period, but buyers should consider contracts to avoid the potential of rising prices.

## Market Risk

Recent Demand Driver Volatility



**MEDIUM**

Recent Price Volatility

**MEDIUM**

Vendor Financial Risk



**MEDIUM**

Supply Chain Risk



**MEDIUM**

Growth percentages represent annualized data.

## Buyer Power Score

**3.9**

See p. 24 for details.

## Benchmark Price

**$618**

per ton

## Key Price Drivers

World price of wood pulp

Price of electric power

Average wages – paperboard mills

Industrial production index

Consumer spending

## Major Vendors

International Paper Company **$27,833m**

Georgia-Pacific Corporation **$12,508m**

Rock-Tenn Company **$9,207m**

Weyerhaeuser Company **$7,059m**

MeadWestvaco Corporation **$5,459m**

## Vendor Cost Benchmarks

**3.9%**↑
Profit

**9.0%**↓
Wages

**50.8%**↓
Purchases

**36.3%**↓
Overhead

Arrow indicates trend since 2010.

WWW.IBISWORLD.COM

Paperboard & Packaging: Procurement October 2013          3

# Executive Summary

## Buyer Power Score



| Supplier Power 1 | | | | | Buyer Power 5 | |
|---|---|---|---|---|---|---|

**3.9** / 5

- 3.6  Price Trend
- 4.5  Market Structure
- 3.6  Market Risk

The IBISWorld Buyer Power Score is a weighted score based on a number of quantitative and qualitative criteria associated with buying a product or service. The score is calculated between 1 and 5, with 1 signifying low buyer power and 5 meaning high buyer power. The more power a buyer has the greater leverage they have to get lower prices and better contract terms. For more information see page 24.

## Executive Summary

Paperboard and packaging papers have a buyer power score of 3.8 out of 5.0. This score reflects the widespread availability of substitute packaging materials that enable buyers to gain leverage in the negotiation process. The movement away from paper-based products has given way to the growing adoption of plastics, metal and other packaging substrates. As a result, suppliers are experiencing weaker demand from primary end users that provide buyers with negotiation leverage during the purchase process.

The benchmark price for paperboard and packaging papers is $618.00 per ton, but there is a moderate price range for differing paperboard grades. Declining paperboard prices have been favorable to buyers during the three years to 2013, but IBISWorld expects prices to rise during the three years to 2016, which will hurt negotiating leverage for buyers. The standardized nature of paperboard grades affords buyers limited leverage in price discussions because commoditized raw materials account for the largest expenditure by suppliers. Nevertheless, buyers should seek out volume purchases to reduce list prices, or long-term supply agreements that give suppliers guaranteed purchases in exchange for a discounted or capped rate throughout the duration of the contract.

Though there is a moderate level of market share concentration, transportation inefficiencies surrounding paperboard have led to substantial fragmentation and a sizeable number of local and regional suppliers. The abundance of paperboard suppliers provides buyers with multiple options when entering the procurement process, creating leverage during negotiations. Additionally, low switching costs give buyers flexibility when contracting with paperboard suppliers that have supply or distribution interruptions; therefore, the purchasing environment for paperboard is advantageous to buyers. Short lead times make the paperboard purchase process relatively quick, giving buyers the ability to source paperboard from a number of suppliers.

WWW.IBISWORLD.COM
Paperboard & Packaging Paper - October 2015    4

# Price Environment

## Price Summary

Three-year Price Trend **2.0%**

Three-year Price Forecast **1.7%**



- 🔴 Factor is a threat to buyer
- 🟠 Factor should be investigated
- 🟢 Factor is not a threat to buyer



Producer Price Index – Price of Paperboard vs. Sector

- 🔴 Price of Paperboard
- 🟢 Price of Pulp, Paper and Allied Products

SOURCE: IBISWorld

## Price Fundamentals

| | |
|---|---|
| **Average Price** | $618 per ton |
| **Price Range** | MEDIUM: $590 to $820 per ton |
| **Key Pricing Factors** | Materials<br>Processing Type<br>Rent and Utilities<br>Wages |

### Benchmark Price

Market prices for paperboard and packaging papers vary based on the grade of paper selected, with suppliers typically selling products by the ton. Based on the most recent data available from the Food and Agriculture Organization (FAO), the average price for paperboard and packaging paper is expected to be just more than $618.00 per ton. Suppliers offer a variety of paperboard and packaging paper grades to fit the needs of different end uses, which can cause variations in the average price estimate. Therefore, the price range for paperboard and packaging papers is moderate due to the differing prices in raw materials, including wood pulp and chemicals, and the grade of paperboard required for end uses, such as food and beverage products. Virgin linerboard, also known as

kraftliner, commands higher prices in the market place due to fiber purity; however, recycled linerboard, also known as testliner, and RB fluting that are used in corrugated box production have lower average costs. While packaging for food and beverage products is produced in bulk, health and safety requirements from the US Food and Drug Administration (FDA) and the US Department of Agriculture (USDA) regarding contact materials and packaging machinery can increase manufacturing costs and selling prices.

The fluctuation of raw material costs for paperboard and packaging papers suppliers leaves buyers with limited options in negotiation. Profit margins tighten as suppliers' input costs increase, forcing suppliers to pass higher costs on to buyers. As a result, buyers should

# Price Environment

## Price Fundamentals continued

consider bulk purchases to secure discounts or multiyear supply agreements to lock in prices with suppliers. Average supply agreements range from one to three years, and securing current prices will allow buyers to avoid future price hikes. However, buyers should be aware that there is the possibility of future declines in raw material costs that could translate into lower selling prices.

### Pricing Model
Suppliers of paperboard and packaging papers use a cost-plus pricing model that calculates the cost of production and adds a predetermined profit margin. Though the sale of paperboard and packaging papers is typically priced by the ton, suppliers offer other buying options, including per piece or square-foot measurements. Purchases can also be made on an ad-hoc basis or by entering a multiyear supply agreement. With volatile raw material purchases accounting for the majority of paperboard inputs cost, buyers are subject to frequent price movements because suppliers typically adjust their pricing to protect margins. Though global wood pulp prices are forecast to remain stable during the three years to 2016, year-over-year price volatility is often

masked by annualized growth rates. For example, global wood pulp prices jumped more than 41.0% from 2009 to 2010, and 11.3% from 2012 to 2013, yet subsequent market corrections pushed the annualized growth rate down to 1.9% in the three years to 2013. Despite expectations of steady annualized growth, buyers should be aware of potential price spikes due to economic volatility or tight supplies.

The effort to maintain margins by suppliers limits the negotiating power of buyers, and securing prices in supply agreements can be a safe way for buyers to remain safe from fluctuations in volatile input costs that would require producers to raise prices. In addition, volume purchases can provide better selling prices for buyers, though without a supply agreement future purchase prices are not guaranteed. Nevertheless, ordering on an as-needed basis provides buyers with flexibility and allows them to take advantage of price drops, but it also leaves them exposed to potential price spikes. Buyers of large quantities of paperboard and packaging papers should consider entering supply agreements, while buyers of smaller quantities should asses supply needs to determine whether securing volume discounts or locking in prices for the long term is advantageous.

## Price Drivers



Price Driver Volatility Level — MEDIUM

Due to fluctuations in the prices of raw materials, driver volatility for paperboard is medium. As commodities, prices of wood pulp, recovered paper and chemicals are constantly changing, forcing suppliers to frequently reevaluate list prices. The moderate volatility of paperboard prices negatively affects buyers because consistent changes in prices can create an unstable purchasing environment that can affect inventory planning.

### Input Cost Drivers
**World price of wood pulp:** The largest cost driver for paperboard and packaging papers suppliers is purchases, which account for nearly 51.0% of revenue in 2013. Major purchases for producers include wood pulp, chemicals and converted paper containers used for packaging. Because primary raw material costs experience price fluctuations, suppliers are constantly evaluating product prices to minimize operating

# Price Environment

## Price Drivers continued

expenses. The global economic recession put a strain on activity in the construction sector, which hampered the availability of wood cut-offs used in pulp production, driving up input prices. Nevertheless, pulp and recovered material prices lowered in 2012, alleviating cost pressures on suppliers. In the three years to 2016, IBISWorld expects global wood pulp prices to remain steady, and they are forecast to grow at an average annual rate of 0.6%.

Buyers should note that the rising demand for products packaged using 100% recycled paper is causing suppliers of virgin materials to produce paperboard that contains a greater amount of recovered content. This will affect prices of virgin and recycled paperboard, and packaging papers because high demand for recycled material encourages suppliers to reduce virgin fiber, shortening the supply of recovered and virgin materials.

**Price of electric power:** Rent and utilities is another significant cost driver



Change in World Price of Wood Pulp

SOURCE: IBISWorld

for paperboard suppliers, accounting for about 10.1% of revenue. The operation of large industrial machines used in the production of paperboard requires significant space and energy expenditures. Paperboard manufacturing demands large quantities of water and electricity, which can be subject to price changes. Despite historic fluctuations in cost, electricity prices have recently

## Price Driver Statistics

| | World Price of Wood Pulp ($ per ton) | Change (%) | Average Wages – Paperboard Mills ($) | Change (%) | Industrial Production Index | Change (%) | Consumer Spending ($b) | Change (%) | Import Penetration Into The Manufacturing Sector (%) | Change (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2003 | 525.70 | 16.22 | 69,772.48 | -1.97 | 90.20 | 1.23 | 8,244.50 | 2.77 | 24.60 | 2.07 |
| 2004 | 640.79 | 21.89 | 70,830.56 | 1.51 | 92.30 | 2.33 | 8,515.80 | 3.29 | 26.20 | 6.50 |
| 2005 | 635.48 | -0.83 | 70,235.18 | -0.84 | 95.30 | 3.25 | 8,803.50 | 3.38 | 26.80 | 2.29 |
| 2006 | 703.31 | 10.67 | 71,949.60 | 2.44 | 97.40 | 2.20 | 9,054.50 | 2.85 | 27.80 | 3.73 |
| 2007 | 766.96 | 9.05 | 72,619.87 | 0.93 | 100.00 | 2.67 | 9,262.90 | 2.30 | 28.00 | 0.72 |
| 2008 | 820.16 | 6.94 | 73,331.73 | 0.98 | 96.60 | -3.40 | 9,211.70 | -0.55 | 27.60 | -1.43 |
| 2009 | 614.60 | -25.06 | 71,859.62 | -2.00 | 85.70 | -11.28 | 9,032.60 | -1.94 | 25.70 | -6.88 |
| 2010 | 866.79 | 41.03 | 76,059.30 | 5.84 | 90.60 | 5.72 | 9,196.20 | 1.81 | 28.10 | 9.34 |
| 2011 | 899.65 | 3.79 | 76,617.35 | 0.73 | 93.60 | 3.31 | 9,428.80 | 2.53 | 29.00 | 3.20 |
| 2012 | 762.80 | -15.21 | 77,127.92 | 0.66 | 97.00 | 3.63 | 9,604.90 | 1.87 | 29.50 | 1.72 |
| 2013 | 854.20 | 11.98 | 77,781.53 | 0.84 | 99.10 | 2.16 | 9,767.30 | 1.69 | 30.00 | 1.69 |
| 2014 | 884.40 | 3.54 | 78,083.19 | 0.38 | 102.00 | 2.93 | 9,990.40 | 2.28 | 30.10 | 0.33 |
| 2015 | 906.60 | 2.51 | 78,109.24 | 0.03 | 105.60 | 3.53 | 10,263.30 | 2.73 | 30.40 | 1.00 |
| 2016 | 889.70 | -1.86 | 78,243.26 | 0.17 | 109.40 | 3.60 | 10,587.10 | 3.15 | 30.70 | 0.99 |

SOURCE: IBISWORLD

WWW.IBISWORLD.COM     Paperboard Mills & Packaging Papers October 2013

# Price Environment

## Price Drivers continued

shown a low level of volatility, having grown at an annualized rate of only 0.6% in the three years to 2013. Rent or mortgage payments tend to be stable for suppliers, allowing them to factor these costs in to their budgets on a fixed basis. Unlike purchases, rent and utilities tend to be very stable, predictable costs for suppliers, mitigating the effect these costs have on buyer prices. The price of electricity is expected to continue to grow in the three years to 2016 at an annualized rate of 1.0%.

**Average wages – paperboard mills:** Though wages are the third-most significant expense at 9.0% of revenue, labor costs as a percentage of revenue fell slightly during the three years to 2013. The global economic recession and subsequent slow recovery led paperboard producers to scale back labor to cut operating expenses. New computerized systems and machinery also led to an increase in productivity during the period, which has continued to reduce the need for human capital. Labor reductions and the rise in automated production have led to a decline in labor dependency and improved manufacturing efficiency, reducing overall expenses and allowing for pass-through savings to buyers. Wages are expected to continue to decline at an average annual rate of 0.3% in the three years to 2016.

### External Demand Drivers
**Industrial production index:** Demand for paperboard and packaging papers is influenced by a variety of external macroeconomic variables. Trends in industrial production, consumer spending and import penetration into the manufacturing sector affect demand and pricing for paperboard and packaging papers.

Paperboard-based packaging is the most common form of packaging for

| Vendor Average Cost Structure | Proportion of Revenue (%) |
|---|---|
| **Profit** | 3.9 |
| **Wages** | 9.0 |
| **Purchases** | 50.8 |
| Pulp and pulp products | 16.5 |
| Chemicals | 6.8 |
| Other | 27.5 |
| **Overhead** | 36.3 |
| Rent and Utilities | 10.1 |
| Depreciation | 5.8 |
| Marketing | 0.1 |
| Other | 20.3 |
| **Total** | 100.0 |

SOURCE: IBISWORLD

transporting and selling goods, and as such, it is highly correlated with trends in industrial production. After a precipitous decline in 2009, the Industrial Production Index began to recover in 2010, and the index is expected to return to a low level of volatility during the three years to 2013. The index is expected to maintain low volatility and slowly rise in the three years to 2016, indicating steady demand for paperboard and packaging papers in industrial processes.

With food producers among the largest consumers of paperboard and packaging papers, rising food production leads to greater demand for packaging. Demand from food manufacturers exhibited moderate volatility during the three years to 2013, but volatility is anticipated to cool in the three years to 2016, bringing any significant risk of price fluctuation under control.

**Consumer spending:** The rise in consumer spending fuels the demand for consumer packaged goods (CPGs), and paperboard and packaging papers. After experiencing a period of decline during the global recession, consumer spending has stabilized and started to recover.

WWW.IBISWORLD.COM

# Price Environment

## Price Drivers continued

During the three years to 2016, consumer spending is expected to rise, leading to the consumption of more CPGs and in turn, paperboard and packaging papers. The increasing demand for paperboard and packaging papers will lead to an increase in prices, forcing buyers to consider volume discounts or multiyear agreements.

**Import penetration into the manufacturing sector:** Import penetration into the manufacturing sector negatively impacts demand for paperboard and packaging papers.

Because manufacturers are among the largest end users of paperboard, an increase in imports offsets domestic production and drives down demand for paperboard and packaging papers. Import penetration exhibited low volatility during the three years to 2013, but an upward trend in the driver during the period helped maintain slow price growth for paperboard and packaging papers. Nevertheless, import penetration volatility and growth are expected to remain low in the three years to 2016, leading to higher domestic demand and rising prices for paperboard and packaging papers.

## Recent Price Trend

Three-Year Average Annual Price Trend:
**2.0%**

Price Volatility  MEDIUM

The recent price trend for paperboard has been positive for buyers. The producer price index (PPI) for paperboard has stabilized after a sharp spike in 2010 as the global economy moved toward recovery. In the three years to 2013, the price of paperboard is estimated to grow at an annualized rate of 2.0%. A decline in consumer spending amid the global recession has cut demand for paperboard and packaging papers, but this slide in demand has been met by upward pressure from rising wood pulp prices. These two forces have counteracted one another, keeping paperboard prices in check. Despite economic headwinds during the period, paperboard prices have had medium volatility, providing buyers with a somewhat stable purchasing

environment. The recovering economy has spurred industrial activities and demand for CPGs, causing paperboard prices to increase at a faster rate than the sector average.

The moderate volatility of paperboard and packaging paper prices during the three-year period gives buyers flexibility when making purchasing decisions. Whether purchasing small or large quantities of paperboard, buyers have the ability to capitalize on stable prices. Buyers looking to enter supply agreements can take advantage of current prices to secure volume discounts, while those buying on an ad-hoc basis can purchase paperboard and packaging papers without fear of major price swings in the three years to 2016.

Case: 1-10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 10 of 512 PageID #:20238
Case: 15-2385          Document: 56-26          Filed: 10/27/2015          Pages: 512

# Price Environment

## Price Forecast

Three-Year Average Annual Price Forecast:
**1.7%**

Buyer power will be moderately affected by the price environment during the three years to 2016. IBISWorld expects prices for paperboard and packaging papers to grow at an average annual rate of 1.7% in the three years to 2016, boosted by recovering economic activity. Despite the low degree of price volatility expected during the forecast period, buyers should consider locking in prices for the duration of the three years to avoid any potential cuts into margins.

The recovering economy, including growth in consumer spending and industrial activity, is driving rising demand for paperboard, sending prices higher in the forecast period. During the three years to 2016, IBISWorld expects consumer spending to grow at an average annual rate of 2.9%, while industrial production is anticipated to rise at an annualized rate of 3.9%. Because paperboard is the leading material used in the production of industrial and consumer packaging, prices will face upward pressure as demand from end users grows.

The move toward sustainability has boosted demand for paper products that contain higher levels of recycled content. Also, rising demand from Asia for US-recovered paper has started applying upward pressure to recycled material prices, forcing domestic producers to consider price hikes to offset higher raw



Paperboard & Packaging Papers – Benchmark Price

SOURCE: IBISWorld

material costs. With a large portion of recovered paper supplies being exported, suppliers are having a harder time securing the recycled paper needed to meet growing demand for sustainable products. As such, buyers will experience price increases in recycled paperboard from supplier pass-through costs. The ongoing recovery of the housing market will increase the availability of wood pulp, applying some downward pressure on the prices of virgin fiber for paperboard. Nevertheless, overall paperboard prices are expected to move slowly upward to the disadvantage of buyers. The use of volume discounts and supply agreements will continue to help buyers mitigate the upward trend in pricing and protect margins.

Case: 1-10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 11 of 512 PageID #:20239

# Product Characteristics

## Product Life Cycle

Paperboard and packaging papers are in the mid-maturity stage of the product lifecycle. Sales growth is steady and moderate, largely following broader manufacturing trends, given its common use as a packaging substrate. Furthermore, the product has widespread adoption, so significant growth is not expected to occur. The moderate degree of fragmentation within the paperboard sector provides buyers with a number of supplier choices and, thus, more bargaining power. The mature stage of paperboard and packaging papers provides a stable purchasing environment for buyers because the commoditized nature of the product

### Life Cycle Stage: **Mid maturity**



allows for healthy price competition given that the standardized products have little variance among suppliers.

| Life Cycle Factor | Paperboard & Packaging Papers Characteristics |
|---|---|
| Price Trend | Prices for paperboard and packaging papers are stable but growing, following broader economic trends. Industrial production and consumer spending are key indicators for paperboard prices. An increase in industrial production and consumer spending indicate a higher demand for paperboard and packaging papers, leading to rising prices. Price often drives purchasing decisions due to the standardized nature of the product. |
| Product Change | The production of paperboard and packaging papers is a standardized process. There are few complementary products and little resources dedicated to R&D. Major suppliers benefit from economies of scope, diversifying offerings with other paper-based products or finished packaging. Nevertheless, the rise in substitute materials for packaging, such as plastics, have challenged paperboard as the dominant medium for primary packaging. |
| Distribution Scope | The distribution scope is stable. Industry fragmentation has led to a number of local and regional players that create efficient supply chains and distribution channels for smaller buyers. This fragmentation has challenged the dominance of larger vertically integrated companies. |
| Marketing Trends | Marketing of paperboard and packaging papers is primarily aimed at packaging converters and other end users of paper products. There is low spending, with companies using an internal sales force as a means of revenue generation. Typically, marketing costs account for 0.1% of revenue among suppliers. |

## Total Cost of Ownership



Total Cost of Ownership — **HIGH**

The total cost of ownership for paperboard and packaging papers is high. Paperboard is a bulky material that requires extensive warehouse space for storage. Typically, paperboard is used in the production of finished packaging, which requires an abundant amount of space to accommodate conversion

machinery. As such, the cost of storage space is often built into the rental budget. Nevertheless, buyers should be aware of how storage space requirements will negatively impact the availability of production space, potentially cutting into profit by reducing production capacity. The cost of warehouse storage space is

WWW.IRISVCFD.COM
Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 12 of 512 PageID #:20240

# Product Characteristics

## Total Cost of Ownership continued

also compounded by potential carrying costs; buyers that convert paperboard will require a substantial inventory of raw material to ensure continuous production. As a result, storage space cannot only cut production activity, but it can also keep a sizeable amount of revenue tied up in raw materials.

## Product Specialization

Paperboard and packaging papers have a low level of specialization. Typically, paperboard is bought and sold in bulk as a raw material for further conversion; therefore, there is little differentiation between grades of paperboard across suppliers. Some suppliers are able to establish a low level of material specialization by focusing on recovered paper as a primary raw material, which appeals to eco-friendly businesses and consumers.



Product Specialization    **LOW**

## Related Goods

Suppliers of paperboard and packaging papers often have excess raw materials and a diverse line of paper-related products. As a result, suppliers typically sell a range of pulp, packaging and finished paper-based products to buyers.

| Related Goods | Description |
| --- | --- |
| **Wood Pulp** | Vertically integrated paperboard producers typically operate wood pulp mills that provide the raw material for paperboard production.  Pulp is not used in the production of paperboard and packaging papers, but it is sold to the market as a commodity. |
| **Coated/Laminated Paperboard** | Suppliers treat paperboard with plastic, clay, latex and metal to improve the rigidity and durability of the end product. Buyers should consider purchasing coated or laminated paperboard if they intend to apply coatings or finishes to paperboard in house. Buying pre-treated paperboard can reduce the overall cost of producing finished packaging products. |
| **Office Stationery** | Paperboard suppliers often produce paper for office stationery, including printing paper and envelopes. Suppliers of office stationery compete with other paperboard producers and office stationery wholesalers and retailers. Buyers should assess their stationery needs to determine if buying directly from a single manufacturer would provide beneficial cost savings compared with other wholesalers and retailers. |
| **Finished Packaging** | Large paperboard suppliers often convert paperboard into finished packaging products, including folding cartons and cardboard boxes.  Buyers should assess end-use intentions to determine whether purchasing finished paper packaging products would provide cost savings. |

WWW.IBISWORLD.COM

# Product Characteristics

## Substitute Goods

Availability of Substitutes  **HIGH**

There is a high availability of substitutes to paperboard and packaging papers for buyers to consider. Though paperboard is the most widely used substrate for primary packaging, the increasing availability of cheap, reusable plastics is undercutting demand for paper-based packaging. Metal and glass are older forms of packaging materials that continue to compete with paperboard; however, plastic is by far most threatening to the status of paperboard as the leading packaging substrate.

| Substitutes | Description |
|---|---|
| Plastics | Plastics, including polyethylene (PE), polypropylene (PP), and polyethylene terephthalate (PET), have started to displace paperboard as a primary packaging substrate. Paperboard remains the dominant medium for secondary packaging, but plastic often requires less material and can be more cost effective than paperboard. Plastics are sold as commodities by the pound on a spot or contract basis. The average price for PE is about $1,255 per metric ton. Buyers should evaluate end-use needs to determine if plastic is a cheaper material for container production. Despite the growing popularity of plastics, paperboard is still viewed as a more eco-friendly packaging material, giving it a comparative advantage. |
| Metal | Metals such as aluminum and tin are common packaging substrates, typically used for industrial products or long-term food storage. Unlike paperboard, metal materials have a smaller range of applications and present potential health and safety issues with rust and chemical migration. Despite this factor, aluminum has a high recovery rate, creating a sustainable, eco-friendly supply chain. Aluminum is sold on a spot or contract basis, and prices are around $2,329 per metric ton. |
| Glass | Glass has long been used to make containers because of its extended shelf life, impermeability and low cost of production. Glass is 100% recyclable, creating a stable, reusable material supply chain. Nevertheless, glass is bulky, heavy and fragile, making shipping and storage of finished glass products potentially inefficient. Glass is a semi-finished product that can be sold in different forms for different prices, so there is no average selling price. |

## Regulation

Regulatory Change  **HIGH**

Suppliers of paperboard face a relatively high level of regulation relating to environmental issues. For vertically integrated companies, the US Environmental Protection Service (EPA) closely monitors effluent and waste emissions from the pulping process to reduce any environmental impact from by-products, including air and water pollutants. Similarly, paperboard suppliers that purchase pulp for processing are subject to noise pollution monitoring by the EPA.

Despite stringent regulations for suppliers, buyers of paperboard and packaging papers will face few regulatory hurdles. Though material and chemical content is of concern for regulating bodies, including the FDA and USDA for food-contact materials, regulation has little effect on the price of paperboard. The varying grades of paperboard are priced to include any cost variance that producers encounter as a result of the aforementioned regulatory requirements. The standardization of paperboard grades has helped to limit any identifiable impact regulations may have on pricing. Furthermore, regulations surrounding the disposal of paperboard waste are virtually nonexistent, keeping buyers free from strict waste removal requirements that could factor into the total cost of ownership for paperboard.

WWW.IBISWORLD.COM

# Product Characteristics

## Quality Control

| Key Quality Factors | Wood pulp fibers |
|---|---|
| | Consistency and durability |
| | Ink transferability |
| | Processing type |

The quality of paperboard and packaging papers is heavily influenced by the fiber content and the process used to make the paper. Fiber content can affect important factors such as consistency and durability, which are indicators of the quality of finished paperboard. Paperboard composed of primarily virgin fibers will be more consistent due to the integrity of the unused fiber, and this consistency lends itself to a more durable paperboard grade. On the other hand, the use of recycled materials can lead to an inconsistent product and, thus, a less durable paperboard grade. This is because of the varying sources of recovered paper. Recycled materials have been processed more than once, which leads to a breakdown in fiber integrity and, in turn, the consistency and durability of paperboard. Buyers will need to examine various samples of paperboard to identify grades that meet consistency and durability requirements.

Because packaging is a major end use of paperboard, color and ink transferability are important quality factors to consider. After being mechanically processed into paperboard, natural kraftliner is light brown in color, and is often used in paper bags and other corrugated packaging. Nevertheless, many buyers require white or colored kraftliner for their specific end use, and bleaching or coloring kraftliner requires chemical processing that yields a more expensive paperboard grade. Furthermore, the ability of paperboard to absorb and display inks for on-package labels is an important factor for consideration. Ink transferability is especially significant for buyers who intend to convert paperboard into finished secondary packaging that will display directions or other product information. During the purchasing process, buyers should compare samples of white and colored paperboard to assess consistency, while also testing different grades to determine how well inks transfer and display on different surfaces.

WWW.IBISWORLD.COM
Equipment Paper: Food Service & Packaging Exerts Corp.-2019
Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 15 of 512 PageID #:20243

# Supply Chain & Vendors

## Supply Chain Dynamics



Supply Chain Risk — **MEDIUM**



Average Vendor Risk — **MEDIUM**

### Supply Chain Risk

The supply chain for paperboard and packaging papers poses a moderate risk of input price shocks and waning on downstream demand. Paper-based products are subject to price fluctuations due to the nature of commodity pricing. Prices for inputs including wood pulp and chemicals change on a daily basis, but buyers should be more concerned with medium- and long-term price trends for commodities. While suppliers typically pass sustained increases in raw material prices on to buyers, production and supply chain efficiencies have helped to keep the volatility of such inputs at a moderate level during the three years to 2013.

Disruptions in wood supplies due to weather, natural disasters or falling demand from housing and construction markets typically causes spikes in pulp prices, increasing supplier price risk. Similarly, rising demand for wood can apply cost pressure to paperboard and packaging papers suppliers that are competing for resources, which also results in higher input prices. Larger macroeconomic trends can influence the health of industries that supply paperboard producers, so buyers should take note of trends in housing starts and construction spending.

Demand from some key buyers for paperboard has slightly declined due to attitudes toward eco-friendly products and technological advancement. The threat to paper product and packaging manufacturers from digitization and material substitution has put strains on the margins of paperboard producers, leading to incremental price hikes along the way. The waning demand for paperboard should be a consideration for buyers because paperboard suppliers will increasingly look to unload their product, making them more apt to negotiate on price.



WWW.IBISWORLD.COM

# Supply Chain & Vendors

## Supply Chain Dynamics continued

Continued robust demand for paperboard as a primary packaging substrate keeps long-term supply risks at bay. The growing acceptance and availability of recovered paper materials that can be used to create paperboard ensures a steady ancillary source of raw materials for paperboard. Nevertheless, buyers of primarily virgin materials could experience greater supply difficulties as environmentally conscious producers and consumers demand a larger amount of post-consumer content in paperboard. This would limit the supply of both virgin and recycled materials and raise prices. Additionally, Asia's rising demand for US-recovered paper is placing stress on domestic supplies of recycled paper. As a result, recovered paper prices are facing upward price pressure, and paperboard producers are forecast to raise prices to offset higher input costs.

### Geographic Locations

Inefficiencies in the transportation of paperboard and packaging papers have worked to create many local and regional points of distribution. The bulky and low-cost nature of paperboard makes it uneconomical to transport and trade, creating local and regional hubs that fulfill paperboard demand. Within the United States, paperboard producers are fairly spread out throughout the country, with the Southeastern region accounting for nearly 36.0% of manufacturing facilities. High concentrations of suppliers in states such as Georgia, Alabama and North Carolina reflect the ease of access to forestry operations that provide raw materials. Likewise, high concentrations of suppliers in places like New York and California reflect the localized nature of paperboard distribution; that is, they are situated around manufacturing hubs and large cities that have a high demand for CPGs. Geography is significant for buyers

because it provides them with the ability to source paperboard at the local and regional level, cutting down on the potential costs of transportation. Additionally, geographic spread provides buyers with a chance to meet with suppliers in person to determine product and provider compatibility.

### Imports

Imports are a very small portion of the US Paperboard and Packaging Papers market, accounting for only 1.6% of domestic consumption. In the three years to 2013, the value of imports is estimated to grow at an annualized rate of 3.3%, driven by a rebound in Canadian production following the recession, and a substantial jump in production from China, Finland and Sweden. IBISWorld estimates the value of paperboard imports will grow 10.1% in 2013 to $524.9 million.

Despite the trend of rising imports, transportation inefficiencies surrounding the distribution of paperboard protects the domestic market. As a result, buyers will primarily source products from local or regional channels. Suppliers are effectively shielded from intense foreign competition due to the cheap and bulky nature of paperboard that makes it too expensive to transport and trade. With both foreign and domestic suppliers producing nearly identical products, buyers will find little advantage in purchasing imports; on the contrary, domestic producers have supply chains efficiencies in place that can undermine costs typically associated with imports, including material sourcing and transportation. Along the supply chain, the majority of suppliers to US paperboard producers are domestically based, alleviating buyer concerns regarding supply disruptions due to social, political or economic turmoil

WWW.IBISWORLD.COM

# Supply Chain & Vendors

### Supply Chain Dynamics continued

abroad. With Canada being the largest source country of paperboard imports, the North American Free Trade

Agreement protects buyers from price spikes that could result from prohibitive tariffs.

## Competitive Environment



Market Share Concentration **MEDIUM**

**Market Share Concentration**

The Paperboard and Packaging Papers market, which has more than 80 operators, has a medium level of concentration. According to the most recent information available from 2012, the top four companies in the market account for 40.2% of sales. The moderate level of competition provides buyers with a healthy environment from which to source their raw materials, as the substantial number of local and regional suppliers ensures that buyers can seek out multiple price offerings before making a purchase decision. Some of the largest players in the US market include International Paper, Rock-Tenn, Georgia-Pacific (owned by Koch Industries) and MeadWestvaco. In the three years to 2013, market share concentration has increased as large, vertically integrated players purchased smaller companies and other paperboard operations. The most notable example of this is Rock-Tenn's $3.5 billion acquisition in 2011 of the second-largest paperboard producer, Smurfit-Stone Container. The overall market concentration is forecast to rise in the three years to 2016, as leading companies continue to consolidate production operations and boost economies of scale.

Despite a handful of large, vertically integrated players, there are a substantial number of local and regional suppliers of paperboard and packaging papers. Fragmentation within the market has occurred due to the inefficiencies of transporting paperboard products, which had led to heightened local competition that buyers can take advantage of by

soliciting multiple bids. Buyers of large quantities of paperboard and packaging papers can leverage the flexibility of market leaders who have entrenched production and distribution networks throughout the United States. Likewise, buyers of small quantities have the ability to find local or regional distributors to fulfill demand. Medium concentration within the market affords buyers the ability to explore options and seek out the best deal for their purpose, whether through spot or volume purchases or long-term supply agreements.

**Vendor Company Types**

The majority of paperboard and packaging papers are supplied directly by manufacturers of paperboard and paper-related products. There are an estimated 87 companies with 187 manufacturing facilities throughout the United States. Nearly two-thirds of the market's 35,000 employees work for medium- and large-sized operations that employ 250 people or more. On the other hand, small businesses with fewer than 250 workers comprise the remaining one-third of the market's employees. The largest manufacturers and suppliers of paperboard and packaging papers are primarily public, though there are a number of private companies, including Georgia Pacific and Caraustar, which claim a notable portion of the US market. The number of paperboard suppliers has been stable during the three years to 2013, growing at an average annual rate of 0.8%. The high barriers to entry in the Paperboard and Packaging Papers market have limited the number of suppliers entering the market each year.

WWW.IBISWORLD.COM

# Supply Chain & Vendors

## Competitive Environment continued

**Global and national suppliers:** The ten largest suppliers of paperboard and packaging papers account for nearly 65.0% of the paperboard market in the United States. Large suppliers have a national or global footprint and are vertically integrated, with operations throughout the paperboard supply chain. These suppliers offer a diverse array of products beyond raw paperboard that include coated or laminated paperboard, office stationery and finished packaging products.

In general, large suppliers of paperboard offer buyers greater purchasing security because firmly entrenched distribution networks have greater access to cash. Similarly, buyers should look to large suppliers because their resources afford them greater ability to undercut smaller producers and negotiate on prices. Large suppliers often own and operate wood pulp mills that allow them to easily secure cheap access to raw materials. The lower cost of key inputs offers large suppliers lower cost advantages that can translate into lower selling prices for buyers. Likewise, the firm market position of larger companies is an assurance to buyers that there are adequate production resources to meet current and future demand.

Buyers with a large scope of operations should consult with major manufacturers due to the scale of their operations. Typically, national suppliers may have minimum order volumes and generally establish supply agreements with large buyers. Buyers with smaller operations, however, typically source from regional or local suppliers.

### Vendor Statistics – Paperboard & Packaging Papers

| | Total Revenue ($m) | US Product Revenue ($m) | Total Revenue 3-year CAGR (%) | Employees |
|---|---|---|---|---|
| International Paper Company | 27,833 | 2,076 | 6.0 | 70,000 |
| Georgia-Pacific Corporation | 12,508 | 1,219 | -8.0 | 35,000 |
| Rock-Tenn Company | 9,207 | 5,752 | 47.5 | 26,300 |
| Weyerhaeuser Company | 7,059 | 233 | 11.7 | 13,200 |
| MeadWestvaco Corporation | 5,459 | 2,951 | 0.3 | 16,000 |
| Sonoco Products Company | 4,786 | 1,282 | 10.0 | 19,900 |
| Graphic Packaging Holding Company | 4,337 | 3,205 | 1.9 | 13,900 |
| Packaging Corporation of America | 2,484 | 2,236 | 5.0 | 8,600 |
| Caraustar Industries, Inc. | 2,425 | 2,025 | 6.5 | 2,982 |
| Longview Fibre Paper and Packaging Inc. | 781 | 203 | 9.7 | 2,464 |

SOURCE: IBISWORLD

WWW.IBISWORLD.COM
Equipment Rental Repair Tool Rental & Packaging Centers September 2019   18

# Supply Chain & Vendors

## Competitive Environment continued

**Regional and local suppliers:** Small- and mid-sized suppliers of paperboard tend to serve local or regional buyers while maintaining some integrated operations throughout the supply chain. Nevertheless, many small- and mid-sized companies rely heavily on outside suppliers for raw materials such as wood pulp and recovered paper, which can raise input costs and selling prices. Like large manufacturers, local and regional suppliers have strong distribution networks, and they often have solid supply chains that source materials regionally.

Profit margins typically dwindle as a company's size and scope decreases, leaving buyers with less room for negotiation. Buyers may have less flexibility in price discussions with local and regional providers due to narrower margins, but other considerations, including ease of distribution and quality of paperboard products should be taken into account when entering into negotiations. Volume purchases and supply agreements with small- and mid-sized providers present an opportunity for buyers to negotiate on prices and cultivate supply relationships that can be easily tailored to a buyer's needs in a local or regional setting.

## Vendor Financial Benchmarks



| Profit Level | LOW |
| Profit Trend | RISING |

The waning downstream demand for the Paper Products industry has created some financial health risks for suppliers. Due to decreased sales volume and rising inputs among diversified paper product producers, bankruptcies and divestments have grown more common during the past decade. Furthermore, suppliers have also faced declining profit margins because of the above trends. The market's average profit margin of 3.9% limits the ability of buyers to negotiate prices during the purchasing process. Profit margins for paperboard and packaging papers suppliers have decreased due to volatile input prices and price-based competition from alternate packaging substrates. Additionally, the fragmentation of the market also leads to high price-based competition among suppliers.

Nevertheless, the top five suppliers of paperboard have maintained profit margins well above the industry average, primarily due to easier and cheaper access to raw materials, as well as more product offerings provides. Unlike the margins of large suppliers, profit margins at local and regional paperboard suppliers tend to be lower due to their smaller scope of operations and limited products, which leaves less room for buyers to secure price discounts during the negotiation process. Sourcing materials from upstream providers drives up the input costs for small and medium suppliers, which are passed down to buyers in the form of higher prices. Despite less room in price negotiation, buyers should consider other aspects of smaller suppliers, including product quality, and supply and distribution dependability before making a purchasing decision.

The market's average z-score indicates a heightened risk of future bankruptcies for paperboard companies. Despite healthier profit margins, large suppliers of paperboard and packaging papers still face financial risks because of the declining paper market. When dealing with most big suppliers, buyers will have access to financial records that can help identify potential issues in a company's financial health or draw attention to capital expenditures that will work to reinforce a supplier's market position. The transparency of publicly available financials provides a better sense of whether a supplier will be able to

WWW.IBISWORLD.COM

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 20 of 512 PageID #:20248
Equipment Repair Franchises in the US March 2013 19
Case: 15-2385      Document: 56-28      Filed: 10/27/2015      Pages: 512

# Supply Chain & Vendors

## Vendor Financial Benchmarks continued

meet both short- and long-term product needs and remain economically viable through the duration of the supply

agreement. Buyers should take advantage of public financials during the course of the procurement process.

### Vendor Expense Benchmarks

| | Year | Profit Margin (%) | SG&A/ Revenue (%) | Cost of Revenue / Revenue (%) | Altman Z-Score |
|---|---|---|---|---|---|
| Sonoco Products Company | 2012 | 7.3 | 9.0 | 96.6 | 2.4 |
| Graphic Packaging Holding Company | 2012 | 7.4 | 9.0 | 96.6 | 1.3 |
| MeadWestvaco Corporation | 2012 | 8.4 | 9.0 | 88.3 | 1.2 |
| Rock-Tenn Company | 2012 | 5.5 | 10.1 | 93.5 | 1.5 |
| International Paper Company | 2012 | 6.7 | 7.5 | 81.5 | 1.5 |
| **Industry Average** | **2012** | **3.9** | **9.0** | **59.8** | **1.4** |

SOURCE: IBISWORLD

## Switching Cost



Switching Costs · LOW

The cost of switching paperboard suppliers is low. Buyers should face little resistance when moving between suppliers, but buyers who enter supply agreements should be aware of competition and exit clauses in the supply contract that could result in financial penalties. Because paperboard is a raw material ordered on a rolling basis, buyers often reserve the right to source materials from multiple suppliers. With paperboard grades effectively commoditized across companies, buyers should spend time during the RFP

process becoming familiar with overall paperboard quality, product offerings and the logistical infrastructure of various suppliers. This information will help procurement professionals minimize the time involved in a subsequent RFP process if switching suppliers becomes a necessity. Identifying suppliers and product differences early in the purchasing process will make it easier for buyers to make switching decisions, minimizing the time and effort that is associated with seeking out a new provider.

WWW.IBISWORLD.COM

# Purchasing Process

## Buying Basics



Buying Lead Time **SHORT**

### Buying Lead Time

Buying lead time for paperboard and packaging papers is typically short, depending on the terms of the purchase agreement. Due to the commoditized nature of paperboard and packaging papers, ad-hoc buyers will face a short lead time that is only a few weeks long. However, potential buyers may face delays due to product availability, which is based on a supplier's inventory or production schedule. The standardized nature of paperboard grades makes off-the-shelf purchases a stable and predictable option for one-off or less-frequent orders. Additionally, buyers looking for immediate purchases retain the flexibility to evaluate and switch suppliers if they are dissatisfied with the quality of paperboard or the execution of the purchase agreement.

Buyers looking to purchase in large quantities or enter a supply agreement with producers may find buying lead time to be longer, though not substantially. Buyers interested in securing a bulk purchase of paperboard or packaging papers should be aware of inventory available for immediate purchase, and a supplier's production cycle that could limit product availability. Negotiation of supply agreements with producers will require more due diligence to determine supplier compatibility with a buyer's procurement and production cycles. Some suppliers work on stagnated production schedules that would create limited options for delivery dates for specific paperboard grades.

Buyers should also be aware of their short- and long-term demand requirements because the production process for different suppliers could extend lead times due to potential shortages of necessary paperboard grades. Similarly, buyers should thoroughly vet a supplier's production and delivery cycles during the RFP process to ensure they do not enter an agreement that would perpetually extend lead times for paperboard purchases due to inconsistent or incompatible production or shipping schedules.

### Selection Process

The selection process for paperboard and packaging papers is usually centralized. A dedicated procurement department is typically tasked with sourcing paperboard based on the particular end use of the product to be made, such as consumer and industrial packaging or coated paperboard. Because different grades of paperboard offer a variety of qualities that appeal to a number of end users, buyers may consider consulting with their customers to better understand expectations for finished products. Buyers who provide packaging to consumer products or food companies may need to purchase a higher-grade paperboard that will better enable the application of inks and dyes and also meet the rigorous requirements for food-contact materials. On the other hand, buyers who supply industrial packaging may be primarily interested in purchasing paperboard with the highest durability or tensile strength. Regardless, procurement professionals will be relied upon to understand the intended use of the purchased product. Therefore, they will be required to find and source the proper grade of paperboard and packaging papers from suppliers. The RFP process provides a chance to compare paperboard grades of competing suppliers to determine end-use compatibility, but buyers should ensure that they are indemnified if paperboard or packaging papers are faulty or fail to meet quality specifications when selecting a supplier.

### Buying-Decision Scorecard

The Buying-Decision Scorecard outlines the key criteria a buyer should consider when purchasing this good or service.

WWW.IBISWORLD.COM

# Purchasing Process

## Buying Basics continued

When weighing the importance of each factor, we assume that a buyer has narrowed down potential suppliers to those that meet the technical and price criteria specified in the RFP. The criteria and weights assigned below can be used as guidelines to help further differentiate already qualified vendors.

| Buying-Decision Scorecard | | |
|---|---|---|
| **Factor** | **Weight (%)** | **Description** |
| **Technical Factors** | **60.0** | |
| Fiber Content and Process | 15.0 | The quality of paperboard is primarily based on fiber content and the processes used to generate the pulp, whether mechanical or chemical. Fiber content is important because it helps dictate other important qualities of the paperboard, including durability and ink transferability. Additionally, chemical processing determines paperboard color and can affect pricing. |
| Durability and Ink Transferability | 15.0 | Though primarily determined by fiber content, durability of paperboard and its ability to display inks or pigments are also other important aspects of quality to consider. These attributes are particularly important for buyers that intend to use paperboard for finished industrial or consumer packaging. |
| Production Cycles and Product Availability | 15.0 | Buyers should be aware of a supplier's product availability or production cycles. Many suppliers will stagger the production of different paperboard grades due to the limited availability of machine space. This alternating production cycle can disrupt a buyer's supply chain by limiting the availability of the required grades of paperboard and packaging papers. |
| Transportation Efficiency | 15.0 | Buyers should thoroughly investigate the logistical infrastructure of potential suppliers. Depending on the supply arrangement with producers, buyers could be adversely affected by a supplier whose distribution capabilities are inefficient or unreliable. Ensuring a steady and predictable supply of paperboard is imperative for buyers who will be in constant production and, therefore, in constant need of raw materials. |
| **Cost** | **40.0** | |
| Price | 40.0 | Price is the most important determinant when purchasing paperboard and packaging papers.  Paperboard grades are standardized throughout the industry and variations in product quality are minimal; therefore, these factors are not a major part of buyer's decision. |
| **Total** | **100.0** | |

## Key RFP Elements

**Specific information to impart to suppliers in the RFP process:**
   • Inform supplier of intended operational scope and production volumes. This will include recent production trends and a demand forecast for future raw material needs.
   • Describe products to be made with paperboard and packaging papers and identify major end users that the buyer supplies.
   • Identify paperboard grades required for the production of specific end-use products.

**Specific information to gather from suppliers in the RFP process:**
   • Identify businesses and industries that supply materials to potential paperboard suppliers to recognize any

WWW.IRISVCFO.COM     Procurement Forecasting, Demand and Budgeting Careers Go Here 2019     22
Case: 1:10-cv-05711 Document #: 756-3 *SEALED*  Filed: 09/19/14 Page 23 of 512 PageID #:20251

# Purchasing Process

**Key RFP Elements continued**

possible disruptions in the product supply chain. Buyers should consider whether any suppliers along the supply chain, whether foreign or domestic, pose a risk with regard to available product supply or company financial health.
• Describe production schedules for various paperboard grades to ensure demand will be met in a timely manner.
• Identify current on-hand inventories

to recognize any disparity between required raw materials and product availability.
• Find references or cases studies that involve buyer companies with a similar size and scope of operations. This information will help buyers recognize strengths and weaknesses in the ability of the potential supplier to meet the buyer's demand.

| Standard Elements in an RFP | |
|---|---|
| **Overview & Scope** | This tells the vendor about your company, why your company needs this product and what you hope to achieve from its purchase. Deadlines for steps in the procurement process should be clearly defined in the section. |
| **Vendor Qualification** | This section details the features a winning company must possess, such financial size, scope of work completed or geographical reach. This section will also explain the criteria used in evaluating the bid and its relative importance in your scorecard. This section might disqualify some companies, such as suppliers to your competitors. |
| **Technical Specifications** | This section details the technical and functional specifications of the product you want. The more detail provided, the shorter the procurement cycle since all vendors are bidding to the same, exact specifications. Further, if all needs are specified there is less chance of additional costs will surface down the road. This section will also look at service level agreement needs. |
| **Financial Factors** | This section is where vendor quotes prices for the product or service being supplied. This section should specify cost breakdowns, billing frequency (with specific dates, time periods), billing methods (mode of payment, including currency) and taxes. |
| **Legal Framework** | This section should reference the legal jurisdiction in the event of a dispute, methods for arbitration and contract termination mechanisms. Nondisclosure agreements are also part of this section, as are escrow agreements (mainly in the event of shared proprietary knowledge). |

# Negotiation Questions

| Issue | Questions |
|---|---|
| **Supply Chain:** Raw materials comprise the largest expense for paperboard suppliers, and any disruptions in inputs could result in inadequate paperboard supplies or higher prices for buyers. | • From where do you source your primary raw materials, including wood pulp, recovered paper and chemicals?<br>• Have you ever experienced supply chain disruptions resulting in insufficient paperboard supplies or higher list prices?<br>• How often do you reevaluate list prices in relation to fluctuations in input costs?<br>• How do you control sudden spikes in wood pulp or other input costs in selling prices?<br>• Do prices in supply agreements have a fluctuation cap in the case of input price shocks? |
| **Supplier Size, Experience and Geographic Scope:** Paperboard suppliers vary in size and scope of operation, and it is important for buyers to determine whether suppliers can fulfill procurement needs in a timely manner. | • How do you track customer satisfaction, and do you have client references I can review?<br>• What is your past experience in working with a company of my size and operation specialty?<br>• What is the turnaround for a rush order? How does this change by volume?<br>• How many production and distribution points do you have around the United States? |
| **Paperboard Production and Delivery:** The production and distribution schedules of suppliers need to be explored to ensure a consistent supply of raw material for buyers. | • Is your production process stagnated by paperboard types? If so, how does that affect the availability of on-hand stocks and your delivery schedule?<br>• What is your delivery schedule, and can buyers in supply agreements develop custom delivery schedules?<br>• What is your return policy on low-quality or defective paperboard shipments?<br>• What is your lead time for one-off and volume purchases and supply agreements? |
| **Market Competition:** Market fragmentation and rising imports are creating a competitive environment for paperboard producers. Buyers should find out how suppliers keep costs competitive. | • As a large supplier, do you have minimum purchase requirements when working with small- and medium-sized clients?<br>• How have the rises in imports from Canada, China, Sweden and Finland affected demand and pricing for your paperboard and packaging papers?<br>• How does your company differentiate itself in the market? How does this benefit you financially?<br>• How do your products compete with other forms of packaging? What are your product advantages? |
| **Substitute Competition:** The rise in materials that buyers can substitute for paperboard is creating weaker downstream demand for suppliers. Buyers should be aware of how this shift impacts supplier prices and margins. | • How is the increasing adoption of plastic as a primary packaging substrate affecting paperboard margins?<br>• What are you doing to remain competitive as buyers move toward plastics and other packaging substrates?<br>• How diversified is your product portfolio?<br>• How are prices of paperboard being affected by the prevalence of substitutes? |
| **Product Content and Quality:** The content of virgin or recycled materials is a primary determinant in paperboard grading. Buyers should evaluate available paperboard grades to ensure they meet end-use requirements. | • What grades of paperboard do you produce?<br>• Which paperboard grades offer the highest durability and tensile strength?<br>• Which paperboard grades offer surfaces that are good for on-package printing?<br>• What specific paperboard grades do you offer with recycled content? What is the post-consumer content percentage for these grades? |

WWW.IBISWORLD.COM

# Buyer Power Score Components

## Price Trend

| Factor | Definition | Weight | Score |
|---|---|---|---|
| Recent Price | | 40% | 1.2 |
| Neutral | Compound annual growth rate in benchmark price over the past three years 2.0-4.0% | | |
| Forecast Price | | 60% | 2.4 |
| Good | Compound annual growth rate in benchmark price in the next three years 0.1-1.9% | | |
| **Weighted Score** | | **40%** | **1.4** |

## Market Structure

| Factor | Definition | Weight | Score |
|---|---|---|---|
| Availability of Substitutes | | 35% | 1.8 |
| High | There are many viable substitutes for this product/service | | |
| Market Share Concentration | | 25% | 0.8 |
| Medium | The top four suppliers of this product/service have 30.1-49.9% market share | | |
| Product Specialization | | 25% | 1.3 |
| Low | The product/service is assessed as having a low level of specialization | | |
| Switching Costs | | 15% | 0.8 |
| Low | The cost of switching from this product and/or supplier is assessed as low | | |
| **Weighted Score** | | **30%** | **1.4** |

## Market Risk

| Factor | Definition | Weight | Score |
|---|---|---|---|
| Recent Demand Driver Volatility | | 30% | 1.5 |
| Low | Average absolute difference in percentage change of external drivers < 2.0% | | |
| Recent Price Volatility | | 30% | 0.9 |
| Medium | Average absolute difference in % change in benchmark price over last 3 years 4.0-5.9% | | |
| Vendor Financial Risk | | 20% | 0.6 |
| Medium | The average level of financial risk for product/service vendors is assessed as medium | | |
| Supply Chain Risk | | 20% | 0.6 |
| Medium | The average level of product/service supply chain risk is assessed as medium | | |
| **Weighted Score** | | **30%** | **1.1** |

## Overall Buyer Power Score   3.9

IBISWorld's Buyer Power Score is a calculation based on weighted quantitative and qualitative factors that measure a buyers' ability to negotiate lower prices and favorable contract terms. The higher the Buyer Power Score, the greater the average buyer's negotiating strength for this product. The overall score is composed of three components:
1) **Price Trend:** compares this product's average recent and forecast price change to the economy-wide inflation rate
2) **Market Structure:** assesses the availability of alternatives and ease of purchasing in this product's marketplace
3) **Market Risk:** measures elements of volatility and risk impacting a buyer's confidence in making long-terms deals with suppliers of this product.

WWW.IBISWORLD.COM

# Jargon & Glossary

## Jargon

**BLEACHED PAPERBOARD** A white paperboard made from pulp containing no fewer than 80.0% bleached virgin wood fibers.

**CONTAINER BOARD** Any type of paperboard that is used in the production of corrugated cardboard, including linerboard and corrugated medium.

**KRAFTLINER** Linerboard made from virgin wood pulp fibers.

**LINERBOARD** The solid outer sides of corrugated cardboard.

**RECYCLED PAPERBOARD** A paperboard made out of a combination of recycled fibers from various grades of paper stock, with the larger portion of the pulp being recycled fibers and the lesser amount being virgin fibers.

**TESTLINER** Linerboard made from recycled wood pulp fibers.

**UNBLEACHED KRAFT PAPERBOARD** A paperboard made from pulp containing no fewer than 80% wood fibers produced by the sulfate (kraft) process.

## Glossary

**HS** The Harmonized Commodity Description and Coding System is maintained by the World Customs Organization as a standardized system of names and numbers for classifying traded products.

**Life Cycle** All products/services go through periods of growth, maturity and decline. IBISWorld determines a life cycle by considering such factors as pricing trends, the level and speed of product characteristic change, the extent of products distribution and the maturity of marketing trends.

**NAICS** The North American Industry Classifications System is the standard by which industries (not products) in the United States, Canada and Mexico are classified.

**Nonemployer** Businesses with no paid employment or payroll. These are mostly set up by self-employed individuals.

**Profit** IBISWorld uses earnings before interest and tax (EBIT) as an indicator of a company's profitability. It is calculated as revenue minus expenses, excluding interest and tax.

**UNSPSC** Coding for each report title is based primarily on the United Nations Standard Products & Services Code. The code is a hierarchical classification codeset of expenditure items.

**Wages** The gross total wages and salaries of all employees in the industry. The cost of benefits is also included in this figure.

**Z-score** The Altman Z-score formula is used to help predict a company's chances of going bankrupt within the next two years. The Z-score uses multiple corporate income and balance sheet values to measure the financial health of a company. Z-Scores above 2.9 are in the "Safe" Zone; scores between 1.23-2.9 are in the "Grey" Zone and scores below 1.23 are in the "Distress" Zone.

**Producer Price Index (PPI)** This index represents the change in amounts that producers receive for their products, as opposed to the prices consumers pay.

www.ibisworld.com  |  1800-330-3772  |  procureinfo@ibisworld.com

# At IBISWorld we know that industry intelligence is more than assembling facts
It is combining data with analysis to answer the questions that successful companies ask

Our procurement and strategic sourcing research helps clients engage and negotiate effectively with suppliers, internal stakeholders and C-level executives. Our insight on price trends, major suppliers and supply chain risk helps clients better manage the entire sourcing process.



**Who is IBISWorld?**
We are strategists, analysts and researchers. We provide answers to information-hungry, time-poor businesses. Our goal is to provide real world answers that matter to your business in our Procurement and Industry report collections. When tough business decisions need to be made, our suite of products give you deeply researched answers quickly.

**IBISWorld Membership**
IBISWorld offers tailored membership packages to meet your needs.

**Disclaimer**

This product has been supplied by IBISWorld Inc. ('IBISWorld') solely for use by its authorized licensees strictly in accordance with their license agreements with IBISWorld. IBISWorld makes no representation to any other person with regard to the completeness or accuracy of the data or information contained herein, and it accepts no responsibility and disclaims all liability (save for liability which cannot be lawfully disclaimed) for loss or damage whatsoever suffered or incurred by any other person resulting from the use of, or reliance upon, the data or information contained herein. Copyright in this publication is owned by IBISWorld Inc. The publication is sold on the basis that the purchaser agrees not to copy the material contained within it for other than the purchasers own purposes. In the event that the purchaser uses or quotes from the material in this publication – in papers, reports, or opinions prepared for any other person – it is agreed that it will be sourced to: IBISWorld Inc.

Copyright 2013 IBISWorld Inc

# Exhibit 12

# RISI

# CHANGES TO PPW/OBM CONTAINERBOARD PRICES - FINAL

January 18, 2013

## SUMMARY OF CHANGES FROM ORIGINAL PROPOSAL PRESENTED NOV. 5, 2012

- Postponed implementation of this plan from January 2013 to March 2013, shifting the entire timetable back by two months.
- Postponed the date when the transaction price and list price footnotes will be discontinued from Jan 1, 2014 to Jan 1, 2015.
- Eliminated the term "(net)" from the official name of the "open market price" because of the inexact definition of the term "net"
- Changed the order of the prices presented in the Price Watch table
- Made minor changes to the wording of descriptions of the various prices

The changes discussed herein are the culmination of a major initiative over the past year to improve our price reporting. Steps we have taken as part of this process include:

- Audited our existing price assessment methodology
- Talked to key market players
- Reviewed legal issues around price reporting
- Looked at best practices in price assessment from other industries

In addition, RISI acquired Official Board Markets (OBM) several months ago, and part of the integration process has been to explore how to rationalize OBM's containerboard price coverage with that of PPW.

As a result, RISI will:

1. Introduce a new PPW "open market price" and phase out OBM prices
2. Improve our price assessment methodology

RISI's containerboard prices are relied on by players throughout the supply chain, from producers to converters to buyers of packaging, so we have proceeded deliberately with these changes and gathered extensive market feedback before finalizing them.

## INTRODUCTION OF NEW PPW "OPEN MARKET PRICE" AND PHASING OUT OF OBM PRICES

After acquiring OBM, we looked at the differences between OBM and PPW prices and methodologies. The most notable difference is that PPW measures transaction prices before market-wide discounts while OBM measures

# RISI

prices after market-wide discounts.  (In this respect, PPW prices are "gross" prices and OBM "net" prices, although we are avoiding using the term "net" because of possible ambiguity in the term.)

There is broad agreement among the many market players we've spoken to that a price after market-wide discounts would be a better representation of market activity.  So, we will create a new open market price series in PPW and phase out the OBM prices as well as, eventually, the PPW legacy list and transaction prices.  The new open market prices will be similar to the level of the current OBM prices.

**Current price table**

(simplified)

| | Oct. 2012 | Sep. 2012 | Oct. 2011 |
|---|---|---|---|
| **Linerboard (42-lb)** | | | |
| Unbleached kraft, East (list $735-745*) | $685 - 695 | $635 - 645 | $635 - 645 |
| Unbleached kraft, West (list $755-765*) | 705 - 715 | 655 - 665 | 655 - 665 |
| High performance, (35-36 lb) (list $745-755*) | 695 - 705 | 645 - 655 | 645 - 655 |
| White top, East (list $920-930*) | 885 - 895 | 835 - 845 | 835 - 845 |
| White top, West (list $940-950*) | 905 - 915 | 855 - 865 | 855 - 865 |
| | | | |
| **Corrugating medium (26-lb)** | | | |
| Semichemical, East (list $705-715*) | 655 - 665 | 605 - 615 | 605 - 615 |
| Semichemical, West (list $755-765*) | 705 - 715 | 655 - 665 | 625 - 635 |

**Disclaimer**

The following images present how Price Watch tables will be presented in the future.  They include prices for illustration only – these are in no way predictions of what prices will be or should be.

2

## RISI

### MARCH 2013 – NEW PRICES

| | Mar. 2013 | Feb. 2013 | Mar. 2012 |
|---|---|---|---|
| **Open market price** **1** | | | |
| Net small/medium buyer price for standard, open market transactions in ongoing supply relationships.* | | | |
| | | | |
| *Linerboard (42-lb)* | | | |
| Unbleached kraft, East | 590 - 600 | 590 - 600 | 540 - 550 |
| Unbleached kraft, West | 610 - 620 | 610 - 620 | 560 - 570 |
| High performance (35-36 lb) | 610 - 620 | 610 - 620 | 560 - 570 |
| White top, East | 790 - 800 | 790 - 800 | 740 - 750 |
| White top, West | 810 - 820 | 810 - 820 | 760 - 770 |
| | | | |
| *Corrugating medium (26-lb)* | | | |
| Semichemical, East | 560 - 570 | 560 - 570 | 510 - 520 |
| Semichemical, West | 610 - 620 | 610 - 620 | 530 - 540 |
| | | | |
| **Transaction price (gross)** **2** | | | |
| Legacy PPW price series published prior to March 2013 representing the price before market-wide discounts. To be discontinued as of December 31, 2014. | | | |
| | | | |
| *Linerboard (42-lb)* | | | |
| Unbleached kraft, East | $685 - 695 | $685 - 695 | $635 - 645 |
| Unbleached kraft, West | 705 - 715 | 705 - 715 | 655 - 665 |
| High performance (35-36 lb) | 695 - 705 | 695 - 705 | 645 - 655 |
| White top, East | 885 - 895 | 885 - 895 | 835 - 845 |
| White top, West | 905 - 915 | 905 - 915 | 855 - 865 |
| | | | |
| *Corrugating medium (26-lb)* | | | |
| Semichemical, East | 655 - 665 | 655 - 665 | 605 - 615 |
| Semichemical, West | 705 - 715 | 705 - 715 | 625 - 635 |

\* The open market price was introduced in March 2013 and is meant to replace the transaction price (gross) as the most pertinent price series.

The PPW legacy "List price" can be calculated by adding $50 to the transaction price (gross) for domestic containerboard. This footnote will be discontinued as of December 31, 2014.

NOTE: Open market price levels will be $80 to $100 lower than transaction price levels. Exact differentials will be announced in the February Price Watch. Once established, differentials will stay constant going forward.

**1** The new **"open market prices"** will be $80 to $100 lower than the "transaction price" (exact levels to be announced in February's Price Watch). **This differential will be constant going forward**. The series is described as "Small/medium buyer price after market-wide discounts for standard, open market transactions in ongoing supply relationships." Footnote specifies that "The open market price was introduced in March 2013 and is meant to replace the transaction price (gross) as the most pertinent price series."

**2** Description **"Transaction price (gross)"** will be added to original prices. The modifier "gross" had been added to clarify the way this price has been reported in the past; it does not represent a change in what is represented by the price. Series is described as, "'Legacy PPW price series published prior to March 2013 representing the price before market-wide discounts. To be discontinued as of December 31, 2014."

**3** **"List price"** will be moved to footer:

The PPW legacy "List price" can be calculated by adding $50 to the transaction price (gross) for domestic containerboard. This footnote will be discontinued as of December 31, 2014.

**RISI**

**The introduction of the new, lower open market price does NOT mean that the market price has moved down.**
The open market price is lower than the gross transaction price because the former nets out the market-wide discounts that are applied in the market.

The gross transaction price is a level that virtually nobody actually pays for tonnage within our assessed specifications; everyone receives a discount off of this price. By contrast, the new open market price is a net price – a price that represents what small/medium-sized buyers are actually paying.

The fact that the open market price is lower than the transaction price in no way suggests that the market price has gone down. It's just a different view on the same market.

For historical comparisons, we will include a one-year history for this price. The differential between the gross transaction price and the open market price will be constant back to one year ago as well as going forward.

## JUNE 2013 – OBM PRICES DISCONTINUED

- Through May 2013, OBM prices will be published online. Where to find OBM prices:
  - www.risi.com/OBMcontainerboard
  - On subscriber site, search for "OBM containerboard prices"
  - Note: Whereas OBM updated prices monthly, then published the same prices in each week's issue, PPW publishes prices only when those prices are updated each month (3rd Friday of each month). OBM prices are published on the same schedule
- Prices discontinued as of June 2013
- Until then, the differential between OBM and PPW prices will be constant



# RISI

## SEPTEMBER 2013 – TRANSACTION PRICE TO FOOTNOTE

|  | Sep. 2013 | Aug. 2013 | Sep. 2012 |
|---|---|---|---|
| **Open market price** | | | |
| Net small/medium buyer price for standard, open market transactions in ongoing supply relationships | | | |
| *Linerboard (42-lb)* | | | |
| Unbleached kraft, East | $590 - 600 | $590 - 600 | $590 - 600 |
| Unbleached kraft, West | 610 - 620 | 610 - 620 | 610 - 620 |
| High performance (35-36 lb) | 610 - 620 | 610 - 620 | 610 - 620 |
| White top, East | 790 - 800 | 790 - 800 | 790 - 800 |
| White top, West | 810 - 820 | 810 - 820 | 810 - 820 |
| *Corrugating medium (26-lb)* | | | |
| Semichemical, East | 560 - 570 | 560 - 570 | 560 - 570 |
| Semichemical, West | 610 - 620 | 610 - 620 | 610 - 620 |

**Legacy prices**
- *The PPW legacy "List price"* can be calculated by adding $50 to the transaction price, gross for domestic containerboard. This footnote will be discontinued as of December 31, 2014.

**1** - *The PPW legacy "Transaction price (gross)"* can be calculated by adding $95 to the domestic open market price for all grades except high-performance. For high-performance, add $85 to the domestic open market price. This footnote will be discontinued as of December 31, 2014.

**1** Transaction prices will move from main table to footnote:

> The PPW legacy "Transaction price (gross)" can be calculated by adding $TBD to the domestic open market price for all grades except high-performance. This footnote will be discontinued as of December 31, 2014.

## JANUARY 2015 – LEGACY PRICE FOOTNOTES DISCONTINUED

|  | Jan. 2015 | Dec. 2014 | Jan. 2014 |
|---|---|---|---|
| **Open market price** | | | |
| Net small/medium buyer price for standard, open market transactions in ongoing supply relationships | | | |
| *Linerboard (42-lb)* | | | |
| Unbleached kraft, East | $590 - 600 | $590 - 600 | $590 - 600 |
| Unbleached kraft, West | 610 - 620 | 610 - 620 | 610 - 620 |
| High performance (35-36 lb) | 610 - 620 | 610 - 620 | 610 - 620 |
| White top, East | 790 - 800 | 790 - 800 | 790 - 800 |
| White top, West | 810 - 820 | 810 - 820 | 810 - 820 |
| *Corrugating medium (26-lb)* | | | |
| Semichemical, East | 560 - 570 | 560 - 570 | 560 - 570 |
| Semichemical, West | 610 - 620 | 610 - 620 | 610 - 620 |

# RISI

## TIMELINE FOR CHANGES

**REVISED TIMETABLE**



## IMPROVEMENTS TO PRICE ASSESSMENT METHODOLOGY

The changes noted above are the most visible changes, but just as important are the improvements we're making behind the scenes.

These improvements have been driven by talking to key players throughout the market; looking at price assessment practices in other industries such as oil, gas, metals and chemicals to identify best practices; and by consulting antitrust attorneys about legal issues around price reporting.

Another area of focus has come from the International Organization of Securities Commissions (IOSCO), which has issued principles for price reporting agencies. Those principles are specifically for oil price reporting agencies, but many of the principles apply to containerboard as well, and we are adopting those principles.

All together, this improvement initiative has generated a number of improvements that will reinforce RISI's robust price assessment methodology.

### RISI'S PRICE ASSESSMENT METHODOLOGY TODAY

We have the most comprehensive methodology in the industry and it is improving with OBM's integration.

**How information is gathered:** RISI's price assessment team gathers information on agreed transactions through a comprehensive survey of market participants, including buyers and sellers.

**What is represented:** RISI's assessment of the range in which the large majority of <u>standard</u>[1], <u>open market</u>[2] transactions <u>in ongoing supply relationships</u>[3] <u>have occurred</u>[4].

1. **Standard =**
   - Transactions meeting specifications listed for each grade (see methodology and specifications online)

**RISI**

- Prices are normalized to represent prices paid by small to mid-size buyers (i.e. buyers of <5000 tons/month)

2. **Open market =**
   - Excludes transactions that are contractually linked to a published price (whether published by RISI or otherwise)
   - Arm's-length, i.e. transactions between unaffiliated parties

3. **In ongoing supply relationships =**
   - All transactions *excluding* orders filled over a period of less than one month without the expectation of future business

4. **Time window =**
   - Ordered from the first of the month through the week of publication
   - To the extent that suppliers have offered to postpone price increases for particular customers, those increases are *not* reflected in the current month's assessment

Following are proposed improvements to RISI's price assessment methodology:

## 1) INCREASED PRICE ASSESSMENT RESOURCES

- Acquisition of OBM
- Retention of OBM staff + rationalization of OBM/PPW price series → greater resources for price assessment
- Significant increase in survey size

## 2) PROCESS IMPROVEMENTS

- Documentation of methodology
- Transparent procedures for changes in methodology
- Qualification and succession planning of price assessors
- Procedures for internal sign-off on assessments
- Measures to avoid conflicts of interest
- Formal complaint procedure

## 3) NEW CONTRIBUTED TRANSACTION PRICE SYSTEM

- New, more formal process
- Collection of auditable transaction data
- Aggregation through a standard, objective calculation procedure
- Separate data-collection process from our price surveying team to maintain confidentiality
- Supplement to existing survey method
  - Many players resistant to transparency

It's important to note that this new system will be a *supplement* to our existing price collection methodology.

**RISI**

Some players in the industry want greater transparency, and a price index based on a contributed transaction price system where every single transaction was reported would be a very reliable, efficient index.

However, many players in the industry don't want transparency. There are strong incentives for some players in this industry against price transparency. So many of these players likely won't want to participate in a price collection system like this.

One of RISI's reasons for existing is to bring transparency to the forest products industry. Overall, transparency of price and other information helps achieve the most efficient allocation of resources and ultimately benefits investors and well as customers throughout the supply chain.

This new contributed transaction price system will improve our price assessments and increase price transparency. We will have incentives for market participants to contribute their data. But in all likelihood there will still be significant resistance to this new system. So it will be a supplement to our existing survey method, which has proven an effective method to bring price transparency to a market where all players don't want price transparency.

## HOW THE SYSTEM WOULD WORK

The details of how this new system will work are still to be worked out based on dialog with the industry. However, following is a rough proposal that seeks to get the dialog started.



**Data validation:** We will have a series of checks to validate submissions and follow up on any that are questionable.

**Aggregation:** To be done according to objective criteria, e.g. exclude highest 10% and lowest 10%, then weighted average of remainder capping the weighting of any single respondent at 30%.

# RISI

**Normalization**: The weighted average from contributed data will be normalized to the open market price. For instance, if weighted average of contributed data is $586 over the base period and the PPW open market price is $600, the normalization adjustment would be $14, so the normalized contributed data price would be the contributed data weighted average + $14.

**Aggregated detail**: Once we have a sufficient number of contributors, contributors will be able to see the results of the contributed data sub-index, including additional data break-downs beyond what is published in PPW.

## CONTRIBUTING DATA

- Contributors will sign an agreement to provide accurate data
- Contributes will submit data monthly
- Data contributions will be auditable by a third party
- The exact information to be submitted for each grade is still to be determined. Possibilities include:
  - Weighted average price, total volume
  - Highest and lowest prices with volume for each
  - One to three transactions per site, with price and volume for each

## INCENTIVES TO CONTRIBUTE

- Contributed data sub-index, plus break-outs (once we have sufficient participation):
  - Spot vs contract prices?
  - Prices for recycled grades?
  - Additional regional break-out?
- Benchmarking: Participants will have access to a secure site that will show their contributed prices compared to the overall average over time
- Confidentiality will be ensured. This new system will be completely separate from our price survey team and our editorial team. RISI has been collecting and aggregating confidential information from companies for more than 20 years with a track record of confidentiality that has never been compromised. We have a series of strict protocols around this sort of data, so we are confident in our ability to keep individual customer data confidential.

## HOW YOU CAN HELP US IMPROVE RELIABILITY OF PRICE ASSESSMENTS

- Contribute to our new contributed transaction price system
- Be a source: Contact editorial director Will Mies, wmies@risi.com, 415-947-6617
- If you buy/sell containerboard, don't index all of it to PPW prices. A healthy open market…
  - …lets prices improve the efficiency of the market
  - …gives us something to measure

# Exhibit 13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

KLEEN PRODUCTS, LLC, et al.,
individually and on behalf
of all others similarly situated,

    Plaintiff,

Vs.                    Case No. 1:10-cv-05711

PACKAGING CORPORATION OF
AMERICA, et al.,

    Defendants.

_____


THE DEPOSITION OF JAMES P. ROYALTY, JR.

December 6, 2013

_____




OUTSIDE ATTORNEYS EYES ONLY




_____



SHERYL G. WEATHERFORD, RPR
236 Adams
Memphis, Tennessee 38103
901.523.8974

Page 77

16:48:23  1    A.    The only one that I can think of would be

16:48:27  2    Kroger.

16:48:28  3    Q.    Okay.  Is that considered a national?

16:48:30  4    A.    And that is a national account, yes.

16:48:31  5    Q.    And why are they considered a national

16:48:35  6    account?

16:48:35  7    A.    You know, we are serving I want to say

16:48:41  8    plus or minus a dozen Kroger locations out of

16:48:47  9    roughly the same number of International Paper

16:48:49 10    facilities.  They're buying $30 million worth of

16:48:53 11    packaging a year so that would be -- that would

16:48:56 12    definitely be -- there's no gray area on whether

16:49:02 13    or not that would be a national account.  It's

16:49:03 14    clearly a national account.

16:49:04 15    Q.    Are there guidelines about what is and

16:49:06 16    what is not a national account?

16:49:08 17    A.    Not -- there are -- there are general

16:49:11 18    considerations, but then ultimately we do have

16:49:17 19    some what we would call local accounts that for

16:49:23 20    whatever reason even though they're served out of

16:49:26 21    you know, multiple locations, you know, the

16:49:29 22    primary relationship is more locally based.  So

16:49:35 23    there isn't a hard and fast rule around that.

16:49:38 24    There's guidelines, and then ultimately the senior

16:49:41 25    management team of the container division would

Page 78

16:49:45  1    make that determination on whether or not

16:49:48  2    something would be a national account.

16:49:49  3    Q.    You have indicated to me that with

16:49:53  4    occasional exception on national accounts, the

16:49:57  5    relationship you have with them is pursuant to a

16:50:00  6    written contract?

16:50:00  7    A.    Yes.

16:50:01  8    Q.    Okay.  How about local accounts, is the

16:50:05  9    relationship also for the most part pursuant to

16:50:09 10    written contract?

16:50:09 11    A.    I would -- many local accounts have

16:50:14 12    contracts, and I would use the term contract I

16:50:18 13    guess a little bit loosely.  I mean, it could be

16:50:21 14    everything from what, you know, you would

16:50:23 15    recognize as very much a formal contract to

16:50:28 16    something that would represent more of a

16:50:31 17    memorandum of understanding.  But a high

16:50:39 18    percentage -- a significant percentage of local

16:50:41 19    accounts would have some type of written

16:50:43 20    agreement.

16:50:43 21    Q.    So is it fair to say that over 50 percent

16:50:47 22    of the local accounts have some sort of written

16:50:50 23    agreement to memorialize the terms of the

16:50:53 24    relationship?

16:50:54 25    A.    I would -- it would be in that magnitude,

Page 79

16:50:58  1    you know, 50 percent plus or minus would be a good

16:51:02  2    rule of thumb.

16:51:03  3    Q.    How about the remaining local accounts,

16:51:05  4    how is that relationship defined?

16:51:07  5    A.    You know, some are handshake agreements.

16:51:13  6    Some are -- you know, in the produce segment it's

16:51:17  7    not -- it wouldn't be uncommon for a customer and

16:51:22  8    International Paper to agree to supply a certain

16:51:25  9    number of boxes over a six-month period.  That

16:51:28 10    would be more of what, you know, would be called a

16:51:31 11    handshake agreement or a gentleman's agreement.

16:51:34 12    Q.    So that wouldn't be written down anywhere?

16:51:37 13    A.    In some cases, you know, it would.  In

16:51:40 14    some cases it's maybe just more generally

16:51:45 15    understood.

16:51:45 16    Q.    How do you keep track of it if it's not

16:51:47 17    written down?

16:51:48 18    A.    Well, we would certainly if -- International

16:51:51 19    Paper would write -- would document every account

16:51:54 20    that we have.  But you might not have a document

16:51:57 21    that was mutually signed by an International Paper

16:52:00 22    representative and a customer representative.  We

16:52:02 23    document the -- our understanding of the terms

16:52:04 24    around every customer relationship that we have.

16:52:07 25    Q.    Any other type of customer relationship

Page 80

16:52:11  1    for boxes that we haven't covered?  We have

16:52:13  2    covered national accounts, which you have

16:52:16  3    indicated to me typically are pursuant to written

16:52:19  4    contract.  You have indicated local accounts and

16:52:21  5    you have broken those down approximately

16:52:24  6    50 percent of them have some sort of written

16:52:26  7    documentation memorializing the terms of the

16:52:28  8    agreement and 50 percent of local accounts are

16:52:32  9    either oral or -- and a handshake deal.  Any other

16:52:37 10    types of customers for boxes?

16:52:41 11    A.    You know, all of the variety of customers

16:52:45 12    that we would have would generally fall into one

16:52:49 13    of those categories.

16:52:50 14    Q.    Okay.  Now, let's take the national

16:52:57 15    accounts first.  All right.  The ones that almost

16:53:03 16    all of them are under written contract.  Is

16:53:13 17    there -- how is pricing -- if I come in, I'm --

16:53:18 18    I'm in charge of Kroger, all right, for example.

16:53:22 19    You have had no relationship with me.  I come to

16:53:25 20    you and I say, I want to start a relationship with

16:53:30 21    you, IP, to buy boxes.  What is the process to

16:53:39 22    come up with a price term?

16:53:42 23    A.    Generally speaking we would -- you know, a

16:53:50 24    sales rep would have a -- basically interview you

16:53:53 25    to get, you know, a lot of information around

# Exhibit 14

# DOCUMENT INFO

Filename:    D'Arrigo Deal Worksheet 2010 - 2011.xlsx

Comments:   File Not Printed

# DOCUMENT INFO

CONFIDENTIAL

IP013405

# CTA Deal Worksheet (V.1 dated 09.23.08)

**Instructions:** Fill in yellow areas only; READ-ONLY file; to save PROPOSED information use FILE / SAVE AS option and use customer name for file name.

FOR INTERNAL USE ONLY

Case: 15-2385    Document 56-2    Filed: 10/27/2015    Pages: 512

| Plant | Deal Worksheet Approval Dates (use xx/xx/xx format) | Contract Required | ☐ Yes  ☑ No | |
|---|---|---|---|---|
| **Salinas, Yuma, Compton, Anaheim** | **01/01/09** | Required Contract Approvals | | Name / Date |
| **Sales Professional** | | ☑ PGM | | Gregg Franklin   9/13/2010 |
| **Baker** | **09/01/10**  Final Approval by: Franklin | ☑ RGM | | Bernardo Lawrence 9/14/2010 |
| **Customer Or Prospect** | | ☐ AVP | | |
| **D'Arrigo** | | ☐ VP | | |
| **Credit Check** | | | | |
| ☑ Yes  ☐ No | | | | |

| Annual IP Account Sales Statistics *(if current account)* or Projected Annual Account Purchases *(if a prospect)* | | |
|---|---|---|
| **MSF** | **Type Of Account** (check one only) | **Price ($/MSF)** |
| **230,000** | | **$98.00** |
| **Sales Revenue M$($000)** | ☐ Current Account    ☐ Prospect | **Contribution ($/MSF)** |
| **$22,500,000** | | **$1.00** |

| | Element | Standard | Other | Proposal |
|---|---|---|---|---|
| **Contract Fundamentals** | Term of contract | 1 – 5 years | None: Not applicable | Not contractual |
| | Effective dates (from-to) | mm/dd/yyyy - mm/dd/yyyy | None: Not applicable | 09/01/10 - 10/31/2011 |
| | Quantity Commitment | • % of requirements;  • MSF or # unit or $$ commitment | None: Not applicable | No quantity commitment |
| | Price Changes Based on Change in Published Linerboard Price | • Rate:  x.x% per $10 change (calculation method:  multiply by 1 + % increase; divide by 1 + % decrease)  • Source:  Pulp & Paper Week; mid-point list price; east region for #42# Kraft  • Linerboard Price Base: $_____  • Effective: 30 days following publication cycle | • Rate:  % pass-through  • Medium pass-through  • Index:  White Sheet Board Conv News (BCN); Official Board Market (OBM); RISI Quarterly Price Review | For upcoming "Yuma Season" , which constitutes any item run and shipped to Yuma between October 1st, 2010and April 30th, 2011, prices will be held firm for the Yuma season. For the "Salinas Season", which constitutes any item run and shipped to Salinas between April 1st 2011 and November 30th 2011, prices can adjust up 9% and be held firm through that season. |
| | Price Changes Based on Changes in Wax Cost | • Rate:  x.x% per one cent per pound change in IP's cost of wax.  • Method:  Multiply by 1 + % increase; divide by 1 + % decrease;  • Base:  Current prices based on ___¢ per pound. | | See above |
| | Price changes:  Openers For All "Other" Cost Increases | • Annual review subject to mutual agreement by the parties, or either may terminate. | | See above |
| | Cost Savings | | • Good faith efforts  • Guaranteed | Good Faith |
| | Rebate | • Rebates based on additional sales $ or MSF | • Other customized – see Profitability Mgr | No Rebate |
| | Freight | • Customer Pick-Up  • FOB customer full or mixed full truckloads | • Freight allowance  • LTL  • Stop-off charges / Fuel surcharge | Boxes delivered. Freight in the cost. |
| | Terms of Payment | • 1% 10 net 30 from invoice date | • Other options | 2%10 Net 30 |
| **Services** | Minimum Order Quantities Per Print | • Full truckload | • As requested  • Min # of boxes or MSF per plant | As requested |
| | Lead Time | • 10 - 15 work days | • JIT - *explain*  • Other options - *explain* | As needed - usually 5 - 15 working days |
| | Inventorying & Warehousing | • Make and Ship | • Min/max [Add Addendum to Contract]  • # of days allowed and invoice thereafter  • Consignment | Inventory at IP plant as necessary to supply seasonal needs. |
| | Pallets | • No pallets | • Pallets included in price  • Pallet exchange | D'Arrigo pays for pallets - billed separately |
| | Drop Trailers | • Not included in price  • $400/month/trailer | • [#] included in price;  • $400/month/additional trailer | NA |
| | Packaging Machine | • Box upcharge  • Loan Amount  • Interest Rate | • Lease  • Buy | No Drop Trailers |
| | Tooling | • Customer pays initial set; IP pays replacements | • IP pays % initial set | IP purchases existing tooling, D'Arrigo purchases new tooling. |
| | List all other Costs to Serve | • Box Design, Graphic Design, Graphics, spec management, Pre-press, Samples | | No other Costs to Serve |

Revision Date9/16/201418:14

# Exhibit 15



## Corrugated Packaging Supply Agreement

This Agreement is entered into as of the __21st__ day of December 2004, by and between Kellogg Company, a Delaware Corporation together with its subsidiaries and affiliates, having an address at One Kellogg Square, Battle Creek, MI 49017 USA (hereinafter called "Kellogg") and Georgia-Pacific and its subsidiaries and affiliates, having an address at 133 Peachtree Street NE Atlanta, Ga. 30303 USA (hereinafter called "Georgia-Pacific").

WHEREAS Kellogg and Georgia-Pacific entered into that certain Corrugated Container Agreement, effective as of October 1, 1998, an Amendment to the Agreement dated July 28, 2000 and a Second Amendment to Corrugated Container Agreement dated July 1, 2002 (together, the "Prior Agreement"); and

WHEREAS, Kellogg and Georgia-Pacific now desire to terminate that Prior Agreement as of January 1, 2005 and to replace it in its entirety with this Agreement.

1. **Scope.**

This Agreement covers Kellogg's purchase of corrugated packaging materials (the "GP Containers") and micro-flute packaging materials (the "Color-Box Containers" and, together with the GP Containers, the "Containers") from Georgia-Pacific for those Containers and those locations set forth in Exhibit A, attached hereto and incorporated herein by reference. Kellogg agrees that it will purchase and accept and Georgia-Pacific agrees that it will sell and deliver one hundred percent (100%) of the GP Containers required for those GP Container locations set forth in Exhibit A; and Color-Box Containers for those Color-Box Container items set forth in Exhibit A. Kellogg, in its sole discretion, may discontinue or change its requirements for specific design or specification of Containers. In the event that Kellogg does elect to discontinue or change the design of a particular Container being sold to Kellogg by Georgia-Pacific, Kellogg agrees that it will review with Georgia-Pacific any such planned changes, additions, or deletions of corrugated packaging and will provide Georgia-Pacific with the opportunity to meet any competitive offer Kellogg may receive for any such new corrugated packaging design or specification. In the event that Georgia-Pacific does meet or beat any third party offer to supply such new corrugated container to Kellogg, Kellogg agrees that it will thereafter purchase all of its requirements for that specific Container for the remainder of the term of this Agreement. Kellogg, in its sole discretion, may also change delivery locations, subject to the adjustment of pricing to reflect differences in delivery costs. Kellogg does not guarantee that it will purchase a specific quantity of Containers from Georgia-Pacific. Kellogg does not guarantee that Georgia-Pacific will profit because of this Agreement. If Georgia-Pacific fails or refuses to provide Containers within the time required by Kellogg, meeting the agreed upon pricing and quality specifications, then Kellogg may immediately buy Containers from any other supplier until such time as Georgia-Pacific can meet the requirements set forth in this Agreement. This Agreement is subject to the terms and conditions contained in Kellogg's respective regional standard purchase order, the terms of which are attached hereto as Attachment B this Agreement shall govern in the event of a conflict.

*[handwritten margin note: GP needs the ability to do similar requirement changes]*

*[handwritten margin note: need to add volume require...]*

*[handwritten margin note: Need to review Attachment B]*

2. **Term.** *[handwritten: Sept 30 2008 - Sept 30 2010]*

The Term of this Agreement shall be January 1, 2005 through September 30, 2008. Kellogg, in its sole discretion, may accelerate the purchase of those Color-Box Products set

Confidential                    Page 1 of 10

CONFIDENTIAL
GP-KLEEN01068099



forth in Exhibit A prior to January 1, 2005. If Kellogg believes that Georgia-Pacific has failed or refused to provide proper quality Containers within the time required by Kellogg, or is otherwise in material breach of this Agreement, Kellogg shall provide written notice to Georgia-Pacific. If Georgia-Pacific fails to remedy any such breach within 30 days of such written notice, Kellogg may immediately terminate this Agreement in total or by plant without further liability. If Kellogg notifies Georgia-Pacific of a third material breach at any time during this Agreement, Kellogg may immediately terminate this Agreement without any further liability, even if Georgia-Pacific has remedied the prior two (2) material breaches within the allotted thirty (30) day time frame. This Agreement shall automatically terminate on September 30, 2008, without any further liability. Both parties are willing to open discussions regarding future extensions to this contract no later than one hundred eighty (180) days prior to the contract termination date providing that both parties agree on price.

3. **Price**.

    a. Underline{GP Containers}.

Initial prices for GP Containers are set forth in Exhibit B, attached hereto and incorporated herein by reference. These prices are based on the Container specification information (size, board, color, etc.) provided by Kellogg. Component pricing (i.e., board, conversion, freight) is set forth in Exhibit C and will be used for existing and new items throughout the life of the Agreement. Container pricing may be revised to reflect changes to these specifications. Initial prices, before any competitive discount, are those prices that were in effect as of December 31, 2004 in accordance with the Prior Agreement. During the term of this Agreement the low List prices for Linerboard (42-lb) Unbleached kraft, East ("Liner") and Corrugating Medium (26-lb) Semichemical, East ("Medium"), as published in the "Pricewatch: Paperboard/Packaging" section of Underline{Pulp & Paper Week} (hereinafter, referred to as the "PPW Liner Index" and the "PPW Medium Index" and together as the "PPW Indicies") shall be used as the basis for any adjustments in Container prices.

Notwithstanding changes in the PPW Liner Indicies, the prices for Liner and Medium used herein shall not be outside of (greater than the maximum nor lower than the minimum) the following price ranges during the specifically designated periods during the Agreement:

January 2005 – March 2005:        Liner shall be between $365 and $440 per ton
                                  Medium shall be between $345 and $420 per ton

April 2005 – September 2008:      Liner shall be between $370 and $450 per ton
                                  Medium shall be between $350 and $430 per ton

In addition, the following competitive discounts shall be applied, depending on the current PPW Indicies at the time Georgia-Pacific ships containers to Kellogg:

Liner discount shall be $30/ton when the PPW price for Liner is $400-$450/ton
Liner discount shall be $20/ton when the PPW price for Liner is $350-$400/ton

Medium discount shall be $30/ton when the PPW price for Medium is $380-$430/ton
Medium discount shall be $20/ton when the PPW price for Medium is $330-$380/ton

Kellogg Company Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan  49016-3599   (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068100

*Kellogg's*

*2% 10-1-05*
*2% 10-1-06*
*1% 10-1-06*

An additional discount of three percent (3%) shall be applied to all prices in effect as of October 1, 2006.

**b.** **Color-Box Containers**

Prices for Color-Box Containers are set forth in Exhibit A, attached hereto and incorporated herein by reference. These prices are based on a PPW Liner Index of $425/ton and the Color-Box Container specification information (size, board, color, etc.) provided by Kellogg. Component pricing (i.e., board, conversion, freight) is set forth in Exhibit A and will be used for existing and new items throughout the life of the Agreement. Color-Box Container pricing may be revised to reflect changes to these specifications. In the event that the PPW Liner Index published in November 2005 is equal to or greater than $450/ton, then all Color-Box Container prices set forth in Exhibit A shall be increased by five percent (5%), effective January 1, 2006, and shall thereafter remain fixed for the remainder of the term of this Agreement.

Notwithstanding changes in the PPW Liner Indicies, the prices for Liner and Medium used herein shall not be outside of (greater than the maximum nor lower than the minimum) the following price ranges during the specifically designated periods during the Agreement:

**c.** **Payment Terms.**

*move to terms*
*standard*
*1% net 30*

For the period from January 1, 2005 through September 30, 2006, payment terms are 2% fifteen (15) days, net thirty (30) days. Thereafter, for the remainder of the term of this Agreement, payment terms shall be net sixty (60) days. All payments shall be payable in U.S. dollars upon delivery of containers. Under the terms from January 1, 2005 through September 30, 2006, Kellogg is eligible for the two percent (2.0%) discount provided the disbursement is made by the fifteenth (15th) day following Kellogg's receipt of Containers that are the subject of such invoice. The disbursement date is defined as the day on which Kellogg issues a check for payment. Any disbursement not made on or before the fifteenth (15th) day following receipt of Containers will be issued thirty (30) days following receipt of Containers. Kellogg will consider payment made when the financial institution of Georgia-Pacific has received or has control of the payment transaction. This will generally occur three (3) calendar days following initiation by Kellogg.

**d.** Kellogg and Georgia-Pacific will work together to select acceptable modes of transportation and carriers.. Freight charges will be paid by Georgia-Pacific as a "delivered" price for Georgia-Pacific Container locations. Freight charges will be paid by Kellogg's for Color-Box Container Items. Methods for applying freight charges to Kellogg's will be mutually agreed upon. Pricing will be adjusted to reflect relevant freight rates. Freight terms will be Free on Board destination. Kellogg maintains the right to make the final decision regarding the motor carrier to be used. Georgia-Pacific will use these carriers to ship to Kellogg. Georgia-Pacific agrees to adhere to those safety and transportation policies officially issued by Kellogg throughout the term of this Agreement.

*unacceptable*

**e.** No plant of Georgia-Pacific's which is supplying a facility of Kellogg shall sell to any other company, which competes with Kellogg within the packaged food industry, any corrugated Containers in substantially the same quantities, specification, terms of sale and quality at prices which are lower than the prices which the supplying plant of Georgia-Pacific is

Kellogg Company Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan 49016-3599 (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068101

*Kellogg's*

then charging to such facility of Kellogg. Kellogg may, at its sole expense, appoint a mutually acceptable third party to verify compliance with this requirement.

*all other increase take out*

f. Georgia-Pacific shall not adjust Container prices charged to Kellogg during the term of the Agreement, except as a result of changes in the PPW Indicies. Prices shall be adjusted based on the PPW Indicies published in the second month of each calendar quarter (i.e., November, February, May and August), provided that such change prices remain between the minimum and maximum prices set forth in Section 3(a), and any changes will be effective for all shipments made beginning the first day of the second month following such change (i.e., January, April, July and October). Container price changes will be based on the following formula:

(New Index – Old Index)/Old Index = % change in Index
(% change in Index x 70% x (65% for Liner and 35% for Medium)

*fine →*

g. If Pulp & Paper Week ceases publication or is determined by the parties to be unreliable, then the parties shall mutually agree upon a substitute index.

*NB prebate remove*

h. In anticipation of the volumes of GP Containers and Color-Box Containers Kellogg will be purchasing from Georgia-Pacific, Georgia-Pacific hereby agrees to pay Kellogg annual pre-bates in accordance with the following schedule, provided that this Agreement has been executed by both parties by December 21, 2004 and that all Color-Box Containers have been qualified by December 27, 2004:

(i) Two million dollars ($2,000,000) will be paid by December 31, 2004 as a pre-bate for 2005;

(ii) One million dollars ($1,000,000) will be paid by January 31, 2006, as a pre-bate for 2006;

(iii) One million dollars ($1,000,000) will be paid by January 31, 2007 as a pre-bate for 2007 and 2008.

All volumes implied or discussed represent Kellogg's best estimate. Kellogg does not guarantee purchase volumes for specific packaging materials, or in the aggregate. In the event that significant volume declines in the Georgia Pacific Corrugated business have occurred during the term of this agreement, Kellogg is willing to open discussions regarding potential adjustments to pre-bate dollars payable January 31, 2006 and Janaury 31, 2007. Run-lengths for micro-flute items are estimates only.

Kellogg shall pay current contract prices for:

Approved materials used for qualification in new applications (i.e. new cereal flavor).
Any material used for product that is sold.
Any material that is used for sales samples.

Confidential

Page 4 of 10

Kellogg Company Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan 49016-3599 (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068102



Unless agreed to in writing, prior to the start of the project, Georgia-Pacific shall absorb their cost of all materials used internally for research and development.

Kellogg will incur no additional expense due to supplier changes. Food waste, line efficiency, packaging material waste and any additional expenses will be charged back to Georgia-Pacific. The parties will agree on a documented baseline of current efficiencies and waste levels. Kellogg agrees to provide data to support baseline waste levels and line efficiencies. Kellogg agrees to use reasonable efforts to ensure no arbitrary or capricious costs are charged to Georgia-Pacific.

The board combinations quoted by Georgia-Pacific are based on Kellogg performance specifications including but not limited to: compression strength, paperboard stiffness, scorebend ratio, caliper, basis weight, coating characteristics, appearance and efficient machinability on Kellogg's equipment. If, for any reason, a more expensive material or process is required to meet Kellogg's written specifications, this cost will be bourne by Georgia-Pacific. Increases in material pricing due to Kellogg directed specification changes will be bourne by Kellogg.

Qualification and implementation testing requirements will be determined on a by item basis by Kellogg. Georgia-Pacific will be required to provide Kellogg's with written results on qualification material and then provide monthly summaries of results of on line testing. Kellogg reserves the right to conduct its own testing to verify these requirements are being met throughout the term of this Agreement.

Georgia-Pacific agrees to supply materials to Kellogg at the prices listed in Exhibit A. At Kellogg's request, pricing updates will be submitted in electronic spreadsheet format, using an agreed upon a template.

4.    **Continuous Improvement.**

Georgia-Pacific agrees to work with Kellogg on continuous improvement cost reduction projects initiated by Kellogg or Georgia-Pacific and provide resources against those projects.

In the event of a specification change, if the new structural design is determined to potentially be a commercially available structure and is not considered innovative or proprietary as determined by both parties, Kellogg reserves the right to pursue pricing from other suppliers for this structure but will give Georgia-Pacific the opportunity to retain the business if Georgia-Pacific has provided competitive pricing. If the parties determine the structure is innovative or uses a technology proprietary to Georgia-Pacific, Kellogg will not solicit pricing on the structural design from other suppliers.

5.    **Service Requirements.**

a. Both parties will regularly monitor service requirements as defined in Exhibit D. At a minimum, a formal review between the parties must occur quarterly. Specifically, Georgia-Pacific warrants that all bar codes meeting the mutually agreed upon Georgia-Pacific/Kellogg UPC guidelines shall be 100 percent scan-able. Monthly defect-free rates shall be at least 99.9%. The method to be used to calculate waste and line efficiency shall be determined jointly. Monthly on-time delivery rate shall be at least 98.0%. Detailed performance measures

Confidential    Page 5 of 10

Kellogg Company / Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan 49016-3599  (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068103

*Kellogg's*

and tracking systems will be mutually agreed upon. Kellogg agrees to provide reasonable efforts and support to allow Georgia-Pacific the opportunity to achieve these service levels.

*[handwritten: no charge for rework ? 1 hrs-seems agreem]*

b. Georgia-Pacific shall not charge Kellogg for returns and/or re-stock except for special orders. Kellogg shall not be charged for any contaminated or defective products. Georgia-Pacific shall produce and ship replacement product for contaminated or defective products within 12 hours of receipt of notice. Georgia-Pacific will accept all reasonable returns. Kellogg and Georgia-Pacific will investigate and document the underlying cause of contamination or defects to take corrective or preventive action.

*[handwritten: Disney Plea ??]*

*[handwritten: 2 resources]*

c. Georgia-Pacific will provide technical, logistics, and marketing/graphics resources; technical support wherever and whenever required by Kellogg, within twenty-four (24) hours of such request; 7 x 24 telephone service/support line for each Kellogg's Facility; and training seminars, where practical; all at no extra cost to Kellogg. Kellogg will provide Georgia-Pacific with reasonable advance notification for requests for support services or resources. Georgia-Pacific shall employ a corporate quality manager responsible for consistent quality throughout the Georgia-Pacific organization. All plants supplying Kellogg will be AIB certified by April 1, 2005 and maintain that certification throughout the contract. In the event that Georgia-Pacific participates in a Disney licensed promotion each Georgia-Pacific producing plant shall also execute a Disney Enterprises Inc. Manufacturer's Agreement and remain compliant, at Georgia-Pacific's sole cost, with the terms thereof for so long as Disney product is manufactured at that plant. Additionally, Georgia-Pacific shall be required to provide three (3) full time resources as follows: one resource will function as a technical Manager for the Color-Box Containers to interface with Kellogg Marketing, continuous improvement, project management and general assistance with engineering and quality issues; the second resource will function as a technical consultant for GP Container project management, continuous improvement and general assistance with engineering and quality related issues; and the third resource will function as a logistics resource to provide daily support regarding ordering requirements and plant liaison communications. All resources shall be located at Battle Creek, Michigan, unless otherwise specified by Kellogg's. In the event of a staffing change in one of these positions the final selection must be approved by the Kellogg packaging group. Furthermore, the individual selected from such an assignment to a competitor of Kellogg, either directly or indirectly, for a period of two (2) years after leaving this position.

d. In accordance with the activities contemplated in this Agreement, the parties do not expect or anticipate the conception of any inventions. Should the Parties hereto choose to pursue such activities where an invention is expected or anticipated, the Parties hereby agree to draft one or more subsequent agreements for such activities.

e. Subject to the provisions set forth above, Kellogg will have the first rights to negotiate exclusive rights, for use in the breakfast foods or snacking market any new invention developed at Kellogg's request or developed using Kellogg machines for testing the invention concept on terms similar or more favorable to Kellogg as those set forth in this Agreement. The length of this exclusivity shall typically be the length of one year from full commercialization of the invention, unless otherwise agreed to prior the agreement to pursue activities where invention is expected or anticipated.

f. Individual Plant Service requirements shall be negotiated, documented, and agreed to between each supplying location and the associated Kellogg plant by April 1, 2005. These

Confidential

Kellogg Company / Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan 49016-3599 (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068104



service agreements will include but not be limited to, inventory levels, lead times, expedited order procedures, backup supplying locations, resources, plant team interaction, quality procedures, delivery specifications, and contact lists and shall remain subject to the terms of this Agreement. Under no circumstances will individual plant service requirements be considered cause for price increases.

6. **Use of Marks.**

Each party grants to the other a royalty-free, non-exclusive, non-transferable right to use trademarks, trade names, copyrights, logos, color combinations, insignias, and devices (collectively the "Marks") under this Agreement. Any Marks developed or created for use on the materials shall become the property of Kellogg and shall inure to the benefit of Kellogg for the term of this Agreement. Georgia-Pacific agrees to affix any Marks as may be designated or required by Kellogg on the materials, including those Marks of third parties, at Kellogg's expense. Kellogg warrants that it will obtain permission for use of any third party Mark it requires for use on the materials.

Except as expressly provided in this Agreement, no right, property, license, permission ownership or interest of any kind in or to the use of any Mark owned or used by a party is or is intended to be given or transferred to or acquired by the other party by the execution, performance or non-performance of this Agreement or any part of it. Each party agrees that it shall in no way contest or deny the validity of, or the right or title of, the other party in or to such Marks by reason of this Agreement and shall not encourage or assist others directly or indirectly to do so, during the lifetime of this Agreement. In addition, neither party shall utilize any Mark in any manner that would diminish its value or harm the reputation of the other party.

Upon termination of this Agreement, Georgia-Pacific shall cease any and all use of the Kellogg Marks and return or destroy any file, film, plates, cylinders or other printing material or product.

7. **Insurance.**

During the term of this Agreement, or any extension thereof, Georgia-Pacific shall maintain at its own expense (i) Commercial General Liability Insurance, including products and completed operations coverage, with a combined single limit minimum of $5,000,000; (ii) Automobile Liability Insurance, including coverage for hired, owned or non-owned vehicles, with a combined single limit minimum of $5,000,000; and (iii) Workers' Compensation Insurance (including Longshoremen's and Harbor Workers' Coverage, if applicable) at the statutory limits; and (iv) products Liability Insurance with a combined single limit of $5,000,000 per occurrence.. Georgia-Pacific shall furnish Kellogg with certificates of insurance issued by the companies providing the coverage, if specifically requested in writing by Kellogg. The issuers of all such certificates will endeavor to provide Kellogg with at least thirty (30) days' prior written notice of cancellation or material changes to such insurance policies.

8. **General Warranties.**

a. Georgia-Pacific warrants that all Containers purchased hereunder will be free from defects in design, material, and workmanship, and will conform to the specifications as set forth

Confidential

Kellogg Company / Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan 49016-3599 (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068105



in Exhibit A and accepted samples. Final determination of the suitability of Containers for the use contemplated by Kellogg is the sole responsibility of Kellogg and Georgia-Pacific shall in no way be responsible for the suitability of such Containers for any particular end use. The warranty set forth in this Paragraph 8.a. with respect to the Containers purchased hereunder, is in lieu of all other warranties, expressed or implied, including implied warranties of merchantability and fitness for a particular purpose and shall survive any delivery, inspection, acceptance, or payment by Purchaser.

OK

b. Georgia-Pacific warrants that any Container, as of the date of shipment or delivery, made by or through Georgia-Pacific to, or on the order of, Kellogg, is not (i) adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act and all amendments thereto, including, but not limited to, the Food Additive Amendment; (ii) materials which may not, under the provisions of Sections 404 and 505 of said Food Drug and Cosmetic Act, be introduced into interstate commerce; and (iii) adulterated or misbranded within the meaning of any food laws or ordinances (then in effect) of the country to which such material is shipped.

c. Georgia-Pacific warrants that no liens, encumbrances, security interests, or other third party claims shall attach to real or personal property owned or leased by Kellogg as a consequence of Georgia-Pacific's performance of services hereunder.

d. Georgia-Pacific warrants that all Containers covered hereby are at prices and terms lawful and permissible under the anti-trust laws and any other applicable official price control laws, orders and regulations.

confl'd.
with →
Best 4th

e. Georgia-Pacific warrants that it shall not substitute raw materials unless specifically authorized by Kellogg in writing.

9.  **Indemnification.**

Each party shall indemnify and hold harmless the others from any and all liabilities, damages, claims, suits, judgments, costs and expense (including reasonable counsel fees), directly or indirectly incurred, as a result of (a) the actions of each party relating to this Agreement and the actions contemplated herein; (b) the breach of any of the provisions by the respective parties; (c) any claims or allegations by third parties or government agencies arising out of or in connection with any alleged breach of the provisions of this Agreement by the respective parties; (d) any claims by third parties based upon contract resulting directly from the Material or any other activity contemplated by this Agreement; (e) any claims by third parties based upon any representations or warranties arising out of or in connection with the respective products or services, representations or art work of the parties, or upon alleged patent, trademark or copyright infringement or unfair competition in connection with the respective products or services, representations or art work of the parties, by reason of the Material; and (f) acts or omissions of any firm employed by the respective parties to perform any portion of the duties or obligations contained within.

10.  **Miscellaneous.**

Confidential

Kellogg Company Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan 49016-3599 (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068106

*Kellogg's*

a. Any dispute arising out of or relating to this Agreement, or the breach thereof, shall be settled in a binding arbitration by a panel of three (3) arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and governed by the laws of the state of Michigan without regard to its choice of law rules. Judgment upon the award may be entered in any court located in the state of Michigan and both parties hereby consent to submit to the jurisdiction of such courts and expressly waive any objections or defense based upon the lack of personal jurisdiction or venue. Kellogg shall select one (1) arbitrator, Georgia-Pacific shall select one (1) arbitrator, and then those two (2) arbitrators shall mutually agree upon the third arbitrator. The location of Arbitration shall be Battle Creek, Michigan. The prevailing party shall be entitled to recover its reasonable attorneys' fees and costs.

b. In the event of a material breach by Georgia-Pacific, Kellogg shall be entitled to damages associated with such breach. In addition, Georgia-Pacific shall be laible for personal injury or property damage, provided that aggregate damages shall be limited to Three Million Dollars ($3,000,000).    Notwithstanding any provision in this Agreement to the contrary, the limitations of liability set forth in this Section 10 shall not apply to third party claims or claims relating to product defects or recalls resulting from a defect of any corrugated packaging material provided by Georgia-Pacific

*Not mutual →*

c. In the event of early termination of this contract for any reason by Georgia-Pacific, Kellogg shall be entitled to actual damages incurred to transition to new supplier and return to 100% production efficiencies.

*No longer applicable*

d. Georgia-Pacific and Kellogg may mutually agree to immediately utilize a diversity supplier as administrator of the account (co-manufacturer) for the Rome, GA and Rossville, TN locations and may also add additional Kellogg locations to the mutual benefit of both parties. For the Rome, GA and Rossville, TN locations, the parties have agreed that Integrated Packaging Corporation will be the preferred diversity supplier. For the Blue Earth MN, Mecca CA and Milan MI Kashi locations, the parties have agreed that Vision Packaging will be the preferred diversity supplier. In the event that the parties are not able to establish mutually satisfactory terms and conditions for such diversity solutions, Kellogg may engage a minority vendor directly for not more than ten percent (10.0%) of the volume of corrugated containers purchased by any Kellogg location.

*revamp not correct →*

e. Kellogg may assign its rights and obligations under this Agreement to any of its subsidiaries or affiliates. Georgia-Pacific  may not assign its rights and obligations under this Agreement (including through any merger or acquisition by Georgia-Pacific) without the advance, written permission of Kellogg, which permission shall not be unreasonably withheld or delayed by Kellogg and in the event of such a merger or acquisition by Georgia-Pacific, the terms and conditions of this Agreement (including without limitation price and payment terms) shall remain in full force and effect following such acquisition or merger.

*ok*

f. Kellogg and Georgia-Pacific will not disclose the other party's confidential information, including any information regarding this Agreement except when disclosure is necessary to fulfill the terms and conditions of the Agreement. This includes the Agreement's terms, pricing, purchased materials, and volumes. In any event, Georgia-Pacific shall be responsible for any breach of this confidentiality Agreement between parties, dated October 20, 2003 (the "NDA")

Confidential

Kellogg Company Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan 49016-3599  (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068107

*Kellogg's*

by any of its employees, agents, and representatives and Georgia-Pacific shall, at its sole expense, take all reasonable measures (including but not limited to court proceedings) to restrain its employees, agents, and representatives from prohibited or unauthorized disclosure or use of any confidential information.

g. Georgia-Pacific may use Kellogg as a business reference only after obtaining express written permission in each instance from Kellogg, which permission shall not be unreasonably withheld. Georgia-Pacific shall not publish the Kellogg name or any registered trademark without express written consent of Kellogg.

h. If either party at any time fails to exercise any of its rights under this Agreement, this failure shall not be considered a waiver of said rights. A waiver by either party will only occur when an authorized officer, of such party, signs a written waiver. Any failure to enforce a right under this Agreement will not preclude the enforcing party from subsequently asserting that right or any other right that arises from this Agreement.

i. If any provision of this Agreement is found to be void or unenforceable, the validity or enforceability of the remaining provisions of the Agreement shall not be affected, but shall remain in full force and effect, as though such void or unenforceable provision had never been included in the Agreement.

j. Force Majeure events, aside from any labor disputes affecting the supply of Containers to Kellogg, will excuse either party's non-performance of its obligations under this Agreement. Georgia-Pacific must immediately notify Kellogg of any Force Majeure event and will notify Kellogg in advance if such an event is reasonably anticipated. If Georgia-Pacific cannot fulfill its obligations to Kellogg during a force majeure event, Kellogg may buy from other suppliers on an interim basis. This interim period will last until Georgia-Pacific can resume meeting Kellogg's requirements.

k. This Agreement shall be governed by and construed in accordance with the laws of the state of Michigan, United States of America. The U.N. Convention of Contracts for the International Sale of Goods shall not govern this Agreement.

l. Except as otherwise noted, this Agreement contains the entire Agreement between the parties and supersedes any prior agreements between Kellogg and Georgia-Pacific that apply to Containers or similar products. Neither party is relying on any oral or written agreement made prior to this Agreement. This Agreement can be modified only in writing, signed by both parties.

**Kellogg Company**                          **Georgia-Pacific**

By: _Joseph J Julleen_        _____        _GMR_

Title: _V.P. Procurement_     _SR. VICE PRESIDENT_

Date: _12/21/04_             _DECEMBER 22, 2004_

Confidential                   **Page 10 of 10**

Kellogg Company / Corporate Headquarters
One Kellogg Square / P.O. Box 3599 / Battle Creek, Michigan 49016-3599  (269) 961-2000

CONFIDENTIAL
GP-KLEEN01068108

**Kellogg Company/Color-Box Exhibit A**
**KNA Club Fluted Item List**

| Cube | SAP # | Item Description | Kellogg Plant Location | Length | Width | Depth | Drawing | CBX Drawing | Typical Run Qty | Board Grade | Price per 1000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 391 | K112351.003 | Smart Start Soy | Omaha | 7.688 | 4.750 | 10.375 | 96SN178 | R104285 | 105m | I.E. | $330.00 |
| 391 | K126834.000 | Kashi Go lean Crunch | RxRaisin GR Mi | 7.688 | 4.750 | 10.375 | 05SN108 | | | I.E. | $241.80 |
| 423 | K127476.000 | Kashi Heart to Heart | Boston GR Mi | 8.000 | 5.750 | 10.500 | 300G58RA | R104286 | 110m | ? | $294.55 |
| 469 | K124004.002 | Raisin Bran Crunch | Battle Creek | 7.688 | 5.438 | 10.875 | 92SN208A | R104288 | 110m | Std E. | $285.00 |
| 469 | K117219.003 | SmartStart | Omaha | 7.688 | 5.438 | 10.875 | 75SN110A | R104277 | 110m | Std E. | $282.00 |
| 469 | K121817.003 | Special K Red Berries | Omaha | 7.688 | 5.438 | 10.875 | | R104276 | 110m | Std E. | $282.00 |
| 469 | | Raisin Bran Crunch | Omaha | 7.688 | 5.438 | 10.875 | | | 110m | Std E. | $285.00 |
| 512 | K130186.003 | 512 Cube Special K Red Berries | Omaha | 7.688 | 5.438 | 12.0 | 14SN069 | R104288 | 110m | I.E. | $285.00 |
| 611 | K124003.004 | Raisin Bran Crunch | Battle Creek | 7.648 | 5.375 | 13.375 | 92SN172EA | R104289 | 75m | Std E. | $284.66 |
| 611 | K112367.830 | Crispix | Lancaster | 7.648 | 5.375 | 12.125 | 95SN174A | R104290 | 75m | Std E. | $325.00 |
| 611 | K127445.029 | Raisin Bran Crunch | Omaha | 7.648 | 5.375 | 13.375 | 98SN114A | R104290 | 75m | Std E. | $325.00 |
| 611 | K129395.000 | Tony's Cinn Crunchers | | 7.648 | 5.375 | 13.375 | 98SN114AX | R104290 | 75m | Std E. | $325.00 |
| 648 | K112565.031 | RxSrw | Battle Creek | 7.648 | 6.375 | 13.875 | 96SN153XA | R104291 | 110m | I.E. | $301.00 |
| 648 | K121431.002 | RX Cereal | Battle Creek | 7.648 | 6.375 | 13.875 | 96SN152XA | R104291 | 110m | I.E. | $301.00 |
| 648 | K113280.003 | Special K | Lancaster | 7.648 | 6.375 | 13.875 | 98SN152XA | R104291 | 110m | I.E. | $301.00 |
| 674 | K117260.031 | Corn Flakes WBZ | Lancaster | 9.250 | 6.375 | 11.000 | 93SN069S | R104287 | 110m | Std E. | $330.00 |
| 753 | K117430.029 | Raisin Bran | Battle Creek | 8.250 | 5.375 | 12.438 | 98SN195A | R104293 | 110m | Std E. | $344.02 |
| 753 | K117435.029 | Raisin Bran | Lancaster | 8.250 | 5.375 | 12.438 | 98SN196A | R104283 | 110m | Std E. | $344.02 |
| 753 | K124012.028 | Raisin Bran | Battle Creek | 8.250 | 5.375 | 12.438 | 99SN196EA | R104296 | 110m | Std E. | $344.02 |
| 753 | K117471.2 | TriSum Pack | Rockford GR Mi | 8.250 | 5.375 | 12.438 | 95SN211EA | R104296 | 110m | Std E. | $344.02 |
| 753 | K117472.003 | TriFun Pack | Omaha | 8.250 | 5.375 | 12.438 | | | 110m | I.E. | $334.00 |
| 809 | K112451.003 | Corn Flakes | Lancaster | 9.250 | 5.375 | 10.375 | 98SN155A | R104283 | 110m | Std E. | $334.00 |
| 809 | K112352.003 | Frosted Flakes (9 copies) | Lancaster | 9.250 | 5.375 | 10.375 | 98SN196AX | R104279 | 110m | Std E. | $334.00 |
| 809 | K124421.003 | Special K 36ct | Lancaster | 9.250 | 4.375 | 13.375 | 97SN209EB | R104279 | 110m | Std E. | $390.00 |
| 809 | | Special K 36ct | Omaha | 9.250 | 6.0? | 13.375 | | R104279 | 110m | Std E. | $390.00 |
| | K125971.002 | 48ct Nutri-Grain | Itasca, IL | 7.938 | 9.250 | 1.00 | | | 110m | I.E. | $198.00 |
| | K125190.003 | Keebler Soft Batch | Athens, Ga | 6.000 | 5.625 | 10.750 | 99SN201X | R104290 | 110m | Std E. | $202.97 |
| | K125449.003 | 24ct Vienna Cremes | Itasca, IL | 12.375 | 4.875 | 15.625 | 96SN07M1201 | R104292 | 110m | Std E. | $298.24 |
| | K127353.003 | 48ct Town Cracker Cookies | Allentn, Pa | | | | 08SM1120101 | R104293 | 110m | Std E. | $174.74 |
| | | | | | | | | R104293 | 110m | Std E. | $200.86 |

Pricing for the materials listed in this Exhibit do not include associated freight charges unless otherwise noted.

CONFIDENTIAL
GP-KLEEN01068109

## Kellogg/Georgia-Pacific Exhibit A Location List

| Kellogg Plant | Kellogg Plant Location | Georgia-Pacific Supplying Location |
|---|---|---|
| Athens Packaging | Athens, GA | Doraville, GA |
| President Baking | Augusta, GA | Spartanburg, SC |
| Kellogg | Battle Creek, MI | Owosso, MI |
| Kashi/Vision Pkg | Blue Earth, MN | Dubuque, IA |
| Keebler | Cary, NC | Philadelphia |
| Murray Biscuit | Charlotte, NC | Spartanburg, SC |
| Keebler | Cincinnati, OH | Circleville, OH |
| Keebler | Columbus, GA | Augusta, GA |
| Emerald Baking | Florence, KY | Circleville, OH |
| Roskam Baking (Kellogg) | Grand Rapids, MI | Milan, MI |
| Roskam/Kerry Kashi (Vision Pkg) | Grand Rapids, MI | Milan, MI |
| Keebler | Grand Rapids, MI | Owosso, MI |
| Peacock Engineering | Itasca, IL | Chicago, IL |
| Keebler | Kansas City, KS | Kansas City, MO |
| Mountain Top | Kemper, KY | Circleville, OH |
| Kerry Sweet Ingredients | Kentwood, MI | Milan, MI |
| Keebler | Macon, GA | Augusta, GA |
| Nuvex Kashi (Vision Pkg) | Mecca, CA | Buena Park |
| Kellogg | Memphis, TN | Memphis, TN |
| Kellogg | Muncy, PA | Bradford, PA |
| Standard Candy (Vision Pkg) | Nashville, TN | Cleveland, TN |
| Diversapack | Orland, IN | Milan, MI |
| Kellogg-Mondo | Rome, GA | Cleveland, TN |
| Kellogg | Rossville, TN | Memphis, TN |

CONFIDENTIAL
GP-KLEEN01068110

# Exhibit 16

| From: | Mehiel, Peter <PeterMehiel@templeinland.com> |
|---|---|
| Sent: | Tuesday, February 12, 2008 4:52 PM |
| To: | Grube, Bruce <BruceGrube@templeinland.com> |
| Cc: | Calvert, Paul <PaulCalvert@templeinland.com>; Jacka, Ted <TedJacka@templeinland.com> |
| Subject: | Sell Price Analysis |
| Attach: | SELL PRICE ANALYSIS v5.xls |

Bruce:

RE: Price erosion at Bayline.

**Local:**

In general, our sell price has been dropping as we have been responding to market pressure on existing volume as well as getting aggressive in order to grow the business.

Bayline's traditionally high sell price has come under pressure from several directions:
1. Weyland (China) is 25% below us across the board.
2. Star is approximately 15% below us
3. Smurfit is 10% to 20% below us on a spot basis
4. New entries, such as Sac. Container, are 15% low and offering a one year lock on price, no upcharge for one or two colors, no plate charges.

Here is a typical example of existing business:
14" MW, PLN Pizza Box

| | | |
|---|---|---|
| (1) Tony's (long standing customer, high price) | | $1,972/ton |
| (2) I just quoted this item to a new account at | | $1,329/ton |
| (3) Bi-Rite (recently re-priced in order to retain business) | | $1,125/ton |

By the way, Tony's is complaining about the price and wants to talk to us. No kidding.

I believe this goes a long way toward explaining the price erosion. As for the budget, the local sales price peaked in October about the same time the budget was being prepared and has been dropping ever since.

| Oct | 1,657 |
|---|---|
| Nov | 1,553 |
| Dec | 1,571 |
| Jan | 1,503 |
| Feb | 1,484 |

If we do the math (see attached), the effect of the sell price variance can be seen to be largely Saladino's, which was budgeted right at the peak in selling price. As our other (higher priced) sales drop off, Saladinos becomes a bigger influencer on sell price.

**National:**

Again, this is just a matter of doing the math. Removal of TPP (CA Pizza Kitchen) at $1,722/ton reduces sell price from $1,073 to $782/ton. Budgeted sell price for Jan was $897.

| | 2007 | 2007, Less CPP |
|---|---|---|
| M$ | $3,306 | $1,663 |
| Tons | 3,082 | 2,128 |
| $/Ton | $1,073 | $ 782 |

**Action Plan:**

The pizza box business in Northern California is becoming highly competitive. Most new suppliers have modern, efficient facilities, a low cost basis, and are offering aggressive pricing. At Bayline, we are hand-breaking and packing, and strapping pallets with a hand gun.

If we are to survive and even grow, we need to modernize our facility (the RDC and Unitizer from Tracy will help), and aggressively seek new volume. This will have a negative effect on sell price as we push toward critical mass, and beyond.

*Pete Mehiel*
*General Manager*
*Bayline Paper*
*510.429.3800*

**Outside Attorneys Eyes Only**

**Produced as Native**

**Outside Attorneys Eyes Only**                                                          **Temple-Inland 01307967**

| Customer Name | January, 2008 | | Jan Budget $/Ton | Jan-'08 vs. Budget | |
|---|---|---|---|---|---|
| | TONS | $/Ton | | Variance, $/Ton | Effect on Sell Price |
| **LOCAL ACCOUNTS (Top 20)** | **TOTAL TONS SHIPPED (1/08, Local) = 810** | | | | |
| SALIDINOS INC. (Both Locations) | 527 | $ 1,444 | $ 1,567 | $ (123) | $ (79.77) |
| ROMA/VISTAR LIVERMORE | 74 | $ 1,544 | $ 1,587 | $ (43) | $ (3.96) |
| VISTAR/PORTLAND | 37 | $ 1,714 | $ 1,648 | $ 66 | $ 3.01 |
| G.L. MEZZETTA | 29 | $ 1,105 | $ 1,111 | $ (6) | $ (0.20) |
| SYSCO FOODS SACRAMENTO | 22 | $ 1,987 | $ 1,820 | $ 167 | $ 4.53 |
| MIKE HUDSON | 15 | $ 1,689 | $ 1,498 | $ 191 | $ 3.53 |
| TRIPLE F DIST/HAWAII | 8 | $ 2,053 | $ 2,073 | $ (20) | $ (0.19) |
| TONY'S FINE FOODS | 7 | $ 2,279 | $ 2,085 | $ 194 | $ 1.68 |
| SYSCO/SEATTLE | 6 | $ 1,497 | $ 1,482 | $ 15 | $ 0.11 |
| US FOODS/LIVERMORE | 6 | $ 1,870 | $ 1,696 | $ 174 | $ 1.29 |
| LINTON PAPER | 5 | $ 2,309 | $ 2,498 | $ (190) | $ (1.17) |
| BI-RITE | 5 | $ 1,852 | $ 1,923 | $ (71) | $ (0.44) |
| DAWN/UNION CITY | 4 | $ 2,279 | $ 2,382 | $ (103) | $ (0.51) |
| SERVICE PAPER CO./WASH | 4 | $ 2,251 | $ 2,352 | $ (101) | $ (0.50) |
| AREA DIST. INC. | 3 | $ 1,645 | $ 2,118 | $ (473) | $ (1.75) |
| ROBB-ROSS FOODS INC. | 3 | $ 2,497 | $ 2,353 | $ 144 | $ 0.53 |
| JOSEPH MARTIN DIST. | 2 | $ 1,643 | $ 1,756 | $ (113) | $ (0.28) |
| MOR-RAD/HAWAII | 2 | $ 2,418 | $ 2,196 | $ 222 | $ 0.55 |
| UNISOURCE/PLEASANTON | 1 | $ 2,939 | $ 2,180 | $ 759 | $ 0.94 |
| OAKLAND PAPER & SUPPLY CO. | 1 | $ 3,881 | $ 2,768 | $ 1,113 | $ 1.37 |
| CALIFORNIA VEGETABLE | | | $ 1,183 | $ (1,183) | $ - |
| **Summary (Local)** | **761** | **1,503** | **1,778** | **$ (275)** | **$ (258.36)** |

# Exhibit 17

# DOCUMENT INFO

**Filename:**     Win Loss Report Central Area.xlsx

**Comments:**     File Not Printed

# DOCUMENT INFO

OUTSIDE ATTORNEYS EYES ONLY     IP562918

## 2009 Losses

| Account | Mo. Out | Segment | RGM | Plant/Complex | L/N | Competitor | Tons | MSF | Cont/MSF | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Wincup | Oct-09 | Non-durable | Smith | San Antonio | L | | 1,000 | 19000 | $13.11 | Closed |
| Heritage Bag | Sep-09 | CPG | Smith | DFW Complex | L | PCA | 800 | 12000 | $4.50 | Lost on pricing |
| Sealed Air | Sep-09 | Durables | Smith | DFW Complex | N | Pratt | 2,000 | 25000 | $22.97 | |
| Sage V | Sep-09 | Food | Smith | Sealy | L | | 350 | 4500 | $41.80 | Moved to Arkansas |
| Bay Valley Foods | Aug-09 | Process Foods | Smith | San Antonio | N | SSCC | 850 | 13000 | $24.04 | Lost on pricing |
| Bell Ind | Aug-09 | Folding Cartons | Schiltz | Austin | L | SSCC | | 27,000 | $2.64 | |
| Crate and Barrel | Jul-09 | Retail | Wise | Bedford Park | N | Great Northern | 375 | 5,000 | $3.00 | Bedford portion sold through IP Chicago |
| Cook's (Smithfiled/Farmland) | Jun-09 | Protein | Grover | Omaha | N | PCA | 3,100 | 38,700 | $1.40 | will be running in to August at a minimum |
| Conagra | Jun-09 | FMCG | Grover | Omaha | N | SSCC | 2,850 | 40,000 | $43.30 | Preprint that was part of National bid |
| Sears/K-Mart | Jun-09 | Distribution | Grover | Golden | N | ? | 163 | 3,300 | $6.20 | Lost in online National RFQ |
| Office Depot | Jun-09 | Durables | Grover | Golden | N | TIN | 513 | 8,732 | $9.32 | National Account / Payment Issues |
| Ring | Jun-09 | Durables | Schiltz | Austin | N | N/A | 1,750 | 28,000 | $8.00 | Plant closure |
| Little Ceasars | Jun-09 | Pizza | Smith | Grand Praire | N | SSCC | 3,156 | 60,000 | $14.50 | Lost on pricing |
| Master Packaging | Jun-09 | Distribution | Smith | OKC | L | S Missouri | 600 | 10,000 | | Logistics |
| Michael Angelo's | Jun-09 | Process Foods | Smith | San Antonio | L | Pratt | 1,300 | 19,500 | $19.16 | Lost on pricing. |
| Ventura Foods | Jun-09 | Process Foods | Schiltz | Austin | N | MCB | | 45,000 | $11.00 | |
| H.Field & Sons | Jun-09 | | Wise | Northlake | L | SSCC | 1,000 | 15,000 | $6.25 | Credit issues |
| Champion Container | Jun-09 | | Wise | Northlake | L | | 700 | 10,000 | $16.62 | Champion lost Tiger Direct business |
| Sears/K-Mart | Jun-09 | | Wise | Aurora | N | Inland | 2,000 | 31,000 | $12.00 | Lost on Natl Bid |
| Appleton Coated | May-09 | Paper | Ahola | MTW | L | GP | | 7000 | $21.50 | Lost to competitor - annual bid |
| Texas American | May-09 | Protein | Smith | DFW Complex | L | Bates | 3,000 | 50,000 | $9.00 | Lost on pricing |
| Domtar | Apr-09 | Paper | Ahola | Manitowoc | N | GP | 1,500 | 27,000 | $2.00 | Lost natl bid |
| Freedman Food Service | Apr-09 | Protein | Grover | Golden | L | PCA | 60 | 1,200 | $25.30 | National agreement deal made with PCA |
| Carneco (Cargill) | Apr-09 | Protein | Grover | Omaha | N | PCA | 1,329 | 18,600 | $3.90 | Purchased by Cargill |
| Shamrock Foods(Black Jack Pizza) | Apr-09 | Pizza | Grover | Golden | L | TIN | 705 | 15,008 | $24.50 | Price reduction 34.3% |
| Carneco(Tyson Co-pack) | Apr-09 | Protein | Grover | Omaha | N | N/A | 190 | 26,400 | ($3.42) | Dispersed to other locations |
| Victory | Apr-09 | moving boxes | Smith | OKC | N | Pratt | 966 | 17,000 | $3.00 | Lost on pricing |
| Cedar Box | Apr-09 | Sheets | Schiltz | Fridley | L | Liberty | 370 | 6,000 | $37.00 | Customer on credit hold |
| Supply One Meadowbrook | Apr-09 | | Wise | Lincoln | L | | 1,540 | 22,000 | $18.50 | Bankruptcy |
| Kong Company | Mar-09 | Pet Care | Grover | Golden | L | TIN/Victory Pkg | 286 | 4,000 | $15.00 | JIT Program, price reduction 21.3% |
| Jasper Products | Mar-09 | Process Foods | Grover | KC Complex | L | SSCC | 375 | 6,000 | $13.00 | Some items lost to SSCC on nat'l bid |
| Premium Waters | Mar-09 | Process Foods | Schiltz | MN | L | Green Bay Pkg | 788 | 15,000 | $9.32 | Lost on pricing |
| Medline | Mar-09 | Hospital Equip | Smith | San Antonio | L | SSCC Mexico | 2,000 | 24,000 | $5.00 | Lost on pricing |
| Medline | Mar-09 | Hospital Equip | Wise | Northlake | L | SSCC | 2,500 | 35,000 | $10.00 | Lost to Natl Bid |
| ConAgra (Davd & Sons) | Mar-09 | Process Foods | Wise | Belleville | N | | 704 | 11,000 | $21.94 | |
| Graphic Packaging | Mar-09 | | Wise | Lincoln | N | Louisiana Corrug | 924 | 12,000 | $25.10 | GPI cut medium deal with Louisiana Corr |
| Bay Valley Foods | Mar-09 | | Wise | Rockford | N | SSCC | 4,000 | 80,000 | $8.00 | Lost on Natl Bid |
| DFA Springfiled | Mar-09 | | Wise | Belleville | N | | 441 | 6,000 | $19.39 | |
| Bay Valley Foods | Feb-09 | Process Foods | Ahola | Manitowoc | N | SSCC | 1,500 | 25,000 | | Bd Member of BV former Altivity EE |
| Western Sugar | Feb-09 | Process Foods | Grover | Golden | L | TIN | 1,114 | 14,819 | $19.80 | Connell Group bid, price reduction 12-14% |
| Bay Valley Foods | Feb-09 | Process Foods | Wise | Rockford | N | SSCC | | 55,000 | $10.00 | |
| Blackhawk Molding | Feb-09 | Plastic closure | Wise | Aurora | L | GP | 325 | 4,500 | $8.00 | Lost on pricing |
| Daddy Ray's | Jan-09 | | Wise | Lincoln | L | | | 7,000 | $23.43 | |
| ConAgra - Macon | Jan-09 | | Wise | Belleville | N | SSCC | 1,920 | 30,000 | ($4.50) | Lost on Natl Bid |
| ConAgra - Rossville | Jan-09 | | Wise | Lincoln | N | SSCC | 2,430 | 36,000 | ($6.50) | Lost on Natl Bid |
| Johnsonville | Jan-09 | Protein | Ahola | Manitowoc | L | GP | 1,200 | 23,000 | | One of the largest volume items |
| Great Kitchens | Jan-09 | | Ahola | Cedarburg | L | Midland Container | 1,000 | 20,000 | | |
| Minnesota Corrugated Box | Jan-09 | Sheets | Schiltz | Fridley | L | Pratt | 10,000 | 150,000 | $9.00 | Lost on pricing |
| Sherwin Williams | Jan-09 | Durables | Smith | DFW Complex | N | Pratt | 600 | 10,000 | | Lost on pricing |
| Staples | Jan-09 | Distribution | Wise | Bedford Park | L | | 600 | 10,000 | $5.00 | Lost on pricing |
| Cook's (Smithfiled/Farmland) | Jan-09 | Protein | Grover | KC Complex | N | PCA | 3,200 | 45,000 | | Lost to PCA in national bid |
| | | | | | | | | | | |
| Total | | | | | | | 66,274 | 1,197,259 | | |

# Exhibit 18

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 65 of 512 PageID #:20293
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512



PAPERBOARD

# CONTAINERBOARD & CORRUGATED PACKAGING

- OVERVIEW — 233
- LINERBOARD — 233
- CORRUGATING MEDIUM — 238
- CORRUGATED BOXES — 241
- INDUSTRY ECONOMICS — 243
- CURRENT MARKETS — 250
- EUROPEAN MARKET — 252
- ASIAN MARKET — 257

## NORTH AMERICAN OVERVIEW

The U.S. is the world's largest corrugated box maker, accounting for an estimated 27% of the world's box production. Growth in U.S. corrugated box demand has traditionally tracked U.S. real GDP growth closely, but in recent years the industry has seriously lagged overall economic growth. Among reasons for this underperformance have been the U.S. trade deficit and flood of merchandise into the U.S. packed in boxes made overseas. At the same time there has been enormous growth in containerboard and boxmaking capacity in Asia, particularly in China. Another factor for the weaker demand have been changes in the retail environment in which mass merchandisers are placing pressure on consumer products companies to reduce cost and the amount of packaging used to ship their products. The U.S. is also the world's largest producer and exporter of kraft linerboard but offshore demand has been declining due to significant capacity expansion in Asia and Europe based on recycled fiber. The combination of sluggish domestic demand and declining linerboard export shipments combined with incremental capacity growth has led to recent significant industry overcapacity, resulting in mill closures and volatility in prices. The Canadian containerboard industry has been undergoing an even more severe retrenchment due to the strong Canadian dollar.



## LINERBOARD

Linerboard is a commodity grade of paperboard used in the production of corrugated shipping containers. It is used in the inner and outer facing (liner) in combination with corrugating medium (the fluted inner sheet) to form the rigid structure of the combined board in the corrugating process. Medium is

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 66 of 512 PageID #:20294
Case: 15-2385 Document: 56-26 Filed: 10/27/2015 Pages: 512

formed on the corrugator into waves called flutes and adhesive is applied to the tips of the flutes, which are then typically faced on both sides with linerboard. The combined board is then cut and shaped into corrugated containers. Linerboard provides the strength component of a container, while corrugating medium gives rigidity or stiffness. Linerboard is sold in rolls; the width of the roll is determined by the width of corrugators.

Unbleached linerboard is made in a wide range of basis weights. The standard kraft linerboard weight has traditionally been 42 lb/1,000 ft², but basis weights have been trending lower reflecting a trend to lighter weight, high-compression strength containerboard. In the last several years, 34–37 lb "high performance" linerboard has become the most common basis weight in the U.S. In 2004, 34–37 lb weights accounted for 25% of unbleached linerboard production for domestic use, while 42-lb accounted for 23.5%, down from more than 50% in the 1980s. Linerboard is now sold on ring crush value, which determines compression strength or the stacking strength of the finished box.

The shift to lower basis weight linerboard and medium began to grow when in 1991 railroad and truck freight classifications committees approved an

### NORTH AMERICAN STATISTICS FOR LINERBOARD

| (000 tons) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2005e | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 | 1995 | 1994 |
| **U.S.** | | | | | | | | | | | | |
| Box shipments (billion ft²) | 389.0 | 390.5 | 379.9 | 379.4 | 379.6 | 401.3 | 405.1 | 395.5 | 390.1 | 377.8 | 372.5 | 374.8 |
| % change | -0.4 | 2.8 | 0.1 | 0.0 | -5.4 | -0.9 | 2.4 | 1.4 | 3.3 | 1.4 | -0.6 | 6.0 |
| Production, total [1] | 23,970 | 24,336 | 23,327 | 23,455 | 22,414 | 23,712 | 25,160 | 24,622 | 25,000 | 23,537 | 22,537 | 22,318 |
| % change | -1.5 | 4.3 | -0.5 | 4.6 | -5.5 | -5.8 | 2.2 | -1.5 | 6.2 | 4.4 | 1.0 | 6.0 |
| Production domestic use [1] | 21,210 | 21,614 | 20,471 | 20,823 | 19,953 | 20,920 | 21,963 | 20,911 | 20,477 | 19,770 | 19,773 | 19,313 |
| % change | -1.8 | 5.6 | 0.8 | 2.4 | -3.1 | -3.6 | 4.1 | 4.3 | 1.6 | 0.6 | 2.3 | 5.9 |
| Capacity [1,2] | 25,637 | 25,479 | 25,536 | 25,661 | 25,891 | 26,414 | 25,973 | 27,070 | 26,917 | 25,608 | 24,022 | 23,079 |
| % change | 0.6 | -0.2 | -0.5 | -0.9 | -2.0 | 1.7 | -4.1 | 0.6 | 5.1 | 6.6 | 4.1 | 3.8 |
| Utilization rate % | 93.5 | 95.5 | 91.3 | 91.4 | 86.6 | 89.8 | 96.9 | 91 | 92.9 | 91.9 | 93.8 | 96.7 |
| Average annual price $ [3] | $425 | $418 | $371 | $391 | $430 | $467 | $401 | $370 | $340 | $380 | $510 | $375 |
| % change | 1.7 | 12.7 | -5.1 | -9 | -7.9 | 16.4 | 8.3 | 11.7 | -10.5 | -25.5 | 36 | 22.5 |
| Exports | 2,760 | 2,722 | 2,856 | 2,632 | 2,460 | 2,792 | 3,196 | 3,711 | 4,523 | 3,767 | 2,762 | 3,005 |
| Imports [4] | 720 | 764 | 610 | 667 | 608 | 620 | 590 | 427 | 300 | 290 | 315 | 294 |
| Apparent consumption | 21,930 | 22,378 | 21,081 | 21,490 | 20,562 | 21,540 | 22,544 | 21,338 | 20,777 | 20,060 | 20,090 | 19,607 |
| lb/capita | 147.9 | 152.4 | 147.2 | 147 | 144 | 155.1 | 163.3 | 156.1 | 153.3 | 150.3 | 151.1 | 149.4 |
| 000 tons/billion $ real GDP (1992 | 1.96 | 2.06 | 2.80 | 2.75 | 2.67 | 2.81 | 2.98 | 2.89 | 2.9 | 2.89 | 2.95 | 2.94 |
| (000 tonnes) | | | | | | | | | | | | |
| **Canada** | | | | | | | | | | | | |
| Production | 1,960 | 2,014 | 1,828 | 1,931 | 1,833 | 1,891 | 1,891 | 1,750 | 1,628 | 1,624 | 1,575 | 1,638 |
| % change | -2.7 | 10.2 | -5.4 | 5.3 | -3.1 | 0.0 | 8.1 | 7.4 | 0.3 | 3.1 | -3.8 | 14.7 |
| Capacity | 2,127 | 2,124 | 2,075 | 2,062 | 2,000 | 1,954 | 1,981 | 1,911 | 1,759 | 1,758 | 1,643 | 1,699 |
| % change | 0.1 | 2.4 | 0.6 | 1.5 | 3.1 | -1.4 | 3.7 | 8.6 | 0.0 | 7.0 | -3.3 | 4.7 |
| Utilization rate | 92.1 | 94.8 | 88.1 | 93.6 | 91.7 | 96.8 | 95.5 | 91.6 | 92.6 | 92.4 | 95.9 | 96.4 |
| Exports | 930 | 945 | 803 | 860 | 805 | 902 | 936 | 812 | 809 | 726 | 638 | 710 |
| Imports | 345 | 340 | 345 | 350 | 350 | 347 | 338 | 275 | 300 | 257 | 184 | 132 |

n.a. = not available.
1. Production and capacity includes unbleached kraft, white top, bleached and recycled linerboard.
2. Based on 2004 AF&PA survey (assumes closure of 203,000 Smurfit-Stone PM in 2Q/2003 offset by capacity creep).
3. *Pulp & Paper Week* (42-lb unbleached kraft liner delivered in the eastern U.S. before customer specific discounts).

Source: AF&PA, PPPC.

CONFIDENTIAL

NORAMPAC00018644

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 67 of 512 PageID #:20295
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING 235

"alternate" Rule 41 and Item 222 which (1) replaced mullen or bursting strength with compression strength as the most important measurement of box performance, and (2) eliminated mandatory basis weight requirements. These changes encouraged use of lighter weight linerboard as long as it had the required ring crush or STFI value. Ring crush relates to the top-to-bottom compression strength of the finished corrugated box, which is a critical measure of stacking height. Increased transport and stacking of boxes on pallets made compression strength an important measure of box performance.

The earlier mullen test measured bursting strength,

which showed how well a corrugated container protects its contents during individual loading of boxes into railroad cars or trucks. The shift to lighter weight, yet strong containerboard reduces mill costs because less fiber is required to impart strength. Although the industry has no standard definition for high-performance grades, some industry managers define high performance containerboard as those grades of linerboard offering at least two pounds of ring crush strength for each pound of basis weight.

About 83% of the 24.3 million tons of linerboard produced in the U.S. in 2004 is unbleached kraft linerboard, which under industry definitions must contain at least 80% sulfate (kraft) pulp. However, the percentage of wastepaper fiber used in unbleached kraft board has

## U.S. LINERBOARD PRODUCTION BY FURNISH

(000 tons)

|  | Unbleached kraft[1] | % change | Recycled linerboard[2] | % change |
|---|---|---|---|---|
| 2004 | 19,992 | 4.3% | 4,195 | 3.6% |
| 2003 | 19,154 | 2.7 | 4,050 | -12.7 |
| 2002 | 18,656 | 3.4 | 4,638 | 8.8 |
| 2001 | 18,041 | -6.4 | 4,263 | -0.7 |
| 2000 | 19,278 | -6.7 | 4,294 | -1.6 |
| 1999 | 20,655 | 0.2 | 4,364 | 13.1 |
| 1998 | 20,614 | -1.2 | 3,858 | -2.7 |
| 1997 | 20,861 | 5.0 | 3,967 | 13.1 |
| 1996 | 19,875 | -2.8 | 3,508 | 81.2 |
| 1995 | 20,450 | -0.3 | 1,936 | 17.8 |
| 1994 | 20,514 | 4.9 | 1,644 | 22.1 |
| 1993 | 19,561 | -1.2 | 1,346 | 71.7 |
| 1992 | 19,808 | 3.3 | 784 | 25.8 |
| 1991 | 19,179 | 2.0 | 623 | 92.8 |
| 1990 | 18,808 | 4.9 | 323 | −16.8 |
| 1989 | 17,931 | 1.4 | 388 | −4.7 |
| 1988 | 17,679 | 0.8 | 407 | −14.9 |
| 1987 | 17,535 | 7.9 | 478 | 13.8 |
| 1986 | 16,256 | 8.0 | 420 | 47.4 |
| 1985 | 15,047 | −5.5 | 285 | 39.7 |
| 1984 | 15,922 | 7.1 | 204 | −29.4 |
| 1983 | 14,871 | 11.2 | 289 | 3.6 |
| 1982 | 13,370 | −6.8 | 279 | −13.9 |
| 1981 | 14,341 | 2.1 | 324 | −27.2 |
| 1980 | 14,044 | 1.9 | 445 | 10.7 |
| 1979 | 13,787 | 4.2 | 402 | 57 |

e=estimate.
1. Includes white top, wet strength, and export; excludes bleached, other uses.
2. Recycled is for domestic use and excludes small amount of export tonnage (11,000 tons in 2004 and 21,000 in 2003).

Source: American Forest & Paper Assn.

## U.S. CORRUGATING MEDIUM PRODUCTION BY FURNISH

(000 tons)

|  | Semichemical medium[1] | % change | Recycled medium | % change |
|---|---|---|---|---|
| 2004 | 6,527 | 7.1 | 3,925 | 4.4 |
| 2003 | 6,096 | 4.4 | 3,759 | -9.2 |
| 2002 | 5,837 | 4.7 | 4,140 | 2.2 |
| 2001 | 5,573 | 6.2 | 4,051 | 1.9 |
| 2000 | 5,940 | 1.1 | 3,965 | -2.3 |
| 1999 | 6,007 | 0.8 | 4,058 | 9.6 |
| 1998 | 5,867 | 2.4 | 3,704 | -2.3 |
| 1997 | 6,031 | 7.4 | 3,793 | -0.1 |
| 1996 | 5,616 | -1.2 | 3,795 | 15.2 |
| 1995 | 5,683 | -4.7 | 3,295 | 1 |
| 1994 | 5,966 | 5.2 | 2,980 | 11.8 |
| 1993 | 5,672 | −1.6 | 2,666 | 10.6 |
| 1992 | 5,762 | 3.8 | 2,396 | 11.3 |
| 1991 | 5,552 | −1.6 | 2,097 | 2.2 |
| 1990 | 5,640 | −0.3 | 2,052 | 12.7 |
| 1989 | 5,656 | −0.1 | 1,820 | −0.1 |
| 1988 | 5,664 | 2.3 | 1,823 | 9 |
| 1987 | 5,536 | 2.9 | 1,673 | 9.6 |
| 1986 | 5,376 | 5.7 | 1,526 | 12.2 |
| 1985 | 5,088 | −1.6 | 1,359 | 9.8 |
| 1984 | 5,169 | 9.3 | 1,385 | 6.1 |
| 1983 | 4,731 | 7.8 | 1,305 | 14.6 |
| 1982 | 4,389 | −7.0 | 1,139 | −0.2 |
| 1981 | 4,719 | −0.1 | 1,141 | 9 |
| 1980 | 4,723 | 0.7 | 1,047 | −12.9 |
| 1979 | 4,689 | 5.6 | 1,202 | 0.3 |
| 1978 | 4,439 | 4.1 | 1,198 | 0.5 |

e = estimate.
1. Includes small amount of tonnage for other uses from 1970-86.
Source: American Forest & Paper Assn.

NORAMPAC00018645

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 68 of 512 PageID
Case: 15-2385    Document: 56-26    Filed: 10/27/2015    Pages: 512
#:20296

236  2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING

been growing, and more mills are beginning to produce "kraft" linerboard with more than 20% recycled fiber content. Average recycled fiber content of kraft linerboard in 2004 was 15.7%, up from around 5% in 1980. Meanwhile, recycled linerboard (usually based on 100% recycled fiber) grew rapidly in the 1990s due to a combination of favorable economics, customer demand for "environmentally friendly" packaging, and new technology, which made the quality of recycled comparable to virgin linerboard. Recycled linerboard now accounts for about 17% of total U.S. linerboard production (4.2 million tons in 2004), up from 2–3% in the 1980s.

Unbleached kraft linerboard is produced at large, integrated mills located close to softwood timber supplies. About 85% of U.S. unbleached kraft linerboard capacity is located in the South, with most of the remainder in the West, where production costs are higher. Recycled linerboard mills are typically smaller, less capital intensive, and located near major urban areas, where wastepaper supplies are abundant and shipping cost to customers are low. About a dozen recycled containerboard "mini mills" were installed during the 1980s with capacity typically in the 100,000 to 150,000 ton/yr range. Many of the small recycled linerboard mills have been built by independent converters, seeking their own board supply and representing a major structural shift in the industry.

Most kraft linerboard is produced on wide (220 to 348-in. trim), conventional fourdrinier paper machines at speeds reaching 2,000 fpm or more. About 75% of industry capacity is now represented by machines with capacity to produce 300,000 to 500,000 tons/yr. Normally the wet end of the fourdrinier machine used to manufacture linerboard has two forming devices, or headboxes, which form two different plies, or layers, of fiber. The primary layer, comprising up to 85% of the fiber furnish, contains coarse, strong, high-yield kraft fiber, which means that a minimum amount of the natural binding chemicals contained in the wood is removed during the pulping process. The top layer contains higher-quality, more highly refined pulp for good printing surface. In some grades, the top layer may be bleached fiber used to produce a white top appearance over an unbleached basesheet.

Special chemical additives are either mixed into the pulp slurry or extruded onto the surface of the formed sheet to give linerboard its unique properties. The most common internal additives are sizes and wet-

## U.S. CONTAINERBOARD PRODUCTION BY BASIS WEIGHT

| Basis weight (lb/1,000 ft²) | Distribution (%) | |
|---|---|---|
| Regular Unbleached Kraft Linerboard [1] | 2004 | 1990 |
| 26 & under | 3.5% | 3.7% |
| 27-33 | 8.5 | 12.1 |
| 34-37 | 25.0 | 3.0 |
| 38-41 | 1.0 | 3.4 |
| 42 | 23.5 | 48.3 |
| 43-54 | 5.0 | 1.9 |
| 55-61 | 18.9 | 3.8 |
| 62-69 | 10.9 | 20.5 |
| 70-89 | 2.3 | 0.7 |
| 90 & OVER | 1.5 | 2.6 |
| | | |
| Semichemical Medium [1] | | |
| Under 26 | 28.5 | 0.9 |
| 26 | 26.7 | 67.6 |
| 27-32 | 7.2 | 3.2 |
| 33 | 21.1 | 18.6 |
| 36 | 7.5 | 2.9 |
| 40 | 4.9 | 6.8 |
| Over 40 | 4.2 | 0.0 |

1. For domestic use.
2. Semichemical 33 and 36 lb contain small percentage of slightly higher basis weights.
Source: American Forest & Paper Assn.

## U.S. WHITE LINERBOARD PRODUCTION [1]

| | (000 tons) | | | |
|---|---|---|---|---|
| | White-top | % change | Solid bleached | % change |
| 2004 | 1,315 | 1.3% | 149 | 21.1% |
| 2003 | 1,298 | 28.8 | 123 | 6.0 |
| 2002 | 1,008 | -1.0 | 116 | 5.5 |
| 2001 | 1,018 | 0.7 | 110 | -21.4 |
| 2000 | 1,011 | -18.5 | 140 | 0.0 |
| 1999 | 1,240 | -6.1 | 140 | 6.0 |
| 1998 | 1,321 | -3.3 | 149 | -13.4 |
| 1997 | 1,366 | -0.9 | 172 | 11.6 |
| 1996 | 1,379 | -8.9 | 154 | 1.3 |
| 1995 | 1,514 | -4.2 | 152 | -0.5 |
| 1994 | 1,580 | 8.1 | 160 | 1.3 |
| 1993 | 1,462 | 2.5 | 158 | 0.0 |
| 1992 | 1,427 | 9.7 | 160 | -9.6 |
| 1991 | 1,301 | 3.3 | 177 | 27.3 |
| 1990* | 1,260 | 10.0 | 139 | -21.9 |
| 1985 | 837 | | 114 | |
| 1980 | 628 | | 96 | |
| 1975 | 536 | | 82 | |

1. Production for domestic use.
* change from 1989.
Source: American Forest & Paper Assn.

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 69 of 512 PageID #:20297
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

2005 Pulp & Paper Global Fact & Price Book—Paperboard: Containerboard/Corrugated Packaging 237

strength agents used to develop desired sheet strength and moisture resistance. About 2% of linerboard produced in the U.S. is wet-strength treated (532,000 tons in 2004). The most common surface additive is starch, which is applied at a size press on the paper machine to seal the surface of the sheet for increased strength and printing smoothness.

Most U.S. linerboard is unbleached, but grades with a white printing surface represent about 6% of U.S. linerboard production. The grades include white-top, mottled white, and solid bleached linerboard. White linerboard production grew in the 1980s as consumer products companies became interested in corrugated boxes that not only transport merchandise but would also catch customer attention in the aisles of mass merchandise stores

with few sales personnel. The growth of white linerboard grades peaked in the mid-1990s as box users have attempted to reduce their packaging costs. White-top linerboard production in 2004 totaled 1.3 million tons, down from a peak of nearly 1.6 million tons in 1994. Solid bleached kraft linerboard production was 149,000 tons in 2004. Some companies also offer unbleached linerboard with a smooth surface for improved graphic quality, as well as coated white linerboard.

White-top linerboard has been replacing mottled white linerboard for improved graphic quality boxes. Mottled white linerboard is produced by using a secondary headbox to lay down a thin layer of bleached pulp on top of an unbleached sheet, creating a swirl effect. White-top is produced using a multi-ply former

## NORTH AMERICAN STATISTICS FOR CORRUGATING MEDIUM

(000 tons)

| | 2005e | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 | 1995 | 1994 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **U.S.** | | | | | | | | | | | | |
| Box shipments (billion ft²) | 389.0 | 390.5 | 379.9 | 379.4 | 379.6 | 401.3 | 405.1 | 395.5 | 390.1 | 377.8 | 372.5 | 374.8 |
| % change | -0.4 | 2.8 | 0.1 | 0.0 | -5.4 | -0.9 | 2.4 | 1.4 | 3.3 | 1.4 | -0.6 | 6.0 |
| Production [1] | 10,420 | 10,479 | 9,885 | 10,930 | 10,021 | 9,690 | 9,933 | 10,085 | 9,609 | 9,853 | 9,439 | 8,982 | 8,932 |
| % change | -0.5 | 6.0 | -1.4 | 3.4 | -2.4 | -1.5 | 5.0 | -2.5 | 4.4 | 5.1 | 0.6 | 4.6 |
| Capacity [1,2] | 10,966 | 11,095 | 10,930 | 11,160 | 11,306 | 11,003 | 10,669 | 10,462 | 10,304 | 10,045 | 9,670 | 9,020 |
| % change | -1.2 | 1.5 | -2.1 | -1.3 | 2.8 | 3.3 | 0.0 | 1.5 | 2.6 | 3.9 | 7.2 | 3.9 |
| Utilization rate % [1] | 95.0 | 94.4 | 90.4 | 89.8 | 85.7 | 90.3 | 94.7 | 91.8 | 95.6 | 94.0 | 92.9 | 99.0 |
| Average annual price $ [4] | $396 | $383 | $325 | $350 | $389 | $446 | $360 | $315 | $272 | $314 | $431 | $360 |
| % change | 3.4 | 17.8 | -6.8 | -11 | -12.8 | 23.8 | 14.3 | 15.8 | -13.3 | -27.1 | 19.7 | 24.5 |
| Exports | 175 | 181 | 165 | 358 | 373 | 282 | 316 | 241 | 282 | 234 | 155 | 158 |
| Imports | 330 | 398 | 429 | 468 | 552 | 563 | 572 | 530 | 509 | 389 | 308 | 321 |
| Apparent consumption | 10,575 | 10,696 | 10,149 | 11,270 | 11,485 | 10,214 | 10,314 | 9,898 | 10,062 | 9,594 | 9,135 | 9,095 |
| lb/capita | 70.6 | 72.8 | 72.5 | 69.3 | 71.7 | 72 | 75.1 | 71.4 | 73.2 | 70.5 | 69.5 | 68.3 |
| 000 tons/billion real GDP (1992) | 0.93 | 0.99 | 0.98 | 1.21 | 1.04 | 1.29 | 1.16 | 1.13 | 1.2 | 1.2 | 1.36 | 1.35 |

(000 tonnes)

| | 2005e | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 | 1995 | 1994 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Canada** | | | | | | | | | | | | |
| Production | 785 | 891 | 966 | 1,059 | 1,100 | 1,117 | 1,137 | 1,075 | 1,061 | 1,028 | 920 | 899 |
| % change | -11.8 | -17.1 | -8.8 | -3.7 | 0.1 | -2.8 | 5.7 | 1.3 | 3.2 | 11.7 | 2.3 | 8.8 |
| Capacity [3] | 887 | 977 | 1,104 | 1,200 | 1,223 | 1,171 | 1,172 | 1,203 | 1,106 | 1,021 | 972 | 950 |
| % change | -9.2 | -11.5 | -8.0 | -1.9 | 4.4 | 0.0 | -2.6 | 8.8 | 8.3 | 2.2 | 2.3 | 3.7 |
| Utilization rate % | 88.5 | 91.2 | 87.5 | 88.3 | 89.9 | 95.4 | 97.0 | 89.4 | 95.9 | 100.6 | 94.7 | 94.7 |
| Exports | 330 | 380 | 482 | 522 | 635 | 609 | 615 | 571 | 596 | 517 | 422 | 404 |

1. Includes semichemical and recycled medium.
2. AF&PA capacity for 2005 adjusted downward by 200,000 tons to reflect shutdown of Menasha's Otsego, Mich., and International Paper's Fort Madison, Iowa, mills in 3Q/2005, offset by capacity creep and swings.
3. PPPC capacity for 2005 adjusted downward by 90,000 tonnes to reflect shutdown of Smurfit-Stone's Bathurst, N.B., mill mid-year.
4. *Pulp & Paper Week* (26-lb semichemical medium, eastern U.S.)
Source: American Forest & Paper Assn.; Pulp & Paper Products Council.

CONFIDENTIAL
NORAMPAC00018647

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 70 of 512 PageID #:20298
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

to produce a premium grade with a solid white surface on the unbleached sheet. White top typically sells for $170-$190/ton more than 42-lb unbleached kraft linerboard. Major North American producers include Smurfit-Stone Container (1.1 million tons/yr), Green Bay Packaging (350,000 tons/yr), Simpson Tacoma Kraft (250,000 tons/yr) and International Paper (175,000 tons/yr), and Norske Canada (110,000 tons/yr). In Canada, Kruger produces about 155,000 tons/yr of recycled white linerboard.

## CORRUGATING MEDIUM

Corrugating medium is used to form the fluting

material in corrugated board. In the corrugating process, it is formed on the corrugator into waves called flutes. Adhesive is applied to the tips of the flutes, which are then typically faced on both sides with linerboard to form rigid combined board for making boxes.

Medium is made from semichemical pulp using hardwoods and recycled fiber. In 2004, nearly 63% of the 10.5 million tons of medium produced in the U.S. was designated as semichemical medium and made primarily from semichemical pulp, and 37% was recycled medium (usually produced from 100% recycled fiber). The amount of recovered paper used in semichemical medium has been rising and in 2004 was 50% compared with only 25.6% in 1980, according to American Forest & Paper Assn. AF&PA still defines

### MONTHLY CONTAINERBOARD INVENTORIES AT U.S. BOX PLANTS AND MILLS

(000 tons/weeks of supply[1])

| End of month | 2005 Tons | 2005 Weeks | 2004 Tons | 2004 Weeks | 2003 Tons | 2003 Weeks | 2002 Tons | 2002 Weeks | 2001 Tons | 2001 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|
| January | 2,695 | 4.2 | 2,577 | 4.1 | 2,868 | 5.1 | 2,812 | 5 | 2,977 | 5.2 |
| February | 2,731 | 4.7 | 2,511 | 4.4 | 2,755 | 5 | 2,730 | 5 | 3,006 | 5.5 |
| March | 2,648 | 4.6 | 2,354 | 4.2 | 2,738 | 4.8 | 2,567 | 4.5 | 2,855 | 5.2 |
| April | 2,619 | 4.2 | 2,292 | 3.6 | 2,725 | 4.5 | 2,577 | 4.4 | 2,826 | 4.6 |
| May | 2,545 | 4.4 | 2,287 | 3.8 | 2,715 | 4.9 | 2,500 | 4.5 | 2,725 | 4.9 |
| June | 2,558 | 4.4 | 2,256 | 3.8 | 2,680 | 4.6 | 2,516 | 4.1 | 2,674 | 4.7 |
| July | 2,549 | 4.0 | 2,443 | 3.9 | 2,677 | 4.7 | 2,596 | 4.3 | 2,776 | 4.7 |
| August | 2,533 | 4.6 | 2,447 | 4.3 | 2,616 | 4.7 | 2,601 | 4.6 | 2,766 | 5.1 |
| September | 2,369 | 3.9 | 2,516 | 4.2 | 2,610 | 4.4 | 2,735 | 4.4 | 2,760 | 4.5 |
| October | 2,182 | 3.3 | 2,628 | 4.1 | 2,537 | 4.2 | 2,726 | 4.6 | 2,635 | 4.6 |
| November | 2,179 | 3.5 | 2,676 | 4.5 | 2,455 | 3.9 | 2,729 | 4.6 | 2,671 | 4.6 |
| December | n.a. | n.a. | 2,687 | 4.6 | 2,417 | 4.3 | 2,867 | 5.2 | 2,752 | 4.9 |

| End of month | 2000 Tons | 2000 Weeks | 1999 Tons | 1999 Weeks | 1998 Tons | 1998 Weeks | 1997 Tons | 1997 Weeks | 1996 Tons | 1996 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|
| January | 3,103 | 4.8 | 2,724 | 4.2 | 3,055 | 4.8 | 3,081 | 5.5 | 3,144 | 5.6 |
| February | 3,137 | 5.4 | 2,663 | 4.5 | 3,097 | 5.4 | 3,101 | 5.6 | 3,111 | 6.0 |
| March | 3,000 | 5 | 2,571 | 4.4 | 3,089 | 5.4 | 3,008 | 5.1 | 3,009 | 5.4 |
| April | 3,037 | 4.5 | 2,542 | 4.0 | 2,937 | 4.6 | 2,855 | 4.8 | 3,036 | 5.2 |
| May | 3,056 | 5.4 | 2,568 | 4.3 | 2,919 | 4.9 | 2,719 | 4.8 | 2,906 | 5.4 |
| June | 2,974 | 5 | 2,528 | 4.3 | 2,931 | 5.0 | 2,609 | 4.5 | 2,835 | 4.8 |
| July | 3,042 | 4.5 | 2,610 | 4.1 | 2,957 | 4.9 | 2,556 | 4.4 | 2,878 | 4.9 |
| August | 2,920 | 5.2 | 2,602 | 4.4 | 2,970 | 5.0 | 2,544 | 4.3 | 2,759 | 4.9 |
| September | 2,939 | 4.7 | 2,655 | 4.3 | 2,955 | 5.0 | 2,486 | 4.1 | 2,816 | 4.9 |
| October | 2,849 | 4.5 | 2,671 | 4.1 | 2,827 | 4.5 | 2,466 | 4.1 | 2,790 | 4.8 |
| November | 2,792 | 4.8 | 2,695 | 4.5 | 2,728 | 4.5 | 2,350 | 4.0 | 2,682 | 4.6 |
| December | 2,812 | 4.9 | 2,797 | 4.9 | 2,605 | 4.6 | 2,678 | 4.6 | 2,812 | 5.1 |

p = preliminary, n.a. = not available.
1. Weeks of supply based on dividing inventories by average weekly usage in corrugated box plants during prior month, excluding holidays.
Sources: Fibre Box Assn., American Forest & Paper Assn.

CONFIDENTIAL
NORAMPAC00018648

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 71 of 512 PageID #:20299
Case: 15-2385 Document: 56-26 Filed: 10/27/2015 Pages: 512

semichemical medium as containing no more than 25% recycled fiber.

Semichemical medium is normally manufactured on conventional fourdrinier paper machines, although some mills use twin-wire machines. Semichemical medium contains some long fibers to improve paper machine runability and lessen the tendency of medium to crack and break upon corrugating. Hardwood chips are the main furnish, along with OCC and new double-lined corrugated cuttings (NDLK).

The semichemical pulping process includes a mild chemical pulping of chips prior to mechanical defibrating. This produces a material with high yield—60%–80%—as well as an intermediate strength level. Neutral sulfite semichemical (NSSC) pulp, developed in the 1920s, was originally used. It contained sodium sulfite and soda ash, and pulping was initially performed in rotary batch digesters. Most semichemical mills now use continuous digesters and have shifted from NSSC to the newer carbonate-base and green liquor semichemical pulping processes, which are simpler and less capital-intensive and produce less pollution.

Recycled medium has grown to 37% of total medium production from 24% in 1980. Recycled medium made at newer mills using the latest technology is considered functionally equivalent to semichemical medium. The growth in recycled medium has been driven by producers' desire for lower-cost materials, the emergence of recovered paper as a reliable material for making medium, and the entry of 100% recycled medium mills

### NORTH AMERICAN CONTAINERBOARD MACHINE/MILL SHUTDOWNS, 2000–2006[1]

| Company | Mill location | Grade | Capacity |
|---|---|---|---|
| APC-Pomona Paper | Pomona, Calif. | 1 PM medium | 123,000 |
| Bay State Paper | Hyde Park, Mass. | 1 PM liner/medium | 103,000 |
| International Paper | Oswego, N.Y. | 1 PM liner/medium | 100,000 |
| International Paper | Roanoke Rapids, N.C. | 1 PM linerboard [3] | 300,000 |
| International Paper | Roanoke Rapids, N.C. | 1 PM linerboard | 230,000 |
| International Paper | Savannah, Ga. | 2 PM linerboard | 380,000 |
| International Paper | Fort Madison, Iowa | 1 PM medium | 100,000 |
| Longview Fibre | Longview, Wash. | 1 PM liner/medium | 125,000 |
| Menasha | Otsego, Mich. | 1 PM medium [5] | 306,000 |
| Norampac | Red Rock, Ont. | 1 PM linerboard | 150,000 |
| Smurfit-Stone Container | Missoula, Mont. | 1 PM linerboard | 180,000 |
| Smurfit-Stone Container | Fernandina Beach, Fla. | 1 PM linerboard | 203,000 |
| Smurfit-Stone Container | Hodge, La. | 1 PM medium [4] | 150,000 |
| Smurfit-Stone Container | York, Pa. | 1 PM medium | 130,000 |
| Smurfit-Stone Container | Jacksonville, Fla. | 1 PM liner/medium | 170,000 |
| Smurfit-Stone Container | Thunder Bay, Ont. | 1 PM medium | 160,000 |
| Smurfit-Stone Container | Bathurst, N.B. | 1 PM medium | 243,000 |
| Smurfit-Stone Container | New Richmond, Que. | 1 PM medium | 235,000 |
| Temple-Inland | Antioch, Calif. | 1 PM linerboard | 425,000 |
| Temple-Inland | Bogalusa, La. | 2 PM linerboard | 115,000 |
| Temple-Inland | Newport, Ind. | 1 PM medium [2] | 285,000 |
| Weyerhaeuser | Springfield, Ore. | 1 PM linerboard | 243,000 |
| Weyerhaeuser | Plymouth, N.C. | 2 PM medium/liner | 565,000 |
| Weyerhaeuser | Sturgeon Falls, Ont. | 1 PM medium | 105,000 |
| Weyerhaeuser | North Bend, Ore. | 1 PM medium | 275,000 |
| Weyerhaeuser | Hawesville,Ky. | 1 PM medium | 200,000 |
| Total | | 29 PMs | 5,501,000 |

1. Includes conversions of machines to grades other than containerboard (noted in footnote).
2. Former Temple-Inland recycled medium mill converted to mainly gypsum liner production in j.v. with Caraustar Industries.
3. Net capacity increase was 65,000 tons because IP restarted an idle kraft paper PM at its Savannah, Ga., mill at the same time.
4. Smurfit-Stone converted Hodge medium machine to kraft paper production.
5. Company has been trying to sell mill with possible conversion to mainly gypsum liner production.
Source: *Pulp & Paper Week*, American Forest & Paper Assn.

CONFIDENTIAL
NORAMPAC00018649

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 72 of 512 PageID #:20300
Case: 15-2385 Document: 56-26 Filed: 10/27/2015 Pages: 512

240 2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING

that can be built at a lower cost per ton than semichemical medium mills.

The standard basis weight for semichemical medium has been 26 lb/1,000 ft², but in 2004 under 26 lb became the most popular basis weight, accounting for 28.5% of domestic production vs. 26.7% for 26 lb. The same trend to lower basis weights has been taking place in recycled medium. Another common basis

### NORTH AMERICAN CONTAINERBOARD CAPACITY CHANGES 2000-2007

(000 tons)

| Company | Location | Linerboard | Corrugating medium | Date | Comments |
|---|---|---|---|---|---|
| Smurfit-Stone | York, Pa. | | -130 | 1Q/2000 | Shut RM mill |
| Premier Boxboard [1] | | | -285 | 3Q/2000 | Convert RM mill mainly to gypsum liner |
| Smurfit-Stone | Missoula, Mont. | -180 | | 1Q/2001 | Shut PM 1 making KL |
| Longview Fibre | Longview, Wash. | -125 | | 3Q/2001 | Shut PM 1 |
| International Paper | Savannah, Ga. | -375 | | 2Q/2001 | Shut PM 2 & 4 making KL |
| | Roanoke Rapids, N.C. | -230 | | 4Q/2000 | Convert PM 3 to kraft paper |
| Smurfit-Stone | Fernandina Beach, Fla. | -203 | | 2Q/2001 | Shut PM 2 making KL |
| Weyerhaeuser | Springfield, Ore. | -243 | | 2Q/2001 | Shut PM 1 |
| International Paper | Oswego, N.Y. | -100 | | 1Q/2002 | Shut RL mill |
| Longview Fibre | Longview, Wash. | | -106 | 1Q/2002 | Shut PM 4 making RM (later restarted) |
| Solvay Paperboard | Syracuse, N.Y. | | 215 | 2Q/2002 | New PM making RM |
| Temple-Inland | Bogalusa, La. | -115 | | 2Q/2002 | Shut KL PMs 5 & 6 |
| Weyerhaeuser | Plymouth, N.C. | | -215 | 2Q/2002 | Shut PM making RM |
| Temple-Inland | Antioch, Calif. | -425 | | 4Q/2002 | Shut mill making RL |
| Weyerhaeuser | Hawesville, Ky. | | -200 | 4Q/2002 | Shut PM making RM |
| Smurfit-Stone | Hodge, La. | | -150 | 4Q/2002 | Converted PM making SC to kraft paper |
| Weyerhaeuser | Sturgeon Falls, Ont. | | -100 | 4Q/2002 | Shut mill making RM |
| APC Pomona Paper | Pomona Calif. | | -123 | 4Q/2002 | Shut mill making RM |
| Weyerhaeuser | North Bend, Ore. | | -275 | 3Q/2003 | Shut mill making RM |
| International Paper [2] | Roanoke Rapids, N.C. | -300 | | 4Q2003 | Convert PM 4 to kraft paper |
| Smurfit-Stone | Jacksonville, Fla. | -360 | | 1Q/2004 | Convert PM2 from KL |
| | Jacksonville, Fla. | | 270 | 1Q/2004 | PM 2 conversion to RM |
| | Jacksonville, Fla. | -170 | | 1Q/2004 | PM 1 shut making KL |
| | Thunder Bay, Ont. | | -160 | 1Q/2004 | |
| International Paper | Savannah, Ga. | 235 | | 2Q/2004 | Convert idle PM 6 from kraft paper |
| Bay State Paper | Hyde Park, Mass. | -103 | | 2Q/2004 | Mill closure |
| Longview Fibre | Longview, Wash. | | 106 | 2Q/2004 | Restart PM 4 making RM |
| PCA | Tomahawk, Wis. | | -65 | 1Q/2005 | Shut PM 3 making SC |
| | Filer City, Mich. | | 65 | 1Q/2005 | Restart PM 1 making SC |
| Menasha | Otsego, Mich. | | -306 | 3Q/2005 | Shut mill (2 SC PMs) |
| Smurfit-Stone | Bathurst, N.B. | | -243 | 3Q/2005 | Shut mill (2 SC PMs) |
| | New Richmond, Que. | -235 | | 3Q/2005 | Shut mill (1 KL PM) |
| International Paper | Fort Madison, Iowa | | -100 | 3Q/2005 | Shut mill (1 SC PM) |
| Norampac | Red Rock, Ont. | -150 | | 3Q/2005 | Shut PM 1 making KL |
| Weyerhaeuser | Plymouth, N.C. | -350 | | 1Q/2006 | Shut PM 1, making recycled liner |
| Groveton Paper Board | Groveton, N.H. | | -150 | 1Q/2006 | Mill shut indefinitely |
| Atlantic Packaging | Scarborough, Ont. | | 220 | 1Q/2006 | New PM |
| International Paper | Pensacola, Fla. | 350 | | 1Q/2007 | Convert PM 1 from uncoated freesheet to KLB |

KL = kraft linerboard; RL = recycled linerboard; SC = semichemical medium; RM = recycled medium; PM = paper machine.
1. Partnership of Carauster Industries and Temple-Inland converted mill former Inland RM mill to mainly to gypsum liner, but still makes some medium (net capacity change).
2. Net capacity IP capacity from conversion of PM 4 at Savannah was 65,000 because of conversion and restart of idle kraft paper PM 6 at Savannah, Ga., at the same time.
Source: *Pulp & Paper Week*, RISI.

CONFIDENTIAL
NORAMPAC00018650

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 73 of 512 PageID #:20301
Case: 15-2385 Document: 56-26 Filed: 10/27/2015 Pages: 512

2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING 241

weight for both semichemical and recycled medium is 33 lb, which accounts for about 20% of production. The trend toward lighter basis weights reflects the move to high performance containerboard.

## CORRUGATED PACKAGING

Corrugated containers are the workhorses of the packaging industry. More goods and products are shipped in corrugated containers than in any other type of packaging. In the corrugated converting process, linerboard and medium are combined on a corrugator, which flutes the corrugating medium and bonds the linerboard to the top and bottom of the medium. A rotary die cutter cuts the board to size. Before the blank can be formed into a box, score lines must be added and slots must be cut to form flaps that can be

### ESTIMATED ANNUAL CAPACITY RANKING OF NORTH AMERICAN LINERBOARD PRODUCERS[1]

(000 tons)

| | Company | Unbleached kraft[1] | Recycled[1] | Total | % market share |
|---|---|---|---|---|---|
| 1 | Weyerhaeuser | 4,090 | 1,090 | 5,180 | 18.6% |
| 2 | Smurfit-Stone Container [2] | 4,510 | 330 | 4,840 | 17.4 |
| 3 | International Paper [3] | 3,500 | 430 | 3,930 | 14.1 |
| 4 | Temple-Inland | 2,700 | 335 | 3,035 | 11.0 |
| 5 | Georgia-Pacific | 2,580 | 275 | 2,855 | 10.3 |
| 6 | Packaging Corp. of America | 1,465 | | 1,465 | 5.2 |
| 7 | Green Bay Packaging | 450 | 220 | 670 | 2.4 |
| 8 | Longview Fibre | 600 | | 600 | 2.2 |
| 9 | Norampac Inc. [4] | 290 | 260 | 550 | 2.0 |
| 10 | Boise Cascade | 550 | | 550 | 2.0 |
| 11 | Solvay Paperboard | | 455 | 455 | 1.6 |
| 12 | Pratt Industries USA | | 390 | 390 | 1.4 |
| 13 | West Fraser | 380 | | 380 | 1.4 |
| 14 | Simpson Paper | 380 | | 380 | 1.4 |
| 15 | MeadWestvaco | 320 | | 320 | 1.2 |
| 16 | Interstate Resources | 300 | | 300 | 1.1 |
| 17 | Corrugated Services | — | 215 | 215 | 0.8 |
| 18 | Rand Whitney | | 205 | 205 | 0.7 |
| 19 | Grupo Durango (McKinley) | | 200 | 200 | 0.7 |
| 20 | Atlantic Packaging [5] | | 170 | 170 | 0.6 |
| 21 | Greif Bros. | — | 165 | 165 | 0.6 |
| 22 | Kruger | | 155 | 155 | 0.6 |
| 23 | Liberty Paper | | 150 | 150 | 0.5 |
| 24 | Norske Canada | 125 | | 125 | 0.4 |
| 25 | Minas Basin Pulp & Power | | 110 | 110 | 0.4 |
| 26 | Lin Pac (Somerset Fiber) | | 105 | 105 | 0.4 |
| 27 | Port Townsend Paper | 90 | | 90 | 0.3 |
| 28 | Graphic Packaging | 80 | | 80 | 0.3 |

North American capacity (2005 estimate): 27.814 million tons (U.S. 25.470 million tons and Canada 2.344 million tons).
Capacity share of top five companies: 71.4%.
Capacity share of top ten companies: 85.2%.

1. Includes white top linerboard capacity. Recycled mills may swing production between linerboard, medium and sometimes other grades. Capacity figures adjusted for machine closures announced through 3Q/2005.
2. Includes SSCC's permanent closure of 203,000-tpy PM 2 at Fernandina Beach, Fla. (indefinitely closed in 2Q/2001) and 235,000-tpy New Richmond, Que., mill in 3Q/2005.
3. Includes 400,000 Pineville, La., mill, which IP said it may sell or close.
4. Includes Norampac's closure of 150,000 tpy of PM 1 at Red Rock, Ont., mill in 3Q/2005.
5. Includes half production of new 220,000 tpy containerboard PM scheduled to start in early 2006.
Source: American Forest & Paper Assn., Pulp and Paper Products Council, company reports, *Pulp & Paper Week* estimates.

NORAMPAC00018651

folded. The machine that performs these multiple steps is called a flexo-slotter-folder-gluer.

The most common form of corrugated board is single wall (one layer of medium between two layers of linerboard). About 90% of boxes in the U.S. are made from single-wall board. Corrugators can also produce single-face (one layer of medium bonded to a single layer of liner), which is used mainly for wrapping and interior packaging. Heavier-duty boxes can be made from double-wall (two layers of medium and three

## ESTIMATED ANNUAL CAPACITY RANKING OF NORTH AMERICAN CORRUGATING MEDIUM PRODUCERS[1]

(000 tons)

| Company | Semichemical medium | Recycled medium | Total | % market share |
|---|---|---|---|---|
| Smurfit-Stone Container[2] | 1,850 | 475 | 2,325 | 19.5% |
| Weyerhaeuser | 650 | 630 | 1,280 | 10.7 |
| Georgia-Pacific[3] | 935 | 150 | 1,085 | 9.1 |
| PCA | 940 | | 940 | 7.9 |
| Norampac | 230 | 470 | 700 | 5.9 |
| International Paper[4] | 630 | | 630 | 5.3 |
| Temple-Inland[5] | 320 | 150 | 470 | 3.9 |
| Greif Bros. | 290 | 175 | 465 | 3.9 |
| Pratt Industries USA | | 300 | 300 | 2.5 |
| Solvay Paperboard | | 250 | 250 | 2.1 |
| Atlantic Packaging[6] | | 240 | 240 | 2.0 |
| J.D. Irving | 190 | | 190 | 1.6 |
| Rock-Tenn | | 190 | 190 | 1.6 |
| Interstate Resources | | 150 | 150 | 1.3 |
| Groveton Paper Board[7] | 150 | | 150 | 1.3 |
| Graphic Packaging | 145 | | 145 | 1.2 |
| Longview Fibre | 145 | | 145 | 1.2 |
| Boise Cascade | 130 | | 130 | 1.1 |
| Hartford City Paper | | 125 | 125 | 1.0 |
| Port Townsend Paper | 112 | | 112 | 0.9 |
| Jackson Paper LP | | 105 | 105 | 0.9 |
| Fibercorr | | 85 | 85 | 0.7 |
| Corrugated Services | | 70 | 70 | 0.6 |
| Lin Pac (Somerset) | | 65 | 65 | 0.5 |
| Newark Group (Calif. Paperboard) | | 65 | 65 | 0.5 |
| Creative Paper | | 45 | 45 | 0.4 |

North American semichemical and recycled medium capacity (2005): 11.945 million tons (10.966 million tons in U.S. and 979,000 tons in Canada)[1]

Market share of top five companies: 53.1%
Market share of top 10 companies: 70.8%

1. AF&PA and PPPC capacity estimates for 2005 may be revised downward by 200,000 in U.S. and 100,000 in Canada to reflect closure of three mills owned by Menasha, International Paper and Smurfit-Stone in third quarter (see footnotes for latter two companies) with total capacity of 650,000 tpy in the third quarter of 2005, partly offset by machine capacity creep and swings. Menasha is trying to sell its 306,000 tpy Otsego, mill.
2. Reflects closure of SSCC's 243,000-tpy Bathurst, N.B., semichemical mill in 3Q/2005.
3. Includes 100% of 188,000-tpy machine jointly owned by G-P and Sonoco Products at latter's Hartsville, S.C., mill.
4. Reflects IP's closure of its 100,000 tpy Fort Madison, Iowa, semichemical mill in 3Q/2005; also announced plans to sell 200,000 tpy Terre Haute, Ind., semichem mill and interest in Groveton Paper Board and may shift some linerboard production to medium within its mill system.
5. Includes recycled medium from joint venture Premier Boxboard mill in Newport, Ind., jointly owned with Caraustar and some additional recycled medium from rebuild of PM 2 in Orange, Texas.
6. Includes half the production of new 220,000 tpy recycled containerboard PM scheduled to startup in early 2006.
7. Joint owners International Paper, Smurfit-Stone, and Liberty Diversified announced plans to sell mill in 3Q/2005; indefinitely closed 1/1/2006.
Sources: American Forest & Paper Assn., Pulp & Paper Products Council, Lockwood-Post Directory, company reports.

CONFIDENTIAL
NORAMPAC00018652

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 75 of 512 PageID
Case: 15-2385 Document: 56-28 #:20303 Filed: 10/27/2015 Pages: 512

linerboard facings) and triple-wall (three medium layers and four liner facings).

Flutes have five standard sizes and are designated "A" through "E." An "F" flute, which is only 0.03 thick was introduced in the early 1990s, followed by even smaller mini-flutes such as "F," "G," "N" and "O." Flute size is determined by the size and number of teeth on a corrugating roll and is measured in flutes per linear ft. The larger flutes generally offer greater stacking strength, while the smaller flutes have greater puncture resistance. The mini-flute corrugated offers a better printing surface and is being used in point-of-purchase (POP) displays and for consumer packaging. Mini-flutes have helped corrugated manufacturers make significant inroads into the traditional folding carton market and the small flutes work well for small strong but lightweight packages with high-quality, multi-color graphics.

Corrugated boxes are manufactured in several different styles, the most common of which is the regular slotted container (RSC). More specialized types of boxes include bag-in-box for liquids and powdered products, bulk bins that can carry products weighing up to 3,000 lb, and trays for produce. Solid fiber boxes were the first fiber boxes to replace wood packaging and consist of two or more plies of paperboard glued or laminated together. They account for about 0.4% of total industry corrugated shipments. One application for solid-fiber board is in slip sheets, which have been replacing wood pallets under forklift loads.

U.S. corrugated box shipments in 2004 total 390.5 billion ft² and had a value of $23.2 billion, according to the Fibre Box Assn. In 2004, 1,417 plants were in operation in the U.S., 590 corrugator plants and 826 sheet plants. A full-service corrugated plant has a corrugator and equipment for printing, cutting, folding and gluing the finished box. A corrugated sheet feeder plant produces corrugated board for sale to sheet plants, but has no box converting equipment. A sheet plant has no corrugator and purchases combined corrugated board from corrugated sheet-feeders to convert into boxes.

Corrugator plants are larger and accounted for 83% of corrugated box shipments, while sheet plants handled the remaining 17% in 2004. The average corrugator plant in 2004 produced 549 million ft²/yr of corrugated board, up from 425 million ft² in 1990 and 262 million ft² in 1970. The rising productivity of corrugators has been contributing to industry overcapacity and a reduction in the number of plants. Another related trend has been the growth in corrugated sheet feeder plants with high-speed corrugators feeding a nework of small sheet plants. Most corrugated sheet plants run one or two shifts and operate five or six days a week, but some large, new plants are beginning to run 24/7 and produce up to 2 billion ft²/yr. The corrugated business is highly regional, with most plants serving customers within a 50-mile radius.

## INDUSTRY ECONOMICS

U.S. corrugated box shipments used to closely track the economy but since 2000 there has been a growing disconnect between box demand and economic growth. Box demand used to track industrial production on an almost 1:1 basis, but shipments now appear to be lagging manufacturing growth by around 1.5%/year. The reason has been structural factors such as the shift of manufacturing customers to lower cost

| | | | | | | |
|---|---|---|---|---|---|---|
| **MAJOR NORTH AMERICAN CORRUGATED BOX PRODUCERS, 2004** | | | | | | |
| Company | Number of box plants | Shipments (BSF) | Market share [1] % | Containerboard capacity (000 tons) | Integration level [2] % |
| 1 | Smurfit-Stone Container | 130 | 86.5 | 20.4% | 7,165 | 73%. |
| 2 | Weyerhaeuser | 98 | 77.8 | 18.3 | 6,460 | 85 |
| 3 | Temple-Inland | 69 | 50.5 | 12.6 | 3,505 | 106 |
| 4 | Georgia-Pacific | 54 | 47.2 | 11.8 | 3,940 | 70-75 |
| 5 | International Paper | 70 | 40.0 | 10.0 | 4,560 | 70 |
| 6 | PCA | 66 | 29.9 | 7.0 | 2,405 | 80 |
| 7 | Norampac | 25 | 13.6 | 3.2 | 1,250 | n.a. |
| 8 | Pratt Industries (USA) | 28 | 12.1 | 2.9 | 690 | 88 |

1. Based on 2004 North American box shipments of 424.5 billion ft² (U.S. 390.5 bsf and Canada 33.95 bsf).
2. Amount of containerboard consumed by the company's own box plants.
Sources: Company annual reports, *Pulp & Paper Week* estimates.

NORAMPAC00018653

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 76 of 512 PageID #:20304
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

regions of the world and the large U.S. trade deficit, which has resulted in a flood of imported merchandise in boxes made overseas.

U.S. box shipments grew at a 2.6% average annual rate during the 1990s, peaking at 405.1 billion ft² in 1999. Box shipments dropped around 6.3% over the next couple of years to 379.5 billion ft² in 2001, then remained flat for a couple of years before jumping 2.8% in 2004. But in 2005 shipments weakened by about 1.1% to 386.0 million tons and were still 4.7% below the 2000 peak.

The biggest driver of U.S. box demand is production of food and other nondurable goods, which accounted for about 77% of box demand in 2004, according to the Fibre Box Assn. The single largest end use market is food products, which accounted for 41.3% of box shipments. Production of food products in the U.S. in mid-2005 was up 6% from its level in 2000, but nondurables output other than food (including paper, apparel, textiles, chemicals and plastics) is still 6% below its pre-recession level. Production of manufactured goods, which accounts for about 33% of box demand, was up 10% above its pre-recession level.

About 75% of U.S. containerboard is shipped by integrated producers to be consumed in their own box plants or traded with other containerboard producers to save on freight costs. The remaining 25% is either sold in the U.S. domestic market to "independent" converters or exported. Linerboard prices are the major factor driving corrugated box prices, and many box contracts in the industry are tied through various formulas to published linerboard prices. For example, customers (depending on size) might have to accept a 1.7% to 2.0% increase in box prices under such formulas for each $10/ton move in the published linerboard price. Because most of the industry is integrated, producers must pass through linerboard price increases in fin-

ished box prices in order to significantly improve profitability. Independent converters buy containerboard from integrated producers, which they compete with in the corrugated box market.

Implementing price increases and passing them through in finished box prices is challenging because of sluggish demand in recent years which has resulted in excess capacity at mills and box plants. Another factor has been strong resistance from major "national account" box buyers at consumer goods companies, which have been under pressure from mass merchandise retailers to keep prices low (Wal-Mart effect).

Containerboard producers tend to achieve "pricing power" when at least some of the following market indicators are present: (1) containerboard mill operating rates at 93% or higher; (2) containerboard mill and box plant inventories below 4.5 weeks of supply; (3) monthly average per day box shipments are at 1.55 bil-

## U.S. CORRUGATED CONTAINER SHIPMENTS BY END USE MARKET 2004/2000

(% of total shipments)

|  | 2004 | 2000 |
|---|---|---|
| Food/meat/dairy/bakery beverages/fruits/vegetables | 40.8% | 41.3% |
| Paper, allied products | 24.9 | 21.0 |
| Rubber/plastic products | 6.1 | 5.0 |
| Chemicals/resins/soap/ paints/drugs | 5.2 | 5.7 |
| Other nondurable goods | 4.7 | 4.5 |
| Subtotal—nondurable goods | 81.7 | 77.5 |
| Miscellaneous manufacturing/ toys/athletic goods | 2.4 | 7.7 |
| Electrical machinery/radio/ TV/appliances | 2.8 | 3.3 |
| Stone/clay/pottery/glass | 4.0 | 3.2 |
| Other durable goods | 8.3 | 7.8 |
| Subtotal durable goods | 17.5 | 22.0 |
| Motor freight/warehousing/ government | 0.8 | 0.5 |
| Total | 100.0 | 100.0 |

Source: Fibre Box Association.

## U.S. CORRUGATED BOX SHIPMENTS BY REGION

(% of total)

|  | 2004 | 2000 | 1990 | 1980 | 1970 | 1960 |
|---|---|---|---|---|---|---|
| Northeast | 14.6% | 15.0% | 17.3% | 20.9% | 23.8% | 27.3% |
| Southeast | 18.9 | 19.8 | 18.7 | 17.1 | 13.6 | 10.1 |
| East Central | 14.6 | 14.4 | 14.5 | 15.3 | 19 | 21.4 |
| North Central | 12.2 | 12.0 | 12.3 | 12.5 | 13.4 | 14.5 |
| South Central | 21.4 | 21.3 | 20.2 | 17.8 | 15.7 | 13.7 |
| West | 18.3 | 17.5 | 17.0 | 16.4 | 14.5 | 13.0 |
| Total U.S. shipments | 390.5 | 401.3 | 318.1 | 241.4 | 184.9 | 108.9 |

Source: Fibre Box Association.

CONFIDENTIAL

NORAMPAC00018654

Case: 1:10-cv-05711 Document #: 756-3 *SEALED*  Filed: 09/19/14 Page 77 of 512 PageID #:20305
Case: 15-2385    Document: 56-26    Filed: 10/27/2015    Pages: 512

## U.S. CONTAINERBOARD TRANSACTION PRICES

($/ton)

| Period | —Unbleached kraft— linerboard - 42 lb[1] U.S. East | | —Unbleached kraft— linerboard - 42 lb[1] U.S. West | | —White top— linerboard - 42 lb U.S. East | | —White top— linerboard - 42 lb U.S. West | |
|---|---|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High | Low | High |
| 2005 4Q | 420 | 430[2] | 435 | 445[2] | 620 | 630[2] | 635 | 645[2] |
| 3Q | 390 | 400 | 405 | 415 | 600 | 610 | 615 | 625 |
| 2Q | 435 | 445 | 450 | 460 | 610 | 620 | 625 | 635 |
| 1Q | 445 | 455 | 460 | 470 | 620 | 630 | 635 | 645 |
| 2004 4Q | 445 | 455 | 460 | 470 | 620 | 630 | 635 | 645 |
| 3Q | 445 | 455 | 460 | 470 | 620 | 630 | 635 | 645 |
| 2Q | 405 | 415 | 420 | 430 | 580 | 590 | 595 | 605 |
| 1Q | 355 | 365 | 370 | 380 | 550 | 560 | 565 | 605 |
| 2003 4Q | 355 | 365 | 370 | 380 | 550 | 560 | 565 | 575 |
| 3Q | 360 | 370 | 375 | 385 | 550 | 560 | 565 | 575 |
| 2Q | 370 | 380 | 385 | 395 | 550 | 560 | 565 | 575 |
| 1Q | 370 | 380 | 385 | 395 | 550 | 560 | 565 | 575 |
| 2002 4Q | 390 | 400 | 405 | 415 | 575 | 585 | 590 | 600 |
| 3Q | 400 | 410 | 415 | 425 | 590 | 600 | 605 | 615 |
| 2Q | 375 | 385 | 390 | 400 | 565 | 575 | 580 | 590 |
| 1Q | 375 | 385 | 390 | 400 | 565 | 575 | 580 | 590 |
| 2001 4Q | 400 | 410 | 415 | 425 | 595 | 605 | 600 | 610 |
| 3Q | 405 | 425 | 420 | 440 | 595 | 605 | 610 | 620 |
| 2Q | 430 | 440 | 445 | 455 | 605 | 615 | 620 | 630 |
| 1Q | 440 | 450 | 450 | 460 | 610 | 620 | 620 | 630 |
| 2000 4Q | 455 | 465 | 465 | 475 | 620 | 630 | 630 | 640 |
| 3Q | 455 | 465 | 465 | 475 | 620 | 630 | 630 | 640 |
| 2Q | 455 | 465 | 465 | 475 | 620 | 630 | 630 | 640 |
| 1Q | 455 | 465 | 465 | 475 | 620 | 630 | 630 | 640 |
| **Year end** | | | | | | | | |
| 1999 | 405 | 415 | 415 | 425 | 570 | 580 | 580 | 590 |
| 1998 | 320 | 330 | 325 | 345 | 480 | 500 | 490 | 510 |
| 1997 | 365 | 385 | 385 | 395 | 530 | 550 | 540 | 560 |
| 1996 | 345 | 355 | 355 | 365 | 510 | 510 | 510 | 510 |
| 1995 | 465 | 475 | 485 | 495 | 640 | 640 | 680 | 680 |
| 1994 | 410 | 420 | 430 | 440 | 560 | 570 | 575 | 580 |
| 1993 | 300 | 310 | 320 | 330 | 475 | 475 | | |
| 1992 | 335 | 335 | 355 | 355 | 495 | 495 | | |
| 1991 | 345 | 345 | 365 | 365 | 495 | 495 | | |
| 1990 | 345 | 355 | 355 | 365 | | | | |
| 1989 | 395 | 395 | 395 | 395 | | | | |
| 1988 | 395 | 395 | 395 | 395 | | | | |
| 1987 | 365 | 365 | 365 | 365 | | | | |
| 1986 | 305 | 305 | 305 | 305 | | | | |
| 1985 | 235 | 245 | 245 | 255 | | | | |
| 1984 | 305 | 305 | 315 | 315 | | | | |
| 1983 | 275 | 275 | 285 | 285 | | | | |
| 1982 | 235 | 235 | 245 | 275 | | | | |
| 1981 | 255 | 255 | | | | | | |
| 1980 | 255 | 255 | | | | | | |

1. Before customer specific discounts and rebates for volume and fidelity. Prices may vary based on shipping distance from southern mill. Basis weight differentials from standard 42-lb linerboard in the East are: 26-lb, +$50-60/ton; 64-lb, no upcharge; 90-lb, +$10. The upcharge on wet strength board typically ranges from $20-30/ton.
2. Price increase of $40/ton announced for January 2006.
Source: *Pulp & Paper Week.*

CONFIDENTIAL

NORAMPAC00018655

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 78 of 512 PageID #:20306
Case: 15-2385    Document: 56-26    Filed: 10/27/2015    Pages: 512

246  2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING

## U.S. CONTAINERBOARD TRANSACTION PRICES

($/ton)

| | | —High performance— linerboard - 35-36 lb U.S. East | | —Semichemical— corrugating medium - 26 lb U.S. East | | —Semichemical— corrugating medium - 26 lb U.S. West | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| 2005 | 4Q | 450 | 460 [1] | 390 | 400 [1] | 405 | 415 [1] |
| | 3Q | 420 | 430 | 360 | 370 | 375 | 385 |
| | 2Q | 465 | 475 | 400 | 410 | 415 | 425 |
| | 1Q | 475 | 485 | 415 | 425 | 430 | 440 |
| 2004 | 4Q | 475 | 485 | 415 | 425 | 430 | 440 |
| | 3Q | 475 | 485 | 415 | 425 | 430 | 440 |
| | 2Q | 385 | 395 | 370 | 380 | 385 | 395 |
| | 1Q | 385 | 395 | 310 | 320 | 325 | 335 |
| 2003 | 4Q | 385 | 395 | 310 | 320 | 325 | 335 |
| | 3Q | 390 | 400 | 315 | 325 | 330 | 340 |
| | 2Q | 400 | 410 | 325 | 335 | 340 | 350 |
| | 1Q | 400 | 410 | 330 | 340 | 345 | 355 |
| 2002 | 4Q | 420 | 430 | 350 | 360 | 365 | 375 |
| | 3Q | 430 | 440 | 355 | 365 | 370 | 380 |
| | 2Q | 405 | 415 | 335 | 345 | 350 | 360 |
| | 1Q | 405 | 415 | 335 | 345 | 350 | 360 |
| 2001 | 4Q | 430 | 440 | 360 | 370 | 375 | 385 |
| | 3Q | 435 | 455 | 370 | 390 | 395 | 405 |
| | 2Q | 460 | 470 | 385 | 395 | 395 | 405 |
| | 1Q | 470 | 480 | 405 | 415 | 420 | 430 |
| 2000 | 4Q | 485 | 495 | 425 | 435 | 440 | 450 |
| | 3Q | 485 | 495 | 425 | 435 | 440 | 450 |
| | 2Q | 485 | 495 | 440 | 450 | 455 | 465 |
| | 1Q | 485 | 495 | 440 | 450 | 455 | 465 |
| Year end | | | | | | | |
| 1999 | | 435 | 445 | 380 | 390 | 395 | 405 |
| 1998 | | 345 | 360 | 250 | 260 | 265 | 275 |
| 1997 | | 395 | 415 | 315 | 335 | 335 | 355 |
| 1996 | | | | 265 | 285 | 275 | 285 |
| 1995 | | | | 435 | 445 | 445 | 455 |
| 1994 | | | | 405 | 415 | 430 | 440 |
| 1993 | | | | 280 | 290 | 320 | 320 |
| 1992 | | | | 305 | 305 | 325 | 325 |
| 1991 | | | | 295 | 305 | 325 | 325 |
| 1990 | | | | 305 | 305 | 325 | 335 |
| 1989 | | | | 345 | 355 | | |
| 1988 | | | | 375 | 375 | | |
| 1987 | | | | 335 | 345 | | |
| 1986 | | | | 275 | 275 | | |
| 1985 | | | | 215 | 225 | | |
| 1984 | | | | 295 | 295 | | |
| 1983 | | | | 265 | 265 | | |
| 1982 | | | | 225 | 225 | | |
| 1981 | | | | 245 | 245 | | |
| 1980 | | | | 245 | 245 | | |
| 1979 | | | | 225 | 245 | | |

1. Price increase of $40/ton announced for January 2006.
Source: *Pulp & Paper Week.*

CONFIDENTIAL

NORAMPAC00018656

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 79 of 512 PageID #:20307
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

lion ft² or higher; (4) rising export demand and prices; and (5) old corrugated container (OCC) prices of $80/ton or higher, according to a recent Smurfit-Stone Container presentation to analysts.

### INDUSTRY STRUCTURE

The North American containerboard market has become increasingly consolidated through mergers and acquisitions. The largest North American containerboard producers and their estimated capacities in 2005 were: Smurfit-Stone Container (7.1 million tons), Weyerhaeuser (6.5 million tons), International Paper, (4.6 million tons), Georgia-Pacific (3.9 million tons), Temple-Inland (3.5 million tons), Packaging Corp. of America (2.4 million tons) and Norampac (1.3 million tons).

### WORLD CONTAINERBOARD PRODUCTION BY REGION, 2004-1995

(000 tonnes)

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|
| **North America** | 31,190 | 32,575 | 34,378 | 33,820 | 35,035 | 33,506 | 32,040 | 33,342 | 32,938 | 34,510 |
| U.S. | 28,741 | 29,957 | 31,622 | 31,055 | 31,974 | 30,523 | 29,124 | 30,369 | 30,130 | 31,601 |
| Canada | 2,449 | 2,618 | 2,756 | 2,765 | 3,061 | 2,983 | 2,916 | 2,973 | 2,809 | 2,909 |
| | | | | | | | | | | |
| **Western Europe** | 16,164 | 16,773 | 17,687 | 18,294 | 18,990 | 19,824 | 19,789 | 20,472 | 20,977 | 21,493 |
| Germany | 2,950 | 3,152 | 3,442 | 3,475 | 3,623 | 3,829 | 4,080 | 4,402 | 4,605 | 4,808 |
| France | 2,640 | 2,714 | 2,912 | 3,193 | 3,197 | 3,330 | 3,152 | 3,219 | 3,266 | 3,383 |
| Italy | 1,976 | 2,099 | 2,194 | 2,314 | 2,405 | 2,533 | 2,493 | 2,615 | 2,670 | 2,683 |
| Spain | 1,454 | 1,555 | 1,596 | 1,708 | 1,788 | 1,919 | 2,123 | 2,253 | 2,333 | 2,360 |
| Sweden | 1,904 | 1,910 | 1,970 | 1,909 | 2,040 | 2,103 | 2,040 | 2,053 | 2,085 | 2,186 |
| UK | 1,668 | 1,690 | 1,754 | 1,761 | 1,813 | 1,872 | 1,791 | 1,822 | 1,866 | 1,873 |
| Austria | 699 | 743 | 782 | 813 | 844 | 875 | 905 | 890 | 912 | 942 |
| Netherlands | 660 | 693 | 713 | 727 | 782 | 787 | 747 | 800 | 802 | 823 |
| | | | | | | | | | | |
| **Eastern Europe** | 2,413 | 2,228 | 2,507 | 2,548 | 2,957 | 3,526 | 3,994 | 4,349 | 4,786 | 5,233 |
| Russia | 779 | 595 | 782 | 738 | 1,045 | 1,305 | 1,575 | 1,759 | 1,984 | 2,232 |
| Poland | 528 | 516 | 562 | 605 | 650 | 740 | 815 | 840 | 901 | 923 |
| | | | | | | | | | | |
| **Asia** | 21,646 | 23,286 | 24,640 | 24,328 | 26,499 | 28,741 | 29,590 | 31,983 | 34,925 | 38,594 |
| China | 4,854 | 5,837 | 6,010 | 6,478 | 7,131 | 8,228 | 9,062 | 10,849 | 13,000 | 16,000 |
| Japan | 9,019 | 9,048 | 9,425 | 8,961 | 9,180 | 9,676 | 9,419 | 9,284 | 9,207 | 9,290 |
| S. Korea | 2,122 | 2,280 | 2,498 | 2,198 | 2,574 | 2,775 | 2,874 | 3,101 | 3,434 | 3,525 |
| Indonesia | 1,061 | 1,211 | 1,401 | 1,450 | 1,800 | 1,825 | 1,900 | 2,010 | 2,050 | 2,110 |
| Taiwan | 1,989 | 2,205 | 2,240 | 2,069 | 2,213 | 2,352 | 2,234 | 2,349 | 2,504 | 2,612 |
| India | 850 | 940 | 1,025 | 1,115 | 1,250 | 1,400 | 1,515 | 1,630 | 1,769 | 1,930 |
| Thailand | 932 | 945 | 1,192 | 1,222 | 1,414 | 1,417 | 1,429 | 1,499 | 1,592 | 1,713 |
| | | | | | | | | | | |
| **Australasia** | 1,154 | 1,242 | 1,287 | 1,325 | 1,300 | 1,394 | 1,600 | 1,752 | 1,750 | 1,919 |
| | | | | | | | | | | |
| **Latin America** | 4,225 | 4,535 | 4,762 | 4,937 | 5,268 | 5,496 | 5,709 | 6,032 | 6,210 | 6,739 |
| Brazil | 1,940 | 2,206 | 2,304 | 2,368 | 2,588 | 2,755 | 2,945 | 3,120 | 3,125 | 3,460 |
| Mexico | 1,256 | 1,316 | 1,392 | 1,483 | 1,537 | 1,596 | 1,652 | 1,760 | 1,779 | 1,854 |
| Argentina | 338 | 374 | 390 | 395 | 413 | 466 | 483 | 429 | 500 | 525 |
| Chile | 80 | 90 | 100 | 112 | 150 | 136 | 141 | 235 | 283 | 350 |
| Colombia | 231 | 227 | 232 | 228 | 236 | 245 | 252 | 271 | 282 | 295 |
| | | | | | | | | | | |
| **Africa** | 1,183 | 1,055 | 1,183 | 1,272 | 1,261 | 1,400 | 1,479 | 1,550 | 1,633 | 1,762 |
| S. Africa | 896 | 734 | 835 | 913 | 859 | 927 | 1,044 | 1,094 | 1,135 | 1,150 |
| Egypt | 139 | 181 | 199 | 207 | 252 | 318 | 274 | 301 | 350 | 452 |
| | | | | | | | | | | |
| **Total World** | 77,975 | 81,694 | 86,443 | 86,524 | 91,309 | 93,887 | 94,201 | 99,480 | 103,219 | 110,249 |

Source: Paperloop's Global Industry Statistics Database.

NORAMPAC00018657

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 80 of 512 PageID #:20308
Case: 15-2385 Document: 56-26 Filed: 10/27/2015 Pages: 512

248 2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING

In linerboard, the five largest North American producers accounted for 71.4% of capacity in 2005, up from 60.7% in 2000 and 34.1% in 1980. The market share of the ten largest linerboard producers rose to 85.2% in 2004, from 80.2% in 2000 and 57.5% in 1980. The corrugating medium market remains more fragmented with the five largest producers accounting for 53.1% of North American capacity in 2005, down slightly from 54.1% in 2000 but up from 49.8% in 1980. The ten largest medium producers accounted for 70.8% of capacity in 2005, down from 74.7% in 2000, but up from 49.8% in 1980.

Containerboard industry consolidation took its biggest leap forward with the $2.2 billion acquisition of Stone Container Corp. by Jefferson Smurfit Corp. in

## WORLD LINERBOARD PRODUCTION BY REGION, 2004-1995

(000 tonnes)

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|
| **North America** | 21,978 | 23,003 | 24,353 | 24,034 | 24,740 | 23,385 | 22,153 | 23,208 | 22,994 | 24,089 |
| U.S. | 20,441 | 21,394 | 22,682 | 22,339 | 22,824 | 21,512 | 20,333 | 21,278 | 21,162 | 22,077 |
| Canada | 1,537 | 1,609 | 1,671 | 1,695 | 1,916 | 1,873 | 1,820 | 1,930 | 1,832 | 2,011 |
| | | | | | | | | | | |
| **Western Europe** | 9,353 | 9,623 | 10,115 | 10,389 | 10,698 | 11,122 | 11,066 | 11,417 | 11,672 | 11,956 |
| Germany | 1,520 | 1,620 | 1,790 | 1,805 | 1,885 | 1,988 | 2,135 | 2,302 | 2,400 | 2,508 |
| France | 1,547 | 1,587 | 1,709 | 1,862 | 1,794 | 1,855 | 1,780 | 1,839 | 1,871 | 1,925 |
| Italy | 956 | 1,004 | 1,014 | 1,061 | 1,060 | 1,081 | 1,038 | 1,090 | 1,106 | 1,112 |
| Spain | 783 | 808 | 856 | 882 | 933 | 990 | 1,033 | 1,121 | 1,171 | 1,166 |
| Sweden | 1,587 | 1,600 | 1,630 | 1,581 | 1,685 | 1,738 | 1,658 | 1,650 | 1,675 | 1,776 |
| UK | 934 | 926 | 943 | 941 | 957 | 991 | 949 | 963 | 958 | 960 |
| Austria | 452 | 485 | 519 | 541 | 570 | 610 | 645 | 630 | 642 | 662 |
| Netherlands | 290 | 308 | 320 | 332 | 353 | 357 | 337 | 370 | 367 | 375 |
| | | | | | | | | | | |
| **Eastern Europe** | 1,307 | 1,235 | 1,370 | 1,442 | 1,783 | 2,139 | 2,507 | 2,744 | 3,029 | 3,307 |
| Russia | 509 | 393 | 508 | 521 | 780 | 978 | 1,224 | 1,354 | 1,539 | 1,710 |
| Poland | 300 | 306 | 342 | 380 | 425 | 510 | 570 | 595 | 625 | 645 |
| | | | | | | | | | | |
| **Asia** | 12,038 | 12,850 | 13,608 | 13,591 | 14,749 | 16,172 | 16,586 | 18,040 | 19,445 | 21,470 |
| China | 2,354 | 2,831 | 2,929 | 3,005 | 3,384 | 3,820 | 4,168 | 4,774 | 5,824 | 7,248 |
| Japan | 5,451 | 5,490 | 5,733 | 5,434 | 5,531 | 5,790 | 5,625 | 5,541 | 5,516 | 5,539 |
| S. Korea | 1,356 | 1,444 | 1,646 | 1,440 | 1,692 | 1,958 | 2,028 | 2,130 | 2,267 | 2,374 |
| Indonesia | 563 | 618 | 703 | 760 | 953 | 954 | 981 | 1,029 | 1,047 | 1,097 |
| Taiwan | 1,120 | 1,228 | 1,239 | 1,152 | 1,231 | 1,258 | 1,179 | 1,237 | 1,297 | 1,377 |
| India | 336 | 378 | 412 | 450 | 507 | 570 | 619 | 668 | 726 | 791 |
| Thailand | 412 | 400 | 503 | 552 | 707 | 712 | 703 | 738 | 750 | 831 |
| | | | | | | | | | | |
| **Australasia** | 722 | 761 | 784 | 810 | 795 | 863 | 1,014 | 1,158 | 1,141 | 1,270 |
| | | | | | | | | | | |
| **Latin America** | 2,429 | 2,586 | 2,684 | 2,793 | 2,956 | 3,129 | 3,295 | 3,538 | 3,730 | 3,998 |
| Brazil | 1,193 | 1,289 | 1,345 | 1,423 | 1,547 | 1,686 | 1,833 | 1,951 | 2,041 | 2,225 |
| Mexico | 699 | 787 | 825 | 870 | 883 | 917 | 951 | 1,038 | 1,054 | 1,099 |
| Argentina | 154 | 163 | 151 | 160 | 175 | 176 | 209 | 202 | 225 | 237 |
| Chile | 65 | 65 | 70 | 44 | 67 | 72 | 66 | 110 | 154 | 170 |
| Colombia | 150 | 137 | 141 | 141 | 145 | 151 | 152 | 164 | 172 | 180 |
| | | | | | | | | | | |
| **Africa** | 777 | 667 | 803 | 912 | 871 | 960 | 1,019 | 1,075 | 1,124 | 1,177 |
| S. Africa | 615 | 504 | 620 | 695 | 646 | 711 | 807 | 840 | 875 | 862 |
| Egypt | 81 | 89 | 101 | 130 | 142 | 166 | 124 | 148 | 165 | 228 |
| | | | | | | | | | | |
| **Total World** | 48,604 | 50,725 | 53,717 | 53,971 | 56,592 | 57,770 | 57,640 | 61,179 | 63,134 | 67,266 |

Source: Paperloop's Global Industry Statistics Database.

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 81 of 512 PageID #:20309
Case: 15-2385 Document: 56-26 Filed: 10/27/2015 Pages: 512

2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING 249

1998 and International Paper's acquisition of Union Camp Corp. in 1999. This was followed by IP's $9.6 billion acquisition of Champion International Corp. in 2000. Smurfit-Stone Container acquired St. Laurent Paperboard Inc. for $1.4 billion in 2000 and MeadWestvaco's low-cost corrugating medium mill in Stevenson Ala., for $375 million in 2002. In early 2002, Temple-Inland completed the acquisition of Gaylord Container Corp. for $868 million, but closed 40% of its linerboard capacity with the closure of its Antioch, Calif., mill and two machines at Bogalusa, La.

Jefferson Smurfit became North America's largest containerboard and corrugated producer through its merger Stone Container in 1998. The company's main focus was on reducing $6.8 billion in debt and selling or closing noncore or high cost operations. Ireland's Jefferson Smurfit Group was the company's largest shareholder through the first five years of the com-

### WORLD CORRUGATING MEDIUM PRODUCTION BY REGION

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|
| **North America** | 9,212 | 9,572 | 10,024 | 9,786 | 10,294 | 10,121 | 9,887 | 10,134 | 9,945 | 10,422 |
| U.S. | 8,300 | 8,563 | 8,939 | 8,716 | 9,149 | 9,011 | 8,791 | 9,091 | 8,968 | 9,524 |
| Canada | 912 | 1,009 | 1,085 | 1,070 | 1,145 | 1,110 | 1,096 | 1,043 | 977 | 898 |
| | | | | | | | | | | |
| **Western Europe** | 6,811 | 7,150 | 7,572 | 7,905 | 8,292 | 8,702 | 8,723 | 9,055 | 9,305 | 9,537 |
| Germany | 1,430 | 1,532 | 1,652 | 1,670 | 1,738 | 1,841 | 1,945 | 2,100 | 2,205 | 2,300 |
| France | 1,093 | 1,127 | 1,203 | 1,331 | 1,403 | 1,475 | 1,372 | 1,380 | 1,395 | 1,458 |
| Italy | 1,020 | 1,095 | 1,180 | 1,253 | 1,345 | 1,452 | 1,455 | 1,525 | 1,564 | 1,571 |
| Spain | 671 | 747 | 740 | 826 | 855 | 929 | 1,090 | 1,132 | 1,162 | 1,194 |
| Sweden | 317 | 310 | 340 | 328 | 355 | 365 | 382 | 403 | 410 | 410 |
| UK | 734 | 764 | 811 | 820 | 856 | 881 | 842 | 859 | 908 | 913 |
| Austria | 247 | 258 | 263 | 272 | 274 | 265 | 260 | 260 | 270 | 280 |
| Netherlands | 370 | 385 | 393 | 395 | 429 | 430 | 410 | 430 | 435 | 448 |
| | | | | | | | | | | |
| **Eastern Europe** | 1,106 | 993 | 1,137 | 1,106 | 1,174 | 1,387 | 1,487 | 1,605 | 1,757 | 1,926 |
| Russia | 270 | 202 | 274 | 217 | 265 | 327 | 351 | 405 | 445 | 523 |
| Poland | 228 | 210 | 220 | 225 | 225 | 230 | 245 | 245 | 276 | 278 |
| | | | | | | | | | | |
| **Asia** | 9,609 | 10,436 | 11,032 | 10,737 | 11,750 | 12,569 | 13,004 | 13,944 | 15,480 | 17,124 |
| China | 2,500 | 3,006 | 3,081 | 3,473 | 3,747 | 4,408 | 4,893 | 6,076 | 7,176 | 8,752 |
| Japan | 3,568 | 3,557 | 3,692 | 3,527 | 3,648 | 3,886 | 3,794 | 3,744 | 3,691 | 3,751 |
| S. Korea | 766 | 837 | 853 | 758 | 882 | 817 | 846 | 971 | 1,167 | 1,151 |
| Indonesia | 497 | 593 | 698 | 690 | 847 | 871 | 919 | 981 | 1,003 | 1,013 |
| Taiwan | 869 | 976 | 1,000 | 917 | 982 | 1,094 | 1,055 | 1,112 | 1,207 | 1,235 |
| India | 514 | 562 | 613 | 665 | 743 | 830 | 896 | 962 | 1,043 | 1,140 |
| Thailand | 520 | 545 | 688 | 670 | 707 | 705 | 726 | 761 | 842 | 882 |
| | | | | | | | | | | |
| **Australasia** | 432 | 481 | 503 | 515 | 505 | 531 | 586 | 594 | 609 | 649 |
| | | | | | | | | | | |
| **Latin America** | 1,796 | 1,949 | 2,077 | 2,144 | 2,312 | 2,367 | 2,414 | 2,494 | 2,480 | 2,741 |
| Brazil | 748 | 917 | 959 | 945 | 1,041 | 1,068 | 1,113 | 1,170 | 1,084 | 1,235 |
| Mexico | 557 | 529 | 567 | 613 | 654 | 678 | 701 | 722 | 725 | 756 |
| Argentina | 184 | 211 | 239 | 235 | 238 | 290 | 274 | 227 | 275 | 288 |
| Chile | 15 | 25 | 30 | 68 | 83 | 64 | 75 | 125 | 129 | 180 |
| Colombia | 81 | 90 | 91 | 87 | 91 | 94 | 100 | 107 | 110 | 115 |
| | | | | | | | | | | |
| **Africa** | 406 | 388 | 380 | 360 | 390 | 440 | 460 | 476 | 509 | 585 |
| S. Africa | 281 | 230 | 215 | 218 | 213 | 216 | 237 | 254 | 260 | 288 |
| Egypt | 58 | 92 | 98 | 77 | 110 | 152 | 150 | 153 | 186 | 224 |
| | | | | | | | | | | |
| **Total World** | 29,371 | 30,969 | 32,725 | 32,553 | 34,717 | 36,117 | 36,561 | 38,301 | 40,086 | 42,983 |

Source: Paperloop's Global Industry Statistics Database.

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 82 of 512 PageID

Case: 15-2385    Document: 56-2    #:20310    Filed: 10/27/2015    Pages: 512

pany's existence. But in 2003 JSG was taken private by Madison Dearborn Partners in a $3.66 billion deal, which included the spinoff of JSG's equity interest in Smurfit-Stone Container to shareholders.

Smurfit-Stone remains the largest North American containerboard producer with an 18% market and is the largest seller of containerboard in the open market, with shipments in 2004 of 3.6 million tons. But the company is still saddled with $4 billion in debt and a number of higher cost containerboard mills and excess box capacity. In mid-2005 the company announced the closure of its New Richmond, Que., linerboard mill and its Bathurst, N.B., semichemical medium mill. The company also permanently closed the No. 2 machine at its Fernandina Beach, Fla., linerboard mill, which had been down since April 2001. In the fourth quarter of 2005, the company was expected to announce a major rationalization plan for its 130 corrugated box plants, which had 2004 shipments of 86.5 billion sq ft, and possibly more mill closures.

Through box plant acquisitions, producers have been increasing their level of integration and reducing their exposure to the domestic independent market and declining export markets. One major example was International Paper's acquisition of Box USA in mid-2004, adding the company's 24 box plants. But there have been numerous small acquisitions of independent converters. Most major producers are now more than 70% integrated (Smurfit-Stone), with some up to 90-100% and higher (Weyerhaeuser, Temple-Inland).

## CURRENT MARKET CONDITIONS

Sluggish growth in U.S. corrugated box demand since 2000 has resulted in excess industry containerboard capacity, volatile pricing and weak profitability. Box shipments declined by an unprecedented 6.3% between 1999's peak shipments of 405.1 billion $ft^2$ and 379.4 billion $ft^2$ in 2002 and then remained flat in 2003. This was a significant change from the past in which shipments have closely tracked industrial production and grew at a 2.7%/yr average annual rate through the 1990s.

The U.S. recession in 2001 was the main reason for the decline but long-term structural factors were also a major factor. The large U.S. trade deficit caused by the strong dollar resulted in a flood of merchandise imports packaged in corrugated boxes made overseas. Many of these imports were from China, where that country's containerboard and corrugated box industry was expanding rapidly. Another factor in the slower growth may have been a changing retail environment in which mass merchandisers such as Wal-Mart have pressured major consumer products companies to cut

costs, including reducing the amount of packaging.

Domestic corrugated box cutup is the largest driver of containerboard demand, but linerboard exports have also been important for the industry. Linerboard exports, however, were in a longer term declining trend, dropping from a peak of 4.5 million tons in 1997 to under 2.5 million tons by 2001. The major reasons for the decline were the strong U.S. dollar and buildup of new containerboard capacity based mainly on recycled fiber in China and Europe.

The drop in domestic box demand and linerboard export shipments left the North American containerboard industry with a significant amount of excess capacity. Through a series of mill closures, producers reduced North American capacity by 5.0 million tons or 13% over the 1998–2004 period. But the major consolidation in the industry and resulting integration of acquired companies drove major productivity gains, resulting in the addition of 4 million tons of capacity growth, resulting in a net industry capacity reduction of only about 2-3%, according to Smurfit-Stone Container estimates.

U.S. containerboard mills cut back on production to keep supply in balance with demand. Average operating rates for containerboard mills declined from 96.2% in 1999 to 86.3% by 2001 and then rose to 91% by 2003. Total containerboard inventories at box plants and mills remained relatively high over the 1998–2001 ranging in most months between 2.7–3.0 million tons and 4.7 to 5.0 weeks of supply but began to decline in the second half of 2003 as the economy picked up strength as buyers began to rebuild inventories.

The high inventory levels and low operating rates caused prices to begin dropping in 2001, with the price of 42-lb linerboard in the eastern U.S. declining from $460/ton in 2000 to $355/ton by the end of 2003 (before volume and other customer-specific discounts), according to *Pulp & Paper Week*. This brought prices down to the variable cost level of higher cost mills, which set the stage for another recovery in prices as mills cut back on production and inventories dropped to 2.4 million tons or 4.3 weeks of supply by the end of 2003.

Box shipments rose 4% in the first half of 2004 and 2.8% for the entire year in the strongest performance since 1999 as customers continued to replenish inventories. Containerboard mills ran at 95.2% for 2004 and inventories dropped to their lowest level in a decade to under 2.3 million tons from April to June (3.6 to 3.8 weeks of supply). Producers announced spring and fall price increases and prices rose by $95/ton to $450/ton by the summer. But inventories began to rise in the second half of the year as the frenzied demand began to cool and mills failed to cut back fast enough production. This caused inventories to rise by 431,000 tons in

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 83 of 512 PageID
Case: 15-2385 Document: 56-2 #:20311 Filed: 10/27/2015 Pages: 512

the second half of the year to end 2004 at nearly 2.7 million tons or 4.6 weeks of supply.

Box shipments rose in January 2005 but then began to weaken due to a brief downturn in U.S. industrial production (nondurables), which may have triggered inventory reduction by consumer products companies. North American containerboard producers in February announced a $50/ton price increase on containerboard to take effect in the spring. But the softness in box demand combined with weakening export markets caused producers to beginning discounting domestic prices. Export prices declined rapidly in the first half of 2005 as U.S. producers pushed more tonnage overseas combined with a significant expansion in recycled containerboard capacity in China and Europe. Shipments to China dropped sharply after the Chinese government in May announced preliminary antidumping duties ranging from 16–65% on North American producers.

Producers were unsuccessful in pushing through their $50/ton spring price increase and instead domestic prices began to crumble. The price for 42-lb linerboard dropped to $390–400/ton in the eastern U.S., with even lower spot prices down to the mid-$300/ton range, according to *Pulp & Paper Week*. This brought spot prices back close to where they were before the 2004 price increases despite significant energy-related cost increases and below the level of higher cost mills in the industry.

North American producers responded by shuttering more than 1.0 million tons of production capacity around the third quarter of 2005. Menasha Corp. closed its 306,000 ton/yr Otsego, Mich., corrugating medium mill in August after termination of a long-term natural gas contract. International Paper shut down its 100,000 ton/yr Fort Madison, Iowa, semichemical medium mill. Smurfit-Stone Container shut down its 235,000-ton/yr New Richmond, Que., and 243,000 ton/yr Bathurst, N.B., semichemical medium mill. The company also announced plans to shut 20-30 box plants over the 2006-2008 period. Norampac shut the 150,000 ton/yr No. 1 kraft linerboard machine at its New Richmond, Que., mill.

Box shipments through August were down 1.7% from a year ago, but the containerboard market began to tighten in September as box shipments showed a somewhat less than normal seasonal pickup. Hurricanes Rita and Katrina caused the loss of an estimated 150,000 tons of containerboard production due to mill curtailments and inventory destruction. The hurricanes also contributed to a significant increase in energy and freight costs and resulted in major dislocations in the transportation system resulting in delivery delays. Sensing a change in the market independent converters and export customers began to restock

inventories, adding to overall demand.

Producers announced a $30–$40/ton increase for October which was accepted by independent converters after integrated suppliers announced around an 8% price increase on corrugated boxes and 9–11% increase on sheets. The tightness in the market was confirmed by industry statistics, which showed total U.S. containerboard inventories at box plants and mills dropped by 163,500 tons in September to end the month at 2.37 million tons 3.9 weeks of supply—the lowest level for that month since 1994. Inventories were also the lowest level in 15 months since the extreme lows reached in the summer of 2004.

U.S. linerboard export prices rose by $20–30/ton or more in the fall in Europe and Latin American as offshore customers also began to rebuild inventories. The Chinese government in late September announced final antidumping duties of 11% to 56% on U.S. producers, slightly lower than originally announced, which may enable suppliers at the lower end of the penalty range to increase shipments to China.

## FUTURE MARKET OUTLOOK

North American corrugated box and containerboard demand should pick up strength in 2006, but the loss in U.S. kraft linerboard export markets appears to be permanent. Corrugated box shipments are projected to grow 2% in 2006 following a 0.4% decline in 2005 as the industry completes a major inventory cycle, according to RISI forecasts. Box shipments in 2005 were much weaker than U.S. nondurable goods production as customers reduced inventories in the first half of the year to resist announced price increases and also because of economic uncertainty caused by rising energy costs.

The recovery in corrugated box demand in 2006 would increase domestic containerboard demand, keep inventories low and lift mill operating rates to around the 95% range at which the industry can push through price increases. Producers announced a $40/ton price increase for early January 2006 and were expected to try for a third price increase in late spring.

But not much help will be provided by export demand for U.S. kraft linerboard, except from Latin America. The loss in export markets appears to be permanent because of the growth in recycled containerboard capacity in China, Western Europe and other parts of the world. Recycled containerboard capacity in China is expected to jump by more than 6.0 million tons over the 2004–2007 period, while Europe became of net exporter of containerboard several years ago. U.S. kraft linerboard exports in 2006 are projected to be about 3.0 million tons (18% of total production) in 2006, down from as high as 4.5 million (24%) in 1997,

NORAMPAC00018661

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 84 of 512 PageID
Case: 15-2385 Document: 56-2 #:20312 Filed: 10/27/2015 Pages: 512

252 2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING

according to RISI estimates.

A future challenge for North American container-board producers will be whether they can keep future supply in balance with demand because of "capacity creep." RISI estimates producers will need to remove as much as 700,000 tons of higher cost capacity annually to offset incremental capacity growth. In 2005, North America producers shut one million tons of containerboard capacity (and this does not include Weyerhaeuser's closure of a 350,000 ton/yr machine in Plymouth, N.C., in February 2006). North American producers shut down around six million tons of higher cost capacity since 2000, but because of capacity creep during this period, the net reduction in capacity has been less than one million tons, according to RISI estimates.

International Paper as part of a major "transformation" program said it would close or sell its 200,000 ton/yr Terre Haute, Ind., medium mill and its interest in the 150,000 ton/yr Groveton, N.H., medium mill. In addition, the company said it was evaluating future options for its 300,000 ton/yr Pineville, La., kraft linerboard mill. However, the company is planning to convert an uncoated freesheet machine at its Pensacola, Fla., mill to production of 330,000 ton/yr of lightweight linerboard by the first quarter of 2007. Norampac was evaluating the future viability of its remaining Red Rock linerboard machine and its Burnaby, B.C., mill.

Mills in Canada have been vulnerable to closure because of high production costs exacerbated by the strong Canadian dollar. Cash production costs (excluding delivery) of mills in the southern U.S. for unbleached kraft linerboard ranged from around $290-$335/ton in the second quarter of 2005, according to Paperloop Benchmarking. Production costs for Canadian mills were in the $370-$400/ton range. Because of capacity closures in Canada, U.S. imports of containerboard from Canada are expected to decline, while U.S. exports into Canada should rise.

## EUROPEAN CONTAINERBOARD MARKET

European containerboard falls into two main categories, virgin fiber-based and recycled. The former includes bleached and unbleached kraftliner, white-top liner and semichemical (SC) fluting. The latter comprises testliner 1, testliner 2, testliner 3, testliner 4, recycled fluting and chipboard. Recycled fluting is often called by its German name, wellenstoff, while chipboard is more commonly known as schrenz.

Kraftliner has the best tensile-strength properties in relation to its basis weight. SC fluting is the second strongest. Testliner can only match the strength of kraftliner at relatively higher basis weights, with testliner 1 being the strongest and the scale sliding down to testliner 4. Recycled fluting and schrenz are the weakest. Schrenz is also used as a catch-all name for low quality, off-grade containerboard grades such as camoscio. Camoscio is a type of recycled fluting produced and consumed only in Italy. It is named after a breed of small deer that has a rough, mottled-brown hide.

Unbleached kraftliner is produced in the 125-g/m² to 440-g basis weight range. But the most commonly used weights are 115-g, 125-g, 140-g, 150-g and 175-g. SC fluting is made in the 112-g to 175-g range, with 127-g being the benchmark. Testliner is manufactured in the 90-g to 300-g range and recycled fluting in the 75-g to 180-g range. The most common testliner and recycled fluting types are 140-g and 105-g, respectively. Schrenz is made in the 100-g to 127-g range. Other important properties of containerboard are moisture absorption, air resistance and smoothness.

Unbleached kraftliner is made from one ply of unbleached softwood kraft pulp. Nordic SC fluting is made from one ply of neutral sulfite semichemical (NSSC) pulp. Central European SC fluting also consists of one ply, but the furnish is made from a mix of 60–70% of NSSC and 30–40% recovered paper, such as 1.05 old corrugated containers (OCC).

Testliner and recycled fluting are made from one ply of good quality recovered fiber, such as 1.04 supermarket corrugated paper and board or OCC. Some mills top up their furnish with small quantities of unbleached softwood kraft pulp, fiber-rich qualities of recovered paper such as 4.01 new shavings of corrugated board or 1.01 mixed paper and board (unsorted), which contains small quantities of pulp substitutes. These additions boost the tensile strength of the containerboard. Schrenz is made from a single ply of the lowest quality of recovered fiber, typically 1.02 mixed paper and board (sorted).

Europe consumes about 23 million tonnes/yr of containerboard in total, which translates into some 38 billion m²/yr of corrugated board production. Western European capacity amounts to 24 million tonnes/yr. And eastern European producers bring a further 5.4 million tonnes/yr to the table.

Testliner and schrenz make up the lion's share of the European market with some 40% of consumption. Recycled fluting accounts for 30%, unbleached kraftliner 15%, SC fluting 10% and bleached kraftliner just 5%. But the rates vary from country to country.

Average European corrugated board consumption per capita is 38 kg. But individual levels also vary in this area. Italy has the highest rate at 64 kg. In terms of end-users of corrugated packaging, the food and beverage sector is the most important with over 30% of

NORAMPAC00018662

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 85 of 512 PageID
#:20313
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

| EUROPEAN CONTAINERBOARD PRODUCERS | | |
|---|---|---|
| Company | Tonnes (000) | Mkt. Share |
| Jefferson Smurfit | 2,965 | 9.9% |
| SCA | 2,850 | 9.5 |
| Kappa Packaging | 2,320 | 7.7 |
| Mondi Packaging | 1,670 | 5.6 |
| SAICA | 1,525 | 5.1 |
| DS Smith | 1,035 | 3.5 |
| OTOR | 742 | 2.5 |
| Palm | 725 | 2.4 |
| Jass, Adolf | 700 | 2.3 |
| Emin Leydier | 635 | 2.1 |
| Prinzhorn Group | 634 | 2.1 |
| Pulp Mill Holding | 595 | 2.0 |
| Billerud | 565 | 1.9 |
| Stora Enso | 530 | 1.8 |
| Ilim Pulp Enterprise | 500 | 1.7 |
| Varel | 468 | 1.6 |
| La Veggia | 460 | 1.5 |
| Pro-Gest Group | 435 | 1.5 |
| VPK Packaging Group | 360 | 1.2 |
| M-Real | 345 | 1.2 |

Source: RISI.

total European consumption. The food sector is especially important in Spain, where it accounts for 40% of consumption due to the size of the agricultural produce sector.

Western Europe imported 2.4 million tonnes of containerboard in 2004, of which 54%, or 1.3 million tonnes, was kraftliner. The US, Canada, Latin America, Russia and Poland are the main sources of unbleached kraftliner imports. Most recycled containerboard imports originate in eastern Europe. Western Europe is also active on the export front. In 2004 it shipped 2.3 million tonnes outside the region. Recycled containerboard comprised 60% of this figure, or 1.4 million tonnes. Eastern Europe is the number one destination, followed by the Middle East, the Far East and Africa. The figures are based on information from RISI and the European Federation of Corrugated Board Manufacturers (FEFCO).

**MARKET OVERVIEW**

There are about 350 mills producing containerboard in Europe, 255 of which are located in western Europe and 95 in the east. There are just 17 plants manufacturing kraftliner in western Europe. Over two thirds of kraftliner and SC fluting capacity is located in Norway, Sweden and Finland. Kappa Packaging runs the largest kraftliner facility in western Europe. The Dutch group's mill in Piteå, Sweden, has a capacity of 675,000

tonnes/yr of bleached and unbleached kraftliner. Stora Enso and Billerud have the largest SC fluting plants, each with 280,000 tonnes/yr of capacity. Jefferson Smurfit operates the biggest kraftliner plant in central Europe. The Irish group's Cellulose du Pin mill in Facture, France, has a capacity of 500,000 tonnes/yr of bleached and unbleached kraftliner.

Western European recycled containerboard capacity is concentrated in Germany, Italy, France, Spain and the UK. Germany has 5.2 million tonnes/yr, Italy 2.9 million tonnes/yr, France 3 million tonnes/yr, Spain 2.5 million tonnes/yr and the UK 1.8 million tonnes/yr. The Benelux countries and Austria are also large players. Belgium and the Netherlands have 1.1 million tonnes/yr of capacity combined, while Austria can produce up to 715,000 tonnes/yr.

Germany's Papierfabrik Palm owns the largest recycled containerboard machine in Europe, a 600,000 tonne/yr unit at its Wörth mill. The next largest plants are in the 460,000-505,000 tonne/yr range. These comprise Adolf Jass' Fulda facility in Germany, DS Smith's plant in Kemsley, UK, Emin Leydier's plant in Champblain, France, Kappa Packaging's Roermond mill in the Netherlands, La Veggia's mill in Cadidavid, Italy, and the SAICA 1 facility in Zaragoza, Spain.

Western European containerboard production is heavily consolidated, with the top five players controlling 44% of total capacity. Jefferson Smurfit leads with 3.1 million tonnes/yr. Sweden's SCA is second with 2.8 million tonnes/yr. Kappa Packaging is third on 2 million tonnes/yr. SAICA is the fourth largest producer with 1.5 million tonnes/yr and DS Smith is fifth with 895,000 tonnes/yr. In late 2005, Jefferson Smurfit merged with Kappa.

These same producers dominate the western European recycled containerboard sector to a similar extent, but virgin fiber supply has a slightly different structure. The big three — Jefferson Smurfit, SCA and Kappa Packaging — represent 62% of western European kraftliner output. But the Nordic powerhouses — Billerud, Stora Enso and M-real — control 68% of the SC fluting market. The degree of consolidation also varies from country to country.

Germany is the largest market overall, consuming 4.6 million tonnes/yr of containerboard and producing 7.6 million m²/yr of corrugated packaging. Italy is the second biggest with 3.8 million tonnes/yr and 6.1 billion m²/yr. France consumes 3.5 million tonnes/yr and manufactures 5.2 billion m²/yr. Spain consumes 2.7 million tonnes/yr and produces 4.4 billion m²/yr, while the UK consumes 2.4 million tonnes/yr and makes 4.5 billion m²/yr. Russia is the largest consumer of containerboard in eastern Europe, taking 1.2 million tonnes/yr, followed by Turkey, which gobbles up 920,000 tonnes/

NORAMPAC00018663

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 86 of 512 PageID #:20314
Case: 15-2385 Document: 56-26 Filed: 10/27/2015 Pages: 512

254 2005 Pulp & Paper Global Fact & Price Book—Paperboard: Containerboard/Corrugated Packaging

## EUROPEAN CONTAINERBOARD CAPACITY CHANGES, 2004-2009

(000 tonnes)

| Country | Company | Location | Grade | Capacity | Date |
|---|---|---|---|---|---|
| **Western Europe** | | | | | |
| Austria | W. Hamburger | Pitten | Recycled Containerboard | 60 | Q1:2004 |
| Denmark | SCA | Djursland | Testliner | -200 | Q1:2006 |
| Denmark | Skjern Papierfabrik | West Denmark | Recycled Linerboard & Core-Board | 15 | Next 5 Years |
| Finland | Powerflute Oy | Kuopio | Semichemical Fluting | 35 | 2005-2007 |
| France | Papeteries de Veuze | Magnac-sur-Touvre | White Top Testliner | 30 | Q1:2004 |
| France | Emin Leydier | La Ferrandiere | Recycled Containerboard | -50 | Q4:2004 |
| France | Kaysersberg Packaging | Kaysersberg | Greyboard, White Board & Testliner | 10 | Q4:2004 |
| France | Otor | Rouen | Recycled Containerboard | 30 | Q4:2004 |
| France | Otor | Saint-Michel | Recycled Containerboard | 20 | 2004-2006 |
| France | Otor | Rouen | Recycled Containerboard | 150 | 2005 |
| France | Emin Leydier | Nogent-sur-Seine | Recycled Containerboard | 300 | Q2:2005 |
| Germany | Peters Papierfabrik | Gelsenkirchen | Testliner & Gypsum Board | 60 | 2003-2005 |
| Germany | Jefferson Smurfit | Diemelstadt | Recycled Containerboard | 40 | Q3:2004 |
| Germany | W. Hamburger/Papierfabrik Rieger | Rieger/Trostberg | White Top Testliner | 11 | Q3:2004 |
| Germany | Papier & Kartonfabrik Varel | Varel | Recycled Containerboard | 250 | Q4:2004 |
| Germany | Papierfabrik Vreden | Vreden | Recycled Containerboard | 35 | 2004-2006 |
| Germany | Adolf Jass | Rudolstadt-Schwarza | Recycled Containerboard (lightweight) | 400 | Q1:2005 |
| Germany | W. Hamburger | Schwarze Pumpe | Tesliner & Recycled Fluting | 265 | Q2:2005 |
| Germany | Papierfabrik Schoellershammer | Dueren | Recycled Containerboard | 10 | Q3:2005 |
| Germany | SCA | Aschaffenburg | Recycled Containerboard | 100 | Q1:2006 |
| Germany | Papierfabrik Rieger | Trotsberg | White Top Testliner | 11 | Q2:2006 |
| Germany | Jefferson Smurfit | Hoya | Recycled Containerboard | 140 | 2006-2007 |
| Ireland | Jefferson Smurfit | Dublin | Recycled Containerboard | -50 | Q1:2005 |
| Italy | Alce SpA | Lucca | Semichemical Medium | 10 | Q4:2004 |
| Italy | Cartiera del Polesine | Adria | Testliner & Fluting | 130 | Q4:2004 |
| Italy | Cartitalia (Pro-Gest) | Mesola | Recycled Containerboard | 35 | Q4:2004 |
| Italy | Pro-Gest | Tolentino | Recycled Fluting | 45 | Q1:2005 |
| Portugal | Gescartao | Viana do Castelo | Recycled Containerboard | 250 | 2007 |
| Spain | Union Industrial Papelera | La Pobla de Claramunt | Recycled Containerboard | 60 | 2003-2004 |
| Spain | Europac | Duenas | Recycled Containerboard | 25 | Q1:2004 |
| Spain | Jefferson Smurfit | Cordoba | Recycled Containerboard | -55 | Q4:2004 |
| Spain | Europac | Duenas | Recycled Containerboard | 25 | 2005 |
| Spain | Smurfit Espana | Mengibar | White Top Testliner & Recycled Fluting | -145 | 2005 |
| Spain | Alier | Rosello | Recycled Containerboard | 11 | Q2:2005 |
| Spain | Smurfit Espana | Mengibar | White Top & Unbleached Testliner & Recycled Fluting | 245 | mid-2005 |
| Spain | SAICA | Zaragoza | Recycled Containerboard | 400 | Q2:2006 |
| Sweden | Kappa Packaging | Pitea | Kraftliner | 50 | Q2:2007 |
| Switzerland | Mondi Packaging Europe | Moudon | Recycled Containerboard | -50 | Q2:2004 |
| Switzerland | SCA | Oftringen | Recycled Containerboard | -100 | Q4:2005 |
| United Kingdom | Papermarc | Burnley | Recycled Containerboard | -50 | Q3:2004 |
| United Kingdom | Mondi Packaging | Creams | Recycled Containerboard | -65 | Q4:2004 |
| United Kingdom | Active Craft | Bury | Recycled Containerboard | -30 | Q2:2005 |
| United Kingdom | BPB | Aberdeen | Recycled Linerboard | -240 | Q2:2005 |
| United Kingdom | VPK | Selby | Testliner 2 & 3 | 10 | Q2:2005 |
| United Kingdom | Smith Anderson | Fettykil | Recycled Containerboard | -45 | Q3:2005 |
| United Kingdom | St Regis | Kemsley | Testliner & Plasterboardliner | 15 | Q2:2006 |
| United Kingdom | St Regis | Wansbrough | Testliner & Plasterboardliner | 15 | Q2:2006 |
| **Eastern Europe** | | | | | |
| Kazakhstan | Kazakhstan Kagazy | Abai | Recycled Containerboard | 28 | 2005 |
| Lithuania | Klaipedos Kartonas | Klaipeda | Recycled Containerboard | 65 | 2006 |
| Poland | Frantschach Swiecie | Swiecie | Lightweight Unbleached Kraftliner | 25 | Q4:2004 |
| Poland | Intercell | Ostroleka | Recycled Containerboard | 160 | 2006 |
| Romania | Ambro | Suceava | Kraftliner | -150 | Q1:2005 |
| Romania | Ambro | Suceava | Wellenstoff & Schrenz | 60 | Q1:2005 |
| Russia | Syassky | near Lake Lagoda | White Top Liner | -80 | 2005 |
| Russia | Ilim Pulp Enterprise | Kotlas | Fluting & Kraftliner | 55 | Q3:2005 |
| Russia | Segezha | Segezha | Unbleached Sack Kraft & Kraftliner | 70 | 2006 |
| Ukraine | Donetsk-Vtorma | Donetsk | Recycled Containerboard | 24 | 2004 |
| Ukraine | Rubizhansky Cardboard & Pkg. | Kiev | Fluting | 30 | Q4:2006 |

Source: RISI.

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 87 of 512 PageID #:20315
Case: 15-2385    Document: 56-28    Filed: 10/27/2015    Pages: 512

2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING  255

## EUROPEAN KRAFTLINER PRICES

(175-g unbleached; EUR/tonne)

| | | Kraftliner - 175 g+ Germany | | Kraftliner - 175 g+ France | | Kraftliner - 175 g+ United Kingdom | | Kraftliner - 175 g+ Italy | |
|---|---|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High | Low | High |
| **2005** | | | | | | | | | |
| Q4 | | 440 | 475 | 448 | 493 | 379 | 450 | 383 | 417 |
| Q3 | | 413 | 440 | 422 | 465 | 377 | 440 | 355 | 400 |
| Q2 | | 435 | 460 | 435 | 475 | 400 | 445 | 387 | 423 |
| Q1 | | 447 | 472 | 443 | 483 | 394 | 430 | 418 | 462 |
| **2004** | | | | | | | | | |
| Q4 | | 453 | 487 | 455 | 495 | 414 | 450 | 437 | 483 |
| Q3 | | 427 | 468 | 425 | 470 | 420 | 466 | 407 | 453 |
| Q2 | | 420 | 460 | 425 | 470 | 412 | 462 | 383 | 427 |
| Q1 | | 400 | 460 | 400 | 470 | 376 | 424 | 350 | 415 |
| **2003** | | | | | | | | | |
| Q4 | | 400 | 460 | 400 | 470 | 394 | 444 | 350 | 415 |
| Q3 | | 400 | 460 | 400 | 470 | 421 | 475 | 360 | 430 |
| Q2 | | 417 | 485 | 417 | 490 | 419 | 472 | 388 | 458 |
| Q1 | | 420 | 490 | 420 | 495 | 438 | 494 | 395 | 465 |
| **2002** | | | | | | | | | |
| Q4 | | 420 | 490 | 420 | 495 | 470 | 530 | 395 | 465 |
| Q3 | | 420 | 490 | 420 | 495 | 451 | 511 | 395 | 465 |
| Q2 | | 393 | 463 | 393 | 468 | 468 | 533 | 348 | 418 |
| Q1 | | 380 | 450 | 380 | 455 | 491 | 559 | 335 | 405 |
| **2001** | | | | | | | | | |
| Q4 | | 428 | 498 | 491 | 551 | 525 | 592 | 412 | 482 |
| Q3 | | 450 | 520 | 470 | 540 | 547 | 613 | 420 | 490 |
| Q2 | | 521 | 559 | 470 | 540 | 608 | 655 | 430 | 500 |
| Q1 | | 542 | 573 | 475 | 545 | 618 | 651 | 452 | 522 |
| **2000** | | | | | | | | | |
| Q4 | | 542 | 573 | 485 | 555 | 665 | 699 | 465 | 535 |
| Q3 | | 542 | 573 | 485 | 555 | 653 | 686 | 465 | 535 |
| Q2 | | 542 | 573 | 485 | 555 | 632 | 664 | 465 | 535 |
| Q1 | | 491 | 522 | 445 | 515 | 547 | 578 | 460 | 525 |
| **Year end** | | | | | | | | | |
| 1999 | Q4 | 435 | 470 | 427 | 457 | 410 | 437 | 413 | 446 |
| 1998 | Q4 | 463 | 484 | 457 | 488 | 421 | 443 | 439 | 468 |
| 1997 | Q4 | 470 | 491 | 473 | 503 | 443 | 465 | 432 | 478 |
| 1996 | Q4 | 414 | 445 | 414 | 447 | 376 | 388 | 382 | 427 |
| 1995 | Q4 | 518 | 586 | 564 | 602 | 511 | 566 | 575 | 668 |
| 1994 | Q4 | 460 | 473 | 457 | 473 | 420 | 446 | 460 | 480 |
| 1993 | Q4 | 305 | 345 | 320 | 364 | 285 | 326 | 279 | 324 |
| 1992 | Q4 | 406 | 416 | 432 | 462 | 339 | 350 | 298 | 320 |
| 1991 | Q4 | 430 | 452 | 464 | 490 | 328 | 337 | 313 | 320 |
| 1990 | Q4 | 429 | 440 | 473 | 488 | 313 | 320 | 289 | 310 |
| 1989 | Q4 | 588 | 588 | 556 | 579 | 455 | 455 | 310 | 331 |
| 1988 | Q4 | 560 | 560 | 526 | 556 | 457 | 457 | 367 | 367 |
| 1987 | Q4 | 506 | 506 | 503 | 503 | 392 | 392 | 351 | 351 |
| 1986 | Q4 | 491 | 491 | 495 | 495 | 399 | 399 | 310 | 325 |

Note: Average price from Western European sources.
Source: PPI This Week.

NORAMPAC00018665

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 88 of 512 PageID #:20316
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

256 2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING

## EUROPEAN TESTLINER PRICES

(testliner 2; EUR/tonne)

| | Testliner 2 - 140 g Germany | | Testliner 2 - 140 g France | | Testliner 2 - 140 g United Kingdom | | Testliner 2 - 140 g Italy | |
|---|---|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High | Low | High |
| **2005** | | | | | | | | |
| Q4 | 307 | 343 | 328 | 368 | 321 | 365 | 270 | 310 |
| Q3 | 275 | 310 | 295 | 330 | 312 | 349 | 255 | 290 |
| Q2 | 295 | 332 | 312 | 353 | 324 | 376 | 265 | 300 |
| Q1 | 308 | 348 | 322 | 368 | 320 | 356 | 282 | 318 |
| **2004** | | | | | | | | |
| Q4 | 318 | 360 | 330 | 380 | 338 | 374 | 297 | 332 |
| Q3 | 303 | 363 | 317 | 365 | 365 | 402 | 285 | 320 |
| Q2 | 310 | 370 | 320 | 375 | 398 | 440 | 295 | 330 |
| Q1 | 298 | 360 | 303 | 363 | 331 | 382 | 275 | 317 |
| **2003** | | | | | | | | |
| Q4 | 275 | 340 | 280 | 340 | 321 | 371 | 245 | 290 |
| Q3 | 253 | 323 | 260 | 320 | 327 | 380 | 222 | 262 |
| Q2 | 283 | 367 | 300 | 353 | 335 | 392 | 272 | 323 |
| Q1 | 277 | 360 | 285 | 340 | 353 | 413 | 262 | 310 |
| **2002** | | | | | | | | |
| Q4 | 283 | 365 | 285 | 347 | 393 | 469 | 255 | 300 |
| Q3 | 310 | 400 | 305 | 380 | 370 | 452 | 295 | 340 |
| Q2 | 243 | 323 | 233 | 293 | 326 | 409 | 218 | 248 |
| Q1 | 233 | 313 | 223 | 283 | 333 | 418 | 180 | 211 |
| **2001** | | | | | | | | |
| Q4 | 298 | 378 | 350 | 410 | 368 | 449 | 320 | 360 |
| Q3 | 323 | 403 | 380 | 440 | 393 | 474 | 340 | 380 |
| Q2 | 355 | 435 | 425 | 485 | 409 | 491 | 360 | 400 |
| Q1 | 368 | 448 | 425 | 485 | 419 | 498 | 383 | 441 |
| **2000** | | | | | | | | |
| Q4 | 385 | 465 | 425 | 485 | 450 | 533 | 413 | 475 |
| Q3 | 385 | 465 | 425 | 485 | 454 | 518 | 434 | 496 |
| Q2 | 375 | 455 | 395 | 455 | 468 | 492 | 420 | 479 |
| Q1 | 325 | 405 | 335 | 395 | 391 | 416 | 362 | 413 |
| **1999** | | | | | | | | |
| Q4 | 310 | 390 | 335 | 395 | 361 | 385 | 346 | 398 |
| Q3 | 324 | 344 | 303 | 363 | 329 | 349 | 298 | 336 |
| Q2 | 307 | 327 | 275 | 335 | 309 | 332 | 279 | 310 |
| Q1 | 307 | 327 | 288 | 333 | 298 | 320 | 284 | 317 |
| **Year end** | | | | | | | | |
| 1998 Q4 | 317 | 337 | 330 | 340 | 299 | 324.5 | 290 | 320 |
| 1997 Q4 | 307 | 337 | 313 | 335 | 304 | 339 | 279 | 305 |
| 1996 Q4 | 281 | 319 | 301 | 328 | 329 | 363 | 244 | 277 |
| 1995 Q4 | 380 | 414 | 409 | 437 | 396 | 428 | 320 | 388 |
| 1994 Q4 | 399 | 429 | 399 | 419 | 346 | 365 | 413 | 439 |
| 1993 Q4 | 220 | 230 | 229 | 244 | 234 | 263 | 196 | 212 |
| 1992 Q4 | 254 | 274 | 287 | 308 | 252 | 268 | 222 | 231 |
| 1991 Q4 | 317 | 331 | 300 | 312 | 285 | 304 | 235 | 248 |
| 1989 Q4 | 363 | 389 | 351 | 358 | 319 | 333 | 258 | 279 |
| 1988 Q4 | 409 | 424 | 389 | 419 | 314 | 333 | 289 | 294 |
| 1987 Q4 | 404 | 419 | 381 | 412 | 353 | 368 | | |
| 1986 Q4 | 332 | 343 | 320 | 351 | 309 | 309 | | |

Note: Average price from Western European sources.
Source: PPI This Week.

CONFIDENTIAL

NORAMPAC00018666

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 89 of 512 PageID #:20317
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING 257

yr. Poland is the third largest on 849,000 tonnes/yr.

The converting industry is more fragmented than the containerboard side. FEFCO lists 491 companies involved in corrugated packaging production in Europe, which operate 741 plants between them. The actual number is probably over 600 companies with more than 1,000 plants, though, as the trade association's membership does not embrace Russia, the Ukraine, the Baltic countries, Belarus and most of southeast Europe. Germany has the highest number of corrugating facilities in western Europe with 112, followed by Spain with 107, Italy on 106, and the UK on 84. Turkey has 125 corrugating facilities. The majority of corrugating lines in western and eastern Europe are over 2 m wide. But the situation is reversed in Turkey. The same companies that dominate western European containerboard production are also leaders in the corrugated board industry. This is due to the heavy level of integration in the sector.

## MARKET TRENDS

The long-term prospect for European packaging demand is for moderate growth. Market watchers predict that containerboard demand will grow by 2.4% per year during 2004–2019. The point-of-sale and display packaging sector is currently enjoying the highest rates of growth. But the main challenges facing the industry in future are likely to come from government-led initiatives to reduce packaging waste in a bid to protect the environment, and the advance of reusable plastic crates. Recycled grades are expected to continue to win market share in western Europe as the quality improves and prices remain low in comparison to virgin fiber grades. Eastern Europe is expected to continue to enjoy healthy demand growth for containerboard, averaging 7.7% per year until 2009. Imports into eastern Europe are to set to mushroom on the recycled side, as western producers tap into the expanding market amid declining demand for imports in Asia due to domestic capacity expansions. Eastern Europe, namely Russia, is forecast to remain a net exporter of kraftliner as capacity continues to increase, while production costs remain low compared to Nordic competitors. Overall, recycled containerboard capacity is expected to swell during 2004-2006, before the balance tips toward oversupply. Capacity is then forecast to shrink following industry restructuring.

## PRICING

The pricing picture is complicated by a number of factors. Integrated converters tend to follow prices dictated by the overall group strategy. The multinational corrugated packaging firms also take part in grade swaps to boost their financial profile. Furthermore, the largest customers, who consume tens of thousands of tonnes of containerboard or corrugated packaging annually, often pay more per tonne or m² than smaller end-users. This is because industrial-scale packaging operations rely on an uninterrupted flow of board with very stable strength, appearance and runnability characteristics in order to operate efficiently. The multinational end-users pay a premium to the multinational packaging producers in order to guarantee these volumes. Some mills also give discounts to small, local converters in order to offload excess stocks, while keeping prices for major customers stable. The sellers do this because limited, local sales tend not to impact the overall market price, while rumors of price cuts on major contracts can snowball into a Europe-wide run on prices.

European traders favor free-delivered contracts, which cover the costs of transportation and extend the sellers' responsibility over the shipment until the buyer signs for the goods at its depot. Delivery costs add Euro 8–12/tonne to the basic price of containerboard, depending on the distance from the mill to the converting plant. Italian prices usually stand 10–20% below northern European levels. Prices also tend to fall off the further east the product travels. Levels in Poland are similar to Italian prices. But prices in the Ukraine and Bulgaria are over 50% lower than in Germany.

In 2004, an improvement in the demand/supply balance enabled western European containerboard producers to push for price rises twice during the year. However, the increases fell short of sellers' targets and were followed by some erosion. Weak demand and competition from lower-priced imports limited price gains. Producers struggled with rising costs for energy and chemicals throughout the year.

## ASIAN CONTAINERBOARD MARKET

Most of the containerboard manufactured in Asia contains at least some recovered fiber. Kraft-top liner, which is a hybrid linerboard made up of a virgin fiber top layer and a recovered fiber bottom layer, is one of the most popular grades in the region. It is fast becoming the linerboard of choice for many Asian buyers, at the expense of kraftliner and testliner. Kraft-top liner is cheaper than kraftliner and only marginally more expensive than testliner, but is of a better quality. Some large US importers of Chinese products such as electronic goods, household products and other consumer items, have agreed to let Chinese exporters use kraft-top liner instead of kraftliner in their boxes. As a result,

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 90 of 512 PageID #:20318
Case: 15-2385 Document: 56-26 Filed: 10/27/2015 Pages: 512

### TOP 5 ASIAN CONTAINERBOARD PRODUCERS IN 2004

(000 tonnes)

| Company | Capacity | Market Share (%) |
|---|---|---|
| Oji Paper | 2,740 | 6.0% |
| Nine Dragons/America Chung Nam | 2,374 | 5.2 |
| Rengo* | 1,919 | 4.2 |
| Nippon Paper Group | 1,624 | 3.5 |
| Lee & Man Paper Manufacturing | 1,393 | 3.0 |

* Includes Rengo's share of Zhongshan Ren Hing Paper and Zhongshan Rengo Hung Hing.
Source: RISI.

demand for kraft-top liner has surged.

In China, the standard basis weights for kraft-top liner are 125–175-gsm, while the benchmark weights for testliner and recycled fluting are 125-g and 110–112-g, respectively. While the country does produce some unbleached kraftliner, it is not really a true kraftliner as it usually contains recovered fiber. The bulk of the kraftliner consumed in China is imported from Europe, the US and Russia and has basis weights

of 125–175-g. In Taiwan, kraft-top liner is referred to as kraftliner A and has a basis weight of 250-g. Testliner is called kraftliner B2 and also has a 250-g weight. Domestically produced corrugating medium has a standard basis weight of 100-g. In the Korean market, the benchmark testliner ranges from 180-g to 210-g, while corrugating medium has a standard weight of 115-g. Japanese kraftliner also usually contains some recovered fiber.

### MARKET TRENDS

The Asian containerboard market has grown considerably over the past few years. In 2002, the region churned out 37.4 million tonnes of containerboard, compared to 34.9 million tonnes in 2002, according to *Paperloop's Annual Review of Global Pulp & Paper Statistics 2005*. In 2004, the region moved ahead again; producing 41.4 million tonnes of containerboard. The increase can be attributed to a raft of new machines brought on in China recently.

With major retail stores such as Wal-Mart and Carrefour growing their businesses and stores in China, and with the country's entry into the World Trade Organization in January 2002, China has worked on aligning its industry by significantly grow-

### MAJOR NEW CONTAINERBOARD MACHINES IN ASIA: 2004 AND ONWARD

| Company | Location | Country | Capacity (tonnes/yr) | Grade | Start of commercial production |
|---|---|---|---|---|---|
| Lee & Man Paper Manufacturing | Changshu, Jiangsu | China | 200,000 | Recycled linerboard | Jan-04 |
| Wuxi Long Chen Paper | Wuxi, Jiangsu | China | 180,000 | Recycled containerboard | Feb-04 |
| Zaozhuang Hua Run Paper | Zaozhuang, Shandong | China | 150,000 | Gypsum paper, recycled containerboard | Aug-04 |
| Lee & Man Paper Manufacturing | Changshu, Jiangsu | China | 350,000 | Recycled fluting | Sep-04 |
| Jiangsu Wanda Paper | Changzhou, Jiangsu | China | 150,000 | Recycled containerboard | Oct-04 |
| Nine Dragons Paper Industries | Dongguan, Guangdong | China | 250,000 | Recycled fluting | Oct-04 |
| Nine Dragons Paper Industries | Dongguan, Guangdong | China | 250,000 | Recycled fluting | Oct-04 |
| Shanghai Chung Loong Paper | Pudong, Shanghai | China | 300,000 | Recycled containerboard | Nov-04 |
| Henan Yinge Industrial Investment Holding | Luohe, Henan | China | 150,000 | Recycled containerboard | Jan-05 |
| Zhejiang Jingxing Nippon Paper | Pinghu, Zhejiang | China | 150,000 | Recycled fluting | Jan-05 |
| Wanlida Paper | Zengcheng, Guangdong | China | 300,000 | Recycled containerboard | Apr-05 |
| Nine Dragons Paper Industries | Taicang, Jiangsu | China | 450,000 | Recycled fluting | May-05 |
| Lee & Man Paper Manufacturing | Hongmei, Guangdong | China | 400,000 | Recycled containerboard | End 2005 |
| Yuen Foong Yu Paper Manufacturing | Yangzhou, Jiangsu | China | 200,000 | Recycled containerboard | End 2005 |
| Zhejiang Jian Paper Packet | Haiyan, Zhejiang | China | 300,000 | Recycled containerboard | Early 2006 |
| Zhangjiagang Huaxing Paper | Zhangjiagang, Jiangsu | China | 150,000 | Recycled fluting | Mar-06 |
| Packages | Kasur | Pakistan | 110,000 | Recycled containerboard/ white-lined chipboard | Jun-06 |
| Yuen Foong Yu Paper Manufacturing | Yangzhou, Jiangsu | China | 200,000 | Recycled containerboard | Mid-2006 |
| Visy Paper | Tumut, New South Wales | Australia | 240,000 | Unbleached kraftliner | 2007 |
| Wuxi Long Chen Paper | Wuxi, Jiangsu | China | 400,000 | Recycled containerboard | 2007 |

Source: *PPI Asia News.*

CONFIDENTIAL

NORAMPAC00018668

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 91 of 512 PageID #:20319
Case: 15-2385 Document: 56-2 Filed: 10/27/2015 Pages: 512

2005 PULP & PAPER GLOBAL FACT & PRICE BOOK—PAPERBOARD: CONTAINERBOARD/CORRUGATED PACKAGING 259

## ASIAN UNBLEACHED LINERBOARD PRICES

(US$/tonne)

| | China Kraft-top imports 125-g | S. Korea Testliner domestic 180-g | Taiwan Kraftliner A domestic 250-g | Japan kraftliner (some recycled content) 220-g |
|---|---|---|---|---|
| 2005:Q3 | | | 989 | 401 |
| 2005:Q2 | 346 | 566 | 1,013 | 398 |
| 2005:Q1 | 347 | 586 | 1,045 | 404 |
| 2004:Q4 | 361 | 566 | 1,060 | 392 |
| 2004:Q3 | 331 | 536 | 999 | 392 |
| 2004:Q2 | 345 | 558 | 982 | 417 |
| 2004:Q1 | 358 | 584 | 988 | 429 |
| 2003:Q4 | 326 | 542 | 998 | 392 |
| 2003:Q3 | 333 | 550 | 934 | 392 |
| 2003:Q2 | 353 | 540 | 909 | 411 |
| 2003:Q1 | 323 | 591 | 906 | 435 |
| 2002:Q4 | 332 | 561 | 882 | 411 |
| 2002:Q3 | 330 | 550 | 888 | 435 |
| 2002:Q2 | 328 | 554 | 885 | 508 |
| 2002:Q1 | 302 | 464 | 820 | |
| 2001:Q4 | 340 | 418 | 854 | |
| 2001:Q3 | 363 | 405 | 919 | |
| 2001:Q2 | 363 | 372 | 891 | |
| 2001:Q1 | 379 | 598 | 897 | |
| 2000:Q4 | 403 | 589 | 971 | |
| 2000:Q3 | 438 | 721 | 1,021 | |
| 2000:Q2 | 438 | 487 | 1,013 | |
| 2000:Q1 | 439 | 774 | 1,012 | |
| 1999:Q4 | 431 | 720 | 1,048 | |
| 1999:Q3 | 358 | 707 | 1,006 | |
| 1999:Q2 | 325 | 661 | 891 | |
| 1999:Q1 | 325 | 362 | 900 | |
| 1998:Q4 | 354 | 353 | 966 | |
| 1998:Q3 | 327 | 289 | 840 | |
| 1998:Q2 | 343 | 333 | 855 | |
| 1998:Q1 | 322 | 431 | 930 | |
| 1997:Q4 | 216 | 411 | 910 | |
| 1997:Q3 | 351 | 418 | 977 | |
| 1997:Q2 | 359 | 412 | 1,050 | |
| 1997:Q1 | 272 | 485 | 978 | |
| 1996:Q4 | 356 | 345 | 1,053 | |
| 1996:Q3 | 413 | 355 | 1,092 | |
| 1996:Q2 | 482 | 380 | 1,102 | |
| 1996:Q1 | 493 | 420 | 1,114 | |
| 1995:Q4 | 499 | 440 | 1,159 | |
| 1995:Q3 | 583 | 547 | 1,174 | |
| 1995:Q2 | 543 | 728 | | |
| 1995:Q1 | 482 | | | |
| 1994:Q3 | 460 | | | |

Source: PPI Asia News.

CONFIDENTIAL

NORAMPAC00018669

Case: 1:10-cv-05711 Document #: 756-3 *SEALED* Filed: 09/19/14 Page 92 of 512 PageID
Case: 15-2385    Document: 56-26    Filed: 10/27/2015    Pages: 512
#:20320

ing containerboard and corrugated board capacity to be able to supply both domestic demand and the regional market in Southeast Asia. Strong demand has prompted China to become the fastest-growing box-producing market in the world, with more than 50,000 box plants, mostly independent, churning out around 14 billion m²/yr of corrugated containers. The box industry, like the upstream containerboard sector, is plagued with overcapacity and manufactures are competing fiercely to get market share. Prices for both recycled containerboard and boxes have been stagnant as a result, and are unlikely to pick up in the near term.

One consequence of this was an anti-dumping probe launched by the Chinese Ministry of Commerce on March 31, 2004. The authorities decided to investigate after four Chinese producers filed a petition on January 31 of that year. The complainants comprised Nine Dragons Paper Industries, Fujian Qingshan Paper, Shandong Bohui Paper and Sun Paper. Another two unnamed domestic manufacturers supported the petition.

The inquiry centered on alleged dumping of unbleached kraftliner and kraft-top liner imports from the US, Korea, Taiwan and Thailand, with basis weights of 115–360 gsm. In May 2005, the ministry imposed provisional anti-dumping duties ranging from 7.2% to 65.2% on imports from these countries. The measures were set to remain in place until a final ruling was announced in September of that year.

The six petitioners' combined production of the grades under investigation represented 50.5% and 42.6%, respectively, of China's total output in 2003 and 2002. While the inquiry was focused on alleged dumping during 2003, the probe into possible harm to domestic manufacturers covered the period from January 1, 2001, to December 31, 2003. Bleached linerboard, testliner, white-top liner and corrugating medium were not included in the scope of the investigation.

Looking at the Pacific Rim, compared with other regions, only a small amount of kraftliner is produced in the Far East and Oceania (Australia and New Zealand). The U.S. has become the region's primary supplier, making Asia one of the most important export markets. Australia is basically self-sufficient in kraftliner, testliner and corrugating medium, though. Two international but locally integrated operations, Amcor and Visy Industries (Pratt Industries in the U.S.), control over 90% of the market, leaving the balance to a few small, independent players. On the corrugated board side, Amcor and Visy lead the market in Australia and New Zealand, but Carter Holt Harvey has moved into the market through the 1999 acquisition of Stone Container Australia and its two plants in Melbourne and Sydney.

## CAPACITY

Recycled containerboard is the boom sector for expansions in the Asian paper and board industry, particularly in China. The country added some 1.83 million tonnes of new capacity in 2004, with at least 1.65 million tonnes set to come online in 2005. But the surfeit of expansions has led to overcapacity problems in the home market and the rest of Asia. Producers are struggling with shrinking profits due to fierce competition across Asia and are becoming reluctant to invest in new machines.

On top of that, the Chinese government began tightening up bank credit from April 2004 to cool its overheated economy, making it difficult for producers to obtain bank loans to fund expansion schemes. The pace of expansion in China has slowed down since then, although 1.05 million tonnes of new capacity is still planned for 2006–2007. The number of new machines planned in China or that have started up in recent years has raised concerns about the raw materials that will be needed to feed them. There are worries that recovered paper prices will skyrocket in the next few years, as board producers compete for furnish.

Companies leading the way in capacity growth include the Hong Kong-based firm, Lee & Man Paper Manufacturing, and China's Nine Dragons Paper Industries. Lee & Man is the second largest corrugating materials producer in China, behind Nine Dragons. The company started up two recycled containerboard machines with a combined capacity of 550,000 tonnes/yr in 2004. The firm owns two plants in China, which house six recycled containerboard units with a total capacity of 1.25 million tonnes/yr, and it was set to bring a 350,000 tonne/yr recycled linerboard machine on stream in late 2005. Nine Dragons has ambitious plans to boost its corrugating materials capacity to 3 million tonnes/yr. The firm moved closer to that goal in May 2005, with the startup of a 450,000 tonne/yr recycled fluting machine, which brought its capacity to 2.05 million tonnes/yr.

CONFIDENTIAL
NORAMPAC00018670



CONFIDENTIAL

# Exhibit 19



**AF&PA®**

Presentation to Wall Street Analysts

**American Forest & Paper Association**
**45th Annual Survey of Paper, Paperboard & Pulp Capacity**
**2004-2007**

**AF&PA Staff:**
Terry Serie, Vice President, Statistics
Stan Lancey, Chief Economist
Sundar Mahadevan, Capacity Survey Director

March 10, 2005

Copyright 2005, American Forest & Paper Association

It's good to see you all once again. This marks the 45th annual AF&PA capacity survey, which means that by the standards of this industry it's still a young report. Since our Paper Association got started in 1865, it took 95 years to come up with the idea of this survey.

This compares with average annual growth of 2.1% during the 1980's and 2.2% during the 1990's.

## Capacity Survey Concepts

- AF&PA will remove immediately from capacity those shut machines where the machine has been dismantled or the owner's intention to shut them permanently has been clearly stated in a public announcement. The capacity of other idled machines will be removed from the capacity survey after one year, unless resumed operation is in prospect.

- Practical maximum capacity assumes machines operate on an all-out basis excluding downtime for scheduled maintenance.

- Expansion projects included in the survey are considered to be firm, which typically means secure financing, site acquisition, and board approval.

- Capacity changes reflect new machines, rebuilds, incremental efficiencies on existing machines (creep), shutdowns, and swinging. Capacity changes do not include "sponge" -- delaying maintenance, fewer grade changes and other expedients taken in order to temporarily increase machine output during periods of atypically strong demand.

Copyright 2005, American Forest & Paper Association

2

After three years of decline, paper and paperboard capacity stabilized in 2004 and is projected to grow during the next three years, but only at fractional rates.

We'll review the numbers in just a few minutes; first let's talk for a moment about the survey's ground rules.

AF&PA now removes closed capacity from the survey effective the date of closure if it is the clear intention of the owner not to restart it. Prior to the 43rd survey, we had the so called one-year rule.

(Companies often do not report expected creep – they only know what it is after is has happened. During good times, you may get heavier grades or fewer grade shifts.)



This chart tracks the survey's three-year-out projections extending back to the mid-1970's.

The interesting point is that each successive survey since the one conducted in 1995 showed progressively lower growth rates for the projection period.

This Survey reverses that downtrend, but only marginally.

It places capacity growth for the projection period (2005-07) at 0.3%, versus 0.1% projected in last year's survey for 2004-06.

3



This chart shows actual capacity growth over a succession of three year periods. Capacity contracted at an average annual rate of 0.6% during the most recent interval which covered 2002-2004.

In the 2001-03 period, the rate of contraction was 1.2%. So we are seeing some moderation.



Copyright 2005, American Forest & Paper Association

During the 1980s and 90s, when capacity was expanding, it was typical to see out-year capacity projections being revised upwards with each successive Survey because companies had more time to firm up their plans.

During recent years, capacity has tended to turn out lower in the final reading than when it was being projected several years out.

However, this year the downtrend reversed, but only slightly -- 0.5%.

3.8% below the original projection in 2001



In the 44th annual capacity survey, the adjustments were negative.

2003 0

2004 -1.3%

2005 -1.1%



Again, we are looking at a flattening in 2004 and fractional growth in the projection years.

Just one new machine – small tissue machine during the entire projection period (4Q quarter of 2005).

We're clearly in a new era of restrained capacity growth compared with previous decades.



Copyright 2005, American Forest & Paper Association

Rate of capacity contraction has been moderating

## Tissue Paper New Machines

| | |
|---|---|
| Georgia-Pacific,  Pt. Hudson, LA,  Jan '03 | 80,000 tons |
| | |
| Potlatch, Las Vegas, NV -- Jan '04 | 30,000 tons |
| Georgia-Pacific, Clatskanie, OR -- Jan '04 | 80,000 tons |
| SCA, Barton,  AL -- April 2004 | 110,000 tons |
| Procter & Gamble, Cape Gira., MO -- 3Q '04 | 80,000 tons |
| First Quality Products, Lock Haven, PA-- Q4 '04 | 70,000 tons |
| **2004 Total:** | **370,000 tons** |
| | |
| Unicell, Brownstown, IN-- 4Q '05 | 30,000 tons |

Five tissue machines came on line in 2004 and other is due to start up early this year, with combined capacity of 400,000 tons.

However, there is also a lot of tissue paper capacity that is being taken out of commission.

9

## Tissue Paper Capacity Reductions

| | |
|---|---|
| Kimberly-Clark (one machine) Mobile, AL -- Jan '03 | 50,000 tons |
| Greentree* (two machines) Middletown, OH -- Feb '03 | 30,000 tons |
| Georgia-Pacific (one machine) Old Town, ME -- April '03 | 43,000 tons |
| **2003 Total** | **123,000 tons** |

---

| | |
|---|---|
| Georgia-Pacific (5 machines idled in 2003 removed from Survey Jan. 2004) Bellingham, WA; Camas, WA; and Plattsburgh, NY.) | 89,000 tons |
| Georgia-Pacific (2 machines shut in 1Q, 2004) Green Bay, WI; and Plattsburgh, NY | 45,000 tons |
| SCA (one machine) Gary, IN -- October 2004 | 36,000 tons |
| **2004 Total** | **170,000 tons** |

*Capacity reduction includes specialty.

Eight machines representing 176,000 tons of capacity were removed from survey base in 2004.

10



2005 increase largely reflects ramping up of machines that came on line in 2004.



As we can see here, generally the growth of tissue paper capacity has been moderating since the 1999-2002 period when growth averaged 3.7% a year.



For the fourth consecutive year, **newsprint** capacity declined in 2004 – from over 6.9 million tons in 2003 to about 6.6 million tons last year, or by almost 5%. And it is 11% below its peak level in 2000.

Most of the drop in capacity in 2004 is due to newsprint shifts/swings to uncoated mechanical and a capacity shutdown in December 2003.

# Newsprint Developments

## Factors Impacting Capacity Changes in 2004

**Removed From Survey Numbers:**
Abitibi-Consolidated, Sheldon, TX – PM #6 (155,000 tons) – December 2003
**Major Grade Swings:**
Bowater, Catawba, SC – Removed 250,000 tons from newsprint & added 330,000 tons to coated mechanical, March 2003
Bowater, Calhoun, TN – Removed 110,000 tons from newsprint & added 110,000 tons to uncoated mechanical – April 2003
Other swings from newsprint to uncoated mechanical

## Factors Impacting Capacity Changes in Outlook

**Removed From Survey Numbers:**
Abitibi-Consolidated, Sheldon, TX (365,000 tons) – January 2005
**Major Grade Swings:**
Katahdin Paper Company, East Millinocket, ME – From newsprint to uncoated mechanical

Copyright 2005, American Forest & Paper Association

14

**Closed and removed from survey** - Abitibi closed Sheldon entire mill in January 2005 as part of company's operations review to improve efficiencies. The shutdown of this mill alone reduced U.S. newsprint capacity by 5.5% from 2004. This machine was idle since December 2002.

**Idle capacity that remains in survey** is equal to 415K tons: Belkorp is 250K (former Enron) and Abitibi Consolidated (Lufkin) is 165 – 3 machines altogether. Equal to almost 7% of capacity and continues to be included in capacity. Belkorp planned to restart one of two machines in Garfield, NJ for 3Q 2003, but did not happen – now looking to sell that mill (130,000 tons).

**Katahdin Paper Company**, East Millinocket June 2003 –Uncoated mechanical to newsprint at first, but gradually shifting back to uncoated mechanical in 2005. Actual tonnage of mills is large in total, but the swings relatively small compared with those in chart above.

**Grade Changes.** Actual reductions from the grades swings above are 42 for Catawba and 28 for Calhoun (both Bowater). Add those two to 155 shut down and get 225. But NP capacity is down about 355. Most of that difference is from NORPAC, which switched about 90,000 tons to CM from NP – but not public knowledge (Steve says he read that about it somewhere, but doesn't remember where – but data seem not to be public)

14



Most newsprint growth in the early 1990s – flat in the second half of 1990s and declining since 2000.

Capacity is projected to decline another half million tons to about 6.1 million tons in 2005. At that point, newsprint capacity would be at its lowest level since the late 1980s and 18% below its peak level, which was reached in 2000. No appreciable changes in capacity are scheduled for 2006 and 2007.

In 2005, over 70% of the half million drop in capacity to 6.1 million tons can be attributed to the permanent shutdown of the Abitibi Consolidated mill in January 2005. The mill had been idle for the previous two years.

Most of the remaining curtailment in newsprint capacity for that year reflects the conversion of newsprint capacity to uncoated mechanical, as shown in the previous chart.



Excludes bleached bristols and cotton fiber paper

U.S. **printing-writing paper** capacity peaked in 2000 at 27.6 million tons, and then fell to a low of 25.5 million tons in 2003, a decline of nearly 8% over a three-year period. Capacity resumed growing in 2004 – by about 1%. No new machine is scheduled during the *Survey* period and capacity is projected to only increase fractionally each year through 2007. At that point, capacity will still be slightly below the level of a decade earlier.



The strong dollar that prevailed from the late 1990s through the early 2000s worsened the competitive positions of U.S. producers in the domestic market, as well as in foreign markets. The subsequent squeeze in U.S. shipments forced U.S. producers to shut down machines and shelve capacity expansion plans, as shown in the chart.

At the same time, the strong dollar induced foreign producers to build more manufacturing capacity in their home countries, as well as marketing infrastructure within the United States. In addition to the strong dollar, various kinds of government subsidies also played a role in boosting capacity overseas, particularly in Asian countries. As a result, by 2004, the U.S. share of worldwide capacity had fallen to 20% from 27% during the mid 1990s



## All PW numbers sum of 4 major grades

U.S. **printing-writing paper** capacity peaked in 2000 at 27.6 million tons, and then fell to a low of 25.5 million tons in 2003, a decline of nearly 8% within a three-year period. Capacity resumed growing in 2004 – by 0.8%.

In recent years it has been the free sheet grades that have undergone the largest cutbacks in capacity. Between 2000 and 2004, capacity of these grades slumped by roughly 10%. By comparison, during the four-year period ending in 1994, coated free sheet soared by 25% while uncoated free sheet was up more than 10%. Coated free sheet capacity is scheduled to grow by a total of 6% in the two-year period ending in 2006, and then remain basically unchanged in 2007. Uncoated free sheet is expected to grow by less than 1.5% in 2005 and then remain flat in 2006/2007.

The mechanical grades have fared somewhat better in recent years than the free sheet grades. Coated mechanical capacity, for example, rose by almost 3% between 2000 and 2004, while uncoated mechanical was up more than 5%. Coated mechanical is projected to remain basically unchanged over the survey period, while uncoated mechanical is expected to grow by almost 6% this year and then grow fractionally in 2006-2007.

18



By 2007, capacity will still be below the level it was in 1997. No new machine is scheduled during the *Survey* period.



The large uncoated mechanical capacity gains in 2004 and 2005 are primarily due to capacity shifts from other grades. Most of the shifts are from newsprint, but a relatively small amount is from coated mechanical and uncoated free sheet.

Retained in the Survey total are two paper machines that were idle during nearly all of 2004, and which account for more than 15% of total uncoated mechanical paper capacity. See below.

**Idle capacity** of 325,000 tons are Belkorp 65,000 (former Enron) and Abitibi – 260,000

325 divided by 2058 = 15.8%

## Uncoated Mechanical Developments

### Factors Impacting Capacity Changes in 2004

**Removed From Survey Numbers:**

Katahdin Paper Company, Millinocket, ME  (45,000 tons of uncoated and coated mechanical) – May 2004

**Major Grade Swings:**

Bowater, Calhoun, TN – Removed 110,000 tons from newsprint & added 110,000 tons to uncoated mechanical – April 2003
Other swings from newsprint to uncoated mechanical

### Factors Impacting Capacity Changes in Outlook

**Major Grade Swings:**

Katahdin Paper Company, East Millinocket, ME  – From newsprint to uncoated mechanical

Copyright 2005, American Forest & Paper Association

21

**Shutdown-** *Confidential – about one third of* Katahdin's *shutdown capacity is uncoated mechanical -- not public knowledge.*

This is publicly available: Bowater Calhoun in above table:  110 for 9 months operating already in 2004.  So addition this year is only  28,000. Also maybe 40,000 more from expansions and rest conversions.

*These are conversions not publicly available.*

*The confidential facts from capacity survey on Katahdin are that switch of about 95K tons at East Millinocket out of NP in 2005 and 82K tons to UM.*

*Also not in Sundar's table:  Bowater Calhoun swing of 70K from NP to UM. And Norpac -- 90,000*

**Startups of Idle Mill/Machines**

Katahdin Paper Company, Millinocket, ME – May 2004 – 185,000 tons.  This is not increase in survey but it does increase capacity actually in operation.  Production in fact did increase sharply after reopening.



In 2005, capacity is scheduled to rise nearly 120,000 tons to almost 2.2 million tons. Consequently, in 2005 is expected to be 17% higher than its recent low in 2003. Nevertheless, it would still be 5% below its 1996 peak.

In 2005, virtually all growth from swings. Vast majority mills show no creep.



At almost 5 million tons, **coated mechanical** capacity in 2004 showed little change from the year before, and was down about 1% from its 2002 peak level.

In 2004, some mills expanded capacity, but this was largely offset by a permanent closure of a paper machine and by grade switching, primarily to coated free sheet

# Coated Mechanical Developments

## Factors Impacting Capacity Changes in 2004

**Removed From Survey Numbers:**

Stora Enso, Wisconsin Rapids, WI (75,000 tons) – September 2003

Katahdin Paper Company, Millinocket, ME (45,000 tons of uncoated and coated mechanical) – May 2004

**Major Grade Swings:**

Bowater, Catawba, SC – PM #3. Ramping up machine rebuilt in 2003 replacing newsprint capacity

Stora Enso, Kimberly, WI – 2003-2007 – Will remove 165,000 tons of coated mechanical; will add 190,000 tons of coated free sheet over several years.

## Factors Impacting Capacity Changes in Outlook

Completion of conversions started in earlier years

Machine rebuilds

Copyright 2005, American Forest & Paper Association

24

*there is a number of unannounced capacity swings from coated mechanical to coated free sheet:*

*Interlake, Fraser, Meadwestvaco – over 100,000 in total. But none of the swings are huge.*

*IP expanding by 50,000 partially offsetting – not in table but could say some expansion, but in general not much.*

In essence, conversion from newsprint (from Bowater) essentially offset by conversions to other grades, primarily cfs. And the capacity that is removed from the survey is partially offset by IP expansion. Net result overall capacity in 2004 up slightly.

After 2004, capacity growth is negligible – not much going on with individual mills. Bowater Catawba up 18 (from NP end of project). Interlake down by 37 swinging to cfs and 30 up for Stora Enso. Everything else essentially unchanged in forecasted period.



Capacity is projected to remain essentially unchanged at about 5 million tons through 2007 – despite more than a 15% jump in U.S. demand over the last two years and an operating rate of 95% in 2004.

Beyond 2004, capacity at most mills is projected to show no appreciable change – up or down.  And swings to and from other grades will play a much smaller role than in 2004.



From its high of 5.6 million tons in 2000, **coated free sheet** capacity had fallen to 4.8 million tons by 2003, a drop of 800,000 tons. This represents a 14% reduction in just three years. In 2004, however, capacity rebounded by almost 200,000 tons.

In 2004, nearly every coated free sheet mill surveyed increased coated free sheet capacity. A number of these gains are due to conversions from other printing-writing grades, primarily uncoated free sheet and coated mechanical. They are also due to the direct expansion of coated free sheet capacity at some mills. These capacity gains were partially offset by the permanent shutdown of a mill in early 2004, and by a substantial conversion from coated free sheet to uncoated free sheet by a major producer. Stan cannot say previous – just say offset to some extent because some capacity swung to ufs from cfs.

## Coated Free Sheet Developments

### Factors Impacting Capacity Changes in 2004

**Removed From Survey Numbers:**

Sappi, Westbrook, ME – PM #14 (85,000 tons) – 1Q 2004

**Major Grade Swings:**

Stora Enso, Kimberly, WI – 2003-2007 – Will remove 165,000 tons of coated mechanical; will add 190,000 tons of coated free sheet over several years.
Appleton Coated, Combined Locks, WI – Shift to coated free sheet from uncoated free sheet following rebuilds in late 2004.

### Factors Impacting Capacity Changes in Outlook

Completion of conversions started in earlier years – most important factor behind growth in capacity in 2005 and 2006.
Machine rebuilds.
Offset partially by capacity shift to uncoated free sheet.

Copyright 2005, American Forest & Paper Association

27

Sappi closed due to weak demand and high costs – and demand was still weak at the beginning of last year.

*What is reflected in the total capacity numbers are numerous grade swings to coated free sheet from all the other printing-writing grades. Appleton from uncoated free sheet, Interlake from coated mechanical. Meadwestvaco from CM too (from Rumford plant that swings often) and from uncoated free sheet. These swings really provide most of the growth after 2004. And capacity growth would be larger except for a big swing from cfs to ufs by IP almost 138K  30 in 2004 and 108 this year.*

27



Capacity is scheduled to increase by 200,000 tons to 5.2 million tons in 2005. At that point capacity will have risen by more than 10% from 2003 level. By 2007 capacity will have increased to almost 5.4 million tons. This is only 4% below its peak reached in 2000.



**Uncoated free sheet** capacity declined from almost 13.9 million tons in 2003 to below 13.7 million tons in 2004, a loss of 1.4 percent. This left total capacity that year some 10% below its peak in 2000. Shipments just five years earlier (1999) were almost 3% higher than capacity was in 2004.

Although the 2004 change in total uncoated free sheet capacity was small – just 200,000 tons -- the changes reported for individual mills were numerous and in some cases substantial. Most of the swings reflected shifting between uncoated free sheet and coated free sheet, but there were also swings between uncoated free sheet and the mechanical grades. However, because the changes were mostly offsetting, total capacity has remained, and is projected to remain, roughly unchanged.

## Uncoated Free Sheet Developments

### Factors Impacting Capacity Changes in 2004

**Removed From Survey Numbers:**
Glatfelter, Neenah, WI (40,000 tons) – September 2003
Weyerhaeuser, Longview, WA (90,000 tons) – November 2003
Weyerhaeuser, Rothschild, WI (32,000 tons) – 4Q 2003
Georgia Pacific, Camas, WA (65,000 tons) – May 2004
Eastern Pulp & Paper, Brewer, Me (75,000 tons) – May 2004
RFS Ecusta, Pisgah Forest, NC (110,000 tons) – August 2004

**Major Grade Swings:**
Net capacity loss due to swings

### Factors Impacting Capacity Changes in Outlook
Net capacity gain due to swings

Copyright 2005, American Forest & Paper Association                          30

**Removed** GP permanently shut PM#5 as part of strategy to reposition product mix at the mill.

Eastern P&P -- The mill was handed over to the city

**Grade swings** Table in our Survey says none but actual swings were rather large into uncoated free sheet by IP (215,000 tons) from coated free sheet and from non printing-writing grade – did in 2004 but impact most in 2005.

Relatively big swing out of UFS in several mills to cfs maybe 100,000 tons or so. In 2004

**Indefinite shutdowns retained in the survey**

International Paper, Jay, ME & Pensacola, FL – April 2005 – 250,000 tons
IP idled indefinitely to match production to customer needs and combat increase in production costs. So true operating capacity is almost 2% below reported capacity.

**Restarts Never taken out of survey but idle for a while**

Dirigo Paper, Gilman VT, closed April 2002, reopened August 2004 – 70,000 tons

Wausau-Mosinee, Brainerd, MN, closed November 2003, reopened November 2004 – 90,000 tons

Fraser Papers, Berlin/Gorham, NH, closed November 2003, reopened January 2004 – 76,000 tons

Lincoln Paper, Lincoln, ME, closed April 2002, reopened August 2004 – 75,000 tons



Capacity in 2005 is projected to regain most of last year's loss, rising 1.2%, and is then expected to remain basically flat during the following two years.  By 2007, U.S. uncoated free sheet capacity will likely be at about the level it was in 1994.

As in 2004, the net change in total capacity in 2005 will not be significant, and more than 90% of mills do not project appreciable changes in that year. But  there were a number of mills that showed significant changes --.  Moreover, some of them are expected to be substantial -- in absolute tons, and relative to the reporting mills themselves.  Because the changes are in large part offsetting, change in 2005 is not significant.

After 2005 almost no mill projects changes from the previous year.

## Kraft Paper Developments

**Shuts:**

Inland (one machine) Bogalusa, LA – November 2003    63,000 tons

**Shifts:**

In 2004, International Paper transitioned PM#4 at Roanoke Rapids, NC, from linerboard to unbleached kraft paper.

IP also idled an unbleached kraft paper machine PM#7 at Savannah, GA, leaving kraft paper capacity unchanged.

Copyright 2005, American Forest & Paper Association

32

**The 65,000 ton reduction in linerboard capacity was only 0.3% of total linerboard capacity. It seems that efficiencies were responsible for the growth in linerboard which was quite small.**



Inland Kraft paper machine with capacity of 63,000 tons closed in Nov '03. That accounts for 3.6% of the decline.

# Linerboard Developments

**New Machines:** None

**Shifts:**

In 2004, International Paper transitioned PM#4 at Roanoke Rapids, NC, from linerboard to unbleached kraft paper.

IP also re-started idled linerboard machine PM#6 at Savannah, GA—the net result being a 65,000 ton reduction in linerboard capacity.

Smurfit-Stone shifted machine at Jacksonville, FL, mill from recycled linerboard to recycled medium in Nov. 2003. Linerboard capacity was reduced by 360,000 tons.

Copyright 2005, American Forest & Paper Association

34



## Corrugating Medium Developments

**Removed From Survey Numbers:**
Bay State Paper, Hyde Park, MA -- April 2004 -- 103,000 tons recycled containerboard.

**Machine Shifts:**
Smurfit-Stone shifted recycled linerboard machine at Jacksonville, FL, mill to recycled medium in Nov. 2003 (+270,000 tons of medium).

PCA restarted PM#1 at Filer City, MI in Feb. 2005. Once fully operational, the company will close PM#3 at Tomahawk, WI. The objective of the shift is to reduce transportation costs. Both machines have same capacity so there will be no change in company's semichemical medium capacity.

Copyright 2005, American Forest & Paper Association

36

**The 65,000 ton reduction in linerboard capacity was only 0.3% of total linerboard capacity. It seems that efficiencies were responsible for the growth in linerboard which was quite small.**



Three mills two companies – may be basis weight changes.

## Bleached Board Developments

**New Machines:** None

**Removed From Survey Numbers:** None

**Shifts From Other Grades:**

Several shifts to bleached board from other products

**Indefinite Closures:**
Durango, St. Mary's GA -- Fourth Quarter 2002 – 190,000 Tons

Copyright 2005, American Forest & Paper Association

38

IP Moss Point mill closed in June 2001

Durango-Georgia – St. Mary's, GA mill indefinitely idled –Sept 02



2004 increased reflected swings from bristols, uncoated free sheet and bleached
kraft papers – the usual suspects.

## Recycled Boxboard & Other Recycled Developments

**Removed From Survey Numbers:**

| | |
|---|---:|
| Caraustar, Lockport, NY,  March '03  (Gypsum) | 72,000 tons |
| Caraustar, Roanoke Rapids, NC Jan '03 (Uncoated Recycled) | 34,000 tons |
| Newark, Newark, NJ, July '03  (Uncoated Recycled) | 45,000 tons |
| Newark, Stockton, PA, March'03 (Coated & Uncoated – Recycled) | 130,000 tons |
| Smurfit-Stone, Philadelphia, PA, Dec. '03 (Coated Recycled) | 70,000 tons |
| Sonoco, Atlanta, GA, Nov '03 (Tube, Can & Drum) | 48,000 tons |
| Sorensen Paperboard, Palmyra, MI,  July '03 (Tube, Can & Drum) | 30,000 tons |
| **Total 2003:** | **430,000 tons** |
| | |
| Caraustar, Cedartown, GA,  Jan '04  (Uncoated Recycled) | 28,000 tons |
| Rock-Tenn, Ostego, MI, July '04 (Uncoated Recycled) | 106,000 tons |
| **Total 2004:** | **134,000 tons** |
| | |
| Caraustar, Rittman, OH, Jan '05 (coated recycled) | 80,000 tons |
| Sonoco, Hartsville, SC, Jan '05 (uncoated recycled) | 20,000 tons |
| **Total 2005:** | **100,000 tons** |

Copyright 2005, American Forest & Paper Association

40

A lot of capacity has been closing in the recycled paperboard segment of the industry.

8 machines in 2003

2 in 2004

2 already this year.

40



Note that this is the format we will use during the remainder of the presentation. On the left hand panel you'll see 2002 growth, the middle panel shows results for the three year projection period. The right hand panel shows average annual growth for the projection period and for the ten year period of 1990's.



Three mills two companies -- may be basis weight changes.



Strong on-site pulp usage at integrated mills contributed to the 2004
decline in chemical grade market pulp capacity.

# Exhibit 20



INTERNATIONAL PAPER
6400 POPLAR AVENUE
MEMPHIS, TENNESSEE 38197

# News Release

### International Paper Begins Production of High Performance Linerboard at Pensacola Mill

*PENSACOLA, Fla.—Sept. 24, 2007—*International Paper (NYSE:IP) today announced it has begun production of high-performance lightweight linerboard at its Pensacola, Fla., mill. Start-up of the project allows International Paper to economically produce linerboard grades with greater strength characteristics while using less wood fiber. The company expects to ramp up machine production during the fourth quarter and estimates average production of 50 to 60 percent of the machine's capacity for that period.

The product line provides the dual benefits of premium performance and sustainability. Sourced with 100 percent virgin wood fiber, the lightweight linerboard has excellent performance properties. It is fully recyclable and recoverable and allows customers to reduce their overall volume of packaging.

"Our Pensacola machine is the first of its kind in North America, designed to deliver lighter-weight grades with unmatched performance to provide our customers with the competitive advantage they need to win in today's packaging marketplace," said Glenn Landau, vice president and general manager of International Paper's containerboard business. "Across the globe, our customers demand packaging that meets their changing needs. This machine will provide the high-quality linerboard they have come to expect from IP."

In early 2006, International Paper announced plans to convert its Pensacola mill from a 350,000 ton-per-year uncoated paper machine to a 500,000 ton-per-year lightweight linerboard machine. The conversion was part of International Paper's strategy to strengthen its existing uncoated paper and packaging businesses. Related changes within the company's containerboard business include the previously announced closure of the 200,000-ton Terre Haute, Ind., mill slated for Oct. 1.

"With the global demand for containerboard growing at 4 percent, we believe our customers' demand matches our capacity," Landau said.

The mill conversion and paper machine rebuild began in the first quarter of 2007 and involved hundreds of mill employees and significant contracted engineering and

OUTSIDE ATTORNEYS EYES ONLY

construction support. "This was one of the largest capital projects we've undertaken in North America in the past several years. Our employees and the firms that worked to complete this project deserve the credit for a job well done," said Michael Exner, International Paper vice president of containerboard manufacturing. "Now our goal is to operate the mill safely and productively to manufacture high-quality board on a consistent basis," he added.

International Paper's Pensacola mill is located in Cantonment, Fla., on the outskirts of Pensacola. The mill employs approximately 550 employees. In addition to its new linerboard capacity, used to make boxes and other industrial packaging products, the mill also produces fluff pulp, an absorbent pulp used in diapers, feminine care and adult hygiene products.

*International Paper (NYSE:IP), founded in 1898, is a global uncoated paper and packaging company with primary markets and manufacturing operations in North America, Europe, Russia, Latin America, North Africa and Asia. Its uncoated papers and packaging businesses are complemented by xpedx, North America's largest distributor of printing papers and graphics supplies and equipment. Headquartered in the United States, International Paper employs approximately 54,000 people in more than 20 countries, and serves customers worldwide. Annual sales are about $22 billion. International Paper partners with customers and environmental, academic, civic and governmental organizations, as well as landowners and harvesting professionals, to encourage responsible forest stewardship, improve the health and productivity of forestlands and increase recovery of our recyclable products. The company has a long-standing policy of using no wood from endangered forests. To learn more about International Paper, its products and commitment to economic, social and environmental sustainability, visit www.internationalpaper.com.*

*This press release may contain forward-looking statements. These statements reflect management's current views and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed or implied in these statements. Factors which could cause actual results to differ include changes in business conditions, mill productivity rates or mill efficiency rates which could affect the date on which the mill achieves full production rates. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Other factors that could cause or contribute to actual results differing materially from such forward looking statements are discussed in greater detail in the company's Securities and Exchange Commission filings.*

### ###

**International Paper Contacts:**
Media, Amy Sawyer, +1 901 419 4312; Investors, Tom Cleves, +1 901 419 4957, or Ann-Marie Donaldson, +1 901 419 4967

OUTSIDE ATTORNEYS EYES ONLY

# Exhibit 21



# News Release

## International Paper to Shut Down Three Mills
*Permanent closures to reduce IP's North American capacity by 2.1 million tons*

*MEMPHIS, Tenn. – Oct. 22, 2009 –* International Paper (NYSE: IP) today announced plans to close its paper mill and associated operations in Franklin, Va., and its containerboard mills in Pineville, La., and Albany, Ore. The company also announced it would permanently shut down the previously idled No. 3 machine at its Valliant, Okla., containerboard mill. The Valliant Mill's other two machines will continue to operate. These permanent shutdowns will reduce the company's North American paper and board capacity by 2.1 million tons.

"We recognize these are very difficult decisions affecting our employees, their families and the communities surrounding these mills," said Chairman and CEO John Faraci. "We have concluded that we have excess capacity in our North American paper and packaging businesses, and these decisions will better match our supply with our expected customer demand."

Since the onset of the global recession, the decline in demand for International Paper's uncoated freesheet in North America has accelerated, and consequently the company has decided to further reduce its uncoated freesheet capacity.

In its containerboard and coated paperboard businesses, International Paper expects demand to resume growth as the economy rebounds. However, the company's demand is not expected to return to 2008 levels in the near future. Therefore, permanent IP capacity closures are necessary.

The closures, which will impact about 1,600 employees, will result in permanent North American capacity reductions as follows:

| Mill (# of Impacted Employees) | Products | Annual Capacity (Tons) | # of Machines | % of IP Capacity | Estimated Closure |
|---|---|---|---|---|---|
| Franklin, Va. (1,100) | Uncoated Freesheet | 600,000 | 3 | 19% | Spring 2010 |
| | Coated Paperboard | 140,000 | 1 | 7% | By 2009 Year-End |
| Albany, Ore. (270) | Containerboard | 580,000[1] | 2 | 12% | Mid-December |
| Pineville, La. (230) | | 390,000 | 1 | | |
| Valliant, Okla. (No Additional Impact) | | 430,000[2] | 1 | | |

[1] Includes 250,000 tons of capacity previously idled in October 2008
[2] Capacity of No. 3 paper machine previously idled in November 2008

IP603368

Following these permanent shutdowns, International Paper will have approximately 10 million tons of North American containerboard capacity, 2.6 million tons of North American uncoated freesheet production capacity, and 1.7 million tons of North American coated paperboard capacity. These capacity shutdowns will not impact the company's ability to serve its customers.

International Paper is committed to helping employees through this transition. The company will work closely with union officials concerning severance benefits for hourly employees. Salaried employees impacted by these shutdowns will be offered severance packages and outplacement assistance consistent with company policy. Employee assistance providers will be available to support employee and family needs.

The company estimates that these closures will result in noncash asset write-off and accelerated depreciation charges of approximately $1.1 billion and cash severance charges of approximately $60 million to be recorded in the fourth quarter of 2009 and first quarter of 2010, plus additional closure costs to be determined and recorded as the facilities are closed.

### *About International Paper*

*International Paper (NYSE: IP) is a global paper and packaging company with manufacturing operations in North America, Europe, Latin America, Russia, Asia and North Africa. Its businesses include uncoated papers and industrial and consumer packaging, complemented by xpedx, the company's North American distribution company. Headquartered in Memphis, Tenn., the company employs more than 58,000 people in more than 20 countries and serves customers worldwide. 2008 net sales were approximately $25 billion. For more information about International Paper, its products and stewardship efforts, visit www.internationalpaper.com.*

*This press release may contain forward-looking statements. These statements reflect management's current views and are subject to risks and uncertainties that could cause actual results to differ materially from those expressed or implied in these statements. Factors which could cause actual results to differ include changes in business conditions which could affect the timing of the mill closure process. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Other factors that could cause or contribute to actual results differing materially from such forward looking statements are discussed in greater detail in the company's Securities and Exchange Commission filings.*

***

Contacts:

Virginia media: Desmond Stills, 757-569-4912 or 757-617-9746; or Rick Ouellette, 901-573-4002

Louisiana or Oklahoma media: Amy Sawyer, 901-826-4278

Oregon media: Jessica Savage, 706-414-6087

All other media: Kathleen Bark, 901-419-4333

Investors: Thomas A. Cleves, 901-419-7566, or Emily Nix, 901-419-4987

IP603369

# Exhibit 22



Expert Report of Professor N...

In re Smurfit-Stone Container Corp. et al.,

April 5, 2010

HIGHLY CONFIDENTIAL
GP-KLEEN01067346



- Qualifications
- Questions Presented
- Summary of Conclusions
- Detailed Analysis
  - Market prices
  - Sales volumes
  - Costs of manufacturing
  - Capital spending
  - Performance of Reclamation
  - Other Risks

2

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067347



# Qualifications

I am the founder and President of Fisher International, Inc. ("FI"), a management consulting firm specializing in the pulp and paper industry since 1985. We build and maintain analytical tools used in analyzing markets and recommending strategies for sales, marketing, product development, and capital investment in the paper industry by executives in producer, supplier, buyer, and financial investor organizations.

FI's clients include manufacturers of pulp and paper, suppliers of capital equipment and consumables used in pulp and paper mills, purchasers of paper and board, hedge funds and other investors in the pulp and paper industry. A list of some of FI's clients is shown starting two slides below.

FI has developed a number of proprietary databases and tools that have become widely-used throughout the industry. These include:

– FisherSolve™, an analytical tool with a global database containing detailed information about the production, assets, raw materials, costs of production, viability, and other factors for every operating mill in the world

– Fisher Logic Optimizer™, a strategic optimization tool designed for executives in paper-producing organizations to enable integrated decision-making on all major management responsibilities including capital allocation, production, procurement, logistics, and sales.

– Fisher-STE Forecasts, a model-based service that reliably predicts cycles in commodity markets such as pulp, containerboard, and coated papers and allows management to see how strategic actions will affect the market with the model's simulation capabilities.

HIGHLY CONFIDENTIAL
GP-KLEEN01067348



## Qualifications

Prior to forming Fisher International, I was a managing director of a management consulting firm, William Kent & Co., specializing in advising American manufacturing firms on growth strategy in international markets.

I have a B.A. from Harvard College (1974) and an M.B.A. from Wharton School of Business (1980).

I have never testified as an expert witness prior to this engagement. I am being compensated for my work in this matter on an hourly basis ($600 per hour for myself, lower amounts for individuals at Fisher International and our partner firm, Systems Thinking Europe, Oy ("STE"), working at my direction). My compensation is in no way contingent on the opinions I offer or the outcome of this matter.

HIGHLY CONFIDENTIAL
GP-KLEEN01067349

**Fisher**
*International Inc.*
BUSINESS INTELLIGENCE

## Largest Paper Industry Research Clients

| | | |
|---|---|---|
| AF Engineering | BOC Gases Americas | Erco |
| Ahlstrom Paper | Boise Cascade | ExxonMobil |
| Air Products and Chemicals | Buckman Laboratories | Fibria (formerly VCP, Aracruz) |
| Alcoa | Canexus | FM Global |
| Alstom Power | ChevronTexaco | FMC Corporation |
| AMEC E&C Services | Clariant | Fraser Paper |
| Andritz | Corn Products | GE Capital |
| Appleton Mills | CSX Transportation | Georgia-Pacific |
| Appleton Paper | Degussa | GL&V |
| APRIL | Domtar | Glatfelter |
| Ashland-Hercules | Dow Chemical | Graphic Packaging |
| Asten Group | DTE Energy | Green Bay Packaging |
| B E & K | Eka Chemicals | Greif |
| Babcock & Wilcox | Elf Atochem | Honeywell Corporation |
| BASF | Emerson | Imerys |

5

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067350

## Fisher International
BUSINESS INTELLIGENCE

## Selected Fisher Intelligence Engagements

| | | |
|---|---|---|
| International Paper | Nalco Company | Siemens |
| Invensys Process Systems | National Starch & Chemical | Southern Company |
| Irving Pulp & Paper | Neenah Paper | Specialty Minerals |
| Jacobs Engineering | NewPage | Specialty Paperboard |
| John Hancock Financial | Paperchine | Stora Enso |
| Kaupthing Bank | Papier Masson (White Birch) | Suzano |
| Kellogg Brown & Root | Parsons & Whittemore | Tamfelt |
| Kemira | Penford Products | Tate & Lyle |
| Kimberly Clark | Potlatch | Tembec |
| Koehler Group | Praxair Surface Technologies | Thilmany |
| Lazard | Rayonier | UPM |
| MeadWestvaco (now MWV) | Rhinelander Paper | VCP (now Fibria) |
| Mercer Paper | SCA | Verso Paper |
| Metso | SCG Paper (Siam) | Voith |
| M-real | Shell Oil Company | Weyerhaeuser |

6

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067351



## Questions Presented

I have been retained by counsel for the Official Committee of Unsecured Creditors in the bankruptcy of Smurfit-Stone Container Corp. ("Smurfit" or "Smurfit") to review the business projections that have been provided by Smurfit in the Disclosure Statement, together with backup material, and to provide my opinions on the following questions:

– What are the key drivers affecting Smurfit's forecast EBITDA?

– Are the projected values for those drivers in Smurfit's projections reasonable, or unduly pessimistic or optimistic?

– Is it likely that Smurfit's actual EBITDA will be significantly higher or lower than the levels projected?

I am producing a list of materials considered, as well as copies of my internal work papers and materials provided by colleagues working at my direction.

HIGHLY CONFIDENTIAL
GP-KLEEN01067352



# Summary of Conclusions

- The key drivers of EBITDA in Smurfit's projections that merit examination are:
    - Product prices
    - Sales volume
    - Cost of manufacturing inputs, especially fibers (virgin, recycled) and energy (fuels, electricity)
    - Corporate overhead costs, typically referred to as "SG&A"
    - Capital expenditures ("Capex")
    - Performance of the Reclamation business

© 2010 Fisher International Inc.

8

HIGHLY CONFIDENTIAL
GP-KLEEN01067353

Fisher
International Inc.
BUSINESS INTELLIGENCE

## Summary of Conclusions

- My analysis shows that, as to each of these drivers, Smurfit's projections are either reasonable or somewhat optimistic.

  – Smurfit's projected prices are reasonable for the first three years of the projection period, but likely to be overstated for the last two years.

  – Smurfit's projected input costs are reasonable throughout the projection period.

  – The sales volumes projected by Smurfit reflect a reasonable to aggressive business plan.

    o The volumes reflected in the business plan actually require Smurfit to slightly increase its market share, which, in a highly competitive industry, is difficult to do without incurring additional cost.

    o Smurfit could not significantly increase production without additional expenditures, and even if it did so it would have a negative impact on market prices and hence a negative impact on EBITDA.

  – Smurfit's has historically spent less on capital than its peers and plans to continue doing so. It is not plausible that Smurfit could operate with lower capex than projected.

  – SG&A is low compared to peers and does not offer an opportunity for further cost savings.

  – The Reclamation business projections appear reasonable with the one exception that the business relies heavily on truck transportation but the projections do not appear to reflect the increase in diesel fuel costs that is projected by other Smurfit businesses elsewhere in its business plan.

9

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067354

**Fisher** International Inc.
BUSINESS INTELLIGENCE

## Summary of Comments

- Smurfit is unlikely to realize the level of EBITDA shown in the latter years of the projections because prices will not reach the projected levels and the amount of capital spending in the projections is unlikely to be enough to allow the company to sustain its earnings level in the future.

  – As noted above, projected capital expenditures would continue to lag significantly behind Smurfit's peer group.

  – As a result:

    o the quality of Smurfit's assets, which is already at the bottom of its peer group, would continue to lag its competitors or fall further behind;

    o cost of production, which also lags its peers, would remain high or, relative to competitors, become worse; and

    o EBITDA margins would remain low compared to peers.

  – By the end of the projection period, Smurfit's assets are likely to be less competitive, relative to competitors, which would make it less capable of sustaining current earnings levels in the future absent increased capital expenditures.

  – In sum, Smurfit will be faced with the choice of either spending more capital than projected, or accepting lower quality assets and reduced earnings capability at the end of the period.

10

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067355

# Major EBITDA Contributors



**Fisher**
International Inc.
BUSINESS INTELLIGENCE

### 2010 Projected EBITDA by Source



### 2010 Projected Costs by Major Category



### 2010 Projected Sales by Product Line

11

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067356



## Certain Components of Smurfit's Costs Are Highly Predictable and Reasonable

- In assessing Smurfit's projections, certain components of EBITDA need not be considered at length because they are known with some certainty:

  – **Labor:** costs are governed by union contracts the details of which are known to management and not susceptible to material change during the period in question (2010 through 2014).

  – **Specialty chemicals, minerals, MRO materials, machine clothing, other variable costs in mills:** these represent large numbers of small items whose usage rates are predictable and whose unit costs change largely independently of each other. Independently, each has an immaterial impact on EBITDA. As a group, their aggregate cost is highly unlikely to fluctuate enough to have a material impact on EBITDA during the period.

  – **Box plant fixed and variable costs:** the prices and quantities used of variable cost items in box plants fluctuate less than those used in mills and so are highly predictable. Moreover, Smurfit recently completed a transformation program in its box division that dramatically reduced fixed costs through a combination of plant consolidation, capital investment, and productivity improvements. It is unlikely that significant additional EBITDA gains are available during the period.

12

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067357

# Detailed Analysis

- Smurfit's Peer Group
- Market prices
- Sales volumes
- Costs of manufacturing
- Capital spending
- Performance of Reclamation
- Other Risks



HIGHLY CONFIDENTIAL
GP-KLEEN01067358



## Design of Smurfit peer group comparisons

- To assess Smurfit, I selected a peer group based on similarity of the mix of products produced. This is a good measure of similarity as products that are made determine the markets and applications each company serves and the types of manufacturing assets required, all of which are main determinants of the behavior necessary for success.

- I analyzed product mix at two levels using the global FisherSolve™ database: "Major Grade" which differentiates Packaging producers from others and "Grade" which differentiates Linerboard ("LB") and Corrugating Medium ("CM") producers (like Smurfit) from other those making other grades, principally "Board" grades. (The results of this analysis are included in Appendix A attached to this report.) The latter serves different applications (typically those that influence consumer choice, such as cosmetic boxes) whereas Smurfit's products (such as corrugated boxes for protecting products during shipment), tend to have less influence over consumer buying behavior. "Board" producers typically operate somewhat different assets, a main difference being expensive coating equipment that treats the surface of paper by applying coating ingredients largely not used by Smurfit and its closest peers.

- I use the companies shown on the next page as "Best" through "Fair" in the comparisons with Smurfit shown throughout this Report.

14

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067359

## Selection of Smurfit's Peers for Comparison

| Company | LB/CM Match | Packaging Match | Overall Match |
|---|---|---|---|
| Norampac[1] | 100% | 99% | Best |
| Smurfit-Kappa | 77% | 98% | Best |
| Temple-Inland | 97% | 100% | Best |
| PCA | 13% | 100% | Good |
| Rock-Tenn | 38% | 99% | Good |
| IP | 53% | 62% | Good |
| Longview Fiber | 54% | 94% | Good |
| Mondi | 31% | 49% | Fair |
| MeadWestvaco | 12% | 100% | Fair |
| Mayr-Melnhof | 20% | 100% | Fair |
| Sonoco | 22% | 100% | Fair |
| Graphic Packaging | 6% | 100% | Fair |
| Domtar | 0% | 0% | Poor |
| Stora | 4% | 22% | Poor |
| UPM | 2% | 2% | Poor |
| Boise | 29% | 29% | Poor |

1. Acquired in 2006 by Cascades; data available from 1999 through 2005

15

© 2010 Fisher International Inc.

**Fisher** International Inc.
BUSINESS INTELLIGENCE

HIGHLY CONFIDENTIAL
GP-KLEEN01067360

# Detailed Analysis

Smurfit's Peer Group

Market prices

Sales volumes

Costs of manufacturing

Capital spending

Performance of Reclamation

Other Risks



Fisher
International Inc.
BUSINESS INTELLIGENCE

HIGHLY CONFIDENTIAL
GP-KLEEN01067361

**Fisher**
*International Inc.*
BUSINESS INTELLIGENCE

## LINERBOARD PRICE CAN BE USED AS AN INDEX

- Linerboard Corrugating Medium, and White Top Liner prices are highly correlated.

- The paper industry typically uses Kraft Linerboard prices as an index for other grades.

- I therefore evaluate Smurfit's price prediction for Kraft Linerboard to assess Smurfit's price projections for its Containerboard business.

17

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067362



## Kraft Linerboard and Corrugating Medium
### Price Correlation is 99%

— Historical 26 Lb. Semichemical Medium (Eastern U.S.) PPW price [$/ton]
— Historical 42 Lb. Unbleached Kraftliner (Eastern U.S.) PPW price [$/ton]

Correlation coefficient calculated from Jan-90 to Dec-09 (monthly data) between the 26 Lb. Semichemical Medium price and the 42 Lb. Unbleached Kraftliner price is 0.99.

Last Historical Data Point: Dec-09
Data Source: PPW Price

18

Fisher
International Inc.
BUSINESS INTELLIGENCE

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067363





Kraft Linerboard and White Top Linerboard
Price Correlation is 97%

— 42 Lb. Unbleached Kraftliner [Eastern U.S.] Estimated Transaction Price
— 42 Lb. White Top Liner (Eastern U.S.) Estimated Transaction Price

Correlation coefficient between Kraft Linerboard and White Top Liner from Jan-1990 to Dec-09 is 0.97

Last Historical Data Point: Dec-09
Data Source: RISI Estimated Transaction Price

19



Fisher
International Inc.
BUSINESS INTELLIGENCE

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067364



**Fisher**
*International Inc.*
BUSINESS INTELLIGENCE

## The Fisher-STE Forecast Approach

- To assess Smurfit's Linerboard price projections, I directed my employees and partner in Finland, STE, to create our own forecasts using the Fisher-STE North American Containerboard Model.

- This is a computerized model of the dynamics of the North American Containerboard industry. It has the unique capability of predicting the cycles in which prices move, which is critical to an understanding of this market. The model uses a branch of mathematics called System Dynamics, which was pioneered in the 1950s at MIT by Jay Forester. System Dynamics is a widely accepted modeling technology that is used in a wide range of applications and industrial settings to capture the complexities of situations, including markets, that are characterized by cycles and interacting variables. Several major paper companies subscribe to Fisher-STE market models for a variety of grades.

- We originally built the North American Containerboard model several years ago. To build a System Dynamics model, we identify the decision-making processes that buyers and sellers use in negotiating price through a series of interviews, develop hypotheses for rules that govern how decisions are made, and test those hypotheses using rigorous statistical analysis of historical data. Validated rules are used to create a mathematical model (using calculus and simultaneous equations) that simulates the market's actual behavior.

- The model takes an initial set of conditions – those of today, for example – and predicts what will happen in the immediate subsequent period, say one week later. The model then takes that new status and predicts the next week, and so on. As a result, the model evolves its view of the future much as actual markets evolve in the real world and does not have to rely on forecasts of other variables.

© 2010 Fisher International Inc.

20

HIGHLY CONFIDENTIAL
GP-KLEEN01067365



## The Fisher-STE Forecast Accuracy Approach

- Projections made with such System Dynamics models are uniquely capable of representing real-world conditions, which are non-linear and irregular. While such projections are of course not infallible, the Fisher-STE Forecast methodology has a statistically verifiable track record:

### Fisher-STE Forecast Accuracy Metrics



|  |  | Forecast horizon: | | |
|---|---|---|---|---|
|  |  | 6 months | 12 months | 24 months |
| **STE Point Accuracy:** |  |  |  |  |
| Average, Absolute Error in Level (1) | [%] | 3.9 | 5.5 | 9.4 |
| 80% fractile (2) | [%] | 6.6 | 9.1 | 13.5 |
| 50% fractile (median) | [%] | 2.7 | 4.0 | 6.3 |
| **Traditional Methodology's Point Accuracy:** |  |  |  |  |
| Average, Absolute Error in Level | | 5.7 | 13.3 | - |
| 80% fractile | | 8.9 | 26.2 | - |
| 50% fractile (median) | | 5.3 | 10.7 | - |
| **Turning Point Accuracy:** |  |  |  |  |
| Fisher-STE | [Months] | 0.7 (3 weeks) | 1.2 (3 weeks) | 2.6 |
| Traditional methodology | [Months] | 5.7 (6 months) | 5.7 (6 months) | - |
| If random, accuracy would be ... | [Months] | 6.0 | 6.0 | 6.0 |

Shows that Fisher-STE forecasts have predicted turning points of prices to within a few weeks compared to other methods whose accuracy has been closer to randomness.

STE Forecast accuracy compared to traditional methods represented by another paper industry forecaster.

- The Fisher-STE Forecast North American Containerboard model was developed several years ago through hundreds of hours of interviews and analysis and is continuously refined and tested. A visual representation of the model is shown on the following page, and a narrative description of the major market dynamics underlying the model follows thereafter.

© 2010 Fisher International Inc.

21

HIGHLY CONFIDENTIAL
GP-KLEEN01067366



**BUSINESS INTELLIGENCE**

# The Fisher's FE Forecast Approach

- The diagram below shows a graphical representation of a typical system model (in this case, the pulp market) that captures the interactions, feedback loops, and lags that create market movement and cycles.



© 2010 Fisher International Inc.

22

HIGHLY CONFIDENTIAL
GP-KLEEN01067367



Fisher-STE Forecast Accuracy Illustrated with
Series of Actual Historic Forecast Made by Fisher
NBSK Price (USD/metric ton delivered to Western Europe)

Blue curve is the historical pulp price.
Other curves are forecasts.

23

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067368



Other Leading Industry Forecast Methodology

* *Source: TAPPI Journal, June 2001*

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067369



## Dynamics of Containerboard Pricing

- The behavior of containerboard market prices is typical of commodity products. Prices move up and down in irregular cycles within a relatively narrow band, driven by a variety of factors. Profit margins are relatively thin as there is little product differentiation between suppliers and the technology necessary to make the products is available to all producers. As a result, producers compete largely on the basis of price and delivery.

- Containerboard products have been sold in relatively high quantities for decades and price behavior is relatively consistent over time. There is no futures market for containerboard. Prices are negotiated between individual buyers and sellers. Producers also often make public announcements of their intention to raise prices, usually giving buyers as many as three months notice of impending increases. Prices are expressed in "list price" terms.

- Monthly historical prices are tracked by a publication called Pulp and Paper Week ("PPW") which publishes them near the end of each month. The prices of the majority of the industry's volume, especially "national" business (major accounts), are indexed in to PPW prices.

25

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067370



# Dynamics of Corrugated and Linerboard Pricing

- Indexing in sales contracts modifies actual prices via discounts and lags. Lags can delay the implementation of price changes for up to a year. Discounts vary from customer to customer and also change over time. We have found through an analysis of the discount history in North American containerboard that discount levels have increased over the last several years in a step-wise linear fashion, typically increasing when product prices rise and then never falling backwards. We have found that increasing levels of discounts is typical in paper industry commodity markets.

- Prices move between relatively narrow bands. The lower boundary of the band, below which prices do not fall, is set by the variable cost of production of the marginal producers. This boundary is called the "floor price." The upper boundary typically is set by the price of substitutes for the product. Floor prices come from Fisher International's Fisher Logic cost benchmarking product which estimates the production costs of every mill and machine globally. To forecast production costs, we used the same factors as Smurfit uses in its business plan.

- Between the floor and ceiling, prices are driven by free market drivers. The main free market drivers are the operating rate of mills and box plant inventory levels. Box plant inventory levels, in turn, are heavily influenced by the end-demand for corrugated boxes. End demand is highly correlated with GDP, lagging it by two quarters. Therefore, the model uses GDP as a predictor of end-demand. We used the most recent Federal Reserve GDP forecast as an input.

- Historically, the free market drivers and the floor price have been the active determinants of prices in the linerboard market. The competitive nature of the market, particularly its relatively flat growth rate and the large amount of excess capacity the industry has, have combined to keep prices historically from rising very far from the floor price which has kept the profit margins of producers such as Smurfit compressed.

26

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067371



## Fisher STF Forecast of 42 lb. Unbleached Kraftliner PPW Price

### 42 Lb. Unbleached Kraft Linerboard (Eastern US)

While "list" prices have steadily risen over time, ...

Forecast

Actual

— Simulated and forecast 42 lb. Unbleached Kraftliner PPW price
— Historical 42 lb. Unbleached Kraftliner PPW price

Last Historical Data Point: Dec-09
Data Source: PPW Price

27

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067372





## Fisher Site Forecast Unbleached Kraftliner Prices

### 42 Lb. Unbleached Kraft Linerboard (Eastern US)

— Simulated and forecast 42 lb. Unbleached Kraftliner actual transaction price

... so has the level of discounts that sellers have given buyers. The result has been that prices have remained flat or declining.

(The exception has been the unusual period from 2006 to mid-2008 when the economy overheated just before the crash.)

Actual

Forecast

Last Historical Data Point: Dec-09
Data Source: PPW Price

28

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067373



Linerboard Actual Transaction Price and Floor Price Forecasts

42 Lb. Unbleached Kraft Linerboard (Eastern US)

Actual transaction prices have remained near the floor price most of the time. Fluctuations in inventory levels and operating rates allow sellers and buyers temporary advantage over each other which causes prices to move in small cycles.

Forecast

Actual

Transaction Price

Floor Price

Last Historical Data Point: Dec-09
Data Source: PPW Price

29

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067374

# Fisher International
## Containerboard Pricing 2010 - CM/LB

| | | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Actual | | | | Projected | | | |
| List Price | CM | ($/ton) | - | - | - | | | | | 527 | 578 | 545 | 559 | 575 | 634 | 626 | 684 |
| List Price | LB | ($/ton) | - | - | - | | | | | 547 | 599 | 575 | 612 | 620 | 683 | 672 | 731 |
| List Price | OCC | ($/ton) | - | - | - | | | | | 102 | 86 | 47 | 171 | 110 | 174 | 73 | 131 |
| Actual Transaction Price | CM | ($/ton) | | | | | | | | 465 | 508 | 445 | 451 | 445 | 476 | 457 | 484 |
| Actual Transaction Price | LB | ($/ton) | | | | | | | | 485 | 528 | 472 | 486 | 479 | 513 | 490 | 517 |
| Floor price | CM | ($/ton) | | | | | | | | 346 | 360 | 320 | 424 | 425 | 413 | 427 | 447 |
| Floor price | LB | ($/ton) | | | | | | | | 401 | 427 | 397 | 463 | 464 | 447 | 461 | 451 |
| | | | | | | | | | | | | | | | | | |
| Box Inventory | CB | (Mtons) | | | | | | | | 2.1 | 2.1 | 1.9 | 1.9 | 2.0 | 2.0 | 2.0 | 2.1 |
| Operating rate | CB | (%) | | | | | | | | 97.7 | 93.5 | 86.4 | 95.7 | 92.5 | 96.8 | 92.7 | 94.3 |
| End Use | CB | (Mtons/year) | | | | | | | | 31.3 | 29.2 | 27.6 | 29.4 | 29.3 | 30.1 | 29.8 | 30.0 |
| Mill Deliveries | CB | (Mtons/year) | | | | | | | | 31.1 | 29.4 | 27.2 | 29.8 | 28.9 | 30.5 | 29.4 | 30.3 |
| Export | CB | (Mtons/year) | | | | | | | | 4.3 | 4.6 | 4.3 | 5.3 | 5.4 | 5.6 | 5.7 | 5.8 |
| Capacity | CB | (Mtons/year) | | | | | | | | 36.3 | 36.4 | 36.5 | 36.6 | 37.2 | 37.2 | 37.9 | 38.3 |
| End Demand | Box | (Mtons/year) | | | | | | | | 30.5 | 30.1 | 28.9 | 29.1 | 29.5 | 30.0 | 30.4 | 30.5 |

Last Historical Data Point: Dec-09
Data Source: RISI Index List Price

**Input values:**

| | | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Disc. % | CM | (%) | - | - | - | 2% | 8% | 10% | 15% | 13% | 14% | 19% | 21% | 23% | 25% | 27% | 29% |
| Disc. % | LB | (%) | - | - | - | 2% | 8% | 10% | 15% | 13% | 14% | 19% | 21% | 23% | 25% | 27% | 29% |
| Exports | CB | (Mtons/year) | 3.6 | 3.2 | 3.3 | 3.5 | 3.5 | 3.9 | 3.9 | 4.3 | 4.6 | 4.3 | 5.3 | 5.4 | 5.6 | 5.7 | 5.8 |
| End Demand | Box | (Mtons/year) | 30.2 | 29.5 | 28.8 | 29.2 | 29.9 | 30.5 | 30.6 | 30.5 | 30.1 | 28.9 | 30.5 | 29.5 | 30.0 | 30.4 | 30.5 |

30

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067375

Smurfit's Projections and Fisher-STE
Fisher-STE in Action

## Linerboard Actual Transaction Prices



Legend:
- Smurfit projection given product mix
- Fisher-STE calibrated to Smurfit product mix

© 2010 Fisher International Inc.

31

HIGHLY CONFIDENTIAL
GP-KLEEN01067376

# The Future of Discounts in Containerboard

- Paper industry experts interviewed over the past several years in conjunction with the construction of Fisher-STE models have consistently agreed that, in markets with a "list" price index, discounts tend to rise over time until the index becomes meaningless.

- Statistical analysis supports anecdotal evidence that the discount level increases when price increases are put into effect. After one quarter, sellers succeed in lowering the discount percent but not as much as it was raised and not below the long-term level that buyers have negotiated in the past. As a result, the discount rate trends upwards in a saw-tooth pattern. (See the following slide.)

- Smurfit's projections agree that discount levels will increase through 2012 for Linerboard and 2013 for Corrugating Medium. However, Smurfit assumes that Linerboard discount levels will fall 1% in 2012, 1% in 2013, and 2% in 2014; and that the Corrugating Medium discount will fall 4% in 2013 and 2% in 2014. Smurfit assumes that SBS discounts will increase over the period from 20% in 2010 to 32% in 2014 and that White Top Liner discounts will increase until 2013 but fall 1% each of the next two years.

- I believe the realistic view for the projection period is a continuation of the pattern of discount inflation that is occurring in Containerboard and other paper grades. The Containerboard forecast in this report assumes that the historical trend for the increase in the discount level continues at the same pace in the future as it has in the past. (See the following slide for actual discount rates we have modeled.)

32

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067377

Fisher
International Inc.
BUSINESS INTELLIGENCE



The Discount Level as a Percent of List Price Has Increased Steadily Over Time

After 2010, Steady Growth Is Expected to Continue
*(42 lb Unbleached Kraft Linerboard)*

The correlation coefficient between the historical and simulated discount levels calculated with monthly average data from Feb-04 to Dec-09 is 0.86.

Discounts increase linearly over time but in a saw-toothed pattern in the short-term.

— Simulated Discount
— Historical Discount
– – Used in the Reference Scenario

Discount % [%]

Last Historical Data Point: Dec-09
Data Source: Fisher, STE

33

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067378

# Detailed Analysis

- Market prices
- Sales volumes
- Costs of manufacturing
- Capital spending
- Performance of Reclamation
- Other Risks



HIGHLY CONFIDENTIAL
GP-KLEEN01067379

**Fisher** International Inc.
BUSINESS INTELLIGENCE

# Smurfit's Volume Assumptions Are Reasonable

- Smurfit's assumptions of volume are reasonable given the quality of the company's assets. After adjusting for plant shutdowns, the company has produced roughly the same amount of product with the mix of assets it currently operates for the last five years.



**Smurfit Containerboard Capacity Adjusted for Shutdowns**

35

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067380



## Additional Capacity Risk

- The North American industry has significant Containerboard capacity that is currently idle but that could be started up if Containerboard prices rose sufficiently to justify it.

- Because paper machines can only be used to make paper and because paper mills are highly-capital-intensive, owners have typically restarted capacity whenever there are even marginal returns to be made. The paper industry has a long history of mills returning to production, whether under original ownership or that of new investors who see an opportunity to acquire expensive assets at low prices. The next page shows a list of closed capacity that may be available to be restarted.

- Because Containerboard market prices are driven by the operating rate, the addition of even small amounts of capacity would usually drive prices down. Excess capacity in the industry tends to keep margins low.

36

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067381

**Fisher International Inc.**
BUSINESS INTELLIGENCE

## Substantial Excess Capacity Permits Customers to Re...
### Enter the Market if Prices Were to Approa...

| Company | City | State | Site Country | Site Status | PM Name | PM Status | TPD Capacity | PM Still Available to make Liner or Medium? | Comments about PM or Mill |
|---|---|---|---|---|---|---|---|---|---|
| Catalyst | Campbell River | BC | Canada | Closed | 1266 PM 4 | Shutdown | 380 | Y | PM4 machine for sale made white top liner. Contact John Fitzpatrick (250) 724-7081 |
| Greif | Massillon | OH | United States | Operating | 0805 PM 1 | Shutdown | 115 | Y | PM1 is gone a new PM1 will start-up June 2010. It can make medium. Other PM2 is making medium |
| IP | Albany | OR | United States | Closed | 0848 PM 2 | Shutdown | 650 | Y | IP meeting w/ local interested parties to sell facility. IP does not want another Kraft operation at this mill. |
| IP | Albany | OR | United States | Closed | 0848 PM 3 | Shutdown | 850 | Y | IP meeting w/ local interested parties to sell facility. IP does not want another Kraft operation at this mill. |
| IP | Pineville | LA | United States | Closed | 0355 PM 1 | Shutdown | 1,116 | Y | Machine still there |
| IP | Valliant | OK | United States | Operating | 0838 PM 3 | Shutdown | 1,100 | Y | Machine is down - still there - could return to production if market improves |
| Longview Fibre | Longview | WA | United States | Operating | 1117 PM 6 | Shutdown | 525 | Y | PM4 machine for sale made white top liner. Contact John Fitzpatrick (250) 724-7081 |
| PCA | Tomahawk | WI | United States | Operating | 1200 PM 3 | Shutdown | 180 | Y | PM3 closed - It can make medium |
| Smurfit-Stone | Ontonagon | MI | United States | Closed | 0494 PM 1 | Shutdown | 330 | Y | Mill just closed in Dec. '09 Negotiations under way to sell to another "Non-Brown" producing manufacturer |
| Smurfit-Stone | Ontonagon | MI | United States | Closed | 0494 PM 2 | Shutdown | 430 | Y | Negotiations under way to sell to another "Non-Brown" producing manufacturer |
| Smurfit-Stone | Missoula | MT | United States | Closed | 0579 PM 2 | Shutdown | 550 | Y | Mill just closed in Dec. '09 Negotiations under way to sell to another "Non-Brown" producing manufacturer |
| Smurfit-Stone | Missoula | MT | United States | Closed | 0579 PM 3 | Shutdown | 1,200 | Y | Negotiations under way to sell to another "Non-Brown" producing manufacturer |

| | Without Miss. Ont | With Miss. Ont |
|---|---|---|
| TPD | 4900 | 7400 |
| Days | 350 | 350 |
| TPY | 1,715,000 | 2,590,000 |

*Report Date: Monday, March 08, 2010*
*© 2006-2009 Fisher International, Inc.*
*Source: FisherSolve™*

37

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067382



## Additional Capacity Risk

- A relatively newer risk of new capacity entering the Containerboard market comes from other segments of the paper industry where declining demand is forcing even competitive machines to exit their product segment. An example is newsprint, an industry that has suffered dramatic decreases in demand. Rather than lose their investment entirely, many owners are searching for other products to make. Newsprint machines and their mills often have the right asset configuration to produce Containerboard competitively with acceptable amounts of capital investment.

- There is a substantial risk that newsprint machine conversions enter the Containerboard market with competitive costs and displace less competitive Corrugating Medium machines, affecting the Containerboard market price in the meantime, even if Containerboard prices do not reach higher levels. Conversions would affect all Containerboard grades, even though conversions would be mainly to Corrugated Medium, because excess Medium capacity could be used to make Linerboard, thus lowering the operating rate and, therefore, the price.

- Boise's DeRidder mill newsprint capacity, AbititibiBowater newsprint mills, and Renew Paper (which used to make printing and writing grades), are examples of mills that could add capacity to the Containerboard market.

38

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067383

# Fisher
## International Inc.
BUSINESS INTELLIGENCE

## On Mills Come and Go and Come Back Again
### Paper mill near St. Francisville has returned to production

**Paper mill near St. Francisville has returned to production**

By Kim Quillen
July 31, 2009, 12:14PM

A paper mill near St. Francisville has returned to production under a new owner following a two-year shutdown.

The operation, now known as Renew Paper, started one of its four paper machines Thursday to produce liner board. About 500 contractors are working at the site formerly owned by Tembec Inc, along with most of the 200 employees the mill agreed to hire in an incentive agreement signed with the state in April.

The mill was acquired in April for $16 million by PanAmerican Capital Group, a New York-based private equity firm. Canada-based Tembec shut the mill in 2007, putting 540 people out of work, citing high energy prices, payroll costs and a declining market for coated paper. ...

Dean Schaffer, owner representative for Renew Paper, said all four paper machines could eventually be producing. ...

The state's deal with PanAmerican gave the company $6 million to help restart the mill, with $2 million of that to be repaid in a loan. In addition, PanAmerican could receive $16 million in the next decade if it maintains its 200-person payroll. That could increase to $19.4 million if Renew Paper keeps a payroll of 375 with pay raises.

http://blog.nola.com/tpmoney/2009/07/paper_mill_near_st_francisvill.html

9 months ago, this mill restarted to make Linerboard

Replacement value would be over $200 million, 12 times more than paid.

Government incentives can make restarts even easier.

39

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067384

HIGHLY CONFIDENTIAL
GP-KLEEN01067385

**Fisher** International Inc.
BUSINESS INTELLIGENCE

# Renew Paper Illustrates the Flow of Forward Capacity Into the Curtailed Bucket Matrix

•By GARY PERILLOUX
•Advocate business writer
•Published: Mar 3, 2010 - Page: 6B

The Renew Paper mill south of St. Francisville could be sold shortly after an April 9 hearing, according to court documents filed in the parent company's bankruptcy case.

U.S. Bankruptcy Court Judge Douglas Dodd will convene a Baton Rouge hearing that date to review bids from a court-approved process. … Here's how the court has established the bid process: …

Steve Jones, executive director of the West Feliciana Community Development Foundation, said Tuesday that several parties have expressed interest in buying and operating the mill. His office is actively marketing the property to find an owner who would operate the mill, rather than buy and dismantle equipment at the site, which includes 455,000 square feet of building space, a pulp mill and four paper machines.

9 months later, mill fails again.

Bankruptcy process anticipates another restart.

Mill is still available for restart.



40

© 2010 Fisher International Inc.



Smurfit Projects Questionnaire Intelligence II

## Market Share

- Smurfit's projections show plans for an increase in production of over 450,000 tons during the period.[1] Given forecast mill shipments in each period, Smurfit's sales plan requires an increase in market share over the 2010 level of between 0.8% and 1.5% each year.

- In commodity markets, there are generally only three ways to increase market share:  (1) make new capital investments to improve products; (2) use more expensive materials to attract new customers; or (3) make price concessions.  Each way incurs costs.

- As discussed below, Smurfit's projected capex is insufficient to support significant new product development. Smurfit's White Top Liner strategy does appear to have merit and may capture some market share.  Other than this, I have not seen a basis to support expansion of domestic market share in the business plan.

- In addition, market share is also a function of the actions of other competitors in a highly competitive market. It is likely that Smurfit will face competitive resistance to an increase in its market share.

1. The increase in Smurfit's production is taken into account in our forecast.

41

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067386

Smurfit Projects Increase in Market Share that Could Increase Smurfit's Costs of Luxury to Achieve Pricing

**Additional Market Share Over 2010 Level Implied by Sales Plan**



■ Implied change in market share

42

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067387



# Smurfit Cannot Improve EBITDA, Materially, by Increasing Production Further

- Adding capacity in the North American Containerboard industry today has the effect of lowering market prices. Sensitivity analysis using the Fisher-STE model shows that, on the margin, each half-percent of capacity (approximately 182,000 tons per year in 2010) would cause a $5 per ton decrease in the domestic market price.

- Smurfit sells approximately 800,000 tons of unbleached Containerboard to the domestic market, and 3.6 million tons through its own box plants whose prices are largely indexed to the linerboard price. A $5 per ton price decrease would thus have a $23.3 million negative impact on EBITDA. Smurfit's estimate of price sensitivity per $5 dollar change in price per ton for linerboard, medium, and white top liner is $23.1 million.

- Smurfit's projection shows an average mill-net after freight costs of about $458 per ton in 2010 in the domestic market for Containerboard, against an estimated cost of production of about $325 per ton. At the new mill-net price level of $453 ($458 less $5), new capacity of 182,000 tons would earn a gross margin of about $128 per ton or a total of $23 million.

- However, the negative $23 million impact on EBITDA from a lower market price would eliminate the benefit of the increase in production. Moreover, any investment cost necessary for increasing production would create a net loss.

43

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067388



# Smurfit Cannot Improve EBITDA Materially by Increasing Production

- Sensitivity analysis using the Fisher-STE model also shows that the effect of adding capacity is not linear. In other words, if a producer were to add significantly more capacity than 0.5%, the effect would be to drive the market price down to the floor price. As several of Smurfit's paper machines have cost-of-production at or close to the floor price, the impact on Smurfit's EBITDA would be negative.

- Expanding capacity for the export market would be even more likely to produce a negative return, as market prices in the export market are significantly lower than the domestic market. Moreover, the export is likely to become less attractive over time as more and more new, world-class machines are installed, particularly in Asia, close to end-demand that is now served through exports from the US.

44

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067389

## Detailed Analysis

Market prices

Sales volumes

Costs of manufacturing

Capital spending

Performance of Reclamation

Other Risks



**Fisher** International Inc.
PROCESS INTELLIGENCE

HIGHLY CONFIDENTIAL
GP-KLEEN01067390



# Virgin Fiber Assumptions Are Reasonable

- Virgin fiber (softwood and hardwood logs and chips) costs are driven by two factors, volume used and the price of wood. The volume of fiber used is a strict function of the amount of final product produced and is driven by recipes for making each product that essentially cannot be changed. Therefore, any variation in the impact of virgin fiber costs on EBITDA must come from price of wood.

- Prices of virgin fiber are determined by supply-demand dynamics in the regions immediately surrounding each mill (its "wood basket"). Each mill's procurement department typically has a sophisticated understanding of the supply-demand environment affecting the mill. It is reasonable to rely on the fiber price forecast produced by Smurfit's professionals.

- Fisher International operates a cost-of-production model called Fisher Logic, part of the analytical tool called FisherSolve™, for all pulp and paper mills globally. To model cost-of-production, we monitor fiber prices (and the prices of the other major commodities used by the paper industry). We used this database and model as a cross-check on Smurfit's assumptions.

- The chart below suggests that Smurfit's virgin fiber price assumptions are reasonable.

46

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067391



Softwood Fiber Prices (Chips and Logs) (GE US)

Softwood Delivered Pricing Per Green Short Ton - Chips and Pulpwood Combined
Nominal Dollars

Average annual inflation of 1.6% is consistent with Smurfit's projections and economic inflation.

Smurfit-Stone Projections

47

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067392





Hardwood Delivered Pricing Per Green Short Ton - Chips and Pulpwood Combined
Nominal Dollars

Average annual inflation of 2.2% is consistent with Smurfit's projections and economic inflation.

Smurfit-Stone Projections

48

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067393



**Fisher** International Inc.
BUSINESS INTELLIGENCE

## Recycled Fiber Price Assumptions Are Reasonable

- Prices of the major recycled fiber categories used in containerboard, OCC, Double Lined Kraft ("DLK"), and Mixed Papers ("MP"), are highly correlated. The industry typically tracks the price of OCC and uses it as an index for other categories. (See the next slide.)

- Smurfit's assumptions for future prices of OCC are realistic.

- Prices of OCC are steadily trending upward due to steadily growing demand from China for OCC. Regression analysis of the trend shows that Smurfit's predicted average annual prices for OCC are very close to the trend line.

    – Regression lines are either slightly above or slightly below Smurfit's projected prices, depending on whether one expects today's historic high OCC prices to persist for a longer or shorter period.

    – The higher-priced analysis is more likely because OCC prices have already been high for the first quarter whereas the second analysis assumes a low level of OCC prices for the whole of 2010.

    – The average of the two very closely matches Smurfit's projections, suggesting that Smurfit's projections are either quite close to the trend line or very slightly optimistic.

49

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067394



Given Today's OCC Prices, Regression Analysis Indicates Smurfit's OCC Assumptions Would be Slightly Optimistic

OCC Delivered Pricing Per Short Ton

Prices include freight to 60 mills

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067395



Excluding Today's OCC Prices, Regression Indicates Smurfit's OCC Projections Would Be Slightly Pessimistic

Prices include freight to mills

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067396



OCC's a Good Index for the Southeast

Southeast US OCC, DLK and MP Nominal 1997-2009
Real Dollars, OBM Pricing FOB Sellers Dock

OCC SE — DLK SE — MP SE

52



© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067397



# Fuel Assumptions Are Reasonable

- Fuels with the largest impact on EBITDA are coal, #6 fuel oil, and natural gas.

- Smurfit assumes an average annual growth in its purchased fuel costs of 5.8% and of purchased electricity of 2.9%. Given that Smurfit assumes an increase in tons produced by an annual average of 0.7%, the implied net annual energy price inflation is 5.1% for purchased fuels and 2.2% for purchased electricity.

- Energy prices over the past 5 years increased over 20% per year (from $35 per barrel in January 2005 to approximately $75 per barrel today).

- While the volatility of energy markets makes forecasting them difficult, the modest inflation assumptions of Smurfit appear to be reasonable.

- Smurfit's projections of coal prices is lower than coal futures prices from NYMEX. (See next slide.) The annual impact of higher coal prices implied by the futures markets could be an average of between $20 and $25 million in additional cost.

- The average of # 6 oil futures prices from NYMEX also agree with the average of Smurfit's projections over the projection period, although the timing of NYMEX and Smurfit price fluctuation projections differ. (See two slides below.) The annual impact of higher natural gas prices implied by the futures markets would be an average of $10 million in additional cost.

53

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067398



# Coal Assumptions May Be Optimistic

- Smurfit's projected cost for coal is significantly lower than NYMEX futures prices which may indicate that the projections are optimistic.

**Compare NYMEX Coal Futures to Smurfit-Stone Projections**



© 2010 Fisher International Inc.

54

HIGHLY CONFIDENTIAL
GP-KLEEN01067399



# #6 Oil Assumptions Are Reasonable

- #6 oil futures prices on an average are close to those of Smurfit which implies that Smurfit's projections are reasonable.



Compare Smurfit-Stone Crude and #6 Oil Projections to NYMEX Crude Oil Futures

© 2010 Fisher International Inc.

55

HIGHLY CONFIDENTIAL
GP-KLEEN01067400



## Natural Gas Assumptions Are Pessimistic

- Natural gas futures prices on average are under those of Smurfit which implies that Smurfit's projections for natural gas may be pessimistic.



56

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067401

## Electricity Assumptions Are Reasonable

- As in the case of virgin fiber, electricity prices are determined by negotiations with local utilities which gives mill procurement people significant insight into the dynamics of the local power market.

- An analysis of average NYMEX electricity futures prices (see the following slide) suggest that Smurfit's projections for purchased electricity are reasonable or slightly optimistic.



NYMEX PJM Electricity Future Prices Adjusted to Smurfit-Stone Electricity
Prices Using 2009 Prices

57

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067402

HIGHLY CONFIDENTIAL
GP-KLEEN01067403

Fisher
International Inc.
BUSINESS INTELLIGENCE

## SG&A as Percent of Sales is Low Compared with Peers but Consistent with Smurfit's Past

- Smurfit's SG&A is reasonable.

- Smurfit's historical SG&A has been relatively low as a percentage of sales compared to its peers.

- I have no reason to believe that Smurfit cannot continue to operate at this level of SG&A, but I do not believe that SG&A could be materially lowered.



58

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067404

# Detailed Analysis

Market prices

Sales volumes

Costs of manufacturing

Capital spending

Performance of Reclamation

Other Risks



Fisher
International Inc.
BUSINESS INTELLIGENCE

HIGHLY CONFIDENTIAL
GP-KLEEN01067405



## Analysis of Smurfit's Capital Spending Plan

- Smurfit's historic and projected levels of capital spending are, in my view, among the most important elements driving the performance of the business.

- As shown in the following slides, Smurfit has historically lagged its peer group in capital spending on any analysis, and would continue to do so under the projected business plan.

- Logic and experience teaches that capital spending in the paper industry is directly correlated to asset quality, which in turn translates directly into cost of production, which in turn translates directly into EBITDA margin. This has in fact been the demonstrable result for Smurfit.

- From these observations I draw two conclusions:
  – First, it is unreasonable to believe that Smurfit could general the projected levels of EBITDA with lower levels of capital spending than shown in the business plan (and likewise unreasonable to believe that higher EBITDA levels could be achieved absent increased capital spending)
  – Second, unless actual capital spending exceeds what is in the projections, Smurfit will be left at the end of the projection period with inferior quality assets relative to its peers and will be less able to sustain future earnings

60

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067406

HIGHLY CONFIDENTIAL
GP-KLEEN01067407



Growth Historically Spent Less on Capital Than Peers
(Measured as a Percent of Sales)

**Capital Expenditures as % of Sales**
**Average 1999 - 2008**

61

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067408





62

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067409

HIGHLY CONFIDENTIAL
GP-KLEEN01067410



63

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067411





64

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067412

# The Technical Age of Smurfit's Assets is High Relative to its Competitors

Fisher International's FisherSolve™ calculates the Technical Age of each mill's assets. The Technical Age measure shows that Smurfit's assets are among the least competitive of its peer group. (Higher technical age means older assets.) Smurfit's higher Technical Age results from lower capex.



**Company Technical Age in Years 2009**

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067413

# Smurfit's Asset Quality Reflects its Low Level of Capital Spending in Fisher-Core Viability Index

Fisher International's Viability Index™ compares companies on a normalized basis reflecting the quality of assets in terms of Technical Age, Capital Required, Cost, and other metrics. It shows that Smurfit's assets are among the least competitive of its peer group. (Higher index scores indicate less competitive assets.)



Total Average Ranking and Cumulative Production

Viability Index Ranking Value

Cumulative Production, FST per Year (x1,000,000)

©2000-2009 Fisher International Inc.
Source: FisherSolve™

© 2010 Fisher

HIGHLY CONFIDENTIAL
GP-KLEEN01067414

# Low Asset Quality Contributes to Smurfit's High Cost-of-Production in Linerboard

FisherSolve™ estimates the cost-of-production of each machine and rolls up costs to higher levels. This cost curve, rolled up to company level, shows that Smurfit's assets in Linerboard, are among the highest cost among its peers.



**Total Cash Cost and Cumulative Production**

© 2008-2009 Fisher International, Inc.
Source: FisherSolve™

67

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067415

# Low Asset Quality Contributes to Smurfit's Average-High Cost-of-Production in Corrugating Medium

FisherSolve™ estimates the cost-of-production of each machine and rolls up costs to higher levels. This cost curve, rolled up to company level, shows that Smurfit's assets in Corrugating Medium, are among the highest cost among its peers.



Total Cash Cost and Cumulative Production

© 2006-2009 Fisher International, Inc.
Source: FisherSolve™

68

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067416

HIGHLY CONFIDENTIAL
GP-KLEEN01067417

Smurfit's High Production Costs Translated Into
Lower EBITDA Margin 2006 through 2008

EBITDA as % of Sales
Average 2006 - 2008

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067418



# Smurfit Underspent its Peer Group in Capex Over the Past 10 Years

- In the ten-year period from 1999 to 2008, Smurfit spent less on capex than its peer group when measured as a percent of sales, depreciation, and current replacement value. (To calculate the latter, we normalized capex as a percent of sales first, took its average, and divided it by the current replacement value of its mill assets.)

- Had Smurfit spent at the average level for 10 years on the stock of assets it currently operates, the company would have spent $ 1.4 to $1.8 billion more than it actually did in today's dollars depending on whether you compare Smurfit to its closest peer group or the whole peer group respectively.

- "Defensive" capital (defined by Smurfit as capital spending designed largely to replace aging assets without significantly increasing productivity or lowering cost) will account for most of Smurfit's capex budget. At 60% of depreciation, the capex budget indicates that the company plans to maintain its assets in the short-term only.

70

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067419

# Smurfit Underspent its Whole Peer Group in Capex by $1.8 Billion Over the Past 10 Years (in Today's Dollars)

## Capital Spending Required to 'Catch Up'
### Based on Average Capex as % Sales of Whole Group of Peers



Capex that would be spent to "catch up" with peers.

Under-spending on capex compared to peers each year

USD in Capex

Base Capex ■ Additional Capex □ Additional Capex 2009 $

71

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067420

# Detailed Analysis

- Market prices
- Sales volumes
- Costs of manufacturing
- Capital spending
- Performance of Reclamation
- Other Risks



HIGHLY CONFIDENTIAL
GP-KLEEN01067421



Fisher
International Inc.
BUSINESS INTELLIGENCE

## Reclamation

- Reclamation will contribute only about 5% of Smurfit's 2010 EBITDA

- Reclamation business makes its margin in the form of a brokerage commission. Predicting its revenue is a function of

  – Transactions

  – Brokerage commission level

  – To a lesser extent, the price of recovered papers

  – Fixed and non-fiber variable costs

- Smurfit projects relatively aggressive 120% EBITDA margin growth from $24.8 million in 2010 to $54.8 million three years later in 2012 (the latest forecast year published for the Reclamation business). Some of this growth is attributable to the increase in market prices of recovered paper. However, Smurfit appears to predict additional "Strategic" growth to account for roughly half of growth during the period. While I did not review the Reclamation business' operating plan, a steep growth curve suggests that there may be risk that the growth target is not completely met.

- Smurfit states that there is significant growing competitive pressure on margins.

  – "Future margin impact is hard to predict due to rapid changes in the recycling market. Overall aggressiveness to control supply is increasingly putting pressure on margin as companies seek to ensure fiber security, maintain competitive advantage, and expand sustainability initiatives. This includes increased competition from financially-backed entities, waste haulers, mill supply brokers, and traditional recyclers as well as waste haulers internalizing tons to protect their core businesses and large generators like Wal-Mart maintaining ownership of material." (Source: notes in the Levin model.)

- The Reclamation forecast assumes no increase in the cost of hauling or freight, but Smurfit's model for mills and box plants assumes an increase in logistics costs due to increases in diesel prices of 61% over the period.

- I therefore believe that Smurfit's predicted contributions of margin to EBITDA by the Reclamation to be optimistic.

73

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067422



**Reclamation Historically Had at a Nearly Constant Brokerage Margin of 46%**

© 2010 Fisher International Inc.

74

HIGHLY CONFIDENTIAL
GP-KLEEN01067423





HIGHLY CONFIDENTIAL
GP-KLEEN01067424

## Detailed Analysis

Market prices

Sales volumes

Costs of manufacturing

Capital spending

Performance of Reclamation

Other Risks



HIGHLY CONFIDENTIAL
GP-KLEEN01067425



# Smurfit's Projections Are Subject to Substantial Downside Risks with Little Upside Potential

- Smurfit's projections do not take into account significant downside legal/regulatory risks that are difficult to quantify:

  – Cap-and-trade legislation represents a risk that would likely have a significant negative impact on Smurfit's profitability. If legislation were to pass in forms now contemplated, Smurfit would incur significant additional costs of compliance and/or for buying credits and possibly would be forced to shutter one or more of its mills.

  – Smurfit relies heavily on coal as a fuel. Coal-burning facilities are the least efficient in terms of the release of $CO_2$ per MMBTU produced.

  – Air pollution control regulations, also being contemplated by Congress, could also have a significant impact on capex requirements for Smurfit.

- By contrast, there is currently no reasonable indication of legal/regulatory developments that would significantly benefit the paper industry

77

© 2010 Fisher International Inc.

HIGHLY CONFIDENTIAL
GP-KLEEN01067426

**Fisher**
International, Inc.
BUSINESS INTELLIGENCE

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 5, 2010.

Rodney N. Fisher

*North American Office:*
Rodney Fisher
Fisher International, Inc.
50 Water Street
Norwalk, CT 06854, USA
+1 203-854-5390
rfisher@fisheri.com

*Latin American Office:*
Marcello Collares
Fisher International, Inc.
Rua 38 – No. 10 apto 203
65077-360, São Luis-Ma, Brasil
+55 98 3227-7081
mcollares@fisheri.com

*South Asian Office:*
Tushar Deshpande
Fisher International, Inc.
406, Manchester Regent
Avinashi Road
Coimbatore Tamil Nadu 641037
India
Tel: +91 (984) 307 7796

*European Office:*
Armin Waidele
Fisher International, Inc.
Hochdorfer Strasse. 30
72294 Grombach, Germany
Tel: +49-(0) 7453-95 94 94
Mobile: +49-(0) 171-22 33 453
awaidele@fisher.com

HIGHLY CONFIDENTIAL
GP-KLEEN01067427

# **Exhibit 1**

80960-001\DOCS_DE:129223.5

HIGHLY CONFIDENTIAL
GP-KLEEN01067428

# Exhibit 23

# **EXHIBIT 1**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| SMURFIT-STONE CONTAINER CORPORATION, et al.,[1] | Case No. 09-10235 (BLS) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION FOR SMURFIT-STONE CONTAINER CORPORATION AND ITS DEBTOR SUBSIDIARIES AND PLAN OF COMPROMISE AND ARRANGEMENT FOR SMURFIT-STONE <u>CONTAINER CANADA INC. AND AFFILIATED CANADIAN DEBTORS</u>

SIDLEY AUSTIN LLP
James F. Conlan
Matthew A. Clemente
Dennis M. Twomey
Bojan Guzina
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

STIKEMAN ELLIOTT LLP
Sean F. Dunphy
Alexander D. Rose
5300 Commerce Court West
199 Bay Street
Toronto, Ontario M5L 1B9
Telephone:  (416) 869-5261
Facsimile:  (416) 947-0866

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware, 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Smurfit-Stone Container Corporation (1401), Smurfit-Stone Container Enterprises, Inc. (1256), Calpine Corrugated, LLC (0470), Cameo Container Corporation (5701), Lot 24D Redevelopment Corporation (6747), Atlanta & Saint Andrews Bay Railway Company (0093), Stone International Services Corporation (9630), Stone Global, Inc. (0806), Stone Connecticut Paperboard Properties, Inc. (8038), Smurfit-Stone Puerto Rico, Inc. (5984), Smurfit Newsprint Corporation (1650), SLP Finance I, Inc. (8169), SLP Finance II, Inc. (3935), SMBI Inc. (2567), Smurfit-Stone Container Canada Inc. (3988), Stone Container Finance Company of Canada II (1587), 3083527 Nova Scotia Company (8836), MBI Limited/Limitée (6565), Smurfit-MBI (1869), 639647 British Columbia Ltd. (7733), B.C. Shipper Supplies Ltd. (7418), Specialty Containers Inc. (6564), SLP Finance General Partnership (9525), Francobec Company (7735), and 605681 N.B. Inc. (1898).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 222 North LaSalle Street, Chicago, Illinois 60601.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS A SOLICITATION OF ACCEPTANCES OF THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY OTHER PURPOSE UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT PURSUANT TO
 SECTION 1125 OF THE BANKRUPTCY CODE.

---

**IMPORTANT DATES**

- Date by which Ballots and Master Ballots must be received:  [_____]

- Date by which objections to Confirmation of the Plan must be filed and served:  [_____]

- Hearing on Confirmation of the Plan:  [_____] at [  --.m.] (Prevailing Eastern Time)

---

CH1 5118439 5168368v.41

## TABLE OF CONTENTS

DISCLAIMER ....................................................................................................... 1

I.  INTRODUCTION ........................................................................................... 4

    **A.**    **Overviews of Chapter 11 and CCAA Proceedings.** ........................ 5

        **1.**    **Chapter 11 Proceedings.** ................................................... 5

        **2.**    **CCAA Proceedings.** ......................................................... 6

    **B.**    **Overview of Voting Procedures and Plan Confirmation in Chapter 11 Proceedings.** ................................................................. 7

        **1.**    **Parties Entitled to Vote on the Plan.** .................................. 7

        **2.**    **Solicitation Package.** ........................................................ 8

        **3.**    **Voting Procedures, Ballots, and Voting Deadline.** ............... 9

        **4.**    **Plan Confirmation Hearing.** ............................................. 10

        **5.**    **Objections to Confirmation.** ............................................. 10

    **C.**    **Overview of Solicitation and Voting on the Plan in the CCAA Proceedings.** ................................................................. 11

II. OVERVIEW OF THE PLAN AND CCAA PLAN .......................................... 12

    **A.**    **General Overview.** ...................................................................... 12

    **B.**    **Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors and Canadian Debtors Under the Plan.** ................................................................. ~~14~~13

    **C.**    **Canadian Asset Sale.** ................................................................. ~~17~~20

    **D.**    **Executive Compensation:  Management Incentive Plans and Employment Agreements.** ......................................................... ~~20~~23

        **1.**    **Management Incentive Plans.** ........................................... ~~20~~23

        **2.**    **Executive Employment Agreements.** ................................. ~~23~~26

III. GENERAL INFORMATION ........................................................................ ~~23~~31

    **A.**    **The Debtors' Businesses and Properties.** ..................................... ~~27~~31

        **1.**    **Company Overview.** ........................................................ ~~27~~31

2.      Properties. ................................................................. 27 31

B.      Operational Structure of the Debtors. ............................... 27 31

1.      Products and Materials. ........................................ 28 32

2.      Materials. ............................................................ 29 33

3.      Customers. ........................................................... 29 33

4.      Employees. ............................................................ 30 34

5.      Recent Operations. ................................................ 30 34

6.      Corporate History and Business Acquisitions. .............. 31 35

C.      Management of Debtors. .................................................. 32 36

1.      Board of Directors. ............................................... 32 36

2.      Biographies of Directors. ....................................... 32 36

3.      Committees of the Board of Directors. ...................... 34 37

4.      Compensation of Directors. ................................... 34 38

5.      Executive Officers. ................................................. 35 38

6.      Biographies of the Senior Executive Officers. ............. 35 39

7.      Executive Compensation. ....................................... 39 43

D.      Compensation and Benefits Programs. ............................... 39 43

1.      Historical Incentive Programs Prior to the Chapter 11 Cases. ........ 40 44

2.      Short-Term and Long-Term Incentive Compensation Plans
        Approved During the Chapter 11 Cases. ..................... 41 44

3.      Executive Agreements. .......................................... 46 50

4.      Retirement Plans. ................................................. 47 51

5.      Other Post-Retirement Benefit Programs. .................. 48 52

E.      Pre-Petition Debt and Capital Structure of the Company. ........ 49 53

1.      Pre-Petition Secured Debt Under the Pre-Petition Credit
        Agreement. .......................................................... 49 53

iv

2.  **Senior Note Debt.** ................................................................. ~~51~~55

3.  **Securitization Facilities.** ..................................................... ~~51~~55

4.  **Utility and Industrial Revenue Bonds and Other Debt
    Obligations.** ......................................................................... ~~52~~56

5.  **Intercompany Debt.** ............................................................. ~~53~~57

6.  **Trade Debt.** ......................................................................... ~~57~~61

7.  **Equity of SSCC.** .................................................................. ~~57~~61

F.  **Restructuring Transactions and Post-Effective Date Debt and Capital
    Structure of the Company.** .................................................... ~~57~~61

    1.   **Restructuring Transactions.** ......................................... 61

    2.   **Post-Effective Date Equity in Reorganized SSCC.** ........................ ~~58~~62

    ~~2.~~3.  **Exit ~~Financing for~~Facilities of Reorganized Debtors.** .................... ~~58~~62

G.  **Pending Litigation Against the Debtors.** ................................. ~~58~~63

H.  **Events Leading up to Chapter 11.** ......................................... ~~59~~64

IV.  EVENTS DURING THE PROCEEDINGS .......................................... ~~59~~64

A.  **First-Day Relief in the Chapter 11 Cases.** .............................. ~~60~~64

    1.   **Utility Services.** ............................................................ ~~60~~65

    2.   **Payment of Federal, State and Local Taxes.** ..................... ~~60~~65

    3.   **Shippers, Warehousemen and Other Lien Claimants.** .................. ~~61~~65

    4.   **Critical Trade Vendor Treatment and Payment of Priority
         Claims.** ......................................................................... ~~61~~66

    5.   **Continuation and Payment of Prepetition Insurance.** ................... ~~61~~66

    6.   **Customer Programs.** ..................................................... ~~62~~66

    7.   **Employee Compensation and Benefits.** ............................. ~~62~~66

    8.   **Cash Management.** ....................................................... ~~62~~67

    9.   **Use of Cash Collateral.** ................................................ ~~63~~67

|  | 10. | Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs. | 63 67 |
| B. | | Relief in CCAA Proceedings. | 63 68 |
| C. | | Debtor-in-Possession Financing. | 65 70 |
|  | 1. | Post-Petition Financing Needs. | 65 70 |
|  | 2. | The DIP Financing Motion and Orders. | 65 70 |
|  | 3. | The DIP Facility. | 65 70 |
| D. | | Appointment of Creditors' Committee. | 67 71 |
| E. | | Professional Retention. | 67 72 |
| F. | | Cross-Border Insolvency Protocol. | 69 73 |
| G. | | Substantive Matters in the Proceedings. | 69 74 |
|  | 1. | Exclusive Procedures for Section 503(b)(9) Claims. | 69 74 |
|  | 2. | Claims Reconciliation | 74 |
|  | 3. | Extension of Time to Remove Actions. | 69 74 |
|  | 3. 4. | Executory Contracts and Unexpired Leases. | 69 74 |
|  | 4. 5. | Asset Sales. | 70 75 |
|  | 6. | Ontonagon, MI and Missoula, MT Mill Closures. | 77 |
|  | 5. 7. | Hodge Trustee's Motion for Payment of Administrative Expenses. 72 and Disclosure Statement Objection. | 78 |
|  | 6. 8. | Georgia Pacific Litigation. | 73 78 |
|  | 7. 9. | i2i Europe, ltd. Adversary Proceeding. | 73 80 |
|  | 8. 10. | Caspian Capital Advisors' Motion for Appointment of Official Committee of Equity Security Holders. | 74 81 |
|  | 11. | 7.375% Notes Due 2014 and Related Claims and Pleadings. | 82 |
|  | 10. 12. | Motions to Lift or Modify the Automatic Stay. | 76 87 |
|  | 13. | Approval of the Exit Term Loan Facility Arrangement Motion. | 87 |

| | | |
|---|---|---|
| **H.** | **Administrative Matters in the Proceedings.** | ~~76~~88 |
| | 1. | Schedules of Assets and Liabilities; Statements of Financial Affairs. | ~~76~~88 |
| | 2. | Filing Claims and Bar Date. | ~~76~~89 |
| | 3. | Bankruptcy Rule 2015.3 Reports. | ~~78~~90 |
| | 4. | Exclusivity Period. | ~~78~~91 |
| **I.** | **Avoidance Actions.** | ~~79~~92 |
| | 1. | Preference Actions. | ~~79~~92 |
| | 2. | Fraudulent Transfer and Conveyance Actions. | ~~79~~92 |
| **J.** | **The Plan and Disclosure Statement** | 93 |
| | 1. | Bond Safeguard Insurance Co. and Lexon Insurance Co. ("Bond Safeguard"). | 94 |
| | 2. | ACE American Insurance Company, Pacific Employers Insurance Company, and Possibly Other Members of the ACE Group of Companies ("ACE"). | 94 |
| | 3. | Henry L. Fernandez, Jr. | 95 |
| | 4. | The County of Ontonagon, the Township of Ontonagon and the Village of Ontonagon ("Ontonagon"), The Flower Garden, LLC ("Flower Garden"), Aspirus Ontonagon Hospital ("Aspirus"), Missoula Area Economic Development Corporation ("MAEDC") and the Attorney General of the State of Montana ("Montana"). | 95 |
| | 5. | Mariner Investment Group, LLC and Senator Investment Group LP ("Mariner"). | 95 |
| | 6. | Certain Holders of Smurfit-Stone Container Corporation's Common Stock. | 97 |
| | 7. | Aurelius Capital Management, LP and Columbus Hill Capital Management, L.P. | 98 |
| | 8. | U.S. Bank Trust National Association as Indenture Trustee. | 98 |
| | 9. | Concrete Restoration Services Ltd. (objection filed by Specialty Construction Products Ltd.) ("Concrete Restoration"). | 98 |

V.  THE PLAN OF REORGANIZATION .......................................................................... ~~80~~98

    A.    Classification and Allowance of Claims & Equity Interests Generally. ..... ~~81~~99

    B.    Treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases. ..................................... ~~81~~99

        1.    Administrative Expense Claims. ..................................................... ~~81~~99

        2.    No Double Payment of Administrative Expense Claims. ............. ~~82~~100

        3.    DIP Facility Claims. ....................................................................... ~~82~~100

        4.    Priority Tax Claims. ....................................................................... ~~83~~101

    C.    Classification and Treatment of Claims Against and Interests in the Debtors in the Chapter 11 Cases. ................................................................. ~~83~~101

        1.    Summary of Classification and Treatment of Classified Claims and Interests. ................................................................................... ~~83~~101

        2.    Classification and Treatment of Claims Against and Interests in SSCC. .............................................................................................. ~~88~~106

        3.    Classification and Treatment of Claims Against and Interests in SSCE. ............................................................................................... ~~92~~110

        4.    Classification and Treatment of Claims Against and Interests in Cameo Container. ........................................................................... ~~97~~115

        5.    Classification and Treatment of Claims Against and Interests in Calpine Corrugated. ....................................................................... ~~100~~118

        6.    Classification and Treatment of Claims Against and Interests in SSPRI. ............................................................................................. ~~104~~122

        7.    Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (United States). ................................. ~~106~~124

        8.    Classification and Treatment of Claims Against and Interests in SSC Canada. .................................................................................... ~~109~~127

        9.    Classification and Treatment of Claims Against and Interests in Smurfit-MBI. ................................................................................... ~~113~~132

        10.    Classification and Treatment of Claims Against and Interests in MBI Limited. .................................................................................. ~~117~~135

11.    Classification and Treatment of Claims Against and Interests in
       Stone FinCo II. ...................................................................... ~~120~~139

12.    Classification and Treatment of Claims Against and Interests in
       B.C. Shipper Supplies Ltd. ................................................... ~~123~~142

13.    Classification and Treatment of Claims Against and Interests in
       Francobec Company. .............................................................. ~~126~~144

14.    Classification and Treatment of Claims Against and Interests in
       3083527 Nova Scotia Company. ............................................ ~~129~~148

15.    Classification and Treatment of Claims Against and Interests in
       the Non-Operating Debtors (Canada) ................................... ~~132~~151

16.    Acceptance or Rejection of the Plan by Classes of Claims and
       Interests. ............................................................................... ~~135~~154

D.    Classification and Treatment of Affected Claims Against the Canadian
      Debtors in the CCAA Proceedings. ................................................. ~~136~~155

      1.    Purpose and Effect of the CCAA Plan. ...................... ~~136~~155

      2.    Classification of Creditors. ......................................... ~~137~~155

      3.    Treatment of Affected Secured Claims, CCAA Charges and
            Priority Tax Claims. .................................................... ~~139~~157

      4.    Treatment of Affected Unsecured Claims ~~140~~ .................................. 158

      5.    Conditions Precedent to Implementation of CCAA Plan. .......... ~~141~~160

      6.    CCAA Creditors' Meeting. .......................................... ~~141~~160

      7.    General. ......................................................................... ~~144~~162

E.    The Canadian Asset Sale. ............................................................... ~~146~~164

      1.    Sale of the Canadian Assets to Canadian Newco. ....... ~~146~~164

F.    Means For Implementation of the Plan. ........................................ ~~149~~167

      1.    Procedural Consolidation. .......................................... ~~149~~167

      2.    Corporate Governance and Corporate Actions. .......... ~~149~~168

      3.    Issuance and Distribution of New Securities and Related
            Matters. ........................................................................ ~~151~~170

ix

4.       Listing on the New York Stock Exchange or the NASDAQ Stock Market.................................................................152171

5.       Exit Facilities..................................................................153172

6.       Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors...................................................153172

7.       Dissolution of SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II.................153Certain Canadian Debtors.    172

8.       Vesting of the Canadian Assets in Canadian Newco. .................154173

9.       Cancellation of Credit Documents, Debt Instruments, and Interests...................................................................154173

10.     Cancellation of Liens.....................................................155174

11.     Employee Compensation and Benefit Programs. ........................155174

12.     Canadian Pension Plans..................................................156175

13.     Management Incentive Plans............................................157176

14.     Restructuring Transactions.............................................157176

15.     Additional Transactions Authorized Under the Plan.................158177

16.     Cash-Out Auction for Eligible Cash-Out Participants...............158177

G.     Treatment of Executory Contracts and Unexpired Leases in the Chapter 11 Cases and the CCAA Proceedings.......................161180

     1.       Assumption/Ratification of Executory Contracts and Unexpired Leases. ................................................161180

     2.       Cure of Defaults Under Assumed/Ratified Executory Contracts and Unexpired Leases.............................161180

     3.       Assumption of Collective Bargaining Agreements. ....................161180

     4.       Insurance Policies and Agreements....................................162181

     5.       Rejection Damages Bar Date.............................................162181

     6.       Post-Petition Contracts and Leases....................................162181

H.     Provisions Governing the Distributions Under the Plan.......................162181

x

1.    **General Provisions on Distributions under the Plan.** .................. ~~162~~182

2.    **No Interest on Claims Unless Otherwise Provided in the Plan.** .. ~~163~~182

3.    **Distributions by Disbursing Agents.** ............................................. ~~163~~182

4.    **Delivery of Distributions – Chapter 11 Cases** ............................ ~~164~~183

5.    **Delivery of Distributions – CCAA Proceedings.** ......................... ~~165~~184

6.    **Undeliverable and Unclaimed Distributions.** .............................. ~~165~~184

7.    **Record Date for Distributions.** .................................................... ~~166~~185

8.    **Assignment of Claims.** ................................................................. ~~167~~186

9.    **Means of Cash Payment.** ............................................................. ~~167~~186

10.   **Withholding and Reporting Requirements.** ................................. ~~167~~186

11.   **Allocation of Plan Distributions Between Principal and Interest.** ........................................................................................ ~~168~~187

12.   **Setoff and Recoupment.** ............................................................... ~~168~~187

13.   **Fractional Shares.** ........................................................................ ~~168~~187

14.   **Compromises and Settlements.** .................................................... ~~168~~187

15.   **Claims Administration Responsibility – Chapter 11 Cases.** ........ ~~168~~187

16.   **Procedures for Treating and Resolving Disputed Claims – Chapter 11 Cases.** ..................................................................... ~~169~~188

17.   **Distribution Reserve– CCAA Proceedings.** ............................... ~~172~~190

I.    **Confirmation and Consummation of the Plan.** ...................................... ~~173~~191

1.    **Conditions to Confirmation.** ....................................................... ~~173~~191

2.    **Conditions to Occurrence of the Effective Date.** ........................ ~~173~~192

3.    **Waiver of Conditions.** .................................................................. ~~174~~192

4.    **Consequences of Non-Occurrence of Effective Date.** ................. ~~174~~193

5.    **Notice of Effective Date.** .............................................................. ~~174~~193

J.    **Injunctions, Releases And Discharge.** ................................................... ~~174~~193

| | | | |
|---|---|---|---|
| 1. | Discharge. | ..................................................... | 174193 |
| 2. | Releases. | ..................................................... | 177195 |
| 3. | Supplemental Injunction. | ..................................... | 179198 |
| 4. | Disallowed Claims. | ......................................... | 180199 |
| 5. | Exculpation. | ................................................ | 181199 |
| 6. | Revesting of Assets. | ....................................... | 182200 |
| 7. | Preservation of Litigation Claims. | ...................... | 182201 |
| 8. | Survival of Indemnification Obligations. | ............... | 182201 |
| K. | **Retention of Jurisdiction.** | ................................ | 183202 |
| 1. | Jurisdiction of the Bankruptcy Court and the Canadian Bankruptcy Court. | ....................... | 183202 |
| L. | **Miscellaneous.** | ............................................ | 186205 |
| 1. | Surrender of Instruments. | ................................. | 186205 |
| 2. | Dissolution of the Committee. | ............................ | 187205 |
| 3. | Pre-Effective Date Injunctions or Stays. | ............... | 187206 |
| 4. | Post-Confirmation Date Retention of Professionals. | ... | 187206 |
| 5. | Payment of the Fee Auditor's Fees and Expenses. | .... | 187206 |
| 6. | Bar Date for Certain Administrative Expense Claims. | .. | 188206 |
| 7. | Effectuating Documents and Further Transactions. | ... | 188207 |
| 8. | Exemption from Transfer Taxes. | ......................... | 188207 |
| 9. | Payment of Statutory Fees. | ............................... | 188207 |
| 10. | Payment of Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees. | .... | 189207 |
| 11. | ~~Proofs of Claim Filed by~~ Payment of Professional Fees of the Ad Hoc Group of Prepetition ~~Notes Indenture Trustees.~~....189Noteholders. | | 208 |
| 12. | Proofs of Claim Filed by ~~Industrial Revenue Bond~~ Prepetition Notes Indenture Trustees. | .......................... | 189208 |

CH1 5118439 5168368v.41

**13.** **Proofs of Claim Filed by Industrial Revenue Bond Indenture Trustees.** .................................................................... 208

**14.** Creditor Representative Duties and Payment of Fees ................ ~~189~~208

**14.15.** Amendment or Modification of the Plan. .................................... ~~189~~209

**15.16.** Severability of Plan Provisions. .............................................. ~~190~~209

**16.17.** Binding Effect; Successors and Assigns. ................................. ~~190~~209

**17.18.** Revocation, Withdrawal or Non-Consummation. .................... ~~190~~209

**18.19.** Notice. .................................................................................. ~~190~~210

**19.20.** Governing Law. ..................................................................... ~~191~~210

**20.21.** Reservation of Rights. ........................................................... ~~191~~210

VI. VOTING PROCEDURES AND REQUIREMENTS ................................. ~~192~~211

    **A.** **Voting Procedures/Solicitation in the Chapter 11 Proceedings.** ............. ~~192~~211

        **1.** Voting Deadline. ............................................................ ~~192~~211

        **2.** Vote Required for Acceptance by a Class of Claims. ................. ~~193~~212

        **3.** Voting Procedures. ......................................................... ~~193~~212

    **B.** **Canadian Voting Procedures.** ................................................ ~~194~~213

        **1.** Voting and Acceptance of Plan in CCAA Proceedings. .............. ~~194~~213

        **2.** Solicitation in CCAA Proceedings. ..................................... ~~194~~213

VII. CONFIRMATION OF THE PLAN ...................................................... ~~196~~215

    **A.** **Confirmation in Chapter 11 Cases.** ......................................... ~~196~~215

        **1.** Confirmation Hearing. .................................................... ~~196~~215

        **2.** Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases. ......................................................... ~~197~~216

    **B.** **Canadian Requirements for Sanction of CCAA Plan.** ............................ ~~202~~221

VIII. PROJECTED FINANCIAL INFORMATION ~~202~~ AND VALUATION ANALYSIS .................................................................................. 221

**A.**     **Projected Financial Information.**........................................................ 221

**B.**     **Valuation Analysis.**.......................................................................... 223

　　**1.**     **Overview.**.......................................................................... 223

　　**2.**     **Valuation Methodology.**.................................................... 225

IX. DESCRIPTION OF CAPITAL STOCK OF REORGANIZED DEBTORS.................~~204~~228

X.  CERTAIN RISK FACTORS TO BE CONSIDERED ................................................~~204~~229

　　**A.**     **Certain Bankruptcy Considerations.**.........................................~~205~~229

　　　　**1.**     **Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.**........~~205~~229

　　　　**2.**     **Undue Delay in Confirmation of the Plan May Disrupt the Debtors' Operations.**.....................................................~~206~~230

　　　　**3.**     **Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.**........~~206~~230

　　**B.**     **Risks Relating to the Reorganized Debtors' Financial Results and Condition.** ...................................................................~~206~~231

　　　　**1.**     **The Reorganized Debtors' Failure to Achieve Their Projected Financial Results May Affect Their Ability to Pay Obligations.**~~206~~231

　　　　**2.**     **The Debtors' Financial Projections Are Based on Assumptions and Subject to Uncertainty.**..............................................~~207~~232

　　　　**3.**     **Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect.** ...............................................................~~207~~232

　　　　**4.**     **Historical Financial Information May Not Be Comparable.**........~~208~~232

　　**C.**     **Risks Relating to the Reorganized Debtors' Business.**.........................~~208~~232

　　　　**1.**     **Global Economic Conditions and Credit Tightening Materially and Adversely Affect the Reorganized Debtors' Business.**..........~~208~~232

　　　　**2.**     **The Reorganized Debtors May Be Required to Record Impairment On Their Long-Lived Assets.**..................................~~208~~233

　　　　**3.**     **The Reorganized Debtors' Capital Structure.**............................~~209~~233

4.     The Reorganized Debtors' Exit Financing Credit Facility May
       Limit Their Ability to Plan For or Respond to Changes in Their
       Business. ................................................................................ ~~209~~233

5.     The Debtors' Industry is Cyclical and May Experience Periods
       of Overcapacity. ..................................................................... ~~209~~234

6.     The Debtors' Industry is Highly Competitive. ............................ ~~210~~234

7.     The Debtors' Pension Plans Are Underfunded and Will Require
       Additional Cash Contributions. ................................................ ~~210~~235

8.     Fluctuations in Energy, Transportation and Raw Materials
       Prices Could Adversely Affect Reorganized Debtors'
       Manufacturing Costs. .............................................................. ~~211~~235

9.     Factors Beyond the Reorganized Debtors' Control Could
       Hinder Their Ability to Service Debt and Meet Operating
       Requirements. .......................................................................... ~~211~~236

10.    Cost of Compliance with Government Regulation May
       Adversely Affect the Reorganized Debtors' Financial Results. .... ~~212~~236

11.    Failure to Maintain Customer Relationships May Adversely
       Affect Financial Results. ......................................................... ~~212~~237

12.    Failure to Attract and Retain Employees May Adversely Affect
       Financial Results. .................................................................... ~~212~~237

13.    Foreign Currency Risks and Exchange Rate Fluctuations Could
       Hinder the Results of the Reorganized Debtors' Canadian
       Operations. .............................................................................. ~~213~~237

14.    Work Stoppages and Other Labor Relations Matters May Have
       an Adverse Effect on the Reorganized Debtors' Financial
       Results. .................................................................................... ~~213~~238

D.     Risks Relating to the New SSCC Common Stock. ................................. ~~213~~238

1.     A Liquid Trading Market for the New SSCC Common Stock
       May Not Develop. .................................................................... ~~213~~238

2.     Certain Holders May be Restricted Under Applicable Securities
       Laws in Their Ability to Sell or Transfer New SSCC Common
       Stock. ...................................................................................... ~~214~~238

3.     The Market Price of Shares of New SSCC Common Stock May
       Fluctuate Significantly. ............................................................ ~~214~~239

|   | 4. | Sales of a Substantial Number of Shares of New SSCC Common Stock Could Depress Stock Prices. | ~~215~~239 |
|---|---|---|---|
|   | 5. | Value of New SSCC Common Stock May be Diluted. | ~~215~~239 |
|   | 6. | Lack of Dividends on New SSCC Common Stock May Adversely Affect Liquidity. | ~~215~~240 |

XI. CERTAIN TAX CONSEQUENCES OF THE PLAN ............................................. ~~215~~240

|   | A. | U.S. Federal Income Tax Consequences to the Debtors. | ~~216~~241 |
|---|---|---|---|
|   | B. | U.S. Federal Income Tax Consequences to the Holders of Claims. | ~~218~~243 |
|   | C. | Certain Canadian Federal Income Tax Consequences of the Plan. | ~~223~~247 |
|   | D. | Importance of Obtaining Professional Tax Assistance. | ~~227~~251 |
|   | E. | Reservation of Rights. | ~~227~~252 |

XII. CERTAIN U.S. FEDERAL AND STATE, CANADIAN AND FOREIGN SECURITIES LAW CONSIDERATIONS ............................................. ~~227~~252

|   | A. | Exemption From Registration Requirements. | ~~227~~252 |
|---|---|---|---|
|   | B. | Subsequent Transfers of Securities. | ~~228~~252 |
|   | C. | Canadian Securities Law Considerations. | ~~229~~253 |

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN AND CCAA PLAN ............................................. ~~229~~254

|   | A. | Continuation of the Chapter 11 Cases. | ~~229~~254 |
|---|---|---|---|
|   | B. | Liquidation Under Chapter 7 or Chapter 11. | ~~230~~255 |
|   | C. | Alternatives in CCAA Proceedings. | ~~230~~255 |

~~XV~~XIV. CONCLUSION AND RECOMMENDATION ............................................. ~~230~~255

## INDEX OF EXHIBITS

Exhibit A        Debtors' Joint Plan of Reorganization and Plan of Compromise and Arrangement

Exhibit B-1     Petition Date Corporate Structure Chart

Exhibit B-2     Anticipated Post-Effective Date Corporate Structure Charts

Exhibit C        Projected Financial Information

Exhibit D        Liquidation Analysis

Exhibit E        Selected Historical Financial Statements: Smurfit-Stone Container Corporation
                 Quarterly Report on Form 10-Q For the Quarterly Period Ended September 30,
                 2009

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND CONFIRMATION, OF THE PLAN (AS DEFINED BELOW) AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY INCOMPLETENESS OF ANY SUMMARY OR STATEMENT MADE IN THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.  CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW) AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF CANADA OR ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.

EXCEPT FOR THE HISTORICAL INFORMATION CONTAINED IN THIS DOCUMENT, CERTAIN MATTERS DISCUSSED HEREIN CONTAIN FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  ALTHOUGH THE DEBTORS BELIEVE THAT, IN MAKING ANY SUCH STATEMENTS, THEIR EXPECTATIONS ARE BASED ON REASONABLE ASSUMPTIONS, ANY SUCH STATEMENTS MAY BE INFLUENCED BY FACTORS THAT COULD CAUSE ACTUAL OUTCOMES AND RESULTS TO BE MATERIALLY DIFFERENT FROM THOSE CONTAINED IN SUCH FORWARD-LOOKING STATEMENTS.  WHEN USED IN THIS DOCUMENT, THE WORDS "ANTICIPATES," "BELIEVES," "EXPECTS," "INTENDS" AND SIMILAR EXPRESSIONS AS THEY RELATE TO THE DEBTORS, THEIR OPERATIONS OR THEIR MANAGEMENT ARE INTENDED TO IDENTIFY SUCH FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO NUMEROUS RISKS AND UNCERTAINTIES. THERE ARE IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN FORWARD-LOOKING STATEMENTS, CERTAIN OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THESE FACTORS, RISKS AND UNCERTAINTIES ARE DISCUSSED BELOW IN ARTICLE X OF THIS DISCLOSURE STATEMENT.

THE DEBTORS' ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENT COULD DIFFER MATERIALLY FROM THOSE EXPRESSED IN, OR IMPLIED BY, THESE FORWARD-LOOKING STATEMENTS. ACCORDINGLY, THE DEBTORS CAN GIVE NO ASSURANCES THAT ANY OF THE EVENTS ANTICIPATED BY THE FORWARD-LOOKING STATEMENTS WILL TRANSPIRE OR OCCUR OR, IF ANY OF THEM DO SO, WHAT IMPACT THEY WILL HAVE ON THE DEBTORS' RESULTS OF OPERATIONS OR FINANCIAL CONDITION.  THE DEBTORS EXPRESSLY DECLINE ANY OBLIGATION TO PUBLICLY REVISE ANY FORWARD-LOOKING STATEMENTS THAT HAVE BEEN MADE TO REFLECT THE OCCURRENCE OF EVENTS AFTER THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS, IN CONSULTATION WITH THE DEBTORS' PROFESSIONAL ADVISORS, PREPARED THE PROJECTIONS (AS DEFINED BELOW) PROVIDED IN THIS DISCLOSURE STATEMENT.  THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO

SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT BE CORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.

# I. INTRODUCTION

On January 26, 2009 (the "Petition Date"),[2] Smurfit-Stone Container Corporation ("SSCC") and its subsidiaries Smurfit-Stone Container Enterprises, Inc. ("SSCE"), Calpine Corrugated, LLC, Cameo Container Corporation, Lot 24D Redevelopment Corporation, Atlanta & Saint Andrews Bay Railway Company, Stone International Services Corporation, Stone Global, Inc. Stone Connecticut Paperboard Properties, Inc., Smurfit-Stone Puerto Rico, Inc., Smurfit Newsprint Corporation, SLP Finance I, Inc., SLP Finance II, Inc., SMBI Inc., Smurfit-Stone Container Canada Inc., Stone Container Finance Company of Canada II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc. (collectively with SSCC, the "Debtors" or the "Company") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (collectively, the "Chapter 11 Cases").

On the Petition Date, following the commencement of the Chapter 11 Cases, certain of the Debtors – including Smurfit-Stone Container Canada Inc. ("SSC Canada"), a wholly-owned subsidiary of SSCE, and certain of its affiliates (collectively, the "Canadian Debtors")[3] – applied for protection from their creditors in Canada pursuant to the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-~~36~~36, as amended (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Bankruptcy Court"). On the Petition Date, the Canadian Bankruptcy Court issued an order that, *inter alia*, imposed a stay of all proceedings (the "CCAA Stay") against the Canadian Debtors and their property (as amended and restated on January 28, 2009, the "CCAA Initial Order"). The proceedings before the Canadian Bankruptcy Court are referred to herein as the "CCAA Proceedings," and together with the Chapter 11 Cases as the "Proceedings").

On December 22, 2009, the Debtors filed their Joint Plan of Reorganization and Plan of Compromise and Arrangement (as the same may be amended from time to time, the "Plan") with the Bankruptcy Court. The Plan provides for a coordinated restructuring and compromise of all Claims against and Interests in the Debtors, including the Canadian Debtors, in both the Chapter 11 Cases and the CCAA Proceedings. Article IV of the Plan, together with the incorporated definitions and other generally applicable provisions, shall also serve as the plan of compromise and arrangement (the "CCAA Plan") to be proposed in the CCAA Proceedings to each Class of Affected Claims against the Canadian Debtors. A copy of the Plan is attached hereto as Exhibit A. The Debtors hereby submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to the Holders of certain Claims against the Debtors in connection with (i) the solicitation of

---

[2] Unless otherwise defined elsewhere in this Disclosure Statement, capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the Bankruptcy Code.

[3] The Canadian Debtors are Smurfit-Stone Container Canada Inc., Stone Container Finance Company of Canada II, 3083527 Nova Scotia Company, MBI Limited/Limitée, Smurfit-MBI, 639647 British Columbia Ltd., B.C. Shipper Supplies Ltd., Specialty Containers Inc., SLP Finance General Partnership, Francobec Company, and 605681 N.B. Inc. Smurfit-MBI and SLP Finance General Partnership ~~did not apply for~~also received protection ~~under~~from their creditors pursuant to the CCAA Initial Order (as defined below) but instead sought recognition of their respective Chapter 11 Cases in the Canadian Bankruptcy Court under Section 268 of the Bankruptcy and Insolvency Act, R.S.C. 1985 c. B-3.

acceptances of the Plan and (ii) the hearing to consider confirmation of the Plan scheduled for [_____], commencing at [ ] --.m. prevailing Eastern Time.  In advance of the hearing on confirmation, the Debtors will file a Plan Supplement containing certain exhibits to the Plan that were not filed with the Plan.

The Plan constitutes a separate plan of reorganization for each Debtor in the Chapter 11 Cases and the CCAA Plan constitutes a separate plan of compromise and arrangement for each Canadian Debtor in the CCAA Proceedings.  The Debtors reserve the right to withdraw the Plan or the CCAA Plan with respect to one or more Debtors or Canadian Debtors, as applicable, while seeking confirmation or approval of the Plan or the CCAA Plan with respect to all other Debtors or Canadian Debtors, as applicable.

The purpose of this Disclosure Statement is to describe the Plan, including the CCAA Plan, and the provisions thereof, provide certain information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims who will have the right to vote to accept or reject the Plan so that they can make an informed decision in doing so, and to urge such creditors to vote to accept the Plan.  Holders of Claims entitled to vote to accept or reject the Plan will receive a ballot ("<u>Ballot</u>") together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of these Proceedings.  This Disclosure Statement also contains information respecting significant events that have occurred during these Proceedings, including the formulation and development of the Plan.  In addition, an overview of the Plan is included, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan.  This Disclosure Statement also discusses the confirmation process and the procedures for voting, which must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

By order dated [_____], the Bankruptcy Court approved this Disclosure Statement, in accordance with section 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, Holders of Claims should not rely on any information relating to the Debtors and their businesses, other than the information contained in this Disclosure Statement, the Plan, and all exhibits and appendices hereto and thereto.

The Debtors may supplement and/or amend this Disclosure Statement or any Exhibits attached thereto, including filing the Exhibits referenced herein, at any time prior to the hearing to approve this Disclosure Statement.

**A.     <u>Overviews of Chapter 11 and CCAA Proceedings.</u>**

**1.     Chapter 11 Proceedings.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity security holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

After a plan of reorganization has been filed in a chapter 11 case, certain holders of the claims against or equity interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan. The Debtors are submitting this Disclosure Statement to certain Holders of Claims against and Interests in each Debtor in order to satisfy the requirements of section 1125 of the Bankruptcy Code.

## 2.      CCAA Proceedings.

Over the last twenty-five years, the CCAA has emerged as the principal Canadian statute for carrying out major insolvency restructurings. Similar to chapter 11, the CCAA is "debtor-in-possession" legislation. The CCAA creates a Court-supervised process that allows the debtor to carry on business and maintain control over its assets while it negotiates, and seeks approval for, a plan of compromise and arrangement acceptable to its creditors. The consummation of a plan of compromise and arrangement is the CCAA's principal objective.

Where a plan is proposed between a debtor company and its secured or unsecured creditors, or any class thereof, the Canadian Bankruptcy Court may (but is not obligated to) order a meeting of creditors or class of creditors. The Canadian Bankruptcy Court order calling the meeting will approve the process for creditors to vote on the proposed plan and will also, among other things, establish classes of creditors for plan voting purposes. While the debtor has the ability to define the classes of creditors subject to the proposed plan, they remain subject to the Canadian Bankruptcy Court's approval. In evaluating proposed classes, courts will consider (a) the commonality of interest of creditors who share a class, and (b) the purposes of the CCAA.

A plan must be approved by a majority in number representing two-thirds of the value of the creditors, or the class of creditors, as the case may be, voting at the meeting held for that purpose in person or by proxy.  The Canadian Bankruptcy Court may, but is not obligated to, sanction a plan that has received the requisite creditor vote.

Following sanction by the Canadian Bankruptcy Court, the plan becomes binding on the debtor and on all classes of creditors that (i) are affected by the plan and (ii) accepted the plan.  The plan will ordinarily provide that all claims against the debtor (except for certain unaffected claims) shall be settled in accordance with the terms of the plan if the class of such claims accepts the plan, and the ability of the holder of any such claim to proceed against the debtor is forever discharged and any proceedings relating to such claims are stayed.

While certain references are made to the CCAA Proceedings below, creditors of the Canadian Debtors should make reference to the reports filed with the Canadian Bankruptcy Court by the CCAA Monitor and available on its website: www.deloitte.com/ca/smurfitstonecanada (the "Monitor's Reports") and the materials included in the "Canadian Solicitation Package" described below in addition to reviewing this Disclosure Statement.

**CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORTS AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".**

**B.**      **Overview of Voting Procedures and Plan Confirmation in Chapter 11 Proceedings.**

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE VI, "VOTING PROCEDURES AND REQUIREMENTS."

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN IN THE CANADIAN PROCEEDINGS, SEE SECTION I.C, "OVERVIEW OF SOLICITATION AND VOTING ON THE PLAN IN THE CCAA PROCEEDINGS" AND SECTION VI.B, "CANADIAN VOTING PROCEDURES."

**1.**      **Parties Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote.  Creditors or equity interest holders whose claims or interests are impaired by the Plan, but will receive no distribution under the Plan, are also not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  For a discussion of these matters, see Article VI, "Voting Procedures and Requirements" and Article VII, "Confirmation of the Plan."

The following sets forth which classes are entitled to vote on the Plan and which are not:

- The Debtors are seeking votes from the Holders of Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19B, 19C, 20B, 20C, 20D, 21B and 21C.

- The Debtors are not seeking votes from Holders of Claims and Interests in Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C because those Claims and Interests are impaired under the Plan and the Holders are receiving no distribution on account of such Claims and Interests. These Holders will be deemed to have voted to reject the Plan.

- The Debtors are not seeking votes from Holders of Claims and Interests in Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, 19B, 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E because those Claims and Interests are unimpaired under the Plan, and the Holders of Claims and Interests in each of these Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

- The Debtors, as the Plan Proponents, and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims; provided, however, if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

For a detailed description of the Classes of Claims and Interests and their treatment under the Plan, see Article V, Sections B, C, D and E.

**2.    Solicitation Package.**

Accompanying this Disclosure Statement (which is provided on CD-ROM) to Holders of Claims in Classes voting to accept or reject the Plan is a package of materials called the "Solicitation Package."  The Solicitation Package contains copies of, among other things:

- the Bankruptcy Court order approving this Disclosure Statement and procedures for soliciting and tabulating votes on the Plan (the "Voting Procedures Order") which, among other things, approves this Disclosure Statement as containing adequate information, schedules the Confirmation Hearing, sets the Voting Deadline, sets out the procedures for distributing Solicitation Packages to the Holders of Claims against and Interests in the Debtors, establishes the procedures for tabulating Ballots used in voting on the Plan, and sets the deadline for objecting to confirmation of the Plan (the Voting Procedures Order will also be on the CD-ROM containing this Disclosure Statement);

8

- the notice of Confirmation Hearing and entry of the Voting Procedures Order; and

- one or more Ballots and a postage-paid return envelope (Ballots are provided only to Holders of Claims that are entitled to vote on the Plan), which will be used by Holders of Claims who are entitled to vote on the Plan; and

- the Committee statement of support.

**3.      Voting Procedures, Ballots, and Voting Deadline.**

After carefully reviewing the materials in the Solicitation Package and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan, and, in the case of Holders of Claims in Class 2E (that are not Holders of Prepetition Noteholder Claims, Industrial Revenue Bond Claims or Hodge Industrial Revenue Bond Claims) indicate whether or not you choose to make the Convenience Claim Election or the Cash-Out Election.  Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order for your vote to be counted, you must complete and sign your original Ballot and return it in the envelope provided (only original signatures will be accepted).  Please return your completed Ballot to the Voting Agent, unless you are a beneficial holder of a Claim in one of the series of Prepetition Notes or Industrial Revenue Bonds (each as defined below) who receives a Ballot from a broker, bank, commercial bank, trust company, dealer, or other agent or nominee (each, a "Voting Nominee"), in which case you must return the Ballot to such Voting Nominee.  Ballots should not be sent to the Debtors or to each Prepetition Notes Indenture Trustee.

**If you are a beneficial holder of a Prepetition Note or Industrial Revenue Bond who receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is received no later than [_____] at 4:00 p.m. (prevailing Eastern time) (the "Voting Deadline").  If you are the Holder of any other type of Claim, in order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and received by Epiq Bankruptcy Solutions, LLC (the "Voting Agent") no later than the Voting Deadline.  Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors.  Do not return any debt instruments or equity securities with your Ballot.**

**Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as a vote either to accept or reject the Plan.**

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Voting Agent, at (877) 264-9638 (for U.S. calls) or (503) 597-7694 (for Non-U.S. calls).

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received, the amount of your Claim, or if you wish to obtain at your own expense an additional copy of this Disclosure Statement and its appendices and exhibits, please contact the Voting Agent.

Before voting on the Plan, each Holder of a Claim in Classes that are entitled to vote on the Plan should read, in its entirety, this Disclosure Statement, the Plan, the Solicitation Order, the notice of the Confirmation Hearing, and the instructions accompanying the Ballots.  These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated.

### 4.     Plan Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  The Bankruptcy Court has scheduled the Confirmation Hearing on [_____], [_____] at [__:_.m.] (prevailing Eastern time) before the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom No. 1, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

### 5.     Objections to Confirmation.

Any objection to Confirmation of the Plan must be made in accordance with the requirements of section 1128(b) of the Bankruptcy Code and Bankruptcy Rule 9014 and be filed with the Court, together with proof of service, and served so that they are received **on or before [_____] at 4:00 p.m., prevailing Eastern Time,** by the following parties:

**Counsel to the Debtors:**

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Facsimile: (312) 853-7036
Attn: Matthew A. Clemente

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Facsimile:  (302) 571-1253
Attn: Robert S. Brady

**The U.S. Trustee:**

U.S. Trustee
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, Delaware 19801
Facsimile: (302) 573-6497
Attn: David M. Klauder

**Counsel to the Official Committee of Unsecured Creditors:**

Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attn: Thomas Moers Mayer

## C.     Overview of Solicitation and Voting on the Plan in the CCAA Proceedings.

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, all creditors of the Canadian Debtors who are Affected Creditors are entitled to vote on the CCAA Plan.  Any Class of Affected Creditors that does not vote to approve the CCAA Plan shall not be bound by the CCAA Plan for purposes of the CCAA Proceedings.  The votes of Holders of Claims against Canadian Debtors that are entitled to vote in the Chapter 11 Cases and are also Affected Creditors to accept or reject entitled to vote on the CCAA Plan will be counted once for the purposes of both the CCAA Proceedings and the Chapter 11 Cases.  Such creditors will be allowed to vote using a Ballot received as part of the Solicitation Package that will also serve as a proxy for purposes of voting in the CCAA Proceedings (a "Ballot/Proxy").  If such creditors prefer to vote in person at the CCAA Creditors' Meeting (as defined below), their vote for purposes of both the Chapter 11 Cases and the CCAA Proceedings will be as recorded at the CCAA Creditors' Meeting.

The Affected Claims against each Canadian Debtor are divided into the following two (2) Classes:  (a) Affected Secured Claims (consisting of the Prepetition Canadian Lender Claims and all Other Secured Claims, as applicable, ) against SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company), and (b) Affected Unsecured Claims (consisting of all General Unsecured Claims) against SSC Canada, Smurfit-MBI, and Stone FinCo II).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or receive distributions provided for, under and pursuant to the CCAA Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

As described above, the process for Affected Creditors to vote on the CCAA Plan is established by order of the Canadian Bankruptcy Court, which has the discretion to order a meeting of creditors to vote on the CCAA Plan (the "CCAA Creditors' Meeting").  The Canadian Bankruptcy Court issued a CCAA Plan Filing and Meeting Order on [_____] (the "CCAA Creditors' Meeting Order").  The CCAA Creditors' Meeting Order provides, among other things, that:

- The CCAA Plan is accepted for filing with the Canadian Bankruptcy Court and the Canadian Debtors are authorized to seek its approval in the manner prescribed in the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to modify and/or supplement the CCAA Plan in accordance with the terms of the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to call, hold and conduct ~~a meeting of Affected~~the CCAA Creditors' Meeting for the purpose of voting (in person or by proxy) on, with or without variation, a resolution to approve the CCAA Plan;

- For purposes of voting on the CCAA Plan, Affected Claims against each of the Canadian Debtors shall be separated into classes, as described in the CCAA Creditors' Meeting Order;

- The CCAA Monitor shall make available on its website or send copies of certain documents (collectively, the "Canadian Solicitation Package") in accordance with the CCAA Creditors' Meeting Order, including the following:

  (a)      ~~The~~the CCAA Creditors' Meeting Order and Notice of Creditors' Meeting; ~~and~~

  (b)      ~~The~~the Disclosure Statement, Plan, and Voting Procedures Order~~, including the form of proxy~~; and

  (c)      the Ballot ~~) for use at the Creditors' Meeting~~/Proxy.

- If the CCAA Plan is accepted by the Required Majority of ~~a Class~~the Classes of Affected Secured Claims, the Canadian Debtors shall bring a motion seeking an order sanctioning the CCAA Plan with respect to such Claims on [_____], or such later date as the Canadian Bankruptcy Court may set.

CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORT AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".

## II. OVERVIEW OF THE PLAN AND CCAA PLAN

The following summary is a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. The Debtors, moreover, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

FOR A MORE DETAILED DESCRIPTION OF THE TERMS AND PROVISIONS OF THE PLAN AND CCAA PLAN, SEE ARTICLE V OF THIS DISCLOSURE STATEMENT, "THE PLAN OF REORGANIZATION."

## A.      General Overview.

Between the Petition Date and filing of the Plan and Disclosure Statement, the Debtors have undertaken a careful review of their business operations and implemented various restructuring efforts, in an effort to improve the Company's business results and financial condition. At the same time, the Debtors engaged in ongoing discussions with the Official Committee of Unsecured Creditors (the "Committee") appointed in these Chapter 11 Cases,

regarding the terms of its equity and capital structure, and the formulation and implementation of an advantageous capital structure for the Reorganized Debtors.

At its core, the Plan, a copy of which is also attached as Exhibit A to this Disclosure Statement, provides that (i) Holders of the Allowed Prepetition Lender Claims will receive 100% recovery in the form of cash, (ii) CIT Group Claims and Union Bank Claims will receive a 100% recovery in the form of cash, (iii) Holders of General Unsecured Claims against SSCE will receive their Pro Rata Share of the New SSCC Common Stock Pool to be issued pursuant to the Plan,[4] Holders of General Unsecured Claims against Cameo Container, Calpine Corrugated and SSPRI will receive a 100% recovery in the form of cash, (iv) Holders of General Unsecured Claims against SSCC and Holders of General Unsecured Claims against Non-Operating Debtors (United States) will be extinguished and receive no recovery, and (v) SSCC Interests will be extinguished.

The Plan and also provides that the Canadian Assets will be sold if certain conditions are met. If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI vote to accept the Plan, the Canadian Assets will be transferred to Canadian Newco and the unsecured creditors of SSC Canada and Smurfit-MBI will receive their Pro Rata Share of the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, respectively. On the other hand, if the Classes of General Unsecured Claims against SSC Canada or Smurfit-MBI do not approve the Plan, the Canadian Assets will be sold pursuant to a process ordered by the Canadian Bankruptcy Court. Affected Creditors will be treated as follows: (i) Holders of the Allowed Prepetition Canadian Lender Claims will receive 100% recovery in the form of cash, (ii) if they vote to accept the Plan, Holders of General Unsecured Claims against SSC Canada and Smurfit-MBI will receive their Pro Rata Share of cash from the SSC Canada Distribution Pool and Smurfit-MBI Distribution Pool, respectively, and Holders of General Unsecured Claims against B.C. Shippers Supplies and Francobec Company will receive a 100% recovery in the form of cash, (iii) Holders of General Unsecured Claims against Stone FinCo II will receive their Pro Rata Share of the Stone FinCo II Settlement Distribution if they vote to accept the plan, (iv) Holders of General Unsecured Claims against MBI Limited, 3083527 Nova Scotia Company and Non-Operating Debtors (Canada) will be extinguished and receive no recovery, and (v) SSC Canada Interests, Smurfit-MBI Interests and Francobec Company Interests will be extinguished.

~~Notwithstanding the fact that the Plan provides for an internal reorganization of the Debtors which equitizes the Prepetition Noteholder Claims and certain other Claims, if not later than ten (10) days prior to the hearing to approve this Disclosure Statement a third party purchaser determined to be credible by the Debtors expresses an interest, and demonstrates the wherewithal, to (i) purchase all or a substantial portion of the New SSCC Common Stock for the Full Payment~~

---

[4] Pursuant to the Plan, a Holder of a General Unsecured Claim against SSCE may be eligible to receive cash on account of its claim by either (i) electing Convenience Class treatment described below in Section V.C.3(d) of this Disclosure Statement or (ii) participating in the Cash-Out Auction described below in Section V.F.16 of this Disclosure Statement. Alternatively, such Holder has the option of selling its Claim for cash to a claims buyer. This liquid market provides Holders an alternative to participating in the reorganization process. If a Holder decides to sell its Claim, however, it will not be entitled to any further recovery on account of the Claim (other than the cash received from the sale), and it will no longer have any rights in the Chapter 11 Cases arising from that Claim. Holders may find further information on selling their Claims, along with a list of potential claims buyers that have either appeared in these Chapter 11 Cases or have expressed an interest in buying and selling General Unsecured Claims in these cases, can be found on the Smurfit-Stone Creditors Committee website at: www.smurfitcreditorscommittee.com.

~~Amount,[5] or (ii) purchase all of the assets of the Debtors for the Full Payment Amount and satisfy all other obligations provided for in the Plan, the Debtors reserve the right, in consultation with the Committee and the CCAA Monitor, to modify the Plan and this Disclosure Statement, including by seeking approval of appropriate sale or other procedures, in a manner necessary to allow such a transaction to be pursued, and appropriate management incentive compensation and other terms and conditions of employment in the event of such a transaction.[6]~~

## B.     Summary of Classification and Treatment of Allowed Claims Against and Interests in Each of the Debtors and Canadian Debtors Under the Plan.

The following charts summarize the projected distributions to Holders of Allowed Claims against and Interests in each of the Debtors and Canadian Debtors under the Plan. Although every reasonable effort was made to be accurate, the projections of estimated recoveries in the Summary Chart are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court and in the CCAA Proceedings, as applicable. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to Confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. The recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims and Interests as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS – UNITED STATES DEBTORS | | | | |
|---|---|---|---|---|
| Class ~~& Description~~ | Description | Estimated Allowed Claims | Treatment | ~~Treatment and~~ Estimated Recovery |
| ~~DIP Facility~~ | DIP Facility | $~~[0]~~ [5] | Unimpaired | ~~Unimpaired –~~ 100% ( See |

---

~~[5] "Full Payment Amount" means an amount of cash sufficient to satisfy all Allowed Claims against the Debtors (including, without limitation, all Allowed Administrative Expense Claims and all Allowed General Unsecured Claims) in full, plus all post-petition interest, fees and costs that are Allowed against any Debtor under applicable law.~~
~~[6] In addition, the Committee shall have consultation rights with respect to whether any potential third party purchaser is credible.~~
~~[7] On September 9, 2009, SSCE made a voluntary $250 million prepayment on the $400 million U.S. term loan under the DIP Facility. Following the prepayment, there was approximately $137 million outstanding under the U.S. term loan and $35 million outstanding under the Canadian term loan under the DIP Facility. The Company continues to have zero borrowings outstanding under revolving credit facilities under the DIP Facility Credit Agreement and it anticipates that all existing borrowings under the U.S. term loan and the Canadian term loan will be repaid in full prior to the Effective Date.~~
[5] On September 9, 2009, SSCE made a voluntary $250 million prepayment on the $400 million U.S. term loan under the DIP Facility. Following the prepayment, there was approximately $137 million outstanding under the U.S. term

| ~~Claims:~~N/A | Claims | | | Section V.B.3) |
|---|---|---|---|---|
| ~~Administrative Expense Claims:~~N/A | Administrative Expense Claims | $~~[62.6]~~65.8 million | Unimpaired | ~~Unimpaired~~ 100% (See Section V.B.1) |
| ~~Priority Tax Claims:~~N/A | Priority Tax Claims | $~~[1.7]~~1.65 million | Unimpaired | ~~Unimpaired~~ 100% (See Section V.B.4) |
| ~~Priority Non~~1A ~~Tax Claims:~~14A | Priority Non-Tax Claims | $~~[0]~~ | Unimpaired | ~~Unimpaired~~ 100% (See Sections V.C.2(a)-7(a)) |
| ~~Other Secured Claims:~~ 1B-14B | Other Secured Claims | $~~[3.5]~~4.8 million | Unimpaired | ~~Unimpaired~~ 100% in the form of cash, reinstatement, or surrender of collateral (See Sections V.C.2(b)-7(b)) |
| ~~Prepetition Lender Claims:~~ 1C, 2C | Prepetition Lender Claims | $~~[969.1]~~ million | Impaired | ~~Impaired~~ 100% in the form of cash (See Sections V.C.2(c) and V.C.3(c)) |
| ~~Union Bank Claims:~~4C | Union Bank Claims | $~~[8.6]~~ million | Impaired | ~~Impaired~~ 100% in the form of cash (See Section V.C.5(c)) |
| ~~CIT Group Claims:~~ 4D | CIT Group Claims | $~~[34.9]~~ million | Impaired | ~~Impaired~~ 100% in the form of cash (See Section V.C.5(d)) |
| ~~General Unsecured Claims:~~ 2E | General Unsecured Claims: | $~~[2.9]~~2.8-3.1 billion | Impaired | ~~SSCE: Impaired   Less than 100~~64-71%[7] in the form of a Pro Rata Share of New SSCC Common |

loan and $35 million under the Canadian term loan under the DIP Facility.  The Company continues to have zero borrowings outstanding under revolving credit facilities under the DIP Facility Credit Agreement and it anticipates that all existing borrowings under the U.S. term loan and the Canadian term loan will be repaid in full prior to the Effective Date.

[7] This estimated recovery percentage range is based upon a $1.987 billion midpoint Equity Value (as defined below) of the Reorganized Debtors, which is discussed below in  Lazard's valuation analysis in Section VIII.B.

CH1 ~~5118439~~5168368v.~~4~~1

|  | SSCE | ~~$[11.2] million~~<br><br>~~$[4] million [6]~~ |  | Stock. (See Section V.C.3.(e))[8]<br><br>~~SSCC and Non-Operating Debtors (United States): Impaired—0%.~~<br><br>~~Cameo Container, Calpine Corrugated and SSPRI: Impaired—100% in the form of cash.~~ |
|---|---|---|---|---|
| 1D, 6C-14C | General Unsecured Claims:<br><br>SSCC and Non-Operating Debtors (United States) | $11.2 million | Impaired | 0% (See Sections V.C.2(d) and V.C.7(c)) |
| 3C, 4E, 5C | General Unsecured Claims:<br><br>Cameo Container, Calpine Corrugated and SSPRI | $4 million | Impaired | 100% in the form of cash (See Sections V.C.4(c), V.C.5(e) and V.C.6(c)) |
| ~~Convenience Claims:~~2D | Convenience Claims | $~~[25-30]~~ million | Impaired | ~~Impaired—~~100% in the form of cash (See Section V.C.(3)(d)) |
| ~~Intercompany Claims:~~1E, 2F, | Intercompany | N/A[9] | Impaired | ~~Impaired—~~0% (See Sections V.C.2(e), |

---

[6] The Debtors continue to analyze whether or not to assume or reject certain executory contracts and unexpired leases. Upon assumption of certain of these agreements, the Debtors currently estimate that between $30 and $35 million of these Class 2E General Unsecured Claims will be paid as cure amounts, and will result in a corresponding reduction of the Estimated Allowed Claims in Class 2E.

[8] Provided, however, that any Eligible Cash-Out Participant that makes the Cash-Out Election may, to the extent any Cash-Out Payments are made pursuant to Section 6.16 of the Plan, receive on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, its Allowed General Unsecured Claim against SSCE, the Cash-Out Percentage of such Allowed Claim payable in cash on the Initial Distribution Date.

[9] A summary chart in Section III.E.5 below provides additional detail on the Intercompany Claims.

| 3D, 4F, 5D-14D | Claims | | | V.C.3(f), V.C.4(d), V.C.5(f), V.C.6(d), V.C.7(d)) |
|---|---|---|---|---|
| ~~SSCC~~1F, ~~Interests:~~1G | SSCC Interests | N/A | Impaired | ~~Impaired~~ 0% (See Sections V.C.2(f) and (g)) |
| 2G, 3E, 5E-14E | Subsidiary Interests: SSCE, Cameo Container, SSPRI and the Non-Operating Debtors | N/A | Unimpaired | Retained (See Sections V.C.3(g), V.C.4(e), V.C.6(e), V.C.7(e)) |
| ~~Subsidiary Interests:~~4G | Subsidiary Interests: Calpine Corrugated | ~~N/A~~ N/A | Impaired | ~~SSCE, Cameo Container, SSPRI and the Non-Operating Debtors (United States): Unimpaired — retained~~0% (See Section V. ~~Calpine Corrugated: Impaired — 0%~~ C.5(g)) |

| SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS – CANADIAN DEBTORS | | | | |
|---|---|---|---|---|
| Class ~~& Description~~ | Description | Estimated Allowed Claims | Treatment | ~~Treatment and~~ Estimated Recovery |
| ~~DIP Facility Claims:~~N/A | DIP Facility Claims | $~~[0]~~[10] | Unimpaired | ~~Unimpaired —~~100% ( See Section V. B.3) |
| ~~Administrative Expense Claims:~~N/A | Administrative Expense Claims | $~~[8]~~8.3 million | Unimpaired | ~~Unimpaired —~~100% (See Section V. B.1) |
| ~~Priority Tax~~ | Priority Tax | $~~[0]~~ | Unimpaired | ~~Unimpaired —~~100% (See |

---

[10] See footnote ~~7~~,5, *supra*.

CH1 ~~5118439~~5168368~~v.4~~1

| | Claims | | | Section V.B.4) |
|---|---|---|---|---|
| ~~Priority Non~~15A ~~Tax Claims:~~25A | Priority Non-Tax Claims | $~~[0]~~ | Unimpaired | ~~Unimpaired~~ 100% (See Sections V.B.8(a)-15(a)) |
| 15B -17B, 19B-21B | Other Secured Claims: SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company and 3083527 Nova Scotia Company | $2.05 million | Impaired | 100% in the form of cash (See Sections V.B.8(b)-10(b), V.B.12(b)-14(b)) |
| ~~Other Secured Claims:~~ 18B, 22B-25B | Other Secured Claims: Stone FinCo II and Non-Operating Debtors (Canada) | $~~[1.05] million~~ $~~[1.00] million~~0 | Unimpaired | ~~SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company: Impaired~~ 100% in the ~~form of cash.~~ ~~Stone FinCo II, B.C. Shipper Supplies Ltd. and Non-Operating Debtors (Canada): Unimpaired~~ 100% in the form of cash, reinstatement, or surrender of collateral (See Sections V. B.11(b), V.B.15(b)) |
| ~~Prepetition Canadian Lender Claims:~~15C-17C, | Prepetition Canadian Lender Claims | $~~[393]~~ million | Impaired | ~~Impaired~~ 100% in the form of cash (See Sections V.B.8(c)-10(c), V.B.13(c), V.B.14(c)) |

CH1 ~~5118439~~5168368v.~~4~~1

| | | | | |
|---|---|---|---|---|
| 20C-21C | | | | |
| 15D | General Unsecured Claims: SSC Canada | $57 million | Impaired | (i) if Classes 15D and 16D accept the Plan, [    ]% in the form of cash, or (ii) if Classes 15D or 16D reject the Plan, such recovery, if any, shall depend on the outcome of the sale described below in Section II.C. (See Section V.B.8(d)) |
| 16D | General Unsecured Claims: Smurfit-MBI | $29 million | Impaired | (i) if Classes 15D and 16D accept the Plan, [    ]% in the form of cash, or (ii) if Classes 15D or 16D reject the Plan, such recovery, if any, shall depend on the outcome of the sale described below in Section II.C. (See Section V.B.9(d)) |
| 17D, 21D, 22C-25C | General Unsecured Claims: MBI-Limited, 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada) | $0 | Impaired | 0% (See Sections V.B.10(d), V.B.14(d), V.B.15(d)) |
| General Unsecured Claims:18C | General Unsecured Claims: Stone FinCo II | $[57]200 million | Impaired | SSC Canada: Impaired - (i) if Class accepts the Plan, [    ]% in the form of cash, or (ii) if Class rejects the Plan, such recovery, if any, shall depend on the |

| | | | |
|---|---|---|---|
| | | | ~~outcome of the sale described below in Section II.C.~~ |
| ~~$[29] million~~ | | | |
| | | | ~~**Smurfit-MBI: Impaired** — (i) if Class accepts the Plan, [___]% in the form of cash, or (ii) if Class rejects the Plan, such recovery, if any, shall depend on the outcome of the sale described below in Section II.C.~~ |
| ~~$[0] million~~ | | | |
| ~~$[295,000]~~ | | | ~~**MBI Limited, 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada): Impaired** — 0%.~~ |
| ~~$[0]~~ | | | ~~**Stone FinCo II: Impaired** —~~(i) if Class accepts the Plan, [___]%, or (ii) if Class rejects the Plan, 0%.[11] (See Section V.B.11(c)) |
| | | | ~~**B.C. Shipper Supplies**~~ |

[11] If (i~~a~~) the Class of General Unsecured Claims against Stone FinCo II votes to ~~reject~~accept the Plan ~~or~~and (~~ii) either the Bankruptcy Court or~~b) the Canadian Bankruptcy Court ~~shall have~~has not determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or ~~Interest in SSC Canada~~an Interest in SSC Canada, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution.  On the other hand, if the foregoing conditions are not satisfied as of the Effective Date, then the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall ~~not be entitled to receive any distributions under the Plan in the Chapter 11 Cases unless the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is an Allowed Claim, in which case the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive~~ be entitled to receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of any shares of the New SSCC Common Stock or other distributions that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim and/or the Stone FinCo II Intercompany Claim; provided, however, that (x) the distributions to any Holder of a General Unsecured Claim against Stone FinCo II shall not exceed, when combined with all other distributions that such Holder is receiving under the Plan, 100% of its Allowed General Unsecured Claim against Stone FinCo II; and (y) if the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan, General Unsecured Claims against Stone FinCo II shall be deemed to be Excluded Claims for purposes of the CCAA Plan.

| | | | | |
|---|---|---|---|---|
| | | | | ~~Ltd., Francobec Company: Impaired—100% in the form of cash.~~ |
| 19C, 20D | General Unsecured Claims:<br><br>B.C. Shipper Supplies Ltd. and Francobec Company | $0 | Impaired | 100% in the form of cash (See Sections V.B.12(c), V.B.13(d)) |
| 15E, 16E | Intercompany Claims:<br><br>SSC Canada and Smurfit-MBI | N/A[12] | Impaired | 0% (See Sections V.B.8(e), V.B.9(e)) |
| 17E, 19D, 20E-21E, 22D-25D | Intercompany Claims:<br><br>MBI Limited, B.C. Shipper Supplies Ltd., Francobec Co., 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada) | N/A | Impaired | 0% (See Sections V.B.10(e), V.B.12(d), V.B.13(e), V.B.15(d)) |
| ~~Intercompany Claims:~~18D | Intercompany Claims:<br><br>Stone FinCo II | ~~N/A[12]~~<br><br>~~N/A~~<br><br>N/A | Impaired | ~~SSC Canada and Smurfit-MBI: Impaired—0%~~ (See Section V.<br><br>~~MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 3083527 Nova Scotia Company and the Non-Operating Debtors~~ |

[12] See footnote 9, *supra.*
~~[12] See footnote 9, *supra.*~~

| | | | | (Canada): Impaired – 0%. Stone FinCo II: Impaired – 0%. B.11(d)) |
|---|---|---|---|---|
| Stone FinCo II Intercompany Claim: 15F | Stone FinCo II Intercompany Claim | $[200.7] million | Impaired | Impaired – 0% (See Section V.B.8(f)) |
| 15G, 16F, 20F | Subsidiary Interests: SSC Canada, Smurfit-MBI and Francobec Company | N/A | Impaired | 0% (See Sections V.B.8(g), V.B.9(f), V.B.13(f)) |
| Subsidiary Interests: 18E | Subsidiary Interests: Stone FinCo II | N/A / N/A / N/A | Impaired | SSC Canada, Smurfit-MBI and Francobec Company: Impaired – 0%. Stone FinCo II: Impaired – 0%.[13] 0%[13] MBI Limited, B.C. Shipper Supplies Ltd., 3083527 Nova Scotia Company and the Non-Operating Debtors (Canada): Unimpaired – retained. (See Section V.B.11(e)) |
| 17F, 19E, 21F, 22E-25E | Subsidiary Interests: MBI Limited, B.C. Shipper Supplies, Ltd., 3083527 Nova | N/A | Unimpaired | Retained (See Sections V.B.10(f), V.B.12(e), V.B.14(f), V.B.15(e)) |

[13] SSCE, as the sole Holder of Interests in Stone FinCo II, shall receive 100% of any cash or other property remaining in the Estate of Stone FinCo II after the Holders of General Unsecured Claims against Stone FinCo II have received distributions under the Plan (whether from Stone FinCo II or any other Debtor) with a value equaling 100% of their Allowed Claims.

| Scotia Company and the Non-Operating Debtors (Canada) | | | |
|---|---|---|---|

### C.    Canadian Asset Sale.

Prior to the Effective Date, the Debtors (in consultation with the Committee and the CCAA Monitor) shall establish (a) Canadian Newco ~~(including, without limitation, one or more intermediate holding companies formed for the purpose of holding SSCE's equity interests in~~as a wholly-owned, direct subsidiary of Canadian ~~Newco)~~Holdco and (b) Canadian Holdco as a wholly-owned, direct or indirect, subsidiary of SSCE.  On or prior to the Effective Date, the Canadian Newco ~~Certificate of Incorporation and the Canadian Newco By-Laws,~~ Partnership Agreement (in substantially the ~~forms~~form of Exhibit 7 ~~and Exhibit 8 to the Plan (to be filed with the Plan Supplement), respectively~~to the Plan, to be filed with the Plan Supplement), the Canadian Holdco Articles of Association (in substantially the form of Exhibit 8 to the Plan), and the Canadian Holdco Memorandum of Association (in substantially the form of Exhibit 9 to the Plan) shall become effective.  From and after the Effective Date, Canadian ~~Newco~~Holdco shall be a wholly-owned subsidiary of Reorganized SSCC and Canadian Newco shall continue to be a wholly-owned subsidiary of Canadian Holdco.

Pursuant to the Plan, Canadian Newco shall be deemed to have made an offer to purchase the Canadian Assets on the Effective Date, free and clear of all Liens, Claims, interests and encumbrances other than those liabilities that are expressly assumed by Canadian Newco in accordance with the terms of the Asset Purchase Agreement, upon and in consideration for (i) the payment to the Prepetition Agent of cash in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and all other amounts payable in connection therewith under this Plan, (ii) the payment of cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) the payment of cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned to Canadian Newco is in default, (iv) the assumption by Canadian Newco of certain liabilities of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company as set forth in the Asset Purchase Agreement, including, without limitation, all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans, and (v) the payment of cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, which shall be

23

available for distribution to Affected Unsecured Creditors of SSC Canada and Smurfit-MBI in accordance with <u>Article IV</u> of the Plan. For the avoidance of doubt, the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Affected Unsecured Claims if the Classes of Affected Unsecured Claims against either SSC Canada or Smurfit-MBI fail to accept the Plan. Prior to or on the Effective Date, the Debtors or the Reorganized Debtors shall transfer to Canadian Newco the cash necessary to consummate the Canadian Asset Sale.

Pursuant to the Asset Purchase Agreement, Canadian Newco shall assume certain liabilities of the Canadian Debtors. Such assumed liabilities shall include, without limitation: (i) all existing and future obligations of SSC Canada, Smurfit-MBI, <u>MBI Limited, B.C. Shipper Supplies Ltd.</u> or Francobec Company under the Canadian Pension Plans (including all unfunded liabilities thereunder) and the Canadian Employee Benefit Plans, (ii) all existing and future obligations of SSC Canada, Smurfit-MBI, <u>MBI Limited, B.C. Shipper Supplies Ltd.</u> or Francobec Company under the Canadian Collective Bargaining Agreements, (iii) ~~all~~<u>certain</u> existing and future obligations of SSC Canada, Smurfit-MBI ~~or~~, <u>MBI Limited, B.C. Shipper Supplies Ltd. and</u> Francobec Company to their current employees, <u>as set forth in the Asset Purchase Agreement,</u> but excluding any obligations <u>of such Canadian Debtors</u> with respect to Non-Qualified Employee Benefit Plans, (iv) all existing and future obligations of SSC Canada, Smurfit-MBI, <u>MBI Limited, B.C. Shipper Supplies Ltd.</u> or Francobec Company under executory contracts or unexpired leases that are assigned to Canadian Newco pursuant to the Asset Purchase Agreement, and (v) all obligations to vendors, suppliers and customers arising in the ordinary course of SSC Canada, Smurfit-MBI, <u>MBI Limited,</u> B.C. Shipper Supplies Ltd., or Francobec Company's operations from and after the Petition Date, to the extent such obligations ~~are deemed to be Allowed~~<u>constitute Post-Filing</u> Claims ~~and~~<u>that</u> are not <u>otherwise</u> satisfied ~~or discharged~~ pursuant to the Plan. For the avoidance of doubt, the liabilities assumed by Canadian Newco shall not include any existing or future obligations of any Canadian Debtor under any Non-Qualified Employee Benefit Plans.

Canadian Newco shall be entitled to receive a CCAA Vesting Order from the Canadian Bankruptcy Court, which shall provide for the transfer and assignment to Canadian Newco of, among other things: (i) the unexpired leases that were previously assumed by SSC Canada or Smurfit-MBI, as set forth in <u>Exhibit</u> ~~9~~<u>10</u> to the Plan (to be filed with the Plan Supplement), and (ii) the executory contracts and unexpired leases set forth in <u>Exhibit</u> ~~10~~<u>11</u> to the Plan (to be filed with the Plan Supplement). Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such transfer and/or assignment for purposes of the Chapter 11 Cases. Entry of the CCAA Vesting Order shall constitute the Canadian Bankruptcy Court's approval of such transfer and/or assignment for purposes of the CCAA Proceedings. Canadian Newco shall assume and perform all obligations of SSC Canada or Smurfit-MBI under each of the executory contracts and unexpired leases that shall be assigned to Canadian Newco.

If the CCAA Plan is approved by the Required Majority of the Affected Secured Creditors and the Affected Unsecured Creditors of both SSC Canada and Smurfit-MBI, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the CCAA Vesting Order, the Confirmation Order, and the CCAA Sanction Order. The Affected Secured Creditors and the Affected Unsecured Creditors shall be deemed to have consented to such transfer.

Should the CCAA Plan not be approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, members of such Classes shall be deemed thereafter to be Unaffected Creditors for all purposes of the CCAA Plan.  If (x) the CCAA Plan is not approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, or should(y) the Plan failfails to be sanctioned by the Canadian Bankruptcy Court with respect to any Class of Affected Creditors, or (z) the Debtors so choose at any time prior to the Confirmation Hearing in consultation with the Committee, (i) the Debtors, in consultation with the Committee and the CCAA Monitor, shall be permitted (with the assistance and under the supervision of the CCAA Monitor) to pursue a marketing process for the Canadian Assets pursuant to sale procedures that shall be approved by the Canadian Bankruptcy Court and/or the Bankruptcy Court (the "Sale Procedures") at any time prior to or at the Confirmation Hearing and (ii) Canadian Newco's offer for the Canadian Assets under Section 5.1.2 of the Plan shall be modified to exclude the cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool.  If no Competing Bids are submitted on or before any applicable deadline for the submission of Competing Bids that shall be established pursuant to the Sale Procedures (the "Competing Bid Deadline"), the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.

If any Competing Bids for the Canadian Assets are submitted on or before the Bid Deadline, the Canadian Bankruptcy Court shall determine whether any such Competing Bid constitutes a Superior Competing Bid.  Each Competing Bid shall be in writing, shall not be subject to any contingencies (financing or otherwise), and shall consist of  (i) cash payable to the Pretition Agent in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and all other amounts payable in connection therewith under this Plan, (ii) cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada and Smurfit-MBI in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned by the Canadian Debtors is in default,  and (iv) an unconditional commitment to assume all existing and future obligations of SSC Canada and Smurfit-MBI under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans.  Competing Bids may, but shall not be required to, provide additional consideration for the Canadian Assets that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI. If no Competing Bid is determined by the Canadian Bankruptcy Court to constitute a Superior Competing Bid, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.  If the Canadian Bankruptcy Court determines that at least one Competing Bid constitutes a Superior Competing Bid, the Debtors shall conduct an auction for the Canadian Assets, under the supervision of the CCAA Monitor and in accordance with the Sale

Procedures, between Canadian Newco and the Person(s) that submitted such Superior Competing Bid(s). Canadian Newco shall be entitled to participate in the bidding and auction process and may, but shall not be required to, revise its bid to include cash or other consideration that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI.

**D.**     **Executive Compensation:  Management Incentive Plans and Employment Agreements.**

    **1.**     **Management Incentive Plans.**

On the Effective Date, the Reorganized SSCC shall adopt and assume (as applicable) each of the Management Incentive Plans (including the forms of the stock option and restricted stock unit award agreements) substantially in the forms set forth in <u>Exhibit 3</u> to the Plan.

These Management Incentive Plans include the Equity Incentive Plan, pursuant to which Reorganized SSCC will make grants of equity-based compensation to certain officers and other employees, including on the Effective Date.  Eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans.  Four and one tenth percent (4.1%) of New SSCC Common Stock (or approximately half of the number of shares reserved) will be granted to officers and other employees at, and as of, the times set forth in <u>Exhibit 3</u> to the Plan (the "<u>Emergence Equity Grants</u>") pursuant to the Equity Incentive Plan. Emergence Equity Grants of restricted stock units will be made on the Effective Date, and Emergence Equity Grants of stock options will be made on the first date on which the New SSCC Common Stock is listed for trading.

Management Incentive Plans also include the 2009 Long-Term Incentive Plan (the "<u>2009 LTIP</u>") and the annual short-term Management Incentive Plan for 2010 (the "<u>2010 MIP</u>") (both of which previously were approved by the Bankruptcy Court subject to the development of certain performance goals and are described in Section III.D.2 of this Disclosure Statement) which will have the financial performance goals and (as applicable) restructuring goals, and will provide for such payments to participants, as set forth in <u>Exhibit 3</u> to the Plan, notwithstanding any prior order issued by the Bankruptcy Court with respect thereto.

The 2009 LTIP, 2010 MIP and Equity Incentive Plan, together in the aggregate, will provide appropriate incentives and create competitive, market-based compensation opportunities for the Company's management team in the short term as the Company emerges from its Chapter 11 cases that will continue in the long-term.

(a)      Equity Incentive Plan.

As a result of the Company's Chapter 11 cases, the Company has not had the ability to make any equity-based awards that provide appropriate long-term incentives for Company growth. Upon emergence, however, the Reorganized Debtors (as defined herein) again will have equity-based compensation vehicles to provide its executive management and other members of its management team with appropriate, market-based, long-term incentive compensation opportunities that will be substantially dependent on performance. Consistent with its historical practice, Reorganized SSCC will be reestablishing an equity-based long-term incentive plan – the Equity Incentive Plan – to align the interest of executive management and other employees with the interests of Reorganized SSCC's shareholders in creating additional shareholder value in the long term and to retain the management team.

Eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of New SSCC Common Stock) shall be reserved for issuance pursuant to the Equity Incentive Plan and other Management Incentive Plans. Awards under the Equity Incentive Plan will be made in stock options, restricted stock units, and/or other equity-based interests (a) to certain officers and other employees at, and effective as of, such times as are set forth in Exhibit 3 to the Plan and described below as the Emergence Equity Grants, and (b) to officers, other employees, and directors from time to time on or after the Effective Date as determined by the compensation committee of the board of directors of Reorganized SSCC in such committee's discretion. Awards under the Equity Incentive Plan generally are subject to a three-year ratable vesting schedule, subject to full accelerated vesting in the event of a change of control of the Reorganized Debtors or the termination of a participant's employment without cause, a resignation for Good Reason, death, incapacity, and retirement (except in the case of the Emergence Equity Grants which are subject to special vesting conditions as described below).

(b)      Emergence Equity Grants Totaling 4.1% of New SSCC Common Stock.

The Company's Plan provides that a group of the Company's key executives and managers designated by the Company prior to the Effective Date will receive grants of equity in Reorganized SSCC pursuant to an applicable award agreement(s) and the Equity Incentive Plan. The Emergence Equity Grants will total four and one-tenth percent (4.1%) of New SSCC Common Stock, which means that Reorganized SSCC will grant approximately half of the 8% total reservation of New SSCC Common Stock under the Plan (as described above) as Emergence Equity Grants. Providing initial grants of equity will provide an immediate and meaningful incentive for management to continue to enhance the value of the Reorganized Debtors post-emergence.

The following table shows the percentage of the New SSCC Common Stock that will be allocated and granted upon emergence to the Company's current President/Chief Operating Officer ("COO") individually and to the remaining participants in the aggregate:

CH1 5118439 5168368 v.4 1

| Participant | Percent of Shares Granted | Approx. Percentage of Shares Granted in Restricted Stock Units | Approx. Percentage of Shares Granted in Stock Options |
|---|---|---|---|
| President and COO | 0.90% | 0.22% | 0.68% |
| Remaining Participants (in the aggregate) | 3.20% | 0.78% | 2.42% |
| Total Percent of Shares | 4.10% | 1.00% | 3.10% |

The Company's current Chief Executive Officer will not receive an Emergence Equity Grant, but rather will receive certain cash compensation in lieu of receiving such an equity grant as described in Section III.D.2 below.

With respect to each Emergence Equity Grant, the award will be granted to participants using two equity vehicles – restricted stock units and options. One percent (1%) on a fully diluted basis of New SSCC Common Stock (or approximately 24% of the Emergence Equity Grants) will be granted in the form of restricted stock units on and as of the Effective Date.

Three and one-tenth percent (3.1%) on a fully diluted basis of New SSCC Common Stock (or approximately 76% of the Emergence Equity Grants) will be granted in the form of options ("Emergence Options") on and as of the first date after the Effective Date on which New SSCC Common Stock becomes listed for trading on the NYSE or the NASDAQ (the "Listing Date"). Each Emergence Option will have a seven-year term and a strike price equal to the average of the closing transaction prices of the New SSCC Common Stock for the thirty (30) calendar day period beginning on the Listing Date.

To preserve the potential value of the Emergence Options (and the performance-based incentives associated therewith) in the event of an offer to purchase Reorganized SSCC prior to the option grants or calculation of the option strike price, in the event that a bona fide offer for the acquisition of Reorganized SSCC (a "Transaction") is announced after the Listing Date but before the end of such thirty (30) calendar day period, and the option strike price exceeds the per share value of the New SSCC Common Stock as of the Effective Date determined by using the Debtors' Average Bond Trading Price (as defined in Exhibit 3 to the Plan) (such per share value, the "Effective Date Value"), then, in addition to retaining all of the Emergence Options, each optionee will receive a cash payment from the Reorganized Debtors, in an amount equal to the number of shares of New SSCC Common Stock subject to the optionee's outstanding Emergence Options multiplied by the lesser of (i) the excess of the strike price over the Effective Date Value or (ii) the excess of the per share consideration received by holders of New SSCC Common Stock in such Transaction over the Effective Date Value, with the applicable amount payable upon the closing of such Transaction. Similarly, in the event that a Transaction is announced and closes on or before the date on which the New SSCC Common Stock has become listed, then in lieu of the Emergence Options grants, each prospective recipient of Emergence Options will receive a cash payment from the Reorganized Debtors equal difference between the value of the number of shares of New SSCC Common Stock that would have been subject to the employee's Emergence Option grant in such Transaction and the value of those shares based upon the Effective Date Value, with such amount payable upon the closing of such Transaction.

28

Consistent with awards that will be made under the Equity Incentive Plan generally, the Emergence Equity Grants will be subject to a three-year, ratable vesting schedule subject to full accelerated vesting upon a change in control, a termination of employment without cause, a resignation for Good Reason, death, disability, and retirement, except that if the employment of a participant terminates without Cause, for Good Reason, or due to retirement within the first 12 months after the Effective Date, only 33.3% of the participant's Emergence Equity Grant would become fully vested, and the remaining 66.7% would remain unvested and would be canceled (in all circumstances subject to any different vesting terms and conditions provided in an employment agreement or award agreement).  A summary of the vesting schedule with respect to the Emergence Equity Grants is contained in Exhibit 3 to the Plan under certain conditions.

## 2.      Executive Employment Agreements.

The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management.  These agreements will be substantially in the forms contained in Exhibit ~~12~~13 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.  Described below are some of the key terms of these agreements.

*Patrick J. Moore's Employment Agreement*

The Company will enter into, as of the Confirmation Date, an amended and restated employment agreement with Mr. Moore (the "Moore Employment Agreement").  This agreement will be substantially in the form contained in Exhibit ~~12~~13 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan. Described below are some of the key terms of Mr. Moore's employment agreement.

Mr. Moore's Employment Agreement requires him to devote substantially all of his business time to the Reorganized Debtors' operations through ~~a specified post-emergence retirement date (with the specific date still to be determined but in any event, not later than one year after~~ the nine-month anniversary of the Effective Date~~)~~, at which time he will retire from his employment with Reorganized SSCC, unless his retirement date is accelerated due to Mr. Moore's voluntary resignation for Good Reason or death, or due to the Company's termination of his employment without Cause (or his employment otherwise terminates sooner in accordance with the provisions of ~~his~~ the Moore Employment Agreement).  He will continue in his position as Chief Executive Officer until his retirement.  During his employment, Mr. Moore will receive a base salary and will be eligible to participate in the Reorganized Debtors' annual incentive bonus plan and receive other benefits and perquisites as are made available to their senior executives generally.

Upon his retirement from Reorganized SSCC, Mr. Moore is eligible, pursuant to the terms of his Employment Agreement, to receive, among other things, (i) a retirement benefit determined under the benefit formula contained in the  Company's supplemental income pension plan in which he had participated as a senior executive of the Company; (ii) a special incentive bonus payment of $3,500,000 in lieu of Mr. Moore's participation in the Reorganized SSCC Equity Incentive Plan (in which all other senior executives except Mr. Moore will participate) that is designed to provide market-based ~~long-term~~ incentive compensation to Mr. Moore during his

employment preceding his retirement, which payment is subject to reduction by the portion of his target level incentive bonus under the 2009 LTIP that is based on the Company's financial performance (and not any restructuring goals) and will be earned in 2010; (iii) to the extent Mr. Moore's retirement date is accelerated, to a date earlier than December 31, 2010, certain additional amounts that represent the difference between one year of Mr. Moore's annual base salary and incentive bonus amounts and the base salary and incentive bonus amounts already paid to him prior to his retirement date; and (iv) certain other benefits including continued health coverage until the earlier of the three-year anniversary of his retirement date and the date on which he becomes eligible for coverage through another employer, and secretarial support and office space through the end of the second year after his retirement (which will cease earlier if he becomes employed full-time by another employer). His Employment Agreement does not provide for any additional benefits if his employment terminates prior to the ~~specified post-emergence retirement date~~nine-month anniversary of the Effective Date; however, he will remain eligible to receive certain of the payments and benefits described above depending on the circumstances of his termination of employment. Additionally, payment of any benefits provided to Mr. Moore upon his retirement is conditioned upon, among other things, his execution of a valid release of claims and his compliance with post-employment obligations under his employment agreement. If, at any time, the payments and benefits described above would be "excess parachute payments" as defined in Section 280G of the Internal Revenue Code, with the effect that Mr. Moore is liable for the payment of an excise tax, then Reorganized SSCC will pay the executive an additional amount to "gross up" the executive for such excise tax (provided that such payments to Mr. Moore will be reduced to the extent necessary to avoid such excise tax if the aggregate of such payments is less than 110% of the amount that would result in the payment of such excise tax).

Because Mr. Moore is not participating in the Reorganized SSCC Equity Incentive Plan, the Employment Agreement provides that he is eligible to receive a cash incentive payment in the event that Reorganized Debtors receive, prior to the cessation of his employment, an offer to acquire them (or otherwise engage in a transaction) that results in a Change in Control prior to ~~prior the end of the six-month period following the cessation of his employment~~ the fifteen-month anniversary of the Effective Date, provided that Mr. Moore has participated in the efforts to attempt to sell the Reorganized Debtors (or to engage in such other transaction). The cash payment will be ~~determined based upon~~equal to the monetary value of the equity-based compensation that that the individual holding the positions of President and Chief Operating Officer ("COO") of Reorganized SSCC as of the Effective Date would receive if all of the equity-based compensation that such President and COO received in accordance with the Company's Plan ~~of Reorganization~~ (i.e., 0.9% of the common shares of the New SSCC Common Stock ~~on a fully diluted basis~~ issued on the Effective Date on a fully diluted basis, allocated in a restricted stock unit award with respect to 0.22% of such common shares and in an award granting options to acquire 0.68% of such common shares) were fully vested and liquidated upon the acquisition of the Reorganized Debtors, reduced by the amount of the $3,500,000 special incentive bonus payment described above paid to Mr. Moore.

Mr. Moore's Employment Agreement also prohibits him from: (i) disclosing Reorganized SSCC's confidential information, inventions or developments; (ii) diverting any business opportunities or prospects from Reorganized SSCC that are presented to him in his capacity as an employee of the Company; (iii) during his employment, competing with any business conducted

by Reorganized SSCC or any of its affiliates (or with any material new line of business), within the United States, Canada, Mexico, or China or soliciting any employees, customers or suppliers of the Reorganized SSCC or any of its affiliates; (iv) for a period of two years following the termination of his employment, competing with any business conducted by Reorganized SSCC or any of its affiliates as of the termination of his employment (or with any material new line of business in which Reorganized SSCC or its affiliates engage within the one-year period following the termination of his employment); and (v) for a period of two years following the termination of his employment, soliciting employees, customers, or suppliers of Reorganized SSCC or its affiliates to terminate their relationships with Reorganized SSCC or its affiliates.

*Steven J. Klinger's Employment Agreement and Retirement Agreement*

The Company will enter into, as of the Confirmation Date, an amended and restated employment agreement, and an amended and restated retirement agreement, with Mr. Klinger (respectively, the "Klinger Employment Agreement" and "Klinger Retirement Agreement"). Each of these agreements will be substantially in the forms contained in Exhibit 1213 to the Plan and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.  Described below are some of the key terms of these agreements.

The Klinger Employment Agreement requires Mr. Klinger to devote substantially all of his business time to the Reorganized Debtors' operations through the term of his employment and is subject to automatic renewal for successive two-year terms unless sooner terminated by either party in accordance with the provisions of the Klinger Employment Agreement.  The Klinger Employment Agreement also provides that he shall be eligible to participate in any annual performance bonus plans, long-term incentive plans, and/or equity-based compensation plans established or maintained by the Reorganized Debtors for their senior executive officers, including the MIP and the Equity Incentive Plan, and provides that he will receive an Emergence Equity Grant of 0.9% of the shares of New SSCC Common Stock (on a fully diluted basis) issued as set forth in the Plan and Exhibits 3 and 12 to the Plan.

Pursuant to the Klinger Employment Agreement, no later than the earlier of nine-month anniversary of the Effective Date and thirty days after Reorganized SSCC receives notice of the current CEO's termination of employment (the "Promotion Date"), Reorganized SSCC will consider Mr. Klinger for employment as its CEO.  Any offer from Reorganized SSCC to Mr. Klinger to become CEO will be subject to good faith negotiations between them prior to the Promotion Date.  If Reorganized SSCC does not offer Mr. Klinger the position of CEO prior to the Promotion Date on mutually acceptable terms, or if they cannot agree on a mutually acceptable form of an employment agreement (or if Reorganized SSCC designates an executive chairperson of the board but does not offer such position to Mr. Klinger), Mr. Klinger has the right to voluntarily terminate his employment for "good reason" and receive the severance benefits described below (but, at the option of Reorganized SSCC, would remain employed for up to six months thereafter to transition his duties).

The Klinger Employment Agreement also provides that if Reorganized SSCC terminates the executive's employment "without cause" or the executive terminates his employment with "good reason", Reorganized SSCC will pay as severance, in a lump sum, a multiple of two times (which multiple will increase to 2.99 times if he is CEO) the sum of his base salary and the highest

31

of higher of the Executive's (x) average annual incentive bonus for the three fiscal years preceding the effective termination date of his employment; and (y) actual annual incentive bonus paid with respect to the fiscal year immediately preceding the effective termination date of his employment, provided that in the event that Mr. Klinger's employment terminates ~~within the first 12 months following the Effective~~prior to the Promotion Date "without cause" or for "good reason", then he is entitled to receive the greater of $5 million and the foregoing severance pay. In particular, Mr. Klinger will be eligible to resign for "good reason" and receive the greater of $5 million and the foregoing severance pay in the event he is not ~~promoted to CEO, upon such terms and conditions as Mr. Klinger and Reorganized SSCC shall in good faith negotiate, after the retirement of the current~~offered the position of CEO as described above. In addition to the foregoing severance pay, Reorganized SSCC also will: (i) continue the executive's coverage under the its medical, dental, life, disability, pension, profit-sharing and other executive benefit plans and perquisites for two (2) years after the termination of his employment (which will increase to three (3) years if he becomes CEO); (ii) pay him the supplemental retirement benefit he would have received had he remained employed and retired at such time as set forth in the Employment Agreement; (iii) cause accelerated vesting of 33.3% of any unvested equity-based awards if the termination of his employment or resignation for "good reason" occurs within the first 12 months after the Effective Date, and full ~~accelerate~~accelerated vesting of such awards if such termination occurs after the first 12 months following the Effective Date; and (iv) provide outplacement services. ~~If, at any time, his employment terminates "without cause" or for "good reason" within 24 months following a "change of control" of Reorganized SSCC, he will receive the foregoing benefits and in addition, if~~ Upon a Change in Control, Mr. Klinger is entitled to full accelerated vesting of his Emergence Equity Awards but is not entitled to receive any severance or other benefits solely due a Change in Control.  If, at any time, the payments and benefits described above would be "excess parachute payments" as defined in Section 280G of the Internal Revenue Code, with the effect that the executive is liable for the payment of an excise tax, then Reorganized SSCC will ~~in certain circumstances~~ pay the executive an additional amount to "gross up" the executive for such excise tax.  ~~Payment of any severance benefits provided to Mr. Klinger is conditioned upon, among other things, his execution of a valid release of claims~~ (provided that such payments to Mr. Klinger will be reduced to the extent necessary to avoid such excise tax if the aggregate of such payments is less than 110% of the amount that would result in the payment of such excise tax).

Mr. Klinger's Employment Agreement also prohibits him from: (i) disclosing ~~the~~ Reorganized Debtors' confidential information, inventions or developments; (ii) diverting any business opportunities or prospects from the Reorganized Debtors; ~~and~~ (iii) during his employment ~~and for a period of up to two years following termination of his employment~~, competing with any business conducted by ~~the~~ Reorganized ~~Debtors~~SSCC or any of their affiliates (or with any material new line of business), within the United States, Canada, Mexico, or China, or soliciting any employees, customers or suppliers of the Reorganized Debtors ~~within the United States, Canada, Mexico, or China~~; (iv) for a period of two years following the termination of his employment, competing with any business conducted by Reorganized SSCC or any of its affiliates as of the termination of his employment (or with any material new line of business in which Reorganized SSCC or its affiliates engage within the one-year period following the termination of his employment); and (v) for a period of two years following the termination of his employment soliciting employees, customers, or suppliers of Reorganized SSCC or its affiliates to terminate their relationships with Reorganized SSCC or its affiliates.

*Mr. Klinger's Retirement Agreement*

Prior to the commencement of the Chapter 11 Cases, the Company and Mr. Klinger were parties to an Executive Retirement Agreement that provides certain retirement-related benefits to Mr. Klinger. Pursuant to the Plan, Reorganized SSCC will be assuming the Klinger Retirement Agreement upon emergence from bankruptcy. The Klinger Retirement Agreement was designed to provide a target benefit to Mr. Klinger. Service is earned while he is employed by the Company. The benefit formula is 50% of final average earnings less the annuity equivalent of the benefit earned under his previous employer's pension plan and benefits earned under any Company sponsored retirement plans excluding accruals attributable to salary deferrals and matching employer contributions. Earnings include basic salary and annual incentive bonuses, but exclude compensation under long-term incentive plans and any other bonus or incentive compensation. Final average earnings are the average of the highest five consecutive years of earnings out of the last 10 years prior to termination. Mr. Klinger is immediately vested in his benefit. Prior to completing 15 years of service with the Company, the benefit will be prorated by the ratio of service at termination to 15. Mr. Klinger is entitled to a full retirement benefit after completion of 15 years of service. Benefits commence on the first day of the seventh month following termination, if he has completed at least 15 years of service, or on the first day of the seventh month following age 62 if he has not completed 15 years of service. The normal form of payment is a single-life annuity. The value of the single-life annuity benefit is converted and paid in five equal annual installments.

*Other Executives' Employment Agreements*

The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management. These agreements will be substantially in the forms contained in Exhibit ~~12~~13 to the Plan (which forms will be filed with the Plan Supplement) and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.

*Employment Security Agreements*

The Company will enter into, as of the Confirmation Date, certain amended and restated employment-related agreements with certain key members of management. These agreements will be substantially in the forms contained in Exhibit ~~12~~13 to the Plan (which forms will be filed with the Plan Supplement) and will become effective and will be assigned to Reorganized SSCC as of the Effective Date pursuant to the terms of the Plan.

## III. GENERAL INFORMATION

### A. The Debtors' Businesses and Properties.

**1.     Company Overview.**

Based in Creve Coeur, Missouri, and Chicago, Illinois, the Company is one of the leading integrated manufacturers of paperboard and paper-based packaging in North America and one of the world's largest paper recyclers. The Company sells a broad range of paper-based packaging products, including containerboard, corrugated containers, kraft paper and point of purchase displays, to a broad range of manufacturers of industrial and consumer products. The Company also has a complete line of graphics capabilities for packaging. As of the Petition Date, the Company held approximately 18% of the North American containerboard market capacity.

As of the Petition Date, the Company operated 159 manufacturing facilities located primarily in the United States and Canada. The Company's operations span all phases of the container industry including: 14 paper mills which produce containerboard; 117 corrugated container facilities which convert containerboard into corrugated containers that are sold to a wide array of customers, principally in the food and beverage consumer product industries; and 26 reclamation plants which process recyclable materials to be sold to the Company's mills or third-party customers. In addition, the Company operated one wood products plant and one lamination plant. The Company also owned approximately one million acres of timberland in Canada and operates wood harvesting facilities in the United States. The Company employed approximately 21,250 employees as of the Petition Date.

### 2. Properties.

The current corporate headquarters of the Company are located at 222 North LaSalle Street, Chicago, Illinois 60601.[14] As of September 30, 2009 the Company's operations included 14 paper mills, 109 corrugated container facilities, 27 reclamation plants and one lamination plant, in addition to owning and leasing several other properties in connection with operating the Company's businesses. The general character, location and approximate size of the principal physical properties used by the Company as of the Petition Date are listed in the Company's Schedules of Assets and Liabilities filed with the Bankruptcy Court on April 6, 2009.

## B.    Operational Structure of the Debtors.

SSCC is a non-operating holding company that primarily conducts its business operation through its wholly-owned subsidiary SSCE. SSCE is the direct or indirect parent company of all of the other Debtors and non-debtor affiliates. A chart depicting the Company's corporate structure as of the Petition Date is annexed hereto as Exhibit B-1.

### 1.    Products and Materials.

#### (a)    Paper Products

---

[14] Pursuant to the Debtors' Tenth Omnibus Motion Of The Debtors For Entry Of An Order Authorizing Rejection Of Certain Executory Contracts And Unexpired Leases Pursuant To Section 365 Of The Bankruptcy Code filed on June 19, 2009 and the Court's subsequent entry of an Order Authorizing Rejection of Certain Executory Contracts and Unexpired Leases Pursuant To Section 365 of the Bankruptcy Code on July 9, 2009, the Debtors changed corporate headquarters from 150 N. Michigan Avenue, Chicago Illinois 60601 to 222 North LaSalle Street, Chicago, Illinois 60601 as of August 31, 2009.

The Company also produces a full range of high-quality, corrugated containers designed to protect, ship, store and display products. Corrugated containers are used to transport such diverse products as home appliances, electric motors, small machinery, grocery products, produce, books, and furniture. The containers are made to the merchandising and distribution specifications of the Company's customers and are sold to a broad range of consumer goods manufacturers. The Company also manufactures and sells a variety of retail-ready, point-of-purchase displays and a full line of specialty products, including pizza boxes, corrugated clamshells for the food industry, Cordeck® recyclable pallets, and custom die-cut products to display merchandise on the sales floor. In 2008, the container division generated approximately 63% of the Company's net sales.

The Company also produces a full line of containerboard, which is used primarily in the production of corrugated packaging. Sixty-nine percent of the Company's containerboard production that is comprised of linerboard and medium is consumed internally. In 2008, the containerboard operations generated approximately 20% of the Company's net sales. The Company also produces market pulp, including southern hardwood pulp, bleached southern softwood pulp, and fluff pulp, kraft paper, and other specialty products. Market pulp is sold to manufacturers of paper products as well as those within the printing and writing sectors. The Company's kraft paper is used in consumer and industrial bags, grocery and other types of shopping bags, counter rolls, handle stock, and refuse bags.

      (b)        Paper and Corrugated Container Manufacturing Process

Several steps are necessary to manufacture paper suitable for paper-based packaging. To begin, pulpwood is debarked and sent through a chipper. The resulting chips are then placed into a pressure cooker with specified chemicals that separates the wood fiber. This fiber is washed to remove additional chemicals. Black liquor results from the washing and is put in recovery boilers to create steam. Other byproduct materials created in the papermaking process such as bark, sawdust and wastewater treatment solids are put into power boilers to also create steam. The pulp is then moved to a decker (a machine used to thicken fibers), where a disc refiner brushes and cuts the fibers to increase strength. This mixture then travels to a machine tank, where it is diluted with water. Chemicals may also be added, depending on the requirements of the finished paper. The pulp then moves to the paper machine headbox, which distributes the material on a wire mesh conveyor to remove excess water. The paper then moves through a dryer section. Finally, the paper is rolled, cut and shipped to customers, including corrugated converting plants, where it can then be transformed into paper-based packaging. In addition to the use of virgin fiber as described above, the Company also utilizes waste paper fiber in the papermaking process as additional raw material with the virgin fiber.

Producing corrugated containers also involves several steps. Production begins with medium, a containerboard component, being inserted into a machine, where it is heated, moistened and formed into a fluted pattern and bonded to the inside of single-face linerboard, the other component of containerboard. Single-face board is then fed into a machine where the outside paper, or double-face linerboard, is affixed to the fluted medium to form single-wall corrugated board. Hot plates remove excess moisture and help set starch-based glue. The board is then fed into a device that trims the board to appropriate widths and adds lines for later folding. Knives cut the board to the required length. These cut-to-size sheets are stacked in preparation for finishing.

35

Finishing then cuts, prints, folds, and glues the sheets into the finished product. Finally, flat boxes are bundled, stacked into units and banded for shipment.

  (c)  Reclamation Facilities

  The Company's reclamation operations procure fiber resources for its containerboard mills as well as for other producers. The Company currently operates 27 reclamation facilities in the United States that collect, sort, grade and bale recovered paper. The Company also collects aluminum, glass and plastic materials for resale to manufacturers that utilize such materials. In addition, the Company operates a nationwide brokerage system whereby it purchases and resells reclaimed paper to its recycled paper mills and other producers of recycled products on a regional and national contract basis. The Company's waste reduction services operation extracts additional recyclables from the waste stream by partnering with customers to reduce their waste expenses and increase recycling. Brokerage contracts provide bulk purchasing, often resulting in lower prices and cleaner reclaimed paper. Many of the Company's reclamation facilities are located close to the recycled paper mills to ensure availability of supply with minimal shipping costs.

  **2.**  **Materials.**

  (a)  Raw Materials

  The products that the Company produces require wood fiber and reclaimed fiber as the principal raw materials. The Company satisfies the majority of its demand for wood fiber through purchases on the open market or under supply agreements with certain providers. Approximately 90% of the Company's wood fiber needs are purchased in the open market. The remaining 10% comes directly from individual landowners. The Company satisfies essentially all of its need for reclaimed fiber through its reclamation facilities and nationwide brokerage system.

  (b)  Supplier Exchanges

  The Company is also party to several different exchange agreements with certain paper manufacturers. These agreements create a reciprocal relationship in which the Company requires a quantity of containerboard from certain suppliers. In consideration, the Company exchanges its internally produced containerboard with these suppliers. The exchanges under these agreements reduce costs (primarily freight costs), maximize paper machine efficiencies, and allow the Company to obtain grades of paper which it does not produce.

  **3.**  **Customers.**

  The Company obtains new customers and maintains long-term customer relationships through various sales, marketing, and distribution channels. The Company's marketing strategy is based on selling a broad range of paper-based packaging products to manufacturers of industrial and consumer products. This strategy has created a broad customer base which consists of sales directly to end users and converters as well to resellers. To serve its customer base, the Company has centralized its marketing and sale of containerboard and pulp to third parties in the Company's board sales group located in Chicago, Illinois, and West Point, Virginia. The Company's corrugated container sales organization is centralized with sales responsibilities for all converting facilities.

CH1 5118439 5168368 v.4 1

The Company greatly values its diversified and high-quality customer base. The Company produces paper products and containerboard for some of the world's largest consumer products companies. The Company's top customers include Kellogg Company, PepsiCo Inc., Unilever, and Smithfield Foods Inc. In addition to these high-volume customers, the Company is also able to efficiently and economically serve local and regional customers. No single customer accounted for more than three percent (3%) of the Company's sales during the twelve months ending September 2009. During that time period, the Company's top fifteen customers represented approximately twenty percent (20%) of the Company's total sales.

### 4.     Employees.

The Company currently employs approximately 20,000 active employees (the "Employees"), of whom approximately 14,200 are hourly and 5,800 are salaried. Approximately 11,640, or more than fifty-eight percent (58%) of these Employees are represented by unions and covered under one of the approximately 120 collective bargaining agreements. The collective bargaining agreements expire at various times between 2009 and 2013. While the terms of the collective bargaining agreements may vary, the material terms of such agreements are customary for the industry, the type of facility, the classification of the employees, and the geographic location covered thereby.

### 5.     Recent Operations.

As of September 30, 2009, the Company reported total assets having a net book value of approximately $5.276 billion and total liabilities of approximately $6.600 billion. In addition, the Company had net sales of approximately $7.042 billion for the year ending December 31, 2008. For the nine months ended September 30, 2009, the Company had net sales of approximately $4.195 billion. The Company's financial position had been adversely impacted by the recent downturn in the global economy, substantial price competition and volatility in the pulp and paper industry, and recent volatility in the cost of energy and raw materials.

During 2009, the Company has received refunds related to an allowance of an excise tax credit for alternative fuel mixtures produced for sale or for use as a fuel in a taxpayer's trade or business. This credit is scheduled to expire on December 31, 2009. On May 6, 2009, the Company was notified that its registration as an alternative fuel mixer was approved by the Internal Revenue Service. The Company submitted refund claims of approximately $473 million for the nine months ended September 30, 2009 related to production at ten of its U.S. mills and has received refund claims of approximately $415 million for such period. During the nine months ended September 30, 2009, the Company recorded other operating income of $455 million, net of fees and expenses, in its consolidated statements of operations related to this matter.

For the nine months ended September 30, 2009, the Company had net income attributable to common stockholders of $3 million, or $0.01 per diluted share, compared to net income of $6 million, or $0.02 per diluted share, for the same period last year. The 2009 results benefited from the alternative fuel tax credit income of $455 million, but were negatively impacted by debtor-in-possession debt issuance costs of $63 million, reorganization items of $109 million, lower segment operating profits of $80 million, higher interest expense of $30 million and loss on early extinguishment of debt of $20 million. The 2008 results benefited from the resolution of

certain Canadian income tax examination matters and higher non-cash foreign currency exchange gains, but were negatively impacted by a charge of $22 million to fully reserve for all amounts due from Calpine Corrugated, LLC and litigation charges of $8 million.  The segment operating results for the nine months ended September 30, 2009 were negatively impacted by lower sales volume for containerboard and corrugated containers and lower average selling prices for containerboard and corrugated containers.  The 2009 nine month results benefited from lower energy and reclaimed fiber costs compared to the comparable period in 2008.

### 6.    Corporate History and Business Acquisitions.

Jefferson Smurfit Group plc, an Ireland-based packaging conglomerate, formed Jefferson Smurfit Corporation ("JSC") in 1983 as a holding company for its U.S. interests.  In the years following its formation, JSC acquired several container companies and operations, including Container Corporation of America and Alton Boxboard Company.  By 1997, JSC had achieved sales of more than $3 billion.

Stone Container Corporation ("Stone") was founded in 1926 as J.H. Stone and Company in Chicago, Illinois, and incorporated in 1945 under the name Stone Container Corporation.  Following this formation, Stone expanded throughout the Midwest, both building and buying corrugated container plants.  Stone continued this expansion by purchasing mills throughout the U.S. and establishing an international presence in Canada, Latin America, Asia and Europe.

In, 1998, JSC, now known as SSCC, completed a merger with Stone and Stone became a wholly-owned subsidiary of SSCC (the "Merger").  In 2004, a subsequent internal reorganization transaction resulted in Stone being renamed SSCE.  SSCC continues to own 100% of the equity interest of SSCE.

This combined Company then focused on strategic expansion, elimination of unnecessary facilities and operations, and cost reduction.  In the years following the Merger, the Company closed 10 containerboard mills, a market pulp mill and 82 container plants, including 47 such closures since 2005.  As the initial phase of its divestiture strategy in 1999-2000, the Company sold its U.S. timberlands, newsprint mills, its ownership position in Abitibi-Consolidated, Inc. and a pulp mill.  The Company's strategy for expansion entailed acquiring corporations that would enable it to improve efficiency levels, broaden its high-quality containerboard offerings, and meet the growing demand for value-added packaging.  As part of this strategy, in May 2000, the Company acquired Montreal-based St. Laurent Paperboard, Inc., a major manufacturer, supplier, and converter of high-quality, value-added paperboard products including containerboard and food board.  Additionally, in September 2002, the Company acquired a large corrugated medium mill and related assets located in Stevenson, Alabama, and sold its industrial packaging operations.  In March 2003, the Company completed a transaction with Jefferson Smurfit Group involving (a) the sale of the Company's European operations to the Jefferson Smurfit Group plc and (2) the Company's purchase of the Jefferson Smurfit Group's 50% ownership in Smurfit-MBI, a Canadian packaging business.  This transaction gave the Company 100% ownership of Smurfit-MBI and effectively ended its manufacturing presence in Europe.  In 2006, the Company sold its consumer packaging business, which allowed it to be solely focused on its core business of containerboard, corrugated containers and recycling, and in 2007 the Company sold its Brewton, Alabama white top linerboard and solid bleached sulfate mill.  In July 2008, the Company acquired

a 90% ownership in Calpine Corrugated, LLC, which enabled the Company to accelerate the optimization of its Northern California business unit and improve its position in the agricultural market segment.

## C.  **Management of Debtors.**

### 1.  **Board of Directors.**

The board of directors of the Company (the "Board of Directors") currently consists of nine (9) members.  Seven of the nine members are independent directors.  Set forth below are the directors of the Company as of the date of this Disclosure Statement.

### 2.  **Biographies of Directors.**

*James R. Boris, Board Member*

James R. Boris was first elected as a Director in 2003. He is the retired Chairman and Chief Executive Officer of EVEREN Capital Corporation and its primary subsidiary EVEREN Securities, Inc. (now known as Wachovia Securities, Inc.). Mr. Boris is the non-executive Chairman of the Board of Integrys Energy Group, Inc., and lead director of the Chicago Board Options Exchange.

*Connie K. Duckworth, Board Member*

Connie K. Duckworth was first elected as a Director in 2004. She has been President and Chairman of Arzu, Inc. since August 2003. She was a partner of Circle Financial Group, LLC from January 2003 to December 2004. Ms. Duckworth retired from Goldman, Sachs & Co. as Advisory Director in 2001. Ms. Duckworth is a director of Northwestern Mutual Life Insurance Company, DNP Select Fund, and Russell Investment Group.

*Steven J. Klinger, President and Chief Operating Officer*

Steven J. Klinger joined Smurfit-Stone as President and Chief Operating Officer in May 2006.  He was appointed to the Board of Directors on December 11, 2008.  Prior to joining Smurfit-Stone, Mr. Klinger was employed by Georgia-Pacific Corporation for 23 years, most recently as Executive Vice President of Packaging from February 2003 to May 2006, and President, Packaging and Containerboard Sales/Logistics from August 2001 to January 2003.  He is a graduate of Georgia State University, with a degree in accounting, and Duke University's Advanced Management Program. In June 2008, Mr. Klinger was appointed to the board of directors of Navistar International Corporation.

*William T. Lynch, Jr., Board Member*

William T. Lynch was first elected as a Director in 2003. He has been President and Chief Executive Officer of Liam Holdings, LLC since April 1997. He is the retired President and Chief Executive Officer of Leo Burnett Company. Mr. Lynch is also a director of Pella Corporation.

*Patrick J. Moore, Chairman and Chief Executive Officer*

Patrick J. Moore has served as Chairman and Chief Executive Officer since May 2006. He had been Chairman, President and Chief Executive Officer since May 2003, and prior to that he was President and Chief Executive Officer since January 2002, when he was also elected as a director of the Company. He was Vice President and Chief Financial Officer from November 1998 until January 2002. Mr. Moore is the lead director for Archer Daniels Midland Company and serves on the board of directors of DePaul University in Chicago. He also serves on the Nasdaq CEO Council, J.P. Morgan's National Advisory Board, and the boards of the YMCA of Greater St. Louis, Boys Hope Girls Hope, and Big Shoulders in Chicago.

*James J. O'Connor, Board Member*

James J. O'Connor was first elected as a Director in 1998 and serves as the Lead Independent Director. He is the former Chairman and Chief Executive Officer of Unicom Corporation and its subsidiary, Commonwealth Edison Company. He is a director of Armstrong World Industries, Inc., Corning Incorporated and UAL Corporation.

*Jerry K. Pearlman, Board Member*

Jerry K. Pearlman was first elected as a Director in 1998. He is the retired Chairman of the Board and Chief Executive Officer of Zenith Electronics Corporation. Mr. Pearlman is a director of Nanophase Technologies Corporation, and from 1984 to 1998 served as a director of Stone Container Corporation, a predecessor of the Company.

*Thomas A. Reynolds, III, Board Member*

Thomas A. Reynolds was first elected as a Director in 1997. He has been a Partner with Winston & Strawn LLP, a law firm that has regularly represented the Company on numerous matters, since 1984, and is a member of Winston & Strawn LLP's executive committee.

*William D. Smithburg, Board Member*

William D. Smithburg was first elected as a Director in 2003. He is the retired Chairman, President and Chief Executive Officer of The Quaker Oats Company. He is a director of Abbott Laboratories, Barry Wehmiller Companies, Inc., Northern Trust Corporation, and Corning Incorporated.

**3.     Committees of the Board of Directors.**

SSCC's Board of Directors has four committees: (i) the Audit Committee, (ii) the Compensation Committee, (iii) the Nominating and Governance Committee, and (iv) the Strategy and Finance Committee. The Audit Committee assists the Board of Directors in fulfilling its oversight responsibilities with respect to auditing, financial reporting, internal control systems, and compliance with legal and regulatory requirements. The members of the Audit Committee are Mr. Boris, Mr. O'Connor, and Mr. Pearlman (Chair). The Compensation Committee has the responsibility for (i) annually appraising the performance of the executive officers of the Company and reviewing and establishing the annual salary and incentive plan participation levels and bases of participation, (ii) administering, reviewing, and subject to board approval, approving any changes to incentive compensation plans for executive officers, (iii) reviewing and approving

payments, as appropriate, under incentive compensation plans for executive officers, (iv) administering, reviewing and, subject to Board approval, approving any changes to stock option and any other stock-based compensation plans in which executive officers participate, and (v) reviewing and, subject to Board approval, approving employment, severance and compensation agreements with individual executive officers. The members of the Compensation Committee are Ms. Duckworth, Mr. Lynch, Mr. Pearlman, and Mr. Smithburg (Chair). The Nominating and Governance Committee assists the Board of Directors by identifying individuals qualified to become Board members, recommending to the Board the director nominees to be proposed for election by the stockholders and recommending to the Board the corporate governance guidelines and procedures applicable to the Company. The members of the Nominating and Governance Committee are Mr. Lynch, Mr. O'Connor (Chair) and Mr. Smithburg. The Strategy and Finance Committee was established to provide guidance on major strategic initiatives and financing strategies and to review the Administrative Committee of the Smurfit-Stone Container Corporation Retirement Plans' administration, investment and management of the Company's retirement plans and plan assets. The members of the Strategy and Finance Committee are Mr. Boris (Chair), Ms. Duckworth, Mr. Lynch, and Mr. Reynolds.

**4.        Compensation of Directors.**

Each independent director is entitled to receive an annual fee of $120,000 as compensation for serving on the board. Independent Directors also receive a fee of $1,500 per board and committee meeting attended, plus travel expenses. The Chairman of the Audit Committee receives an additional fee of $10,000 annually, and the Chairmen of the Compensation Committee, the Nominating and Governance Committee, and the Strategy and Finance Committee receive an additional fee of $7,500 annually. Mr. O'Connor, as Lead Independent Director, also receives a fee of $20,000 annually for his service in that capacity. The Company also maintains a matching gift program for charitable donations of up to $7,500 per year made by independent directors. Mr. Moore and Mr. Klinger do not receive any additional compensation by reason of their membership on, or attendance at meetings of, the Board.

**5.        Executive Officers.**

Set forth below are the senior executive officers of SSCC as of the date of this Disclosure Statement and each officer's position within SSCC.

| Name | Position |
| --- | --- |
| Patrick J. Moore | Chairman of the Board and Chief Executive Officer |
| Steven J. Klinger | President and Chief Operating Officer |
| John R. Murphy | Senior Vice President and Chief Financial Officer |
| Craig A. Hunt | Senior Vice President, Secretary and General Counsel |
| Ronald D. Hackney | Senior Vice President, Human Resources |

41

| | |
|---|---|
| Susan M. Neumann | Senior Vice President of Corporate Communications and Public Affairs |
| Mark R. O'Bryan | Senior Vice President of Strategic Initiatives and Chief Information Officer |
| Mathew J. Blanchard | Senior Vice President and General Manager, Board Sales |
| Michael P. Exner | Senior Vice President and General Manager, Containerboard Mill Division (effective January 1, 2010) |
| Paul K. Kaufmann | Senior Vice President and Corporate Controller |
| John L. Knudsen | Senior Vice President of Corporate Strategy |
| Michael R. Oswald | Senior Vice President and General Manager, Recycling Division |
| Steven C. Strickland | Senior Vice President, Container Operations |

**6.      Biographies of the Senior Executive Officers.**

*Patrick J. Moore, Chairman of the Board and Chief Executive Officer*

See Section III.C.2 – "Biographies of Directors"

*Steven J. Klinger, President and Chief Operating Officer*

See Section III.C.2 – "Biographies of Directors"

*John R. Murphy, Senior Vice President and Chief Financial Officer*

John R. Murphy is senior vice president and chief financial officer for Smurfit-Stone Container Corporation. Mr. Murphy joined Smurfit-Stone in May 2009.  Prior to joining Smurfit-Stone, he served as president and chief executive officer, and as a member of the board of directors of Accuride Corporation of Evansville, IN.  During his 10-year tenure with Accuride, Mr. Murphy served as president and chief operating officer; chief financial officer; and executive vice president.  Mr. Murphy also held key leadership positions with North American Stainless, Inc., Armco, Inc. and Corning, Inc. He began his career with PricewaterhouseCoopers. Mr. Murphy currently serves on the board of directors and holds committee positions with O'Reilly Automotive, Inc., of Springfield, MO.  He  holds a bachelor's degree in accounting from Pennsylvania State University, an MBA from the University of Colorado, and is a certified public accountant.

*Craig A. Hunt, Senior Vice President, Secretary and General Counsel*

Craig A. Hunt is senior vice president, general counsel and secretary for Smurfit-Stone Container Corporation. He is also a member of the Company's executive committee.  Mr. Hunt

joined the former Jefferson Smurfit Corporation in November 1990 as staff counsel. In 1993, he began serving as senior counsel and assistant secretary. He assumed his current post in 1998. Mr. Hunt practiced general corporate law for several years in the corporate finance section of the Shook, Hardy & Bacon law firm in Kansas City. He earned a bachelor's degree in economics and a Juris Doctor degree from the University of Kansas.

### Ronald D. Hackney, Senior Vice President, Human Resources

Ronald D. Hackney is senior vice president of human resources for Smurfit-Stone Container Corporation, a post he assumed in 2003. He is also a member of the company's executive committee. A 32-year veteran in human resources management, Mr. Hackney joined one of Smurfit-Stone's predecessor companies, Container Corporation of America, in 1976. He served as corporate labor relations manager from 1986 to 1995 and held regional human resources posts in the container and mill operations divisions prior to that. From 1995 to 2003, Mr. Hackney served as human resources manager for the company's Mill division. Mr. Hackney earned a bachelor's degree from Berea College in Kentucky and a master's degree in business administration from Ball State University in Indiana.

### Susan M. Neumann, Senior Vice President of Corporate Communications and Public Affairs

Susan M. Neumann is senior vice president of corporate communications and public affairs for Smurfit-Stone Container Corporation and is a member of the company's executive committee. Ms. Neumann has more than 25 years of corporate communications experience in the retail food/drug and manufacturing industries. Before joining Smurfit-Stone in 2006, Ms. Neumann was senior vice president of corporate communications and education for Albertsons, Inc., one of the nation's largest food and drug retailers. Prior to the acquisition by Albertsons, she was vice president of communications for the former American Stores Company. Ms. Neumann also held positions of increasing responsibility at Whirlpool Corporation, including director of corporate communications for the company's North American Appliance Group. Ms. Neumann earned a bachelor's degree in political science and journalism, and a master's degree in organizational communications from Western Michigan University in Kalamazoo, MI. She was appointed to serve on the Economic Development Council for the City of Creve Coeur, MO, and is a member of the St. Louis Forum and the St. Louis Executive Leadership Team of Go Red for Women. Ms. Neumann serves on the board of directors of Webster University in St. Louis and the Western Michigan University Alumni Association.

### Mark R. O'Bryan, Senior Vice President of Strategic Initiatives and Chief Information Officer

Mark R. O'Bryan is senior vice president of strategic initiatives and chief information officer for Smurfit-Stone Container Corporation. He is also a member of the company's executive committee. He previously served as vice president of operational improvement for the company's former Consumer Packaging division. Mr. O'Bryan joined the company in October 1999 as vice president of procurement. He was appointed to his current role in July 2005. Mr. O'Bryan has 13 years' experience with General Electric Company (GE), holding senior-level positions in sourcing

and materials management at several GE manufacturing businesses, and serving as manager of global materials and sourcing for GE Aircraft Engines in Evendale, OH. Prior to that, he held similar posts with GE Plastics in Pittsfield, MA, and a GE Power Systems operation in Florence, Italy.   Mr. O'Bryan holds bachelor's and master's degrees in mechanical engineering from the University of Dayton.

*Mathew J. Blanchard, Senior Vice President and General Manager, Board Sales*

Mathew J. Blanchard is senior vice president and general manager of board sales for Smurfit-Stone Container Corporation – a post he assumed in 2000.  He joined the company in 1995 and has earned positions of increasing responsibility within the board sales group.  Mr. Blanchard served as vice president of supply chain operations for the former St. Laurent Paperboard Inc., which Smurfit-Stone acquired in 2000.  He served as both vice president and director of operations planning for several St. Laurent facilities. Prior to that, he held a variety of positions with Avenor Inc.  Mr. Blanchard received a bachelor's degree from Dalhousie University in Halifax, Nova Scotia.

*Michael P. Exner, Senior Vice President and General Manager, Containerboard Mill Division*

Michael P. Exner was appointed senior vice president and general manager of the Containerboard Mill division of Smurfit-Stone Container Corporation, effective as of January 1, 2010. Mr. Exner will join the Company from International Paper Company where he was vice president of manufacturing for containerboard since 2003.  Prior to that he was director of manufacturing for its commercial printing and imaging papers division from 1997 to 2003, and mill manager of two of its paper mills from 1992 to 1997.  Mr. Exner received his bachelor's degree in Chemistry from Lawrence University and a master's degree from The Institute of Paper Chemistry.

*Paul K. Kaufmann, Senior Vice President and Corporate Controller*

Paul K. Kaufmann is senior vice president and corporate controller for Smurfit-Stone Container Corporation. Mr. Kaufmann assumed his current position in 1998.  Mr. Kaufmann joined the former Jefferson Smurfit Corporation (JSC) in 1990 as a corporate accounting manager and was promoted to director of corporate accounting in 1991. He was controller of the Mill division from 1993 to 1998.   Prior to his employment with JSC, Mr. Kaufmann was a senior manager at Ernst & Young, where he worked from 1978 to 1990.  Mr. Kaufmann earned a bachelor's degree from the University of Iowa and a master's degree in business administration from the University of Illinois.

*John L. Knudsen, Senior Vice President of Corporate Strategy*

John L. Knudsen is senior vice president of corporate strategy and is responsible for developing and executing the company's overall capital investment strategy, as well as leading key manufacturing and strategic services. Mr. Knudsen has more than 20 years of experience in operations management and strategic planning for the Container division. He served from October 2005 until November 2008 as senior vice president of manufacturing. Previous positions included vice president of strategic planning and vice president and regional manager of the Container division. Prior to that, Mr. Knudsen held positions of increasing responsibility, including general manager, area production manager, regional quality assurance manager and production manager. He began his career with the former Container Corporation of America, a predecessor company to Smurfit-Stone, in 1986 as a production supervisor. Mr. Knudsen is a graduate of Michigan Technological University with a degree in civil engineering. He obtained a degree in accounting from Northern Michigan University and a master's degree in business administration from the University of Michigan. Currently he is a board member of the Fibre Box Association.

*Michael R. Oswald, Senior Vice President and General Manager, Recycling Division*

Michael R. Oswald is senior vice president and general manager for the Recycling division of Smurfit-Stone Container Corporation. He assumed his current position in 2005 after serving as vice president of operations for the division from 1997 to 2005. Mr. Oswald has 30 years' experience in the recycling industry and began his career at Smurfit-Stone as a fiber coordinator. He has held a variety of operational, sales and management positions, including general manager, regional manager of operations, and vice president and regional manager of East Coast operations. Mr. Oswald earned a bachelor's degree from the University of Missouri–Columbia and a master's degree in business administration from Washington University in St. Louis. He is a member of the American Forest & Paper Association (AF&PA) Recovered Fiber Executive Committee.

*Steven C. Strickland, Senior Vice President, Container Operations*

Steven C. Strickland is senior vice president of container operations for the Container division of Smurfit-Stone Container Corporation and is responsible for the division's sales and manufacturing activities. He joined the company in 2006 as senior vice president of container sales after gaining more than 30 years of experience in executive and sales leadership roles for packaging manufacturers. Mr. Strickland previously served as senior vice president of packaging and facility supplies for Unisource, a distributor of commercial printing and imaging paper, packaging systems and facility supplies. Prior to that, Mr. Strickland served as senior vice president of operations–East, and vice president of national sales. Before joining Unisource, Mr. Strickland spent 19 years with Georgia-Pacific, where he served in various sales management roles for the containerboard, packaging and consumer products businesses.

45

7.    **Executive Compensation.**

Compensation of the Company's named executive officers (the "NEOs") is defined in Item 402(a) of Regulation S-K promulgated under the Securities Exchange Act of 1934, as amended, for the fiscal year 2008 is reflected in the summary compensation table set forth below.

| Name & Principal Position | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($)[15] | Non-equity Incentive Plan Compensation ($) | Change in Pension Value & Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Patrick J. Moore - Chairman & CEO | 1,089,000 | 0 | 1,032,284 | (349,067) | 553,500 | 63,285 | 93,527 | 2,482,529 |
| Charles A. Hinrichs- Senior Vice President and Chief Financial Officer.[16] | 415,875 | 0 | 129,914 | (78,053) | 130,000 | 75,410 | 11,840 | 684,986 |
| Steven J. Klinger - President and Chief Operating Officer | 783,750 | 0 | 1,035,643 | (90,447) | 397,500 | 108,966 | 11,022 | 2,246,434 |
| Craig A Hunt - Senior Vice President, General Counsel and Secretary | 403,875 | 0 | 111,094 | (31,223) | 204,250 | 70,660 | 11,403 | 770,059 |
| Steven C. Strickland – Senior Vice President- Container Operations | 349,000 | 65,000 | 199,963 | (41,490) | 129,000 | 0 | 7,750 | 709,223 |

D.    **Compensation and Benefits Programs.**

The Compensation Committee determines the compensation of all of the Company's executive officers.  There are several elements to the compensation package, including a base salary, annual incentives based on corporate, division and operating performance, long term incentives in the form of stock options and restricted stock units, customary benefits such as group insurance and savings plans, and pension plans.[17]  Historically and in the ordinary course of its business, the Company has implemented various compensation and benefits programs that are designed to incentivize future performance, align management incentives with those of

---

[15] Because the vesting requirements for certain options were not met, the value recorded for those options in 2006 and 2007 was reversed in 2008.

[16] On the Petition Date, Charles A. Hinrichs was Senior Vice President and Chief Financial Officer for the Company. Mr. Hinrichs' employment with the Company ended as of May 18, 2009, and John R. Murphy became Senior Vice President and Chief Financial Officer on that date.

[17] All of the executive officers hired by the Company prior to January 1, 2006 participate in the Company's qualified and non-qualified pension plans for salaried employees.  Salaried employees hired after January 1, 2006 are not eligible to participate in the pension plans.

46

Company's other stakeholders through equity-based compensation, provide employees with market-based, competitive compensation opportunities and benefits packages, and reward its management employees for excellent service. The Company also has entered into various employment and other similar agreements with certain of its senior executives.

Certain of these employee compensation and benefits programs and agreements are generally described below, with the blanket exception of insured and self-insured programs (e.g., health plans), and customary fringe benefit policies (e.g., vacation, sick leave). The list of programs, descriptions, and agreements set forth below is not, and is not intended to be, exhaustive or comprehensive. In the event the Company substantially modifies or terminates any compensation or benefit programs or employment agreements prior to the Confirmation Date, it will file an amendment to Exhibits ~~11 and~~3, 12 or 13 to the Plan, as applicable.

### 1. Historical Incentive Programs Prior to the Chapter 11 Cases.

(a) The Company's Annual Management Incentive Plan.

The Company historically has provided market-based, annual incentive bonus opportunities to more than 3,650 management employees pursuant to its Management Incentive Plan and other similar annual incentive bonus plans (collectively, the "MIP"). The purpose of the MIP is to ensure that annual incentive awards were based on achievement of corporate, division and individual performance objectives. The MIP remains an important element of the Company's continued efforts to further align management interests with other Company stakeholders, provide its management-level employees with market-based, competitive incentive bonus compensation opportunities and, ultimately, to reward superior performance.

(b) The Company's Long-Term Incentive Plan.

The Company also has a long history of granting long-term incentive awards in the form of stock options, restricted stock units, and other equity-based vehicles, which were designed to align the long-term interests of executive officers with those of the stockholders of the Company to increase long-term Company value. The long-term incentives typically included multi-year vesting requirements to encourage executive officers to remain employed with the Company. When making such awards, the Compensation Committee considered the value of the long-term incentives and the impact of long-term incentives on total compensation of the executive officers relative to appropriate paper and pulp and general industry peer groups to provide market-based compensation opportunities for management.

### 2. Short-Term and Long-Term Incentive Compensation Plans Approved During the Chapter 11 Cases.

The Company's compensation philosophy of providing appropriate, market-based financial incentives to enhance Company performance continued through the Company's Chapter 11 cases. On March 19, 2009, the Company filed the Motion of the Debtors for Entry of an Order Authorizing, But Not Directing, the Debtors to Implement Their Short-Term and Long-Term Incentive Compensation Plans wherein the Company requested authorization to continue their

historical practice of providing employees performance-based short-term and long-term incentive compensation.

On April 22, 2009, the Bankruptcy Court entered an order approving performance-based, annual and long-term cash incentive programs in the form of the Company's 2009 Management Incentive Plan ("2009 MIP"), 2010 Management Incentive Plan ("2010 MIP"), and 2009 Long-Term Incentive Plan ("2009 LTIP") (such order, the "Incentive Plan Order"). These plans were designed to drive the Company's financial performance and, in the case of the 2009 LTIP, restructuring objectives, during the Chapter 11 cases. Pursuant to the Incentive Plan Order, the Company was authorized to implement its 2010 MIP on the same terms as its 2009 MIP, subject only to the development of a 2010 budget to provide the objective financial performance metrics.

      (a)      2009 MIP and 2010 MIP.

The more than 3,650 management employees who historically participated in the MIP in 2009 will continue to participate in 2010. These MIP participants are divided into four tiers: Tier I is comprised of 13 senior executives; Tier II includes approximately 100 additional management employees who are critical to the Company's performance and successful reorganization efforts; Tier III includes approximately 850 managerial employees with corporate or division-specific responsibilities; and Tier IV includes approximately 2,600 employees whose responsibilities significantly impact the Company's ability to meet its budgeted financial targets at the Company and divisional levels.

Each MIP participant has an annual target incentive bonus potential that is expressed as a percentage of his or her base salary. On April 28, 2009, the Compensation Committee established the Company's NEOs' target level incentive bonuses for 2009 and 2010 consistent with the Incentive Compensation Order (expressed as a percentage of the participant's annual base salary) as follows:

| Named Executive Officer | Target |
|---|---|
| Patrick J. Moore,<br>Chairman and Chief Executive Officer | 125% |
| Steven J. Klinger,<br>President and Chief Operating Officer | 125% |
| John R. Murphy,*<br>Senior Vice President and Chief Financial Officer | 100% |
| Craig A. Hunt<br>Senior Vice President, Secretary and General Counsel | 100% |
| Steven C. Strickland,<br>Senior Vice President of Container Operations | 100% |

CH1 5118430 5168368v.4 1

\*  Mr. Murphy joined the Company on May 18, 2009, and was not eligible to participate in the 2009 MIP for the first semi-annual performance period (as described below).  He is, however, eligible to participate in the second semi-annual and annual performance periods on a pro-rated basis.  Mr. Murphy's predecessor, Charles A. Hinrichs, participated in the 2009 MIP from January 1, 2009 until the cessation of his employment on May 18, 2009, and received a pro-rata award under the MIP as a result.

The MIP plan years are from January 1 through December 31 for 2009 and 2010, and are comprised of three performance periods:  two six-month, semi-annual performance periods and one annual performance period.  Accordingly, consistent with the Incentive Plan Order, a MIP participant is eligible to receive a semi-annual award after the end of each semi-annual performance period and an annual award after the end of the annual performance period, subject to the Company's achievement of the financial and/or operational goals for the applicable performance period.  The percentages of the target incentive bonus payouts attributable to each performance period for each MIP participant (except certain Tier IV participants as described below) are as follows:

| Performance Targets Evaluation Date | Percentage Payout of Target Bonus |
|---|---|
| June 30 (based on semi-annual performance) | 40% of annual target bonus (based on semi-annual performance – January 1 through June 30) |
| December 31 (based on semi-annual performance) | 30% of annual target bonus (based on semi-annual performance – July 1 through December 31) |
| December 31 (based on annual performance) | 30% of annual target bonus (based on annual performance – January 1 through December 31) |

Certain Tier IV B MIP Participants, however, are eligible to receive a quarterly award pursuant to the 2009 MIP and 2010 MIP after the end of each calendar quarter, consistent with the Company's past practice and the Incentive Plan Order.

With the exception of certain participants in Tier IV whose performance targets are based upon plant or area key performance indicators, the Company's objective financial performance targets applicable under the MIP are based on a corporate EBITDAR metric and a divisional EBITDA metric.  The Company previously established the 2009 MIP performance targets and has developed the budgeted 2010 EBITDAR that will be used as the 2010 MIP Performance Targets, which isas set forth in Exhibit 3 of the Plan.

Because the MIP performance targets are entirely performance-based, actual earned incentive bonuses will vary depending on the extent to which the Company achieves the established performance targets.  Like the 2009 MIP, the 2010 MIP establishes a threshold level of

performance (85% of the performance target) at which 50% of the target incentive bonus will be paid (and below which level no bonus payment will be made), a target level of performance at which 100% of the target incentive bonus will be paid, and a maximum level of performance (140% of the performance target) at which a maximum level bonus payment will be paid (175% of the target incentive bonus), provided that any above-target incentive bonus amount earned with respect to the first six-month semi-annual performance period is scheduled to be paid after the end of the MIP plan year. Additionally, only Tier I and II participants are eligible to earn any above-target level payments under the MIP.

In the event that the Company has not implemented the 2010 MIP prior to the Confirmation Date as authorized by the Incentive Plan Order, it will adopt and implement it on the Confirmation Date pursuant to the terms of the Plan. Additionally, pursuant to the Plan, the 2010 MIP will be assumed by the Reorganized Company and will remain in effect after the Effective Date.

## MIP Awards for the First 2009 Semi-annual Performance Period[18]

For the first semi-annual performance period from January 1, 2009 through June 30, ~~2009 (the only performance period that has been completed as of the filing of this Disclosure Statement).~~2009, the Company exceeded the corporate and divisional 2009 MIP EBITDAR performance targets. As a result, each of the Tier I and II participants (including the NEOs) earned the maximum 175% of his or her target level incentive bonus for the first semi-annual performance period. However, because the amount of the payout for the first semi-annual performance period is capped at 40% of the annual target, the balance of the earned bonus was carried over and will be paid to such participants after the end of the 2009 MIP year, consistent with the Incentive Plan Order.

The value of the award paid for the first semi-annual performance period is set forth below and expressed as a percentage of annual base salary. The amount carried over and to be paid after the end of the 2009 MIP year is also set forth below. Total awards earned under the 2009 MIP for the first semi-annual performance period amounted to approximately $22 million, with approximately $3.8 million of such amount being awarded to executive officers.

| Named Executive Officer | Target | Value of Award Paid for First Semi-Annual Performance Period | Earned Award Carried Over for Payment in 2010 |
|---|---|---|---|
| Patrick J. Moore, Chairman and Chief Executive Officer | 125% | $553,500 (50% of salary) | $415,125 |
| Steven J. Klinger, President and Chief Operating Officer | 125% | $397,500 (50% of salary) | $298,125 |

---

[18] Although the second semi-annual and annual performance periods have been completed, as of the filing of this Disclosure Statement, the earned incentive bonus amounts for those performance periods have not yet been determined. The Company will file additional information regarding such bonus amounts in the Plan Supplement.

| John R. Murphy,*<br>Senior Vice President and<br>Chief Financial Officer | 0% | $0 (0% of salary) | $0 |
|---|---|---|---|
| Charles A. Hinrichs,**<br>Former Senior Vice<br>President and Chief<br>Financial Officer | 80% | $89,173 (21.3% of salary) | $0 |
| Steven C. Strickland,<br>Senior Vice President -<br>Container Operations | 100% | $142,800 (40% of salary) | $107,100 |
| Craig A. Hunt<br>Senior Vice President,<br>Secretary and General<br>Counsel | 100% | $163,400 (40% of salary) | $122,550 |

\*  Mr. Murphy joined the Company on May 18, 2009, and was not eligible to participate in the 2009 MIP for the
first semi-annual performance period.
\*\* Mr. Hinrichs' employment with the Company ended as of May 18, 2009, and he earned a pro-rata award under
the 2009 MIP for the period from January 1, 2009 through May 18, 2009.

> (b)     The 2009 LTIP.

The 2009 LTIP approved by the Incentive Plan Order provides market-based, potential
cash incentive bonuses for a group of approximately 50 employees whose top-level performance is
critical to the Company's success through the Chapter 11 cases (the "2009 LTIP Participants").
The 2009 LTIP is based upon a two-year plan cycle that runs from January 1, 2009 through
December 31, 2010 as set forth in the Incentive Plan Order, provided that the Company will pay
out earned 2009 LTIP incentive bonus as of the Effective Date, as described below.  In the event
that the Company has not implemented the 2009 LTIP prior to the Confirmation Date as
authorized by the Incentive Plan Order, it will adopt and implement it on the Confirmation Date
pursuant to the terms of the Plan.

Each 2009 LTIP Participant is eligible to receive a long-term cash incentive bonus target
award expressed as a percentage of base salary.  Consistent with the Incentive Plan Order, the
Company's NEOs' target level bonuses under the 2009 LTIP (expressed as a percentage of base
salary) are as follows:

| **Named Executive Officer** | **Target** |
|---|---|
| Patrick J. Moore,<br>Chairman and Chief Executive Officer | 375% |
| Steven J. Klinger,<br>President and Chief Operating Officer | 375% |
| John R. Murphy,*<br>Senior Vice President and Chief Financial Officer | 100% |

51

| Craig A. Hunt<br>Senior Vice President, Secretary and General Counsel | 150% |
|---|---|
| Steven C. Strickland,<br>Senior Vice President of Container Operations | 120% |

\* Mr. Murphy joined the Company on May 18, 2009, and is eligible to participate in the 2009 LTIP on a pro-rated basis based upon factors including his length of service during the plan cycle and the discretion of the Compensation Committee.  Mr. Murphy's predecessor, Mr. Hinrichs, is not eligible to participate in the 2009 LTIP due to the cessation of his employment on May 18, 2009.

Under the 2009 LTIP "payout curve" as approved pursuant to the Incentive Plan Order, 2009 LTIP Participants will receive an award at 50% of target for 85% "threshold" achievement of the performance objectives; 100% of target payout or 100% of "target" level achievement of the performance objectives; and 175% of target payout for 140% "maximum" achievement of the performance objectives.

The 2009 LTIP "Performance Target" will be comprised of (i) the average of the Debtors' actual performance over the two-year plan cycle compared to the Debtors' combined Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year) and (ii) achievement of restructuring goals that will be substantially comprised of total enterprise value or a substantially similar financial metric as provided in the Incentive Plan Order.  Fifty percent (50%) of each 2009 LTIP Participant's 2009 LTIP Performance Target will be based solely on the Debtors' performance relative to the combined Budgeted EBITDAR, and the remaining 50% will be solely based on the Debtors' achievement of restructuring goals.

        (i)        Budgeted EBITDAR Performance Target.

The 2009 LTIP Performance Target that is based on the combined Budgeted EBITDAR for 2009 and 2010 ~~is~~as set forth in <u>Exhibit 3</u> of the Plan.  Any earned awards based on the Company's performance relative to the Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year) will be paid at the end of the two-year plan cycle, unless the Confirmation Date occurs prior to the end of such plan cycle, in which case, the Company will pay, on the Effective Date, the pro-rata amount of the <u>financial performance portion of each participant's</u> 2009 LTIP Incentive Bonus (determined by the number of completed calendar days between January 1, 2009 and the Effective Date) based on the achievement as of the Confirmation Date of the Budgeted EBITDAR for the full calendar years 2009 and 2010 (pro-rated as appropriate for any partial 2010 calendar year).

        (ii)        Restructuring Goal Performance Target.

The restructuring goal portion of the 2009 LTIP Performance Target will be based upon improvements in the trading price of the Company's bonds relative to the trading prices of those bonds on the date that the Company commenced its chapter 11 cases (approximately $0.13) and

Case: 1:10-cv-03570-RLS Doc. 44-86 Filed 01/27/09 Page 71 of 92 PageID #:20527
Case: 1:10-cv-03570-RLS Doc. 44-86 Filed 01/27/09 Page 299 of 512 PageID #:20527
Case: 15-2385     Document: 56-26     Filed: 10/27/2015     Pages: 512

the date that the Bankruptcy Court entered the Incentive Plan Order approving the 2009 LTIP (approximately $0.25).

Each 2009 LTIP Participant will be entitled to receive a full maximum payment (without pro-ration) with respect to the restructuring goal portion of their LTIP incentive bonus, provided that the average trading price of the Company's bonds in the 30-day period prior to the Confirmation Date ("Average Bond Trading Price")[18][19] is not less than $0.50.  All earned LTIP incentive bonus payments will be made on the Effective Date or at such later time as set forth in the 2009 LTIP.

### 3.     Executive Agreements.

The Company's Board of Directors historically has approved customary employment agreements for certain senior executives of the Company, including the Chairman and Chief Executive Officer, the President and Chief Operating Officer, and for the former Senior Vice President and Chief Financial Officer, whose retention has been critical to the success of the Company.

These employment agreements generally provided that the executives will devote substantially all of their business time to the Company's operations through the term of each executive's respective Employment Agreement, unless sooner terminated by either party in accordance with the provisions thereof.  The executive is prohibited from disclosing the confidential information of the Company, diverting business opportunities or prospects from the Company; and, for two years following the termination of employment, competing with any business conducted by the Company or its affiliates, or soliciting any employees, customers or suppliers of the Company within the United States.  If the Company terminated the executive's employment  "without cause" or if the executive terminated his employment with "good reason", the Company would (i) pay the executive his expected compensation for the remainder of the term, (ii) continue the coverage under group insurance, pension, and other executive benefit plans through the end of the term, (iii) provide certain perquisites, (iv) continue to count the period through the end of the term for purposes of determining the executive's age and service with the Company for the benefit plans and vesting of equity-based compensation awards, and (v) provide outplacement services.  Furthermore, if the executive's employment is terminated "without cause" or the executive terminates his employment "for good reason" within twenty-four months following a "change of control" of the Company, the Company would make certain payments within the ten days following the termination of the employment

Recognizing the key roles of its senior vice presidents, generally, the Board of Directors also historically approved Employment Security Agreements which, among other things, provided lump-sum payments under certain circumstances following a "change of control" of the Company. These agreements were beneficial to the Company by providing for the continuity of service by these executive officers in the critical period surrounding a change of control transaction.

### 4.     Retirement Plans.

---

[18][19] The Average Bond Trading Price will be calculated using the weighted average of the closing trading prices of the Company's series of five publicly traded bonds over the 30-calendar-day period preceding the Effective Date.

Retirement benefits are provided to employees through savings and pension plans, which are generally described below.

(a)     Employee Savings Plans.

In the ordinary course of business the Company maintains a number of 401(k) savings plans (the "Employee Savings Plans") for the benefit of its United States employees. Additionally, the Company maintained savings plans for the benefit of the Canadian employees. These Employee Savings Plans generally provide for pre-tax salary deductions of eligible compensation, which amounts are generally deducted automatically from each participating employee's paycheck. Approximately 18,400 employees are eligible to participate in the Employee Savings Plans, and they contributed approximately $48 million of their own funds into the Employee Savings Plans during 2008. The Company also makes varying contributions, which are indexed to employee contributions to the Employee Saving Plans for certain participating employees. During 2008, the Company made contributions to the Employee Savings Plans in the amount of approximately $17 million.

(b)     Pension Plans.

The Company maintained two (2) defined benefit pension plans for United States employees and former employees. The Company further maintained four (4) non-qualified pension plans for United States employees and former employees. In Canada, the Company maintained six (6) registered pension plans and four (4) non-registered pension plans for the benefit of its Canadian employees and former employees.

The Company also makes contributions to ten (10) multi-employer pension plans pursuant to the collective bargaining agreements governing approximately thirty (30) of its facilities in the United States and Canada (the "Multi-Employer Plans"). The Company's Multi-Employer Plan contribution requirements vary by collective bargaining agreement and are generally based on a percentage of earnings as calculated on a shift, hourly, or weekly basis. The Multi-Employer Plan contributions are paid on a monthly basis, and the Company paid approximately $4 million in total contributions in such plans in 2008.

At December 31, 2008, the qualified defined benefit retirement plans maintained by the Company were under funded by approximately $900 million. The Company estimates that this level of under funding increased by approximately $140 million during the nine months ended September 30, 2009, due primarily to decreases in the discount rate assumptions used to determine the amount of plan benefit obligations, which were less than fully offset by positive returns on plan assets. The Reorganized Debtors will likely be required to make significant cash contributions to these plans under applicable U.S. and Canadian laws over the next several years following emergence from bankruptcy in order to amortize the existing under funding and satisfy current service obligations under the plans. These contributions will significantly impact future cash flows that might otherwise be available for repayment of debt, capital expenditures, and other corporate purposes. The Company currently estimates that these cash contributions under the United States and Canadian qualified plans will be approximately $75 million in 2010, and potentially up to approximately $105 million depending upon how unpaid Canadian contributions for 2009 are impacted by the Plan. The Company currently estimates that these contributions will

54

potentially be in the range of approximately $275 million to $325 million annually in 2011 through 2014, and will then decrease to approximately $220 million in 2015 and approximately $130 million in 2016, at which point almost all of the shortfall would be funded. The actual required amounts and timing of such future cash contributions will be highly sensitive to changes in the applicable discount rates and returns on plan assets, and could also be impacted by future changes in the laws and regulations applicable to plan funding.

### 5.  Other Post-Retirement Benefit Programs.

(a)  Health Care and Life Insurance Continuation

The Company maintains a self-insured plan that provides different levels of medical, dental and prescription drug programs to approximately 6,800 retired non-union and union former employees and approximately 60 retired former employees that receive such benefits through HMOs (collectively, the "Retiree Medical Benefits"). The Retiree Medical Benefits are administered though Blue Cross Blue Shield. The Company also maintains a retiree life insurance plan that is provided by a third party insurer (the "Retiree Life Insurance" and together with the Retiree Medical Benefits, the "Retiree Benefits"). The Retiree Life Insurance provides benefits to approximately 13,900 retired non-union and union former employees. The Company spends an average of $1.6 million on Retiree Medical Benefits per month and pays a monthly premium of $215,000 for the Retiree Life Insurance.

(b)  Severance Benefits.

Prior to the Petition Date and in the ordinary course of business, the Company maintained severance plans in the United States and allocated severance in Canada in accordance with Canadian law (the "Severance Programs") for all active, full-time non-union salaried employees and certain active, full-time hourly employees. Pursuant to the Severance Programs, employees become eligible for severance payments and benefits ("Severance") if (i) their employment was terminated without cause; and (ii) the employee has worked for the Company for at least thirty (30) days prior to termination. In the U.S., employees entitled to Severance generally receive one week of salary for each year of service with the Company, plus four additional weeks. In Canada, Severance varies depending on the employee's location, years of service and job responsibilities. The amount and duration of the employee's Severance depends on whether the employee signs a company-provided agreement containing, among other things, a waiver and release of claims.

In addition to the employees included in the Company's Severance Programs, the Company's union employees typically obtain severance payment and/or payments during specified notice periods prior to termination and heath care benefits (the "CBA Severance") pursuant to agreements (the "CBA Severance Agreements") negotiated between the Debtors and the unions in accordance with the governing collective bargaining agreements. The Company currently is providing CBA Severance pursuant to six (6) CBA Severance Agreements.

On February 23, 2009, the Bankruptcy Court entered an order permitting the Debtors to continue the Severance Programs in the ordinary course of business (the "Severance Continuation Order"). The Severance Continuation Order authorized the Debtors to pay for and provide all prepetition Severance relating to the Severance Programs in accordance with the Debtors'

prepetition policies and practices, and further authorized the Debtors to continue the Severance Programs in the ordinary course of business. The Severance Continuation Order did impose certain limitations, however. The Debtors are required to first seek Court approval before making any payment under the Severance Programs to an insider, as defined in the Bankruptcy Code, that would be subject to section 503(c)(2) of the Bankruptcy Code, and the Severance Continuation Order does not apply to any employees that are party to an executive severance plan or individual employment agreements or similar agreements that provide for severance.

**E.      Pre-Petition Debt and Capital Structure of the Company.**

Prior to the Petition Date, the Debtors funded their operations with four different types of debt financing. First, the Debtors arranged senior secured bank financing comprised of term loans and revolving credit facilities (the "Pre-Petition Secured Debt"). The aggregate amount of Pre-Petition Secured Debt outstanding as of the Petition Date was approximately $1.2 billion. Second, the Debtors issued long-term debt comprised of five series of unsecured notes, which had an aggregate principal amount outstanding of $2.275 billion (the "Senior Note Debt") as of the Petition Date. Third, the Debtors established two accounts receivable securitization facilities (the "Securitization Facilities") – one in the United States (the "U.S. Securitization Facility") and one in Canada (the "Canadian Securitization Facility"). As of the Petition Date, receivables sold by the Debtors (in which the Debtors have a residual interest) secured approximately $350 million and $30 million in obligations related to the U.S. Securitization Facility and the Canadian Securitization Facility, respectively.[1920] Finally, as of the Petition Date, the Debtors were obligated on approximately $284 million of tax-exempt utility systems bonds, industrial revenue bonds and similar bonds. Each of the Debtors' four primary types of pre-petition financing and the Debtors' other pre-petition obligations are described in greater detail below.

**1.      Pre-Petition Secured Debt Under the Pre-Petition Credit Agreement.**

Prior to the Petition Date, SSCE and its wholly-owned subsidiary, SSC Canada, were borrowers under that certain Credit Agreement, dated as of November 1, 2004, with JPMorgan Chase Bank and several other financial institutions (as amended, restated or modified from time to time, the "Prepetition Credit Agreement"), which established the Pre-Petition Secured Debt. The Prepetition Credit Agreement provided for (i) a revolving credit facility of $600 million to SSCE and (ii) a revolving credit facility of $200 million to SSCE and SSC Canada. The Prepetition Credit Agreement also provided for a Tranche B term loan to SSCE in the aggregate principal amount of $975 million, a Tranche C term loan to SSC Canada in the aggregate principal amount of $300 million, and a Tranche C-1 term loan to SSC Canada in the aggregate principal amount of $90 million. Certain letters of credit (for both U.S. and Canada) were issued under the Pre-Petition Credit Agreement.

In addition, the Prepetition Credit Agreement provided for a deposit funded facility (the "Prepetition Revolving Facility Letters of Credit") for approximately $120 million relating to the

---

[1920] After the Petition Date, the Debtors applied proceeds from the DIP Facility, as defined below, to defease the outstanding notes under the Securitization Facilities in order to regain ownership of the receivables.

variable rate industrial revenue bonds issued by SSCE relating to the Stevenson Facility (the "Stevenson Notes").[20][21]

As of the Petition Date, the Debtors were indebted under the Prepetition Credit Agreement (a) on account of loans made to SSCE, in the approximate aggregate principal amount of not less than approximately $746 million plus letters of credit issued in the approximate aggregate stated amount of not less than approximately $252.8 million,[21][22] plus, in each case, interest accrued and accruing, costs, expenses, fees, other charges, and other obligations, including, without limitation, on account of certain swap agreements (the "Pre-Petition U.S. Obligations"), and (b) on account of loans made to SSC Canada, in the approximate aggregate principal amount of not less than approximately $366 million, plus letters of credit in the approximate aggregate stated amount of not less than approximately $27.6 million, plus, in each case, interest accrued and accruing, costs, expenses, fees, other charges, and obligations, including, without limitation, on account of certain Swap agreements (the "Pre-Petition Canadian Obligations").

Pursuant to the Prepetition Credit Agreement, certain of the Debtors executed Guarantee Agreements and Security Documents (as defined in the Pre-Petition Credit Agreement) to secure the Pre-Petition Secured Debt. SSCE's Pre-Petition U.S. Obligations were unconditionally guaranteed by SSCC.[22][23] SSC Canada's Pre-Petition Canadian Obligations were unconditionally guaranteed by MBI Limited/Limitée, Smurfit-MBI, 3083527 Nova Scotia Company and Francobec Company (the "Pre-Petition Canadian Guarantors"), as well as SSCE and SSCC. Certain of the Debtors also granted security interests, mortgages and liens (the "Pre-Petition Liens") on personal and real property and the proceeds thereof (as described and defined as "Collateral"). The Pre-Petition U.S. Obligations are secured by those Pre-Petition Liens granted by SSCC and SSCE, as well as by the capital stock of SSCE and 65% of the capital stock of SSC Canada. The Pre-Petition Canadian Obligations are secured by those Pre-Petition Liens granted by SSC Canada and the Pre-Petition Canadian Guarantors, pledges of all of the capital stock of the Pre-Petition Canadian Guarantors, and the liens and stock pledges securing the Pre-Petition U.S. Obligations.

**2.    Senior Note Debt.**

SSCE is obligated under five separate series of unsecured notes (the "Prepetition Notes") with an aggregate principal amount of $2.275 billion:

(i) 8.375% unsecured notes in the aggregate principal amount of $400 million, due on July 1, 2012;

---

[20][21] After the Petition Date, the indenture trustee of the Stevenson Notes drew on the Prepetition Revolving Facility Letters of Credit to fully repay the Stevenson Notes. SSCE's obligations under the Stevenson Notes are described below in Section III.E.4.

[21][22] As of the Petition Date, none of the issued letters of credit had been drawn on.

[22][23] The Prepetition Credit Agreement also required SSCE's material domestic subsidiaries to guarantee SSCE's obligations under the agreement. However, as of the Petition Date, none of SSCE's domestic subsidiaries were deemed material for purposes of the agreement and none are obligated on a guaranty of SSCE's obligations under the agreement.

(ii) 8.25% unsecured notes in the aggregate principal amount of $700 million, due on October 1, 2012;

(iii) 7.50% unsecured notes in the aggregate principal amount of $300 million, due on June 1, 2013;

(iv) 7.375% unsecured notes in the aggregate principal amount of $200 million, due on July 15, 2014; and

(v) 8.00% unsecured notes in the aggregate principal amount of $675 million, due on March 15, 2017.

The 7.375% unsecured notes were issued by Stone FinCo II and were guaranteed by SSCE. Each of the other four series of Prepetition Notes was issued directly by SSCE or by a predecessor of SSCE.

### 3.     Securitization Facilities.

Prior to the Petition Date SSCE participated in  the $475 million U.S. Securitization Facility, pursuant to which it sold, on an ongoing basis and without recourse, certain of its accounts receivable to Stone Receivables, LLC ("SRC"), a wholly-owned non-consolidated subsidiary of SSCE.  SRC then transferred the receivables to a non-consolidated subsidiary, SSCE Funding, LLC (the "Securitization Issuer").  The Securitization Issuer in turn issued notes to third-party investors, pursuant to (a) that certain Master Indenture, dated as of November 23, 2004 (the "Indenture"), between the Securitization Issuer and Deutsche Bank Trust Company Americas, as Indenture Trustee (in such capacity, the "Securitization Trustee"), (b) that certain Series 2004-1 Indenture Supplement to Master Indenture, dated as of November 23, 2004 (the "Indenture Supplement"), between the Securitization Issuer and the Securitization Trustee, and (c) that certain Series 2004-2 Indenture Supplement to Master Indenture, dated as of November 23, 2004, between the Securitization Issuer and the Securitization Trustee, in each case, as amended, restated, modified or waived from time to time.  The notes issued pursuant to the Series 2004-2 Indenture Supplement have since been defeased.  The U.S. Securitization Facility was scheduled to mature on November 15, 2009.  As of the Petition Date, more than $485 million of receivables sold by SSCE into the U.S. Securitization Facility secured approximately $350 million in outstanding notes issued by the Securitization Issuer under the Indenture.

Additionally, prior to the Petition Date, SSCE, through its wholly-owned subsidiary Smurfit-MBI, also participated in the $70 million Canadian Securitization Facility, pursuant to which it sold, on an ongoing basis and without recourse, certain of its Canadian accounts receivable to an asset-backed commercial paper conduit (the "Canadian CP Conduit").[2324]  The Canadian Securitization Facility was scheduled to mature on March 31, 2009.  As of the Petition Date, over $52 million of receivables sold by SSCE into the Canadian Securitization Facility secured approximately $30.4 million in indebtedness and other obligations outstanding under the Canadian Securitization Facility.

---

[2324] The sale occurred pursuant to that certain Receivables Purchase Agreement, dated as of March 30, 2004, among MBI Limited/Limitée, as general partner of Smurfit-MBI, and certain other parties.

After the Petition Date, the Debtors applied certain of the proceeds of the DIP Facility (as defined below) to defease the outstanding notes under the Securitization Facilities, as authorized by the Court in an interim order approving the DIP Facility entered on January 27, 2009, in order to regain ownership of the receivables.

**4.      Utility and Industrial Revenue Bonds and Other Debt Obligations.**

SSCE is an obligor on approximately $284 million in aggregate principal amount of tax-exempt utility bonds, environmental improvement bonds, industrial revenue bonds and similar bonds issued by local government entities:

(i)    certain Series 1986 revenue bonds issued by the Industrial Development Board of the City of Stevenson (the "Stevenson IDB") in the aggregate principal amount of $7,165,000 due on November 1, 2016;

(ii)   certain Series 1996 revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on January 1, 2031;

(iii)  certain Series 1997 revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on June 1, 2032;

(iv)   certain Series 1998B revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $25,000,000 due on April 1, 2033;

(v)    certain Series 1998C revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $8,000,000 due on November 1, 2033;

(vi)   certain Series 1998D revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $4,950,000 due on November 1, 2011;

(vii)  certain Series 1999A revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $15,000,000 due on February 1, 2034;

(viii) certain Series 2000A revenue bonds issued by the Stevenson IDB in the aggregate principal amount of $10,000,000 due on October 1, 2035;

(ix)   certain Series 2003 revenue bonds issued by the Village of Hodge, Louisiana in the aggregate principal amount of $58,085,000, due on March 1, 2024;

(x)    certain Series 2005 revenue bonds issued by the City of Coshocton, Ohio in the aggregate principal amount of $30,000,000, due on August 1, 2013;

(xi)   certain Series 2005 revenue bonds issued by the Industrial Development Authority of the City of Hopewell, Virginia in the aggregate principal amount of $41,340,000, due on June 1, 2015;

(xii) certain Series 1996 revenue bonds issued by the Industrial Development Authority of the County of Navajo, Arizona (the "Navajo IDA") in the aggregate principal amount of $20,000,000, due on April 1, 2026; and

(xiii) certain Series 1997 revenue bonds issued by the Navajo IDA in the aggregate principal amount of $14,500,000, due on June 1, 2027.

The industrial revenue bonds described above in (i) through (vii) are secured by the Prepetition Revolving Facility Letters of Credit.

Additionally, in conjunction with its July 29, 2008 acquisition of Calpine Corrugated, LLC ("Calpine") – an independent corrugated container producer in Fresno, California, for which SSCC is the primary containerboard supplier – SSCE agreed to guarantee Calpine's outstanding funded bank debt. As of the Petition Date, Calpine's aggregate amount of debt guaranteed by SSCE was approximately $46 million.

**5.      Intercompany Debt.**

In the normal operations of the Company's businesses, the Debtors and certain of their non-debtor affiliates engage in various intercompany transactions. Certain receivables and payables among the Debtors and/or the Debtors and non-debtor subsidiaries of SSCC are evidenced by intercompany notes (the "Intercompany Note Claims"). In addition to Intercompany Note Claims, the Debtors and/or the Debtors and non-debtor subsidiaries of SSCC engaged in intercompany trading transactions which give rise to Claims between Debtors and/or Debtors and non-Debtor subsidiaries (the "Intercompany Trade Claims", and together with the Intercompany Note Claims, the "Intercompany Claims"). As a result, on any given date, there are numerous Intercompany Claims that reflect intercompany receivables and payables made and/or accrued in the ordinary course between and among the Debtors and between and among the Debtors and certain of their non-debtor affiliates (the "Intercompany Transactions"). These Intercompany Transactions include, but are not limited to:

Accounts Receivable, Accounts Payable and Payroll. In the ordinary course of business, the Debtors contribute cash and process disbursements through a centralized cash management system. Each of the Debtors, with the exception of Cameo Container Corporation, maintains its own separate accounts, all of which are managed at the corporate level. Occasionally, SSCE will fund disbursements and collect accounts on behalf of the other debtors, resulting in Intercompany Claims between the Debtors. The Debtors' accounts reflect the net position of both receipts and disbursements received or made on behalf of each Debtor. Prior to the Petition Date, such accounts were never settled in cash. From and after the Petition Date, such accounts, with the exception of the balance owing between SSCE and Cameo, are settled in cash on a monthly basis.

Centrally Billed Expenses. In the ordinary course of business, the Debtors and Stone Container de Mexico S. de R.L. de C. V. ("Stone Container Mexico"), a wholly-owned non-debtor subsidiary of SSCE, incur centrally billed expenses, such as employee medical costs, insurance premiums, certain taxes (including real

estate, franchise, sales taxes, etc.) and leased equipment. These charges are allocated among the Debtors and Stone Container Mexico and are reflected in the intercompany accounts.

<u>Corporate Expense Allocation.</u> Charges for corporate expenses provided by SSCE to the other Debtors are allocated among the Debtors based upon the cost of service provided, directly identifiable costs, and other allocation methods, in addition to a services fee payable to SSCE.

<u>Containerboard Sales.</u> In the ordinary course of business, SSC Canada sells containerboard from its mills to SSCE, with such sales resulting in a corresponding Intercompany Claim. Prior to the Petition Date, SSC Canada had a large Intercompany Claim owing from SSCE which was never settled in cash. From and after the Petition Date, such sales are settled in cash on a monthly basis.

<u>Containerboard Purchases.</u> In the ordinary course of business, SSCE sells containerboard, including that purchased from SSC Canada to certain of its Debtor and non-debtor affiliates, with such sales resulting in a corresponding Intercompany Claim. For example, SSCE regularly sells containerboard to Smurfit-Stone Puerto Rico, Inc., Stone Container Mexico, and Smurfit-MBI. The prices for such containerboard are determined by SSCE based on the prices applicable to certain third parties that purchase containerboard from SSCE on an arm's-length basis. Prior to the Petition Date, such intercompany purchases resulted in a corresponding Intercompany Claim which was never settled in cash. From and after the Petition Date, the Debtors have settled all such intercompany purchases in cash on a monthly basis.

Below is a summary of the net receivables or payables comprising, as applicable, the Intercompany Claims for each Debtor as of the Petition Date.

**Net I/C Balances (US$) as of January 25, 2009**

| | I/C Note Receivable/ (Payable) (1) | Other I/C Transactions Receivable/ (Payable) | Total Net Receivable/ (Payable) |
|---|---|---|---|
| **_U.S. Debtors Net I/C Balances_** | | | |
| Cameo Container Corporation | (76,899,599) | 118,956,524 | 42,056,925 |
| Smurfit-Stone Puerto Rico, Inc. | - | (8,229,063) | (8,229,063) |
| Smurfit Newsprint Corporation | - | 51,821 | 51,821 |
| Smurfit-Stone Container Enterprises, Inc. (SSCE) | **112,607,660** | **(214,697,924)** | **(102,090,264)** |
| _(To) From Stone de Mexico_ | 35,506,929 | (322,804) | 35,184,125 |
| _(To) From SSC Canada_ | (50,000,000) | (193,797,070) | (243,797,070) |
| _(To) From SMBI_ | - | 27,057,213 | 27,057,213 |
| _(To) From Cameo_ | 76,899,599 | (118,956,524) | (42,056,925) |

61

| | | | |
|---|---|---|---|
| *(To) From Calpine* | 50,201,132 | (6,840,899) | 43,360,233 |
| *(To) From Smurfit Newsprint Corporation* | - | (51,821) | (51,821) |
| *(To) From Smurfit-Stone Puerto Rico, Inc.* | - | 8,229,063 | 8,229,063 |
| *(To) From Stone International Services Corp* | - | 3,876,850 | 3,876,850 |
| *(To) From Stone Finance Company of Canada II* | - | 66,108,068 | 66,108,068 |
| Calpine Corrugated LLC | (50,201,132) | 6,840,899 | (43,360,233) |
| Stone International Services Corporation | - | (3,876,850) | (3,876,850) |
| ***Total US Debtor Net I/C Balances*** | **(14,493,071)** | **(100,954,593)** | **(115,447,664)** |
| | | | |
| ***Canadian Debtors Net I/C Balances*** | | | |
| | | | |
| SLP Partnership | 427,474,132 | - | 427,474,132 |
| Smurfit-Stone Container Canada Inc. (SSCCI) | **(257,557,534)** | **206,913,663** | **(50,643,871)** |
| *(To) From Nova Scotia* | 209,252,768 | 11,423,695 | 220,676,463 |
| *(To) From Smurfit-MBI* | (89,336,170) | - | (89,336,170) |
| *(To) From SSCE* | 50,000,000 | 193,797,070 | 243,797,070 |
| *(To) From Francobec* | - | 303,036 | 303,036 |
| *(To) From  605861 N B Inc.* | - | 1,389,862 | 1,389,862 |
| *(To) From Stone Finance Company of Canada II* | - | - | - |
| *(To) From SLP Partnership* | (427,474,132) | - | (427,474,132) |
| B.C. Shipper Supplies Ltd. | - | (1,696,793) | (1,696,793) |
| Specialty Containers Inc. | - | (408,374) | (408,374) |
| 605861 N B Inc. | - | (1,389,862) | (1,389,862) |
| Smurfit-MBI | **89,336,170** | **(24,952,046)** | **64,384,124** |
| *(To) From SSC Canada* | 89,336,170 | - | 89,336,170 |
| *(To) From SSCE* | - | (27,057,213) | (27,057,213) |
| *(To) From BC Shippers* | - | 1,696,793 | 1,696,793 |
| *(To) From Specialty Containers Inc.* | - | 408,374 | 408,374 |
| 3083527 Nova Scotia Company | (209,252,768) | (11,423,695) | (220,676,463) |
| Francobec Company | - | (303,036) | (303,036) |
| Stone Container Finance Co of Canada II | - | (66,108,068) | (66,108,068) |

| Total Canadian Debtors Net I/C Balances | 50,000,000 | 100,631,789 | 150,631,789 |
|---|---|---|---|
| _**Non-Debtors Net I/C Balances**_ | (35,506,929) | 322,804 | (35,184,125) |
| Consolidated Intercompany Balances | - | (0) | (0) |

_* The balances above do not reflect an amount of $200,677,778 issued by Stone FinCo II to SSC Canada in the form of equity._

Below is a summary of Intercompany Claims entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code.

**Intercompany 503(b)(9) Claims**

| Creditor | Debtor | Description | 503(B)(9) Amount |
|---|---|---|---|
| SSC Canada (La Tuque) | SSCE | Shipments from the La Tuque Mill received by SSCE container plants and warehouses | 1,873,481 |
| SSC Canada (La Tuque) | SSCE | Shipments from the La Tuque Mill received by SMBI container plants and warehouses (via CBM) | 341,166 |
| **SSCCI** | **SSCE** | | **2,214,647** |
| SSCE (CBM) | SMBI | Shipments from SSC Canada mills received by SMBI container plants and warehouses | 341,166 |
| SSCE (Mills) | SMBI | Shipments from SSCE mills to SMBI container plants | 14,087,733 |
| SSCE (Plants) | SMBI | Shipments from SSCE plants to SMBI plants | 595,086 |
| **SSCE** | **SMBI** | | **15,023,985** |
| SMBI | SSCE | Shipments from SMBI container plants to SSCE container plants | 625,572 |
| SMBI | SSCE | Shipments from SMBI container plants to SSCE Reclamation Division | 83,122 |
| **SMBI** | **SSCE** | | **708,693** |

## 6.    Trade Debt.

As of the Petition Date, the Debtors had accrued approximately $[365.0] million in trade debt (excluding amounts for payments by check dishonored post-petition and goods shipped or

services rendered pre-petition, but invoiced post-petition).[2425] These amounts, for goods and services, constitute a relatively small percentage of the Debtors' prepetition debt profile.

### 7.     Equity of SSCC.

SSCC currently has two classes of equity interests. SSCC's common stock has a par value of $0.01 per share with 400,000,000 shares authorized. As of September 30, 2009, SSCC had 256,658,958 shares of common stock issued and outstanding. SSCC's preferred stock is 7% Series A Cumulative Exchangeable Redeemable Convertible Preferred Stock with a par value of $0.01. As of September 30, 2009, 25,000,000 preferred shares were authorized, 4,599,300 preferred shares were issued and outstanding, and the aggregate liquidation preference was $116. The 7% Series A Cumulative Exchangeable Redeemable Convertible Preferred Stock is defined as an SSCC Preferred Interest under the Plan. The Plan contemplates that the SSCC Preferred Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged, and that the Holders of SSCC Preferred Interests will not receive any distribution on account of such SSCC Preferred Interests pursuant to the Plan (see Section V.C.2(f) below).

### F.     Restructuring Transactions and Post-Effective Date Debt and Capital Structure of the Company.

#### 1.     Restructuring Transactions.

On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in the Plan. Through such Restructuring Transactions, SSCC will be merged into SSCE (the "SSCC/SSCE Merger"), which will survive the merger and become Reorganized SSCC under the Plan ("Reorganized SSCC") and continue to be the ultimate parent company of each of the remaining reorganized Debtors (collectively, the "Reorganized Debtors") and of each of the remaining non-debtor subsidiaries of the Debtors. In addition to the SSCC/SSCE Merger, the Restructuring Transactions may include one or more other mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate to effect the purposes of such Restructuring Transaction for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Debtors or Reorganized Debtors. In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided by applicable law or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations. Exhibit 1314 to the Plan (to be filed with the Plan Supplement) shall set forth a detailed description

---

[2425] This amount does not include certain prepetition trade debt that has been satisfied through payments made pursuant to one of the "first day" motions described below in Section IV.A, "First-Day Relief in the Chapter 11 Cases."

of the actions and steps required to implement the Restructuring Transactions. A chart depicting the Company's planned post-Effective Date corporate structure is annexed hereto as Exhibit B-2.

## 2.  Post-Effective Date Equity in Reorganized SSCC.

Pursuant to the Plan, Reorganized SSCC will authorize the issuance of 150,000,000 shares, and will issue ~~approximately 1000,000,000~~100,000,000 shares, of new common stock (the "New SSCC Common Stock") for distribution to creditors as set forth herein, with eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of New SSCC Common Stock) reserved for issuance pursuant to the pertinent Management Incentive Plans. The New SSCC Common Stock will be subject to dilution as a result of further issuances thereof, including with respect to shares that may be issued under a management incentive plan. Reorganized SSCC will also authorize the issuance of 10,000,000 shares of preferred stock (the "New SSCC Preferred Stock").

As soon as practicable after the Effective Date, Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of the New SSCC Common Stock for trading on the New York Stock Exchange ("NYSE") or the NASDAQ Stock Market but will incur no liability if it is unable to do so.[25][26]

## 3.  Exit Facilities of Reorganized Debtors.

~~In order to, among other things, facilitate the consummation of the Plan, and to provide working capital for the business operations and general corporate purposes of the Reorganized Debtors, on or prior to the Effective Date, certain of the Debtors shall enter into such financing agreements and commitments as the Debtors, in consultation with the Committee and the CCAA Monitor, shall have arranged on or prior to the Effective Date, including term loans and revolving credit facilities (the "Exit Facilities"). The Exit Facilities may include back-to-back letters of credit that will be used to replace any unexpired letters of credit outstanding under the DIP Facility. Definitive documentation for the Exit Facilities will be filed in substantially the form attached as Exhibit 14 to the Plan, which shall be filed with the Plan Supplement.~~Securing exit financing will be a key component of the Plan and the Debtors' emergence from bankruptcy. The Debtors intend to use the exit financing to fund cash obligations under the Plan and for working capital for the Reorganized Debtors. The Debtors currently contemplate entering into an approximately $1.2 billion term loan facility (the "Exit Term Loan Facility") and an approximately $650 million revolving credit facility (the "Exit Revolving Facility" and with the Exit Term Loan Facility, the "Exit Facilities"), with funding under both Exit Facilities to occur on the Effective Date.

As described in Section V.G.13 below, the Bankruptcy Court authorized the Debtors to enter into the Arrangement Letter for the Exit Term Loan Facility on January 14, 2010. The

---

[25][26] Effective as of the opening of business on February 4, 2009, SSCC's common stock and preferred stock were delisted from the NASDAQ Global Select Market and the trading of these securities was suspended. SSCC's common stock and preferred stock are now quoted on the Pink Sheets Electronic Quotation Service under the ticker symbols "SSCCQ.PK" and "SSCJQ.PK," respectively.

Arrangement Letter provides that certain financial institutions party thereto will use commercially reasonable efforts to structure, arrange and syndicate the $1.2 billion Exit Term Loan Facility and will assist in obtaining commitments from prospective lenders in respect of the Exit Term Loan Facility.  It is anticipated that the Exit Term Loan Facility will have a six-year term and will be secured by first and second liens on substantially all of the Debtors' assets.  Various other key terms and provisions of the Exit Term Loan Facility are set forth in the Term Sheet filed with the Bankruptcy Court on January 12, 2010 [Docket No. 4097].  Since the January 14 hearing, the Debtors have been negotiating the definitive documentation for the Exit Term Loan Facility with the prospective lenders and expect to seek authority to execute the definitive documents, including a credit agreement, in February, 2010.  The definitive documentation for the Exit Facilities also will be filed as Exhibit 15 to the Plan, which will be filed with the Plan Supplement.

The Debtors also are in discussions with prospective lenders in connection with the Exit Revolving Facility.  The Debtors expect to return to the Bankruptcy Court in the weeks following approval of this Disclosure Statement to seek authority related to the Exit Revolving Facility.

G.      **Pending Litigation Against the Debtors.**

As a consequence of the Debtors' commencement of these Chapter 11 Cases, all pending claims and litigation against the Debtors in the United States have been automatically stayed pursuant to section 362 of the Bankruptcy Code.[26][27]

The Company is involved in various legal proceedings arising in the ordinary course of business, as well as certain litigation and tax matters.  The Company periodically assesses its liabilities and contingencies in connection with these matters based upon the latest information available to it.  Based on its review of the latest information available, the Company believes its ultimate liability in connection with pending or threatened legal proceedings will not have a material effect on its results of operations, cash flows or financial position.

As of the Petition Date, the Company had approximately 21 employment-related  actions filed against it, 70 employment-related administrative charges, as well as 11 environmental actions, 19 personal injury actions, and several other workers' compensation, union grievance, contract, tax, and asbestos- related actions.  A list of the litigation pending prior to the Petition

---

[26][27] On June 18, 2009, the Debtors filed a verified complaint in the Bankruptcy Court [Adv. Pro. No. 09-51067] against the plaintiffs in an ERISA lawsuit (the "ERISA Action") filed against certain key executives and officers of the Debtors seeking to hold them liable for alleged violations of their fiduciary duties in connection with the administration of the Company's employee savings plans.  The Debtors' verified complaint sought an extension of the automatic stay to the defendants in the ERISA Action, and in conjunction therewith, or in the alternative, temporary and preliminary injunctive relief with respect to the ERISA Action.  At a hearing on  November 4, 2009, the Court ordered that the automatic stay be extended to protect the Debtors' executives and officers named as defendants in the ERISA Action.  The Court stayed the ERISA Action for a period of 120 days and ordered a status hearing immediately prior to the conclusion of that period to consider whether the stay should remain in effect.  On January 19, 2010,  Mark W. Mayer, Larry C. Welsh and Brandi Young (the "ERISA Objectors") filed a DS Objection (as defined below) seeking clarification with respect their voting rights and the applicability of certain releases under the Plan and objecting to Plan treatment of Class 1D.  The Voting Procedures Order addresses the ERISA Objectors' concern relating to Ballot classification and amount.  Moreover, the Plan and Disclosure Statement make it clear that the third-party releases are optional,  and to the extent that the ERISA Objectors choose to opt-out of such releases, they will not apply to them.  Treatment of the Class 1D Claims is a plan confirmation objection.

Date is included in the Debtors' Schedules of Assets and Liabilities filed with the Bankruptcy Court on April 6, 2009.

The Debtors anticipate that, to the extent any of the pending litigation is not resolved prior to the Effective Date of the Plan or removed by the Debtors to federal court consistent with their powers under the Bankruptcy Code, such litigation will continue after the Effective Date in the forum(s) in which it was initiated. Any adverse judgment in any of these actions would constitute a Claim that will be treated in accordance with the provisions of the Plan, so long as such Claim was otherwise allowable because it complied with the applicable requirements of these Chapter 11 Cases and the Bankruptcy Code.

## H.  Events Leading up to Chapter 11.

The Company's financial performance depends primarily upon the market demand for its products and the prices that it receives for such products. The recent downturn in the global economy resulted in an unprecedented decline in demand for the Company's products, leading to increased inventory levels and downward pressure on the Company's operating income. At the same time, substantial price competition and volatility in the pulp and paper industry resulted in decreased prices for the Company's products which, coupled with the Company's leveraged financial position and the recent volatility in energy prices and the cost of raw materials, have adversely impacted the Company's financial performance. In addition dramatic changes in the capital markets adversely impacted the Company's prospects for refinancing its revolving credit and securitization facilities. Because of these factors, the Debtors found it necessary to commence these Chapter 11 Cases.

## IV.  EVENTS DURING THE PROCEEDINGS

On the Petition Date, the Debtors filed voluntary petitions for reorganization under the Bankruptcy Code in the Bankruptcy Court. The Debtors' bankruptcy cases have been assigned to United States Bankruptcy Judge Brendan L. Shannon and have been administratively consolidated under case number 09-10235 (BLS). Also on the Petition Date, following the commencement of the Chapter 11 Cases, certain of the Debtors – including SSC Canada, a wholly-owned subsidiary of SSCE, and the other Canadian Debtors – applied for protection from their creditors in Canada pursuant to the CCAA in the Canadian Bankruptcy Court. The CCAA Proceedings have been assigned to Justice Pepall and are being administered under court file number CV-09-7966-00CL.

## A.  First-Day Relief in the Chapter 11 Cases.

On the Petition Date, the Debtors also filed "first day" motions seeking authority to, among other things, (i) prohibit utility companies from discontinuing, altering, or refusing service, (ii) make tax payments to federal, state and local taxing authorities on an uninterrupted basis, (iii) pay certain pre-petition claims of shippers, warehousemen and other lien claimants; (iv) make payments to certain pre-petition creditors that are critical to the Debtors' uninterrupted operations; (v) continue pre-petition insurance programs and pay all premium installments outstanding in connection therewith; (vi) honor prepetition obligations to certain customers and brokers and continue customer programs; (vii) pay pre-petition wages and other benefits to their employees; (viii) continue use of their existing cash management system, bank accounts and business forms;

(ix) for authority to continue using cash collateral, and (x) extend time to file schedules of assets and liabilities. All of the Debtors' first-day motions were granted by the Bankruptcy Court in substantially the manner requested by the Debtors on an interim or final basis.

### 1.     Utility Services.

In connection with the operation of their business and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telephone service, data service, fiber transmission, waste disposal and other similar services (the "Utility Services"). Because uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts, the Debtors requested entry of (i) an interim order and (ii) a final order (a) prohibiting utility providers from altering, refusing, or discontinuing utility services, (b) providing that utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtors' establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtors' estimated monthly cost of Utility Services, and (c) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the utility providers (the "Utility Motion"). The Bankruptcy Court entered the interim order on January 27, 2009 and entered the final order on February 23, 2009.

### 2.     Payment of Federal, State and Local Taxes.

In the ordinary course of business, the Debtors incur certain sales, use, property, and other taxes and governmental charges (collectively, the "Taxes") that are payable directly to various state, local and foreign taxing authorities (collectively, the "Taxing Authorities") as such payments become due. On the Petition Date, the Debtors filed a motion seeking authority to pay the relevant Taxing Authorities (i) any pre-petition Taxes that have accrued, but were not yet due and owing or were not paid in full, as of the Petition Date and (ii) any pre-petition Taxes that arose prior to the Petition Date that become due and owing during the pendency of the cases in the ordinary course of business (the "Tax Motion"). The order, signed January 27, 2009, granted the Debtors the authority to pay any accrued and outstanding pre-petition Taxes up to an aggregate amount of $23,100,000.

### 3.     Shippers, Warehousemen and Other Lien Claimants.

The Debtors' supply and delivery system depends upon the use of reputable common carriers, dedicated carriers, rail carriers, less-than-truckload carriers, freight-forwarders, ocean carriers, parcel carriers, and non-asset based carriers (collectively, the "Shippers") as well as a network of third-party warehousemen who store goods in transit on behalf of the Debtors (the "Warehousemen"). In addition, the Debtors utilize the services of customs agents to facilitate the shipment of goods into and out of the United States. On the Petition Date, the Debtors sought authority to pay certain pre-petition claims held by Shippers and Warehousemen in amounts necessary or appropriate to (i) obtain releases of critical or valuable goods or equipment that may be subject to liens, (ii) maintain a reliable, efficient and smooth distribution system, and (iii) induce critical Shippers and Warehousemen and other lien claimants to continue to carry goods and equipment and make timely deliveries thereof. By an order dated January 27, 2009, the

Bankruptcy Court granted the Debtors the authority to satisfy the pre-petition claims of the Shippers and Warehousemen in an amount not to exceed $33 million.

### 4. Critical Trade Vendor Treatment and Payment of Priority Claims.

On the Petition Date, the Debtors sought the authority to pay the pre-petition claims of critical vendors that delivered essential goods or provided essential services to the Debtors prior to the Petition Date (the "Critical Vendor Motion"). The ability to pay critical vendors is essential because the Debtors need to ensure that they can continue to receive such goods and services to continue operating their businesses. The Bankruptcy Court entered an interim order dated January 27, 2009 granting the Critical Vendor Motion and authorizing the Debtors to pay critical vendors in a total amount not to exceed $50 million. The Court entered a final order dated February 23, 2009 (the "Critical Vendor Order"). Pursuant to the Critical Vendor Order, in return for payment of their pre-petition claims, such Critical Vendors were required to continue providing the Debtors with goods or services according to customary trade terms, or such other favorable trade terms as mutually agreed upon.

### 5. Continuation and Payment of Prepetition Insurance.

On the Petition Date, the Debtors filed a motion requesting the authority to continue performing their obligations under prepetition insurance policies and premium financing agreements (the "Insurance Motion"). By order dated January 27, 2009, the Bankruptcy Court authorized the Debtors to (i) make all post-petition installment payments under certain pre-petition insurance premium finance agreements as such installment payments come due, (ii) continue all of the Debtors' prepetition insurance programs in the ordinary course of business, and (iii) pay all prepetition obligations in respect thereof. The ability to continue payments under their policies was necessary to ensure that the Debtors maintained insurance coverage with respect to their business activities.

### 6. Customer Programs.

Prior to the Petition Date, and in the ordinary course of their business operations, the Debtors engaged in certain practices to develop and sustain a positive reputation with their customers and in the marketplace for their products (collectively, the "Customer Programs"). Additionally, the Debtors utilized the services of several independent brokers or broker groups (collectively, the "Brokers") in order to obtain new customers and maintain long-term customer relationships for certain of their products through various sale and distribution channels. Accordingly, the Debtors requested the entry of an order granting them the authority to (i) perform their pre-petition obligations related to the Customer Programs, (ii) continue, renew, replace, modify and/or terminate any of the Customer Programs without further application to this Court, (iii) maintain their relationships with the Brokers, and (iv) perform and pay certain pre-petition obligations the Debtors owe to the Brokers (the "Customer Motion"). The Bankruptcy Court granted the relief requested in the Customer Motion on January 27, 2009.

### 7. Employee Compensation and Benefits.

On the Petition Date, the Debtors filed a motion seeking court authority to (i) pay all prepetition wages, salaries, commissions and other compensation owed to the Debtors'

employees, (ii) pay all prepetition compensation owed to individuals who work regularly as the Debtors' independent contractors and temporary workers, (iii) reimburse all prepetition business expenses to employees, (iv) make all payments for which pre-petition payroll and tax deductions were made, (v) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course, and (vi) honor workers' compensation obligations, (vii) make all payments to third parties relating to the foregoing payments and contributions (the "Employee Wage Motion").  The Debtors sought this relief to minimize the personal hardship that the employees, independent contractors, and temporary workers will suffer if the pre-petition employee-related obligations are not paid when due, as well as to maintain morale and an essential workforce.  By order entered on January 27, 2009, the Bankruptcy Court granted the relief requested in the Employee Wage Motion in substantially the manner requested, except that the Bankruptcy Court held a hearing and authorized the Debtors to continue their severance plans on February 23, 2009.

###### 8.    Cash Management.

Prior to the Petition Date, the Debtors utilized a centralized cash management system to collect funds from their operations and to pay operating and administrative expenses (the "Centralized Cash Management System").  In order to, among other things, avoid administrative inefficiencies, the Debtors moved the Bankruptcy Court for an order (i) authorizing the continued use of the Centralized Cash Management System, (ii) authorizing continued use of existing bank accounts and business forms, (iii) authorizing the continuation of certain intercompany transactions, (iv) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis, and (v) granting administrative expense status to post-petition intercompany transactions (the "Cash Management Motion").  By an interim order signed January 27, 2009, and a final order entered on February 23, 2009, the Bankruptcy Court approved the Cash Management Motion and waived the requirements of section 345(b) on an interim basis.

###### 9.    Use of Cash Collateral.

In order to continue running its business in the ordinary course throughout the Chapter 11 Case, the Debtors sought an interim order on the Petition Date (i) authorizing Calpine, one of the Debtors herein, to use cash collateral in accordance with the terms of the budget set forth therein and (ii) granting adequate protection to pre-petition lenders pursuant to section 363 of the Bankruptcy Code (the "Calpine Cash Collateral Motion").  The relief sought in the Calpine Cash Collateral Motion was necessary as Calpine had an immediate and critical need to use the cash to maintain its business and pay related expenses.  The relief requested in the Calpine Cash Collateral motion was granted on an interim basis on January 27, 2009, a second interim order was entered on February 23, 2009 and a final order was entered on March 10, 2009.  On January 4, 2010, the Bankruptcy Court entered an order approving a stipulation extending Calpine's authority to use cash collateral through and including January 30, 2010.

###### 10.    Additional Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs.

On the Petition Date, the Debtors sought entry of an order granting the Debtors an extension of thirty (30) days (in addition to the thirty (30) day extension under Local Rule

1007-1(b)) to file their Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"), allowing the Debtors a total of sixty (60) days from the Petition Date to file their Schedules and Statements. The Bankruptcy Court granted the requested relief on January 27, 2009 and the Debtors filed their Schedules and Statements on April 6, 2009.

On August 26, 2009, SSCE filed an amended Schedule F. On October 10, 2009, SSCC, SSC Canada and Calpine Corrugated, LLC each filed an amended Schedule F. On October 15, 2009, SSCE again filed an amended Schedule F.

## B.     Relief in CCAA Proceedings.

On the Petition Date, certain of the Canadian Debtors brought a motion seeking the CCAA Initial Order. The CCAA Initial Order provides that the Canadian Debtors shall remain in possession and control of their current and future property and grants the CCAA Stay, which precludes any proceeding or enforcement process in any court or tribunal from being commenced or continued in respect of the Canadian Debtors or the CCAA Monitor (as defined below) or affecting the business or property, and stays and suspends any such proceedings currently under way, during the specified stay period (the "CCAA Stay Period"). By order of the Canadian Bankruptcy Court, the CCAA Stay Period has been extended to December 24, 2009. Among other things, the CCAA Initial Order also:

- appointed Deloitte and Touche Inc. to act as monitor for the Canadian Debtors (the "CCAA Monitor"). The CCAA Monitor is an officer of the Canadian Bankruptcy Court charged with monitoring the Canadian Debtors' property and the conduct of their business. The CCAA Monitor has the powers and obligations set out in the CCAA and in the CCAA Initial Order;

- authorizes the Canadian Debtors to continue to retain and employee their employees, consultants, agents, experts, accountants and counsel ("Assistants") with liberty to retain such further Assistants as deemed reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of the CCAA Initial Order;

- authorizes the Canadian Debtors to continue to utilize the Centralized Cash Management System;

- entitles, but does not require, the Canadian Debtors to pay certain expenses (whether incurred prior to or after the Petition Date), including (i) all outstanding future wages, salaries, employee and pension benefits and contributions, vacation pay, bonuses and expenses payable on or after the Petition Date, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements; (ii) the fees and disbursements of any Assistants retained in respect of the CCAA proceedings; and (iii) amounts owing for goods and services actually supplied to the Canadian Debtors, or to obtain the release of goods contracted for, prior to the date of the CCAA Initial Order, (A) by railways, trucking companies and other carriers and customs brokers, with the consent of the CCAA Monitor and the Canadian DIP Agent, and (ii) with the

consent of the CCAA Monitor and the Canadian DIP Agent, up to $11.6 million by other critical vendors;

- entitles, but does not require, the Canadian Debtors to pay all reasonable expenses incurred by them in carrying on the business in the ordinary course and in carrying out the provisions of the CCAA Initial Order;

- directs the Canadian Debtors to pay, until the delivery of written notice of repudiation, all amounts constituting rent under real property leases or as otherwise may be negotiated between the Canadian Debtors and the relevant landlords;

- directs the Canadian Debtors, except as permitted in the CCAA Initial Order or in the DIP Credit Agreement and other documents, until further order of the Canadian Bankruptcy Court: (i) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Canadian Debtors to any of their creditors as of the date of the CCAA Initial Order; (ii) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of their property; and (iii) to not grant creditor or incur liabilities except in the ordinary course of business;

- permits the Canadian Debtors, subject to the DIP Documents, to pursue an orderly restructuring of the business by (i) within certain limits, permanently or temporarily ceasing, downsizing or shutting down any of their business or operations and disposing of redundant or non-material assets; (ii) terminating the employment of such of their employees or temporarily laying off such of their employees as deemed appropriate; (iii) subject to the terms of the CCAA Initial Order, vacating, abandoning or quitting the whole but not part of any leased premises and/or repudiating any real property lease; (iv) repudiating such of their arrangements or agreements of any nature whatsoever, whether oral or written, as the Canadian Debtors deem appropriate; and (v) pursuing all avenues of refinancing and offers for material parts of the business or property, subject to prior Court approval before any material refinancing or sale;

- precludes any person during the CCAA Stay Period from discontinuing, failing to honor, altering, interfering with, repudiating, terminating or ceasing to perform any right, renewal right, contract, agreement, license or permit in favor of or held by the Canadian Debtors;

- restrains, during the CCAA Stay Period, all persons having oral or written agreements with a Canadian Debtor from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Canadian Debtors, subject to the terms set forth in the CCAA Initial Order; and

- authorized the Canadian Debtors to enter into the DIP Credit Agreement to borrow up to $350 million thereunder.

## C.     **Debtor-in-Possession Financing.**

### 1.     **Post-Petition Financing Needs.**

The Debtors required additional working capital financing in order to preserve and maintain their business.  The level of necessary additional borrowing was not limited to the Debtors' need for incremental working capital.  The Debtors also sought to replace the Securitization Facilities because both facilities would automatically "unwind" as a result of the Debtors' bankruptcy filings, and the Debtors would be denied access to the proceeds of approximately $537 million in accounts receivable unless and until the Securitization Facilities were satisfied.

### 2.     **The DIP Financing Motion and Orders.**

On the Petition Date, the Debtors requested entry of an order (i) authorizing Debtors to obtain post-petition financing; (ii) granting liens, including priming liens, and superpriority claims pursuant to 11 U.S.C. § 364; (iii) authorizing use of proceeds to effectuate payout of the Securitization Facilities; (iv) authorizing use of cash collateral pursuant to 11 U.S.C. § 363; and (v) granting adequate protection pursuant to 11 U.S.C. §§ 363 and 364.   The immediate access to sufficient post-petition financing and access to cash collateral was vital to the preservation of the Debtors' business and the success of the Debtors' reorganization.  On January 27, 2009, the Bankruptcy Court entered an interim order granting the relief requested and entered a final order on February 23, 2009.  On December 23, 2009, the Debtors filed a motion seeking the entry of an agreed order authorizing the continued use of pre-petition secured parties' cash collateral following the expiration of DIP Facility.  The Bankruptcy Court entered the agreed order on January 14, 2010.

### 3.     **The DIP Facility.**

Prior to initiating their pursuit of debtor-in-possession ("DIP") financing, the Debtors, with the assistance of their advisors, had pursued out-of-court financing.  Toward the end of 2008, the Debtors' advisors initially contacted approximately twenty-five (25) potential lenders regarding possible out-of-court financing.  It soon became apparent that the Debtors would not be able to secure out-of-court financing in the then current lending market in the time period available to the Debtors, particularly in light of their liquidity position and their significant leverage.  The Debtors and their advisors then pursued DIP financing.  The number of potential lenders who could meet their DIP financing requirements was limited due to the size and complexity (given the cross-border and securitization components) of the requested facility and because the DIP facility would require the priming of the prepetition Debt.

The Debtors determined that a proposed financing arrangement (the "DIP Facility") was the best, and only available and viable option.  The DIP Facility was established pursuant to that certain Credit Agreement (as amended, modified or supplemented in accordance with the terms of the Interim Order, the "DIP Credit Agreement") by and between SSCE and SSC Canada, SSCC, the other Loan Parties thereto, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (the "U.S. DIP Agent"), JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian administrative agent and Canadian collateral agent ("Canadian DIP Agent", collectively with the

U.S. DIP Agent, the "DIP Agents"), and the Lenders party thereto (the "DIP Lenders", collectively with the DIP Agents, the "DIP Secured Parties"). The DIP Facility was established to provide the Debtors with much needed liquidity to fund their operating, working capital, and capital expenditure needs during the course of the Chapter 11 Cases, as well as the retirement of obligations owing in connection with the Securitization Facilities.

The DIP Credit Agreement provided for borrowings up to an aggregate amount of US$750 million, consisting of (i) a US$400 million U.S. term loan for borrowings by SSCE; (ii) a US$35 million Canadian term loan for borrowings by SSC Canada; (iii) a US$250 million U.S. revolving loan for borrowings by SSCE and/or SSC Canada; and (iv) a US$65 million Canadian revolving loan for borrowings by SSCE and/or SSC Canada. SSCE and the U.S. Debtors (other than SMBI, Inc.) (collectively, the "U.S. Guarantors") and SSC Canada guaranteed all of the obligations under the DIP Facility and the Canadian Debtors (other than SSC Canada) and SMBI, Inc. (collectively, the "Canadian Guarantors") guaranteed the obligations of SSC Canada as borrower under the DIP Facility.

The DIP Facility grants, inter alia, (i) with respect to SSCE, the U.S. Guarantors and SSC Canada, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim for all of the obligations under the DIP Facility payable from and having recourse to all pre-petition and post-petition property of the estates of SSCE, the U.S. Guarantors and SSC Canada and all proceeds thereof; and (ii) with respect to the Canadian Guarantors, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim for all of the Canadian obligations under the DIP Facility payable from and having recourse to all pre-petition and post-petition property of the estates of Canadian Guarantors and all proceeds thereof. The Debtors granted a perfected first priority lien on all unencumbered property of the Debtors and granted a perfected junior lien on all property of the Debtors that is subject to valid, perfected and unavoidable liens in existence on the petition Date. Additionally, the Debtors granted a perfected first priority, senior priming lien an all property of the Debtors that is subject to existing liens which secure the obligations of the Debtors under the Pre-Petition Credit Agreement and other liens, obligations, or indebtedness junior to the Pre-Petition Credit Agreement.

**D.      Appointment of Creditors' Committee.**

On February 5, 2009, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee. The Committee is comprised of the following parties: (i) Wilmington Trust Company, as Successor Indenture Trustee; (ii) United Steelworkers; (iii) Pension Benefit Guaranty Corporation; (iv) UMB Bank, N.A.; (v) Aegon USA Investment Management; (vi) Corn Products International; and (vii) Voith Paper Fabrics US Sales, Inc. On or about April 27, 2009, Wilmington Trust Company determined that it had to resign as indenture trustee for the 7 3/8 7.375% Senior Notes due July 15, 2004 and, upon its resignation, Manufacturers and Traders Trust Company ("M&T") was appointed as successor indenture trustee for the 7 3/8 7.375% Notes effective May 7, 2009. M&T was thereafter appointed as an *ex officio* member of the Committee.

The Committee applied for an order authorizing the retention of Kramer Levin Naftalis & Frankel, LLP ("Kramer Levin") as its counsel under section 328(a) and 1103 of the Bankruptcy Code on March 5, 2009. The order approving Kramer Levin's retention was entered on March 23,

2009.   In addition, the Committee also filed an application to retain Pachulski Stang Ziehl & Jones LLP ("PSZJ") as Delaware bankruptcy co-counsel on March 10, 2009.  The order approving PSZJ's retention was signed on or about April 2, 2009.  To further assist them in carrying out their duties, the Committee also retained the following professionals with the Bankruptcy Court's approval: (i) FTI Consulting, Inc., as financial advisors; (ii) Houlihan Lokey Howard & Zukin Capital, Inc., as financial advisors and investment banker; and (iii) Bennett Jones, LLP, as Canadian Counsel.

On March 6, 2009, the Committee filed a motion to: (i) limit creditor access to confidential information *nunc pro tunc* to February 5, 2009; (ii) establish related procedures pursuant sections 105(a), 1102(b)(3) and 1103(c) of the Bankruptcy Code; and (iii) to retain Kurtzman Carson Consultants LLC as website administrative agent (the "Information Protocol Motion").  The order approving the Information Protocol Motion was entered on March 23, 2009.

**E.     Professional Retention.**

The Debtors applied for an order authorizing the retention of Sidley Austin LLP ("Sidley") as their general reorganization and bankruptcy counsel under section 327(a) of the Bankruptcy Code on February 5, 2009 (the "Sidley Retention").  The order approving the Sidley Retention was entered on February 23, 2009.

The Debtors also filed an application to retain Young Conaway Stargatt & Taylor, LLP ("YCST") as Delaware bankruptcy co-counsel in these Chapter 11 Cases (the "YCST Retention").  The YCST Retention was filed on February 19, 2009 and the application was approved by an order entered on March 6, 2009.

Additionally, the Debtors filed an application to retain Armstrong Teasdale, LLP as special counsel to the Debtor.  The application was filed on February 5, 2009 and the application was approved by an order entered on February 23, 2009.

The Debtors filed an application to retain Lazard Fréres & Co., LLC ("Lazard") as their investment banker and financial advisors (the "Lazard Retention") on February 5, 2009.  The order approving the Lazard Retention was entered on February 23, 2009.

To further assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases, the Debtors also retained the following professionals with the Bankruptcy Court's approval: (i) Epiq Bankruptcy Solutions, LLC, as claims, noticing, and Balloting agent; (ii) PricewaterhouseCoopers, LLP, as financial advisors and tax advisors; (iii) Ernst & Young LLP, as auditors, tax advisors, and risk advisory services provider; (iv) Hewitt Associates LLC, as compensation consultants; (v) State Tax Solutions LLC, as special counsel for the recovery and recoupment of excessive tax payments; (vi) The Levin Group LP, as strategic and financial advisors; (vii) Studley, Inc., as real estate broker; (viii) Grubb & Ellis Co., as real estate broker; and (ix) KPMG LLP, as fresh start valuation consultants.  The Debtors have retained Stikeman Elliott LLP as their Canadian Counsel.

In addition, the Debtors filed a motion seeking authorization to retain, employ, and compensate certain professionals utilized in the ordinary course of the Debtors' business (the

"Ordinary Course Motion").  The Ordinary Course Motion was approved by order entered February 23, 2009.

On June 19, 2009, the Bankruptcy Court entered an order (i) appointing Warren H. Smith & Associates, P.C. as the fee auditor, effective *nunc pro tunc* as of May 19, 2009, to act as special consultant to the Bankruptcy Court for professional fee and expense review and analysis and (ii) establishing uniform procedures for the review, allowance and payment of fees and expenses of (a) all professionals employed pursuant to section 327, 328, 1103 or 1106 of the Bankruptcy Code, including professionals retained by the Debtors and by the Committee, (b) all members of the official committees, and (c) any claims for reimbursement of professional fees and expenses under section 503(b) of the Bankruptcy Code, to ensure compliance with section 330 of the Bankruptcy Code and other applicable rules and guidelines.

On December 16, 2009, the Bankruptcy Court entered an order approving the Debtors' retention of Spencer Stuart as search consultant under section 327(a) and 328(a) of the Bankruptcy Code, nunc pro tunc to October 2, 2009 (the "Spencer Stuart Retention).  As the unsecured creditors will be the future owners of the reorganized Debtors, the Committee and the Debtors have agreed to allow certain members of the Committee to actively participate in identifying, interviewing and selecting qualified candidates for the board of directors of Reorganized SSCC.  Spencer Stuart will assist the Debtors and Committee in their search for seven independent directors to serve on the board of directors of Reorganized SSCC.  The identity of the seven independent directors will be disclosed in a Plan Supplement.  On or promptly after the Effective Date, the initial Board of Directors of Reorganized SSCC shall select a non-executive Chairman of the Board of Directors of Reorganized SSCC; provided, however, that nothing in the Plan or in the Amended and Restated Certificate of Incorporation shall prohibit any officer of Reorganized SSCC from serving as an executive Chairman of the Board of Directors of Reorganized SSCC after the Effective Date.

## F.    **Cross-Border Insolvency Protocol.**

To facilitate coordination between the Chapter 11 Cases and the CCAA Proceedings, the Debtors filed a motion seeking approval of a Cross-Border Insolvency Protocol (the "Protocol"). The Bankruptcy Court entered an order approving the Protocol on March 10, 2009.  The Canadian Debtors also submitted the Protocol to the Canadian Bankruptcy Court, and the CCAA Monitor recommended that the Canadian Bankruptcy Court approve the Protocol on March 6, 2009.  The Protocol provides that its purpose is to effectuate an orderly and efficient administration of the Chapter 11 Cases and CCAA Proceedings (collectively, the "Proceedings") and to maintain the respective independent jurisdiction of the Canadian Bankruptcy Court and the Bankruptcy Court. The Canadian Bankruptcy Court shall have sole and exclusive jurisdiction over the CCAA Proceedings, and the Bankruptcy Court shall have sole and exclusive jurisdiction over the Chapter 11 Cases.  The Bankruptcy Court and the Canadian Bankruptcy Court may coordinate activities, communicate with one another and conduct joint hearings.  The Protocol provides that any creditors or other interested parties have the right to be heard in the Canadian Bankruptcy Court or the Bankruptcy Court as if the party was domiciled in the forum country, subject to any local rules or regulations generally applicable to all parties appearing in the forum, provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the relevant

court.  An appearance by the Committee in the CCAA Proceedings, however, shall not form a basis for personal jurisdiction in Canada over the members of the Committee.

**G.      Substantive Matters in the Proceedings.**

    **1.      Exclusive Procedures for Section 503(b)(9) Claims.**

By its order dated March 10, 2009, the Bankruptcy Court entered an order establishing and implementing exclusive, global procedures for the allowance of claims under 11 U.S.C § 503(b)(9) relating to goods received within 20 days prior to the Petition Date (the "503(b)(9) Order").  Pursuant to the 503(b)(9) Order, all creditors asserting claims under 11 U.S.C. § 503(b)(9) must have done so prior to the Bar Date (defined below).  The Debtors have filed initial responses to the majority of asserted 503(b)(9) claims and continue to work with claimants to resolve disputes.

    **2.      Claims Reconciliation.**

The Debtors continue to actively reconcile and respond to claims in the Chapter 11 Cases and CCAA Proceedings.  In the Chapter 11 Cases, the Debtors have filed their first (non-substantive), second (non-substantive), third (non-substantive), fourth (substantive), fifth (non-substantive), sixth (substantive), seventh (non-substantive) and eighth (substantive) omnibus objections to claims on September 18, 2009, October 19, 2009, November 18, 2009, December 15, 2009 and January 15, 2010.  Furthermore, in the CCAA Proceedings, the CCAA Monitor continues to distribute Notices of Revision or Disallowance with respect to claims.

    **3.      2. Extension of Time to Remove Actions.**

Pursuant to an order entered on May 5, 2009, the Bankruptcy Court extended the time within which the Debtors may seek to remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rules 9027 and 9006 (the "Removal Period") through August 24, 2009.  On August 21, 2009, the Debtors filed a motion seeking to further extend the Removal Period, and on September 9, 2009, the Bankruptcy Court entered an order further extending the Removal Period through December 22, 2009.  On December 21, 2009, the Debtors filed their third motion to further extend the Removal Period.  This motion is set to be heard by the The Bankruptcy Court at the approved such motion on January 14, 2010 omnibus hearing. 2010.

    **4.      3. Executory Contracts and Unexpired Leases.**

On February 23, 2009, the Bankruptcy Court entered an order approving the Debtors' first omnibus motion to reject executory contracts and unexpired leases, which authorized the rejection of approximately sixty-nine (69) executory contracts and twelve (12) leases of vacant office and plant space, resulting in annual cost savings to the Debtors of over $3 million.  Since that time, the Bankruptcy Court has entered orders approving the Debtors' second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth and, sixteenth, seventeenth and eighteenth omnibus motions to reject executory contracts and unexpired leases, on March 10, 2009, March 23, 2009, April 7, 2009, April 21, 2009, May 5, 2009, May 20, 2009, June 4, 2009, June 19, 2009 July 8, 2009, August 17, 2009, September 8, 2009, September 30, 2009, October 19, 2009, November 16, 2009 and 2009, December 16, 2009, 2009, December 28,

2009 and January 12, 2010, respectively, resulting in the rejection of approximately seventy-nine (79) additional unexpired leases and the rejection of approximately one hundred nine (109 forty eight (148) additional executory contracts., thus far, with the rejection of an additional six (6) unexpired leases and thirteen (13) executory contracts set for hearing on January 29, 2010.

On April 15, 2009, Debtors filed a motion requesting a ninety (90) day extension of the deadline for the Debtors to assume or reject their remaining leases of nonresidential real property. The Bankruptcy Court approved the motion by order entered on May 7, 2009 and extended the time to assume or reject leases of nonresidential real property through and including August 24, 2009. On August 19, 2009 the Bankruptcy Court entered an order authorizing the Debtors to assume approximately one hundred twenty (120) unexpired leases of non-residential real property.

    **5.**    4. **Asset Sales.**

    (a)    1424 S. Raymond Avenue, Fullerton, California

On June 5, 2009, the Debtors filed a motion seeking the Bankruptcy Court's approval of the sale of that certain real property located at 1424 S. Raymond Avenue, Fullerton, California (the "Fullerton Property"), free and clear of all liens, claims and encumbrances (except for certain permitted exceptions) to Western Realco, LLC for $8,250,000.00, or to any bidder who presented a higher and better offer. The Fullerton Property was owned by SSCE and was no longer being used in the Debtors' business operations. The Fullerton Property consists of 14.91 acres and contains approximately 192,500 square feet of existing structures in addition to several concrete loading platforms, all of which would require demolition. The purchase agreement between Western Realco, LLC and SSCE provided that Western Realco, LLC would pay $8,250,000 in cash for the Fullerton Property. The Debtors established procedures whereby other parties could submit higher and better bids for the Fullerton Property, however no other parties submitted bids for the property. The Bankruptcy Court entered an order approving the sale of the Fullerton Property on July 6, 2009, and entered an amended order approving the sale on July 8, 2009.

    (b)    Canadian Timberlands

On July 30, 2009, the Debtors filed a motion seeking (i) the Bankruptcy Court's approval of a sale of approximately 962,204 acres of timberlands located in Québec, Canada (the "Timberlands") and (ii) authorization to (a) enter into and perform all of the Debtors' obligations under the asset purchase agreement, (b) assume and assign certain executory contracts and unexpired leases, (c) share a portion of the sale proceeds with AbitibiBowater Inc. ("Abitibi"), (d) enter into a wood fiber supply agreement with Abitibi, (e) pay all related transaction costs, and (f) reject certain existing wood supply agreements with Abitibi (the "Timberlands Motion"). SSC Canada, the owner of the Timberlands, proposed to sell the Timberlands and certain related assets and operations, free and clear of all rights, claims, liens, security interests and other encumbrances, to Société générale de financement du Québec, an investment arm of the provincial government of Québec for CAD$60,400,000 (based on the exchange rate reported for July 29, 2009, approximately US$55,374,720). The Canadian Debtors also sought approval of this transaction in the CCAA Proceedings on July 30, 2009.

The purchase agreement for the Timberlands required the Debtors to terminate the existing cutting and harvesting agreements between the Debtors and Abitibi and required Abitibi to release the Debtors from all obligations going forward. To replace the terminated agreements, SSCE, SSC Canada and Abitibi proposed to enter into a wood fiber supply agreement to ensure a supply of wood fiber for SSC Canada's paper mill located in La Tuque, Québec. Additionally, the Debtors proposed to share with Abitibi fifty percent (50%) of the net proceeds of the sale derived from a portion of the Timberlands representing approximately ninety-eight percent (98%) of the total surface area (approximately CAD$28 million). Abitibi held a right of first refusal in connection with a sale of that portion of the Timberlands, and agreed to waive the right of first refusal in exchange for a share of the sale proceeds attributable to that portion of the Timberlands. The Bankruptcy Court entered an order approving the Timberlands Motion on August 14, 2009, and the Canadian Bankruptcy Court approved the Timberlands Motion on August 17, 2009. The sale of the Timberlands closed on September 11, 2009, and the proceeds of the sale were received on October 23, 2009, except for $1 million held in escrow pending the satisfaction of certain title matters relating to a small number of parcels included in the transaction, which is expected to be released by the end of January 2010. The proceeds were then applied on October 26, 2009 to pay down portions of the Canadian term loan issued under the DIP Facility.

(c)     De Minimis Asset Sales

In order to establish a framework to effect sales and other dispositions of relatively modest value, the Debtors filed a motion to set procedures for the sale, transfer or abandonment of de minimis assets ("De Minimis Sales Motion"). Pursuant to an order of the Bankruptcy Court approving the procedures set forth in the De Minimis Sales Motion, dated March 11, 2009 (the "De Minimis Sales Order"), the Debtors have pursued several such asset sales.[2728] The De Minimis Sales Order provides that, for transactions with a selling price equal to or less than $500,000, the Debtors are authorized to consummate the sale without providing notice to interested parties and without the need for any further authorization from the Bankruptcy Court so long the Debtors determine that the transaction is in the best interests of their estates and otherwise complies with the De Minimis Sales Order, and so long as the sale is consistent with the terms of the DIP Facility.

The De Minimis Sales Order further provides that, for transactions with a selling price greater than $500,000 but less than or equal to $5 million, the Debtors are authorized to consummate the sale without further authorization of the Bankruptcy Court after the Debtors provide at least five business days written notice of each sale to certain notice parties. If there are no written objections filed within the five business day notice period, the Debtors are authorized to immediately consummate such sale after the entry of an order approving such sale under certification of counsel. If written objections are filed, the sale will only proceed upon either the consensual resolution of the objection or further order of the Bankruptcy Court after notice and a hearing.

The Debtors filed their quarterly reports of such sales on April 22, 2009, July 30, 2009, and October 30, 2009. As reported in the first quarterly report, second quarterly report and third quarterly report, the Debtors have reported fifty-four (54) sales of equipment, trailers, a

---

[2728] The CCAA Initial Order similarly provides for the sale, transfer or abandonment of de minimis assets, not to exceed CAD$2,000,000 for any one transaction or CAD$25,000,000 in the aggregate.

warehouse, and other assets pursuant to the procedures for transactions with a selling price equal to or less than $500,000. Additionally, the Debtors have sold certain property pursuant to the procedures for transactions with a selling price greater than $500,000 but less than or equal to $5 million. Under such procedures, the Debtors sold or have received authority to sell the following assets: (i) a mill in Carthage, Indiana, (ii) real property in St. Joseph, Missouri, (iii) Coastal Particulate Matter less than 10 microns (PM10) Short Term Emission Reduction Credits, (iv) real property in Fresno, California, (v) a sawmill business in Homerville, GA, (vi) real property in New Richmond, Quebec, Canada; (vii) real property in Portage-du-Fort, Quebec, Canada, (viii) real property in Edmonton, Alberta, Canada, (ix) real property in Bathurst, New Brunswick, Canada, and (x) real property in Whitby, Ontario, Canada. The Debtors are in the process of obtaining authority from the Bankruptcy Court to sell real property in Murfreesboro, Tennessee pursuant to these procedures.

### 6.     Ontonagon, MI and Missoula, MT Mill Closures.

In December, 2009, the Debtors announced they would be closing their medium mill in Ontonagon, Michigan (the "Ontonagon Mill") and their linerboard mill in Missoula, Montana (the "Missoula Mill"), effective as of the end of 2009. The Ontonagon Mill was already temporarily shut down at the time of the announcement, and the Missoula Mill ceased production in early January. In the weeks following the announcement of the Ontonagon Mill closure, the Bankruptcy Court received several hundred letters from employees, Ontonagon residents and government officials regarding the closure and expressing concern over the economic and environmental ramifications of the closure, and the possibilities for future use of the remaining land and structure.

The Ontonagon Mill and Missoula Mill closures were ordinary course transactions which did not require Bankruptcy Court approval. However, in response to the numerous letters received, on January 14, 2010, a status conference was held regarding the Ontonagon Mill closure. At the status conference, the Debtors explained that during the course of the chapter 11 cases, the Debtors conducted a series of successive temporary mill shutdowns, including at the Ontonagon Mill. As part of this overall strategy, the Ontonagon Mill was shut down for a significant portion of 2009. The Ontonagon Mill and the Missoula Mill were two of the highest cost mills in the Debtors' system. The Debtors, after exercising their business judgment, determined that it was in the best interests of the Debtors' estates that the Ontonagon Mill and the Missoula Mill be permanently closed because of the significant positive impact of such closures on future earnings, which are incorporated into the Debtors' Projections set forth in this Disclosure Statement. The Committee concurred that the closures were an appropriate exercise of the Debtors' business judgment. The Debtors will continue to consider and explore alternative transactions with respect to the Ontonagon Mill and the Missoula Mill post confirmation of the Plan. The Committee supports the Debtors' efforts to explore alternative transactions. The Debtors do not believe that the sale of either facility is critical to the Plan.

The Debtors have worked closely with the Michigan and Montana environmental regulatory agencies since officially announcing the closures of these mills. The Debtors have developed plans to ensure that all measures were taken so that no adverse environmental consequences result from the closures, and are in the process of completing all necessary activities in that regard.

In addition to discussions with the environmental regulators the Debtors have had conversations with various federal, state and local elected officials in both Michigan and Montana to ensure that full information was provided regarding the closure. The Debtors also conducted negotiations with the United Steelworkers Union regarding closure, ultimately reaching an agreement regarding severance and other benefits at both facilities.

The Debtors received disclosure statement objections from the County of Ontonagon, Township of Ontonagon and Village of Ontonagon [Docket No. 4224], The Flower Garden, LLC [Docket No. 4264], Aspirus Ontonagon Hospital [Docket No. 4404] and Ontonagon County Historical Society regarding the closure of the Ontonagon Mill. Furthermore, the Debtors received an objection from the Missoula Area Economic Development Corporation [Docket No. 4376], which was joined by the Attorney General of the State of Montana [Docket No. 4403] and a number of letters from Missoula-area citizens regarding the closure of the Missoula Mill. These objections and letters generally requested that the Debtors provide their creditors with fulsome information regarding the decision to close the Ontonagon Mill and the Missoula Mill. The Debtors have inserted this section IV.G.6 in response to these objections.

**7. 5. Hodge Trustee's Motion for Payment of Administrative Expenses and Disclosure Statement Objection.**

On April 24, 2009, U.S. Bank Trust National Association, as Indenture Trustee (the "Hodge Trustee") for the Village of Hodge Louisiana Combined Utility System Bonds filed a motion (the "Hodge Admin Motion") seeking entry of an order (i) allowing an administrative expense priority claim against SSCE's estate in the amount of not less than $17,599,249.23; and (ii) compelling the Debtors to immediately pay the outstanding obligations due and owing associated with the administrative expense claim.

The Debtors operate a paper manufacturing facility located in Hodge, Louisiana (the "Hodge Mill"). In connection with the manufacturing operations of the Hodge Mill, the Debtors use large amounts of electricity, steam, water, and treatment and disposal services for sewage and industrial waste (the "Contract Services"). The Debtors receive the Contract Services pursuant to the terms of a Utility Contract dated as of March 1, 1972, by and between SSCE and the Village of Hodge, as amended on January 1, 1990, and December 1, 2003 (the "Utility Contract"). In consideration of for receiving the Contract Services, the Debtors are required to pay the Village of Hodge the amounts set forth under in the Utility Contract. The Hodge Trustee asserts that the Debtors have refused to pay the amounts that have come due after the Petition Date under the Utility Contract.

On May 14, 2009, the Debtors filed an opposition to the Hodge Trustee's Admin Motion. The Debtors submit that the Debtors have continued believe they have paid and continue to pay all of the costs relating to the actual operation and maintenance of the utility facilities. The Debtors have not paid the debtor service portions of the utility contract that are for the benefit of the bondholders certain of the obligations owed under the Utility Contract, because the Debtors believe that such amounts are not administrative expenses and do not benefit the estate. The Hodge Trustee disputes the contentions of the Debtors. The Bankruptcy Court entered a Scheduling Order applying to this contested matter the Hodge Admin Motion on July 7, 2009. On November 13, 2009, the Debtors filed a motion for summary judgment on this matter. On

81

November 23, 2009, the Hodge Trustee filed a cross-motion for summary judgment ~~on this matter~~. On December 2, 2009, the Bankruptcy Court entered an Agreed Revised Scheduling Order ~~with respect to this matter~~.  On December 8, 2009 the Debtors filed a brief opposing the Hodge Trustee's cross-motion for summary judgment and in support of their brief for summary judgment. On December 15, 2009, the Hodge Trustee filed a reply brief in further support of its cross-motion for summary judgment.  A hearing on the parties' cross-motions for summary judgment ~~will be~~was conducted on January 6, 2010.  The Bankruptcy Court has yet to issue a ruling on this matter.

On January 22, 2010, the Hodge Trustee filed an objection to the Disclosure Statement, asserting, among other things, that the Disclosure Statement lacks an adequate description of the Debtors' intention to assume or reject the Utility Contract, and fails to adequately describe how the Debtors intend to treat any potential Claims relating to the Utility Contract.  In addition, the Hodge Trustee raises certain plan confirmation objections relating to the cancellation and surrender of the Hodge Industrial Revenue Bonds and the Debtors' procedures establishing the amount of the SSCE Distribution Reserve.  The Hodge Trustee believes that such procedures impermissibly establish a cap on Disputed Claims, including contract rejection damages Claims, at an amount estimated by the Debtors.

With respect to the Hodge Trustee's request for further information regarding the Debtors' intent with respect to the Utilities Contract, the Debtors intend to reject the Utility Contract and negotiate a potential new utility agreement with the Village of Hodge.  The Hodge Trustee reserves all rights in connection with any rejection of the Utility Contract and the negotiations regarding a potential new contract.  Furthermore, the Debtors assert that any Allowed Industrial Revenue Bond Claims, including any Allowed Claims arising from the rejection of the Utility Agreement, are General Unsecured Claims against SSCE and the Debtors have modified Plan to make it clear that the Hodge Utility Bonds are not terminated or cancelled by operation of the Plan and that the Plan will not require the Hodge Utility Bonds to be surrendered .  Finally, the Debtors disagree that the Plan establishes a de facto cap on Disputed Claims.  In fact, the Plan obligates the Debtors to file a notice with the reserve amounts of any Disputed Claim if that reserve is less than the amount set forth in the underlying Proof of Claim, or for any contingent, unliquidated or disputed Claim.  Upon receipt of such notice, the Holders have an opportunity to object.  Only after notice and a failure to object would the Disputed Claim be "capped" at that amount.  To resolve this issue the Debtors agree that to the extent that any claim asserted by the Hodge Trustee is a Disputed Claim (the "Hodge Disputed Claim") and the Debtors and the Hodge Trustee dispute the estimation of such Disputed Claim for purposes of the SSCE Distribution Reserve, and such dispute is not resolved prior to the Effective Date, then for purposes of the SSCE Distribution Reserve the Hodge Disputed Claim shall be estimated at the  amount stated in the Hodge Trustee's proof of claim, or an amount set by order of this Court entered on or prior to the Effective Date (the "Reserved Hodge Disputed Claim Amount"); provided however, that the Reserved Hodge Disputed Claim Amount may be adjusted based upon a subsequent order  of this Court.

**8.**  ~~6.~~  **Georgia Pacific Litigation.**

On July 23, 2008, Georgia-Pacific Corrugated I, LLC and GNN Investor, LLC (collectively "Georgia-Pacific") and SSCE entered into a purchase agreement wherein SSCE agreed to purchase and Georgia-Pacific agreed to sell that certain parcel of real property located at 210 Grove Street, Franklin, Norfolk County, Massachusetts and certain personal property associated therewith for a purchase price of $15 million.  In connection with that purchase agreement, SSCE entered into an escrow agreement and deposited $1 million with Land America Title Insurance Company as earnest money to be applied against the agreed purchase price at closing.  Georgia-Pacific and SSCE never closed the contemplated transaction.

On January 15, 2009, Georgia-Pacific filed a complaint for breach of contract in the Superior Court of Fulton County, Georgia against SSCE in the action styled *Georgia Pacific Corrugated I, LLC et al. v. Smurfit-Stone Container Enterprises, Inc.*, Civil Action No., 2009 CV 163117.  Subsequent to the Petition Date, on May 4, 2009, an order was entered staying the action pending in state court.  On June 1, 2009, Georgia-Pacific instituted an adversary proceeding in this Bankruptcy Court by filing a complaint for breach of contract and seeking declaratory and injunctive relief against SSCE.  On September 11, 2009, SSCE filed a motion seeking the Bankruptcy Court's approval of the settlement agreement reached between Georgia-Pacific and SSCE.  The settlement agreement provided that the parties would direct the escrow agent to disburse $700,000 of the $1 million to Georgia-Pacific and to disburse the remaining funds, including any accrued interest, to SSCE.  The settlement agreement shall not constitute an admission of liability as to the facts alleged in the actions or an admission as to whether the funds held in escrow were property of the estate.  Furthermore, the settlement agreement provides that Georgia-Pacific and SSCE agree that after the funds are disbursed, any and all claims arising from the purchase agreement , escrow agreement, and settlement agreement will be waived and released, provided, however, that the settlement agreement should not be interpreted to waive, release, or settle any other claims between or among Georgia-Pacific and Smurfit.  The action pending in state court and the adversary proceeding will be dismissed with prejudice.  The Bankruptcy Court approved the Georgia-Pacific and SSCE settlement agreement in an order entered on October 13, 2009.

**9.**  ~~7.~~  **i2i Europe, ltd. Adversary Proceeding.**

i2i Europe, ltd. ("i2i Europe") is a United Kingdom corporation that operates a design center in United Kingdom, and is a joint venture between SSCE and Weedon Holdings Ltd. ("Weedon Holdings").  i2i Europe was formed on October 24, 2005, by the execution of three agreements: the Shareholders Agreement, Sales Broker Agreement and Noncompetition Agreement, each of which is governed by English law.

On September 11, 2009, the Debtors filed the Thirteenth Omnibus Motion of the Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code (the "Rejection Motion"), formally seeking to reject the Noncompetition Agreement and Sales Broker Agreement.  i2i Europe filed an objection to the Rejection Motion on September 23, 2009.  On the same day, i2i Europe initiated an adversary proceeding by filing a complaint seeking entry of an order enjoining SSCE from soliciting i2i Europe's customers and misappropriating trade secret information in alleged

violation of the Noncompetition Agreement. i2i Europe also filed a motion seeking entry of a temporary restraining order and preliminary injunction enjoining SSCE from soliciting i2i Europe's customers and misappropriating trade secret information.

On October 5, 2009, SSCE filed a motion seeking authority pursuant to section 554(a) of the Bankruptcy Code for SSCE to abandon SSCE's shares of i2i Europe (the "Abandonment Motion"). i2i Europe objected to the Abandonment Motion on October 15, 2009. At the October 20, 2009 hearing, the Bankruptcy Court adjourned the matter until a hearing on October 27, 2009.

At the October 27, 2009 hearing, the Court entered an order approving the terms of a settlement agreement between the Debtors and i2i Europe. The result of such settlement agreement, generally, was that the Debtors transferred their ownership interest in i2i Europe to Weedon Holdings in addition to paying Weedon Holdings $290,000. Simultaneously, Weedon Holdings paid $45,000 to an Asian subsidiary of SSCE to settle ordinary course business balances. Finally, all agreements among and between the Debtors, i2i Europe and Weedon Holdings were terminated and all pleadings in the Bankruptcy Court related to such agreements and parties were withdrawn.

### 10. 8. Caspian Capital Advisors' Motion for Appointment of Official Committee of Equity Security Holders.

Caspian Capital Advisors ("Caspian") filed a motion for an order appointing an official committee of equity security holders (an "Equity Committee") of SSCC (the "Equity Committee Motion") on August 20, 2009. The Equity Committee Motion followed a letter dated August 7, 2009, that Caspian sent to the U.S. Trustee requesting the appointment of an Equity Committee. In the Equity Committee Motion, Caspian asserted that it was an investment manager on behalf of certain entities and currently held shares of SSCC in excess of fourteen percent (14%) of the issued and outstanding 7% Series A Preferred Stock of SSCC. Caspian argued that the shareholders of SSCC will not be adequately represented in the Debtors' Chapter 11 Cases without the appointment of an official committee. Caspian further argued that the Debtors' financial outlook was improving, that the common stock and preferred stock of SSCC were widely held and actively traded, that the complexity of the Chapter 11 Cases warranted the appointment of an Equity Committee, that the request was timely, and that the need for adequate representation of shareholders outweighed the costs associated with an official Equity Committee. Fiduciary Counselors Inc. filed a joinder to the Equity Committee Motion on September 21, 2009. On September 28, 2009, Smith Management LLC filed a statement in support of the Equity Committee Motion.

The Debtors, the Committee, and the U.S. Trustee each filed objections to the Equity Committee Motion. The Debtors argued Caspian failed to establish that there was a substantial likelihood that the equity holders would receive a meaningful distribution or that equity holders' interests were not represented without an official equity committee. Furthermore, the Debtors argued that the significant costs associated with an official Equity Committee would not justify the minimal benefit, if any, in appointing an Equity Committee. Mariner Investment Group, LLC filed a reply to the objections of the U.S. Trustee, the Committee, and the Debtors, and the Bankruptcy Court held a hearing on the Equity Committee Motion on September 30, 2009. The Bankruptcy Court held that the moving parties had not met the heavy burden required to

demonstrate the need to appoint an Equity Committee, but the Bankruptcy Court adjourned the matter until the December 4, 2009 hearing to allow for a more substantive hearing.

After further briefing, and submission by Caspian of the report of Moelis & Company (the "Moelis Report") and by the Debtors of the rebuttal report of Lazard in opposition to the Equity Committee Motion (the "Lazard Report"), on December 4, 2009, the Bankruptcy Court heard further oral arguments on this matter. On December 10, 2009, the Bankruptcy Court entered a memorandum order denying the relief requested in the Equity Committee Motion (the "Equity Order"). In the Equity Order, the Court found the aggregate secured and unsecured Claims in the Proceedings to total at least $5.627 billion, and cited the "comparable company" and "precedent transaction" analyses in the Lazard Report in finding that the estimated range of values for the Debtors "falls (at best) between $700 million and $900 million short of the point at which distributable value is likely to be available for shareholders."

~~9.     Stone FinCo II Motion.~~

**11.     7.375% Notes Due 2014 and Related Claims and Pleadings.**

(a)     Stone FinCo II Claims

One of the five series of Prepetition Notes described in Section III.E.2 above – the 7.375% unsecured notes in the aggregate principal amount of $200 million, due on July 15, 2014 (the "7.375% Notes Due 2014") – were issued by Stone FinCo II and were guaranteed by SSCE (the "SSCE Guarantee"). The holders of the Stone FinCo II Notes (the "Stone FinCo II Noteholders") therefore have direct claims against both Stone FinCo II and SSCE.

Section 3.3.5(e) of the Plan provides for the Allowance of the direct claims of the Stone FinCo II Noteholders against SSCE in the amount of $200 million (plus any accrued but unpaid interest thereon as of the Petition Date). This Allowed Claim will give the Stone FinCo II Noteholders their Pro Rata Share of the New SSCC Common Stock Pool – the same distribution that all of the other holders of Prepetition Notes will receive under the Plan. Such distribution will give the Stone FinCo II Noteholders a recovery of approximately 64-71% based upon the Debtors' recovery estimates.

Section 3.11.3(d) of the Plan provides for the Allowance of the direct claims of the Stone FinCo II Noteholders against Stone FinCo II in the amount of $200 million (plus any accrued but unpaid interest thereon as of the Petition Date). The Stone FinCo II Noteholders are the only known holders of General Unsecured Claims against Stone FinCo II. The Stone FinCo II Noteholders would therefore share Pro Rata with holders of Intercompany Claims any assets of Stone FinCo II remaining after the payment of any priority and secured claims against Stone FinCo II. The Debtors do not anticipate that any significant priority or secured claims will be allowed against Stone FinCo II.

*Assets of Stone FinCo II*

Stone FinCo II has two potential assets, both of which are Intercompany Claims. The Stone FinCo II Contribution Claim is a potential Intercompany Claim against SSCE, and the Stone FinCo II Intercompany Claim is a potential Intercompany Claim against SSC Canada. As detailed

in Section IV.G.11(b), two Stone FinCo II Noteholders – Aurelius Capital Management, LP ("Aurelius") and Columbus Hill Capital Management, L.P. ("Columbus Hill") – have engaged in extensive litigation in both the U.S. Bankruptcy Court and the Canadian Bankruptcy Court in connection with these two claims.

The Stone FinCo II Contribution Claim is based upon Stone FinCo II's status as an unlimited liability company incorporated under the *Companies Act (Nova Scotia)* and SSCE's status as the sole member of Stone FinCo II. Aurelius and Columbus Hill have asserted that notwithstanding the SSCE Guarantee and the distribution to be made directly by SSCE to the Stone FinCo II Noteholders on account thereof, SSCE is obligated under the *Companies Act (Nova Scotia)* to make a further contribution of funds to Stone FinCo II to fully satisfy the obligations of Stone FinCo II (i.e., Stone FinCo II's obligations to the Stone FinCo II Noteholders). This obligation of SSCE, if any, would be an unsecured obligation of SSCE. Therefore, if Allowed, the Stone FinCo II Contribution Claim would entitle Stone FinCo II to a Pro Rata Share of the New SSCC Common Stock Pool. See § 3.3.6 of the Plan. Such Pro Rata Share of the New SSCC Common Stock Pool would, in turn, be distributed to the Stone FinCo II Noteholders. See § 3.11.3 of the Plan.

The Stone FinCo II Intercompany Claim against SSC Canada arises under a loan agreement between Stone FinCo II and SSC Canada pursuant to which Stone FinCo II advanced $200 million to SSC Canada. As detailed in Section IV.G.11(b) below, issues surrounding the Stone FinCo II Intercompany Claim have been extensively litigated before the Canadian Bankruptcy Court and a ruling is pending. In that litigation, SSC Canada took the position that the Stone FinCo II Intercompany Claim should be treated as equity rather than debt because, among other reasons, the terms of the Loan Agreement require repayment in equity upon an event of default. Aurelius, Columbus Hill and the indenture trustee for the Stone FinCo II Notes took the position that the Stone FinCo II Intercompany Claim should properly be classified as debt and cited facts that allegedly supported such classification. The Plan will recognize the ruling of the Canadian Bankruptcy Court regarding the Stone FinCo II Intercompany Claim and will treat the Stone FinCo II Intercompany Claim in accordance with such ruling. See § 3.8.6 of the Plan.

Aurelius and Columbus Hill have also asserted in various pleadings that the Debtors and their directors and officers have violated their fiduciary duties in connection with the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim. The Debtors believe that these assertions completely lack merit. Further information regarding the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim can be found in various pleadings filed in the Canadian Bankruptcy Court (available on the Monitor's website) and the Bankruptcy Court.[29]

*Treatment of the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim Under the Plan*

Potential Settlement Distribution. The Plan provides for a potential settlement of all Intercompany Claims held by Stone FinCo II, including the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim. Section 3.11.3 provides that the Stone FinCo II General Unsecured Claims Class (comprised entirely of the Stone FinCo II Noteholders) can settle

---

[29] See, e.g., Docket Nos. 4003, 4092, 4107 and 4350.

all of Stone FinCo II's Intercompany Claims in return for a distribution of $[_____] in cash by accepting the Plan. Such distribution would be in addition to Stone FinCo II Noteholders' Pro Rata Share of the New SSCC Common Stock Pool on account of the SSCE Guarantee. However, the Plan further provides that this settlement will no longer be offered in the event that the Canadian Bankruptcy Court rules that the Stone FinCo II Intercompany Claim should be treated as equity rather than debt.

Potential Recovery Scenarios If No Settlement. Absent the settlement described in the preceding paragraph, the Stone FinCo II Noteholders (in addition to the direct recovery from SSCE on account of the SSCE Guarantee) and the holders of Intercompany Claims against Stone FinCo II will share Pro Rata any proceeds received by Stone FinCo II on account of the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim (after satisfaction of any priority and secured claims against Stone FinCo II).

(1) If the Canadian Bankruptcy Court rules that the Stone FinCo II Intercompany Claim should be treated as equity, not debt, then Stone FinCo II will not receive any distribution from SSC Canada on account of such equity interest. In the event that the Canadian Bankruptcy Court has not ruled prior to the Confirmation Hearing that the Stone FinCo II Intercompany Claim should be treated as equity, then either (a) there shall be a determination made by the Canadian Bankruptcy Court and the Bankruptcy Court at the Confirmation hearing that the value of the secured claims against SSC Canada exceeds the value of the property of SSC Canada, thereby entitling Stone FinCo II to no distribution on account of the Stone FinCo II Intercompany Claim, or (b) if no such determination is made, then the Plan of SSC Canada may nevertheless be confirmed and the validity of the Stone FinCo II Intercompany Claim and any entitlement (if any) on account of such claim shall be resolved post-Effective Date. If the Canadian Bankruptcy Court subsequently determines that the Stone FinCo II Intercompany Claim should be treated as debt and the Canadian Bankruptcy Court further determines that a distribution should be made on account of such claim, such distribution shall be paid by SSC Canada and/or Reorganized SSCE.

(2) If the Bankruptcy Court rules that the Stone FinCo II Contribution Claim is an Allowed Claim against SSCE, then Stone FinCo II will receive a Pro Rata Share of the New SSCC Common Stock Pool based upon the Allowed amount of the Stone FinCo II Contribution Claim. If the Bankruptcy Court rules that the Stone FinCo II Contribution Claim is not an Allowed Claim, then Stone FinCo II will receive nothing on account of such claim. In the event the Bankruptcy Court has not ruled on the Stone FinCo II Contribution Claim in advance of the Confirmation Hearing, then the Plan shall nevertheless be confirmed and the validity of the Stone FinCo II Contribution Claim shall be determined post-Effective Date and the Debtors shall reserve New SSCC Common Stock on account of such claim in accordance with Article VIII of the Plan.

The rulings on the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim could impact the other unsecured creditors at SSCE and SSC Canada, respectively. For example, a ruling that either such claim is an Allowed Claim would increase the unsecured claims pools at SSCE or SSC Canada, as applicable, and could result in a corresponding dilution of recoveries to unsecured creditors of the applicable Debtor. However, the maximum

CH1 5118439 5168368 v.4 1

aggregate recovery that the Stone FinCo II Noteholders could receive on account of all claims is payment in full under the Stone FinCo II Notes and thus the maximum dilution that could occur would be limited to the difference between (a) payment in full of the principal amount of the Stone FinCo II Notes (plus any accrued but unpaid interest thereon as of the Petition Date) and (b) the value received by the Stone FinCo II Noteholders on account of the SSCE Guarantee.

*Aurelius and Columbus Hill*

As noted above, Aurelius and Columbus Hill are the two Stone FinCo II Noteholders that have been involved in the litigation surrounding the Stone FinCo II Contribution Claim, the Stone FinCo II Intercompany Claim and related issues.

(b)     Stone FinCo II Fund Managers' Pleadings

On October 7, 2009, Aurelius Capital Management, LP and Columbus Hill Capital Management, L.P., fund managers for funds holding a majority of the ~~7 3/8~~7.375% Notes Due 2014 (together, the "Stone ~~Finance~~FinCo II Fund Managers"), brought a motion before the Canadian Bankruptcy Court ~~with the support of the indenture trustee, M&T.  Referencing (amongst other things) the fact that the proceeds of the issuance of the 7 3/8% Notes were advanced to SSC Canada pursuant to an intercompany loan agreement dated July 20, 2004, the Stone Finance II Fund Managers sought~~seeking, among other things, an order: (a) declaring that the interests of the officers and directors of Stone FinCo II, the Canadian Monitor and counsel to the Canadian Debtors conflict irreconcilably with the interests of Stone FinCo II; (b) declaring that counsel to the Canadian Debtors ~~cannot~~could not continue to act for Stone FinCo II; (c) directing the officers and directors of Stone FinCo II to file an assignment in bankruptcy under the *Bankruptcy and Insolvency Act,* R.S.C. 1985, c. B-3, as amended, in respect of Stone FinCo II; and (d) discharging the Canadian Monitor vis-à-vis Stone FinCo II.  This motion was supported by M&T, the indenture trustee for the 7.375% Notes Due 2014.

The Canadian Debtors opposed the motion with the support of the Canadian Monitor and the Committee and, on October 20, 2009, the Canadian Bankruptcy Court released its endorsement, dismissing the motion.  In its endorsement, the Canadian Bankruptcy Court ~~directed~~invited the parties to address the issue of the proper characterization of Stone FinCo II's intercompany claim against SSC Canada.  ~~The~~SSC Canada and the other Applicants subsequently brought a motion to resolve the characterization and amount of the Stone FinCo II intercompany claim, which the Canadian Bankruptcy Court heard on December 11, ~~2009, and which relief~~2009.  The motion was supported by the Canadian Monitor and the Committee and opposed by the Stone FinCo II Fund Managers and M&T.  The Canadian Bankruptcy Court~~'s decision on the Applicants' motion is currently under reserve.~~ has taken the matter under advisement and a ruling is pending.

As discussed in more detail below in Section IV.H.4., the Stone FinCo II Fund Managers filed an objection to the Debtors' motion, filed on December 28, 2009, seeking an extension of the exclusive periods within which the Debtors may file a Chapter 11 plan and solicit acceptances of such plan.  On January 14, 2010, the Bankruptcy Court overruled this objection and entered an order extending the Debtors' exclusive periods.  On January 12, 2010, the Stone Finance II Fund Managers filed a motion to convert the chapter 11 case of Stone FinCo II to a case under chapter 7

88

of the Bankruptcy Code.  The motion to convert was originally scheduled to be heard on January 29, 2010.  At a teleconference on January 26, 2010, the Bankruptcy Court scheduled the motion for hearing on February 22, 2010.  On January 22, 2010, the Stone FinCo II Fund Managers filed a request for adjournment of the hearing on the Disclosure Statement, which request was subsequently withdrawn.

On January 21, 2010, the Stone FinCo II Fund Managers filed an objection to the Disclosure Statement (the "Fund Managers' DS Objection").[30]  The Fund Managers' DS Objection asserts that the Disclosure Statement lacks adequate information in certain areas.  The Debtors have responded to certain of those assertions by providing the additional information set forth above in Section IV.G.11(a), "Stone FinCo II Claims."

In addition to these requests for further information which the Debtors have address herein, the Fund Managers' DS Objection also asserts that the Plan is patently unconfirmable as to Stone FinCo II, and that the Debtors should not be able to solicit votes on such Plan until such infirmities are remedied.  The Stone FinCo II Fund Managers believe that the Stone FinCo II Plan cannot be confirmed for the following reasons:

- The Plan was not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.  The Debtors disagree with this assertion, and believe that the Plan is the product of arm's length, good faith negotiations and thus satisfies 1129(a)(3).

- The Plan does not disclose the proposed officers and directors for the reorganized Debtor after the Effective Date, and thus violates section 1129(a)(5) of the Bankruptcy Code.  Such information will be provided in the Plan Supplement, which shall be filed ten (10) days prior to the Voting Deadline, and thus 1129(a)(5) will not prohibit confirmation of the Plan.

- The Plan violates the "best interests" test under section 1129(a)(7) of the Bankruptcy Code because, the Stone Finance II Fund Managers believe, the creditors of Stone FinCo II would receive a greater recovery on their claims in a liquidation than under the Plan.  The Debtors disagree, and believe that the Liquidation Analysis attached hereto as Exhibit D reflects the Plan's compliance under 1129(a)(7).

- There will not be a non-insider, impaired voting Class that votes to accept the Plan, and thus the Debtors will be unable to satisfy section 1129(a)(10).  This is a plan confirmation objection and may be moot after solicitation on the Plan has been completed.

- The Debtors will be unable to "cram down" the dissenting Classes of Stone FinCo II claims because the Plan unfairly discriminates and is not fair and equitable as required by section 1129(b) of the Bankruptcy Code.  Whether these classes will

[30] In addition, M&T filed an objection to the Disclosure Statement, joining in the Fund Manager' DS Objection.  The Debtors believe that their added disclosure related to the Fund Managers' DS Objection adequately addresses the M&T DS Objection as well.

89

CH1 5118439 5168368v.4 1

need to be crammed down can only be determined after solicitation on the Plan is complete and in any event the Debtors believe that they will be able to satisfy 1129(b) if necessary.

- • The Plan incorporates impermissible discharge, release, injunction and exculpation provisions. The Debtors believe that such provisions are appropriate under applicable law and are prepared to make that showing at the Plan confirmation hearing. The Debtors therefore do not believe that such provisions will have any impact on their ability to confirm the Plan.

More information regarding the Fund Managers' likely objections to the Plan can be found in the Fund Managers' DS Objection. [See Docket No. 4286]. The Debtors do not believe any of the Fund Managers' objections will render the Plan unconfirmable or present any roadblock to confirmation of the Plan. Although the Stone FinCo II Fund Managers stated at a January 26, 2010 teleconference that they would not raise their "patently unconfirmable" argument at the January 29, 2010 Disclosure Statement hearing, if necessary, the Debtors will be prepared to successfully address each of the foregoing at the Plan confirmation hearing.

**12.    10.    Motions to Lift or Modify the Automatic Stay.**

Numerous motions have been filed seeking to lift or modify the automatic stay under section 362 of the Bankruptcy Code. Movants have sought to modify the automatic stay for reasons consisting of, but not limited to, continuing pre-petition litigation outside of the Bankruptcy Court, filing actions in state court to perfect pre-petition mechanics' liens, compelling the Debtors to assume or reject executory contracts and effectuating setoffs of pre-petition payables and receivables. The Debtors have generally cooperated with movants in stipulating to mutually agreeable orders allowing limited relief from the automatic stay in these matters. In a few instances, automatic stay lift motions have been withdrawn without the need for stipulation by the Debtors.

**13.    Approval of the Exit Term Loan Facility Arrangement Motion.**

On January 2, 2010, the Debtors filed a motion seeking authority to (i) enter into an exit term loan facility Engagement and Arrangement Letter (the "Arrangement Letter") and Arrangement Fee Letter (the "Arrangement Fee Letter"), (ii) pay associated fees and expenses, and (iii) furnish related indemnities (the "Exit Term Loan Facility Arrangement Motion"). The Arrangement Fee Letter was filed with the Exit Term Loan Facility Arrangement Motion and the Fee Letter was filed under seal. The Bankruptcy Court approved the Exit Term Loan Facility Arrangement Motion on January 14, 2010.

On January 12, 2010, the Debtors filed a term sheet (the "Term Sheet") containing the anticipated terms of the Exit Term Loan Facility [Docket No. 4097]. Although the terms contained in the Term Sheet are not definitive, various key terms are summarized below:

- • SSCE will be the borrower under the Exit Term Loan Facility, which will be a 6-year senior secured term loan facility in an aggregate principal amount of $1.2 billion.

- The Exit Term Loan Facility will be arranged by J.P. Morgan Securities Inc., Deutsche Bank Securities Inc. and Banc of America Securities LLC, with JPMorgan Chase Bank, N.A. as the administrative agent and Deutsche Bank Securities Inc. as the syndication agent.

- The term loans made under the Exit Term Loan Facility (the "Term Loans") will be repayable in equal quarterly installments of 25 basis points for five years and nine months in an aggregate amount equal to 1.0% annually of its original principal amount, with the balance payable at maturity.

- The Exit Term Loan Facility will be guaranteed by each existing and future direct and indirect domestic Material Subsidiary (as defined in the Term Sheet).

- Interest on the Term Loans will accrue on a per annum basis, at the option of the company, at (i) up to the LIBOR rate (for the applicable interest period, subject to a floor of 2.00%) plus 5.00% or (ii) up to the ABR rate (highest of the prime rate, the federal funds rate plus 0.5% and the one month Libor rate plus 1.00%, subject to a floor of 3.00%) plus 4.00%.

- The Term Loans (together with cash management services and designated hedging obligations) will be secured by (a) a first priority lien on substantially all assets of the company and each domestic Material Subsidiary (other than accounts receivable, inventory and related assets) and a pledge of capital stock of all Material Subsidiaries (limited to 65% in the case of first-tier foreign subsidiaries) and (b) a second priority lien on the accounts receivable, inventory and related assets of the company and each domestic Material Subsidiary.

The Debtors expect to return to the Bankruptcy Court and seek authority to execute the definitive documents for the Exit Term Loan Facility in February, 2010.

In their objection to the Disclosure Statement, Mariner Investment Group LLC and Senator Investment Group LP asserted that this Disclosure Statement contains no discussion of the risk that the Debtors will be unable to secure exit financing on terms that will enable them to operate outside of bankruptcy. The Debtors do not believe there is a material risk that they will be unable to secure exit financing on acceptable terms.

## H.    Administrative Matters in the Proceedings.

### 1.    Schedules of Assets and Liabilities; Statements of Financial Affairs.

On April 6, 2009, the Debtors filed their Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs (the "Statements") with respect to each of the Debtors. Among other things, the Debtors' Schedules contain information identifying the Debtors' executory contracts and unexpired leases, the creditors holding claims against the Debtors, and the nature of such Claims. The Debtors' Statements provide information including, among other things, payments or other transfers of property made by the Debtors to creditors on or within 90 days before the Petition Date or, in the case of "insiders", payments or other transfers of property made by the Debtors on or within one year before the Petition Date.

On August 26, 2009, SSCE filed its amended Schedule F to its Schedules [Docket No. 1765], which lists creditors holding unsecured nonpriority claims. On October 10, 2009, SSCC, SSC Canada and Calpine Corrugated, LLC each filed an amended Schedule F to the Schedules [Docket Nos. 2214, 2217 and 2216, respectively]. On October 15, 2009, SSCE again filed an amended Schedule F to its Schedules [Docket No. 2313].

### 2.     Filing Claims and Bar Date.

On June 12, 2009, the Debtors filed the Motion of the Debtors for an Order Pursuant to Bankruptcy Rule 3003(c)(3), and Local Rule 2002-1(e) Establishing Certain Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Motion"). In the Bar Date Motion, the Debtors requested that the Bankruptcy Court establish certain deadlines for filing Proofs of Claim (as defined in the Bar Date Motion). Specifically, the Debtors requested that the Bankruptcy Court (i) establish August 28, 2009, at 4:00 p.m. (prevailing Eastern Time) (the "Bar Date") as the deadline for all persons and entities, including governmental units (as such term is defined in the Bankruptcy Code) holding a claim against any of the Debtors to file a proof of such claim in the Chapter 11 Cases, except as otherwise provided in the Bar Date Motion; (ii) except where a claim has previously been included in the Schedules (as defined in the Bar Date Motion) as disputed, contingent, or unliquidated, establish the later of (a) the Bar Date or (b) twenty (20) days after the holder of such claim is served with notice of the applicable amendment or supplement to the Schedules as the bar date for filing a Proof of Claim with respect to such amended claim; and (iii) except as otherwise set forth in any order authorizing rejection of an executory contract or unexpired lease, establish the later of (y) the Bar Date or (z) thirty (30) days after the entry of any order authorizing the rejection of an executory contract or unexpired lease, as the bar date by which a Proof of Claim for any damages resulting from the Debtors' rejection of such executory contract or unexpired lease must be filed.

The Bankruptcy Court approved the Bar Date Motion on June 22, 2009, and set August 28, 2009 at 4:00 p.m. prevailing Eastern Time as the Bar Date for filing proofs of claim against the Debtors in the Chapter 11 Cases on account of claims arising, or deemed to have arisen pursuant to section 501(d) of the Bankruptcy Code, prior to the Petition Date (the "Pre-petition Claims"). Each person or entity asserting a Pre-petition Claim against one or more of the Debtors was required to file a separate proof of claim that substantially complies with Official Bankruptcy Form 10 against each such Debtor so as to be actually received on or before the Bar Date by Epiq Bankruptcy Solutions, LLC; provided, however, proofs of claim filed against Canadian Debtors were accepted and considered timely in the Chapter 11 Cases if received by the CCAA Monitor prior to the expiration of the Canadian Bar Date (as defined below), and pursuant to the claims procedures established in the CCAA Proceedings.

On June 25, 2009, the Canadian Bankruptcy Court issued an order approving certain notice procedures and procedures for filing proofs of claim against the Canadian Debtors (the "Canadian Claims Procedure Order"). In the Canadian Claims Procedure Order, the Canadian Bankruptcy Court set the bar date for filing proofs of claim in respect of pre-petition claims against the Canadian Debtors ("Claims") as August 28, 2009 (the "Canadian Bar Date") and the bar date for filing claims arising as a result of or in connection with the repudiation, termination or restructuring of any contract, lease or other agreement after the Petition Date ("Subsequent Claims") as the later of the Canadian Bar Date and the date established for such purpose by the

Canadian Bankruptcy Court or the Bankruptcy Court ("Canadian Subsequent Claims Bar Date").
Holders of Claims or Subsequent Claims against the Canadian Debtors must have filed their proofs
of claim with the CCAA Monitor so that they are actually received by the CCAA Monitor by the
Canadian Bar Date or Canadian Subsequent Claims Bar Date, as the case may be. Proofs of claim
filed against the Canadian Debtors in the Chapter 11 Cases are deemed Claims or Subsequent
Claims timely filed in the CCAA Proceedings ("Deemed Canadian Claims") if the proofs of claim
were properly and timely filed in accordance with the procedures established for filing claims in
the Chapter 11 Cases.

On November 6, 2009, the Canadian Bankruptcy Court issued an order approving certain
procedures for reviewing and determining the classification and amount of Claims and Subsequent
Claims (the "Canadian Claims Determination Order"). Among other things, the Canadian Claims
Determination Order directs the Canadian Debtors and the CCAA Monitor to review each proof of
claim and determine whether to accept, revise or disallow each Claim or Subsequent Claim in the
CCAA Proceedings. Any holder of a Claim or Subsequent Claim that disputes the classification or
amount of its Claim or Subsequent Claim may deliver a Notice of Dispute, at which time the
Canadian Debtors and the CCAA Monitor may (a) attempt to consensually resolve the
classification and amount of the Claim or Subsequent Claim, (b) send the dispute to a "Claims
Officer", or (c) schedule a motion with the Canadian Bankruptcy Court to resolve the Claim or
Subsequent Claim.

Despite the foregoing, the Canadian Debtors and the CCAA Monitor have the ability,
subject to objection by the creditor, to elect to resolve Deemed Canadian Claims in the Chapter 11
Proceedings by objecting to the Claim or Subsequent Claim in those proceedings rather than in the
CCAA Proceedings. Deemed Canadian Claims resolved in the Chapter 11 Proceedings shall be
deemed to have been accepted as proven claims in the CCAA Proceedings on those terms. If the
holder of a Claim or Subsequent Claim objects to the choice of forum and the issue cannot be
resolved consensually, a joint hearing may be requested under the Protocol to resolve the choice of
forum.

As of the Bar Date, the Debtors' Claims Agent and the CCAA Monitor received
approximately 13,800 timely filed Proofs of Claim that totaled, along with the scheduled Claims
against the Debtor, approximately $64 billion. However, the Debtors believe that many of the
Claims filed in the Chapter 11 Cases are invalid, untimely, duplicated and/or overstated. The
Debtors are in the process of evaluating the Proofs of Claim and anticipate that they will continue
filing objections to many of the Proofs of Claim. The Debtors believe that, following
reconciliation of filed and scheduled Claims, the estimated Allowed Amount of Claims in each
Class will be as set forth in the summary chart included in Section II.B of this Disclosure
Statement.

### 3. Bankruptcy Rule 2015.3 Reports.

The Debtors are required to comply with new Bankruptcy Rule 2015.3 ("Rule 2015.3")
which became effective on December 1, 2008. Pursuant to Rule 2015.3, the Debtors are required
to file certain reports with the Bankruptcy Court, which provide additional financial reporting for
non-Debtor entities in which the Debtors hold a "controlling or substantial" interest (the "2015.3
Reports"). The Debtors hold a direct ownership interest of at least fifty percent (50%) in nine (9)

non-debtor entities and hold direct ownership interests of between twenty percent (20%) and fifty percent (50%) in nineteen (19) non-debtor entities.  Because of the nature of the Debtors' interest in these entities, compliance with Rule 2015.3 and the production of the 2015.3 Reports presented challenges to the Debtors in terms of, among other things, achieving workable reporting mechanics.  On February 19, 2009, the Debtors filed a motion seeking additional time to file their initial 2015.3 Reports or seek a modification of such reporting requirements and subsequently on March 19, 2009, filed an additional motion requesting another extension of time to file their 2015.3 Reports (the "2015.3 Extension Motions").  On April 22, 2009, the Debtors filed a motion to approve a modification of the Rule 2015.3 reporting requirements.  The Debtors requested that the reporting requirements be (i) modified for non-Debtor entities in which the Debtors maintained a direct ownership of at least fifty percent (50%) of the interests and (ii) waived for all other non-Debtor entities.  This matter has been adjourned until the ~~January 14,~~February 16, 2010 hearing.

### 4.    Exclusivity Period.

On May 1, 2009, the Debtors filed a motion requesting an extension of the Debtors' exclusive period within which to file a chapter 11 plan and solicit acceptances thereto (the "Exclusivity Motion").  In the Exclusivity Motion, the Debtors requested an extension of the exclusivity period through and including September 23, 2009, and the extension of the exclusive right to solicit acceptance of such plan through and including November 23, 2009.  By order entered May 20, 2009, the Bankruptcy Court granted the relief requested in the Exclusivity Motion.

On August 24, 2009, the Debtors filed a motion requesting a further extension of the Debtors' exclusive period within ~~in~~ which to file a chapter 11 plan and solicit acceptances thereto (the "Second Exclusivity Motion").  In the Second Exclusivity Motion, the Debtors requested an extension of the exclusivity period through and including January 21, 2010, and the extension of the exclusive right to solicit acceptance of such plan through and including March 23, 2010.  On September 9, 2009, the Bankruptcy Court granted the relief requested in the Second Exclusivity Motion without prejudice to the ~~Debtor's~~Debtors' right to seek further extensions of the exclusivity period and the extension of the exclusive right to solicit acceptances of the plan.  ~~The Debtors anticipate seeking a further extension of the exclusivity periods before January 21, 2010.~~

On December 28, 2009, the Debtors filed a motion requesting a further extension of the Debtors' exclusive periods within which to file a chapter 11 plan and solicit acceptances thereof (the "Third Exclusivity Motion").  In the Third Exclusivity Motion, the Debtors requested an extension of the exclusivity period through and including May 21, 2010, and the extension of the exclusive right to solicit acceptance of such plan through and including July 21, 2010.  The Stone Finance II Fund Managers filed an objection to the Third Exclusivity Motion as it applied to Stone FinCo II on January 7, 2010 (the "Exclusivity Objection") and the Debtors filed a reply to the Exclusivity Objection on January 12, 2010.  On January 14, 2010, the Bankruptcy Court (i) granted the relief requested in the Third Exclusivity Motion for all Debtors without prejudice to the Debtors' right to seek further extensions of the exclusivity period and the extension of the exclusive right to solicit acceptances of the plan and (ii) overruled the Exclusivity Objection.

### I.    Avoidance Actions.

Certain transactions that occurred prior to the Petition Date may have given rise to claims, including preference actions, fraudulent transfers, and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law.

### 1.     Preference Actions.

Under section 547 of the Bankruptcy Code, a debtor may seek to avoid and receive certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (i) was made when the debtor was insolvent and (ii) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code where the transfer had not been made.  Transfers made to a creditor that was not an "insider" of the debtor are subject to these provisions generally only if the payment was made within 90 days prior to the debtor's filing a petition under chapter 11 of the Bankruptcy Code (the "Preference Period").  Under section 547 of the bankruptcy Code, certain defenses, in addition to the solvency of the debtor at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought.  Among other defenses, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor.  The debtor has the initial burden of demonstrating the existence of all the elements of a preference and is presumed to be insolvent during the Preference Period.  The creditor has the initial burden of proof as to the aforementioned defenses.

### 2.     Fraudulent Transfer and Conveyance Actions.

Under sections 548 and 544 of the Bankruptcy Code, a debtor may seek to recover certain fraudulent transfers and conveyances.  Generally, a conveyance or transfer is fraudulent if (i) it was made with the actual intent to hinder, delay, or defraud a creditor (i.e., an intentional fraudulent conveyance or (ii) reasonably equivalent value was not received by the transferee in exchange for the transfer and (a) the debtor was insolvent at the time of the transfer, (b) was rendered insolvent as a result of the transfer or (c) was left with insufficient capitalization as a result of the transfer (i.e., a constructive fraudulent conveyance).  Two primary sources of fraudulent conveyances law exist in a chapter 11 case.

The first source of fraudulent conveyance law in a chapter 11 case is section 548 of the Bankruptcy Code under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers that were made or incurred within two years before the date the bankruptcy case was filed.

The second source of fraudulent conveyance law in a chapter 11 case is section 544 of the Bankruptcy Code – the so-called strong arm provision – under which the debtor in possession (or creditors with bankruptcy court permission) may have the rights of a creditor under state law to avoid transfers as fraudulent.  State fraudulent conveyance laws generally have statutes of limitations longer than two years and are applicable in a bankruptcy proceeding pursuant to section 544 of the Bankruptcy Code if the statute of limitations with respect to a transfer has not expired prior to the filing of the bankruptcy case.  If such statute of limitations has not yet expired, the debtor in possession (or creditors with bankruptcy court permission) may bring the fraudulent

conveyance claim within the time period permitted by section 546 of the Bankruptcy Code notwithstanding whether the statute of limitations period expires prior to the expiration of such time.

**J.     The Plan and Disclosure Statement**

On December 1, 2009, the Debtors filed their Joint Amended Plan of Reorganization for Smurfit Stone Container Corporation and its Debtor Subsidiaries and Plan of Compromise and Arrangement for Smurfit-Stone Container Canada Inc. and Affiliated Canadian Debtors [Docket No. 2914] (as subsequently amended, the "Plan") and accompanying Disclosure Statement for the Plan [Docket No. 2915] (as subsequently amended, the "Disclosure Statement"). On December 22, 2009, the Debtors filed revised versions of the Plan and Disclosure Statement and the Notice of Hearing to Consider Approval of Disclosure Statement for the Plan [Docket No. 3376] (the "Disclosure Statement Hearing Notice"). The Disclosure Statement Hearing Notice was served upon all of the Debtors' creditors pursuant to Bankruptcy Rule 2002(b) on or about December 23, 2009. The Disclosure Statement Hearing Notice set January 29, 2010 for a hearing on the Disclosure Statement, and established January 21, 2010 as the deadline to object to the Disclosure Statement.

On January 14, 2009, the Debtors filed their Motion of the Debtors for an Order (i) Approving the Disclosure Statement, (ii) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Plan of Reorganization, (iii) Scheduling a Hearing to Consider Confirmation of the Debtors' Joint Plan of Reorganization and Establishing Notice and Objection Procedures in Respect Thereof, and (iv) Granting Related Relief [Docket No. 4151] (the "Solicitation Motion"). The Solicitation Motion seeks to establish, among other things, April 14, 2010 as the date of the Confirmation Hearing. The Solicitation Motion will be heard at the Disclosure Statement Hearing.

The Debtors received approximately twenty-eight (28) objections and informal comments to the Disclosure Statement (the "DS Objections"), and filed their Omnibus Response to Objections to Approval of the Disclosure Statement for the Joint Plan of Reorganization Proposed by the Debtors on January 27, 2010 (the "DS Response"). The Debtors have added additional disclosures throughout this Disclosure Statement in order to address concerns raised in certain of the DS Objections. The added disclosure, along with the corresponding DS Objections, are described in the summary chart of the DS Objections attached as Exhibit A to the DS Response. As noted in the DS Response, the Debtors have reached agreement with many of the objecting parties on such additional language. In instances where the Debtors and the objecting parties did not agree on the added language, the Debtors have either (a) added language that they believe provides "adequate information" as that term is defined in section 1125 of the Bankruptcy Code, or (b) discussed in the DS Response why adding add additional language is unnecessary.

In addition to the various additions throughout the Disclosure Statement, the Debtors describe some of the DS Objections and the certain concerns raised therein below.

**1.    Bond Safeguard Insurance Co. and Lexon Insurance Co. ("Bond Safeguard").**

Bond Safeguard asserts in its DS Objection that additional information is needed in the Disclosure Statement regarding the Debtors' intention with respect to Bond Safeguard's existing surety bonds and indemnity agreement (the "Bond Safeguard Contracts").  In response, and in satisfaction of Bond Safeguard's DS Objection, the Debtors have added the following clarifying language.  To date, one or more beneficiaries of surety bonds issued by Bond Safeguard on behalf of the Debtors (a "Bond Safeguard Bond") have drawn on such bonds, and as a result, Bond Safeguard has a Claim against the Debtors for any such drawn amounts (to the extent not otherwise satisfied).  Certain other Bond Safeguard Bonds remain outstanding.  It is possible that these outstanding Bond Safeguard Bonds may expire by their terms and/or be replaced by Bond Safeguard or another surety bond provider.  It also is possible that the beneficiaries of such outstanding Bond Safeguard Bonds may draw down on such bonds in the future, in which case Bond Safeguard's aggregate unsecured claim against the Debtors may increase.  At this time, the Debtors have not reached definitive conclusions regarding their future intentions with respect to the Bond Safeguard Contracts.

**2.    ACE American Insurance Company, Pacific Employers Insurance Company, and Possibly Other Members of the ACE Group of Companies ("ACE").**

ACE objects to, among other things, a lack of specific information regarding the Debtors' treatment of the various policies and agreements in place between the Debtors and ACE.  Pursuant to an agreement between the Debtors and ACE under which ACE will withdraw its DS Objection, the Debtors have added the following language:[31]

> Nothing in the Plan, the Confirmation Order, any Exhibit to the Plan, Plan Supplement or any other Plan document (including any provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, expanding the scope of, altering, or impairing in any respect the prepetition legal, equitable or contractual rights, obligations and defenses of the insured or insurer with respect to any of the Debtors' insurance policies and related insurance agreements under the policies, related agreements, and applicable non-bankruptcy law; and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have, including the right to contest and/or litigate with any party, including the Debtors, the existence, primacy and/or scope of available coverage under any alleged applicable policy and related agreements.  The rights and obligations of the insured and insurer shall be determined under the insurance policies and related agreements, including all terms, conditions, limitations and exclusions thereof, which shall remain in full force and effect, and any applicable non-bankruptcy law.  To the extent that any insurance policies issued by ACE American Insurance Company, Pacific Employers Insurance Company, Zurich American Insurance Company, Travelers Insurance, their predecessors or successor in interest, or any other members of the ACE group of companies

---

[31] The Debtors also received requests from Zurich American Insurance Company and Travelers Insurance requesting that they be included in the language agreed to between the Debtors and ACE.  The Debtors agreed to add these parties to the agreed disclosure as well.

(collectively, the "Insurers") and/or any related agreements between the Debtors and the Insurers ("Policies and Agreements") are considered executory, they will be assumed by the Debtors and assigned to the Reorganized Debtors.  Regardless of whether the Policies and Agreements are executory or not, after the Effective Date the Reorganized Debtors and the Insurers will perform their respective obligations under the Policies and Agreements including any that remain unperformed as of the Effective Date of the Plan.

### 3.      Henry L. Fernandez, Jr.

Mr. Fernandez filed a DS Objection asserting that additional disclosure is required in order for holders of workers' compensation claims against the Debtors to be able to understand how their claims will be treated under the Plan.  Pursuant to the Employee Wage Motion, described above in Section IV.A.7, the Debtors have continued their workers' compensation plans in the ordinary course of business, and do not intend to affect such plans though the Plan.  Further, section 1.1.106 of the Plan defines "Employee Benefit Plans" to mean "any . . . workers compensation . . . plan, agreement or arrangement for the benefit of the current or former directors, officers or employees (whether salaried or hourly, active or retired) of the applicable Debtor . . . ".  Section 6.11.1 of the Plan contemplates that all of the Employees Benefit Plans will be deemed to be and treated as executory contracts and assumed by the Debtors and assigned to the Reorganized Debtors on the Effective unless otherwise rejected pursuant to the Plan.  As a result, unless a specific workers' compensation plan is rejected pursuant to the Plan, the Debtors will assume such plans in accordance with the Plan, and claimants with valid workers' compensation claims under workers' compensation plans, agreements or arrangements assumed by the Debtors would receive payment of any valid claims and such claims would not be, as queried by Mr. Fernandez, Class 1D General Unsecured Claims.

### 4.      The County of Ontonagon, the Township of Ontonagon and the Village of Ontonagon ("Ontonagon"), The Flower Garden, LLC ("Flower Garden"), Aspirus Ontonagon Hospital ("Aspirus"), Missoula Area Economic Development Corporation ("MAEDC") and the Attorney General of the State of Montana ("Montana").

See the description of, and additional language addressing, the Ontonagon, Flower Garden, Aspirus, MAEDC and Montana DS Objections above in Section IV.G.7 of this Disclosure Statement.

### 5.      Mariner Investment Group, LLC and Senator Investment Group LP ("Mariner").

Mariner filed a DS Objection (the "Mariner DS Objection") listing various additional disclosures that it contends are necessary in order for the Debtors' Disclosure Statement to satisfy section 1125 of the Bankruptcy Code.  The Debtors address many of Mariner's "adequate information" objections herein, including the added valuation section below in Article VIII) and the added description of the Exit Facility above in Sections III.F.3 and IV.G.13.  Additionally, Mariner has raised other objections which the Debtors believe are Plan confirmation issues and/or do not require additional language in the Disclosure Statement.  In order to provide maximum

information to their creditors and other stakeholders, the Debtors have described the additional objections below.[32]

- Mariner does not believe that the Debtors are using current assumptions in their Projections, that such Projections are "not in line with industry analysts' and market expectations" and do not properly consider price trends, and that the Debtors' EBITDA projections likely materially understate the value of the Company because, among other reasons, the Debtors do not take into account the cyclical nature of their industry. The Debtors disagree with these assertions.

- Mariner asserts that the Debtors have undervalued their assets, and overstated their liabilities. The Debtors disagree with these assertions.

- Mariner asserts that the Debtors' description of Intercompany Claims in this Disclosure Statement and treatment under the Plan is vague, and may implicate the Debtors' ability to comply with the "best interests" test under section 1129(a)(7) of the Bankruptcy Code. The Debtors disagree with each of these assertions.

- Mariner asserts that more disclosure is needed to support the need for the proposed compensation being paid to certain of the Debtors' senior executives. The Debtors strongly believe that such compensation is warranted and that no further disclosure (except as noted in the DS Response) is required.

- Mariner asserts that the Debtors should be required to disclose any potential recoveries from retained Litigation Claims and discuss any potential value of the released Avoidance Actions. The Debtors are still determining which, if any, Litigation Claims to pursue, and have not formally determined which Avoidance Actions to release. The Debtors believe, however, that neither any retained Litigation Claims nor the potential release of Avoidance Actions will impact the zero recovery to Holders of SSCC Interests pursuant to the Plan, including Mariner.

- Mariner asserts that the releases, injunctions, exculpation and discharge provisions in the Plan are too broad and thus not permitted, and could impact the Debtors' ability to confirm their Plan. The Debtors have added language to section 10.2 of the Plan and Section V.J.2 below, further clarifying the existing opt-out provision with respect to the third-party releases, and believe that such releases are otherwise appropriate and will not interfere with their ability to confirm the Plan. To the extent necessary these issues will be addressed at the Confirmation Hearing.

- Mariner asserts that the Debtors' Plan more closely resembles a "pot plan" or a substantively consolidated plan because of features allowing the Debtors to advance funds to other Debtors, and requests additional information as of the Effective Date with respect

---

[32] This list is not meant to be exclusive, as many of the objections raised in the Mariner DS Objection have been addressed elsewhere in this Disclosure Statement or in the DS Response. The summary chart attached as Exhibit A to the DS Response contains a full description of each of Mariner's "adequate information" and plan confirmation objections in the Mariner DS Objection, and the Debtors' corresponding responses and/or additions.

to the cash balances of the Debtors. Mariner also requests additional information in connection with the Smurfit-Stone Container Corporation and Smurfit-Stone Container Enterprises merger. The Debtors believe that the Plan and Disclosure Statement contain adequate information with respect to these points. To the extent necessary, these issues will be addressed at the Confirmation Hearing.

- Mariner asserts that the Debtors will not be able to "cramdown" the Holders of SSCC Interests because, Mariner asserts, the Plan is not fair and equitable with respect to these non-accepting classes as certain creditors "will likely receive in excess of 100% recovery on account of their claim . . . ", as required by section 1129(b) of the Bankruptcy Code. Mariner also notes that the Plan is not fair and equitable because Subsidiary Interests in certain of the Debtors are being retained, while Holders of General Unsecured Claims against those Debtors will not receive any distribution. The Debtors disagree with these contentions, and do not anticipate significant confirmation risk from having to cramdown certain Classes under section 1129(b) of the Bankruptcy Code.

### 6.      Certain Holders of Smurfit-Stone Container Corporation's Common Stock.

In addition to Mariner, a separate ad hoc group (the "Certain Holders," together with Mariner, the "Ad Hoc Committees") has filed a DS Objection objecting to, among other things, the Debtors' lack of a valuation calculating total enterprise value and the vintage of the Projected Financial Information. As noted above, the Debtors have added a valuation section to this Disclosure Statement, thus satisfying most of the Certain Holders' DS Objection. Similar to Mariner, the Certain Holders object to the Debtors' Projections, calling the Projections stale and in need of certain adjustments to react to industry developments. As discussed above, the Debtors disagree that their Projected Financial Information is not current and sufficient for purposes of soliciting votes on the Plan. The Certain Holders also believe that Debtors' valuation will be challenged at the Confirmation Hearing, and that such challenge is likely to be successful and show that the Plan provides more than a 100% recovery to the SSCE General Unsecured Claims. The Debtors disagree with this view, and any valuation objections will be heard at the Confirmation Hearing, and not in connection with the approval of this Disclosure Statement.

In addition to these "adequate information" objections in their DS Objection, the Certain Holders request additional language be added to the Disclosure Statement, Plan confirmation notice, and the notice of deemed rejecting class non-voting status. Because the Holders of SSCC Interests will receive the notice of deemed rejecting class non-voting status, the Debtors have agreed to add certain language to the appropriate notice of deemed rejecting status that will be sent to Holders of SSCC Common Interests, on the condition that the Certain Holders provide the information required by Bankruptcy Rule 2019, although they strenuously disagree with the valuation and legal commentary contained in the proposed language (which is described in the DS Response).

### 7.      Aurelius Capital Management, LP and Columbus Hill Capital Management, L.P.

See the description of, and additional language addressing, the Fund Managers' DS Objection above in Section IV.G.11(b) of this Disclosure Statement.

**8.      U.S. Bank Trust National Association as Indenture Trustee.**

See the description of, and additional language addressing, Hodge Trustee DS Objection above in Section IV.G.7 of this Disclosure Statement.

**9.      Concrete Restoration Services Ltd. (objection filed by Specialty Construction Products Ltd.) ("Concrete Restoration").**

Concrete Restoration asserts in its DS Objection that has a registered security by way of a builder's lien.  To the extent that Concrete Restoration does, in fact, have a valid builder's lien under applicable law, Concrete Restoration's Claim shall be treated as a Other Secured Claim against the applicable Debtor under the Plan.

## V.  THE PLAN OF REORGANIZATION

The following sections describe and summarize the proposed Plan for the resolution of outstanding Claims against and Interests in the Debtors.  The confirmation requirements of section 1129(a) of the Bankruptcy Code must be satisfied separately with respect to each Debtor.  Therefore, notwithstanding the combination of the separate plans of reorganization of all Debtors in the Plan for purposes of, among other things, economy and efficiency, the Plan shall be deemed a separate Chapter 11 plan for each such Debtor.  The Plan shall also serve as the CCAA Plan for the Canadian Debtors in the CCAA Proceedings.

The Plan provides for the coordinated restructuring and compromise of all Claims against and Interests in the Debtors in both the Chapter 11 Cases and the CCAA Proceedings.  The effectiveness of the Plan in the Chapter 11 Cases is conditioned upon the effectiveness and implementation of the CCAA Plan in the CCAA Proceedings, and the effectiveness of the CCAA Plan in the CCAA Proceedings is conditioned upon the effectiveness and implementation of the Plan in the Chapter 11 Cases.  The Debtors will seek the confirmation of the Plan by the Bankruptcy Court and the sanction of the CCAA Plan by the Canadian Bankruptcy Court.

**THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN.  THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.  THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.  THE BANKRUPTCY COURT AND THE CANADIAN BANKRUPTCY COURT HAVE NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY.  IF THE BANKRUPTCY COURT AND THE CANADIAN BANKRUPTCY COURT DO CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.**

**CAPITALIZED TERMS USED IN THIS ARTICLE V OF THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED IN THIS ARTICLE V OF**

THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

## A.  Classification and Allowance of Claims & Equity Interests Generally.

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates numerous "Classes" of Claims and Interests. These Classes take into account the differing nature and priority of Claims against and Interests in the Debtors. Administrative Expense Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

The Plan provides specific treatment for each Class of Claims and Interests. Only holders of Allowed Claims are entitled to vote on and receive distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Interest.

## B.  Treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims have not been classified for purposes of the Chapter 11 Cases and therefore are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The treatment of Administrative Expense Claims, DIP Facility Claims, and Priority Tax Claims in the Chapter 11 Cases is set forth below.

### 1.  Administrative Expense Claims.

Subject to the provisions of sections 328, 330, 331 and 503(b) of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, on either: (i) the latest to occur of (a) the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Distribution Date after such Administrative Expense Claim becomes an Allowed Claim, and (c) such other date as agreed upon by the Debtors and the Holder of such Administrative Expense Claim, or (ii) on such other date as the Bankruptcy Court may order, (x) cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, or (y) such other treatment as the Debtors and the Holder of such Administrative Expense Claim shall have agreed; provided, however, that (aa) Allowed Administrative Expense Claims not yet due on the Effective Date or that represent obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date or assumed by the Debtors during the Chapter 11 Cases, shall be paid or performed when due in the ordinary course of the

Reorganized Debtors' business operations and in accordance with the terms and conditions of the particular agreements or applicable non-bankruptcy law governing such obligations; and (bb) Allowed Administrative Expense Claims against SSC Canada or Smurfit-MBI that are not yet due on the Effective Date, or that represent obligations incurred by SSC Canada or Smurfit-MBI in the ordinary course of their business operations after the Petition Date, shall be assumed by Canadian Newco pursuant to the Asset Purchase Agreement and shall be paid or performed by Canadian Newco when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements or applicable non-bankruptcy law governing such obligations.

If all Classes of Impaired Claims against a particular Debtor vote to accept the Plan, such Debtor may agree to waive, and may not receive any distributions under the Plan on account of, any Post-Petition Intercompany Claims held by such Debtor. On the other hand, if any Class of Impaired Claims against a particular Debtor votes to reject the Plan, any Post-Petition Intercompany Claims held by such Debtor shall be paid in full in cash on the latest to occur of (i) the Effective Date and (ii) the date on which such Post-Petition Intercompany Claim becomes payable in the ordinary course of the Debtors' business operations; provided, however, that any Post-Petition Intercompany Claim may be cancelled, waived, subordinated or reinstated, in full or in part, in the Debtors' sole discretion, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liability, or for any other reason.

## 2.    No Double Payment of Administrative Expense Claims.

To the extent that an Administrative Expense Claim is Allowed against the Estate of more than one Debtor, there shall be only a single recovery on account of such Allowed Administrative Expense Claim. In addition, to the extent any obligation that would otherwise constitute an Administrative Expense Claim is paid in full as a CCAA Charge in the CCAA Proceedings, the payment of such CCAA Charge in the CCAA Proceedings shall be the only payment on account of such Administrative Expense Claim under the Plan.

## 3.    DIP Facility Claims.

The DIP Facility Claims shall be Allowed on the Effective Date pursuant to the Plan. In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Debtors shall pay all Allowed DIP Facility Claims (if any) in full in cash on the Effective Date. In addition, on the Effective Date, any unexpired letters of credit outstanding under the DIP Facility shall either be (i) returned to the issuer undrawn and marked canceled, (ii) cash collateralized with cash in an amount equal to 105% of the face amount of such outstanding letter of credit, or (iii) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such outstanding letter of credit and in form and substance acceptable to the issuer thereof.

## 4.    Priority Tax Claims.

Except to the extent that the Debtors and the Holder of an Allowed Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable

on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the Debtors' sole discretion, either (i) cash equal to the amount of such Allowed Priority Tax Claim on the later of the Initial Distribution Date (or as soon as is reasonably practicable thereafter) and the first Distribution Date after such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, or (ii) pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, deferred cash payments made on the first Business Day following each anniversary of the Effective Date over a period not exceeding five (5) years after the Petition Date, with a total value as of the Effective Date equal to the amount of such Allowed Priority Tax Claim. All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the applicable non-bankruptcy law governing such Claims.

## C.   Classification and Treatment of Claims Against and Interests in the Debtors in the Chapter 11 Cases.

### 1.   Summary of Classification and Treatment of Classified Claims and Interests.

(a)   General

(i)   Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims against and Interests in the Debtors are classified for all purposes, including, without express or implied limitation, voting, confirmation and distributions pursuant to the Plan, as set forth in the Plan and described in this Disclosure Statement. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. If there are no Claims or Interests in a particular Class, then such Class of Claims or Interests shall not exist for any purposes under the Plan.

(ii)   The Plan does not provide for substantive consolidation of the Estates and, on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes of the Plan. Unless otherwise provided in the Plan or the Confirmation Order, Allowed Claims against a particular Debtor shall be satisfied solely from the cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor by any of the other Debtors solely for purposes of consummating the Plan. Except as specifically set forth in the Plan, nothing in the Plan or this Disclosure Statement shall constitute or be deemed to constitute an admission that any Debtor is liable for any Claims against any other Debtor. Claims that are asserted against multiple Debtors shall be treated as separate Claims against

each applicable Debtor for all purposes (including, but not limited to, voting and distributions), provided that (i) there shall only be a single recovery on account of such Claims and the aggregate distributions to the Holders of such Claims shall not exceed the largest Allowed amount of any such Claim against any particular Debtor, (ii) any distributions from a particular Estate on account of such Claims shall take into account the distributions to be made on account of such Claims by the other Estates, and (iii) such Claims shall be administered and treated in the manner set forth in the Plan and described below.

(iii)     All Claims against SSCE that are held by a single Holder as of the Record Date shall be deemed to be aggregated and shall be treated as a single Claim for purposes of classification and treatment as a Convenience Claim under the Plan, regardless of whether or not any such Claim is subsequently assigned, in whole or in part, to any other Person or Entity.

(iv)     For purposes of brevity and convenience, but with the same legal force and effect as if set forth at length in the Plan, the classification and treatment of Claims against and Interests in the Debtors under the Plan has been set forth in the following groups: (i) SSCC (Debtor 1), (ii) SSCE (Debtor 2), (iii) Cameo Container (Debtor 3), (iv) Calpine Corrugated (Debtor 4), (v) SSPRI (Debtor 5), (vi) the Non-Operating Debtors (United States) (Debtors 6 through 14), (vii) SSC Canada (Debtor 15); (viii) Smurfit-MBI (Debtor 16), (ix) MBI Limited (Debtor 17), (x) Stone FinCo II (Debtor 18), (xi) B.C. Shipper Supplies Ltd. (Debtor 19), (xii) Francobec Company (Debtor 20), (xiii) 3083527 Nova Scotia Company (Debtor 21), and (xiv) the Non-Operating Debtors (Canada) (Debtors 22 through 25).

(b)     Identification of Classes of Claims Against and Interests in the Debtors.

(i)     The following chart assigns a letter to each Class of Claims against or Interests in SSCC (Debtor 1) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | SSCC Preferred Interests[28][33] |
| G | SSCC Common Interests |

---

[28][33] The Debtors reserve the right, if and as appropriate, to classify any potential Subordinated Securities Claim against SSCC as either an SSCC Preferred Interest or an SSCC Common Interest, depending on the SSCC Interest on which such Subordinated Securities Claim is based, or in a separate Class of Subordinated Securities Claims.

(ii)     The following chart assigns a letter to each Class of Claims against or Interests in SSCE (Debtor 2) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Lender Claims |
| D | Convenience Claims |
| E | General Unsecured Claims |
| F | Intercompany Claims |
| G | Interests |

(iii)    The following chart assigns a letter to each Class of Claims against or Interests in Cameo Container (Debtor 3) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(iv)    The following chart assigns a letter to each Class of Claims against or Interests in Calpine Corrugated (Debtor 4) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Union Bank Claims |
| D | CIT Group Claims |
| E | General Unsecured Claims |
| F | Intercompany Claims |
| G | Interests |

(v)     The following chart assigns a letter to each Class of Claims against or Interests in SSPRI (Debtor 5) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(vi)     The following chart assigns a letter to each Class of Claims against or Interests in the Non-Operating Debtors (United States) (Debtors 6 through 14) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(vii)     The following chart assigns a letter to each Class of Claims against or Interests in SSC Canada (Debtor 15) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Stone FinCo II Intercompany Claim |
| G | Interests |

(viii)     The following chart assigns a letter to each Class of Claims against or Interests in Smurfit-MBI (Debtor 16) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(ix)     The following chart assigns a letter to each Class of Claims against or Interests in MBI Limited (Debtor 17) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

CH1 5118439 5168368 v.41

(x)     The following chart assigns a letter to each Class of Claims against or Interests in Stone FinCo II (Debtor 18) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(xi)     The following chart assigns a letter to each Class of Claims against or Interests in B.C. Shipper Supplies Ltd. (Debtor 19) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

(xii)     The following chart assigns a letter to each Class of Claims against or Interests in Francobec Company (Debtor 20) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(xiii)     The following chart assigns a letter to each Class of Claims against or Interests in 3083527 Nova Scotia Company (Debtor 21) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|-------|-------------------|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | Prepetition Canadian Lender Claims |
| D | General Unsecured Claims |
| E | Intercompany Claims |
| F | Interests |

(xiv)    The following chart assigns a letter to each Class of Claims against or Interests in the Non-Operating Debtors (Canada) (Debtors 22 through 25) for purposes of identifying such Class:

| CLASS | CLAIM OR INTEREST |
|---|---|
| A | Priority Non-Tax Claims |
| B | Other Secured Claims |
| C | General Unsecured Claims |
| D | Intercompany Claims |
| E | Interests |

**2.    Classification and Treatment of Claims Against and Interests in SSCC.**

(a)    Class 1A: Priority Non-Tax Claims Against SSCC

(i)    Classification:  Class 1A consists of all Priority Non-Tax Claims against SSCC.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 1A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 1A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 1A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 1A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 1A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 1A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claim in Class 1A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 1B: Other Secured Claims Against SSCC.

(i)    Classification:  Class 1B consists of all Other Secured Claims against SSCC.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 1B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 1B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Class 1B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 1B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 1C: Prepetition Lender Claims Against SSCC.

(i)     Classification:  Class 1C consists of all Prepetition Lender Claims against SSCC.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Lender Claim, plus any accrued but unpaid interest thereon payable at the ~~applicable~~ non-default interest rate under the Prepetition Credit ~~Agreement~~Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized

in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Lender Claims in Class 1C are Impaired.  Each Holder of an Allowed Prepetition Lender Claim in Class 1C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Lender Claims in Class 1C shall be Allowed pursuant to the Plan in the aggregate principal amount of $969.1 millionthereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.2.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 1D: General Unsecured Claims Against SSCC.

(i)     Classification:  Class 1D consists of all General Unsecured Claims against SSCC.

(ii)     Treatment:  Holders of General Unsecured Claims against SSCC shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed General Unsecured Claims against SSCC shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)     Voting:  General Unsecured Claims in Class 1D are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 1D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)     Class 1E: Intercompany Claims Against SSCC.

(i)     Classification:  Class 1E consists of all Intercompany Claims against SSCC.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against SSCC shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the

111

Plan, all Allowed Intercompany Claims against SSCC shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against SSCC may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSCC or any Reorganized Debtor, or for any other reason.

(iii)     Voting:  Intercompany Claims in Class 1E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 1E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 1E.

(f)     Class 1F: SSCC Preferred Interests.

(i)     Classification:  Class 1F consists of all SSCC Preferred Interests.

(ii)     Treatment:  On the Effective Date, all SSCC Preferred Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of SSCC Preferred Interests shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.[~~29~~34]

(iii)     Voting:  SSCC Preferred Interests are Impaired.  Each Holder of an SSCC Preferred Interest in Class 1F shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(g)     Class 1G: SSCC Common Interests.

(i)     Classification:  Class 1G consists of all SSCC Common Interests.

(ii)     Treatment:  On the Effective Date, all SSCC Common Interests that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of SSCC Common Interests shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  SSCC Common Interests are Impaired.  Each Holder of an SSCC Common Interest in Class 1G shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

---

[~~29~~34] In the event that the Debtors separately classify any Subordinated Securities Claims against SSCC, any such Claims shall be extinguished, cancelled and discharged as of the Effective Date, and any Holders thereof shall receive no distribution in respect of such Claims, pursuant to section 1129(b)(2)(C) of the Bankruptcy Code.

3.     **Classification and Treatment of Claims Against and Interests in SSCE.**

(a)     Class 2A: Priority Non-Tax Claims Against SSCE.

(i)     Classification:  Class 2A consists of all Priority Non-Tax Claims against SSCE.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 2A has agreed to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 2A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 2A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 2A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 2A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 2A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claim in Class 2A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 2B: Other Secured Claims Against SSCE.

(i)     Classification:  Class 2B consists of all Other Secured Claims against SSCE.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 2B shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid

113

under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 2B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Class 2B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 2B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)     Class 2C: Prepetition Lender Claims Against SSCE.

(i)     Classification:  Class 2C consists of all Prepetition Lender Claims against SSCE.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit Agreement Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

114

(iii)    Voting:  Prepetition Lender Claims in Class 2C are Impaired.  Each Holder of an Allowed Prepetition Lender Claim in Class 2C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)    Allowance:  The Prepetition Lender Claims in Class 2C shall be Allowed pursuant to the Plan in the aggregate principal amount of $969.1 millionthereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.3.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)    Class 2D: Convenience Claims Against SSCE.

(i)    Classification:  Class 2D consists of all Convenience Claims against SSCE.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Convenience Claim against SSCE becomes an Allowed Claim, each Holder of an Allowed Convenience Claim against SSCE shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Convenience Claim, the payment of one hundred percent (100%) of such Allowed Convenience Claim in cash.

(iii)    Convenience Class Election:  Each Holder of a Claim against SSCE that (i) is in an amount greater than $10,000 and (ii) would otherwise be classified as a General Unsecured Claim (other than a Prepetition Note Claim, an Industrial Revenue Bond Claim or a Hodge Industrial Revenue Bond Claim) against SSCE may elect to have its Claim treated as a Convenience Claim against SSCE by making such election on the Ballot to be provided to the Holders of Impaired Claims entitled to vote to accept or reject the Plan and returning such Ballot to the address specified therein before the Voting Deadline.  Any Convenience Class Election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.  All Convenience Claim Elections submitted before the Voting Deadline shall be final and irrevocable.

(iv)    Voting:  Convenience Claims in Class 2D are Impaired.  Each Holder of an Allowed Convenience Claim in Class 2D shall be entitled to vote to accept or reject the Plan.

(e)    Class 2E: General Unsecured Claims Against SSCE.

(i)    Classification:  Class 2E consists of all General Unsecured Claims against SSCE.

115

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against SSCE becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSCE shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the New SSCC Common Stock Pool; provided, however, that any Eligible Cash-Out Participant that makes the Cash-Out Election may, to the extent any Cash-Out Payments are made pursuant to Section 6.16 of the Plan, receive on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, its Allowed General Unsecured Claim against SSCE, the Cash-Out Percentage of such Allowed Claim payable in cash on the Initial Distribution Date.

(iii)     Cash-Out Election:  Each Eligible Cash-Out Participant may elect to participate in the Cash-Out Auction pursuant to the procedures set forth in Section 6.16 of the Plan by making such election on the Ballot to be provided to the Holders of Impaired Claims entitled to vote to accept or reject the Plan and returning such Ballot to the address specified therein before the Voting Deadline.  Any Cash-Out Election made after the Voting Deadline shall not be binding on the Debtors unless the Voting Deadline is expressly waived in writing by the Debtors with respect to any such Claim.  All Cash-Out Elections submitted before the Voting Deadline shall be final and irrevocable.

(iv)     Voting:  General Unsecured Claims in Class 2E Claims are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 2E shall be entitled to vote to accept or reject the Plan.

(v)     Allowance:  The Prepetition Noteholder Claims in Class 2E shall be Allowed pursuant to the Plan in the aggregate principal amount of $2.275 billion (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset.  The Industrial Revenue Bond Claims in Class 2E shall also be Allowed pursuant to the Plan, in the aggregate principal amount of $105.840 million (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset.  All other General Unsecured Claims in Class 2E (including, without limitation, the Hodge Industrial Revenue Bond Claims) shall be allowed or disallowed in accordance with Article VIII of the Plan and applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

(f)     Class 2F: Intercompany Claims Against SSCE.

(i)     Classification:  Class 2F consists of all Intercompany Claims against SSCE.  If the Bankruptcy Court determines pursuant to a Final

116

Order that the Stone FinCo II Contribution Claim is an Allowed Claim, the Stone FinCo II Contribution Claim shall be classified and treated as an Allowed Intercompany Claim in Class 2F.

(ii)    Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against SSCE shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against SSCE shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against SSCE may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSCE or any Reorganized Debtor, or for any other reason; (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims that any Debtor (or any purchaser of the Canadian Assets) holds against SSCE shall be treated as Allowed General Unsecured Claims against SSCE for purposes of the Plan and any Debtor (or any purchaser of the Canadian Assets) holding such Intercompany Claim shall receive its Pro Rata Share of the New SSCC Common Stock Pool in full and complete satisfaction, settlement, release and discharge of such Intercompany Claim on the Initial Distribution Date; and (iii) if the Bankruptcy Court determines pursuant to a Final Order that the Stone FinCo II Contribution Claim is an Allowed Claim against SSCE, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall receive its Pro Rata Share of the New SSCC Common Stock Pool on account of the Stone FinCo II Contribution Claim in full and complete satisfaction, settlement, release and discharge of such Claim.  Notwithstanding the foregoing provisions, if (x) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (y) ~~neither the Bankruptcy Court nor~~ the Canadian Bankruptcy Court has not determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, Stone FinCo II shall receive the Stone FinCo II Settlement Distribution on the Effective Date in full and complete satisfaction, settlement, compromise, release and discharge of any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim).

(iii)    Voting:  Intercompany Claims in Class 2F are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 2F, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 2F.  Notwithstanding the foregoing,  if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to

have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

(g)     Class 2G:  Interests in SSCE.

(i)     Classification:  Class 2G consists of all Interests in SSCE.

(ii)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in SSCE shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in Class 2G are Unimpaired.  Each Holder of an Allowed Interest in Class 2G shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance:  All Interests in SSCE shall be Allowed pursuant to the Plan.

### 4.     Classification and Treatment of Claims Against and Interests in Cameo Container.

(a)     Class 3A: Priority Non-Tax Claims Against Cameo Container.

(i)     Classification:  Class 3A consists of all Priority Non-Tax Claims against Cameo Container.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 3A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 3A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 3A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 3A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 3A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

        (iii)     Voting:  Priority Non-Tax Claims in Class 3A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 3A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

    (b)     Class 3B:  Other Secured Claims Against Cameo Container.

        (i)     Classification:  Class 3B consists of all Other Secured Claims against Cameo Container.

        (ii)     Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 3B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 3B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

        (iii)     Voting:  Other Secured Claims in Class 3B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Class 3B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

    (c)     Class 3C: General Unsecured Claims Against Cameo Container.

        (i)     Classification:  Class 3C consists of all General Unsecured Claims against Cameo Container.

        (ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date

after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Cameo Container shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)    Voting:  General Unsecured Claims in Class 3C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 3C shall be entitled to vote to accept or reject the Plan.

(d)    Class 3D: Intercompany Claims Against Cameo Container.

(i)    Classification:  Class 3D consists of all Intercompany Claims against Cameo Container.

(ii)    Treatment:  Holders of Allowed Intercompany Claims against Cameo Container shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against Cameo Container shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against Cameo Container may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Cameo Container or any Reorganized Debtor, or for any other reason.

(iii)    Voting:  Intercompany Claims in Class 3D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 3D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 3D.

(e)    Class 3E:  Interests in Cameo Container.

(i)    Classification:  Class 3E consists of all Interests in Cameo Container.

(ii)    Treatment:  As of the Effective Date, each Holder of an Allowed Interest in Cameo Container shall retain, unaltered, the legal, equitable and contractual rights to which such Allowed Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in Class 3E are Unimpaired.  Each Holder of an Allowed Interest in Class 3E shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  All Interests in Cameo Container shall be Allowed pursuant to the Plan.

5.    **Classification and Treatment of Claims Against and Interests in Calpine Corrugated.**

(a)    Class 4A: Priority Non-Tax Claims Against Calpine Corrugated.

(i)    Classification:  Class 4A consists of all Priority Non-Tax Claims against Calpine Corrugated.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 4A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 4A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 4A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 4A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 4A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 4A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 4A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 4B:  Other Secured Claims Against Calpine Corrugated.

(i)    Classification:  Class 4B consists of all Other Secured Claims against Calpine Corrugated.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 4B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b)

payment of such Allowed Other Secured Claim in full in cash; (c)
satisfaction of such Allowed Other Secured Claim through the surrender of
the collateral securing such Claim and the payment of any interest required
to be paid under section 506(b) of the Bankruptcy Code; or (d) such
treatment in accordance with section 1129(b) of the Bankruptcy Code as
may be determined by the Bankruptcy Court.  The Debtors' failure to object
to the allowance of any Other Secured Claim in Class 4B during the course
of the Chapter 11 Cases shall be without prejudice to the rights of the
Debtors or the Reorganized Debtors to contest or otherwise defend against
such Claim in the appropriate forum when and if such Other Secured Claim
is sought to be enforced by the Holder of such Claim.  Nothing in the Plan
shall preclude the Debtors or Reorganized Debtors from challenging the
validity of any alleged Lien on any asset of any Debtor or Reorganized
Debtor or the value of any such collateral.

(iii)    Voting:  Other Secured Claims in Class 4B are Unimpaired.  Each
Holder of an Allowed Other Secured Claim in Class 4B shall be
conclusively deemed to have accepted the Plan pursuant to section 1126(f)
of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to
accept or reject the Plan.

(c)    Class 4C: Union Bank Claims Against Calpine Corrugated.

(i)    Classification:  Class 4C consists of all Union Bank Claims against
Calpine Corrugated.

(ii)    Treatment:  On the Effective Date, each Holder of an Allowed
Union Bank Claim shall receive, on account of, and in full and complete
satisfaction, settlement, release and discharge of, and in exchange for, such
Allowed Union Bank Claim, payment of the principal amount of such
Allowed Union Bank Claim in full in cash, plus any accrued but unpaid
interest thereon payable at the non-default interest rate under the Union
Bank Credit Agreement.  In addition, the reasonable fees and expenses of
counsel and financial advisors to Union Bank that were incurred prior to the
Effective Date shall be paid by the Debtors or the Reorganized Debtors not
later than thirty (30) days after the Effective Date.

(iii)    Voting:  Union Bank Claims in Class 4C are Impaired.  Each Holder
of an Allowed Union Bank Claim in Class 4C shall be entitled to vote to
accept or reject the Plan.

(iv)    Allowance:  The Union Bank Claims in Class 4C shall be Allowed
pursuant to the Plan in the aggregate principal amount thereof as of the
Petition Date, plus any accrued but unpaid interest thereon payable at the
non-default interest rate under the Union Bank Credit Agreement, and shall
not be subject to objection, challenge, deduction or offset.

(d)    Class 4D: CIT Group Claims Against Calpine Corrugated.

(i)    Classification:  Class 4D consists of all CIT Group Claims against Calpine Corrugated.

(ii)    Treatment:  On the Effective Date, each Holder of an Allowed CIT Group Claim shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed CIT Group Claim, payment of the principal amount of such Allowed CIT Group Claim in full in cash, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the CIT Group Credit Agreement.  In addition, the reasonable fees and expenses of counsel and financial advisors to CIT Group that were incurred prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors not later than thirty (30) days after the Effective Date.

(iii)    Voting:  CIT Group Claims in Class 4D are Impaired.  Each Holder of an Allowed CIT Group Claim in Class 4D shall be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  The CIT Group Claims in Class 4D shall be Allowed pursuant to the Plan in the aggregate principal amount thereof as of the Petition Date, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the CIT Group Credit Agreement, and shall not be subject to objection, challenge, deduction or offset.

(e)    Class 4E:  General Unsecured Claims Against Calpine Corrugated.

(i)    Classification:  Class 4E consists of all General Unsecured Claims against Calpine Corrugated.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Calpine Corrugated shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)    Voting:  General Unsecured Claims in Class 4E are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 4E shall be entitled to vote to accept or reject the Plan.

(f)    Class 4F:  Intercompany Claims Against Calpine Corrugated.

(i)    Classification:  Class 4F consists of all Intercompany Claims against Calpine Corrugated.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against Calpine Corrugated shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and, pursuant to the Plan, all Allowed Intercompany Claims against Calpine Corrugated shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against Calpine Corrugated may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Calpine Corrugated or any Reorganized Debtor, or for any other reason; and (ii) notwithstanding anything to the contrary in the Plan, Reorganized SSCC, as the successor in interest to SSCE (the Holder of an Intercompany Claim against Calpine Corrugated), shall receive 100% of the New Calpine Corrugated Interests on the Effective Date in full and complete satisfaction, settlement, release and discharge of such Intercompany Claim.

(iii)     Voting:  Intercompany Claims in Class 4F are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 4F, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 4F.

(g)     Class 4G: Interests in Calpine Corrugated.

(i)     Classification:  Class 4G consists of all Interests in Calpine Corrugated.

(ii)     Treatment:  On the Effective Date, all Interests in Calpine Corrugated that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Calpine Corrugated shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  Interests in Calpine Corrugated are Impaired.  Each Holder of an Interest in Calpine Corrugated shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in Calpine Corrugated shall be Allowed pursuant to the Plan.

**6.     Classification and Treatment of Claims Against and Interests in SSPRI.**

(a)     Class 5A: Priority Non-Tax Claims Against SSPRI.

(i)     Classification:  Class 5A consists of all Priority Non-Tax Claims against SSPRI.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 5A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 5A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Allowed Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 5A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 5A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 5A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 5A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 5A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 5B:  Other Secured Claims Against SSPRI.

(i)    Classification:  Class 5B consists of all Other Secured Claims against SSPRI.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 5B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 5B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim

is sought to be enforced by the Holder of such Claim. Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)    Voting: Other Secured Claims in Class 5B are Unimpaired. Each Holder of an Allowed Other Secured Claim in Class 5B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(c)    Class 5C: General Unsecured Claims Against SSPRI.

(i)    Classification: Class 5C consists of all General Unsecured Claims against SSPRI.

(ii)    Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSPRI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)    Voting: General Unsecured Claims in Class 5C are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 5C shall be entitled to vote to accept or reject the Plan.

(d)    Class 5D: Intercompany Claims Against SSPRI.

(i)    Classification: Class 5D consists of all Intercompany Claims against SSPRI.

(ii)    Treatment: Holders of Allowed Intercompany Claims against SSPRI shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against SSPRI shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against SSPRI may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSPRI or any Reorganized Debtor, or for any other reason.

(iii)    Voting: Intercompany Claims in Class 5D are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 5D, shall be deemed to have accepted the Plan and votes to accept or

reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 5D.

(e)     Class 5E: Interests in SSPRI.

(i)     Classification:  Class 5E consists of all Interests in SSPRI.

(ii)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in SSPRI shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in SSPRI are Unimpaired.  Each Holder of an Allowed Interest in SSPRI shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

**7.     Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (United States).**

(a)     Classes 6A through 14A: Priority Non-Tax Claims Against the Non-Operating Debtors (United States).

(i)     Classification:  Classes 6A through 14A consist of all Priority Non-Tax Claims against the Non-Operating Debtors (United States).

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Classes 6A through 14A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Classes 6A through 14A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Classes 6A through 14A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Classes 6A through 14A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Classes 6A through 14A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Classes 6A through 14A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Classes 6A through 14A shall be conclusively deemed to have accepted the

Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Classes 6B through 14B:  Other Secured Claims Against the Non-Operating Debtors (United States).

(i)      Classification:  Classes 6B through 14B consist of all Other Secured Claims against the Non-Operating Debtors (United States).

(ii)      Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Classes 6B through 14B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Classes 6B through 14B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)      Voting:  Other Secured Claims in Classes 6B through 14B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Classes 6B through 14B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan

(c)      Classes 6C through 14C:  General Unsecured Claims Against the Non-Operating Debtors (United States).

(i)      Classification:  Classes 6C through 14C consist of all General Unsecured Claims against the Non-Operating Debtors (United States).

(ii)      Treatment:  Holders of General Unsecured Claims against the Non-Operating Debtors (United States) shall not be entitled to receive or

128

retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed General Unsecured Claims against the Non-Operating Debtors (United States) shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)     Voting: General Unsecured Claims in Classes 6C through 14C are Impaired. Each Holder of an Allowed General Unsecured Claim in Classes 6C through 14C shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)     Classes 6D through 14D: Intercompany Claims Against the Non-Operating Debtors (United States).

(i)     Treatment: Holders of Allowed Intercompany Claims against the Non-Operating Debtors (United States) shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Intercompany Claims against the Non-Operating Debtors (United States) shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against the Non-Operating Debtors (United States) may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by the Non-Operating Debtors (United States) or any Reorganized Debtor, or for any other reason.

(ii)     Voting: Intercompany Claims in Classes 6D through 14D are Impaired. The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 6D through 14D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Classes 6D through 14D.

(e)     Classes 6E through 14E: Interests in the Non-Operating Debtors (United States).

(i)     Classification: Classes 6E through 14E consist of all Interests in the Non-Operating Debtors (United States).

(ii)     Treatment: As of the Effective Date, each Holder of an Allowed Interest in the Non-Operating Debtors (United States) shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting: Interests in the Non-Operating Debtors (United States) are Unimpaired. Each Holder of an Allowed Interest in the Non-Operating Debtors (United States) shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

8.  **Classification and Treatment of Claims Against and Interests in SSC Canada.**

(a)  Class 15A: Priority Non-Tax Claims Against SSC Canada.

(i)  Classification:  Class 15A consists of all Priority Non-Tax Claims against SSC Canada.

(ii)  Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 15A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 15A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 15A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 15A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 15A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)  Voting:  Priority Non-Tax Claims in Class 15A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 15A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)  Class 15B: Other Secured Claims Against SSC Canada.

(i)  Classification:  Class 15B consists of all Other Secured Claims against SSC Canada.

(ii)  Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 15B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

(iii)    Voting:  Other Secured Claims in Class 15B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 15B shall be entitled to vote to accept or reject the Plan.

(c)    Class 15C: Prepetition Canadian Lender Claims Against SSC Canada.

(i)    Classification:  Class 15C consists of all Prepetition Canadian Lender Claims against SSC Canada.

(ii)    Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit ~~Agreement~~Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)    Voting:  Prepetition Canadian Lender Claims in Class 15C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 15C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)    Allowance:  The Prepetition Canadian Lender Claims in Class 15C shall be Allowed pursuant to the Plan in the aggregate principal amount ~~of $392.9 million~~thereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.8.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)    Class  15D: General Unsecured Claims Against SSC Canada.

131

(i)    Classification:  Class 15D consists of all General Unsecured Claims against SSC Canada.

(ii)    Treatment:  If the Plan is accepted by the Classes of General Unsecured Claims against each of SSC Canada and Smurfit-MBI, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date and (ii) the first Distribution Date after such General Unsecured Claim against SSC Canada becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the SSC Canada Distribution Pool. If the Plan is not accepted by the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI, (a) the Holders of Allowed General Unsecured Claims against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of such Allowed General Unsecured Claims, their Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court or the Canadian Bankruptcy Court to be properly allocable to SSC Canada and (b) all General Unsecured Claims against SSC Canada shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  For the avoidance of doubt, if the Plan is not accepted by the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI, the SSC Canada Distribution Pool shall not be available for distribution to the Holders of Allowed General Unsecured Claims against SSC Canada.

(iii)    Voting:  General Unsecured Claims in Class 15D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 15D shall be entitled to vote to accept or reject the Plan.

(e)    Class 15E: Intercompany Claims Against SSC Canada.

(i)    Classification:  Class 15E consists of all Intercompany Claims against SSC Canada.

(ii)    Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against SSC Canada shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against SSC Canada shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against SSC Canada may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by SSC Canada or any Reorganized Debtor, or for any other reason, and (ii) if the

Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims against SSC Canada (including the Stone FinCo II Intercompany Claim, to the extent it is deemed to be an Allowed Intercompany Claim against SSC Canada) shall be treated as Allowed General Unsecured Claims against SSC Canada for purposes of the Plan and the Debtor holding such Intercompany Claim shall receive, in full and complete satisfaction, settlement, release and discharge of such Claim, its Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court.

(iii)     Voting:  Intercompany Claims in Class 15E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 15E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 15E.

(f)     Class 15F: Stone FinCo II Intercompany Claim Against SSC Canada.

(i)     Classification:  Class 15F consists of the Stone FinCo II Intercompany Claim against SSC Canada.

(ii)     Treatment:  If (i) the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and (ii) neither the Bankruptcy Court nor the Canadian Bankruptcy Court has not determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, Stone FinCo II shall receive the Stone FinCo II Settlement Distribution on the Effective Date in full and complete satisfaction, settlement, compromise, release and discharge of any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Intercompany Claim).  On the other hand, if the foregoing conditions are not satisfied as of the Effective Date, then the Stone FinCo II Intercompany Claim shall be entitled to the following treatment:  (a) if the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, then (x) the Stone FinCo II Intercompany Claim shall be treated as a Subordinated Securities Claim against SSC Canada and shall be subordinated to all other Claims against SSC Canada, including, without limitation, all General Unsecured Claims and all other Intercompany Claims against SSC Canada, (y) Stone FinCo II, as the Holder of the Stone FinCo II Intercompany Claim, shall not be entitled to receive any distributions on account of such Claim under the Plan, and (z) the Stone FinCo II Intercompany Claim shall be deemed settled, cancelled and extinguished on the Effective Date; or (b) if the Canadian Bankruptcy Court has determined that the Stone FinCo II Intercompany Claim should be treated as an Allowed Intercompany Claim against SSC Canada, then (x)

the Stone FinCo II Intercompany Claim shall be treated as an Allowed Intercompany Claim against SSC Canada if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, or (y) if the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Stone FinCo II Intercompany Claim shall be entitled to such treatment as the Canadian Bankruptcy Court shall determine on or prior to the Confirmation Date.

(iii)     Voting:  Stone FinCo II Intercompany Claims in Class 15F are Impaired.  Stone FinCo II, as the Holder of the Stone FinCo II Intercompany Claims, shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(g)     Class 15G:  Interests in SSC Canada.

(i)     Classification:  Class 15G consists of all Interests in SSC Canada.

(ii)     Treatment:  On the Effective Date, all Interests in SSC Canada that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in SSC Canada shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  Interests in SSC Canada are Impaired.  Each Holder of an Interest in SSC Canada shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in SSC Canada shall be Allowed pursuant to the Plan.

**9.     Classification and Treatment of Claims Against and Interests in Smurfit-MBI.**

(a)     Class 16A: Priority Non-Tax Claims Against Smurfit-MBI.

(i)     Classification:  Class 16A consists of all Priority Non-Tax Claims against Smurfit-MBI.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 16A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 16A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 16A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the

Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 16A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. All Allowed Claims in Class 16A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting: Priority Non-Tax Claims in Class 16A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 16A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 16B: Other Secured Claims Against Smurfit-MBI.

(i)    Classification: Class 16B consists of all Other Secured Claims against Smurfit-MBI.

(ii)    Treatment: On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 16B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

(iii)    Voting: Other Secured Claims in Class 16B are Impaired. Each Holder of an Allowed Other Secured Claim in Class 16B shall be entitled to vote to accept or reject the Plan.

(c)    Class 16C: Prepetition Canadian Lender Claims Against Smurfit-MBI.

(i)    Classification: Class 16C consists of all Prepetition Canadian Lender Claims against Smurfit-MBI.

(ii)    Treatment: On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit ~~Agreement~~Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such

Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Canadian Lender Claims in Class 16C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 16C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Canadian Lender Claims in Class 16C shall be Allowed pursuant to the Plan in the aggregate principal amount of $ 392.9 millionthereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.9.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class  16D: General Unsecured Claims Against Smurfit-MBI.

(i)     Classification:  Class 16D consists of all General Unsecured Claims against Smurfit-MBI.

(ii)     Treatment:  If the Plan is accepted by the Classes of General Unsecured Claims against each of Smurfit-MBI and SSC Canada, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against Smurfit-MBI becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata Share of the Smurfit-MBI Distribution Pool. If the Plan is not accepted by the Class of General Unsecured Claims against either Smurfit-MBI or SSC Canada, (a) the Holders of Allowed General Unsecured Claims against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge

136

of such Allowed General Unsecured Claims, their Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court or the Canadian Bankruptcy Court to be properly allocable to Smurfit-MBI and (b) all General Unsecured Claims against Smurfit-MBI shall be deemed to be Excluded Claims for purposes of the CCAA Plan.  For the avoidance of doubt, if the Plan is not accepted by the Class of General Unsecured Claims against either Smurfit-MBI or SSC Canada, the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Allowed General Unsecured Claims against Smurfit-MBI.

(iii)     Voting:  General Unsecured Claims in Class 16D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 16D shall be entitled to vote to accept or reject the Plan.

(e)     Class 16E: Intercompany Claims Against Smurfit-MBI.

(i)     Classification:  Class 16E consists of all Intercompany Claims against Smurfit-MBI.

(ii)     Treatment:  If the Classes of General Unsecured Claims against SSC Canada and Smurfit-MBI accept the Plan, the Holders of Allowed Intercompany Claims against Smurfit-MBI shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and Allowed Intercompany Claims against Smurfit-MBI shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that (i) any Allowed Intercompany Claim against Smurfit-MBI may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Smurfit-MBI or any Reorganized Debtor, or for any other reason, and (ii) if the Class of General Unsecured Claims against either SSC Canada or Smurfit-MBI rejects the Plan, the Allowed Intercompany Claims against Smurfit-MBI shall be treated as Allowed General Unsecured Claims against Smurfit-MBI for purposes of the Plan and the Debtor holding such Intercompany Claim shall receive, in full and complete satisfaction, settlement, release and discharge of such Claim, its Pro Rata Share of such portion of the Superior Competing Bid Distribution, if any, as shall be determined by the Bankruptcy Court.

(iii)     Voting:  Intercompany Claims in Class 16E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 16E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 16E.

(f)     Class 16F: Interests in Smurfit-MBI.

(i)      Classification:  Class 16F consists of all Interests in Smurfit-MBI.

(ii)      Treatment:  On the Effective Date, all Interests in Smurfit-MBI that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Smurfit-MBI shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)      Voting:  Interests in Smurfit-MBI are Impaired.  Each Holder of an Interest in Smurfit-MBI shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)      Allowance.  All Interests in Smurfit-MBI shall be Allowed pursuant to the Plan.

**10.      Classification and Treatment of Claims Against and Interests in MBI Limited.**

(a)      Class 17A: Priority Non-Tax Claims Against MBI Limited.

(i)      Classification:  Class 17A consists of all Priority Non-Tax Claims against MBI Limited.

(ii)      Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 17A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 17A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 17A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 17A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 17A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)      Voting:  Priority Non-Tax Claims in Class 17A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 17A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)      Class 17B: Other Secured Claims Against MBI Limited.

CH1 5118439 5168368 v.4 1

(i)      Classification:  Class 17B consists of all Other Secured Claims against MBI Limited.

(ii)      Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 17B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

(iii)      Voting:  Other Secured Claims in Class 17B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 17B shall be entitled to vote to accept or reject the Plan.

(c)      Class 17C: Prepetition Canadian Lender Claims Against MBI Limited.

(i)      Classification:  Class 17C consists of all Prepetition Canadian Lender Claims against MBI Limited.

(ii)      Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit Agreement Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Canadian Lender Claims in Class 17C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 17C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Canadian Lender Claims in Class 17C shall be Allowed pursuant to the Plan in the aggregate principal amount of $392.9 millionthereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.10.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 17D: General Unsecured Claims Against MBI Limited.

(i)     Classification:  Class 17D consists of all General Unsecured Claims against MBI Limited.

(ii)     Treatment:  Holders of General Unsecured Claims against MBI Limited shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against MBI Limited shall be deemed settled, cancelled and extinguished on the Effective Date.  For purposes of the CCAA Proceedings, all General Unsecured Claims against MBI Limited shall be deemed to be Excluded Claims.

(iii)     Voting:  General Unsecured Claims in Class 17D are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 17D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)     Class 17E: Intercompany Claims Against MBI Limited.

(i)     Classification:  Class 17E consists of all Intercompany Claims against MBI Limited.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against MBI Limited shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against MBI Limited shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against MBI Limited may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by MBI Limited or any Reorganized Debtor, or for any other reason.

(iii)    Voting:  Intercompany Claims in Class 17E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 17E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 17E.

(f)    Class 17F: Interests in MBI Limited.

(i)    Classification:  Class 17F consists of all Interests in MBI Limited.

(ii)    Treatment:  Treatment:  As of the Effective Date, each Holder of an Allowed Interest in MBI Limited shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)    Voting:  Interests in MBI Limited are Unimpaired.  Each Holder of an Allowed Interest in MBI Limited shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance.  All Interests in MBI Limited shall be Allowed pursuant to the Plan.

## 11.    Classification and Treatment of Claims Against and Interests in Stone FinCo II.

(a)    Class 18A: Priority Non-Tax Claims Against Stone FinCo II.

(i)    Classification:  Class 18A consists of all Priority Non-Tax Claims against Stone FinCo II.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 18A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 18A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 18A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 18A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 18A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 18A are Unimpaired.
Each Holder of an Allowed Priority Non-Tax Claims in Class 18A shall be
conclusively deemed to have accepted the Plan pursuant to section 1126(f)
of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to
accept or reject the Plan.

(b)     Class 18B: Other Secured Claims Against Stone FinCo II.

(i)     Classification:  Class 18B consists of all Other Secured Claims
against Stone FinCo II.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest
to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date
after such Other Secured Claim becomes an Allowed Other Secured Claim,
each Holder of an Allowed Other Secured Claim in Class 18B, if any, shall
receive, on account of, and in full and complete settlement, release and
discharge of and in exchange for such Allowed Other Secured Claim, at the
election of the Debtors, either (a) Reinstatement of such Allowed Other
Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b)
payment of such Allowed Other Secured Claim in full in cash; (c)
satisfaction of such Allowed Other Secured Claim through the surrender of
the collateral securing such Claim and the payment of any interest required
to be paid under section 506(b) of the Bankruptcy Code; or (d) such
treatment in accordance with section 1129(b) of the Bankruptcy Code as
may be determined by the Bankruptcy Court.  The Debtors' failure to object
to the allowance of any Other Secured Claim in Class 18B during the course
of the Chapter 11 Cases shall be without prejudice to the rights of the
Debtors or the Reorganized Debtors to contest or otherwise defend against
such Claim in the appropriate forum when and if such Other Secured Claim
is sought to be enforced by the Holder of such Claim.  Nothing in the Plan
shall preclude the Debtors or Reorganized Debtors from challenging the
validity of any alleged Lien on any asset of any Debtor or Reorganized
Debtor or the value of any such collateral.

(iii)     Voting:  Other Secured Claims in Class 18B are Unimpaired.  Each
Holder of an Allowed Other Secured Claim in Class 18B shall be
conclusively deemed to have accepted the Plan pursuant to section 1126(f)
of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to
accept or reject the Plan.

(c)     Class 18C: General Unsecured Claims Against Stone FinCo II.

(i)     Classification:  Class 18C consists of all General Unsecured Claims
against Stone FinCo II.

(ii)     Treatment:  If (a) the Class of General Unsecured Claims against
Stone FinCo II votes to accept the Plan and (b) neither the Bankruptcy

~~Court nor~~ the Canadian Bankruptcy Court has not determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or an Interest in SSC Canada, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution. On the other hand, if ~~(i) the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan or (ii) either the Bankruptcy Court or the Canadian Bankruptcy Court shall have determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim against or Interest in SSC Canada, then (x) the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive any distributions under the Plan in the Chapter 11 Cases unless the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is an Allowed Claim, in which case~~ the foregoing conditions are not satisfied as of the Effective Date, then the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall be entitled to receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of any shares of the New SSCC Common Stock or other distributions that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim and/or the Stone FinCo II Intercompany Claim; provided, however, that (x) the distributions to any Holder of a General Unsecured Claim against Stone FinCo II shall not exceed, when combined with all other distributions that such Holder is receiving under the Plan, 100% of its Allowed General Unsecured Claim against Stone FinCo II; and (y) if the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan, General Unsecured Claims against Stone FinCo II shall be deemed to be Excluded Claims for purposes of the CCAA Plan. ~~If the Bankruptcy Court determines that the Stone FinCo II Contribution Claim is a Disallowed Claim, the Holders of General Unsecured Claims against Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and all Allowed General Unsecured Claims against Stone FinCo II shall, for purposes of the Chapter 11 Cases, be deemed settled, cancelled and extinguished on the Effective Date.~~

(iii)    Voting:  General Unsecured Claims in Class 18C are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 18C shall be entitled to vote to accept or reject the Plan.

(iv)    Allowance:  The Prepetition Noteholder Claims against Stone FinCo II arising under or evidenced by the 7.375% Notes Due 2014 shall be Allowed pursuant to this Plan in the aggregate principal amount of $200

million (plus any accrued but unpaid interest thereon as of the Petition Date), and shall not be subject to objection, challenge, deduction or offset.

(d)    Class 18D: Intercompany Claims Against Stone FinCo II.

(i)    Classification:  Class 18D consists of all Intercompany Claims against Stone FinCo II.

(ii)    Treatment:  If the Class of General Unsecured Claims against Stone FinCo II votes to accept the Plan and receives the Stone FinCo II Settlement Distribution, the Holders of Intercompany Claims against Stone FinCo II shall not be entitled to receive any distributions under the Plan on account of such Claims.  If the Class of General Unsecured Claims against Stone FinCo II votes to reject the Plan and the Bankruptcy Court and/or the Canadian Bankruptcy Court determines that the Stone FinCo II Contribution Claim and/or the Stone FinCo II Intercompany Claim shall be an Allowed Claim, the Holders of General Unsecured Claims and Intercompany Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, release and discharge of such Claims, their Pro Rata Share of the shares of New SSCC Common Stock or other distributions that Stone FinCo II shall be entitled to receive under the Plan on account of the Stone FinCo II Contribution Claim and/or the Stone FinCo II Intercompany Claim.  If the Stone FinCo II Contribution Claim isand the Stone FinCo II Intercompany Claim are deemed to be a Disallowed ClaimClaims, the Holders of Intercompany Claims against Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan and all Allowed Intercompany Claims against Stone FinCo II shall be deemed settled, cancelled and extinguished on the Effective Date.

(iii)    Voting:  Intercompany Claims in Class 18D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 18D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 18D.

(e)    Class 18E: Interests in Stone FinCo II.

(i)    Classification:  Class 18E consists of all Interests in Stone FinCo II.

(ii)    Treatment:  On the Effective Date, all Interests in Stone FinCo II that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Stone FinCo II shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan; provided, however, that Holders of Interests in Stone FinCo II shall receive 100% of any cash or other property remaining in the Estate of Stone FinCo II after the Holders of General

Unsecured Claims against Stone FinCo II have received distributions under the Plan (whether from Stone FinCo II or any other Debtor) with a value equaling ~~100% of~~ their Allowed Claims.

(iii)    Voting:  Interests in Stone FinCo II are Impaired.  Each Holder of an Interest in Stone FinCo II shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)    Allowance.  All Interests in Stone FinCo II shall be Allowed pursuant to the Plan.

## 12.    Classification and Treatment of Claims Against and Interests in B.C. Shipper Supplies Ltd.

(a)    Class 19A: Priority Non-Tax Claims Against B.C. Shipper Supplies Ltd.

(i)    Classification:  Class 19A consists of all Priority Non-Tax Claims against B.C. Shipper Supplies Ltd.

(ii)    Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 19A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 19A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 19A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 19A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 19A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting:  Priority Non-Tax Claims in Class 19A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Class 19A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)    Class 19B: Other Secured Claims Against B.C. Shipper Supplies Ltd.

(i)    Classification:  Class 19B consists of all Other Secured Claims against B.C. Shipper Supplies Ltd.

(ii)    Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 19B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, ~~at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b)~~ payment of such Allowed Other Secured Claim in full in cash~~; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any~~ <u>(plus any accrued but unpaid</u> interest required to be paid under <u>applicable non-bankruptcy law and</u> section 506(b) of the Bankruptcy Code~~; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Class 19B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral~~<u>)</u>.

(iii)   Voting:  Other Secured Claims in Class 19B are ~~Unimpaired~~<u>Impaired</u>.  Each Holder of an Allowed Other Secured Claim in Class 19B shall ~~be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not~~ be entitled to vote to accept or reject the Plan.

(c)    Class 19C:  General Unsecured Claims Against B.C. Shipper Supplies Ltd.

(i)    Classification:  Class 19C consists of all General Unsecured Claims against B.C. Shipper Supplies Ltd.

(ii)   Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against B.C. Shipper Supplies Ltd. shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)  Voting:  General Unsecured Claims in Class 19C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Class 19C shall be entitled to vote to accept or reject the Plan.

(d)      Class 19D: Intercompany Claims Against B.C. Shipper Supplies Ltd.

    (i)      Classification:  Class 19D consists of all Intercompany Claims against B.C. Shipper Supplies Ltd.

    (ii)      Treatment:  Holders of Allowed Intercompany Claims against B.C. Shipper Supplies Ltd. shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against B.C. Shipper Supplies Ltd. shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against B.C. Shipper Supplies Ltd. may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by B.C. Shipper Supplies Ltd. or any Reorganized Debtor, or for any other reason.

    (iii)      Voting:  Intercompany Claims in Class 19D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 19D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 19D.

(e)      Class 19E: Interests in B.C. Shipper Supplies Ltd.

    (i)      Classification:  Class 19E consists of all Interests in B.C. Shipper Supplies Ltd.

    (ii)      Treatment:  As of the Effective Date, each Holder of an Allowed Interest in B.C. Shipper Supplies Ltd. shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

    (iii)      Voting:  Interests in B.C. Shipper Supplies Ltd. are Unimpaired. Each Holder of an Allowed Interest in B.C. Shipper Supplies Ltd. shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

    (iv)      Allowance.  All Interests in B.C. Shipper Supplies Ltd. shall be Allowed pursuant to the Plan.

**13.      Classification and Treatment of Claims Against and Interests in Francobec Company.**

(a)      Class 20A: Priority Non-Tax Claims Against Francobec Company.

    (i)      Classification:  Class 20A consists of all Priority Non-Tax Claims against Francobec Company.

147

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 20A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 20A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 20A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 20A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 20A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 20A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 20A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 20B: Other Secured Claims Against Francobec Company.

(i)     Classification:  Class 20B consists of all Other Secured Claims against Francobec Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 20B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

(iii)     Voting:  Other Secured Claims in Class 20B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 20B shall be entitled to vote to accept or reject the Plan.

(c)     Class 20C: Prepetition Canadian Lender Claims Against Francobec Company.

CH1 5118439 5168368 v. 4 1

(i)     Classification:  Class 20C consists of all Prepetition Canadian Lender Claims against Francobec Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit Agreement Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Canadian Lender Claims in Class 20C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 20C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Canadian Lender Claims in Class 20C shall be Allowed pursuant to the Plan in the aggregate principal amount of $392.9 million thereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and other amounts set forth in section 3.13.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 20D:  General Unsecured Claims Against Francobec Company.

(i)     Classification:  Class 20D consists of all General Unsecured Claims against Francobec Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date

after such General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed General Unsecured Claim against Francobec Company shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such Allowed General Unsecured Claim, the payment of one hundred percent (100%) of such Allowed General Unsecured Claim in cash.

(iii)     Voting:  General Unsecured Claims in Class 20D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 20D shall be entitled to vote to accept or reject the Plan.

(e)     Class 20E: Intercompany Claims Against Francobec Company.

(i)     Classification:  Class 20E consists of all Intercompany Claims against Francobec Company.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against Francobec Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan. Pursuant to the Plan, all Allowed Intercompany Claims against Francobec Company shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against Francobec Company may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by Francobec Company or any Reorganized Debtor, or for any other reason.

(iii)     Voting:  Intercompany Claims in Class 20E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 20E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 20E.

(f)     Class 20F: Interests in Francobec Company.

(i)     Classification:  Class 20F consists of all Interests in Francobec Company.

(ii)     Treatment:  On the Effective Date, all Interests in Francobec Company that are outstanding as of the Effective Date shall be extinguished, cancelled and discharged.  Holders of Interests in Francobec Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Interests under the Plan.

(iii)     Voting:  Interests in Francobec Company are Impaired.  Each Holder of an Interest in Francobec Company shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in Francobec Company shall be Allowed pursuant to the Plan.

14.     **Classification and Treatment of Claims Against and Interests in 3083527 Nova Scotia Company.**

(a)     Class 21A: Priority Non-Tax Claims Against 3083527 Nova Scotia Company.

(i)     Classification:  Class 21A consists of all Priority Non-Tax Claims against 3083527 Nova Scotia Company.

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 21A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 21A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Class 21A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Class 21A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Class 21A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Class 21A are Unimpaired. Each Holder of an Allowed Priority Non-Tax Claims in Class 21A shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Class 21B: Other Secured Claims Against 3083527 Nova Scotia Company.

(i)     Classification:  Class 21B consists of all Other Secured Claims against 3083527 Nova Scotia Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Class 21B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, payment of such Allowed Other Secured Claim in full in cash (plus any

151

accrued but unpaid interest required to be paid under applicable non-bankruptcy law and section 506(b) of the Bankruptcy Code).

(iii)     Voting:  Other Secured Claims in Class 21B are Impaired.  Each Holder of an Allowed Other Secured Claim in Class 21B shall be entitled to vote to accept or reject the Plan.

(c)     Class 21C: Prepetition Canadian Lender Claims Against 3083527 Nova Scotia Company.

(i)     Classification:  Class 21C consists of all Prepetition Canadian Lender Claims against 3083527 Nova Scotia Company.

(ii)     Treatment:  On or as soon as reasonably practicable after the Effective Date, in full and complete satisfaction, settlement, release and discharge of such Claim, each Holder of an Allowed Prepetition Canadian Lender Claim shall receive a cash payment of 100% of the principal amount of such Allowed Prepetition Canadian Lender Claim, plus any accrued but unpaid interest thereon payable at the applicable non-default interest rate under the Prepetition Credit ~~Agreement~~Documents and 100% of all reasonable unpaid or unreimbursed fees, costs and expenses payable to such Holder under the Prepetition Credit Documents.  In addition, (i) on the Effective Date, each Prepetition Canadian Revolving Facility Letter of Credit shall, in the Debtors' discretion, in consultation with the Committee and the CCAA Monitor, either be (x) returned to the issuer undrawn and marked canceled, (y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(iii)     Voting:  Prepetition Canadian Lender Claims in Class 21C are Impaired.  Each Holder of an Allowed Prepetition Canadian Lender Claim in Class 21C shall be entitled to vote (excluding, for voting purposes only, any Claim for unreimbursed fees, costs and expenses) to accept or reject the Plan.

(iv)     Allowance:  The Prepetition Canadian Lender Claims in Class 21C shall be Allowed pursuant to the Plan in the aggregate principal amount ~~of $392.9 million~~thereof, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and

152

other amounts set forth in section 3.14.3(b) of the Plan, and shall not be subject to objection, challenge, deduction or offset.

(d)     Class 21D: General Unsecured Claims Against 3083527 Nova Scotia Company.

(i)     Classification:  Class 21D consists of all General Unsecured Claims against 3083527 Nova Scotia Company.

(ii)     Treatment:  Holders of General Unsecured Claims against 3083527 Nova Scotia Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against 3083527 Nova Scotia Company shall be deemed settled, cancelled and extinguished on the Effective Date.  For purposes of the CCAA Proceedings, all General Unsecured Claims against 3083527 Nova Scotia Company shall be deemed to be Excluded Claims.

(iii)     Voting:  General Unsecured Claims in Class 21D are Impaired. Each Holder of an Allowed General Unsecured Claim in Class 21D shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(e)     Class 21E: Intercompany Claims Against 3083527 Nova Scotia Company.

(i)     Classification:  Class 21E consists of all Intercompany Claims against 3083527 Nova Scotia Company.

(ii)     Treatment:  Holders of Allowed Intercompany Claims against 3083527 Nova Scotia Company shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against 3083527 Nova Scotia Company shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against 3083527 Nova Scotia Company may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by 3083527 Nova Scotia Company or any Reorganized Debtor, or for any other reason.

(iii)     Voting:  Intercompany Claims in Class 21E are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Class 21E, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Class 21E.

(f)     Class 21F: Interests in 3083527 Nova Scotia Company.

CH1 5118439 5168368 v.4 1

(i)     Classification:  Class 21F consists of all Interests in 3083527 Nova Scotia Company.

(ii)     Treatment:  Treatment:  As of the Effective Date, each Holder of an Allowed Interest in 3083527 Nova Scotia Company shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in 3083527 Nova Scotia Company are Unimpaired. Each Holder of an Allowed Interest in 3083527 Nova Scotia Company shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(iv)     Allowance.  All Interests in 3083527 Nova Scotia Company shall be Allowed pursuant to the Plan.

15.     **Classification and Treatment of Claims Against and Interests in the Non-Operating Debtors (Canada) .**

(a)     Classes 22A through 25A: Priority Non-Tax Claims Against the Non-Operating Debtors (Canada).

(i)     Classification:  Classes 22A through 25A consist of all Priority Non-Tax Claims against the Non-Operating Debtors (Canada).

(ii)     Treatment:  Except to the extent that a Holder of an Allowed Claim in Classes 22A through 25A has agreed in writing to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in 22A through 25A that is due and payable on or before the Effective Date shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for, such Claim, at the election of the Debtors, (i) cash equal to the amount of such Allowed Claim in Classes 22A through 25A in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter) and (b) the first Distribution Date after such Priority Non-Tax Claim in Classes 22A through 25A becomes an Allowed Claim, or as soon thereafter as is practicable, or (ii) such other treatment required to render such Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.  All Allowed Claims in Classes 22A through 25A which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof.

(iii)     Voting:  Priority Non-Tax Claims in Classes 22A through 25A are Unimpaired.  Each Holder of an Allowed Priority Non-Tax Claims in Classes 22A through 25A shall be conclusively deemed to have accepted

the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(b)     Classes 22B through 25B:  Other Secured Claims Against the Non-Operating Debtors (Canada).

(i)      Classification:  Classes 22B through 25B consist of all Other Secured Claims against the Non-Operating Debtors (Canada).

(ii)     Treatment:  On or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim in Classes 22B through 25B, if any, shall receive, on account of, and in full and complete settlement, release and discharge of and in exchange for such Allowed Other Secured Claim, at the election of the Debtors, either (a) Reinstatement of such Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment of such Allowed Other Secured Claim in full in cash; (c) satisfaction of such Allowed Other Secured Claim through the surrender of the collateral securing such Claim and the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; or (d) such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  The Debtors' failure to object to the allowance of any Other Secured Claim in Classes 22B through 25B during the course of the Chapter 11 Cases shall be without prejudice to the rights of the Debtors or the Reorganized Debtors to contest or otherwise defend against such Claim in the appropriate forum when and if such Other Secured Claim is sought to be enforced by the Holder of such Claim.  Nothing in the Plan shall preclude the Debtors or Reorganized Debtors from challenging the validity of any alleged Lien on any asset of any Debtor or Reorganized Debtor or the value of any such collateral.

(iii)    Voting:  Other Secured Claims in Classes 22B through 25B are Unimpaired.  Each Holder of an Allowed Other Secured Claim in Classes 22B through 25B shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan

(c)     Classes 22C through 25C:  General Unsecured Claims Against the Non-Operating Debtors (Canada).

(i)      Classification:  Classes 22C through 25C consist of all General Unsecured Claims against the Non-Operating Debtors (Canada).

(ii)     Treatment:  Holders of General Unsecured Claims against the Non-Operating Debtors (Canada) shall not be entitled to receive or retain

155

any monetary distributions or other property on account of such Claims under the Plan.  For purposes of the Chapter 11 Cases, pursuant to the Plan, all Allowed General Unsecured Claims against the Non-Operating Debtors (Canada) shall be deemed settled, cancelled and extinguished on the Effective Date.  For purposes of the CCAA Proceedings, all General Unsecured Claims against the Non-Operating Debtors (Canada) shall be deemed to be Excluded Claims.

(iii)     Voting:  General Unsecured Claims in Classes 22C through 25C are Impaired.  Each Holder of an Allowed General Unsecured Claim in Classes 22C through 25C shall be conclusively deemed to have rejected the Plan and, accordingly, shall not be entitled to vote to accept or reject the Plan.

(d)     Classes 22D through 25D: Intercompany Claims Against the Non-Operating Debtors (Canada).

(i)     Treatment:  Holders of Allowed Intercompany Claims against the Non-Operating Debtors (Canada)  shall not be entitled to receive or retain any monetary distributions or other property on account of such Claims under the Plan.  Pursuant to the Plan, all Allowed Intercompany Claims against the Non-Operating Debtors (Canada)  shall be deemed settled, cancelled and extinguished on the Effective Date; provided, however, that any Allowed Intercompany Claim against the Non-Operating Debtors (Canada)  may be Reinstated, in full or in part, to the extent the Debtors determine to be advisable in order to avoid the incurrence of any past, present or future tax or similar liabilities by the Non-Operating Debtors (Canada) or the Reorganized Non-Operating Debtors (Canada), or for any other reason.

(ii)     Voting:  Intercompany Claims in Classes 22D through 25D are Impaired.  The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims in Classes 22D through 25D.

(e)     Classes 22E through 25E: Interests in the Non-Operating Debtors (Canada).

(i)     Classification:  Classes 22E through 25E consist of all Interests in the Non-Operating Debtors (Canada).

(ii)     Treatment:  As of the Effective Date, each Holder of an Allowed Interest in the Non-Operating Debtors (Canada) shall retain, unaltered, the legal, equitable and contractual rights to which such Interest entitled the Holder thereof immediately prior to the Effective Date.

(iii)     Voting:  Interests in the Non-Operating Debtors (Canada) are Unimpaired.  Each Holder of an Allowed Interest in the Non-Operating

Debtors (Canada) shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, accordingly, shall not be entitled to vote to accept or reject the Plan.

**16.     Acceptance or Rejection of the Plan by Classes of Claims and Interests.**

(a)     Impaired Classes of Claims Entitled to Vote on the Plan.

Holders of Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D, 17B, 17C, 18C, 19B, 19C, 20B, 20C, 20D, 21B and 21C are Impaired and shall be entitled to vote as a Class separate Classes to accept or reject the Plan.

(b)     Acceptance by Impaired Classes of Claims.

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that actually vote have timely and properly voted to accept the Plan.

(c)     Presumed Acceptance by Holders of Intercompany Claims.

The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims.

(d)     Presumed Acceptance by Unimpaired Classes.

Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, 19B, 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E are Unimpaired under the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

(e)     Presumed Rejection by Impaired Classes.

Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C are Impaired under the Plan, but the Holders of Claims and Interests in such Classes shall not receive or retain any property under the Plan on account of such Claims or Interests. Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in such Classes are conclusively presumed to have rejected the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

(f)     Voting for Purposes of the CCAA Plan.

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, Affected Creditors shall be entitled to vote on the CCAA Plan as described in Article IV of the Plan.

157

**D.     Classification and Treatment of Affected Claims Against the Canadian Debtors in the CCAA Proceedings.**

**1.     Purpose and Effect of the CCAA Plan.**

(a)     Purpose.

For purposes of the CCAA Proceedings, Article IV of the Plan (together with the incorporated definitions and other related provisions) constitutes the CCAA Plan to be proposed to each Class of Affected Claims described below.

(b)     Affected Persons.

The CCAA Plan will be implemented under the CCAA and, subject to its terms, will become effective on, and be binding on and after, the Effective Date on the Canadian Debtors and the Classes of Affected Creditors that have voted in favor of its acceptance by the Required Majority, providing it has been sanctioned by the Canadian Bankruptcy Court by CCAA Sanction Order(s) in form and substance satisfactory to the Canadian Debtors.  The only Classes of Affected Creditors that shall be required to have accepted the CCAA Plan by the Required Majority shall be the Affected Secured Creditors.

(c)     Unaffected Persons.

For the avoidance of doubt, Affected Creditors in any Class that fails to accept the CCAA Plan by the Required Majority, or in respect of which the CCAA Plan is not sanctioned by the Canadian Bankruptcy Court, shall be deemed to be Unaffected Creditors for the purposes of the CCAA Plan.

**2.     Classification of Creditors.**

(a)     Affected Creditors.

For purposes of voting on and receiving distributions under the CCAA Plan, Affected Creditors are divided into the following Classes:

(i)     Affected Secured Creditors.

(1) Affected Secured Creditors of SSC Canada;

(2) Affected Secured Creditors of Smurfit-MBI;

(3) Affected Secured Creditors of MBI Limited;

(4) Affected Secured Creditors of Francobec Company; and

(5) Affected Secured Creditors of 3083527 Nova Scotia Company.

(ii)     Affected Unsecured Creditors.

(1) Affected Unsecured Creditors of SSC Canada;

(2) Affected Unsecured Creditors of Smurfit-MBI; and

(3) Affected Unsecured Creditors of Stone FinCo II.

(iii)    Affected Creditors shall be entitled to prove their respective Affected Claims, vote in respect of the CCAA Plan, and receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

(b)    Excluded Claims.

For purposes of the CCAA Proceedings, the CCAA Plan shall not affect the following types of Claims (each, an "Excluded Claim" and, collectively, the "Excluded Claims"):

(i)   the indebtedness, liabilities and obligations secured by the Administration Charge;

(ii)  the indebtedness, liabilities and obligations secured by the DIP Lenders' Charge;

(iii)  the indebtedness, liabilities and obligations secured by the Directors' Charge;

(iv)  any amounts owing to employees and officers employed by, and directors of, the Canadian Debtors on the Petition Date that are entitled to priority in payment under the CCAA, including any Claims for wages, salary, benefits, unreimbursed expenses, and amounts owing for accrued but unpaid vacation pay as of the Petition Date that are entitled to priority in payment under the CCAA, but expressly excluding all Non-Qualified Employee Benefit Claims;

(v) any Post-Filing Claim;

(vi) any Administrative Expense Claim against a Canadian Debtor;

(vii) any Other Secured Claim against a Canadian Debtor;

(viiviii) any Priority Tax Claim against a Canadian Debtor;

(viiiix) any Claim of a Person who was an officer, director or employee of any Canadian Debtor as of the Petition Date for indemnification and/or contribution with respect to such officer's, director's, or employee's service to such Canadian Debtor, pursuant (and subject) to applicable laws and the policies and procedures of such Canadian Debtor (provided that all such

indemnification and/or contribution Claims shall be assumed by Canadian
Newco);

(ixx) any General Unsecured Claim against a Canadian Debtor other than
SSC Canada, Smurfit-MBI, and Stone FinCo II;

(x)  any Secured Claim against a Canadian Debtor other than SSC Canada,
Smurfit-MBI, MBI Limited, Francobec Company, and 3083527 Nova Scotia
Company; (xi)  any Intercompany Claim; and

(xii)  Affected Claims in any Class that fails to accept the CCAA Plan by the
Required Majority or in respect of which the CCAA Plan is not sanctioned
by the Canadian Bankruptcy Court, from and after the date of such rejection
or non-approval by the Canadian Bankruptcy Court (as the case may be).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in
respect of the CCAA Plan or otherwise or to receive distributions provided for, under and pursuant
to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA
Creditors' Meeting Order, and the CCAA Plan.  Nothing in the CCAA Plan shall affect the rights
and defenses of any Canadian Debtor, either legal or equitable, with respect to any Excluded
Claim, including any rights arising under or pursuant to the CCAA Plan or any rights with respect
to legal or equitable defenses or entitlements to setoff or recoupment against such Excluded
Claims; provided, however, that the Debtors reserve the right to seek confirmation of the Plan in
the Chapter 11 Cases pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class
of Affected Claims that has failed to accept the Plan, in which case the Holders of such Claims
shall receive the treatment set forth in Article III of the Plan and shall be subject to all applicable
provisions of the Plan for purposes of the Chapter 11 Cases.

**3.**     **Treatment of Affected Secured Claims, CCAA Charges and Priority Tax
Claims.**

(a)     Affected Secured Claims.

(i)     Voting:  Affected Secured Creditors shall be entitled to vote on the
CCAA Plan in accordance with the CCAA Creditors' Meeting Order.

(ii)     Treatment:  On or as soon as reasonably practicable after the
Effective Date, in full and complete satisfaction, settlement, release and
discharge of such Claim, each Holder of an Allowed Prepetition Canadian
Lender Claim shall receive a cash payment of 100% of the principal amount
of such Allowed Prepetition Canadian Lender Claim, plus any accrued but
unpaid interest thereon payable at the applicable non-default interest rate
under the Prepetition Credit AgreementDocuments and 100% of all unpaid
or unreimbursed fees, costs and expenses payable to such Holder under the
Prepetition Credit Documents.  In addition, (i) on the Effective Date, each
Prepetition Canadian Revolving Facility Letter of Credit shall, in the
Debtors' discretion, in consultation with the Committee and the CCAA
Monitor, either be (x) returned to the issuer undrawn and marked canceled,

160

(y) cash collateralized in accordance with the terms of the Prepetition Credit Agreement with cash in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit, or (z) collateralized with back-to-back letters of credit issued under the Exit Facilities in an amount equal to 105% of the face amount of such Prepetition Canadian Revolving Facility Letter of Credit and in form and substance acceptable to the issuer thereof and the Prepetition Agent; and (ii) the reasonable fees and expenses of counsel and financial advisors to the Prepetition Agent that were incurred prior to the Effective Date in accordance with the terms of the DIP Facility Order shall be paid not later than thirty (30) days after the Effective Date.

(b)     Treatment of CCAA Charges.

The Canadian Debtors shall satisfy, in full and in cash, all obligations secured by the CCAA Charges on the Effective Date.

(c)     Treatment of Priority Tax Claims Against the Canadian Debtors.

Except to the extent that the Canadian Debtors and the Holder of a Priority Tax Claim agree to a less favorable treatment of such Claim (in which event such agreement shall govern), each Holder of a Priority Tax Claim against any of the Canadian Debtors that is a Proven Claim and is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Priority Tax Claim, cash equal to the amount of such Priority Tax Claim on the later of (i) the Initial Distribution Date (or as soon as is reasonably practicable thereafter) and (ii) the first Distribution Date after such Priority Tax Claim becomes a Proven Claim, or as soon thereafter as is reasonably practicable.  All Priority Tax Claims against any of the Canadian Debtors that are not due and payable on the Effective Date shall be paid in the ordinary course of business after the Effective Date in accordance with the applicable non-bankruptcy law governing such Claims.

**4.     Treatment of Affected Unsecured Claims.**

The treatment of Affected Unsecured Claims under the CCAA Plan depends on the identity of the Canadian Debtor against which such Affected Unsecured Claims are asserted.

(a)     Affected Unsecured Claims Against SSC Canada.

If:

(i)     the Classes of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI approve the CCAA Plan by the Required Majority,

(ii)     the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class, and

(iii) the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1 of the Plan,

161

then, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against SSC Canada becomes a Proven Claim, each Holder of a General Unsecured Claim against SSC Canada shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata Share of the SSC Canada Distribution Pool.

(b)        Affected Unsecured Claims Against Smurfit-MBI.

If:

(i)        the Classes of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI approve the CCAA Plan by the Required Majority,

(ii)        the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class, and

(iii)        the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1 of the Plan,

then, on or as soon as reasonably practicable after the latest to occur of (i) the Initial Distribution Date or (ii) the first Distribution Date after such General Unsecured Claim against Smurfit-MBI becomes a Proven Claim, each Holder of a General Unsecured Claim against Smurfit-MBI shall receive, on account of, and in full and complete satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, its Pro Rata Share of the Smurfit-MBI Distribution Pool.

(c)        Affected Unsecured Claims Against Stone FinCo II.

If:

(i)        the Class of Affected Unsecured Creditors of Stone FinCo II approves the CCAA Plan by the Required Majority,

(ii)        ~~neither the Bankruptcy Court nor~~ the Canadian Bankruptcy Court has ~~not~~ determined that the Stone FinCo II Intercompany Claim should be treated as a Subordinated Securities Claim or an Interest in SSC Canada,

(ii)        the CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to such Class, and

(iii)        the Canadian Assets are transferred to Canadian Newco in accordance with Section 5.1.5 of the Plan,

then, the Holders of General Unsecured Claims against Stone FinCo II shall receive, in full and complete satisfaction, settlement, compromise, release and discharge of such General Unsecured Claims and any Claims that Stone FinCo II may be able to assert against any other

162

Debtor (including, without limitation, the Stone FinCo II Contribution Claim and the Stone FinCo II Intercompany Claim), their Pro Rata Share of the Stone FinCo II Settlement Distribution.

**5.     Conditions Precedent to Implementation of CCAA Plan.**

In addition to any other approvals and receipt of the CCAA Sanction Order described above, the implementation of the CCAA Plan shall be conditioned upon the fulfillment or satisfaction of the following conditions on or before the Effective Date, each of which may be waived by the relevant Canadian Debtors:

(a)     The Classes of Affected Secured Creditors approve the CCAA Plan by the Required Majority;

(b)     The CCAA Plan is sanctioned by the Canadian Bankruptcy Court with respect to each such Class;

(c)     Execution and delivery of all such agreements, resolutions, indentures, documents and other instruments which are necessary to be executed and delivered by the Canadian Debtors to implement the CCAA Plan and perform their obligations hereunder;

(d)     In respect of the CCAA Sanction Orders described above, the expiry of the applicable appeal periods and, in the event of an appeal or application for leave to appeal, final determination by the applicable appellate tribunal;

(e)     The Plan shall have become effective in the Chapter 11 Cases in accordance with the terms of Section 9.2 of the Plan.

**6.     CCAA Creditors' Meeting.**

The CCAA Creditors' Meeting shall be held in accordance with the CCAA Plan, the CCAA Creditors' Meeting Order, and any further order which the Canadian Bankruptcy Court may enter from time to time for the purposes of considering and voting on the CCAA Resolution or any other matters to be considered at the CCAA Creditors' Meeting.

(a)     Severance.

The CCAA Plan shall be severable such that it may be voted upon and approved by each Class of Affected Creditors separately.

(b)     Voting by Creditors.

The Canadian Debtors are seeking approval of the CCAA Plan by the affirmative vote of the Required Majorities of each of the Classes of Affected Creditors.  Except for the CCAA Resolution, which shall be decided by the Required Majorities on a vote by ballot, any other matter submitted for a vote at the CCAA Creditors' Meeting shall be decided by a majority of votes cast on a vote by a show of hands, unless the CCAA Meeting Chair decides, in his or her sole discretion, to hold such vote by way of ballot.

The result of any vote at the CCAA Creditors' Meeting shall be binding on all Affected Claims of the applicable Class, regardless of whether or not the Holder of such Affected Claim was present and voting (in person or by proxy) at the CCAA Creditors' Meeting.

(c)      Claims for Voting Purposes.

Each Holder of a Voting Claim shall be entitled to one (1) vote and the weight attributed to such vote (for the purposes of determining the Required Majorities) shall be equal to the aggregate United States dollar amount of such Voting Claim.  Voting Claims shall not include fractional numbers and shall be rounded to the nearest whole United States dollar amount, in accordance with the CCAA Creditors' Meeting Order.

For the purposes of determining the value of Affected Claims denominated in currencies other than United States dollars for voting and distribution purposes under the CCAA Plan, such Affected Claims shall be converted to United States dollars at the conversion rate set forth inas prescribed by paragraph 20 of the CCAA Bar Date Order.

If the amount of any Affected Claim is not resolved for voting purposes at least five (5) Business Days prior to the CCAA Creditors' Meetingby the Record Date in accordance with the CCAA Claims Determination Order and the CCAA Creditors' Meeting Order, the Affected Creditor shall be entitled to vote at the CCAA Creditors' Meeting based on that portion of its Affected Claim that has been accepted for voting purposes by the Canadian Debtors and the CCAA Monitorin accordance with the procedures provided for in the CCAA Creditors' Meeting Order, without prejudice to any rights of such Affected Creditor or the Canadian Debtors with respect to the final determination of such Affected Claim for distribution purposes in accordance with the terms of the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

(d)      Claims Bar Date.

If any Person required by the CCAA Bar Date Order and the CCAA Claims Determination Order to file a Proof of Claim by the Claims Bar Date has failed to do so (and is not deemed to have filed a Proof of Claim by the Claims Bar Date pursuant to the CCAA Bar Date Order or the CCAA Claims Determination Order), that Person shall not be permitted to vote at the CCAA Creditors' Meeting and shall not be entitled to receive any distribution under the Plan.

(e)      CCAA Creditors' Meeting Chair.

The CCAA Creditors' Meeting Chair shall decide all matters relating to procedure at the CCAA Creditors' Meeting that are not otherwise set out in the CCAA Creditors' Meeting Order.

(f)      Application for CCAA Sanction Order(s).

If the Classes of Affected Secured Claims approve the CCAA Plan, the Canadian Debtors shall apply for a Sanction Order in respect of each Class that has approved the CCAA Plan, providing, inter alia, that:

CH1 51184395168368v.41

(i)     the compromises and arrangements effected by the CCAA Plan are approved, binding and effective on all Classes of Affected Claims that approved the CCAA Plan;

(ii)     consent is given to the assignment of the Canadian Assets to Canadian Newco; and

(iii)     no Person who is a party to an obligation or agreement with the Canadian Debtors shall, following the Effective Date, accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder, or enforce or exercise any right (including any right of set-off, dilution or other remedy) or make any demand under or in respect of such obligation or agreement, by reason:

>    (1)     of any event(s) which occurred on or prior to the Effective Date that would have entitled any other Person thereto to enforce those rights or remedies (including defaults or events of default arising as a result of the insolvency of the Canadian Debtors);
>
>    (2)     of the fact that the Canadian Debtors have sought or obtained relief under the CCAA of Chapter 11 of the Bankruptcy Code or that the reorganization has been implemented by the Canadian Debtors;
>
>    (3)     of the effect on the Canadian Debtors of the completion of any of the transactions contemplated by the CCAA Plan; or
>
>    (4)     of any compromises or arrangements effected pursuant to the CCAA Plan.

(g)     Further Stay.

The Canadian Debtors may apply for an interim order extending the CCAA stay period so that the application for the CCAA Sanction Orders may be made before the stay period expires and the stay period shall not expire until the Effective Date.

## 7.     General.

(a)     CCAA Releases.

On the Effective Date, all Affected Creditors subject to the CCAA Plan as sanctioned by the Canadian Bankruptcy Court, any other Persons asserting such Claims, and each of their respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally the applicable Canadian Debtors, the CCAA Monitor, and each of their respective Related Persons (collectively, the "CCAA Released Parties") from any and all demands, Claims, actions (including any class actions or proceedings before an administrative tribunal), causes of action, grievances, obligations, counterclaims, suits, debts, sums of money, accounts, covenants, damages, remedies, judgments, expenses, executions, liens

and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any such Person may be entitled to assert, including, without limitation, any and all claims for accounting, reconciliation, contribution or indemnity, restitution or otherwise, as well as any Claims in respect of potential statutory liabilities of the former and present directors and officers of the Canadian Debtors, whether known or unknown, matured or unmatured, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction, dealing, termination, disclaimer, rescission or repudiation of any contract, lease or other agreement, whether written or oral, or other occurrence existing or taking place on or prior to the Effective Date relating to, arising out of or in connection with any Claim, trust, constructive trust or deemed trust, the business and affairs of the Canadian Debtors, the CCAA Plan, the Canadian Asset Sale, or the CCAA Proceedings, provided that nothing in the Plan shall release or discharge (i) any CCAA Released Party if such CCAA Released Party is adjudged by the express terms of a judgment rendered on a final determination on the merits to have committed fraud or (ii) any director of a Canadian Debtor for a Claim excluded by Section 5.1(2) of the CCAA.

     (b)     Amendments to the CCAA Plan.

The Canadian Debtors may (in consultation with the Committee and the CCAA Monitor) alter, amend, modify and/or supplement the CCAA Plan at any time prior to or after the entry of the CCAA Saction Order, provided that:

     (i)     The Canadian Debtors reserve the right, at any time and from time to time, to (in consultation with the Committee and the CCAA Monitor) amend, modify and/or supplement the CCAA Plan, or to waive in whole or in part any condition, provided that any such alteration, amendment, modification, or supplement must be in a written document which that is: (i) filed with the Canadian Bankruptcy Court; and (ii) communicated to the Affected Creditors in such manner, if any, as may be required by the Canadian Bankruptcy Court. Any supplement or amendment to the CCAA Plan so filed with the Canadian Bankruptcy Court shall, for all purposes, be and be deemed to be a part of and incorporated in the CCAA Plan deemed appropriate by the Canadian Debtors and the CCAA Monitor;

     (ii)     Any any such alteration, amendment, modification, supplement or waiver may be made following the entry of the CCAA Sanction Order unilaterally by the Canadian Debtors, provided that it concerns a matter that, in the opinion of the Canadian Debtors, acting reasonably, is of an administrative nature required to better give effect to the implementation of the CCAA Plan and the CCAA Sanction Order and is not adverse to the financial or economic interest does not materially or adversely change the treatment of any Class of Affected Creditors.; and

     (iii)     Any supplementary plan or plans of compromise or arrangement any such alteration, amendment, modification or supplement filed with the Canadian Bankruptcy Court shall, for all purposes, be and be deemed to be a part of and incorporated in the CCAA Plan.

(c)     Further Assurances.

Notwithstanding that the transactions and events set out in the CCAA Plan shall be deemed to occur without any additional act or formality other than as set out in the CCAA Plan, each of the Persons affected hereby shall make, do and execute or cause to be made, done or executed all such further acts, deeds, agreements, transfers, assurances, instruments, documents or discharges as may be reasonably required by the Canadian Debtors in order to better implement the CCAA Plan.

(d)     Paramountcy.

From and after the Effective Date, any conflict between the CCAA Plan and the covenants, warranties, representations, terms, conditions, provisions or obligations, expressed or implied, of any contract, credit document, agreement for sale, by-laws of the Canadian Debtors subject to the CCAA Plan, lease or other agreement, written or oral, and any and all amendments or supplements thereto, existing between one or more of the Affected Creditors and the Canadian Debtors subject to the CCAA Plan as of the Effective Date, shall be deemed to be governed by the terms, conditions and provisions of this CCAA Plan and any applicable CCAA Sanction Order, which shall take precedence and priority. From and after the Effective Date, any conflict between the terms of Article III of the Plan and the CCAA Plan shall be resolved by the Bankruptcy Court and the Canadian Bankruptcy Court in accordance with the terms of the Cross-Border Insolvency Protocol.

(e)     Termination.

At any time until the Effective Date, the Canadian Debtors may determine not to proceed with the CCAA Plan, notwithstanding any prior approval given at the CCAA Creditors' Meeting.

(f)     Successors and Assigns.

The CCAA Plan and any compromise effected by the CCAA Plan shall be binding upon and shall ~~inure~~enure to the benefit of the heirs, administrators, executors, representatives, successors and assigns of any Person named or referred to in, or affected by, the Plan for all purposes, as of the Effective Date.

(g)     Deeming Provisions.

In the CCAA Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

## E.     The Canadian Asset Sale.

### 1.     Sale of the Canadian Assets to Canadian Newco.

(a)     Formation of Canadian Newco.

Prior to the Effective Date, the Debtors (in consultation with the Committee and the CCAA Monitor) shall establish (a) Canadian Newco ~~(including, without limitation, one or more intermediate holding companies formed for the purpose of holding SSCE's equity interests in~~as a

167

wholly-owned, direct subsidiary of Canadian ~~Newco)~~Holdco and (b) Canadian Holdco as a wholly-owned, direct or indirect, subsidiary of SSCE. On or prior to the Effective Date, the Canadian Newco ~~Certificate of Incorporation and the Canadian Newco By-Laws,~~ Partnership Agreement (in substantially the ~~forms of Exhibit 7 and Exhibit 8 to the Plan (to be filed with the Plan Supplement), respectively,~~ form of Exhibit 7 to the Plan, to be filed with the Plan Supplement), the Canadian Holdco Articles of Association (in substantially the form of Exhibit 8 to the Plan), and the Canadian Holdco Memorandum of Association (in substantially the form of Exhibit 9 to the Plan) shall become effective. From and after the Effective Date, Canadian ~~Newco~~Holdco shall be a wholly-owned subsidiary of Reorganized SSCC~~.~~ and Canadian Newco shall continue to be a wholly-owned subsidiary of Canadian Holdco.

     (b)     Offer to Purchase the Canadian Assets.

Pursuant to the Plan, Canadian Newco shall be deemed to have made an offer to purchase the Canadian Assets on the Effective Date, free and clear of all Liens, Claims, interests and encumbrances other than those liabilities that are expressly assumed by Canadian Newco in accordance with the terms of the Asset Purchase Agreement, upon and in consideration for (i) the payment to the Prepetition Agent of cash in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and all other amounts payable in connection therewith under the Plan, (ii) the payment of cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) the payment of cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned to Canadian Newco is in default, (iv) the assumption by Canadian Newco of certain liabilities of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company as set forth in the Asset Purchase Agreement, including, without limitation, all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans, and (v) the payment of cash in the amounts necessary to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool, which shall be available for distribution to Affected Unsecured Creditors of SSC Canada and Smurfit-MBI in accordance with Article IV of the Plan. For the avoidance of doubt, the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool shall not be available for distribution to the Holders of Affected Unsecured Claims if the Classes of Affected Unsecured Claims against either SSC Canada or Smurfit-MBI fail to accept the Plan. Prior to or on the Effective Date, the Debtors or the Reorganized Debtors shall transfer to Canadian Newco the cash necessary to consummate the Canadian Asset Sale.

     (c)     Assumption of Certain Liabilities by Canadian Newco.

Pursuant to the Asset Purchase Agreement, Canadian Newco shall assume certain liabilities of the Canadian Debtors. Such assumed liabilities shall include, without limitation: (i)

all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Pension Plans (including all unfunded liabilities thereunder) and the Canadian Employee Benefit Plans, (ii) all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under the Canadian Collective Bargaining Agreements, (iii) allcertain existing and future obligations of SSC Canada, Smurfit-MBI or, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company to their current employees as set forth in the Asset Purchase Agreement, but excluding any obligations of such Canadian Debtors with respect to Non-Qualified Employee Benefit Plans, (iv) all existing and future obligations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. or Francobec Company under executory contracts or unexpired leases that are assigned to Canadian Newco pursuant to the Asset Purchase Agreement, and (v) all obligations to vendors, suppliers and customers arising in the ordinary course of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., or Francobec Company's operations from and after the Petition Date, to the extent such obligations are deemed to be Allowedconstitute Post-Filing Claims andthat are not otherwise satisfied or discharged pursuant to the Plan. For the avoidance of doubt, the liabilities assumed by Canadian Newco shall not include any existing or future obligations of any Canadian Debtor under any Non-Qualified Employee Benefit Plans.

     (d)    Assignment of Executory Contracts and Unexpired Leases to Canadian Newco.

Canadian Newco shall be entitled to receive a CCAA Vesting Order from the Canadian Bankruptcy Court, which shall provide for the transfer and assignment to Canadian Newco of, among other things: (i) the unexpired leases that were previously assumed by SSC Canada or Smurfit-MBI, as set forth in Exhibit 910 to the Plan (to be filed with the Plan Supplement), and (ii) the executory contracts and unexpired leases set forth in Exhibit 1011 to the Plan (to be filed with the Plan Supplement). Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such transfer and/or assignment for purposes of the Chapter 11 Cases. Entry of the CCAA Vesting Order shall constitute the Canadian Bankruptcy Court's approval of such transfer and/or assignment for purposes of the CCAA Proceedings. Canadian Newco shall assume and perform all obligations of SSC Canada or Smurfit-MBI under each of the executory contracts and unexpired leases that shall be assigned to Canadian Newco.

     (e)    Consensual Transfer of the Canadian Assets to Canadian Newco.

If the CCAA Plan is approved by the Required Majority of the Affected Secured Creditors and the Affected Unsecured Creditors of both SSC Canada and Smurfit-MBI, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the CCAA Vesting Order, the Confirmation Order, and the CCAA Sanction Order. The Affected Secured Creditors and the Affected Unsecured Creditors shall be deemed to have consented to such transfer.

     (f)    Sale of the Canadian Assets if Affected Unsecured Creditors of SSC Canada and Smurfit-MBI Do Not Approve the CCAA Plan.

Should the CCAA Plan not be approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, members of such Classes shall be deemed thereafter to be Unaffected Creditors for all purposes of the CCAA Plan. If (x) the CCAA

Plan is not approved by the Required Majority of the Affected Unsecured Creditors of either SSC Canada or Smurfit-MBI, ~~or should~~(y) the Plan ~~fail~~fails to be sanctioned by the Canadian Bankruptcy Court with respect to any Class of Affected Creditors, or (z) the Debtors so choose at any time prior to the Confirmation Hearing in consultation with the Committee, (i) the Debtors shall be permitted (in consultation with the Committee and with the assistance and under the supervision of the CCAA Monitor) to pursue a marketing process for the CCAA Assets pursuant to sale procedures that may be approved by the Canadian Bankruptcy Court and/or the Bankruptcy Court (the "Sale Procedures") at any time prior to or at the Confirmation Hearing and (ii) Canadian Newco's offer for the Canadian Assets under Section 5.1.2 of the Plan shall be modified to exclude the cash in the amounts required to fund the SSC Canada Distribution Pool and the Smurfit-MBI Distribution Pool. If no Competing Bids are submitted on or before any applicable deadline for the submission of Competing Bids that shall be established pursuant to the Sale Procedures (the "Competing Bid Deadline"), the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order.

If any Competing Bids for the Canadian Assets are submitted on or before the Bid Deadline, the Canadian Bankruptcy Court shall determine whether any such Competing Bid constitutes a Superior Competing Bid. Each Competing Bid shall be in writing, shall not be subject to any contingencies (financing or otherwise), and shall consist of (i) cash payable to the Prepetition Agent in the amount necessary to repay the principal amount of the Prepetition Canadian Revolving Loans and the Prepetition Canadian Term Loans in full, plus any accrued but unpaid interest thereon payable at the non-default interest rate under the Prepetition Credit Agreement and all other amounts payable in connection therewith under the Plan, (ii) cash in the amount necessary to pay the principal amount of all Other Secured Claims against SSC Canada and Smurfit-MBI in full, plus any accrued but unpaid interest thereon required to be paid under applicable law, (iii) cash in the amount necessary to satisfy in full all Administrative Expense Claims, Post-Filing Claims and CCAA Charges against the Canadian Debtors, including, without limitation, any monetary amounts by which each executory contract and unexpired lease to be assigned by the Canadian Debtors is in default, and (iv) an unconditional commitment to assume all existing and future obligations of SSC Canada and Smurfit-MBI under the Canadian Collective Bargaining Agreements, the Canadian Pension Plans (including all unfunded liabilities thereunder), and the Canadian Employee Benefit Plans. Competing Bids may, but shall not be required to, provide additional consideration for the Canadian Assets that would be available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI. If no Competing Bid is determined by the Canadian Bankruptcy Court to constitute a Superior Competing Bid, the Canadian Assets shall be transferred to Canadian Newco on the Effective Date pursuant to the terms of the Asset Purchase Agreement, and such transfer shall be approved by the Bankruptcy Court pursuant to the Confirmation Order and by the Canadian Bankruptcy Court pursuant to the CCAA Vesting Order. If the Canadian Bankruptcy Court determines that at least one Competing Bid constitutes a Superior Competing Bid, the Debtors shall conduct an auction for the Canadian Assets, under the supervision of the CCAA Monitor and in accordance with the Sale Procedures, between Canadian Newco and the Person(s) that submitted such Superior Competing Bid(s). Canadian Newco shall be entitled to participate in the bidding and auction process and may, but shall not be required to, revise its bid to include cash or other consideration that would be

available for distribution to the Holders of General Unsecured Claims against SSC Canada and/or Smurfit-MBI.

F.   **Means For Implementation of the Plan.**

1.   **Procedural Consolidation.**

The Plan is a joint plan that does not provide for substantive consolidation of the Estates, and on the Effective Date, the Estates shall not be deemed to be substantively consolidated for purposes of the Plan.  Unless otherwise provided by the Plan or the Confirmation Order, Allowed Claims held against any Debtor shall be satisfied solely from the cash and other assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, funds or other property may be advanced to the relevant Debtor(s) by any of the other Debtors.  Except as specifically set forth in the Plan and Disclosure Statement, nothing in the Plan or this Disclosure Statement shall constitute, or be deemed to constitute, an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor.  A Claim against multiple Debtors shall be treated as a separate Claim against each Debtor for all purposes (including, but not limited to, voting and distributions); provided, however, that there shall only be a single recovery on account of any such Claim, any distributions from a Debtor on account of such a Claim shall take into account the Distributions to be made by the other Debtors on account of such Claim pursuant to the Plan, and such Claims shall be administered and treated in the manner provided in the Plan and described in this Disclosure Statement.

2.   **Corporate Governance and Corporate Actions.**

(a)   Amended and Restated Certificate of Incorporation and By-Laws.

(i)   On the Effective Date, the Amended and Restated By-Laws and the Amended and Restated Certificate of Incorporation, in substantially the forms of Exhibit 2 and Exhibit 1 to the Plan (to be filed with the Plan Supplement), respectively, and in a form reasonably acceptable to the Committee, shall become effective.  The Amended and Restated Certificate of Incorporation and the Amended and Restated By-Laws shall include, among other things, (i) provisions authorizing the issuance of 150,000,000 shares of New SSCC Common Stock, of which up to 100,000,000 shares shall initially be issued and outstanding as of the Effective Date; provided, however, that shares representing eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the applicable Management Incentive Plan(s) at, and as of, such times as are set forth in Exhibit 3 to the Plan; (ii) provisions authorizing the issuance of 10,000,000 shares of New SSCC Preferred Stock; provided, however,

that no shares of the New SSCC Preferred Stock shall be issued on the Effective Date; and (iii) provisions to the extent necessary or appropriate, giving effect to the terms of the Plan. Consistent with section 1123(a)(6) of the Bankruptcy Code, the Amended and Restated Certificate of Incorporation shall, among other things, prohibit the issuance of non-voting equity securities in contravention of the Bankruptcy Code.

(ii)    The certificates or articles of incorporation, by-laws, limited liability company agreements, and partnership agreements, as applicable, of each Reorganized Debtor other than Reorganized SSCC shall be amended as necessary to (a) include director and officer liability exculpation and indemnity provisions (including advancement of expenses) for those individuals who are or were directors or officers of the Debtors or the Reorganized Debtors on or after the Petition Date in accordance with, and to the fullest extent authorized by, the law of such Reorganized Debtor's state of organization and (b) satisfy the provisions of the Plan and the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their certificates or articles of incorporation, by-laws, limited liability company agreements and partnership agreements, as applicable, in accordance with applicable law.

(b)    Directors and Officers of Reorganized SSCC.

As of the Effective Date, the initial directors of Reorganized SSCC shall be the persons identified in Exhibit 4 to ~~the~~this Plan (to be filed with the Plan Supplement). The term of any current members of the board of directors of SSCC or SSCE not identified as members of the initial Board of Directors of Reorganized SSCC shall expire on the Effective Date. **The number of members of the initial Board of Directors of Reorganized SSCC shall** ~~consist of _____ (__) directors, including~~**be disclosed in the Plan Supplement. The members of the initial Board of Directors of Reorganized SSCC shall include** (a) Patrick J. Moore, the Chief Executive Officer of Reorganized SSCC and (b) Steven J. Klinger, the President and Chief Operating Officer of Reorganized SSCC. On or promptly after the Effective Date, the initial Board of Directors of Reorganized SSCC shall select a non-executive Chairman of the Board of Directors of Reorganized SSCC, who shall not be an officer of Reorganized SSCC; provided, however, that nothing in ~~the~~this Plan or in the Amended and Restated Certificate of Incorporation shall prohibit any officer of Reorganized SSCC from serving as an executive Chairman of the Board of Directors of Reorganized SSCC after the Effective Date.

In accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in Exhibit 4 to the Plan (to be filed with the Plan Supplement) the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized SSCC, and to the extent such person is an insider other than by virtue of being a director, the nature of any compensation for such person. Each director of Reorganized SSCC shall serve from and after the Effective Date pursuant to the terms of the Amended and Restated Certificate of Incorporation, the Amended and Restated By-Laws, and applicable law. As set forth in Exhibit 4 to the Plan, all existing executive officers of SSCC are currently expected to serve as officers of Reorganized SSCC in their existing capacities from and after the Effective Date and, where applicable, pursuant to the terms and

conditions of the Employment and Retirement Benefit Agreements to which such executive officers are party on the Effective Date, as set forth in Exhibit ~~12~~13 to the Plan.

(c)        Management of Reorganized Debtors Other Than Reorganized SSCC.

The board of directors of each Reorganized Debtor other than Reorganized SSCC shall consist of such officers or employees of Reorganized SSCC or the other Reorganized Debtors as shall be designated by the Chief Executive Officer of Reorganized SSCC.  All existing executive officers of Reorganized Debtors other than Reorganized SSCC are currently expected to continue to serve in their existing capacities from and after the Effective Date.

(d)        Corporate Action.

On the Effective Date, the adoption of the Amended and Restated Certificate of Incorporation or similar constituent documents, the adoption of the Amended and Restated By-Laws, the selection of directors and officers for Reorganized SSCC and the other Reorganized Debtors, and all other corporate actions contemplated by the Plan, including the formation of Canadian Newco pursuant to Section 5.1.1 of the Plan, shall be deemed to have been authorized and approved in all respects (subject to the provisions of the Plan).  All matters provided for in the Plan involving the entity structure of the Debtors or the Reorganized Debtors, and any entity action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders, directors, officers, managers, partners or shareholders of SSCC, Reorganized SSCC, or any of the other Debtors or Reorganized Debtors. On the Effective Date, the appropriate directors and officers of Reorganized SSCC and/or of the other Reorganized Debtors shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of Reorganized SSCC and/or the other Reorganized Debtors.

**3.        Issuance and Distribution of New Securities and Related Matters.**

(a)        Issuance of New SSCC Common Stock.

On the Effective Date, Reorganized SSCC shall issue ~~up to~~ 100,000,000 shares of New SSCC Common Stock and all related instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order or rule; provided, however, that shares representing eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance pursuant to the pertinent Management Incentive Plans, with initial equity-based grants made to certain officers and other employees of the Reorganized Debtors pursuant to the pertinent Management Incentive Plan(s) at, and as of, such times as are set forth in Exhibit 3 to the Plan.

The issuance and distribution of the New SSCC Common Stock under or in connection with the Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable non-bankruptcy

law and under the Bankruptcy Code, including, without limitation, section 1145(a) of the Bankruptcy Code. Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto. In addition, all of the shares of New SSCC Common Stock issued pursuant to the Plan shall be deemed to be fully paid, non-assessable and freely tradable to the fullest extent permissible under section 1145 of the Bankruptcy Code.

(b)     Distribution of New SSCC Common Stock.

On or as soon as reasonably practicable after the Effective Date, all of the shares of the New SSCC Common Stock to which any Holder of a Claim shall become entitled pursuant to the Plan shall be made by delivery of one or more certificates representing such shares as described in the Plan or issued in the name of such Holder or DTC or its nominee or nominees, in accordance with DTC's book-entry exchange procedures, as contemplated by Section 8.7.2 of the Plan, subject to the terms and conditions of the Plan. In the period pending distribution of the New SSCC Common Stock to any Holder of an Allowed Claim entitled to receive such distribution, such Holder shall be entitled to exercise any voting rights and shall be entitled to receive dividends or other distributions payable in respect of such Holder's New SSCC Common Stock (including, without limitation, receiving any proceeds of any permitted transfer of such New SSCC Common Stock), and to exercise all other rights in respect of the New SSCC Common Stock (so that such Holder shall be deemed for tax purposes to be the owner of any shares of the New SSCC Common Stock issued in the name of such Holder pursuant to the Plan).

(c)     Issuance of New Calpine Corrugated Interests.

On the Effective Date, Reorganized Calpine Corrugated shall issue 100% of the New Calpine Corrugated Interests to Reorganized SSCC (as the successor in interest to SSCE) without the necessity of any further act or action under applicable law, regulation, order or rule.

**4.     Listing on the New York Stock Exchange or the NASDAQ Stock Market.**

As soon as practicable after the Effective Date, Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of the New SSCC Common Stock for trading on the New York Stock Exchange ("NYSE") or the NASDAQ Stock Market ("NASDAQ") but will incur no liability if it is unable to do so. Persons receiving distributions of New SSCC Common Stock, by accepting such distributions, shall be deemed to have agreed to cooperate with Reorganized SSCC's reasonable requests to assist Reorganized SSCC in its efforts to list the New SSCC Common Stock on the NYSE or NASDAQ, including, without limitation, appointing or supporting the appointment of a sufficient number of directors to the board of directors of Reorganized SSCC who satisfy the independence and other requirements of the NYSE or NASDAQ and establishing committees of the board of directors of Reorganized SSCC and cooperating with any other requirements of listing on the NYSE or NASDAQ.

5.      **Exit Facilities.**

On or prior to the Effective Date, certain of the Debtors shall enter into the Exit Facility Documentation and execute all other necessary and appropriate documentation in connection with the Exit Facilities.  As discussed above in section IV.G.13, the Debtors received Bankruptcy Court authority to enter into the Arrangement Letter and Arrangement Fee Letter.  The Debtors are currently negotiating the terms of the Exit Facilities, which will be embodied in the Exit Facility Documentation.  The proceeds of the Exit Facilities shall be used, among other things, to make cash payments required under the Plan and to provide working capital for the business operations and general corporate purposes of the Reorganized Debtors.

6.      **Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors.**

On and after the Effective Date, after giving effect to each of the Restructuring Transactions contemplated under the Plan, each of the Reorganized Debtors and Canadian Newco shall continue to exist as separate entities in accordance with the applicable law in the respective jurisdictions in which they are organized and pursuant to their respective certificates or articles of incorporation and by-laws, limited liability company agreements or partnership agreements in effect prior to the Effective Date, except to the extent such documents are to be amended pursuant to the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, subject to the effect of the Restructuring Transactions contemplated under the Plan, the Reinstated Claims and Interests and Impaired Claims and Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Cases, or otherwise.  Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all Claims, rights and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors and Canadian Newco free and clear of all Claims, Liens, charges, remedies and other encumbrances.  On and after the Effective Date, the Reorganized Debtors and Canadian Newco may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court or the Canadian Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, with the sole exception of any restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors shall be authorized to pay the charges that they incur on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without the need for any application to the Bankruptcy Court or the Canadian Bankruptcy Court.

7.      **Dissolution of** ~~SSC Canada, Smurfit-MBI, Francobec Company, and Stone FinCo II~~**Certain Canadian Debtors.**

If the CCAA Plan is approved by each Class of Affected Creditors, then from and after the Confirmation Date and through the Effective Date, SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 639647 British Columbia Ltd., Specialty Containers Inc., 605681 N.B. Inc. and Stone FinCo II shall continue in existence and each then current officer and director of such Debtors shall continue to serve in his or her respective capacity through the

earlier of the date such Debtors are dissolved pursuant to the Plan and the date such officer or director resigns, is replaced, or is terminated. On the Effective Date, to the extent that the Canadian Assets are transferred to Canadian Newco and the SSC Canada Distribution Reserve and the Smurfit-MBI Distribution Reserve are established, SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 639647 British Columbia Ltd., Specialty Containers Inc., 605681 N.B. Inc. and Stone FinCo II shall be deemed dissolved for all purposes without the necessity for any other or further action by or on behalf of Debtors or any payments to be made in connection therewith; provided, however, that the Debtors or the Reorganized Debtors shall file with the appropriate public office certificates of dissolution for SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, 639647 British Columbia Ltd., Specialty Containers Inc., 605681 N.B. Inc. and Stone FinCo II, to the extent required by applicable non-bankruptcy law. From and after the Effective Date, neither the Debtors nor the Reorganized Debtors shall be required to file any document, or take any other action, to withdraw the business operations of SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd., Francobec Company, and 639647 British Columbia Ltd., Specialty Containers Inc., 605681 N.B. Inc., or Stone FinCo II from any state or province in which such Debtors previously conducted their business operations.

## 8. Vesting of the Canadian Assets in Canadian Newco.

To the extent that the Canadian Assets are transferred to Canadian Newco on the Effective Date, they shall be transferred to and vest in Canadian Newco free and clear of all Liens, Claims, interests and encumbrances of any kind (except as otherwise set forth in the CCAA Vesting Order or in the Plan). From and after the Effective Date, Canadian Newco shall operate and may use, acquire and dispose of any Canadian Assets free of any restrictions of the Bankruptcy Code, the CCAA, the Bankruptcy Court, or the Canadian Bankruptcy Court.

The transfer of the Canadian Assets to Canadian Newco on the Effective Date and the assignment of any executory contracts, unexpired leases, licenses or permits to Canadian Newco in connection with the Canadian Asset Sale, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under the section 1146(a) of the Bankruptcy Code.

## 9. Cancellation of Credit Documents, Debt Instruments, and Interests.

On the Effective Date, after giving effect to the distributions to be made on the Effective Date pursuant to the Plan and except as otherwise provided in the Plan, the obligations of the Debtors under all (a) Prepetition Credit Documents, Calpine Corrugated Credit Agreements, Prepetition Notes, Prepetition Notes Indentures, Industrial Revenue Bonds, Industrial Revenue Bond Indentures (other than the Hodge Industrial Revenue Bond Indenture), SSCC Interests, all other Interests that are Impaired under the Plan, and any other notes, bonds, indentures, stockholders agreements, stockholders rights agreements (including, without limitation, the Stockholder Rights Plan), registration rights agreements, repurchase agreements and repurchase arrangements, or other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests that are Impaired under the Plan, shall be cancelled, and (b) the obligations of the Debtors under any agreements, stockholders agreements, stockholders rights agreements (including, without limitation, the Stockholder Rights Plan),

registration rights agreements, repurchase agreements and repurchase arrangements, or indentures (including the Prepetition Notes Indentures and the Industrial Revenue Bond Indentures) governing the Prepetition Notes, the Industrial Revenue Bonds, the SSCC Interests, and any other notes, bonds, indentures, or other instruments or documents evidencing or creating any Claims or Interests against a Debtor that relate to Claims or Interests that are Impaired under the Plan shall be discharged.  Notwithstanding the foregoing and anything contained in the Plan, (x) the Prepetition Notes Indentures shall continue in effect solely to the extent necessary to (i)  allow the applicable Disbursing Agent(s) to make distributions pursuant to the Plan on account of the Prepetition Noteholder Claims under the respective Prepetition Notes Indentures, (ii) permit the relevant Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien, (iii) permit the Prepetition Notes Indenture Trustees to appear in the Chapter 11 Cases and the CCAA Proceedings, including, without limitation, in connection with any contested matter or adversary proceeding to which such Prepetition Notes Indenture Trustee is a party, and (iv) permit the applicable Prepetition Notes Indenture Trustee to perform any  functions that are necessary in connection with the foregoing clauses (i) through (iii); and (y) the Industrial Revenue Bond Indentures (other than the Hodge Industrial Revenue Bond Indenture) shall continue in effect solely to the extent necessary to (i) allow the applicable Disbursing Agent(s) to make distributions pursuant to the Plan on account of the Industrial Revenue Bond Claims under the respective Industrial Revenue Bond Indentures, (ii) permit the relevant Industrial Revenue Bond Indenture Trustee to assert its Industrial Revenue Bond Indenture Trustee Charging Lien, (iii) permit the Industrial Revenue Bond Indenture Trustees to appear in the Chapter 11 Cases and the CCAA Proceedings, including, without limitation, in connection with any contested matter or adversary proceeding to which such Industrial Revenue Bond Indenture Trustee is a party, and (iv) permit the applicable Industrial Revenue Bond Indenture Trustee to perform any functions that are necessary in connection with the foregoing clauses (i) through (iii).  As of the Effective Date, any SSCC Interest that has been authorized to be issued but that has not been issued shall be deemed cancelled and extinguished without any further action of any party.

### 10.      Cancellation of Liens.

Except as otherwise provided in the Plan, on the Effective Date, in consideration for the distributions to be made on the Effective Date pursuant to the Plan, (i) all Liens, charges, encumbrances and rights related to any Claim or Interest, including, without limitation, those existing under the Prepetition Credit Documents and the Calpine Corrugated Credit Agreements, shall be terminated, null and void and of no effect, and (ii) any Lien securing any Other Secured Claim (other than a Lien securing an Other Secured Claim that is Reinstated pursuant to the Plan) shall be deemed released and the Holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such release documents as may be requested by the Debtors (or the Reorganized Debtors, as the case may be).

### 11.      Employee Compensation and Benefit Programs.

Except and to the extent previously assumed pursuant to an order of the Bankruptcy Court, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Employee

Benefit Plans and Employment and Retirement Benefit Agreements (as set forth in Exhibit 1213 to the Plan), as amended or modified pursuant to the Plan or otherwise, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before, on or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed by the Debtors and assigned to the Reorganized Debtors on the Effective Date, except for (i) any executory contracts or plans specifically rejected pursuant to the Plan, and (ii) any executory contracts or plans that have previously been rejected or are the subject of a motion to reject as of the Confirmation Date; provided, however, that (x) the Debtors and the Reorganized Debtors shall pay all "retiree benefits" (as defined in section 1114(a) of the Bankruptcy Code) and (y) to the extent applicable, each of the Employment and Retirement Benefit Agreements (as set forth in Exhibit 1213 to the Plan) shall be amended prior to (or upon) the assumption thereof by the Debtors (and assignment thereof to the Reorganized Debtors) to provide that the implementation of the restructuring in accordance with the Plan shall not alone constitute "Good Reason" or "Good Cause" (or provide any other similar basis) for any employee of the Debtors or the Reorganized Debtors to terminate his or her employment nor constitute a "Change in Control" that would result in any obligation of the Debtors or Reorganized Debtors to provide any payments or other benefits to any employee.

With respect to the Employment and Retirement Benefit Agreements that the Debtors have not entered into prior to the Confirmation Date, as identified in Exhibit 1213 to the Plan, the pertinent Debtor shall be deemed to have entered into each such Employment and Retirement Benefit Agreement with the applicable employee(s) on the Confirmation Date pursuant to the Plan.  Such Employment and Retirement Benefit Agreements shall become binding in all respects on the Debtors and the applicable employee(s) on the Effective Date and shall be assigned by the Debtors to the Reorganized Debtors on the Effective Date.

On the Effective Date, Reorganized SSCC and any other Reorganized Debtor, whose employees are covered by any of the U.S. Pension Plans shall assume and continue the U.S. Pension Plans, satisfy the minimum funding standards under the U.S. Pension Plans pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, and administer the U.S. Pension Plans in accordance with their terms and the provisions of ERISA; and nothing in the Plan shall be construed in any way as discharging, releasing or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from liability imposed under any law or regulatory provision with respect to the U.S. Pension Plans.

On and after the Effective Date, Reorganized SSCC and any other Reorganized Debtor whose employees are covered by any Multi-Employer Pension Plan shall continue to perform their respective obligations under such Multi-Employer Pension Plan as such obligations may exist as of the Effective Date; provided, however, that nothing in the Plan shall limit, diminish or otherwise alter the Reorganized Debtors' rights or obligations with respect to such Multi-Employer Pension Plan.

12.     **Canadian Pension Plans.**

To the extent that the Canadian Assets are transferred to Canadian Newco, then, on the Effective Date, the Canadian Pension Plans shall be assigned to Canadian Newco pursuant to the terms of the CCAA Vesting Order, the Plan, the Confirmation Order, and the CCAA Sanction

Order.  From and after the Effective Date, Canadian Newco shall assume and continue the
Canadian Pension Plans, satisfy the minimum funding standards thereunder pursuant to applicable
Canadian law, and administer the Canadian Pension Plans in accordance with their terms and the
provisions of applicable Canadian law.  Nothing in the Plan shall be construed in any way as
discharging, releasing or relieving Canadian Newco from liability imposed under any law or
regulatory provision with respect to the Canadian Pension Plans.

### 13.    Management Incentive Plans.

On the Effective Date, Reorganized SSCC shall adopt and assume (as applicable) each of
the Management Incentive Plans (including the form award agreements) substantially in the form
as set forth in <u>Exhibit 3</u> to the Plan.

Eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued
or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the
Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective
Date) (i.e., 8,695,652 shares of the New SSCC Common Stock) shall be reserved for issuance
pursuant to the pertinent Management Incentive Plans.  Reorganized SSCC shall deliver (a) the
stock option, restricted stock, and/or other equity-based awards to certain officers and other
employees in such allocations, at and effective as of such times as set forth in <u>Exhibit 3</u> to the Plan
and in such forms as set forth in <u>Exhibit 3</u> to the Plan, pursuant to the Management Incentive Plans
and (b) such additional stock options, restricted stock unit grants and/or other equity-based awards
pursuant to the Management Incentive Plans, from time to time on or after the Effective Date, as
determined by the compensation committee of the board of directors of Reorganized SSCC in such
committee's discretion.  On and after the Effective Date, eligible officers and other employees
who earn or receive incentive bonus, equity-based awards, and/or other benefits under such
Management Incentive Plans shall be entitled to such payments, awards, and other benefits as
provided in <u>Exhibit 3</u> to the Plan, on the terms and conditions provided for therein, including the
applicable award agreements provided pursuant to such Management Incentive Plans and in
Section IV.C of the "Summary of Management Incentive Plans for Smurfit-Stone Container
Corporation and its Subsidiaries" as set forth in <u>Exhibit 3</u> to the Plan.  As of the Effective Date, all
equity-based awards granted by a Debtor prior to the Petition Date shall terminate and cease to be
binding on such Debtor.

The Debtors' 2009 Long-Term Incentive Plan and 2010 Management Incentive Plan,
which were previously approved by the Bankruptcy Court, shall have the financial performance
goals and (as applicable) restructuring goals, and shall provide for such payments to participants,
as set forth in <u>Exhibit 3</u> to the Plan, notwithstanding any prior order issued by the Bankruptcy
Court with respect thereto.

### 14.    Restructuring Transactions.

On, prior to, or after the Effective Date, any Debtor or Reorganized Debtor may enter into
or undertake any Restructuring Transactions and may take such actions as may be determined by
such Debtor or Reorganized Debtor to be necessary or appropriate to effect such Restructuring
Transactions.  Such Restructuring Transactions will include the merger of SSCC into SSCE (the
"SSCC/SSCE Merger"), which will ~~survive~~occur on or before the Effective Date, with SSCE

179

surviving the merger and become becoming Reorganized SSCC under the Plan.  The actions to effect the Restructuring Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms in the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms in the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such transactions.  In addition to the SSCC/SSCE Merger, the Restructuring Transactions may include one or more other mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate to effect  the purposes of such Restructuring Transaction for the benefit of the Reorganized Debtors, including, without limitation, the potential simplification of the organizational structure of the Debtors or Reorganized Debtors.  In each case in which the surviving, resulting or acquiring person in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring person will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided by applicable law or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring person, which may provide that another Reorganized Debtor will perform such obligations.  Exhibit 13 14 to the Plan, to be filed with the Plan Supplement, shall set forth a detailed description of the actions and steps required to implement the Restructuring Transactions.  On or prior to, or as soon as practicable after, the Effective Date, the Debtors or the Reorganized Debtors may take such steps as they may deem necessary or appropriate to effectuate any Restructuring Transactions that satisfy the requirements set forth in Section 6.13 6.14 of the Plan.  The Restructuring Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code without any further notice, action, or process of any kind.

### 15.     Additional Transactions Authorized Under the Plan.

In accordance with the provisions of the Plan and the Confirmation Order, on or prior to the Effective Date, the Debtors shall be authorized to take such actions as may be necessary or appropriate to Reinstate certain Claims or Interests or to render certain Claims or Interests not Impaired in accordance with the terms of the Plan.

### 16.     Cash-Out Auction for Eligible Cash-Out Participants.

(a)     General.

Each Eligible Cash-Out Participant may elect to participate in the Cash-Out Auction by making the Cash-Out Election on its timely-submitted Ballot.  Each Eligible Cash-Out Participant shall be entitled to make the Cash-Out Election regardless of whether such Eligible

Cash-Out Participant has voted in favor of the Plan. All Eligible Cash-Out Participants that choose not to make the Cash-Out Election shall receive shares of the New SSCC Common Stock on account of their Allowed Claims and shall not be subject to the terms and conditions set forth in Section 6.16 of the Plan. Any Eligible Cash-Out Participant holding a Disputed Claim as of the Voting Deadline shall be entitled, but not required, to participate in the Cash-Out Auction, provided that all Eligible Cash-Out Participants must hold Allowed General Unsecured Claims against SSCE on or before the Initial Distribution Date in order to receive a Cash-Out Payment. Any Eligible Cash-Out Participant that holds a Disputed Claim as of the Initial Distribution Date that is deemed to be an Allowed Claim after the Initial Distribution Date shall receive shares of the New SSCC Common Stock on account of its Allowed Claims and shall not be entitled to receive a Cash-Out Payment. THE DEBTORS, IN CONSULTATION WITH THE COMMITTEE, RESERVE THE RIGHT TO CANCEL THE CASH-OUT AUCTION AT ANY TIME PRIOR TO THE EFFECTIVE DATE BY FILING A WRITTEN NOTICE OF SUCH CANCELLATION WITH THE BANKRUPTCY COURT. If the Cash-Out Auction is cancelled by the Debtors, all Eligible Cash-Out Participants that made the Cash-Out Election on their timely-submitted Ballots shall receive their Pro Rata Share of the New SSCC Common Stock Pool on account of their Allowed Claims.

(b)      Cash-Out Auction.

Pursuant to the Cash-Out Election, each Eligible Cash-Out Participant may elect to forego its Pro Rata Share of the New SSCC Common Stock Pool, which it otherwise would have received under the Plan on account of its Allowed General Unsecured Claims against SSCE, in exchange for receiving a payment in cash equal to the Cash-Out Percentage of such Allowed Claim (the "Cash-Out Payment") on the Initial Distribution Date, in full and complete satisfaction, settlement, release and discharge of such Allowed Claim. Each Eligible Cash-Out Participant that receives a Cash-Out Payment shall be deemed to have irrevocably waived its right to receive any shares of the New SSCC Common Stock under the Plan. The process for determining which Eligible Cash-Out Participants may be entitled to receive Cash-Out Payments on account of their Allowed Claims in accordance with the procedures set forth in Section 6.16.3 of the Plan and described below is referred to in the Plan as the "Cash-Out Auction."

(c)      Cash-Out Auction Procedures.

The Debtors will administer the Cash-Out Auction in accordance with the following procedures:

(i)      Participation: In order to participate in the Cash-Out Auction, the Eligible Cash-Out Participant must specify on its timely-submitted Ballot the percentage of its Claim (if and when it is deemed to be an Allowed Claim) that such Eligible Cash-Out Participant is willing to receive in cash (the "Cash-Out Percentage") in lieu of its Pro Rata Share of the New SSCC Common Stock Pool. The Cash-Out Percentage shall be set forth in whole numbers and clearly marked on a timely-submitted Ballot. Eligible Cash-Out Participants who fail to comply with the foregoing requirements shall not be eligible to receive a Cash-Out Payment.

181

(ii)     Successful Cash-Out Participants:  Following the Voting Deadline, the Debtors will examine all timely-submitted Ballots and will identify the Eligible Cash-Out Participants who made the Cash-Out Election.  All Eligible Cash-Out Participants who specified the same Cash-Out Percentage (in whole numbers) on their timely-submitted Ballots shall be grouped together (each such group, a "Cash-Out Percentage Group") by the Debtors for purposes of the Cash-Out Auction.  The Cash-Out Percentage Groups will be ranked by the Debtors from the lowest Cash-Out Percentage to the highest Cash-Out Percentage.

(iii)    Cash-Out Distribution Pool:  If the Cash-Out Auction is not cancelled by the Debtors prior to the Effective Date, the Cash-Out Distribution Pool will be distributed as follows:  (i) the Eligible Cash-Out Participants in the Cash-Out Percentage Group with the lowest Cash-Out Percentage will be entitled to receive a Cash-Out Payment on the Initial Distribution Date if sufficient cash is available in the Cash-Out Distribution Pool to make a Cash-Out Payment to all Eligible Cash-Out Participants in such Cash-Out Percentage Group; (ii) if insufficient cash is available in the Cash-Out Distribution Pool to fund a Cash-Out Payment to each Eligible Cash-Out Participant in the Cash-Out Percentage Group with the lowest Cash-Out Percentage, such Eligible Cash-Out Participants shall not be entitled to receive any portion of the Cash-Out Distribution Pool and will instead receive their Pro Rata Share of the New SSCC Common Stock Pool on the Initial Distribution Date in full and complete satisfaction, settlement, release and discharge of their Allowed Claims; (iii) once the Eligible Cash-Out Participants in the Cash-Out Percentage Group with the lowest Cash-Out Percentage have received their Cash-Out Payments, the Debtors will move to the Cash-Out Percentage Group with the second-lowest Cash-Out Percentage and will repeat the procedures set forth in subclauses (i) and (ii) hereof until insufficient funds remain in the Cash-Out Distribution Pool to allow the Debtors to fund a Cash-Out Payment to each Eligible Cash-Out Participant in the applicable Cash-Out Percentage Group, at which point any remaining funds in the Cash-Out Distribution Pool will be returned to the Reorganized Debtors (and all Eligible Cash-Out Participants who did not receive a Cash-Out Payment will receive their Pro Rata Share of the New SSCC Common Stock Pool on account of their Allowed Claims).

(iv)    Additional Procedures: The Debtors or the Reorganized Debtors (in consultation with the Committee) shall be authorized to adopt any additional procedures for administering the Cash-Out Auction that are not inconsistent with the procedures set forth in Section 6.16 of the Plan and are reasonably necessary to efficiently administer the Cash-Out Auction in accordance with the terms of the Plan.  The Reorganized Debtors shall send a written notice prior to the Initial Distribution Date to each Eligible Cash-Out Participant that the Reorganized Debtors reasonably believe will be entitled to receive a Cash-Out Payment under the Plan.

## G.   Treatment of Executory Contracts and Unexpired Leases in the Chapter 11 Cases and the CCAA Proceedings.

### 1.      Assumption/Ratification of Executory Contracts and Unexpired Leases.

Upon the occurrence of the Effective Date, all executory contracts or unexpired leases of the Debtors shall (i) be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and (ii) be deemed ratified by the Canadian Debtor that is a party to such executory contract or unexpired lease, unless such executory contract or unexpired lease (a) was previously assumed or rejected by the Debtors in the Chapter 11 Cases or repudiated by the Canadian Debtors in the CCAA Proceedings, (b) previously expired or terminated in accordance with its terms, or (c) is subject to the Assumption/Rejection Motion in the Chapter 11 Cases.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of each such assumption pursuant to sections 365(a) and 1123 of the Bankruptcy Code in the Chapter 11 Cases.  Entry of the CCAA Sanction Order by the Canadian Bankruptcy Court shall constitute approval of each such ratification in the CCAA Proceedings. Each executory contract and unexpired lease assumed pursuant to this Article VI shall revest in and be fully enforceable by the respective Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, the terms of the Confirmation Order or the CCAA Sanction Order, as applicable, or applicable law.  Except as otherwise set forth in the Plan, (x) all Employee Benefit Plans shall be deemed to have been assumed by the Debtors on the Effective Date and (y) all Non-Qualified Employee Benefit Plans shall be deemed to have been rejected by the Debtors, and to have been terminated with the approval of the Bankruptcy Court pursuant to the Bankruptcy Code, on the Effective Date.

### 2.      Cure of Defaults Under Assumed/Ratified Executory Contracts and Unexpired Leases.

Any monetary amounts by which each executory contract and unexpired lease to be assumed or ratified pursuant to the Plan is in default shall be satisfied by payment of the default amount in cash on the Effective Date or on such other terms as the parties to such executory contract or unexpired lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption or ratification of such contract or lease , the cure payments required shall be made following the entry of a Final Order resolving the dispute and approving the assumption or ratification, as applicable.  Pending the entry of such Final Order, the executory contract or unexpired lease at issue shall be deemed assumed or ratified by the Debtors, as applicable, unless otherwise ordered by the Bankruptcy Court or the Canadian Bankruptcy Court.

### 3.      Assumption of Collective Bargaining Agreements.

All Collective Bargaining Agreements shall be deemed to have been assumed or ratified by the Debtors party thereto upon the occurrence of the Effective Date, provided that the Canadian Collective Bargaining Agreements shall be assigned to Canadian Newco on the Effective Date if the Canadian Asset Sale is consummated.  Entry of the Confirmation Order shall constitute the

Bankruptcy Court's approval of the pertinent Debtor's assumption of each Collective Bargaining Agreement to which it is a party for the remaining term of agreement of each such Collective Bargaining Agreement as in effect on the Effective Date, except to the extent that such agreements have already been assumed prior to the Effective Date.

### 4. Insurance Policies and Agreements.

Insurance policies issued to, or insurance agreements entered into by, the Debtors prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) shall continue in effect after the Effective Date. To the extent that such insurance policies or agreements (including, without limitation, any policies covering directors' or officers' conduct) are considered to be executory contracts, then, notwithstanding anything to the contrary in the Plan, the Plan shall constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, (i) the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of each Debtor and its Estate and (ii) the entry of the CCAA Sanction Order shall constitute approval of such ratification. Unless otherwise determined by the Bankruptcy Court or the Canadian Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments shall be required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement. To the extent that the Bankruptcy Court or the Canadian Bankruptcy Court determines otherwise as to any such insurance policy or agreement, the Debtors reserve the right to seek the rejection of such insurance policy or agreement or other available relief.

### 5. Rejection Damages Bar Date.

If the rejection by a Debtor (or repudiation by a Canadian Debtor) of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor unless a Proof of Claim with respect to such Claim is filed with the Claims and Noticing Agent and served upon counsel to the Debtors or the Reorganized Debtors (as the case may be) by the earlier of (i) thirty (30) days after the Effective Date or (ii) thirty (30) days after entry of a Final Order rejecting such executory contract or unexpired lease.

### 6. Post-Petition Contracts and Leases.

All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date (including, without limitation, all Employment and Retirement Benefit Agreements entered into by any Debtor after the Petition Date and on or before the Confirmation Date, as set forth in Exhibit ~~12~~13 of the Plan) shall be deemed to have been assumed by the Debtors and assigned to the Reorganized Debtors on the Effective Date.

### H. Provisions Governing the Distributions Under the Plan.

### 1. General Provisions on Distributions under the Plan.

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court or to the extent that any Holder of an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the

CCAA Proceedings agrees to different treatment, distributions to be made on account of Claims that are Allowed Claims or Proven Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable. Notwithstanding anything in the Plan to the contrary, distributions on account of (i) Administrative Expense Claims that are Allowed Claims as of the Effective Date and (ii) CCAA Charges shall be made on, or as soon as practicable after, the Effective Date, with no action to enforce a right to such payment until at least thirty (30) days after the Effective Date. Distributions on account of any Claim that first becomes an Allowed Claim or a Proven Claim after the Effective Date shall be made on the first Distribution Date after such Claim becomes an Allowed Claim or a Proven Claim, as applicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

Notwithstanding any other provision of the Plan to the contrary, no distributions shall be made on account of any Disputed Claims unless and until such Claim has become an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings. Prior to the Effective Date, Disputed Claims in the CCAA Proceedings shall be dealt with in accordance with the terms of the CCAA Claims Determination Order. Following the Effective Date, the resolution of Disputed Claims in the CCAA Proceedings shall continue to be dealt with in accordance with the terms of the CCAA Claims Determination Order.

### 2. No Interest on Claims Unless Otherwise Provided in the Plan.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or any other order of the Bankruptcy Court (including, without limitation, the DIP Financing Order), or as otherwise required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to the payment of interest accruing on or after the Petition Date on any Claim.

### 3. Distributions by Disbursing Agents.

Except as specifically provided in the Plan, the Disbursing Agent shall make all distributions required to be made under the Plan. The Reorganized Debtors may act as Disbursing Agent or may employ or contract with other entities to assist in or make the distributions required by the Plan. The Prepetition Agent shall be the Disbursing Agent for all distributions to the Holders of Prepetition Lender Claims under the Prepetition Credit Agreement and Prepetition Canadian Lender Claims under the Prepetition Credit Agreement, and all such distributions shall be made subject to and in accordance with the Prepetition Credit Documents. The Prepetition Notes Indenture Trustees shall be the Disbursing Agents for all distributions to the Holders of Prepetition Noteholder Claims. The Disbursing Agents for all distributions to the Industrial Revenue Bondholders shall be either the applicable Industrial Revenue Bond Indenture Trustee, the Reorganized Debtors, or any Person or Entity retained by the Reorganized Debtors for the purpose of making distributions under the Plan to the Industrial Revenue Bondholders. Other than as specifically set forth in the Plan, distributions to be made on account of Prepetition Noteholder Claims or, Industrial Revenue Bond Claims or Hodge Industrial Revenue Bond Claims shall be made in accordance with the terms of the applicable Prepetition Notes Indenture or Industrial Revenue Bond Indenture, or in accordance with the Plan if such Prepetition Notes Indenture or Industrial Revenue Bond Indenture is silent.

185

4.     **Delivery of Distributions – Chapter 11 Cases**.

The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Allowed Claims in the Chapter 11 Cases.

(a)     Delivery of Distributions in General.

Distributions to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (i) at the address set forth in the Schedules if no Proof of Claim was filed with respect to such Allowed Claim; (ii) at the address set forth in the last-filed Proof of Claim with respect to such Allowed Claim; (iii) at the address set forth in any written notice of address change delivered to the Claims and Noticing Agent at least five (5) Business Days prior to the applicable Distribution Date; or (iv) in accordance with Section 8.8 of the Plan, at the address set forth in any notice of transfer received at least ten (10) Business Days prior to the applicable Distribution Date.

(b)     Distributions to Holders of Prepetition Lender Claims.

On the Effective Date, the Reorganized Debtors shall deliver to the Prepetition Agent, for distribution on behalf of the Debtors to the Holders of Prepetition Lender Claims (and, in the case of Claims in respect of Prepetition Swap Agreements, to the Holders thereof), any distributions that the Debtors are required to make to such Holders pursuant to Article III of the Plan.

(c)     Distributions to Holders of Union Bank Claims and CIT Group Claims.

On the Effective Date, the Reorganized Debtors shall deliver to Union Bank and CIT Group, for distribution on behalf of Calpine Corrugated, the cash distributions that Calpine Corrugated is required to make to such Holders pursuant to Article III of the Plan.

(d)     Distributions to Holders of General Unsecured Claims Against SSCE.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver shares of the New SSCC Common Stock to the applicable Disbursing Agent for distribution to the Holders of Allowed General Unsecured Claims against SSCE in accordance with the procedures set forth in Sections 8.4 and 8.7 of the Plan.  If the Cash-Out Auction has not been cancelled by the Debtors prior to the Effective Date, the Reorganized Debtors shall deliver the Cash-Out Payments to the applicable Eligible Cash-Out Participants in accordance with the procedures set forth in Sections 8.4 and 8.7 of the Plan.

(e)     Distributions to Holders of Convenience Claims.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall distribute cash to the Holders of Allowed Convenience Claims against SSCE in accordance with the procedures set forth in Sections 8.4 and 8.7 of the Plan.

(f)     Distributions to Holders of General Unsecured Claims Against Cameo Container and Calpine Corrugated.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver to the Holders of Allowed General Unsecured Claims against Cameo Container and Calpine Corrugated the cash distributions that Cameo Container and Calpine Corrugated are required to make to such Holders pursuant to Article III of the Plan.

**5.    Delivery of Distributions – CCAA Proceedings.**

The following terms shall govern the delivery of distributions and undeliverable or unclaimed distributions with respect to Proven Claims in the CCAA Proceedings.

(a)    Delivery of Distributions in General.

Distributions to Holders of Proven Claims shall be made by the applicable Disbursing Agent (i) at the address set forth in the Schedules if no Proof of Claim was filed with respect to such Proven Claim; (ii) at the address set forth in the last-filed Proof of Claim with respect to such Proven Claim; (iii) at the address set forth in any written notice of address change delivered to the CCAA Monitor or the Claims and Noticing Agent at least five (5) Business Days prior to the applicable Distribution Date; or (iv) in accordance with Section 8.8 of the Plan, at the address set forth in any notice of transfer received at least ten (10) Business Days prior to the applicable Distribution Date.

(b)    Distributions to Holders of Prepetition Canadian Lender Claims.

On the Effective Date, the Reorganized Debtors shall deliver to the Prepetition Agent, for distribution on behalf of the Debtors to the Holders of Prepetition Canadian Lender Claims (and, in the case of Claims in respect of Prepetition Swap Agreements, to the Holders thereof), any distributions that the Debtors are required to make to such Holders pursuant to Article III and Article IV of the Plan.

(c)    Distributions to Holders of General Unsecured Claims Against SSC Canada and Smurfit-MBI.

On the Initial Distribution Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall deliver cash and/or shares of New SSCC Common Stock to the Holders of Allowed General Unsecured Claims against SSC Canada and Smurfit-MBI in accordance with the procedures set forth in Sections 8.5 and 8.7 of the Plan.

**6.    Undeliverable and Unclaimed Distributions.**

(a)    Holding and Investment of Undeliverable and Unclaimed Distributions.

If the distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtors or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtors or the Disbursing Agent is notified in writing of such Holder's then current address, at which time all previously-missed distributions shall be made to such Holder without interest.

(b)    Failure to Claim Undeliverable Distributions.

Amounts in respect of undeliverable distributions made in cash shall be retained by the Reorganized Debtors until such distributions are claimed. Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed distribution within six (6) months after the Effective Date shall be deemed to have forfeited its rights to such undeliverable or unclaimed distribution and shall be forever barred and enjoined from seeking the payment of any such undeliverable or unclaimed distribution from the Debtors or the Reorganized Debtors. In such cases, any cash for distribution on account of such claims for undeliverable or unclaimed distributions shall become the property of the Estates and the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any shares of New SSCC Common Stock returned to the Debtors and not claimed within one (1) year of return shall irrevocably revert to the Reorganized Debtors and shall be cancelled, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the Holder of the Allowed Claim with respect to which the check was originally issued. Any Claim in respect of a voided check shall be made on or before the six (6) month anniversary of the date of issuance of such check. After such date, all Claims and respective voided checks on account thereof shall be discharged and forever barred and the Reorganized Debtors shall retain all moneys related thereto notwithstanding any federal or state escheat laws to the contrary.

**7.      Record Date for Distributions.**

The Reorganized Debtors and the other Disbursing Agents shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Proven Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes hereof to recognize and make distributions only to those Holders of Allowed Claims or Proven Claims that actually held such Claims as of the close of business on the Distribution Record Date. The Reorganized Debtors and the other Disbursing Agents shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as stated on the official claims register in the Chapter 11 Cases, or as reflected in the CCAA Monitor's records, as of the close of business on the Distribution Record Date.

Distributions to Holders of Allowed Prepetition Noteholder Claims administered by each Prepetition Notes Indenture Trustee shall be made to the account of, or at the direction of, the respective Prepetition Notes Indenture Trustee and subject to the rights of each respective Prepetition Notes Indenture Trustee to assert its Prepetition Notes Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the Distribution Record Date shall not apply to such distributions. In connection with such book-entry exchange, each Prepetition Notes Indenture Trustee shall deliver instructions to the DTC instructing the DTC to effect distributions in accordance with the Plan with respect to all applicable Prepetition Noteholder Claims.

Distributions to Holders of Allowed Industrial Revenue Bond Claims administered by any Industrial Revenue Bond Indenture Trustee or any other Disbursing Agent shall be made to the account of, or at the direction of, the respective Industrial Revenue Bond Indenture Trustee and subject to the rights of each respective Industrial Revenue Bond Indenture Trustee to assert its Industrial Revenue Bond Indenture Trustee Charging Lien, by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, and the Distribution Record Date shall not apply to such distributions.  In connection with such book-entry exchange, each Industrial Revenue Bond Indenture Trustee shall deliver instructions to the DTC instructing the DTC to effect distributions in accordance with the Plan with respect to all applicable Industrial Revenue Bond Claims.

**8.      Assignment of Claims.**

For purposes of determining entitlement to  receive any distribution pursuant to the Plan, the Debtors, the Reorganized Debtors and the applicable Disbursing Agent, and each of their respective agents, successors and assigns, shall have no obligation to recognize any transfer of a Claim unless and until notice of the transfer or assignment from either the transferor, assignor, transferee or assignee, together with evidence showing ownership, in whole or in part, of such Claim and that such transfer or assignment was valid under applicable law, has been received by the Debtors, the Reorganized Debtors, or the applicable Disbursing Agent, as the case may be, at least ten (10) Business Days prior to the applicable Distribution Date.

**9.      Means of Cash Payment.**

Unless otherwise set forth in the Plan, all payments of cash made pursuant to the Plan shall be in United States dollars and shall be made, at the option and in the sole discretion of the Reorganized Debtors, by (a) checks drawn on or (b) wire transfer from a bank selected by the Reorganized Debtors; provided that cash payments made to the Prepetition Agent, Union Bank and CIT Group shall be made in immediately available funds by wire transfer.  Cash payments to foreign creditors may be made, at the option of the Reorganized Debtors, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**10.      Withholding and Reporting Requirements.**

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All Holders of Allowed Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes.  Notwithstanding any other provision of the Plan, each Person or Entity that has received any distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

11.     **Allocation of Plan Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest thereon.

12.     **Setoff and Recoupment.**

The Reorganized Debtors may, but shall not be required to, setoff or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan in respect of such Allowed Claim, Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may assert against the Holder of such Allowed Claim; provided, however, that neither the failure to assert such rights of setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any Claim that the Debtors or the Reorganized Debtors may assert against any Holder of an Allowed Claim.

13.     **Fractional Shares.**

No fractional shares of New SSCC Common Stock shall be distributed.  Where a fractional share would otherwise be called for, the actual issuance shall reflect a rounding up (in the case of more than .50) of such fraction to the nearest whole share of New SSCC Common Stock or a rounding down of such fraction (in the case of .50 or less than .50) to the nearest whole share of New SSCC Common Stock.  The total number of shares of New SSCC Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding in the Plan.

14.     **Compromises and Settlements.**

Up to and including the Effective Date, the Debtors may compromise and settle, in accordance with Bankruptcy Rule 9019(a), any and all Claims against them.  On the Effective Date, such right to compromise and settle Claims shall pass to the Reorganized Debtors as contemplated in Section 8.15 of the Plan, and the Reorganized Debtors shall thereafter be authorized (subject to the Creditor Representative's approval when necessary under Section 12.11 of the Plan) to compromise and settle any Disputed Claim and execute all necessary documents, including a stipulation of settlement or release, in their sole discretion, without notice to any party, and without the need for further approval of the Bankruptcy Court.

15.     **Claims Administration Responsibility – Chapter 11 Cases.**

(a)     **Sole Responsibility of the Reorganized Debtors.**

From and after the Effective Date, the Reorganized Debtors shall have sole responsibility and authority for administering, disputing, objecting to, compromising and settling, or otherwise resolving and making distributions (if any) with respect to all Claims, including all Administrative Expense Claims; provided, however, that the foregoing shall not apply to any objections to Claims filed by the Committee prior to the Effective Date; provided, further, however that the

190

Reorganized Debtors or the Committee (if applicable) shall not be authorized to compromise, settle, or resolve any Claim, including any Administrative Expense Claim, if the Allowed amount of such Claim would exceed the Creditor Representative Threshold Amount, without the consent of the Creditor Representative in accordance with Section 12.11 of the Plan.

(b)     Objections to Claims.

Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and filed on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if the Debtors or the Reorganized Debtors effect service of such objection in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable in the Chapter 11 Cases by Bankruptcy Rule 7004; (ii) to the extent counsel for a Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory to the applicable Proof of Claim or other representative identified in the proof of claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

(c)     Determination of Allowed Claims.

Except as otherwise agreed to by the Debtors in writing or as set forth in the Plan, the Allowed amount of any Claim as to which a Proof of Claim was timely filed in the Chapter 11 Cases, and which Claim is subject to an objection filed by the Debtors or the Reorganized Debtors before the Claims Objection Deadline, will be determined and liquidated pursuant to a Final Order of the Bankruptcy Court. Upon such determination, the Claim shall become an Allowed Claim and will be satisfied in accordance with the Plan. Any Claim that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, shall be deemed Allowed for purposes of the Plan unless otherwise ordered by the Bankruptcy Court.

**16.     Procedures for Treating and Resolving Disputed Claims – Chapter 11 Cases.**

(a)     No Distributions Pending Allowance.

Except as otherwise set forth in the Plan, no distributions shall be made with respect to any portion of a Disputed Claim unless and until such Disputed Claim has become an Allowed Claim; provided, however, that where (i) any portion of a Claim is listed in the Schedules as neither contingent, unliquidated or disputed or (ii) the Debtors, in good faith, reasonably dispute the allowance of no more than 50% of any Claim, the Reorganized Debtors shall make a distribution on the Initial Distribution Date on account of the higher of (a) any portion of such Claim that is listed in the Schedules as neither contingent, unliquidated or disputed and (b) any portion of such Claims that is not a Disputed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

(b)     SSCE Distribution Reserve.

On the Effective Date, the Reorganized Debtors shall issue and hold in the SSCE Distribution Reserve shares of the New SSCC Common Stock in such amount as the Reorganized

Debtors reasonably determine is necessary to enable them to make the distributions required to be made to the Holders of Allowed General Unsecured Claims against SSCE once the allowance or disallowance of each Disputed Claim, including any filed or anticipated Rejection Damages Claims, is ultimately determined. To the extent that the SSCE Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors shall file a list of such affected Disputed Claims with the Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. To the extent that the SSCE Distribution Reserve incorporates Rejection Damages Claim arising from the rejection of any executory contracts or unexpired leases under the Plan, the Debtors shall, at such time as they file the Assumption/Rejection Motion, identify the amount of the SSCE Distribution Reserve allocated for the putative Rejection Damages Claims arising from the rejection of such executory contracts or unexpired leases. Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court sustaining such objection, the Debtors' estimation of each Disputed Claim for purposes of the SSCE Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim, once Allowed, than the pro rata distribution it would have received based on the Debtors' estimation. Shares of the New SSCC Common Stock held in the SSCE Distribution Reserve pending the resolution of all Disputed Claims shall be deemed to have been voted in the same proportion as the shares of New SSCC Common Stock issued on the Initial Distribution Date. Any transfer or surrender of shares out of the SSCE Distribution Reserve shall be accompanied by any distributions or proceeds received in respect of such shares while in the SSCE Distribution Reserve.

(c)     Distributions After Allowance.

Except as otherwise set forth in the Plan with respect to General Unsecured Claims against SSCE, promptly after a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors or the Disbursing Agent, as applicable, will distribute on the next succeeding Distribution Date to the Holder of such Allowed Claim any cash or other property that would have been distributed to the Holder of such Allowed Claim on the dates Distributions were previously made to Holders of other Allowed Claims had such Claim been an Allowed Claim on such dates. After a Final Order has been entered, or other resolution has been reached, with respect to any Disputed Claim that is a General Unsecured Claim against SSCE for less than the amount of the SSCE Distribution Reserve for such Disputed Claim, the excess remaining shares of New SSCC Common Stock in the SSCE Distribution Reserve shall either be distributed on a pro rata basis to the Holders of Allowed General Unsecured Claims against SSCE on the Final Distribution Date or irrevocably surrendered to Reorganized SSCC (together with any dividends, distributions or proceeds received in respect thereof); provided, however, that if more than [_____]1,000,000 shares of the New SSCC Common Stock remain in the SSCE Distribution Reserve after the Final Distribution Date, such remaining shares shall be distributed on a pro rata basis to the Holders of Allowed General Unsecured Claims against SSCE who had previously received distributions of the New SSCC Common Stock under the Plan. All Distributions under the Plan on account of Allowed Claims will be made together with any dividends, payments, or other distributions made on account of the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims in such Class.

(d)     No Recourse.

No Holder of a Disputed Claim shall have any recourse against the Debtors, the Estates, the Reorganized Debtors, the Committee, the Prepetition Agent, the Prepetition Lenders, the Prepetition Notes Indenture Trustees, or the Industrial Revenue Bond Indenture Trustees, or any of their respective directors, officers, employees, agents, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors, in the event that the SSCE Distribution Reserve is insufficient to provide a sufficient distribution on account of any Disputed Claim that becomes an Allowed Claim.

(e)     Unliquidated and Contingent Claims.

Any Claim that is filed or scheduled as an unliquidated or contingent Claim shall be disallowed as of the Confirmation Date unless the Holder thereof files a motion seeking the allowance or estimation of such Claim at least twenty (20) days prior to the Confirmation Hearing. In addition, the Debtors may, at any time prior to the Confirmation Hearing, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to the allowance of such Claim.

## 17.     Distribution Reserve– CCAA Proceedings.

(a)     SSC Canada Distribution Reserve.

If the CCAA Plan is approved by the Required Majority of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, then, on the Effective Date, the Reorganized Debtors shall fund the SSC Canada Distribution Pool.  The CCAA Monitor shall hold the SSC Canada Distribution Pool in one or more segregated accounts and shall disburse funds from the SSC Canada Distribution Pool in accordance with the terms of the Plan.  Prior to the Initial Distribution Date, the CCAA Monitor (in consultation with the Reorganized Debtors) shall establish the SSC Canada Distribution Reserve for the purpose of holding cash from the SSC Canada Distribution Pool in the aggregate amount sufficient to distribute to each Holder of a Disputed Claim against SSC Canada the amount of cash that such Holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim against SSC Canada as of the Initial Distribution Date.  To the extent that the SSC Canada Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors or the CCAA Monitor shall file a list of such affected Disputed Claims with the Bankruptcy Court and the Canadian Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan.  Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court or the Canadian Bankruptcy Court sustaining such objection, the Debtors' or CCAA Monitor's estimation of each Disputed Claim for purposes of the SSC Canada Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim than the pro rata distribution it would have received based on such estimation.  Any funds remaining in the SSC Canada Distribution Reserve following the resolution of the final Disputed Claim against SSC Canada and the payment of any

193

fees and expenses incurred by the CCAA Monitor in connection therewith shall be transferred from the SSC Canada Distribution Reserve to Reorganized SSCC.

       (b)       Smurfit-MBI Distribution Reserve.

If the CCAA Plan is approved by the Required Majority of Affected Unsecured Creditors of SSC Canada and Smurfit-MBI, then, on the Effective Date, the Reorganized Debtors shall fund the Smurfit-MBI Distribution Pool. The CCAA Monitor shall hold the Smurfit-MBI Distribution Pool in one or more segregated accounts and shall disburse funds from the Smurfit-MBI Distribution Pool in accordance with the terms of the Plan. Prior to the Initial Distribution Date, the CCAA Monitor (in consultation with the Reorganized Debtors) shall establish the Smurfit-MBI Distribution Reserve for the purpose of holding cash from the Smurfit-MBI Distribution Pool in the aggregate amount sufficient to distribute to each Holder of a Disputed Claim against Smurfit-MBI the amount of cash that such Holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim against Smurfit-MBI as of the Initial Distribution Date. To the extent that the Smurfit-MBI Distribution Reserve is based on the amount of any Disputed Claim that is less than the amount of the Proof of Claim filed with respect to such Disputed Claim, or if such Disputed Claim is unliquidated, the Debtors or the CCAA Monitor shall file a list of such affected Disputed Claims with the Bankruptcy Court and the Canadian Bankruptcy Court and shall serve such list on any affected Holders of Disputed Claims no later than ten (10) Business Days prior to the last date for filing objections to Confirmation of the Plan. Absent an objection filed on or before the deadline for filing objections to Confirmation of the Plan and an order of the Bankruptcy Court or the Canadian Bankruptcy Court sustaining such objection, the Debtors' or CCAA Monitor's estimation of each Disputed Claim for purposes of the Smurfit-MBI Distribution Reserve for such Claim shall be final and the Holder of such Disputed Claim shall not be entitled to receive any greater distribution on account of its Claim than the pro rata distribution it would have received based on such estimation. Any funds remaining in the Smurfit-MBI Distribution Reserve following the resolution of the final Disputed Claim against SSC Canada and the payment of any fees and expenses incurred by the CCAA Monitor in connection therewith shall be transferred from the Smurfit-MBI Distribution Reserve to Reorganized SSCC.

## I.      Confirmation and Consummation of the Plan.

      **1.**      **Conditions to Confirmation.**

The following are conditions precedent to the occurrence of the Confirmation of the Plan, each of which may be satisfied or waived in accordance with Section 9.3 of the Plan:

       (a)       The Bankruptcy Court shall have entered a Final Order, in a form reasonably acceptable to the Debtors and the Committee, approving the adequacy of this Disclosure Statement.

       (b)       The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall (i) have been entered and (ii) be in form and substance reasonably acceptable to the Debtors and the Committee.

       (c)       The conditions precedent for implementation of the CCAA Plan, as set forth in Section 4.6 of the Plan, shall have been satisfied.

**2.**      **Conditions to Occurrence of the Effective Date.**

The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or waived in accordance with Section 9.3 of the Plan:

       (a)       All conditions to Confirmation in Section 9.1 of the Plan shall have been either satisfied or waived in accordance with Section 9.3 of the Plan.

       (b)       The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors and the Committee.

       (c)       Each CCAA Sanction Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtors and the Committee.

       (d)       Each document, instrument, or agreement to be executed in connection with the Plan shall be reasonably acceptable to the Debtors.

       (e)       The transactions contemplated by Article V of the Plan shall have occurred or shall have been waived by the Debtors in accordance with the terms of the Plan.

**3.**      **Waiver of Conditions.**

Notwithstanding anything to the contrary in Section 9.1 or Section 9.2 of the Plan, the Debtors (in consultation with the Committee and the CCAA Monitor) may waive in writing the occurrence of any of the foregoing conditions precedent to the Confirmation of the Plan and/or occurrence of the Effective Date or modify any such conditions precedent, other than the conditions set forth in Sections 9.2.2 and 9.2.3 of the Plan.  Any such written waiver or modification of a condition precedent may be effected at any time without notice, without leave or order of the Bankruptcy Court or the Canadian Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors decide that one of the foregoing conditions cannot be satisfied, and the occurrence of such condition is not waived in the manner set forth above, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

4.      **Consequences of Non-Occurrence of Effective Date.**

If the Effective Date has not occurred within one hundred and twenty (120) days of the Confirmation Date (as such date may be extended by the Debtors in consultation with the Committee and the CCAA Monitor), upon notice to such parties in interest as the Bankruptcy Court may direct, the Debtors will request that the Bankruptcy Court enter an order vacating the Confirmation Order.  If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume, assign or reject executory contracts and unexpired leases shall be extended for a period of sixty (60) days after the date the Confirmation Order is vacated.

5.      **Notice of Effective Date.**

The Debtors shall file with the Bankruptcy Court and the Canadian Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Section 9.2 of the Plan have been satisfied or waived pursuant to Section 9.3 of the Plan.

J.      **Injunctions, Releases And Discharge.**

1.      **Discharge.**

(a)      Discharge of Claims and Termination of Interests.

(i)      As of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all distributions and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Interests, or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors, the Reorganized Debtors, Canadian Newco, or any of their respective assets, property and Estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Interests or other rights of a Holder of an equity security or other ownership interest, and upon the Effective Date, the Debtors and the Reorganized Debtors shall (i) be deemed discharged under section 1141(d)(1)(A) of the Bankruptcy Code and applicable provisions of the CCAA and released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest, of any nature

196

whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is deemed to be an Allowed Claim in the Chapter 11 Cases or a Proven Claim in the CCAA Proceedings (or is otherwise resolved), or (c) the Holder of a Claim based upon such debt voted to accept the Plan and (ii) terminate and cancel all rights of any equity security Holder in any of the Debtors and all Interests, including, without limitation, the SSCC Interests.

(ii)     As of the Effective Date, except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, all Persons and Entities shall be precluded from asserting against the Debtors and their respective assets, property and Estates, the Reorganized Debtors, Canadian Newco, and each of their respective Related Persons, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests or other rights of a Holder of an equity security or other ownership interest, relating to any of the Debtors or Reorganized Debtors or any of their respective assets, property and Estates, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as expressly provided in the Plan, the Confirmation Order, or the CCAA Sanction Order, the Confirmation Order and the CCAA Sanction Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Interests or other rights of a Holder of an equity security or other ownership interest and termination of all rights of any equity security Holder in any of the Debtors and all Interests, including the SSCC Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code and applicable provisions of the CCAA, and such discharge shall void and extinguish any judgment obtained against the Debtors, the Reorganized Debtors or Canadian Newco, or any of their respective assets, property and Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any equity security Holder in any of the Debtors or terminated Interest, including, without limitation, an SSCC Interest.

(iii)     Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order shall not discharge SSC Canada, Smurfit-MBI or Stone FinCo II from any Claims and other debts or obligations that arose prior to the Petition Date.

(b)     Discharge Injunction.

Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or any of their respective assets, property and Estates, the Reorganized Debtors, or Canadian Newco that is discharged pursuant to Section 10.1.1 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors, Canadian Newco, any of their respective property and their respective Related Persons, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.1.1 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order or the CCAA Sanction Order.

(c)      Integral to Plan.

Each of the discharges and injunctions provided in Section 10.1 of the Plan is an integral part of the Plan and is essential to its implementation. Each of the Debtors, the Reorganized Debtors, and Canadian Newco shall have the right to independently seek the enforcement of the discharge and injunction set forth in Section 10.1 of the Plan.

**2.      Releases.**

(a)      Releases by Debtors and Estates.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtors and Reorganized Debtors on its own behalf and as a representative of its respective Estate, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims and Causes of Action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or

otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors, Canadian Newco, or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, this Disclosure Statement, the Canadian Asset Sale, or the Restructuring Transactions that may be asserted by or on behalf of any of the Debtors, the Reorganized Debtors or their respective Estates.

(b)     Releases by Holders of Claims and Interests.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest, or other right of a Holder of an equity security or other ownership interest that is terminated, and each of its respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, the Reorganized Debtors or their respective assets, property and Estates, the Chapter 11 Cases or the Plan, this Disclosure Statement, the Restructuring Transactions, or the Canadian Asset Sale; provided, however, that each Person that has submitted a Ballot may elect, by checking the appropriate box on its Ballot, not to grant the releases set forth in Section 10.2.2 of the Plan with respect to those Released Parties other than the Debtors, the Reorganized Debtors, Canadian Newco, and their respective predecessors, successors and assigns (whether by operation of law or otherwise).

(c)     Injunction Related to Releases.

Except as provided in the Plan, the Confirmation Order, or a CCAA Sanction Order, as of the Effective Date, (i) all Persons that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and Estates, that is released pursuant to Section 10.2 of the Plan, (ii) all other parties in interest, and (iii) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding

(including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 10.2 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan, the Confirmation Order, or the CCAA Sanction Order.

        (d)     Integral to Plan.

Each of the releases and injunctions provided in Section 10.2 of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties and any other Persons protected by the releases and injunctions set forth in Section 10.2 of the Plan shall have the right to independently seek the enforcement of such releases and injunctions.

        (e)     Deemed Consent.

By submitting a Ballot and not electing to withhold consent to the releases of the applicable Released Parties set forth in Section 10.2.2 of the Plan by marking the appropriate box on the Ballot, each Holder of a Claim or Interest in a voting Class shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 10.2.2 of the Plan.  For the avoidance of doubt, the releases set forth in Section 10.2.2 of the Plan shall not be applicable to (i) any Holders of Claims or Interests that are not entitled to vote to accept or reject the Plan, nor (ii) any Holders in voting Classes that (a) do not vote, or (b) submit a Ballot and "opt-out" by marking the appropriate box on the Ballot.

        (f)     No Waiver.

Notwithstanding anything to the contrary contained in Section 10.2 of the Plan, the releases and injunctions set forth in Section 10.2  of the Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Reorganized Debtors or Canadian Newco to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by the Reorganized Debtors or Canadian Newco pursuant to the Plan.

        **3.**     **Supplemental Injunction.**

In order to supplement the injunctive effect of the Discharge Injunction, the Confirmation Order and the CCAA Sanction Order shall provide for the following injunctions to take effect as of the Effective Date.

        (a)     Terms.  In order to preserve and promote the settlements contemplated by and provided for in the Plan, and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in this Article, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons and

any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the United States, Canada, or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(i)        commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;

(ii)       enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;

(iii)      creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;

(iv)       except as otherwise expressly provided in the Plan, the Confirmation Order, or the CCAA Sanction Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest; and

CH1 5118439 5168368 v.4 1

(v)     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Related Documents, the Confirmation Order, or the CCAA Sanction Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.

(b)     **Bankruptcy Rule 3016 Compliance.**  The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(c)     **Integral to Plan.**

Each of the injunctions provided in Section 10.3 of the Plan is an integral part of the Plan and is essential to its implementation.  Each of the Released Parties and any other Persons protected by the injunctions set forth in Section 10.3 of the Plan shall have the right to independently seek the enforcement of such injunctions.

**4.     Disallowed Claims.**

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any Order disallowing any Claim or Interest which is not a Final Order as of the Effective Date solely because of an entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (a) disallowing all Claims to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

**5.     Exculpation.**

(a)     No Released Party shall have or incur any liability to (i) any Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) any other party in interest, (iii) any Person claiming by or through any of the foregoing entities, or (iv) any of the Related Persons of any of the foregoing entities, from (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken at any time or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting,

confirming or consummating the Plan, this Disclosure Statement, the Restructuring Transactions, the Canadian Asset Sale, the Exit Facilities, or any other contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence, and each Released Party in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities under the Plan.

(b)      Notwithstanding any other provision in the Plan, (i) no Person that has held, currently holds or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability of any nature whatsoever, or any Interest or other right of a Holder of an equity security or other ownership interest, (ii) no other party in interest, (iii) no Person claiming by or through any of the foregoing entities, and (iv) none of the Related Persons of any of the foregoing entities, shall, or shall be deemed to, have any Claim or right of action whatsoever against any Released Party for, or on account of or relating to (x) any and all claims and causes of action arising on or after the Petition Date, and (y) any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, relating to, or arising out of, the Chapter 11 Cases, the CCAA Proceedings, or the formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, this Disclosure Statement, the Confirmation Order, the Restructuring Transactions, the Canadian Asset Sale, the Exit Facilities, or any other contract or instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of any of the Debtors, with the sole exception of willful misconduct or gross negligence.

**6.      Revesting of Assets.**

Pursuant to section 1141(b) of the Bankruptcy Code and any applicable provisions of the CCAA, all property of the respective Estate of each Debtor, together with any property of each Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the applicable Reorganized Debtor on the Effective Date (subject to the effects of the Restructuring Transactions). Thereafter, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. As of the Effective Date, all property of each Reorganized Debtor shall be free and clear of all Liens, Claims and Interests, except as specifically provided in the Plan, the Confirmation Order, or the CCAA Sanction Order. Without limiting the generality of the foregoing, each Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay fees that it incurs after the Effective Date for professional services and expenses.

7.      **Preservation of Litigation Claims.**

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and their Estates shall retain the Litigation Claims.  The Reorganized Debtors, as the successors in interest to the Debtors and their Estates, may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Litigation Claims.  The Debtors or the Reorganized Debtors expressly reserve all rights to prosecute any and all Litigation Claims against any Person, except as otherwise expressly provided in the Plan, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Litigation Claims upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

8.      **Survival of Indemnification Obligations.**

(a)      Prepetition Indemnification and Reimbursement Obligations.

For purposes of the Plan, all respective obligations of SSCC and the other Debtors to indemnify and reimburse persons who are or were directors, officers, managers or employees and agents of the Debtors on the Petition Date or at any time thereafter, whether pursuant to certificates or articles of incorporation, codes of regulation, by-laws, limited liability company agreements, limited liability partnership agreements, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, shall be treated as if they are executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan as of the Effective Date, and such obligations shall survive confirmation of the Plan, shall remain unaffected by the Plan, and shall not be discharged or impaired by the Plan, irrespective of whether the indemnification or reimbursement obligation is owed in connection with any event occurring before, on or after the Petition Date, it being understood that all indemnification provisions in place on and prior to the Effective Date for directors, officers, managers or employees and agents of the Debtors shall survive the effectiveness of the Plan for claims related to or in connection with any actions, omissions or transactions prior to the Effective Date (including prior to the Petition Date).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the survival, and the Debtors' assumption, of each of the Debtors' director and officer liability insurance policies.  Additionally, the Debtors shall obtain (at market-based premiums) prior to the Effective Date insurance policies providing coverage for claims (as defined in such policies) made for any wrongful acts (as defined in such policies) or other covered conduct, acts or omissions occurring prior to the Effective Date (also referred to as "tail coverage") with coverage (in scope and substance) and on terms no less favorable to the current insureds than the Debtors' insurance policies existing as of the date of entry of the Confirmation Order, which insurance policies shall be described in greater detail in the Plan Supplement.

(b)      Integral Part of Plan.

Each of the provisions set forth in Section 10.8 of the Plan is an integral part of the Plan and is essential to its implementation.  Each Person entitled to indemnification and insurance pursuant

to Section 10.8 of the Plan shall have the right to independently seek the enforcement of each of the terms of Section 10.8 of the Plan.

**K.**     **Retention of Jurisdiction.**

    **1.**     **Jurisdiction of the Bankruptcy Court and the Canadian Bankruptcy Court.**

        Subject to the Cross-Border Insolvency Protocol, the Bankruptcy Court and the Canadian Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, the CCAA Proceedings, and the Plan, pursuant to sections 105(c) and 1142 of the Bankruptcy Code and applicable provisions of the CCAA, to the fullest extent permitted by law, including, among other things, jurisdiction to:

    (a)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

    (b)    grant or deny any applications for allowance of compensation or reimbursement of expenses for periods ending on or before the Effective Date;

    (c)    resolve any matters related to the assumption or assumption and assignment of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor or the Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

    (d)    ensure that distributions to Holders of Allowed Claims or Proven Claims are accomplished pursuant to the provisions of the Plan;

    (e)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

    (f)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Confirmation Order, the CCAA Sanction Order, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, this Disclosure Statement, the Confirmation Order, or the CCAA Sanction Order;

    (g)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or

any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)    reconcile any inconsistency between the terms of the Confirmation Order and the terms of the CCAA Sanction Order;

(i)    approve any modification of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and applicable provisions of the CCAA or approve any modification of this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, this Disclosure Statement, the Confirmation Order, the CCAA Sanction Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement, the Confirmation Order, or the CCAA Sanction Order, in such manner as may be necessary or appropriate to consummate the Plan;

(j)    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code, which shall be payable by the Debtors only upon allowance thereof pursuant to the order of the Bankruptcy Court, provided, however, that (i) the fees and expenses of Professionals retained by the Reorganized Debtors, including counsel fees, that are incurred after the Effective Date, (ii) the fees and expenses of Professionals retained by the Committee, including counsel fees, that are incurred after the Effective Date and payable by the Debtors in accordance with the terms of the Plan, and (iii) the fees and expenses of agents for or external counsel to any Prepetition Notes Indenture Trustee or Industrial Revenue Bond Indenture Trustee that are incurred after the Effective Date and payable by the Debtors in accordance with the terms of the Plan, may be paid by the Reorganized Debtors in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(k)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(l)    hear and determine any Causes of Action by or on behalf of the Debtors or the Reorganized Debtors;

(m)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(n)     enter and implement such orders as are necessary or appropriate if the
        Confirmation Order is for any reason or in any respect modified, stayed,
        reversed, revoked or vacated, or if distributions pursuant to the Plan are
        enjoined or stayed;

(o)     determine any other matters that may arise in connection with or relate to
        the Plan, this Disclosure Statement, the Confirmation Order, the CCAA
        Sanction Order, or any contract, instrument, release, or other agreement, or
        document created in connection with the Plan, this Disclosure Statement,
        the Confirmation Order or the CCAA Sanction Order;

(p)     enforce all orders, judgments, injunctions, releases, exculpations,
        indemnifications and rulings entered in connection with the Chapter 11
        Cases and the CCAA Proceedings;

(q)     hear and determine all matters related to (i) the property of the Estates from
        and after the Confirmation Date and (ii) the activities of the Reorganized
        Debtors;

(r)     hear and determine all claims, rights or disputes arising under or in
        connection with the Asset Purchase Agreement and related agreements;

(s)     hear and determine any disputes with respect to requests for the allowance
        of compensation and reimbursement of expenses incurred by any
        Professional;

(t)     hear and determine such other matters as may be provided in the
        Confirmation Order or the CCAA Sanction Order, or as may be authorized
        under the Bankruptcy Code or the CCAA;

(u)     resolve and finally determine all disputes that may relate to, have an impact
        on, or arise in connection with the Plan;

(v)     hear any other matter consistent with the provisions of the Bankruptcy Code
        or the CCAA, as the case may be;

(w)     enter an order closing the Chapter 11 Cases; and

(x)     enter an order winding up the CCAA Proceedings.

L.     **Miscellaneous.**

1.     **Surrender of Instruments.**

As a condition to participation under the Plan, the Holder of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness of the Debtors that desires to receive the property to be distributed on account of an Allowed Claim based on such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness shall surrender such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness to the Debtors, or their designee (unless such Holder's Claim will be Reinstated by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that if a claimant is a Holder of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by DTC or other securities depositary or custodian thereof, then the beneficial holder of such a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness shall be deemed to have surrendered such Holder's Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness upon the surrender of such global security by DTC or such other securities depository or custodian thereof, or in the event the DTC or such other securities depository or custodian does not surrender such global security on the Effective Date or as soon as practicable thereafter, then the Debtors may waive any requirement of surrender of such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness.  Except as otherwise provided in Section 12.1.1 of the Plan, if no surrender of a Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness occurs and a claimant does not provide an affidavit and indemnification agreement, in form and substance satisfactory to the Debtors, that such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness was lost, then no distribution may be made to any claimant whose Claim or Interest is based on such Prepetition Note, Industrial Revenue Bond, or other evidence of indebtedness.  The Debtors or the Reorganized Debtors (as the case may be) shall make subsequent distributions only to the persons who surrender the securities for exchange (or their assignees) and the record Holders of such securities shall be those Holders of record as of the Effective Date.

2.     **Dissolution of the Committee.**

The Committee shall continue in existence until the Effective Date.  On the Effective Date, the appointment of the Committee shall terminate, and the Committee shall be dissolved, provided, however, that following the Effective Date, the Committee shall continue to have standing and a right to be heard solely with respect to: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date; (iii) any adversary proceedings or contested matter as of the Effective Date to which the Committee is a party; and (iv) responding to creditor inquiries for one hundred and twenty (120) days following the Effective Date.  All reasonable fees and expenses incurred by the Professionals retained by the Committee in connection therewith shall be paid by the Reorganized Debtors without the requirement of any further order of the Bankruptcy Court.  Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, the Committee shall be dissolved and the members of the

Committee shall be released and discharged of and from all duties, responsibilities and obligations related to or arising from or in connection with the Chapter 11 Cases.

**3.      Pre-Effective Date Injunctions or Stays.**

All injunctions or stays that are in effect in the Chapter 11 Cases or the CCAA Proceedings on the Confirmation Date, whether by operation of law (including, without limitation, section 362 of the Bankruptcy Code) or by order of the Bankruptcy Court or the Canadian Bankruptcy Court (including, without limitation, the CCAA Initial Order), shall continue and remain in full force and effect through and including the Effective Date.

**4.      Post-Confirmation Date Retention of Professionals.**

Upon the Effective Date, any requirement that professionals employed by the Reorganized Debtors comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will be authorized to employ and compensate professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

**5.      Payment of the Fee Auditor's Fees and Expenses.**

Following the Effective Date, the Reorganized Debtors shall pay in cash, within thirty (30) days of receipt by the Reorganized Debtors of an invoice from the Fee Auditor, all reasonable fees and expenses of the Fee Auditor that are incurred after the Effective Date, without the need for any further authorization from the Bankruptcy Court. In the event that the Reorganized Debtors object to payment of such invoice from the Fee Auditor for post-Effective Date fees and expenses, in whole or in part, and the parties cannot resolve such objection after good faith negotiation, the Bankruptcy Court shall retain jurisdiction to make a determination as to the extent to which the invoice shall be paid by the Reorganized Debtors.

**6.      Bar Date for Certain Administrative Expense Claims.**

All applications for final allowance of compensation or reimbursement of the expenses incurred by any Professional, and all other requests for the payment of Administrative Expense Claims, including all requests for the allowance of any Administrative Expense Claim pursuant to section 503(b)(3)(D) of the Bankruptcy Code for substantial contributions made in these Chapter 11 Cases (but expressly excluding all requests for the payment of obligations incurred by the Debtors in the ordinary course of their business operations after the Petition Date), must be filed with the Bankruptcy Court and served on the Reorganized Debtors and their counsel at the addresses set forth in Section 12.16 of the Plan not later than thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Any request for the payment of an Administrative Expense Claim that is not timely filed and served shall be discharged and forever barred and the Holder of such Administrative Expense Claim shall be enjoined from commencing or continuing any action, process, or act to collect, offset or recover such Claim. The Debtors and the Reorganized Debtors shall have sole responsibility for filing objections to and resolving all requests for the allowance of Administrative Expense Claims.

### 7. Effectuating Documents and Further Transactions.

Each of the Debtors and the Reorganized Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

### 8. Exemption from Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents under the Plan; (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest under the Plan; (c) the making or assignment of any lease or sublease pursuant to the Plan; or (d) the making or delivery of any deed or other instrument of transfer under, pursuant to, or in connection with the Plan, including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, assignments, and transfers of tangible property executed in connection with the Plan, the Confirmation Order or the CCAA Sanction Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee or similar tax, charge or expense to the fullest extent provided for under the Bankruptcy Code.

### 9. Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

### 10. Payment of Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees.

Notwithstanding anything to the contrary in the Plan, the Prepetition Notes Indenture Trustee Fees and the Industrial Revenue Bond Indenture Trustee Fees that are incurred prior to the Effective Date shall be paid in full, in cash, on the Effective Date; provided, however, that such amounts shall exclude (a) any Industrial Revenue Bond Indenture Trustee Fees that are incurred by the Hodge Industrial Revenue Bond Indenture Trustee and (b) any fees or expenses incurred by any Prepetition Notes Indenture Trustee or Industrial Revenue Bond Indenture Trustee in connection with any (i) objections to approval of this Disclosure Statement, (ii) objections to Confirmation of the Plan, (iii) any requests to convert any of the Chapter 11 Cases into cases under Chapter 7 of the Bankruptcy Code, (iv) any requests to convert any of the CCAA Proceedings into proceedings under the BIA, or (v) any other actions that may interfere with or delay Confirmation of the Plan. The Prepetition Notes Indenture Trustee Fees and Industrial Revenue Bond Indenture Trustee Fees that are incurred after the Effective Date (other than any Industrial Revenue Bond Indenture Trustee Fees that are incurred by the Hodge Industrial Revenue Bond Indenture Trustee) shall be paid in full, in cash, by the Reorganized Debtors in the ordinary course of business after the Effective Date.

### 11. Payment of Professional Fees of the Ad Hoc Group of Prepetition Noteholders.

Notwithstanding anything to the contrary in the Plan, the reasonable fees and expenses incurred by Paul, Weiss, Rifkind, Wharton & Garrison LLP prior to the Effective Date in its capacity as counsel to the ad hoc group of certain Prepetition Noteholders who actively participated in negotiations on the terms of the Plan shall be paid in cash, in an aggregate amount not to exceed $250,000, on or as soon as practicable after the Effective Date.

### 12. 11. Proofs of Claim Filed by Prepetition Notes Indenture Trustees.

Consistent with Bankruptcy Rule 3003(c), the Debtors or the Reorganized Debtors, as applicable, shall recognize any Proofs of Claim filed by the Prepetition Notes Indenture Trustees with respect to the Prepetition Noteholder Claims.  If any Prepetition Notes Indenture Trustee files a Proof of Claim in respect of the Prepetition Noteholder Claims and a Prepetition Noteholder also files a Proof of Claim with respect to any Prepetition Noteholder Claim included in the Proof of Claim filed by the Prepetition Notes Indenture Trustee, only the Proof of Claim of the Prepetition Notes Indenture Trustee shall be Allowed.

### 13. 12. Proofs of Claim Filed by Industrial Revenue Bond Indenture Trustees.

Consistent with Bankruptcy Rule 3003(c), the Debtors or the Reorganized Debtors, as applicable, shall recognize any Proofs of Claim filed by the Industrial Revenue Bond Indenture Trustees with respect to the Industrial Revenue Bond Claims.  If any Industrial Revenue Bond Indenture Trustee files a Proof of Claim in respect of the Industrial Revenue Bond Claims and an Industrial Revenue Bondholder also files a Proof of Claim with respect to any Industrial Revenue Bond Claim included in the Proof of Claim filed by the Industrial Revenue Bond Indenture Trustee, only the Proof of Claim of the Industrial Revenue Bond Indenture Trustee shall be Allowed.

### 14. 13. Creditor Representative Duties and Payment of Fees

The Committee, in consultation with the Debtors, shall select the Creditor Representative, whose identity shall be disclosed in the Plan Supplement.  From and after the Effective Date, the Creditor Representative, with the assistance of counsel, shall be responsible for (i) approving the settlement or allowance of any Claim where the Allowed amount would exceed the Creditor Representative Threshold Amount and (ii) enforcing the terms of the Plan.  The reasonable fees and expenses of the Creditor Representative (including the reasonable fees and expenses of counsel retained by the Creditor Representative) shall be paid by the Reorganized Debtors after the Effective Date without the need for approval by the Bankruptcy Court, provided that such fees and expenses shall not exceed $[_____]500,000 in the aggregate.

### 15. 14. Amendment or Modification of the Plan.

Subject to section 1127 of the Bankruptcy Code and applicable provisions of the CCAA, the Debtors may alter, amend, modify or supplement the Plan, Plan Supplement or the Plan Exhibits at any time prior to or after the Confirmation Date but prior to the Substantial Consummation of the Plan.  A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented, if the proposed

alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claim or Interest of such Holder.

### 16. ~~15.~~ Severability of Plan Provisions.

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 17. ~~16.~~ Binding Effect; Successors and Assigns.

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and all other parties in interests in these Chapter 11 Cases and the CCAA Proceedings and the respective successors and assigns of each of the foregoing, including, without limitation, the Reorganized Debtors. The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### 18. ~~17.~~ Revocation, Withdrawal or Non-Consummation.

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

### 19. ~~18.~~ Notice.

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Smurfit-Stone Container Corporation
222 North LaSalle Street
Chicago, IL 60601
Attention:  General Counsel
Telephone:
Facsimile:

with a copy to:

SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Attention: James F. Conlan
              Matthew A. Clemente
              Dennis M. Twomey
              Bojan Guzina
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

### 20. ~~19.~~ Governing Law.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law of the United States is applicable to the Plan in the Chapter 11 Cases, or to the extent that an Exhibit to the Plan or any relevant document provides otherwise, the rights and obligations arising under the Plan in the Chapter 11 Cases shall be governed by, and construed and enforced in accordance with, the laws of the United States and the State of Delaware, without giving effect to the principles of conflicts of laws thereof.  Except to the extent that the CCAA or other federal law of Canada is applicable to the CCAA Plan, or to the extent that an Exhibit to the Plan or any relevant document provides otherwise, the rights and obligations arising under the CCAA Plan shall be governed by, and construed and enforced in accordance with, the laws of Canada and the Province of Ontario, without giving effect to the principles of conflicts of laws thereof.

### 21. ~~20.~~ Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force and effect unless (i) the Bankruptcy Court has entered the Confirmation Order and (ii) the Canadian Bankruptcy Court has entered the CCAA Sanction Order.  The filing of the Plan, this Disclosure Statement, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, shall not be and shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to any Holders of Claims against or Interests in the Debtors.

## VI. VOTING PROCEDURES AND REQUIREMENTS

**A.**     **Voting Procedures/Solicitation in the Chapter 11 Proceedings.**

If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote such Claims in more than one Class, you will receive separate Ballots which must be used for each separate Class of Claims.  If you are entitled to vote and did not receive a Ballot, received a damaged Ballot or lost your Ballot please call the Voting Agent at (877) 264-9638 (for U.S. calls) or (503) 597-7694 (for Non-U.S. calls).

**1.**     **Voting Deadline.**

TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE **ACTUALLY RECEIVED BY** THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE OF 4:00 P.M. PREVAILING EASTERN TIME ON [_____ __], 2010 (THE "VOTING DEADLINE").  ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN.  ALL BALLOTS MUST BE SENT TO THE FOLLOWING ADDRESS:

**FOR FIRST CLASS MAIL:**

SMURFIT-STONE CONTAINER CORPORATION BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
FDR STATION, P.O. BOX 5014
NEW YORK, NEW YORK
10150-5014

**FOR OVERNIGHT MAIL AND HAND DELIVERY:**

SMURFIT-STONE CONTAINER CORPORATION BALLOT PROCESSING CENTER
C/O EPIQ BANKRUPTCY SOLUTIONS, LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NEW YORK 10017

Votes cannot be transmitted orally, by facsimile or by electronic mail.  Accordingly, you are urged to return your signed and completed Ballot promptly.  Any executed Ballot received that does not indicate either an acceptance or rejection of the Plan shall be deemed to constitute an acceptance of the Plan.

THE DEBTORS INTEND TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN IN THE CHAPTER 11 CASES UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY CLASS DEEMED TO REJECT, OR AS TO ANY CLASS THAT VOTES TO REJECT, THE PLAN,

AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

> **2.      Vote Required for Acceptance by a Class of Claims.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Solicitation Order.

> **3.      Voting Procedures.**

>> (a)      Ballots.

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly competed and executed form of Ballot designated for such Class. Holders of Impaired Claims voting on the Plan should complete and sign the Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan." Holders of Claims in Class 2E (that are not Holders of Prepetition Noteholder Claims, Industrial Revenue Bond Claims or Hodge Industrial Revenue Bond Claims) should indicate whether or not you choose to make the Convenience Claim Election or the Cash-Out Election.

Ballots must be delivered to the Voting Agent, at its address set forth above, and actually received by the Voting Deadline.  THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.  If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery.

In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a contested Claim, this amount may not be the amount ultimately allowed for purposes of Distribution) and the Class into which the Claim has been placed under the Plan.

In addition, each Holder of a Claim entitled to vote on the Plan may elect, by checking the appropriate box on the Ballot, not to grant the releases contained in Section 10.2 of the Plan and the related injunction.  All Holders of Claims who submit a Ballot without such box checked will be deemed to consent to the releases set forth in Section 10.2 of the Plan and the related injunction to the fullest extent permitted by applicable law.

If you are a beneficial holder of a Prepetition Note or Industrial Revenue Bond who receives a Ballot from a Voting Nominee, in order for your vote to be counted, your Ballot must be completed in accordance with the voting instructions on the Ballot and received by the Voting Nominee in enough time for the Voting Nominee to transmit a Master Ballot to the Voting Agent so that it is actually received no later than the Voting Deadline.  If you are the Holder of any other type of Claim, in order for your vote to be counted, your Ballot must be properly completed in accordance with the voting instructions on the Ballot and returned to the Voting Agent so that it is

received no later than the Voting Deadline.  Any Ballot received after the Voting Deadline shall be counted at the sole discretion of the Debtors.

**If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth in this Disclosure Statement.**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Order also sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly.

(b)     Withdrawal or Change of Votes on the Plan.

After the Voting Deadline, no vote may be withdrawn without the prior consent of the Debtors, which consent shall be given in the Debtors' sole discretion.

Any Holder who has submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Voting Agent prior to the voting deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  If more than one timely, properly completed Ballot is received with respect to the same Claim, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines was the last to be received.

**B.     Canadian Voting Procedures.**

**1.     Voting and Acceptance of Plan in CCAA Proceedings.**

As noted above, in addition to confirmation of the Plan by the Bankruptcy Court, the CCAA Plan will need to be sanctioned by the Canadian Bankruptcy Court as the CCAA Plan pertains to the Canadian Debtors.  The voting procedures for approval of the CCAA Plan in the CCAA Proceedings are described in the CCAA Creditors' Meeting Order.

A class of creditors shall have agreed to the CCAA Plan in the CCAA Proceedings if it is accepted by a majority in number representing two-thirds (⅔) in value of the creditors present and voting in person or by proxy on a class-by-class basis.  The CCAA Plan is binding only against creditors of those classes which vote to accept the proposal.  Classes that reject the CCAA Plan are not bound thereunder.

**2.     Solicitation in CCAA Proceedings.**

In addition to any entitlement to vote in the Chapter 11 Cases, as described above, all creditors of the Canadian Debtors who are Affected Creditors are entitled to vote on the CCAA Plan.  Any Class of Affected Creditors that does not vote to approve the CCAA Plan shall not be bound by the CCAA Plan for purposes of the CCAA Proceedings.  The votes of Holders of Claims against Canadian Debtors that are entitled to vote in the Chapter 11 Cases and are also Affected Creditors to accept or rejectentitled to vote on the CCAA Plan will be counted once for the

purposes of both the CCAA Proceedings and the Chapter 11 Cases.  Such creditors will be allowed to vote on the Ballot/Proxy received as part of the Solicitation Package that will also serve as proxy for purposes of voting in the CCAA Proceedings.  If such creditors prefer to vote in person at the CCAA Creditors' Meeting, their vote for purposes of both the Chapter 11 Cases and the CCAA Proceedings will be as recorded at the CCAA Creditors' Meeting.

The Affected Claims against each Canadian Debtor are divided into the following two (2) Classes:  (a) Affected Secured Claims (consisting of the Prepetition Canadian Lender Claims and all Other Secured Claims, as applicable,) against SSC Canada, Smurfit-MBI, MBI Limited, Francobec Company and 3083527 Nova Scotia Company), and (b) Affected Unsecured Claims (consisting of all General Unsecured Claims) against SSC Canada, Smurfit-MBI, and Stone FinCo II).

Holders of Excluded Claims (the "Unaffected Creditors") shall not be entitled to vote in respect of the CCAA Plan or otherwise or receive distributions provided for, under and pursuant to the CCAA Claims Bar Date Order, the CCAA Claims Determination Order, the CCAA Creditors' Meeting Order, and the CCAA Plan.

As described above, the process for Affected Creditors to vote on the CCAA Plan is established by order of the Canadian Bankruptcy Court, which has the discretion to order a meeting of creditors to vote on the CCAA Plan CCAA Creditors' Meeting.  The Canadian Bankruptcy Court issued a CCAA Plan Filing and Meeting Order on [_____] (the "CCAA Creditors' Meeting Order").  The CCAA Creditors' Meeting Order provides, among other things, that:

- CCAA Plan is accepted for filing with the Canadian Bankruptcy Court and the Canadian Debtors are authorized to seek its approval in the manner prescribed in the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to modify and/or supplement CCAA Plan in accordance with the terms of the CCAA Creditors' Meeting Order;

- The Canadian Debtors are authorized to call, hold and conduct a meeting of Affected the CCAA Creditors' Meeting for the purpose of voting (in person or by proxy) on, with or without variation, a resolution to approve CCAA Plan;

- For purposes of voting on CCAA Plan, Affected Claims against each of the Canadian Debtors shall be separated into classes, as described in the CCAA Creditors' Meeting Order;

- The CCAA Monitor shall make available on its website or send copies of certain documents (collectively, the "Canadian Solicitation Package") in accordance with the CCAA Creditors' Meeting Order, including the following:

    (a)    The the CCAA Creditors' Meeting Order and Notice of Creditors' Meeting; and

(b)      ~~The~~the Disclosure Statement, Plan, and Voting Procedures Order~~, including the form of proxy~~; and

(c)      the Ballot~~) for use at the Creditors' Meeting~~/Proxy.

- If the CCAA Plan is accepted by the Required Majority of ~~a Class~~the Classes of Affected Secured Claims, the Canadian Debtors shall bring a motion seeking an order sanctioning the CCAA Plan with respect to such Claims on [_____], or such later date as the Canadian Bankruptcy Court may set.

CREDITORS HOLDING CLAIMS AGAINST THE CANADIAN DEBTORS SHOULD REFER TO THE MONITOR'S REPORT AND THE MATERIALS INCLUDED IN THE "CANADIAN SOLICITATION PACKAGE".

## VII.  CONFIRMATION OF THE PLAN

**A.**      **Confirmation in Chapter 11 Cases.**

**1.**      **Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [_____, ] ~~20__~~2010 at [__ _.m.], prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Sixth Floor, Courtroom No. 1, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the  objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court, together with proof of service, and served so that they are received **on or before [_____], 2010 at 4:00 p.m., prevailing Eastern Time** by the following parties:

Counsel to the Debtors:

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Facsimile: (312) 853-7036
Attn:  James F. Conlan
        Matthew A. Clemente
        Dennis M. Twomey
        Bojan Guzina

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Facsimile: (302) 571-1253
Attn:  Robert S. Brady
        Edmon L. Morton

218

The United States Trustee:

U.S. Trustee
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lock Box 35
Wilmington, Delaware 19801
Facsimile: (302) 573-6497
Attn: David M. Klauder

Counsel to the Official Committee of
Unsecured Creditors:

Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, New York 10036
Facsimile: (212) 715-8000
Attn: Thomas Moers Mayer

Objections to confirmation of the Plan are governed by Rule 9014 of the Bankruptcy Rules.
UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED
AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## 2.     Statutory Requirements for Confirmation of the Plan in Chapter 11 Cases.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the
requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for
confirmation are that the Plan (i) is accepted by all Classes of Claims and Interests or, if rejected by
an impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to such
Class, (ii) is feasible and (ii) is in the "best interests" of Holders of Claims and Interests impaired
under the Plan.

AS EXPLAINED ABOVE, THE BANKRUPTCY CODE CONTAINS PROVISIONS
FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES.
THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b)
OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF
REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY
ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE
IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.

(a)     Acceptance.

Claims in Classes 1C, 2C, 2D, 2E, 3C, 4C, 4D, 4E, 5C, 15B, 15C, 15D, 16B, 16C, 16D,
17B, 17C, 18C, 19B, 19C, 20B, 20C, 20D, 21B and 21C are impaired under the Plan, and,
therefore, must accept the Plan in order for it to be confirmed without application of the "fair and
equitable test," described below, to such Classes. As stated above, impaired Classes of Claims will

219

have accepted the Plan if the Plan is accepted by at least two-thirds in dollar amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have noted to accept or reject the Plan.

Classes 1A, 1B, 2A, 2B, 2G, 3A, 3B, 3E, 4A, 4B, 5A, 5B, 5E, 6A through 14A, 6B through 14B, 6E through 14E, 15A, 16A, 17A, 17F, 18A, 18B, 18E, 19A, ~~19B,~~ 19E, 20A, 21A, 21F, 22A through 25A, 22B through 25B, and 22E through 25E are unimpaired under the Plan, and the Holders of Allowed Claims in each of these Classes are conclusively presumed to have accepted the Plan.

Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C are impaired and the Holders of such Claims and Interests will not receive or retain any property under the Plan. Accordingly, these classes are deemed not to have accepted the Plan and confirmation of the Plan will require application of the "fair and equitable test," described below.

The Debtors, as the Plan Proponents and the Holders of Intercompany Claims in Classes 1E, 2F, 3D, 4F, 5D, 6D through 14D, 15E, 16E, 17E, 18D, 19D, 20E, 21E, and 22D through 25D, shall be deemed to have accepted the Plan and votes to accept or reject the Plan shall not be solicited from the Debtors in their capacities as the Holders of Intercompany Claims; provided, however, if the Stone FinCo II Contribution Claim is deemed to be an Allowed Claim against SSCE prior to the Voting Deadline, Stone FinCo II, as the Holder of the Stone FinCo II Contribution Claim, shall be deemed to have voted such Claim against SSCE in the same fashion as the Holders of the majority in amount of the 7.375% Notes Due 2014 shall have voted their General Unsecured Claims against Stone FinCo II.

(b)    Fair and Equitable Test.

The Debtors will seek to confirm the Plan notwithstanding the non-acceptance or deemed non-acceptance of the Plan by any impaired Class of Claims or Interests. To obtain such confirmation, it must be demonstrated that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to on account of its claims or interests. The Debtors believe that the Plan satisfies these requirements.

The Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and equity interests, as follows:

(i)    Secured Creditors. Either (i) each holder of an impaired secured claim retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens

attaching to the proceeds of the sale and the treatment of such liens on proceeds is as provided in clauses (i) or (ii) above.

(ii)    <u>Unsecured Creditors</u>.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

(iii)    <u>Interest Holders</u>.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the equity interest, or (ii) the holders of equity interests that are junior to the nonaccepting class will not receive or retain any property under the plan.

**THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN).  ACCORDINGLY, THE DEBTORS WILL DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.**

(c)    Feasibility.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan.  This condition is often referred to as the "feasibility" of the Plan.  The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the financial advisors of the Debtors have analyzed the Debtors' ability to meet their obligations under the Plan.  As part of that analysis, the Debtors have prepared consolidated projected financial results for each of the years ending December 31, 2009 through and including 2014.  These financial projections, and the assumptions on which they are based, are annexed hereto as <u>Exhibit C</u> (the "<u>Projections</u>").  Based upon the Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  The Debtors also believe that they will be able to repay or refinance on commercially reasonable terms any and all of the indebtedness under the Plan at or prior to the maturity of such indebtedness.

The Debtors have prepared the Projections based upon certain assumptions that they believe to be reasonable under the current circumstances.  Those assumptions the Debtors considered to be significant are described in the notes which are part of the Projections.  The Projections have not been examined or compiled by independent accountants.  Many of the assumptions on which the Projections are based are subject to significant uncertainties.  Inevitably,

some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore the actual results achieved throughout the period covered by the Projections may vary from the projected results, and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based in evaluating the Plan.

(d)     Best Interests Test.

The "best interests" test under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of impaired claims or impaired interests receive property with a value not less than the amount such holder would receive in a Chapter 7 liquidation. As indicated above, the Debtors believe that under the Plan, Holders of Impaired Claims and Impaired Interests will receive property with a value equal to or in excess of the value such Holders would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code. The Chapter 7 liquidation analysis set forth below demonstrates that the Plan satisfies the requirements of the "best interests" test.

To estimate potential returns to Holders of Claims and Interests in a Chapter 7 liquidation, the Debtors determined, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code. The Debtors considered many factors and data and have assumed that the liquidation of all assets would be conducted in an orderly manner and, as such, the bids received for the Debtors' significant assets would be, at most, materially no different from the bids that the Debtors have received from sales and inquiries in recent months. The liquidation proceeds available for distribution to Holders of Claims against and Interests in the Debtors would consist of the net proceeds from the disposition of the Debtors' assets, augmented by any other cash that the Debtors held and generated during the assumed holding period stated in the Plan and after deducting the incremental expenses of operating the business pending disposition.

In general, as to each entity, liquidation proceeds would be allocated in the following priority:

- first, to the Claims of secured creditors to the extent of the value of their collateral;

- second, to the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' Chapter 7 cases, including tax liabilities;

- third, to the unpaid Administrative Expense Claims;

- fourth, to Priority Tax Claims and other Claims entitled to priority in payment under the Bankruptcy Code;

- fifth, to Unsecured Claims; and

- sixth, to Interests.

The Debtors' liquidation costs in a Chapter 7 case would include the compensation of a bankruptcy trustee, as well as compensation of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, Claims arising from the Debtors' operation during the pendency of the Chapter 7 cases and all unpaid Administrative Expense Claims that are allowed in the Chapter 7 case. The liquidation itself might trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate Claims or, in the case of taxes, make it likely that the Internal Revenue Service would assert all of its claims as Priority Tax Claims rather than asserting them in due course as is expected to occur under the Chapter 11 Cases. These Priority Claims would be paid in full out of the net liquidation proceeds, after payment of secured Claims, Chapter 7 costs of administration and other Administrative Expense Claims, and before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

The following Chapter 7 liquidation analysis is provided solely to discuss the effects of a hypothetical Chapter 7 liquidation of the Debtors and is subject to the assumptions set forth below. The Debtors cannot assure you that these assumptions would be accepted by a Bankruptcy Court. The Chapter 7 liquidation analysis has not been independently audited or verified.

(e)     Liquidation Analysis.

A liquidation analysis is attached to this Disclosure Statement as Exhibit D (the "Liquidation Analysis"). This analysis is based upon a number of estimates and assumptions that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the Debtors' control. Accordingly, while the analyses contained in the Liquidation Analysis are necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized if the Debtors were in fact liquidated, nor can the Debtors assure you that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

**ACTUAL LIQUIDATION PROCEEDS COULD BE MATERIALLY LOWER OR HIGHER THAN THE AMOUNTS SET FORTH IN EXHIBIT D. NO REPRESENTATION OR WARRANTY CAN OR IS BEING MADE WITH RESPECT TO THE ACTUAL PROCEEDS THAT COULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS. THE LIQUIDATION VALUATIONS HAVE BEEN PREPARED SOLELY FOR PURPOSES OF ESTIMATING PROCEEDS AVAILABLE IN A CHAPTER 7 LIQUIDATION OF THE ESTATE AND DO NOT REPRESENT VALUES THAT MAY BE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THESE VALUATIONS IS INTENDED TO OR MAY BE ASSERTED TO CONSTITUTE A CONCESSION OR ADMISSION OF THE DEBTORS FOR ANY OTHER PURPOSE.**

The Liquidation Analysis is based upon the Debtors' balance sheets as of September 30, 2009, and assumes that the actual September 30, 2009 balance sheets are conservative proxies for the balance sheets that would exist at the time the Chapter 7 liquidation would commence.

Under section 704 of the Bankruptcy Code, a Chapter 7 trustee must, among other duties, collect and convert the property of a debtor's estate to Cash and close the estate as expeditiously as

is compatible with the best interests of the parties-in-interest.  Consistent with these requirements, it is assumed for purposes of the Liquidation Analysis that a liquidation of the Debtors would commence under the direction of a Chapter 7 trustee appointed by the Bankruptcy Court and would continue for a period of nine (9) months, during which time all of the Debtors' major assets would either be sold or conveyed to their respective lien holders, and the Cash proceeds of such sales, net of liquidation-related costs, would then be distributed to the Debtors' creditors. Although the liquidation of some assets might not require nine months to accomplish, other assets would be more difficult to collect or sell and hence would require a liquidation period substantially longer than nine (9) months.

As set forth in detail on the Liquidation Analysis attached hereto as <u>Exhibit D</u>, the Debtors believe that the Plan will produce a greater recovery for the Holders of Claims than would be achieved in a Chapter 7 liquidation.  Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' businesses, will provide a substantially greater ultimate return to the Holders of Claims than would a Chapter 7 liquidation.

**B.    Canadian Requirements for Sanction of CCAA Plan.**

Section 6 of the CCAA provides that the Canadian Bankruptcy Court may ~~section~~<u>sanction</u> a plan that has received the requisite creditor vote.  However, the Canadian Bankruptcy Court does not have to sanction the plan even if approved by the requisite majority of creditors.  While there is no statutory test for the exercise of the Canadian Bankruptcy Court's discretion, courts have held that the person applying to have the plan sanctioned must meet three tests:  (1) there has been compliance with all statutory requirements and adherence to previous orders of the Canadian Bankruptcy Court; (2) nothing has been done or purported to be done that is not authorized by the CCAA; and (3) the plan is fair and reasonable.  In determining whether a plan is fair and reasonable, the Canadian Bankruptcy Court has discretion to consider whatever factors it determines are relevant.  Common considerations may include (a) the proper classification of claims, (b) anticipated receipts in liquidation or bankruptcy, and (c) the public interest.

## VIII. PROJECTED FINANCIAL INFORMATION <u>AND VALUATION ANALYSIS</u>

### A.    Projected Financial Information.

The Debtors have prepared the projected financial information contained in this Disclosure Statement relating to the Reorganized Debtors, including the consolidated pro forma financial statements attached to this Disclosure Statement as <u>Exhibit C</u>, in connection with the development of the Plan.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and in the Plan in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto) and other financial information set forth in SSCC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, SSCC's Quarterly Report on Form 10-Q for the third quarter ending September  30, 2009, and other reports filed by SSCC with the SEC filed prior to the Bankruptcy Court's approval of this Disclosure Statement. These filings are available by visiting the SEC's website at http://www.sec.gov or the Debtors' website at http://www.smurfit.com.

The Debtors prepared the Projections based upon, among other things, the anticipated future financial condition and results of operations of Reorganized Debtors.  The Debtors do not, as a matter of course, publish their business plans, strategies, projections, or their anticipated results of operations or financial condition.  Accordingly, the Debtors and the Reorganized Debtors do not intend to update or otherwise revise the Projections, or to include such information in documents required to be filed with the SEC or otherwise make such information public to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.  EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  SEE ARTICLE X, "CERTAIN RISK FACTORS TO BE CONSIDERED."

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE

REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE
PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

**B.      Valuation Analysis.**

In order to provide information to parties in interest regarding the possible range of values
of their distributions under the Plan, the Debtors have been advised by Lazard, their investment
banker and financial advisor, with respect to the estimated consolidated value of the Reorganized
Debtors on a going-concern basis.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE
CONTAINED IN THIS SECTION VIII.B DO NOT REFLECT VALUES THAT COULD BE
ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.  THE IMPUTED ESTIMATE OF THE
RANGE OF EQUITY VALUE OF THE COMPANY ASCRIBED IN THE ANALYSIS DOES
NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET
TRADING VALUE.  ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT
FROM THE IMPUTED ESTIMATE OF EQUITY VALUE RANGE FOR THE COMPANY
ASSOCIATED WITH LAZARD'S VALUATION ANALYSIS.  THE VALUATION
INFORMATION CONTAINED IN THIS SECTION IS NOT A PREDICTION OR
GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED
THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.

**1.      Overview.**

Lazard has estimated the consolidated value of the Reorganized Debtors as of an assumed
Effective Date of March 31, 2010.  Lazard has undertaken this valuation analysis to determine the
value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze
the relative recoveries to such holders thereunder.  The estimated total value available for
distribution to holders of Allowed Claims (the "Distributable Value") consists of the estimated value
of the Reorganized Debtors' operations on a going concern basis (the "Enterprise Value") plus the
estimated cash balance at the assumed Effective Date plus the value of potential asset dispositions
plus the potential value of investments in certain non-consolidated affiliates. The valuation analysis
assumes that the Plan becomes effective on March 31, 2010 and is based on Projections provided
by the Debtors' management for 2009 – 2014 (the "Projection Period"), which are attached to this
Disclosure Statement as Exhibit C.

Based on these Projections and solely for purposes of the Plan, Lazard estimates that the
Enterprise Value of the Reorganized Debtors falls within a range from approximately $2,900 to
$3,200 million.  Adding the estimated cash balance at the assumed Effective Date of
approximately $125.5 million, the value of potential asset dispositions of approximately $6.3
million, and the potential additional value of investments in non-consolidated affiliates of
approximately $5.8 million to the Enterprise Value range of $2,900 to $3,200 million yields a
range of Distributable Value of the Reorganized Debtors of $3,037.6 million to $3,337.6 million
with a mid-point estimate of $3,187.6 million.

Based on an estimated gross debt balance of approximately $1,200.0 million projected as
of the assumed Effective Date, Lazard's mid-point estimate of Distributable Value implies a value

for the New Common Stock of the Reorganized Debtors (the "Equity Value") of approximately $1,987.6 million. These values do not give effect to the potentially dilutive impact of any shares issued upon exercise of options or restricted shares that may be granted under a long-term incentive plan, which the Board of Directors of the Reorganized Debtors may authorize for management of the Reorganized Debtors.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF MARCH 31, 2010, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD CURRENTLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS, HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.

Lazard assumed that the Projections prepared by the management of the Debtors were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Reorganized Debtors will achieve their Projections in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins, earnings and cash flow as projected. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have materially positive impact on Enterprise Value.

In estimating the hypothetical range of the Enterprise Value of the Reorganized Debtors, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years; (b) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Reorganized Debtors' business and its prospects; (c) met with and discussed the Debtors' operations and future prospects with the senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating business; (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate, and (g) considered recent precedent transactions in the paper packaging industry. Although Lazard reviewed the Reorganized Debtors' business, operating assets and liabilities and business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Reorganized Debtors as well as publicly available information.

In addition, Lazard did not independently verify the Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims thereunder.

Lazard's estimated Enterprise Value of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Lazard's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Reorganized Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Reorganized Debtors' industry and economic conditions generally, and other factors which generally influence the prices of securities.

As noted above, the estimate of the hypothetical range of Enterprise Values consists of the aggregate Enterprise Value of the Reorganized Debtors on a going-concern basis. The Plan is premised upon complete deconsolidation of the Debtor entities. As such, the values of the individual Debtors and the Allowed Claims against such Debtors may affect what is available for distribution to the creditors of each separate Debtor.

**2.     Valuation Methodology.**

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for the Reorganized Debtors. Lazard's valuation analysis must be considered as a whole. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

(a)     Discounted Cash Flow Analysis

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the

"Discount Rate").  The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure.  The Enterprise Value of the firm is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period known as the terminal value.  The terminal value is derived by applying a multiple to the Reorganized Debtors' projected earnings before interest, taxes, depreciation and amortization ("EBITDA") and earnings before interest, taxes, depreciation, amortization and pension expense ("EBITDAP") in the final year of the Projection Period, discounted back to the assumed date of emergence by the Discount Rate.

To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term debt-to-total capitalization ratio.  Lazard calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market.  To estimate the cost of debt, Lazard estimated what would be the Reorganized Debtors' blended cost of debt based on the current assumed pricing on the Reorganized Debtors' proposed exit financing.  In determining EBITDA and EBITDAP terminal multiples, Lazard relied upon various analyses including a review of trading multiples for comparable companies operating in the paper packaging and paper sectors.  Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples.

In applying the above methodology, Lazard utilized management's detailed Projections for the period beginning March 31, 2010, and ending December 31, 2014, to derive unlevered after-tax free cash flows.  Free cash flow includes sources and uses of cash not reflected in the income statement, such as capital expenditures, cash taxes and changes in working capital.  These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using a range of Discount Rates calculated in a manner described above to arrive at a range of Enterprise Values.

(b)      Comparable Company Analysis

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics.  Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value) and minority interest.  Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly EBITDA.  Lazard also examined enterprise values for each selected public company by including the pension underfunding of each company in enterprise value and then expressing those enterprise values as multiples of EBITDAP.  In addition, each of the selected public company's operational performance, operating margins, profitability, leverage and business trends were examined.  Based on these analyses, financial multiples and ratios are calculated to apply to the Reorganized Debtors' actual

and projected operational performance. Lazard focused primarily on EBITDA and EBITDAP multiples of the selected comparable companies to value the Reorganized Debtors.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

Lazard selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Reorganized Debtors in one or more of the factors described above: Cascades, Inc., MeadWestvaco Corporation, Packaging Corporation of America, Rock-Tenn Co., Smurfit-Kappa Group PLC, Temple-Inland Inc., International Paper Co, Boise, Inc., Domtar Corporation, Stora Enso Corp., and UPM-Kymmene Oyj.

Lazard calculated market multiples for the Peer Group based on 2009-2011 estimated EBITDA and EBITDAP by dividing the appropriate enterprise value of each comparable company as of January 2010 by the mean projected 2009-2011 EBITDA and EBITDAP as estimated by equity research analysts. In determining the applicable EBITDA and EBITDAP multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue, EBITDA and capital expenditure amounts, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines. Lazard then applied the range of multiples described above to the Reorganized Debtors' 2009E, 2010E and 2011E EBITDA and EBITDAP to determine a range of Enterprise Values.

(c)      Precedent Transactions Analysis

The precedent transactions analysis estimates value by examining public merger and acquisition transactions. The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial results. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Reorganized Debtors. Since precedent transaction analysis reflects aspects of value other than the intrinsic value of a company, there are limitations as to its applicability in determining the Enterprise Value. Nonetheless, Lazard reviewed recent M&A transactions involving paperboard and containerboard companies. Many of the transactions analyzed occurred in different fundamental, credit and other market conditions from those prevailing in the marketplace and therefore may not be the best indication of value in the current market. Lazard focused mainly on EBITDA multiples in comparing the valuations of the selected companies involved in the relevant precedent transactions.

(d)      Other Assets/ Liabilities Valuation

In determining a range for Distributable Value for the Reorganized Debtors, Lazard used an estimated cash balance at the Assumed Effective Date of approximately $125.5 million based

on a review of the Reorganized Debtors' business plan and emergence costs assumptions including restructuring costs and professional fees. Lazard, with the assistance of management, estimated the value of the potential asset dispositions to be approximately $6.3 million and the potential additional value of investments in non-consolidated Canadian affiliates to be approximately $5.8 million.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE REORGANIZED DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

## IX. DESCRIPTION OF CAPITAL STOCK OF REORGANIZED DEBTORS

Pursuant to the Plan, Reorganized SSCC will authorize the issuance of 150,000,000 shares, and will issue approximately 100,000,000 shares, of New SSCC Common Stock for distribution to creditors as set forth herein, with no less than eight percent (8%) on a fully diluted basis of the New SSCC Common Stock that is issued or reserved for issuance pursuant to the Plan (including shares reserved for issuance pursuant to the Management Incentive Plans and shares held in the SSCE Distribution Reserve as of the Effective Date) (i.e., 8,695,652 shares of New SSCC Common Stock) reserved for issuance pursuant to the pertinent Management Incentive Plans. The New SSCC Common Stock will be subject to dilution as a result of further issuances thereof, including with respect to shares that may be issued under a management incentive plan. Reorganized SSCC will authorize the issuance of 10,000,000 shares New SSCC Preferred Stock.

The Amended and Restated Certificate of Incorporation of Reorganized SSCC, to be filed as <u>Exhibit 2</u> to the Plan, provides that Reorganized SSCC will have authorized shares of New SSCC Common Stock in the numbers set forth therein, $.001 par value per share and authorized shares of New SSCC Preferred Stock in the numbers set forth therein, $.001 par value per share. Each share of New SSCC Common Stock will have one vote upon all matters to be voted on by the holders of New SSCC Common Stock, and shall be entitled to participate equally in all dividends payable with respect to the New SSCC Common Stock. The Board of Directors of Reorganized SSCC will be elected by the affirmative vote of a majority of the New SSCC Common Stock present and entitled to vote on such matter. Each share of New SSCC Common Stock will share equally, in all assets of Reorganized SSCC, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of Reorganized SSCC, or upon any distribution of the assets of the Reorganized SSCC. Holders of the New SSCC Common Stock will not have preemptive rights. Voting of the New SSCC Common Stock will not be cumulative. The New SSCC Preferred Stock may be issued in one or more classes or series, with each such class or series

having such voting powers, full or limited, or no voting powers, and such distinctive designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions, as may be fixed by the Board of Directors in accordance with the by-laws of Reorganized SSCC.  Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the Certificate of Incorporation shall prohibit the issuance of non-voting equity securities.  To the extent that there is any inconsistency between this summary and the Certificate of Incorporation, the terms of the Certificate of Incorporation shall control.

## X.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST ANY OF THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), INCLUDING THE DISCLAIMERS SET FORTH ABOVE, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

A.    **Certain Bankruptcy Considerations.**

1.    **Failure to Obtain Confirmation of the Plan May Result in Liquidation or Alternative Plan on Less Favorable Terms.**

Although the Debtors believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code and sanction under the CCAA, there can be no assurance that the Bankruptcy Court and the Canadian Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or sanction or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.

The Plan provides that the Debtors reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 1D, 1F, 1G, 4G, 6C through 14C, 15F, 15G, 16F, 17D, 18E, 20F, 21D, and 22C through 25C.  In the event that any Class of Claims entitled to vote fails to accept the Plan in accordance with sections 1126(c) and 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with Section 12.14 thereof.  While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  In addition, there can be no assurance that any challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan.

Similarly, under the CCAA, the Canadian Bankruptcy Court is not required to sanction the CCAA Plan even if it has been approved by the requisite creditor vote.  While the Debtors believe that the CCAA Plan is "fair and reasonable", there can be no assurance that the Canadian Bankruptcy Court will reach the same conclusion.

In addition, confirmation of the Plan is subject to certain conditions as described in Article IX of the Plan.  Failure to meet any of these conditions could result in the Plan not being confirmed.

If the Plan is not confirmed there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan.  Likewise, in Canada, if the CCAA Plan is not sanctioned, there can be no assurance that the CCAA Proceedings will continue or that any alternative plan would provide terms as favorable as the CCAA Plan.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

## 2.    Undue Delay in Confirmation of the Plan May Disrupt the Debtors' Operations.

Although the Plan is designed to minimize the length of the Proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.  The continuation of the Chapter 11 Cases or the CCAA Proceedings, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could materially adversely affect operations and relationships with customers, vendors, service providers, employees, regulators and partners.  For example, negative events or publicity associated with the Proceedings could adversely affect the Debtors' sales and relationships with their customers, particularly if the Proceedings are protracted. Also, transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court and/or the Canadian Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, if confirmation, sanction and consummation of the Plan do not occur expeditiously, the Proceedings could result in, among other things, increased costs for professional fees and similar expenses.

## 3.    Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms.

Although the Debtors believe that the Effective Date may occur as soon as ten (10) Business Days after the Confirmation Date, there can be no assurance as to such timing.  The occurrence of the Effective Date is subject to certain conditions precedent as described in Articles IV and IX of the Plan.  Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign

or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

If the Effective Date of the Plan does not occur, there can be no assurance that the Proceedings will continue rather than be converted into liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against any of the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be eroded to the detriment of all stakeholders.

**B.      Risks Relating to the Reorganized Debtors' Financial Results and Condition.**

**1.      The Reorganized Debtors' Failure to Achieve Their Projected Financial Results May Affect Their Ability to Pay Obligations.**

The Debtors have prepared the projected financial information contained in this Disclosure Statement relating to the Reorganized Debtors, including the consolidated pro forma financial statements attached as Exhibit C to this Disclosure Statement, in connection with the development of the Plan. The Projections are qualified by the introductory paragraphs thereto and the accompanying assumptions, and must be read in conjunction with such introductory paragraphs and assumptions, which constitute an integral part of the Projections.

 The Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow and financial condition of the Reorganized Debtors for the periods indicated. The Projections are based upon a variety of assumptions as set forth therein, and the Reorganized Debtors' future operating results are subject to and likely to be affected by a number of factors, including significant business, economic and competitive uncertainties, many of which will be beyond the control of the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations. Accordingly, the Reorganized Debtors' actual operating results may vary materially from the operating results shown in the Projections.

Failure of the Reorganized Debtors to achieve projected revenue or cash flow levels may materially adversely affect the ability of the Reorganized Debtors to continue operating their businesses consistent with the Projections after the Effective Date and to pay the obligations owing to certain Holders of Claims entitled to distributions under the Plan and other indebtedness incurred after confirmation of the Plan.

2.     **The Debtors' Financial Projections Are Based on Assumptions and Subject to Uncertainty.**

The Projections are based on a variety of assumptions that are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.  Moreover, the Debtors believe that the industries in which the Reorganized Debtors will be operating are volatile due to numerous factors, all of which make accurate forecasting very difficult.  Accordingly, the Projections should not be regarded as a representation, guaranty or other assurance by the Debtors, the Reorganized Debtors or any other person that the Projections will be achieved.

In addition, the Projections assume that all aspects of the Plan will be successfully implemented on the terms set forth in this Disclosure Statement and that the publicity associated with the Proceedings contemplated by the Plan will not adversely affect the Reorganized Debtors' operating results.  There can be no assurance that these assumptions are accurate, and the failure of the Plan to be successfully implemented, or adverse publicity, could have a materially detrimental effect on the Reorganized Debtors' results of operations and financial condition.

3.     **Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect.**

It has been generally assumed in the preparation of the Projections that the historical book value of the Debtors' assets approximates those assets' fair value, except for specific adjustments. For financial reporting purposes, the fair value of the Debtors' assets must be determined as of the Effective Date.  This determination will be based on an independent valuation.  Although the Debtors do not presently expect this valuation to result in values that are materially greater or less than the values assumed in the preparation of the Projections, the Debtors can make no assurances with respect thereto.

4.     **Historical Financial Information May Not Be Comparable.**

As a result of the consummation of the Plan and the transactions contemplated thereby, the results of operations and financial condition of the Reorganized Debtors from and after the Effective Date may not be comparable to results of operations and financial condition reflected in the Debtors' historical financial statements.

C.     **Risks Relating to the Reorganized Debtors' Business.**

1.     **Global Economic Conditions and Credit Tightening Materially and Adversely Affect the Reorganized Debtors' Business.**

The Debtors' business has been materially and adversely affected by changes in regional, national and global economic conditions. Such changes have included or may include reduced consumer spending, reduced availability of capital, inflation, deflation, adverse changes in interest rates, reduced energy availability and increased energy costs and government initiatives to manage economic conditions.  Continuing instability in financial markets and the deterioration of other national and global economic conditions may have further materially adverse effects on the

Reorganized Debtors' operations, financial results or liquidity. For example, the financial stability of the Reorganized Debtors' customers or suppliers may be compromised, which could result in additional bad debts for the Reorganized Debtors or non-performance by suppliers, and one or more of the financial institutions that make available the exit financing credit facility may become unable to fulfill their funding obligations, which could materially and adversely affect the Reorganized Debtors' liquidity.

Uncertainty about current economic conditions may cause consumers of the Reorganized Debtors' products to postpone or refrain from spending in response to tighter credit, negative financial news, declines in income or asset values, or other adverse economic events or conditions, which could materially reduce demand for the Reorganized Debtors' products and materially and adversely affect the Reorganized Debtors' results of operations and financial condition. Further deterioration of economic conditions would likely exacerbate these adverse effects, result in wide-ranging, adverse and prolonged effects on general business conditions, and materially and adversely affect the Reorganized Debtors' operations, financial results and liquidity.

### 2. The Reorganized Debtors May Be Required to Record Impairment On Their Long-Lived Assets.

If the Reorganized Debtors are unable to generate sufficient cash flows from operations, they may be required to record impairment on tangible assets such as facilities and equipment, which would have a negative impact on their financial results.

### 3. The Reorganized Debtors' Capital Structure.

Although the Plan will result in the elimination of debt, the Reorganized Debtors will continue to have a significant amount of indebtedness that could have significant consequences. For example, a substantial portion of the Reorganized Debtors' cash flow from operations may be needed to meet the payment of principal and interest on their indebtedness and other obligations and may not be available for their working capital, capital expenditures and other general corporate purposes. In addition, the Reorganized Debtors' level of debt may make them more vulnerable to economic downturns and may reduce their operational and business flexibility in responding to changing business and economic conditions and opportunities, including obtaining additional financing for working capital, capital expenditures, product development, debt service requirements, acquisitions and general corporate or other purposes important to their growth and productivity improvement programs. To the extent that the Reorganized Debtors are more highly leveraged than their competitors, this may place them at a competitive disadvantage.

### 4. The Reorganized Debtors' Exit Financing Credit Facility May Limit Their Ability to Plan For or Respond to Changes in Their Business.

The Reorganized Debtors' exit financing credit facility may include [financial and other] covenants that impose restrictions on their financial and business operations. These covenants may have a material adverse impact on the Reorganized Debtors' operations. The Reorganized Debtors' failure to comply with any of these covenants could result in an event of default that, if not cured or waived, could result in the Reorganized Debtors being required to repay the borrowings under the exit financing credit facility before their due date. The exit financing credit

facility may also contain other events of default customary for similar financings[, including cross defaults to certain other material indebtedness and certain change of control events].  If the Reorganized Debtors were unable to repay or otherwise refinance their borrowings when due (as a result of acceleration or otherwise), the lenders could foreclose on the Reorganized Debtors' assets. If the Reorganized Debtors were unable to refinance these borrowings on favorable terms, their costs of borrowing could increase significantly.

There can be no assurance that Reorganized Debtors will have sufficient liquidity to repay or refinance borrowings under the exit financing credit facility if such borrowings were accelerated upon an event of default. In addition, an event of default or declaration of acceleration under the exit financing credit facility could also result in an event of default under other indebtedness agreements.

### 5.    The Debtors' Industry is Cyclical and May Experience Periods of Overcapacity.

The Debtors' operating results reflect general cyclical pattern of the industry in which the Debtors operate. The Debtors' industry is also capital intensive, which leads to high fixed costs. These conditions have contributed to substantial price competition and volatility in the industry. The majority of the Debtors' products can be subject to extreme price competition. Future decreases in prices would adversely affect the Reorganized Debtors' financial results.  In addition, some segments of the Debtors' industry also experience production overcapacity, which may require the Reorganized Debtors to take downtime periodically to reduce inventory levels during periods of weak demand. Decreases in prices for the Reorganized Debtors' products, coupled with their highly leveraged financial position, may adversely impact their ability to respond to competition and to other market conditions or to otherwise take advantage of business opportunities.

### 6.    The Debtors' Industry is Highly Competitive.

The paperboard and packaging products industries are highly competitive and are particularly sensitive to price fluctuations as well as other factors including innovation, design, quality and service, with varying emphasis on these factors depending on the product line. To the extent that one or more of the Reorganized Debtors' competitors become more successful with respect to any key competitive factor, the Reorganized Debtors' ability to attract and retain customers could be materially adversely affected. Many of the Debtors' competitors are less leveraged, have financial and other resources greater than those which the Reorganized Debtors will have and are more capable to withstand the adverse nature of the business cycle. In addition, the Debtors' filing the Chapter 11 Cases and the CCAA Proceedings and the associated risks and uncertainties may be used by competitors in an attempt to divert the Debtors' existing customers or may discourage future customers from purchasing the Reorganized Debtors' products under long-term arrangements.  If the Reorganized Debtors facilities are not as cost efficient as those of their competitors, the Reorganized Debtors may need to temporarily or permanently close such facilities and suffer a consequent reduction in their revenues.

7.    **The Debtors' Pension Plans Are Underfunded and Will Require Additional Cash Contributions.**

The Debtors have made substantial contributions to their pension plans in the past five years and may be required to make substantial contributions in the coming years in order to ensure that their funding levels remain adequate in light of projected liabilities and to meet the requirements of the Pension Protection Act of 2006. Future contributions to the Reorganized Debtors' pension and other postretirement plans will be dependent on future regulatory changes, future changes in discount rates, the earnings performance of the Reorganized Debtors' plan assets, and the impact of the Proceedings. These contributions reduce the amount of cash available for the Reorganized Debtors to repay indebtedness or make capital investments.

At December 31, 2008, the qualified defined benefit retirement plans maintained by the Debtors were under funded by approximately $900 million. The Debtors estimate that this level of under funding increased by approximately $140 million during the nine months ended September 30, 2009, due primarily to decreases in the discount rate assumptions used to determine the amount of plan benefit obligations, which were less than fully offset by positive returns on plan assets. The Reorganized Debtors will likely be required to make significant cash contributions to these plans under applicable U.S. and Canadian laws over the next several years following emergence from bankruptcy in order to amortize the existing under funding and satisfy current service obligations under the plans. These contributions will significantly impact future cash flows that might otherwise be available for repayment of debt, capital expenditures, and other corporate purposes. The Debtors currently estimate that these cash contributions under the United States and Canadian qualified plans will be approximately $75 million in 2010, and potentially up to approximately $105 million depending upon how unpaid Canadian contributions for 2009 are impacted by the Plan. The Debtors currently estimate that these contributions will potentially be in the range of approximately $275 million to $325 million annually in 2011 through 2014, and will then decrease to approximately $220 million in 2015 and approximately $130 million in 2016, at which point almost all of the shortfall would be funded. The actual required amounts and timing of such future cash contributions will be highly sensitive to changes in the applicable discount rates and returns on plan assets, and could also be impacted by future changes in the laws and regulations applicable to plan funding.

8.    **Fluctuations in Energy, Transportation and Raw Materials Prices Could Adversely Affect Reorganized Debtors' Manufacturing Costs.**

The cost of producing and transporting the Debtors' products is highly sensitive to the price of energy. Energy prices, in particular oil and natural gas, have experienced significant volatility in recent years, with a corresponding effect on the Debtors' production and transportation costs. Energy prices may continue to fluctuate and may rise to higher levels in future years. This could materially adversely affect the Reorganized Debtors' production costs and results of operations.

Wood fiber and reclaimed fiber, the principal raw materials used in the manufacture of the Debtors' paper products, are purchased in highly competitive, price-sensitive markets, which have historically exhibited price and demand cyclicality. Adverse weather, conservation regulations

and the shutdown of a number of sawmills have caused, and will likely continue to cause, a
decrease in the supply of wood fiber and higher wood fiber costs in some of the regions in which
the Debtors procure wood fiber. Fluctuations in supply and demand for reclaimed fiber,
particularly export demand from Asian producers, have occasionally caused supplies of reclaimed
fiber to be limited. At such times, the Reorganized Debtors may experience an increase in the cost
of fiber or may temporarily have difficulty obtaining adequate supplies of fiber. If the
Reorganized Debtors are not able to obtain wood fiber at favorable prices or at all, their results of
operations may be materially adversely affected.

### 9. Factors Beyond the Reorganized Debtors' Control Could Hinder Their Ability to Service Debt and Meet Operating Requirements.

The ability of the Reorganized Debtors to meet their obligations and to comply with the
financial covenants contained in their debt instruments will largely depend on their future
performance. The Reorganized Debtors' performance will be subject to financial, business and
other factors. Many of these factors will be beyond Reorganized Debtors' control, such as: the
state of the economy; the financial markets; demand for, and selling prices of, the Reorganized
Debtors' products; performance of the Reorganized Debtors' major customers; costs of raw
materials and energy; hurricanes and other major weather-related disruptions; and legislation and
other factors relating to the paperboard and packaging products industries generally or to specific
competitors.

If operating cash flows, net proceeds from borrowings, divestitures or other financing
sources do not provide the Reorganized Debtors with sufficient liquidity to meet the Reorganized
Debtors' operating and debt service requirements, they will be required to pursue other
alternatives to repay debt and improve liquidity. Such alternatives may include: sales of assets;
cost reductions; deferral of certain discretionary capital expenditures and benefit payments; and
amendments or waivers to debt instruments.

The Reorganized Debtors might not successfully complete any of these measures or such
measures may not generate the liquidity that the Reorganized Debtors require to operate their
business and service their obligations.

### 10. Cost of Compliance with Government Regulation May Adversely Affect the Reorganized Debtors' Financial Results.

The Debtors are subject to various federal, state, provincial, foreign, and local laws and
regulations that affect the conduct of their operations. For example, environmental requirements,
particularly those relating to air and water quality, are a significant factor in the Debtors' business.
There can be no assurance that compliance with these laws and regulations or the adoption of
modified or additional laws and regulations will not require large expenditures by the Reorganized
Debtors or otherwise have a significant effect on the Reorganized Debtors' results of operations or
financial condition. In particular, compliance with existing environmental laws, as well as
complying with requirements imposed by new or changed environmental laws, such as proposed
legislation intended to mitigate the impacts of industrial activity on climate change, may require
capital expenditures for compliance. In addition, ongoing remediation costs and future
remediation liability at sites where the Reorganized Debtors may be a potentially responsible party

(PRP) for cleanup activity under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) and analogous state and other laws may materially adversely affect the Reorganized Debtors' results of operations and financial condition.  Among other laws, a change in the tax laws of the United States could materially affect the consequences of the Plan as described herein to the Reorganized Debtors and the holders of Claims and Interests.  See Article XI, "Certain Tax Consequences of the Plan."

### 11.     Failure to Maintain Customer Relationships May Adversely Affect Financial Results.

The loss of one or more major customers, or a material reduction in sales to these customers as a result of competition from other packaging manufacturers, would have a material adverse effect on the Reorganized Debtors' results of operations and financial condition.

### 12.     Failure to Attract and Retain Employees May Adversely Affect Financial Results.

Among the Debtors' most valuable assets are their highly skilled professionals who have the ability to leave the Debtors and so deprive the Debtors of valuable skills and knowledge that contribute substantially to their business operations.  Although the Debtors have tried to maintain the confidence and dedication of their personnel through the pendency of the Proceedings, the Debtors cannot be sure that they will ultimately be able to do so and, if not, that they will be able to replace such personnel with comparable personnel.  In addition, the Debtors cannot be sure that such key personnel will not leave after consummation of the Plan and emergence from chapter 11 and CCAA.  Further attrition may hinder the Reorganized Debtors' ability to operate efficiently, which could have a material adverse effect on their results of operations and financial condition.

### 13.     Foreign Currency Risks and Exchange Rate Fluctuations Could Hinder the Results of the Reorganized Debtors' Canadian Operations.

The Debtors' assets and liabilities outside the United States are primarily located in Canada.  Their principal foreign exchange exposure is the Canadian dollar.  The functional currency for their Canadian operations is the U.S. dollar.  The Reorganized Debtors' net income could be reduced to the extent they have un-hedged positions, their hedging procedures do not perform as planned or the Canadian dollar strengthens.  The financial performance of the Reorganized Debtors will be directly affected by exchange rates because certain of their products will be manufactured in Canada, but sold in U.S. dollars, and the monetary assets and liabilities of their Canadian operations are translated into U.S. dollars for financial reporting purposes.

**14.    Work Stoppages and Other Labor Relations Matters May Have an Adverse Effect on the Reorganized Debtors' Financial Results.**

A significant number of the Debtors' employees in North America are governed by collective bargaining agreements that have either already expired or will do so before 2013. Expired North American contracts are in the process of renegotiation.  The Reorganized Debtors may not be able to successfully negotiate new union contracts covering their employees at various sites without work stoppages or labor difficulties.  If the Reorganized Debtors are unable to successfully renegotiate the terms of any of their agreements or an industry association is unable to successfully negotiate a national agreement when they expire, or if the Reorganized Debtors experience any extended interruption of operations at any of their facilities as a result of strikes or other work stoppages, the Reorganized Debtors' results of operations and financial condition could be materially adversely affected.

**D.    Risks Relating to the New SSCC Common Stock.**

**1.    A Liquid Trading Market for the New SSCC Common Stock May Not Develop.**

There can be no assurance that an active market for the New SSCC Common Stock will develop, nor can any assurance be given as to the prices at which such securities might be traded. Although the Company has agreed that as soon as practicable after the Effective Date Reorganized SSCC shall use its commercially reasonable efforts to obtain the listing of New SSCC Common Stock for trading on the NYSE or the NASDAQ Stock Market, there can be no assurance that Reorganized SSCC will be able to obtain this listing or, even if such listing is obtained, that an active or liquid trading market will develop for such securities.

**2.    Certain Holders May be Restricted Under Applicable Securities Laws in Their Ability to Sell or Transfer New SSCC Common Stock.**

The New SSCC Common Stock to be issued under the Plan has not been registered under the Securities Act of 1933 (as amended, together with the rules and regulations promulgated thereunder, the "Securities Act"), any state securities laws or "blue sky" laws or the laws of any other jurisdiction.  Absent such registration, the New SSCC Common Stock may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws.  As explained in more detail in Article XII of this Disclosure Statement ("Certain U.S. Federal and State, Canadian and Foreign Securities Law Considerations"), in general, recipients of the New SSCC Common Stock will be able to resell the New SSCC Common Stock without registration under the Securities Act pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. Holders of New SSCC Common Stock who are deemed to be "underwriters" within the meaning of section 1145(b) of the Bankruptcy Code will be restricted in their ability to resell their shares of New SSCC Common Stock.

The New SSCC Common Stock to be issued under the Plan to any Canadian residents is being issued under an exemption from the prospectus requirements under applicable Canadian

securities laws. Any resale of such New SSCC Common Stock may be subject to resale restrictions under applicable Canadian securities laws.

### 3. The Market Price of Shares of New SSCC Common Stock May Fluctuate Significantly.

There can be no assurance as to the prices at which shares of New SSCC Common Stock might be traded. The market price at which New SSCC Common Stock trades may fluctuate significantly, depending on many factors, some of which may be beyond Reorganized SSCC's control and may not be directly related to its operating performance. These factors include: price and volume fluctuations in the overall stock market from time to time; changes in earnings or variations in operating results; Reorganized SSCC's capital structure, including the amount of its indebtedness; the depth and liquidity of the market for Reorganized SSCC's common stock; Reorganized SSCC's dividend policy; investor perception of Reorganized SSCC and its business; operating performance of companies comparable to Reorganized SSCC; general economic trends and other external factors; and the impact of the factors referred to elsewhere in this Disclosure Statement.

In addition, the stock market regularly experiences significant price and volume fluctuations. This volatility has had a significant impact on the market price of securities issued by many companies, including SSCC and other companies in SSCC's industry. The changes frequently appear to occur without regard to the operating performance of the affected companies. Hence, the price of the New SSCC Common Stock may fluctuate based upon factors that have little or nothing to do with Reorganized SSCC, and these fluctuations could materially reduce Reorganized SSCC's share price.

### 4. Sales of a Substantial Number of Shares of New SSCC Common Stock Could Depress Stock Prices.

Shares of New SSCC Common Stock distributed by Reorganized SSCC pursuant to the Plan, other than shares distributed to "underwriters" within the meaning of section 1145(b) of the Bankruptcy Code and shares that may be subject to resale restrictions under applicable Canadian securities laws, will generally be eligible for resale in the public market. It is likely that some stockholders will sell shares of New SSCC Common Stock for various reasons, including the fact that Reorganized SSCC's business profile or market capitalization does not fit their investment objectives. Any sales of substantial amounts of New SSCC Common Stock in the public market, or the perception that such sales might occur, could cause declines in the market price of New SSCC Common Stock. SSCC is unable to predict whether significant amounts of New SSCC Common Stock will be sold in the open market following its issuance pursuant to the Plan or whether a sufficient number of buyers will be in the market at that time.

### 5. Value of New SSCC Common Stock May be Diluted.

The Certificate of Incorporation of Reorganized SSCC will authorize the issuance of up to a total of 150,000,000 shares of New SSCC Common Stock. The issuance of additional shares of New SSCC Common Stock, or any security convertible into or exchangeable for shares of New SSCC Common Stock, in the future would dilute the ownership percentage represented by the

shares of New SSCC Common Stock to be issued pursuant to the Plan. In addition, the New SSCC Common Stock will be subject to dilution with respect to shares that will be issued under the Management Incentive Plan.

**6.      Lack of Dividends on New SSCC Common Stock May Adversely Affect Liquidity.**

SSCC does not anticipate that cash dividends or other distributions will be made by Reorganized SSCC with respect to the New SSCC Common Stock in the foreseeable future. Further, such restrictions on dividends may have an adverse impact on the market demand for New SSCC Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

## XI.  CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax and Canadian federal income tax aspects of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion of U.S. federal income tax is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

The discussion of Canadian federal income tax is based on the current provisions of the Income Tax Act (Canada), as amended (the "ITA"), the regulations promulgated thereunder, and the published administrative practices and assessing policies of the Canada Revenue Agency (the "CRA") publicly released prior to the date hereof. This discussion also takes into account all specific proposals to amend the ITA and the regulations promulgated thereunder publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof. This discussion is not exhaustive of all possible Canadian federal income tax considerations, and except for the forgoing, this discussion of Canadian federal income tax consequences does not take into account or anticipate any changes in law, whether by way of legislative, judicial or administrative action or interpretation, nor does it address any provincial, territorial or foreign tax considerations.

No ruling has been requested or obtained from the U.S. Internal Revenue Service (the "IRS") or the CRA with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax or Canadian federal income tax consequences described herein.

*        *        *        *

Any discussion of U.S. or Canadian federal income tax issues set forth in this Disclosure Statement was written solely in connection with the confirmation of the Plan to which the transactions described in this Disclosure Statement are ancillary. Such discussion is not intended or written to be legal or tax advice to any person and is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any U.S. or Canadian federal income tax penalties that may be imposed on such person. Each Holder of a Claim or Interest should seek advice based on its particular circumstances from an independent tax advisor.

*     *     *     *

## A.     U.S. Federal Income Tax Consequences to the Debtors.

 Cancellation of Indebtedness Income

A debtor generally must recognize income from the cancellation of debt ("COD Income") to the extent that its debt is discharged for consideration less than the amount of such debt. For these purposes, consideration includes the amount of cash and the fair market value of property, including stock of the debtor. COD Income is not required to be recognized, however, if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 and the discharge is granted, or is effected pursuant to a plan approved, by the court (the "Bankruptcy Exception"). Instead, the debtor is required to reduce certain of its tax attributes by the amount of COD Income, generally in the following order: any net operating loss for the taxable year and carryovers to such year ("NOLs"), general business and minimum tax credit carryforwards, capital losses for the taxable year and carryovers to such year, the tax basis of the debtor's assets and foreign tax credit carryforwards (collectively, "Tax Attributes"). Generally, the reduction in the tax basis of assets cannot exceed the excess of the total tax bases of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge (the "Floor Rule"). A debtor may elect to first apply any portion of the reduction to the tax basis of the debtor's depreciable assets, with any remaining balance applied to the debtor's other Tax Attributes in the order stated above. The Floor Rule does not apply to any reduction in tax basis by reason of this election.

Generally, debtors that realize COD Income in 2009 or 2010 may, in lieu of the rules described above, elect to take into taxable income the COD Income with respect to discharged debt in equal installments in 2014 through 2018 (i.e., the debtor would report 20% of the COD Income in each such year). This election to defer COD Income is made separately with respect to each debt instrument on which COD Income is realized and must be made on the debtor's tax return for the year that includes the transaction that creates the COD Income.

Special rules apply to COD Income realized by a debtor corporation that is a member of a group filing a consolidated U.S. federal income tax return (the "Consolidated Attribute Reduction Rules"). The Consolidated Attribute Reduction Rules generally provide that the Tax Attributes attributable to the debtor member are the first to be reduced. For this purpose, Tax Attributes attributable to the debtor member include consolidated Tax Attributes (such as consolidated NOLs) that are attributable to the debtor member, and also include the tax basis of property of the debtor (including subsidiary stock), all of which are reduced in the order described above. To the extent that the COD Income of the debtor member exceeds the Tax Attributes attributable to it, the

244

consolidated Tax Attributes attributable to other members of the consolidated group (including the portion of the consolidated NOLs attributable to other members, but not including the tax basis of property of other members) must be reduced.  In the case of a consolidated group with multiple debtor members, each debtor member's Tax Attributes must be reduced before such member's COD Income can be applied against by Tax Attributes attributable to other members of the consolidated group.  In addition, to the extent the debtor member is required to reduce its tax basis in the stock of another group member, that lower-tier member also must reduce its Tax Attributes, including the consolidated Tax Attributes attributable to that lower-tier member.  Any required Tax Attribute reduction takes place after the consolidated group has determined its taxable income, and any U.S. federal income tax liability, for the taxable year in which the COD Income is realized

The Company expects to realize substantial COD Income as a result of the implementation of the Plan.  The precise amount of COD Income will depend on, among other things, the fair market value of the New SSCC Common Stock, which cannot be known with certainty until after the Effective Date.  Assuming, however, that the New SSCC Common Stock is valued consistently with the ~~valuation assumption~~estimate of Equity Value mentioned in Article ~~IV~~VIII of this Disclosure Statement, the Company estimates that it will realize COD Income in the United States ~~between~~of approximately $[___] ~~billion and $[___]~~1.1 billion for U.S. federal income tax purposes.  Pursuant to the Bankruptcy Exception, this COD Income will not be recognized as taxable income, but the Debtor that realizes the COD Income will have to reduce its Tax Attributes after calculating the tax for the taxable year of discharge.  The Company does not expect to make the elections described above to reduce the tax basis of depreciable property first or to defer COD Income to 2014-2018.

<u>Net Operating Losses and Other Tax Attributes</u>.

As of December 31, 2008, the U.S. consolidated group of which SSCC is the common parent (the "<u>SSCC U.S. Group</u>") had approximately $[___]616 million of NOLs.  In addition, the SSCC U.S. Group expects that it will generate approximately $[___]510 million in additional NOLs in 2009 due primarily to the worthlessness of its equity interest in Smurfit-Stone Container Canada Inc. and approximately $[___]550 million in capital losses in 2010 due to the worthlessness of its equity interests in certain other Canadian subsidiaries.  These NOLs and capital losses have not been examined or approved by the IRS and remain subject to adjustment or disallowance.

As a general rule, an NOL incurred by a debtor during a taxable year can be carried back and deducted from its taxable income generated within the two preceding taxable years (five preceding taxable years in the case of qualifying NOLs generated in 2008 and 2009) and the remainder can be carried forward and deducted from the debtor's taxable income over the 20 succeeding taxable years.  Capital losses of corporations can only be used to offset capital gains and generally can be carried back three years or forward five years for such purposes.

The Company expects that the COD Income realized by the SSCC U.S. Group will exceed its NOLs and general business credits and minimum tax credits (which credits are reduced 33⅓ cents for each dollar of COD Income) and thus that these Tax Attributes will be eliminated.  However, the Company expects that it will have sufficient capital losses to absorb any remaining COD Income and thus that no reduction in the basis of assets (including the stock of subsidiaries)

245

will be necessary. This result depends upon a number of assumptions, including the amount of COD Income and the available NOLs and capital losses, which, as noted above, have not been examined or approved by the IRS. If these assumptions are incorrect, the SSCC U.S. Group might have to reduce its basis in assets.

**B.     U.S. Federal Income Tax Consequences to the Holders of Claims.**

The U.S. federal income tax consequences of the transactions contemplated by the Plan to holders of Claims or Interests that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States; (2) that is a corporation (or entity treated as a corporation) created or organized in or under the laws of the United States or any state thereof; (3) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (4) that is a trust (a) over the administration of which a United States Person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control, or (b) that has validly elected to continue to be treated as a United States Person for U.S. federal income tax purposes. In the case of a partnership, the U.S. federal income tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity (other than a partnership) that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" means a beneficial owner of a Claim or Interest that is a United States Person. The general U.S. federal income tax consequences to holders of Allowed Claims or Interests that are Non-United States Persons are discussed below under Section XI.B of this Disclosure Statement.

The U.S. federal income tax consequences to Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for U.S. federal income tax purposes. Certain holders of Claims or Interests (such as Non-United States Persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary. There also may be state, local and/or foreign income or other tax considerations or U.S. federal estate and gift tax considerations applicable to holders of Claims or Interests, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN

General.

246

A Holder who receives cash or other consideration (including, without limitation, New SSCC Common Stock) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors reserve the right, to the extent consistent with the Plan, to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a Holder receives less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the consummation of the Plan by Holders of Claims or Interests who hold their Claims or Interests as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset. Capital gain or loss will be long-term if the Claim or Interest was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

If not otherwise so required, a Holder who receives New SSCC Common Stock in exchange for its Claim will be required to treat gain recognized on a subsequent sale or other taxable disposition of the New SSCC Common Stock as ordinary income to the extent of (i) any bad debt deductions taken with respect to the Claim and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the Holder upon satisfaction of its Claim, and (ii) any amounts which would have been included in a Holder's gross income if the Holder's Claim had been satisfied in full, but which was not included in income because of the application of the cash method of accounting.

<u>Market Discount</u>.

The market discount provisions of the IRC may apply to Holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the holder's hands immediately after its acquisition. If a Holder has accrued market discount with respect to its Claims and such Holder

realizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. Holders who have accrued market discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

Holders of Prepetition Lender Claims.

A Holder of a Prepetition Lender Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of cash it receives. The Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange.

Holder of General Unsecured Claims Against SSCE.

A Holder of a General Unsecured Claim against SSCE who exchanges it for New SSCC CommonCommon Stock will realize gain or loss for U.S. federal income tax purposes equal to the difference between (i) the adjusted tax basis in the Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the fair market value of the New SSCC Common Stock it receives in the exchange.

The tax consequences to a Holder of a General Unsecured Claim against SSCE depend on whether its Claim is a "security" for U.S. federal income tax purposes. See "Definition of 'Security'" below. If the Claim does not constitute a "security" for U.S. federal income tax purposes, then the exchange of the Claim for New SSCC Common Stock will be a taxable transaction, and the Holder of such Claim will be required to recognize gain or loss equal to the full amount of its gain or loss realized on the exchange. In such a case, a Holder's initial tax basis in the New SSCC Common Stock it receives in the exchange will equal the fair market value of such New SSCC Common Stock on the Effective Date, and its holding period in its New SSCC Common Stock would commence on the day after the Effective Date.

If a Holder's General Unsecured Claim against SSCE constitutes a "security" for U.S. federal income tax purposes, then the exchange of the Claim for New SSCC Common Stock will be treated as a tax-free transaction for U.S. federal income tax purposes. In such a case, the Holder should not recognize any gain or loss realized for U.S. federal income tax purposes with respect to the exchange, the Holder's initial tax basis in the New SSCC Common Stock it receives in exchange for its Claim should equal its adjusted tax basis in such Claim, and the Holder's holding period in the New SSCC Common Stock it receives in the exchange will include its holding period in the Claim surrendered.

A Holder of a General Unsecured Claim against SSCE who exchanges it for a Cash-Out Payment will realize gain or loss for U.S. federal income tax purposes as a result of the confirmation of the Plan equal to the difference between (i) the adjusted tax basis in the Claim surrendered in the exchange, determined immediately prior to the Effective Date, and (ii) the amount of the Cash-Out Payment. The Holder of such Claim will be required to recognize the full amount of it gain or loss realized on the exchange.

<u>Holder of Claims Against Calpine Corrugated, Cameo Container, and SSPRI</u>.

A Holder of a Union Bank Claim, CIT Group Claim or General Unsecured Claim against Calpine Corrugated, Cameo Container, or SSPRI will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of cash it receives. The Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange.

<u>Holder of General Unsecured Claims Against SSCC and General Unsecured Claims Against Non-Operating Debtors</u>.

Pursuant to the Plan, all General Unsecured Claims against SSCC and General Unsecured Claims Against Non-Operating Debtors, will be cancelled, annulled and extinguished as of the Effective Date, and Holders of such Claims will receive nothing in exchange for such Claims. As a result, each Holder of such Claims generally should recognize a loss for U.S. federal income tax purposes equal to the Holder's tax basis in such Claims extinguished under the Plan unless the Holder previously claimed a loss with respect to such Claim under its regular method of accounting.

<u>Holders of Convenience Claims</u>.

A Holder of a Convenience Claim will realize gain or loss for U.S. federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) its adjusted tax basis in its Claim, determined immediately prior to the Effective Date, and (ii) the amount of cash it receives. The Holder of such Claim will be required to recognize the full amount of its gain or loss realized on the exchange.

<u>Holders of SSCC Interests and Calpine Corrugated Interests</u>.

Pursuant to the Plan, all SSCC Interests and Calpine Corrugated Interests will be cancelled, annulled and extinguished as of the Effective Date, and Holders of such Interests will receive nothing in exchange for such Interests. As a result, each Holder of such Interests generally should recognize a loss for U.S. federal income tax purposes equal to the Holder's tax basis in such Interests extinguished under the Plan unless the Holder previously claimed a loss with respect to such Interests under its regular method of accounting.

<u>Definition of "Security"</u>.

The term "security" is not defined in the IRC or in the United States Treasury regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness

of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### Non-United States Persons.

A holder of a Claim that is a Non-United States Person generally will not be subject to U.S. federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### Information Reporting and Backup Withholding.

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the payor (the relevant Debtor) to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

## C.     **Certain Canadian Federal Income Tax Consequences of the Plan.**

The following discussion identifies certain Canadian federal income tax considerations that are relevant to Holders of Claims under the Plan. This discussion also describes certain Canadian federal income tax considerations relevant to the Debtors arising in connection with the CCAA Plan.

For the purposes of the following discussion, the term "Canadian Holder" means a Holder that, for purposes of the ITA, (i) is resident or deemed resident in Canada and (ii) deals at arm's length with and is not affiliated with any Debtors for the purposes of the ITA. This discussion is not applicable to a Canadian Holder that is a "financial institution" (as defined in the ITA for purposes of the mark-to-market rules).

All amounts, including the cost of, interest or dividends received and accrued on, and proceeds of disposition from, any Claim, Interest or any New SSCC Common Stock must be determined in Canadian dollars at applicable exchange rates for the purposes of the ITA.

### Canadian Debt Forgiveness Rules.

The ITA contains rules (the "debt forgiveness rules") which may affect certain Debtors as a result of the implementation of the CCAA Plan. These rules generally apply where a "commercial debt obligation" (as defined for these purposes in the ITA) is settled or extinguished without any payment or by the payment of an amount less than the principal amount of the debt.

In general, the debt forgiveness rules provide that the amount by which the principal amount of a debt (including, generally, accrued and unpaid interest thereon) exceeds the amount paid in satisfaction of such principal amount (such excess being referred to in this discussion as the "forgiven amount") is to be applied to reduce, in the following order, the debtor's (i) non-capital losses of prior taxation years, (ii) net capital losses of prior taxation years, (iii) capital cost and undepreciated capital cost of depreciable property, (iv) cumulative eligible capital and (v) adjusted cost base of certain other capital property. Generally, one-half of any remaining unapplied portion of the forgiven amount is included in computing the income of the debtor in the year the debt is settled. Although the debt forgiveness rules are applied on a legal entity basis, in certain circumstances a debtor may elect to transfer any unapplied forgiven amount to another entity within a corporate group. In addition, corporations resident in Canada are allowed a deduction (the "insolvency deduction") which effectively offsets any income inclusion under the debt forgiveness rules to the extent that such inclusion exceeds twice the fair market value of the corporation's net assets at the end of the taxation year (as determined under the applicable provisions of the ITA) in which the settlement or extinguishment occurs.

Where pursuant to the CCAA Plan a Claim that is a commercial debt obligation is settled or extinguished without any payment or by the payment of an amount less than the principal amount of such Claim, the debt forgiveness rules will generally apply to the relevant Debtor. Depending on the circumstances of the Debtor, the insolvency deduction may be available to fully or partially offset any income inclusion arising pursuant to the debt forgiveness rules. Different rules may apply to the settlement of debts accrued to suppliers of inventory and certain other trade debts.

<u>Certain Canadian Tax Consequences of Canadian Asset Sale.</u>

The sale of the Canadian Assets to Canadian Newco by SSC Canada, Smurfit-MBI, MBI Limited, B.C. Shipper Supplies Ltd. and Francobec Company (the "Seller Group") may give rise to taxable capital gains or losses or ordinary income or loss to ~~SSC Canada, Smurfit-MBI and Francobec Company~~the Seller Group. For Canadian tax purposes, Canadian Newco should generally acquire the Canadian Assets at a cost equal to the price at which such assets are acquired from ~~SSC Canada, Smurfit-MBI and Francobec Company~~the Seller Group, subject to certain adjustments under the ITA applicable in respect of transfers of assets between affiliated corporations (including any adjustments pursuant to section 69 of the ITA, which deems certain transfers of property between persons not dealing at arm's length to occur at fair market value for purposes of the ITA).

<u>Amounts Received by a Canadian Holder on Account of Interest.</u>

The Debtors reserve the right, to the extent consistent with the Plan, to allocate the consideration paid pursuant to the Plan with respect to a Claim first to the principal amount of such Claim and then to accrued but unpaid interest, if any, with respect to such Claim. However, such allocation will not be binding on the CRA and the CRA may assert an alternative allocation.

A Canadian Holder who receives cash or other consideration (including New SSCC Common Stock) in satisfaction of a Claim may realize ordinary income or loss to the extent that any portion of such consideration is characterized as interest.

The income tax consequences arising as a result of the non-payment of interest owing to a Canadian Holder will be dependent on the particular circumstances of the Canadian Holder, including the method followed in computing its income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such interest.

<u>Canadian Trade Creditors.</u>

The following portion of this summary is applicable to a Canadian Holder whose Claim arose in the course of a business carried on by it, and who has included an amount in income for the year or a previous year in respect of such Claim (a "Canadian Trade Creditor").

The Canadian income tax consequences to a Canadian Trade Creditor of receiving cash or other property (including New SSCC Common Stock) in satisfaction of a Claim will depend on its particular circumstances, including the method regularly followed in computing income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such Claim.

Where a Canadian Trade Creditor has previously claimed a bad or doubtful debt deduction in respect of a Claim and receives cash, New SSCC Common Stock or other property in satisfaction of such Claim, the Canadian Trade Creditor may be required to include in computing its income (in the taxation year in which such property is received) an amount equal to the aggregate fair market value of such property.

It is the published administrative position of the CRA that where property (including a security such as the New SSCC Common Stock) is accepted by a Canadian Trade Creditor in settlement of a trade debt of a kind that would qualify for a deduction under paragraph 20(1)(p) of the ITA, and the fair market value of the property at the time it is acquired by the Canadian Trade Creditor is less than the amount of the trade debt, the difference will be deductible by the Canadian Trade Creditor as a bad debt.

It is the published administrative position of the CRA that where a trade debt of a taxpayer is satisfied by the issuance of property (including a security such as the New SSCC Common Stock), if the property is retained by the taxpayer for a period of time which, in the circumstances, indicates that it was held as an investment, any subsequent disposition will be considered to be the disposition of a capital property and will be subject to the rules relating to capital gains and capital losses (see "Taxation of Capital Gains and Capital Losses", below). However, if the property is disposed of in circumstances indicating that the taxpayer did not have the intention of retaining it as an investment, then the profit or loss arising on the disposition will constitute income or loss from business.

<u>Canadian Holders Disposing of Claims Held as Capital Property.</u>

The following portion of this summary is applicable to a Canadian Holder whose Claim is held as capital property for the purposes of the ITA.

A Canadian Holder who receives cash or other property in satisfaction of the principal amount of a Claim held as capital property will be considered to have disposed of such Claim for proceeds of disposition equal to the amount of cash plus the fair market value of any other property

received.  Generally, such Canadian Holder will realize a capital gain (or capital loss) for Canadian federal income tax purposes equal to the amount by which the proceeds of disposition, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base of the Claim, determined immediately prior to the Effective Date.

A Canadian Holder of a Claim held as capital property that is extinguished without payment should generally realize a capital loss for Canadian federal income tax purposes equal to the Canadian Holder's adjusted cost base in such Claim extinguished under the Plan.

<u>Canadian Holders Disposing of SSCC Interests Held as Capital Property.</u>

The following portion of this summary is applicable to a Canadian Holder whose SSCC Interests are held as capital property for the purposes of the ITA.

Pursuant to the Plan, all SSCC Interests will be cancelled, annulled and extinguished as of the Effective Date, and all Holders of SSCC Interests will receive nothing in exchange for such Interests.  As a result, a Canadian Holder should generally realize a capital loss for Canadian federal income tax purposes equal to the Canadian Holder's adjusted cost base in such Interest extinguished under the Plan.  The general tax consequences to a Canadian Holder of an SSCC Interest held as capital property realizing a capital loss are described below under "Taxation of Capital Gains and Capital Losses".

<u>Tax Consequences of Holding and Disposing of New SSCC Common Stock.</u>

Dividends, if any, received by a Canadian Holder on New SSCC Common Stock acquired pursuant to the Plan will be required to be included in computing the Canadian Holder's income for the purposes of the ITA.  Such dividends received by a Canadian Holder who is an individual will not be subject to the gross-up and dividend tax credit rules in the ITA.  A Canadian Holder that is a corporation will not be entitled to deduct the amount of such dividends in computing its taxable income.  A Canadian Holder that is throughout the relevant taxation year a Canadian-controlled private corporation may be liable to pay Additional Refundable Tax (defined below) on such dividends.  Subject to the detailed rules in the ITA, a Canadian Holder may be entitled to a foreign tax credit or deduction for any foreign withholding tax paid with respect to dividends received on account of New SSCC Common Stock acquired pursuant to the Plan.

A Canadian Holder will be considered to have acquired any New SSCC Common Stock received under the Plan at a cost equal to its fair market value on the Effective Date.  A Canadian Holder who holds New SSCC Common Stock as capital property will generally realize a capital gain (or capital loss) on the disposition or deemed disposition of such New SSCC Common Stock equal to the amount, if any, by which the Canadian Holder's proceeds of disposition of such New SSCC Common Stock, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base of the New SSCC Common Stock to the Canadian Holder immediately before the disposition.  The general tax consequences to a Canadian Holder of realizing a capital gain or capital loss are described below under "Taxation of Capital Gains and Capital Losses".  The Canadian Holder may be entitled to claim a foreign tax credit or deduction in respect of any foreign tax payable by the Canadian Holder on any capital gain realized on such disposition or deemed disposition.

253

Taxation of Capital Gains and Capital Losses.

In general, under the current provisions of the ITA, one-half of any capital gain (a "taxable capital gain") realized in a taxation year will be included in a Canadian Holder's income for the year, and one-half of the amount of any capital loss (an "allowable capital loss") realized in a taxation year is deducted from income for the year to the extent of any taxable capital gains realized in the year. Allowable capital losses in excess of taxable capital gains for the taxation year of disposition may generally be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any subsequent taxation year against net taxable capital gains realized in such years, to the extent and under the circumstances specified in the ITA.

A Canadian Holder that throughout the taxation year is a "Canadian-controlled private corporation" (as defined in the ITA) may be liable to pay an additional refundable tax of $6\,^2/_3\%$ ("Additional Refundable Tax") on certain investment income, including an amount in respect of taxable capital gains.

Non-Canadian Holders.

The following is a summary of certain Canadian federal income tax considerations generally applicable to a Holder who, at all relevant times, for purposes of the ITA (a) is not and is not deemed to be resident in Canada, (b) holds any relevant Claim as capital property, (c) deals at arm's length and is not affiliated with any Debtor, and (d) does not use or hold and is not deemed to use or hold the Claim in the course of carrying on a business in Canada (a "Non-Canadian Holder"). This summary does not address the considerations relevant to a Non-Canadian Holder (a) that is an insurer carrying on business in Canada and elsewhere, or (b) to whom the relevant Claim constitutes "taxable Canadian property" (as defined in the ITA). This summary also assumes that no amounts are paid or payable to a non-Canadian Holder on account of "participating debt interest" (as defined in the ITA).

A Non-Canadian Holder will not realize any Canadian federal income tax consequences as a result of the settlement of a Claim pursuant to the Plan.

## D.      **Importance of Obtaining Professional Tax Assistance.**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. AND CANADIAN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND CANADIAN FEDERAL, PROVINCIAL, TERRITORIAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## E.      **Reservation of Rights.**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan.  The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XI and the other tax related sections of the Plan up to ten (10) days prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XII.  CERTAIN U.S. FEDERAL AND STATE, CANADIAN AND FOREIGN SECURITIES LAW CONSIDERATIONS

### A.    Exemption From Registration Requirements.

Upon consummation of the Plan, the Debtors will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New SSCC Common Stock from the registration requirements of the Securities Act and of any state securities or "blue sky" laws.  Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan.  The Debtors believe that Reorganized SSCC is a successor to SSCC under the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer and sale of the New SSCC Common Stock under the Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

### B.    Subsequent Transfers of Securities.

In general, recipients of the New SSCC Common Stock will be able to resell the New SSCC Common Stock without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code.  In addition, the New SSCC Common Stock generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of the New SSCC Common Stock issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(a)(11) of the Securities Act.  Under Section 2(a)(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New SSCC Common Stock under the Plan are deemed to be "underwriters," the resale of the New SSCC Common Stock by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or

other applicable laws except for certain trading transactions. The Debtors believe that sales by any persons deemed to be underwriters of such New SSCC Common Stock or other securities without registration pursuant to certain provisions of Rule 144 under the Securities Act would constitute such exempt trading transactions. This rule permits the public resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if certain volume limitations and other conditions are met.

Certain persons may have rights to require Reorganized SSCC to register shares of New SSCC Common Stock held by such person for resale pursuant to a registration statement filed and effective under the Securities Act in accordance with the terms and conditions of the Registration Rights Agreement.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW SSCC COMMON STOCK OF REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF COMMON STOCK OF REORGANIZED DEBTORS ISSUED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS OR INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## C.    **Canadian Securities Law Considerations.**

Canadian securities laws provide for a specific statutory exemption from the prospectus requirements when securities are issued or distributed in connection with a reorganization or arrangement that is under a statutory procedure. The Canadian securities regulatory authorities interpret the phrase "statutory procedure" broadly; it includes any statute of a jurisdiction or foreign jurisdiction under which the entities involved have been incorporated or created and exist or under which the transaction is taking place. The Debtors believe that the issuance and distribution of the New SSCC Common Stock under the Plan to any Canadian-resident holders of Claims would constitute trades made in connection with a reorganization or arrangement that is under a statutory procedure and would therefore be exempt from the prospectus requirements under applicable Canadian securities laws.

~~Any~~Further, any resale or trade of ~~the~~such New SSCC Common Stock ~~acquired under an exemption from the prospectus requirements~~ must be made in accordance with applicable Canadian securities laws~~, which may require resales to be made in accordance with~~.

Such New SSCC Common Stock would, except for "control distributions" (as defined under applicable Canadian securities laws), be generally freely tradeable in Canada provided (i) the issuer of the security is and has been a reporting issuer in a jurisdiction of Canada for the four months immediately preceding the trade, (ii) no unusual effort is made to prepare the market or to create a demand for the security that is the subject of the trade, (iii) no extraordinary commission or consideration is paid to a person or company in respect of the trade, and (iv) if the selling security holder is an insider or an officer of the issuer, the selling security holder has no reasonable grounds to believe that the issuer is in default of securities legislation. While SSCC is currently a reporting issuer in a number of jurisdictions of Canada, there is no guarantee that Reorganized

SSCC will be a reporting issuer in such jurisdictions following the SSCC/SSCE Merger.  On or prior to, or as soon as practicable after, the Effective Date, Reorganized SSCC currently intends to take such steps as it may deem necessary or appropriate, acting reasonably, to confirm its status and/or seek to be designated as a reporting issuer in a jurisdiction of Canada.

In the event that Reorganized SSCC's status as a reporting issuer has not been confirmed or designated, or the conditions described in the preceding paragraph are not satisfied, resales or trades of New SSCC Common Stock will be subject to applicable prospectus requirements or will have to be made in compliance with exemptions from the prospectus requirements. These resale restrictions may in some circumstances apply to resales of the New SSCC Common Stock outside of Canada. therefrom.   Where Reorganized SSCC is not a reporting issuer, a prospectus exemption may be available for resales or trades of the New SSCC Common Stock through an exchange or a market, or to a person or company, outside of Canada provided residents of Canada do not own more than 10% of the outstanding New SSCC Common Stock and do not represent more than 10% of the total number of owners of such securities. Other exemptions from the prospectus requirements may also be available to holders of New SSCC Common Stock.

Canadian-resident holders of New SSCC Common Stock are advised to seek legal advice prior to any resale or trade of the New SSCC Common Stock. Such holders should also seek legal advice concerning any dealer registration requirements under applicable Canadian securities laws.

## XIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN AND CCAA PLAN

If the Plan is not confirmed, the alternatives for the Chapter 11 Cases include (a) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

## A.    **Continuation of the Chapter 11 Cases.**

If the Debtors remain in chapter 11, the Debtors could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could continue as viable going concerns in protracted chapter 11 cases.  The Debtors could have difficulty operating with the high costs, operating financing and the eroding confidence of their customers and trade vendors, if the Debtors remained in chapter 11.  If the Debtors were able to obtain financing and continue as a viable going concern, the Debtors (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Debtors under chapter 7 or chapter 11.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

## B.    **Liquidation Under Chapter 7 or Chapter 11.**

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtors.

The Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the estates. The assets available for distribution to creditors and equity holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7. Thus, chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distributions to the Holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially.

**C.    Alternatives in CCAA Proceedings.**

As in the Chapter 11 Cases, in the CCAA Proceedings if CCAA Plan is not approved by creditors in the CCAA Proceedings or is not sanctioned by the Canadian Bankruptcy Court, the Canadian Debtors would not automatically lose control of the CCAA Proceedings (i.e., have a trustee appointed to oversee its assets). ~~It is possible for the Canadian Debtors to submit a new or amended plan and, during the intervening period, continue to operate under the CCAA.~~ In the event that CCAA Plan is not accepted, however, the Canadian Debtors' significant creditors may seek to lift the CCAA Stay to exercise their remedies against the debtor that are otherwise available.

**~~XV~~XIV.    CONCLUSION AND RECOMMENDATION**

The Debtors believe that confirmation of the Plan in the Chapter 11 Cases and sanction of CCAA Plan in the CCAA Proceedings is preferable to the alternatives described above because it provides the greatest distributions and opportunity for distributions to Holders of Claims against any of the Debtors. In addition, any alternative to confirmation of the Plan in the Chapter 11 Cases and/or sanction of CCAA Plan in the CCAA Proceedings could result in extensive delays and increased administrative expenses, or the ultimate liquidation of certain or all of the Debtors.

Accordingly, the Debtors urge all Holders of Claims entitled to vote on the Plan to vote to <u>accept</u> the Plan in the Chapter 11 Cases and/or approve CCAA Plan in the CCAA Proceedings.

Dated: ~~December 22, 2009~~January 27, 2010

CH1 ~~5118439~~5168368v.~~4~~1

Respectfully submitted,

SMURFIT-STONE CONTAINER CORPORATION
(for itself and on behalf of each of the other Debtors)


By: /s/ Craig A. Hunt_____.
Name: Craig A. Hunt
Title: Senior Vice President, Secretary and General
Counsel

CH1 5118439 5168368v.41

SIDLEY AUSTIN LLP                          YOUNG CONAWAY STARGATT & TAYLOR, LLP

James F. Conlan                            Robert S. Brady (No. 2847)
Matthew A. Clemente                        Edwin J. Harron (No. 3396)
Dennis M. Twomey                           Edmon L. Morton (No. 3856)
Bojan Guzina                               Matthew B. Lunn (No. 4119)
One South Dearborn Street                  The Brandywine Building
Chicago, Illinois 60603                    1000 West Street, 17th Floor
Telephone:  (312) 853-7000                 P.O. Box 391
Facsimile:  (312) 853-7036                 Wilmington, Delaware 19899-0391
                                           Telephone:  (302) 571-6600
                                           Facsimile:  (302) 571-1253


STIKEMAN ELLIOTT LLP
Sean F. Dunphy
Alexander D. Rose
5300 Commerce Court West
199 Bay Street
Toronto, Ontario M5L 1B9
Telephone:  (416) 869-5261
Facsimile:  (416) 947-0866


Counsel to the Debtors and Debtors in Possession

# Exhibit 24

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3                              )
     KLEEN PRODUCTS LLC,        )
 4   et al.,                    )
                                )
 5              Plaintiffs,     )
                                )
 6        -vs-                  )      No. 1:10-cv-05711
                                )
 7   PACKAGING CORPORATION      )
     OF AMERICA, et al.,        )
 8                              )
                Defendants.     )
 9   _____)

10

11

12         *** OUTSIDE ATTORNEYS' EYES ONLY ***

13

14              VIDEOTAPED DEPOSITION OF

15                    LARRY NORTON

16            Wednesday, August 27, 2014

17

18

19

20   Reported by Michael E. Miller,

21   Fellow of the Academy of Professional Reporters

22   NCRA Registered Diplomate Reporter

23   NCRA Certified Realtime Reporter

24   Notary Public in and for the State of Texas

25   JOB NO. 57967
```

| Page 138 | Page 140 |
|---|---|

**Page 138**

|  |  |
|---|---|
| 1 | mean, again, I'm not running the business, you know, |
| 2 | at that time. I don't know what these guys were |
| 3 | thinking. I mean, with Temple -- you know, |
| 4 | Temple-Inland, all we thought about is |
| 10:44 5 | Temple-Inland. We didn't spend two seconds worrying |
| 6 | about anybody else. |
| 7 | BY MR. RISSMAN: |
| 8 | Q. And I'm just asking if you understand |
| 9 | what "supply discipline" means in this document. |
| 10:44 10 | **A. I know what -- I know what it means for** |
| 11 | **Temple-Inland.** |
| 12 | Q. I'm asking if you understand what it |
| 13 | means when Mark Connelly -- what Mark Connelly means |
| 14 | by it. |
| 10:44 15 | **A. I have no idea.** |
| 16 | MR. MAROVITZ: And that's |
| 17 | objection -- sorry, yeah, that's fine, but |
| 18 | I'm still objecting to form and foundation |
| 19 | and calls for speculation. |
| 10:45 20 | BY MR. RISSMAN: |
| 21 | Q. Okay. Do you have an understanding as |
| 22 | to why -- well, you mentioned earlier that downtime |
| 23 | is expensive, right? |
| 24 | **A. Yes.** |
| 10:45 25 | Q. Okay. And it says "but," and there's -- |

**Page 139**

|  |  |
|---|---|
| 1 | and it says "but discipline in a highly fragmented |
| 2 | business like containerboard is expensive." So does |
| 3 | "discipline" in that context mean downtime? |
| 4 | MR. MAROVITZ: Objection, form, |
| 10:45 5 | foundation, calls for speculation. |
| 6 | BY MR. RISSMAN: |
| 7 | Q. Or capacity cuts? |
| 8 | MR. MAROVITZ: Same objections. |
| 9 | A. Yeah, I mean, I would have no way of |
| 10:45 10 | knowing what these guys think. |
| 11 | MR. RISSMAN: You can put that one |
| 12 | aside. |
| 13 | THE WITNESS: Okay. |
| 14 | BY MR. RISSMAN: |
| 10:45 15 | Q. So I believe you testified earlier that |
| 16 | it was a good practice to take market downtime and |
| 17 | maintenance downtime at the same time, to reduce the |
| 18 | amount of days you're taking? |
| 19 | MR. MAROVITZ: No. Objection to |
| 10:46 20 | form, misstates his testimony. |
| 21 | Go ahead. |
| 22 | THE WITNESS: Read the question |
| 23 | again. |
| 24 | BY MR. RISSMAN: |
| 10:46 25 | Q. Well, I guess I'm asking: Was it your |

**Page 140**

|  |  |
|---|---|
| 1 | testimony earlier that it was a good idea to take |
| 2 | market and maintenance downtime at the same time for |
| 3 | one mill to reduce the number of days, like you |
| 4 | could overlap them, right? |
| 10:46 5 | MR. MAROVITZ: Same objection. |
| 6 | A. To reduce the number of days is -- what |
| 7 | you would do is if you had an outage -- so you kind |
| 8 | of kill two birds with one stone, right? If you |
| 9 | didn't take the outage, you'd be taking it later. |
| 10:46 10 | So, you know, again, our charge at Temple-Inland, |
| 11 | you've got to make as many tons as you can make |
| 12 | because you're trying to keep the box plants full of |
| 13 | paper. You minimize downtime -- we minimize |
| 14 | downtime wherever we can minimize downtime. |
| 10:47 15 | MR. RISSMAN: Was this 13? |
| 16 | MR. MAROVITZ: 16 is next. |
| 17 | MR. RISSMAN: It's our internal |
| 18 | system here. |
| 19 | (Conference out of the hearing of the |
| 10:47 20 | reporter.) |
| 21 | (Norton Deposition Exhibit 16 |
| 22 | marked.) |
| 23 | BY MR. RISSMAN: |
| 24 | Q. Mr. Norton, you've been handed what's |
| 10:47 25 | been marked as Exhibit 16, Temple-Inland_00436901. |

**Page 141**

|  |  |
|---|---|
| 1 | Please take a moment to look at this document and |
| 2 | let me know when you're ready. |
| 3 | (Document review.) |
| 4 | A. Okay. |
| 10:48 5 | BY MR. RISSMAN: |
| 6 | Q. Okay. Have you seen this document |
| 7 | before? |
| 8 | **A. I don't recall it, but yeah, I mean, it** |
| 9 | **looks like something that I would see.** |
| 10:48 10 | Q. You see that you were the author of the |
| 11 | final e-mail in the chain? |
| 12 | **A. Yes.** |
| 13 | Q. And that you received various other |
| 14 | e-mails in the chain? |
| 10:48 15 | **A. Yes.** |
| 16 | Q. Any reason to doubt that you sent and |
| 17 | received those? |
| 18 | **A. No. That's when I replaced Roger** |
| 19 | **Purrington. I mean, I had probably been in the job** |
| 10:48 20 | **for a week or something like that.** |
| 21 | Q. Okay. And so let me direct you to what |
| 22 | Barry Baker -- Barry Baker's e-mail. |
| 23 | **A. Okay.** |
| 24 | Q. So you're discussing taking maintenance |
| 10:49 25 | and market downtime at the Bogalusa mill; is that |

# Exhibit 25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

KLEEN PRODUCTS, LLC, et al.,
individually and on behalf
of all others similarly situated,

    Plaintiff,

Vs.                 Case No. 1:10-cv-05711

PACKAGING CORPORATION OF
AMERICA, et al.,

    Defendants.

_____

THE DEPOSITION OF SHELLEY A. CARR

November 20, 2013

_____

OUTSIDE ATTORNEYS EYES ONLY

_____

| | |
|---|---|
| 09:30:44 1 | A. Those are the only two that I can think of |
| 09:30:46 2 | right now. |
| 09:30:47 3 | Q. Okay. Is downtime the main factor that |
| 09:30:51 4 | contributes to the operating efficiency? |
| 09:30:55 5 | A. No. Both can have a significant impact on |
| 09:31:02 6 | what the machine produces. |
| 09:31:04 7 | Q. Okay. What are the types of downtime that |
| 09:31:07 8 | you talked to Mr. Sosnowski about? |
| 09:31:10 9 | A. We talked about three different types of |
| 09:31:16 10 | downtime at the highest level. We talked about |
| 09:31:19 11 | planned maintenance downtime. We talked about |
| 09:31:25 12 | unplanned downtime, and we talked about lack of |
| 09:31:30 13 | order downtime. |
| 09:31:32 14 | Q. How far in advance is planned maintenance |
| 09:31:48 15 | downtime planned? |
| 09:31:50 16 | A. It can be planned up to a year or more in |
| 09:31:54 17 | advance. |
| 09:31:57 18 | Q. Is there typically a schedule for planned |
| 09:32:02 19 | maintenance downtime so that the mills can know |
| 09:32:05 20 | what is coming? |
| 09:32:05 21 | A. Yes, there is. |
| 09:32:06 22 | Q. Okay. What types of unplanned downtime |
| 09:32:11 23 | are there? |
| 09:32:11 24 | A. A break on the machine would be one |
| 09:32:14 25 | example. Clothing failure would be another |

| | |
|---|---|
| 09:32:20 1 | example. Failure in another part of the mill, a |
| 09:32:26 2 | power outage might cause a machine to go down |
| 09:32:31 3 | would be another example. There are a lot of |
| 09:32:34 4 | different things that could cause unplanned |
| 09:32:36 5 | downtime. |
| 09:32:36 6 | Q. Is there ever -- is -- are changes in |
| 09:32:42 7 | downtime dictated by lack of orders ever |
| 09:32:49 8 | categorized as unplanned downtime? |
| 09:32:52 9 | A. The only time that we would have unplanned |
| 09:32:56 10 | downtime that would move into lack of order |
| 09:33:00 11 | downtime would be if we asked a machine to stay |
| 09:33:04 12 | down longer because they can save additional |
| 09:33:10 13 | money. So if a machine -- if a mill could work |
| 09:33:16 14 | overtime on maintenance and come up faster but we |
| 09:33:20 15 | needed -- we needed to take some lack of order |
| 09:33:23 16 | downtime, we might ask them do the work on |
| 09:33:26 17 | straight time and the additional downtime will |
| 09:33:29 18 | count as lack of order downtime. |
| 09:33:31 19 | Q. Okay. The last category is lack of order |
| 09:33:42 20 | downtime. Could you define that for me, again in |
| 09:33:45 21 | layman's terms? |
| 09:33:46 22 | A. Sure. Lack of order downtime is downtime |
| 09:33:50 23 | that we take when we don't have demand to -- |
| 09:33:57 24 | enough demand to run the machines. |
| 09:34:02 25 | Q. Who is the highest level official or |

| | |
|---|---|
| 09:34:13 1 | executive who signs off on the lack of order |
| 09:34:20 2 | downtime that IP is going to take in a given |
| 09:34:25 3 | period whether it's -- I don't know if it's six |
| 09:34:30 4 | months or a year? |
| 09:34:30 5 | A. The final approval for lack of order |
| 09:34:33 6 | downtime is given in our sales and operations |
| 09:34:38 7 | planning meeting or with the lead team for the |
| 09:34:45 8 | industrial packaging group. The highest level |
| 09:34:48 9 | person in that group is the senior vice president |
| 09:34:52 10 | of industrial packaging. |
| 09:34:56 11 | Q. Okay. And you mentioned a lead team in -- |
| 09:35:00 12 | what was that, in what group? |
| 09:35:03 13 | A. Industrial packaging. |
| 09:35:05 14 | Q. And the highest level official would be -- |
| 09:35:15 15 | I apologize, you said -- |
| 09:35:16 16 | A. The senior vice president. |
| 09:35:18 17 | Q. Senior vice president. Is the lack of |
| 09:35:34 18 | order downtime that you defined, are there |
| 09:35:40 19 | different types of lack of order downtime or is |
| 09:35:42 20 | there just one type of lack of order downtime? |
| 09:35:47 21 | A. I think about it as -- it's one type of |
| 09:35:50 22 | lack of order downtime. |
| 09:35:51 23 | Q. Okay. Is lack of order downtime then, is |
| 09:35:59 24 | it something that is forecast or projected for the |
| 09:36:02 25 | future? |

| | |
|---|---|
| 09:36:03 1 | A. We do plan for lack of order downtime. We |
| 09:36:08 2 | also monitor during a given month and may add |
| 09:36:14 3 | additional or take away lack of order downtime. |
| 09:36:23 4 | Q. And is that -- those monthly changes |
| 09:36:31 5 | effectuated through the S&OP process? |
| 09:36:34 6 | A. They're modified during -- we use the same |
| 09:36:40 7 | main document, our supply and demand balance, to |
| 09:36:45 8 | evaluate if we need to make those changes. We |
| 09:36:49 9 | don't have a formal sales and operations planning |
| 09:36:54 10 | meeting when we make those changes. |
| 09:37:00 11 | Q. Is the supply and demand balance document |
| 09:37:03 12 | something that -- is that a live document that |
| 09:37:06 13 | just is maintained on the system or is that |
| 09:37:08 14 | something that is printed and then issued on a |
| 09:37:11 15 | periodic basis? |
| 09:37:13 16 | A. It's a -- it's a report that is compiled |
| 09:37:18 17 | on at a minimum monthly basis. And again |
| 09:37:24 18 | thinking about timing or time, it's something that |
| 09:37:30 19 | we have been doing in our -- in the current format |
| 09:37:35 20 | since the late 2000's for that particular report. |
| 09:37:41 21 | Q. Are there instances when in the downtime |
| 09:38:23 22 | planning process a decision is made by a higher |
| 09:38:27 23 | level person than say you or Brian Sosnowski, |
| 09:38:36 24 | maybe we should use him. Let me start over. |
| 09:38:39 25 | Is there a -- are there occasions where |